**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| LILIAN PAHOLA CALDERON JIMENEZ and LUIS GORDILLO, SANDRO DE SOUZA and CARMEN SANCHEZ, OSCAR RIVAS and CELINA RIVERA RIVAS, LUCIMAR DE SOUZA and SERGIO FRANCISCO, DENG GAO and AMY CHEN, Individually and on behalf of all others similarly situated, Plaintiffs-Petitioners, v. KIRSTJEN M. NIELSEN, Secretary of Homeland Security, THOMAS HOMAN, Acting Director, Immigration and Customs Enforcement, THOMAS BROPHY, Immigration and Customs Enforcement, Enforcement and Removal Office, Boston Field Office Director, YOLANDA SMITH, Superintendent of Suffolk County House of Correction, STEVEN W. TOMPKINS, Sheriff of Suffolk County, DONALD J. TRUMP, President of the United States, Defendants-Respondents. | No. 1:18-cv-10225-MLW<br><br>**AMENDED CLASS ACTION COMPLAINT AND PETITION FOR WRIT OF HABEAS CORPUS UNDER 28 U.S.C. § 2241**<br><br>**ORAL ARGUMENT REQUESTED** |

## INTRODUCTION

1.      This case concerns the government's practice of subjecting noncitizens to detention and removal while they follow the government's own regulations for obtaining lawful immigration status based on their marriages to U.S. citizens.  Petitioners[1] are married couples— each comprising one U.S. citizen and one noncitizen with a final order of removal—whose lives have been unlawfully and unconstitutionally upended by this practice.

2.       Petitioners' plight arises from the incompatible actions of two Department of Homeland Security (DHS) agencies.  One agency, U.S. Citizenship and Immigration Services (USCIS), enacted regulations in 2016 that allow Petitioners to pursue a process whereby noncitizen spouses of U.S. citizens can legalize their immigration status, and thereby address their Final Order of Removals, while largely remaining in the United States with their families. But another agency, Immigration and Customs Enforcement (ICE), detains or seeks to remove noncitizen Petitioners following this "stateside" provisional waiver process, ostensibly because those Petitioners are subject to final orders of removal.  ICE thus defeats the "stateside" provisional waiver process's express purpose, which is to protect United States citizens and their spouses from the extended and potentially indefinite family separation that would occur if their spouses had to leave the U.S. for the duration of their efforts to regularize their status.  In effect, the government's one hand beckons Petitioners forward, and its other hand grabs them.

3.      ICE now carries the day, seemingly because (unlike USCIS) it possesses armed agents, jail cells, and the mistaken belief it has unfettered authority to target Petitioners pursuing the provisional waiver process.  What ICE lacks, though, is a lawful basis for its actions.  Its

---

[1] Plaintiffs-Petitioners are referred to herein as Petitioners; Defendants-Respondents are referred to as Respondents.

efforts to detain and remove noncitizen Petitioners violates the rights of all Petitioners under the due process and equal protection guarantees of the U.S. Constitution, the Immigration and Nationality Act and its regulations, and the Administrative Procedure Act.

4.      On behalf of themselves and all others similarly situated, Petitioners seek declaratory and injunctive relief preserving their ability to remain with their families while availing themselves of the 2016 provisional waiver regulations.  Without this Court's intervention, ICE will continue systematically targeting the very individuals that the provisional waiver regulations were meant to protect, at great cost to them and their U.S. citizen spouses.

## PARTIES

5.      Petitioner Lilian Pahola Calderon Jimenez was apprehended by ICE on January 17, 2018 and detained in immigration custody at the Suffolk County House of Correction in Boston, Massachusetts.  She was released from custody on February 13, 2018 and granted a stay of removal that expires on May 12, 2018.  She remains subject to the jurisdiction of the Boston Field Office of ICE Enforcement and Removal Operations (ERO).  Her U.S. citizen husband is Petitioner Luis Gordillo.

6.      Petitioner Lucimar de Souza was apprehended by ICE on January 30, 2016 and is detained at the Suffolk County House of Corrections in Boston Massachusetts.  She remains

subject to the jurisdiction of the ICE-ERO Boston Field Office.  Her U.S. citizen husband is
Petitioner Sergio Francisco.

7.      Petitioner Sandro de Souza is subject to GPS monitoring and has been ordered to
leave the United States on April 24, 2018.  He is subject to the jurisdiction of the ICE-ERO
Boston Field Office.  His U.S. citizen wife is Petitioner Carmen Sanchez.

8.      Petitioner Oscar Rivas is subject to GPS monitoring and has been ordered to leave
the United States on May 2, 2018.  He is subject to the jurisdiction of the ICE-ERO Boston Field
Office.  His U.S. citizen wife is Petitioner Celina Rivera Rivas.

9.      Petitioner Deng Gao has a pending I-130 application.  He is subject to the
jurisdiction of the ICE-ERO Boston Field Office.  His U.S. citizen wife is Petitioner Amy Chen.

10.     Respondent Kirstjen M. Nielsen is the Secretary of Homeland Security, the arm of
the federal government responsible for the enforcement of immigration laws.  Secretary Nielson
is the ultimate legal custodian of the noncitizen Petitioners and the noncitizen members of the
proposed Class.  She is sued in her official capacity.

11.     Respondent Thomas D. Homan is the Acting Director for ICE, the department of
DHS responsible for apprehending, detaining, and removing Petitioners.  Director Homan is a
legal custodian of the noncitizen Petitioners and the noncitizen members of the proposed Class.
He is sued in his official capacity.

12.     Respondent Thomas Brophy is the Acting Field Office Director for the ICE-ERO
Boston Field Office.  He is the immediate legal custodian of the noncitizen Petitioners. He is
sued in his official capacity.

13.     Respondent Yolanda Smith is the Superintendent of the Suffolk County House of Correction.  She was Ms. Calderon's direct custodian until February 13, 2018, and continues to be Ms. Lucimar de Souza's direct custodian.  She is sued in her official capacity.

14.     Respondent Steven W. Tompkins is the Sheriff of Suffolk County.  He was also Ms. Calderon's direct custodian until February 13, 2018, and continues to be Ms. Lucimar de Souza's direct custodian.  He is sued in his official capacity.

