# EXHIBIT C
# Affidavit of Martin D. Harris

# AFFIDAVIT OF MARTIN D. HARRIS

1. I am an immigration attorney and have been practicing immigration law throughout the United States since 1984.

2. I represent Lilian P. Calderon Jimenez in matters pending before the Board of Immigration Appeals (BIA), U.S. Citizenship and Immigration Services (USCIS), the Office of Chief Counsel of the Department of Homeland Security, and Immigration and Customs Enforcement (ICE). I was retained to handle Ms. Calderon's case after her detention by ICE at her I-130 interview on January 17, 2018.

3. I submitted an affidavit in connection with Ms. Calderon's petition for writ of habeas corpus on February 5, 2018. I am herein updating that affidavit.

4. Ms. Calderon entered the United States on or around May 1, 1991. She and her parents and two brothers were placed in removal proceedings in 1998 in connection with her father's application for asylum. Ms. Calderon was a child at the time and was a derivative beneficiary on her father's application.

5. Ms. Calderon's father's application for asylum was denied in 1999, and Ms. Calderon was granted 60 days to voluntarily depart the United States.

6. In 2002, that order was affirmed by the BIA, and Ms. Calderon was provided 30 days to depart the United States.

7. When she did not depart, that voluntary departure grant converted into a final order of removal. See 8 C.F.R. § 1240.26(d).

8. Ms. Calderon has lived with a final order of removal since 2002.

9. In 2008, a motion to reopen that removal case on behalf of Ms. Calderon and her parents was denied.

10. The motion to reopen was predicated on the claim that Ms. Calderon and her parents were eligible for relief under the Nicaraguan Adjustment and Central American Relief Act of 1997 (NACARA), Pub. L. No. 105-100, 111 Stat. 2193, 2196 (1997), *amended by* Pub. L. No. 105-139, 111 Stat. 2644 (1997).

11. Ms. Calderon's parents asserted that their family qualified for this relief because they had attempted to register as class members in accordance with *American Baptist Church* v. *Thornburgh*, 760 F. Supp. 796 (N.D. Cal. 1991),

prior to the December 31, 1991 filing deadline. Via affidavit, Ms. Calderon's parents explained that they had completed forms and paid a fee to a Rhode Island agency that defrauded them and did not submit their registration materials.

12. The motion to reopen was denied on the grounds that Ms. Calderon's parents provided insufficient evidence that they had timely registered for relief under NACARA.

13. In May 2016, Ms. Calderon applied for Deferred Action for Childhood Arrivals (DACA). This application required her to prove that she was continuously physically present in the United States since 2007. Ms. Calderon attempted to demonstrate her continual physical presence with photographs, receipts, and other records. In February 2017, she was asked to supply more evidence of her continual physical presence. She supplied additional evidence, but her application for DACA was denied in April 2017 when USCIS deemed this evidence insufficient.

14. In November 2016, Ms. Calderon's husband filed an I-130, Petition for Alien Relative, on her behalf.

15. USCIS interviewed Ms. Calderon and her husband in connection with their I-130 application on January 17, 2018. See Ex. A (interview notice). The agency approved the I-130 that same day. See Ex. B (I-130 approval).

16. Despite this, ICE detained Ms. Calderon at the Johnston, RI offices of USCIS immediately after her January 17, 2018 interview. After being processed in Rhode Island, she was held at the Suffolk County House of Correction in Boston.

17. On January 30, 2018, I submitted a request on behalf of Ms. Calderon asking U.S. Citizenship and Immigration Services to conduct an internal review of their decision to deny Ms. Calderon's DACA application. On April 3, 2018, I learned through the office of Senator Jack Reed of Rhode Island that the agency's denial of Ms. Calderon's DACA would stand.

18. Also on January 30, 2018, I filed a Form I-246 with ICE in Burlington, Massachusetts, asking the agency to administratively stay Ms. Calderon's removal.

19. On January 29, 2018, I submitted a request to the Department of Homeland Security's Office of Chief Counsel, asking them to join Ms. Calderon in a joint motion to reopen to the BIA. The government declined to join in a reopening.

