```
                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MASSACHUSETTS

    --------------------------------
    LILIAN PAHOLA CALDERON JIMENEZ,  )
                      Petitioner,    )
                                     )  Civil Action
    vs.                              )  No. 18-10225-MLW
                                     )
    KIRSTJEN M. NIELSEN,             )
    Secretary of Homeland Security,  )
    CHRISTOPHER CRONEN,              )
    Immigration and Customs          )
    Enforcement, Boston Field Office )
    Director, YOLANDA SMITH,         )
    Superintendent of Suffolk County )
    Correctional Facility,           )
    STEVEN W. TOMPKINS,              )
    Sheriff of Suffolk County,       )
                      Respondents.   )
    --------------------------------
                                     )
    EDUARDO RALPH JUNQUEIRA,         )
                      Petitioner,    )  Civil Action
                                     )  No. 18-10307-MLW
    vs.                              )
                                     )
    STEVE SOUZA, Superintendent of   )
    Bristol County House of          )
    Corrections, THOMAS M. HODGSON,  )
    Sheriff of Bristol County,       )
                      Respondents.   )
    --------------------------------
                                     )
    EDJANN HENRIQUE DOS SANTOS,      )
                      Petitioner,    )  Civil Action
                                     )  No. 18-10310-MLW
    vs.                              )
                                     )
    KIRSTJEN M. NIELSEN, Secretary   )
    of Homeland Security,            )
    CHRISTOPHER CRONEN, Immigration  )
    and Customs Enforcement, Boston  )
    Field Office Director,           )
    YOLANDA SMITH, Superintendent of )
    Suffolk County House of          )
    Correction, STEVEN W. TOMPKINS,  )
    Sheriff of Suffolk County,       )
                      Respondents.   )
    --------------------------------
```

```
--------------------------------
                              )
MANUEL JESUS PINGUIL LOJA,     )
               Petitioner,     )   Civil Action
                              )   No. 18-10579-MLW
vs.                            )
                              )
STEVEN SOUZA, Superintendent of )
Bristol County Jail and House of )
Corrections, THOMAS M. HODGSON, )
Sheriff of Bristol County,     )
               Respondents.    )
--------------------------------
```

BEFORE THE HONORABLE MARK L. WOLF
UNITED STATES DISTRICT JUDGE

STATUS CONFERENCE

May 1, 2018
10:27 a.m.

John J. Moakley United States Courthouse
Courtroom No. 10
One Courthouse Way
Boston, Massachusetts  02210

Kelly Mortellite, RMR, CRR
Official Court Reporter
John J. Moakley United States Courthouse
One Courthouse Way, Room 5200
Boston, Massachusetts  02210
mortellite@gmail.com

1    APPEARANCES:

2    Counsel on behalf of Petitioners Calderon and Pinguil:
     Adriana Lafaille
3    Matthew Segal
     American Civil Liberties Union
4    211 Congress Street
     Boston, MA 02110
5    617-482-3170
     alafaille@aclum.org
6    msegal@aclum.org

7    Counsel on behalf of Petitioner Calderon:
     Jonathan A. Cox
8    Stephen Nicholas Provazza
     Wilmer Hale LLP
9    60 State Street
     Boston, MA 02109
10   617-526-6212
     stephen.provazza@wilmerhale.com
11   jonathan.cox@wilmerhale.com

12   Counsel on behalf of Petitioners Junqueira and Dos Santos:
     Todd C. Pomerleau
13   Rubin Pomerleau PC
     One Center Plaza
14   Suite 230
     Boston, MA 02108
15   617-367-0077
     tcp@rubinpom.com
16
     Counsel on behalf of Petitioner Pinguil:
17   Julio Cortes del Olmo
     Del Olmo Law
18   251 Harvard Street
     Brookline, MA 02446
19   617-391-0110
     julio@delolmolaw.com
20
     (continued on next page)
21

22

23

24

25

1     APPEARANCES:   (Cont.)

2     Counsel on behalf of Respondents:
      Eve A. Piemonte
3     Michael P. Sady
      Thomas E. Kanwit
4     United States Attorney's Office
      Suite 9200
5     1 Courthouse Way
      John Joseph Moakley Federal Courthouse
6     Boston, MA 02210
      617-748-3271
7     eve.piemonte@usdoj.gov
      michael.sady@usdoj.gov
8     thomas.kanwit@usdoj.gov

9     Mary Larakers
      U.S. Department of Justice, Office of Immigration Litigation
10    District Court Section
      P.O. Box 868
11    Washington, DC 20044
      202-353-4419
12    mary.larakers@usdoj.gov

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              (The following proceedings were held in open court

3    before the Honorable Mark L. Wolf, United States

4    District Judge, United States District Court, District of

5    Massachusetts, at the John J. Moakley United States Courthouse,

6    One Courthouse Way, Courtroom 10, Boston, Massachusetts, on May

7    1, 2018.)

8              THE COURT:  Good afternoon -- good morning.  I

9    apologize for the delay in starting.  I'm trying to get

10   organized to assure that we proceed in a fair and efficient

11   manner.  Would counsel in Calderon please identify themselves

12   for the record.

13             MS. PIEMONTE:  Good morning, Your Honor.  Sorry.  Go

14   ahead.

15             MS. LAFAILLE:  Good morning, Your Honor.  Adriana

16   Lafaille.

17             MR. SEGAL:  Good morning, Your Honor.  Matthew Segal.

18   I have to also issue an apology.  Depending on the --

19             THE COURT:  I'm sorry, I'm having trouble hearing you.

20             MR. SEGAL:  Sorry, Your Honor.  I need to apologize in

21   advance.  Depending on the length of this hearing, I may need

22   to leave to attend to a family medical situation, but I will

23   stay as long as I can.  Good morning.

24             THE COURT:  Okay.

25             MR. COX:  Jonathan Cox and Stephen Provazza of Wilmer

1    Hale on behalf of Calderon petitioners.  Kevin Prussia, also of

2    Wilmer Hale on behalf of the Calderon, conveys his apologies

3    for not being able to attend in person.

4              THE COURT:  Okay.

5              MS. LARAKERS:  Good morning, Your Honor.  Mary

6    Larakers on behalf of the United States.

7              MS. PIEMONTE:  Good morning, Your Honor.  Eve Piemonte

8    on behalf of the United States.

9              THE COURT:  All right.  And counsel in Junqueira,

10   please.

11             MR. POMERLEAU:  Good morning as well, Your Honor.

12   Todd Pomerleau on behalf of Junqueira.

13             MS. LARAKERS:  Mary Larakers on behalf of the United

14   States.

15             MR. SADY:  Michael Sady, Your Honor, on behalf of the

16   United States.

17             THE COURT:  All right.  And Dos Santos?

18             MR. POMERLEAU:  Good morning again, Your Honor.  Todd

19   Pomerleau on behalf of Mr. Dos Santos.

20             THE COURT:  Still?

21             MR. POMERLEAU:  Yes, still me.  Thank you.

22             MR. SADY:  Your Honor, Michael Sady.

23             THE COURT:  And Pinguil?

24             MR. CORTES:  Good morning, Your Honor.  Julio Cortes

25   del Olmo Torres on behalf of Mr. Pinguil.

1           MS. LAFAILLE:  Good morning.  Adriana Lafaille also on

2     behalf of Mr. Pinguil.

3           MR. SEGAL:  Good morning again, Your Honor.  Matthew

4     Segal also on behalf of Mr. Pinguil.

5           MR. KANWIT:  Good morning, Your Honor.  Thomas Kanwit

6     on behalf of the respondents Steven Souza and Thomas Hodgson.

7           THE COURT:  Thank you.  As a threshold matter,

8     pursuant to orders that I issued the parties have stated --

9     well, let me take a step back.

10          As I've informed you in prior orders, Ms. Lafaille and

11    Mr. Cox are among my legions of law clerks over the last 33

12    years.  And neither has worked for me for more than two years.

13    So under my practices, they're permitted to appear before me,

14    and the parties in response to the orders I issued agree that a

15    reasonable person would not question my impartiality because

16    each of them served as my law clerk.  Therefore, my

17    disqualification is not required under 28 United States Code,

18    section 455(a).  And in any event, the parties have waived any

19    such ground for disqualification under section 455(e).

20    However, do I understand that correctly?

21          MS. LARAKERS:  Yes, Your Honor.

22          MR. KANWIT:  Yes, Your Honor.

23          MR. COX:  Yes, Your Honor.

24          MS. LAFAILLE:  Yes, Your Honor.

25          THE COURT:  Okay.  All right.  Then just to put this

1    in context, each of the three cases -- each of the four cases,

2    except for Pinguil, was assigned to me under Local Rule 40.1(g)

3    as related to a civil case I had about one year ago, Arriaga

4    Gil.  They were properly characterized as related because at

5    least one of the parties, essentially the respondent for the

6    Department of Homeland Security, is the same and the cases

7    involve one of the same or similar issue:  That is, whether

8    ICE, Immigration and Custom Enforcement, is required to give an

9    alien previously ordered deported who was not detained and did

10   not depart the United States in the 90-day removal period a

11   bail hearing in effect under 8 CFR section 241.1.

12        Pinguil was randomly drawn to me and presents

13   different issues regarding detention.  I had been assigned

14   another related case, De Oliveira, and I would say commendably

15   the parties conferred and settled, and that case has been

16   dismissed.

17        One other matter, when each of these cases was

18   assigned to me, I issued an order directing that the

19   petitioners not be transferred out of Massachusetts during the

20   pendency of his or her case to assure that I had continued

21   jurisdiction to decide the habeas petition.  I said in the

22   order that I could be asked to reconsider that direction.

23        In Calderon, the defendants have responded and since

24   stated that ICE has been ordered not to remove the named alien

25   petitioners from Massachusetts or the United States as long as

1    my order remains in effect.  That's in docket number 38 in the

2    Calderon case.  Do I understand that correctly, though, with

3    regard to the respondents?

4            MS. LARAKERS:  Yes, Your Honor.

5            THE COURT:  And has ICE received the same or similar

6    direction with regard to the other petitioners?

7            MS. LARAKERS:  I'm not sure, Your Honor.  I only know

8    in Calderon because we were talking with opposing counsel about

9    it.

10           THE COURT:  Okay.  But basically, if there's a -- just

11   to be very careful and clear, as long as my order remains in

12   effect, they can't be moved out of Massachusetts.  And if you

13   move for reconsideration of that order, we'll set up some

14   appropriate, deliberate schedule to reconsider it.

15           MS. LARAKERS:  Yes, Your Honor.  And I do know when

16   the stay is issued, it is entered into the system that they

17   shouldn't be moved out of Massachusetts; I do know that much.

18   I just hadn't independently conferred with ICE if that's what

19   has happened, but I will let them know.

20           THE COURT:  And I think there had been earlier an

21   undertaking by ICE not to detain Calderon again at least until

22   May 12.  Does this undertaking not to move her relate to that,

23   or is May 12 still a possible date for her being put in

24   detention again?

25           MS. LARAKERS:  It's possible that she could be

1   re-detained on May 12.  However, pursuant to the order, she

2   won't be moved from Massachusetts.  And we have told the

3   petitioners to apply for an additional stay of removal, which

4   ICE will adjudicate prior to May 12.

5         MS. LAFAILLE:  So that has actually happened, Your

6   Honor.  She has applied for an extension of that stay, and it's

7   been granted to August 18.

8         THE COURT:  Okay.  All right.  And that, too, I'm

9   particularly happy to hear.  Part of the reason for today's

10   hearing is I've got now four cases, and they raise a number of

11   challenging, important issues.  And I'd like to decide them, to

12   the maximum extent possible, on a priority basis but

13   particularly on a well-informed basis.  And as we'll get to

14   eventually, some of the issues aren't fully briefed yet.

15         All right.  Let me clarify that again, though.  So

16   there's an extended stay of removal until a date -- August 18;

17   is that right?

18         MS. LAFAILLE:  Yes, Your Honor.

19         THE COURT:  And is there any specific undertaking not

20   to detain her again?

21         MS. LAFAILLE:  Not to my knowledge.  Of course we

22   would certainly argue any detention, when someone has a stay of

23   removal, it's not only not customary but also contrary to the

24   due process clause certainly.

