```
 1                  UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS
 2
     --------------------------------
 3   LILIAN PAHOLA CALDERON JIMENEZ,  )
                         Petitioner,  )
 4                                    )  Civil Action
     vs.                              )  No. 18-10225-MLW
 5                                    )
     KIRSTJEN M. NIELSEN,             )
 6   Secretary of Homeland Security,  )
     CHRISTOPHER CRONEN,              )
 7   Immigration and Customs          )
     Enforcement, Boston Field Office )
 8   Director, YOLANDA SMITH,         )
     Superintendent of Suffolk County )
 9   Correctional Facility,           )
     STEVEN W. TOMPKINS,              )
10   Sheriff of Suffolk County,       )
                         Respondents. )
11   --------------------------------
                                      )
12   EDUARDO RALPH JUNQUEIRA,         )
                         Petitioner,  )  Civil Action
13                                    )  No. 18-10307-MLW
     vs.                              )
14                                    )
     STEVE SOUZA, Superintendent of   )
15   Bristol County House of          )
     Corrections, THOMAS M. HODGSON,  )
16   Sheriff of Bristol County,       )
                         Respondents. )
17   --------------------------------
                                      )
18   EDJANN HENRIQUE DOS SANTOS,      )
                         Petitioner,  )  Civil Action
19                                    )  No. 18-10310-MLW
     vs.                              )
20                                    )
     KIRSTJEN M. NIELSEN, Secretary   )
21   of Homeland Security,            )
     CHRISTOPHER CRONEN, Immigration  )
22   and Customs Enforcement, Boston  )
     Field Office Director,           )
23   YOLANDA SMITH, Superintendent of )
     Suffolk County House of          )
24   Correction, STEVEN W. TOMPKINS,  )
     Sheriff of Suffolk County,       )
25                         Respondents. )
     --------------------------------
```

```
1    --------------------------------
                                     )
2    MANUEL JESUS PINGUIL LOJA,       )
                     Petitioner,      )   Civil Action
3                                     )   No. 18-10579-MLW
     vs.                             )
4                                     )
     STEVEN SOUZA, Superintendent of  )
5    Bristol County Jail and House of )
     Corrections, THOMAS M. HODGSON,  )
6    Sheriff of Bristol County,       )
                     Respondents.     )
7    --------------------------------
```

                    BEFORE THE HONORABLE MARK L. WOLF
                      UNITED STATES DISTRICT JUDGE


                              HEARING


                           May 8, 2018



                John J. Moakley United States Courthouse
                          Courtroom No. 10
                          One Courthouse Way
                     Boston, Massachusetts  02210



                    Kelly Mortellite, RMR, CRR
                       Official Court Reporter
                John J. Moakley United States Courthouse
                     One Courthouse Way, Room 5200
                     Boston, Massachusetts  02210
                         mortellite@gmail.com

```
 1    APPEARANCES:

 2    Counsel on behalf of Petitioners Calderon and Pinguil:
      Adriana Lafaille
 3    American Civil Liberties Union
      211 Congress Street
 4    Boston, MA 02110
      617-482-3170
 5    alafaille@aclum.org

 6    Counsel on behalf of Petitioner Calderon:
      Jonathan A. Cox and Colleen McCullough
 7    Wilmer Hale LLP
      60 State Street
 8    Boston, MA 02109
      617-526-6212
 9    jonathan.cox@wilmerhale.com

10    Counsel on behalf of Petitioners Junqueira and Dos Santos:
      Todd C. Pomerleau
11    Rubin Pomerleau PC
      One Center Plaza
12    Suite 230
      Boston, MA 02108
13    617-367-0077
      tcp@rubinpom.com
14
      Stephanie E.Y. Marzouk
15    Marzouk Law LLC
      31 Union Square
16    Somerville, MA 02143
      651-341-0971
17    sym@marzouklaw.com

18    Counsel on behalf of Respondents:
      Eve A. Piemonte and Michael P. Sady
19    United States Attorney's Office
      1 Courthouse Way
20    John Joseph Moakley Federal Courthouse
      Boston, MA 02210
21    617-748-3271
      eve.piemonte@usdoj.gov
22
      Mary Larakers
23    U.S. Department of Justice, Office of Immigration Litigation
      District Court Section
24    P.O. Box 868
      Washington, DC 20044
25    202-353-4419
      mary.larakers@usdoj.gov
```

P R O C E E D I N G S

THE COURT:  Good morning.  Would counsel please identify themselves for the court and for the record; and if their clients are here, please say so.

MS. LAFAILLE:  Good morning, Your Honor.  Adriana Lafaille here for the Calderon --

THE INTERPRETER:  Sorry, Your Honor.  The interpreter can't hear.

THE COURT:  I'll ask her to keep her voice up, but if the interpretation is going to be a problem, we'll just cease it.  Go ahead.

MS. LAFAILLE:  Good morning, Your Honor.  Adriana Lafaille here for the Calderon petitioners.

MR. COX:  Jonathan Cox here for the Calderon petitioners, including Lucimar De Souza, who is present in the courtroom.

MS. McCULLOUGH:  Colleen McCullough here for the Calderon petitioners.

MS. LARAKERS:  Mary Larakers on behalf of the United States.  Good morning, Your Honor.

MS. PIEMONTE:  Good morning, Your Honor.  Eve Piemonte for the respondents.

MR. SADY:  Your Honor, Michael Sady for the respondents.

THE COURT:  Mr. Sady, are you in all of the cases, or

1   which one?

2          MR. SADY:  Just one, Your Honor.  Dos Santos.

3          THE COURT:  And Ms. Piemonte?

4          MS. PIEMONTE:  Calderon, Your Honor.

5          THE COURT:  All right.

6          MS. LARAKERS:  And Your Honor, I'm counsel of record

7   for the Junqueira and Calderon case but not for Dos Santos.

8          THE COURT:  Okay.  That's Mr. Sady?

9          MS. LARAKERS:  Yes, Your Honor.

10         THE COURT:  Okay.

11         MR. POMERLEAU:  Good morning as well, Your Honor.

12  Todd Pomerleau.  I'm here today on behalf of two petitioners:

13  Edjann Dos Santos, who is present in yellow seated in the jury

14  box, as well as Eduardo Junqueira, who is seated in white in

15  the jury box.  I have co-counsel as well.

16         MS. MARZOUK:  Stephanie Marzouk on behalf of Mr. Dos

17  Santos and Mr. Junqueira.

18         THE COURT:  Thank you.  The petitioners who have been

19  named are here.  Their liberty is at stake.  In my view, this

20  therefore has some features that are comparable in the criminal

21  case.  I believe it's in the interests of the administration of

22  justice that they be permitted to observe the proceedings that

23  affect their liberty, but I haven't had the court reporter --

24  the interpreter sworn because she actually is not a court

25  reporter [sic] for these purposes.  She's privately retained.

1    And if I understand correctly, it's only De Souza who needs

2    interpretation.

3           On my agenda for today, I'll ask you if it's accurate

4    and complete, are the following.  The primary purpose of

5    today's hearing is to address the detention issues regarding De

6    Souza and Junqueira.  There are other issues in those cases,

7    but they're not yet fully briefed.  Is that correct as far as

8    it goes?

9           MR. COX:  Yes, Your Honor.

10          MS. LARAKERS:  Yes, Your Honor.

11          THE COURT:  Okay.  Then on Friday, May 4, I was

12   compelled to issue an order concerning whether I should

13   institute civil or criminal contempt proceedings against

14   Mr. Pomerleau for failing to make the required filing in Dos

15   Santos on May 3, 2018.  He's responded to that, and I expect to

16   address that relatively briefly later today.

17          I also have in Dos Santos respondents' assented-to

18   motion for an extension to reply to the preliminary injunction

19   that was filed yesterday, and it's my intention to allow it,

20   and I am.

21          Then last Friday, May 4, Dos Santos filed a motion for

22   meeting to permit marriage, essentially requesting that I find

23   that he's entitled to be married and allow that to occur here

24   in the courthouse or the courtroom today.

25          That motion raises the same issues as the motion for a

1    preliminary injunction, which is not yet briefed.  And as I

2    said last week, it really would be in the nature of a permanent

3    injunction, so it's my present intention to deny this motion

4    without prejudice and to take it up if and when it's fully

5    briefed.  Does anybody want to be heard on that?

6            MR. POMERLEAU:  Just very briefly, if I could, Your

7    Honor.  In conference in this matter with my brother, Attorney

8    Sady, on Friday, it's my understanding after him speaking to

9    ICE they're no longer going to object to Mr. Dos Santos being

10   married.

11           THE COURT:  That's fine.  If this matter becomes moot,

12   you'll tell me, and there will be one less thing for me to do.

13           MR. POMERLEAU:  Right.  And it's my understanding as

14   well that he wouldn't object to a marriage taking place at the

15   courthouse sometime in the foreseeable future if Your Honor

16   were going to permit that.

17           THE COURT:  I'll cross that bridge if I come to it,

18   but --

19           MR. POMERLEAU:  Thank you.

20           THE COURT:  You asked for more time, and I gave it to

21   you.  I really, given all the other issues, I don't think it's

22   profitable to spend any time on matters that may become moot.

23   So this motion for meeting to permit marriage today is denied

24   without prejudice.  But I assume that on or before May 17, the

25   date to which I extended the response to preliminary

1   injunction, I'll either get a response to the motion for a

2   preliminary injunction or a statement that the parties have

3   agreed, reached an agreement to resolve the case.  Okay?

4          MR. SADY:  Yes, Your Honor, that's correct.

5          THE COURT:  Thank you.

6          All right.  Here you go, Christine.

7          All right.  Then in Calderon, yesterday I received an

8   amended joint statement, docket number 63, which informs me

9   that the parties have conferred and agree that the respondents'

10  motion to dismiss and the petitioners' motion for a preliminary

11  injunction are intertwined and should be argued together and

12  argued first at a hearing; and after that is decided, if the

13  case isn't dismissed, there should be a hearing on the issues

14  of class-wide injunctive relief and class certification.  Is

15  that the parties' agreement?

16         MS. LARAKERS:  Yes, Your Honor.

17         MR. COX:  Yes, Your Honor.

18         THE COURT:  Well, that makes sense to me, and the

19  briefing schedule is acceptable, so I'm adopting it.  But you

20  proposed certain dates for the hearings between June 6 and 12

21  and June 18 and 20, and I'm going to have to wait to determine

22  whether I'm available then.  I have a -- but once I get the

23  briefing and my schedule clarifies, I will try to accommodate

24  those dates, but I can't assure you that will be done.

25         So on the amended joint report, I've written, "The

1    proposed briefing schedule is hereby adopted.  Hearing date or

2    dates will be set after briefing is complete."  Here you go.

3            All right.  Then counsel for the government is not

4    present in Pinguil nor is Pinguil's counsel, but I'll say for

5    the record it's my understanding that the parties didn't reach

6    an agreement to resolve the detention issue in Pinguil, and I

7    will schedule a hearing and any needed additional briefing.

8            With regard to De Souza and Junqueira, as I understand

9    it, the only individual issue regarding De Souza is the

10   detention issue I'll be addressing today.  De Souza is also

11   part of the Calderon class regarding the preliminary injunction

12   sought to prohibit detention and removal while petitioners and

13   perhaps a class of petitioners pursue provisional waivers.  Am

14   I right in that understanding?

15           MR. COX:  Yes, Your Honor.

16           MS. LARAKERS:  Yes, Your Honor.

17           THE COURT:  All right.  And with regard to Junqueira,

18   as far as I know, the only remaining issue is the detention

19   issue to be addressed today and that Junqueira is not

20   challenging removal?

21           MR. POMERLEAU:  Correct, Your Honor.

22           THE COURT:  Okay.  Now, in reading Mr. Pomerleau's

23   affidavit in response to the motion relating to possible

24   contempt, I learned some things relating to Junqueira.  And

25   that is, according to the affidavit, that Mr. Junqueira was

1    brought to the ICE office to be released on May 3, last

2    Thursday.

3            MR. POMERLEAU:  That is correct, Your Honor.

4            THE COURT:  And then you spoke to Ms. Larakers about

5    that, and she said she didn't know about it.

6            MR. POMERLEAU:  Correct.

7            THE COURT:  Junqueira wasn't released on May 3 but was

8    brought back to be released on May 4 but is still in detention,

9    correct?

10           MR. POMERLEAU:  That's still correct, Your Honor.  And

11   we added emails from -- Mr. Junqueira's wife is here.  She

12   received emails from Mr. Junqueira's caseworker at the Suffolk

13   County House of Correction, basically relaying information that

14   she had spoken to William Chambers, who works for ICE, he's at

15   the jail, and he told the case officer that he's getting

16   released today and go pick him up.

17           So she drove three hours from Connecticut.  She

18   informed both of her children that their father was coming

19   home, and she went to pick him up.  And she waited nearly four

20   hours in Burlington for his release.  And I didn't find out

21   until quarter of 5:00 in the afternoon he was not actually

22   getting out that day.

23           But she informed me he might get out the next day.  He

24   was brought again Friday again, and I was dealing with that

25   again Friday morning thinking he was possibly getting released

1    and this case would become moot, and he was never released.

2           It's unclear to me why he was ever taken there in the

3    first place, why this information was given to his wife, which

4    obviously has caused her a lot of emotional harm, to say the

5    least, and it did throw me off step a bit, too.  That's why I

6    greatly apologize to the court for missing that deadline.

7           THE COURT:  I'm going to go through that with you

8    later.  I appreciate that, and I see you were doing a lot.

9    Although, I'll go through the chronology with you, in the two

10   cases you have before me, you missed many deadlines, and you

11   need to seek leave of court to do that.

12          But right now, my able and exhausted law clerk and I

13   have been working very hard on these cases because there's

14   urgency to them; and, you know, if they're going to become

15   quickly moot or if they're going to become moot, I'd like to

16   know it.

17          But Ms. Larakers, what happened with regard to

18   Mr. Junqueira?

19          MS. LARAKERS:  Your Honor, it's my understanding that

20   the first time he was brought to ICE he was brought to ICE to

21   be served with his notice of Post-Order Custody Review.

22          THE COURT:  Last Thursday?

23          MS. LARAKERS:  Yes.  And I'm not sure as to the second

24   time.  However, I can certainly investigate it.  However, this

25   court's order has not been violated.  He has not been moved out

 1     of Massachusetts, and he has not been ever in danger of being

 2     moved out of Massachusetts.

 3              THE COURT:  No.  I see that, but, you know, I've had a

 4     series of cases that -- the goal with the petitioners, what the

 5     petitioners are seeking is release from detention.  So I'm

 6     not -- you know, if ICE agrees that he should be released from

 7     detention, I'm not trying to discourage that.  On the other

 8     hand, I've had three cases that shortly before hearings became

 9     moot.  And, you know, if there's something foreseeable that may

10     make it unnecessary to hear argument and decide some of these

11     intriguing issues, I'd like to know it.

12              MS. LARAKERS:  Absolutely, Your Honor.  And I will

13     keep this court informed as to whether that's ever a

14     possibility and promptly informed.  I did not know that -- I

15     did not know what happened at ICE before I had reached out to

16     determine the circumstances after Mr. Pomerleau reached out to

17     me.

18              THE COURT:  So you spoke to somebody or communicated

19     with somebody on May 3?

20              MS. LARAKERS:  Yes, the first time he was taken to

21     ICE, and I confirmed that he was taken to ICE to be served with

22     his Post-Order Custody Review.  The reason why his wife was

23     given that information, I was not able to ascertain.

24              THE COURT:  Who did you speak to?

25              MS. LARAKERS:  Todd Masters.  He's an attorney for

 1    ICE.  But that's the extent of my knowledge, Your Honor.

 2           THE COURT:  All right.  Well, in my current

 3    conception, we'll get back to this.

 4           All right.  With regard to the De Souza and

 5    Junqueira -- hold on just one second.  With regard to the De

 6    Souza and Junqueira motions to be released from detention,

 7    essentially I want to compartmentalize the arguments somewhat.

 8    One, that the first thing I need to do because usually I know

 9    what the questions are and then it's challenging sometimes to

10    figure out the answers.  But here, it's not clear to me what

11    the government's position is with regard to the applicable

12    legal framework.

13           In the opening brief in Calderon, which is relevant to

14    Ms. De Souza today, the government stated that 8 CFR Section

15    241.4 regulations do not apply to De Souza because the

16    regulations do not apply to aliens not currently detained at

17    the expiration of the removal period.  In that view, it's

18    reiterated I think in the Rutherford affidavit in opposition to

19    a motion for dismiss that it was asserted that ICE could detain

20    without individualized determination of dangerousness or flight

21    in April 23.  That's the April 23 affidavit of Rutherford.

22           But then last Thursday, in the May 3, 2018

23    supplemental brief regarding Junqueira, the government stated

24    that the procedures in 8 CFR Section 241.4 apply to

25    petitioners, which include De Souza, once they've been detained

1   for 90 days.  And Ms. Larakers, you said essentially the same

2   thing last Tuesday at the hearing, that the regulations would

3   apply, 90 days.

4        What exactly is the government's position?  Because I

5   believe originally the government was arguing that it had,

6   under Zadvydas, as it reads, that it had six months to decide

7   what to do on detention and the regulations were not relevant,

8   and the more recent statement is that the regulations are

9   relevant.  I just need that clarified.

10       MS. LARAKERS:  Yes, Your Honor.  And I apologize for

11  the confusion.  I think the confusion is arising from the

12  complaints and the government trying to address all of the

13  allegations in the complaints.

14       So the first question that we were trying to address

15  in the first -- in our opening brief was do the regulations in

16  8 CFR 241.4 apply to petitioners prior to any detention.  And

17  that's the question we were trying to answer.  And in that

18  brief we were trying to answer that the -- the answer to that

19  clearly based on this text of regulation is no, it doesn't

20  apply to petitioners prior to any detention.

21       Then, once respondents realized that there was a

22  second question before this court, at what point do those

23  regulations apply to petitioners once they are in detention.

24  And that is what we have cleared up in the supplemental

25  briefing and before this court.  The answer to that question is

1    that there are two prerequisites for the POCR regulations to

2    apply to a detainee.  First, the petitioner -- the detainee

3    must be detained pursuant to 1231(a)(6).  That's found in

4    241.4(a), and the second requirement is that the detainee must

5    have been detained for 90 days.  That's the government's

6    position on that.

