```
 1                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF MASSACHUSETTS
 2
      ---------------------------------------
 3    LILIAN PAHOLA CALDERON JIMENEZ,         )
                            Petitioner,       )
 4                                            )  Civil Action
      vs.                                     )  No. 18-10225-MLW
 5                                            )
      KIRSTJEN M. NIELSEN, Secretary of       )
 6    Homeland Security, CHRISTOPHER CRONEN,  )
      Immigration and Customs Enforcement,    )
 7    Boston Field Office Director, YOLANDA   )
      SMITH, Superintendent of Suffolk County )
 8    Correctional Facility,                  )
      STEVEN W. TOMPKINS, Sheriff of          )
 9    Suffolk County,                         )
                            Respondents.      )
10    ---------------------------------------
                                              )
11    EDJANN HENRIQUE DOS SANTOS,             )
                            Petitioner,       )  Civil Action
12                                            )  No. 18-10310-MLW
      vs.                                     )
13                                            )
      KIRSTJEN M. NIELSEN, Secretary of       )
14    Homeland Security, CHRISTOPHER CRONEN,  )
      Immigration and Customs Enforcement,    )
15    Boston Field Office Director, YOLANDA   )
      SMITH, Superintendent of Suffolk County )
16    House of Correction, STEVEN W. TOMPKINS,)
      Sheriff of Suffolk County,             )
17                            Respondents.     )
      ---------------------------------------
18
                   BEFORE THE HONORABLE MARK L. WOLF
19                   UNITED STATES DISTRICT JUDGE

20                            HEARING

21                         May 22, 2018

22          John J. Moakley United States Courthouse
                        Courtroom No. 10
23                      One Courthouse Way
                   Boston, Massachusetts  02210
24

25                           Kelly Mortellite, RMR, CRR
                             Official Court Reporter
```

```
 1    APPEARANCES:

 2    Counsel on behalf of Petitioners:
      Adriana Lafaille and Matthew Segal
 3    American Civil Liberties Union
      211 Congress Street
 4    Boston, MA 02110
      617-482-3170
 5    alafaille@aclum.org

 6    Counsel on behalf of Petitioners:
      Jonathan Cox, Colleen McCullough, Kevin Prussia and
 7    Michaela Sewall
      Wilmer Hale LLP
 8    60 State Street
      Boston, MA 02109
 9    617-526-6212
      jonathan.cox@wilmerhale.com
10
      Counsel on behalf of Petitioners Junqueira and Dos Santos:
11    Todd C. Pomerleau and Jeff Rubin
      Rubin Pomerleau PC
12    One Center Plaza
      Boston, MA 02108
13    617-367-0077
      tcp@rubinpom.com
14
      Stephanie E.Y. Marzouk
15    Marzouk Law LLC
      31 Union Square
16    Somerville, MA 02143
      651-341-0971
17    sym@marzouklaw.com

18    Counsel on behalf of Respondents:
      Eve A. Piemonte and Michael P. Sady
19    United States Attorney's Office
      1 Courthouse Way
20    John Joseph Moakley Federal Courthouse
      Boston, MA 02210
21    617-748-3271
      eve.piemonte@usdoj.gov
22
      Mary Larakers and J. Max Weintraub
23    U.S. Department of Justice, Office of Immigration Litigation
      District Court Section
24    P.O. Box 868
      Washington, DC 20044
25    202-353-4419
      mary.larakers@usdoj.gov
```

<pre>
 1                    P R O C E E D I N G S
 2          THE COURT:  Good morning.  I apologize for the delay
 3   in getting in, but there's a lot to organize.  Could counsel,
 4   starting with the petitioners, please identify themselves for
 5   the record.
 6          MS. LAFAILLE:  Good morning, Your Honor.  Adriana
 7   Lafaille for the petitioners.
 8          MR. SEGAL:  Good morning, Your Honor.  Matthew Segal,
 9   also for the petitioners.
10          MR. PRUSSIA:  Good morning, Your Honor.  Kevin Prussia
11   from Wilmer Hale, also for the petitioners.
12          THE COURT:  Could you say your name again, please.
13          MR. PRUSSIA:  Kevin Prussia from Wilmer Hale, also for
14   the petitioners.
15          MS. McCULLOUGH:  Good morning, Your Honor.  Colleen
16   McCullough, also for petitioners, with Wilmer Hale.
17          MR. COX:  Good morning, Your Honor.  Jonathan Cox for
18   the petitioners, Wilmer Hale.
19          MS. SEWALL:  Michaela Sewall from Wilmer Hale --
20          THE COURT:  You're going to have to keep your voice
21   up.
22          MR. RUBIN:  Good morning, Judge Wolf.  May it please
23   the court.  My name is Jeff Rubin.  We are from Rubin Pomerleau
24   for the petitioners, Your Honor.
25          THE COURT:  Well, the first group of lawyers are for
</pre>

1    the petitioners in Calderon, correct?

2           MR. RUBIN:  Yes, Your Honor.  Mr. Dos Santos, excuse

3    me.

4           MS. MARZOUK:  I'm Stephanie Marzouk, also for Mr. Dos

5    Santos.

6           MR. POMERLEAU:  Good morning, Your Honor.  Todd

7    Pomerleau on behalf of Edjann Dos Santos.

8           MR. WEINTRAUB:  Good morning, Your Honor.  Max

9    Weintraub representing the United States.

10          MS. LARAKERS:  Good morning, Your Honor.  Mary

11   Larakers on behalf of the United States.

12          MR. SADY:  Good morning, Your Honor.  Michael Sady on

13   behalf of the United States.

14          THE COURT:  Thank you.  Okay.  There are a number

15   of -- this is in some respects a continuation of the May 8

16   hearing.  There are a number of attorneys here who weren't here

17   on May 8.  Have you each read the transcript of that

18   proceeding?

19          MR. WEINTRAUB:  I have not, Your Honor.

20          THE COURT:  You have not?

21          MR. WEINTRAUB:  No, sir.

22          THE COURT:  Do you intend to speak today?

23          MR. WEINTRAUB:  Very little would be my guess, Your

24   Honor.

25          THE COURT:  Okay.  All right.  Say your name for the

```
 1    record, please.  Have you read the transcript of the May 8
 2    proceeding, and do you anticipate speaking today?
 3            MR. PRUSSIA:  Your Honor, I have read the transcript.
 4    I must admit I haven't absorbed all of it.  I do intend to
 5    speak some today, but primary speaking will be by Ms. Lafaille,
 6    Ms. Sewall and Mr. Cox and Mr. Segal as well.
 7            THE COURT:  First of all, I want you to each say your
 8    name for the record, A; and B, I don't know if I'm going to
 9    hear from four or five lawyers for one party, but we'll see.
10    All right.  Who else?
11            MS. SEWALL:  Michaela Sewall from Wilmer Hale.  I read
12    the transcript.
13            MR. POMERLEAU:  Your Honor, I was present at the last
14    hearing.
15            THE COURT:  For some reason Mr. Dos Santos wasn't
16    transported to the courthouse this morning, but the marshals
17    are getting him.  And I don't anticipate that we will get to
18    the questions relating to Mr. Dos Santos until later in the day
19    in any event.
20            We're here today in part pursuant to my May 14 order,
21    docket number 69, in Calderon.  I rescheduled the hearing that
22    initially had been scheduled for last week to accommodate
23    Ms. Larakers' schedule.  I ordered the decision makers and
24    affiants in these cases to be present and prepared to testify,
25    particularly Thomas Brophy, James Rutherford, Todd Falvey,
```

1     Michael Loser, Stephen Wells and Todd Lyons.  Are they all

2     here?

3               MS. LARAKERS:  Yes, Your Honor.

4               THE COURT:  Okay.  And yesterday, as a result of a

5     filing that was made late Friday afternoon, I ordered that Mr.

6     McGee be here, too, to give evidence if necessary regarding

7     Mr. Dos Santos because now there seems to be some disputed fact

8     or facts that may be material, but I understand that Mr. McGee

9     is in Georgia and Mr. Brophy will be prepared to testify

10    concerning the Dos Santos case; is that correct?

11              MR. SADY:  That's correct, Your Honor.

12              THE COURT:  Okay.  That's fine.  On May 14, 2018 I

13    also issued a sequestration order.  Did the attorneys for the

14    respondents give the sequestration order to the witnesses?

15              MS. LARAKERS:  Yes, Your Honor.

16              THE COURT:  When did you do that?

17              MS. LARAKERS:  We did it the same day.

18              THE COURT:  And have there been any violations of that

19    order to your knowledge?

20              MS. LARAKERS:  To my knowledge, no, Your Honor.

21              THE COURT:  All right.  And actually, does the

22    government want to designate a representative to be present in

23    the courtroom despite the sequestration order?

24              MS. LARAKERS:  No, Your Honor.

25              THE COURT:  Okay.  That makes things easier.  Thank

1     you.

2          Please excuse -- I've never done this before in 33

3     years.  Please excuse the informality of my drinking Gatorade,

4     but I've got a bad cold.  My doctors directed me to be

5     hydrated.

6          All right.  We're here today because in my view,

7     although maybe not the Department of Justice's view, its

8     positions have changed on some of the relevant issues, and more

9     importantly, the evidence and arguments on May 8 caused me to

10    be concerned that counsel's recent characterization of ICE's

11    understanding of its legal obligations may not be correct.

12         The issues that have emerged as to what ICE's

13    understanding and perhaps policies and practices are are

14    relevant to petitioners' motions for preliminary injunction and

15    class certification.  With regard to whether 8 CFR Section

16    241.4 applies, there have been admitted violations, if it

17    applies to, say, De Souza, if it applied, which I think it did,

18    to Mr. Junqueira and for preliminary injunction purposes, there

19    will be a question of whether those violations are likely to

20    occur -- recur.

21         The issue, issues, are also relevant to the motion for

22    class certification.  Under Rule 23(a) I'll be required to

23    decide whether there are common issues of law or fact.  I'll

24    have to decide whether the petitioners are typical of the

25    putative class members.  Under Rule 23(b)(2), there will be the

1    issue of whether ICE acted or failed to act on grounds that are

2    common to the class.

3         And the parties of both or all wanted this and

4    comparable cases to proceed on an expedited basis.  And I've

5    tried to accommodate that interest, but issues are emerging

6    that haven't been addressed in the briefs filed so far.

7    Plaintiffs had asked -- the petitioners had asked for discovery

8    if necessary, and I'm hoping that the evidence in today's

9    hearing will help focus the issues and help these cases proceed

10   as expeditiously as possible but based on true facts, accurate

11   information.

12        In addition, in connection with Mr. Dos Santos, I

13   learned last Friday that there is a dispute as to whether he's

14   now trying to cooperate in his deportation, removal, or still

15   refusing to cooperate.  He says he's no longer an impediment,

16   and respondents say he isn't.  So that can make a difference in

17   the analysis, and I think hopefully the questioning today or if

18   necessary tomorrow will get that clarified and then there will

19   be a proper basis, a factual basis to decide the issues.

20        For the purposes of the motions for preliminary

21   injunction, for class certification, the court, me, I'm the

22   factfinder, so I think -- and I know generally what my

23   questions are, having read your briefs.  So it's my present

24   intention to question the witnesses first.  The parties should

25   not be timid about registering any objections you may have.

1    I'll want to know if anything seems objectionable.  And then

2    you can follow up with your own questions.  Does anybody want

3    to be heard on that process?

4                MS. LARAKERS:  No, Your Honor.

5                MS. LAFAILLE:  No, Your Honor.

6                THE COURT:  Okay.  Then I'd like to start with

7    Mr. Brophy first.  Could we bring him into the courtroom.

8                MR. WEINTRAUB:  I'll get him, Your Honor.

9                THE COURT:  Thank you.

10               Do you know where Mr. Brophy is?  Typically the

11   witnesses are outside of the courtroom.

12               MS. LARAKERS:  Yes, Your Honor, they are.  I'm not

13   sure why he's having trouble.  I can go check.

14               MR. WEINTRAUB:  I apologize, Your Honor.  To comply

15   with the sequestration order, the witnesses are spread at some

16   distance around --

17               THE COURT:  Okay.  Thank you very much.

18               THOMAS BROPHY, having been duly sworn by the Clerk,

19   was examined and testified as follows:

20               THE COURT:  You may be seated.  Would you please state

21   your name.

22               THE WITNESS:  It's Thomas Brophy.

23               THE COURT:  And Mr. Brophy, I'm going to ask you some

24   questions.  Your attorneys have been told they can object if

25   they think any of them are improper or inappropriate.  And then

1    they'll have a chance to question you as well as the attorneys

2    for the petitioners.  Do you understand?

3              THE WITNESS:  Yes.

4              THE COURT:  Where are you employed?

5              THE WITNESS:  With the United States Department of

6    Homeland Security, Immigration and Customs Enforcement,

7    Enforcement and Removal Operations.

8              THE COURT:  What is your present position?

9              THE WITNESS:  I'm the deputy field office director for

10   the office in Buffalo, New York.  I'm here temporarily acting

11   as the field office director in Boston.

12             THE COURT:  When did you become the acting director?

13             THE WITNESS:  February 5 of this year.

14             THE COURT:  And how did you travel to the courthouse

15   today?

16             THE WITNESS:  In my government vehicle.

17             THE COURT:  By yourself or with somebody else?

18             THE WITNESS:  No.  By myself.

19             THE COURT:  Have you received a copy of the

20   sequestration order that I issued on May 14?

21             THE WITNESS:  Yes, I have.

22             THE COURT:  And do you understand that that prohibited

23   you from discussing these cases and the matters they involve

24   with any of the other potential witnesses today?

25             THE WITNESS:  Yes.

 1          THE COURT:  And have you -- when did you receive that

 2   order?

 3          THE WITNESS:  I don't remember the exact date.  I

 4   presume it would be the date that you issued it.

 5          THE COURT:  And have you talked to any of the other

 6   prospective witnesses about these cases or issues in these

 7   cases since receiving that order?

 8          THE WITNESS:  No.

 9          THE COURT:  I'm going to ask -- and somebody will put

10   it up.  Maybe somebody from the government can put it up as

11   well.  But please give Mr. Brophy docket number 56-1, which is

12   his declaration filed on May 3.  We have copies for the

13   parties.

14          Mr. Sady, do you know how to operate that device?

15          MR. SADY:  Your Honor, I have difficulty operating my

16   computer in my office.

17          THE COURT:  I understand.  Is there some -- is one of

18   the legions of lawyers able to put that up on the screen?

19          All right.  Mr. Brophy, do you recognize that

20   document?

21          THE WITNESS:  Yes, I do.

22          THE COURT:  What is it?

23          THE WITNESS:  It's my signed declaration regarding a

24   matter with Ms. De Souza.

25          THE COURT:  Okay.  I'll make that Exhibit 1 of today's

```
 1  date.
 2            Did you read that document before you signed it?
 3            THE WITNESS:  Yes, I did.
 4            THE COURT:  And do you see you signed it under the
 5  penalty of perjury and stated that it's true and correct?
 6            THE WITNESS:  Yes.
 7            THE COURT:  Did you speak to anybody before you signed
 8  it?
 9            THE WITNESS:  Yes.
10            THE COURT:  To whom did you speak?
11            THE WITNESS:  Frank Crowley from the Office of Chief
12  Counsel with ICE.
13            THE COURT:  And is all of the information -- well, is
14  all the information in that document important in your view?
15            THE WITNESS:  Yes, Your Honor.
16            THE COURT:  And is it all correct?
17            THE WITNESS:  Yes, Your Honor.
18            THE COURT:  Do you see in paragraph 4 on page 2, it
19  says, "The notice of Post-Order Custody Review was served upon
20  De Souza on April 23, 2018, seven days prior to the occurrence
21  of the custody review."  Did I read that accurately?
22            THE WITNESS:  Yes, sir.
23            THE COURT:  And was that intended to communicate that
24  the custody review occurred on April 30?
25            THE WITNESS:  Yes, I would guess it would be seven
```

1  days from that date, yes, sir.

2         THE COURT:  All right.  Would somebody please -- here.

3  We'll give Mr. Brophy the decision to continue detention that

4  was marked as Exhibit 1 on May 8, and we'll put that up on the

5  screen too.

6         Actually, before we do that, what -- I asked you who

7  you spoke to before you submitted this declaration.  What did

8  you -- what led up -- and I'm not asking you now about

9  communications you had with your lawyer, your lawyers,

10 unless -- the substance of communications, but what did you do

11 to prepare this declaration?

12        THE WITNESS:  Well, I reviewed the draft.  I also

13 reviewed the file previously and discussed the language that's

14 in it with the attorney.

15        THE COURT:  Okay.  So you reviewed the De Souza file?

16        THE WITNESS:  Yes.

17        THE COURT:  This declaration is dated May 3, and it's

18 in response to an order I issued the day before, May 2.  So did

19 you review the file on May 2 or 3?

20        THE WITNESS:  I don't recall exactly which day, but I

21 reviewed the file and also our electronic records as well.

22        THE COURT:  You did?

23        THE WITNESS:  Yes.

24        THE COURT:  Okay.  And then who drafted the affidavit;

25 you or somebody else?

1              THE WITNESS:  I did not draft it.

2              THE COURT:  Do you know who drafted it?

3              THE WITNESS:  I'm assuming it was the attorney, Mr.

4    Crowley.

5              THE COURT:  Okay.  Where did you get -- who did you

6    get it from?

7              THE WITNESS:  I believe it was from Mr. Crowley via

8    email.

9              THE COURT:  All right.  So let's give Mr. Brophy the

10   document that was marked as Exhibit 1 on May 8 and give copies

11   to counsel, and someone should put it up on the document

12   presenter, please.

13             Okay.  This is Exhibit 2 of today's date.

14             THE WITNESS:  Yes, sir.

15             THE COURT:  Have you ever seen this document before?

16             THE WITNESS:  I believe I have, yes.

17             THE COURT:  Did you read it?

18             THE WITNESS:  Have I read it?

19             THE COURT:  Well, you told me you've seen it.  Have

20   you ever read it before?

21             THE WITNESS:  Yes.

22             THE COURT:  And do you see it's dated April 27, 2018?

23             THE WITNESS:  Yes, I do.

24             THE COURT:  Was this among the records you reviewed on

25   May 2 or 3?

1          THE WITNESS:  Very well could have been.

2          THE COURT:  Do you remember?

3          THE WITNESS:  No.

4          THE COURT:  Is it the regular practice of ICE to enter

5     documents like this into its files, including its electronic

6     files promptly?

7          THE WITNESS:  This would not go in our electronic

8     files but an alien file, yeah.

9          THE COURT:  It would go in the alien file.

10          THE WITNESS:  Yes.

11          THE COURT:  Is that what you reviewed on May 2 or 3,

12     the alien file?

13          THE WITNESS:  Yes.

14          THE COURT:  And should there have been a hard copy of

15     this in that file?

16          THE WITNESS:  Yes.

17          THE COURT:  This says it's signed by Thomas Brophy,

18     Acting Field Office Director.  Is that what's typed on there?

19          THE WITNESS:  Yes, that's typed there, yes.

20          THE COURT:  Did you sign this, or did somebody else

21     sign it?

22          THE WITNESS:  That was signed by deputy field office

23     director I believe James Rutherford.

24          THE COURT:  And is he authorized to sign these

25     documents for you?

1            THE WITNESS:  He can, yes.

2            THE COURT:  Do you see in the first line it says,

3    "This letter is to inform you that your custody status has been

4    reviewed and it has been determined as a matter of

5    administrative discretion that you will not be released from

6    the custody of U.S. Immigration and Customs Enforcement, ICE,

7    at this time."

8            THE WITNESS:  Yes, I see that.

9            THE COURT:  And it's dated April 27, 2018, correct?

10           THE WITNESS:  Yes.

11           THE COURT:  And does that communicate to you that the

12   decision to deny Ms. De Souza's release was made on April 27,

13   2018 or before that date?

14           THE WITNESS:  It would appear it was made on that

15   date, yes.

16           THE COURT:  If that's true, then your statement that

17   the notice, the Post-Order Custody Review, POCR, was served on

18   De Souza on April 23, 2017, seven days prior to the occurrence

19   of the custody review, is not correct because the custody

20   review occurred on or before April 27, 2018; is that right?

21           THE WITNESS:  Yes.

22           THE COURT:  So why did you make that false statement

23   under oath?

24           THE WITNESS:  The one you asked me previously today?

25           THE COURT:  No.  In the declaration.  You told me

1   earlier that that sentence told me what I understood; that it

2   would communicate to somebody that the custody review was made

3   on April 30.  And that statement is not correct, so I'm asking

4   you why you made a false statement in your declaration.

5               THE WITNESS:  It was an error on my part.

6               THE COURT:  An error you made after reviewing the file

7   that should have had this Exhibit 2 in it, correct?

8               THE WITNESS:  Correct.

9               THE COURT:  And then this letter says, "This decision

10  has been made based on a review of your file and/or your

11  personal interview in consideration of any information you

12  submitted to ICE reviewing officials."  Did I read that

13  correctly?

14              THE WITNESS:  Yes, you did.

15              THE COURT:  And it says, "The decision has been made

16  based on a review of your file."  Do you know whether a file

17  review was done?

18              THE WITNESS:  Yes, a file review was done by the

19  deportation officer assigned to her case.

20              THE COURT:  Who is that?

21              THE WITNESS:  I don't know offhand, as well as --

22              THE COURT:  Then it says, "and/or your personal

23  interview."  So that communicates that to me -- well, you agree

24  that that communicates that while a file review may or may not

25  have been done, there was a personal interview?

1          THE WITNESS:  I don't know if a personal interview was

2     conducted or not; I don't know.

3          THE COURT:  I'm asking you what it says.  It says,

4     "Based on a review of your file and your personal interview,"

5     "or" it says, "the decision has been made based on a review of

6     your file or your personal interview," correct?

7          THE WITNESS:  Yes, it says "and/or your personal

8     interview."

9          THE COURT:  Right.  So that's intended to communicate

10    that there was at least a personal interview, right?  That's

11    what it says.

12         THE WITNESS:  Or a personal interview could have been

13    conducted.

14         THE COURT:  Right.  Maybe not a file review, but there

15    was either a file review and a personal interview or just a

16    personal interview, right?

17         THE WITNESS:  No, I don't think I agree.  I think it

18    says, "The decision has been made based on a review of your

19    file and/or your personal interview."

20         THE COURT:  Well, when it says, "or personal

21    interview," doesn't that communicate that there may not --

22    here -- that there was a personal interview?

23         THE WITNESS:  That's not my understanding of it.  I

24    understand it to read to say that a personal interview could

25    have been done.

1        THE COURT:  You think that's what "and/or" means?

2        THE WITNESS:  To me, yes.

3        THE COURT:  Is that because you know what the practice

4   is?

5        THE WITNESS:  No, because that's what I believe this

6   means in reading it.

7        THE COURT:  And it says, "This decision has been made

8   based on a review of your file and/or your personal interview

9   and consideration of any information you submitted to ICE

10  reviewing officials."  Did I read that right?

11       THE WITNESS:  Yes, sir.

12       THE COURT:  Are you aware that Ms. De Souza

13  personally, not her attorney, received a notice on April 23,

14  that there would be a file -- there would be a detention

15  decision made on about April 30?

16       THE WITNESS:  Yes.

17       THE COURT:  Are you aware that Ms. De Souza's attorney

18  submitted some documents for consideration on April 30?

19       THE WITNESS:  I don't recall offhand, but I trust that

20  they did.

21       THE COURT:  Does the government stipulate that he can

22  assume, he can understand that documents were delivered on

23  April 30 for consideration?

24       MS. LARAKERS:  Your Honor, I haven't reviewed the

25  file.  I don't know what was submitted.  He can answer to the

```
 1    best of his knowledge whether he saw it in the file or not.
 2              THE COURT:  Well, did you see any documents that have
 3    been submitted on behalf of Ms. De Souza for consideration?
 4              THE WITNESS:  I don't recall at this point.  If there
 5    were --
 6              THE COURT:  Where is the file?
 7              THE WITNESS:  I believe it's in our office in
 8    Burlington, Massachusetts.
 9              THE COURT:  Am I recalling correctly that Ms. Andrade
10    submitted documents on April 30, according to her affidavit?
11              MS. LAFAILLE:  Yes, Your Honor, she did submit
12    documents on that day.
13              THE COURT:  She submitted an affidavit to that effect,
14    correct?  Does nobody know the record in this case?
15              MS. LAFAILLE:  Yes, Your Honor.  She submitted her --
16    her affidavit was signed prior to her submitting those
17    documents, so the affidavit does not reflect that she submitted
18    the documents.
19              THE COURT:  If documents were submitted on Ms. De
20    Souza's behalf on April 30, do you agree they could not have
21    been considered when the decision to detain her was made on
22    April 27?
23              THE WITNESS:  Yes.
24              THE COURT:  And does ICE take seriously in making
25    these detention decisions information submitted by the alien?
```

 1          THE WITNESS:  Yes, and that's why I directed that a

 2     new POCR should be done, because she wasn't given enough time.

 3          THE COURT:  I think I understand what you mean.  I

 4     appreciate your telling me that.  We'll get to it.

 5          Docket 50-5 is Tiffany Andrade's April 27 affidavit.

 6     She says in paragraph 24, "I'm in the process of preparing a

 7     form I-246 application for stay of removal for filing with ICE.

 8     I plan to file this formal request for stay with ICE on April

 9     30."  So maybe I'm confused about whether she did deliver

10     anything on April 30.

11          MS. LAFAILLE:  Your Honor, the paragraph above it --

12          THE COURT:  Oh, okay.  I see.  "On April 27, 2018 I

13     received correspondence from Ms. De Souza containing a notice

14     to alien of file custody review along with a warning for

15     failure to depart and an instruction to detainee regarding

16     requirements to assist in removal.  These documents were signed

17     by Officer William Chambers.  I intend to file the requested

18     documents in person to ICE on Monday, April 30, 2018.  See

19     notice to alien file custody review, Exhibit E."

20          She signed that on April 27, so according to that

21     affidavit, there were no documents filed prior to the time that

22     the decision was made on April 27.

