1                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF MASSACHUSETTS
2
    ---------------------------------------
3   LILIAN PAHOLA CALDERON JIMENEZ,          )
                            Petitioner,      )
4                                            )  Civil Action
    vs.                                      )  No. 18-10225-MLW
5                                            )
    KIRSTJEN M. NIELSEN, Secretary of        )
6   Homeland Security, CHRISTOPHER CRONEN,   )
    Immigration and Customs Enforcement,     )
7   Boston Field Office Director, YOLANDA    )
    SMITH, Superintendent of Suffolk County )
8   Correctional Facility, STEVEN W.         )
    TOMPKINS, Sheriff of Suffolk County,     )
9                            Respondents.    )
    ---------------------------------------
10                                           )
    EDJANN HENRIQUE DOS SANTOS,              )
11                          Petitioner,      )  Civil Action
                                             )  No. 18-10310-MLW
12  vs.                                      )
                                             )
13  KIRSTJEN M. NIELSEN, Secretary of        )
    Homeland Security, CHRISTOPHER CRONEN,   )
14  Immigration and Customs Enforcement,     )
    Boston Field Office Director, YOLANDA    )
15  SMITH, Superintendent of Suffolk County )
    House of Correction, STEVEN W. TOMPKINS,)
16  Sheriff of Suffolk County,               )
                            Respondents.     )
17  ---------------------------------------

18              BEFORE THE HONORABLE MARK L. WOLF
                 UNITED STATES DISTRICT JUDGE
19

                            HEARING
20
                         May 23, 2018
21
            John J. Moakley United States Courthouse
22                    Courtroom No. 10
                      One Courthouse Way
23             Boston, Massachusetts  02210

24

25                          Kelly Mortellite, RMR, CRR
                            Official Court Reporter

```
 1   APPEARANCES:

 2   Counsel on behalf of Petitioners:
     Adriana Lafaille and Matthew Segal
 3   American Civil Liberties Union
     211 Congress Street
 4   Boston, MA 02110
     617-482-3170
 5   alafaille@aclum.org

 6   Counsel on behalf of Petitioners:
     Jonathan Cox, Colleen McCullough, Kevin Prussia and
 7   Michaela Sewall
     Wilmer Hale LLP
 8   60 State Street
     Boston, MA 02109
 9   617-526-6212
     jonathan.cox@wilmerhale.com
10
     Counsel on behalf of Petitioners Junqueira and Dos Santos:
11   Todd C. Pomerleau and Jeff Rubin
     Rubin Pomerleau PC
12   One Center Plaza
     Boston, MA 02108
13   617-367-0077
     tcp@rubinpom.com
14
     Stephanie E.Y. Marzouk
15   Marzouk Law LLC
     31 Union Square
16   Somerville, MA 02143
     651-341-0971
17   sym@marzouklaw.com

18   Counsel on behalf of Respondents:
     Eve A. Piemonte and Michael P. Sady
19   United States Attorney's Office
     1 Courthouse Way
20   John Joseph Moakley Federal Courthouse
     Boston, MA 02210
21   617-748-3271
     eve.piemonte@usdoj.gov
22
     Mary Larakers and J. Max Weintraub
23   U.S. Department of Justice, Office of Immigration Litigation
     District Court Section
24   P.O. Box 868
     Washington, DC 20044
25   202-353-4419
     mary.larakers@usdoj.gov
```

```
1                    P R O C E E D I N G S
2            THE COURT:  Good morning.  Would counsel please
3    identify themselves for the court and for the record.
4            MS. LAFAILLE:  Good morning, Your Honor.  Adriana
5    Lafaille for the petitioners.
6            MR. SEGAL:  Matthew Segal also for the Calderon
7    petitioners.
8            MR. PRUSSIA:  Good morning.  Kevin Prussia for the
9    Calderon petitioners.
10           MS. McCULLOUGH:  Good morning, Your Honor.  Colleen
11   McCullough for the Calderon petitioners.
12           MR. COX:  Good morning, Your Honor.  Jonathan Cox for
13   the Calderon petitioners.
14           MS. SEWALL:  Michaela Sewall for the Calderon
15   petitioners.
16           MR. POMERLEAU:  Good morning as well, Your Honor.
17   Todd Pomerleau on behalf of a different petitioner, Edjann Dos
18   Santos.
19           MS. MARZOUK:  My name is Stephanie Marzouk, also on
20   behalf of Mr. Dos Santos.
21           MR. RUBIN:  Good morning, Judge Wolf.  Jeff Rubin from
22   Rubin & Pomerleau on behalf of Edjann Dos Santos.
23           MR. WEINTRAUB:  Max Weintraub representing the United
24   States.
25           MS. LARAKERS:  Mary Larakers also representing the
```

1    United States.

2         MR. SADY:  Michael Sady, Your Honor, also representing

3    the United States.

4         THE COURT:  Mr. Dos Santos is present.  The documents

5    and the video that were entered yesterday are judicial records

6    and presumptively available to the public.  I believe that all

7    except 2 and 6 have been filed before and are already part of

8    the public record, although I'll have the exhibits docketed,

9    unless there's a reason to seal a particular exhibit or to make

10   redactions.

11        I asked the clerk to give you 2 and 6.  Are there any

12   proposed redactions?

13        MS. LAFAILLE:  Your Honor, we've brought copies of the

14   exhibits that just redact Ms. De Souza's alien number, so I

15   would ask that these be used for the public record.

16        THE COURT:  That's appropriate.  If you would give

17   them to the clerk.  All right.  The exhibits will be docketed

18   so they can be viewed by the public.

19        All right.  Have the parties, the lawyers in Dos

20   Santos, had some discussions; and can you tell me the status of

21   that matter, please.

22        MR. POMERLEAU:  Yes, Your Honor.  My brother, Attorney

23   Sady, and myself, we had fruitful discussions this morning, we

24   believe.  We have a tentative agreement which would allow

25   Mr. Dos Santos to be released from custody and be on an order

```
 1    of supervision and be allowed to pursue adjustment of status
 2    before the Boston Immigration Court on a joint motion to
 3    reopen.
 4            MR. SADY:  That's correct, Your Honor.  That was a
 5    proposal brought to the government by the petitioners
 6    yesterday, so we entertained that, Your Honor.  And it will
 7    lead to the dismissal of Dos Santos from this matter.
 8            THE COURT:  So Mr. Dos Santos will not be in the
 9    putative Calderon class?
10            MR. SADY:  Not physically, Your Honor.
11            THE COURT:  You're going to have to speak into the
12    microphone, please.
13            MR. SADY:  Yes, Your Honor.  Until the court grants it
14    as a class and et cetera, and all the variables that make
15    someone within that member of the class, he will be -- his case
16    will be physically dismissed.  If he believes he qualifies
17    later on to be a member of the class, that's another thing.
18            THE COURT:  Okay.  So he would be released.  And then
19    what was the next thing you told me?
20            MR. POMERLEAU:  So it was three steps.  He would sign
21    for the travel documents, so that issue would be moot.  He
22    would be released from custody to an order of supervision.  And
23    most importantly, we would be filing a joint motion to reopen
24    with the Board of Immigration Appeals.  Because what's unique
25    about Mr. Dos Santos is he has two ways in which he could have
```

1    got his lawful permanent residency.  He could do the I-130,

2    provisional 212 waiver, a 61A and go the consular, or, because

3    he's a visa overstay, it would be an I-130, a motion to reopen,

4    then an adjustment of status on Form I-45, which would be

5    adjusted before the immigration court.

6         He was originally ordered removed before the

7    immigration court when she denied him an adjustment of status.

8    Then that was appealed to the BIA.  The appeal became final

9    until May of 2014.  He was detained in June of 2017.  So by

10   agreeing to reopen the case jointly, the jurisdiction would lie

11   with the immigration court.  And I think that would take him

12   outside of this putative class because he would no longer need

13   to seek the provisional waivers that the other putative class

14   members are seeking.  Just because he's a visa overstay, the

15   law allows him to adjust status within the United States, and

16   he could also choose to do consulate processing with the

17   appropriate waivers.

18        THE COURT:  And when would he be released, do you

19   expect?

20        MR. SADY:  Once an agreement that is -- that both

21   sides agree to the language, Your Honor, that's when it would

22   occur.

23        THE COURT:  So would that take a couple of days?

24        MR. SADY:  I'd have to run it up the DHS flagpole as

25   to -- again, it has to be agreeable language to both parties,

```
1    in particular with regard to the motion to reopen.
2             THE COURT:  Okay.  Well, it sounds as if you've made a
3    lot of progress.  If I understand it correctly, this couldn't
4    have been done -- well, maybe because there are two ways he can
5    seek adjustment of status, it could have been done earlier, but
6    the parties reached an agreement that Mr. Dos Santos could get
7    married last week.  I didn't have to decide that issue.  He got
8    married.
9             So now he's in a different posture than he was before
10   he was married.  He's now willing to cooperate and sign the
11   papers necessary to seek travel documents if he is removed, but
12   you've reached an agreement that he should be released from
13   detention under the supervision of ICE, and you have an
14   agreement in principle at least that you'll jointly ask the
15   Board of Immigration Appeals to reopen his case, and there are
16   two possible ways he could become a lawful permanent resident.
17   Do I have an accurate understanding?
18            MR. SADY:  That's an accurate understanding, Your
19   Honor.
20            MR. POMERLEAU:  Yes, Your Honor, that's accurate.
21   It's Section 245 of the Immigration and Nationality Act, which
22   is what allows him to adjust status within the United States
23   just because he's a visa overstay.  The unlawful presence isn't
24   triggered until you depart the United States.
25            THE COURT:  All right.
```

1          MR. POMERLEAU:  That's what the provisional waiver is

2     for, is that it allows you to waive in advance --

3          THE COURT:  All right.

4          MR. POMERLEAU:  It used to be you had to leave and

5     apply for a waiver.

6          THE COURT:  All right.  That may be more than I need

7     to know or can absorb right at the moment.  So the point is

8     it's likely, if the path you're pursuing results in an

9     agreement on language, Mr. Dos Santos will be released and this

10    case will be dismissed, correct?

11         MR. SADY:  That's correct, Your Honor.

12         MR. POMERLEAU:  Yes, that is correct, Your Honor.

13    Hopefully he'll be released within a few days.

14         THE COURT:  Yeah, I'm ordering that you file a status

15    report or a dismissal by 12:00 noon on Friday, which is the

16    25th.  If you haven't concluded it, I'll give you an extension.

17    I'd just like to know where it stands.

18         MR. SADY:  Your Honor, I'm going to be out.  I have

19    college graduation.  So if it can be extended to Monday.

20         MR. WEINTRAUB:  Monday is a holiday.

21         THE COURT:  Monday is a holiday.  When are you leaving

22    for the graduation?

23         MR. SADY:  I'm actually here in Cambridge, but I'm not

24    going to be in work during that time.

25         THE COURT:  Okay.  Good for you.  Graduation is

1    tomorrow?

2         MR. SADY:  Yeah.

3         THE COURT:  All right.  I'm ordering that you report

4    by the close of business next Tuesday, which is the 29th.

5    You'll either file a status report or a dismissal.  And the

6    parties should note that under our local rules, if something is

7    to be filed on a particular day, it has to be filed by 6:00

8    p.m.  If you file it after 6:00 p.m., you haven't, according to

9    the rules, filed it on the right day, okay?

10        Anyway, I commend you for making the progress that

11   you've made on Mr. Dos Santos's case.  It's just what I said

12   yesterday.  There may be disagreements and they have to be

13   litigated, but we're talking about issues with profound human

14   consequences, and if the parties can in good faith resolve them

15   by agreement, that's a very positive thing.  Thank you.

16        MR. SADY:  Thank you, Your Honor.

17        MR. POMERLEAU:  You're welcome, Your Honor.  Thank

18   you.

19        MR. SADY:  Your Honor, is it okay if I'm dismissed

20   from this now, or would you like me to stay with regard to

21   Calderon?

22        THE COURT:  I would prefer that you stay.

23        MR. SADY:  Okay.

24        THE COURT:  Unless Ms. Piemonte is available.  I know

25   she wasn't yesterday, and I wanted somebody here from the U.S.

1    Attorney's Office.

2         MR. SADY:  I will stay, Your Honor.  Ms. Piemonte will

3    be available later this afternoon, so if it goes into the

4    afternoon --

5         THE COURT:  Okay.  I'd like one of you to be here

6    because there may be essentially local counsel responsibilities

7    to be discharged.

8         MR. SADY:  Sure, absolutely.

9         THE COURT:  And has this been explained to Mr. Dos

10   Santos?

11        MR. POMERLEAU:  Yes, it has, Your Honor.

12        MR. WEINTRAUB:  Your Honor, while I expect I know the

13   answer, you had asked that we make acting FOD Brophy available

14   today to discuss Mr. Dos Santos' case.  I presume he can still

15   not go, as you may want --

16        THE COURT:  I'm going to start with Mr. Brophy.  I was

17   just about to say that.  But I don't see any reason to ask him

18   any questions about Mr. Dos Santos.

19        MR. WEINTRAUB:  Thank you, Your Honor.

20        THE COURT:  That's what I was going to tell you next.

21   I think I'd like to start with Mr. Brophy to see if he found

22   and brought any of the documents he was ordered to look for

23   yesterday, because if he has those, we should duplicate them.

24   And at some point you should read them, and they may suggest

25   more questions for him.  They may suggest some questions for

1   Mr. Rutherford.

2           MR. WEINTRAUB:  It doesn't raise a question.  He does

3   have some of the documents.  We have not had a chance to review

4   them for privilege, for any other protected matter.  We're not

5   certain where some of the documents came from, and we are

6   trying to hunt that down.  Did they come from the chief

7   counsel's office?  Did they come from the Office of the General

8   Counsel?  We're not certain about that.  I understand that Your

9   Honor has asked him to bring them in and asked us to produce

10  them.

11          THE COURT:  Have you met with him this morning?

12          MR. WEINTRAUB:  We have, but, you know, we just got

13  them this morning, and we're trying to hunt down the answers

14  behind this.

15          THE COURT:  Do you have them now?

16          MR. WEINTRAUB:  We don't -- I don't have them here.

17          THE COURT:  Let's bring him in.  For example, he

18  talked about an audit that he had done.  That's not going to

19  implicate any privilege.

20          MR. WEINTRAUB:  All right.  That's fine.  It may be --

21  apologize.  It may be that we have them electronically.  We'll

22  need to get them to something to print out.  I don't know that

23  he necessarily has the paper versions on him there but has got

24  them electronically.

25          THE COURT:  Well, you don't want to come back

1    tomorrow.

2           MR. WEINTRAUB:  No, we can make this work, Your Honor.

3           THE COURT:  What's that?

4           MR. WEINTRAUB:  We can get electronic copies turned

5    into paper copies.

6           THE COURT:  I assumed he would bring paper copies and

7    that I would have them duplicate it.  But here, let's have him

8    come in, and we'll go step by step.

9           MR. WEINTRAUB:  Okay.

10          MR. RUBIN:  Your Honor, in light of this new

11   development, is it okay to leave the counsel table?

12          THE COURT:  In fact, should Mr. Dos Santos be excused?

13          MR. POMERLEAU:  I think that's fine, Your Honor.

14          THE COURT:  All right.  Do you want to take Mr. Dos

15   Santos back?

16          MR. RUBIN:  Thank you very much.

17          THE COURT:  You know, Christine, he should not be

18   shackled in the courtroom.  There's no -- I've had murderers in

19   the courtroom, and they're not shackled.  God.

20          OFFICER:  It's your call, if you want them removed.

21          THE COURT:  Well, you're taking him out now.  For

22   future reference, unless somebody asks me and persuades me

23   there's a security risk, do not shackle him.  Frank Salemme

24   wasn't shackled.  Steven Flemmi wasn't shackled.  Gary Sampson

25   wasn't shackled.  They've all been convicted of multiple

1    murders, and there's no reason to shackle Mr. Dos Santos.

2    There's no evidence that he's dangerous.

3             So you're in Federal Court.  You better ask for

4    guidance not just from me but from my colleagues before you try

5    to do something in the courtroom, which is our space.  You're

6    excused.

7             Christine, come here.

8    CONTINUED EXAMINATION OF THOMAS BROPHY:

9             THE COURT:  Mr. Brophy is back on the witness stand.

10   Mr. Brophy, do you understand you're still under oath?

11            THE WITNESS:  Yes, sir.

12            THE COURT:  And do you understand you're still subject

13   to the sequestration order I issued on May 14?

14            THE WITNESS:  Yes, sir.

15            THE COURT:  Have you spoken to anybody about this case

16   since you left the courtroom yesterday?

17            THE WITNESS:  No one, other than my attorneys.

18            THE COURT:  Have you read or heard any media accounts

19   of what transpired yesterday?

20            THE WITNESS:  My public affairs office sent me a link

21   this morning.

22            THE COURT:  And my sequestration order doesn't

23   prohibit you from reading something or listening to something,

24   watching something that may be in the media.

25            Yesterday I ordered you, with your agreement, to look

1    for certain documents.  Did you look for the audit that you had

2    done of detained aliens?

3            THE WITNESS:  Yes.  My attorneys have it.

4            THE COURT:  Okay.  And did you consult any attorneys

5    in connection with initiating that audit?

6            THE WITNESS:  I mentioned it to Chief Counsel Ardinger

7    that I was going to take those steps.  I didn't seek her

8    guidance on it.

9            THE COURT:  Do your attorneys now have a copy of the

10   audit?

11           THE WITNESS:  Yes.

12           THE COURT:  Is it a paper copy?

13           THE WITNESS:  I believe -- it was e-mailed.  I didn't

14   give them a hard copy.  It was e-mailed.

15           THE COURT:  Is there any reference in that document to

16   your communication with the chief counsel?

17           THE WITNESS:  No.

18           THE COURT:  All right.  Well, I'd like that -- I want

19   to be able to print that out now.  Do you want to email it to

20   Ms. Bono?  In fact, here, why don't we hold on for just a

21   second.  There will probably be other things, too.

22           MR. WEINTRAUB:  That's fine.  That's what I had

23   thought.  But that's fine.  I'm making a list, Your Honor.

24           THE COURT:  We'll go one at a time.  Did you also look

25   for the guidance, the ICE guidance that you said existed and

1  you had read concerning the POCR regulations?

2          THE WITNESS:  Yes, I sent that to them, too.

3          THE COURT:  All right.  Where was that guidance found?

4          THE WITNESS:  I had a copy of it on an email, and it

5  also can be found on our internal agency web page, one of our

6  web pages.

7          THE COURT:  The web page is internal; is that right?

8          THE WITNESS:  Yes, sir.

9          THE COURT:  Does that mean it's not available to the

10  public?

11          THE WITNESS:  Correct.

12          THE COURT:  And did you email that to your attorneys

13  as well?

14          THE WITNESS:  Yes.

15          THE COURT:  Mr. Weintraub, have you had a chance to

16  look at it?

17          MR. WEINTRAUB:  Briefly, Your Honor.  Briefly, Your

18  Honor.  As I had mentioned, we just did get it, and that's what

19  I was saying, that we're trying to go through it now.  The

20  origin is unclear.  It looks like it may have been joint

21  between ICE and ICE counsel, and we've reached out to ICE

22  counsel for their input.

23          THE COURT:  Who did you reach out to?

24          MR. WEINTRAUB:  The -- Frank Crowley I believe and

25  whoever else is in that office.  Apologize, Your Honor.

1        THE COURT:  So are you asking for time to consider

2    whether it's something that's privileged and you might want to

3    assert a privilege?

4        MR. WEINTRAUB:  We may, Your Honor.  I'll note that

5    one of the things that we found, if we're talking about the

6    same document, which I believe we are, is that even in the

7    version that we received, there's some redaction in there.  We

8    don't know where the redaction came from.  We don't know who

9    made it.  It's just redacted text, I believe, is how it's

10   indicated.  And, you know, we wouldn't want to produce

11   something that's improperly redacted any more than we'd want to

12   produce something that's not protected at all.  So I think we

13   will need some time.

14       THE COURT:  How much?  Here, let me put it this way.

15   The document is potentially important.  These proceedings are

16   in part to determine whether there's a policy and whether the

17   policy is consistent with the law which relates to the issues

18   of the propriety of class certification and possibly

19   preliminary injunction.  So I was hoping to conclude this

20   matter today and not have to have Mr. Brophy or Mr. Rutherford

21   and others, you, come back.  But let's just go through a few

22   other things, and then we'll see where we are.

23       MR. WEINTRAUB:  Thank you, Your Honor.

24       THE COURT:  Did you look for the documents that

25   reflected when you asked the office in Buffalo and Mr. Lyons

1    asked the office in Dallas to send you people to do the audit?

2          THE WITNESS:  Yes.  I found my email, and I sent it to

3    counsel, so they have a copy.  As for Mr. Lyons, I don't have a

4    copy of it, and I obviously did not speak to him about that.

5          THE COURT:  Okay.  For example, your lawyers could

6    have talked to him.  What was the date of the email you sent to

7    Buffalo?

8          THE WITNESS:  It was May 3 at 9:34 a.m.

9          THE COURT:  When you sent that, did you know that I

10   had a hearing in these cases on May 1?

11         THE WITNESS:  I don't recall if I knew exactly.  I was

12   aware that there was hearings ongoing, yes.

13         THE COURT:  And did you know that there would be a

14   report filed on May 3, a joint status report, docket number 56?

15         THE WITNESS:  No, sir.

16         THE COURT:  I want to be careful about this.  Do you

17   recall whether you submitted a declaration on May 3?

18         THE WITNESS:  Yes.

19         THE COURT:  You did, correct?

20         THE WITNESS:  Yes, sir.

21         THE COURT:  That related to the detention of De Souza,

22   right?

23         THE WITNESS:  Yes, sir.

24         THE COURT:  I questioned you about that yesterday.

25         THE WITNESS:  Okay.

 1          THE COURT:  Do you remember that?

 2          THE WITNESS:  Yes, sir.

 3          THE COURT:  It's the one where you said that the April

 4   3 notice was filed seven days prior to the occurrence of the

 5   custody review?

