```
 1                     UNITED STATES DISTRICT COURT.
                      FOR THE DISTRICT OF MASSACHUSETTS
 2
      ----------------------------------------
 3    LILIAN PAHOLA CALDERON JIMENEZ,          )
                              Petitioner,      )
 4                                             )   Civil Action
      vs.                                      )   No. 18-10225-MLW
 5                                             )
      KIRSTJEN M. NIELSEN, Secretary of        )
 6    Homeland Security, CHRISTOPHER CRONEN,   )
      Immigration and Customs Enforcement,     )
 7    Boston Field Office Director, YOLANDA    )
      SMITH, Superintendent of Suffolk County  )
 8    Correctional Facility, STEVEN W.         )
      TOMPKINS, Sheriff of Suffolk County,     )
 9                              Respondents.   )
      ----------------------------------------
10                                             )
      EDJANN HENRIQUE DOS SANTOS,              )
11                              Petitioner,    )   Civil Action
                                               )   No. 18-10310-MLW
12    vs.                                      )
                                               )
13    KIRSTJEN M. NIELSEN, Secretary of        )
      Homeland Security, CHRISTOPHER CRONEN,   )
14    Immigration and Customs Enforcement,     )
      Boston Field Office Director, YOLANDA    )
15    SMITH, Superintendent of Suffolk County  )
      House of Correction, STEVEN W. TOMPKINS, )
16    Sheriff of Suffolk County,               )
                              Respondents.     )
17    ----------------------------------------

18                  BEFORE THE HONORABLE MARK L. WOLF
                      UNITED STATES DISTRICT JUDGE
19
                           LOBBY CONFERENCE
20
                            May 23, 2018
21
                John J. Moakley United States Courthouse
22                        Courtroom No. 10
                          One Courthouse Way
23                   Boston, Massachusetts  02210

24

25                             Kelly Mortellite, RMR, CRR
                               Official Court Reporter
```

```
 1    APPEARANCES:

 2    Counsel on behalf of Petitioners:
      Adriana Lafaille and Matthew Segal
 3    American Civil Liberties Union
      211 Congress Street
 4    Boston, MA 02110
      617-482-3170
 5    alafaille@aclum.org

 6    Counsel on behalf of Petitioners:
      Jonathan Cox, Colleen McCullough, Kevin Prussia and
 7    Michaela Sewall
      Wilmer Hale LLP
 8    60 State Street
      Boston, MA 02109
 9    617-526-6212
      jonathan.cox@wilmerhale.com
10
      Counsel on behalf of Respondents:
11    Eve A. Piemonte
      United States Attorney's Office
12    1 Courthouse Way
      John Joseph Moakley Federal Courthouse
13    Boston, MA 02210
      617-748-3271
14    eve.piemonte@usdoj.gov

15    Mary Larakers and J. Max Weintraub
      U.S. Department of Justice, Office of Immigration Litigation
16    District Court Section
      P.O. Box 868
17    Washington, DC 20044
      202-353-4419
18    mary.larakers@usdoj.gov

19    Thomas Brophy, Immigration and Customs Enforcement
      Todd Lyons, Immigration and Customs Enforcement
20

21

22

23

24

25
```

```
 1                     P R O C E E D I N G S
 2          THE COURT:  Would you each please identify yourselves
 3   for the record.
 4          MS. LAFAILLE:  Adriana Lafaille for the petitioners.
 5          MR. PRUSSIA:  Kevin Prussia for the petitioners.
 6          MR. COX:  Jonathan Cox for the petitioners.
 7          MR. SEGAL:  Matthew Segal for the petitioners.
 8          MR. SEWALL:  Michaela Sewall for the petitioners.
 9          MS. McCULLOUGH:  Colleen McCullough for the
10   petitioners.
11          MS. LARAKERS:  Mary Larakers for the United States.
12          MR. WEINTRAUB:  Max Weintraub for the United States.
13          MS. PIEMONTE:  Eve Piemonte for the United States.
14          MR. BROPHY:  Tom Brophy, ICE.
15          MR. LYONS:  Todd Lyons, ICE.
16          THE COURT:  Where is Mr. Rutherford?
17          MR. WEINTRAUB:  I apologize, Your Honor.  It was our
18   understanding that you released him, so we let him -- we may
19   have misunderstood.
20          THE COURT:  I think so, but all right.  One, as I
21   said, the sequestration order has been and continues to be
22   important with regard to the testimony.  So it's still in
23   effect.  Mr. Lyons, Mr. Brophy, you can't tell anybody who is
24   in that universe of potential witnesses what you were asked and
25   answered or, you know, discuss those issues.  Although I
```

1    could -- you know, they're the issues that you were questioned

2    about with regard to what happened with De Souza, what happened

3    with Calderon, what happened with Junqueira.

