UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

LILIAN PAHOLA CALDERON JIMENEZ        )
AND LUCIMAR DE SOUZA, ET AL.          )
    Petitioner-Plaintiffs,            )
                               )
           v.                         )     C.A. No. 18-10225-MLW
                               )
CHRISTOPHER CRONEN, ET AL,            )
    Respondent-Defendants.            )
                               )
                               )
EDUARDO RALPH JUNQUEIRA,              )
    Petitioner,                       )
                               )
           v.                         )     C.A. No. 18-10307-MLW
                               )
STEVEN SOUZA, ET AL,                  )
    Respondents.                      )
                               )

MEMORANDUM AND ORDER[1]

WOLF, D.J.                                      June 11, 2018

    I.    SUMMARY

    This country was born with a declaration of universal human rights, proclaiming that: "all men are created equal, that they are endowed by their Creator with certain unalienable rights," and that among these" is "Liberty." U.S.C.A. Declaration of Independence (1776). This concept was codified in the Fifth Amendment to the United States Constitution, which states in part that "no person shall be...deprived of...liberty...without due

---

[1] This Memorandum and Order amplifies and, to a limited extent, updates a decision delivered orally in court on May 8, 2018.

process of the law." U.S. Const. Amend. V. As the Supreme Court has written, "[f]reedom from imprisonment--from government custody, detention, or other forms of physical restraint--lies at the heart of the liberty that Clause protects." Zadvydas v. Davis, 533 U.S. 678, 690 (2001). As the words "no person" indicate, and as the Supreme Court has confirmed, "the Due Process Clause applies to all 'persons' within the United States whether their presence here is lawful, unlawful, temporary, or permanent." Id. at 693.

The United States has historically been distinguished by its dedication to treating lawfully and fairly all among us, including aliens who are in the country illegally. However, as Supreme Court Justice Louis D. Brandeis observed, in each generation we "must labor to possess that which [we] have inherited." Paul Freund, "Mr. Justice Brandeis," in On Law and Justice at 119 (1968). These cases are a reminder that Justice Brandeis was right.

Lucimar De Souza, a Brazilian national, entered the United States unlawfully in 2002. She alleges that she did not receive notice of the hearing to determine whether she should be deported from the United States. In any event, in June 2002, De Souza was ordered to leave the country and did not.

Eduardo Junqueira, who was also born in Brazil, entered the United States unlawfully in 2004. He was apprehended and deported later that year. Junqueira soon reentered the United States unlawfully.

2

In 2006, De Souza married a United States citizen. They have an 11-year old son who is a United States citizen. Junqueira also married a United States citizen. They have two children, ages 10 and 12, who are United States citizens. Neither De Souza nor Junqueira has ever violated any law other than by entering and remaining in the United States illegally.

De Souza and Junqueira present the United States with dilemmas. As generous as the United States has traditionally been in admitting immigrants and refugees, it cannot accommodate everyone who aspires to live here.  Therefore, its immigration laws must be enforced. However, the country also has a strong interest in not destroying families by deporting the wives, husbands, mothers, and fathers of United States citizens.

To reconcile these competing interests, the United States has established a process for determining whether aliens in the country illegally should be allowed to remain here with their families and become lawful Permanent Residents. The first step in that process requires the alien to prove to United States Citizenship and Immigration Services ("CIS"), an agency of the Department of Homeland Security ("DHS"), that his or her marriage is bona fide, rather than a sham to obtain immigration benefits. Both De Souza and Junqueira have attempted to utilize this process.

On January 30, 2018, at a scheduled appointment at a CIS office, De Souza and her husband were found to have a genuine

3

marriage.  De Souza was, however, immediately arrested there by another agency of DHS, Immigration and Customs Enforcement ("ICE"). Similarly, on February 1, 2018, Junqueira and his wife were at a CIS office for a scheduled interview concerning their marriage.  Before the interview began, ICE arrested Junqueira.

De Souza and Junqueira each filed petitions for habeas corpus asserting they are being detained by ICE in violation of the Constitution and laws of the United States, and seeking an order directing ICE to release them. De Souza is also attempting to represent a putative class in challenging the authority of ICE to arrest aliens at CIS offices and, wherever they are arrested, to deport them before CIS decides whether to grant them provisional waivers that would allow them to seek to remain in the United States with their families.

Federal law also creates a process for determining whether aliens like De Souza and Junqueira, who have been ordered removed, should be detained while the government attempts to effectuate their removal. A federal statute, 8 U.S.C. §1231(a)(2), requires that an alien ordered removed from the United States be detained for up to 90 days, ordinarily starting on the date the order becomes final. These 90 days are defined by the statute as the "removal period." Id. §1231(a)(1). ICE must give an alien notice and an opportunity to be heard before detaining him or her for longer than 90 days. See 8 C.F.R. §241.4. At the time of the May

4

8, 2018 hearing in these cases, ICE had detained De Souza and Junqueira for more than 90 days without following the process prescribed by its regulations.

ICE initially argued that the regulations do not apply to De Souza, and that they had not been violated with respect to Junqueira. ICE subsequently acknowledged that the regulations do apply and, even on its interpretation, which may be incorrect, the regulations were violated in each case. See May 8, 2018 Tr. at 15-18, 22-25, 35-36. However, ICE contends that the court does not have the power to provide a remedy for the unlawful detention of an alien who has not been in custody for at least six months. ICE relies on the Supreme Court's decision in Zadvydas in making this claim.

ICE's argument is unmeritorious. The Fifth Amendment guarantee of due process has two components. The substantive component prohibits restrictions on liberty that are not narrowly tailored to serve a compelling state interest, no matter what process is employed in deciding to impose them. In addition, a person who is detained has a right to procedural due process, meaning a right to a fair process for challenging the reasons for detention. Fundamental features of procedural due process are fair notice of the reasons for the possible loss of liberty and a meaningful opportunity to address them. Zadvydas addressed the substantive due process component of the Fifth Amendment. The

Supreme Court held, in effect, that an alien's right to substantive due process could be violated by prolonged detention even if the alien's right to procedural due process had been satisfied. See 533 U.S. at 697. Implicitly assuming that the alien had been afforded procedural due process, the Court found that detention of an alien for up to six months is presumptively reasonable for the purpose of the substantive due process analysis. Id. at 701.

However, as Justice Anthony Kennedy wrote in his dissent in Zadvydas, without dispute from the majority, "[w]ere the [DHS], in an arbitrary or categorical manner, to deny an alien access to the administrative processes in place to review continued detention, habeas jurisdiction would lie to redress the due process violation caused by the denial of the mandated procedures..." Id. at 724-25. Justice Kennedy's position was a particular application of a long line of Supreme Court and other decisions holding that regulations are laws that the government must obey. In the "McCarthy era," the Supreme Court held that having issued regulations delegating to the Board of Immigration Appeals (the "BIA") the discretion to decide whether an alien should be deported, the Attorney General could not dictate the BIA's decisions. See Accardi v. Shaughnessy, 347 U.S. 499, 502-04 (1954). During the "Watergate" era, the Attorney General issued regulations delegating to a Special Prosecutor the authority to conduct investigations relating to the 1972 election of President

Richard Nixon. See United States v. Nixon, 418 U.S. 683, 694-96 (1974). This authority included the power to issue subpoenas and to seek judicial enforcement of them, including by contesting any assertion of Executive Privilege. Id. at 694-95. The President claimed that he had the unreviewable power to assert that privilege and refuse to comply with the Special Prosecutor's subpoena for tapes the President secretly made in the Oval Office. Id. at 693. The Supreme Court rejected this claim, holding that the regulation had "the force of law," the "Executive Branch [was] bound by it," and the Court was "bound to respect and enforce it." Id. at 695, 696. Finding that the subpoena was properly issued and that the Executive Privilege did not provide a basis to quash it, the Court ordered the President to comply with the subpoena. Id. at 716.

The predecessor to DHS, the Immigration and Naturalization Service ("INS"), issued regulations that were expressly intended to provide all aliens the due process that is constitutionally required before deciding whether their detention should be continued following the initial 90-day removal period. ICE now argues that those regulations provide that any alien ordered removed can later be detained for 90 days before his or her custody is reviewed. See May 8, 2018 Tr. at 15. It acknowledges that the alien and his or her attorney must be given notice of that custody review 30 days in advance to afford them the opportunity to provide information in support of the alien's release. See 8 C.F.R.

§241.4(d)(3), (h)(2). ICE has a duty to obey these regulations even if they provide greater protection than is constitutionally required. See Nelson v. INS, 232 F.3d 258, 262 (1st Cir. 2000).

As indicated earlier, it is undisputed that neither De Souza nor Junquiera were provided the process required under ICE's interpretation of the regulations and, the court finds, by the Fifth Amendment. Indeed, ICE made no effort to follow the process prescribed by its regulations until alerted to issues raised in the litigation of these cases. As De Souza was arrested and detained on January 30, 2018, she was entitled to a custody review no later than about April 30, 2018, and to notice of it to her attorney and her by about March 30, 2018. Instead De Souza, but not her attorney, was given a notice on April 23, 2018 of a custody review to be conducted on or about April 30, 2018. On April 27, 2018, the ICE Deputy Field Office Director decided to continue De Souza's detention before her attorneys had an opportunity to provide information in support of her release. In the notice of that decision, the Deputy Field Office Director represented that De Souza had been personally interviewed. However, De Souza was never interviewed. The Acting Field Office Director subsequently filed a sworn declaration stating, falsely, that De Souza had received notice seven days before her custody review. A May 1, 2018 hearing in these cases evidently prompted ICE to recognize that it had violated its regulations in continuing to detain De

8

Souza. It then decided to conduct another custody review 30 days later and to continue to deprive De Souza of her liberty at least until that review occurred.

Junqueira was arrested on February 1, 2018 and, therefore, was entitled to a custody review no later than about May 1, 2018. Neither Junqueira nor his attorney received notice that any such review had been scheduled. Again, evidently alerted to ICE's unlawful conduct by the litigation in these cases, on May 3, 2018, the Acting and Deputy Field Office Directors decided that Junqueira would be released that day. However, after being contacted by an ICE lawyer, the Acting Field Office Director reversed that decision. ICE subsequently issued a notice that Junqueira would receive a custody review on about June 3, 2018, which would have deprived him too of his liberty at least until that review was conducted.

