# EXHIBIT 1

## REDACTED

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| LILIAN PAHOLA CALDERON JIMENEZ and LUIS GORDILLO, et al., | ) ) ) ) | |
| Individually and on behalf of all others similarly situated, | ) ) | No. 1:18-cv-10225-MLW |
| Plaintiffs-Petitioners, | ) ) ) | |
| v. | ) ) ) | **ORAL ARGUMENT REQUESTED** |
| KIRSTJEN M. NIELSEN, et al., | ) ) | |
| Defendants-Respondents. | ) ) | |

## PETITIONERS' SUPPLEMENTAL MEMORANDUM
## IN SUPPORT OF THEIR MOTIONS FOR
## PRELIMINARY INJUNCTIVE RELIEF AND CLASS CERTIFICATION

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

STATEMENT OF SUPPLEMENTAL ARGUMENT .........................................................3

I.     Discovery confirms that without class-wide injunctive relief, Petitioners and putative class members will continue to be arrested, detained, and removed while they pursue provisional waivers in violation of the law ..........................................4

II.    Class-wide injunctive relief is necessary to prevent the provisional waiver process from being used as a trap. ......................................................................................7

III.   The Boston ERO struggles to comply with its own interpretation of the POCR regulations, and continues to deny Petitioners and class members a constitutionally adequate detention review..........................................................11

CONCLUSION...................................................................................................................12

## INTRODUCTION

Limited discovery has revealed the stunning extent to which Department of Homeland Security (DHS) in New England transformed the 2016 provisional waiver regulations—which were supposed to protect the families of noncitizens with final orders of removal from unnecessary separation and hardship during the legalization process—into a trap calculated to cause that separation.  Discovery has also demonstrated that Immigration and Customs Enforcement (ICE) is entrenched in its commitment to detain and remove the noncitizen members of the putative class despite their efforts to obtain lawful status under these regulations. Petitioners submit this supplemental brief pursuant to the Court's order (Dkt. No. 117) to alert the Court to information uncovered by the documents and depositions which confirm the need for immediate, class-wide intervention to prevent irreparable harm to Petitioners and putative class members.

*First*, the discovery has verified that ICE's Enforcement and Removal Operations (ERO) in Boston intends to continue detaining and removing putative class members despite their ability to obtain lawful status under the provisional waiver regulations.  For one thing, Rebecca Adducci, Interim Field Office Director for the Boston ERO, has confirmed that Respondents have disavowed what it told the Court just two months ago—that "absent a danger to public safety, the Boston Field Office would no longer make arrests of persons pursuing I-130s and presenting themselves at U.S. [Citizenship and Immigration Services (CIS)]."  According to Ms. Adducci, who was abruptly appointed to lead ICE's Boston Field Office in the immediate aftermath of the Court's hearings in this case in May, Executive Order 13768 requires ICE to continue arresting, detaining, and removing putative class members—regardless of their pursuit of provisional waivers.  As such, putative class members are still in danger of being detained and removed, whether through arrest at CIS offices or through other enforcement actions.  These

1

actions violate Petitioners' and class members' legal and constitutional rights on grounds
common to the class by pretermitting noncitizens' ability to pursue provisional waivers and
detaining them without a constitutionally permissible justification.  Pets. Mot. for Prelim. Inj.
(Dkt. No. 50); Pets. Reply in Supp. (Dkt. No. 97).  And irreparable harm is clear; some putative
class members have already been removed.  Lyons Dep.[1] 69:25-70:4, 79:16-19; Lyons Dep. Ex.
6 (Email to Greenbaum and others from Guarna-Armstrong, with attachment, Jul. 18, 2018)
(Decl. Ex. E) (showing that five people arrested at CIS interviews in 2018 have already been
removed).

     ***Second***, discovery confirmed that DHS in New England actually uses the provisional
waiver process to target individuals with final orders of removal.  Indeed, arrests at CIS offices
are not random.  They are the result of active coordination between the Boston ERO and CIS.
Specifically, the Boston ERO receives "referrals" from CIS, which inform ICE about the
individuals who have applied for I-130s and have final orders of removal.  ICE then works with
CIS to facilitate arrests at CIS offices, including offering to set up an interview, scheduling that
interview to occur at a convenient time for ICE, and notifying ICE about when an individual
arrives for his or her interview and how the interview is progressing.  The Boston ERO and CIS
thus act in concert to use the provisional waiver process—and, specifically, the I-130
interviews—to target individuals for detention and removal rather than, as contemplated by the
regulations, a method to minimize family separation and encourage noncitizens with final orders
to seek to obtain legal status.  This shows that Petitioners have a strong likelihood of success on

---

[1] All deposition transcripts are attached to the contemporaneously filed August 1, 2018
Declaration for Stephen N. Provazza ("Provazza Decl.").  Citations to "Decl. Ex. []" refer to
exhibits to the Provazza Decl.

the merits of their claims and that Respondents are violating Petitioners' constitutional and statutory rights.

