# EXHIBIT A

## REDACTED

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - x

LILIAN PAHOLA CALDERON JIMENEZ and
LUIS GORDILLO, et al.

Plaintiff-Petitioners,

vs. Civil Action No.

KIRSTJEN M. NIELSEN, et al., 1:18-cv-10225-MLW

Defendants-Respondents

- - - - - - - - - - - - - - - - - - - x

CONFIDENTIAL

VIDEOTAPED DEPOSITION of REBECCA J. ADDUCCI

Boston, Massachusetts

Thursday, July 26, 2018

9:36 a.m.

Reported By: Michael D. O'Connor, RMR, CRR, CRC

Job No: 145302

Thursday, July 26, 2018
9:36 a.m.

VIDEOTAPED DEPOSITION of REBECCA J. ADDUCCI, held at the Offices of Wilmer, Cutler, Pickering, Hale and Dorr, LLP, 60 State Street, LLP, Boston, Massachusetts, before Michael D. O'Connor, Registered Merit Reporter, Registered Realtime Captioner, Certified Realtime Reporter and Notary Public in and for the Commonwealth of Massachusetts.

A P P E A R A N C E S:

ON BEHALF OF PETITIONERS:
WILMERHALE
60 State Street
Boston, MA 02109
BY: MICHAELA SEWALL, ESQ.
STEPHEN PROVAZZA, ESQ.
COLLEEN MCCULLOUGH, ESQ.
- and -
KATHLEEN M. GILLESPIE, ESQ.
6 White Pine Lane
Lexington, MA 02421

A P P E A R A N C E S, Continued:

ON BEHALF OF RESPONDENTS:
U.S. DEPARTMENT OF JUSTICE/CIVIL DIVISION
450 Fifth Street Northwest
Washington, DC 20001
BY: MARY LARAKERS, ESQ.
WILLIAM WEILAND, ESQ.
- and -
U.S. DEPARTMENT OF JUSTICE/CIVIL DIVISION
John Joseph Moakley U.S. Courthouse
One Courthouse Way
Boston, MA 02210
BY: EVE PIEMONTE, ESQ.
- and -
U.S. IMMIGRATION CUSTOMS & ENFORCEMENT
15 New Sudbury Street
Boston, MA 02203
BY: JOELLEN ARDINGER, ESQ.

ALSO PRESENT: Crystal Strawbridge, Videographer
Emma Goold, ACLU.
Emily Kase, ACLU
Katherine Jones, U.S. DOJ

R. ADDUCCI

P R O C E E D I N G S

MS. PIEMONTE: The parties are proceeding today under the following stipulations; that all objections, except as to form, are reserved until the time of trial. That includes motions to strike that are also reserved until the time of trial.

We would like the witness to have 30 days to read and sign any deposition transcript in this case, waive the notary and filing of the transcript.

VIDEOGRAPHER: This is the start of tape label number one of the videotape deposition of Rebecca Adducci in the matter of Lilian Pahola Calderon Jimenez and Luis Gordillo, et al. v. Kirstjen M. Nielsen, et al., in the United States District Court, District of Massachusetts, Civil Action Number 1:18-cv-10225-MLW.

This deposition is being held at 60 State Street, Boston, Massachusetts on July 26, 2018, approximately 9:36 a.m.

My name is Crystal Strawbridge from

R. ADDUCCI

TSG Reporting, and I am the legal video specialist. The court reporter is Michael O'Connor in association with TSG Reporting.

Will counsel please introduce yourself.

MS. SEWALL: Michaela Sewall of Wilmer Hale. I represent the Plaintiff Petitioners, along with my colleagues, Colleen McCullough and Stephen Provazza, as well as Kathleen Gillespie, who also is counsel for Plaintiff Petitioners and is an attorney in Lexington, Massachusetts.

MS. LARAKERS: My name is Mary Larakers. I'm with the Department of Justice, Office of Immigration Litigation, District Court Section, and I represent the United States, along with my colleague William Weiland.

MS. PIEMONTE: Eve Piemonte, the United States Attorneys Office, representing the government.

* * *

R. ADDUCCI

REBBECCA ADDUCCI,

having been satisfactorily identified by a Massachusetts drivers license and duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION

BY MS. SEWALL:

Q. Good morning.

A. Good morning.

Q. Would you please state and spell your name for the record.

A. Rebecca Adducci, R-e-b-e-c-c-a, A-d-d-u-c-c-i.

Q. And where do you live?

A. I live in Michigan.

Q. Do you currently live in Michigan?

A. My permanent address is Michigan, but I'm residing in a residence in Confidential/PII .

Q. So you currently reside in Confidential/PII Massachusetts?

A. Yes.

Q. Do you understand that you are testifying under oath today and your answers are subject to the pains and penalties of

R. ADDUCCI

perjury?

A. Yes.

Q. You will provide truthful testimony today?

A. Yes.

Q. I'll be asking you a number of questions. If you don't understand a question that I ask you, just let me know, and I will try to clarify it.

Do you understand that?

A. Yes.

Q. If you need a break at any time, you can tell me, or you can tell your attorney, and we'll try to accommodate that. The only time that we wouldn't be able to take a break is if a question is pending. I would ask you to finish your answer to the question, and then we can break.

Do you understand that?

A. I do.

Q. If you realize at any time during the deposition today that the answer you gave to a question was inaccurate or incomplete, just let me know, and we can get that clear on

R. ADDUCCI

the record.

Do you understand?

A. Yes.

Q. And is there any reason that you wouldn't be able to recall events and testify truthfully today?

A. No.

Q. Will you please describe your educational background since high school?

A. I attended Michigan State University, and got a Bachelor's degree in criminal justice in 1987. Subsequently, I attended the Federal Law Enforcement Training Academy in Glynco, Georgia.

Q. Did you obtain any degrees after attending the academy?

A. No.

Q. And what sort of degree do you get when you attend the Law Enforcement Academy?

A. I don't think it's a degree. It's just you graduate from the academy. I graduated as a criminal investigator special agent with at the time Immigration and Naturalization Service. Basically, just a

R. ADDUCCI

certificate of completion. It was a long time ago. I can't remember exactly what it looked like.

Q. Where do you work currently?

A. I currently am the interim field office director for ICE Enforcement and Removal Operations in Burlington.

Q. You are on detail at that position, correct?

A. Correct.

Q. What does "on detail" mean exactly?

A. I'm temporarily -- it's a temporary duty assignment away from my permanent duty station.

Q. So do you currently also work for the Detroit office?

A. Well, someone is in my stead in Detroit right now. My deputy is covering the Detroit field office.

Q. Do you have any current responsibilities to the Detroit field office?

A. Technically, I'm dealing with some disciplinary issues with employees, things like that, that can't be handled by anyone

R. ADDUCCI

else. But for operational purposes, I'm not involved.

Q. And when -- how did you come to work on detail at the Boston field office?

A. I received a phone call from my boss. It would have been the Wednesday after Memorial Day. So I'm not sure of the date. Maybe the 30th, I think. I was standing outside of Pirates Stadium and I got a phone call asking if I could go to Baltimore -- I mean, Boston. If I could go to Boston.

Q. Who's your boss?

A. This boss was David Jennings.

Q. Where does he work?

A. In Washington.

Q. What department?

A. ICE Enforcement and Removal Operations.

Q. And what's his title?

A. He's the acting assistant director for field operations.

Q. So he offered you the position in Boston?

A. He asked me if I could go to

R. ADDUCCI

Boston, and I said, For how long?

Q. How long did he answer?

A. He said, Can you do 60 days?

Q. Do you expect to work for 60 days?

A. It's going to be a little bit longer, because I have to go home for a medical appointment. So I'm going to come back. So it's going to go a little past that, but I'm currently scheduled to leave on August 17th.

Q. And why did you accept the position in Boston?

A. I don't really know that it was an option. I like to -- you know, I want to help. If my boss calls me and asks me to do something, I generally say yes.

Q. You said this was approximately May 30th, this conversation?

A. It would have been the Wednesday after Memorial Day. I just don't know the date.

Q. Okay. And when did you start working in the Boston field office?

A. I came on June 7th. I think I flew

R. ADDUCCI

in midday. So I did stop by the office on the 7th. And then from there, I have been in charge.

I did have to leave for a conference in between. I think I left on the Friday after that. So it would have been maybe the 15th, and then I returned the following Monday the twenty -- I'd have to see a calendar, but I think it would have been maybe about the 24th or 25th, whatever that Monday was.

Q. After August 17th, do you expect to return to Detroit?

A. Yes.

Q. And resume your prior position?

A. Yes.

Q. Do you know who will succeed you in Boston?

A. Yes.

Q. Who?

A. Todd Lyons.

Q. What's your current job title?

A. Field office director.

Q. And what are your responsibilities

R. ADDUCCI

in that role?

A. Basically you oversee all operational functions of enforcement and removal operations. In this instance, it would be in the New England area.

Q. Do you report to anyone currently?

A. I do.

Q. Who do you report to?

A. My first-line supervisor, or first-line report, is Christopher Cronin.

Q. Where does he work?

A. In Washington.

Q. In what department?

A. In ICE Enforcement and Removal Operations.

Q. What's his title?

A. He's the deputy assistant director for field operations.

Q. And you said he's your first-line supervisor?

A. Correct.

Q. Is there a supervisor above that?

A. That would be Dave Jennings.

Q. Is there anybody above that?

R. ADDUCCI

A. There's the deputy executive associate director would be Jennings' boss. That would be -- did you want that person's name? Nathalie Asher.

Q. I think you explained this a little bit, but what does it mean to be an interim field office director?

A. I think that it's a distinction between an acting in that I'm actually a field office director versus somebody who is in a deputy role, or a subordinate role, stepping into the position.

Q. So the person who is currently in Detroit, for example, would be an acting director?

A. Correct.

Q. So interim is temporary?

A. Right.

Q. But you're the field office director?

A. Correct.

Q. I might call that FOD. Will you understand what I'm talking about?

A. That's okay.

R. ADDUCCI

Q. Is there generally, you know, a default amount of time where somebody would serve as an interim FOD or does it vary?

A. I would say it varies.

Q. Do you know what the procedures are, if any, to be reappointed after your expected time period runs out?

A. To be reappointed to Boston?

Q. Yes. If you're the interim FOD and your time period runs out, but you want -- either you want to or your boss wants you to be reappointed, are there any procedures for that?

A. I suppose it would start with the conversation. I believe there is some paperwork that is completed at the headquarters level, but it's done by support staff in headquarters.

Q. Have you ever been involved in litigation before?

A. As the field office director, I've been involved in habeas cases.

Q. In your role as field office director, is that in the Detroit office?

R. ADDUCCI

A. Yes.

Q. The office has been named as a Defendant in litigation, correct?

A. Yes.

Q. In any of those cases, has a Court made a finding that you or the field office acted improperly?

MS. LARAKERS: Objection. It's outside the scope. You're talking about Detroit, and we're talking about Boston here.

MS. SEWALL: I think her prior experience with litigation is just background information that's relevant to everything that we're going to be talking about today.

MS. LARAKERS: Continue.

A. I cannot say I know for certain.

Q. You can't remember one way or the other?

A. No.

Q. Would you remember if there was a finding against your office?

A. I guess I need clarification. Can you give me an example of a finding?

Q. If a Court found that your office

R. ADDUCCI

committed a constitutional violation, for example, or a violation of the law.

A. I think I would recall if somebody alleged we violated the law.

Q. If the Court found --

A. Found. I can't think of an instance, but I -- I can't. I'm sorry. I don't know what you're getting at. I don't know -- if someone told me that our staff violated the law, I think I would know, or the field office violated the law, I think I would know. But I've been the field office director there for nine years. I don't -- there's been multiple litigation.

So would a -- a habeas case that is found to, you know, that we are ordered to release someone from custody, that's happened.

Q. Okay.

A. I mean, I'm not sure if I...

Q. Do you know, approximately, how many habeas cases have been released from custody?

A. No.

Q. Would it be more than five?

R. ADDUCCI

A. I would not want to guess.

Q. Have you ever testified at trial before?

A. In -- many years ago as a special agent.

Q. What was the case?

A. I think I was a witness, and I think it was, I believe, in a marriage fraud case.

Q. This was before your time as FOD?

A. Oh, yes.

Q. Have you ever testified at a hearing before?

A. I've testified in immigration court.

Q. When was that?

A. It was before I was field office director. I can remember the person. I just can't remember the timeframe. It would have been prior to 2007; I can say that.

Q. And what was the issue?

A. He had -- he had escaped from custody, I believe, and -- oh, actually, no. That's not it. His brother -- somebody that

R. ADDUCCI

we were looking for, his brother was, I think, asking to get out of custody. All I remember is my specifics, I had encountered him at a traffic stop, and he had been sort of threatening.

So I had to testify to the encounter at the traffic stop. I don't remember what his litigation -- what his situation was. I don't know if he was trying to get, you know, some type of relief from the Court. I just had to testify to my interaction with him.

Q. Have you ever been deposed before?

A. No.

Q. When did you first learn about this litigation?

A. I think I read something about it just in our ICE clips when I was still in Detroit. But, you know, very cursory information. I just saw something about some, I believe, testimony from the previous -- the acting field office director, I think.

Q. And after that, did you learn more about the litigation?

R. ADDUCCI

A. Yes.

Q. How?

A. Since coming here, I've been briefed on it, had conversations with counsel, and had conversations with subordinate staff.

And before I came, I actually spoke to the previous -- once I found out I was coming, I called and spoke to acting FOD Brophy. B-r-o-p-h-y.

Q. What did you speak to Mr. Brophy about?

MS. PIEMONTE: Objection to the extent it includes law enforcement.

MS. LARAKERS: Oh, yeah. Objection to the extent it includes law enforcement sensitive information.

MS. SEWALL: This isn't to the current question, or is it -- is it to the current question?

MS. LARAKERS: It's to the current question.

BY MS. SEWALL:

Q. Without revealing any law enforcement sensitive information, what did

Page 22

R. ADDUCCI

you discuss with Mr. Brophy?

A. I think general situation within the office; the fact that there had been extensive litigation, and that there were some challenges with some of the processes within the office and how the post-order custody review process was taking place.

Q. You mentioned some challenges with the processes of the office. Can you explain that?

A. Some lack of staffing issues, some, I guess, training issues, possible -- some need for some more training for some newer staff, very, very new staff in certain parts of the office, and sort of staffing assignments as it relates to the challenges that they were facing with getting POCRs completed timely, and things like that.

Q. Did he mention an audit report that he had conducted?

A. Yes. I don't know if he mentioned it or if I got it after I got -- I might have learned that in -- I don't know how I learned it, but I know there was an audit.

Page 23

R. ADDUCCI

Q. Have you reviewed that report?

A. Yes.

Q. Have you reviewed the issues that it lists in the recommendation?

A. Yes.

Q. And since becoming field office director, have you worked to make the changes that are in the report?

MS. LARAKERS: Objection. Deliberative process.

MS. SEWALL: I can rephrase.

Q. Have you, since becoming field office director, have you been addressing the issue -- have you been working to address the issues that are in the report?

A. Yes. Many had been addressed by the time I got here.

Q. We can revisit that later.

You've reviewed documents from this litigation, right?

A. Yes.

Q. Which documents have you reviewed?

A. Well, I -- many. A lot of them are a little above my, I want to say, education

Page 24

R. ADDUCCI

level as it relates to, you know, litigiousness. So things, orders to show cause, motions, declarations of mine, the 62-page order that the Judge required me to read. I think that was in late June.

Then there were some other documents that I read prior to doing my declaration. I just don't remember the, you know, the names of all of the documents. I think there was a lobby conference, and then I think there was another order, or an initial order, an order with a little "1" that was maybe May 8th maybe. I don't know. I think.

Q. Why did you review all of those documents?

A. To familiarize -- well, some I was instructed. I had to. Otherwise, to familiarize myself with sort of the situation.

Q. Okay.

A. Some of them, many of them, I would need to have interpreted for me, just because they're very legal and technical.

Page 25

R. ADDUCCI

(Adducci Exhibit 1, Notice of Substituted Party Under Rule 25(d), marked for identification)

Q. The court reporter has handed you what's been marked as Exhibit 1. Do you recognize this document?

A. Yes.

Q. What is it?

A. It's my declaration from June 19th.

Q. If you turn a few pages, the first is where your declaration starts, correct?

A. Hmm-hmm.

Q. It's titled "Declaration of Rebecca J. Adducci."

And if you look at the last page, it says "Executed this 19th day of 2018 in New Orleans, Louisiana."

A. Yes.

Q. It has your signature on it?

A. Yes.

Q. Why was it executed in New Orleans?

A. Because I was at a conference in New Orleans.

Q. If you turn back to Paragraph 5 --

R. ADDUCCI

actually, sorry. Turn back all the way to the beginning, and then go to Paragraph 5, which is on Page 2. The first two pages are the filing in this case, correct?
A. (Witness nods.)
Q. Paragraph 5 says you have been given the following documents from this matter, and it lists these documents. Do you see that?
A. Yes.
Q. Did you review all of these documents, to the best of your knowledge?
A. Yes. These are the sequestration orders and the orders to show cause. Those are the types of documents that were very litigious. The transcript of the lobby conference was probably the most -- the easiest to read.
Q. And you read the Amended Complaint, correct?
A. Yes.
Q. So you're familiar with the claims that the petitioners are asserting in this case?

R. ADDUCCI

A. Correct.
Q. You mentioned you also reviewed the Court's June 11, 2018, order that he ordered you to review?
A. If that was the 62-page...
Q. To the best of your knowledge, these documents and that June -- that 60-page order would be all the documents you've reviewed from this case?
A. There could be more. I've reviewed those. But I've -- when you say "this case" documents, do you mean only court documents?
MS. LARAKERS: Can you just clarify a little bit?
Q. The court documents. The filings within this case.
MS. LARAKERS: Can you restate the question as a whole so she makes sure she gets it?
MS. SEWALL: Sure. If she's confused by the question, then she can always tell me that she's confused.
A. So I don't know if these are the only documents that I've reviewed. I've

R. ADDUCCI

reviewed multiple documents since I've been here on different habeas cases, different judges. I'd be really uncomfortable saying these are the only documents I've seen, but I have seen all of those.
Q. Can you tell me in your own words what the dispute in this litigation is?
A. You had -- you have a situation where you have U.S. citizens married to illegal aliens who are attempting to adjust their status at CIS, and to my understanding -- I don't know that they were all going through the provisional way, but they all were filing I-130 applications, and there's an opinion, or the Plaintiffs believe, that it's a violation for ICE to arrest people when they're trying to regularize their status or make themselves legal.
Q. When did you first learn you were giving a deposition in this case?
A. Last Monday. I mean, I saw the motion for. But the order from the Judge, I believe, was a week ago Monday.
Q. And from that date to today, have

R. ADDUCCI

you talked with anyone other than counsel about your deposition?
A. I told my husband I had to give a deposition. No.
Q. Nobody at the office?
A. My bosses know that it's happening. I mean, actually, a lot of people know, because it was in the paper. So, no. But about the specifics, no.
Q. So about the fact of the deposition, but not about --
A. Right. What to say, no.
Q. So the court reporter reminds me that it's important for us not to speak over each other. It's something that can be challenging, but we should do our best to let the other person finish before the other person starts speaking. We'll be reminded of that throughout the process, I'm pretty sure.
So you testified that your current supervisor, first-line supervisor, is Christopher Cronin, correct?
A. Correct.
Q. When did you first learn about

Page 30

R. ADDUCCI

Mr. Cronin? When did you first hear about him?
A. As a person?
Q. Hmm-hmm.
A. Probably shortly after I became field office director or -- I shouldn't say that. I don't really know. It was sometime probably maybe 2010. I believe he worked in our Firearms Division at headquarters. I think I was on detail there. Don't hold me to dates. It's a long time ago. But I met him sitting at a table like this.
Q. Is this the first time you've worked with him?
A. Well, he's my supervisor in Detroit as well, because he covers the eastern half of the country.
Q. So you have been working with him for the past nine years?
A. No, I wouldn't say that. I'm not sure when he became -- I mean, he was a colleague as a field office director in Boston, whenever he became the field office director in Boston. Then he became my boss

Page 31

R. ADDUCCI

after that. So I think maybe January of this year he became my boss. Prior to that, you know, I didn't have a lot of interaction with him. He wasn't one of my closer colleagues.

Beyond Scope of Deposition Order

Page 32

Irrelevant comments of counsel

Q. Beyond scope of deposition order

Q. When was the first time you learned of Mr. Brophy?
A. Probably when he got the deputy field office director position in Buffalo, but I don't recall when that was. A few years ago.
Q. And he's currently in Buffalo, correct?
A. He's assigned in Buffalo.
Q. The field office director in Buffalo?

Page 33

R. ADDUCCI

A. Deputy.
Q. Deputy field office director.
Are you familiar with Mr. Brophy's work generally?
A. No.
Q. Do you have an opinion about the quality of his work?
A. No. I have no reference to it.
Q. Are you familiar with his reputation at ICE?
A. Yes.
Q. And do you know what it is?
A. He has a good reputation.
Q. What about Mr. Cronin's reputation at ICE?
A. He's -- yeah, I would say he has a fine reputation.
Q. And you know Todd Lyons, correct?
A. Yes.
Q. Are you working with Todd Lyons currently?
A. Yes. We haven't had a really large opportunity to work together, because we have not been in the same office but for a handful



Page 34

R. ADDUCCI

of days since between different assignments. But yes, he is the deputy here.

Q. And his current title is?

A. Deputy field office director.

Q. And when did you first learn about Mr. Lyons?

A. Beyond the scope of deposition order

Page 35

R. ADDUCCI

ago.

Q. And --

A. Almost two years ago, I guess.

Q. That's the first time you've learned about it?

A. Yes. I didn't know him before then.

Q. And are you familiar with his work currently?

A. Very little, because I've -- as I said, we've sort of been ships passing in the night. He has been in some trainings and he has had some vacation. I've had a little bit of occasion to work with him, but nothing of -- not a long enough time to make any judgment calls.

Q. And are you familiar with his reputation at ICE generally?

A. Yes.

Q. And what's that reputation?

A. He has a good reputation.

Q. Have you ever spoken to Mr. Cronin about this litigation?

A. No.

Page 36

R. ADDUCCI

Q. Have you ever spoken to Mr. Brophy about this litigation?

A. Yes.

Q. Are those the conversations that we talked about when you were first onboarding in your role as interim field office director in Boston?

A. Correct.

Q. Any other conversation?

A. I mean, I talked to him about the fact that he was coming here, or potentially coming here to do a deposition, but it was more about the order. I probably talked to him, I think, twice maybe since I've been here. That was kind of making arrangements to come here when he was coming. It's my understanding his was postponed. Some e-mails about his availability because of the timeframe involved with completing the depositions.

I think -- actually, I don't know if that was e-mails between he and I; because it was part of my declaration or I just saw it later, if it was e-mails -- I think I might

Page 37

R. ADDUCCI

have been copied on the e-mail.

Q. Okay. And what did you discuss with him about this case, aside from depositions?

A. Nothing. It has been somewhat of a challenge, because there's a sequestration order. So I think that's been -- that's been a lot of a challenge, because people don't know what they can talk about or should or shouldn't, and I think it has been -- other than the after action report that was provided to me and, you know, sort of -- we really haven't discussed much at all about it.

Q. Can you remember anything that you did discuss?

A. We discussed -- we discussed the fact that a team came in, what they referred to as sort of a tiger team, to do some reviews. And then completed the after action report. I've had so many things going on, I can't...

I'm sure we discussed people potentially having been released because of what I would refer to as a POCR timeline



Page 38

R. ADDUCCI

issue, kind of more in generalities.

I really haven't talked to Tom much. He wasn't at the conference that I was at in New Orleans. I'm trying to think of when I would have had an opportunity to talk to him. I might have, you know -- I don't even think I did that.

That's pretty much what we discussed.

Q. What is the after action report you referred to?

A. That's this -- the result of this team of people that came in, and we talked about it earlier, the recommendations to make some improvements in processes in the field office.

Q. And you called it a tiger team, correct?

A. That's not my term, but that's what it has been referred to as.

Q. What does "tiger team" mean?

A. It just means a team to come in and do an evaluation, I mean, to work a project. Sort of a working group is probably a

Page 39

R. ADDUCCI

better...

Q. Is it a common practice in ICE to bring in a tiger team if you identified any issues with the procedures in the office?

A. I can't -- I wouldn't call it common.

Q. Have you ever in your nine years in Detroit brought in a tiger team?

A. No.

Q. Do you know James Rutherford?

A. Yes.

Q. And when did you first learn of him?

A. I believe he was also -- I don't know if I interviewed him, but I think I may have interviewed him as the deputy field office director, because there was a big pool of people. I think he may as well have been one of the interviews that was conducted at the same time that I interviewed now-Deputy Field Office Director Lyons.

Q. And you work with Mr. Rutherford currently?

A. Correct.

Page 40

R. ADDUCCI

Q. Confidential/Privacy Sensitive

Page 41

R. ADDUCCI

A. Confidential/Privacy Sensitive



R. ADDUCCI

Q. Confidential/Privacy Sensitive/ Beyond Scope of Deposition Order

Q. Have you ever spoken to Mr. Rutherford about this case?

A. Other than the, you know, having had to testify, but not the details of the testimony. Certainly trying to resolve issues or address potential challenges, we have. But there's a lot going on in the field office, so day-to-day operations kind of are very fluid, and we're -- you know, other than to say that he had done testimony, which again, I don't think, you know, he knows obviously I'm here today. He's running the office, because Mr. Lyons is on vacation. So he knows I'm at a deposition for this today. But just really, again, nothing of substance, I guess.

Q. And so when you said that you talked to him about trying to resolve issues

R. ADDUCCI

or address what's going on in the field office, what were you referring to?

A. Making sure that the paperwork is done timely, making sure that the processes that are in place are adhered to, making sure that we have appropriate staffing for the different divisions within the office, making sure they have the right equipment that they need to get the job done; things like that.

Q. When you say making sure paperwork is done timely and processes adhered to, are you referring to POCR processes specifically?

A. Right. I mean, I don't know that I specifically talked to -- I talked to the management team. You know, we have meetings pretty regularly. So talking kind of through the process and making sure everyone understands.

Again, like I said, I think there was a bit of a lack of clarity as to -- I think people were very reluctant to talk about what was going on. So there were a lot of people wanting to do the right thing, taking obviously this very seriously, but not exactly

R. ADDUCCI

knowing what was kind of behind that sequestration curtain to some degree.

So it has been sort of getting people a little bit educated, and things like that. Much of that, I think, was addressed before I got here, but I think that there was some, you know, reinforcing. It was more in a group setting with, you know, the management team.

Q. Did you mean uncertainty about the POCR regulations or uncertainty about the sequestration order and what could be discussed?

A. Well, I just think the general gist of the case. Because people -- I mean, what you can read. Again, a lot of what you can read, one, is in the media, which is sometimes not accurate. A lot of what you can read is very litigious. And, you know, we're not lawyers; we're operators.

So that's, I mean, I can't say that no one is a lawyer, but, I mean, if there are, it's very few lawyers that are actual officers. I think they just needed clearer

R. ADDUCCI

guidance. And, you know, new people onboard learning or being trained properly.

Q. When you're saying all of this, are you referring to POCR regulations? Are you referring to what the Judge has ordered in this case? I'm just not sure what the confusion -- I'm just not sure what the source of the confusion is.

A. No. I would say in the POCR regulations.

Q. So people being unsure about the processes necessary to comply with the POCR regulations?

A. I wouldn't -- I mean, I think there was some training that needed to occur, because you had some very, very brand new staff and some overwhelmed staff.

Q. And training to occur on what?

A. On the POCR process.

Q. And has that training happened?

A. Much of it has, and it is still ongoing. It's more of an informal sort of mentor-type training.

Q. So what training specifically has

Page 46

R. ADDUCCI

already occurred?

A. It would be, again, an officer working with another officer. It's more of an informal training, and having probably access to some more staff and senior staff in the office, and readjustment of staffing levels.

Q. What do you mean "readjustment of staffing levels"?

A. So there were three people on what would be the group that did the POCRs before I got here; and, as of now, there are 12. Three people, and an acting supervisor kind of situation. The staffing has been significantly increased, as well as bringing in some seasoned officers.

Q. And with this informal mentoring training, do you know that everybody has had training in the office?

A. Everybody in the office?

Q. Everybody who needs it who deals with POCRs, who needs to be trained on the POCR process.

A. It's not an official training, so I don't know how -- you know, different people

Page 47

R. ADDUCCI

require different levels. So to say somebody has had sufficient training, I feel like everybody has had access -- has access to and understands the issues that we saw were generally the lack of service or the timeliness of service of the Notice of File Custody Review.

I mean, there were some other, you know, issues; but that was a big issue, the timeliness of the service of that Notice of File Custody Review.

Q. So how has the training that's been conducted helped people in the office on that?

A. Well, I would hope it has helped in that I haven't seen any issues since. But, you know, it still is a time -- there's still some time to pass before you have a huge level of confidence that everybody is -- I mean, I've had meetings with staff. I've had meetings with line officers just to say the importance of the process.

Q. So if I have this right, there's been no formal classes or training sessions that come in that everybody in the office

Page 48

R. ADDUCCI

needs to attend?

A. Correct. A formal POCR training comes out of ICE headquarters.

Q. And is that scheduled to happen at any time?

A. They were here prior to the issues. So it's not scheduled. It has been discussed, but it is not scheduled yet.

Q. And so the people who are, let's say, lower level who might need the training, who are either new or they are overwhelmed or they need information on how the process works, how did they go about getting that? They just reach out to a mentor?

A. And their supervisor. I mean, there's information that is on our ICE internal website or -- internal website, the processes. I mean, they have access to things. And then there have been some, for lack of a better term, sort of go-bys that have been created, or some are in the process of being created and being reviewed, and others are -- this is above. Again, I'm not a computer person -- but they use certain

Page 49

R. ADDUCCI

programs to be able to access certain things. One of the more senior people has worked pretty hard on putting something together for them.

I haven't reviewed it, because I don't do POCRs, but I saw -- I mean, I've spoken to them about it.

Q. So what's a go-by?

MS. LARAKERS: Objection to the extent that that's prepared by counsel.

A. It would be sort of a checklist, a checklist of what to do when.

Q. With relation to the POCR process?

A. There's different, but that would be one example, yes.

Q. So go-bys are in the process of being created now?

A. I think they are created. I think they are just being reviewed.

Q. And those will be distributed to people?

A. Yes.

Q. So how will you know when everybody in the office has had enough training on the

R. ADDUCCI

POCR process to be familiar with it going forward?

A. I would have to rely on my subordinates to tell me that they're confident their staff is appropriately trained.

Q. And has that happened?

A. I haven't asked.

Q. Are you planning to ask them?

A. Yes. Now that we brought it up.

I feel -- I've asked multiple times how we're doing, are things improving, things have improved vastly, the kinds of things that I'm hearing, and I haven't seen any issues of -- huge issues of concern since I've been there, you know, anything that's occurred since I've been there that I can think of. I know there were several before.

Again, I'm not taking responsibility for fixing it. A lot of that was in the works when I got here. So I feel like -- I feel like the staffing level had a lot to do with some of the issues.

Q. And how would you become aware of any issues that arise in people receiving

R. ADDUCCI

proper POCR review?

A. Through the chain of command, I had a subordinate reviewing the detained docket, and, you know, working with the staff and working with the assistant field office directors to ensure if he noted any issues of concern, they were being addressed.

Q. So he's reviewed the entire currently detained docket?

A. Yes.

Q. And when did he conduct that review or she?

A. Beginning June 25th or 26th.

Q. And when did he finish his review?

A. Yesterday.

Q. And what did he report on that review?

A. It's in the office. I haven't seen it, because he was there late and I left, and I'm here today.

Q. And you mentioned the sequestration order. Just to confirm, it sounds like this is the case, but have you been acting as if you were bound by the sequestration order as

R. ADDUCCI

Brophy's successor?

A. I don't know. I don't know if I know the answer to that. I don't know that I was bound by the sequestration order, but I don't know anything that's behind it, so I couldn't say anything about it.

Q. I'll rephrase the question.

A. Okay.

Q. I don't think it was put very well. I more mean, have you been abiding by the sequestration order?

A. I think so, yes.

Q. The sequestration order says that you're not allowed to discuss what was asked --

MS. LARAKERS: Objection. Can you show her the document and not just characterize it, because I know it doesn't say "you."

(Adducci Exhibit 2, Order, marked for identification)

Q. The court reporter has handed you what's been marked as Exhibit 2. Do you recognize this document?

R. ADDUCCI

A. Okay.

Q. Do you recognize this document?

A. Yes.

Q. What is it?

A. It's the sequestration order. I think it's part of this document as well, ECF No. 69 or No. 85. There's two. I don't know if it's the revised or the original. But, yes.

