# EXHIBIT B

## REDACTED

CONFIDENTIAL

Page 1

1

2          UNITED STATES DISTRICT COURT

3           DISTRICT OF MASSACHUSETTS

4

5   - - - - - - - - - - - - - - - - - x

6   LILIAN PAHOLA CALDERON JIMENEZ and

7   LUIS GORDILLO, et al.

8         Plaintiff-Petitioners,

9     vs.                       Civil Action No.

10   KIRSTJEN M. NIELSEN, et al., 1:18-cv-10225-MLW

11        Defendants-Respondents

12   - - - - - - - - - - - - - - - - - x

13

14              CONFIDENTIAL

15     VIDEOTAPED DEPOSITION of TODD M. LYONS

16            Boston, Massachusetts

17            Friday, July 27, 2018

18                9:37 a.m.

19

20

21

22   Reported By:  Michael D. O'Connor, RMR, CRR,

23   CRC

24   Job No.:  145300

25

CONFIDENTIAL

## Page 2

1
2
3
4
5
6      Friday, July 27, 2018
7        9:37 a.m.
8
9
10      VIDEOTAPED DEPOSITION of TODD M.
11 LYONS, held at the Offices of WilmerHale,
12
13 60 State Street, Boston, Massachusetts, before
14 Michael D. O'Connor, Registered Merit
15 Reporter, Registered Realtime Captioner,
16 Certified Realtime Reporter and Notary Public
17 in and for the Commonwealth of Massachusetts.
18
19
20
21
22
23
24
25

## Page 3

1
2     A P P E A R A N C E S:
3
4 ON BEHALF OF PETITIONERS:
5   WILMERHALE
6
7   60 State Street
8   Boston, Massachusetts 02109
9 BY:  MICHAELA SEWALL, ESQ.
10    STEPHEN PROVAZZA, ESQ.
11    COLLEEN McCULLOUGH, ESQ.
12   - and -
13 KATHLEEN GILLESPIE, ESQ.
14 6 White Pine Lane
15 Lexington, Massachusetts 02421
16
17
18
19
20
21
22
23
24
25

## Page 4

1
2   A P P E A R A N C E S, Continued:
3
4 ON BEHALF OF RESPONDENTS:
5   U.S. DEPARTMENT OF JUSTICE
6   450 Fifth Street, N.W.
7   Washington, D.C. 20001
8   BY:  MARY LARAKERS, ESQ.
9    WILLIAM WEILAND, ESQ.
10   - and -
11 U.S. DEPARTMENT OF JUSTICE
12 John Joseph Moakley U.S. Courthouse
13 One Courthouse Way
14 Boston, Massachusetts 02210
15 BY:  THOMAS KANWIT, ESQ.
16   - and -
17 U.S. IMMIGRATION CUSTOMS & ENFORCEMENT
18 15 New Sudbury Street
19 Boston, Massachusetts 02203
20 BY:  JO ARDINGER, ESQ.
21    MARK SAUTER, ESQ.
22
23
24
25

## Page 5

1
2   A P P E A R A N C E S, Continued:
3
4 ALSO PRESENT: Crystal Strawbridge, Videographer
5     Emma Goold, ACLU.
6     James Barnette, Wilmer Hale
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

CONFIDENTIAL

Page 6

T. LYONS

P R O C E E D I N G S

MS. LARAKERS:  All objections, except as to form, are reserved until the time of trial.  All motions, including motions to strike, are also reserved.  And the deponent will have 30 days to read and sign the deposition transcript with waiver of the notary and filing.  Those are the stipulations that we have agreed to.

In addition, as per yesterday, we would like to mark the entire transcript today as confidential.

MS. SEWALL:  Did you mark that on the record yesterday?

MS. LARAKERS:  Yeah.  I think we had the discussion on the record.  Yesterday's transcript was also marked as confidential.

VIDEOGRAPHER:  This is the start of tape labeled number one of the videotaped deposition of Todd Lyons in the matter of Lilian Pahola Calderon Jimenez and Luis Gordillo, et al. versus Kirstjen M. Nielsen, et al., in the United States District Court,

Page 7

T. LYONS

District of Massachusetts, civil action number 1:18-CV-10225-MLW.

This deposition is being held at 60 State Street, Boston, Massachusetts on July 27, 2018, at approximately 9:37 a.m.

My name is Crystal Strawbridge from TSG Reporting and I'm the legal video specialist.  The court reporter is Michael O'Connor in association with TSG Reporting.

Will counsel please introduce yourselves.

MS. McCULLOUGH:  My name is Colleen McCullough with Wilmer Hale, along with my colleague Michaela Sewall, also with Wilmer Hale on behalf of Petitioners, and my colleague Kathleen Gillespie.

MS. LARAKERS:  My name is Mary Larakers on behalf of the United States with the Office of Immigration Litigation District Court section, along with my colleague William Weiland.

MR. KANWIT:  I'm Thomas Kanwit from the U.S. Attorney's Office here in Boston.

MS. ARDINGER:  Jo Ellen Ardinger

Page 8

T. LYONS

from ICE, Chief Capital Office, along with my colleague Mark Sauter.

VIDEOGRAPHER:  Will the court reporter please swear in the witness.

TODD M. LYONS

having been satisfactorily identified by the production of his Government identification, and duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION
BY MS. McCULLOUGH:

Q.  Good morning.

A.  Good morning.

Q.  Got ahead of myself.  Please state and spell your name for the record.

A.  My complete name is Todd Michael Lyons, L-y-o-n-s.

Q.  And where do you live?

A.  I live in [ ], Massachusetts.

Q.  Do you understand that you're testifying under oath today and that your

Page 9

T. LYONS

answers are subject to the penalty of perjury?

A.  Yes.

Q.  You will give your truthful testimony today, right?

A.  Yes.

Q.  Is there any reason why you would not be able to recall events and testify accurately today?

A.  No.

Q.  I will be asking you a number of questions.  If you do not understand a question that I ask you, let me know, so I can change it and make it clearer.

Do you understand that?

A.  Yes.

Q.  If you need a break at any time, just tell me or your attorney, and we will try to take it.  If a question is pending or you are in the middle of your answer, we'll get the answer to the question and then take a break.

Do you understand that?

A.  Yes.

Q.  If you realize at any time during

CONFIDENTIAL

Page 10

T. LYONS

1  the deposition that your answer to a previous
2  question was not accurate or complete, please
3  let me know so that we can get that corrected
4  on the record today.
5      A.  Yes.
6      Q.  Have you ever been involved in
7  litigation before?
8      A.  Yes.
9      Q.  What cases?
10     A.  Prior to coming to work for
11 Immigration and Customs Enforcement, I was a
12 civilian law enforcement officer in Tampa,
13 Florida.
14     Q.  Were you personally involved in
15 litigation?
16     A.  Yes.
17     Q.  Did you testify?
18     A.  Not in court proceedings, no.  Only
19 in deposition.
20     Q.  About how many depositions have you
21 taken?
22     A.  Approximately four.
23     Q.  Okay.  And when was the most
24 recent?

Page 11

T. LYONS

1      A.  2008.
2      Q.  And were there ever findings in
3  those cases against you or your office?
4      A.  No.
5      Q.  What were the issues in those
6  cases?
7      A.  It was a use of force complaint.
8      Q.  That's the most recent one?
9      A.  Yes.  It was the only one.
10     Q.  You said there were four?
11     A.  Depositions in regards to that
12 case.
13     Q.  Oh, all for the same case?
14     A.  Yes.
15     Q.  Okay.  And what areas were covered
16 in your deposition testimony for that case?
17     A.  As far as what?
18     Q.  What were you asked about?  What
19 was the general subject?
20     MS. LARAKERS:  Objection.
21     A.  Circumstances of the arrest and the
22 force used in the arrest.
23     Q.  Okay.  Were you the arresting
24 officer?

Page 12

T. LYONS

1      A.  No.
2      Q.  Have you reviewed any documents
3  from this litigation?
4      A.  Just my own declaration that I did
5  for the case.
6      Q.  Did you review your testimony from
7  the hearing?
8      A.  No.
9      Q.  Have you ever reviewed any other
10 filings in this case?
11     A.  No.
12     Q.  Have you seen any of the judge's
13 orders in this case?
14     A.  I saw the judge's order for my
15 deposition.
16     Q.  Have you seen the judge's
17 protective order?
18     A.  I'm not sure which one you're --
19 I've seen most of the judge's orders.  I'm not
20 specific on which one you're referring to?
21     Q.  You have seen the judge's orders?
22     A.  Yes.
23     Q.  Okay.  Have you seen any media
24 coverage of this litigation?

Page 13

T. LYONS

1      A.  No.
2      Q.  None at all?
3      A.  Specific to?
4      Q.  Regarding any of the petitioners in
5  this case?
6      A.  I saw the original media coverage
7  on the Calderon arrest back in January,
8  February, first week of February.
9      Q.  Have you seen any media coverage of
10 Ms. De Souza's case?
11     A.  I don't recall.  We receive daily
12 ICE public affairs about any type of media,
13 but I can't recall specifically.
14     Q.  You didn't know whether Ms.
15 De Souza was in any of those alerts?
16     A.  Could have been.  I just don't
17 recall.
18     Q.  Have any of those gone out since
19 the May hearing?
20     A.  There was a specific "Globe"
21 article, I believe, or a WBUR report.
22     Q.  What was that about?
23     A.  It was about our previous acting
24 field office director, Tom Brophy's testimony,

CONFIDENTIAL

Page 14

T. LYONS

1  in front of the Judge Wolf on the stand.
2
3      Q.  And you read that article?
4      A.  Yes.
5      Q.  Is that the only article you've
6  read about this case?
7      A.  Most recent, yes.  That's the
8  biggest one I remember from before.
9      Q.  What's your understanding of the
10  dispute in this litigation?
11      A.  As far as the arrest at the Citizen
12  & Immigration Service offices?
13      Q.  Regarding all aspects of this
14  litigation.
15      A.  Well, it's my understanding as far
16  as the arrest of individuals that were
17  arrested at ICE -- I'm sorry, Citizen &
18  Immigration Services, CIS offices, around the
19  New England area from the time of January of
20  2018 until now, along with detention issues in
21  some of those cases.
22      Q.  What do you know about the
23  petitioners in this case?
24      A.  Do you mind just expanding?  As far
25  as what?  As far as their status?  Each

Page 15

T. LYONS

1
2  individual one, I can't give you specifics.
3      Q.  Do you know that Ms. Lilian
4  Calderon is one of the petitioners in this
5  case?
6      A.  Yes.
7      Q.  Do you know what claims she's
8  bringing?
9      A.  Claims as what?
10      Q.  Do you know why she's bringing this
11  litigation?
12          MS. LARAKERS:  Objection.
13      A.  Because she was arrested at the CIS
14  office in Providence, Rhode Island, I believe.
15      Q.  And what's your understanding of
16  why you're testifying here today?
17          MS. LARAKERS:  Objection.
18      A.  I was the -- well, I am the deputy
19  field office director for the Immigration &
20  Customs Enforcement removal operations, Boston
21  field office, which covers those offices where
22  the arrests at the CIS offices were made.
23      Q.  When did you first learn that you
24  were going to give a deposition in this case?
25      A.  When I was notified by chief

Page 16

T. LYONS

1
2  counsel of the order for my deposition.
3      Q.  And when was that?
4      A.  Last week.  Approximately Monday of
5  last week, just as far as scheduling, because
6  I'm on vacation this week.
7      Q.  From that date to today, have you
8  talked with anyone other than your counsel
9  about your deposition?
10      A.  No.
11      Q.  Have you spoken with friends about
12  it?
13      A.  No.
14      Q.  Have you spoken with your
15  colleagues about it?
16      A.  No.
17      Q.  Have you abided by the Court's
18  current sequestration order?
19      A.  Yes.
20      Q.  And you said your work already.
21  But could you just say again where you work
22  currently?
23      A.  I'm currently assigned to the
24  Boston field office, which is physically
25  located in Burlington, Massachusetts.

Page 17

T. LYONS

1
2      Q.  Okay.  And you refer to that as the
3  Boston field office, regardless of its
4  location --
5      A.  Yes.
6      Q.  -- in Burlington?
7          And I think you said your job title
8  is deputy field office director?
9      A.  Yes.  I'm the deputy field office
10  director over law enforcement operations.
11      Q.  And when did you start working
12  there?
13      A.  September 19th of 2017.
14      Q.  What was your position immediately
15  before your current position?
16      A.  I was the acting deputy field
17  office director for north Texas and Oklahoma.
18      Q.  How long did you have that
19  position?
20      A.  I was in that position for six
21  months.
22      Q.  Was that a temporary position?
23      A.  Yes.
24      Q.  What was your position before that?
25      A.  Assistant field office director for

CONFIDENTIAL

Page 18

T. LYONS

1  the Dallas field office.
2
3       Q.   When you were assistant field
4  office director in Dallas, was there an acting
5  deputy field office director?
6       A.   Yes.  There was two vacancies at
7  the time.  So the assistant field office
8  directors rotated through the deputy field
9  office director position.
10      Q.   Is that common at ICE offices?
11      A.   When senior management positions
12  aren't filled rapidly because of the extensive
13  process, the next line of supervision usually
14  steps in.
15      Q.   And you served as interim or acting
16  field office director -- acting field office
17  director in Boston, correct?
18      A.   Yes.
19      Q.   And you testified at the May
20  hearing in this case on May 23rd that you
21  expected to hold that position beginning on
22  June 1st, correct?
23           MS. LARAKERS:  Objection.
24      A.   Yes.
25      Q.   When you stated that at the

Page 19

T. LYONS

1  hearing, how long did you expect to hold that
2  position?
3       A.   The expected time could be anywhere
4  from two weeks up to eight months.
5       Q.   How long did you think you would
6  hold that position?
7           MS. LARAKERS:  Objection.
8       A.   I thought I would at least hold it
9  until they found someone hired -- qualified
10  field office director, until they hired a new
11  candidate for the position.
12      Q.   Were they looking for candidates
13  for that position --
14           MS. LARAKERS:  Objection.
15      Q.   -- in May?
16           MS. LARAKERS:  Objection.
17      A.   Yes.  There's always an open
18  rotating vacancy, not specifically for the
19  Boston office, but for field office directors
20  nationwide.
21      Q.   How long does a person typically
22  hold the position of acting field office
23  director?
24           MS. LARAKERS:  Objection.
25

Page 20

T. LYONS

1       A.   It can vary.  It can be one day
2  while the field office director is out on
3  leave, whether that be annually or sick leave.
4  It can be up to a month to four months,
5  depending upon the rotation schedule.
6       Q.   And how long did you hold that
7  position in Boston?
8       A.   Four days.  One day I was out on
9  leave.
10      Q.   Okay.  Why did you hold that
11  position for just four days?
12           MS. LARAKERS:  Objection.
13      A.   Because they brought in a senior
14  field office director to come in to mentor
15  management, as well as handle federal
16  litigation.
17      Q.   Were you told why they brought in a
18  senior field office director?
19           MS. LARAKERS:  Objection.
20      A.   Yes.
21      Q.   Were there any other reasons that
22  they brought in a senior field office
23  director?
24           MS. LARAKERS:  Objection.
25

Page 21

T. LYONS

1       A.   That was the only reason why I was
2  told.
3       Q.   When you said to handle federal
4  litigation, are you referring to this case?
5       A.   Yes.
6       Q.   Are there any other cases you're
7  referring to?
8       A.   To my knowledge --
9           MS. LARAKERS:  Objection.
10      A.   -- no.
11      Q.   When were you informed about the
12  end date of your service as acting FOD?
13           MS. LARAKERS:  Objection.
14      Q.   Do you mind if I refer to it as
15  FOD, the term used?
16      A.   That's fine.  I didn't want to have
17  to say it and explain what it was.
18           No, I was notified on May 31st of
19  the succession plan for the office.
20      Q.   Were you terminated from that
21  position?
22           MS. LARAKERS:  Objection.
23      A.   No.
24      Q.   Was your tenure as acting FOD
25

CONFIDENTIAL

Page 22

T. LYONS

1   shorter than you expected because of any
2   policies you implemented?
3       MS. LARAKERS:  Objection.
4       A.  No.
5       Q.  Was it shorter than you expected
6   because of any policies you planned to
7   implement?
8       MS. LARAKERS:  Objection.
9       A.  No.
10      Q.  Ms. Adducci has that position now,
11  correct?
12      A.  Yes.  She's currently the interim
13  field office director.  Interim, because she's
14  the director in Detroit.
15      Q.  When were you told that Ms. Adducci
16  would assume that position?
17      MS. LARAKERS:  Objection.
18      A.  May 31st.
19      Q.  Were you told why Ms. Adducci would
20  assume that position?
21      MS. LARAKERS:  Objection.
22      A.  Yes.
23      Q.  Were those for the reasons you
24  stated?

Page 23

T. LYONS

1       A.  Yes.
2       Q.  Do you anticipate being acting FOD
3   in Boston again?
4       A.  There has been discussion of me
5   taking over as the acting FOD once Ms. Adducci
6   returns to Detroit.
7       Q.  When would that be?
8       A.  I believe her detail ends August
9   19th.
10      Q.  How likely is it that you will
11  become acting FOD on August 19th?
12      MS. LARAKERS:  Objection.
13      A.  I can't really speculate to what
14  ICE, Immigration & Customs Enforcement
15  headquarters, would decide.
16      Q.  Do you know if they're looking for
17  somebody else for that position?
18      MS. LARAKERS:  Objection.
19      A.  Our field office director permanent
20  position is vacant.  Like I said, there's a
21  one-year open vacancy for any open FODs within
22  the U.S.
23      Q.  What do you mean there's a one-year
24  open vacancy?

Page 24

T. LYONS

1       A.  On the system that we apply to, USA
2   jobs, it's just an open continuous vacancy
3   that they can pull candidates from a list that
4   apply.
5       Q.  And it has been open for one year?
6       A.  No, not our position.  Our
7   position, the permanent position of the field
8   office director, was vacated in January of
9   2018.
10      Q.  Was that when Mr. Cronin left?
11      A.  Yes.
12      Q.  And the position would be for one
13  year?
14      A.  No.  The job announcement where
15  they could -- the pool of candidates could be
16  selected from.
17      MR. KANWIT:  Could we have a
18  moment?
19      MS. McCULLOUGH:  Sure.
20      (Government counsel confer off the
21  record)
22      Q.  So I believe we were asking about
23  the position of acting FOD in Boston.
24      You said that there was a job

Page 25

T. LYONS

1   announcement where they could -- the pool of
2   candidates could be selected from?
3       A.  Yes.
4       Q.  Are you in that pool of candidates?
5       A.  No.
6       Q.  Why not?
7       MS. LARAKERS:  Objection.
8       A.  At the time, I didn't apply.
9       Q.  Have you applied since?
10      MS. LARAKERS:  Objection.
11      A.  No.
12      Q.  Why not?
13      MS. LARAKERS:  Objection.
14      A.  Because it's a decision that I need
15  to discuss with my family if I want to pursue
16  that route or not.
17      Q.  When you were told that Ms. Adducci
18  would be coming to Boston to serve as the
19  interim FOD, were you surprised?
20      MS. LARAKERS:  Objection.
21      A.  No.
22      Q.  Were you disappointed?
23      MS. LARAKERS:  Objection.
24      A.  No.

CONFIDENTIAL

Page 26

T. LYONS

1
2    Q.  Why do you think Ms. Adducci
3  replaced you?
4        MS. LARAKERS:  Objection.
5    A.  I believe just for the reasons that
6  our executive associate director stated, that
7  they wanted a more seasoned field office
8  director.
9    Q.  Are there any other reasons?
10       MS. LARAKERS:  Objection.
11   A.  No.
12   Q.  You stated that they wanted
13 somebody to help handle the litigation,
14 correct?
15       MS. LARAKERS:  Objection.
16   A.  Yes.  They wanted a more senior
17 field office director with experience in all
18 aspects of enforcement and removal operations
19 to be able to mentor senior staff.
20   Q.  Do you know when Boston ERO will
21 have a permanent field office director?
22   A.  No.
23   Q.  Do you have any idea?
24   A.  No.
25   Q.  Is it possible that you would

Page 27

T. LYONS

1
2  become the permanent FOD in Boston?
3    A.  Yes, it's possible.
4    Q.  Even though you're not in the pool
5  of candidates?
6    A.  Yes.
7    Q.  How would they make that decision?
8        MS. LARAKERS:  Objection.
9    A.  I would have to apply.
10   Q.  Do you think that your replacement
11 as acting FOD had anything to do with your
12 testimony in May?
13       MS. LARAKERS:  Objection.  Can we
14 talk?  We can excuse him for a minute if you'd
15 like.  I just don't want to talk on the record
16 or have him here if we could have a
17 discussion.
18       MS. SEWALL:  Are you instructing
19 him not to answer the question?
20       MS. LARAKERS:  No.  We believe it's
21 way beyond the scope of the discovery order.
22 We obviously let it go on for a little while
23 yesterday and we'll let it go on for a little
24 while today.  But you've asked him the same
25 question a couple times now, and we think he

Page 28

T. LYONS

1
2  stated the answer to the question, so we
3  wouldn't really like this to go forward.
4        He specifically stated in his order
5  that anything with regard to the replacement
6  of him as acting FOD is not relevant to the
7  preliminary injunction, and that's the reason
8  why we think it's outside the scope.
9        If you have one or two more
10 questions, certainly go forward.  I just don't
11 want this to go on for much longer.
12       MS. McCULLOUGH:  This is the last
13 question.
14       MS. LARAKERS:  Okay.  Good.
15   Q.  I can restate the question.
16   A.  Sure.
17   Q.  Actually, I will just read it.  Do
18 you think that your replacement as acting FOD
19 had anything to do with your testimony in May?
20       MS. LARAKERS:  Objection.
21   A.  No, I don't think so.
22   Q.  You oversee operations in the
23 Boston area of responsibility, correct?
24   A.  Yes.  I oversee law enforcement
25 operations.

Page 29

T. LYONS

1
2    Q.  What is the Boston area of
3  responsibility?
4    A.  It includes all New England states,
5  Massachusetts, New Hampshire, Vermont, Rhode
6  Island and Connecticut, as well as Maine.
7    Q.  Do you report to anyone?
8    A.  I report to the field office
9  director.
10   Q.  Ms. Adducci currently?
11   A.  Yes.
12   Q.  Does anybody report to you?
13   A.  Yes.  I have three assistant field
14 office directors that report to me.
15   Q.  What are their names?
16   A.  The first one is Todd Thurlo,
17 T-h-u-r-l-o.  The second is Ms. Tina, and I'll
18 spell it, G-u-a-r-n-a hyphen Armstrong.  And
19 Anthony Ciulla, and it's C-i-u-l-l-a.
20   Q.  What are their job
21 responsibilities?
22   A.  They are assistant field office
23 directors.
24   Q.  What do those jobs entail?
25   A.  Mr. Thurlo is the assistant field

CONFIDENTIAL



Page 30

T. LYONS

1
2  office director for the northern states, as
3  well as congressional affairs.
4        Ms. Armstrong is the assistant
5  field office director over at-large
6  operations.
7        Q.  What does that mean?
8        A.  That entails the fugitive
9  operations program, the secure communities
10 operations.
11       And Mr. Ciulla is the assistant
12 field office director over the criminal alien
13 program, as well as the non-detained unit.
14       Q.  And what are your responsibilities?
15       A.  I oversee law enforcement
16 operations for all six -- well, primarily for
17 Massachusetts and the northern states, as well
18 as congressional affairs.
19       Q.  What does that mean?
20       A.  Dealing with local to include state
21 senators and representatives, as well as U.S.
22 congressional staff.
23       Q.  Communicating with them?
24       A.  Yes.
25       Q.  And you communicate with them about

Page 31

T. LYONS

1
2  ICE operations in New England?
3        A.  Yes.  Specifically answering any
4  type of questions they have for their
5  constituents.
6        Q.  You transferred to the Boston ERO
7  in September of 2017, correct?
8        A.  Yes.
9        Q.  And Christopher Cronin was the FOD
10 at that time, correct?
11       A.  Yes.
12       Q.  What was ERO Boston's policy with
13 respect to making arrests at CIS offices in
14 September 2017?
15       MS. LARAKERS:  Objection.
16       A.  ERO Boston, there is no specific
17 policy for making arrests at CIS.  There is no
18 specific policy within ERO for making arrests
19 at CIS.
20       ERO Boston would take enforcement
21 action on cases that were referred by CIS if
22 there was -- to see if there was some type of
23 enforcement scope, which ERO would act on.
24       Is it okay if I say ERO and not ICE
25 instead of spelling it out all the time?

Page 32

T. LYONS

1
2        Q.  You mean the same thing by both?
3        A.  Yeah.  I just don't want to confuse
4  all the components.
5        Q.  And you said there was no
6  enforcement policy?
7        A.  No, no.  I said there was no
8  policy.  There's no policy for making arrests
9  specifically at CIS.
10       Q.  In September of 2017?
11       A.  Yes.
12       Q.  You said ERO Boston would take
13 enforcement action on cases that were referred
14 by CIS?
15       A.  Yes.
16       Q.  What do you mean by "take
17 enforcement action"?
18       MR. KANWIT:  Are we talking about
19 Irrelevant discussion between coun_

Page 33

T. LYONS

1
2  Irrelevant discussion of counsel

16 BY MS. McCULLOUGH:
17       Q.  What was ERO Boston's policy with
18 respect to making arrests at CIS offices in
19 September of 2017?
20       A.  ERO Boston didn't have a specific
21 policy as far as making arrests at CIS.  ERO
22 Boston followed the executive order -- I
23 believe it's 13756 -- along with General
24 Kelly's implementation letter for the
25 executive order, which outlines specific

CONFIDENTIAL

Page 34

T. LYONS

1
2  priorities of non-document -- people that were
3  subject to arrest under the executive order.
4        One of those categories under
5  Subsection (f) fell -- the way the statute is
6  written, aliens that are subject to a final
7  order or previously deported were subject to
8  arrest under the executive order.
9        That's the written policy that ICE
10 Boston followed.
11       Q.  Is your interpretation of that
12 policy that anybody with a final order is
13 subject to arrest?
14       A.  Yes.
15       Q.  Is your interpretation of that
16 policy that no exemptions are permitted,
17 regardless of the location of the arrest?
18       A.  Each case is reviewed case by case
19 based on the circumstances.  ICE does have a
20 specific set of sensitive locations where
21 arrests are not made.
22       Q.  CIS offices are not one of those
23 locations, correct?
24       A.  No.
25       Q.  Did Mr. Cronin give instructions

Page 35

T. LYONS

1
2  about arrests at CIS?
3        A.  Mr. Cronin had us focus primarily
4  on implementation of the executive order based
5  upon criminality, if someone had a valid final
6  order issued by a federal immigration judge.
7        Q.  What else did he say about how to
8  implement the executive order?
9        A.  What do you mean by what did he
10 say?
11       Q.  Did he say anything about CIS
12 offices, arrests at CIS offices?
13       A.  No.  CIS referred cases to ERO
14 about cases which had final orders and were
15 subject to arrest under the executive order.
16       Q.  And then was it ICE -- ICE then
17 made a decision about what to do with those
18 referrals, correct?
19       A.  Yes.
20       Q.  Did Mr. Cronin instruct you to do
21 anything in response to those referrals?
22       A.  We looked at each case, case by
23 case, as far as if there was going to be some
24 type of enforcement action.
25       Q.  Did Mr. Cronin instruct you to

Page 36

T. LYONS

1
2  arrest people with final orders of removal at
3  CIS offices?
4        A.  Mr. Cronin gave us the ability to
5  make arrests of anyone subject to a final
6  order.
7        Q.  He never mentioned CIS offices to
8  you?
9        A.  If it fell within the scope of the
10 executive order, we had ERO Boston officers
11 were authorized to make that arrest.
12       Q.  Did he ever say to you anything
13 about making an arrest at a CIS office?
14       A.  No.
15       Q.  Do you know if the Boston ERO has
16 always made arrests at CIS offices?
17       MS. LARAKERS:  Objection.
18       A.  I can't speak to what it did prior
19 to when I got here.
20       Q.  When you got there, they were
21 making arrests at CIS offices?
22       A.  Yes.
23       Q.  Did anybody at the Boston ERO give
24 you -- talk to you about arrests at CIS
25 offices?

