# EXHIBIT C

## REDACTED

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - x

LILIAN PAHOLA CALDERON JIMENEZ and LUIS GORDILLO, et al.

Plaintiff-Petitioners,

vs. Civil Action No.

KIRSTJEN M. NIELSEN, et al., 1:18-cv-10225-MLW

Defendants-Respondents

- - - - - - - - - - - - - - - - - - x

CONFIDENTIAL

VIDEOTAPED DEPOSITION of THOMAS P. BROPHY

Boston, Massachusetts

Monday, July 30, 2018

11:05 a.m.

Reported By: Michael D. O'Connor, RMR, CRR, CRC

Job No.: 145301

Monday, July 30, 2018
11:05 a.m.

VIDEOTAPED DEPOSITION of THOMAS P. BROPHY, held at the Offices of WilmerHale,

60 State Street, Boston, Massachusetts, before Michael D. O'Connor, Registered Merit Reporter, Registered Realtime Captioner, Certified Realtime Reporter and Notary Public in and for the Commonwealth of Massachusetts.

A P P E A R A N C E S:

ON BEHALF OF PETITIONERS:
WILMERHALE

60 State Street
Boston, Massachusetts 02109
BY: STEPHEN PROVAZZA, ESQ.
COLLEEN McCULLOUGH, ESQ.
JONATHAN COX, ESQ.
- and -
KATHLEEN GILLESPIE, ESQ.
6 White Pine Lane
Lexington, Massachusetts 02421

A P P E A R A N C E S, Continued:

ON BEHALF OF RESPONDENTS:
U.S. DEPARTMENT OF JUSTICE/CIVIL DIVISION
450 Fifth Street, N.W.
Washington, D.C. 20001
BY: MARY LARAKERS, ESQ.
WILLIAM WEILAND, ESQ.
- and -
U.S. DEPARTMENT OF JUSTICE/CIVIL DIVISION
John Joseph Moakley U.S. Courthouse
One Courthouse Way, Suite 9200
Boston, Massachusetts 02210
BY: MICHAEL SADY, ESQ.
- and -
U.S. IMMIGRATION CUSTOMS & ENFORCEMENT
15 New Sudbury Street
Boston, Massachusetts 02203
BY: JO ARDINGER, ESQ.
MARK SAUTER, ESQ.

A P P E A R A N C E S, Continued:

ALSO PRESENT: Crystal Strawbridge, Videographer
James Barnette, Wilmer Hale
Katherine Jones, U.S. DOJ
Adriana Lafaille, ACLU
Veronica Saltzman, ACLU
Asma Jaber, ACLU

T. BROPHY

P R O C E E D I N G S

VIDEOGRAPHER: This is the start of tape labeled number one of the videotaped deposition of Thomas Brophy in the matter of Lillian Pahola Calderon Jimenez and Luis Gordillo, et al. versus Kirstjen M. Nielsen, et al., in the United States District Court, District of Massachusetts, civil action number 1:18-CV-10225-MLW.

This deposition is being held at 60 State Street, Boston, Massachusetts on July 30, 2018 at approximately 11:05 a.m.

My name is Crystal Strawbridge from TSG Reporting, Inc. and I'm the legal video specialist. The court reporter is Michael O'Connor in association with TSG Reporting.

Will counsel please introduce yourself.

MR. PROVAZZA: My name is Stephen Provazza with Wilmer Hale for the Petitioners.

MR. COX: Jonathan Cox from Wilmer Hale on behalf of the Petitioners.

MS. McCULLOUGH: Colleen McCullough

T. BROPHY

with Wilmer Hale on behalf of the Petitioners.

MS. LAFAILLE: Adriana Lafaille with ACLU Massachusetts on behalf of the Petitioners.

MS. GILLESPIE: Kathleen Gillespie on behalf of the Petitioners.

MS. LARAKERS: My name is Mary Larakers for the United States with the Office of Immigration Litigation District Court section.

MR. SADY: Michael Sady, U.S. Attorney's Office in Boston.

MS. ARDINGER: Jo Ellen Ardinger, ICE chief counsel.

MR. WEILAND: Will Weiland from the Department of Justice Office of Immigration Litigation and District Court section on behalf of the United States.

MR. SAUTER: Mark Sauter from ICE chief counsel office.

VIDEOGRAPHER: Will the court reporter please swear in the witness.

T. BROPHY

THOMAS P. BROPHY

having been satisfactorily identified by the production of his driver's license, and duly sworn by the Notary Public, was examined and testified as follows:

MS. LARAKERS: So we're operating under the following stipulations today. First, all objections, except as to form, are reserved until the time of trial.

Second, all motions, including motions to strike, are also reserved.

And third, the deponent will have 30 days to read and sign the deposition transcript with waiver of the notary and filing.

Last, I'd like to mark the entire transcript today as confidential.

MR. PROVAZZA: Agreed.

EXAMINATION

BY MR. PROVAZZA:

Q. Good morning.

T. BROPHY

A. Good morning.

Q. Could you please state and spell your name for the record.

A. Sure. Thomas P. Brophy, T-h-o-m-a-s, P., Brophy, B-r-o-p-h-y.

Q. And where do you currently live?

A. [redacted] New York.

Q. Do you understand that you are testifying under oath today?

A. I do.

Q. And that your answers are subject to the penalty of perjury?

A. Yes.

Q. So I'll be asking you a number of questions today. If you don't understand a question that I ask, let me know, and I can change the question to make it clearer.

Do you understand?

A. Yes.

Q. If you need a break at any time, just tell me or your attorney, and we'll try to take it. If a question is pending or you are in the middle of your answer, we will get the answer to that question and then take a

CONFIDENTIAL

Page 10

T. BROPHY

break.

A. Okay.

Q. If you realize at any time during the deposition that your answer to a previous question was not accurate or complete, please let me know so that we can get it correct on the record.

Do you understand?

A. Sure.

Q. Is there any reason why you would not be able to recall events and testify accurately today?

A. No.

Q. Okay. So you previously testified that you began working with ICE in New England on February 5, 2018, correct?

A. Correct.

Q. And your job title was acting field office director?

A. Yes.

Q. What does it mean to be an acting field office director?

A. I'm not the permanent field office director. I was asked to come in for a period

Page 11

T. BROPHY

of time to fill that position temporarily.

Q. If I refer to the field office director position as a FOD, do you understand that?

A. Yes, I do.

Q. How did you come to work as acting FOD in Boston?

A. I was asked by management at headquarters if I would come to Boston to act as the FOD for 120 days.

Q. Who asked you?

A. Nathalie Asher.

Q. And what was her position?

A. She is the deputy executive associate director.

Q. Was there anyone else?

A. No.

Q. Did she ask you by phone?

A. Yes.

Q. When, approximately, did she ask you?

A. Sometime in January. I don't know the specific date.

Q. Did she explain why she wanted you

Page 12

T. BROPHY

to take that position?

A. Just that they needed somebody to come in and act for a period of 120 days to kind of watch the field office while they transitioned to a permanent position.

Q. And why did you accept that position?

MS. LARAKERS: Objection.

Q. You can answer.

MS. LARAKERS: Yes.

A. Well, when you're asked to go on a detail, I don't have any objection as to why I wouldn't. So I was fine.

Q. What were your responsibilities as the acting FOD?

A. To oversee the day-to-day operations of the field office, to -- yeah, really just oversee the day-to-day operations.

Q. Did you report to anyone?

A. Not directly, no. But I did have regular communication with headquarters and, you know, chief counsel's office.

Q. Who did you have regular communications with at headquarters?

Page 13

T. BROPHY

A. I spoke with [redacted] and another gentleman by the name of [redacted].

Q. Who is David Jennings?

A. He is an assistant director over field operations. And Corey Price is an assistant director for enforcement.

Q. Did anyone report to you directly when you were acting FOD?

A. Yes. The deputy field office directors, Mr. Lyons and Mr. Rutherford.

Q. Anyone else?

A. Directly, no.

Q. So is there a default amount of time that someone usually serves as an acting FOD?

A. The most, I think, they can have you detailed is eight months.

Q. And why did you leave your position as acting FOD in Boston?

A. My 120 days was up at the end of May.

Q. And when was your last day?

A. May 31st.

Q. And Mr. Lyons replaced you as

CONFIDENTIAL

T. BROPHY

acting FOD, correct?
A. Yes.
Q. And where do you currently work?
A. In Buffalo, New York.
Q. Have you ever been involved in litigation before?
A. Yes.
Q. What were those cases?
A. As an officer, I was involved in a case regarding somebody we had in detention in a drug -- federal drug matter.
Q. Were you a party in that case?
A. Not in the drug investigation, no.
Q. Were you deposed in that case?
A. No.
Q. Sorry, there was two different cases? Is it one case or two different cases?
A. No, yeah.
Q. Sorry; one or two?
A. One.
Q. Have you ever testified at trial before?
A. In that case.
Q. That's the only time you've ever

T. BROPHY

testified?
A. In criminal court, yes.
Q. In civil court?
A. Immigration court once, yes.
Q. What was that case?
A. It was a removal hearing.
Q. Okay. When did you first learn that you were going to give a deposition in this case?
A. I don't remember the exact date. A few weeks ago.
Q. Okay. From that date to today, have you talked to anyone, other than your counsel, about your deposition?
A. No.
Q. What did you do to prepare for today's deposition?
A. I reviewed a couple declarations that I submitted.
Q. You didn't look at any other documents except for those declarations?
A. Correct.
Q. Did you meet with counsel?
A. This morning.

T. BROPHY

Q. That was the only time you met with counsel to prepare for this deposition?
A. Yes.
Q. For how many hours?
A. Two, two and a half hours.
Q. Have you abided by the Court's current sequestration order?
A. Yes.
Q. Do you know Christopher Cronin?
A. Yes.
Q. How do you know him?
A. I met him when he was an instructor at one of our academies in Georgia some years back.
Q. When was that?
A. I think 2006.
Q. Did you have any interaction with him after that?
A. On occasion, not directly. Just more of a friendly, not in a work capacity.
Q. How often would you communicate with him?
A. Maybe once, twice a year.
Q. Do you know if he still works for

T. BROPHY

ICE?
A. Yes.
Q. And do you know his current title?
A. I believe he's a deputy assistant director with field operations.
Q. Are you familiar with his work at ICE at all?
A. Like what he's doing right now?
Q. Any work he's done at ICE.
A. I remember him as an instructor.
Q. Do you have an opinion of him as an instructor?
A. He was very good.
Q. Have you heard anything about his performance as FOD in Boston?
A. No.
Q. Have you ever talked with anyone about his reputation?
A. No.
Q. Have you ever spoken to Mr. Cronin about this case?
A. Only to tell him that there was a sequestration order and that I couldn't discuss it.

Page 18

T. BROPHY
Q. When was that?
A. In May.
Q. Was that by phone or e-mail?
A. Phone.
Q. Do you know Rebecca Adducci?
A. Yes.
Q. How do you know her?
A. She's a field office director from Detroit, Michigan.
Q. When is the first time you met Ms. Adducci?
A. I don't know the exact date or year, but probably within the last three to four years.
Q. In what context?
A. I was a -- I went there one time to conduct interviews, and she was the field office director. Then for a short period of time in Buffalo I was the acting field office director when a FOD retired, so I had some limited interaction with her.
Q. When you said you went there to conduct interviews, where did you go?
A. Detroit, Michigan. I'm sorry.

Page 19

T. BROPHY
Q. So are you familiar with her work at ICE?
A. Not personally.
Q. Have you heard about her work at ICE?
A. No.
Q. Do you have any opinion about the quality of her work?
A. I think she's a very well-respected field office director. She has a very good reputation. She's somebody, when I was acting in Buffalo, I actually sought guidance from her before.
Q. Did you speak to Ms. Adducci about this case?
A. No.
Q. And you know Todd Lyons, correct?
A. Yes, sir.
Q. You worked with him in Boston?
A. Yes.
Q. Do you have an opinion about the quality of his work?
A. Todd was a very good deputy field office director.

Page 20

T. BROPHY
Q. Are you familiar with Mr. Lyons' reputation at ICE?
A. No.
Q. Have you ever heard anything about Mr. Lyons from anyone in Washington headquarters?
A. No.
Q. And you worked with James Rutherford, correct?
A. Yes.
Q. You worked with him extensively while you were in Boston?
A. Yeah. I worked with both of the deputies.
Q. Do you have an opinion about the quality of his work?
A. Do I have an opinion?
Q. Yes.
A. Yeah, I think he was doing the best he could with the situation at hand.
Q. Do you know if he has a reputation at ICE?
A. Not that I'm aware of.

Page 21

T. BROPHY
Confidential/Privacy Sensitive

Q. Mr. Lyons was designated to succeed you as interim FOD in the Boston office, correct?
A. Yes.
Q. And he assumed the position of acting FOD on June 1, 2018, right?

CONFIDENTIAL

Page 22

T. BROPHY

A. I believe so, yes.

Q. And Rebecca Adducci replaced him as acting FOD on June 7, 2018, correct?

A. I don't know the exact date, but yes.

Q. So Mr. Lyons served as acting FOD for less than a week, correct?

A. Correct.

Q. Why was his tenure so brief?

MS. LARAKERS: Objection.

A. I don't know specifically.

Q. Do you think it was related at all to Beyond the scope of deposition order

Page 24

T. BROPHY

come in and temporarily fill the position that

.

Q. Okay. So you're familiar with the petitioners in this litigation, correct?

A. Yes, more or less, yes.

Q. Are you aware that they are married couples?

A. I believe some of them are, yeah. I don't know if everybody, but yes, I know some of them are.

Q. Do you know how many petitioners there are in this case?

A. Not offhand.

Q. So do you know that each petitioner is part of a couple where one spouse is a U.S. citizen and one is a non-citizen with a final order of removal?

A. Okay.

Q. So you're not aware of that today?

A. Yes, the cases that I do know of, yeah.

Q. Are you aware that any of these couples have U.S. citizen children?

A. They may.

Q. Are you aware that in 2016 U.S. CIS

T. BROPHY

promulgated regulations that allowed non-citizens with final orders of removal who are married to U.S. citizens to apply for provisional waivers?

A. Yes.

Q. And if I refer to that as provisional waivers, you'll understand what I'm saying?

A. Yes.

Q. And do you understand that the petitioners in this litigation are pursuing provisional waivers?

A. Yes, the cases that I'm familiar with, yes.

Q. Do you know how petitioners would benefit from a provisional waiver application?

A. Well, each case is kind of specific. I'm guessing that a provisional waiver would permit them the pathway towards lawful permanent residency.

Q. Do you know specifically what benefit they would gain from applying?

MS. LARAKERS: Objection.

A. Specifically, no.

T. BROPHY

Q. Are you aware that the first step in this process is to file a Form I-130?

A. Yes.

Q. And that's called a Petition For Alien Relative, right?

A. I believe so.

Q. If I refer to that as an I-130 application, will you understand what I'm saying?

A. Yes.

Q. Are you aware that in adjudicating an I-130 application, U.S. CIS might require the couple to appear for an interview at CIS offices?

A. I'm sorry, can you repeat that?

Q. Are you aware that when CIS is adjudicating the I-130 application, they may require the applicant and their spouse to appear at CIS offices for an interview?

A. Yes.

Q. And that that interview is to determine whether the couple have a bona fide marriage, right?

A. Yes, that's my understanding of

T. BROPHY

what an I-130 is for.

Q. Do you know the names of the other forms individuals fill out in the provisional waiver process?

A. Well, if they are applying for lawful permanent residency, after I-130, I believe that it would be the I-485. And there might also be an I-212 and possibly a 601.

Q. Do you know how an individual would benefit from an I-212?

A. That would be a waiver of removability.

Q. And what about a -- did you refer to it as a 601?

A. Yeah. And I'm not very familiar with that, I apologize, what a 601 does.

Q. Does ICE track which individuals are participating in the provisional waiver process?

A. No.

Q. Does it have the ability to track that?

A. No, we don't.

Q. How would they find this

T. BROPHY

information out?

A. It would -- if it's in the alien file, perhaps.

Q. Were you aware of the provisional waiver process before this litigation?

A. I understood that there was a process, but I had never been familiar with it, no.

Q. Are you aware that the regulations specifically made non-citizens with final orders of removal eligible for the provisional waiver process in order to minimize family separation?

A. Yes.

Q. And that this was also to prevent undue hardship to U.S. citizen family members?

MS. LARAKERS: Objection.

A. Yeah, I don't know if that was the rationale behind it or not. I don't know.

Q. How did you learn about the provisional waiver process?

A. Really from being involved in cases where, you know, people have been arrested that were going through the process.

T. BROPHY

Q. Do you remember when the first time you became aware of it was?

A. No, I don't recall.

Q. Was this in Buffalo or Boston?

A. Buffalo.

Q. How many cases?

MS. LARAKERS: Objection.

A. I have no idea.

Q. Did ICE ever conduct any training on the provisional waiver process?

A. No.

Q. Are you aware that two of the petitioners in this case appeared for I-130 interviews?

A. Yes.

Q. Are you aware that CIS determined both of them had bona fide marriages?

A. I was not aware.

Q. Are you aware that ICE arrested and detained them at CIS offices immediately following their interviews?

A. That's my understanding.

Q. What is an immigration benefit?

MS. LARAKERS: Objection.

T. BROPHY

Q. You can answer.

A. I would guess it would be a favorable adjudication of an application.

Q. Is that your understanding or is that ICE policy?

A. It's not a policy. It's my understanding.

Q. How did you get that understanding?

MS. LARAKERS: Objection.

A. Just my experience.

Q. And what do you mean by a "favorable adjudication"?

A. It means the application wasn't denied.

Q. And can you define what you mean by "application"?

A. It could be -- well, there's a lot of applications. It could be an application for an employment authorization card, it would be the I-130, I-485.

Q. Do you believe that the provisional waiver process is an immigration benefit?

A. Yeah, I would categorize it as that.

T. BROPHY

Q. And an I-130 application is an immigration benefit?

A. Yeah.

Q. In 2017, ICE began a practice of arresting non-citizens with final orders of removal who appeared at CIS offices to seek immigration benefits, correct?

MS. LARAKERS: Objection.

A. I'm not aware of an ICE policy or direction.

MR. SADY: I thought this was limited to 2018. The Court order is very specific in that regard. We're spending a lot of time on a lot of information that is wholly unrelated to the order. We have been giving you a lot of leeway here. Now to ask him about 2017 when it's very, very specific it's 2018.

MR. PROVAZZA: So the language of the judge's order refers to the pending motions before the Court, and Mr. Brophy's policy and Ms. Adducci's change in that policy.

All of these questions are directly

T. BROPHY

relevant to the pending motions and his understanding of the policy before he arrived, his change and Ms. Adducci's change.

Everything I've asked so far is directly relevant to the Court's order.

MR. SADY: I don't think so.

MR. PROVAZZA: Are you instructing the witness not to answer any questions?

MR. SADY: No, I'm not instructing. I'm just asking you to get on focus.

MR. PROVAZZA: I believe these are very focused questions and are directly on point.

MS. LARAKERS: I think we can limit it to the months leading up to starting about in September of 2017. But when you ask him specifically what the ICE policy is in 2017, please, you know, be aware that he was not there in 2017.

So to the extent you ask him what ICE Boston is, he may not know.

MR. PROVAZZA: Sure. I can limit my questions to September of 2017.

MS. LARAKERS: Going forward.

T. BROPHY

MR. PROVAZZA: Forward.

Q. Do you understand that in September of 2017 forward, ICE Boston had a policy of arresting non-citizens with final orders of removal who appeared at CIS offices to seek immigration benefits?

A. I'm not aware of a policy that directed that.

Q. So ICE Boston's targeting of individuals at I-130 interviews at CIS offices is not a policy -- was not a policy?

A. As far as I know, no, it was never a policy.

Q. What would you describe it as?

A. Enforcing the immigration law. I believe that those cases all fall within the executive orders.

Q. Do you believe that the executive order required ICE to arrest people at those interviews?

A. I believe it directed the people who are subject to a final order for national security or public interest -- I mean, public risk, if you would, should be focused upon.

T. BROPHY

Q. So if I refer to this as an arrest practice, would you understand what I'm talking about?

A. I guess, yeah.

Q. So this practice was instituted in Boston by your predecessor, Mr. Cronin, correct?

A. That's my understanding.

Q. And you testified in May that you became aware of Mr. Cronin's policy around February 12th or 13th, right?

A. That sounds right.

Q. Has your recollection changed at all since then?

A. No.

Q. This was after Ms. Calderon filed her habeas petition, correct?

A. I believe so.

Q. And you found out about Ms. Calderon's arrest and Mr. Cronin's practice around the same time, right?

A. Yes.

Q. Was her arrest what brought this to your attention?

T. BROPHY

A. No. It was brought to my attention, but I thought it was a poor utilization of our enforcement assets.

In Boston, one thing that I quickly found was that there was a lot of public safety risk, people committing crimes, and to focus on -- I wanted to focus our enforcement efforts there rather than going after people at CIS offices that didn't pose a public safety risk.

