UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS

    --------------------------------
                                     )
    LILIAN PAHOLA CALDERON JIMENEZ,  )
    and LUIS GORDILLO, et al.,       )
                                     )
            Petitioners,             )
                                     )  Civil Action
    vs.                              )  No. 18-10225-MLW
                                     )
    KIRSTJEN M. NIELSEN, et al.,     )
                                     )
            Defendants-Respondents.  )
                                     )
    --------------------------------


                 BEFORE THE HONORABLE MARK L. WOLF
                   UNITED STATES DISTRICT JUDGE


                         MOTION HEARING


                       August 20, 2018
                          10:37 a.m.


             John J. Moakley United States Courthouse
                       Courtroom No. 10
                       One Courthouse Way
                  Boston, Massachusetts  02210




                              Kelly Mortellite, RMR, CRR
                              Official Court Reporter
                              One Courthouse Way, Room 5200
                              Boston, Massachusetts  02210
                              mortellite@gmail.com

```
 1    APPEARANCES:

 2    Counsel on behalf of Petitioner:
      Adriana Lafaille
 3    Matthew Segal
      American Civil Liberties Union
 4    211 Congress Street
      Boston, MA 02110
 5    617-482-3170
      alafaille@aclum.org
 6    msegal@aclum.org

 7    Jonathan A. Cox
      Stephen Nicholas Provazza
 8    Kevin Prussia
      Michaela Sewall
 9    Wilmer Hale LLP
      60 State Street
10    Boston, MA 02109
      617-526-6212
11    jonathan.cox@wilmerhale.com

12    Kathleen M. Gillespie
      Attorney at Law
13    6 White Pine Lane
      Lexington, MA 02421
14    339-970-9283
      Kathleen.m.gillespie@outlook.com
15
      Counsel on behalf of Respondents:
16    Eve A. Piemonte
      United States Attorney's Office
17    Suite 9200
      1 Courthouse Way
18    John Joseph Moakley Federal Courthouse
      Boston, MA 02210
19    617-748-3271
      eve.piemonte@usdoj.gov
20
      Mary Larakers
21    William Weiland
      U.S. Department of Justice, Office of Immigration Litigation
22    District Court Section
      P.O. Box 868
23    Washington, DC 20044
      202-353-4419
24    mary.larakers@usdoj.gov

25
```

```
 1                    P R O C E E D I N G S
 2              (The following proceedings were held in open court
 3     before the Honorable Mark L. Wolf, United States
 4     District Judge, United States District Court, District of
 5     Massachusetts, at the John J. Moakley United States Courthouse,
 6     One Courthouse Way, Courtroom 10, Boston, Massachusetts, on
 7     August 20, 2018.)
 8              THE COURT:  Good morning.  Would counsel please
 9     identify themselves for the court and for the record.
10              MR. PRUSSIA:  Good morning, Your Honor.  Kevin Prussia
11     from Wilmer Hale on behalf of the petitioners.
12              MS. LAFAILLE:  Good morning, Your Honor.  Adriana
13     Lafaille, also here for the petitioners.
14              MR. PROVAZZA:  Steven Provazza, also here for the
15     petitioners.
16              MR. SEGAL:  Good morning, Your Honor.  Matthew Segal
17     for the petitioners.
18              MR. COX:  Good morning, Your Honor.  Jonathan Cox for
19     the petitioners.
20              MS SEWALL:  Good morning.  Michaela Sewall for the
21     petitioners.
22              MS. GILLESPIE:  Kathleen Gillespie for petitioners.
23              MS. LARAKERS:  Good morning, Your Honor.  Mary
24     Larakers on behalf of the United States.
25              MR. WEILAND:  Good morning, Your Honor.  Wil Weiland
```

1    on behalf of the United States.

2            MS. PIEMONTE:  Good morning, Your Honor.  Eve Piemonte

3    on behalf of the United States.

4            MS. LARAKERS:  Your Honor.  Sorry, I apologize, Your

5    Honor.  The witnesses are here in the courtroom.  If you would

6    like them to step out, I can instruct them.

7            THE COURT:  We're on the same wavelength.  Are

8    Ms. Adducci and Mr. Lyons each here?

9            MS. LARAKERS:  Yes, Your Honor.

10           THE COURT:  And there is a sequestration order in the

11   case that most strictly applies to testimony.  Do you request

12   they be allowed to stay here for the argument?

13           MS. LARAKERS:  Yes, Your Honor.

14           THE COURT:  Is there any objection to that?

15           MR. PRUSSIA:  There's no objection to that, Your

16   Honor.

17           THE COURT:  If and when we get to testimony, we'll

18   talk again.

19           MS. LARAKERS:  Absolutely.

20           THE COURT:  Okay.  Thank you.

21           All right.  We're here today for a hearing or to begin

22   a hearing on the defendants' motion to dismiss, on the

23   plaintiffs' motion for preliminary injunction, and on the

24   plaintiffs' motion for class certification under Federal Rule

25   of Civil Procedure 23 or certification as a representative

1    habeas action.

2          Are there any other pending motions that ought to be

3    addressed in these proceedings?

4          MR. PRUSSIA:  Your Honor, there is I believe still

5    pending a motion for clarification.  I don't think it needs to

6    be addressed by Your Honor.  I think resolution of these other

7    motions that you identified could potentially resolve that, but

8    I just wanted to --

9          THE COURT:  Actually, why don't you refresh me.  The

10   motion for clarification seeks clarification of what?

11         MR. PRUSSIA:  It's ECF 37, I believe it is.  It was

12   with reference to the jurisdictional order preserving Ms. De

13   Souza and prohibiting the government from removing her from the

14   District of Massachusetts.  We had a request from Ms. Calderon

15   in particular, who is a resident of Rhode Island.  I wanted

16   some clarification to ensure that it precluded the government

17   from removing her from the United States generally and not

18   specifically to this district.

19         There was a response to that by the government stating

20   that they didn't believe any additional clarification was

21   necessary.  I just wanted to raise that for Your Honor.

22         THE COURT:  Well, I think the government understands

23   this, but it's my intention that none of the named plaintiffs

24   be removed from my jurisdiction -- well, be removed from the

25   Boston field office jurisdiction, essentially, Connecticut,

1    Rhode Island, Massachusetts.  They have to remain available.

2    They may need to testify, if we get that far on the motion of

3    for preliminary injunction, for example.

4          MS. LARAKERS:  Yes, Your Honor, and I believe that's

5    what we had indicated what we believed Your Honor's order to be

6    as well, so I think we're on the same page.

7          MR. PRUSSIA:  Thank you, Your Honor.

8          THE COURT:  Good.  All right.  It's my intention to

9    address these motions in the foregoing order.  If I'm persuaded

10   to dismiss the case, the other motions will be moot, but with

11   regard to the motion to dismiss, I'd like to try to determine

12   to what extent there is understanding and agreement and to what

13   extent there may be or are disagreements.  So first I want to

14   try to assure that I understand and that the defendants,

15   respondents, understand what relief the petitioners are

16   seeking.

17         As I understand it, at least with regard to removal,

18   the main question or argument is that as a result of the 2013

19   and 2016 regulations, the plaintiffs, petitioners, have a due

20   process right to pursue provisional waivers while in the United

21   States with their citizen spouses and children and that the

22   defendants cannot order their removal without an individualized

23   decision or reason or process for doing so.

24         As I understand it, the petitioners assert a right not

25   to have the existence of final orders of removal alone serve as

1        the basis to remove or detain and remove them while they pursue

2        a provisional waiver.  Do I understand that accurately so far?

3                    MS. LAFAILLE:  Yes, Your Honor, that's generally

4        right.

5                    THE COURT:  And do the plaintiffs contend that the

6        respondents are required to let the petitioners stay in the

7        United States until ICE or CIS decides if a petitioner is

8        eligible for a waiver?

9                    MS. LAFAILLE:  Yes, Your Honor.  Our contention is

10       that in the ordinary course, the procedures of the provisional

11       waiver process have to be allowed to play out.  And if for any

12       special circumstance they're not being allowed to play out,

13       there should be some basic opportunity to contest that.

14                   THE COURT:  Basic opportunity to contest it.  So am I

15       right that it's your argument that unless there's a national

16       security or public security reason or some other reason other

17       than there's a final order of removal, the petitioner -- a

18       petitioner should be allowed by ICE to stay in the United

19       States with his or her citizen spouse until CIS, Citizenship

20       and Immigration Services, decides whether a provisional waiver

21       should be granted?

22                   MS. LAFAILLE:  Yes, Your Honor.

23                   THE COURT:  And is it your position that petitioners

24       are not challenging the merits of any discretionary decision

25       but rather what you allege to be a failure of the Department of

1    Homeland Security to consider the petitioners for discretionary

2    relief to which the 2013 and 2016 regulations make them

3    eligible?

4            MS. LAFAILLE:  Correct, Your Honor.

5            THE COURT:  Are you also challenging the right of ICE

6    to arrest aliens at CIS offices who are there to establish that

7    their marriages to American citizens are legitimate and then to

8    detain them?

9            MS. LAFAILLE:  Yes, Your Honor, to the limited extent

10   of this class and not extended to people outside the class.

11           THE COURT:  Okay.  And succinctly, what's the basis

12   for arguing that the arrests are unlawful?

13           MS. LAFAILLE:  Your Honor, the arrests -- our claims

14   relating to the arrests are essentially the same as our claims

15   relating to the removal.  The arrests themselves are an

16   interference with the petitioners' rights under the provisional

17   waiver process.  They create that very hardship and

18   interference that the process was designed to avoid.

19           THE COURT:  So I'm just trying to understand and hope

20   the government can understand what the arguments are.  So as I

21   understand it, with regard to the arrests and subsequent

22   detentions, the argument is that the regulations create a right

23   for people who have final removal orders to seek provisional

24   waivers basically that allow them to stay in the United States

25   until it's decided whether they should get or be eligible for

waivers of laws that would ordinarily bar their re-entry to the

United States for up to ten years; and then if they are

approved by CIS, they leave the United States probably just for

a couple of weeks, not many months or years, go abroad to a

U.S. consular office, get issued a visa that lets them return

to the United States immediately, not wait three or ten years,

and when they get to the United States, they become lawful

permanent residents?

        MS. LAFAILLE:  That's right, Your Honor.

        THE COURT:  And you also challenge the detention of

aliens who have initiated the provisional waiver process by

seeking the I-130s, the findings that their marriage to an

American citizen is genuine?

        MS. LAFAILLE:  Yes, Your Honor.  And just to further

clarify, and I think the government would agree here,

ordinarily the purpose of detention is removal, and that's why

these claims are very much related.

        THE COURT:  Okay.  And are there any other grounds for

relief that I haven't touched on?  I know the complaint I think

has a claim for violation of equal protection, which I frankly

haven't focused on.  Is that another claim you have?

        MS. LAFAILLE:  Yes, Your Honor.  But I think that it's

related -- obviously we're not seeking a preliminary injunction

on that claim, but that goes again to our claim that the

government's practice of detaining and removing people going

1    through this process is motivated -- in the case of that claim,

2    the claim is that it's motivated by animus and is unlawful for

3    that additional reason.

4         And I will just add we also have claims that are more

5    traditional claims relating to detention.  In the event that

6    detention does occur of a class member, we think that the

7    government has been violating certainly the post-order custody

8    regulations of the due process clause.

9         THE COURT:  Okay.  Those are issues that I addressed

10   in my May 8 oral decision and June 11 written decision, I

11   think.

12        MS. LAFAILLE:  Yes, Your Honor.

13        THE COURT:  All right.  Hopefully that's helpful to

14   the government as well as to me because it gives me a more

15   clear understanding than I got from reading the perhaps

16   evolving submissions.

17        Okay.  Then again, I'm just trying to get the legal

18   framework before the arguments.  So as I understand it, the

19   motion to dismiss has two grounds.  One is that this court

20   lacks jurisdiction; and the second is that the petitioners do

21   not state a plausible claim on which relief can be granted.  Am

22   I right about that?

23        MS. LARAKERS:  Yes, Your Honor.

24        THE COURT:  Are there any other grounds for the motion

25   to dismiss?

1        MS. LARAKERS:  The mootness ground, which is also

2   within the jurisdictional ground, yes.

3        THE COURT:  Okay.  Mootness --

4        MS. LARAKERS:  In other words, it's not just the

5   statutory jurisdictional argument.  We also have the mootness

6   argument as well.

7        THE COURT:  That's helpful.  So mootness with regard

8   to both detention and removal?

9        MS. LARAKERS:  Yes, Your Honor.

10       THE COURT:  All right.  Then with regard to

11   jurisdictional arguments, the government argues that 8 United

12   States Code sections 1252(a)(5) and (b)(9) should operate

13   together and also 1252(g) deprive a District Court of

14   jurisdiction over the claims in this case; is that right?

15       MS. LARAKERS:  Yes, Your Honor.

16       THE COURT:  And with regard -- so section 1252(a)(5)

17   directs us to 1252(b)(9), entitled Consolidation of Questions

18   For Judicial Review, right?

19       MS. LARAKERS:  Yes, Your Honor.

20       THE COURT:  And 1252(b)(9) says, Judicial review of

21   all questions of law and fact, including interpretation and

22   application of constitutional and statutory provisions, arising

23   from any action taken or proceeding brought to remove an alien

24   from the United States under this subchapter shall be available

25   only in judicial review of the final order under this section.

1    Except as otherwise provided in this section, no court shall

2    have jurisdiction by habeas corpus under section 2241 of Title

3    28 or any other habeas corpus provision by section 1361 or 1651

4    of such title or by any other provision of law, statutory or

5    nonstatutory, to review such an order or questions of law

6    effect."  So that's 1252(b)(9), correct?

7              MS. LARAKERS:  Yes, Your Honor.

8              THE COURT:  And then do you agree that section 1252

9    (b)(9) has been held by the Supreme Court and the First Circuit

10   to be a judicial channelling provision, not one that bars

11   claims from any kind of judicial review completely?

12             MS. LARAKERS:  Yes, Your Honor.

13             THE COURT:  Okay.  That's <u>St. Cyr</u> and <u>Aguilar</u>.  Do you

14   agree that section (b)(9) does not extinguish habeas

15   jurisdiction concerning claims that are not subject to judicial

16   review by a Court of Appeals on an appeal from the Board of

17   Immigration Appeals?

18             MS. LARAKERS:  Yes, generally, Your Honor, as long as

19   there's an adequate substitute for habeas.

20             THE COURT:  Well, isn't that the substitute for

21   habeas?

22             MS. LARAKERS:  Yes, Your Honor.

23             THE COURT:  Appeal to, in this case, the First

24   Circuit?

25             MS. LARAKERS:  Yes, Your Honor.

1          THE COURT:  Through something that -- appeal of

2    something the Board of Immigration Appeals, the BIA, has

3    decided?

4          MS. LARAKERS:  Yes, Your Honor.

5          THE COURT:  Would the Court of Appeals have

6    jurisdiction to review an ICE decision to deny a request for a

7    stay of removal?

8          MS. LARAKERS:  In so many words, Your Honor, the Court

9    of Appeals would have jurisdiction to review constitutional

10   claims in any way in which those are brought.  So here the

11   process would be the petitioners would file a sua sponte motion

12   to reopen.  It would be granted or denied by the immigration

13   judge or by the BIA.  And then they could appeal that sua

14   sponte motion to reopen in front of the Court of Appeals.  And

15   the First Circuit here, along with other circuits, has not

16   foreclosed the ability for constitutional claims to be brought

17   on a petition for review in a sua sponte reopening case.

18         THE COURT:  All right.  Here, let me take a step back.

19   The motion to reopen, including the bizarrely called request

20   for sua sponte court initiated reopening, that's different than

21   a motion for a stay, right?

22         MS. LARAKERS:  Yes, Your Honor, it is different.

23         THE COURT:  Okay.  So my first question was would the

24   Court of Appeals have jurisdiction to review an ICE decision or

25   a BIA decision, ICE decision, to deny a motion for a stay?

1          MS. LARAKERS:  No, Your Honor, not a purely

2      discretionary one.  However, one regarding constitutional

3      claims, yes.  So it's a little interesting.

4          THE COURT:  How --

5          MS. LARAKERS:  Because the immigration court, the BIA

6      and Court of Appeals can issue their own stays of removal.  So

7      the motion to reopen could come in that form of a request for a

8      stay as well as a sua sponte motion to reopen.

9          THE COURT:  So the motion -- let's go back.  I'm going

10     to want you to -- we'll have a discussion of this.  I'm just

11     trying to see how much in terms of sort of black letter law is

12     in agreement and how much is in dispute.  So if it was ICE,

13     Immigration and Customs Enforcement, that was asked to issue a

14     stay and it has -- well, ICE has their regulations providing

15     for stays in ICE's discretion, right?

16         MS. LARAKERS:  Yes, Your Honor.  Those are not

17     reviewable on a petition for review.

18         THE COURT:  Okay.  And then the immigration court can

19     be asked to grant a stay?

20         MS. LARAKERS:  Immigration court, Board of Appeals and

21     the Circuit Court.

22         THE COURT:  And if the immigration court denies the

23     stay, can that be appealed to the BIA?

24         MS. LARAKERS:  Usually -- the reason we're having a

25     disconnect is usually the stay comes in a request for a motion

1   to reopen.  So the motion to reopen is filed and a request for

2   a stay all in one, and then the Circuit Court would review that

3   all together as well, because it's presumed that the motion to

4   reopen, the purpose of it is to prevent removal.

5          THE COURT:  Well, that's not a stay, though.  If it's

6   reopened, isn't the removal order vacated?

7          MS. LARAKERS:  Yes, Your Honor, but while they're

8   adjudicating whether the motion to reopen should be reopened,

9   the stay is also requested.  So at any point in time the

10  petitioner can request a stay from the immigration court, the

11  BIA, or, if it gets to that point, the petition for review at

12  any point along the way.

13         THE COURT:  All right.  And then is it your position

14  that the Court of Appeals can review the decision to deny a

15  stay?

16         MS. LARAKERS:  From ICE's decision to deny a stay?

17         THE COURT:  I'm sorry.  The immigration court's and

18  the BIA's decisions to deny a stay.

19         MS. LARAKERS:  No, Your Honor, not if it's purely

20  discretionary, but they can certainly review whether their case

21  should be reopened based on changed circumstances or based on

22  constitutional claims, the same constitutional claims that form

23  the basis of this lawsuit.

24         THE COURT:  Okay.  I think this is good because we're

25  zeroing in on something.  From what I have read, I have doubts

1    about whether in this case the First Circuit could review

2    the -- whether the constitutional claims being made here could

3    be made in a motion to reopen that a Court of Appeals could

4    review.  But this is exactly -- I'm trying to get into sharp

5    focus.  But it's your position that on a motion to reopen, to

6    stay and reopen -- which has already been denied I think in

7    Ms. Calderon -- the constitutional claims in this case could

8    get to the First Circuit?

9            MS. LARAKERS:  Yes, Your Honor.

10           THE COURT:  Could the Court of Appeals issue a stay

11   even if there are no grounds to reopen the removal order?

12           MS. LARAKERS:  Your Honor, the Court of Appeals can do

13   what it wants.

14           THE COURT:  I bet you wouldn't always tell the Supreme

15   Court that.  Does it have the jurisdiction, the authority to

16   issue a stay even if there are no grounds to reopen the removal

17   order?

18           MS. LARAKERS:  If the First Circuit has already found

19   that they're not going to reopen the removal order, then they

20   wouldn't issue the stay.  However, in the meantime, a lot of

21   times what happens is they file a motion to reopen and then the

22   Court of Appeals will stay the removal so that they can

23   consider the claims that are brought in the motion to reopen.

24   And that's normally what would happen.

25           THE COURT:  All right.  So we were just talking about

1   1252(b)(9).  The other provision that the government argues

2   deprives this court of jurisdiction in this case is 1252(g).

3   Section 1252(g) states that, No court shall have jurisdiction

4   to hear any cause or claim by or on behalf of any alien arising

5   from the decision or action by the Secretary of DHS to commence

6   proceedings, adjudicate cases or execute removal orders against

7   any alien.  That's what it states?

8         MS. LARAKERS:  Yes, Your Honor.

9         THE COURT:  All right.  And am I correct in

10  understanding that it's respondents' argument that petitioners'

11  claim relates to the execution of a removal order and therefore

12  is barred by 1252(g)?

13        MS. LARAKERS:  Yes.

14        THE COURT:  And if I were to find, properly, if I were

15  to correctly conclude that -- well, let me just put it this

16  way.  If we're focusing on 1252(g), if section 1252(g) deprives

17  a District Court of jurisdiction, would the suspension clause

18  of the Constitution require this court to exercise habeas

19  jurisdiction because there is no meaningful opportunity for the

20  plaintiffs to have the Court of Appeals review their allegedly

21  colorable claim that ICE is effectuating removals in violation

22  of the provisional waiver regulations and the Fifth Amendment?

