UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
--------------------------------
                              )
LILIAN PAHOLA CALDERON JIMENEZ,  )
and LUIS GORDILLO, et al.,       )
                              )
         Petitioners,            )
                              )  Civil Action
vs.                              )  No. 18-10225-MLW
                              )
KIRSTJEN M. NIELSEN, et al.,     )
                              )
         Defendants-Respondents. )
                              )
--------------------------------
```

BEFORE THE HONORABLE MARK L. WOLF
UNITED STATES DISTRICT JUDGE


MOTION HEARING


August 21, 2018
10:09 a.m.


John J. Moakley United States Courthouse
Courtroom No. 10
One Courthouse Way
Boston, Massachusetts  02210



Kelly Mortellite, RMR, CRR
Official Court Reporter
One Courthouse Way, Room 5200
Boston, Massachusetts  02210
mortellite@gmail.com

1   APPEARANCES:

2   Counsel on behalf of Petitioner:
    Adriana Lafaille
3   Matthew Segal
    American Civil Liberties Union
4   211 Congress Street
    Boston, MA 02110
5   617-482-3170
    alafaille@aclum.org
6   msegal@aclum.org

7   Jonathan A. Cox
    Stephen Nicholas Provazza
8   Kevin Prussia
    Michaela Sewall
9   Wilmer Hale LLP
    60 State Street
10  Boston, MA 02109
    617-526-6212
11  jonathan.cox@wilmerhale.com

12  Kathleen M. Gillespie
    Attorney at Law
13  6 White Pine Lane
    Lexington, MA 02421
14  339-970-9283
    Kathleen.m.gillespie@outlook.com

15

    Counsel on behalf of Respondents:
16  Eve A. Piemonte
    United States Attorney's Office
17  Suite 9200
    1 Courthouse Way
18  John Joseph Moakley Federal Courthouse
    Boston, MA 02210
19  617-748-3271
    eve.piemonte@usdoj.gov

20

    Mary Larakers
21  William Weiland
    U.S. Department of Justice, Office of Immigration Litigation
22  District Court Section
    P.O. Box 868
23  Washington, DC 20044
    202-353-4419
24  mary.larakers@usdoj.gov

25

1                                       INDEX

2
    WITNESS                                                        PAGE
3

4   LUCIMAR De SOUZA

5       Direct Examination By Mr. Prussia                           15

6   LUIS GORDILLO

7       Direct Examination By Mr. Prussia                           29

8   LILIAN CALDERON

9       Direct Examination By Mr. Prussia                           38

10  REBECCA ADDUCCI

11      Direct Examination By Mr. Prussia                           49
        Cross-Examination By Ms. Larakers                           93
12

13  TODD LYONS

14      Direct Examination By Mr. Prussia                          124
        Cross-Examination By Ms. Larakers                          159
15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2              (The following proceedings were held in open court
 3    before the Honorable Mark L. Wolf, United States
 4    District Judge, United States District Court, District of
 5    Massachusetts, at the John J. Moakley United States Courthouse,
 6    One Courthouse Way, Courtroom 10, Boston, Massachusetts, on
 7    August 21, 2018.)
 8              THE COURT:  Good morning.  Would counsel please
 9    identify themselves for the court and for the record.
10              MR. PRUSSIA:  Good morning, Your Honor.  Kevin Prussia
11    from Wilmer Hale on behalf of the petitioners.
12              MS. LAFAILLE:  Good morning, Your Honor.  Adriana
13    Lafaille, also here for the petitioners.
14              MR. PROVAZZA:  Good morning, Your Honor.  Stephen
15    Provazza on behalf of petitioners.
16              MS. GILLESPIE:  Good morning, Your Honor.  Kathleen
17    Gillespie on behalf of petitioners.
18              MS SEWALL:  Good morning.  Michaela Sewall from Wilmer
19    Hale on behalf of petitioners.
20              MS. LARAKERS:  Good morning, Your Honor.  Mary
21    Larakers on behalf of the United States.
22              MR. WEILAND:  Good morning, Your Honor.  Wil Weiland
23    on behalf of the United States.
24              THE COURT:  Before we get to the issues of the
25    preliminary injunction and class certification, I want to go
```

1    back a bit.  Yesterday the respondents argued with regard to

2    the motion to dismiss that if any of the petitioners or members

3    of the putative class had a right to have the fact they were

4    pursuing a provisional waiver considered, it was only aliens

5    for whom an I-212 had already been granted?

6            MS. LARAKERS:  Yes, Your Honor.  That's the point at

7    which we think that it should begin.

8            THE COURT:  All right.  Where do I find -- and I

9    didn't anticipate that argument, and I have a feeling the

10   petitioners didn't.  Where do I find that in your written

11   submissions?

12           MS. LARAKERS:  Your Honor, our position has always

13   been that there is no right to seek relief, and so this is an

14   alternative argument that we didn't make because we simply

15   don't think that the right exists.

16           THE COURT:  Well, there's a rule in the First Circuit

17   and also in this District Court that if you don't make an

18   argument and develop it, essentially -- the First Circuit says

19   issues adverted to in a perfunctory manner, unaccompanied by

20   some effort in development of argumentation, are deemed waived.

21   That's Zannino, 895 F.2d 1, 17.  I discuss this and cite a

22   number of District Court cases in the First Circuit that assert

23   the same principle.  In De Giovanni, 968 F.Supp.2d 447, 450.

24           It's a particular problem in this case.  It may be

25   waived for the purposes of the motion to dismiss, but it could

1    make a real difference on the motion.  And it may be -- well,

2    it could make a difference with regard to class certification,

3    for example.

4           I mean, that argument, if it's meritorious, would have

5    a meaningful effect on the definition of any class.  But you

6    know, it's my goal to decide these matters orally the way I did

7    on May 8.  The petitioners didn't have fair -- or any notice of

8    the issue or a chance to address it in writing or consider it,

9    so it's a problem.

10          Do the petitioners want a chance to submit something,

11   although it would have to be on an expedited basis, on this

12   issue?

13          MR. PRUSSIA:  Your Honor, on this issue I don't think

14   it's relevant to the Rule 12 motion or preliminary injunction

15   motion.  I do agree that if there is any relevance, it would be

16   relevant to the class certification issue.  I think we're

17   prepared to address generally why in our view our proposed

18   class is correct.  I think it does address this specific issue.

19          However, we are also happy to provide additional

20   briefing.  We could do so on an expedited basis.  But I do

21   think during the course of the day today, during our oral

22   argument explaining why our proposed class is appropriate,

23   we'll address this issue.  But if Your Honor would appreciate

24   additional briefing, we're happy to provide it.

25          THE COURT:  Well, I think yesterday, you know, I had

1    analyzed how the provisional waiver regulations seemed to me to

2    provide an obligation, create an obligation on the Department

3    of Homeland Security to let people apply and to adjudicate the

4    request for a provisional waiver, but I hadn't thought about

5    whether there's a right to apply for an I-130 that would be

6    frustrated by arrests at CIS offices and a right to apply for

7    an I-212.

8         MR. PRUSSIA:  That's exactly right, Your Honor, and I

9    think we'll hear a little bit more today.  You don't even get

10   to the 212 process if they're arresting you.

11        THE COURT:  I am directing that you file something to

12   address this issue, and the government can, too, say by noon

13   tomorrow.  Because I'm going to be working on this.

14        MR. PRUSSIA:  Just to clarify, Your Honor, our paper

15   by noon tomorrow?

16        THE COURT:  Right.

17        MR. PRUSSIA:  Yes, sir, we'll do that.

18        THE COURT:  I mean, is there a text -- petitioners

19   presented me with information and I studied it as to why the,

20   what I'm calling the provisional waiver regulations, 2013, 2016

21   regulations provide them a right to have their request

22   adjudicated if they get that far.  I'm particularly interested

23   in whether there's anything in the I-130 or the I-212

24   regulations.  There are a couple -- there's one paragraph on

25   this that I found in the government's response to the motion

1  for preliminary injunction.  It's docket number 78 at page 22.

2  And they say there's no right to remain in the United States to

3  pursue two purely discretionary forms of relief, the I-130 and

4  the I-212.  And I just don't think anybody has provided me any

5  briefing on what the regulations say.

6       MS. LARAKERS:  Your Honor, I think when I was making

7  that argument also I was bleeding in a little bit to the class

8  cert argument.  I apologize if it's not clear, but I certainly

9  make the argument that there's not commonality precisely

10  because there are steps in this process.  So I think it was

11  wading in a little bit to that, at what point should it end.

12       THE COURT:  Well, look, the point has engaged my

13  attention.  I do want to get this right.  I don't think it's

14  necessarily material to the outcome of the motion to dismiss,

15  but it could affect the scope of any putative class.  It could

16  affect the scope of any injunction.

17       MS. LARAKERS:  Absolutely.  Your Honor, to be clear,

18  if you'd like, I can certainly submit a brief by 12:00 noon

19  tomorrow as well.

20       THE COURT:  Yes, assuming we finish enough here so

21  you're not here then.

22       MS. LARAKERS:  Thank you, Your Honor.

23       MR. PRUSSIA:  Your Honor, may I ask until 3:00 p.m.

24  tomorrow?

25       THE COURT:  Okay, okay.

```
 1          MR. PRUSSIA:  Thank you, sir.

 2          MS. LARAKERS:  Thank you, Your Honor.

 3          THE COURT:  All right.  Now, with regard to the motion

 4   for preliminary injunction, I guess there's a threshold issue.

 5   The standards are familiar.  Judge Saris in an analogous

 6   immigration context or in an immigration context addressed them

 7   in Devitri, 289 F.Supp.3d at 292, among other things, and the

 8   petitioners have to demonstrate a reasonable likelihood of

 9   success on the merits.  Petitioners also have to demonstrate

10   that they will likely suffer irreparable harm in the absence of

11   a preliminary injunction.

12          So as I said yesterday, I would like to hear some

13   testimony from Ms. Calderon and Ms. De Souza about what impact,

14   you know, being separated from their citizen spouses and

15   children, I believe, would have on them.  I have the

16   declarations, and I've made the finding I made on June 11.  But

17   it would be helpful in this process to hear some testimony from

18   them addressing that.

19          Is there any -- I do have the sequestration order in

20   place, but is there any objection to Ms. Adducci and Mr. Lyons

21   being here for that testimony?

22          MR. PRUSSIA:  No objection to that, Your Honor.  I

23   don't know if now is the right time, but I would like to be

24   heard on their testimony prior to it occurring.  I know there's

25   a lot to do today.
```

1          THE COURT:  The testimony of who?

2          MR. PRUSSIA:  Of Ms. Calderon and De Souza, our

3     petitioners.  I don't know if now is the time to do it.

4          THE COURT:  Okay.  So, yes, now is the time.

5          MR. PRUSSIA:  Okay.  Your Honor, certainly we

6     understand they've submitted declarations in this case in

7     support of our irreparable harm arguments.  And as yesterday, I

8     explained while I appreciate the court has an obligation and

9     duty to make certain factfinding, there's no challenge on

10    respondents' side with respect to our irreparable harm

11    arguments.

12          And I raise this because I do have concern about our

13    non-citizen petitioners testifying, being cross-examined by the

14    government in open court.  As Your Honor knows, they've been

15    targeted by ICE for enforcement.  They're under protection

16    under the court's jurisdictional stay order, but they are also

17    in the process of applying for immigration benefits.  I am not

18    their counsel in connection with those applications.

19          And while we've attempted to coordinate with their

20    counsel between yesterday afternoon and today, we really

21    haven't had an opportunity to do so.  And I have discomfort

22    with them being on the stand and being open to

23    cross-examination on matters that may implicate their pending

24    immigration benefits.

25          THE COURT:  Well, I was anticipating pretty focused

1    and limited testimony on what the impact of having been

2    separated, I've found unlawfully, from their U.S. citizen

3    spouses and children were; and, you know, if they're required

4    to leave the country, what effect they anticipate that will

5    have on them and their families.  I actually thought it would

6    be relatively brief as well as targeted.  If there's something

7    that goes beyond that -- because that's what's relevant to the

8    preliminary injunction -- you could object.  And I don't know

9    if the government would intend to --

10        MS. LARAKERS:  Your Honor, as much as he doesn't know

11   about what their applications say at USCIS, I certainly do not

12   either.  I think I can't at this point say that I won't have

13   any questions, but I can at this point say it would be

14   unlikely.  Because as I said yesterday, the government

15   recognizes that being separated from a U.S. citizen child is

16   certainly harm.  It's just our position that the likelihood of

17   that harm is questionable since they have the relief, since

18   certainly Ms. Calderon has a stay of removal.  And that's

19   really the questioning that's not relevant to them but possibly

20   relevant to the government witnesses.

21        MR. PRUSSIA:  Your Honor, certainly what you described

22   is what I expected from the court, and that's within my zone of

23   comfort.  What I would suggest, Your Honor, as a potential path

24   forward, if the court is interested in having testimony on

25   this, there is the possibility, I believe, of having testimony

1    from the citizen petitioner, for example, Ms. Calderon's

2    husband.  I'd feel more comfortable and I think he's able to

3    testify to those issues.  He didn't submit an affidavit, but I

4    think the matters to which he'd testify, he's equally able to

5    provide testimony about, considering he's her husband.  And I

6    would have more comfort if he was able to do that in court in

7    her stead, just given that I haven't really had an opportunity

8    to coordinate with her immigration counsel.

9         THE COURT:  Well, I might hear from him as well, but

10   she's the party.

11        MR. PRUSSIA:  They are both parties, Your Honor.

12        THE COURT:  They're both parties.

13        MS. LARAKERS:  Your Honor, our position on that is the

14   right that you tentatively recognized yesterday would only be

15   her right, not her U.S. citizen husband's right, because she's

16   the one that has the right to seek relief.  She's the one

17   applying for the 212 waiver and 601 waiver.

18        MR. PRUSSIA:  I think as the I-130 is filed by the

19   citizen petitioner, the benefit flows to the married unit.  The

20   harm is experienced by the married unit and their children.

21        MS. LARAKERS:  Your Honor, the government defers to

22   your judgment on this.

23        THE COURT:  Let me be as transparent as reasonable.  I

24   want -- I'm going to hear from Ms. Adducci and Mr. Lyons, who

25   as I understand at the moment is the acting interim director of

1    the field office, right?  And in connection with the

2    likelihood -- petitioner has to have likelihood of irreparable

3    harm in the absence of preliminary injunction.  It actually has

4    two dimensions.  So I need to determine whether they've been

5    violating their obligations if I conclude, as I indicated

6    yesterday tentatively I probably would, that they in the past

7    had not been taking into account that somebody was pursuing the

8    provisional waiver process.

9         Then, though, if they've been violating in the past

10   but they've convincingly demonstrated they were going to stop,

11   you know, it would have to be persuasive, there wouldn't be

12   irreparable harm.  And maybe that if these officials hear this

13   testimony, it will influence their voluntary behavior in the

14   future.  And this is Farmer v. Brennan, for example, 511 U.S.

15   845 at 847.  I discussed it in my decision in Kosilek v.

16   Spencer, 889 F.Supp.2nd 190, which was reversed on other

17   grounds.  So that's what all this is in my view both relevant

18   to but important to.  Because District Courts are encouraged to

19   be cautious and careful in determining whether it's necessary

20   to issue an injunction to the government.  There are issues of

21   comity, things like that.

22        But on the other hand, as I said yesterday, if I issue

23   an injunction, it will be clear, it will be defined, and I'm

24   going to expect it to be followed.  So I'm willing to hear from

25   Ms. Calderon's spouse, too, if he's a party, but I'd like to

1    hear from her.  And as I said, if there's something that you

2    think could compromise or complicate immigration proceedings,

3    raise it.  But it doesn't sound like the government -- they may

4    have no questions or let alone questions that are going to

5    create those complications.  But what I'm interested in is

6    relevant to the issues I need to decide.

7           MR. PRUSSIA:  I understand, Your Honor.  Thank you

8    very much.  I appreciate your consideration.

9           THE COURT:  All right.  Who would the petitioners like

10   to call first?

11          MR. PRUSSIA:  Ms. Adducci.

12          THE COURT:  No, no.  We're going to start with your

13   clients first.

14          MR. PRUSSIA:  Okay.  Can I have a moment to confer

15   with my team?

16          THE COURT:  Sure.

17          (Discussion off the record.)

18          THE COURT:  Here, do you want to administer the oath?

19   Actually, although this is a civil proceeding, it might be

20   prudent to administer the oath to the interpreter.

21          (Interpreter duly sworn.)

22          INTERPRETER:  Certified Portuguese interpreter.  Good

23   morning, Your Honor.

24          THE COURT:  Good morning.

25          LUCIMAR De SOUZA, having been duly sworn by the clerk,

1   was examined and testified as follows:

2         THE COURT:  And this witness is who?

3         MR. PRUSSIA:  Lucimar De Souza.  If it pleases the

4   court, I'm ready to proceed.

5         THE COURT:  Yes.

6   DIRECT EXAMINATION BY MR. PRUSSIA:

7   Q.   Good morning, Ms. Lucimar.

8   A.   Good morning.

9   Q.   How are you?

10  A.   Good.

11  Q.   Please state your name for the court, please.

12  A.   Lucimar De Souza.

13  Q.   Are you married?

14  A.   Yes.

15  Q.   Who is your husband?

16  A.   Sergio Francisco.

17  Q.   When were you and Sergio married?

18  A.   Should I say it in English?

19        THE COURT:  If you're able, if you're able to

20  understand the question and answer in English, please do.  If

21  you're at all confused by the question or how to state your

22  answer, consult the interpreter and she can interpret it for

23  you, okay?

24        THE WITNESS:  Okay.  Thank you.

25  A.   August 22, 2006.

1    Q.   So you've been married for about 12 years; is that right?

2    A.   Yes.

3    Q.   Do you have children?

4    A.   Yes.

5    Q.   How many children?

6    A.   Three.

7    Q.   When were your children born?

8    A.   My first one born January 26, 1988.  The second one born

9    August 6, 19 -- 2001.  And the third one born September 13,

10   2007.

11   Q.   Were all of your children born in the United States?

12   A.   No.

13   Q.   Which ones were born in the United States?

14   A.   The last one, Anthony Francisco.

15   Q.   And Anthony is about 16 years old; is that right?

16   A.   No.  Ten.

17   Q.   Ten.  He was born in 2008?

18   A.   2007.

19   Q.   2007.  Is Anthony in school?

20   A.   Yes.

21   Q.   Where does he go to school?

22   A.   Everett.  Everett.

23   Q.   In Everett?

24   A.   Mm-hmm.

25   Q.   Which grade is he in?

```
 1   A.    Fifth.

 2   Q.    Are you familiar with an I-130 application?

 3   A.    Yes.

 4   Q.    Have you submitted an I-130 application?

 5   A.    Yes.

 6   Q.    Approximately when did you submit an I-130 application?

 7   A.    I don't remember.

 8   Q.    At some point did you appear at Customs and Immigration

 9   Services offices for an I-130 interview?

10   A.    Yes.

11   Q.    CIS?

12   A.    Yes.

13   Q.    Around when did that occur?

14   A.    January 3.

15   Q.    Of 2018?

16   A.    2018.

17   Q.    What happened during that interview?

18   A.    He made questions about the marriage, about my life.

19   Q.    This is the CIS officer?

20   A.    Yes.

21   Q.    What did you tell the CIS officer about your marriage and

22   your life?

23   A.    I answer the questions about my son.  He asked about my

24   son, what kind of sport he likes, and when I married, and I

25   answer the questions.
```

1   Q.   How did the CIS officer respond to your answers?

2   A.   It was good.  The application was approved.

3   Q.   So the CIS officer approved your I-130 application.  Is

4   that your understanding?

5   A.   Yes, yes.

6   Q.   What happened after the interview?

7   A.   When we finish the interview, me and my husband and my

8   lawyer went outside from the office.  When you get out, five

9   ICE officers was waiting for me outside.

10  Q.   You said five ICE officers?

11  A.   Yes.

12  Q.   At the time did you know that they were ICE officers?

13  A.   No.

14  Q.   They didn't identify themselves as ICE officers?

15  A.   Yes, they did.

16  Q.   And then what happened next?

17  A.   I went to Burlington to have the fingerprints and the

18  paperworks.  But in front of my lawyer, the officer said I

19  should be in Burlington because they need to do the paperworks,

20  but I probably not going to be there.

21  Q.   Did you go to Burlington voluntarily?

22  A.   I had to.

23  Q.   What do you mean when you say you had to?

24  A.   I had to go.  I was under arrest.

25  Q.   So they arrested you outside of the CIS office after your

1    I-130 interview?

2    A.    Inside the immigration.

3    Q.    Did they explain to you why?

4    A.    No.

5    Q.    How did that make you feel?

6    A.    Afraid.

7    Q.    Your husband was present when you were arrested?

8    A.    Yes.

9    Q.    What was your husband's reaction as you were being

10   arrested?

11   A.    Surprised.

12   Q.    You mentioned that he was surprised.  Did you have an

13   expectation that by applying for I-130 benefits that you would

14   be arrested by the United States government?

15   A.    No, not expectation.

16   Q.    Why did you apply for the I-130?

17   A.    Because my lawyer said that would be best.

18   Q.    Did you consider it a pathway to legalizing your status in

19   the United States?

20   A.    Yes.

21   Q.    How did you learn about an I-130 application?

22   A.    Through my lawyer.

23   Q.    Are you familiar with the term "provisional unlawful

24   presence waiver"?

25   A.    When you say like "familiar" --

```
1              THE COURT:  He wants to know if you had heard that
2    term before.
3    A.    No.
4    Q.    Did you understand that by filing -- strike that.  At some
5    point you were transferred to the Suffolk County House of
6    Corrections; is that right?
7    A.    They transferred me at the same day, afternoon.
8    Q.    How long were you there for?
9    A.    At Suffolk?
10   Q.    At Suffolk, yes.
11   A.    99 days.
12   Q.    Was your husband and your children able to visit you?
13   A.    Yes.
14   Q.    How often could they visit you?
15   A.    Once a week.
16   Q.    How did you feel being separated from your husband and
17   your children?
18   A.    How can I say it?  Devastated.
19   Q.    Can you explain why?
20   A.    Because my son, he's very close to me.  And every single
21   day I had to put him in bed, read with him, talk to him.  So
22   for him, this was very hard.  Why I was in detention when it
23   was bedtime?  He kissed my photo.  He told me he said to the
24   picture that he missed me and he ask God to bring me home.
25              THE COURT:  I don't think you interpreted the end of
```

1    that.

2             INTERPRETER:  It was all in English, Your Honor.

3    That's why the interpreter didn't say anything.  Would you like

4    the interpreter to repeat?

5             THE COURT:  Well, I see, he said to the picture that

6    he missed me and he asked dad to bring me home.

7             INTERPRETER:  He asked God to bring me home.

8    A.   He asked to God to bring me home because he was missing

9    me.  And every night I used to stay with him before he's

10   sleeping.  And when he went to the prison to see me, he always

11   ask me, Mom, when you go back home?  And I never had an answer

12   to him.

13   Q.   Did you tell him why you were at Suffolk County Jail?

14   A.   Yes.

15   Q.   What was his reaction?

16   A.   He didn't understand because he's too young.

17   Q.   How did it make you feel to see the pain in Anthony as you

18   were held in Suffolk County Jail?

19   A.   Because when I was -- when I were at the room waiting for

20   him and then I saw the elevator open, he came to me crying,

21   crying, desperate.  And he hug me, and he didn't want to stay,

22   hug me all the time.

23   Q.   How did your detention in Suffolk County Jail affect your

24   husband, Sergio?

25   A.   Because he never -- he was never alone with Anthony, and

1    he was not able to manage this trauma that he was suffering.

2    Q.   Who was at home with the children while you were in

3    Suffolk County Jail?

4    A.   My husband.

5    Q.   Did he have -- strike that.  Was it just your husband?

6    A.   Only my husband.

7    Q.   Does your husband work?

8    A.   No.  He is retired.

9    Q.   And who had responsibility for preparing the meals for the

10   family?

11   A.   Sergio.

12   Q.   Is it fair to say that with you being in Suffolk County

13   Jail, all of the responsibilities of taking care of your family

14   fell to your husband, Sergio?

15   A.   Yes, yes.

16   Q.   At some point you were released from Suffolk County Jail;

17   is that right?

18   A.   Yes.

19   Q.   It was after a hearing in this very courtroom, right?

20   A.   Yes.

21   Q.   How did you feel when you heard that you were going to be

22   released from jail?

23   A.   Relieved.

24   Q.   Can you explain why?

25   A.   Because I knew from that day on I would be able to take

1    care of my child.

2    Q.   What happened when you came -- strike that.  How did your

3    children react when you arrived at home?

4    A.   My son -- my son cried a lot.  Hugged me and asked me for

5    never more to get away or leave him.

6    Q.   Today you're under supervised release; is that right?

7    A.   Yes.

8    Q.   What are some of the conditions of your release?

9    A.   I have the bracelet.

10   Q.   You have a bracelet?

11   A.   (Nods).

12   Q.   Where is the bracelet?

13   A.   My leg.

14   Q.   What is the purpose of the bracelet?

15   A.   To supervise me.

16   Q.   How does it feel to have to wear an ankle bracelet?

17   A.   Bad because I can't go with my son, like, to the beach.  I

18   always have to be covering it up, hiding it, because I feel

19   very ashamed.  And at night I feel a lot of pain on my foot

20   because of the bracelet.

21   Q.   Has anyone from ICE explained to you why you need to wear

22   an ankle bracelet?

23   A.   No.

24   Q.   Now, you understand that the court has issued an order

25   precluding ICE from removing you from this country, right?

1    A.    Yes.

2    Q.    And as part of your supervised release, you need to check

3    in with ICE on a regular basis, right?

4    A.    Yes.

5    Q.    And you appeared for your regular check-in on June 12 of

6    this year; is that right?

7    A.    Yes, yes.

8    Q.    What happened when you checked in with ICE on June 12?

9    A.    They asked me to buy a ticket until August 12 so I could

10   show the ticket on August 12.

11   Q.    Buy a ticket to where?

12   A.    To Brazil.

13   Q.    They asked you to buy a ticket to leave the United States?

14   A.    Yes.

15   Q.    Even though this court has an order in place precluding

16   them from removing you from this country?

17   A.    Yes.

18   Q.    How did that make you feel?

19   A.    I got so scared.  I called Adriana to find out what I

20   should do, if I should buy the ticket or not.

21   Q.    So it's only because of your lawyer that you're able --

22   strike that.  It's only because of your lawyers that you're

23   still here today; is that right?

24              MS. LARAKERS:  Objection, Your Honor.

25              THE COURT:  There's an objection.  So please don't

1    interpret.  I'll sustain that objection.  She may not know all

2    the reasons she's still here.

3    Q.   What would happen if you had bought that ticket and you

4    were deported to Brazil?

5    A.   My life would be ruined.

6    Q.   How?

7    A.   Because I would have to bring my son with me.  My husband,

8    he's not Brazilian.

9    Q.   What effect would that have on your children?

10   A.   The effect would be very bad because he doesn't speak

11   fluent Portuguese.  He would not have the same opportunities

12   that he has here.

