```
 1                  UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MASSACHUSETTS
 2
     --------------------------------
 3                                      )
     LILIAN PAHOLA CALDERON JIMENEZ,   )
 4   and LUIS GORDILLO, et al.,         )
                                        )
 5           Petitioners,               )
                                        )  Civil Action
 6   vs.                                )  No. 18-10225-MLW
                                        )
 7   KIRSTJEN M. NIELSEN, et al.,       )
                                        )
 8           Defendants-Respondents.   )
                                        )
 9   --------------------------------


10

                  BEFORE THE HONORABLE MARK L. WOLF
11                   UNITED STATES DISTRICT JUDGE

12
                             RULING
13

14                       August 23, 2018
                            2:30 p.m.
15

16

                 John J. Moakley United States Courthouse
17                        Courtroom No. 10
                         One Courthouse Way
18                   Boston, Massachusetts  02210

19

20

21                               Kelly Mortellite, RMR, CRR
                                 Official Court Reporter
22                               One Courthouse Way, Room 5200
                                 Boston, Massachusetts  02210
23                               mortellite@gmail.com

24

25
```

```
 1    APPEARANCES:

 2    Counsel on behalf of Petitioner:
      Adriana Lafaille
 3    Matthew Segal
      American Civil Liberties Union
 4    211 Congress Street
      Boston, MA 02110
 5    617-482-3170
      alafaille@aclum.org
 6    msegal@aclum.org

 7    Jonathan A. Cox
      Stephen Nicholas Provazza
 8    Kevin Prussia
      Michaela Sewall
 9    Wilmer Hale LLP
      60 State Street
10    Boston, MA 02109
      617-526-6212
11    jonathan.cox@wilmerhale.com

12    Kathleen M. Gillespie
      Attorney at Law
13    6 White Pine Lane
      Lexington, MA 02421
14    339-970-9283
      Kathleen.m.gillespie@outlook.com
15
      Counsel on behalf of Respondents:
16    Michael Sady
      United States Attorney's Office
17    Suite 9200
      1 Courthouse Way
18    John Joseph Moakley Federal Courthouse
      Boston, MA 02210
19    617-748-3271
      michael.sady@usdoj.gov
20
      Mary Larakers
21    William Weiland
      U.S. Department of Justice, Office of Immigration Litigation
22    District Court Section
      P.O. Box 868
23    Washington, DC 20044
      202-353-4419
24    mary.larakers@usdoj.gov

25
```

```
 1                    P R O C E E D I N G S
 2              (The following proceedings were held in open court
 3    before the Honorable Mark L. Wolf, United States
 4    District Judge, United States District Court, District of
 5    Massachusetts, at the John J. Moakley United States Courthouse,
 6    One Courthouse Way, Courtroom 10, Boston, Massachusetts, on
 7    August 23, 2018.)
 8              THE COURT:  Good afternoon.  Would counsel please
 9    identify thelmselves for the record.
10              MR. PRUSSIA:  Good afternoon, Your Honor.  Kevin
11    Prussia from Wilmer Hale on behalf of the petitioners.
12              MS. LAFAILLE:  Good afternoon.  Adriana Lafaille also
13    for the petitioners.
14              MR. SEGAL:  Good afternoon, Your Honor.  Matthew Segal
15    also for the petitioners.
16              MS SEWALL:  Good afternoon.  Michaela Sewall from
17    Wilmer Hale on behalf of petitioners.
18              MR. COX:  Good afternoon.  Jonathan Cox from Wilmer
19    Hale on behalf of petitioners.
20              MR. PROVAZZA:  Good afternoon.  Stephen Provazza from
21    Wilmer Hale on behalf of petitioners.
22              MS. GILLESPIE:  Good afternoon.  Kathleen Gillespie on
23    behalf of petitioners.
24              MS. LARAKERS:  Good afternoon, Your Honor.  Mary
25    Larakers on behalf of the United States.
```

1          MR. WEILAND:  Good afternoon, Your Honor.  Wil Weiland

2    on behalf of the United States.

3          MR. SADY:  Your Honor, Michael Sady on behalf of the

4    United States.

5          THE COURT:  We're here today primarily so I can give

6    you my decision on the respondents' motion to dismiss.  I'm

7    going to deliver this decision orally in part because I believe

8    there's some urgency to clarifying and communicating what the

9    applicable law is so the Department of Homeland Security can be

10   on notice of that and hopefully comply with it.

11         The transcript will be the record of the decision.  I

12   may convert the transcript into a more formal memorandum and

13   order, but I think in the particular circumstances of this

14   case, it's in the public interest to give you this decision

15   orally rather than taking what could be a long time to write

16   something more formal.

17         I'm directing the parties to order the transcript on

18   an expedited basis.  And it's going to take me a good amount of

19   time to explain the reasons for this decision, so if anybody

20   other than me needs a break, let us know, and we'll take one.

21         To alleviate any suspense, I'll tell you that the

22   motion to dismiss is being denied.  In essence, I find that

23   this court, I have habeas jurisdiction under 28 United States

24   Code section 2241 concerning petitioners' claims relating to

25   removal.  Petitioners' claims concerning detention are not

1    moot, and therefore I also have jurisdiction concerning them.

2         In addition, for the reasons I'll explain, petitioners

3    have stated a plausible claim on which relief can be granted

4    regarding removal.  They've also stated a plausible claim on

5    which relief can be granted regarding detention.  At the heart

6    of the procedural due process claims in this case are

7    regulations that give United States Citizenship and Immigration

8    Services, CIS, the discretion to permit certain aliens with

9    final orders of removal or deportation to remain in the United

10   States with their U.S. citizen spouses and often their U.S.

11   citizen children while seeking a discretionary decision by CIS

12   that, if granted, would make him or her a lawful permanent

13   resident after departing the United States briefly.

14        The key substantive issue is whether United States

15   Immigration and Customs Enforcement, ICE, can remove or deport

16   such an alien solely because the alien has a final order of

17   removal without considering the fact that the petitioner has

18   initiated the process to receive relief from that order and to

19   be allowed to become a lawful permanent resident.  The

20   threshold issue is whether this court has jurisdiction

21   concerning the claims in this case.

22        All right.  For the court security officer, anybody

23   who leaves will have to stay out while I'm delivering this

24   decision.  This is open to the public.  The media is welcome.

25   But people running back and forth are too distracting.  Okay?

1          As I said, the provisional waiver regulations are at

2     the heart of the procedural due process claims in this case.

3     Ordinarily, an alien who has been unlawfully present in the

4     United States for at least one year and then leaves the country

5     is barred from re-entering the United States for ten years.

6     And I may not mention all the statutory cites.  They're

7     familiar to counsel, and if I convert this into a formal

8     memorandum and order, I will include them.

9          But if an alien has been in the U.S. unlawfully for

10    more than 180 days but less than one year and then departs, he

11    or she is ordinarily barred from re-entering the United States

12    for three years.  However, the Secretary of Homeland Security

13    by statute has the discretion to waive these unlawful presence

14    bars if refusing to admit an alien would, quote, "result in

15    extreme hardship to the citizen spouse of such an alien," end

16    quote.