15.     Respondent Donald J. Trump is the President of the United States and is ultimately responsible for the policies of all federal agencies, including DHS.  He is sued in his official capacity.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction under 28 U.S.C. § 1331 (federal question), § 1361 (federal employee mandamus action), § 1651 (All Writs Act—mandamus), and § 2241 (habeas corpus), and Art. I § 9, cl. 2 of the U.S. Constitution ("Suspension Clause"), as Petitioners and members of the proposed Class are currently in custody under color of the authority of the United States in violation of the Constitution, laws, or treaties of the United States.  *See Devitri* v. *Cronen*, No. 17-cv-11842-PBS, 2017 WL 5707528, at *2-3 (D. Mass. Nov. 27, 2017) (final orders constitute "custody" for purposes of habeas).

17.     Venue is proper in this Court because Petitioner and members of the proposed Class are subject to the jurisdiction of the ICE-ERO Boston Field Office.  Accordingly, a substantial part of the events or omissions giving rise to the claims have occurred and will occur in the District of Massachusetts, including decisions concerning the detention and/or removal of noncitizen Petitioners and other noncitizen members of the proposed Class.  28 U.S.C. §§ 1391, 2241.  Respondent Brophy is responsible for detention and removal decisions for individuals

subject to the jurisdiction of the ICE-ERO Boston Field Office, and, on information and belief, is

based in Massachusetts.

## STATUTORY AND REGULATORY BACKGROUND

18.     The Immigration and Nationality Act (INA) allows the noncitizen spouses of U.S.

citizens to apply for lawful permanent resident status in the United States.  8 U.S.C.

§ 1151(b)(2)(A)(i).  If the noncitizen relative is in the United States unlawfully but is eligible for

"adjustment of status" under 8 U.S.C. § 1255, he may apply to "adjust" to the status of a lawful

permanent resident without leaving the country.  But if that noncitizen relative is ineligible or

unable to adjust his status, he must leave the United States in order to apply for an immigrant

visa at a U.S. consulate.  In general, noncitizens who entered the country with a visa and were

never ordered removed may be eligible to adjust their status. Others, including those who crossed

the border unlawfully and—as relevant here—those who have outstanding orders of removal,

may generally not adjust their status, and must go abroad in order to apply to return as lawful

permanent residents.

19.     The latter process is at issue in this case.  Under that process, the noncitizen

spouse must travel abroad to interview with a consular official and obtain an immigrant visa

from the Department of State.  But if he is subject to any grounds of inadmissibility described in

8 U.S.C. § 1182(a), he will not be permitted to immigrate to the United States unless a waiver of

that ground is available and is granted in his case.

20.     In 2013, USCIS promulgated regulations that made it possible for the

undocumented spouses of U.S. citizens to remain in the United States for most of the process of

seeking permanent residency.  The regulations reduced the time that the noncitizen spouse would

need to wait overseas from many months or years to a few weeks, making it possible for many

more families to pursue lawful status.  Then, in 2016, the agency expanded that process to make

it available to noncitizens with final orders of removal—including the noncitizen Petitioners and class members here.

## I.     The 2013 Provisional Waiver Regulations

21.     A noncitizen who has been unlawfully present in the United States for at least a year who departs and then seeks to return is ordinarily inadmissible (and thus barred from reentry) for 10 years.  8 U.S.C. § 1182(a)(9)(B)(i)(II).[2]  The Attorney General, however, may waive this inadmissibility ground if denying admission would cause "extreme hardship" to a U.S. citizen or lawful permanent resident spouse or parent.  *Id.* § 1182(a)(9)(B)(v).

22.     Prior to 2013, a noncitizen spouse of a U.S. citizen had to remain outside the United States while he or she applied for an immigrant visa and an unlawful presence waiver— often for "well over a year."  *Provisional Unlawful Presence Waivers of Inadmissibility for Certain Immediate Relatives; Proposed Rule*, 77 Fed. Reg. 19902 (Apr. 2, 2012).  USCIS recognized that "the prolonged separation from immediate relatives … cause[d] many U.S. citizens to experience extreme humanitarian and financial hardship."  *Id.*; *see also id.* at 19906 ("[A]n immediate relative's extended absence from the United States can give rise to the sort of extreme hardships to U.S. citizen family members that the unlawful presence waivers are intended to address and, if the waiver is merited, avoid.").  It further acknowledged that, due to this hardship, "many immediate relatives who may qualify for an immigrant visa are reluctant to proceed abroad to seek an immigrant visa."  *Id.*

23.     In 2013, USCIS created a special provisional, or "stateside," waiver process that allowed the noncitizen spouses of U.S. citizens to pursue permanent residency almost entirely

---

[2] A noncitizen who has been unlawfully present in the United States for more than 180 days but less than one year who departs and then seeks to return is ordinarily inadmissible for 3 years.  *Id.* § 1182(a)(9)(B)(i)(I).

from within the United States. By regulation, USCIS allowed these noncitizens to apply for and obtain a provisional unlawful presence waiver *prior* to departing for their consular interviews abroad. *Provisional Unlawful Presence Waivers of Inadmissibility for Certain Immediate Relatives; Final Rule* ("2013 Final Rule"), 78 Fed. Reg. 535, 536 (Jan. 3, 2013).

24.    USCIS enacted the streamlined provisional waiver process for the express purpose of "reduc[ing] the overall visa processing time, the period of separation of the U.S. citizen from his or her immediate relative, and the financial and emotional impact on the U.S. citizen and his or her family due to the immediate relative's absence from the United States."  77 Fed. Reg. at 19907.  The process further would "encourage individuals to take affirmative steps to obtain an immigrant visa to become [lawful permanent residents] as reduced waiting times abroad would render it an efficient, more predictable process, rather than one with unpredictable and prolonged periods of separation."  *Id.*

25.    But the 2013 regulations authorized stateside provisional waivers only for noncitizens not subject to any inadmissibility ground other than the unlawful presence bar.  Thus, they did not directly benefit individuals with final orders of removal or their U.S. citizen spouses—*i.e.*, Petitioners and proposed class members.

## II.    The 2016 Provisional Waiver Regulations

26.    In 2016, USCIS expanded the stateside provisional waiver program to cover, among others, those who have final orders of removal.  A person who leaves the country with a final order of removal outstanding is inadmissible (and thus barred from reentry) for 10 years

after his removal or departure.  8 U.S.C. § 1182(a)(9)(A).[3]  The Attorney General, however, may waive this requirement by granting permission to reapply for admission.  *Id.* § 1182(a)(9)(A)(iii) (providing that the Attorney General may "consent[]" to the alien's application for readmission).

27.     The 2016 regulation expressly extended the streamlined stateside provisional waiver process to cover individuals who would be subject to inadmissibility on the basis of a prior removal order.  *See Expansion of Provisional Unlawful Presence Waivers of Inadmissibility; Final Rule* ("2016 Final Rule"), 81 Fed. Reg. 50244, 50245 (July 29, 2016).