20. On January 31, 2018, I filed motion asking the BIA to reopen Ms. Calderon's immigration proceeding in order to allow her to seek to legalize her status by way of her marriage to a United States citizen, and to allow her to submit further evidence in support of her eligibility for NACARA. I have since supplemented that motion and have asked, as an additional ground for reopening, that Ms. Calderon be permitted to submit further evidence in support of asylum. That motion remains pending.

21. Along with that motion to reopen, I filed a motion for an Emergency Stay of Removal with the BIA. That motion is pending.

22. When I called the BIA's emergency stay line on Friday, February 2, 2018, I was informed that the BIA had contacted Ms. Calderon's ICE deportation officer in Burlington, Massachusetts but was told that no date had been set for Ms. Calderon's removal and that—because no date had been set—the BIA had not ruled on the emergency stay request. The person I spoke to invited me to call back on the next business day.

23. In order to demonstrate the hardship that Ms. Calderon's continued separation from her family would cause to her children, I arranged for her children to be assessed by a licensed mental health counselor. See Ex. C (counselor's assessments).

24. On February 5, 2018, after hearing from Ms. Calderon's family that she believed she was leaving the Suffolk County House of Correction, I spoke to an officer at the facility and learned that ICE had prepared to transport Ms. Calderon to Louisiana, but had not done so as a consequence of the pending stay request.

25. Ms. Calderon filed a petition for writ of habeas corpus in the District of Massachusetts on February 5, 2018. The following day, the federal court issued an order preventing her removal from Massachusetts during the pendency of the litigation.

26. Despite that Order, on February 7, 2018, Ms. Calderon was transported to New Hampshire for an apparent transfer to the Strafford County House of Corrections. Apparently as a result of the Order in this case, her transport

turned around in New Hampshire and returned her to the Suffolk County House of Correction in Boston.

27. On February 13, 2018, ICE granted my request for an administrative stay (form I-246) of Ms. Calderon's removal, granting her a stay until May 12, 2018.

28. Ms. Calderon was released from detention on February 13, 2018, and returned home to her husband and children in Providence.

29. On or around February 27, 2018, I filed a form I-212, Application for Permission to Reapply for Admission Into the United States After Deportation or Removal on behalf of Ms. Calderon. I asked that consideration of the I-212 be expedited in light of ICE's efforts to remove her.

30. On April 2, 2018, USCIS approved Ms. Calderon's I-212. See Ex. D (I-212 approval). Provisional I-212 applications are adjudicated at an individual's local USCIS office (in this case, Johnston, RI). I believe the speed with which Ms. Calderon's I-212 was adjudicated may have been a consequence of my request to expedite the request and the favorable publicity that Ms. Calderon's case has received in the Rhode Island media.

31. On April 13, 2018, I filed a new I-246, asking ICE to renew its stay of Ms. Calderon's removal beyond May 12, 2018. Upon receipt of this motion, ICE placed Ms. Calderon on an order of supervision and required her to report to the Providence field office on May 28, 2018. On April 19, 2018 ICE granted Ms. Calderon a further stay of removal, this time to August 18, 2018.

32. I am now in the process of preparing to file Ms. Calderon's I-601A, Application for Provisional Unlawful Presence Waiver.

I declare under penalty of perjury that the foregoing is true and correct.

/s/ Martin D. HarrisApril 28, 2018
Martin D. HarrisDate

# EXHIBIT A



U.S. Department of Homeland Security
U.S. Citizenship and Immigration Services
Providence Field Office, District #1
1543 Atwood Avenue
Johnston, RI 02919

**U.S. Citizenship and Immigration Services**

Luis A. Gordillo & Lilian Calderon-Jimenez

File Number: ███

CC: Marcela Ordonez

Date: December 18, 2017

Please appear at the below address on the indicated date for the following interview. It is important that you keep this appointment and bring this letter with you.