25         THE COURT:  Okay.

1          MS. LARAKERS:  ICE has indicated to me that they do

2     not detain petitioners when they have stays of removal.

3          THE COURT:  Okay.  All right.  Then before we get to

4     setting the agenda and in identifying the overlapping and

5     distinct legal issues, I think it would be helpful if I receive

6     from you a brief overview of each of the four cases.  I've

7     tried to sort that out myself, but I also think it's important

8     that none of these cases which have such profound human

9     implications get lost in technicality.

10          So why don't we start with Calderon.  Please remind me

11     what this one is about and what the primary legal issues are,

12     and then I'm very anxious to hear the same from the government.

13          MS. LAFAILLE:  Certainly, Your Honor.  So Calderon, as

14     Your Honor knows, began as a petition for writ of habeas corpus

15     filed on February 5 on behalf of a single petitioner, Lilian

16     Calderon, who had been detained at the office of USCIS in

17     Johnston, Rhode Island when she and her husband appeared for

18     her I-130, essentially her marriage interview, as part of the

19     process of seeking lawful status in the United States.

20          The government released Ms. Calderon from detention on

21     February 13, and we have since amended the case into a class

22     action lawsuit filed on behalf of ten petitioners now who are

23     comprised of five U.S. citizens and five non-citizen spouses,

24     all of whom have final orders of removal and are pursuing a

25     path for lawful status that is set out in what we've described

1    in the complaint as the 2016 provisional waiver regulations,

2    which essentially create a path for someone to remain in the

3    United States while pursuing most of the process of seeking

4    lawful status through their U.S. citizen spouse.

5           There are essentially two buckets of legal claims that

6    arise in Calderon.  The first bucket is claims relating to the

7    argument that by detaining and removing people who are seeking

8    lawful status through a process prescribed by these

9    regulations, ICE is violating these regulations, and in doing

10   that is also violating the Administrative Procedure Act and

11   violating the due process interest that has been created by

12   the -- that these noncitizen petitioners and their citizen

13   spouses have in this process.

14          THE COURT:  And one of the ten named plaintiffs, am I

15   correct, is Lucimar De Souza?

16          MS. LAFAILLE:  Yes.

17          THE COURT:  And Ms. De Souza is detained now?

18          MS. LAFAILLE:  Yes.

19          THE COURT:  So her case is the one that most neatly

20   presents the issue you're discussing?

21          MS. LAFAILLE:  Well, I think all of them neatly

22   present the issue, Your Honor, in that all of them are

23   threatened with removal, in some cases very directly.  All of

24   them are in this pipeline at different stages.

25          THE COURT:  Well, if we get to it, when we get to it,

 1   one of the questions I'll have is whether -- I think I'll

 2   need -- I think there's going to be a question of whether all

 3   ten of them have standing or all five of the aliens have

 4   standing, whether the threat to them is sufficiently actual and

 5   imminent to give them standing on the detention issues.  But

 6   anyway, keep going.

 7         MS. LAFAILLE:  Sure.  So just to finish describing the

 8   legal issues, Your Honor, I would say that the first bucket are

 9   claims relating to essentially the interference with this

10   process created by the 2016 provisional waiver regulations.

11         The second bucket are arguments that, even beyond its

12   violation of the 2016 regulations, the detention of Ms. De

13   Souza and any class members who are detained without any

14   procedural protections violates the due process clause and the

15   governing statutory and regulatory provisions.

16         THE COURT:  Well, Calderon challenges detention,

17   including Ms. De Souza's detention, right?

18         MS. LAFAILLE:  Yes.

19         THE COURT:  Does it also challenge the authority of

20   the government to remove, let's say De Souza, or any of them?

21         MS. LAFAILLE:  Yes, Your Honor, it does.

22         THE COURT:  Which bucket does that fit in?

23         MS. LAFAILLE:  So the first bucket that I've described

24   is that both the detention and removal of any of these named

25   petitioners violates the regulations because the purpose of

1     these regulations, Your Honor, was to ensure that families

2     would stay together while seeking lawful status.

3          THE COURT:  Instead of having to leave the United

4     States to seek a provisional waiver, they could stay

5     essentially until it was approved, and then they would leave

6     for a short period of time, go to a consular office in their

7     home country and come back perhaps in a couple of weeks.

8          MS. LAFAILLE:  Right, exactly.  As the supporting

9     materials attached to our preliminary injunction memo describe,

10    that process for someone detained and removed at an I-130

11    interview would take about two years of seeking what would --

12    at that point they wouldn't be provisional waivers.  They would

13    be the actual waivers themselves.

14         The 2016 regulations created a provisional -- well,

15    the 2013 regulations created the process, and then the 2016

16    regulations made available to the petitioners in this case a

17    provisional waiver process which allowed families to stay

18    together while pursuing lawful status in the United States.

19         And so the arguments there are that both when it

20    separates families by detaining someone and when it separates

21    families by removing someone in the middle of that process, the

22    government violates those regulations, and in doing so it also

23    violates the APA and the due process clause.

24         THE COURT:  It violates the APA how?

25         MS. LAFAILLE:  It violates the APA in two ways, Your

1     Honor.  One, because this is an action that is so arbitrary and

2     capricious, having created this process and then cutting off

3     access to it for no good reason; and second, because

4     effectively the government has attempted to wipe out its

5     regulations without going through the notice and comment

6     period.

7             THE COURT:  Okay.  And what are Ms. De Souza's

8     personal circumstances?  Where was she arrested?  What does her

9     family consist of?

10            MS. LAFAILLE:  So she was arrested on January 30 at

11    her I-130 interview.  Her family consists of her husband and

12    their ten-year-old son who has now been without his mom for

13    three months.  And in the show cause materials that the

14    government has submitted, it's clear that the government does

15    not view or has presented nothing to indicate that Ms. De Souza

16    would pose any danger to the community.  She has no criminal

17    record whatsoever.  And the government's process for detaining

18    her was essentially running an algorithm that labeled her as a

19    flight risk because of the fact that she had an order of

20    removal and without regard for the fact that she was following

21    a process to address that order of removal and seek lawful

22    status and voluntarily appeared at a USCIS office.

23            THE COURT:  All right.  What should I know from the

24    government's perspective about Ms. Calderon's case, or the

25    Calderon cases?  There's more than one at the moment.

1          MS. LARAKERS:  The government's position is that the

2     crux of what petitioners request here is a stay of removal, an

3     injunction from being removed from the United States.  And

4     they, the petitioners, have no right to seek that stay of

5     removal in the United States because they have no due process

6     right, right under the regs, and section 1252(g) expressly

7     precludes the court from interfering in ICE's decision to

8     execute a removal order.

9          With regard to the due process violation, the First

10    Circuit and many other courts across the country have made it

11    clear that an alien who has been ordered removed has no right

12    to remain in the United States with their family.  And while it

13    is unfortunate, the law is clear on that point.

14         With regard to petitioner's claim that the government

15    is violating its own regulations, those regulations clearly

16    state that a pending or approved provisional unlawful presence

17    waiver is not a stay of removal.  Therefore just because the

18    process exists, that does not mean that they have a right to

19    remain in the United States while they pursue it.  Indeed, if

20    the petitioners were ultimately removed, they would not be

21    precluded from seeking that same unlawful presence waiver.  The

22    crux of the issue is where they get to seek it.  And here the

23    petitioners say that they have a right to seek it in the United

24    States, and the government's position is that they do not.

25         With regard to the detention of any of the alien

 1   petitioners, that detention would only be to execute their

 2   final orders of removal.  And under Zadvydas, the government

 3   has six months presumptively reasonable --

 4        THE COURT:  Here, let's pause for a moment.  One, I

 5   understand that the petitioner's argument before we get to

 6   Zadvydas is under the regulation 241.4, which is the issue I

 7   was addressing on a preliminary injunction a year ago.  Am I

 8   mistaken about that?

 9        MS. LARAKERS:  No, Your Honor.  You're correct, yes.

10        THE COURT:  So I mean, with regard to detention, the

11   regulation exists.  The question that I was dealing with in

12   Arriaga almost a year ago today, May 5 last year, was whether

13   the removal period had expired and that the government

14   eventually acknowledged that it had and then whether it

15   applied.

16        Is that an issue here?  I mean, whether the regulation

17   applied, is that an issue in Calderon?

18        MS. LARAKERS:  Yes, it is, the petitioners have raised

19   that issue.

20        THE COURT:  And I said it was -- I didn't know I was

21   going to get a series of these cases, but I said as part of the

22   colloquy -- have you looked at the transcript of what I said at

23   the end of the Arriaga hearing?  I mean, the parties settled

24   the case after I pretty clearly signaled my tentative view.

25   The merits and I think the arguments may be more refined now,

1   but I said on page 84 of docket number 26, the transcript, I

2   was prepared to rule for the tentative purposes on the

3   temporary restraining order that ICE is required to give

4   somebody in these circumstances the hearing contemplated by 8

5   CFR section 241.4 because admittedly the removal period ended.

6   The case was proceeding under section 1231(a)(6).  8 CFR

7   section 2411.4(a) says the regulation applies, and essentially

8   the procedures codified requirements of due process.  So, you

9   know, going very fast a year ago, that's where I was.  You

10  should know that and have it in mind.

11         In addition, with regard to the regulations, we've

12  begun to do some work on this, and as far as I know neither

13  party has cited the INS's explanation for the regulation when

14  it was initially published in the Federal Register.  Take a

15  look at 65 Federal Register 80281-01, 80292.  Should I say that

16  again?

17         MS. LARAKERS:  Yes, please, Your Honor.

18         THE COURT:  65 F.R. 80281-01 and 80292.  It says,

19  "This rule establishes a permanent review procedure applying to

20  aliens who are detained following expiration of the 90-day

21  removal period.  It also applies to aliens released under the

22  provisions of the final rule upon finding that they do not

23  constitute a risk of flight, a risk to the community or flight

24  risk."  Then it says goes on to other language.  "This

25  permanent review procedure governs all post-order custody

1    reviews, inclusive of aliens who are the subjects of a final

2    order of removal, deportation, exclusion, with the exception of

3    inadmissible Mariel Cubans."

4           I'm saying that so you can address it because I

5    understand that parts of the regulation talk about what happens

6    after detention and giving notice that you -- requirement to

7    give notice that you say wouldn't make any sense if somebody

8    hasn't been detained, but there's also that explanation from

9    the INS at the time.

10          If either of you want to submit anything further on

11   this regulation or, you know, the implications of what I just

12   quoted, the statement in the Federal Register, you should do

13   that by May 5, which means by 6:00 p.m.  The local rule

14   provides the day ends for filing purposes at 6:00 p.m.

15          All right.  What should I know about Dos Santos?

16          MR. POMERLEAU:  Good morning as well, Your Honor.  The

17   issues in Dos Santos --

18          THE COURT:  It might be helpful for the court

19   reporter -- she's got your names, right?

20          MR. POMERLEAU:  Attorney Todd Pomerleau on behalf

21   of --

22          THE COURT:  She knows.  Go ahead.

23          MR. POMERLEAU:  So the issue in Dos Santos is really

24   twofold.  He was engaged to be married, and his fiancé was

25   waiting to graduate from college.  He was also in the process

1    of vacating an OUI conviction which would have made him

2    eligible for DACA.  Our office was successful in vacating his

3    OUI conviction.  Around the same time, President Trump

4    announced he was ending the DACA program.  Additionally, he was

5    detained at his place of employment, in our view outside of the

6    90-day removal period.  He worked in a liquor store.  He was

7    stocking shelves.  A couple of ICE officers went in there,

8    acted like they were trying to buy a bottle of wine, and they

9    arrested him in front of co-workers and customers.

10           Since his detention, for nearly ten months, he's been

11   trying to get married to his U.S. citizen fiancé.  So one issue

12   in that case is we've moved for a preliminary injunction to

13   allow him to be married, because the issue here is he's a visa

14   overstay, and if he's able to be married, he can file an I-130

15   petition.  Those are routinely approved within six months.

16   He's already been detained nearly ten months, and he's not able

17   to even take that first step without being allowed to be

18   married.  So we believe one issue here to the core is his

19   fundamental right to be married, which is being denied day

20   after day due to his ICE detention.