7              THE COURT:  There's some ambiguity to that.  Are you

8    saying that -- well, Section 241.4 has certain deadlines, a

9    document review decision on detention by about 90 days, right?

10             MS. LARAKERS:  Yes.

11             THE COURT:  And notice to the alien or, if the alien

12   has an attorney, to the alien's attorney approximately 30 days

13   before that, correct?

14             MS. LARAKERS:  Yes, Your Honor.  So about the 60-day

15   mark of being detained.

16             THE COURT:  So basically, this is what I thought you

17   were getting at.  If somebody has been subject to an order of

18   removal but not detained, as the statute requires, the clock

19   starts running for 241.4 purposes, in your view, when that

20   person is detained.

21             MS. LARAKERS:  Yes, Your Honor.

22             THE COURT:  Okay.  Then let me ask you a series of

23   questions because when I said I'm going to bifurcate this

24   argument, I'm not -- if I assume without finding -- we're going

25   to have argument later about whether that interpretation of the

1    regulations is right -- I want to know the following.

2         So let me do this first with regard to De Souza and

3    try to make a chronology.  So Ms. De Souza was arrested when

4    she was at the CIS office seeking a provisional waiver after

5    she demonstrated to the satisfaction of CIS that she was really

6    married, it wasn't a sham, on January 30, 2018, correct?

7         MS. LARAKERS:  Yes, when she was seeking her I-130 to

8    be approved.

9         THE COURT:  The I-130, which is the first step in the

10   provisional waiver process.

11        MS. LARAKERS:  The first step.

12        THE COURT:  All right.  And then Section 241.4

13   (k)(1)(i) says that prior to the expiration of the removal

14   period, which I think you argue is 90 days, DHS officials

15   conduct a custody review, which is a record review, under

16   Section 241.4(b); is that right?

17        MS. LARAKERS:  Yes, Your Honor.

18        THE COURT:  All right.  And we just covered this.

19   There is about -- so 90 days for Ms. De Souza would be about

20   April 30, 2018, correct?

21        MS. LARAKERS:  Yes, Your Honor.

22        THE COURT:  And then we also covered this but a little

23   less precisely.  Under Section 241(h)(2), the Department of

24   Homeland Security official must provide written notice

25   approximately 30 days in advance of the pending record review

1    so the alien may submit information in writing in support of

2    his or her release, correct?

3              MS. LARAKERS:  Yes, Your Honor.

4              THE COURT:  And Section 241(d)(3) provides that if the

5    alien has an attorney, the notice must be mailed only to the

6    attorney.

7              MS. LARAKERS:  Yes, Your Honor.

8              THE COURT:  Therefore, am I right in understanding

9    that under your view of Section 241.4 the notice should have

10   been mailed to De Souza's attorney by approximately March 30 of

11   2018?

12             MS. LARAKERS:  Yes, Your Honor.

13             THE COURT:  And the record -- is this correct -- the

14   record indicates that on April 23, 2018, ICE mailed De Souza,

15   not her attorney, a notice to the alien of a file custody

16   review to be conducted on or about April 30, 2018, right?

17             MS. LARAKERS:  Yes, Your Honor.  However, that's not

18   because ICE views the regulation in that way.  ICE has

19   identified that that was not the way the regulation should be

20   complied with.

21             THE COURT:  I'm getting there.  I'm just trying to see

22   if I've got this straight.

23             MS. LARAKERS:  Yes, Your Honor.

24             THE COURT:  So then the notice was not given on or

25   approximately March 30, 2018, correct?

1           MS. LARAKERS:  Yes, Your Honor.

2           THE COURT:  And it wasn't sent to the attorney, as

3    required by 241.4, right?

4           MS. LARAKERS:  No, Your Honor.

5           THE COURT:  And it wasn't approximately 30 days in

6    advance of the scheduled record review; is that correct?

7           MS. LARAKERS:  That is correct.

8           THE COURT:  So ICE didn't give Ms. De Souza the

9    process provided by Section 241.4 as of April 3, right?

10          MS. LARAKERS:  Yes, Your Honor.

11          THE COURT:  But on April 30, ICE decided to continue

12   Ms. De Souza's detention, right?

13          MS. LARAKERS:  Yes, Your Honor.

14          THE COURT:  And ICE says it sent a copy of that

15   decision to her on May 2, right?

16          MS. LARAKERS:  Yes.

17          THE COURT:  And then on May 3, ICE sent Ms. De Souza

18   and her attorney a new notice of another post-custody review to

19   be conducted on June 3, 2018 in order to provide -- I think

20   this is what you were about to explain to me a minute ago --

21   the required 30 days' notice because of what ICE characterized

22   as irregularities in the notice.  That's a term that was used

23   in the Brophy affidavit, docket number 56.1.  Is that correct?

24          MS. LARAKERS:  Yes, Your Honor.

25          THE COURT:  And you were beginning to explain that to

1   me.

2           MS. LARAKERS:  Yes.  When it became aware to ICE that

3   that wasn't done correctly, ICE attorneys and to the Justice

4   Department, we attempted to remedy that.  And that was our

5   response to remedying the POCR notice.  However, this is

6   alluding to the question that you asked before, compliance with

7   the POCR notice does not affect the legality of Ms. De Souza's

8   detention.

9           THE COURT:  Here.  This is where I'm going.  Okay.  So

10  and maybe you've just answered this, but do you agree with

11  Justice Kennedy who wrote in his dissent in Zadvydas, 533 U.S.

12  678 at 725 in 2001 that removable aliens held pending

13  deportation have a due process liberty right to have the INS,

14  at that time, Department of Homeland Security now, conduct the

15  review procedures in place.  I'll break this up.  Do you agree

16  with that?

17          MS. LARAKERS:  Your Honor, as a Justice employee, I

18  can't agree with the dissent of Zadvydas.  However, ICE does

19  agree that they are entitled to the procedures in 241.4 because

20  that's the law as written.

21          THE COURT:  Okay.  And then Justice Kennedy went on to

22  say, "Were the INS," now DHS, "in an arbitrary or categorical

23  manner to deny an alien access to the administrative process in

24  place to review continued detention, habeas jurisdiction would

25  lie to redress the due process violation caused by the denial

1    of the mandated procedures under 8 CFR Section 241.4."  Do you

2    agree with that?

3            MS. LARAKERS:  No, Your Honor.  Because the majority

4    in _Zadvydas_, the question is whether -- the due process right

5    recognized in _Zadvydas_ was to protect against prolonged

6    detention.  And _Zadvydas_ recognized that the POCR regulations

7    in 241.4 aren't enough to protect against that prolonged

8    detention, therefore, at Kennedy's dissent, he was really

9    looking at, well, the POCR regs are enough; however with

10   _Zadvydas_ recognizing that they're not enough, ICE does

11   recognize that the regulation -- that they should apply the

12   regulations consistently.  However, it does not affect the --

13   it should not affect the legality of the detention, especially

14   when the whole point of the regulations is to protect against

15   prolonged detention, and the petitioners here have not been

16   subject to prolonged detention.

17           THE COURT:  Well, A, that doesn't seem to be

18   consistent with what you agreed is correct.  Removable aliens

19   held pending deportation have a due process liberty right to

20   have INS conduct review procedures in place.

21           But it clarifies the position.  In my view -- it's

22   tentative.  You're going to get a chance to argue it -- you

23   misunderstand _Zadvydas_, and you're not the only one who has.

24   _Zadvydas_ is talking about judicial review of decisions, I

25   believe, that are properly made by the Department of Homeland

1    Security now.

2         If the Department of Homeland Security follows its

3    proper procedures -- this is a procedural due process point --

4    follows its proper procedures and reaches the conclusion that

5    an alien should be detained while an effort is being made to

6    effectuate his or her removal, then the court has to, out of

7    comity -- this is what Justice Breyer was talking about --

8    comity and recognition of the authority and presumed expertise

9    of the executive branch defer to that decision for six months

10   and assume it's reasonable, and then after six months that

11   presumption, which can be rebutted in my view at the moment, in

12   the first six months, that presumption disappears.

13        But the majority didn't, as I read Zadvydas, disagree

14   with Justice Kennedy on this.  If the government doesn't follow

15   the proper procedures, and you admit that DHS didn't follow the

16   proper procedures, then I believe at the moment that habeas

17   jurisdiction exists, the authority exists to remedy the due

18   process violation.  The question is what's the remedy?  Do I

19   send it back to DHS to conduct this review, which you're trying

20   to do; you're trying to remedy it.  But you probably never

21   spent a day in jail, did you?

22        MS. LARAKERS:  No, Your Honor.

23        THE COURT:  But I bet you visited some.

24        MS. LARAKERS:  Yes.

25        THE COURT:  Yeah, sure.  And, you know, there are

1   cases that confirm what I think is intuitively obvious to many

2   people.  It's a form of irreparable harm to be detained for

3   even a day; nothing is going to repay you for that.  And there

4   should be some fair and efficient way to provide a remedy.

5          At the moment, and I'll listen to all of this, I don't

6   think that, you know, even on your reading of the regulations,

7   which I also think are not correct, and I do think -- but even

8   starting on day one, because the chronology is essentially the

9   same, I don't think -- I think I have the authority and the

10  responsibility to assure that justice is served with regard to

11  Ms. De Souza, which at the moment for reasons I can explain

12  will be a bond hearing before me next week.  And I think the

13  chronology is comparable with regard to Mr. Junqueira.  He was

14  arrested at the CIS office on February 1, 2018, right?

15         MS. LARAKERS:  Yes, Your Honor.

16         THE COURT:  And so he would have been entitled to

17  receive notice of a document review under the regulation on

18  about April 1, right?

19         MS. LARAKERS:  Yes, Your Honor.  But what makes him

20  different from Ms. De Souza is he's a reinstatement.  He's

21  under an order of reinstatement of removal.

22         THE COURT:  He's not eligible for I-130.

23         MS. LARAKERS:  Yes, Your Honor.  But not only that,

24  but for his first 90 days of detention he was under 1231(a)(2)

25  detention, not 1231(a)(6), for his first 90 days.

1      THE COURT:  Is this explained in your brief?

2      MS. LARAKERS:  Yes, Your Honor.  In the motion --

3      THE COURT:  Have you told me that before just now?

4      MS. LARAKERS:  No, Your Honor.  We made it clear in

5  the response to this court's order with regard to 141.4.  We

6  attempted to clear up how it applies differently in Junqueira

7  than De Souza.

8      THE COURT:  Where did you write about that?  Docket

9  number what?

10      MS. LARAKERS:  55.

11      THE COURT:  Is that the filing last Thursday?

12      MS. LARAKERS:  Yes.  And we explained it on --

13      THE COURT:  Hold on.  Anyway.  I guess we'll get to

14  this but --

15      MS. LARAKERS:  The long and short of it, Your Honor,

16  is it still applies to Mr. Junqueira; however, it's important

17  to note that he's slightly different.  It would still apply to

18  him on that 90-day mark, as Your Honor just said.  I just

19  wanted to make clear --

20      THE COURT:  Well, I'm sorry.  Do you agree with Mr.

21  Junqueira -- I won't ask you if you agree.  Did that 90-day

22  clock start running the day that Mr. Junqueira was detained?

23      MS. LARAKERS:  Yes, Your Honor, yes.

24      THE COURT:  February 1.  Okay.  Then under the

25  regulations at about 60 days, April 1, his attorney should have

 1   received a notice that there would be a document review and he

 2   could submit documents, but the document-reviewing decision

 3   would be about May 1, right?

 4            MS. LARAKERS:  Yes, Your Honor.

 5            THE COURT:  And did he get any such notice?  Was the

 6   notice sent?

 7            MS. LARAKERS:  No.

 8            THE COURT:  All right.  So that's inconsistent with

 9   the regulations, right?

10            MS. LARAKERS:  Yes.

11            THE COURT:  A second instance in which ICE didn't

12   follow its regulations, right?

13            MS. LARAKERS:  Yes, Your Honor.

14            THE COURT:  I mean, the second instance we discussed

15   today.

16            MS. LARAKERS:  Yes, Your Honor.

17            THE COURT:  And then, though, did somebody write -- I

18   mean, Mr. Pomerleau said that Mrs. Junqueira, not Mrs. -- well,

19   that Mrs. Junqueira was told that Mr. Junqueira was going to be

20   released from the Burlington ICE office on May 3, last

21   Thursday.  Did somebody write that to him?

22            MS. LARAKERS:  Your Honor, I'm not aware.  I haven't

23   confirmed that with ICE.  All I could confirm was that he was

24   transported there to receive his POCR notice again in the

25   attempt to remedy.

1          THE COURT:  You're talking shorthand.  That's P-O-C-R.

2          MS. LARAKERS:  I'm sorry.  The Post-Order Custody

3    Review, instead of saying "241.4," but I can continue to say --

4          THE COURT:  Post-Order Custody Review.  I mean, I knew

5    what you were talking about, but there are a lot of people

6    interested in this might be confused in thinking --

7          MS. LARAKERS:  However, the difference in

8    Mr. Junqueira that's important for this court to know is that

9    even under this court's current view of the POCR regulations --

10         THE COURT:  I haven't expressed my current view yet.

11   I'm saying under your view, under your view, neither De Souza

12   nor Junqueira got the process that the regulations provide.

13         MS. LARAKERS:  Yes.  However, even under the

14   petitioners', I guess the petitioners' view of the statute, of

15   the regulation, Mr. Junqueira would not be entitled to -- would

16   not in any way be entitled to pre-notice of that, to pre-notice

17   of detention.

18         THE COURT:  I'm accepting your view.  And I think that

19   all of this can be reconciled.  But it's your position that

20   Section 241.4 applies to both De Souza and Junqueira, right?

21         MS. LARAKERS:  Yes, Your Honor.

22         THE COURT:  And the process provided by that

23   regulation neither of them received, correct?

24         MS. LARAKERS:  Yes, Your Honor.

25         THE COURT:  And do you accept the proposition -- there

```
 1    are legions of cases on this -- that the government is obliged
 2    to follow its own regulations?
 3         MS. LARAKERS:  Yes, Your Honor, with the caveat that
 4    the due process right implicated here, the claim to the due
 5    process right that has been recognized in Zadvydas is not
 6    implicated here because these petitioners are not subject to
 7    prolonged detention.  And Your Honor, they have put forth no
 8    such facts to show that their removal isn't foreseeable.  And
 9    they can be removed, they can be removed imminently if this
10    court lifted the stay.  And since that's the only due process
11    right implicated --
12         THE COURT:  But this is the conversation I had with --
13    I don't know if he's still your colleague -- in Arriaga almost
14    a year ago today.  I said, I have the authority, the government
15    doesn't dispute it, to decide detention issues, right?
16         MS. LARAKERS:  Yes, Your Honor.
17         THE COURT:  So if you let these people out, say
18    particularly with regard to Junqueira because the only issue is
19    detention, then assuming the law is followed, you can do what
20    you want.  But as I said, I think you've misread but you're not
21    misunderstood what Zadvydas is about, and you're not the first
22    to do that.  And I want to hear your argument and I want to of
23    course hear the petitioners' argument.
24         Neither of them received the process that was due, and
25    you agree -- and I can lay this out in the cases.  But you
```

1    agree that the government has an obligation to follow its

2    procedures.  And I think Justice Kennedy was right because he

3    explained what kind of case habeas redress would exist for,

4    that is, when the INS in an arbitrary categorical manner denied

5    an alien access to the administrative process in that case, and

6    he said Zadvydas wasn't that kind of case.  The facts were

7    materially different in his view than this case.

8           So I think on your interpretation -- I can listen to

9    you more -- of the regulation, De Souza and Junqueira are

10   entitled to a bond hearing.  My present view, and I'll give you

11   a chance to address it and the petitioners can address it too,

12   it needs to be a bond hearing before me.  The Department of

13   Homeland Security has shown that it hasn't followed its proper

14   procedures -- the proper procedures with regard to either

15   Junqueira or De Souza.  It has repeatedly made errors.  We can

16   go back to -- it was Mr. Wells who decided to detain De Souza

17   originally; is that right?

18          MS. LARAKERS:  Yes, I believe so, Your Honor.

19          THE COURT:  And one of his stated reasons was that she

20   had a removal order, right?

21          MS. LARAKERS:  Yes, Your Honor.

22          THE COURT:  And the other -- another reason was that

23   she was ineligible for any possible relief from removal; is

24   that right?

25          MS. LARAKERS:  Yes, Your Honor.  That they had the

1  authority to remove her under the statute, which gives them --

2          THE COURT:  No, but isn't it true that she was

3  eligible, you know, first -- well, I don't know how you would

4  characterize this, but first to seek I-130 status and then seek

5  a provisional waiver?

6          MS. LARAKERS:  Your Honor, that is relief available to

7  her whether she is within the United States or outside the

8  United States, so the relief is not being limited.

9          THE COURT:  No, but his reasoning was that she wasn't

10 eligible.

11         MS. LARAKERS:  Yes, Your Honor.

12         THE COURT:  Was he correct that she was ineligible for

13 that?

14         MS. LARAKERS:  He is correct that she is not eligible

15 for any benefit that would give her a right, due process or

16 statutory, to remain in the United States, yes.

17         THE COURT:  Was she eligible for I-130 status?

18         MS. LARAKERS:  Your Honor, respectfully, I-130 isn't a

19 status, but she was eligible to have an I-130 approved, yes,

20 Your Honor.

21         THE COURT:  Actually, was it approved?

22         MS. LARAKERS:  Yes, I believe so.

23         THE COURT:  It was approved right before she was

24 arrested, wasn't it?

25         MS. LARAKERS:  Yes.

1        THE COURT:  Okay.  And did that make her eligible to

2   pursue either inside or outside the United States -- well, make

3   her eligible to pursue a provisional waiver so she would only

4   have to leave the United States for a couple of weeks if she

5   got that waiver?

6        MS. LARAKERS:  Yes.  The 212 application to seek

7   admission and then the provisional waiver, yes, which are two

8   forms of discretionary relief for which she would have to show

9   extreme hardship.