23          Did you know that Ms. De Souza was arrested at the

24     Citizenship and Immigration Services office in Burlington, I

25     believe, on January 30, 2018?

1      THE WITNESS:  I did know she was arrested at this CIS

2  office, but I believe it's here in Boston proper, not

3  Burlington.

4      THE COURT:  Okay.  You knew she was arrested at CIS.

5      THE WITNESS:  I've since learned it since coming here,

6  yes, yeah.

7      THE COURT:  Have you learned who decided to arrest her

8  at CIS?

9      THE WITNESS:  I don't recall offhand right now who the

10  officer or supervisor was.

11      THE COURT:  Do you know that she was one of seven

12  people arrested at CIS offices when they were seeking to show

13  that their marriages were genuine as the first step in seeking

14  provisional waivers in January?

15      THE WITNESS:  Yes.  I found out about that practice of

16  arresting people at the CIS around the 12th or 13th of

17  February, and I put a stop to it on the 16th.  I advised my

18  supervisory staff that that practice was no longer going to

19  continue and we were going to focus our efforts on threats to

20  the public safety, that we weren't going to CIS any longer to

21  arrest people unless there was a direct threat to national

22  security and public safety.  And I even informed the director

23  of CIS of me changing that practice.

24      THE COURT:  The national director of the district --

25      THE WITNESS:  No.  Mr. Riordan here in Boston.

1              THE COURT:  Denis Riordan?

2              THE WITNESS:  Yes.

3              THE COURT:  Why did you stop the practice?  I think

4       you just began to tell me, but I want to give you a chance to

5       explain it.

6              THE WITNESS:  Yeah.  I thought our enforcement efforts

7       were better suited with a lot of criminal conduct here in the

8       State of Massachusetts.  I think our first emphasis for

9       enforcing immigration law should be those that pose a risk to

10      national security or public safety.

11             THE COURT:  And who was your predecessor as the

12      district director or acting district director?

13             THE WITNESS:  It was Christopher Cronen.

14             THE COURT:  Is Mr. Cronen still employed by ICE?

15             THE WITNESS:  Yes.  He's now working at our

16      headquarters in Washington, D.C.

17             THE COURT:  Have you ever discussed the origin of the

18      practice of arresting people at CIS offices when they were

19      there for their appointments with anybody other than your

20      attorneys?

21             THE WITNESS:  Yeah.  I asked my supervisors when I was

22      made aware of it.

23             THE COURT:  Which supervisors?

24             THE WITNESS:  Would have been DFOD Lyons.  I'm sorry,

25      Deputy Field Office Director Todd Lyons and deputy field office

1    director James Rutherford.

2              THE COURT:  And did they tell you about the origins

3    and reasons for the practice prior to your arrival of arresting

4    people at CIS offices when they were there for their

5    appointments?

6              THE WITNESS:  The best I can recall is that was the

7    direction they were given from the previous field office

8    director.

9              THE COURT:  Mr. Cronen?

10             THE WITNESS:  Yes.

11             THE COURT:  What's Mr. Cronen's position at

12   headquarters now?

13             THE WITNESS:  I'm not 100 percent certain.  He works

14   in the field operations unit.  I don't know his exact title

15   offhand.

16             THE COURT:  Did you know or did anybody tell you that

17   the CIS manual says that people coming in seeking provisional

18   waivers should not be arrested?

19             THE WITNESS:  No.

20             THE COURT:  Let me ask you this, because I didn't

21   realize that you weren't here when Ms. De Souza was arrested on

22   January 30.  What's your -- how long have you worked for ICE or

23   any of its predecessors?

24             THE WITNESS:  23 years.

25             THE COURT:  So did you work in the Immigration and

 1   Naturalization Service, INS, before the creation of the
 2   Department of Homeland Security?
 3            THE WITNESS:  Yes, sir, I did.  I started on May 14,
 4   1995 with INS.
 5            THE COURT:  And what was your original position?
 6            THE WITNESS:  I was an immigration inspector.
 7            THE COURT:  What does an immigration inspector do?
 8            THE WITNESS:  I'm sorry --
 9            THE COURT:  There's no reason to apologize.
10            THE WITNESS:  We meet and greet and inspect arriving
11   people in ports of entry, whether it be land, sea or air.
12            THE COURT:  And how long did you do that?
13            THE WITNESS:  Two and a half years, roughly.
14            THE COURT:  What was your next position?
15            THE WITNESS:  Deportation officer.
16            THE COURT:  And what were your duties as a deportation
17   officer?
18            THE WITNESS:  I was assigned to our facility in
19   Batavia, New York, and I had oversight over a portion of a
20   detained population of male INS detainees.
21            THE COURT:  Did you have any responsibilities at that
22   time relating to whether aliens should be detained pending
23   removal?
24            THE WITNESS:  I normally took the case over after that
25   decision was already made and they were placed into detention.

1    My job was to monitor the case through the immigration

2    proceedings and then upon issuance of a final order try and

3    effect removal.

4            THE COURT:  And what years did you serve as a

5    detention officer?

6            THE WITNESS:  It was from 1997 to 2002, and I

7    transferred as a deportation officer to our office in Buffalo,

8    New York.

9            THE COURT:  And what were your duties in Buffalo?

10           THE WITNESS:  I was assigned a non-detained docket, so

11   people that were not in detention and may have been going

12   through the different stages of removal process.

13           THE COURT:  And how long did you perform those

14   functions?

15           THE WITNESS:  Approximately five years.

16           THE COURT:  And that takes us up to about when?

17           THE WITNESS:  2007.

18           THE COURT:  And what did your duties become in 2007?

19           THE WITNESS:  I became a supervisory detention and

20   deportation officer.

21           THE COURT:  Did that position involve any duties with

22   regard to deciding whether aliens should be detained pending

23   removal?

24           THE WITNESS:  Yes.

25           THE COURT:  What were your duties with regard to that?

1          THE WITNESS:  I would review arrests to make a

2     determination --

3          THE COURT:  You would review what?

4          THE WITNESS:  The arrest and the documents, charging

5     documents, and I-213, which is a document that records the

6     arrest and like a little bit of an interview thereafter to make

7     a determination whether or not the person should be detained,

8     released, given a bond.

9          THE COURT:  Did you have any training with regard to

10    making those decisions?

11         THE WITNESS:  Some, yes, from our local chief

12    counsel's office.

13         THE COURT:  What did the training consist of?

14         MS. LARAKERS:  Objection, Your Honor.  Attorney-client

15    privilege.  Anything that comes from those trainings is done by

16    the Office of Chief Counsel, which is his lawyer.

17         THE COURT:  Well, I'm not asking what he was told.

18    I'm asking what it consisted of.  Did you go to classes?

19         THE WITNESS:  It wasn't a classroom setting.  It was

20    more like in a conference room kind of an overview, if you

21    would.

22         THE COURT:  Were you given materials to read?

23         THE WITNESS:  I don't recall.

24         THE COURT:  How long did the training take?

25         THE WITNESS:  I don't recall.  I don't remember.

1          THE COURT:  Was it done in Buffalo, or did you go

2    somewhere for the training?

3          THE WITNESS:  No.  In Buffalo.

4          THE COURT:  Was it one day or more than one day?

5          THE WITNESS:  I can't recall exactly.

6          THE COURT:  Was it part of a larger training on other

7    issues?

8          THE WITNESS:  They conducted training on various

9    issues, you know, with us over the years, so I can't recall

10   exactly if it was part of a larger class or if it was something

11   specific.

12         THE COURT:  Did you receive training with regard to

13   the ICE regulations concerning the detention of aliens?

14         THE WITNESS:  I can't recall exactly, but I'm -- I

15   would guess that's what we would go over.

16         THE COURT:  About what year did you get the

17   training -- well, what year did you get the training?

18         THE WITNESS:  When I first became a supervisor in

19   2007.

20         THE COURT:  About 11 years ago?

21         THE WITNESS:  Sir, yes, sir.

22         THE COURT:  And do you recall how long the training

23   took?

24         THE WITNESS:  Not offhand.

25         THE COURT:  Well, it's not offhand.

1          THE WITNESS:  I'm sorry.  No, I don't recall exactly

2     how long it was.

3          THE COURT:  Do you recall whether you got any

4     training -- whether or not you got any training -- let me ask

5     you this.  Are you familiar with 8 CFR Section 241.4?

6          THE WITNESS:  I would have to look it up to know

7     exactly what that reference is.

8          THE COURT:  Are you familiar with 8 USC, United States

9     Code, Section 1231?

10          THE WITNESS:  Yes.

11          THE COURT:  What does that relate to?

12          THE WITNESS:  That relates to different detention

13     authorities.

14          THE COURT:  And are there regulations that apply to

15     the detention of aliens who or the possible release of aliens

16     who are detained or might be detained?

17          THE WITNESS:  Yes.  I just can't cite the exact --

18          THE COURT:  Have you ever read them?

19          THE WITNESS:  Yes.

20          THE COURT:  When is the first time you read them?

21          THE WITNESS:  I don't know, Your Honor.

22          THE COURT:  When is the last time you read them?

23          THE WITNESS:  I looked at them a little bit today,

24     too, before coming up.

25          THE COURT:  Before today, when was the last time you

1      read them?

2              THE WITNESS:  I don't recall.

3              THE COURT:  Have you read them since you became the

4      acting district director here in about February -- well, in

5      February 2018?

6              THE WITNESS:  I can't recall the exact date.

7              THE COURT:  No, but I'm not asking you what day you

8      read them, but before you looked at them this morning did you

9      read any of the -- I'll tell you that Section 241.4 of the Code

10     of Federal Regulations is discussed in the submissions in this

11     case.  They relate to the detention of certain aliens at least.

12     Did you, before you looked at them this morning, read those

13     regulations since becoming acting district director here in

14     February?

15             THE WITNESS:  Before coming here?  Yes, I believe I

16     have.

17             THE COURT:  So between -- when did you become the

18     acting district director, February 5?

19             THE WITNESS:  Yes, sir.

20             THE COURT:  So between February 5 and today did you

21     read those regulations?

22             THE WITNESS:  I don't recall ever reading them since

23     February 5 and today.

24             THE COURT:  Do you recall reading them before February

25     5?

1              THE WITNESS:  Not the exact date, but I do have

2      familiarity with it, yes.

3              THE COURT:  No.  I don't need the exact date you read

4      them.  Did you read them at some point before February 5?

5              THE WITNESS:  Yes, sir.

6              THE COURT:  One time or more than one time?

7              THE WITNESS:  I don't recall.  I would have to guess.

8              THE COURT:  I don't want you to speculate or guess.

9      If you don't know, the right answer is "I don't know."

10             Did you discuss those regulations and their

11     requirements with anybody after you became acting district

12     director?

13             THE WITNESS:  Other than with my attorneys?

14             THE COURT:  No.  I want to know whether -- the fact

15     that you -- Ms. Larakers can be heard on this if she wants.

16     The fact that you spoke to an attorney is not privileged.  The

17     content of the communication, if it was maintained as

18     confidential, would be privileged.  But no.  Subject to any

19     objection, which I'll listen to, you need to tell me, did you

20     discuss the regulations relating to detention with anyone,

21     including an attorney, after you became acting district

22     director?

23             THE WITNESS:  Yes.

24             THE COURT:  With whom?

25             THE WITNESS:  The attorneys sitting at the table right

 1   there.

 2          THE COURT:  Did you talk to Mr. Sady, the fellow with

 3   the white hair?

 4          THE WITNESS:  Yes, he was there this morning, too.

 5          THE COURT:  Did you have one conversation or more than

 6   one conversation?

 7          THE WITNESS:  I had one conversation this morning

 8   where I read those regulations that you referenced.

 9          THE COURT:  Okay.  Did you have any conversation with

10   any attorney about the regulations before this morning?

11          THE WITNESS:  No, sir.

12          THE COURT:  So on February -- you became acting

13   director February 5?

14          THE WITNESS:  Yes.  My first day in the office was on

15   the 6th.

16          THE COURT:  At that time what was your understanding

17   regarding the legal requirements concerning the detention or

18   possible release of an alien who had been arrested?

19          THE WITNESS:  I'm sorry, can you repeat that?

20          MS. LARAKERS:  Objection, Your Honor.  That calls for

21   a legal conclusion.  He's not an attorney.

22          THE COURT:  I'm not asking him for the truth of it.

23   I'm asking him in part to find out if what you represented

24   ICE's position is is factually correct.  Overruled.

25          I said what was your legal understanding of -- when

1    you became the district director, what was your understanding

2    regarding the legal requirements of the detention or possible

3    release of an alien who had been arrested?

4            THE WITNESS:  I believe that the aliens are entitled

5    to -- if they're in detention and it's post order, they're

6    entitled to a POCR review, Post-Order Custody Review, within 90

7    days.

8            THE COURT:  Was that your understanding on February 5?

9            THE WITNESS:  Yes.

10           THE COURT:  How did you develop that understanding?

11           THE WITNESS:  When I was a detained docket officer I

12   had to conduct POCRs.

13           THE COURT:  And did you have any discussion about

14   those requirements with anybody before this morning with the

15   lawyers since you became district director -- acting district

16   director?

17           THE WITNESS:  Yes, I have discussed that with some of

18   my supervisory staff in Burlington, yes.

19           THE COURT:  With whom?

20           THE WITNESS:  It would be two deputy field office

21   directors, Mr. Lyons, Mr. Rutherford, Assistant Field Office

22   Director Greenbaum.

23           THE COURT:  Are you familiar with the term "removal

24   period"?

25           THE WITNESS:  Yes.

```
 1              THE COURT:  Do you understand that's defined in a
 2   statute and regulations?
 3              THE WITNESS:  Yes, sir.
 4              THE COURT:  What do you understand removal period to
 5   be?
 6              THE WITNESS:  It's the 90-day period after the order.
 7              THE COURT:  After an order of removal becomes final?
 8              THE WITNESS:  Yes, sir.
 9              THE COURT:  When you're talking about the POCR
10   requirements, that's P-O --
11              THE WITNESS:  P-O-C-R.
12              THE COURT:  P-O-C-R.  Do you know whether those are in
13   a regulation?
14              THE WITNESS:  Yes, I do believe.  I don't know the
15   exact --
16              THE COURT:  All right.  And I believe the parties
17   would agree that Section 241.4, 8 CFR Section 241.4 is what the
18   government refers to as the POCR requirements.  Am I correct?
19              MS. LARAKERS:  Yes, Your Honor.
20              THE COURT:  Okay.  I'm sorry.  I'm just trying to
21   avoid any confusion.
22              When is the last time -- well, do you know whether you
23   ever read those regulations before you looked at them with the
24   attorneys today?
25              THE WITNESS:  Yes, I believe I have.
```

```
 1              THE COURT:  Approximately when?

 2              THE WITNESS:  I don't know exactly.

 3              THE COURT:  Did you look at them after you became

 4    acting district director and before today?

 5              THE WITNESS:  I know I reviewed POCR guidance.  I

 6    don't know if I looked at that exact section in the law book.

 7              THE COURT:  What is POCR guidance?

 8              THE WITNESS:  It would be our internal policies

 9    regarding the administration of the POCR process.

10              THE COURT:  Is there an ICE manual that has a section

11    on this?

12              THE WITNESS:  I don't know if it's part of a manual,

13    but yes, there's direction, policy, guidance that's out there.

14    I've recently had people from headquarters come and conduct

15    POCR training at the office.

16              THE COURT:  Here.  I want to get to that.  But what

17    are the documents?

18              THE WITNESS:  What are the documents?

19              THE COURT:  Yeah.  Did you read documents relating to

20    the POCR requirements after becoming acting director?

21              THE WITNESS:  Yeah.  It's our home internal web page.

22    It would be policies, I guess would be the best way to call

23    them.

24              THE COURT:  And did you read those?

25              THE WITNESS:  Yes, sir.
```

1          THE COURT:  Once or more than once since becoming

2    acting director?

3          THE WITNESS:  I can't recall exactly how many times I

4    read it.

5          THE COURT:  Do you recall what the guidance says?

6          THE WITNESS:  Roughly, yes, yeah.  I think I have a

7    decent working knowledge of it.

8          THE COURT:  So what's your understanding of what's

9    required once somebody is arrested under the POCR regulations?

10          THE WITNESS:  After the order becomes administratively

11    final, within that first initial 90-day period, at day 45 or

12    so, if a travel document has not been obtained, that they

13    should be served with a notice of POCR review and given 30

14    days.  At that point the review will be done by the case

15    officer and sent up for, you know, final decision through the

16    chain of command, whether or not the person will be continued

17    in detention or considered for release.

18          THE COURT:  The regulations, as you understand it -- I

19    just want to know your understanding.  Does the statute or

20    regulations make any distinction between somebody arrested

21    during the 90-day removal period and what is to occur after the

22    90-day removal period?

23          THE WITNESS:  I can't recall exactly.

24          THE COURT:  So as of today it's your understanding

25    that the internal guidance -- well, do you remember the last

1    time that you looked at this guidance concerning the POCR

2    regulations?

3              THE WITNESS:  I don't recall the exact date, no.  I'm

4    sorry.

5              THE COURT:  But did you read the guidance after

6    becoming acting director before today?

7              THE WITNESS:  Yes.

8              THE COURT:  And did you discuss it with any of your

9    colleagues?

10             THE WITNESS:  Yes.

11             THE COURT:  And I think I asked you this, but with

12    whom?

13             THE WITNESS:  The two deputy field office directors,

14    Mr. Lyons and Mr. Rutherford, and Mr. Greenbaum, who is an

15    assistant field office director.

16             THE COURT:  And did you do that once or more than

17    once?

18             THE WITNESS:  I don't recall.

19             THE COURT:  Did you do it with all of them together or

20    individually?

21             THE WITNESS:  I don't recall exactly.  It could have

22    been a mix of both.

23             THE COURT:  How long did the discussion take?

24             THE WITNESS:  I don't recall.

25             THE COURT:  And you don't recall when you did this?

1           THE WITNESS:  No, sir.

2           THE COURT:  And what did you say to them and what did

3     they say to you?

4           THE WITNESS:  I don't recall exactly, but I can, you

5     know -- what I think started the conversation was my concern

6     about how some of the POCRs were being done, and that's why we

7     had training come in to train and help the staff.

8           THE COURT:  When did you have training come?

9           THE WITNESS:  That was in April at some point.  I

10    don't know the exact date offhand.

11          THE COURT:  And what caused you concern about how the

12    POCRs were being done?

13          THE WITNESS:  I noticed some errors, and I thought it

14    was a lack of training.  We have some new staff that are

15    assigned to this docket.  I thought it would be important they

16    receive good training, so I had somebody from headquarters, and

17    they brought somebody from general counsel as well.

18          THE COURT:  Who came from headquarters?

19          THE WITNESS:  I don't remember the gentleman's last

20    name.  The first name is Arthur, but I know the attorney was

21    Joan Lieberman.

22          THE COURT:  What's that name again?

23          THE WITNESS:  Joan Lieberman.

24          THE COURT:  And who did they train?

25          THE WITNESS:  They trained my detained docket first

```
 1   line supervisors and the deputy supervisor's staff and support

 2   staff, as well as there may have been other people in

 3   attendance.

 4           THE COURT:  When did you first hear of the De Souza

 5   case?

 6           THE WITNESS:  I don't recall the exact date.

 7           THE COURT:  Approximately?

 8           THE WITNESS:  I don't know.  Shortly after me arriving

 9   at the office, I was made aware of it.

10           THE COURT:  All right.  Do you recall that you learned

11   about -- let me help you because --

12           THE WITNESS:  Yes, sir.

13           THE COURT:  And if I have the facts inaccurately,

14   you're invited to -- do you recall that an individual named

15   Calderon was detained at a CIS office -- was arrested at a CIS

16   office and detained?

17           THE WITNESS:  Yes.

18           THE COURT:  And did you learn about that shortly after

19   you arrived here?  I think it said in one of the affidavits it

20   came to your attention about February 12.

21           THE WITNESS:  Okay.

22           THE COURT:  Does that sound right?

23           THE WITNESS:  Yeah.

24           THE COURT:  How did it come to your attention?

25           THE WITNESS:  I don't recall who brought it to my
```

```
 1   attention, whether it was from chief counsel or if it was from

 2   one of my supervisors; I don't recall exactly.

 3            THE COURT:  Do you recall whether you read about that

 4   case in the newspapers or saw it in the media?

 5            THE WITNESS:  No, I don't recall.  I have since, but I

 6   don't know if that's what triggered it or not.

 7            THE COURT:  What's that?

 8            THE WITNESS:  I have since seen that, but I don't

 9   think that was how it first came to my attention.

10            THE COURT:  Did you discuss it with one of your

11   supervisors?

12            THE WITNESS:  I don't recall exactly.  I don't know.

13            THE COURT:  Do you remember Ms. Calderon's case?

14            THE WITNESS:  Generally, yes.

15            THE COURT:  And who is Todd Lyons?

16            THE WITNESS:  One of the deputy field office

17   directors.

18            THE COURT:  Did you ever discuss her case with him?

19            THE WITNESS:  I don't recall.  It's possible.

20            THE COURT:  When you decided that -- do you know that

21   Calderon was released from detention?

22            THE WITNESS:  Yes.

23            THE COURT:  Who decided she should be released?

24            THE WITNESS:  I don't recall if it was myself or if it

25   was another supervisor.
```

1          THE COURT:  In an affidavit, a declaration filed on

2     February 21, 2018, which is docket number 19, Mr. Lyons in

3     paragraph 7 said the official who decided that Calderon should

4     be released, the Acting Field Office Director Thomas Brophy

5     made the decision that Calderon be released.

6          THE WITNESS:  Okay.

7          THE COURT:  Does that refresh your memory?

8          THE WITNESS:  Yes.  Thank you.

9          THE COURT:  I apologized to everybody else before you

10    came in.  I wouldn't ordinarily sit here drinking Gatorade, but

11    I have a bad cold.

12         THE WITNESS:  That's okay.

13         THE COURT:  So why did you decide that Calderon should

14    be released?

15         THE WITNESS:  I don't recall the exact reasons.  I

16    would have to maybe look at that document that you're

17    referencing to refresh my memory.  Like, I don't recall if

18    there was a stay in the case or I just made a determination

19    based on a POCR.  I don't recall.

20         THE COURT:  I'll give you a copy of it.  We'll make

21    this Exhibit 3.  I'm on page 4.

22         So you see paragraph 7, it says that you made the

23    decision that Calderon be released?

24         THE WITNESS:  Yes, sir.

25         THE COURT:  And does reading this document or part of

     1    it refresh your recollection as to why you decided she should

     2    be released?

     3              THE WITNESS:  Yes.  I'm sorry.  I was reading --

     4              THE COURT:  What's that?

     5              THE WITNESS:  I was reading Paragraph 8 to refresh

     6    myself.

     7              THE COURT:  Here.  Why don't you read pages 4 to 6 and

     8    let me know when you finish.

     9              THE WITNESS:  Yes, sir.  Thank you.

    10              THE COURT:  Have you read it?

    11              THE WITNESS:  Yes.

    12              THE COURT:  All right.  So does it refresh your

    13    recollection on why you decided Calderon should be released?

    14              THE WITNESS:  Yes, I believe it does.

    15              THE COURT:  Why did you decide she should be released?

    16              THE WITNESS:  I adjudicated her application for a stay

    17    of removal, granted that for a period of time, I believe it was

    18    three months, and I considered factors that they submitted to

    19    include medical condition, ties to the community and likelihood

    20    of removal.

    21              THE COURT:  In paragraph 9 it says, "This case was

    22    brought to the acting field officer director's attention on

    23    February 12, 2018."  Do you recall who brought it to your

    24    attention or how it came to your attention?

    25              THE WITNESS:  I don't, no.

1          THE COURT:  Did you see any newspaper or television

2     accounts of Calderon's case?

3          THE WITNESS:  I have.  I don't know if it's the same

4     timeframe or not.  I don't know.

5          THE COURT:  Did somebody come and tell you that this

6     was a highly publicized case and that you should pay attention

7     to it?  Here.  Let me break it up.

8          THE WITNESS:  Yeah, I was told it was an important

9     case.

10          THE COURT:  Excuse me.  I asked you -- I want to break

11     it up.  Did somebody tell you this was a highly publicized

12     case, Calderon?

13          THE WITNESS:  Yes, it was garnering media attention.

14          THE COURT:  On February 12 you had been acting

15     director for about a week, right?

16          THE WITNESS:  Yes, sir.

17          THE COURT:  And you paid prompt attention to her case,

18     right?

19          THE WITNESS:  Yes, sir.

20          THE COURT:  And you decided she should be released?

21          THE WITNESS:  Yes, sir.  This is about the same time I

22     found out that the CIS arrest even happened.

23          THE COURT:  And did you review the cases -- do you

24     know how many other people were arrested at CIS offices in

25     Massachusetts and Rhode Island in January of 2018?

1          THE WITNESS:  Not personally, but I think it stated

2     something of that in here, there might have been five

3     additional aliens.

4          THE COURT:  Five or six?  I thought there was a total

5     of seven.  I may be wrong.

6          THE WITNESS:  Okay.

7          THE COURT:  Did you look into the cases of every

8     single one of those?

9          THE WITNESS:  I can't recall if I looked at every

10    single one of them.

11         THE COURT:  Well, Calderon was in the media, right?

12         THE WITNESS:  Yeah.

13         THE COURT:  And you looked at her case?  Yes or no.

14         THE WITNESS:  Yes.

15         THE COURT:  Did you look at the cases of other people

16    arrested at CIS offices in January to see whether, like

17    Calderon, they should be released?

18         THE WITNESS:  I don't know if all of them were

19    arrested.  The cases that I have looked at that were CIS

20    arrests, I don't know if they all happened in the same

21    timeframe offhand.  I have looked at the De Souza case and some

22    other cases that were brought before the court.