 6          THE WITNESS:  Yes.

 7          THE COURT:  And who did you talk to about that

 8   declaration?  I'm not asking you what was said, but I want to

 9   know who you spoke to.

10          THE WITNESS:  It would have been one my attorneys,

11   Ms. Ardinger and Mr. Crowley.

12          THE COURT:  And when did you first have discussions

13   that led to that declaration particularly, was it before May 3?

14          THE WITNESS:  I believe it was.

15          THE COURT:  So by May 3, is it correct that you knew

16   that Ms. De Souza hadn't been given the 30 days' notice

17   required by the POCR regulations as you understood them?

18          THE WITNESS:  Yes.

19          THE COURT:  Then on May 3 you initiated the audit,

20   correct?

21          THE WITNESS:  Initiated by requesting people to come

22   in, yes.

23          THE COURT:  And that audit was conducted the next

24   week, the week of May 7 I think you said.

25          THE WITNESS:  Yeah, the 7th through the 18th.

1      THE COURT:  And was that an audit of everybody

2   detained throughout your district or just Massachusetts?

3      THE WITNESS:  It was everybody that we have in our

4   detained docket.  So yeah, it would include people in other

5   facilities, not outside of Massachusetts, yeah.

6      THE COURT:  All right.  Is there any objection to

7   producing the audit?

8      MS. LARAKERS:  Your Honor, again, we just got those

9   documents, and we'd have to look at them, but at this point in

10  time, if it doesn't come from chief counsel, then we don't have

11  a problem with it.  We haven't had time to review it, Your

12  Honor.

13     THE COURT:  It doesn't come from chief counsel.  He

14  says that -- is there any reference in the audit to any

15  lawyers?

16     THE WITNESS:  No, sir.

17     THE COURT:  Does it include any advice or

18  communications you had with lawyers?

19     THE WITNESS:  No.

20     MS. LARAKERS:  I'll take his word for it, Your Honor.

21  I haven't looked at it as closely as he has because I just

22  received it.  It's certainly easier for us to review that

23  document because it's shorter than some of the other documents

24  that we received.

25     THE COURT:  How long is that?

```
 1              MS. LARAKERS:  I think it's four or five pages.

 2              MR. WEINTRAUB:  Maybe a little longer, I'm not

 3    certain.

 4              MS. LARAKERS:  A little longer.

 5              THE COURT:  All right.  We'll see where we're going

 6    with this.

 7              Mr. Brophy, you're the acting director.

 8              THE WITNESS:  Yes, sir.

 9              THE COURT:  I think you discussed this yesterday, but

10    when were you asked to become acting director?

11              THE WITNESS:  In January sometime.

12              THE COURT:  Were you told about how long you should

13    expect to be acting director?

14              THE WITNESS:  About four months, 120 days.

15              THE COURT:  Have you been here more than 120 days?

16              THE WITNESS:  No, sir.

17              THE COURT:  Do you expect that your tenure will end

18    after about 120 days?

19              THE WITNESS:  Yes, sir.

20              THE COURT:  And then what do you understand is going

21    to happen with regard to you?

22              THE WITNESS:  I'll return back to my normal duty post

23    in Buffalo.

24              THE COURT:  Do you know whether there will be a

25    permanent director?
```

1          THE WITNESS:  No.

2          THE COURT:  Or director?

3          THE WITNESS:  There will be another person acting.  It

4    will be Mr. Todd Lyons, the current deputy, will be acting

5    until they can find a permanent person to fill the position.

6          THE COURT:  I'm going to talk to Mr. Lyons, but if I

7    recall your testimony yesterday correctly, you told Mr. Lyons

8    and Mr. Rutherford that it was your policy that people, aliens

9    should not be arrested at CIS offices and they should so

10   instruct the people who worked under them; is that right?

11         THE WITNESS:  Yes, sir.

12         THE COURT:  Did Mr. Lyons say anything to you when you

13   told him that was the new policy?

14         THE WITNESS:  No, other than he agreed and, you know,

15   he would make sure that it's adhered to.

16         THE COURT:  And has he discussed that policy with you

17   since?

18         THE WITNESS:  Yeah.  We've talked about the topic

19   before, and I've never had any pushback.

20         THE COURT:  Obviously one would have to ask Mr. Lyons

21   this, but would you expect that he would continue your policy

22   prohibiting those arrests, except if there are issues of

23   national security or danger to the community?

24         THE WITNESS:  Yes.

25         THE COURT:  Did you try to identify the five people in

1    addition to Calderon and De Souza who were arrested at CIS

2    offices in Massachusetts or Rhode Island in January 2018?

3              THE WITNESS:  I did, and I sent that information to my

4    attorneys as well.

5              THE COURT:  Do you know the names of those people?

6              THE WITNESS:  Not off the top of my head, but they

7    have it.

8              THE COURT:  What are the names?

9              MS. LARAKERS:  Your Honor, if you allow me to look at

10   my phone, I can tell you.

11             MR. WEINTRAUB:  So we do have the email, that

12   Mr. Brophy --

13             THE COURT:  What are the names?

14             MR. WEINTRAUB:  It's Fabiano Mateus-De Oliveira,

15   F-a-b-i-a-n-o, M-a-t-e-u-s, D-e-O-l-i-v-e-i-r-a, Faviolia

16   Martinez-Martinez, F-a-v-i-o-l-i-a, M-a-r-t-i-n-e-z,

17   M-a-r-t-i-n-e-z, Jovel Calderon Morales, J-o-v-e-l,

18   C-a-l-d-e-r-o-n, M-o-r-a-l-e-s, Mkazilakwa Omary Mchiloah,

19   M-k-a-z-i-l-a-k-w-a, O-m-a-r-y, M-c-h-i-l-o-a-h, and Jose

20   Felicio DaSilva, J-o-s-e, F-e-l-i-c-i-o, D-a-S-i-l-v-a, and

21   Joelson Serafim Fontoura, J-o-e-l-s-o-n, S-e-r-a-f-i-m,

22   F-o-n-t-o-u-r-a.

23             THE COURT:  Thank you.  All right.  Did Mr. De

24   Oliveira have a case in front of me that's now dismissed?

25             MS. LARAKERS:  Yes, Your Honor.  That's one and the

1  same.

2          THE COURT:  All right.

3          MR. POMERLEAU:  That's correct, Your Honor.  We also

4  represented Mr. De Oliveira.

5          THE COURT:  Right.  So the other five I'm not familiar

6  with.  Did you find the files for these people?

7          THE WITNESS:  Not the actual physical files.  Some

8  were in the office, but we did it via electronic files, and I

9  provided them updates on the cases' statuses.

10         THE COURT:  Okay.  And so one of the people arrested

11 at a CIS office in January was Faviola Martinez-Martinez, I was

12 just told, correct?

13         THE WITNESS:  Yes.

14         THE COURT:  Is that a male or a female?

15         THE WITNESS:  I'm not certain.

16         THE COURT:  What happened to that individual?

17         THE WITNESS:  I would have to refer back to the email.

18         THE COURT:  To the email?

19         THE WITNESS:  Yeah, that she has.

20         MS. LARAKERS:  Your Honor, if you'd like --

21         THE COURT:  What's that?

22         MS. LARAKERS:  If you would like to know the status of

23 each one, I have that on the email as well.

24         THE COURT:  Okay.  So what's on the email?

25         THE WITNESS:  I identified people that were arrested

1    at CIS that you requested, and I provided them updates of the

2    current status of the case as well.

3           THE COURT:  And did the information you provide

4    indicate, for example, whether the person was given by or

5    before -- well, were all of those people detained?

6           THE WITNESS:  They were at one point.  I think one may

7    still be in detention.

8           THE COURT:  One may still be in detention?

9           THE WITNESS:  I believe so.

10          THE COURT:  Have any of them been removed from the

11   United States?

12          THE WITNESS:  Yes.

13          THE COURT:  How many?

14          THE WITNESS:  I believe maybe two.  I'd have to refer

15   back to the email.

16          THE COURT:  So what's in the email?

17          THE WITNESS:  It identifies the name of the people and

18   the status of the case, whether they're in custody, released,

19   removed, and if they're in custody, whether or not POCR was

20   done or not.

21          THE COURT:  When you say whether or not a POCR was

22   done, what do you mean?

23          THE WITNESS:  I believe some people were released

24   before the 90-day period or removed before the 90-day period,

25   too.

1          THE COURT:  And how many are still detained?

2          THE WITNESS:  I believe one at this point.

3          THE COURT:  Which one?

4          THE WITNESS:  I think it might be Calderon.  I would

5     have to ask the attorney to verify them.

6          THE COURT:  Did Calderon get within 60 days of his

7     detention a notice that there would be a review at about 90

8     days?

9          THE WITNESS:  In my review it showed -- I don't know

10    if that was the error or the error was that the review was done

11    post 90 days.  So he was tentatively scheduled for removal.

12    I've had him taken off of that removal, and he was transferred

13    to another part of the country.  I'm having him brought back

14    here so I can rectify that situation and release him.

15         THE COURT:  So Calderon did not get the process

16    required by the POCR regulations as you understand it, correct?

17         THE WITNESS:  Correct.

18         THE COURT:  And he's still detained?

19         THE WITNESS:  Right.  He's being transferred back

20    here, and then he'll be released, rather than having him

21    released in another party of the country.  I think he's staged

22    in Louisiana, and I don't know if releasing him in Louisiana --

23    if he has family there or not, so I asked for him to be sent

24    back so we can release him.

25         THE COURT:  When do you expect he'll be back?

1          THE WITNESS:  I don't know, but I can follow up and

2    try to get you that information.

3          THE COURT:  So is it your understanding now that he's

4    being detained in violation of law as of this moment?

5          THE WITNESS:  That we violated the POCR process for

6    him, yes, sir.

7          THE COURT:  Do you understand those are laws?

8          THE WITNESS:  I do, and I did read your May 8 document

9    as well that you had instructed.

10         THE COURT:  All right.  And do you recall which of the

11   people arrested have been removed from the United States?

12         THE WITNESS:  I don't remember the exact names, but I

13   would ask the attorney to provide that if he could.

14         THE COURT:  Do you know whether any of them were

15   detained more than 90 days before they were removed?

16         THE WITNESS:  It does not appear that they were, no,

17   other than Calderon.

18         THE COURT:  All right.  Well, it's going to be

19   necessary to get those documents to question about this matter.

20   It's now quarter of 11:00.  I'd like to use the time today as

21   efficiently and as effectively as possible, but it's going to

22   be necessary to question Mr. Brophy and perhaps other witnesses

23   about these documents.

24         If government counsel can share the responsibilities,

25   maybe Mr. Weintraub can go and look at the documents, talk to

```
 1    whoever you need to talk to and let me know whether there's any
 2    objection to our making copies of them so they can be read and
 3    we can have some questioning on them.  And while you're doing
 4    that, maybe we can continue with Mr. Rutherford.
 5           MR. WEINTRAUB:  That's fine, Your Honor.  Just to
 6    verify, you're talking about the audit, the ICE POCR
 7    guidance -- excuse me -- Mr. Brophy's documents regarding
 8    asking for the audit from the people in Buffalo, or do you not
 9    need that document?
10           THE COURT:  I'd like to see it, but there's no --
11    yeah, I want to see it.
12           MR. WEINTRAUB:  Then finally the information
13    containing -- the information on the individuals who were
14    arrested at the USCIS offices.
15           THE COURT:  Yes, which is especially important.
16           MR. WEINTRAUB:  Absolutely.  The last one I don't
17    think is an issue.  We can probably have it back down here in
18    five minutes, as long as it takes to go upstairs --
19           THE COURT:  That would be terrific.  I just want to --
20    that's good.
21           MR. WEINTRAUB:  If there's something else, Your Honor?
22           THE COURT:  What?
23           MR. WEINTRAUB:  I'm saying if there's something else?
24           THE COURT:  The guidance, the audit, the files on the
25    other people who were arrested and his email to Buffalo.  I
```

1    think that's it.

2           MR. WEINTRAUB:  When you say "the files," you just

3    mean the information -- we obviously don't have the files.  He

4    sent an email containing the information.  You want the

5    information on their arrest?

6           THE COURT:  I want that now and eventually we're going

7    to need the files, but not today.

8           MR. WEINTRAUB:  That's what I mean.  For now, that's

9    what you mean, great.

10          THE COURT:  This is good.  Do petitioners' counsel

11   have any thoughts before I excuse Mr. Weintraub?

12          MS. LAFAILLE:  Your Honor, the affidavit previously

13   stated that there were five people arrested at USCIS in

14   Massachusetts and Rhode Island in January, and we've been given

15   a list of six names -- well, five names other than Ms. Calderon

16   and De Oliveira.  The list does not include, for example,

17   Ms. De Souza, who was also arrested at USCIS in January.  It

18   doesn't include one other individual that I'm aware of.  In

19   addition, there are USCIS offices in four other New England

20   states within the jurisdiction of the Boston Enforcement and

21   Removal Office, so we would ask that at some point ICE be asked

22   to provide more complete information about those arrests as

23   well.

24          THE COURT:  Okay.  To the extent there's a discrepancy

25   in the numbers, it sounds like there may be an error in the

1    affidavit that was provided by I think Mr. Lyons on the number

2    of people who were arrested.

3             MS. LAFAILLE:  That's right, Your Honor.

4             THE COURT:  He can be asked about that.

5             MS. LARAKERS:  Yes, Your Honor.  I just want to point

6    out quickly that affidavit was submitted I think back in

7    February.  And again, we only have Mr. Brophy doing the search.

8    So these things can develop.  He may have missed someone.  Mr.

9    Lyons' affidavit was from a long time ago, so it doesn't

10   necessarily mean there's a discrepancy.  It just means that --

11            THE COURT:  We'll see.  All I asked him was how many

12   people -- all I ordered him to tell us is how many people were

13   arrested at CIS offices in January in Rhode Island and

14   Massachusetts, as I recall.

15            MS. LAFAILLE:  Right.

16            THE COURT:  It's possible Mr. Brophy made a more

17   expansive search.  We'll see.

18            MS. LAFAILLE:  Right.  It seems that review missed at

19   least two people.

20            THE COURT:  We'll see.  We'll see if errors have been

21   made.  Violation of a court order -- you want to listen to

22   this.  Violation of a court order, if it's intentional,

23   willful, can be criminal contempt, a crime.  A lot of errors in

24   this case, including statements under oath, like the false

25   statement of Mr. Brophy's May 3 declaration.  But if there are

1   errors, mistakes, violations of the law, we need to find them

2   and find what the facts are.

3           All right.  I'm going to take a brief break for about

4   five minutes.  Mr. Weintraub, you can go.  I want you to -- if

5   the information about these cases can be e-mailed to Ms. Bono,

6   email them, but also come back after you can determine how long

7   it's likely to take you to get guidance from chief counsel's

8   office as to whether anything in that guidance is allegedly

9   privileged or protected.  But the guidance -- and you

10  understand this.  You know, the guidance is important because

11  I'm trying to ascertain what their policies and practices were

12  and whether they comport with the statues and regulations.  So

13  it's important to see them, I think.

14          MR. WEINTRAUB:  Certainly, Your Honor.  I'd need an

15  email address for Ms. Bono.

16          THE COURT:  Sure.  Come up here and get it.  Court is

17  in recess for five minutes.

18          (Recess taken 10:56 a.m. - 11:06 a.m.)

19          THE COURT:  So I'm sure Mr. Brophy knows that he's not

20  to leave.

21          MS. LARAKERS:  Yes, Your Honor, he does.

22          THE COURT:  And I think we'll resume with

23  Mr. Rutherford.  Would you get him, please?

24          MS. LARAKERS:  Yes, Your Honor.

25  CONTINUED EXAMINATION OF JAMES LEE RUTHERFORD:

```
1              THE COURT:  Mr. Rutherford, good morning.

2              THE WITNESS:  Good morning, sir.

3              THE COURT:  You can be seated.

4              THE WITNESS:  Okay.

5              THE COURT:  Do you understand that you're still under

6   oath?

7              THE WITNESS:  Yes, sir.

8              THE COURT:  And have you had talked to anybody

9   relating to this case or the issues in the case since you left

10  the courtroom yesterday?

11             THE WITNESS:  I just had a brief conversation with my

12  attorney this morning.  That's it.

13             THE COURT:  And did you read or hear anything about

14  the case in the media?

15             THE WITNESS:  No, sir, I did not.

16             THE COURT:  I asked you yesterday about training that

17  you had relating to the POCR regulation.

18             THE WITNESS:  Yes, sir.

19             THE COURT:  Have you had any training relating to the

20  POCR regulations since January of this year?

21             THE WITNESS:  Yes, sir.  Our office of chief counsel

22  came and gave an overview of the POCR process.

23             THE COURT:  Approximately when was that?

24             THE WITNESS:  Maybe February, March.

25             THE COURT:  How long was that training?
```

1          THE WITNESS:  I don't believe it was more than just a

2     couple of hours, sir.

3          THE COURT:  And do you know or have an understanding

4     of what caused that training to be given?

5          THE WITNESS:  No, sir.

6          THE COURT:  Did you discuss that training or any

7     training with Mr. Brophy before it occurred?

8          THE WITNESS:  I don't recall speaking to him about it,

9     sir.

10          THE COURT:  Who else received that training?

11          THE WITNESS:  If I remember correctly, it would have

12     been the officers assigned to the detained docket, along with

13     supervisory staff within the field office as well.

14          THE COURT:  Was everybody trained together?

15          THE WITNESS:  We were all put in the training room

16     within the field office, yes, sir.

17          THE COURT:  Were you given anything to read?

18          THE WITNESS:  I don't recall, sir.

19          THE COURT:  You don't recall one way or the other, or

20     you don't recall being given anything to read?

21          THE WITNESS:  I believe it was just a PowerPoint.

22          THE COURT:  And what are some of the most important

23     things, if any, that you remember from that training?

24          THE WITNESS:  The 90-day mark and the 180-day mark and

25     ensuring that we provide the detained individual with a notice

1   at least 60 days, at least 60 days.

2          THE COURT:  So you had that training in February or

3   March, correct?

4          THE WITNESS:  Yes, sir.

5          THE COURT:  Then you reviewed the file of De Souza on

6   April 27 and decided she should be detained as we discussed

7   yesterday, right?

8          THE WITNESS:  Yes, sir.

9          THE COURT:  And you didn't see any notice of that

10  detention review in her file, you testified yesterday; is that

11  right?

12         THE WITNESS:  Correct, sir, I didn't recall seeing it.

13         THE COURT:  And did you do anything when you didn't

14  see a notice in the file?

15         THE WITNESS:  Not that I can recall, sir.

16         THE COURT:  Did the training include instruction that

17  there had to be, under the POCR regulations, as ICE understands

18  them, a 30-day notice of a detention review?

19         THE WITNESS:  As I understand it, yes, sir.

20         THE COURT:  Is that part of the training?

21         THE WITNESS:  I would have to review the PowerPoint,

22  sir; I don't recall specifically.

23         THE COURT:  Do you have the PowerPoint?

24         THE WITNESS:  I may in my email archives.

25         THE COURT:  Well, I'm going to order the government to

```
1    get the PowerPoint.  You can look at it, you may consider it
2    privileged.  The privilege can be waived by the client.  But is
3    it your understanding -- all right.  Let me ask you this.  If
4    people -- if aliens are detained, arrested in Massachusetts, or
5    Rhode Island, say, or actually anywhere in the district, are
6    some of them then transported outside the district, to
7    Louisiana or other places?
8            THE WITNESS:  For removal, yes, sir.
9            THE COURT:  For removal?
10           THE WITNESS:  Yes, sir.
11           THE COURT:  So what's that practice?  Explain to me
12   what happens.
13           THE WITNESS:  Once an individual gets a final order of
14   removal and they are scheduled to, let's say El Salvador or
15   something to that effect where they do flights into the
16   country, they will stage individuals in Alexandria, Louisiana
17   for Air OPS, and they will fly so many on a plane back to their
18   home country.
19           THE COURT:  At what point in the process would
20   somebody arrested in Massachusetts be transferred outside of
21   Massachusetts?
22           THE WITNESS:  Once their case would be final with ICE
23   and immigration court.
24           THE COURT:  What makes it final?
25           THE WITNESS:  An immigration judge's order of removal.
```

 1          THE COURT:  Well, somebody like De Souza, for example,
 2    had a final order of removal, correct?
 3          THE WITNESS:  Yes, sir.
 4          THE COURT:  So when she was arrested on January 30,
 5    2018, pursuant to ICE's practices and policies, could she have
 6    been moved to Louisiana?
 7          THE WITNESS:  Or wherever else they would stage
 8    somebody, but not until we were in possession of a travel
 9    document.
10          THE COURT:  What's a travel document?
11          THE WITNESS:  Either a passport, or some countries
12    will issue -- similar to a boarding letter, it has a person's
13    biographical information on it along with a photo.
14          THE COURT:  If you have the passport, is that
15    sufficient to move somebody outside of Massachusetts?
16          THE WITNESS:  As long as the case is final, sir, yes.
17          THE COURT:  So if De Souza had an order of removal and
18    nothing pending in the immigration court and a passport, she
19    could have been transported to Louisiana or someplace else to
20    be removed to Brazil?
21          THE WITNESS:  She could have, yes, sir.
22          THE COURT:  And is that the general practice?
23          THE WITNESS:  Other times folks are removed from Logan
24    Airport or other locations, wherever we can get a commercial
25    flight, depending on the case.

1          THE COURT:  Are you aware of anybody who's been

2     arrested in Massachusetts, detained for more than 90 days, who

3     didn't get the notice at about 60 days and the decision at

4     about 90 days but is still detained outside of Massachusetts?

5          THE WITNESS:  I don't know, sir.

6          THE COURT:  Is that because you don't know what

7     happens after they leave Massachusetts or after they leave your

8     district?

9          THE WITNESS:  Once they would be transferred to

10     Alexandria, Louisiana, then the New Orleans field office would

11     be responsible for their case.

12          THE COURT:  And would they be responsible, as you

13     understand it, for complying with the POCR regulation?

14          THE WITNESS:  Yes, sir.

15          THE COURT:  Are you able to estimate about what

16     percentage of people arrested in Massachusetts are transported,

17     transferred outside of Massachusetts or -- well, transferred

18     outside of Massachusetts before 90 days?