4         But I want you to be able to work together in the next

5    week and not be impeded by the sequestration order so you can

6    have a well-informed transition and, to the extent that there

7    are reforms that have been initiated, so they won't be impeded.

8    So I don't know.  Do petitioners have any concern about my

9    revising the sequestration order to make clear that that's

10   permissible?

11        MS. LAFAILLE:  Subject to knowing exactly what the

12   revision might be, not generally, no.

13        MR. PRUSSIA:  I think generally speaking, Your Honor,

14   as you outlined, no discussion about testimony, no discussion

15   about the cases from which they were questioned about during

16   the course of the past two days.  Outside of that it would seem

17   to me that they should be able to communicate in order to

18   facilitate their duties.

19        THE COURT:  And what about the government?

20        MS. LARAKERS:  To the extent that they need to speak

21   about what happened in those cases, the shortfalls, so they can

22   fix those shortfalls, I think that's what you were getting at.

23   So I understand that's a hard line to cross.  I just don't want

24   them to say, "Calderon" and what happened there if they're

25   trying to fix it, you know.

1          THE COURT:  Well, I don't know that you need to -- let

2     me ask Mr. Brophy and Mr. Lyons.  Do you feel you need to

3     discuss specifically what happened with De Souza?  For example,

4     in the context of her case, the situation there wasn't timely

5     notice under the POCRs --

6          MR. BROPHY:  I think we can talk in generalities about

7     it, and if we run into the issue, I'll let the attorneys know.

8          THE COURT:  Yeah, let the attorneys know.  And we'll

9     be commonsensical, to a certain extent you and Mr. Rutherford

10    are on record, we've got into Mr. Lyons, but I think we all

11    want you to work on accelerating the progress it appears you've

12    made since May 8.  Because as I said to the lawyers and have

13    said to you in court, it's a very serious thing when you break

14    the law and people are detained longer than they lawfully can

15    be or as a result of an illegal process.  Having said that, you

16    know, I also have the impression that the two of you want to

17    correct that.

18         MR. BROPHY:  Yes, sir.

19         THE COURT:  And I think it would be better for

20    everyone involved if you have sufficient success in that, you

21    know, there's no question of whether I'm going to have to order

22    you to do certain -- meet your obligations.

23         So, all right.  I'm orally modifying the order to

24    direct that you not discuss and Mr. Rutherford not discuss with

25    either of you what you were asked and answered in court or the

1    specifics of the cases you were asked about.  But, you know, to

2    the extent that there are issues that emerge from those cases,

3    we have to give notice at least 30 days in advance and a

4    decision at 90 days, you can discuss those issues.  That's one.

5            Then I'm going to direct that the parties begin

6    speaking.  But I want to talk to you about this, a reasonable

7    schedule, and maybe give me a status report on Friday.  It

8    seems to me that it's possible that the dimensions of this

9    Calderon case have changed a lot in the sense that we're

10   seeking -- you were seeking an injunction in part to stop

11   arrests at CIS offices, but they say there haven't been any

12   recently, and Mr. Lyons says it will be his directive that

13   there not be any in the foreseeable future.  I think you were

14   also seeking to stop arrests away from CIS based solely on

15   orders of removal or people who don't have any criminal

16   history, for example, or aren't dangerous.  Is that a part of

17   the relief you're seeking?

18           MS. LAFAILLE:  Yes, Your Honor, and also there are

19   cases including two of our class members of people given

20   departure dates.

21           THE COURT:  I'm going to get to it.

22           Who are those two class members?

23           MS. LAFAILLE:  The two named petitioners are Sandro De

24   Souza and Oscar Rivas.

25           THE COURT:  Okay.  I was going to get to that.  I'll

1    ask Mr. Brophy and then I'll ask Mr. Lyons.  Am I correct in

2    understanding that under your present policies, somebody who

3    has a final order of removal but no criminal history or charges

4    against him or her and are no threat to national security

5    ordinarily wouldn't be arrested?