As indicated earlier, with regard to both De Souza and Junqueira, ICE argues that this court lacks the authority to order a remedy for its unlawful conduct. However, as the Supreme Court held in Zadvydas, §2241 habeas corpus proceedings provide a forum for statutory and constitutional challenges to post-removal detention. 533 U.S. at 693. The presumption created by Zadvydas, that up to six months of detention is reasonable, is based on the assumption that ICE followed the process prescribed by its regulations to ensure that continued detention was justified. This

assumption is not true for either De Souza or Junqueira. As of May 8, 2018, ICE was detaining each of them in violation of its regulations and without the "due process of law" required by the Fifth Amendment. Therefore, each is entitled to judicial relief.

Habeas corpus is an equitable remedy. The court has the discretion to fashion relief that is fair in the circumstances, including to order an alien's release. In view of ICE's repeated violations of its regulations -- and its indifference to its duty to obey the law -- it would not now be fair to keep De Souza or Junqueira incarcerated for another 30 days. Therefore, the court will promptly decide if either or both should be released pending possible deportation.[2]

ICE's illegal actions concerning De Souza and Junqueira have had profound human consequences that would continue without the court's intervention. It appears likely that De Souza and Junqueira will each be able to prove that if released, they will not be dangerous or flee and, therefore, that each will be entitled to release. Each will nevertheless still face the threat of being deported and separated from their families. Each day with their families is now particularly precious. Any unjustified loss of liberty for even another day would be a painful form of irreparable harm to them and to the United States citizens who love them.

---

[2] After the court rendered this decision orally on May 8, 2018, ICE released De Souza and Junqueira.

If accepted, ICE's argument that the court lacks the power to grant petitioners relief in these cases would deeply damage the Constitution's system of checks and balances that, as intended by the nation's Founders, has been fundamental to protecting the rights of every person--citizens as well as aliens. As the Supreme Court reminded in the case of a prisoner detained at Guantanamo, the writ of habeas corpus gives the "Judiciary...a time-tested device...to maintain the delicate balance of governance that is itself the surest safeguard of liberty" and "protects the rights of the detained by [conferring] the duty and authority on the Judiciary to call the jailor to account." Boumediene v. Bush, 553 U.S. 723, 745 (2008).

The unlawful treatment of De Souza and Junqueira occurred in cases that ICE knew would be subject to scrutiny by a federal judge. This suggests that other aliens who do not have lawyers to file suit on their behalf are also being illegally deprived of their liberty and irreparably harmed by being separated from their families before possibly being deported. The effort by De Souza and others to maintain her case as a class action to enjoin an alleged pattern of unlawful conduct by ICE presents these issues. They are not yet ripe for resolution.

However, it should be noted that in Boumediene, the Supreme Court explained the historic significance of the loss of liberty and the fundamental importance of habeas corpus to our democracy.

As the Court wrote, in advocating for the adoption of the Constitution in 1788, "Alexander Hamilton explained in The Federalist No. 84:

> [T]he practice of arbitrary imprisonments, have been, in all ages, the favorite and most formidable instruments of tyranny. The observations of the judicious Blackstone... are well worthy of recital: 'To bereave a man of life...or by violence to confiscate his estate, without accusation or trial, would be so gross and notorious an act of despotism as must at once convey the alarm of tyranny throughout the whole nation; but confinement of the person, by secretly hurrying him to jail, where his sufferings are unknown or forgotten, is a less public, a less striking, and therefore a more dangerous engine of arbitrary government.' And as a remedy for this fatal evil he is everywhere peculiarly emphatical in his encomiums on the habeas corpus act, which in one place he calls 'the bulwark of the British Constitution.' C. Rossiter ed., p. 512 (1961) (quoting 1 Blackstone 4 id., at 438)."

Boumediene, 553 U.S. at 744 (emphasis in original).

This court was informed that after it issued its decisions regarding De Souza and Junqueira on May 8, 2018, the Boston ICE Field Office reviewed its files and found 30 to 40 other individuals were being detained without the procedural due process ICE's regulations were intended to provide. See May 22, 2018 Tr. at 86; May 23, 2018 Tr. at 138. ICE released about 20 of them. Id. at 51. The court has not been informed of the status of the other 10 to 20 aliens who, evidently, were also denied due process.

## II. JURISDICTION

28 U.S.C. §2241(c)(3) authorizes a district court to issue a writ of habeas corpus to a person "in custody in violation of the

Constitution or laws or treaties of the United States." The writ of habeas corpus "entitles the prisoner to a meaningful opportunity to demonstrate that he is being held pursuant to 'the erroneous application or interpretation' of relevant law" and to obtain relief, including release, if he is being unlawfully detained. Boumediene, 553 U.S. at 779.

The Illegal Immigration Reform and Immigrant Responsibility Act and Real ID Act, codified in 8 U.S.C. §1252, places certain limits on judicial review in immigration cases. See 8 U.S.C. §§1252(a)(2)(B)(ii), 1252(b)(9), 1252(g). However, "§2241 habeas corpus proceedings remain available as a forum for statutory and constitutional challenges to post-removal-period detention." See Zadvydas, 533 U.S. at 688 (addressing 8 U.S.C. §§1252(a)(2)(B)(ii) and 1252(g)); see also Jennings v. Rodriguez, 138 S. Ct. 830, 841 (2018) (addressing 8 U.S.C. §§1252(g) and 1252(b)(9)); Aguilar v. ICE, 510 F.3d 1, 11 (1st Cir. 2007)(addressing 8 U.S.C. §1252(b)(9)).

De Souza and Junqueira have each been previously ordered removed from the United States. Each claims, among other things, that ICE violated 8 U.S.C. §1231(a)(6) and the Due Process Clause of the Fifth Amendment by detaining him or her for more than three months without the opportunity to be heard required by DHS regulations. These are "statutory and constitutional challenges to post-removal-period detention," for which §2241 gives the court

13

jurisdiction. Zadvydas, 533 U.S. at 688; Jennings, 138 S. Ct. at 841; Aguilar, 510 F.3d at 11.

   III. THE LEGAL FRAMEWORK

     A. The Fifth Amendment Due Process Clause

     Congress has "'plenary power' to create immigration law, and [the] judicial branch must defer to Executive and Legislative decisionmaking in that area. But that power is subject to important constitutional limitations." Zadvydas, 533 U.S. at 694-95 (citations omitted). The Due Process Clause of the Fifth Amendment imposes one such limitation. As indicated earlier, it states that "No person shall...be deprived of life, liberty, or property, without due process of law." U.S. Const. Amend. V. As also noted earlier, the Fifth Amendment "applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." Zadvydas, 533 U.S. at 693; see also Wing Wong v. United States, 163 U.S. 228, 238 (1896). The Due Process Clause protects an alien subject to a final order of deportation, "though the nature of that protection may vary depending upon status and circumstance." Zadvydas, 533 U.S. at 693-94.

     Due process has two components. The "substantive component...forbids the government to infringe certain 'fundamental' liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a

compelling state interest." Reno v. Flores, 507 U.S. 292, 301-02 (1993)(emphasis added); see also Foucha v. Louisiana, 504 U.S. 71, 80 (1992). "Freedom from imprisonment--from government custody, detention, or other forms of physical restraint--lies at the heart of the liberty that Clause protects." Zadvydas, 533 U.S. at 690. Except as punishment for a crime, detention of any "person" is justified only "in special and narrow non-punitive circumstances, where a special justification...outweighs the individual's constitutionally protected interest in avoiding physical restraint." Id. In addition, detention may only continue as long as it bears a "reasonable relation" to permissible purposes. Id.

"When government action depriving a person of life, liberty, or property survives substantive due process scrutiny, it must still be implemented in a fair manner." United States v. Salerno, 481 U.S. 739, 746 (1987); Morrissey v. Brewer, 408 U.S. 471, 482, 484 (1972). Therefore, although "Congress's broad immigration powers allow it to pass a law authorizing an alien's initial detention...those implementing the statute [must] provide individualized procedures through which an alien might contest the basis of his detention." Diop v. ICE, 656 F.3d 221, 232 (3d Cir. 2011); see also Demore v. Kim, 538 U.S. 510, 532 (2003)(Kennedy, J., concurring). "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." Mathews v. Eldridge, 424 U.S. 319, 333 (1976).

15

When regulations are promulgated to protect a fundamental right derived from the Constitution or a federal statute, such as the Fifth Amendment right to notice and an opportunity to be heard, the Due Process Clause requires federal agencies to follow them, "even when those regulations provide greater protection than is constitutionally required." Nelson, 232 F.3d at 262; Accardi, 347 U.S. 267-68; Waldron v. INS, 17 F.3d 511, 518 (2d Cir. 1994); Rombot v. Souza, 296 F.Supp.3d 383, 388 (D. Mass. 2017)(Saris, D.J.). "So long as [a] regulation remains in force the Executive Branch is bound by it, and indeed the United States as the sovereign composed of the three branches is bound to respect and to enforce it." Nixon, 418 U.S. at 695-96. In essence, the government, as well as the governed, must follow the law, and in habeas it is the court's duty to ensure that it does. See Boumediene, 553 U.S. at 741 (stating the "from an early date it was understood that the King, too, was subject to the law," and that by the 1600s, habeas courts could ensure that he followed it when detaining individuals).

B. The Post-Order Detention Statute

8 U.C.S. §1231 authorizes the Secretary of Homeland Security (the "Secretary")[3] to detain aliens subject to final orders of

---

[3] The statute refers to the Attorney General as the official exercising the authority to detain aliens subject to a final order of removal, and to adjudicate applications for immigration benefits. Before 2002, the INS exercised those powers on behalf of

removal while efforts are made to obtain travel documents and deport them. The statute provides that when an alien is "ordered removed" from the United States, "the [Secretary of Homeland Security] shall remove the alien from the United States within a period of 90 days (in this section referred to as the 'removal period')." §1231(a)(1)(A). The removal period begins on "[t]he date the order of removal becomes administratively final," the date of a court's final disposition if the removal order is judicially reviewed, or "the date the alien is released from [non-immigration] detention," whichever is latest. Id. §1231(a)(1)(B). The statute contemplates that if the alien is not immediately removed, he or she will be detained for at least 90 days, stating that "during the removal period, the [Secretary] shall detain the alien." Id. §1231(a)(2).