*Third*, notwithstanding their promises to this Court in May, the Boston ERO continues to struggle to comply with the 8 C.F.R. § 241.4 (the "POCR regulations") and has failed to implement changes necessary to ensure compliance. Moreover, ICE continues to detain individuals for up to 90 days without any meaningful review of the reasons for their detention, in violation of the INA and the Constitution. Petitioners are likely to succeed on the merits of their detention-specific claims (Counts 5 and 6).

Another court has already rejected arguments similar to those made in Respondents' motion to dismiss and held that it "has jurisdiction to review the limited question of whether a person has a right to complete the process of obtaining a provisional waiver of grounds of inadmissibility before his removal," and that the petitioner in that case "indeed does have a right to complete the process of obtaining a provisional waiver." *Villavicencio Calderon v. Sessions*, 18-cv-5222 (PAC), (S.D.N.Y. July 24, 2018) (Decl. Ex. D). Petitioners here, too, have an urgent need for this Court to recognize their rights under the provisional waiver regulations.

## STATEMENT OF SUPPLEMENTAL ARGUMENT

Pursuant to this Court's Order, Dkt. No. 117, Petitioners took the depositions of Rebecca Adducci on July 26, Todd Lyons on July 27, and Thomas Brophy on July 30. Additionally, the government produced information and documents responsive to the Court's order.[2] The information revealed confirms the need for immediate, class-wide intervention to prevent irreparable harm to Petitioners and putative class members. It shows that the Boston ERO

---

[2] Petitioners are still awaiting production of a limited number of documents relating to certain noncitizens, and will seek leave to update this submission if necessary upon receipt of these documents.

uniformly ignores a candidate's eligibility or application for an I-130 or other stages in the provisional waiver process, clearly acting or refusing to act "on grounds that apply generally to the class," Fed. R. Civ. P. 23(b)(2), and in violation of Petitioners' and class members' rights under the Administrative Procedure Act (APA), and the Immigration and Nationality Act (INA), and to due process and equal protection under the Fifth Amendment to the U.S. Constitution.

I.    **Discovery confirms that without class-wide injunctive relief, Petitioners and putative class members will continue to be arrested, detained, and removed while they pursue provisional waivers in violation of the law**

The Boston ERO is committed to continuing enforcement actions against individuals participating in the provisional waiver process. Indeed, discovery has confirmed that the Boston ERO interprets Executive Order 13768 to prohibit ICE from exempting any classes of individuals—including noncitizens who are eligible to gain lawful status through the provisional waiver process—from enforcement actions. And all deponents confirmed that a person's pursuit of the provisional process will not prevent ICE from arresting, detaining, or removing that person.

As Ms. Adducci testified, the Boston ERO's policy pursuant to the Executive Order is that "there is no specific class of individuals that is exempt from enforcement action." Adducci Dep. 67:8-10. Ms. Adducci's policy is thus to allow the arrest, detention, and removal of anyone with a final order of removal, regardless of their pursuit of provisional waivers, including at CIS offices. *See, e.g.*, Adducci Dep. 66:2-7; 90:22-91:4; 133:7-13 (Decl. Ex. A); *see also* Brophy Dep. 99:11-17 (Decl. Ex. C) ("Q. Executive Order 1368 requires ICE to remove all individuals with final orders of removal, correct? . . . A. I don't know if that the specific language in it or not, but yes."); Lyons Dep. 40:19-41:10 ("[A]s far as what they were applying for, no, that wasn't one of the options or one of the considerations" used to decide not to take enforcement action). Thus, in addition to the approximately 13 would-be class members who were arrested in

2018 at I-130 interviews,[3] there are likely many more who have had their pursuit of provisional waivers obstructed through arrest, detention, or removal. *See, e.g.*, Dkt. No. 117 at 5 (citing *Nkojo v. Nielsen*, C.A. No. 18-11401 (filed July 3, 2018)).