Q. Is it your understanding that you are bound to the requirements that are set out in this document?

A. Well, my name is not in this document.

Q. Correct. My question is, so is it your understanding that you're bound to the requirements in this document?

A. I -- no.

Q. Okay. If you turn back to Exhibit 1, your June 22nd declaration. If you turn to the second-to-last page, Paragraph 4 of your declaration.

Are you with me?

A. Yes.

R. ADDUCCI

Q. In the second sentence you say, "I have also been made aware of the Court's concerns regarding the implementation of the relevant POCR regulations in ensuring timely reviews conducted with proper notice to the parties. In light of those concerns, I plan to include those issues among my priorities to address."

Do you see that?

A. Yes.

Q. Have you included those issues among your priorities to address since being the interim FOD in the Boston field office?

A. Yes.

Q. Can you explain how you've included it in your priorities?

A. Well, probably the biggest thing is I've brought a subject matter expert from Detroit with me to review the entire detained docket.

Q. Is that the subordinate you were referring to earlier?

A. Yes.

Q. What makes him a subject matter

R. ADDUCCI

expert?

A. He was SDDO in Detroit over the detained docket -- I'm sorry -- supervisory detention and deportation officer over the detained docket. And then subsequently the assistant field office director over the detained docket in Detroit. I rely very heavily on him for his expertise in that -- in my office in Detroit.

Q. So his review of the detained docket, is that one of the ways you've made this a priority?

A. Yes.

Q. And his review was finished yesterday, but you haven't had time to look, because it was late yesterday, correct?

A. Right.

Q. Did he tell you if he encountered any major issues yet?

A. He -- one of the problems or challenges he had was he couldn't be for sure, certain, on everything, because he didn't have all of the files. He had to rely much on a computer screen.

R. ADDUCCI

So sometimes, depending on if there is a potential data quality issue, he may or may not know if something occurred timely.

I know he was working with the officers. If he saw something that he considered to be a potential problem, and he didn't share with -- he was very busy, and he didn't, you know, he didn't share with me on individual cases. He was working with the assistant field office director over the detained docket, as well as the SDDOs, and then provided guidance to some of the newer deportation officers as well, again, just on an as-needed basis if they came in to talk to him.

Q. What is the data quality issue you're referring to?

A. If something wasn't put into a system, and it actually occurred, you know, the best way to know what's happened is the file. It's sort of, I mean, when I started, we didn't have computers. So you had to rely on the files for everything.

Then as time progressed and you

R. ADDUCCI

start using computer systems, everything in the computer is as good as the person putting it in. Occasionally something might get overlooked or something might be input improperly or erroneously. The best evidence has always been the actual file itself.

One of the challenges we have is we don't own the files. They're owned by another agency. So we have to coordinate and, you know, and the files are needed by other divisions of our agency as court occurs, or being needed by potentially citizenship and immigration services for adjudication of applications. So the best evidence has always been the file.

So without -- if there was a question, he wasn't comfortable saying until he actually saw the file, which sometimes weren't available. I mean, files get moved all over the country unfortunately.

Q. Besides bringing in somebody to review the detained docket, what else have you done to make the implementation of the POCR regulations one of your priorities?

R. ADDUCCI

A. Personally, I've done -- I haven't done anything. I've spoken to staff. Oh, I did have a meeting with the non-detained -- or the detained staff. I can't be certain that they were all present based leave and it was very early in my tenure here, although it still feels very early in my tenure here. I don't know everyone here. I don't know everyone's names, and I don't know if the full contingent of staff was present for the meeting, but it was a good-sized meeting.

But I expect my subordinate managers, as we discuss things, to be talking to their staff. And I've told the subordinate managers to make sure that people are feeling comfortable and educated. And there's reviews, you know, the SDDOs have assured me they have reviewed the cases on a pretty regular basis to -- again, something that -- I'm speaking to something that occurred before I got here, but part of -- I think it might have been part of the after action report, or part of the team that came in was a recommendation to use some spreadsheets.

R. ADDUCCI

I haven't actually seen the spreadsheets, but the staff has assured me that they are reviewing these spreadsheets on a regular basis; that being the supervisors, not -- on more of a random as opposed to every single case, every single week, or every other week. I mean, that would be a lift. And say that things are doing much better.

Q. What are the spreadsheets that you've referenced?

A. I haven't seen them. It's sort of -- it came from another field office and it's sort of an antiquated way of using a system. It's sort of a 2008 way of using a system, but it's more visual than using what we call call-ups in our system to sort of tell you when things are due. It's just a visual tool.

Q. Anything else that you've done since?

A. I can't think of anything.

Q. Is it the current policy of the Boston field office to release somebody who has not received proper POCR review?

A. There's usually a discussion that

R. ADDUCCI

will take place before that happens. So I would review it with our counsel to make a determination if it appears as though there has been.

But ultimately, yeah, if there's an improper POCR timeline issue or POCR review, the remedy has sort of been release -- has been release.

Q. So once it's definitively determined that somebody has had their -- has had an improper POCR review, they will be released; is that correct?

A. In consult with our attorneys.

Q. Has anybody been released that you know of since you started office?

A. Yeah, there have been a couple.

Q. Do you know who they are?

A. No.

Q. You said a couple. Is that two?

A. I'm thinking of two, but there may have been three. I don't want to be pinned-in on that number. I can find out and get back. It has been less than, you know, it has been a handful at most.

R. ADDUCCI

Q. Are you familiar with the name Confidential/PII ?

A. Yes.

Q. Has he been released from custody?

A. He's not in custody, to my knowledge, unless something happened in the last day. But I believe he was released by -- I think that's a case that was released by a district court judge.

Q. Did your office determine whether he had received a POCR violation?

A. I think that happened before -- I don't know. I don't -- I don't know the answer.

Q. You're aware that in this litigation the Court conducted hearings on May 22nd and May 23rd, correct?

A. Yes. Towards the end of May, yes. Before Mr. Brophy left.

Q. Are you aware that at those hearings Thomas Brophy testified?

A. Yes.

Q. And Todd Lyons testified?

A. Yes.

R. ADDUCCI

Q. And James Rutherford testified?
A. Yes.
Q. Have you read the transcripts of the testimony from those hearings?
A. No.
Q. If you look back at your declaration, Exhibit 1, and you turn to Paragraph 4, the first sentence says, "I'm aware that testimony was taken by the Court from the then-Acting FOD as well as other local ERO leadership regarding operations of the Boston Field Office, so I wanted to ensure the Court was made aware of my transition to the position of Interim FOD at the Boston Field Office."
Do you see that?
A. Yes.
Q. What testimony are you referring to?
A. The lobby conference. I don't know if that was technically testimony.
Q. Yeah, well, you said "testimony was taken from then-Acting FOD, as well as other local ERO leadership, regarding the operations

R. ADDUCCI

of the Boston Field Office."
Do you know who you were referring to?
A. That would have been Lyons and -- Brophy is the acting FOD, and then Lyons and Rutherford.
Q. Why did you say you wanted to ensure the Court was made aware of your transition?
A. I read the lobby conference, and in the lobby conference they indicated that Mr. Lyons was going to be the acting FOD, and it was a recommendation of counsel that we notify the judge that that had changed.
Q. If you turn to Paragraph 5, you state, in the first sentence you state, "I also understand that statements may have been made by prior local ERO leadership which may have been interpreted as a commitment with regard to the prioritization of enforcement resources."
Do you see that?
A. Hmm-hmm.
Q. Were you aware that Mr. Brophy

R. ADDUCCI

testified that absent a danger to public safety, the Boston field office would no longer make arrests of persons pursuing I-130s and presenting themselves as CIS officers?
A. Yes, because it was in the lobby conference.
Q. And were you referring to that in Paragraph 5?
A. In part.
Q. What other part?
A. Is there a possibility I could see -- I know what I'm thinking of, but I don't know if I'm going to say it exactly right.
There was some discussion about the CIS-related arrests. But then there was subsequent discussion in the lobby conference about final orders with -- final order aliens with no criminal activity, and the fact that we would -- there was a desire or there was a discussion about whether those people would be targeted for arrest outside of CIS.
Then my recollection is Mr. Brophy said that he would -- he would not commit to not -- he could not commit to not arresting

R. ADDUCCI

those, but that he would not detain them.
Q. So if you turn back to your declaration, after that sentence you say, "As Interim FOD, I intend to prioritize enforcement resources consistent with Executive Order No. 13768."
Do you see that?
A. Yes.
Q. So that was a true statement at the time, right?
A. Yes.
Q. And that is true today?
A. Yes.
Q. Do you think that Mr. Brophy's practice that you were referencing contradicts the President's executive order?
A. Yes.
Q. In what sense?
A. There are no specific classes of individuals that are off the table for enforcement action.
Q. What do you mean by "enforcement action"?
A. Arrest, detention, removal.

R. ADDUCCI

Q. And so Mr. Brophy's statement that "absent a danger to public safety, the Boston Field Office would no longer make arrests of persons pursuing I-130s and presenting themselves at U.S. CIS" was contrary to that?

A. Correct.

Q. And his statement that they wouldn't detain individuals who were pursuing provisional waivers was contrary to that?

A. Yes.

Q. So in your view, the President's order requires arrest of anyone with final orders of removal?

A. I don't know if I would say requires. I would say permits.

Q. Regardless of where the person is located at the time of arrest?

A. That's just -- it's not addressed. So yes, regardless.

Q. And regardless of whether they're pursuing a provisional waiver?

A. Correct.

Q. Regardless of their marriage to a U.S. citizen?

R. ADDUCCI

A. Correct. These are all factors that should be considered when making a decision on whether or not to conduct an enforcement action. But the policy, the executive order, I'm sorry, doesn't address that issue.

Again, the premise behind it is there is no specific class of individuals that is exempt from enforcement action. And if you say that, you're making a class of individuals that is exempt from enforcement action.

Q. So what considerations go into whether to conduct an enforcement action?

A. I mean, there's really no magic bullet or magic potion for that. It's all case by case. There are so many things that can go on in a case.

Q. And you said that somebody -- but the fact that somebody is pursuing a provisional waiver is married to a U.S. citizen is something that should be considered, correct?

A. I think everything should be considered when you're making a custody

R. ADDUCCI

determination, a decision to make an enforcement action of any kind, a removal decision.

Q. How can everything be considered?

A. Well, everything that's part of that case. Anything that's presented to you for consideration should be considered.

Q. And what should be -- so if it's considered, does it affect the decision at all?

A. It could.

Q. But it could not?

A. It could not.

Q. So when ICE makes a decision to arrest somebody appearing at U.S. CIS offices, it doesn't actually matter if after that interview they have an approved I-130 application, does it?

MS. PIEMONTE: Objection.

A. What do you mean it doesn't matter?

Q. It doesn't matter to the decision to arrest, the decision to arrest --

A. I could.

Q. -- will go forward?

R. ADDUCCI

A. I mean, I would have to -- it's a case-by-case situation. I mean, there could be a situation where they may make a determination not to exercise prosecutorial discretion on the spot and not arrest the individual.

I mean, prosecutorial discretion is not a new term. It's a term that's been around forever. Officers are exercising prosecutorial discretion every day. There is so many people out there, there is no way we could possibly enforce all cases. But when someone is in front of our -- in front of us, and we have dockets that we manage, we are responsible to manage those dockets. And the ultimate goal is to enforce the Judge's order for somebody who has a final order of removal.

Q. Have you ever heard of a case where somebody declined to make an arrest, because once they had decided to make an arrest at a CIS office because during the interview the applicant's I-130 application was approved?

A. I have not.

Q. Is there any guidance that tells

R. ADDUCCI

arresting officers what factors to account for in making and enforcing an enforcement decision?

A. Guidance that's in existence -- there were some policy -- I mean, I think those have been superseded by the executive order, because I believe that there were some sort of more detailed guidance from previous directors of ICE and/or secretaries that laid out some factors to consider.

So, I mean, I don't think anyone forgot those, but I don't think -- and I think some of it is common sense. But I don't think there's any written guidance at this juncture.

The guidance that the staff follows is the executive order, followed by at the time Secretary Kelly's implementation memo.

Q. So the guidance is the executive order and Secretary Kelly's implementation memo, and that's it?

A. Right.

Q. Are there consequences for not following the President's executive order?

MS. PIEMONTE: Objection.

R. ADDUCCI

A. I'm sure that it would be some type of a policy violation, and it could be -- policy violations are on the table of penalties. So I would say there could be some type of discipline.

Q. Are you aware of anybody who has been disciplined for not following the President's executive order?

A. I'm not.

Q. And you're aware that Mr. Lyons was designated to succeed Mr. Brophy as interim field office director in Boston, correct?

A. I am.

Q. And he assumed that position on June 1st, correct?

A. I don't know.

Q. You're aware that Mr. Lyons testified that he would continue Mr. Brophy's policies that you testified are inconsistent with the executive order; is that right?

A. I would have to read the lobby conference again, because that's where I saw that information. I do know that that was -- I think that, yes, he did assure that he would

R. ADDUCCI

continue forward.

Q. And how did you first learn that he said he would continue Mr. Brophy's policies?

A. By reading the lobby conference.

Q. And you replaced Mr. Lyons as -- well, you became interim field office director on June 7th, correct?

A. Correct.

Q. So Mr. Lyons did not go forward with the field office director position?

A. Correct. I mean, if he was -- I'm not exactly sure what date Mr. Brophy left. So there was a -- there would have been someone probably in an acting role, just as if I'm out, you know, today James is sort of covering the field office. I don't know. He assumed it for maybe a short window until I got there.

THE WITNESS: Is now a time for a break? Is that okay?

MS. LARAKERS: You can ask.

A. Could we take a quick break, please?

Q. Sure, yes. Of course.

R. ADDUCCI

VIDEOGRAPHER: We are going off the record at 10:58.

(Recess taken at 10:58 a.m. and reconvening at 11:13 a.m.)

VIDEOGRAPHER: We're back on the record at 11:13.

(Adducci Exhibit 3, Declaration of Rebecca J. Adducci, marked for identification)

BY MS. SEWALL:

Q. Ms. Adducci, the court reporter has handed you what's been marked as Exhibit 3. Do you recognize this document?

A. I do.

Q. This is another declaration you submitted in this litigation?

A. Correct.

Q. And it's dated June 28, 2018?

A. Yes.

Q. And your signature is on the bottom, correct?

A. Yes.

Q. If you turn to Paragraph 1, toward the middle, it says, "I have been serving" --



Page 74

R. ADDUCCI

it says, the first sentence says, you have been become the interim FOD. The second sentence says," I have been serving in this position since Thursday, June 7, 2018. I replaced Deputy FOD Todd Lyons, who is acting as FOD following Thomas Brophy."

Do you see that?

A. Yes.

Q. Does that refresh your recollection about the fact that Mr. Lyons was acting FOD following Mr. Brophy?

A. Yes.

Q. So you replaced him on June 7, 2018, correct?

A. Correct.

Q. So he had been serving as FOD for less than a week; is that right?

A. From whatever day Mr. Brophy left, I guess.

Q. Was he terminated from that position?

A. Beyond scope of deposition order

Page 75

R. ADDUCCI

Beyond scope of deposition order

Q. Do you know why his tenure as FOD was so brief?

MS. LARAKERS: Objection.

A. Beyond scope of deposition order

Q. And so Mr. Lyons testified, I think we talked about, that he expected to replace Mr. Brophy, correct?

A. Correct.

Q. And he replaced him for less than a

Page 76

R. ADDUCCI

week, correct?

A. Correct.

Q. So do you know why he wasn't -- he didn't serve in the position in the manner he expected to?

MS. LARAKERS: Objection.

A. Beyond scope of the deposition order.

Page 77

R. ADDUCCI

Beyond scope of deposition order

Q. But Mr. Lyons was told that he would succeed Mr. Brophy, correct?

A. I don't know.

Q. You read the lobby conference transcript, right?

A. Right.

Q. And that was your understanding from the lobby conference transcript?

A. That he -- that he was going to be. I don't know who he conversed with. I don't know where that came -- I don't know if that was a conversation between Mr. Brophy and Mr. Lyons. I don't know if the headquarters people were involved. I don't know.

Q. And do you have any understanding of why he is not the person that's been replaced -- who has replaced Thomas Brophy and you have instead?

MS. LARAKERS: Objection.

A. I'm sorry, can you ask that again?

Q. Sure. I'll just repeat the question.

Page 78
R. ADDUCCI
Beyond scope of deposition order / deliberative process
Page 79
R. ADDUCCI
A.
Beyond scope of deposition order / deliberative process
Page 80
R. ADDUCCI
Beyond scope of deposition order / deliberative process
Page 81
R. ADDUCCI
Beyond scope of deposition order / deliberative process

R. ADDUCCI

Beyond scope of deposition order / deliberative process

MS. LARAKERS: Objection to scope, and to the extent it impedes on the deliberative process.

R. ADDUCCI

A. Beyond scope of deposition order / deliberative process

R. ADDUCCI

Beyond scope of deposition order / deliberative process

Q. Are you aware that sometime in 2017 ICE Boston began a practice of arresting, detaining and removing non-citizens who appeared at CIS offices to seek immigration benefits?

A. I know it happened in 2017. I don't know that that's when it began. I would say that that's not been -- that's gone on -- I don't know, because I'm unfamiliar with this AOR to that level of granularity. But I would say that, I mean, it's not uncommon for someone to be arrested at a CIS.

It's not common either, but it has happened everywhere for years.

Q. So --

A. So to say to begin a practice, I guess, I know it occurred in 2017, but I don't know that it began in 2017.

Q. It's a common practice, though, to

R. ADDUCCI

arrest individuals at CIS offices?

A. No. I said common is -- that was -- I misspoke. I wouldn't say it's common, but it's not unheard of.

Q. It's common to have a policy where people can be arrested at CIS offices?

A. No. There's no policy about arresting people at CIS offices.

Q. There's no -- there's no policy whatsoever about it?

A. I'm not aware of a policy about arresting people at CIS.

Q. Well, in 2017, starting in -- well, I say in 2017, non-citizens who appeared at CIS for I-130 interviews were arrested in Boston, correct?

A. Yes.

Q. Did you engage in a similar practice in Detroit?

A. We -- not very often. I'd say not like that, no. I would say we do get referrals from CIS, but in most instances, we get -- we don't arrest them at CIS.

Q. Why is that?

R. ADDUCCI

MS. LARAKERS: Objection.

A. I would have to check with my subordinates. I trust that my subordinate staff knows what they're doing.

I mean, I have assistant field office -- I have deputy field office directors and assistant field office directors and supervisory detention and deportation officers all that deal with these issues. I've heard nothing about CIS arrests.

For years, CIS has referred cases.

Q. So you're -- in Detroit, generally, you did not make arrests at CIS?

MS. LARAKERS: Objection.

A. I don't ever, but my staff may. I don't think it occurs. I think it would be very infrequent. I think generally it would be at another location at a residence or...

Q. And when you were in Detroit, you didn't tell your staff to make -- to start making arrests at CIS offices?

MS. LARAKERS: Objection.

A. No.

Q. And you didn't tell them not to

R. ADDUCCI

make arrests at CIS offices?

MS. LARAKERS: Objection.

A. No.

Q. So in Boston, arrests at CIS offices became more frequent in 2017, correct?

A. Well, I don't know what happened here prior to what I've looked at. So I don't know the answer.

Q. Mr. Cronin was interim FOD in the period of late 2017 to the beginning of 2018, correct?

A. I don't think he was interim. I think he was permanent.

Q. He was the acting FOD?

A. Cronin?

Q. Yeah.

A. No. He was the field office director.

Q. Just field office director.

A. I don't know his exact tenure. I'm trying to think if I can remember when he became my boss. Just like Boston, I have a round-robin of supervisors. I think he became my boss around January of this year. So

R. ADDUCCI

that's probably about the time he left Boston, maybe the late -- the end of last -- the end of '17.

Q. Do you know whether he directed individuals in Boston to make arrests at CIS offices?

A. I do not.

Q. Do you know whether he directed them not to make arrests at CIS offices?

A. I do not.

Q. Have you ever talked to Mr. Cronin about the practice of making arrests at CIS offices?

A. No.

Q. Have you ever talked to Mr. Brophy about the practice of making arrests at CIS offices?

A. I -- yes, but only to the fact that it occurred. At one point in -- I think shortly after Brophy came to Boston, I had an employee that asked if he could be considered for a transfer from Detroit to Boston, so I contacted Tom, and we talked about a multitude of things.

R. ADDUCCI

I think at that time he might have mentioned to me -- at some point he did mention to me something about CIS arrests and that it's -- it's resulted in a lawsuit, I think, but it was -- it was vague.

And I would -- you know, I think I remember him telling me that staff was arresting CIS at offices, and that it had been a problem.

Q. Did you say anything in response?

A. I don't remember.

Q. When did this conversation occur?

A. Oh, well, it was after he got here, and it has been a while. I want to say early -- I would say sometime in late January or early February, but I'm guessing. I could find out if I could look at my e-mails, but I don't -- it was when my employee inquired as to whether or not I could help him try to find a vacant position here.

He's not here yet, so it's taking a really long time. But I think -- that's why I'm concerned about when exactly it might have been.

R. ADDUCCI

Q. So did this conversation happen over the phone or by e-mail?
A. Over the phone.
Q. Did Mr. Brophy express any opinion on the practice of arresting people at CIS offices?
A. I think he thought it -- I think he mentioned to me that it was probably not the best use of resources.
Q. Anything else?
A. I don't recall.
Q. Did you agree with him or disagree with him?
A. Without knowing all the facts, that might not be where I would prioritize my resources. But I would have to know the facts.
Q. As a general matter, is it where you would prioritize your resources?
A. No.
Q. But arrests at CIS offices are permissible, correct?
A. Yes.
Q. And they're consistent with the

R. ADDUCCI

President's executive order, correct?
A. In the sense that there's no class of individual that's exempt.
Q. Mr. Cronin left the Boston office, correct?
A. Yes.
Q. And Mr. Brophy replaced Mr. Cronin?
A. Yes.
Q. And he changed the practice with respect to arrests at CIS, correct?
A. That's what I -- yes. I would agree.
Q. He instructed his staff to stop making arrests at CIS, absent national security or other public safety issues, correct?
A. I don't know if he ever instructed the staff, but that's what he said he was going to do in the lobby conference. I think the lobby conference was so close to his departure. So, you know...
Q. When did you first learn that this was his practice?
A. When I read the lobby conference.

R. ADDUCCI

Q. Do you know, since you've taken over as field office director in Boston, have you talked to anybody about Mr. Brophy's directive?
MS. LARAKERS: Objection to the extent it includes attorney-client privilege.
Q. Aside from your attorneys.
A. I think I've probably talked to -- probably Todd Lyons and/or an assistant field office director in the office, and maybe some of the management, the supervisors that would be involved.
I don't know if we've talked -- I've talked about CIS arrests. I just don't know if I've talked about them as it relates to Mr. Brophy.
Q. And what have you said about CIS arrests?
A. I've said that -- I mean, most individuals saw my deposition, because it was in the media. So I wanted to clarify that while no class of aliens is off the table, I don't want any CIS arrests taking place at this point without having -- without reviewing

R. ADDUCCI

them personally, if there's an individual that they indicated that they were going to target at a CIS office, and that it needed to come up through the chain for discussion if that was going to happen.
Q. Did you -- how did you communicate that?
A. At a managers' meeting.
Q. Who was in attendance?
A. I don't remember. It would be all of the -- both BFODs, all AFODs, some on the phone, and supervisory detention and deportation officers. But I can't, you know, again, I don't know the whole staff. So if somebody was absent or if somebody was on vacation, they might not have been at that meeting.
Q. And you never put anything in writing to tell people not to make arrests at CIS offices -- sorry, to bring it up through the chain if they were thinking about making arrests at CIS offices?
A. No.
Q. Did you tell the people on the call

Page 94

R. ADDUCCI

that you just referenced to inform their staff?

A. Yes.

Q. Did anybody push back about your policy?

A. No.

Q. What did you discuss with Mr. Lyons about Mr. Brophy's policy?

A. I don't know that I -- I probably more discussed about the lobby conference and having to do the declaration, saying that there were things within the lobby conference that didn't appear to -- that conflicted with the executive orders and the implementation memo.

So I don't think I ever -- I don't know -- I don't recall ever saying, What did you and Tom instruct people to do? Because once the declaration came out and it was in the media, I wanted to make sure everybody was clear that it wasn't -- it wasn't open season. We need to be judicious about our approach and we need to prioritize our resources, and I wanted to know because of the sensitivity of

Page 95

R. ADDUCCI

the topic that I had some visibility.

Q. And you said that Mr. Brophy's policy was, in fact, contrary to the executive order, right?

A. Well, I don't know that he specifically had a policy. But his statement in the interrogatory -- or interrogatory -- his statement in the lobby conference was somewhat difficult to interpret in certain parts, so I didn't, you know, there was some question about whether things might have been misinterpreted.

So in order to clarify, you know, my misunderstanding, or potential misunderstanding, I just wanted to make it simple and say we would be, you know, following the guidance of our bosses, which is the implementation memo from Secretary Kelly, from then-Secretary Kelly.

So I think that would be more of the conversation that I would have had with Todd, with Mr. Lyons.

Q. Under the executive order and in Mr. Kelly's memorandum, no arrest of citizens

Page 96

R. ADDUCCI

with final orders is off the table, correct?

A. I'm sorry, can you rephrase that?

Q. Under the executive order and under the memorandum that you referred to, there are no categories of people exempt from arrest or deportation, correct, or detention?

A. That's correct.

Q. And you testified earlier that there's no location of arrest that's off limits, correct?

A. Well, I mean, we have a sensitive locations policy, but it's not 100 percent off limits. But there's quite a process to potentially arrest someone at a church or a school or a hospital. Those all fall under our sensitive locations policy.

It doesn't completely negate the ability, but there's a level of review that has to occur if you are going to make an arrest there.

Q. Is CIS offices on the list of sensitive locations?

A. No. Just the three places.

Q. And is the sensitive locations list

Page 97

R. ADDUCCI

policy currently in effect?

A. Yes.

Q. And it's not inconsistent with the executive order?

A. No.

Q. It wasn't superseded by the executive order?

A. No.

Q. How do you know that?

A. Just from being a field office director and reading, you know, e-mails or -- I just know the sensitive locations policy is still in effect. I mean, it's pretty -- it's discussed.

Q. And CIS offices are not on that list?

A. That's correct.

Q. So there's no official guidance to staff about making arrests at CIS offices?

MS. LARAKERS: Objection to the extent it impedes on attorney-client privilege.

A. "No official"?

Q. Guidance to staff about making

R. ADDUCCI

arrests at CIS offices.

A. No official national guidance. I don't know if there was official guidance that -- I guess it just depends on how you define "official." If it's official as in national, no. But if we're talking about some guidance that was ever put in place in Boston, I don't have access to it, but I'm not aware of it.

Q. Was there guidance that was ever put in place in Detroit, for example?

MS. LARAKERS: Objection.

A. No.

Q. Do you know if guidance was ever put in place in any location across the United States?

MS. LARAKERS: Objection.

A. No.

Q. So, as far as you know, there's never been any official guidance to staff about making arrests at CIS offices?

A. As far as I know.

Q. And, actually, CIS makes referrals to ICE about when people will appear for their interviews --

R. ADDUCCI

MS. LARAKERS: Objection.

MS. SEWALL: I'm not finished with my question.

Q. CIS makes referrals to ICE about when people will appear for appointments or interviews, correct?

A. In Boston. I saw -- apparently in Boston.

Q. Is that a common practice?

A. Oh, in the rest of the country?

Q. Hmm-hmm.

A. I can't -- I don't know.

Q. Is it your -- was it the practice in Detroit?

MS. LARAKERS: Objection.

A. Confidential/LE techniques

Q. And so it's --

A. Generally, it's someone coming in

R. ADDUCCI

for some kind of an interview.

Q. So it's not a common practice across the country?

A. I can't speak to the country.

Q. It's the first -- is this is first time -- since you've come to Boston, is this is first time you've seen it in place?

MS. LARAKERS: Objection. Form. "It."

A. I guess I don't know what -- seeing what in place?

Q. Is this the first time you've seen CIS making referrals to ICE?

A. No.

Q. When was the other time you've seen that?

A. They have been making them since we became ICE. At one point there was a memo that -- and it could have been superseded at this juncture, but there were egregious cases that needed to be referred from CIS to ICE. I don't know the date of the memo -- well, it was after '03.

Q. That CIS must refer egregious cases

R. ADDUCCI

to ICE?

A. I believe it would have probably been -- well, I don't know if it was a joint memo or if it was solely a CIS memo. I've never worked for CIS, but I know we were -- we were responsible to be responsive to egregious cases.

Q. When you came to Boston, was it the first time you have seen ICE making referrals to -- I mean, sorry, CIS making referrals to ICE about individuals who were attending I-130 interviews?

A. Yes.

Q. Have you heard of that practice taking place anywhere else?

A. No.

Q. So by these referrals from CIS, ICE knows when people are going to be appearing at CIS for an I-130 interview, correct?

A. Yes.

Q. And an I-130 interview isn't actually required in order to -- it's not in every case going to be required in order to adjudicate an I-130 application, correct?

R. ADDUCCI

MS. LARAKERS: Objection. Legal conclusion.

A. I don't work for CIS, so I don't know.

Q. You don't know one way or the other?

A. Right.

Q. CIS will work with ICE in Boston, the Boston field office, to schedule these I-130 interviews, won't it?

A. I don't know firsthand. I haven't -- but I -- I think there was some e-mail traffic that I reviewed at some point that looked like there might have been some scheduled -- scheduling coordination.

Q. They scheduled -- they schedule interviews at a time that will be convenient for ICE to come in and make arrests, correct?

A. I don't know.

Q. They have scheduling coordination with ICE?

A. I thought I saw some e-mail traffic or one e-mail that might have involved some scheduling coordination.

R. ADDUCCI

Q. Will CIS ever schedule an interview that it wouldn't otherwise have scheduled so that ICE can come and make an arrest of the individual --

MS. LARAKERS: Objection.

Q. -- appearing for the interview?

A. I have no idea.

Q. Have you ever heard of that taking place?

A. No.

Q. Has anybody ever talked to you about that taking place?

A. No.

Q. And if an alien has an I-130 application pending and CIS calls them in for an interview, they have to go to the interview if they want to get their I-130 adjudicated, correct?

MS. LARAKERS: Objection.

A. From my past, under the INS days, I would say the answer is yes. But there are so many changes in policies. I don't work for CIS. I don't know if something has changed.

At one point I worked for the same

R. ADDUCCI

agency, and at that point that would be the true answer. But I have not worked for the same umbrella since 2003. So I don't know what, you know, in 15 years there could have been -- I assume you have to be there if you have a scheduled appointment and it would be like a lack of prosecution if you didn't show up, but I don't -- I don't know for sure.

Q. And CIS schedules those at times that it would be convenient for ICE to come in and make arrests, correct?

MS. LARAKERS: Objection.

A. I don't know.

Q. And CIS informs ICE of individuals who are coming in so that ICE can determine whether to make an arrest, correct?

A. It has happened.

Q. And CIS brings them in to the office for one reason or another so that the individual can continue working towards obtaining legal status, correct?

MS. LARAKERS: Objection.

A. Again, I don't work for CIS, but, I mean, that seems to be the general...

R. ADDUCCI

Q. And instead of obtaining legal status, for some individuals they actually just get arrested by ICE and detained and removed?

MS. LARAKERS: Objection to form. Who is "they"?

A. Okay. Can you just -- you could say it again the same way, but -- if you don't mind.

Q. Sure. Instead of obtaining -- instead of appearing at CIS to obtain legal status for certain non-citizens, they actually are appearing at CIS to get arrested by ICE and detained and removed?

MS. LARAKERS: Objection.

A. I might need it reworded somehow. People are being -- coming in for I-130 interviews.

Q. So take people who are coming in for I-130 interviews. What's their expectation when they go in for an I-130 interview?

MS. LARAKERS: Objection.

A. A interview.

Page 106

R. ADDUCCI

Q. And it's required in order to adjudicate their I-130 application, correct?

MS. LARAKERS: Objection.

A. Correct.

Q. And that is the first stage in the provisional waiver process?

MS. LARAKERS: Objection.

A. I don't work for CIS. I really don't feel comfortable speaking to their processes.

Q. I'm not asking you to speak to CIS processes. I'm asking you if you know that the first step to obtain a provisional waiver would be to have an I-130 adjudicated?

A. I think it is the first step in an I-130.

Q. We already talked about how an I-130 adjudication sometimes requires an interview at CIS offices.

A. Right.

Q. And it doesn't necessarily require an interview at CIS offices, but sometimes CIS could call somebody in for an I-130 interview to adjudicate their I-130 application,

Page 107

R. ADDUCCI

correct?

A. Correct.

Q. And the individual has to appear for that interview if they want to have their I-130 application favorably adjudicated?

A. I don't -- I -- it makes sense to me they would have to appear, but CIS would have to answer that question.

Q. And so when they appear for this interview, they're going in thinking that they're going to adjudicate their I-130 interview and make it on the first step, possibly if it's approved, to obtain legal status by the provisional waiver process, correct?