Page 37

T. LYONS

1
2        A.  Specifically in what capacity do
3  you mean?  It's kind of open-ended question.
4  That's why I'm just wondering what you
5  specifically kind of want.
6        Q.  When you arrived in September of
7  2017, did anyone at the Boston office tell you
8  anything about ICE's practice of making
9  arrests at CIS offices?
10       A.  My assistant field office director
11 for enforcement at the time advised me how
12 often and how they received referrals from
13 CIS.
14       Q.  Did he explain to you how they
15 respond to those referrals?
16       A.  Yes.  She explained how each case
17 -- how she vet the cases.
18       Q.  Was Mr. Cronin aware of this
19 process?
20       A.  Yes.
21       Q.  And did he approve of this process?
22       MS. LARAKERS:  Objection.
23       A.  Yes.
24       Q.  Was it the practice in Boston, the
25 Boston ERO, to arrest people with final orders

Page 38

T. LYONS

1  of removal at CIS offices, regardless of
2  whether they had a criminal record?
3      A.  Could you repeat the question?
4      Q.  Was it the practice of the Boston
5  ERO to arrest people with final orders of
6  removal at CIS offices, regardless of whether
7  they had a criminal record?
8      A.  Yes.  At the time if the subject
9  fell within the scope of the executive order,
10  specifically Subsection (f) like I referred
11  to.
12      Q.  Was it the practice to arrest
13  people with final orders at CIS offices,
14  regardless of whether there was -- they were
15  considered dangerous?
16      A.  Yes.  If the subject had a valid
17  unexecuted final order or was deported by an
18  immigration judge and then reentered the United
19  States after being formally removed by an
20  immigration judge, then yes.
21      (Lyons Exhibit 1, E-Mail to Todd
22  Lyons from Confidential/PII, dated 5/24/18, with
23  attached e-mails, marked for identification)
24      Q.  Mr. Lyons, do you recognize the

Page 39

T. LYONS

1  document?
2      MS. LARAKERS:  What exhibit?
3      MS. McCULLOUGH:  I'm sorry.  This
4  document has been marked as Exhibit 1.
5      MS. LARAKERS:  Okay.
6      Q.  Mr. Lyons, do you recognize the
7  document you have been handed marked as
8  Exhibit 1?
9      A.  Yes.
10      Q.  What is this document?
11      A.  It's an e-mail that I received from
12  SDDO Confidential/PII.
13      Q.  And when did you receive this
14  e-mail?
15      A.  May 24, 2018.
16      Q.  CONFIDEN says in this e-mail,
17  "This is the earliest organized effort that I
18  had any involvement with since the end of the
19  enforcement priorities policy," correct?
20      A.  Yes.
21      Q.  What is the enforcement priorities
22  policy that he's referring to?
23      MS. LARAKERS:  Objection.
24      A.  He's referring to the previous

Page 40

T. LYONS

1  administration's executive order, which is
2  known as the Prior Enforcement Program, PEP.
3      Q.  And generally, what did that
4  involve?
5      MS. LARAKERS:  Objection.
6      A.  It had a limited scope as far as
7  cases that ICE took enforcement action on.
8      Q.  Were there specific criteria given
9  for making enforcement decisions?
10      MS. LARAKERS:  Objection. Form.
11      A.  There was basis of criminality,
12  criminal history, and there was an entry date
13  or a final order date, which I'm not familiar
14  with off the top of my head.
15      Q.  And this ended -- did this policy
16  end when the executive order went into effect?
17      A.  Yes.
18      Q.  During your time at Boston ERO in
19  end of 2017, did ICE ever decline to
20  arrest a person appearing at a CIS office for
21  an interview because that person was eligible
22  for provisional waivers?
23      A.  We were never notified of what
24  exactly the person had applied for or the

Page 41

T. LYONS

1  status of what their interview was.
2      We made the decision to decline an
3  arrest or not take enforcement action based
4  upon numerous different, I guess you could
5  say, options.
6      But as far as what they were
7  applying for, no, that wasn't one of the
8  options or one of the considerations, I should
9  say.
10      (Lyons Exhibit 2, E-Mail to Vance
11  Ely from Thomas Brophy, dated 2/13/18, with
12  attached e-mails, marked for identification)
13      Q.  Mr. Lyons, you have been handed
14  what's been marked as Exhibit 2.
15      A.  Yes.
16      Q.  Do you recognize this e-mail or
17  this document?
18      A.  Yes.
19      Q.  What is it?
20      A.  It's an e-mail from myself to the
21  supervisors in the Rhode Island office.
22      Q.  And if you look at the second
23  e-mail that you were sent on February 13,
24  2018.  Do you see that?  Sorry, it's the

Page 42

T. LYONS

1
2  second e-mail on the first page of the
3  document I handed you.
4      A.  From Vance Ely?
5      Q.  Yes.
6      A.  Yes.
7      Q.  And Mr. Ely says, "Yes, there were
8  two cases targeted for arrest at U.S. CIS on
9  1/17/2018; Lilian Calderon," and he gives her
10 A number, "and Confidential/PII ," and he
11 gives his A number.  "The cases/subjects were
12 unrelated.  However, during the officer's
13 initial encounter with Confidential/PII , it
14 appeared he was DACA pending/eligible and no
15 enforcement action was taken, allowing
16 officers the opportunity to conduct further
17 investigation into his case."
18      Did I read that correctly?
19      A.  Yes.
20      Q.  Did ICE officers decline to take
21 enforcement action against Mr.
22 ████████████ because of his eligibility
23 for DACA?
24      A.  Yes.
25      Q.  But ICE officers did not decline to

Page 43

T. LYONS

1
2  take enforcement action against Ms. Calderon,
3  correct?
4      A.  Yes.  She was arrested.
5      Q.  Are you aware that Ms. Calderon was
6  applying for provisional waivers?
7      A.  No.
8      Q.  You were aware Ms. Calderon was
9  coming for an I-130 interview, correct?
10     A.  Yes.  I was notified of her arrest
11 after.  I don't cover Rhode Island.  That's
12 Deputy Rutherford.
13     Q.  Individuals were arrested -- strike
14 that.
15     Referral -- CIS referred cases to
16 ICE of individuals who were potentially going
17 to be interviewed for I-130 interviews,
18 correct?
19     A.  Yes.
20     Q.  And that's at the end of 2017 and
21 beginning of 2018, correct?
22     A.  Yes.
23     Q.  Did ICE ever decline to arrest
24 somebody because their I-130 application was
25 likely to be approved?

Page 44

T. LYONS

1
2      A.  I can't give you a definite answer,
3  because I would have to see the A file and see
4  what the circumstances of the case were.
5      Q.  Do you know of any instances where
6  ICE declined to arrest somebody because they
7  became aware that their I-130 was likely to be
8  approved?
9      A.  Off the top of my head, I don't
10 recall.
11     Q.  Were you or was anyone -- sorry.
12 Did you ever give anyone instructions about
13 arresting someone at CIS if their I-130 was
14 likely to be approved?
15     A.  No.
16     Q.  Were instructions like that given
17 in your office at any time?
18     A.  I don't believe so.  Like I said,
19 each case was dealt with on a case-by-case
20 basis through the supervisor and the assistant
21 field office director and with guidance from
22 chief counsel.
23     Q.  So ICE officers would arrest people
24 even if their I-130s were likely to be
25 approved?

Page 45

T. LYONS

1
2      MS. LARAKERS:  Objection.
3      A.  Yes.  But I can't think of a
4  specific case to refer you to.
5      Q.  And ICE arrested people whose
6  I-130s had, in fact, been approved, correct?
7      A.  I'm not sure as far as -- are you
8  talking about a specific case in general?  I'm
9  not sure which ones had specifically approved?
10     Q.  I'm asking if it ever happened
11 while you were --
12     A.  It could have happened, yes.
13     Q.   -- in Boston.
14     Did ICE receive any information
15 from CIS regarding whether a person was
16 eligible for provisional waivers?
17     A.  No.  To the best of my knowledge,
18 no.
19     Q.  So CIS referrals tell ICE when a
20 non-citizen subject to a final order of
21 removal will appear for an I-130 interview,
22 correct?
23     A.  Yes.
24     Q.  In fact, CIS referrals include a
25 full list of pending I-130 interviews where

CONFIDENTIAL

Page 46

T. LYONS

1 the beneficiary is subject to a final order of
2 removal, correct?
3          MS. LARAKERS:  Objection.
4     A.  Yes.
5     Q.  ICE tells CIS which non-citizens it
6 wants to arrest, correct?
7     A.  Yes.
8     Q.  And CIS would then schedule
9 interviews for -- would then schedule those
10 interviews at a time convenient for ICE to
11 come in and arrest those individuals, correct?
12     A.  Yes.
13     Q.  CIS even tells ICE when an
14 individual arrives for his or her interview,
15 correct?
16     A.  Yes.
17     Q.  And ICE updates CIS about the
18 progress -- excuse me.  CIS updates ICE about
19 the progress of the interview, correct?
20     A.  I'm not sure on that.  What do you
21 mean by that one?
22     Q.  Would CIS tell ICE officers when
23 they thought the interview was likely to
24 conclude?
25

Page 47

T. LYONS

1     A.  I've never been out on a CIS arrest
2 here in the Boston office, so I can't say if
3 they do or not.
4     Q.  And ICE will arrest individuals
5 immediately following their interview,
6 correct?
7     A.  Yes.
8     Q.  And ICE would arrest those
9 individuals regardless of the outcome of that
10 interview, correct?
11     A.  Yes.
12     Q.  In other words, whether the I-130
13 application was approved or not would not
14 impact the decision to arrest, correct?
15     A.  The decision to arrest would take
16 several different factors, including officers
17 discussing the case with the adjudication
18 officer.
19     Q.  Would that decision have been made
20 before the CIS interview?
21     A.  It could have been.  It could have
22 been, depending upon the discussion that the
23 field team supervisor had with the
24 adjudications officer or the supervisor of
25

Page 48

T. LYONS

1 that office; the CIS office specifically.
2     Q.  Would ICE officers discuss the
3 outcome of the interview with the CIS officer
4 upon arrival at CIS?
5     A.  They could, yes.
6     Q.  Do you know of any instances where
7 they did?
8     A.  No, I do not.
9          (Lyons Exhibit 3, E-Mail to James L.
10 Rutherford from CONF████████ dated 1/30/18,
11 with attached e-mails, marked for
12 identification)
13     Q.  Mr. Lyons, do you recognize the
14 document that has just been handed to you
15 marked as Exhibit 3?
16     A.  Yes.
17     Q.  And what is this document?
18     A.  It's another e-mail from Supervisor
19 CONF████
20     Q.  When was it sent?
21     A.  It is sent January 30th.
22     Q.  2018?
23     A.  Yes.
24     Q.  And who is CONF██████?
25

Page 49

T. LYONS

1     A.  He's a supervisory deportation
2 officer on one of our fugitive operations
3 units.
4     Q.  What are his responsibilities?
5     A.  He oversees a team of six
6 deportation officers that are assigned a
7 specific geographic area within -- in this
8 case, the State of Massachusetts, where they
9 conduct at-large arrests.
10     Q.  What's an at-large arrest?
11     A.  Meaning that it's someone that's
12 not already in law enforcement custody,
13 whether it be state or local sheriff's office.
14     Q.  What's an arrest that's not an
15 at-large arrest?
16     A.  Someone that's been arrested, say,
17 by the Boston Police Department, who has
18 either an outstanding final order, been
19 previously removed from the United States and
20 has already been arrested for another crime
21 within the Commonwealth, and at that point is
22 turned over to immigration and customs.
23     Q.  Does CONF██████ report to you?
24     A.  He reports to Ms. Tina Armstrong,
25

CONFIDENTIAL



Page 50

T. LYONS

1  and she reports to me.
2      Q.  Does he perform his job well?
3      A.  Yes.
4      (Lyons Exhibit 4, E-Mail to Todd M.
5  Lyons from CONF                    , dated 1/30/18, with
6  attached e-mails, marked for identification)
7      Q.  Mr. Lyons, you've just been handed
8  what is been marked as Exhibit 4.  Do you
9  recognize this document?
10     A.  Yes.
11     Q.  What is it?
12     A.  It's another e-mail from CONF
13  ___ to myself and Deputy Rutherford and
14  Director Cronin.
15     Q.  Do you see the attachment at the
16  back of that document?
17     A.  The one that's highlighted?
18     Q.  Yes.
19     A.  Yes.
20     Q.  Do you recognize this?
21     A.  Yes.
22     Q.  Did ICE Boston send this chart to a
23  CIS office?
24     A.  I'm not sure on this specific one,

Page 51

T. LYONS

1  because I've seen several, but this is one
2  that we would send back to CIS.
3      Q.  And this shows which individuals
4  ICE sought to arrest, correct?
5      A.  Arrest and not arrest.
6      Q.  And this shows that ICE sought to
7  arrest most of the individuals applying for
8  I-130s in January, correct?
9      MS. LARAKERS:  Objection.
10     A.  Yes.
11     Q.  This shows that ICE sought to
12  arrest individuals coming in for interviews
13  who had no criminal record, correct?
14     A.  They had no criminal record, but
15  they did have a final order of removal.
16     Q.  Do you know how many of these
17  people ICE arrested?
18     A.  No.
19     Q.  Do you have any idea?
20     A.  I would be speculating if I gave
21  you a number.  I can't give you...
22     Q.  Do you think it was more than half
23  of the people marked will arrest barring
24  significant medical or childcare issues?

Page 52

T. LYONS

1      MS. LARAKERS:  Objection.
2      A.  No.  Again, I would just be
3  guessing if I gave you a number.
4      Q.  Do you think it was more than a
5  quarter of those people?
6      MS. LARAKERS:  Objection.
7      A.  I'm not sure.
8      Q.  CIS schedule interviews in
9  conjunction with ICE, correct?
10     A.  Yes.
11     Q.  And this allowed, at least in one
12  instance, six arrests to be executed on one
13  day, correct?
14     A.  That sounds right.  I'm not sure if
15  it was one day, but I know definitely it was
16  at least within a week's span.  But
17  specifically one day, I'm not sure if it was
18  one day.
19     Q.  Do you recall the day that Ms.
20  Calderon was arrested multiple others were
21  arrested?
22     A.  That sounds right, yes.
23     Q.  Who at ICE works with CIS to
24  schedule interviews?

Page 53

T. LYONS

1      A.  CONF
2  ___
3  ___
4      Q.  Who are those at ICE?
5      A.  CONF
6  ___
7      Q.  Do you know who they work with at
8  CIS to schedule the interviews?
9      A.  I'm sorry, I don't.
10     Q.  Have you ever communicated with
11  individuals at CIS about these interviews?
12     A.  No, ma'am.
13     Q.  Does CIS schedule interviews it
14  would not otherwise schedule to facilitate an
15  arrest by ICE?
16     MS. LARAKERS:  Objection.
17     A.  I'm not sure what you mean.
18     Q.  Are you aware that interviews are
19  not required for an I-130 to be approved?
20     A.  No, I'm not familiar with the CIS
21  side of the operations.
22     Q.  You don't know if interviews are
23  required or not required --

CONFIDENTIAL

Page 54

T. LYONS

1
2    A.  No.  I've never been trained as an
3  adjudicator, so I don't know.
4    Q.  Do you know what an I-130 is?
5    A.  Yes.
6    Q.  What is it?
7    A.  It's a petition for a relative.
8    Q.  Is the person applying for
9  immigration benefits for their relative?
10    A.  Yes.
11    Q.  Sometimes CIS will approve --
12  strike that.
13        CIS spreads out interviews so that
14  ICE spreads out interviews so that
15  ICE officers have the capacity to make all the
16  arrests they are interested in making,
17  correct?
18        MS. LARAKERS:  Objection.
19    A.  They have that ability, yes.
20    Q.  And they did that, correct?
21        MS. LARAKERS:  Objection.
22    A.  If our supervisors coordinate it
23  with the supervisor of that specific ICE
24  office, then yes.
25    Q.  Are you aware that it was difficult
    Q.  Are you aware that it was difficult
    for ICE to make many arrests on a single day?

Page 55

T. LYONS

1
2    A.  Yes.
3    Q.  And so it was to ICE's advantage or
4  it facilitated ICE's arrest for CIS to spread
5  those interviews out over multiple days?
6    A.  Well, ICE has extremely limited
7  resources.  So yes.
8    Q.  Does CIS typically accommodate
9  ICE's requests for an interviews schedule?
10        MS. LARAKERS:  Objection.
11    A.  I believe so.
12    Q.  Are you familiar with CONF
13
14    A.  No, I'm not.  Sorry.
15    Q.  Can you turn back to Exhibit 1,
16  please.
17    A.  Okay.
18    Q.  And the second e-mail on the first
19  page, beginning the -- the paragraph that
20  begins, "As far as scheduling goes."  Do you
21  see that paragraph?
22    A.  On the second page?
23    Q.  The first page.  The second
24  paragraph on the first page.
25    A.  Okay.

Page 56

T. LYONS

1
2    Q.  And this says -- CONF says in
3  the second paragraph, "As far as scheduling
4  goes, I would prefer not to do them all at one
5  time as it is not only a strain on our ability
6  to transport and process several arrests at
7  once, but it also has the potential to be a
8  trigger for negative media interest, as we
9  have seen in the past.  If you have the
10  ability to schedule one or two at a time and
11  spread them apart, that would work best for
12  us."
13        Did I read that correctly?
14    A.  Yes.
15    Q.  Did ICE try to avoid media
16  attention in making these arrests?
17    A.  Yes.
18    Q.  Was this kind of coordination with
19  CIS common in the end of 2017 and beginning of
20  2018?
21    A.  Yes.  The field supervisors would
22  coordinate with whoever their point of contact
23  is, which was usually someone at the
24  supervisory level at CIS.
25    Q.  Does ICE still get referrals from

Page 57

T. LYONS

1
2  CIS?
3    A.  Yes.
4    Q.  These come monthly?
5    A.  I'm not sure if monthly, but at
6  least every couple of weeks.
7    Q.  And --
8    A.  Some come in one, two at a time.
9  Others will come in in a batch.
10    Q.  Will CIS send ICE a spreadsheet of
11  individuals with final orders who may be
12  scheduled for I-130 interviews?
13    A.  If it's a large number, yes.  It's
14  usually a spreadsheet, yes.  But I've also
15  seen it done with one or two names on it.
16    Q.  Does CIS send ICE the name of every
17  person with a final order who is coming in for
18  an I-130 interview?
19        MS. LARAKERS:  Objection.
20    A.  To that, I don't know.
21    Q.  Do you know if they try to send
22  them for every person?
23        MS. LARAKERS:  Objection.
24    A.  I don't know.
25    Q.  Do you know, approximately, how

CONFIDENTIAL

Page 58

T. LYONS

1
2 many referrals ICE receives from CIS every
3 month?
4      A.  No.
5      Q.  Does CIS inform the person who has
6 been scheduled for an I-130 interview that CIS
7 has referred them to ICE?
8      MS. LARAKERS:  Objection.
9      A.  I'm not sure what CIS tells them.
10      Q.  Do you have any idea?
11      A.  No.
12      Q.  Do you think they know that they
13 have been referred to ICE?
14      MS. LARAKERS:  Objection.
15      A.  I don't know.
16      Q.  Do you think they would come to
17 their interview if they knew they had been
18 referred to ICE?
19      MS. LARAKERS:  Objection.
20      A.  No.
21      Q.  Do you think they would not come?
22      MS. LARAKERS:  Objection.
23      A.  No.
24      Q.  Given that people do come to their
25 interviews, do you think they don't know they

Page 59

T. LYONS

1
2 have been referred to ICE?
3      MS. LARAKERS:  Objection.
4      A.  I would be speculating, but yes.
5      Q.  Do you think CIS and ICE together
6 are tricking these people?
7      MS. LARAKERS:  Objection.
8      A.  No.
9      Q.  These people think they're coming
10 in for an interview that will help them pursue
11 immigration benefits, correct?
12      A.  Yes.
13      Q.  And even if that interview is
14 successful, they are arrested and potentially
15 detained, correct?
16      MS. LARAKERS:  Objection.
17      A.  They could be, yes.
18      Q.  Do you think if people knew that
19 this was ICE's practice, they would continue
20 to come for these interviews?
21      MS. LARAKERS:  Objection.
22      A.  I can't speak to what they would do
23 or not.  But the subjects know they do have a
24 final order of removal.  If they know that
25 they were supposed to leave the United States,

Page 60

T. LYONS

1
2 I don't think they would show up.
3      Q.  Does CIS conduct these interviews
4 to help them adjudicate I-130 applications?
5      MS. LARAKERS:  Objection.
6      A.  I guess what do you mean?  Do you
7 mean like the validity of an application?
8      Q.  Yes.
9      A.  Yes.
10      Q.  By deterring people from coming to
11 these interviews, is ICE inhibiting CIS's
12 ability to do its job?
13      MS. LARAKERS:  Objection.
14      A.  No, because I think if someone is
15 trying to apply for a benefit, and who has not
16 already been ordered by an immigration judge
17 or federal judge, in most cases, with a prior
18 deportation order, they will still come.
19      Q.  But with respect to people who have
20 final orders?
21      A.  Most people with final orders would
22 more likely not show up, because they have
23 already been ordered and either evaded
24 immigration enforcement or evaded a judge's
25 order already.

Page 61

T. LYONS

1
2      Q.  Does that mean that people with
3 final orders are practically not able to apply
4 for these benefits?
5      MS. LARAKERS:  Objection.
6      A.  They can apply, sure.
7      Q.  But they will be arrested?
8      MS. LARAKERS:  Objection.
9      A.  Like I said, each case is looked at
10 case by case.  So...
11      Q.  But the majority of cases, as we
12 discussed, ICE seeks to arrest, barring
13 significant medical or childcare issues,
14 correct?
15      MS. LARAKERS:  Objection.
16      A.  Yes.  Because final orders, like I
17 said previously, it's, you know, priority
18 under the executive order.
19      Q.  So people who are applying for
20 benefits who have final orders have no reason
21 to show up to their interviews?
22      A.  Well, they are subject to arrest.
23      MS. LARAKERS:  Objection.
24      A.  I'm not sure if they were advised
25 either by an attorney to show up or they got

CONFIDENTIAL

Page 62

T. LYONS

1  bad information.
2      Q.  You think they should not show up?
3      MS. LARAKERS:  Objection.
4      A.  It's really not my place to say if
5  they should show up or not.
6      Q.  If you were them, would you show
7  up?
8      MS. LARAKERS:  Objection.
9      A.  I can't speak to what they would do
10 or not do.
11     Q.  What would you do?
12     MS. LARAKERS:  Objection.
13     A.  I'm not in that position.  I'd just
14 be speculating on what someone else would do.
15     Q.  But you agree that if they knew
16 that this was the policy, many fewer people
17 would come to I-130 interviews who have final
18 orders of removal?
19     MS. LARAKERS:  Objection.
20     A.  I believe so, because they're
21 subject to that final order of removal.
22     Q.  What do you know about provisional
23 waivers?
24     A.  In what capacity, ma'am?

Page 63

T. LYONS

1      Q.  Do you know what they are?
2      A.  Yes.  Do you mean at the time
3  people are applying in lieu of leaving the
4  United States to adjust their status?
5      Specifically, people in the past
6  used to -- when they used to leave to counsel
7  a process, as they call it, would return to
8  their home country to apply and go through the
9  counselor process interview outside of the
10 U.S., whereas the provisional waiver allows
11 them to remain in the U.S. while they go
12 through that same process.
13     Q.  And that allows them to shorten the
14 amount of time they are abroad before
15 re-entering the United States, correct?
16     A.  Yes.
17     Q.  And what are the forms a person has
18 to file in applying for provisional waivers?
19     A.  Off the top of my head, I'm not
20 sure.
21     Q.  Are you aware that the I-130 is the
22 first step in that process?
23     A.  Yes, the I-130s is the first step
24 in most immigration proceedings -- well, I

Page 64

T. LYONS

1  should say immigration benefits, application.
2      Q.  Are you aware of a change that was
3  made to the waiver process in 2016 with
4  respect to people with final orders of
5  removal?
6      A.  Yeah, well that was the provisional
7  waiver which allowed them to remain in the
8  U.S. while speaking counselor process in lieu
9  of returning to their home nation.
10     Q.  Do you know the purpose of that
11 change?
12     A.  The specific purpose, no.  But I
13 would say that it would be to shorten the
14 time, if you will.
15     Q.  Do you believe or are you aware
16 this increased the number of people applying
17 for provisional waivers?
18     A.  I don't know anything about the CIS
19 statistics, if you will, about the increase or
20 decrease in applications.  But I would
21 speculate that, yes, it would increase.
22     Q.  Are you familiar with the
23 petitioners in this litigation at all?
24     A.  Yes.

Page 65

T. LYONS

1      Q.  You're aware that they are all
2  pursuing provisional waivers?
3      A.  Yes.
4      Q.  You're aware that they all have
5  final orders of removal?
6      A.  Yes.
7      Q.  You're aware that they are all
8  married to U.S. citizens?
9      A.  I know specifically about Calderon,
10 Ms. Calderon in that case.  But I'm not too
11 familiar on the other ones, no, ma'am.
12     Q.  You're aware the provisional waiver
13 process is extended to people, among others,
14 who are married to U.S. citizens?
15     A.  Yes.
16     Q.  Are you aware that many of these
17 couples have U.S. citizen children?
18     A.  Yes.
19     Q.  Are you aware that two of the
20 petitioners in this case appeared for I-130
21 interviews?
22     A.  Yes.
23     Q.  Are you aware that CIS decided that
24 they had bona fide marriages?

CONFIDENTIAL

Page 66

T. LYONS

1
2     A.  Off the top of my head, no.
3  Without the case file in front of me, I would
4  just be speculating.  I'm not into the files
5  as much as that.
6     Q.  Are you aware that ICE arrested and
7  detained them at CIS offices immediately
8  following their interviews?
9     MS. LARAKERS:  Objection.
10    A.  Which ones, ma'am?
11    Q.  Both Confidential/ and Confidential/ .
12    A.  Yes.
13    Q.  Are you aware that the named
14 petitioners in this case have not been removed
15 from the United States?
16    A.  Do you mean that they are still in
17 the U.S.?
18    Q.  Yes.
19    A.  Yes, ma'am.
20    Q.  Do you know why?
21    A.  They have stays in place, ma'am,
22 stays of deportation to pursue their
23 provisional waivers.
24    Q.  If those stays were not in place,
25 would they be subject to removal under the

Page 67

T. LYONS

1
2  executive order?
3     A.  Under the executive order, yes,
4  they are subject to removal.
5     Q.  So the provisional waiver process,
6  you're aware, was extended specifically to
7  people with final orders of removal, correct?
8     A.  Yes.
9     Q.  And the benefits that it confers of
10 a shorter family separation time are
11 specifically made available to people with
12 final orders of removal?
13    A.  Yes.
14    Q.  But when people with final orders
15 of removal who are married to U.S. citizens
16 apply for -- excuse me, take the first step in
17 applying for provisional waivers by attending
18 their I-130 interview, they are likely to be
19 arrested by ICE, correct?
20    MS. LARAKERS:  Objection.
21    A.  They could be on a case-by-case
22 basis, yes.
23    Q.  And they could be removed?
24    MS. LARAKERS:  Objection.
25    A.  Yes.

Page 68

T. LYONS

1
2     Q.  And then they would have to seek
3  waivers from outside the United States?
4     A.  Yes.
5     Q.  They would not receive any of the
6  benefits of the provisional waiver process,
7  correct?
8     MS. LARAKERS:  Objection.
9     A.  If they are already removed, no.
10    Q.  So ICE is effectively eliminating
11 the benefits of the 2016 provisional waiver
12 process by arresting and removing people of
13 these I-130 interviews, correct?
14    MS. LARAKERS:  Objection.
15    A.  Were arrested subject to a final
16 order that have eluded an immigration judge.
17 We've arrested individuals that have eluded a
18 judge's order sometimes several years.  We
19 don't know what they are applying for at the
20 time.
21    Q.  They may be applying for
22 provisional waivers, correct?
23    A.  They could be, yes.
24    Q.  And provisional waivers are
25 specifically available to people who, as you

Page 69

T. LYONS

1
2  say, have been eluding a judge's order?
3     A.  Yes.
4     Q.  So these people are not able to
5  receive the benefits that they are legally
6  entitled to, correct?
7     MS. LARAKERS:  Objection.
8     A.  Yes.  If they apply for them, they
9  are.
10    Q.  If they are arrested and removed,
11 as we just discussed, they don't receive the
12 benefits of the provisional waiver process,
13 correct?
14    A.  If their attorney of record is
15 applying for them still, and CIS said there's
16 a bona fide case as far as the merits of their
17 application, they won't be removed.
18    Q.  I believe we just looked at a list
19 of individuals who were applying for I-130s --
20    A.  Yes.
21    Q.   -- most of whom ICE had expressed
22 an interest in removing, correct?
23    MS. LARAKERS:  Objection.
24    Q.  And you agreed that ICE had removed
25

CONFIDENTIAL

Page 70

T. LYONS

1
2 individuals whose I-130s had been approved,
3 correct?
4         A.  Yes.
5         Q.  So even if their I-130s are
6 approved, ICE may still remove them, correct?
7         A.  Yes.
8         Q.  And those people are denied the
9 benefits of the provisional waiver process,
10 correct?
11         MS. LARAKERS:  Objection.
12         A.  I don't know if CIS denied their
13 provisional waiver or not.
14         Q.  ICE has eliminated their ability to
15 receive the benefits of the provisional waiver
16 process by removing them, correct?
17         MS. LARAKERS:  Objection.
18         A.  Not if they applied before removal.
19         Q.  Provisional waivers prevent
20 prolonged family separation, correct?
21         A.  Yes.
22         Q.  So unlike waivers, they allow an
23 individual to be separated from their family
24 abroad for a short period of time?
25         A.  Yes.