Q. So was Ms. Calderon's case what brought that practice of targeting individuals at CIS to your attention?

A. I believe it was, yes.

Q. And you also saw several media reports about Ms. Calderon's arrest around that time, correct?

A. Yeah, I believe it was.

Q. And did Mr. Lyons and Mr. Rutherford brief you on that arrest practice?

A. I asked them about it, yeah.

Q. What did they tell you?

A. That, you know, they would go to CIS and arrest people there that were, you

T. BROPHY

know, after their interview or whatnot.

Q. Did you ask questions about it?

A. I told them I didn't think that was a smart utilization of our enforcement efforts.

Q. Do you know of any written documentation for this arrest practice?

A. No. I've never seen anything.

Q. Did you ever talk to Mr. Cronin about it?

A. No.

Q. Did you ever talk to anyone you report to, that you report to, at ICE about this practice?

A. I don't recall if I had that in a conversation with somebody or not.

Q. You don't remember talking to anyone at ICE --

A. Headquarters?

Q. -- headquarters around February 12th or 13th?

A. No.

Q. Or around February 16th?

A. No. That was a decision I made on

CONFIDENTIAL

Page 38

T. BROPHY

my own.

Q. And from February 16th until the end of your tenure at ICE Boston, you don't recall talking to anyone at ICE headquarters about --

A. Not specifically if that topic came up. I'm sorry.

Q. Did this practice exist in ICE Buffalo before you arrived in Boston?

MS. LARAKERS: Objection.

A. I'm sorry, could you say that again?

Q. Did this policy exist in ICE Buffalo before you arrived in Boston?

A. There's no policy, you know. It would have been --

Q. Did this practice exist in ICE Buffalo?

A. Yes. We had made arrests at CIS offices in ICE Buffalo in the past.

Q. In what circumstances would ICE Buffalo make arrests at CIS offices?

MS. LARAKERS: Objection. That is not -- that is outside the scope. This is

Page 39

T. BROPHY

related to the preliminary injunctions in ICE Boston. You can certainly is ask him what ICE Boston does. But what ICE Buffalo does is not even within the jurisdiction of this court and not relevant to your question.

MR. PROVAZZA: I believe that that question is directly relevant to his understanding of what was going on in Boston and his decisions as acting Boston FOD.

If you're going to instruct him not to respond, you can do that, and we would reserve the right to ask this question at a later time and challenge that objection.

MS. LARAKERS: He can respond. But that's well outside the scope. I just wanted to preserve my objection. Go ahead.

A. Could you repeat it?

Q. Was there a policy in Buffalo ICE to target individuals for arrest at I-130 interviews?

A. First of all, there's no policy, period, regarding targeting people at CIS. It's in furtherance of the law and it falls within the executive orders. In the past we

Page 40

T. BROPHY

have made arrests at CIS offices in Buffalo.

Q. In what circumstances --

A. I can't recall the specifics of the cases.

Q. Do you know if that practice still goes on now in Buffalo?

A. I'm not familiar with any recent cases, no.

Q. And just to point something out, I think you and I are speaking over a little bit of each other on the record. So when I'm asking a question, wait for me to finish --

A. I apologize.

Q. -- and I will make sure I don't interrupt your answer. So I'm worried we're speaking over each other a little bit.

And you mentioned that this practice that went on in ICE Buffalo of arresting individuals at CIS was consistent with the executive order, correct? What executive order are you referring to there?

A. (No response).

Q. When you stated that targeting individuals for arrests at I-130 interviews

Page 41

T. BROPHY

fall within the executive order, what executive order were you referring to?

A. I don't recall the number of the executive order, but I can summarize the executive order that delineated our enforcement posture focusing on national security, public safety risks, subjects of final orders of removal for the interior enforcement of immigration.

Q. Is that executive order 13768?

A. Without seeing it, I can't say if that is the exact number or not.

Q. Are you aware that two of the petitioners in this case appeared for I-130 interviews in January of 2018?

A. I wasn't aware of the exact date or timeframe, but I knew that they appeared for interviews at CIS.

Q. And Lilian Calderon is one of those individuals?

A. Yes.

Q. When did you first become aware of Ms. Calderon's arrest?

A. I don't recall the exact date, but

CONFIDENTIAL

Page 42

T. BROPHY

in early February, around the time that I gave my direction that we're going to focus our efforts.

Q. Was anyone else arrested at CIS that day?

A. I have no idea.

MR. PROVAZZA: I'm going to mark this as Exhibit 1.

(Brophy Exhibit 1, E-Mail to Ely Vance, and others, from Thomas P. Brophy, dated 2/13/18, with attached e-mails, marked for identification)

Q. So if you could look at the bottom e-mail on the first page from Mr. Lyons.

A. Okay.

Q. Do you see the question, "On the day of the arrest, were there any other scheduled arrests at that CIS office?"

A. Okay.

Q. Do you see that question?

A. Yes. First bullet.

Q. And do you see Mr. Vance's response at the next in time e-mail?

A. Yes, I do see his response.

Page 43

T. BROPHY

Q. Are you familiar with -- I'm sorry if I mispronounce this -- Mr. Confidential/PII s case?

A. No.

Q. Did you know at this time that he wasn't arrested because he was eligible for DACA?

A. I'm sorry?

Q. Did you know at this time that he wasn't arrested because he was eligible for DACA?

A. I believe that's what it says in the e-mail.

Q. And you generally read your e-mails, correct?

A. Generally.

Q. And you responded to this one with a "Thanks Vance"?

A. Yes.

Q. So at this time you knew that Mr. Confidential/PII wasn't arrested because he was eligible for DACA, correct?

A. Yes.

Q. But Ms. Calderon was arrested,

Page 44

T. BROPHY

despite her eligibility for provisional waivers, correct?

A. Yes.

Q. When you received this e-mail, were you aware that Ms. Calderon was eligible for provisional waivers?

A. Just because she's eligible for the waiver doesn't preclude us from arresting her.

Q. Were you aware at this time that she was eligible for provisional waivers?

A. I don't recall if I was aware of the nuances of her case to that extent.

Q. Are you aware that Lucimar De Souza is the second petitioner in this case that was arrested in January?

A. Yeah, I do recognize that name.

Q. When did you become aware of Ms. De Souza?

A. I don't recall.

Q. Are you aware that she was arrested along with Ms. Calderon after their I-130s were approved and their marriages were found bona fide?

MS. LARAKERS: Objection.

Page 45

T. BROPHY

A. I don't recall it if I knew that they happened at the same time or not.

Q. Do you recall that when Ms. Lucimar De Souza was arrested, her I-130 petition had been approved?

A. I don't know if I was aware of that.

Q. Are you familiar with CIS?

A. Yes.

Q. Do you work with them regularly?

A. Not regularly. On occasion.

Q. How often is on occasion?

A. Quarterly.

Q. And what kind of interactions do you have with them?

A. It could be anything, depending on -- it could be a case. It could be -- we could be attending a meeting together. It could be a lot of different interactions.

Q. What do you view as their relationship to ICE?

A. They are part of DHS.

Q. So you knew that CIS informs ICE when individuals will appear for I-130

T. BROPHY

interviews, correct?
A. Yeah, that's my understanding.
Q. And that CIS would tell ICE when non-citizens appearing for their interview were subject to final orders of removal, right?
A. I don't know if they told us that or if we found that out through our own due diligence.
Q. Do you know what kind of information CIS would send to ICE?
MS. LARAKERS: Objection.
A. I've never -- I've never -- no, I don't. I don't know how they communicate it.
Q. Did you ever talk to Mr. Rutherford or Mr. Lyons about it?
A. About how they communicated?
Q. What kind of information ICE -- CIS provided to ICE?
MS. LARAKERS: Objection.
A. Not specifically, no.
Q. Do you know who at ICE would receive information from CIS?
MS. LARAKERS: Objection.

T. BROPHY

A. I'm sorry?
Q. Who at ICE Boston would receive information from CIS?
A. I don't know who that information came to.
Q. So you're aware that CIS would provide ICE Boston with the names of non-citizens appearing for interviews at CIS with final orders of removal?
A. Yes, I'm aware of that.
Q. And then ICE would use that information to plan arrests?
A. I believe that's what they were doing, yes.
Q. Do you know who at ICE would plan the arrests?
A. No, not specifically. It could have been any one of the deportation officers, staff members, that were assigned to that enforcement side of the house.
Q. Do you know if that required any supervisory approval?
A. To what extent, sir?
Q. To plan an arrest at CIS.

T. BROPHY

A. Yes.
Q. Who would they go to for approval?
A. Their first line supervisors.
Q. And was that in every instance?
A. I don't know specifically if it was every instance, but that's the normal course of action.
Q. How did you find out that information?
A. For ERO, any planned enforcement action is supposed to have a supervisor review or approval, if you would.
Q. Do you know if that supervisory approval ever took place for arrests at CIS?
A. I do not know.
Q. And you agree that the decision to arrest an individual at a CIS interview was not impacted by the approval of their I-130?
A. I'm sorry, can you say that again?
Q. Sure. The decision to arrest someone at their CIS interview was not impacted by the approval of their I-130?
A. Correct.
Q. So at a certain point you asked CIS

T. BROPHY

to stop sending ICE information regarding I-130 interviews, unless there was a national security or public safety risk, correct?
A. Correct.
Q. When did you do that?
A. I'm struggling to remember the exact timeframe. It would have been around the same time that I gave my direction to the staff. So mid-February.
Q. Do you think it would have been before or after you gave your direction?
A. I don't know if it was before or after.
Q. Do you know who you spoke to at CIS?
A. Mr. Reardon, Dennis Reardon.
Q. Who is that?
A. Director of CIS here in Boston.
Q. Does he oversee multiple portions of CIS in Boston? Sorry.
What is his responsibility as head of CIS in Boston?
A. I'm not 100 percent certain, although he's the director and has oversight

CONFIDENTIAL

Page 50

T. BROPHY

of the day-to-day operations for his area of responsibility.

Q. Does he oversee CIS's office in Lawrence?

A. Massachusetts?

Q. Yes.

A. I would assume so.

Q. Do you remember what you specifically said to him?

A. Specifically, no.

Q. Generally, do you remember what you said to him?

A. I would have to guess.

Q. Go ahead.

A. Probably something along the lines, unless they are a national security risk or public safety concern, don't forward us that information. We're not going to be making those arrests unless they are a national security or public safety concern.

Q. Did he say anything in response?

A. I don't recall. Probably said okay.

Q. How did you communicate that to

Page 51

T. BROPHY

him?

A. I believe I called him.

Q. Was there anyone else on the phone?

A. I have no idea.

Q. Was there anyone in your office when you made that directive?

A. I don't recall.

Q. After you asked -- sorry, is it Mr. Reardon?

A. Reardon.

Q. After you asked Mr. Reardon, did you ever follow up to see if that request was being followed?

A. No.

Q. And, in fact, CIS didn't follow that instruction, correct?

A. I have no idea if they did or they didn't.

MR. PROVAZZA: Do you mind if we take a short break?

MS. LARAKERS: Sure.

VIDEOGRAPHER: We are going off the record at 11:46.

(Recess taken at 11:46 a.m. and

Page 52

T. BROPHY

reconvening at 11:54 a.m.)

VIDEOGRAPHER: We are back on the record at 11:54.

BY MR. PROVAZZA:

Q. Mr. Brophy, are you aware that the U.S. CIS manual says that arrests won't occur at CIS interviews?

A. No, I'm not aware of that.

Q. Have you reviewed the filings in this case?

A. No.

Q. Are you aware that it's against CIS policy for arrests to occur during interviews where a non-citizen subject to a final order of removal is seeking benefits under a provision of law that specifically allows a non-citizen to seek such benefits?

MS. LARAKERS: Objection.

Q. You can answer.

A. I'm not aware of any CIS policies. They are CIS's, not ICE's.

Q. So ICE hasn't accounted for CIS policies when executing these arrests?

MS. LARAKERS: Objection.

Page 53

T. BROPHY

A. Like I said, I'm not aware of CIS policies.

Q. Do you know whether ICE agents making those arrests took those policies into consideration?

MS. LARAKERS: Objection.

A. I've never seen the policies. So, no.

Q. CIS scheduled interviews to help facilitate those ICE arrests, correct?

A. I don't know if that was the purpose of the scheduling of the interview or not.

Q. So CIS would schedule I-130 interviews of non-citizens with final orders to facilitate their arrests, correct?

A. I'm not aware if that was the reason why they scheduled the interview or if it was because of the application that they were filing.

Q. Are you aware that CIS would schedule the interview at certain times of day to facilitate the arrest?

A. Like I said, I'm not aware. I've

T. BROPHY

never had any communication with CIS to schedule or not schedule interviews.

Q. ICE never told the public that they may arrest non-citizens with final orders of removal at CIS interviews, correct?

A. Correct. I don't know if we would.

Q. And there was no discussion of this at any public conference, correct?

MS. LARAKERS: Objection.

A. Not that I'm aware of.

Q. And ICE never told the public that CIS provided referrals to ICE, correct?

MS. LARAKERS: Objection.

A. Not that I'm aware of.

Q. So ICE hid this fact from the public, correct?

MS. LARAKERS: Objection.

A. No, I wouldn't say they hid it. I don't know that's something we would normally discuss and broadcast anyway. That's a law enforcement tool. I don't know if we would do that.

Q. Who is John Mohan?

A. Oh, he is the public affairs

T. BROPHY

officer for ICE.

Q. In Boston or in D.C.?

A. Sorry. Boston.

Q. What's his role generally?

A. He interacts with stakeholders and media requests.

(Brophy Exhibit 2, E-Mail to Thomas P. Brophy from John Mohan, dated 2/7/2018, with attached e-mails, marked for identification)

Q. You have been handed a document marked as Exhibit 2. The top line e-mail is from John Mohan on February 7, 2018, correct?

A. I'm sorry, the top line is February 7, 2018?

Q. February 7th, correct. Can you go to the first in time e-mail, second page.

A. Okay.

Q. You were a recipient of this e-mail, correct?

A. Yes. I'm on here.

Q. Do you see the first paragraph?

A. Yes.

Q. Do you see the bolded sentence that

T. BROPHY

states "female Guatemalan detainee at Suffolk (Calderon, wife of an individual who was in an application process with U.S. CIS, arrested in Rhode Island)"?

A. I see that.

Q. So is this when you first became aware of ICE's targeting individuals for arrest at CIS?

A. It very well could be. I don't remember if this was the exact way I found out or not. But timeframe wise, it could be.

Q. Do you think you read this e-mail?

A. Yeah.

Q. If you had read that sentence, would that indicate to you that ICE was arresting people at CIS?

A. Yeah. It says it right there.

Q. Reading this e-mail, do you think your statement at your May 22nd testimony that you discovered this CIS arrest practice on February 12th or 13th was wrong?

MS. LARAKERS: Objection.

A. I don't know if this is wrong or not. I might not have recalled this e-mail at

T. BROPHY

the time I stated that.

Q. But you received this e-mail?

A. Yeah. I'm on it.

Q. And you approved this language in the -- let me rephrase that.

Do you see the bottom three paragraphs of this e-mail, this first in time e-mail?

A. The first. Okay. Yeah, I see them here.

Q. Was this ICE's official statement about Ms. Calderon's arrest?

A. I don't know if this was what was pushed out to the media or not, but it would appear that would be the draft version of it, yes.

Q. And you approved this language?

A. Yes.

Q. Who is OPA leadership; OPA?

A. Office of Public Affairs.

Q. Where are they?

A. Washington, D.C. headquarters.

Q. So in that statement, in the third paragraph of the bottom of the page, the third

T. BROPHY

paragraph of the statement at the bottom of the page, it says, ICE does not exempt classes or categories of removable aliens from potential enforcement. "All of those in violation of the immigration laws may be subject to immigration arrest, detention and, if found removable by final order, removal from the United States."

Is that right?

A. Yeah. Can I read it?

Q. Sure. Take your time.

A. It says, "While ICE does focus its enforcement resources on individuals who pose a threat to national security, public safety and border security, no classes or categories of removable aliens are exempt."

Yes, okay.

Q. So no class is exempted from enforcement, correct?

A. Yes.

Q. And this is dictated by executive order No. 13768, correct?

A. Yes. That was part of the executive orders.

T. BROPHY

Q. And as part of the statement, you didn't tell the public that ICE received referrals from CIS, correct?

A. That's what I said, yes, correct.

Q. And you didn't tell them that based on that information, ICE arrests individuals appearing at I-130 interviews who are subject to final orders?

A. I'm sorry, can you repeat that?

Q. So you didn't tell them that based on these referrals from CIS, you didn't tell the public based on these referrals from CIS, that ICE arrests individuals appearing for I-130 interviews who are subject to final orders?

MS. LARAKERS: Objection.

A. Once again, I don't know why a law enforcement agency would discuss its practices with the public. So, no, we did not.

Q. Did you ever instruct anyone that this information should be made public?

MS. LARAKERS: Objection.

A. No.

Q. Do you think this is something that

T. BROPHY

I-130 applicants would want to know?

MS. LARAKERS: Objection.

A. I have no idea. I would think if I was subject to a final order of removal, knowing that I was in violation of the law, that I could run that risk that ICE could arrest me at any point.

Q. Did you participate in the March 2, 2018 AILA conference in Boston?

A. Yeah, I believe I was in attendance.

Q. What is AILA?

A. AILA. I forget exactly what the acronym means. I apologize. It's basically immigration attorneys.

Q. What was the conference for?

A. I don't recall the specifics. Sometimes they ask questions for each component that's there in attendance from DHS about practices and enforcement.

Q. Why were you invited to participate?

A. Because I was the acting field office director for ERO.

T. BROPHY

Q. So were you on a panel presentation during the conference?

A. Yes.

Q. What was the topic of the panel?

A. I don't recall exactly.

Q. Do you know who else participated?

A. Yeah. There was somebody from CBP, Customs and Border Protection, Office of Field Operations, Homeland Security investigations, CIS, myself. I think that's it.

Q. Was Mr. Reardon there?

A. Yes.

Q. And issue of arrests at I-130 interviews came up at that panel, right?

A. It could have, yes.

Q. Do you remember it coming up?

A. Not specifically.

Q. Do you remember arrests at CIS coming up during that panel?

A. I don't recall if that was a question that I had or not.

Q. Well, you stated that although ICE does make arrests at I-130 interviews, they weren't required to do that, correct?

T. BROPHY

MS. LARAKERS: Objection.

A. I don't recall if that's specifically what I said or not. I don't remember.

Q. Generally was that what you said?

MS. LARAKERS: Objection.

A. I don't recall. It's possible.

Q. Do you recall addressing the issue of CIS interviews at all?

A. Obviously it was brought up. I don't recall each question that was discussed, but obviously it was.

Q. Do you recall being asked about ICE's CIS arrest practice?

A. I don't know if I was specifically asked that question or how it came about.

Q. You said earlier this was a conference for immigration attorneys, right?

A. Hmm-hmm.

Q. And their clients might be deciding whether to attend I-130 interviews, right?

MS. LARAKERS: Objection.

A. I have no idea. It could.

Q. By the time of this conference, you

T. BROPHY

had already issued your directive stopping arrests at CIS, except for national security and public safety, correct?

A. Yes.

Q. But you didn't mention it at the panel at all?

A. I guess I didn't.

Q. And Mr. Reardon spoke as part of this panel, correct?

A. I recall he did, yes.

Q. And he explained that CIS still provided ICE with lists of individuals with final orders of removal attending interviews at CIS?

A. He may have. I don't recall specifically what he said.

Q. Did you pay attention to other people's remarks during that panel?

A. Yeah, but it was -- how long ago was it? March. Yeah, I don't recall specifically what was said at a conference in March now.

Q. Do you think if he had said that, you would have followed up with him about what

T. BROPHY

he was talking about?

A. Possibly.

Q. Did you follow up with him?

A. I don't -- I don't know.

Q. He also explicitly stated that CIS did not work with ICE to schedule I-130 interviews, right?

MS. LARAKERS: Objection.

A. I don't recall what Mr. Reardon said or didn't say.

Q. Would you have remembered if he had said that?

A. I don't know.

Q. Would you have corrected him if he had said that?

A. I don't think it would be my place to correct it.

Q. How many individuals were arrested at CIS while you were acting FOD?

A. I don't recall any being arrested after I gave my direction.

Q. Do you remember anyone arrested before you gave your direction?

A. No, other than when I found out

T. BROPHY

about the practice that people had been, no.

Q. Would you have remembered if you had seen that information?

A. I'm sorry?

MS. LARAKERS: Objection.

Q. Would you have remembered if you had seen that people were arrested prior to your directive during your tenure?

A. I don't know if I understand your question.

(Brophy Exhibit 3, Spreadsheet of names, marked for identification)

Q. You have been handed Exhibit 3. Do you recognize this document?

A. No.

Q. Can you read it?

A. Yeah, kind of. The print is kind of small.

Q. Do you see the bottom two lines on this?

A. Okay.

Q. Do you see the name Confidential/PII [redacted]?

A. I do.

T. BROPHY

Q. Do you recognize those names?

A. I do not.

Q. So if I represented to you that this was a list of CIS arrests produced by ICE in this litigation, would you have any reason to doubt me -- doubt that?

A. No.

Q. Are you surprised to hear that two individuals were arrested on February 14th?

A. No, not surprised.

Q. Why not?

A. I gave my direction, I believe, after that.

Q. Are you surprised that you haven't heard about these arrests before?

A. I wasn't apprised of every single arrest that was made as the acting field office director. No, it does not surprise me.