23        Maybe I have to amend that to say if both 1252(b)(9)

24  and 1252(g) deprive the court of jurisdiction, would the

25  suspension clause mean that essentially as applied, those

```
 1    statutory provisions are unconstitutional because habeas exists
 2    to provide for meaningful judicial review that's barred by
 3    statutes?
 4         MS. LARAKERS:  Your Honor, if you were to find that
 5    section 1252(g) applied, the questioning would stop there.
 6    Because in Reno, the Supreme Court held that section 1252(g)
 7    and those three specific situations is not unconstitutional.
 8    So if you were to find that section 1252(g) did apply, then the
 9    questioning would stop.
10         THE COURT:  They weren't -- what was the relief being
11    sought in Reno?
12         MS. LARAKERS:  It arose out of the action to commence
13    proceedings.  However, there is a lot of dicta from Justice
14    Scalia speaking about discretionary decisions in general made
15    by the Immigration and Naturalization Service at the time,
16    which has now been split into ICE and USCIS, et cetera.
17         THE COURT:  Which is part of the problem here.  But in
18    Reno -- we'll get to this.  But in Reno, as I recall, the
19    attack was characterized as one concerning the exercise of
20    prosecutorial discretion, right?
21         MS. LARAKERS:  Yes, Your Honor, that's how it was
22    characterized by them.
23         THE COURT:  That was actually I think the next
24    question I was going to ask you.  It's my understanding -- and
25    all of this can change in the course of the argument -- that
```

1    the court doesn't have jurisdiction, the authority to review on

2    habeas the merits of any decision to deny discretionary relief

3    if legally required factors are considered, right?  That's your

4    position?

5         MS. LARAKERS:  Yes, Your Honor.

6         THE COURT:  And there are many cases that stand for

7    that proposition, <u>Saint Fort</u> being one.  However, do you agree

8    that the court has habeas jurisdiction or habeas jurisdiction

9    can be exercised to decide whether the respondents failed to

10   consider plaintiffs petitioners for discretionary relief

11   afforded by the provisional waiver regulations -- or even put

12   aside the provisional waiver regulations.

13        As a general proposition, if a petitioner is entitled

14   to -- if there's a statute or regulation that gives the

15   Department of Homeland Security the authority to grant

16   discretionary relief and habeas, the petitioner can challenge

17   an alleged failure to consider the petitioner for discretionary

18   relief but not, if that discretionary decision was made, the

19   merits of the decision.

20        MS. LARAKERS:  Yes, Your Honor.  However, in that

21   vein, that's if the regulations, as you said, require that of

22   the agency prior to removal, prior to arrest, et cetera.  And

23   our position here is that they do not.

24        THE COURT:  But that takes us back, I think, to the

25   suspension clause.  But here, this may help each of you as you

1    argue this.

2         One, I think I'm particularly interested in whether

3    the claims made in this case could be raised in an immigration

4    court, go to the BIA, and then be decided by the First Circuit.

5    That's an important question.

6         And then an important question, in my tentative view

7    or understanding in this area in the law that district judges

8    until recently didn't deal with very often, my tentative view

9    is that they could not get to the First Circuit -- I'll tell

10   you my tentative view with regard to 1252(g) is that it does

11   appear to strip this court of jurisdiction.  But if the First

12   Circuit doesn't have jurisdiction over the claims in this case,

13   and 1252(g) operates to -- would operate to strip this court of

14   jurisdiction because the relief being sought relates to the

15   execution of an order of removal, then it appears to me there

16   will be no opportunity for judicial review anywhere, and

17   essentially 1252(g) would be unconstitutional as applied in

18   this case.

19        But you'll address all of that.  Not yet.  I'm trying

20   to figure out what the questions are before you start answering

21   them.

22        MS. LARAKERS:  Your Honor, if I may, without any

23   argument, so the second step to that analysis is (b)(9) because

24   when a motion to reopen is granted, that removal order goes

25   away.  And that's the reason why the Court of Appeals and the

1    IJ and the BIA can grant a state of removal so that they can

2    consider whether a motion to reopen can be granted; and if they

3    grant the motion to reopen, the final order of removal goes

4    away.  So they can still see all of those underlying claims.

5         THE COURT:  But what if they deny the motion to

6    reopen, they just write Denied?

7         MS. LARAKERS:  Your Honor, our argument is that is all

8    the process that is due, and that's what the suspension clause

9    allows for.

10         THE COURT:  If a motion to reopen is denied by the

11    immigration court and it's appealed to the BIA, so the

12    immigration court just writes Denied, and the BIA -- there's an

13    appeal to the BIA that says Denied, can the First Circuit

14    review that?

15         MS. LARAKERS:  Yes, Your Honor.  And it's our position

16    that they can review that because they certainly haven't

17    foreclosed that ability, especially in this context with regard

18    to constitutional claims, which is the heart of the matter

19    here.

20         THE COURT:  All right.  Well, all right.  Now I think

21    I'm ready to start the argument on the motion to dismiss,

22    unless there's something the petitioners would like to say by

23    way of example on this.  Or should I just hear the argument?

24         MS. LAFAILLE:  I think this may go to the argument,

25    but obviously we dispute that this can be raised in a petition

1    for review.  I don't know if that's --

2          THE COURT:  Here.  Speak a little louder, please, into

3    the microphone.

4          MS. LAFAILLE:  I apologize, Your Honor.  We don't

5    agree that these claims can be raised in a petition for review

6    or that they could be channelled into review of an order of

7    removal.  I don't know if the court wants me to address that

8    now or --

9          THE COURT:  No, I don't.  Well, here, just very

10   succinctly, why not?

11         MS. LAFAILLE:  Well, Your Honor, I mean --

12         THE COURT:  Maybe it can't be done succinctly.

13         MS. LAFAILLE:  Maybe it's not succinct.  But

14   fundamentally, the petitioners don't challenge the orders of

15   removal.  As Your Honor identified, the purpose of a motion to

16   reopen is to reopen the immigration proceeding.  And a very

17   telling document is at ECF 50-5.  When Ms. De Souza tried to

18   reopen her case to pursue provisional waivers, the BIA told her

19   she didn't need to reopen; she could, under the regulations,

20   pursue her provisional waiver without reopening her case.

21   That's exactly what she tried to do.

22         THE COURT:  And did she appeal that?

23         MS. LAFAILLE:  No, Your Honor.  And I'd be shocked if

24   the government had ever acknowledged jurisdiction of a Circuit

25   Court over a sua sponte denial of a motion to reopen.

1          THE COURT:  And it has to be so-called sua sponte

2     because you have to file a motion to reopen within 90 days of

3     the removal order?

4          MS. LAFAILLE:  Correct, Your Honor.  Or narrowly --

5     all of our clients have tried to reopen their removal orders

6     after being married to U.S. citizens.  All of those motions

7     have been denied.  And one of the reasons they've been denied,

8     Your Honor, is, as Your Honor identified, they are time-barred.

9          THE COURT:  All right.  So that helps me get to the

10    starting line.  Do you want to argue your motion to dismiss --

11    well, actually first on jurisdictional grounds, and then I'll

12    hear you on whether there is a failure to state a plausible

13    claim under which relief can be granted.

14         MS. LARAKERS:  Yes, Your Honor.  So as already stated,

15    the first question before this court is whether and then to

16    what extent this court has jurisdiction over the petitioners'

17    claim.  And the government's first argument with regard to that

18    is the mootness issue.  To be clear, the government does not

19    argue that the remaining claims of petitioners are barred

20    because they are moot.  Rather our claim is this court has

21    jurisdiction over the detention claims brought by petitioners,

22    and because the petitioners are no longer in detention, that

23    the rest of their claims cannot be heard by this court for

24    another reason under 1252.

25         THE COURT:  Okay.  So I have jurisdiction over the

1   detention claims but they're moot?

2          MS. LARAKERS:  Yes, Your Honor.  None of the named

3   petitioners are currently in custody.

4          THE COURT:  Are they -- aren't some of them released

5   on conditions of release?

6          MS. LARAKERS:  Yes, Your Honor.  However, they would

7   certainly -- upon being re-detained, they could certainly bring

8   a Zadvydas petition again.

9          THE COURT:  All right.  So if you're released on

10  conditions, you're in custody, right?

11         MS. LARAKERS:  Yes, Your Honor.

12         THE COURT:  Okay.  So they're in custody.  I have

13  jurisdiction.  The claims are you say moot or maybe not ripe.

14  Mootness and ripeness I think are related concepts.

15         MS. LARAKERS:  Yes, Your Honor.  And so there are

16  other jurisdiction-barring provisions with regard to

17  challenging or -- we call them orders of supervision.  I won't

18  get into that.  But the basis of any claim here is that the

19  removal should be stayed and they shouldn't be detained because

20  their removal is stayed and should be stayed under the

21  Constitution.

22         And that's precisely why the detention issues here are

23  moot.  Because they're not solely seeking not to be

24  re-detained; they're seeking not to be re-detained because they

25  can currently not be removed under the Constitution.  And

1    that's the reason why the petitioners' claims are moot and the

2    detention claims --

3            THE COURT:  Detention claims are moot.

4            MS. LARAKERS:  -- the detention claims are moot in

5    this case.

6            THE COURT:  Well, I addressed this somewhat in my

7    February 15, 2018 order, docket number 17.  If there's an

8    exception to the mootness doctrine for a controversy that is

9    capable of repetition yet evading review, am I right that ICE

10   asserts that it could again detain each of the petitioners?

11           MS. LARAKERS:  Yes, Your Honor.  But as this court has

12   demonstrated, it's not incapable of review.  It's certainly

13   reviewable by this court.  And certainly here in Boston you

14   immediately ordered that her detention be -- that her removal

15   be stayed.  And Your Honor held hearings on the detention

16   issues in this case, so it's not incapable of review.  It's not

17   evading review.  And that's the reason why it's moot.

18           And the cases that petitioners cite to, many of them

19   are pre-REAL ID ACT, Your Honor.  And that's important here

20   because pre-REAL ID ACT, there was this collateral consequences

21   doctrine.  So sometimes the Court of Appeals would remand

22   questions to the District Court, would say certainly the case

23   would be moot because they're out of detention --

24           THE COURT:  The REAL ID ACT was when, 2005?

25           MS. LARAKERS:  Yes, Your Honor.  And they would remand

1     to the District Court to consider these collateral issues,

2     which at the time the Circuit Court still believed that the

3     court had jurisdiction over.  And those may have been claims

4     exactly like that are brought here.  However, because there's

5     no longer jurisdiction over those collateral consequences for

6     the District Court, the entire case is moot here.

7             THE COURT:  I think petitioners' claims may be more

8     organic, and that's why I didn't start by focusing on

9     detention.  I think -- and this will be further clarified, but

10    I think this is part of what Ms. Lafaille was saying.  The

11    petitioners argue that provisional waiver regulations give them

12    a right, absent exceptional circumstances, to stay with their

13    families, one of the stated purposes of the regulations, while

14    Citizenship and Immigration Services decides whether they

15    should get a provisional waiver and only be separated from

16    their families for a couple of weeks before they come back to

17    the United States, not in a couple of years or -- not many

18    months or a couple of years or more; and that if petitioners or

19    people in the class they seek to represent are arrested at CIS

20    offices when they're participating in this process that could

21    lead to a provisional waiver and then detained and removed, a

22    continuum of events in their view, they're deprived of the

23    right granted to them to pursue the process, not a right to a

24    particular decision but a right to pursue the process.

25            MS. LARAKERS:  Yes, Your Honor.  And our argument is

1    not that those claims are moot.  Those claims are precluded by

2    1252.  And certainly, I could just move on to there.  I just

3    wanted to make clear that if this court were to dismiss those

4    claims, there would be no remaining detention claims for this

5    court to exercise jurisdiction over.

6              THE COURT:  Which I think is why I was starting with

7    that.  This is helpful because I raised mootness with you back

8    in February.  So it's useful.

9              I guess what this argument means is if I don't dismiss

10   the more I'll call it organic claim, the one I just tried to

11   articulate, the detention claims might be moot in any event

12   because, while they're in custody as a result of being under

13   supervision, they're not detained.

14             MS. LARAKERS:  Yes, Your Honor.  And just to tie up

15   any loose ends, if this court were to dismiss the remaining

16   claims, the entire case should be dismissed.

17             THE COURT:  Yes.

18             MS. LARAKERS:  So I can move on to the section 1252

19   argument.  The First Circuit in Aguilar made very clear that

20   courts should be wary of creative pleading to get around

21   jurisdictional rules.  And our position is that that's exactly

22   what the petitioners are doing here.  It's creative pleading to

23   get around the jurisdictional rules in section 1252(g), and if

24   this court were to agree with section 1252(g), also with

25   section 1252(b)(9).

1            The petitioners can't simply state that they're not

2     challenging the discretionary decision of the government when

3     they're also asking for the government to exercise their

4     discretion in a certain way.

5            THE COURT:  I think their argument then is in part

6     that, as in a McCarthy era case or Nixon, the Watergate case,

7     the executive branch by regulations that are law has limited

8     the discretion it would have in the absence of those legal

9     obligations.  And as long as the regulations are in effect, it

10    can't ignore them, and it alleges they are ignoring them.  I

11    think that's the argument.

12           MS. LARAKERS:  Your Honor, that's why this case can be

13    confusing at times and hard to delineate.  Because certainly

14    our position is that the regulations do not require that.

15           THE COURT:  Well, no.  I think that's -- that's what I

16    have to -- I think that's the heart of the motion, the

17    beginning of the heart of the motion to dismiss.  Maybe you

18    want to address that.  Because -- well, why is that?

19           MS. LARAKERS:  First, Your Honor, I'd like to direct

20    you to -- I think the dicta in Reno is very telling on these

21    issues.

22           THE COURT:  Let's see.  Reno --

23           MS. LARAKERS:  Reno v. AADC.  I think it's Arab --

24           THE COURT:  Arab Anti-Discrimination -- yes, they're

25    calling it Reno.  Okay.  I have it.

```
 1              MS. LARAKERS:  So Your Honor, I don't have the -- let
 2    me find the pin cite.
 3              THE COURT:  What page?
 4              MS. LARAKERS:  Let me find the pin cite.  I have it
 5    all highlighted.
 6              THE COURT:  Maybe 482?
 7              MS. LARAKERS:  The pin cite is 491.  It starts on 489.
 8    That's where Justice Scalia's dicta starts regarding the
 9    expanse of 1252(g).  And I think the exact thing that I want to
10    read is on 491.  But he's delineating the difference in between
11    prosecutorial discretion in criminal cases versus immigration
12    cases.  And he says, Whereas in criminal proceedings the
13    consequence of delay is merely to postpone the criminal's
14    receipt of his just deserts, in deportation proceedings the
15    consequence is to permit and prolong the continuing violation
16    of United States law.
17              THE COURT:  Hold on just one second.  You say that
18    that's on 491?
19              MS. LARAKERS:  It's right above that, 490, right above
20    where it says 491.  I'm sorry.  Right at the end of 490.
21              THE COURT:  I see it.
22              MS. LARAKERS:  So the most telling thing in that quote
23    is that Justice Scalia clearly contemplates this type of
24    situation to arise.  He says, Postponing justifiable
25    deportation (in the hope that the alien's status will change
```

by, for example, marriage to an American citizen or simply with
the object of extending the alien's unlawful stay) is often the
principal object of resistance to a deportation proceeding and
the additional obstacle of selective-enforcement suits could
leave the INS hard pressed to enforce routine status
requirements.

THE COURT:  This is a 1999 decision, correct?

MS. LARAKERS:  Yes, Your Honor, but it is still the
leading decision.

THE COURT:  I know, but it's prior to the regulations
that are at issue here, right?

MS. LARAKERS:  Yes, Your Honor.  And again, we could
go back and talk about the regulations.  However, I just want
to show in 1999, Justice Scalia did contemplate this type of
situation to arise, and that people, the longer they stay here,
could certainly get married to United States citizens.  And
he's recognizing that even though their equities in the United
States may change, that doesn't change the fact that the
situation is still precluded by section 1252(g) because ICE is
still exercising their discretion to remove people despite
their ties to the United States.  And he warns against the INS
having to justify that every single time.

And certainly the government's position is that if
this court were to order -- it's hard to imagine a situation
where any iteration of granting the relief by petitioners

1    wouldn't result in these selective prosecution cases coming to

2    the District Court to say, Well, they didn't consider -- INS

3    didn't consider --

4             THE COURT:  It's actually easy, for me anyway.  We

5    went through this before.  I understand that -- isn't there --

6    aren't there a whole series of cases that stand for the

7    proposition that we went over before, that I think you agree

8    with, that the District Court doesn't have the authority to

9    review the merits of a discretionary decision but does have the

10   authority to consider the failure to consider someone for

11   discretionary relief if he or she is eligible to be considered

12   for that relief, right?  I mean, isn't that the black letter

13   law?

14            MS. LARAKERS:  It is, Your Honor.

15            THE COURT:  And that's what I understand they're

16   arguing, and I'm getting a little ahead of this because --

17   well, it goes to whether there's a plausible claim or, if we

18   get to injunction, preliminary injunction, a reasonable

19   likelihood of success on the merits.  And the argument is that

20   in 2013 the provisional waiver regulations were promulgated

21   because there's a strong interest in keeping, you know,

22   families of United States citizens together.  This is in the

23   explanation.  And there are cases that discerned it previously

24   in the Immigration and Naturalization Act.  But originally in

25   2013, people with final removal orders were not eligible.  Then

1    in 2016, the regulations were amended to make them eligible for

2    consideration, right?

3              MS. LARAKERS:  Yes, Your Honor.

4              THE COURT:  And then, so the argument is, as I

5    understand it from the petitioners, not that ICE has made an

6    incorrect or unwise discretionary decision in any particular

7    case, but it's categorically not considering the provisional

8    waiver applications in deciding how to exercise its discretion.

9              MS. LARAKERS:  Your Honor, and because it's the

10   government's position that the regulations don't clearly

11   state -- even if the government's position was that the

12   regulations did require that prior to removing someone, the

13   regulations certainly clearly don't state -- there's no

14   guideline for what ICE is supposed to go by.  And certainly

15   Justice Scalia --

16             THE COURT:  But the allegation is -- I think I

17   understand that if this was one person attacking one isolated

18   ICE decision and ICE said, you know, they had some guidance, we

19   considered all the laws, all the regulations; you lose.  But

20   here the allegation is that -- because this is a motion to

21   dismiss, so if there's jurisdiction, I have to decide if the

22   claim is plausible.  I think it's plausible.

23             Ms. Adducci is in charge of the field office.  She

24   didn't even know the regulations exist, according to her

25   deposition.  So there's a reasonable likelihood, it seems --

1    I'm going to listen to all of this if we get to it -- that

2    they're going to be able to prove that ICE is not considering

3    the regulations, at least around here.

4              MS. LARAKERS:  Well, very quickly, Your Honor.

5              THE COURT:  It doesn't have to be that quick.

6              MS. LARAKERS:  Okay.  Well, Your Honor, with regard to

7    the regulations, first, the government's position is that the

8    regulations are very clear that they do not protect against

9    removal; and second, even backing up further than that, Your

10   Honor, even the named petitioners here are not yet eligible to

11   file the provisional waiver that they seek.  And it is not as

12   easy as the petitioners characterize it in their briefs to even

13   get to that point.

14             The I-130, yes, is a nondiscretionary decision, and it

15   is the simplest step in this process to establish a bona fide

16   marriage.  But as stated in our briefing, there are even

17   putative class members who have a marriage fraud bar to even

18   getting that first step of form of relief.

19             THE COURT:  And this is part of the reason I tried to

20   clarify things at the outset.  I don't understand them to be

21   arguing that they're entitled to provisional waivers, but

22   they're saying they're entitled ordinarily to pursue the

23   provisional waiver process because, you know, there was a legal

24   process that was followed to create the regulation.  I don't

25   know if you're still arguing -- or are arguing this.  Is it

1   your argument that those regulations aren't laws the way

2   statutes are laws?

3           MS. LARAKERS:  No, that's not my argument.  The

4   argument is that the regulations don't protect from removal.

5           THE COURT:  We can get into that.

6           MS. LARAKERS:  We can get into that, but even if we're

7   backing up here, the I-130 is the first step in that process,

8   and ICE is aware of what an I-130 is.

9           THE COURT:  Well, first of all, the allegations --

10          MS. LARAKERS:  Go ahead, Your Honor.

11          THE COURT:  Go ahead.

12          MS. LARAKERS:  Your Honor --

13          THE COURT:  Didn't Ms. Adducci testify in her

14  deposition that she didn't know the provisional waiver

15  regulation, 2016 provisional waiver regulation had been adopted

16  making aliens subject to a final order of removal eligible to

17  pursue that process?

18          MS. LARAKERS:  I believe that part of the deposition

19  was unclear.  She later did come back and say that she did.

20  But the point is --

21          THE COURT:  I read it.  Well, she may testify.  We'll

22  see.

23          MS. LARAKERS:  Yes, absolutely.  And that can be

24  cleared up, Your Honor.