13   Q.   He would have to leave his school here in the United

14   States, right?

15   A.   He would have to leave the school, and the school in

16   Brazil doesn't have the same conditions as the school here.

17   Q.   Why did you leave Brazil to begin with?

18   A.   To have a better life situation here in the United States.

19   Q.   Now, you mentioned that you would have to bring your

20   children and your family to Brazil.  But they could stay in the

21   United States.  Isn't that an option?

22   A.   No, they wouldn't be away from me.

23   Q.   And why is that?

24   A.   My husband needs me, my son needs me.  It wouldn't be like

25   a short stay in Brazil.  I would have had to stay for a long

1   time, and my son couldn't be away from me for that long

2   anymore.

3   Q.   Have you thought about what will happen to you if you lose

4   this lawsuit?

5   A.   Yes.

6   Q.   What do you think will happen to you?

7   A.   I think they might want to deport me.

8            MR. PRUSSIA:   Excuse me one second.

9            (Discussion off the record.)

10  Q.   So if you are deported and if you had to be separated from

11  your family and your U.S. citizen child, what would it be like

12  for them?

13  A.   Their lives would be very complicated.  Because my husband

14  needs medical assistance, and in Brazil he wouldn't have the

15  same treatment as he has here.  My son wouldn't have the

16  opportunities that he has.  He's now in fifth grade.  He would

17  have to go back to, like, third grade so he could learn

18  Portuguese.  So their lives would be very much affected.  And

19  the quality of life financially speaking would be very affected

20  in Brazil.

21  Q.   And so if your husband wanted to come to Brazil, are you

22  even sure that he can do so?

23  A.   No, because he would be an immigrant, so he would have to

24  go through the process of becoming legal.

25            MR. PRUSSIA:   I have no further questions, Your Honor.

1          THE COURT:  Would the respondents like to

2    cross-examine?

3          MS. LARAKERS:  Your Honor, I do have one question --

4    three questions that relate to whether she's a class member.

5    They don't relate to harm, and I don't want to ask if this is

6    solely related to harm.

7          THE COURT:  What specifically are the questions?

8          MS. LARAKERS:  Just have you ever left -- when did you

9    come to the United States and have you ever left the United

10   States since coming here.

11         MR. PRUSSIA:  Your Honor, I object to that as outside

12   the scope.

13         THE COURT:  Since I ordered this -- I ordered this to

14   be limited to irreparable harm, I think if I had anticipated

15   that, maybe I would have made somewhat different judgments.

16         MS. LARAKERS:  Absolutely.

17         THE COURT:  I'm excluding those as essentially beyond

18   the scope, but thank you for raising it.

19         MR. PRUSSIA:  Thank you, Your Honor.

20         THE COURT:  All right.  Your testimony is complete.

21   You may be seated.

22         THE WITNESS:  Thank you.

23         THE COURT:  Who would the petitioners like to call

24   next?

25         MR. PRUSSIA:  One moment, Your Honor, please.

1           THE COURT:  Hold on just a second.

2           (Discussion off the record.)

3           MR. PRUSSIA:  Your Honor, is it all right if I ask if

4   we can take a short recess?  Just to give you my thinking, Your

5   Honor, I would like to, if possible, call Luis Calderon, but I

6   want to go back and talk to my --

7           THE COURT:  That's fine.  I think Mr. Lyons may have

8   left the courtroom, too.  And I don't know if that's temporary

9   or permanent, but it's my intention that he be here.  So sure.

10  It's 11:00.  Would about ten minutes be sufficient?

11          MR. PRUSSIA:  That would be just fine.  Thank you.

12          MS. LARAKERS:  And I will get him back in the room,

13  Your Honor.

14          THE COURT:  Court is in recess.

15          (Recess taken 11:02 a.m. - 11:20 a.m.)

16          THE COURT:  Who would the petitioners like to call

17  next?

18          MR. PRUSSIA:  Luis Gordillo, Your Honor.

19          THE COURT:  Who is that?

20          MR. PRUSSIA:  Luis Gordillo, Lily Calderon's husband.

21  Two housekeeping matters.  The first, for Lucimar's

22  interpreter, do you anticipate further questioning of her?  Can

23  we release the interpreter for the day?

24          THE COURT:  I don't anticipate any further questioning

25  of Ms. De Souza.

1          MR. PRUSSIA:  Okay.  Thank you very much, Your Honor.

2    And second, even though Your Honor didn't direct it, we had

3    Lilian and her husband go in the back room during Lucimar's

4    testimony.  We're going to have Luis come forward now.  Would

5    you like Lilian to stay in the back room, or is it okay she

6    join in the courtroom?

7          THE COURT:  She's a party.  She's entitled under the

8    sequestration order to be here if she wants to be.

9          MR. PRUSSIA:  Thank you very much, Your Honor, for

10   that clarification.  We call Luis Gordillo.

11         MR. COX:  Your Honor, Jonathan Cox from Wilmer Hale,

12   attorney on behalf of petitioners.

13         LUIS GORDILLO, having been duly sworn by the clerk,

14   was examined and testified as follows:

15   DIRECT EXAMINATION BY MR. PRUSSIA:

16   Q.   Good morning.

17   A.   Good morning.

18   Q.   Could you please state your name for the record.

19   A.   Luis Gordillo.

20   Q.   Luis, do you have a wife?

21   A.   Yes, I do.

22   Q.   Who is your wife?

23   A.   Lilian Calderon.

24   Q.   Where were you and Lilian married?

25   A.   We got married in September 2016.

1    Q.    How long have you known each other?

2    A.    Since 2002.

3    Q.    Do you have children?

4    A.    Yes, we do.

5    Q.    How many children?

6    A.    We have two.

7    Q.    When were your children born?

8    A.    Natalie was born on July 13, 2013.  Noah was born March --

9    sorry -- 2016.

10   Q.    Where were they born?

11   A.    In Warwick, in Providence.

12   Q.    In the United States?

13   A.    Yes, in the United States.  Sorry.

14   Q.    And you are a United States citizen?

15   A.    Yes, I am.

16   Q.    Where do you and your family live?

17   A.    We live in Providence.

18   Q.    Can you describe just generally what your family life is

19   like?

20   A.    Currently?

21   Q.    Yes.

22   A.    I have a full-time job.  I work on average between 50 or

23   65 hours a week.  Lilian takes care of the kids.  I drop

24   Natalie off at school.  My mother picks her up from school,

25   drops her off at home.  When I come back home, it's usually

1    between 8:30 and 9:00.

2    Q.    Lilian is not a United States citizen, right?

3    A.    No, she's not.

4    Q.    At some point -- are you familiar with an I-130

5    application?

6    A.    Yes, I am.

7    Q.    And at some point did you file an I-130 application?

8    A.    Yes, we did.

9    Q.    What was the purpose of you filing an I-130 application?

10   A.    To get her on the path of becoming a lawful resident.

11   Q.    At some point did you have an interview at United States

12   CIS with respect to your I-130 application?

13   A.    Yes.

14   Q.    Approximately when was that interview?

15   A.    January 17 of this year.

16   Q.    And what happened during that interview?

17   A.    When we arrived to the interview, I went in first.  My

18   interview was a matter of five minutes.  I wasn't really asked

19   much.  I wasn't asked if I was married to Lilian.  I wasn't

20   asked if my name was Luis.  I wasn't asked any personal

21   information on either my behalf or hers.  The gentleman at the

22   interview, he just went on the sheet of paper he had in front

23   of him.

24         I showed him the photo album we had, bank statements and

25   our marriage license, any forms that we had to prove that we

1    were a legitimate couple.  Then he told me everything seemed

2    fine, that he just needed to speak to Lilian, and he was going

3    to approve the I-130.

4    Q.   So the CIS officer told you that your I-130 application

5    was approved; is that right?

6    A.   Yes.

7    Q.   What happened after the interview?

8    A.   After the interview, once I stepped out, Lilian went in.

9    Within maybe five minutes or so two agents came over to me and

10   asked me if I was Luis.  I responded, Yes, I am.  They told me

11   they were detaining my wife Lilian, and when I asked why, they

12   wouldn't give me a reason.  They handed me back the album, the

13   albums we brought, and they told me I was all set to leave.

14   Q.   So at that point was she arrested?

15   A.   I assume.  I never got to see her once she went for her

16   interview.

17   Q.   When did you next see Lilian?

18   A.   Not until three weeks after, I was allowed to see her in

19   Suffolk County Jail.

20   Q.   So you were not able to see your wife for three weeks?

21   A.   No, I wasn't.

22   Q.   And where was she located?

23   A.   In Suffolk County prison.  Sorry -- I don't know if --

24   Q.   How did it make you feel when you saw the ICE agents

25   appear after your CIS interview?

1   A.   I was shocked.  I wasn't expecting something like that to

2   happen.

3   Q.   Why didn't you expect that there would be ICE agents at

4   your CIS interview?

5   A.   I just, from hearing from other couples doing the same

6   process and them going for an interview and just coming out

7   fine, I guess I felt comfortable going in.  I was nervous but I

8   was comfortable.  I wasn't expecting anything like this to

9   happen.

10  Q.   What did you do in the three-week period before you were

11  able to see Lilian when she was in jail?

12  A.   Well, life got a little difficult.  We had a routine.  I

13  would come home.  We'd eat dinner.  I would spend time with her

14  and the kids.  We had a routine, structure.  The kids would be

15  in bed by 8:30.  We would read to them, put them to bed.  Wake

16  up, go to work.

17       When she was away, I would wake up at 7:00 to get the kids

18  ready, go to work.  I wouldn't pick them up until between

19  10:00, 11:00 at night, sometimes even midnight, because I was

20  trying to do what I could to try to help Lilian be released.

21  So there was no structure.  I wasn't able to spend time with

22  the kids.  So now mommy wasn't around.  But I couldn't spend

23  time with them like we used to.

24  Q.   And how did that make you feel?

25  A.   It just made me feel sad.

1    Q.   What about your children; what did this do to your
2    children?
3    A.   They were traumatized.  There was nights that Natalie,
4    being the oldest, she was four at the time, she would wake up
5    in the middle of the night screaming, asking where mommy was.
6    She would just cry.  And I would just stay up until I was able
7    to calm her down and put her back to bed.  They used to sleep
8    in their own bedrooms in their own beds.  After this they just
9    wanted to stay with me every night, so I let them sleep in my
10   own bedroom I guess to make them feel as comfortable as I
11   could.
12        After a few days she was detained, she wasn't home,
13   Natalie asked me, How come my friends have a mom and I don't?
14   I just didn't know what to respond.
15   Q.   How long was Lilian detained?
16   A.   Shy of a month.
17   Q.   How often could you visit her during that time?
18   A.   I was only able to visit her once, because the way the
19   process works, you have to get a background check.  There's a
20   process.  The initial process takes two weeks.  And then to set
21   a schedule, you have to set the schedule in advance a week.
22   That's the reason I was only able to see her once during her
23   being detained.
24   Q.   What was that visit like?
25   A.   I mean, it felt good to see her after a few weeks not

1    being able to see her or talk to her.  We just tried to stay --
2    I tried to just -- we just tried to talk about positive things
3    and things the kids were doing, just trying to distract each
4    other from what was actually going on around us.  She was in a
5    jumpsuit with other inmate detainees.  I think it was for 30
6    minutes or 45 minutes if I recall right.
7    Q.   At some point Lilian was released from jail, right?
8    A.   Yes.
9    Q.   And how did you feel when you heard that Lilian was going
10   to be released?
11   A.   I felt happy.  I mean, I was excited to finally have
12   Lilian back at home.
13   Q.   And how did your children react seeing your wife at home?
14   A.   I remember driving back with Lilian, and I opened the door
15   and I told them I had a surprise for them, and that's when
16   mommy walked in.  They were very excited, happy.  They were
17   showing mommy what they -- Noah, being the little one, he was
18   showing that he could jump, and just being a kid.  And Natalie
19   was showing her what she knew, she read other books at school
20   or just things that kids do.
21   Q.   What would happen if Lilian was deported to Guatemala?
22   A.   I don't know because we don't know that country.  We
23   don't -- I personally don't speak the language.  I'm not
24   Guatemalan myself.  I don't know how we'd be able to support my
25   family over here and her over there, her safety.  I don't know

1    how things would work out.

2    Q.   Do you even know that you could emigrate to Guatemala if

3    you wanted to?

4    A.   I don't even know if I would be able to get a job.  How

5    would I be able to support our family?

6    Q.   If you were to move to Guatemala -- strike that.  If your

7    family were to move to Guatemala, what effect would that have

8    on your children?

9    A.   Natalie doesn't even speak Spanish.  My little one doesn't

10   either.  I'm sure it would be a shock to them going to a

11   different environment.  We don't know anything about Guatemala.

12   We don't have any family, we don't have any roots over there,

13   so we would just be in a country that we don't know how normal

14   life is I guess I would say over there.

15   Q.   What would happen to all your assets in the United States?

16   A.   I would have to sell my property that we have.  If not,

17   we'll probably have to let it go.  Depending on how the market

18   is, you can't sell property right away.  So I would have to

19   probably make a decision on what to do with the properties.

20   Q.   Now, if Lilian was deported, you could just stay here,

21   couldn't you?

22   A.   I could, but I don't know how traumatic that would be for

23   our kids to be separated from their mom.  Our kids are very

24   close to us, and we spend all the time we can with them.  We

25   are very involved with them.  Just the three weeks -- I mean,

1    the four weeks she was detained, that was very harmful to them.

2    Q.   Have you thought about what will happen to you and Lilian

3    and your family if you lose this lawsuit?

4    A.   We thought about it, but we are very hopeful, and we stay

5    positive that the outcome ends in a positive way.  We were

6    separated once, and we don't want to be separated again.

7              MR. PRUSSIA:  One moment.

8              (Discussion off the record.)

9              MR. PRUSSIA:  I don't have any further questions, Your

10   Honor.

11             THE COURT:  Is there any cross-examination?

12             MS. LARAKERS:  Not on irreparable harm, Your Honor.

13             THE COURT:  Your testimony is complete.  You may take

14   your seat.

15             THE WITNESS:  Thank you.

16             THE COURT:  Who would petitioners like to call next?

17             MR. PRUSSIA:  On the irreparable harm issue, we don't

18   have any other witnesses, Your Honor.

19             THE COURT:  You don't intend to call Ms. Calderon?

20             MR. PRUSSIA:  No, we do not, Your Honor.  If Your

21   Honor would like to hear from her, we'd be happy to put her on.

22   I just thought between Ms. De Souza, you have the perspective

23   of the harm to non-citizen petitioner, and --

24             THE COURT:  Well, I think I would like to hear from

25   her.

```
 1              MR. PRUSSIA:  Okay.  Lilian.
 2              LILIAN CALDERON, having been duly sworn by the clerk,
 3     was examined and testified as follows:
 4     DIRECT EXAMINATION BY MR. PRUSSIA:
 5     Q.   Good morning.
 6     A.   Hi, good morning.
 7     Q.   Would you please state your name for the court.
 8     A.   My name is Lilian Calderon.
 9     Q.   Lilian, your husband is Luis, right?
10     A.   Yes.
11     Q.   How long have you known Luis?
12     A.   I have known Luis more than half of my life now.  Luis and
13     I have known each other since 2002.
14     Q.   And you have children, right?
15     A.   We do.  We have Natalie who is five and Noah who is two.
16     Q.   And where were they born?
17     A.   They were born here in Rhode Island.  Well, not
18     Massachusetts.  Rhode Island.
19     Q.   So they're United States citizens?
20     A.   They are.
21     Q.   As is your husband, right?
22     A.   Yes.
23     Q.   Could you describe your family life today?
24     A.   At the moment?
25     Q.   Yes.
```

1   A.   At the moment our family life is a little -- it's a little

2   hectic.  So Luis works long weeks, and I take care of our kids,

3   and he comes home at night and we, you know, do our routine.

4   We have dinner.  We have play time.  We have story time,

5   kisses, and we continue the day and so forth.  Natalie is going

6   to be starting -- she's in preschool at the moment.  She's

7   going to be starting kindergarten in a couple of weeks, and

8   Noah is my baby.

9   Q.   So Luis is the breadwinner; is that right?

10  A.   Yes.

11  Q.   Now, at some point -- are you familiar with an I-130

12  application?

13  A.   Yes, I am.

14  Q.   At some point you and your husband submitted an I-130

15  application?

16  A.   Yes, we did.

17  Q.   Why did you submit an I-130 application?

18  A.   We submitted an I-130 in the hopes to legalize my status.

19  Q.   And approximately when was your -- strike that.  At some

20  point you appeared for an interview on your I-130 application

21  at CIS; is that right?

22  A.   We did.  We were scheduled for our interview on January

23  17, 2018.

24  Q.   And what happened during that interview?

25  A.   During that interview, Luis went in first for an

1   interview.  He came out shortly, and then I went in for an

2   interview after that.

3   Q.   What happened during your portion of the interview?

4   A.   During my portion of the interview, I was interviewed by

5   two -- I guess two officers.  And one of them was training and

6   the other one did the actual interview.  It was maybe a

7   five-minute interview.  But during that interview I wasn't

8   asked anything that pertained to our marriage specifically.  I

9   was never asked if I was married to Luis, if we had children

10  together.  All the officer said to me was, It appears that your

11  marriage is a legitimate marriage.  I am going to go ahead and

12  approve your I-130.  And, you know, the other thing is there

13  are two officers here that want to speak to you.

14       Then as soon as he did that, two ICE agents came in and

15  proceeded to detain me.  I was handcuffed around my -- I was

16  handcuffed.  I was shackled.  And the only reason why they

17  didn't shackle my ankles was because I was wearing winter boots

18  because we were in the middle of winter.

19            THE COURT:  Excuse me.  Here, try to slow down and

20  speak loudly and clearly into the microphone.

21            THE WITNESS:  Okay.

22  A.   And they said that they were going to detain me while I

23  was being processed, while everything was being processed.

24  Q.   So your I-130 application was approved at CIS?

25  A.   Yes.

1   Q.   But then you were detained by ICE?

2   A.   Yes.

3   Q.   Did they tell you why?

4   A.   No.

5   Q.   How did that make you feel?

6   A.   I was shocked because at the moment I asked if I could see

7   my husband, and they said no.  And I asked to speak to my

8   lawyer, and they also said no.  And I was taken in a van, taken

9   to an office in Warwick, Rhode Island and processed there.

10   Q.   Your husband was at the interview with you, right?

11   A.   Yes.

12   Q.   And at the time you were arrested, you were not able to

13   say goodbye to your husband?

14   A.   No.  I wasn't even allowed to give him a hug.  I didn't

15   know I was going to be taken and detained for three weeks and

16   not be allowed to see him.  I didn't even know it was the last

17   morning I would see my kids for three weeks.  If I would have

18   known, I would have given them the biggest hug I could have.

19   You know, I just said, We'll see you later.

20   Q.   When you appeared for your I-130 interview, did any part

21   of you expect that the result of that interview would be that

22   you would be detained by ICE?

23   A.   No.

24   Q.   Why is that?

25   A.   I mean, we were optimistic that we were just going to go

1    in for a routine interview because this is the first step in

2    the process of what we were trying to do.  So we thought it was

3    just going to be going for an interview, approve the interview

4    and then go on to step two, which is trying to file the rest of

5    the waivers.

6    Q.   You mentioned that you went to an office in Rhode Island;

7    is that right?

8    A.   Yes.

9    Q.   And what happened next?

10   A.   When I went to the field office in Johnston or when they

11   transferred me to Warwick?

12   Q.   Let's go from Warwick to Johnston.

13   A.   So I was detained in USCIS in Johnston, Rhode Island, then

14   I was transferred to Warwick, and then I was taken to Suffolk

15   House of Corrections in Boston.

16   Q.   You were shackled when you were taken to the field office

17   in Warwick, right?

18   A.   Correct.

19   Q.   Is that the only point in time during your custody of ICE

20   that you were in shackles?

21   A.   No.  I was shackled when I was taken from Warwick to

22   Suffolk House of Corrections also.

23   Q.   How did that make you feel to be in shackles?

24   A.   I was really -- I was sad because I had never been in a

25   situation at all even close to something like that where I had

1   been just, you know, handcuffed and shackled and put in the

2   back seat of a van, taken to a prison.  You know, I had never

3   been put through something like that.

4   Q.   How long were you in ICE's detention?

5   A.   Just shy of a month.  It was three weeks.

6   Q.   What did that do to your kids?

7   A.   So, you know, we've always tried to do the best that we

8   could for our kids.  We had a very set routine from the moment

9   they wake up until the moment they go to bed.  And it just --

10  it highly traumatized Natalie and Noah.  Natalie, even when I

11  was released, she still had nightmares.  Natalie had nightmares

12  of mommy not being there and just screaming out for mommy and

13  wondering why all of her schoolmates have a mommy and she

14  doesn't have a mommy anymore.

15       And Noah, who is an amazing little boy, just suffered from

16  separation anxiety.  You know, I couldn't even -- when I was

17  released, when I would be with him, he was great, but if I had

18  to step away to go to the bathroom, it would take me a solid

19  20, 30 minutes to calm him down before I could set him down to

20  use the bathroom.  He developed separation anxiety, which he

21  didn't have before.  And it was just -- it was horrible for

22  them and for my husband.

23  Q.   What are you doing to respond to the separation anxiety?

24  A.   So our kids are currently in therapy, and we have been

25  working with them to ease the nightmares.  I remember when I

1    came home, when I was released from detention, Luis said to me,

2    Honey, I'm sorry, but we're all sleeping in the same bed.

3    We're co-sleeping.  And I said to him, There's nothing to be

4    sorry about.  You did the best that you could.  If this means

5    that we're all squished in the bed, it's okay.  Eventually

6    we'll get back to where we were.

7         And we eventually, working with them and working with the

8    therapist, have gotten them back on their routine where we can

9    safely turn off the lights and they don't have to worry that

10   mommy is not going to be there when the lights turn on.  So

11   we're still working with that.

12   Q.   What was the month like for your husband when you were

13   away from your family?

14   A.   It was horrible.  My husband is one of the strongest men I

15   know.  From the moment I met him, I knew he was a great man,

16   and I knew he was going to be eventually a great dad.  And he

17   developed anxiety and depression and things that he never

18   suffered from before.  So it's hard for me to see this man

19   that's always taken care of us, you know, have a moment where

20   he breaks down because a court date is looming or a pending

21   approval is looming or something is happening.  Something as

22   simple as if I don't reply to a phone call or a text, he thinks

23   the worst.  It's -- you know, it's done damage to him in a

24   sense that he's now on medication, and he is in therapy also

25   trying to, you know, grasp the situation that we're in.

1  Q.    How often could you see your husband when you were

2  detained?

3  A.    I saw him once.

4  Q.    What was that visit like for you?

5  A.    Sorry?

6  Q.    What was that visit like for you?

7  A.    At that moment it was the best thing because I hadn't seen

8  him in three weeks.  Even when I asked to just -- you know,

9  when I was being detained, I asked to give him a hug or say

10  goodbye and I was denied, you know, just -- I was denied.  I

11  couldn't even give him a hug.  I couldn't even say goodbye.  So

12  seeing him that day had just -- you know, I was just hoping

13  that it wasn't the last day that I saw him.

14  Q.    Now, at some point you were released from detention,

15  correct?

16  A.    Yes.

17  Q.    How did that make you feel?

18  A.    When I was released from detention, I was -- I was happy.

19  I was shocked and I was happy, and I was nervous because the

20  way I was released was, you know, I wasn't given an explanation

21  or anything.  I was just -- the officers just came to my cell

22  at Suffolk and told me to pack up my things because I was being

23  moved.  And automatically I thought that -- I didn't know what

24  to think.  And then when we were transferred to Burlington, I

25  was put in a cell and wasn't given an explanation, wasn't told

1    what was going on.  And then another officer came in and just
2    said I was all set, I was being released.  And I couldn't
3    believe it.  It was surreal.  I was released.  I walked out,
4    and I saw my husband, and I gave him the biggest hug that I
5    could, like, give him because it was -- I almost didn't
6    recognize him at the moment.
7    Q.    At some point you saw your kids for the first time?
8    A.    Yeah.
9    Q.    Can you describe that experience, please?
10   A.    Natalie was so happy to see me, and Noah was showing me
11   everything that he had learned in that month.  He showed me how
12   he could now jump on a bed and do flips.  And Natalie was just
13   hugging me and hugging me, Mommy, why did you leave me?  Don't
14   leave us again.  And it was just the biggest -- the biggest
15   embrace I ever got from them.  It was amazing to see them
16   again.
17   Q.    Have you thought about what may happen to you if you lose
18   the litigation?
19   A.    Honestly, no.
20   Q.    Why not?
21   A.    I mean, we haven't -- we haven't thought of it, we just
22   haven't.  At the moment we're living day to day right now and
23   just enjoying our life together, our time together.
24   Q.    What would happen if you were ordered to return to
25   Guatemala?

1   A.   I don't know.  Guatemala is not a country that I remember.

2   It's not the country of origin of my husband.  My children

3   don't speak Spanish.  My husband's Spanish isn't that great,

4   although he'd like to believe it is.  I don't know.

5   Q.   What effect would that have on your children?

6   A.   I think it -- I think it would be a traumatic effect for

7   them in the sense of here we are the only home they've ever

8   known, the only place they've ever known.  All of a sudden now

9   we're all uprooted and we move to a country that they know

10  nothing of.  They don't even speak the language.  She's away

11  from her friends, her security, her safe zone, everything she's

12  known, everything that's Natalie, and now we're in a country

13  that we don't know anything of.  I think it would be very

14  extremely hard to try to explain that to a five-year-old and to

15  a toddler -- well, two-year-old.

16  Q.   And my earlier questions assumed that they would come with

17  you to Guatemala, but they could just stay here, couldn't they?

18  A.   They could, yeah.

19  Q.   What would happen if that choice was made?

20  A.   I don't know.  I mean, I don't want to think that we would

21  be separated again.  It's not something that we've -- we

22  haven't discussed that.

23  Q.   How would it make you feel if you were separated from your

24  husband and your kids again?

25  A.   I would be -- I would be extremely heartbroken because

1    when you start a family, you know, you don't think of what if
2    one day I no longer see them, you know, what if I'm forced to
3    not be with them.  I don't think of that.  And it would sadden
4    me to know that my kids are here and that my husband is here
5    and I won't be able to see all of the things that he sees with
6    them.  I wouldn't be there for her first day of kindergarten,
7    their first father/daughter dance.  I don't know.
8                MR. PRUSSIA:  Thank you very much.
9                THE WITNESS:  Thank you.
10               MR. PRUSSIA:  I don't have any further questions, Your
11   Honor.
12               THE COURT:  Is there any cross-examination?
13               MS. LARAKERS:  Not on irreparable harm, Your Honor.
14               THE COURT:  Okay.  Thank you.  You're excused.
15               THE WITNESS:  Thank you.
16               THE COURT:  Okay.  Would petitioners like to call
17   Ms. Adducci?
18               MR. PRUSSIA:  Correct, Your Honor.
19               THE COURT:  Okay.  She should approach the witness
20   stand and be sworn.
21               And just to confirm or clarify -- no.  Mr. Lyons,
22   wait.  Okay.  Mr. Lyons is subject to a sequestration order.
23   He probably should step out.  Unless he's the designated
24   representative of the government, then he could stay.
25               MS. LARAKERS:  No, Your Honor, he's not.

```
 1              THE COURT:  Okay.  Why don't you step out then.
 2              REBECCA ADDUCCI, having been duly sworn by the clerk,
 3     was examined and testified as follows:
 4     DIRECT EXAMINATION BY MR. PRUSSIA:
 5     Q.   Good morning.
 6     A.   Good morning.
 7     Q.   Would you please state your name for the court.
 8     A.   It's Rebecca Adducci.
 9     Q.   Ms. Adducci, who is your employer?
10     A.   Immigration and Customs Enforcement.
11     Q.   What is your title?
12     A.   I'm a field office director.
13     Q.   Where are you located?
14     A.   I'm field office director for Detroit, Michigan.
15     Q.   At some point you were a field office director, interim
16     field office director presiding over the Boston ERO; is that
17     right?
18     A.   Yes.
19     Q.   When did that end?
20     A.   Technically it ended on August 18.
21     Q.   When did that begin?
22     A.   June -- I came here on June 7, but on paper it actually
23     started on June 10.  But I was here June 7.
24     Q.   And in your position as the interim field office director,
25     it's your view that under the President's 2017 Executive Order
```

1   no classes of aliens are exempt from enforcement action; is

2   that right?