17         The authority and responsibility to make this

18    determination was delegated to CIS.  Before 2013 an alien had

19    to be outside the United States to apply for an unlawful

20    presence waiver by submitting a Form I-601.  In 2013, the

21    Department of Homeland Security, DHS, recognized that this

22    scheme caused a separation of U.S. citizen spouses and often

23    U.S. citizen children from their husbands, their wives and

24    their mothers for a year or more and that this inflicted a

25    financial, emotional and humanitarian hardship that the waiver

process is intended to avoid.  The scheme separated families
that included at least one U.S. citizen, even though promoting
family unification is an important objective of the U.S.
immigration laws.  Therefore, after acknowledging these
interests and concerns, in 2013, the Department of Homeland
Security adopted regulations to permit unlawful aliens who were
immediate relatives of U.S. citizens to apply for provisional
waivers of the unlawful presence bars to readmission while in
the United States and to leave only briefly before being
readmitted and becoming lawful permanent residents upon
re-entering the country.

In 2016 these regulations were amended and expanded to
make unlawful aliens with final orders of removal eligible for
such provisional waivers.  The Department of Homeland Security
explained in promulgating the 2016 regulation that this was
done to avoid the significant emotional and financial hardship
that Congress aimed to avoid when it authorized the waiver.

Under the 2016 regulations, an alien subject to a
final removal order and his U.S. citizen spouse may follow a
five-part process to allow the alien to apply to become a
lawful permanent resident without leaving the United States
except for a brief trip to a U.S. consulate abroad.

First, the United States citizen spouse may file a
Form I-130, Petition For Alien Relative.  CIS may require an
appearance at an interview to determine whether the U.S.

1    citizen and the alien's spouse have a bona fide marriage.

2              Second, the alien spouse may file a Form I-212,

3    Permission to Reapply For Permission to the United States After

4    Deportation Or Removal.  Consistent with the 2016 regulations,

5    aliens can file a Form I-212 and obtain conditional approval

6    prior to their departure from the United States if they will

7    become subject to inadmissibility on the ground of having

8    previously been removed or having departed with a final order

9    of removal.

10             Third, once a Form I-212 is conditionally approved, an

11   alien's spouse may apply for a provisional unlawful presence

12   using a Form I-601A, Application For Provisional Unlawful

13   Presence Waiver.

14             Fourth, once an alien obtains an unlawful presence

15   waiver, he or she must go abroad to appear for an immigrant

16   visa interview at a U.S. consulate, after which the Department

17   of State may issue an immigrant visa if no other

18   inadmissibility ground applies.

19             Fifth, the alien may travel to the United States with

20   his or her immigrant visa.  Upon admission to the United

21   States, the alien becomes a lawful permanent resident.

22             In essence, these regulations allow an otherwise

23   eligible individual who is the spouse of a U.S. citizen and who

24   lives in the United States unlawfully and with a final order of

25   removal outstanding to seek to demonstrate the bona fide nature

1    of his or her marriage, obtain the necessary waivers of

2    inadmissibility, depart the country only briefly to obtain an

3    immigrant visa, and then return to the United States to rejoin

4    his or her family as a lawful permanent resident.

5          The provisional waiver application process was

6    designed to shorten the time that a non-citizen, an alien

7    applicant, is separated from his or her family from about a

8    year or more to approximately one month.

9          The following facts are alleged concerning the

10   petitioners in this case:

11         Petitioners are aliens with final orders of removal

12   who are pursuing provisional waivers at various stages of the

13   process.  Lilian Calderon Jimenez's family brought her to the

14   United States from Guatemala in 1991 when she was three.  In

15   2002, when she was 15, the Board of Immigration Appeals, BIA,

16   ordered her to voluntarily depart.  When she did not, a final

17   order of removal automatically entered.

18         Ms. Calderon married Luis Gordillo, a U.S. citizen, in

19   2016 after living with him for ten years.  They have two U.S.

20   citizen children, ages two and four.  ICE arrested Calderon at

21   her I-130 interview on January 17, 2018.  On February 13, 2018,

22   shortly after she filed the original complaint in this case,

23   ICE released her and granted her a three-month administrative

24   stay of removal which was later extended to August 18, 2018.

25   CIS has approved her Form I-130 and her Form I-212 advance

1    waiver of the final order-based bar.  She is in the process of

2    preparing her application for an I-601A.

3          Lucimar De Souza, who immigrated from Brazil, was

4    ordered removed in 2002.  She married Sergio Francisco, a

5    United States citizen, in 2006.  They have a ten-year-old son

6    who is a United States citizen.  She was arrested immediately

7    after her I-130 interview on January 30, 2018.  De Souza has a

8    pending I-212 application to lift the final order-based bar.

9    ICE released her on May 8, 2018 after this court held that ICE

10   was detaining her in violation of its regulations and the Fifth

11   Amendment's guarantee of due process.

12         Sandro De Souza fled Brazil in 1997 after being

13   threatened by a criminal group, entered the U.S. on a tourist

14   visa, stayed here beyond the time authorized by that visa.  He

15   married a U.S. citizen, Carmen Sanchez, in April 2011.  They

16   live with their 20-year-old son.  De Souza was ordered removed

17   in September 2011.  He voluntarily reported to ICE on June 12,

18   2017 while applying for an I-130 and has been under an order of

19   supervision ever since.  That means he was released rather than

20   detained on certain conditions.

21         At his January 2018 check-in, ICE told Sanchez to

22   depart the United States by March 9, 2018.  He had an I-130

23   interview on March 1, 2018 and was not arrested.  That

24   application was approved.  Because of the progress on his

25   I-130, ICE moved his required departure date to April 24, 2018.

1    As a result of the order I issued at the outset of this case
2    that petitioners not be removed during the pendency of this
3    case, De Souza is still in the United States.
4          Oscar Rivas entered the United States in 2006 from El
5    Salvador after being beaten and shot by a gang he refused to
6    join there.  He was ordered removed in 2012 and was granted a
7    stay of removal by ICE in 2013 which has been renewed annually.
8    He married a United States citizen, Celina Rivera Rivas, in
9    2016.  They have two daughters, age five and seven.  He has
10   pending I-130 and I-212 applications but has not had an
11   interview.  At a March 1, 2018 check-in, ICE ordered him to
12   depart by May 2, 2018.  He, too, is still in the United States
13   as a result of this court's order.
14         Finally, with regard to the petitioners, Deng Gao came
15   to the United States from China in 2005 on a visa, was ordered
16   removed in 2008, married Amy Chen, and then filed an I-130 in
17   2016.  The couple has four children between the ages of a few
18   months old and 13 years old.  The couple has not had an I-130
19   interview yet but fears that Gao will be arrested when he
20   appears for one.
21         The defendant respondents in this case include the
22   Secretary of DHS, the acting director of ICE, the acting Boston
23   field office director of the Enforcement and Removal Office of
24   ICE, and the President of the United States.
25         The dispute over whether this court has jurisdiction

1    concerning petitioners' claims has been a focus of briefing and

2    hearings.  28 United States Code Section 2241 gives district

3    courts the jurisdiction to grant a writ habeas corpus to

4    individuals in custody in violation of the Constitution or laws

5    or treaties of the United States.  The government did not in

6    its briefing dispute that the petitioners are all in custody

7    for the purpose of section 2241 because of their final orders

8    of removal and, for four of the petitioners, their orders of

9    supervision requiring that they appear for removal when ordered

10   to do so.  In any event, I find that the petitioners are in

11   custody, and Chief Judge Patti Saris discussed this concept,

12   this point, in <u>Devitri</u>, 290 F.Supp.3d 86 at 90.