28.     USCIS included noncitizens subject to final orders of removal in the 2016 regulation in order to afford them and their U.S. citizen family members the same benefits of certainty and reduced financial and emotional hardship that the 2013 regulation had provided to others.  Specifically, the 2016 regulations note that the stateside provisional waiver process "encourage[s] individuals who are unlawfully present in the United States to seek lawful status after departing the country," "reduce[s] the hardship that U.S. citizen and [lawful permanent resident] family members of individuals seeking the provisional waiver may experience as a result of the immigrant visa process," and "offers applicants and their family members the certainty of knowing that the applicants have been provisionally approved for a waiver before departing from the United States."  *Id.* at 50245-46.

29.     Thus, as a result of the 2016 stateside provisional waiver regulations, a noncitizen spouse of a U.S. citizen can remain in the United States while applying for waivers of

---

[3] The period is five years for noncitizens who were removed or departed under expedited removal orders or after removal proceedings initiated upon arrival in the United States, 8 U.S.C. § 1182(a)(9)(A)(i), and 20 years in the case of a noncitizen convicted of an aggravated felony, *id.* § 1182(a)(9)(A)(ii).

inadmissibility associated with both his unlawful residency and his prior removal order.  The applicant need only travel abroad once provisionally approved for both of these waivers.

**III.     The Stateside Provisional Waiver Application Process**

30.     Under the 2016 regulations, a noncitizen and his U.S. citizen spouse may follow a five-part process to allow the noncitizen to apply to become a lawful permanent resident with minimal time processing overseas.

31.     First, the U.S. citizen spouse may file a Form I-130, Petition for Alien Relative. USCIS may require an appearance at an interview to determine whether the U.S. citizen and noncitizen spouses have a bona fide marriage.

32.     Second, the noncitizen spouse may file a Form I-212, Permission to Reapply for Admission into the United States After Deportation or Removal.  Consistent with the 2016 regulations, noncitizens can file a Form I-212 and obtain conditional approval prior to their departure from the United States if they will become subject to inadmissibility on the ground of having been previously removed or having departed with a final order of removal outstanding. 8 C.F.R. § 212.2(j); 2016 Final Rule, 81 Fed. Reg. at 50262.

33.     Third, once a Form I-212 is conditionally approved, a noncitizen spouse may apply for a provisional unlawful presence waiver using Form I-601A, Application for Provisional Unlawful Presence Waiver.  *Id.*; 8 C.F.R. § 212.7(e).[4]

34.     Fourth, once the noncitizen obtains a provisional unlawful presence waiver, he or she must go abroad to appear for an immigrant visa interview at a U.S. consulate, 8 C.F.R.

---

[4] Prior to filing an I-601A, the noncitizen must also pay the immigrant visa processing fee to the Department of State.  8 C.F.R. § 212.7(e)(5)(ii)(F)(1).

§ 212.7(e)(3)(v), after which the Department of State may issue an immigrant visa if no other inadmissibility grounds apply.

35.     Fifth, the noncitizen may travel to the United States with his or her immigrant visa. Upon admission to the United States, the noncitizen becomes a lawful permanent resident.

36.     In sum, these regulations allow an otherwise eligible individual who is the spouse of a U.S. citizen—and who lives in the United States unlawfully and with a final order of removal outstanding—to demonstrate the bona fide nature of his marriage, prove his eligibility for the necessary waivers of inadmissibility, depart the country briefly to obtain an immigrant visa, and then return to the United States to rejoin his family as a lawful permanent resident. All in all, the provisional waiver application process shortens the time that a noncitizen applicant is separated from his family from years to approximately one month.

## FACTUAL ALLEGATIONS

37.     Although the 2016 regulations remain in effect, ICE has adopted a policy and practice of detaining and seeking to remove individuals availing themselves of the provisional waiver process.

## I.     Petitioners Lilian Pahola Calderon Jimenez and Luis Alberto Gordillo

38.     Petitioner Lilian Pahola Calderon Jimenez came to the United States from Guatemala with her family in 1991, when she was three years old. She and her family entered the U.S. by crossing its border with Mexico.

39.     In 1999, when Ms. Calderon was 12 years old, an immigration judge denied her father's application for asylum, and gave her and her family 60 days to voluntarily depart the United States.

40.     The Board of Immigration Appeals (BIA) affirmed that order in 2002, providing Ms. Calderon and her family 30 days to voluntarily depart.[5]  When they did not leave, that voluntary departure grant automatically became a final order of removal.  *See* 8 C.F.R. § 1240.26.  Ms. Calderon was 15 years old.

41.     In 2008, the BIA denied a motion to reopen that immigration proceeding, filed on behalf of Ms. Calderon and her parents.

42.     Ms. Calderon applied for Deferred Action for Childhood Arrivals (DACA) in May 2016.  In April 2017, her application for DACA was denied because, according to the government, she had not provided sufficient evidence of her continuous presence in the United States.

43.     In 2016, while her DACA application was pending, Ms. Calderon and Petitioner Luis Gordillo began the process of pursuing her residency by virtue of their marriage.

44.     Ms. Calderon and Mr. Gordillo were high school sweethearts and have lived together for more than 10 years.  They had their first child, a daughter, in 2013.  Their son was born in 2016.  Like their father, both children are U.S. citizens.

45.     Ms. Calderon and Mr. Gordillo were married in September 2016, after the birth of their second child.

46.     Mr. Gordillo filed an I-130 petition in November 2016.

47.     Ms. Calderon and Mr. Gordillo were scheduled for an I-130 interview on January 17, 2018 at USCIS's offices in Johnston, Rhode Island.

---

[5] Ms. Calderon and her family lodged a petition for review at the Court of Appeals for the First Circuit, but did not pursue it.  A motion to voluntarily dismiss the petition stated that counsel had been informed that the family had departed the country.

48.     Consistent with the purpose of an I-130 interview to assist in verification of their marriage, the interview notice instructed Ms. Calderon and Mr. Gordillo to bring "proof of [their] marital relationship," including their children's birth certificates and other documents.

49.     Ms. Calderon and Mr. Gordillo were interviewed on January 17, 2018. Immediately after USCIS completed Ms. Calderon's portion of the interview, ICE entered the interview room, handcuffed, and apprehended Ms. Calderon.