| OFFICE LOCATION | 1543 Atwood Ave<br>Johnston, RI 02919 |
|---|---|
| DATE AND TIME | Wednesday, January 17th, 2018 @ 11:00 AM |
| REASON FOR APPOINTMENT | I-130 Interview |
| BRING WITH YOU | This Notice, photo identifications, and your passport.<br><br>Also, please bring an interpreter if applicable as this interview will be conducted in English. The interpreter must be a United States citizen or permanent resident. Photo identification and alien registration card, if applicable, must be presented by the interpreter.<br><br>An attorney or representative may not act as an interpreter if they have filed Form G-28 and are representing you in relation to this petition.<br><br>Your interview may be recorded on videotape.<br><br>Also, please bring proof of your marital relationship, to include, but not limited to:<br><br>• Documentation showing joint ownership of property;<br>• Lease showing joint tenancy of a common residence;<br>• Documentation showing commingling of financial resources;<br>• Birth certificates of children born to the applicant and his or her spouse;<br>• Affidavits of third parties having knowledge of the bona fides of the marital relationship, or<br>• Other documentation establishing that the marriage was not entered into in order to evade the immigration laws of the United States.<br><br>**THIS WILL SERVE AS A FINAL NOTICE. FAILURE TO APPEAR WITHOUT GOOD CAUSE FOR YOUR INTERVIEW WILL RESULT IN THE DENIAL OF YOUR PETITION IN ACCORDANCE WITH 8 CFR § 103.2(b).** |

In the event that you are unable to appear, please attach a statement and any available evidence to show good cause for your failure to appear for your interview. Any documentation submitted should be attached to this notice and returned to the address listed above.

Sincerely,

Adam Bergeron
Field Office Director

# EXHIBIT B

I-797 NOTICE OF ACTION — DEPARTMENT OF HOMELAND SECURITY, U.S. CITIZENSHIP AND IMMIGRATION SERVICES

| Receipt Number | | Case Type |
| --- | --- | --- |
| [redacted] | | I130 - PETITION FOR ALIEN RELATIVE |
| Received Date | Priority Date | Petitioner |
| 11/28/2016 | 11/28/2016 | GORDILLO, LUIS ALBERTO |
| Notice Date | Page | Beneficiary |
| 01/17/2018 | 1 of 1 | CALDERON JIMENEZ, LILIAN PAHOLA |

LUIS ALBERTO GORDILLO
[redacted]

Notice Type: Approval Notice
Section: Husband or wife of U.S. Citizen, 201(b) INA

The above petition has been approved. We have sent a cable to the consulate listed above to notify them of the approval of the petition. We have sent the petition to the **Department of State National Visa Center (NVC), 32 Rochester Avenue, Portsmouth, NH 03801-2909**.

The NVC processes all approved immigrant visa petitions that require consular action. The NVC also determines which consular post is the appropriate consulate to complete visa processing. It will then forward the approved petition to that consulate.

The NVC will contact the person for whom you are petitioning concerning further immigrant visa processing steps.

The approval of this visa petition does not in itself grant any immigration status and does not guarantee that the alien beneficiary will subsequently be found to be eligible for a visa, for admission to the United States, or for an extension, change, or adjustment of status.

**THIS FORM IS NOT A VISA AND MAY NOT BE USED IN PLACE OF A VISA.**

**NOTICE:** Although this application or petition has been approved, USCIS and the U.S. Department of Homeland Security reserve the right to verify this information before and/or after making a decision on your case so we can ensure that you have complied with applicable laws, rules, regulations, and other legal authorities. We may review public information and records, contact others by mail, the internet or phone, conduct site inspections of businesses and residences, or use other methods of verification. We will use the information obtained to determine whether you are eligible for the benefit you seek. If we find any derogatory information, we will follow the law in determining whether to provide you (and the legal representative listed on your Form G-28, if you submitted one) an opportunity to address that information before we make a formal decision on your case or start proceedings.

Please see the additional information on the back. You will be notified separately about any other cases you filed.

National Benefits Center
U. S. CITIZENSHIP & IMMIGRATION SVC
P.O. Box 648004
Lee's Summit MO 64064
Customer Service Telephone: 800-375-5283



# EXHIBIT C

# CASEY C. GALLAGHER, LMHC
57 Metropolitan Rd., Providence, RI 02908     Phone: (617) 909-8159  MHC000737

Office of the Chief Counsel
DHS/ICE/USCIS
JFK Federal Building
15 New Sudbury Street, Room 320
Boston, MA 02203

January 27, 2018

Dear Sir or Madam:

    I am writing on behalf of ███████████████ (DOB: ██ 2013). I am an independently Licensed Mental Health Counselor in the State of Rhode Island (MHC000737) and I am also the Social Services Coordinator at St. Joseph's Health Center in Providence, RI. I have been providing mental health and behavioral health care services to children and their families since 2010 in both Massachusetts and Rhode Island and have extensive experience providing assessment and treatment services to children and families who have experienced traumatic events, attachment disruptions, and more recently over the past few years, my work has focused more on families whose lives have been impacted by immigration issues.