21           THE COURT:  In reading the papers, you asked for a

22   preliminary injunction, but I think I would be almost compelled

23   to merge any hearing on a preliminary injunction with a trial

24   on the merits, because if I granted what you characterize as a

25   preliminary injunction and he got married, I don't think I

1 could reverse it.

2          MR. POMERLEAU:  I understand.

3          THE COURT:  So that may have some procedural

4 implications, when we get to the issue.

5          MR. POMERLEAU:  One issue, for example, if he is

6 married, he can file an I-130, and then he has two tracks that

7 he can fall under the regulatory scheme.  In 2013, the

8 provisional 601 waiver went into effect, and then in 2016 it

9 was expanded to include provisional 212 waivers, so that's one

10 option he can avail himself of.  He could apply for a 601(a)

11 waiver because his unlawful presence only was triggered upon

12 turning the age of 18.  And once he leaves the United States,

13 that so-called ten-year bar goes into effect.  That's what the

14 601(a) waiver would cure.

15          THE COURT:  It provides he doesn't have to leave the

16 United States to initiate the process?

17          MR. POMERLEAU:  Correct.  And if you look at the

18 regulatory scheme cited in the Federal Register, there's all

19 this discussion in there about promoting family unity,

20 promoting administrative efficiency, allowing for people to --

21 encouraging people to actually go to their consular interviews.

22 There's a lengthy discussion in there about who qualifies for

23 the 601(a) waiver and in 2016 why they were expanded.

24          Before he does a 610(a), he has to do what's called an

25 I-212 waiver.  That would waive the old removal order.

1          Another step would be to file a motion to reopen.  He

2    could file a 212 and motion to reopen at the same time.  If the

3    Immigration Court reopens his case, because he's a visa

4    overstay, he would be allowed to adjust status in the Boston

5    Immigration Court.  That's what he tried to do previously.  He

6    had another marriage, and about two months before his final

7    immigration hearing he was arrested for the OUI.

8          The OUI has since been vacated due to a Padilla v.

9    Kentucky violation, but the immigration judge noted in denying

10   him the adjustment of status that the sole criteria for which

11   she was denying him the adjustment was that he had a recent OUI

12   arrest and she thought that looked disfavorably upon his

13   application.  That OUI arrest is now over six years old.  There

14   is no conviction anymore.  And we believe if he was married, he

15   would be on a better footing than he was previously as far as

16   seeking adjustment.

17         So he really has two tracks.  He could go through the

18   consular to require a 601(a) waiver as well as a 212 waiver and

19   attending a consular interview, which he has no problem doing;

20   or, if his motion to reopen is allowed, he could seek

21   readjustment from the Immigration Court.  So he really has two

22   pipelines, if you will, to achieve his green card.  However,

23   he's been denied access to this process through his detention,

24   which we believe is unlawful.  We believe it violates the due

25   process clause.  And we believe that -- you know, the key issue

1   really, for ten months he had been following every process

2   available to him at South Bay, trying to get married.  At his

3   denial he was told the reason we're denying your marriage after

4   not answering several of his applications for a marriage is

5   because he's not cooperating with his own removal, which we

6   believe is unlawful in the first place.  Since his detention is

7   unlawful, we don't believe he should be cooperating with his

8   removal.

9         THE COURT:  He's not cooperating now or he didn't

10   cooperate previously?

11         MR. POMERLEAU:  Now.

12         THE COURT:  Now?  I thought -- and this is why I want

13   to get the overview.  I thought the claim was that he didn't

14   cooperate -- when was his order of removal?

15         MR. POMERLEAU:  Order of removal is from 2015, I

16   believe, Your Honor.

17         THE COURT:  2015.

18         MR. POMERLEAU:  He lost an appeal before the Board of

19   Immigration Appeals.  And he was living at the same address,

20   and ICE never went to execute the removal order.  He hired our

21   office.  We were trying to do two things for him:  vacate his

22   conviction so he could apply for DACA, which was a new form of

23   relief that wasn't available to him at the time he was placed

24   in removal proceedings and ultimately ordered removed.

25         Another interesting wrinkle in the case is just last

1   week there was another order regarding these DACA cases to

2   accept new applications.  His issue was when we vacated the

3   conviction, President Trump announced that DACA would end, so

4   he couldn't apply for DACA.  So his sole resource really was

5   through marriage.  But he was being detained and had been

6   denied access to marriage.  We believe he now would be eligible

7   to apply for DACA.  But there's a 90-day period right now --

8          THE COURT:  This is Judge Bates's decision to be

9   stayed for 90 days?

10          MR. POMERLEAU:  Correct.  Because now he could apply

11   for a new application for DACA, but we won't know until 90 days

12   are up how that litigation unfolds.

13          THE COURT:  All right.

14          MR. POMERLEAU:  So those are really the core issues

15   with his case, Your Honor.

16          THE COURT:  Am I correct you're challenging both his

17   detention and his removal?

18          MR. POMERLEAU:  That's correct.  Because his removal,

19   we believe, is unlawful in these circumstances because he's

20   being denied his opportunity to be married, which is a

21   fundamental constitutional right, which would allow him to

22   apply for I-130 and apply for the various waivers or do the

23   motion to reopen the process.

24          THE COURT:  And he's been detained since June 14,

25   2017?

```
 1              MR. POMERLEAU:  That's correct, Your Honor.

 2              THE COURT:  So am I correct there's also a Zadvydas

 3      issue?

 4              MR. POMERLEAU:  I don't think -- I guess there could

 5      be, but the government is claiming he is not cooperating with

 6      his removal because he's not signing all the documents

 7      necessary to get the travel documents for removal.

 8              THE COURT:  So is it undisputed that he's not now

 9      cooperating in the effort to remove him because he's not

10      applying for those documents?

11              MR. POMERLEAU:  I would say there's no dispute.  What

12      routinely happens, Your Honor -- and this is probably for

13      another case -- but ICE approaches him at the jail, and they

14      shove documents in front of him and ask him to sign them.  I

15      tell all my clients not to sign any document without me

16      present.  Then they leave the room and they say he failed to

17      cooperate.  Then they come back and do it again.  My client

18      speaks limited English.  He's a Brazilian native citizen, and

19      he has difficulty comprehending legal documents.

20              THE COURT:  So the main issue here is not, as I

21      perceived it, I think -- the immediate issue is not the

22      Zadvydas issue as to whether his detention is prolonged, I

23      mean, whether he's due a review of his detention because he's

24      been detained more than ten months, but you view the main issue

25      as being whether he should be allowed to be married?
```

1          MR. POMERLEAU:  Married, and then with his marriage,

2     he would be able to apply for the I-130.  And we believe the

3     other significant issue is he was detained outside of the

4     removal period when he was arrested at his place of employment.

5          THE COURT:  Why can't he be detained after the removal

6     period if there's an order of deportation?

7          MR. POMERLEAU:  We believe in the circumstances we're

8     outside the 90 days.  But even if he were able to be detained

9     within the 90 days --

10          THE COURT:  I thought -- I'm sorry.  Keep going.

11          MR. POMERLEAU:  I think it's a live issue in these

12     cases.  I think there's some ambiguity in that statute as to

13     regarding the removal period.  Because it doesn't seem -- I

14     think a fair reading of it is if you're outside of the 90-day

15     removal period, you can't arrest somebody.

16          THE COURT:  Okay.  This is very helpful because you

17     all do this all the time.  I was introduced to it a year ago

18     for about two days, and here we are again.  I thought the

19     removal period, the 90-day removal period was the period in

20     which an alien, if ordered deported, was detained, the

21     government didn't have to provide a bail hearing, except that's

22     one of the issues here.

23          MR. POMERLEAU:  Right.  I think another reading could

24     be that when you have a final order of removal, there's a

25     90-day period to go and detain a person to deport them, which

1    didn't happen in this case.

2            THE COURT:  So are there any of these other four cases

3    that raise that issue?

4            MR. POMERLEAU:  I think it's an issue in Junqueira as

5    well, if I may speak briefly about his case.

6            THE COURT:  No.  I want to hear from the government,

7    the respondents, on Dos Santos, I think.

8            MR. SADY:  Good morning, Your Honor.  My understanding

9    with regard to his client is it's not just been a recent

10   failure to comply.  It's been a failure to comply from the

11   outset.  And that is why his detention is continuing under

12   Zadvydas and the case law that has followed as this court

13   appropriately mentioned to Attorney Pomerleau is that you can't

14   save yourself from removal and detention by failing to comply.

15   As a matter of law you must comply once you have a final order

16   of removal.  And that's what's going on here, Your Honor.

17           With regard to the marriage, you don't have an

18   absolute right as an alien subject to a detention order of

19   getting married.  There are conditions.  And as

20   Mr. Pomerleau mention -- I just received his preliminary

21   injunction motion a couple of days ago -- there's national

22   detention standards which provide for marriage of aliens who

23   are detained.  However, it's discretionary.  And the

24   discretionary part of it is if there's a compelling government

25   interest not to allow the marriage to go forward, then the INS

1    can deny that, and that's what we have right here.

2         When you have an alien subject to a final order of

3    removal who refuses to comply with his removal, there is a

4    compelling government interest to deny his request to marry.

5    And that is what the denial letter stated to Mr. Dos Santos

6    when it was provided to him.  That's with regard to the

7    marriage.

8         THE COURT:  The parties seem to agree this is an issue

9    I can decide next week or soon after.  I'd have to focus in on

10   the briefing schedule and hearings, but it seems to me, A, this

11   is an issue that you need to anticipate, and, B, I was

12   concerned that there might be disputed material facts regarding

13   cooperation.  Maybe there aren't.  I didn't know whether it

14   really could be decided as a legal issue.

15        But Dos Santos in the -- well, just one second.  So De

16   Souza has been -- now I'm back to Ms. Lafaille.  De Souza has

17   been detained since when, last August?

18        MS. LAFAILLE:  Since -- you're talking about

19   petitioner Lucimar De Souza?

20        THE COURT:  Yes.

21        MS. LAFAILLE:  She has been detained since January 30.

22        THE COURT:  January 30.

23        MS. LAFAILLE:  Yes.

24        THE COURT:  Okay.  So that raises the issue of whether

25   she's entitled to an opportunity to be heard, even though she

1    hasn't been held six months.

2         MS. LAFAILLE:  Yes, Your Honor.

3         THE COURT:  And I didn't say this earlier, but

4    Zadvydas does say that detention is presumptively reasonable in

5    the first six months.  Usually when I hear presumptive, it

6    means it's a rebuttable presumption, and it suggests it would

7    be consistent with there being an opportunity to try to rebut

8    the presumption if an alien wanted to attempt that.  This is

9    not -- again, I'm just telling you what my present, very

10   tentative -- it's not even a position.  It's just a question so

11   you don't get it for the first time next Tuesday.

12        MS. LARAKERS:  I understand, Your Honor.  The

13   presumption absolutely can be rebutted.  It could be rebutted

14   in a situation where ICE was making no movement to effectuate

15   the removal of the alien.  So where ICE isn't trying to get a

16   travel document, where they're just -- where, in short, the

17   alien is just sitting in detention with no movement on their

18   case.  That could be a situation that could be presented and

19   where the presumption may be able to be rebutted.  However,

20   here we have Ms. De Souza, who has been detained for three

21   months.  ICE has applied -- she has applied for a travel

22   document.  Those steps are moving forward to remove her.  And

23   in that type of situation, the government's position would be

24   that the presumption can't be rebutted.

25        THE COURT:  All right.  But then you're back to

1    section 241.4 in any event, I think.

2        MS. LARAKERS:  Yes, Your Honor.  And with regard to

3    that, the detention statute, which all of these petitioners are

4    detained under, is 1231(a)(6), that is what governs post-order

5    detention.  That's where the authority comes from.

6        8 CFR 241, that issue has been created by petitioners

7    to say that there should be notice prior to being brought in

8    detention.  But the plain language of the statute makes it

9    clear that those regulations were written to make sure that an

10   alien isn't detained without any additional -- for a prolonged

11   period of time without any additional process.  However, they

12   must initially have been detained.  And it's the --

13       THE COURT:  Well, Ms. De Souza is detained now?

14       MS. LARAKERS:  Yes, Your Honor.  And it's the

15   government's position that after 90 days of being in detention,

16   she will receive all of the procedures available in 8 CFR 241.