10        THE COURT:  And she was eligible to pursue that

11   relief, right?

12        MS. LARAKERS:  Yes, from inside or outside of the

13   United States.

14        THE COURT:  I'm going to ask Mr. Wells this when he

15   comes in next week because I'm going to make a detention

16   decision on these people, and I want to understand the

17   reasoning so I can give whatever weight it deserves to the

18   reasoning, but it appears to me that he was mistaken when he

19   said she was ineligible for any form of relief.  She might not

20   get it, but that's different than being eligible.

21        MS. LARAKERS:  Your Honor, he wasn't mistaken.  His

22   belief was she's not eligible for any form of relief that would

23   preclude ICE from effectuating her removal.  Yes, Your Honor,

24   you're absolutely correct that that's what the affidavit says.

25        THE COURT:  It says she's ineligible.  I can only

1    decide this case based on the evidence, and that's what I have

2    right now.  And it appears to me that that was wrong.  If he

3    had put in an affidavit that told me -- I mean, isn't that what

4    he wrote in the records?

5           MS. LARAKERS:  Yes, Your Honor.  And if he were here

6    before you today, he would tell you that she is not eligible

7    for any relief that would preclude ICE from effectuating her

8    removal, which was the question at hand in the affidavit.

9           If I may, Your Honor, very shortly, with regard to any

10   bond hearing this court wishes to conduct, the detention

11   question here is whether she could be removed in the reasonably

12   foreseeable future.  And if this court were to find there is a

13   constitutional violation there, the constitutional violation

14   articulated in Zadvydas is present here, the remedy would be

15   release, or, if it was just a violation of the POCR

16   regulations, it would be to redo the POCR regulations.

17          THE COURT:  Why --

18          MS. LARAKERS:  And the reasoning why is because of the

19   recent decision in Jennings v. Rodriguez.

20          THE COURT:  Okay.  Actually, let's pause here.

21          MS. LARAKERS:  Absolutely.

22          THE COURT:  We'll come back to this.  And I haven't

23   given you -- I've given you sort of my tentative thoughts, and

24   this is helpful.  But putting aside what the remedy is -- I

25   don't know.  Is there more you want to say about what Zadvydas

1    means?  Why don't you do that.  This is not quite the way -- I

2    didn't know how this was going to go, but this is very helpful,

3    and so let me hear your argument on the meaning of Zadvydas.

4           MS. LARAKERS:  Okay.  So respondents agree with

5    petitioners that the right implicated in Zadvydas is the right

6    to detention that is connected with its purposes.  And the

7    purposes articulated in Zadvydas is to ensure the alien's

8    presence at the time of removal.  And that is the only right

9    that this court has the authority to decide with regard to

10   whether the detention is constitutional or not.

11          THE COURT:  I don't have the right to decide whether

12   the regulations have been followed?

13          MS. LARAKERS:  Yes, Your Honor.  However, that --

14          THE COURT:  Yes, I do; or yes, I don't?

15          MS. LARAKERS:  Yes, you do have the right to decide

16   that under the due process right articulated in Zadvydas, which

17   is that an alien has a right to be free from prolonged

18   detention.

19          THE COURT:  No.  This is separate.

20          MS. LARAKERS:  Yes, Your Honor.

21          THE COURT:  Here.  Excuse me.

22          MS. LARAKERS:  Sorry.

23          THE COURT:  I think I'm understanding you, but I don't

24   think you're understanding me because you agreed with me

25   earlier that, as Justice Kennedy said, removable aliens held

1    pending deportation have a due process liberty right to have

2    the INS conduct the review procedures in place.

3            MS. LARAKERS:  Your Honor, I think I said that I don't

4    agree with that.  I agree with the due process right

5    articulated in Zadvydas, which is that the detention must be --

6            THE COURT:  I thought you told me -- maybe I

7    misunderstood.

8            MS. LARAKERS:  Yes, I don't have the authority as a

9    Justice employee to agree with the dissent.

10           THE COURT:  The majority didn't disagree with that.

11           MS. LARAKERS:  The majority --

12           THE COURT:  Here.  Let me tell you where I think some

13   of this dispute comes in.  I do want to listen to you.  But,

14   one, there's substantive due process and procedural due

15   process, as the Supreme Court describes it, right?

16           MS. LARAKERS:  Yes, Your Honor.

17           THE COURT:  And detention can violate substantive due

18   process, which has always struck me as an oxymoron.  It can be

19   fundamentally unfair if it's too long without a good reason,

20   it's unreasonably long, right?

21           MS. LARAKERS:  Yes, Your Honor.

22           THE COURT:  That's a colloquial way of describing

23   substantive due process.  But there's also procedural due

24   process that, like American citizens, aliens have a right to

25   procedural due process, correct?

1          MS. LARAKERS:  Yes, Your Honor.

2          THE COURT:  And they have a right to have -- hold on a

3     second.

4          So as I read them, and you tell me if you disagree

5     with this and why, because it's important to my thinking.  "The

6     due process clause requires a federal agency to follow its own

7     binding regulations before depriving someone of liberty even

8     when those regulations provide greater protection than is

9     constitutionally required," as the First Circuit wrote in

10    Nelson v. INS, 232 F. 3d 258 at 262.  I think Accardi, 347 U.S.

11    260 at 267-68 is consistent with that, a McCarthy era case,

12    1954.

13         As the Supreme Court wrote in United States v. Nixon,

14    Richard Nixon, "So long as a regulation remains in force, the

15    executive branch is bound by it and indeed the United States as

16    the sovereign composed of the three branches is bound to

17    respect and enforce it."  That's Nixon at 418 U.S. 683 at

18    695-96.

19         "When an immigration regulation is promulgated to

20    protect a fundamental right derived from the Constitution or a

21    federal statute," I would say like the opportunity of notice,

22    to have notice and to be heard, "and ICE fails to adhere to it,

23    the challenged action is invalid and may be reversed."  That's

24    what Judge Saris wrote recently in Souza, 2017 Westlaw 5178789

25    at page 4, citing Waldron, a Second Circuit case.

1          "In short, the government, as well as the governed,

2     must follow the law and the habeas court may ensure that it

3     does," which is a principle that was reiterated by the Supreme

4     Court in Boumediene, 553 U.S. 723 at 741, one of the Guantanamo

5     cases.  Do you agree with that line of cases or not?

6          MS. LARAKERS:  Yes, Your Honor, and I believe many of

7     those cases are speaking correctly to the procedural due

8     process procedures within removal proceedings, which all of

9     these petitioners did receive.  However, with regard to the

10    POCR regulations, even if they're violated here, the

11    government's position is they would receive the benefit of

12    those POCR procedures and not a bond hearing because neither

13    the statute nor the regulation provides for that.

14          THE COURT:  What's the difference -- I'm calling this

15    a bond hearing.

16          MS. LARAKERS:  Sure, Your Honor.  There is a

17    difference.  The standard in a POCR and a bond hearing I would

18    be happy to brief for you.

19          THE COURT:  Actually, I was going to give you until

20    Friday to do that.

21          MS. LARAKERS:  Yes, I can brief how those procedures

22    would work.  And ICE certainly is conducting a new POCR review.

23    But if we look, if we zoom out a little bit and look at the

24    purpose of the POCR regulations and look at the due process

25    right as articulated in Zadvydas, what we find is that the

1    alien petitioners have --

2            THE COURT:  Let's just stop.  Do you think Zadvydas is

3    talking in the majority decision about -- maybe in the whole

4    decision -- in the dissent as well about substantive due

5    process or procedural due process?

6            MS. LARAKERS:  Your Honor, I think Zadvydas is talking

7    about substantive due process, and I think they're talking

8    about whether the procedures -- the POCR procedures were enough

9    to protect that substantive due process, that substantive due

10   process right to have their detention bear reasonable relation

11   to the purpose of removal.

12           THE COURT:  No.  Then I -- but here you admit that for

13   neither De Souza nor Junqueira has ICE observed what you call

14   the POCR.

15           MS. LARAKERS:  POCR --

16           THE COURT:  It's easier for me to say 241.4

17   procedures.

18           MS. LARAKERS:  Your Honor, I'll switch to that.

19           THE COURT:  They haven't.  This case doesn't attack --

20   well, at the moment, because I'm assuming, and I'm not finding,

21   and I doubt I will find, that your interpretation is correct, I

22   don't think you had 90 days and I can tell you how the

23   regulations can be read sensibly to apply but not give you 90

24   days.  But that's not where we are now.

25           Even on your reading, there's 90 days, you admit they

```
 1    didn't get it, and then I think they're not the only ones who
 2    didn't get it.  This seems to be categorical.  With regard to
 3    Junqueira, they didn't send out a notice at all.
 4         MS. LARAKERS:  Yes, Your Honor.  So the question is
 5    then, the ultimate question that this court has the authority
 6    to decide, whether their detention bears a reasonable relation
 7    to the purposes of removal.
 8         THE COURT:  Okay.  We're going back.  I understand
 9    your position, but it's not the only question.  It may be
10    that -- it may be, may or may not be, that substantive due
11    process is violated, but I don't think I'm going to need to
12    rely on that because I think it's quite clear that they've been
13    denied procedural due process.
14         MS. LARAKERS:  So even if the procedures aren't --
15    they weren't in Zadvydas's view and they aren't in this court's
16    view right now sufficient to protect that --
17         THE COURT:  No.  The procedures -- I think in Zadvydas
18    they assumed that the procedures were adequate, but you
19    acknowledge that for these two people who have been locked up
20    now for more than three months, separated from their spouses,
21    separated from their children, the government didn't give them
22    the process that it obligated itself to give them in the 241.4
23    regulations.
24         MS. LARAKERS:  And if this court were to find that
25    they're entitled to release based on not being provided those
```

1    regulations, that would mean that this court would have to find

2    some other due process right to remain here because here,

3    petitioners have not set forth --

4            THE COURT:  No.  I'm not talking about removal.  If I

5    order Mr. Junqueira's release, this is what I was clarifying,

6    Mr. Pomerleau, I'm not even being asked to do anything about

7    his removal, except essentially to keep him here so I can

8    decide whether he should continue to be detained.  If I order

9    his removal, the case is over before me.  And then, you know,

10   you'll be in the immigration court or wherever you go, and it

11   will go to the Court of Appeals if there's anything to go to

12   the Court of Appeals.

13           Let me -- we've been going for about an hour and 15

14   minutes and we haven't heard from the petitioners yet.  I think

15   I understand your position.

16           MR. COX:  One prefatory note, Your Honor, just to

17   clarify the record, you mentioned the decision to continue

18   detention was delivered to Ms. De Souza last Wednesday, May 2.

19   We have a copy -- I don't know if you've already seen a copy of

20   this.

21           THE COURT:  No.  I haven't seen the decision.  Let's

22   see.  Does the government have this?

23           MS. LARAKERS:  Yes, Your Honor.

24           THE COURT:  I'll make it Exhibit 1 of today's date.

25           MR. COX:  What I wanted to draw the court's attention

1    to, Your Honor, was the date on which Thomas Brophy had signed

2    the decision to continue detention, April 27, which was only --

3    it was only four days after she was given the original notice.

4    And this is the same date that Ms. De Souza's counsel,

5    immigration counsel received the notice of record review.  And

6    this is also several days before the April 30 deadline or date

7    on which she was expected to have the decision made.

8           THE COURT:  Well, am I correct that the documents --

9    so the notice went to De Souza, not to her lawyer, right?

10          MR. COX:  That's correct.

11          THE COURT:  And there wasn't about 30 days' notice,

12    but the lawyer filed some documents on April 27.

13          MR. COX:  On April 30, Your Honor.

14          THE COURT:  The documents were filed on April 30.

15          MR. COX:  Yes, Your Honor.  That was the date on which

16    she was told the record review would occur.

17          THE COURT:  So this decision was made before there was

18    any opportunity to consider what she had submitted?

19          MR. COX:  That's what it appears from the face of the

20    document, yes.

21          THE COURT:  Is April 27 also the day the motion to

22    dismiss, I think, was filed?

23          MR. COX:  I think that was April 23, Your Honor.  I

24    can confirm.

25          THE COURT:  It was April 23, okay.  Go ahead.

1          MR. COX:  Well, I don't want to speak at great length

2     about this because we agree with your reading.

3          THE COURT:  Talk to me about Zadvydas.  I think that

4     would be most helpful.  I told you my reading of it is that it

5     assumes the proper procedures have been followed.  Then it's a

6     question of what should the role of the court be if the

7     procedures have been followed and Department of Homeland

8     Security has decided to detain somebody for six months or six

9     months hasn't gone by.  But here, just tell me as if I hadn't

10    said that to you, explain Zadvydas.

11         MR. COX:  That's right.  Zadvydas was decided against

12    the backdrop of the regulation.  So as we mentioned in our

13    brief last week, the 2000 final rule that enacted 241.4 says

14    that the rule was, quote, "structured to afford," quote,

15    "periodic and meaningful opportunity to seek release from

16    custody as required under the Constitution."  That was 65

17    Federal Register 80283.

18         Then in Zadvydas, the majority opinion at pages 683

19    through 684 sets out the 241.4 procedures and then proceeds to

20    analyze the detainee's arguments against the backdrop of those

21    procedural protections that were offered by 241.4.  And then if

22    you look, as you noted, in Justice Kennedy's dissent in Section

23    2, he mentions that --

24         THE COURT:  Actually, does Zadvydas -- this isn't

25    entirely rhetorical.  Does the majority decision in Zadvydas

1   discuss the 241.4 regulations?

2           MR. COX:  Yes, Your Honor.  It's at pages 683 through

3   684, and it describes the initial record review.

4           THE COURT:  Sorry.  682?

5           MR. COX:  683, Your Honor.

6           THE COURT:  That's right, under Section A, primarily.

7   And this actually this hasn't come up yet, but this whole issue

8   exists because the government I think for understandable

9   reasons hasn't followed the statutory mandate to detain people

10  as soon as their orders of removal are final.  If the

11  government did that, the regulation -- the removal period would

12  be 90 days and we'd go from there, but go ahead.

13          MR. COX:  You know, as you mentioned, Justice Kennedy

14  flagged the same provisions of Section 241.4 of his dissent,

15  and I think the meaningful distinction there was that Justice

16  Kennedy thought that because these regulations already existed

17  to protect the rights of the detainees, you didn't need to go

18  forward to have a habeas inquiry to determine whether the due

19  process rights have been violated.

20          Obviously, the majority disagreed with that.  But both

21  sides of that were making their arguments against the backdrop

22  of adhesion to the 241.4 procedures.  In Zadvydas -- and it's

23  also important to consider the posture in which the petitioners

24  came to the court.  Both of them had been detained continuously

25  throughout the removal period, and then you have the transition

1    immediately into the 1231(a)(6) post-removal period detention.

2    So they had the benefit of the 241.4 regulations.  And even

3    then the court said that extended detention beyond the six

4    months is not presumptively reasonable.  So we think that the

5    241.4 procedures are a predicate for the kind of rights that

6    are -- well, a predicate for the application of even the

7    deferential review the government might argue for under

8    _Zadvydas_.

9         THE COURT:  _Zadvydas_, as you call it, should be read

10   as a substantive due process analysis decision?

11        MR. COX:  We think it's both, Your Honor.  I think it

12   talks about making sure that -- it's not simply the procedure

13   you go through but also ensuring that the detention is

14   reasonably related to the underlying purposes.  And the court

15   identified -- in fact, the government identified to the court

16   in _Zadvydas_ the twin interests of ensuring that there wasn't

17   going to be someone dangerous out in public and then also

18   ensuring availability for removal in a timely manner.

19        So the court against the backdrop of 241.4 in those

20   procedures was evaluating, you know, the amount of deference or

21   leeway you should give to the government and enforcing those,

22   enforcing those statutory purposes through detention.  And so

23   when you take away the 241.4 procedure, you're left with kind

24   of a vacuum with _Zadvydas_ where it still emphasizes the very

25   strong constitutional and substantive rights guaranteed to

1    detainees, particularly because they're detainees in a civil

2    proceeding.  This is not punitive.  They're given very strong

3    substantive constitutional rights.  And if you remove the 241.4

4    procedures, you've created an even more significant

5    constitutional problem for those petitioners.

6         So our view is that 241.4 is an integral part of the

7    Zadvydas decision, and removing those procedures creates a very

8    significant constitutional problem that goes beyond simply

9    giving a petitioner a right to do that on a delayed basis

10   rather than -- again, the remedy didn't seem -- the remedy of

11   kind of just allowing it in the future doesn't seem to correct,

12   as you said, the irreparable harm of remaining in detention,

13   especially when the government has not made any kind of

14   requisite showing that there is a risk of flight, nor some kind

15   of public danger.

16        THE COURT:  So a couple of things.  Do you think I

17   characterized it correctly when I said essentially the

18   majority -- well, the decision in Zadvydas is a decision about

19   the role of the courts in presuming, you know, that in

20   reviewing detention decisions, and that because of

21   considerations of comity among other things, that for the first

22   six months courts should presume that decisions that were made

23   pursuant to the procedures, 241.4 in this case, are reasonable,

24   and after that, that presumption disappears, but it's basically

25   about how courts should review decisions if they're properly

```
 1    made.  Is that the way I should be viewing it?

 2         MR. COX:  Yes, I think so.  We do want just to clarify

 3    that we don't think there's some kind of -- that presumption of

 4    reasonableness is kind of a categorical carte blanche before

 5    the six months.

 6         THE COURT:  I agree with that, too.  The idea of a

 7    presumption is generally it can be rebutted.  And, for example,

 8    in the case that Justice Breyer cited -- or one of the two

 9    cases, it's not perfectly clear.  He says, "We think it

10    practically necessary to recognize some presumptive reasonable

11    period of detention," and then he cited Riverside v.

12    McLaughlin, adopting a presumption that 48-hour delay in

13    probable cause hearings is reasonable and hence

14    constitutionally permissible.  But in Riverside, they said

15    that's not going to be true in every case.  It still has the

16    presumption, but it could be rebutted in some instances.

17         MR. COX:  Yeah.  We don't think you need to reach some

18    decision on that basis, although we're happy to argue separate

19    from the 241.4 arguments.  But I think it's pretty clear from

20    Zadvydas that they didn't pluck the six months out of thin air.

21    It was taken from the initial 90-day removal period detention,

22    the mandatory detention, and then the first 90 days of

23    discretionary detention under 1231(a)(6).  And it's very

24    clearly connected, the period of their presumptive

25    reasonableness is very clearly connected to the same periods
```

1     that are protected under 241.4.  So we agree that the

2     underlying constitutional reasoning of Zadvydas is contingent

3     upon the prior application of 241.4 procedures.