23         THE COURT:  Well, here, let me see.  Okay.  So the

24    affidavit says that -- if you look at paragraph 12, I ask

25    whether any individuals other than Calderon and De Oliveira,

```
1   who we haven't discussed, were arrested while taking steps to
2   seek permanent residency in a Massachusetts or Rhode Island CIS
3   office in January 2018.  Do you see that?
4             THE WITNESS:  Yes, sir.
5             THE COURT:  So that was two, and I was told the answer
6   was yes.  Then five other aliens were subject to final orders
7   of removal and were apprehended during January 2018 at CIS.  Do
8   you see that?
9             THE WITNESS:  Yes, sir.
10            THE COURT:  So that's a total of seven.  Did you
11  participate in the decision to release De Oliveira, or did they
12  come before you came perhaps?
13            THE WITNESS:  I don't recall.
14            THE COURT:  All right.  But then there were five
15  others who were arrested in January like Calderon, according to
16  this affidavit, correct?
17            THE WITNESS:  Yes.
18            THE COURT:  And then if you go down to paragraph 14 in
19  response to another provision of my order, it says that one of
20  those other five was released from ICE custody the same day as
21  the day of the arrest, right?
22            THE WITNESS:  Yes, that's what it says.
23            THE COURT:  And this was on February 21.  So that
24  means that four others were detained, correct?
25            THE WITNESS:  Yes.
```

1          THE COURT:  And did you look at the cases of any or

2     all of those four others to determine whether, like Calderon,

3     they should be released?

4          THE WITNESS:  I would have to identify who those cases

5     are before I could say whether or not I've looked at them.  I

6     don't recall somebody ever bringing me a stack of cases and

7     saying these are all the ones that were arrested at CIS.

8          THE COURT:  Well, did you talk to Mr. Lyons about this

9     affidavit before he submitted it?

10          THE WITNESS:  No.  I was on leave that week that this

11     was drafted.

12          THE COURT:  Have you seen it before I gave it to you

13     today?

14          THE WITNESS:  Yeah, I've seen it.

15          THE COURT:  When did you first see it?

16          THE WITNESS:  I don't recall.

17          THE COURT:  How long were you on leave?

18          THE WITNESS:  A week.

19          THE COURT:  School vacation?

20          THE WITNESS:  Yeah, it was a college tour for my

21     oldest.

22          THE COURT:  Did she show you this when you came back?

23          THE WITNESS:  I believe so.

24          THE COURT:  Are these cases here in Federal Court, if

25     I can be colloquial, a big deal?

```
 1              THE WITNESS:  Yes, sir.

 2              THE COURT:  Are they serious matters?

 3              THE WITNESS:  Absolutely.

 4              THE COURT:  Do you take them seriously?

 5              THE WITNESS:  Yes, sir, I do.

 6              THE COURT:  So did Mr. Lyons or somebody else show you

 7     this declaration when you came back?

 8              THE WITNESS:  I don't recall exactly, but I know I

 9     have seen it and I have read it.

10              THE COURT:  So you knew there were four people who,

11     like Calderon and De Oliveira, were arrested at CIS offices and

12     as of February 21 were still detained?

13              THE WITNESS:  I guess so.

14              THE COURT:  And was there any media attention to their

15     individual cases?

16              THE WITNESS:  Without identifying those cases, I don't

17     know.

18              THE COURT:  Petitioners' counsel know the names --

19     well, do we know the names?  Do you know who those other four

20     were?

21              THE WITNESS:  Not offhand, no, sir.

22              THE COURT:  Do you know where they are?

23              THE WITNESS:  Without identifying the cases --

24              THE COURT:  Well, if I order you to give us the names

25     and tell us what's transpired after they were detained, would
```

1  you be able to respond to that order if I gave you some time to

2  do it?

3          THE WITNESS:  Yes, sir.

4          THE COURT:  Okay.  Well, I'm issuing that order, and

5  we'll figure out -- how long would it take to get that

6  information?

7          THE WITNESS:  A day or two.

8          THE COURT:  Okay.  Today is Tuesday.  Unless I change

9  my mind, I'm ordering that that information be provided on

10 Thursday, which will be May 24.  Here.

11         MR. WEINTRAUB:  Your Honor, if I could -- I apologize.

12 With us being here today and potentially tomorrow, it may not

13 be possible for us to --

14         THE COURT:  You know, let's see where we are at the

15 end of the day or the end of hearing.  There may be a series of

16 things to do, and I'll give you a reasonable amount of time for

17 that.

18         MR. WEINTRAUB:  Thanks.  That's all we ask, Your

19 Honor.

20         THE COURT:  And we have a common interest in this.  We

21 want this to proceed efficiently, fairly and on an informed

22 basis.

23         MR. WEINTRAUB:  Certainly, Your Honor.

24         THE COURT:  All right.  I want to pause and go back to

25 Ms. De Souza, okay?

1          THE WITNESS:  Yes, sir.

2          THE COURT:  So do I understand correctly that having

3     at some point read the guidance on the POCR regulations you

4     understood that at about 45 days after somebody was detained,

5     they should get a 30-day notice that a custody review would be

6     conducted at about 90 days and that they could submit

7     information to be considered relevant to whether their

8     detention should continue or they should be released?  Is that

9     your understanding?

10          THE WITNESS:  Yes.

11          THE COURT:  And that was -- okay.  Do you know

12     whether, if the alien had an attorney, the notice was to go to

13     the alien or to the attorney under the regulations?

14          THE WITNESS:  I don't know if it's under the

15     regulations.  I can't recall; however, it's been my past

16     experience that if they're represented, it should go to the

17     attorney as well as the alien.

18          THE COURT:  Should go to both?

19          THE WITNESS:  Yes, sir.

20          THE COURT:  Was any notice ever sent to De Souza or

21     her attorney?

22          THE WITNESS:  Well, when I determined or figured out

23     that the first POCR review she wasn't given the full 30 days --

24          THE COURT:  No.  Take a step back.  Do you know

25     whether any notice was ever given to De Souza or her attorney?

1          THE WITNESS:  Yes.

2          THE COURT:  When did you learn notice had been given

3    to De Souza or her attorney?

4          THE WITNESS:  Well, I directed it on May 3, according

5    to my declaration, that it should be done, that she and her

6    attorney should be served giving her a new 30-day period for

7    the purpose of the review.

8          THE COURT:  You did that on about May 2 or 3; is that

9    correct?

10          THE WITNESS:  Yes, sir.

11          THE COURT:  Is that the first time De Souza's case

12    came to your attention?

13          THE WITNESS:  I don't -- I don't recall when it came

14    to my attention.

15          THE COURT:  Did you learn that De Souza, not her

16    attorney, had been given a notice on April 23 of a review that

17    was to occur on about April 30?

18          THE WITNESS:  Yes, sir.

19          THE COURT:  Do you know that now?

20          THE WITNESS:  Yes, sir.

21          THE COURT:  Was that a violation of the regulations?

22          THE WITNESS:  Yes, sir.

23          THE COURT:  And now you know from the letter

24    Mr. Rutherford signed for you that a decision was made to

25    detain her on April 27, right?

```
 1              THE WITNESS:  Yes.
 2              THE COURT:  And you know that was before ICE had
 3    received any information on her behalf from her attorney or
 4    her, correct?
 5              THE WITNESS:  Correct.
 6              THE COURT:  And to your knowledge there was no
 7    personal interview of her, right?
 8              THE WITNESS:  Correct.
 9              THE COURT:  So why didn't she get the notice required
10    by the POCR regulations?
11              THE WITNESS:  I don't know why.
12              THE COURT:  Have you tried to find out?
13              THE WITNESS:  Not specifically, but I had noticed --
14    that's why I brought training in --
15              THE COURT:  You brought training in when?
16              THE WITNESS:  In April.  And then I brought another
17    group in on May 7 through the 18th.
18              THE COURT:  So when did you learn that De Souza had a
19    case here in Federal Court?
20              THE WITNESS:  I don't recall the exact date, sir.
21              THE COURT:  Did you ask any of your deputies why she
22    didn't get the required notice, 30 days' notice?
23              THE WITNESS:  I don't recall specifically.
24              THE COURT:  Do you generally have a good memory?
25              THE WITNESS:  I think so.
```

1           THE COURT:  For things that are important?  Do you

2    have a good memory for things that are important?

3           THE WITNESS:  I think so, yes.

4           THE COURT:  And you don't remember whether you asked

5    any of your deputies why she didn't get the required notice?

6           THE WITNESS:  I presume I did because I directed them

7    to redo it --

8           THE COURT:  No.

9           THE WITNESS:  -- and give the full 30, yes.

10          THE COURT:  Oh, so you -- so which of your deputies

11   did you discuss it with?

12          THE WITNESS:  I would presume it's Mr. Rutherford

13   because he has oversight over that program.

14          THE COURT:  And what did Mr. Rutherford tell you about

15   why she didn't get the required 30 days' notice?

16          THE WITNESS:  I don't recall.  I don't recall if I

17   asked that specific question either.

18          THE COURT:  Well, you ordered a new notice be given on

19   May 2 or 3, right?

20          THE WITNESS:  Yes, sir.

21          THE COURT:  And today is May 22, so about 20 days ago,

22   right, correct?

23          THE WITNESS:  Yes, sir.

24          THE COURT:  You knew that Ms. De Souza was locked up,

25   right?

1              THE WITNESS:  Yes, sir.

2              THE COURT:  Why did you decide -- and you knew that

3    her rights under the POCR regulations had been violated by May

4    2 or 3, right?

5              THE WITNESS:  Yes.

6              THE COURT:  With whom did you -- did you discuss with

7    anybody giving a new notice because of what I think you called

8    in your declaration the irregularities concerning the notice

9    given to her?  Did you discuss that with anybody?

10             THE WITNESS:  Yes.

11             THE COURT:  Who?

12             THE WITNESS:  I believe I discussed it with chief

13   counsel's office.

14             THE COURT:  Who in chief counsel's office?

15             THE WITNESS:  Mr. Crowley and quite possibly the chief

16   counselor, Jo Ellen Ardinger I believe is how I say the name.

17             THE COURT:  After that conversation you decided to

18   give a new notice?

19             THE WITNESS:  Yes, sir.

20             THE COURT:  Why did you think that was lawful?

21             THE WITNESS:  I thought it was the right way to

22   address the mistake, was to afford her the opportunity to have

23   the review and the full 30 days.

24             THE COURT:  To keep her locked up for another five or

25   six weeks?

```
1                THE WITNESS:  I guess so.
2                THE COURT:  What did you understand Ms. De Souza's
3       family circumstances were when you made that decision?
4                THE WITNESS:  I don't recall.
5                THE COURT:  Did you know she was married to a United
6       States citizen?
7                THE WITNESS:  Yes, I do believe that.
8                THE COURT:  Do you know -- did you know that she had
9       children who were a United States citizen?
10               THE WITNESS:  I believe so.
11               THE COURT:  Do you know that one of them was about 10
12      or 11 years old?
13               THE WITNESS:  I don't recall if I know their exact
14      ages.
15               THE COURT:  Did you think what it would feel like --
16      how many children do you have?
17               THE WITNESS:  Three.
18               THE COURT:  I think Ms. De Souza has three, too.
19               Did you think about what it would feel like to be
20      facing the threat of deportation and be separated from your
21      spouse and children for six weeks, say five weeks, four weeks,
22      while ICE gave a notice that it was required to give you a
23      month earlier?
24               THE WITNESS:  I don't know if I thought about that,
25      but I understand.
```

1          THE COURT:  Have you followed this case in the media?

2          THE WITNESS:  Since, yes.

3          THE COURT:  Have you seen the video of Ms. De Souza --

4     well, who made the decision to release Ms. De Souza on May 3

5     after I decided that and announced that I had decided that ICE

6     had violated her legal rights?

7          THE WITNESS:  I believe I did.

8          THE COURT:  Why did you make that decision?

9          THE WITNESS:  Based on your direction, your order.

10         THE COURT:  Well, did anybody tell you that I had

11    decided I would conduct essentially a bail hearing but I hadn't

12    ordered that she be released?

13         THE WITNESS:  No, sir, I don't recall being told that.

14         THE COURT:  Okay.  But you have followed this case in

15    the media since it came to your attention?

16         THE WITNESS:  From time to time, yeah.

17         THE COURT:  You know, I asked you if you thought about

18    what it would be like to be separated from your children

19    because of the illegal -- well, under any circumstances but

20    particularly because of the illegal conduct of the U.S.

21    government.  Tell me if you've seen this video.

22         Would you play it?  We'll mark this.  I got it from

23    the Boston Globe website.  We'll make a copy of it Exhibit 4.

24         (Video played.)

25         THE COURT:  Have you seen that before?

1          THE WITNESS:  Yes.

2          THE COURT:  Do you know whether any of the four

3    individuals who were arrested in January at CIS offices and,

4    unlike De Oliveira, Calderon and De Souza, have cases before

5    this court, and then they were detained, do you know whether

6    any of them have children?

7          THE WITNESS:  I believe some of them do.

8          THE COURT:  Is it the policy of ICE to pay attention

9    to cases and to following the regulations in cases only when a

10   suit is filed in Federal Court?

11         THE WITNESS:  No, sir.

12         THE COURT:  Is it the practice of ICE to do that?

13         THE WITNESS:  No, sir.

14         THE COURT:  Is it the practice of ICE to pay attention

15   to cases and try to follow the regulations only when there's

16   publicity in the media?

17         THE WITNESS:  No, sir.

18         THE COURT:  So is it your understanding that I ordered

19   Ms. De Souza's release, right?

20         THE WITNESS:  I'm sorry?

21         THE COURT:  Was it your understanding on May 3 that I

22   had ordered that Ms. De Souza be released?

23         THE WITNESS:  Yes.

24         THE COURT:  And who did you speak to before you

25   reached that understanding?

1          THE WITNESS:  It would have been the attorney, Mr.

2     Crowley and/or Chief Counsel Ardinger.

3          THE COURT:  Do you know why De Souza -- I may have

4     asked you this -- was given a notice on April 23?

5          THE WITNESS:  Why she was given it?

6          THE COURT:  Yeah.  Well, she hadn't been given it

7     around April 1, right?

8          THE WITNESS:  Right.

9          THE COURT:  Which would have been 30 days before her

10    90th day, April 30.

11         THE WITNESS:  Okay.

12         THE COURT:  So why was she given a notice on April 23?

13         THE WITNESS:  I don't know specifically other than to

14    ensure that she had a review.

15         THE COURT:  And do you know who decided to give her

16    that notice?

17         THE WITNESS:  I don't recall if it was Mr. Rutherford

18    or Mr. Greenbaum or one of the supervisors.

19         THE COURT:  Without telling me the content, were there

20    any communications with the Department of Justice counsel or

21    ICE counsel and people in your office, including but not

22    limited to you, about this case shortly before the April 23

23    order -- notice?

24         THE WITNESS:  There may have been.

25         THE COURT:  Well, did you have any communications?

1          THE WITNESS:  I definitely did with chief counsel and

2     Mr. Crowley.  I don't know if I spoke to anybody from DOJ.

3          THE COURT:  Have you ever spoken to anybody from the

4     Department of Justice about these cases before today?

5          THE WITNESS:  Yes.

6          THE COURT:  Who did you talk to?

7          THE WITNESS:  Mary.  I forget her last name; I

8     apologize.

9          THE COURT:  Larakers, I think.  Do you know that on

10    April 23 your lawyers filed a motion to dismiss this case?

11         THE WITNESS:  No.

12         THE COURT:  Let me shift a little.  Are you familiar

13    with the Junqueira case which I also was hearing on May 3?

14         THE WITNESS:  Yes, sir.

15         THE COURT:  And do you know that Mr. Junqueira was

16    detained, arrested, on about February 1, 2018?

17         THE WITNESS:  Okay, yes.

18         THE COURT:  And do you know that he was also arrested

19    at the CIS office?

20         THE WITNESS:  Yes, sir.

21         THE COURT:  Do you recall when his case first came to

22    your attention?

23         THE WITNESS:  The exact date, no.

24         THE COURT:  Did it come to your attention on about

25    February 12 when you were dealing with Calderon?

```
 1            THE WITNESS:  It may have.  I don't remember the exact
 2    date.  I believe Junqueira came to my attention a little bit
 3    later.
 4            THE COURT:  Approximately when?
 5            THE WITNESS:  I don't remember if it was in February
 6    or if it was March.  Like I said, I don't remember the exact
 7    date.
 8            THE COURT:  February or March?
 9            THE WITNESS:  Yeah.
10            THE COURT:  And when did you become concerned that the
11    POCR regulations weren't being followed?
12            THE WITNESS:  I don't know.
13            THE COURT:  I don't mean -- I don't mean with regard
14    to De Souza.  Sorry.  I don't mean with regard to Junqueira.  I
15    just mean in general.
16            THE WITNESS:  Well, we had training in April, so in
17    April, I guess.
18            THE COURT:  Was it your understanding that
19    Mr. Junqueira should have received a 30-day notice by about
20    April 1 of a review to be done on about May 1?
21            THE WITNESS:  I don't know.  I would have to review.
22            THE COURT:  Well, the parties can correct me if I'm
23    wrong, but assume he was arrested on February 1, 2018 at a CIS
24    office while he was seeking a provisional waiver, okay?
25            THE WITNESS:  Okay.
```

```
 1              THE COURT:  Based on your understanding of the
 2    regulations, the law, when should he have received 30 days'
 3    notice that a custody determination would be made?
 4              THE WITNESS:  Around the 45-day mark is when he should
 5    be given that notice.
 6              THE COURT:  So that would have been about March 15
 7    roughly?
 8              THE WITNESS:  Okay.
 9              THE COURT:  Is that about 45 days after February 1?
10              THE WITNESS:  Yeah.
11              THE COURT:  And he should have received, based on your
12    understanding of the law, a decision by when?
13              THE WITNESS:  No later than his 90th day, but the
14    review normally would have been 30 days from the date that he
15    was given on March 15.  So 30 days from that date, the review.
16              THE COURT:  But basically no later than May 1 if he
17    was arrested on February 1?
18              THE WITNESS:  Yes.
19              THE COURT:  All right.  Was he ever given any notice
20    that a review would be conducted?
21              THE WITNESS:  I would have to review the record.  I
22    don't recall.
23              THE COURT:  I think the parties will agree he was not
24    given a notice.  You're not aware of that?
25              THE WITNESS:  No.  Like I said, I would have to
```

1    review.  I don't recall if he was given a notice or not, sir.

2            THE COURT:  Have you ever looked at his file?

3            THE WITNESS:  I don't recall ever reviewing his alien

4    file, no.

5            THE COURT:  You don't?

6            THE WITNESS:  No.  I may have reviewed electronic

7    records of his case.

8            THE COURT:  Was Mr. Junqueira ever given -- was

9    Mr. Junqueira -- did anybody make a decision before May 2 that

10   Junqueira should be released --

11           THE WITNESS:  I know --

12           THE COURT:  -- or detained?

13           THE WITNESS:  Detained?

14           THE COURT:  Detained or released.

15           THE WITNESS:  I don't recall offhand.  I would have to

16   review his record.  I know he was released.

17           THE COURT:  So what to your memory happened with

18   regard to Mr. Junqueira?

19           THE WITNESS:  I know he was arrested at CIS, and I

20   know he's been released from custody.  I don't recall if -- I

21   would have to look at my declaration or copy of his record to

22   get into more depth into his case.

23           THE COURT:  Do you recall you submitted a declaration

24   under oath concerning Mr. Junqueira in this case?

25           THE WITNESS:  Yes.

```
 1              THE COURT:  Let's give him that declaration.  It's
 2    docket number 67.  You'll see there are two declarations there.
 3    The Junqueira-related declaration is the second one.
 4              MR. WEINTRAUB:  Could we get a copy here, please?
 5              THE COURT:  You should be giving everybody copies.
 6              MR. WEINTRAUB:  Sorry.
 7              THE COURT:  Please let me know when you finish reading
 8    it.
 9              THE WITNESS:  Yes, sir. (Witness reviews document)
10    Yes, sir.
11              THE COURT:  Look at paragraph 3 on page 1.  It says,
12    "After inquiry, discussion and review of pertinent DH records,
13    I report the following."  What inquiry did you make before this
14    declaration?
15              THE WITNESS:  "After inquiry, discussion and
16    review" -- that would have been conversation with my attorneys.
17              THE COURT:  Did you discuss it with anybody on your
18    staff?
19              THE WITNESS:  Yes, I'm sure I discussed it, I can't
20    recall exactly, but with the deputies.
21              THE COURT:  Well, who did you discuss it with?
22              THE WITNESS:  Mr. Rutherford and Mr. Crowley, our
23    attorney.
24              THE COURT:  All right.  Put aside Mr. Crowley.  Did
25    you talk to Mr. Rutherford about this once or more than once,
```

1    this declaration?

2            THE WITNESS:  This declaration?

3            THE COURT:  Right.

4            THE WITNESS:  I don't know if I talked to him more

5    than once or not.

6            THE COURT:  Well, this declaration is dated May 11,

7    2018, right?  Ten days ago, 11 days ago?

8            THE WITNESS:  Yes.

9            THE COURT:  And it's responding to an order I issued

10   on May 8, correct?

11           THE WITNESS:  Yes.

12           THE COURT:  So sometime between May 8 and May 11, you

13   spoke to Mr. Rutherford, correct?

14           THE WITNESS:  Yes, sir.

15           THE COURT:  And this is an important matter, correct?

16           THE WITNESS:  Yes, sir.

17           THE COURT:  And you don't recall whether you talked to

18   Mr. Rutherford once or more than once?

19           THE WITNESS:  I'm sure I did.  I just can't give you

20   the exact dates or times of when those conversations happened.

21           THE COURT:  No.  But did you talk to him one time or

22   more than one time in connection with this declaration

23   concerning Junqueira?

24           THE WITNESS:  Concerning his case, more than once,

25   yes.

1          THE COURT:  Okay.  And what did he say to you and what

2     did you say to him regarding Mr. Junqueira's case?

3          THE WITNESS:  I don't recall the exact --

4          THE COURT:  I don't need it word for word.  What did

5     you say and what did he say?

6          THE WITNESS:  I had concern about the current status

7     of the case and whether or not POCR was done, whether or not,

8     you know, with your order, we had to review the case and take

9     action.

10          THE COURT:  Had you discussed Junqueira's case with

11     anyone on your staff before my May 3 hearing?

12          THE WITNESS:  I don't recall if I did.

13          THE COURT:  Did anybody tell you that he had a case in

14     Federal Court?

15          THE WITNESS:  I think it was identified by our

16     attorneys that he was one of the members that was before your

17     court, yes.

18          THE COURT:  Then this goes on to say that you reviewed

19     pertinent DHS records.  What records did you review?

20          THE WITNESS:  I believe I reviewed our electronic

21     records of his case.

22          THE COURT:  Of his DHS case or his court case?

23          THE WITNESS:  I'm sorry.  Our internal DHS records.

24          THE COURT:  And what did you learn in reviewing those

25     records?

1          THE WITNESS:  It would show me the length of time he's

2     in custody.  It would show me case comments from the case

3     officer as the case progressed, what was going on, you know,

4     when the person was ordered removed or if there was an appeal.

5          THE COURT:  Would those records have told you whether

6     he received the 30-day notice?

7          THE WITNESS:  It should, yes.

8          THE COURT:  And did you learn anything about that

9     reviewing the records?

10          THE WITNESS:  I don't recall if that point was blurred

11     or brought up or whatnot.

12          THE COURT:  Had you ever reviewed his file before my

13     May 8 order?

14          THE WITNESS:  No.

15          THE COURT:  Did you learn when you reviewed his file

16     that he hadn't been given a 30-day notice?

17          THE WITNESS:  I don't remember, but if it -- I'm

18     sure if -- if it wasn't, it would be reflected in there.

19          THE COURT:  Well, you've testified under oath that you

20     were concerned that the POCR regulations weren't being

21     followed, right?

22          THE WITNESS:  Yes.

23          THE COURT:  And the cases in Federal Court were

24     important, right?

25          THE WITNESS:  Yes, sir.

1          THE COURT:  And you don't remember whether in reading

2     the file you saw that Mr. Junqueira had never been given any

3     notice at all that there would be a review of whether his

4     detention should continue?

5          THE WITNESS:  Right now I don't recall if that was in

6     the electronic file or not.

7          THE COURT:  Do you know that he was never given any

8     notice?

9          THE WITNESS:  I do right now, yes.

10          THE COURT:  Did anybody on your staff tell you that?

11          THE WITNESS:  I don't recall if that was brought to my

12     attention in conversation with the staff.

13          THE COURT:  Did anybody tell you that no custody

14     review was ever scheduled?

15          THE WITNESS:  No, but like I said, that would be

16     reflected in the record.

17          THE COURT:  Did anybody tell you that Mr. Junqueira

18     was brought to the Burlington office of ICE on May 3 and his

19     wife was told he was going to be released on that date?

20          THE WITNESS:  Yeah, I am aware of that.

21          THE COURT:  When did you learn that?

22          THE WITNESS:  I learned that on May -- actually, I

23     directed it on May 2.

24          THE COURT:  You directed that he be brought there on

25     May 2?

1              THE WITNESS:  On May 2 I directed that he be brought
2      there on May 3.
3              THE COURT:  Why did you do that?
4              THE WITNESS:  At that point in time I anticipated
5      possibly releasing him.
6              THE COURT:  Did you know I was having a hearing on May
7      3 in his case?
8              THE WITNESS:  I might have been aware.  I don't know
9      exactly.
10             THE COURT:  Did anybody tell you I was having a
11     hearing in Junqueira's case on May 3?
12             THE WITNESS:  I don't remember if they told me it was
13     specific to May 3 or not, but I did know you were having
14     hearings with Junqueira, yes.
15             THE COURT:  And you ordered that he be brought to the
16     ICE office on May 3 because you anticipated possibly releasing
17     him, correct?
18             THE WITNESS:  I did.
19             THE COURT:  Do you know whether he was told he was
20     going to be released?
21             THE WITNESS:  I don't know.
22             THE COURT:  Do you know whether his wife was told that
23     he was going to be released?
24             THE WITNESS:  I don't know.
25             THE COURT:  Do you know whether she drove several

1   hours from Connecticut to pick him up because she had been told

2   he was going to be released?

3           THE WITNESS:  I was not aware of that.

4           THE COURT:  So you ordered that he brought to the ICE

5   office because you anticipated he would possibly be released.