19          THE WITNESS:  No, sir, I'm not.

20          THE COURT:  Is it a lot?  Is it common?

21          THE WITNESS:  Again, sir, I don't have an answer for

22     you; I don't know.

23          THE COURT:  All right.  Here, I want to shift gears.

24          THE WITNESS:  Yes, sir.

25          THE COURT:  When we stopped yesterday we were talking

1    about Ms. De Souza --

2         THE WITNESS:  Yes, sir.

3         THE COURT:  -- and your decision on April 27 that she

4    should continue to be detained?

5         THE WITNESS:  Yes, sir.

6         THE COURT:  Are you aware that on about May 3 she was

7    issued another notice that there would be a review of her

8    detention on about June 3?

9         THE WITNESS:  I don't recall that, sir.

10        THE COURT:  Did Ms. Brophy ever tell you that he

11   scheduled another review after the 30-day notice was given?

12        THE WITNESS:  Again, sir, I don't recall.

13        THE COURT:  Did Mr. Brophy ever discuss with you the

14   fact that Ms. De Souza hadn't received the process she was

15   legally entitled to under the POCR regulations because she

16   hadn't been given 30 days' notice before you conducted your

17   detention review and decision?

18        THE WITNESS:  Not that I can remember.

19        THE COURT:  Did Ms. Brophy ever discuss De Souza's

20   case with you?

21        THE WITNESS:  I believe the only time Mr. Brophy had

22   discussed it with me is when we received a stay application and

23   she was getting released.

24        THE COURT:  What did he say to you?

25        THE WITNESS:  That we were going to approve her stay

1  and release her from custody.

2              THE COURT:  Did he tell you why?

3              THE WITNESS:  No, sir.  That she had a stay and we

4  were going to release her, but I don't recall when that was.

5              THE COURT:  Did he point out to you that you hadn't

6  conducted -- the process leading up to your decision to detain

7  her had not been in accordance with the POCR regulations?

8              THE WITNESS:  I don't recall that being said, sir, no.

9              THE COURT:  Did he tell you there was no notice in the

10 file?

11             THE WITNESS:  Again, I don't recall, sir.

12             THE COURT:  Well, when did you have this discussion

13 with Mr. Brophy about her being released?

14             THE WITNESS:  The day that we received the stay

15 application, sir, and I don't remember what day that was.

16             THE COURT:  What was the date?  It was around May 8 --

17 when was she released?

18             MS. LAFAILLE:  Your Honor, the stay application was

19 filed April 30.  It was denied on May 2.  She was released on

20 May 8.

21             THE COURT:  So was that discussion on about May 8?

22             THE WITNESS:  I believe so, sir, yes.

23             THE COURT:  Two weeks ago?

24             THE WITNESS:  Yes, sir.

25             THE COURT:  Two weeks and a day.  Where were you and

1    Mr. Brophy when you had the discussion about De Souza's case?

2            THE WITNESS:  It would have been at his office, I

3    believe.

4            THE COURT:  How long was the discussion?

5            THE WITNESS:  No more than a couple of minutes, if I

6    were to provide a timeline.

7            THE COURT:  And what to the best of your memory did

8    Mr. Brophy say and did you say in that conversation?

9            THE WITNESS:  What I remember, sir, is we received a

10   stay application, and I believe Mr. Brophy said that we were

11   going to approve it and release her.

12           THE COURT:  What time of day was this meeting?

13           THE WITNESS:  I don't recall, sir.

14           THE COURT:  Was it in the afternoon?

15           THE WITNESS:  Again, sir, I don't recall.

16           THE COURT:  Do you recall that he told you I had

17   conducted a hearing on the morning of May 8?

18           THE WITNESS:  Not that I can recall, no, sir.

19           THE COURT:  Did he tell you that I had decided that De

20   Souza had been illegally detained?

21           THE WITNESS:  Not that I recall, no, sir.

22           THE COURT:  Did he tell you that he understood that

23   the court had ordered that De Souza be released?

24           THE WITNESS:  Again, not that I recall, sir, no.

25           THE COURT:  And you had decided that De Souza should

1    be detained, right?

2             THE WITNESS:  Yes, sir, I did.

3             THE COURT:  And then Mr. Brophy decided that she

4    should be released, right?

5             THE WITNESS:  Yes, sir.

6             THE COURT:  Did you ask him why?

7             THE WITNESS:  No, sir.

8             THE COURT:  Why not?

9             THE WITNESS:  He's the field office director.

10            THE COURT:  Do you know who -- are you aware that De

11   Souza was given a notice on about May 3 that she would have

12   another detention review on about June 3?

13            THE WITNESS:  I don't recall if I've seen that

14   document or not, sir.

15            THE COURT:  Do you understand today -- do you

16   understand today that ICE broke the law, acted illegally by not

17   giving De Souza the notice required by the POCR regulations

18   before you decided on April 27 that she should still be

19   detained?

20            THE WITNESS:  Yes, sir.

21            THE COURT:  Have you thought about the human

22   consequences of that?

23            THE WITNESS:  Yes, sir.

24            THE COURT:  What are your thoughts about the human

25   consequences of that illegal conduct?

```
 1              THE WITNESS:  By violating that, it's not --
 2              THE COURT:  What's that?
 3              THE WITNESS:  By violating that, it's not just.
 4              THE COURT:  And do you understand that there are other
 5    cases -- well, here, I want to play something for you, and I'm
 6    going to ask you whether you've seen this before.  It will be
 7    on your screen.
 8              (Video played.)
 9              THE COURT:  Have you ever seen that before?
10              THE WITNESS:  I saw it on the local news, sir, yes.
11              THE COURT:  What's that?
12              THE WITNESS:  I saw it on the local news.
13              THE COURT:  How did you feel when you saw it on the
14    local news?
15              THE WITNESS:  Personal opinion, sir, it's
16    heartbreaking.
17              THE COURT:  Do you think seeing that and having a
18    decision by me that ICE has at least in certain cases been
19    operating illegally in detaining people will have an impact on
20    how you do your job in the future?
21              THE WITNESS:  On a personal level, sir, I will
22    continue to make my best decision regarding every individual
23    case on its merits.
24              THE COURT:  Are you going to look to see if there are
25    notices in the file that comply with the POCR regulations as
```

1    you understand them?

2            THE WITNESS:  Yes, sir.

3            THE COURT:  When you saw that on TV, did you discuss

4    it with any of your colleagues or subordinates at ICE?

5            THE WITNESS:  No, sir, I did not.

6            THE COURT:  You didn't say to any of them, "I saw

7    Ms. De Souza being reunited with her son on TV and I realize

8    that we've been operating unjustly"?

9            THE WITNESS:  No, sir, I did not.

10           THE COURT:  Why?

11           THE WITNESS:  I have been in my position long enough,

12   and for me, this is a job.  There's also a human aspect to this

13   that I try to remind myself every single day that I'm not

14   dealing with articles.  I'm dealing with people.  And I try to

15   maintain that mindset, and I've tried to do that my entire

16   career.

17           THE COURT:  Then why didn't you discuss that with your

18   colleagues, that we made a mistake or we broke the law and it's

19   had serious harmful human consequences?

20           THE WITNESS:  A lot of times, sir, I keep my personal

21   opinion to myself.

22           THE COURT:  Well, you're a supervisor, right?

23           THE WITNESS:  Yes, I am, sir.

24           THE COURT:  You're the deputy director of the field

25   office?

1              THE WITNESS:  Yes, sir.

2              THE COURT:  Is it part of your responsibility to

3      assure that your colleagues and subordinates perform their

4      duties in a legal and proper way?

5              THE WITNESS:  Yes, sir, it is.

6              THE COURT:  Are you familiar with the Junqueira case?

7              THE WITNESS:  Not specifically, no.

8              THE COURT:  Do you know that Mr. Junqueira was

9      arrested at a CIS office on about February 1, 2018?

10             THE WITNESS:  I believe I saw email traffic on that,

11     yes, sir.

12             THE COURT:  And did you make any decisions relating to

13     his case?

14             THE WITNESS:  Yes, sir, to release him.

15             THE COURT:  And you made a decision to release him

16     when?

17             THE WITNESS:  I don't remember the date off the top of

18     my head, sir.

19             THE COURT:  Do you know whether or not Mr. Junqueira

20     ever received notice of a detention review -- here.  Let me

21     take a step back.

22             He was arrested on February 1, 2018.  Is it your

23     understanding that under the POCR regulations, he should have

24     had a detention review no later than 90 days later, say, May 1,

25     2018?

1          THE WITNESS:  If that would have been 90 days, yes,
2     sir.
3          THE COURT:  And that he was entitled -- is it your
4     understanding that he was entitled to notice of the detention
5     review approximately 30 days before the detention review?
6          THE WITNESS:  Yes, sir.
7          THE COURT:  So that would have been on approximately
8     April 1, correct?
9          THE WITNESS:  I believe so, sir, yes.
10         THE COURT:  And did you ever look at Junqueira's file?
11         THE WITNESS:  I don't recall seeing his file at all,
12     sir.
13         THE COURT:  Do you know whether he ever received what
14     I'll call a 30-day notice?
15         THE WITNESS:  I don't know, sir.
16         THE COURT:  Do you know whether any detention review
17     was conducted within 30 days?
18         THE WITNESS:  No, sir, I don't.
19         THE COURT:  Do you know that his wife was told on May
20     3 that she should come to the Burlington office because he was
21     going to be released?
22         THE WITNESS:  No, sir, I did not know that.
23         THE COURT:  Do you know that she drove several hours
24     from Connecticut and he wasn't released?
25         THE WITNESS:  Again, I did not know that, sir.

```
 1              THE COURT:  Do you know he was brought back to the
 2    Burlington office on May 4?
 3              THE WITNESS:  I did not know that, sir.
 4              THE COURT:  Do you know he wasn't released on May 4?
 5              THE WITNESS:  No, sir, I do not.
 6              THE COURT:  You said you made the decision to release
 7    him, right?
 8              THE WITNESS:  Yes, sir.
 9              THE COURT:  So do you know whether he was given a new
10    notice of a detention review to be conducted on June 3?
11              THE WITNESS:  No, sir, I don't know if he received
12    that.
13              THE COURT:  You just said that you made the decision
14    to release Mr. Junqueira.
15              THE WITNESS:  Yes, sir.
16              THE COURT:  How did that come about?
17              THE WITNESS:  Prior to that date, I instructed my
18    detain staff to review the dockets for anybody that was a final
19    order with no criminality and get them processed for release
20    unless they were being removed within the next two weeks.
21              THE COURT:  Why did you do that?
22              THE WITNESS:  I saw no reason to continue the
23    detention of somebody that posed no risk or flight risk to the
24    community at the time.
25              THE COURT:  And about how much before Mr. Junqueira's
```

1    release did you direct that that review be conducted?

2            THE WITNESS:  I believe it was at the same time, sir.

3            THE COURT:  Did you know about Junqueira before you

4    directed that the review be conducted of all the files?

5            THE WITNESS:  I don't recall if I was aware of the

6    case prior to, no, sir.

7            THE COURT:  So how did you become aware of Junqueira's

8    case?

9            THE WITNESS:  I believe my AFOD brought me the file.

10           THE COURT:  Did you ever discuss it with Mr. Brophy?

11           THE WITNESS:  I brought him the file, and I suggested

12   that Mr. Junqueira be released.

13           THE COURT:  And what did he say?

14           THE WITNESS:  If I recall correctly, he concurred.

15           THE COURT:  Did you know that Mr. Junqueira had a case

16   in Federal Court?

17           THE WITNESS:  I think I saw email traffic on that,

18   sir, yes.

19           THE COURT:  What is the date Mr. Junqueira was

20   released?

21           MS. LAFAILLE:  I believe it was May 10.

22           MR. POMERLEAU:  If I could, Your Honor, it was a

23   Thursday, and it was --

24           THE COURT:  That would be the 9th.  No.  Thursday was

25   the 10th, May 10.

```
 1            MR. POMERLEAU:  It was Thursday, May 10.  We actually
 2   brought an I-246 to the Burlington office.  My paralegal
 3   brought that in and we waited for --
 4            THE COURT:  An I-246 is what?
 5            MR. POMERLEAU:  Application for a stay of removal.  It
 6   was requested by ICE in order to release him.
 7            THE COURT:  They asked for it?
 8            MR. POMERLEAU:  That is correct.  They have to be
 9   hand-delivered.
10            THE COURT:  Who asked for it?
11            MR. POMERLEAU:  It was part of the settlement
12   agreement that we reached in the case.
13            THE COURT:  Settlement agreement between who,
14   negotiated between who?
15            MR. POMERLEAU:  Myself and Ms. Larakers.
16            THE COURT:  Were you told that -- were you told that
17   there was a hearing on May 8 and I had decided that
18   Mr. Junqueira was being detained illegally?
19            THE WITNESS:  I don't recall any conversation to that
20   effect, sir, no.
21            THE COURT:  Do you recall being told that the
22   attorneys for the government had agreed he should be released?
23            THE WITNESS:  I don't recall at this moment.
24            THE COURT:  How many cases in Federal Court have you
25   been involved with?
```

```
 1                  THE WITNESS:  Cases similar to this, this is the
 2       first.  In the early 2000s I was assigned to do criminal
 3       prosecutions for ICE in Oregon in approximately 330 cases.
 4                  THE COURT:  Cases with regard to illegal detention,
 5       this is the first one?
 6                  THE WITNESS:  Yes, sir, it is.
 7                  THE COURT:  And you don't remember what you were told
 8       two weeks ago?
 9                  THE WITNESS:  No, sir, I don't.
10                  THE COURT:  You don't remember whether or not you were
11       told that the attorneys had agreed that Junqueira should be
12       released?
13                  THE WITNESS:  No, sir, I don't.
14                  THE COURT:  You say you made that decision?
15                  THE WITNESS:  I made the decision to release him, and
16       it's ultimately the FOD's final decision whether or not the
17       person is released or not.
18                  THE COURT:  Did you decide to release anybody else, or
19       recommend --
20                  THE WITNESS:  There have been several.
21                  THE COURT:  -- that anybody else be released?
22                  THE WITNESS:  Sorry, sir?
23                  THE COURT:  Or recommend that anybody else be
24       released.
25                  THE WITNESS:  Yes, sir, I have.
```

1          THE COURT:  Since May 8?

2          THE WITNESS:  Ongoing, yes, sir.

3          THE COURT:  How many have you ordered released?

4          THE WITNESS:  If I would have to guess a number, maybe

5    20, sir.

6          THE COURT:  20?

7          THE WITNESS:  Maybe, yes, sir.

8          THE COURT:  Did you review each of their files?

9          THE WITNESS:  Yes, sir.

10         THE COURT:  Did you see any -- here.  Why did you

11   order their release?

12         THE WITNESS:  Several of them were final orders where

13   we could not obtain a travel document.  Some were Cuban

14   parolees that were encountered at the border and moved up here

15   for detention space.

16         THE COURT:  Had any of those people been detained more

17   than 90 days?

18         THE WITNESS:  I don't recall, sir.

19         THE COURT:  Had any of those people not received

20   30-day notices of a detention decision to be made about 90 days

21   after their arrest?

22         THE WITNESS:  Again, sir, I don't recall.

23         THE COURT:  Did you check to see?

24         THE WITNESS:  Again, going through every one of the

25   files, I don't recall seeing any of that paperwork.

1          THE COURT:  You don't recall seeing any notices?

2          THE WITNESS:  I don't recall seeing or looking for the

3     notices at this time.

4          THE COURT:  Well, you were trained in February or

5     March to understand that those notices had to be given,

6     correct?

7          THE WITNESS:  Yes, sir.

8          THE COURT:  And were you trained to understand that

9     those notices were important?

10         THE WITNESS:  Yes, sir.

11         THE COURT:  And did you understand that if people

12    hadn't been given the legally required process, they might have

13    a right to be released?

14         THE WITNESS:  Yes, sir.

15         THE COURT:  But you didn't look to see if the notices

16    were there in deciding whether people should be released?

17         THE WITNESS:  I don't recall seeing it, sir.

18         THE COURT:  You don't recall what?

19         THE WITNESS:  Seeing any document, sir, no.

20         THE COURT:  You don't recall seeing any notices?

21         THE WITNESS:  No, sir.

22         THE COURT:  30-day notices.

23         THE WITNESS:  I don't recall what was in the

24    individual files at this point, sir.

25         THE COURT:  Do you recall any in which there were no

1      30-day notices?

2              THE WITNESS:  I don't recall, sir, no.

3              THE COURT:  So about 20 people have been released --

4      you decided that about 20 people should be released after

5      May -- well, you said you ordered the review the day Junqueira

6      was released; is that right?

7              THE WITNESS:  I believe so, sir, yes.

8              THE COURT:  So let's say that was May 10.

9              THE WITNESS:  Okay, sir.

10             THE COURT:  And about 20 people have been released

11     since then?

12             THE WITNESS:  Approximately, yes, sir.

13             THE COURT:  Is there a reason those people weren't

14     released previously?

15             THE WITNESS:  I don't know, sir.

16             THE COURT:  We went over this yesterday in your

17     affidavit.  Was it your understanding that they were not

18     entitled to any individualized determination of whether they

19     should be detained or released at least before 90 days?

20             THE WITNESS:  That was my understanding, yes, sir.

21             THE COURT:  And was it your understanding that they

22     could be held for up to six months without any individualized

23     determination of whether they should be detained or released?

24             THE WITNESS:  No, sir.  As part of the POCR process,

25     they would get an individual determination.

```
 1          THE COURT:  Do you know that ICE has said that several
 2   people were arrested at the CIS office in Massachusetts and
 3   Rhode Island in January 2018?
 4          THE WITNESS:  I didn't know the number, sir, no.
 5          THE COURT:  (To clerk):  What is that, the Lyons
 6   affidavit?
 7          Who is Todd Lyons?
 8          THE WITNESS:  He is the other deputy field office
 9   director.
10          THE COURT:  Have you ever seen his declaration or
11   declarations in this case?
12          THE WITNESS:  No, sir, I have not.
13          THE COURT:  Did you have any discussion with him about
14   my order that ICE disclose how many people were arrested at CIS
15   in January 2018 in Massachusetts or Rhode Island?
16          THE WITNESS:  No, sir.
17          THE COURT:  Did you have any involvement in the case
18   of Ms. Calderon, who was released on February 13 after having
19   been arrested at a CIS office?
20          THE WITNESS:  No, sir.
21          THE COURT:  Did you discuss that with anybody?
22          THE WITNESS:  No, sir.
23          THE COURT:  Are you aware of anybody -- well, do you
24   understand now that De Souza was not given the process required
25   by the POCR procedures as you understand them when you decided
```

1    to detain her on April 27?

2            THE WITNESS:  Yes, sir.

3            THE COURT:  Do you know of anybody else who wasn't

4    given the process required by the POCR regulations as you

5    understand them in connection with their detention, continued

6    detention?

7            THE WITNESS:  No, sir.

8            THE COURT:  Do you think she was the only one?

9            THE WITNESS:  I don't know, sir.

10           THE COURT:  And you don't remember whether any of the

11   approximately 20 people you ordered or recommended be released

12   since May 10 didn't get the required notices?

13           THE WITNESS:  No, sir, I don't remember.

14           THE COURT:  You ordered a file review on May 10,

15   correct, of people to determine whether there were people in

16   detention who should be released?

17           THE WITNESS:  I used one of our systems and brought up

18   individual dockets of folks in detention and instructed my

19   staff to look at these cases for possible release.

20           THE COURT:  Had you ever done that before?

21           THE WITNESS:  Not in the seven months I've been here,

22   no, sir.

23           THE COURT:  Why did you do it then?

24           THE WITNESS:  As part of my continual learning in my

25   job, I want to make sure I'm understanding what my people are

1    doing on a day-to-day basis.

2         THE COURT:  And why did you decide to do that on May

3    10?

4         THE WITNESS:  With the De Souza case, it was apparent

5    that we may have some folks in custody that we could get back

6    out while either litigation or while we're attempting to get a

7    travel document to get them out of custody.

8         THE COURT:  Did you know on May 10 that on May 8 I had

9    decided that De Souza and Junqueira had been detained in

10   violation of the laws that the POCR regulations represent?

11        THE WITNESS:  Again, sir, I don't recall.

12        THE COURT:  I'm talking about something that happened

13   13 days ago, and this is the first case you've ever had in

14   Federal Court.  You don't recall whether anybody told you about

15   my decision?

16        THE WITNESS:  No, sir, I don't recall.

17        THE COURT:  All right.  Would petitioners' counsel

18   like to question?

19        MR. COX:  Yes, Your Honor.  I have questions from the

20   Calderon petitioners.

21        THE COURT:  Just one second, before we go on, have we

22   heard from Mr. Weintraub?

23        COURTROOM CLERK:  Not yet.

24        THE COURT:  Ms. Larakers, do you have Mr. Weintraub's

25   email?

```
 1              MS. LARAKERS:  I do, Your Honor.
 2              THE COURT:  I thought we were going to hear promptly
 3    about the people who were arrested.  Would you give to it to
 4    Ms. Bono, please, so she can write him and tell him that I'd
 5    like to get those files.  I thought he said that could be done
 6    very quickly.
 7              COURTROOM CLERK:  I believe I have his email.
 8              THE COURT:  He sent you the email?
 9              COURTROOM CLERK:  No, he hasn't.
10              THE COURT:  We have his address.
11              MS. LARAKERS:  Okay.  Would you like me to do
12    anything, Your Honor?
13              THE COURT:  No, I don't think so.  We'll go on and
14    then we'll get him back and see where we are.  Thank you very
15    much.  You may proceed.
16    EXAMINATION BY MR. COX:
17    Q.   Good morning, Mr. Rutherford.  My name is Jonathan Cox.
18    I'm one of the attorneys for the Calderon petitioners.
19    A.   Good morning, sir.
20    Q.   I just want to ask you a few questions starting with your
21    background and recent experiences at the ICE office.  So what
22    are your responsibilities as deputy field office director?
23    A.   I'm the --
24              THE COURT:  Here, speak into the microphone loudly and
25    clearly, please.
```

1          THE WITNESS:  Can I move it forward, sir?

2          THE COURT:  We'll see.

3          THE WITNESS:  Okay.

4    Q.   Can you repeat that?

5    A.   I'm the deputy field office director over custody

6    management and removals.