6              MR. BROPHY:  They may be arrested and not detained.

7              THE COURT:  Arrested and not detained.

8              MR. BROPHY:  They could be arrested and put into like

9    supervised release, you know, so we can track their case for

10   removal purposes.

11             THE COURT:  And do you intend that to be your policy?

12             MR. LYONS:  Yes, sir.

13             THE COURT:  And to what extent does that address the

14   petitioners' concerns?

15             MS. LAFAILLE:  Well, if the members of our class are

16   still being targeted for removal even if not detained during

17   the process, that's still one of the main concerns of this

18   case.

19             THE COURT:  But there's a question of whether they

20   are -- I mean, if they're not in one of your priority

21   categories, under what circumstances would you arrest them?  I

22   think Mr. Lyons wants to respond.

23             MR. LYONS:  I was just going to ask if it was a

24   non-detained setting, is that what you're referring to?  A case

25   in a non-detained atmosphere versus someone checking in,

1    reporting in?

2           THE COURT:  Go ahead.

3           MS. LAFAILLE:  It's come up with individuals coming in

4    and given departure dates despite efforts to obtain lawful

5    status and it's come up obviously with individuals arrested at

6    I-130 interviews and arrested in other ways, perhaps people

7    you're not targeting but what you call collaterals, ICE

8    nevertheless proceeding against these folks despite the fact

9    that they're eligible to seek lawful status.

10          THE COURT:  What's a collateral?

11          MS. LAFAILLE:  I think that's what ICE is calling

12   people that it's not actually trying to go out and arrest but

13   might, you know, sort of be in the wrong place at the wrong

14   time.

15          THE COURT:  Because it seems to me right now I think

16   there are five named plaintiffs; is that right?

17          MS. LAFAILLE:  Yes.

18          THE COURT:  In Calderon, there's a stay of removal

19   until September?

20          MS. LAFAILLE:  Until August.

21          THE COURT:  Until August.  And De Souza is released

22   but there's no stay of removal?

23          MS. LAFAILLE:  That's right, nothing other than this

24   court's --

25          THE COURT:  What's that?

| | |
|---|---|
| 1 | MS. LAFAILLE:  Nothing other than what this court has |
| 2 | provided. |
| 3 | THE COURT:  Nothing other than my order? |
| 4 | MS. LAFAILLE:  Correct. |
| 5 | THE COURT:  And who are the other three named |
| 6 | plaintiffs? |
| 7 | MS. LAFAILLE:  So Mr. Rivas and Mr. De Souza who would |
| 8 | have had to have departed already if not for this court's |
| 9 | order. |
| 10 | THE COURT:  De Souza? |
| 11 | MS. LAFAILLE:  Yes, there are two people with the last |
| 12 | name De Souza. |
| 13 | THE COURT:  All right.  I'm being refreshed.  Okay. |
| 14 | So those are people who are arrested at the -- the De Souza |
| 15 | I've dealt with was arrested -- |
| 16 | MS. LAFAILLE:  Yes. |
| 17 | THE COURT:  All right.  So that's three that were |
| 18 | arrested at CIS offices, right? |
| 19 | MS. LAFAILLE:  No, Your Honor.  The two you've dealt |
| 20 | with were arrested at CIS offices. |
| 21 | THE COURT:  Calderon and De Souza. |
| 22 | MS. LAFAILLE:  Yes.  There are two others, who, after |
| 23 | they got final orders of removal, were for years checking in |
| 24 | with ICE every year.  Once they were married to U.S. citizens, |
| 25 | they began following the process to begin to regularize their |

1    status, and they were abruptly told to depart the country

2    despite progress on their applications.

3         THE COURT:  Their names are what?

4         MS. LAFAILLE:  That's Sandro De Souza and Oscar Rivas.

5    I'm sorry.  Mr. Rivas' wife actually naturalized after he began

6    the process.

7         MS. LARAKERS:  There's one more.

8         THE COURT:  Who is the fifth?

9         MS. LAFAILLE:  The fifth is Deng Gao who is in the cue

10   for his I-130 interview to take place in Boston.

11        THE COURT:  All right.  Well, I mean, there are some,

12   to me, surprising but positive things that have happened in the

13   course of this litigation.