Congress and the President foresaw that the Secretary might unable to remove some aliens within the removal period. The statute provides that "[i]f the alien does not leave or is not removed within the removal period, the alien, pending removal, shall be subject to supervision under regulations prescribed by the [Secretary]." Id. §1231(a)(3). The statute also states that aliens

_____

the Attorney General. The Homeland Security Act of 2002 abolished the INS and transferred the immigration powers previously exercised by the Attorney General to the Secretary of Homeland Security and divisions of DHS, ICE and CIS. See Clark v. Martinez, 543 U.S. 371, 374 (2005)(citing 6 U.S.C. §§251(2), 252(a)(3), 271(b)).

who entered the United States unlawfully, among others, "may be detained beyond the removal period." Id. §1231(a)(6)(emphasis added).

The parties agree that the 90-day removal period for both De Souza and Junqueira has elapsed. Therefore, if they may be detained at all,[4] they are subject to §1231(a)(6), which makes detention discretionary.[5]

Although §1231(a)(6) states that the Secretary "may" detain an inadmissible alien beyond the removal period, it does not authorize the government to detain an alien indefinitely merely because he or she is subject to a final order of removal. In

---

[4] De Souza argues that she cannot be detained now because she cannot be deported while seeking the provisional waivers necessary to remain with her family in the United States, and if her deportation is not likely in the near future, detention is not permissible. See Traverse and Response in Support of Release from Custody (Docket No. 45) at 8-9. In addition, she asserts that there is no basis to find that she is a risk of flight or danger to the community. Id. at 9-10. She argues that, therefore, the decision to detain her would be arbitrary and capricious and violate substantive due process and the Administrative Procedure Act even if ICE used the required procedures to make it. Id. Because the court has found that ICE was detaining De Souza in violation of its regulations during the May 8, 2018 hearing, it is unnecessary to address these arguments.

[5] At the latest, De Souza's removal order became final on July 23, 2015, when the BIA dismissed the appeal of the decision denying the motion to reopen her 2002 removal order. See Affidavit of Tiffany Andrade, ¶¶5-6. Therefore, her removal period ended no later than October 21, 2015. DHS reinstated Junqueira's removal order on February 1, 2018, starting the removal period again. See 8 U.S.C. §1231(a)(5). Therefore, his removal period ended on May 2, 2018 at the latest.

Zadvydas, the Supreme Court addressed the substantive component of the Due Process Clause. It held that the statute's use of the word "may" was "ambiguous," as it "suggest[ed] discretion," but not "unlimited discretion." 533 U.S. at 697. Without an explicit limit on how long the government could detain an alien, §1231(a)(6) raised a serious constitutional question: "whether, irrespective of the procedures used, the Constitution permits detention that is indefinite and potentially permanent." 533 U.S. at 696 (emphasis added)(citation omitted). To avoid having to decide the constitutional question, the court read "an implicit limitation into the statute" based on "its basic purpose, namely, assuring the alien's presence at the moment of removal." Id. at 699. It held that §1231(a)(6) authorizes detention only so long as it is "reasonably necessary to secure [the alien's] removal." Id.

In Zadvydas, the Court implicitly assumed that the Attorney General had followed the procedures prescribed in 8 C.F.R. §241.4, which are discussed below. The Court held that even when the Attorney General finds that an alien poses a risk of flight or danger to the community, "once removal is no longer reasonably foreseeable, continued detention is no longer authorized by statute." Id. The Court reasoned that the statute's "first justification--preventing flight--is weak or nonexistent where removal seems a remote possibility at best." Id. at 690.

19

The Court also held that there is a six-month period in which
the Attorney General's, now the Secretary's, decision to detain an
alien is "presumptively reasonable." Id. at 701.[6] The Court
directed that "after this 6-month period, once the alien provides
good reason to believe that there is no significant likelihood of
removal in the reasonably foreseeable future, the Government must
respond with evidence sufficient to rebut that showing," and if it
does not, the court "should hold continued detention unreasonable
and no longer authorized by statute." Id. at 699-701. As explained

---

[6] Respondents acknowledged at the May 1, 2018 hearing that the
presumption that detention is reasonable for six months can be
rebutted in particular cases. See May 1, 2018 Tr. at 29. This is
correct. In establishing the presumption, the Court cited County
of Riverside v. McLaughlin, 500 U.S. 44, 56-58 (1991), in which it
presumed that 48 hours is a reasonable time to detain a defendant
in a criminal case before providing a probable cause hearing.
Zadvydas, 533 U.S. at 701. In County of Riverside, the Court
explained that the 48-hour presumption could be rebutted "if the
arrested individual can prove that her probable cause
determination was delayed unreasonably." 500 U.S. at 56. The Court
also cited Cheff v. Schnackenberg, 384 U.S. 373, 379-80 (1966)
(plurality op.), which "adopted [the] rule, based on [the]
definition of 'petty offense' in the United States Code, that [the]
right to a jury trial extends to all cases in which a sentence of
six months or greater is imposed." Zadvydas, 533 U.S. at 701.
However, in Cheff, the Court suggested that the serious "nature"
of some crimes could require the protection of a jury trial for
conviction, even though the maximum penalty is less than six months
in prison. 384 U.S. at 380. As an example, the Court cited District
of Columbia v. Colts, 282 U.S. 63 (1930), in which the Court
required a jury to convict for the offense of reckless
driving at an excessive speed, even though the maximum punishment
for a first offender was a $100 fine and 30 days in jail. See
Cheff, 384 U.S. at 380; see also id. at 388 (Douglas, J.,
dissenting)(describing the facts of Colts).

below, Zadvydas did not decide the implications of depriving a detained alien of his or her right to procedural due process.

### C. The Post-Order Custody Review Regulations

8 C.F.R §241.4 delegates to ICE the authority to detain aliens beyond the initial 90-day removal period. It establishes standards and procedures ICE must follow to do so. The regulation provides that ICE will periodically review an alien's records and consider whether to continue detention or release the alien. See 8 C.F.R. §241.4(d), (h), (i) & (k). ICE must conduct the initial review "prior to the expiration of the removal period," id. §241.4(h)(1), (k)(1)(i), or "as soon as possible thereafter," id. §241.4(k)(2)(iv), unless it makes written findings that the "detainee's prompt removal is practicable and proper," or that there is other "good cause" for postponing the review, id. §241.4(k)(3). If the review is postponed, ICE must use "reasonable care" to conduct the review "once the reason for delay is remedied or if the alien is not removed from the United States as anticipated at the time review was suspended or postponed." Id. ICE must "provide written notice to the detainee approximately 30 days in advance of the pending records review so that the alien may submit information in writing in support of his or her release." Id. §241.4(h)(2). In addition, ICE must "forward by regular mail a copy of any notice or decision that is being served

21

on the alien" to the alien's attorney if he or she is represented. Id. §241.4(d)(3).

To obtain release, the alien must show that: his or her immediate removal is not practical or proper; he or she is not likely to be violent or "pose a threat to the community following release"; and he or she does not "pose a significant risk of flight" or of "violat[ing] the conditions of release." Id. §241.4(e). The regulation requires ICE to consider "the likelihood that the alien is a significant flight risk or may abscond to avoid removal," "favorable factors, including ties to the United States such as the number of close relatives residing here lawfully," and factors bearing on the alien's dangerousness, such as criminal history, disciplinary infractions, and past immigration violations, among others. Id. §241.4(f). It also requires that ICE issue a written decision. Id. §241.4(d).

When the INS published 8 C.F.R. §241.4 on December 21, 2000, it explained that the regulation was intended to provide aliens procedural due process, stating that §241.4 "has the procedural mechanisms that...courts have sustained against due process challenges." Detention of Aliens Ordered Removed, 65 F.R. 80281-01, at 80283 (2000). INS cited, among other decisions, Chi Thon Ngo v. INS, 192 F.3d 390, 398 (3d Cir. 1999). Id. In Ngo, the Third Circuit held that "the process due even to excludable aliens requires an opportunity for an evaluation of the individual's

current threat to the community and his risk of flight." 192 F.3d at 398. It held that a process by which "Directors simply relied on the aliens' past criminal history and the fact that they were facing removal from the United States" to "summarily conclude[e] that the aliens posed such risks and deny[] them release," was "not satisfactory and d[id] not afford due process." Id. at 399. The INS stated that, in an effort to provide the constitutionally required due process, §241.4 "contemplates individualized determinations where each case must be reviewed on its particular facts and circumstances, and affords aliens periodic reconsideration in a non-adversarial process." 65 F.R. at 80284.

The procedures in §241.4, therefore, are not meant merely to "facilitate internal agency housekeeping, but rather afford important and imperative procedural safeguards to detainees." Bonitto v. ICE, 547 F.Supp.2d 747, 757-58 (S.D. Tex. 2008). They protect the fundamental Fifth Amendment right to notice and an opportunity to be heard, and must be followed. See Rombot, 296 F.Supp.3d at 388; D'Alessandro v. Mukasey, 628 F.Supp.2d 368, 388-403 (W.D.N.Y. 2009). When DHS fails to do so, the court may order ICE to conduct a custody review, or conduct the review itself and, if warranted, order the alien released. See Rombot, 296 F.Supp.3d at 388-89.