ICE apparently recognizes that removing Petitioners denies them the benefits of the provisional waiver process. Lyons Dep. 67:14-68:9. But at no stage in ICE's apprehension and removal process does eligibility for or pursuit of provisional waivers have any impact on ICE's actions. Ms. Adducci has not given any instruction to deportation officers that they should account for the fact that a noncitizen with a final order of removal was arrested at or immediately after an I-130 interview. Adducci Dep. 207:24-208:6, 135:6-15.

Not surprisingly, the Boston ERO's policy of refusing to account for eligibility for the provisional waiver process is coupled with an almost complete lack of knowledge and understanding of the process. The Boston ERO's three most recent FODs hardly know about the process: current Interim FOD Rebecca Adducci testified that she is "not that versed with" the provisional waiver process (Adducci Dep. 111:20-112:10), admitted that she was not aware that the 2016 regulations made noncitizens with final orders of removal who are married to U.S. citizens eligible for provisional waivers (*id.* at 113:21-114:2), and was not aware that the purpose of the regulations was to minimize the hardship of family separation (*id.* at 114:3-10). Former Acting FOD Todd Lyons does not know whether an interview is required for CIS to approve an

---

[3] ICE identified seventeen individuals with final orders of removal arrested at I-130 interviews in 2018. Lyons Dep. 77:11-79:15; 107:7-21. Based on the available information (Petitioners are still awaiting some files), four appear to fall outside the class definition for other reasons. The remaining 13, including Petitioners Lilian Calderon and Lucimar de Souza, are likely to have fallen within the definition of the putative class at the time of their detention. Of these, six are not currently putative class members because they have been removed (four individuals) or have reopened their immigration cases (two individuals). Five noncitizens who were arrested at their I-130 interviews in New England in 2018, in addition to Petitioners Calderon and de Souza, appear to be current members of the putative class. None remain in custody.

I-130 (Lyons Dep. 53:20-54:3) or what forms a person has to file in applying for provisional

waivers (*id.* at 63:18-21).  And Former Acting FOD Thomas Brophy testified that he is

unfamiliar with how an individual would benefit from provisional waivers (Brophy Dep. 26:16-

25), or each of the required forms (*id.* at 28:3-18).

      ICE makes no effort to learn whether someone is pursuing provisional waivers.  Lyons

Dep. 45:14-17 ("Q: Did ICE receive any information from CIS regarding whether a person was

eligible for provisional waivers? A: No.").  Thus, despite claiming to make wholistic

determinations, it is clear that ICE does not account for individuals' pursuit of provisional

waivers.  Adducci Dep. 134:17-19 (expecting subordinates to consider all factors in executing

prosecutorial discretion); 135:13-136:4, 137:19-138:11 (stating she has no idea whether her

subordinates know about how the provisional waiver process works or that the waivers are

available to people with final orders of removal).[4]

      ICE continues to violate Petitioners' and class members' constitutional and statutory

rights.  Named Petitioners would be subject to removal if it were not for this Court's

jurisdictional Order.  Lyons Dep. 66:13-67:4.  Indeed, Ms. de Souza nearly was.  *See* Dkt. No.

---

[4] ICE still does not track whether a person was arrested at an I-130 interview.  Adducci Dep. 206:14-207:3.  Thus, the information ICE provided in response to this Court's order to produce "the identity and status of all aliens arrested while at a USCIS office in 2018 within the jurisdiction of the ICE Boston Field Office while appearing for an I-130 interview" (Dkt. No. 117 at 11) may not be complete.  *Id.*

98-2.[5]  And unless they receive similar protection, ICE will not refrain from removing any

unnamed putative class members on the basis that they are applying for provisional waivers.

Lyons Dep. 82:13-17; *id.* at 61:19-62:2 (suggesting their attorneys should advise them not to

attend their scheduled interviews).  A class-wide injunction is necessary to put an end to these

legal violations.

## II.  Class-wide injunctive relief is necessary to prevent the provisional waiver process from being used as a trap.

The discovery has revealed that DHS in Boston not only disregards putative class

members' participation in the provisional waiver process in making enforcement decisions—it

uses that process to target them.  Absent Court intervention, DHS will continue to violate the

APA, INA, and due process by turning the provisional waiver process into a trap.[6]

Indeed, CIS and the Boston ERO have worked hand-in-hand to bring individuals in for

interviews so that ICE could arrest and remove them.  CIS sends ICE a full list of pending I-130

interviews where the beneficiary is subject to a final order of removal.  Lyons Dep. 45:24-46:5;

Lyons Dep. Ex. 3 (Email chain from Graham to Rutherford and Lyons, Jan. 30, 2018) (Decl. Ex.