MS. LARAKERS: Objection.

A. I mean, that -- I don't -- it -- I don't work for CIS.

Q. Yeah, I'm not asking you about working for CIS. I'm saying that if somebody goes in for an I-130 interview, a reasonable expectation might be that they are going to have their I-130 application adjudicated; is that correct?

Page 108

R. ADDUCCI

A. Correct.

Q. But instead, oftentimes these individuals are going in and being arrested and detained for removal --

MS. LARAKERS: Objection. Form.

Q. -- correct?

A. Depending on whether their interview occurred, their I-130 could still be approved.

Q. Does that do them any good --

MS. LARAKERS: Objection.

Q. -- to get arrested and detained for removal?

MS. LARAKERS: Objection.

A. I mean, an I-130 approved is the first -- is the first step towards an immediate relative...

Q. Let me ask you this. Do you think it's fair that the CIS office calls somebody in for an I-130 interview and ICE arrests them at the office?

MS. LARAKERS: Objection.

A. I would have to see the individual case.

Page 109

R. ADDUCCI

Q. Well, you've read the Amended Complaint in this case, correct?

A. Correct.

Q. Lilian Calderon is one of the named Plaintiffs, correct?

A. Yes.

Q. She has lived in the United States under a final order of removal, correct?

A. Correct.

Q. She's married to a U.S. citizen, correct?

A. Correct.

Q. She has two U.S. citizen children, correct?

A. I don't recall.

Q. I will represent to you she has two U.S. citizen children. She does not have a history of any criminal history, correct?

A. I don't recall.

Q. Okay. If we looked at the complaint, she doesn't have a history, any history of criminal history. And she was arrested following her I-130 interview, correct?

R. ADDUCCI

A. Correct.

Q. And she was arrested after -- after the I-130 interview, it was decided that her marriage was bona fide, correct?

A. I don't know.

Q. Do you think that's fair?

MS. LARAKERS: Objection.

A. I guess, to some degree, what I think doesn't matter.

Q. It's my question. My question is, do you think it's fair?

MS. PIEMONTE: She answered the question.

MS. SEWALL: No, she didn't.

MS. PIEMONTE: Okay. We have a record.

Q. Do you think it's fair?

A. I think it's within the laws that ICE enforces.

Q. Do you think it's fair?

MS. LARAKERS: Objection.

A. Yes, I do. I don't think it's fair that she takes cuts in front of somebody who is waiting outside to do it legally.

R. ADDUCCI

Q. Excuse me? Sorry, I didn't hear the last part.

A. I think it's fair, yes.

Q. You said, "I don't think it's fair that she takes cuts in front of somebody who is waiting outside to do it legally." What does that mean?

MS. LARAKERS: Objection. That's not a question.

MS. SEWALL: You have to wait until I'm finished in answering the question.

A. There are people that don't come to the United States. They come legally to the United States. They wait their turn outside the United States and immigrate legally. I guess that person would probably think that it would be unfair that somebody who comes illegally gets to stay.

Q. Are you familiar with the regulations that makes somebody with a final order of removal eligible to pursue the provisional waiver process?

A. Very vaguely. I think because I was well into the field office director job

R. ADDUCCI

when the -- I think it was the comment period was out, and my exposure to it was people asking questions about it at advocacy and non-government organizational meetings to the CIS director.

So he would speak to it, and I knew that there was going to be an ability for people to kind of wait to get a waiver to -- I'm not that versed with it.

Q. So in 2016, U.S. CIS promulgated regulations that allow non-citizens with final orders of removal who are married to U.S. citizens to apply for an immigrant visa and an unlawful presence waiver while staying in the United States with their family, correct? I will start again.

Are you aware that in 2016 U.S. CIS promulgated regulations that allow non-citizens with final orders of removal who are married to U.S. citizens to apply for an immigrant visa and an unlawful presence waiver while staying in the United States with their families?

A. I'm aware that there was a comment

R. ADDUCCI

period for this concept.

Q. Are you aware that the regulation was adopted?

A. I am now.

Q. It was passed by Congress?

A. Correct.

Q. And that's the provisional waiver process, right?

A. Right.

Q. And the first step is to obtain an I-130 application?

A. Okay.

Q. And these regulations specifically in 2016 made non-citizens with final orders of removal who are married to U.S. citizens applicable for the provisional -- they made them eligible for the provisional waiver process?

A. Could you say that again?

Q. Did you know that the regulations in 2016 specifically made non-citizens with final orders of removal who are married to U.S. citizens eligible for the provisional waiver process?

R. ADDUCCI

A. No.
Q. Are you aware that they did that to minimize the hardship that would result to U.S. citizen families if they were separated from their spouse?
A. Well, I wasn't aware that they did that, so I couldn't be aware of that.
Q. So the answer is no?
A. Correct.
Q. But in your view, somebody with a final order of removal who gets arrested at CIS offices while pursuing a provisional waiver process, it's fair, because they came here illegally?
A. I don't think "fair" is a word I would use.
Q. You testified that it was fair.
MS. LARAKERS: Objection.
A. I think "fair" is a poor choice of a word. I don't think it's -- but I said it's not -- it's not permitted.
Q. Did ICE ever make it known to the public that ICE may arrest non-citizens with final orders who are appearing at an I-130

R. ADDUCCI

interview?
A. I'm sorry?
Q. Did ICE ever make it known to the public that ICE may arrest non-citizens with final orders of removal who are appearing at an I-130 interview?
A. ICE? Not that I'm aware of, but that's -- I'm not ICE. I mean, that would be something that would be a national question.
Q. Are you aware of --
A. No.
Q. -- that ever occurring?
A. No.
Q. Did ICE ever make the public -- did ICE ever tell the public that CIS may schedule I-130 interviews at times that are convenient for ICE officers to make arrests?
MS. LARAKERS: Objection.
A. I don't know.
Q. So some non-citizens with final orders can go into an I-130 interview and not be arrested, right?
A. Yes.
Q. And some can go in and be arrested,

R. ADDUCCI

right?
A. Yes.
Q. And they have no way of knowing ahead of time whether appearing for that interview is going to result in their arrest and detention and removal, correct?
MS. LARAKERS: Objection.
A. I don't -- I don't -- I don't know.
Q. Would you say that this discourages participation in the 2016 regulation process?
MS. LARAKERS: Objection.
A. I don't know.
Q. What would you expect, sitting here today, what would be your expectation?
MS. LARAKERS: Objection as to form.
A. I don't know that it would discourage people. I still see -- I mean, there's an awful lot of applications out there. I don't know.
Q. You don't know one way or the other?
A. I don't.
Q. You can't imagine one way or the

R. ADDUCCI

other?
A. I guess it depends on the individual.
Q. So if you were an individual who was in the country illegally and married to a U.S. citizen with small U.S. citizen children, and you knew there was a likelihood that you could be arrested and detained and deported if you attended your I-130 interview, would you go to the I-130 interview?
MS. LARAKERS: Objection.
A. Yes.
Q. You would go?
MS. LARAKERS: Objection.
A. Yes.
Q. And then potentially face months of separation by being detained and removed from the country?
MS. LARAKERS: Objection.
A. If the end result was going to be I would ultimately get my status, I would, yes.
Q. So do you know -- have you read about the facts around the Petitioner Lilian Calderon -- I mean, sorry, Lucimar De Souza?

R. ADDUCCI

A. Yes.
Q. She was arrested following an I-130 interview, correct?
A. Yes.
Q. And her I-130 was approved at that interview, correct?
A. I don't know. I don't remember.
Q. And ICE arrested her after the interview, correct?
A. Correct.
Q. And she was held in detention for over three months?
A. Correct.
Q. And the judge has held that her detention was illegal because POCR regulations were not followed, right?
MS. LARAKERS: Objection.
A. That's my recollection, yes.
Q. She has a 10-year-old son, right?
A. I don't remember the ages -- the age or ages.
Q. She has a son?
A. I thought she had two children, but.

R. ADDUCCI

Q. She has a son; does that sound right? She has a 10-year-old son, and she was separated from him for over three months while she was detained; did you know that?
A. Yeah -- well, if she was detained, she would have been separated from her son, yes.
Q. Did you know that she was separated from her son for over three months while she was detained?
A. I mean, I would -- hopefully she got to see him, but she was detained for over three months.
Q. And then upon her release because of this -- she was released because of this litigation on May 8th, correct?
A. I don't -- that was before I was here.
Q. You read the --
A. Right. I've read so many cases. This is not the only case, so I can't -- details to cases I would have to have reference. I would never be comfortable saying who had what children without seeing

R. ADDUCCI

the actual file or the statements.
Q. Right. My question is --
A. I'd be happy to look at it.
Q. My question is, do you know that she was -- she was released in May because of this litigation?
A. Yes.
Q. After she was released, and after you took your position as acting FOD, she was ordered to be removed from the country, correct?
MS. LARAKERS: Objection.
A. My recollection is she was told to bring tickets and to depart.
Q. And the Court has ordered that none of the named petitioners in this case be ordered to -- be removed from Massachusetts while this case is pending, correct?
A. Correct.
Q. How did that happen?
MS. LARAKERS: Objection. Form.
A. It happened because an officer -- not an officer -- somebody who really wasn't in a position to make, in my opinion,

R. ADDUCCI

instructions to an alien about their case, in the case management process on the non-detained docket, gave instructions. It was an inexperienced person, and as soon as -- I mean, I believe it was my third day in the office. I was notified what happened, and I immediately said -- looked into it, and found out what I didn't think it would be -- what I don't believe was the appropriate staff to -- officer-alien communication occurred, because you didn't have experience.
Somebody who is working there doing something they probably shouldn't have done.
Q. Do you know who was responsible?
MS. LARAKERS: Objection to the extent it is law enforcement sensitive.
A. It was an enforcement and removal assistant.
Q. What was his or her name?
A. Confidential/PII
MS. LARAKERS: Can we mark that as confidential.
MS. SEWALL: The whole transcript

R. ADDUCCI

is going to be --

MS. LARAKERS: Sorry --

MS. SEWALL: I understand we're marking the whole transcript.

MS. LARAKERS: -- I just want to mark that part so I can go back.

BY MS. SEWALL:

A. I don't know --

Q. Does Confidential/PII still work at --

A. -- the individual.

Q. Does Confidential/PII still work in the Boston field office?

A. I believe so. I don't know him.

Q. He wasn't fired?

A. No.

Q. Was he reprimanded?

A. He was spoken --

MS. LARAKERS: Objection. Deliberative process.

A. I didn't speak to him. I spoke to his management and said he needs -- we shouldn't be having that position doing the communications with -- it's the deportation

R. ADDUCCI

officer's job to do the communication with an individual that's coming in to report.

Q. Do you know if he has received any training subsequent to this to fix these kinds of mistakes?

A. Well, he is not --

MS. LARAKERS: Objection.

A. He was told not to have that type of communication.

Q. What type of communication?

A. He shouldn't be --

MS. LARAKERS: Objection.

A. He shouldn't be instructing -- I don't think I specifically said him. I said ERAs should not be working with aliens coming in on their orders of supervision to discuss the way forward, the next steps in the case. That's the job of a deportation officer. It's not the job of an enforcement and removal assistant.

To quantify, you know, everything someone could do, you could receive documents, you could, you know, pass documents. It's hard to say what he should be doing when it

R. ADDUCCI

comes to -- or ERAs should be doing when it comes to orders of supervision reporting appointment, but that case management should be done by the deportation officer.

Q. So that was the instruction that he was provided after the mistake was made and, to the best of your knowledge, you think --

A. Yes.

Q. -- that a supervisor told him that?

A. Yes.

Q. Was anything else done?

A. No.

MS. PIEMONTE: And if you could just wait until she finishes her question before you answer.

Q. Do you know of any other times that somebody was -- that an ERA instructed somebody to leave the -- to show up with tickets to leave the country?

A. I do not.

Q. But it's not proper for an ERA to do that?

A. I don't know what the practices in the Boston field office were in the past, but

R. ADDUCCI

it wouldn't be permitted in Detroit.

Q. And is it permitted as a general matter in ICE?

A. I can't speak to that.

Q. Where would you look if you wanted to find out?

A. I don't know if you could look. I guess you could look at a position description, but position descriptions often have "and other duties as assigned" as a caveat. So I don't know that there's a preclusion. I just don't think it's a best practice.

Q. So ERAs in Boston and elsewhere don't actually know that they're not supposed to do that?

MS. LARAKERS: Objection.

A. I can't speak to elsewhere.

Q. What about Boston?

MS. LARAKERS: Objection.

A. They do now. My instructions were enforcement and removal assistants should not be instructing or should not be providing case instruction -- instructions to individuals

R. ADDUCCI

reporting on orders of supervision.

Q. And as far as you know, that's the first time they have heard that, right?

MS. LARAKERS: Objection.

A. I don't know. This was a fairly new employee to the field office.

Q. What's the training that new employees receive?

A. I don't know.

Q. You have no understanding of the training that somebody would receive?

A. Well, no, there is enforcement and removal assistant training in the academy, but I don't know if he's received it, because he was an employee that has a medical issue. He went down to become a deportation officer, but because of a medical issue, came back to the field office prior to graduating from the academy.

And then rather than -- I don't know -- I don't know him, but I -- I mean, my understanding is whatever the medical issue was -- well, I don't know that. He decided for whatever reason that he wasn't going to go

R. ADDUCCI

back to the academy and try to become a deportation officer, rather accepted an enforcement and removal assistant position. And I think that happened in maybe February or March -- it was this year, sometime this year.

Q. So an ERA can assume the position of ERA and the job responsibilities before they receive any training on the position?

A. People are on duty and have sort of OJT, but because the ERA academies are sparse.

Q. What's "OJT"?

A. On-the-job training.

Q. And enforcement and removal assistants have an important job, correct?

A. Yes.

Q. They profoundly can impact people's lives that they are responsible for?

MS. LARAKERS: Objection.

A. Yeah, I don't know if profoundly impact people's lives?

Q. Let me put it this way. If this --

A. They're generally --

Q. -- litigation didn't exist --

MS. LARAKERS: She didn't finish

R. ADDUCCI

her answer.

Q. Were you finished? Do you want to add something?

If this litigation didn't exist, Lucimar De Souza might have been ordered removed and separated from her family based on this ERA order?

A. She already was ordered removed.

Q. Sorry. She would have had to present with papers and left the country?

A. Well, I mean, to some degree, part of the order of supervision appointment is an interactive, and I would hope that someone would inform that there's been a mistake.

Q. In this instance, counsel intervened to fix the error?

A. Okay.

Q. If Ms. De Souza's counsel had not intervened, she might have had to buy a ticket and leave the country?

MS. LARAKERS: Objection to form. Speculating.

A. And she might have spoken on her own to her officer.

R. ADDUCCI

Q. Do you think that the powers that tell somebody they have to appear with papers is an important power?

A. I do. That's why I don't think an enforcement and removal assistant should be doing that.

Q. But the enforcement and removal assistant can execute that power before they received any training?

A. No. I just said they shouldn't be doing that.

Q. Right. But, in this instance, they did.

A. But it was a mistake.

Q. Well, you said that ERAs are not actually -- you don't know if ERAs are instructed one way or the other --

Irrelevant discussion of counsel



R. ADDUCCI

Irrelevant discussion of counsel

Q. In this instance, just taking this instance, an ERA assumed the position of ERA without receiving training beforehand, correct?

A. Again, the enforcement and removal assistant, training is -- it's not the same as the training for a deportation officer. It's more of informative training as opposed to graduating from an academy.

So in order to become a deportation officer, you have to graduate in the academy.

R. ADDUCCI

And the enforcement and removal assistant goes to a training, enforcement and removal assistant training.

The majority of enforcement and removal assistants don't go for quite some time, just because the training is fairly infrequent, and it could be, you know, years. So much of it is on-the-job training.

Q. So before they received the ERA training, they can act as an ERA?

A. Yes.

MS. SEWALL: I think this might be a good stopping point if we wanted to break for lunch. It's 12:18. It's up to you guys.

MS. PIEMONTE: That's fine.

VIDEOGRAPHER: We are going off the record at 12:18.

(Luncheon recess taken at 12:18 p.m. and reconvening at 1:19 p.m.)

VIDEOGRAPHER: We are back on the record at 1:19.

BY MS. SEWALL:

Q. Ms. Adducci, could you please look back at Exhibit 1, your June 22nd declaration.

R. ADDUCCI

If you turn to Paragraph 5, the second-to-last page, in the second sentence you say, "As interim FOD, I intend to prioritize enforcement resources consistent with Executive Order No. 13768," and then continuing on, "the memorandum from former Secretary of Homeland Security, John Kelly."

Do you see that?

A. Yes.

Q. Then I'd like to look at the next clause after the comma that says, "No classes or categories of removable aliens are exempt from enforcement, including detention."

Do you see that?

A. Yes.

Q. Will you please explain just what this means in terms of what you intend to enforce as interim FOD?

A. The priorities as listed in the implementation memo from Secretary Kelly.

Q. And the executive order?

A. Right. But the implementation memo is sort of our -- our direction from our leadership.

R. ADDUCCI

Q. And what does that mean as a practical matter in terms of ICE executing arrests at CIS offices?

A. It allows -- it permits them to occur.

Q. And what does it mean as a practical matter in terms of ICE detaining and removing non-citizens with final orders of removal who are the beneficiaries of a pending or approved I-130 application?

A. It means they could be detained and removed.

Q. And how will you effectuate your policy?

A. It's not my policy. It's the Secretary's implementation memo, and they know the memo. They read the memo. They know what -- I mean, practically, we would prioritize criminal aliens in national security cases, as we always have, I believe. The memo kind of speaks for itself, the implementation memo, Secretary Kelly's.

Q. So you'll rely on your subordinates to execute arrests, detentions and removal of

Page 134

R. ADDUCCI

non-citizens or the beneficiaries of I-130 applications, correct?

A. I rely on my subordinates to enforce the memo.

Q. And so, you said you'll rely on their prosecutorial discretion to make those decisions, right?

A. Well, in the instance as it relates to CIS arrests, I did say initially I wanted to be consulted; that it needed to come up the chain. So I wouldn't be necessarily relying on them to make that decision.

Q. What about for the detention and removal of people with I-130s?

A. I would rely on my subordinates.

Q. And you expect them to consider all factors in executing discretion, right?

A. Yes.

Q. But the executive order and the memo don't talk about factors to consider in making these decisions, do they?

A. No.

Q. And that's the only official guidance that they can act under?

Page 135

R. ADDUCCI

A. Correct.

Q. And those each say that everyone is fair game for enforcement, right?

A. They do say that.

Q. And you said pursuit of a provisional waiver process is something that should be considered, right?

A. Yes.

Q. But you don't instruct your subordinates to consider that, do you?

A. No.

Q. Nobody instructs them to consider that, correct?

A. I don't know.

Q. You don't know one way or the other?

A. Correct.

Q. And they can't actually consider a factor that they don't know about, right?

A. That would be correct, yes.

Q. And do you have any idea if your subordinates know about how the provisional waiver process works?

A. And we're referring to the

Page 136

R. ADDUCCI

subordinates in Boston?

Q. Yes.

A. No.

Q. And, in fact, you're the boss, right?

A. Yes.

Q. And you didn't know that the 2016 regulations had been implemented, right?

A. No. I knew that the provisional waiver process had been implemented.

Q. But you didn't know that aliens with final orders of removal were made specifically eligible for the process?

A. No.

Q. And that's with all of this litigation going on, correct?

A. Well, I know -- I didn't know prior to coming here.

Q. Did you know on coming here?

A. To Boston, not here today, for clarification purposes.

Q. When we talked earlier, you said you were not aware that they had gone into effect. Are you changing that testimony?

Page 137

R. ADDUCCI

A. That the provisional waiver processes had gone into effect?

Q. That the 2016 regulations had gone into effect.

A. If I said that, I misspoke. I definitely knew they went into effect, because I have been here, and we've...

Q. Okay. So you misspoke if you had said that?

A. If I had said that, I -- yes. Since I've been here, since I've been in Boston, clearly the provisional waiver process is in effect.

Q. And you know that, based on reviewing several papers in this litigation, correct?

A. Yes.

Q. And so you do know that individuals with final orders of removal were specifically made eligible for the provisional waiver process under the 2016 regulations?

A. No.

Q. Okay. So that was my question.

A. Okay.

R. ADDUCCI

Q. So you don't know -- you didn't know that until today?

A. Yes.

Q. Or if you trust what I said.

A. Yes.

Q. That's a big if.

So your subordinates probably don't know that?

MS. LARAKERS: Objection.

A. I don't -- I don't know.

Q. And I said this, but they can't consider a factor that they don't know about, right?

A. Correct.

Q. Do arrests -- do arrests of non-citizens count anywhere in your office? Do they count towards the arresting officer? Do they count towards the supervisors? Anybody? Are they tracked? Do they count?

Does that make sense to you, or shall I rephrase?

A. I think it makes sense. There's no quotas. People aren't rated based on numbers. So, no, I don't think there's a comparator --

R. ADDUCCI

Q. Okay. And are they --

A. -- to, you know, one group of people arresting more than one or...

Q. And are they tracked at all?

A. Arrests are tracked.

Q. So the number of arrests per office or the number of arrests per officer is tracked?

A. Not per officer, but per office.

Q. And you said it's not -- there's no quotas to meet per office?

A. Correct.

Q. Do any of the -- do any of your superiors in Washington look at the numbers that are generated by various offices?

A. Yes.

Q. What do they evaluate when they look at those numbers?

MS. LARAKERS: Objection.

A. What do they evaluate as in?

Q. I can rephrase. It's not very clear.

Why do they look at those numbers?

A. I can suppose that there are, you

R. ADDUCCI

know, to determine staffing requirements and funding requirements, budget requests, funding requirements for detention space, personnel distribution.

Q. And do they ever tell an office, to the best of your knowledge, you need to get your numbers up?

A. Not -- specific to an office, I would say no.

Q. What about otherwise?

A. I can remember in many years past people looking really closely at removal numbers. That would have been in the time that Director Morton was in charge of ICE, and looking at trends or, you know, drops in removal numbers and asking whys, you know, for potential explanations.

Q. So there's some incentive to keep your numbers up?

A. Nobody talks about numbers specifically needing to be up, but they talk about trends in rising and falling.

Q. And as a field office director, would you worry if your numbers became very

R. ADDUCCI

low?

A. I would question why -- if there was a significant trend change, you know, from one year to the next or from one quarter to the next, I would question why, whether it was up or down.

Q. Would you worry about what your superiors thought?

A. No. As long as I felt like there was an explanation, you know, as long as things were being addressed and covered.

Q. As long as you felt like there was an explanation for why this is happening?

A. Yes.

Q. With CIS working with ICE to schedule interviews to execute arrests, arrests become a lot easier to make, right?

A. Yes. Provided -- easier in a multitude of ways. Potentially the person -- if the person shows up, sometimes they don't. But there's probably the most -- the thing that is -- that gives me the most comfort of someone conducting an arrest would be in a secure location versus in some -- in an

R. ADDUCCI

at-large type situation, which would be at a residence or out on the street.

My primary concern would be safety. So I prefer that any time someone can effect an arrest, it would be done in the safest environment for everyone, including the person being arrested.

Q. And for somebody showing up for an I-130 interview, ICE knows where they are going to be and when they are going to be there, right?

A. It would seem so, yes.

Q. The arrests would generally be nonviolent, correct?

A. An arrest can go south at any time, so I -- I don't...

Q. Have you ever heard of an arrest of somebody at CIS following an I-130 interview being violent?

A. I don't have any experience hearing about arrests at CIS, the actual arrest itself.

Q. ICE Boston was even enable to arrest six people in one day who attended

R. ADDUCCI

I-130 interviews, correct, at CIS offices?

A. I don't know if that's true.

Q. You don't know one way or the other?

A. Numbers in one specific day, I do not know.

Q. And U.S. CIS informs ICE in Boston when a non-citizen appearing for an I-130 interview is subject to a final order of removal, right?

A. I don't know.

Q. We had talked about referrals. Is that -- to the best of your knowledge, is that information in the referral?

A. I don't know if it's in the referral. If it's not in the referral, I would assume it's a case that's reviewed, at which time it would -- I don't know if they can -- if they know -- if CIS has access to determine the status of our case.

Q. So CIS sends a referral to ICE, right?

A. Correct. Or not necessarily sends. It could be call someone. You know, there's

R. ADDUCCI

multiple ways, I think, of communication I think.

Q. Do you know how frequently those referrals come into ICE? And all of these questions are in Boston, just to be clear.

A. I do not.

Q. And you don't know how they're communicated?

A. In my sort of time here, I think there's multiple -- well, potentially in person, on the phone or on e-mail.

Q. And they will tell ICE when somebody is coming in for -- when somebody is coming in who has a final order of removal, right?

A. I don't know if they tell us on all cases that are coming in for a final order of removal, but they have told us.

Again, I don't know if they are -- I don't know what information they have. I don't know if they know the person has a final order of removal, if they suspect the person isn't somehow, you know, under our docket in -- I don't know the answer to what information

R. ADDUCCI

they have when they make their referrals.

(Adducci Exhibit 4, E-mail to Mark Sauter from Todd Masters dated 7/16/18, with attached e-mails, marked for identification)

Q. The court reporter is handing you what's been marked as Exhibit 4. If you look at the second e-mail in the chain, you're copied on this e-mail, right?

A. Yes.

Q. It's from Tina Guarna-Armstrong?

A. Yes.

Q. It's dated July 5, 2018?

A. Okay.

Q. And she says, "I got approximately 25 e-mails since last November that contain referrals from CIS in Lawrence."

Do you see that?

A. Yes.

Q. Then she goes on to say, "These are mainly the ones with referrals, but other e-mails related to these that involve the scheduling of the activity or other questions

R. ADDUCCI

are not included here."
Do you see that?
A. Yes.
Q. What does "scheduling of the activity" refer to?
A. I don't know. It's not a very well-worded question. I would have to ask Tina what she meant by it, or worded sentence.
(Adducci Exhibit 5, E-mail to Rebecca Adducci from Todd Lyons dated 7/17/18, with attachments, marked for identification)
Q. The court reporter has now handed you what's been marked Exhibit 5. This is an e-mail from Todd Lyons to you. Do you see that at the top? The top e-mail --
A. Yes.
Q. -- dated July 17, 2018?
A. Yes.
Q. And it says on the attachments, it says, "Copy of CIS Referrals to ERO 7/17 to 7/18 (Consolidated)."
Do you see that?
A. Yes.

R. ADDUCCI

(Adducci Exhibit 6, Native version of attachment to Adducci Exhibit 5, marked for identification)
Q. This is the attachment that went to this e-mail. You can't quite see in the Bates numbers, but this is the native version of the attachment that was to this e-mail.
Do you recognize this spreadsheet?
A. Yes.
Q. What is it?
A. A list of -- a combined list of the referrals that occurred. I don't know if it's -- that occurred between July 21, 2017 and July 10, 2018, with sort of a status, action taken, what the person's immigration status was, status at time of arrest and the current custody status.
Q. And so is this --
A. Some identifiers at the top, I guess.
Q. Is this the information that CIS provides to ICE when making a referral?
A. No.

R. ADDUCCI

Q. What is this document?
A. This was a document that was created by the staff in Boston; ERO, sorry. ICE.
Q. Do you know why it's titled "Copy of CIS Referrals to ERO"?
A. Because the first column -- well, the first column is the date -- well, it says "Date of Referral from CIS," and it's a compilation of the cases that were referred.
Q. So these all represent cases that were referred from CIS to ICE?
A. Yes.
Q. It's not numbered, so it's going to be hard to find. If you go down to January 30, 2018.
A. Okay.
Q. Do you see there's one for "De Souza Gomes, Lucimar."
A. Yes.
Q. That's one of the named petitioners in this case, right?
A. Yes.
Q. So her case was referred from CIS

R. ADDUCCI

-- from U.S. CIS to ICE, correct?
A. Correct.
Q. If you go to January 16, 2018, one of the names is "Calderon, Lilian." Do you see that?
A. I'm sorry?
Q. January 16, 2018.
A. Yes, I see it.
Q. Lilian Calderon is one of the petitioners in this case, correct?
A. Yes.
Q. Her case was referred from CIS to ICE, right?
A. Right.
Q. After ICE received a referral from CIS, what is the next step that ICE takes?
A. I don't know.
Q. You don't know? You have no idea?
A. The very next step? I could tell you what I -- no, I don't know the very next step. I would assume it's forwarded. But it depends on where the lead comes from. The next step could be an immediate -- there are so many things that could happen, because it

R. ADDUCCI

depends on how we get the referral.
Q. The referral from CIS?
A. Correct.
Q. Is this -- when did you first become aware that CIS refers cases to ICE in Boston?
A. I think that was a conversation I had with Brophy when I called him to tell him -- I don't know if I knew CIS referred them. I think he just said CIS arrests occurred. I think I didn't find out about the actual process until I arrived here.
Q. Do you know, approximately, when after you arrived here?
A. Probably immediately, within the first day or two.
Q. And it's not something you looked into?
A. I mean, as to how it occurs, I've asked, and there's multiple different ways that it -- the referral occurs. What happens after the referral, I have not looked into.
Q. Who would you ask if you wanted to know about that?

R. ADDUCCI

A. Well, you'd have to ask multiple people, because there are multiple CIS offices in the AOR.
Q. Who would you ask in the Boston office?
A. I would ask Assistant Field Office Director Guarna-Armstrong, and I would ask one of the supervisory detention and deportation officers, because it's -- that's what I would ask.
Q. Does ICE have any policies on how to handle arrests coming from referrals from CIS?
A. Not that I'm aware of.
Q. You're not aware of any required procedures for handling referrals coming from CIS?
A. No.
Q. You're familiar with CIS generally, right?
A. Generally.
Q. What is the agency?
A. Citizenship and Immigration Services.

R. ADDUCCI

Q. And what is it responsible for?
A. The adjudication of applications of foreign nationals.
Q. And ICE is the agency that's supposed to execute arrests, right, not CIS?
A. Yes. CIS does not make arrests, to my knowledge. However, they do make -- they can make enforcement actions. They can issue notices to appear.
Q. Have you ever heard of the U.S. CIS adjudicator's field manual?
A. No.
Q. Have you ever taken any CIS policies into account when deciding your own policies on arrests, detention and removal?
A. I can't -- I can't think that I'm really aware of CIS policies, versed in CIS policies.
Q. And just to be clear, ICE and CIS are part of both arms of DHS, right?
A. Two agencies within the department.
Q. They are sister agencies basically?
A. I don't know if I would call -- they are both agencies within the department.

R. ADDUCCI

I mean, the Secret Service is an agency within the department as well.
(Adducci Exhibit 7, "Exhibit A U.S. CIS Adjudicator's Field Manual Ch 15," marked for identification)
Q. The court reporter is handing you what's been marked as Exhibit 7. Apologies, but the copy that I have says Exhibit A. You can sort of disregard that, because that was a filing in this case. It was filed as an exhibit in one of the pleadings in this case. I meant to get a copy without that on it, but I didn't. But the rest of it is the same.
If you turn to the first page, at the top it says "U.S. Citizenship and Immigration Services," correct?
A. Yes.
Q. And then it says, "Adjudicator's Field Manual Redacted Public Version." Do you see that?
A. Yes.
Q. Chapter 15, "Interviewing." Do you see that?

R. ADDUCCI

A. Yes.
Q. And then 15.1, "Interview Policies." Do you see that?
A. Yes.
Q. And then a header that says, "15.1 Interview Policies," correct?
A. Yes.
Q. And you've never seen this document before, correct?
A. Never.
Q. If you turn to Page 3 at the bottom, it says 1 of 8, 2 of 8. If you go to Page 3, subsection C says "Arrest of an alien during the interview process."
Do you see that?
A. Yes.
Q. This section, if you look at the first paragraph under "General," it says, "As a general rule, any alien who appears for an interview before a U.S. CIS officer in connection with an application or petition seeking benefits under the Act shall not be arrested during the course of the interview, even though the alien may be in the United

R. ADDUCCI

States illegally."
Do you see that?
A. Yes.
Q. If you turn to the next page, the number (2) says, "Exceptions to the General Rule." Do you see that?
A. Yes.
Q. And if you look to the fifth bullet point, it says, "An alien who is the subject of a previously-issued warrant of deportation or warrant of removal" -- oh, sorry, I should read the first paragraph first.
"In some cases, an alien's illegal" -- "an alien's actions or situation might be so egregious as to justify making an exception to the general rule that those who appear voluntarily for an interview should not be arrested during the course of that interview. Such actions and situations include, but are not limited to," and the fifth bullet point now says, "An alien who is the subject of a previously-issued warrant of deportation or warrant of removal." And then says, "UNLESS" -- capital letters in bold -- "the alien is

R. ADDUCCI

seeking benefits under a provision of law (e.g., NACARA or HRIFA) which specifically allows an alien under an order of deportation or removal to seek such benefits."
Do you see that?
A. Yes.
Q. And the provisional waiver regulations are a provision of law, correct?
A. Yes.
Q. And they specifically allow aliens with final orders to apply for a provisional waiver, correct?
A. I'm sorry, they specifically allow?
Q. They specifically allow an alien with a final order of removal to apply for a provisional waiver?
A. That's what -- if I believe what you're saying, yes.
Q. Okay. And we talked about this, but the first step in that process is to obtain an I-130, correct?
A. Yes.
Q. And yet ICE is arresting people at U.S. CIS offices when they show up for an

R. ADDUCCI

I-130 interview, correct?
A. Correct.
Q. That seems to violate U.S. CIS regulations, doesn't it?
MS. LARAKERS: Objection.
A. I don't know if this is a regulation, a policy.
Q. A policy.
A. Okay. But this is a CIS policy. So this would be for CIS employees.
Q. Right. And it seems to violate that based on what we've read.
A. But ICE can't violate a CIS policy.
Q. Right. Just my question, though, if you focus on my question is it seems to violate that policy.
A. I don't know, because it -- I don't know what the meaning behind the policy is. So if -- I don't know.
Q. I guess the real question, though, is, ICE never takes into account CIS policies in executing arrests?
A. I didn't even know about this policy, so we wouldn't have taken this into

R. ADDUCCI

account. I would say this would be applicable to the adjudicator. That's how I read it. The adjudicator should not be allowing someone to be arrested during the interview.