Page 71

T. LYONS

1
2         Q.  So when a person is removed by ICE,
3 that person is not able to receive the
4 benefits of the provisional waivers, correct?
5         A.  A person is not just removed
6 overnight from ICE.
7         Q.  How long could it take?
8         A.  It's case by case.
9         Q.  You agree that petitioners in this
10 case might be removed if it were not for the
11 stay entered by the judge, correct?
12         MS. LARAKERS:  Objection.
13         A.  Yes.
14         Q.  And are you aware that they have
15 not all completed the provisional waiver
16 process?
17         A.  Yes.
18         Q.  So they would have to wait abroad
19 while those waivers are adjudicated, correct?
20         MS. LARAKERS:  Objection.
21         A.  The stay was granted, so they could
22 adjudicate the provisional waiver.
23         Q.  For individuals not protected by
24 the stay, they would have to wait -- if they
25 were removed, they would have to wait abroad

Page 72

T. LYONS

1
2 where their waivers are adjudicated, correct?
3         MS. LARAKERS:  Objection.
4         A.  I can't speak to the case not
5 knowing it, but yes.
6         Q.  So those individuals would not
7 receive the benefits of the provisional waiver
8 process, correct?
9         A.  No.
10         Q.  No, that's correct?
11         A.  No, they wouldn't.  Sorry about
12 that.  Before you do the next exhibit, would
13 you mind if I use the men's room?
14         Q.  Sure.  Do you want to take a break?
15 We'll go off the record.
16         VIDEOGRAPHER:  We are going off the
17 record at 10:54.
18         (Recess taken at 10:54 a.m. and
19 reconvening at 11:16 a.m.)
20         VIDEOGRAPHER:  We are back on the
21 record at 11:16.
22         Irrelevant comment of counsel
■
■

Page 73

T. LYONS

1
2         Irrelevant comment of counsel
■
■
■
■
7         MS. McCULLOUGH:  Okay.  Could you
8 mark that as Exhibit 5.
9         (Lyons Exhibit 5, E-Mail to Tina
10 Guama-Armstrong from Todd M. Lyons, dated
11 7/16/18, marked for identification)
12         Q.  Mr. Lyons, you have just been
13 handed what has been marked as Exhibit 5.
14         A.  Yes.
15         Q.  Do you recognize this document?
16         A.  Yes.
17         Q.  What is it?
18         A.  It is a spreadsheet, it's a
19 consolidation of all CIS referrals that
20 supervisors and the assistant field office
21 directors had from July of 2017 to now.
22         Q.  And how was this document made?
23         A.  I had one of the assistant field
24 office directors create it based upon my
25 instructions.  It's the third e-mail when you

CONFIDENTIAL

Page 74

T. LYONS

1  flip to that page -- I'm sorry, the page you
2  were just -- based upon the bullets right
3  there for discovery in the litigation.
4      Q.  What information did Tina, Steve
5  and Vance use to create the spreadsheet?
6      MS. LARAKERS:  Objection.
7      A.  What do you mean information?  Do
8  you mean sources, how they got it?
9      Q.  Yes.
10     MS. LARAKERS:  Objection.
11     A.  They would have built the
12  spreadsheet based upon ERO systems checks,
13  records within a subject's alien file or the A
14  file, e-mails, traffic from CIS to ERO
15  supervisors.
16     Q.  To identify the initial
17  identification of the names to put in the
18  spreadsheet, was that done by referencing
19  e-mails from CIS?
20     A.  I believe so, yes, because there's
21  no other way that we track CIS referrals.
22  There's no ERO centric system that talks to
23  the CIS system.  It would have to come from
24  e-mail-based referrals.

Page 75

T. LYONS

1      Q.  Is there any other way to track
2  whether a person has been arrested at an I-130
3  interview?
4      A.  No.  There would be a way based
5  upon site location in the ERO system.  But
6  that's the only other way if you search by
7  that.
8      Q.  Could you search by that using key
9  word search?
10     MS. LARAKERS:  Objection.
11     A.  You can either search by a site
12  location or you could search by a number or a
13  name.
14     Q.  In the database that tracks --
15     A.  It's not necessarily a database
16  that tracks.  It's what we use to process.
17     Q.  So that -- that's a system?
18     A.  Yes.
19     Q.  Is that the EARM system?
20     A.  EARM.
21     Q.  Does that system contain
22  information about the location of arrest?
23     A.  It would have a site code, which
24  has a location of arrest.

Page 76

T. LYONS

1      Q.  Would it have information of
2  whether the person was arrested at an I-130
3  interview?
4      A.  No.  The site code is a dropdown.
5  So it's limited to -- it would just have a
6  location.  For instance, Boston,
7  Massachusetts, Suffolk County, Superior Court,
8  Chelsea, Mass.  It's specific to that.  It's
9  not...
10     Q.  Do you know if ICE made -- strike
11  that.
12     Do you know that ICE did not make
13  any arrests of individuals other than
14  individuals referred to them through CIS,
15  arrests of individuals at I-130 interviews?
16     A.  Well, yes, the only way ICE or ERO
17  would even know about any type of benefit
18  interview would be from a referral from CIS.
19     Q.  Were all referrals done by e-mail?
20     A.  To the best of my knowledge, yes.
21     Q.  They were never done by phone?
22     A.  I'm not sure.
23     Q.  Is it possible that this
24  spreadsheet omits individuals arrested at

Page 77

T. LYONS

1  I-130 interviews?
2      A.  It's possible, but I don't believe
3  so.
4      MS. McCULLOUGH:  Can you mark this
5  as Exhibit 6.
6      (Lyons Exhibit 6, E-Mail to Alan
7  Greenbaum, and others, from Tina Guarna-
8  Armstrong, dated 7/18/18, with attachments,
9  marked for identification)
10     Q.  Mr. Lyons, you have been handed
11  what has been marked as Exhibit 6.  Do you
12  recognize this document?
13     A.  Yes.
14     Q.  What is it?
15     A.  It's an e-mail from AFOD Armstrong
16  to, it looks like, the rest of the AFODs, as
17  well as any of the field supervisors that have
18  contacts with CIS, instructing them on where
19  she created a folder on our shared drive so
20  that the employees could put any e-mails
21  regarding the case.
22     Q.  Regarding the case as listed in the
23  attached spreadsheet?
24     A.  I'm sorry, yes.

| | |
|---|---|
| Page 78 | Page 79 |

**Page 78**

T. LYONS

1
2      Q.   And was this spreadsheet created
3  based on the spreadsheet in Exhibit 5?
4      A.   Sorry, it's harder when it's
5  broken.
6      Q.   Sorry.  If you go to the very back
7  of the spreadsheet, it should be a more
8  readable version of the attachment.
9          Do you see that?
10     A.   Yes.
11     Q.   It's a legal-sized --
12     A.   Yes.
13     Q.   Okay.
14     A.   Yes, I believe it was pulled from
15  the same spreadsheet.
16     Q.   From the spreadsheet in Exhibit 5?
17     A.   Yes.
18     Q.   And what is this spreadsheet?  What
19  is it?
20     A.   Do you mind if I take this apart?
21     Q.   Sure.
22     A.   This one shows arrests that began
23  -- the date of referrals were October 17th was
24  the earliest, and it shows arrests in 2018.
25     Q.   And these were individuals arrested

**Page 79**

T. LYONS

1  at I-130 interviews, correct?
2      A.   Well, they were arrested at CIS or
3  outside of a CIS office.  Sixth tab over has
4  the location of the arrest.
5      Q.   Do you know if these individuals
6  were arrested at or immediately after CIS --
7  I-130 interviews?
8      A.   I'm not sure of the arrest time.  I
9  mean, to answer your question, not if it was
10  before or after or during.
11     Q.   Sure.  But they were at CIS for
12  I-130 interviews, correct?
13     A.   They were there for some type of
14  interview, for a benefit.
15     Q.   Some of these people have been
16  removed, correct?  If you look at the second
17  to last column or the last column.
18     A.   Yes.
19     Q.   And some of these people are --
20  none of these people are in detention?
21     A.   No.  None of them are in custody.
22     Q.   Do you know if they're released on
23  orders of supervision?
24     A.   Yeah, what it says is that
25

| | |
|---|---|
| Page 80 | Page 81 |

**Page 80**

T. LYONS

1
2  abbreviation OSUP, they're out on an order of
3  supervision, except for the one, where you see
4  it says released by a judge at a detention
5  hearing, the prosecution case.  That subject
6  is out on their own recognizance based on the
7  magistrate.
8      Q.   If you look at the column titled
9  "Immigration Status"?
10     A.   Yes.
11     Q.   What does "WD" stand for?
12     A.   It's a warrant of removal.
13     Q.   Is that just a final order of
14  removal?
15     A.   Yes.  It's a warrant of
16  deportation.
17     Q.   Okay.
18     A.   Again, it's one of those acronyms
19  that have multiple uses that people use.
20     Q.   There are a lot of those.
21         Does ICE intend to remove any of
22  these individuals?
23     A.   Do you mind if I take a quick look?
24     Q.   Please do.
25     A.   The ones that are currently on

**Page 81**

T. LYONS

1
2  orders of supervision, it could be for
3  multiple reasons, which could -- there could
4  be a stay in effect, which allows them to
5  either make a timely departure on their own or
6  seek some type of benefit.  You can tell the
7  orange one, there is a pending motion to
8  reopen where MTR is in the orange.
9      Q.   If you look at the person in the
10  third row, CONF      do you know if there are
11  plans to remove this person?
12     A.   Without the file in front of me, I
13  do not know.
14     Q.   What would you look at in the file
15  to see if there are plans to remove the
16  person?
17     A.   There's several different things
18  you can look at.  Look to see if there's a
19  stay.  Look to see if there's a valid travel
20  document.
21         The chances of obtaining a travel
22  document, if there's a current passport, if
23  there's any pending litigation, like a motion
24  to reopen, or if the subject was released on
25  an order of supervision pending the final

CONFIDENTIAL

Page 82

T. LYONS

1
2  outcome of any type of immigration benefit.
3      Q.  If one of these individuals does
4  not have a stay and has provided valid travel
5  documents, and is applying for provisional
6  waivers, is there any reason ICE would not
7  remove them?
8      A.  So you're asking if all of the
9  other factors were in place with regard to the
10  provisional if we remove them?
11      Q.  Would ICE refrain from removing --
12  strike that.
13          ICE would not refrain from removing
14  any of these individuals simply because they
15  are applying for provisional waivers, correct?
16      A.  No, ma'am.  ERO is only tasked with
17  the execution of the final orders.  As far as
18  the CIS adjudicating them and how long it
19  takes them to adjudicate, I can't speak to
20  that.
21      Q.  From looking at this, are you
22  familiar with the situation for any of these
23  individuals with respect to whether they are
24  likely to be removed in the near future?
25      A.  No, ma'am.  That's not my purview.

Page 83

T. LYONS

1
2  That's for the case management operational
3  side.
4      Q.  Do you have any reason to think
5  that any of them would not be removed in the
6  near future?
7          MS. LARAKERS:  Objection.
8      A.  Again, there's multiple reasons
9  where someone may not be removed.
10      Q.  Are there any reasons that you know
11  of with respect to any of these individuals?
12      A.  I believe there are several that
13  have an active stay in place, and that would
14  -- we wouldn't remove someone that has a stay
15  of removal.
16          MS. McCULLOUGH:  Mark that as
17  Exhibit 7.
18          (Lyons Exhibit 7, Adjudicator's
19  Field Manual, marked for identification)
20      Q.  You have been handed what has been
21  marked as Exhibit 7.  Have you ever seen this
22  document?
23      A.  Never.
24      Q.  Do you know what it is?
25      A.  I only know now from reading the

Page 84

T. LYONS

1
2  top of it there, it's the adjudicator's field
3  manual.
4      Q.  Are you familiar with CIS's
5  policies regarding arrests at interviews?
6      A.  No, ma'am.
7      Q.  Have you ever investigated what
8  CIS's policies are regarding arrests at
9  interviews?
10      A.  No, ma'am.
11      Q.  Can you read -- excuse me.
12          The top of this document, Section
13  15.1 says "Interview Policies," correct?
14      A.  Yes.
15      Q.  If you turn to Page 3 under "Arrest
16  of an Alien During the Interview Process," and
17  then under "General," it says, "As a general
18  rule, any alien who appears for an interview
19  before a U.S. CIS officer in connection with
20  an application or petition seeking benefits
21  under the Act shall not be arrested during the
22  course of the interview, even though the alien
23  may be in the United States illegally."
24          Did I read that correctly?
25      A.  Yes.

Page 85

T. LYONS

1
2      Q.  Would you turn to the next page.
3  Do you see the title "Exceptions to the
4  General Rule"?
5      A.  Yes.
6      Q.  And do you see the paragraph below
7  that says, "In some cases, an illegal alien's
8  actions or situation may be so egregious as to
9  justify making an exception to the general
10  rule that those who appear voluntarily for an
11  interview should not be arrested during the
12  course of that interview.  Such actions and
13  situations include, but are not limited to,"
14  and then under bullet point 5, "An alien who
15  is the subject of a previously-issued warrant
16  of deportation or warrant of removal, UNLESS,"
17  in all bold or caps, "the alien is seeking
18  benefits under a provision of law (e.g.,
19  NACARA or HRIFA) which specifically allows an
20  alien under an order of deportation or removal
21  to seek such benefits."
22      A.  Yes.
23      Q.  Did I read that correctly?
24      A.  Yes.
25      Q.  At least some of the people coming

CONFIDENTIAL

Page 86

T. LYONS

1 to CIS for I-130 interviews are seeking
2 benefits under the provisional waiver process,
3 correct?
4 MS. LARAKERS:  Objection.
5 A.  Yes.
6 Q.  So at least some of the people
7 coming to CIS for I-130 interviews are seeking
8 benefits under a provision of law which
9 specifically allows an alien under an order of
10 deportation or removal to seek such benefits,
11 correct?
12 MS. LARAKERS:  Objection.
13 A.  I don't know which ones were
14 seeking any type of provision of law.
15 Q.  You're aware that the provisional
16 waiver process is made specifically available
17 to people with final orders of removal,
18 correct?
19 A.  Yes.
20 Q.  So at least some of the people
21 coming to I-130 interviews seeking provisional
22 waiver benefits are there seeking a benefit
23 for which an alien under an order of
24 deportation or removal is specifically allowed

Page 87

T. LYONS

1 to seek, correct?
2 MS. LARAKERS:  Objection.
3 A.  They could be, but I don't know
4 what benefit they're seeking.
5 Q.  If they are seeking the provisional
6 waiver?
7 MS. LARAKERS:  Objection.
8 Q.  Benefits of the provisional waiver?
9 MS. LARAKERS:  Objection.
10 A.  They could be, yes.  But I don't
11 know what benefits they are seeking.
12 Q.  So if they are seeking benefits of
13 the provisional waiver process?
14 A.  Yes.
15 Q.  And they come in for an I-130
16 interview --
17 MS. LARAKERS:  Objection.
18 Q.  -- they are seeking a benefit
19 under a provision of law which specifically
20 allows an alien under an order of deportation
21 or removal to seek such benefits, correct?
22 MS. LARAKERS:  Objection.
23 A.  Again, you'd have to speak to CIS
24 to that.  As you can tell from the one

Page 88

T. LYONS

1 spreadsheet, the referral in the e-mails that
2 you have, it show that they were showing up
3 for an I-130 interview.  Never, if they were
4 applying for a provisional, a U-Visa, WAVA.
5 Q.  So certain people who appear for
6 I-130 interviews are applying for provisional
7 waivers, correct?
8 A.  They could be.
9 Q.  Some of them are, right?
10 A.  Yes.  I don't know which ones are.
11 Q.  Some of them are?
12 A.  Right.  My offices don't know which
13 ones they are when they go there.
14 Q.  And with respect to those who are
15 applying for provisional waivers, those
16 individuals are seeking benefits under a
17 provision of law which specifically allows an
18 alien under an order of deportation or removal
19 to seek such benefits, correct?
20 MS. LARAKERS:  Objection.
21 A.  Yes.
22 Q.  So those individuals shall not be
23 arrested during the course of the interview,
24 even though they may be in the United States

Page 89

T. LYONS

1 illegally, correct?
2 MS. LARAKERS:  Objection.
3 A.  Yes.  But I think -- again, I'm not
4 -- don't mean to be confrontational, but you
5 would need to address that to CIS
6 adjudicators.  That's their policy.
7 Q.  So ICE does not take this policy
8 into account when it makes its own policies?
9 A.  I can't speak for what a CIS policy
10 is.
11 Q.  Does ICE -- you are not aware of
12 this policy?
13 A.  No, ma'am.
14 Q.  And no one at ICE -- are you aware
15 of discussion of this policy at ICE?
16 A.  No, ma'am.
17 Q.  And when ICE makes arrests of
18 individuals, is it violating this policy?
19 MS. LARAKERS:  Objection.
20 A.  It's not a violation of my policy.
21 You would have to direct that to the
22 supervisor of an adjudication office that sent
23 that referral.  From what you've seen in this

CONFIDENTIAL

Page 90

T. LYONS

1
2  document --
3      A.  It's not a --
4      MS. LARAKERS:  Objection.
5      Q.  From what you've seen in this
6  document, is ICE making arrests of people
7  seeking provisional waivers at I-130
8  interviews violating U.S. CIS's policy?
9      MS. LARAKERS:  Objection.
10     A.  No, because it's not my -- well,
11 ERO's policy.
12     Q.  But it's CIS's policy?
13     A.  CIS, if that is, then CIS is
14 violating their own policy.
15     Q.  Is ICE violating their policy?
16     MS. LARAKERS:  Objection.
17     A.  We don't fall under their policies.
18     Q.  ICE doesn't account for this policy
19 when making arrests?
20     A.  No, ma'am.
21     Q.  You had concerns about Mr. Cronin's
22 policy of arresting noncriminal interviewees
23 at CIS offices, correct?
24     MS. LARAKERS:  Objection.
25     A.  Can I clarify your question?

Page 91

T. LYONS

1
2      Q.  Yes.
3      A.  In regards to my testimony in front
4  of Judge Wolf?
5      Q.  Yes.
6      A.  My concern was a resource issue.
7  It wasn't the arrest itself.
8      Q.  Did you ever discuss concerns with
9  Mr. Brophy?
10     A.  Mr. Brophy and I did discuss the
11 best utilization of resources.
12     Q.  Was one of your concerns media
13 attention?
14     A.  Yes.
15     Q.  Were you concerned that it made ICE
16 look bad to make these arrests?
17     MS. LARAKERS:  Objection.
18     A.  I don't want to say made us look
19 bad.  Unfortunately, a lot of our enforcement
20 practices are never seen in a positive light.
21 I just didn't want any more undue attention.
22     Q.  Were you concerned that these
23 arrests deterred people from showing up for
24 their interviews?
25     MS. LARAKERS:  Objection.

Page 92

T. LYONS

1
2      A.  Yes, I did make the chilling effect
3  comment in the testimony.
4      Q.  And you believed -- you were
5  concerned at the time that these arrests would
6  have a chilling effect on individuals seeking
7  benefits at CIS?
8      A.  I believe it had a chilling effect
9  not only on any individual seeking it, but
10 also as other federal agencies and law
11 enforcement partners.
12     Q.  And you stand by your testimony in
13 May with regard to your concerns about Mr.
14 Cronin's policy?
15     MS. LARAKERS:  Objection.
16     A.  Yes.
17     Q.  And you thought these effects were
18 undesirable, correct?
19     MS. LARAKERS:  Objection.
20     A.  Yes.
21     Q.  Did you communicate -- excuse me.
22     You communicated with other ICE
23 officials about the appropriate response --
24 strike that.
25     You were aware of press coverage of

Page 93

T. LYONS

1
2  Ms. Calderon's arrest, correct?
3      A.  Yes.
4      Q.  And you communicated with other ICE
5  officials about the appropriate response to
6  inquiries about ICE's policy after Ms.
7  Calderon's arrest, correct?
8      MS. LARAKERS:  Objection to the
9  extent that it invades on the deliberative
10 process.  You can answer as long as it
11 doesn't.
12     A.  I would have just spoken with our
13 public affairs officer.
14     Q.  Ms. Calderon was arrested at an
15 I-130 interview at CIS, correct?
16     A.  Yes.
17     Q.  Are you aware that she was applying
18 for a provisional waiver through her U.S.
19 citizen husband?
20     A.  No, I'm not.  Well, I was not.
21     Q.  Are you aware that she has a U.S.
22 citizen husband?
23     A.  Yes.
24     Q.  Are you aware that she has two
25 children who are under the age of five?

| Page 94 | Page 95 |
|---|---|

T. LYONS

2  A.  Yes.
3  Q.  Are you aware that she has no
4  criminal history?
5  A.  Yes.
6  Q.  Are you aware that she was detained
7  for approximately one month after her arrest?
8  A.  Yes.
9  (Lyons Exhibit 8, E-Mail to Todd M.
10  Lyons from CONF █████████ dated 1/30/18, with
11  attached e-mails, marked for identification)
12  Q.  I believe you have been handed
13  what's been marked as Exhibit 8.  Do you
14  recognize this document?
15  A.  Yes.
16  Q.  What is it?
17  A.  It's an e-mail traffic from the
18  public affairs officer.
19  Q.  Is it about Ms. Lilian Calderon?
20  A.  The last name Calderon isn't in the
21  title of the e-mail, but yes.
22  Q.  And in this e-mail, Confident ████
23  proposes a response to press inquiries about
24  Ms. Calderon's arrest, correct?
25  A.  Yes.

T. LYONS

2  Q.  He says -- so on the last page that
3  I handed you, the e-mail from Confidentia l/PII
4  █████████ to you --
5  A.  Yes.
6  Q.  -- and the last unitalicized
7  paragraph, he says, "As ICE Deputy Director
8  Thomas Homan has made clear, ICE does not
9  exempt classes or categories of removable
10  aliens from potential enforcement.  All of
11  those in violation of the immigration laws may
12  be subject to immigration arrest, detention
13  and, if found removable by final order,
14  removal from the United States."
15  Is that right?
16  A.  Yes.
17  Q.  You agree with him in this
18  statement, correct?
19  A.  Yes.
20  Q.  And you believe this is dictated by
21  the executive order?
22  A.  Yes.
23  Q.  You didn't express concerns about
24  the circumstances of Ms. Calderon's arrest?
25  A.  No.

| Page 96 | Page 97 |
|---|---|

T. LYONS

2  Q.  ICE never told the public that ICE
3  would be arresting people at CIS interviews,
4  correct?
5  MS. LARAKERS:  Objection.
6  A.  No.
7  Q.  ICE never issued a press release on
8  its policy with respect to arresting or --
9  excuse me -- with respect to its practice of
10  arresting people at CIS interviews?
11  MS. LARAKERS:  Objection.
12  A.  Do you mean prior to us ever doing
13  anything like that; is that what you mean?  Or
14  after?
15  Q.  At any point -- are you aware of
16  any press release issued by ICE regarding its
17  practices of arresting people at CIS
18  interviews at the end of 2017 and the
19  beginning of 2018?
20  MS. LARAKERS:  Objection.
21  A.  Do you mean like before an arrest
22  or after or just any in general?
23  Q.  A press release regarding the
24  general practice.
25  A.  I believe if there was an media

T. LYONS

2  inquiry after an arrest, there would have been
3  one, yes, but not like a pre-emptive...
4  Q.  Did ICE ever state to the media
5  that its practice was to make arrests at CIS
6  offices?
7  MS. LARAKERS:  Objection.
8  A.  I don't believe so.
9  Q.  In fact, ICE tried to hide that
10  fact from the public, correct?
11  MS. LARAKERS:  Objection.
12  A.  I don't know.  I don't think that's
13  correct.  It's an operational issue.
14  Q.  Is it an operational issue that ICE
15  did not want the public to know about?
16  MS. LARAKERS:  Objection.
17  A.  It's an operational issue because
18  it's a law enforcement arrest, and we don't --
19  I'm trying to think of the correct word --
20  premeditatively announce where we're going to
21  do arrests at.
22  Q.  You also didn't announce your
23  general policy regarding arrests, correct?
24  MS. LARAKERS:  Objection.
25  A.  There is no policy on arrests.

CONFIDENTIAL

Page 98

T. LYONS

1  It's the executive order.
2
3      Q.  You didn't announce --
4      A.  Well, actually, the executive order
5  was announced.
6      Q.  You didn't announce that it was
7  your practice to arrest people at CIS offices,
8  correct?
9          MS. LARAKERS:  Objection.
10      A.  No.
11      Q.  If the public knew about CIS's
12  arrests or ICE's arrests at CIS offices, this
13  would be unpopular, wouldn't it?
14          MS. LARAKERS:  Objection.
15      A.  It could be.
16      Q.  CIS tried to hide from the media
17  that it was making these arrests, didn't it --
18  excuse me, ICE tried to hide from the media?
19          MS. LARAKERS:  Objection.
20      A.  No.
21      (Lyons Exhibit 9, E-Mail to John
22  Mohan, and others from Vance Ely, dated
23  1/24/18, with attached e-mails, marked for
24  identification)
25      Q.  You have been handed what's been

Page 99

T. LYONS

1  marked as Exhibit 9.  Do you recognize this
2  document?
3
4      A.  Yes.
5      Q.  What is it?
6      A.  It's e-mail traffic between the
7  public affairs officer and assistant director
8  -- assistant field office director, I'm sorry,
9  Vance Ely, and Deputy Field Office Director
10  James Rutherford.
11      Q.  Who is Vance Ely?
12      A.  He's an assistant field office
13  director for the Rhode Island suboffice.
14      Q.  Who is John Mohan?  Am I
15  pronouncing that correctly?
16      A.  Mohan.  He's a public affairs
17  officer for ERO Boston.
18      Q.  And you're copied on these e-mails,
19  correct?
20      A.  Yes.  It's standard practice to
21  copy both deputies.
22      Q.  And these e-mails were sent January
23  24, 2018, correct?
24      A.  Yes.
25      Q.  If you could turn to the third page

Page 100

T. LYONS

1  of this document.  Do you see an e-mail from
2  Vance Ely to John Mohan and others?
3
4      A.  I'm sorry, when you said third, are
5  you counting -- like each side?
6      Q.  Yes.  Counting each side.  The
7  bottom of the third page.
8      A.  Okay.
9      Q.  Do you see that e-mail?
10      A.  Is it the one that starts "Any
11  interest in saying"?
12      Q.  Yes.
13      A.  Yes.
14      Q.  And you're copied on this e-mail,
15  correct?
16      A.  Yes.
17      Q.  And this e-mail thread is a
18  discussion about responses to the media
19  regarding arrests -- an arrest at CIS,
20  correct?
21      A.  Yes.
22      Q.  Vance Ely says in this e-mail, "Any
23  interest in saying that the ICE took action
24  based upon a investigative referral was from
25  U.S. CIS Johnston, RI."

Page 101

T. LYONS

1  Is that right?
2
3      A.  Yes.
4      Q.  Then in response in the subsequent
5  e-mail, John Mohan responds, "I didn't mention
6  anything about how she was referred for the
7  reasons that we don't need to defend a
8  referral from CIS and because media likely
9  already know how it came about and will spin
10  it in a twisted way anyway, so defending it is
11  a moot point."
12      Did I read that correctly?
13      A.  Yes.
14      Q.  Then he says, "This one only one
15  media inquiry on it; if they get back to us I
16  will make sure they know this was a completely
17  legitimate referral from a partner federal
18  agency that has authority to refer cases that
19  require investigation to us."
20      A.  Yes.
21      Q.  Do you see anything in this e-mail
22  chain in which Mr. Mohan gets back to this
23  media inquiry and updates them about the
24  circumstances of the arrest?
25          MS. LARAKERS:  Objection.