MR. PROVAZZA: I think now is a good time to break for lunch.

MS. LARAKERS: Okay.

MR. PROVAZZA: Is that okay with you?

MS. LARAKERS: Sure.

T. BROPHY

VIDEOGRAPHER: We are going off the record at 12:10.

(Luncheon recess taken at 12:10 p.m. and reconvening at 1:05 p m.)

VIDEOGRAPHER: We are back on the record at 1:05.

BY MR. PROVAZZA:

Q. So, Mr. Brophy, during your May 22nd testimony, you told Judge Wolf that you advised your supervisory staff that that practice, referring to the arrest practice under Mr. Cronin, was no longer going to continue, and we are going to focus our efforts on threats to the public safety, that we weren't going to go to CIS any longer to arrest people unless there was a direct threat to national security and public safety; is that correct?

A. Yes. That's how I recall it.

Q. You also stated, I even informed the director of CIS of my changing that practice, correct?

A. Correct.

Q. What prompted that change?

T. BROPHY

A. Like I said before, the poor utilization of our enforcement assets, as well as, you know, every day that I was really struck at how many people here in this AOR -- I shouldn't say people -- municipalities or local governments or courts don't honor immigration detainers, and the large amount of people that are committing crimes, violent crimes or drug-related crimes in the community, they wouldn't honor our detainers.

And to pull our assets from doing that work to go to CIS to go and arrest somebody who's not a threat to public safety didn't make sense to me. That's kind of why.

Q. Is there any other reason?

A. I probably would have considered, too, you know, habeas actions that were coming in and stuff like that, too, as well. It could have been a lot of factors.

But the biggest thing that comes out to me is it's not a smart utilization of my enforcement assets at the time.

Q. Would media attention be part of that mix of information you considered?

T. BROPHY

A. No. I look at the case, the cases themselves. One thing I noticed quickly, you know, media is what it is. I try not to pay attention to it.

(Brophy Exhibit 4, Letter to Honorable Kirstjen M. Nielsen from Sheldon Whitehouse, James R. Langevin, David N. Cicilline, dated 2/9/18, marked for identification)

Q. You have been handed what's been marked for identification as Exhibit 4.

A. Okay.

Q. Do you recognize this letter?

A. No.

Q. Take a look at the letter, the first and second page, and then I'll ask you the same question, do you recognize this letter.

A. Okay.

Q. So do you remember receiving this letter?

A. It looks vaguely familiar, yeah.

Q. If you had received a letter from a senator and two congressmen, would you

T. BROPHY

remember that?

A. I received a lot of correspondence from congressional and in state senators.

Q. For what reason?

A. All different cases and different topics. I was actually surprised at the volume. I was not used to it, in comparison to what I experienced in Buffalo.

Q. Was it your practice to read these letters?

A. Yeah, normally I would read it and it would be assigned to somebody to respond in conjunction with seeing this is congressional, with our Congressional Affairs Office.

Q. If you look at the last paragraph on the first page, it says, "After marrying her U.S. citizen husband, Ms. Calderon's latest attempt to gain legal status, through an I-130 petition, looked promising. We understand that her Form I-130 had been approved and she was in the process of having her marriage verified by U.S. CIS when she was suddenly detained by ICE officers."

If you had read that, would you be

T. BROPHY

aware that she was targeted at a CIS interview?

A. Yeah, I believe it says that.

(Brophy Exhibit 5, Letter to Honorable Senator Sheldon Whitehouse from Thomas Brophy, dated 2/14/18, marked for identification)

Q. You have been handed what's been marked as Exhibit 5. This is a letter dated February 14, 2018 with your signature on the second page. Take your time to review it.

A. Okay. Thank you.

Q. Let me know when you're done.

A. Okay.

Q. Do you recognize this letter?

A. In reading it, yes.

Q. And that's your signature on the second page?

A. Yes.

Q. And this letter was in response to Senator Whitehouse's February 9th inquiry, correct?

A. Yes, that's what it says.

Q. Do you see the last paragraph on

T. BROPHY

this first page of your letter?

A. Yes.

Q. So it says, "ICE has exercised considerable discretion in this case in the form of allowing Ms. Calderon Jimenez to remain out of ICE custody for the aforementioned 90-day period."

Do you see that?

A. Yes.

Q. That refers to the 90-day stay she was granted?

A. Okay.

Q. Next sentence is, "This is ample time to settle her affairs and prepare for orderly departure, as previously stated having been ordered removed by the BIA on September 25, 2002."

Do you see that?

A. Yes.

Q. How did you come up with a three-month stay?

A. I don't know if I granted it, if it was me or my predecessor. I don't know if I granted that stay of 90 days. Oh, okay. I'm

T. BROPHY

sorry, I did.

How did I come up with the 90 days?

Q. Hmm-hmm.

MS. LARAKERS: Objection. To the extent that this impedes on deliberative process in this specific case, perhaps you could ask generally what someone looks at with regard to requests for stays of removal. But with regard to each specific case, it's a deliberative process.

MR. PROVAZZA: I will ask a different question.

Q. If you would turn to the next page, and look at the first paragraph. You state, "After reviewing all available facts in the case, I have determined that ICE will offer no further prosecutorial discretion in this case and that Ms. Calderon Jimenez must comply with her obligation under law."

What did you mean by her obligation under law?

A. In reference to the issuance of the order of removal.

Q. So what was her obligation?

T. BROPHY

A. That she must comply with the removal process.

Q. And going back to the paragraph previous to that, what did you mean by "settle her affairs"?

A. To prepare whatever she needed on her private life to be removed.

Q. Do you think -- strike that.

At this time you knew that it took more than three months to complete the provisional waiver process, correct?

A. I'm not aware how long it takes.

Q. Did you think she could have completed the provisional waiver process in that 90-day removal period?

A. I don't know. I was more concerned about affecting the order.

Q. I'm sorry, I misspoke. Do you think she could have completed the provisional waiver process during the 90-day stay you had granted her?

A. I don't know how long that process takes.

Q. Do you think this was the right

T. BROPHY

decision?

A. At the time?

Q. At the time.

A. Yes.

Q. Do you think it is now?

A. I don't know what the case -- what her status is right now. Had she been granted a stay longer than that? I think at the time, based on the discussions that I had with the case and with counsel and my staff, yeah, I do.

Q. And do you think that was a fair decision?

MS. LARAKERS: Objection.

A. I don't look at it whether it's fair or not. Whether it looks like -- whether it's correct under the law, somebody who is the subject of a final order to be removed.

Q. I'm asking your opinion whether you think it's fair that Ms. Calderon was only given 90 days to depart the country, despite the fact she wouldn't complete her provisional waivers by then?

MS. LARAKERS: Objection.

T. BROPHY

A. I don't personalize it. I look at it objectively. I look at the merits of the case. That was my decision. I thought that was the right decision.

Q. So as --

A. I thought I was giving her discretion in the form of 90 days to prepare herself. Some people don't get that. So I do.

Q. So you think it was fair that --

A. I think 90 days was a discretionary time to prepare herself with that stay was the right decision at the time.

Q. Just to clarify one other question. I asked earlier why you granted a 90-day stay, and your counsel objected that's a deliberative process.

MR. PROVAZZA: Are you instructing him not to answer that question because it's protected by the deliberative process privilege?

MS. LARAKERS: Yes. And I suggest you could ask factors generally when adjudicating a stay, and I think he was asked

T. BROPHY

that in the May 22nd/23rd hearing.

MR. PROVAZZA: Okay. Understood.

Q. Do you think it was the right decision to give Ms. Calderon only 90 days to depart the United States?

A. I think it was appropriate.

Q. So going back to your February 16th directive, why did you limit that directive only to arrests at CIS?

A. I don't understand.

Q. So you limited your directive to forbidding arrests at CIS, except for national security and public safety concerns, for individuals attending I-130 interviews, correct?

A. Correct.

Q. Why didn't you extend that policy outside of CIS grounds?

MS. LARAKERS: Objection.

A. I don't know if I'm following you as to why I would expand that anywhere else. That was the topic that was brought up. That was the topic that was discussed, was the CIS arrest.

CONFIDENTIAL

Page 78

T. BROPHY

Those people making those applications, we have their address information. We can send them notification to come to the office, report in. We can control their cases under a docket that didn't mean detaining them.

There's other ways we can handle those cases instead of dispatching enforcement assets to go and make a physical arrest at that location, which I said before, I thought was a misuse of my staff.

Q. Does that same logic apply to anyone in the provisional waiver process, whether they are at their home address or they're at the grocery store?

A. If they are going through the application process for the waiver, they would be covered, right, because -- are you saying instead of waiting for the day that they go for their interview and then arrest them at their home; is that -- I'm having trouble following, and I apologize.

Q. I'll restate my question.

Your directive forbid ICE officers

Page 79

T. BROPHY

from arresting individuals that are not public safety concerns or national security concerns at CIS?

A. Right.

Q. The policy behind that was because your resources were better spent making arrests elsewhere?

A. The direction I gave, not policy, but yes.

Q. Doesn't that same logic apply to making arrests at a provisional waiver applicant's house?

A. I don't -- that issue was never presented to me, that concern or issue.

Q. So under your directive, an ICE agent can still use the information they got from CIS to target an individual for an arrest at their home?

A. Theoretically, I guess so. But I wanted my enforcement assets to be focusing on public safety and national security risks predominantly. That's what they were there for.

We could send them a notice to say

Page 80

T. BROPHY

please show up at the office, put you on an order of supervision, like I said, so we could track that case on a different docket from a non-detained setting. There's nothing with that either, rather than going and making the physical arrest at the CIS office.

Q. So if an ICE officer saw from CIS that there was going to be an arrest on a Tuesday, and the ICE officer went and waited at that individual's home to wait for them to return from the interview, they could arrest them and not violate your directive?

A. I guess.

Q. Do you know if that ever happened?

A. I have no idea.

Q. One way or the other?

A. If it happened or if it didn't?

Q. Yes.

A. I have no idea.

Q. So after your directive was implemented, what did ICE do with the names of the individuals they had received from CIS?

A. I have no idea. I never saw the list. I don't even know how it was

Page 81

T. BROPHY

communicated to the office. So I don't know what they did with it, if they maybe looked at the list to see if people had crimes that would constitute public safety concerns or national security issues. I don't know what they did with vetting of that list.

Q. But your policy didn't prevent them from then targeting those individuals after their CIS interview?

A. The public safety and national security cases?

Q. Let me rephrase that. Your directive did not prevent ICE officers from arresting individuals who weren't national security or public safety concerns after their CIS interview, correct?

A. No.

Q. So during your testimony on May 22nd, you said that ICE might follow up with those individuals in a different way?

A. Yes.

Q. What did you mean by that?

A. Like I said before, we can send them a notice saying come to the office. We

T. BROPHY

can place them on an order of supervision. We can track their cases from a non-detained setting rather than from a detained setting.

We have other programs, like an alternative to detention program, which is GPS ankle monitoring, stuff like that. So we have other ways to monitor those cases rather than the physical custody in a detained setting. That's what I was referring to.

Q. But it's still possible ICE officers were arresting individuals from the lists that CIS would send?

A. I'm not aware that that happened.

Q. Are you aware that it didn't happen?

A. No.

Q. Mr. Lyons became interim FOD on June 1, 2018, right?

A. Yes.

Q. Did he continue your arrest directive?

A. I believe so.

Q. How did you first become aware of his intention to continue that directive?

T. BROPHY

A. We discussed it, and I believe it was a question asked -- I don't know if it was in -- called chambers or whatever. We met in the judge's chambers, and I believe the judge asked him that, and he said, yes, he was going to continue my directive.

Q. And that was the first time you heard him say that one way or the other?

A. That I recall, yeah, yeah.

Q. Do you know if there's any documentation created after that date reflecting that decision?

A. I didn't put any directive out in writing or e-mail, no. I don't know if Mr. Lyons did.

Q. Did you see any e-mails reflecting that decision from Mr. Lyons?

A. Not that I recall, no.

Q. Did you ever discuss it with him again after that May 23rd lobby conference?

A. We may have discussed it, other than he was going to continue the practice. I know he agreed with it, too. When he was the deputy, he was over at the enforcement side of

T. BROPHY

the house, and he thought that the assets were better suited responding to public safety and national security issues.

Q. Have you ever communicated with anyone else at ICE about Mr. Lyons' decision?

A. I'm sorry?

Q. Have you ever communicated with anyone else at ICE about Mr. Lyons' decision?

A. No.

Q. Ms. Adducci became interim FOD on June 7, 2018, correct?

A. I guess so, yeah. I don't know exactly.

Q. Do you know that she became --

A. I know she came in, but I don't know the exact date.

Q. Do you know what her arrest policy is?

A. No.

Q. Did you ever discuss what she would do with your directive with her?

A. No.

Q. Do you know who will succeed Ms. Adducci as FOD in Boston?

T. BROPHY

A. I don't know. I presume it would be Mr. Lyons.

Q. Have you seen Ms. Adducci's declaration in this case?

A. I have not read it.

Q. So are ICE arrests counted in any way?

A. Counted? Well, they are entered into our system.

Q. What does that system track?

A. It's our case management system. So when you make an arrest and you process somebody, it capitalizes all the information that forwards it on to like a case management system.

Q. Who runs that case management system?

A. The individual case officers have access to their cases that are assigned in that system.

Q. Do the supervisors also have access?

A. Yes.

Q. Does it feed into anything at ICE

T. BROPHY

national?
A. Yeah. That information is national.
Q. Are removals counted in that system?
A. Yes.
Q. And does that system track aggregate data on those two?
A. I'm not sure.
Q. Do you know if arrests are tracked on an officer-by-officer basis by officer?
A. No. The system does not track officer like individual statistics, no.
Q. When an officer enters that data into the system, is their name identified with it in any way?
A. Yeah, their name would be in the system, because they're the one processing that information.
Q. So do you know if ICE can pull data that says officer X made Y number of arrests in a given month?
A. I don't know if they can boil it down to the individual person or not. I have

T. BROPHY

no idea.
Q. Do you know if ICE tracks arrests or removals on an office-by-office basis?
A. Yes.
Q. How?
A. I don't know how, you know, but periodically we'll see reports, snapshot comparisons between the fiscal year now and the previous that would show that information. But how they pull it or where they pull it from, I don't know.
Q. So what kind of reports would you receive that would show that information?
A. It would be just like an Excel or a PDF version of a report that headquarters produces.
Q. How often would you see something like that?
A. Quarterly.
Q. Would it compare office to office, like, let's say, Buffalo to Boston?
A. It doesn't compare, but it would show, you know, what the figures are for each office, yes.

T. BROPHY

Q. Have you ever heard of a performance work plan?
A. Yes. That's the rating system for employees.
Q. How does that work?
A. How does the performance rating program -- there's performance measures, goals that employees are given, and they get rated by the supervisors on how they're doing throughout the rating period.
Q. What are some examples of the types of things they would be given as goals?
A. Oh, gee, it could be from report writing, it could be from submitting your documentation, whether it be your time and attendance, your vehicle sheets, in a timely fashion. It could be that your case call-ups in the system aren't ever past due, that you're timely in keeping your cases up to date; stuff like that.
Q. Would it ever give a number of a certain number of arrests as a goal?
A. No. Like a quota? No.
Q. Not a quota. A target?

T. BROPHY

A. No.
Q. What about removals?
A. No.
Q. Would any of those statistics show up in anyone's performance work plan?
A. No. We don't use those.
Q. So after someone is given their goals, what happens next?
A. Well, it depends on where they are assigned, you know, what kind of docket they are assigned to. They would be assigned their cases and they would be tracked and make sure that they are working the cases properly.
Q. Who would track that?
A. The supervisor.
Q. And at the end of a given amount of time, would they receive a performance review?
MS. LARAKERS: Objection. I know you asked your ultimate question about whether they were tracked. This is well outside the scope now. We're getting into the minutia of how an employee is -- and it's outside the arrest record.
You can certainly ask about the

T. BROPHY

arrest record and whether that tracks, but outside of that, that's not relevant to what the judge ordered.

MR. PROVAZZA: Are you asking the witness not to -- are you ordering the witness not to respond to my questions?

MS. LARAKERS: No. I'm saying it's way beyond the scope.

MR. PROVAZZA: Your concern is noted.

Q. Are individuals at every level of ICE ERO given a performance work plan?

A. Yes.

Q. So a supervisor?

A. Hmm-hmm.

Q. Were you given a performance work plan?

A. Yes.

Q. Would that performance work plan ever involve a certain number of arrests or certain number of removals?

A. No.

Q. Did you ever see any data about the number of arrests or removals under your

T. BROPHY

tenure as acting FOD in Boston?

A. I don't recall if I saw one of those quarterly reports. It may have come out.

Why? I don't understand.

MR. SADY: That's a good question. I'm wondering, too.

Q. Well, as the examiner, I'm asking questions.

A. I apologize.

Q. If your counsel has clarifying questions later, they can ask you.

A. Okay. I apologize. Sorry, sir.

Q. That's okay.

So is the performance of a FOD measured in any way by the numbers of arrests or removals during their tenure?

A. I don't know what the FOD's PWPs -- I'm sorry, performance work plans look like. I don't know. But we don't have like removal quotas or arrest quotas or anything like that. So I don't know exactly what a real FOD, you know, in an acting position, my performance work plan never changed.

T. BROPHY

Q. Did you ever get any feedback during your time in Buffalo or in Boston about the number of arrests or removals that you were responsible for?

A. Feedback in what way, sir?

Q. Any feedback.

A. Yeah, you know, if we're doing a good job and removing people and making good arrests, then yeah, there would probably be feedback on that.

Q. What would qualify as good work on removals?

A. That we're being consistent and moving people timely and in accordance to the law.

Q. Would removing more individuals with final orders than less mean that you were doing good work?

A. You could only remove people with a final order. So it's really case by case specific, and a lot of it is dictated by what nation people are from, too. Some nations more readily accept the people back. Other people, it takes a long time to get travel

T. BROPHY

documents and make arrangements.

Q. What's an example of a nation that's easy to get people back?

MS. LARAKERS: Yeah, he's not going to answer. We're way beyond the scope here.

MR. PROVAZZA: I think these are extremely relevant questions to Ms. Adducci's decision to alter Mr. Brophy's directive. If the number of arrests have something to do with why she made her decision, that's extremely relevant to this case.

MS. LARAKERS: Well, ask that question, then.

MR. PROVAZZA: I'm exploring the background on that now. So if you're telling him not to respond, please tell him not to respond.

MS. LARAKERS: You explored the background on that extensively. You're not asking -- you're asking him -- that's not the question you're asking.

MR. PROVAZZA: Counsel, I'm going to ask that you please limit your speaking objections. If you're going to ask your

T. BROPHY

witness not to respond to my questions, please do that. We will take that up if you do that. Otherwise, I'd like you to limit your objections and stop the speaking objections and leading the witness.

MR. SADY: You can't tell us we have to limit our objections. I've never heard of that.

MR. PROVAZZA: Sorry, I didn't mean to say limit your objections. I meant to say limit your speaking objections.

MS. LARAKERS: We can certainly stop the time of the deposition. I certainly don't want to waste any of your time. You can have your full four hours if you want to stop the clock.

These objections aren't improper. I would just like you to ask the question that's relevant and not this long lead up of background questions that aren't relevant.

There are one or two questions in this line of questioning that have been relevant, and I've let you explore the background quite a bit, but please ask the

T. BROPHY

relevant question and get on with that. As long as you do that, we're not going to have any other objection.

MR. PROVAZZA: Your concern is noted.

Q. What is an example of a country that's easier to remove someone to?

A. CONF

Q. Isn't it true that arresting someone at CIS is generally easier to execute than another arrest?

A. Easier in what way? I'm sorry.

Q. How would you define easier?

A. I don't know if it's -- from one aspect, I guess, it's a safer way of doing it, because people -- kind of like courthouses, too. They go through security. They are screened. It's somewhat of a controlled environment in respect to trying to make that arrest on the street, at somebody's home. If it's safer, and if that's what you mean by easier, then I guess.

Q. You said earlier that Mr. Cronin was promoted in 2018, correct?

T. BROPHY

A. Yeah, I don't know if it was a promotion or -- his series and grade, if you would, didn't change. It's just a different position.

Q. So if an individual is subject to an order of supervision, they are usually required to check in regularly with ICE, correct?

A. Correct.

Q. Who at ICE would conduct those meetings?

A. The case officer, deportation officer.

Q. Is there a difference between those two?

A. No. I'm sorry. Case officer and the deportation officer is the title.

Q. Continue. Sorry.

A. I'm sorry. Yeah, a deportation officer or maybe support staff.

Q. You worked as a deportation officer?

A. Yes, sir.

Q. When was that?

T. BROPHY

A. I started as a deportation officer May 14th -- no, September 30th of '97.

Q. What kind of training do deportation officers receive?

A. I went to a 16-week academy, and then firearms law, defensive tactics, driving; a lot of training.

Q. Do you know if that's still the type of training deportation officers receive today?

A. I believe so.

Q. Have you heard of an enforcement and removal assistant position?

A. Yes. That's one of our support staff.

Q. What do they generally do?

A. The best way to describe it, they're like a clerical support position to the deportation officers. They have access to the case management systems. They take bonds. They can receive correspondence. They can do a myriad of things to assist deportation officer staff.