25          They point is, this term "provisional waiver process"

1   is something that the petitioners have coined.  So when they

2   say it in that way -- ICE knows about applications for relief,

3   and they've testified previously in this courtroom that they do

4   consider applications for relief when they see them on their

5   system.

6          And those applications for relief could be anything.

7   It could be an I-130, it could be an I-212, the second step in

8   that process, or it could be the last step in that process,

9   I-601A.  But the government's argument is that that first step

10  in that process is a nondiscretionary decision, and it is very

11  far away from that last step of the process.  That could change

12  whether ICE decides to exercise discretion in a favorable way.

13         And the 212 is important.  The reason why the 212 is

14  so important to be granted first before ICE really considers

15  whether someone's eligible for a 601 is because --

16         THE COURT:  You're talking shorthand.

17         MS. LARAKERS:  I apologize, Your Honor.

18         THE COURT:  You want to make sure I understand it, and

19  there are a lot of people here who might like to know what

20  we're talking about, too.

21         MS. LARAKERS:  Absolutely.  Let me clarify.  The I-212

22  is a permission to reapply after you have a final order of

23  removal.

24         THE COURT:  So the first step in the process is you

25  have to prove to Citizenship and Immigration Services that your

1   marriage to an American citizen is genuine, not a sham attempt

2   to get an immigration benefit you're not eligible for.

3          MS. LARAKERS:  Or that you haven't been -- that you're

4   not barred by a previous marriage fraud as well.  Because even

5   if your current marriage is legitimate, if you tried to commit

6   marriage fraud in the past, you're still barred.  That's the

7   first step.

8          THE COURT:  Okay.  So that's the first step.  A couple

9   has to go to -- may have to go to a CIS office to be

10  interviewed so that determination can be made.

11         MS. LARAKERS:  Yes.  And importantly, that's a

12  nondiscretionary decision by USCIS.  It's merely just

13  recognizing that a relationship exists.  The hard part comes at

14  the 212 process, which is the permission for consent to reapply

15  for admission.  And in that application they have to show

16  there's some form of extreme hardship to a U.S. citizen

17  qualifying relative, such as a spouse.

18         And that in that point in the process, I think any ICE

19  official would also agree, that somebody who has been approved

20  at that process certainly has more discretionary factors to

21  consider than someone at the I-130 process.  And I say this all

22  to come back to what Justice Scalia said in Reno, which

23  actually is on 491 this time.  He says, The executive should

24  not have to disclose its real reasons for deeming nationals of

25  a particular country a special threat or indeed for simply

1    wishing to antagonize a foreign country by focussing on that

2    country's nationals.  And even if it did disclose them, a court

3    would be ill-equipped to determine their authenticity and

4    utterly unable to assess their adequacy.

5           THE COURT:  I think I understand that.  I used to work

6    with Justice Scalia in the Justice Department from 1974 to '77.

7    You said earlier, you know, that if somebody had gotten the

8    I-212, they've shown there was extreme hardship to a U.S.

9    citizen, that would weigh more heavily with ICE than somebody

10   who was earlier in the process, correct?

11          MS. LARAKERS:  Yes, Your Honor, it should.  And

12   certainly -- I don't want to speak wholly for ICE.  We have

13   witnesses here.  You can ask them.

14          THE COURT:  Now we're on the motion to dismiss.  So I

15   have to take the well-pleaded allegations as true.  The

16   allegation is that ICE -- and I'm the one who started

17   conflating the --

18          MS. LARAKERS:  ICE does not consider it --

19          THE COURT:  The allegation is that ICE is not doing

20   that.  It's not even perfectly clear to me that it's ICE that

21   should be making this decision, but that's another issue.

22   Assuming it is, the allegation is that ICE is not considering

23   where somebody is on the provisional waiver continuum; that

24   they're not considering it at all.

25          MS. LARAKERS:  And Your Honor, the point of me laying

1    out the process and where ICE's discretion may lay is just to

2    tie it back into my argument with 1252(g).

3            THE COURT:  So the first step is getting an I-130 that

4    you have to go to CIS often, maybe not always, to get, right?

5            MS. LARAKERS:  Yes, Your Honor, yes.

6            THE COURT:  And in about the last 18 months -- well,

7    at some point in the last 18 months in this geographical area,

8    CIS was telling ICE when people with final orders of removal

9    were scheduled to have appointments seeking an I-130 and then

10   they were getting arrested right before -- some of them, right

11   before or after their appointments, right?

12           MS. LARAKERS:  Yes, Your Honor.

13           THE COURT:  All right.  If you get the I-130, then the

14   alien tries to get what?

15           MS. LARAKERS:  They try to get an I-212 approved.

16   They file an application for -- it's called an I-212.  It's

17   called an application for consent to reapply to the United

18   States.  It's basically to get rid of the removal order, Your

19   Honor.

20           THE COURT:  So that would -- if you get that I-212,

21   your removal order is eliminated, correct?

22           MS. LARAKERS:  It's not technically -- I don't want to

23   get too into the regulations.

24           THE COURT:  It's not a bar any longer.

25           MS. LARAKERS:  It's not a bar any longer to apply for

1    more applications for relief and to adjust -- to get permanent

2    residency, Your Honor.

3              THE COURT:  All right.  Then what's the next thing?

4              MS. LARAKERS:  Then the final step in the process is

5    the provisional waiver, which is based on a statute that allows

6    the alien to waive their unlawful presence in the United

7    States, and that statute allows for that waiver.  And then

8    there are regulations that allow that waiver, the application

9    for that waiver to be applied for from within the United States

10   or from outside of the United States.  But importantly, it's

11   tied to that one statute which allows the waiver.  And the

12   statute is silent on where that application should be.

13             THE COURT:  But the regulation --

14             MS. LARAKERS:  But the regulation, yes, allows it to

15   be applied for from within the United States.

16             THE COURT:  And we can get into this.  I mean, you

17   know, there are certain provisions that say, you know -- and

18   the explanations seem to contemplate that somebody pursuing

19   this process will be in the United States for the provisional

20   waiver decision to be made.  I mean, the hardship is separating

21   an alien from a U.S. citizen spouse and often from his children

22   who are U.S. citizens.

23             And it's a hardship for the citizens to be separated

24   from their spouses and parents, and it can be a financial as

25   well as an emotional hardship.  So that's essentially what the

1    provisional waiver regulations are intended to address, isn't

2    it?

3         MS. LARAKERS:  Yes, Your Honor.  And it's certainly --

4    it says that in the purpose, and the government doesn't dispute

5    that.

6         But the reason why I explained this entire process and

7    the reason why I went into the regulations which speak to the

8    merits -- and certainly I can move on when Your Honor would

9    like me to -- is because what Justice Scalia said in Reno the

10   government completely agrees with.  It would be very difficult

11   to define the parameters of how ICE is supposed to exercise

12   that discretion in a process that is inherently complicated and

13   has multiple steps.

14        THE COURT:  I think we're going in circles, but let's

15   say ICE admitted, said we don't -- we know there are those

16   provisional waiver regulations, they were promulgated in the

17   Obama administration, they don't mean anything to us, we

18   completely ignore them and don't take them into account.  We

19   just categorically -- some people are eligible for provisional

20   waivers including some people with final orders of removal.  We

21   don't care.  We're not going to consider that somebody has

22   initiated that process and is someplace on the continuum.

23   Would I have jurisdiction over that claim under (b)(9)?

24        MS. LARAKERS:  No, Your Honor.  I have to say that

25   this is a motion to dismiss, and so even if as the complaint

1    alleges ICE doesn't consider any of that, there are no -- as

2    Justice Scalia said, there are no parameters for ICE's

3    discretion in that area to execute a removal.

4         THE COURT:  There were no parameters in 1999.  A

5    regulation, as you agree, is a legal obligation and, you know,

6    this is what -- this is where I came in, this is when I was

7    working with future Justice Scalia.

8         You know, President Nixon said, "The special

9    prosecutor can't subpoena the tapes that I made in the Oval

10   Office.  In fact, I'm directing them not to do that."  And I

11   wrote about this in my June 11 decision on detention when I

12   found ICE wasn't following the regulations even as it

13   interprets it, which, as I said, I think may well be too

14   favorable to ICE.  But the Supreme Court said the regulation

15   limits, you know, the President, the executive branch, put

16   limits on the authority that the President might otherwise

17   have, and those regulations are laws.  The President has to

18   obey the law.  And the courts have to enforce the law as

19   expressed in the regulation.  So that's why at the moment I

20   don't think Reno disposes of it.  And this isn't an attack on

21   any discretionary decision.  It's an attack on an alleged

22   failure to consider something that the existence of the

23   regulations require be considered by somebody.

24        MS. LARAKERS:  So Your Honor, it does seem very clear

25   that your decision on 1252(g) is inherently wrapped up in what

1    the regulations say.  And certainly the government would

2    probably agree that if there were explicit regulations stating

3    that -- if the regulations in this case or in any case stated

4    that ICE has to consider X, Y and Z before removing someone,

5    then that would be a different case.

6         THE COURT:  This is the Department of Homeland

7    Security.  If the Department of Homeland Security -- you know,

8    it's my right hand and my left hand.  It's me.  That's why I'm

9    not -- it's not perfectly clear to me that it's ICE that should

10   be making this decision.  Maybe it's somebody who supervises

11   both DHS and ICE.

12        Because the Department of -- sorry.  I mean, this is

13   kind of what's vexing about this.  Removal authority wasn't

14   amended, but these constraints on the Department of Homeland

15   Security and on the executive branch in the regulations exist.

16   But anyway, I'm trying to frame the question.  I don't

17   understand that it's Ms. Calderon or anybody else attacking a

18   particular discretionary decision in their own case, the merits

19   of it, as opposed to the failure to consider something that,

20   you know, many cases, including First Circuit cases, have said

21   if something has to be considered, if there's a failure to

22   consider it, there's habeas jurisdiction.  The question maybe

23   is what imposes an obligation on ICE to consider the

24   provisional waiver process.

25        MS. LARAKERS:  Yes, Your Honor.  That is the question.

1    And certainly if the regulations stated that ICE or USCIS or

2    any arm of DHS had to consider a person's future, not current

3    but even future eligibility for the provisional waiver process,

4    that would be a different case.

5            THE COURT:  Actually, when you say provisional waiver,

6    eligibility for the process, as I understand it -- maybe I

7    misunderstand it -- the contention is that somebody who is --

8    this only relates to people who initiate the process, in other

9    words, if they're seeking at least an I-130.  I don't

10   understand that I'm being asked to order relief for somebody

11   who hasn't tried to avail themselves of the legal process and

12   is picked up in a traffic stop or robbing a bank.

13           MS. LARAKERS:  Absolutely.  But the regulations don't

14   say either, Your Honor.  They certainly don't say that any arm

15   of DHS has to consider whether someone has filed an I-130

16   before removing them, and the I-130, Your Honor, was --

17           THE COURT:  What's the purpose of the provisional

18   waiver regulations if not to impose some constraint on removal?

19           MS. LARAKERS:  Your Honor, the purpose can't outweigh

20   the text.  The text says that a pending or approved waiver does

21   not prevent you from being removed and it's not a stay of

22   removal.  That's what the regulation text says.

23           And in fact, the I-130, the beginning of this

24   provisional waiver process, as is coined by the petitioners,

25   was available for people with final orders of removal at the

```
 1   time Reno was decided.  So some form of this process, some
 2   relief has always been available for people with final orders
 3   of removal in this country.  And the fact that Scalia didn't
 4   point that out, and with regard to the first two steps, the
 5   answer certainly shouldn't change here with regard to a last
 6   step with regard to a regulation which does not -- which states
 7   explicitly in its text that a pending or approved waiver is not
 8   a stay of removal.  And certainly --
 9            THE COURT:  That's not quite -- that's not what the
10   regulation says.
11            MS. LARAKERS:  A pending or approved -- sorry, Your
12   Honor.  I can read it out loud.  A pending or approved
13   provisional unlawful presence waiver does not constitute a
14   grant of lawful immigration status or a period of stay.
15            THE COURT:  Okay.  So it's not a grant of lawful
16   immigration status, so it doesn't mean, for example, you're a
17   lawful permanent resident.  That's an immigration status,
18   right?
19            MS. LARAKERS:  Yes.
20            THE COURT:  So you're still an alien who is in the
21   country illegally, right?
22            MS. LARAKERS:  Yes.
23            THE COURT:  And read the second part of it.
24            MS. LARAKERS:  Then it says, Or a period of stay.
25            THE COURT:  Here, is that the --
```

1          MS. LARAKERS:  It says, Grant of lawful immigration

2     status or a period of stay.

3          THE COURT:  Okay.  A period of stay is a term of art I

4     think, because if the clock is running, if you're in the United

5     States for, what, more than a year, for some period of time --

6     it makes a difference how long you're unlawfully in the United

7     States for some purposes, doesn't it?

8          MS. LARAKERS:  Your Honor, the term of art here is a

9     period of stay, a stay of removal.  That's what it's referring

10     to.  I think what you're referring to is maybe stopping the

11     clock on the unlawful presence, but there would be no point for

12     the regulation if they had to stop the clock because the

13     regulation already assumes that you have exceeded your unlawful

14     presence and need the waiver.

15          So the period of stay here, it refers to a stay of

16     removal.  And it's also made clear, as much as we talk about

17     the purpose, we should also talk about what's also in those

18     comments, which are suggestions by the public.  The public

19     suggested while somebody has a provisional unlawful presence

20     waiver, and this was during the Obama administration still, why

21     doesn't DHS give interim benefits such as an employment

22     authorization card or other benefits while they pursue this

23     waiver.  And DHS explicitly said, No, we don't want to give

24     interim benefits because the purpose is not to extend someone's

25     unlawful stay.

1          So those types of benefits, a stay of removal, which

2     is explicitly denied in the text, and other interim benefits

3     were explicitly denied by DHS even at the time the regulation

4     was promulgated.

5          And even on the USCIS website -- and I can certainly

6     pull it up for Your Honor -- there is a chart, and on this

7     provisional waiver chart that's available to the public, it

8     states that a provisional unlawful presence waiver does not

9     protect you from removal.  This isn't -- the regulations do not

10    say that ICE or DHS or USCIS has to consider a pending or

11    approved --

12         THE COURT:  Am I correct that -- now we're on

13    jurisdictional --

14         MS. LARAKERS:  I understand --

15         THE COURT:  No, but I just want to -- for me to have

16    jurisdiction, for this court to have jurisdiction, there has to

17    be a colorable claim that the regulations require

18    consideration.  I'm not deciding the merits now.  It's a

19    different standard than the usual motion to dismiss, failure to

20    state a plausible claim.  Here there has to be a colorable

21    claim.  Is that the right terminology?

22         MS. LARAKERS:  Yes, I believe so, Your Honor.

23         THE COURT:  All right.

24         MS. LARAKERS:  So again, not going to the merits, but

25    since 1252(g) -- to determine whether it's a discretionary

1     decision or whether the regulations require it, which would

2     certainly bring it outside, as Your Honor noted, it would bring

3     it outside this discretionary decision, there are no guidelines

4     for which this court or other courts in the future to determine

5     whether ICE did something correctly.  Because the regulations

6     themselves say that ICE shouldn't grant -- doesn't have to

7     grant a period of stay even if someone is at that last step in

8     the process.

9          THE COURT:  I'm repeating myself.  If ICE considers

10    everything it's legally required to consider, then I don't have

11    jurisdiction to review whether that was a wise discretionary

12    decision.  But if there's something they're required to

13    consider and don't, that I do have jurisdiction to consider.

14    And the question is, I think, is there a colorable claim that

15    ICE is failing to consider something it's legally required to

16    consider.  So that's one issue.

17         MS. LARAKERS:  Yes, Your Honor.  And the government

18    doesn't have -- the government's position is that there is no

19    such statute that says that they must consider it.  And in

20    fact, all the regulation text and all of what we have in front

21    of us says that's not what the regulation was intended to do.

22    It was for people who were already here who were not having

23    their orders of removal executed, it was an act of grace by the

24    government to allow them to do it here anyway to encourage them

25    to apply.  And in that way the petitioners are correct.  The

1    purpose is stated there, and the government doesn't dispute

2    that.  But what the government does dispute is that there is

3    some regulation that requires them to consider it.  And that

4    regulation isn't -- there is no such regulation, and it's not

5    the provisional waiver regulation at issue in this case.

6              THE COURT:  And this goes to the 1252(b)(9) issue.  So

7    right now I'm trying to start with jurisdiction.  Start off

8    with jurisdiction.  If I don't have the power to decide this,

9    it will go someplace.  How would this issue, the issue of

10   whether there's a duty -- that ICE has a duty to consider that

11   somebody has initiated the provisional waiver process and is in

12   it get to the First Circuit?

13             MS. LARAKERS:  So, Your Honor, as we stated before,

14   there is a process, sua sponte reopening.  I'm not sure why

15   it's called that because the petitioner can -- certainly the

16   immigrant can move for it themselves.  That can be denied

17   from -- as I understand it can be denied at the IJ level or at

18   the BIA level, assuming it is denied.

19             THE COURT:  Hold on just one second.  All right.

20   Here, why don't you go ahead.

21             MS. LARAKERS:  Yes, Your Honor.  So I think this is --

22             THE COURT:  The question is how would this get to the

23   First Circuit.

24             MS. LARAKERS:  Yes.  So it would be a motion for a sua

25   sponte reopening.  And as petitioners pointed out, their

1   motions to reopen have been denied.  But just because a motion

2   to reopen has been denied doesn't mean that it's not available.

3   And that's all a --

4          THE COURT:  How is it available to -- how does it get

5   to the First Circuit?  Isn't that a discretionary decision?

6          MS. LARAKERS:  By the IJ and by the -- what's not

7   discretionary is a constitutional claim.  So they would bring

8   that -- they would say that the petitioners -- sorry -- would

9   petition for review in the First Circuit of their denial of

10  their sua sponte motion to reopen based on the constitutional

11  claims that are stated here.

12         The First Circuit in <u>Mata v. Sessions</u>, that's a 2017

13  case, said that we're not presented squarely with this question

14  today of whether a sua sponte reopening can be appealed in the

15  First Circuit, so we don't need to decide it.  However, it goes

16  on a string cite of cases that have said, But many Circuit

17  courts have held that we can, we can review it, that we can

18  review a denial of a sua sponte reopening.

19         THE COURT:  I've looked at that case, and the First

20  Circuit said it repeatedly held it does not have jurisdiction

21  to review challenges to the BIA's failure to exercise its sua

22  sponte authority because such decisions are committed to its

23  unfettered discretion, but it recognized that there may be an

24  exception that's been recognized in other circuits for refusals

25  to reopen removal proceedings sua sponte when the petitioner

1    raised constitutional claims or legal questions.  And the First

2    Circuit may join.  So that's your point.

3              MS. LARAKERS:  That's my point.

4              THE COURT:  Then let's keep going.  So there's a

5    question of whether that would be adequate.  Let's say this got

6    to the First Circuit and the First Circuit said the BIA didn't

7    consider the provisional waiver applications and there's a

8    legal obligation to do it, claims it's an error of law, and the

9    First Circuit presumably would -- let's say hypothetically the

10   First Circuit decided that is an error of law.  You're required

11   to consider the provisional waiver applications.  And it went

12   back to the immigration judge, and then the immigration judge

13   could say, Well, I've considered the provisional waiver

14   applications, and I again deny reopening, right?

15             MS. LARAKERS:  Yes, Your Honor.

16             THE COURT:  That's a discretionary decision.  That one

17   can't be reviewed by the First Circuit, right?

18             MS. LARAKERS:  Yes, Your Honor.  So the First Circuit

19   would give the legal parameters by which the immigration judge

20   or the BIA is supposed to review these types of cases based on

21   the Constitution.  And in St. Cyr, that's all that was

22   required.

23             THE COURT:  So here, okay.  So one of the people

24   who -- one of the petitioners in this case, Ms. Calderon, but

25   several of them, they've asked to have their cases reopened,

1    and it's been denied, correct?

2              MS. LARAKERS:  Yes, Your Honor.  That's what I -- as

3    petitioners have said, that's what I believe.

4              THE COURT:  So how do you respond to the following:

5              So I think we're in agreement that if this got to the

6    First Circuit and the First Circuit said the immigration judge

7    and the BIA have to consider the provisional waiver

8    applications in deciding to whether to reopen and then it was

9    again denied, that would be a discretionary decision that

10   couldn't be reviewed by the First Circuit.  Am I correct?

11             MS. LARAKERS:  Yes.  Assuming that the immigration

12   judge followed the parameters that the First Circuit set.

13   Certainly it could set -- there is no claim stripping

14   jurisdiction with regard to (b)(9), so it could set a full

15   constitutional framework for the immigration judge and the BIA.

16             THE COURT:  Then Professor Newman in his treatise

17   wrote that, The mere existence of the possibility of reopening

18   would not make the remedy adequate on those occasions when

19   reopening has been denied, thus only a judicially enforceable

20   obligation to reopen would provide a solution to the

21   constitutional problem.  Is Professor Newman wrong?