3   A.   That's correct.

4   Q.   So in your view there are no classes of aliens who are

5   exempt from arrest, detention or removal, correct?

6   A.   That's correct.

7   Q.   So that includes persons whom are pursuing a provisional

8   waiver, right?

9   A.   That's correct.

10  Q.   So any removable alien may be arrested and detained,

11  regardless of whether they are pursuing a provisional waiver,

12  correct?

13  A.   That's correct.

14  Q.   So it doesn't matter to ICE that the non-citizen is

15  legitimately married to a U.S. citizen, correct?

16  A.   No, I wouldn't say it doesn't matter to ICE.

17  Q.   Well, those persons are subject to arrest, detention and

18  removal by ICE regardless of whether they are legitimately

19  married to a U.S. citizen, right?

20  A.   They're subject to, yes.

21  Q.   In fact, a removable alien's pursuit of a provisional

22  waiver isn't even a factor that is considered in deciding

23  whether to take enforcement action, correct?

24  A.   I haven't seen an instance where -- it hasn't been

25  presented to me in my experience as a field office director

1    that someone is pursuing a provisional waiver, so it hasn't

2    been something that I have been able to consider.

3    Q.   Now, you were deposed in this case, right?

4    A.   Correct.

5    Q.   Around the end of July, right?

6    A.   Yes.

7    Q.   And it's true that until that deposition, you did not know

8    that individuals with final orders of removal are eligible to

9    pursue provisional waivers, correct?

10    A.   That's correct.

11    Q.   So until you were deposed in this case, the interim field

12    office director in Boston did not know that the laws of this

13    country permit people with final orders of removal to pursue

14    provisional waivers, isn't that right?

15    A.   Yes, that's correct.

16    Q.   And by the time of your deposition in July, you had served

17    in this role as interim field office director for two months,

18    correct?

19    A.   Not quite two months.  Six weeks.

20    Q.   Fair.  And you had reviewed papers related to this

21    litigation, right?

22    A.   Yes.

23    Q.   In fact, the court ordered you to do so, right?

24    A.   Correct.

25    Q.   And you swore under oath that you had, right?

1  A.   Yes.

2  Q.   But you still did not know six weeks into that term that

3  individuals with final orders of removal were eligible to

4  pursue provisional waivers, right?

5  A.   I guess I would say, I guess I did know that.  When I

6  think about reviewing the June -- I think it was a June 8

7  document, I had to have because we just -- it indicated some of

8  the individuals, some of the plaintiffs in this case.

9       So I understand the concept of the fact that waivers are

10  eligible for people, but I don't have a lot of experience in

11  the provisional waiver because I had never seen a case that I

12  was reviewing.  All of the cases that we were looking at were

13  cases that had occurred in the past, and I was very much

14  focused on the Post-Order Custody Review end of issues.

15  Q.   When you came to Boston you became aware of this case,

16  right?

17  A.   Yes, I did.

18  Q.   That's the reason why you were brought to Boston, right?

19  A.   Well, I was brought to Boston because I was a field office

20  director and my boss asked me if I would come and cover the

21  Boston ERO.

22  Q.   Before you were appointed as interim field office

23  director, that was Mr. Lyons's position, right?

24  A.   For a short timeframe.

25  Q.   In fact, you were replacing him, right?

1    A.    Yes.  Well, I really replaced Mr. Brophy.  I got the call

2    to replace Mr. Brophy.  However, in the timeframe that it took

3    me to get here, there had to be someone covering the office.

4    Q.    Prior to coming to Boston, had you worked in the Boston

5    field office?

6    A.    No.

7    Q.    Had you ever been to Boston at all?

8    A.    I had been here one time prior.

9    Q.    Did you live here?

10   A.    Never.

11   Q.    Any family ties here?

12   A.    No.

13   Q.    So why were you brought to Boston?

14   A.    I would have to speculate.  My bosses called me and asked

15   me to come to Boston.

16   Q.    Isn't it true the reason you were brought to Boston was

17   because you were willing to initiate enforcement activities

18   against anyone with a final order of removal regardless of what

19   immigration benefits they were availing themselves of?

20   A.    No.

21   Q.    And isn't the reason why Mr. Lyons was released from his

22   duties because he told this court he was not going to do that

23   any longer?

24   A.    I don't believe so, no.

25   Q.    Well, it's your belief that your field office needs to

1  follow the President's Executive Order, right?

2  A.   Yes.

3  Q.   And the implementation from Secretary Kelly, right?

4  A.   Yes.

5  Q.   In your view those documents require -- strike that.   In

6  your view those documents say that no removable alien is exempt

7  from enforcement action, right?

8  A.   Yes, that's correct.

9  Q.   And you're going to enforce the President's Executive

10  Order, right?

11  A.   I'm going to enforce the implementation --

12  Q.   To the letter, right?

13  A.   Yes.

14  Q.   Because of the policy, it would be a policy violation for

15  you not to, right?

16  A.   Yeah.

17  Q.   You would be disciplined for not following it, right?

18  A.   Well, I can't speculate to that.

19  Q.   You were deposed in this case, right?

20  A.   Yes.

21  Q.   You provided testimony under oath, right?

22  A.   I did.

23       MR. PRUSSIA:  Your Honor, I'm just going to show her

24  her prior deposition testimony.  I have provided courtesy

25  copies to the Court.

1          THE COURT:  Can you put it up on the monitor?

2          MR. PRUSSIA:  Yes, sir.

3          THE COURT:  This is her deposition.

4          MR. PRUSSIA:  It is.

5          THE COURT:  What page?

6          MR. PRUSSIA:  71.

7   Q.   I'm going to start at the bottom of 70, line 23, and the

8   question, Ms. Adducci, is:  Are there consequences for not

9   following the President's Executive Order?

10       Do you see that?

11  A.   Yes.

12  Q.   And your response:  I'm sure that it would be some type of

13  policy violation and it could be -- policy violations are on

14  the table of penalties.  So I would say there could be some

15  type of discipline.

16       Did I read that correctly?

17  A.   Yes.

18  Q.   And that was true testimony at the time you gave it,

19  correct?

20  A.   Yes.

21  Q.   And so there could be discipline for you in not following

22  the President's Executive Order, correct?

23  A.   There could be.  There would have to be a determination if

24  it was misconduct, if it was performance-based.  Discipline

25  usually -- discipline comes into misconduct, whereas a

1    performance-based issue would be something more relating to

2    your review of your performance at the end of the year.

3    Q.   Isn't that what happened to Mr. Lyons?  Wasn't Mr. Lyons

4    disciplined for not following the President's Executive Order

5    and that's the reason why you replaced him as interim field

6    office director?

7    A.   No, not to my knowledge.

8    Q.   Now, you read the court's June 11 order in this case,

9    right?

10   A.   I believe, if that was the 62-page document.

11   Q.   That's right.

12   A.   Yes.

13   Q.   The court held that ICE broke the law by violating the

14   POCR regulations, correct?

15   A.   That's correct.

16   Q.   And you told the court you would make compliance with the

17   POCR regulations one of your priorities, right?

18   A.   Yes, among my priorities.

19   Q.   Among your priorities, fair enough.  True?

20   A.   Yes.

21   Q.   But you haven't done that, have you?

22   A.   Oh, no.  I think I have.

23   Q.   You haven't instituted any training on the POCR process,

24   right?

25   A.   Not formal training, no.

1   Q.   And formal training on the POCR process has not even been

2   scheduled in the Boston field office, right?

3   A.   The formal training in the Boston field office occurred

4   actually in April so shortly, a month or so before I got here.

5   So while I think there's always benefits to training, I feel

6   like the training and the interaction that the employees have

7   had here is actually probably superior to what they would have

8   gotten in the PowerPoint training that is provided by

9   headquarters.

10  Q.   So you believe that training happened in April, right?

11  A.   I believe it did, yeah.  I believe, to the best of my

12  recollection, I believe they came here in April.  I mean, I

13  wasn't here, but I think that I was told that, yes.

14  Q.   Fair enough.  Either way it occurred before the court's

15  June 11 order, right?

16  A.   That's correct.

17  Q.   And it occurred before the hearing in early May where this

18  court announced orally that ICE had broken the law, right?

19  A.   Well, it occurred -- if it occurred in April, yes, it

20  occurred before that.

21  Q.   And since then there have been no formal trainings in ICE

22  Boston of the process, right?

23  A.   There have been no formal trainings.

24  Q.   And how many people in ICE Boston work on or have

25  responsibility for implementation of the POCR process?

1    A.   Well, I mean, there's 12 officers.  It's something that

2    falls within the detain docket.  So at present there are 12

3    officers assigned to the detain docket.  There are two

4    supervisory detention and deportation officers, so I guess that

5    would be part of their responsibility.  There are currently

6    three enforcement and removal assistants, which are sort of

7    like clerks that are assigned to the detain docket, and then

8    there's an assistant field office director and then a deputy,

9    et cetera.

10   Q.   Ma'am, can you aver under oath to this court that each one

11   of those 12 individuals are properly trained in the POCR

12   process?

13   A.   I feel like they have had -- yeah, I feel very confident

14   that they are in very good shape compared to what was going on

15   before I got here.

16   Q.   Well, that's not my question, Ms. Adducci, respectfully.

17   My question is, can you state under oath to this court that

18   each one of those individuals with responsibility for the

19   detain docket are properly trained in the POCR process?

20   A.   I have -- I believe they are, yes.

21   Q.   Now, when you arrived in the office, you instructed the

22   detain docket officers to serve POCR notices immediately upon

23   intake, right?

24   A.   The I-229 and the notice of file custody review I did,

25   because it appeared through some of the things that I had seen

1    that one of the bigger concerns was the notice of file custody

2    review.

3    Q.   And so your way to remedy that was to say immediately on

4    intake issue the notice?

5    A.   Yeah, that's more -- yes.

6    Q.   But that's not the appropriate procedure under the POCR

7    regulations, is it, ma'am?

8    A.   It -- yes, it's appropriate to do it that way.

9    Q.   Well, the POCR regulations state that written notice

10   should be provided approximately 30 days in advance of the

11   pending records review, right?

12   A.   No later than 30 days -- no.  It says no later than 60

13   days.

14             MR. PRUSSIA:  May we approach, Your Honor?

15             THE COURT:  Yes.

16             MR. PRUSSIA:  Thank you.

17   Q.   Okay.  Ms. Adducci, you have in front of you 8 CFR 241.4,

18   correct?

19   A.   Yes.

20   Q.   Are you familiar with that?

21   A.   Yes.

22   Q.   241.4?

23   A.   Yes.

24   Q.   What is 241.4?

25   A.   It relates to the continued detention of aliens in

1    custody.

2    Q.    And I'm going to direct your attention, as I have on the

3    ELMO, to Section (h)(2), Notice to Alien.  Do you see that?

4    A.    Yeah, yes, I do.

5    Q.    Okay.  And it states, The district director or director of

6    the detention and removal field office will provide written

7    notice to the detainee approximately 30 days in advance of the

8    pending records review so that the alien may submit information

9    in writing in support of his or her beliefs.  Do you see that?

10   A.    Yes.

11   Q.    What do you understand the purpose of that regulation to

12   be?

13   A.    It allows the opportunity for people to provide

14   information prior to a custody review taking place.

15   Q.    And the law states that the notice should be given

16   approximately 30 days in advance of the pending records review,

17   right?

18   A.    Yes.

19   Q.    Now, on intake there's no records review pending, right?

20   A.    No.  There is a records review pending ultimately.

21   Q.    At the time of intake there's no records review that's

22   been scheduled, correct?

23   A.    Well, it's part of the POCR process that a records review

24   will take place 90 days --

25   Q.    At some point in the future.  But at the moment of intake

1    there's no records review that has been scheduled and is

2    pending, correct?

3    A.    It is inherent in the process that a records review will

4    take place no later than 90 days and in this instance 80 days

5    because in order for it to be done by 90 days, it has to go

6    through a chain of command.

7    Q.    Well, if there's no records review that's pending at the

8    time the notice is given, you're not complying with the law,

9    correct?

10   A.    I'm sorry.  Can you say that again.

11   Q.    The law requires that the notice 30 days approximately --

12   strike that.  The law requires they're to be given 30 days'

13   notice in advance of the pending records review, right?

14   A.    Yes.

15   Q.    And if there's no pending records review at the time of

16   intake and that's when you provide notice, you're not complying

17   with the law, correct?

18   A.    I -- no.  I believe we are trying our best to comply with

19   the POCR regulations and afford people opportunities to give

20   any information that they have.  So for all intents and

21   purposes, we're giving them more than what the regs are giving

22   them.

23   Q.    Aren't you really just taking a shortcut?  You're just

24   giving out notice on intake just so that you can cover your

25   ground and tell the court you gave notice?

1    A.    No.  I'm aware of what the court found as it relates to

2    the POCR timeline violations.  And I take it very, very

3    seriously.  And with that, we have been trying our very, very

4    best to comply with and make sure there are no violations or

5    occurrences again.

6    Q.   In your experience about when does the records review

7    occur, generally speaking?

8    A.    Well, at about 80 days now.  80 days post-detention.

9    Q.    So it's not 30 days from intake; it's longer than that,

10   right?

11   A.    That's correct.

12   Q.    Okay.  And at the time of intake, a detainee may not have

13   any representation yet, correct?

14   A.    That is correct.

15   Q.    The detainee may need time to find representation, right?

16   A.    That's correct.

17   Q.    So this notice, if it's given out at the time of intake

18   and the detainee does not yet have representation, counsel may

19   not receive the notice, right?

20   A.    Well, if they didn't have representation, there would be

21   no one to give the representation to.  However, if they

22   subsequently had representation, we would then give it to

23   counsel.

24         In instances such as this, if it was not going to allow

25   for 30 days for the counsel to review, we would communicate

1   with the counsel and see if they wanted to use an exception or

2   if they wanted us to conduct it in 80 days.  But this would be

3   one --

4   Q.   Well -- I'm sorry.  Go ahead, please.  I didn't want to

5   interrupt you.  Please finish.

6   A.   This would be one instance where we would probably make an

7   exception if counsel asked us to because they wanted a full 30

8   days.  So it may push that 90-day window a little bit if

9   counsel actually asked to have the full 30 days' timeframe to

10  give evidence of why someone should not be continued or

11  continued detention should not occur.

12  Q.   So let me understand this.  Is it your testimony that ICE

13  Boston, after giving out this notice on intake, will

14  subsequently send out a second notice once they learn about

15  counsel for the detainee?

16  A.   Absolutely.

17  Q.   And that's your testimony as to what happens in ICE

18  Boston?

19  A.   Yeah, it is.

20  Q.   Now, you ordered a review of the detain docket during your

21  time at ICE Boston, right?

22  A.   Yes, I did.

23  Q.   And the review was finished on July 25, right,

24  thereabouts?

25  A.   25th or 26th, yeah, thereabouts.

1    Q.    Was a report generated summarizing the report?

2    A.    There was no formal report, no.

3    Q.    How were the conclusions of the report communicated?

4    A.    Report is a term that I know I used in my deposition, but

5    it was technically I asked one of my assistant field office

6    directors from Detroit to come to Boston to do a top-to-bottom

7    review of the detain docket and to work with the SDDOs, the

8    supervisory detention and deportation officers, the deportation

9    officers and the assistant field office director here to help

10   them -- help them with the challenges that they were facing

11   because it was clear that they were having some challenges on

12   the detain docket.

13        He was communicating throughout his timeframe here with

14   those individuals, and then at the end he sat down with the

15   assistant field office director and gave him some information

16   to work with the supervisory detention and deportation

17   officers.

18   Q.    So how were his findings going to be communicated to the

19   current field office director?

20   A.    After my deposition, because I believe my deposition was

21   actually the day that he left, my employee I have in Detroit, I

22   believe it was -- shortly after he left, I met with the

23   assistant field office director, the two supervisory detention

24   and deportation officers and Deputy Field Office Director Lyons

25   to sort of go through the process of -- we all met.

```
 1              THE COURT:  Wait a minute.  I'm the one that needs to
 2    understand this.  I'm not clear.  Did you bring somebody in
 3    from Detroit to review the detention docket to see if what you
 4    call the POCR regulations were being followed as you understood
 5    them?
 6              THE WITNESS:  Yes.  A full review.
 7              THE COURT:  What's that?
 8              THE WITNESS:  Yes, and a full review of the detain
 9    docket.  So some of the cases would not be subject to POCRs
10    because if they're not -- if they are pre-order cases, he would
11    have been looking at pre-order cases as well.
12              THE COURT:  Okay.  And what's the name of the person
13    who did the review?
14              THE WITNESS:  His name is Kevin Raycraft.  He's an
15    assistant field office director in Detroit.
16              THE COURT:  How do you spell his last name?
17              THE WITNESS:  R-a-y-c-r-a-f-t.
18              THE COURT:  And did he finish that review?
19              THE WITNESS:  He did.
20              THE COURT:  When?
21              THE WITNESS:  That would have been the end of, I
22    believe it was July 25.
23              THE COURT:  And did he write a report?
24              THE WITNESS:  He did not write a report.  He took
25    notes through the process and he gave the information to -- he
```

1    worked -- as it was sort of a living report, so he was working

2    with the supervisory detention and deportation officers.  I

3    asked him to work with the staff here.

4          THE COURT:  Did he give you a report?

5          THE WITNESS:  He did not.

6          THE COURT:  You don't know what he found?

7          THE WITNESS:  Well, I know that he found a -- he found

8    that there were some data quality issues, and he was working

9    with the staff on data quality issues, and he found, as he

10   worked through the process, he found cases that may or may not

11   have had some POCR or timeline issues.

12         THE COURT:  POCR or timeline issues, you mean people

13   who didn't get reviews at 90 days?

14         THE WITNESS:  No, I don't believe he found any cases.

15   I think -- and I didn't see every case that he reviewed.  I

16   relied on him to coordinate with the people here because I'm

17   going to be leaving, and I wanted -- he was here for a finite

18   period of time, and he needed to work with the people who are

19   still going to be here.

20         But the biggest concern that I understand that he

21   found was the situation with the lack of service of the notice

22   of file custody review on attorneys or the delayed service.

23         THE COURT:  So there were people, there were detainees

24   whose attorneys weren't given notice about or at least 30 days

25   before the document review to determine whether they should be

1   detained?

2          THE WITNESS:  That's correct.

3          THE COURT:  How many?

4          THE WITNESS:  I'm aware of three for certain.  These

5   are cases that were --

6          THE COURT:  How do you know about those?

7          THE WITNESS:  Because I asked them.  When I brought

8   Deputy Field Office Director Lyons in to talk to the assistant

9   field officer director and the SDDOs, I asked them, you've had

10  a chance to look at the information that AFOD Raycraft had gone

11  through.  What did he uncover?

12         And there were -- let me take that back a little bit.

13  Initially when Kevin was first there a case came to my

14  attention that involved what I'm speaking to as it relates to

15  the lack of or the late -- lack of service on an attorney.  And

16  I believe he brought that case to my attention early on in his

17  tenure here.

18         THE COURT:  And what did you do?

19         THE WITNESS:  I spoke with our counsel as to whether

20  or not it appeared to have not -- you know, to be in violation,

21  or it looked like the only remedy would be release, and we in

22  fact released the individual.  Again, these were cases that

23  were pre my tenure here.  These were cases from --

24         THE COURT:  Well, that was one case you just --

25         THE WITNESS:  That's correct.

1             THE COURT:  Then there were two more.

2             THE WITNESS:  So at the end, at the end, two more

3     cases were brought to my attention again.

4             THE COURT:  The end was about July 25.

5             THE WITNESS:  Yes, 26th, 27th.  I don't know what day

6     I sat down, but it was after Kevin's departure.  And there were

7     two additional cases that had very complicated procedural

8     histories.  Again, these cases were things that occurred prior

9     to my tenure here where the -- I can't remember the specifics

10    of each case, but I asked the assistant field officer director

11    to work with chief counsel's office to make a determination as

12    to whether or not this would require a release again.  And

13    there were two more cases.  Again, these are all cases that

14    were kind of pre my arrival.

15            THE COURT:  Has anybody -- so let's see.  How long was

16    your appointment for, 60 days?

17            THE WITNESS:  It was supposed to be for 60.  It turned

18    out to be closer to 70.

19            THE COURT:  So three people have been released since

20    you became interim director?

21            THE WITNESS:  Three people that I'm aware of.

22            THE COURT:  Did you ask your subordinates to tell you

23    if there were other apparent POCR violations the way ICE

24    interprets the regulation?

25            THE WITNESS:  I did.  I did.  I stressed

1    communication.  I think that was one of the problems here.  And

2    I stressed communication within the field office -- within the

3    ER office itself.  I made a significant increase in the

4    communication with our Office of Chief Counsel.

5           And when I first got here, I think that the office was

6    very shaken, and I spent a great deal -- I spent time talking

7    to them, to specifically the detain docket and the chain up the

8    detain docket to me, telling them that they need -- trying to

9    get people to grab on to a solid piece of ground because people

10   were shaken and they needed to be able to get their confidence

11   back.

12          THE COURT:  What were they shaken by?

13          THE WITNESS:  By the fact that there were statements

14   that they had violated the law by not conducting POCR reviews

15   properly.

16          THE COURT:  Do you think court orders should be taken

17   seriously?

18          THE WITNESS:  Yes.

19          THE COURT:  And followed?

20          THE WITNESS:  Yes.

21          THE COURT:  Do you remember when you took office you

22   filed a declaration and affidavit with me telling me what

23   documents you had read?

24          THE WITNESS:  Yes.

25          THE COURT:  And do you remember that I issued an order

1   noting that it appeared you hadn't been given and read my June

2   11 decision, I think you said 62-page decision?

3           THE WITNESS:  Yes.

4           THE COURT:  Did you ask anybody why they didn't give

5   you that to read with everything else they gave you to read?

6           THE WITNESS:  No.  I know that when I first -- no.  I

7   didn't ask.  I assumed it was maybe because they thought it was

8   part of the sequestration.

9           THE COURT:  Was part of what?

10          THE WITNESS:  The sequestration order.  I know there

11  were some concerns about documents and me seeing things because

12  of the sequestration order when I first came.  I didn't ask

13  anyone why I didn't get that document, no.

14          THE COURT:  You knew that people were shaken by the

15  statements I made in my 62-page decision and perhaps also that

16  I made orally on May 8.  Did you know that?

17          THE WITNESS:  In the process of Mr. Brophy's departure

18  I believe the office was made aware of the concerns with the

19  POCR violations.

20          THE COURT:  But you thought maybe I had issued an

21  order that prohibited the interim field director from reading

22  my 62-page decision about the unlawful conduct of the office of

23  ICE that you were heading?

24          THE WITNESS:  No, sir.  I don't know what -- I don't

25  know what -- I didn't know necessarily that the 62-page

```
 1    document existed.  I was relying on counsel.

 2            THE COURT:  When you said you were relying on

 3    counsel --

 4            THE WITNESS:  To give me the appropriate documents.

 5            THE COURT:  What counsel?

 6            THE WITNESS:  The Office of Immigration Litigation and

 7    our chief counsel.

 8            THE COURT:  In Washington?

 9            THE WITNESS:  No.  The local office.

10            THE COURT:  But you didn't ask anybody, Why didn't you

11    give me the court's order?

12            THE WITNESS:  Well, when I initially got here I don't

13    think the order had been completed.

14            THE COURT:  No.  After I ordered you to read my

15    decision.

16            THE WITNESS:  I'm sorry.  No.

17            THE COURT:  Did you ask anybody, When you gave me all

18    of those other things to read, why didn't you give me this?

19            THE WITNESS:  No, I didn't ask.

20            THE COURT:  And you thought maybe it was subject to

21    some sequestration order and you were prohibited from reading

22    it?

23            THE WITNESS:  Honestly, I didn't think about that.  I

24    had been reading a lot of things.

25            THE COURT:  And so I ordered you to read it and to
```

1    file a declaration and affidavit saying that you had read it,

2    correct?

3             THE WITNESS:  Yes.

4             THE COURT:  Did you read it?

5             THE WITNESS:  I did.

6             THE COURT:  Carefully?

7             THE WITNESS:  I did.

8             THE COURT:  And could you please show her page --

9    well, start with page 111 of her deposition.  Do you have a

10   copy of your deposition?

11            THE WITNESS:  Yes, I do.

12            THE COURT:  So look at page 11, line 20.  It says --

13   or does it say:  Are you familiar with the regulations that

14   make somebody with a final order of removal eligible to pursue

15   the provisional waiver process?

16            And would you read your answer to that, please.

17            THE WITNESS:  I said:  Very vaguely.  I think because

18   I was into the field office director job when the -- I think

19   was the comment period was out, and my exposure to it was

20   people asking questions about it at an advocacy and

21   non-government organizational meeting to the CIS director, so

22   he would speak to it and I knew there was going to be an

23   ability for people to kind of wait to get a waiver, but I'm not

24   versed with it.

25            THE COURT:  And then look at page 113.  There's a

1  question at line 21.  It says:  Did you know that the

2  regulations in 2016 specifically made non-citizens with final

3  orders of removal who are married to U.S. citizens eligible for

4  the provisional waiver process?

5          Do you see that question?

6          THE WITNESS:  I do.

7          THE COURT:  And would you read your answer, please?

8          THE WITNESS:  I said:  No.

9          THE COURT:  So you said -- and then the question was:

10  Are you aware that they did that to minimize the hardship that

11  would result to U.S. citizen families if they were separated

12  from their spouse?

13          And your answer was what?

14          THE WITNESS:  Well, I wasn't aware that they did that,

15  so I could not be aware of that.

16          THE COURT:  So your deposition was on July 26, right?

17          THE WITNESS:  Yes.

18          THE COURT:  And as of that time you were not aware

19  that individuals with final removal orders who are married to

20  U.S. citizens were eligible for the provisional waiver process?

21          THE WITNESS:  I don't believe I was aware that final

22  orders were.

23          THE COURT:  But you read my 62-page decision?

24          THE WITNESS:  Yes, I did.

25          THE COURT:  Have you ever read it a second or

1  additional times?

2            THE WITNESS:  I did read it a few times.  I haven't

3  read it since my deposition.

4            THE COURT:  You haven't?

5            THE WITNESS:  No.

6            THE COURT:  So you read it more than once before July

7  27?

8            THE WITNESS:  I did.

9            THE COURT:  Does somebody have a copy of that decision

10  here?  I just have one.  I have the Westlaw version.  What do

11  you have?

12            MR. PRUSSIA:  I've got the ECF version.

13            THE COURT:  Good.

14            MR. PRUSSIA:  Would you like me to give one to the

15  witness?