13        The respondents argue that three provisions of the

14   REAL ID ACT of 2005 codified at 8 United States Code section

15   1252(a)(5), (b)(9) and (g) strip this court of jurisdiction

16   over petitioners' claims regarding removal.  Section 1252(a)(5)

17   entitled "exclusive means of review," provides that "a petition

18   for review filed with an appropriate court of appeals in

19   accordance with this section shall be the sole and exclusive

20   means for judicial review," including habeas review, "of an

21   order of removal issued under any provision of this chapter."

22        Section 1252 (b)(9) entitled, "consolidation of

23   questions for judicial review," provides that:

24        Judicial review of all questions of law and fact,

25   including interpretation and application of constitutional and

1   statutory provisions, arising from any action taken or

2   proceeding brought to remove an alien from the United States

3   under this subchapter shall be available only in judicial

4   review of a final order under this section.  Except as

5   otherwise provided in this section, no court shall have

6   jurisdiction, by habeas corpus under section 2241 of Title 28

7   or any other habeas corpus provision, by section 1361 or 1651

8   of such title, or by any other provision of law, statutory or

9   nonstatutory, to review such an order or such questions of law

10  or fact.

11          Neither of these provisions applies to petitioners'

12  claims.  Despite its broad terms, subsection (b)(9), like

13  subsection (a)(5), only governs review of an order of removal

14  under section (a)(1) as stated in 8 United States Code Section

15  1252(b).  Therefore, in St. Cyr, 533 U.S. at 313, the Supreme

16  Court held that section 1252(b)(9), by its own terms, does not

17  bar habeas corpus over claims not subject to judicial review

18  under section 1252 (a)(1).  The REAL ID ACT did not change the

19  language in section 1252(b) on which St. Cyr relied.

20  Accordingly, as the First Circuit explained in Aguilar v. ICE,

21  "section 1252(b)(9) is a judicial channeling provision, not a

22  claim-barring one."  It does not apply to claims that "cannot

23  be raised efficaciously within the administrative proceedings

24  delineated by the Immigration and National Act, INA," because

25  the failure to exercise jurisdiction over such claims "would

1    foreclose them from any meaningful judicial review."  That's

2    Aguilar, 510 F.3d 1, 11.  However, if petitioners could raise

3    their claims in the immigration courts and obtain review of an

4    adverse decision of a court of appeals, this court would lack

5    jurisdiction over them, as again explained in Aguilar.

6         Petitioners claim that the Department of Homeland

7    Security's decision made by ICE to execute their removal orders

8    without considering that they have initiated the provisional

9    waiver process violates their rights to receive a decision on

10   the requested waivers before they leave the United States.

11   This claim could not "effectively be handled through available

12   administrative process."  It is too late for a petitioner to

13   file a motion to reopen removal proceedings.  There's only 90

14   days permitted to do that.

15        Respondents assert however that petitioners could

16   raise the claim on a motion to reopen their cases, "sua

17   sponte," which, if granted, would vacate their removal orders.

18   However, the immigration court could not reopen petitioners'

19   cases because, in doing so, it could not provide any relief

20   concerning their claims.  As the First Circuit explained in

21   Pandit, 824 F.3d 1, 3, "In order for a motion to reopen to

22   succeed, it must . . . establish a prima facie case for the

23   underlying relief sought."  Reopening petitioners' removal

24   proceedings would make them ineligible to apply for a

25   provisional waiver.  This is the effect of 8 C.F.R. section

1    212.7(e)(4)(iii).

2        In addition, as a result of a recent decision by the

3 Attorney General in the United States in the Matter of

4 Castro-Tum, the immigration court could not close or stay the

5 proceedings to make the petitioners eligible again.  In any

6 event, petitioners' claims would not be subject to judicial

7 review of their final orders of removal or their motion to

8 reopen them under section 1252(a)(1) in the First Circuit, a

9 concept again discussed in St. Cyr, 533 U.S. at 313.  "Judicial

10 review" of a "final order" by a court of appeals "includes all

11 matters on which the validity of the final order is

12 contingent," as the First Circuit stated in Cano-Saldarriaga,

13 729 F.3d 25, 27.  As indicated earlier, petitioners here do not

14 challenge the validity of their underlying orders of removal or

15 any decision on which they are contingent.  They only challenge

16 the Department of Homeland Security's, ICE's, decision to

17 enforce the order while they are pursuing provisional waivers.

18 In Cheng Fan Kwok, the Supreme Court held that the court of

19 appeals could not directly review the INS district director's

20 decision not to stay the execution of a removal order.  That's

21 392 U.S. 206, 213.  The court explained that the "application

22 for a stay assumed the prior existence of an order of

23 deportation," and the "petitioner did not attack the

24 deportation order itself;" instead he "sought relief

25 [consistent] with it."  Therefore, the court of appeals could

1   not review the denial of the stay, the Supreme Court held.

2   Although Cheng Fan Kwok analyzed section 1252(b)(9)'s

3   predecessor, courts of appeals have held that, like its

4   predecessor, that under section 1252(b)(9), courts of appeals

5   do "not have jurisdiction over denials of petitions to ICE for

6   a stay of removal."  The Sixth Circuit reached that conclusion

7   in Casillas, 656 F. 3d 273, 274, for example.  Therefore, the

8   court of appeals would not have a means of reviewing the claims

9   in this case, and 1252(b)(9) doesn't strip this court of

10  jurisdiction.

11       The other section on which respondents rely is

12  1252(g).  Section 1252(g) provides that "no court shall have

13  jurisdiction to hear any cause or claim by or on behalf of any

14  alien arising from the decision or action by the Secretary of

15  DHS to commence proceedings, adjudicate cases, or execute

16  removal orders against any alien."  It applies only to these

17  three discrete actions, including the decision to "execute

18  removal orders," as discussed in Reno v. American-Arab

19  Anti-Discrimination Committee, 525 U.S. 471, 382.  ICE's

20  decision not to stay petitioners' deportation is a decision

21  "directly part of the decision to execute a removal order," as

22  the Sixth Circuit wrote in Moussa, 389 F.3d 550, 554 and as

23  Judge Saris found in Devitri, 290 F.Supp.3d 86, 91.

24       However, the question is not whether the action the

25  petitioners seek to enjoin are "taken to remove an alien, but

1   whether the legal questions arise from such an action," as

2   Supreme Court discussed in Jennings, 138 Supreme Court 830,

3   841.   Petitioners argue that their claims "arise from" DHS'

4   misinterpretation of a regulation, not the decision to execute

5   their removal orders and, therefore, section 1252(g) does not

6   apply in this case.   Some courts of appeals have agreed with

7   that argument.   They have held that section 1252 does not apply

8   to "a purely legal question that does not challenge the

9   Attorney General's discretionary authority, even if the answer

10  to that legal question . . .   forms the backdrop against which

11  the Attorney General will later exercise discretionary

12  authority."   That was the conclusion in Hovsepian, 359 F.3d

13  1144, 1155, a Ninth Circuit decision, and Jama, 329 F.3d 630,

14  cases decided at a time when the immigration and naturalization

15  service was within the justice department.   Those decisions

16  emphasize that in the Reno case the Supreme Court stated that

17  "section 1252(g) was directed against a particular evil:

18  attempts to impose judicial constraints upon prosecutorial

19  discretion."   That's 525 U.S. 485 note 9.