50.     Outside, Mr. Gordillo was informed he was "all set."

51.     Petitioner's abrupt detention caused significant harm to her four-year-old daughter and 22-month-old son.  Her daughter began having nightmares three or four times a night, bursting into tears without warning, crying for her mother, and becoming frightened by brief separations from other family members.  Her son could not sleep in his crib on his own and became distressed because his mother was not there to soothe him.  Both children face the risk of lasting trauma from nearly a month of separation.

52.     Upon information and belief, nothing in Ms. Calderon or Mr. Gordillo's interview provided grounds for Ms. Calderon's detention and attempted removal.

53.     To the contrary, Ms. Calderon was informed that the I-130 was approved, meaning that USCIS recognized her marital relationship to a U.S. citizen as legitimate, the first step in her effort to apply for permanent residency.

54.     ICE determined Ms. Calderon to be a flight risk on the basis that she was subject to final order of removal yet still present in the United States.  In doing so, ICE relied on an algorithm, the Risk Classification Assessment.  *See* Lyons Affidavit (Dkt. No. 19) ¶ 6. On information and belief, the Risk Classification Assessment heavily biases outcomes in favor of detention in any case in which a noncitizen has a final order of removal and did not depart, even

though the 2016 provisional waiver process allows individuals in precisely this situation to

address these deficiencies in their immigration status and become lawful permanent residents by

virtue of their marriage to U.S. citizens.

55.     ICE's determination that Ms. Calderon is a flight risk was reached irrespective of

her efforts to avail herself of the 2016 provisional waiver regulations, or the facts that she has

been in the United States for 26 years, is married to a U.S. citizen, and is the primary caretaker of

her two U.S. citizen children.  Instead, ICE noted that "[t]he availability of bed space and lack of

child-care issues were also considered and determined to weigh in favor of detention."  *Id.*

56.     ICE further stated that its actions were "in accordance with Executive Order

13768 of January 25, 2017 – Enhancing Public Safety in the Interior of the United States … and

ICE's operating procedures."  *Id.*  Executive Order 13768, issued on January 25, 2017, defined

as a removal priority noncitizens subject to "final orders of removal … who have not complied

with their legal obligation to depart the United States."[6]

57.     Ms. Calderon poses no danger or flight risk.

58.     Indeed, she was released without conditions on February 13, 2018, shortly after

the filing of this litigation, and granted a three-month stay of removal.

59.     On March 8, 2018, Ms. Calderon filed a Form I-212, Permission to Reapply for

Admission into the United States After Deportation or Removal.  That application was approved

on April 2, 2018.[7]

---

[6] *Executive Order: Enhancing Public Safety in the Interior of the United States* (Jan. 25, 2017), *available at* https://www.whitehouse.gov/presidential-actions/executive-order-enhancing-public-safety-interior-united-states/.

[7] Petitioner has also filed a motion to reopen her immigration case, and requested an emergency stay of removal from the BIA.  The BIA has not ruled on these requests.

60.     Ms. Calderon's stay of removal expires May 12.  But she remains subject to the threat of detention at any time, *see* Apr. 3, 2018 Joint Status Report (Dkt. No. 23), and to removal once her administrative stay expires in May.

## II.     Petitioners Lucimar de Souza and Sergio Francisco

61.     Petitioners Lucimar de Souza and Sergio Francisco have been married since August 22, 2006.  They have a 10-year-old son.

62.     Ms. Lucimar de Souza is subject to a final order of removal and is detained.  Mr. Francisco is a U.S. citizen.

63.     Ms. Lucimar de Souza is a native of Brazil, and arrived in the United States in 2002.  After being apprehended at the border, she did not receive notice of her immigration court hearing.  When she failed to attend, she was ordered removed on June 11, 2002.

64.     In May 2014, Ms. Lucimar de Souza filed a motion to reopen her removal proceedings.  Her motion was denied in June 2014.  She appealed that denial to the BIA, which dismissed her appeal on July 23, 2015.

65.     Mr. Francisco filed his I-130 Petition on September 26, 2016.  Mr. Francisco and Ms. Lucimar de Souza attended their I-130 interview on January 30, 2018.  The petition was approved.

66.     Immediately after the interview concluded Ms. Lucimar de Souza was detained.  She is being held at the Suffolk County House of Correction in Boston.

67.     Ms. Lucimar de Souza filed an emergency motion to reopen her removal proceedings on January 30, 2018.  But the BIA's systems did not properly reflect that Ms. Lucimar de Souza was detained, so the agency declined to hear her appeal on an expedited basis.  The BIA's systems were not corrected until March 8, 2018 following over a month in prison and

thirteen phone calls from her attorney to ICE and the BIA.  The motion to reopen remains pending.

68.     On March 23, 2018, Ms. Lucimar de Souza's immigration attorney filed a request for bond or supervised release with ICE.  ICE has not responded.

69.     Ms. Lucimar de Souza's counsel is currently in the process of preparing her I-212 application.

70.     Ms. Lucimar de Souza poses no danger or flight risk.

71.     Ms. Lucimar de Souza's detention has been extremely trying for her family, especially her 10-year-old son, who has begged to be allowed to stay with his mother in detention rather than go back home without her.

### III.     Petitioners Sandro de Souza and Carmen Sanchez

72.     Petitioners Sandro de Souza and Carmen Sanchez have been married since April 14, 2011.  They live with Mr. Sandro de Souza's 20-year-old son.

73.     Mr. Sandro de Souza is subject to a final order of removal and has been ordered to depart the United States by April 24; Ms. Sanchez is a U.S. citizen.

74.     Mr. Sandro de Souza is a native of Brazil and has lived in the United States since 1997, when he entered on a tourist visa.  Mr. Sandro de Souza fled Brazil after his life was threatened by a criminal group whose prior assault he had reported to the police.

75.     Mr. Sandro de Souza was placed into removal proceedings in 2005 and applied for asylum in 2007.  His application was denied in 2010, but he was granted a voluntary departure.  The BIA affirmed the immigration judge's decision on September 8, 2011.  When Mr. Sandro de Souza did not leave, his voluntary departure was converted to an order of removal.

76.     By then, Mr. Sandro de Souza was married to Ms. Sanchez, a U.S. citizen.  On October 31, 2011, Ms. Sanchez filed an I-130 Petition for Mr. Sandro de Souza.  The couple attended an I-130 interview on June 13, 2013 in Boston.

77.     The day before his interview, Mr. Sandro de Souza voluntarily went to ICE's Burlington Office to enter into an order of supervision.  He has regularly reported to ICE ever since and has received stays of removal.

78.     After the 2013 provisional waiver regulations went into effect, Mr. Sandro de Souza moved to reopen his immigration proceedings based on his potential eligibility to seek an I-601A waiver.  The BIA declined to reopen the case because Ms. Sanchez's I-130 was still pending.