    I completed a comprehensive assessment of ███████████ on the morning of January 27, 2018. This assessment included the gathering of biopsychosocial information, an interview with ██████'s father, Luis Alberto Gordillo (DOB: ████ 1983) and engaging in a play therapy assessment with the child. Based on the information gathered during this assessment, I have significant concerns about ██████'s current mental health, as well as the long-term implications of this attachment disruption, due to her mother's ICE detention and possible deportation. While ██████ currently meets the criteria for Adjustment Disorder with Anxiety, evidence shows that a longer term separation from her mother will have a drastic effect on her health and mental health, including possible Posttraumatic Stress Disorder, emotional and behavioral disturbances, sleep problems, depression, anxiety and difficulties concentrating and performing in school (Allen, Cisneros & Tellez, 2015).

    ██████ is a healthy 4 year old child, who up until 10 days ago has never experienced any medical, behavioral or mental health concerns. She attends preschool and prior to this recent family stressor, she was known as a "happy-go-lucky" child who rarely cried. ██████ is currently not being told by her family the nature of her mother's absence from the family's routines and rituals; however she is a perceptive and intelligent 4 year child and is very aware that her mother is not there to bring her to school in the morning, cuddle with her, and read her books at night. Developmentally, her mother's sudden absence is having a significant impact on her emotional and behavioral well-being. Per her father's

report, ▆ has been experiencing many sleep disruptions including waking up with nightmares 3-4x per night, tossing and turning in her bed, and she has regressed to sleeping in her parents bed with her father and brother. Prior to this separation, ▆ slept in her own bed and did not suffer from sleep disturbances. ▆ is also experiencing many difficulties regulating her emotions. She frequently bursts into tears and worries whether other members of her family will suddenly leave her. She becomes frightened when her father has to leave for work or her brother has to separate from her for short periods of time. ▆ frequently cries out, "Where is mommy, I want my mommy. How come my friends have a mommy and I don't have a mommy?" ▆ is also engaging in some regressive behaviors, such as sucking on her fingers when she feels anxious or sad.

In my observation of the family, ▆ was acting as a gatekeeper for her younger brother, ▆ as there have been many people in and out of the home working to help the family as they manage this crisis. ▆ is a very kind and caring big sister, but she is currently unsure of who is safe and unsafe in her world, which causes her to be very hypervigilent, which is an emerging symptom of posttraumatic stress. The longer that she is separated from her mother, the more difficult it will be to buffer her from the long term effects of stress and trauma.

▆'s mother, Lillian Pahola Calderon (▆/1987), has been the only caregiver other than her father, that this child has ever known and to separate this child from her mother will cause irreparable mental health trauma. I truly hope that you take into consideration the best interests of the child in your decision-making process. I will continue to work with ▆ and the Calderon/Gordillo family to provide them therapy on an ongoing basis. If you have any additional questions for me, please do not hesitate to contact me.

Best,

*Casey Gallagher LMHC*

Casey Gallagher, LMHC

Cited Article:

Allen, B., Cisneros, E.M. & Tellez, A. J Child Fam Stud (2015) The Children Left Behind: The Impact of Parental Deportation on Mental Health. 24: 386. https://doi.org/10.1007/s10826-013-9848-5

# CASEY C. GALLAGHER, LMHC
57 Metropolitan Rd., Providence, RI 02908     Phone: (617) 909-8159  MHC000737

Office of the Chief Counsel
DHS/ICE/USCIS
JFK Federal Building
15 New Sudbury Street, Room 320
Boston, MA 02203

January 27, 2018

Dear Sir or Madam:

I am writing on behalf of ▮▮▮▮ (DOB: ▮▮ 2016). I am an independently Licensed Mental Health Counselor in the State of Rhode Island (MHC000737) and I am also the Social Services Coordinator at St. Joseph's Health Center in Providence, RI. I have been providing mental health and behavioral health care services to children and their families since 2010 in both Massachusetts and Rhode Island and have extensive experience providing assessment and treatment services to children and families who have experienced traumatic events, attachment disruptions, and more recently over the past few years, my work has focused more on families whose lives have been impacted by immigration issues.