17   We call those the poker regulations, is what they're generally

18   referred to as.  So the purpose of those regulations was to

19   make sure that an alien sitting in detention knows the status

20   of their removal and that if the government is having a hard

21   time obtaining documents or being able to remove them, that

22   they will receive notice that something is going on or they

23   will be able to present evidence that they should be released.

24       However, all of that, all of those procedures are

25   designed to give Zadvydas to aliens in detention, and that's

1    plain by the statute when it refers to the alien who is

2    detained, continue in detention.  It simply wouldn't make sense

3    to give petitioners a notice to run.

4              THE COURT:  Well, you ought to look at the Federal

5    Register.

6              MS. LARAKERS:  Absolutely, Your Honor.

7              THE COURT:  The INS, as it was at the time, seems to

8    have expressed a different view.  But, no.  This is helpful.

9    When will the 90 days have run on De Souza, Lucimar De Souza?

10             MS. LAFAILLE:  So Your Honor, I also want to address

11   those Zadvydas issue.  But to Your Honor's more direct

12   question, the 90 days ran yesterday, and rather than receive

13   the 30 days in advance notice of her post-order custody review

14   and have that mailed to her attorney as those regulations

15   provide, Ms. De Souza was hand-delivered with a notice of her

16   post-order custody review one week before the post-order

17   custody review, and it was not given to her attorney, so she

18   then mailed it to her attorney, who received it on Friday, a

19   notification of a custody review happening on Monday.

20             THE COURT:  Last Monday, yesterday?

21             MS. LAFAILLE:  Yesterday.  It's on or around, so she

22   has submitted these materials.  To my knowledge there's been no

23   decision that we're aware of on the custody review, but because

24   her attorney is very committed and diligent --

25             THE COURT:  That's you?

1          MS. LAFAILLE:  No.  Her immigration attorney, Your

2     Honor.  She made that work with one business day's notice and

3     submitted materials to that review.  But the requirements of

4     the regulation, even as the government acknowledges, at the

5     90-day mark were certainly not complied with.

6          THE COURT:  Let me just pause.  This could have some

7     practical significance because if she's released now, let's say

8     she's released before next Tuesday, would that moot the

9     detention issue in her case?

10          MS. LAFAILLE:  Your Honor, release of that sort does

11     not moot detention claims.  We think that's black letter law

12     under the Supreme Court's decision in Clark v. Martinez, but it

13     would certainly, I would agree, remove the urgency for this

14     court to rule on some of the detention issues that affect the

15     petitioners and class members in this case.

16          THE COURT:  In Calderon?

17          MS. LAFAILLE:  Yes.

18          THE COURT:  Why wouldn't it moot it?

19          MS. LAFAILLE:  Because as the Supreme Court states and

20     as Judge Talwani has found in one of our cases here involving a

21     petitioner released days after we filed a habeas petition, when

22     the government does not disclaim the authority to re-detain,

23     the detention issues are not mooted by voluntary release.

24     Otherwise, the government could simply moot the habeas and then

25     re-detain somebody the next day, violating the same provisions

1    of law again.

2             THE COURT:  Well, I issued you an order a while back

3    on my tentative thoughts on mootness.  It would be a question.

4    But I don't -- it would just be a question.  And what did

5    you -- sorry.  Did you want to say something about mootness?

6             MS. LARAKERS:  Just quickly on mootness, Your Honor.

7    The government's position is that release in the immigration

8    context does moot the claim because under the statutory scheme,

9    the only power the court has in an immigration context is to

10   order the release, therefore there is just simply no more

11   remedy to give.

12            MS. LAFAILLE:  In Clark v. Martinez --

13            THE COURT:  What's that?

14            MS. LAFAILLE:  Clark v. Martinez is an immigration

15   case finding non-mootness after release.  But with regards to

16   the Zadvydas issue, if I might, Your Honor, I just want to be

17   clear about the due process argument that we are advancing

18   here.  We are not claiming that Ms. De Souza's removal is not

19   reasonably foreseeable because she cannot -- the government

20   cannot secure her travel document to Brazil.  In fact, as part

21   of her stay application yesterday, she has turned over her

22   travel document to ICE.  But Zadvydas is not a blank check for

23   the government to do whatever it wants for six months.  There

24   are other reasons why detention can violate the due process

25   clause other than detention of someone for whom there's no

1   travel document.  And that's clear from Zadvydas itself.  What

2   Zadvydas affirms is that detention has to be reasonably related

3   to permissible purposes.  Those purposes are to assure

4   someone's appearance in proceedings or compliance with removal

5   or to protect the community.

6          The government has had the opportunity through the

7   motion -- through the order to show cause to present

8   justifications for Ms. De Souza's detention, and the government

9   has put forth nothing that could give this court any reason to

10  allow Ms. De Souza to be continued in detention.  Even the

11  dissenters in Zadvydas agreed that arbitrary detention would

12  violate the due process clause.  This detention has all the

13  hallmarks of arbitrariness, even without going for six

14  months --

15         THE COURT:  I think that's a -- I think that's a

16  significant issue.  I understood that was the argument, and I'm

17  interested in hearing it amplified.  Am I right that -- so you

18  have an argument based on the regulation 241.4, and then you

19  have the constitutional argument in effect.  And it seems to me

20  at the moment they're closely related because, if they're read

21  together, if the regulation applies, say, to somebody in De

22  Souza's situation, immediately, then that provides a form of

23  due process or would satisfy the requirements of due process.

24         MS. LAFAILLE:  So let me say about that, the Supreme

25  Court in Zadvydas was pretty unimpressed with that form of

1    process.  This is an administrative file review where the

2    presumption is basically in favor of detention, the noncitizen

3    bears a burden to overcome that presumption.  We certainly

4    don't believe that that is protective enough in this case.

5         THE COURT:  So what process do you say is necessary to

6    meet the constitutional requirement?

7         MS. LAFAILLE:  So what Zadvydas makes clear is that

8    when the regulations do not provide a sufficient process, the

9    habeas court can decide the legality of detention.  And I think

10   that we are here fully briefed.  The government has presented

11   its argument.  It's responded an order to show cause, it's

12   provided an affidavit.  Everything is already teed up.  And

13   this court can decide the legality of Ms. De Souza's custody by

14   deciding whether that custody serves the purposes of preventing

15   her flight and protecting the community.  If the court doesn't

16   want to do that, it could certainly also order a bond hearing

17   which would provide a process again.

18        THE COURT:  Bond hearing before whom?

19        MS. LAFAILLE:  Well, this court could certainly

20   conduct a bond hearing.  I would argue it doesn't need to

21   because the government has had the opportunity to put forth its

22   evidence in support of detention.

23        THE COURT:  Well, actually, I think there's a

24   threshold question.  I thought the issue was is Ms. De Souza

25   entitled to a bond hearing before somebody under the regulation

1    or for some other reason.  Then the next question would be

2    would it be before the Department of Homeland Security, before

3    an immigration judge or before this court.  That's an issue I

4    addressed in 2010 in Flores-Powell, 677 F. Supp. 2d 455.

5    Nobody knows these things?  You know it.  They're writing it

6    down.

7             I mean, I have had extensive discussion as to who

8    should conduct the hearing, and I conducted it in that case.

9    If we get that far, the government might want to argue somebody

10   else should conduct it.  Anyway.  So basically, I want you to

11   know what's on my mind for next week.

12            Generally speaking, the Supreme Court invoked the

13   doctrine of constitutional avoidance, as I recall, in deciding

14   Zadvydas -- however it's pronounced -- saying, you know, we'll

15   read the statute to have a reasonableness requirement.  And

16   that could influence the way the regulation should be read.  In

17   other words, you'd have a whole -- arguably there's a whole

18   unconstitutional scheme, but there's reason to believe that the

19   regulation seeks to satisfy due process.  So it should be

20   interpreted the way the petitioners argue it should be

21   interpreted.

22            I'm going to do -- my law clerk is going to do a lot

23   of work on this before next Tuesday.  In the cleanest case,

24   this is the issue you agree should be taken up first, and that

25   makes sense to me up to a point.  But if there's a material,

1    possibly material change in circumstances because Ms. De Souza

2    is let out before next Tuesday, I'd like to know it sooner

3    rather than later.

4           Do you have any idea when a determination will be made

5    as to whether Ms. De Souza is going to be released now that her

6    90 days have expired?

7           MS. LARAKERS:  I do not, Your Honor.  I am in constant

8    communication with ICE.

9           THE COURT:  I'm ordering that you file a report on

10   that on May 5, too.  Then if the issues change, you need to

11   tell me what you think the implications are because I don't

12   have to hear that on May 8, but that seemed to be the cleanest

13   case on the regulations at least, anyway.  All right.

14          MS. LAFAILLE:  Your Honor had mentioned May 5 a couple

15   of times.  I know that's a Saturday.

16          THE COURT:  I'm sorry.  I meant May 3.  Today is May

17   1?

18          MS. LAFAILLE:  Yes.

19          THE COURT:  I thought it was May 3.  All right.

20   Thursday, I want you to file it on Thursday before we -- May 3,

21   Thursday.  All right.  Well, we went back from Dos Santos to

22   Calderon.  Mr. Pomerleau, what should I know about Junqueira?

23          MR. POMERLEAU:  Yes, Your Honor.  Regarding

24   Mr. Junqueira, he too has a process, albeit a little more

25   complicated, to getting a green card because he's a re-entry

1   after removal.  He was removed in 2004 and re-entered a few

2   months later in 2005.  So he applied for an I-130, and he had

3   an interview scheduled at the Hartford USCIS office.  He

4   resides in Connecticut.  No criminal record, father of a 10 and

5   12-year-old citizen children and a U.S. citizen wife he's been

6   married to for nearly a decade.  On his I-130 application, he

7   disclosed the prior removal.  Unfortunately for him, he was

8   given some inaccurate advice from his immigration attorney

9   about the --

10          THE COURT:  Not you?

11          MR. POMERLEAU:  -- straightforwardness of the process.

12          THE COURT:  Not you?

13          MR. POMERLEAU:  Not me, no, not me.  But he's subject

14   to the so-called lifetime bar.  The lifetime bar essentially is

15   for people who have re-entered the country with an order of

16   removal after 1997 or people who have lived here with one year

17   of unlawful presence after 1997 and then left and re-entered.

18   You have to essentially leave the country and then apply for

19   the 212 waiver but after waiting ten years.

20          That said, you're still eligible to apply for an

21   I-130.  So he applies for an I-130.  He discloses on the I-130

22   that he has an old removal order.  He waits many months for a

23   interview.  He goes and gets fingerprinted as part of his I-130

24   process.  They gladly accept his filing fee.  He goes there

25   with his wife, and they don't even conduct the I-130 interview.

1     In our view, they used it as a ruse to get him to go in there

2     when they knew where he lived and knew where he worked and knew

3     where he had been for at least a year after he filed for this

4     I-130.  And he got arrested prior to even having the interview

5     in front of his wife.

6          We think that that in and of itself is unlawful

7     because there's no notice given to him that he's going to be

8     arrested.  There's no notice at all --

9          THE COURT:  What creates the obligation to give a

10    person notice that he's going to be arrested?

11         MR. POMERLEAU:  Well, I think it's as interesting

12    question, Your Honor, because you have these -- for example,

13    you go to the USCIS website, and there's all this information

14    that's supposed to be readily available for people to not even

15    use lawyers.  Here is how you apply for an I-130.  Provide

16    evidence that you have a bona fide marriage that you entered

17    into in good faith.  And you'll be fingerprinted, and you'll be

18    asked to come in to an interview.  Then he gets an interview

19    notice that says, Wear your best clothes and show up and bring

20    the documents with you.  Then he goes to the interview and gets

21    arrested before the interview is even conducted.

22         If he has his I-130 in hand, he can then utilize those

23    other processes, albeit after waiting outside the country ten

24    years.  That's a process he was willing to take and still is.

25    He still to this day has never even had his interview.  He

1  applied for an I-130 and is still sitting in jail waiting for

2  it to happen.  The interview has never been conducted in this

3  case.

4          THE COURT:  Is he challenging his removal as well as

5  his detention?

6          MR. POMERLEAU:  No.  The detention we believe is

7  unlawful in these circumstances.

8          THE COURT:  That was my understanding.  He's not

9  challenging his removal.  And how long has he been detained?