4          THE COURT:  Okay.  I think maybe we'll just stay on

5     this Zadvydas issue.  Mr. Pomerleau, do you want to address it?

6          MR. POMERLEAU:  Just briefly, Your Honor.  I mean, I

7     would agree that I think the case does implicate both

8     procedural and substantive due process issues particularly here

9     where the 241.4 regulations are not being followed by DHS.  And

10    we have a petitioner's liberty at stake, where they're sitting

11    there, they're not getting their 30 days' notice at day 60 in

12    advance of the 90-day hearing, like Mr. Junqueira's case and

13    Mr. Dos Santos's case.  So we have the confluence here of these

14    due process considerations that are discussed in Zadvydas.  And

15    then additionally you have a lot of petitioners, in our view,

16    detained well outside of the mandatory removal period.

17          So I think that everything that co-counsel have

18    suggested, I would respectfully join.  And I do agree with

19    their assessment, as well as your view of this case.  I think

20    we are at the level of a constitutional violation that's

21    occurring because these 241.4 regulations are not being

22    followed.  I would indicate this is commonplace.  It's not just

23    in these cases, but this is widespread at the Department of

24    Homeland Security.

25          THE COURT:  Well, I'm getting that impression.

1        MR. POMERLEAU:  The only notice Mr. Junqueira

2  received -- and I got this from him yesterday in a jail visit.

3        THE COURT:  What is that?

4        MR. POMERLEAU:  He got a notice May 3, 2018, so that's

5  93 days after he was detained.  That's the only notice he

6  received.

7        THE COURT:  What did the notice say?

8        MR. POMERLEAU:  It's titled Notice to Alien to File

9  Custody Review.  It's addressed to him at Suffolk County House

10  of Correction.

11        THE COURT:  Not addressed to you?

12        MR. POMERLEAU:  I never received a copy of it, other

13  than through him, meeting with him yesterday evening.

14        THE COURT:  Is there any objection to making that part

15  of the record?  You've referenced it.

16        MR. POMERLEAU:  Not at all, Your Honor.

17        THE COURT:  I'm asking the government.

18        MS. LARAKERS:  No, Your Honor.  The decision -- the

19  notice can come in.  I was under the impression that it had

20  been sent.

21        THE COURT:  Had been sent to who?

22        MS. LARAKERS:  Had been sent to Mr. Pomerleau, but I

23  will certainly check.

24        THE COURT:  Well, it was mailed May 3.  Given the post

25  office, it may be on its way.  May I see it?

 1            MR. POMERLEAU:  Yes, Your Honor.  May I approach?

 2            THE COURT:  Yes.  So this gave him notice of a June 3

 3    custody review.  So this is like in effect a 60-day notice.  Is

 4    that what --

 5            MR. POMERLEAU:  That's what it appears to be, Your

 6    Honor.  Obviously, it should be given 30 days prior.

 7            THE COURT:  Well, they're giving it 30 days prior, but

 8    you're not getting a decision in 90 days on the government's

 9    interpretation.

10            MS. LARAKERS:  Yes, Your Honor.  And again, this was

11    done to remedy any irregularities in the first POCR.

12            THE COURT:  Any irregularities?  You admit there were

13    irregularities?

14            MS. LARAKERS:  Yes, Your Honor.  These new notices

15    were given to give them the benefit of the regulation because

16    it wasn't given to them in the first instance.

17            MR. POMERLEAU:  Based on that notice, he'll be held

18    roughly 123 days before he even gets his custody review

19    determination made, which violates 241.4.

20            THE COURT:  It's now 11:30.  We'll take about a

21    ten-minute break.  And I've been conducting this discussion on

22    the narrowest possible grounds, as if the government's

23    interpretation of the regulation is correct.  My tentative view

24    is that it's incorrect; that for reasons I can explain -- I

25    mean, I think the government agrees that the -- well, the

1    removal period as defined in the statute and regulations

2    expired years ago for each of these petitioners because the

3    removal period is the 90 days after their order of removal

4    becomes final, right?

5              MS. LARAKERS:  Yes, Your Honor.

6              THE COURT:  But then they weren't detained, and you

7    argue --

8              MS. LARAKERS:  They weren't detained because we didn't

9    know where they were until recently.  With regard to Ms. De

10   Souza, she was an abstention order.  She didn't show up to

11   immigration hearings.  There would have been an opportunity

12   there to detain her within the removal period.

13             THE COURT:  And this will be helpful.  When we come

14   back, I want you to explain all of this to me.

15             MS. LARAKERS:  Absolutely.

16             THE COURT:  But basically -- and there are various

17   provisions and I can point them out to you.  But the way I

18   would now read the regulations, because the removal period has

19   expired, and I think you just agreed with that, as it's

20   defined, and it's what your colleague acknowledged a year ago

21   in Arriaga.  And your argument is, well, it doesn't make sense

22   to say we don't get the -- we can't use the regulations once we

23   get somebody in detention.  You can't give notice in advance if

24   you don't know where somebody is, for example.  And they might

25   run away again.  But I think --

1          Here.  Think about this.  Basically, there's language

2     in the regulations -- I can point it out when I come back more

3     easily -- that you have to do this within 60 days, this within

4     90 days, unless there is good cause, or, you know, emergency

5     circumstances that make that not possible.

6          So I'm with you as far as it goes, and it makes sense

7     not to be required to give notice before somebody is detained,

8     but if that's considered good cause for not having done it

9     within the way the law defines removal period, the good cause

10    has disappeared when the detention has occurred.  And the

11    government could give a 30-day notice immediately upon

12    detaining somebody and detaining them for maybe up to 30 days

13    if it takes that long to get the information and make the

14    decision, but that's different than 90 days.  And every day is

15    precious.

16         MS. LARAKERS:  Yes, Your Honor.  And the government

17    would agree that that certainly could be a possibility.

18    However, the reason why the government has interpreted the

19    regulation the way it has and because that interpretation is

20    reasonable, the reason why we've interpreted it that way is

21    because the whole purpose of the regulation was to make sure

22    that someone isn't detained indefinitely while we're trying to

23    effectuate removal.

24         THE COURT:  We'll come back to it.

25         MS. LARAKERS:  But that's the reason for the 90 days,

1   Your Honor.  The 90 days, the reason why we're interpreting it
2   to be 90 days is because that's what Congress expected a
3   reasonable period of time to be to remove a person.

4          THE COURT:  Congress defined the removal period as 90
5   days after the final order.  They didn't define it as 90 days
6   after you get somebody in detention.

7          But here, we're going to come back on this.  I told
8   the court reporter I'd give her a break.  All right.  So when
9   we come back, I want to hear your arguments.  I think I'll
10  start with the petitioner, why is the government's
11  interpretation of 241.4 wrong; and even if it's right, why is
12  there -- well, why is it wrong, and then also what's the
13  substantive due process argument.

14         My present sense is that the case can be decided based
15  on violation of procedural due process.  I don't know if I'll
16  decide the substantive due process issue.  It won't be material
17  to the upcoming case.  All right.  So catch your breath, and
18  we'll resume at about 11:45 -- ten minutes of 12:00.  Court
19  will be in recess.

20         (Recess taken 11:37 a.m. - 12:03 p.m.)

21         THE COURT:  Okay.  All right.  As I said, I'm
22  interested in hearing your arguments, perhaps the arguments you
23  planned to start with on what the proper interpretation of
24  Section -- excuse me.  No.  That's too distracting.  You're
25  supposed to be in the jury box.

1          THE INTERPRETER:  I'm sorry, Your Honor.  The

2     interpreter was just trying to hear better.

3          THE COURT:  Well, they have no right to have this

4     interpreted at all, and I can't deal with this distraction.

5          THE INTERPRETER:  Okay.  I apologize.

6          THE COURT:  I've had interpreters who can do it

7     quietly enough, but I don't think you're yet one of them.  So

8     just do your best.

9          THE INTERPRETER:  Thank you.

10          THE COURT:  Thank you.

11          Okay.  I'm interested in your arguments, petitioners'

12     arguments and the government's response, on what the proper

13     interpretation of Section 241.4 is and the substantive due

14     process argument as well.

15          I indicated before I left that my tentative view is

16     that Section 241.4 can be sensibly interpreted to apply to

17     people who are not detained during the removal period.  Since

18     there seemed to be a lot of them, it would be preferable to

19     have a regulation that dealt with this directly, but the

20     requirement that the review occur before the expiration of the

21     removal period, is not under Section 241.4 absolute.

22          The regulation permits DHS to issue a 30-day notice

23     and conduct a custody review as soon as possible after the

24     removal period allowing for any unforeseen circumstances or

25     emergent situation.  That's 241.4(k)(2)(iv).  It's not possible

1   to conduct a custody review concerning whether to continue an
2   alien in custody as required by 241.4(d)(1) when the alien has
3   not yet been detained.

4        As the explanatory note that I brought to your
5   attention last week indicates or stated, Section 241.4 was
6   intended to apply to all aliens who are detained following the
7   expiration of the 90-day removal period, the INS said.  But in
8   promulgating the regulation, INS at the time evidently did not
9   foresee that the government would be unable to detain every
10  alien during the removal period.  Neither the regulation nor
11  the explanatory material explicitly addresses how the
12  regulation applies in that circumstance.

13       But basically, as I said, I understand it wouldn't be
14  practical to give notice to an alien who is not detained of a
15  detention review in advance.  The alien might flee.  But the
16  timing requirement at the moment I think would be satisfied if
17  DHS gave notice and conducted a review as soon as possible
18  after the arrest.  DHS may postpone a review if there's good
19  cause to do so, and the fact that the alien is not in custody
20  may well be good cause under 241.4(k)(3).  But Section
21  241.4(k)(3) also says that reasonable care must be exercised to
22  ensure that the alien's case is reviewed once the reason for
23  delay is remedied.  Therefore, it may be not that DHS gets 90
24  days when they bring somebody into custody but approximately 30
25  days to give notice and to conduct a review when the removal

1    period is expired.

2          That's my tentative thinking as to how the regulation

3    should be read, if it's not read the way the government asserts

4    it should be read.  So why don't we hear first from Calderon.

5          MR. COX:  First of all, I'll address the government's

6    interpretation and then move on to what we believe the correct

7    one is.

8          THE COURT:  I thought you already addressed the

9    government's interpretation.  Maybe I didn't let you.  Talking

10   about Zadvydas.

11         MR. COX:  241.4, the application --

12         THE COURT:  All right.  Go ahead.

13         MR. COX:  So the basic issue is we understand why the

14   government is interested in starting the clock at the moment of

15   detention before the 90 days, but unfortunately, we don't see

16   any textual basis for that in the language of 241.4.  You know,

17   we already discussed how the 2000 final rule makes it kind of a

18   comprehensive regulation for implementation of 1231(a)(6).  The

19   regulations talk -- there's nothing in the regulations that

20   starts the 90-day clock at any time other than the initial

21   notice of removal.  So if you look at 241.4(h)(1), it talks

22   about the records review.

23         THE COURT:  Hold on, (h)(1)?

24         MR. COX:  Yes, Your Honor.

25         THE COURT:  Go ahead.

1          MR. COX:  That section discusses the records review

2     prior to the expiration of removal period, so that would be

3     within the first 90 days.  Then it talks at 241.4(c)(1) and

4     (c)(2) about a record review by HQPDU for those who have not

5     been removed or released at the end of the three-month period

6     after the removal period.  Nowhere in that is there something

7     that is connected with the start of detention to grant a 90-day

8     review.

9          I think Your Honor's tentative interpretation better

10    reflects the underlying text and purpose of 241.4, which is

11    that as soon as the discretionary detention under 1231(a)(6)

12    commences, the government is required to initiate a meaningful

13    record review for the petitioner.  And I think Your Honor's

14    suggestion regarding looking at Section (k)(2)(iv) and (k)(3)

15    reflects a reasonable balance of providing notice to the

16    petitioners while not necessarily frustrating the underlying

17    purposes of the removal statute.

18         I think that better reflects the need for a prompt

19    custody review outside of the mandatory detention period under

20    1231(a)(2).  And it also avoids, although the government

21    doesn't need to be pressing this argument, it would be

22    important to have -- we shouldn't -- I also just want to

23    quickly state why it wouldn't be appropriate to have no

24    application of 241.4 to those who are initially detained.

25         THE COURT:  No.  That's worth addressing because I did

```
 1    consider whether maybe there's just no regulation that applies.

 2         MR. COX:  Right.  And so I think there are two issues

 3    there.  And I think what helps illustrate this is if you were

 4    to consider what the world would look like if 241.4 didn't

 5    apply to those who were initially detained outside of the

 6    removal period.

 7         So first you'd have constitutional issues.  You know,

 8    as we've already discussed, you have Justice Kennedy's dissent

 9    in Zadvydas which appears to share the same reasoning the

10    majority had that the 241.4 procedures are an integral

11    component of protecting due process rights for post-order

12    detention, 1231(a)(6).  And as I noted earlier, the rule itself

13    is clear -- the 2000 final rule was clear that the procedures

14    were implemented to provide constitutional protections.  So if

15    you pulled away those protections --

16         THE COURT:  Where is that?

17         MR. COX:  That's 65 Federal Register 80283.

18         THE COURT:  Here, let me get that.  Can you read the

19    pertinent part of the rules, please?

20         MR. COX:  Yes, Your Honor.

21         THE COURT:  The pertinent part of the explanation.

22         MR. COX:  Let's find it here.  Yes.  I'm looking, it's

23    that paragraph that starts, "The Attorney General 's

24    authority."  It's referencing decisions from the Third, Fifth

25    and Tenth Circuits and discussing the need for review,
```

1   constitutional review of detention under Section 1231(a)(6).

2   And it says, "The final rule is structured to afford this type

3   of review, and it has the procedural mechanisms that those

4   courts have sustained against procedural due process

5   challenges."

6        So it was intended to provide very meaningful

7   constitutional protections.  And as I explained earlier this

8   morning, the Zadvydas decision was made against the background

9   of those procedural protections being available to petitioners.

10  So without those protections at all --

11       THE COURT:  There's actually a Third Circuit case that

12  stands for that proposition, too, but the parties didn't cite

13  it.  Alexander v. Attorney General, 495 Federal Appendix 274 at

14  277.  Third Circuit said, "Zadvydas is not the only word on

15  post-removal detention.  A failure to satisfy Zadvydas,"

16  meaning by showing there's no significant likelihood of removal

17  in the reasonably foreseeable future, "may not necessarily be

18  fatal to an alien's ability to prevail on an alternative ground

19  predicated on regulatory noncompliance," meaning with the

20  Post-Order Custody Review procedures in Section 241.4.

21       MR. COX:  I think we would agree with that, Your

22  Honor.

23       THE COURT:  I think you would, too.

24       MR. COX:  So I think that's step one, where you have

25  severe constitutional issues where if you didn't provide --

1          THE COURT:  Constitutional issues meaning substantive

2     due process issues?

3          MR. COX:  Substantive and procedural.  I think you can

4     view them together in this instance.  I think the second

5     issue -- and we don't think the court needs to reach this

6     point, but as we already discussed, our interpretation of the

7     2000 final rule is that it was designed to be a comprehensive

8     regulatory solution for addressing the transition from the

9     90-day removal period to the post-removal detention or

10    post-removal supervised release under either 1231(a)(6) or 1231

11    (a)(3).  So those regulations are designed to provide structure

12    for that.  And we think they're comprehensive.

13         So I think our interpretation of those rules is that

14    if it's authorized under 1231(a)(6), if that detention is

15    authorized, you're going to need the regulatory framework under

16    123 -- sorry -- under 241.4 is going to need to address that

17    scenario.  If it were the case that those who were initially

18    detained at the end of the removal period weren't covered by

19    241.4, that would raise some pretty significant questions about

20    whether the statute even authorizes detention for those who are

21    first initially detained after the close of the removal period.

22         Again, we're not asking the court -- we are very

23    content with a ruling that is as narrow as possible.  I will

24    point out that there have been some courts that have found that

25    under 1231(a)(6), once the removal period is expired, it's not

1  permissible to initiate detention of a petitioner after that

2  point.  Those are cases like --

3          THE COURT:  Are these cases in your brief?

4          MR. COX:  At least two of them, Your Honor,

5  Farez-Espinoza v. Chertoff, which is 600 F. Supp. 2d 488.

6  That's from the Southern District of New York.  And there's

7  also Ulysse v. Department of Homeland Security.

8          THE COURT:  What is that called?

9          MR. COX:  Ulysse v. Department of Homeland Security.

10  That's 291 F. Supp. 2d 1318.

11          THE COURT:  They provide there can be no detention

12  after the removal period?

13          MR. COX:  Yes.  In Ulysse, for example, it says, "The

14  courts find that the respondents are without statutory

15  authority" --

16          THE COURT:  Two things.  One, not so fast, and two, do

17  we have it?  Did you cite Ulysse in your submission?

18          MR. COX:  I believe we did.  I know we cited Farez-

19  Espinoza.

20          THE COURT:  I know you did, too.  Okay.  So what does

21  Ulysse say?  Say it slowly, please.

22          MR. COX:  Sure.  The relevant part is on page 1326.

23  It says, "The court finds that the respondents are without

24  statutory authority to detain Ulysse because the 90-day removal

25  period has expired."

1          Now, again, we don't necessarily need to press that

2     line of argument.  We understand that would be a much broader

3     ruling than what would be necessary to resolve the claims in

4     front of the court today.  What we wanted to point out is that

5     there could be in some significant tensions.  We only raise it

6     to point out that if 241.4 were read to exclude those who were

7     initially detained after the removal period expired, that could

8     create significant problems in terms of whether -- that would

9     undermine the government's general view that 1231(a)(6) even

10    authorizes that detention in the first place.