6   Why did you anticipate he would possibly be released?

7           THE WITNESS:  In conversations with chief counsel's

8   office, I discussed that I was considering releasing him, and

9   then on May 3, the followup conversation I had again with chief

10  counsel, and I decided that we should possibly enter him into

11  the POCR process for review.

12          THE COURT:  Well, this is helpful because basically

13  it's what I was inferring from the record, but I want you to

14  think about this very hard as to what you remember and what you

15  don't remember.

16          Did you know on May 2 that Mr. Junqueira had not been

17  given a 30-day notice of any custody review?

18          THE WITNESS:  I believe, yes.  That's why my first

19  reaction was -- or decision was to possibly release.

20          THE COURT:  Wasn't it your decision before you spoke

21  to the lawyers on May 3 to release Mr. Junqueira on May 3

22  because you realized that he hadn't been given the process

23  required by law?

24          THE WITNESS:  I believe -- yes.

25          THE COURT:  People change their minds, but didn't you

1    decide on May 2 to have him brought to the ICE office so he

2    could be released that day?

3           THE WITNESS:  I did.

4           THE COURT:  Okay.  And then did you make the decision

5    on May 3 that he should not be released?

6           THE WITNESS:  Yes.

7           THE COURT:  And did that occur after you spoke to a

8    lawyer?

9           THE WITNESS:  Yes.

10          THE COURT:  Which lawyer?

11          THE WITNESS:  I believe Jo Ellen Ardinger and Mr.

12   Crowley.

13          THE COURT:  And have you discussed what you spoke

14   about with them with anybody except other attorneys?

15          THE WITNESS:  Sir?

16          THE COURT:  Have you told anybody what they told you?

17          THE WITNESS:  I don't recall.  There may have been

18   other supervisors of the office when the conversation was going

19   on, too.  But I haven't had a meeting with anybody to discuss

20   that conversation, no.

21          THE COURT:  So you changed -- you spoke to the lawyers

22   and you changed your mind?

23          THE WITNESS:  Yes.

24          THE COURT:  Is that correct?

25          THE WITNESS:  Yes.

1           THE COURT:  And who did you tell you changed your mind

2    that he wouldn't be released?

3           THE WITNESS:  My deputies, so they can let the staff

4    know that the decision had been made that he was not going to

5    be released.

6           THE COURT:  And instead he would be given another

7    30-day notice?

8           THE WITNESS:  Yes, sir.

9           THE COURT:  Do you know whether Mr. Junqueira has any

10   children?

11          THE WITNESS:  Not offhand I don't.

12          THE COURT:  But you thought, like Ms. De Souza, the

13   remedy for the illegal conduct by ICE should be that he would

14   be locked up for another four or five weeks at least, right?

15          THE WITNESS:  Yeah.  And I don't know if I thought it

16   was illegal conduct, but I thought that the remedy to fix that

17   was to give him the opportunity, yes.

18          THE COURT:  Do you understand that regulations are

19   laws?

20          THE WITNESS:  I do.

21          THE COURT:  Do you understand it -- well, did you

22   understand, you know, before today, that an agency like ICE has

23   a legal obligation to follow its regulations?

24          THE WITNESS:  Yes.

25          THE COURT:  So why didn't you -- and you knew that

1    Mr. Junqueira hadn't been given the process provided by the

2    POCR regulations which you understood applied, right?

3                THE WITNESS:  Yes, sir.

4                THE COURT:  So why did you think that wasn't illegal?

5                THE WITNESS:  I guess I just didn't think about it in

6    that context, sir.

7                THE COURT:  It's illegal for people to enter the

8    United States unlawfully when they're not authorized to come

9    here if they're aliens, right?

10               THE WITNESS:  Yes, sir.

11               THE COURT:  And it's important that we enforce those

12   laws, isn't it?

13               THE WITNESS:  Yes, sir.

14               THE COURT:  You've dedicated your career to it?

15               THE WITNESS:  Correct.

16               THE COURT:  Do you think it's also important that the

17   United States Government obey the law?

18               THE WITNESS:  Yes, sir.

19               THE COURT:  And do you understand that you act for the

20   United States Government?

21               THE WITNESS:  I do.

22               THE COURT:  And do you understand that I've found that

23   you and those working in concert with you have acted illegally,

24   have also violated the law?

25               THE WITNESS:  I do now, yes.

1          THE COURT:  But that didn't occur to you before?

2          THE WITNESS:  No.  It was never presented to me that

3     way from my attorneys, no.

4          THE COURT:  Do you see, when you look at that video,

5     for example, of Ms. De Souza being reunited with her son that

6     when the government breaks the law, it can have profound human

7     consequences?

8          THE WITNESS:  I do.

9          THE COURT:  Do you know whether ICE is breaking the

10    law with regard to any of the other people who were arrested at

11    CIS offices in January in Massachusetts or Rhode Island in your

12    district?

13         THE WITNESS:  To what respect of breaking the law?

14         THE COURT:  Well, cases in Federal Court are

15    important, right --

16         THE WITNESS:  Yes, sir.

17         THE COURT:  -- to you?

18         THE WITNESS:  Yes.

19         THE COURT:  And to ICE, right?

20         THE WITNESS:  Yes.

21         THE COURT:  And ICE broke the law with regard to De

22    Souza, didn't provide De Souza the protections in the POCR

23    regulations as you interpret them, correct?

24         THE WITNESS:  Yeah.  I thought that, you know, that

25    the policy wasn't followed, yes.

1          THE COURT:  All right.  But now you understand that

2     I've held that you broke the law?

3          THE WITNESS:  I do now, yes.

4          THE COURT:  Right.  And in another case important to

5     you and ICE, Junqueira, your office also broke the law,

6     correct?

7          THE WITNESS:  That's my understanding right now, yes,

8     from what you're saying, yes.

9          THE COURT:  So do you share my concern that your

10    office may be breaking the law with regard to the other four

11    people who were arrested at CIS offices who don't have cases in

12    front of me?

13         THE WITNESS:  I understand your concern; I do.

14         THE COURT:  Do you share it?

15         THE WITNESS:  Yes.  And that's why I've taken steps to

16    bring in training from May 7 through the 18th.  I brought in

17    three subject matter experts from different parts of the

18    country to come in and to audit the operations over the

19    detained docket and to help correct any errors or to point out

20    any deficiencies.

21         THE COURT:  But you haven't looked at the cases of the

22    other four people detained at CIS offices in January?

23         THE WITNESS:  All the cases that we have detained --

24         THE COURT:  What's that?

25         THE WITNESS:  All the cases that we have detained were

1    reviewed during that two-week process.

2         THE COURT:  Did you review those four cases of people

3    similarly situated to De Oliveira and Calderon?

4         THE WITNESS:  I would have to -- I don't know without

5    identifying those cases if I've reviewed them or not.  I have

6    not reviewed every single case that we currently have in

7    detention.

8         THE COURT:  Are you aware that the relevant statute

9    and regulations provide that aliens shall be detained during

10   the 90-day detention period?

11        THE WITNESS:  Yes.

12        THE COURT:  And you're aware that the law and

13   regulations provide that after the -- I misspoke.  Are you

14   aware that the relevant statute and regulations provide that

15   aliens shall be detained during the 90-day removal period?

16        THE WITNESS:  Yes.

17        THE COURT:  Have you ever read anything -- well, do

18   you understand that the law and regulations have different

19   provisions as to what's required after the expiration of the

20   90-day removal period?

21        THE WITNESS:  I don't know what you're referring to.

22   Could you be more specific?  I'm sorry.

23        THE COURT:  Well, the question is do you understand

24   that the law and regulations have different provisions as to

25   what's required after the expiration of the 90-day removal

1    period?

2           THE WITNESS:  I think I do, yes.

3           THE COURT:  What's required after the expiration of

4    the 90-day removal period?

5           THE WITNESS:  I don't know if you're referencing the

6    POCR review process.  I don't know if that's what you're

7    referring to.

8           THE COURT:  What's the -- I want to know what you

9    understand.  What do you understand?

10          THE WITNESS:  After the expiration of the 90-day

11   period, if we determined through the POCR review that they were

12   going to be released because of -- we thought their removal

13   would be forthcoming, or they're a threat to national security

14   that they could be held in detention longer for the purpose of

15   removal.

16          THE COURT:  And did you tell me earlier that you

17   understood that the 90-day removal period began when an order

18   of removal was final?

19          THE WITNESS:  Yes.

20          THE COURT:  And do you know when Ms. De Souza's order

21   of removal became final?

22          THE WITNESS:  No, I don't.

23          THE COURT:  Do you know that she was ordered removed I

24   think in 2000?

25          THE WITNESS:  Okay.  I know she wasn't taken into

1    custody subsequent to the issuance of that order.

2              THE COURT:  We're going to get there.  So if she was

3    finally ordered removed in 2000, would her removal period have

4    expired 90 days later, presumably in 2000 or maybe early 2001?

5              THE WITNESS:  Yes.

6              THE COURT:  But is it your understanding that even if

7    the removal period expired, ICE could detain her for 90 days

8    once it arrested her?

9              THE WITNESS:  Yes.

10             THE COURT:  What's that understanding based on?

11             THE WITNESS:  I think it's based on -- is it

12   1231(a)(6).

13             THE COURT:  You're talking about 8 United States Code

14   Section 1231(a)(6), right?

15             THE WITNESS:  Yes.

16             THE COURT:  So what do you think (a)(6) says?

17             THE WITNESS:  That it refers to detention of aliens

18   for the purpose of removal if they pose a flight risk or risk

19   to public safety.

20             THE COURT:  It says, "An alien ordered removed or who

21   has been determined by the Attorney General to be a risk to the

22   community or unlikely to comply with the order of removal may

23   be detained beyond the removal period and, if released, shall

24   be subject to the terms of supervision in paragraph 3."

25             Did you know that's what it provided?

```
1                THE WITNESS:  Yes, that was my general understanding.

2                THE COURT:  And do you know that paragraph 3 is

3        captioned "Supervision After 90-Day Period," and it says, "If

4        the alien does not leave or is not removed within the removal

5        period, the alien pending removal shall be subject to

6        supervision under regulations prescribed by the Attorney

7        General," and then the regulations shall include provisions

8        requiring the alien to do certain things.  Do you understand

9        that?

10               THE WITNESS:  I do.

11               THE COURT:  For Ms. De Souza, was any -- I'm just

12       asking your understanding -- was ICE required to make an

13       individualized determination after she was arrested at the ICE

14       office as to whether she should be detained?

15               THE WITNESS:  Yes.

16               THE COURT:  Was that done?

17               THE WITNESS:  I don't know.  That happened before I

18       arrived.

19               THE COURT:  I don't think so.  Well, maybe.  Might

20       have overlapped.  She was arrested on January 30.  Have you

21       read all the declarations that were submitted in this case?

22               THE WITNESS:  I don't know if I read them all, no.

23               THE COURT:  I might have to do this after lunch.  But

24       are you aware that since you became acting director your office

25       has taken the position that somebody like Ms. De Souza was not
```

1    entitled to an individualized determination of whether she

2    should be detained after being arrested?

3         THE WITNESS:  I'm struggling to understand what you

4    mean by individualized determination.  Is that like a hearing

5    or -- or are you talking about a decision --

6         THE COURT:  No.  That she couldn't be detained merely

7    because she had been ordered removed.

8         THE WITNESS:  I'm sorry?

9         THE COURT:  What I understand the position in

10   declarations other than yours I think to be is that ICE had the

11   authority to detain somebody for at least six months -- I'm

12   sorry -- at least 90 days without making an individualized

13   determination even if the removal period had expired.  Is that

14   your understanding?

15        THE WITNESS:  Yes, and I think if we're talking about

16   that individualized review, is that POCR, is that what we're

17   referring to?

18        THE COURT:  I'm asking you.

19        THE WITNESS:  Well, that would be my understanding of

20   it.

21        THE COURT:  So if the POCR regulations -- so is it

22   your understanding that under the POCR regulations you could

23   hold somebody up to 90 days without considering individually

24   whether that, you know, based on individual circumstances,

25   whether that person should be locked up?

```
 1              THE WITNESS:  I think so.

 2              THE COURT:  Even if the removal period had expired?

 3              THE WITNESS:  That's one understanding, but I also

 4     understand those same issues come up at the time of arrest,

 5     too, in making a determination.

 6              THE COURT:  Is ICE supposed to make a determination at

 7     the time of arrest whether to detain somebody?

 8              THE WITNESS:  Yes.

 9              THE COURT:  Why are they supposed to do that?  What

10     creates the obligation to do that?

11              THE WITNESS:  I don't know exactly, you know, where

12     it's referenced in the law, but it's a policy that, you know,

13     we make a determination of whether someone is going to be

14     detained, released, possibly given bond.  We have systems in

15     place, too, that assist us in that process.

16              THE COURT:  And in fact you did that with Calderon.

17     You didn't require that she be detained 90 days before you

18     decided to release her, right?

19              THE WITNESS:  I'm sorry?

20              THE COURT:  That's what you did with Calderon.  When

21     her case came to your attention, you decided she could been

22     released even though she hadn't been detained 90 days?

23              THE WITNESS:  Yes.

24              THE COURT:  What is your understanding with regard to

25     ICE 's authority to detain somebody after 90 days?
```

1          THE WITNESS:  That that previously mentioned section

2     affords us, you know, if we deem it worthy or if the case

3     warrants it, for the purpose of removal.

4          THE COURT:  And do you have any understanding whether

5     before 90 days or after 90 days a court has the authority to

6     review detention in a Federal Court, like this one, U.S.

7     District Court, and to order that somebody be released if the

8     court finds that the Constitution and laws of the United States

9     are being violated by the detention?

10          THE WITNESS:  It's my understanding the court can make

11     that decision at any point.  Not after 90 days.  It could

12     happen prior to as well.

13          THE COURT:  What is that understanding based on?

14          THE WITNESS:  Just my experience.

15          THE COURT:  Of?

16          THE WITNESS:  Somebody can file a habeas contesting

17     their detention, and it could be reviewed at any point.

18          THE COURT:  That's my understanding, too.  Did you

19     read the transcript of my decision on May 8?

20          THE WITNESS:  No, sir, I have not.

21          THE COURT:  Would you like to?

22          THE WITNESS:  Sure.

23          THE COURT:  Do I need to order you to?

24          THE WITNESS:  No, sir.  I can ask the attorneys.  I

25     can get a copy of it if you wish.

```
 1              THE COURT:  I'll order them to give you a copy.

 2              THE WITNESS:  Thank you.

 3              THE COURT:  Why did you decide to come to work for INS

 4    and dedicate your career to this?

 5              THE WITNESS:  Why did I decide to apply?

 6              THE COURT:  Yeah.

 7              THE WITNESS:  I was told by a family member who worked

 8    for the agency that they were hiring, and I was looking for,

 9    you know, a good-paying job.  I was out of college.  I didn't

10    really know what I wanted to do with my career or life at that

11    time.  And since then it's afforded me the opportunity to

12    support a family and keep gainfully employed.

13              THE COURT:  Is it gratifying to have the opportunity

14    to serve the United States?

15              THE WITNESS:  Yes.

16              THE COURT:  And do you want to do that honorably and

17    legally?

18              THE WITNESS:  Yes, sir.

19              THE COURT:  Then I'd suggest you read my decision.

20              THE WITNESS:  Yes, sir.

21              THE COURT:  It might be appealed.  And there will

22    eventually be a written decision, but this testimony today, I

23    found I couldn't write the decision because it wasn't clear to

24    me what ICE's policies and practices were as opposed to the

25    arguments being made on behalf of ICE.
```

1          Look, it's quarter of 1:00.  Like most things, this
2     took longer than I thought it would.  I think you should all go
3     to lunch.  Come back at 2:00.  I'll try not to think of any
4     more questions for this witness, but I can't promise.  Then
5     I'll give the parties an opportunity to follow up on my
6     questions and probably go to Mr. Rutherford next.  Okay?
7          MR. WEINTRAUB:  Thank you, Your Honor.
8          THE COURT:  Court is in recess.
9          (Recess taken 12:45 p.m. - 2:04 p.m.)
10         THE COURT:  I see Mr. Dos Santos is now present.  Of
11    course I thought of a few more questions over the break, so
12    I'll try to do it promptly.
13         Mr. Brophy, do you understand you're still under oath?
14         THE WITNESS:  I do, sir.
15         THE COURT:  When were you told you were going to
16    become the acting district director?
17         THE WITNESS:  January sometime.  I don't know the
18    exact date.
19         THE COURT:  January 2018?
20         THE WITNESS:  Yes.
21         THE COURT:  Who told you?
22         THE WITNESS:  Her name is Natalie Asher.  She's
23    employed with ICE at headquarters.
24         THE COURT:  And you succeeded Mr. Cronen?
25         THE WITNESS:  Yes.

1            THE COURT:  Was he the director, the acting director?

2            THE WITNESS:  He was the director.  He was the field

3     office director.

4            THE COURT:  Did anybody tell you why he was being

5     moved to Washington and why you were being asked to come here?

6            THE WITNESS:  No.  I had heard that he just took

7     another job in D.C.

8            THE COURT:  Do you have any information as to whether

9     the conduct of the district office in his tenure had been

10    criticized by a federal judge?

11           THE WITNESS:  No, not prior to me coming here.

12           THE COURT:  Have you learned that since?

13           THE WITNESS:  I get that sense.

14           THE COURT:  From what?

15           THE WITNESS:  From you.

16           THE COURT:  From what?

17           THE WITNESS:  I get that sense from you right now,

18    yes.  But no, no one's ever told me that anything was brought

19    to the table.

20           THE COURT:  Anybody ever mention to you Chief Judge

21    Saris' decision in Rombot v. Souza?

22           THE WITNESS:  No, sir.

23           THE COURT:  It's a case involving Indonesia.  Has

24    anybody at ICE discussed that with you?

25           THE WITNESS:  No, but the case has come up recently.

1    Again, there were inquiries about it from a Congressional

2    member as to what is the status of those cases.

3         THE COURT:  Has anybody told you that Judge Saris

4    described how counsel for ICE seemed to know nothing about

5    ICE's decision to continue detention during a November 2017

6    hearing before her?

7         THE WITNESS:  No, sir.

8         THE COURT:  Did anybody tell you that she wrote the

9    decision of ICE -- it says, "This decision is evidence of ICE's

10   utter disregard for the agency's own procedures"?

11        THE WITNESS:  I've never seen or no one's discussed

12   that with me, no.

13        THE COURT:  And she wrote, "ICE, like any agency, has

14   a duty to follow its own regulation," citing cases.

15        THE WITNESS:  That's never been discussed with me, no.

16        THE COURT:  Do you wish you had known that when you

17   started your job?

18        THE WITNESS:  Yes.

19        THE COURT:  You testified this morning that there were

20   issues with the way ICE staff was applying the POCR procedures

21   that prompted you to direct training for your staff.  What were

22   the issues?

23        THE WITNESS:  It appeared to me that some of the cases

24   were not adhering to our POCR policies, that they weren't

25   issuing the notice of interview in a timely fashion and that

1     some POCRs weren't being completed on time or being completed.

2            THE COURT:  How did you learn that?

3            THE WITNESS:  During the -- I had the three outside

4     staff members come in to do an internal audit.  As they

5     discovered cases in reviewing all the detained cases that we

6     have, they would bring it to my attention.

7            THE COURT:  And when was that audit done?

8            THE WITNESS:  They started on May 7 and completed on

9     the 18th.

10            THE COURT:  And what does an audit of the detention

11    docket mean?

12            THE WITNESS:  I ask them to come in and review all the

13    cases that are on our detained docket to make sure that we're

14    keeping proper records in our database systems as well as to

15    ensure that we're complying with the policies regarding POCRs

16    and all of our policies.

17            THE COURT:  The audit is complete now?

18            THE WITNESS:  Yes, yeah.

19            THE COURT:  Did you get a written report concerning

20    it?

21            THE WITNESS:  Yeah.

22            THE COURT:  How long is it?

23            THE WITNESS:  How long is the report?  I don't

24    remember.  It's a number of pages.  Probably less than eight.

25            THE COURT:  And what did the audit find?

```
1              THE WITNESS:  They found that there were cases where

2    errors were made and they gave suggestions on how to improve

3    productivity and to ensure better docket maintenance, if you

4    would.

5              THE COURT:  About how many cases in which errors were

6    made?

7              THE WITNESS:  I don't remember offhand.

8              THE COURT:  A large number or a small number?

9              THE WITNESS:  I think small, relative to the size of

10   the docket.

11             THE COURT:  How big is the docket?

12             THE WITNESS:  Roughly 630.

13             THE COURT:  In about what percentage were errors

14   found?

15             THE WITNESS:  My best guess at this point, maybe four

16   or five percent.

17             THE COURT:  Well, when did you get this written

18   report?

19             THE WITNESS:  Probably on the 17th of May.

20             THE COURT:  Last week?

21             THE WITNESS:  Yeah.

22             THE COURT:  About five days ago?

23             THE WITNESS:  Yeah.

24             THE COURT:  Did you read it?

25             THE WITNESS:  Yeah, I have.
```

1          THE COURT:  But you can't remember what's in it?

2          THE WITNESS:  I can remember generally.  I don't

3    remember the specific numbers and figures.

4          THE COURT:  Did the auditors find that your staff had

5    failed to give any other detainees timely notice of a 90-day

6    custody review?

7          THE WITNESS:  Yeah, they did.

8          THE COURT:  How many cases did they find that occurred

9    in?

10          THE WITNESS:  I don't have that figure.

11          THE COURT:  Did the auditors find that your staff had

12    violated the requirements of the POCR process, as you

13    understand it, in any other way?

14          THE WITNESS:  Other than maybe not issuing the

15    interview notice timely or conducting the POCR in a timely

16    fashion, those were the major errors that were found.

17          THE COURT:  And with regard to the cases in which the

18    auditors discovered ICE had violated the POCR requirements, as

19    you understand them, what did you do about it?

20          THE WITNESS:  We took steps to correct the POCR

21    process the way that I have in the past in issuing the notice

22    of the review and conducting POCRs.

23          THE COURT:  So people are still detained, but you've

24    given them a notice?

25          THE WITNESS:  Some of them may be detained.  I did

1  release some people from custody as well.

2        THE COURT:  Can you think of any reason why I

3  shouldn't order that the audit be produced in this case?

4        THE WITNESS:  No.  That's fine.

5        THE COURT:  I order it.  Did the audit find that

6  anybody who didn't get what you regard as timely notice of a

7  detention review had been removed or deported?

8        THE WITNESS:  No.  They were just looking at currently

9  detained cases.

10        THE COURT:  Oh.  They didn't look at --

11        THE WITNESS:  Cases that were closed or whatnot, no.

12  I asked them to come in and specifically look at the current

13  detained population.

14        THE COURT:  Okay.  Finally -- I'm finished for now.  I

15  think the burden on the issues is going to be on the

16  petitioners.  So do the petitioners have any questions?  And I

17  should say that the opposition to the motion to dismiss was

18  filed very late yesterday and I haven't read it.  If I read it,

19  it might suggest some questions, but I didn't deliberately not

20  answer them -- ask them.

21        THE WITNESS:  Okay.

22        MS. LAFAILLE:  Thank you.  Would Your Honor like us at

23  the podium?

24        THE COURT:  If you're going to question the witness,

25  you should question him from over there.

1    EXAMINATION BY MS. LAFAILLE:

2    Q.   Good afternoon, Director.  I'm Adriana Lafaille, one of

3    the attorneys for the petitioners.

4    A.   Good afternoon.

5    Q.   You mentioned arriving in the Boston field office around

6    February 5; is that right?

7    A.   Yes.

8    Q.   And you mentioned that the following week you learned of a

9    new practice that was unfamiliar to you; is that correct?

10   A.   Yes.

11   Q.   Can you describe that practice.

12   A.   Staff were -- excuse me -- going to the CIS office and

13   arresting people who were subject to a final order subsequent

14   to some kind of appointment, whether it be for an I-130

15   adjustment or whatever.

16           THE COURT:  Here.  Mr. Brophy, pull that microphone a

17   little closer to you and try to speak into it.

18           THE WITNESS:  Is that better?

19           MS. LAFAILLE:  Yes.

20           THE WITNESS:  Do you need me to repeat that?

21           MS. LAFAILLE:  I don't.

22           THE COURT:  That's okay.

23   Q.   And how did that differ from your experience at your prior

24   office?

25   A.   Well, in Buffalo, we've had cases, not as many as this,

1    but we've taken similar action.  But normally I would focus on

2    somebody that had like a criminal record or a possible nexus to

3    national security before we would go and arrest somebody at the

4    location.  So it was a little different than what I'm used to.

5    Q.    So in Buffalo there was no absolute bar on detaining

6    someone on an I-130 interview, correct?

7    A.    No.

8    Q.    It was just that it was only done when special

9    circumstances warranted it; is that right?

10   A.    Yeah.  It's case by case.

11   Q.    Okay.  And how did you change the practice that you

12   observed when you got here?

13   A.    I told them to stop.  I didn't want them going to CIS for

14   every case that was a final order that was appearing for an

15   interview unless there was a national security threat or threat

16   to public safety, and that we could always follow up on those

17   cases, whether it be somebody who is just ordered removed but

18   no criminal history, we could follow up with those cases in

19   another way rather than going to the CIS office and taking them

20   into custody.

21   Q.    So with regard to the arrests that had already occurred,

22   was it your view that those were not national security threats

23   or cases that presented special circumstances?

24   A.    The way it was presented to me, yes.

25   Q.    Yes meaning they were not?

1   A.   They were not.

2   Q.   Okay.  And who did you inform of the new policy?

3   A.   It's not really a policy.  It was direction that I gave my

4   two deputy field office directors and the assistant field

5   office directors during a telephonic supervisory meeting that I

6   conducted.

7   Q.   And that happened on February 16?

8   A.   Yes, ma'am.

9   Q.   And what exactly was the direction that you gave them?

10  A.   To stop that practice of going to CIS for everybody who

11  has an administrative final order who is appearing for a

12  hearing, unless they are a public safety risk or a threat to

13  national security.