7    Q.   So what does that entail?

8    A.   Removing individuals from the United States and persons

9    currently in detention.

10   Q.   And does anyone report to you directly?

11   A.   I have one assistant field office director here locally in

12   Burlington, and then also the assistant field office director

13   for Providence, Rhode Island and Hartford, Connecticut.

14   Q.   What are their names?

15   A.   Aldean Beaumont is in Hartford, Connecticut and Vance Ely

16   is in Providence, Rhode Island.

17   Q.   When you said there was one locally, who was --

18   A.   Alan Greenbaum.

19   Q.   Alan Greenbaum.  And you report directly to Thomas Brophy,

20   correct?

21   A.   Correct.

22   Q.   And how long has Mr. Brophy been in your office?

23   A.   He's been detailed here since April of this year.

24   Q.   Would January be also a possibility, or February, pardon

25   me?

1    A.    Yeah.

2    Q.    Okay.

3    A.    Sorry.

4    Q.    And how often do you speak with Mr. Brophy?

5    A.    Up until the sequestration, daily.

6    Q.    And what do you speak with him about?

7    A.    We'll talk about work issues.  We'll talk about personal

8    stuff, family.

9    Q.    And if he ever gives you a directive or policy, how would

10   you communicate that to other people within your office?

11   A.    I will immediately notify my assistant field office

12   directors and instruct them to pass it out to their staff.

13   Q.    And how would you notify them, by phone, in person, email?

14   A.    All three, depending.

15   Q.    And then how do they notify other ICE employees?

16   A.    They do the same, either from email or in person.  And

17   sometimes we'll ask that they confirm that they've notified

18   their staff, depending on what it is.

19   Q.    The previous field office director was Christopher Cronen,

20   correct?

21   A.    Correct.

22   Q.    And he was the field office director when you arrived in

23   the office?

24   A.    Correct.

25   Q.    And where is Mr. Cronen now?

1   A.    Washington, D.C.

2   Q.    Do you know why he left the Boston field office?

3   A.    He took a promotion.

4   Q.    And did the ICE office change at all after Mr. Brophy

5   replaced Mr. Cronen?

6   A.    How so?

7   Q.    Any differences in policies, directives that agents were

8   given, anything like that?

9   A.    Yeah.  Mr. Brophy has put out that we'll no longer go to

10  CIS offices and work alongside them in regards to targeting or

11  arresting individuals that have a final order of removal that

12  are seeking an immigration benefit.

13  Q.    So just to separate that out, you said that his directive

14  was to not arrest individuals at USCIS interviews, correct?

15  A.    Unless they posed a threat to national security.

16  Q.    And also not to arrest individuals who were seeking

17  provisional waiver benefits; is that right?

18  A.    Correct.  Again, somebody seeking an immigration benefit,

19  ICE would not seek to take an enforcement action on.

20  Q.    An enforcement action, it wouldn't just be restricted to

21  arrests at USCIS interviews, right?

22  A.    Correct.

23  Q.    So it could be any time they would be -- they wouldn't be

24  subject to arrest unless they were some kind of a threat.  Is

25  that what you were told?

1    A.    Correct.

2    Q.    You're familiar with Ms. Lucimar De Souza, correct?

3    A.    Ms. De Souza, yes, sir.

4    Q.    And you're familiar with the circumstances of her arrest?

5    A.    I know that she was arrested at a CIS office.

6    Q.    And you're familiar with the circumstances of her

7    detention?

8    A.    Yes, sir.

9    Q.    And you submitted an affidavit in this case on April 23 of

10   this year; is that right?

11   A.    Yes, sir.

12   Q.    And that affidavit discusses the detention of Ms. De

13   Souza, right?

14   A.    Yes, sir.

15   Q.    And you were personally involved with the review of Ms. De

16   Souza's detention decision, correct?

17   A.    Yes, sir.

18   Q.    And you testified she was arrested on January 30 of 2018,

19   right?

20         THE COURT:  Mr. Cox, we're going to take a break until

21   about 12:00 noon.  Ms. Larakers, I assume you have

22   Mr. Weintraub's phone number?

23         MS. LARAKERS:  Yes, Your Honor.

24         THE COURT:  Give it to Ms. Bono.  I want to know why

25   we don't have the information on the people who were --

1          MS. LARAKERS:  Your Honor, I have that information.  I

2    can give that to you.  I assume what he's looking for upstairs

3    are the documents that you requested.  I know that one of the

4    documents, the audit, is shorter than the other ones.  So he's

5    probably trying to prioritize that process.

6          THE COURT:  I thought he was going to give priority to

7    getting us the information on the people who have been arrested

8    and detained?

9          MS. LARAKERS:  Yes, and I have that, I have that

10   information as well, so I can give that to her right now.

11         THE COURT:  You can give it to her?

12         MS. LARAKERS:  Yes, Your Honor, yes.

13         THE COURT:  I thought he said he had to review it.

14         MS. LARAKERS:  No.  He needs to review the POCR

15   guidance.

16         THE COURT:  Okay.  I want you to give Ms. Bono right

17   now everything that doesn't need to be reviewed.

18         MS. LARAKERS:  Yes, Your Honor.

19         THE COURT:  There was a miscommunication.  All right.

20   Then she'll come back and tell me when that's been

21   accomplished.  All right?  Sorry to interrupt, but I'm trying

22   to get us in a posture where we can use the afternoon

23   productively.  Court is in recess.

24         (Recess taken 11:55 a.m. - 12:13 p.m.)

25         THE COURT:  I've received the email Ms. Larakers sent

1    to the deputy clerk with Mr. Brophy's run-down of certain

2    people.  Do the petitioners' counsel have that, too?

3            COURTROOM CLERK:  Yes.

4            MR. COX:  Yes, Your Honor.

5            THE COURT:  Okay.  And I understand Mr. Weintraub was

6    making copies and will come as soon as possible.  So Mr. Cox,

7    you may resume.

8    BY MR. COX:

9    Q.   Mr. Rutherford, during the break did you speak at all with

10   your counsel?

11   A.   Briefly.

12   Q.   Did you speak at all about the substance of your

13   testimony?

14   A.   No, sir.

15   Q.   One clarifying question about what we were discussing

16   earlier.  Other than the changes regarding arrests at USCIS

17   interviews and arrests of people following the provisional

18   waiver process, were there any other policy changes or other

19   kinds of changes between Mr. Cronen and Mr. Brophy that you can

20   think of?

21   A.   Not off the top of my head, no.

22   Q.   So Ms. De Souza was arrested on January 30 of this year;

23   is that right?

24   A.   I believe so, yes.

25   Q.   And she was arrested at USCIS in Boston, right?

1    A.    I believe so, yes.

2    Q.    And she was arrested after an I-130 interview, right?

3    A.    Yes, sir.

4    Q.    And that interview was successful, correct?

5    A.    Yes, sir.

6    Q.    Since you've been in the office, has it been a common

7    practice to arrest individuals at USCIS interviews?

8    A.    Subsequent to my arrival?

9    Q.    Yes.

10   A.    I've heard that it's happened.  It no longer does.

11   Q.    While it was happening, how often did it happen, to your

12   knowledge?

13   A.    I don't know.  I'm not responsible for the enforcement

14   side of the house.

15   Q.    Approximately when was the instruction given not to make

16   any further arrests at USCIS interviews?

17   A.    If I had to guess, maybe April, but I could be incorrect.

18   Q.    Okay.  And that was after Mr. Brophy assumed the position

19   of acting field office director, right?

20   A.    Yes, sir.

21   Q.    Back when that practice happened, who would have

22   authorized an arrest at a USCIS interview?

23   A.    A field supervisor would be with the enforcement team when

24   they go out.

25   Q.    And why would ICE be interested in arresting somebody at

1  one of those interviews?

2  A.   I guess it would depend on the case, sir.

3  Q.   Would the fact that someone had a final order of removal

4  be a reason they might arrest someone there?

5  A.   Could be, yes, sir.

6  Q.   You testified yesterday you were not familiar with the

7  USCIS field manual, right?

8  A.   No, sir, I'm not.

9  Q.   Are you familiar with any USCIS policies regarding arrests

10  at USCIS?

11  A.   No, sir.

12  Q.   Are you familiar with any ICE policies other than the one

13  we just discussed about not making arrests at USCIS field

14  offices?

15  A.   No, sir.

16  Q.   How does an ICE agent find out that someone is going to be

17  at a USCIS interview?

18  A.   It could be a referral from CIS itself.

19  Q.   What do you mean by "a referral"?

20  A.   They would notify us somebody would be coming into the

21  field office.

22  Q.   Would that be an official USCIS communication?

23  A.   I don't know, sir.

24  Q.   So it could be an official communication or an informal

25  communication from a USCIS employee?

1    A.    I don't know, sir.

2    Q.    Earlier you said that USCIS would, quote, "work alongside"

3    ICE agents.  What did you mean by "work alongside"?

4    A.    Again, if they sent a referral our way, that's what I

5    would consider working alongside of us.

6    Q.    Do you know if ICE still receives referrals from USCIS

7    today?

8    A.    Not that I'm aware of, no.

9    Q.    And do you know when that practice stopped?

10   A.    No, sir, I don't.

11   Q.    Do you know how many other arrests ICE made at USCIS

12   offices -- the USCIS office in Boston in January, for example?

13   A.    I don't know the number, no, sir.

14   Q.    Do you know how many arrests they've made since January?

15   A.    No, sir, I don't.

16   Q.    Do you know whether it's higher or lower than the number

17   they made in January?

18           THE COURT:  Are you talking about CIS offices?

19           MR. COX:  Yes, Your Honor.

20   A.    No, sir, I don't.

21   Q.    So do you think there's been any change in the number of

22   arrests at USCIS?

23           MS. LARAKERS:  Objection.  He's already asked him if

24   he knows any number, and now he's asking again if he knows the

25   difference between two numbers he just said he didn't know.

1              THE COURT:  Well, he's permitted to test this a bit.

2    Overruled.

3    A.    Can you repeat your question?  I'm sorry.

4    Q.    So you don't know whether there's been any difference in

5    the number of USCIS arrests -- let me rephrase.  You don't know

6    whether there's been any difference in the number of arrests at

7    USCIS interviews in January versus April, for example?

8    A.    No, sir, I don't.

9    Q.    And that's true even though Mr. Brophy said that ICE was

10   no longer supposed to be making those arrests?

11   A.    I guess I don't understand your question.

12   Q.    You testified earlier that Mr. Brophy instructed you and

13   you instructed other agents that you were no longer supposed to

14   be making arrests at USCIS interviews unless there was some

15   public safety risk or national security risk, right?

16   A.    Correct.

17   Q.    So in light of that policy, you don't know whether there's

18   been a change in the number of arrests at USCIS interviews?

19   A.    With the field office director instructing our staff not

20   to make any arrests, there should not have been any arrests.

21   But if there have been, I personally am not aware of them.

22   Q.    And it's your position that ICE is still allowed to make

23   arrests at USCIS interviews, right?

24   A.    Yes, sir.

25              MR. COX:  And I'd like to hand up, Your Honor, a copy

1    of a Boston Globe article from March 11 of this year.

2              THE COURT:  May I see it, please?

3              MR. COX:  Yes.

4              THE COURT:  Do you have a copy you can give the

5    witness?

6              MR. COX:  Oh, yes.  May I approach the witness, Your

7    Honor?

8              THE COURT:  Yes.  Then you should also put it up on

9    the screen.

10             MR. COX:  Of course.

11             THE COURT:  What's the next number, 8?

12             COURTROOM CLERK:  9.

13             THE COURT:  9.  This will be, unless there's an

14   objection, Exhibit 9.  It's not offered for the truth of

15   anything that's in it, but I assume there's going to be some

16   questions.

17             MR. COX:  Yes, Your Honor.

18   BY MR. COX:

19   Q.   So Mr. Rutherford, this appears to be a Boston Globe

20   article from March 11, 2018; is that right?

21   A.   That's what's on here, yes, sir.

22   Q.   And if you look at the third page, I'm not sure if it's

23   paginated, but I'll put it on the screen here.  You can see

24   where I'm pointing on the ELMO starting with this paragraph

25   starting with, "John Mohan, a spokesman for ICE."  I'm looking

1    at this next paragraph here.  Could you read this paragraph

2    that I'm pointing here out loud.

3    A.   "It has always been the case that an arrest could happen

4    at USCIS offices, he said."  Do you want me to continue?

5    Q.   That's fine.

6    A.   Okay.

7    Q.   So that's an official statement from a spokesman for ICE,

8    right?

9    A.   Yes, sir.

10   Q.   And that was made after Mr. Brophy became acting director,

11   correct?

12        MS. LARAKERS:  Objection.  He's asking again about the

13   truth of this document.  He has no idea.

14        THE COURT:  You can rephrase the question, but it's

15   not for the truth of what's in it.  It's for the fact that this

16   person reportedly said it.  Go ahead.  Overruled.

17   Q.   And this article was from March 11, right?

18   A.   Yes, on the page.

19   Q.   And that's after Mr. Brophy became the acting field office

20   director in Boston, right?

21   A.   Yes.

22   Q.   And that's after he issued the directive to stop making

23   arrests at USCIS interviews except in extraordinary

24   circumstances, right?

25   A.   Yes.

1    Q.    So did Mr. Brophy -- I just want to clarify this.  Did

2    Mr. Brophy say anything about not making arrests outside of

3    USCIS offices?

4         Let me rephrase.  One part of his directive was that ICE

5    officers should not be making arrests at USCIS offices unless

6    there are extraordinary circumstances, correct?

7    A.    Correct.

8    Q.    Did he say anything about whether ICE officials could be

9    -- should not be making certain arrests outside of ICE offices?

10   A.    CIS offices?

11   Q.    Yes, CIS offices.  Excuse me.

12   A.    No, he did not use that language.

13   Q.    What language did he use?

14   A.    That we would not be making arrests at CIS offices.

15   Q.    Did he say anything about making arrests of those with

16   provisional waivers -- that are applying for provisional

17   waivers?

18   A.    Any individual seeking an immigration benefit that didn't

19   pose a threat to public safety or national security ICE would

20   not take an enforcement action on.

21   Q.    Period?

22   A.    Correct.

23   Q.    And I just want to be clear on this.  Setting aside what

24   Mr. Brophy has given as a directive, it's still your view that

25   ICE has the authority to make those arrests notwithstanding

1    this directive from Mr. Brophy?

2    A.    In cases that pose a threat to public safety and national

3    security.

4    Q.    Even setting aside cases that are not posing a risk to

5    national security and public safety, does ICE still have legal

6    authority to make those arrests?

7    A.    Yes, sir.

8    Q.    So if Mr. Brophy were to change his mind, ICE would still

9    be able to make those arrests at USCIS offices?

10   A.    Yes, sir.

11   Q.    You talked yesterday about some earlier directives you

12   received from Mr. Cronen; is that right?

13   A.    Yes, sir.

14   Q.    And Mr. Cronen said ICE agents should be arresting anyone

15   with a final order of removal; is that right?

16   A.    Correct.

17   Q.    Anyone -- well, let me rephrase.  He said you should be

18   arresting anyone subject to an enforcement action; is that

19   right?

20   A.    Correct.

21   Q.    So Mr. Brophy's directive narrowed the scope of

22   individuals that ICE officers should be arresting; is that

23   right?

24   A.    No, sir.

25   Q.    Why is that incorrect?

1   A.   We can still take an enforcement action on an individual.

2   We could use what is commonly referred to as a G-56 or a

3   call-in letter.  So if we were to get a referral from CIS, in

4   lieu of actually going out and physically arresting an

5   individual, we could send them a call-in letter and instruct

6   them to come into an ICE office to potentially put them on

7   reporting requirements.

8   Q.   That would apply to people who were applying for

9   provisional waivers?

10  A.   It could.

11  Q.   Okay.  And you said that Mr. Cronen -- again, Mr. Cronen

12  said that you were supposed to be arresting anyone with a final

13  order of removal, right?

14  A.   Correct.

15  Q.   And he said -- I believe you testified that was based on

16  an executive order; is that right?

17  A.   Yes, sir.

18  Q.   And what executive order do you have in mind?

19  A.   The Presidential executive order in regards to immigration

20  enforcement.

21  Q.   And what was the context of that order, to the best of

22  your recollection?

23  A.   To the best of my recollection, anybody that is in

24  violation of immigration law is subject to arrest.

25  Q.   So it's your understanding that, legally, ICE can arrest

1    anyone with a final order of removal?

2          MS. LARAKERS:  Calls for a legal conclusion, Your

3    Honor.

4          THE COURT:  He's just asking for his understanding.

5          MR. COX:  Yes, Your Honor.

6          THE COURT:  Overruled.

7    Q.   Let me restate it again.  Is it your legal understanding

8    that ICE can arrest anyone with a final order of removal?

9    A.   In certain cases, yes.

10   Q.   In what cases would ICE not be allowed to arrest someone

11   with a final order of removal?

12         MS. LARAKERS:  Again, calling for a legal conclusion,

13   Your Honor.  He can ask what the policy is with ICE, but he

14   can't ask about legal understanding when he doesn't have any

15   legal knowledge.

16         THE COURT:  I've spent two days asking them questions

17   of their understanding of the POCR regulations.  Look, there's

18   no jury here.  I'm not going to be deciding what the law is

19   based on this testimony, but I do think this is -- well,

20   Mr. Cox, why is this relevant?

21         MR. COX:  Again, I think it's similar to what we were

22   discussing the last couple of days, as you said.  It's relevant

23   to what the witnesses believe their legal constraints to be

24   rather than kind of the underlying truth of what those legal

25   constraints are.

```
1              THE COURT:  The objection is overruled.
2    Q.   We'll just get a clean record on that.  Is it your
3    understanding that ICE is permitted to arrest anyone with a
4    final order of removal?
5    A.   Yes, sir.
6    Q.   In your April 23 affidavit, you describe some of the
7    procedures that your office followed in making the detention
8    decision for Ms. De Souza; is that right?
9    A.   Yes.
10   Q.   And I believe we have a copy of Exhibit 8 that I'll just
11   hold up on the screen.  This is a copy of your affidavit?
12   A.   I have a copy right here.
13   Q.   Okay.  Is this a copy of your affidavit?
14   A.   It is.
15   Q.   And you testified yesterday that after a person is
16   arrested by ICE, there is an initial interview that happens; is
17   that right?
18   A.   Yes.
19   Q.   And you said that the interview determines whether there
20   would be some kind of impediment to detaining that person,
21   right?
22   A.   Special vulnerability, yes.
23   Q.   Those would be like health issues or children that need to
24   be taken care of; is that right?
25   A.   Yes, medical conditions.
```

1    Q.   You also testified that unless there was a special
2    condition that would impede detention, you would detain the
3    person, right?
4    A.   Yes.
5    Q.   What if the person wasn't a flight risk; would you still
6    detain a person if the person wasn't a flight risk or
7    dangerous?
8    A.   If they were a final order with a valid travel document,
9    yes.
10   Q.   And if they were a final order without a travel document?
11   A.   At this point no, because we would work to obtain a travel
12   document to effect their removal.
13   Q.   Would you work to obtain a travel document while they were
14   in custody or on supervised release?
15   A.   Both.
16   Q.   Under what circumstances does ICE consider supervised
17   release for someone with a final order of removal?
18   A.   If there are childcare issues, single parent caring for
19   children, in lieu of -- and they pose no threat to public
20   safety, ICE can release them on what is called an order of
21   supervision to include alternatives to detention.  Could be an
22   ankle bracelet or telephonic monitoring or just an order of
23   supervision where they would periodically report to an ICE
24   office and check in.
25   Q.   Let's imagine there's no flight risk or dangerousness for

1  a person, and let's also imagine that person didn't have any

2  special issues having to care for someone or something like

3  that.  Under those circumstances would you still detain them?

4  A.   Again, it would depend on the case.

5  Q.   Let's turn to, if you could turn to paragraph 7 of your

6  affidavit.  This is on page 4 of Exhibit 8.

7         THE COURT:  I don't think this has been admitted as an

8  exhibit yet, has it?

9         COURTROOM CLERK:  He's reading from Exhibit 8.

10        THE COURT:  Oh, it's Exhibit 8.  Okay.

11 Q.   I'm looking at the first paragraph within Section 7.  Do

12 you see that there?

13 A.   Yes, sir.

14 Q.   And once you've had a chance to read it, I just want to

15 understand correctly.  So this paragraph means that in your

16 view, ICE doesn't need to make an individualized determination

17 of dangerousness or risk of flight in order to detain someone,

18 right?

19 A.   In regards to Ms. De Souza's case?

20 Q.   Yes.

21 A.   Yes.  We factored into the fact that she had an absentia

22 order, her bond was breached, and she had filed several motions

23 to reopen with immigration court that had been denied.

24 Q.   So you didn't need to make a determination of

25 dangerousness or flight risk at the time she was arrested,

1    correct?

2    A.    I was not there, sir.

3    Q.    But the officer who did wouldn't have needed to make that

4    determination under your view?

5    A.    I guess I don't understand the question.

6    Q.    The arresting officer -- the arresting officer in this

7    case -- the person who authorized her detention was Stephen

8    Wells; is that right?

9    A.    Correct.

10   Q.    And when he made the decision to detain her, did he need

11   to consider dangerousness or flight risk?

12   A.    Yes, sir, he did.

13   Q.    And why did he need to make that determination?

14   A.    Again, if there were any special vulnerabilities and/or

15   flight risks, and that's the information that he would

16   ascertain prior to authorizing detention or putting her on an

17   order of supervision.

18   Q.    So he would need to make findings concerning dangerousness

19   and flight risk before placing Ms. De Souza in detention,

20   right?

21   A.    Upon her arrest.

22   Q.    Upon her arrest, true.  And you testified earlier that the

23   POCR review is supposed to occur 90 days into detention; is

24   that right?

25   A.    Correct.

1   Q.   Then ICE can detain for another 90 days before there's

2   another review; is that right?