14        I mean, last week Mr. Dos Santos was a contested case,

15   and now Mr. Dos Santos is going to be a dismissed case.  So my

16   inclination, subject to hearing from you and the implications

17   of this is to have you discuss whether there's some way to

18   reasonably resolve the situations, not necessarily the cases, I

19   mean the case in this court.

20        Here is my thought.  So there are five left, and the

21   litigation got the respondents focused, and they've resolved

22   many of the cases.  I wonder if it makes sense or -- I think it

23   makes sense but maybe you'll explain to me if it doesn't, to

24   have you confer to see whether you could reach some agreement

25   with regard to those five that would provide them the relief

 1    that's important to them.  That's one.

 2          Two, then stay this case and maybe have a reporting

 3    requirement where ICE will report to the plaintiffs on some

 4    regular schedule, you know, We haven't made any arrests at CIS

 5    this month.  We haven't detained anybody pursuing provisional

 6    waivers -- we haven't arrested anybody pursuing original

 7    provisional waivers.  But then there could be a request, if

 8    things don't continue to go in a good direction, that this stay

 9    be lifted and you can resume the litigation.

10          I mean, you're going to need some time to think about

11    this.  I mean, you've had your battle helmets on, and, you

12    know, you're well prepared to battle.  But recently, after

13    realizing I think the dimensions of its illegal activity, local

14    leaders of ICE are trying to improve.  It would be good to

15    focus on that.  I've said previously that -- I've said -- I

16    think I wrote this, said it in a hearing, that the stay of

17    deportation during the pendency of this case doesn't apply to

18    putative class members.  I think you said we'd have to bring an

19    individual case.  I think you wouldn't be barred from bringing

20    another individual case if there was a good reason, you felt

21    there was a good reason for it.  You know, I just wonder based

22    on what I've heard and given that the remedy here -- you're not

23    looking for money damages from the United States -- is

24    prospective relief, you know, whether you can't reach some

25    agreement with regard to the remaining named plaintiffs,

1   there's five more people, and then share information so

2   decisions can be made whether further litigation is necessary.

3          MR. WEINTRAUB:  Sure.  Your Honor, if I could add one

4   thing.  You mentioned individuals would have to bring their own

5   cases.  We certainly encourage plaintiffs' counsel prior to

6   bringing a case to let us know of the situation.  It's going to

7   probably move quicker if you tell us, Hey, X, Y or Z has

8   happened.  We get to reach out to ICE and then see what's

9   happened, rather than bringing a suit, having to get a hearing,

10  having to get briefs filed.  In the days that all of that's

11  happening, even as quickly and as efficiently as Judge Wolf

12  moves, we could probably still move quicker if it looks like

13  there's reason to move quicker.

14          MR. PRUSSIA:  I think -- and certainly, the judge can

15  talk about this, but my initial reaction to some of this, we

16  still have folks out there that are in fear of availing

17  themselves of the process because of statements that they've

18  heard from ICE, including in the papers that were filed just

19  the day before Mr. Brophy testified suggesting that they're

20  going to be subject to an enforcement action.

21          And so I think that it's difficult to say we'll bring

22  this on a case-by-case basis when we have people that are in

23  fear of availing themselves of the process because of what

24  they're hearing from the government.  And so I think that the

25  judge has offered some good thoughts, but I do think that as

1    part of that it's going to be important for there to be a clear

2    statement on the record that has some enforceability with

3    respect to what exactly the policy is of ICE.

4          THE COURT:  When you say "some enforceability," you

5    can talk to Ms. Lafaille because she worked on one matter with

6    me where I settled -- it became a civil procedure exam question

7    at the Yale Law School in Judith Resnick's class because I was

8    settling a big class action on behalf of mentally ill prisoners

9    who were being kept in solitary confinement, and it took years

10   to settle because of limited financial resources.

11         But I said at the outset I discourage you from giving

12   me a consent decree because I don't want to be running the

13   Department of Corrections.  Then I issued my Kosilek decision,

14   and I set out at the end ordering the Department of Corrections

15   to give sex reassignment surgery to a prisoner with gender

16   identity disorder, severe.

17         You know, there are certain requirements in that

18   context for getting an injunction, but one of the conventional

19   requirements is there has to be imminent threat of irreparable

20   harm.  So even if you won the case, if you go back to any 2002

21   Kosilek decision, I was satisfied that the state government was

22   going to follow the law, and as long as that person was the

23   commissioner, they did follow the law, and I didn't issue the

24   injunction.  So when they got a new commissioner who changed

25   the policy, that wasn't a violation of the law.