D. <u>The Provisional Waiver Process</u>

Federal immigration laws permit an undocumented alien who has been ordered removed from the United States, and is married to a United States citizen, to seek to become a lawful Permanent Resident. To do so, he or she must obtain the permission of two government agencies. First, the alien must apply to CIS for waivers of the Secretary of DHS's right to enforce two statues that would bar the alien from applying for a visa for ten years after departing the United States. As the first step in the process of obtaining waivers, the alien's spouse must file a "Form I-130" application with CIS. CIS then interviews the couple to determine whether their marriage is genuine. If CIS finds the marriage is authentic, the alien may file another series of forms asking CIS to exercise its discretion to grant the waivers. CIS may grant the waivers if it finds that failure to do so would "result in extreme hardship to the citizen...spouse." 8 U.S.C. §1182(9)(B)(v). Under a 2016 regulation, the alien may pursue these waivers while in the United States, as well as while abroad.[7] <u>See</u> <u>Expansion of Provisional Unlawful Presence Waivers of Inadmissibility; Final Rule</u>, 81 Fed. Reg. 50244, 50245 (July 29, 2016). If the alien has

---

[7] The petitioners in the <u>Calderon</u> putative class action, including De Souza, claim that DHS must allow them to remain in the United States while seeking the waivers. This issue is not yet ripe to be decided.

re-entered the United States unlawfully, the alien must remain outside the United States for ten years, then apply for a waiver. See 8 U.S.C. §1182(a)(9)(C).

If an alien receives waivers and therefore permission to apply for a visa, but is ineligible to "adjust" his or her status in the United States because of his or her unlawful entry,[8] the alien must travel to his or her country of origin and meet with a representative of the United States Department of State. The State Department official conducts an interview and, if appropriate, issues a visa which authorizes the alien to re-enter the United States and, upon doing so, to become a lawful Permanent Resident.

IV.  FACTS AND PROCEDURAL BACKGROUND

In March 2017, five aliens, including Leandro Arriaga Gil, were arrested by ICE while at the Lawrence, Massachusetts CIS office for an I-130 interview. See Arriaga v. Tomkins, C.A. No. 17-10743, Docket No. 1.[9] Arriaga filed a habeas petition under §2241 and a motion for a temporary restraining order requiring his

---

[8] An alien who lawfully enters the United States and overstays his or her visa, and then marries a United States citizen, may "adjust" his or her status to that of a lawful permanent resident without leaving the United States. See 8 U.S.C. §1255. However, the petitioners are not eligible to do so because they unlawfully entered the United States. Id.

[9] See also Milton J. Valencia, "Immigration Officials Agree to Release Lawrence Immigrant Who Was Detained without Bail," Boston Globe, May 5, 2017, https://www.bostonglobe.com/metro/2017/05/05/judge-reviews-case-lawrence-immigrant-detained-without-bail/c4CkszjUhyd4ExUu33uLYI/story.html.

release. ICE detained Arriaga, whose removal period had expired in 2001, for about one month without giving him a custody review. Therefore, at a May 5, 2017 hearing on Arriaga's motion for a temporary restraining order, this court indicated it was likely to decide that ICE violated its regulations and allow the motion. During a break, before the court announced its final decision, ICE agreed to release Arriaga and to allow him to stay in the United States until CIS processed his application for a waiver. The court was not informed of what happened to the four similarly situated aliens who did not bring cases in federal court.

In January 2018, at least eight individuals, including De Souza, Fabiano Mateus de Oliveira, and Lilian Pahola Calderon Jiminez, were arrested by ICE at their I-130 interviews in Massachusetts and Rhode Island. See Affidavit of Todd M. Lyons ¶12; see also De Oliveira v. Moniz, C.A. No. 18-10150, Docket No. 1; May 23, 2018 Tr. at 22-23. Junqueira was similarly arrested on February 1, 2018 at a CIS office in Connecticut. C.A. No. 18-10307, Amended Petition at ¶32. De Souza, Junqueira, De Oliveira, and Calderon each filed petitions under 28 U.S.C. §2241, which were properly designated as related to Arriaga and assigned to this court. See Rule 40.1(g) of the Local Rules of the United States District Court for the District of Massachusetts.

The court scheduled briefing and hearings to decide whether De Oliveira and Calderon, like Arriaga, were entitled to bail

hearings and possible release. See De Oliveira, C.A. No. 18-10150, Jan. 26, 2018 Order (Docket No. 5); Calderon, C.A. No. 18-10225, Feb. 6, 2018 Order (Docket No. 6). Shortly before each of their hearings, ICE agreed to release De Oliveira and Calderon. See De Oliveira, C.A. No. 18-10150 (Docket No. 16); Calderon, C.A. No. 18-10225 (Docket No. 15). ICE did not, however, agree to release De Souza or Junqueira.[10] Therefore, on May 8, 2018, the court held a hearing to decide whether De Souza and Junqueira were entitled to relief.

A. Lucimar De Souza

De Souza, who is from Brazil, entered the United States unlawfully on February 22, 2002. Aff. of Tiffany R. Andrade (Docket No. 50-5), ¶4. Upon entering the United States, she was detained by immigration officials. Id. While in detention, she provided

---

[10] On February 21, 2018, Deputy Field Office Director Todd Lyons represented that ICE arrested five individuals other than De Oliveira and Calderon at Massachusetts and Rhode Island CIS offices in January of 2018. See Lyons Aff. at ¶12. On May 22, 2018, the court ordered Acting Field Office Director Brophy to report on the status of these five individuals. At a May 23, 2018 hearing, Brophy confirmed that ICE arrested five individuals other than Calderon and De Oliveira at CIS offices in Massachusetts and Rhode Island in January of 2018. See May 23, 2018 Tr. at 23. One of them, Jovel Calderon Morales, was still being detained in violation of §241.4. Id. at 25-26. On about May 23, 2018, Brophy directed that Morales be released. Id. at 25. The others had been released or deported. Id. However, these five did not include De Souza, who was detained in Massachusetts during that same period. Id. at 28. Therefore, it appears that Lyons' February 21, 2018 declaration underrepresented the number of aliens who had been arrested at Massachusetts and Rhode Island CIS offices, and that Brophy's May 23, 2018 list of arrestees may not have been complete. Id. at 28-29.

immigration officers with the address of a friend in Waterbury, Connecticut. Id. She was released, stayed in Waterbury briefly, then moved to Danbury, Connecticut. Id. Her friend allegedly told De Souza that he did not receive any communications concerning her immigration case. Id. On June 11, 2002, De Souza did not appear at a hearing the Immigration Court had scheduled to determine whether she should be deported. Id. ¶5. As a result, an Immigration Judge ordered her removed. Id. Despite her 2002 final order of removal, De Souza stayed in the United States. On August 26, 2006, she married Sergio Santos Francisco, a United States citizen. Id. at ¶3. They have an 11 year-old-son. Id. In May 2014, she moved to reopen the proceedings. Id. ¶6. Her motion to reopen was denied. Id. On July 23, 2015, the BIA affirmed the decision. Id. ¶7.

On September 29, 2016, Francisco filed an I-130 petition on De Souza's behalf to begin the process of applying for provisional waivers. Id. ¶9. On December 28, 2017, CIS sent De Souza and Francisco a notice that CIS would interview them on January 30, 2018 at the John F. Kennedy Federal Building in Boston, Massachusetts. Id. ¶10 & Ex. B. The notice instructed the couple to bring "clear and convincing evidence that you have been residing together in a bona fide marital relationship from the date of marriage continuously to the present." Id., Ex. B. De Souza and Francisco attended the interview. Id. ¶10. CIS determined that

their marriage is legitimate and approved the I-130 petition. Id. Ex. A.

However, when De Souza left the building, five ICE officers arrested her. Id. ¶11. From January 30, 2018 to May 8, 2018, she was held at the South Bay House of Corrections in Boston. Id. ¶3.

Immediately after she was arrested, De Souza filed an emergency motion in the BIA to reopen her case and stay her deportation so that she could pursue her waiver applications with CIS. Id. ¶13. In addition, on March 23, 2018, she submitted to ICE a Request for Bond or Supervised Release. Id. ¶20.

On April 10, 2018, De Souza and Francisco joined the Amended Complaint in Calderon v. Nielsen, C.A. No. 18-10225, with four other couples, as petitioner-plaintiffs. In that putative class action, plaintiffs seek an order enjoining ICE from detaining or deporting them or similarly situated individuals[11] until CIS adjudicates their applications for waivers. In any event, they request an order prohibiting ICE from detaining or deporting them

---

[11] In particular, they seek to represent: "any U.S. citizen and his or her noncitizen spouse who: (1) has a final order of removal and has not departed the U.S. under that order; (2) is the beneficiary of a pending or approved I-130, Petition for Alien Relative, filed by the U.S. citizen spouse; (3) is not "ineligible" for a provisional waiver under 8 C.F.R. § 212.7(e)(4)(i) or (vi); and (4) is within the jurisdiction of Boston ICE-ERO field office (comprising Massachusetts, Rhode Island, Connecticut, Vermont, New Hampshire, and Maine)." C.A. No. 18-10225, Motion for Class Certification (Docket No. 46).

without giving them an opportunity to be heard and a written explanation of why the class member should not be permitted to remain in the United States while pursuing waivers from CIS. They also seek to prevent ICE from continuing any class members' detention for longer than two weeks without a bond hearing before an Immigration Judge, at which the government would bear the burden to demonstrate by clear and convincing evidence that the alien poses a danger or flight risk, and that no conditions of release will reasonably assure the safety of the community or the alien's appearance or cooperation with any order to depart. See Motion for Temporary Restraining Order and Preliminary Injunctive Relief (Docket No. 49).

De Souza individually requested that respondents be ordered to show cause for her detention, under 28 U.S.C. §2243, which establishes procedures for §2241 petitions.[12] On April 16, 2018, the court granted the motion and directed ICE to submit an affidavit explaining, among other things, why De Souza was detained and what procedures ICE followed in making the decision to detain her.

---

[12] Section 2243 states that "a court, justice, or judge entertaining an application for a writ of habeas corpus shall forthwith award the writ or issue an order directing the respondent to show cause why the writ should not be granted, unless it appears from the application that the applicant or person detained is not entitled thereto."

On April 11, 2018, De Souza filed with CIS an I-212 Application for Permission to Reapply for Admission into the United States After Deportation or Removal, which is the second step in the process of seeking the permission of CIS to pursue a visa before traveling to Brazil for an interview with the Department of State. Id.

On April 13, 2018, the BIA declined to exercise its discretion to reopen De Souza's proceedings in the Immigration Court and stay her deportation. Id. ¶22, Ex. D. It reasoned that under the operative 2016 regulations, it was not necessary that De Souza's proceedings be reopened in order to request waivers from CIS while in the United States, and that she could seek an administrative stay of deportation from ICE. Id. (citing 8 C.F.R. §212.7(e)(4)(iv), §241.6(a)).