F).  Until Acting FOD Brophy temporarily halted the practice, ICE would then tell CIS which

---

[5] On June 12, Petitioner Lucimar de Souza was told to report to ICE with plane tickets for her departure.  Adducci Dep. 120:9-15.  This apparently occurred because she was assigned to meet with an "enforcement and removal assistant," who was not qualified to give Ms. de Souza instructions about her case.  Adducci Dep. 120:9-121:12.  The assistant whose improper actions caused Ms. de Souza such anxiety was not disciplined or given further training, but merely "spoken to."  *Id.* at 122:13-124:13.  As it turns out, enforcement and removal assistants often receive little or no training before working at ICE.  *Id.* at 130:15-131:12.  This shows continued carelessness for the law, and the need for injunctive relief identifying the procedures necessary for ICE to comply with its legal obligations.

[6] By confirming that its treatment of putative class members is a direct result of President Trump's Executive Order 13768, the discovery also confirms the claim that Petitioners stated under the equal protection clause, that President Trump's policies towards Petitioners and other noncitizens are motivated by animus.

noncitizens it wanted to arrest.  *Id.* at 46:6-8, 50:8-51:11, 51:4-16, Lyons Dep. Ex. 4 (I-130

Ordered Removed Spreadsheet) (Decl. Ex. G).

      For example, in January 2018, the Boston ERO had a list of twenty-six individuals whom

CIS was considered asking to come in for I-130 interviews.  Lyons Dep. 50:21-11; Decl. Ex. G

(I-130 Ordered Removed Spreadsheet).  For nineteen of the individuals referred, ICE noted in

the spreadsheet: "Will arrest barring significant medical or childcare issues."  *Id.*; Lyons Dep.

51:7-11.  ICE would send this information back to CIS.  *Id.* at 50:23-51:3.  ICE arrested these

noncitizens simply because they "had a valid unexecuted final order," not because of any

perceived danger to the community.  Lyons Dep. 37:24-38:21, 51:12-16; Decl. Ex. G (I-130

Ordered Removed Spreadsheet) (noting most individuals as "non-criminal").  No consideration

was given to the individuals in the provisional waiver process.  Lyons Dep. 44:23-45:3 ("Q: So

ICE officers would arrest people even if their I-130s were likely to be approved? . . . . A: Yes.");

Lyons Dep. 61:2-22 (explaining that people with final orders can apply for provisional waivers,

but "they are subject to arrest" at their interviews).

      Although interviews are not necessary to adjudicate most I-130s,[7] CIS then scheduled

interviews for those individuals, and did so at a time convenient for the Boston ERO to arrest

them.  *Id.* at 46:9-13; Decl. Ex. G (I-130 Ordered Removed Spreadsheet).  In some instances,

ICE officers asked CIS to spread out the interviews on different days so that ICE could employ

its limited resources to arrest all the people appearing for interviews.  CIS complied.  Lyons

Dep. 54:13-55:11; Lyons Dep. Ex. 1 (Email Chain from Andrew Graham to Todd Lyons, May

---

[7] USCIS Service Center Operations Directorate, Form I-130 Petition for Alien Relative (date unknown), available at https://www.uscis.gov/sites/default/files/USCIS/Resources/Resources%20for%20Congress/Congressional%20Reports/I-130%20Petition%20for%20Alien%20Relative.pdf (last visited Aug. 1, 2018) (noting "[m]ost standalone I-130 petitions [i.e. petitions not accompanied by an I-485 application for adjustment of status] will be completed without the need of a personal interview").

24, 2018) (Decl. Ex. H).  For example, in October 2017, ICE officer Graham explained to a CIS employee:

> As far as scheduling goes, I would prefer not to do them all at one time as it is only a strain on our ability to transport and process several arrests at once, but it also has the potential to be a trigger for negative media interests, as we have seen in the past.  If you have the ability to schedule one or two at a time and spread them apart, that would work best for us.

Decl. Ex. H.