I mean, CIS doesn't govern ICE policies.

Q. I'm not suggesting they do.

A. So I don't know how it's -- ICE can't violate a CIS policy.

Q. Right. So does ICE take this policy into account at all when deciding to execute arrests at CIS?

A. I don't know, because I --

Q. You've never heard --

A. I've never seen the policy.

Q. So the answer is probably no?

A. I can't say for each individual officer that makes arrests.

Q. And ICE itself doesn't have any policies about whether people should be arrested at U.S. CIS, correct?

A. Correct.

Q. And not only does CIS allow arrests to be executed at its offices, but it actually

R. ADDUCCI

facilitates those arrests in Boston, correct?

A. I mean, I'm not the CIS director. I can't speak to that.

Q. But you know that CIS works with ICE to facilitate arrests?

A. They refer cases. I don't think that -- it's not -- it's not -- I wouldn't say to facilitate. I would say they refer cases for our consideration.

Q. Well, they don't just refer cases, right? They will actually schedule interviews on a day that's convenient for ICE to make arrests?

A. I saw an e-mail that implied that happened at least one time.

Q. Okay. And this is a public document, a public version, this CIS manual, adjudicator's field manual? It says "Redacted Public Version"?

A. It says that, yes.

Q. So this is what's open to the public, this information?

A. Assuming that's accurate. I guess U.S. CIS has the link down here, so I'm

R. ADDUCCI

assuming it's on this link.

Q. Okay. Are you familiar with the name Confidential/PII ? Confidential/PII

A. I believe I've seen that name since I've been here. That's about my level of familiarity.

Q. This is somebody who was arrested at an interview at CIS; is that your understanding?

A. Can I look at the spreadsheet?

Q. Oh, yeah. You don't remember?

A. I don't remember every specific case.

Q. Do you have any idea if ICE is intending to depart Confidential/PII ?

A. Not without referring.

Q. So who would you talk to if you wanted to find out whether ICE was intending to deport certain individuals?

A. I think the first thing I would do is look in our systems and see what, you know, look at kind of the progress of the case, and see if I could -- I might not talk to anyone, depending on the thoroughness of the

R. ADDUCCI

documentation within the systems.

Q. Which system is that?

A. Our case management system.

Q. And does that have -- if the information is filled in, does that have any indication of whether this is somebody who is slated to be removed?

A. There's generally sort of a case summary, case progression, comments that I would refer to to see what was currently going on with the case.

And to answer your previous question, if there was something not clear to me, I would talk to whoever was responsible for that. I would go to the -- probably -- more likely than not, I would go to the assistant field office director. Ideally, it would go to the deputy, but I tend to go closer to the source.

Q. So it could be the assistant field office director or it could be the deputy?

A. Correct. I may ask to see the file.

Q. Would the case progression comments

R. ADDUCCI

have sort of like a column or a default line that's devoted to does ICE intend to support this person basically?

A. The responsibility of ICE, ERO, is to execute the order of the immigration judge. So if it's on a docket, the ultimate goal is that removal.

So I would say it's going to say...

Q. For example, if somebody is on an order of supervision --

A. Yes.

Q. -- and they are doing regular check-ins, they have been, you know, consistently showing up, they are applying for benefits. In that situation, would ICE -- when would it become clear if ICE was intending to remove them?

MS. LARAKERS: Objection.

Q. How would you find out, I guess, if ICE was intending to remove them?

A. Generally, as I discussed before, on order of supervision appointments, there's supposed to be this interaction. An order of supervision is you're working your way through

R. ADDUCCI

towards removal.

So long as you're doing the requirements of your order of supervision, for example, doing what you can to obtain your travel document, finalizing your affairs, and ultimately leaving, you can sort of see that progress.

The person has to provide tickets or travel document obtained from -- the person -- individual -- I mean, it's not exactly. It will say subject has an appointment at the embassy, or something like that. So you see sort of a progression.

Q. Okay. Besides, you know -- how are these individuals given notice if they're on a regular order of supervision and they are showing up for their interviews each time, when are they going to receive notice that their time is up and they have to be removed?

A. Well, it's -- I mean, once they have a final order, that's the goal. That's when they start working towards that execution of the final order.

Q. But people with final orders are on

R. ADDUCCI

supervised release, correct?

A. Yes. But they're on supervised release to get to the removal.

Q. Right. But you could show up for a check-in and just check in, or you could show up for a check-in and then somebody could say now it's time to leave, correct?

A. It's always time to leave once you have a final order of removal.

Q. Right. But you're not told you have to show up at your next -- not every meeting you are told you have to show up at your next meeting with papers to leave the country, right?

A. Not every. But there could be instances where someone is. I mean, it's a case-by-case situation.

Q. What kind of notice is given to the person?

A. The case officer tells the person, You need to provide tickets for, you know, or, You need to self-remove. It's a conversation.

Q. And do they get -- is there a default amount of notice time period that they

R. ADDUCCI

have to give?

A. That would be case by case.

Q. So there's no default time period?

A. No.

(Adducci Exhibit 8, Memo to Thomas P. Brophy, and others, from Miguel Vergara dated 5/16/18, marked for identification)

Q. The court reporter has handed you what's been marked as Exhibit 8. Do you recognize this document?

A. Yes.

Q. This is a redacted version of the audit report ordered by Thomas Brophy, correct?

A. Yes.

Q. I will just let you know, this is how the document was produced to us by Respondents with the redactions in it.

A. Okay.

Q. If you go to the first paragraph, and it says "Purpose." It says, "The following After Action Review describes the



Page 166

R. ADDUCCI

findings resulting from the detained docket review conducted at the Boston Field Office from March 8 to 17, 2018. In addition to identifying deficiencies, this report suggests changes to current" policies "along with procedures needed to maintain the detained unit operating efficiently while minimizing the Field Office's exposure to litigation."

Do you see that?

A. It says "current practices," not "policies." But, yes.

Q. "Current practices along with procedures."

And then in the background, it lists two violations: "Failure to serve ICE detainees with notifications of File Review and/or serving the notification less than 30 days prior to conducting post-order custody reviews." And then "Failure to timely conduct and/or conduct POCRs for aliens detained for 90 days or longer."

Do you see that?

A. Yes.

Q. Then it says, "Findings and

Page 167

R. ADDUCCI

Recommendations," and there's several bullet points after that.

A. Yes.

Q. The first is "Lack of unit staff rotation throughout the field office."

Do you see that?

A. Yes.

Q. Is that still a problem at the Boston field office?

A. There is not a staff rotation in the field office. Confidential/ Deliberative Process

So it -- I don't know that I would agree that that was -- I don't know that I agree with the recommendation in that instance 100 percent, but I think there's a use for -- there's -- yes, it's still a problem. Confidential/Deliberative Process

Page 168

R. ADDUCCI

Confidential / Deliberative Process

Q. So it won't be fixed for months longer?

A. I can't tell you how long it's going to take. I don't know how long it's

Page 169

R. ADDUCCI

going to take.

Q. And it's not fixed yet?

A. There is not staff rotations.

Q. And in the second bullet point it says, "Insufficient experienced supervisors assigned to the detained unit."

Do you see that?

A. Yes.

Q. It says, "The detained unit currently has one experienced supervisor on duty. This caused one docket officer to serve as acting supervisor while overseeing her docket and assisting with two other dockets as well."

What does that mean?

A. That means a docket officer was acting in a supervisory capacity while working on a docket as well.

Q. And why was that a problem?

A. It just was understaffed. There were not enough people doing the work for that -- the volume of work that was in that division or that section of the office didn't have enough people to address it.

Page 170

R. ADDUCCI

Q. And has that been -- have measures been taken to fix that?

A. Yes. This was done before my arrival. As of now, there's 12 officers and two supervisory detention and deportation officers.

Q. Do you still think that this is a problem?

A. Lack of insufficient staffing? No.

Q. The third bullet point says, "AFOD performs tasks belonging to first line supervisors."

Do you see that?

A. Yes.

Q. What is the issue referred to here?

A. I think this was just an AFOD that had to do the job. It is what it says. I don't know that there was a specific thing, but I think it was just somebody who maybe should have been thinking on a bigger, more macro level, having to do -- I don't know. You'd have -- I didn't do this report, and I wasn't here when some of these fixes were put into place. But I don't -- I think they

Page 171

R. ADDUCCI

wanted the AFOD to do the AFOD's job and not the SDDO job.

Q. What did ICE do to fix this problem?

A. I think with the additional SDDO and potentially seven, eight additional deportation officers, he is able to focus on higher level of management.

Q. Do you know that to be the case?

A. Yes.

Q. Is this something you've looked into personally?

A. Yes.

Q. Do you think it's still a problem?

A. I do not.

Q. The next bullet point says, "Detainee population spread among multiple detention facilities."

Do you see that?

A. Yes.

Q. What's the issue described here?

A. There are schools of thought that it would be -- it's easier to manage a docket if all the detainees are in one location.

Page 172

R. ADDUCCI

Some field offices use one large detention facility. Others that are more spread out and have multiple states use multiple intergovernment service agreements.

So this is something that's at a much higher level than something that can be done in the field office. It requires, you know, contracting and all sorts of headquarters involvement.

It's a concept that a lot of people wish you could go to, but it's not 100 percent realistic.

Q. So is ICE doing anything to address this problem?

A. In this, I don't see this -- well, actually, I did here something from -- I think it was from Todd -- that they were looking at the possibility of -- they would like to do something to have more centralized detention.

But, again, having done this from my own experience, it's not as easy as one thinks.

Q. So it's not a problem that's going to be solved?

Page 173

R. ADDUCCI

A. It may be solved. I don't know if it's a problem. Now that there's appropriate staff, I don't, you know, again there's different schools of thought. So this is one, you know, one guy's opinion, if you will. I don't know that that's a solution.

Q. I don't think it's one guy's opinion. I think you said it was a tiger team.

A. Okay. That was a term. But, okay, it's three individuals' opinion. It could be one. I don't know whose opinion it was.

Q. It says from these three individuals here.

A. Okay. I don't know any of those three individuals, but I would beg to differ that that is a problem. I have 11 IGSAs in Michigan and Ohio.

Q. What are "IGSAs"?

A. Intergovernment service agreement, that's under the bullet.

Q. And you don't think you have a problem in Detroit?

A. No.

R. ADDUCCI

Q. So you just don't think this is a problem at all?

A. I don't think this is a problem that caused the failure to serve the notices and the failure to conduct the POCR reviews.

Q. But the three individuals who are specifically brought in to evaluate the office concluded otherwise, correct?

A. That's true.

Q. The next bullet point says, "Untimely service or failure to serve Notice of File Review and Failure to Comply forms (Form I-229)."

Do you see that?

A. Yes.

Q. What's the issue here?

A. This was the late service of file custody reviews, and the late service of form I-229s, which is the failure to comply.

Q. And what have you done to correct the issue?

A. I told them to serve those immediately upon intake.

Q. Told who?

R. ADDUCCI

A. The staff. I'm sorry.

Q. How did you tell them?

A. Verbally in our managers' meeting, and then I met with the detained staff and up the chain, the deputy down to the detained DOs, and I said there's no reason to wait to serve notice of file custody reviews.

There's sort of a process in place that allows for service up to 60 days, and I said it doesn't hurt to serve it early. It just has to be served by a certain date. So just serve everything at the beginning and you won't run into that issue.

Q. So other than telling the supervisory staff to serve them --

A. No. The officers were in attendance as well.

Q. So was it the whole --

A. The detained docket officers.

Q. The detained docket officers.

Other than telling the detained docket officers to serve them on time or early, did you do anything else?

A. No.

R. ADDUCCI

Q. The next bullet point says "Notice of File Review and Failure to Comply forms not furnished to the attorney on record."

What's the issue described here?

A. That would be similar to the above, while that was either not being -- well, it was untimely service of the Notice of File Custody Review, and the fact they were not being served on attorneys.

Q. What have you done to correct this issue?

A. I told them they need to be served on attorneys. Every time they serve the alien, they need to serve the attorney.

Q. Told who?

A. The same meeting, the deportation officers, up the chain to the deputy field office director.

Q. Have you done anything else?

A. No.

Q. The next bullet point says, "Basic case management." What is this issue?

A. This is this case management system that I referred to earlier, people not using

R. ADDUCCI

the system clear -- clearly. And I -- this was resolved before I came. So I've done nothing with this.

Q. I thought you said that the system is still missing clear case comments, and things like that? Didn't you say the person you brought in to review the detained docket is having issues with this?

MS. LARAKERS: Objection.

A. But that was before I got here. I mean, that was -- that was comments that were input before I got here. They're not using -- I'm sorry, I'm not sure if I understand.

Q. So, I mean, this says, "The following were the main case management tasks/functions identified as not being performed or untimely documented in EARM."

What's "EARM"?

A. It's the case management system.

Q. It says, "Case actions and decisions," "Call-ups missing a clear narrative as to the reason for the follow-up," and then "Unclear case comments (e.g., document send to jail liaison officer for

R. ADDUCCI

service), with no indication as to the nature of the document or the expected return date."

So I guess I just ask, what have you done to correct this issue?

A. Well, what was done to correct this issue was the spreadsheets that I talked about. So it was already done by the time I got there.

Q. The spreadsheets where you can visualize?

A. Yes.

Q. Can you just describe them again?

A. I haven't seen one, but it's more of a visual case. So instead of having case actions and decisions, that should still be occurring within the system, they're relying more on this visual document. They should be doing it in both locations, but they're relying on this visual document to aid them in making sure they're not missing things, missing case call-ups, missing case actions and decisions.

Q. How do you know that that's fixing the problem?

R. ADDUCCI

A. I haven't seen -- I guess I don't know that it has completely fixed the problem. I haven't seen a significant amount of problems since they started using their spreadsheets.

Q. When did they start using their spreadsheets?

A. I don't know. Sometime after this or during this.

Q. So how do you know that there hasn't been any significant problems after they started using the spreadsheets?

A. I didn't say "after they started." If I did, I -- since I've been here.

Q. Have you seen any problems since you've been here?

A. Yes, there have been a couple of cases that we talked about earlier that were released.

Q. And so those aren't a significant number that you think in your mind?

A. Again, the errors occurred prior to the implementation of these things. They were things that as the cases were reviewed, people

R. ADDUCCI

were finding things that happened quite a while ago.

I don't know. To give an example, I can't...

Q. And the person that you brought in to review the detained docket, what's his name?

A. Kevin Raycraft.

Q. How do you spell the last name?

A. R-a-y-c-r-a-f-t.

Q. He was having trouble with the EARM system, correct?

A. No.

Q. Which system was he having trouble with?

A. He wasn't having trouble with any system.

Q. You said the electronic system had incomplete information, so he was having trouble finishing his report.

A. Oh. That would be EARM. He wasn't having trouble with the system. He just didn't know if the system was complete. He would rather have seen the file.

R. ADDUCCI

Q. So the system doesn't provide the complete information that you would want to evaluate --

A. Again --

Q. -- the detained docket?

A. -- they were old cases.

Q. But the system doesn't -- didn't provide him with the information that he needed to evaluate the detained docket, correct?

MS. LARAKERS: Objection.

A. I have to see his full report. He didn't really do a full report, but I'd have to see -- I mean, I would have to see what he had to say. I can't -- he indicated in a couple of instances there were some questions that he had, and he would rather talk to the officer and/or see the -- and see the A file.

Q. And you said specifically because information would be missing?

A. Correct. I don't know if I said that, but that's why.

Q. If you look to the next bullet point, it says, "Unverified service/return of

R. ADDUCCI

documents from jail liaison officers."

What's the issue referred to here?

A. That Notice of File Custody Review, or the 229 was, you know, there were some issues with not getting them back timely or not -- maybe not making their way to the officer's desk.

I didn't spend -- well, I -- that they would come back to the officers and potentially sit on an officer's desk and not make it into EARM comments that the actual service had occurred.

Q. What have you done to correct this issue?

A. I think that just comes with not having this big of a pile, because you have twelve -- you don't have as many cases that you're managing.

Q. So you mean you've added additional staffing to correct the issue?

A. Yes.

Q. Have you done anything else?

A. I've asked -- I went through this after action report with the AFOD, and asked

R. ADDUCCI

if we have addressed these issues. Much of it -- it's difficult, because I can't see the redacted stuff.

So I think most of what is recommended was done.

Q. Okay. But specifically, you recall that you added staffing. Or --

A. I didn't add staffing.

Q. -- Mr. Brophy added staffing, and that's --

A. Correct.

Q. -- what has been done. So you specifically have not added anything, but Mr. Brophy added staffing and that is --

A. I've confirmed with the assistant field office director and the SDDOs that they aren't having the challenges they were with the jail liaison officers getting the information back. Sometimes they are being mailed back. Sometimes they are being scanned back. And they say that the issues have been resolved.

Q. And how would you know if there were issues that were cropping up?

R. ADDUCCI

A. I would have to rely on my subordinates. They have to tell me that they were seeing issues of concern.

Q. And have you told them to come to you if there are issues of concern?

A. Yes.

Q. The next bullet point says, "Failure to timely and/or complete POCRs."

What is that referring to?

A. Basically the 90th day. And the assistant field office director has mandated POCRs be on his desk at about day 80, and he has seen them at day 80 or 81, given a weekend or something like that.

Q. Which assistant field office director are you talking about?

A. Alan Greenbaum.

Q. Is it just him?

A. He is the assistant field office director that reviews the POCRs, yes.

Q. And there's just one in Boston?

A. In Boston, yes.

Q. Do you find that's enough?

A. Yes.

R. ADDUCCI

Q. The next bullet point says, "Lack of clear priorities when targeting at-large aliens, placing detainers and/or taking detainees into custody."

What is the issue referred to here?

A. I would assume it has to -- I don't know what that refers to.

Q. You have no sense whatsoever?

A. I really don't.

Q. Have you reviewed the report before?

A. I have. I've read a lot of things since I've been here. I look at 15 cases a day involving, you know, different issues. I can't -- I've read a lot of documents. And I've actually gone over this document. I just don't remember what this means. "Lack of clear priorities," I don't know what that has to do with really anything.

They shouldn't have a lack of clear priorities. They should know what the -- the officers should know what the guidance is. But that's a discussion for management to have with the chain to make sure the deportation

Page 186

R. ADDUCCI

officers have an idea of what their priorities should be.

I really don't know what the meaning behind that is.

Q. So what is the guidance for deportation officers?

A. It's the implementation memo from Secretary Kelly.

Q. So just reading that, they should have what they need?

A. I mean, there's -- there's musters and group discussions and the SDDOs work daily with their teams. In most instances, they work with them out on the street. I'm not present for their conversations.

Q. The guidance given to management is Secretary Kelly's memo, correct?

A. Yes.

Q. And so everybody is operating under that guidance when making these decisions?

A. Yes.

Q. And there's not any other written guidance?

A. I have not produced any other

Page 187

R. ADDUCCI

written guidance.

Q. The next bullet point says, "Lack of Enforcement and Removal Assistants (ERA)."

What is the issue referred to here?

A. I think there was only one ERA at the time. I believe there's three now. This is just staffing, once again.

Q. Have the two new ERAs received the ERA training?

A. No -- well, I don't know. There are new ERAs that just entered on duty. So they would not have gone to the ERA training. I don't know the specific ERAs that moved into that unit, if they already had it, if there was a journeyman or a more senior ERA that moved into that unit. I don't know if they had the training or not.

Q. And one of the ERAs is the ERA who told Ms. De Souza that she had to depart?

A. No. Actually, that was an ERA on the non-detained docket, because she's not detained.

Q. So this is only adding ERAs on the detained docket?

Page 188

R. ADDUCCI

A. Yes.

Q. And have you done anything else to address the issue?

A. It was pretty much done. The lack of ERAs was addressed by adding ERAs. So, no, I've done nothing.

Q. Do you know if adding two more ERAs has fixed the issue that's described in the report?

A. I don't know if it's fixed yet. I'm sure that they would -- anybody would love to have more, but we do have limited resources. So it certainly helped.

Q. If you go to the next bullet, it says, "Docket officers assigned to multiple dockets in addition to serving as acting supervisor."

What was done to correct this issue?

A. Again, that was -- there's no acting supervisor now. There's two full-time supervisors, and then, you know, the dockets have been significantly reduced by tripling the staff.

Page 189

R. ADDUCCI

Q. The next bullet point says "Unit needs (e.g. staffing, equipment, etc.) are not being communicated all the way through the chain of command and therefore not met."

Do you see that?

A. Yes.

Q. What is that referring to?

A. That referred to scanners. I know the staff would prefer not to have to get up and go to the joint printers, you know, shared printers. They would like their own printers at their desks. Again, there are some resource issues. Scanners are in significant need, and that has been addressed.

I think they -- the thing I remember the most was scanners and printers. Printers are not something, you know, they're just going to have to get up. I guess in the sense this was, you know, some people's wish lists.

Q. So what it says is "Unit needs are not being communicated all the way through the chain of command."

Has there been anything implemented

R. ADDUCCI

to make it so that unit needs will be communicated all the way through the chain of command?

A. Just discussions.

Q. Just discussions?

A. You need to talk to your staff. I mean, you know, hopefully this after action report had some impact if people are feeling this. I don't know. I can't -- nothing else has been done, other than getting the equipment that they asked for.

Q. And that next bullet point says, "Lack of essential equipment needed for the job (... scanners, color printers)."

So is that the same thing?

A. I think so, yes. Well, staffing they talk about in the first bullet as well, or the previous bullet, and that obviously was addressed.

Q. The next bullet on the next page says, "Lack of data quality."

What does that refer to?

A. Again, that's EARM comments and call-ups and using the system as it's

R. ADDUCCI

designed.

Q. You said "using the system as it's designed."

A. To utilize the case call-ups. Again, they kind of -- these spreadsheets are almost, in a sense, a substitution for the process, because the spreadsheets were something that people did way back when, and the data -- or the system sort of allows for the elimination of the spreadsheets, but people, I guess, aren't comfortable yet using the system to the extent that it needed to be, and some of the officers were brand, brand new, and it takes -- it takes a little bit of finesse to work the process.

I don't use the system. I can only read it. I don't put anything into the system, nor have I ever. So I don't have a lot of firsthand knowledge on the system inputting.

Q. What have you done to correct this issue?

A. That's really my assistant field office director's, or Kevin's, reviews.

R. ADDUCCI

Q. In the report that he's going to give you?

A. I don't know what he's going to give me. I didn't have him do a formal report like this. He was just working with the officers, you know, as he would review a case.

Q. But you said he did do a report?

A. I said he gave information -- he was going to give information to -- report information to the assistant field office director. I don't think he did a formal report.

Q. I thought you said he did a report and he put -- he gave it to you, but you haven't had time to review it because --

A. No, I don't have it. He gave -- I told -- he told me he was going to provide anything that he had left, anything that he had uncovered to Alan.

Q. To who?

A. To Alan Greenbaum, to the AFOD, over the detained docket.

Q. He's going to do it verbally?

A. I'm not sure how he did it. I

R. ADDUCCI

wasn't there.

Q. Right. But you said he finished it late last night and you haven't had time to review it because you're here today.

MS. LARAKERS: Objection.

A. He finished reviewing the dockets yesterday.

Q. Hmm-hmm.

A. And I haven't had a chance, an opportunity, to discuss what his findings were with him, nor will I. I will be discussing them with Alan.

Q. Okay. The next bullet says, "Lack of docket training throughout the year."

What does that mean?

A. I don't know, because I've never heard of that. They don't do docket training in my field office. Throughout the year, it's kind of -- again, it's an OJT if you don't -- if you have all new people. I don't know what that means.

Q. You don't know what "Lack of docket training throughout the year" means?

A. I mean, it means someone is not

R. ADDUCCI

getting trained throughout the -- I know what lack of docket training throughout the year is, but I don't know what docket training throughout the year is.

Q. My question is, what is the issue described here?

A. I don't know.

Q. So you don't know what has been done to fix it?

A. I have not heard of docket training throughout the year before.

Q. And you haven't done anything to fix this issue?

A. No.

Q. The next bullet point says "Lack of examples/tools to assist officers in organizing and prioritizing their work."

What does that refer to?

A. I believe this refers to those spreadsheets.

Q. Do you know?

A. Oh, no. I this think this actually refers to those go-bys that I referred to earlier, sort of the checklists.

R. ADDUCCI

Q. Which haven't been finished yet?

A. Some work has been done by the local office, and then Kevin worked on some things from Detroit to carry forward here. Those documents, I think, were being reviewed for usefulness.

Q. Who are they being reviewed by?

A. I believe the attorneys right now.

Q. The next bullet point says, "Unawareness of the cases entering custody daily."

What does that refer to?

A. People aren't apparently aware of who -- there wasn't a mechanism in place to access who was coming into custody, no formal -- or they weren't aware of cases entering detention.

Q. And who is "they"?

A. The deportation officers on the detained docket.

Q. What have you done to fix this issue?

A. I did nothing. Again, most of these issues had already been addressed by the

R. ADDUCCI

time I got here, because, again, they did this in March. So Tom and Todd and James had addressed most of these points.

This one I just know from being there, is -- there's a daily report that comes out. I get it via e-mail. I think it might be on the shared drive. I don't know if it goes out. It's accessible so people are reviewing the daily intake reports.

Q. What's in the daily intake reports?

A. People that have come into custody and people that have been released from custody.

Q. And how does this help the deportation officers?

A. Well, it makes them aware of the cases entering custody daily.

Q. The next bullet point says "Absence of a mentoring/training program for new officers."

Do you see that?

A. Yes.

Q. What's this referring to?

A. I think it refers to the -- it

R. ADDUCCI

refers to a lack of a training program for new officers coming into the office.

Q. And what's been done to fix the issue?

A. Well, there are informal mentoring and training going on. Again, this is an issue that involves some union considerations, if you start developing post-academy training programs. So that's usually done on a more national level.

So anything that you do in this sort of arena you have to do informally.

Q. And how do you do it informally?

A. Well, by providing newer staff with seasoned people to give them guidance and advice and be available for questions.

Q. Is this something you've worked to implement since you've started?

A. I didn't implement it myself. It was already in the works. But two very seasoned officers who had previously worked in the Boston office came back to the Boston office from -- one, I believe, came back from headquarters, and one came from another work

R. ADDUCCI

assignment. I can't recall. Somewhere in Vermont, I believe. Both very experienced detained docket officers. That was already in the works, though. I didn't do that. That was done before I got here.

They didn't arrive until after I got here, but it was in the works.

Q. And how do you know that new officers are getting the mentoring or informal training that they need?

A. Just from the day-to-day conversations. I don't have a formal process set up to say that people are getting -- again, it's sort of an informal mentoring training. So I can't -- other than having confidence that my staff is telling me the truth, and that this is occurring, and people are starting to feel comfortable asking people for help, that's how I have to -- that's what I have to rely upon.

Q. The next bullet point says "National File Tracking System is not utilized."

What does that refer to?

R. ADDUCCI

A. It's a file tracking system that's owned by CIS. I think it's owned by CIS. Just to see where a file is.

Q. Do you mean an alien file?

A. Yes.

Q. And --

A. If it moves from one desk to another desk, or one location to another location.

Q. It says it's not being utilized, right?

A. It does say that.

Q. So what's the issue being described?

A. I would assume that somebody -- I don't know. I would assume that somebody is just sending a file without wanding it in or typing it into the system to say it's moving from one location to another. I don't use the NFTS myself. I haven't used it in many, many years.

Q. Have you done anything to fix this issue?

A. No.

R. ADDUCCI

Q. The next bullet says "Detained duty officer." Do you know what that refers to?

A. Yes. Just having someone available for -- it's just a duty. Somebody who's available for random issues as it relates to the detained docket.

Q. What sort of random issues?

A. Taking something out to jail. I don't know how they utilize the detained duty officer. I don't have -- I don't think we have one in Detroit, and I'm not sure what the benefit is, because -- so I -- I don't know what the meaning behind this bullet was.

Q. The next bullet says, "Two-person docket officer teams."

What does that refer to?

A. The ability to have some coverage when someone is gone. So instead of having one person over one docket, you might combine, in a sense, you would have double the amount of cases on one docket and both officers covering that docket.

Q. And what have you done to fix this issue?

R. ADDUCCI

A. I've done nothing. I know they worked on -- until they had the 12 officers, until they got situated with the 12 officers, which I believe was final last week or the week before, speaking to the two SDDOs, their intent was to implement some type of docket team concept so that there was coverage if some people were traveling or out on leave.

Q. So you think that this is something people might still be intending to implement, but you're not sure?

A. I think it's -- I think it's partially implemented, but I would have to double-check with the SDDOs, because it would have just been able to have been implemented last week.

MS. SEWALL: Go off the record for a couple minutes.

VIDEOGRAPHER: We are going off the record at 2:46.

(Recess taken at 2:46 p.m. and reconvening at 2:59 p.m.)

VIDEOGRAPHER: We are back on the record at 2:59.

R. ADDUCCI

BY MS. SEWALL:

Q. Ms. Adducci, since you became interim FOD in Boston, how many non-citizens subject to final orders of removal has the ICE Boston field office arrested at or immediately following an I-130 interview?

A. Zero, I hope.

Q. Do you know?

A. I -- yeah, I believe -- yes.

Q. Do you anticipate -- sorry. Are there any individuals arrested at or following their attendance at I-130 interviews that are currently in custody?

A. No.

Q. Since you became interim FOD in Boston, have any non-citizens arrested at or following their attendance at I-130 interviews been removed?

A. I'm sorry, will you ask that one again?

Q. Sure. Since you became interim FOD in Boston, have any non-citizens arrested at or following their attendance at I-130 interviews been removed?

R. ADDUCCI

A. I don't think so, but I don't know.

Q. How would you find out?

A. I would have to go back and look at this whole spreadsheet and make sure -- I know -- I'm pretty sure no.

Again, I don't know if the spreadsheet is all inclusive, because there's no mechanism for tracking people arrested at I-130 interviews. It's all based on gathering information from multiple different sources and individuals.

Q. And you don't think that's been done?

A. I think it has been done. I just don't know -- I think this is the best it's going to get, because this is everything everybody said they had for records from this time period.

But, again, to -- if there was some one-off conversation in Hartford or at a co-located office where somebody didn't document it or didn't have any e-mails or didn't recall it, having had happened over a year ago, or upwards of a year ago, there

R. ADDUCCI

could be a missed case or two. I feel like it's relatively comprehensive, but I would not be able to swear it was entirely comprehensive.

Q. So people could be getting arrested at or following an I-130 interview and it wouldn't get documented in the system, correct?

MS. LARAKERS: Objection.

A. It would get documented in a record of arrest. But there's no way to pull that information without going through every arrest and looking at every single arrest that occurred in office, regardless of where it occurred. You'd have to look at every single record of apprehended alien for whatever timeframe, and then see where the encounter took place.

Q. So this spreadsheet pulls from a database where that information might not have been inputted into; is that what you're saying?

MS. LARAKERS: Objection.

A. This spreadsheet is based on

R. ADDUCCI

individual people reporting what they got from CIS, and recollections of officers and supervisory detention and deportation officers.

There's no way to put in location of arrest and pull out individuals.

Q. And you said it's documented file by file, the location of arrest would be documented in each file?

A. It would be -- the place of encounter is documented on the arrest report. So when any person is arrested, a document is created. And in that document, the record of the arrest, it shows where the person was encountered.

Q. So this spreadsheet doesn't go through each report and find the location of arrest; it relies on people, arrest officers reporting where the arrest has taken place?

A. Yes.

Q. And you don't know the method by which those officers determined where the arrest took place?

A. I think it was memory, reviewing

R. ADDUCCI

e-mails, and that would pretty much be the only way.