CONFIDENTIAL

Page 102

T. LYONS

1
2   A.   No, I don't think.
3   Q.   Are you aware of any time when John
4   Mohan explained to the media about the
5   referral process between CIS and ICE?
6        MS. LARAKERS:  Objection.
7   A.   I can't speak to what John spoke
8   to...
9   Q.   Are you aware of him doing that?
10       MS. LARAKERS:  Objection.
11  A.   I'm not.
12  Q.   As far as you are aware, does the
13  public know about ICE's referral -- CIS's
14  referral process to ICE?
15       MS. LARAKERS:  Objection.
16  A.   To my knowledge, no.
17  Q.   Mr. Mohan even says that if he
18  chose -- even says that he chose not to make
19  this revelation, and it would be unpopular if
20  he did so, correct?
21       MS. LARAKERS:  Objection.
22  A.   Where do you see that, ma'am?
23  Q.   He said, "I didn't mention anything
24  about how she was referred."
25  A.   I'm sorry, going back and reading

Page 103

T. LYONS

1   it.  Could you just repeat your question?
2   Q.   Sure.  He says that he
3   intentionally did not tell the media about the
4   fact that she was referred to ICE through CIS,
5   correct?
6        MS. LARAKERS:  Objection.
7   A.   Yes.
8   Q.   And he states that making that
9   revelation to the media would be unpopular,
10  correct?
11       MS. LARAKERS:  Objection.
12  A.   He doesn't say unpopular.  He said
13  "will spin in a twisted way anyway."
14  Q.   Does that convey to you that he
15  thinks it would be unpopular?
16       MS. LARAKERS:  Objection.
17  A.   I don't know if John meant
18  unpopular or not.
19  Q.   It would be conveyed negatively,
20  correct?
21       MS. LARAKERS:  Objection.
22  A.   Again, I'm not sure what John meant
23  by "twisted."
24  Q.   Is "twisted" a word that conveys
25

Page 104

T. LYONS

1
2   something positive to you?
3        MS. LARAKERS:  Objection.
4   A.   No.
5   Q.   So he's concerned about negative
6   media attention, correct?
7        MS. LARAKERS:  Objection.
8   A.   Again, I can't answer what John was
9   thinking.
10  Q.   Based on these words in this
11  e-mail, do you think he was concerned about
12  negative media attention?
13       MS. LARAKERS:  Objection.
14  A.   I'm not sure.
15  Q.   What do you think he meant by
16  "media likely already know how it came about
17  and will spin it in a twisted way anyway"?
18       MS. LARAKERS:  Objection.
19  A.   I'm not sure.
20  Q.   You have no idea?
21  A.   I'm just not sure what he meant.
22  Q.   You received this e-mail on January
23  24th, correct?
24  A.   Yes.
25  Q.   Did you ask him what he meant?

Page 105

T. LYONS

1
2   A.   No.
3   Q.   You submitted a declaration in this
4   case on February 2, 2018, correct?
5   A.   Yes.
6   Q.   And in that declaration, you stated
7   that there were five individuals arrested at
8   Massachusetts or Rhode Island CIS offices in
9   January 2018, in addition to Ms. Calderon,
10  correct?  Do you remember that?
11  A.   Vaguely.  Do you have a copy of
12  mine so I can refresh?
13  Q.   Yes.
14       (Lyons Exhibit 10, Affidavit From
15  ICE Representative, marked for identification)
16  Q.   You have been handed what has been
17  marked as Exhibit 10.  Do you recognize this?
18  A.   Yes.
19  Q.   And what is it?
20  A.   It's my declaration that I prepared
21  in answering the questions regarding Ms.
22  Calderon's case.
23  Q.   Can you turn to Paragraph 12.
24  A.   Yes.
25  Q.   Okay.  And you state here that, "In

CONFIDENTIAL

Page 106

T. LYONS

1
2 response to the Court's question at Paragraph
3 1(i) regarding 'whether any individuals other
4 than Calderon and de Oliveira were arrested
5 while taking steps to seek permanent residency
6 at a Massachusetts or Rhode Island CIS office
7 in January 2018', the answer is yes, that an
8 additional five aliens subject to final orders
9 of removal were so apprehended during January
10 2018."
11       Is that correct?
12    A.  Yes.
13    Q.  And you made that statement under
14 oath, correct?
15    A.  Yes.
16    Q.  Was that statement correct?
17    A.  That was the information that I was
18 given by the assistant field office directors
19 at the time.  I was answering the questions
20 for Judge Wolf in order to meet the timeline
21 on this.  This would have actually been
22 handled by DFOD James Rutherford or Assistant
23 Field Office Director Brophy, but both of them
24 were on leave, and I had to reach out to the
25 supervisors and assistant field office

Page 107

T. LYONS

1
2 directors to give me the answers to the
3 questions.
4       So based on the information that I
5 had, I answered the questions as truthfully as
6 I can.
7    Q.  Do you now know that more
8 individuals than seven were arrested at CIS
9 offices in Massachusetts or Rhode Island in
10 January 2018?
11    A.  Yes.  I believe it's on the one
12 spreadsheet, the exhibit you gave me.  It
13 broke down.
14    Q.  And that showed that 16 people were
15 arrested at CIS offices in Boston's field
16 office's jurisdiction in 2018, correct?
17       MS. LARAKERS:  Objection.
18    A.  I have to pull it out and count.
19    Q.  Sure.  That was marked as Exhibit
20 6.
21    A.  Ma'am, this one?
22    Q.  I believe so.  Yes, I believe
23 that's right.  Yes, how many individuals are
24 on this spreadsheet?
25       MR. KANWIT:  Can you identify the

Page 108

T. LYONS

1
2 spreadsheet?
3       MS. McCULLOUGH:  It was marked as
4 Exhibit 6.
5    A.  14, unless I counted wrong.
6    Q.  I count 17 individuals on this
7 list.
8    A.  Well, you said for January, right?
9    Q.  Yes.  So you took out the February?
10    A.  Sorry.  Yeah.
11    Q.  Well, one of them doesn't have a
12 date, correct, of the referral?
13    A.  Of the referral, no.  I wasn't
14 counting the referrals.  I was actually
15 counting Tab 7.
16    Q.  Okay.
17    A.  So I was just strictly -- I thought
18 you asked for arrests, right?
19    Q.  Yes.  So 14 individuals arrested in
20 January 2018, correct?
21    A.  Yes.  14.
22    Q.  Apologies that there aren't numbers
23 on this spreadsheet.
24    A.  I had to use the pen.  If not, I
25 was...

Page 109

T. LYONS

1
2    Q.  When you were asked under the
3 judge's order, and the question that you
4 responded to in your declaration, was with
5 respect to arrests in Massachusetts and Rhode
6 Island, correct?
7    A.  Yes.
8    Q.  And this includes arrests in
9 Connecticut, correct?
10    A.  Yes.
11    Q.  Do you know how many individuals
12 were arrested in Connecticut in January of
13 2018 at CIS offices?
14    A.  No, I don't believe it's broken
15 down.  I believe it was just when I asked --
16 when the question was asked, I think I
17 specifically asked the Boston and the Rhode
18 Island assistant field office director, since
19 that's where Ms. Calderon was arrested.
20    Q.  Do you now know that there are
21 additional individuals -- excuse me.
22       Do you now know that the number you
23 provided in your declaration was lower than
24 the actual number?
25       MS. LARAKERS:  Objection.

CONFIDENTIAL

T. LYONS

1
2    A.  Yes.
3    Q.  When did you learn that?
4       MS. LARAKERS:  Objection.
5    A.  After we started to compile the
6  list.
7    Q.  Around what date?
8       MS. LARAKERS:  Objection.
9    A.  Do you mind if I go back and get
10  it?  It was around July 15th.
11    Q.  Did you notify the judge that the
12  number that you submitted in the declaration
13  in February was incorrect?
14       MS. LARAKERS:  Objection.
15    A.  No.
16    Q.  Mr. Brophy became interim FOD in
17  February of 2018, correct?
18    A.  Yes.
19    Q.  And under his direction, ICE ceased
20  making arrests at CIS offices for individuals
21  with no criminal history, correct?
22    A.  Yes.
23    Q.  He directed that arrests of
24  non-citizens with final removal orders
25  appearing at CIS offices should occur only if

T. LYONS

1
2  the non-citizen presented a threat to national
3  security or public safety, correct?
4    A.  Yes.
5    Q.  At the May hearing you testified
6  you believed you wrote down Mr. Brophy's
7  directive in your notepad.  Do you recall
8  that?
9       MS. LARAKERS:  Objection.
10    A.  Yes.
11    Q.  Have you seen that notepad between
12  the May hearing and today?
13    A.  Yes.
14    Q.  Did you look for any notes on Mr.
15  Brophy's directive?
16    A.  Yes.
17    Q.  Did you find any?
18    A.  No.
19    Q.  Under Mr. Brophy you required your
20  team to get approval from you to arrest
21  someone who had no criminal history and did
22  not pose a public safety threat, correct?
23    A.  Yes.
24    Q.  When did you give that directive to
25  your team?

T. LYONS

1
2    A.  It was after Valentine's Day.  I
3  want to say approximately February 17th.
4    Q.  How do you remember that date?
5    A.  I remember the timeframe when Tom,
6  the acting assistant field office director,
7  discussed it with the senior management staff.
8    Q.  Did he discuss it in light of
9  arrests made on Valentine's Day?
10    A.  I'm not sure.
11    Q.  Were you asked for approval to make
12  any arrests of individuals who did not pose a
13  public safety threat after you gave that
14  directive?
15    A.  Yes.  Recently I was asked for one.
16    Q.  Did you approve it?
17    A.  No.
18    Q.  When were you asked that?
19    A.  Last -- two Thursdays ago, I want
20  to say.  I don't want to say an exact day
21  without a calendar in front of me.
22    Q.  Two Thursdays ago?
23    A.  Yes.
24    Q.  Okay.  Mr. Brophy left his position
25  as acting FOD at the end of May 2018, correct?

T. LYONS

1
2    A.  Yes.  May 31st was his last day.
3    Q.  And you assumed the position on
4  June 1st, correct?
5    A.  Yes.
6    Q.  What was your policy when you were
7  acting FOD with respect to arrests at CIS
8  offices?
9    A.  My policy was still in line with
10  Director Brophy's, in that barring any public
11  safety or national security threat, we weren't
12  making any arrests at CIS.
13    Q.  Did you communicate this to the
14  people who work for you?
15    A.  Yes.
16    Q.  Did you write it down?
17    A.  No.
18    Q.  Is that Ms. Adducci's policy as
19  well?
20    A.  Ms. Adducci's policy is in line
21  with the executive order that no section or
22  subsection of undocumented individual is not
23  subject to arrest or detention.
24    Q.  What's Ms. Adducci's policy with
25  respect to arrests at CIS offices?

CONFIDENTIAL

Page 114

T. LYONS

A. It's in line with Mr. Brophy's, in that arrests will only take place if there's a significant public safety threat or national security implication.

Q. Has she communicated that to you?

A. Yes.

Q. Did she communicate that by e-mail?

A. No. In our senior staff meeting.

Q. In person?

A. Yes.

Q. Have you had conversations with anyone besides your attorneys about ICE making arrests at CIS offices besides that meeting you mentioned?

A. As far as Ms. Adducci's direction?

Q. As far as any issue regarding or any aspect.

MS. LARAKERS: Objection. Go ahead.

A. No. I notified my people in my chain of command as far as the FODs' direction in regard to those, whereas anyone in an instance for a referral comes in, it was the same as Mr. Brophy's before, where it would

Page 115

T. LYONS

come through me, through the FOD, for approval.

Q. Have any arrests at CIS offices been planned since Ms. Adducci assumed her position?

A. No.

Q. Has this litigation had any impact on ICE's arrest policy at CIS offices?

A. No, because we don't have a policy.

Q. Has this litigation had any impact on ICE's practice of making arrests at CIS offices?

A. No, because I believe it's still in line with Mr. Brophy's intention as far as focusing on public safety and national security threats.

Q. Is there any difference between Ms. Adducci's policy with respect to making arrests at CIS offices and Mr. Brophy's policy?

A. I don't believe so.

Q. Or practice?

A. I don't believe so. I believe the practice is still the same as having the

Page 116

T. LYONS

concurrence or the approval of such an arrest at that office at the field office director level.

Q. Are there any differences between Ms. Adducci's policies about making arrests generally and Mr. Brophy's?

MS. LARAKERS: Objection.

A. I don't believe so. I still believe Ms. Adducci's focus is still on public safety.

Q. Did you review Ms. Adducci's declaration that she submitted in this case?

A. No.

Q. Are you aware that she stated that she believed Mr. Brophy's policy regarding -- Mr. Brophy's policy which he expressed at the May lobby conference after the hearing was contrary to the executive order?

MS. LARAKERS: Objection.

A. That was discussed in meetings with counsel.

Q. You were present at the lobby conference, correct?

A. Yes.

Page 117

T. LYONS

Q. What was your understanding of the policy that Mr. Brophy expressed at that conference?

A. That only arrests would take place at a specific CIS office were one where the individual had a criminal history or public safety threat or a national security link.

Q. Do you have any understanding about any policy he expressed with respect to detaining individuals pursuing provisional waivers?

MS. LARAKERS: Objection.

A. Can you be more specific? I mean, he -- without the lobby conference notes in front of me, I think FOD Brophy expressed that each case would be case by case.

Q. Does ICE track the number of arrests made by each ERO?

A. What do you mean?

Q. Does it record them?

A. Which? Every arrest is documented. So you could look statistically as to how many arrests an office does.

CONFIDENTIAL

Page 118

T. LYONS

1
2      Q.   Are you aware that ICE does that?
3      A.   Yes.
4      Q.   And are they -- do they track
5  arrests per officer?
6      A.   Per officer?  It could be tracked
7  per officer, but it's mostly tracked per
8  office.
9      Q.   Are they tracked monthly, tallied
10  monthly?
11      A.   Quarterly is the most.
12      Q.   Has the Boston field office ever
13  been compared to other offices based on the
14  number of arrests?
15      MS. LARAKERS:  Objection.
16      A.   Each office is -- when those
17  numbers are reported, are reported
18  specifically for all offices.
19      So, I mean, if you looked Detroit
20  or Chicago compared to Boston, you could see
21  it on the list.
22      Q.   Are those numbers sent to the ICE
23  offices?
24      MS. LARAKERS:  Objection.
25      A.   Yes.  Senior managers receive those

Page 119

T. LYONS

1
2  periodically.  The exact number of how many we
3  get each year or quarter, just really depends.
4      Q.   Are there any arrest quotas?
5      A.   No.
6      Q.   Do you know of anybody -- do you
7  know if ICE offices are evaluated based on the
8  number of arrests?
9      MS. LARAKERS:  Objection.
10      A.   As far as what?  I mean, like a
11  quantitative scale type?
12      Q.   Are individual officers, for
13  example, the individual FOD in an office, is
14  their performance evaluated based on the
15  number of arrests affected by that office?
16      MS. LARAKERS:  Objection.
17      A.   I've never seen specifically a
18  FOD's performance work plan, just because it's
19  outside of, I hate to say my pay scale or my
20  pay scale, where the GS grades 1 through 15
21  were field office directors, a senior
22  executive service, which is outside of our
23  skill.
24      Q.   You don't know if they are
25  evaluated based on the --

Page 120

T. LYONS

1
2      A.   I've never seen a FOD.  They call
3  them PWP.  They are yearly evaluations.  So
4  I'm not sure what they are graded on.
5      Q.   Have you ever heard that they are
6  evaluated based on the number of arrests?
7      MS. LARAKERS:  Objection.
8      A.   I would assume -- yes, I would
9  assume they are graded on arrests.
10      Q.   You have heard that?
11      MS. LARAKERS:  Objection.
12      A.   Yes.
13      Q.   And does the number of arrests that
14  they make affect their eligibility for
15  promotions?
16      MS. LARAKERS:  Objection.
17      A.   No.  Because each ERO field office
18  is different than the next one.  What I mean
19  by that is, just circumstances, as far as, at
20  least, for like -- that I can speak to as far
21  as, is the enforcement side.  It really
22  depends on the environment you work in.
23      Q.   Mr. Cronin, under Mr. Cronin's
24  leadership, the Boston ERO made a number of
25  arrests at CIS offices, correct?

Page 121

T. LYONS

1
2      MS. LARAKERS:  Objection.
3      A.   Yes.  There were arrests made
4  there, yes.
5      Q.   And Mr. Cronin was promoted in
6  January of 2018, correct?
7      MS. LARAKERS:  Objection.
8      A.   I'm not sure if that's considered a
9  promotion, but he did take a new position.
10  Same pay grade.  So I'm not sure if that's
11  considered a promotion.
12      Q.   Does he have supervisory authority
13  over Ms. Adducci?
14      A.   I'm not sure if she's actually in
15  his chain of command.  But the field office
16  directors do report to the deputy assistant
17  directors of field operations, which Mr.
18  Cronin is one of them.  They are broken up
19  east and west, so I'm not sure which ones fall
20  under.
21      Q.   If they are in the same chain of
22  command, would he have supervisory authority
23  over her?
24      A.   Yes.
25      Q.   So is that a promotion?

CONFIDENTIAL

Page 122

T. LYONS

MS. LARAKERS:  Objection.

A.  When I think of promotion, I think of something to gain by it -- not gain, but new title, more money, whereas it was a lateral move.

Q.  He's not being paid more in that position?

A.  No.

Q.  Are arresting officers or number of arrests tracked per officer, per arresting officer?

A.  You can do that, yes.

Q.  Is that done?

A.  Yes.

Q.  Are officers' numbers compared to each other?

A.  No.  They are used for their performance work plans, PWPs, evaluations.

Q.  Are officers eligible for promotions or does it increase their ability to obtain promotions if they have more arrests?

A.  No.

Q.  Does the number of arrests affect

Page 123

T. LYONS

their performance evaluation?

A.  No.

Q.  They include it, but it has no effect?

A.  No, because most of the ERO officers do more than arrest.  It depends upon what their job is at the time.

For instance, you can have someone that works for me that's a fugitive operations officer, which is actually out making arrest, or you can have someone from the case management division, which is a docket officer, which monitors cases and is not in the field and doesn't arrest anyone.

So you can't compare the two or use that -- use the arrest number for promotion.

Q.  For somebody who is, I believe you said, a fugitive arresting --

A.  Fugitive operations officer.

Q.  -- fugitive operations officer, is that person evaluated, in part, on the number of arrests that they make or the people beneath them make?

A.  No.  Because again, still some

Page 124

T. LYONS

aspects of fugitive operations involves what's known as our violent criminal alien section, which works with the U.S. Attorney's Office for prosecuting cases.

Those officers, they don't actually make street arrests.  So you couldn't use that as comparative to someone's evaluation as far as promotion, because we have a union, and that wouldn't be a quantitative scale to judge someone by.

Q.  Apart from comparing them to other individuals, just on their own, if they are being evaluated, does the person evaluating them consider the number of arrests that they made?

A.  Yes.  It could come into play, yes.

Q.  Is your performance as deputy FOD evaluated in any manner based on the number of arrests or removals that your office makes?

A.  No.  My performance work plan last year didn't include any quantitative goals like that as far as statistics, like increase X or, you know, I had none of those in my performance plan for last year.

Page 125

T. LYONS

Q.  Did it include any evaluation of your past performance based on those metrics?

A.  No.  My previous work plans were based specifically on what I did in Dallas, not based on what I was doing up here.

Q.  Did it note the number of arrests you made in Dallas or that were made under you?

MS. LARAKERS:  Objection.

A.  No.  It showed increase -- I can tell you specifically in my performance plan from Dallas, it showed an increase in prosecution cases, because that was a section that I was over in Dallas.

Q.  But it didn't state anything about arrests, number of arrests?

MS. LARAKERS:  Objection.

A.  Without it in front of me, no.  I can't tell you.

Q.  You don't know?

A.  No.

Q.  You said your performance plan included quantitative goals?

A.  I said it didn't include any

CONFIDENTIAL

Page 126

T. LYONS

1
2 quantitative like I had to increase this by so
3 much percentage.  I didn't have any of those
4 in my performance plan this year.
5     Q.   Are individuals ever given
6 quantitative goals in your office?
7        MS. LARAKERS:  Objection.
8     A.   No.  They're given quantitative
9 goals more as in what direction we want to
10 take the office operationally, but not as far
11 as like, I think you had referred to it, like
12 for promotion or things like that, no.
13        It's mostly used in the same kind
14 of tool as the civilian police -- larger
15 agencies, like New York City and those, when
16 they use -- I'm not sure of the acronym it's
17 called for.  It's COMSTAT, where you evaluate
18 treads, increase in crimes, things like that.
19     Q.   Something like that is done in the
20 ICE office?
21        MS. LARAKERS:  Objection.
22     A.   Yes.
23     Q.   And that does not include number of
24 arrests?
25        MS. LARAKERS:  Objection.

Page 127

T. LYONS

1
2     A.   Yes, it does.
3     Q.   It does include?
4     A.   Right.
5     Q.   If CIS schedules interviews at
6 convenient times for ICE, that makes it easier
7 for ICE to make arrests, correct?
8     A.   Easier how?  Easier for the officer
9 to get there or easier --
10     Q.   Easier to make the arrest happen.
11     A.   Yes.
12     Q.   And I believe we mentioned before
13 at one point there were multiple people
14 arrested in one day at the CIS office,
15 correct?
16     A.   Yes.
17     Q.   How does ICE decide to detain
18 people after arresting them?
19     A.   Each case is looked at specifically
20 individually.  There's numerous factors that
21 are taken into account, whether it be
22 subject's criminal history, any threat to
23 national security or public safety, flight
24 risk.  Each case is taken on the totality of
25 the case.

Page 128

T. LYONS

1
2        We also use the risk classification
3 assessment, too.
4     Q.   Does someone's -- what information
5 is entered into the RCA or the risk
6 classification assessment tool?
7     A.   Everything -- there are multiple
8 factors that can be entered into from equities
9 in the U.S. to criminal history to factors of
10 flight risk.
11        Would you mind if I use the men's
12 room?
13     Q.   Sure.  We can take a break.
14        VIDEOGRAPHER:  We are going off the
15 record at 12:22.
16        (Luncheon recess taken at 12:22
17 p.m. and reconvening at 1:09 p.m.)
18        VIDEOGRAPHER:  We are back on the
19 record at 1:09.
20 BY MS. McCULLOUGH:
21     Q.   Did you want to clarify previous
22 testimony?
23     A.   Yeah, one clarification, when were
24 talking at lunch, in the very beginning, when
25 the court reporter was asking me, I thought

Page 129

T. LYONS

1
2 you asked place of birth, not where I live.
3 So my actual mailing address is West Newbury,
4 Massachusetts.
5     Q.   Okay.
6     A.   Not Boston.
7     Q.   I have no follow-up questions on
8 that.
9     A.   That was an easy one.
10     Q.   So are you familiar with the RCA?
11     A.   Yes.
12     Q.   Have you ever completed one for a
13 detainee?
14     A.   When I was a line deportation
15 officer before I was a line officer, I would
16 do it in my capacity as a regular deportation
17 officer.
18     Q.   What information is entered into
19 the RCA?
20     A.   Everything from the aspects of the
21 arrest to biographical information, like I
22 said previously, equities in the U.S.,
23 criminal history, flight risk, final order
24 status.
25     Q.   And the RCA gives a recommendation

CONFIDENTIAL

Page 130

T. LYONS

1  
2 on whether to detain or release a person?
3    A. Yes.
4    Q. Does the RCA ever recommend
5 releasing someone?
6    A. Yes.
7    Q. When you enter information into the
8 RCA, are you checking boxes?
9    A. You have the ability to have a
10 dropdown as well as provide information. When
11 you provide information, it's more of a
12 clarification to the dropdowns.
13    Q. Does the system itself spit out a
14 recommendation?
15    A. Yes, it does, after the initial
16 officer assessment, and then the supervisor
17 goes in for the first verification of the
18 information, it does offer a recommendation as
19 far as release, detention, bond.
20    Q. So for the information that's
21 entered in written form, not the information
22 that, for example, involves checking a box, is
23 the evaluation of that information done by an
24 officer at ICE?
25    A. That is inputted. It would be

Page 131

T. LYONS

1 inputted by a field officer. But what's
2 written will be reviewed by a supervisory
3 deportation officer.
4  
5    Q. So the RCA is a place where
6 information is put together; is that right?
7    A. Yes.
8    Q. It's actually a human being who is
9 giving the recommendation to release or
10 detain?
11    A. No. It's a human being that
12 concurs with the -- concur or denies with the
13 recommendation of the system.
14    Q. So when the system makes a
15 recommendation to release or detain, that
16 system can't take into account written notes,
17 right?
18    A. No. It's taking into account what
19 the officer does on the dropdowns.
20    Q. Is one of the dropdowns whether a
21 person has a final order of removal?
22    A. Yes.
23    Q. Is one of the dropdowns whether a
24 person has applied for an I-130?
25    A. No.

Page 132

T. LYONS

1  
2    Q. Who decides whether to follow the
3 RCA's recommendation?
4    A. Well, the field supervisor, the
5 SDDO, supervisory detention deportation
6 officer, makes the decisions to concur or deny
7 the recommendations of the RCA.
8    Q. Would the fact of an I-130
9 application is pending or approved ever be
10 enough for someone reviewing the RCA's
11 recommendation --
12    A. The I-130 alone?
13    MS. LARAKERS: Objection.
14    Q. Yes.
15    MS. McCULLOUGH: Can I finish my
16 question?
17    MS. LARAKERS: Yes. Don't answer
18 until she finishes.
19    Q. So would the fact of a -- I'll
20 start from the beginning.
21    Would the fact that the person who
22 has been arrested has a pending or approved
23 I-130 application ever be enough for the
24 reviewing officer to recommend to release
25 somebody who had otherwise been recommended to

Page 133

T. LYONS

1 be detained?
2  
3    MS. LARAKERS: Objection.
4    A. No. The supervisor will look at
5 everything in the totality of the case. I-130
6 alone won't be a specific reason to either
7 concur or deny.
8    Q. So it would not be a reason to
9 override the RCA's recommendation to detain?
10    MS. LARAKERS: Objection.
11    A. No.
12    Q. When ICE detains a person, one of
13 the purposes of that detention is to
14 effectuate their removal, correct?
15    A. Yes.
16    Q. And when ICE releases a person on
17 an order of supervision, one of the purposes
18 of continuing to supervise that person is to
19 facilitate effectuating their removal,
20 correct?
21    A. Yes, that's one of the factors.
22    Q. The executive order doesn't make
23 any exception for people who are pursuing
24 provisional waivers, correct?
25    A. No. An executive order that I

CONFIDENTIAL

Page 134

T. LYONS

1 quoted earlier, when we talked about kind of
2 the priorities of arrest, there's no
3 specification as to if anyone is applying for
4 a benefit or not.
5     Q.  You're aware that Ms. Adducci
6 testified in this case yesterday, correct?
7     A.  Yes.
8     Q.  Are you aware that she testified
9 that absent a danger to public safety --
10 excuse me -- that she testified that Mr.
11 Brophy's policy, that absent a danger to
12 public safety, the Boston field office would
13 no longer make arrests of persons pursuing
14 I-130s and presenting themselves at U.S. CIS
15 was contrary to the executive order?
16     MS. LARAKERS:  Objection.
17     A.  I don't know what she testified to
18 yesterday.
19     Q.  Has she conveyed to you that she
20 thinks that that policy is contrary to the
21 executive order?
22     MS. LARAKERS:  Objection.
23     A.  Which policy?  Tom Brophy's?
24     Q.  Yes.

Page 135

T. LYONS

1     A.  Yes.
2     Q.  How does ICE decide to remove
3 someone?
4     MS. LARAKERS:  Objection.
5     A.  Can I just ask for clarification on
6 that as far as -- what do you mean?  How we --
7     Q.  Is ICE Boston's goal to remove
8 anyone who has a final order of removal,
9 regardless of whether they are pursuing
10 provisional waivers?
11     MS. LARAKERS:  Objection.
12     A.  Well, the mission for enforcement
13 of removal operations is to effect the final
14 order.
15     (Lyons Exhibit 11, Memo to Thomas
16 Brophy and others from Miguel Vergara, dated
17 5/16/18, marked for identification)
18     Q.  Are you aware that Mr. Brophy --
19     MS. LARAKERS:  I'm sorry, what
20 exhibit is it?
21     Q.  You have been handed what's been
22 marked as Exhibit 11.  Are you aware that Mr.
23 Brophy noticed violations of the POCR process
24 when he was acting FOD in Boston?