Q. Would they ever conduct check-ins

T. BROPHY

with individuals on orders of supervision?

A. They could, yeah.

Q. There's nothing that forbids them from doing that?

A. Not that I'm aware of.

Q. Do they receive any training to conduct those interviews?

A. I don't know what their training...

Q. So when an individual checks in with ICE at an order of supervision interview, they can be ordered to -- excuse me, not ordered -- they could be asked to purchase a ticket to depart the country?

A. I'm sorry, could you repeat that, sir?

Q. Yes. If an individual checks in under an order of supervision with ICE, they could be asked to purchase a ticket to depart the country?

A. Yes, they could be asked that.

Q. And who would usually ask them that?

A. The case officer, deportation officer.

T. BROPHY

Q. Would that require any kind of supervisory approval before the deportation officer makes that request?

A. No. That's part of the progression of the case that the case officer, the deportation officer, if you would, those are the steps they are supposed to take once it's post order, if you would, to try and move that case forward to the timely removal.

Q. Executive order 13768 requires ICE to remove all individuals with final orders of removal, correct?

MS. LARAKERS: Objection.

A. I don't know if that's the specific language in it or not, but yes. Yes, there's a section there about people with final orders.

Q. So you agree that executive order 13768 requires ICE to remove all individuals with final orders of removal?

MS. LARAKERS: Objection.

A. I would have to review it to say that that specific language is in there. So I would have to review it.

T. BROPHY

Q. Is that your understanding of it sitting here today?

A. That all final orders?

I think it didn't exempt any class of person to include subjects of final orders, public safety risks, national security risks, people that have previously been removed from the United States and unlawfully came back.

Q. So the executive order does not make any exception for people pursuing provisional waivers?

MS. LARAKERS: Objection.

A. Correct.

(Brophy Exhibit 6, Memo to Thomas P. Brophy, and others, from Miguel Vergara, date 5/16/18, marked for identification)

Q. You have been handed a document marked as Exhibit 6. Do you recognize this document?

A. Yes.

Q. Have you reviewed this document before?

A. Yes.

Q. Who is Miguel Vergara?

T. BROPHY

A. He's an assistant field office director from Dallas, Texas.

Q. Did you order this review?

A. Yes.

Q. Why did you order this review?

A. I was concerned about the state of the detained docket, and I wanted to have some subject matter experts come in and review it for me to give me some possible areas to consider via an after action report.

Q. Did you participate in the review at all?

A. Did I -- no.

Q. Were you a subject of the review?

A. No.

Q. Did anyone talk to you about the review?

A. The people conducting it.

Q. Did they interview you for it?

A. No.

Q. Did you give them any direction about how it should be carried out?

A. I asked them to review the detained docket.

T. BROPHY

Q. Other than that directive, there was no other communication with them about how the review should be done?

A. No.

Q. Did this review look at Boston EROs' arrest decisions?

A. No. I was more focused on the detained docket operations.

Q. Did it look at deportation decisions?

MS. LARAKERS: Objection.

A. To what respect, deportation decisions? Like who to remove, who not to remove?

I don't understand the question. I apologize.

Q. To your understanding, what deportation decisions did these auditors, I will refer to them as auditors, look at?

MS. LARAKERS: Objection.

A. They looked at how the detained docket was operating. I don't know if that...

Q. And that might incorporate some removal decisions?

T. BROPHY

MS. LARAKERS: Objection.

A. It could.

Q. So if you look at Page 2 under the heading "Findings & Recommendations," the first bullet here is, "Lack of unit/staff rotation throughout the field office."

Do you see that?

A. Yes, sir.

Q. Do you agree with that finding?

A. Yeah.

Q. Did you do anything to address that finding?

A. Well, I did increase the staffing. I tripled it between case officers and support staff that was on there when I first came in.

But what this is talking about is the lack of unit/staff rotations throughout the entire field office, and there's not much we can do with this, because we would have to negotiate with the local union on how that could be implemented in the field office.

Q. And what does the rotation throughout the field office refer to?

A. Rotating people, whatever timeframe

T. BROPHY

it is, one-year, two-year assignments in different docket areas to promote a more well-rounded employee.

Q. Do you see the next bullet point, "Insufficient experienced supervisors assigned to the detained unit"?

A. I see it.

Q. Do you agree with that statement?

A. There was a -- yes, to an extent. There was a brand new supervisor assigned to that unit, and he was brand new when he got there, and there was one other supervisor that had been working on the detained docket much longer.

Q. Did you do anything to address this issue?

A. No. We kept him in place, and hopefully with working with the other detained supervisor, he would learn the nuances of that docket.

Q. Could you turn to the third page.

A. I'm sorry, third page?

Q. Yes. The first bullet here "AFOD." What does that stand for?

T. BROPHY

A. Assistant field office director.

Q. And who are those individuals?

A. They are second line supervisors. So the first line supervisor's direct report. They directly report to the assistant field office directors.

They normally have programmatic oversight, like an AFOD is how we refer to them, over enforcement removals or over smaller offices. It could be run by an AFOD.

Q. Who do AFODs report to?

A. The deputies.

Q. How many AFODs are there?

A. In Boston? Six, I believe.

Q. And do you agree with this finding?

A. Yeah, I guess at times that the AFOD had to step in to support the supervisors.

Q. Did you do anything about that?

A. Did I do anything about it? No. That would have been passed down to the deputies to look at and see if there was anything that could remedy that or assist that AFOD.

T. BROPHY

Q. Would you mind turning to Page 4, please. So here it says "Basic case management."

What does that refer to?

A. That would be the day-to-day practice of the deportation officer, case officer's, if you would, input in the system, which is named here EARM. That's what that would be.

Q. Do you agree that there was unclear case comments?

A. Yeah, I do.

Q. Do you generally agree with this finding?

A. I do. That's why we had training, too.

Q. What kind of training?

A. We had headquarters, people come in from the removal management unit and headquarters of OPLA, our attorneys, to come in to provide case management training.

Q. And when was that?

A. That was in April.

Q. That was what you discussed during

T. BROPHY

your May 22nd and 23rd testimony?

A. May have been.

Q. So that was before you received this report?

A. Hmm-hmm.

Q. Turn to Page 5. Here it says "Lack of Enforcement and Removal Assistants."

What was that problem?

A. Having trouble filling those vacancies.

Q. Was that addressed?

A. Yeah. There were some selections made. I don't know if all the positions had been filled or not.

Q. Do you believe all of these issues we've just discussed contributed to the POCR violations?

A. I believe that they did.

Q. Do you agree that there was a lack of experienced supervisors assigned to other units within ERO?

MS. LARAKERS: Objection.

A. I don't know what other units you're referring to.

T. BROPHY

Q. So what are the other units within Boston ERO?

A. There's the fugitive operations unit, there's the criminal alien program, secure communities, there's the non-detained docket, there's the alternatives to detention dockets.

Q. Do you agree that any of those units had insufficiently experienced supervisors?

A. Not offhand, no.

Q. What's the unit that conducts the order of supervision interactions I was talking about earlier?

A. That would be the non-detained docket.

Q. Do you believe that that supervisor was insufficiently experienced?

A. No, no. She was -- I don't remember her name, but I know she was a seasoned supervisor.

Q. I'm sorry, could you turn back to Page 4.

The last bullet point here, "Lack

T. BROPHY

of clear priorities when targeting at-large aliens, placing detainers and/or taking detainees into custody?"

Do you see that?

A. Yes.

Q. What did that mean?

A. I'm not 100 percent certain. If I had to guess, we had competing priorities or being pulled in different directions.

We had cases every day where municipalities weren't honoring our detainers, so we had to send enforcement assets to go and sit at courthouses to try and encounter those people after their initial appearance or arraignment, as well as cases that we had already existing on our dockets that would be good, viable targets for enforcement actions in the field for arrests, possibly prosecution.

In placing detainers, placing detainers in an area that doesn't honor them is problematic, right, because they won't honor them, then we have to be available to try and -- if they get released from that

T. BROPHY

municipality, try and go get them before they get back on the street and possibly reoffend.

So really, that's kind of what I feel that means.

Q. So targeting at-large aliens would mean going out and arresting individuals?

A. Yes.

Q. Do you agree that there's a lack of clear priorities for targeting individuals for arrest?

A. No, I don't agree it's a lack of priorities. I think it's -- we don't have enough staff to handle the flow of work here.

Q. So there's a lack of supervision?

A. No. It's assets. It's numbers of officers. I don't think we have the number -- the correct number of officers to handle the workflow, because, like I said, it's daily, and it's not one or two.

It's quite often, you know, talking 10, 12 a night where detainers weren't honored and people have to go out and try to find these people who committed offenses in our community.

T. BROPHY

So it's more of an asset -- lack of assets to match the workflow.

Q. Did you raise that disagreement with this statement with the people that conducted the audit?

MS. LARAKERS: Objection.

A. I don't recall.

MS. LARAKERS: Don't answer that. The discussions that go on with the recommendations is also part of the deliberative process with regard to the recommendation.

Q. What did you understand taking detainees into custody to me?

A. Simply that. Taking them into custody.

Q. Same thing as subjecting someone to detention?

A. Yeah.

Q. Did you agree with the lack of clear priorities when subjecting individuals to detention?

A. No. I don't know if that's how I interpreted it the way it's written.

T. BROPHY

I think the lack of priorities were targeting at-large aliens. I think that's what that lack of priorities was referencing, is the targeting.

We were being pulled in so many different directions that a lot of the cases that we had already existing on our docket we couldn't get to because of these new emergencies, if you would, popped up every night, every day.

Q. So did you do anything in response to this finding?

A. I would have deferred it to the deputies to follow up on.

Q. Is this the only item in this audit that you disagreed with?

A. I don't recall. I would have to review it in entirety now than try to reflect on what I did or didn't --

Q. Do you recall sitting here if you disagreed with any of the findings of this audit?

A. Not offhand.

MR. PROVAZZA: Do you mind if we

T. BROPHY

take a break?

MS. LARAKERS: Sure.

VIDEOGRAPHER: We are going off the record at 1:55.

(Recess taken at 1:55 p m. and reconvening at 2:09 p.m.)

VIDEOGRAPHER: We are back on the record at 2:09.

BY MR. PROVAZZA:

Q. A few more questions on the May 16th audit report.

If you would turn to Page 4, and you look at the second bullet point. "Unverified service/return of documents from jail liaison officers."

Did you agree with that finding?

A. Yeah. I believe that's what they found.

Q. Did you do anything to follow up on it?

A. Other than to reinforce the importance of it, with the supervisors, to ensure that it was being corrected.

Q. Who were the supervisors that you

T. BROPHY

--

A. I would pass it to the DFODs, to the AFODs, to the first line supervisors.

Q. So you would communicate just to the DFODs?

A. Yes.

Q. The next bullet point, "Failure to timely and/or complete POCRs."

Did you agree with that finding?

A. Yes.

Q. Did you do anything about it?

A. Yeah, we did. We took corrective action.

Judge Wolf made it obvious that he thought the corrective action for somebody whose POCR policies weren't followed were to release.

So we did, we had to release some people whose POCRs weren't timely adhered to.

Q. And you communicated that to your DFODs?

A. Yeah.

Q. Could you turn back to Page 3. If you look at the final bullet point here,

T. BROPHY

"Notice of File Review and Failure to Comply forms not furnished to the attorney on record."

Do you see that?

A. Yes.

Q. Did you agree with that finding?

A. Yes.

Q. Did you do anything about it?

A. Yeah. I informed the supervisors that we had to notify and provide copies to the attorneys on record.

Q. Again, the DFODs?

A. Yes. Through the chain of command.

Q. So you agree that this case is an important matter?

A. Yes.

Q. And that it was in the news throughout its time?

MS. LARAKERS: Objection.

Q. Since this case was filed, it has been in the news, correct?

A. Yeah, I believe it has gotten a lot of media coverage.

Q. And immigration attorneys would

T. BROPHY

have thought this was important?

MS. LARAKERS: Objection.

A. I don't know if they would have thought it was important. Who do you mean by immigration attorneys? Service employees?

Q. The immigration attorneys -- the immigration bar in Boston that is assisting people seeking status in the United States or representing immigrants would have thought this case was important?

MS. LARAKERS: Objection.

A. I guess they could have.

Q. Could you repeat your answer?

A. I guess they could have.

Q. Do you think it was important if you were an immigration attorney?

A. I guess so.

Q. Did you ever speak with immigration attorneys during this litigation?

A. I may have. I don't recall.

Q. You spoke at a panel in front of hundreds of immigration attorneys, correct?

A. Yeah. I thought you meant like we are now, one-on-one conversation regarding a

T. BROPHY

case or something like that, no.

Q. So you don't recall any one-on-one interactions with immigration attorneys?

A. I may have. Yeah, I may have.

Q. Do you recall any other type of panel discussions with multiple immigration attorneys?

A. Like the AILA conference?

Q. Yes.

A. Yes.

Q. There were others?

A. There was another AILA conference. There was two.

Q. When was that?

A. I forget the exact date and time, but it was after the one you asked me about previously.

Q. But while you were still working at ICE Boston?

A. Yes.

Q. Did arrests at CIS come up during that conference?

A. It may have. I don't recall.

Q. Provisional waiver applicants?

T. BROPHY

A. It may have. I don't recall.

Q. Did you ever have any other conversations with groups of immigration attorneys?

A. No, not that I recall.

Q. So to confirm your testimony earlier, you spoke with Mr. Reardon about stopping CIS from sending lists of I-130 interviews to ICE, right?

A. Yes.

Q. But you never followed up on that request?

A. Correct.

Q. You never spoke to anyone else at CIS?

A. No.

Q. Never spoke to anyone else internal at ICE about that request?

A. Other than my staff?

Q. Including your staff.

A. To the DFODs, when I gave them that direction.

Q. Did you do anything else to follow up and check whether this directive had been

T. BROPHY

followed?

A. No.

Q. If you had learned that that directive hadn't been followed, what would you have done?

MS. LARAKERS: Objection.

A. I don't know. I would have addressed it and found out why it happened when I asked questions.

MR. PROVAZZA: We have nothing else for today.

As we discussed, I think we are holding the depositions open, I believe, or did we hold the other two open or not?

MR. WEILAND: You did not.

MS. LARAKERS: You did not.

MR. PROVAZZA: I don't foresee us having to hold this one open either.

MS. LARAKERS: Okay.

MR. PROVAZZA: That's all for today.

MS. LARAKERS: Thank you.

VIDEOGRAPHER: This concludes today's deposition. We are off the record at

T. BROPHY

2:14.

(Time Noted: 2:14 p.m.)

---------------------

THOMAS P. BROPHY

Subscribed and sworn to before me this day of 2018.

-----------------------------------------

C E R T I F I C A T E

Commonwealth of Massachusetts )
) ss:
County of Suffolk )

I, Michael D. O'Connor, a Notary Public within and for the Commonwealth of Massachusetts, do hereby certify:

That THOMAS P. BROPHY, the witness whose deposition is hereinbefore set forth, was duly sworn before me and that such deposition is a true record of the testimony given by such witness.

I certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 30th day of July, 2018.

______________________________

Michael D. O'Connor, RMR, CRR, CRC

CONFIDENTIAL

INDEX

| WITNESS: | EXAMINATION BY | PAGE |
|---|---|---|
| THOMAS P. BROPHY | Mr. Provazza | 8 |

---------------- E X H I B I T S ---------------

| THOMAS P. BROPHY | EXHIBIT | PAGE |
|---|---|---|
| Exhibit 1 | E-Mail to Ely Vance, and others, from Thomas P. Brophy, dated 2/13/18, with attached e-mails, Bates GOV002561 - GOV002565 | 42 |
| Exhibit 2 | E-Mail to Thomas P. Brophy from John Mohan, dated 2/7/2018, with attached e-mails, Bates GOV002375 - GOV002376 | 55 |
| Exhibit 3 | Spreadsheet of names | 65 |
| Exhibit 4 | Letter to Honorable Kirstjen M. Nielsen from Sheldon Whitehouse, James R. Langevin, David N. Cicilline, dated 2/9/18, Bates GOV002600 - GOV002601 | 69 |

----------- E X H I B I T S (Cont'd) -----------

| THOMAS P. BROPHY | EXHIBIT | PAGE |
|---|---|---|
| Exhibit 5 | Letter to Honorable Senator Sheldon Whitehouse from Thomas Brophy, dated 2/14/18, Bates GOV002338 - GOV002339 | 71 |
| Exhibit 6 | Memo to Thomas P. Brophy, and others, from Miguel Vergara, dated 5/16/18 | 100 |

ERRATA SHEET FOR THE TRANSCRIPT OF:

Case Name: Lilian Pahola Calderon Jimenez, et al vs. Kirstjen M. Nielsen, et al.

Dep. Date: July 30, 2018

Deponent: THOMAS P. BROPHY

CORRECTIONS:

| Pg. | Ln. | Now Reads | Should Read | Reason |
|---|---|---|---|---|
| __ | __ | ______________ | ______________ | ______ |
| __ | __ | ______________ | ______________ | ______ |
| __ | __ | ______________ | ______________ | ______ |
| __ | __ | ______________ | ______________ | ______ |
| __ | __ | ______________ | ______________ | ______ |
| __ | __ | ______________ | ______________ | ______ |
| __ | __ | ______________ | ______________ | ______ |
| __ | __ | ______________ | ______________ | ______ |
| __ | __ | ______________ | ______________ | ______ |
| __ | __ | ______________ | ______________ | ______ |

______________________

Signature of Deponent

SUBSCRIBED AND SWORN BEFORE ME

THIS___DAY OF_____________, 2018

________________________________

(Notary Public) MY COMMISSION EXPIRES:__________

**A**

**a m (5)** 1:18 2:7 6:14 51:25 52:2
**abided (1)** 16:7
**ability (1)** 28:22
**able (1)** 10:12
**academies (1)** 16:14
**academy (1)** 97:6
**accept (2)** 12:7 92:24
**access (3)** 85:20,23 97:20
**accounted (1)** 52:23
**accurate (1)** 10:6
**accurately (1)** 10:13
**ACLU (4)** 5:7,8,9 7:4
**acronym (1)** 60:15
**act (2)** 11:10 12:4
**acting (19)** 10:19,22 11:7 12:16 13:9,15,20 14:2 18:20 19:12 21:25 22:4,7 39:10 60:24 64:20 66:18 91:2,24
**action (8)** 1:9 6:10 48:8,12 101:11 114:14,16 121:15
**actions (2)** 68:18 109:18
**address (4)** 78:3,15 103:12 104:16
**addressed (2)** 107:12 119:9
**addressing (1)** 62:9
**Adducci (9)** 18:6,12 19:15 21:2 22:3 23:4,23 84:11 84:25
**Adducci's (5)** 24:11 32:23 33:4 85:4 93:8
**adhered (1)** 114:20
**adjudicating (3)** 27:12,18 76:25
**adjudication (2)** 31:4,13
**Adriana (2)** 5:7 7:3
**advised (1)** 67:11
**affairs (5)** 54:25 57:21 70:15 72:15 74:6
**AFOD (5)** 104:24 105:9,11,18 105:25
**AFODs (3)** 105:12,14 114:4
**aforementioned (1)** 72:8
**agency (1)** 59:19
**agent (1)** 79:17
**agents (1)** 53:4
**aggregate (1)** 86:9
**ago (2)** 15:12 63:20
**agree (16)** 48:17 99:19 103:10 104:9 105:16 106:11,14 107:20 108:9 110:9,12 111:21 113:17 114:10 115:7,15
**agreed (2)** 8:21 83:24
**ahead (2)** 39:17 50:15
**AILA (5)** 60:10,13,14 117:9,13
**al (6)** 1:7,10 6:8,9 124:2,3
**Albence (3)** 23:7,7,12
**alien (3)** 27:6 29:3 108:5
**aliens (5)** 58:4,17 109:3 110:6 112:3
**allowed (1)** 26:2
**allowing (1)** 72:6
**allows (1)** 52:17
**alter (1)** 93:9
**alternative (1)** 82:6
**alternatives (1)** 108:7
**amount (3)** 13:14 68:8 89:17
**ample (1)** 72:14
**and/or (2)** 109:3 114:9
**ankle (1)** 82:7
**answer (13)** 9:24,25 10:5 12:10 22:21 31:2 33:9 40:16 52:20 76:20 93:6 111:9 116:14
**answers (1)** 9:12
**anyone's (1)** 89:6
**anyway (1)** 54:21
**AOR (1)** 68:5
**apologize (7)** 28:17 40:14 60:15 78:23 91:11,14 102:17
**appear (4)** 27:14,20 45:25 57:16
**appearance (1)** 109:15
**appeared (5)** 30:14 32:7 34:6 41:15 41:18
**appearing (4)** 46:5 47:9 59:8,14
**applicant (1)** 27:19
**applicant's (1)** 79:13
**applicants (2)** 60:2 117:25
**application (12)** 26:17 27:9,13,18 31:4 31:14,17,19 32:2 53:20 56:4 78:18
**applications (2)** 31:19 78:3
**apply (3)** 26:4 78:13 79:11
**applying (2)** 26:23 28:6
**appointment (1)** 24:12
**apprised (1)** 66:17
**appropriate (1)** 77:7
**approval (7)** 47:23 48:3,13,15,19 48:23 99:3
**approved (5)** 44:23 45:6 57:5,18 70:22
**approximately (2)** 6:14 11:21
**April (1)** 106:24
**Ardinger (3)** 4:20 7:14,14
**area (2)** 50:2 109:22
**areas (2)** 101:10 104:3
**arraignment (1)** 109:16
**arrangements (1)** 93:2
**arrest (43)** 34:20 35:2,21,24 36:17,21,25 37:8 39:20 41:24 42:18 47:25 48:18,21 53:24 54:5 56:9,21 57:13 58:7 60:8 62:15 66:18 67:12 67:17 68:13 77:25 78:10,21 79:18 80:7 80:9,12 82:21 84:18 85:13 89:24 90:2 91:22 95:12,21 102:7 110:11
**arrested (16)** 29:24 30:20 42:5 43:7 43:11,22,25 44:16 44:21 45:5 56:4 64:19,21,23 65:8 66:10
**arresting (10)** 32:6 34:5 40:20 44:9 56:17 79:2 81:15 82:12 95:10 110:7
**arrests (40)** 38:20,23 40:2,25 42:19 47:13,17 48:15 50:20 52:7,14 52:24 53:5,11,17 59:7,14 61:14,19,24 63:3 66:5,16 77:10 77:13 79:8,12 85:7 86:11,22 87:3 88:23 90:21,25 91:17 92:4 92:10 93:10 109:19 117:22
**arrived (3)** 33:3 38:10,15
**Asher (1)** 11:13
**asked (22)** 10:25 11:9,12 12:12 33:5 36:22 48:25 51:9,12 62:14,17 76:16,25 83:3,6 89:20 98:13,19,21 101:24 117:17 119:10
**asking (9)** 9:15 33:11 40:13 75:20 90:5 91:9 93:21,21,22
**Asma (1)** 5:9
**aspect (1)** 95:16
**asset (1)** 111:2
**assets (10)** 36:4 68:3,12,23 78:10 79:21 84:2 109:13 110:16 111:3
**assigned (9)** 47:20 70:13 85:20 89:11,12,12 104:6 104:11 107:21
**assignments (1)** 104:2
**assist (2)** 97:23 105:24
**assistant (7)** 13:5,7 17:5 97:14 101:2 105:2,6
**Assistants (1)**