22             MS. LARAKERS:  Your Honor, I think that heavily

23   depends on what the First Circuit does.  I think the First

24   Circuit is capable of creating a constitutional framework that

25   neither -- for an immigration judge or the BIA to apply, that

1   neither violates -- that doesn't violate the Constitution on

2   any front, not on a due process front and not on a suspension

3   clause front, and I think it's presumptuous for us to say they

4   couldn't do so in this case.  And I think what we should really

5   look at then is St. Cyr.  In St. Cyr, the problem there, the

6   court said two things.  They said that this case would be very

7   different if two things existed.

8           THE COURT:  Hold on a second.  I'm getting it.

9           MS. LARAKERS:  Absolutely.

10          THE COURT:  What is that, INS v. St. Cyr, maybe?

11          MS. LARAKERS:  Yes, Your Honor.

12          THE COURT:  What page would you like me to take a look

13   at?

14          MS. LARAKERS:  314.

15          THE COURT:  Okay.

16          MS. LARAKERS:  So they say, If it were clear that the

17   question of law could be answered in another judicial forum, it

18   might be permissible to accept INS's reading of 1252, but the

19   absence of such a forum coupled with the lack of a clear,

20   unambiguous and expressed statement of Congressional intent to

21   preclude judicial consideration on habeas of such an important

22   question of law strongly counsels us against adopting a

23   construction that would raise serious constitutional questions.

24          So there are two considerations with regard to

25   suspension clause claims, not just one.  The first one is

1    certainly whether it could be answered in another judicial

2    forum.  And this court already knows my argument as to that

3    point.

4        THE COURT:  Well, maybe, are we talking about -- this

5    may go back to this idea of it being a colorable claim.  If it

6    were clear that the question of law could be answered in

7    another forum, judicial forum, it might be permissible to

8    accept INS's reading.

9        MS. LARAKERS:  So that's the first part, but also the

10   second part is clearly met here.  Again, St. Cyr is another

11   pre-REAL ID ACT case where the Congressional intent had not

12   been established.  The Congressional intent they're speaking of

13   here has now been established all over 1252, stripping courts

14   of habeas jurisdiction explicitly.  Before the REAL ID ACT --

15       THE COURT:  So now we're on (g), right?

16       MS. LARAKERS:  Yes, Your Honor.

17       THE COURT:  Which I think is a good place to be.  So I

18   actually think at the moment -- and this is fluid -- that

19   you're right; that this case attacks the execution of a removal

20   order.  So the statute, if the Constitution allows it to

21   operate in this case, would deprive this court of jurisdiction.

22   But if it's not clear that the question of law could get to the

23   First Circuit, you know, so I assume or I find for present

24   purposes, jurisdictional purposes, that it can't get to the

25   First Circuit and there's no statutory jurisdiction or the

1    statute doesn't permit jurisdiction, the statute being 1252(g),

2    then it seems to me as Chief Judge Saris found in Devitri, the

3    suspension clause requires a finding of habeas jurisdiction

4    because otherwise there's no opportunity for meaningful

5    judicial review.

6              MS. LARAKERS:  Your Honor, first I'd go back to St.

7    Cyr and say that there are two considerations there, not just

8    one.  And I think that the Supreme Court is saying here that

9    either one of these would inform -- I'm not saying that it

10   would absolutely overturn their case, but certainly those are

11   two things to consider.

12             THE COURT:  The second point -- I'd have to look at

13   this again, I've read so many cases.  But this goes to I

14   think -- the second point is talking I think about the concept

15   of judicial avoidance, how do you interpret the statute.  And

16   there are many cases, several cases that interpret the statute

17   the way the petitioners want it to and say, No, this doesn't

18   relate to the execution of removal orders.  It's ambiguous, so

19   you should construe it as if it doesn't and you avoid the

20   constitutional issue, something I agree should be done whenever

21   it's properly permissible.  But I'm actually agreeing with you

22   at the moment on the interpretation of 1252(g).  Maybe you're

23   confused because --

24             MS. LARAKERS:  I understand, Your Honor.

25             THE COURT:  -- I haven't always that often agreed with

1    you.  I'm agreeing with you and disagreeing with the cases that

2    come out the other way.  But if it's not clear that the

3    questions being raised can get to the First Circuit, and

4    1252(g), if it were allowed to operate in this case, would

5    deprive the District Court of jurisdiction, then the

6    Constitution requires the exercise of habeas jurisdiction.  In

7    effect, although this terminology causes lots of problems, it

8    would be unconstitutional as applied in this case because it

9    would mean no opportunity for meaningful judicial review of

10   petitioners' claims.

11        MS. LARAKERS:  So two responses.  First, even if the

12   court in St. Cyr is referring to constitutional avoidance, I

13   still think it's a consideration here when the court -- when

14   Congress clearly strips jurisdiction, and that has been done

15   here, and the fact that they say it's clear that it could be

16   answered.  And I think it is clear that it could be, that there

17   is a possibility.  Of course that's a matter of semantics and

18   we may disagree on what the court meant there.

19        But my second argument with regard to that is, in

20   Devitri, I think Judge Saris there, she was deciding a very

21   narrow issue.  The legal question from the case is whether the

22   right to post-removal consideration of a motion to reopen and

23   motion to stay meets due process standards in a change of

24   country conditions case where there is a colorable claim of

25   persecution.  Judge Saris was faced with a much more difficult

1  question, where the United States does have a duty not to

2  remove people to a country where they have a claim of

3  persecution.  And that is a well-established right that --

4  United States has entered into conventions saying that they,

5  you know, without process, remove someone to a country where

6  they will face persecution.  And in that case, certainly each

7  of the petitioners had the opportunity to go through removal

8  proceedings and had been ordered removed.  But the question

9  there was given the United States had affirmatively given

10 protection for those petitioners for so long and then in their

11 discretion took it away, should they get another bite at the

12 apple, in consideration with the fact that the United States is

13 party to these conventions.

14       THE COURT:  But I think the argument is that this

15 case is -- I was talking about the Devitri for the legal

16 principle because I think Judge Saris read (g) the way I'm now

17 reading (g), is stripping jurisdiction, then she relied on the

18 constitutional right to habeas corpus.  Am I correct?

19       MS. LARAKERS:  Yes, Your Honor.

20       THE COURT:  So that's why I was raising it, but in

21 response -- now we're sort of getting to the more -- maybe it

22 goes to the colorable claim.  But it's analogous, I think she

23 called it Kafkaesque.  And this transcript will be prepared.

24 I'm ordering you all to order it.  And I'll give it to Judge

25 Saris.  She'll be very pleased to see that the government

1   thinks she got it right in <u>Devitri</u> because she wouldn't have

2   had to decide it if the Department of Justice was telling her

3   that she was wrong about the suspension clause.

4        It's not a frivolous point.  This is why the

5   Department of Justice has litigating authority and used to

6   fight very hard to keep it.

7        Anyway, you want to take uniform positions.  But her

8   reasoning, as I recall, is this is Kafkaesque.  The government

9   is arguing that people who say they'll be persecuted, tortured

10  if they have to go back to their homeland should go back to

11  their homeland and then apply for asylum in the United States

12  or whatever it is to be protected from persecution in their

13  homeland.

14       The analogy here is that the provisional waiver

15  applications create a legal obligation to do what sort of

16  enlightened common sense says a civilized society should do.

17  They say, you know, there are people who are in the country

18  unlawfully.  Ms. Calderon says she was brought here by her

19  parents when she was three years old, and they were all ordered

20  to leave in the 1990s, and her parents decided not to go and

21  she didn't go.  So she's still here.  And she was ordered

22  removed, and she didn't go.  That's a violation of law.  But

23  then she made a life.  She married an American citizen.  She

24  has one or more children who are American citizens.  I wrote

25  about this on June 11 and talked about on May 8.  You know,

1   there are competing legitimate considerations.

2          One is the need to not encourage people to come to the

3   United States illegally or the desire not to reward them for

4   that.  And there's also a compelling interest in keeping

5   families of United States citizens together.

6          And so the regulations say, Well, there's always been

7   a provision, people could leave the country and apply to be

8   reunited with their spouses and children, but they're looking

9   to stay with their spouses and children, and they might be

10  allowed to do that.  Wouldn't it make more sense economically,

11  wouldn't it be more humane, you know, not to separate a mother

12  from her child for six months or two years while this process

13  is being pursued if she's going to be found eligible to have

14  stayed with him.

15         So that's I think the argument why this is analogous

16  to Judge Saris's case.  It's in the sense that it's not that

17  being separated from your children is as bad as getting killed.

18  You have the hope of being reunited with them.  But it can be

19  pretty torturous.  And if somebody is going to be allowed to

20  stay in the United States anyway, that decision should be made,

21  the regulations say, while the person is here, and then you

22  have the unqualified authority to remove.

23         And, you know, as I read it, the then Secretary of

24  Homeland Security Kelly said, you know, no category is exempt.

25  I don't think the petitioners are arguing that you can't -- you

1   know, Department of Homeland Security cannot remove anybody who

2   has initiated the provisional waiver process, but they're

3   arguing there needs to be some exceptional circumstances.

4          And the memorandum -- this is just guidance -- says no

5   category is exempt, but removal authority should be exercised

6   in accordance with current Department of Homeland Security

7   policies, which mean no category is totally exempt, and with

8   the exercise of prosecutorial discretion.  Right, isn't that

9   what it says in the memo?

10         MS. LARAKERS:  Yes.

11         THE COURT:  The regulation puts -- there's paragraphs

12  about the exercise of prosecutorial discretion.  And this

13  dovetails with the petitioners' argument.  They're saying that

14  that discretion is not being exercised.  There's not

15  consideration given to the sister agency's obligations and

16  responsibilities, opportunities to decide people should stay

17  here and that some balancing should be done.  And if all the

18  proper factors are considered, then I know I can't review how

19  the balancing was done.  But if there is a colorable claim that

20  can't get to the First Circuit that one of the legally required

21  factors is not being considered, then I think I have

22  jurisdiction.  Look, it's 12:30.  I'm sorry, you can --

23         MS. LARAKERS:  Briefly, Your Honor.  I do have to

24  clear something up for the record.  The litigating position of

25  the Department of Justice is that neither in <u>Devitri</u> nor here

60

1     the suspension clause is not at issue.

2          THE COURT:  I'll give Judge Saris this part of the

3     transcript, too.

4          MS. LARAKERS:  Your Honor, the parallel I was trying

5     to make is you said it's analogous.  However, that analogy is

6     attenuated.  And that's the point I was trying to make, that I

7     understand the juxtaposition of that case.  And while our

8     position there is that the suspension clause is not violated,

9     it's certainly not violated here either where we don't have a

10    juxtaposition against that background, against that convention

11    against torture background which says that on a first instance

12    that without process we can't remove someone to a country where

13    they will be persecuted.

14         Certainly in that case for different reasons we're

15    arguing that the suspension clause does not apply, but here

16    it's even more clear that the suspension clause should not

17    apply because that's not the claim here.  And certainly I also

18    understand that there is harm, that when families are

19    separated, there is inherent harm in that.  However, the system

20    was set up to -- the Congressional directive is that people who

21    have orders of removal entered should be executed, and that if

22    Congress does not wish that to happen in cases such as these,

23    then they can make that directive.

24         THE COURT:  But didn't Congress also authorize

25    provisional waivers and the regulations implement that

```
 1   authority?

 2          MS. LARAKERS:  Your Honor, Congress implemented a

 3   waiver in a statute.

 4          THE COURT:  A waiver.

 5          MS. LARAKERS:  And DHS interpreted that statute to

 6   mean that it could be applied for within the United States or

 7   outside the United States.  But the at the same time --

 8          THE COURT:  Applied for by people who have final

 9   orders of removal?

10          MS. LARAKERS:  Yes, Your Honor, but also the DHS did

11   not interpret that regulation to say that it's a period of stay

12   or say that ICE, USCIS or DHS as a whole should consider that

13   factor before removing a person.  It explicitly said that it --

14          THE COURT:  Well, why have the regulation if it

15   doesn't need to be considered?

16          MS. LARAKERS:  Your Honor --

17          THE COURT:  I mean, look.  We've had a change in

18   administration, and when there's a change of administration,

19   policies, I think -- you know, this is democracy -- can change,

20   priorities can change.  But that's not how laws change.  Laws

21   change through a legal process.  A regulation is a law.  That's

22   what the Supreme Court told President Nixon.  That's what in

23   the McCarthy era the Supreme Court told the Attorney General.

24   You can't dictate the results of BIA decisions in advance

25   because you've delegated discretion to the BIA.
```

 1            You know, the executive branch could go through the

 2    required legal process established by the Administrative

 3    Procedure Act and revoke the provisional waiver regulations.

 4    But as long as they're there, they apply, and now the question

 5    for me is do I have jurisdiction; and if I have jurisdiction,

 6    is there a plausible claim that they're being violated.

 7            Look, it's 25 minutes of 1:00.  I'd like to get a

 8    preview of the petitioners' response to this before lunch.  So

 9    we'll take about a ten-minute break and go for about 15 or 20

10    minutes and then resume after.  Court is in recess.

11            (Recess taken 12:33 p.m. - 12:48 p.m.)

12            THE COURT:  Okay.  Why don't we begin with

13    petitioners' argument on the jurisdictional issue, please.

14            MS. LAFAILLE:  Your Honor, I think we agree with the

15    court that the key question here is whether there's a forum for

16    the claims that we're presenting here.  And we also agree with

17    the court that the language that the government cites in St.

18    Cyr is constitutional avoidance analysis and that Congress

19    cannot override the suspension clause, obviously.  I just

20    wanted to clean up two quick things before I get into the meat

21    of our jurisdictional argument.  I want to respond first --

22            THE COURT:  Hold on just a second.  Go ahead.

23            MS. LAFAILLE:  So I wanted to respond first to the

24    claim that the petitioners somehow made up or coined

25    provisional waiver process.  This is from USCIS's website.  The

1   provisional unlawful presence waiver process allows those

2   statutorily eligible for immigrant visa, et cetera, who only

3   need a waiver of inadmissibility to apply for that waiver in

4   the United States before they depart for their immigrant visa

5   interview.  That same website goes on to describe how you

6   follow that process if you are someone with a final order of

7   removal.  This is one of the attachments to our PI motion, ECF

8   50.

9          THE COURT:  Do you claim that has any legal effect?

10          MS. LAFAILLE:  By itself that wouldn't be our claim,

11   Your Honor.  But we think the regulation itself has legal

12   effect, and it certainly describes a process.  And we didn't

13   invent this process, Your Honor.  This process was put into law

14   by DHS.

15          And I also wanted to respond to the language the

16   government cites about the period of stay authorized by the

17   secretary, and that's addressed in the rulemaking itself, in

18   the 2013 rulemaking at page 561.

19          THE COURT:  Hold on a second.  I'll look at it.  Did

20   you say the 2013 rulemaking?

21          MS. LAFAILLE:  Yes, exactly.  My point there --

22          THE COURT:  What page?

23          MS. LAFAILLE:  561.  My point there, Your Honor, is

24   just --

25          THE COURT:  Hold on a second.  Let me find it.

1          MS. LAFAILLE:  So I'm looking at paragraph number 4.

2     Our point there is just that the court is exactly right, period

3     of stay authorized by the Secretary is a statutory term.

4          THE COURT:  Actually, hold on a second.  I'm not sure

5     I'm in the right place.

6          MS. LAFAILLE:  Page 561.

7          THE COURT:  Hold on a second.  All right.  And then --

8     okay, 561.  Where will I find this?

9          MS. LAFAILLE:  Paragraph 4, there are a few numbered

10    paragraphs on that page.

11         THE COURT:  Under where it says Regulatory Amendments?

12         MS. LAFAILLE:  Yes, exactly.  Your Honor had correctly

13    identified this as the language that comes from the statute

14    1182(a)(9)(b)(ii).  Period of stay authorized by the

15    Secretary -- in the statute it's period of stay authorized by

16    the Attorney General, in the INS days.  It's a statutory term

17    of art.  It refers to the accrual of unlawful presence.

18         THE COURT:  It refers to the accrual of unlawful

19    presence.

20         MS. LAFAILLE:  Right.

21         THE COURT:  And the accrual of unlawful presence is

22    significant why?

23         MS. LAFAILLE:  It's significant, for example, because

24    there are different lengths -- for example, if someone was

25    denied a provisional waiver, you know, but was not yet subject

1    to the ten-year bar because they hadn't yet accrued enough

2    unlawful presence, this would be relevant to them.  They would

3    want to argue that they were not accruing unlawful presence

4    during the pendency of the application.  This clearly

5    forecloses that kind of argument.

6         We're not disputing, as I think Your Honor understands

7    our claims, we're not disputing -- we're not arguing that

8    there's some sort of automatic stay across the board, but I

9    think Your Honor understands our claim is that this is law and

10   that it has to have meaning and has to be followed.

11        With regards to the jurisdictional arguments

12   specifically, the government is contending that our petitioners

13   could somehow bring this claim through a motion to reopen, and

14   I just want to -- I guess I'm puzzled by the argument because

15   the result -- even if somehow our clients could prevail, the

16   result is they would be in removal proceedings where under the

17   regulation they can't apply for provisional waivers.

18        THE COURT:  Wait a minute.  So they apply to reopen.

19   If the request to reopen is granted, what's the legal effect?

20        MS. LAFAILLE:  Your Honor --

21        THE COURT:  Now it's reopened and they're back in

22   removal proceedings.

23        MS. LAFAILLE:  They're in removal proceedings.  And in

24   removal proceedings, they're not eligible to apply for unlawful

25   presence waivers.  They would have to administratively close

```
 1   the removal proceeding.  And the regulation talks about that.
 2        THE COURT:  Didn't Attorney General Sessions in
 3   reviewing a BIA decision decide that they can't close,
 4   administratively close proceedings any more?
 5        MS. LAFAILLE:  Exactly, Your Honor.  Reopening
 6   proceedings would essentially make our clients ineligible for
 7   the provisional unlawful presence waiver.
 8        THE COURT:  So they would just go through the removal
 9   proceedings again and be ordered removed, presumably.
10        MS. LAFAILLE:  Precisely.
11        THE COURT:  But also --
12        MS. LAFAILLE:  They might assert other things in the
13   removal proceeding such as cancellation of removal and other
14   things that may happen.  But with regard to this process, Your
15   Honor, that they're seeking to avail themselves of, they're
16   eligible now, the regulation that has the force of law makes
17   them eligible now.  What the government is telling them to do
18   would render them ineligible for it.
19        THE COURT:  But could they raise the arguments that
20   you're raising here in a sua sponte motion to reopen?
21        MS. LAFAILLE:  Well, their argument isn't that they
22   have a right to reopen their proceeding, Your Honor, precisely
23   because the regulation gives them no right to seek provisional
24   unlawful presence waivers while in removal proceedings.  So it
25   would be bizarre for them to make that claim.  Even if -- the
```

1    government cites a First Circuit case in response to our due

2    process claims, Chun Xin Chi v. Holder.

3              THE COURT:  Which one?

4              MS. LAFAILLE:  Chun Xin Chi v. Holder, a 2010 case

5    which the government cites for the proposition --

6              THE COURT:  Let me get it, please.  Go ahead.

7              MS. LAFAILLE:  The government cites that for the

8    proposition that you cannot raise a due process claim relating

9    to the denial of reopening for purposes of adjustment of

10   status.

11             THE COURT:  What page should I look at?  I think page

12   9.  Go ahead.

13             MS. LAFAILLE:  So although our broader point is that

14   reopening is simply not the remedy that our clients seek, I

15   think it's also the case that if our clients were going to try

16   to make the claim that they had a due process right to reopen

17   their proceedings to seek provisional waivers, if

18   hypothetically they could, which as I've just explained they

19   can't, that wouldn't be a remedy they would seek.  The First

20   Circuit would likely say that they have no right to reopen

21   their proceedings.  But the right we're asserting of course is

22   not a right to reopen their proceedings.  It's a right to seek

23   to follow the provisional waiver process despite the fact that

24   they have an order of removal, which is what the regulations

25   have expressly allowed for.

1            THE COURT:  Why shouldn't I interpret provisional

2    waiver -- well, waive the regulations particularly including

3    the 2016 amendment as just saying or providing that if you have

4    an order of removal, you can apply, and, you know, back in the

5    Obama administration, if you applied and the only unlawful

6    thing you did was come to this country before marrying an

7    American citizen, you know, we're going to put you at the

8    bottom of the list for removal.  But now we have a new

9    administration, and this is the operation of democracy.  It has

10   different priorities.  And some of the evidence showed these

11   are very easy people to capture.  They're going to tell them to

12   come in for an I-130, and then we got you, and our statistics

13   will be great, and Congress will give us more money.  Why can't

14   they do that?  Why is that unlawful to do that?