16            THE COURT:  Yeah.

17            MR. PRUSSIA:  Thank you.

18            THE COURT:  But why don't you go through it, Mr.

19  Prussia.  You'll see about halfway there's a suggestion that

20  says:  D.  The provisional waiver process.  See if you can find

21  that and put it up on the machine.

22            MR. PRUSSIA:  Not too hard for me to find, Your Honor.

23            THE COURT:  Do you see that?  What page is that so she

24  can --

25            MR. PRUSSIA:  It's page 24 of the opinion and also

```
 1    ECF, which is docket 95 for the record.
 2            THE COURT:  Ms. Adducci, do you see Section D --
 3            THE WITNESS:  I do.
 4            THE COURT:  -- captioned and underlined:  The
 5    Provisional Waiver Process?
 6            THE WITNESS:  I do.
 7            THE COURT:  The first sentence says:  Federal
 8    immigration laws permit an undocumented alien who has been
 9    ordered removed from the United States and is married to a U.S.
10    citizen to seek to become a lawful permanent resident.
11            THE WITNESS:  Yes.
12            THE COURT:  And then there are a couple paragraphs
13    explaining that process.
14            THE WITNESS:  Yes.
15            THE COURT:  So if you read the decision several times
16    and took it seriously, why did you say under oath on July 27
17    that you didn't know about these regulations?
18            THE WITNESS:  I just didn't recall this -- I was very,
19    very focused on the Post-Order Custody Review process, and I
20    just didn't recall this from reading it.
21            THE COURT:  Did you know what this lawsuit is about?
22            THE WITNESS:  I do.
23            THE COURT:  Did you know on July 26 what this lawsuit
24    was about?
25            THE WITNESS:  Yes.
```

1          THE COURT:  And did you know that the petitioners are

2     claiming that the Department of Homeland Security has a duty to

3     consider the provisional waiver process in deciding whether to

4     remove, deport somebody who is pursuing that process?

5          THE WITNESS:  I do.

6          THE COURT:  Did you know that at the time of your

7     deposition?

8          THE WITNESS:  I did.

9          THE COURT:  And you didn't ask anybody:  What's the

10    provisional waiver process?

11         THE WITNESS:  Again, I was very focused on the -- I

12    was focused on the Post-Order Custody Review issue.  I wasn't

13    as focused on the waiver.  I know that -- I know what an I-130

14    is, and I know that there are waivers that are attached to

15    I-130s, but I don't know the level of detail.

16         THE COURT:  Well, did you know what I wrote in my

17    decision?  You read that.  I'm repeating myself.

18         THE WITNESS:  I did read it.  I did read it.

19         THE COURT:  You took it --

20         THE WITNESS:  I just didn't recall.  There's 62 pages

21    and there's details within it that I would refer back to it if

22    I needed to.  If the issue was in front of me for a decision, I

23    would have asked someone about it.

24         THE COURT:  You would refer back to it if you needed

25    to?

1          THE WITNESS:  Right, if I was facing an issue as it

2     related to --

3          THE COURT:  Okay.

4          THE WITNESS:  -- if I was facing -- if someone was

5     presenting that to me as a concept as it related to their case.

6     But I had no cases that --

7          THE COURT:  You knew I required that you be here to be

8     available to testify in these hearings, right --

9          THE WITNESS:  Yes.

10          THE COURT:  -- this week?

11          THE WITNESS:  Yes.

12          THE COURT:  Did you know that the hearings were in

13     part on a motion to dismiss the claim that the Department of

14     Homeland Security is required to consider somebody who had

15     initiated the provisional waiver process before removing them?

16          THE WITNESS:  I know that there were supposed to be

17     hearings on the motions; I did know that.

18          THE COURT:  And that they involved the -- did you know

19     they involved the provisional waiver process and the legal

20     effect of them?

21          THE WITNESS:  I knew they involved the I-130 process

22     and the ability for someone to get a waiver, yes.

23          THE COURT:  A waiver that would do what?

24          THE WITNESS:  A waiver that would -- well, I don't

25     know.  What I knew because I sat in court all day yesterday,

1    but I believe I knew before I came, a waiver that would allow

2    someone to not be separated from their family, that would allow

3    them to go foreign for a shorter period of time and not have

4    the time bar to coming back to the United States.

5              THE COURT:  Well, you didn't know that on July 26, you

6    testified, correct?

7              THE WITNESS:  I believe -- I think I later -- that's

8    correct.

9              THE COURT:  Okay.  You didn't know it on July 26, and

10   you didn't read my decision again after July 26, correct?

11             THE WITNESS:  I did not.

12             THE COURT:  So what information -- did you read -- how

13   did you learn about this provisional waiver process that

14   arguably starts with the I-130 between July 26 and the time you

15   came to court yesterday?

16             THE WITNESS:  Well, I reread my deposition.  And it's

17   difficult when you have to admit not knowing something, so I

18   think I -- I'm sure I did some discussions -- I don't exactly

19   remember because I can't exactly pin down when I learned what.

20   I sat in court all day yesterday and listened to talk about it.

21             THE COURT:  That's part of the reason I wanted you

22   here, that everybody would learn.

23             THE WITNESS:  It was very informative.

24             THE COURT:  But do you understand you're under oath

25   now?

1          THE WITNESS:  I do.

2          THE COURT:  Did you have any discussions -- so you

3    didn't know about the provisional waiver process on July 26,

4    2018 and you didn't read my decision, and I asked you -- you

5    know, I could break it down.  Is there anything you read that

6    informed you of the provisional waiver process before you came

7    to court yesterday?

8          THE WITNESS:  Nothing that I read.

9          THE COURT:  Okay.

10         THE WITNESS:  And to clarify, I was aware of the

11   provisional waiver process.  I just didn't know the level of

12   detail and who it applied to.

13         THE COURT:  Well, did you tell the truth on July 26

14   when you were asked:  Did you know that the regulations in 2016

15   specifically made non-citizens with final orders of removal who

16   are married to U.S. citizens eligible for the provisional

17   waiver process?  Your answer was no.  So is that true?

18         THE WITNESS:  Because they were final orders of

19   removal, correct.

20         THE COURT:  July 26.  And before you came to court

21   yesterday, did you learn that the 2016 regulations did make

22   non-citizens with final orders of removal who are married to

23   U.S. citizens eligible for the provisional waiver process?

24         THE WITNESS:  I believe I did in discussions with

25   counsel.

1           THE COURT:  How, how?

2           THE WITNESS:  In discussions with counsel.

3           THE COURT:  All right.  It's 1:45.  We'll take a break

4    and resume at -- oh, it's 12:45.  It's not 1:45.  It's 12:45.

5    Come back at 1:45.  Court is in recess.

6           (Recess taken 12:44 p.m. - 1:41 p.m.)

7           THE COURT:  Let me I think reiterate and if necessary

8    refine something I said this morning.  The issue of when any

9    entitlement to consideration that somebody has initiated the

10   process to get a provisional waiver would begin isn't an issue

11   that was briefed and presented to me.

12          As I think I said this morning, I'm regarding it as

13   deeming it waived for the purposes of the motion to dismiss.

14   But it will be in the case later if I don't dismiss the case.

15   And while I'll be interested in the briefing you're going to

16   submit tomorrow by 3:00, by that time I may have reached my

17   decision.  And basically I'm not reopening the issue.  But the

18   government in its briefing essentially took an all-or-nothing

19   position, and I'll decide that issue.

20          All right.  Mr. Prussia, would you like to resume?

21          MR. PRUSSIA:  Yes, Your Honor.  If it pleases the

22   court, I'm ready.

23          THE COURT:  You may.

24   BY MR. PRUSSIA:

25   Q.   Ms. Adducci, are you familiar that around April 2018 the

1   court issued an order preventing ICE and the other respondents

2   in this case from removing Lucimar De Souza from the District

3   of Massachusetts and the United States?

4   A.   Yes.

5   Q.   So under that order it's your understanding that she is

6   not -- that ICE Boston is not permitted to remove her from the

7   United States, correct?

8   A.   Correct.

9   Q.   And she's under supervised release, right?

10  A.   Yeah, an order of supervision, yes.

11  Q.   And that requires her to check in on a regular basis,

12  correct?

13  A.   Yes.

14  Q.   And she did so on June 12 of this year, correct?

15  A.   Yes.

16  Q.   And isn't it true that on that check-in, officers from

17  your field office under your supervision told her to buy a

18  ticket to leave the country?

19  A.   Actually not officers but employees.

20  Q.   Employees?

21  A.   Correct.

22  Q.   Who were they?

23  A.   It was an enforcement and removal assistant.

24  Q.   What's an enforcement and removal assistant?

25  A.   For lack of a better term it would be -- it's basically a

1    clerk.  It's someone that works with the deportation officers

2    in more of a clerk-type fashion.

3    Q.   And this clerk told Ms. De Souza that she needed to buy a

4    ticket to leave the country, correct?

5    A.   That's my understanding, yes.

6    Q.   Now, if she had done so, that would have been a violation

7    of the court's order, right?

8    A.   Yes.

9    Q.   And in fact, her being told to buy a ticket to depart the

10   country was a violation of the court's order, correct?

11   A.   I think removing her would have been a violation of the

12   court's order.  I'm not sure if actually -- it was a mistake.

13   I know it's discussed in my deposition that a mistake occurred.

14   I don't know if -- she wasn't to be removed from the country.

15   Telling her to buy a ticket certainly wasn't an appropriate

16   instruction.

17   Q.   You expect that she would have complied with that

18   instruction, correct?

19   A.   I would -- I would hope that she would communicate and her

20   counsel did communicate I believe through our counsel that this

21   occurred, and it was remedied the same day.

22   Q.   And you did not discipline this clerk who told Ms. De

23   Souza to leave the country, right?

24   A.   No, I did not.

25   Q.   Did you conduct any investigation to understand how

1    something like this could have happened on your watch?

2    A.    Clearly, I told the staff it should not happen.  It was my

3    third day in the office.  And I said:  Why is an enforcement

4    and removal assistant giving instruction to a reporting alien?

5    Q.    Well, the judge issued his order in April 2018.  I

6    understand you weren't there, but that was two months before

7    she was directed by an employee at your office to leave the

8    country, right?

9    A.    That's correct.

10   Q.    And in those two months, had there been any attempt to

11   educate the employees in the office and the officers of ICE

12   Boston that this court, a Federal Court, had issued an order

13   precluding them from removing her from this country?

14         MS. LARAKERS:  Objection to the extent she has

15   knowledge.  He's asking about a time before she was there.

16         MR. PRUSSIA:  It includes a period she was there, Your

17   Honor.

18         THE COURT:  What's that?

19         MR. PRUSSIA:  It includes a period she was there, and

20   if she knows, she can answer.

21         THE COURT:  It's based on your knowledge.  The

22   objection is overruled.

23   A.    I have no knowledge as to whether or not --

24   Q.    Well, you certainly didn't order folks working in ICE

25   Boston to read the judge's order precluding them from removing

1    Ms. De Souza, right?

2    A.    No.

3    Q.    And to the best of your knowledge, neither Mr. Lyons nor

4    Mr. Brophy did so either, right?

5    A.    I have no idea.

6    Q.    And you didn't bother to investigate?

7    A.    No, I did not.

8    Q.    Did you know of the existence of the order at the time you

9    took over the field office?

10    A.    I don't think I knew it on the day I took over, no.

11    Q.    Do you recall the circumstances under which you learned of

12    the judge's order precluding ICE Boston from removing Ms. De

13    Souza from the United States?

14    A.    I think it was probably that day, the day she came in to

15    report and that unfortunate incident occurred.

16    Q.    After her counsel had contacted counsel for the government

17    to notify them of what happened, right?

18    A.    That's correct.

19    Q.    Because you learned through your lawyers, right?

20    A.    That's correct.

21    Q.    So absent that intervention by counsel, Ms. De Souza would

22    have departed the United States, right?

23    A.    I don't know if she would have or not.  I don't know if --

24    it happened immediately, the intervention.  But I don't know, I

25    can't say if she would have actually left the United States.

1    Q.    Well -- sorry.  Are you finished with the answer?

2    A.    Yes.

3    Q.    After an individual is told to depart the United States,

4    what happens next?

5    A.    A multitude of things could happen.  They could abscond.

6    They could file a stay of removal.  Hopefully they're

7    communicating with their deportation officer.  In this case --

8    I mean, part of an order of supervision is communication.

9    Cases are evolving and things are happening, and things are

10   happening on the individual who is on an order of supervision's

11   cases and situation in life, and hopefully there's an ongoing

12   communication so that if they have any information that is

13   crucial, beneficial to them, it could be considered in a

14   favorable factor.

15   Q.    You'd agree with me the only reason why Ms. De Souza is

16   still here in the United States today is because of the court's

17   order?

18   A.    I can't say.

19   Q.    But for the court's order, ICE Boston would have removed

20   her from the United States, right?  That's what you told her on

21   June 12?

22   A.    I'm sorry.  I'm sorry.

23   Q.    But for the court's order, ICE would have removed her from

24   the United States, right?

25   A.    I don't know.  I mean, she may have -- she may have filed

1    a stay of removal.  I don't know.  That case was before I was

2    here.  But for the June 12 issue --

3    Q.   You've mentioned now a few times now a stay of removal.

4    What is that?

5    A.   It's an administrative stay of removal.  It's an I-246.

6    Something that is statutorily available to people who have

7    final orders of removal.

8    Q.   So what's the effect of an I-246 if it's granted?

9    A.   It stays the person's removal.

10   Q.   And the person is not supposed to be removed from the

11   United States, right?

12   A.   That's correct.

13            THE COURT:  If someone applies for a stay of removal,

14   are there regulations that state factors to be considered in

15   deciding -- in ICE deciding whether to grant the stay?

16            THE WITNESS:  I can't speak to -- there are factors

17   that are considered every time someone files a stay of removal.

18   All the factors related to the case are -- in most instances

19   there's a volume of documents that are attached to stays of

20   removal.  That's the opportunity that --

21            THE COURT:  My question is different.  Does ICE have

22   regulations telling employees what to consider in deciding

23   whether to grant a stay of removal?  Are there regulations?

24            THE WITNESS:  I don't know if they specifically say

25   what to consider.

1          THE COURT:  Anyway.  Is ICE required to consider
2     community ties, including family ties, in deciding whether to
3     grant a stay of removal?
4          THE WITNESS:  I wouldn't -- that would be something
5     that would be considered required to consider -- we consider
6     all the facts of the case that we're aware of when we
7     adjudicate stays.
8          THE COURT:  So you're saying you're not required to
9     consider it, but you would consider community ties, including
10    family ties?
11         THE WITNESS:  I would.
12         THE COURT:  Hold on just one second.  Why don't you go
13    ahead, Mr. Prussia.
14         MR. PRUSSIA:  Thank you, Your Honor.
15    BY MR. PRUSSIA:
16    Q.   If the stay of removal, the I-246 is granted, the
17    non-citizen is able to remain in the United States for some
18    period of time, correct?
19    A.   Correct.
20    Q.   ICE nevertheless retains some discretion to remove the
21    individual if they commit a crime or something else like that
22    occurs, correct?
23    A.   That's correct.
24    Q.   Short of that, it would be improper --
25         THE COURT:  Excuse me just a second.  Here, we're

```
 1    going to be in recess for about five minutes.
 2              (Recess taken 2:00 p.m. - 2:07 p.m.)
 3              THE COURT:  You may resume.
 4              MR. PRUSSIA:  Thank you, Your Honor.
 5    Q.   Before the recess, Ms. Adducci, we were discussing the
 6    I-246 process.  Do you remember that?
 7    A.   Yes.
 8    Q.   And the grant of the I-246 stay of removal protects the
 9    non-citizen from removal absent some other reason for
10    enforcement, correct?
11    A.   Yes.
12    Q.   And short of the occurrence of these other reasons that
13    may occur for enforcement, whatever they may be, it would be
14    improper to remove someone with a stay of removal, right?
15    A.   Yes.
16    Q.   Are you familiar with the Rutkowskis?
17              THE COURT:  Could you spell that, please.
18              MR. PRUSSIA:  For the record it's R-u-t-k-o-w-s-k-i.
19    A.   Only in name.  I heard that name shortly -- from counsel
20    shortly before I left, I believe it was last week, shortly
21    before I left to return to Detroit.
22    Q.   Piotr Rutkowski was a non-citizen or is a non-citizen who
23    was detained despite having a pending I-130, correct?
24    A.   I don't know.
25    Q.   Well, he filed a lawsuit in this court, correct?
```

1    A.    I'm not aware.

2          MR. PRUSSIA:  May I approach, Your Honor?

3          THE COURT:  Yes.

4          THE WITNESS:  Thank you.

5    Q.    Ms. Adducci, you've been handed a document filed in the

6    District of Massachusetts titled Stipulation of Settlement in

7    Civil Action 18-10953-MLW.  Is that a document that's in front

8    of you?

9    A.    Yes.

10   Q.    And the document is dated June 6, 2018, correct?  Look at

11   the last page.

12   A.    Yes.

13   Q.    And the petitioner that's identified in the document is --

14   I may have mispronounced it.  I said Peter, but it's P-i-o-t-r.

15   Do you see that?

16   A.    I do.

17   Q.    And if you turn to paragraph 3 of the stipulation of

18   settlement, it states:  Upon the filing of an application for

19   administrative stay of removal with ICE, Form I-246, petitioner

20   will be granted, in the exercise of administrative discretion,

21   a stay of removal for one year in order to pursue whatever

22   administrative remedies or waivers for which he believes

23   himself to be eligible.  Prior to the expiration of the

24   authorized administrative stay period, petitioner may apply for

25   any additional period of discretionary stay he believes to be

```
1    necessary for resolution of any pending administrative waivers
2    or other pending administrative matters upon a showing of due
3    diligent prosecution of the same.
4         Did I read that correctly?
5    A.   Yes.
6    Q.   So according to this, Mr. Rutkowski, upon the filing of a
7    stay of removal, he should not be removed from the United
8    States, right?
9    A.   Yeah, it would be a logical -- no, he shouldn't.  Yes,
10   because he was going to be granted.  Yes, that's what it says.
11   Q.   Is says:  Petitioner will be granted?
12   A.   Right.
13   Q.   For a period of a year, right?
14   A.   Correct.
15   Q.   And isn't it true, Ms. Adducci, that he appeared at your
16   office for a check-in, according to the conditions of his
17   supervised release, on June 25 of 2018, and he was directed to
18   buy tickets to depart the United States?
19   A.   I don't have any knowledge of him appearing.
20             MR. PRUSSIA:  May I approach, Your Honor?
21             THE COURT:  Yes.  And I'll make the stipulation of
22   settlement Exhibit 1 of today's date.
23             MR. PRUSSIA:  Thank you, Your Honor.  I'm not going to
24   put this on the ELMO because it has personal information on it,
25   Your Honor.
```

```
 1              THE COURT:  We'll make this Exhibit 2.

 2              MR. PRUSSIA:  Thank you, Your Honor.

 3    Q.   Ms. Adducci, can you identify the document, Exhibit 2?

 4    A.   Yes.

 5    Q.   Please identify it for the record.

 6    A.   It's an order of supervision chronology page.

 7    Q.   And what does it identify -- is the subject of the

 8    chronology Mr. Rutkowski?

 9    A.   Yes.

10    Q.   And what does it state with respect to him?

11    A.   The whole thing or just in the comments?

12    Q.   Well, let's focus on -- I misspoke earlier.  I said June

13    25, but the August 14 entry, the one he appeared for a

14    check-in.

15    A.   August 14.  It says:  Reported.  Then there's something

16    scratched out.  You must provide an itinerary to depart the

17    United States by 9/28 with a departure date of 10/3, Monday

18    through Friday, direct flights out of JFK Airport in New York

19    City only.

20    Q.   So Mr. Rutkowski was directed to depart the United States,

21    correct?

22    A.   Well, it's crossed out, so it appears as though he must

23    have been, and then it's crossed out.

24    Q.   And do you have an understanding as to why it was crossed

25    out?
```

1    A.    Probably because -- I'm going to make an assumption that

2    he -- for some reason that was changed.

3    Q.    Because his counsel intervened, right?

4    A.    I don't know.

5    Q.    So short of his counsel intervening, he would have left

6    the United States, right?

7    A.    If -- I don't know if he would have left, but he was being

8    instructed to buy a ticket.

9    Q.    Now, who gave him that instruction?

10   A.    I don't know who this person is.  There's an officer SP.

11   I don't know who that is.

12   Q.    You don't know who SP is?

13   A.    No.  Looking at this, it says:  Your next appointment --

14   above that it says:  Your next appointment is at ERO Hartford.

15   And I didn't have -- in the short time I was here, I didn't

16   have an opportunity to go to the sub-offices.

17   Q.    The officer that's identified next to the June 25 entry,

18   who is that?

19   A.    I do.

20   Q.    Who is that?

21   A.    J. Parland.  He is an employee in the Burlington office.

22   Q.    Now, Ms. De Souza was told to depart, notwithstanding the

23   court's order in this case precluding ICE from doing so, as we

24   discussed, right?

25   A.    Yes.

1   Q.   And how do you think that made her feel?

2   A.   I would imagine it didn't make her feel good.

3   Q.   You called it a mistake earlier, right?

4   A.   Yes.

5   Q.   It's a serious mistake, right?

6   A.   It's -- yes.

7   Q.   But not only that, it would be a violation of this court's

8   order, right?

9   A.   It would be a violation for us to remove her.

10   Q.   And Mr. Rutkowski was told to depart notwithstanding a

11   stipulation filed in this court by ICE that he would have a

12   stay of removal, correct?

13   A.   Upon filing of a stay, of a 246 -- I'm not aware -- I'm

14   not aware of the case, so I don't --

15          THE COURT:  Mr. Prussia, I think I've got this point.

16          MR. PRUSSIA:  Thank you, Your Honor.  Just give me one

17   minute, Your Honor, to confer with my co-counsel.

18          (Discussion off the record.)

19          MR. PRUSSIA:  I pass the witness, Your Honor.  I'm

20   finished.  Nothing further.

21          THE COURT:  Nothing further?  Is there

22   cross-examination?

23          MS. LARAKERS:  Just briefly, Your Honor.

24          THE COURT:  Sure.

25   CROSS-EXAMINATION BY MS. LARAKERS:

1    Q.    Good afternoon, Ms. Adducci.

2    A.    Good afternoon.

3    Q.    You testified earlier that you're familiar with the I-246

4    process?

5    A.    Yes.  Although I don't -- I haven't done a 246

6    adjudication in quite a while until I came here to Boston

7    because I delegate that responsibility to my deputies.

8    Q.    What is your understanding of how that works?

9    A.    An individual that wants to stay in the United States

10   files an I-246, files it in the field office in person and

11   usually attaches a significant amount -- in many instances

12   there's a significant amount of paperwork attached or sort of

13   the equities that they have and the reason for the stay.

14   Q.    When you've adjudicated I-246s in the past, what factors

15   have you considered?

16   A.    Everything that's in front of me.  I usually have the A

17   file.  Well, I should say 50 percent of the time I have the A

18   file because half of my office is remote in Ohio.  I would have

19   all of the attachments that are filed with the 246, the

20   supporting documents.  I'm sorry.  I don't know if I completed

21   the answer.

22   Q.    That's fine.  If an I-130 is included in that stack of

23   documents, is that considered?

24   A.    Yes.  Everything in the stack of documents is considered.

25   Q.    If someone has a pending -- shows proof that they have a

1    pending or approved I-212, is that considered a positive factor

2    or a negative factor?

3    A.    I can't recall seeing that.  But if I did, I would say it

4    would be a positive factor, hypothetically.  I don't recall

5    ever having that as a consideration.  But I've adjudicated a

6    lot of stays in my time as field office director.

7    Q.    Have you instructed employees in the past and in the

8    present how to adjudicate stays of removal?

9    A.    Well, employees don't -- I should say line officers don't

10   adjudicate them.  Deputy field office directors and assistant

11   field office directors adjudicate them.  My instructions would

12   be to consider all the case equities and procedural history and

13   everything related to the case, both the positive and negative

14   issues.

15   Q.    Would a pending or approved provisional unlawful presence

16   waiver be considered?

17   A.    Yes.

18   Q.    How do you --

19   A.    Again, prior to this experience, I haven't considered one,

20   but -- and not, you know, not being aware of the process, not

21   being -- not knowing what -- how the provisional waiver process

22   worked doesn't mean I wouldn't consider it, certainly.  I would

23   generally go talk to someone who did.  I'd either talk to my

24   local chief counsel or potentially call the CIS director, the

25   field office director at CIS in Detroit.  I mean, there's a lot

1    of times things that I don't understand that are part of stay

2    applications.  There's oftentimes medical conditions that I

3    don't know what they are so I might, you know, communicate with

4    our health service core individuals to see what exactly that

5    is.

6    Q.   So if you don't know -- just to be clear, if you don't

7    know what an application is or what a medical condition is, do

8    you go and ask someone to find out what it is?

9    A.   Yes.

10   Q.   Do you go ask what the significance of an application is?

11   A.   I mean, I would ask the entirety of what it involved.

12   Q.   Now, you're a field office director in Detroit, correct?

13   A.   Yes.

14   Q.   Are you aware of the factors that are considered when an

15   enforcement action is taken?

16        MR. PRUSSIA:  I'm just going to object to the leading

17   nature of the series of questions.  I've refrained, but I think

18   it would be appropriate for counsel to ask some direct

19   questions.

20        THE COURT:  Well, I don't know that it's irrelevant or

21   beyond the scope of what you asked, but I do think there needs

22   to be some foundation because that question assumes that

23   there's some factors that have to be considered for an

24   enforcement action to be taken.  So the objection is overruled,

25   but why don't you go back and try to lay a foundation.

1          MS. LARAKERS:  Certainly, Your Honor.

2    Q.   What are your responsibilities as a field office director

3    with regard to instructing officers how to conduct enforcement

4    operations?

5    A.   Well, I mean, I have a subordinate staff.  I am a field

6    office director, so I rely on my supervisory and detention and

7    deportation officers, my assistant field officer directors and

8    my deputy field office directors to instruct individuals.  I

9    expect them to take all case factors into consideration, but I

10   expect them to follow the executive orders and the

11   implementation memo of Secretary Kelly.

12   Q.   Now, you testified previously that there was training on

13   the POCR -- the Post-Order Custody Review process prior to you

14   getting to Boston, correct?

15   A.   Yeah.  I understand that to be the case.  I wasn't here,

16   but I believe there was.  I don't know who all attended because

17   I wasn't here yet.

18   Q.   How have you ensured -- have you ensured that the people

19   in the Boston field office understand how the Post-Order

20   Custody Review process works?

21   A.   Well, I gave them access to an incredible amount of

22   knowledge from an assistant field office director out of

23   Detroit, and he worked I know with many people on a daily

24   basis.  I can't take credit for much of the things that have

25   occurred because a lot of things were implemented before I got

1    here.  For example, this item to enhance the staff and adding

2    senior experienced officers to sort of mentor the current --

3    the less experienced officers.  I know that there have been a

4    resource -- sort of a resource library added to the detain

5    docket Sharepoint site that has just an incredible volume of

6    information for people to reference in the event that they

7    don't have access maybe to their supervisor or to one of the

8    mentors.  There's been some hard work put into some of those

9    processes by both my assistant field office director and one of

10   the more senior tech-savvy deportation officers.