20          Whether ICE can remove an applicant for a provisional

21  waiver based solely on an order of removal, thus "failing to

22  exercise the discretion authorized" by the provisional waiver

23  regulations, is a question of what a regulation requires, not a

24  claim that ICE has abused its discretion or has abused

25  discretion that it exercised.   This is discussed in St. Cyr,

1    533 U.S. at 307.

2          However, this court finds that section 1252(g) applies

3    to the legal question raised in petitioners' claim.  Although

4    statutes must be read, where plausible, to avoid the serious

5    constitutional questions that would arise if they stripped

6    habeas jurisdiction, as discussed in St. Cyr at 299 to 300,

7    "the canon of constitutional avoidance comes into play only

8    when, after application of ordinary textual analysis, the

9    statute is found to be susceptible of more than one

10   construction," as the Supreme Court discussed in Jennings at

11   842-43.  I find that section 1252(g) is not ambiguous.  Unlike

12   other provisions in 1252, such as section 1252(a)(2)(B)(ii) and

13   1252(a)(2)(D), it does not limit itself to "discretionary"

14   decisions or preserve jurisdiction over "constitutional claims

15   or questions of law."  "Where Congress includes particular

16   language in one section of a statute but omits it in another

17   section of the same Act, it is generally presumed that Congress

18   acts intentionally and purposely in the disparate inclusion or

19   exclusion," as the Supreme Court said in Kucana, 558 U.S. 233,

20   249.  Petitioners have not suggested alternative language that

21   Congress could have used if it wanted to make any more clear

22   that section 1252(g) covers the claims alleged here, without

23   using a broad phrase like "relating to," which would threaten

24   to bar jurisdiction over claims such as the challenges to

25   detention in the execution of an order that Congress did not

1  intend to cover, as discussed in Zadvydas, 533 U.S. at 688.

2          In addition, the Supreme Court's reference to

3  discretionary decisions in the Reno case did not say that

4  section 1252(g) applies only to discretionary decisions

5  notwithstanding plain language that includes no such

6  limitation.  Congress often passes statutes that sweep more

7  broadly than the main problem they were designed to address.

8  The terms of the statute, not the principal concerns of the

9  enacted legislators, must govern, which is what the 8th Circuit

10  said in Silva, 866 F.3d 938, 941.  Comparable conclusions were

11  reached by the Fifth Circuit in Foster, 243 F.3d 210, 213 and

12  by Judge Saris in Devitri, 290 F.Supp.3d 86, 91.  Although the

13  8th Circuit in Silva concluded that section 1252(g) contains an

14  implied exception for habeas corpus petitioners but applies to

15  claims for damages, it did not identify any basis in the text

16  for that distinction.  In addition, the Supreme Court explained

17  that section 1252(g) exists not only to protect exercises of

18  discretion from judicial review but to reduce the

19  "deconstruction, fragmentation, and hence prolongation of

20  removal proceedings," by avoiding "separate rounds of judicial

21  intervention outside the streamlined process that Congress has

22  designed."  That was explained by the court in Reno at 525 U.S.

23  at 485-87.

24          Petitioners assert ICE cannot execute their removal

25  orders and thus "eliminate the availability of provisional

1    waivers arbitrarily or on the basis of grounds unsupported by

2    the regulations' purposes and unrelated to an applicant's

3    eligibility for legalization under the process."  Although a

4    legal claim, this claim is a direct challenge to the decision

5    to execute their removal orders and seeks to enjoin removal

6    until ICE considers their pursuit of provisional waivers.

7    Therefore, I find that section 1252(g), if allowed to operate,

8    would bar jurisdiction over it.

9         However, the suspension clause of the Constitution

10   requires the court to exercise jurisdiction over petitioners'

11   claim that 8 C.F.R. section 212.7, the I-601A waiver

12   regulation, requires ICE to consider their pursuit of

13   provisional waivers before deciding to execute their removal

14   orders.  As indicated earlier, 28 U.S.C. section 2241 gives

15   district courts the jurisdiction to grant a writ of habeas

16   corpus to individuals "in custody in violation of the

17   Constitution or laws or treaties of the United States."

18   Article I, section 9, clause 2 of the Constitution provides

19   that "The Privilege of the Writ of Habeas Corpus shall not be

20   suspended, unless in Cases of Rebellion or Invasion that public

21   safety may require it."  In St. Cyr, the Supreme Court held

22   that "because of that clause, some 'judicial intervention in

23   deportation cases' is unquestionably 'required by the

24   Constitution.'"  That's 533 U.S. at 300.

25        In St. Cyr, the Supreme Court explained that the

1 habeas jurisdiction required by the Constitution extends to

2 "questions of law concerning an alien's eligibility for

3 discretionary relief," including claims, such as petitioners

4 here, that the executive branch failed to exercise the

5 discretion required by regulation.  That's St. Cyr at 300.  The

6 court explained that in Accardi v. Shaughnessy, 347 U.S. 260,

7 the Supreme Court was exercising habeas jurisdiction only

8 "insofar as it was required by the Constitution."  The court

9 held in Accardi that "a deportable alien had a right to

10 challenge the Executive's failure to exercise the discretion

11 authorized by law."  In Accardi, the Supreme Court at 347 U.S.

12 268 wrote:

13         "It is important to emphasize that the court is not

14 here reviewing and reversing the manner in which discretion was

15 exercised.  If such were the case, it would be discussing the

16 evidence in the record supporting or undermining petitioners'

17 claims to discretionary relief.  Rather, the petitioners object

18 to the Board's alleged failure to exercise its own discretion

19 contrary to existing regulations."

20         This distinction with regard to habeas jurisdiction

21 concerning a claim that an agency is refusing to consider the

22 petitioner for relief and a claim challenging the way

23 discretion was actually exercised or the result of an exercise

24 of discretion is recognized and discussed by the First Circuit

25 in habeas cases such as Saint Fort, 329 F.3d 191, 203 and

1    Goncalves, 144 F.3d 110, 125.  Therefore, as in Accardi, in

2    this case, the Constitution requires that if it is colorable,

3    some court have jurisdiction to review petitioners' claim that

4    by deporting them or removing them before considering their

5    applications for provisional waivers, the Department of

6    Homeland Security is failing to exercise the discretion

7    required by 8 C.F.R. section 212.7, even though the court, this

8    court, could not review that discretion for possible abuse if

9    it was actually exercised.