79.     USCIS failed to act on Ms. Sanchez's I-130 petition for almost *seven years* despite numerous inquiries and requests to process his application.  Finally, USCIS interviewed Mr. Sandro de Souza and Ms. Sanchez for a second time on March 1, 2018 and approved their I-130.

80.     On February 8, 2017, the Field Office Director of ICE's Boston Field Office denied Mr. Sandro de Souza's application for a stay of removal.  Mr. Sandro de Souza continued to report to ICE as required.

81.     At his January 2018 check-in, Mr. Sandro de Souza was told to purchase an airline ticket to depart the United States by March 9, 2018.  The date was pushed back because of progress on his I-130.  But Mr. Sandro de Souza was ultimately told to appear on March 20, 2018 to present tickets for departure from United States by April 24, 2018.

82.     At his March 20, 2018 check-in, Mr. Sandro de Souza was placed on electronic monitoring and given instructions to depart, despite the approval of his I-130.  That day, he again

applied for a stay of removal.  It was denied.  On information and belief, if he does not depart by April 24, 2018, he will face the threat of detention and removal.

83.    Ms. Sanchez and Mr. Sandro de Souza's son both suffer from mental health issues that are likely to be exacerbated of Mr. Sandro de Souza is forced to depart the United States.

## IV.    Petitioners Oscar Rivas and Celina Rivera Rivas

84.    Petitioners Oscar Rivas and Celina Rivera Rivas have been married since December 23, 2016.  They have two kids together: a seven-year-old daughter and a five-year-old son.

85.    Mr. Rivas is subject to a final order of removal and has been ordered to depart the United States by May 2, 2018.  Ms. Rivera is a U.S. citizen.

86.    Mr. Rivas is a native of El Salvador.  He entered the United States in 2006 at the age of 18 after being beaten and shot at by a gang that he refused to join.  He is afraid that if he returns to El Salvador he will be killed.

87.    Mr. Rivas was placed into removal proceedings upon entry and filed a timely application for asylum.  An immigration judge denied asylum and ordered his removal in 2009. The BIA dismissed his appeal in 2011, and dismissed his motion to reconsider in 2012.  After losing these appeals, Mr. Rivas surrendered to ICE.

88.    After Mr. Rivas surrendered to ICE, he was granted a stay of removal in 2013, which was renewed annually.  In March 24, 2017, his application for a stay was denied for the first time.

89.    By then, Mr. Rivas and Ms. Rivera had recently married.  On April 12, 2017, Ms. Rivera, who was at that time a legal permanent resident, filed an I-130 Petition for Mr. Rivas. When she became a citizen on September 22, 2017, she upgraded her I-130 petition to that of a petition for an immediate relative of a U.S. citizen.

90.     Mr. Rivas filed his I-212 Application on July 7, 2017.  The USCIS has yet to respond to either application.

91.     At his March 1, 2018 check-in with ICE, Mr. Rivas was ordered to return to ICE's office on April 2, 2018 with airline ticket departing the U.S. by May 2, 2018.  On April 2, 2018, Mr. Rivas returned to ICE with these tickets.  That day, ICE placed Mr. Rivas on electronic monitoring.  On information and belief, if he does not depart by May 2, Mr. Rivas will be subject to detention and removal.

92.     Mr. Rivas's departure would devastate his wife and children and make it difficult for them to afford housing and other basic necessities.

## V.     Petitioners Deng Gao and Amy Chen

93.     Petitioners Deng Gao and Amy Chen have been married since May 20, 2016. They live with Mr. Gao's thirteen-year-old son, Ms. Chen's eight-year-old son, Ms. Chen's five-year-old daughter, and their six-week-old son.

94.     Mr. Gao is subject to a final order of removal and fears that he will be detained at his I-130 interview. Ms. Chen is a U.S. citizen.

95.     Mr. Gao is a native of China and arrived in the United States in 2005 on a K-3 visa after his family arranged his courtship to a woman who was a U.S. citizen.  Upon arrival, he learned that his new wife had severe special needs and that he would be under the control of his in-laws, who did not allow him to see his immigration paperwork and threatened to ruin his immigration case if he ceased supporting his wife.

96.     Mr. Gao missed a hearing before an immigration judge on September 10, 2008 because he never received notice of the hearing.  He was ordered removed.

97.     After fleeing his first wife's family, Mr. Gao moved to Massachusetts, where he met Ms. Chen in 2011.  They started dating in 2014 and were legally married in 2016, after Mr. Gao's divorce was finalized.

98.     The immigration court denied Mr. Gao's motion to reopen his immigration case on August 17, 2017.  His appeal is currently pending.

99.     Ms. Chen filed her I-130 Petition on June 28, 2016.  It is still pending and he is in the queue for an interview in Boston.

100.     Mr. Gao and Ms. Chen worry that Mr. Gao could be detained at his I-130 interview and removed.  Their family is completely dependent on Mr. Gao for financial support, and has trouble imagining how they would care for their children—particularly Mr. Gao's thirteen-year-old son, who needs constant care—if he were removed to China.

## CLASS ACTION ALLEGATIONS

101.     As this Court has noted, and as Petitioners' cases demonstrate, Ms. Calderon's detention was "part of a pattern that has emerged in related cases."  Feb. 15, 2018 Order (Dkt. No. 17) at 2.

102.     ICE has admitted that five individuals other than Petitioner Calderon were arrested while seeking permanent residency at a Massachusetts or Rhode Island USCIS office in January 2018 alone.  Lyons Affidavit (Dkt No. 19) ¶¶ 12-14; *see also Oliveira v. Moniz et al.*, No. 18-cv-10150-MLW.  Ms. Lucimar de Souza is one of these individuals.

103.     This Court has also observed that the petitioner in *Arriaga Gil v. Tompkins*, No. 17-cv-10743-MLW, was one of five noncitizens aliens arrested by ICE at a USCIS office in March 2017 while seeking lawful permanent residency by virtue of their marriages to U.S. citizens.  Feb. 15, 2018 Order (Dkt. No. 17) at 2.

104.    Petitioners now bring this action for themselves and as a class action on behalf of

others similarly situated pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2), or, in

the alternative, as a class-action habeas, on behalf of a class of people pursuing the provisional

waiver application process.  This proposed class is defined as:

> Any U.S. citizen and his or her noncitizen spouse who (1) has a final order of removal
> and has not departed the U.S. under that order; (2) is the beneficiary of a pending or
> approved I-130, Petition for Alien Relative, filed by the U.S. citizen spouse; and (3) is
> not "ineligible" for a provisional waiver under 8 C.F.R. § 212.7(e)(4)(i) or (vi).