I completed a comprehensive assessment of ▮▮▮▮ on the morning of January 27, 2018. This assessment included the gathering of biopsychosocial information, an interview with ▮▮▮'s father, Luis Alberto Gordillo (DOB: ▮▮ 1983) and engaging in a play therapy assessment with the child. Based on the information gathered during this assessment, I have concerns about ▮▮▮ current mental health, as well as the long-term implications of this attachment disruption, due to his mother's ICE detention and possible deportation.

▮▮▮ is a healthy 21 month old child, who has never experienced any medical, behavioral or mental health concerns. His father Luis said that ▮▮▮ has shown fewer signs and symptoms of behavioral disturbances than his sister, ▮▮▮ since his mother's detention, which is to be expected. The two areas in which ▮▮▮ has been struggling are sleep and self-soothing. ▮▮▮ has not been able to sleep in his own crib since his mother's absence from the home. When ▮▮▮ is upset, he cries for his "Mama," but becomes more distressed when she cannot soothe him, as this is all he has known in his short life.

For ▮▮▮ while his behavioral symptoms may not be widespread at this time, the implications of this attachment disruption are significant. From a bio-ecological perspective, children who experience early chronic stress and attachment disruptions compounds the negative effects on their health and well being, because they face the stress of situation, which negatively affects their health (ex. sleep

disturbances, somatic issues, emotional dysregulation, academic issues, increased risk of poverty) and they no longer have the support of the healthy attachment figure who would typically be the person that would buffer their stress and help that child build resilience. Children who lose a parent to deportation, like ▇ are more likely to not only have more significant emotional and behavioral issues in childhood, but their health and mental health outcomes are more likely to be worse in adulthood as well, as a result of these early childhood stressors.

▇ mother, Lillian Pahola Calderon (▇/1987), has been the only caregiver other than his father, that this child has ever known and to separate this child from his mother will cause irreparable mental health trauma. I truly hope that you take into consideration the best interests of the child in your decision-making process. I will continue to work with ▇ and the Calderon/Gordillo family to provide them therapy on an ongoing basis. If you have any additional questions for me, please do not hesitate to contact me.

Best,

*Casey Gallagher LMHC*

Casey Gallagher, LMHC

# Casey Gallagher, LMHC
57 Metropolitan Rd. Providence, RI
Phone: 617-909-8159 E-Mail: cchamblin826@gmail.com

**Licensed Mental Health Counselor**  September 2015
State of Rhode Island and Providence Plantations  MHC00737

## EDUCATION
**Master of Arts in Counseling Psychology**  May 2011
Lesley University  Cambridge, MA

**Bachelor of Arts in English**  May 2003
Siena College  Loudonville, NY

## CLINICAL EXPERIENCE
**CharterCARE Health Partners**  February 2017-Present
**Social Services Coordinator, St. Joseph Health Center**  Providence, RI
- Responsible for managing all integrative health services between all medical and behavioral health care providers at St. Joseph Health Center in Providence, RI, which includes the Behavioral Health Clinicians, Case Managers, Adult Primary Care, OBGYN, Pediatric, Dental, Asthma, Lead, and Immunization Clinics.
- Provide wraparound mental health treatment services including, but not limited to warm hand offs, brief therapy, mental health assessments, group therapy, family therapy and individual psychotherapy to patients at St. Joseph Health Center.
- Develop brief and/or comprehensive clinical assessments and formulation of all referred patients medical and mental health needs, as well as the social-ecological factors that are impacting their health, including but not limited to housing instability, food instability, unemployment, immigration issues, relational issues, substance use, domestic violence and trauma histories.
- Document collaborative treatment plans with patient's PCP and communicate any patient updates in weekly huddle; record all progress in EHR; track patient follow up and outcomes in EHR.
- Build relationships with local hospitals, community agencies and grassroots organizations that can provide support to patients for both mental health and case management needs; refer patients to services and collaborate with providers, as needed.