10          MR. POMERLEAU:  He's been detained now since --

11          THE COURT:  August?

12          MR. POMERLEAU:  I have the exact date here.  February

13  1, 2018.

14          THE COURT:  So again, that's less than six months and

15  probably less than 90 days?

16          MR. POMERLEAU:  That's correct.

17          THE COURT:  So this raises the detention issue of

18  whether some notice and an opportunity to be heard is required

19  before six months.

20          MR. POMERLEAU:  Correct.  And I think importantly it

21  deals with the core issue.  Numerous people that apply for

22  I-130s either need a 601(a) or they need a 212, or they have

23  prior removal or deportation orders just like him; and he goes

24  to the interview and he gets arrested before the interview is

25  conducted.  So he's attempting to regularize his status in the

1      United States by following USCIS's own procedures.

2                  THE COURT:  Well, okay.  What does the government say?

3                  MS. LARAKERS:  Well, first I'd like to say I think

4      we're getting away from the true issue in Zadvydas and what the

5      court was truly concerned with there.  They were concerned with

6      prolonged detention.  And here they were concerned with

7      prolonged detention with no likelihood of the person actually

8      being removed, which was the purpose of their detention.  And

9      here that is not an issue in any of these cases.  All detention

10     is reasonably related to effectuate removal petitions.

11                 THE COURT:  Well, if the Supreme Court decided the

12     precise issue, it would be very easy for me and for you.

13     However, I recognize this is a different issue.  As the Supreme

14     Court often, almost always does, it's made statements about in

15     this case essentially requirements of due process that applied

16     beyond the particular facts of that case.  So that's I think

17     the issue, what are the implications of Zadvydas for the

18     different factual circumstances in these cases that implicate

19     that decision.

20                 MS. LARAKERS:  Yes, Your Honor.  And so then we go

21     back to the threshold issue, which you mentioned, is whether

22     any of these petitioners have a due process right to remain in

23     the United States despite their final orders of removal.

24     That's the issue that needs deciding.

25                 THE COURT:  But it seems to me at the moment there are

1  two related issues.  One, did they have a right under the

2  regulations.  It's possible that the regulations provide more

3  for an alien than the Constitution requires.  There's a line of

4  cases, isn't there?  The government is required to follow its

5  regulations or revise them.

6       MS. LARAKERS:  Yes, Your Honor, and I'm not sure which

7  regulations we're speaking about.

8       THE COURT:  I think 241.4.

9       MS. LARAKERS:  So with regard to the poker

10 regulations, yes, the government's position is that that would

11 satisfy any due process.

12      THE COURT:  Right.

13      MS. LARAKERS:  However, with regard to the other --

14      THE COURT:  But then it's your position it doesn't

15 apply to Junqueira yet?

16      MS. LARAKERS:  It certainly would apply to Junqueira

17 at that 90-day mark as it has applied to Ms. De Souza.  That's

18 when the regulation kicks in to make sure that the agency is

19 detaining with the purpose of removal under Zadvydas.

20          And with regard to the petitioner's argument that

21 Junqueira is not challenging his order of removal, in effect he

22 is, Your Honor, because here he's asking to be released which

23 the purpose of the detention is to be removed.

24      THE COURT:  No.  But I mean, in criminal cases we

25 release all the time people pending trial because there are

1    conditions that reasonably assure they'll appear for trial and

2    they won't be dangerous.  I mean, he's married, right?

3              MS. LARAKERS:  Yes, he's married.

4              THE COURT:  So he's married.  And he's got a

5    ten-year-old son, right?

6              MS. LARAKERS:  Yes.

7              THE COURT:  And I mean, where is he going to go?  I

8    mean, these are the issues if we're conducting a bail hearing.

9    You put an electronic monitor on him.  He pays for it.  You

10   don't have to pay to keep him in jail, and you know where he is

11   when the paperwork is done.

12             MS. LARAKERS:  Yes, Your Honor.  And here, the

13   statutory scheme that Congress has set in place is to have --

14   they had their day in court in front of an immigration judge

15   where they could have challenged their removal order.  After

16   that, ICE provides several administrative processes for them to

17   remain here in the United States if they do want to seek relief

18   from that removal again.  Here, those processes are set forth

19   in the form I-246, which is an administrative stay of removal,

20   which Ms. Calderon has already received.

21             THE COURT:  Now we're on Junqueira, right?

22             MS. LARAKERS:  Yes.  However, I wanted to show that

23   the scheme, the statutory scheme and the regulatory scheme is

24   in place and it works.  And ICE can certainly take those

25   factors into account, and there certainly is a process for ICE

1    to take those factors into account.  And the government's only

2    position is that those processes are available and they are

3    adequate for all the petitioners in this case.  And there is no

4    need to say that there's a due process right, which many courts

5    have already denied that there is, to remain in the United

6    States, especially when there are these processes in place and

7    that Congress anticipated the statutory scheme this way.

8            THE COURT:  At the moment I don't understand the

9    Junqueira case, though, to raise that issue.  Junqueira is

10   challenging his detention.  This was the colloquy I had in

11   Arriaga a year ago.  I said, you know, I can decide the

12   detention issue, but if you agree to let him out, I thought I

13   had no further jurisdiction.  I may not have been right.  But

14   because I can't make decisions relating to removal, I can make

15   decisions relating to detention.  So just off the top of my

16   head, this is not an answer.  I think if ICE released Junqueira

17   the way it did De Oliveira, I think this case would be over as

18   a habeas.  Wouldn't have to deal with me anymore.

19           MS. LARAKERS:  Your Honor, De Oliveira and Junqueira

20   are two very different cases.  The reason why ICE hasn't

21   released Junqueira to this point and why his case isn't -- his

22   for -- isn't as strong.  This is not certainly precluding his

23   ability to apply for a stay and for ICE to adjudicate it.

24   However, the reason why his case isn't as strong is because he

25   is subject to that ten-year bar because he illegally

1    re-entered.  That means he must remain outside of the country

2    for ten years.  In that sort of situation, it doesn't make

3    sense like it did for ICE in De Oliveira to release him and

4    allow him to have the procedures available to the United

5    States.  Here it would make sense for ICE to remove him because

6    he has to wait those ten years anyway.  And that's the issue

7    that we're in here.

8         THE COURT:  And you heard Mr. Pomerleau say, and I

9    still don't understand what the foundation for finding it

10   unlawful was, and it would be -- unless it's some notion of

11   substantive due process that, you know, it was just unlawful to

12   arrest him while he was doing what the United States government

13   encouraged him to do, which is go in and follow the legal

14   process to try to obtain the right to stay with his wife and

15   stay with his child.

16        MS. LARAKERS:  Yes.  And I think that's the due

17   process, that argument that the detention and the removal is

18   unlawful is under the due process clause.  That's where the

19   argument is coming from.  With regard to their argument that

20   the detention is unlawful --

21        THE COURT:  No.  But I just wanted sort of a preview

22   of coming attractions.  He argues that it's unconstitutional to

23   arrest him when he went to follow the legal process to try to

24   be authorized to stay with his wife and son.

25        MS. LARAKERS:  Like in Calderon, the main argument

1    here, as I understand, is that the petitioner has a due process

2    right to remain in the United States while he completes these

3    processes.  However, the reason why his case is different from

4    Calderon and why I don't even think under their definition of

5    the class at hand he wouldn't fall under it is because he's not

6    even entitled to apply for those processes, unlike the Calderon

7    petitioners here.  That's what makes them distinct and

8    separate.  So any claim to due process Mr. Junqueira would have

9    would certainly be less than any claim that the Calderon

10   petitioners have.  And that is what makes them truly distinct

11   here.

12          THE COURT:  And what about the Pinguil case, which is

13   different?

14          MR. CORTES:  Good morning, Your Honor.  Julio

15   Cortes --

16          THE COURT:  Could you spell your name for us, please.

17          MR. CORTES:  It's Julio, Cortes, C-o-r-t-e-s, and then

18   del Olmo, d-e-l O-l-m-o.  Thank you.  It's kind of a long last

19   name, Your Honor.

20          THE COURT:  Go ahead.

21          MR. CORTES:  Your Honor, we believe that Pinguil's

22   case is more straightforward than the other cases, and that's

23   why we are in agreement with the respondents that it should be

24   perhaps decided before the other --

25          THE COURT:  It's not going to be decided before.  This

1    is not -- go ahead.  Is it fully briefed?

2           MR. CORTES:  Your Honor, we filed a traverse this

3    morning, and we believe it's fully briefed.

4           THE COURT:  I haven't even seen these.  It's not over

5    when you write it.  I've got to read it.  Anyway, keep going.

6    I'm going to order that you confer on this case.  Based on the

7    little I know, I'm somewhat baffled about why it's such a

8    contentious issue, and it may not be.  And these things go very

9    fast and the government doesn't have time sometimes to catch

10   its breath and think about what it wants to do.  Go ahead.

11          MR. CORTES:  Thank you, Your Honor.  Pinguil has been

12   detained for nine months.  And contrary to what my sister

13   indicated in the Calderon case, he has a stay of removal

14   granted by ICE, and he's still in detention.  Although -- well,

15   as my sister indicated in the Calderon case, ICE normally

16   should not detain somebody who has a stay, and he has a stay

17   granted until September 9, 2018.  And that is based on the fact

18   that he has shown that he's prima facie eligible for a U visa.

19          THE COURT:  I believe it's public, I believe it's

20   public that he previously cooperated with the U.S. government.

21          MR. CORTES:  That is correct, Your Honor.

22          THE COURT:  That is correct, so we can talk about that

23   in court?

24          MR. CORTES:  Yes, Your Honor.

25          THE COURT:  So he previously cooperated with the U.S.

1   government, and then he was deported to Ecuador.  And the

2   information I have seems to show he keeps coming back to the

3   United States because he's being persecuted or tortured in

4   Ecuador because of his known cooperation with the U.S.

5   government.  Is that right?

6          MR. CORTES:  Yes, Your Honor.  He's been persecuted or

7   he fears torture precisely because of the cooperation, his

8   cooperation with the U.S. government in prosecuting a man who

9   was involved in a vehicular homicide and fled the U.S.  And he

10  was able to help both the Milford police and ICE to find out

11  where this person was.  So now this person is making threats

12  against his life, and that's why he is claiming, Your Honor,

13  that he fears torture or persecution in his country.

14         Moreover, he has a pending U visa that he filed in

15  February, and that can take months to adjudicate, and the

16  government's position seems to be he has to remain for an

17  indefinite period of time in detention while his U visa is

18  being adjudicated, while he's withholding of removal and

19  commencing to start a claim that's been --

20         THE COURT:  Well, convention against torture claim,

21  CAT.

22         MR. CORTES:  Correct, Your Honor.

23         THE COURT:  And did the first level of immigration

24  review find that he appears to be eligible for asylum under the

25  convention against torture?

1          MR. CORTES:  Your Honor, that will be decided on May

2     21.  We had a hearing already where the immigration judge heard

3     the petitioner's testimony, and that will be decided on May 21,

4     Your Honor.

5          But even if the immigration judge decides -- whether

6     he decides that he merits CAT relief or withholding relief or

7     decides that he doesn't, he has a right to appeal that decision

8     to the BIA as well as the government has the right to appeal

9     that decision.  So as a matter of fact, he already filed a --

10    Mr. Pinguil filed two appeals of the two denials of his motions

11    for bond hearing in Immigration Court.  We filed those appeals

12    in -- sorry, Your Honor -- in December and March, and we don't

13    have a response yet.  So his case could be pending for months

14    or potentially for years.

15         THE COURT:  When was he detained?

16         MR. CORTES:  He was detained on August 8, 2017.  He's

17    coming up to the nine-month mark, Your Honor.

18         THE COURT:  All right.

19         MR. CORTES:  And we asked twice in Immigration Court

20    for a bond hearing, and the immigration judge indicated that he

21    has no jurisdiction to even hold a bond hearing where it could

22    be determined whether he needs to remain in detention because

23    of the government's security or flight risk concerns, Your

24    Honor.

25         THE COURT:  And what do you say is the basis for his

1   right to a bond hearing?