11         That's the point we wanted to make about that, is just

12    to illustrate that 241.4, its application, if it didn't apply

13    at all, there would be some pretty significant consequences

14    both constitutionally and statutorily.  So we think the better

15    solution is something similar to what you had proposed, which

16    is that, you know, once the detention commences, you must do

17    some kind of relatively expedited review process.  You wouldn't

18    need to necessarily give notice in advance of the detention,

19    but it would certainly need to be on an expedited basis and

20    faster than the 90 days the government is advocating.

21         THE COURT:  Why should it be faster?  You know, the

22    government was beginning to argue and they'll explain more

23    that, you know, Mr. Calderon -- are you talking about Calderon

24    or De Souza -- De Souza, maybe, didn't appear for her hearing,

25    and they didn't know where she was, so although they knew where

1    she was before they arrested her, but for a period of time they

2    didn't know where she was, why should she be subject to less, a

3    shorter period of detention than presumptively is reasonable

4    than somebody who is available to be detained?

5         MR. COX:  I think, again, it comes back to just the --

6    well, first of all, I should say there really hasn't been

7    anything established in the record that she wasn't available

8    for apprehension before this.  I mean, I think the government

9    provided its explanation in response to your order to show

10   cause, and it didn't say that, you know, January 30, 2018 was

11   really the first opportunity they had that indicated that it

12   made some decisions.  We can disagree with those as being

13   legitimate decisions, but it certainly didn't say that the

14   reason it hadn't tried to remove her or detain her previously

15   was that she was unavailable.  I think her contact information

16   would have been available through the I-130 applications, but

17   certainly would have been in the system for longer than, you

18   know, 90 days before ultimate detention.

19        And, you know, if the government were claiming that it

20   had some inability to remove her appropriately, you know,

21   within the first 90 days, it has the mechanism under

22   1231(a)(3)(c) I think where the statutory period is tolled.  We

23   haven't heard any argument along those lines.

24        THE COURT:  1231 --

25        MR. COX:  I just want to make sure I have the citation

1    exactly right.  I'm sorry, Your Honor.  It's 1231(a)(1)(c).

2              THE COURT:  Suspension of period.

3              MR. COX:  I think even if that were --

4              THE COURT:  Hold on.

5              MR. COX:  Pardon me, Your Honor.

6              THE COURT:  That actually may be helpful to the

7    government.  I mean, during the removal period, neither De

8    Souza nor Junqueira were making good faith efforts to get the

9    travel documents necessary, so maybe the removal period did

10   start running when they were detained.

11             MR. COX:  We would disagree with that.  I only

12   illustrated this to point out that the government has not

13   done -- and I think number one, if that were the contention,

14   that the removal period hasn't run, everything they've done in

15   this case until now has contradicted that.  They've been

16   explicit, after the removal period --

17             THE COURT:  And they acknowledged that in Arriaga a

18   year ago, too.

19             MR. COX:  Exactly.  So just to be clear, I don't think

20   anyone is contending that this provision would apply.  And I

21   think there are some cases, I belive that Farez-Espinoza is one

22   of them, that discusses that it's something more than just

23   being absent.  It really requires active effort to avoid the

24   removal process.  And there's been absolutely no indication

25   that is true here.  So we don't think there's any basis to look

1    to 1231(a)(1)(C).

2         The reason I mentioned it, Your Honor, was to

3    illustrate that if the government were concerned about, had a

4    basis to believe that a petitioner should be detained because

5    of flight risk or something like that for the first 90 days,

6    then there is a statutory remedy that would allow them to

7    extend the removal period and do it that way.

8         The problem is there's just nothing in the text that

9    would permit the court to -- you know, to a presumption of

10   reasonable detention for 90 days when everything else in the

11   statutory literature points out that after the removal period,

12   if it hasn't been tolled, is supposed to be by default a period

13   of supervised release under 12(a)(3), and then if certain

14   conditions are met under 241.4, the Attorney General could

15   decide to keep someone in detention subject to the procedural

16   rights in 241.4 and of course the constitutional rights that

17   were explained in Zadvydas.

18        So we don't think there's a hook for allowing -- for

19   effectively making detention mandatory for the full 90 days

20   after initial capture because that's simply a different matter.

21   Once you're out of the removal period, removal is

22   discretionary, and the default is supervised release under 1231

23   (a)(2).

24        THE COURT:  Okay.  So that goes to the interpretation

25   of the regulation.  Is there -- should we stop there and then

```
 1    should I leave some time for what I understand to be the

 2    substantive due process argument is just unreasonably long

 3    or --

 4              MR. COX:  Whatever procedure.  If you'd like to hear

 5    the government on the statutory --

 6              THE COURT:  Mr. Pomerleau, would you like to be heard

 7    on this point, or do you adopt Mr. Cox's arguments?

 8              MR. POMERLEAU:  I adopt most of his argument.  There's

 9    just one point I would like to make that I believe has not been

10    addressed completely.  Section 1231 has as a subpart -- just

11    get it for you.  It talks about the removal period.  (a)(1) is

12    the removal period, (a)(2) is detention.  It just says, "During

13    the removal period" --

14              THE COURT:  (a)(2) --

15              MR. POMERLEAU:  "Attorney General shall detain the

16    alien," but then subpart 3 talks about supervision after the

17    90-day period.  So if the alien does not leave or is not

18    removed within this removal period, it says, "The alien pending

19    removal shall be subject to supervision."  Supervision is a

20    non-detention mechanism.  ICE routinely has people on orders of

21    supervision with final orders of removal.  They check into ICE,

22    they're on GPS monitors, all different scenarios, but they're

23    often told you have 30 days to leave the country, give us plane

24    tickets or we have tickets for you.  These are non-detention

25    circumstances.  So I believe when you're outside of this
```

1    removal period, ICE cannot detain somebody in these

2    circumstances.

3           At least for Dos Santos, he was detained 37 months

4    after his removal period had expired, and the government knew

5    where he was.  His address was in all the paperwork they had.

6    He was in an immigration court proceeding.  He had an appeal

7    that became final in May of 2014, and he was arrested in June

8    of 2017.  In our view in that type of circumstance, he should

9    have been subject to part 3, which is the order of supervision

10   while the removal commences, and that had never been followed

11   in this case.

12          THE COURT:  Hold on just a second.  I want to make a

13   note and then clarify something.  So actually (a)(3) indicates

14   that, contrary to what I may have said in expressing some

15   tentative views, Congress and the president anticipated that

16   somebody ordered deported might not leave because, they're

17   right, if the alien does not leave or is not removed --

18          MR. POMERLEAU:  During the removal period.

19          THE COURT:  During the removal period -- so then you

20   say, "to be subject to supervision under regulations prescribed

21   by the Attorney General."  Do such regulations exist?

22          MR. POMERLEAU:  Yes.  They're routinely referred to as

23   orders of supervision.  Some people file a form I-246, which is

24   a stay.  Those are often coupled with orders of supervision.

25          THE COURT:  So this is something -- is this part of

 1    Section 241.4 or something else?  I mean, is it the 241.4

 2    factors that are to be considered that are in the notice to

 3    your client?

 4          MR. POMERLEAU:  Essentially, yes.  What typically

 5    happens is when somebody's on an order of supervision, there's

 6    a form that they sign that says, for example, they won't

 7    associate with known criminals, they won't associate with gang

 8    members.

 9          THE COURT:  But what's the regulation?  What's the

10    regulation?  Is it part of 241.4, or is there some other

11    regulation?

12          MR. POMERLEAU:  The form, if you look at Section 3, it

13    has subparts, A, B, C.

14          THE COURT:  Section 3 of what?

15          MR. POMERLEAU:  1231.

16          THE COURT:  No, but it says, "shall be subject to

17    supervision under regulations prescribed by the Attorney

18    General."  I want to know what regulations.

19          MR. POMERLEAU:  It says, underneath it says, "The

20    regulations shall include provisions requiring the alien (a),

21    to appear before an immigration officer."

22          THE COURT:  Okay.  Stop.

23          MR. POMERLEAU:  It lists various criteria.

24          THE COURT:  That's the statute.  Hold on.  Well, it

25    may be Section 241.5 but that applies to an alien released

1  under 241.4.

2        MR. POMERLEAU:  Right.  Those factors are largely

3  similar to the letter that I handed forth, Your Honor, earlier

4  that lists the various factors to be considered as part of the

5  post-custody review, so-called POCR rights.

6        So the statutory scheme seems to suggest, and it's our

7  contention, that an alien in these circumstances should not be

8  arrested outside of the removal period.  Rather what should go

9  into effect is the order of supervision contemplated by subpart

10  3 that we just discussed.  And Mr. Dos Santos was arrested 37

11  months outside of the removal period.  Mr. Junqueira was

12  arrested over a decade outside of the removal period.  What's

13  unique with him is he applied for an I-130 and he notified

14  USCIS that he had a prior order of removal and he was applying

15  for an I-130, and he went to a fingerprint -- his interview was

16  held nearly a year later after he applied.  So I just wish to

17  make that additional point, Your Honor, for your consideration.

18        THE COURT:  Thank you.  It's helpful.  So it's the

19  government's position that there's a 90-day clock that starts

20  running when an alien is detained after the removal period is

21  defined in the statute and regulation are defined.  And you've

22  heard how the petitioners argue the law, the statute and

23  regulation should be interpreted.  How do you respond to that?

24        MS. LARAKERS:  Yes, Your Honor.  I think we have to

25  start with the purpose of the regulation in view with the

1    Supreme Court's decision in <u>Zadvydas</u>.  And the purpose of the

2    regulation is to ensure that someone will not be subject to

3    continued detention without any process.

4         Here, each and every one of these petitioners can be

5    removed, and they have put no facts forward to show that they

6    can't be removed in the reasonably foreseeable future.  So

7    that's the lens through which ICE interprets these regulations

8    to make sure that both aliens are getting some sort of

9    administrative review of their detention and to make sure that

10   the Supreme Court's decision in <u>Zadvydas</u> is put -- is adopted

11   by the agency.  So that's the lens through which ICE is looking

12   at this regulation.

13        And to the extent -- the first question before this

14   court is whether that regulation applies to aliens prior to

15   detention.  And I think the statute is abundantly clear that it

16   applies only to detainees.  The title of the section states

17   "Continued Detention," and throughout the regulation it states

18   "continued detention" 11 times.  And it continuously refers to

19   the person receiving the process as the detainee.  So as to the

20   first question, there is no ambiguity.  It definitely applies

21   to someone after they are detained, as is I believe your

22   tentative view.

23        With regard to the second question, ICE would

24   recognize that it is a little bit more ambiguous.  But to the

25   extent that that is ambiguous, ICE's interpretation is a

1   reasonable interpretation of the statute.  It certainly may not

2   be the only permissible interpretation.

3        THE COURT:  ICE's interpretation is reflected where?

4        MS. LARAKERS:  It's reflected in the government's

5   brief, Your Honor.

6        THE COURT:  In the first brief or the second brief?

7   This is part of the reason I started this.  The first brief

8   said that the regulation didn't apply at all.

9        MS. LARAKERS:  Your Honor, it said -- and I apologize

10  to the extent that I was unclear.  However, it was the

11  government's perception that what they were arguing in the

12  first instance was that it applies prior to detention.  We did

13  not -- we were not aware that the second question was on the

14  table yet.  So we were just trying --

15       THE COURT:  So the interpretation is in the

16  government's brief.

17       MS. LARAKERS:  Yes, and the brief --

18       THE COURT:  It's not in the regulation itself, right?

19       MS. LARAKERS:  The position comes from the regulation,

20  from the text of the regulation.

21       THE COURT:  Is it in the explanatory note that was

22  issued by INS at the time of the regulation?

23       MS. LARAKERS:  No, Your Honor, it is not.  However,

24  DHS's interpretation of the regulation is reasonable.  The

25  position of the government is set forth in the government's

 1    brief and in response to this court's order in docket number

 2    55.  That expresses the view of the government.  It should be

 3    given no less deference unless the petitioners show that it is

 4    an unreasoned judgment.

 5          THE COURT:  Actually, there's sort of a continuum of

 6    the degree of deference that is due to agency interpretations

 7    under the existing law.  And, you know, if it was in the

 8    regulation, it would be one thing.  If it was in some policy

 9    statement, it might be higher.  I'm just looking for the --

10          MS. LARAKERS:  Your Honor --

11          THE COURT:  Just stop.  I'm looking for something --

12          MS. LARAKERS:  Sorry, Your Honor.

13          THE COURT:  -- so I can give you a chance to address

14    it.

15          The Supreme Court says that, "The court should defer

16    to DHS's interpretation unless it's plainly erroneous or

17    inconsistent with the regulation or there's reason to suspect

18    that DHS's interpretation does not reflect the agency's fair

19    and considered judgment of the matter in question or when it

20    conflicts with a prior interpretation," Christopher, 567 U.S.

21    142 at 145.  "Deference is particularly inappropriate if an

22    alternative reading is compelled by indications of the agency's

23    intent at the time of the regulation's promulgation."  That's

24    Caruso, a Third Circuit decision.  And I think deference is

25    released when it appears to be a sort of post hoc litigating

1    position.

2         The Department of Homeland Security -- you represent

3    the Department of Homeland Security.  You're the Department of

4    Justice.  I want to know how they interpret the regulation.

5    They don't apply the regulation the way you're arguing it.

6    They didn't give either of these two petitioners the process

7    that you say is due.  They're the agency.  You're the lawyer.

8         I'm looking at their conduct, and their conduct

9    communicates to me what your opening brief communicated to me.

10   They don't have to do anything for six months, and if they can

11   get them out of the country before they get to kiss their

12   children again, you know, courts can't interfere with it.

13        I mean, I'm looking at their conduct.  And, you know,

14   what happened last week in Junqueira?  They were prepared to

15   let him out, and then his case would be over in front of me.

16   If the immigration judge would let you, you could deport him

17   next week.  But it appears that Mr. Pomerleau calls you.  You

18   call an ICE lawyer.  And all of a sudden -- you know, if the

19   messages have been accurately characterized to me, you know, he

20   doesn't get out.  And now he gets 30 days' notice.  But I think

21   I can look at the way -- I think I can look at the conduct in

22   deciding whether to give any deference to the argument that

23   you're making, and I don't think that's their interpretation of

24   it.

25             MS. LARAKERS:  Your Honor, the conduct is also that

1    ICE recognized that they were supposed to.  ICE did recognize

2    they were supposed to do that.  And if this court were to

3    order -- DHS would have no problem with this court ordering

4    compliance on that with regard to DHS's interpretation of it.

5          THE COURT:  That goes down the line.  I mean, this is

6    part of what they want in their class action.  So you would

7    have no problem with my ordering that?

8          MS. LARAKERS:  With ordering --

9          THE COURT:  Ordering what?

10         MS. LARAKERS:  Ordering ICE to comply with its

11   interpretation.

12         THE COURT:  They can't comply with regard to Junqueira

13   and De Souza because the dates are past and they're suffering

14   irreparable harm.

15         MS. LARAKERS:  Your Honor, they can still provide them

16   with the benefit of the regulation in regard to the purpose of

17   the regulation to protect against prolonged detention.  Your

18   Honor, if we go back to the statutory text then, the regulatory

19   text contemplates that these custody reviews should be done

20   every 30 days for the first two 90-day time periods.

21         THE COURT:  Wait.

22         MS. LARAKERS:  Sorry.  Every 90 days for the first two

23   time periods.

24         THE COURT:  Stop.  What are you looking at?

25         MS. LARAKERS:  231.4(c)(1) explains that the procedure

1    should be done every three months following the expiration of

2    the 90-day removal period.  So right there, ICE looks at that

3    part of the regulation and determines, okay, there is our

4    three-month time period.  There's our 90-day time period.  It's

5    reasonable for ICE to interpret that as meaning the clock

6    starts on the day they're detained, and every three months they

7    should have that custody review.

8         THE COURT:  Why should I think that's the way they

9    interpret it?  They didn't do it with regard to either of these

10   two -- I'm sorry.  Let me just take a deep breath.  Because I

11   don't think this should get lost in technicality.  I mean, this

12   is -- you know this.  Think about this, though.  This is a

13   profoundly human thing.  People are being separated from their

14   spouses, from their children.  They may be separated for the

15   rest of their lives if and when they get removed.

16        But the question is, does the Constitution of the

17   United States essentially allow them to be locked up the way

18   the Department of Homeland Security has had them locked up.

19   And there were, I think I was told, eight people arrested while

20   they were pursuing a legal process at Citizenship and

21   Immigration Services in January and February in Rhode Island

22   and in Massachusetts.  Maybe there were seven.  I've got two of

23   them before me.  Did I have any more of them before me in the

24   two settled cases?

25        MS. LARAKERS:  Yes.  De Ollivierra was one of them.

1          THE COURT:  So there are five others, five others who

2     haven't come to court.  And a year ago when I asked the

3     Department of Justice, as I said, where are they?  I mean, I

4     asked why don't they come to court.  And I was told by the

5     petitioners' lawyer, not by the Justice Department, that the

6     Department of Homeland Security wouldn't say where they were,

7     wouldn't say where they were because that would invade the

8     privacy of the people who are locked up.  So they were deprived

9     of access to lawyers who were willing to represent them.

10          You've admitted the Department of Homeland Security

11     hasn't followed its procedures with regard to De Souza or

12     Junqueira, the ones who came to court.  Those are the two cases

13     I would think where the Department of Homeland Security would

14     be most likely to obey the law.  Because that's what we're

15     talking about here.  These are people who disobeyed the law by

16     coming to the United States illegally, but the Department of

17     Homeland Security, based on your admission, violated the law,

18     and this is the jurisprudence, by not following their own

19     regulations.

20          And there are at least five other people who are -- if

21     they're still in the United States -- I would guess -- it's

22     only a guess, an inference, are not being provided the

23     protection of 241.4 as the Department of Justice now argues it

24     because it doesn't appear to me from the conduct in these cases

25     that the Department of Homeland Security interprets a statute

1    the way you do.  So it's a serious matter.

2         MS. LARAKERS:  I understand, Your Honor, but even

3    without the deference, if we can move forward from that, the

4    text of the regulation is reasonable.  It's a reasonable

5    interpretation, and it makes sense in light of the purpose of

6    the regulation and in light of what ICE is just trying to do

7    here.