14          THE COURT:  Excuse me just one moment.  Do you know

15  how ICE in this district was previously learning that people

16  ordered removed would be at CIS to pursue this provisional

17  waiver process?

18          THE WITNESS:  First-hand, no.  I don't know if it was

19  via email, telephone; I don't know.

20  BY MS. LAFAILLE:

21  Q.   And what were your reasons for changing the policy?

22  A.   I thought with the cases that I saw here from an

23  enforcement standpoint in the Commonwealth that we have enough

24  public safety risk, especially with the issue with immigration

25  detainers and people getting out of custody that have criminal

1    records or pending criminal charges, I felt there was more of a

2    concern for me about public safety issues rather than somebody

3    going to the interview that may not have the same public safety

4    concerns.  So for me it was a matter of focusing my enforcement

5    assets, if you would, to address what I thought was more

6    relevant at the time.

7    Q.   And that's because the people being detained at these

8    interviews were not necessarily a danger to the community,

9    right?

10   A.   The way it was presented to me, yes.  You know, I need --

11   the guidance I gave was that public safety risk is somebody

12   that has a criminal conviction or pending serious crime, or

13   charge I should say, that would lead to a public safety issue,

14   and national security is national security.  And these cases

15   that we're talking about here I don't believe met that

16   criteria.

17   Q.   And you also determined then that these cases were not --

18   let me rephrase.  People presenting themselves for an I-130

19   interview, did you determine that those people were not likely

20   to be flight risks?

21   A.   No, no.  I looked at whether or not they were a threat to

22   public safety or national security.

23   Q.   I just want to understand your answer.  You did not make

24   the determination as to whether they would be likely to be

25   flight risks?

1    A.    When I told them to stop the practice?

2    Q.    Yes.

3    A.    No.  I wasn't -- I wasn't concerned because we had that

4    information, where they would be, because it was on the

5    applications.  If we needed to have follow up, send

6    correspondence or whatnot, we could.

7    Q.    So there was no particular flight risk concern presented

8    by people showing up for an I-130 interview; is that right?

9    A.    There might have been previously in their case, if they're

10   an in absentia order and they had been out and about without

11   reporting or they had been granted a volunteer departure before

12   and they failed to comply with it.  So yeah, it's case by case.

13        It's not overall saying there isn't a flight risk just

14   because they're showing up for a hearing.  I would have to look

15   at the totality of the case.  But I was more concentrating on

16   public safety issues and threats to national security.  The

17   point of whether I thought they were a flight risk or not at

18   the time before the interview or subsequent to it didn't really

19   come into my equation.

20   Q.    And is your policy limited to the USCIS offices itself?

21   A.    I'm sorry?

22   Q.    Are the arrests that you would like to -- that are now

23   contrary to your policy just the ones that happened in USCIS

24   offices themselves?

25   A.    You know, I've instructed my staff my priorities are

1    national security threats and public safety threats.  If we do

2    encounter somebody that is a subject of a final order but

3    there's no other compelling factor, criminality or national

4    security threat, we can address that.  It doesn't mean they're

5    going to be detained, but right now my enforcement groups are

6    focusing on criminals and national security risks.

7    Q.   And how should those cases be addressed if individuals are

8    not detained at the I-130 interview?

9    A.   Well, we have a lot of mechanisms how we can still retain

10   docket control over the case, whether it be on an order of

11   supervision, an alternative to detention, i.e., like an ankle

12   bracelet, GPS monitoring, telephonic reporting.

13   Q.   So since February 16 have there been interviews at USCIS

14   offices involving individuals with final orders of removal?

15   A.   I don't know.  I haven't been advised by CIS or my staff

16   that people have.  They could have.  I don't know.  But no one

17   has informed me of that.

18   Q.   And if today ICE learns about an individual who is going

19   in to a USCIS office for an interview, what should ICE do;

20   what's your direction to your subordinates about what ICE

21   should do in those cases?

22   A.    If they're a risk to public safety or national security,

23   we would work with CIS and make arrangements to take them into

24   custody.

25   Q.   And if they're not?

1   A.   Then it's not a priority for my enforcement at this point

2   in time.  We can always come back to those cases at a later

3   time.

4   Q.   When you made that determination, was it your view that

5   the entire arrests have been inconsistent with your new policy?

6   A.   Well, it wasn't a policy that I was giving forth.  It was

7   direction.

8   Q.   With the arrests that happened in January, would they have

9   been contrary to your direction?

10  A.   Yeah.

11  Q.   And did you take steps to address the existing cases of

12  people that had been detained in January?

13  A.   As they were brought to my attention, yes.

14  Q.   Did you direct that any review be conducted of those

15  cases?

16  A.   Not at that point.

17  Q.   Can you rescind that direction?

18  A.   Which direction?

19  Q.   The direction not to detain people at I-130 interviews?

20  A.   I guess if I had a reason to, but I don't see that I do.

21  Q.   And why is that?

22  A.   Like I said, I think my enforcement elements are better

23  utilized handling national security and public safety threats.

24  There's quite an epidemic in this state with narcotics, and

25  we're seeing quite a few of immigration detainers get lodged

1    and not honored for criminal aliens; so for me, that is the

2    emphasis.

3    Q.   I want to direct you to what's been marked as Exhibit 3.

4    I think it's --

5    A.   I'm sorry.  Which one is Exhibit 3?

6    Q.   This is the declaration of Todd Lyons.

7    A.   Okay.

8    Q.   If I could direct you to just look at paragraph 5 on page

9    3.

10   A.   Okay.  Paragraph 5 on page 3, thank you.

11   Q.   Do you see the reference to the Executive Order 13768 of

12   January 25, 2017?

13             THE COURT:  Wait.  What paragraph is that?

14             MS. LAFAILLE:  Paragraph 5 at the top of the.

15             THE COURT:  The docket number is what?

16             MS. LAFAILLE:  Docket number 19.

17             THE COURT:  Right.

18             MS. LAFAILLE:  ECF page is page 6.

19             THE COURT:  There's something wrong here.  I see.

20   Thank you.

21   BY MS. LAFAILLE:

22   Q.   So do you see the reference to Executive Order 13768?

23   A.   Yes.

24   Q.   And can you tell us what that is?

25   A.   It's the enhancing public safety in the interior of the

1    United States.

2    Q.    And who issued that?

3    A.    I believe President Trump.

4    Q.    And what does it say, as far as you know?

5    A.    I don't recall verbatim what it says.  I would have to

6    refer to it, but I don't think I can cite it.

7    Q.    Do you have a general recollection of what it says?

8    A.    Yeah.  I think it's basically that there was no longer

9    going to be enumerated classes of people that were no longer

10   considered subject to immigration enforcement, concentrate

11   efforts on national security, public safety, I think along

12   those lines.

13   Q.    How has, to your knowledge, that executive order

14   influenced the detentions of Ms. Calderon and Ms. De Souza?

15   A.    Other than under the previous administration, their

16   enforcement priorities, I don't think they would have been

17   included in those.  Now, after the executive order, anybody who

18   is in violation of law could be subject to detention and

19   enforcement.

20   Q.    So prior to this executive order, would it be correct to

21   say that Ms. Calderon and Ms. De Souza would not have been

22   targeted for detention and removal?

23   A.    Quite possibly.  I would have to look at their cases to

24   see if it fell within those parameters of the guidance of the

25   previous administration.

1    Q.   Based on what you know from having reviewed their cases,

2    is it likely that they would not have been targeted?

3    A.   Likely.

4    Q.   Who at ICE would receive notification about a non-citizen

5    who is going to show up for an interview at USCIS?

6    A.   I don't know who the communication was with between the

7    CIS and the ERO office of Boston.  I never found out.  And

8    honestly, I never asked.

9    Q.   Who is likely it to have been?

10   A.   I don't know if it was one of the supervisory detention

11   and deportation officers.  I don't know, ma'am.

12   Q.   And do you know anything about what USCIS has communicated

13   to the Boston ERO about individuals showing up for interviews?

14   A.   No, other than that they used to, until I asked them to

15   please stop.

16   Q.   You asked USCIS to stop?

17   A.   Yes.  As I mentioned earlier, I did have a conversation

18   with the local CIS director, Mr. Riordan, and told him unless

19   there was a national security risk or public safety risk that

20   my staff would not be coming for these I-130 CIS office

21   arrests.  So I discussed it with him at a meeting we had.

22   Q.   And did you ever follow up to make sure that USCIS is in

23   fact not communicating this information to ICE?

24   A.   No.

25   Q.   Are you aware of whether they are?

1   A.    No, I'm not.  All I can say is, to the best of my

2   knowledge, no arrests at CIS offices have happened since I gave

3   that guidance.

4   Q.    What would be the process if ICE learned about an

5   individual, for example, someone who was going to be at a USCIS

6   office for an interview, what would be the process for making a

7   decision about whether to target that individual for removal?

8   A.    We would look at their record and determine whether or not

9   they had a criminal record, which would lead me to believe that

10  they're a possible public safety risk, or if there was some

11  information that related to national security concerns.

12  Q.    And why would you look at their record?

13  A.    In our database systems and through NCIC and other shared

14  systems between the federal government, as well as we could

15  review their immigration file, too.  But I would think that CIS

16  would have that if they're going for some kind of benefit or

17  whatnot.  So we would really be looking at our own internal

18  systems and what we can find out via criminal history checks

19  and such.

20  Q.    And what would the removal decision be made based on?

21  A.    Removal decision?

22  Q.    The decision to target someone for removal.

23  A.    Well, for removal or arrest?  I'm sorry.

24  Q.    Is that a different decision?

25  A.    Yes.  We can still intend to remove that person that goes

for the interview, but we might not effect any arrest at that

point in time.

Q.   And how would you do that?

A.   We could send them a notice to say, Hey, please show up at

our office on this date.  We can give them guidance at that

point, saying, Hey, there's an order on file; we're not going

to take you into custody; we're going to have you on an order

of supervision or maybe enroll them in alternatives to

detention to ensure their compliance as we're working on trying

to get them removed if the removal order is administratively

final.

Q.   So what would be a circumstance where you would target

someone, where you would decide to target someone for removal,

not necessarily arrest, but you would want to begin the process

of trying to remove someone?

A.   Well, to remove them I'm going to have to at some point in

time make a custody decision.  So there would be some form of

arrest, but I would look at whether or not the appeal -- if

there's an appeal, if the case, if the order is

administratively final and if a travel document is available

that they can be scheduled for removal.

     I might also, you know -- really, it's going to be that,

if there's an appeal pending, if that order is administratively

final, and if I think the likelihood of the removal is good

because of the issuance of a travel document.

1  Q.   So for someone ICE encounters who has pending proceedings

2  at USCIS but has a final order, when might ICE still determine

3  that they should be targeted for removal?

4  A.   It's case by case.  Some people probably appearing for

5  those interviews might be eligible to adjust in the United

6  States.  And if that's the case, we're probably not going to

7  take action until the decision is made on the applications

8  pending.

9      If there isn't any other compelling factors such as

10  criminal history or national security issues for somebody that

11  may not be able to adjust within the United States, I'll see

12  where they are in the process of the I-130 and 212 and whether

13  or not there was a 601 filed.  So I would look at the totality

14  of their individual case in making a decision.

15          THE COURT:  Let me interrupt because I think you're

16  making a distinction, and I want to make sure I understand it.

17  So you said if someone's eligible to adjust in the United

18  States in effect you wouldn't arrest them.  You'd let that

19  process run its course.

20          THE WITNESS:  It's not that I necessarily wouldn't

21  arrest them.  I wouldn't detain them --

22          THE COURT:  Well, okay.

23          THE WITNESS:  -- I think is better stated.

24          THE COURT:  But what type of -- so adjustment in the

25  United States means they would never have to leave before

1    becoming a lawful permanent resident?

2            THE WITNESS:  Generally, yes, sir.

3            THE COURT:  And then are you making a distinction then

4    between people who were applying for I-130s and then

5    provisional waivers who at some point would have to leave the

6    United States briefly before getting an immigrant visa to come

7    back legally?

8            THE WITNESS:  No.  I would look at those cases

9    individually and determine whether or not detention was going

10   to be brought into play or not.  I'm not saying they won't be

11   arrested.  I'm saying they're not going to be detained.  But

12   cases like that scenario, yes, I would consider those avenues

13   to see if they could shorten their time abroad, if you would,

14   before being able to come back with the benefit.

15           THE COURT:  So you might let people seeking I-130

16   status and then provisional waivers to stay in the United

17   States until CIS determined -- I may not be stating this

18   exactly right.

19           THE WITNESS:  I think I understand.

20           THE COURT:  -- until it was determined whether they

21   should be given the provisional waivers?

22           THE WITNESS:  It could.  It could also depend upon

23   whether or not the person has actually taken an assertive

24   effort to get it done.  If they just get an I-130 and let it

25   languish for a certain period of years, I might have to force

1   their hand a little bit because the law is to enforce that

2   lawful order and remove them.  So like I said, it's really

3   contingent upon the facts of each case.

4   BY MS. LAFAILLE:

5   Q.   And have you ever given any direction to your subordinates

6   about how to deal with cases involving individuals who might be

7   going through the provisional waiver process?

8   A.   No.

9   Q.   Do you know whether --

10  A.   Not specific to that point, no.  I'm sorry.

11  Q.   Do you know whether your deportation officers and

12  supervisory deportation officers take the provisional waiver

13  process into account in making their determinations?

14  A.   I would think yes, they would.

15  Q.   Do you know whether they do?

16  A.   Not 100 percent, no.

17  Q.   Do you have any evidence that they do?

18  A.   Based on my past experience and my knowledge and

19  experience, I know that's what we would consider in Buffalo.  I

20  seem to think that same train of thought would be here as well.

21  It's just kind of a practice, if you would.

22  Q.   But you don't have any evidence that that is taken into

23  account here in the Boston office?

24  A.   I don't have any evidence that it's not either.

25  Q.   Okay.  So I want to just make sure I understand.  The

1    removal decision, the arrest decision and the detention

2    decision, are those three separate decisions that might all

3    occur around the time that an individual is detained?

4    A.   Yes.

5    Q.   And we've seen some declarations about the risk

6    classification assessment.  Are you familiar with that?

7    A.   A little, yes.

8    Q.   When does that come into play?

9    A.   It's my understanding that that comes into play at the

10   time of the arrest when the arresting officer going through the

11   process of drafting the 213 document, any other charging

12   documents and then they're taking information that they get

13   from the person they arrested during an interview subsequent to

14   the arrest and as well as the information we have in our

15   system, and they put it into the RCA.  Then it has supervisory

16   approval, concurrence or whether or not they agree or disagree

17   with whatever the RCA's standard recommendation might be.

18   Q.   Is that all happening after there's been a determination

19   to make an arrest?

20   A.   Yeah, that's after the physical arrest happens.

21   Q.   Okay.  It's happening after there's been a determination

22   that ICE would like to target someone for removal?

23   A.   Yes.  That's the reason why we do arrest, is for the

24   purpose of removal.

25   Q.   Is the RCA integrated into any ICE databases, or does

1   everything that goes into the RCA have to be inputted manually

2   at the time of the determination?

3   A.   I believe it's manual, but it's part of the overall, but

4   you have to manually enter the information.

5   Q.   And what kind of information is entered into the RCA?

6   A.   I'm a little embarrassed.  I've actually never done one

7   since it came out.  But from what I understand it's

8   biographical information, whether or not the subject is a final

9   order or not.  To be honest with you, I can't really get into

10  the specifics of what gets put into it.  I've never personally

11  done it.

12  Q.   And is it likely that the RCA or do you know whether the

13  RCA accounts for, for example, someone having an approved

14  I-130?

15  A.   I don't know.

16  Q.   Do you know whether it accounts for whether someone is

17  following the steps to gain provisional waivers?

18  A.   I don't know if that's information that gets put into that

19  system or not.

20  Q.   Do you agree that both of those things are things that

21  might weigh against flight risk?

22  A.   I guess it could.  I think a lot of the points that you're

23  asking me about, those provisional waivers and the I-130 would

24  have been brought up during the interview with the alien

25  subsequent to arrest when they're asked if they have any

1    pending applications, if they have any medical conditions, if

2    there's anything compelling for the arresting office to take

3    into consideration.  But I don't know if that actually gets

4    directly -- I don't know how the system is laid out.  If

5    there's a box to check that I-130 is filed, 212 is filed, I

6    don't know.

7    Q.   Forgive me.  My last question was not about the computer

8    system itself but just about your own understanding of flight

9    risk.  You agree that there are things, there are factors that

10   weigh in favor of flight risk; is that right?

11   A.   Yeah.

12   Q.   And there are factors that weigh against flight risk?

13   A.   Correct.

14   Q.   And do you agree that an approved I-130 generally is a

15   factor weighing against flight risk?

16   A.   I would have to look at the totality of the case.  I don't

17   think I can make a general statement saying yes --

18   Q.   All things equal, an approved I-130 --

19   A.   -- 100 percent a waiver of flight risk for me.

20   Q.   That's not quite my question.  Is it a factor that comes

21   in on either side?

22   A.   Yeah, it could be considered, yes.

23   Q.   And would someone be more likely to be a flight risk if

24   they have an approved I-130, or would that go more in the

25   against column?

1    A.    I don't know.  Like I said, it depends on the totality of

2    the cases.  They could have been charged -- I've seen it where

3    people have been charged at a local level and have bench

4    warrants issued for them and they could have applications

5    pending.

6              THE COURT:  I think her question is different, though.

7    Not whether everybody with an I-130 would deserve to be

8    released, but if you're putting things on a scale and, you

9    know, with the fact that somebody's --

10             THE WITNESS:  I think it would be favorable to them --

11             THE COURT:  Let me just finish -- pursuing an I-130

12   generally weigh in favor of release or detention?

13   Understanding there will be other factors on those scales.

14             THE WITNESS:  Just the filing of it might not make

15   that decision.  Whether it was filed and approved would

16   definitely weigh better for them, showing there is an avenue

17   possibly for relief at that point.  Just the mere filing of it

18   I don't think would necessarily weigh it to say this person

19   should be considered to be detained or released.  I would look

20   at whether or not that application was actually adjudicated

21   favorably or not.

22   BY MS. LAFAILLE:

23   Q.    So where the I-130 is approved, you agree that although

24   there are obviously other factors in play, that factor itself

25   is a factor in favor of the non-citizen being released?

1    A.   It could be, yes.

2    Q.   Could be or it is?

3    A.   Like I said, each case is independent.

4         THE COURT:  I think I've -- this is enough.  Move on.

5         MS. LAFAILLE:  Okay.

6    Q.   And is the fact that someone has the ability to pursue the

7    provisional waiver process generally a factor in favor of the

8    non-citizen?

9    A.   Yes, if there weren't any other compelling factors that

10   would warrant detention, it could.

11   Q.   And have you given any direction to your subordinates

12   about how to take those factors into account when using the

13   RCA?

14   A.   No, because I don't know if that's captured in the RCA, so

15   I've never given that kind of direction.

16   Q.   Director, you made the decision to release Lilian

17   Calderon; is that right?

18   A.   Yes, I believe I did.

19   Q.   I direct you to paragraphs 8 and 9 of Deputy Lyons'

20   affidavit.  Why did you decide to release Ms. Calderon?

21   A.   I'm sorry.  I'm still reading.  I apologize.

22   Q.   Oh, go ahead.

23   A.   (Witness reviews document.)  Okay.  I'm sorry, ma'am?

24   Q.   Why did you decide to release Ms. Calderon?

25   A.   After I received her request for a stay of removal, I

1    looked at what was submitted and took the totality of her case

2    into consideration.

3    Q.    And what specific factors in her case merited the granting

4    of a stay?

5    A.    Well, that she was going through -- well, A, that she's

6    not a criminal.  I don't deem her a threat to public safety or

7    national security.  Looks like she has a pathway, if you would,

8    to eventually get to some kind of status, whether -- I don't

9    know if she has the consular process or she could adjust here,

10   I'm not 100 percent certain on the manner of her entry.  And I

11   also look at whatever they submit, which can be very compelling

12   at times.

13   Q.    And you released her because necessarily you determined

14   that she was not a danger to the community, right?

15   A.    Yes.

16   Q.    And you determined that she was not a flight risk, right?

17   A.    Yes.

18   Q.    And you also determined that no conditions of release were

19   necessary in this case, right?

20   A.    No.  I thought there were conditions of release.  I think

21   she reports to ICE.

22   Q.    I'm going to represent to you that there are no conditions

23   of release in this case.

24   A.    With her stay?

25   Q.    That's right.  If you -- if in fact you determined that no

1    conditions of release -- my question is if Ms. Calderon was

2    released without conditions, that would be because you

3    determined that no conditions of release were necessary?

4    A.   Yes, could have been, yeah, yes.  I thought she was

5    released on an order of supervision and told to report back to

6    the office when the stay expired.

7    Q.   But whatever her conditions were, you determined that

8    nothing more was necessary to ensure her appearance and her

9    compliance and protect the community, correct?

10   A.   In this case, yes.

11   Q.   Okay.  You mentioned -- well, not you, but Deputy Lyons,

12   do you see where it discusses case review and consult here with

13   supervisory staff and the ICE Office of Chief Counsel?

14   A.   Yes.

15   Q.   Is that an accurate representation of the process, the

16   discussions that went into releasing Ms. Calderon?

17   A.   Yes.

18   Q.   And is that the typical process for deciding a stay

19   application?

20   A.   It can be, yes.  Sometimes I make the decision on my own,

21   too.  Depends on the case.

22   Q.   Okay.

23          THE COURT:  What paragraph are you looking at?

24          MS. LAFAILLE:  Paragraph 9.

25          THE COURT:  Okay.

1    Q.    Let me take you back to paragraph 6.

2    A.    The same, Mr. Lyons?

3    Q.    The same affidavit.  Do you see where it says that

4    Ms. Calderon was determined to be a flight risk?

5    A.    Yes.

6    Q.    Was that determination wrong?

7    A.    No.

8    Q.    That determination was correct at the time?

9          THE COURT:  Excuse me.  Whose phone is that?

10         OFFICER:  I'm sorry.  It was mine.  I hit it by

11   accident.

12         THE COURT:  Go ahead.

13   A.    I'm sorry.  Ma'am?

14   Q.    On February 13 you determined that Ms. Calderon was not a

15   flight risk, correct?

16   A.    Yes.

17   Q.    In paragraph 6 it describes how on January 17,

18   Ms. Calderon was determined to be a flight risk.  Was that

19   determination incorrect?

20   A.    No.

21   Q.    Why not?

22   A.    I think it was probably based on the information that they

23   had at the time, based on the interview they conducted with

24   her.  I don't know if her attorney was present.  I don't know

25   if they spoke with him or not.  But I made a decision based on

1  what was submitted to me in the 246 application as well as

2  looking at the totality of the case.

3       So at the time I don't know, I wasn't the one that

4  connected the review.  So I have to say yes, these factors that

5  are in here, the risk of flight based on a final order of

6  removal, the BIA's dismissal of appeal and her failure to

7  comply with the previous voluntary departure order in 1999

8  issued by the judge, if I didn't have any other compelling

9  factors to consider, I would say that yeah, that would be a

10  flight risk.

11  Q.   And at the time an officer is making an arrest and making

12  an initial detention decision, is it the officer's job to

13  inquire into other factors?

14  A.   Yes.  They normally ask what the family situation is, if

15  there's any medical conditions, if they have applications

16  pending.  Yes, that's normally what's done at the time of the

17  arrest when they're processing a person.  They use all of that

18  information in making a decision on the final detention

19  decision at that point.

20  Q.   And to your knowledge is there any information that you

21  had that was not available on January 17?

22  A.   I don't know what was discussed at that time, so I don't

23  know.  All I can tell you is what I reviewed, and I knew these

24  factors as well.  But I thought whatever they also submitted

25  mitigated these concerns as well as her process that she's

1    undergoing with CIS with her applications.  So I don't know

2    what was discussed at the time of the arrest.  And I apologize;

3    I don't know.

4    Q.    Do you see where it discusses bed space?

5    A.    Yes.

6    Q.    Do you know how many beds are available at the Suffolk

7    County House of Correction?

8    A.    As of last night I think there might have been 30, but I

9    don't know what classification the beds were or if they were

10   male or female.

11   Q.    So I'm sorry.  You were staying there are 30 available

12   beds at Suffolk right now?

13   A.    Yes.

14   Q.    Is that a figure that you get on a daily basis?

15   A.    Yes.

16   Q.    And is it broken down by sex?

17   A.    Yeah, male, female, and the facilities classify people

18   based on criminality, so whether they're in high supervision or

19   low supervision beds as well.

20   Q.    And how often do you get those updates from Suffolk

21   County?

22   A.    I get that update from one of the supervisors every

23   morning.

24   Q.    And that update is specifically every morning you get the

25   number of available --

1    A.    Beds.

2    Q.    -- male and female detention beds in each facility?

3    A.    Yes.

4    Q.    And is there a number of available beds that is too many?

5    A.    Too many?  I don't understand, I'm sorry.

6    Q.    Have you ever made a determination that there were too

7    many available beds?

8    A.    No.

9    Q.    You've never determined that more beds needed to be

10   filled?

11   A.    Oh, I misunderstood.  Have I made a determination that I

12   need more beds?

13          THE COURT:  No.  I think she's asking you -- well,

14   here.  Seek your clarification, but I think you're not

15   understanding each other.

16          THE WITNESS:  I'm afraid --

17          THE COURT:  Your question was have you ever decided

18   more beds needed to be filled and therefore that weighed in

19   favor of detaining somebody.

20          THE WITNESS:  Oh, well, if I have beds available, then

21   yeah.  Back in Buffalo I paid a contractual fee for beds.  So

22   if we have -- if we encounter somebody that's subject to arrest

23   or removal and we have a bed available, then yeah, there's

24   nothing compelling as to why I wouldn't detain that person;

25   yes, I would utilize that bed.

1           And I brought that same philosophy here.  I think

2    that's kind of the normal course of business for ERO as a

3    whole.  If there's a bed available and there's a case that

4    warrants detention and there's no compelling factors as to why

5    that person shouldn't be detained, we would utilize that bed.