3   A.   Correct.

4   Q.   Does ICE need to provide anything other than POCR review

5   to a detainee during that period?

6   A.   It's a notice of custody review.  No, I don't remember

7   exactly the wording on it.

8   Q.   But that's the only review that someone is guaranteed

9   while they're in custody for those 180 days?

10  A.   Correct.

11  Q.   In your affidavit you also talk about the risk

12  classification assessment or RCA; is that right?

13  A.   Yes, sir.

14  Q.   Are you familiar with the RCA?

15  A.   Briefly.

16  Q.   Have you ever completed one for a detainee?

17  A.   No, sir.  It came out after I left the field.

18  Q.   Okay.  When is an RCA completed?  Is it before or after

19  the arrest?

20  A.   Subsequent to the arrest.

21  Q.   Subsequent to the arrest.  And that's before every

22  detention is to be applied; is that right?

23  A.   Yes, sir.

24  Q.   Is that analysis done locally at the field office?

25  A.   The processing case officer completes it.

1    Q.    Okay.  And how does the processing case officer input

2    information for that RCA?

3    A.    Again, sir, I've never used it.

4    Q.    So you don't know what the output of RCA would look like?

5    A.    No, I don't, sir.

6    Q.    We've already discussed this is in your affidavit that

7    Stephen Wells was the supervisory detention and deportation

8    officer that made the detention decision for Ms. De Souza,

9    right?

10   A.    Correct.

11   Q.    Does Officer Wells report to you or someone else?

12   A.    To Deputy Field Office Director Todd Lyons through

13   Assistant Field Office Director Tina Grana Armstrong.

14   Q.    So he does not report directly to you?

15   A.    No, sir, he does not.

16   Q.    And Officer Wells considered Ms. De Souza's final order of

17   removal as part of his consideration, correct?

18   A.    Correct.

19   Q.    And he also considered the fact that Ms. De Souza is not

20   eligible for any immigration benefits that would allow her to

21   remain in the United States; is that right?

22   A.    Correct.

23   Q.    And he considered both of those things to be evidence of

24   flight risk; is that right?

25   A.    Correct.

1    Q.   Do you consider a final order of removal to be evidence of

2    a flight risk?

3    A.   Again, it would depend on the case, sir.

4    Q.   What would it depend on?

5    A.   If a person has failed to go before an immigration court

6    or if they have gone to an immigration court and received a

7    final order of removal and given a certain timeframe to depart

8    and then they fail to do so, I would consider that a flight

9    risk.

10   Q.   If someone was applying for a provisional waiver, would

11   that make them more or less of a flight risk in your mind?

12   A.   Seeking a provisional waiver, it's my understanding, would

13   just waive the inadmissibility as to their physical presence in

14   the United States.

15   Q.   You don't think it would make it less likely that they

16   would try to flee?

17   A.   I guess I don't -- in regards to a provisional waiver to

18   waive somebody's inadmissibility to the U.S. would allow them

19   to adjust their status, go foreign and come back in a more

20   rapid time than somebody with an outstanding removal order that

21   are subject to a five- ten- or 20-year bar to return to the

22   U.S. as a permanent resident.

23   Q.   How familiar are you with the provisional waiver process?

24   A.   I'm honestly not that familiar at all.

25   Q.   But you know it applies to people that are married to U.S.

1    citizens, for example, right?

2    A.    And other foreign nationals, yes.

3    Q.    Right.  And do you think that a marriage to a U.S. citizen

4    would make someone more or less of a flight risk?

5    A.    Potentially less, sir.

6    Q.    Is that something that is considered during the process to

7    make a detention determination?

8    A.    Yes, sir.

9    Q.    Does that process consider whether someone has U.S.

10   citizen children?

11   A.    All of those factors are considered, yes, sir.

12   Q.    You testified earlier that one of Officer Wells' reasons

13   was that Ms. De Souza was not eligible for any immigration

14   benefits that would allow her to remain in the United States;

15   is that right?

16   A.    Correct, sir.

17   Q.    Wasn't that finding incorrect?

18   A.    How so?

19   Q.    Well, you testified that -- you're aware that she was

20   applying for provisional waivers, correct?

21   A.    I knew that she was applying for an I-130.

22   Q.    So you didn't know that she was going to be -- was

23   applying ultimately to become a lawful permanent resident?

24   A.    The I-130 is the first step.

25   Q.    Okay.  So I-130 would give her certain immigration

1   benefits; is that right?

2   A.   It would establish the relationship between her and her

3   U.S. citizen spouse.

4   Q.   And that would be the first step towards getting some

5   immigration benefits; is that right?

6   A.   Yes, that is the first step.

7   Q.   So why wouldn't ICE consider that when determining whether

8   she was eligible for immigration benefits?

9   A.   An approved I-130 still would not allow her to physically

10  remain in the U.S. without having the other provisional waivers

11  as well.

12  Q.   Everybody that is applying for these provisional waivers

13  has to do the I-130 as the first step; is that right?

14  A.   I don't believe so, no.

15  Q.   Under what circumstances would that not be true?

16  A.   Somebody that is a non-immigrant that overstays their

17  visa, I believe, they can apply for a provisional waiver to

18  waive -- let's say they overstay their visa for five years and

19  they want to get a non-immigrant visa to come back to work for

20  a different company, they would to have to apply for a

21  provisional waiver for that.

22  Q.   Let's restrict it to people that are married to U.S.

23  citizens that want to get lawful permanent resident status

24  because of that marriage.  Every one of them would have to

25  start with an I-130?

1    A.   If they did not have an established relationship, yes.

2    Q.   So that would be the first step that someone in Ms. De

3    Souza's position would take towards getting immigration

4    benefits, right?

5    A.   Yes, sir.

6    Q.   We already discussed she was -- pardon me.  Ms. De Souza

7    was arrested, as we discussed earlier, she was arrested on

8    January 30 of this year; is that right?

9    A.   Yes, sir.

10   Q.   And that that was at the USCIS office in Boston; is that

11   right?

12   A.   Yes, sir.

13   Q.   And she was not detained during her removal period; is

14   that right?

15   A.   No, sir.

16   Q.   How is that wrong?

17   A.   I don't believe she was --

18   Q.   I'm sorry.  She was -- it is correct that she was not

19   detained --

20   A.   Yes, it is correct she was not detained.

21   Q.   And she was first detained -- let me step back.  Her

22   removal order became effective in 2002, right?

23   A.   Yes, sir.

24   Q.   So she was detained 16 years after her removal order

25   became final, right?

1    A.    Yes, sir.

2    Q.    How common is it in your experience for ICE to detain

3    someone after the removal period has ended?

4    A.    Again, it would depend on the case.  The removal orders

5    stay in effect until the person -- and I've seen some cases

6    where a person has adjusted status to a permanent resident

7    under a completely different identity which would negate the

8    removal order, or somebody that is encountered, like Ms. De

9    Souza, 16 years later.

10   Q.    Ms. De Souza was sent a Notice to Alien of File Custody

11   Review; is that correct?

12   A.    The custody determination worksheet, sir?

13   Q.    No.  The Notice to Alien of File Custody Review; is that

14   right?

15   A.    Do you have an exhibit I could take a look at to make

16   sure?

17   Q.    Let's see if I can find this.

18             MR. COX:  I believe, Your Honor, this is Exhibit 7.

19             THE COURT:  7?

20             MR. COX:  Yes, Your Honor.

21             THE COURT:  No.  7 is the affidavit of Andrade.

22             MR. COX:  Yes, Your Honor, and the notice --

23             THE COURT:  It's on there?  Okay.

24   Q.    Do you have a copy of this, Exhibit 7?

25   A.    Yes.

1    Q.   I'm looking at page 24 on top.  Do you see there, page 24

2    of 26?  Do you see that?

3    A.   I see page --

4         THE COURT:  I don't have page 24 in the version I

5    have.

6         THE WITNESS:  I don't either, sir.

7         MR. COX:  I can shortcut this.

8         May I approach the witness, Your Honor?

9         THE COURT:  Yes.

10        MR. COX:  I think I may have just given up our last

11   copy.

12   Q.   Sir, looking at this page 24 --

13   A.   Yes, I am.

14   Q.   What is this?

15   A.   As it states at the top, Notice to Alien of File Custody

16   Review.

17   Q.   This is the Notice to Alien of File Custody Review given

18   to Ms. De Souza on April 23; is that right?

19   A.   That's what it appears, so, yes.

20   Q.   And William Chambers is the person who signed this; is

21   that right?

22   A.   That's what it appears to be, yes.

23   Q.   Who is William Chambers?

24   A.   He is a deportation officer within the Boston field

25   office.

1   Q.   Is it his responsibility to issue Notices to Alien of File

2   Custody Review to people under his supervision?

3   A.   He is a jail liaison officer, and he is assigned to the

4   Suffolk House of Correction, so he would be responsible to

5   issue that from the case officers as the jail liaison.

6   Q.   So for someone detained in the Suffolk County House of

7   Correction, he would be the person responsible for giving them

8   the POCR notice in a timely manner; is that right?

9   A.   Yes, sir.

10  Q.   And this is dated April 23, 2018, right?

11  A.   Yes, it is.

12  Q.   And that was only a week before the review was supposed to

13  occur on April 30, right?

14  A.   Yes, sir.

15  Q.   And ICE didn't mail this notice to Ms. De Souza's counsel,

16  correct?

17  A.   I don't know, sir.

18  Q.   Is it common not to send notices to counsel, in your

19  experience?

20  A.   In my experience, no, sir, it's not.

21  Q.   Have you spoken with Officer Chambers about this notice?

22  A.   No, sir, I have not.

23  Q.   You haven't asked him why he only sent it to Ms. De Souza?

24  A.   No, sir.

25  Q.   And you haven't asked him why he sent it on April 23?

1    A.    No, sir.

2    Q.    You testified yesterday that you received Ms. De Souza's

3    POCR paperwork from Alan Greenbaum; is that right?

4    A.    Yes, sir.

5    Q.    And that's the assistant field officer that reports

6    directly to you, right?

7    A.    Correct.

8    Q.    Is he responsible for providing you with all of the POCR

9    files for detainees whose records are in review?

10   A.    Unless I'm out of the office, yes.

11   Q.    Did Mr. Greenbaum tell you anything when he gave you that

12   file?

13   A.    Not that I recall, no.

14   Q.    When did he give you that file?

15   A.    I don't recall the date.

16   Q.    Was it before April 27, do you think?

17   A.    Probably.

18   Q.    I'd like to show you what has been marked as Exhibit 2

19   from this hearing, although I believe there may have been a

20   redacted version that was handed up.  I want to make sure we're

21   using the correct version.  It doesn't have the alien number on

22   there.

23         Do you have Exhibit 2 in front of you?

24   A.    I have one that's stamped Exhibit 1 and Exhibit 2.

25   Q.    I believe that's the right one.  Let me just do this.

1   Does it look something like this?

2   A.   Yes.

3   Q.   So this is a decision to continue detention, correct?

4   A.   Yes, it is.

5   Q.   And you signed this on behalf of Thomas Brophy; is that

6   right?

7   A.   Yes, I did.

8   Q.   You signed it on April 27 of this year?

9   A.   Yes, I did.

10  Q.   That was four days after Ms. De Souza received the notice

11  of file custody review, correct?

12  A.   Yes, it is.

13  Q.   And that was three days before April 30, right?

14  A.   Yes, it was.

15  Q.   And April 30 was the date in the notice that the review

16  would occur, right?

17  A.   Yes, it is.

18  Q.   Did you know about the April 30 date when you reviewed her

19  POCR file?

20  A.   I don't recall if I did or not.

21  Q.   Is it your practice to check on the dates in notices when

22  you make your POCR review?

23  A.   Yes, sir.

24  Q.   Is it your practice to review notices for other things

25  when you make your POCR review?  Is it your practice to review

1  notices, POCR notices, when you make your POCR review?

2  A.   Yes, sir.

3  Q.   You typically make sure they're included in the POCR file

4  when you make your review?

5  A.   I do my best, yes, sir.

6  Q.   How often are they not in the file?

7  A.   I honestly couldn't give you a guesstimate, sir.

8  Q.   You testified yesterday that there was no notice in Ms. De

9  Souza's file; is that right?

10 A.   Correct.

11 Q.   And that is unusual?

12 A.   For me it would have been.

13 Q.   Did it strike you as unusual at the time?

14 A.   No, it did not.

15 Q.   So you didn't think to ask anyone about why the notice

16 wasn't in the file?

17 A.   No, sir, I didn't.

18 Q.   You didn't ask Mrs. Greenbaum?

19 A.   No, sir, I did not.

20 Q.   You didn't --

21      MS. LARAKERS:  Asked and answered, Your Honor.  He

22 asked him if he asked anyone.  He said no.

23      THE COURT:  Overruled.  Excuse me.  I don't know where

24 you're accustomed to practicing, but every objection doesn't

25 have to be in an angry tone of voice.  Just tell me what your

```
 1    objection is, and we'll have a dialogue on it.
 2              MS. LARAKERS:  Yes, Your Honor.
 3              THE COURT:  Go ahead.
 4    Q.   You didn't ask Officer Chambers about why the notice
 5    wasn't in there?
 6    A.   No, sir.
 7    Q.   You testified a couple minutes ago that you signed this on
 8    Mr. Brophy's behalf?
 9    A.   I did, sir.
10    Q.   Ordinarily does Mr. Brophy make these custody
11    determinations or do you?
12    A.   No.  He makes the final determination.
13    Q.   And why did you sign on his behalf for Ms. De Souza's?
14    A.   I believe he was on leave and out of the office.
15    Q.   Okay.  Did you also -- when Mr. Cronen was the field
16    office director, did he make the final decisions on POCR?
17    A.   He delegated that to myself and Deputy Field Office
18    Director Lyons.
19    Q.   So that was another change from when Mr. Cronen was field
20    office director --
21    A.   Yes, it is.
22              THE COURT:  Mr. Cox, when you reach a convenient
23    breaking point, Mr. Weintraub is back, and I want to see what
24    he has for us.
25              MR. COX:  Just a couple of more questions, Your Honor.
```

1    Q.   What files did you review when you made your POCR decision

2    for Ms. De Souza?

3    A.   She had a temporary administrative alienage file.  I'm not

4    sure where her permanent A file was, but her T file had all her

5    relevant immigration paperwork in it.

6    Q.   And what would that relevant immigration paperwork consist

7    of?

8    A.   It would have been records checks through the various DHS

9    systems to include the CIS database, which shows if somebody

10   applies for immigration benefits, if they have an immigration

11   file history, it would have been the final order of removal,

12   the IJ order, there would have been a copy of the warrant of

13   deportation, things like that.

14   Q.   Her file didn't include any submissions from her attorney,

15   correct?

16   A.   I don't recall seeing anything like that.

17   Q.   Is that something you would check for when you review a

18   file to see whether an attorney had submitted anything on --

19   A.   Yes, sir.

20        MR. COX:  Your Honor, I don't want to delay things too

21   much longer.  This is a convenient stopping point, and we can

22   resume.

23        THE COURT:  Okay.  And do you have a sense of how much

24   longer you have with Mr. Rutherford?

25        MR. COX:  I think 10 or 15 minutes.

1          THE COURT:  All right.  Mr. Weintraub, what have you

2     got for us?

3          MR. WEINTRAUB:  Well, I believe I sent down to the

4     court already the information regarding the arrests from USCIS

5     and AFOD Brophy's email asking for the audit.

6          THE COURT:  All right.  I haven't seen that.

7          MR. WEINTRAUB:  I'm sorry.  I've sent it down, but

8     I've got copies here.

9          THE COURT:  So okay.  What do you have?

10          MR. WEINTRAUB:  That's what I can produce now without

11     further labor, without further questions.  I apologize, Your

12     Honor.  I can see it already.  As far as the audit, by the time

13     we get back from lunch break, I hope to have an answer.  The

14     problem is that apparently there are ICE counsel in D.C. who

15     had never seen this, never heard of it, and they need to

16     authorize it.

17          THE COURT:  Wait a minute.  No, no, no.  What do you

18     mean they need to authorize it?  You've got a court order.  Do

19     you think I'm limited by attorneys in the ICE office?

20          MR. WEINTRAUB:  Your Honor, the question is --

21          THE COURT:  I've given you the opportunity to review

22     it, which frankly should have been done last night.  This is

23     not a 9:00 to 5:00 job.

24          MR. WEINTRAUB:  I'm sorry, Your Honor.  The concern

25     is, is there law enforcement sensitive, is there law

1    enforcement privileged material in that audit.

2         THE COURT:  What's the name of the person who is

3    reviewing it?

4         MR. WEINTRAUB:  Mr. Crowley is outside.  I believe he

5    has the answer to that.  I can check through an email string,

6    but I can in one moment go out and find out.

7         THE COURT:  So here.  Let's go on.  I mean, the

8    testimony was that -- Mr. Brophy's testimony was that he told

9    the general counsel that he was going to do the audit, and he

10   called Buffalo, and Lyons called Dallas, and they gave him

11   people to do the audit.

12        MR. WEINTRAUB:  That's not the issue.  The issue --

13   we're not suggesting that there's attorney-client privilege in

14   the audit itself.  The concern is that there may be law

15   enforcement sensitive or law enforcement privileged material

16   contained within --

17        THE COURT:  What's the law enforcement privilege?

18        MR. WEINTRAUB:  That law enforcement sensitive

19   material included in that that, would there be a protective

20   order, we would probably have addressed in a protective order.

21   It's my understanding there's not a protective order that

22   covers this yet.  Ordinarily, we wouldn't produce this without

23   being subject to a protective order, because there is

24   material -- there may be material, and this is all I'm trying

25   to ascertain, Your Honor --

1          THE COURT:  How long is it?

2          MR. WEINTRAUB:  It's ten pages.

3          THE COURT:  Have you read it?

4          MR. WEINTRAUB:  I have.  But I'm not an ICE -- I'm not

5     an ICE operations -- I'm not ICE operations counsel.  I have

6     recommended --

7          THE COURT:  Go ahead.

8          MR. WEINTRAUB:  I have -- it's my recommendation

9     that -- it's my counsel that there's nothing in here that seems

10    like a problem.  But if we produce it and then have to claw it

11    back later, that's not going to be possible in this situation,

12    Your Honor.

13         MR. PRUSSIA:  Your Honor, if it would expedite things,

14    petitioners would be happy for it to be submitted to the court

15    in camera based off of your judgement as to whether it contains

16    law enforcement sensitive materials.

17         THE COURT:  Well, I think I'd want to hear from them

18    before I make that judgment, but I am going to order that you

19    give me a copy so I can look at it over the break.  I had been

20    hoping petitioners' counsel could, too.

21         MR. WEINTRAUB:  May I approach?

22         THE COURT:  Just wait.  We'll try to keep you to one

23    trip.  What else do you have?

24         MR. WEINTRAUB:  The POCR guidance, as I mentioned

25    before, that we were sent contains several redactions that we

1    simply don't -- we don't know what the basis of those

2    redactions is.  It appears that this may have been produced in

3    a different piece of litigation, but we can't tell.  We don't

4    know the underlying rationale.  We can't necessarily at this

5    point defend the redactions, and so it's our concern that

6    again --

7              THE COURT:  Well, I think with regard to that one, the

8    way you're explaining it, it sounds as if you could give it to

9    both me and petitioners' counsel and you should be looking for

10   an unredacted version to see whether the unredacted version can

11   be disclosed.

12             MR. WEINTRAUB:  Again, I will let you know that we've

13   been attempting to do that.  The concern is that this may be an

14   older version, and the new versions, the unredacted versions

15   would be --

16             THE COURT:  Actually, that's important to me, too.

17             MR. WEINTRAUB:  That's why I'm trying --

18             THE COURT:  This is what Mr. Brophy looked at.

19             MR. WEINTRAUB:  Your Honor, that's what I explained to

20   ICE.  That's why I'm concerned.

21             THE COURT:  I will take the redacted version and then

22   we'll figure out what it is.  Because if it's an outdated

23   version, that's relevant.  If the current version is not

24   accessible to the people who have got to implement the law,

25   it's relevant.

1           All right.  That one you can give me and petitioners'
2    counsel, but with the understanding that -- I mean, I think
3    you've been careful, and it's good, that you're concerned that
4    it's not the unredacted version and you don't know the reasons
5    for the redactions.
6           MR. WEINTRAUB:  Certainly.
7           THE COURT:  Okay.  So the audit you'll give me for in
8    camera review, ex parte.  The guidance you'll give everybody.
9    We all have the email on the people who have been arrested at
10   CIS.  And that leaves, I think you also have Mr. Brophy's
11   notes.
12          MR. WEINTRAUB:  It's just an email to an individual
13   that initiated the -- it's not notes so much as this is what he
14   knew was the start of the process.
15          THE COURT:  Is there any problem with giving that to
16   petitioners as well as to me now?
17          MR. WEINTRAUB:  There is not.
18          THE COURT:  All right.  So you're going to give only
19   me the audit.  You're going to give petitioners and me the
20   redacted guidance with the understanding that it may not be
21   current and we don't know what's redacted or why.  And you're
22   going to give everybody the Brophy email to Buffalo.  And we
23   already have the email on the people detained.  So I think
24   that's everything --
25          MR. WEINTRAUB:  I think so, Your Honor.

1       THE COURT:  -- that you were dealing with.  Okay.

2       MR. WEINTRAUB:  May I approach?

3       THE COURT:  Good work.

4       MR. WEINTRAUB:  Thank you, Your Honor.

5       THE COURT:  Okay.  It's 1:00.  Did you say you thought

6  by 2:00 you could find out if there are any objections with

7  regard to the audit?

8       MR. WEINTRAUB:  That is certainly my expectation, yes,

9  Your Honor.

10      THE COURT:  All right.  Well, why don't you tell the

11  ICE lawyers that you made that representation to the court and

12  come back at -- you need to eat.  Come back at 2:00 and tell us

13  whether the petitioners can have the audit or whether there's

14  some issue.  And then we'll probably take another break so I

15  can read it.