1          You say "enforceable."  You have statements that have

2     been on the front page yesterday, today, of the Boston Globe of

3     Mr. Brophy saying we're not going to give priority to this.  I

4     mean, this all off the top of my head.  It may not be as good

5     an idea at the moment as I think it is.  But they've let a lot

6     of people out of custody since I made my ruling on May 8.

7          And you might be able to -- you know, you've got human

8     clients as well as a cause, and those are five people living

9     with great anxiety for good reasons.  You know, they may be

10    separated from their spouses and their children.  You might be

11    able to reach an agreement that they'll be allowed to stay in

12    the United States until the process of provisional waivers is

13    exhausted.

14         That's how the Arriaga case before me last May was

15    resolved in just a couple of hours.  I said right before lunch,

16    at 1:00 I expect I'm going to allow this preliminary injunction

17    because this is my current view of the law.  Why don't you talk

18    about it.  And all I could have ordered was release, and they

19    agreed that Arriaga would be released on Monday, this was on

20    Friday, and could stay in the United States until the process

21    of pursuing provisional waivers was exhausted.  So there was

22    more relief in the settlement than I could have ordered.

23         And my sense is, you know, I've been focused on

24    detention because I'm confident I have jurisdiction over the

25    detention issues, the Supreme Court said in <u>Zadvydas</u>.  When you

1    get to removal issues, it's not so simple.  So think about

2    that.  If you reach some agreement that would resolve things

3    for the five named plaintiffs and have a stay and the case

4    could be reinstated, maybe a stay for -- not for 50 years

5    but --

6              MR. WEINTRAUB:  That was exactly what I was going to

7    recommend, 50 years.

8              THE COURT:  I'll try to stick around for you.  I'm on

9    the list to 97, so watch out.  But let me ask Mr. Brophy and

10   Mr. Lyons, does this sound like a reasonable approach to

11   explore?

12             MR. BROPHY:  I think there's definitely room for

13   conversation, and I'm sure we can probably work something out

14   between the attorneys here and you folks.  You know, we're

15   going to give it the good old college try.

16             THE COURT:  Mr. Lyons, this is going to be your

17   responsibility in about ten days.  Do you think this is worth

18   exploring, talking about?

19             MR. LYONS:  Yes, sir.

20             MR. WEINTRAUB:  Your Honor, toward that end, I don't

21   mean to constantly sound like I'm trying to delay things, but

22   might it not be a good use of our time rather than coming back

23   up here and continuing the hearings next week to use that

24   time to --

25             THE COURT:  Well, this is what I want you to tell me

1   on Friday.  I want you to have some discussions between now and

2   noon on Friday.  Just have some discussions.  And if you say,

3   you know, We've reached some agreement, or we think we have a

4   basis to talk, we don't want to come in next Wednesday, can we

5   wait, I'll give you more time, if you both tell me that it's

6   being used.

7          But I'll tell you something else.  The primary motive

8   I've had for trying to move this along very fast is there are

9   people locked up and they're being irreparably harmed.  And

10  I've received confirmation that was intuitively obvious to me

11  that it wouldn't just be De Souza and Junqueira who had the

12  cases in front of me for whom the POCR regulations weren't

13  observed.  They were the most likely to get the protection if

14  they were generally being followed.  A lot of people didn't get

15  it.  That was one motive.

16         But the other is, I've got two other things that are

17  very substantial and will be time-consuming that I have to

18  start dealing with very soon.  One is a multibillion-dollar

19  patent case that I'm get getting ready to try in August, and

20  the other, as soon as it gets unsealed maybe the week after

21  next you will read about in the newspaper.  It's been in there.

22  This is nothing confidential.  It involves a dispute relating

23  to $75 million of attorney's fees in a class action case and

24  has implications for the whole industry.  Then I'm not going to

25  be here in July, and I'm not going to let anybody else deal

1    with this case in my absence.  So I think you need a sense of

2    urgency.  And these things -- I mean, a week ago Dos Santos was

3    a complicated case.  Then the government agreed he could get

4    married, which is wonderful, and then the government agreed he

5    could get released.  And next Tuesday it will be no case at

6    all.