As ordered by this court, on April 23, 2018, respondents submitted an affidavit of ICE Deputy Field Office Director James Rutherford to explain the decision to detain De Souza after her arrest. He wrote that ICE used a Risk Classification Assessment, a computer algorithm, to make the determination, which was reviewed by Supervisory Deportation Officer Stephen Wells. Rutherford Aff. (Docket No. 40-1) ¶¶5-6. Rutherford explained that in deciding that De Souza should be detained:

> [] Wells considered De Souza's final order of removal and the fact that De Souza is not eligible for any immigration benefits that would allow her to remain in the United

States to be evidence of flight risk. [] Wells also
considered the availability of bed space, her lack of
health issues and her lack of dependent-care issues (De
Souza's child was in the care and custody of his father
and there were no elderly or infirmed parents to care
for) in making his discretionary decision.

Id. ¶6. Rutherford asserted that ICE "still ha[d] the authority to
detain De Souza without an individualized determination of
dangerousness and risk of flight" under §1231(a)(6). Id. ¶7. In
addition, he noted that De Souza breached her bond by failing to
appear for her 2002 immigration hearing, but he did not state that
Wells considered this a reason for her detention. Id. ¶6. He also
stated that ICE had requested, but not yet received from the
Brazilian consulate, the documents necessary to deport De Souza to
Brazil (also called "travel documents"). Id.

On April 23, 2018, respondents also filed a motion to dismiss
the Amended Complaint. See Respondent's Opposition to Petition for
Writ of Habeas Corpus and Motion to Dismiss (Docket No. 40) ("Apr.
23, 2018 Opp."). The same day, ICE gave De Souza a Notice to Alien
of File Custody Review, informing her that she could submit
information in favor of her release, and that ICE would conduct a
custody review "on or about" April 30, 2018. See Aff. of Tiffany
Andrade ¶21 & Ex. E. ICE did not send a copy of the notice to any
of De Souza's attorneys. De Souza mailed a copy to one of them,
Tiffany Andrade, who received it on April 27, 2018. Id. ¶23. Ms.
Andrade worked quickly to submit by April 30, 2018 documents in

support of De Souza's release and a request for an administrative stay of removal. Id. ¶¶23-24.

ICE subsequently made a series of false or misleading statements relating to the decision to continue De Souza's detention. On April 27, 2018, Deputy Field Office Director Rutherford, on behalf of Acting Field Office Director Brophy, decided to continue De Souza's detention. The Notice of the decision signed by Rutherford and sent to De Souza stated that "[t]his decision has been made based on a review of your file and/or your personal interview and consideration of any information you submitted to ICE reviewing officials." Notice of Decision to Continue Detention, May 8, 2018 Ex. 1. De Souza was not, however, interviewed before the decision was made. Nor was the information she sought to submit considered because, as a result of ICE's failure to provide De Souza and her attorneys timely notice, in violation of §241.4(h)(2) and (d)(3), her attorneys were not aware that a custody review had been scheduled until the day it was conducted. In any event, the Notice of the decision stated that De Souza's detention would continue because she had "failed to demonstrate significant equities within the United States...[and] would pose a significant risk of flight if released from ICE custody." Id. De Souza received the Notice of the decision on May 2, 2018.

At a May 1, 2018 hearing, respondents' counsel from the Department of Justice, who represented that she was in constant communication with ICE, stated that she did not know when a decision would be made concerning De Souza's possible release. See May 1, 2018 Tr. at 37. Therefore, the court ordered the parties to report on De Souza's status by May 3, 2018, not knowing that the decision to continue her detention had already been made. See May 2, 2018 Order ¶4.

That Order evidently prompted Acting Field Office Director Brophy to focus on De Souza's case. On May 3, 2018, Brophy signed, under penalties of perjury, an affidavit stating that ICE had decided to deny De Souza's application for a stay of removal and continue her detention, and that De Souza had been served with the decision on May 2, 2018. May 3, 2018 Brophy Decl. ¶4. Brophy also stated that "[t]he notice of Post Order Custody Review (POCR) was served upon De Souza on April 23, 2018, seven days prior [sic] the occurrence of the custody review." Id. This statement was false, as the decision to continue De Souza's detention was made on April 27, 2018, four days after the notice was provided to her. In addition, the notice was not served on her attorneys.

In his affidavit, Brophy acknowledged that "the [post-order custody review] notice was not sent to counsel for De Souza." Id. He stated that, therefore, "on May 3, 2018, due to irregularities in the timing of De Souza's [post-order custody review] notice,

ICE provided De Souza and her attorney with a new [post-order custody review] notice with the required 30 days' notice of a renewed [post-order custody review] to be conducted...on or about June 3, 2018." Id. ¶5.

### B. Eduardo Junqueira

Eduardo Junqueira was born in Brazil. Amended Petition, ¶2. He is 35 years old. Id. ¶20. In June 2004, Junqueira crossed the border unlawfully, was arrested, and was placed into deportation proceedings. Id. ¶21. On July 23, 2004, he was ordered removed and was deported. Id. ¶22; Resp. Apr. 6, 2018 Memo., Ex. 3.

 In November 2004, Junqueira re-entered the United States without authorization. Id. He subsequently married a United States citizen, with whom he has two children, aged 10 and 12. Id. ¶24. He has resided continuously in the United States for more than thirteen years. Id.

Because of his illegal reentry, Junqueira is not eligible for a waiver of inadmissibility from CIS and, therefore, may not remain in the United States while he pursues his application for lawful Permanent Resident status. Id. ¶27. This means he must leave the country for ten years before seeking permission to reapply for a visa. Id.

However, in February 2017, an immigration attorney erroneously advised Junqueira and his wife that he was eligible to apply for a waiver of inadmissibility from CIS while in the United

States. Id. at ¶29. As a result, his wife filed a Form I-130 with CIS seeking to prove their marriage is genuine. Id.

On February 1, 2018, Junqueira and his wife appeared for a scheduled interview at the Hartford, Connecticut CIS office. Id. ¶31. The same day, ICE reinstated Junqueira's removal order under 8 U.S.C. §1231(a)(5) and 8 C.F.R. §1241.8. See Resp. Apr. 6, 2018 Memo., Ex. 3. Before the interview began, ICE arrested Junqueira. Amended Petition ¶32. On May 8, 2018, he was still detained at the Bristol County, Massachusetts House of Correction. Amended Petition, ¶6.

Junqueira filed his §2241 petition on February 16, 2018. Originally, he challenged the legality of his detention and ICE's attempts to remove him from the United States before he received a decision on his I-130 and eventual applications for waivers from CIS. On April 6, 2018, respondents filed a motion to dismiss, which argued, in part, that Junqueira is ineligible for a waiver until he has remained outside the United States for ten years due to his illegal reentry. On April 26, 2018, Junqueira filed an Amended Petition, which conceded that he is not eligible for an inadmissibility waiver. Id. ¶3. The Amended Petition, therefore, does not seek a stay of Junqueira's removal. However, he continues to challenge ICE's decision to detain him without complying with the §241.4 procedures. Id. ¶¶39-43.

On May 3, 2018, Deputy Field Office Director Rutherford and Acting Field Office Director Brophy decided to release Junqueira. See May 11, 2018 Brophy Aff., ¶6; May 22, 2018 Tr. at 68. Junqueira's wife was contacted and told he was being transferred to the Burlington, Massachusetts ICE office in preparation for release. She drove to Burlington from Connecticut to get him. When Junqueira's counsel discovered he was being moved to Burlington, he contacted Department of Justice counsel for respondents, who did not know of the decision to release Junqueira. See May 8, 2018 Tr. at 8. Department of Justice counsel communicated with attorneys in the office of ICE's Chief Counsel. Id. At least one of those lawyers spoke to Brophy. See May 22, 2018 Tr. at 68. Brophy then reversed the decision to release Junqueira and directed that his detention continue. Id. at 68-69. Instead of releasing Junqueira on May 3, 2018, ICE gave him a Notice of File Custody Review to occur on June 3, 2018, and he was returned to the Bristol County House of Correction. Id.

As of May 8, 2018, ICE had not communicated that Brophy had decided to release Junqueira and reversed that decision, or the reasons for Junqueira's continued detention, to its counsel at the Department of Justice or to Junqueira's counsel. See May 8, 2018 Tr. at 11-12, 24.

V.   ANALYSIS

ICE failed to follow its regulations with respect to both De Souza and Junqueira when it decided to detain each of them for approximately four months. As explained earlier, 8 C.F.R. §241.4(h)(2) and (d)(3) provide that the alien and his or her attorney must be given written notice approximately 30 days in advance of a custody review by ICE to determine whether detention should continue, so that the alien can submit information to support a request for his or her release. Id. §241.4(d)(3), (h)(2). As now interpreted by ICE, the regulations require that an alien's custody be reviewed within 90 days of his or her detention, unless there are exceptional circumstances, which ICE does not assert in these cases. May 8, 2018 Tr. at 15; 8 C.F.R. §241.4(k)(2)(iv), (k)(3).

Because De Souza was detained on January 30, 2018, ICE should have given her attorney and her notice of a custody review by approximately March 30, 2018. It did not. On April 27, 2018, ICE decided to continue De Souza's detention before she had an opportunity to provide information in support of her release. It then made a series of false or misleading statements concerning that decision. When ICE finally recognized that it had violated §241.4, characterizing the violation as an "irregularit[y]," ICE decided to belatedly give De Souza 30 days' notice of a custody review and to detain her at least until the review occurred on about June 3, 2018. Therefore, in essence, ICE decided that because

38

it had acted unlawfully in violating its regulations, De Souza, who might be entitled to be released and to be reunited with her family before her possible deportation, should lose her liberty for at least another month.

ICE dealt with Junqueira in a comparable manner. Junqueira was arrested and detained on February 1, 2018. Therefore, under §241.4 as now interpreted by ICE, Junqueira his attorney should have been given notice by April 1, 2018, that his custody would be reviewed on about May 1, 2018. No such notice was ever provided. Evidently recognizing this violation of the regulations, Rutherford and Brophy decided that Junqueira should be released on May 3, 2018. However, without any opportunity for Junqueira or his attorney to submit anything in favor of release, the decision to release him was reversed, and ICE decided to continue his detention until at least June 3, 2018. Once again, ICE decided that because it had acted unlawfully, an alien who might deserve to be released and reunited with his family before his possible deportation should be detained for at least another month.