Under this collaboration, ICE officers would then arrive to arrest the interviewee immediately following the interview.  Lyons Dep. 47:5-8.  ICE and CIS officers worked closely in concert in this process.  For example, on December 5, 2017, the ICE officers were running late.  Decl. Ex. I (Dec. 5, 2017 e-mail chain).  An ICE officer asked CIS to delay the applicant's interview by fifteen minutes to accommodate the officers' tardiness.  *Id.*  A CIS officer then alerted ICE when the interviewee appeared.  *Id.*   CIS also notified the ICE officers that the CIS officer "believes the case is approvable." *Id.*  ICE nonetheless arrested the applicant.  *See* Lyons Dep. Ex. 5 (Email Chain from Lyons To Guarna-Armstrong, July 16, 2018) (Decl. Ex. J) (listing Confidential/PII as arrested on Dec. 5, 2017).

Pursuant to this efficient round-up system, far more people were arrested at CIS offices than ICE previously represented to this Court.  *Compare* Lyons Decl. Feb. 2, 2018 (Dkt. No. 19) ¶ 12 (identifying five individuals arrested at CIS offices in Massachusetts and Rhode Island in January 2018, in addition to Ms. Calderon and Mr. De Oliveira) *with* Lyons Decl. July 27, 2018 (Dkt. No. 125) ¶ 4 (correcting that number to ten additional arrests); Lyons Dep. 105:3-107:13.

Moreover, the Boston ERO concealed this practice from the public.  It tried to avoid media attention in making these arrests (Lyons Dep. 56:15-17), and in responding to media inquiries and inquiries from elected officials, ICE declined to mention anything about its referral

system from CIS.  Lyons Dep. 98:6-15 (agreeing that ICE never announced that it would be making arrests at CIS offices); Brophy Dep. 54:12-15.

DHS also ignored CIS's own guidelines.  As Petitioners explained in their Motion for a Preliminary Injunction (Dkt. No. 50 at 6-7, 13, 16), CIS's publicly available Field Manual provides that noncitizens with final orders of removal are generally not subject to arrest if they are "seeking benefits under a provision of a law … which specifically allows an alien under an order of deportation or removal to seek such benefits."  Dkt. No. 50 Ex. A (CIS Adjudicator's Field Manual Ch. 15) at § 15.1(a), (c)(2).  But the Boston ERO made arrests directly contrary to this policy.  Lyons Dep. 90:18-20; Adducci Dep. 155:9-157:3.  In fact, none of the Boston ERO's last three Field Office Directors were even aware of the relevant CIS policy.  Lyons Dep. 84:4-6, Adducci Dep. 152:11-19, 157:21-158:2; Brophy Dep. 52:6-53:9.

Because DHS turned the provisional waiver process into a trap, CIS did not appear to schedule or conduct interviews in furtherance of adjudication, but instead in order to facilitate enforcement and deprive the applicant of the benefit of the process.  ICE continued to regularly make arrests through mid-February 2018 when, in the face of media and political outrage, Mr. Brophy issued a directive voluntarily, and temporarily, ceasing it.  Lyons Dep. 56:18-24 (agreeing that this kind of coordination was common between ICE and CIS); Brophy Dep. 35:20-36:19; 71:5-24 (acknowledging media coverage of and Congressional interest in Ms. Calderon's detention prior to issuing directive).

Now that Mr. Brophy has left the Boston ERO, Ms. Adducci has instructed her team that "no class of aliens is off the table" for potential arrest and that arrests at CIS offices are permissible as long as she approves them.  Adducci Dep. 92:20-93:14.  She testified that she believes Mr. Brophy's directive was contrary to Executive Order 13768, and that individuals

10

with final orders of removal are subject to arrest regardless of location and regardless of whether

they are pursuing provisional waivers.  Adducci Dep. 65:15-66:7; 135:3-5 ("Q.  And [the

Executive Order and Memorandum] each say that everyone is fair game for enforcement, right?

A.  They do say that."); Lyons Dep. 134:9-25 (stating that Adducci conveyed to him that she

believed Mr. Brophy's policy was contrary to the Executive Order).  Indee, even while Mr.

Brophy's directive was in effect, CIS continued to send ICE regular referrals that listed any

individuals with final orders of removal who may be scheduled for I-130 interviews.  Lyons Dep.

57:10-15.  Petitioners have every reason to fear that ICE officers will resume targeting them for

arrest when they appear for interviews at CIS offices.[8]

The Boston ERO is thereby pretermitting Petitioners' and class members' ability to

pursue provisional waivers in violation of their rights to due process and under the APA and

INA, and will continue to do so without intervention by this Court.