Q. Do you anticipate that the ICE Boston field office will remove non-citizens who have been arrested at or following their attendance at I-130 interviews in the future?

MS. LARAKERS: Objection.

A. I don't know. It could happen. I don't anticipate it, but I wouldn't say it won't.

Q. You wouldn't prohibit it?

A. Correct.

Q. Are there any individuals arrested at or following their attendance at I-130 interviews currently in custody and scheduled for removal?

A. I can't say that with 100 percent clarity. I don't think so, but I -- without knowing, I'd have to go through, you know, 700 cases in custody and see where they were encountered.

Q. And to find that information out, would you have to go through every case file?

A. Yeah, every report of arrest, which

R. ADDUCCI

is in that documented system, or in the case file.

Q. And the documented arrest is in the EARM system?

A. It is in the narrative part of an apprehension. So it's not tracked. It's just a...

Q. Are there any individuals arrested at or following their attendance at I-130 interviews that are not in custody but are currently scheduled for removal?

A. Any? There may be any, yes. There could be some. I don't know.

Q. And have you given any instruction to deportation officers that they should particularly account for the fact that a non-citizen with a final order of removal was arrested at an I-130 interview or immediately after in deciding whether to remove somebody?

A. Can you...

Q. I will read it again. It's a long one.

Have you given any instruction to deportation officers that they should

R. ADDUCCI

particularly account for the fact that a non-citizen with a final order of removal was arrested at an I-130 interview or immediately after in deciding whether to remove somebody?

A. No.

MS. SEWALL: I have no further questions. Do you guys have anything?

MS. LARAKERS: No.

VIDEOGRAPHER: This concludes today's deposition. We are off the record at 3:07.

(Time Noted: 3:07 p.m.)

---------------------

REBECCA J. ADDUCCI

Subscribed and sworn to before me this day of 2018.

-----------------------------------------

C E R T I F I C A T E

Commonwealth of Massachusetts )
) ss:
County of Suffolk )

I, Michael D. O'Connor, a Notary Public within and for the Commonwealth of Massachusetts, do hereby certify:

That REBECCA J. ADDUCCI, the witness whose deposition is hereinbefore set forth, was duly sworn before me and that such deposition is a true record of the testimony given by such witness.

I certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 26th day of July 2018.

______________________________

Michael D. O'Connor, RMR, CRR, CRC

I N D E X

| WITNESS: | EXAMINATION BY | PAGE |
|---|---|---|
| REBECCA J. ADDUCCI | | |
| | Ms. Sewall | 7 |

------------------ E X H I B I T S ---------------

| REBECCA J. ADDUCCI EXHIBIT | | PAGE |
|---|---|---|
| Exhibit 1 | Notice of Substituted Party Under Rule 25(d) | 25 |
| Exhibit 2 | Order | 52 |
| Exhibit 3 | Declaration of Rebecca J. Adducci | 73 |
| Exhibit 4 | E-mail to Mark Sauter from Todd Masters, dated 7/16/18, with attached e-mails | 145 |
| Exhibit 5 | E-mail to Rebecca Adducci from Todd Lyons, dated 7/17/18, with attachments | 146 |
| Exhibit 6 | Native version of attachment to Adducci Exhibit 5 | 147 |
| Exhibit 7 | "Exhibit A U.S. CIS Adjudicator's Field Manual Ch 15" | 153 |
| Exhibit 8 | Memo to Thomas P. Brophy, and others, from Miguel Vergara, dated 5/16/18 | 165 |

NAME OF CASE:

DATE OF DEPOSITION:

NAME OF WITNESS:

Reason Codes:

1. To clarify the record.
2. To conform to the facts.
3. To correct transcription errors.

Page ______ Line ______ Reason ______
From ____________________ to ____________________

Page ______ Line ______ Reason ______
From ____________________ to ____________________

Page ______ Line ______ Reason ______
From ____________________ to ____________________

Page ______ Line ______ Reason ______
From ____________________ to ____________________

Page ______ Line ______ Reason ______
From ____________________ to ____________________

Page ______ Line ______ Reason ______
From ____________________ to ____________________

Page ______ Line ______ Reason ______
From ____________________ to ____________________

Page ______ Line ______ Reason ______
From ____________________ to ____________________

______________________

## A

**A-d-d-u-c-c-i** 7:14
**a.m** 1:18 2:7 5:24 73:4,5
**abiding** 52:11
**ability** 96:19 112:8 200:18
**able** 8:16 9:6 49:2 75:10 82:18 171:8 201:16 204:4
**Absence** 196:19
**absent** 64:2 66:3 91:15 93:16
**academies** 127:11
**academy** 9:15,17 9:20,22 126:14,20 127:2 130:23,25
**accept** 12:12
**accepted** 127:3
**access** 46:5 47:4,4 48:19 49:2 98:9 143:20 195:16
**accessible** 196:9
**accommodate** 8:15
**account** 70:2 152:15 157:22 158:2,12 207:17 208:2
**accurate** 44:19 159:24
**ACLU** 4:23,24
**act** 131:11 134:25 154:23
**acted** 17:8
**acting** 11:21 15:10 15:15 20:23 21:9 46:13 51:24 63:6 63:13 72:15 74:6 74:11 81:22,24 87:15 120:10 169:13,18 188:17 188:22
**action** 1:9 5:20 37:12,20 38:11 58:23 65:22,24 67:5,10,12,14 68:3 147:16 165:25 182:25 190:8 209:15
**actions** 152:9 155:15,20 177:21 178:16,22
**activity** 64:19 145:25 146:6
**actual** 44:24 57:7 76:9 81:6 120:2 142:22 150:12 182:12
**add** 128:4 183:9
**added** 182:20 183:8,10,14,15
**adding** 187:24 188:6,8
**addition** 166:4 188:17
**additional** 171:6,7 182:20
**address** 7:18 23:15 42:14 43:2 54:9 54:13 67:6 169:25 172:14 188:4
**addressed** 23:17 44:6 51:8 66:19 141:12 183:2 188:6 189:15 190:20 195:25 196:4
**addressing** 23:14
**Adducci** 1:15 2:11 5:1,16 6:1 7:1,2 7:13 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1,2 25:15 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1,21 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1,8,9,12 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 131:24 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1,3 146:1,10 146:11 147:1,2,3 148:1 149:1 150:1 151:1 152:1 153:1 153:4 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1 164:1 165:1,6 166:1 167:1 168:1 169:1 170:1 171:1 172:1 173:1 174:1 175:1 176:1 177:1 178:1 179:1 180:1 181:1 182:1 183:1 184:1 185:1 186:1 187:1 188:1 189:1 190:1 191:1 192:1 193:1 194:1 195:1 196:1 197:1 198:1 199:1 200:1 201:1 202:1 202:3 203:1 204:1 205:1 206:1 207:1 208:1,17 209:9 210:3,6,11,15,19
**adhered** 43:6,12
**adjudicate** 101:25 106:3,25 107:12
**adjudicated** 103:18 106:15 107:6,24
**adjudication** 57:14 106:19 152:3
**adjudicator** 158:3 158:4
**adjudicator's** 152:12 153:5,20 159:19 210:20
**adjust** 28:11
**adopted** 113:4
**advice** 197:17
**advocacy** 112:4
**affairs** 163:6
**affect** 68:10
**AFOD** 170:11,17 171:2 182:25 192:22
**AFOD's** 171:2
**AFODs** 93:12
**age** 118:22
**agencies** 152:22,23 152:25
**agency** 34:10 57:10 57:12 104:2 151:23 152:5 153:2
**agent** 9:24 19:6
**ages** 118:21,22
**ago** 10:3 19:5 28:24 30:12 32:20 35:2 35:4 180:3 203:25 203:25
**agree** 90:13 91:13 167:19,20
**agreement** 173:21
**agreements** 172:5
**ahead** 116:5
**aid** 178:20
**al** 1:7,10 5:18,19
**Alan** 184:18 192:20 192:22 193:13
**Alexander** 61:3
**alien** 103:15 121:2 154:14,20,25 155:10,22,25 156:4,15 176:15 199:5 204:17
**alien's** 155:14,15
**aliens** 28:11 64:18 92:23 123:16 132:13 133:20 136:12 156:11 166:21 185:4
**alleged** 18:5
**allow** 112:12,19 156:11,14,15 158:24
**allowed** 52:15
**allowing** 158:4
**allows** 133:5 156:4 175:10 191:10
**Amended** 26:20 109:2
**amount** 16:3 82:11 164:25 179:4 200:21
**and/or** 70:10 92:10 166:18,21 181:19 184:9 185:4
**answer** 8:18,23 12:3 32:8 52:4 61:15 87:9 103:22 104:3 107:9 114:9 124:16 128:2 130:8 144:25 158:17 161:13
**answered** 110:13
**answering** 111:12
**answers** 7:24 130:7
**anticipate** 202:11 206:4,10
**antiquated** 59:14
**anybody** 14:25 60:15 71:7 80:21

92:4 94:5 103:12
138:20 188:12
**AOR** 84:16 151:4
**Apologies** 153:9
**apparently** 99:8
168:11 195:14
**appear** 94:14 98:24
99:6 107:4,8,10
129:3,21 152:10
155:17
**appeared** 84:10
85:15
**appearing** 68:16
101:19 103:7
105:12,14 114:25
115:6 116:5 143:9
**appears** 60:4
154:20
**applicable** 113:17
158:2
**applicant's** 69:23
**application** 68:19
69:23 101:25
103:16 106:3,25
107:6,24 113:12
133:11 154:22
**applications** 28:15
57:15 78:19
116:20 134:3
152:3
**apply** 112:14,21
156:12,16
**applying** 162:15
**appointment** 12:8
104:7 124:4
128:13 163:12
**appointments** 99:6
162:23
**apprehended**
204:17
**apprehension**
207:7
**approach** 83:15
94:23
**appropriate** 43:7
121:10 173:3
**appropriately** 50:6
**approved** 68:18

69:23 107:14
108:10,16 118:6
133:11
**approximately**
5:24 12:18 18:21
145:17 150:14
**ARDINGER** 4:20
**area** 14:6
**arena** 197:13
**arms** 152:21
**arrangements**
36:16
**arrest** 28:17 64:22
65:25 66:13,18
68:16,23,23 69:6
69:20,21 78:17
85:2,24 95:25
96:6,10,15,21
103:4 104:17
114:24 115:5
116:6 141:24
142:6,16,18,22,25
147:18 154:14
204:12,13,14
205:7,9,12,15,19
205:19,20,24
206:25 207:4
**arrested** 84:18 85:7
85:16 105:4,14
108:4,13 109:24
110:3 114:12
115:23,25 117:9
118:3,9 142:8
154:24 155:19
158:5,22 160:8
202:6,12,17,23
203:9 204:6
205:13 206:6,14
207:9,19 208:4
**arresting** 64:25
70:2 84:8 85:9,13
89:9 90:6 138:18
139:4 156:24
**arrests** 64:4,16
66:4 86:11,14,22
87:2,5 88:6,10,13
88:17 89:4 90:22
91:11,15 92:15,19

92:24 93:20,23
97:20 98:2,21
102:19 104:12
108:21 115:18
133:4,25 134:10
138:16,16 139:6,7
139:8 141:17,18
142:14,22 150:11
151:13 152:6,7,16
157:23 158:13,19
158:24 159:2,6,14
**arrival** 170:5
**arrive** 198:7
**arrived** 150:13,15
**as-needed** 56:15
**Asher** 15:5 81:3
**aside** 37:4 92:8
**asked** 11:25 31:17
31:22 32:10 50:8
50:11 52:15 76:16
80:10,14,20 88:22
150:21 182:24,25
190:12
**asking** 8:7 11:11
20:3 106:12,13
107:20 112:4
140:17 198:19
**asks** 12:16
**asserting** 26:24
**assigned** 32:23
125:11 169:7
188:16
**assignment** 10:14
198:2
**assignments** 22:17
34:2 79:24
**assist** 194:17
**assistant** 11:21
14:18 31:14,16
51:6 55:7 56:11
86:6,8 92:10
121:19 123:21
126:14 127:4
129:6,9 130:20
131:2,4 151:7
161:18,21 183:16
184:12,16,20
191:24 192:11

**assistants** 125:23
127:15 131:6
187:4
**assisting** 169:14
**associate** 15:3
**association** 6:4
**assume** 81:15,21
82:16 104:6 127:7
143:18 149:22
185:7 199:16,17
**assumed** 71:15
72:18 130:16
**assuming** 159:24
160:2
**assurances** 78:24
**assure** 71:25
**assured** 58:18 59:3
**at-large** 142:2
185:3
**attached** 145:5
210:14
**attachment** 147:3,6
147:9 210:18
**attachments**
146:12,21 210:17
**attempting** 28:11
**attend** 9:20 48:2
**attendance** 93:10
175:18 202:13,18
202:24 206:7,15
207:10
**attended** 9:11,14
117:10 142:25
**attending** 9:17
101:12
**attorney** 6:12 8:15
168:15 176:4,15
**attorney-client**
92:7 97:22
**attorneys** 6:21
60:14 92:8 168:4
176:10,14 195:9
**audit** 22:20,25
165:16
**August** 12:10 13:13
**availability** 36:19
**available** 57:20
197:17 200:4,6

**aware** 50:24 54:3
61:16,21 62:10,14
63:9,25 71:7,11
71:18 79:8,9 84:7
85:12 98:9 112:18
112:25 113:3
114:3,7,8 115:8
115:11 136:24
150:6 151:15,16
152:18 195:14,17
196:17
**awful** 116:20

**B**

**B** 210:5
**B-r-o-p-h-y** 21:10
**Bachelor's** 9:12
**back** 12:9 25:25
26:2 41:16 53:20
60:23 62:7 65:3
73:6 94:5 122:7
126:18 127:2
131:21,25 182:6
182:10 183:20,21
183:22 191:9
197:23,24 201:24
203:4
**background** 9:10
17:13 40:22
166:15
**Baltimore** 11:11
**bargain** 168:9,9
**baseball** 80:6
**based** 58:6 78:8
128:7 137:15
138:24 157:13
203:10 204:25
**Basic** 176:22
**basically** 9:25 14:3
152:23 162:4
184:11
**basis** 56:15 58:20
59:5
**Bates** 147:7
**becoming** 23:7,13
**beg** 173:17
**began** 84:8,13,24
**beginning** 26:3

51:14 87:11 175:13
**BEHALF** 3:5 4:4
**believe** 16:16 19:9 19:24 20:22 28:16 28:24 30:9 39:15 61:8 70:8 76:9 81:20 82:14 101:3 121:6,10,21 122:15 133:21 156:18 160:5 187:7 194:20 195:9 197:24 198:3 201:5 202:10
**belonging** 170:12
**beneficiaries** 133:10 134:2
**benefit** 200:13
**benefits** 84:11 154:23 156:2,5 162:16
**best** 26:13 27:7 29:17 56:21 57:6 57:15 90:10 124:8 125:13 140:7 143:14 203:16
**better** 39:2 48:21 59:9
**BFODs** 93:12
**big** 39:18 47:10 138:7 182:17
**bigger** 170:21
**biggest** 54:18
**bit** 12:6 15:7 27:15 35:14 40:3,4 43:21 44:5 167:12 191:15
**blood** 209:15
**bold** 155:25
**bona** 110:5
**boss** 11:7,13,14 12:16 15:3 16:12 30:25 31:3 87:23 87:25 136:5
**bosses** 29:7 95:18
**Boston** 1:16 2:13 3:8 4:14,19 5:23 11:5,12,12,24 12:2,13,24 13:19 16:9 17:11 30:24 30:25 31:9 34:9 36:8 54:14 59:23 62:13,15 63:2 64:3 66:3 71:13 76:16 79:20 80:10 80:15 82:21 84:8 85:17 87:5,23 88:2,6,21,23 91:5 92:3 98:8 99:8,9 100:7 101:9 102:9 102:10 122:14 124:25 125:15,20 136:2,21 137:13 142:24 143:8 144:6 148:4 150:7 151:5 159:2 166:3 167:10 184:22,23 197:23,23 202:4,6 202:17,23 206:5
**bottom** 73:22 154:13
**bound** 51:25 52:5 53:12,17
**brand** 45:17 191:14,14
**break** 8:13,17,19 72:21,23 131:14
**brief** 75:4
**briefed** 21:5
**bring** 39:4 93:21 120:15
**bringing** 46:15 57:22
**brings** 104:19
**Brophy** 21:10,11 22:2 32:16 36:2 41:6 61:20,22 63:6,25 64:23 71:12 72:13 74:7 74:12,19 75:20,23 77:5,15,20 78:4,8 83:6 88:16,21 90:5 91:8 92:17 150:9 165:7,16 183:10,15 210:22
**Brophy's** 33:4 52:2 65:15 66:2 71:19 72:4 78:16 92:4 94:9 95:3
**brother** 19:25 20:2
**brought** 39:9 50:10 54:19 174:8 177:8 180:6
**budget** 140:3
**budgets** 42:7
**Buffalo** 32:18,21 32:23,25
**bullet** 67:16 155:9 155:21 167:2 169:5 170:11 171:17 173:22 174:11 176:2,22 181:24 184:8 185:2 187:3 188:15 189:2 190:13,18,19,21 193:14 194:16 195:10 196:19 198:22 200:2,14 200:15
**Burlington** 7:19,21 10:8 31:10,11
**busy** 56:8
**buy** 128:20

**C**

**C** 3:2 4:2 5:2 154:14 209:1,1
**Calderon** 1:6 5:17 109:5 117:25 149:5,10
**calendar** 13:10
**call** 11:6,11 15:23 39:6 59:16 75:7 79:25 93:25 106:24 143:25 152:24
**call-ups** 59:17 177:22 178:22 190:25 191:5
**called** 21:9 38:18 76:16 150:9 168:8
**calls** 12:16 35:17 79:24 103:16 108:20
**capacity** 169:18
**capital** 155:25
**Captioner** 2:15
**carry** 195:5
**case** 5:12 18:16 19:7,10 26:5,25 27:10,12,17 28:21 37:4 42:10 44:16 45:7 51:24 59:7 61:9 67:17,17,18 68:7 69:19 99:23 101:24 108:25 109:3 119:22 120:17,19 121:2,3 123:18 124:4 125:24 143:18,21 148:23,25 149:11 149:13 153:12,13 160:14,23 161:4,9 161:10,12,25 164:21 165:3,3 171:10 176:23,24 177:6,16,20,21,24 178:15,15,22,22 191:5 192:7 204:2 206:24 207:2 211:1
**case-by-case** 69:3 164:18
**cases** 16:23 17:6 18:22 28:3 56:10 58:19 69:13 86:12 100:21,25 101:8 119:21,23 133:20 144:18 148:11,12 150:6 155:14 159:7,9,11 179:19 179:25 181:7 182:18 185:14 195:11,17 196:18 200:22 206:21
**categories** 96:6 132:13
**cause** 24:4 26:15
**caused** 169:12 174:5
**caveat** 81:18 125:12
**centralized** 172:20
**certain** 17:17 22:15 42:2,5 48:25 49:2 55:23 58:5 82:11 95:10 105:13 160:20 175:12
**certainly** 42:13 188:14
**certificate** 10:2
**Certified** 2:16
**certify** 209:8,14
**Ch** 153:6 210:21
**chain** 51:3 79:13,13 93:5,22 134:12 145:10 175:6 176:18 185:25 189:5,24 190:3
**challenge** 37:7,9
**challenges** 22:6,9 22:17 42:14 55:22 57:8 183:18
**challenging** 29:17
**chance** 193:10
**change** 141:4
**changed** 63:15 91:10 103:24
**changes** 23:8 103:23 166:6 168:10
**changing** 136:25
**Chapter** 153:24
**characterize** 52:19
**charge** 13:4 75:15 140:15
**check** 86:3 164:6
**check-in** 164:6,7
**check-ins** 162:14
**checklist** 49:12,13
**checklists** 194:25
**children** 109:14,18 117:7 118:24 119:25
**choice** 114:20
**Chris** 121:21 122:10,13
**Christopher** 14:11

29:23
**church** 96:15
**circle** 41:4
**CIS** 28:12 64:5,22
66:6 68:16 69:22
84:10,18 85:2,7,9
85:13,16,23,24
86:11,12,14,22
87:2,5 88:6,10,13
88:17 89:4,9 90:6
90:22 91:11,15
92:15,18,24 93:4
93:21,23 96:22
97:16,20 98:2,21
98:23 99:5 100:14
100:22,25 101:5,6
101:11,18,20
102:4,9 103:2,16
103:24 104:10,15
104:19,24 105:12
105:14 106:9,12
106:20,23,23
107:8,19,21
108:20 112:6,11
112:18 114:13
115:16 133:4
134:10 141:16
142:19,22 143:2,8
143:20,22 145:19
146:22 147:23
148:7,10,13,25
149:2,13,17 150:3
150:6,10,11 151:3
151:14,18,20
152:6,7,11,14,18
152:18,20 153:5
154:21 156:25
157:4,10,11,14,22
158:6,10,13,22,24
159:3,5,18,25
160:9 199:3,3
205:3 210:20
**CIS-related** 64:16
**citizen** 66:25 67:22
109:11,14,18
114:5 117:7,7
**citizens** 28:10
95:25 112:14,21

113:16,24
**citizenship** 57:13
151:24 153:17
**Civil** 1:9 5:20
**claims** 26:23
**clarification** 17:23
136:22
**clarify** 8:10 27:14
92:22 95:14 211:5
**clarity** 43:21
206:19
**class** 67:9,11 91:3
92:23
**classes** 47:24 65:20
132:12
**clause** 132:12
**Clayton** 61:3
**clear** 8:25 94:22
139:23 144:6
152:20 161:14
162:17 177:2,6,22
185:3,19,21
**clearer** 44:25
**clearly** 137:13
177:2
**clips** 20:19
**close** 91:21
**closely** 140:13
**closer** 31:5 161:20
**co-located** 203:22
**Codes** 211:4
**colleague** 6:18
30:23
**colleagues** 6:9 31:5
**Colleen** 3:11 6:9
**color** 190:15
**column** 148:8,9
162:2
**combine** 200:20
**combined** 147:13
**come** 11:4 12:8
31:6,18 32:11
36:17 38:23 47:25
76:10,16,19 80:19
93:4 100:7 102:19
103:4 104:11
111:13,14 134:11
144:5 182:10

184:5 196:12
**comes** 48:4 111:18
124:2,3 149:23
182:16 196:6
**comfort** 141:23
**comfortable** 57:18
58:17 106:10
119:24 191:12
198:19
**coming** 21:4,9
36:12,13,17 75:19
83:12 99:21,25
104:16 105:18,20
123:3,16 136:19
136:20 144:14,15
144:18 151:13,17
195:16 197:3
**comma** 132:12
**command** 51:3
189:5,24 190:4
**comment** 112:2,25
**comments** 161:10
161:25 177:6,12
177:24 182:12
190:24
**commit** 64:24,25
**commitment** 63:20
**committed** 18:2
**common** 39:3,7
70:14 84:19,25
85:3,4,6 99:10
100:3
**Commonwealth**
2:17 209:2,7
**communicate** 93:7
**communicated**
144:9 189:4,23
190:3
**communication**
121:11 123:2,10
123:11 144:2
**communications**
122:25
**comparator** 138:25
**compilation** 148:11
**complaint** 26:20
109:3,22
**complete** 83:25

180:24 181:3
184:9
**completed** 16:17
22:19 37:20
**completely** 96:18
179:3
**completing** 36:20
**completion** 10:2
**comply** 45:13
174:13,20 176:3
**comprehensive**
204:3,5
**computer** 48:25
55:25 57:2,3
**computers** 56:23
**concept** 113:2
172:11 201:8
**concern** 50:15 51:8
142:4 184:4,6
**concerned** 89:24
**concerns** 54:4,7
**concluded** 174:9
**concludes** 208:10
**conclusion** 102:3
**conduct** 31:18
32:11 51:12 67:4
67:14 166:20,21
174:6
**conducted** 22:21
39:20 47:14 54:6
61:17 166:3
**conducting** 141:24
166:19
**conference** 13:6
24:11 25:23 26:18
38:4 40:9 62:21
63:11,12 64:7,17
71:23 72:5 77:7
77:11 91:20,21,25
94:11,13 95:9
**confidence** 47:19
198:17
**confident** 50:5
**confidential** 1:14
121:24
**confirm** 51:23
**confirmed** 183:16
**conflicted** 94:14

**conform** 211:6
**confused** 27:22,23
**confusion** 45:8,9
**Congress** 113:6
**connection** 154:22
**consequences**
70:23
**consider** 70:11
134:17,21 135:11
135:13,19 138:13
**consideration** 68:8
159:10
**considerations**
67:13 197:8
**considered** 56:7
67:3,23,25 68:5,8
68:10 88:22 135:8
**consistent** 65:6
90:25 132:5
**consistently** 162:15
**Consolidated**
146:23
**constitutional** 18:2
**consult** 60:14
**consulted** 134:11
**contacted** 88:24
**contain** 145:18
**contingent** 58:11
**continue** 17:16
71:19 72:2,4
78:16 82:6 104:21
**Continued** 4:2
**continuing** 132:7
**contracting** 172:9
**contradicts** 65:16
**contrary** 66:6,10
95:4
**convenient** 102:18
104:11 115:17
159:13
**conversation** 12:19
16:16 36:10 77:15
79:5 80:13 89:13
90:2 95:22 150:8
164:23 203:21
**conversations** 21:5
21:6 36:5 186:16
198:13

**conversed** 77:13
**coordinate** 57:10
**coordination** 102:16,21,25
**copied** 37:2 145:11
**copy** 146:22 148:6 153:10,14
**correct** 10:10,11 14:22 15:17,22 17:4 25:12 26:5 26:21 27:2 29:23 29:24 31:10 32:22 33:19 36:9 38:19 39:25 48:3 53:16 55:17 60:13 61:18 66:7,23 67:2,23 71:13,16 72:8,9 72:12 73:18,22 74:15,16 75:23,24 76:2,3 77:5 81:15 85:17 87:6,12 90:23 91:2,6,11 91:17 96:2,7,8,11 97:18 99:7 101:20 101:25 102:19 103:19 104:12,17 104:22 106:3,5 107:2,3,16,25 108:2,7 109:3,4,6 109:9,10,12,13,15 109:19,25 110:2,5 112:16 113:7 114:10 116:7 118:4,7,10,11,14 119:17 120:12,19 120:20 127:15 130:18 134:3 135:2,14,18,21 136:17 137:17 138:15 139:13 142:15 143:2,24 149:2,3,11 150:4 153:18 154:7,10 156:9,13,22 157:2 157:3 158:22,23 159:2 161:23 164:2,8 165:17 174:9,21 176:11 178:5,6 180:13 181:11,22 182:14 182:21 183:12 186:18 188:19 191:22 204:9 206:13 211:7
**counsel** 6:5,11 21:5 29:2 49:11 60:3 63:14 128:16,19
**count** 138:17,18,19 138:20
**country** 30:18 57:21 77:3 99:11 100:4,5 117:6,19 120:11 124:20 128:11,21 164:15
**County** 209:4
**couple** 40:5,8 60:17 60:20 179:18 181:17 201:19
**course** 72:25 154:24 155:19
**court** 1:2 5:19 6:3 6:17 17:6,25 18:6 19:16 20:12 25:5 27:13,16 29:14 52:23 57:12 61:10 61:17 62:10,14 63:9 73:12 120:16 145:8 146:14 153:8 165:11
**Court's** 27:4 54:3
**Courthouse** 4:12 4:13
**coverage** 200:18 201:8
**covered** 141:12
**covering** 10:19 72:17 200:23
**covers** 30:17
**CRC** 1:24 209:22
**created** 48:22,23 49:18,19 148:4 205:14
**criminal** 9:13,23 64:19 109:19,23 133:20
**Cronin** 14:11 29:23 30:2 35:23 87:10 87:16 88:12 91:5 91:8
**Cronin's** 33:15
**cropping** 183:25
**CRR** 1:24 209:22
**Crystal** 4:22 5:25
**current** 10:21 13:23 21:19,20,21 29:21 34:4 42:3 59:22 147:18 166:6,11,13
**currently** 7:17,20 10:5,6,16 12:10 14:7 15:14 32:21 33:22 35:10 39:24 51:10 97:2 161:11 169:11 202:14 206:16 207:12
**cursory** 20:20
**curtain** 44:3
**custody** 18:18,23 19:24 20:3 22:7 47:8,12 61:5,6 67:25 147:19 166:19 174:19 175:8 176:9 182:4 185:5 195:11,16 196:12,14,18 202:14 206:16,21 207:11
**CUSTOMS** 4:17
**Cutler** 2:12
**cuts** 110:24 111:6

**D**

**D** 1:24 2:14 5:2 209:6,22 210:1
**daily** 186:13 195:12 196:6,10 196:11,18
**danger** 64:2 66:3
**data** 56:3,17 190:22 191:10
**database** 204:21
**date** 11:8 12:22 28:25 72:13 100:23 148:9,10 175:12 178:3 211:2
**dated** 73:19 145:5 145:15 146:12,19 165:8 210:13,16 210:23
**dates** 30:12
**Dave** 14:24 80:23
**David** 11:14
**day** 11:8 12:21 25:17 61:8 69:11 74:19 80:18 121:6 142:25 143:6 150:17 159:13 184:11,13,14 185:15 208:19 209:19
**day-to-day** 42:16 198:12
**days** 5:11 12:4,5 34:2 40:8,10 76:17 79:21,25 82:14 83:12 103:21 166:19,22 175:10
**DC** 4:7
**De** 117:25 128:6,19 148:20 187:20
**deal** 86:10
**dealing** 10:23
**deals** 46:21
**decided** 69:21 110:4 126:24
**decider** 82:8
**deciding** 152:15 158:12 207:20 208:5
**decision** 67:4 68:2 68:4,10,15,22,23 70:4 78:7,23 134:13
**decision-makers** 79:10
**decisions** 134:8,22 177:22 178:16,23 186:21
**declaration** 24:9 25:10,12,14 36:24 53:21,23 62:8 65:4 73:8,16 94:12,20 131:25 210:10
**declarations** 24:4
**declined** 69:20
**default** 16:3 162:2 164:25 165:4
**Defendant** 17:4
**Defendants-Resp...** 1:11
**deficiencies** 166:5
**define** 98:5
**definitely** 137:7
**definitively** 60:10
**degree** 9:12,19,21 44:3 83:19 110:9 128:12
**degrees** 9:16
**deliberative** 23:11 82:25 122:21
**depart** 120:15 160:16 187:20
**department** 4:5,11 6:15 11:17 14:14 152:22,25 153:3
**departure** 91:22
**depending** 56:2 108:8 160:25
**depends** 98:5 117:3 149:23 150:2
**deport** 160:20
**deportation** 55:5 56:14 86:9 93:14 96:7 122:25 123:19 124:5 126:17 127:3 130:21,24 151:9 155:11,23 156:4 170:6 171:8 176:17 185:25 186:7 195:20 196:16 205:4 207:16,25
**deported** 117:9
**deposed** 20:14
**deposition** 1:15 2:10 5:11,16,22

8:23 28:21 29:3,5
29:12 36:13 42:22
92:21 208:11
209:10,11 211:2
**depositions** 36:21
37:5
**deputy** 10:19 14:18
15:2,12 32:17
33:2,3 34:3,5,8,11
34:14 39:17 40:22
74:6 81:2 83:23
86:7 161:19,22
175:6 176:18
**describe** 9:9 178:13
**described** 171:22
176:5 188:9 194:7
199:15
**describes** 165:25
**description** 125:10
**descriptions**
125:10
**designated** 71:12
**designed** 191:2,4
**desire** 64:20
**desk** 182:8,11
184:13 199:8,9
**desks** 189:13
**detail** 10:9,12 11:5
30:11
**detailed** 70:9
**details** 42:12
119:23
**detain** 65:2 66:9
**detained** 51:4,10
54:20 55:4,6,8,11
56:12 57:23 58:5
105:4,15 108:5,13
117:9,18 119:5,6
119:11,13 133:12
166:2,7,21 169:7
169:10 175:5,6,20
175:21,22 177:8
180:7 181:6,10
187:23,25 192:23
195:21 198:4
200:2,7,10
**Detainee** 171:18
**detainees** 166:17

171:25 185:5
**detainers** 185:4
**detaining** 84:9
133:8
**Detection** 99:18
**detention** 55:5
65:25 78:17 86:9
93:13 96:7 116:7
118:12,16 132:14
134:14 140:4
151:9 152:16
170:6 171:19
172:2,20 195:18
205:4
**detentions** 133:25
**determination**
34:17 60:4 68:2
69:5 75:18
**determine** 61:11
104:16 140:2
143:21
**determined** 60:11
205:23
**Detroit** 10:17,19,20
10:22 13:14 15:15
16:25 17:11 20:20
30:16 39:9 54:20
55:3,8,10 85:20
86:13,20 88:23
98:11 99:15 125:2
173:24 195:5
200:12
**developing** 197:9
**devoted** 162:3
**DHS** 152:21
**differ** 173:17
**different** 28:3,3
34:2 41:11,17,23
43:8 46:25 47:2
49:15 79:23,24
99:22 150:21
173:5 185:15
203:11
**difficult** 95:10
183:3
**directed** 88:5,9
**direction** 132:24
**directive** 92:5