Page 136

T. LYONS

1     MS. LARAKERS:  Objection.
2     A.  Yes.
3     Q.  And that he ordered an audit of
4 that process?
5     A.  Yes.
6     Q.  Have you reviewed that audit, the
7 report generated by that audit?
8     A.  As far as Exhibit 11?
9     Q.  Yes.  Do you recognize Exhibit 11?
10     A.  Yes.
11     Q.  And what is it?
12     A.  It's the after action review of the
13 Boston detained unit.
14     Q.  Have you reviewed the
15 recommendations in this report?
16     A.  I don't want to say briefly, but I
17 reviewed them, but not as in depth as Deputy
18 Rutherford would have.  But I'm familiar with
19 the report.
20     Q.  Have you been charged with
21 implementing any of the recommendations?
22     A.  No, ma'am.
23     Q.  If you could turn to Page 4.  There
24 are page numbers in the top right corner.

Page 137

T. LYONS

1     A.  Yes, ma'am.
2     Q.  Do you see at the very bottom of
3 the page where it says, "Lack of clear
4 priorities when targeting at-large aliens,
5 placing detainers and/or taking detainees into
6 custody"?
7     A.  Yes, ma'am.
8     Q.  What does that refer to?
9     A.  That refers to Mr. Brophy's
10 directive, the one that he implemented when he
11 first took over as the acting field office
12 director.
13     Q.  What directive is that?
14     A.  That we focus the priority of
15 targeting at-large aliens of those which pose
16 a public safety threat or national security
17 risk.
18     Q.  This report is critical of that
19 objective?
20     A.  No.  It concurred with Mr. Brophy's
21 assessment.
22     Q.  This report was created on May 16,
23 2018, correct?
24     A.  Yes.

CONFIDENTIAL



Page 138

T. LYONS

1
2     Q.   Mr. Brophy had been acting FOD for
3  a few months at that point, correct?
4     A.   Yes.
5     Q.   And this report found a lack of
6  clear priorities when targeting at-large
7  aliens, placing detainers and/or taking
8  detainees into custody, correct?
9     A.   Yes.
10    Q.   So did this report find that under
11 Mr. Brophy, the Boston ERO did not have clear
12 priorities?
13    A.   No.  It found it prior to Mr.
14 Brophy's arrival.
15    Q.   Did they investigate the operations
16 of the Boston field office prior to his
17 arrival?
18    A.   When you say "investigate," as far
19 as what?
20    Q.   Did they review the performance of
21 the Boston field office before Mr. Brophy's
22 arrival?
23    A.   The team specifically focused on
24 the detained unit, which is, as I stated
25 earlier, like case management.  However, they

Page 139

T. LYONS

1
2  were also looking at subjects we already had
3  in custody that were noncriminal.  When I say
4  noncriminal, I meant they had a noncriminal
5  history, other than their final order of
6  deportation.  And their recommendation agreed
7  with Tom's assessment to utilize bed space for
8  targets -- subjects that pose a public safety
9  threat.
10    Q.   And Ms. Adducci -- Ms. Adducci has
11 conveyed to you that she believes this is
12 contrary to the executive order, correct?
13       MS. LARAKERS:  Objection.
14    A.   Yes.
15    Q.   How does this affect compliance
16 with the POCR regulations?
17    A.   Both are opposite.  I mean, they're
18 both -- neither one of them weigh on each
19 other.
20       The POCR violations happen after
21 someone is in custody.  It has the -- the POCR
22 violations have nothing to do with the subject
23 at the time of arrest.
24    Q.   I wanted to just ask you a couple
25 of questions about something I asked you about

Page 140

T. LYONS

1
2  at the beginning of this deposition.
3       You had mentioned that you were
4  involved in litigation?
5     A.   Yes, ma'am.
6     Q.   And that you had been deposed four
7  times?
8     A.   Approximately.
9     Q.   Were you a party to that case?
10    A.   Yes.

Irrelevant discussion between counsel

Page 141

T. LYONS

Irrelevant discussion between counsel

36

CONFIDENTIAL



Page 142

T. LYONS

1
2  Irrelevant discussion between
   counsel

Page 143

T. LYONS

1
2  Irrelevant
   discussion
   between
   counsel

13       MS. McCULLOUGH:  We would like a
14  moment to confer about any further questions
15  we may have for the witness.
16       VIDEOGRAPHER:  We are going off the
17  record at 1:31.
18       (Recess taken at 1:31 p.m. and
19  reconvening at 1:35 p m.)
20       VIDEOGRAPHER:  We are back on the
21  record at 1:35.
22       MS. McCULLOUGH:  We have no further
23  questions for you.
24       MS. LARAKERS:  Oh, okay.
25       MS. McCULLOUGH:  Do you have any

Page 144

T. LYONS

1
2  questions for the witness?
3       MS. LARAKERS:  No, we don't.
4       VIDEOGRAPHER:  This concludes
5  today's deposition.  We are off the record at
6  1:35.
7       (Time Noted:  1:35 p.m.)
8
9
10       ---------------------
11          TODD M. LYONS
12  Subscribed and sworn to before me
13  this    day of        2018.
14
15  ----------------------------------------
16
17
18
19
20
21
22
23
24
25

Page 145

1         C E R T I F I C A T E
2  Commonwealth of Massachusetts  )
3                                  ) ss:
4  County of Suffolk               )
5
6       I, Michael D. O'Connor, a Notary
7  Public within and for the Commonwealth of
8  Massachusetts, do hereby certify:
9       That TODD M. LYONS, the witness whose
10  deposition is hereinbefore set forth, was duly
11  sworn before me and that such deposition is a
12  true record of the testimony given by such
13  witness.
14       I certify that I am not related to
15  any of the parties to this action by blood or
16  marriage; and that I am in no way interested in
17  the outcome of this matter.
18       IN WITNESS WHEREOF, I have hereunto
19  set my hand this 27th day of July 2018.
20
21
22       _____
22       Michael D. O'Connor, RMR, CRR, CRC
23
24
25

CONFIDENTIAL

Page 146

```
 1              I N D E X
 2    WITNESS:   EXAMINATION BY          PAGE
 3    TODD M. LYONS   Ms. McCullough        8
 4
 5    --------------- E X H I B I T S ---------------
 6    E DEFINE NAME      EXHIBIT        PAGE
 7    Exhibit 1   E-Mail to Todd Lyons from
 8              CONF           dated 5/24/18,
 9              with attached e-mails, Bates
10              GOV003046 - GOV003048        38
11    Exhibit 2   E-Mail to Vance Ely from
12              Thomas Brophy, dated 2/13/18,
13              with attached e-mails, Bates
14              GOV002561 - GOV002565        41
15    Exhibit 3   E-Mail to James L. Rutherford
16              from CONF       , dated
17              1/30/18, with attached e-mails,
18              Bates GOV001641 - GOV001644   48
19    Exhibit 4   E-Mail to Todd M. Lyons from
20              CONF           dated 1/30/18,
21              with attached e-mails, Bates
22              GOV001645 - Bates GOV001651   50
23
24
25
```

Page 147

```
 1    ----------- E X H I B I T S (Cont'd) -----------
 2    E DEFINE NAME      EXHIBIT        PAGE
 3    Exhibit 5   E-Mail to Tina Guarna-Armstrong
 4              from Todd M. Lyons, dated
 5              7/16/18, Bates GOV001996 -
 6              GOV002021            73
 7    Exhibit 6   E-Mail to Confidential/  , and
 8              others, from Tina Guarna-
 9              Armstrong, dated 7/18/18, with
10              attachments, Bates GOV002125 -
11              GOV002135            77
12    Exhibit 7   Adjudicator's Field Manual    83
13    Exhibit 8   E-Mail to Todd M. Lyons from
14              CONF          dated 1/30/18,
15              with attached e-mails, Bates
16              GOV002235 - GOV002237        94
17    Exhibit 9   E-Mail to John Mohan, and
18              others from Vance Ely, dated
19              1/24/18, with attached
20              e-mails, Bates
21              GOV002330 - GOV002336        98
22    Exhibit 10  Affidavit From ICE
23              Representative           105
24
25
```

Page 148

```
 1    ----------- E X H I B I T S (Cont'd) -----------
 2    E DEFINE NAME      EXHIBIT        PAGE
 3    Exhibit 11  Memo to Thomas Brophy and
 4              others from Miguel Vergara,
 5              dated 5/16/18          135
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 149