CONFIDENTIAL

107:8
**assisting (1)**
116:8
**associate (1)**
11:16
**association (1)**
6:18
**assume (1)**
50:8
**assumed (1)**
21:24
**at-large (3)**
109:2 110:6 112:3
**attached (4)**
42:12 55:10 122:9,14
**attempt (1)**
70:19
**attend (1)**
62:22
**attendance (3)**
60:12,20 88:17
**attending (3)**
45:19 63:14 77:15
**attention (6)**
35:25 36:3,14 63:18 68:24 69:5
**attorney (3)**
9:22 115:3 116:17
**Attorney's (1)**
7:13
**attorneys (12)**
60:16 62:19 106:21 115:12,25 116:6,7 116:20,23 117:4,8 118:5
**audit (5)**
24:17 111:6 112:16 112:23 113:12
**auditors (2)**
102:19,20
**authorization (1)**
31:20
**available (2)**
73:16 109:24
**aware (48)**
20:24 25:6,19,22,25 27:2,12,17 29:5,10 30:3,13,17,19,20 32:10 33:19 34:8 35:11 41:14,17,23 44:6,10,12,14,18,21 45:7 47:7,11 52:6,9 52:13,21 53:2,18,22 53:25 54:11,15 56:8 71:2 74:13 82:14,15 82:24 98:6

**B**

**B (2)**
122:5 123:1
**B-r-o-p-h-y (1)**
9:6
**back (12)**
16:15 52:3 67:6 74:4 77:8 92:24 93:4 100:9 108:23 110:3 113:8 114:24
**background (5)**
21:3 93:16,20 94:21 94:25
**bar (1)**
116:8
**Barnette (1)**
5:5
**based (4)**
59:6,11,13 75:10
**Basic (1)**
106:3
**basically (1)**
60:15
**basis (2)**
86:12 87:4
**Bates (4)**
122:10,14,21 123:5
**began (2)**
10:16 32:5
**behalf (7)**
3:4 4:4 6:24 7:2,4,7 7:19
**believe (32)**
17:5 22:2 24:9 25:8 27:7 28:8 31:22 33:12 34:17,19,22 35:19 36:15,19 39:7 43:13 47:14 51:3 60:11 66:13 71:4 82:23 83:2,5 97:12 105:15 107:16,19 108:18 113:18 115:23 119:14
**believes (1)**
21:2
**benefit (6)**
26:17,23 28:11 30:24 31:23 32:3
**benefits (4)**
32:8 34:7 52:16,18
**best (2)**
20:20 97:18
**better (2)**
79:7 84:3
**beyond (2)**
90:9 93:6
**BIA (1)**
72:17
**biggest (1)**
68:21
**bit (3)**
40:11,17 94:25
**blood (1)**
121:15
**boil (1)**
86:24
**bolded (1)**
55:25
**bona (3)**
27:23 30:18 44:24
**bonds (1)**
97:21
**border (2)**
58:16 61:9
**Boston (43)**
1:16 2:13 3:8 4:14,19 6:13 7:13 11:8,10 13:20 17:16 19:20 20:13 21:21 30:5 33:22 34:4 35:7 36:5 38:4,10,15 39:3,4,9,10 47:3,8 49:19,21,23 55:3,4 60:10 84:25 87:22 91:2 92:3 102:6 105:15 108:3 116:8 117:20
**Boston's (1)**
34:10
**bottom (5)**
42:14 57:7,25 58:2 65:20
**brand (2)**
104:11,12
**break (5)**
9:21 10:2 51:21 66:21 113:2
**brief (2)**
22:10 36:21
**broadcast (1)**
54:21
**Brophy (143)**
1:15 2:11 6:1,6 7:1 8:1,2 9:1,5,6 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 42:10,11 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 52:6 53:1 54:1 55:1 55:8,9 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 65:12 66:1 67:1,9 68:1 69:1,6 70:1 71:1,5,7 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1,15 100:16 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1,7 121:9 122:3,6,8,12 123:2,5,7 124:5
**Brophy's (2)**
32:22 93:9
**brought (5)**
35:24 36:2,13 62:11 77:23
**Buffalo (18)**
14:5 18:20 19:13 30:5 30:6 38:10,15,19,21 38:23 39:4,19 40:2 40:7,19 70:9 87:22 92:3
**bullet (8)**
42:22 103:6 104:5,24 108:25 113:14 114:8,25

**C**

**C (6)**
3:2 4:2 5:2 6:2 121:1 121:1
**Calderon (13)**
1:6 6:7 35:17 41:20 43:25 44:6,22 56:3 72:6 73:19 75:21 77:5 124:2
**Calderon's (6)**
35:21 36:12,17 41:24 57:13 70:18
**call-ups (1)**
88:18
**called (3)**
27:5 51:3 83:4
**Canada (1)**
95:9
**capacity (1)**
16:21
**capitalizes (1)**
85:14
**Captioner (1)**
2:15
**card (1)**
31:20
**carried (1)**
101:23
**case (55)**
14:11,13,15,18,24 15:6,10 17:22 19:16 25:12 26:18 30:14 36:12 41:15 43:4 44:13,15 45:18 52:11 69:2 72:5 73:7,10,17,18 75:7 75:11 76:4 80:4 85:5,12,15,17,19 88:18 92:21,21 93:12 96:13,17 97:21 98:24 99:6,6 99:10 103:15 106:3 106:7,12,22 115:15 115:21 116:11 117:2 124:2
**cases (24)**
14:9,18,18 25:20 26:14 29:23 30:7 34:17 40:5,9 69:2 70:6 78:6,9 81:12 82:3,8 85:20 88:20 89:13,14 109:11,16 112:7
**categories (2)**
58:4,16
**categorize (1)**
31:24
**CBP (1)**
61:8

**certain (7)** 48:25 49:24 53:23 88:23 90:21,22 109:8
**certainly (4)** 39:3 89:25 94:13,14
**Certified (1)** 2:16
**certify (2)** 121:8,14
**chain (1)** 115:14
**challenge (1)** 39:14
**chambers (2)** 83:4,5
**change (6)** 9:18 32:23 33:4,4 67:25 96:4
**changed (2)** 35:14 91:25
**changing (1)** 67:22
**check (2)** 96:8 118:25
**check-ins (1)** 97:25
**checks (2)** 98:10,17
**chief (3)** 7:15,21 12:23
**children (1)** 25:23
**Christopher (1)** 16:10
**Cicilline (2)** 69:9 122:20
**circumstances (2)** 38:22 40:3
**CIS (90)** 25:25 27:13,14,17,20 30:17,21 32:7 34:6 34:11 36:10,14,25 38:20,23 39:23 40:2 40:20 41:19 42:5,19 45:9,24 46:4,12,19 46:24 47:4,7,9,25 48:15,18,22,25 49:16,19,21,23 51:16 52:7,8,13,21 52:23 53:2,10,15,22 54:2,6,13 56:4,9,17 56:21 59:4,12,13 61:11,19 62:10,15 63:3,12,15 64:6,20 66:5 67:16,22 68:13 70:23 71:2 77:10,13 77:19,24 79:4,18 80:7,8,23 81:10,17 82:13 95:11 117:22 118:9,16
**CIS's (2)** 50:4 52:22
**citizen (4)** 25:16,23 29:17 70:18
**citizens (1)** 26:4
**civil (3)** 1:9 6:10 15:4
**clarify (2)** 23:21 76:15
**clarifying (1)** 91:12
**class (2)** 58:19 100:5
**classes (2)** 58:3,16
**clear (3)** 109:2 110:10 111:22
**clearer (1)** 9:18
**clerical (1)** 97:19
**clients (1)** 62:21
**clock (1)** 94:17
**Colleen (2)** 3:10 6:25
**come (14)** 10:25 11:7,10 12:4 24:2 72:21 73:3 78:5 81:25 91:4 101:9 106:19,21 117:22
**comes (1)** 68:21
**coming (3)** 61:17,20 68:18
**command (1)** 115:14
**comments (1)** 106:12
**COMMISSION (1)** 124:25
**committed (1)** 110:24
**committing (2)** 36:7 68:9
**Commonwealth (3)** 2:17 121:2,7
**communicate (4)** 16:22 46:15 50:25 114:5
**communicated (5)** 46:18 81:2 84:5,8 114:21
**communication (3)** 12:22 54:2 102:3
**communications (1)** 12:25
**communities (1)** 108:6
**community (2)** 68:11 110:25
**compare (2)** 87:21,23
**comparison (1)** 70:8
**comparisons (1)** 87:9
**competing (1)** 109:9
**complete (4)** 10:6 74:11 75:23 114:9
**completed (2)** 74:15,20
**comply (3)** 73:19 74:2 115:2
**component (1)** 60:20
**concern (5)** 50:18,21 79:15 90:10 95:5
**concerned (2)** 74:17 101:7
**concerns (5)** 77:14 79:3,3 81:5,16
**concludes (1)** 119:24
**conduct (6)** 18:18,24 30:10 96:11 97:25 98:8
**conducted (1)** 111:6
**conducting (1)** 101:19
**conducts (1)** 108:13
**conference (11)** 54:9 60:10,17 61:3 62:19,25 63:22 83:21 117:9,13,23
**confidential (2)** 1:14 8:20
**confirm (1)** 118:7
**congressional (3)** 70:4,14,15
**congressmen (1)** 69:25
**conjunction (1)** 70:14
**consider (1)** 101:11
**considerable (1)** 72:5
**consideration (1)** 53:6
**considered (2)** 68:17,25
**consistent (2)** 40:20 92:14
**constitute (1)** 81:5
**Cont'd (1)** 123:1
**context (1)** 18:16
**continue (6)** 67:14 82:21,25 83:7 83:23 96:19
**Continued (2)** 4:2 5:2
**contributed (1)** 107:17
**control (1)** 78:5
**controlled (1)** 95:19
**conversation (2)** 37:17 116:25
**conversations (1)** 118:4
**copies (1)** 115:11
**Corey (2)** 13:3,6
**correct (62)** 10:7,17,18 14:2 15:23 19:18 20:10 21:22 22:4,8,9 25:4 32:8 35:8,18 36:18 40:21 43:16,23 44:3 46:2 48:24 49:4,5 51:17 53:11,17 54:6,7,9,13 54:17 55:14,17,21 58:20,23 59:4,5 61:25 63:4,10 64:18 67:19,23,24 71:23 74:12 75:18 77:16 77:17 81:17 84:12 95:25 96:9,10 99:13 100:14 110:18 115:22 116:23 118:14
**corrected (2)** 64:15 113:24
**CORRECTIONS (1)** 124:6
**corrective (2)** 114:13,16
**correspondence (2)** 70:3 97:22
**counsel (10)** 6:19 7:15,21 15:15,24 16:3 75:11 76:17 91:12 93:23
**counsel's (1)** 12:23
**counted (3)** 85:7,9 86:5
**country (4)** 75:22 95:7 98:14,20
**County (1)** 121:4
**couple (4)** 15:19 25:15 27:14,23
**couples (2)** 25:7,23
**course (2)** 21:15 48:7
**court (12)** 1:2 6:9,17 7:10,18,22 15:3,4,5 32:13,22 39:5
**Court's (2)** 16:7 33:6
**Courthouse (2)** 4:12,13
**courthouses (2)** 95:17 109:14
**courts (1)** 68:7
**coverage (1)** 115:24
**covered (1)** 78:19
**Cox (3)**

CONFIDENTIAL

3:11 6:23,23
**CRC (2)**
1:23 121:22
**created (1)**
83:12
**crimes (5)**
36:7 68:9,10,10 81:4
**criminal (2)**
15:3 108:5
**Cronin (6)**
16:10 17:21 35:7 37:10 67:13 95:24
**Cronin's (2)**
35:11,21
**CRR (2)**
1:22 121:22
**Crystal (2)**
5:4 6:15
**Cuenca-Brava (1)**
65:23
**current (3)**
16:8 17:4 24:4
**currently (2)**
9:7 14:4
**custody (5)**
72:7 82:9 109:4 111:15,17
**Customs (2)**
4:17 61:9

**D**

**D (6)**
1:22 2:14 6:2 121:6 121:22 122:1
**D.C (4)**
4:7 21:11 55:3 57:23
**DACA (3)**
43:8,12,23
**daily (1)**
110:19
**Dallas (1)**
101:3
**data (4)**
86:9,15,21 90:24
**date (13)**
11:24 15:11,13 18:13 22:5 41:17,25 83:12 84:17 88:21 100:16 117:16 124:4
**dated (10)**
42:12 55:9 69:9 71:7 71:10 122:8,13,20 123:5,9
**David (4)**
13:2,4 69:8 122:20
**day (11)**
13:23 42:6,18 53:23 68:4 78:20 109:11 112:11 120:9 121:19 124:22
**day-to-day (4)**
12:17,19 50:2 106:6
**days (11)**
8:16 11:11 12:4 13:21 21:15 72:25 73:3 75:22 76:8,12 77:5
**De (3)**
44:14,19 45:5
**decided (1)**
23:4
**deciding (1)**
62:21
**decision (22)**
23:9,11,15,19,21,22 25:2 37:25 48:17,21 75:2,14 76:4,5,14 77:5 83:13,18 84:6 84:9 93:9,11
**decisions (6)**
39:10 102:7,11,14,19 102:25
**declaration (1)**
85:5
**declarations (2)**
15:19,22
**default (1)**
13:14
**Defendants-Respon...**
1:11
**defensive (1)**
97:7
**deferred (1)**
112:14
**define (2)**
31:16 95:14
**deliberative (5)**
73:6,11 76:18,21 111:12
**delineated (1)**
41:6
**denied (1)**
31:15
**Dennis (1)**
49:17
**Dep (1)**
124:4
**depart (4)**
75:22 77:6 98:14,19
**Department (3)**
4:5,11 7:17
**departure (1)**
72:16
**depending (1)**
45:17
**depends (1)**
89:10
**deponent (3)**
8:15 124:5,20
**deportation (17)**
47:19 96:13,18,20,22 97:2,5,10,20,23 98:24 99:3,7 102:10 102:13,19 106:7
**deposed (1)**
14:15
**deposition (14)**
1:15 2:10 6:6,12 8:16 10:5 15:9,15,18 16:3 94:14 119:25 121:10,11
**depositions (1)**
119:14
**deputies (4)**
20:15 105:13,23 112:15
**deputy (5)**
11:15 13:10 17:5 19:24 83:25
**describe (2)**
34:15 97:18
**designated (1)**
21:20
**despite (2)**
44:2 75:22
**detail (1)**
12:13
**detailed (1)**
13:18
**detained (11)**
30:21 70:24 82:4,9 101:8,24 102:9,22 104:7,14,19
**detainee (1)**
56:2
**detainees (2)**
109:4 111:15
**detainers (7)**
68:8,11 109:3,12,21 109:22 110:22
**detaining (1)**
78:7
**detention (6)**
14:11 58:7 82:6 108:7 111:19,23
**determine (1)**
27:23
**determined (2)**
30:17 73:17
**Detroit (2)**
18:10,25
**DFODs (5)**
114:3,6,22 115:13 118:22
**DHS (2)**
45:23 60:20
**dictated (2)**
58:22 92:22
**difference (1)**
96:15
**different (14)**
14:17,18 21:8,17 45:20 70:6,6 73:13 80:4 81:21 96:4 104:3 109:10 112:7
**diligence (1)**
46:10
**direct (2)**
67:17 105:5
**directed (2)**
34:9,22
**direction (10)**
32:11 42:3 49:9,12 64:22,24 66:13 79:9 101:22 118:23
**directions (2)**
109:10 112:7
**directive (20)**
51:7 63:2 65:9 77:9,9 77:12 78:25 79:16 80:13,21 81:14 82:22,25 83:7,14 84:22 93:9 102:2 118:25 119:5
**directly (9)**
12:21 13:8,13 16:20 32:25 33:6,13 39:8 105:6
**director (25)**
10:20,23,25 11:4,16 13:5,7 17:6 18:9,19 18:21 19:11,25 23:6 23:25 24:5,7,10 49:19,25 60:25 66:19 67:22 101:3 105:2
**directors (2)**
13:11 105:7
**disagreed (2)**
112:17,22
**disagreement (1)**
111:4
**discovered (1)**
56:21
**discretion (3)**
72:5 73:18 76:8
**discretionary (1)**
76:12
**discuss (7)**
17:25 21:7 23:11 54:21 59:19 83:20 84:21
**discussed (7)**
62:12 77:24 83:2,22 106:25 107:17 119:13
**discussion (1)**
54:8
**discussions (3)**
75:10 111:10 117:7
**dispatching (1)**
78:9
**District (6)**
1:2,3 6:9,10 7:10,18
**DIVISION (2)**
4:5,11
**docket (13)**
78:6 80:4 89:11 101:8 101:25 102:9,23 104:3,14,21 108:7 108:17 112:8
**dockets (2)**
108:8 109:17
**document (5)**
55:12 65:15 100:18 100:20,22
**documentation (3)**
37:8 83:12 88:16
**documents (3)**
15:22 93:2 113:15
**doing (9)**
17:9 20:20 47:15 68:12 88:10 92:8,19 95:16 98:5
**DOJ (1)**
5:6
**doubt (2)**
66:7,7
**draft (1)**
57:16
**driver's (1)**

CONFIDENTIAL

8:5
**driving (1)**
97:7
**drug (3)**
14:12,12,14
**drug-related (1)**
68:10
**due (2)**
46:9 88:19
**duly (2)**
8:5 121:11