15           MS. LAFAILLE:  I think it's precisely what Your

16   Honor's questions to the government were getting at before.

17   There are cases like Saint Fort, like Accardi, like Arevalo in

18   the First Circuit and Gonzales that raise a distinction between

19   the right to discretionary relief and the right to follow a

20   process.

21           And these regulations created a process.  And, you

22   know, while we do think they leave the government some room for

23   exceptional cases, we don't think there's any reasonable

24   reading of these regulations that says that they should be used

25   as a weapon to bring about the very harm that they say so much

1    that they want to prevent.  Whatever the regulations mean, they

2    cannot mean that.

3             THE COURT:  The regulations -- the regulations, you

4    argue, limit the discretion of the Department of Homeland

5    Security.  ICE is one part of the Department of Homeland

6    Security; CIS is another.  But your contention is that the

7    discretion that would exist in the absence of the provisional

8    waiver regulations to remove anybody with a final order of

9    removal is limited by the provisional waiver applications.

10            MS. LAFAILLE:  That's exactly right, Your Honor.  And

11   that I think brings us to 1252(g), and this is an area where I

12   hope I might push the court a little bit --

13            THE COURT:  Go ahead.

14            MS. LAFAILLE:  -- because my understanding of this

15   statute has evolved in the process of working on this case.

16            To start, I think we're not -- we're not reading this

17   text on a blank slate.  We start with judicial presumptions

18   that have been established through many, many cases, requiring

19   us to read jurisdiction-limiting statutes as narrowly as

20   possible to presume review of administrative action and to

21   presume habeas jurisdiction unless Congress expressly limits

22   it.  And the Supreme Court has spoken precisely to the statute

23   that we are talking about, 1252(g), in the AADC case.

24            THE COURT:  Which case?

25            MS. LAFAILLE:  The AADC case, which the government

1    refers to as the Reno case.  And what the Supreme Court talked

2    about there is the purposes of this statute, that this statute

3    came about to respond to a specific problem, and that is that

4    because the agency exercises prosecutorial discretion in

5    deciding to start proceedings or not to start proceedings

6    against certain individuals, there were people who brought

7    lawsuits simply to challenge the exercise of prosecutorial

8    discretion.

9           And as the Supreme Court says, that is the purpose of

10   this statute.  It's to bar challenges to the agency's denial of

11   prosecutorial discretion at the three specific stages in which

12   the agency might decide to forgo enforcement.

13          So I'm looking at 485 of AADC where the Supreme Court

14   says --

15          THE COURT:  Hold on a second.  Let me get it out.

16   This is Reno v.  --

17          MS. LAFAILLE:  AADC.

18          THE COURT:  What page, please?

19          MS. LAFAILLE:  Page 485.

20          THE COURT:  Sorry, 485.

21          MS. LAFAILLE:  Yes.  I'm looking at the bottom of the

22   paragraph that starts, Such litigation.  In this section the

23   Supreme Court describes the history that I just described.

24          THE COURT:  Just one second.  Okay.  I'm on 485.  What

25   do you want me to look at, please?

1          MS. LAFAILLE:  The bottom of the paragraph that
2  begins, Such litigation.

3          THE COURT:  Section 1252(g).

4          MS. LAFAILLE:  Section 1252(g) seems clearly designed
5  to give some measure of protection to no deferred action
6  decisions and similar discretionary determinations providing
7  that if they are reviewable at all, they will at least not be
8  made the bases for separate rounds of judicial intervention
9  outside the streamlined process.

10         THE COURT:  Well, why isn't the decision to execute a
11 removal order a similar discretionary determination?

12         MS. LAFAILLE:  The discretionary decision to execute a
13 removal order, a challenge to that we agree would be barred.
14 And the Villavicencio case that we cited to Your Honor in our
15 supplemental submission draws a distinction between someone who
16 is raising the claims that our clients are raising and the
17 Raghbir case also out of New York where an individual was
18 simply challenging the agency's decision to proceed against him
19 as retaliatory.

20         That's, as I think Your Honor's question indicated,
21 that's not the nub of our claims.  We are not in any way
22 challenging the agency's exercise of discretion about when to
23 exercise removal order -- when to execute, excuse me, removal
24 orders.  Our claim is that the agency does not have the
25 discretion to ignore the law and that these regulations created

1    law that the agency has to follow.

2         I wanted to point the court to a couple of other

3    passages here.  In footnote 9, the middle of that footnote, the

4    bottom of the first paragraph, again, the court explains that

5    section 1252(g) was directed against a particular evil,

6    attempts to impose judicial constraints upon prosecutorial

7    discretion.

8         And back, Your Honor, at page 482, the sentence that

9    begins, at the bottom of the middle paragraph there, there's a

10   sentence that begins, There are of course many other decisions

11   or actions that may be part of the deportation process.  Here

12   the court is giving some examples of things that are not swept

13   up into 1252(g), for example, if we brought a claim challenging

14   the government's decision to open an investigation that the

15   court says would not be swept up into 1252(g).

16        And I think that's actually -- some of these examples

17   are actually quite analogous to our case because what we have

18   here, it's not quite that the government has opened an

19   investigation into our clients because of their I-130 filings

20   but essentially the I-130 process has been weaponized, which

21   essentially is very similar to what the court is describing

22   here.

23        THE COURT:  In some sense -- well, I guess I come back

24   and say why -- What section 1252(g) says is much narrower than

25   what was being argued.  The provision applies only to three

1   discrete actions the Attorney General, now the Secretary of

2   Homeland Security, may take:  Her decision or action to

3   commence proceedings, adjudicate cases or execute removal

4   orders.  There's a final order of removal, and they want to

5   execute it.  So it seems to me it would fall within the literal

6   language of (g).

7          MS. LAFAILLE:  Well, Your Honor, it's not -- it's

8   whether the claim arises from the execution of the order.

9   There's helpful language about this in -- well, in Aguilar, the

10  First Circuit talks generally about not interpreting words like

11  arising from to have the same meaning as relevant to, but

12  there's some specific language in the --

13         THE COURT:  What would they have to do different for

14  this to arise from the execution of the order?  They say we

15  have a removal order, and this is low-hanging fruit.  We don't

16  have to go out and look for these people the way we would have

17  to go out and look for a drug dealer or rapist.  These

18  people -- I think Mr. Lyons, not knowing about the regulations,

19  said in his deposition:  I can't imagine why any lawyer would

20  tell his client to go to CIS.  It's like saying, you know,

21  arrest me.

22         But let me come back.  What would they have to do

23  different to make this arise out of the execution of a removal

24  order?

25         MS. LAFAILLE:  So I'm not referring to what the

1    government would have to do differently.  I'm referring to what

2    our claim is here.  And our claim does not arise from their

3    discretionary decision about where and when and who against to

4    execute removal orders.  Our claim arises from the government's

5    misapprehension of a regulation such that a process designed to

6    help keep families together is used to bring about the harm of

7    family separation.

8         And I do think, Your Honor, the language, particularly

9    given we are reading the statute against a backdrop where we

10   have to presume that action is reviewable unless Congress is

11   specifically addressing it.  The Supreme Court is telling us in

12   AADC that the challenges that are barred are the challenges to

13   the exercise of prosecutorial discretion.

14        THE COURT:  But here, you know, in the prior

15   administration there was direction from the Secretary of

16   Homeland Security, you know, give the lowest priority to people

17   who are married, who have final orders of removal that are

18   married to U.S. citizens and they may be eligible to stay with

19   their spouses and children, and we don't break up families

20   unnecessarily.  So we'll give them, in the exercise of our

21   discretion, even though they're removable, lowest priority, and

22   we'll never get to them because we don't have unlimited

23   resources.

24        And now, you know, there's a new administration, and

25   it says, you know, we're not going to give low priority to

1    people who have final orders of removal even if they're married

2    to U.S. citizens and have children who are U.S. citizens and

3    the U.S. citizens will suffer greatly if they're temporarily

4    separated from their alien parents even if the parents are

5    allowed to come back, but, you know, our policy is not to give

6    them low priority.  Why isn't that a discretionary decision?

7         MS. LAFAILLE:  The administration can definitely

8    change removal priorities, Your Honor.  But what we're talking

9    about here is a regulation that, as Your Honor has

10   acknowledged, is law.  And that law constrains the agency's

11   discretion in the area of removal.  What we're having with the

12   government is a legal dispute about the effect of that law and

13   whether the government can ignore it and whether the government

14   can weaponize it.

15        THE COURT:  Right now we're talking about whether you

16   have a colorable claim that can't be reviewed in the Court of

17   Appeals.  It's not being channelled there.  It just would never

18   happen, you say, and I'm saying it looks to me like the statute

19   says if something arises out of the execution of a removal

20   order, the District Court doesn't have jurisdiction.  And then

21   I'm saying, but if that's true, I do -- under the Constitution,

22   you're saying I think that I don't need to go that far, right?

23   Is there a problem if I go that far?

24        MS. LAFAILLE:  Your Honor, we agree that the central

25   purpose of this exercise is to evaluate whether there is a

1    channel for our claims, and we agree that the case could be

2    resolved on the suspension clause.  But I do want to push the

3    court a bit on whether the court has to go there, given the

4    narrowing construction that the Supreme Court has given to

5    these jurisdictional statutes.

6              THE COURT:  What difference does it make?  Here, I

7    suppose it makes the following difference because if you

8    persuade me that this can't be raised in a Court of Appeals and

9    that's wrong, then if (g) would also strip me of jurisdiction,

10   you've got to go try to get to the Court of Appeals.  I suppose

11   that's --

12             MS. LAFAILLE:  I think ultimately if the court finds

13   that the suspension clause requires that the case is going to

14   be dealt with under the suspension clause instead of on a

15   statutory matter, the court would still reach the merits of our

16   claims.  But as I often heard Your Honor say, our goal is to

17   win and to be upheld on appeal, and for that reason I want the

18   court to get it right on the 1252(g) question.

19             THE COURT:  To get it right.  I might get it right and

20   get reversed on appeal.  That's happened in my view

21   occasionally.  But all right.  Look, it's 1:20, and there are a

22   lot of people who want to go to the cafeteria, including you.

23   We're going to recess and resume at 2:30.  I'll hear some more

24   argument on jurisdiction, then I want to hear about whether, if

25   I have jurisdiction, there's a plausible claim.  And then to

1    the extent time permits, we'll begin talking about preliminary

2    injunction, and I'm going to want to know whether you want to

3    hear some testimony.  It's pretty clear to me we're probably

4    going to have to resume tomorrow.  So get some lunch.  Court is

5    in recess.

6              (Recess taken 1:20 p.m. - 2:45 p.m.)

7              THE COURT:  Two things.  Since it's my hope to decide

8    this matter orally, I'm ordering that the parties order the

9    transcript on an expedited basis.  And second, Ms. Piemonte,

10   the deputy clerk told me you would like to be excused tomorrow

11   morning because you have another case?

12             MS. PIEMONTE:  If I may, Your Honor.  I have an

13   evidentiary hearing and closing arguments at 11:30 before Judge

14   Saris, and I request permission to be excused for that time.

15             THE COURT:  Okay.  I think if there's somebody else

16   from your office who could attend, that would be valuable, but

17   it may not be essential if that's not possible.  Okay?

18             MS. PIEMONTE:  Thank you, Your Honor.

19             THE COURT:  All right.  Ms. Lafaille, is there more

20   you'd like to say about jurisdiction?

21             MS. LAFAILLE:  If I could, Your Honor.  We left off

22   discussing 1252(g) and the narrowing construction that the

23   Supreme Court has given it in the AADC case, applying it to

24   challenges to the denial of prosecutorial discretion.  I did

25   just along those lines want to point the court to some relevant

1     language in <u>Jennings</u>.

2               THE COURT:  Just a minute.  What page?

3               MS. LAFAILLE:  So this is at page 8 and 9.

4               THE COURT:  Page what?

5               MS. LAFAILLE:  8 and 9, although I still have the

6     version that doesn't have the actual Supreme Court Reporter

7     page numbers.  I'm not sure if Your Honor has.  These look like

8     slip opinion page numbers.  I'm looking at footnote 3 and some

9     of the text that comes after that.

10              THE COURT:  Footnote 3.  Anyway.  Go ahead.

11              MS. LAFAILLE:  So this is in the context of (b)(9),

12    but the discussion is helpful because of a couple of phrases

13    that also appear in 1252(g).  Footnote 3 relates to the phrase

14    "arising from."

15              THE COURT:  Okay.

16              MS. LAFAILLE:  At the bottom, there obviously the

17    Supreme Court is acknowledging that detention arises from the

18    execution of removal orders.  And so if we were to deal with --

19    if we were to read (b)(9) to encompass everything that, taken

20    in the broadest possible meaning, arises from removal, we would

21    be encompassing detention and all manner of other claims as

22    well.  And the Supreme Court makes clear that the issue, it's

23    not whether detention is an action taken to remove the alien.

24    It's whether the legal question arises from that action.

25              THE COURT:  Why doesn't the legal question here

1    arise --

2            MS. LAFAILLE:  Well, here --

3            THE COURT:  Let me ask the question.

4            MS. LAFAILLE:  Right.

5            THE COURT:  It would be easier to answer it if you let

6    me ask it.

7            MS. LAFAILLE:  I'm sorry.

8            THE COURT:  The legal question here is whether -- it

9    seems to me -- whether the Department of Homeland Security can

10   execute the removal order during the pendency of the

11   provisional waiver process.  So is that the question?  And if

12   it is, why doesn't that arise from executing the removal order?

13           MS. LAFAILLE:  So the way I would explain this is the

14   language in -- I'm using (b)(9) here as an analogy for (g).

15   The language in (g) is whether the cause or claim arises from

16   the action or decision to execute the removal order.  And our

17   cause and our claim here do not arise from the decision to

18   execute the removal order.  They arise from the legal

19   determination that this regulation is not something that they

20   have to follow, and that is similar to the distinction being

21   drawn here by the Supreme Court.

22           THE COURT:  In Jennings what were they addressing?

23           MS. LAFAILLE:  So Jennings they were just addressing

24   jurisdiction over detention, which I think is sort of an

25   uncontroversial proposition.

1          THE COURT:  Let's say Congress and the President

2     wanted to strip the District Courts of jurisdiction in this

3     case.  How would they have written the statute to cover that?

4          MS. LAFAILLE:  So one thing the First Circuit talks

5     about in Aguilar is the availability of broader terms like

6     "relating to," and the Supreme -- Congress also didn't need to

7     point exact -- Congress used three specific instances,

8     initiation of removal proceedings, the adjudication or the

9     execution of a removal order, which the Supreme Court held was

10    because Congress was focused on prosecutorial discretion at

11    each of those junctures.

12          And then I just wanted to point the court to the text

13    immediately following that, which deals with 1226(e).  And

14    1226(e), generally speaking, is the statute that prevents

15    District Courts from reviewing the discretionary determination

16    on bond whether to release or detain them.  And its wording is,

17    No court may set aside an action or decision regarding the

18    detention or release.  And that phrase in 1252(g) also refers

19    to decision or action.  And I just want to point the court down

20    at the bottom of that section, the second to last sentence,

21    Because the extent of the government's detention authority is

22    not a matter of discretionary judgment, the action or

23    decision -- sorry -- right, sorry.  The court is saying the

24    extent of the government's detention authority is not an action

25    or decision regarding the detention or release of the alien.

1          Here I think in the same way, the extent of the
2     government's removal authority is not an action or decision to
3     execute a removal order.
4          THE COURT:  All right.  Now I'm back to where I was
5     before lunch.  If the claims you're making are not reviewable
6     by the Court of Appeals on a motion to reopen because if the
7     matter was reopened the petitioners would be eligible for
8     provisional waivers -- you characterize that as bizarre.  If I
9     find that review by the Circuit is not available under (b)(9),
10    whether habeas jurisdiction exists despite 1252(g) because this
11    doesn't arise out of the execution, or if it does arise out of
12    the execution by virtue of the operation of the suspension
13    clause, I still have jurisdiction, right?
14         MS. LAFAILLE:  Yes, I agree, Your Honor.
15         THE COURT:  So if you persuade me on the first point,
16    there may be no practical effect of the second point, correct?
17         MS. LAFAILLE:  Yes, Your Honor.
18         THE COURT:  All right.  What else, if anything?
19         MS. LAFAILLE:  I'm happy to leave it at that.
20         THE COURT:  All right.  Would the government like to
21    respond?
22         MS. LARAKERS:  Only, Your Honor, to point out that
23    Aguilar here is very telling as to the 1252(g) points and what
24    is and is not a challenge to detention.  If I can find it.
25         THE COURT:  Aguilar?

1          MS. LARAKERS:  Yes, Your Honor.

2          THE COURT:  What do you want me to look at in <u>Aguilar</u>?

3          MS. LARAKERS:  If you look at pin cite, page 19,

4   towards the end.  It starts with, In reaching the conclusion

5   that family integrity claims are collateral --

6          THE COURT:  Sorry, page 18.

7          MS. LARAKERS:  19, Your Honor.  If you're looking at

8   the Westlaw version, it's the paragraph before headnote 23.

9          THE COURT:  Okay.

10         MS. LARAKERS:  There they talk about why they're not

11  breaking with precedent and why the detention claims in <u>Aguilar</u>

12  didn't fall under (b)(9).  Here they talk about a case where

13  the petitioner was seeking a stay of removal, was seeking to

14  not be removed from the United States as a result of their due

15  process claims.  And there they said, Well, this is a different

16  situation from that one.  Here, that case here, that case that

17  they're distinguishing here is analogous to the case at hand.

18  Because the petitioners are seeking a stay of removal, that's

19  what makes this "arising from" an action to execute a removal

20  order.  And that's all I had, Your Honor.

21         THE COURT:  All right.  So for present purposes,

22  assume I find I have jurisdiction.  Then as I understand it,

23  the respondents argue that the petitioners have failed to state

24  a plausible claim on which relief can be granted, correct?

25         MS. LARAKERS:  Yes, Your Honor.

1           THE COURT:  And as I understand it, at the moment, the

2    plaintiffs, petitioners, must have a liberty interest to have a

3    Fifth Amendment right to procedural due process, correct?

4           MS. LARAKERS:  Yes, Your Honor, and I think they have

5    some substantive due process claims as well.

6           THE COURT:  Right now I'm focused on the procedural

7    due process claims.  It strikes me as the stronger of the

8    claims.  And then I think you may have confirmed this, but you

9    agree that a regulation can create a liberty interest?

10           MS. LARAKERS:  Yes, Your Honor, it can.

11           THE COURT:  And that's cases like Accardi and

12    Gonzales, First Circuit case, Arevalo, another Circuit case.

13    And do you agree that a decision that deprives an alien of a

14    right to pursue relief created by a regulation may in some

15    circumstances be unlawful?

16           MS. LARAKERS:  Yes, Your Honor.

17           THE COURT:  Okay.  And some of the cases I looked at

18    for that proposition again are Accardi.  A case I think or pair

19    of cases I think the parties may not have cited, one is Succar,

20    394 F. 3d particularly at 19 to 20, a First Circuit case.  And

21    there's another called Ceta, 535 F. 3d at 646 to 47, Seventh

22    Circuit case, which actually I think is significant in the

23    context of this case.  But then also -- Ceta is cited in the

24    You case, one of the recent cases in the Southern District of

25    New York.  There's also Devitri and Goncalves.

1          All right.  So I think that's my current framework on

2     the procedural due process claims.  So let me hear your

3     argument, please.

4          MS. LARAKERS:  Absolutely.  So with regard to the

5     right to seek relief, the government's arguments are twofold.

6     First that the right to seek relief isn't implicated here.  It

7     simply doesn't apply.  And second, even if the right to seek

8     relief did apply at some point in this case, it would only

9     apply to this regulation when the person is actually eligible

10    for it.  So it would not vest, that right would not vest until

11    they're actually eligible to seek that last step in the

12    process, the provisional waiver, at which point they must have

13    an I-130 approved recognizing their marriage is legitimate and

14    an I-212 approved recognizing that they can seek permission to

15    reapply.

16         So regarding the first argument that the right is not

17    implicated, in Arevalo and the cases -- Your Honor, I haven't

18    read these cases and I certainly can for tomorrow.  But I think

19    Arevalo is very telling on this point.  It talks about the

20    statutory right.  And then in that case, the petitioner had

21    already applied for that statutory section of relief, and then

22    their application had simply been tossed out, essentially,

23    saying there's new laws and regulations that apply that their

24    application can no longer be considered.

25         Here, that right isn't implicated like it was in

1    Arevalo because there's only one statutory section of relief

2    here, and that's the waiver under section 212.

3          THE COURT:  But a right can be created by a

4    regulation.

5          MS. LARAKERS:  It can, it absolutely can, Your Honor.

6          THE COURT:  So the regulation states -- the

7    provisional waiver regulation states certain immigrants may

8    apply for a provisional unlawful presence waiver of

9    inadmissibility, right; they may apply?