11   Q.    You testified earlier that you instructed your employees

12   in Boston to serve the notice that the Post-Order Custody

13   Review was going to be done immediately, right?

14   A.    Yes.

15   Q.    And why did you do that?

16   A.    Well, I wanted to make sure that we were affording the

17   30-day opportunity.  I didn't want people to miss it.  I didn't

18   want to, you know, have an issue with POCR timelines, but I

19   wanted to ensure that people were getting the most amount of

20   time they could to provide any documents that they thought were

21   relevant to be considered during the process.

22   Q.    Did you do that because you were under the impression that

23   it was required by law to serve it right away?

24   A.    No.  I did it because I thought it would be a best

25   practice and I know that we do that in Detroit.

1          MS. LARAKERS:  No further questions, Your Honor.

2          THE COURT:  Is there any redirect?

3          MR. PRUSSIA:  No, Your Honor.

4          THE COURT:  I have a few questions, and if you think

5     they're objectionable, you shouldn't be timid about expressing

6     your objection.

7          Let me go back, please, to something I was asking you

8     before.  So if somebody files for an administrative stay of

9     removal, are they filing an I-246?

10         THE WITNESS:  Yes.

11         THE COURT:  And does the Department of Homeland

12    Security have any regulations describing what should be

13    considered when ICE decides whether to grant an I-246 request

14    for stay of removal?

15         THE WITNESS:  I believe that the 246 is statutorily

16    based, and I would -- I would not be surprised if there were

17    regulations that say what to consider.

18         THE COURT:  Have you ever read regulations as to what

19    you're to consider, what one under your supervision perhaps is

20    to consider in deciding whether to grant an I-246?

21         THE WITNESS:  No.

22         THE COURT:  Let me take a step back.  What is your

23    education?

24         THE WITNESS:  I graduated from Michigan State.  I have

25    a bachelor's degree from Michigan State University.

```
 1              THE COURT:  I'm sorry, I'm having a little trouble
 2      hearing.
 3              THE WITNESS:  I have a bachelor's degree from Michigan
 4      State University.
 5              THE COURT:  All right.  And what year?
 6              THE WITNESS:  1987.
 7              THE COURT:  And when did you go to work for what is
 8      now ICE?
 9              THE WITNESS:  1987.
10              THE COURT:  And did you have training?
11              THE WITNESS:  I did.
12              THE COURT:  What did that consist of?
13              THE WITNESS:  I went to the Federal Law Enforcement
14      Training Center in Georgia.
15              THE COURT:  And have you worked for what is now ICE
16      ever since 1987?
17              THE WITNESS:  I have.  But just to clarify, for the
18      first 20 years of my career, I did not work in this division of
19      ICE.
20              THE COURT:  Okay.  And you don't know whether or not
21      there are regulations that describe what should be considered
22      in determining whether to grant an I-246 stay of removal?
23              THE WITNESS:  I would be -- I believe there probably
24      are.  I just don't know for certain.
25              THE COURT:  Do you remember ever reading them?
```

 1              THE WITNESS:  No.

 2              THE COURT:  Do you know whether there's a

 3    responsibility to consider community ties, including family

 4    ties, that someone applying for I-246 stay of removal should

 5    consider?

 6              THE WITNESS:  Whether -- I don't know if there's a

 7    responsibility, but I certainly would consider it.

 8              THE COURT:  And you were here when Ms. Calderon

 9    testified this morning, correct?

10              THE WITNESS:  Yes, I was.

11              THE COURT:  And you were here when Ms. De Souza

12    testified?

13              THE WITNESS:  Yes, I was.

14              THE COURT:  Are they eligible, are either or both of

15    them eligible for stays of removal from ICE?

16              THE WITNESS:  Yes.

17              THE COURT:  Does it sound like they have compelling

18    family ties?

19              THE WITNESS:  Yes.

20              THE COURT:  And would those ties weigh in favor of

21    granting them a stay of removal?

22              THE WITNESS:  Absolutely.

23              THE COURT:  Why do you say absolutely?

24              THE WITNESS:  Because family ties -- I guess based on

25    the facts I know, I suppose it would depend on what the family

1  ties were.  But yes, the family ties presented in their cases

2  would -- there are immediate family ties, they have approved

3  I-130s, that would definitely weigh in their favor.

4        THE COURT:  And do you know whether or not ICE would,

5  as a practical matter, consider those factors that there is an

6  approved I-130 and somebody has compelling immediate family

7  ties would be -- actually, let me take a step back because

8  you've answered that immediate question.

9        You've referenced an Executive Order.  Is that

10  President Trump's January 25, 2017 Executive Order enhancing

11  public safety in the interior of the United States?

12        THE WITNESS:  Yes.

13        THE COURT:  And then you mentioned I think a

14  memorandum from the then Secretary of Homeland Security John

15  Kelly?

16        THE WITNESS:  Yes, the implementation memo.

17        THE COURT:  Is that a memorandum dated February 20,

18  2017?

19        THE WITNESS:  That sounds correct.

20        THE COURT:  Under the -- and what is your

21  understanding of the Executive Order and the memorandum of then

22  Secretary Kelly regarding what's to be done with aliens who

23  have final orders of removal?

24        THE WITNESS:  They are -- aliens who have final orders

25  of removal who have not complied with the judge's orders are

1    technically -- are priorities under Secretary Kelly's memo.  I

2    think fifth or sixth priority.

3           THE COURT:  All right.  And does Secretary Kelly's

4    memo give you and your subordinates when you were a field

5    officer any discretion not to remove somebody with a final

6    order of removal?

7           THE WITNESS:  There is a section within the memo that

8    talks about prosecutorial discretion, yes, and sort of does

9    specify that it needs to be forwarded up the chain of command.

10   But it also specifies that there are no class -- you can't

11   exercise prosecutorial discretion in a specific class of

12   individuals.

13          THE COURT:  And I'm trying to figure out what that

14   means.  But does that mean that, for example, you are not

15   supposed to, as a field office director, say that we won't

16   arrest or detain and remove anyone with a final order of

17   removal who is married to a U.S. citizen?  That would be

18   prohibited by the Kelly memorandum?

19          THE WITNESS:  I'm sorry.  Would you -- could you help

20   clarify that.  I just want to make sure I understand.

21          THE COURT:  Do you understand the Kelly memorandum to

22   mean that, for example, you are not supposed to, as a field

23   officer director, say to your subordinates:  We won't arrest or

24   detain anyone with a final order of removal who is married to a

25   U.S. citizen?

1              THE WITNESS:  Yes.

2              THE COURT:  Does ICE have unlimited resources?

3              THE WITNESS:  No.

4              THE COURT:  Does ICE have enough resources to arrest,

5     detain and remove everybody in the United States unlawfully?

6              THE WITNESS:  No.

7              THE COURT:  Does ICE have sufficient resources to

8     arrest, detain and remove everyone with a final order of

9     removal?

10             THE WITNESS:  I would speculate no.  I wouldn't --

11    that would be an opinion.

12             THE COURT:  And did Secretary Kelly's memo create

13    seven priority areas, priorities or -- did it instruct that

14    department personnel should prioritize removable aliens who

15    fall into one of seven categories?

16             THE WITNESS:  Yes.

17             THE COURT:  And having a final order of removal is one

18    of the seven?

19             THE WITNESS:  Yes.  Well, final orders that aren't

20    compliant with the judge's order, so that would be fugitives.

21             THE COURT:  And they haven't left?

22             THE WITNESS:  Right.

23             THE COURT:  But others are somebody who has been

24    convicted of a criminal offense?

25             THE WITNESS:  Yes.

1          THE COURT:  Is that one of the priorities?

2          THE WITNESS:  Yes.

3          THE COURT:  And there's another one.  Somebody who has

4    been charged with a criminal offense?

5          THE WITNESS:  Yes.

6          THE COURT:  Or committed acts which could be charged

7    as a criminal offense?

8          THE WITNESS:  Yes.

9          THE COURT:  Does Secretary Kelly's memorandum provide

10   guidance on how to prioritize within the categories?

11         THE WITNESS:  No, I don't believe it does.

12         THE COURT:  Does Secretary Kelly's memorandum direct

13   the director of ICE to, if they determine appropriate, issue

14   further guidance on how to prioritize within the priorities?

15         THE WITNESS:  I believe so.

16         THE COURT:  Does it say the director of ICE, the

17   commissioner of CBP and the director of USCIS may, as they

18   determine is appropriate, issue further guidance to allocate

19   appropriate resources to prioritize enforcement activities

20   within these categories, for example, by prioritizing

21   enforcement activities against removable aliens who are

22   convicted felons or who are involved in gang activity or drug

23   trafficking?

24         THE WITNESS:  Yes, I believe it does.

25         THE COURT:  And has the director of ICE done that?

1           THE WITNESS:  I do not believe so, no.

2           THE COURT:  Have you while you've been in

3  Massachusetts set any priorities for enforcement activities

4  against removable aliens?

5           THE WITNESS:  I don't think I enumerated priorities,

6  but I've always prioritized criminal aliens over non-criminal

7  aliens, and there were discussions that took place.

8           THE COURT:  Is arresting people at CIS offices when

9  they're applying for I-130s as the first step in seeking to

10  stay with their families giving priority to enforcement

11  activities concerning criminal aliens?

12          THE WITNESS:  No.  Well, unless --

13          THE COURT:  Unless they were a criminal.

14          THE WITNESS:  Unless they're a criminal.

15          THE COURT:  But just generally --

16          THE WITNESS:  Right, no.

17          THE COURT:  If somebody is one of these priorities

18  because they were ordered to deport, to leave, and they didn't

19  leave but they're not otherwise criminals, they wouldn't be in

20  the highest priority?

21          THE WITNESS:  Not for me, no.

22          THE COURT:  And you sent me a statement in June saying

23  that, you know, to the extent Mr. Brophy may have said that

24  arrests wouldn't be made at CIS offices of people seeking

25  I-130s, I shouldn't rely on that any longer --

```
1               THE WITNESS:  Correct.
2               THE COURT:  But in your tenure, has anybody been
3       arrested at a CIS office?
4               THE WITNESS:  In Boston?
5               THE COURT:  In Boston.
6               THE WITNESS:  Not to my knowledge.
7               THE COURT:  Okay.  I think you'd know about it.
8               THE WITNESS:  I better.
9               THE COURT:  And in fact, in the district?
10              THE WITNESS:  Yeah.  I instructed that if they were
11      going to conduct an arrest at CIS, it needed to come up the
12      chain to me.
13              THE COURT:  Why did you give that instruction?
14              THE WITNESS:  Because of the sensitivity involved,
15      and, you know, I wanted to ensure we were utilizing our
16      resources appropriately.
17              THE COURT:  I think you mentioned that Secretary
18      Kelly's memorandum had made some reference to prosecutorial
19      discretion.
20              THE WITNESS:  Yes, it does.
21              THE COURT:  I couldn't hear you.
22              THE WITNESS:  Yes, it does.
23              THE COURT:  What did it say?
24              THE WITNESS:  Prosecutorial discretion is still
25      available to exercise.  It's not gone away.  However, it does
```

1    also say you can't create -- you can't create a class of aliens

2    within a prosecutorial discretion I guess arena.

3           THE COURT:  Did they communicate to you that

4    prosecutorial discretion should be exercised on an individual

5    case-by-case basis?

6           THE WITNESS:  Yes.

7           THE COURT:  But not on a whole category of removable

8    aliens?

9           THE WITNESS:  Yes.

10          THE COURT:  And in your roughly 60-day tenure, has

11   that been done?

12          THE WITNESS:  Has --

13          THE COURT:  Has prosecutorial discretion -- well, the

14   memo -- I'll read you the memo.  We can make it Exhibit 3 if

15   somebody has a clean copy.

16          The exercise of prosecutorial discretion with regard

17   to any alien who is subject to arrest, criminal prosecution or

18   removal in accordance with the law shall be made on a

19   case-by-case basis in consultation with the head of the field

20   office component, where appropriate, of ICE if it initiated or

21   will initiate the enforcement action.

22          So who is the head of the field office component?

23          THE WITNESS:  That would be me in the ERO.

24          THE COURT:  What does ERO stand for?

25          THE WITNESS:  Enforcement and removal operations.

1          THE COURT:  So that's you.  In the time you've been

2     here has anybody come to you and said:  We found a removable

3     alien, but we need to make an individual decision whether to

4     arrest, detain and remove her, or him?

5          THE WITNESS:  There was at least one instance that

6     there was a CIS referral.  There was only one instance that

7     something was referred to me as a CIS arrest.  So yes.

8          THE COURT:  And what did you decide to do?

9          THE WITNESS:  I decided not to have them conduct the

10    arrest.

11         THE COURT:  Why was that?

12         THE WITNESS:  In this instance it had a little bit to

13    do with timeliness.  I didn't feel like I had enough time to

14    review the facts because it was I think 20 minutes until the

15    person was supposed to show up for their appointment, and I

16    wanted to have an opportunity to sort of, to review the facts

17    with counsel as well.  And in this instance the individual

18    didn't show up for his appointment, so it became moot, but I

19    had just decided not to conduct -- I wanted more time to

20    explore the specific fact pattern.

21         THE COURT:  Was that person going to CIS for an I-130

22    interview?

23         THE WITNESS:  I believe so.

24         THE COURT:  Earlier on you mentioned the sensitivity

25    of these cases.  What did you mean -- these matters.  What did

1    you mean by the sensitivity of them?

2            THE WITNESS:  Well, it's sort of this, obviously

3    partly --

4            THE COURT:  What do you mean -- you have to spell it

5    out.

6            THE WITNESS:  The litigation involved with arrests

7    occurring at CIS.  I wanted to have some visibility to make

8    sure we were utilizing our resources appropriately.

9            THE COURT:  Does the media attention in this case and

10   matters relating to it contribute to the sensitivity?

11           THE WITNESS:  Media attention is a factor, but I don't

12   think media attention would be a reason I would shy away from

13   an enforcement action.

14           THE COURT:  So you were asked by somebody to come to

15   the Boston office for 60 days?

16           THE WITNESS:  Yes.

17           THE COURT:  And were you told why?

18           THE WITNESS:  It's really difficult for me to -- at

19   some point I believe I was told that there was some issues with

20   the POCR process.  I just can't remember when I was told that.

21   The initial phone call I got, I wasn't told anything because I

22   was standing outside of a baseball stadium.  I didn't --

23           THE COURT:  Who told you?

24           THE WITNESS:  That was my acting assistant director

25   for field operations.  It was a pretty quick phone call.

```
 1            THE COURT:  Was that somebody in Detroit?
 2            THE WITNESS:  No.  In headquarters, in Washington,
 3   D.C.
 4            THE COURT:  What is that person's name?
 5            THE WITNESS:  Dave Jennings.
 6            THE COURT:  Jennings?
 7            THE WITNESS:  Yes.
 8            THE COURT:  Were you told whether or not you would be
 9   asked to stay for more than 60 days?
10            THE WITNESS:  No.  He just said -- I said:  For how
11   long?  And he said:  Can you do 60 days?  That was the extent
12   of it.  As a matter of fact, I think he told me:  You're going
13   to see the paperwork and it's going to be cut for 120 days,
14   because that's the way they do it, but you'll only be there for
15   60.
16            THE COURT:  And what do you understand is going to
17   happen after you leave?
18            THE WITNESS:  Mr. Lyons will be acting field office
19   director.
20            THE COURT:  For how long?
21            THE WITNESS:  I believe 240 days.  That's the maximum
22   that he would be allowed to be in I think a 365-day -- I'm not
23   exactly sure how it works, but I think he's only allowed to do
24   240 days.  Again, they do them in 120-day increments.  So I
25   don't have any --
```

1           THE COURT:  Did anybody tell you how long he's

2      expected to serve?

3           THE WITNESS:  I believe I saw an email because I asked

4      to see when my interim actually ended because I wanted to make

5      sure it was factually accurate.  So I saw the email asking him

6      or forwarding up to our human capital people, because there's

7      paperwork that has to be done, and I think within that email it

8      said:  Please do it for 120 days with a likely extension, I

9      believe.

10          THE COURT:  Did you see the Boston Globe editorial on

11     about July 1 that reported that when you were in Detroit, you

12     directed that aliens with orders of removal be arrested and

13     detained when they were dropping their children off at Head

14     Start programs?

15          THE WITNESS:  I did not.  Just this July?

16          THE COURT:  Yes.

17          THE WITNESS:  No, I didn't.

18          THE COURT:  Did you do that?

19          THE WITNESS:  No.

20          THE COURT:  You're smiling.  Why are you shaking your

21     head?

22          THE WITNESS:  I just -- I did not do it.  It's just

23     funny to me how the media reports things or where they get

24     their sources; I don't know.

25          THE COURT:  But when you were the field office

1    director in Detroit, were arrests made of aliens dropping their

2    children off at Head Start programs?

3            THE WITNESS:  Ever?  That may have happened in nine

4    years that I've been there.

5            THE COURT:  Do you remember that ever happening?

6            THE WITNESS:  At Head Start specifically -- there were

7    allegations that people were being arrested when they were

8    taking their kids to school.

9            THE COURT:  And did that occur, essentially?

10           THE WITNESS:  I believe someone was arrested taking

11   their child to school.

12           THE COURT:  Was that one of your policies?

13           THE WITNESS:  No.

14           THE COURT:  You have to speak --

15           THE WITNESS:  No.  I'm sorry.  I said no.

16           THE COURT:  You wouldn't do that?  Ordinarily, if

17   somebody had an order of removal but no other evidence of being

18   a dangerous person -- you were smiling so --

19           THE WITNESS:  No.  It's very difficult for officers.

20   They don't want to upset children.  Many, many have families

21   and children, and it's not an ideal place to conduct an

22   enforcement action.

23           THE COURT:  All right.  Do my questions suggest --

24   hold on a second.

25           Under the Executive Order and then Secretary Kelly's

1    memorandum, as you understand it, would it be permissible for

2    an ICE field office director to say, you know, aliens with

3    final orders of removal are not all exempt from removal, but

4    generally we won't arrest and detain and remove them unless

5    there's some evidence that they're a danger to public safety or

6    national security or there's some other reason not to remove

7    them?  Would that be permissible?

8                THE WITNESS:  Can you -- not to remove them?

9                THE COURT:  In fact, actually, I'll change it and

10   maybe focus it a little more on the allegations of this case.

11   I understand that you interpret Secretary Kelly's memo to say

12   that -- and contrary to the directions perhaps in the previous

13   administration -- that there's no category of removable aliens

14   that should be treated as categorically or completely exempt

15   from removal, correct?

16               THE WITNESS:  Yes.

17               THE COURT:  But would it be -- and there's also an

18   instruction to exercise prosecutorial discretion case by case?

19               THE WITNESS:  Yes.

20               THE COURT:  And there are limited resources that each

21   ICE office has, right?

22               THE WITNESS:  Yes.

23               THE COURT:  Would it be consistent with Secretary

24   Kelly's directions, as you understand it, for an ICE director

25   to say that if somebody is pursuing an I-130 with a view to

1   seeking to stay with -- to get a provisional waiver and

2   someplace in that process that, absent some additional

3   circumstance that is additional to the final order of removal,

4   we're not going to arrest, detain and remove that person;

5   instead we're going to look for people who have committed

6   crimes, been convicted of crimes, who are dangerous.  Would

7   that be permissible?

8         THE WITNESS:  I -- I feel like that would be creating

9   a class.

10         THE COURT:  Okay.

11         THE WITNESS:  I would always focus on criminal aliens

12   and national security threats and have for my 31 years doing

13   this.  And given a document that says you can't -- it wouldn't

14   be case by case if I said anyone with this situation.  Because

15   the cases get so complicated, and it's hard to say the fact

16   patterns are even the same in any two cases.

17         THE COURT:  But basically, did you testify earlier

18   that if somebody requested a stay of removal, you or you would

19   expect your subordinates would look at the file, and if the

20   file showed that person applied for or had an I-130, the person

21   applied or had an I-212, the person was married to a U.S.

22   citizen and was pursuing a legally available path to stay in

23   the country with her spouse and perhaps her U.S. citizen

24   children, you would consider that?

25         THE WITNESS:  Absolutely.  I just -- yes, I would.

1           THE COURT:  And what if they didn't for some reason
2    file the request for a stay but that was one of the
3    circumstances?
4           THE WITNESS:  I think I would be more comfortable with
5    a stay if they were on the docket that was being managed by the
6    non-detained officers.  If they have a stay, that would -- it's
7    a statutorily-based remedy that I feel more comfortable than
8    just sort of having nothing.
9           THE COURT:  I want to take you back to the POCR
10   regulations.  So you read my June 11 decision several times
11   after I ordered you to read it, correct?
12          THE WITNESS:  Yes, and clearly I didn't catch every --
13          THE COURT:  Do you remember and is it your
14   understanding -- well, do you remember I wrote about how the
15   regulation at issue described what was supposed to happen in
16   the initial 90-day removal period?
17          THE WITNESS:  Yes.
18          THE COURT:  And do you remember that all of the people
19   involved in this case that 90 days expired a long time ago?
20          THE WITNESS:  Yes.
21          THE COURT:  So the regulation doesn't directly
22   describe what to do with these people, right?
23          THE WITNESS:  Yes.
24          THE COURT:  And ICE's interpretation, the most recent
25   one, when I was deciding it, was that ICE had 90 days to hold

1   people and then it had to by 60 days give their attorney

2   notice, there would be a document review in about 90 days, and

3   then it had to make a decision.  That was ICE's interpretation.

4   Do you remember that?

5           THE WITNESS:  Yes.

6           THE COURT:  And do you remember that I said, I wrote

7   that might be too generous to ICE, that ICE in my view might

8   not have the authority to hold everybody for 90 days, but

9   assuming without finding that they had 90 days, they were

10  violating it for the people I was addressing?

11          THE WITNESS:  Yes.

12          THE COURT:  All right.

13          THE WITNESS:  If I recall, you talked about 30 days

14  might be better for people.

15          THE COURT:  Right, right.  And you give a notice, it's

16  your practice to have notices given as soon as somebody is

17  arrested and detained, right?

18          THE WITNESS:  As soon as possible, within a very short

19  window.

20          THE COURT:  Sure, short window.  And you heard

21  Ms. Calderon and Ms. De Souza this morning, correct?

22          THE WITNESS:  Yes.

23          THE COURT:  And if their lawyers -- if there was a

24  review after 30 days or say 45 days and their lawyers came in

25  with the information you heard this morning, would you have

1   decided at that 30- to 45-day mark that they should continue to

2   be detained?

3           THE WITNESS:  I don't know all of the facts on the

4   non-equity side of the case, but I would have to probably know

5   if there were any flight risk issues, but not -- I'm not

6   feeling -- in many instances, I think alternatives to detention

7   which I believe Ms. De Souza sounds like she's on now would

8   have been appropriate.

9           THE COURT:  These are people who want to get out and

10  be with their families, right?

11          THE WITNESS:  Yes.

12          THE COURT:  And they have roots in the community,

13  correct?

14          THE WITNESS:  Yes.

15          THE COURT:  Jobs, correct?

16          THE WITNESS:  Yes.

17          THE COURT:  Homes?

18          THE WITNESS:  Yes.  Well --

19          THE COURT:  And some children?

20          THE WITNESS:  I don't think they had jobs.  I didn't

21  know if either of the ladies had --

22          THE COURT:  Families?

23          THE WITNESS:  Yes.

24          THE COURT:  And they desperately don't want to leave

25  their spouses and children based on what we heard this morning.

1    You can leave out "desperately."  They don't want to leave

2    their spouses and children, right?

3              THE WITNESS:  I would say desperately, yes.

4              THE COURT:  Yeah, I would say desperately, too.  I

5    have to make judgments like this.  I make bail decisions, is

6    somebody like that likely to flee.  You're not going to find

7    them in Providence or wherever they live.

8              THE WITNESS:  On the fact patterns that I have, I just

9    don't have any -- I don't have the whole case background.

10             THE COURT:  But based on what you heard --

11             THE WITNESS:  Yes.  I wouldn't say they would be -- it

12   doesn't sound like they would be a flight risk.

13             THE COURT:  And, you know, since you give notice at

14   about the time that somebody is arrested and detained, if that

15   notice said not that you're going to be reviewed at 90 days but

16   you're going to be reviewed at 45 days, you know, give us

17   information before that if you want to be considered, is there

18   any reason why that wouldn't be feasible?

19             THE WITNESS:  It would depend.  That's a little

20   complicated because it would depend on the country that they

21   were from.  Because obviously in their two specific instances

22   that might be, but for just a general concept as to a 45 days,

23   if 45 days would be enough to conduct an appropriate Post-Order

24   Custody Review, I don't know if I would say that to be the case

25   in part because a lot of the reasons we're looking at -- when

```
 1    we're looking at -- one of the factors we're considering is
 2    whether or not they were going to obtain a travel document.
 3    And depending on what country you're from, it could take -- it
 4    could be that we would continue to detain because we
 5    wouldn't -- I don't feel like we would have enough information
 6    to make a decision in that short timeframe.  Maybe in some
 7    cases you could but not all.
 8              THE COURT:  If somebody's not a flight risk, why
 9    should they be locked up --
10              THE WITNESS:  They shouldn't.
11              THE COURT:  -- while you're waiting to get a travel
12    document?
13              THE WITNESS:  They maybe shouldn't.
14              THE COURT:  So why does it matter what country they're
15    from?
16              THE WITNESS:  I thought we were talking about people
17    that were in custody.  So somebody in custody should be locked
18    up.  If you're not a flight risk, you shouldn't be in custody
19    in the first place.
20              THE COURT:  All right.  Do my questions suggest any
21    further questions to counsel?
22              MR. PRUSSIA:  Nothing further from petitioners, Your
23    Honor.
24              MS. LARAKERS:  Nothing from us, Your Honor.
25              THE COURT:  All right.  Okay.  Thank you.  That's
```

1    helpful.  You're excused, but you have to wait outside.  Please

2    don't leave the courthouse.  Okay?  It's possible there could

3    be more questions, but I think there's a hope you're going to

4    be able to get back to see the Detroit Tigers rather than the

5    Boston Red Sox.

6                    THE WITNESS:  I don't know about that.  They're not

7    doing so great.  I did go to a Red Sox game.

8                    THE COURT:  You did go to a Red Sox game?

9                    THE WITNESS:  I did.

10                   THE COURT:  So you're here during a historic season.

11   It hasn't been all bad.

12                   THE WITNESS:  It hasn't been bad.  Do I --

13                   THE COURT:  Just leave those there.  We'll take a

14   brief break for the court reporter, who doesn't need it and

15   deserves it, and we'll be back at about 4:15 with Mr. Brophy.

16   Okay?  We'll be back at about 4:15 with Mr. Brophy.  Oh, it's

17   3:08.  Okay.  Be back at 3:15.  Court is in recess.

18                   (Recess taken 3:09 p.m. - 3:24 p.m.)

19                   THE COURT:  Is there anything before we hear from

20   Mr. Brophy -- Mr. Lyons?  Excuse me.  Okay.  You should get Mr.

21   Lyons on the stand.

22                   MR. PRUSSIA:  Would you like me to start, Your Honor?

23                   THE COURT:  Yes.

24                   MS. LARAKERS:  Your Honor, I was just informed by

25   opposing counsel that they have some of the confidential

1    documents that are part of the protective order that they plan

2    to use, and ICE hasn't looked at those documents to make sure

3    they're okay for the public record to see at this point in time

4    because we didn't have prior notice of it.  We're certainly

5    okay with them using them for questioning, but we can't have a

6    public -- we can't have those documents on the record at this

7    time.