10           "Congress could, without raising any constitutional

11   questions, provide an adequate substitute for habeas corpus

12   through the courts of appeals," as the Supreme Court said in

13   St. Cyr at 314 note 38.  To do so, however, it must provide

14   petitioners a meaningful opportunity to demonstrate that ICE

15   will execute their removal orders "pursuant to the alleged

16   erroneous application or interpretation of relevant law," and

17   to seek adequate relief, here, a stay of removal under -- I'm

18   sorry -- here, a stay of removal, until DHS complies with the

19   regulation and considers their pursuit of provisional waivers.

20   That concept is in Boumedienne, 553 U.S. 723, 779-80 and also

21   discussed by Judge Saris in Devitri, 290 F.Supp.3d at 93.

22   However, as explained earlier, the administrative process with

23   direct review in the court of appeals, could not adequately

24   address petitioners' challenge to the execution of their

25   removal orders.  As in Devitri, 289 F.Supp.3d at 294, if

1      deported, petitioners would be deprived of the very relief they

2      assert the regulations entitle them to seek from DHS, in this

3      case an opportunity to remain in the United States with their

4      families until they must briefly travel abroad for their visa

5      interviews.  Therefore, if petitioners' claim is colorable,

6      this court must exercise habeas jurisdiction over it under

7      section 2241.

8              A claim is "colorable" and confers jurisdiction over

9      it under section 2241, "if it is not so insubstantial,

10     implausible, foreclosed by prior decisions of the Supreme Court

11     or the First Circuit, or otherwise completely devoid of merit

12     as not to involve a federal controversy."  That's the

13     definition provided by the Supreme Court in Steel Co., 523 U.S.

14     83, 89.  As I will explain, I find the petitioners' claim under

15     section 2241 is not only colorable, but it meets the higher

16     standard of being "plausible."  Therefore, this court has

17     jurisdiction to decide it.

18             Moving then to the merits of the motion to dismiss,

19     respondents have moved to dismiss under Federal Rule of Civil

20     Procedure 12(b)(6), alleging that petitioners have failed to

21     state a claim on which relief can be granted.  As I will

22     explain, petitioners have alleged a procedural due process

23     claim rooted in the provisional waiver regulations on which

24     relief can be granted, therefore it is not necessary to decide

25     now the viability of their other claims, including whether

family ties create a liberty interest entitling petitioners to due process or their equal protection claims with regard to removal.  I am not doing so.

The motion to dismiss standard is familiar.  A motion to dismiss should be denied if a plaintiff has shown "a plausible entitlement to relief."  That is the complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."

In deciding a motion to dismiss under Rule 12(b)(6), the court must "take all factual allegations as true and . . . draw all reasonable inferences in favor of the plaintiff," or petitioner.  The court "neither weighs the evidence nor rules on the merits because the issue is not whether plaintiffs will ultimately prevail, but whether they are entitled to offer evidence in support of their claims."

The court now finds that petitioners have stated a plausible procedural due process claim that for aliens who are pursuing provisional waivers with pending applications for an I-130 and I-212 or an I-601A, ICE may only remove them from the

1    United States after considering the fact that they are pursuing

2    provisional waivers and the reasons for the provisional waiver

3    regulations.

4            As I explained on May 8, 2018 and amplified in my June

5    11, 2018 memorandum and order in this case, the Due Process

6    Clause of the Fifth Amendment protects the "liberty" of "all

7    persons within the United States, including aliens, regardless

8    of whether their presence here is lawful, unlawful, temporary,

9    or permanent."  That's what the Supreme Court wrote in

10   Zadvydas, 533 U.S. at 678, 693.  "A liberty interest may arise

11   from the Constitution itself, by reason of guarantees implicit

12   in the word 'liberty,' or it may arrive from an expectation or

13   interest created by other laws or policies," including

14   regulations.  The Supreme Court wrote about that in Wilkinson,

15   545 U.S. 209, 221.  As the First Circuit in Goncalves, 144 F.3d

16   125, among other courts, have recognized, a regulation is for

17   the purpose of a case like this a "law."  To create a

18   constitutionally protected interest in a benefit, a regulation

19   must create a "legitimate claim of entitlement" to it, as the

20   Supreme Court said in Kentucky Department of Corrections, 490

21   U.S. 454.

22           When a regulation grants an entitlement to apply for

23   relief, "the availability of relief, or at least the

24   opportunity to seek it, is properly classified as a substantive

25   right" and a "legitimate expectation," even when the relief

1    depends on the exercise of the agency's discretion.  The First

2    Circuit said that in <u>Arevalo</u>, 344 F.3d 1, 11, 14.  For example,

3    the Immigration and Nationality Act in 8 U.S.C. section

4    1229a(C)(7), states that "an alien may file one motion to

5    reopen."  This has been held to create a right to have the BIA

6    adjudicate the motion in cases such as <u>Perez Santana</u>, 731 F.3d

7    50, 55-56, and <u>Devitri</u>, 289 F.Supp.3d at 291.  8 C.F.R. section

8    212.7 uses comparable language.  It says that "certain

9    immigrants," including immigrants who are subject to final

10   orders of removal, "may apply" for a provisional waiver.

11   That's found in section 212.7(a) and (e)(4).  The regulation

12   also states that "USCIS will adjudicate a provisional unlawful

13   waiver, a provisional unlawful presence waiver

14   application . . ."  That's in 8 C.F.R. section 212.7(e)(8).

15          Therefore, although the regulation does not require

16   CIS on behalf of DHS to grant an unlawful presence waiver, it

17   does require that the agency exercise discretion in deciding

18   whether to do so.  As the Supreme Court explained in <u>Accardi</u> at

19   page 268, "if the word 'discretion' means anything in a

20   statutory or administrative grant of power, it means that the

21   recipient must exercise his authority according to his own

22   understanding and conscience."  Therefore, courts have reviewed

23   and reversed decisions to remove an alien "the effect of which

24   are to preclude an alien from even applying for relief" he or

25   she is entitled to pursue under a statute or regulation.

1    Succar, 394 F.3d 8, 19-20, a First Circuit case explained that.

2         In Accardi the Supreme Court explained:

3         It is important to emphasize that the court is not

4    reviewing and reversing the manner in which discretion is

5    exercised.  If such were the case, it would be discussing the

6    evidence in the record supporting or undermining petitioners'

7    claims for discretionary relief.  Rather, the petitioners

8    object to the Board's alleged failure to exercise its own

9    discretion, contrary to existing valid regulations.  That's

10   Accardi at 268.  A comparable point is made in Succar, 394 F.3d

11   29 note 28.  This court may therefore decide petitioners' claim

12   on a petition for habeas corpus under section 2241, as the

13   First Circuit confirmed in Goncalves, 144 F.3d at 125.

14        This court concludes that 8 C.F.R. section 212.7

15   requires DHS, acting through ICE, to consider an eligible

16   immigrant's application for a provisional unlawful presence

17   waiver before deciding to remove him or her from the United

18   States.  The regulation entitles an eligible applicant to

19   relief that is distinct from a waiver granted while the alien

20   is outside of the United States.  As I explained earlier, DHS

21   in the 2016 explanation of the regulation, said "without the

22   ability to pursue a provisional waiver, individuals who must

23   seek a waiver of inadmissibility abroad through the Form I-601

24   waiver process after the immigrant visa interview may face

25   longer separation times from their families in the United

1    States and will experience less certainty regarding the

2    approval of a waiver of the three- to ten-year unlawful

3    presence bar before departing from the United States."  And

4    these statements are found in 81 Federal Register from about

5    50244 to 50246.