105.    *Numerosity*: The proposed class meets the requirements of Federal Rule of Civil

Procedure 23(a)(1) because it is so numerous that joinder would be impracticable.  On

information and belief, the proposed class presents a common scenario in Massachusetts'

immigrant communities, and there are well over 40 putative class members.  According to its

own statistics, in the third quarter of 2017 alone, USCIS had 9,336 pending I-130 applications

filed by U.S. citizens on behalf of their immediate family members in states within the

jurisdiction of ICE-ERO Boston Field Office.  Even if less than one percent of these were filed

by and on behalf of class members who were otherwise eligible, the numerosity requirement

would be readily satisfied.  In addition, as U.S. citizens continue to file I-130 applications for

noncitizen spouses who are subject to final orders of removal, additional members will join the

class in the future.  Moreover, the inherent transitory state of the putative class members as I-130

applications are submitted and noncitizen class members acquire lawful permanent resident

status or are removed further demonstrates that joinder is impracticable.

106.    *Commonality*: The proposed Class meets the requirements of Federal Rule of

Civil Procedure 23(a)(2) because class members share common issues of law and fact, including,

but not limited to, whether the government may detain or remove noncitizen class members on

the basis of their removal orders alone, and without regard to their efforts to correct deficiencies in their immigration status under the 2016 provisional waiver regulations.

107.    *Typicality*: The requirements of Federal Rule of Civil Procedure 23(a)(3) are satisfied because petitioners' claims are typical of those of the proposed class as a whole. Petitioners and the class of individuals they seek to represent are all either: (1) subject to final removal orders, married to U.S. citizens, and have a pending or approved I-130 petition submitted by their spouse, or (2) the U.S. citizen spouse of such a person.  Petitioners assert that detaining or taking steps toward removing noncitizen petitioners violates all petitioners' Fifth Amendment rights to due process and equal protection, the Immigration and Nationality Act and applicable regulations, and the Administrative Procedure Act.  Their claims therefore raise the same legal questions at the core of the class claims.

108.    *Adequacy*: The requirements of Federal Rule of Civil Procedure 23(a)(4) are satisfied.  Petitioners will adequately represent the proposed class because they seek the same relief as the other members of the proposed class and do not have any interests adverse to those of the proposed class as a whole.  In addition, the proposed class is represented by counsel from Wilmer Cutler Pickering Hale and Dorr LLP, the American Civil Liberties Union Foundation of Massachusetts, and immigration attorney Kathleen Gillespie.  These counsel have experience litigating class actions, including class actions involving the rights of noncitizens.

109.    Finally, the proposed Class satisfies Federal Rule of Civil Procedure 23(b)(2) because immigration authorities have acted on grounds that are generally applicable to the proposed Class, in that all class members or their spouses have pending I-130 petitions and face potential detention or removal without regard to their efforts to correct deficiencies in their

immigration status under the 2016 provisional waiver regulations.  Classwide injunctive and

declaratory relief is therefore appropriate.

## ALLEGATIONS RELATING TO ANIMUS

110.  On information and belief, Respondents' efforts to restrict eligibility for the

stateside provisional waiver process for eligible noncitizen petitioners and class members is

motivated by racial animus and animus based on national origin.  Indeed, many of

Respondents' immigration policies—from the decisions to render one million noncitizens

unlawfully present,[8] to the calls for the elimination of "chain migration,"[9] to the policies

obstructing citizenship for lawful permanent residents in the military[10]—can hardly be

understood as means of protecting national security or controlling illegal immigration.  Instead,

on information and belief, Respondents' immigration policies reflect a consistent desire to

drive out immigrants of color and prevent non-white people from becoming American.

---

[8]  Adam Adelman, "Trump Ends DACA Program, No New Applications Accepted," NBC News (Sept. 5, 2017), https://www.nbcnews.com/politics/immigration/trump-dreamers-daca-immigration-announcement-n798686 (noting that termination of DACA affected 800,000 "Dreamers"); Nick Miroff & David Nakamura, "200,000 Salvadorans May Be Forced to Leave the U.S. as Trump Ends Immigration Protections," Wash. Post (Jan. 8, 2018), https://www.washingtonpost.com/world/national-security/trump-administration-to-end-provisional-residency-for-200000-salvadorans/2018/01/08/badfde90-f481-11e7-beb6-c8d48830c54d_story.html.

[9]  Julie Bykowicz & Rebecca Ballhaus, "Trump Revives Attack on Diversity Visa, 'Chain Migration' in Speech," Wall St. J. (Feb. 23, 2018), https://www.wsj.com/articles/trump-revives-attack-on-diversity-visa-chain-migration-in-speech-1519410081; Nick Miroff, "Family Ties Drive U.S. Immigration.  Why Trump Wants to Break the 'Chains,'" Wash. Post. (Jan. 2, 2018), https://www.washingtonpost.com/world/national-security/how-chain-migration-became-a-target-in-trumps-immigration-agenda/2018/01/02/dd30e034-efdb-11e7-90ed-77167c6861f2_story.html, ("Attorney General Jeff Sessions, Homeland Security Secretary Kirstjen Nielsen and other Trump Cabinet members have also hammered at 'chain migration' in recent weeks, calling it a threat to American workers and national security.").

[10]  Jim Garamone, "DoD Announces Policies Affecting Foreign Nationals Entering Military," U.S. Dep't of Defense (Oct. 13, 2017), https://www.defense.gov/News/Article/Article/1342430/dod-announces-policies-affecting-foreign-nationals-entering-military/.

111.    Respondent Trump's statements provide evidence of this animus.  He has asked
why the United States could not have more immigrants from Norway, a predominantly white
country.[11]  While campaigning, he labeled Mexican immigrants as criminals and rapists[12]; as
President, he famously stated that Haitians "all have AIDS"[13] and expressed a desire to reduce
immigration from "shithole" countries such as Haiti, El Salvador, and African nations.[14]
Respondent Trump declined to criticize white nationalist demonstrators[15] and pardoned an
Arizona sheriff convicted of contempt of a judicial order requiring that he cease racially profiling
Latinos, calling the sheriff an "American patriot."[16]

---

[11]  Henrik Prysker Libell & Catherin Porter, "From Norway to Haiti, Trump's Comments Stir
Fresh Outrage," N.Y. Times (Jan. 11, 2018), https://www.nytimes.com/2018/01/11/world/trump
-countries-haiti-africa.html.