**Justice Resource Institute**  May 2016-December 2016
**Director of Admissions and Transitions, Meadowridge Academy**  Swansea, MA
- Review of referral information, collaborate with referral sources, and interview all potential students and their caregivers to identify appropriate placement at our residential school.
- Develop a comprehensive clinical assessment and formulation of referral behaviors and provide all staff from direct care workers to teachers to clinician's with initial treatment plan to support student's transition to Meadowridge Academy.
- Implement monthly Attachment, Self-Regulation and Competency (ARC) initiative by offering weekly staff trainings, incorporating the ARC block of the month into staff documentation and supervision paperwork, and identifying activities to teach staff and students new strategies and skills.
- Build and maintain relationships with new and existing referral sources by identifying local and national conferences to attend and associations/organizations to obtain membership, developing new marketing materials, networking, and providing tours to Educational Consultants, and DCF, DMH, LEA providers.
- Provide programmatic oversight as a member of the administrative team by reviewing all daily communication, attending weekly meetings, and participating in the on-call administrative rotation.

**North American Family Institute**  May 2015- May 2016

**Assistant Program Director, Enhanced Outpatient Services**  Warwick, RI
- Provide weekly supervision to a caseload of three clinical supervisors.
- Meet bi-yearly with all clinical staff members to develop professional development plans, as well as oversee supervisory support of these plans.
- Coordinate all in-house staff trainings, as well as train all staff in Therapeutic Crisis Intervention, trauma informed care- ARC and attachment-based theories, behavioral interventions, NSSI, and insurance policies and procedures.
- Collaborate with the Program Director and Director of Community Based Services to ensure that the four core values of the EOS program (strengths-based, formulation-driven, team based and seeking constant improvement) are being adhered to by all EOS staff members.
- Oversee staff administrative tasks and issues including, but not limited to, staff adherence to program policies and procedures, review of mileage, signing off on client treatment plans, and the development and implementation of staff action plans and disciplinary issues.
- Communicate with families, referral sources including outpatient therapists, psychiatrists, schools and daycare providers, Bradley and Hasbro Hospitals, CEDARR Agencies, FCCP, and insurance providers (Medicaid, Beacon Health Services and United Behavioral Health), as appropriate.
- Attend/participate in client home visits and meetings with collaterals, as appropriate.
- Oversee weekly staff productivity and co-manage program budget.

**North American Family Institute**  May 2013-May 2015
**Clinical Supervisor, Enhanced Outpatient Services**  Warwick, RI
- Provide weekly administrative and clinical supervision to a caseload of 4-6 clinicians.
- Consult with supervisee's about clinician caseloads, weekly treatment planning, clinical issues and professional development.
- Collaborate with the members of the leadership team to identify and address staff issues, develop trainings and professional development opportunities.
- Train all staff in Therapeutic Crisis Intervention, trauma informed care- ARC and attachment-based theories, behavioral interventions and insurance policies and procedures.
- Act as liaison between the insurance companies and staff, in order to ensure that all billing and insurance matters are handled properly and within a timely fashion.

**Psychological Centers**  June 2011-May 2013
**Clinician, Center for Community Based Services**  Providence, RI
- Deliver intensive home-based behavioral and clinical treatment to youth aged 2-17.
- Conceptualize client's cases based on historical information, collateral reports, and observations made in home, community and school settings and implemented a developmentally appropriate treatment plan for each client and their family.
- Integrate evidenced-based therapy techniques, while providing parents with psychoeducation about mental health and behavioral issues.
- Process incidents with family members in order to identify drivers to behaviors, labeled triggers and cues, and developed effective behavioral plans.
- Model and assist caregivers in using skills, including effective language, appropriate rewards and consequences, and limit setting.
- Provide case management services, including collaboration with community resources and strengthening the home-school link.

**Walden Street School**  Mar-Sept 2010
**In-Home Therapist and Mentor**  Concord, MA
- Implement Children's Behavioral Health Initiative WRAP principles to children, teens and their families struggling with mental health issues in the metro-Boston area.
- Administer intake paperwork and all relevant assessments, including a risk/safety plan, CANS assessment, comprehensive individual assessment and cultural strengths assessment.
- Individualize treatment plans, write progress notes and collateral notes.

- Provide case management services, including contact with school and community resources.
- Develop appropriate therapeutic alliances with clients, by focusing on their strengths and integrating expressive therapy into their weekly sessions.