2          MR. CORTES:  Your Honor, that's the statutory question

3   that is underlying his habeas petition.  Our position is that

4   whether we are under 1226 or 1231 --

5          THE COURT:  That means pre-removal or post-removal.

6          MR. CORTES:  Yes, whether we are pre-removal or

7   post-removal, whether we're in one situation or another, he

8   clearly, because his detention has been so prolonged, he is

9   clearly entitled to either release or a bond hearing.

10         THE COURT:  So this would be the Zadvydas issue.  And

11  if you didn't look at my Flores-Powell decision, you'll want to

12  do that.  Mr. Kanwit.

13         MR. KANWIT:  Yes, Your Honor.  This is an individual

14  who, as the court has suggested it's aware, has re-entered

15  illegally three times, the last time after having been

16  convicted of illegal re-entry.  So there's every reason to

17  believe that detention is necessary to secure his presence for

18  further proceedings.  It's the government's position that the

19  Ninth Circuit got it right on the 1226 versus 1231

20  applicability for purposes of someone who has been subject to a

21  prior order of removal, clearly.

22         THE COURT:  The Ninth Circuit, in which case?

23         MR. KANWIT:  It's cited in my brief, Your Honor.

24         THE COURT:  All right.  But the Ninth Circuit treats

25  this as, what, pre-removal or post-removal?

1          MR. KANWIT:  Post-removal.  And it's clear that under

2     1231, 8 U.S.C. section 1231, the prior order of removal is

3     reinstated.  So there is a prior final order of removal.  The

4     fact that Mr. Pinguil Loja has a pending U visa application and

5     a pending withholding application doesn't change the finality

6     of that order of removal.  So we think he's under 1231.

7          Now, I'm a little confused because in the original

8     petition the petitioner argued that he was subject to 1226(a)

9     and now in the filing that was made this morning they say we

10    still think that's a better argument but we agree it can be

11    analyzed under 1231.  So I'm still reviewing it, but it

12    certainly doesn't change our position that 1231 is applicable.

13         THE COURT:  So, okay.  If 1231 is applicable, then

14    what?

15         MR. KANWIT:  Then you look at whether the 90-day

16    period has even begun.  The 1231 itself sets out what the

17    triggering events are to start that 90 days, and you have to

18    have a final order of removal.  There's a question if you have

19    a final order of removal and you're removed but you come back,

20    what starts the 90-day period again?

21         THE COURT:  Well, let's say it wasn't -- it might have

22    expired before he was removed, but let's say it didn't.  Let's

23    say it started again when he came back or even when he was

24    detained.  It's been more than 90 days.

25         MR. KANWIT:  It has, and the delay in removal is a

1    result of actions he's taken by seeking a U visa and by seeking

2    withholding of removal to Ecuador.  Absent those things, he

3    would have been removed back to Ecuador.  So it cannot be that

4    he gets released just because he's filed these actions when he

5    keeps not obeying the orders of removal and keeps coming back,

6    he claims now --

7            THE COURT:  Yeah, but -- I'm sorry.  Keep going.  This

8    is helpful.

9            MR. KANWIT:  So I would take a step back and look at

10   it a little bit more broadly, and I suspect --

11           THE COURT:  Exactly.

12           MR. KANWIT:  -- that's where the court might want me

13   to go.  That is from the government's point of view, Jennings

14   changes the landscape, Jennings v. Rodriguez, and does so in

15   important ways.

16           THE COURT:  Jennings was decided within the last year?

17           MR. KANWIT:  Yes, yes, Your Honor.

18           THE COURT:  Go ahead.

19           MR. KANWIT:  And the Jennings court basically said

20   Zadvydas was based on 1231, and the case decided in Jennings

21   was under 1226(a), but important for our discussion is the idea

22   that what Jennings said was you can't graft onto the statute

23   provisions that are not there for a bond hearing.  You can't

24   say this statute would be unconstitutional if it doesn't

25   provide for a bond hearing solely because you want to avoid a

1    constitutional issue.

2         First, according to <u>Jennings</u>, you have to find that

3    the statute is ambiguous.  Constitutional avoidance does not

4    come into play, according to <u>Jennings</u>, unless and until there's

5    ambiguity, which is very important, given the positions taken

6    by the petitioner.

7         If that's the case and we're under 1231, <u>Zadvydas</u>

8    survives <u>Jennings</u>, although I think there's some question about

9    how long, but right now it has survived, and the question is

10   the six-month presumption.  So it's been more than six months

11   for Pinguil Loja.  Clearly, under <u>Zadvydas</u>, six months isn't an

12   absolute rule.  It's a presumption that can be rebutted in

13   either direction.  The government can show that it has reasons

14   to continue detention post six months, which is exactly the

15   situation here with somebody who keeps re-entering and not

16   following orders.

17        THE COURT:  But I think -- you know, I would encourage

18   you to take even a broader focus.  And I'll decide this if I

19   need to, although I don't think -- probably not next Tuesday.

20   But now somebody in another area of the Department of Homeland

21   Security has decided that this person may have had -- this

22   person cooperated with law enforcement, helped in a homicide

23   case, this is what I'm told, and may have a very good reason

24   for continually fleeing Ecuador, which is a violent place

25   anyway, but he has a reasonable fear of being tortured because

he cooperated with the U.S. government.  So there's one branch

of the Department of Homeland Security saying it's not a final

decision.  This person should be allowed to stay in the United

States.

MR. KANWIT:  May I be heard on that, Your Honor?

THE COURT:  Yes, please.

MR. KANWIT:  I would change the characterization a

little bit.  First, I think it's a very preliminary decision.

Second, if it's a preliminary finding at all, it's that he has

on a very, very basic level set forth facts which could show

that he might be subject to torture or persecution in Ecuador.

That doesn't mean he gets to come to the United States.  He can

leave Ecuador, and there are many other countries he could go

to.

THE COURT:  No, but here we're talking about -- that's

right.  And I don't think that's an issue for a United States

district judge to decide as far as I know.  We're talking about

detention.  That's an issue that would have to go through the

immigration process, the asylum process, U visa process, which

I'm not familiar with.  The question is should he be detained

while that's occurring or whether there's some set of

reasonable conditions that would assure that if he doesn't

eventually prove to be entitled to stay in the United States,

allowed to stay in the United States, the government knows

where he is so he can be deported.

1          And, you know, I'd encourage -- you can decide

2    whatever you're going to decide, but I'm going to order that

3    you confer on this because I've already heard today in the

4    context of the other cases that ordinarily if somebody receives

5    a stay of removal, they're permitted -- they're no longer

6    detained.

7          Now, this person came back three times.  If he came

8    back three times because otherwise there was a good chance he

9    was going to get killed or at least tortured in Ecuador, it

10   might make him a more reliable person.

11         Anyway, you know, these are really intriguing issues,

12   and I haven't read Jennings, and it may qualify what I said in

13   Zadvydas.  And the Supreme Court hasn't been very consistent on

14   this.  In Booker, I don't think the guidelines were

15   particularly ambiguous.  They said they were unconstitutional

16   and then they rewrote them.  So there's a kind of ebb and flow.

17   And as far as I know, you're right.  Well, I know you're right.

18   I've written it, so I agree.  There has to be some ambiguity

19   before the doctrine of constitutional avoidance gets invoked,

20   some certainly.  They found it in Zadvydas.  It's all very

21   interesting.

22         But this is part of the reason I wanted to get the

23   overview before setting the agenda.  It's been very helpful to

24   me at least because, you know, these are profoundly human

25   issues.  And if it's necessary to decide the parties' legal

1    rights, that's what the court is here for.  But the idea that

2    there's somebody from Ecuador who helped law enforcement in the

3    United States solve a homicide, and, you know, there are

4    preliminary indications that he may be entitled to stay here, I

5    would think that the hope of staying here would give him a big

6    incentive to obey any conditions of release.  It would be

7    monumentally stupid not to.  He'll get caught.  Which raises

8    another question that I'm going to ask at the end, but do the

9    petitioners' counsel want the petitioners here for the hearing

10   next week?

11          MR. CORTES:  Yes, Your Honor.

12          THE COURT:  But this is a civil case.  I can issue an

13   order that they be brought here, but you would have to supply

14   and pay for the interpreter.  So you can let us know on May 3

15   whether you want them here.  We have interpreting equipment.

16   We can put them someplace where it wouldn't be disruptive.

17   They could sit in the jury box or something.  But you'll have

18   to bear that expense.

19          MR. CORTES:  Thank you, Your Honor.  I will talk to my

20   client about that.  Thank you.

21          THE COURT:  And that applies to all of them.  This is

22   affecting their lives in a very serious way.  So if they want

23   to observe the proceedings, I think it's appropriate to

24   facilitate that.

25          All right.  Mr. Kanwit -- and I don't know if we're

1    going to get to Mr. -- we're going to get to Mr. Pinguil next

2    week, although he does have a Zadvydas issue.  Maybe we will.

3    But you've got your positions, and they're well thought out.

4    But this is a sort of constitutional avoidance.  If there's a

5    way to agree to a resolution of the case, then the court

6    doesn't have to decide the constitutional issue.

7         So I think I'm going to order it with regard to

8    Mr. Pinguil, that you confer and report to me by 12:00 noon on

9    Friday, which will be the 4th, whether you've reached some

10   agreement that moots, that takes care of his detention and

11   think about whether there's some reasonable set of conditions

12   that are feasible that would assure that he's not going to

13   flee.  Does that sound reasonable?

14        MR. CORTES:  That's reasonable, Your Honor.

15        THE COURT:  Does he have a place to live?

16        MR. CORTES:  Yes, Your Honor.  His wife and his

17   children are waiting for him in Milford if he's released.

18        THE COURT:  In Milford?

19        MR. CORTES:  Milford, Massachusetts, yes, sir.

20        THE COURT:  So he has a home.  And we have -- could I

21   ask the probation officer to identify herself, please.

22        U.S. PROBATION:  Yes, Your Honor.  Gina Affsa with

23   U.S. Probation.

24        THE COURT:  Because I did this previously in

25   Flores-Powell, it was done before.  I don't know whether any of

1    these petitioners are going to be entitled to detention

2    hearings.  I don't know whether I'll decide whether the court

3    should conduct them and defer to immigration.  Although -- I

4    don't know.  But if I were to conduct the hearings, I'd be

5    considering, as we do in criminal cases, Mr. Kanwit is fully

6    familiar with this, is there some reasonable accommodation or

7    condition -- is there some combination of reasonable conditions

8    that would reasonably assure the person is not going to run

9    away.

10        I mean, his desire is to be with his wife and his son,

11   and he's got a prospect of staying in the United States.  So if

12   this were a criminal case, he may have a good argument for

13   getting released on electronic monitoring or something.  So

14   Ms. Affsa will participate in your discussions if the

15   government is willing to discuss possible conditions.

16   Otherwise, you each need to be developing conditions, and you

17   can contact Ms. Affsa.  She'll tell you how to do that after

18   the hearing.  Because if I'm going to conduct a hearing and,

19   you know, it would eventually get to that issue, is there some

20   combination of conditions, feasible conditions that would

21   reasonably assure this person won't be dangerous, this person

22   will appear as needed, including he'd be deported if that's

23   where it ends up.

24        MR. KANWIT:  Thank you, Your Honor.  I appreciate you

25   recognizing that I have a question about that.  I'm not

1    prejudging what my discussion with my client will be or what

2    the outcome of conferring will be, but I'm anticipating that

3    one of the pieces of information that would be important in my

4    client making a decision about whether it's willing to release

5    Mr. Pinguil on conditions is the reliability of the home that

6    has been suggested by counsel.  So what would actually be

7    helpful to the government, if the court asked probation to make

8    a home visit and inquire about that.

9              THE COURT:  Yes.  I think that's terrific.  Do you

10   think it will be feasible to look into the suitability of the

11   home in Milford before they have to report back to me on

12   Friday, or you can report on that, probation could.

13             U.S. PROBATION:  We'll do our best to get it done,

14   Your Honor.

15             THE COURT:  Friday is not a drop -- it's not

16   necessarily a final deadline, but I've got this hearing next

17   week, and if something is going to be moot, as you've seen,

18   we've got plenty of other issues to focus on.  All right.  But

19   the short answer is yes, they'll look at it.

20             MR. KANWIT:  Thank you, Your Honor.

21             THE COURT:  So you all should talk when we finish.

22   All right.  Now we need an agenda, and I'm not sure if this has

23   all become more clear or more cloudy.