8         The statutory scheme Congress put in place is for ICE

9    to effectuate final orders of removal.  Here it would make

10   sense for a person upon being detained, it would make sense for

11   ICE to have at least a 90-day time period with which to

12   effectuate that order of removal without a review because the

13   regulation, the regulation contemplates that the purpose of the

14   regulation is to provide review of prolonged detention.

15   Therefore, it would make sense for ICE to have first that

16   opportunity to remove them within a reasonable period, which

17   DHS believes is 90 days, and which the regulation contemplates

18   as 90 days, and 241.4 (c)(1), where it says that the review

19   should be done every three months.  So that's where ICE gets

20   the 90 days from.

21        THE COURT:  I mean, as I understand it -- I'm having a

22   little trouble keeping the cases straight.  Is it De Souza

23   where Wells used the algorithm and decided that detention was

24   appropriate?  Or is that Calderon?

25        MS. LARAKERS:  Yes.

1          THE COURT:  It's De Souza?

2          MS. LARAKERS:  Yes.  I wouldn't characterize it as an

3     algorithm.  But yes.  And I don't know much about it, Your

4     Honor.  I only know to the extent the affidavit says it is.

5     It's important to --

6          THE COURT:  I was going to say.  I mean, you know, the

7     argument, I think your argument is they do do some initial

8     review.  You know, they run some test, and then a person looks

9     at it and makes a judgment, right?

10          MS. LARAKERS:  Yes, Your Honor.

11          THE COURT:  And so the judgment here, according to the

12    affidavit, I think didn't come from Wells, but we're told that

13    Wells made the decision and he noted two factors particularly.

14    One, there was a removal order.  That was one of them, right?

15    But there's going to be a removal order in every case.  We

16    wouldn't be under 241.4 if there wasn't a removal order, so it

17    seems to me that the existence of a removal order alone must

18    not be enough.  And then we go back again, and you're adding

19    something to what's in the written record that, you know, he

20    said, "and she's not eligible for any adjustment of status."

21          MS. LARAKERS:  She's not, Your Honor.

22          THE COURT:  Well, it appears to me that she's

23    eligible.  She may not be entitled, but she's eligible to

24    pursue it whether she's inside the country or not.  But she's

25    eligible to pursue it.  And is the provisional waiver -- I

1   think I know the answer to this -- embodied in a regulation?

2       MS. LARAKERS:  Yes, Your Honor, it is.

3       THE COURT:  Okay.  And that's a regulation that was

4   promulgated in the Obama administration, and it permitted

5   certain people to stay in the United States longer with their

6   spouses and not have to go abroad and ask to be reunited,

7   except, once it was provisionally approved or conditionally

8   approved, they could go abroad for a couple of weeks and be

9   authorized to come back.  Is that essentially the way it works?

10      MS. LARAKERS:  Essentially, except for the regulation

11  does also state that it's not a stayed removal.  So it's

12  independent from ICE's authority -- the eligibility is

13  independent from ICE's authority.

14      THE COURT:  Somebody has the discretion to let them

15  stay here and try to prove that our country honors family

16  values, and looking at all the circumstances, it's better to

17  keep a man with his wife and children or a woman with her

18  husband and American U.S. citizen children than separating them

19  or force the departure of U.S. citizens.

20      So when we have -- and this is just a general

21  observation.  You know, when a new president is elected, he's

22  entitled to have different priorities and policies.  But if a

23  policy is embodied in a regulation, generally speaking, it

24  seems to me the way to change that is to change the regulation.

25  And that's not at the heart of this case, but it's generally

1   applicable, there's a whole line of cases, you know, once the

2   government -- because it still is the United States

3   government -- adopts a policy and a regulation, it has a duty

4   to follow the regulation.

5          I mean, what happened to the other five people who

6   were arrested while they were at Citizenship and Immigration

7   Services in February and January in Massachusetts and Rhode

8   Island?

9          MS. LARAKERS:  Your Honor, I'm not aware.  I do know,

10  what I am aware of is that their detention is discretionary and

11  lawful under 1231(a)(6), and it is lawful under 1231(a)(6)

12  until they can prove that their removal is no longer reasonably

13  foreseeable.  And here, they have final orders of removal; it

14  is reasonably foreseeable; and yes, ICE is required to comply

15  with those regulations.  And certainly this court can order

16  that they comply with the regulations.  However, the purpose of

17  that regulation is to make sure they're not subject to

18  prolonged detention.  And here that certainly isn't the case.

19  They aren't subject to prolonged detention.  And if it weren't

20  for this court's order, they could be removed, and not only

21  removed from the United States but also released from

22  detention.  With regard to the regulation, the provisional

23  unlawful presence waiver --

24          THE COURT:  So you can release them -- I haven't

25  issued any order that prevents you from releasing them.  I had

1    two other cases -- well, I've had three cases where ICE changed

2    its mind and released them.  Then that was the end of my cases.

3    So, you know, to exercise the habeas authority with regard to

4    detention, I have ordered that they not be removed, but they

5    could have been released.  And, you know, if Mr. Junqueira had

6    been released last Thursday, as apparently somebody decided he

7    should have been, then I'd have just one case here today.  But

8    anyway.  I think I understand your argument.

9         MS. LARAKERS:  Yes, Your Honor.  The point here is

10   that ICE has the authority to effectuate removal for people

11   with final orders of removal.  And there's no right under the

12   regulation, under Zadvydas or otherwise, that gives any of

13   these petitioners the right to remain in the United States.

14   And for that simple reason, ICE is just trying to effectuate

15   the removal order that is against them.

16        THE COURT:  There is a difference between having a

17   right to stay in the United States indefinitely, permanently,

18   and a right to be with your family while those decisions are

19   being made.

20        MS. LARAKERS:  Certainly.

21        THE COURT:  Look, I understand your argument.  I'm not

22   persuaded by it, but I understand it.  Do you want to address

23   the remaining issues, maybe the substantive due process?

24        MR. COX:  Yes, Your Honor.  So it's our view that even

25   setting aside the 241.4 issues that, as the Supreme Court

1    explained in Zadvydas, the detention under these circumstances

2    violates the Constitution, full stop.

3         The court in Zadvydas was clear that the purpose of

4    detention under 1231(a) is to secure a petitioner's

5    availability for removal.  It's a civil rule.  It's not a

6    criminal one.  And it's not punitive.  That's what the court

7    said at 533 U.S. at 690.  And as has already been discussed,

8    after the 90-day removal period has expired, the default is

9    supervised release under 1231(a)(3).  Detention is not supposed

10   to be the automatic remedy or the automatic choice.

11        So the court recognized that because of that, against

12   that background, there have to be strong protections for people

13   facing that transition from the mandatory detention under

14   1231(a)(2) to the discretionary detention under 1231(a)(6),

15   especially if there doesn't appear to be an end in sight to

16   that detention.

17        So as we've already discussed about the dissent in

18   Zadvydas, which I think illustrates exactly how strong the

19   majority opinion was, that even Justice Kennedy in the dissent

20   said that "both removable and inadmissible aliens are entitled

21   to be free from detention that is arbitrary or capricious.  And

22   where detention is incident to removal, the detention cannot be

23   justified as punishment" --

24        THE COURT:  Hold on just one second.  First of all,

25   what did you say about the majority?

1          MR. COX:  Well, I think the point I was trying to

2     make, Your Honor, is that even Justice Kennedy in the dissent

3     was recognizing this very strong baseline that both removable

4     and inadmissible aliens are entitled to be free from detention

5     that is arbitrary or capricious.

6          Obviously the majority in Zadvydas went beyond that,

7     but at a very minimum, you have the ability to be free from

8     arbitrary and capricious detention, especially as Justice

9     Kennedy said, "Where detention is incident to removal, the

10    detention cannot be justified as punishment, nor can the

11    confinement or its conditions be designed" --

12         THE COURT:  Where are you reading?

13         MR. COX:  533 U.S. at 721.

14         THE COURT:  Just one second.  The first thing you

15    quoted was talking about a liberty interest.  Where is that?

16         MR. COX:  It was saying that both removable -- it's

17    also in the same page.  I think it's part of the same

18    paragraph, Your Honor, 721.

19         THE COURT:  Okay.  I don't see the reference to the

20    liberty interest, but I'll find it.

21         MR. COX:  That language that may not have been inside

22    the quotation mark, Your Honor.

23         THE COURT:  It's okay.  Go ahead.

24         MR. COX:  The general point is that he was saying

25    that, you know, it is neither arbitrary nor capricious to

1   detain the aliens where necessary to avoid the risk of flight

2   or danger to the community.  But in general, if it is arbitrary

3   and capricious, that represents a constitutional violation.

4   Then on top of that, the majority went further.  I think this

5   is a very minimalist reading of the underlying due process

6   guarantees.  At a bare minimum I think Zadvydas illustrates

7   that if it's an arbitrary and capricious detention, especially

8   one that is disconnected from the goals of avoiding risk of

9   flight or avoiding danger to the community, then you run into

10  due process considerations.

11          And as we discussed earlier, Zadvydas did establish

12  the six-month presumption.  But again, that was against the

13  backdrop of the procedural protections of 241.4.  And again,

14  that was because you have -- the government in Zadvydas

15  admitted that the twin goals of 1231(a)(6) were, first,

16  ensuring the appearance of aliens at future immigration

17  proceedings, and number two, preventing danger to the

18  community.

19          And the majority in Zadvydas pointed out that under

20  the statute, the choice really isn't between letting a person

21  go free or holding them in detention.  You also have this

22  middle ground, as very clearly explained in the statute, which

23  is supervised release.  That's what the court said at 533 U.S.

24  at 696.  "The choice, however, is not between imprisonment" --

25          THE COURT:  Where is this, 696?

1          MR. COX:  696, Your Honor.  "The choice is not between

2     imprisonment" --

3          THE COURT:  Well, here.  Let me find it.  So this is

4     the majority decision?

5          MR. COX:  Yes, Your Honor.

6          THE COURT:  All right.  I have it.

7          MR. COX:  Just to illustrate the point that the

8     majority was recognizing that there are other options to

9     address the stated purposes of the removal statutes that aren't

10    necessarily detention.  And against that backdrop, I think it

11    makes sense to look at the factual record about Ms. De Souza.

12    She has no criminal history.  Just for your reference, the

13    clear summary of this is in the Andrade affidavit, which I

14    think was submitted at docket number 50-5.  But she has no

15    criminal history.  She has a U.S. citizen spouse and a U.S.

16    citizen child.  She's set down roots in the United States.  And

17    as we've already discussed, she is in the middle of this

18    process to secure a lawful permanent resident status as a

19    result of her husband's U.S. citizenship.  It's highly likely

20    that she will ultimately gain the ability to live permanently

21    in the United States as a result of that.

22          You know, we can cabin the discussion of the 2016

23    regulations and how that fits into it.  But the ultimate point

24    is that it is highly likely, and the government has not put

25    forth evidence to the contrary on this, that she's ultimately

1   going to be granted lawful permanent resident status.  The

2   question is how long it's going to take her and how frustrating

3   that process is going to be.

4        Under Zadvydas and the Constitution, the government

5   has to offer some kind of explanation for the detention that

6   bears a meaningful relationship to the underlying statutory

7   purposes.  And we've already discussed it a little bit, the

8   Rutherford affidavit that describes the stated reasons behind

9   the detention decision.  Your Honor pointed out the circularity

10   of citing the final order of removal as evidence of a flight

11   risk because that would apply to everybody.  That's certainly

12   not an individualized determination.

13        We also discussed a bit the fact that she is, quote,

14   "not eligible" for immigration benefits that would allow her to

15   remain in the United States.  We obviously dispute that that's

16   a factual matter.

17        THE COURT:  I mean, is it your position she is

18   eligible?

19        MR. COX:  Yes, she's eligible for benefits that would

20   ultimately entitle her to lawful permanent residency in the

21   United States.  Again, we don't want to veer too far down that

22   because we don't think it's necessary.

23        THE COURT:  I think, to me, the relevance of that

24   stated reason for the detention after the initial review goes

25   to whether, if I find a constitutional violation, I should let

1    DHS try to get it right when it hasn't got it right in the last

2    three months, admittedly, for either of the petitioners or

3    whether I should conduct it myself.  It's my understanding the

4    immigration judges think they don't have jurisdiction to do

5    this.  Is that your understanding?

6          MR. COX:  That is my understanding as well.  The one

7    other thing I'd like to point out about that particular

8    justification --

9          THE COURT:  Go ahead.

10         MR. COX:  -- it was listed as a justification as

11   evidence of a flight risk.  Now, you can talk about -- you

12   know, we obviously disagree that it would generally be a reason

13   to detain somebody.  But we see absolutely no reason why, even

14   if it were true that she weren't be eligible for immigration

15   benefits, why that would be evidence of a flight risk.  That

16   seems like a completely disconnected reasoning.  We can't

17   discern any meaningful connection to the underlying statutory

18   purposes.  The other explanations --

19         THE COURT:  Let's see.  Remind me of her personal

20   circumstances.  She's married to an American citizen?

21         MR. COX:  That's right.  She's married to an American

22   citizen.  They were married in 2006, and they have a

23   ten-year-old son.

24         THE COURT:  And in which municipality do they live?

25         MR. COX:  They're in Everett, Massachusetts.

1           THE COURT:  Do they own a home or rent?

2           MR. COX:  I'm afraid I don't know the answer.

3           THE COURT:  Okay.  Keep going.

4           MR. COX:  Well, just to look at the last set of

5      justifications that were mentioned in the Rutherford affidavit,

6      it mentions the availability of bed space, lack of health

7      issues and lack of dependent care issues.  That seems like

8      those concerns -- it's not at all clear why -- that kind of

9      explains the kind of -- well, number one, they don't explain

10     why those became salient concerns as of January 30, but it also

11     doesn't tie it back to the underlying reasons for it.

12          THE COURT:  I think -- you know, we're in a colloquy.

13     When I read those things, I didn't think they reflected on risk

14     of flight.  But I actually was -- I think it's legitimate and

15     may in particular cases be favorable to the alien to have the

16     Department of Homeland Security consider those things because,

17     something like a criminal sentence, there's a range of reason.

18     So if there's no evidence whatsoever, it's not in my view

19     reasonable to detain somebody, that they are a risk of flight

20     or danger.  But if, you know, there's some evidence, it's a

21     discretionary decision.  How do you exercise your discretion.

22     So if somebody is the sole parent of a young child, you know,

23     within the range of reason that would cause, I think most

24     reasonable people to say that weighs in favor of releasing

25     somebody when we're in this discretionary range.  Or are they

1  taking care of, you know, a very ill parent.

2       I infer, because we do this at sentencing, that it

3  didn't relate to risk of flight or risk of committing crimes,

4  but if there was sufficient evidence to permit but not require

5  detention in the judgment of the person making the judgment, I

6  think those would be reasonable considerations.

7       MR. COX:  We're certainly not arguing that -- I think

8  the point I was trying to make is those considerations listing

9  those presupposes that there is a justification for detention

10  that could or could not be relaxed if you found other

11  mitigating factors that would make detention unreasonable under

12  those particular circumstances.

13       So our point is that the record really contains, you

14  know, as far as we can tell, only two justifications of any

15  risk of flight.  One of them is not an individualized

16  determination at all.  And the other one, as far as we can

17  tell, doesn't bear any relation to flight risk at all.  So

18  that's the record we're looking at for Ms. De Souza's

19  detention.  You know, our position is we just haven't heard

20  anything from the government explaining why it needs to detain

21  her, other than the fact that it wants her to be in custody.

22  It seems very circular to us.

23       THE COURT:  Well, they want to make sure they have her

24  so when they're allowed to remove her she'll be available to

25  go.  But the question is whether there's evidence that she

1    wouldn't go back to Everett for precious time with her husband

2    and son but instead they try to go someplace else, or she would

3    try to go someplace else.  But that would undermine, if not

4    destroy, her effort to get the provisional waiver.

5              MR. COX:  That's right, Your Honor.

6              THE COURT:  I think she's got a very strong incentive

7    to stay here.

8              MR. COX:  Yes.  And as the Supreme Court said, the

9    choice is not letting somebody go free and hoping they're

10   available for removal and putting them in detention.  You have

11   this clear statutory default of supervised release under

12   1231(a)(2) -- excuse me, 1231(a)(3).  And, you know, the

13   government may say that it wants to detain her for the purposes

14   of effectively removing her, but I think under these

15   circumstances the default option is supervised release.  And

16   given the liberty interests at stake here, there needs to be an

17   explanation of why supervised release wouldn't be an

18   appropriate way to secure her availability for removal if

19   that's ultimately what ends up happening.

20             THE COURT:  Okay.

21             MR. COX:  So I think if we're -- I don't want to --

22   just looking back at the dangerousness of flight risk and that

23   sort of thing, we haven't seen any showing there.  And we also

24   think that the court doesn't need to -- what I'm expecting to

25   hear is that the Zadvydas framework says that the ultimate

```
 1    inquiry is about whether removal is imminent.  And I think what
 2    we've heard from -- what we've seen -- as a legal matter now in
 3    this case, removal cannot be imminent because of the order that
 4    you've entered.  And additionally, Zadvydas did not make that
 5    the end of the inquiry regarding whether removal is --
 6              THE COURT:  All right.  I mean, I've already indicated
 7    that I think Zadvydas assumed that the 241.4 procedures were
 8    properly employed, and, you know, an informed decision that
 9    deserves deference was made in a timely manner.
10              Do you have much more?
11              MR. COX:  No, Your Honor.  I think that's sufficient.
12              THE COURT:  Mr. Pomerleau?
13              MR. POMERLEAU:  I have nothing additional to add on
14    those points, Your Honor.
15              THE COURT:  All right.
16              MR. POMERLEAU:  But if you wanted to know about danger
17    or flight risk, Mr. Dos Santos has one criminal charge that was
18    vacated.
19              THE COURT:  Wait a minute.  We're talking about
20    Junqueira today.
21              MR. POMERLEAU:  Mr. Junqueira has no criminal record
22    at all.  He has a 10 and 12-year-old U.S. citizen children, two
23    boys, wife who is a U.S. citizen, been residing in Connecticut
24    for 13 and a half years, had a job, was paying taxes.  As far
25    as flight risk, he attended his I-130 interview at the Hartford
```

1    USCIS office.  He also went and had his fingerprints taken in

2    the year after he applied.  So he's not a risk of flight.  He's

3    actually coming forth to participate in this process that was

4    authorized through regulatory schemes authorized by DHS.