6    BY MS. LAFAILLE:

7    Q.   And do the facilities -- have you ever had any kind of

8    communication with a facility in which a facility has

9    complained that population was too low?

10   A.   No, I have not personally.

11   Q.   Are you aware of a facility ever complaining to ICE that

12   population was too low?

13   A.   Not in my experience.

14   Q.   Are you aware of anyone at ICE ever expressing any

15   sentiment that population of any facility was too low?

16   A.   No.

17   Q.   Okay.

18   A.   They try and use the beds.  You know, unfortunately

19   there's more people than we have beds available nationally.  So

20   even if I have beds available here, for example, and there were

21   cases from the Southwest border, if there's beds available

22   here, we make those available.

23   Q.   Okay.  So I want to just go back to what we were

24   discussing earlier about the directive you gave your staff on

25   February 16 not to conduct arrests at ICE facilities.

1   A.    NCIS facilities.

2   Q.    Excuse me, NCIS facilities.  Is that right?

3   A.    Yes, unless there was something that warranted it, that it

4   was a public safety risk or national security nexus.

5   Q.    After you gave that directive did you review the detention

6   of Ms. De Souza?

7   A.    At some point yes, but not because of that direction.

8   Q.    And in general we've talked about things that counsel in

9   favor of release and factors that counsel against release in

10  general.  What are some examples of equities that might counsel

11  in favor of release, speaking generally about any case?

12  A.    Generally for me, if there's a medical condition that

13  somebody has that I can't treat or the facilities that we have

14  available to us can't treat, if they're a single parent, if

15  there's immediate -- you know, if the removal is not imminent,

16  like they're from a nation that I can't return them to, those

17  are some factors that come to mind.

18  Q.    What about U.S. citizen family members, is that an equity?

19  A.    It can be.  Like, for example --

20  Q.    Yes.

21  A.    -- if we're talking about a single parent and they have

22  children, whether they be U.S. citizen children or not, I would

23  take that into consideration.

24  Q.    Would you take into consideration that someone has a U.S.

25  citizen spouse?

1   A.   I could, yeah.

2   Q.   That's an equity?

3   A.   It could be, it could be.

4   Q.   Could it be a significant equity?

5   A.   It depends on the circumstance.  If that U.S. citizen

6   spouse had a medical condition and this person was a sole care

7   provider for that person, I would take that into consideration.

8   Q.   And what about U.S. citizen children; is that an equity?

9   A.   It can be, yes.

10  Q.   Putting up here the exhibit that's been marked Exhibit 2,

11  Decision to Continue Detention --

12  A.   Yes, ma'am.

13  Q.   Did you make that decision?

14  A.   It was signed off and made by DFOD Rutherford.

15  Q.   Does that mean that you didn't make this decision at all?

16  A.   Yes.  If I made the decision, I'd sign it.

17  Q.   You would sign it yourself?

18  A.   Yes.

19  Q.   So does this document indicate to you that you did not

20  review this file on April 27?

21  A.   No.  It means that he signed it.  He made that decision.

22  I would have to -- no, it doesn't mean that, per se.

23  Q.   So did you review the file on April 27?

24  A.   Yes, I believe I did.  That's why I said -- actually, it

25  was probably May 2, that I thought that there were inaccuracies

1   in the POCR process.  That's why I want it to be reissued.

2   Q.   You said that on May 2?

3   A.   I believe so.

4   Q.   But going back to Friday, April 27, did you review Ms. De

5   Souza's file on that day in connection with this POCR denial?

6   A.   I would have to look at my declaration.  I don't recall

7   offhand.

8   Q.   If you had reviewed it, would you have signed it?

9   A.   Yes.  Every case that I review, whether it be a stay

10  application, POCR, parole request, if I review it, I sign it.

11  Q.   So does this document tell you that you did not review her

12  file?

13  A.   Yeah.

14  Q.   Do you see where it says in paragraph 4 the sentence that

15  begins "Upon review"?

16  A.   I'm sorry.  Yes, ma'am.

17  Q.   Do you see where it says, "You have failed to demonstrate

18  significant equities within the United States"?

19  A.   Yes.

20  Q.   Is that an accurate statement in your view?

21  A.   Well, when I reviewed it, I don't believe that was the

22  decision I made when I decided to release her with what I had

23  in front of me that they submitted, but at this point in time I

24  don't know what was submitted.  I don't think anything was.

25  Q.   Right.  We've established earlier that nothing was

1    submitted because there was no notice, right?

2    A.    Right.  So really, that's probably an answer I can't give.

3    You would have to probably direct that to Mr. Rutherford, I

4    would think.

5          MS. LAFAILLE:  Your Honor, I want to show the witness

6    the May 2 stay denial.

7          THE COURT:  Let's see.  I think that's a document I

8    may not have seen.

9          MS. LAFAILLE:  May I approach the witness, Your Honor?

10         THE COURT:  No, you can't.

11         MS. LARAKERS:  Can we have a copy as well because we

12   don't have that.

13         THE COURT:  Let me look at it.  Okay, you can give the

14   witness a copy, but you should also put it up on the document

15   presenter, which may be sufficient.  What's the next number?

16         COURTROOM CLERK:  6.

17         THE COURT:  What's the question?

18   BY MS. LAFAILLE:

19   Q.    Do you recognize this document?

20   A.    Yes.

21   Q.    Did you sign this document?

22   A.    Yes, that's my signature.

23   Q.    And what is this document?

24   A.    It's a response to a request for a stay that was filed on

25   April 30.

1   Q.   And what was your response?

2   A.   I denied it.

3   Q.   Do you see where it says in paragraph 2, "I have carefully

4   reviewed your file as well as the factors addressed in the stay

5   request"?

6   A.   Yes.

7   Q.   What did that review consist of?

8   A.   It would be reviewing what was submitted in support of the

9   application as well as whatever was contained in the file or in

10  our records and whether or not that's -- you know, that's

11  pretty much it.

12  Q.   And what were the factors that warranted denying a stay in

13  this case?

14  A.   It could be whether or not a travel document is readily at

15  hand and that removal is imminent.  It could be that we thought

16  we were going to be able to remove this person soon, or it

17  could be that they haven't met the satisfaction of me to stay

18  that request because they haven't provided enough compelling

19  issues for me to consider.

20  Q.   But do you have a recollection of what that decision was

21  actually based on in this case?

22  A.   No, not without reviewing the file.

23            THE COURT:  Did you want this admitted as Exhibit 6?

24            MS. LAFAILLE:  Yes, Your Honor.  I'm sorry.  I thought

25  the court had done that.  My mistake.

```
 1              THE COURT:  Okay.
 2              MS. LAFAILLE:  I would like to submit this as Exhibit
 3    6.
 4              THE COURT:  I think there's no objection.  It is
 5    admitted as Exhibit 6.
 6    Q.   On May 8 when Ms. De Souza was released, did you make that
 7    determination?
 8    A.   I believe I did.
 9    Q.   And did you decide that she was not a danger to the
10    community?
11    A.   I'm guessing I did.  I don't know if that was what I was
12    focusing on; I don't recall.
13    Q.   And did you decide she was not a flight risk?
14    A.   Well, I think we were releasing her on an order of
15    supervision, which would kind of give us some control over the
16    possible flight risk.
17    Q.   So you decided that there were conditions of release that
18    were adequate to control any risk of flight?
19    A.   Yes.
20              THE COURT:  Do you have an idea of how much longer
21    you're going to be with Mr. Brophy?
22              MS. LAFAILLE:  I think I'm wrapping up, Your Honor.  I
23    was just going to ask the court if I could have a minute to ask
24    co-counsel whether there was anything else I should ask.
25              THE COURT:  You may.
```

1   Q.   With regard to your February 16 directive, you
2   communicated that to your two field office -- two field office
3   deputy directors; is that right?
4   A.   Yes.
5   Q.   And to your six assistant field office directors; is that
6   right?
7   A.   Yes.
8   Q.   Did you communicate that to anybody else?
9   A.   No.  I instructed them to inform the first line
10  supervisory staff and their staff.
11  Q.   And did you put that in writing at any moment?
12  A.   No, I did not.
13  Q.   Do you know whether any of them, any of the people that
14  you communicated that to, put that in writing?
15  A.   I don't know.
16  Q.   And have you done anything since then to make sure that
17  that directive was being followed?
18  A.   I have not followed up, but also it's not been brought to
19  my attention that more CIS cases have been arrested.
20          MS. LAFAILLE:  Thank you.
21          THE COURT:  It's now ten after 3:00.  We'll take a
22  ten-minute break and then the government can question.  Court
23  is in recess.
24          (Recess taken 3:09 p.m. - 3:25 p.m.)
25          THE COURT:  All right.  Ms. Larakers, do you have some

1    questions?

2         MS. LARAKERS:  Yes, Your Honor, I do.

3    EXAMINATION BY MS. LARAKERS:

4    Q.   Good afternoon.  I hope to have you out of here shortly.

5         First, does the existence of a court case or media

6    attention affect your decision to release an alien from

7    detention?

8    A.   No.

9    Q.   And is it your understanding that ICE had the legal

10   authority to detain all aliens arrested at the USCIS office in

11   January of this year?

12   A.   Yes, it is.

13   Q.   And why is that your understanding?

14   A.   Because they were subject to final orders of removal.

15   Q.   Did you release Ms. De Souza, Ms. Calderon and

16   Mr. Junqueira because you believed their detention was

17   unlawful?

18   A.   No.

19   Q.   Can you explain to me your general process when

20   adjudicating a request for an alien to be released?

21   A.   I look at the request, whether it comes from the alien or

22   attorney, whatever document they submit.  I look at whether or

23   not there's a pending removal.  I look at whether or not I have

24   a valid travel document, and I take into consideration what

25   they present.

1  Q.    Does media coverage factor into that decision?

2  A.    No.

3  Q.    Does the fact that they have a court case pending in front

4  of Federal Court affect the decision on whether to release an

5  alien?

6  A.    No.

7  Q.    Generally, what is the process when a request for a stay

8  of removal or request to be released -- what is the process;

9  where does it come in; who reviews it?  Do you review it?

10  A.    Yes.  The case officer will get the request from the

11  attorney or the person themselves.  They would do a review with

12  a recommendation, and they would send that review through the

13  chain of command to my desk where I would review everything in

14  the entirety and make a final decision.

15  Q.    When those packets of information are submitted, does that

16  affect the legality of their detention in your understanding?

17  A.    No.

18  Q.    So it only affects whether you believe in your discretion

19  that they should be released?

20  A.    Correct.

21  Q.    Are you familiar with the procedures laid out in 8 CFR

22  241.4 that are otherwise known as the POCR procedures?

23  A.    Yes.

24  Q.    How are you familiar with those procedures?

25  A.    I was a docket officer.  I did POCRs.  I'm familiar with

1    it.  The recent training that I had for people to come in in

2    April, I also attended it, too, just to refamiliarize myself

3    with it.

4    Q.    And when is an alien entitled to a POCR?

5    A.    When their final order is administratively final.

6    Q.    How long does an alien need to be -- how long does an

7    alien need to be detained before they have a POCR conducted?

8    A.    Normally that decision is done at the 90th day.  However,

9    normally, the practice that I'm familiar with, in Buffalo at

10   least, is that around 45 to 50 days in detention, that that

11   notice of the review would be served, telling them they have 30

12   days from that date that the review is going to be conducted,

13   and then the final decision would be on the 90th.

14   Q.    Have you ever conducted a POCR prior to an alien being

15   detained?

16   A.    No.  POCRs are only for people that are in detention.

17   Q.    And it's your goal to conduct that POCR by the 90th day?

18   A.    Yes.

19   Q.    And that's why your best practice is to get that POCR

20   notice out?

21            THE COURT:  You need to do this in a non-leading

22   manner, please.

23            MS. LARAKERS:  Yes, Your Honor.

24   Q.    Why is it your goal to get the notice to the attorney and

25   to the alien out by the 45-day mark?

1    A.    That they have time to present whatever they want me to

2    consider and then I have to time to review it before the 90th

3    day to make my decision.

4    Q.    And what day -- you said the that's the 90th day?

5    A.    Yes.

6    Q.    What is the practice regarding the POCR process in Buffalo

7    where you were before Boston?

8    A.    Once the person has an administrative final order, if

9    they're still detained, if they're still in detention at day

10   45, that notice of the interview or review, I should say, is

11   given, with the 30-day date from there, informing them the

12   review is going to be conducted on that, and the decision is

13   rendered by the 90th day.

14   Q.    On what day does the POCR clock, the countdown to that

15   90th day start running?

16   A.    Once the case is administratively final.

17   Q.    Okay.  For people with old final orders of removal, say,

18   entered ten years ago, when does that POCR clock start running?

19   A.    Once they're in detention because of that final order of

20   removal.

21   Q.    Has the way you've instructed your employees to conduct

22   POCR reviews changed since you've been the acting director?

23   A.    No.

24   Q.    Has it changed since the beginning of this lawsuit?

25   A.    No.

1  Q.   Is the way you have instructed your employees to conduct

2  POCRs any different than the way you have instructed them your

3  entire career?

4  A.   No.

5  Q.   Is it different than how you instructed them in Buffalo?

6  A.   No.

7  Q.   Have you received any guidance that would make you change

8  your decision as to how you conduct POCRs?

9  A.   No.

10  Q.   When you came to Boston you implemented the same

11  procedures with regard to POCRs that you conduct in Boston?

12         THE COURT:  Excuse me.  Look.  I directed you not to

13  ask leading questions.  Don't, please.

14         MS. LARAKERS:  Yes, Your Honor.

15  Q.   When you became aware of the POCR violations happening in

16  Boston, what did you do about it?

17  A.   I instituted -- I brought in people to review the docket

18  to see to what extent needed to be addressed, and we reviewed

19  the detained cases to see if there are other people whose POCRs

20  were, you know, in error and needed to be adjusted or fixed or

21  addressed.

22         THE COURT:  Is that the audit that you were referring

23  to earlier?

24         THE WITNESS:  Yes, yeah.  I'm sorry.

25         THE COURT:  And when did you ask -- who did you work

1    with to arrange the audit?

2         THE WITNESS:  I reached out to the field office

3    directors -- well, I reached out to the field office director

4    in Buffalo.  I think Mr. Lyons reached out to the field office

5    director in Dallas to bring in that assistant field office

6    director from Dallas, and I requested two people from Buffalo.

7         THE COURT:  And when did you do that?

8         THE WITNESS:  It was the week -- it was a quick

9    turnaround.  It was the week before.  I don't remember the

10   exact day, if it was the 3rd or the 4th or the 5th.

11        THE COURT:  Around?

12        THE WITNESS:  But it was the week before they arrived,

13   and they arrived on the 7th.

14        THE COURT:  So it was the 3rd, the 4th or the 5th?

15        THE WITNESS:  I don't remember the exact date, but

16   yes, it was the week before.

17        THE COURT:  Was it after I conducted my hearing on May

18   3?

19        THE WITNESS:  I don't know.

20        THE COURT:  Have you ever asked for people to come

21   from another field office to conduct an audit before?

22        THE WITNESS:  I've done it.  I have been asked.

23        THE COURT:  No.  Have you ever asked?

24        THE WITNESS:  Not in Buffalo.

25        THE COURT:  Any place else?

1           THE WITNESS:  I've only worked in Buffalo.

2           THE COURT:  This is the first time in your life that

3    you asked for an audit, right?

4           THE WITNESS:  That I had, yes.

5           THE COURT:  And you received a call on May 3 that

6    caused you to believe that I had ordered that De Souza be

7    released.  Was that your testimony this morning?

8           THE WITNESS:  Yes.

9           THE COURT:  And you can't remember whether it was

10   before or after that that you asked people to come in and see

11   whether the defects -- actually the illegal conduct with regard

12   to De Souza was occurring in any other cases?

13          THE WITNESS:  It could have been, Your Honor.  I don't

14   remember the exact day.  It could have been the 4th or the 5th.

15          THE COURT:  Do you have notes?  Did you make a note of

16   when you contacted --

17          THE WITNESS:  I don't know if I did.  I would have to

18   go back to my office and look to see.

19          THE COURT:  You can do that.  You're going to need to

20   come back tomorrow anyway because the questioning of the other

21   witnesses may propose more for you.  So go check.  I'd like to

22   know whether it was before or after.

23          THE WITNESS:  Okay.

24          THE COURT:  Go ahead.

25   BY MS. LARAKERS:

1   Q.   Did you ensure that everyone in ICE's custody in Boston

2   who had not yet received a POCR after that audit?

3   A.   Yes.

4   Q.   How did you make clear to your employees that the POCR

5   process would be adhered to?

6   A.   I advised DFOD Rutherford, who was having a meeting with

7   the detain staff, to make sure that was intimated to them, that

8   they need to follow the strict guidance, as well as the people

9   who came in and conducted training with them, I don't know if

10  it was the last day or second to last day, about the POCR

11  process and the policies.

12  Q.   And in what form did you do that, oral, written?

13  A.   Orally.

14  Q.   And about how many times did you reiterate that?

15  A.   It probably came up numerous times.  As things were

16  brought to my attention, I would address it and give direction.

17  Q.   Can you describe to me your general job duties?

18  A.   Yes.  Well, here in Boston as the acting field office

19  director, I have oversight of six states, I think roughly 120

20  employees.  I forget how many facilities we have, but we have

21  facilities in each state that house people in detention.  I

22  have oversight of all of our enforcement operations, detain

23  operations, removal operations.  I work closely with Office of

24  Chief Counsel.  The U.S. Attorney's Office from time to time

25  will present cases for criminal prosecution, as well as I do

1    have oversight over the fiscal responsibilities of the field

2    office, too, which is roughly over a $30 million budget

3    annually.

4            THE COURT:  Is New Hampshire one of the six states?

5            THE WITNESS:  Yes, sir.

6            THE COURT:  Go ahead.

7    Q.   Do you review a lot of alien files throughout the day?

8    A.   Yes.  I get stay requests, POCRs and other files for

9    review.

10   Q.   Is it ICE Boston's current practice to arrest people at

11   their USCIS interview, absent if they're criminal aliens?

12   A.   As of my direction from February, no.  The practice is to

13   not arrest people there unless they're a threat to national

14   security or public safety risk.

15   Q.   Okay.  Is it your understanding that you are required to

16   make a dangerousness and flight risk determination prior to

17   detention?

18   A.   No.

19   Q.   In your practice does ICE generally make those

20   determinations anyway?

21   A.   Yeah.  The determination will be made at the time of

22   arrest and when trying to factor -- take into consideration

23   whether to detain or not, as well as it could come up

24   throughout the life cycle of the case as well, if they are

25   detained.

1   Q.   If a person does not remove themselves from the United

2   States after being ordered removed, is that generally an

3   indication that they are a flight risk?

4   A.   Yeah, if they fail to comply with the order to voluntarily

5   depart.

6   Q.   Same question for someone who is ordered removed in

7   absentia.

8   A.   Yes.

9   Q.   Do you ever reconsider a determination of flight risk for

10  dangerousness?

11  A.   Yes.  Those requests come up periodically.  While somebody

12  may be in detention, they might have other factors that weren't

13  available at that time that are available now for consideration

14  at the POCR process.  Yeah, it could be brought up.  A stay

15  application request, factors like that could be brought up,

16  too.

17  Q.   In your experience, 23 years of experience, are aliens

18  generally forthcoming about information about their case in

19  arrest interviews?

20          MS. LAFAILLE:  Objection, Your Honor.

21          THE COURT:  I think you have to lay a foundation for

22  that.

23          MS. LARAKERS:  Okay.

24  Q.   How long have you been employed by ICE?

25  A.   23 years in government service and since the creation of

1    ICE in 2003.

2    Q.   Have you conducted arrest interviews?

3    A.   Yes.

4    Q.   Have you instructed your officers how to conduct arrest

5    interviews?

6    A.   Yeah, I did.

7    Q.   About how many arrest interviews have you done in your

8    career, over 100?

9    A.   Yes.

10   Q.   Over 500?

11   A.   Probably between 100 and 500.

12   Q.   So I'm going to ask, in your experience are aliens

13   forthcoming --

14          THE COURT:  No.  Here.  Ask one or two more questions.

15   Have you noticed any regular pattern or practice -- you can

16   just answer that yes or no -- with regard to how aliens behave,

17   whether they're candid or not in arrest interviews.

18          THE WITNESS:  I'm sorry.  Can you guys repeat the

19   question?  Is the question, when I've arrested people in the

20   past, have they -- have I believed them always to be 100

21   percent candid?  No.

22          THE COURT:  No, not whether they always are.  Here.

23   You just answered part of the question.  Are they always 100

24   percent candid?

25          THE WITNESS:  No.

 1           THE COURT:  Are they never 100 percent candid?

 2           THE WITNESS:  No.

 3           THE COURT:  Sometimes they're candid and sometimes

 4   they're not?

 5           THE WITNESS:  Correct, sir.

 6           THE COURT:  Go ahead.

 7   BY MS. LARAKERS:

 8   Q.   So in your experience have you recognized a pattern with

 9   how forthcoming aliens are in their arrest interviews?

10   A.   Yes.  Quite often they're not.  As a matter of fact, I

11   just had a meeting last week with the consulate general from

12   Mexico.  He even brought that to my attention, and he says that

13   when he meets with the Mexican community in his area of

14   responsibility, he actually tells them to be forthcoming with

15   ICE, to let us know at the time of arrest if they have things

16   that we should consider.

17           MS. LAFAILLE:  Objection, Your Honor.

18           THE COURT:  What's that?

19           MS. LAFAILLE:  Objection, hearsay.

20           THE COURT:  It is hearsay, but the objection is too

21   late.  Go ahead.  And there's no jury here.

22   Q.   How does the information that the alien gives in an arrest

23   interview affect the detention decision?

24   A.   It can play a big part.  You know, like I said, if there's

25   a compelling factor as to why that person's detention isn't the

1   right decision, such as, you know, whether or not, like I've

2   said before, if there are childcare issues, medical issues,

3   pending applications.  You know, it does play a part.

4   Q.   Now that you've had experience as an arresting officer and

5   as someone who reviews stay requests and requests to be put on

6   order of supervision, have you recognized a difference in the

7   amount of information that is submitted between those two

8   situations?

9   A.   Yeah.  It seems to be when people are making a request

10   after they've finished being arrested and detained, they

11   provide more supporting information as to asking for the

12   discretionary release, if you would, more factors I guess for

13   me to consider.

14   Q.   The more information that an alien submits, does that help

15   you make a better detention decision?

16   A.   Yes, it can.

17   Q.   Is a request for a stay of removal different from a

18   request to be released on an order of supervision?

19   A.   Yes.  The stay of removal is asking me not to effect their

20   removal, where a request to be released on an order of

21   supervision is to be released from physical custody.

22   Q.   So why might a person be granted an order of supervision

23   but not granted a stay of removal?

24   A.   A decision could be made that their detention, their

25   continued detention, you know, we don't have to monitor the

```
 1   case from a detained standpoint.  We can monitor it from a
 2   non-detained and still try and effect their removal.  Where, in
 3   a stay, we're saying we're not going to remove you for a
 4   designated period of time.
 5           MS. LARAKERS:  Okay.  Thank you.  I have no further
 6   questions, Your Honor.
 7           THE COURT:  Thank you.  Is there any further
 8   questioning from petitioners?
 9           MS. LAFAILLE:  Yes, Your Honor.
10   RE-EXAMINATION BY MS. LAFAILLE:
11   Q.   As part of the initial process of deciding whether
12   someone's going to be detained, an officer fills out the RCA,
13   right?
14   A.   Yes.
15   Q.   And to do that he consults ICE's records, right?
16   A.   Yes.
17   Q.   And he speaks to the non-citizen involved, right?
18   A.   Yes.
19   Q.   And he obtains information that he needs in order to
20   complete the RCA from the non-citizen involved, right?
21   A.   I guess in essence if they share that information with
22   them, yes.
23   Q.   And that's an essential part of the initial determination;
24   is that right?
25   A.   Yeah, those are factors that we consider.
```

1   Q.   It's your testimony that media had no influence on the

2   release of Lilian Calderon; is that right?

3   A.   Yes.

4   Q.   And it's your testimony that proceedings in this case had

5   no influence on the release of Ms. Calderon?

6   A.   Correct.

7   Q.   And it's your testimony that the existence of this

8   litigation had no bearing on the release of Ms. Calderon?

9   A.   Correct.

10  Q.   It's also your testimony that media played no role in the

11  release of Ms. De Souza; is that correct?

12  A.   Correct.

13  Q.   And it's your testimony that federal litigation played no

14  role in the release of Ms. De Souza; is that correct?

15  A.   Correct.

16          THE COURT:  Wait a minute.  When did you let Ms. De

17  Souza out?  When did you release Ms. De Souza?

18          THE WITNESS:  Pardon me, I don't know the exact date.

19          THE COURT:  All right.  Did you testify earlier that

20  you released Ms. De Souza because you thought I had ordered it

21  after my hearing on May 3?

22          THE WITNESS:  I don't know if that was what I said, if

23  that was the reason why.  That wasn't --

24          THE COURT:  Did you testify truthfully this morning?

25          THE WITNESS:  Yeah, absolutely.

 1             THE COURT:  Go ahead.

 2    BY MS. LAFAILLE:

 3    Q.   You testified that you made the decision to release Ms. De

 4    Souza on May 8; is that right?

 5    A.   Yes.

 6    Q.   And you've just testified that federal litigation did not

 7    play a role in your decision to release Ms. De Souza; is that

 8    right?

 9    A.   Correct.

10    Q.   We looked earlier at POCR document --

11             THE COURT:  If I said "May 3," I meant May 8 in my

12    earlier questioning.

13             MS. LAFAILLE:  Yes.

14             THE COURT:  You decided to release De Souza on May 8?

15             THE WITNESS:  Yes, I believe so, yes.

16             THE COURT:  Was that after you received a call from

17    ICE general counsel's office?

18             THE WITNESS:  Yeah, I did discuss it with them, yes.

19             THE COURT:  And did you know I conducted a hearing

20    that morning, that day?