16      MR. WEINTRAUB:  Certainly.  Thank you, Your Honor.

17      THE COURT:  In fact, here.  Come back at 2:15.  You

18  have to eat.  Okay?  And come back with your calendars, too.

19  It's possible, sadly, that we're not going to finish today.

20  And I probably would want you to come back on May 30 if we need

21  to continue.  But it could be the 29th or 30th or 31st.  But I

22  don't want you to have to travel on Memorial Day.  Okay?  Court

23  is in recess.

24      (Recess taken 1:02 p.m. - 2:53 p.m.)

25                    * * * * *

1          THE COURT:  I just met with Mr. Brophy and his lawyers

2     because I was told that they weren't prepared now to make the

3     May 16, 2018 memorandum that I was given for in camera review

4     available to the petitioners.  And I was told the respondents

5     may want to assert a deliberative process privilege and law

6     enforcement privilege.  And my immediate reaction was to issue

7     an oral order that respondents, if they wish to assert the

8     privilege, either of those privileges, file affidavits, motion

9     and memorandum tomorrow, May 24.

10          Part of the reason that I, after having reviewed this,

11     was hoping that it could be made immediately available to the

12     petitioners, as I said in the lobby, is it doesn't contain the

13     information that I thought I would find in it.  And the

14     document does have a number of recommendations.

15          Mr. Weintraub, now I've taken a breath.  I used to

16     work for the Attorney General, the Deputy Attorney General and

17     the U.S. Attorney's Office.  The deliberative process privilege

18     is an important one, but it doesn't protect facts that are

19     severable from opinions.  I don't know that the petitioners are

20     going to be primarily interested in the recommendations of how

21     things could be improved.  But I thought if they saw this, then

22     we could have a discussion about what else, and you can just

23     ponder this.  We'll discuss it again later this afternoon.

24          But, you know, I believe at the moment that the three

25     investigators, the two from Buffalo, the one from Dallas, could

1    be required to disclose the facts that they found in conducting

2    the audit even if their recommendations were withheld, which

3    maybe they should be.

4             MR. WEINTRAUB:  Your Honor, if I may?

5             THE COURT:  Sure.

6             MR. WEINTRAUB:  As I mentioned, Your Honor, we do have

7    the redacted version.  If Your Honor --

8             THE COURT:  Could I see the redacted version, please?

9             MR. WEINTRAUB:  I have it right here, Your Honor.

10            Your Honor, the privileges sought to be asserted are

11   texted into the redactions.  It's hard to see on the black and

12   white print.  If we printed out a color one, that would be in

13   red.  But I think you can still make out what they are.  And as

14   you can see, for the most part the redactions are of the

15   recommendations as I mentioned.

16            THE COURT:  So you're willing to give the redacted

17   version now?

18            MR. WEINTRAUB:  We can give -- if it means that we're

19   not going to have to argue about it and file a brief by

20   tomorrow --

21            THE COURT:  Well, I don't think before they see it we

22   can determine whether it means you're not going to have to

23   argue about it.

24            MR. WEINTRAUB:  Well, if we could review it in camera

25   maybe with petitioners so that it's not part of the docket here

1    today, then that's something I think we could do.  But, you

2    know, this was provided, so I don't think there's a problem

3    producing it in this fashion, Your Honor.

4         THE COURT:  Well, actually, I'm just glancing at this.

5    I'm going to make this Exhibit B under seal in camera.  So the

6    unredacted version is Exhibit A under seal in camera.  This is

7    Exhibit B under seal in camera.  It may be at very quick glance

8    that the redactions were made with the distinction between

9    facts and recommendations in mind that I just articulated, not

10   having a lot of time to think about it.  Because it does

11   keep --

12        MR. WEINTRAUB:  I do understand.  I apologize, Your

13   Honor, but I do understand that that was the discussion that we

14   had with agency counsel, was that if they're going to make

15   redactions, if they're going to make redactions and assert

16   privileges, those privileges have to be supportable.  And

17   facts, just because they are facts, even if they might not

18   necessarily reflect well on the agency, aren't redactable for

19   just that purpose, and I don't believe those redactions have

20   been proffered by the agency here, Your Honor.

21        THE COURT:  All right.  But it leaves open the issue

22   that essentially the data underlying the facts that are

23   unredacted is not included in this report.

24        MR. WEINTRAUB:  I don't believe -- I would be

25   surprised if it had been represented to the court that the

1    underlying data was.

2         THE COURT:  Well, I don't think it was discussed.  I

3    just thought --

4         MR. WEINTRAUB:  You know, that was not the purpose, I

5    don't believe, of the audit.  Acting AFOD Brophy could testify

6    to that, but I think that the testimony we've heard was he saw

7    problems, he wanted to see how deep those problems ran and what

8    the recommendations would be to fix them.  And it's the

9    recommendations that we're suggesting, you know, are exempt

10   from review by petitioners' counsel.

11        THE COURT:  All right.  But I expect that there's

12   going to be a desire and perhaps a need to get the underlying

13   facts.

14        MR. WEINTRAUB:  Ordinarily I would suggest that if the

15   case got to discovery and we got to that stage, then we could

16   address that then.

17        THE COURT:  We're in discovery now.  I wanted to cut

18   through that.  When I started this earlier this month, there

19   were people detained in violation of law.  And rather than have

20   you go off and do depositions and come back, file briefs, and

21   this thing take months, I thought it would be most efficient

22   and fair to just have a hearing to develop the facts.

23        MR. WEINTRAUB:  I understand.

24        THE COURT:  So the idea is, you know, there may be

25   some written document with the facts.  Mr. Brophy testified

1    yesterday, you know, to the small number of cases where notices

2    hadn't been sent or hearings, decisions hadn't been made in 90

3    days.

4         I expected to see that here.  I thought there would be

5    findings that said we've reviewed 100 cases and we found, you

6    know, four of them no notices were sent or they were sent late

7    and the decisions weren't made, based on what he said

8    yesterday.  That kind of information is not in here.

9         MR. WEINTRAUB:  But Your Honor is not amenable to

10   permitting us to produce the redacted version and see how

11   petitioners --

12        THE COURT:  Yes -- no, actually --

13        MR. PRUSSIA:  I was just going to rise to say that we

14   would accept that.  We would take a redacted version now.  And

15   what I'm hearing from my brother is that he needs a little bit

16   more time to first of all ascertain whether or not he wants to

17   assert a privilege.

18        MR. WEINTRAUB:  Certainly a privilege beyond the

19   redactions.

20        MR. PRUSSIA:  If you do, the basis for that privilege.

21   And we would be amenable, if it pleases the court, to allow the

22   government some reasonable period of time for them to be able

23   to make that determination.  In the meantime we'll take the

24   redacted version and proceed on that basis.

25        THE COURT:  I think that the -- so in the

1   circumstances, I think petitioners should be given the redacted

2   version, should talk about whether more is necessary, but I do

3   want to tell petitioners, because we shouldn't have a fight

4   over the redactions that I think are not likely to be of

5   interest to you.  They didn't redact what I thought I would

6   find in there.  It does appear that there are recommendations

7   how to improve the staffing and the internal processing, but it

8   doesn't include the figures on which the factual issues are

9   based.  Some of that, not much, or some opinion.

10          Just by way of example, one of the headings is

11  Untimely Service Or Failure to Serve Notice of File Review and

12  Failure to Comply Forms, and then it says, "It is recommended,"

13  and there are a couple of lines redacted, but the information

14  redacted wouldn't tell you how many cases it was untimely

15  service or failure to serve notice of file review.

16          MR. WEINTRAUB:  Your Honor, it's not in the

17  government's interest to withhold from petitioners information

18  that we think they're entitled to.

19          THE COURT:  Well, I appreciate that.  You're right.

20  All right.  Exhibit B will stay under seal, I think.

21          MR. WEINTRAUB:  Thank you, Your Honor.

22          THE COURT:  You should give copies to the petitioners,

23  and then we're going to meet at the end of the day to see where

24  we are and where we're going.  And so I'm revoking my order

25  about your having to file tomorrow, but when we schedule a

1    continuation of the hearing --

2         MR. WEINTRAUB:  Thank you, Your Honor.

3         THE COURT:  -- you should check and make sure the

4    three people who this memo is said to be from are available, or

5    you should let them know.

6         MR. WEINTRAUB:  That they ought to make --

7         THE COURT:  That they should be making their plans to

8    be here if needed.  And I actually wonder about that redaction

9    because this memo is said to be from three people but only two

10   of their names were redacted anyway.

11        MR. WEINTRAUB:  Frankly, Your Honor, I believe the

12   testimony earlier and yesterday's testimony from AFOD Brophy

13   disclosed those names.  We need to check.

14        THE COURT:  Here.  That's fine.  Why don't you give

15   them redacted copies.

16        MR. WEINTRAUB:  I've done that, Your Honor.

17        THE COURT:  You did it when?

18        MR. WEINTRAUB:  Just as we were standing here, I

19   handed them a copy.

20        MR. PRUSSIA:  Just to be clear, this is under seal?

21        THE COURT:  Yes.

22        MR. WEINTRAUB:  Yes.

23        MR. PRUSSIA:  Okay.  We'll treat it as such.

24        MR. WEINTRAUB:  Thank you, Your Honor.

25        THE COURT:  All right.  Why don't we complete

1    Mr. Rutherford as efficiently as possible.  What?

2             MR. POMERLEAU:  Your Honor, just very briefly, there

3    was a development over the lunch break I wanted to inform the

4    court of.

5             THE COURT:  There was what?

6             MR. POMERLEAU:  A development over the lunch break

7    regarding Mr. Dos Santos' detention.  So ICE is going to

8    release him from the Burlington office around 4:00 this

9    afternoon.  He wanted me to be there with him.

10            THE COURT:  Do you want to be excused?

11            MR. POMERLEAU:  I was just going to ask if I could be

12   excused for that purpose, Your Honor, in light of these

13   circumstances.

14            THE COURT:  Yes, you may be excused.

15            MR. POMERLEAU:  Thank you so much, Your Honor.

16            THE COURT:  But I am ordering that tomorrow morning --

17   so you anticipate once he's released the case will be

18   dismissed, right?

19            MR. POMERLEAU:  Yes.

20            THE COURT:  Okay.  When do you want to report on that?

21            MR. POMERLEAU:  Can we keep that same date of Tuesday

22   by close of business?

23            THE COURT:  That's fine.  I don't want Mr. Sady

24   distracted at his graduation tomorrow.

25            MR. POMERLEAU:  Understood, Your Honor.  Thank you.

1          THE COURT:  That's fine.

2          MR. POMERLEAU:  Have a good day.  Thanks so much.

3          THE COURT:  It's too late for that, but thank you.

4          I was going to suggest that we finish with Mr. Brophy

5     for now, that Mr. Lyons testify at least briefly, and then that

6     Mr. Brophy come back to begin some things at least about the

7     other people who were detained, arrested and detained after

8     they were arrested at CIS, and then we'll need to discuss

9     scheduling, okay?  We'll proceed in that fashion.  Let's get

10    Mr. Rutherford back.  And Mr. Cox, you should get ready to

11    question him.

12         MR. WEINTRAUB:  Yes, Your Honor.

13         THE COURT:  Okay.  You may continue.

14    BY MR. COX:

15    Q.   Good afternoon, Mr. Rutherford.  I just have a few more

16    minutes of questions.

17    A.   Okay.

18    Q.   So I'd like to return to discussing Ms. De Souza's

19    detention and release.  So you were the one who made the

20    decision to give her the second notice of file custody review;

21    is that right?

22    A.   No, sir.

23         MR. COX:  Your Honor, I'd like to mark as -- this may

24    already be Exhibit 4 but I don't see it up here.  Docket number

25    67, that's an exhibit already?

```
1              MR. WEINTRAUB:  Exhibit 4 was the video.
2              MR. COX:  Oh.
3              THE COURT:  It's Exhibit 5, the Brophy affidavit.
4              MR. COX:  That's correct, yes.
5    Q.   I'd like to direct your attention to paragraph 7.  This is
6    on page 2.  Are you --
7    A.   I see what you're referring to.
8    Q.   So it says there that you made the decision to schedule a
9    new review of Ms. De Souza's custody on or about June 3, 2018;
10   is that correct?
11   A.   Maybe I misspoke.  It would have to be correct then.  I
12   just don't recall.
13   Q.   Okay.  Did you speak with Mr. Brophy before he prepared
14   his affidavit?
15   A.   Before he prepared his affidavit?
16   Q.   Yes.
17   A.   No, I did not.
18   Q.   Did he speak with you about anything concerning whether
19   you sent Ms. De Souza a new notice of file custody review?
20   A.   As I stated yesterday, no, we did not discuss his
21   affidavit.
22   Q.   I'd like to mark as Exhibit 9 I think the Notice to Alien
23   of File Custody Review.  This is a redacted version.  I'll hand
24   up copies.  And this does have one redaction with the alien
25   number.  And this is the May 3 notice of file custody review.
```

| 1 | THE COURT:  Thank you.  We'll mark that as Exhibit 10. |
| 2 | MR. COX:  May I approach the witness? |
| 3 | THE COURT:  Yes. |
| 4 | Q.   Do you recognize this document? |
| 5 | A.   First time I've seen it. |
| 6 | Q.   Okay.  So this is another Notice to Alien of File Custody |
| 7 | Review? |
| 8 | A.   Correct. |
| 9 | Q.   Issued on May 3 to Ms. De Souza; is that right? |
| 10 | A.   The date is a little -- could be May 3, yes. |
| 11 | Q.   Okay.  That was also by William Chambers; is that right? |
| 12 | A.   That appears to be his signature, yes. |
| 13 | Q.   If you look where I'm pointing here in the second |
| 14 | paragraph, it says, "Your custody status will be reviewed on or |
| 15 | about June 3, 2018"; is that right? |
| 16 | A.   I see that, yes. |
| 17 | Q.   But you didn't make that determination what that date |
| 18 | would be? |
| 19 | A.   Not that I recall, no. |
| 20 | Q.   Do you know why a notice would have been sent so soon |
| 21 | after you had denied her release based on her first POCR |
| 22 | review? |
| 23 | A.   No, sir, I don't. |
| 24 | Q.   Okay.  You testified this morning that you received two |
| 25 | hours of training on POCR procedures in February or March of |

1    this year; is that right?

2    A.    Correct.

3    Q.    Is that the only POCR training you've received since you

4    joined the ICE office in Boston?

5    A.    The ICE office in Boston, yes.

6    Q.    Okay.  Was there a recent audit of the ICE office POCR

7    procedures here in Boston?

8    A.    Yes.

9    Q.    Are when was that audit conducted?

10   A.    The 8th through the 17th.

11   Q.    Who conducted the audit?

12   A.    Three officers from different offices came in to conduct

13   the audit and to assist with reviewing the cases with the

14   officers.

15   Q.    Did those individuals speak to you as part of that audit?

16   A.    Only briefly.

17   Q.    And what did you discuss?

18   A.    I was actually out of the office when they first were

19   identified to come into the office, and I did not arrive back

20   until mid to late of the first week, and they were already in

21   the progression of conducting their audit.  I just stayed and

22   let them do their thing for the time being.

23   Q.    Did you provide them any documents?

24   A.    No, I did not.

25   Q.    Did you provide them with any other information?

```
 1   A.    Such as?

 2   Q.    Well, you didn't speak with any of them, right?

 3   A.    Just a general hello.

 4   Q.    Just a general hello?

 5   A.    Yeah.

 6   Q.    Okay.  For example, did any of the assistant DFODs or

 7   assistant FODs speak with them that worked for you?

 8   A.    They dealt directly with Alan Greenbaum, the AFOD there in

 9   Burlington.

10   Q.    And do you know what triggered the audit?

11   A.    The acting FOD wanted to bring some folks in with

12   reviewing POCR custody cases.

13   Q.    Did you speak with Mr. Brophy about the audit?

14   A.    No.  This was decided when I was out of the office.

15   Q.    Have you heard anything about the results of the audit?

16   A.    I have it.  I have not yet reviewed it.

17   Q.    When did you receive the results?

18   A.    I want to say it was the 17th.

19   Q.    So about a week ago; is that right?

20   A.    Yes.

21   Q.    Have there been any changes in the office since that audit

22   was completed?

23   A.    I have instructed my assistant field office director on a

24   biweekly basis he is to provide me with the status of every

25   person in detention as to where they stand POCR-wise, and also
```

1    I review the case management system to identify cases that we

2    could possibly release.

3    Q.    Is the first biweekly review going to be next week?

4    A.    It should be Friday, if I'm in the office.

5    Q.    It should be Friday?

6          THE COURT:  Biweekly, does that mean every other week?

7          THE WITNESS:  Yes, sir.

8    Q.    What will that biweekly review involve?

9    A.    Again, I instructed him to provide me all the cases that

10   they have in custody and where we stand as to their POCR

11   status.

12   Q.    Are you planning to personally review those cases?

13   A.    My staff will, and they'll provide me the results.

14   Q.    Are you providing any guidance to your staff about what

15   they should look at when they make that review?

16   A.    To ensure that we're in compliance with the POCR

17   guidelines.

18   Q.    And those are the guidelines that are published on the

19   insight page, right?

20   A.    Correct.

21   Q.    You said that Mr. Brophy was the one who decided to

22   release Ms. De Souza; is that right?

23   A.    Yes, sir.

24   Q.    And that was on May 8; is that right?

25   A.    I believe so.

1    Q.    And you said he did that because of a pending I-246

2    application; is that right?

3    A.    I believe so, yes.

4    Q.    Okay.  He didn't say anything about this court case?

5    A.    Not that I recall, no.

6    Q.    He didn't say anything about media coverage?

7    A.    Not that I recall, no.

8    Q.    Was the I-246 application the only reason he gave you for

9    this release decision?

10   A.    From what I recall, we had a stay, and he said we're going

11   to release her.

12   Q.    Just a couple more questions.  I'd like to turn back to

13   the announcement of Mr. Brophy's directive not to make any more

14   arrests at USCIS interviews.  How did Mr. Brophy communicate

15   that policy to you or that directive to you?

16   A.    He told myself and the other deputy in person to let the

17   staff know.

18   Q.    That's you and Mr. Lyons; is that correct?

19   A.    Correct.

20   Q.    Do you remember approximately when you had that

21   conversation with him?

22   A.    No, I don't.

23   Q.    Even the month?

24   A.    No, I don't.

25   Q.    How long was that conversation?

1    A.    Five minutes maybe.

2    Q.    And what exactly did he tell you in that conversation?

3    A.    That we're to no longer make arrests at USCIS offices

4    unless it's somebody that poses a public safety threat or

5    national security.

6    Q.    Did he say anything else about arrests outside of the

7    USCIS offices?

8    A.    I don't understand your question, sir.

9    Q.    Right.  So you said he mentioned his directive was not to

10   arrest anyone at USCIS offices unless they were a national

11   security issue or otherwise a danger to the public, right?

12   A.    Correct.

13   Q.    Did he say anything about arrests that weren't at USCIS

14   offices?

15   A.    So for somebody that would be considered non-criminal?

16   Q.    Correct.  In other words, what I'm trying to get at --

17   well, what I'm trying to get at is you said, you talked about

18   not making arrests at USCIS offices, right?

19   A.    Correct.

20   Q.    Did he also say anything about not making arrests of

21   anyone pursuant to a provisional waiver application --

22   A.    So an individual seeking an immigration benefit?

23   Q.    Correct.

24   A.    Not specifically, no.

25   Q.    So the conversation was restricted to discussion of

1    arrests at USCIS offices?

2    A.    From what I can recall, yes.

3    Q.    Have you had any substantive conversations with Mr. Brophy

4    about this?

5    A.    No, sir, we have not.

6    Q.    Have you spoken with other staff members about that

7    directive you received?

8    A.    Only when I passed it out to my staff.

9    Q.    And who did you pass that along to?

10   A.    Again to my assistant field office directors,

11   Mr. Greenbaum, Ms. Beaumont and Mr. Healy.

12   Q.    And did they pass that along to anyone else?

13   A.    To their staff.

14   Q.    Is that written down anywhere?

15   A.    No, it's not.

16   Q.    So you didn't put it in an email?

17   A.    No, sir.

18   Q.    You don't know of any staff members that have put it in

19   emails?

20   A.    I don't know of an email, sir.

21   Q.    No memos on that?

22   A.    No, sir.

23   Q.    Forgive me, I may have missed it.  Was your conversation

24   with Mr. Brophy in person when you discussed this?

25   A.    From what I recall, yes.

1   Q.   Did he say anything about media coverage or arrests at

2   USCIS interviews?

3   A.   Not that I recall, no.

4   Q.   Did he say anything about court cases?

5   A.   Not that I recall, no.

6   Q.   Have you ever had any conversations with Mr. Brophy about

7   court cases?

8   A.   Only when we were sequestered and received this notice

9   that we were coming to court, that we were no longer to speak

10  about any of the -- on any of this.

11  Q.   But you spoke with Mr. Brophy about that?

12  A.   Only for the fact that we were sequestered, yes.

13  Q.   Okay.  You would agree this is an important case, right?

14  A.   Yes, sir.

15  Q.   And a key part of that is -- a key part of this case are

16  the arrests that were made at USCIS interviews here in Boston,

17  right?

18  A.   Yes, sir.

19  Q.   In light of that, would you agree that Mr. Brophy's

20  directive not to make arrests at USCIS interviews would be

21  relevant to this case?

22  A.   Yes, sir.

23  Q.   But it wasn't written down anywhere?

24  A.   No, sir.

25  Q.   If someone violates that directive, are they subject to

1    any discipline?

2    A.   They could be, yes, sir.

3    Q.   What kind of discipline would they be subject to?

4    A.   ICE has a table of disciplinary penalties that we go by.

5    Q.   What, for example, might the discipline be for someone who

6    violated that directive?

7         MR. WEINTRAUB:  Objection, Your Honor.  Lacks

8    foundation.  He hasn't testified that he knows anything about

9    those directives or the discipline.

10        THE COURT:  All right.  Ms. Larakers is not doing this

11   any more?