7            So I don't know why this would be so hard from the

8    respondents' perspective.  And I think I would encourage the

9    petitioners to think about, you know, named plaintiffs and

10   their present plights which can be ameliorated if you reach a

11   mutually agreeable resolution.  Maybe they, too, can stay here

12   until their process is finished.  And then you find some way to

13   monitor whether Mr. Lyons' policies are being followed and not

14   generating the problems that you would hope to get class-wide

15   relief for and stay the case for a reasonable period of time

16   without prejudice to people bringing individual cases if they

17   have concrete controversy, particularly if they're detained.

18           So I'll issue something that clarifies the protective

19   order and expect that they'll proceed in good faith with regard

20   to it.  And I'm ordering that you begin talking and report by

21   noon on Friday, which is the 25th.  If you reach some

22   agreement, tell me what it is.  I'm tentatively ordering that

23   we're going to resume next Wednesday, the 30th.  Is Wednesday

24   the 30th?  The 30th.  But if either or both of you think we

25   should be having some proceedings on the 30th, tell me what you

```
 1    think they should be.  I'm concerned, I think petitioners'
 2    counsel are going to be concerned about what happened to those
 3    other people who were arrested at CIS offices.
 4              MR. LYONS:  In January, sir?
 5              THE COURT:  Yes.  The email that you gave us this
 6    morning --
 7              MR. BROPHY:  I think he was referring to the email I
 8    sent to the attorneys.
 9              THE COURT:  Right.  How long would it take to get the
10    files on those people?
11              MR. BROPHY:  I believe they may be at CIS.  We can
12    request them, so it could make a few days, maybe a week to get
13    the alien file.
14              MR. WEINTRAUB:  In addition, we've already discussed
15    this with petitioners' counsel, we'll do what we can to get
16    them at least the G-28s if we have them, and they can indicate
17    who the attorneys are.
18              THE COURT:  If they have attorneys.
19              MR. WEINTRAUB:  Of course, Your Honor.
20              THE COURT:  Look.  This is positive.  In the Arriaga
21    case I met with them after, right here, and there were five
22    people arrested, and one had got before me and had got more
23    relief than I could have ordered, which was good.  But I was
24    very concerned about what happened to the other four, and I
25    asked, and I was told that ICE wouldn't tell the plaintiffs'
```

1   counsel where they were.  One had an immigration attorney, but

2   three had just disappeared.  And the government's position was

3   those people had a privacy interest in where they were being

4   held, so no lawyer could say, We'll represent you, or they

5   didn't know they could contact a lawyer.  And that's not your

6   policy anymore.  That's good, that's good.

7            When I write my decision memorializing May 8, you

8   might find some language that goes back.  It will tell you who

9   Blackstone was, the Federalist papers, and the Guantanamo

10  cases.  From the beginning of the United States, it was

11  recognized that one of the worst things can be to disappear in

12  detention when you haven't been convicted for anything.

13           So yeah, talk about it.  It's a good idea.  You know,

14  they may have lawyers, they may not have lawyers, but you're

15  talking about the right things.  And I think while there have

16  been very serious violations of the law with really profound

17  human consequences, at the moment I think you're trying to get

18  the office operating lawfully, and that's one of the goals of

19  this case.  If you do it, I don't have to decide whether I need

20  to order you to do it.  All right?  Is there anything else we

21  should discuss?

22           MS. LARAKERS:  Nothing from us, Your Honor.

23           THE COURT:  All right.  We're in recess.

24           (Recess taken 5:25 p.m.)

25

```
 1                  CERTIFICATE OF OFFICIAL REPORTER

 2

 3              I, Kelly Mortellite, Registered Merit Reporter

 4    and Certified Realtime Reporter, in and for the United States

 5    District Court for the District of Massachusetts, do hereby

 6    certify that pursuant to Section 753, Title 28, United States

 7    Code that the foregoing is a true and correct transcript of the

 8    stenographically reported proceedings held in the

 9    above-entitled matter and that the transcript page format is in

10    conformance with the regulations of the Judicial Conference of

11    the United States.

12                        Dated this 4th day of June, 2018.

13

14                        /s/ Kelly Mortellite

15                        _____

16                        Kelly Mortellite, RMR, CRR

17                        Official Court Reporter

18

19

20

21

22

23

24

25
```