Respondents have at different times made different arguments for the lawfulness of ICE's conduct in detaining De Souza and Junqueira for more than three months without the notice and opportunity to be heard required by §241.4.

First, respondents asserted that "[t]he Post Order custody Review Regulations [8 C.F.R. §241.4] do not apply to Ms. De Souza"

39

because she had not been detained during her 90-day removal period. Apr. 23, 2018 Opp. at 11-12. Therefore, respondents argued De Souza and others similarly situated had no right to notice, an opportunity to be heard, or an individualized determination of whether they would be released after 90 days, because the removal period had long ago expired.

In addition, respondents argued that the court does not have the authority to order release from ICE detention until an alien has been detained for at least six months. Id. at 11. More specifically, respondents wrote:

> To the extent that Ms. de Souza, and any of the other alien Petitioners, are challenging the lawfulness of their immigration detention, this Court has no basis to grant any relief because Ms. De Souza's detention, and the detention of any of the other alien Petitioners, is lawful under 8 U.S.C. § 1231(a)(6) and as a matter of constitutional interpretation under Zadvydas v. Davis, 533 U.S. 678, 701 (2001). Section 1231(a)(6) authorizes detention of aliens with orders of removal beyond the 90 day removal period. 8 U.S.C. §1231(a)(6). Detention pursuant to this section is presumptively reasonable for six-months, thereby making habeas petitions filed prior to the six-month mark not ripe for adjudication.

Id.

ICE repeatedly asserted that §241.4 did not apply to De Souza, and other similarly situated aliens, once she was detained, and that she was not entitled to any individualized determination of whether she should be released, evidently for at least six months. On February 21, 2018, ICE Deputy Field Office Director Todd M. Lyons stated in an affidavit that ICE "still [had] the authority

to detain [De Souza's co-petitioner Lilian] Calderon," who had also not been detained during her removal period, "without an individualized determination of dangerousness and risk of flight." Feb. 21, 2018 Lyons Decl. (Docket No. 40-1), ¶7. On April 23, 2018, Deputy Field Office Director Rutherford stated that ICE "still [had] the authority to detain De Souza without an individualized determination of dangerousness and risk of flight." Apr. 23, 2018 Rutherford Decl. (Docket No. 40-1), ¶7. ICE's conduct was consistent with the contention that §241.4 did not apply to De Souza, or to Junqueira either. As explained earlier, ICE did not follow the regulation in any respect with regard to De Souza or Junqueira until government lawyers contacted them on about April 23 and May 3, 2018, to request affidavits concerning De Souza's and Junqueira's petitions.

ICE's initial argument that §241.4 does not apply to aliens who are arrested after their 90-day removal period has expired is contradicted by 8 U.S.C. §1231 and "the [agency's] intent at the time of [§241.4]'s promulgation." Caruso v. Blockbuster-Sony Music Entm't Ctr. at Waterfront, 193 F.3d 730, 736 (3d Cir. 1999) (quoting Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994)). In enacting §1231, Congress contemplated that ICE might not discharge its duty to detain every alien within the removal period. Section 1231(a)(3), therefore, provides that "[i]f the alien does not leave or is not removed within the removal period,

the alien, pending removal, shall be subject to supervision under regulations prescribed by the [Secretary of Homeland Security]." Section 241.4 is one of those regulations.[13] If, as respondents initially argued, aliens first detained after the removal period are never entitled to a custody review to determine whether they should be released, they would not be "subject to supervision under [the] regulations prescribed by the [Secretary]," which include §241.4. ICE would, therefore, regularly and repeatedly be in violation of §1231(a)(3).

In promulgating 8 C.F.R. §241.4, INS explained that all aliens, including aliens first detained following their removal period, would be eligible for possible release under §241.4. More specifically, when it published §241.4 in the Federal Register, INS stated that:

> This rule establishes a permanent custody review procedure applying to aliens who are detained following expiration of the 90-day removal period...This permanent review procedure governs <u>all</u> post-order custody reviews inclusive of aliens who are the subjects of a final order of removal, deportation, or exclusion, with the exception of inadmissible Mariel Cubans...

<u>Detention of Aliens Ordered Removed</u>, 65 Fed. Reg. at 80291 (emphasis added). As explained earlier, §241.4 was intended to provide these aliens the procedural due process courts had found to be constitutionally required. <u>Id.</u> at 80283. If, as ICE initially

---

[13] The relevant regulations also include 8 C.F.R. §241.5, which governs the terms of release.

claimed, §241.4 authorizes the detention of aliens like De Souza, who are arrested after the expiration of their removal periods, without an individualized determination concerning their detention for up to six months, the regulation would likely be unconstitutional as applied.

Perhaps recognizing that it was legally untenable to continue to contend that ICE's failure to detain De Souza during her 90-day removal period gave it the unfettered discretion to later detain her for up to six months without notice and any opportunity to be heard, ICE changed its position. At the May 1, 2018 hearing, in its May 3, 2018 supplemental memorandum, and at the May 8, 2018 hearing, the respondents argued that "the procedures in 8 C.F.R. §241.4 apply to petitioners," including De Souza and Junqueira, and that "once an alien has been detained for 90 days under the post-order detention statute, they are entitled to a post-order custody review pursuant to 8 C.F.R. §241.4." Respondents' Response to Court's May 2, 2018 Order (Docket No. 55) at 4; see also May 1, 2018 Tr. at 30 ("It's the government's position that after 90 days of being in detention, [De Souza] will receive all of the procedures available in 8 C.F.R. §241."); May 8, 2018 Tr. at 15. Therefore, ICE now concedes that it must review the detention of any alien, including aliens who were not detained during their removal period, but maintains that it is not required to do so until 90 days after the alien is arrested. ICE asserts that the

43

agency's current interpretation of its regulation deserves deference from the court. See Christopher v. SmithKline Beecham Corp., 567 U.S. 142, 155 (2012); Auer v. Robbins, 519 U.S. 452, 461 (1997).

It is questionable whether ICE's more recent interpretation of §241.4 deserves such judicial deference. Such deference is not justified:

> when the agency's interpretation is "'plainly erroneous or inconsistent with the regulation.'" [Auer, 519 U.S.] at 461 (quoting Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 359 (1989))...[or] when there is reason to suspect that the agency's "does not reflect the agency's fair and considered judgment on the matter in question." Auer, [519 U.S.] at 462, 117 S.Ct. 905; see also, e.g., Chase Bank [v. McCoy, 131 S. Ct. 871, 881 (2011)], when the agency's interpretation conflicts with a prior interpretation, see, e.g., Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 515 (1994), or when it appears that the interpretation is nothing more than a "convenient litigating position," Bowen v. Georgetown Univ. Hospital, 488 U.S. 204, 213 (1988), or a "post hoc rationalizatio[n] advanced by an agency seeking to defend past agency action against attack," Auer, [519 U.S.] at 462, (quoting Bowen, [488 U.S.] at 212).

Christopher, 567 U.S. at 155. This may be such a case.

Section 241.4 is ambiguous with regard to detention of aliens like De Souza who were not detained during their initial 90-day removal periods as required by 8 U.S.C. §1231(a)(2) and 8 C.F.R. §241.3. As described earlier, in enacting §1231, Congress and the President anticipated that not all aliens ordered removed would be deported during the removal period. See §1231(a)(3)(referring to

"an alien" who "does not leave...within the removal period"). However, in promulgating §241.4, INS evidently assumed that all aliens would be detained during the removal period. As explained earlier, the regulation applies to all aliens detained following the removal period. See 65 Fed. Reg. at 80291. Yet, the regulation is entitled "Continued detention of [certain] aliens beyond the removal period," suggesting that all aliens will have been detained within the removal period. Id. (emphasis added). In addition, §241.4(h)(2) and (k)(1)(i) require 30 days' notice "to the detainee" and an initial custody review "prior to the expiration of the removal period." In cases in which an alien is not in custody during the removal period, it would not be possible to give timely notice and conduct a timely custody review.

However, ICE's current interpretation of the ambiguous regulation, giving it 90 days after arrest within which to conduct all custody reviews, is inconsistent with the regulation's express "requirement that the review occur prior to the expiration of the removal period," §241.4(h)(2), (h)(1), (k)(2)(emphasis added), in the absence of exceptional circumstances, id. §241.4(k)(2)(iv), (k)(3). The 90-day removal period runs from "[t]he date the order [of removal] becomes administratively final," the date of a court's final disposition if the removal order is judicially reviewed, or "the date the alien is released from [non-immigration] detention," whichever is latest. Id. §241.4(g)(1)(i); see also 8 U.S.C.

§1231(a)(1)(B). The regulation does not state that the removal period runs from the date the alien is first detained.

The regulation can be reasonably read in a manner that is consistent with its language and that would not require ICE to give aliens notice of a custody review before arresting and detaining them, while still affording these aliens due process. The regulations permit ICE to issue the 30-day notice and conduct the custody review "as soon as possible []after" the removal period, "allowing for any unforeseen circumstances or [an] emergent situation." §241.4(k)(2)(iv). ICE could, consistent with this provision, give notice and decide whether detention is justified "as soon as possible" after the arrest of an alien who was not detained during his or her removal period. Id. This approach would also be consistent with the authority to postpone a custody review "for good cause" as long as "reasonable care [is] exercised to ensure that the alien's case is reviewed once the reason for delay is remedied." Id. §241.4(k)(3). Therefore, for an alien arrested after the removal period like De Souza, it would be faithful to the language of §241.4 to interpret the regulation as requiring notice promptly after arrest and a custody review approximately 30 days later.