III.    **The Boston ERO struggles to comply with its own interpretation of the POCR regulations, and continues to deny Petitioners and class members a constitutionally adequate detention review.**

As Petitioners explained in their motion for a preliminary injunction, Dkt. No. 50 at 20-

23, Petitioners are entitled to a meaningful review of their detention as soon as practicable to

comply with the plain language of 8 U.S.C. § 1231 of the INA and the strictures of due process.

*See Zadvydas v. Davis*, 533 U.S. 678 (2001).  This Court has already held that Respondents have

---

[8] Even under Mr. Brophy's direction, nothing prevented ICE from using the information CIS provided to target these individuals for arrest and removal in other settings.  Brophy Dep. 81:13-18 ("Q. . . . your directive did not prevent ICE officers from arresting individuals who weren't national security or public safety concerns after their USCIS interview, correct?  A. No.").  Mr. Brophy testified that he has no idea whether his staff was still utilizing those lists to target class members for arrest or removal.  *Id.* at 80:21-81:7.  Indeed, he expected ICE may use those lists to target individuals for eventual removal in a "non-detained" setting by requiring them to come to an ICE office, placing them on an order of supervision, or utilizing another program like GPS ankle monitoring.  *Id.* at 81:19-82:10.

not even met the much lower bar of providing review on the much more lenient timeline they believe to be required.  *See* Dkt. No. 95 at 61-62.  As the Court has also noted, these violations have continued.  Dkt. No. 117 at 6; *see also* Dkt. Nos. 25, 26, *Matias v. Tompkins*, C.A. No. 18-11056 (noting POCR violations in June 2018).

The discovery confirmed that compliance with even Respondents' limited view of their POCR obligations remains a continuing problem.  Adducci Dep. 60:10-25 (stating that at least two people, and maybe "a handful," were released from detention due to POCR violations after her tenure as Interim FOD began on June 1, 2018); Dkt. No. 66 (Order, May 8, 2018); Dkt. No. 95 at 10 ("Any unjustified loss of liberty for even another day would be a painful form of irreparable harm to them and to the United States citizens who love them.").  The office's review of its docket for compliance remains ongoing, more than eleven weeks after this Court found violations in Ms. de Souza's and Mr. Juqueira's cases.  Adducci Dep. 180:6-181:23; 193:3-13.

The Boston ERO also failed to cure the causes of these repeated constitutional violations. Despite identifying additional staff training as necessary for compliance with the POCR regulations (*id.* at 45:15-20), no further formal training has taken place or been scheduled.  *Id.* at 47:23-48:9.  Nor has Ms. Adducci asked whether everybody in the office has had sufficient training on the process. *Id.* at 49:24-50:10.  And despite identifying a lack of unit staff rotation throughout the field office as a cause of the POCR violations, Ms. Adducci testified that this was "still a problem."  *Id.* at 167:5-22.

Class-wide injunctive relief is necessary to protect Petitioners and class members from further detention that violates their statutory and constitutional rights.

## CONCLUSION

For these reasons, and those stated in Petitioners' briefs, Petitioners' motions for a preliminary injunction and class certification should be granted.

Respectfully submitted this 1st day of August, 2018.


                                          /s/   Kevin S. Prussia

Matthew R. Segal (BBO # 654489)           Kevin S. Prussia (BBO # 666813)
Adriana Lafaille (BBO # 680210)           Michaela P. Sewall (BBO # 683182)
AMERICAN CIVIL LIBERTIES UNION            Jonathan A. Cox (BBO # 687810)
FOUNDATION OF MASSACHUSETTS, INC.         Stephen Provazza (BBO # 691159)
211 Congress Street                       Colleen M. McCullough (BBO # 696455)
Boston, MA 02110                          WILMER CUTLER PICKERING
(617) 482-3170                              HALE AND DORR LLP
                                          60 State Street
Kathleen M. Gillespie (BBO # 661315)      Boston, MA 02109
Attorney at Law                           Telephone: (617) 526-6000
6 White Pine Lane                         Facsimile:  (617) 526-5000
Lexington, MA 02421                       kevin.prussia@wilmerhale.com
(339) 970-9283                            michaela.sewall@wilmerhale.com
                                          jonathan.cox@wilmerhale.com
                                          stephen.provazza@wilmerhale.com
                                          colleen.mccullough@wilmerhale.com

                                          *Attorneys for Petitioners*

13