**director** 10:7 11:21
13:24 14:18 15:3
15:8,11,16,21
16:22,25 18:13
19:19 20:23 23:8
23:14 30:7,23,25
31:15,17 32:13,18
32:24 33:3 34:5,9
34:14,20 36:7
39:18,22 40:23
55:7 56:11 71:13
72:7,11 74:25
76:10,23 78:6
82:16 83:5,8,24
87:19,20 92:3,11
97:12 111:25
112:6 140:15,24
151:8 159:3
161:18,22 176:19
183:17 184:12,17
184:21 192:12
**director's** 191:25
**directors** 34:11,15
51:7 70:10 77:2
83:3,23 86:7,8
**disagree** 90:13
**disciplinary** 10:24
**discipline** 71:6
**disciplined** 71:8
**discourage** 116:19
**discourages** 116:10
**discretion** 69:6,8
69:11 134:7,18
**discuss** 22:2 37:3
37:16 52:15 58:14
94:8 123:17
193:11
**discussed** 37:14,17
37:17,23 38:10
44:14 48:8 94:11
97:15 162:22
**discussing** 193:12
**discussion** 41:9
59:25 64:15,17,21
93:5 185:24
**discussions** 186:13
190:5,6
**dispute** 28:8

**disregard** 153:11
**distinction** 15:9
**distributed** 49:21
**distribution** 140:5
**district** 1:2,3 5:19
5:20 6:16 61:10
**division** 4:5,11
30:10 169:24
**divisions** 43:8
57:12
**docket** 51:4,10
54:21 55:4,6,8,12
56:12 57:23 121:4
144:24 162:7
166:2 169:12,14
169:17,19 171:24
175:20,21,23
177:8 180:7 181:6
181:10 187:22,25
188:16 192:23
193:15,18,23
194:3,4,11 195:21
198:4 200:7,16,20
200:22,23 201:7
**dockets** 69:15,16
169:14 188:17,23
193:7
**document** 25:7
52:18,25 53:3,7
53:13,15,18 73:14
148:2,3 154:9
159:18 163:6,10
165:13,20 177:25
178:3,18,20
185:17 203:23
205:13,14
**documentation**
161:2
**documented**
177:18 204:8,11
205:8,10,12 207:2
207:4
**documents** 23:20
23:23 24:8,10,16
26:8,9,13,16 27:8
27:9,13,13,16,25
28:2,5 123:23,24
182:2 185:16

195:6
**doing** 24:8 50:12
59:9 86:5 121:13
122:24 123:25
124:2 129:7,12
162:13 163:3,5
167:13 168:14
169:22 172:14
178:19
**DOJ** 4:25
**Dorr** 2:12
**DOs** 175:7
**double** 200:21
**double-check**
201:15
**drive** 196:8
**drivers** 7:4
**drops** 140:16
**due** 59:18
**duly** 7:4 209:11
**duties** 125:11
**duty** 10:14,14 42:6
127:10 169:12
187:12 200:2,5,10

**E**

**E** 3:2,2 4:2,2 5:2,2
209:1,1 210:1,5
**e-mail** 37:2 90:3
102:13,23,24
144:12 145:3,10
145:11 146:10,16
146:17 147:7,9
159:15 196:7
210:12,15
**e-mails** 36:18,23,25
89:18 97:12 145:6
145:18,24 203:23
206:2 210:14
**e.g** 156:3 177:24
189:3
**earlier** 38:15 54:23
76:8 96:9 136:23
176:25 179:19
194:25
**early** 58:7,8 89:15
89:17 175:11,24
**EARM** 177:18,19

180:12,22 182:12 190:24 207:5
**easier** 141:18,19 171:24
**easiest** 26:19
**eastern** 30:17
**easy** 172:22
**ECF** 53:8
**educated** 44:5 58:17
**education** 23:25
**educational** 9:10
**effect** 97:2,14 136:25 137:3,5,7 137:14 142:5
**effectuate** 133:14
**efficiently** 166:8
**egregious** 100:21 100:25 101:7 155:16
**eight** 171:7
**either** 16:12 48:12 84:19 176:7
**electronic** 180:19
**eligible** 111:22 113:18,24 136:14 137:21
**elimination** 191:11
**embassy** 163:13
**Emily** 4:24
**Emma** 4:23
**employee** 88:22 89:19 126:7,16
**employees** 10:24 126:9 157:11
**enable** 142:24
**encounter** 20:8 204:18 205:12
**encountered** 20:4 55:19 205:16 206:22
**encourage** 82:21
**enforce** 69:13,17 132:19 134:5
**enforcement** 4:17 9:14,20 10:7 11:18 14:4,15 21:14,16,25 63:21 65:6,22,23 67:5 67:10,12,14 68:3 70:3 121:17,18 123:20 125:23 126:13 127:4,14 129:6,8 130:19 131:2,3,5 132:5 132:14 135:4 152:9 187:4
**enforces** 110:20
**enforcing** 70:3
**engage** 85:19
**England** 14:6
**ensure** 51:7 62:13 63:9
**ensuring** 54:5
**enter** 42:6
**entered** 187:12
**entering** 195:11,17 196:18
**entire** 51:9 54:20
**entirely** 204:4
**entitled** 32:6
**environment** 142:7
**equipment** 43:9 189:3 190:12,14
**ERA** 124:18,22 127:7,8,11 128:8 130:16,16 131:10 131:11 187:4,6,10 187:13,16,19,21
**ERAs** 123:16 124:2 125:15 129:16,17 187:9,12,14,19,24 188:6,6,8
**ERO** 62:12,25 63:19 146:22 148:4,7 162:5
**erroneously** 57:6
**error** 128:17
**errors** 179:23 211:7
**escaped** 19:23
**ESQ** 3:9,10,11,13 4:8,9,15,20
**essential** 190:14
**et** 1:7,10 5:18,18
**evaluate** 40:7 76:11 139:18,21 174:8 181:4,10
**evaluation** 38:24 40:13 76:20
**Eve** 4:15 6:20
**events** 9:6
**everybody** 46:18 46:20,21 47:4,19 47:25 49:24 83:14 94:21 186:20 203:18
**everyone's** 58:10
**evidence** 57:6,15
**exact** 87:21
**exactly** 10:3,12 43:25 64:14 72:13 89:24 163:11
**EXAMINATION** 7:7 210:2
**examined** 7:5
**example** 15:15 17:24 18:3 49:16 98:11 162:10 163:5 180:4
**examples/tools** 194:17
**exception** 155:16
**Exceptions** 155:6
**Excuse** 111:2
**execute** 129:9 133:25 141:17 152:6 158:13 162:6
**executed** 25:17,22 158:25
**executing** 133:3 134:18 157:23
**execution** 163:23
**executive** 15:2 65:7 65:17 67:6 70:7 70:17,19,24 71:9 71:21 91:2 94:15 95:4,24 96:4 97:5 97:8 132:6,22 134:20
**exempt** 67:10,12 91:4 96:6 132:13
**exercise** 69:5
**exercising** 69:10
**exhibit** 25:2,6 52:21,24 53:20 62:8 73:8,13 131:25 145:3,9 146:10,15 147:2,4 153:4,4,9,10,13 165:6,12 210:6,7 210:9,10,12,15,18 210:19,20,20,22
**exist** 127:24 128:5
**existence** 70:5
**expect** 12:5 13:13 58:13 116:14 134:17
**expectation** 105:22 107:23 116:15
**expected** 16:8 75:22 76:6 178:3
**experience** 17:13 121:12 142:21 172:22
**experienced** 169:6 169:11 198:3
**expert** 54:19 55:2
**expertise** 55:9
**explain** 22:10 54:16 132:17
**explained** 15:6
**explanation** 141:11 141:14
**explanations** 140:18
**exposure** 40:11 112:3 166:9
**express** 90:5
**expressing** 41:22
**extensive** 22:5
**extent** 21:14,16 49:11 82:24 92:7 97:22 121:17 167:25 191:13
**extra** 167:15

**F**

**F** 209:1
**face** 117:17
**facilitate** 159:6,9
**facilitates** 159:2
**facilities** 171:19
**facility** 172:3
**facing** 22:18
**fact** 22:4 29:11 36:12 37:18 64:19 67:20 74:11 78:15 88:19 95:4 136:5 176:9 207:17 208:2
**factor** 135:20 138:13
**factors** 67:2 70:2 70:11 134:18,21
**facts** 90:15,18 117:24 211:6
**failure** 166:16,20 174:5,6,12,13,20 176:3 184:9
**fair** 83:16 108:20 110:7,12,18,21,23 111:4,5 114:14,16 114:18,20 135:4
**fairly** 126:6 131:7
**fall** 96:16
**falling** 140:23
**familiar** 26:23 33:4 33:10 35:9,18 40:2,24 50:2 61:2 111:20 151:20 160:3
**familiarity** 160:7
**familiarize** 24:17 24:19
**families** 112:24 114:5
**family** 112:16 128:7
**far** 98:19,22 126:3
**favorably** 107:6
**February** 89:17 127:5
**Federal** 9:14
**feel** 47:3 50:11,21 50:22 106:10 198:19 204:2
**feeling** 58:16 190:9
**feels** 58:8

**felt** 141:10,13
**fide** 110:5
**field** 10:6,20,22 11:5,22 12:24 13:24 14:19 15:8 15:10,20 16:22,24 17:7 18:12,13 19:18 20:23 23:7 23:13 30:7,23,24 31:14,16 32:13,18 32:24 33:3 34:5,9 34:11,14,15,19 36:7 38:16 39:17 39:22 40:23 42:15 43:2 51:6 54:14 55:7 56:11 59:13 59:23 62:13,16 63:2 64:3 66:4 71:13 72:7,11,17 74:25 76:9,22,25 78:5 82:15 83:3,4 83:8,21,23,23 86:6,7,8 87:18,20 92:3,10 97:11 102:10 111:25 122:14 124:25 126:7,19 140:24 151:7 152:12 153:5,21 159:19 161:18,21 166:3,9 167:6,10,12 168:12,16 172:2,8 176:18 183:17 184:12,16,20 191:24 192:11 193:19 202:6 206:5 210:21
**fifth** 4:6 155:9,21
**figure** 76:20
**figured** 80:7
**file** 47:7,12 56:22 57:7,16,19 120:2 161:24 166:17 174:13,18 175:8 176:3,8 180:25 181:19 182:4 198:23 199:2,4,5 199:18 205:8,9,10 206:24 207:3
**filed** 153:12
**files** 55:24 56:24 57:9,11,20
**filing** 5:13 26:5 28:15 153:12
**filings** 27:16
**filled** 161:6
**final** 64:18,18 66:13 69:18 96:2 109:9 111:21 112:12,20 113:15 113:23 114:12,25 115:6,21 133:9 136:13 137:20 143:10 144:15,18 144:22 156:12,16 163:22,24,25 164:10 201:5 202:5 207:18 208:3
**finalizing** 163:6
**find** 60:23 82:2 89:18,20 125:7 148:16 150:12 160:19 162:20 184:24 203:3 205:18 206:23
**finding** 17:7,22,24 180:2
**findings** 166:2,25 193:11
**fine** 33:18 131:16
**finesse** 191:16
**finish** 8:18 29:18 51:15 127:25
**finished** 55:15 99:3 111:12 128:3 193:3,7 195:2
**finishes** 124:15
**finishing** 180:21
**Firearms** 30:10
**fired** 122:16
**first** 20:16 25:11 26:4 28:20 29:25 30:2,14 32:2,15 34:6 35:5 36:6 39:13 62:9 63:17 72:3 74:2 91:23 100:6,6,8,13 101:10 106:6,14 106:16 107:13 108:17,17 113:11 126:4 148:8,9 150:5,17 153:16 154:19 155:13,13 156:21 160:21 165:23 167:5 170:12 190:18
**first-line** 14:10,11 14:20 29:22
**firsthand** 102:12 191:20
**five** 18:25
**fix** 123:5 128:17 167:24 170:3 171:4 194:10,14 195:22 197:4 199:23 200:24
**fixed** 168:22 169:3 179:3 188:9,11
**fixes** 170:24
**fixing** 50:20 178:24
**flew** 12:25
**fluid** 42:16
**focus** 157:16 171:8
**FOD** 15:23 16:4,10 19:11 21:9 54:14 62:11,15,24 63:6 63:13 65:5 74:3,6 74:7,11,17 75:3 79:16 81:6,8,9,22 81:23,24 82:2 87:10,15 120:10 132:4,19 202:4,16 202:22
**follow** 168:2,18
**follow-up** 177:23
**followed** 70:17 118:17
**following** 5:5 13:9 26:8 70:24 71:8 74:7,12 95:18 109:24 118:3 142:19 165:25 177:16 202:7,12 202:18,24 204:7 206:6,15 207:10
**follows** 7:6 70:16
**foreign** 152:4
**forever** 69:10
**forgot** 70:13
**form** 5:7 100:9 105:6 108:6 116:17 120:22 128:22 129:22 174:14,19
**formal** 47:24 48:3 192:5,12 195:16 198:13
**former** 132:7
**forms** 174:13 176:3
**forth** 41:16 209:10
**forward** 50:3 68:25 72:2,10 76:21 123:18 195:5
**forwarded** 149:22
**found** 17:25 18:6,7 18:17 21:8 76:18 121:8
**four** 83:7
**fraud** 19:9 99:18
**frequent** 87:6
**frequently** 144:4
**Friday** 13:7
**front** 69:14,14 110:24 111:6
**full** 58:10 181:13 181:14
**full-time** 188:22
**function** 83:10,18
**functions** 14:4
**funding** 140:3,3
**furnished** 176:4
**further** 208:7
**future** 206:7

G

**G** 5:2
**game** 135:4
**gathering** 203:10
**general** 22:3 44:15 81:11 90:19 104:25 125:3 154:19,20 155:6 155:17
**generalities** 38:2
**generally** 12:17 16:2 33:5 35:19 40:25 47:6 80:2 86:13,18 99:22,25 127:23 142:14 151:20,22 161:9 162:22
**generated** 139:16
**Georgia** 9:15
**getting** 18:9 22:18 44:4 48:14 182:6 183:19 190:11 194:2 198:10,14 204:6
**Gillespie** 3:13 6:11
**gist** 44:15
**give** 17:24 29:4 76:17,19 165:2 180:4 192:3,5,10 197:16
**given** 26:8 163:16 164:19 184:14 186:17 207:15,24 209:12
**gives** 141:23
**giving** 28:21
**Glynco** 9:15
**go** 11:11,12,25 12:7 12:9 26:3 34:18 48:14 67:13,18 68:25 72:10 76:25 79:20 80:6 81:8 81:10 103:17 105:22 115:22,25 117:11,14 122:7 126:25 131:6 142:16 148:16 149:4 154:13 161:16,17,19,19 165:23 172:12 188:15 189:11 201:18 203:4 205:17 206:20,24
**go-by** 49:9
**go-bys** 48:21 49:17

194:24
**goal** 69:17 162:7
 163:22
**goes** 107:22 131:2
 145:22 196:9
**going** 12:6,8,9
 17:15 28:13 34:18
 37:21 41:10,22
 42:15 43:2,23
 50:2 63:13 64:14
 73:2 77:12 81:10
 81:14,18,25 83:13
 83:22,24 91:20
 93:3,6 96:20
 101:19,24 107:11
 107:12,23 108:4
 112:8 116:6
 117:21 122:2
 126:25 131:17
 136:17 142:11,11
 148:15 161:11
 162:9 163:19
 168:2,14,20,20,25
 169:2 172:24
 189:19 192:2,4,10
 192:18,24 197:7
 201:20 203:17
 204:13
**Gomes** 148:20
**good** 7:9,10 33:14
 35:22 57:3 108:11
 131:14
**good-sized** 58:12
**Goold** 4:23
**Gordillo** 1:7 5:18
**govern** 158:6
**government** 6:22
 42:5 81:19
**graduate** 9:22
 130:25
**graduated** 9:23
**graduating** 126:19
 130:23
**granularity** 84:16
**Greenbaum** 184:18
 192:22
**group** 31:17 38:25
 44:9 46:11 139:3

186:13
**Guarna-Armstro...**
 145:13 151:8
**guess** 17:23 19:2
 22:13 35:4 42:23
 74:20,23 84:6,23
 98:5 100:11 110:9
 111:17 117:3
 125:9 147:22
 157:21 159:24
 162:20 178:4
 179:2 189:19
 191:12
**guessing** 76:15
 89:17
**guidance** 45:2
 56:13 69:25 70:5
 70:9,15,16,19
 95:18 97:19,25
 98:3,4,7,10,14,20
 134:25 185:23
 186:6,17,21,24
 187:2 197:16
**guy's** 173:6,8
**guys** 131:15 208:8

**H**

**H** 210:5
**habeas** 16:23 18:16
 18:22 28:3
**Hale** 2:12 6:8
**half** 30:17
**hand** 209:19
**handed** 25:5 52:23
 73:13 146:14
 165:11
**handful** 33:25
 60:25
**handing** 145:8
 153:8
**handle** 151:13
**handled** 10:25
**handling** 151:17
**happen** 48:5 90:2
 93:6 120:21
 149:25 168:5
 206:9
**happened** 18:18

34:19 45:21 50:7
 56:21 61:7,13
 81:20 84:3,12,20
 87:7 104:18
 120:23 121:7
 127:5 159:16
 180:2 203:24
**happening** 29:7
 141:14
**happens** 60:2 81:19
 150:22
**happy** 80:2 120:4
**hard** 40:19 41:19
 49:4 83:10 84:5
 123:25 148:16
**hardship** 114:4
**Hartford** 203:21
**header** 154:6
**headquarters**
 16:18,19 30:10
 41:14,18 48:4
 75:10 77:16 79:7
 172:10 197:25
**hear** 30:2 111:2
**heard** 69:19 86:10
 101:15 103:9
 126:4 142:18
 152:11 158:15
 193:18 194:11
**hearing** 19:14
 50:14 142:21
**hearings** 61:17,22
 62:5
**heavily** 55:9
**held** 2:11 5:22
 118:12,15
**help** 12:16 31:7
 81:11 89:20
 196:15 198:20
**helped** 47:14,15
 188:14
**hereinbefore**
 209:10
**hereunto** 209:18
**high** 9:10
**higher** 171:9 172:7
**hire** 76:25
**hiring** 34:11

**history** 109:19,19
 109:22,23,23
**Hmm-hmm** 25:13
 30:5 63:24 99:12
 193:9
**hold** 30:11
**holding** 75:18 81:9
**home** 12:7
**Homeland** 132:8
**hoops** 167:15
**hope** 47:15 128:14
 202:8
**hopefully** 119:12
 190:8
**hospital** 96:16
**HRIFA** 156:3
**huge** 47:18 50:15
**hurt** 175:11
**husband** 29:4

**I**

**I-130** 28:15 68:18
 69:23 78:19 85:16
 99:21 101:12,20
 101:22,25 102:11
 103:15,18 105:18
 105:21,22 106:3
 106:15,17,19,24
 106:25 107:6,12
 107:22,24 108:9
 108:16,21 109:24
 110:4 113:12
 114:25 115:7,17
 115:22 117:10,11
 118:3,6 133:11
 134:2 142:10,19
 143:2,9 156:22
 157:2 202:7,13,18
 202:24 203:10
 204:7 206:7,15
 207:10,19 208:4
**I-130s** 64:4 66:5
 134:15
**I-229** 174:14
**I-229s** 174:20
**ICE** 10:7 11:18
 14:15 20:19 28:17
 33:11,16 35:19

39:3 40:25 41:24
 48:4,17 68:15
 70:10 84:8 98:24
 99:5 100:14,19,22
 101:2,10,12,18
 102:9,19,22 103:4
 104:11,15,16
 105:4,14 108:21
 110:20 114:23,24
 115:4,5,8,9,15,16
 115:18 118:9
 125:4 133:3,8
 140:15 141:16
 142:10,24 143:8
 143:22 144:5,13
 147:24 148:5,13
 149:2,14,16,17
 150:6 151:12
 152:5,20 156:24
 157:14,22 158:6,9
 158:11,20 159:6
 159:13 160:15,19
 162:3,5,16,17,21
 166:16 171:4
 172:14 202:5
 206:4
**idea** 103:8 135:22
 149:19 160:15
 186:2
**Ideally** 161:18
**identification** 25:4
 52:22 73:10 145:7
 146:13 147:5
 153:7 165:10
**identified** 7:3 39:4
 177:17
**identifiers** 147:21
**identifying** 166:5
**IGSAs** 173:18,20
**illegal** 28:11 118:16
 155:14
**illegally** 111:19
 114:15 117:6
 155:2
**imagine** 116:25
**immediate** 108:18
 149:24
**immediately** 121:8

150:16 174:24
202:6 207:19
208:4
**immigrant** 112:14
112:22
**immigrate** 111:16
**immigration** 4:17
6:16 9:24 19:15
57:14 84:10
147:17 151:24
153:18 162:6
**impact** 42:7 127:17
127:21 190:9
**impeded** 83:17
**impedes** 82:24
97:22
**implement** 197:19
197:20 201:7,11
**implementation**
54:4 57:24 70:18
70:20 94:15 95:19
132:21,23 133:17
133:22 179:24
186:8
**implemented** 136:9
136:11 189:25
201:14,16
**implied** 159:15
**importance** 47:22
**important** 29:15
127:15 129:4
**improper** 60:7,12
130:11
**improperly** 17:8
57:6
**improved** 50:13
**improvements**
38:16
**improving** 50:12
**inaccurate** 8:24
**incentive** 140:19
**include** 54:8
155:20
**included** 54:12,16
146:2
**includes** 5:8 21:14
21:16 92:7
**including** 132:14

142:7
**inclusive** 203:8
**incomplete** 8:24
180:20
**inconsistent** 71:20
97:4
**increased** 46:15
**indicated** 63:12
93:3 181:16
**indication** 161:7
178:2
**individual** 56:10
69:7 79:8 91:4
93:2 103:5 104:21
107:4 108:24
117:4,5 122:12
123:3 158:18
163:11 205:2
**individuals** 65:21
66:9 67:9,11
78:17 85:2 88:6
92:21 101:12
104:15 105:3
108:4 125:25
137:19 160:20
163:16 173:12,15
173:17 174:7
202:12 203:12
205:7 206:14
207:9
**inexperienced**
121:5
**influencing** 130:7
**inform** 94:2 128:15
**informal** 45:23
46:5,17 197:6
198:10,15
**informally** 197:13
197:14
**information** 17:14
20:21 21:17,25
48:13,17 71:24
99:17 143:15
144:21,25 147:23
159:23 161:6
180:20 181:3,9,21
183:20 192:9,10
192:11 203:11

204:13,21 206:23
**informative** 130:22
**informs** 104:15
143:8
**infrequent** 86:18
131:8
**initial** 24:12
**initially** 134:10
**input** 57:5 177:13
**inputted** 204:22
**inputting** 191:21
**inquired** 89:19
**inquiries** 41:15
**INS** 103:21
**instance** 14:5 18:8
84:5 128:16
129:13 130:15,16
134:9 167:20
**instances** 85:23
164:17 181:17
186:14
**instruct** 94:19
135:10
**instructed** 24:18
91:14,18 124:18
129:18
**instructing** 123:14
125:24
**instruction** 124:6
125:25 207:15,24
**instructions** 121:2
121:4 125:22,25
**instructs** 135:13
**insufficient** 169:6
170:10
**intake** 174:24
196:10,11
**intend** 65:5 132:4
132:18 162:3
**intended** 78:15
**intending** 160:16
160:19 162:18,21
201:11
**intent** 201:7
**interaction** 20:13
31:4 162:24
**interactive** 128:14
**interest** 41:22

**interested** 34:14
209:16
**interests** 41:10
**intergovernment**
172:5 173:21
**interim** 10:6 15:7
15:18 16:4,10
36:7 54:14 62:15
65:5 71:12 72:7
74:3 79:16 87:10
87:13 132:4,19
202:4,16,22
**internal** 48:18,18
**interpret** 95:10
**interpreted** 24:22
63:20
**interrogatory** 95:8
95:8
**intervened** 128:17
128:20
**interview** 34:21
68:18 69:22 99:21
100:2 101:20,22
103:2,7,17,17
105:23,25 106:20
106:23,24 107:5
107:11,13,22
108:9,21 109:24
110:4 115:2,7,22
116:6 117:10,11
118:4,7,10 142:10
142:19 143:10
154:3,7,15,21,24
155:18,19 157:2
158:5 160:9 202:7
204:7 207:19
208:4
**interviewed** 34:8
39:16,17,21
**Interviewing**
153:24
**interviews** 31:7,13
31:19,25 32:11
34:24 39:20 78:20
85:16 98:25 99:7
101:13 102:11,18
105:19,21 115:17
141:17 143:2

159:12 163:18
202:13,18,25
203:10 206:7,16
207:11
**introduce** 6:5
**investigator** 9:23
**involve** 145:24
**involved** 11:3
16:20,23 34:21
36:20 77:17 92:13
102:24 167:13
168:13
**involvement**
172:10
**involves** 197:8
**involving** 185:15
**issue** 19:22 23:15
38:2 47:10 56:3
56:17 60:7 67:7
126:16,18,23
152:9 170:16
171:22 174:17,22
175:14 176:5,12
176:23 178:5,7
182:3,15,21 185:6
187:5 188:4,9,20
191:23 194:6,14
195:23 197:5,8
199:14,24 200:25
**issues** 10:24 22:12
22:13 23:4,16
39:5 42:13,25
47:5,10,16 48:7
50:14,15,23,25
51:7 54:8,12
55:20 86:10 91:16
177:9 182:6 183:2
183:22,25 184:4,6
185:15 189:14
195:25 200:6,8

**J**

**J** 1:15 2:11 25:15
73:9 208:17 209:9
210:3,6,10
**jail** 177:25 182:2
183:19 200:9
**James** 39:11 62:2

72:16 196:3
**January** 31:2 87:25 89:16 148:16 149:4,8
**Jennings** 11:14 14:24 15:3 79:15 80:23
**Jimenez** 1:6 5:17
**job** 1:25 13:23 43:10 79:22 111:25 123:2,19 123:20 127:8,15 170:18 171:2,3 190:15
**JOELLEN** 4:20
**John** 4:12 132:8
**joint** 101:4 189:11
**Jones** 4:25
**Joseph** 4:12
**journeyman** 187:16
**judge** 24:5 28:23 45:6 61:10 63:15 118:15 162:6
**Judge's** 69:17
**judges** 28:4
**judgment** 35:16
**judicious** 94:23
**July** 1:17 2:6 5:23 145:15 146:19 147:15,16 209:19
**jump** 167:15
**juncture** 70:15 100:21
**June** 12:25 24:6 25:10 27:4,8 40:10 51:14 53:21 71:16 72:8 73:19 74:5,14 131:25
**justice** 6:15 9:13
**JUSTICE/CIVIL** 4:5,11
**justify** 155:16

**K**

**Kase** 4:24
**Katherine** 4:25
**Kathleen** 3:13 6:11
**keep** 83:13 140:19
**Kelly** 95:19,20 132:8,21 186:9
**Kelly's** 70:18,20 95:25 133:23 186:18
**Kevin** 180:9 195:4
**Kevin's** 191:25
**kind** 34:13 36:16 38:2 42:16 43:17 44:2 46:13 68:3 81:10,11 100:2 112:9 133:21 160:23 164:19 191:6 193:20
**kinds** 50:13 123:5
**Kirstjen** 1:10 5:18
**knew** 41:2 78:23 79:6 83:11 112:7 117:8 136:10 137:7 150:10
**know** 8:9,25 12:14 12:15,21 13:18 16:2,6 17:17 18:9 18:10,11,13,17,21 20:10,11,20 22:22 22:24,25 24:2,10 24:14 27:24 28:13 29:7,8 30:8 31:4 31:22 32:10,14 33:13,19 34:25 35:7 36:22 37:10 37:13 38:7 39:11 39:16 41:4,13 42:11,17,19 43:14 43:16 44:8,9,20 45:2 46:18,25,25 47:10,17 49:24 50:16,18 51:5 52:3,3,4,4,6,19 53:9 56:4,5,9,20 56:21 57:11 58:9 58:9,10,18 60:16 60:18,24 61:14,14 62:21 63:3 64:13 64:14 66:15 71:17 71:24 72:16,17 74:24 75:3,6,17 76:4 77:6,13,14 77:14,16,17 78:13 78:14,25 79:7,13 79:14 80:2,7 81:7 81:10,11 82:12 83:14,22 84:12,13 84:15,23,24 87:7 87:9,21 88:5,9 89:7 90:17 91:18 91:22 92:2,14,16 93:14,15 94:10,18 94:25 95:6,11,14 95:17 97:10,12,13 98:4,14,19,22 99:13 100:11,23 101:4,6 102:5,6 102:12,20 103:24 104:4,5,9,14 106:13 110:6 113:21 115:20 116:9,13,18,21,22 117:23 118:8 119:5,9 120:5 121:15 122:9,15 123:4,22,24 124:17,24 125:8 125:12,16 126:3,6 126:10,15,22,22 126:24 127:20 129:17,25 131:8 133:17,18 135:15 135:16,20,23 136:8,12,18,18,20 137:15,19 138:2,3 138:9,11,13 139:3 140:2,16,17 141:4 141:11 143:3,4,7 143:12,16,19,20 143:25 144:4,8,17 144:20,21,22,22 144:24,25 146:7 147:14 148:6 149:18,19,21 150:10,14,25 152:24 157:7,18 157:19,20,24 158:9,14 159:5 160:22 162:14 163:15 164:22 165:19 167:18,19 168:25 170:19,22 171:10 172:9 173:2,4,6,7,13,16 178:24 179:3,9,11 180:4,24 181:22 182:5 183:24 185:8,15,19,22,23 186:4 187:11,14 187:17 188:8,11 188:23 189:9,11 189:18,20 190:8 190:10 192:4,7 193:17,21,23 194:2,4,8,9,22 196:5,8 198:9 199:17 200:3,10 200:13 201:2 202:9 203:2,5,7 203:16 205:22 206:9,20 207:14
**knowing** 44:2 90:15 116:4 206:20
**knowledge** 26:13 27:7 61:7 124:8 140:7 143:14 152:8 191:20
**known** 114:23 115:4
**knows** 42:19,21 86:5 101:19 142:10

**L**

**L-i** 160:4
**label** 5:15
**labor** 168:4,15
**lack** 22:12 43:21 47:6 48:21 104:8 167:5 170:10 185:2,18,21 187:3 188:5 190:14,22 193:14,23 194:3 194:16 197:2
**laid** 70:10
**land** 76:11
**Lane** 3:14
**Larakers** 4:8 6:14 6:15 17:9,16 21:15,21 23:10 27:14,18 31:23 49:10 52:17 72:22 75:5 76:7 77:22 78:10,21 79:17 80:11 81:5 82:23 86:2,15,23 87:3 92:6 97:21 98:12 98:17 99:2,16 100:9 102:2 103:6 103:20 104:13,23 105:6,16,24 106:4 106:8 107:17 108:6,12,15,23 110:8,22 111:9 114:19 115:19 116:8,12,16 117:12,15,20 118:18 120:13,22 121:16,23 122:3,6 122:20 123:8,13 125:18,21 126:5 127:19,25 128:22 129:19,22 130:8 130:13 138:10 139:20 157:6 162:19 177:10 181:12 193:6 204:10,24 206:8 208:9
**large** 33:23 172:2
**last-minute** 79:23
**late** 24:6 51:20 55:17 87:11 88:3 89:16 174:18,19 193:4
**law** 9:14,20 18:3,5 18:11,12 21:14,16 21:24 121:17 156:2,9
**Lawrence** 145:19
**laws** 110:19
**lawsuit** 89:5
**lawyer** 44:23
**lawyers** 44:21,24