```
 1          ERRATA SHEET FOR THE TRANSCRIPT OF:
 2    Case Name:  Lilian Pahola Calderon Jimenez, et
 3          al. vs. Kirstjen M. Nielsen, et al.
 4    Dep. Date:  July 27, 2018
 5    Deponent:   TODD M. LYONS
 6              CORRECTIONS:
 7    Pg. Ln.  Now Reads   Should Read   Reason
 8    ___ ___  _____   _____   _____
 9    ___ ___  _____   _____   _____
10    ___ ___  _____   _____   _____
11    ___ ___  _____   _____   _____
12    ___ ___  _____   _____   _____
13    ___ ___  _____   _____   _____
14    ___ ___  _____   _____   _____
15    ___ ___  _____   _____   _____
16    ___ ___  _____   _____   _____
17    ___ ___  _____   _____   _____
18
19          _____
20              Signature of Deponent
21    SUBSCRIBED AND SWORN BEFORE ME
22    THIS___DAY OF_____, 2018
23
24    _____
25    (Notary Public)  MY COMMISSION EXPIRES:_____
```

CONFIDENTIAL

## A

**a m (7)**
1:18 2:7 7:6 33:13,13
72:18,19

**abbreviation (1)**
80:2

**abided (1)**
16:17

**ability (8)**
36:4 54:18 56:5,10
60:12 70:14 122:21
130:9

**able (5)**
9:8 26:19 61:3 69:4
71:3

**abroad (4)**
63:15 70:24 71:18,25

**absent (2)**
134:10,12

**accommodate (1)**
55:8

**account (5)**
89:9 90:18 127:21
131:16,18

**accurate (1)**
10:3

**accurately (1)**
9:9

**ACLU (1)**
5:5

**acronym (1)**
126:16

**acronyms (1)**
80:18

**act (2)**
31:23 84:21

**acting (21)**
13:24 17:16 18:4,15
18:16 19:23 21:13
21:25 23:3,6,12
24:24 27:11 28:6,18
112:6,25 113:7
135:25 137:12
138:2

**action (14)**
1:9 7:2 31:21 32:13
32:17 35:24 40:8
41:4 42:15,21 43:2
100:23 136:13
145:15

**actions (2)**
85:8,12

**active (1)**
83:13

**actual (2)**
109:24 129:3

**addition (2)**
6:12 105:9

**additional (2)**
106:8 109:21

**address (2)**
89:6 129:3

**Adducci (12)**
22:11,16,20 23:6
25:18 26:2 29:10
115:5 121:13 134:6
139:10,10

**Adducci's (8)**
113:18,20,24 114:16
115:19 116:6,10,12

**adjudicate (3)**
60:4 71:22 82:19

**adjudicated (2)**
71:19 72:2

**adjudicating (1)**
82:18

**adjudication (2)**
47:18 89:23

**adjudications (1)**
47:25

**adjudicator (1)**
54:3

**adjudicator's (3)**
83:18 84:2 147:12

**adjudicators (1)**
89:7

**adjust (1)**
63:5

**administration's (1)**
40:2

**advantage (1)**
55:3

**advised (2)**
37:11 61:24

**affairs (7)**
13:13 30:3,18 93:13
94:18 99:7,16

**affect (3)**
120:14 122:25 139:15

**Affidavit (2)**
105:14 147:22

**AFOD (1)**
77:16

**AFODs (1)**
77:17

**age (1)**
93:25

**agencies (2)**

**agency (1)**
101:18

**ago (2)**
112:19,22

**agree (3)**
62:16 71:9 95:17

**agreed (2)**
6:11 69:25 139:6

**ahead (2)**
8:18 114:20

**al (6)**
1:7,10 6:24,25 149:3
149:3

**Alan (2)**
77:7 147:7

**alerts (1)**
13:16

**alien (13)**
30:12 74:14 84:16,18
84:22 85:14,17,20
86:10,24 87:21
88:19 124:3

**alien's (1)**
85:7

**aliens (6)**
34:6 95:10 106:8
137:5,16 138:7

**allegations (2)**
140:11 142:11

**allow (1)**
70:22

**allowed (3)**
52:12 64:8 86:25

**allowing (1)**
42:15

**allows (7)**
63:11,14 81:4 85:19
86:10 87:21 88:18

**amount (1)**
63:15

**and/or (2)**
137:6 138:7

**Andrew (11)**
38:23 39:13 48:11,20
48:25 50:6,13 53:7
146:8,16,20

**announce (4)**
97:20,22 98:3,6

**announced (1)**
98:5

**announcement (2)**
24:15 25:2

**annually (1)**

92:10 126:15

20:4

**answer (15)**
9:20,21 10:2 27:19
28:2 32:25 44:2
79:10 93:10 104:8
106:7 132:17
140:14 141:10,17

**answered (1)**
107:5

**answering (3)**
31:3 105:21 106:19

**answers (2)**
9:2 107:2

**Anthony (1)**
29:19

**anticipate (1)**
23:3

**anybody (4)**
29:12 34:12 36:23
119:6

**anyway (3)**
101:10 103:14 104:17

**apart (3)**
56:11 78:20 124:12

**Apologies (1)**
108:22

**appear (3)**
45:21 85:10 88:6

**appeared (2)**
42:14 65:21

**appearing (2)**
40:21 110:25

**appears (1)**
84:18

**application (8)**
43:24 47:14 60:7 64:2
69:17 84:20 132:9
132:23

**applications (2)**
60:4 64:21

**applied (4)**
25:10 40:25 70:18
131:24

**apply (10)**
24:2,5 25:9 27:9
60:15 61:3,6 63:9
67:16 69:8

**applying (20)**
41:8 43:6 51:8 54:8
61:19 63:4,19 64:17
67:17 68:19,21
69:15,19 82:5,15
88:5,7,16 93:17
134:4

**apprehended (1)**
106:9

**appropriate (2)**
92:23 93:5

**approval (2)**
111:20 112:11 115:3
116:2

**approve (3)**
37:21 54:11 112:16

**approved (12)**
43:25 44:8,14,25 45:6
45:9 47:14 53:21
70:2,6 132:9,22

**approximately (7)**
7:6 10:23 16:4 57:25
94:7 112:3 140:8

**Ardinger (3)**
4:20 7:25,25

**area (4)**
14:19 28:23 29:2 49:8

**areas (1)**
11:16

**Armstrong (6)**
29:18 30:4 49:25 77:9
77:16 147:9

**arrest (75)**
11:22,23 13:8 14:11
14:16 34:3,8,13,17
35:15 36:2,11,13
37:25 38:6,13 40:21
41:4 42:8 43:10,23
44:6,23 46:7,12
47:2,5,9,15,16 49:11
49:15,16 51:5,6,6,8
51:13,24 53:17 55:4
61:12,22 75:23,25
79:5,9 84:15 91:7
93:2,7 94:7,24
95:12,24 96:21 97:2
97:18 98:7 100:19
101:24 111:20
113:23 115:9 116:2
117:23 119:4 123:7
123:11,15,17
127:10 129:21
134:3 139:23

**arrested (36)**
14:17 15:13 43:4,13
45:5 49:17,21 51:18
52:21,22 59:14 61:7
66:6 67:19 68:15,17
69:10 75:3 76:3,25
78:25 79:3,7 84:21
85:11 88:24 93:14

105:7 106:4 107:8
107:15 108:19
109:12,19 127:14
132:22
**arresting (12)**
11:24 44:13 68:12
90:22 96:3,8,10,17
122:10,11 123:19
127:18
**arrests (82)**
15:22 31:13,17,18
32:8 33:18,21 34:21
35:2,12 36:5,16,21
36:24 37:9 49:10
52:13 54:15,25 56:6
56:16 76:14,16
78:22,24 84:5,8
89:18 90:6,19 91:16
91:23 92:5 97:5,21
97:23,25 98:12,12
98:17 100:19
108:18 109:5,8
110:20,23 112:9,12
113:7,12,25 114:3
114:14 115:4,12,20
116:6 117:5,20,25
118:5,14 119:8,15
120:6,9,13,25 121:3
122:11,23,25
123:23 124:7,15,20
125:7,17,17 126:24
127:7 134:14
**arrival (4)**
48:5 138:14,17,22
**arrived (1)**
37:6
**arrives (1)**
46:15
**article (3)**
13:22 14:3,5
**asked (12)**
11:19 27:24 108:18
109:2,15,16,17
112:11,15,18 129:2
139:25
**asking (5)**
9:11 24:23 45:10 82:8
128:25
**aspect (1)**
114:18
**aspects (4)**
14:13 26:18 124:2
129:20
**assessment (5)**

128:3,6 130:16
137:22 139:7
**assigned (2)**
16:23 49:7
**assistant (21)**
17:25 18:3,7 29:13,22
29:25 30:4,11 37:10
44:20 73:20,23 99:7
99:8,12 106:18,22
106:25 109:18
112:6 121:16
**associate (1)**
26:6
**association (1)**
7:10
**assume (4)**
22:17,21 120:8,9
**assumed (2)**
113:3 115:5
**assuming (1)**
73:2
**assumption (1)**
142:7
**at-large (7)**
30:5 49:10,11,16
137:5,16 138:6
**attached (13)**
38:24 41:13 48:12
50:7 77:24 94:11
98:23 146:9,13,17
146:21 147:15,19
**attachment (2)**
50:16 78:8
**attachments (2)**
77:9 147:10
**attempted (1)**
141:11
**attending (1)**
67:17
**attention (5)**
56:16 91:13,21 104:6
104:12
**attorney (3)**
9:18 61:25 69:14
**Attorney's (2)**
7:24 124:4
**attorneys (1)**
114:13
**audit (3)**
136:4,7,8
**August (2)**
23:9,12
**authority (3)**
101:18 121:12,22

**authorized (1)**
36:11
**available (3)**
67:11 68:25 86:17
**avoid (1)**
56:15
**aware (39)**
37:18 43:5,8 44:7
53:20 54:24 63:22
64:3,16 65:2,5,8,13
65:17,20,24 66:6,13
67:6 71:14 86:16
89:12,15 92:25
93:17,21,24 94:3,6
96:15 102:3,9,12
116:15 118:2 134:6
134:9 135:19,23

——————————
**B**
——————————
**B (3)**
146:5 147:1 148:1
**back (14)**
13:8 33:14 50:17 51:3
55:15 72:20 78:6
101:15,22 102:25
110:9 128:18 141:5
143:20
**bad (3)**
62:2 91:16,19
**Barnette (1)**
5:6
**barring (3)**
51:24 61:12 113:10
**based (22)**
34:19 35:4 41:4 73:24
74:3,13 75:5 78:3
80:6 100:24 104:10
107:4 118:13 119:7
119:14,25 120:6
124:19 125:3,5,6
142:7
**basis (4)**
40:12 44:20 67:22
141:21
**batch (1)**
57:9
**Bates (9)**
146:9,13,18,21,22
147:5,10,15,20
**bed (1)**
139:7
**began (1)**
78:22
**beginning (8)**

18:21 43:21 55:19
56:19 96:19 128:24
132:20 140:2
**begins (1)**
55:20
**behalf (4)**
3:4 4:4 7:16,19
**believe (34)**
13:22 15:14 23:9
24:23 26:5 27:20
33:23 44:18 55:11
62:21 64:16 69:18
74:21 77:3 78:14
83:12 92:8 94:12
95:20 96:25 97:8
107:11,22,22
109:14,15 115:14
115:22,24,24 116:9
116:10 123:18
127:12
**believed (3)**
92:4 111:6 116:16
**believes (1)**
139:11
**beneath (1)**
123:24
**beneficiary (1)**
46:2
**benefit (9)**
60:15 76:18 79:15
81:6 82:2 86:23
87:5,19 134:5
**benefits (28)**
54:9 59:11 61:4,20
64:2 67:9 68:6,11
69:5,12 70:9,15
71:4 72:7 84:20
85:18,21 86:3,9,11
86:23 87:9,12,13,22
88:17,20 92:7
**best (5)**
45:17 56:11 76:21
91:11 120:20
**beyond (1)**
27:21
**biggest (1)**
14:8
**biographical (1)**
129:21
**birth (1)**
129:2
**blood (1)**
145:15
**bold (1)**

85:17
**bona (2)**
65:25 69:16
**bond (1)**
130:19
**Boston (54)**
1:16 2:13 3:8 4:14,19
7:5,24 8:23 15:20
16:24 17:3 18:17
19:20 20:8 23:4
24:24 25:19 26:20
27:2 28:23 29:2
31:6,16,20 32:12
33:20,22 34:10
36:10,15,23 37:7,24
37:25 38:5 40:19
45:13 47:3 49:18
50:23 76:7 99:17
109:17 118:12,20
120:24 129:6
134:13 135:25
136:14 138:11,16
138:21 142:4
**Boston's (4)**
31:12 33:17 107:15
135:8
**bottom (2)**
100:7 137:3
**box (1)**
130:22
**boxes (1)**
130:8
**break (4)**
9:17,22 72:14 128:13
**briefly (1)**
136:17
**bringing (2)**
15:8,10
**broke (1)**
107:13
**broken (3)**
78:5 109:14 121:18
**Brophy (16)**
41:12 91:9,10 106:23
110:16 111:19
112:24 117:3,17
135:17,19,24 138:2
138:11 146:12
148:3
**Brophy's (17)**
13:25 111:6,15
113:10 114:2,25
115:15,20 116:7,16
116:17 134:12,24

CONFIDENTIAL

137:10,21 138:14
138:21
**brought (3)**
20:14,18,23
**built (1)**
74:12
**bullet (1)**
85:14
**bullets (1)**
74:3
**Burlington (2)**
16:25 17:6

**C**
**C (6)**
3:2 4:2 5:2 6:2 145:1
145:1
**C-i-u-l-l-a (1)**
29:19
**Calderon (19)**
1:6 6:23 13:8 15:4
42:9 43:2,5,8 52:21
65:10,11 66:11
93:14 94:19,20
105:9 106:4 109:19
149:2
**Calderon's (5)**
93:2,7 94:24 95:24
105:22
**calendar (1)**
112:21
**call (3)**
63:8 120:2 141:11
**called (1)**
126:17
**candidate (1)**
19:12
**candidates (6)**
19:13 24:4,16 25:3,5
27:5
**capacity (4)**
37:2 54:14 62:25
129:16
**Capital (1)**
8:2
**caps (1)**
85:17
**Captioner (1)**
2:15
**case (59)**
11:13,14,17 12:6,11
12:14 13:6,11 14:6
14:23 15:5,24 18:20
21:5 34:18,18,18

35:22,22,23 37:16
42:17 44:4,19 45:4
45:8 47:18 49:9
61:9,10,10 65:11,21
66:3,14 69:16 71:8
71:8,10 72:4 77:22
77:23 80:5 83:2
105:4,22 116:13
117:18,18,18
123:12 127:19,24
127:25 133:5 134:7
138:25 140:9 149:2
**case-by-case (2)**
44:19 67:21
**cases (20)**
10:10 11:4,7 14:21
21:7 31:21 32:13
35:13,14 37:17 40:8
42:8 43:15 60:17
61:11 85:7 101:18
123:14 124:5
125:14
**cases/subjects (1)**
42:11
**categories (2)**
34:4 95:9
**ceased (1)**
110:19
**centric (1)**
74:23
**certain (1)**
88:6
**certainly (1)**
28:10
**Certified (1)**
2:16
**certify (2)**
145:8,14
**chain (4)**
101:22 114:22 121:15
121:21
**chances (1)**
81:21
**change (3)**
9:14 64:3,12
**charged (1)**
136:21
**chart (1)**
50:23
**checking (2)**
130:8,22
**checks (1)**
74:13
**Chelsea (1)**

76:9
**Chicago (1)**
118:20
**chief (3)**
8:2 15:25 44:22
**childcare (2)**
51:25 61:13
**children (2)**
65:18 93:25
**chilling (3)**
92:2,6,8
**chose (2)**
102:18,18
**Christopher (2)**
31:9 32:23
**circumstances (6)**
11:22 34:19 44:4
95:24 101:24
120:19
**CIS (130)**
14:18 15:13,22 31:13
31:17,19,21 32:9,14
33:18,21 34:22 35:2
35:11,12,13 36:3,7
36:13,16,21,24 37:9
37:13 38:2,7,14
40:21 42:8 43:15
44:13 45:15,19,24
46:6,9,14,18,19,23
47:2,21 48:2,4,5
50:24 51:3 52:9,24
53:3,10,13,15,22
54:11,13 55:4,8
56:19,24 57:2,10,16
58:2,5,6,9 59:5 60:3
64:19 65:24 66:7
69:15 70:12 73:19
74:15,20,22,24
76:15,19 77:19 79:3
79:4,7,12 82:18
84:19 86:2,8 87:24
89:6,10 90:13,13,23
92:7 93:15 96:3,10
96:17 97:5 98:7,12
98:16 100:19,25
101:8 102:5 103:5
105:8 106:6 107:8
107:15 109:13
110:20,25 113:7,12
113:25 114:14
115:4,9,12,20 117:6
120:25 127:5,14
134:15
**CIS's (7)**

60:11 84:4,8 90:8,12
98:11 102:13
**citizen (5)**
14:11,17 65:18 93:19
93:22
**citizens (3)**
65:9,15 67:15
**City (1)**
126:15
**Ciulla (2)**
29:19 30:11
**civil (3)**
1:9 7:2 141:13
**civilian (2)**
10:13 126:14
**claims (2)**
15:7,9
**clarification (3)**
128:23 130:12 135:6
**clarify (2)**
90:25 128:21
**classes (1)**
95:9
**classification (2)**
128:2,6
**clear (4)**
95:8 137:4 138:6,11
**clearer (1)**
9:14
**code (2)**
75:24 76:5
**colleague (4)**
7:15,17,21 8:3
**colleagues (1)**
16:15
**Colleen (2)**
3:11 7:13
**column (3)**
79:18,18 80:8
**come (15)**
20:15 46:12 57:4,8,9
58:16,21,24 59:20
60:18 62:18 74:24
87:16 115:2 124:17
**comes (1)**
114:24
**coming (10)**
10:11 25:19 43:9
51:13 57:17 59:9
60:10 85:25 86:8,22
**command (3)**
114:22 121:15,22
**comment (1)**
92:3

**COMMISSION (1)**
149:25
**common (2)**
18:10 56:19
**Commonwealth (4)**
2:17 49:22 145:2,7
**communicate (4)**
30:25 92:21 113:13
114:8
**communicated (4)**
53:12 92:22 93:4
114:6
**Communicating (1)**
30:23
**communities (1)**
30:9
**comparative (1)**
124:8
**compare (1)**
123:16
**compared (3)**
118:13,20 122:16
**comparing (1)**
124:12
**compile (1)**
110:5
**complaint (1)**
11:8
**complete (2)**
8:20 10:3
**completed (2)**
71:15 129:12
**completely (1)**
101:16
**compliance (1)**
139:15
**components (1)**
32:4
**COMSTAT (1)**
126:17
**concern (1)**
91:6
**concerned (5)**
91:15,22 92:5 104:5
104:11
**concerns (5)**
90:21 91:8,12 92:13
95:23
**conclude (1)**
46:25
**concludes (1)**
144:4
**concur (3)**
131:12 132:6 133:7

concurred (1)
137:21
concurrence (1)
116:2
concurs (1)
131:12
conduct (3)
42:16 49:10 60:3
confer (2)
24:21 143:14
conference (4)
116:18,24 117:4,16
confers (1)
67:9
confidential (3)
1:14 6:14,19
confrontational (1)
89:5
confuse (1)
32:3
congressional (3)
30:3,18,22
conjunction (1)
52:10
connected (1)
141:24
Connecticut (3)
29:6 109:9,12
connection (2)
84:19 141:23
consider (1)
124:15
considerations (1)
41:9
considered (3)
38:16 121:8,11
consolidation (1)
73:19
constituents (1)
31:5
Cont'd (2)
147:1 148:1
contact (2)
53:3 56:22
contacts (1)
77:19
contain (1)
75:22
continue (1)
59:19
Continued (2)
4:2 5:2
continuing (1)
133:18

continuous (1)
24:3
contrary (4)
116:19 134:16,21
139:12
convenient (2)
46:11 127:6
conversations (1)
114:12
convey (1)
103:15
conveyed (3)
103:20 134:20 139:11
conveys (1)
103:25
coordinate (2)
54:21 56:22
coordination (1)
56:18
copied (2)
99:18 100:14
copy (2)
99:21 105:11
corner (1)
136:25
correct (119)
18:17,22 22:12 26:14
28:23 31:7,10 34:23
35:18 39:20 43:3,9
43:18,21 45:6,22
46:3,7,12,16,20 47:7
47:11,15 51:5,9,14
52:10,14 54:16,19
59:11,15 61:14
63:16 67:7,19 68:7
68:13,22 69:6,13,22
70:3,6,10,16,20 71:4
71:11,19 72:2,8,10
79:2,13,17 82:15
84:13 86:4,12,19
87:2,22 88:8,20
89:2 90:23 92:18
93:2,7,15 94:24
95:18 96:4 97:10,13
97:19,23 98:8 99:19
99:23 100:15,20
102:20 103:6,11,21
104:6,23 105:4,10
106:11,14,16
107:16 108:12,20
109:6,9 110:17,21
111:3,22 112:25
113:4 116:24
120:25 121:6 127:7

127:15 133:14,20
133:24 134:7
137:24 138:3,8
139:12
corrected (1)
10:4
CORRECTIONS (1)
149:6
correctly (6)
42:18 56:13 84:24
85:23 99:15 101:12
counsel (9)
7:11 16:2,8 24:21
44:22 63:7 116:22
141:8,9
counselor (2)
63:10 64:9
count (2)
107:18 108:6
counted (1)
108:5
counting (4)
100:5,6 108:14,15
country (1)
63:9
County (2)
76:8 145:4
couple (3)
27:25 57:6 139:24
couples (1)
65:18
course (4)
73:5 84:22 85:12
88:24
court (10)
1:2 6:25 7:9,21 8:4
10:19 76:8 128:25
141:11 142:2
Court's (2)
16:17 106:2
Courthouse (2)
4:12,13
cover (1)
43:11
coverage (4)
12:25 13:7,10 92:25
covered (1)
11:16
covers (1)
15:21
CRC (2)
1:23 145:22
create (2)
73:24 74:6

created (3)
77:20 78:2 137:23
credibility (1)
140:20
crime (1)
49:21
crimes (1)
126:18
criminal (14)
30:12 38:3,8 40:13
51:14,15 94:4
110:21 111:21
117:7 124:3 127:22
128:9 129:23
criminality (2)
35:5 40:12
criteria (1)
40:9
critical (1)
137:19
Cronin (13)
24:11 31:9 32:23
34:25 35:3,20,25
36:4 37:18 50:15
120:23 121:5,18
Cronin's (3)
90:21 92:14 120:23
CRR (2)
1:22 145:22
Crystal (2)
5:4 7:7
current (3)
16:18 17:15 81:22
currently (7)
16:22,23 22:13 29:10
80:25
custody (6)
49:13 79:22 137:7
138:8 139:3,21
customs (5)
4:17 10:12 15:20
23:15 49:23

_____
D
D (6)
1:22 2:14 6:2 145:6
145:22 146:1
D.C (1)
4:7
DACA (2)
42:14,23
daily (1)
13:12
Dallas (6)

18:2,4 125:5,8,13,15
danger (2)
134:10,12
dangerous (1)
38:16
database (2)
75:15,16
date (9)
16:7 21:13 40:13,14
78:23 108:12 110:7
112:4 149:4
dated (18)
38:23 41:12 48:11
50:6 73:10 77:9
94:10 98:22 135:17
146:8,12,16,20
147:4,9,14,18 148:5
day (16)
20:2,9 52:14,16,18,19
52:20 54:25 112:2,9
112:20 113:2
127:14 144:13
145:19 149:22
days (4)
6:8 20:9,12 55:5
de (4)
13:11,16 66:11 106:4
deal (1)
53:4
Dealing (1)
30:20
dealt (1)
44:19
decide (3)
23:16 127:17 135:3
decided (1)
65:24
decides (1)
132:2
decision (7)
25:15 27:7 35:17 41:3
47:15,16,20
decisions (2)
40:10 132:6
declaration (8)
12:5 105:3,6,20 109:4
109:23 110:12
116:13
decline (5)
40:20 41:3 42:20,5
43:23
declined (1)
44:6
decrease (1)

CONFIDENTIAL

64:21
**defend (1)**
101:7
**Defendants-Respon...**
1:11
**defending (1)**
101:10
**DEFINE (3)**
146:6 147:2 148:2
**definite (1)**
44:2
**definitely (1)**
52:16
**deliberative (1)**
93:9
**denied (2)**
70:8,12
**denies (1)**
131:12
**deny (2)**
132:6 133:7
**Dep (1)**
149:4
**Department (3)**
4:5,11 49:18
**departure (1)**
81:5
**depending (2)**
20:6 47:23
**depends (3)**
119:3 120:22 123:7
**deponent (3)**
6:7 149:5,20
**deportation (16)**
49:2,7 60:18 66:22
   80:16 85:16,20
   86:11,25 87:11
   88:19 129:14,16
   131:4 132:5 139:6
**deported (2)**
34:7 38:18
**deposed (1)**
140:6
**deposition (18)**
1:15 2:10 6:9,22 7:4
   10:2,20 11:17 12:16
   15:24 16:2,9 140:2
   142:15 143:12
   144:5 145:10,11
**depositions (2)**
10:21 11:12
**depth (1)**
136:18
**deputies (1)**

99:21
**deputy (13)**
15:18 17:8,9,16 18:5
   18:8 43:12 50:14
   95:7 99:9 121:16
   124:18 136:18
**detail (1)**
23:9
**detain (5)**
127:17 130:2 131:10
   131:15 133:9
**detained (6)**
59:15 66:7 94:6 133:2
   136:14 138:24
**detainee (1)**
129:13
**detainees (2)**
137:6 138:8
**detainers (2)**
137:6 138:7
**detaining (1)**
117:12
**detains (1)**
133:12
**detention (8)**
14:20 79:21 80:4
   95:12 113:23
   130:19 132:5
   133:13
**deterred (1)**
91:23
**deterring (1)**
60:10
**Detroit (3)**
22:15 23:7 118:19
**DFOD (1)**
106:22
**dictated (1)**
95:20
**difference (2)**
33:3 115:18
**differences (1)**
116:5
**different (4)**
41:5 47:17 81:17
   120:18
**difficult (1)**
54:24
**direct (3)**
32:24 53:4 89:22
**directed (1)**
110:23
**direction (4)**
110:19 114:16,22

126:9
**directive (6)**
111:7,15,24 112:14
   137:11,14
**director (43)**
13:25 15:19 17:8,10
   17:17,25 18:4,5,9,16
   18:17 19:11,24 20:3
   20:15,19,24 22:14
   22:15 23:20 24:9
   26:6,8,17,21 29:9
   30:2,5,12 37:10
   44:21 50:15 95:7
   99:7,8,9,13 106:23
   109:18 112:6
   113:10 116:3
   137:13
**directors (11)**
18:8 19:20 29:14,23
   73:21,24 106:18
   107:2 119:21
   121:16,17
**disagree (1)**
143:10
**disappointed (1)**
25:23
**discovery (3)**
27:21 74:4 142:2
**discuss (7)**
25:16 48:3 91:8,10
   112:8 140:22
   142:21
**discussed (4)**
61:12 69:11 112:7
   116:21
**discussing (2)**
47:18 143:11
**discussion (7)**
6:18 23:5 27:17 33:12
   47:23 89:16 100:18
**dispute (1)**
14:10
**District (5)**
1:2,3 6:25 7:2,20
**division (1)**
123:13
**docket (1)**
123:13
**document (22)**
39:2,5,8,11 41:18
   42:3 48:15,18 50:10
   50:17 73:15,22
   77:13 81:20,22
   83:22 84:12 90:2,6

94:14 99:3 100:2
**documented (1)**
117:23
**documents (2)**
12:3 82:5
**doing (3)**
96:12 102:9 125:6
**drive (1)**
77:20
**dropdown (2)**
76:5 130:10
**dropdowns (4)**
130:12 131:19,20,23
**duly (2)**
8:11 145:10

_____

**E**

**E (17)**
3:2,2 4:2,2 5:2,2 6:2,2
   145:1,1 146:1,5,6
   147:1,2 148:1,2
**e-mail (44)**
38:22 39:12,15,17
   41:11,17,21,24 42:2
   48:10,19 50:5,13
   55:18 73:9,25 76:20
   77:7,16 94:9,17,21
   94:22 95:3 98:21
   99:6 100:2,9,14,17
   100:22 101:5,21
   104:11,22 114:8
   146:7,11,15,19
   147:3,7,13,17
**e-mail-based (1)**
74:25
**e-mails (18)**
38:24 41:13 48:12
   50:7 74:15,20 77:21
   88:2 94:11 98:23
   99:18,22 146:9,13
   146:17,21 147:15
   147:20
**e.g (1)**
85:18
**earlier (3)**
72:23 134:2 138:25
**earliest (2)**
39:18 78:24
**EARM (2)**
75:20,21
**easier (5)**
127:6,8,8,9,10
**east (1)**
121:19

**easy (1)**
129:9
**effect (7)**
40:17 81:4 92:2,6,8
   123:5 135:14
**effectively (1)**
68:10
**effects (1)**
92:17
**effectuate (1)**
133:14
**effectuating (1)**
133:19
**effort (1)**
39:18
**egregious (1)**
85:8
**eight (1)**
19:5
**either (7)**
49:19 60:23 61:25
   75:12 81:5 133:6
   141:20
**eligibility (2)**
42:22 120:14
**eligible (3)**
40:22 45:16 122:20
**eliminated (1)**
70:14
**eliminating (1)**
68:10
**Ellen (1)**
7:25
**eluded (2)**
68:16,17
**eluding (1)**
69:2
**Ely (10)**
41:12 42:4,7 98:22
   99:9,11 100:3,22
   146:11 147:18
**Emma (1)**
5:5
**employees (1)**
77:21
**encounter (1)**
42:13
**ended (1)**
40:16
**ends (1)**
23:9
**enforcement (33)**
4:17 10:12,13 15:20
   17:10 23:15 26:18

CONFIDENTIAL

28:24 30:15 31:20
31:23 32:6,13,17
35:24 37:11 39:20
39:22 40:3,8,10
41:4 42:15,21 43:2
49:13 60:24 91:19
92:11 95:10 97:18
120:21 135:13
**England (3)**
14:19 29:4 31:2
**entail (1)**
29:24
**entails (1)**
30:8
**enter (1)**
130:7
**entered (5)**
71:11 128:5,8 129:18
130:21
**entire (1)**
6:13
**entitled (1)**
69:6
**entry (1)**
40:13
**environment (1)**
120:22
**equities (2)**
128:8 129:22
**ERO (31)**
26:20 31:6,12,16,18
31:20,23,24 32:12
33:17,20,21 35:13
36:10,15,23 37:25
38:6 40:19 74:13,15
74:23 75:6 76:17
82:16 99:17 117:20
120:17,24 123:6
138:11
**ERO's (1)**
90:11
**ERRATA (1)**
149:1
**ESQ (9)**
3:9,10,11,13 4:8,9,15
4:20,21
**et (6)**
1:7,10 6:24,25 149:2
149:3
**evaded (2)**
60:23,24
**evaluate (1)**
126:17
**evaluated (7)**

119:7,14,25 120:6
123:22 124:14,19
**evaluating (1)**
124:14
**evaluation (4)**
123:2 124:8 125:2
130:23
**evaluations (2)**
120:3 122:19
**events (1)**
9:8
**exact (2)**
112:20 119:2
**exactly (1)**
40:25
**EXAMINATION (2)**
8:14 146:2
**examined (1)**
8:12
**example (2)**
119:13 130:22
**exception (2)**
85:9 133:23
**Exceptions (1)**
85:3
**excuse (9)**
27:14 46:19 67:16
84:11 92:21 96:9
98:18 109:21
134:11
**executed (1)**
52:13
**execution (1)**
82:17
**executive (26)**
26:6 33:22,25 34:3,8
35:4,8,15 36:10
38:10 40:2,17 61:18
67:2,3 95:21 98:2,4
113:21 116:19
119:22 133:22,25
134:16,22 139:12
**exempt (1)**
95:9
**exemptions (1)**
34:16
**exhibit (51)**
38:22 39:3,5,9 41:11
41:15 48:10,16 50:5
50:9 55:15 72:12
73:8,9,13 77:6,7,12
78:3,16 83:17,18,21
94:9,13 98:21 99:2
105:14,17 107:12

107:19 108:4
135:16,21,23 136:9
136:10 146:6,7,11
146:15,19 147:2,3,7
147:12,13,17,22
148:2,3
**expanding (1)**
14:24
**expect (1)**
19:2
**expected (4)**
18:21 19:4 22:2,6
**expedition (1)**
143:7
**experience (2)**
26:17 140:19
**EXPIRES (1)**
149:25
**explain (2)**
21:18 37:14
**explained (2)**
37:16 102:4
**express (1)**
95:23
**expressed (5)**
69:21 116:17 117:3
117:11,17
**extended (2)**
65:14 67:6
**extensive (1)**
18:12
**extent (1)**
93:9
**extraneous (1)**
141:23
**extremely (1)**
55:6

—————
**F**
—————
**f (3)**
34:5 38:11 145:1
**facilitate (1)**
53:16 133:19
**facilitated (1)**
55:4
**fact (8)**
45:6,24 97:9,10 103:5
132:8,19,21
**factors (6)**
47:17 82:9 127:20
128:8,9 133:21
**fall (2)**
90:17 121:19
**familiar (9)**

40:14 53:22 55:12
64:23 65:12 82:22
84:4 129:10 136:19
**family (4)**
25:16 67:10 70:20,23
**far (29)**
11:18 14:11,15,24,25
16:5 33:21 35:23
40:7 41:7 45:7
55:20 56:3 69:16
82:17 102:12
114:16,17,22
115:15 119:10
120:19 124:8,23
126:10 130:19
135:7 136:9 138:18
**February (8)**
13:9 41:24 105:4
108:9 110:13,17
112:3
**federal (6)**
20:16 21:4 35:6 60:17
92:10 101:17
**fell (3)**
34:5 36:9 38:10
**fewer (1)**
62:17
**fide (2)**
65:25 69:16
**field (68)**
13:25 15:19,21 16:24
17:3,8,9,16,25 18:22