**E**

**E (13)**
3:2,2 4:2,2 5:2,2 6:2,2 121:1,1 122:1,5 123:1
**e-mail (19)**
18:4 42:10,15,24 43:14 44:5 55:8,13 55:18,21 56:13,19 56:25 57:3,8,9 83:15 122:7,12
**e-mails (6)**
42:12 43:16 55:10 83:17 122:10,14
**earlier (5)**
62:18 76:16 95:24 108:15 118:8
**early (1)**
42:2
**EARM (1)**
106:9
**easier (5)**
95:8,11,13,14,23
**easy (1)**
93:4
**efforts (4)**
36:9 37:6 42:4 67:15
**eight (1)**
13:18
**either (2)**
80:6 119:19
**eligibility (1)**
44:2
**eligible (7)**
29:12 43:7,11,23 44:6 44:8,11
**Ellen (1)**
7:14
**Ely (2)**
42:10 122:7
**emergencies (1)**
112:10
**employee (2)**
89:23 104:4
**employees (3)**
88:5,9 116:6
**employment (1)**
31:20
**encounter (1)**
109:14
**enforce (1)**
22:24
**enforcement (26)**
4:17 13:7 24:13 36:4 36:8 37:5 41:7,10 47:21 48:11 54:22 58:5,14,20 59:19 60:21 68:3,23 78:9 79:21 83:25 97:13 105:10 107:8 109:13,18
**Enforcing (1)**
34:16
**England (1)**
10:16
**ensure (1)**
113:24
**entered (1)**
85:9
**enters (1)**
86:15
**entire (2)**
8:19 103:19
**entirety (1)**
112:19
**environment (1)**
95:20
**ERO (5)**
48:11 60:25 90:13 107:22 108:3
**EROs' (1)**
102:7
**ERRATA (1)**
124:1
**ESQ (9)**
3:9,10,11,13 4:8,9,15 4:20,21
**et (6)**
1:7,10 6:8,9 124:2,3
**events (1)**
10:12
**everybody (1)**
25:9
**exact (10)**
15:11 18:13 22:5 41:13,17,25 49:8 56:11 84:17 117:16
**exactly (5)**
21:14 60:14 61:6 84:14 91:23
**EXAMINATION (2)**
8:23 122:2
**examined (1)**
8:6
**examiner (1)**
91:9
**example (2)**
93:3 95:7
**examples (1)**
88:12
**Excel (1)**
87:15
**exception (1)**
100:11
**excuse (1)**
98:12
**execute (1)**
95:11
**executing (1)**
52:24
**executive (16)**
11:15 34:18,19 39:25 40:21,22 41:2,3,5,6 41:11 58:22,25 99:11,19 100:10
**exempt (3)**
58:3,17 100:5
**exempted (1)**
58:19
**exercised (1)**
72:4
**Exhibit (20)**
42:9,10 55:8,13 65:12 65:14 69:6,12 71:5 71:10 100:15,19 122:6,7,12,16,17 123:2,3,7
**exist (3)**
38:9,14,18
**existing (2)**
109:17 112:8
**expand (1)**
77:22
**expected (1)**
22:24
**experience (1)**
31:11
**experienced (5)**
70:9 104:6 107:21 108:10,19
**experts (1)**
101:9
**EXPIRES (1)**
124:25
**explain (1)**
11:25
**explained (1)**
63:12
**explicitly (1)**
64:6
**explore (1)**
94:24
**explored (1)**
93:19
**exploring (1)**
93:15
**extend (1)**
77:18
**extensively (2)**
20:12 93:20
**extent (5)**
33:21 44:13 47:24 73:6 104:10
**extremely (2)**
93:8,12

**F**

**F (1)**
121:1
**facilitate (3)**
53:11,17,24
**fact (3)**
51:16 54:16 75:23
**factors (2)**
68:20 76:24
**facts (1)**
73:16
**Failure (2)**
114:8 115:2
**fair (4)**
75:13,17,21 76:11
**fall (2)**
34:17 41:2
**falls (1)**
39:24
**familiar (11)**
17:7 19:2 20:2 25:3 26:14 28:16 29:8 40:8 43:2 45:9 69:23
**family (2)**
29:13,17
**far (2)**
33:5 34:13
**fashion (1)**
88:18
**favorable (2)**
31:4,13
**February (14)**
10:17 35:12 37:21,24 38:3 42:2 55:14,15 55:17 56:22 66:10 71:11,22 77:8
**federal (1)**
14:12
**feed (1)**
85:25
**feedback (4)**
92:2,6,7,11
**feel (1)**
110:5
**female (1)**
56:2
**fide (3)**
27:23 30:18 44:24
**field (29)**
10:19,23,24 11:3 12:5 12:18 13:6,10 17:6 18:9,18,20 19:11,24 23:25 24:5,7,10 60:24 61:9 66:18 101:2 103:7,19,22 103:24 105:2,6 109:19
**Fifth (1)**
4:6
**figures (1)**
87:24
**file (3)**
27:3 29:4 115:2
**filed (2)**
35:17 115:21
**filing (2)**
8:18 53:21
**filings (1)**
52:10
**fill (3)**
11:2 24:2 28:4
**filled (1)**
107:15
**filling (1)**
107:10
**final (26)**
25:16 26:3 29:11 32:6 34:5,23 41:9 46:6 47:10 52:15 53:16 54:5 58:8 59:9,15 60:5 63:14 75:19

92:18,21 99:12,17 99:21 100:4,6 114:25
**find (3)** 28:25 48:9 110:23
**finding (8)** 103:10,13 105:16 106:15 112:13 113:17 114:10 115:7
**findings (3)** 24:17 103:5 112:22
**fine (1)** 12:14
**finish (1)** 40:13
**firearms (1)** 97:7
**first (26)** 8:11 15:8 18:11 27:2 30:2 39:22 41:23 42:15,22 48:4 55:18 55:23 56:7 57:8,10 69:17 70:17 72:2 73:15 82:24 83:8 103:6,16 104:24 105:5 114:4
**fiscal (1)** 87:9
**flow (1)** 110:14
**focus (6)** 33:11 36:8,8 42:3 58:13 67:14
**focused (3)** 33:13 34:25 102:8
**focusing (2)** 41:7 79:21
**FOD (24)** 11:4,8,11 12:16 13:9 13:16,20 14:2 17:16 18:21 21:21,25 22:4 22:7,25 24:12 39:10 64:20 82:18 84:11 84:25 91:2,16,23
**FOD's (1)** 91:19
**follow (7)** 51:13,16 64:4 81:20 112:15 113:20 118:24
**followed (6)** 51:14 63:25 114:17 118:12 119:2,5
**following (4)** 8:10 30:22 77:21 78:23
**follows (1)** 8:7
**forbid (1)** 78:25
**forbidding (1)** 77:13
**forbids (1)** 98:4
**foresee (1)** 119:18
**forget (2)** 60:14 117:16
**form (5)** 8:11 27:3 70:21 72:6 76:8
**forms (2)** 28:4 115:3
**forth (1)** 121:10
**forward (5)** 33:25 34:2,4 50:18 99:10
**forwards (1)** 85:15
**found (9)** 35:20 36:6 44:23 46:9 56:11 58:8 64:25 113:19 119:9
**four (2)** 18:15 94:16
**friendly (1)** 16:21
**front (1)** 116:22
**fugitive (1)** 108:4
**full (1)** 94:16
**furnished (1)** 115:3
**further (1)** 73:18
**furtherance (1)** 39:24

**G**

**G (1)** 6:2
**gain (2)** 26:23 70:19
**gee (1)** 88:14
**generally (10)** 43:15,17 50:12 55:5 62:6 73:8 76:24 95:11 97:17 106:14
**gentleman (1)** 13:3
**Georgia (1)** 16:14
**getting (1)** 89:22
**Gillespie (3)** 3:13 7:6,6
**give (6)** 15:9 23:14 77:5 88:22 101:10,22
**given (9)** 75:22 86:23 88:9,13 89:8,17 90:13,17 121:12
**giving (2)** 32:16 76:7
**go (17)** 12:12 18:24 36:24 39:17 48:3 50:15 55:17 67:16 68:13 68:13 78:10,20 95:18 109:13 110:2 110:23 111:10
**goal (1)** 88:23
**goals (3)** 88:8,13 89:9
**goes (1)** 40:7
**going (27)** 15:9 29:25 33:25 36:9 39:9,11 42:3,8 50:19 51:23 67:2,13 67:14,16 74:4 77:8 78:17 80:6,9 83:6 83:23 93:5,23,25 95:3 110:7 113:4
**good (12)** 8:25 9:2 17:14 19:11 19:24 66:21 91:7 92:9,9,12,19 109:18
**Gordillo (2)** 1:7 6:8
**gotten (1)** 115:23
**GOV002338 (1)** 123:6
**GOV002339 (1)** 123:6
**GOV002375 (1)** 122:15
**GOV002376 (1)** 122:15
**GOV002561 (1)** 122:11
**GOV002565 (1)** 122:11
**GOV002600 (1)** 122:21
**GOV002601 (1)** 122:22
**governments (1)** 68:7
**GPS (1)** 82:6
**grade (1)** 96:3
**granted (6)** 72:12,23,25 74:22 75:8 76:16
**grocery (1)** 78:16
**grounds (1)** 77:19
**groups (1)** 118:4
**Guatemalan (1)** 56:2
**guess (14)** 31:3 35:5 50:14 63:8 79:20 80:14 84:13 95:16,23 105:17 109:9 116:13,15,18
**guessing (1)** 26:19
**guidance (1)** 19:13

**H**

**H (2)** 122:5 123:1
**habeas (2)** 35:18 68:18
**Hale (4)** 5:5 6:22,24 7:2
**half (1)** 16:6
**hand (2)** 20:21 121:19
**handed (5)** 55:12 65:14 69:11 71:9 100:18
**handle (3)** 78:8 110:14,18
**happen (1)** 82:16
**happened (5)** 45:3 80:15,18 82:14 119:9
**happens (1)** 89:9
**hardship (1)** 29:17
**head (1)** 49:22
**heading (1)** 103:5
**headquarters (11)** 11:10 12:22,25 20:7 37:20,21 38:5 57:23 87:16 106:19,21
**hear (1)** 66:9
**heard (8)** 17:15 19:5 20:5 66:16 83:9 88:2 94:9 97:13
**hearing (2)** 15:7 77:2
**held (2)** 2:11 6:12
**help (1)** 53:10
**hereinbefore (1)** 121:10
**hereunto (1)** 121:18
**hid (2)** 54:16,19
**Hmm-hmm (4)** 62:20 73:4 90:16 107:6
**hold (2)** 119:15,19
**holding (1)** 119:14
**home (5)** 78:15,22 79:19 80:11 95:21
**Homeland (1)** 61:10
**honor (4)** 68:7,11 109:22,24
**Honorable (4)** 69:7 71:6 122:17 123:3

**honored (1)** 110:22
**honoring (1)** 109:12
**hopefully (1)** 104:19
**hours (3)** 16:5,6 94:16
**house (3)** 47:21 79:13 84:2
**hundreds (1)** 116:23
**husband (1)** 70:18

**I**

**I-130 (30)** 27:3,8,13,18 28:2,7 30:14 31:21 32:2 34:11 39:20 40:25 41:15 45:5,25 48:19 48:23 49:3 53:15 59:8,15 60:2 61:14 61:24 62:22 64:7 70:20,21 77:15 118:9
**I-130s (1)** 44:22
**I-212 (2)** 28:9,11
**I-485 (2)** 28:8 31:21
**ICE (95)** 7:15,20 10:16 17:2,8 17:10 19:3,6 20:3 20:23 21:9 28:18 30:10,20 31:6 32:5 32:10 33:18,22 34:4 34:10,20 37:14,19 38:4,5,9,14,18,21,22 39:2,3,4,19 40:19 45:22,24 46:4,12,19 46:20,23 47:3,8,12 47:16 49:2 52:23 53:4,11 54:4,12,13 54:16 55:2 56:16 58:3,13 59:3,7,14 60:7 61:23 63:13 64:7 66:5 70:24 72:4,7 73:17 78:25 79:16 80:8,10,22 81:14,20 82:11 84:6 84:9 85:7,25 86:21 87:3 90:13 96:8,11 98:11,18 99:11,20 117:20 118:10,19
**ICE's (4)** 52:22 56:8 57:12 62:15
**idea (13)** 21:6 23:18 24:15 30:9 42:7 51:5,18 60:4 62:24 80:16,20,24 87:2
**identification (7)** 42:13 55:11 65:13 69:10,12 71:8 100:17
**identified (2)** 8:4 86:16
**immediately (1)** 30:21
**immigrants (1)** 116:10
**immigration (26)** 4:17 7:10,17 15:5 30:24 31:23 32:3,8 34:7,16 41:10 58:6 58:7 60:16 62:19 68:8 115:25 116:6,7 116:8,17,19,23 117:4,7 118:4
**impacted (2)** 48:19,23
**impedes (1)** 73:6
**implemented (2)** 80:22 103:22
**importance (1)** 113:23
**instituted (1)** 35:6
**important (5)** 115:16 116:2,5,11,16
**improper (1)** 94:18
**include (1)** 100:6
**including (2)** 8:13 118:21
**incorporate (1)** 102:24
**increase (1)** 103:14
**indicate (1)** 56:16
**individual (10)** 28:10 48:18 56:3 79:18 85:19 86:14 86:25 96:6 98:10,17
**individual's (1)** 80:11
**individuals (32)** 28:4,18 34:11 36:13 39:20 40:20,25 41:21 45:25 56:8 58:14 59:7,14 63:13 64:19 66:10 77:15 79:2 80:23 81:9,15 81:21 82:12 90:12 92:17 98:2 99:12,20 105:3 110:7,10 111:22
**information (23)** 23:15 29:2 32:15 46:12,19,24 47:4,5 47:13 48:10 49:2 50:19 59:7,22 65:4 68:25 78:4 79:17 85:14 86:3,20 87:10 87:14
**informed (3)** 23:10 67:21 115:10
**informs (1)** 45:24
**initial (1)** 109:15
**injunctions (1)** 39:2
**input (2)** 23:8 106:8
**inquiry (1)** 71:22
**instance (2)** 48:5,7
**instituted (1)** 35:6
**instruct (2)** 39:11 59:21
**instructing (3)** 33:8,10 76:19
**instruction (1)** 51:17
**instructor (3)** 16:13 17:11,13
**Insufficient (1)** 104:6
**insufficiently (2)** 108:10,19
**intention (1)** 82:25
**interaction (2)** 16:18 18:22
**interactions (4)** 45:15,20 108:14 117:4
**interacts (1)** 55:6
**interest (1)** 34:24
**interested (1)** 121:16
**interim (4)** 21:21 22:24 82:18 84:11
**interior (1)** 41:9
**internal (2)** 24:17 118:18
**interpreted (1)** 111:25
**interrupt (1)** 40:16
**interview (17)** 27:14,20,22 37:2 46:5 48:18,22 53:13,19 53:23 71:3 78:21 80:12 81:10,17 98:11 101:20
**interviews (30)** 18:18,24 30:15,22 34:11,21 39:21 40:25 41:16,19 46:2 47:9 49:3 52:8,14 53:10,16 54:3,6 59:8,15 61:15,24 62:10,22 63:14 64:8 77:15 98:8 118:10
**introduce (1)** 6:19
**investigation (1)** 14:14
**investigations (1)** 61:10
**invited (1)** 60:22
**involve (1)** 90:21
**involved (3)** 14:6,10 29:23
**Island (1)** 56:5
**issuance (1)** 73:23
**issue (5)** 61:14 62:9 79:14,15 104:17
**issued (1)** 63:2
**issues (3)** 81:6 84:4 107:16
**item (1)** 112:16

**J**

**Jaber (1)** 5:9
**jail (1)** 113:16
**James (4)** 5:5 20:9 69:8 122:19
**January (3)** 11:23 41:16 44:16
**Jennings (2)** 13:2,4
**Jimenez (5)** 1:6 6:7 72:6 73:19 124:2
**Jo (2)** 4:20 7:14
**job (4)** 1:24 10:19 21:4 92:9
**John (5)** 4:12 54:24 55:9,14 122:13
**Jonathan (2)** 3:11 6:23
**Jones (1)** 5:6
**Joseph (1)** 4:12
**judge (4)** 67:10 83:5 90:4 114:15
**judge's (2)** 32:21 83:5
**July (5)** 1:17 2:6 6:13 121:19 124:4
**June (4)** 21:25 22:4 82:19 84:12
**jurisdiction (1)** 39:5
**Justice (1)** 7:17
**JUSTICE/CIVIL (2)** 4:5,11

**K**

**Katherine (1)** 5:6

**Kathleen (2)**
3:13 7:6
**keeping (1)**
88:20
**kept (1)**
104:18
**kind (15)**
12:5 26:18 45:15 46:11,19 65:18,18 68:15 87:13 89:11 95:17 97:4 99:2 106:18 110:4
**Kirstjen (5)**
1:10 6:8 69:7 122:17 124:3
**knew (5)**
41:18 43:21 45:2,24 74:10
**know (121)**
9:17 10:7 11:23 12:23 16:10,12,25 17:4 18:6,8,13 19:18 20:22 22:5,12 23:4 23:18 24:3,25 25:9 25:9,11,14,20 26:16 26:22 28:3,10 29:19 29:20,24 33:19,22 34:13 36:24 37:2,7 38:16 40:6 43:6,10 45:7 46:8,11,15,23 47:5,16,22 48:6,14 48:16 49:13,15 53:4 53:12 54:7,20,22 56:24 57:14 59:18 60:2 61:7 62:16 64:5,14 65:10 68:4 68:18 69:4 71:14 72:23,24 74:17,23 75:7 77:21 80:15,25 81:2,6 83:3,11,15,24 84:13,15,16,17,18 84:24 85:2 86:11,21 86:24 87:3,7,7,12,24 89:11,19 91:19,21 91:23,24 92:8 95:15 96:2 97:9 98:9 99:15 102:23 107:14,24 108:21 110:21 111:24 116:4 119:8
**knowing (1)**
60:6
**Kukreja (1)**
65:24

**L**

**labeled (1)**
6:5
**lack (12)**
103:6,18 107:7,20 108:25 110:9,12,15 111:2,21 112:2,4
**Lafaille (3)**
5:7 7:3,3
**Lane (1)**
3:14
**Langevin (2)**
69:8 122:19
**language (5)**
32:20 57:5,18 99:16 99:24
**Larakers (79)**
4:8 7:8,9 8:9 12:9,11 21:5,18 22:11,16,20 23:2,16,20 24:8,14 24:19,24 26:24 29:18 30:8,25 31:10 32:9 33:15,25 38:11 38:24 39:15 44:25 46:13,21,25 51:22 52:19,25 53:7 54:10 54:14,18 56:23 59:17,23 60:3 62:2 62:7,23 64:9 65:6 66:22,25 73:5 75:15 75:25 76:23 77:20 89:19 90:8 93:5,13 93:19 94:13 99:14 99:22 100:13 102:12,21 103:2 107:23 111:7,9 113:3 115:20 116:3 116:12 119:7,17,20 119:23
**large (1)**
68:8
**latest (1)**
70:19
**law (11)**
34:16 39:24 52:17 54:21 59:18 60:6 73:20,22 75:18 92:16 97:7
**lawful (2)**
26:21 28:7
**Lawrence (1)**
50:5
**laws (1)**
58:6
**lead (1)**
94:20
**leadership (1)**
57:20
**leading (2)**
33:16 94:6
**learn (4)**
15:8 20:25 29:21 104:20
**learned (1)**
119:4
**leave (1)**
13:19
**leeway (1)**
32:17
**legal (2)**
6:16 70:19
**let's (1)**
87:22
**letter (13)**
69:6,14,16,19,22,24 71:5,10,16,21 72:2 122:17 123:3
**letters (1)**
70:11
**level (1)**
90:12
**Lexington (1)**
3:15
**liaison (1)**
113:16
**license (1)**
8:5
**life (1)**
74:8
**Lilian (3)**
1:6 41:20 124:2
**Lillian (1)**
6:7
**limit (8)**
33:15,23 77:9 93:24 94:4,8,11,12
**limited (3)**
18:22 32:13 77:12
**line (7)**
48:4 55:13,15 94:23 105:4,5 114:4
**lines (2)**
50:16 65:20
**list (4)**
66:5 80:25 81:4,7
**lists (3)**
63:13 82:13 118:9
**litigation (9)**
7:10,18 14:7 24:23 25:4 26:12 29:6 66:6 116:20
**little (2)**
40:11,17
**live (1)**
9:7
**Ln (1)**
124:7
**lobby (1)**
83:21
**local (2)**
68:7 103:21
**location (1)**
78:11
**logic (2)**
78:13 79:11
**long (6)**
63:20 74:13,23 92:25 94:20 95:3
**longer (4)**
67:13,16 75:9 104:15
**look (17)**
15:21 42:14 69:2,16 70:16 73:15 75:16 76:2,3 91:20 102:6 102:10,20 103:4 105:23 113:14 114:25
**looked (3)**
70:20 81:3 102:22
**looks (3)**
69:23 73:8 75:17
**lot (12)**
31:18 32:14,15,17 36:6 45:20 68:20 70:3 92:22 97:8 112:7 115:23
**Lucimar (2)**
44:14 45:4
**Luis (2)**
1:7 6:7
**lunch (1)**
66:21
**Luncheon (1)**
67:4
**Lyons (16)**
13:11,25 19:18 20:6 21:20 22:7 23:5,23 24:6 36:20 42:15 46:17 82:18 83:16 83:18 85:3
**Lyons' (3)**
20:2 84:6,9

**M**

**M (5)**
1:10 6:8 69:7 122:18 124:3
**making (7)**
50:19 53:5 78:2 79:7 79:12 80:6 92:9
**management (8)**
11:9 85:12,15,17 97:21 106:4,20,22
**manual (1)**
52:7
**March (3)**
60:9 63:21,23
**mark (4)**
4:21 7:20 8:19 42:8
**marked (10)**
42:12 55:10,13 65:13 69:9,12 71:7,10 100:17,19
**marriage (3)**
27:24 70:23 121:16
**marriages (2)**
30:18 44:23
**married (2)**
25:6 26:4
**marrying (1)**
70:17
**Mary (2)**
4:8 7:8
**Massachusetts (14)**
1:3,16 2:13,17 3:8,15 4:14,19 6:10,13 7:4 50:6 121:2,8
**match (1)**
111:3
**matter (5)**
6:6 14:12 101:9 115:16 121:17
**Matthew (1)**
23:7
**McCULLOUGH (3)**
3:10 6:25,25
**mean (14)**
10:22 31:12,16 34:24 73:21 74:5 78:6 81:23 92:18 94:10 95:22 109:7 110:7 116:5
**means (3)**
31:14 60:15 110:5
**meant (2)**
94:11 116:24
**measured (1)**