10         MS. LARAKERS:  Yes, Your Honor.

11         THE COURT:  So this goes a little bit to the arrest.

12   But the first step in applying is getting an I-130?

13         MS. LARAKERS:  Yes.

14         THE COURT:  Where CIS -- the Department of Homeland

15   Security -- I'm going to talk about the Department of Homeland

16   Security because I think it may clarify some of this.  So the

17   person has to go to the CIS office, usually to demonstrate that

18   the marriage is genuine, right?

19         MS. LARAKERS:  Yes, Your Honor.

20         THE COURT:  And that's the first -- that opens the

21   gate to apply for the provisional waiver?

22         MS. LARAKERS:  Right, it's the first --

23         THE COURT:  It's the first step.  Well, if the

24   regulation provides a right to apply and somebody gets arrested

25   as they're waiting for their interview or right after they have

 1    the interview, hasn't that deprived them of their right to

 2    apply?

 3            MS. LARAKERS:  No, Your Honor, because making it

 4    available from within the United States does not deprive them

 5    of the right to apply for the statute, for the statutory

 6    section which gives them the waiver.

 7            THE COURT:  I think that's what confuses this.  If

 8    there were no regulations, we wouldn't be here, I think.  The

 9    regulations are laws that add requirements to the statute,

10    right?

11            MS. LARAKERS:  Yes, Your Honor.

12            THE COURT:  And the regulation says you may apply.  So

13    I mean, the Constitution of the United States gives me a right

14    to practice my religion -- well, to vote, say to vote.  So it's

15    Election Day and -- probably a lousy analogy.  Forget it.

16            You know, if somebody -- I don't know.  It's not a

17    good analogy, but if it says you may apply -- so this is the

18    Secretary of Homeland Security, you know, the boss of both ICE

19    and CIS -- says you may apply, we live in a country that

20    doesn't like people to come here unlawfully, but we also live

21    in a country that doesn't like to break up families of American

22    citizens, so we have some competing considerations here.  So

23    you may apply, certain eligible people may apply, and that

24    includes people with a final removal order.  I'm eligible, I'm

25    not trying to stay under the radar screen, I'm trying to use

1    the legal process.  How are you going to apply if you get

2    arrested in the first step of the application process?

3            MS. LARAKERS:  Your Honor, I think, first of all, the

4    regulation doesn't provide for any consideration of -- it

5    doesn't require DHS to consider someone's provisional waiver

6    process before removing them.  It doesn't provide that DHS must

7    stay their removal.

8            THE COURT:  But here, try this.  Respond to this,

9    please.  I believe 8 CFR section 212.7(e)(8) says, USCIS will

10   adjudicate a provisional unlawful presence waiver, right?

11           MS. LARAKERS:  Yes, Your Honor.

12           THE COURT:  If somebody is deported, removed, they're

13   arrested, detained, removed, it deprives CIS, the Secretary of

14   Homeland Security, of the ability to adjudicate the provisional

15   unlawful presence waiver and in fact decides the matter, but

16   ICE has decided it, right?

17           MS. LARAKERS:  No, Your Honor, because at that point

18   in time they're still eligible to gain the ultimate relief,

19   which is a waiver of the unlawful -- I understand that --

20           THE COURT:  The ultimate relief is the ability to come

21   back into the United States and get reunited with your family,

22   right; that's what you're calling the ultimate relief?

23           MS. LARAKERS:  Yes, Your Honor.

24           THE COURT:  Okay.  But the provisional waiver says

25   that some people will be allowed to stay with their families

1    while they seek essentially the ultimate relief.  That's what

2    they're being deprived of.

3         MS. LARAKERS:  Your Honor, if that were DHS's

4    intention in the regulation, it would have stated so.  And I

5    have examples where DHS has done that.  In the T visa and U

6    visa context, for example, if you can show that you have a

7    prima facie eligibility for that form of relief, then it stays

8    your removal.

9         There are other places both in the INA and in the

10   regulations is where either Congress or DHS has given that

11   interim benefit or has given that stay of removal.  And the

12   fact that they didn't here is very telling, and it's certainly

13   telling against the backdrop, as you said, the priorities at

14   the time the regulation was adopted.

15        THE COURT:  In the context of a motion to reopen, the

16   words "may file" I believe have been interpreted to entitle an

17   alien to an adjudication of the motion, not just to file it

18   with the BIA.  Chief Judge Saris found that in Devitri, but the

19   First Circuit I think said something similar in Perez Santana,

20   731 F. 3d 50 at 51.

21        This again is -- I wish this was more clear, but at

22   the moment, you know, I'm looking -- it seems to me the

23   Secretary of Homeland Security is a little bit like a judge in

24   a sentencing.  We do civil work.  Too bad nobody but the judge

25   does civil or criminal work anymore.  Analogies occur.  So we

1    have a sentencing statute that requires the judge to consider

2    the nature and circumstances of the crime and the history and

3    nature of the person, sometimes competing.

4         And here the Secretary of Homeland Security said, I'm

5    not saying that I'll never remove somebody who has a final

6    order of removal and is married to an American citizen;

7    however, I am saying that I'm going to give that person and

8    that alien a path to staying here so they don't have to leave

9    the country for a year until I decide whether they can come

10   back.  And she's saying in the regulation, I'll adjudicate it,

11   the request for the provisional waiver.  So she's retained this

12   authority, but she says I really do value keeping families

13   together.

14        So if all of this went to the Secretary of Homeland

15   Security, if ICE didn't have one piece of it and CIS, a single

16   person I think would look at each individual case and consider

17   the regulations in deciding whether on balance to remove the

18   person or whether the most appropriate thing is to let the

19   person try to obtain the provisional waiver while he or she is

20   in the United States.

21        MS. LARAKERS:  Your Honor, that's exactly what DHS

22   didn't do.  They didn't set out those parameters in the

23   regulation.  And I think they did that for a reason.  They

24   certainly could have done that.  They've done it in the T visa

25   context, they've done in the U visa context.  They've given

1    parameters that say if you have prima facie liability, then you

2    get a stay of removal.  There are regulations in play that say

3    that, but this one doesn't.  And that's what makes this case

4    separate and distinct.

5         And I do have to go back to the fact that like in

6    Arevalo, I think it's much more constrained.  I don't think

7    that this is a large right to seek any relief that you can

8    possibly apply for anywhere that you want.  I don't think

9    that's what Arevalo stands for.  It was specifically talking

10   about retroactive statutes which, as all courts across the

11   country have held, the retroactivity of a statute is especially

12   important for courts to decide.  It also dealt with an

13   application for the ultimate form of relief being tossed out,

14   the difference in between being able to being able to come and

15   being able to come to the country and being not able to come to

16   the country.

17        Here, I think the way that the procedural due

18   process right, or maybe it should be defined as a substantive

19   process right the petitioners are seeking here is not a right

20   to seek relief but the right to where that relief is sought.

21        THE COURT:  But the provisional waiver, if you get a

22   provisional waiver you've been allowed to stay in the United

23   States until a decision to remove the removal bar is made,

24   right?

25        MS. LARAKERS:  I'm not sure if I understand, Your

1    Honor.

2            THE COURT:  The first step is an I-130.  The second

3    step is what?

4            MS. LARAKERS:  Permission to reapply.  In the future

5    you could ask for permanent resident again, essentially.

6            THE COURT:  That's a what?

7            MS. LARAKERS:  I-212, allowing you to apply for

8    immigration status again, because normally you can't if you

9    have an order of removal.

10           THE COURT:  So it essentially puts aside the order of

11   removal?

12           MS. LARAKERS:  Yes, essentially.

13           THE COURT:  While you're in the United States.

14           MS. LARAKERS:  Or while you're outside the United

15   States.

16           THE COURT:  But one of the options -- the provisional

17   waiver process provides an opportunity to stay in the United

18   States while you pursue this final waiver.

19           MS. LARAKERS:  And I think that's where the government

20   disagrees.  It allows you, if you're here and if ICE has not

21   taken an action to enforce your removal order to apply.

22           THE COURT:  Your argument essentially is this general

23   authority of ICE to remove people should trump the specific

24   authority of CIS to adjudicate requests for provisional

25   waivers?

1          MS. LARAKERS:  In this case, because a regulation does
2     not directly speak to limiting ICE's authority.
3          THE COURT:  Why does it have to?  The Secretary of
4     Homeland Security has limited her own authority.  I mean, this
5     is all a little spastic, but the regulation is a law that
6     says -- I mean, Arevalo says, A right to seek relief is
7     analytically separate and distinct from a right to the relief
8     itself.
9          So I understand that a person might not be granted the
10    provisional waiver.  They might not be granted the ultimate
11    waiver.  But the regulation starts by saying that an eligible
12    person may apply and that CIS will adjudicate it.  I don't
13    think you've seen Ceta, and I'll read you what I think is the
14    most pertinent part because it resonates, and I want to give
15    you a chance to address it.
16         Print out two copies of 535 F. 3d 639.
17         You and I work for the government.  We'll give you a
18    copy of the decision.  So this involves a request to the BIA
19    for a continuance and the BIA's affirmation of the denial of a
20    request for a continuance.  And the Seventh Circuit found --
21    hold on a second.  The immigration judge denied the
22    continuance.  Seventh Circuit held, Although it did not
23    generally have jurisdiction to review an immigration judge's
24    discretionary decisions, such as the denial of a continuance --
25    actually stop that -- to retain jurisdiction if that denial

1     operates to nullify some statutory right or leads inescapably

2     to a substantive adverse decision on the merits of an

3     immigration claim.  The court found that the immigration

4     judge's denial, more specifically the BIA's affirmation of that

5     denial of Ceta's request for continuance amounts in the

6     circumstances of this case to a denial of the statutory right

7     to apply for adjustment of status.

8          It explained the BIA's ruling has the effect of a

9     substantive ruling on Ceta's application to adjust his status.

10    Under the INA, Immigration and Nationality Act, in general, an

11    administratively final order of removal, unless appealed, must

12    be executed within a period of 90 days.  Moreover, once an

13    alien has been removed he no longer may obtain adjustment of

14    status based on marriage.

15         Because of the denial of the continuance, therefore,

16    Mr. Ceta's statutory right to apply for adjustment of status is

17    trapped within the regulatory interstices, and section 1255

18    affords him an opportunity to seek an adjustment of status with

19    the USCIS, but he'll be deported by ICE before the USCIS is

20    able to adjudicate that application.  Indeed, under the new

21    regulatory regime, unless these sub-agencies engage in some

22    minimal coordination of their respective proceedings, for

23    example by the immigration court's favorably exercising

24    discretion in the appropriate case to continue proceedings to

25    allow the other sub-agency to act, the statutory opportunity to

1    seek adjustment of status will prove to be a mere illusion.

2           So here we're operating under regulation that has the

3    same effect as the statute, they're both laws.  And if ICE

4    doesn't even consider -- well, if ICE orders removal, it has

5    deprived CIS of the opportunity to decide whether to grant the

6    provisional waiver, and it has the same practical effect as CIS

7    denial.  So I think that's and -- at the moment, in my still

8    tentative view, this seems analogous to Ceta.  Anyway, go

9    ahead.

10          MS. LARAKERS:  Well, Your Honor, I know that there are

11   cases within this circuit that have held that an I-484, a

12   person doesn't have a right to have their I-484 adjudicated.

13          THE COURT:  What's that?

14          MS. LARAKERS:  I apologize.  Adjustment of status, the

15   form of relief I believe Ceta is talking about.  I can't find

16   the case in my notes right now, but I can certainly provide it.

17   But the idea that the -- I understand that that case is

18   persuasive.  However here, when the regulation is silent on

19   circumscribing the Secretary's power under 1231, which is the

20   statute that actually mandates the removal of individuals with

21   final orders of removal, where it's not -- where the regulation

22   doesn't circumscribe that power explicitly, I don't think that

23   the regulation can be found to have -- the petitioners do not

24   have an entitlement to have the 601A, the provisional unlawful

25   presence waiver, adjudicated here.

1      THE COURT:  I think they're actually asking for less

2   than that.  Although maybe now they're going to go back and ask

3   for more.  I think at the beginning they told me that they're

4   arguing that ICE is obligated to consider, among other things,

5   that the person has initiated and is someplace in the process

6   of pursuing a provisional waiver.  Although, actually, they may

7   have said something different this morning, and that is --

8   because they're arguing that if there aren't exceptional

9   circumstances, you have to allow CIS to adjudicate the

10  provisional waiver application.

11      MS. LARAKERS:  And our argument is that the regulation

12  does not circumscribe the power of section 1231, which mandates

13  that ICE remove those with final orders of removal.  And it

14  certainly could have said that because DHS has certainly done

15  that in other cases, and the fact that they didn't do it here

16  is telling.

17      THE COURT:  Well, here, this is also telling.  So the

18  Secretary of Homeland Security says in this regulation -- and

19  this is officially law, not as a policy, says I will -- I mean,

20  there are a couple of things.  It says, I will adjudicate the

21  request for provisional waiver, that is, the request that you

22  be allowed to stay in the United States and have to leave just

23  for a couple of weeks, not for many months or years, and, you

24  know, as part of the process, I will take your biometrics,

25  which you have to be in the United States to give.

1          So arguably, that's saying, I promise you that if

2    you've been ordered removed and you're married to a United

3    States citizen, I'll make this decision as to whether you

4    should be able to get a provisional waiver before you're

5    required to leave; I promise you that.  And then ICE, also

6    acting on her behalf, says, No, boss, I'm going to deprive you

7    of the opportunity to make the decision, the adjudication you

8    said you would make for the provisional waiver, not the

9    ultimate waiver.

10          MS. LARAKERS:  Your Honor, I think the regulation

11    simply allows you to apply and doesn't give any interim

12    benefits in the meantime.  And if it did give interim benefits,

13    which include a stay of removal, which is what should have been

14    given if they wanted to prevent this type of situation from

15    happening or it could have listed factors for ICE to consider.

16    It could have done a lot of things, but it didn't.  And as I've

17    stated, it's done at other places in INA.

18          I can move on to the second part of my argument, which

19    is that if this court finds that the right to seek relief is

20    implicated, the right to seek relief doesn't vest until that

21    person is actually eligible to apply for that 601 waiver, the

22    actual provisional unlawful presence waiver.  And it makes a

23    lot of sense practically and it makes a lot of sense with the

24    due process right that you find is implicated.

25          A petitioner can't have a right to seek relief when

```
1    they're not even eligible to seek that relief.  And they are

2    not eligible to seek that relief here until that I-212 is

3    granted.  And for practical reasons, it makes sense for ICE

4    because at that point in time that petitioner has already

5    established extreme hardship, which is one of the --

6              THE COURT:  What if there is extreme hardship?  And

7    this isn't a farfetched hypothetical.  One of the people in my

8    cases you arrested I think had a child who was four months old.

9    Do I remember that right?

10             Let's say hypothetically you had somebody whose

11   husband had applied for a provisional waiver, started the

12   process, but they haven't got as far as you say they need to

13   get.  And let's say she has a baby and the baby is very

14   fragile, you know, life-or-death situation, and she's

15   breastfeeding the baby, and the baby can't go with her, that

16   would be extremely dangerous or fatal to the baby, and the baby

17   needs to continue to be breastfed.  In view of the regulation,

18   is it your argument that the Secretary of Homeland Security

19   acting through ICE has no obligation to consider that?

20             MS. LARAKERS:  Your Honor, I think ICE does consider

21   that, and that can come in multiple -- that can come in a

22   variety of ways.

23             THE COURT:  But this is on a motion to dismiss.  The

24   claim is that ICE doesn't.  And so, you know, is that a

25   plausible claim, that ICE doesn't.  To me it's plausible
```

1    because so far in this case I have found ICE to be ignorant of

2    its legal obligations, for example, under what you call the

3    POCR regulations, and there are other evidentiary examples.

4        But is it your position that ICE is not obligated to

5    consider that this is a person who, this woman and her husband,

6    an American citizen, have come out of the shadows, sort of

7    started this legal process so that provides an opportunity --

8    not a right but an opportunity -- for them to get the

9    Department of Homeland Security to exercise its discretion to

10   let that family stay together and in effect to let that baby

11   live?

12       MS. LARAKERS:  Yes, Your Honor, it is the government's

13   position that this regulation would not -- it's the

14   government's position that they could remove that person, and

15   under this procedural due process right to seek relief that

16   we're talking about here, have the duty to do that.

17       THE COURT:  They wouldn't have the duty to consider

18   that?

19       MS. LARAKERS:  Yes, Your Honor, under this specific

20   due process here.  Of course that type of situation can be

21   defined --

22       THE COURT:  Well, when the Secretary of the Department

23   of Homeland Security says in a regulation, I will adjudicate, I

24   will decide whether this couple is entitled to a provisional

25   waiver, why doesn't the decision to remove deprive her of the

1    opportunity to make the decision she's legally obligated to

2    make?

3              MS. LARAKERS:  Because the text also says that a

4    pending or approved provisional waiver application is not --

5              THE COURT:  Use the exact words.  Because what you

6    said to me before I believe is wrong.  When it says it's not a

7    stay authorized by the Secretary, it ties into a statute that

8    sort of counts how long you were here in determining whether

9    you were eligible for certain benefits.

10              MS. LARAKERS:  But it's not a lawful immigration

11    status.

12              THE COURT:  No, it doesn't, it doesn't give you a

13    right to stay here with your husband and your baby.  It gives

14    you a right, it seems to me at the moment, to have the

15    Secretary do what she promised to do in the regulation, and

16    that is decide, to balance the competing considerations.

17              MS. LARAKERS:  And Your Honor, if you were to hold

18    that, again, I think that feeds right into my second argument

19    that if the right exists, it exists at a time that a person is

20    eligible to apply for that relief.  It doesn't exist at the

21    time someone's filed an I-130.  And if it did, then we would

22    need to be looking at the I-130 regulations to determine

23    whether they give that, whether the I-130 regulations create

24    that entitlement or create that right to seek relief.  But they

25    don't.  We're talking here about the provisional waiver

1     applications.  And like you said, Your Honor, when that

2     provisional waiver application is pending, then under your

3     view, that may create the right, but the right certainly isn't

4     vested at the time they have an I-130 pending at the beginning

5     of this process that could take years to finish.

6              And again, it practically makes sense as well because

7     after that 212 point, at that time that the person has sought

8     permission to reapply, they've already established that they

9     have this -- that they do have some sort of extreme hardship.

10             So when that application is pending, it gives them

11    more of a relation to the relief that they're ultimately

12    seeking.  And the provisional waiver, the provisional waiver

13    regulations don't talk about the beginning of the process.

14    They talk about that specific application.  As you just said,

15    they speak of that application being adjudicated, not an I-130

16    application being adjudicated.  So if the right exists at all,

17    it exists at the time they are pending or that they're eligible

18    to apply for a 601A, not at the beginning of the process.

19             And Your Honor, I do have arguments with regard to

20    whether that process has been held up here, whether there's

21    enough procedural due process, the second step in the analysis,

22    but I don't know if you'd like me to wait on that point until

23    we get to the preliminary injunction.

24             THE COURT:  I'm sorry.  The next point is what?

25             MS. LARAKERS:  My next point is if the court were to

```
1    find that right exists, there's been enough process given to
2    the petitioners through already available applications for
3    relief from ICE, that whatever due process is due is available
4    to be satisfied.  But that's a question for a preliminary
5    injunction.
6              THE COURT:  Well, except now we get into more
7    conventional territory.  I've got to look at the complaint,
8    right, and see whether it states a claim on which relief can be
9    granted.
10             MS. LARAKERS:  Yes, Your Honor, so I didn't want to
11   venture into that territory until we get to the preliminary
12   injunction standard.
13             THE COURT:  Right.  I think that's where it fits.  And
14   this is good.  Because I think we all -- I keep disciplining
15   myself to compartmentalize this.  It's one test for the
16   jurisdiction, another for the motion to dismiss, and then we
17   start looking at the evidence, we get to preliminary
18   injunction.
19             All right.  Why don't I hear from the petitioner.
20             MS. LAFAILLE:  So just briefly, Your Honor, we
21   agree -- I have not looked at the Ceta case, but we agree with
22   the framework that Your Honor has been discussing.  We think
23   that although there's no right to relief, there certainly is an
24   abundance of case law discussing the due process interest in
25   having a fair adjudication.
```

1          And I think there are three things here that make it
2     even stronger than some of the cases we've been discussing.  In
3     the Ceta case, for example, which I haven't looked at but Your
4     Honor described to us, it doesn't sound like there was a
5     specific regulation discussing how that applicant could seek
6     adjustment of status in the removal proceeding.  Here we have a
7     situation where the Secretary of Homeland Security considered
8     this group of people, and they created a pathway.  It's
9     nonsense to say that they created the final step, Your Honor.
10    The regulations describe a pathway for them to seek lawful
11    permanent status without having to endure separation from their
12    loved ones.
13         The second thing that I think makes this worse than
14    some of the cases that we're talking about --
15         THE COURT:  Well, let's see if you can group that
16    argument in the regulations because the government says, you
17    know, there's no -- at most, there's no vested right until an
18    I-212 is approved.  Why is that wrong, or what in the
19    regulations do you say indicates that's incorrect?
20         MS. LAFAILLE:  Well, first I want to just respond to
21    the overall logic of that.
22         THE COURT:  Okay.
23         MS. LAFAILLE:  Which is that the government has been
24    using these regulations to entrap people and detain and remove
25    them.  And if that's what was intended when they made that

1  final step, was that actually no one's even going to get there

2  because we're going to detain them and remove them, I mean,

3  it's incomprehensible to think that that's what the Secretary

4  intended.