8              THE COURT:  What's the nature of the documents?

9              MS. LARAKERS:  I haven't even had time to look at

10   them.

11             THE COURT:  What's the nature of the documents,

12   Mr. Prussia?

13             MR. PRUSSIA:  Your Honor, these are emails, one of

14   which is an email that was produced after the court's deadline

15   that we did not have an opportunity to examine Mr. Lyons on,

16   and there are related emails that were timely produced but sort

17   of relate to that late-produced email.

18             THE COURT:  And why are they subject to the protective

19   order?

20             MS. LARAKERS:  Your Honor, because all the documents

21   that we produced in connection to the expedited discovery in

22   this case are subject to the protective order, and we had

23   agreed in the protective order that if the petitioners were

24   going to use those documents, that ICE would look at them to

25   make sure that they redacted anything else that wasn't

1   available in the public record, such as any numbers, that sort

2   of thing.  We haven't had the opportunity to look at those.

3            THE COURT:  All right.  Do you have the protective

4   order?  The protective order -- documents in discovery that

5   aren't provided to the court to make a judicial decision are

6   not presumptively public.  Documents used in court that become

7   judicial records are actuality presumptively public.  I have in

8   my Arkansas Teacher case a long decision on this in June.  But

9   redactions may be appropriate, limited redactions may be

10  appropriate, and we need to proceed.

11           Does somebody have -- so I'll put the documents

12  temporarily under seal.  They can be shown, and I'll give you

13  time to look at them to see if you want to propose any

14  redactions.

15           MS. LARAKERS:  And Your Honor, I just learned of this,

16  and it would make me much more comfortable if I could just have

17  five minutes to speak to my ICE counsel about it to make sure

18  there's not anything I'm missing?

19           THE COURT:  All right.  Is there any objection to

20  that?

21           MR. PRUSSIA:  No objection, Your Honor.

22           THE COURT:  What's the docket number of the protective

23  order, though?  I want to look at it.

24           COURTROOM CLERK:  119.

25           MS. LARAKERS:  119 sounds right, yes, Your Honor.  And

1    I think the provision we're talking about here is they were

2    supposed to give prior notice of any documents.

3            THE COURT:  I'll find it.  You can take five or so

4    minutes.  Print me out the protective order.  Court is in

5    recess.

6            (Recess taken 3:26 p.m. - 3:37 p.m.)

7            THE COURT:  Are we set?

8            MR. WEILAND:  Yes, Your Honor, we are set.  We have

9    had an opportunity to review the documents and also speak with

10   petitioners' counsel.  I think there's going to be a way

11   they're able to present them here in the courtroom in such a

12   way that doesn't disclose some of those PII sensitive matters.

13   And as you said before the break, we will certainly avail

14   ourselves of the opportunity to redact the public record.

15           THE COURT:  What's a PII sensitive matter?

16           MR. WEILAND:  Personally identifiable information, the

17   alien's name and A file number, email address.

18           THE COURT:  That's fine.  Okay.  Let's see.  I think

19   Mr. Lyons needs to be sworn.

20           COURTROOM CLERK:  He was.

21           THE COURT:  If he's been sworn, we'll go ahead.

22           TODD LYONS, having been duly sworn by the clerk, was

23   examined and testified as follows:

24   DIRECT EXAMINATION BY MR. PRUSSIA:

25   Q.   Mr. Lyons, you understand you're under oath, correct?

1    A.    Yes.

2    Q.    Can you please state your name for the record.

3    A.    Todd Michael Lyons.

4    Q.    Who is your employer?

5    A.    Department of Homeland Security, specifically Immigration

6    and Customs Enforcement.

7    Q.    What is your title?

8    A.    I am the acting field office director.

9    Q.    And where are you located?

10   A.    Burlington, Massachusetts.

11   Q.    How long have you been serving as acting field office

12   director?

13   A.    Two days.

14   Q.    This is not your first time as acting field office

15   director, correct?

16   A.    No, sir.

17   Q.    When were you first installed as acting field office

18   director?

19   A.    June 1 of 2018.

20   Q.    And how long did that term last?

21   A.    Approximately four days.

22   Q.    Do you have an understanding as to why you were removed?

23   A.    I was advised by the executive associate director of the

24   agency, Mr. Matt Albans, that they were bringing in a more

25   seasoned field office director for an unnamed period of time.

1  Q.   What did you understand a more seasoned field office

2  director to mean?

3  A.   Somebody that had been a serving field office director,

4  someone that had been at the executive level for some period of

5  time.

6  Q.   What is your understanding as to why it was determined

7  that a more seasoned field office director was needed?

8  A.   They felt that the continuous turnover of senior

9  leadership at the Boston field office was detrimental to

10  operations.  And while federal litigation was going on along

11  with the realignment of units and duties of officers within the

12  field office that someone more seasoned should be there.

13  Q.   And who was that person that was installed as the more

14  seasoned field office director?

15  A.   Rebecca Adducci.

16  Q.   How long was her term?

17  A.   60 days, almost 70.

18  Q.   So notwithstanding the fact that one of the reasons

19  headquarters determined that a more seasoned field office

20  director was appropriate is because of the extensive turnover

21  in the office, her term was only for two months?

22  A.   Yes.  It was explained to me that they were bringing in a

23  more seasoned field office director to mentor me prior to

24  taking over.

25  Q.   You mentioned, you referred to some realignment within the

1    field office.  What did you have in mind?

2    A.   We realigned officers and resources to better address some

3    of the issues that Judge Wolf brought up with his June 11 order

4    and findings.

5    Q.   How so?

6    A.   Well, one area in particular was we noticed and we

7    discovered they we didn't have -- we had a lack of resources

8    within the detain unit, which is the custody case management

9    unit, which, for I guess lack of better terms, for this setting

10   was the POCR situation.

11        Historically, Boston only had anywhere between four to

12   five officers, which made their caseload anywhere from 150 to

13   200 cases sometimes on their docket, which didn't properly

14   allow for officers to properly maintain and observe and track

15   cases that they needed to diligently.

16   Q.   So aside from this realignment, were any other actions

17   taken in the Boston field office in response to Judge Wolf's

18   order?

19   A.   Yes, we went ahead and we also, with Ms. Adducci's help,

20   brought in another assistant field office director, that was,

21   his area of his expertise was case management, which did a

22   complete overview of al the cases we had, identified any

23   shortcomings, pitfalls.

24        So during that time it was his recommendation and, you

25   know, through what we found is that we lacked the officers, so

1   we went from five to 12.  During that time we also implemented

2   a more hands-on approach to case management which the field

3   office lacked in terms of day-to-day contact with individuals

4   on their dockets and more along the lines of what Judge Wolf

5   found in his findings both in written and oral.

6   Q.   No additional training was done for the staff in the

7   detain unit side of the field office, direct?

8   A.   No.  What we did was we made sure that through the one

9   seasoned assistant field office director of case management

10  that Ms. Adducci brought in, he went down individually and he

11  gave OJT mentorship to each one of the detain supervisors as

12  well as went through each one of the detain officers' dockets,

13  where he did train, as well as we brought in three seasoned

14  officers from other units which had an area of expertise and

15  which served as a mentor role for the brand-new eight which

16  were assigned.

17  Q.   In your view, any alien with a final order of removal is

18  subject to arrest, detention and removal, correct?

19  A.   As I stated, the first time when I appeared before Judge

20  Wolf, under Executive Order 17368, subsection (e), an alien

21  with an unexecuted final order is open for an enforcement

22  action.

23  Q.   And there is no exception for any class of individuals

24  with final orders who are diligently pursuing provisional

25  waivers, right?

1    A.    Well, as Judge Wolf had in his finding and also that we

2    discussed during my deposition, we do evaluate cases on a

3    case-by-case basis.  And as discussed, there are avenues for

4    individuals that do have a final order of removal or someone

5    who has been lawfully removed from the United States previously

6    to seek a benefit or provision under the provisional waiver

7    program.

8    Q.    There's nothing in the Executive Order and it's your

9    understanding that it is not consistent with the Executive

10   Order to exempt as a class individuals with final orders who

11   are pursuing provisional waivers, correct?

12   A.    Correct.  That's -- with the provisional waivers, much

13   like myself and Mr. Brophy said before, we had to prioritize

14   arrests, which we mainly were focused on subsections A through

15   C and D, which were criminal history and national security

16   threats.

17   Q.    So as acting field office director in the four days that

18   you've been serving this current term --

19   A.    Three days.

20   Q.    Three days, sorry -- you have made no exception for a

21   class of individuals with final orders who are diligently

22   pursuing provisional waivers, correct?

23   A.    No.  I think the way moving forward with the Boston field

24   office is the way -- both what Ms. Adducci had in place and the

25   intent that Mr. Brophy had when he testified in front of Judge

1    Wolf, in that using the limited amount of resources within the

2    Boston field office, we'll be prioritizing cases that have

3    criminal history, significant public safety threat, fraud,

4    national security aspect.

5        Each case, to include the ones under subsection (e) and

6    (f), which do have executed final orders, will be reviewed on a

7    case-by-case basis for the merits of their case.  And I think

8    also through our legal counsel, through our chief counsel's

9    training and talking with supervisors, you know, more merit,

10   weight, examination will be given to those who are pursuing

11   avenues such as the 212, 601A, U visa, T visa, VAWA.

12   Q.   So the fact that a person who has been arrested has an

13   approved I-130 application would not override the decision to

14   detain the person, correct?

15   A.   That's correct.  To even go to an open source public site,

16   on CIS' own website, in the steps for lawful permanent

17   residency, the examples and instructions for the I-130 as well

18   as for the provisional waiver, it states that the I-130 is the

19   first step, but it gives specific instructions on someone in

20   current removal proceedings, someone that currently has an

21   unexecuted final order of removal, steps they need to take in

22   addition to that I-130.

23   Q.   So these persons that have pending I-130s or approved

24   I-130s are still subject to enforcement action by the Boston

25   field office, correct?

1    A.   Correct.  Again, each case is looked at on the merits.

2    You know, specifically to what myself and Mr. Brophy testified

3    in front of Judge Wolf back in May, in regards to cases that

4    were, you know, arrested at CIS, we do look at each one, case

5    by case, on the merits.

6         And I think, you know, through our actions from the time

7    that we spoke in front of Judge Wolf until now that, although

8    we continue to receive CIS leads and lists of individuals that

9    have either applied or are pending an I-130, we have not taken

10   any action on any individual that's applying for a benefit.

11   Q.   And that's because of this litigation, right?

12   A.   Well, it was -- well, because of this litigation and

13   because of Judge Wolf's findings and research into the case, we

14   identified pitfalls in areas that we were lacking in the way

15   that we handled immigration arrests and enforcement.

16   Q.   You agree that the -- strike that.  You would agree that

17   the existence of an approved I-130 suggests ties to the

18   community by the non-citizen, correct?

19   A.   Yes.  By definition alone, it's a member of a family

20   that's applying on behalf of someone, whether it be a

21   non-immigrant, someone who entered without inspection, or

22   someone that's still currently overseas.

23   Q.   It expresses, it's evidence of an intention to come out of

24   the shadows and address the non-citizen status, correct?

25   A.   Yes.

1    Q.   Prior to this litigation, ICE Boston used the mere fact of

2    the I-130 application as a way to identify and detain and

3    initiate enforcement actions against persons with final orders

4    of removal, correct?

5    A.   Yes.

6    Q.   Do you find that a little ironic?

7    A.   If I could, I was going to expand.  Also, as I said in my

8    deposition, you know, if someone was pending a 212, a 601 or

9    what was commonly referred to as a consular process back prior

10   to the provisional waiver, we would adjudicate that favorably.

11   However, just as I said in my deposition, the standalone I-130

12   doesn't vacate the final order of removal.

13        To take it a step further and to speak to Ms. Calderon's

14   case, which is the one that I'm most familiar with, she applied

15   for an I-130 and which was approved on January 18, but she

16   didn't apply for the I-212 waiver, which was required on the

17   CIS public website under the frequently asked questions, until

18   January 30, after she was released.  Had she had that 212

19   waiver at the same time as the I-130, I truly believe that

20   enforcement action would have been adjudicated better.

21   Q.   So Ms. Calderon was detained solely on the basis of her

22   final order of removal, correct?

23   A.   She was -- the supervisor on the case made the assumption

24   to detain based upon the final order of removal and the flight

25   risk factors which were factored in that I spoke to in my

1    declaration.

2    Q.    She had an approved I-130, correct?

3    A.    It was approved that day.

4    Q.    Just a minute ago you testified that an I-130 -- you agree

5    with me that the I-130, the existence of an approved I-130

6    suggests ties to the community, right?

7    A.    Correct.

8    Q.    So that's not flight risk, right?

9    A.    Yes.  But in Ms. Calderon's case, the reason why the

10   supervisor made the decision to detain, which they came to the

11   conclusion as a flight risk was, I believe truly not

12   Ms. Calderon's fault, but not to have someone be a recipient of

13   an action because of their parents, but she was a rider on her

14   parents' case, which also went in front of the First Circuit.

15   And the attorney of record submitted a sworn affidavit that the

16   family unit had left the United States and did not want to move

17   forward with the PFR.

18   Q.    So let me get this straight.  The sole basis of the

19   finding that Ms. Calderon was a flight risk was the fact that

20   she didn't comply with her final order of removal, correct?

21   A.    Yes, sir, the three previous times of compliance, yes.

22   Q.    So prior to the initiation of this lawsuit, it was

23   sufficient to initiate enforcement activities against anyone

24   with a final order of removal notwithstanding the fact that

25   they had an approved I-130, correct?

1   A.   Yes, sir.

2   Q.   And but for this litigation, that would still be the case,

3   correct?

4   A.   Yes, sir.

5   Q.   And in fact, under the President's Executive Order, that

6   would still be appropriate in terms of enforcement priorities,

7   correct?

8   A.   Yes, sir, because nothing has ever been stated that the

9   I-130 would preclude or vacate a final order of removal.

10  Q.   And in fact, prior to 2017, you can't recall any specific

11  instance where the Boston field office, at ICE, had arrested an

12  individual at CIS at or after an I-130 interview, correct?

13          MS. LARAKERS:  Objection.  Lack of knowledge.

14          THE COURT:  Well, we'll see if he knows.  If you know,

15  you may answer.

16  A.   No, sir.  I can't speak to anything prior to my arrival on

17  September 19 of 2017.  I can only speak to my experiences in

18  other field offices.

19  Q.   Now, you've seen documents -- strike that.  You're aware

20  the court has ordered some discovery in this case, correct?

21  A.   Yes, sir.

22  Q.   And as part of that discovery, you investigated arrests at

23  CIS since 2017, correct?

24  A.   Yes, sir.

25  Q.   I think at all, right?  I don't think it was limited to

1  time; is that right?

2  A.   One of the emails that you have in discovery that we

3  produced was that I reached out to one of the acting assistant

4  field office directors to explain to me how the process was

5  handled here, which was different than what I had been used to

6  some other.

7  Q.   According to your investigation, there had been no arrests

8  at CIS offices by the Boston field office prior to 2017,

9  correct?

10  A.   I believe the first time I discovered or was kind of

11  alluded to arrests was November when the first set of referrals

12  came in, I believe.  But prior to that -- originally I asked

13  from July 2017 back.

14  Q.   I'm going to show you a document and see if that refreshes

15  your recollection.

16  A.   Sure.

17        MR. PRUSSIA:  May I approach, Your Honor?

18        THE COURT:  Yes.

19  Q.   Mr. Lyons, can you please identify the document that's

20  been handed in front of you?

21  A.   It is a document that was sent out to the assistant field

22  office director in Connecticut where I asked for more

23  information as far as CIS arrests throughout the AOR, and there

24  are five listed.  And that's from Ms. Aldean Beaumont.  She's

25  the assistant field office director over the state of

1    Connecticut.

2    Q.   The document includes a cover email as well as what

3    appears to be an attachment to that email, correct?

4    A.   Yes, yes.  So what I did was --

5    Q.   Let me ask the question.  Sorry.  And the document starts

6    at Bates ICE 2068, correct?

7    A.   I guess I already lost you.

8    Q.   The document, the first page of the document, the Bates

9    number --

10   A.   The one from July 17, 2018?

11   Q.   That's right.

12   A.   Mm-hmm.

13   Q.   At the very bottom, ICE 2068, correct?

14   A.   On mine it's government, but yes.  GOV 2068.

15   Q.   Okay.  GOV 2068, and the last number is GOV 2094, correct?

16   A.   Yes, sir.

17   Q.   And the cover document is an email from you, right?

18   A.   Yes.

19   Q.   To Rebecca Adducci, right?

20   A.   Yes.

21   Q.   And the subject is:  A File Locations For the Arrested

22   Aliens.  Do you see that?

23   A.   Yes.

24   Q.   And it includes an attachment.  Do you see that?

25             THE COURT:  Let me ask you this.  I thought you were

1   using this to refresh his recollection.

2           MR. PRUSSIA:  Now I actually want to put it into

3   evidence, Your Honor.

4           THE COURT:  Because if you just wanted to refresh his

5   recollection, the substance of it shouldn't be disclosed.  So

6   do you want to move this into evidence?  Is there an objection?

7   It will be under seal at the moment so you can make redactions.

8           MS. LARAKERS:  No, Your Honor.

9           THE COURT:  So this will be Exhibit 4 under seal.

10  Q.   Now we can cut to the chase.  If you could turn to page

11  GOV 2071.

12  A.   Yes.

13  Q.   And what's your understanding as to what this portion of

14  Exhibit 3 is?

15  A.   It would be better if I could break up the exhibit and

16  spread it out as a spreadsheet, as it is, it's the first set of

17  columns on a spreadsheet.  It's this way, not each page.

18  Q.   The left-hand column refers to date of referrals?

19  A.   Yes.

20  Q.   Do you see that?

21  A.   Yes.

22  Q.   What's that in reference to?

23  A.   That's the task I provided all the field office directors

24  to provide any documentation or spreadsheets, information that

25  they had received for any CIS removals from July of 2017 until

1    the date of my email.

2    Q.   So is it your understanding that the first -- this

3    document suggests or establishes that the first arrest by

4    Boston ICE field office at a CIS office was on or about July

5    2017?

6    A.   I would -- you have to go to page GOV 2080 to reach the

7    arrest tab.  The arrest tab states:  Arrested 1/24 of 2018.

8    And that referral was received July 21 of 2017.

9    Q.   And then right below that you see a reference to an arrest

10   of July 31, 2017, correct?

11   A.   Yes, that goes to the July 13, second one on the sheet.

12   Q.   Okay.  So my only question is is it fair -- strike this.

13   Does this document establish that the first arrest at CIS by

14   Boston field office was around July of 2017?

15   A.   Yes.  But again, they went back to what I asked for.

16   There could be ones prior to July 2017.  I only asked for July.

17           THE COURT:  And we know there was.  Arriaga was

18   arrested prior to July 2017, along with four others.  I'm not

19   quite sure what the purpose of this is, but his qualification

20   about how limited his request was may be material or important

21   because --

22           THE WITNESS:  If I could clarify my reasoning for --

23   go ahead.

24           MR. PRUSSIA:  I was going to move on.

25           THE COURT:  All right.  Go ahead.

1   Q.   Based on your investigation, is it fair to say that the

2   practice of arresting individuals at CIS offices by the Boston

3   field office began in 2017 after the Executive Order?

4   A.   Yes.

5   Q.   And the practice began at the specific request of CIS,

6   correct?

7   A.   Yes.

8          MR. PRUSSIA:  May I approach, Your Honor?

9          THE COURT:  Yes.

10  Q.   Mr. Lyons, you've been handed a document that is

11  identified at GOV 2917 ending at GOV 2921.  Is that the

12  document in front of you?

13  A.   Yes, sir.

14  Q.   And it's an email from Cronen, CM.  Who is that?

15  A.   That's Christopher Cronen, the former field office

16  director.

17  Q.   And the email is addressed to Lyons, Todd M.  Is that you?

18  A.   Yes, sir.

19  Q.   And the email is dated January 30 of 2018, correct?

20  A.   Yes, sir.

21  Q.   Is this an email that you received on that date?

22  A.   Yes, sir.

23          MR. PRUSSIA:  Your Honor, I'd like to mark this as

24  Exhibit 4.

25          COURTROOM CLERK:  5.

1          THE COURT:  Is there any objection?  And does this

2     need to be under seal?  Are there potential redactions to this

3     one?

4          MS. LARAKERS:  Yes, Your Honor.

5          THE COURT:  All right.  This will be Exhibit 5

6     temporarily under seal.  And we'll see how many of these there

7     are, but I'm ordering that redacted versions be filed for the

8     public record by 6:00 tomorrow, August 22.

9     Q.   Mr. Lyons, the second email in the chain is from you to

10    David Jennings.  Do you see that?

11    A.   Yes, sir.

12    Q.   And a C. Cronen?

13    A.   Yes, sir.

14    Q.   Who is David Jennings?

15    A.   David Jennings was the acting assistant director of field

16    operations, which is the supervisor of all the field office

17    directors for ERO.

18    Q.   And copied on the email is James Rutherford.  Do you see

19    that?

20    A.   Yes.

21    Q.   Who is that?

22    A.   He was the deputy field office director for ERO Boston

23    case management.

24    Q.   And the subject line, it's a forward:  Standalone I-130

25    Visa Petitions Pending At USCIS Law Field Office.  Do you see

1    that?

2    A.    Yes.

3    Q.    What is "Law field office"?

4    A.    It's an acronym for Lawrence.

5    Q.    Is this an email that you sent to Mr. Cronen?

6    A.    It's an email I sent to Mr. Cronen and Mr. Jennings.

7    Q.    In the email you sent you write:  Good morning, sir.  More

8    background on The Herald story that the EAD inquired about for

9    Mr. Homan.  Do you see that?

10   A.    Yes.

11   Q.    What is the EAD?

12   A.    The EAD is the executive associate director, which at the

13   time was Matt Albans.

14   Q.    And who is Mr. Homan?

15   A.    Mr. Homan was the director of ICE.

16   Q.    What is The Herald story that's referenced in your email?

17   A.    Without the actual story line in front me, it was more

18   likely arrests which took place at CIS.

19   Q.    What is the purpose of your email?

20   A.    To give them background, as the email says, on the request

21   for where the arrests came from.  Do you want me to read the

22   email?

23   Q.    That's sufficient.  You wrote in the second sentence:

24   These arrests have been at the request of the new FOD for CIS

25   Boston, correct?

1    A.    Yes.

2    Q.    And that was a true statement at the time you made it,

3    right?

4    A.    That was the information that was given to me in the email

5    which is referenced below the last portion of 2917.

6    Q.    Who was the new FOD for CIS Boston in January 2018?

7    A.    I don't know, sir.

8    Q.    Turn to the page ending in 2920.

9    A.    Yes.

10   Q.    There's an email from Tiberi Mirella.  Do you see that?

11   A.    Yes.

12   Q.    Who is that?

13   A.    That is from my investigation -- section chief at the

14   USCIS Lawrence office.

15   Q.    You mentioned, and I made reference earlier, and you just

16   made reference to an investigation.  What was your

17   investigation?

18   A.    They wanted to know specifics to why subjects were

19   targeted at or arrests made at the Lawrence field office.

20            THE COURT:  Sorry.  Who wanted to know?

21            THE WITNESS:  The leadership at ERO, sir.

22            THE COURT:  In Washington?

23            THE WITNESS:  Yes, sir.

24   BY MR. PRUSSIA:

25   Q.    And that's because of media attention on the topic?

1    A.    Yes.

2    Q.    The other individuals to whom the email from Mirella is

3    addressed to, are they all ICE employees?

4    A.    For the email at the very bottom of 2922, the cc for

5    Kirsten Smith -- or Kristen Smith, I'm not familiar with that

6    employee.

7    Q.    Okay.  But the other two individuals are --

8    A.    Yes.  And Andrew Graham and Stephen Wells are both --

9    Q.    Okay.  You don't have the benefit of this discussion with

10   counsel.  I'm avoiding names at the request of counsel.

11   A.    That's fine.

12   Q.    Okay.  In an email CIS is passing on to ICE a list of

13   individuals with I-130 applications pending at the CIS field

14   office in Lawrence that appear to have final orders of removal,

15   correct?

16   A.    Yes.

17   Q.    And Ms. Tiberi is specifically stating that her FOD asked

18   that she reach out to ICE with this information and, if need

19   be, coordinate the interviewing scheduling so they are not all

20   scheduled at once, correct?

21   A.    Yes.

22            THE COURT:  I'm sorry.  Ms. Tiberi works for what

23   agency?

24            THE WITNESS:  USCIS.

25            THE COURT:  Go ahead.

1    Q.   Now, if you would turn to the prior page, the one ending

2    in 2919, please, sir.

3    A.   Yes.

4    Q.   I'm focused on the second half of the email, of the

5    document.  It's the email from Ms. Tiberi from October 18, 2017

6    at 2:23 p.m.  Are you with me?

7    A.   Yes.

8    Q.   And it's addressed to the same individuals as the prior

9    email, correct?

10   A.   Yes.

11   Q.   And it's marked with:  Importance high, right?

12   A.   Yes.

13   Q.   In the third paragraph she states:  We need to know if any

14   interest exists in any of these cases as we will need to plan

15   out the scheduling.  If no interest exists, the issue of

16   scheduling all them in one day will not be an issue for us.

17   But if we know that you might be interested in any of them, we

18   will spread out the scheduling.  Please let us know.  That way

19   we can proceed with interview scheduling.

20        Do you see that?

21   A.   Yes.

22   Q.   Turn to the prior page, 2918.  And I'm focused on the

23   bottom portion of the document.  It's the email from Andrew

24   Graham.  Do you see that?

25   A.   Yes.

1  Q.   Who is that?

2  A.   He's a supervisory deportation agent -- officer.  I'm

3  sorry.

4  Q.   And it's addressed to Ms. Tiberi, correct?

5  A.   Yes.

6  Q.   At CIS, right?

7  A.   Yes.

8  Q.   The first line of the email states:  I have reviewed each

9  of the cases for criminality and updated the spreadsheet with a

10  column titled ERO Response, which indicates our level of

11  interest in each case.

12       Do you see that?

13  A.   Yes.

14  Q.   If you turn to the next page.

15  A.   2917 or 2919?

16  Q.   2919, sir.  As the email continues, the paragraph starts:

17  As far as scheduling goes.

18  A.   Yes.

19  Q.   It's redacted partially in that sentence, right?

20  A.   Yes, it is.

21  Q.   It states:  It also has the potential to be a trigger for

22  negative media interest as we have seen in the past.

23       Do you see that?

24  A.   Yes.

25  Q.   And then he states:  If you have ability to schedule one

1    or two at a time and schedule them apart, that would work best

2    for us.

3         Do you see that?

4    A.   Yes.

5    Q.   So ICE Boston is telling CIS:  Hey, we're interested in

6    these individuals.  We're interested in initiating enforcement

7    activities against them.  Correct?

8    A.   Yes.  Mr. Graham in the first paragraph breaks down the

9    priority followed by the case nexus and then the final order

10   outcome if it was a non-criminal.

11   Q.   So as to avoid negative media interests, we ask that you

12   spread them apart.  Right?