6          The explanation of the regulation explains or states

7    that the regulation was designed to avoid the "extreme,"

8    "significant emotional and financial hardship that Congress

9    aimed to avoid when it authorized the waiver."  On its website,

10   CIS also states that the provisional waiver "process was

11   developed to shorten the time that U.S. citizens and lawful

12   permanent resident family members are separated from their

13   relatives while those relatives are obtaining immigrant visas

14   to become lawful permanent residents of the United States."

15         Therefore, the provisional waiver regulation protects

16   a "prevailing purpose" of the Immigration and Nationality Act:

17   to "implement the underlying intention of our immigration laws

18   regarding the preservation of the family unit," language used

19   by the Second Circuit in Nwozuzu, F.3d 323, quoting the House

20   Report on the statute.  In the INA, "Congress felt that, in

21   many circumstances, it was more important to unite families and

22   preserve family ties than it was to enforce strictly the quota

23   limitations or even the many restrictive sections that are

24   designed to keep undesirable or harmful aliens out of the

25   country," the Supreme Court said in Errico, 385 U.S. 214, 220.

1          Accordingly, in the explanation of the 2016

2     regulation, DHS promised applicants that it would decide an

3     application for provisional waiver before the alien was

4     required to leave the United States.  In describing the

5     benefits of the 2016 regulation, DHS stated "those applying for

6     provisional waivers will receive advance notice of USCIS'

7     decision to provisionally waive their three- or ten-year

8     unlawful presence bar before they leave the United States for

9     their immigrant visa interview abroad.  This offers applicants

10    and their family members the certainty of knowing that the

11    applicants have been provisionally approved for waivers of the

12    three- and ten-year unlawful presence bars before departing

13    from the United States."  That's 81 Federal Register 50246.

14    DHS also stated that "instead of attending multiple immigrant

15    visa interviews and waiting abroad while UCIS adjudicates a

16    waiver application as required under the Form I-601 process,

17    the provisional waiver process allows individuals to file a

18    provisional waiver application while in the United States and

19    receive a notification of USCIS' decision on their provisional

20    waiver application before departing for DOS, Department of

21    State, consular processing of their immigrant visa

22    applications."  That's 81 Federal Register 50271.

23          The text of section 212.7(e) also manifests the

24    Secretary's expectation that the alien would be in the United

25    States until the application for provisional waiver is

adjudicated.  An alien is eligible if, among other things, he

or she "will depart, from the United States to obtain the

immigrant visa."  That's section (e)(2)(v).  Eligible aliens

must "provide biometrics to USCIS at a location in the United

States designated by us USCIS."  That's section (e)(3)(ii) and

(6).  And "if an alien fails to appear for a biometric services

appointment or fails to provide biometrics in the United States

as directed by USCIS, a provisional unlawful presence waiver

application will be considered abandoned and denied."  That's

section (6)(ii).  It would be impossible for somebody to attend

the biometrics appointment "in the United States" after he or

she was deported and barred from re-entering.  The regulation

also states that "a provisional unlawful presence waiver

granted under this section does not take effect unless and

until the alien who applied for and obtained the provisional

unlawful presence waiver departs from the United States," among

other things.  That's section (e)(12).

Respondents argue that the regulation does not place

constraints on ICE's discretion to execute a removal order

because it states that "a pending or approved provisional

unlawful presence waiver does not constitute a grant of lawful

immigration status or a period of stay authorized by the

Secretary," quoting section 212.7(e)(2)(i).  However, in 2013,

DHS characterized this provision as "making clear that approval

of the provisional unlawful presence waiver is discretionary,"

1  and DHS wrote "does not constitute a grant of any lawful

2  immigration status or create a period of stay authorized by the

3  Secretary for the purpose of INA section 212(a)(9)(B), 8 United

4  States Code section (a)(9)(B).  8 United States Code Section

5  (a)(9)(B) defines "unlawful presence" for the purpose of

6  determining whether and for how long an alien is inadmissible

7  for having been illegally present in the United States.

8  Section 212.7(e)(2)(i), therefore, indicates that a pending

9  application does not make an alien lawfully present, meaning

10 that if he or she remains in the United States for longer than

11 a year while the application is pending, he or she may become

12 subject to the ten-year bar for admission rather than a shorter

13 three-year bar.  It also clarifies that applicants are not

14 eligible for certain immigration benefits available to aliens

15 who are lawfully present.  Unlike the statute and regulation

16 governing stays of removal by DHS, 8 United States Code Section

17 1231(c)(2) and 8 C.F.R. section 241.6, the regulation does not

18 refer to a "stay of removal" or a "stay of deportation."

19         Nevertheless, I find that ICE may deport an alien

20 before CIS has the opportunity to adjudicate his or her

21 application for a provisional waiver if it makes an

22 individualized decision to do so based on more than the mere

23 fact that the alien is subject to a final order of removal.  In

24 its explanation of the 2013 Rule, DHS stated that it did not

25 intend the pending waiver application to prevent ICE from

1   removing all aliens applying for unlawful presence waivers.

2   That's at 78 Federal Register 555.

3        Therefore, the Department of Homeland Security

4   evidently intended that ICE be allowed in some circumstances to

5   remove aliens who are applying for provisional waivers.

6   However, a decision by ICE to remove an alien pursuing a

7   provisional waiver solely because he or she has a final order

8   of removal would, as a practical matter, eliminate that alien's

9   right to apply for a provisional waiver and CIS' opportunity to

10  decide the merits of the application before the alien must

11  depart the United States and leave his or her family.  The

12  binding promises to United States citizens and their alien

13  spouses in the provisional waiver regulations would be

14  meaningless and their purposes would be undermined if ICE was

15  not required to consider that an alien with a final order of

16  removal was seeking a provisional waiver before ordering his or

17  her removal.  There is no reason to conclude that having

18  promulgated the provisional waiver regulations in 2013 and

19  revised them in 2016 to make aliens with final orders of

20  removal eligible for such waivers the Secretary of DHS intended

21  to allow ICE to ignore those regulations and their important

22  purposes.