[12]  Katie Reilly, "Here Are All the Times Donald Trump Insulted Mexico," Time (Aug. 31,
2016), http://time.com/4473972/donald-trump-mexico-meeting-insult/.

[13]  Michael D. Shear & Julie Hirschfield Davis, "Stoking Fears, Trump Defied Bureaucracy to
Advance Immigration Agenda," N.Y. Times (Dec. 23, 2017), https://www.nytimes.com/2017
/12/23/us/politics/trump-immigration.html.

[14]  Josh Dawsey, "Trump Derides Protections for Immigrants from 'Shithole' Countries," Wash.
Post. (Jan. 12, 2018), https://www.washingtonpost.com/politics/trump-attacks-protections-for-
immigrants-from-shithole-countries-in-oval-office-meeting/2018/01/11/bfc0725c-f711-11e7
-91af-31ac729add94_story.html; Julie Hirschfield Davis et al., "Trump Alarms Lawmakers with
Disparaging Words for Haiti and Africa," N.Y. Times (Jan. 11, 2018), https://www.nytimes.com
/2018/01/11/us/politics/trump-shithole-countries.html.

[15]  Glenn Thrush & Maggie Haberman, "Trump Is Criticized for Not Calling Out White
Supremacists," N.Y. Times (Aug. 12, 2017), https://www.nytimes.com/2017/08/12/us/trump
-charlottesville-protest-nationalist-riot.html.

[16] Julie Hirschfield Davis & Maggie Haberman, "Trump Pardons Joe Arpaio, Who Became Face
of Crackdown on Illegal Immigration," N.Y. Times (Aug. 25, 2017), http://www.nytimes.com
/2017/08/25/us/politics/joe-arpaio-trump-pardon-sheriff-arizona.html.

## CLAIMS FOR RELIEF

### Count 1 - Immigration and Nationality Act and Applicable Regulations

112.    The foregoing allegations are realleged and incorporated herein.

113.    The INA does not condemn individuals who live in the United States unlawfully and under final orders of removal to permanent separation from their U.S. citizen spouses and children.  Instead, it allows these individuals, if otherwise eligible, to leave the U.S. temporarily and return as lawful permanent residents—if they are granted waivers of applicable inadmissibility grounds under 8 U.S.C. § 1182(a).  Specifically, § 1182(a)(9)(A)(iii) allows an individual who departed under an order of removal to avoid a bar on admission by obtaining the "consent[]" of the Attorney General.  And § 1182(a)(9)(B)(v) allows an individual who lived in the United States unlawfully to avoid a similar 3-to-10-year bar by demonstrating that a denial of admission would cause "extreme hardship" to a U.S. citizen spouse or parent.

114.    These regulations thus allow an otherwise eligible individual who is the spouse of a U.S. citizen—and who lives in the United States unlawfully and with a final order of removal—to demonstrate the bona fide nature of his or her marriage, prove his or her eligibility for required waivers, depart the country briefly to complete processing of an immigrant visa application at a U.S. consulate, and then return to the United States to rejoin his or her family as a lawful permanent resident.

115.    Detaining and threatening to detain and remove noncitizen Petitioners and other noncitizen members of the proposed class without allowing them to follow these provisional waiver procedures violates the INA and applicable regulations.

### Count 2 - Due Process under the U.S. Constitution

116.    The foregoing allegations are realleged and incorporated herein.

117.    Due process protects a noncitizen's liberty interest in the adjudication of applications for relief and benefits made available under the immigration laws. *See Arevalo* v. *Ashcroft,* 344 F.3d 1, 15 (1st Cir. 2003) (recognizing protected interests in the "right to seek relief" even when there is no "right to the relief itself").  Moreover, Petitioners and class members have a liberty interest in being able to remain in the United States in order to pursue adjudications for relief under the provisional waiver process—which was specifically designed to allow them to take steps towards legalization from within the United States in order to avoid protracted separation from their U.S. citizen spouses and other family members.

118.    Due process also protects a U.S. citizen's liberty interest in living with his spouse in the United States. *Zablocki v. Redhail*, 434 U.S. 374, 383 (1978) ("The freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men." (quoting *Loving v. Virginia*, 388 U.S. 1, 12 (1967))).  The citizen Petitioners and other citizen members of the proposed class have a protected due process interest in their spouse's ability to remain in the United States while seeking lawful permanent residency through the provisional waiver process.

119.    Finally, due process protects Petitioners from being the victims of a bait and switch. *See, e.g.*, *Raley v. State of Ohio*, 360 U.S. 423, 438-439 (1959) ("convicting a citizen for exercising a privilege which the State clearly had told him was available to him" was the "most indefensible sort of entrapment by the State" and violated the Due Process Clause).

120.    Detaining and threatening to detain and remove noncitizen Petitioners and other noncitizen members of the proposed class without allowing them to follow the 2016 provisional waiver procedures violates all Petitioners' rights under the Due Process Clause of the Fifth Amendment.

## Count 3 – Equal Protection under the U.S. Constitution

121.    The foregoing allegations are realleged and incorporated herein.

122.    Petitioners have a right under the Fifth Amendment to the U.S. Constitution to equal protection of the laws.  On information and belief, Executive Order 13768—and Respondents' practice of subjecting noncitizen Petitioners and noncitizen members of the proposed class to detention and removal despite their efforts to legalize their immigration status—are motivated by racial animus and animus based on national origin and are unlawful. *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265-266 (1977) (explaining that courts must look at whether "a discriminatory purpose" was "a motivating factor" in assessing whether a government action violates the equal protection clause).

## Count 4 - Administrative Procedure Act

123.    The foregoing allegations are realleged and incorporated herein.

124.    The Administrative Procedure Act (APA) forbids agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  A court reviewing agency action "must assess … whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment"; it must "examin[e] the reasons for agency decisions—or, as the case may be, the absence of such reasons."  *Judulang* v. *Holder,* 565 U.S. 42, 53 (2011) (quotations omitted).

125.    Detaining and threatening to detain and remove noncitizen petitioners and other noncitizen members of the proposed class without allowing them to follow these provisional waiver procedures is and would be arbitrary and capricious under the APA.

126.     The APA also sets forth rulemaking procedures that agencies must follow before adopting substantive rules.  *See* 5 U.S.C. § 553.  DHS followed these rulemaking procedures to establish the provisional waiver process for the unlawful presence waiver, *see* 2013 Final Rule, 78 Fed. Reg. at 536, and to expand the availability of that waiver to noncitizens living with final orders of removal, *see* 2016 Final Rule, 81 Fed. Reg. at 50244.