**Walden Street School**  Sept 2009–June 2010
**Clinical Intern**  Concord, MA

- Provide counseling services, life skills and social skills lessons, and behavioral management, to adolescent girls with complex trauma histories and mental health challenges living at a residential school.
- Collaborate with the clinicians, teachers, residential staff and administrators to consistently monitor the changing functional levels of clients and determine appropriate plans that will address their needs.
- Implement ARC Model interventions to help students and staff understand and treat complex trauma, while helping to build healthy attachment, regulate emotions and gain self-efficacy.
- Propose, research, and develop social skills and peer leadership curriculums to implement in clinical groups.
- Practice clinical written and oral communication skills, by conducting intake interviews, documenting student's progress and intervention outcomes, as well as presenting students strengths and challenges in clinical rounds meetings and quarterly IEP evaluations.

## TRAINING CERTIFICATIONS

**Building Communities of Care (BCC) Train-the-Trainer**  July 2016
Justice Resource Institute

**Risking Connection Train-the-Trainer**  March 2016
Sidran Institute

**Therapeutic Crisis Intervention (TCI) Train-the-Trainer**  November 2014
Cornell University

## PROFESSIONAL PRESENTATIONS

NAFI Rhode Island Community Based Services  April 2015
Non-Suicidal Self-Injurious Behaviors  Warwick, RI

NAFI Rhode Island Foster Care Conference  March 2015
Preventing the Conflict Cycle  Warwick, RI

NAFI Rhode Island Annual Conference  October 2014
Formulation Based Treatment  Peabody, MA

NAFI Rhode Island Annual Conference  October 2013
Addressing Engagement Issues in Community Based Settings  Peabody, MA

NAFI Rhode Island Community Based Services  June 2013
Attachment Disruptions and Child Development  Providence, RI

Psychological Centers  October 2012
Developmental Trauma and ARC Interventions  Providence, RI

# EXHIBIT D

# THIS NOTICE DOES NOT GRANT ANY IMMIGRATION STATUS OR BENEFIT.

| Receipt Number | | Case Type |
|---|---|---|
| | | I212 - APPLICATION TO REAPPLY FOR ADMISSION AFTER DEPORTATION OR REMOVAL |
| **Received Date** 03/08/2018 | **Priority Date** | **Applicant** CALDERON JIMENEZ, LILIAN PAHOLA |
| **Notice Date** 04/02/2018 | **Page** 1 of 1 | **Beneficiary** CALDERON JIMENEZ, LILIAN PAHOLA |

LILIAN PAHOLA CALDERON JIMENEZ
c/o MARTIN DELMAR HARRIS
MDH
132 DORRANCE STREET
PROVIDENCE RI 02903

**Notice Type:** Approval Notice
**Consulate:** GUATEMALA CITY
**POE:** PROVIDENCE, RI

We have mailed an official notice about this case (and any relevant documentation) according to the mailing preferences you chose on Form G-28, Notice of Entry of Appearance as Attorney or Accredited Representative. **This is a courtesy copy, not the official notice.**

**What the Official Notice Said**

The above application has been granted. It has been forwarded to the consulate listed above. This consulate is not the same as you requested. However, our information indicates that the consulate listed above has jurisdiction in this case.

This completes our action on this case. If you have any questions about visa issuance, please contact the consulate directly.

**THIS FORM IS NOT A VISA AND MAY NOT BE USED IN PLACE OF A VISA.**

**NOTICE:** Although this application or petition has been approved, USCIS and the U.S. Department of Homeland Security reserve the right to verify this information before and/or after making a decision on your case so we can ensure that you have complied with applicable laws, rules, regulations, and other legal authorities. We may review public information and records, contact others by mail, the internet or phone, conduct site inspections of businesses and residences, or use other methods of verification. We will use the information obtained to determine whether you are eligible for the benefit you seek. If we find any derogatory information, we will follow the law in determining whether to provide you (and the legal representative listed on your Form G-28, if you submitted one) an opportunity to address that information before we make a formal decision on your case or start proceedings.

Please see the additional information on the back. You will be notified separately about any other cases you filed.

National Benefits Center
U. S. CITIZENSHIP & IMMIGRATION SVC
P.O. Box 648004
Lee's Summit MO 64064

Customer Service Telephone: 800-375-5283



If this is an interview or biometrics appointment notice, please see the back of this notice for important information.

Form I-797C 07/11/14 Y