24             So your proposed agenda, docket number 42, pages 7 and

25   8, you propose that the first issue would be whether De Souza

1    is lawfully detained, Ms. De Souza is lawfully detained under 8

2    U.S.C. section 1231(a)(6) and the Constitution.

3           My intention for next -- I have all day next Tuesday.

4    I'm not available, I'm not going to be in Massachusetts on

5    Wednesday and Thursday.  I have all day next Tuesday.  I want

6    to give you an ample opportunity to argue.  My goal is to

7    always decide things orally.  That may not be possible or most

8    appropriate with regard to these issues, but my intention --

9    you want to listen to this.  My intention is to focus on the

10   detention issues next Tuesday.  The other issues don't have the

11   same urgency.  And in fact, I don't think they're all fully

12   briefed.

13          So does it still make sense in the parties' view to

14   start with the questions of whether Ms. De Souza is lawfully

15   detained under section 1231(a)(6) and the Constitution?

16          MS. LAFAILLE:  Yes, Your Honor.

17          MS. LARAKERS:  Yes, that's fine with us as well, Your

18   Honor.

19          MS. LAFAILLE:  Your Honor, if I could just point out

20   one feature of this proposed agenda.  When we compiled this

21   agenda the parties all agreed that Mr. Pinguil's case could be

22   resolved before, or perhaps not resolved but heard before this

23   consolidated hearing because it was sufficiently distinct, so

24   there's no plan in this proposed agenda for dealing with

25   Mr. Pinguil's case, and I understand there's actually a

 1    scheduling conflict for Tuesday morning as well with

 2    Mr. Pinguil's counsel.

 3          THE COURT:  Well, Mr. Pinguil's case, I can deal with

 4    it separately.  A, it may be moot.  B, I can deal with it

 5    separately but not before next Tuesday.  So when you report

 6    12:00 noon on Friday -- in fact, I'm not going to deal with

 7    it -- 12:00 noon on Friday, if you haven't reached an

 8    agreement, identify the issues, identify -- do you think

 9    Pinguil is fully briefed now, as of perhaps this morning?

10          MR. KANWIT:  I would like an opportunity to respond,

11    and I would keep it -- unlike -- we often talk about briefs.  I

12    would like to keep it fairly brief, but I would like an

13    opportunity for a short sur-reply.

14          THE COURT:  All right.  And how long will that take

15    you?

16          MR. KANWIT:  I have another immigration case on before

17    Chief Judge Saris tomorrow, and I'm trying to get a final brief

18    done on that, so I probably wouldn't be able to work on Pinguil

19    until tomorrow afternoon.

20          THE COURT:  Well, maybe you won't have to work on it

21    at all.  But would a week from Friday be sufficient time for

22    you?

23          MR. KANWIT:  Absolutely.

24          THE COURT:  And actually, even better, would a week

25    from Thursday be sufficient time for you?

1           MR. KANWIT:  That would also be sufficient.

2           THE COURT:  All right.  So that's May 10, if I count

3    right.  You can file a reply if necessary by May 10, and you

4    should confer and suggest some dates for a hearing.  The

5    problem is -- well, I have a trial scheduled the week of May

6    21.  If it settles, which it may, I'll have time that week.  If

7    it doesn't settle, things are pretty crowded.  But we'll get it

8    all done.

9           All right.  So the first issue we'll take up next week

10   is whether De Souza is lawfully detained after post-removal

11   order under section 1231(a)(6) and the Constitution.

12          Then second question to be argued would be whether

13   Junqueira, Dos Santos and Ms. De Souza are entitled to the

14   benefit of the procedures in 8 CFR section 241.4.  It appeared

15   to me that perhaps these two issues boil down to the same legal

16   question, whether section 241.4 applies to decisions to detain

17   aliens who are arrested after the removal period expired; and

18   if so, how.

19          So is your A2 -- how is your A2 distinct from A1, or

20   do they overlap?

21          MS. LARAKERS:  The government's position is that

22   they're distinct because even if this court were to find that

23   there was a violation of 241.4, the poker regs, the remedy

24   would only be a new poker reg, new notice, new procedures.  It

25   wouldn't mean that their detention is any less lawful.  So the

1   detention authority found in (a)(6) is distinct and separate

2   from the procedures they receive during detention, which is

3   241.4.

4        MS. LAFAILLE:  And Your Honor, I would agree.

5   Question two is a narrower and more specific question.

6   Question one involves the arguments I was making earlier about

7   whether Ms. De Souza's detention is reasonably related to its

8   purposes.  And that is both a constitutional question, and to

9   the extent that the canon of constitutional avoidance applies,

10  which Jennings has indicated that this provision is different

11  than the mandatory detention provisions it was interpreting, it

12  can be a statutory question as well, but that's the question in

13  part one.

14       THE COURT:  All right.  So we'll go with your one and

15  two.  I don't intend next week, next Tuesday -- well, next

16  week, to take up your B, the common issues presented in

17  Junqueira and Dos Santos regarding whether 8 USC section 1252

18  precludes the court from staying removal of them.  I think that

19  may not be fully briefed yet.  Is there another brief coming in

20  on May 3, or I confused about that?

21       MS. LARAKERS:  We had a briefing schedule set up in

22  Junqueira to respond to our motion to dismiss, and they, with

23  leave of this court, filed a response to that motion to dismiss

24  on Monday -- or Sunday -- sorry, yesterday and Sunday.  So our

25  position is that it is fully briefed and ready to go.

1          THE COURT:  I think it may not be briefed in Calderon.

2          MS. LARAKERS:  No.  Your Honor, not in Calderon, but

3     it is in Junqueira.

4          THE COURT:  I'd rather have everything you want to

5     tell me on an issue before I decide it in one case and then

6     have to deal with it again in another case.

7          MS. LARAKERS:  Sure.

8          THE COURT:  Then C, a hearing on the unique issues in

9     Junqueira.  Remind me what the unique issues in Junqueira are.

10         MS. LARAKERS:  What's unique about Junqueira's case is

11    really how distinct it is from Calderon.  So his due process

12    question is different, and that's why we propose that that

13    issue be heard first.  Whether he has a due process right to

14    remain in the United States should be heard first because it is

15    so different from the Calderon petitioner is the same claim

16    because the facts are so entirely different.

17         THE COURT:  Remind me which one is Junqueira.  I think

18    I know, but I'm not confident.

19         MS. LARAKERS:  He was ordered removed and then came,

20    illegally re-entered, so he came back, so he would be unable to

21    avail himself of the unlawful presence waiver, et cetera.

22    That's the Calderon petitioner's claim is part of their due

23    process right.

24         THE COURT:  And would I be dealing with this issue in

25    Calderon next Tuesday?

1          MS. LARAKERS:  No, Your Honor.  The due process issue

2     in Calderon is not fully briefed.  However, we thought still

3     that the due process issue in Junqueira could be heard on

4     Tuesday because it's just so different.

5          THE COURT:  I think I'm going to take up Junqueira and

6     Calderon together when Calderon is briefed.  I think the

7     contrast may help me understand the argument.  And then the

8     hearing on the unique issues in Dos Santos.  The unique issues

9     are what?

10          MR. SADY:  Your Honor, I think the unique issue here

11    is the effect of the denial of Mr. Dos Santos's marriage

12    request.  I think that's the only unique issue in this case.

13          MR. POMERLEAU:  I would agree, Your Honor.

14          THE COURT:  So that's not a detention issue, is it?

15          MR. POMERLEAU:  No.  Well, it is not.

16          THE COURT:  All right.

17          MR. POMERLEAU:  It does arguably deal with detention,

18    because but for being able to apply for the I-130, he can't

19    avail himself of that process and additional waivers, which is

20    similar in Calderon and the other companion cases.

21          THE COURT:  Well, you can prepare to argue it, but I

22    at the moment don't anticipate that I'm going to hear that

23    argument.

24          MR. POMERLEAU:  All right.  Thank you.

25          THE COURT:  I may give you some further guidance on

1    Monday.

2           MR. POMERLEAU:  Appreciate it.  Thanks.

3           THE COURT:  Mr. Pomerleau, let me ask you some

4    questions about Dos Santos.

5           MR. POMERLEAU:  Yes, Your Honor.

6           THE COURT:  And this goes back to something we talked

7    about some time ago.  Do you agree -- you told me earlier that

8    it's undisputed that Mr. Dos Santos is not cooperating with

9    removal now.  Do you agree with the government's contention

10   that the removal period hasn't expired because of his failure

11   to cooperate under section 1231(a)(1)(C)?

12          MR. POMERLEAU:  Not necessarily.  Because I think like

13   sister counsel indicated earlier, with the Zadvydas case there

14   are different -- there's distinctions in that case for the

15   various purposes of detention.  What's really at issue with Dos

16   Santos is by not allowing him to be married, it's denying him

17   the opportunity to avail himself of the regulatory scheme to

18   get a green card.  And the government's position is that he's

19   not cooperating solely because he's not signing off for a

20   travel document, but then if he signs off on the travel

21   document, they'll let him get married.  There's no assurance

22   that that would actually occur because they could put him on a

23   plane with a travel document, and then he'd be in Brazil and

24   he'd have to get married, and it could be three or four years

25   to get back to the United States, whereas the other process

1    could take him a year and a half start to finish.

2         I mean, the other issues I think that were discussed

3    by Ms. Lafaille dealing with Zadvydas, I think the case does

4    have more aspects of it than most people realize.

5         THE COURT:  Well, I intended in that question to make

6    a distinction between the regulations that require some

7    discussion in Zadvydas and just a straight Zadvydas issue that

8    this is unreasonably long.  So I think I don't understand your

9    response.  Is it your position that the 90-day removal period

10   has expired, or do you agree with the government that it has

11   not expired?

12        MR. POMERLEAU:  Our contention is that it expired in

13   February of -- excuse me -- May of 2015 when the BIA decision

14   became final.  He wasn't detained for 37 months thereafter.

15        THE COURT:  I'm sorry.  It's the government's position

16   that it hasn't expired, and it's your position that it has?

17        MR. POMERLEAU:  That it expired, yes, in May of 2014,

18   would be our position.

19        THE COURT:  Am I going to -- is there going to be a

20   dispute?  You say it's undisputed he's not cooperating now,

21   he's not applying for travel documents.  Am I going to have --

22   is there a dispute on which evidence might have to be taken as

23   to whether he cooperated previously?

24        MR. SADY:  I don't think so, Your Honor.  I mean, I

25   think it's rather clear that --

1         MR. POMERLEAU:  This is the only time he was detained.

2    He was originally out on bond before the Immigration Court.

3    That process took four years, a little over four years before

4    he had a final decision from the Board of Immigration Appeals.

5         THE COURT:  So you're telling me this, but are you

6    able to stipulate to these facts that you're now explaining to

7    me?

8         MR. POMERLEAU:  We could have that discussion.

9         THE COURT:  So the record will be clear.

10        MR. SADY:  Certainly we could definitely have the

11   discussion.

12        THE COURT:  Why don't you talk about whether you can

13   stipulate to these facts that relate to whether he was

14   cooperative and when.  I'll give you until May 3 to give me a

15   stipulation you can reach.  Okay?

16        MR. SADY:  Yes, Your Honor.

17        MR. POMERLEAU:  Yes, Your Honor.  Thank you.

18        THE COURT:  All right.  Then I'm going to have to look

19   at the briefing schedule.  Is the preliminary injunction,

20   Calderon's preliminary injunction fully briefed yet?

21        MS. LAFAILLE:  No, Your Honor.  It was just filed

22   around midnight last night.

23        THE COURT:  That's what you filed last night?

24        MS. LAFAILLE:  Yes.

25        THE COURT:  And I haven't looked at that.  In that

1   motion do you say what procedures the Fifth Amendment requires

2   if section 2414 is not sufficient?

3           MS. LAFAILLE:  Yes, Your Honor.  There is a -- our

4   contention of course is that the petitioners are receiving no

5   procedures, and there is a remedy section discussing the

6   proposed remedy.