5            THE COURT:  Okay.  Thank you.

6            MR. POMERLEAU:  You're welcome.

7            MS. LARAKERS:  Your Honor, the only thing that the

8    government has to say is that Zadvydas only implicates one due

9    process right, and that's the due process right to be free from

10   detention that is unrelated to the purposes of removal.  And it

11   does not -- whatever Zadvydas says, it does not place that

12   burden to prove otherwise on the government.  It places that

13   burden on the petitioner.  The petitioner has the burden to

14   prove that her removal is not reasonably foreseeable and is not

15   foreseeable in the reasonable future.  It does not say that the

16   government has to prove that the person is a flight risk before

17   putting them in detention.  The statute doesn't say that, and

18   therefore, the government's position is that this court cannot

19   import those requirements on 1231(a)(6) when the statute does

20   not require it.  And that proposition --

21           THE COURT:  Stop.  Pause.  There's a line of cases

22   that says that even if a regulation provides more process or

23   more protection than the Constitution would require, the agency

24   is obligated to follow its regulations.

25           MS. LARAKERS:  Yes, Your Honor, and ICE is willing to

1    conduct that.

2         THE COURT:  It can't.  I'm afraid the cafeteria is

3    going to close in 20 minutes, and you'd probably rather eat

4    than say the same thing again and hear me say it.  You can't

5    follow the regulations because, even as you interpret them, the

6    time has passed.

7         MS. LARAKERS:  Yes, Your Honor.

8         THE COURT:  I hope your mother is still alive and

9    you'll get to see her on Mother's Day.  But that's not going to

10   happen for Ms. De Souza because I don't anticipate concluding

11   this today.  But, you know, that's what we're talking about

12   here.  So that's what we've got.

13        Look, it's 1:15.  I've got -- I'm going to give you a

14   ruling orally when we come back, but it's going to be

15   abbreviated.  I'm going to write something that will not alter

16   the conclusion but will explain it and amplify it, but for

17   reasons I'll explain when we come back, the petitioners' rights

18   to procedural due process has been violated.  Habeas is an

19   equitable remedy.  It doesn't mean I can do anything I want.

20   But given the inability or the unwillingness of the Department

21   of Homeland Security to follow its own regulations, the number

22   of times that the Department of Homeland Security in this case

23   has broken the law, the most appropriate equitable thing is for

24   me to conduct a bond hearing, which I'll do next week, next

25   Tuesday morning.  I'll tell you what you need to file before

1   that.

2         And it's not any kind of final relief because it's

3   still an open question whether either petitioner will be

4   released.  But we'll go one step at a time.  I'll explain all

5   this to you when you come back, and I'll give you some work to

6   do for the next few days while I'm out of the jurisdiction.

7         MS. LARAKERS:  Just one minor point, Your Honor, in

8   case it helps you with scheduling.  I am required to be in

9   court on that Tuesday in the Southern District of Texas.

10        THE COURT:  You want to go home?

11        MS. LARAKERS:  No.  I'm actually required to be in

12  court for a pretrial.

13        THE COURT:  Are you from Texas?

14        MS. LARAKERS:  I am, Your Honor.

15        THE COURT:  What part of Texas?

16        MS. LARAKERS:  I'm from a place called Beeville, which

17  is about three hours from the border.

18        THE COURT:  Is it in the district you're going to?

19        MS. LARAKERS:  No.  It's in the Western District

20  technically.

21        THE COURT:  Do you get to stop at home on the way

22  there?

23        MS. LARAKERS:  I hope to, yes.

24        THE COURT:  Do you want to see your mother on Mother's

25  Day?

1          MS. LARAKERS:  I hope to, Your Honor.  However, I

2     am -- this district does require the lead attorney to be in

3     court on Tuesday, and I am the lead attorney.

4          THE COURT:  All right.

5          MS. LARAKERS:  And I won't be back until -- I'm flying

6     back very late on Tuesday, so it would preclude any morning on

7     Wednesday as well, unfortunately.

8          THE COURT:  Thank you for telling me that.  This is

9     challenging because I'm away the next couple of days.  We'll

10    figure it out.

11         MS. LARAKERS:  Okay.  I can certainly talk to the

12    petitioners, and perhaps we can come to some agreement.

13         THE COURT:  Well, these people are locked up.  This is

14    a problem.  Why don't you also talk to your co-counsel, because

15    you're under a court order to be there personally --

16         MS. LARAKERS:  Yes, Your Honor.

17         THE COURT:  -- in Texas.  I haven't given you that

18    order.  If there's going to be a set of defined issues, and

19    you're from the Department of Justice, which includes the U.S.

20    Attorney's Office, maybe you're not indispensable.

21         MS. LARAKERS:  Perhaps, Your Honor, the petitioners

22    and I could come to some sort of agreement to do it on papers,

23    the review on papers, but we can discuss that as well if that's

24    a possibility.

25         THE COURT:  That's actually not going to work because

1    I've got some questions to ask of people.

2            MS. LARAKERS:  Okay, Your Honor.

3            THE COURT:  I want to -- I think -- you know, you talk

4    about deference -- and I believe in this very strongly.  I'll

5    probably decide this on the narrowest possible grounds, and

6    then I'll get another case and have to do it all over again.

7    But, no.  I believe in that.  But, like the Court of Appeals

8    doesn't defer to trial judges who don't explain their reasons.

9    And, you know, decisions were made to detain Mr. Junqueira.  I

10   want to understand them.  So I don't think it would be possible

11   to do it on the papers in my present conception.  I'll think

12   about it.  But you're surrounded by two experienced, able

13   lawyers.  One of them has an appearance in this case already.

14   As I said, you may not be indispensable.  Although we'll miss

15   you.

16           MS. LARAKERS:  Thank you, Your Honor.

17           THE COURT:  All right.  Court is in recess.  I'm

18   sorry, I didn't say it.  Come back at 3:00.

19           (Recess taken 1:17 p.m. - 3:25 p.m.)

20           THE COURT:  I apologize for keeping you waiting.  I

21   guess I was ambitious in estimating how long it would take me

22   to prepare my thoughts.  As I indicated earlier and as I

23   explained, the Department of Homeland Security has admittedly

24   violated the applicable regulations in continuing to detain

25   Ms. De Souza and Mr. Junqueira.  Habeas corpus is an equitable

1   proceeding, and the remedy must be equitable for reasons I'll

2   explain.  They're entitled to a hearing to determine whether

3   they should be released on conditions, and it's most

4   appropriate that the court, rather than the Department of

5   Homeland Security, conduct that hearing.

6          I will need some expedited briefing and affidavits.

7   I've looked at my schedule, and I feel I really should conduct

8   that hearing on May 15 at 10:00 a.m.  And I will need certain

9   witnesses here to testify, if necessary, from DHS, from ICE.

10          Have you decided who will represent DHS in that

11   proceeding?

12          MS. LARAKERS:  No, Your Honor.  However, I did get a

13   moment to speak to ICE, and they decided based on the

14   particular circumstances here and your tentative view that ICE

15   has violated Ms. De Souza's procedural due process rights.  ICE

16   made the decision to release her, and she will be released

17   tonight, and she will be placed on conditions tomorrow.  But

18   that -- I haven't had time to speak with them about

19   Mr. Junqueira as of yet, nor about who will be able to testify

20   at any hearing.  However, the petitioners and I, Calderon and

21   petitioners and I have agreed that we wouldn't need a hearing

22   immediately on Ms. De Souza's detention.

23          Is that correct?  Am I representing that correctly?

24          MR. COX:  That's correct, Your Honor.

25          THE COURT:  Well, this is the fourth time this has

1    happened.  I'm not going to impede her release.  I'm not going

2    to be here myself tomorrow, but you'll inform me.  I may

3    conduct this hearing next week anyway.  I have a whole series

4    of cases and issues that are related, and I've got some

5    questions.  But we'll see.

6            Okay.  This is not an utterly unforeseen development,

7    and I'm going to explain the outline of my reasoning.  I'm

8    going to issue a decision.  I mean, I told you before lunch

9    what I decided.  This will let us proceed in a more deliberate

10   way with regard to Ms. De Souza.  ICE evidently, it appears,

11   was poised to release Mr. Junqueira last week, maybe until the

12   lawyers got involved, so you're working on it.  I'll give you

13   some more time to work on it.  And actually, what I think I'll

14   do is schedule the hearing for 10:00 on May 15, but if the

15   urgency with regard to Mr. Junqueira as well as Ms. De Souza is

16   eliminated, I'll be reasonable, okay?  But otherwise, who is

17   going to -- Mr. Sady has an appearance in Junqueira, and this

18   will be manageable.

19           All right.  Susan Walls from our Probation Office is

20   here.  In case I have to decide the suitability of the

21   residence, for example, please give her the address for

22   Mr. Junqueira so if she has to, she'll check it out.  And is

23   Ms. De Souza going to be released on some conditions?

24           MS. LARAKERS:  Yes, Your Honor.

25           THE COURT:  Okay.  And who is going to supervise those

1    conditions?

2              MS. LARAKERS:  ICE will supervise.

3              THE COURT:  Well, maybe Probation should supervise.  I

4    don't know.  Here.  This is another thing the parties should

5    discuss, okay?  See if you're in agreement.  If you're in

6    disagreement, I'll decide, okay?

7              MS. LARAKERS:  Yes, Your Honor.

8              THE COURT:  But basically -- and you'll have to figure

9    this out tomorrow because I'm traveling tomorrow morning and

10   then I'm traveling someplace else on Thursday afternoon.  So if

11   there's going to be a hearing on May 15, by May 9, tomorrow,

12   the parties shall each propose conditions of release and by May

13   11 file memos and the government at least affidavits regarding

14   the burden of proof, and the factors to be considered may be

15   Section 241(d)(1).  There are also familiar factors to the

16   court at least that are considered in criminal detention

17   hearings under 18 United States Code, Section 3142.

18              In addition, in the affidavit to be filed on May 11,

19   I'm ordering that ICE identify the official who decided to

20   arrest De Souza and who decided to arrest Junqueira at the CIS

21   office.  I note that the petitioners have filed a USCIS field

22   manual that says that arresting at the office is contrary to

23   CIS policy at least.  These are two branches of the Department

24   of Homeland Security that seem to have different policies.

25              But anyway, I want to know in the affidavit the ICE

1    official who decided that each of the petitioners should be

2    detained initially.  I understand it was Officer Wells with

3    regard to De Souza.  I don't know who it was, I haven't been

4    told who it was with regard to Junqueira.  I want to know which

5    ICE official decided on April 30 that De Souza should be --

6    should continue to be detained.  I want to know who the ICE

7    official was who decided to issue a new notice for De Souza

8    scheduling a June 3 review.  I want to know the ICE official

9    who decided Junqueira should be released on May 3 or 4 or

10   brought to the ICE office in Burlington on May 3 or 4.  I want

11   to know the ICE official who reversed any decision to release

12   Junqueira on May 3 or 4.  I want to know which ICE official

13   decided to issue Junqueira notice of a review on June 3.  And

14   all of those individuals shall attend the May 15 hearing and be

15   prepared to testify if necessary.

16          I'm ordering that the parties order the transcript of

17   at least this afternoon's session on an expedited basis and the

18   whole transcript.  I think it will help all of us.

19          All right.  As I told you, I'm going to issue a

20   written memorandum and order in this matter, but I do want to

21   explain the basic reasons for my decision, which will be

22   amplified and perhaps extended because this analysis is based

23   on the government's interpretation of Section 241.4, and as

24   I'll reiterate, I have doubts as to whether that's the correct

25   interpretation.  However, I'll discuss this in the context of

 1    Ms. De Souza.  That's what I prepared to do.  But the

 2    chronology with regard to Junqueira, which I'll also recite at

 3    the end, toward the end, leads to the same result.

 4           So De Souza was ordered removed from the United States

 5    in 2002.  She stayed here.  She married a United States citizen

 6    in 2006.  They have an 11-year-old son who is a United States

 7    citizen.  Her husband filed a petition, an I-130 petition in

 8    order to seek a provisional waiver to apply for admission in

 9    the United States while in the United States, rather than

10    abroad.

11           On January 30, 2018, Ms. De Souza and her husband were

12    at the Citizenship and Immigration Services office for a

13    hearing on the I-130 petition.  CIS determined that their

14    marriage was real, genuine, not a sham, and shortly afterwards

15    another branch in the Department of Homeland Security,

16    Immigration and Customs Enforcement, often referred to as ICE,

17    arrested her.

18           Ms. De Souza has been detained since June 30, 2013.

19    The Department of Homeland Security of these related cases

20    first argued in the Calderon case in which De Souza is now a

21    named plaintiff that 8 CFR Section 241.4 regulations do not

22    apply to aliens like De Souza who are not removed within 90

23    days of their final order of removal.  The Department of

24    Homeland Security now argues that Section 241.4 does apply and

25    its time limits begin running when an alien is detained.

1          In Zadvydas, 533 U.S. 678 at 690, the Supreme Court

2     held that freedom from detention lies at the heart of the

3     liberty that the Fifth Amendment due process clause protects.

4     The due process clause applies to all persons, including

5     aliens, as the Supreme Court said in Zadvydas at 693.

6          In issuing its Section 241.4 regulations, the

7     immigration and naturalization service, INS, the predecessor to

8     the Department of Homeland Security, DHS, said that Section

9     241.4 was promulgated to provide due process to detained aliens

10    as required by the Fifth Amendment.  That can be found at 65

11    Federal Register 80281-01 at page 4.  INS also stated that

12    Section 241.4, quote, "governs all post-order custody reviews

13    inclusive of aliens who are the subjects of a final order of

14    removal."  That's at page 17.

15         In Zadvydas, the majority discussed Section 241.4

16    extensively, including at 533 U.S. at 684.  The court

17    implicitly assumed that Section 241.4 procedures had in that

18    case been followed and generally were being followed.  It held

19    that prolonged detention could nevertheless violate the due

20    process clause, quote, "irrespective of the procedures used."

21    That's at page 695.  And the majority specifically referenced

22    there Justice Kennedy's dissent.  The majority held that up to

23    six months' detention would be presumed reasonable by the

24    courts to allow or to facilitate removal.  That's at page 669.

25    And this is as a matter of comity, of deference by the courts

1    to immigration matters which are a form of foreign policy for

2    which the executive branch has primary responsibility.

3            In his dissent, Justice Kennedy wrote at page 724,

4    "removable aliens held pending deportation have a due process

5    liberty right to have the INS conduct the review procedures in

6    place.  Were the INS in an arbitrary or categorical manner to

7    deny an alien access to the administrative processes in place

8    to review continued detention, habeas jurisdiction would lie to

9    redress the due process violation caused by the denial of the

10   mandated procedures under 8 CFR Section 241.4."  Then he went

11   on to say, "This is not the posture of the instant cases," the

12   Zadvydas case or cases, "however.  Neither Zadvydas nor Ma

13   argues that the Attorney General has applied the procedures in

14   an improper manner.  They challenge only the Attorney General's

15   authority to detain at all where removal is no longer

16   foreseeable."

17           In Alexander v. Attorney General, 495 Federal

18   Appendix, 274 at 277, the Third Circuit in essence agreed with

19   Justice Kennedy.  It wrote, "Zadvydas is not the only word on

20   post-removal detention.  A failure to satisfy Zadvydas by

21   showing that there's no significant likelihood of removal in

22   the reasonably foreseeable future may not necessarily be fatal

23   to an alien's ability to prevail on an alternative ground

24   predicated on regulatory compliance," meaning with the

25   post-order custody review procedures in Section 241.4.

1          I agree with Justice Kennedy and the Third Circuit.

2    This conclusion is consistent with the familiar general

3    principle that any agency must follow its own regulations

4    before depriving a person of liberty.  More specifically, the

5    due process clause requires a federal agency to follow its own

6    regulations before depriving someone of liberty, even when

7    those regulations provide greater protection than is

8    constitutionally required, as the First Circuit wrote in <u>Nelson</u>

9    <u>v. INS</u>, 232 F. 3d 258 at 262.  This is consistent with the

10   Supreme Court's 1954 holding in a <u>Accardi</u>, 347 U.S. 260 at

11   267-68.

12         As the Supreme Court wrote in <u>United States v. Richard</u>

13   <u>Nixon</u>, so long as a regulation "remains in force, the executive

14   branch is bound by it, and indeed the United States as the

15   sovereign composed of the three branches is bound to respect

16   and enforce it."  That was written at 418 U.S. 683 at 695-96.

17         "When an immigration regulation is promulgated to

18   protect a fundamental right derived from the constitution or a

19   federal statute," like the opportunity to have notice and be

20   heard, fundamental features of due process, "and ICE fails to

21   adhere to it, the challenged action is invalid" and may be

22   reversed, as Chief Judge Saris wrote in 2017 in <u>Rombot v.</u>

23   <u>Souza</u>, 2017 Westlaw 5178789 at page 4, citing <u>Waldron v. INS</u>,

24   17 F. 3d 511 at 518.

25         In short, the government as well as the governed must

1  follow the law, and it is the duty of a habeas court to ensure

2  that it does.  This is a principle that the Supreme Court

3  reiterated in one of the Guantanamo cases, <u>Boumediene v. Bush</u>,

4  553 U.S. 723 at 741, stating, "From an early date it was

5  understood that the king, too, is subject to the law" and that

6  by the 1600s habeas courts can ensure that he followed it when

7  detaining free men and women.

8       28 United States Code Section 241.1(c)(3) provides for

9  habeas relief for violations of the Constitution or laws of the

10 United States regulations including Section 241.4, our laws of

11 the United States.  Although I have substantial questions as to

12 whether this is the correct interpretation, assuming without

13 deciding Section 241.4 is now properly interpreted by the

14 government, it has been violated with regard to Ms. De Souza

15 and also Mr. Junqueira.

16      As I said, the government now takes the position that

17 the regulation applies to people such as Junqueira and De Souza

18 and that the time limits in the regulation start running when

19 they are detained.