21             THE WITNESS:  Yeah.

22             THE COURT:  And did you know that I found that ICE had

23    violated the law by not giving De Souza -- at least by not

24    giving De Souza the notice required by the POCR regs, 30 days'

25    notice?

```
 1              THE WITNESS:  I believe that was discussed, yes.
 2              THE COURT:  But that didn't influence your decision to
 3      release her?
 4              THE WITNESS:  That wasn't the reason why, but it could
 5      have been part of the discussion, yes.
 6              THE COURT:  Go ahead.
 7      BY MS. LAFAILLE:
 8      Q.   So your decision to release Ms. De Souza was not because
 9      of proceedings in this case?
10      A.   That was not the sole factor, no.
11      Q.   Was it the main factor?
12      A.   I don't believe so, no.  I looked at the totality of the
13      whole case in conversation with the attorneys as well.
14      Q.   So your testimony is that the primary reasons that she was
15      released have nothing to do with the course of litigation in
16      this case?
17      A.   Primary reason, correct.
18      Q.   On April 27 Ms. De Souza was denied release via the POCR
19      process; is that right?
20      A.   Yeah.
21      Q.   On May 2 you denied her stay of removal; is that right?
22      A.   Yes.
23      Q.   And on May 8 you decided to release her; is that right?
24      A.   Yes.
25      Q.   Did her marital status change between May 2 and May 8?
```

A.    Not that I'm aware of.

Q.    Was there any change to the number of children that she has and whether they're United States citizens?

A.    Not that I'm aware of.

Q.    Her I-130 didn't change between those dates, right?

A.    No.

Q.    But the proceedings in this court took place; is that right?

A.    Yes.

Q.    Since you took the oath this morning, have you spoken to anyone about your testimony here?

A.    Just my attorneys.

Q.    And who did you speak to?

A.    The two sitting right there.

        MS. LAFAILLE:  Thank you.

        MS. LARAKERS:  I'm sorry, Your Honor.  May I have just one minute to consult with my co-counsel here?

        THE COURT:  You may, certainly.

        MS. LARAKERS:  Thank you.  Nothing further, Your Honor.

        THE COURT:  All right.  Sadly I've got just a couple of more.

        Am I correct in understanding that when you became the acting director, you learned that the ICE office here was arresting aliens at the CIS office when they were there for

1  their appointments?

2          THE WITNESS:  Yeah, shortly after coming, I did.

3          THE COURT:  Do you recall how you learned that?

4          THE WITNESS:  No, I don't recall offhand.

5          THE COURT:  Did you discuss that with any of the staff

6  at CIS?

7          THE WITNESS:  Other than Mr. Riordan, when I had the

8  conversation saying --

9          THE COURT:  I misspoke.  At ICE, in your office.

10         THE WITNESS:  Oh, I'm sorry.  Yeah, I believe with my

11  deputy field office directors.

12         THE COURT:  Is that Mr. Rutherford and Mr. Lyons?

13         THE WITNESS:  Oh, yes.  I'm sorry.

14         THE COURT:  And did you ask them or did they tell you

15  when that practice started?

16         THE WITNESS:  I don't recall asking when it started.

17  I don't know how long that practice has been going on here

18  before I got here.

19         THE COURT:  Have you ever heard the case of the alien

20  who was arrested at the CIS office that was before me last May

21  called Arriaga Gil?

22         THE WITNESS:  No, sir.

23         THE COURT:  Did you know there was another case of a

24  alien arrested at the CIS office before me last year?

25         THE WITNESS:  No, I did not.

1          THE COURT:  Did you ask them why this practice had

2     started?

3          THE WITNESS:  Yeah, I did question it, and they said

4     that was the guidance that they were given from the previous

5     director.

6          THE COURT:  Mr. Cronen?

7          THE WITNESS:  Yes, sir.

8          THE COURT:  What to the best -- who told you that,

9     Mr. Rutherford, Mr. Lyons or both?

10          THE WITNESS:  It could have been either one of them.

11     I don't remember exactly who said it.

12          THE COURT:  And did they tell you what Mr. Cronen's

13     reasoning was?

14          THE WITNESS:  No, and I don't know if I asked.

15          THE COURT:  So you said, in effect, Why are we doing

16     this, and they said, Those were Mr. Cronen's directions; and

17     you told them stop.

18          THE WITNESS:  Yes.

19          THE COURT:  Is that all in one conversation?

20          THE WITNESS:  Yeah, when it was brought to my

21     attention.  And then a couple of days later is when I pushed up

22     the guidance.

23          THE COURT:  All right.  So you know that the POCR

24     regulations were not followed with regard to De Souza, correct?

25          THE WITNESS:  Yes, sir.

1          THE COURT:  And you know that they weren't followed

2    with regard to Junqueira, correct?

3          THE WITNESS:  Yes, sir.

4          THE COURT:  And have you tried to find out who was

5    responsible for that failure, those failures, each of those

6    failures?

7          THE WITNESS:  No, I haven't gotten to the point where

8    I'm diving into those cases to find out who made the mistake at

9    this point.

10         THE COURT:  Do you understand now that those weren't

11   just mistakes; I've held that they're violations of United

12   States law?

13         THE WITNESS:  Yes, sir.  I'm sorry.

14         THE COURT:  No, that's -- and do you intend to

15   investigate to find out which ICE employees participated in

16   that violation of the United States law?

17         THE WITNESS:  I will if that's what you're asking me.

18   I haven't at this point.

19         THE COURT:  Do you intend to?

20         THE WITNESS:  Yes, sir.

21         THE COURT:  And is there the potential of discipline

22   if an ICE agent violates the law?

23         THE WITNESS:  Yes.

24         THE COURT:  Okay.  This has been very helpful to me

25   and probably in shaping the issues that are going to be

1   litigated in the future.  I don't know if there are going to be

2   any more questions for you, but I am ordering that you come

3   back tomorrow, that you understand you're still subject to the

4   sequestration order, so you can't talk to any of the other

5   potential witnesses or tell them what was asked or answered.

6           I doubt it's the most important thing I asked you

7   today, but if you have some notes that indicate when, you know,

8   you called Buffalo, Mr. Lyons called Dallas to ask for people

9   to come and do the audit, please bring them.  And I'll give you

10  more time if you need to do this, but if you're able -- and

11  we'll start at 10:00 tomorrow.  But if you're able to determine

12  by tomorrow morning what happened to the other four people who

13  were arrested at CIS in January who weren't released, in other

14  words, I was told in one of the affidavits that four of them

15  were detained.  And I'm interested particularly in knowing

16  whether they received the process prescribed by the POCR

17  regulations and whether any or all of them are still in the

18  United States and detained.  And if they're detained, where;

19  and if they've been removed or deported, when they were removed

20  or deported.

21          THE WITNESS:  Okay.

22          THE COURT:  Okay.  And did petitioners' counsel or

23  anybody else ask you where those other four were and what had

24  been done with them, or am I the first one to ask you that?

25          THE WITNESS:  Yeah, I believe you are.

1           THE COURT:  And if petitioners' lawyers through the

2   government lawyers had asked you, Where are these other four

3   people, we'd be willing to represent them if they want a

4   lawyer, would you have provided that information?

5           THE WITNESS:  Yes.

6           THE COURT:  All right.  Thank you.  You're excused for

7   today.  You can go.  And why don't we continue with

8   Mr. Rutherford.  I think we'll probably go until about 5:00.

9           THE WITNESS:  Thank you.

10          THE COURT:  Thank you, Mr. Brophy.  Thank you.

11          MS. LARAKERS:  Your Honor, just to clarify, is

12  Mr. Brophy excused for at least today?

13          THE COURT:  Yes, unless you want him to stay, he can

14  go home or go wherever he wants to go.

15          (Mr. Brophy exited the courtroom.)

16                  JAMES LEE RUTHERFORD,

17  having been duly sworn, testified as follows:

18      THE COURT:  I'm reminded that I was told Mr. Brophy could

19  answer questions regarding Mr. Dos Santos, so that's going to

20  have to be tomorrow, but I was going to direct you to confer on

21  that anyway.  Somebody will remind me that when we break --

22          MR. WEINTRAUB:  Your Honor, if you'd like, I can try

23  to bring --

24          THE COURT:  No.  I think it's okay.  And

25  Mr. Rutherford may have the information, too, but I'm just

1    going to -- we'll talk about Mr. Dos Santos before we recess,

2    okay, and then resume talking about it tomorrow.

3              Would you please state your full name.

4              THE WITNESS:  My full name is James Lee Rutherford.

5              THE COURT:  Mr. Rutherford, how are you employed?

6              THE WITNESS:  I am currently deputy field office

7    director for Immigration and Customs Enforcement for the Boston

8    field office.

9              THE COURT:  Try and speak into that microphone loudly

10   and clearly.

11             THE WITNESS:  Yes, sir.

12             THE COURT:  How long have you been in that position?

13             THE WITNESS:  I've been in this position for the past

14   seven months.

15             THE COURT:  And what was your position previously?

16             THE WITNESS:  Previously, three years I was in Vermont

17   at the vetting center for ICE for locating foreign nationals

18   that have criminal records in the United States.

19             THE COURT:  How long have you worked for the

20   Department of Homeland Security?

21             THE WITNESS:  Since its inception in 2003, and prior

22   to that from '97 with INS and then CVP.

23             THE COURT:  And what were -- here.  What were your

24   responsibilities initially with INS?

25             THE WITNESS:  I was an immigration inspector.  I

1    worked the land border, seaport and airport.

2         THE COURT:  And when was the first time you had

3    responsibilities that involved the detention of aliens subject

4    to removal?

5         THE WITNESS:  In '97 when I started with INS.

6         THE COURT:  Let me take a step back.  Did you receive

7    a copy of the sequestration order I issued in this case?

8         THE WITNESS:  Yes, sir, I did.

9         THE COURT:  It's dated May 14.  Do you recall about

10   when you received it?

11        THE WITNESS:  I believe it was the same day, sir.

12        THE COURT:  And how did you travel here today?

13        THE WITNESS:  In a government-issued vehicle by

14   myself.

15        THE COURT:  And have you discussed this case or the

16   issues in this case with any of the other potential witnesses

17   since you got the sequestration order?

18        THE WITNESS:  No, sir, I have not.

19        THE COURT:  Did you -- I don't want you to tell me

20   what was said, but did you meet with your lawyers after the

21   morning session today?

22        THE WITNESS:  Briefly, just in passing.

23        THE COURT:  Did you -- what did you do to prepare, if

24   anything, for your testimony today?

25        THE WITNESS:  Yesterday I met with my attorneys and

1    they prepped me with some questions as to what could possibly

2    be asked today.

3              THE COURT:  All right.  You don't have to tell me what

4    they said to you.  You can if you want to, but they may object.

5    So if you want to tell me what you discussed with them, say

6    that, and we'll see if they object.

7              Did you look at any documents before today and

8    relevant to this case?

9              THE WITNESS:  Yes, sir.  I reviewed my declaration

10   that I submitted to the court.

11             THE COURT:  And did you look at -- did you look at

12   anything other than your declaration before today?

13             THE WITNESS:  I reviewed the Post-Order Custody Review

14   paperwork, the guidance on that.  But outside of that, nothing

15   else, sir.

16             THE COURT:  The Post-Order Custody Review guidance,

17   where did you find that?

18             THE WITNESS:  It is on the ICE's insight page, which

19   is an intranet page for the government.

20             THE COURT:  And did you look at anything else before

21   today?

22             THE WITNESS:  No, sir, I did not.

23             THE COURT:  Did you look at anything else today?

24             THE WITNESS:  No, sir, I did not.

25             THE COURT:  Did you look at anything after the morning

1    session?

2            THE WITNESS:  No, sir.

3            THE COURT:  All right.  Is Exhibit 1 Mr. Brophy's May

4    3 affidavit?

5            COURTROOM CLERK:  I believe so.

6            THE COURT:  What's that?

7            COURTROOM CLERK:  I believe so.  Just checking the

8    date.  Yes.

9            THE COURT:  We'll give Mr. Rutherford a copy of

10   Exhibit 1, Mr. Brophy's May 3 affidavit.  Somebody should put

11   it up on the document presenter, please.

12           COURTROOM CLERK:  I believe there's still a copy

13   there.

14           THE COURT:  Does somebody have it to put it up?  The

15   parties have copies.

16           MR. POMERLEAU:  The copies here were taken.  There

17   were three or four copies here earlier before lunch.

18           THE COURT:  All right.  Well, the idea was that each

19   of you would get one and keep it.  Could you look at this

20   document, please, Mr. Rutherford.

21           THE WITNESS:  Yes, sir.

22           THE COURT:  It's two pages.  Why don't you read it.

23           THE WITNESS:  (Witness reviews document.)

24           THE COURT:  Did you read it?

25           THE WITNESS:  Yes, sir, I did.

1              THE COURT:  Have you ever seen this document before?

2              THE WITNESS:  Not before today, sir, no.

3              THE COURT:  Had you ever seen it before I just gave it

4    to you?

5              THE WITNESS:  Not that I recall, sir, no.

6              THE COURT:  Did you know that Mr. Brophy was

7    submitting a declaration?

8              THE WITNESS:  Yes, sir.

9              THE COURT:  You did?

10             THE WITNESS:  I didn't know what case it was for, but

11   I knew he was submitting a declaration.

12             THE COURT:  Did you know what -- did you know that it

13   related in part to Ms. De Souza?

14             THE WITNESS:  I don't recall, sir.

15             THE COURT:  How did you know he was preparing a

16   declaration?

17             THE WITNESS:  There's been a couple that we've been

18   required to prepare for the court in different cases, and

19   Mr. Brophy shut his office door and worked by himself on

20   preparing a declaration, I believe.

21             THE COURT:  Well, how did you know that's what he was

22   doing behind his closed door?

23             THE WITNESS:  He said --

24             THE COURT:  What's that?

25             THE WITNESS:  I believe he said he was preparing a

1  declaration.

2      THE COURT:  Did you discuss it with him?

3      THE WITNESS:  No, sir.

4      THE COURT:  Did he ask you any questions relating to

5  it?

6      THE WITNESS:  No, sir.

7      THE COURT:  Did he ask you to get him a file or any

8  documents?

9      THE WITNESS:  No, sir, he did not.

10     THE COURT:  Are you familiar with Ms. De Souza's case?

11     THE WITNESS:  Yes, sir.

12     THE COURT:  How did you become familiar with it?

13     THE WITNESS:  The paperwork for the Post-Order Custody

14  Review and continued detention was presented to me by my

15  assistant field office director for review.

16     THE COURT:  Who presented it to you?

17     THE WITNESS:  Alan Greenbaum is my assistant.

18     THE COURT:  How do you spell his last name?

19     THE WITNESS:  G-r-e-e-n-b-a-u-m.

20     THE COURT:  Had you heard of this case before

21  Mr. Greenbaum gave you the paperwork for the Post-Order Custody

22  Review?

23     THE WITNESS:  No, sir, I have not.

24     THE COURT:  Do you know -- what did he say to you when

25  he gave it to you?

1          THE WITNESS:  That we had somebody in custody that was

2     coming up on their 90-day mark for review in regards to the

3     custody determination.

4          THE COURT:  And what?

5          THE WITNESS:  And handed me the file.

6          THE COURT:  So you could make the decision?

7          THE WITNESS:  Yes, sir, or I could review and then

8     pass it up to Mr. Brophy to follow.

9          THE COURT:  Was it your practice to, when there was a

10    Post-Order Custody Review, to review it yourself and then give

11    it to Mr. Brophy?

12         THE WITNESS:  Up to Mr. Brophy's arrival, our previous

13    field office director, Chris Cronen, had delegated that

14    authority to myself and my co-partner, the other DFOD, and we

15    would make the determination at that time upon review of the

16    evidence that was submitted to us.

17         THE COURT:  Did Mr. Brophy give you that authority?

18         THE WITNESS:  No, sir.  Subsequent to his arrival he

19    wanted to see all stay applications, all POCRs, to have the

20    final say.

21         THE COURT:  And so did you make a decision or come to

22    what you believed should be the decision with regard to De

23    Souza?

24         THE WITNESS:  Yes, sir.

25         THE COURT:  What decision was that?

1          THE WITNESS:  To continue detention as we were trying

2     to effect her removal from the U.S.

3          THE COURT:  And do you recall when you did that?

4          THE WITNESS:  Without looking at my declaration, no,

5     sir, I don't.

6          THE COURT:  Okay.  So after you reviewed the documents

7     and came to that decision, what did you do next?

8          THE WITNESS:  I returned the file to Mr. Greenbaum to

9     give back to the case officer so the decision for continued

10    detention could be served to Ms. De Souza.

11         THE COURT:  I thought you just told me it was your

12    practice after you reviewed these things and developed what

13    would be a recommendation to go to Mr. Brophy so he could make

14    a decision.

15         THE WITNESS:  I believe in this case, sir, Mr. Brophy

16    might not have been in the office, and I believe I was the

17    acting FOD that day.

18         THE COURT:  Okay.  So you made the decision -- did you

19    make the decision concerning De Souza?

20         THE WITNESS:  Yes, sir, I did.

21         THE COURT:  And did you memorialize that decision?

22         THE WITNESS:  Yes, sir, I did.

23         THE COURT:  And did you do that in a document called

24    "Decision to Continue Detention"?

25         THE WITNESS:  Yes, sir.

```
 1              THE COURT:  Can somebody give him a copy of Exhibit 2
 2     and put it up.  Is that the record of your decision to continue
 3     the detention of Ms. De Souza?
 4              THE WITNESS:  Yes, sir, that's my signature.
 5              THE COURT:  And it's dated 4/27/18.  Is that the day
 6     you made the decision?
 7              THE WITNESS:  Yes, sir.
 8              THE COURT:  And is that the day you issued this
 9     document?
10              THE WITNESS:  Yes, sir.
11              THE COURT:  You've talked about making POCR detention
12     and release decisions, correct?
13              THE WITNESS:  Yes, sir.
14              THE COURT:  That's Post-Order Custody Reviews?
15              THE WITNESS:  Yes, it is.
16              THE COURT:  Are there regulations that you understand
17     establish procedures for those reviews?
18              THE WITNESS:  Yes, sir.
19              THE COURT:  Have you read those regulations?
20              THE WITNESS:  Yes, I reviewed them yesterday while I
21     was talking with my attorneys.
22              THE COURT:  Have you ever read them before?
23              THE WITNESS:  Once previously that I can recall.
24              THE COURT:  When was that?
25              THE WITNESS:  I don't remember exactly, sir.  I think
```

1    it was prior to entering on duty into this position.

2          THE COURT:  So about seven months ago?

3          THE WITNESS:  Yes, sir.

4          THE COURT:  And have you ever read anything else about

5    these POCR regulations?

6          THE WITNESS:  No, sir, I have not.

7          THE COURT:  Did you have any training in them?

8          THE WITNESS:  Upon my entering on duty, yes.  And in

9    2006, when I transitioned from Customs over to ICE, it was

10   discussed briefly in the academy in the transition course that

11   I took.

12         THE COURT:  So you had some brief instruction on these

13   regulations in 2006 when you transferred from Customs to ICE?

14         THE WITNESS:  Yes, sir.

15         THE COURT:  Back on April 27, not necessarily today,

16   what was your understanding of what the POCR regulations

17   required in connection -- well, required with regard to

18   detention or release?

19         THE WITNESS:  That we review a detainee's custody

20   within 90 days, and prior to that, 60 days, we're to give them

21   an opportunity to present evidence as to possibly being

22   released from custody.

23         THE COURT:  So you're saying it was your understanding

24   that by the 60th day a detained alien was to be given notice

25   that there would be a decision on continuing his or her

1    detention at about 90 days, and they had that approximately

2    30-day period to submit information for consideration.

3             THE WITNESS:  Yes, sir.

4             THE COURT:  Did you say that you got De Souza's file

5    before making this decision to continue detention?

6             THE WITNESS:  Yes, sir, I did.

7             THE COURT:  Did you read it?

8             THE WITNESS:  I read the evidence that had been

9    submitted along with the POCR.

10            THE COURT:  The evidence that had been submitted by

11   whom?

12            THE WITNESS:  By my staff.

13            THE COURT:  Who did you understand notice of the

14   detention decision was to be given to, the alien, the alien's

15   attorney if she had one, or what?

16            THE WITNESS:  It's supposed to be both, sir.

17            THE COURT:  Both?

18            THE WITNESS:  Yes, sir.

19            THE COURT:  You think that's in the POCR regulations?

20            THE WITNESS:  It is.

21            THE COURT:  Was there a notice in De Souza's file?

22            THE WITNESS:  That it had been given to her and her

23   attorney or --

24            THE COURT:  Or either of them.

25            THE WITNESS:  Once I sign off on the continued

1    detention or release paperwork, then that information is then

2    given by the case officer to the detainee.

3             THE COURT:  No.  Was there a notice that a detention

4    decision would be made in the file when you reviewed it on

5    April 27?

6             THE WITNESS:  I don't recall seeing one, sir.

7             THE COURT:  You don't recall seeing a notice?

8             THE WITNESS:  No, sir, I don't.

9             THE COURT:  Should there have been a notice in there?

10            THE WITNESS:  Yes, sir, there should have been.

11            THE COURT:  And when should that notice have been

12   given by?

13            THE WITNESS:  By the 60th day, sir.

14            THE COURT:  So did you realize that what you

15   understood to be the required notice hadn't been given when you

16   made this decision?

17            THE WITNESS:  Unfortunately, no, sir.

18            THE COURT:  Why do you say it's unfortunate?

19            THE WITNESS:  Because if we did not follow policy,

20   then we made an error.

21            THE COURT:  Do you understand a regulation is a law?

22            THE WITNESS:  Yes, sir.

23            THE COURT:  So do you understand if you violate a

24   regulation, you broke the law?

25            THE WITNESS:  Yes, sir, I do.

1          THE COURT:  What do you understand the purpose of

2     giving notice and an opportunity to file documents to be?

3          THE WITNESS:  For an individual to be able to present

4     evidence on their behalf that would weigh in their favor.

5          THE COURT:  And was there any information in the file

6     submitted by or on behalf of Ms. De Souza when you made your

7     decision?

8          THE WITNESS:  Not that I recall seeing, no, sir.

9          THE COURT:  But you made the decision on the 24th,

10    correct -- sorry, the 27th of April?

11         THE WITNESS:  Yes, sir.

12         THE COURT:  And you signed this letter?

13         THE WITNESS:  Yes, I did, sir.

14         THE COURT:  Are the statements in the letter true?

15         THE WITNESS:  They appear to be, sir.  Without looking

16    at her file right now, I can't tell you for sure.

17         THE COURT:  Did you know when you made this decision

18    that De Souza had a case pending here in Federal Court?

19         THE WITNESS:  I don't recall that, sir.

20         THE COURT:  And you had responsibility for making

21    decisions in many cases, you know, with regard to aliens who

22    have at the same time had cases pending in Federal Court?

23         THE WITNESS:  No, sir, I have not.

24         THE COURT:  It's a rare thing?

25         THE WITNESS:  For me it is, sir, yes.

1          THE COURT:  In your experience is it rare for this ICE

2     field office to have such cases?

3          THE WITNESS:  Only having been here seven months, sir,

4     this is a first for me.

5          THE COURT:  Nobody told you that De Souza's case was

6     being litigated in Federal Court?

7          THE WITNESS:  Not that I recall, no, sir.

8          THE COURT:  So in the first paragraph it says, "This

9     decision has been made based on a review of your file."  Is

10    that true?

11         THE WITNESS:  Yes, sir.

12         THE COURT:  And then it says, "and/or your personal

13    interview."  So it was either a file -- do you understand that

14    to say the decision was made based on a personal interview in

15    addition to the file review or based only on your personal

16    interview?

17         THE WITNESS:  That's how I understand it, yes, sir.

18         THE COURT:  All right.  Did you conduct a personal

19    interview of De Souza?

20         THE WITNESS:  No, sir, I did not.

21         THE COURT:  Did anybody, to your knowledge?

22         THE WITNESS:  Upon her arrest, it would have been the

23    case officer and/or a supervisory officer and then a jail

24    liaison officer assigned to whatever detention facility.

25         THE COURT:  And was there a record of that personal

 1    interview in the file?

 2            THE WITNESS:  I don't recall, sir.

 3            THE COURT:  You don't recall one way or the other, or

 4    you don't recall there being one?

 5            THE WITNESS:  I don't recall there being one, sir.

 6            THE COURT:  If it wasn't in there, how could you have

 7    relied on the personal interview, as this states?

 8            THE WITNESS:  I would have made my determination and

 9    my decision based on the file review alone.

10            THE COURT:  But this -- we agree, this says that there

11    was a personal interview, right?

12            THE WITNESS:  It does say that, sir.

13            THE COURT:  It says that the decision was based, in

14    effect, at least in part on a personal interview, right?

15            THE WITNESS:  Yes, sir.

16            THE COURT:  And that's not true, is it, because there

17    was no record of a personal interview in the file, you just

18    testified.

19            THE WITNESS:  I did say that, sir.

20            THE COURT:  So that part of the statement is not true,

21    correct?

22            THE WITNESS:  It would appear not to be, sir, no.

23            THE COURT:  Then it says, "In consideration of any

24    information you submitted to ICE reviewing officials."  I think

25    you told me a few minutes ago there was no such information in

1    the file, correct?

2             THE WITNESS:  No, sir.

3             THE COURT:  Do you know whether any information on

4    Ms. De Souza's behalf was submitted after you made your

5    decision on April 27?

6             THE WITNESS:  Yes, sir, I believe that there was a

7    stay application submitted, and she submitted some evidence in

8    regards to a stay application.

9             THE COURT:  Where is the notice that she got?  Did we

10   mark that?

11            LAW CLERK:  We don't have that.

12            THE COURT:  Is the notice that was given to Ms. De

13   Souza personally on April 23 in the record?

14            MS. LARAKERS:  It's not in the documents I submitted,

15   so I can't remember as to petitioners.

16            MR. COX:  Your Honor, I think it might be -- if you

17   just give me a moment, I think it might be in docket 50-5.

18   Yes, it's Exhibit E in the Andrade affidavit, docket number

19   50-5 starting on page 26.

20            THE COURT:  Mr. Cox, can you put it up on the document

21   presenter so we can all see it.