12        MS. LARAKERS:  Your Honor --

13        THE COURT:  Usually one lawyer would speak for each

14   witness, but that's okay.  Sustained.  But if you would have

15   made the same objection, I would have sustained it, too --

16        MS. LARAKERS:  Thank you, Your Honor.

17   Q.   Are you familiar with --

18        THE COURT:  -- politely.  Go ahead.

19   Q.   Are you familiar with the kinds of discipline that are set

20   out in these guidelines?

21   A.   Yes, I am.

22   Q.   And what kind of discipline, what sort of disciplinary

23   options are there?  What's the range of options that an ICE

24   officer might face for violating a directive?

25   A.   Anywhere from a letter of counseling to time off.

1    Q.   And what's an example of a disciplinary action an ICE

2    officer might face for arresting someone at a USCIS interview?

3    A.   Well, I've never encountered that, sir, so I can't give

4    you a direct answer to that.

5    Q.   But they would be subject to some discipline?

6    A.   That would be failure to follow a directive, yes.

7    Q.   And who would impose that discipline?

8    A.   Their first line supervisor.

9    Q.   We've already discussed that Ms. De Souza was arrested at

10   USCIS, right?

11   A.   Yes, we have.

12   Q.   And under the new directive from Mr. Brophy, she shouldn't

13   have been arrested; is that right?

14   A.   Currently, correct.

15   Q.   Okay.  You personally reviewed her file in April to

16   determine whether she should be released, right?

17   A.   Yes, I did.

18   Q.   And you saw in that file that she had been arrested at her

19   I-130 interview, right?

20   A.   I read the arrest report, yes, I did.

21   Q.   And despite that, you didn't decide that she should be

22   released?

23   A.   Correct.

24   Q.   Do you think what happened to Ms. De Souza was right?

25   A.   I don't have a personal opinion to it, sir.  She had an

1    absentia order and a final order of removal, therefore she was

2    subject to arrest.

3    Q.   But even though you received a directive from Mr. Brophy

4    not to -- that future arrests along those lines shouldn't be

5    permissible, right?

6    A.   Subsequent to that, yes.

7         MR. COX:  No further questions for the petitioners,

8    Your Honor.

9         THE COURT:  All right.  Who would like to question for

10   the respondents?

11        MS. LARAKERS:  I will, Your Honor, very briefly.

12   EXAMINATION BY MS. LARAKERS:

13   Q.   Mr. Rutherford, when you're looking to release an alien,

14   what factors do you typically look for?

15   A.   The first thing I will look for is any criminal history,

16   if they have a place to be released to.  We don't want to

17   release somebody to a homeless shelter if we can help that.  We

18   also look at the ability for us to obtain a travel document.

19   Some countries are very difficult in producing those.  And

20   length in custody as well.

21   Q.   You briefly testified that you conducted a widescale

22   review of the detained docket on May 10.  What types of factors

23   were you looking at in order to release those aliens?

24   A.   I was looking for the level of criminality someone may

25   have; if they have no criminality whatsoever, pending charges

1  or if they have criminal convictions, again length in custody,

2  and the ability for us to obtain a travel document.

3  Q.   And do you plan to continue to do those reviews?

4  A.   Those are done every two weeks.

5  Q.   And are you personally going to do those reviews?

6  A.   Yes.  I scrub the case management system, and then I issue

7  my findings to my AFODs and instruct them to have their staff

8  review each case that I identify.

9  Q.   Are you familiar with the POCR process?

10  A.   Yes, ma'am.

11  Q.   Or Post-Order Custody Review process?

12  A.   Yes, ma'am.

13  Q.   How are you familiar with it?

14  A.   The limited training I received in 2006 when I came to ICE

15  and then my subsequent arrival here to Boston in February,

16  March, provided by our local chief counsel's office.

17  Q.   And in your understanding when is an alien entitled to a

18  Post-Order Custody Review?

19  A.   Within 90 days of coming into detention.

20  Q.   And in your understanding, when is an alien entitled to

21  notice that they will be having a Post-Order Custody Review?

22  A.   60 days.  30 days prior to the 90 days.

23  Q.   Have you ever conducted a Post-Order Custody Review for an

24  alien who was not currently detained?

25  A.   No, I have not.

1    Q.   Have you ever heard of another ICE official conducting a

2    Post-Order Custody Review for someone who is not currently

3    detained?

4    A.   No, ma'am, I have not.

5    Q.   Throughout your career in ICE has your understanding on

6    when the notice of POCR review and the actual POCR review are

7    done changed?

8    A.   No, ma'am, it has not.

9         MS. LARAKERS:   That's all I have, Your Honor.

10        THE COURT:   I think I may only have one series of

11   questions.

12        You just testified that when you started reviewing the

13   detained docket on May 10 to determine who ought to be

14   released, you looked at their criminal history and whether they

15   had any charges; is that correct?

16        THE WITNESS:   Yes, sir, I did.

17        THE COURT:   And you also looked at how long they had

18   been in custody?

19        THE WITNESS:   Yes, sir, I did.

20        THE COURT:   And then you said you also looked at the

21   ability to get travel documents; is that right?

22        THE WITNESS:   Yes, sir.

23        THE COURT:   Could you explain that last point to me,

24   ability to get travel documents.

25        THE WITNESS:   Each case officer is responsible to

1    complete what is called an ETD or electronic travel document

2    packet, which is uploaded into the case management system.  And

3    it is forwarded on to the headquarters removal section, and

4    they also reach out to the local embassy or consulate, wherever

5    it is closest to the office, in an attempt to obtain a travel

6    document for the person.

7         Also, they're required to talk with the detainee to

8    obtain any biographical information to where they could help

9    identify what city they're from in their country of citizenship

10   to assist with the ETD process.

11        THE COURT:  But how does ability to get travel

12   documents come into play in the decision whether to release

13   somebody when you're doing a 90-day review or when you're doing

14   a biweekly review?

15        THE WITNESS:  If the case officer has spoken with the

16   embassy and the embassy has informed them that they will be

17   issuing a travel document in a certain timeframe, then we know

18   that there is a likelihood of removing that person.

19        THE COURT:  And how does that affect the decision

20   whether to detain or release?

21        THE WITNESS:  If we have a travel document for an

22   individual with a final order, we would not release them for

23   fear of them being a flight risk.

24        THE COURT:  Did you say that you had read what are

25   referred to as the POCR regulations Section 241.4?

1          THE WITNESS:  Yes, sir, I reviewed it.

2          THE COURT:  Is that ability to get travel documents

3   one of the factors that the regulation says should be

4   considered?

5          THE WITNESS:  Within 90 days, yes, sir, I believe so.

6          THE COURT:  And after 90 days?

7          THE WITNESS:  The person could be released and the

8   file forwarded to headquarters for assistance.

9          THE COURT:  Okay.  Do my questions suggest any further

10  questions to counsel?

11         MR. COX:  No, Your Honor.

12         MS. LARAKERS:  No, Your Honor.

13         THE COURT:  All right.  Mr. Brophy, you're excused for

14  today.  You may be required to come back and testify again

15  because I don't think we're going to conclude this hearing

16  today.  There are some documents that are being produced today

17  and some that may be produced soon, and they may raise more

18  questions.

19         THE WITNESS:  Yes, sir.

20         THE COURT:  You're still subject to the sequestration

21  order.  Although I'm going to talk with the lawyers before we

22  end today about revising that order so you won't be injured in

23  your ability to work with Mr. Brophy, probably with Mr. Lyons,

24  to do your work in a lawful way.

25         THE WITNESS:  Thank you, sir.

1            THE COURT:  Okay?

2            THE WITNESS:  Yes, sir.

3            THE COURT:  Thank you.  You're excused for today.

4            THE WITNESS:  Thank you.

5            THE COURT:  I'm going to take about a ten-minute

6    break -- about a five-minute break.  We should get Mr. Lyons in

7    and on the stand.  I think I just have a small number of

8    questions for him, but I may have more after I hear questions

9    from counsel.  Okay?

10           MR. WEINTRAUB:  Thank you, Your Honor.

11           THE COURT:  Court is in recess.

12           (Recess taken 3:32 p.m. to 3:34 p.m.)

13           THE COURT:  Do we have Mr. Lyons?  Would you approach

14   the stand and be sworn, please.

15                      TODD MICHAEL LYONS,

16   having been duly sworn, testified as follows:

17           THE COURT:  Would you please state your name.

18           THE WITNESS:  Todd Michael Lyons.

19           THE COURT:  How are you employed?

20           THE WITNESS:  I'm currently the deputy field office

21   director with Immigration and Customs Enforcement, enforcement

22   removal operations in the Boston field office.

23           THE COURT:  How long have you been employed by the

24   Department of Homeland Security?

25           THE WITNESS:  I've been with the Department of

1    Homeland Security since April of 2007.

2          THE COURT:  When is the first time you had any

3    responsibilities that involved what the parties have been

4    referring to as the POCR regulations Section 241.4.

5          THE WITNESS:  I'm sorry, sir.  I coughed.  I missed

6    that first part.  I'm sorry.  I have a bad cold.

7          THE COURT:  Me, too.  That's why I have this.

8          When is the first time that you had any

9    responsibilities that involved so called POCR regulations

10   Section 241.4?

11         THE WITNESS:  In the Boston field office, sir?

12         THE COURT:  Anywhere.

13         THE WITNESS:  Anywhere?  I was first trained as a

14   deportation officer in January of 2009.  And during the

15   timeframe in basic deportation officer training is when I

16   received my first initial training on the POCR process.

17         THE COURT:  And what did that training consist of?

18         THE WITNESS:  The training consisted of, we had a

19   five-week class which was in addition to the basic 17-week

20   academy, which I attended in 2007, specifically focusing on

21   case management duties in relation to the deportation officer

22   title.

23         THE COURT:  And how much of that training related to

24   the POCR regulations?

25         THE WITNESS:  It gave a basic deportation officer the

1    overview and the initial sense in the process, how the POCR

2    process takes place and how it applies to each case.

3            THE COURT:  And so in 2009 you were a detention

4    officer?

5            THE WITNESS:  I just became a deportation officer,

6    yes.

7            THE COURT:  Deportation officer?

8            THE WITNESS:  Yes, sir.

9            THE COURT:  What positions have you held since then?

10           THE WITNESS:  Since, when I first came in in 2007, I

11   was an immigration enforcement agent.  In 2009, I became a

12   deportation officer.  In 2012, I became a supervisory

13   deportation officer.  In 2014, I became an assistant field

14   office director up until my promotion to deputy field office

15   director in September of 2017.

16           THE COURT:  And have you had any training on the POCR

17   regulations since that initial training in I think you said

18   2009?

19           THE WITNESS:  I've had periodic refreshers, sir, that

20   did have specific duties over case management units.  However,

21   I haven't had yearly training since I have been an assistant

22   field office director.

23           THE COURT:  Have you had any training on the

24   regulations this year?

25           THE WITNESS:  No, sir.  My -- if I can expand.  My

1    primary duty, sir, is enforcement in ERO, enforcement of

2    removal operations.  Each field office is typically structured

3    with a field office director and two deputy director field

4    office directors.  One is over the case management removal

5    operations, and one is over law enforcement operations.  Since

6    2014, I've been primarily assigned to law enforcement

7    operations.

8         THE COURT:  Do you know whether Mr. Brophy caused

9    there to be any training concerning the POCR regulations during

10   his time as acting director?

11        THE WITNESS:  Yes, sir.  We decided as a management

12   team to bring in outside subject matter experts in custody

13   management when we observed and noticed that our case

14   management standards were lacking.

15        THE COURT:  When was that?

16        THE WITNESS:  Approximately two weeks ago, sir, was

17   the first time we had experts come in.  I had an assistant

18   field office director for me that was a subject matter expert

19   in case law come in to mentor and train our assistant field

20   office director that was over case management.

21        THE COURT:  Prior to about two weeks ago, to your

22   knowledge did Mr. Brophy have any training done for people in

23   the district office on the requirements of the POCR

24   regulations?

25        THE WITNESS:  It was not necessarily Mr. Brophy, sir.

1    Each year the POCR unit, Post-Order Custody Review Unit and

2    headquarters does have a traveling training team which goes to

3    various field offices to provide training and also to go ahead

4    and look at the POCR process and the case review status in each

5    office.

6           Around approximately January or February of this year,

7    the POCR unit did come to ERO Boston and conducted training for

8    the case management officers that are assigned to that

9    division.

10          THE COURT:  And did you participate in that training?

11          THE WITNESS:  I didn't participate, but I did send the

12   opportunity out to any enforcement officers that wanted to go

13   who hadn't worked in the case management side of the house, for

14   their resumes and promotional reasons.

15          THE COURT:  What do you understand the POCR

16   regulations require with regard to aliens who are arrested and

17   initially detained?

18          THE WITNESS:  So the POCR process comes into effect if

19   the alien is subject to a final order.  And once they came into

20   ICE's custody, they're due a review of their custody status at

21   90 days.  60 days prior to their 90 days they should get an

22   additional notice where they are given 30 days to themselves

23   and their attorney of record, which is usually documented on

24   the Immigration Form G-28, of the pending POCR review process

25   and allow the alien or the attorney the opportunity to produce

1    any documents as well as provide any statements in either a

2    positive or -- I guess more of a positive outcome on the review

3    process.

4            THE COURT:  Did there come a time when you learned

5    that the field office in which you are employed was not

6    following those regulations with regard to all detained aliens?

7            THE WITNESS:  Yes, sir.

8            THE COURT:  When did you first become aware of that?

9            THE WITNESS:  Approximately three or four weeks ago,

10   sir, when the first initial judicial orders came down and the

11   case management unit started to look at certain cases that were

12   coming up on the docket.

13           THE COURT:  So you said judicial orders.  If I tell

14   you that I announced a decision on May 8 that the POCR

15   regulations, which are laws, had been violated with regard to

16   the detention of an aliens named De Souza and Junqueira, would

17   you say those are the judicial orders to which you just

18   referred?

19           THE WITNESS:  Yes, sir.

20           THE COURT:  And you didn't know before that that there

21   were problems in the process?

22           THE WITNESS:  No, sir.  As I stated, I'm over at the

23   enforcement division, so I don't oversee Mr. Rutherford's side

24   of the house.

25           THE COURT:  Have you been designated to succeed

1    Mr. Brophy as acting district director?

2              THE WITNESS:  Yes, sir.

3              THE COURT:  When will you assume that position?

4              THE WITNESS:  I should assume the position on June 1st

5    of this year, sir.

6              THE COURT:  A week from Friday?

7              THE WITNESS:  Yes, sir.

8              THE COURT:  Have you done anything to educate yourself

9    on the requirements -- when did you find out you were going to

10   become the acting district director?

11             THE WITNESS:  Approximately a week ago, sir.

12             THE COURT:  And have you done anything to educate

13   yourself or refresh yourself on the requirements of the POCR

14   regulations?

15             THE WITNESS:  Yes, sir.  Prior to this I did sit in on

16   the training, and prior the sequestration order I did sit in on

17   the training and some of the discussions with the subject

18   matter experts that came in to see where we were lacking and

19   into what are key areas we needed to work up follow-on.

20             THE COURT:  Were these the officials from Dallas and

21   Buffalo that Mr. Brophy had arranged to come out at your

22   office?

23             THE WITNESS:  Yes, sir.  There was one assistant field

24   office director from Dallas and one supervisor from Buffalo and

25   one deportation officer from Buffalo.

```
 1              THE COURT:  When did you start work in the field
 2     office you're now in?
 3              THE WITNESS:  Officially transferred, sir, in
 4     September of 2017.
 5              THE COURT:  September of 2017?
 6              THE WITNESS:  Yes, sir.
 7              THE COURT:  Who was the director at that time?
 8              THE WITNESS:  The field office director for Boston was
 9     Christopher Cronen.
10              THE COURT:  And were you ever informed -- did you ever
11     have any discussions with Mr. Cronen or informed of his
12     policies concerning the possible arrest of aliens while they
13     were at the CIS offices seeking I-130s or provisional waivers?
14              THE WITNESS:  Yes, sir.
15              THE COURT:  How were you informed of his policy?
16              THE WITNESS:  When I first on-boarded, sir, he had me
17     kind of not necessarily take over the enforcement unit but to
18     kind of shadow to see how the office ran.  Since I was
19     primarily enforcement for North Texas and the State of
20     Oklahoma, it was a different atmosphere.  So basically through
21     observing him and following his meetings and his guidance, the
22     way he acted out and enforced executive order 13768 is pretty
23     much how I learned that.
24              THE COURT:  Was that the executive order issued in
25     2017?
```

1          THE WITNESS:  Yes, sir.

2          THE COURT:  What did it provide?

3          THE WITNESS:  The executive order laid out the

4    priorities for enforcement for the interior.  Specifically to

5    your question, sir, Section 5, Subsection F focused on the

6    apprehension and arrest of individuals that had a final order

7    that had not been lawfully executed, regardless of criminality.

8          THE COURT:  So did it essentially provide that if an

9    alien had a final order of removal, priority should be given to

10   arresting, detaining and removing that person regardless of

11   whether he or she had any criminal history?

12         THE WITNESS:  Yes, sir.  It was farther down the list.

13   Sections A, B and C primarily focused on subjects with

14   aggravated criminal histories, pending criminal charges or

15   national security threats.  It was lower on the list, sir, but

16   it did fit into the enforcement priorities.

17         THE COURT:  But was it your understanding that it was

18   Mr. Cronen's policy to have aliens arrested at CIS offices if

19   it was possible to apprehend them there?

20         THE WITNESS:  Yes, sir.  Prior to my arrival, the

21   Boston field office, specifically the enforcement division,

22   received information monthly from CIS, and during the course of

23   their investigations, whether it be into an I-130, I-485, a

24   type of benefit background check, if you would, if a subject

25   was found to have criminal history, some type of fraud, whether

1    it be a fraudulent Social Security number or fraudulent

2    passport, or if the subject had a final order, sir, that was

3    unexecuted or if the final order wasn't executed or in absentia

4    or had been given ample opportunity to leave and had not left,

5    CIS would refer those cases to ERO for possible action.

6            THE COURT:  And did you in some fashion learn that

7    Mr. Cronen's policy and direction was that, if possible, people

8    with final orders of removal should be arrested while they were

9    at CIS?

10           THE WITNESS:  Yes, sir.

11           THE COURT:  How did you learn that was his policy or

12   directive?

13           THE WITNESS:  One of my assistant field office

14   directors had first informed me when I was asking about the

15   weekly schedule for enforcement operations during the week.

16   Because one of the questions had arisen that they had

17   originally wanted to limit the amount of arrests done during

18   the day just because of the timeframe and distance of the CIS

19   offices to the Burlington office.  And CIS had scheduled five

20   individuals that had either a criminal history or a final order

21   on one day.  That was the first time that I learned that we

22   were making arrests at CIS.

23           THE COURT:  Approximately when was that?

24           THE WITNESS:  November, sir, of 2017.  Prior to --

25   sorry, sir.

1          THE COURT:  Were those arrests made last November?

2          THE WITNESS:  No, sir, because I felt that that was

3     too many in a day for our officers to be out.  With the recent

4     Lund decision, my primary responsibility in enforcement is

5     public safety.  So I can't have officers spread out all around

6     the state at CIS offices on subjects that don't have criminal

7     histories, sir.

8          THE COURT:  Does ICE have limited resources?

9          THE WITNESS:  Extremely, sir.

10         THE COURT:  And major challenges in terms of the

11    number of people who are eligible to be removed from the United

12    States?

13         THE WITNESS:  Yes, sir.

14         THE COURT:  Is it important to set priorities?

15         THE WITNESS:  Yes, sir.

16         THE COURT:  Have you thought about what your

17    priorities will be when you become the acting director?

18         THE WITNESS:  My priorities are still in line with

19    Mr. Brophy, sir, as far as public safety, specifically, cases

20    where subjects have re-entered the United States and again

21    committed violent felonies.

22         THE COURT:  Well, here.  Let me -- I've heard some

23    testimony about this, but I need to hear this from you, too.

24         THE WITNESS:  Yes, sir.

25         THE COURT:  So Mr. Cronen's policy was and direction

1  was that aliens subject to being arrested should be arrested

2  when possible at a CIS office?

3      THE WITNESS:  Yes, sir.  It was twofold.  One was that

4  in accordance with executive order 13768 that no class of

5  arrestable alien was off the table as far as arrest and the

6  second was to minimize ICE officers from being out in the

7  community and to make an arrest at either a government office

8  or at another DHS building.

9      THE COURT:  Why minimize them being out in the

10  community?

11      THE WITNESS:  One problem, sir, that I think you've

12  seen a lot is the chilling factor of ICE being out in the

13  community and the fact of the bad publicity as far as our

14  targeted enforcement being referred to as raids.  On top of

15  that, sir, you also run the risk of having officers exposed to

16  other safety concerns, if you will, whereas someone who came

17  into a courthouse or to a DHS facility had been through a

18  magnetometer, things like that.

19      THE COURT:  But in other words, if you wanted to find

20  the people who are most dangerous to ICE officers or perhaps

21  others, you'd have to go to the community, correct?

22      THE WITNESS:  Yes, sir.  The places where we'd find

23  the most dangers to the community, sir, would be in a jail or

24  House of Correction.  But if those individuals had been

25  released prior to an ICE officer interviewing or coming to

1    arrest them, then yes, they'd have to go in the community.

2          THE COURT:  But if there was somebody at the CIS

3    office they were less likely -- if it was somebody at the CIS

4    office, they were less likely to be dangerous to an ICE officer

5    or anybody else?

6          THE WITNESS:  That, sir, and we had worked hard, at

7    least I had, with the local police chiefs, sir.  There was a --

8    they've had recent issues with people reporting crime, people

9    fearful to leave their homes, fearful of, you know, once people

10   know ICE is in the area or someone's being arrested.  And I had

11   been working closely with the major city chiefs of police to

12   try to keep our footprint, if you will, sir, down to a minimum

13   to not --

14         THE COURT:  To try to -- to try to increase the

15   likelihood that aliens would report crimes, for example?

16         THE WITNESS:  Yes, sir, trying to be a better law

17   enforcement partner.

18         THE COURT:  Did you think before Mr. Brophy came that

19   arresting people in a CIS office would injure their willingness

20   or ability to pursue lawful permanent resident status to, among

21   other things, stay in this country with their spouses and

22   children?