This interpretation of the regulation would not only be consistent with the language of §241.4(h)(1) and (k)(1)(i), it would also be reasonable. An alien who is detained after the

46

expiration of the removal period, during which detention is mandatory, has not "conspir[ed] or act[ed] to prevent [her] removal." §1231(a)(1)(C). Indeed, ICE concedes De Souza has not done so. See Rutherford Aff., ¶5 (stating that De Souza's detention "is discretionary under 8 U.S.C. §1231(a)(6)"). After the expiration of an alien's removal period, there are good reasons not to automatically detain him or her for 90 days before considering the alien's release. As Judge David Barron has written, "the more time an individual spends in the community, the lower her bail risk is likely to be, and the more probable it is that a fair custody review would result in her release." Castaneda v. Souza, 810 F.3d 15, 41 (1st Cir. 2015).

Three months' detention without a statutory mandate under §1231(a)(2), or at least an informal opportunity to be heard, may be unconstitutional.[14] "Congress may make rules as to aliens that

---

[14] Among other factors, the fact that no statute requires the detention of aliens who, like De Souza and Junqueira, are detained beyond the removal period distinguishes this case from Demore, 538 U.S. at 521. In that case, the Court held that Congress could, by statute, require ICE to detain an alien who committed certain crimes for the "brief period necessary [to complete his or her] removal proceedings," which the Court believed was ordinarily from one to four months. Id. at 523, 529. In any event, in Demore, Justice Kennedy concurred only because the alien was afforded "individualized procedures" to determine whether his detention was mandatory under the statute or, if not, justified by a risk of flight or danger to the community. Id. at 531-32 (Kennedy, J., concurring). Therefore, even when "the Executive Branch must detain an alien at the beginning of removal proceedings, without a bond hearing," it "may do so consistent with the Due Process Clause" only if "the alien is given some sort of hearing when

would be unacceptable if applied to citizens." <u>Demore</u>, 538 U.S. at 521. However, even parolees, who are also "properly subject[]...to many restrictions not applicable to other citizens," are guaranteed "some minimal inquiry" to determine whether there is "probable cause to hold the parolee for the final decision of the parole board on revocation." <u>Morrissey v. Brewer</u>, 408 U.S. 471, 482, 485-87 (1972). That inquiry must be "conducted at or reasonably near the place of the alleged parole violation or arrest and as promptly as convenient after arrest while information is fresh and sources are available." <u>Id.</u> at 485. The formal revocation hearing must then take place "within a reasonable time after the parolee is taken into custody," which has been held to be up to two months. <u>Id.</u> at 488.

Similarly, when ICE arrests an alien who has been released on conditions under §241.4(d)(1), it is required to "notif[y] [her] of the reasons for [the] revocation [and]...her return to [ICE] custody," and "afford[] [her] an informal interview promptly after...her return to [ICE] custody to afford [her] an opportunity to respond to the reasons for revocation stated in the notification," §241.4(*l*)(1). This process precedes a full custody review conducted "approximately three months after release is

---

initially detained at which he may challenge the basis for his detention" and seek to show it is not authorized by statute. <u>Diop</u>, 656 F.3d at 232.

revoked." Id. §241.4(l)(3). It would, therefore, be reasonable, and arguably constitutionally necessary, to interpret §241.4 to require that an alien who is first detained after his or her removal period expires, and who will not be immediately removed, receive a prompt opportunity to demonstrate that §1231(a)(6) and §241.4, which address post-removal-period detention, do not authorize her detention. As explained earlier, §1231(a)(6) and §241.4 do not authorize detention after the removal period has expired if the alien will not be immediately removed and is not a flight risk or dangerous because detention would not be "reasonably necessary to secure removal." Zadvydas, 533 U.S. at 699; see also 8 C.F.R. §241.4(e)-(f).

However, it is not now necessary to decide whether ICE's current interpretation of §241.4 is correct. It is undisputed that ICE violated §241.4 as it now interprets it with regard to both De Souza and Junqueira. See May 8, 2018 Tr. at 15-18, 22-25, 35-36. Nevertheless, ICE continues to assert that the court does not have the authority to remedy those violations. As indicated earlier, respondents argued on April 23, 2018 that "the Supreme Court's analysis in Zadvydas is the sole inquiry in cases like Ms. de Souza's and the alien Petitioners'," and under Zadvydas, "detention pursuant to §1231(a)(6) is presumptively reasonable for six-months, thereby making habeas petitions filed prior to the six-month mark not ripe for adjudication." Apr. 23, 2018 Opp. at

11. Respondents amplified this argument at the May 8, 2018 hearing, stating that "the right implicated in Zadvydas is the right to detention that is connected with its purposes. And the purpose[] articulated in Zadvydas is to ensure the alien's presence at the time of removal. And that is the only right that this court has the authority to decide with regard to whether the detention is constitutional or not." May 8, 2018 Tr. at 31. Respondents assert that under Zadvydas, post-removal-order detention lacks a reasonable connection with its purposes only when it becomes "prolonged" and "removal isn't foreseeable." Id. at 26. Therefore, respondents argue, the court may not order relief for the detained alien as long as his or her removal is reasonably foreseeable and, in any event, not until the alien has spent at least six months in detention.

Respondents' contention is incorrect, however, because they fail to recognize the distinction between the substantive and procedural components of the Due Process Clause discussed earlier. Again, the "substantive component...forbids the government to infringe certain 'fundamental' liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." Flores, 507 U.S. at 301-02. The Court in Zadvydas held that aliens have a liberty interest in "[f]reedom from imprisonment--from government custody, detention, or other forms of physical restraint," which "lies at

the heart of the liberty that Clause protects." <u>Zadvydas</u>, 533 U.S. at 690. Therefore, detention violates substantive due process when it does not "bear[] a reasonable relation" to a "special justification...[that] outweighs the individual's constitutionally protected interest in avoiding physical restraint." <u>Zadvydas</u>, 533 U.S. at 690.

However, even if there are constitutionally permissible reasons to detain an alien, meaning that it "survives substantive due process scrutiny," the decision to do so must result from a fair process. <u>Salerno</u>, 481 U.S. at 746. In the immigration context, as the Third Circuit has held, while Congress may "pass a law authorizing an alien's initial detention...those implementing the statute[] [must] provide individualized procedures through which an alien might contest the basis of his detention." <u>Diop</u>, 656 F.3d at 232. The fundamental features of procedural due process are fair notice and a meaningful opportunity to be heard. <u>See</u> <u>Mathews</u>, 424 U.S. at 333-34, 348.

In <u>Zadvydas</u>, the Supreme Court addressed only the issue of when an alien's right to substantive due process would be violated by prolonged detention. It held, in part, that "an alien's liberty interest is, at the least, strong enough to raise a serious question as to whether, <u>irrespective of the procedures used</u>, <u>cf.</u> post, at 2515-2517 (Kennedy, J., dissenting), the Constitution permits detention that is indefinite and potentially permanent."

Zadvydas, 533 U.S. at 695 (emphasis added). In doing so, the Supreme Court recognized that an alien's right to substantive due process could be violated even if the requirements of procedural due process had been satisfied. As explained earlier, the Court also decided that for a substantive due process analysis, courts should presume that detention for less than six months is reasonably related to §1231(a)'s permissible purpose of ensuring the alien's presence at the time for removal. Id. at 700-01.

In Zadvydas, the Court described the post-removal period procedures required by 8 U.S.C. §1231 and 8 C.F.R. §241.4. Id. at 683-84. It implicitly assumed that those procedures had been properly employed in deciding that there could be a violation of the alien's substantive due process right to freedom from unreasonable detention "irrespective of the procedures used," referencing Justice Kennedy's dissent. Id. at 696. The Court did not suggest that it disagreed with Justice Kennedy's view that a violation of the right to procedural due process would justify judicial relief.

In his dissent from the majority's substantive due process analysis, Justice Kennedy argued that a removable alien challenging detention had only a right to procedural due process, writing: "[w]hether a due process right is denied when removable aliens who are flight risks or dangerous to the community are detained turns, not on the substantive right to be free, but on

whether there are adequate procedures to review their cases..."
Id. at 721 (Kennedy, J., dissenting). He then explained--without
dispute from the majority--his view that:

> like the prisoner in Board of Pardons v. Allen, who sought
> federal-court review of the discretionary decision
> denying him parole eligibility, removable aliens held
> pending deportation have a due process liberty right to
> have the INS conduct the review procedures in place. See
> 482 U.S., at 381. Were the INS, in an arbitrary or
> categorical manner, to deny an alien access to the
> administrative processes in place to review continued
> detention, habeas jurisdiction would lie to redress the
> due process violation caused by the denial of the mandated
> procedures under 8 C.F.R. § 241.4 (2001).

> This is not the posture of the [Zadvydas] case[], however.

Id. at 724-25. In contrast, the situation Justice Kennedy described
is exactly the posture of De Souza's case and Junqueira's case.
Each has been arbitrarily denied the process prescribed by §241.4,
which, as Justice Kennedy recognized, is intended to codify the
procedural due process requirements of the Fifth Amendment.

In Alexander v. Attorney General, the Third Circuit agreed
with Justice Kennedy, stating that "Zadvydas is not the only word
on post-removal detention." 495 Fed. App'x 274, 277 (3d Cir. 2012).
The court observed that "regulations promulgated around the time
of, and after, the Zadvydas decision established a series of
processes for determining whether an alien should be released from
custody after the expiration of the ninety-day removal period,"
discussing §241.4 in particular. Id. Therefore, the court held
that "a failure to satisfy Zadvydas [by showing that there is 'no

significant likelihood of removal in the reasonably foreseeable future'] may not necessarily be fatal to an alien's ability to prevail on an alternative ground predicated on regulatory non-compliance," and remanded to the district court to determine whether DHS had complied with its regulations. Id.

The duty of the President and his subordinates to obey the regulations they have promulgated has been repeatedly recognized by the Supreme Court. During the "McCarthy Era," the Court held that having delegated by regulation to the BIA the discretion to decide, subject to appeal to him, whether an alien should be deported, the Attorney General could not "sidestep the Board or dictate its decision in any manner." Accardi, 347 U.S. at 267.