**lay** 76:10
**lead** 149:23
**leadership** 62:12 62:25 63:19 132:25
**leads** 99:18
**learn** 20:16,24 28:20 29:25 34:6 39:13 72:3 91:23
**learned** 22:24,24 32:15 35:6
**learning** 45:3
**leave** 12:10 13:5 58:6 81:15,21 124:19,20 128:21 164:8,9,14 201:9
**leaving** 41:10 42:3 163:7
**left** 13:6 51:20 61:20 72:13 74:19 75:20 88:2 91:5 128:11 192:19
**legal** 6:2 24:23 28:19 102:2 104:22 105:2,12 107:14
**legally** 110:25 111:7,14,16
**let's** 48:10
**letters** 155:25
**level** 16:18 24:2 47:18 48:11 50:22 83:20 84:16 96:19 160:6 170:22 171:9 172:7 197:11
**levels** 46:7,9 47:2
**Lexington** 3:15 6:13
**Li** 160:4,16
**liaison** 177:25 182:2 183:19
**license** 7:4
**lift** 59:8
**light** 54:7
**likelihood** 117:8
**Lilian** 1:6 5:17 109:5 117:24 149:5,10
**limit** 32:4
**limited** 155:21 188:13
**limits** 96:11,14
**line** 47:21 162:2 170:12 211:8,10 211:12,14,16,18 211:20,22
**link** 159:25 160:2
**list** 96:22,25 97:17 147:13,13
**listed** 132:20
**lists** 23:5 26:9 166:16 189:21
**litigation** 6:16 16:21 17:4,13 18:15 20:9,17,25 22:5 23:21 28:8 35:24 36:3 61:17 73:17 76:15 81:7 119:17 120:7 127:24 128:5 136:17 137:16 166:9
**litigious** 26:17 44:20
**litigiousness** 24:3
**little** 12:6,9 15:6 23:25 24:13 27:15 34:25 35:11,14 40:3,18,19 44:5 167:12 168:13 191:15
**live** 7:15,16,17
**lived** 109:8
**lives** 127:18,21
**LLP** 2:12,13
**lobby** 24:11 26:17 62:21 63:11,12 64:6,17 71:22 72:5 77:7,11 91:20,21,25 94:11 94:13 95:9
**local** 62:12,25 63:19 195:4
**located** 66:18
**location** 34:12 86:19 96:10 98:15 141:25 171:25 199:9,10,20 205:6 205:9,18
**locations** 96:13,17 96:23,25 97:13 178:19
**long** 10:2 12:2,3 30:12 35:16 40:12 79:20,22 89:23 141:10,11,13 163:3 168:18,24 168:25 207:22
**longer** 12:7 64:4 66:4 166:22 168:23
**look** 25:16 55:16 62:7 89:18 120:4 125:6,8,9 131:24 132:11 139:15,19 139:24 145:9 154:18 155:9 160:11,22,23 181:24 185:14 203:4 204:16
**looked** 10:3 87:8 102:15 109:21 121:8 150:18,23 171:12
**looking** 20:2 140:13,16 172:18 204:14
**losing** 168:7
**lost** 79:12
**lot** 23:24 29:8 31:4 37:9 42:15 43:23 44:17,19 50:20,23 116:20 141:18 172:11 185:13,16 191:20
**Louisiana** 25:18
**love** 188:12
**low** 141:2
**lower** 48:11
**Lucimar** 117:25 128:6 148:20
**Luis** 1:7 5:17
**lunch** 131:15
**Luncheon** 131:19
**Lyons** 13:22 33:19 33:21 34:7 39:22 42:21 61:24 63:5 63:6,13 71:11,18 72:6,10 74:6,11 75:21 77:4,16 78:11,12 80:18 81:14 82:3 92:10 94:8 95:23 146:11 146:16 210:16

**M**

**M** 1:10 3:13 5:18
**MA** 3:8,15 4:14,19
**macro** 170:22
**magic** 67:15,16
**mailed** 183:21
**main** 177:16
**maintain** 166:7
**major** 55:20
**majority** 131:5
**making** 36:16 43:4 43:5,6,8,11,18 67:3,11,25 70:3 78:23 86:22 88:13 88:17 91:15 93:22 97:20,25 98:21 100:14,18 101:10 101:11 134:22 147:24 155:16 178:21 182:7 186:21
**manage** 69:15,16 171:24
**management** 43:16 44:9 83:20 84:2 92:12 121:3 122:23 124:4 161:4 171:9 176:23,24 177:16 177:20 185:24 186:17
**managers** 58:14,16 93:9 175:4
**managing** 182:19
**mandated** 184:12
**manner** 76:5
**manual** 152:12 153:6,21 159:18 159:19 210:21
**March** 127:6 166:4 196:3
**mark** 121:23 122:7 145:4 210:12
**marked** 25:4,6 52:21,24 73:9,13 145:6,9 146:13,15 147:4 153:6,9 165:9,12
**marking** 122:5
**marriage** 19:9 66:24 110:5 209:16
**married** 28:10 67:21 109:11 112:13,21 113:16 113:23 117:6
**Mary** 4:8 6:14 32:2 129:24
**Massachusetts** 1:3 1:16 2:13,17 5:20 5:23 6:13 7:4,21 120:18 209:2,8
**Masters** 145:4 210:13
**Matias** 61:3
**matter** 5:16 26:9 54:19,25 68:17,21 68:22 90:19 110:10 125:4 133:3,8 209:17
**McCullough** 3:11 6:10
**mean** 10:12 11:12 15:7 18:20 27:13 28:22 29:8 30:22 36:11 38:22,24 40:11 42:4 43:14 44:11,16,22,23 45:15 46:8 47:9 47:19 48:16,19 49:7 52:11 56:22 57:20 59:8 65:23 67:15 68:21 69:2 69:3,8 70:6,12

72:12 75:9 76:15 78:11 80:5 84:17 86:6 92:20 96:12 97:14 101:11 104:25 107:18 108:16 111:8 115:9 116:19 117:25 119:12 121:6 126:22 128:12 133:2,7,19 150:20 153:2 158:6 159:3 163:11,21 164:17 169:16 177:12,15 181:15 182:20 186:12 190:8 193:16,25 199:5
**meaning** 157:19 186:5 200:14
**means** 38:23 132:18 133:12 169:17 185:18 193:22,24,25
**meant** 146:9 153:14
**measures** 167:23 170:2
**mechanism** 195:15 203:9
**media** 44:18 92:22 94:21
**medical** 12:8 126:16,18,23
**meet** 139:12
**meeting** 58:4,12,12 93:9,18 164:13,14 175:4 176:17
**meetings** 43:16 47:20,21 112:5
**memo** 70:18,21 94:16 95:19 100:19,23 101:5,5 132:21,23 133:17 133:18,18,21,22 134:5,21 165:6 186:8,18 210:22
**memorandum** 95:25 96:5 132:7
**Memorial** 11:8 12:21
**memory** 205:25
**mention** 22:20 89:4
**mentioned** 22:9,22 27:3 51:22 89:3 90:9
**mentor** 48:15
**mentor-type** 45:24
**mentoring** 46:17 197:6 198:10,15
**mentoring/traini...** 196:20
**Merit** 2:14
**met** 30:12 175:5 189:5
**method** 205:22
**Michael** 1:24 2:14 6:3 209:6,22
**Michaela** 3:9 6:7
**Michigan** 7:16,17 7:18 9:11 173:19
**midday** 13:2
**middle** 73:25
**Miguel** 165:8 210:23
**mind** 105:10 179:22
**mine** 24:4
**minimize** 114:4
**minimizing** 166:8
**minutes** 201:19
**misinterpreted** 95:13
**missed** 204:2
**missing** 177:6,22 178:21,22,22 181:21
**misspoke** 85:4 137:6,9
**mistake** 124:7 128:15 129:15
**mistakes** 123:6
**misunderstanding** 95:15,16
**Moakley** 4:12
**Monday** 13:9,12 28:22,24
**months** 80:3 83:7 117:17 118:13 119:4,10,14 168:22
**morning** 7:9,10
**Morton** 140:15
**motion** 28:23
**motions** 5:8 24:4
**moved** 57:20 187:14,17
**moves** 199:8
**moving** 199:19
**multiple** 18:15 28:2 50:11 77:2 79:23 83:3 144:2,11 150:21 151:2,3 171:18 172:4,4 188:16 203:11
**multitude** 88:24 141:20
**musters** 186:12

**N**

**N** 3:2 4:2 5:2 210:1
**NACARA** 156:3
**name** 5:25 6:14 7:12 15:5 53:14 61:2 121:20 160:4 160:5 180:8,10 211:1,3
**named** 17:3 109:5 120:17 148:22
**names** 24:10 58:10 149:5
**narrative** 177:23 207:6
**Nathalie** 15:5 81:3
**national** 91:15 98:3 98:6 99:18 115:10 133:20 197:11 198:23
**nationals** 152:4
**native** 147:2,8 210:18
**Naturalization** 9:25
**nature** 178:2
**necessarily** 40:22 106:22 134:12 143:24
**necessary** 45:13
**need** 8:13 17:23 22:14 24:22 43:10 48:11,13 81:6,7 94:23,24 105:17 129:25 140:7 164:22,23 168:20 168:20 176:13,15 186:11 189:15 190:7 198:11
**needed** 44:25 45:16 57:11,13 93:4 100:22 134:11 166:7 181:10 190:14 191:13
**needing** 140:22
**needs** 46:21,22 48:2 122:23 189:3 189:22 190:2
**negate** 96:18
**never** 41:2 80:20 93:19 98:20 101:6 119:24 154:9,11 157:22 158:15,16 193:17
**new** 4:18 14:6 22:15 25:17,22,24 38:5 45:2,17 48:12 69:9 83:21 126:7,8 187:9,12 191:15 193:21 196:20 197:2 198:9
**newer** 22:14 56:13 197:15
**NFTS** 199:21
**Nielsen** 1:10 5:18
**night** 35:13 193:4
**nine** 18:14 30:20 39:8
**nods** 26:6
**non-citizen** 143:9 207:18 208:3
**non-citizens** 84:9 85:15 105:13 112:12,20 113:15 113:22 114:24 115:5,21 133:9 134:2 138:17 202:4,17,23 206:5
**non-detained** 58:4 121:4 187:22
**non-government** 112:5
**nonviolent** 142:15
**Northwest** 4:6
**notary** 2:16 5:12 7:5 209:6
**noted** 51:7 208:13
**notice** 25:2 47:7,11 54:6 163:16,19 164:19,25 174:12 175:8 176:2,8 182:4 210:7
**notices** 152:10 174:5
**notification** 166:18 168:6
**notifications** 166:17
**notified** 121:7
**notify** 63:15
**November** 145:18
**now-Deputy** 39:21
**number** 5:15,20 8:7 60:23 139:7,8 155:6 179:22
**numbered** 148:15
**numbers** 138:24 139:15,19,24 140:8,14,17,20,21 140:25 143:6 147:8

**O**

**O** 5:2
**O'Connor** 1:24 2:14 6:4 209:6,22
**oath** 7:24
**object** 129:24
**Objection** 17:9 21:13,15 23:10 31:23 49:10 52:17 68:20 70:25 75:5

76:7 77:22 78:10
78:21 79:17 80:11
81:5 82:23 86:2
86:15,23 87:3
92:6 97:21 98:12
98:17 99:2,16
100:9 102:2 103:6
103:20 104:13,23
105:6,16,24 106:4
106:8 107:17
108:6,12,15,23
110:8,22 111:9
114:19 115:19
116:8,12,16
117:12,15,20
118:18 120:13,22
121:16 122:20
123:8,13 125:18
125:21 126:5
127:19 128:22
129:19,22 138:10
139:20 157:6
162:19 177:10
181:12 193:6
204:10,24 206:8
**objections** 5:6 32:3
32:4 130:6,10,10
130:11
**obtain** 9:16 105:12
106:14 107:14
113:11 156:22
163:5
**obtained** 163:10
**obtaining** 104:22
105:2,11
**obviously** 42:19
43:25 83:11 130:6
190:19
**occasion** 35:15
84:4
**Occasionally** 57:4
**occur** 45:16,19
89:13 96:20 133:6
**occurred** 46:2
50:16 56:4,20
58:21 84:23 88:20
108:9 121:11
147:14,15 150:11

179:23 182:13
204:15,16
**occurring** 115:13
178:17 198:18
**occurs** 57:12 86:17
150:20,22
**offered** 11:23
**office** 6:16,21 10:7
10:17,20,22 11:5
12:24 13:2,24
15:8,11,20 16:22
16:24,25 17:3,7
17:22,25 18:12,13
19:18 20:23 22:4
22:7,10,16 23:7
23:14 29:6 30:7
30:23,24 31:15,16
32:13,18,24 33:3
33:25 34:5,9,11
34:14,15,20 36:7
38:17 39:5,18,22
40:23 42:15,20
43:3,8 46:7,19,20
47:14,25 49:25
51:6,19 54:14
55:7,10 56:11
59:13,23 60:16
61:11 62:13,16
63:2 64:3 66:4
69:22 71:13 72:7
72:11,17 74:25
75:15 76:9,20,23
76:25 78:5 81:11
82:16,22 83:3,4,8
83:18,21,23,24
86:7,7,8 87:18,20
91:5 92:3,11,11
93:4 97:11 102:10
104:20 108:20,22
111:25 121:7
122:14 124:25
126:7,19 138:17
139:7,10,12 140:6
140:9,24 151:6,7
161:18,22 166:3
167:6,10,12
168:12,16 169:24
172:8 174:8

176:19 183:17
184:12,16,20
191:25 192:11
193:19 195:4
197:3,23,24 202:6
203:22 204:15
206:5
**Office's** 166:9
**officer** 46:3,4 55:5
120:23,24 123:19
124:5 126:17
127:3 128:25
130:21,25 138:18
139:8,10 154:21
158:19 164:21
169:12,17 177:25
181:19 200:3,11
200:16
**officer's** 123:2
182:8,11
**officer-alien**
121:11
**officers** 44:25
46:16 47:21 56:6
56:14 64:5 69:10
70:2 86:9 93:14
115:18 151:10
170:5,7 171:8
175:17,20,21,23
176:18 182:2,10
183:19 185:23
186:2,7 188:16
191:14 192:7
194:17 195:20
196:16,21 197:3
197:22 198:4,10
200:22 201:3,4
205:3,5,19,23
207:16,25
**offices** 2:11 68:16
84:10 85:2,7,9
86:22 87:2,6 88:7
88:10,14,18 89:9
90:7,22 93:21,23
96:22 97:16,20
98:2,21 106:20,23
114:13 133:4
139:16 143:2

151:3 156:25
158:25 172:2
**official** 46:24 97:19
97:24 98:3,4,6,6
98:20 134:24
**oftentimes** 108:3
**oh** 19:12,24 21:15
58:3 80:22 89:14
99:11 155:12
160:12 180:22
194:23
**Ohio** 173:19
**OJT** 127:11,12
193:20
**okay** 12:23 15:25
18:19 24:20 37:3
52:9 53:2,20
72:21 80:4,8
105:8 109:21
110:16 113:13
128:18 130:13
137:9,24,25 139:2
145:16 148:18
156:20 157:10
159:17 160:3
163:15 165:22
173:11,11,16
183:7 193:14
**old** 181:7
**on-the-job** 127:13
131:9
**onboard** 45:2
**onboarding** 36:6
**once** 21:8 60:10
69:21 94:20
163:21 164:9
187:8
**one-off** 203:21
**ones** 145:23
**ongoing** 45:23
76:14 81:7
**open** 94:22 159:22
**operating** 166:8
186:20
**operational** 11:2
14:4
**operations** 10:8
11:19,22 14:5,16

14:19 42:16 62:12
62:25
**operators** 44:21
**opinion** 28:16 33:7
40:14 90:5 120:25
173:6,9,12,13
**opportunity** 33:24
38:6 193:11
**opposed** 59:6
130:22
**option** 12:15
**order** 24:5,12,13
24:13 27:4,9
28:23 36:14 37:8
44:13 51:23,25
52:5,12,14,21
53:6 64:18 65:7
65:17 66:13 67:6
69:17,18 70:8,17
70:20,24 71:9,21
91:2 95:5,14,24
96:4 97:5,8
101:23,24 106:2
109:9 111:22
114:12 128:8,13
129:20 130:24
132:6,22 134:20
143:10 144:15,18
144:23 156:4,16
162:6,11,23,24
163:4,17,22,24
164:10 207:18
208:3 210:9
**ordered** 18:17 27:4
45:6 120:11,16,18
128:6,9 165:16
**orders** 24:3 26:15
26:15 64:18 66:14
94:15 96:2 112:13
112:20 113:15,23
114:25 115:6,22
123:17 124:3
126:2 133:9
136:13 137:20
156:12 163:25
202:5
**organizational**
112:5

**organizing** 194:18
**original** 53:9
**Orleans** 25:18,22 25:24 38:5
**outcome** 209:17
**outside** 11:10 17:10 31:24 64:22 80:5 110:25 111:7,15
**overlooked** 57:5
**oversee** 14:3
**overseeing** 169:13
**overwhelmed** 45:18 48:12
**owned** 57:9 199:3,3

**P**

**P** 3:2,2 4:2,2 5:2 165:7 210:22
**p.m** 131:20,20 201:22,23 208:13
**page** 25:16 26:4 53:22 132:3 153:16 154:12,14 155:5 190:21 210:2,6 211:8,10 211:12,14,16,18 211:20,22
**pages** 25:11 26:4
**Pahola** 1:6 5:17
**pains** 7:25
**panel** 31:18,20 34:13,21
**panels** 34:17
**paper** 29:9
**papers** 128:11 129:3 137:16 164:14
**paperwork** 16:17 43:4,11
**paragraph** 25:25 26:3,7 53:22 62:9 63:16 64:9 73:24 132:2 154:19 155:13 165:23
**part** 31:20 36:24 53:7 58:22,23,24 64:10,11 68:6 83:19 111:3 122:7 128:12 152:21 207:6
**partially** 201:14
**participate** 34:16
**participation** 116:11
**particularly** 207:17 208:2
**parties** 5:4 54:7 209:15
**parts** 22:15 95:11
**Party** 25:3 210:7
**pass** 47:18 123:24
**passed** 113:6
**passing** 35:12
**penalties** 7:25 71:5
**pending** 8:17 103:16 120:19 133:10
**people** 28:17 29:8 31:18 37:9,23 38:14 39:19 41:3 41:7,13,14 43:22 43:24 44:5,16 45:2,12 46:10,13 46:25 47:14 48:10 49:3,22 50:25 58:16 64:21 69:12 77:17 78:23 79:7 79:9 80:22 82:7 82:10 83:13 85:7 85:9,13 90:6 93:20,25 94:19 96:6 98:24 99:6 101:19 105:18,20 111:13 112:3,9 116:19 127:10 134:15 138:24 139:4 140:13 142:25 151:3 156:24 158:21 163:25 169:22,25 172:11 176:25 179:25 190:9 191:9,12 193:21 195:14 196:9,12 196:13 197:16 198:14,18,19 201:9,11 203:9 204:6 205:2,19
**people's** 127:17,21 189:20
**percent** 96:13 167:21 172:12 206:18
**performed** 177:18
**performs** 170:12
**period** 16:8,11 87:11 112:2 113:2 164:25 165:4 203:19
**perjury** 8:2
**permanent** 7:18 10:14 76:22 81:8 82:15 87:14
**permissible** 90:23
**permits** 66:16 133:5
**permitted** 114:22 125:2,3
**person** 15:14 19:19 29:18,19 30:4 48:25 57:3 66:17 77:19 78:3 111:17 121:5 141:20,21 142:7 144:12,22 144:23 162:4 163:9,10 164:20 164:21 177:7 180:6 200:20 205:13,15
**person's** 15:4 147:17
**personally** 58:2 93:2 171:13
**personnel** 140:4
**persons** 64:4 66:5
**petition** 154:22
**Petitioner** 117:24
**petitioners** 3:5 6:9 6:12 26:24 120:17 148:22 149:11
**phone** 11:6,10 75:7 90:3,4 93:13 144:12
**pick** 34:12
**Pickering** 2:12
**Piemonte** 4:15 5:4 6:20,20 21:13 68:20 70:25 110:13,16 124:14 131:16
**pile** 182:17
**Pine** 3:14
**pinned-in** 60:22
**Pirates** 11:10
**place** 22:8 34:24 43:6 60:2 75:18 92:24 98:8,11,15 100:8,12 101:16 103:10,13 167:24 170:25 175:9 195:15 204:19 205:11,20,24
**places** 96:24
**placing** 74:25 185:4
**Plaintiff** 6:8,12
**Plaintiff-Petition...** 1:8
**Plaintiffs** 28:16 109:6
**plan** 54:7
**planning** 50:9
**pleadings** 153:13
**please** 6:5 7:11 9:9 72:24 131:24 132:17
**POCR** 37:25 43:13 44:12 45:5,10,13 45:20 46:23 48:3 49:14 50:2 51:2 54:5 57:24 59:24 60:7,7,12 61:12 118:16 174:6
**POCRs** 22:18 46:11,22 49:7 166:21 184:9,13 184:21
**point** 88:20 89:3 92:25 100:19 102:14 103:25 104:2 131:14 155:10,21 169:5 170:11 171:17 174:11 176:2,22 181:25 184:8 185:2 187:3 189:2 190:13 194:16 195:10 196:19 198:22
**points** 167:3 196:4
**policies** 71:20 72:4 78:16 103:23 151:12 152:15,16 152:18,19 154:4,7 157:22 158:7,21 166:6,12
**policy** 59:22 67:5 70:6 71:3,4 85:6,8 85:10,12 94:6,9 95:4,7 96:13,17 97:2,13 133:15,16 157:8,9,10,14,17 157:19,25 158:10 158:12,16
**pool** 39:18
**poor** 114:20
**population** 171:18
**position** 10:9 11:23 12:12 13:16 15:13 32:18 34:9,15,20 40:23 41:11,18,23 42:3 62:15 71:15 72:11 74:5,22 76:5 80:19 81:9 81:15,21 89:21 120:10,25 122:24 125:9,10 127:4,7 127:9 130:16
**positions** 34:16 82:10,11
**possibility** 64:12 172:19
**possible** 22:13
**possibly** 69:13 107:14
**post-academy** 197:9
**post-order** 22:7 166:19
**postponed** 36:18

**potential** 42:14 56:3,7 95:15 140:18 168:10
**potentially** 36:12 37:24 41:16 57:13 96:15 99:20 117:17 141:20 144:11 171:7 182:11
**potion** 67:16
**power** 129:4,9
**powers** 129:2
**practical** 133:3,8
**practically** 133:19
**practice** 39:3 65:16 84:8,22,25 85:20 88:13,17 90:6 91:10,24 99:10,14 100:3 101:15 125:14
**practices** 124:24 166:11,13
**precluded** 82:17
**preclusion** 125:13
**prefer** 142:5 189:10
**premise** 67:8
**prepared** 49:11
**presence** 112:15,22
**present** 4:22 58:6 58:11 78:19 128:11 186:16
**presented** 68:7
**presenting** 64:5 66:5
**President's** 65:17 66:12 70:24 71:9 91:2
**pretty** 29:20 38:9 43:17 49:4 58:19 97:14 188:5 203:6 206:2
**previous** 20:22 21:8 70:9 161:13 190:19
**previously** 197:22
**previously-issued** 155:11,23
**primary** 142:4
**printers** 189:11,12 189:12,17,18 190:15
**prior** 13:16 17:12 19:21 24:8 31:3 48:7 63:19 83:6,7 87:8 126:19 136:18 166:19 179:23
**priorities** 54:8,13 54:17 57:25 132:20 185:3,19 185:22 186:2
**prioritization** 63:21
**prioritize** 65:5 90:16,20 94:24 132:4 133:19
**prioritizing** 194:18
**priority** 55:13
**privilege** 92:7 97:23
**probably** 26:18 30:6,9 32:17 36:14 38:25 41:20 46:5 54:18 72:15 76:23 88:2 90:9 92:9,10 94:10 101:3 111:17 121:14 138:8 141:22 150:16 158:17 161:16
**problem** 56:7 89:10 167:9,22,24 169:20 170:9 171:5,15 172:15 172:24 173:3,18 173:24 174:3,4 178:25 179:3
**problems** 55:21 179:5,12,16
**procedures** 16:6,13 39:5 151:17 166:7 166:14
**proceeding** 5:5
**process** 22:8 23:11 29:20 34:10 43:18 45:20 46:23 47:22 48:13,22 49:14,17 50:2 76:25 82:25 96:14 106:7 107:15 111:23 113:9,19,25 114:14 116:11 121:3 122:21 135:7,24 136:11 136:14 137:13,22 150:13 154:15 156:21 168:17 175:9 191:8,16 198:13
**processes** 22:6,10 38:16 43:5,12,13 45:13 48:19 106:11,13 137:3
**produced** 165:20 186:25
**product** 40:7
**profoundly** 127:17 127:20
**program** 196:20 197:2
**programs** 49:2 197:10
**progress** 160:23 163:8
**progressed** 56:25
**progression** 161:10 161:25 163:14
**prohibit** 206:12
**project** 38:24
**promulgated** 112:11,19
**proper** 51:2 54:6 59:24 124:22 168:6
**properly** 45:3
**prosecution** 104:8
**prosecutorial** 69:5 69:8,11 134:7
**Provazza** 3:10 6:10
**provide** 8:4 163:9 164:22 181:2,9 192:18
**provided** 37:12 56:13 124:7 141:19
**provides** 147:24
**providing** 125:24 197:15
**provision** 156:2,9
**provisional** 28:14 66:10,22 67:21 78:18 106:7,14 107:15 111:23 113:8,17,18,24 114:13 135:7,23 136:10 137:2,13 137:21 156:8,12 156:17
**public** 2:16 7:5 64:2 66:3 91:16 114:24 115:5,15 115:16 153:21 159:17,18,20,23 209:7
**pull** 204:12 205:7
**pulling** 83:13
**pulls** 204:20
**Purpose** 165:24
**purposes** 11:2 136:22
**pursue** 111:22
**pursuing** 64:4 66:5 66:9,22 67:20 78:18 114:13
**pursuit** 135:6
**push** 94:5
**put** 52:10 56:19 79:10 93:19 98:8 98:11,15 127:22 167:23 170:24 191:18 192:15 205:6
**putting** 49:4 57:3 82:10

**Q**

**quality** 33:8 56:3 56:17 78:8 190:22
**quantify** 123:22
**quarter** 141:5
**question** 8:8,17,18 8:24 21:19,20,22 27:19,22 32:7,9 52:8 53:16 57:18 77:25 95:12 99:4 107:9 110:11,11 110:14 111:10,12 115:10 120:3,5 124:15 129:23,23 137:24 141:3,6 146:8 157:15,16 157:21 161:14 194:6
**questions** 8:8 112:4 144:6 145:25 181:17 197:17 208:8
**quick** 72:23
**quite** 96:14 131:6 147:7 180:2
**quotas** 138:24 139:12

**R**

**R** 3:2 4:2 5:1,2 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1

80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1 151:1 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1 164:1 165:1 166:1 167:1 168:1 169:1 170:1 171:1 172:1 173:1 174:1 175:1 176:1 177:1 178:1 179:1 180:1 181:1 182:1 183:1 184:1 185:1 186:1 187:1 188:1 189:1 190:1 191:1 192:1 193:1 194:1 195:1 196:1 197:1 198:1 199:1 200:1 201:1 202:1 203:1 204:1 205:1 206:1 207:1 208:1 209:1
**R-a-y-c-r-a-f-t** 180:11
**R-e-b-e-c-c-a** 7:13
**random** 59:6 200:6 200:8
**rare** 83:24
**rated** 138:24
**Raycraft** 180:9
**reach** 48:15
**read** 5:11 20:18 24:6,8 26:19,20 44:17,18,19 62:4 63:11 71:22 77:7 91:25 109:2 117:23 119:20,21 133:18 155:13 157:13 158:3 185:13,16 191:18 207:22
**reading** 72:5 97:12 186:10
**readjustment** 46:7 46:8
**real** 157:21
**realistic** 172:13
**realize** 8:22
**really** 12:14 28:4 30:8 31:24 33:23 37:13 38:3 40:6 41:2 42:22 67:15 84:4 89:23 106:9 120:24 140:13 152:18 181:14 185:10,20 186:4 191:24
**Realtime** 2:15,16
**reappointed** 16:7,9 16:13
**reason** 9:5 104:20 126:25 175:7 177:23 211:4,8,10 211:12,14,16,18 211:20,22
**reasonable** 107:22
**REBBECCA** 7:2
**Rebecca** 1:15 2:10 5:16 7:13 25:14 73:9 146:11 208:17 209:9 210:3,6,10,15
**recall** 9:6 18:4 32:19 90:12 94:18 109:16,20 183:7 198:2 203:24
**receive** 99:17 123:23 126:9,12 127:9 163:19
**received** 11:6 59:24 61:12 123:4 126:15 129:10 131:10 149:16 187:9
**receiving** 50:25 130:17
**recess** 73:4 131:19 201:22
**recognize** 25:7 52:25 53:3 73:14 147:10 165:13
**recollection** 64:23 74:10 118:19 120:14
**recollections** 205:3
**recommend** 82:20
**recommendation** 23:5 58:25 63:14 82:5 167:20
**recommendations** 38:15 167:2
**recommended** 183:6
**reconvening** 73:5 131:20 201:23
**record** 7:12 9:2 73:3,7 110:17 131:18,22 176:4 201:18,21,25 204:11,17 205:14 208:11 209:12 211:5
**records** 203:18
**redacted** 153:21 159:19 165:15 183:4
**redactions** 165:21
**reduced** 188:24
**refer** 37:25 100:25 146:6 159:7,9,11 161:11 190:23 194:19 195:13 198:25 200:17
**reference** 33:9 119:24
**referenced** 59:11 94:2
**referencing** 65:16
**referral** 143:15,17 143:17,22 147:24 148:10 149:16 150:2,3,22,23
**referrals** 85:23 98:23 99:5 100:14 101:10,11,18 143:13 144:5 145:2,19,23 146:22 147:14 148:7 151:13,17
**referred** 37:18 38:12,21 86:12 96:5 100:22 148:11,13,25 149:13 150:10 170:16 176:25 182:3 185:6 187:5 189:9 194:24
**referring** 43:3,13 45:5,6 54:23 56:18 62:19 63:3 64:8 135:25 160:17 184:10 189:8 196:24
**refers** 150:6 185:8 194:20,24 196:25 197:2 200:3
**refresh** 74:10
**regard** 63:21
**regarding** 54:4 62:12,25 78:16
**regardless** 66:17 66:20,21,24 204:15
**Registered** 2:14,15
**regular** 58:20 59:5 162:13 163:17
**regularize** 28:18
**regularly** 43:17
**regulation** 82:13 113:3 116:11 157:8
**regulations** 44:12 45:5,11,14 54:5 57:25 111:21 112:12,19 113:14 113:21 118:16 136:9 137:4,22 156:9 157:5
**reinforcing** 44:8
**related** 31:25 78:14 145:24 209:14
**relates** 22:17 24:2 92:16 134:9 200:6
**relation** 49:14
**relative** 108:18
**relatively** 204:3
**release** 18:18 59:23 60:8,9 119:15 164:2,4
**released** 18:22 37:24 60:13,15 61:5,8,9 119:16 120:6,9 179:20 196:13
**relevant** 17:14 54:5
**relief** 20:11
**relies** 205:19
**reluctant** 43:22
**rely** 50:4 55:8,24 56:23 133:24 134:4,6,16 184:2 198:21
**relying** 134:12 178:17,20
**remedy** 60:8
**remember** 10:3 17:18,21 19:19,20 20:3,9 24:9 37:15 41:20 87:22 89:8 89:12 93:11 118:8 118:21 140:12 160:12,13 168:8 185:18 189:17
**reminded** 29:19
**reminds** 29:14
**removable** 132:13
**removal** 10:8 11:18 14:5,15 65:25