18:3,5,7,8,16,16
19:11,20,23 20:3,15
20:19,23 22:14
23:20 24:8 26:7,17
26:21 29:8,13,22,25
30:5,12 37:10 44:21
47:24 56:21 73:20
73:23 77:18 83:19
84:2 99:8,9,12
106:18,23,25
107:15 109:18
112:6 116:3 118:12
119:21 120:17
121:15,17 123:15
131:2 132:4 134:13
137:12 138:16,21
142:4 147:12
**Fifth (1)**
4:6
**file (7)**
44:3 63:19 66:3 74:14
74:15 81:12,14

**files (1)**
66:4
**filing (1)**
6:10
**filings (1)**
12:11
**filled (1)**
18:12
**final (43)**
34:6,12 35:5,14 36:2
36:5 37:25 38:6,14
38:18 40:14 45:20
46:2 49:19 51:16
57:11,17 59:24
60:20,21 61:3,16,20
62:18,22 64:5 65:6
67:7,12,14 68:15
80:13 81:25 82:17
86:18 95:13 106:8
110:24 129:23
131:21 135:9,14
139:5
**find (2)**
111:17 138:10
**findings (1)**
11:3
**fine (1)**
21:17
**finish (1)**
132:15
**finishes (1)**
132:18
**first (12)**
13:9 15:23 29:16 42:2
55:18,23,24 63:23
63:24 67:16 130:17
137:12
**fishing (1)**
143:7
**five (3)**
93:25 105:7 106:8
**flight (3)**
127:23 128:10 129:23
**flip (1)**
74:2
**Florida (1)**
10:14
**focus (3)**
35:3 116:10 137:15
**focused (1)**
138:23
**focusing (1)**
115:16
**FOD (24)**

CONFIDENTIAL

21:13,16,25 23:3,6
23:12 24:24 25:20
27:2,11 28:6,18
31:9 32:24 110:16
112:25 113:7 115:2
117:17 119:13
120:2 124:18
135:25 138:2
**FOD's (1)**
119:18
**FODs (1)**
23:22
**FODs' (1)**
114:22
**folder (1)**
77:20
**follow (1)**
132:2
**follow-up (1)**
129:7
**followed (2)**
33:22 34:10
**following (2)**
47:6 66:8
**follows (1)**
8:12
**force (2)**
11:8,23
**form (4)**
6:5 40:11 130:21
141:25
**formally (1)**
38:20
**forms (1)**
63:18
**forth (1)**
145:10
**forward (2)**
28:3,10
**found (4)**
19:10 95:13 138:5,13
**four (6)**
10:23 11:11 20:5,9,12
140:6
**Friday (2)**
1:17 2:6
**friends (1)**
16:11
**front (7)**
14:2 66:3 81:12 91:3
112:21 117:17
125:19
**fugitive (7)**
30:8 49:3 123:10,19

123:20,21 124:2
**full (1)**
45:25
**further (3)**
42:16 143:14,22
**future (2)**
82:24 83:6

————— **G** —————
**G (1)**
6:2
**G-u-a-r-n-a (1)**
29:18
**gain (2)**
122:4,4
**general (10)**
11:20 33:23 45:8
84:17,17 85:4,9
96:22,24 97:23
**generally (2)**
40:4 116:7
**generated (1)**
136:8
**geographic (1)**
49:8
**Gillespie (2)**
3:13 7:17
**give (10)**
9:4 15:2,24 34:25
36:23 44:2,12 51:22
107:2 111:24
**given (7)**
40:9 44:16 58:24
106:18 126:5,8
145:12
**gives (3)**
42:9,11 129:25
**giving (1)**
131:9
**Globe (1)**
13:21
**go (16)**
27:22,23 28:3,10,11
33:8 63:9,12 72:15
78:6 88:14 110:9
114:19 140:21,23
142:17
**goal (1)**
135:8
**goals (4)**
124:22 125:24 126:6
126:9
**goes (5)**
55:20 56:4 130:17

141:14 142:12
**going (10)**
15:24 33:10 35:23
43:16 72:16 97:20
102:25 128:14
140:25 143:16
**Good (3)**
8:16,17 28:14
**Goold (1)**
5:5
**Gordillo (2)**
1:7 6:24
**GOV001641 (1)**
146:18
**GOV001644 (1)**
146:18
**GOV001645 (1)**
146:22
**GOV001651 (1)**
146:22
**GOV001996 (1)**
147:5
**GOV002021 (1)**
147:6
**GOV002125 (1)**
147:10
**GOV002135 (1)**
147:11
**GOV002235 (1)**
147:16
**GOV002237 (1)**
147:16
**GOV002330 (1)**
147:21
**GOV002336 (1)**
147:21
**GOV002561 (1)**
146:14
**GOV002565 (1)**
146:14
**GOV003046 (1)**
146:10
**GOV003048 (1)**
146:10
**Government (1)**
8:10 24:21
**grade (1)**
121:10
**graded (2)**
120:4,9
**grades (1)**
119:20
**Graham (14)**
38:23 39:13,17 48:11

48:20,25 49:24 50:6
50:14 53:7 56:2
146:8,16,20
**granted (1)**
71:21
**Greenbaum (2)**
77:8 147:7
**GS (1)**
119:20
**Guarna- (2)**
77:8 147:8
**Guarna-Armstrong...**
73:10 147:3
**guess (2)**
41:5 60:6
**guessing (1)**
52:4
**guidance (1)**
44:21

————— **H** —————
**H (3)**
146:5 147:1 148:1
**Hale (3)**
5:6 7:14,16
**half (1)**
51:23
**Hampshire (1)**
29:5
**hand (1)**
145:19
**handed (13)**
39:8 41:14 42:3 48:15
50:8 73:13 77:11
83:20 94:12 95:3
98:25 105:16
135:22
**handle (3)**
20:16 21:4 26:13
**handled (1)**
106:22
**happen (2)**
127:10 139:20
**happened (2)**
45:10,12
**harder (1)**
78:4
**hate (1)**
119:19
**head (4)**
40:15 44:9 63:20 66:2
**headquarters (1)**
23:16
**heard (2)**

120:5,10
**hearing (8)**
12:8 13:20 18:20 19:2
80:5 111:5,12
116:18
**held (2)**
2:11 7:4
**help (3)**
26:13 59:10 60:4
**hereinbefore (1)**
145:10
**hereunto (1)**
145:18
**hide (3)**
97:9 98:16,18
**highlighted (1)**
50:18
**hired (2)**
19:10,11
**history (9)**
40:13 94:4 110:21
111:21 117:7
127:22 128:9
129:23 139:5
**hold (7)**
18:21 19:2,7,9,23
20:7,11
**Homan (1)**
95:8
**home (2)**
63:9 64:10
**HRIFA (1)**
85:19
**human (2)**
131:8,11
**husband (2)**
93:19,22
**hyphen (1)**
29:18

————— **I** —————
**I-130 (39)**
43:9,17,24 44:7,13
45:21,25 47:13
53:21 54:4 57:12,18
58:6 60:4 62:18
63:22 65:21 67:18
68:13 75:3 76:3,16
77:2 79:2,8,13 86:2
86:8,22 87:16 88:4
88:7 90:7 93:15
131:24 132:8,12,23
133:5
**I-130s (8)**

44:24 45:6 51:9
63:24 69:19 70:2,5
134:15
**ICE (115)**
8:2 13:13 14:17 18:10
23:15 31:2,24 34:9
34:19 35:16,16 40:8
40:20 42:20,25
43:16,23 44:6,23
45:5,14,19 46:6,11
46:14,18,19,23 47:5
47:9 48:3 50:23
51:5,7,12,18 52:10
52:24 53:5,17 54:14
54:22,25 55:6 56:15
56:25 57:10,16 58:2
58:7,13,18 59:2,5
60:11 61:12 66:6
67:19 68:10 69:21
69:25 70:6,14 71:2
71:6 76:11,13,17
80:21 82:6,11,13
89:8,12,15,16,18
90:6,15,18 91:15
92:22 93:4 95:7,8
96:2,2,7,16 97:4,9
97:14 98:18 100:23
102:5,14 103:5
105:15 110:19
114:13 117:19
118:2,22 119:7
126:20 127:6,7,17
130:24 133:12,16
135:3,8 142:4
147:22
**ICE's (10)**
37:8 55:3,4,9 59:19
93:6 98:12 102:13
115:9,12
**idea (4)**
26:23 51:20 58:10
104:20
**identification (13)**
8:10 38:24 41:13
48:13 50:7 73:11
74:18 77:10 83:19
94:11 98:24 105:15
135:18
**identified (1)**
8:9
**identify (2)**
74:17 107:25
**illegal (1)**
85:7

**illegally (2)**
84:23 89:2
**immediately (4)**
17:14 47:6 66:7 79:7
**immigration (22)**
4:17 7:20 10:12 14:12
14:18 15:19 23:15
35:6 38:19,21 49:23
54:9 59:11 60:16,24
63:25 64:2 68:16
80:9 82:2 95:11,12
**impact (3)**
47:15 115:8,11
**implement (2)**
22:8 35:8
**implementation (2)**
33:24 35:4
**implemented (2)**
22:3 137:11
**implementing (1)**
136:22
**implication (1)**
114:5
**include (9)**
30:20 45:24 85:13
123:4 124:22 125:2
125:25 126:23
127:3
**included (1)**
125:24
**includes (2)**
29:4 109:8
**including (2)**
6:6 47:17
**incorrect (1)**
110:13
**increase (8)**
64:20,22 122:21
124:23 125:11,13
126:2,18
**increased (1)**
64:17
**individual (8)**
15:2 46:15 70:23 92:9
113:22 117:7
119:12,13
**individually (1)**
127:20
**individuals (44)**
14:16 43:13,16 46:12
47:5,10 51:4,8,13
53:13 57:11 68:17
69:19 70:2 71:23
72:6 76:14,15,16,25

78:25 79:6 80:22
82:3,14,23 83:11
88:17,23 89:19 92:6
105:7 106:3 107:8
107:23 108:6,19
109:11,21 110:20
112:12 117:12
124:13 126:5
**inform (1)**
58:5
**information (19)**
45:14 62:2 74:5,8
75:23 76:2 106:17
107:4 128:4 129:18
129:21 130:7,10,11
130:18,20,21,23
131:6
**informed (1)**
21:12
**inhibiting (1)**
60:11
**initial (3)**
42:13 74:17 130:15
**injunction (1)**
28:7
**inputted (2)**
130:25 131:2
**inquiries (2)**
93:6 94:23
**inquiry (3)**
97:2 101:15,23
**instance (4)**
52:13 76:7 114:24
123:9
**instances (2)**
44:5 48:7
**instruct (3)**
35:20,25 141:9
**instructing (2)**
27:18 77:19
**instruction (1)**
141:16
**instructions (4)**
34:25 44:12,16 73:25
**intend (1)**
80:21
**intention (1)**
115:15
**intentionally (1)**
103:4
**interest (4)**
56:8 69:22 100:11,23
**interested (2)**
54:15 145:16

**interim (5)**
18:15 22:13,14 25:20
110:16
**interpretation (2)**
34:11,15
**interview (32)**
40:22 41:2 43:9 45:21
46:15,20,24 47:6,11
47:21 48:4 57:18
58:6,17 59:10,13
63:10 67:18 75:4
76:4,19 79:15 84:13
84:16,18,22 85:11
85:12 87:17 88:4,24
93:15
**interviewed (1)**
43:17
**interviewees (1)**
90:22
**interviews (42)**
43:17 45:25 46:10,11
51:13 52:9,25 53:10
53:13,15,20,24
54:13 55:5,9 57:12
58:25 59:20 60:3,11
61:21 62:18 65:22
66:8 68:13 76:16
77:2 79:2,8,13 84:5
84:9 86:2,8,22 88:7
90:8 91:24 96:3,10
96:18 127:5
**introduce (1)**
7:11
**invades (1)**
93:9
**investigate (2)**
138:15,18
**investigated (1)**
84:7
**investigation (2)**
42:17 101:19
**investigative (1)**
100:24
**involve (1)**
40:5
**involved (4)**
10:7,15 140:4 142:18
**involvement (1)**
39:19
**involves (2)**
124:2 130:22
**Island (10)**
15:14 29:6 41:22
43:11 99:13 105:8

106:6 107:9 109:6
109:18
**issue (5)**
91:6 97:13,14,17
114:17
**issued (3)**
35:6 96:7,16
**issues (4)**
11:6 14:20 51:25
61:13

---

**J**

**James (5)**
5:6 48:10 99:10
106:22 146:15
**January (15)**
13:8 14:19 24:9 48:22
51:9 99:22 104:22
105:9 106:7,9
107:10 108:8,20
109:12 121:6
**Jimenez (3)**
1:6 6:23 149:2
**Jo (2)**
4:20 7:25
**job (8)**
1:24 17:7 24:15,25
29:20 50:3 60:12
123:8
**jobs (2)**
24:3 29:24
**John (11)**
4:12 98:21 99:14
100:3 101:5 102:3,7
103:18,23 104:8
147:17
**Johnston (1)**
100:25
**Joseph (1)**
4:12
**Juan (1)**
42:10
**judge (13)**
14:2 35:6 38:19,21
60:16,17 68:16
71:11 80:4 91:4
106:20 110:11
124:10
**judge's (9)**
12:13,15,17,20,22
60:24 68:18 69:2
109:3
**July (7)**
1:17 2:6 7:5 73:21

CONFIDENTIAL

149:4
June (2)
18:22 113:4
jurisdiction (1)
107:16
JUSTICE (2)
4:5,11
justify (1)
85:9

**K**

Kanwit (11)
4:15 7:23,23 24:18
32:18 33:5 107:25
140:21 141:18
142:17,24
Kathleen (2)
3:13 7:17
Kelly's (1)
33:24
key (1)
75:9
Khaalid (3)
94:10 95:3 147:14
kind (5)
37:3,5 56:18 126:13
134:2
Kirstjen (3)
1:10 6:24 149:3
knew (4)
58:17 59:18 62:16
98:11
know (68)
9:13 10:4 13:15 14:22
15:3,7,10 23:17
26:20 36:15 44:5
48:7 51:17 52:16
53:9,24 54:3,4
57:20,21,24,25
58:12,15,25 59:23
59:24 61:17 62:23
63:2 64:11,19 65:10
66:20 68:19 70:12
76:11,13,18 79:6,23
81:10,13 83:10,24
83:25 86:14 87:4,12
88:11,13 97:12,15
101:9,16 102:13
103:18 104:16
107:7 109:11,20,22
119:6,7,24 124:24
125:21 134:18
knowing (1)
72:5

knowledge (5)
21:9 45:17 76:21
102:16 142:6
known (2)
40:3 124:3

**L**

L (2)
48:10 146:15
L-y-o-n-s (1)
8:21
labeled (1)
6:21
lack (2)
137:4 138:5
Lane (1)
3:14
Larakers (175)
4:8 6:4,17 7:18,19
11:21 15:12,17
18:23 19:8,15,17,25
20:13,20,25 21:10
21:14,23 22:4,9,18
22:22 23:13,19 25:8
25:11,14,21,24 26:4
26:10,15 27:8,13,20
28:14,20 31:15
32:22 36:17 37:22
39:3,6,24 40:6,11
45:2 46:4 51:10
52:2,7 53:18 54:17
54:20 55:10 57:19
57:23 58:8,14,19,22
59:3,7,16,21 60:5,13
61:5,8,15,23 62:4,9
62:13,20 66:9 67:20
67:24 68:8,14 69:7
69:23 70:11,17
71:12,20 72:3,22
74:7,11 75:11 83:7
86:5,13 87:3,8,10,18
87:23 88:21 89:3,20
90:4,9,16,24 91:17
91:25 92:15,19 93:8
96:5,11,20 97:7,11
97:16,24 98:9,14,19
101:25 102:6,10,15
102:21 103:7,12,17
103:22 104:3,7,13
104:18 107:17
109:25 110:4,8,14
111:9 114:19 116:8
116:20 117:14
118:15,24 119:9,16

120:7,11,16 121:2,7
122:2 125:10,18
126:7,21,25 132:13
132:17 133:3,10
134:17,23 135:5,12
135:20 136:2
139:13 140:13,17
143:24 144:3
large (1)
57:13
larger (1)
126:14
lateral (1)
122:6
law (12)
10:13 17:10 28:24
30:15 49:13 85:18
86:9,15 87:20 88:18
92:10 97:18
laws (1)
95:11
leadership (1)
120:24
learn (2)
15:23 110:3
leave (6)
20:4,4,10 59:25 63:7
106:24
leaving (1)
63:4
left (2)
24:11 112:24
legal (1)
7:8
legal-sized (1)
78:11
legally (1)
69:5
legitimate (1)
101:17
letter (1)
33:24
level (2)
56:24 116:4
Lexington (1)
3:15
Li (1)
81:10
lieu (2)
63:4 64:9
light (2)
91:20 112:8
Lilian (6)
1:6 6:23 15:3 42:9

94:19 149:2
limited (5)
40:7 55:6 76:6 85:13
142:3
line (7)
18:13 113:9,20 114:2
115:15 129:14,15
link (1)
117:9
list (6)
24:4 45:25 69:18
108:7 110:6 118:21
listed (1)
77:23
litigation (23)
7:20 10:8,16 12:4,25
14:10,14 15:11
20:17 21:5 26:13
64:24 74:4 81:23
115:8,11 140:4,18
141:13,23,24 142:5
142:12
little (2)
27:22,23
live (3)
8:22,23 129:2
Ln (1)
149:7
lobby (3)
116:18,23 117:16
local (2)
30:20 49:14
located (1)
16:25
location (8)
17:4 34:17 75:6,13,23
75:25 76:7 79:5
locations (2)
34:20,23
lodge (1)
141:15
logged (1)
142:22
long (8)
17:18 19:2,6,22 20:7
71:7 82:18 93:10
longer (2)
28:11 134:14
look (14)
41:23 79:17 80:8,23
81:9,14,18,18,19
91:16,18 111:14
117:24 133:4
looked (5)

35:22 61:9 69:18
118:19 127:19
looking (4)
19:13 23:17 82:21
139:2
looks (1)
77:17
lot (2)
80:20 91:19
lower (1)
109:23
Luis (2)
1:7 6:23
lunch (1)
128:24
Luncheon (1)
128:16
Lyons (175)
1:15 2:11 6:1,22 7:1
8:1,7,21 9:1 10:1
11:1 12:1 13:1 14:1
15:1 16:1 17:1 18:1
19:1 20:1 21:1 22:1
23:1 24:1 25:1 26:1
27:1 28:1 29:1 30:1
31:1 32:1 33:1 34:1
35:1 36:1 37:1 38:1
38:22,23,25 39:1,7
40:1 41:1,11,14
42:1 43:1 44:1 45:1
46:1 47:1 48:1,10
48:14 49:1 50:1,5,6
50:8 51:1 52:1 53:1
54:1 55:1 56:1 57:1
58:1 59:1 60:1 61:1
62:1 63:1 64:1 65:1
66:1 67:1 68:1 69:1
70:1 71:1 72:1 73:1
73:9,10,12 74:1
75:1 76:1 77:1,7,11
78:1 79:1 80:1 81:1
82:1 83:1,18 84:1
85:1 86:1 87:1 88:1
89:1 90:1 91:1 92:1
93:1 94:1,9,10 95:1
96:1 97:1 98:1,21
99:1 100:1 101:1
102:1 103:1 104:1
105:1,14 106:1
107:1 108:1 109:1
110:1 111:1 112:1
113:1 114:1 115:1
116:1 117:1 118:1
119:1 120:1 121:1

122:1 123:1 124:1
125:1 126:1 127:1
128:1 129:1 130:1
131:1 132:1 133:1
134:1 135:1,16
136:1 137:1 138:1
139:1 140:1 141:1
141:10 142:1 143:1
144:1,11 145:9
146:3,7,19 147:4,13
149:5

**M**

**M (16)**
1:10,15 2:10 6:24 8:7
50:5 73:10 94:9
144:11 145:9 146:3
146:19 147:4,13
149:3,5
**ma'am (19)**
53:14 62:25 65:12
66:10,19,21 82:16
82:25 84:6,10 89:14
89:17 90:20 102:22
107:21 136:23
137:2,8 140:5
**magistrate (1)**
80:7
**mailing (1)**
129:3
**Maine (1)**
29:6
**majority (1)**
61:11
**making (25)**
31:13,17,18 32:8
33:18,21 36:13,21
37:8 40:10 54:15
56:16 72:24 85:9
90:6,19 98:17 103:9
110:20 113:12
114:13 115:12,19
116:6 123:11
**management (6)**
18:11 20:16 83:2
112:7 123:13
138:25
**managers (1)**
118:25
**manner (1)**
124:19
**manual (3)**
83:19 84:3 147:12
**mark (7)**

4:21 6:13,15 8:3 73:8
77:5 83:16
**marked (27)**
6:19 38:24 39:5,8
41:13,15 48:12,16
50:7,9 51:24 73:11
73:13 77:10,12
83:19,21 94:11,13
98:23 99:2 105:15
105:17 107:19
108:3 135:18,23
**marriage (1)**
145:16
**marriages (1)**
65:25
**married (3)**
65:9,15 67:15
**Mary (2)**
4:8 7:18
**Mass (1)**
76:9
**Massachusetts (23)**
1:3,16 2:13,17 3:8,15
4:14,19 7:2,5 8:23
16:25 29:5 30:17
49:9 76:8 105:8
106:6 107:9 109:5
129:4 145:2,8
**matter (5)**
6:22 141:25 142:15
142:16 145:17
**McCULLOUGH (24)**
3:11 7:13,14 8:15
24:20 28:12 32:20
33:2,7,16 39:4 73:7
77:5 83:16 108:3
128:20 132:15
140:15,18,23
143:13,22,25 146:3
**mean (29)**
23:24 30:7,19 32:2,16
35:9 37:3 46:22
53:19 60:6,7 61:2
63:3 66:16 74:8,9
79:10 89:5 96:12,13
96:21 117:15,21
118:19 119:10
120:18 135:7
139:17 143:2
**Meaning (1)**
49:12
**means (1)**
143:4
**meant (6)**

103:18,23 104:15,21
104:25 139:4
**media (21)**
12:24 13:7,10,13 56:8
56:15 91:12 96:25
97:4 98:16,18
100:18 101:8,15,23
102:4 103:4,10
104:6,12,16
**medical (2)**
51:25 61:13
**meet (1)**
106:20
**meeting (2)**
114:9,14
**meetings (1)**
116:21
**Memo (1)**
135:16 148:3
**memorialize (1)**
72:23
**men's (2)**
72:13 128:11
**mention (2)**
101:5 102:23
**mentioned (4)**
36:7 114:15 127:12
140:3
**mentor (2)**
20:15 26:19
**Merit (1)**
2:14
**merits (1)**
69:16
**metrics (1)**
125:3
**Michael (6)**
1:22 2:14 7:9 8:20
145:6,22
**Michaela (2)**
3:9 7:15
**middle (1)**
9:20
**Miguel (2)**
135:17 148:4
**mind (7)**
14:24 21:15 72:13
78:20 80:23 110:9
128:11
**mine (1)**
105:12
**minute (1)**
27:14
**Mirella (1)**

55:12
**mission (1)**
135:13
**Moakley (1)**
4:12
**Mohan (9)**
98:22 99:14,16 100:3
101:5,22 102:4,17
147:17
**moment (2)**
24:19 143:14
**Monday (1)**
16:4
**money (1)**
122:5
**monitors (1)**
123:14
**month (3)**
20:5 58:3 94:7
**monthly (4)**
57:4,5 118:9,10
**months (4)**
17:21 19:5 20:5 138:3
**moot (1)**
101:11
**morning (2)**
8:16,17
**motion (2)**
81:7,23
**motions (2)**
6:6,6
**move (1)**
122:6
**MTR (1)**
81:8
**multiple (7)**
52:21 55:5 80:19 81:3
83:8 127:13 128:7

**N**

**N (5)**
3:2 4:2 5:2 6:2 146:1
**N.W (1)**
4:6
**NACARA (1)**
85:19
**name (12)**
7:7,13,18 8:19,20
57:16 75:14 94:20
146:6 147:2 148:2
149:2
**named (1)**
66:13
**names (3)**

29:15 57:15 74:18
**nation (1)**
64:10
**national (7)**
111:2 113:11 114:4
115:16 117:8
127:23 137:17
**nationwide (1)**
19:21
**near (2)**
82:24 83:6
**necessarily (1)**
75:16
**need (4)**
9:17 25:15 89:6 101:7
**negative (3)**
56:8 104:5,12
**negatively (1)**
103:20
**neither (1)**
139:18
**never (12)**
36:7 40:24 47:2 54:2
76:22 83:23 88:4
91:20 96:2,7 119:17
120:2
**new (9)**
4:18 14:19 19:11 29:4
29:5 31:2 121:9
122:5 126:15
**Newbury (1)**
129:3
**Nielsen (3)**
1:10 6:24 149:3
**non-citizen (2)**
45:20 111:2
**non-citizens (2)**
46:6 110:24
**non-detained (1)**
30:13
**non-document (1)**
34:2
**noncriminal (4)**
90:22 139:3,4,4
**north (1)**
17:17
**northern (2)**
30:2,17
**notary (5)**
2:16 6:10 8:11 145:6
149:25
**note (1)**
125:7
**Noted (1)**

CONFIDENTIAL

144:7
**notepad (2)**
111:7,11
**notes (3)**
111:14 117:16 131:16
**noticed (1)**
135:24
**notified (5)**
15:25 21:19 40:24
43:10 114:21
**notify (1)**
110:11
**number (30)**
6:21 7:2 9:11 42:10
42:11 51:22 52:4
57:13 64:17 75:13
109:22,24 110:12
117:19 118:14
119:2,8,15 120:6,13
120:24 122:10,25
123:17,22 124:15
124:19 125:7,17
126:23
**numbers (5)**
108:22 118:17,22
122:16 136:25
**numerous (2)**
41:5 127:20

_____
**O**
**O (1)**
6:2
**O'Connor (5)**
1:22 2:14 7:10 145:6
145:22
**oath (4)**
8:25 106:14 142:14
143:5
**objection (162)**
11:21 15:12,17 18:23
19:8,15,17,25 20:13
20:20,25 21:10,14
21:23 22:4,9,18,22
23:13,19 25:8,11,14
25:21,24 26:4,10,15
27:8,13 28:20 31:15
36:17 37:22 39:24
40:6,11 45:2 46:4
51:10 52:2,7 53:18
54:17,20 55:10
57:19,23 58:8,14,19
58:22 59:3,7,16,21
60:5,13 61:5,8,15,23
62:4,9,13,20 66:9

67:20,24 68:8,14
69:7,23 70:11,17
71:12,20 72:3 73:4
74:7,11 75:11 83:7
86:5,13 87:3,8,10,18
87:23 88:21 89:3,20
90:4,9,16,24 91:17
91:25 92:15,19 93:8
96:5,11,20 97:7,11
97:16,24 98:9,14,19
101:25 102:6,10,15
102:21 103:7,12,17
103:22 104:3,7,13
104:18 107:17
109:25 110:4,8,14
111:9 114:19 116:8
116:20 117:14
118:15,24 119:9,16
120:7,11,16 121:2,7
122:2 125:10,18
126:7,21,25 132:13
133:3,10 134:17,23
135:5,12 136:2
139:13 140:13
141:16 142:22
**objections (3)**
6:4 72:24 73:6
**objective (1)**
137:20
**objects (1)**
141:8
**obtain (1)**
122:22
**obtaining (1)**
81:21
**obviously (1)**
27:22
**occur (1)**
110:25
**October (1)**
78:23
**offer (1)**
130:18
**office (91)**
7:20,24 8:2 11:4
13:25 15:14,19,21
16:24 17:3,8,9,17,25
18:2,4,5,7,9,10,16
19:11,20,20,23 20:3
20:15,19,23 21:20
22:14 23:20 24:9
26:7,17,21 29:8,14
29:22 30:2,5,12
36:13 37:7,10 40:21

41:22 44:17,21 47:3
48:2,2 49:14 50:24
54:23 73:20,24 79:4
89:23 99:8,9,12
106:6,18,23,25
109:18 112:6 116:3
116:3 117:6,25
118:8,12,16 119:13
119:15,21 120:17
121:15 124:4,20
126:6,10,20 127:14
134:13 137:12
138:16,21 142:4
**office's (1)**
107:16
**officer (31)**
10:13 11:25 47:19,25
48:4 49:3 84:19
93:13 94:18 99:7,17
118:5,6,7 122:11,12
123:11,14,20,21
127:8 129:15,15,17
130:16,24 131:2,4
131:19 132:6,24
**officer's (1)**
42:12
**officers (15)**
36:10 42:16,20,25
44:23 46:23 47:17
48:3 49:7 54:14
119:12 122:10,20
123:7 124:6
**officers' (1)**
122:16
**offices (45)**
2:11 14:12,18 15:21
15:22 18:10 31:13
33:18 34:22 35:12
35:12 36:3,7,16,21
36:25 37:9 38:2,7
38:14 53:3 66:7
88:13 90:23 97:6
98:7,12 105:8 107:9
107:15 109:13
110:20,25 113:8,25
114:14 115:4,9,13
115:20 118:13,18
118:23 119:7
120:25
**officials (2)**
92:23 93:5
**Oh (2)**
11:14 143:24
**okay (20)**

10:24 11:16,24 12:24
17:2 20:11 28:14
31:24 39:6 55:17,25
73:7 78:13 80:17
100:8 105:25
108:16 112:24
129:5 143:24
**Oklahoma (1)**
17:17
**Oliveira (1)**
106:4
**omits (1)**
76:25
**once (2)**
23:6 56:7
**one-year (2)**
23:22,24
**ones (9)**
45:9 53:6 65:12 66:10
80:25 86:14 88:11
88:14 121:19
**onward (2)**
73:2,3
**open (6)**
19:18 23:22,22,25
24:3,6
**open-ended (1)**
37:3
**operational (4)**
83:2 97:13,14,17
**operationally (1)**
126:10
**operations (19)**
15:20 17:10 26:18
28:22,25 30:6,9,10
30:16 31:2 49:3
53:23 121:17
123:10,20,21 124:2
135:14 138:15
**opportunity (1)**
42:16
**opposite (1)**
139:17
**options (2)**
41:6,9
**orange (2)**
81:7,8
**order (69)**
12:15,18 16:2,18
27:21 28:4 32:22
33:6,7,22,25 34:3,7
34:8,12 35:4,6,8,15
36:6,10 38:10,18
40:2,14,17 45:20

46:2 49:19 51:16
57:17 59:24 60:18
60:25 61:18 62:22
67:2,3 68:16,18
69:2 80:2,13 81:25
85:20 86:10,24
87:21 88:19 95:13
95:21 98:2,4 106:20
109:3 113:21
116:19 129:23
131:21 133:17,21
133:25 134:16,22
135:9,15 139:5,12
142:2
**ordered (3)**
60:16,23 136:4
**orders (26)**
12:14,20,22 35:14
36:2 37:25 38:6,14
57:11 60:20,21 61:3
61:16,20 62:19 64:5
65:6 67:7,12,14
79:24 81:2 82:17
86:18 106:8 110:24
**organized (1)**
39:18
**original (1)**
13:7
**OSUP (1)**
80:2
**outcome (4)**
47:10 48:4 82:2
145:17
**outlines (1)**
33:25
**outside (6)**
28:8 63:10 68:3 79:4
119:19,22
**outstanding (1)**
49:19
**overnight (1)**
71:6
**override (1)**
133:9
**oversee (3)**
28:22,24 30:15
**oversees (1)**
49:6

_____
**P**
**P (7)**
3:2,2 4:2,2 5:2,2 6:2
**p.m (7)**
128:17,17 141:3,4

143:18,19 144:7
**page (19)**
  42:2 55:19,22,23,24
  74:2,2 84:15 85:2
  95:2 99:25 100:7
  136:24,25 137:4
  146:2,6 147:2 148:2
**Pahola (3)**
  1:6 6:23 149:2
**paid (1)**
  122:7
**paragraph (8)**
  55:19,21,24 56:3 85:6
  95:7 105:23 106:2
**part (1)**
  123:22
**parties (1)**
  145:15
**partner (1)**
  101:17
**partners (1)**
  92:11
**party (1)**
  140:9
**passport (1)**
  81:22
**pay (3)**
  119:19,20 121:10
**pen (1)**
  108:24
**penalty (1)**
  9:2
**pending (7)**
  9:19 45:25 81:7,23,25
  132:9,22
**pending/eligible (1)**
  42:14
**people (54)**
  34:2 36:2 37:25 38:6
  38:14 44:23 45:5
  51:18,24 52:6 58:24
  59:6,9,18 60:10,19
  60:21 61:2,19 62:17
  63:4,6 64:5,17
  65:14 67:7,11,14
  68:12,25 69:4 70:8
  79:16,20,21 80:19
  85:25 86:7,18,21
  88:6 90:6 91:23
  96:3,10,17 98:7
  107:14 113:14
  114:21 123:23
  127:13,18 133:23
**PEP (1)**

40:3
**percentage (1)**
  126:3
**perform (1)**
  50:3
**performance (12)**
  119:14,18 122:19
  123:2 124:18,21,25
  125:3,12,23 126:4
  138:20
**period (1)**
  70:24
**periodically (1)**
  119:2
**perjury (1)**
  9:2
**permanent (5)**
  23:20 24:8 26:21 27:2
  106:5
**permitted (1)**
  34:16
**person (28)**
  19:22 40:21,22,25
  45:15 54:8 57:17,22
  58:5 63:18 71:2,3,5
  75:3 76:3 81:9,11
  81:16 114:10
  123:22 124:14
  130:2 131:21,24
  132:21 133:12,16
  133:18
**personally (1)**
  10:15
**persons (1)**
  134:14
**petition (2)**
  54:7 84:20
**petitioners (9)**
  3:4 7:16 13:5 14:23
  15:4 64:24 65:21
  66:14 71:9
**Petitioners' (1)**
  141:8
**Pg (1)**
  149:7
**phone (1)**
  76:22
**physically (1)**
  16:24
**Pine (1)**
  3:14
**place (9)**
  62:5 66:21,24 82:9
  83:13 114:3 117:5

129:2 131:5
**placing (2)**
  137:6 138:7
**Plaintiff-Petitioners...**
  1:8
**plan (7)**
  21:20 119:18 124:21
  124:25 125:12,23
  126:4
**planned (1)**
  22:7 115:5
**plans (4)**
  81:11,15 122:19
  125:4
**play (1)**
  124:17
**please (6)**
  7:11 8:5,18 10:3
  55:16 80:24
**POCR (4)**
  135:24 139:16,20,21
**point (7)**
  49:22 56:22 85:14
  96:15 101:11
  127:13 138:3
**points (1)**
  53:3
**police (2)**
  49:18 126:14
**policies (10)**
  22:3,7 72:25 84:5,8
  84:13 89:9 90:17
  116:6 142:3
**policy (50)**
  31:12,17,18 32:6,8,8
  33:17,21 34:9,12,16
  39:20,23 40:16
  62:17 89:7,8,10,13
  89:16,19,21 90:8,11
  90:12,14,15,18,22
  92:14 93:6 96:8
  97:23,25 113:6,9,18
  113:20,24 115:9,10
  115:19,21 116:16
  116:17 117:3,11
  134:12,21,24
**pool (4)**
  24:16 25:2,5 27:4
**pose (4)**
  111:22 112:12 137:16
  139:8
**position (34)**
  17:14,15,19,20,22,24
  18:9,21 19:3,7,12,14

19:23 20:8,12 21:22
  22:11,17,21 23:18
  23:21 24:7,8,8,13,24
  62:14 112:24 113:3
  115:6 121:9 122:8
  141:9 143:10
**positions (1)**
  18:11
**positive (2)**
  91:20 104:2
**possible (4)**
  26:25 27:3 76:24 77:3