91:17
**measures (1)** 88:8
**media (6)** 36:16 55:7 57:15 68:24 69:4 115:24
**meet (1)** 15:24
**meeting (1)** 45:19
**meetings (1)** 96:12
**members (2)** 29:17 47:20
**Memo (2)** 100:15 123:7
**mention (1)** 63:6
**mentioned (1)** 40:18
**Merit (1)** 2:14
**merits (1)** 76:3
**met (4)** 16:2,13 18:11 83:4
**Michael (7)** 1:22 2:14 4:15 6:17 7:12 121:6,22
**Michigan (2)** 18:10,25
**mid-February (1)** 49:10
**middle (1)** 9:24
**Miguel (3)** 100:16,25 123:8
**mind (3)** 51:20 106:2 112:25
**minimize (1)** 29:13
**minutia (1)** 89:22
**mispronounce (1)** 43:3
**misspoke (1)** 74:19
**misuse (1)** 78:12
**mix (1)** 68:25
**Moakley (1)** 4:12
**Mohan (4)** 54:24 55:9,14 122:13
**Monday (2)** 1:17 2:6
**monitor (1)** 82:8
**monitoring (1)** 82:7
**month (1)** 86:23
**months (3)** 13:18 33:16 74:11
**morning (3)** 8:25 9:2 15:25
**motions (4)** 8:13,14 32:22 33:2
**move (2)** 21:16 99:9
**moving (2)** 21:8 92:15
**multiple (2)** 49:20 117:7
**municipalities (2)** 68:6 109:12
**municipality (1)** 110:2
**myriad (1)** 97:23

**N**

**N (7)** 3:2 4:2 5:2 6:2 69:8 122:1,20
**N.W (1)** 4:6
**name (11)** 6:15,21 7:8 9:4 13:3 44:17 65:23 86:16 86:18 108:21 124:2
**named (1)** 106:9
**names (6)** 28:3 47:8 65:13 66:2 80:22 122:16
**Nathalie (1)** 11:13
**nation (2)** 92:23 93:3
**national (18)** 34:23 41:7 49:3 50:17 50:20 58:15 63:3 67:18 77:13 79:3,22 81:6,11,15 84:4 86:2,4 100:7
**nations (1)** 92:23
**necessary (1)** 21:3
**need (1)** 9:21
**needed (3)** 12:3 24:4 74:7
**negotiate (1)** 103:21
**never (16)** 29:8 34:13 37:9 46:14 46:14 53:8 54:2,4 54:12 79:14 80:24 91:25 94:8 118:12 118:15,18
**new (7)** 4:18 9:8 10:16 14:5 104:11,12 112:9
**news (2)** 115:18,22
**Nielsen (5)** 1:10 6:8 69:7 122:18 124:3
**night (2)** 110:22 112:11
**non-citizen (3)** 25:16 52:15,18
**non-citizens (8)** 26:3 29:11 32:6 34:5 46:5 47:9 53:16 54:5
**non-detained (4)** 80:5 82:3 108:6,16
**normal (1)** 48:7
**normally (3)** 54:20 70:12 105:8
**notary (5)** 2:16 8:6,17 121:6 124:25
**noted (3)** 90:11 95:6 120:3
**notice (3)** 79:25 81:25 115:2
**noticed (1)** 69:3
**notification (1)** 78:4
**notify (1)** 115:11
**nuances (2)** 44:13 104:20
**number (15)** 6:5,10 9:15 41:4,13 86:22 88:22,23 90:21,22,25 92:4 93:10 110:17,18
**numbers (2)** 91:17 110:16

**O**

**O (1)** 6:2
**O'Connor (5)** 1:22 2:14 6:18 121:6 121:22
**oath (1)** 9:10
**objected (1)** 76:17
**objection (61)** 12:9,13 21:5,18 22:11 22:16,20 23:2,16,20 24:8,14,19,24 26:24 29:18 30:8,25 31:10 32:9 38:11,24 39:14 39:17 44:25 46:13 46:21,25 52:19,25 53:7 54:10,14,18 56:23 59:17,23 60:3 62:2,7,23 64:9 65:6 73:5 75:15,25 77:20 89:19 95:4 99:14,22 100:13 102:12,21 103:2 107:23 111:7 115:20 116:3,12 119:7
**objections (8)** 8:11 93:25 94:5,5,8 94:11,12,18
**objectively (1)** 76:3
**obligation (3)** 73:20,21,25
**obvious (1)** 114:15
**obviously (2)** 62:11,13
**occasion (3)** 16:20 45:12,13
**occur (2)** 52:7,14
**offenses (1)** 110:24
**offer (1)** 73:17
**offhand (3)** 25:13 108:12 112:24
**office (46)** 7:9,13,17,21 10:20,23 10:24 11:3 12:5,18 12:23 13:10 18:9,19 18:20 19:11,25 21:21 23:25 24:4,5 24:7,10 42:19 50:4 51:6 57:21 60:25 61:9 66:19 70:15 78:5 80:2,7 81:2,25 87:21,21,25 101:2 103:7,19,22,24 105:2,7
**office-by-office (1)** 87:4
**officer (22)** 14:10 55:2 80:8,10 86:12,14,15,22 96:13,14,17,18,21 96:23 97:2,24 98:24 98:25 99:4,6,7 106:7
**officer's (1)** 106:8
**officer-by-officer (1)** 86:12
**officers (13)** 47:19 70:24 78:25 81:14 82:12 85:19 97:5,10,20 103:15 110:17,18 113:16
**offices (12)** 2:11 27:15,20 30:21 32:7 34:6,11 36:10 38:21,23 40:2 105:11
**official (1)** 57:12
**Oh (3)** 54:25 72:25 88:14
**okay (25)** 10:3,15 15:8,13 25:3 25:18 42:16,20 50:24 55:19 57:10 58:18 65:22 66:22 66:23 69:13,20 71:13,15 72:13,25 77:3 91:14,15 119:20
**once (4)** 15:5 16:24 59:18 99:8
**one-on-one (2)** 116:25 117:3
**one-year (1)**

CONFIDENTIAL

104:2
**OPA (2)**
57:20,20
**open (3)**
119:14,15,19
**operating (2)**
8:9 102:23
**operations (8)**
12:18,19 13:6 17:6 50:2 61:10 102:9 108:4
**opinion (6)**
17:12 19:8,22 20:16 20:18 75:20
**OPLA (1)**
106:21
**order (37)**
16:8 17:24 25:17 29:13 32:13,16,21 33:6 34:20,23 40:21 40:22 41:2,3,5,6,11 52:15 58:8,23 60:5 73:24 74:18 75:19 80:3 82:2 92:21 96:7 98:11,18 99:9 99:11,19 100:10 101:4,6 108:14
**ordered (5)**
24:18 72:17 90:4 98:12,13
**ordering (1)**
90:6
**orderly (1)**
72:16
**orders (22)**
26:3 29:12 32:6 34:5 34:18 39:25 41:9 46:6 47:10 53:16 54:5 58:25 59:9,16 63:14 92:18 98:2 99:12,18,21 100:4,6
**outcome (1)**
121:17
**outside (6)**
38:25 39:16 77:19 89:21,23 90:3
**oversee (4)**
12:17,19 49:20 50:4
**oversight (2)**
49:25 105:9

**P**

**P (24)**
1:15 2:11 3:2,2 4:2,2 5:2,2 6:2 8:2 9:5,6 42:11 55:9 100:15 120:7 121:9 122:3,6 122:8,12 123:2,7 124:5
**p.m (5)**
67:5,5 113:6,7 120:3
**page (21)**
42:15 55:18 57:25 58:3 69:17 70:17 71:12,19 72:2 73:14 103:4 104:22,23 106:2 107:7 108:24 113:13 114:24 122:2,6 123:2
**Pahola (3)**
1:6 6:7 124:2
**panel (9)**
61:2,5,15,20 63:7,10 63:19 116:22 117:7
**paragraph (7)**
55:23 57:25 58:2 70:16 71:25 73:15 74:4
**paragraphs (1)**
57:8
**part (8)**
25:15 45:23 58:24 59:2 63:9 68:24 99:5 111:11
**participate (3)**
60:9,23 101:12
**participated (1)**
61:7
**participating (1)**
28:19
**parties (1)**
121:15
**party (1)**
14:13
**pass (1)**
114:3
**passed (1)**
105:22
**pathway (1)**
26:20
**pay (2)**
63:18 69:4
**PDF (1)**
87:16
**penalty (1)**
9:13
**pending (3)**
9:23 32:21 33:2
**people (37)**
29:24 34:20,22 36:7,9 36:25 39:23 56:17 65:2,8 67:17 68:5,6 68:9 76:9 78:2 81:4 92:9,15,20,23,24,25 93:4 95:17 99:17 100:8,11 101:19 103:25 106:19 109:15 110:23,24 111:5 114:20 116:9
**people's (1)**
63:19
**percent (2)**
49:24 109:8
**perform (1)**
21:3
**performance (12)**
17:16 88:3,7,8 89:6 89:18 90:13,17,20 91:16,20,24
**period (7)**
10:25 12:4 18:19 39:23 72:8 74:16 88:11
**periodically (1)**
87:8
**perjury (1)**
9:13
**permanent (4)**
10:24 12:6 26:21 28:7
**permit (1)**
26:20
**person (2)**
86:25 100:6
**personal (1)**
21:11
**personalize (1)**
76:2
**personally (1)**
19:4
**petition (4)**
27:5 35:18 45:5 70:20
**petitioner (2)**
25:14 44:15
**petitioners (12)**
3:4 6:22,24 7:2,5,7 25:4,11 26:12,16 30:14 41:15
**Pg (1)**
124:7
**phone (4)**
11:19 18:4,5 51:4
**physical (3)**
78:10 80:7 82:9
**Pine (1)**
3:14
**place (4)**
48:15 64:17 82:2 104:18
**placing (3)**
109:3,21,21
**Plaintiff-Petitioners...**
1:8
**plan (9)**
47:13,16,25 88:3 89:6 90:13,18,20 91:25
**planned (1)**
48:11
**plans (1)**
91:20
**please (11)**
6:19 7:23 9:3 10:6 33:19 80:2 93:17,24 94:2,25 106:3
**POCR (3)**
24:22 107:17 114:17
**POCRs (2)**
114:9,20
**point (9)**
33:14 40:10 48:25 60:8 104:5 108:25 113:14 114:8,25
**policies (8)**
22:24 24:13 52:21,24 53:3,5,8 114:17
**policy (23)**
31:6,7 32:10,23,24 33:3,18 34:4,8,12,12 34:14 35:11 38:14 38:16 39:19,22 52:14 77:18 79:6,9 81:8 84:18
**poor (2)**
36:3 68:2
**popped (1)**
112:10
**portions (1)**
49:20
**pose (2)**
36:10 58:14
**position (15)**
11:2,4,14 12:2,6,8 13:19 21:9,17,24 24:2 91:24 96:5 97:14,19
**positions (1)**
107:14
**possible (3)**
62:8 82:11 101:10
**possibly (4)**
28:9 64:3 109:19 110:3
**post (1)**
99:9
**posture (1)**
41:7
**potential (1)**
58:5
**practice (21)**
32:5 35:3,6,21 36:13 36:21 37:8,15 38:9 38:18 40:6,19 56:21 62:15 65:2 67:12,12 67:23 70:10 83:23 106:7
**practices (2)**
59:19 60:21
**preclude (1)**
44:9
**predecessor (2)**
35:7 72:24
**predominantly (1)**
79:23
**preliminary (1)**
39:2
**prepare (6)**
15:17 16:3 72:15 74:7 76:8,13
**PRESENT (1)**
5:4
**presentation (1)**
61:2
**presented (1)**
79:15
**preserve (1)**
39:17
**presume (1)**
85:2
**prevent (3)**
29:16 81:8,14
**previous (3)**
10:5 74:5 87:10
**previously (4)**
10:15 72:16 100:8 117:18
**Price (2)**
13:3,6
**print (1)**
65:18
**prior (1)**
65:8

CONFIDENTIAL

**priorities (7)** 109:2,9 110:10,13 111:22 112:2,4
**private (1)** 74:8
**privilege (1)** 76:22
**probably (5)** 18:14 50:16,23 68:17 92:10
**problem (1)** 107:9
**problematic (1)** 109:23
**process (25)** 27:3 28:5,20 29:6,8 29:13,22,25 30:11 31:23 56:4 70:22 73:7,11 74:3,12,15 74:21,23 76:18,21 78:14,18 85:13 111:12
**processing (1)** 86:19
**produced (1)** 66:5
**produces (1)** 87:17
**production (1)** 8:5
**program (3)** 82:6 88:8 108:5
**programmatic (1)** 105:8
**programs (1)** 82:5
**progression (1)** 99:5
**promising (1)** 70:20
**promote (1)** 104:3
**promoted (1)** 95:25
**promotion (1)** 96:3
**prompt (1)** 21:16
**prompted (1)** 67:25
**promulgated (1)** 26:2
**properly (1)** 89:14
**prosecution (1)** 109:20
**prosecutorial (1)** 73:18
**protected (1)** 76:21
**Protection (1)** 61:9
**Provazza (34)** 3:9 6:21,22 8:21,24 23:22 32:20 33:8,12 33:23 34:2 39:7 42:8 51:20 52:5 66:20,23 67:8 73:12 76:19 77:3 90:5,10 93:7,15,23 94:10 95:5 112:25 113:10 119:11,18,21 122:3
**provide (3)** 47:8 106:22 115:11
**provided (4)** 22:14 46:20 54:13 63:13
**provision (1)** 52:17
**provisional (23)** 26:5,8,13,17,19 28:4 28:19 29:5,12,22 30:11 31:22 44:2,7 44:11 74:12,15,20 75:23 78:14 79:12 100:12 117:25
**public (35)** 2:16 8:6 34:24,24 36:6,10 41:8 49:4 50:18,21 54:4,9,12 54:17,25 57:21 58:15 59:3,13,20,22 63:4 67:15,18 68:14 77:14 79:2,22 81:5 81:11,16 84:3 100:7 121:7 124:25
**pull (4)** 68:12 86:21 87:11,11
**pulled (2)** 109:10 112:6
**purchase (2)** 98:13,19
**purpose (1)** 53:13
**pursuing (2)** 26:12 100:11
**pushed (1)** 57:15
**put (2)** 80:2 83:14
**PWPs (1)** 91:19

**Q**

**qualify (1)** 92:12
**quality (4)** 19:9,23 20:17 22:19
**quarterly (3)** 45:14 87:20 91:4
**question (28)** 9:17,18,23,25 10:6 39:6,8,13 40:13 42:17,21 61:22 62:12,17 65:11 69:18 73:13 76:15 76:20 78:24 83:3 89:20 91:7 93:14,22 94:19 95:2 102:16
**questioning (1)** 94:23
**questions (16)** 9:16 32:25 33:9,13,24 37:3 60:19 90:7 91:10,13 93:8 94:2 94:21,22 113:11 119:10
**quickly (2)** 36:5 69:3
**Quinones-Salgero (1)** 43:22
**Quinones-Salgero's ...** 43:4
**quite (2)** 94:25 110:21
**quota (2)** 88:24,25
**quotas (2)** 91:22,22

**R**

**R (7)** 3:2 4:2 5:2 6:2 69:8 121:1 122:19
**raise (1)** 111:4
**rated (1)** 88:9
**rating (3)** 88:4,7,11
**rationale (1)** 29:20
**read (11)** 8:16 43:15 56:13,15 58:11 65:17 70:10 70:12,25 85:6 124:7
**readily (1)** 92:24
**reading (2)** 56:19 71:17
**Reads (1)** 124:7
**real (1)** 91:23
**realize (1)** 10:4
**really (6)** 12:19 23:13 29:23 68:4 92:21 110:4
**Realtime (2)** 2:15,16
**Reardon (9)** 49:17,17 51:10,11,12 61:12 63:9 64:10 118:8
**reason (6)** 10:11 53:19 66:6 68:16 70:5 124:7
**reasons (1)** 21:12
**Rebecca (2)** 18:6 22:3
**recall (39)** 10:12 30:4 37:16 38:5 40:4 41:4,25 44:12 44:20 45:2,4 50:23 51:8 60:18 61:6,21 62:3,8,9,12,14 63:11 63:16,21 64:10,21 67:20 83:10,19 91:3 111:8 112:18,21 116:21 117:3,6,24 118:2,6
**recalled (1)** 56:25
**receive (8)** 46:24 47:3 87:14 89:18 97:5,10,22 98:7
**received (7)** 44:5 57:3 59:3 69:24 70:3 80:23 107:4
**receiving (1)** 69:21
**recess (3)** 51:25 67:4 113:6
**recipient (1)** 55:20
**recognize (7)** 44:17 65:15 66:2 69:14,18 71:16 100:19
**recollection (1)** 35:14
**recommendation (1)** 111:13
**recommendations (2)** 103:5 111:11
**reconvening (3)** 52:2 67:5 113:7
**record (15)** 9:4 10:8 40:12 51:24 52:4 67:3,7 89:24 90:2 113:5,9 115:4 115:12 119:25 121:12
**refer (9)** 11:3 26:7 27:8 28:14 35:2 102:20 103:24 105:9 106:5
**reference (1)** 73:23
**referencing (1)** 112:4
**referrals (4)** 54:13 59:4,12,13
**referring (5)** 40:22 41:3 67:12 82:10 107:25
**refers (2)** 32:21 72:11
**reflect (1)** 112:19
**reflecting (2)** 83:13,17
**regard (4)** 32:14 73:9,10 111:12
**regarding (4)** 14:11 39:23 49:2 116:25
**Registered (2)** 2:14,15
**regular (2)** 12:22,24
**regularly (3)** 45:11,12 96:8
**regulations (2)** 26:2 29:10
**reinforce (1)** 113:22

**related (6)** 22:13,18,23 24:12 39:2 121:14
**relationship (1)** 45:22
**Relative (1)** 27:6
**release (2)** 114:18,19
**released (1)** 109:25
**relevant (11)** 33:2,6 39:6,8 90:3 93:8,12 94:20,21,24 95:2
**remain (1)** 72:7
**remarks (1)** 63:19
**remedy (1)** 105:24
**remember (16)** 15:11 17:11 21:14 30:2 37:18 49:7 50:9,12 56:11 61:17 61:19 62:5 64:23 69:21 70:2 108:21
**remembered (3)** 64:12 65:3,7
**removability (1)** 28:13
**removable (3)** 58:4,8,17
**removal (26)** 15:7 25:17 26:3 29:12 32:7 34:6 41:9 46:6 47:10 52:16 54:6 58:8 60:5 63:14 73:9,24 74:3,16 91:21 97:14 99:10 99:13,21 102:25 106:20 107:8
**removals (9)** 86:5 87:4 89:3 90:22 90:25 91:18 92:4,13 105:10
**remove (6)** 92:20 95:8 99:12,20 102:14,15
**removed (4)** 72:17 74:8 75:19 100:8
**removing (2)** 92:9,17
**reoffend (1)** 110:3
**repeat (5)** 27:16 39:18 59:10 98:15 116:14
**rephrase (2)** 57:6 81:13
**replace (2)** 23:5,23
**replaced (2)** 13:25 22:3
**report (13)** 12:20 13:8 37:14,14 78:5 87:16 88:14 101:11 105:5,6,12 107:5 113:12
**Reported (1)** 1:22
**reporter (4)** 2:15,16 6:17 7:23
**Reporting (2)** 6:16,18
**reports (4)** 36:17 87:8,13 91:4
**represented (1)** 66:4
**representing (1)** 116:10
**reputation (4)** 17:19 19:12 20:3,22
**request (4)** 51:13 99:4 118:13,19
**requests (2)** 55:7 73:9
**require (3)** 27:13,19 99:2
**required (4)** 34:20 47:22 61:25 96:8
**requires (2)** 99:11,20
**reserve (1)** 39:13
**reserved (2)** 8:12,14
**residency (2)** 26:21 28:7
**resources (2)** 58:14 79:7
**respect (2)** 95:20 102:13
**respond (7)** 39:12,15 70:13 90:7 93:17,18 94:2
**responded (1)** 43:18
**RESPONDENTS (1)** 4:4
**responding (1)** 84:3
**response (6)** 40:23 42:23,25 50:22 71:21 112:12
**responsibilities (1)** 12:15
**responsibility (2)** 49:22 50:3
**responsible (1)** 92:5
**restate (1)** 78:24
**retired (1)** 18:21
**return (1)** 80:12
**review (16)** 48:12 71:12 89:18 99:23,25 101:4,6,9 101:12,15,18,24 102:4,6 112:19 115:2
**reviewed (3)** 15:19 52:10 100:22
**reviewing (1)** 73:16
**Rhode (1)** 56:5
**right (25)** 17:9 21:25 27:6,24 35:12,13,22 39:13 46:7 56:18 58:10 61:15 62:19,22 64:8 74:25 75:8 76:5,14 77:4 78:19 79:5 82:19 109:23 118:10
**risk (6)** 34:25 36:7,11 49:4 50:17 60:7
**risks (4)** 41:8 79:22 100:7,7
**RMR (2)** 1:22 121:22
**role (1)** 55:5
**Rotating (1)** 103:25
**rotation (2)** 103:7,23
**rotations (1)** 103:18
**run (2)** 60:7 105:11
**runs (1)** 85:17
**Rutherford (6)** 13:11 20:10 21:2,8 36:21 46:16