5          The other thing I would point to, which I'm struggling

6  to find, is just the discussion of the specific choice to

7  expand the regulations to people with final orders of removal.

8  Page 50255 of the 2016 regulations --

9          THE COURT:  What's the number?

10         MS. LAFAILLE:  50255.

11         THE COURT:  50255.

12         MS. LAFAILLE:  50255.

13         THE COURT:  Individuals in removal proceedings, right?

14         MS. LAFAILLE:  Right, Your Honor.  This is the

15 section --

16         THE COURT:  What do you want me to look at?

17         MS. LAFAILLE:  So not number 8, which is individuals

18 in removal proceedings, but number 9, which is individuals

19 subject to final orders.

20         THE COURT:  Okay.

21         MS. LAFAILLE:  This is the section where the Secretary

22 again describes this group of people and describes the decision

23 to make them eligible and the process they're going to have to

24 follow.  They're going to have to get an I-212 first and then

25 after that approval get their 601A.  I have no specific thing

```
 1    to point to here, Your Honor, other than just the fact that the
 2    Secretary contemplated this very question.
 3           THE COURT:  Which very question?
 4           MS. LAFAILLE:  Contemplated the eligibility of our
 5    class members and petitioners for these -- for this process and
 6    made a specific determination about how the process was going
 7    to work.  And we also have, Your Honor, more generally the
 8    discussions of the intention of the regulation, and some of
 9    that is at 50245 --
10           THE COURT:  50245.
11           MS. LAFAILLE:  -- talking about how that reduces
12    hardships to U.S. citizens' families.
13           THE COURT:  Are you talking about the language that
14    said before these regulations, for some individuals, the Form
15    I-601 waiver process led to lengthy separations of immigrant
16    visa applicants from their family members, causing some U.S.
17    citizens and lawful permanent residents to experience
18    significant emotional and financial hardships that Congress
19    aimed to avoid when it authorized this waiver?
20           MS. LAFAILLE:  Exactly, Your Honor.  There's
21    similar -- what Your Honor just read captures precisely the
22    intent of this regulation to avoid the hardship that the waiver
23    is designed to prevent.  And the same language at the bottom of
24    that same column and on the next page also discusses the
25    benefits of this program for U.S. citizens and their family
```

1    members, shortened periods of separation.

2         THE COURT:  To improve administrative efficiency and

3    reduce the amount of time that a U.S. citizen spouse or parent

4    is separated from his or her relative.  While the relative

5    completes the immigration visa process, the 2013 rule provided

6    a process by which certain statutorily eligible individuals,

7    specifically certain parents, spouses and children of U.S.

8    citizens, may apply for provisional waivers of the three- and

9    ten-year unlawful presence bars before leaving the United

10   States for their immigrant visa interviews.

11        The final rule also limited eligibility for

12   provisional waivers to those immediate relatives of U.S.

13   citizens who could show extreme hardship to a U.S. citizen's

14   spouse or parent.  One reason DHS limited eligibility for the

15   provisional waiver was to allow DHS and DOS time to assess the

16   effectiveness of the process and the operational impact it may

17   have on existing agency processes and resources.

18        Administration of the provisional waiver process has

19   shown that granting a provisional waiver prior to the departure

20   of and immediate relative of the U.S. citizen can reduce the

21   time that such family members are separated.  The grant of a

22   provisional waiver also reduces hardships to U.S. citizen

23   families.  That's the essence of it?

24        MS. LAFAILLE:  Yes, Your Honor.  And I mean, I think

25   it's redundant, but there's more language about the purpose of

1   the regulation in other parts as well.

2          THE COURT:  I understand the policy argument, I think,

3   but is there language in the regulation that basically you say

4   indicates that there's a right, once somebody's initiated the

5   process, a right to pursue it, absent exceptional

6   circumstances?

7          MS. LAFAILLE:  I think it's the -- I'm relying more on

8   logic here, Your Honor.  The fact that you began the process

9   was simply a channel for detention and removal.  It's very hard

10  to reconcile that with the intention to avoid the hardship to

11  U.S. citizens and their families.  So again, some of the

12  reasons why I think there are some things that make this

13  stronger than the cases we are talking about, although it's

14  a --

15         THE COURT:  Before we get to the cases, do any of the

16  petitioners have an approved I-212?

17         MS. LAFAILLE:  Yes.  Ms. Calderon has an approved

18  I-212 and a pending 601A.

19         THE COURT:  Does 8 CFR section 212.2(j) have any

20  significance?  It says, Advanced approval.  An alien whose

21  departure will execute an order of deportation shall receive a

22  conditional approval depending upon his or her satisfactory

23  departure.

24         MS. LAFAILLE:  Right.  And I think this relates to the

25  next thing that I was going to cite, which is what the court

1    has already pointed to, this language in the provisional waiver

2    regulation that USCIS will adjudicate a provisional waiver, I

3    think both of these regulations have language indicating that

4    the agency will make adjudications, and this is not an area

5    where there is an absence of law.  There are specific

6    thought-out eligibility criteria for people who are going to be

7    able to go through this process.  The agency did not merely

8    create a final step.  It thought about the process, and it

9    created that step in order to make family unity possible during

10   the process of seeking legalization.

11          But besides the fact that the agency gave attention to

12   this specific group of people, the other thing that I think

13   makes this a little bit different than the cases about the

14   right to apply for discretionary relief and be considered for

15   discretionary relief is that we don't have a situation where

16   USCIS is merely tossing our clients' applications into the

17   trash.

18          This would be more akin to somebody applying for

19   asylum, and the consequence was not their application being

20   thrown into the trash but the consequence that they were going

21   to be sent to be persecuted.  That's what USCIS has been doing

22   with our clients' applications.

23          THE COURT:  USCIS --

24          MS. LAFAILLE:  Well, DHS as a whole.  We know of

25   course more about USCIS's role, but ICE and USCIS have been

1    causing our clients' applications to be turned into the means

2    of effectuating the very hardship that the regulations were

3    designed to avoid.

4         THE COURT:  So this is what I was asking Ms. Larakers

5    about.  So is it your argument that the arrests at CIS offices

6    are unlawful because the regulation says essentially somebody

7    married to a -- somebody with a final order of removal married

8    to a U.S. citizen may apply, may pursue this process to get a

9    provisional waiver, but if they're arrested at step one,

10   they're deprived of that opportunity?

11        MS. LAFAILLE:  Yes, Your Honor.  And I wouldn't limit

12   that of course to the location of arrest.  But we believe it's

13   unlawful both for ICE to ignore the regulation but also for ICE

14   to use it, ICE and DHS to use it affirmatively as a trap for

15   enforcement and removal.

16        THE COURT:  What makes it -- it's one thing if it's

17   arguably dishonorable.  Not everything that's arguably

18   dishonorable is unlawful.  What makes it unlawful for them to

19   essentially run an undercover operation to lure these people

20   in?

21        MS. LAFAILLE:  Well, several things, Your Honor.  And

22   I think our claims under the Administrative Procedure Act and

23   the due process clause sort of dovetail here because it's an

24   example of the very kind of arbitrary government conduct that I

25   think both the due process clause and --

1          THE COURT:  But I doubt -- I have questions about

2     whether I have jurisdiction over that kind of question.  If

3     something is arbitrary, it sounds like an argument that

4     discretion has been exercised in an arbitrary manner, and I

5     think we've all agreed I don't have jurisdiction to decide

6     exercises of discretion.

7          I think your argument that the regulation, you know,

8     an argument that the regulation prohibits it categorically, I

9     probably do have jurisdiction over.  You know, they have to

10    consider something if you're arguing that something was

11    categorically prohibited.  But I do have some concerns about my

12    jurisdiction to decide whether they're making arbitrary

13    decisions.

14         MS. LAFAILLE:  And Your Honor, just to be clear, I

15    didn't -- I meant arbitrary in the sense of arbitrary and

16    capriciousness, decisions that are not tied to the purposes of

17    the laws or appropriate considerations of the immigration

18    system.

19         THE COURT:  I mean, usually administrative decisions

20    can be reversed, usually, by a court if they're arbitrary and

21    capricious or contrary to law.

22         MS. LAFAILLE:  Yes.

23         THE COURT:  So it seems to me you're pushing me in

24    dangerous territory on jurisdiction if you're talking about

25    arbitrary and capricious rather than contrary to law.

1          MS. LAFAILLE:  I think it's both, Your Honor.  I don't

2    think that -- I'm not sure I follow fully the court's concern.

3          THE COURT:  I think we agreed earlier that a District

4    Court doesn't have jurisdiction in habeas to review the merits

5    of discretionary decisions, right?

6          MS. LAFAILLE:  Right, Your Honor.

7          THE COURT:  So when you say that decision was

8    arbitrary and capricious, you know, sometimes if there's just

9    no factual basis, no reasonable factfinder could have found

10   facts relied upon, that's arbitrary and capricious.  Maybe I'm

11   wrong about this.  But if something is contrary to law, if the

12   regulation says you may apply and I will decide and another

13   agency of my department is saying, No, boss, we're not going to

14   let them apply, and we're not going to let you adjudicate,

15   we're going to send them out of here, that may be contrary to

16   law.

17         MS. LAFAILLE:  Right, Your Honor.  And our argument is

18   although we also think it's arbitrary and capricious, the

19   government conduct, but to be clear, we also think that the

20   court has jurisdiction over that.  We also think that it is

21   contrary to law and violates the due process interest that

22   non-citizens have in the adjudication of their applications.

23         The final thing I wanted to say about, you know, why I

24   think this is worse in many ways than some of the cases we've

25   talked about mentioned the Secretary's specific provision for

1   this group of individuals and the fact that applications are

2   not merely being tossed out but are actually being weaponized

3   against people to bring about the harm that the regulation was

4   going to prevent.  The final thing that I think makes this

5   stronger is that here we're also talking about the interests of

6   United States citizens.  We're talking about a regulation

7   that's specifically designed to protect their interests in

8   living in this country with their spouses.  And that I think

9   raises this on a level different perhaps than some of the cases

10  that are talking about your right to apply for discretionary

11  relief.

12         THE COURT:  And that's related to but distinct from a

13  substantive due process argument that a U.S. citizen has a

14  right to stay with his spouse.

15         MS. LAFAILLE:  Right, Your Honor.  And to be clear,

16  we're not making any argument that a U.S. citizen has an

17  absolute right that immigration law cannot interfere with to

18  remain with their spouse.  We think there's a very strong due

19  process interest and that the government conduct in this case

20  both shocks the conscience and violates the procedural due

21  process rights of those individuals.

22         THE COURT:  All right.  So far I've had you focused on

23  procedural due process.  Would the government -- are you

24  finished?

25         MS. LAFAILLE:  Yes, I am.  Sorry.

```
1          THE COURT:  Would the government like to say anything
2     in reply to that argument on procedural due process?
3          MS. LARAKERS:  No, Your Honor.  I think we can move
4     on.
5          THE COURT:  All right.  To the extent -- well, there
6     is a substantive due process claim, too, correct?
7          MS. LAFAILLE:  Yes, Your Honor, but to be -- I think
8     we have been more focused on the procedural aspects of our
9     claim.
10          THE COURT:  All right.  Here, all right.  Why don't we
11     take a break.  Since it won't distract me during the break,
12     we'll give you a copy of Ceta, although I don't know that we'll
13     go back to it.  I do expect we're going to be here tomorrow, so
14     you can look at the implications of it.
15          And I think next I'd like to -- so these are
16     assumptions.  These are not rulings.  But assume I find I have
17     jurisdiction.  Assume there's a plausible claim for which
18     relief can be granted, I find.  Then I'd move to the motion for
19     preliminary injunction.  And here are some of the questions I
20     have.  Don't answer them now, but be prepared to when we come
21     back.
22          What's the relief sought?  Is it an order that ICE
23     can't arrest and remove aliens for whom the provisional waiver
24     process has been initiated except if there's a threat to
25     national security or public safety or some other reason not
```

1    related to eligibility for a provisional waiver?  That was I

2    think in the original motion docket number 50 at 29.  The

3    petitioners seem to be asking for notice before a decision is

4    made and individual decisions.

5          I've got a question as to whom any preliminary

6    injunction should be addressed to.  Who is the person?  Is it

7    the Secretary of Homeland Security?  Is it the head of the

8    local office?  Are the petitioners requesting testimony; are

9    the defendants?  Are there material facts in dispute that ought

10   to be developed?  Who would the ICE or CIS potential witnesses

11   be, anybody other than Ms. Adducci and Mr. Lyons?  Do the

12   petitioners want to testify with regard to irreparable harm?

13   And then is additional discovery and testimony necessary for

14   the trial one way or the other?  Because I do have the

15   authority under Rule 65 to merge the hearing on the motion for

16   preliminary injunction with a trial on the merits.  So what

17   more -- let's say I do or I don't grant a preliminary

18   injunction, where do we go from here?

19          It's 4:00.  We'll resume at 4:15.  Court is in recess.

20          (Recess taken 4:01 p.m. - 4:21 p.m.)

21          THE COURT:  Okay.  So we'll begin I think with these

22   questions I left you with with regard to preliminary

23   injunction.  What is the relief exactly that the petitioners

24   are seeking?  What would a preliminary injunction say --

25          MS. LAFAILLE:  So Your Honor, we've proposed specific

1    relief at ECF number 49 --

2              THE COURT:  What's that?

3              MS. LAFAILLE:  We've proposed specific relief at ECF

4    number 49 in our motion, but the basic premise, and recognizing

5    of course that this goes to the issue of not what the

6    requirements of due process are but what is the -- what's a

7    remedy for the due process violations.  And that's an area

8    where we think this court has tremendous discretion.  What

9    we've proposed is for the court to enjoin ICE from removing

10   class members who are pursuing lawful status under the

11   provisional waiver regulations with due diligence unless

12   essentially the extraordinary circumstances the court has

13   described, the specific ones we've proposed are the ones --

14             THE COURT:  I thought I got them from you.  I was

15   reading them from your memo.

16             MS. LAFAILLE:  Yes, exactly.  The specific ones we've

17   proposed in our motion are lifted from CIS's own field manual

18   regarding arrests at USCIS offices, and that's unless someone

19   is the subject of an outstanding warrant of arrest for a

20   criminal violation or is a threat to the safety or well-being

21   of another party.

22             THE COURT:  That would be the preliminary injunction?

23             MS. LAFAILLE:  Yes, Your Honor.

24             THE COURT:  Not arrests at CIS or elsewhere unless

25   they're a threat to national security, public safety or what?

1    Anything else?

2         MS. LAFAILLE:  Your Honor, we've proposed, with

3    regards to arrests, there are criteria in the USCIS field

4    manual that we think could be used.  Someone who assaults

5    another party during the course of a USCIS interview, willfully

6    destroys government property, is a threat to safety or

7    well-being.  Certainly some of those are only applicable to the

8    interview context.  Some of those apply more broadly like

9    someone who is a threat to the safety or well-being of another

10   party.  We think that can be the basic framework because that

11   reflects when USCIS thought it would be appropriate to

12   interrupt the normal course of someone's effort to gain lawful

13   status.

14        THE COURT:  And I think you just made a potentially

15   important point, although I don't know if it will prove to be

16   persuasive.  I think you're not claiming that all of that is

17   required by due process, but you're saying if there's a

18   violation of a right to due process, then I have the equitable

19   power to fashion an appropriate remedy.

20        MS. LAFAILLE:  Yes, Your Honor, and we think within

21   that discretion, this is a -- using those USCIS interview

22   guidance is perhaps a useful way to frame relief in accordance

23   with the agency's own expectations about when it would

24   interrupt the course of a legalization process.

25        THE COURT:  But you're not arguing or are you arguing

1    that the CIS manual provides the petitioners with any rights

2    that can be litigated and enforced?

3              MS. LAFAILLE:  No, we're not, Your Honor.

4              THE COURT:  That's good, because that would be a major

5    question.

6              Well, you don't have to answer it now, but one of the

7    questions is if a preliminary injunction is otherwise

8    justified, why would I order relief beyond the violation?

9    Because I thought at some points in your submissions you were

10   arguing that ICE should be ordered to consider that somebody is

11   pursuing the provisional waiver process, but that's more

12   open-ended.

13             MS. LAFAILLE:  Right, Your Honor.  We think the

14   violation of law and of due process has arisen among other

15   things because of ICE's failure to consider the provisional

16   waiver process.  In another world I could imagine a remedy

17   directing ICE to consider it, but I think for the same reasons

18   that Your Honor held the bond hearing yourself in the

19   Flores-Powell case, for the same reason Your Honor decided here

20   in this case that this court would need to conduct a hearing, I

21   think that having a more concrete injunction is essential.

22             THE COURT:  Are you also asking for notice to the

23   petitioners, a petitioner before he or she is removed?

24             MS. LAFAILLE:  Yes, Your Honor.  And I think

25   particularly -- I mean, we might argue for this in final relief

1   as well, but I think particularly in preliminary relief, that

2   would serve sort of a dual function of allowing us as class

3   counsel to be notified and be able to monitor how the relief

4   was working.

5           THE COURT:  And you want an order that will require

6   individual decisions not based solely on the removal order but

7   that takes into account the alien spouse has initiated the

8   provisional waiver process?

9           MS. LAFAILLE:  Right, Your Honor.  And specifically

10  we've asked that removal be limited to those extraordinary

11  circumstances where someone is a threat to the safety or

12  well-being of another party.  So the individual decision would

13  need to address that.

14          THE COURT:  So the removal would be limited to those

15  extraordinary circumstances where someone is a threat to the

16  safety or well-being of another person -- you said party -- but

17  person.

18          MS. LAFAILLE:  Yes.

19          THE COURT:  What does that mean?

20          MS. LAFAILLE:  So this is language from USCIS's manual

21  about when arrest at an interview is appropriate.  We are

22  proposing to use that as a framework for when it's appropriate

23  for the agency to interrupt the process of seeking relief.

24          THE COURT:  Does that mean, for example, let's say a

25  United States citizen has initiated the provisional waiver

1    process for her husband and they're genuinely married, and in

2    the course of that process, he's beating her up.  So would that

3    be a circumstance where they could remove him?

4            MS. LAFAILLE:  I think, yeah, Your Honor, that could

5    fall into that, yes.

6            THE COURT:  And who would I direct the order to?  How

7    high would this go?  Am I ordering, enjoining the Secretary of

8    Homeland Security?  Am I enjoining some subordinates if I were

9    to issue the preliminary injunction?

10           MS. LAFAILLE:  I think the most effective thing, given

11   the role of USCIS that we've been learning about, would be to

12   direct the injunction to the Secretary of Homeland Security.

13           THE COURT:  All right.  But if I direct an order to

14   the Secretary of Homeland Security and it's not obeyed, it's

15   the Secretary of Homeland Security who potentially could be

16   held in civil or criminal contempt, locked up.  That's what

17   you're asking for?

18           MS. LAFAILLE:  Yes, Your Honor.  I think that would be

19   the consequence.

20           THE COURT:  The Secretary of Homeland Security is the

21   person who is responsible.  I mean, we have this situation

22   where the Secretary has in these regulations told CIS what to

23   do and hasn't apparently, or you argue, told ICE to take these

24   into account, you know, I want humane, sensible decisions to be

25   made on people with final removal orders who are married to

1    United States citizens.  So it's up to the Secretary to

2    harmonize these competing obligations.

3              Are you requesting testimony in connection with the

4    motion for preliminary injunction?

5              MR. PRUSSIA:  Your Honor, actually, we think the

6    record as currently established supports our likelihood of

7    success on the merits, supports our motion as a whole.  So at

8    this time we're not requesting any additional testimony.

9              THE COURT:  Well, I may have some questions, but you

10   say it supports your request.  I mean, would you be asking any

11   further discovery or evidence not for a preliminary injunction

12   but in connection with a request for a permanent junction?

13             MR. PRUSSIA:  Yes, we would, Your Honor.  Earlier you

14   alluded to trial, and in earlier orders I think you've alluded

15   to the possibility of consolidating and doing all of this at

16   one time.  We think that there certainly is additional

17   discovery that would be needed before trial.  For example,

18   you've had no discovery as of yet from CIS.  We've had no

19   discovery from anyone at headquarters in Washington.  And as

20   Your Honor I think correctly pointed out, we have a situation

21   here where the local office of ICE seems to be acting, is

22   acting contrary to the stated regulations that are implemented

23   by the Department of Homeland Security.  So we need some, I

24   think, discovery from Washington.