13   A.   I can't speak to his intent.  I would be speculating.

14   Sorry.  He does mention that.  I also do believe when -- his

15   intent to have it scheduled as one or two at a time is the fact

16   that most of those referrals that I've seen, emails that we

17   provided in discovery come in large batches like the

18   spreadsheet you had, whereas there's not enough resources at

19   ERO Boston to handle one whole day of scheduling, which was

20   sometimes 12 to 13.

21   Q.   So by spreading them apart -- well, take a step back.  The

22   purpose of this is to effect arrests at CIS, right?

23   A.   Yes.

24   Q.   And by spreading the arrests apart, you decrease the

25   chance that they come to light in the public through media

1    attention, right?

2    A.    Yes.  Historically, any time a large amount of

3    individuals, whether it be arrests at a CIS, at a worksite,

4    during a fugitive operation, it triggers a negative media

5    interest.

6                MR. PRUSSIA:  May I approach, Your Honor?

7                THE COURT:  Yes.

8                Are you seeking to have this admitted?

9                MR. PRUSSIA:  Yes, Your Honor.

10               THE COURT:  So the prior document will be admitted as

11   Exhibit 5.  I believe it is under seal.

12               MR. PRUSSIA:  That's right.

13               THE COURT:  And this one will be Exhibit 6, unless

14   there's an objection.

15               MS. LARAKERS:  No objection, Your Honor.

16   Q.    Mr. Lyons, you've been handed what's been marked as

17   Exhibit 6.  It's a document starting at GOV 1641 and ending at

18   1644, correct?

19   A.    Correct.

20   Q.    And the top email is from Andrew Graham, correct?

21   A.    Yes.

22   Q.    Who is an ICE employee, right?

23   A.    Yes.

24   Q.    And the To line includes yourself and James Rutherford,

25   right?

1   A.   Yes.

2   Q.   And this is an email that you received January 30, 2018,

3   right?

4   A.   Yes.

5   Q.   If I could direct you to the third email in the chain, the

6   email from Mr. Graham to you and Mr. Rutherford at 10:06 a.m.,

7   January 30.  Are you with me?

8   A.   Still on 1641?

9   Q.   That's correct.

10  A.   Okay.

11  Q.   The first sentence states:  James, Todd, just to help you

12  guys answer any questions on this CIS arrest topic, here is a

13  brief overview of how we handle these cases.

14       Did I read that correctly?

15  A.   Yes.

16  Q.   What is your understanding of what Mr. Graham was

17  referring to when he says:  Just to help you guys answer any

18  questions on this CIS arrest topic?

19  A.   Because to go back to 2917, I was being asked questions

20  from headquarters about arrests at CIS which were in the media.

21  And also, I had asked the assistant directors in the local

22  office to brief me on just how exactly we were getting the

23  information.

24  Q.   Okay.  Do you have an understanding as to how Mr. Graham

25  identified -- strike that.  What was the basis of the overview

1    as provided by Mr. Graham in this email?

2    A.    The basis is that CIS sends a list of pending I-130s to

3    ERO, a list which has subjects with an active final order.

4         THE COURT:  Mr. Prussia, what's the point of all of

5    this?  It seems pretty clear that up to a certain point at

6    least CIS was informing ICE of when aliens with final orders of

7    removal were coming in for I-130 interviews, and ICE was

8    letting CIS know which of them it wanted to arrest and detain.

9    Is there more to this than that?

10         MR. PRUSSIA:  That's exactly it, Your Honor.

11         THE COURT:  I've got the point then.

12         MR. PRUSSIA:  Okay.

13         (Discussion off the record.)

14         MR. PRUSSIA:  Almost done, Your Honor.  May I

15    approach?

16         THE COURT:  Yes.

17    Q.    Mr. Lyons, you've been handed a document that's been

18    marked, that's identified GOV 2883 to GOV 2885.  Do you see

19    that?

20    A.    Yes.

21    Q.    And it's an email from an individual whose name I don't

22    want to put on the public record.  But do you know who that

23    individual is?

24    A.    Yes.

25    Q.    Where is he employed?

1    A.    ERO Boston.

2    Q.    And on the address line, it includes Ms. Tiberi as well as

3    Mr. Graham.  Ms. Tiberi you've identified as being a CIS

4    employee and Mr. Graham as being an ICE employee, right?

5    A.    Yes.

6              MR. PRUSSIA:  I'd like to offer this into evidence,

7    Your Honor, as Exhibit --

8              THE COURT:  It's admitted as Exhibit 7 under seal.

9    Q.    At the bottom of page 2883 there's an email from an

10   individual to Ms. Tiberi at CIS.  Do you see that?

11   A.    Yes.

12   Q.    Do you know where that individual is employed from whom

13   the email was sent?

14   A.    He's not employed with ERO or an ICE employee.

15   Q.    And the email states:  Hi Mirella.  Two more cases were

16   added to the spreadsheet, making it a total of 23.  Do you see

17   that?

18   A.    Yes.

19   Q.    Now, there's a spreadsheet that's attached here.  Can you

20   generally describe what it identifies?

21   A.    It's broken down by columns where it has receipt numbers,

22   A numbers, names, addresses, I-130 status, address, and then

23   there's a comments section as well as an expedited removal

24   section.

25   Q.    Okay.  In the 11:56 a.m. email from Ms. Tiberi, she

1   states:  Law keeps getting more I-130s that have final orders.

2   Attached are the newest we have received and have added them to

3   spreadsheet, name, number -- three?

4   A.    Yes.

5   Q.    Do you see that?

6   A.    Yes.

7   Q.    Does that accurately describe the spreadsheet that she

8   just identified?

9   A.    Yes.

10  Q.    And the top email is from the individual employed at ICE,

11  correct?

12  A.    Yes.

13  Q.    It states:  We are interested in all but two cases, right?

14  A.    Yes.

15  Q.    So ICE is interested in 21 of the cases, right?

16  A.    It would appear so, yes.

17  Q.    And then this email is dated February 14, 2018, right?

18  A.    Yes.

19  Q.    And a few weeks later is when this lawsuit happened,

20  right?

21  A.    Yes.

22  Q.    So but for this lawsuit, these 21 individuals would have

23  been subject to enforcement by ICE, correct?

24  A.    Yes, but I can't speak to -- that ERO officer wrote:  See

25  attached.  The attached isn't an ERO spreadsheet.  This is a

1    CIS spreadsheet.  So I'm not sure what he sent back as far as

2    the reasons why we're interested.

3         MR. PRUSSIA:  I don't have any further questions, Your

4    Honor.

5         THE COURT:  Actually, I thought you were going to ask

6    Mr. Lyons about what's going to happen in the future.  In other

7    words, whether there's an imminent threat of irreparable harm

8    depends somewhat on his intentions as the interim field office

9    director.

10        MR. PRUSSIA:  I thought I did cover that at the

11   beginning when he testified, I thought, that the way he

12   interprets the Executive Order, no class of aliens are exempt,

13   and that's how he will enforce it on a going-forward basis.

14        THE COURT:  He also said he was going to have certain

15   priorities.

16        Has anybody been arrested by ICE at a CIS office in

17   the jurisdiction of the ERO you now had since this lawsuit was

18   filed in about February 2018?

19        THE WITNESS:  No, sir, not since myself and Mr. Brophy

20   have been in front of you or since Mr. Brophy gave his

21   directions has any action been taken at a CIS office.  To date,

22   to go back to my previous testimony to counsel's questions, we

23   continue to receive CIS referrals, but each case is reviewed on

24   a case-by-case basis.  And even with Ms. Adducci's guidance, no

25   action has been taken.

1          As I stated, going forward, everyone will still be

2   prioritized or every arrest that the Boston field office

3   conducts will be based upon public safety threat, criminality,

4   national security threat as long as the key point for most of

5   the enforcement activities, which happen in New England, are

6   resources.  In every case, specifically the CIS cases, my point

7   is to still continue on as Ms. Adducci did, which is to review

8   every case on the merits of its case and the factors that I

9   laid out as well as any enforcement action at CIS has to be

10  approved by myself.

11          THE COURT:  Just one second.  And assume

12  hypothetically that CIS tells you that someone with a final

13  order of removal has asked for an I-130 appointment and there's

14  no evidence that that person, other than being in the country

15  unlawfully and not leaving when ordered to do so, has done

16  anything unlawful as a threat to public safety, national

17  security or engaged in criminal activity.  Do you expect that

18  you would have that person arrested and detained?

19          THE WITNESS:  No, sir.  And I can unequivocally say in

20  front of you that based on even current media in the positive

21  light for ICE, the amount of individuals that are public safety

22  threats that are in the area of New England far outweighs the

23  resource allocation that I would have to devote to any type of

24  class of alien which falls under subsection (e) or (f).

25          The priorities of the Boston field office still remain

1   the top four priorities of the Executive Order.  We still are

2   following the Executive Order, but I have the daunting task of

3   still trying to do it with the resources that I have, and the

4   public safety aspect far outweighs devoting resources to it.

5         THE COURT:  Basically is it your understanding that's

6   consistent with then Secretary Kelly's February 20, 2017 order

7   that said that the director of ICE, among others, may issue

8   further guidance to allocate appropriate resources to

9   prioritize enforcement activities within these categories, the

10  seven categories that include aliens subject to a final order

11  of removal.  And the memorandum says:  For example, by

12  prioritizing enforcement activities against removable aliens

13  who are convicted felons or who are involved in gang activity

14  or drug trafficking.

15        Is that in essence what you're doing and intend to do?

16        THE WITNESS:  Yes, sir.  And that was the intent, I

17  believe, of what Mr. Brophy related to you as well as I.  And I

18  do believe that after Ms. Adducci came and saw how we conduct

19  operations at ERO Boston, she came to see that, although her

20  first view was that we were excluding class, we weren't

21  excluding class.  We were prioritizing.

22        THE COURT:  And what's the title of the officers who

23  go and actually arrest somebody?

24        THE WITNESS:  A deportation officer.

25        THE COURT:  Deportation officer?

1           THE WITNESS:  Yes, sir.

2           THE COURT:  How many deportation officers are in the

3      ERO you have?

4           THE WITNESS:  Currently under me, sir, I have 202 ICE

5      employees, which approximately 187 of those at any given time

6      are on duty, deportation officers.

7           THE COURT:  Okay.  And did you hear Ms. De Souza say

8      she was arrested by five deportation officers at the CIS

9      office?

10          THE WITNESS:  Yes, sir.

11          THE COURT:  And about how much of a day does it take

12     for a deportation officer to effect an arrest and everything

13     that follows that?

14          THE WITNESS:  A minimum, sir, eight hours.

15          THE COURT:  Eight hours.  So basically five eight-hour

16     days were devoted to arrest -- should I understand -- were

17     devoted to arresting Ms. De Souza?

18          THE WITNESS:  Yes, sir.

19          THE COURT:  And those were five eight-hour days that

20     couldn't be used looking for somebody who was unlawfully in the

21     country selling drugs?

22          THE WITNESS:  Yes, sir.  And I believe that that line

23     of thinking, sir, that you have is what Mr. Brophy shared.

24          THE COURT:  And what you share, correct?

25          THE WITNESS:  Yes, sir.

1          THE COURT:  Thank you.

2          MR. PRUSSIA:  If I may, Your Honor, just a few

3    follow-ups off of that.

4    BY MR. PRUSSIA:

5    Q.   Mr. Lyons, you still, ICE Boston is still receiving lists

6    from CIS of individuals with pending I-130s, right?

7    A.   Yes, sir.

8    Q.   We talked a lot about the reluctance of effecting those

9    arrests at CIS in part because of this litigation and in part

10   because of the media attention, right?

11   A.   Yes, sir.

12   Q.   Those arrests are still occurring outside of CIS, right?

13   A.   Do you mean subjects that currently do not -- current

14   people that have a final order?

15   Q.   That's right.

16   A.   Without a criminality?

17   Q.   That's right?

18   A.   I can't give you a breakdown.  I'm sure arrests have

19   occurred, but I can't give you the amount of numbers.

20   Q.   Are you familiar with the case of Mr. Kutkowski [sic]?

21   A.   No, sir.

22   Q.   An individual that was arrested by the ICE field office of

23   Boston with a pending I-130, I believe it was at his home?

24   A.   I'm unfamiliar, sir.

25   Q.   And that his wife appeared for her I-130 interview

1    thereafter and it was approved?

2    A.    The more you bring it up, I still don't know what it is.

3    Q.    You're not familiar with that?

4    A.    No.

5    Q.    Well, that is right.  The court has -- the court can take

6    judicial notice of it as I believe there's a pending case.

7    That would suggest that this field office is still conducting

8    arrests of individuals with pending I-130s solely based on

9    their final order of removal, correct?

10   A.    Correct.

11             MS. LARAKERS:  Objection.  Calls for speculation.

12             THE COURT:  I'm sorry.  The question is -- I'm not

13   sure I have anything I can take judicial notice of before me.

14             He's asking if it would suggest.  So if Mr. Rutkowski

15   was arrested at home while he had a impending I-130 and if

16   there were no other indicia of criminal activity, it would

17   suggest that ICE is still arresting people solely based on a

18   final order of removal.  That's the question?

19             MR. PRUSSIA:  That is, Your Honor.

20             THE WITNESS:  But to go to the scope of what we're

21   here for was, sir, was a CIS arrest.  That's what I

22   specifically answered for you.  And to speak to a case that I

23   don't know the circumstances behind it, I can't speak to it.

24   There's over 17,000 fugitive cases on the Boston docket right

25   now.

1   Q.   Fair enough.  That is my point.  First, I apologize.  The

2   name is Rutkowski, not Kutkowski, so my apologies.

3   A.   Sorry, that still doesn't help.

4   Q.   The focus has been, as I hear your testimony, on arrests

5   at CIS, and I take your testimony that that practice is

6   undesirable now.  But folks that have pending I-130s with final

7   orders of removal are still subject to enforcement by this

8   field office, right?

9   A.   They could be, yes, sir.

10   Q.   And folks who are under supervised release can still be

11   given instructions to depart the United States solely based on

12   the fact that they have a final order of removal,

13   notwithstanding their pending or approved I-130, correct?

14   A.   Yes, that's true.  Well, yes, they can be ordered or asked

15   to provide tickets, as you would.  But those cases, still to

16   include the I-246, stays are adjudicated case by case on the

17   merits of each one.

18   Q.   In fact, there have been -- since this lawsuit has been

19   initiated, there have been examples of individuals who have

20   been directed by officers in the Boston field office to buy

21   tickets and depart the United States solely because they have a

22   final order of removal?

23   A.   Yes, sir.

24   Q.   And Mr. Rutkowski is an example of that, right?

25          MS. LARAKERS:  Objection.  Lack of knowledge.

1          THE COURT:  He lacks knowledge.  Sustained.

2          MR. PRUSSIA:  I don't have any further questions, Your

3    Honor.

4          THE COURT:  Is there cross-examination?

5          MS. LARAKERS:  Very brief, Your Honor.

6    CROSS-EXAMINATION BY MS. LARAKERS:

7    Q.   You testified that it's your -- it's going to be your

8    directive to spend ICE Boston's resources primarily on criminal

9    aliens, right?

10   A.   Correct.

11   Q.   Does that directive just apply to USCIS arrests?

12   A.   No.  It applies overall.  In regards to the specific

13   questioning as far as counsel had for people that report into

14   the office, that's not an expenditure of resources.  Boston ERO

15   is one of the few field offices that do not automatic detain

16   individuals that do report in that have I-130s -- I'm sorry --

17   that have final orders of removal.  We afford those people

18   opportunities on their own that Mr. Cronen had initiated,

19   what's known as a 30 and 30, where, when the Executive Orders

20   first came out, other field officers took action and

21   immediately detained individuals, where we didn't.

22   Q.   Do the resources that you've spoken about earlier include

23   people checking in, people checking in to ICE?

24   A.   Yes.  Every day there's an on-duty officer for cases on

25   the non-detain docket that check in.

1    Q.   Are there limited resources to have people check in?

2    A.   Extremely.

3    Q.   Who was the field office director at the time Ms. De Souza

4    was arrested and detained?

5    A.   I'm sorry.  Do we have a date, the timeframe?  Mr. Cronen

6    was primarily the field office director until up around January

7    30 and there was a time of flux before Mr. Brophy arrived.  But

8    there's only been three field office directors since I've been

9    at ERO Boston.

10            MS. LARAKERS:  No further questions, Your Honor.

11            THE COURT:  Is there any redirect?

12            MR. PRUSSIA:  No, Your Honor.

13            THE COURT:  Okay.  I've got a few questions, and the

14    attorneys know they can object.

15            Am I correct you testified that you read my June 11,

16    2018 decision in this case?

17            THE WITNESS:  Yes, sir.  I even had look up what Wing

18    Wong was from 1896.

19            THE COURT:  You looked up the case?

20            THE WITNESS:  Yes, sir.

21            THE COURT:  Did you read the decision once or more

22    than once?

23            THE WITNESS:  I've reviewed it several times on the

24    notes which I made on here.

25            THE COURT:  Do you recall that -- I assume -- here.

1    Do you understand that the regulation that was being

2    interpreted and applied by its literal terms applies to aliens

3    in the 90-day removal period which generally begins running

4    after they have a final order of deportation?

5              THE WITNESS:  Yes, sir.

6              THE COURT:  And do you understand that all of the

7    aliens who are petitioners of this case had that 90-day removal

8    period run for them years ago?

9              THE WITNESS:  Yes, sir.  I understand as far as when

10   you referenced Nelson v. INS from 2000 as far as -- and its

11   relation to Zadvydas.

12             THE COURT:  All right.  I was asking a more factual

13   question.

14        Do you remember that I found that ICE was assuming

15   nevertheless that the regulation applied to people after the

16   removal period and that they could be detained for 90 days

17   before they were entitled under the regulation to a document

18   review concerning whether their detention should continue?

19             THE WITNESS:  Yes, sir.

20             THE COURT:  And do you remember I explained that that

21   interpretation might be wrong, and that since the removal

22   period expired, ICE might have less time to make a detention

23   decision under the regulation?

24             THE WITNESS:  Yes, sir.

25             THE COURT:  And do you understand that I found that,

1    assuming without finding that ICE's interpretation was correct,

2    it was still violating the regulation?

3            THE WITNESS:  Yes, sir.  We've acknowledged and saw

4    that's your recommendation and findings as far as violations

5    that we made in the POCR process.

6            THE COURT:  And do you recall that I said although I

7    didn't have to decide it in June, it appeared to me that the

8    proper interpretation of the regulation might be that ICE is

9    required, for somebody after the 90-day removal period, to give

10   prompt notice of a detention review and conduct that review

11   perhaps 30 days or a little more than 30 days after the

12   detention?

13           THE WITNESS:  Yes, sir.

14           THE COURT:  And has it been the practice at least

15   since Ms. Adducci came to the Boston ERO to give notice of a

16   detention review when somebody is arrested and detained?

17           THE WITNESS:  Yes, sir.  Well, as you know, throughout

18   the findings, through the previous training that you alluded to

19   the officers received in February, then again in April, and

20   then again in May, we were working to make, you know, strict

21   adherence to especially notifications to legal counsel.

22           THE COURT:  Okay.  But I was trying to lay a

23   foundation.

24           THE WITNESS:  Sure.

25           THE COURT:  So Ms. Adducci -- since Ms. Adducci came,

1    the ICE office has been giving notice when somebody is

2    detained, arrested and detained, that there would be a document

3    review concerning detention in about 80 days; is that right?

4          THE WITNESS:  Yes, sir.  Her goal in transforming or

5    bringing the thing up to process is not to even deal with set

6    timelines as to do stuff as quickly and effectively as

7    possible.

8          THE COURT:  All right.  But it's possible to give

9    notice that there's going to be a detention review at about the

10   time somebody is arrested and detained; and indeed that's being

11   done now, correct?

12         THE WITNESS:  To my knowledge, yes, sir.

13         THE COURT:  And it would also be -- well, would it

14   also be possible to say that detention review will be conducted

15   at least initially in, say, 40 days, not 80 days?

16         THE WITNESS:  They can begin their review earlier,

17   especially with making sure counsel has that notice to submit

18   proper documentation or any type of benefit request prior to or

19   earlier in the process.

20         THE COURT:  And you were here this morning when Ms. De

21   Souza and Ms. Calderon testified, correct?

22         THE WITNESS:  Yes, sir.

23         THE COURT:  And Ms. Calderon actually was released I

24   think about three weeks after she was detained, correct?

25         THE WITNESS:  I believe so, sir.

1          THE COURT:  All right.  I think that was her

2     testimony.

3          MR. PRUSSIA:  30 days.

4          THE COURT:  Within a month?

5          MR. PRUSSIA:  Yeah.

6          THE COURT:  So it was possible for ICE to determine

7     that her detention, further detention wasn't justified within

8     three or four weeks, correct?

9          THE WITNESS:  Yes, sir.

10          THE COURT:  And having heard her testimony this

11     morning, as far as you know, was it correct to conclude that

12     she wasn't a flight risk?

13          THE WITNESS:  Yes, sir.

14          THE COURT:  What are some of the things that cause you

15     to agree that she wasn't a flight risk?

16          THE WITNESS:  What I said earlier, too, in my

17     testimony to counsel, and actually it's in an email in one of

18     the exhibits, is that I believe that the whole process is

19     convoluted, whereas it's conflicting information on CIS's own

20     website, whereas Ms. Calderon was actually trying to move ahead

21     with a benefit, yet I find it very misleading that no one at

22     CIS advised her that she should possibly go ahead and pursue

23     the 212 that's on their own website prior to, which, that was

24     her goal all along.  And it could have been done, January 18

25     when it was approved, that same paperwork for the 212 waiver

1   could have been done instead of waiting until February 2 when

2   it was adjudicated.

3           THE COURT:  I may be confused as to when she was

4   arrested.  I thought she was arrested at the CIS office.

5           THE WITNESS:  Yes.  No.  But my point, sir, is the day

6   that she had the approved I-130, she could have applied for

7   that 212.  And it's very -- I was just going to say it's very

8   misleading, even on CIS' own website.

9           THE COURT:  So basically are you saying that once she

10  got the I-130, the regulations -- the three-part process, you

11  have to apply for and get an I-130, and then you apply for and

12  get an I-212, and then you apply to get a --

13          THE WITNESS:  601A.

14          THE COURT:  -- waiver, which is an I-601A.

15          THE WITNESS:  601A.

16          THE COURT:  601A.  And you're saying, in your view,

17  once she had the approved I-130 and she wasn't a flight risk,

18  she should have been allowed to file the I-212?

19          THE WITNESS:  Yes, sir.  In my declaration where I

20  outlined the information that was relayed by the supervising

21  officer for the reason for the flight risk, it did lay out

22  certain factors of that.  However, going back to testimony that

23  I gave to counsel, we never even knew of the 212 waiver.  Had

24  we known that, I'm confident enough to say that Ms. Calderon

25  wouldn't have been separated from her children.

1            THE COURT:  She wouldn't have been?

2            THE WITNESS:  No.  And even in my email, sir, that

3    counsel entered into evidence, I specifically state that these

4    type of stories will keep those away who may be truly trying to

5    adjust that have an actual path to a benefit.  I said that back

6    in January.

7            THE COURT:  What's the date of that email?

8            THE WITNESS:  January 30.

9            THE COURT:  So basically, are you telling me that you

10   believe that in making its case-by-case determinations as to

11   whether somebody who has a final order of removal should be

12   removed, arrested, detained and removed, you believe the office

13   you now head should consider whether that person has applied

14   for an I-130, had an approved I-130, applied for an I-212?

15           THE WITNESS:  Yes, sir.

16           THE COURT:  And is that what you intend your office to

17   do as long as you're the acting or permanent director?

18           THE WITNESS:  Yes, sir.  I've instructed supervisors

19   and officers to make sure they reach out to our Office of Chief

20   Counsel to make sure that they have all the facts on a

21   case-by-case basis.  Whether they're looking at an arrest that

22   may take place, an enforcement action of somebody seeking a

23   benefit or even someone who is already in the removal

24   proceedings that's filing for an I-246 stay of removal, all

25   factors should be considered.

1           And just to go a little bit farther into it, I think

2    that since our last time when I was here in May, we've taken

3    positive steps to make sure that each case is properly seen as

4    well as educating more the community.  I was responsible -- we

5    established a round table with U.S. Senate members and their

6    Congressional staff for constituent services, which we brought

7    them into the Boston field office.  And we were able to sit

8    down and tell them exactly positive benefits to each case.

9    Because there was often times that someone may have had a

10   positive benefit outcome, but we weren't notified or privy to

11   it in any of the original documentation.

12          THE COURT:  I think you said a little earlier with

13   regard to Ms. Calderon, you didn't know about the I-212?

14          THE WITNESS:  No, sir.

15          THE COURT:  Were you saying that you didn't know about

16   the existence of the possibility of an I-212?

17          THE WITNESS:  Yes, sir.  What I was kind of going to

18   in that aspect was through discovery I think counsel saw that

19   there was no -- any time we received a referral from CIS, there

20   was no indication that that individual was seeking some type of

21   other benefit besides having an I-130 with an outstanding order

22   of removal.

23          THE COURT:  But had you heard of an I-212 before this

24   case?

25          THE WITNESS:  Yes, sir.

1           THE COURT:  So you knew of the existence of the

2    possibility of an I-212?

3           THE WITNESS:  Yes, sir.  In my previous --

4           THE COURT:  I'm sorry.

5           THE WITNESS:  I'm sorry.

6           THE COURT:  Did you know of the existence of the

7    possibility of a provisional waiver for somebody who had a

8    final removal order?

9           THE WITNESS:  Yes, sir.  And in my previous position

10   in Dallas, my experience has always been that counsel worked

11   with our chief counsel in either opening -- having a motion to

12   reopen a case for someone that has prior -- that's going

13   through removal or coming forward.  So the existence has always

14   been there where we were notified prior to that there was more

15   to the story than that.

16          In these CIS referrals that we received from the

17   Lawrence office specifically, I can only speak to that because

18   these are the ones that are here, there is no mention of any

19   other type of benefit going forward; whereas the environment I

20   came from before, there was a more of a hand-in-hand

21   cooperation.

22          THE COURT:  All right.  And did ICE ask:  Do any of

23   these people have petitions for I-212s or approved I-212s?

24          THE WITNESS:  No, sir.

25          THE COURT:  And in the future, do you intend to ask

1    CIS that?

2           THE WITNESS:  Yes, sir.  Because we do have the

3    ability and access to a system where officers do look for any

4    type of pending benefits.  And in Ms. Calderon's case, had they

5    seen there was a pending 212 or approved 212 with a pending

6    601, that would have been brought to our chief counsel and no

7    action would have been taken.  But even in CIS' own system,

8    there was no record of a 212 being filed or being pursued.

9           THE COURT:  But that might have been because she was

10   arrested -- is getting an I-130 a prerequisite for applying for

11   an I-212?

12          THE WITNESS:  Yes, sir.  And that was the point I was

13   trying to make to counsel, is that even through CIS' own

14   convoluted website, while it is the first step and they

15   specifically state it doesn't vacate or preclude any

16   enforcement action, that I-130 does eventually lead to a 212

17   once the established bona fides and prima facie eligibility are

18   there.

19          THE COURT:  Do most people who get an I-130 later get

20   an I-212 in your experience?

21          THE WITNESS:  An I-212, sir, is mostly for ones who

22   have either been previously deported and returned or pending an

23   unexecuted order.  I've seen a lot of I-130s in my experience

24   where people have just entered the United States illegally or

25   without inspection, which later married a U.S. citizen, which

1    later led down to the adjudication of a 485 for a lawful

2    permanent resident, things like that, yes, sir.