23        In essence, this case is analogous to Ceta, 535 F.3d

24  at 643.  In that case, the Seventh Circuit held on direct

25  review, not habeas review, that although it did not generally

1    have jurisdiction to review an immigration judge's

2    discretionary decision, such as the denial of a continuance, it

3    "retained jurisdiction . . . if that denial operates to

4    nullify some statutory right or leads inescapably to a

5    substantive adverse decision on the merits of an immigration

6    claim."  That's Ceta at 646.  The Seventh Circuit found that

7    "the immigration judge's denial -- more specifically, the BIA's

8    affirmation of that denial -- of Mr. Ceta's request for a

9    continuance amounts under the circumstances of that case to a

10   denial of his statutory right to apply for adjustment of

11   status."  It explained, at 647 to 48:

12          The BIA's ruling has the effect of a substantive

13   ruling on Mr. Ceta's application to adjust his status.  Under

14   the INA in general, an administratively final order of removal,

15   unless appealed, must be executed within a period of 90 days.

16   Moreover, once an alien has been removed, he may no longer

17   obtain adjustment of status based on marriage.  Because of the

18   denial of the continuance, therefore, Mr. Ceta's statutory

19   right to apply for adjustment of status is trapped within a

20   regulatory interstice.  Section 1555 in the amended regulation,

21   8 C.F.R. section 245.2(a)(1), afforded him an opportunity to

22   seek adjustment of status with the USCIS, but he will be

23   deported by ICE before the USCIS is able to adjudicate that

24   application.  Indeed, under the new regulatory regime, unless

25   these subagencies engage in some minimal coordination of their

1    respective proceedings -- for example, by the immigration

2    courts favorably exercising discretion, in the appropriate

3    case, to continue to proceedings to allow the other subagency

4    to act -- the statutory opportunity to seek adjustment of

5    status will prove to be a mere illusion.

6          This reasoning is equally applicable here.  Therefore,

7    the court finds that ICE may not order the removal of an alien

8    pursuing a provisional waiver solely on the basis that he or

9    she is subject to a final order of removal.  Rather, ICE must

10   consider the reasons for the provisional waiver regime and the

11   facts of the alien's particular case before deciding to order

12   removal, which would eliminate CIS' opportunity to decide the

13   merits of the request, and the right of the alien to pursue,

14   and potentially receive, the provisional waiver.  I note that

15   other courts addressing the provisional waiver process have

16   reached the same conclusion.  One such case is Villavicencio,

17   2018 Westlaw 3584704, a recent Southern District of New York

18   case, and Martinez v. Nielsen, Civil Action No. 18-10963,

19   decided earlier this year in New Jersey.  In addition, a

20   similar decision was reached in You v. Nielsen, addressing the

21   adjustment of status process.  That decision is at 2018 Westlaw

22   3677892 at page 10.  That is another 2018 Southern District of

23   New York case.

24          I find that it is plausible that if this case is

25   dismissed, ICE will deny petitioners' future requests for stays

1     of removal and execute their removal orders without determining

2     whether there is a reason, other than their final orders of

3     removal, that petitioners should be prevented from remaining in

4     the United States to pursue provisional waivers.  In their

5     amended complaint, petitioners allege with adequate specificity

6     a "pattern" of arrests at the CIS offices indicating that ICE

7     was "systematically targeting for arrests, detention and

8     removal" individuals who were applying for provisional waivers

9     or launching that process at their I-130 interviews.  This is

10    on its face plausible.

11         While I have to decide the motion to dismiss based on

12    the complaint and there are some narrow exceptions, this case

13    is now in a posture where I've been presented some evidence in

14    connection with the motion for preliminary injunction that's

15    pending particularly, and while I don't rely on it, that

16    evidence certainly reinforces the conclusion that the claim is

17    plausible.

18         I note that the respondents argued for the first time

19    at oral argument on August 20 that even if 8 C.F.R. section

20    212.7 entitles aliens seeking an unlawful presence waiver to

21    obtain an exercise of discretion concerning their applications

22    before they are deported, that entitlement only vests when they

23    receive an approved I-212 waiver of the removal order-based bar

24    and become eligible for a provisional unlawful presence waiver

25    under section 212.7(e)(3) and (4).  The respondents did not

1    present this argument in their several memoranda concerning the

2    motions to dismiss or for preliminary injunction, therefore the

3    petitioners did not have fair notice and an opportunity to

4    address it in their briefs.  The court did not have an

5    opportunity to study the issue before or to make an informed

6    study of the issue after the hearings on August 20 and 21.

7            The First Circuit has held that "issues averted to in

8    a perfunctory manner, unaccompanied by some effort at developed

9    argumentation are deemed waived."  The First Circuit said that

10   in Zannino, 895 F.2d 1, 17.  Courts in the District of

11   Massachusetts as well as elsewhere apply this rule.  Examples

12   are Kuznarowis, 2018 Westlaw 3213491, King International, 968

13   F.Supp.2d 447, 450, Coopersmith 344 F.Supp.2d 783, 790 note 5.

14   Indeed I've applied this principle in cases before me such as

15   De Giovanni, 968 F.Supp.2d 447, 450.  And in fact I mistakenly

16   referenced King earlier.  That's the De Giovanni case.

17           Therefore, respondents' argument that only petitioners

18   and putative class members with approved I-212 waivers are

19   entitled to an adjudication of their provisional waiver

20   applications is waived for the purpose of the motion to

21   dismiss.  The issue may be addressed if properly presented in

22   future motions or later stages of this case.

23           In view of the foregoing, the motion to dismiss

24   plaintiffs' procedural due process claims based on the

25   provisional waiver regulations is denied.  As this case will

1   continue in any event, it is not necessary to decide the

2   viability of petitioners' other claims regarding removal,

3   particularly whether their family ties create a liberty

4   interest entitling them to due process or their equal

5   protection claims.  As I said earlier, I'm not now doing so.

6          I will note that the January 2017 President's

7   Executive Order and then Secretary Kelly's memorandum

8   implementing it are not in my view inconsistent with the ruling

9   I just made.  The memorandum states that no category, no

10  category of aliens are totally exempt from removal.  And then

11  Secretary Kelly wrote that among I think the seven priority

12  areas are aliens with final orders of removal.  That memorandum

13  went on to say that priorities could and should be set within

14  those higher priority areas.  For example, highest priority

15  should be given to aliens with final orders of removal engaged

16  in criminal activity.

17         The memorandum also emphasized that the Executive

18  Order and the guidance by the then Secretary of DHS was not

19  intended to keep officials of DHS, particularly ICE, from

20  exercising prosecutorial discretion.  So I don't mean to

21  qualify anything I've said earlier, but the law doesn't permit

22  ICE to deport somebody, remove somebody who has a final order

23  of removal who is pursuing a provisional waiver solely because

24  there's a final order of removal, but there may be other

25  circumstances that justify removing that alien and preempting

1  CIS' opportunity to decide the merits of the matter, the

2  request for a provisional waiver.

3       And I have deliberately not articulated, at least at

4  this point, because I'm not ordering any remedy, what I think I

5  might find legitimate considerations are, and they probably

6  would be excludable for some other reason.  But if there was

7  compelling evidence that somebody who was pursuing a

8  provisional waiver and robbed a bank, I think, the criminal

9  activity could be taken into account by ICE in deciding whether

10 to wait for the provisional waiver process to be complete.