127.     ICE's sudden decision to prohibit some noncitizens with final orders of removal from pursuing the process created by these regulations—a prohibition accomplished in this case by detaining and attempting to remove noncitizen petitioners and other noncitizen members of the proposed class in the midst of their efforts to legalize their status—improperly alters these substantive rules without notice-and-comment rulemaking and without considering the reliance interests created by the regulations, in violation of the APA.

### Count 5 - Immigration and Nationality Act and Applicable Regulations
### (as applied to individuals in detention)

128.     The foregoing allegations are realleged and incorporated herein.

129.     The Immigration and Nationality Act (INA) provides for mandatory detention during the 90-day "removal period" that begins immediately after a noncitizen's order of removal becomes final.  8 U.S.C. § 1231(a)(1).  After the 90-day removal period, the INA and its applicable regulations provide that detaining noncitizens is generally permissible only upon notice to the noncitizen and after an individualized determination of dangerousness and flight risk.  *See* 8 U.S.C. § 1231(a)(6); 8 C.F.R. § 241.4(d), (f), (h) & (k).

130.     Interpreted in light of the United States Constitution the INA, the applicable regulations do not permit detention of the noncitizen Petitioners and class members simply on the basis of their prior order of removal and without any determination of danger and flight risk by a neutral magistrate.  Nor do they authorize detention of the noncitizen Petitioners and class

members to be substantially determined by an algorithm that, on information and belief, creates a presumption of detention for any individual who has a final order of removal and has not departed the United States.

131.     The government's detention of Ms. Calderon and Ms. Lucimar de Souza violated and violates the INA and applicable regulations.  Moreover, by detaining and threatening to detain other class members without a meaningful determination of flight risk and danger, the government violates the INA and applicable regulations.

**Count 6 - Due Process under the U.S. Constitution**
**(as applied to individuals in detention)**

132.     The foregoing allegations are realleged and incorporated herein.

133.     Other than as punishment for a crime, due process permits the government to take away liberty only "in certain special and narrow nonpunitive circumstances … where a special justification … outweighs the individual's constitutionally protected interest in avoiding physical restraint." *Zadvydas* v. *Davis,* 533 U.S. 678, 690 (2001) (quotations omitted).  Such special justification exists only where a restraint on liberty bears a "reasonable relation" to permissible purposes.  *Jackson* v. *Indiana,* 406 U.S. 715, 738 (1972); *see also Foucha* v. *Louisiana,* 504 U.S. 71, 79 (1992); *Zadvydas,* 533 U.S. at 690.  In the immigration context, those purposes are "ensuring the appearance of aliens at future immigration proceedings and preventing danger to the community." *Zadvydas,* 533 U.S. at 690 (quotations omitted).

134.     Those substantive limitations on detention are closely intertwined with procedural due process protections. *Foucha,* 504 U.S. 78-80.  Noncitizens have a right to adequate procedures to determine whether their detention in fact serves the purposes of ensuring their appearance or protecting the community. *Id.* at 79; *Zadvydas,* 533 U.S. 692; *Casas-Castrillon* v. *Dep't of Homeland Sec.,* 535 F.3d 942, 949 (9th Cir. 2008).  Where laws and regulations fail to

provide such procedures, the habeas court may assess whether the noncitizen's immigration detention is reasonably related to the purposes of ensuring her appearance or protecting the community, *Zadvydas,* 533 U.S. at 699, or require release unless a bond hearing is provided.

135.    Because Ms. Calderon and Ms. Lucimar de Souza pose no danger or flight risk and were detained while pursuing available avenues to legalize their immigration status through their U.S. citizen spouses, their detention was and is not reasonably related to its purposes, and is unlawful.

136.    Moreover, because Ms. Calderon and Ms. Lucimar de Souza and other members of the proposed class face detention without any meaningful determination of danger or flight risk, and on the basis of an algorithm that, on information and belief, creates a presumption of detention for any individual who has a final order of removal and has not departed the United States, their detention violates due process.

## REQUEST FOR ORAL ARGUMENT

137.    Petitioner respectfully requests oral argument on this Amended Class Action Complaint and Petition for Habeas Corpus.

## PRAYER FOR RELIEF

Petitioner asks that this Court grant the following relief:

138.    Order Ms. Lucimar de Souza's immediate release from custody, or, in the alternative, require the government to provide her with a bond hearing in front of an immigration judge;

139.    Enjoin the removal of all the noncitizen Petitioners while they are pursuing legalization by way of the provisional waiver process;

140.    Declare that Respondents' policy and practice of subjecting noncitizen Petitioners and other noncitizen members of the proposed class for detention or removal on the basis of a

final order of removal and thereby denying them the ability to avail themselves of the provisional waiver process is contrary to law;

141.   Enjoin Respondents from subjecting noncitizen Petitioners and other noncitizen members of the proposed class to detention or removal on the basis of a final order of removal, without regard to their efforts to pursue legalization under the provisional waiver regulations;

142.   Enjoin Respondents from detaining any Petitioner or class member without notice and an opportunity to be heard, unless exigent circumstances exist;

143.   Enjoin Respondents from continuing to hold any Petitioner or class member in detention without an individual bond hearing;

144.   Award attorney's fees under the Equal Access to Justice Act, 28 U.S.C. § 2412(d) and 5 U.S.C. § 504, if applicable; and

145.   Order any further relief this Court deems just and proper.

Respectfully submitted this 10th day of April, 2018.

/s/ Kevin Prussia

<table>
<tr>
<td>

Matthew R. Segal (BBO # 654489)
Adriana Lafaille (BBO # 680210)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF MASSACHUSETTS, INC.
211 Congress Street
Boston, MA 02110
(617) 482-3170

Kathleen M. Gillespie (BBO # 661315)
Attorney at Law
6 White Pine Lane
Lexington, MA 02421
(339) 970-9283
</td>
<td>

Kevin Prussia, Esq. (BBO # 666813)
Jonathan Cox, Esq. (BBO # 687810)
Stephen Provazza, Esq. (BBO # 691159)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Facsimile:  (617) 526-5000
kevin.prussia@wilmerhale.com
jonathan.cox@wilmerhale.com
stephen.provazza@wilmerhale.com

*Attorneys for Petitioners*
</td>
</tr>
</table>

## CERTIFICATE OF SERVICE

I hereby certify that on April 10, 2018, a true copy of the foregoing will be electronically filed with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF).

/s/ Kevin Prussia
Kevin Prussia