7           MS. LARAKERS:  Your Honor, the government thinks that

8   this would be cleared up after the motion to dismiss is

9   decided.  I think we can really narrow the issues addressed in

10  the PI after a motion to dismiss is litigated.  Therefore, we

11  would ask that the PI and class cert be held in abeyance until

12  we can sufficiently narrow those issues.  The government has

13  had a motion to dismiss on file.  They've known our position

14  for over a month now.

15          THE COURT:  So actually, this I guess is getting into

16  the last thing on my -- before I move on, is there going to be

17  a need to take evidence, possible need to take evidence on any

18  of these issues next Tuesday?

19          MS. LARAKERS:  No, Your Honor.

20          MS. LAFAILLE:  I don't believe so, Your Honor.

21          THE COURT:  All right.  Okay.  So the respondents have

22  filed a motion to dismiss Calderon.  The opposition is due May

23  14, and I think there's a reply May 21, right?

24          MS. LARAKERS:  Yes, Your Honor.

25          THE COURT:  So that can't be dealt with soon.  And

1   then your proposal is -- the motion for preliminary injunction

2   wouldn't be completely briefed until May 31 in any event.

3          Ms. Lafaille, do you agree that -- ordinarily I would

4   decide a motion to dismiss in connection with hearing a motion

5   for preliminary injunction, because if the case is going to be

6   dismissed, there's no reasonable likelihood of success on the

7   merits, which is the sine qua non of preliminary injunctive

8   relief.  Does it make sense to take them up in tandem or

9   address the motion to dismiss first?

10          MS. LAFAILLE:  Well, we have proposed that those

11   motions are heard together along with our motion for class

12   certification, which we also filed yesterday.  And one of our

13   concerns, Your Honor, is Your Honor has taken some steps and

14   the government has in part agreed that our named petitioners

15   are not at risk of removal during the pendency of this case,

16   but we have named class members out there.  We have a couple in

17   detention that we are aware of.  And my understanding is that

18   some of these individuals detained at their I-130 interviews

19   who fall into our putative class are at risk of imminent

20   removal.  So to the extent that the government proposes to

21   defer argument on preliminary injunctive relief, we also filed

22   a TRO.

23          THE COURT:  You filed a TRO?

24          MS. LAFAILLE:  Yes.  It's a motion for temporary

25   restraining order and --

```
 1              THE COURT:  Well, I know what a TRO is.  I didn't have
 2   that on my radar screen.  When did you file the motion for a
 3   TRO?
 4              MS. LAFAILLE:  It's one motion, Your Honor.
 5              THE COURT:  Preliminary injunction and temporary
 6   restraining order?
 7              MS. LAFAILLE:  Yes.
 8              THE COURT:  But you agreed to a briefing schedule that
 9   doesn't have the matters briefed until May 31.
10              MS. LAFAILLE:  Well, yes.  The briefing schedule we
11   envisioned was relating to the request for preliminary
12   injunction.  Since then we've become aware in the past few days
13   of the risks that some of our class members are facing, and in
14   light of the government's request especially, certainly if --
15              THE COURT:  Did you confer with the government about
16   filing a motion for a TRO as opposed to a motion for a
17   preliminary injunction?
18              MS. LARAKERS:  I think your email said PI/TRO that you
19   were going to file.
20              THE COURT:  Well, emails -- this is insufficient.
21   You've got Local Rule 7.1.  This is not the only case I have,
22   and it's not the only substantial case that I have.  I still
23   don't know what you're proposing.  What are you proposing?
24              MS. LAFAILLE:  Well, certainly, Your Honor, if the
25   government agrees not to remove our class members, putative
```

1   class members --

2           THE COURT:  Do you have the names of all of your

3   putative class members?

4           MS. LAFAILLE:  No, I do not.

5           THE COURT:  This is just a question, obviously, but I

6   don't know how we'd even identify who is in the class.

7           MS. LARAKERS:  Exactly, Your Honor, and I can tell you

8   that would take ICE some time to run through their records and

9   identify those class members.  And essentially what they're

10  asking for is us to agree with their PI.  We simply can't do

11  that.  However, I really -- we really do think that hearing the

12  issues laid out in the motion to dismiss will make everything a

13  lot more clear moving forward, especially in the PI.  And

14  again, my arguments have not changed since -- have not changed

15  substantially or even at all since I filed the first motion to

16  dismiss when this was just a single habeas action and not a

17  class.  So we think it's fair that petitioners respond and give

18  us an idea of what their arguments are going to be moving

19  forward.

20          THE COURT:  Yeah.  And I think on this schedule, the

21  motion to dismiss is not completely briefed until May 21 on a

22  schedule you've agreed to and I've adopted.  And I don't think

23  I fully understand, you know, the issues that are being raised.

24  But, you know, if there are unidentified people who, as I said,

25  my authority -- is it your concern that these people in your

1   putative class are going to be detained or that they're going

2   to be deported?

3         MS. LAFAILLE:  So both, Your Honor.  There are -- and

4   I also want to apologize to the court for perhaps the

5   consequences of this tension we're facing between wanting all

6   of the issues to be fully briefed and to have time to brief

7   them adequately and the reality of knowing that the people who

8   we brought this case to protect will begin to face some of

9   those consequences that we're trying to prevent while we

10  litigate this case.  But specifically I am aware of, for

11  example, two detained individuals who I understand from their

12  immigration counsel are at risk of imminent removal.  And I

13  assume there --

14        THE COURT:  But isn't there a substantial question

15  about the authority in this court to essentially enjoin a

16  removal?

17        MS. LAFAILLE:  Your Honor, it's certainly the normal

18  breakdown of things that the -- petitions for review of final

19  orders of removal of course go to the Courts of Appeals, and

20  this court ordinarily hears issues relating to detention.  Now,

21  there are some issues that cannot be raised in petitions for

22  review and for which the jurisdictional bars that have

23  channelled many questions of review to the Courts of Appeals do

24  not apply, and if they did apply would violate the suspension

25  clause.

1          Judge Saris, for example, has a case in which she has

2    enjoined the removal of Indonesian Christians not permanently

3    but in order to allow them to take advantage of the motion to

4    reopen process.  This is similar in that we're not asking the

5    court to finally decide removal but only to protect the ability

6    of the petitioners here to avail themselves of this process,

7    and that's a claim that cannot be brought on petition for

8    review or in any other judicial forum.

9          THE COURT:  And is that raised in the motion for

10   preliminary injunction you filed this morning sometime after

11   6:00 last night?

12         MS. LAFAILLE:  Yes, it is.

13         MS. LARAKERS:  The suspension clause issue?  Because

14   the suspension clause is not mentioned in their complaint,

15   therefore that hasn't been addressed.  However, Your Honor,

16   what I'm hearing here is that we can at least hear the part of

17   the motion to dismiss that deals with this court's jurisdiction

18   regarding 1252, and perhaps then we can move on to the

19   preliminary injunction.

20         The government would just like to narrow these issues

21   as much as possible and as much as would speed this court.

22         THE COURT:  I think all I can do now is -- I'm

23   adopting your briefing schedule, and that's what I have in

24   front of me.  And this is not ready for a hearing when you file

25   your briefs because my goal is to decide these matters orally

1    to at least study them beforehand.  So if something is not

2    briefed until May 21 or May 31, you're not going to get a

3    hearing the next day, probably.  You know, if you want to file

4    some different motion for more urgent relief, Local Rule 7.1

5    requires that you confer on it, and you can file it, and I'll

6    deal with it.

7          You know, you have come back -- I used the word

8    before.  You've commendably agreed on a lot of things, and in

9    some cases, like dismissal cases, it's led to people being

10   released from detention.  You can't agree on everything.  But

11   the process is not futile.

12         So I'll continue to take these cases, try to give

13   these cases priorities because they raise issues of someone's

14   liberty.  However, they raise complex issues, and they're not

15   the only cases I have that have some urgency to them either.

16   So I'm ordering that you order the transcript of this hearing

17   on an expedited basis.  It's very helpful to me, but I think it

18   may be helpful to you to consider in advance of next Tuesday.

19         Are there other things we should discuss that should

20   have been on the agenda?

21         MS. LAFAILLE:  Your Honor, this is not another thing.

22   I apologize for returning to a discussion that I think Your

23   Honor intended to close, but with regard to our two detained

24   class members --

25         THE COURT:  The two detained class members are?

1          MS. LAFAILLE:  Their names?  I don't have their names

2     in front of me.

3          THE COURT:  I just want to make sure I know who you're

4     talking about.

5          MS. LAFAILLE:  Yes.

6          THE COURT:  De Souza?

7          MS. LAFAILLE:  No.  I'm sorry.  I'm not referring to

8     our named petitioners.  I'm referring to members of our

9     putative class who are detained.  My understanding is that we

10    may have to advise them to proceed as individuals and bring

11    habeas cases.

12         THE COURT:  That's exactly what was occurring to me,

13    bring their own case.  And if they raise -- if they're one of

14    the same parties and raise related issues, I'll have two more

15    cases.

16         MS. LAFAILLE:  That's what I was trying to avoid, Your

17    Honor.

18         THE COURT:  No.  Actually, if there are some people --

19    I have a question.  The question is not an answer.  I have a

20    question as to whether people who are not in detention and

21    haven't been singled out as targets for detention would have

22    standing as class members.  You know, I have to decide actual

23    cases and controversies.  And it's a question, but it's a

24    serious question.  You'll make judgments in consultation with

25    your clients or potential clients, but they may need to file --

1    you know, you might find it's prudent that they file their own

2    cases.

3          And as we've seen today, cases that raise common

4    issues can have very different facts, and that can affect

5    whether the respondents will agree to a release, and it affects

6    the arguments that they make.  So even if there is standing,

7    there would be a question, do common issues predominate, or are

8    the facts so distinct that this couldn't be certified as a

9    class.

10         MS. LARAKERS:  Your Honor, I did have one just

11   additional clarification.  The briefing scheduling in here on

12   the PI and the class cert, that wasn't agreed to by respondents

13   because our request is that this court hold that in abeyance.

14   We also recognize that this court may not want to hear all of

15   the issues presented in the motion to dismiss.  However, to the

16   extent that we can even just limit it to the purely

17   jurisdictional issues about 1252(g) and (b)(9) and the standing

18   issues Your Honor raised, even that I think could be helpful

19   moving forward.

20         THE COURT:  Well, confer on that.  But when will the

21   motion to dismiss be briefed?  May 21st did I say?

22         MS. LAFAILLE:  Yes, Your Honor.

23         THE COURT:  I mean on the proposed schedule.

24         MS. LARAKERS:  Yes, May 21 our reply would be due, so

25   yes.

```
 1              THE COURT:  Confer.  And if you can identify issues
 2      that should be prioritized, if I decide this for the government
 3      it disposes of all the others, that would be helpful.
 4              MS. LARAKERS:  Yes, Your Honor, we can do that.
 5              THE COURT:  When do you want to do that by?
 6              MS. LARAKERS:  Since we're not hearing the motion to
 7      dismiss, if we could have -- we can do it the same day that we
 8      do the -- the 4th.  Yeah, we could do it the 4th, Your Honor.
 9              THE COURT:  May 4?
10              MS. LARAKERS:  May 4.
11              THE COURT:  That's Friday.
12              MS. LARAKERS:  Yes.  Well, the government can at least
13      identify issues --
14              THE COURT:  You have to confer with each other and try
15      to agree.  Talk about everything you need to talk about that's
16      emerged from this hearing.  If they're going to file new cases,
17      when are you going to file them by, things like that.
18              MS. LARAKERS:  We can confer.
19              THE COURT:  Anything further for today?
20              MS. LARAKERS:  No, Your Honor.
21              MS. LAFAILLE:  No, Your Honor.
22              THE COURT:  Court is in recess.
23              (Adjourned, 12:41 p.m.)
24
25
```

CERTIFICATE OF OFFICIAL REPORTER

I, Kelly Mortellite, Registered Merit Reporter
and Certified Realtime Reporter, in and for the United States
District Court for the District of Massachusetts, do hereby
certify that pursuant to Section 753, Title 28, United States
Code that the foregoing is a true and correct transcript of the
stenographically reported proceedings held in the
above-entitled matter and that the transcript page format is in
conformance with the regulations of the Judicial Conference of
the United States.

Dated this 3rd day of May, 2018.


/s/ Kelly Mortellite

_____

Kelly Mortellite, RMR, CRR

Official Court Reporter