20      De Souza was arrested at the CIS office and detained

21 on January 30, 2018.  The regulations provide that prior to the

22 expiration of the removal period -- the respondents argue that

23 means, despite the literal language of the statute and

24 regulations, 90 days after detention -- a Department of

25 Homeland Security official will conduct a custody review of

1    that Section 241.4(k)(1)(i).  That review is a record review

2    governed by section 241.4(b).  90 days for De Souza would be

3    about April 30, 2018.  The regulations, Section 241.4(h)(2),

4    provide or require that written notice approximately 30 days --

5    well, they require written notice approximately 30 days in

6    advance of the pending record review so that the alien may

7    submit information in writing in support of his or her release.

8    If the alien has an attorney, the notice must be mailed only to

9    the attorney pursuant to Section 241.4 (d)(3).  Therefore, the

10   notice should have been mailed to De Souza's attorney by

11   approximately March 30, 2018.

12          On April 23, 2018, ICE sent De Souza, not her

13   attorney, a notice to alien of a file custody review to be

14   conducted on or about April 3, 2018.  The notice was not given

15   on approximately March 30, 2018.  It was not sent, as I said,

16   to De Souza's attorney.  It was not provided approximately 30

17   days in advance of the scheduled record review.

18          I believe the record shows -- can I have Exhibit 1?

19   Exhibit 1 indicates that on April 27, 2018, someone with an

20   unintelligible, by me, signature -- maybe it's Thomas Brophy,

21   acting field office director, denied De Souza's -- well,

22   decided to continue the detention.  I believe it's been

23   represented that De Souza provided documents on August 30.  The

24   unlawfully short notice basically prevented her from presenting

25   evidence in support of her request to be released.

1          I understand that ICE says a copy of the decision was

2     sent to De Souza on May 2.  On May 3, 2018, ICE sent De Souza

3     and her attorney a new notice of another post-custody review to

4     be conducted on June 3, 2018 in order to provide the legally

5     required 30 days' notice because of what ICE characterized as,

6     quote, "irregularities" in the notice.  That's in the Brophy

7     affidavit docket number 56-1.

8          In view of the undisputed violations of Section 241.4,

9     De Souza is entitled to relief under Section 2241.  The

10    Department of Homeland Security argues that the relief should

11    be a decision by the Department of Homeland Security on about

12    June 3 pursuant to the May 3 notice to De Souza.  This I find

13    would not be equitable, and a habeas corpus proceeding is an

14    equitable proceeding.

15         As the Supreme Court more precisely has put it, habeas

16    corpus is at its core an equitable remedy.  That's Schlup, 513

17    U.S. 299 at 319.  28 U.S.C. Section 2243 provides that the

18    court shall dispose of the matter as law and justice require.

19    Historically common law was above all an adaptable remedy in

20    which the court's role was most extensive in cases of pretrial

21    and non-criminal detention, as the Supreme Court wrote in

22    Boumediene, 128 Supreme Court at 2267.  When the judicial power

23    to issue habeas corpus properly is invoked, the judicial

24    officer must have adequate authority to formulate and issue

25    appropriate orders for relief, including, if necessary, an

1   order directing the prisoner's release.

2          As I wrote in Flores-Powell, 677 F. Supp. 2d at 474,

3   "While the court's discretion to devise an equitable remedy is

4   considerable, it is not unfettered."  I said essentially the

5   same in Ferrara, 384 F. Supp. 2d 384 at 434.  "Rather the

6   remedy should be tailored to the injury suffered and should not

7   unnecessarily impinge upon competing interests," as I wrote in

8   Flores-Powell, quoting Gordon, 156 F. 3d 376 at 381.

9          In this case, I find that it would be inequitable and

10  foreseeably futile to allow -- let me put it this way.  When I

11  prepared this decision before coming into court, it was clear

12  to me that it would be inequitable to rely on DHS to conduct

13  the review.  ICE has, until a few moments ago, twice decided

14  that De Souza should remain in custody and I believe

15  predetermined the issue as the Supreme Court said in McCarthy,

16  503 U.S. at 149.  De Souza correctly asserts she's already

17  being held without due process, and she suffers irreparable

18  harm each day she remains incarcerated, again, as the Supreme

19  Court recognized in McCarthy at 147 and as I discussed in

20  Flores-Powell at 463, citing Marsh, 801 F. 2d 462 at 468.

21         I note that Junqueira has also been denied due process

22  because of the violations of his rights under 241.4.  And in

23  Rombot, Judge Saris found that ICE had violated Section 241.4

24  in revoking the petitioner's release and then continuing his

25  detention for an additional approximately three months, so she

1   held a bond hearing and ordered him released on certain

2   conditions.  Basically I find the repeated efforts make ICE

3   untrustworthy.

4        The chronology leads to the same result with regard to

5   Junqueira.  He was arrested at the CIS office on February 1,

6   2018.  And as I understand it, his removal period began running

7   on that date because, in contrast to De Souza, he left the

8   country and had come back, so his removal order was reinstated.

9   However, he never got any notice -- as I explained, under the

10  regulations, he should have received a notice of a document

11  review in 90 days at about 60 days or about April 1, 2018.  He

12  never got any notice.  He wasn't given a date for a document

13  review decision, which should have been on about May 1.

14       His attorney's affidavit in Dos Santos, addressing a

15  different issue, docket 46 in that case, states that on May 3,

16  Mr. Junqueira's wife was told that he would be released from

17  custody that day.  She went to the Burlington, Massachusetts

18  ICE office, driving several hours from Connecticut.

19  Mr. Pomerleau spoke to counsel for the government in this case,

20  Ms. Larakers, who did not know that Junqueira was told he was

21  going to be released.  Junqueira wasn't released on May 3.  He

22  was brought back to the ICE office on May 4 and understood that

23  he was going to be released then.  He was not.  Instead he got

24  a notice dated May 3 for a June 3 decision.

25       As I said and may write, we discussed this earlier

today, I have a substantial question as to whether the
government's interpretation of Section 241.1 -- I would say the
Department of Justice's interpretation of 241.4 is correct.
The Department of Justice properly points out that the title of
the regulation is Continued Detention, and that term is used
throughout, that although the statute and regulations
contemplate, statute, provides that after final order of
removal, the alien will be detained, that doesn't always occur.
It didn't happen with regard to De Souza or Junqueira or many
others.

      Giving somebody who is not detained notice of a
custody review, I agree, would not make sense.  But the
requirement that review occur prior to the expiration of the
removal period, which is defined by statute as 90 days after a
final order of removal, is not absolute.  Rather the
regulations permit the Department of Homeland Security to issue
the 30-day notice and conduct a custody review as soon as
possible after the removal period, allowing for any unforeseen
circumstances or emergent situation.  That's Section 241.4
(k)(2)(iv).

      It is not, as I said, possible to conduct a custody
review concerning whether to continue an alien in custody as
required by Section 241.4(d)(1) when the alien has not yet been
arrested.  However, as I explained earlier, Section 241.4, INS
said when it promulgated it it was intended to apply to all

1   aliens who are detained following expiration of the 90-day

2   removal period.

3          However, the regulation -- as I said, I understand

4   that it would not be possible or practical to give an alien

5   notice of anything before he's arrested or she's arrested.  But

6   the timing requirement of Section 241.4 would be satisfied if

7   DHS gave notice and conducted the review, quote, "as soon as

8   possible" after the arrest.  That is provided by Section 241.4

9   (k)(2)(iv).  In addition, DHS may postpone a review if there's

10  good cause to do so.  The fact that an alien is not in custody

11  may well be good cause to postpone the review under the

12  authority of Section 241.4(k)(3).  In addition, when notice is

13  not practicable before an arrest, there would be good cause to

14  allow the alien up to 30 days to submit materials to assist in

15  the review.  However, as stated in Section 241.4(k)(3),

16  reasonable care must be exercised to ensure that the alien's

17  case is reviewed once the reason for the delay is remedied.

18  Therefore, I may find, although I'm not reaching a conclusion

19  on this now, that an alien arrested after the removal period --

20  for an alien arrested after the removal period, a review must

21  ordinarily be conducted approximately 30 days after the arrest.

22          I had reached the conclusion, as I said, that it would

23  be futile to defer this matter for a decision to DHS, and now

24  DHS has agreed to the removal -- sorry -- to the release of

25  Ms. De Souza and will seriously consider quickly the possible

1    release of Mr. Junqueira.

2           And with regard to their individual cases, you know,

3    evidently I don't believe the -- DHS implicitly recognizes if

4    there's a hearing, if I'm going to conduct a hearing, it's

5    going to be very difficult to present evidence that Ms. De

6    Souza, for example, is a risk of flight.  Her desire is to hug

7    her husband, hug her son, try to get her status regularized

8    through the legal process.  Her desire is to stay here, and

9    there's no contention, I think, that she's dangerous.  So this

10   is the result I could have ordered in her particular case.  But

11   this is an -- and it sounds to me like there's a reasonable

12   likelihood that by this time tomorrow there will be a similar

13   result in Mr. Junqueira's case.

14          But as I explained at one of my earlier orders, I know

15   that mootness is a nuanced doctrine.  When -- if Mr. Junqueira

16   is released, his case before me would be over.  He's not

17   challenging his removal.  But this is a fourth case where the

18   Department of Homeland Security didn't get any new information,

19   except it knew how I was likely to decide the case.  A year ago

20   in Arriaga, right before lunch -- it was a motion for

21   preliminary injunction -- I signaled, basically said I was

22   going to tentatively decide that the petitioner wasn't being

23   held properly under the regulation, and a settlement was

24   reached that provided more relief than I could have ordered.

25          I have to say I'm concerned, although I haven't had a

1   chance to think about the legal consequences of this, and I

2   don't say this to discourage DHS from agreeing to release

3   people similarly situated to Ms. De Souza or Mr. Junqueira, but

4   I'm concerned about the people who don't get their cases into

5   Federal Court.

6           I was told in response to an order, if I remember it

7   right, that there were eight aliens arrested at Citizenship and

8   Immigration Service offices when they were there I think for

9   their I-130 hearings, but they were there pursuing legal means

10  to try to stay in the United States.  And perhaps I've had the

11  cases of two or three of them because under the District

12  Court's related case rule if there's a same defendant and one

13  of the same issues, it comes to the same judge for two years.

14  So that's why I have a number of these cases with this

15  particular issue.

16          You know, this shouldn't be a game of sort of hide and

17  seek.  If somebody can get into court in the District of

18  Massachusetts before me, they can get relief, but that means

19  that there's a larger universe of people who, you know, perhaps

20  there's no jurisprudence out there to explain what this

21  complicated law is, at least in the view of one judge.

22          And the regulation, Section 241.4, as I've just

23  explained, is intended to provide due process to every person,

24  including every alien who is detained in the United States, and

25  it appears to me the Department of Homeland Security is not

1    interpreting or applying the regulation the way the Department

2    of Justice has argued it.  They didn't for Junqueira.  They

3    didn't for De Souza.  They didn't for Rombot.  And they settled

4    the two other -- they agreed to at least two other cases right

5    before I had hearings this year and another one last year.

6         I'm concerned that what the Supreme Court assumed in

7    Zadvydas, that the Department of Homeland Security is following

8    its regulations that ordinarily satisfy due process is not

9    true.  I would have thought that the Department of Homeland

10   Security would be most likely to fastidiously follow the

11   requirements of the law when it had been sued in a particular

12   person's case, but they have been sued with regard to De Souza

13   and Junqueira and utterly ignored their legal requirements.  So

14   that causes me concern about whether they're ignoring it in

15   every other case, many other cases.

16        I don't know what the legal implications of that

17   concern are, but there was a time when I represented the United

18   States, too, when I worked for the Deputy Attorney General of

19   the United States, Attorney General of the United States, when

20   I was the Deputy United States Attorney in Massachusetts, and

21   the Department of Justice has litigating authority rather than

22   the agency's having it in part so it can present uniform

23   arguments, but I think also so it can counsel its clients.

24   There's a lot to think about.

25        So let's see where has this been left.  I'll try to

1    get an order out today memorializing what I've directed you to

2    do this week in connection with the hearing on May 15.  But

3    Ms. De Souza is going to be released when?

4             MS. LARAKERS:  She'll be released tonight, Your Honor.

5             THE COURT:  And the situation with Mr. Junqueira is

6    what?

7             MS. LARAKERS:  I have not spoken to ICE after -- I

8    have not spoken to ICE about Mr. Junqueira after court today.

9             THE COURT:  But you intend to do that?

10            MS. LARAKERS:  Yes, Your Honor, I intend to speak to

11   them again about it.

12            THE COURT:  So I'm ordering that you report to me on

13   the status of that tomorrow, and then if that relates -- if

14   that makes the May 15 hearing less urgent, tell me if you agree

15   on how to proceed with that.  If I said that De Souza was

16   detained since January 30, 2013, I meant January 30, 2018.

17            Oh, yes.  And the record review is governed by Section

18   241.4(h) not (b).  I can't read my own writing.

19            Sadly, there's one other matter.  Mr. Pomerleau, I

20   issued -- I ordered in the Dos Santos case that any opposition

21   to the motion to dismiss the amended petition be filed on May 3

22   rather than May 5, a Saturday, as requested, because I needed

23   time to study this.  It's always my goal to decide things

24   orally.  And it wasn't filed at about 3:00 last Friday

25   afternoon, so I issued that order directing you to file an

1    affidavit seeking to show cause why I shouldn't institute civil

2    or criminal contempt proceedings.  You filed the required memo

3    at the time, about the time I was drafting that order.  So the

4    issue of civil contempt is moot.

5        Civil contempt is intended to compel somebody to obey

6    a court order.  And although you didn't obey it in a timely

7    way, you made the filing.  The issue of criminal contempt is

8    punitive.  Somebody can get locked up.  You have two cases at

9    least in front of me, Dos Santos and Junqueira, and you missed

10   a lot of deadlines.  On March 16, I ordered the government to

11   file its motion to dismiss Dos Santos on March 26 and you to

12   file the response on April 4.

13       The government filed a motion to dismiss late, on

14   March 28, but you didn't file any response on April 4.  You

15   filed an amended complaint on April 5.  On April 20, as I said,

16   noting that I needed time to prepare for the May 8 hearing, I

17   granted the government's motion to extend its previous

18   deadline, April 23, to respond to the amended complaint until

19   April 27 and ordered you to respond by May 3 rather than May 5.

20   You filed that response on May 4 at about the time I issued my

21   order.

22       In Junqueira, the government filed on April 6 the

23   motion to dismiss.  The deadline for you to respond was April

24   16, under my March 27 order.  You didn't respond but on April

25   26 you filed an amended complaint.  The parties agreed the

1    amended complaint raised no new claims.  And on April 30 you

2    requested leave to file a response late to the motion to

3    dismiss, which I allowed.

4         I've read your response.  I can see you were very busy

5    last week, and you thought one of the things you were dealing

6    with was the apparent decision to release Junqueira.

7         MR. POMERLEAU:  That is correct, Your Honor.

8         THE COURT:  But I don't -- I'm not going to institute

9    criminal contempt proceedings against you this time.  But I can

10   see that you're very busy, that you're knowledgeable in this

11   area, and you're devoted to your clients, but that doesn't

12   permit you to file things on whatever schedule you want.  And

13   if you can't meet a deadline, it's your obligation to file a

14   motion early enough so, if I deny it, you'll give priority to

15   responding to the court's orders and meet the deadline.

16        When you file things late, you're injuring the

17   interests of your clients.  I've ordered that they remain in

18   the jurisdiction, you know, during the pendency of this habeas

19   proceedings.  And I feel an obligation to give high priority to

20   resolving these on a properly informed basis as efficiently as

21   I can.  And if the parties don't make filings at the required

22   time, it injures my ability to do that.  So maybe by this time

23   tomorrow you'll have one fewer case in front of me.

24        MR. POMERLEAU:  I hope so, Your Honor.  I greatly

25   apologize to the court.  I think I misunderstood some of the

1    rules.  I thought I could amend the complaint in lieu of filing

2    a response to the government's motion to dismiss in each case

3    we filed amended complaints.  One of those circumstances I

4    moved, asked the government if they would assent because when I

5    resolved amended Junqueira complaint, I didn't raise any new

6    issues.  I just clarified the issues for purposes of these

7    hearings.  And regarding the deadline of last Thursday, again,

8    my affidavit speaks to all the issues I was dealing with.

9    Those are reasons; they're not excuses.  And again, I

10   apologize.  I thank you for not finding me in contempt.

11        THE COURT:  Well, if I was going to find you in

12   criminal contempt, I would have had to have given you a notice

13   under Federal Rule of Criminal Procedure 42.  I've given you

14   sort of more process than the rules require because I have

15   neither much time or any interest in getting sidelined on that.

16   But a court orders are court orders.  They're not suggestions.

17   And if you want relief from a court order, you have to ask for

18   it and get it.  You have to ask for it in time that, if the

19   request is denied, you're going to meet the deadline.  That

20   applies to everybody, including the government and including

21   the petitioners in other cases.

22        MR. POMERLEAU:  Understood, Your Honor.  Again, I

23   apologize.

24        THE COURT:  Well, I appreciate the apology, but none

25   of this is personal.  I'm just trying to administer my docket

1    in very consequential cases.

2           MR. POMERLEAU:  Thank you, Your Honor.

3           THE COURT:  All right.  I'd like to see you all

4    briefly in the lobby.  All right.  Court is in recess.

5           (Recess taken 4:22 p.m.)

1          CERTIFICATE OF OFFICIAL REPORTER

2

3          I, Kelly Mortellite, Registered Merit Reporter

4    and Certified Realtime Reporter, in and for the United States

5    District Court for the District of Massachusetts, do hereby

6    certify that pursuant to Section 753, Title 28, United States

7    Code that the foregoing is a true and correct transcript of the

8    stenographically reported proceedings held in the

9    above-entitled matter and that the transcript page format is in

10   conformance with the regulations of the Judicial Conference of

11   the United States.

12              Dated this 15th day of May, 2018.

13

14              /s/ Kelly Mortellite

15              _____

16              Kelly Mortellite, RMR, CRR

17              Official Court Reporter

18

19

20

21

22

23

24

25