22            MR. PRUSSIA:  I have an extra copy for the court if

23   you would like it.  It's loose.

24            THE COURT:  Thank you.

25            MR. PRUSSIA:  It's loose leaf, my apologies.

```
 1              COURTROOM CLERK:  Thank you.
 2              THE COURT:  Mr. Rutherford, are you able to read that?
 3              THE WITNESS:  Yes, sir.
 4              THE COURT:  That says, "Notice to Alien of File
 5    Custody Review," correct?
 6              THE WITNESS:  Yes, sir.
 7              THE COURT:  What's the next exhibit number?  We'll
 8    make this Exhibit 7.  And do you see that it says in the second
 9    paragraph, "Your custody status will be reviewed on or about
10    April 30, 2018"?
11              THE WITNESS:  Yes, sir.
12              THE COURT:  And do you see that it's dated 4/23/2018?
13              THE WITNESS:  Yes, sir.
14              THE COURT:  So that wasn't 30 days in advance, was it?
15              THE WITNESS:  No, sir, it was not.
16              THE COURT:  Do you recall whether this notice -- I
17    asked you this before, but I want to see if it refreshes your
18    recollection.  Do you recall whether this notice was in the
19    file when you reviewed it?
20              THE WITNESS:  I do not recall that, sir, no.
21              THE COURT:  All right.  Did you review that file again
22    after April 27?
23              THE WITNESS:  I don't recall re-reviewing her file
24    after I made the continued detention decision.
25              THE COURT:  All right.  Now, could somebody put back
```

1    up, please, Mr. Brophy's declaration, Exhibit 1.  So your

2    decision to continue detention was made on April 27, 2018,

3    correct?

4              THE WITNESS:  Yes, sir.

5              THE COURT:  And that was four days after a notice was

6    given to somebody that there would be a file review on about

7    April 30, right?

8              THE WITNESS:  Yes, sir.

9              THE COURT:  And go to page 2 of Exhibit 1.  In the

10   middle, the third line down, do you see it says, "The notice of

11   Post-Order Custody Review, POCR, was served upon De Souza on

12   April 23, 2018, seven days prior to the occurrence of the

13   custody review"?

14             THE WITNESS:  Yes, sir, I see that.

15             THE COURT:  So assuming it was served on De Souza on

16   April 23, it's not correct to say that it was served seven days

17   prior to the occurrence of custody review, is it?

18             THE WITNESS:  I don't understand your question, I'm

19   sorry.

20             THE COURT:  Well, you did your custody review on April

21   27, correct?

22             THE WITNESS:  Yes, sir.

23             THE COURT:  And this states that the notice was served

24   on De Souza on April 23, correct?

25             THE WITNESS:  Yes, sir.

1          THE COURT:  So the custody review was four days after

2     the notice, not seven days after the notice, correct?

3          THE WITNESS:  According to this, yes, sir.

4          THE COURT:  So the statement by Mr. Brophy in the

5     declaration that the notice of Post-Order Custody Review was

6     served upon De Souza on April 23, 2018, seven days prior to the

7     occurrence of custody review is not correct.

8          THE WITNESS:  It doesn't appear to be correct, no,

9     sir.

10         THE COURT:  Do you know whether or not De Souza's

11    attorney delivered documents to ICE on or about April 30 in an

12    effort to provide information that would persuade ICE to

13    release her?

14         THE WITNESS:  Not that I recall, no, sir.

15         THE COURT:  In the ordinary course would you have been

16    told if that occurred?

17         THE WITNESS:  It would have been brought to my

18    attention from the case officer for consideration.

19         THE COURT:  Even after you had made a decision?

20         THE WITNESS:  Yes, sir.

21         THE COURT:  Well, I think there is an ambiguity in the

22    Andrade affidavit.  I don't know whether any documents were

23    delivered or not, but I think that came into focus this

24    morning.  All right.

25         MS. LAFAILLE:  Your Honor, Attorney Andrade is here in

1   case it would be helpful to ask her.

2           THE COURT:  No, not right now, but eventually.

3           All right.  Do you know or are you aware that Ms. De

4   Souza and others were arrested at the Citizenship and

5   Immigration Service office while pursuing the I-130 process

6   which is a predicate to seeking provisional waivers?

7           THE WITNESS:  It was brought to my attention, yes,

8   sir.

9           THE COURT:  When did you first learn that?

10          THE WITNESS:  Upon receiving Ms. De Souza's file when

11  I read through where she was arrested.

12          THE COURT:  And do you know who decided to arrest her

13  at CIS?

14          THE WITNESS:  The supervisor that was there was

15  supervisor Stephen Wells.

16          THE COURT:  And did you say you only came to the

17  Burlington office from Vermont seven months ago?

18          THE WITNESS:  Yes, sir.

19          THE COURT:  Was it the practice in the Burlington area

20  to arrest people at the CIS office?

21          THE WITNESS:  With FOD Cronen in place, Field Officer

22  Director Chris Cronen, yes, anybody subject to an enforcement

23  action was to be arrested.

24          THE COURT:  That was Mr. Cronen's direction?

25          THE WITNESS:  Yes, sir.

```
 1              THE COURT:  And when did he give that direction?

 2              THE WITNESS:  It was prior to my arrival, sir.  It was

 3      that way when I showed up.

 4              THE COURT:  You're talking about Burlington?

 5              THE WITNESS:  Yes, sir.

 6              THE COURT:  All right.  I think I may have misspoken

 7      in thinking of Burlington, Vermont.  When you were in Vermont,

 8      was there a CIS office in Vermont?

 9              THE WITNESS:  Yes, sir, there is.

10              THE COURT:  Was it the practice in that area to arrest

11      people at the CIS office?

12              THE WITNESS:  I can't speak to that, sir.  I worked in

13      a vetting center, so I was not in the field.

14              THE COURT:  I see.  So when you arrived here, you were

15      told something about Mr. Cronen's direction to arrest people at

16      CIS.

17              THE WITNESS:  Persons subject to enforcement action,

18      yes, sir.

19              THE COURT:  Who told you that?

20              THE WITNESS:  Mr. Cronen.

21              THE COURT:  What did he say?

22              THE WITNESS:  That according to the new executive

23      orders, anybody that is subject to enforcement will be taken

24      into custody.

25              THE COURT:  And how did ICE know if people subject to
```

1    removal orders would be at CIS?

2           THE WITNESS:  It's my understanding that some CIS

3    offices actually worked alongside with ICE to provide them

4    information on folks coming in for interviews.

5           THE COURT:  So the two offices coordinated?

6           THE WITNESS:  Yes, sir.

7           THE COURT:  And does that mean CIS would tell

8    people -- tell ICE when people with removal orders were coming

9    in?

10          THE WITNESS:  Yes, sir.

11          THE COURT:  Are you aware that the CIS manual says

12   that people at this CIS office seeking I-130s or perhaps

13   similar relief should not be arrested?

14          THE WITNESS:  No, sir, I have not read the field

15   manual for that.

16          THE COURT:  What is your understanding concerning what

17   was legally required when De Souza was arrested on January 30,

18   2018 at the CIS office, if anything?

19          THE WITNESS:  That she had been identified by an ICE

20   officer and in fact there was an outstanding order of removal

21   in her file.

22          THE COURT:  And therefore what?

23          THE WITNESS:  She would be considered an ICE fugitive.

24          THE COURT:  And?

25          THE WITNESS:  Subject to arrest for removal.

1          THE COURT:  And in your understanding were there any

2     legal requirements as to what was supposed to occur after she

3     was arrested?

4          THE WITNESS:  Upon an arrest of a foreign national,

5     we're required to ask them certain questions, if there are any

6     special vulnerabilities caring for an elderly family member,

7     children at school, single parent, anybody with special needs,

8     anything to that effect; and if there are no impediments to

9     arresting somebody that is subject to an outstanding order of

10    removal, then we take them into custody.

11         THE COURT:  So you take them into custody and then

12    what?

13         THE WITNESS:  Here, locally, they are taken to one of

14    our local detention facilities and the file is prepped for

15    removal, be it, we would have to order a travel document,

16    depending on if there's one in the file or not, and move

17    forward with attempting to effect removal.

18         THE COURT:  Are you familiar with the term defined in

19    the statute and regulations as "removal period"?

20         THE WITNESS:  Yes, sir.

21         THE COURT:  What do you understand the removal period

22    to be?

23         THE WITNESS:  From the time that there's a final order

24    and similar to a POCR, if the person is in custody 90 days from

25    the date of the final order, to attempt to effect the removal.

1    If it goes past 90 days, then we can push the file to

2    headquarters in hopes to have them assist with getting a travel

3    document.

4              THE COURT:  How did you develop that understanding?

5              THE WITNESS:  When I reread the POCR information.

6              THE COURT:  The regulation or the guidance or what?

7              THE WITNESS:  The POCR guidance, sir.

8              THE COURT:  I ordered that that be produced?

9              MS. LARAKERS:  No, Your Honor.  It's not clear where

10   the guidance comes from.  It's likely it comes from the Office

11   of Chief Counsel.  However, I don't even have that guidance.

12   And I've asked for some documents.

13             THE COURT:  I'll help you.  I'm ordering that it be

14   produced, ideally tomorrow.  Anyway.  So is it your

15   understanding that even if the removal period has expired, ICE

16   can detain somebody for up to 90 days?

17             THE WITNESS:  Up to 180 days with headquarters'

18   concurrence, sir.

19             THE COURT:  Up to 180 days?

20             THE WITNESS:  Yes, sir.

21             THE COURT:  Well, you made a decision on April 27 that

22   De Souza should be detained after 90 days, correct?

23             THE WITNESS:  Yes, sir.

24             THE COURT:  Maybe I didn't ask you this.  Did you

25   discuss that issue with anybody before you decided she should

1    be detained further?

2              THE WITNESS:  No, sir, I did not.

3              THE COURT:  Did you discuss it with anybody at

4    headquarters?

5              THE WITNESS:  No, sir.

6              THE COURT:  So how would ICE headquarters get

7    involved?

8              THE WITNESS:  With the local efforts to obtain a

9    travel document, if they are not successful, then we in turn

10   ship the file to headquarters and ask their assistance in

11   attempting to get a travel document.

12             THE COURT:  After how many days?

13             THE WITNESS:  After 90 days, sir.

14             THE COURT:  Was that done with De Souza?

15             THE WITNESS:  No, sir, because local efforts were

16   still ongoing in attempting to get a travel document.

17             THE COURT:  Did you read anything that told you that

18   ICE's authority was different after the expiration of the

19   removal period than before the expiration of it?

20             THE WITNESS:  Yes, sir, I believe it's 1231 in regards

21   to detention.

22             THE COURT:  So is it your understanding that

23   1231(a)(2) requires that an alien be detained during the

24   removal period of 90 days?

25             THE WITNESS:  Yes, sir.

 1             THE COURT:  And the removal period begins?

 2             THE WITNESS:  Upon their coming into custody, if they

 3   weren't already in custody.

 4             THE COURT:  Did somebody tell you that that's what the

 5   statute or regulations state?

 6             THE WITNESS:  No, sir.  That's what I read.

 7             THE COURT:  Where?

 8             THE WITNESS:  In Section 1231.

 9             THE COURT:  And you read 1231 when?

10             THE WITNESS:  When I was re-reviewing my declaration,

11   sir.

12             THE COURT:  Well, I won't do it now, but the lawyers

13   can show you 1231, and you can tell me where you read that in

14   1231.

15             THE WITNESS:  Yes, sir.

16             THE COURT:  And did you also read 241.4, the POCR

17   regulations, in preparation for today?

18             THE WITNESS:  I did read some of it, yes, sir.

19             THE COURT:  You can tell me if you find it in there,

20   too, okay?

21             THE WITNESS:  Yes, sir.

22             THE COURT:  I'm afraid you're going to have to come

23   back tomorrow.  When you reviewed the file on April 27, were

24   you making a discretionary decision as to whether to continue

25   De Souza's detention or release her?

1          THE WITNESS:  Yes, sir.

2          THE COURT:  And did you feel you were acting under

3    those POCR regulations, Section 241.4?

4          THE WITNESS:  Yes, sir, I did.

5          THE COURT:  Was De Souza entitled to any individual --

6    hold on just one second.  So you're -- could we give

7    Mr. Rutherford his declaration docket number 40-1, filed April

8    23.

9          Okay.  When is the last time you read this

10   declaration?

11         THE WITNESS:  I read it last night, sir.

12         THE COURT:  Are the statements in it accurate, that

13   is, true?

14         THE WITNESS:  Yes, sir.

15         THE COURT:  On page 2, you say -- well, actually go to

16   page 3, please, Paragraph 7.  It says, "Responding to the

17   court's question at paragraph 2D at page 9," of my order,

18   "regarding whether respondents assert they had and still have

19   the authority to detain De Souza without an individualized

20   determination of dangerousness and risk of flight," it says,

21   "Yes, ICE relies" -- it says, "Yes.  ICE relies on the

22   authorities indicated in paragraph 5 above in order to execute

23   the order of removal."

24         So here you said that it was your understanding that

25   ICE had the authority to detain De Souza without an

1  individualized determination of dangerousness and risk of

2  flight.  You put that in your declaration.

3          THE WITNESS:  Yes, sir.

4          THE COURT:  What does that mean?

5          THE WITNESS:  Because of the fact that Ms. De Souza

6  was subject to a final order, ICE would continue her detention

7  in an attempt to effect that removal.

8          THE COURT:  And this communicates to me that you

9  believed when you signed the declaration that ICE had no

10  obligation to consider whether she was dangerous or a risk of

11  flight?

12          THE WITNESS:  Yes, sir.

13          THE COURT:  And was that your understanding?

14          THE WITNESS:  Yes, it was, sir.

15          THE COURT:  So when you made the decision four days

16  later on April 27, was it still your understanding that you

17  didn't have to consider dangerousness or risk of flight?

18          THE WITNESS:  Yes, sir.

19          THE COURT:  And is it your understanding that if you

20  had looked at this matter a week later, after 90 days, you

21  still wouldn't have to consider dangerousness or risk of

22  flight?

23          THE WITNESS:  There may have been evidence to support

24  releasing her, sir.

25          THE COURT:  But I'm asking about your understanding

1   and you're not the -- I have to decide what the law is, but

2   it's important for me to understand what you understood, what

3   you thought the law was.

4        Did you think that Ms. De Souza could be detained for

5   up to six months without consideration of her risk of

6   dangerousness or flight if ICE was seeking removal documents in

7   that period?

8        THE WITNESS:  No, sir, because the POCR, she would

9   have had the POCR process where her attorney of record or her

10  could present evidence in hopes to get released.

11       THE COURT:  Then why did you write on April 23 that

12  ICE still had the authority to detain her without an

13  individualized determination of dangerousness and risk of

14  flight?

15       THE WITNESS:  It was my understanding with her removal

16  order in effect, we were still attempting to remove her.

17       THE COURT:  And if you were still attempting to remove

18  her on, say, May 3, more than 90 days afterwards, would you, as

19  you understood it, still have had the authority, the power to

20  detain De Souza without an individualized determination of

21  dangerousness and risk of flight?

22       THE WITNESS:  At the field office level, sir, yes, and

23  we would have also referred it to headquarters as well.

24       THE COURT:  So you could just detain her because you

25  were seeking her removal and hope to get the papers soon?

1          THE WITNESS:  And at the time there was no evidence of

2     her filing for immigration benefits that would allow her to

3     waive her inadmissibility in the United States.

4          THE COURT:  So is it your understanding that you could

5     have held her for up to six months, at least, without

6     considering dangerousness or risk of flight?

7          THE WITNESS:  It is my understanding, yes, sir, but we

8     would also have revisited looking to release her as well.

9          THE COURT:  Looking to what?

10          THE WITNESS:  Release her as well.

11          THE COURT:  I think -- go back to paragraph 6 on the

12     previous page, please.

13          THE WITNESS:  Yes, sir.

14          THE COURT:  It says, "Responding to the court's

15     question at paragraph 2C at page 9 regarding the procedures

16     followed in reaching the detention decision and the

17     individualized reasons for it, if any, ERO's processing

18     system."  What's ERO?

19          THE WITNESS:  Enforcement removal operations.

20          THE COURT:  "The risk classification assessment, RCA,

21     assists the agency in making detention determinations.  The RCA

22     is then reviewed by a supervisory detention and deportation

23     officer who makes the discretionary detention decision.

24     Officer Stephen Wells considered De Souza's final order of

25     removal and the fact that De Souza is not eligible for any

1    immigration benefits that would allow her to remain in the

2    United States to be evidence of flight risk."

3          Did you know that -- well, was De Souza seeking I-130

4    status?

5          THE WITNESS:  She was encountered at a CIS office at

6    an I-130 interview, yes, sir.

7          THE COURT:  And if she was granted an I-130 because

8    CIS determined that her marriage was bona fide, would she then

9    have been ineligible to seek provisional waivers which, if

10   granted, would have led to her becoming a lawful permanent

11   resident?

12         THE WITNESS:  Because of the fact that she had an

13   outstanding removal order, with an approved I-130 and/or an

14   approved I-45, which is an adjustment paperwork, she still

15   would have travel foreign to consulate process to return to the

16   United States as an LPR.

17         THE COURT:  For a couple -- so is that why -- do you

18   think that Mr. Wells was correct that De Souza was not eligible

19   for any immigration benefits that would allow her to remain in

20   the United States to be evidence of risk of flight?

21         THE WITNESS:  Yes, sir, and the fact that her order

22   was an in absentia order as well.

23         THE COURT:  If she succeeded in the provisional waiver

24   process, she would have had to leave the United States

25   relatively briefly and then foreseeably could have come back as

1   a lawful permanent resident to rejoin her U.S. citizen spouse

2   and any children, correct?

3           THE WITNESS:  Yes, sir.

4           THE COURT:  But the fact that she might have to leave

5   the United States for a couple of weeks if she was successful

6   in that process made her a risk of flight?

7           THE WITNESS:  With her removal order she is subject to

8   a bar to re-enter the U.S.  She would have to be granted a

9   waiver of inadmissibility and another form that would allow her

10  to waive that, go foreign, get her visa and come right back.

11          THE COURT:  Right.  And that's what -- that's the

12  process she was pursuing, right?

13          THE WITNESS:  She was pursuing an I-130, is the only

14  thing that I'm aware of, sir, not a 45.

15          THE COURT:  Well, the I-130 is necessary to pursue the

16  provisional waiver process, isn't it?

17          THE WITNESS:  It's the start to establish a

18  relationship to be able to pursue getting permanent residence.

19          THE COURT:  So if somebody's been ordered removed, got

20  married to a United States citizen, perhaps has children who

21  are American citizens and has begun the lawful process to

22  remain united with her family, why does that suggest they're a

23  risk of flight?

24          THE WITNESS:  In Ms. De Souza's case, only that the

25  fact that she was an in absentia order, and her bond had been

1    breached in her case.  So somebody tried to get whoever her

2    obligor was to bring her in and that didn't happen.

3           THE COURT:  All right.  It's almost 5:00.  I'm afraid

4    you're going to have to come back tomorrow.

5           THE WITNESS:  Okay, sir.

6           THE COURT:  We'll start again at 10:00 because I asked

7    Mr. Brophy to look for some things.  So do you understand

8    you're still subject to the sequestration order?  You can't

9    talk with any of the other potential witnesses in the case or

10   tell them what you were asked or answered.

11          THE WITNESS:  Yes, sir.

12          THE COURT:  All right.  Is there anything else before

13   Mr. Rutherford gets excused?

14          MR. WEINTRAUB:  You wanted to mention Mr. Dos Santos.

15          THE COURT:  We can do that -- actually, why don't you

16   step out, but don't leave yet because there's a chance -- do

17   you know anything about Mr. Dos Santos's case?

18          THE WITNESS:  I only saw email traffic that he was

19   being brought down here today, sir; that's it.

20          THE COURT:  All right.  Well, we won't be very long.

21   Why don't you just stay a few minutes outside, please.

22          (Mr. Rutherford exited courtroom.)

23          THE COURT:  All right.  With regard to Mr. Dos Santos.

24          MR. POMERLEAU:  Yes, Your Honor.

25          THE COURT:  You may have disagreements, but you don't

1    always have disagreements regarding Mr. Dos Santos or others.

2    You shouldn't have misunderstandings.  And the documents filed

3    late on Friday, Mr. Pomerleau's submission on behalf of Mr. Dos

4    Santos says that Mr. Dos Santos attempted to sign travel

5    documents but ICE officers told him he would not be allowed to

6    do that.

7          The respondents' submission submitted by Mr. Sady

8    referenced the March 28, 2018 declaration of Mark McGee that

9    was attached to respondents' motion to dismiss and stated that

10   Dos Santos was not cooperating with the removal process, which

11   relates to whether he's entitled to the POCR procedures on the

12   government's interpretation of them.  So at least according to

13   Mr. Pomerleau something has changed since March 28, but it

14   wouldn't be unprecedented in this case or other cases for the

15   lawyers not to be informed.  It's important that the

16   information be up to date.

17         MR. POMERLEAU:  One major change, Your Honor, if you

18   recall, one of the claims we had is ICE's refusal to allow

19   Mr. Dos Santos to get married for nearly ten and a half months.

20   His marriage took place at the Suffolk County House of

21   Correction last Thursday, which is May 17.  On that same day I

22   instructed him to sign the travel documents, and I found out

23   later that afternoon that he was not allowed to do so.  That

24   afternoon we filed an I-130 on his behalf, and on Friday we

25   filed a provisional I-212 waiver at the USCIS office of the JFK

1    building across from my office in Boston.

2         So the change, if you will, as to we believe now part

3    of a potential putative class, in that he has a pending or

4    approved I-130 and is seeking a provisional waiver.  And, you

5    know, the issues regarding the POCR regulations, we didn't get

6    into my questioning of any of the witnesses yet.  I think there

7    are several unanswered questions as to whether these

8    regulations apply, whether he was arrested --

9         THE COURT:  Did you want to question Mr. Brophy or

10   somebody else?

11        MR. POMERLEAU:  It's unclear to me who has the

12   information.  I know Mr. Brophy denied the marriage request.

13        THE COURT:  Well, when he was here, if you told me you

14   wanted to ask him some questions, I probably would have

15   permitted it.

16        MR. POMERLEAU:  Well, when it was clear he would be

17   back tomorrow, I thought I'd --

18        THE COURT:  Well, I think counsel should tell him it's

19   possible he may -- counsel should tell him he might be asked

20   some questions about Mr. Dos Santos.  But this is a very fluid

21   situation.  I'm trying to keep this on a fast track.  You don't

22   want to make mistakes.

23        MR. SADY:  Your Honor, there's no dispute that on May

24   17 Mr. Dos Santos did state that he would be willing to

25   cooperate and sign travel documents.  The problem being at that

```
 1    time, Your Honor, is we're at a correctional facility, there
 2    are no documents there to be signed.  So maybe there is a
 3    misinterpretation of what happened, but we now agree, we'll
 4    stipulate that he has said that he's willing to cooperate.
 5             THE COURT:  Well, this is very good.  So talk to
 6    Mr. Pomerleau.  You know, situations evolve.  You may not have
 7    a dispute.  I may just have to get some documents and then
 8    figure out what your positions are on the implications of the
 9    documents.
10             MR. SADY:  I have no problems speaking with Mr.
11    Pomerleau.
12             THE COURT:  I appreciate it.
13             MR. POMERLEAU:  Understood, Your Honor.  Thank you so
14    much.
15             THE COURT:  All right.  Well, we're not finished, but
16    this has been helpful so far.  And with regard to the Calderon
17    De Souza case, you can begin discussing the implications of the
18    testimony from Mr. Brophy and so far for Mr. Rutherford because
19    I think there's going to have to be supplemental briefing based
20    on what's been heard so far.
21             I assume, among other things, the government would
22    argue there shouldn't be a preliminary injunction because
23    they're not arresting people at CIS anymore.  But I know the
24    relief being sought is broader than that.  But whatever it is,
25    this all should be focused, and the briefing should deal with
```

1    the evidence.

2            Is there anything further for today?

3            MR. WEINTRAUB:  I have one question, Your Honor.

4            THE COURT:  Sure.

5            MR. WEINTRAUB:  Do you still expect that you're going

6    to need all the ICE agents and officers that you had required

7    to show up today tomorrow?

8            THE COURT:  I think it would be prudent to have them

9    all here.  Quite frankly, you're wearing me out.

10           MR. WEINTRAUB:  That was in fact the basis for the

11   question, Your Honor.

12           THE COURT:  It's possible we won't get to all of them

13   or it won't be necessary to have all of them, but I have to

14   think this through.  Actually, you're not wearing me out, but I

15   have to think it through.

16           MS. LARAKERS:  One more question, Your Honor.  Is it

17   possible that the hearing could continue after tomorrow?

18           THE COURT:  No.

19           MS. LARAKERS:  Okay.  Thank you.

20           THE COURT:  Let me put it this way.  It won't continue

21   on Thursday.

22           MS. LARAKERS:  Right.  I understand that it might

23   continue at another time.  I just wanted to make sure it wasn't

24   Thursday.

25           THE COURT:  Yes.  It won't continue on Thursday.

1            MS. LARAKERS:  Thank you, Your Honor.

2            THE COURT:  Although the weather is supposed to be

3    better here tomorrow.  You can go get a lobster or something.

4    All right.  Is there anything further in this matter for today?

5    Court is in recess.

6            (Adjourned, 5:05 p.m.)

1          CERTIFICATE OF OFFICIAL REPORTER

2

3              I, Kelly Mortellite, Registered Merit Reporter

4    and Certified Realtime Reporter, in and for the United States

5    District Court for the District of Massachusetts, do hereby

6    certify that pursuant to Section 753, Title 28, United States

7    Code that the foregoing is a true and correct transcript of the

8    stenographically reported proceedings held in the

9    above-entitled matter and that the transcript page format is in

10   conformance with the regulations of the Judicial Conference of

11   the United States.

12              Dated this 4th day of June, 2018.

13

14              /s/ Kelly Mortellite

15              _____

16              Kelly Mortellite, RMR, CRR

17              Official Court Reporter

18

19

20

21

22

23

24

25