23         THE WITNESS:  Yes, sir, absolutely.

24         THE COURT:  And do you think it would have --

25         THE WITNESS:  It would have a negative impact, yes,

1    sir.

2            THE COURT:  Do you think that's desirable?

3            THE WITNESS:  No, sir.

4            THE COURT:  Okay.  So Mr. Brophy came, and what was

5    his policy with regard to arresting people at the CIS office?

6            THE WITNESS:  When Mr. Brophy first learned of the

7    arrests was after the Calderon case, and actually previous

8    before that, there was another -- I'm going to pronounce it

9    wrong, sir.  I think it was De Oliveira.

10           THE COURT:  De Oliveira.

11           THE WITNESS:  Sorry.  And we had discussed, you know,

12   and I expressed my concerns as well about the limited resources

13   as I stated earlier in my testimony as far as the Lund division

14   and being stretched too thin in the enforcement division that

15   he agreed that we would focus more solely on arrests that had

16   an impact on public safety and national security, primarily

17   those with criminal histories.

18           THE COURT:  Do you know how Mr. Brophy became aware of

19   the De Oliveira and Calderon cases?

20           THE WITNESS:  So the first time we actually all -- it

21   came available through media, sir.

22           THE COURT:  And I think you may have already answered

23   this, but when Mr. Brophy said that it would be his policy that

24   arrests would not be made at CIS, did you agree with that?

25           THE WITNESS:  Yes, sir, I did.  Prior to the executive

1    order from January, sir, ERO had always historically received

2    referrals from CIS.  During the previous administration and

3    under the Priority Enforcement Program, PEP, we would only

4    pretty much receive those if there was a significant criminal

5    history or some likelihood of fraud or national security.  We

6    still received the ones for final orders, sir, but under PEP,

7    we never acted upon them.

8              THE COURT:  And have you decided what your policy will

9    be when you become acting director next week?

10             THE WITNESS:  My policy is the still the same, sir.

11             THE COURT:  As Mr. Brophy's?

12             THE WITNESS:  Yes, sir.

13             THE COURT:  Are you going to be the acting director?

14             THE WITNESS:  Sir?

15             THE COURT:  Are you going to be the acting director?

16             THE WITNESS:  Yes, sir, I'll be the acting field

17   office director.

18             THE COURT:  Is there a time limit on that?

19             THE WITNESS:  Legally, sir, it's eight months, unless

20   they decide to promote me.

21             THE COURT:  Unless they decide to promote you?

22             THE WITNESS:  Yes, sir.

23             THE COURT:  That was going to be my next question.  Do

24   you hope to become the permanent director?

25             THE WITNESS:  Yes, sir.  I'm from Boston, so I'm home.

1  I don't want to transfer around and move anymore.

2          THE COURT:  Are you concerned at all that if you --

3  well, Mr. Cronen left the Boston office, right?

4          THE WITNESS:  Yes, sir.

5          THE COURT:  Where did he go?

6          THE WITNESS:  He went to headquarters, sir.

7          THE COURT:  Do you know why he went to headquarters?

8          THE WITNESS:  Yes, sir.  He was promoted to the deputy

9  assistant director of field operations.

10         THE COURT:  Are you concerned that if you continue

11 Mr. Brophy's policies with regard to arrests at CIS that it

12 will injure your ability to become the permanent director?

13         THE WITNESS:  No, sir, I don't think so, because the

14 primary goal of ERO and what I think the Commonwealth and what

15 people want is for us to enforce immigration laws to focus on

16 the worst of the worst and public safety, and that's my intent.

17         THE COURT:  I don't want you to tell me what's in

18 it -- there's some water right there if you want it.

19         THE WITNESS:  Thank you.

20         THE COURT:  Take some water.  Do you want some cough

21 drops?

22         THE WITNESS:  I'm good, sir.  Thank you.

23         THE COURT:  I have some.

24         THE WITNESS:  I appreciate it.  Thank you.

25         THE COURT:  After my May 8 decision that ICE had

1    violated the law with regard to -- by not giving De Souza and

2    Junqueira the protections of the POCR regulations as ICE

3    interprets them, did you have a discussion with Mr. Brophy

4    about what to do about that?

5              THE WITNESS:  Yes, sir.  That's when we decided to

6    bring in an outside cadre of people because it was apparent

7    that the current staff we had in place was either inadequately

8    trained or not up to the task to get it done.

9              THE COURT:  And did a group come in and do an audit

10   and make recommendations?

11             THE WITNESS:  Yes, sir.

12             THE COURT:  I don't want you to say what the

13   recommendations are right now.  But were you given a copy of

14   the audit?

15             THE WITNESS:  I was given -- it was an AAR, sir, an

16   After Action Report.

17             THE COURT:  All right.  Was that in a memo for

18   Mr. Brophy, Mr. Rutherford and you dated May 16, 2018?

19             THE WITNESS:  I believe so, sir, yes, sir, without

20   seeing it.

21             THE COURT:  And did you have any discussion with the

22   people who did that audit, as Mr. Brophy characterized it?

23             THE WITNESS:  Yes, sir.  As the two weeks went on,

24   sir, I spoke to them daily.

25             THE COURT:  And what did they tell you about how the

1    ICE office they were auditing performed with regard to meeting

2    the requirements of the POCR regulations?

3         THE WITNESS:  I believe, sir, they found

4    approximately -- again, I'm not sure of the exact number, but I

5    want to say about 40 cases which needed to be immediately

6    corrected, which they were.  They also found that officers

7    assigned to the detention unit which handles case management

8    were majority the lowest seniority officers we had, sir, mostly

9    rookies straight out of the academy, so their knowledge base

10   wasn't there.

11        THE COURT:  So when you say they found about 40 cases

12   that needed immediate correction, did they tell you what the

13   deficiencies were in some, many or all of those cases?

14        THE WITNESS:  Not to each specific one, sir.  They did

15   specifically with -- they went through each case with Deputy

16   Rutherford and the assistant field office director that's over

17   detention, sir.

18        THE COURT:  But did you discuss with them generally

19   what the problems were?

20        THE WITNESS:  Yes, sir, there was some specifically

21   deadlines weren't met, sir.

22        THE COURT:  What deadlines?

23        THE WITNESS:  Either the notice of review was not

24   properly timely served to the subject or to the subject's

25   attorney on record, or the actual POCR itself was late for FOD

1    review, field office director review or signature.

2              THE COURT:  And you say there were about 40 cases that

3    you understand had those defects?

4              THE WITNESS:  Yes, sir.  I believe either somewhere

5    between 35 to 40, but without any type of documentation in

6    front of me, sir, it's just --

7              THE COURT:  And what is your understanding with regard

8    to what's happened to those 35 or 45 aliens?

9              THE WITNESS:  They were all -- well, to the cases

10   themselves, sir, I can't speak specifics to those actual POCRs.

11   They were fixed immediately.  What I did was I took four of my

12   most senior officers who spent a lot of time in the case

13   management division and immediately took them off of

14   enforcement duties to help Deputy Rutherford's side of the

15   house as far as training, OJT, and to assist and bring

16   everything up to speed in regards to proper time management.

17             THE COURT:  The auditors who came from Buffalo and

18   Dallas, where physically were the aliens that day whose cases

19   they audited, were they all within the district?

20             THE WITNESS:  As far as housed within our district,

21   sir?

22             THE COURT:  Yes.

23             THE WITNESS:  If they're on our docket, they should be

24   within our district, sir.  But again, I couldn't answer that

25   specifically without looking into it for you.

1           THE COURT:  Here is what I'm trying to get at, perhaps

2    inartfully.

3           THE WITNESS:  Yes, sir.

4           THE COURT:  I've heard that sometimes people are

5    arrested in, say, Florida, and sent to Louisiana.  Does that

6    happen sometimes?

7           THE WITNESS:  Yes, sir, sometimes.  There could be

8    multiple examples for that.

9           THE COURT:  Let me just pause.  Does that happen

10   frequently?

11          THE WITNESS:  I can't give you a frequency, sir, but

12   it does happen.

13          THE COURT:  And if somebody was arrested in

14   Massachusetts and sent to Louisiana, would their case have been

15   examined by the auditors who came in beginning on May,

16   whatever, earlier in May?

17          THE WITNESS:  Yes, sir.  If the docket control,

18   meaning that the case hasn't been officially finalized out and

19   docket control was still within ERO Boston, then yes, it would

20   have been.  To give some examples of why --

21          THE COURT:  No, before that, if somebody was moved to

22   Louisiana, would what you just called docket control stay in

23   Massachusetts or in this district?

24          THE WITNESS:  Yes, sir.  If the case hadn't been

25   finalized, to my knowledge, the case would stay with us.  It

1    would depend upon the reason for the move to Louisiana.

2         The one example I was going to give you was sometimes

3    consulates will have consulate interviews in one specific

4    place.  Alexandria is an air operation hub for ICE so it's

5    easier for people to fly into there.  Consulates like Cambodia,

6    sir, sometimes do that.  So when a subject does go for a

7    consulate interview, the case isn't finalized, the case doesn't

8    transfer to Louisiana, the case would stay in docket control

9    under Boston.  But that's just one example why some were to go,

10   sir.

11        THE COURT:  And if there were say 40 cases in which

12   violations of the POCR regulations were identified by the

13   auditors, what percentage of the detained caseload would that

14   have been?

15        THE WITNESS:  Please forgive my math, but usually our

16   detained population is anywhere between 650 and 700.  So --

17   God, the priests are going to kill me.

18        THE COURT:  It's about roughly 40 out of about roughly

19   650?

20        THE WITNESS:  Yes, sir.

21        THE COURT:  All right.  In view of the time, I don't

22   think I have any further questions now for Mr. Lyons.  Would

23   the petitioners like to inquire?

24        MR. SEGAL:  Yes, Your Honor.

25        THE COURT:  Okay.

1    EXAMINATION BY MR. SEGAL:

2    Q.    Good afternoon, Mr. Lyons.  My name is Matthew Segal.  I

3    represent Lilian Calderon, Lucimar De Souza and some of the

4    other petitioners in this case.  And in recognition of the

5    spring colds that are going around, if at any time you need to

6    take a break for water, that's fine with me.

7    A.    Thank you.

8    Q.    You're aware that there's a sequestration order in this

9    case now, right?

10   A.    Yes, sir.

11   Q.    But before that order was issued there was no order

12   prohibiting you from talking with your colleagues about this

13   litigation that we're in right now, correct?

14   A.    Yes, sir.

15   Q.    And this litigation is very important, correct?

16   A.    Yes, sir.

17   Q.    Before the sequestration order was issued, had you talked

18   with any of your colleagues about this case?

19   A.    Which case specifically, sir?

20   Q.    The federal litigation that we're in right now involving

21   Ms. Calderon and Ms. De Souza and others.

22   A.    Specifically, sir, I spoke maybe on the Calderon case,

23   sir, since I drafted the affidavit responding to the court's

24   questions back in February.  But most of my conversations were

25   generic in nature since I had really no oversight of the case

1    management unit or those cases after the arrests.

2    Q.   With which colleagues did you have those conversations?

3    A.   It primarily would have been the senior management group,

4    which would have consisted of the field office director, the

5    other deputy field office director and the assistant field

6    office directors in the field office.

7    Q.   And the reason why you had those conversations was that

8    this is an important case, and as you mentioned, it's getting

9    some attention?

10   A.   Yes, sir.

11   Q.   I want to talk a little bit about the policy governing

12   people who are arrested at CIS facilities.

13   A.   Yes, sir.

14   Q.   It's your testimony that when you came in in the fall of

15   2017, it was around November of 2017, that's when you first

16   learned about arrests happening at these facilities?

17   A.   Yes, sir.  They had already been occurring prior to my

18   arrival.

19   Q.   And those would have been arrests in 2017?

20   A.   Yes, sir.

21   Q.   Do you know about how many times there were arrests made

22   at ICE facilities in 2017 out of your office?

23   A.   No, sir, I don't.

24   Q.   Do you have a sense of whether it's more than ten, less

25   than ten?

1   A.    I would say more than ten, sir.

2   Q.    More than 20?

3   A.    It would be a guess, sir.  I don't have an answer for

4   that, no, sir.

5   Q.    What about in 2018, before Mr. Brophy came in?

6   A.    2018, sir, I was the one who did do the declaration, and

7   one of the court's specific questions in the 11 questions that

8   were posed were the amount of people that were arrested in

9   Rhode Island and Massachusetts in the month of January.  In

10  that month there was six, five in addition to Ms. Calderon.

11  Q.    And these arrests were happening because of a directive

12  issued by Mr. Cronen, correct?

13  A.    Yes, sir.

14  Q.    This directive that Mr. Cronen issued, you testified that

15  you learned about it because someone told you orally that it

16  had been issued, correct?

17  A.    Yes, sir.

18  Q.    Do you know if anyone ever wrote it down?

19  A.    As far as an order, sir, no, sir.  Like I stated to the

20  judge earlier, CIS has always provided ERO with referrals

21  either quarterly or monthly via email stating the times of

22  individuals that they had identified either having a criminal

23  history, some type of fraud or a final order, an executed final

24  order.

25        At that point the field office -- I'm sorry, the assistant

1    field office director for enforcement would sort those

2    referrals and then assign them to a team to make the arrest.

3    But again, no, there's no written policy, sir.

4    Q.   Beyond the question whether there was a policy or an

5    order, do you know if anyone ever wrote down just the mere fact

6    that it was happening?

7    A.   No, sir.

8    Q.   Before -- it's your understanding that Mr. Cronen issued

9    this directive partly in response to an executive order issued

10   by the President on January 2017, correct?

11   A.   Yes, sir.

12   Q.   So it's your understanding that before that executive

13   order was issued, this was not necessarily the policy or the

14   directive governing your office, correct?

15   A.   No, sir.  At that time we were under a separate executive

16   order, sir.

17   Q.   So before January 2017 when this executive order was

18   issued, were those arrests happening?

19   A.   No, sir.  Only if it was a specific egregious criminality

20   or threat to national security which fell under the Priority

21   Enforcement Program.

22   Q.   So as far as you know, from 2016 going back to the

23   beginning of time, there were no arrests out of your office

24   like the ones that caused this litigation to begin?

25   A.   I couldn't speak for the Boston field office, sir, since I

1    wasn't here.  But based upon national policy, and I can tell

2    you from my field office in Texas, we do not make those arrests

3    solely based on final orders.

4    Q.   Let me separate that out.  So understanding that you

5    weren't in the Boston office until 2017 --

6    A.   Yes, sir.

7    Q.   -- given that, nevertheless, you're not aware of any of

8    these arrests happening before 2017?

9    A.   No, sir, I'm not aware of any of those arrests.

10   Q.   And before 2017, you were in a different office?

11   A.   Yes, sir.

12   Q.   Could you remind me which office that was?

13   A.   I was in the Dallas field office, which covered North

14   Texas, Western Texas and the State of Oklahoma.  We were in the

15   Fifth Circuit.

16   Q.   And in that office, were there arrests like the ones that

17   initiated this case?

18   A.   Sir, on those arrests, if they were made at a CIS office,

19   under the previous executive order, which also governed the

20   Priority Enforcement Program which ERO functioned under from

21   approximately 2011 until 2017, we have only effected arrests at

22   a CIS office for serious criminal history or threat to national

23   security.

24   Q.   You testified in response to one of the judge's questions

25   that it was a different atmosphere when you came to Boston

1    versus where you've been in Texas.  Can you tell us what you

2    mean by that?

3    A.    Coming up as the enforcement deputy and being the previous

4    enforcement deputy in Northern Texas, one of the -- Sorry --

5    one of the initial challenges was the recent Lund decision from

6    the Commonwealth, which obviously put a strain on resources due

7    to the lack of honoring of detainers and cooperation between

8    local and state offices.

9         THE COURT:  Was the Lund decision a decision by the

10   Massachusetts Supreme Judicial Court saying that state and

11   local law enforcement officials did not have the authority to

12   hold aliens who would otherwise be removed just because there

13   was an ICE detainer?

14        THE WITNESS:  Yes, sir.  It specifically barred being

15   held on an I-247 ICE detainer for a civil immigration

16   infraction.

17   BY MR. SEGAL:

18   Q.    So in 2017, Mr. Brophy comes in and becomes the acting

19   FOD, correct?

20   A.    2018.

21   Q.    Sorry, yes.  Is that correct, in 2018 that happened?

22   A.    Yes, sir.

23   Q.    And he changed, he issued a new directive?

24   A.    Yes, sir.

25   Q.    And you indicated in response to some of the judge's

1    questions a little bit about that directive.  Just so I
2    understand, what arrests cannot be -- are not supposed to be
3    made under this directive?
4    A.   It's not a case of, when you say "not supposed" -- it's
5    not like saying the arrest can't happen.  It could happen.  The
6    direction to the staff was to prioritize resources to enhance
7    public safety.
8         So to give you a better example, if we've had several
9    individuals released from local or state custody overnight,
10   either previously deported or aggravated felons, and we only
11   have a very limited amount of officers to either go and appear
12   in court the next day to make that arrest or to try to track
13   them down after their release, the more sensible, logical thing
14   to do would be to focus on those apprehensions instead of going
15   to make an arrest at a CIS office for a non-criminal case that
16   is not a threat to public safety.
17   Q.   And this directive, was it given orally by Mr. Brophy?
18   A.   Yes, yes, sir.
19   Q.   And you passed it on to the people you supervise?
20   A.   Yes, sir.
21   Q.   And you believe they've passed it on to the people that
22   they supervise?
23   A.   Yes, sir.  I just specifically highlighted it again this
24   Wednesday at our all-hands supervisory meeting.  Not so much
25   the fact of the CIS arrests but the fact that right now for the

1    enforcement division, someone that has no criminal history and

2    no public safety threat, the approval needs to come through me

3    to place that person in detention.

4    Q.   And you've highlighted it because it's important, right?

5    A.   It's important because we have a limited amount of

6    resources and also a limited amount of bed space where I'd much

7    rather have a free bed available for a public safety threat.

8    Q.   And this important directive that Mr. Brophy issued which

9    you've reiterated and highlighted, has it ever been written

10   down anywhere in your office?

11   A.   I believe I wrote it down in my notepad when he briefed us

12   on it originally, but I have never issued it as a directive,

13   no, sir.

14   Q.   Do you still have that notepad?

15   A.   I would have to look for it, sir, but I usually keep notes

16   during our supervisory meetings, a senior staff meeting.

17   Q.   And you've testified that this is a matter of -- this

18   directive is primarily driven by priority-setting, correct?

19   A.   Yes, sir.

20   Q.   If you had unlimited resources in your office, these

21   detentions -- these apprehensions at CIS facilities could go

22   forward, correct?

23   A.   That's if we had extreme unlimited resources, sir.  But

24   the amount of removable subjects that are arrestable that have

25   significant criminal histories, along with the amount of people

1  that have unexecuted warrants of deportation or final orders,

2  are just too vast right now.

3          THE COURT:  Excuse me.  We're going to take a

4  five-minute break.  I have to reschedule something.  And

5  counsel should use these roughly five minutes to confer.

6          I thought it would be desirable to have Mr. Brophy

7  back to talk about at least that list of what happened to the

8  people arrested at CIS headquarters, and if the petitioners

9  want them, what would be involved in getting the files.  Why

10  don't you talk about whether Mr. Brophy will be necessary; and

11  if so, whether we should not complete perhaps Mr. Lyons but go

12  to Mr. Brophy shortly after I get back.

13          These hearings probably won't end today.  But I am

14  going to meet with all of you, in fact also Mr. Brophy and

15  Mr. Rutherford and Mr. Lyons, because I do want to try to

16  assure that the sequestration doesn't injure their ability to

17  have a well-informed responsible transition, okay?  That will

18  be on the agenda.

19          MS. LARAKERS:  Your Honor, did you just want to meet

20  with those three?  Because we also have the other two

21  witnesses.

22          THE COURT:  Well, leave the other two for now.  But

23  yeah, I think just those three as far as I know.  The other two

24  are not supervisors, are they?

25          MS. LARAKERS:  No, they're not, but they do need

1    direction from their supervisors.

2            THE COURT:  I know, but I think just the three I've

3    met in court would be sufficient.

4            MS. LARAKERS:  Okay.  Yes, Your Honor.

5            THE COURT:  All right.  We'll take a brief break but

6    talk about where we should be going.  What are your thoughts on

7    how we should proceed today?

8            MS. LAFAILLE:  Your Honor, with regard to these

9    individuals, we've spoken to the government about getting the

10   names of their attorneys so we can follow up with them.  We

11   have some -- clearly we still have more questions for Deputy

12   Lyons.  We have some more questions for Director Brophy as

13   well, but we think any of that can be done in a subsequent

14   hearing.

15           THE COURT:  Yeah.  I think we're going to stop now,

16   and I'm going to see you with the court reporter in the lobby

17   to talk about a schedule for you to confer on certain issues.

18   I can identify them -- well, I can identify some of them, and

19   to develop -- you know, pause and figure out where we are and

20   where we should be going.  And I would like Mr. Brophy,

21   Mr. Lyons and Mr. Rutherford to be there to hear the discussion

22   so we can figure out -- I can figure out how to revise or

23   clarify the sequestration order so they can do their work.

24   Okay?

25           MR. WEINTRAUB:  Yes, Your Honor.

1          THE COURT:  So we're in recess in this session, and

2     I'll see you shortly in the jury room.  Court is in recess.

3          (Recess taken 4:43 p.m.)

1              CERTIFICATE OF OFFICIAL REPORTER

2

3              I, Kelly Mortellite, Registered Merit Reporter

4    and Certified Realtime Reporter, in and for the United States

5    District Court for the District of Massachusetts, do hereby

6    certify that pursuant to Section 753, Title 28, United States

7    Code that the foregoing is a true and correct transcript of the

8    stenographically reported proceedings held in the

9    above-entitled matter and that the transcript page format is in

10   conformance with the regulations of the Judicial Conference of

11   the United States.

12              Dated this 4th day of June, 2018.

13

14              /s/ Kelly Mortellite

15              _____

16              Kelly Mortellite, RMR, CRR

17              Official Court Reporter

18

19

20

21

22

23

24

25