In Nixon, 418 U.S. at 694, the Attorney General had by regulation delegated to a Special Prosecutor the authority to obtain subpoenas and seek judicial enforcement of them in his investigation, including by contesting the assertion of Executive Privilege. The President later claimed that he did not have to comply with the Special Prosecutor's subpoena for tapes of conversations between the President and his aides. Id. at 692. He argued that he had the unreviewable authority to assert Executive Privilege and withhold the tapes. Id. The Supreme Court rejected both contentions. It held that the regulation had "the force of law," "the Executive Branch was bound by it," and the Court was "bound to respect and enforce it." Id. at 696. Holding that the

Special Prosecutor properly issued the subpoena and showed that
the Executive Privilege did not provide a basis to quash it, the
Court ordered the President to produce the requested tapes. Id. at
713-14.

As the Supreme Court held in Nixon, regulations like §241.4,
which are promulgated through a formal notice-and-comment process,
have "the force of law." 418 U.S. at 695; see also Perez v. Mortgage
Bankers Ass'n, 135 S. Ct. 1199, 1203 (2015)(explaining that "Rules
issued through the notice and comment process are often referred
to as 'legislative rules' because they have the 'force and effect
of law'"); Brock v. Cathedral Bluffs Shale Oil Co., 796 F.2d 533,
537 (D.C. Cir. 1986)(Scalia, J.)("A properly adopted substantive
rule establishes a standard of conduct which has the force of
law."); Adrian Vermeule & Cass Sunstein, "The Morality of
Administrative Law," 131 Harv. L. Rev. 1924, 1956-60 (2018). 28
U.S.C. §2241(c)(3) authorizes this court to order relief for any
person, including an alien, who is "in custody in violation of
the...laws...of the United States."

The court recognizes that not every procedural error violates
the constitutional right to due process and justifies judicial
intervention. See Matias v Sessions, 871 F.3d 65, 72 (1st Cir.
2017). However, as explained earlier, when the government violates
a regulation intended to protect a fundamental right derived from
the Constitution or a federal statute, such as the Fifth Amendment

55

right to notice and an opportunity to be heard, the court may order relief. See Waldron, 17 F.3d at 518. As explained earlier, 8 C.F.R. §241.4 was promulgated in an effort to provide aliens the procedural due process that courts had found to be constitutionally required. See 65 Fed. Reg. at 80283.[15] The court may issue a writ of habeas corpus to enforce §241.4 even if the regulation provides greater protection than is constitutionally required. See Accardi, 347 U.S. at 265-68; Nelson, 232 F.3d at 262; Rombot, 296 F.Supp.3d at 388.

It is undisputed that ICE violated §241.4 with regard to both De Souza and Junqueira. They are entitled to judicial relief. Zadvydas, 533 U.S. at 724 (Kennedy, J., dissenting); accord Rombot,

---

[15] The Calderon petitioners "do not concede that the procedures under Section 241.4 are adequate for the protection of Petitioners' and class members' constitutional rights." Response in Opposition to Motion to Dismiss the First Amendment Complaint at 30 n.13. Rather, the petitioners argue that §241.4's presumption favoring detention violates their due process rights because they:

> are entitled to protections beyond those that must be granted to every detainee with a final order of removal. Detention of individuals in the process of seeking lawful permanent resident status cannot be presumptively reasonable--even if all of the Section 241.4 procedures are followed--because the government cannot be presumed to have any interest in the removal of people who may soon become lawful permanent residents, and individuals presenting themselves for legalization cannot be presumed to be flight risks during the pendency of the application process.

Id.; see also Memorandum in Support of Motion for a Temporary Restraining Order and Preliminary Injunctive Relief (Docket No. 50 in Calderon) at 23.

296 F.Supp.3d at 388; Bonitto, 547 F.Supp.2d at 757-58; D'Alessandro, 628 F.Supp.2d at 388-403.

VI. REMEDY

As indicated earlier, habeas corpus is, at its core, an equitable remedy." Schlup v. Delo, 513 U.S. 298, 319 (1995). 28 U.S.C. §2243 provides that "[t]he court shall...dispose of the matter as law and justice require." Historically, "common-law habeas corpus was, above all, an adaptable remedy" in which the "court's role was most extensive in cases of pretrial and noncriminal detention." Boumediene, 128 S. Ct. at 2267. "[W]hen the judicial power to issue habeas corpus properly is invoked the judicial officer must have adequate authority...to formulate and issue appropriate orders for relief, including, if necessary, an order directing the prisoner's release." Id. at 2271.

As this court has repeatedly recognized, "[w]hile the court's discretion to devise an equitable remedy is considerable, it is not unfettered." Flores-Powell v. Chadbourne, 677 F.Supp.2d 455, 474 (D. Mass. 2010) (Wolf, D.J.); Ferrara v. United States, 384 F.Supp.2d 384, 434 (D. Mass. 2005), aff'd, 456 F.3d 278 (1st Cir. 2006). "Rather, the remedy should be tailored to the injury suffered...and should not unnecessarily infringe on competing interests." Flores-Powell, 677 F.Supp.2d at 476 (quoting United States v. Gordon, 156 F.3d 376, 381 (2d Cir. 1998)).

As indicated earlier, ICE argued on May 8, 2018, that the remedy for its violation of its regulations and the constitutional rights of De Souza and Junqueira to procedural due process should be a custody review to be conducted by ICE on about June 3, 2018. This would not be equitable.

ICE has repeatedly demonstrated an inability to perform lawfully and to decide fairly whether detention is justified for either De Souza or Junquiera. Its indifference to its duty not to deprive aliens of liberty without due process is not unique to these cases. For example, in Doe v. Smith, 2017 WL 6509344, at *9 (D. Mass. 2017)(Sorokin, D.J.), the court held that ICE's "repeated errors suggesting negligence, incompetence or bad faith on the part of the agency ha[d] prolonged Doe's [deportation] proceedings and, thus, his detention." Among other things, ICE erroneously informed the Immigration Court that Doe had been released, and that a new bond hearing was not necessary. Id. at *7. Therefore, the district court rejected ICE's argument that "the only appropriate remedy was another bond hearing identical to the two [Doe] already had before the [Immigration Judge], which had been infected by ICE's misconduct," and ordered Doe's release. Id. at *8-9. Similarly, in Rombot, 296 F.Supp.3d at 388-89, the court found that ICE had repeatedly failed to follow the procedures required by §241.4 in detaining the petitioner, therefore violated his constitutional right to due process, and ordered that the

58

petitioner be released.   See also D'Allessandro v. Mukasey, 628
F.Supp.2d 368, 387-406 (W.D.N.Y. 2009)(finding ICE's failure to
follow requirements of §241.4 violated alien's right to procedural
due process and ordering alien's release).

In view of the foregoing, it would not be appropriate to allow
ICE to decide again whether De Souza's or Junquiera's detention
should continue. It would be particularly unfair to require that
petitioners remain detained for another 30 days while ICE attempts
to remedy its failure to follow its regulations and to provide
each of them due process. As explained earlier, both petitioners
face the prospect of being deported and separated from their
families. Each day with their families is, therefore, precious.
Any unjustified loss of liberty for even one more day would be a
particularly painful form of irreparable harm to them and to the
United States citizens who love them.

Furthermore, it appears likely that De Souza and Junqueira
will each be able to persuade the court that they should be
released under the standards in §241.4(e) and (f). There is no
evidence that ICE has obtained the documents necessary to deport
either petitioner to Brazil. Therefore, their immediate removal
does not appear possible. See §241.4(e)(1). It appears that if
released, neither is likely to be a danger to the community because
neither has a criminal history. See §241.4(e)-(f). Nor does it
appear that either is likely to flee. Among other factors, their

"ties to the United States," including "close relatives residing here lawfully," appear to outweigh their "prior immigration violations" of having entered the United States unlawfully. §241.4(f). In addition, both of them have lived in the United States for more than fourteen years, have spouses and children who are United States citizens, and seek to pursue lawful Permanent Resident status through a process prescribed by law. As indicated earlier, CIS's waiver process is designed to prevent "extreme hardship" to United States citizens that would result from the alien's inability to live with them in the United States and support them. Absconding or violating their conditions of release would seriously jeopardize De Souza's and Junqueira's chances of living in this country with their families.

In these circumstances, it is most appropriate that the court exercise its equitable authority to remedy the violations of petitioners' constitutional rights to due process by promptly deciding itself whether each should be released. See §241.4(f); Zadvydas, 533 U.S. at 699; cf. McCarthy v. Madigan, 503 U.S. 140, 147 (1992) ("[I]mpending irreparable injury flowing from delay incident to following the prescribed procedure...may contribute to finding that exhaustion is not required."); see also Flores-Powell, 677F. Supp.2d at 463 (citing Bois v. Marsh, 801 F.2d 462, 468 (D.C. Cir. 1986)).

VII. CONCLUSION

For the foregoing reasons, the court finds that De Souza and Junquiera are each being detained in violation of the Constitution and laws of the United States, and that the court should determine whether their continued detention is justified. Accordingly, on May 8, 2018, the court ALLOWED De Souza and Junqueira's Petitions for Writs of Habeas Corpus under 28 U.S.C. §2241 (C.A. No. 18-10225, Docket No. 27, and C.A. 18-10307, Docket No. 22) concerning their detention and scheduled a bail hearing at which the court would decide whether they should be released. After this decision was announced in court on May 8, 2018, ICE released De Souza and Junqueira.

As discussed at the May 8, 2018 hearing, ICE failed to follow the procedures required by §241.4 and to provide petitioners with the due process the Constitution requires in these two cases, which ICE knew were subject to judicial scrutiny. This causes concern that ICE may be violating the rights of many other detained aliens who do not have counsel to file petitions for habeas corpus on their behalf in federal court. That concern may soon be addressed in the context of the claims in Calderon for class certification and preliminary injunction. However, at least some members of the class may suffer unjustified irreparable harm before these issues are decided, including by being deported without the opportunity

to spend time with their families that they would have had if their constitutional right to due process had been respected.

At hearings on May 22 and 23, 2018, the court was informed that after the court issued its decisions regarding De Souza and Junqueira, ICE reviewed detainee files in the Burlington, Massachusetts Field Office, found 30 to 40 additional cases in which the §241.4 procedures had not been followed, and released approximately 20 aliens. See May 22, 2018 Tr. at 86; May 23, 2018 Tr. at 51, 138. The court has not been informed of the status of the additional 10 to 20 aliens who were evidently also denied due process.


UNITED STATES DISTRICT JUDGE