66:14 68:3 69:18 78:17 108:5,14 109:9 111:22 112:13,20 113:16 113:23 114:12 115:6 116:7 121:18 123:20 125:23 126:14 127:4,14 129:6,8 130:19 131:2,3,6 133:10,25 134:15 136:13 137:20 140:13,17 143:11 144:15,19,23 152:16 155:12,24 156:5,16 162:8 163:2 164:4,10 187:4 202:5 206:17 207:12,18 208:3
**remove** 162:18,21 206:5 207:20 208:5
**removed** 105:5,15 117:18 120:11,18 128:7,9 133:13 161:8 163:20 202:19,25
**removing** 84:9 133:9
**repeat** 77:24 130:2
**rephrase** 23:12 52:8 96:3 138:22 139:22
**replace** 75:22 80:20 82:2
**replaced** 72:6 74:6 74:14 75:2,25 77:20,20 78:3 91:8
**report** 14:7,9,11 22:20 23:2,9,16 37:12,21 38:11 51:17 58:23 123:3 165:16 166:5 170:23 180:21 181:13,14 182:25 185:11 188:10 190:9 192:2,5,8 192:10,13,14 196:6 205:12,18 206:25
**Reported** 1:24
**reporter** 2:15,16 6:3 25:5 29:14 52:23 73:12 145:8 146:14 153:8 165:11
**reporting** 6:2,4 124:3 126:2 205:2 205:20
**reports** 196:10,11
**represent** 6:8,17 109:17 148:12
**representing** 6:21
**reprimanded** 122:18
**reputation** 33:11 33:14,15,18 35:19 35:21,22 40:25
**request** 31:7
**requests** 140:3
**require** 47:2 106:22
**required** 24:5 101:23,24 106:2 151:16
**requirements** 53:12,18 140:2,3 140:4 163:4
**requires** 66:13,16 106:19 172:8
**reserved** 5:7,9
**reside** 7:20
**residence** 7:19 86:19 142:3
**residing** 7:19
**resolve** 42:13,25
**resolved** 177:3 183:23
**resource** 189:14
**resources** 63:22 65:6 90:10,17,20 94:24 132:5 188:14
**respect** 91:11
**Respondents** 4:4 165:21
**response** 89:11
**responsibilities** 10:22 13:25 127:8
**responsibility** 50:20 162:5
**responsible** 69:16 74:24 101:7 121:15 127:18 152:2 161:15
**responsive** 101:7
**rest** 99:11 153:15
**restate** 27:18
**result** 38:13 76:14 114:4 116:6 117:21
**resulted** 89:5
**resulting** 166:2
**resume** 13:16
**return** 13:14 178:3
**returned** 13:8
**revealing** 21:24
**review** 22:8 24:15 26:12 27:5 47:8 47:12 51:2,12,15 51:18 54:20 55:11 55:15 57:23 59:24 60:3,7,12 96:19 165:25 166:3,17 174:13 176:3,9 177:8 180:7 182:4 192:7,16 193:5
**reviewed** 23:2,4,20 23:23 27:3,10,11 27:25 28:2 48:23 49:6,20 51:9 58:19 102:14 143:18 179:25 185:11 195:6,8
**reviewing** 51:4 59:4 92:25 137:16 193:7 196:10 205:25
**reviews** 37:20 54:6 58:18 166:20 174:6,19 175:8 184:21 191:25
**revised** 53:9
**revisit** 23:19
**reworded** 105:17
**right** 10:19 15:19 23:21 29:13 41:25 43:9,14,24 47:23 55:18 64:14 65:11 70:22 71:21 74:18 77:8,9 95:5 102:8 106:21 113:9,10 115:23 116:2 118:17,20 119:3 119:21 120:3 126:4 129:13 132:23 134:8,18 135:4,8,20 136:6 136:9 138:14 141:18 142:12 143:11,23 144:16 145:11 148:23 149:14,15 151:21 152:6,21 157:12 157:15 158:11 159:12 164:5,11 164:15 168:14 193:3 195:9 199:12
**rising** 140:23
**RMR** 1:24 209:22
**role** 14:2 15:12,12 16:24 36:7 72:15 82:14
**rotation** 167:6,11
**rotations** 168:11 169:4
**round-robin** 82:6 87:24
**ruin** 79:19
**rule** 25:3 82:13 154:20 155:7,17 210:8
**rules** 82:9
**run** 41:4,4 175:14
**running** 42:20
**runs** 16:8,11
**Rutherford** 39:11 39:23 41:5,6 42:10 62:2 63:7

**S**

**S** 3:2 4:2 5:2 210:5
**safest** 142:6
**safety** 64:3 66:3 91:16 142:4
Confidential/PII 121:22
**satisfactorily** 7:3
**Saunders** 121:22 122:10,13
**Sauter** 145:4 210:12
**saw** 20:21 28:22 36:24 47:5 49:7 56:6 57:19 71:23 92:21 99:8 102:23 159:15
**saying** 28:4 45:4 57:18 94:12,18 107:21 119:25 156:19 204:23
**says** 25:17 26:7 52:14 62:9 73:25 74:2,2,4 132:12 145:17 146:21,22 148:9 153:10,17 153:20 154:6,13 154:14,19 155:6 155:10,22,24 159:19,21 165:24 165:24 166:11,25 169:6,10 170:11 170:18 171:17 173:14 174:11 176:2,22 177:15 177:21 181:25 184:8 185:2 187:3 188:16 189:2,22 190:13,22 193:14 194:16 195:10 196:19 198:22 199:11 200:2,15
**scanned** 183:21
**scanners** 189:9,14 189:17 190:15
**schedule** 102:10,17 103:2 115:16 141:17 159:12
**scheduled** 12:10

48:5,8,9 102:16 102:17 103:3 104:7 206:16 207:12
**schedules** 104:10
**scheduling** 102:16 102:21,25 145:25 146:5
**school** 9:10 96:16
**schools** 171:23 173:5
**scope** 17:10 31:24 82:23
**screen** 55:25
**SDDO** 55:3 171:3,6
**SDDOs** 56:12 58:18 183:17 186:13 201:6,15
**season** 94:22
**seasoned** 46:16 197:16,22
**second** 32:5 54:2 74:3 132:3 145:10 169:5
**second-to-last** 53:22 132:2
**Secret** 153:2
**secretaries** 70:10
**Secretary** 70:18,20 95:19 132:8,21 133:23 186:9,18
**Secretary's** 133:17
**section** 6:17 154:18 169:24
**secure** 141:25
**security** 91:16 99:19 132:8 133:20
**see** 13:9 26:10 54:10 62:17 63:23 64:12 65:8 74:8 108:24 116:19 119:13 132:9,15 145:20 146:3,16 146:24 147:7 148:19 149:6,9 153:22,25 154:4 154:16 155:3,7 156:6 160:22,24 161:11,23 163:7 163:13 166:10,23 167:7 169:8 170:14 171:20 172:16 174:15 181:13,15,15,19 181:19 183:3 189:6 196:22 199:4 204:18 206:21
**seeing** 100:11 119:25 184:4
**seek** 84:10 156:5
**seeking** 154:23 156:2
**seen** 28:5,6 47:16 50:14 51:19 59:2 59:12 100:8,13,16 101:10 154:9 158:16 160:5 178:14 179:2,4,16 180:25 184:14
**selected** 41:17
**selection** 31:8
**self-remove** 164:23
**send** 177:25
**sending** 199:18
**sends** 143:22,24
**senior** 46:6 49:3 187:16
**sense** 40:20 65:19 70:14 91:3 107:7 138:21,23 185:9 189:20 191:7 200:21
**sensitive** 21:17,25 96:12,17,23,25 97:13 121:17
**sensitivity** 94:25
**sentence** 54:2 62:9 63:17 65:4 74:2,4 132:3 146:9
**separated** 114:5 119:4,7,9 128:7
**separation** 117:18
**sequestration** 26:14 37:7 44:3 44:13 51:22,25 52:5,12,14 53:6
**seriously** 43:25
**serve** 16:4 76:5 78:8 79:16 80:10 80:15 166:16 169:12 174:5,12 174:23 175:8,11 175:13,16,23 176:14,15
**served** 175:12 176:10,13
**service** 9:25 47:6,7 47:11 153:2 172:5 173:21 174:12,18 174:19 175:10 176:8 178:2 182:13
**service/return** 181:25
**services** 57:14 151:25 153:18
**serving** 73:25 74:4 74:17 166:18 188:17
**sessions** 47:24
**set** 53:12 80:18,19 198:14 209:10,19
**setting** 44:9
**seven** 171:7
**Sewall** 3:9 6:7,7 7:8 17:12 21:18,23 23:12 27:21 32:2 73:11 99:3 110:15 111:11 121:25 122:4,8 129:24 130:4,9,14 131:13 131:23 201:18 202:2 208:7 210:4
**share** 56:8,9
**shared** 189:11 196:8
**ships** 35:12
**short** 72:18 83:5
**shortly** 30:6 88:21
**show** 24:3 26:15 52:18 104:8 124:19 156:25 164:5,6,12,13
**showing** 142:9 162:15 163:18
**shows** 141:21 205:15
**sign** 5:11
**signature** 25:20 73:21
**significant** 141:4 179:4,12,21 189:14
**significantly** 46:15 188:24
**similar** 85:19 176:6
**simple** 95:17
**single** 59:7,7 204:14,16
**sister** 152:23
**sit** 182:11
**sitting** 30:13 116:14
**situated** 201:4
**situation** 20:10 22:3 24:19 28:9 46:14 69:3,4 142:2 155:15 162:16 164:18
**situations** 155:20
**six** 80:3 142:25
**slated** 161:8
**small** 117:7
**solely** 101:5
**solo** 40:4
**solution** 173:7
**solved** 172:25 173:2
**somebody** 15:11 16:3 18:4 19:25 47:2 57:22 59:23 60:11 67:19,20 68:16 69:18,20 82:2 93:16,16 106:24 107:21 108:20 110:24 111:6,18,21 114:11 120:24 121:13 124:18,19 126:12 129:3,20 142:9,19 144:14 144:14 160:8 161:7 162:10 164:7 170:20 199:16,17 200:5 203:22 207:20 208:5
**somewhat** 37:6 95:10
**son** 118:20,23 119:2,3,7,10
**soon** 75:11 121:5
**sorry** 18:8 26:2 55:4 67:6 77:23 81:9 93:21 96:3 101:11 111:2 115:3 117:25 122:3 128:10 130:2 148:4 149:7 155:12 156:14 175:2 177:14 202:11,20
**sort** 9:19 20:5 22:16 24:19 35:12 37:13,19 38:25 40:4 44:4 45:23 48:21 49:12 56:22 59:12,14,15,17 60:8 70:9 72:16 76:10 127:10 132:24 144:10 147:16 153:11 161:9 162:2 163:7 163:14 167:14 168:4,7,19 175:9 191:10 194:25 197:13 198:15 200:8
**sorts** 172:9
**sound** 119:2
**sounds** 51:23
**source** 45:8 161:20
**sources** 203:11
**south** 142:16
**Souza** 117:25 128:6 148:20 187:20
**Souza's** 128:19
**space** 140:4 160:4

**sparse** 127:11
**speak** 21:11 29:15 41:20 100:5 106:12 112:7 122:22 125:5,19 159:4
**speaking** 29:19 32:4 58:21 106:10 130:6,11 201:6
**speaks** 133:22
**special** 9:23 19:5
**specialist** 6:3
**specific** 65:20 67:9 140:9 143:6 160:13 170:19 187:14
**specifically** 34:12 41:19 43:13,15 45:25 95:7 113:14 113:22 123:15 136:14 137:20 140:22 156:3,11 156:14,15 174:8 181:20 183:7,14
**specifics** 20:4 29:10
**speculate** 32:12
**Speculating** 128:23
**spell** 7:11 180:10
**spend** 182:9
**spoke** 21:7,9 122:22 168:15
**spoken** 35:23 36:2 42:9 49:8 58:3 122:19 128:24 168:2
**spot** 69:6 74:25
**spouse** 114:6
**spread** 171:18 172:3
**spreadsheet** 147:10 160:11 203:5,8 204:20,25 205:17
**spreadsheets** 58:25 59:3,4,10 178:7 178:10 179:6,8,13 191:6,8,11 194:21
**ss** 209:3
**stability** 82:5,21
**stadium** 11:10 80:6
**staff** 16:19 18:10 21:6 22:15,15 45:18,18 46:6,6 47:20 50:6 51:5 58:3,5,11,15 59:3 70:16 83:10,16 86:5,16,21 89:8 91:14,19 93:15 94:3 97:20,25 98:20 121:10 148:4 167:5,11 168:11 169:4 173:4 175:2,5,16 188:25 189:10 190:7 197:15 198:17
**staffing** 22:12,16 43:7 46:7,9,14 50:22 140:2 170:10 182:21 183:8,9,10,15 187:8 189:3 190:17
**stage** 106:6
**standing** 11:9 80:5
**start** 5:14 12:23 16:15 57:2 86:21 112:17 163:23 168:14 179:7 197:9
**started** 41:21 56:22 60:16 168:16 179:5,13,14 197:19
**starting** 85:14 198:19
**starts** 25:12 29:19
**state** 2:13 3:7 5:23 7:11 9:11 63:17 63:17
**stated** 76:8
**statement** 65:10 66:2,8 95:7,9
**statements** 63:18 120:2
**states** 1:2 5:19 6:18 6:21 98:16 109:8 111:14,15,16 112:16,23 155:2 172:4
**station** 10:15
**status** 28:12,18 104:22 105:3,13 107:15 117:22 143:21 147:16,17 147:18,19
**statute** 82:12
**stay** 82:18,18 111:19
**staying** 112:15,23
**stead** 10:18
**step** 76:11 106:14 106:16 107:13 108:17 113:11 149:17,20,22,24 156:21
**Stephen** 3:10 6:10
**stepping** 15:12
**steps** 123:18
**stipulations** 5:6
**stop** 13:2 20:5,8 91:14 130:5,12
**stopgap** 75:13,16
**stopping** 131:14
**Strawbridge** 4:22 5:25
**street** 2:13 3:7 4:6 4:18 5:23 142:3 186:15
**strike** 5:8
**strongly** 130:5
**stuff** 183:4
**subject** 7:25 54:19 54:25 143:10 155:10,22 163:12 202:5
**submitted** 73:17
**subordinate** 15:12 21:6 51:4 54:22 58:13,15 86:4
**subordinates** 50:5 86:4 133:24 134:4 134:16 135:11,23 136:2 138:8 184:3
**Subscribed** 208:18
**subsection** 154:14
**subsequent** 64:17 123:5
**subsequently** 9:13 55:6 76:18
**substance** 42:23
**Substituted** 25:3 210:7
**substitution** 191:7
**succeed** 13:18 71:12 77:5
**successor** 52:2
**Sudbury** 4:18
**sufficient** 47:3
**Suffolk** 209:4
**suggest** 130:5
**suggesting** 158:8
**suggests** 166:5
**summary** 161:10
**summer** 31:6,9 79:19
**superiors** 139:15 141:9
**superseded** 70:7 97:7 100:20
**supervised** 164:2,3
**supervision** 123:17 124:3 126:2 128:13 162:11,23 162:25 163:4,17
**supervisor** 14:10 14:21,23 29:22,22 30:16 46:13 48:16 124:10 169:11,13 188:18,22
**supervisors** 59:5 87:24 92:12 138:19 169:6 170:13 188:23
**supervisory** 55:4 86:9 93:13 151:9 169:18 170:6 175:16 205:4
**support** 16:18 162:3
**suppose** 16:15 139:25
**supposed** 125:16 152:6 162:24
**sure** 11:8 18:20 27:19,21 29:20 30:22 37:23 43:4 43:5,6,9,11,18 45:7,8 55:22 58:16 71:2 72:13 72:25 77:24 94:21 104:9 105:11 130:3 177:14 178:21 185:25 188:12 192:25 200:12 201:12 202:22 203:5,6
**suspect** 144:23
**swear** 204:4
**swimming** 40:18
**sworn** 7:4 208:18 209:11
**system** 56:20 59:14 59:15,17 161:3,4 176:24 177:2,5,20 178:17 180:13,15 180:18,19,23,24 181:2,8 190:25 191:3,10,13,17,19 191:20 198:23 199:2,19 204:8 207:2,5
**systems** 57:2 160:22 161:2

**T**

**T** 209:1,1 210:5
**table** 30:13 65:21 71:4 92:23 96:2
**take** 8:16 34:24 60:2 72:23 80:19 105:20 158:11 168:25 169:2
**taken** 62:10,24 73:4 82:7 92:2 131:19 147:17 152:14 157:25 170:3 201:22 205:20
**takes** 76:24 110:24 111:6 149:17

157:22 191:15,15
**talk** 37:10 38:6
  41:5 43:22 56:15
  80:7,23,25 134:21
  140:22 160:18,24
  161:15 181:18
  190:7,18
**talked** 29:2 32:6
  36:6,11,14 38:3
  38:14 41:7,13,14
  42:25 43:15,15
  75:22 79:9 80:22
  81:2 88:12,16,24
  92:4,9,14,15,16
  103:12 106:18
  136:23 143:13
  156:20 178:7
  179:19
**talking** 15:24 17:10
  17:11,15 31:24
  43:17 58:14 98:7
  130:9 168:17
  184:17
**talks** 140:21
**tape** 5:15
**target** 93:3
**targeted** 64:22
**targeting** 185:3
**tasks** 170:12
**tasks/functions**
  177:17
**team** 37:18,19
  38:14,18,22,23
  39:4,9 43:16
  44:10 58:24
  173:10 201:8
**teams** 186:14
  200:16
**technical** 24:23
**technically** 10:23
  62:22
**tell** 8:14,14 27:23
  28:7 50:5 55:19
  59:17 79:15 86:21
  86:25 93:20,25
  115:16 129:3
  140:6 144:13,17
  149:20 150:9

168:24 175:3
  184:3
**telling** 89:8 175:15
  175:22 198:17
**tells** 69:25 164:21
**tempo** 83:15
**temporarily** 10:13
**temporary** 10:13
  15:18
**tend** 161:19
**tenure** 58:7,8 75:3
  87:21
**term** 38:20 48:21
  69:9,9 83:6
  173:11
**terminated** 74:21
  74:23 75:17
**terms** 132:18 133:3
  133:8
**testified** 7:6 19:3
  19:13,15 29:21
  61:22,24 62:2
  64:2 71:19,20
  75:21 96:9 114:18
**testify** 9:6 20:7,12
  42:12
**testifying** 7:24
**testimony** 8:4
  20:22 42:13,18
  62:5,10,19,22,23
  136:25 209:12
**Thank** 78:12
**then-Acting** 62:11
  62:24
**then-Secretary**
  95:20
**thing** 43:24 54:18
  141:22 160:21
  170:19 189:16
  190:16
**things** 10:24 22:19
  24:3 37:21 42:7
  43:10 44:5 48:20
  49:2 50:12,12,13
  58:14 59:9,18
  67:17 88:25 94:13
  95:12 141:12
  149:25 167:13

168:5 177:7
  178:21 179:24,25
  180:2 185:13
  195:5
**think** 9:21 11:9
  12:25 13:6,10
  15:6,9 17:12 18:4
  18:7,11,12 19:8,9
  20:2,18,23 22:3
  24:6,11,12,14
  30:11 31:2 32:12
  36:15,22,25 37:8
  37:11 38:5,8
  39:16,19 40:17,18
  40:21 41:3,8,12
  41:21 42:19 43:20
  43:22 44:6,7,15
  44:25 45:15 49:19
  49:19 50:17 52:10
  52:13 53:7 58:22
  59:21 61:9,13
  65:15 67:24 70:6
  70:12,13,13,14
  71:25 74:23 75:7
  75:8,13,16,21
  76:8,14 78:23
  79:4,6,18 80:4,16
  80:24 81:25 82:4
  82:9,9,19 83:7,7
  83:16,17 84:4
  86:17,17,18 87:13
  87:14,22,24 88:20
  89:2,6,7,23 90:8,8
  91:20 92:9 94:17
  95:21 99:22
  102:13 106:16
  108:19 110:7,10
  110:12,18,19,21
  110:23 111:4,5,17
  111:24 112:2
  114:16,20,21
  121:9 123:15
  124:8 125:13
  127:5 129:2,5
  131:13 138:23,25
  144:2,3,10 150:8
  150:11,12 152:17
  159:7 160:21

167:21 170:8,17
  170:20,25 171:6
  171:15 172:17
  173:8,9,23 174:2
  174:4 179:22
  182:16 183:5
  187:6 189:16
  190:17 192:12
  194:23 195:6
  196:7,25 199:3
  200:11 201:10,13
  201:13 203:2,13
  203:15,16 205:25
  206:19
**thinking** 60:21
  64:13 93:22
  107:11 170:21
**thinks** 172:23
**third** 121:6 170:11
**Thomas** 61:22 74:7
  77:20 78:4 165:7
  165:16 210:22
**thoroughness**
  160:25
**thought** 90:8
  102:23 118:24
  141:9 171:23
  173:5 177:5
  192:14
**threatening** 20:6
**three** 46:10,12
  60:22 83:22 96:24
  118:13 119:4,10
  119:14 173:12,14
  173:17 174:7
  187:7
**Thursday** 1:17 2:6
  74:5 75:8
**ticket** 128:20
**tickets** 120:15
  124:20 163:9
  164:22
**tiger** 37:19 38:18
  38:22 39:4,9
  173:9
**time** 5:7,9 8:13,16
  8:22 9:24 10:2
  16:3,8,11 19:11

23:18 30:12,14
  32:15 35:5,16
  39:21 40:6,15,23
  47:17,18 48:6
  55:16 56:25 65:11
  66:18 70:18 72:20
  76:24 82:12,16
  88:2 89:2,23
  100:7,8,13,16
  101:10 102:18
  116:5 126:4 131:7
  140:14 142:5,16
  143:19 144:10
  147:18 159:16
  163:18,20 164:8,9
  164:25 165:4
  175:23 176:14
  178:8 187:7
  192:16 193:4
  196:2 203:19
  208:13
**timeframe** 19:20
  36:20 204:18
**timeline** 37:25 60:7
**timeliness** 47:7,11
**timely** 22:19 43:5
  43:12 54:5 56:4
  166:20 182:6
  184:9
**times** 42:6 50:11
  104:10 115:17
  124:17
**Tina** 145:13 146:9
**title** 11:20 13:23
  14:17 34:4
**titled** 25:14 148:6
**today** 5:5 7:24 8:5
  8:23 9:7 17:15
  28:25 42:20,22
  51:21 65:13 72:16
  116:15 136:21
  138:3 193:5
**today's** 208:11
**Todd** 13:22 33:19
  33:21 61:24 74:6
  92:10 95:23 145:4
  146:11,16 168:2
  168:19 172:18

196:3 210:12,16
**told** 18:10 29:4 58:15 77:4 120:14 123:9 124:10 144:19 164:11,13 174:23,25 176:13 176:16 184:5 187:20 192:18,18
**Tom** 38:3 41:8,12 41:20,21 88:24 94:19 196:3
**tool** 59:18
**top** 146:17,17 147:21 153:17
**topic** 95:2
**tracked** 138:20 139:5,6,9 207:7
**tracking** 198:23 199:2 203:9
**traffic** 20:5,8 102:14,23
**trained** 45:3 46:22 50:6 194:2
**training** 9:14 22:13 22:14 45:16,19,21 45:24,25 46:5,18 46:19,24 47:3,13 47:24 48:3,11 49:25 123:5 126:8 126:12,14 127:9 127:13 129:10 130:17,20,21,22 131:3,4,7,9,11 187:10,13,18 193:15,18,24 194:3,4,11 197:2 197:7,9 198:11,16
**trainings** 35:13
**transcript** 5:12,13 26:17 77:8,11 121:25 122:5
**transcription** 211:7
**transcripts** 62:4
**transfer** 88:23
**transition** 62:14 63:10
**travel** 163:6,10
**traveling** 201:9
**trend** 141:4
**trends** 140:16,23
**trial** 5:7,9 19:3
**tripling** 188:24
**trouble** 180:12,15 180:17,21,23
**true** 65:10,13 104:3 143:3 174:10 209:12
**trust** 86:4 138:5
**truth** 198:18
**truthful** 8:4
**truthfully** 9:7
**try** 8:10,15 82:2 89:20 127:2
**trying** 20:10 28:18 38:5 40:16,17 42:13,25 83:14 87:22 168:7
**TSG** 6:2,4
**turn** 25:11,25 26:2 53:20,21 62:8 63:16 65:3 73:24 111:15 132:2 153:16 154:12 155:5
**turnover** 83:25
**twelve** 182:18
**twenty** 13:9
**twice** 36:15
**two** 26:4 31:15,16 35:4 53:8 60:20 60:21 83:22 109:14,17 118:24 150:17 152:22 166:16 169:14 170:6 187:9 188:8 188:22 197:21 201:6 204:2
**two-and-a-half-...** 40:5
**Two-person** 200:15
**type** 20:11 31:13 71:2,6 99:22 123:9,11 142:2 201:7
**types** 26:16 168:10
**typing** 199:19

**U**

**U.S** 4:5,11,12,17,25 28:10 66:6,25 67:21 68:16 109:11,14,18 112:11,13,18,21 113:16,24 114:5 117:7,7 143:8 149:2 152:11 153:5,17 154:21 156:25 157:4 158:22 159:25 210:20
**ultimate** 69:17 162:7
**ultimately** 60:6 117:22 163:7 168:17
**umbrella** 104:4
**Unawareness** 195:11
**uncertainty** 44:11 44:12
**Unclear** 177:24
**uncomfortable** 28:4
**uncommon** 84:17
**uncovered** 192:20
**understaffed** 169:21
**understand** 7:23 8:8,11,20 9:3 15:24 63:18 122:4 177:14
**understanding** 28:12 36:18 53:11 53:17 77:10,18 78:2 126:11,23 160:10
**understands** 43:19 47:5
**unfair** 111:18
**unfamiliar** 84:15
**unfortunately** 57:21
**unheard** 85:5
**union** 167:14 168:5 197:8
**unit** 99:19 166:8 167:5 169:7,10 187:15,17 189:2 189:22 190:2
**United** 1:2 5:19 6:17,21 98:15 109:8 111:14,15 111:16 112:16,23 154:25
**University** 9:12
**unlawful** 112:15,22
**unsure** 45:12
**untimely** 174:12 176:8 177:18
**Unverified** 181:25
**upper** 83:20,25
**upwards** 203:25
**use** 48:25 58:25 90:10 114:17 167:21 172:2,4 191:17 199:20
**usefulness** 195:7
**usually** 59:25 197:10
**utilize** 191:5 200:10
**utilized** 198:24 199:11

**V**

**v** 5:18
**vacancies** 31:17 77:2
**vacancy** 31:15
**vacant** 34:16,19 89:21
**vacation** 35:14 40:5 42:21 93:17
**vague** 89:6
**vaguely** 111:24
**varies** 16:5
**various** 139:16
**vary** 16:4
**vastly** 50:13
**verbally** 175:4 192:24
**Vergara** 165:8 210:23
**Vermont** 198:3
**versed** 112:10 152:18
**version** 147:3,8 153:21 159:18,20 165:15 210:18
**versus** 15:11 141:25
**vicinity** 83:9
**video** 6:2
**Videographer** 4:22 5:14 73:2,6 131:17,21 201:20 201:24 208:10
**videotape** 5:15
**VIDEOTAPED** 1:15 2:10
**view** 66:12 114:11
**violate** 157:4,12,14 157:17 158:10
**violated** 18:5,11,12
**violation** 18:2,3 28:17 61:12 71:3
**violations** 71:4 166:16
**violent** 142:20
**visa** 112:14,22
**visibility** 95:2
**visual** 59:16,18 178:15,18,20
**visualize** 178:11
**volume** 169:23
**voluntarily** 155:18
**vs** 1:9

**W**

**wait** 111:11,15 112:9 124:15 175:7
**waiting** 80:6 110:25 111:7
**waive** 5:12
**waiver** 66:22 67:21 78:18 106:7,14 107:15 111:23 112:9,15,22 113:8 113:18,25 114:14 135:7,24 136:11

137:2,13,21 156:8 156:13,17
**waivers** 66:10
**wanding** 199:18
**want** 12:15 15:4 16:11,12 19:2 23:25 60:22 81:8 89:15 92:24 103:18 107:5 122:6 128:3 167:16 181:3
**wanted** 32:14 62:13 63:8 76:9,19 78:5 79:16 92:22 94:21 94:25 95:16 125:6 131:14 134:10 150:24 160:19 171:2
**wanting** 43:24
**wants** 16:12
**warrant** 155:11,12 155:23,24
**Washington** 4:7 11:16 14:13 139:15
**wasn't** 31:5 38:4 56:19 57:18 76:4 94:22,22 97:7 114:7 120:24 122:16 126:25 170:24 180:17,22 193:2 195:15
**way** 4:13 17:18 26:2 28:14 56:21 59:14,15 69:12 76:21 78:25 79:13 102:6 105:9 116:4 116:22,25 123:18 127:22 129:18 135:16 143:4 162:25 182:7 189:4,23 190:3 191:9 204:12 205:6 206:3 209:16
**ways** 55:12 141:20 144:2 150:21
**we'll** 8:15 29:19
**we're** 17:11,15 31:24 42:17 44:20 44:21 50:12 73:6 98:7 122:4 135:25 168:14,19
**we've** 35:12 92:14 137:8 157:13
**website** 48:18,18
**Wednesday** 11:7 12:20 75:7
**week** 28:24 59:7,8 74:18 76:2 201:5 201:6,17
**weekend** 184:14
**Weiland** 4:9 6:19
**well-worded** 146:8
**went** 40:9 126:17 137:7 147:6 182:24
**weren't** 57:20 195:17
**whatsoever** 85:11 185:9
**WHEREOF** 209:18
**White** 3:14
**wholesale** 83:25
**whys** 140:17
**William** 4:9 6:18
**Wilmer** 2:11 6:8
**WILMERHALE** 3:6
**window** 72:18
**wish** 172:12 189:20
**witness** 5:10 19:8 26:6 72:20 130:7 209:9,13,18 210:2 211:3
**word** 114:16,21
**worded** 146:9
**words** 28:7
**work** 10:5,16 11:5 11:15 12:5 14:12 33:5,8,24 35:9,15 38:24 39:23 40:2 40:7,11,15 78:9 102:4,9 103:23 104:24 106:9 107:19 122:10,13 168:3,4,20,21 169:22,23 186:13 186:15 191:16 194:18 195:3 197:25
**worked** 23:8 30:9 30:15 49:3 101:6 103:25 104:3 195:4 197:18,22 201:3
**working** 12:24 23:15 30:19 33:21 38:25 46:4 51:5,6 56:5,10 79:13 104:21 107:21 121:13 123:16 141:16 162:25 163:23 169:18 192:6
**works** 48:14 50:21 135:24 159:5 167:14 197:21 198:5,8
**worry** 140:25 141:8
**wouldn't** 8:16 9:6 30:21 39:6 45:15 66:9 85:4 103:3 125:2 134:12 157:25 159:8 204:8 206:10,12
**writing** 93:20
**written** 70:15 186:23 187:2

**X**

**x** 1:5,12 210:1,5

**Y**

**yeah** 21:15 33:17 60:6,17 62:23 78:12 83:19 87:17 107:20 119:6 127:20 160:12 202:10 206:25
**year** 31:3 34:25 80:3 83:9 87:25 127:6,6 141:5 193:15,19,24 194:3,5,12 203:25 203:25
**years** 18:14 19:5 30:20 32:19 35:4 39:8 84:20 86:12 104:5 131:8 140:12 199:22
**yesterday** 51:16 55:16,17 193:8

**Z**

Confidential/PII 160:4
**Zero** 202:8
Confidential/PII 160:4,16

**0**

**02109** 3:8
**02203** 4:19
**02210** 4:14
**02421** 3:15
**03** 100:24

**1**

**1** 24:13 25:2,6 53:21 62:8 73:24 131:25 154:13 210:7 211:5
**1:18-cv-10225-M...** 1:10 5:21
**1:19** 131:20,22
**10** 147:16
**10-year-old** 118:20 119:3
**10:58** 73:3,4
**100** 96:13 167:21 172:12 206:18
**11** 27:4 173:18
**11:13** 73:5,7
**12** 46:12 170:5 201:3,4
**12:18** 131:15,18,19
**13768** 65:7 132:6
**145** 210:14
**145302** 1:25
**146** 210:17
**147** 210:19
**15** 4:18 104:5 153:6 153:24 185:14 210:21
**15.1** 154:3,6
**153** 210:21
**15th** 13:8
**16** 149:4,8
**165** 210:24
**17** 88:4 146:19 166:4
**17th** 12:11 13:13
**1987** 9:13
**19th** 25:10,17
**1st** 71:16

**2**

**2** 26:4 52:21,24 154:13 155:6 210:9 211:6
**2:46** 201:21,22
**2:59** 201:23,25
**20001** 4:7
**2003** 104:4
**2007** 19:21
**2008** 59:15
**2010** 30:9
**2016** 112:11,18 113:15,22 116:11 136:8 137:4,22
**2017** 84:7,12,23,24 85:14,15 87:6,11 147:15
**2018** 1:17 2:6 5:24 25:17 27:4 73:19 74:5,15 87:11 145:15 146:19 147:16 148:17 149:4,8 166:4 208:19 209:19
**21** 147:15
**229** 182:5
**22nd** 53:21 61:18 131:25
**23rd** 61:18
**240** 82:14,19
**24th** 13:11
**25** 145:18 210:8
**25(d)** 25:3 210:8
**25th** 13:11 51:14
**26** 1:17 2:6 5:24
**26th** 51:14 209:19

**28** 73:19

**3**

**3** 73:8,13 154:12,14 210:10 211:7
**3:07** 208:12,13
**30** 5:11 148:17 166:18
**30th** 11:9 12:19 75:8
**31st** 75:10

**4**

**4** 53:22 62:9 145:3 145:9 210:12
**450** 4:6

**5**

**5** 25:25 26:3,7 63:16 64:9 132:2 145:15 146:10,15 147:4 210:15,19
**5/16/18** 165:9 210:24
**52** 210:9

**6**

**6** 3:14 147:2 210:18
**60** 2:12 3:7 5:22 12:4,5 76:17 79:21,25 83:12 175:10
**60-page** 27:8
**62-page** 24:5 27:6
**69** 53:8

**7**

**7** 74:5,14 153:4,9 210:4,20
**7/16/18** 145:5 210:13
**7/17** 146:22
**7/17/18** 146:12 210:16
**7/18** 146:23
**700** 206:20
**73** 210:11
**7th** 12:25 13:3 40:11 72:8

**8**

**8** 154:13,13 165:6 165:12 166:4 210:22
**80** 184:13,14
**81** 184:14
**85** 53:8
**8th** 24:14 119:17

**9**

**9:36** 1:18 2:7 5:24
**90** 166:22
**90th** 184:11