**potential (2)**
  56:7 95:10
**potentially (2)**
  43:16 59:14
**practically (1)**
  61:3
**practice (13)**
  37:8,24 38:5,13 59:19
  96:9,24 97:5 98:7
  99:20 115:12,23,25
**practices (3)**
  91:20 96:17 142:3
**pre-emptive (1)**
  97:3
**prefer (1)**
  56:4
**preliminary (1)**
  28:7
**premeditatively (1)**
  97:20
**prepared (1)**
  105:20
**present (2)**
  5:4 116:23
**presented (1)**
  111:2
**presenting (1)**
  134:15
**presently (1)**
  143:5
**press (5)**
  92:25 94:23 96:7,16
  96:23
**prevent (1)**
  70:19
**previous (6)**
  10:2 13:24 39:25
  125:4 128:21
  141:10
**previously (4)**
  34:7 49:20 61:17
  129:22

**previously-issued (1)**
  85:15
**primarily (2)**
  30:16 35:3
**prior (8)**
  10:11 36:18 40:3
  60:17 96:12 138:13
  138:16 142:5
**priorities (7)**
  34:2 39:20,22 134:3
  137:5 138:6,12
**priority (2)**
  61:17 137:15
**proceeding (1)**
  142:7
**proceedings (2)**
  10:19 63:25
**process (29)**
  18:13 37:19,21 56:6
  63:8,10,13,23 64:4,9
  65:14 67:5 68:6,12
  69:12 70:9,16 71:16
  72:8 75:17 84:16
  86:3,17 87:14 93:10
  102:5,14 135:24
  136:5
**production (1)**
  8:10
**program (3)**
  30:9,13 40:3
**progress (2)**
  46:19,20
**prolonged (1)**
  70:20
**promoted (1)**
  121:5
**promotion (7)**
  121:9,11,25 122:3
  123:17 124:9
  126:12
**promotions (3)**
  120:15 122:21,22
**pronouncing (1)**
  99:15
**proposes (1)**
  94:23
**prosecuting (1)**
  124:5
**prosecution (2)**
  80:5 125:14
**protected (1)**
  71:23
**protective (1)**
  12:18

**PROVAZZA (1)**
3:10
**provide (2)**
130:10,11
**provided (2)**
82:4 109:23
**Providence (1)**
15:14
**provision (5)**
85:18 86:9,15 87:20
88:18
**provisional (43)**
40:23 43:6 45:16
62:23 63:11,19 64:7
64:18 65:3,13 66:23
67:5,17 68:6,11,22
68:24 69:12 70:9,13
70:15,19 71:4,15,22
72:7 82:5,10,15
86:3,16,22 87:6,9,14
88:5,7,16 90:7
93:18 117:12
133:24 135:11
**public (27)**
2:16 8:11 13:13 93:13
94:18 96:2 97:10,15
98:11 99:7,16
102:13 111:3,22
112:13 113:10
114:4 115:16
116:10 117:8
127:23 134:10,13
137:17 139:8 145:7
149:25
**pull (2)**
24:4 107:18
**pulled (1)**
78:14
**purpose (2)**
64:11,13
**purposes (2)**
133:13,17
**pursue (3)**
25:16 59:10 66:22
**pursuing (5)**
65:3 117:12 133:23
134:14 135:10
**purview (2)**
53:7 82:25
**put (3)**
74:18 77:21 131:6
**PWP (1)**
120:3
**PWPs (1)**

122:19
_____
**Q**
**qualified (1)**
19:10
**quantitative (7)**
119:11 124:10,22
125:24 126:2,6,8
**quarter (2)**
52:6 119:3
**Quarterly (1)**
118:11
**question (22)**
9:13,19,21 10:3 27:19
27:25 28:2,13,15
37:3 38:4 79:10
90:25 103:2 106:2
109:3,16 132:16
141:10,12,13
142:10
**questioning (1)**
141:22
**questions (14)**
9:12 28:10 31:4 72:24
73:2 105:21 106:19
107:3,5 129:7
139:25 143:14,23
144:2
**quick (1)**
80:23
**Quinones-Salgero (3)**
42:10,13,22
**quotas (1)**
119:4
**quoted (1)**
134:2
_____
**R**
**R (5)**
3:2 4:2 5:2 6:2 145:1
**rapidly (1)**
18:12
**RCA (8)**
128:5 129:10,19,25
130:4,8 131:5 132:7
**RCA's (3)**
132:3,10 133:9
**re-entering (1)**
63:16
**reach (1)**
106:24
**read (11)**
6:8 14:3,6 28:17
42:18 56:13 84:11

84:24 85:23 101:12
149:7
**readable (1)**
78:8
**reading (2)**
83:25 102:25
**Reads (1)**
149:7
**realize (1)**
9:25
**really (5)**
23:14 28:3 62:5 119:3
120:21
**Realtime (2)**
2:15,16
**reason (10)**
9:7 21:2 28:7 61:20
82:6 83:4 133:6,8
143:3 149:7
**reasons (8)**
20:22 22:24 26:5,9
81:3 83:8,10 101:7
**recall (7)**
9:8 13:12,14,18 44:10
52:20 111:7
**receive (10)**
13:12 39:14 45:14
68:5 69:5,11 70:15
71:3 72:7 118:25
**received (3)**
37:12 39:12 104:22
**receives (1)**
58:2
**recess (3)**
72:18 128:16 143:18
**recognizance (1)**
80:6
**recognize (12)**
38:25 39:7 41:17
48:14 50:10,21
73:15 77:13 94:14
99:2 105:17 136:10
**recommend (2)**
130:4 132:24
**recommendation (10)**
129:25 130:14,18
131:9,13,15 132:3
132:11 133:9 139:6
**recommendations (2)**
132:7 136:16,22
**recommended (1)**
132:25
**reconvening (5)**
33:13 72:19 128:17

141:4 143:19
**record (36)**
6:16,18 8:19 10:5
24:22 27:15 33:9,11
33:12,15 38:3,8
51:14,15 69:14
72:15,17,21 117:22
128:15,19 140:22
140:24 141:2,3,6,7
141:15,20,21
142:20 143:6,17,21
144:5 145:12
**records (1)**
74:14
**reentered (1)**
38:19
**refer (5)**
17:2 21:15 45:4
101:18 137:9
**referencing (1)**
74:19
**referral (13)**
43:15 76:19 88:2
89:24 100:24 101:8
101:17 102:5,13,14
108:12,13 114:24
**referrals (14)**
35:18,21 37:12,15
45:19,24 56:25 58:2
73:19 74:22,25
76:20 78:23 108:14
**referred (14)**
31:21 32:13 35:13
38:11 43:15 58:7,13
58:18 59:2 76:15
101:6 102:24 103:5
126:11
**referring (5)**
12:21 21:5,8 39:23,25
**refers (1)**
137:10
**refrain (2)**
82:11,13
**refresh (1)**
105:12
**regard (5)**
28:5 32:25 82:9 92:13
114:23
**regarding (17)**
13:5 14:13 45:15 73:4
73:4 77:22,23 84:5
84:8 96:16,23 97:23
100:19 105:21
106:3 114:17

116:16
**regardless (7)**
17:3 34:17 38:2,7,15
47:10 135:10
**regards (2)**
11:12 91:3
**Registered (2)**
2:14,15
**regular (1)**
129:16
**regulations (1)**
139:16
**related (2)**
73:3 145:14
**relating (1)**
72:24
**relative (2)**
54:7,9
**release (8)**
96:7,16,23 130:2,19
131:9,15 132:24
**released (3)**
79:23 80:4 81:24
**releases (1)**
133:16
**releasing (1)**
130:5
**relevant (3)**
28:6 33:4 140:15
**remain (2)**
63:12 64:8
**remember (4)**
14:8 105:10 112:4,5
**removable (2)**
95:9,13
**removal (37)**
15:20 26:18 36:2 38:2
38:7 45:21 46:3
51:16 59:24 62:19
62:22 64:6 65:6
66:25 67:4,7,12,15
70:18 80:12,14
83:15 85:16,20
86:11,18,25 87:22
88:19 95:14 106:9
110:24 131:21
133:14,19 135:9,14
**removals (1)**
124:20
**remove (9)**
70:6 80:21 81:11,15
82:7,10 83:14 135:3
135:8
**removed (16)**

38:20 49:20 66:14
67:23 68:9 69:10,17
69:25 71:2,5,10,25
79:17 82:24 83:5,9
**removing (5)**
68:12 69:22 70:16
82:11,13
**reopen (2)**
81:8,24
**repeat (2)**
38:4 103:2
**replaced (1)**
26:3
**replacement (3)**
27:10 28:5,18
**report (14)**
13:22 29:7,8,12,14
49:24 121:16 136:8
136:16,20 137:19
137:23 138:5,10
**reported (3)**
1:22 118:17,17
**reporter (5)**
2:15,16 7:9 8:5
128:25
**Reporting (2)**
7:8,10
**reports (2)**
49:25 50:2
**Representative (2)**
105:15 147:23
**representatives (1)**
30:21
**represented (1)**
141:20
**requests (1)**
55:9
**require (1)**
101:19
**required (4)**
53:21,25,25 111:19
**reserved (2)**
6:5,7
**residency (1)**
106:5
**resource (1)**
91:6
**resources (2)**
55:7 91:11
**respect (14)**
31:13 33:18 60:19
64:5 82:23 83:11
88:15 96:8,9 109:5
113:7,25 115:19

117:11
**respectfully (1)**
143:9
**respond (2)**
37:15 142:9
**responded (1)**
109:4
**RESPONDENTS (1)**
4:4
**Respondents' (1)**
141:9
**responds (1)**
101:5
**response (6)**
35:21 92:23 93:5
94:23 101:4 106:2
**responses (1)**
100:18
**responsibilities (3)**
29:21 30:14 49:5
**responsibility (2)**
28:23 29:3
**rest (1)**
77:17
**restate (1)**
28:15
**return (1)**
63:8
**returning (1)**
64:10
**returns (1)**
23:7
**revelation (2)**
102:19 103:10
**review (4)**
12:7 116:12 136:13
138:20
**reviewed (7)**
12:3,10 34:18 131:3
136:7,15,18
**reviewing (2)**
132:10,24
**Rhode (10)**
15:14 29:5 41:22
43:11 99:13 105:8
106:6 107:9 109:5
109:17
**RI (1)**
100:25
**right (15)**
9:5 52:15,23 74:3
88:10,13 95:15
101:2 107:23 108:8
108:18 127:4 131:6

131:17 136:25
**risk (6)**
127:24 128:2,5,10
129:23 137:18
**RMR (2)**
1:22 145:22
**room (2)**
72:13 128:12
**rotated (1)**
18:8
**rotating (1)**
19:19
**rotation (1)**
20:6
**route (1)**
25:17
**row (1)**
81:10
**rule (3)**
84:18 85:4,10
**ruling (1)**
141:11
**Rutherford (7)**
43:12 48:11 50:14
99:10 106:22
136:19 146:15

---
**S**

**S (7)**
3:2 4:2 5:2 6:2 146:5
147:1 148:1
**safety (13)**
111:3,22 112:13
113:11 114:4
115:16 116:11
117:8 127:23
134:10,13 137:17
139:8
**satisfactorily (1)**
8:9
**Sauter (2)**
4:21 8:3
**saw (2)**
12:15 13:7
**saying (3)**
100:11,23 142:10
**says (19)**
32:23 33:7 39:17 42:7
56:2,2 79:25 80:4
84:13,17 85:7 95:2
95:7 100:22 101:14
102:17,18 103:3
137:4
**scale (4)**

119:11,19,20 124:10
**schedule (10)**
20:6 46:9,10 52:9,25
53:10,15,16 55:9
56:10
**scheduled (2)**
57:12 58:6
**schedules (1)**
127:5
**scheduling (3)**
16:5 55:20 56:3
**scope (7)**
27:21 28:8 31:23 36:9
38:10 40:7 73:5
**SDDO (2)**
39:13 132:5
**search (5)**
75:7,9,10,12,13
**seasoned (1)**
26:7
**second (8)**
29:17 41:23 42:2
55:18,22,23 56:3
79:17
**section (5)**
7:21 84:12 113:21
124:3 125:14
**secure (1)**
30:9
**security (7)**
111:3 113:11 114:5
115:17 117:8
127:23 137:17
**see (19)**
31:22 41:25 44:3,3
50:16 55:21 78:9
80:3 81:15,18,19
85:3,6 100:2,9
101:21 102:22
118:20 137:3
**seek (8)**
68:2 81:6 85:21 86:11
87:2,22 88:20 106:5
**seeking (16)**
84:20 85:17 86:2,8,15
86:22,23 87:5,6,12
87:13,19 88:17 90:7
92:6,9
**seeks (1)**
61:12
**seen (16)**
12:13,17,20,22,24
13:10 51:2 56:9
57:15 83:21 89:25

90:5 91:20 111:11
119:17 120:2
**selected (2)**
24:17 25:3
**senators (1)**
30:21
**send (5)**
50:23 51:3 57:10,16
57:21
**senior (5)**
18:11 20:14,19,23
26:16,19 112:7
114:9 118:25
119:21
**sensitive (1)**
34:20
**sent (6)**
41:24 48:21,22 89:23
99:22 118:22
**separated (1)**
70:23
**separation (2)**
67:10 70:20
**September (8)**
17:13 31:7,14 32:10
33:19 37:6 72:25
73:3
**sequestration (1)**
16:18
**serve (1)**
25:19
**served (1)**
18:15
**service (3)**
14:12 21:13 119:22
**Services (1)**
14:18
**set (3)**
34:20 145:10,19
**seven (1)**
107:8
**Sewall (9)**
3:9 6:15 7:15 27:18
33:8 141:7 142:9,19
143:9
**shape (1)**
141:25
**shared (1)**
77:20
**SHEET (1)**
149:1
**sheriff's (1)**
49:14
**short (1)**

70:24
**shorten (2)**
63:14 64:14
**shorter (3)**
22:2,6 67:10
**show (8)**
60:2,22 61:21,25 62:3
62:6,7 88:3
**showed (3)**
107:14 125:11,13
**showing (2)**
88:3 91:23
**shows (5)**
51:4,7,12 78:22,24
**sick (1)**
20:4
**side (6)**
53:23 83:3 100:5,6
120:21 141:18
**sign (1)**
6:8
**Signature (1)**
149:20
**significant (3)**
51:25 61:13 114:4
**simply (2)**
82:14 142:10
**single (1)**
54:25
**site (4)**
75:6,12,24 76:5
**situation (2)**
82:22 85:8
**situations (1)**
85:13
**six (4)**
17:20 30:16 49:6
52:13
**Sixth (1)**
79:4
**skill (1)**
119:23
**somebody (7)**
23:18 26:13 43:24
44:6 123:18 132:25
142:13
**someone's (2)**
124:8 128:4
**sorry (16)**
14:17 39:4 41:25
44:11 53:11 55:14
72:11 74:2 77:25
78:4,6 99:8 100:4
102:25 108:10

135:20
**sought (3)**
51:5,7,12
**sounds (2)**
52:15,23
**sources (1)**
74:9
**Souza (2)**
13:16 66:11
**Souza's (1)**
13:11
**space (1)**
139:7
**span (1)**
52:17
**speak (10)**
36:18 53:6 59:22
62:10 72:4 82:19
87:24 89:10 102:7
120:20
**speaking (2)**
64:9 143:5
**specialist (1)**
7:9
**specific (21)**
12:21 13:4,21 31:16
31:18 33:20,25
34:20 40:9 45:4,8
49:8 50:25 53:2,3
54:22 64:13 76:9
117:6,15 133:6
**specifically (30)**
13:14 19:19 28:4 31:3
32:9,23 37:2,5
38:11 45:9 48:2
52:18 63:6 65:10
67:6,11 68:25 85:19
86:10,17,25 87:20
88:18 109:17
118:18 119:17
125:5,12 127:19
138:23
**specification (1)**
134:4
**specifics (1)**
15:2
**speculate (2)**
23:14 64:22
**speculating (4)**
51:21 59:4 62:15 66:4
**spell (2)**
8:19 29:18
**spelling (1)**
31:25

**spin (3)**
101:9 103:14 104:17
**spit (1)**
130:13
**spoke (1)**
102:7
**spoken (3)**
16:11,14 93:12
**spread (2)**
55:4 56:11
**spreads (1)**
54:13
**spreadsheet (19)**
57:10,14 73:18 74:6
74:13,19 76:25
77:24 78:2,3,7,15,16
78:18 88:2 107:12
107:24 108:2,23
**ss (1)**
145:3
**staff (4)**
26:19 30:22 112:7
114:9
**stand (3)**
14:2 80:11 92:12
**standard (2)**
99:20 141:13
**start (3)**
6:20 17:11 132:20
**started (1)**
110:5
**starts (1)**
100:10
**state (11)**
2:13 3:7 7:5 8:18
30:20 49:9,14 97:4
105:25 125:16
143:6
**stated (9)**
18:25 22:25 26:6,12
28:2,4 105:6 116:15
138:24
**statement (3)**
95:18 106:13,16
**states (17)**
1:2 6:25 7:19 29:4
30:2,17 38:20 49:20
59:25 63:5,16 66:15
68:3 84:23 88:25
95:14 103:9
**statistically (1)**
117:24
**statistics (2)**
64:20 124:23

**status (5)**
14:25 41:2 63:5 80:9
129:24
**statute (1)**
34:5
**stay (8)**
71:11,21,24 81:4,19
82:4 83:13,14
**stays (3)**
66:21,22,24
**step (3)**
63:23,24 67:16
**Stephen (2)**
3:10 53:7
**steps (2)**
18:14 106:5
**Steve (1)**
74:5
**stipulations (1)**
6:10
**strain (1)**
56:5
**Strawbridge (2)**
5:4 7:7
**street (6)**
2:13 3:7 4:6,18 7:5
124:7
**strictly (1)**
108:17
**strike (6)**
6:7 43:13 54:12 76:11
82:12 92:24
**strong (1)**
141:16
**strongly (1)**
141:8
**subject (26)**
9:2 11:20 34:3,6,7,13
35:15 36:5 38:9,17
45:20 46:2 61:22
62:22 66:25 67:4
68:15 80:5 81:24
85:15 95:12 106:8
113:23 139:22
141:25 142:15
**subject's (2)**
74:14 127:22
**subjects (3)**
59:23 139:2,8
**submitted (3)**
105:3 110:12 116:13
**suboffice (1)**
99:13
**Subscribed (2)**

144:12 149:21
**subsection (3)**
34:5 38:11 113:22
**subsequent (1)**
101:4
**successful (1)**
59:14
**succession (1)**
21:20
**Sudbury (1)**
4:18
**sued (1)**
143:4
**Suffolk (2)**
76:8 145:4
**suggest (1)**
143:3
**suggestion (1)**
141:19
**Superior (1)**
76:8
**supervise (1)**
133:18
**supervision (6)**
18:13 79:24 80:3 81:2
81:25 133:17
**supervisor (9)**
44:20 47:24,25 48:19
54:22 89:23 130:16
132:4 133:4
**supervisors (8)**
41:22 53:2 54:21
56:21 73:20 74:16
77:18 106:25
**supervisory (6)**
49:2 56:24 121:12,22
131:3 132:5
**supposed (1)**
59:25
**sure (36)**
12:19 24:20 28:16
45:7,9 46:21 50:25
52:8,15,18 53:19
57:5 58:9 61:6,24
63:21 72:14 76:23
78:21 79:9,12
101:16 103:3,23
104:14,19,21
107:19 112:10
120:4 121:8,10,14
121:19 126:16
128:13
**surprised (1)**
25:20

CONFIDENTIAL

**swear (1)**
8:5
**sworn (4)**
8:11 144:12 145:11
149:21
**system (11)**
24:2 74:23,24 75:6,18
75:20,22 130:13
131:13,14,16
**systems (1)**
74:13

---

**T**

**T (144)**
6:1 7:1 8:1 9:1 10:1
11:1 12:1 13:1 14:1
15:1 16:1 17:1 18:1
19:1 20:1 21:1 22:1
23:1 24:1 25:1 26:1
27:1 28:1 29:1 30:1
31:1 32:1 33:1 34:1
35:1 36:1 37:1 38:1
39:1 40:1 41:1 42:1
43:1 44:1 45:1 46:1
47:1 48:1 49:1 50:1
51:1 52:1 53:1 54:1
55:1 56:1 57:1 58:1
59:1 60:1 61:1 62:1
63:1 64:1 65:1 66:1
67:1 68:1 69:1 70:1
71:1 72:1 73:1 74:1
75:1 76:1 77:1 78:1
79:1 80:1 81:1 82:1
83:1 84:1 85:1 86:1
87:1 88:1 89:1 90:1
91:1 92:1 93:1 94:1
95:1 96:1 97:1 98:1
99:1 100:1 101:1
102:1 103:1 104:1
105:1 106:1 107:1
108:1 109:1 110:1
111:1 112:1 113:1
114:1 115:1 116:1
117:1 118:1 119:1
120:1 121:1 122:1
123:1 124:1 125:1
126:1 127:1 128:1
129:1 130:1 131:1
132:1 133:1 134:1
135:1 136:1 137:1
138:1 139:1 140:1
141:1 142:1 143:1
144:1 145:1,1 146:5
147:1 148:1

**T-h-u-r-l-o (1)**
29:17
**tab (2)**
79:4 108:15
**take (21)**
9:19,21 31:20 32:12
32:16 41:4 42:20
43:2 47:16 67:16
71:7 72:14 78:20
80:23 89:8 114:3
117:5 121:9 126:10
128:13 131:16
**taken (7)**
10:22 42:15 72:18
127:21,24 128:16
143:18
**takes (1)**
82:19
**talk (4)**
27:14,15 36:24
142:25
**talked (3)**
16:8 134:2 142:19
**talking (3)**
32:18 45:8 128:24
**talks (1)**
74:23
**tallied (1)**
118:9
**Tampa (1)**
10:13
**tape (1)**
6:21
**targeted (1)**
42:8
**targeting (3)**
137:5,16 138:6
**targets (1)**
139:8
**tasked (1)**
82:16
**team (5)**
47:24 49:6 111:20,25
138:23
**tell (9)**
9:18 37:7 45:19 46:23
81:6 87:25 103:4
125:12,20
**tells (3)**
46:6,14 58:9
**temporary (1)**
17:22
**tenure (1)**
21:25

**term (1)**
21:16
**terminated (1)**
21:21
**testified (7)**
8:12 18:19 111:5
134:7,9,11,18
**testify (2)**
9:8 10:18
**testifying (3)**
8:25 15:16 142:13
**testimony (14)**
9:5 11:17 12:7 13:25
27:12 28:19 91:3
92:3,12 128:22
140:19 141:15
142:13 145:12
**Texas (1)**
17:17
**thing (1)**
32:2
**things (3)**
81:17 126:12,18
**think (37)**
6:17 17:7 19:6 26:2
27:10,25 28:8,18,21
33:3 45:3 51:23
52:5 58:12,16,21,25
59:5,9,18 60:2,14
62:3 83:4 89:4
97:12,19 102:2
104:11,15 109:16
117:17 122:3,3
126:11 141:12
142:22
**thinking (1)**
104:9
**thinks (2)**
103:16 134:21
**third (5)**
73:25 81:10 99:25
100:4,7
**Thomas (7)**
4:15 7:23 41:12 95:8
135:16 146:12
148:3
**thought (5)**
19:9 46:24 92:17
108:17 128:25
**thread (1)**
100:17
**threat (9)**
111:2,22 112:13
113:11 114:4 117:8

127:22 137:17
139:9
**threats (1)**
115:17
**three (1)**
29:13
**Thurlo (2)**
29:16,25
**Thursdays (2)**
112:19,22
**Tiberi (1)**
55:13
**time (32)**
6:5 9:17,25 14:19
18:7 19:4 25:9
31:10,25 37:11 38:9
40:19 44:17 46:11
56:5,10 57:8 63:3
63:15 64:15 67:10
68:20 70:24 79:9
92:5 102:3 106:19
123:8 139:23
142:21 143:11
144:7
**timeframe (1)**
112:5
**timeline (1)**
106:20
**timely (1)**
81:5
**times (3)**
27:25 127:6 140:7
**Tina (7)**
29:17 49:25 73:9 74:5
77:8 147:3,8
**title (4)**
17:7 85:3 94:21 122:5
**titled (1)**
80:8
**today (9)**
6:13 8:25 9:5,9 10:5
15:16 16:7 27:24
111:12
**today's (1)**
144:5
**Todd (18)**
1:15 2:10 6:22 8:7,20
29:16 38:22 50:5
73:10 94:9 144:11
145:9 146:3,7,19
147:4,13 149:5
**told (6)**
20:18 21:3 22:16,20
25:18 96:2

**Tom (3)**
13:25 112:5 134:24
**Tom's (1)**
139:7
**tool (2)**
126:14 128:6
**top (7)**
40:15 44:9 63:20 66:2
84:2,12 136:25
**totality (1)**
127:24 133:5
**track (4)**
74:22 75:2 117:19
118:4
**tracked (4)**
118:6,7,9 122:11
**tracks (2)**
75:15,17
**traffic (3)**
74:15 94:17 99:6
**trained (1)**
54:2
**transcript (4)**
6:9,13,19 149:1
**transferred (1)**
31:6
**transport (1)**
56:6
**travel (3)**
81:19,21 82:4
**treads (1)**
126:18
**trial (1)**
6:6
**tricking (1)**
59:6
**tried (3)**
97:9 98:16,18
**trigger (1)**
56:8
**true (1)**
145:12
**truthful (1)**
9:4
**truthfully (2)**
107:5 143:5
**try (3)**
9:18 56:15 57:21
**trying (2)**
60:15 97:19
**TSG (2)**
7:8,10
**turn (6)**
55:15 84:15 85:2

99:25 105:23
136:24
**turned (1)**
49:23
**twisted (5)**
101:10 103:14,24,25
104:17
**two (12)**
18:6 19:5 28:9 42:8
56:10 57:8,15 65:20
93:24 112:19,22
123:16
**type (10)**
13:13 31:4,22 35:24
76:18 79:14 81:6
82:2 86:15 119:11
**typically (2)**
19:22 55:8

**U**

**U-Visa (1)**
88:5
**U.S (25)**
4:5,11,12,17 7:24
23:23 30:21 42:8
63:11,12 64:9 65:9
65:15,18 66:17
67:15 84:19 90:8
93:18,21 100:25
124:4 128:9 129:22
134:15
**understand (4)**
8:24 9:12,15,23
**understanding (7)**
14:9,15 15:15 117:2
117:10
**undesirable (1)**
92:18
**undocumented (1)**
113:22
**undue (1)**
91:21
**unexecuted (1)**
38:18
**Unfortunately (1)**
91:19
**union (1)**
124:9
**unit (3)**
30:13 136:14 138:24
**unitalicized (1)**
95:6
**United (13)**
1:2 6:25 7:19 38:19

49:20 59:25 63:5,16
66:15 68:3 84:23
88:25 95:14
**units (1)**
49:4
**unpopular (6)**
98:13 102:19 103:10
103:13,16,19
**unrelated (1)**
42:12
**updates (3)**
46:18,19 101:23
**USA (1)**
24:2
**use (13)**
11:8 72:13 74:6 75:17
80:19 108:24
123:16,17 124:7
126:16 128:2,11
142:21
**uses (1)**
80:19
**usually (3)**
18:13 56:23 57:14
**utilization (1)**
91:11
**utilize (1)**
139:7

**V**

**vacancies (1)**
18:6
**vacancy (4)**
19:19 23:22,25 24:3
**vacant (1)**
23:21
**vacated (1)**
24:9
**vacation (1)**
16:6
**Vaguely (1)**
105:11
**Valentine's (2)**
112:2,9
**valid (4)**
35:5 38:17 81:19 82:4
**validity (1)**
60:7
**Vance (10)**
41:11 42:4 74:6 98:22
99:9,11 100:3,22
146:11 147:18
**vary (1)**
20:2

**veracity (4)**
141:14,22 142:12,18
**Vergara (2)**
135:17 148:4
**verification (1)**
130:17
**Vermont (1)**
29:5
**version (1)**
78:8
**versus (1)**
6:24
**vet (1)**
37:17
**video (1)**
7:8
**Videographer (14)**
5:4 6:20 8:4 33:10,14
72:16,20 128:14,18
140:25 141:5
143:16,20 144:4
**videotaped (3)**
1:15 2:10 6:21
**violating (4)**
89:19 90:8,14,15
**violation (2)**
89:21 95:11
**violations (3)**
135:24 139:20,22
**violent (1)**
124:3
**voluntarily (1)**
85:10
**vs (2)**
1:9 149:3

**W**

**wait (3)**
71:18,24,25
**waiver (22)**
6:9 63:11 64:4,8
65:13 67:5 68:6,11
69:12 70:9,13,15
71:15,22 72:7 86:3
86:17,23 87:7,9,14
93:18
**waivers (25)**
40:23 43:6 45:16
62:24 63:19 64:18
65:3 66:23 67:17
68:3,22,24 70:19,22
71:4,19 72:2 82:6
82:15 88:8,16 90:7
117:13 133:24

135:11
**waiving (1)**
73:5
**Walls (4)**
94:10,22 95:4 147:14
**want (18)**
21:17 25:16 27:15
28:11 32:3 37:5
72:14 91:18,21
97:15 112:3,19,20
126:9 128:21
136:17 140:22
141:15
**wanted (5)**
26:7,12,16 72:22
139:24
**wants (1)**
46:7
**warrant (4)**
80:12,15 85:15,16
**Washington (1)**
4:7
**wasn't (3)**
41:8 91:7 108:13
**WAVA (1)**
88:5
**way (13)**
4:13 27:21 34:5 74:22
75:2,5,7 76:17
101:10 103:14
104:17 141:24
145:16
**WBUR (1)**
13:22
**WD (1)**
80:11
**we'll (3)**
9:20 27:23 72:15
**we're (5)**
72:23 97:20 142:22
142:24 143:2
**We've (1)**
68:17
**week (4)**
13:9 16:4,5,6
**week's (1)**
52:17
**weeks (2)**
19:5 57:6
**weigh (1)**
139:18
**Weiland (2)**
4:9 7:22
**Wells (1)**

53:8
**went (1)**
40:17
**weren't (1)**
113:11
**west (2)**
121:19 129:3
**WHEREOF (1)**
145:18
**White (1)**
3:14
**William (2)**
4:9 7:21
**Wilmer (3)**
5:6 7:14,15
**WilmerHale (2)**
2:11 3:5
**witness (9)**
8:5 141:17 143:4,15
144:2 145:9,13,18
146:2
**witness' (2)**
141:14,22
**Wolf (3)**
14:2 91:4 106:20
**wondering (1)**
37:4
**word (3)**
75:10 97:19 103:25
**words (2)**
47:13 104:10
**work (11)**
10:11 16:20,21 53:9
56:11 113:14
119:18 120:22
122:19 124:21
125:4
**working (1)**
17:11
**works (3)**
52:24 123:10 124:4
**wouldn't (6)**
28:3 72:11 83:14
98:13 124:10
142:20
**write (1)**
113:16
**written (5)**
34:6,9 130:21 131:3
131:16
**wrong (1)**
108:5
**wrote (1)**
111:6

CONFIDENTIAL

**X**

**x (7)**
1:5,12 124:24 146:1,5
147:1 148:1

**Y**

**Yeah (6)**
6:17 32:3 64:7 79:25
108:10 128:23
**year (6)**
24:6,14 119:3 124:22
124:25 126:4
**yearly (1)**
120:3
**years (1)**
68:18
**yesterday (5)**
6:12,16 27:23 134:7
134:19
**Yesterday's (1)**
6:18
**York (1)**
126:15

**Z**

**Zuying (1)**
81:10

**0**

**02109 (1)**
3:8
**02203 (1)**
4:19
**02210 (1)**
4:14
**02421 (1)**
3:15

**1**

**1 (6)**
38:22 39:5,9 55:15
119:20 146:7
**1(i) (1)**
106:3
**1/17/2018 (1)**
42:9
**1/24/18 (2)**
98:23 147:19
**1/30/18 (6)**
48:11 50:6 94:10
146:17,20 147:14
**1:09 (2)**
128:17,19
**1:18-cv-10225-ML...**

1:10 7:3
**1:23 (2)**
141:2,3
**1:28 (2)**
141:4,6
**1:31 (2)**
143:17,18
**1:35 (4)**
143:19,21 144:6,7
**10 (3)**
105:14,17 147:22
**10:04 (2)**
33:11,12
**10:10 (2)**
33:13,15
**10:54 (2)**
72:17,18
**105 (1)**
147:23
**11 (5)**
135:16,23 136:9,10
148:3
**11:16 (2)**
72:19,21
**12 (1)**
105:23
**12:22 (2)**
128:15,16
**13 (1)**
41:24
**135 (1)**
148:5
**13756 (1)**
33:23
**14 (3)**
108:5,19,21
**145300 (1)**
1:24
**15 (2)**
4:18 119:20
**15.1 (1)**
84:13
**15th (1)**
110:10
**16 (2)**
107:14 137:23
**17 (1)**
108:6
**17th (2)**
78:23 112:3
**19th (3)**
17:13 23:10,12
**1st (2)**
18:22 113:4

**2**

**2 (4)**
41:11,15 105:4
146:11
**2/13/18 (2)**
41:12 146:12
**20001 (1)**
4:7
**2008 (1)**
11:2
**2016 (2)**
64:4 68:11
**2017 (17)**
17:13 31:7,14 32:10
32:19,21 33:3,19
37:7 40:20 43:20
56:19 72:25,25 73:3
73:21 96:18
**2018 (33)**
1:17 2:6 7:6 14:20
24:10 32:23,24,25
33:3 39:16 41:25
43:21 48:23 56:20
78:24 96:19 99:23
105:4,9 106:10
107:10,16 108:20
109:13 110:17
112:25 121:6
137:24 142:3
144:13 145:19
149:4,22
**2018' (1)**
106:7
**23rd (1)**
18:20
**24 (2)**
39:16 99:23
**24th (1)**
104:23
**27 (4)**
1:17 2:6 7:6 149:4
**27th (1)**
145:19

**3**

**3 (4)**
48:10,16 84:15
146:15
**30 (1)**
6:8
**30th (1)**
48:22
**31st (3)**
21:19 22:19 113:2

**38 (1)**
146:10

**4**

**4 (4)**
50:5,9 136:24 146:19
**41 (1)**
146:14
**450 (1)**
4:6
**48 (1)**
146:18

**5**

**5 (7)**
73:8,9,13 78:3,16
85:14 147:3
**5/16/18 (2)**
135:18 148:5
**5/24/18 (2)**
38:23 146:8
**50 (1)**
146:22

**6**

**6 (7)**
3:14 77:6,7,12 107:20
108:4 147:7
**60 (3)**
2:13 3:7 7:4

**7**

**7 (5)**
83:17,18,21 108:15
147:12
**7/16/18 (2)**
73:11 147:5
**7/18/18 (2)**
77:9 147:9
**73 (1)**
147:6
**77 (1)**
147:11

**8**

**8 (4)**
94:9,13 146:3 147:13
**83 (1)**
147:12

**9**

**9 (3)**
98:21 99:2 147:17
**9:37 (3)**

1:18 2:7 7:6
**94 (1)**
147:16
**98 (1)**
147:21