S

**S (6)** 3:2 4:2 5:2 6:2 122:5 123:1
**Sady (8)** 4:15 7:12,12 32:12 33:7,10 91:7 94:7
**safer (2)** 95:16,22
**safety (19)** 36:7,11 41:8 49:4 50:18,21 58:15 63:4 67:15,18 68:14 77:14 79:3,22 81:5 81:11,16 84:3 100:7
**Saltzman (1)** 5:8
**satisfactorily (1)** 8:4
**Sauter (3)** 4:21 7:20,20
**saw (4)** 36:16 80:8,24 91:3
**saying (5)** 26:9 27:10 78:19 81:25 90:8
**says (12)** 43:13 52:7 56:18 58:3 58:13 70:17 71:4,24 72:4 86:22 106:3 107:7
**schedule (5)** 53:15,23 54:3,3 64:7
**scheduled (3)** 42:19 53:10,19
**scheduling (1)** 53:13
**scope (5)** 38:25 39:16 89:22 90:9 93:6
**screened (1)** 95:19
**seasoned (2)** 23:25 108:22
**second (8)** 8:13 44:15 55:18 69:17 71:12,19 105:4 113:14
**section (3)** 7:11,18 99:17
**secure (1)** 108:6
**security (19)** 34:24 41:8 49:4 50:17 50:21 58:15,16 61:10 63:3 67:18 77:14 79:3,22 81:6 81:12,16 84:4 95:18 100:7
**see (26)** 42:17,21,23,25 51:13 55:23,25 56:6 57:7 57:10 65:20,23 71:25 72:9,19 81:4 83:17 87:8,18 90:24 103:8 104:5,8 105:23 109:5 115:5
**seeing (2)** 41:12 70:14
**seek (3)** 32:7 34:6 52:18
**seeking (2)** 52:16 116:9
**seen (5)** 37:9 53:8 65:4,8 85:4
**selections (1)** 107:13
**senator (4)** 69:25 71:6,22 123:3
**senators (1)** 70:4
**send (6)** 46:12 78:4 79:25 81:24 82:13 109:13
**sending (2)** 49:2 118:9
**sense (1)** 68:15
**sentence (3)** 55:25 56:15 72:14
**separation (1)** 29:14
**September (5)** 33:17,24 34:3 72:17 97:3
**sequestration (2)** 16:8 17:24

CONFIDENTIAL

**series (1)** 96:3
**served (1)** 22:7
**serves (1)** 13:15
**Service (1)** 116:6
**service/return (1)** 113:15
**set (2)** 121:10,19
**setting (4)** 80:5 82:4,4,9
**settle (2)** 72:15 74:5
**SHEET (1)** 124:1
**sheets (1)** 88:17
**Sheldon (4)** 69:7 71:6 122:18 123:4
**short (2)** 18:19 51:21
**show (5)** 80:2 87:10,14,24 89:5
**side (2)** 47:21 83:25
**sign (1)** 8:16
**signature (3)** 71:11,18 124:20
**Simply (1)** 111:16
**single (1)** 66:17
**sir (7)** 19:19 47:24 91:14 92:6 96:24 98:16 103:9
**sit (1)** 109:14
**sitting (2)** 100:3 112:21
**situation (2)** 20:21 24:4
**Six (1)** 105:15
**small (1)** 65:19
**smaller (1)** 105:11
**smart (2)** 37:5 68:22
**snapshot (1)** 87:8
**somebody (10)** 12:3 14:11 19:12 37:17 61:8 68:14 70:13 75:18 85:14 114:16
**somebody's (1)** 95:21
**somewhat (1)** 95:19
**sorry (29)** 14:17,20 18:25 27:16 38:8,12 43:2,9 47:2 48:20 49:21 51:9 55:4,15 59:10 65:5 73:2 74:19 84:7 91:14,20 94:10 95:13 96:17,19,20 98:15 104:23 108:23
**sought (1)** 19:13
**sounds (1)** 35:13
**Souza (3)** 44:14,19 45:5
**speak (2)** 19:15 116:19
**speaking (5)** 40:11,17 93:24 94:5 94:12
**specialist (1)** 6:17
**specific (9)** 11:24 26:19 32:14,18 73:7,10 92:22 99:15 99:24
**specifically (17)** 22:12 26:22,25 29:11 33:18 38:7 46:22 47:18 48:6 50:10,11 52:17 61:18 62:4,16 63:17,22
**specifics (2)** 40:4 60:18
**spell (1)** 9:3
**spending (1)** 32:14
**spent (1)** 79:7
**spoke (7)** 13:2 49:15 63:9 116:22 118:8,15,18
**spoken (1)** 17:21
**spouse (2)** 25:15 27:19
**Spreadsheet (2)** 65:12 122:16
**ss (1)** 121:3
**staff (12)** 47:20 49:10 67:11 75:11 78:12 96:21 97:16,24 103:16 110:14 118:20,21
**staffing (1)** 103:14
**stakeholders (1)** 55:6
**stand (1)** 104:25
**start (1)** 6:4
**started (1)** 97:2
**starting (1)** 33:16
**state (7)** 2:13 3:7 6:13 9:3 70:4 73:15 101:7
**stated (6)** 40:24 57:2 61:23 64:6 67:21 72:16
**statement (7)** 56:20 57:12,24 58:2 59:2 104:9 111:5
**states (9)** 1:2 6:9 7:9,19 56:2 58:9 77:6 100:9 116:9
**statistics (2)** 86:14 89:5
**status (3)** 70:19 75:8 116:9
**stay (8)** 72:11,22,25 74:21 75:9 76:13,16,25
**stays (1)** 73:9
**step (2)** 27:2 105:18
**Stephen (2)** 3:9 6:21
**steps (1)** 99:8
**stipulations (1)** 8:10
**stop (4)** 49:2 94:5,14,16
**stopping (2)** 63:2 118:9
**store (1)** 78:16
**Strawbridge (2)** 5:4 6:15
**street (7)** 2:13 3:7 4:6,18 6:13 95:21 110:3
**strike (2)** 8:14 74:9
**strong (3)** 24:5,7,10
**struck (1)** 68:5
**struggling (1)** 49:7
**stuff (3)** 68:19 82:7 88:21
**subject (12)** 9:12 34:23 46:6 52:15 58:7 59:8,15 60:5 75:19 96:6 101:9,15
**subjecting (2)** 111:18,22
**subjects (2)** 41:8 100:6
**submitted (1)** 15:20
**submitting (1)** 88:15
**Subscribed (2)** 120:8 124:21
**succeed (2)** 21:20 84:24
**Sudbury (1)** 4:18
**suddenly (1)** 70:24
**Suffolk (2)** 56:2 121:4
**suggest (1)** 76:23
**Suite (1)** 4:13
**suited (1)** 84:3
**summarize (1)** 41:5
**supervision (8)** 80:3 82:2 96:7 98:2 98:11,18 108:14 110:15
**supervisor (8)** 48:12 89:16 90:15 104:11,13,20 108:18,22
**supervisor's (1)** 105:5
**supervisors (12)** 48:4 85:22 88:10 104:6 105:4,19 107:21 108:11 113:23,25 114:4 115:10
**supervisory (4)** 47:23 48:14 67:11 99:3
**support (5)** 96:21 97:15,19 103:15 105:18
**supposed (2)** 48:12 99:8
**sure (11)** 9:5 10:10 33:23 40:15 48:21 51:22 58:12 66:25 86:10 89:13 113:3
**surprise (2)** 20:25 66:19
**surprised (4)** 66:9,11,15 70:7
**swear (1)** 7:23
**sworn (4)** 8:6 120:8 121:11 124:21
**system (14)** 85:10,11,12,16,18,21 86:6,8,13,16,19 88:4 88:19 106:8
**systemic (1)** 24:22
**systems (1)** 97:21

**T**

**T (119)** 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1

CONFIDENTIAL

27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1,1 122:5 123:1

**T-h-o-m-a-s (1)** 9:6

**tactics (1)** 97:7

**take (11)** 9:23,25 12:2 51:21 58:12 69:16 71:12 94:3 97:21 99:8 113:2

**taken (3)** 51:25 67:4 113:6

**takes (3)** 74:13,24 92:25

**talk (4)** 37:10,13 46:16 101:17

**talked (2)** 15:14 17:18

**talking (7)** 35:4 37:18 38:5 64:2 103:17 108:15 110:21

**tape (1)** 6:5

**target (3)** 39:20 79:18 88:25

**targeted (1)** 71:2

**targeting (11)** 34:10 36:13 39:23 40:24 56:8 81:9 109:2 110:6,10 112:3,5

**targets (1)** 109:18

**tell (10)** 9:22 17:23 36:23 46:4 59:3,6,11,12 93:17 94:7

**telling (1)** 93:16

**temporarily (2)** 11:2 24:2

**tenure (5)** 22:10 38:4 65:9 91:2 91:18

**testified (5)** 8:7 10:15 14:22 15:2 35:10

**testify (1)** 10:12

**testifying (1)** 9:10

**testimony (7)** 22:14 56:20 67:10 81:19 107:2 118:7 121:12

**Texas (1)** 101:3

**Thank (2)** 71:13 119:23

**Thanks (1)** 43:19

**Theoretically (1)** 79:20

**thing (4)** 36:5 68:21 69:3 111:18

**things (2)** 88:13 97:23

**think (45)** 13:17 16:17 19:10 20:20 22:13,18,23 24:6,11,16,21 33:7 33:15 37:4 40:11 49:11 56:13,19 59:25 60:4 61:11 63:24 64:17 66:20 74:9,14,20,25 75:6,9 75:13,21 76:11,12 76:25 77:4,7 93:7 100:5 110:13,17 112:2,3 116:16 119:13

**third (5)** 8:15 57:24,25 104:22 104:23

**Thomas (19)** 1:15 2:10 6:6 8:2 9:5 42:11 55:8 71:7 100:15 120:7 121:9 122:3,6,8,12 123:2,4 123:7 124:5

**thought (11)** 32:12 36:3 76:4,7 78:11 84:2 114:16 116:2,5,10,24

**threat (3)** 58:15 67:17 68:14

**threats (1)** 67:15

**three (3)** 18:14 57:7 74:11

**three-month (1)** 72:22

**ticket (2)** 98:14,19

**time (48)** 8:12 9:21 10:4 11:2 13:15 14:25 16:2 18:11,17,20 30:2 32:15 35:22 36:18 39:14 42:2,24 43:6 43:10,21 44:10 45:3 49:9 55:18 57:2,8 58:12 62:25 66:21 68:23 71:12 72:15 74:10 75:3,4,9 76:13,14 83:8 88:16 89:18 92:3,25 94:14 94:15 115:19 117:16 120:3

**timeframe (4)** 41:18 49:8 56:12 103:25

**timely (6)** 88:17,20 92:15 99:10 114:9,20

**times (2)** 53:23 105:17

**title (3)** 10:19 17:4 96:18

**today (11)** 8:10,20 9:10,16 10:13 15:13 25:19 97:11 100:3 119:12,22

**today's (2)** 15:18 119:25

**Todd (2)** 19:18,24

**told (6)** 21:10 37:4 46:8 54:4 54:12 67:10

**tool (1)** 54:22

**top (2)** 55:13,15

**topic (4)** 38:7 61:5 77:23,24

**topics (1)** 70:7

**track (8)** 28:18,22 80:4 82:3 85:11 86:8,13 89:15

**tracked (3)** 86:11 89:13,21

**tracks (2)** 87:3 90:2

**training (9)** 30:10 97:4,8,10 98:7 98:9 106:16,18,22

**transcript (3)** 8:17,20 124:1

**transfer (1)** 21:11

**transitioned (1)** 12:6

**travel (1)** 92:25

**trial (2)** 8:12 14:22

**tripled (1)** 103:15

**trouble (2)** 78:22 107:10

**true (2)** 95:10 121:12

**try (8)** 9:22 69:4 99:9 109:14 109:25 110:2,23 112:19

**trying (1)** 95:20

**TSG (2)** 6:16,18

**Tuesday (1)** 80:10

**turn (6)** 73:14 104:22 107:7 108:23 113:13 114:24

**turning (1)** 106:2

**twice (1)** 16:24

**two (16)** 14:17,18,20 16:6,6 30:13 41:14 65:20 66:9 69:25 86:9 94:22 96:16 110:20 117:14 119:15

**two-year (1)** 104:2

**type (2)** 97:10 117:6

**types (1)** 88:12

**U**

**U.S (16)** 4:5,11,12,17 5:6 7:12 25:15,23,25 26:4 27:13 29:17 52:7 56:4 70:18,23

**ultimate (1)** 89:20

**unclear (1)** 106:11

**understand (16)** 9:9,16,19 10:9 11:4 26:8,11 27:9 34:3 35:3 65:10 70:21 77:11 91:6 102:16 111:14

**understanding (12)** 23:24 27:25 30:23 31:5,8,9 33:3 35:9 39:9 46:3 100:2 102:18

**understood (2)** 29:7 77:3

**undue (1)** 29:17

**union (1)** 103:21

**unit (5)** 104:7,12 106:20 108:5,13

**unit/staff (2)** 103:6,18

**United (8)** 1:2 6:9 7:9,19 58:9 77:6 100:9 116:9

**units (4)** 107:22,24 108:2,10
**unlawfully (1)** 100:9
**unrelated (1)** 32:16
**Unverified (1)** 113:15
**use (3)** 47:12 79:17 89:7
**usually (3)** 13:15 96:7 98:22
**utilization (4)** 36:4 37:5 68:3,22

**V**

**vacancies (1)** 107:11
**vacating (1)** 24:3
**vaguely (1)** 69:23
**Vance (3)** 42:11 43:19 122:7
**Vance's (1)** 42:23
**vehicle (1)** 88:17
**Vergara (3)** 100:16,25 123:8
**verified (1)** 70:23
**Veronica (1)** 5:8
**version (2)** 57:16 87:16
**versus (1)** 6:8
**vetting (1)** 81:7
**viable (1)** 109:18
**video (1)** 6:16
**Videographer (10)** 5:4 6:4 7:22 51:23 52:3 67:2,6 113:4,8 119:24
**videotaped (3)** 1:15 2:10 6:5
**view (1)** 45:21
**violate (1)** 80:13
**violation (2)** 58:6 60:6
**violations (2)** 24:22 107:18
**violent (1)** 68:9
**volume (1)** 70:8
**vs (2)** 1:9 124:3

**W**

**wait (2)** 40:13 80:11
**waited (1)** 80:10
**waiting (1)** 78:20
**waiver (19)** 8:17 26:17,20 28:5,12 28:19 29:6,13,22 30:11 31:23 44:9 74:12,15,21 78:14 78:18 79:12 117:25
**waivers (8)** 26:5,8,13 44:3,7,11 75:24 100:12
**want (3)** 60:2 94:15,16
**wanted (6)** 11:25 23:25 36:8 39:16 79:21 101:8
**wants (1)** 21:10
**Washington (4)** 4:7 20:6 21:11 57:23
**wasn't (7)** 24:6 31:14 41:17 43:7 43:11,22 66:17
**waste (1)** 94:15
**watch (1)** 12:5
**way (16)** 4:13 56:11 80:17 81:21 83:9 85:8 86:17 90:9 91:17 92:6 93:6 95:13,16 97:18 111:25 121:16
**ways (2)** 78:8 82:8
**we'll (2)** 9:22 87:8
**we're (10)** 8:9 32:14 40:16 42:3 50:19 89:22 92:8,14 93:6 95:3
**we've (1)** 107:17
**week (1)** 22:8
**weeks (1)** 15:12
**Weiland (4)** 4:9 7:16,16 119:16
**well-respected (1)** 19:10
**well-rounded (1)** 104:4
**went (5)** 18:17,23 40:19 80:10 97:6
**weren't (7)** 61:25 67:16 81:15 109:12 110:22 114:17,20
**whatnot (1)** 37:2
**WHEREOF (1)** 121:18
**White (1)** 3:14
**Whitehouse (4)** 69:8 71:6 122:19 123:4
**Whitehouse's (1)** 71:22
**wholly (1)** 32:15
**wife (1)** 56:3
**WILLIAM (1)** 4:9
**Williamsville (1)** 9:8
**Wilmer (4)** 5:5 6:22,23 7:2
**WilmerHale (2)** 2:11 3:5
**wise (1)** 56:12
**witness (10)** 7:23 33:9 90:6,6 94:2 94:6 121:9,13,18 122:2
**Wolf (2)** 67:10 114:15
**wondering (1)** 91:8
**work (25)** 11:7 14:4 16:21 17:7 17:10 19:2,5,9,23 20:17 22:19 45:11 64:7 68:13 88:3,6 89:6 90:13,17,20 91:20,25 92:12,19 110:14
**worked (5)** 19:20 20:9,12,14 96:22
**workflow (2)** 110:19 111:3
**working (5)** 10:16 89:14 104:14 104:19 117:19
**works (1)** 16:25
**worried (1)** 40:16
**wouldn't (4)** 12:14 54:19 68:11 75:23
**writing (2)** 83:15 88:15
**written (2)** 37:7 111:25
**wrong (2)** 56:22,24

**X**

**x (6)** 1:5,12 86:22 122:1,5 123:1

**Y**

**Y (1)** 86:22
**yeah (52)** 12:18 14:19 20:14,20 25:8,21 28:16 29:19 31:24 32:4 35:5 36:19,22 44:17 46:3 56:14,18 57:4,10 58:11 60:11 61:8 63:20,21 65:18 69:23 70:12 71:4 75:11 83:10,10 84:13 86:3,18 92:8 92:10 93:5 96:2,20 98:3 103:11 105:17 106:13 107:13 111:20 113:18 114:13,23 115:10 115:23 116:24 117:5
**year (3)** 16:24 18:14 87:9
**years (2)** 16:14 18:15
**York (2)** 9:8 14:5

**Z**

**0**

**02109 (1)** 3:8
**02203 (1)** 4:19
**02210 (1)** 4:14
**02421 (1)** 3:15

**1**

**1 (5)** 21:25 42:9,10 82:19 122:7
**1:05 (2)** 67:5,7
**1:18-cv-10225-ML...** 1:10 6:11
**1:55 (2)** 113:5,6
**10 (1)** 110:22
**100 (3)** 49:24 109:8 123:9
**11:05 (3)** 1:18 2:7 6:14
**11:46 (2)** 51:24,25
**11:54 (2)** 52:2,4
**12 (1)** 110:22
**12:10 (2)** 67:3,4
**120 (4)** 11:11 12:4 13:21 21:15
**12th (3)** 35:12 37:22 56:22
**13768 (4)** 41:11 58:23 99:11,20

**13th (3)**
35:12 37:22 56:22
**14 (1)**
71:11
**145301 (1)**
1:24
**14th (2)**
66:10 97:3
**15 (1)**
4:18
**16-week (1)**
97:6
**16th (4)**
37:24 38:3 77:8
113:12

**2**

**2 (5)**
55:8,13 60:9 103:4
122:12
**2/13/18 (2)**
42:12 122:9
**2/14/18 (2)**
71:7 123:5
**2/7/2018 (2)**
55:9 122:13
**2/9/18 (2)**
69:9 122:21
**2:09 (2)**
113:7,9
**2:14 (2)**
120:2,3
**20001 (1)**
4:7
**2002 (1)**
72:18
**2006 (1)**
16:17
**2016 (1)**
25:25
**2017 (7)**
32:5,18 33:17,18,20
33:24 34:4
**2018 (20)**
1:17 2:6 6:14 10:17
21:25 22:4 32:13,19
41:16 55:14,16
60:10 71:11 82:19
84:12 95:25 120:9
121:19 124:4,22
**22nd (5)**
22:14 56:20 67:10
81:20 107:2
**22nd/23rd (1)**

77:2
**23rd (3)**
22:15 83:21 107:2
**25 (1)**
72:18

**3**

**3 (4)**
65:12,14 114:24
122:16
**30 (5)**
1:17 2:6 6:14 8:16
124:4
**30th (2)**
97:3 121:19
**31st (1)**
13:24

**4**

**4 (6)**
69:6,12 106:2 108:24
113:13 122:17
**42 (1)**
122:11
**450 (1)**
4:6

**5**

**5 (5)**
10:17 71:5,10 107:7
123:3
**5/16/18 (2)**
100:17 123:9
**55 (1)**
122:15

**6**

**6 (4)**
3:14 100:15,19 123:7
**60 (3)**
2:13 3:7 6:12
**601 (3)**
28:9,15,17
**65 (1)**
122:16
**69 (1)**
122:22

**7**

**7 (4)**
22:4 55:14,16 84:12
**71 (1)**
123:6
**7th (1)**

55:17

**8**

**8 (1)**
122:3

**9**

**90 (6)**
72:25 73:3 75:22 76:8
76:12 77:5
**90-day (5)**
72:8,11 74:16,21
76:16
**9200 (1)**
4:13
**97 (1)**
97:3
**9th (1)**
71:22