25             Also, with respect to the local field office, the

1    discovery that we've obtained so far, which I think has been

2    very helpful in supporting our claims, has been limited to a

3    period of time that does not include an earlier time period in

4    2017 before our named petitioners were identified by CIS to the

5    local field office.

6              THE COURT:  Actually, say the last part of that,

7    please.

8              MR. PRUSSIA:  The limited discovery that was ordered

9    by Your Honor was limited to specific categories of

10   information.  It did not include a period of 2017 before our

11   named petitioners became -- were introduced to the local field

12   office by CIS.

13             So it's a long way of saying, Your Honor, I think the

14   record as it currently stands does support a preliminary

15   injunction.  If we were to move towards a trial, I think that I

16   would prefer to develop the record more fully on all of these

17   remaining issues.

18             THE COURT:  Well, a preliminary injunction should

19   never be issued casually, particularly against the government.

20   I don't issue orders I don't intend to enforce.  20 years ago

21   your partner Seth Waxman was the acting deputy Attorney General

22   of the United States, and I came very close to holding him in

23   contempt in what's now known as the Bulger case when the

24   Department of Justice initially declined to respond to an order

25   to identify whether several people were FBI top echelon

1    informants.

2         I found a way to cut the Gordian knot so the

3    department would comply, but it's a solemn undertaking, and I

4    think even if I were -- in deciding whether to grant a

5    preliminary injunction as well as a permanent injunction,

6    there's a requirement not only of a reasonable likelihood of

7    success on the merits but an imminent threat of irreparable

8    harm.  And I think I'd want to get absolutely up-to-date

9    information as to what the Department of Homeland Security,

10   ICE, perhaps not only ICE, perhaps the Secretary of Homeland

11   Security, intends to do, which is one of the reasons to --

12   anyway, I mean to the extent --

13        MR. PRUSSIA:  We understand, Your Honor.

14        THE COURT:  I mean, I may want to hear some testimony

15   about this tomorrow.  I haven't read every page of the

16   depositions, for example.  There's a lot going on here.

17        MR. PRUSSIA:  Your Honor, I understand that.  I guess

18   when I say that I think the record establishes our motion --

19   let me be specific in terms of what I think it establishes.

20        I think it establishes, with no dispute, that ICE

21   Boston is specifically targeting I-130 applicants with final

22   orders of removal and that enforcement action is being taken

23   against these individuals solely because of the fact of their

24   final order of removal.

25        The ultimate goal of these enforcement activities is

```
 1    removal.  Doing so would preclude these individuals from
 2    availing themselves of their right to engage in the provisional
 3    waiver process, and that would cause irreparable harm.  I think
 4    all of those things are beyond dispute.  We've heard some today
 5    about the legal question as to whether the regulation at issue
 6    here creates a right to access or something short of that.  I
 7    think that's a legal question that Your Honor is able to
 8    decide, but I think the underlying facts here are not in
 9    dispute to support the preliminary injunction.
10         THE COURT:  Well, you took depositions in late July,
11    mid to late July, right?
12         MR. PRUSSIA:  Yes, sir.
13         THE COURT:  And now I'm told that the head of the
14    office is about to change again, who knows for how long.  But
15    you know, I think -- I am inclined to hear testimony on, you
16    know, what's happened up to this point, what's going to happen
17    in the future.  And I do want to consider whether to
18    consolidate -- assuming we get this far -- consolidate the
19    hearing on the motion for preliminary injunction with a trial
20    on the merits.  But we'll see.
21         With regard to irreparable harm, do you want any of
22    the petitioners to testify about the impact on them?
23         MR. PRUSSIA:  Your Honor, we submitted affidavits in
24    the record on that.  There's been no -- in the briefing there's
25    been no argument by respondents challenging irreparable harm.
```

1    I think the only reference they make is in ECF 78, starting at

2    page 28 to 29.  The government simply states that when the

3    movant fails to establish a likelihood of success on the

4    merits, the remaining factors become matters of idle curiosity.

5    And they say that if the court nonetheless considers the other

6    factors, the key point is that the public interest favors

7    applying the federal law correctly.

8            So there's been no challenge by the government with

9    respect to our assertions of irreparable harm.  The only

10   argument that has been made and I say passing in their brief is

11   that the public interest favors applying federal law correctly.

12   So based on that, Your Honor, we would say that additional

13   testimony is not necessary at this point because we consider

14   the point to be conceded.

15           Of course we understand that Your Honor needs to

16   consider all of the factors on their own, but I offer that as a

17   reason why no additional testimony is needed from our

18   petitioners.

19           THE COURT:  Are the petitioners here today?

20           MR. PRUSSIA:  Yes, two of them are, Your Honor.

21           THE COURT:  Which two?

22           MR. PRUSSIA:  Calderon and De Souza.  Ms. De Souza has

23   stepped out.  She may have left for the day, Your Honor, I'm

24   not sure.  But Ms. Calderon is here.

25           THE COURT:  Well, I'm ordering that at least those two

1    be present tomorrow in case I want to hear from them.

2            MR. PRUSSIA:  Yes, Your Honor.  We will make sure of

3    that.

4            THE COURT:  All right.  Preliminarily, what do the

5    respondents say about the relief that's being sought and how I

6    ought to proceed with regard to the motion for preliminary

7    injunction?

8            MS. LARAKERS:  Well, Your Honor, obviously we oppose

9    the preliminary injunction in its entirety.  So the relief

10   sought is their purview and I'll leave it in your hands what

11   relief you would order.  Of course the government would be

12   seeking a very limited preliminary injunction.

13           THE COURT:  Well, that's what I'm asking you.  If you

14   leave it in my hands, it might be broader than what you asked

15   me for.  So if I need to make a decision and -- it's quarter of

16   5:00.  So I don't want to wear you out too much.

17           Think about this, and you don't need to have an

18   immediate answer, but if I find I have jurisdiction and then I

19   deny the motion to dismiss, I'll be finding at a minimum that

20   the Department of Homeland Security has a duty to consider that

21   somebody has initiated what I'm calling the provisional waiver

22   process, declared an intention to come out of the shadows to

23   pursue the legal process, that the Department of Homeland

24   Security, the Secretary of Homeland Security has a duty to

25   consider the interests codified in the regulations in making

1    removal decisions.  And then the question will be are the

2    petitioners reasonably likely, not guaranteed but reasonably

3    likely to prove that that hasn't been done.

4         And the parts of the deposition I have read at the

5    moment, it's all tentative, indicate to me that the ICE

6    officials in charge of the regional office didn't even know

7    about the provisional waiver application, so I don't know how

8    they would have been considering it.

9         Then the related question is, if there have been --

10   which is an immediate question but a major question with regard

11   to any permanent junction possibly is whether the unlawful

12   conduct is likely to continue in the future.  And I thought by

13   raising the possibility that at least Ms. Adducci and Mr. Lyons

14   would testify in these proceedings, it would give them a chance

15   to update me, since from what I have seen so far, the

16   deposition testimony doesn't seem to be completely helpful to

17   the government.

18        MS. LARAKERS:  Your Honor, I can certainly speak to my

19   clients and see what their position on that would be.  I think

20   it's possible that assuming that this court's tentative view --

21   perhaps we could come up with something that Your Honor would

22   find appropriate, assuming that you find that a right to seek

23   relief exists and assuming that you find that there should be

24   some sort of process for considering this provisional waiver

25   process.  I am certain that we could at least come up with a

1    proposal and maybe confer with petitioners about it.

2          THE COURT:  You should definitely confer with

3    petitioners about it.

4          MS. LARAKERS:  I think ICE would just need -- my

5    client would just need to see what the court has defined, and

6    then we can work together to present a proposal that would

7    work.

8          THE COURT:  And that's constructive.  And so that's

9    one.  And then there's the class certification claims that I am

10   going to get more immersed in before I see you again.  But I'm

11   asked to either certify a class under Rule 23 or a

12   representative habeas.  And I know there was some question of

13   whether Rule 23 applies in habeas.  But is there any

14   substantive difference between a representative habeas action

15   and Rule 23 class action in the circumstances of this case?

16         This has turned into a tag-team match.  Go ahead.

17         MR. PROVAZZA:  Your Honor, Stephen Provazza.  I don't

18   think there's a substantive difference between what the class

19   would look like.  It would just be under which provision the

20   court would certify the class.

21         THE COURT:  We'll have more discussion of this, but,

22   but if I certify a class, should we get that far -- and it's a

23   class under Rule 23(b)(2), right?

24         MR. PROVAZZA:  Correct.

25         THE COURT:  So there's no opportunity, for example,

1    for somebody to opt out of the class?

2              MR. PROVAZZA:  Correct, Your Honor.

3              THE COURT:  How would we know who was in the class?

4              MR. PROVAZZA:  Your Honor, the class definition sets

5    out that it would be any individual who has applied for an

6    I-130 -- has an approved or pending I-130 and meets the

7    eligibility requirements for a provisional waiver.

8              THE COURT:  And then if I issued a preliminary

9    injunction, at a minimum I would be ordering that the

10   Department of Homeland Security consider that they've initiated

11   the provisional waiver process and not remove somebody solely

12   because they have an order of removal, right?

13             MR. PROVAZZA:  Correct, Your Honor.

14             THE COURT:  At a minimum.  And what would happen if a

15   class member -- and I don't have the authority to review a

16   discretionary decision.  They're considering the right factors.

17   It's up to them essentially.  They have an obligation to do it

18   in good faith.  So what if some class member thought they

19   hadn't considered her petitions or her initiating the

20   provisional waiver process.  Then what would happen?

21             MR. PROVAZZA:  Well, Your Honor, this is a case about

22   access to the provisional waiver process, and in the evidence

23   we've seen so far, there aren't these individualized

24   determinations.

25             THE COURT:  Well, I know, but they may have been told

1    by some federal judge that they have an obligation to do it,

2    and if it's not done, the Secretary of Homeland Security could

3    get locked up for criminal contempt or civil contempt possibly,

4    after due process.

5              MR. PROVAZZA:  Yes, Your Honor.

6              THE COURT:  Well, you're saying they're not.  I'm

7    trying to figure out practically -- I don't think I've ever

8    certified a (b)(2) class.  I mean, would a person in the class

9    have to come to class counsel and complain, and you would have

10   to come to me?

11             MR. PROVAZZA:  Your Honor, I think that's built into

12   the proposed injunctive relief here, that ICE would have to

13   follow a procedure before they remove someone.

14             THE COURT:  But what if there's a contention that for

15   some unnamed person they haven't followed -- they haven't

16   considered the provisional waiver application?

17             MS. LAFAILLE:  I think, Your Honor, the ordinary

18   way -- certainly as class counsel at some point we might feel

19   that violations had to be brought to the Court's attention, but

20   I think the ordinary way that an individual might do that would

21   be to bring a petition for writ of habeas corpus.

22             THE COURT:  Well, I don't know.  Can they do that?

23   These are questions that need answers.  But if you're a member

24   of a class -- again, I don't issue orders I don't intend to

25   enforce.  And I didn't expect we were going to definitively

1    answer these questions today.

2            Here, Mr. Prussia, listen to this.  If I issue an

3    order, I want it to be clear enough that everybody affected can

4    understand it and that it would be obeyed and that I can

5    enforce it.

6            All right.  So a (b)(2) class would be certified if

7    the requirements of Rule 23(a) were satisfied and the party

8    opposing the class, the government, had acted or refused to act

9    on grounds that apply generally to the class so that final

10   injunctive relief and corresponding declaratory relief is

11   appropriate respecting the class as a whole.

12           So if we got that far, at minimum, I'd be directing,

13   ordering, the Secretary of Homeland Security not to deport

14   people who have initiated the provisional waiver process solely

15   because they have final orders of removal.  Then under the

16   applicable provision it says, The court may direct appropriate

17   notice to the class, but that doesn't mean I have to.  Well,

18   think about it.  How would it work?  Has the government

19   encountered this before?

20           MS. LARAKERS:  I haven't, Your Honor.  I'm sure there

21   is somebody at my office that I could get in touch with who

22   has.

23           THE COURT:  Well, all right.  Well, it's been my

24   intention to cover all of these issues and then to decide at

25   least the first two, jurisdiction and -- decide the motion to

1    dismiss, which has two prongs, jurisdiction and plausible

2    claim.  And I may, as I said, decide them orally and possibly

3    amplify the reasoning.

4         So we're going to continue tomorrow.  If I want to

5    hear testimony, I'm going to want to hear it from Ms. Adducci,

6    Mr. Lyons, if he's still in line to become the interim

7    director.  Is there anybody else we should have from the

8    petitioners' perspective?

9         MR. PRUSSIA:  Not from our perspective, Your Honor.

10        THE COURT:  All right.  And I want Calderon and De

11   Souza here.

12        MR. PRUSSIA:  Yes, sir, we'll do that.

13        THE COURT:  That's an order.  And I do think -- I

14   think Ms. Larakers made a very constructive suggestion.  So

15   assume just for planning, you know, to maintain all the

16   options, if I decide I have jurisdiction and I decide that a

17   plausible claim for which relief can be granted is alleged,

18   then we would move to preliminary injunction.  I think it would

19   be very useful to start now or soon to see if you could reach

20   some agreement on, you know, what I should do about preliminary

21   injunction at that point and then, you know, to see if -- and

22   conceivably your discussions could take care of not just the

23   preliminary injunction but something permanent, and if it's

24   possible, you would reach some agreement -- well, talk about

25   what you'll do.  I mean, you could end up with some kind of

1    temporary consent order, some permanent consent order or some

2    agreement that's not an order.

3            MS. LARAKERS:  Your Honor, from the government's

4    perspective, and certainly this could all be resolved by

5    tomorrow, but it would be almost impossible to move forward

6    with what the preliminary injunction -- what the relief would

7    look like without a class defined because we have to be able to

8    identify class members, and that would certainly be --

9    obviously our position is that there's due process and there

10   should be no class certified, but that's certainly part of it.

11           THE COURT:  And I think I understand that.  My sense

12   on how to proceed is the following:  I'd like to understand

13   better what's happened up to now and what's foreseeably, to the

14   extent anything can be foreseen, is going to happen in the near

15   future.  And I think hearing from Ms. Adducci, who has been

16   responsible since I saw you -- as I understand it since I last

17   saw you in June, and Mr. Lyons, who has been involved and

18   understands he's going to be responsible for a while, maybe

19   more than four days this time, that would be helpful to me, and

20   it may be also to you, seeing where things are.

21           And then I agree.  I think what I would aim to do, I

22   hope this week, is give you at least an oral decision on the

23   motion to dismiss and then give you some time to talk about

24   preliminary injunction, class certification.  That's my present

25   state of mind.

1          So on that thinking, the witnesses would come in

2     tomorrow.  If on reflection I want to hear from them, you could

3     question them.  I may have some questions for them.  And I want

4     to know what's happened and what do they intend to do in the

5     foreseeable future.  What does the Department of Homeland

6     Security, the Secretary of Homeland Security intend to do in

7     the foreseeable future?  And what's the harm to at least two of

8     the petitioners from this?  And then, as I say, I think I'd go

9     back to work on deciding the motion to dismiss and giving you a

10    decision.

11         MR. PRUSSIA:  Your Honor, I was going to rise to I

12    think say the same thing Ms. Larakers did.  And I don't want to

13    speak for them, but based on some of our other discussions, I

14    think the discussion on the scope of the injunction, the

15    discussion that you'd like for us to have, which I'm happy to

16    do, will be informed tremendously by Your Honor's leaning on

17    the class certification.

18         THE COURT:  On class certification?

19         MR. PRUSSIA:  On class certification.

20         THE COURT:  Here, but let's do this.  Let's do this.

21    It seems to me that the preliminary injunction and class

22    certification are closely related.

23         MR. PRUSSIA:  Yes, sir.

24         THE COURT:  If I'm issuing a preliminary injunction

25    that involves five people, I can manage that, I think.  If I'm

1    issuing a preliminary injunction that -- I don't know how many

2    people -- assume that I want to hear -- I'm going to want to

3    hear some testimony -- I might change my mind -- from

4    Ms. Adducci, Mr. Lyons on what's happened, what's likely to

5    happen.  I want to hear your arguments on class certification

6    and your questions.  And then if I don't dismiss the case, and

7    all of my views are tentative until they're final, but I am

8    inclined tentatively to believe and find that I have

9    jurisdiction and that a plausible claim has been stated, so

10   this is likely to go on.  But that could change.  But that's

11   why I want to do this as efficiently as possible.  I understand

12   Ms. Adducci is looking forward to going back to Detroit, for

13   example.  We'll see if -- she's no longer the interim director;

14   is that right?

15            MS. LARAKERS:  Yes, Your Honor, that is correct.

16            THE COURT:  So she does have important information, I

17   think.  But here, why don't I do this.  I'm going to have you

18   come in tomorrow at 10:00, which is a little later than I

19   intended, but I'm going to get more deeply into the depositions

20   but particularly into the class certification issue.  I want

21   to -- assume I'm going to start with testimony from Ms. Adducci

22   and Mr. Lyons as to what's occurred and what's foreseen as

23   occurring in the future that's relevant to the claims in this

24   case, and then I'll hear you on class certification.  But I

25   hope you'll make some time starting now, there's a conference

1    room out there, and before 10:00 tomorrow morning to talk with

2    each other about, if we get to it, what a preliminary

3    injunction might look like, not that you necessarily need to

4    have a final answer, but maybe you'll have some sense of

5    direction.

6            MS. LARAKERS:  And Your Honor, for efficiency's sake

7    as well and because they're so interrelated, I really think any

8    answer from ICE's end is certainly going to have to do with how

9    broad this class is.  And it's really inescapable to have some

10   sort of proposal, even for ICE to come up with a proposal,

11   without knowing what that class looks like because certainly we

12   have arguments ranging from no class to ranging to the class

13   should be limited.  That's why we're leaning, and if at all

14   possible, any sort of tentative view even on class

15   certification would help.

16           THE COURT:  I'm not far enough along in my

17   preparations to tell you anything now.

18           MS. LARAKERS:  I understand.

19           THE COURT:  I may very well have to hear your

20   arguments tomorrow because I'm not sure I come close to

21   discerning all of the issues.  I just know it's complicated.

22           MS. LARAKERS:  Absolutely.

23           THE COURT:  So it may be that I'll hear you tomorrow.

24   We'll recess.  Maybe I'll have you back on Wednesday or

25   Thursday.  My goal would be to give you an oral decision

1    whenever I have figured it out and am able to tell you.  And
2    then if I haven't dismissed the case, I'll be better educated,
3    and then I can give you some tentative guidance.  Does that
4    sound like a reasonable way to proceed?
5                MS. LARAKERS:  Absolutely, Your Honor, yes.
6                MR. PRUSSIA:  Yes, Your Honor.  May I raise one thing
7    before we recess?
8                THE COURT:  Yes.
9                MR. PRUSSIA:  With respect to the petitioners, to the
10   extent that you are interested tomorrow in taking testimony
11   from them, would you be able to give us a sense of the scope of
12   the testimony?
13               THE COURT:  Well, my interest is in hearing on the
14   issue of irreparable harm.  What's going to happen if I don't
15   issue this injunction.  I've got affidavits.  Do they speak
16   English?
17               MR. PRUSSIA:  They do.
18               THE COURT:  I'm interested in hearing them on
19   irreparable harm.
20               MR. PRUSSIA:  As Ms. Lafaille just reminded me, for
21   Ms. De Souza, it would be better for her to testify with the
22   presence of a translator.
23               THE COURT:  We can work with you, but this is a civil
24   case.  It's your obligation to get the translator.
25               MR. PRUSSIA:  We can do that, Your Honor.

1          THE COURT:  Didn't we do that once before in May or

2    June?

3          MS. LARAKERS:  Yes, Your Honor.

4          MR. PRUSSIA:  Yes.

5          THE COURT:  All right.  You can work with the deputy

6    clerk.  We have some.  You may have some.

7          MR. PRUSSIA:  That's all, Your Honor.  Thank you.

8          THE COURT:  This is complex and consequential.  We've

9    spent a lot of time today and we'll spend more time tomorrow,

10   but the adversary process is intended to facilitate

11   well-informed decisionmaking, and sometimes the arguments make

12   things more clear, sometimes they make them more cloudy, but

13   this is the way it's supposed to work.  Court is in recess.

14          (Adjourned, 5:07 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1          CERTIFICATE OF OFFICIAL REPORTER

2

3          I, Kelly Mortellite, Registered Merit Reporter

4    and Certified Realtime Reporter, in and for the United States

5    District Court for the District of Massachusetts, do hereby

6    certify that pursuant to Section 753, Title 28, United States

7    Code that the foregoing is a true and correct transcript of the

8    stenographically reported proceedings held in the

9    above-entitled matter and that the transcript page format is in

10   conformance with the regulations of the Judicial Conference of

11   the United States.

12                    Dated this 24th day of August, 2018.

13

14          /s/ Kelly Mortellite

15          _____

16          Kelly Mortellite, RMR, CRR

17          Official Court Reporter

18

19

20

21

22

23

24

25