3             THE COURT:  So basically should I understand that it's

4    your intention that the Boston ERO will not arrest people with

5    final orders solely because they have the final orders,

6    particularly if they are seeking or have an approved I-130 and

7    are seeking or have an I-212?

8             THE WITNESS:  Definitely, sir.  As far as having a --

9    as I said, having an approved I-130 or pending I-130, I guess

10   you could say is the launching point, but it doesn't preclude

11   any action going forward.  I think every one of my officers

12   knows that if someone sees an I-130 to make sure they

13   investigate further to make sure there's no other pending

14   either litigation, pending benefit claim, things of that, every

15   case going forward on a case-by-case.

16           THE COURT:  And if you see -- so you're going to look

17   at every case case by case, because is it your understanding

18   that then Secretary Kelly's memorandum also reminded you and

19   your colleagues that you have prosecutorial discretion to be

20   exercised in individual cases?

21           THE WITNESS:  I think that the prosecutorial

22   discretion, sir, we have the ability to look at each case case

23   by case when we're prioritizing how we're going to utilize our

24   resources in an enforcement action.

25           THE COURT:  I think you said if you knew there was a

1    pending or approved I-130 or pending or approved I-212, you

2    would look to see what the other circumstances were.

3            THE WITNESS:  Yes, sir.

4            THE COURT:  And if you -- okay.  So you heard

5    Ms. Calderon this morning?

6            THE WITNESS:  Yes, sir.

7            THE COURT:  And you learned she is married to an

8    American citizen, right?

9            THE WITNESS:  Yes, sir.

10           THE COURT:  And you learned that she had children who

11   were American citizens, correct?

12           THE WITNESS:  Yes, sir.

13           THE COURT:  And you learned that they have a home and

14   her husband works, and somebody asked her, she would say I

15   don't want to do anything but stay right where I am.

16           THE WITNESS:  Yes, sir.

17           THE COURT:  So she wouldn't have been a flight risk I

18   think you told me before in your judgment?

19           THE WITNESS:  Yes, sir.

20           THE COURT:  And would you have -- you learned that she

21   was seeking -- you now know there's a possibility to get a

22   provisional waiver, somebody who gets an I-130 that's married

23   to a U.S. citizen gets an I-212, is eligible to apply for a

24   provisional waiver, which means they can stay in the United

25   States until it's determined whether they'll get a permanent

1  waiver and only have to leave for a couple of weeks?

2          THE WITNESS:  Yes, sir.

3          THE COURT:  And would you have considered all of that

4  if you had that information?

5          THE WITNESS:  Yes, sir, all of that would be factored

6  in.

7          THE COURT:  And in those circumstances would she have

8  been arrested and detained?

9          THE WITNESS:  No.  I believe that after consultation

10 with our chief counsel that, while there may have been an

11 enforcement action as far as an interview done with us, a more

12 exploratory investigation done with CIS finding the roots of

13 the benefit claim, I believe our chief counsel would advise us

14 that Ms. Calderon does have a path to a benefit and that we

15 wouldn't take an enforcement action.

16         THE COURT:  You would let her pursue that path and see

17 whether CIS determined essentially that the public interest

18 manifest in the INA as well as in the regulations in keeping

19 families of American citizens together outweighed the also

20 legitimate public interest of not rewarding and discouraging

21 people from coming into the country unlawfully; but you'd let

22 CIS make that decision?

23         THE WITNESS:  Yes, sir.  And we have, through our

24 chief counsel, adjudicated or approved stays for individuals

25 that are in the process that have a bona fide claim where it

1    looks like they are going to receive a benefit.

2         THE COURT:  So a stay -- to apply for a stay, somebody

3    has to file an I-246?

4         THE WITNESS:  Yes.

5         THE COURT:  That's a discretionary decision that ICE

6    makes as to whether to grant a stay?  Do you understand that?

7         THE WITNESS:  Yes.

8         THE COURT:  And are there regulations that apply to

9    requests for stays?

10        THE WITNESS:  Yes.  The stay guidelines are set forth.

11   However, it does give the field office director the discretion

12   to grant or deny.

13        THE COURT:  Right.  But do you know whether there are

14   regulations?

15        THE WITNESS:  Yes, sir.  All of our documents are

16   governed by regulation.

17        THE COURT:  And do the regulations describe what

18   should be considered as ICE exercises its discretion whether or

19   not to grant a requested stay?

20        THE WITNESS:  To speak off the top of head, sir,

21   that's why I usually keep my law book on my desk or I consult

22   with chief counsel.  I would just be --

23        THE COURT:  Well, do you have a pencil there?

24        THE WITNESS:  No, sir.

25        THE COURT:  Somebody will write it down and give it to

1   you.  Take a look at 8 CFR Section 241.6 that sends you to 8

2   CFR Section 212.5.  If you received a request for a stay, is

3   one of the things you would always consider community ties such

4   as close relatives with known addresses?

5          THE WITNESS:  Yes.  Usually people do submit stuff

6   such as utility bills, photos, things like that.

7          THE COURT:  And if somebody had strong community ties,

8   such as a husband and known home address and children who were

9   going to school in that area, would that weigh in favor of

10  granting the stay?

11         THE WITNESS:  Yes, that could be one of the mitigating

12  factors in the stay.

13         THE COURT:  Based on what you heard this morning, that

14  Ms. Calderon has a final order of removal, Ms. De Souza has a

15  final order of removal, but they have strong family ties and

16  well-known addresses where they want to remain, continue to

17  live, do you believe you would have granted the stay?

18         THE WITNESS:  Had I had -- excuse me -- all the

19  evidence which we now have in front of us, yes, I would have,

20  especially since in Ms. Calderon's case she has an approved 212

21  and she also did her biometrics in July for a 601A.

22         THE COURT:  Is it your understanding that to get a

23  601A, you have to have biometrics done in the United States?

24         THE WITNESS:  It can be done in the United States with

25  the provisional waiver or it could be done overseas in the

1    consular process through the Department of State.

2            THE COURT:  I guess that's a legal question I'll have

3    to check.  It's different than my understanding.

4            But as a practical matter, do you understand that if

5    somebody is pursuing a 601A and is at some stage in the

6    process, if you have them removed before CIS gets to decide the

7    merits, ICE will have, as a practical matter, decided the

8    merits and preempted CIS' opportunity to do so?

9            THE WITNESS:  Yes, sir.

10           THE COURT:  And do you understand that the regulations

11   give that authority to decide whether to grant a provisional

12   waiver to CIS, not ICE?

13           THE WITNESS:  Yes, sir.

14           THE COURT:  But basically, all of this is the

15   authority of the Secretary of Homeland Security, and somehow

16   these two powers need to be coordinated or harmonized?

17           THE WITNESS:  To actually make matters worse, actually

18   three.  Because you have to factor in Customs and Border

19   Protection as well, which have their own interpretations of the

20   Executive Order.

21           THE COURT:  Okay.  So you've been appointed interim

22   director again?

23           THE WITNESS:  Well, I'm the acting field office

24   director.  The interim for Ms. Adducci was because she's an

25   actual field office director.

```
 1              THE COURT:  I see.  So you're acting?

 2              THE WITNESS:  Yes, sir.

 3              THE COURT:  Am I correct that one can serve in an

 4     acting capacity for up to 240 days?

 5              THE WITNESS:  Yes, that's what I told you before.

 6              THE COURT:  And last time you were only about four

 7     days in that role?

 8              THE WITNESS:  Yes, sir.

 9              THE COURT:  Has anybody told you how long you should

10     expect to be in that role this time?

11              THE WITNESS:  I was advised to treat the Boston AOR as

12     my own, that this is now my office and that I was the anchor of

13     senior leadership going forward.

14              THE COURT:  Were you led to expect that you'd be made

15     the permanent director at some point?

16              THE WITNESS:  No, sir.  I think even -- within our

17     ranks, at the deputy level, which is still a senior management

18     position, there's been a lot of turnover.  As an example, my

19     counterpart who testified in front of you is no longer with

20     the Boston Field Office.

21              THE COURT:  Mr. Rutherford?

22              THE WITNESS:  Yes, sir.

23              THE COURT:  Where is he?

24              THE WITNESS:  He's assigned to headquarters,

25     enforcement removal operations in D.C.
```

1          THE COURT:  He's not doing training, is he?

2          THE WITNESS:  He's the unit chief over firearms and

3     tactical training.

4          THE COURT:  All right.  Do my questions suggest any

5     further questions to counsel?

6          MR. PRUSSIA:  Briefly, yes, Your Honor, about seven or

7     so questions.

8     BY MR. PRUSSIA:

9     Q.   Mr. Lyons, if I understand your testimony to the judge,

10    had Ms. Calderon had a pending I-212, in your view, no

11    detention action would have been -- she would not have been

12    detained by the Boston field office of ICE, right?

13    A.   It definitely would have been a positive factor when it

14    comes down to it.  Since the basis of this is speaking to the

15    provisional waiver process and since we already discussed about

16    how the I-130 is just the first step but the main portion is

17    someone that does have an unexecuted final order is the 212, if

18    she had that approved 212, that would have definitely weighed

19    more favorably than the I-130.

20    Q.   Is the same true for Ms. De Souza?

21    A.   I would be speculating just because I'm not that familiar

22    with her case.  I was only assigned a declaration on

23    Ms. Calderon's case.

24    Q.   In fact, Ms. De Souza had an I-212 pending as of April 2,

25    2018, right?

1    A.    Again, I don't know Ms. De Souza's case.

2    Q.    And on April 27 of this year, Mr. Brophy issued a decision

3    to continue detention notwithstanding that pending I-212,

4    right?

5            MS. LARAKERS:  Lack of knowledge.

6            THE COURT:  I'm sorry.  What's that?

7            MS. LARAKERS:  Objection.  Lack of knowledge.

8            THE COURT:  Well, he may know.  You should testify

9    based on what you know.

10   A.    No, sir.  I was still a deputy of enforcement.  I wasn't

11   the deputy over custody management.  That would have been

12   Mr. Rutherford and Mr. Brophy.

13   Q.    And on May 2 the ICE Boston field office denied Ms. De

14   Souza's application for a stay, notwithstanding the fact that

15   she had a pending I-212; is that right?

16   A.    Again, I don't know Ms. De Souza's case.

17   Q.    Now, assuming I'm right for the moment that she had a

18   pending I-212 before those two decisions, was Mr. Brophy's

19   decision to continue her detention, notwithstanding the I-212,

20   incorrect in your view?

21           THE COURT:  You're asking him whether it would have

22   been incorrect?

23           MR. PRUSSIA:  Yes, sir.

24           MS. LARAKERS:  Objection, Your Honor.  Speculation and

25   the basis.

1              MR. PRUSSIA:  I don't think it's much speculation.  He

2    just speculated that they wouldn't have detained Ms. Calderon

3    had she had a 212.  Why can't he offer the same testimony with

4    Ms. De Souza?  And the record establishes that there was a 212

5    pending at the time this field office decided to deny her -- to

6    continue her arrest and deny her stay application.

7              THE COURT:  I think you've got the evidence to make

8    that argument.  My memory is that Mr. Rutherford signed that

9    document on April 27.

10             MR. PRUSSIA:  That is correct, Your Honor, on behalf

11   of Mr. Brophy.

12             THE COURT:  On behalf of Mr. Brophy, who told me in a

13   declaration that the decision had been made about April 30.

14   But anyway, I think you've got that, if you want to argue it.

15   But as I said earlier, I think from my perspective Mr. Lyons's

16   testimony is valuable on what's happened historically but most

17   relevant if I want to get to a decision on the motion for

18   preliminary injunction, whether the court would have to order

19   that certain things be considered or whether they're going to

20   be considered anyway.  I'm sorry.  Go ahead, if there was more.

21             MR. PRUSSIA:  Just a few more.

22   BY MR. PRUSSIA:

23   Q.   Ms. Calderon couldn't have applied for a I-212 when her

24   I-130 was approved, right, because she was detained by ICE?

25   A.   Yes.

1   Q.   On the day her I-130 was approved, she was detained,

2   right?

3   A.   Yes.

4   Q.   Okay.  Would you look at Exhibit 6, please, Mr. Lyons.

5   A.   They're not numbered.

6   Q.   I'll identify it by the Bates number.  It's the one that

7   starts at 1641, sir.

8   A.   Yes, sir.

9   Q.   The top email is from Andrew Graham to you and

10  Mr. Rutherford from January 30, 2018.  Do you have that?

11  A.   Yes.

12  Q.   I'm focusing on the page ending on 1642.

13  A.   Yes.

14  Q.   And it's an email from you to Mr. Rutherford and others

15  from January 30 at 8:55 a.m.  Do you see that?

16  A.   Yes.

17  Q.   Can you read that email into the record, please?

18  A.   Sure.

19       Guys, see below.  The subject had an active deportation

20  order which will be acted upon --

21            THE COURT:  Not too fast.

22  A.   Sorry.  We did not target the subject because he was --

23  forgive my horrible English -- illegally.  He was ordered by

24  immigration judge to be removed from the U.S. for sure.  This

25  type of story will keep those away who may be truly trying to

1   adjust (that have an actual path to a benefit).  This subject's

2   attorney should have never advised him to attend this meeting.

3   He has no path unless he leaves the country.  Below is the PAO

4   synopsis from the officer.

5   Q.   And the meeting for which you say his attorneys should

6   have never advised him to attend was an I-130 interview at CIS,

7   right?

8   A.   Yes.

9   Q.   And he was arrested the same day that his I-130 was

10  approved by CIS, right?

11  A.   Yes.

12  Q.   So this individual would have had no opportunity to file

13  an I-212, right?

14  A.   No, because his attorney didn't follow the CIS

15  instructions that we talked about earlier.

16         THE COURT:  What instructions were those?

17         THE WITNESS:  Sir, I alluded to the open source CIS

18  public website that has the frequently asked questions, and

19  specifically on the provisional waiver, it states not to

20  contact CIS until they have an approved I-212.

21         THE COURT:  Well, what was the meeting this alien was

22  going for?

23         THE WITNESS:  Like I stated, it was -- before he was

24  going for an I-130 interview, but now I'm not sure if it's an

25  ineffective counsel or someone that doesn't know immigration

1    law, that they could have applied for an I-130 and I-212 prior

2    to going there.  And that information is public source for

3    someone that doesn't have an attorney of record.

4            THE COURT:  I thought you said earlier -- I have to

5    decide what the law is -- that you couldn't apply for an I-212

6    unless you had an approved I-130.

7            THE WITNESS:  Yes, sir.  And that's the point I was

8    making.  When stories like this get out that people are being

9    arrested at CIS going for interviews, because as I stated

10   before in my testimony that even CIS' own instructions are so

11   convoluted, that it would dissuade people from coming out of

12   the shadows and applying for a benefit.

13           THE COURT:  In your view is it positive for people to

14   come out of the shadows and try to take advantage of the legal

15   means to be allowed to stay here with their U.S. citizen

16   spouses and children?

17           THE WITNESS:  Yes, sir.

18           THE COURT:  All right.  When I alluded to this

19   yesterday when I said the subject's attorney should never have

20   advised him to attend this meeting, I was quoting you.  I

21   wasn't expressing my view.  Go ahead.

22           MR. PRUSSIA:  Your Honor, I said I had about seven

23   questions.  I think I asked seven questions.  I'm all done.

24           THE COURT:  Is there any further cross-examination?

25           MS. LARAKERS:  No, Your Honor.

1          THE COURT:  All right.  Mr. Lyons, your testimony is
2    complete, but I don't want you to leave the courthouse.  All
3    right.  So you can step down.
4          THE WITNESS:  Thank you, sir.
5          THE COURT:  I wanted to do this as efficiently as
6    possible, and the testimony today has been helpful.  But as I
7    said yesterday, I believe I need to decide the motion to
8    dismiss.  And I intend to do that before I hear you on the
9    motion for preliminary injunction.  We have the evidence.
10         But if I dismiss the case, there's no need to hear the
11   motion for preliminary injunction.  I told you my tentative
12   view late yesterday was that I have jurisdiction and a
13   plausible claim has been granted, but until I start outlining
14   that and give you a decision, that's not a final decision.  And
15   I told you that the belated argument that there's a duty to
16   consider only somebody with an approved 212 I deem waived for
17   the purposes of the motion to dismiss, but it can still be
18   later in a case if the case isn't dismissed, say in a motion
19   for summary judgment.  And this is potentially fluid as well.
20   It might have to be considered earlier for some other purpose.
21         I heard extensive argument yesterday on the motion to
22   dismiss.  Is there anything further that counsel feel needs to
23   be said on that?
24         MS. LARAKERS:  Your Honor, I can go first since it's
25   my motion.  And I think it will help with regard to the

1    confusion about which step in the process comes first.  I've

2    been doing some research on it, and it's certainly complicated.

3    But statutorily speaking, the I-130 and I-212 can be filed

4    concurrently.

5             Now, there may be practical reasons why one wouldn't

6    do so.  Petitioners have one.  But my understanding from the

7    statutes, the regulations and the USCIS website is that the

8    I-130 and the I-212 can be filed concurrently, but in order to

9    get a 601A, both of those have to be approved.  And then

10   finally, the basis of beginning the right to seek relief at the

11   212 point is based on the Federal Register.  Sorry.  I can find

12   it.

13            THE COURT:  Are you saying right to seek relief after

14   you get a 212 or before?

15            MS. LARAKERS:  At least at the point where the 212 is

16   pending, Your Honor.  Certainly we would like to limit -- it's

17   on page of the Federal Register 50256.

18            THE COURT:  Hold on just one second, please.

19            MS. LARAKERS:  Sure.

20            THE COURT:  What document --

21            MS. LARAKERS:  This is the Federal Register.

22            THE COURT:  The 2013 reg?

23            MS. LARAKERS:  2016.  So volume 81, number 146, page

24   50256.

25            THE COURT:  50256.

1          MR. PRUSSIA:  Sorry to interrupt.  Isn't this directed
2     to the issue that is waived?
3          THE COURT:  It is, but let's listen to it.  It might
4     facilitate what you're going to be doing.  Because actually I
5     think the government just moved this back a step, which is good
6     for you.  So just see what you have to address.  Hold on a
7     second.  50256.  I've got it.
8          MS. LARAKERS:  So our position is that it would start
9     at the point the I-212 is approved based on the middle column
10    at the very top.
11         THE COURT:  That's different than what I thought you
12    just told me.
13         MS. LARAKERS:  I apologize, Your Honor.  I'm reading
14    the regulation again, and I can collect my thoughts.  It says:
15    The department believes the goals of the provisional waiver
16    process are supported by making it available to those with
17    final orders only if they have conditionally approved a form
18    I-212 application.
19         THE COURT:  Where are you reading that?
20         MS. LARAKERS:  It's at the top of the middle column.
21         THE COURT:  We must have it printed differently.
22         MS. LARAKERS:  It's on page 50256.
23         THE COURT:  I've got 50256.  It's under:  Individuals
24    Subject to Final Orders of Removal, Deportation or Exclusion.
25         MS. LARAKERS:  Yes, Your Honor, yes.

```
 1            THE COURT:  How many paragraphs under that?
 2            MS. LARAKERS:  It's the fifth paragraph, Your Honor.
 3       It's right before a very long footnote.
 4            THE COURT:  We have them printed different ways.  I
 5       found what you're talking about.
 6            MS. LARAKERS:  Right.  So even the comments themselves
 7       reference the I-212.  They don't reference the I-130.  And
 8       certainly it references an approved I-212.  And certainly I
 9       think the DHS could have made it available to those who have a
10       pending I-130, but they didn't.  They put it here at the Form
11       I-212, an approved Form I-212, Your Honor.
12            And then my last -- and Your Honor, that's the point
13       I'm going to bring up in the briefing tomorrow.  I think
14       that's --
15            THE COURT:  All right.  Well, as I said, it wasn't
16       brought up earlier.  There's urgency to deciding this, so it's
17       in my view waived for the purpose of the motion to dismiss.
18       But it's necessary to talk about it.  It has other
19       implications.
20            MS. LARAKERS:  And on that last point, Your Honor, on
21       the motion to dismiss, on page 50258.
22            THE COURT:  Sorry.  What page?
23            MS. LARAKERS:  50258, and it's under the Adjudication
24       title.  There's a 1 and then there's a 2.  Under 2, Motions to
25       Reopen, Motions to Reconsider, and Administrative Appeals.
```

1           THE COURT:  Okay.

2           MS. LARAKERS:  It's the second paragraph that starts

3    with:  DHS declines to allow.

4           THE COURT:  Right.

5           MS. LARAKERS:  So it says:  As a preliminary matter,

6    DHS disagrees that there is a legal due process interest in

7    access to or eligibility for discretionary provisional waivers

8    of inadmissibility.

9           And while the second part doesn't speak directly to --

10   eligibility is, as Your Honor said, distinct from the right to

11   seek relief -- access to, DHS speaks directly to that right to

12   seek relief.  And I think in this sentence, they're making it

13   clear that they did not intend to create that right through

14   this regulation.  And that's the part that's relevant to my

15   motion to dismiss.  And that's all I have, Your Honor.

16          THE COURT:  All right.  Well, this motion has been

17   pending since April, I think.

18          MS. LARAKERS:  I understand.  I apologize, Your Honor.

19          THE COURT:  And this is nothing new.  This is an

20   argument that could have been made.  Petitioners could have

21   addressed it.  I could have spent all last weekend studying it.

22   All right.  Not all last weekend, part of last weekend.

23          Okay.  Is there anything more the petitioners would

24   like to say?

25          MS. LAFAILLE:  Just a couple short points, Your Honor.

1    There's been some confusion about the I-130 and the I-212 and

2    the order of things.  They can be filed concurrently.  The

3    I-212 can be filed whenever.  As a practical matter, the I-212

4    is a discretionary -- the grant of an I-212 is discretionary.

5    And applicants often and their attorneys often feel that the

6    application is stronger when there's an approved I-130.

7         The passage that Ms. Larakers cites here merely

8    acknowledges that the regulation made a sequence of the I-130

9    and I-212 followed by the 601A and that they were not allowing

10   them to be filed at the same time.

11        I did want to address the -- well, briefly this

12   language.  And the relevant question isn't whether DHS took the

13   legal position that they were creating a due process interest.

14   Obviously, they take the legal position that they didn't.  The

15   relevant question is whether they did and also whether there

16   was an existing -- whether the regulation creates one but also

17   whether there was an existing one that we think our clients

18   already had because of their strong liberty interests in their

19   marriage.

20        THE COURT:  So that argument is, even if the

21   regulations do not create a liberty interest, the marriages do.

22   And that hasn't been argued.  It's sort of the corollary of the

23   substantive due process argument that I think you told me we

24   didn't have to get into for these purposes.  So it could be --

25   I mean, this is a good reason for this not to be decided

1    hurriedly.  If I deny the motion to dismiss, the case is going

2    to go on for somebody.  So the marriage creates a liberty

3    interest that generates or creates a right to procedural due

4    process.

5         MS. LAFAILLE:  Right.  And we think it does so on its

6    own, but we also think that the combination of the two, the

7    regulation that is specifically designed to further and protect

8    that very strong interest in the marriage and in family unity,

9    that that's enough to create a liberty interest.

10         THE COURT:  And what are some of the cases which you

11    would primarily rely for the marriage creating a liberty

12    interest?

13         MS. LAFAILLE:  Your Honor, they're cited in our brief.

14    The Supreme Court obviously decided on this issue in the Kerry

15    v. Din case where the three-justice plurality thought that

16    there was no liberty interest created.  The four-justice

17    dissent thought that there was.  And two justices in the

18    concurrence assumed that there was but didn't decide.

19         So I think we'd point to the cases cited in the Kerry

20    v. Din dissent as the most instructive.  And the cases in our

21    brief -- we do cite a line of cases recognizing the fundamental

22    nature of marriage.

23         I also just wanted to address one small point.  We

24    discussed arbitrary and capriciousness yesterday.  And it's our

25    position that that standard applies -- that the application of

1    that standard is not limited to decisions that are

2    discretionary but that that standard is used as a -- in other

3    words, that standard is different than an abuse of discretion

4    standard or at least that it has application beyond instances

5    of abuse of discretion.

6           THE COURT:  And what case or cases would you point me

7    to on that?

8           MS. LAFAILLE:  We have cited the Judulang case.

9           THE COURT:  What's the case?

10          MS. LAFAILLE:  Judulang, the Supreme Court's --

11          THE COURT:  How do you spell it?

12          MS. LAFAILLE:  J-u-d-u-l-a-n-g, is I think the leading

13   case on the arbitrary and capricious review in the immigration

14   context.  And I'll certainly have a look and see if there's

15   anything directly addressing this question.

16          THE COURT:  All right.  Well, I'm going to take the

17   motion to dismiss under advisement.  I'm tentatively -- I'm

18   ordering you to come back at 11:00 a.m. on Thursday, the day

19   after tomorrow.  I'm going to aim to have an oral decision for

20   you then.  If I'm not able to meet that deadline, we'll tell

21   you when to come back, that afternoon or Friday morning.

22          MS. LARAKERS:  Your Honor, just one thing.  I know she

23   touched on the substantive due process, and I don't want to get

24   into it.  I just wanted to state the cases we have.

25          THE COURT:  Go ahead.

 1          MS. LARAKERS:  Certainly we have the plurality opinion

 2     in <u>Din</u>.  <u>Silverman v. Rogers</u>, that's a First Circuit case.

 3     <u>Smith v. INS</u>, and that's a District of Massachusetts case.  And

 4     perhaps most important, <u>Aguilar v. ICE</u>.  There's a quote and I

 5     have it in my -- I have it right here.  I don't have the pin

 6     cite.  But they state that:  We've scoured case law for any

 7     authority suggesting that claims similar to those -- they're

 8     speaking about family unity claims -- are actionable under

 9     substantive due process and found none.

10          And they said that that's important because given the

11     scarcity of the guideposts for responsible decisionmaking in an

12     unchartered area, courts must be reluctant to expand the

13     concepts of substantive due process.  Of course they're saying

14     it's a liberty interest, but our view is that it falls better

15     under a substantive due process claim and not a procedural

16     claim.

17          THE COURT:  Well, now we all know a lot more, or at

18     least I do, about the difference between substantive and

19     procedural due process, making the distinctions.  I want to see

20     counsel in the lobby, and Mr. Lyons is invited, too.

21     Ms. Adducci is not excluded, but she doesn't have continuing

22     responsibilities for the office.  So I think it would be

23     valuable if Mr. Lyons at least heard this.  So we'll take a

24     short break and reassemble.  Court is in recess.

25          (Adjourned, 5:25 p.m.)

```
 1              CERTIFICATE OF OFFICIAL REPORTER

 2

 3          I, Kelly Mortellite, Registered Merit Reporter

 4   and Certified Realtime Reporter, in and for the United States

 5   District Court for the District of Massachusetts, do hereby

 6   certify that pursuant to Section 753, Title 28, United States

 7   Code that the foregoing is a true and correct transcript of the

 8   stenographically reported proceedings held in the

 9   above-entitled matter and that the transcript page format is in

10   conformance with the regulations of the Judicial Conference of

11   the United States.

12                  Dated this 24th day of August, 2018.

13

14              /s/ Kelly Mortellite

15              _____

16              Kelly Mortellite, RMR, CRR

17              Official Court Reporter

18

19

20

21

22

23

24

25
```