11      The remaining claims subject to the motion to dismiss

12 relate to detention.  For the reasons I explained orally on May

13 8, 2018 and in my June 11, 2018 memorandum and order,

14 plaintiffs have stated a plausible claim that respondents were

15 detaining them without due process in violation of the Fifth

16 Amendment and ICE's regulations as ICE was interpreting them.

17      The respondents now claim or assert that the detention

18 claims are moot.  I find that this contention is incorrect.

19 More specifically, petitioners allege that ICE will, if the

20 court vacates its April 13, 2018 order directing DHS to, among

21 other things, not remove them from the United States during the

22 pendency of these habeas proceedings, petitioners allege that

23 if I vacate that order, ICE will detain them for removal and

24 continue their detention in violation of 8 C.F.R. Section 241.4

25 and the Fifth Amendment due process clause.

1        As the First Circuit explained and other circuits have

2   explained, "The court need not determine the standing of all

3   plaintiffs if at least one plaintiff has standing to maintain

4   each claim" for prospective relief.  The First Circuit

5   explained that in Dubois, 102 F.3d 1273, 1282.  The D.C.

6   Circuit reached the same conclusion in Railway Labor

7   Executives' Association, 987 F.2d 806.  In this case, the

8   petitioners all seek the same relief.

9        Petitioners Calderon and Lucimar De Souza were each

10  detained when they filed their claims.  They allege colorable

11  claims that their detention was not reasonably related to

12  permissible purposes, and those claims were at least colorable

13  under Zadvydas, 533 U.S. 678, 690, and under my decision in

14  Jimenez, 2018 Westlaw 2899733.  In the particular cases before

15  me that I was deciding I found they were not just colorable,

16  they were valid.  The petitioners also allege that their

17  detention was without the procedures required under the Fifth

18  Amendment, which I addressed in the Calderon Jimenez decision

19  and are cited in I believe Mathews v. Eldridge and Morrissey v.

20  Brewer.

21       In addition, there was an actual and imminent threat

22  that ICE would continue the petitioners' detention without

23  following even its own interpretation of the post-order custody

24  review regulation, 8 C.F.R. Section 241.4, which petitioners

25  allege affords constitutionally inadequate procedures.

1    Calderon was released only after she filed this case.  Her
2    release was part of a pattern in which ICE released detainees
3    who filed petitions for writs of habeas corpus but continued to
4    detain other individuals without the process required under its
5    regulations.  In this litigation ICE has admitted that at least
6    until May 2018, it frequently kept aliens in detention in
7    violation of Section 241.4, and in May of 2018, after my May 8
8    decision, discovered it was detaining at least 30 aliens in
9    violation of the regulation as ICE then interpreted it.  As I
10   have previously noted, ICE's interpretation of section 241.4
11   may incorrectly allow it to hold certain aliens without a
12   custody review longer than the regulation permits.

13            ICE released both De Souza and Calderon.  However,
14   their claims regarding detention are not moot.  There is a
15   reasonable likelihood that ICE will violate the process they
16   allege, and the court found, it is due, by detaining them again
17   and continuing their detention without the required notice and
18   opportunity to be heard.  As the Supreme Court has stated in
19   Already, LLC, 568 U.S. 85, 89, "A defendant cannot
20   automatically moot a case simply by ending its unlawful conduct
21   once sued."  Rather, "a defendant claiming that its voluntary
22   compliance moots a case bears the formidable burden of showing
23   it is absolutely clear the allegedly wrongful behavior could
24   not reasonably be expected to recur."  Respondents maintained
25   that they may detain Calderon again to effectuate her removal.

1    They said that in the April 3, 2018 status report in this case.

2    The respondents have not disclaimed an intention to detain De

3    Souza again if this case is dismissed.

4         I have been told that the Boston ICE office has

5    undertaken efforts, including internal audit, training and

6    hiring of new staff to ensure that detainees receive notice and

7    an opportunity to be heard before being detained for more than

8    three months.  I previously have written in this case, however,

9    that there's evidence that the Boston ICE office has continued

10   to violate section 241 even after the training occurred.

11   That's reflected in my June 26, 2018 memorandum and order at

12   page 2, citing Magistrate Judge Kelly's decision in Matias v.

13   Tompkins, Civil Action No. 18-11056.

14        In addition, ICE gave De Souza a notice to depart the

15   United States on I believe August 12, 2018 despite this court's

16   order that she not be moved out of Massachusetts.  This

17   indicates that ICE staff might not be receiving or obeying the

18   instructions of superiors even while this litigation is going

19   on.  In addition, the high turnover in ICE leadership creates a

20   risk that new management will be appointed and end what I have

21   been told are the present efforts to form ICE's detention and

22   custody review practices.  For example, I adjourned these

23   proceedings in May 2018 to provide the then acting Boston

24   Office Director Thomas Brophy an opportunity to devote

25   attention to making a transition to his designated acting

1    successor, Todd Lyons, but Mr. Lyons was only allowed to serve

2    for four days before he was replaced by Rebecca Adducci.

3        So in these circumstances the respondents have not

4    shown that it is "absolutely clear" that petitioners cannot

5    "reasonably expect" ICE will not violate Constitution and

6    section 241.4 if they are detained again and thus cause them

7    irreparable harm.  The Supreme Court and courts of appeals have

8    found that a detainee's release did not moot comparable claims

9    brought by alien habeas petitioners where "absent action by the

10   court, the government could re-detain the petitioner, and deny

11   him due process, at any time."  I have in mind, for example,

12   the Ninth Circuit's decision in Diouf, 634 F.3d 1081 note 3,

13   the Supreme Court's decision in Clark, 543 U.S. 371, 376 note

14   3, and the Third Circuit's decision in Rosales-Garcia, 322 F.3d

15   386, 395.  I reach the same conclusion in this case.

16   Therefore, it is not necessary to address petitioners'

17   arguments that the issues regarding detention are "capable of

18   repetition, yet evading review," or that their claims are

19   "inherently transitory" and the request for class certification

20   preserves a live controversy even if their individual claims

21   become moot.

22       So for the foregoing reasons, the motion to dismiss is

23   hereby denied.  It's going to be necessary to update the

24   briefing on the pending motions for preliminary injunction and

25   class certification based on the testimony heard in hearings

1   this week, among other things, and I will see counsel and their

2   clients in the lobby to talk about what an appropriate schedule

3   and agenda for proceeding will be.

4           Is there anything further before we recess in the

5   public session?

6           MR. PRUSSIA:  Nothing from petitioners, Your Honor.

7           THE COURT:  Court is in recess.

8           (Recess taken 4:03 p.m.)

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3              I, Kelly Mortellite, Registered Merit Reporter

4    and Certified Realtime Reporter, in and for the United States

5    District Court for the District of Massachusetts, do hereby

6    certify that pursuant to Section 753, Title 28, United States

7    Code that the foregoing is a true and correct transcript of the

8    stenographically reported proceedings held in the

9    above-entitled matter and that the transcript page format is in

10   conformance with the regulations of the Judicial Conference of

11   the United States.

12                   Dated this 24th day of August, 2018.

13

14                   /s/ Kelly Mortellite

15                   _____

16                   Kelly Mortellite, RMR, CRR

17                   Official Court Reporter

18

19

20

21

22

23

24

25