```
 1                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF MASSACHUSETTS
 2

 3    ----------------------------------------
      LILIAN PAHOLA CALDERON JIMENEZ,         )
 4                         Petitioner,        )
                                              )   Civil Action
 5    vs.                                     )   No. 18-10225-MLW
                                              )
 6    KIRSTJEN M. NIELSEN, Secretary of       )
      Homeland Security, CHRISTOPHER CRONEN,  )
 7    Immigration and Customs Enforcement,    )
      Boston Field Office Director, YOLANDA   )
 8    SMITH, Superintendent of Suffolk County )
      Correctional Facility,                  )
 9    STEVEN W. TOMPKINS, Sheriff of          )
      Suffolk County,                         )
10                         Respondents.       )
      ----------------------------------------
11

12

                   BEFORE THE HONORABLE MARK L. WOLF
13                   UNITED STATES DISTRICT JUDGE

14                             HEARING

15                         December 6, 2018

16

                 John J. Moakley United States Courthouse
17                        Courtroom No. 10
                         One Courthouse Way
18                    Boston, Massachusetts  02210

19

20

21

22

23
                              Kelly Mortellite, RMR, CRR
24                            Official Court Reporter
                              One Courthouse Way
25                            Boston, Massachusetts  02210
                              mortellite@gmail.com
```

```
 1    APPEARANCES:

 2    Counsel on behalf of Petitioners:
      Adriana Lafaille
 3    Matthew Segal
      American Civil Liberties Union
 4    211 Congress Street
      Boston, MA 02110
 5    617-482-3170
      alafaille@aclum.org
 6
      Counsel on behalf of Petitioners:
 7    Stephen Provazza
      Jonathan Cox
 8    Colleen McCullough
      Michaela Sewall
 9    Wilmer Hale LLP
      60 State Street
10    Boston, MA 02109
      617-526-6212
11    stephen.provazza@wilmerhale.com

12    Kathleen M. Gillespie
      Attorney at Law
13    6 White Pine Lane
      Lexington, MA 02421
14    339-970-9283
      kathleen.m.gillespie@outlook.com
15
      Counsel on behalf of Respondents:
16    Eve A. Piemonte
      United States Attorney's Office
17    1 Courthouse Way
      John Joseph Moakley Federal Courthouse
18    Boston, MA 02210
      617-748-3271
19    eve.piemonte@usdoj.gov

20    Mary Larakers
      U.S. Department of Justice, Office of Immigration Litigation
21    District Court Section
      P.O. Box 868
22    Washington, DC 20044
      202-353-4419
23    mary.larakers@usdoj.gov

24

25
```

```
 1                   P R O C E E D I N G S

 2              (The following proceedings were held in open court

 3    before the Honorable Mark L. Wolf, United States

 4    District Judge, United States District Court, District of

 5    Massachusetts, at the John J. Moakley United States Courthouse,

 6    One Courthouse Way, Courtroom 10, Boston, Massachusetts, on

 7    December 6, 2018.)

 8              THE COURT:  Good morning.  Would counsel please

 9    identify themselves for the court and for the record.

10              MR. SEGAL:  Good morning, Your Honor.  Matthew Segal

11    for the petitioners.

12              MS. LAFAILLE:  Good morning, Your Honor.  Adriana

13    Lafaille also for the petitioners.

14              MR. PROVAZZA:  Good morning, Your Honor.  Stephen

15    Provazza for the petitioners.

16              MR. COX:  Good morning, Your Honor.  Jonathan Cox from

17    Wilmer Hale for the petitioners.

18              MS SEWALL:  Good morning, Your Honor.  Michaela Sewall

19    for the petitioners.

20              MS. McCULLOUGH:  Colleen McCullough for the

21    petitioners.

22              MS. GILLESPIE:  Good morning, Your Honor.  Kathleen

23    Gillespie for the petitioners.

24              MS. LARAKERS:  Good morning, Your Honor.  Mary

25    Larakers on behalf of the United States.
```

1          MS. PIEMONTE:  Good morning, Your Honor.  Eve Piemonte

2     on behalf of the United States.

3          THE COURT:  All right.  In the August 27, 2018 lobby

4     conference and in the order memorializing it, I ordered that

5     representatives of the parties with full settlement authority,

6     meaning they didn't have to consult anybody else to agree to a

7     resolution of the case, be present at each hearing.

8          Are all the petitioners present, or does somebody have

9     authority to act for them?

10          MS. LAFAILLE:  Your Honor, at the moment, a couple of

11     our petitioners are still on their way, but those who are not

12     coming, we have settlement authority for them.

13          THE COURT:  Okay.  And with regard to the respondents.

14          MS. LARAKERS:  Your Honor, Todd Lyons is here for

15     respondents.

16          THE COURT:  And he has authority to resolve matters

17     without calling or consulting anybody else?

18          MS. LARAKERS:  Yes, Your Honor.

19          THE COURT:  I directed the parties -- well, the

20     parties resolved a number of issues after I made various

21     rulings.  So encouraged by that, I directed you to confer with

22     a view to seeing whether you could agree to a resolution of the

23     case or that the case should be stayed for some period of time.

24          In the earlier reports, I understood that the

25     respondents were planning or thinking of providing a written

1    settlement proposal.  And most recently, on December 3, docket

2    number 188, I was told that the respondents would not provide a

3    proposed written settlement agreement until after a decision on

4    class certification.  It is respondents' position that this is

5    due to the fact that the decision on class certification will

6    dictate whether a formal settlement agreement must comply with

7    Federal Rule of Civil Procedure 23(e).  I know what 23(e)

8    requires, but what are the concerns or interests implicated by

9    the respondents' position?  And I ask -- well, I'll stop right

10   there.

11          MS. LARAKERS:  So Your Honor, without getting into any

12   of the specific proposals, of course, the respondents are

13   concerned while we could certify a class for the purposes of

14   settlement, I think there is a fundamental disagreement on the

15   scope of any proposed class.

16          So it's hard to say without -- any potential

17   settlement agreement would certainly -- for it to be effective,

18   there would need to be some sort of jointly certified class for

19   the purposes of settlement.  And so it would need to comply

20   with Rule 23(e), and this court would have to have a fairness

21   hearing and do all the things associated with Rule 23(e).

22          So respondents feel that it would be -- because we

23   have differing positions as to the scope of any proposed class,

24   I think it would be helpful to get those settled before we move

25   on to a formal settlement agreement.  The respondents know what

1    they're going to propose to petitioners and know the substance,

2    but it's just the scope of the class and who it would apply to,

3    Your Honor.

4         THE COURT:  Okay.  That's helpful.  So that's what has

5    become referred to as the vesting issue?

6         MS. LARAKERS:  Yes, Your Honor.

7         THE COURT:  Okay.  Because in my September 21, 2018

8    order, I stated that I wanted the vesting issue briefed, argued

9    and decided before class certification was briefed.  I did

10   later allow you to propose a schedule to brief class

11   certification before the vesting issue was decided.  You've

12   done that.  I'm prepared to hear argument and possibly decide

13   today or tomorrow whether Section 1251(f)(1) bars a class-wide

14   declaratory judgment.  I'm prepared to hear argument and

15   hopefully decide, if necessary, whether Section 1251(f)(1) bars

16   class-wide injunctive relief.

17        The issue of vesting I'm interested in hearing

18   argument on, and I'll explain this again perhaps in more detail

19   later, but I have some questions that aren't I think addressed

20   in the brief.  I decided in August and amplified the reasoning

21   in my September decision that ICE is required to consider the

22   fact that a petitioner is seeking a provisional waiver in

23   deciding whether to remove a person with a prior order of

24   removal.

25        The provisional waiver process, as it was described at

1    that time, involved getting an approved I-130, that would be a

2    finding that an alien's marriage to an American citizen is

3    genuine, and then an approved I-212, which is a waiver of the

4    unlawful presence bar, I believe.  And then a person would be

5    eligible to apply for the provisional waiver under 601A.  But

6    that was all sort of generally considered the provisional

7    waiver process.

8         And the government raised at the last hearing, the

9    hearing in August, the issue of vesting.  At what point in that

10   process does it vest.  And that's the way this has been

11   briefed, but I might -- in preparing to hearing the argument,

12   it occurred to me that it's possible that under, say, Kentucky

13   v. Department of Corrections, the right to apply for a 601A

14   provisional waiver vests only after there's an approved I-212.

15   But there may be a separate right to apply for an I-130 and a

16   separate right to apply for an I-212 that could be -- if

17   Kentucky v. Department of Corrections, you know, is the right

18   standard.  And I don't know if it's ever been applied outside

19   of the prison context.  And then I started looking at the

20   statutes that are a little impenetrable if you're not expert on

21   the immigration law.

22        So I'm going to -- I don't know how far we're going to

23   get on all of this today and what the most efficient way to

24   proceed will be.  I directed you to keep today and tomorrow

25   open.  But since there are so many lawyers, particularly on the

1  petitioner's side, maybe some who aren't arguing can begin

2  thinking about those questions.

3      It's the petitioners' argument that if aliens married

4  to U.S. citizens can be removed before they have an approved

5  I-212, the whole 601A provisional waiver process could be

6  effectively abrogated, but it's framed more as a policy

7  argument I think as to -- it would be -- reach the conclusion

8  that the respondents are advocating.

9      So the questions I just articulated occurred to me,

10  and I may need answers to them before I'll feel I have all the

11  information I need to decide the vesting question.  It doesn't

12  mean we won't have argument on it.  It's possible that you know

13  the answers and can tell me.

14      But anyway.  Essentially the questions I'm meaning to

15  communicate to you are does the petitioner have a right to

16  apply for an I-130 and what statutes or regulations create that

17  right.  Does the petitioner have a right to apply for an I-212

18  waiver and what statutes or regulations create that right.  And

19  then the third question would be what is required to give a

20  petitioner a right to apply for a 601A provisional waiver.

21      So basically, on my agenda for today are the issue of

22  whether Section 1251(f)(1) bars class-wide declaratory relief,

23  whether, if it has to be decided -- and it may not -- whether

24  that provision bars class-wide injunctive relief and at least

25  beginning on vesting.

```
 1              Is there anything else that -- and until I decide the
 2    vesting issue, I don't believe I -- I can't decide the class
 3    certification issue.  And I don't know if it would make sense
 4    to hear argument on it.  It might or might not.
 5              But anyway, on the agenda today are the 1251(f)(1)
 6    issues and the vesting.  Is there anything else that you think
 7    ought to be on the agenda for today?
 8              MR. PROVAZZA:  Your Honor, I would just like to point
 9    out I think the vesting issue is the key issue for class
10    certification.
11              THE COURT:  Yeah, that's what I pointed out.  That's
12    why I thought you would -- I'm sorry.  Go ahead.
13              MR. PROVAZZA:  I think it would be most effective to
14    decide that in the context of class certification.  It's an
15    issue that would determine the scope of the class.
16              THE COURT:  Yeah.  I'll listen to that, but I don't --
17    it does determine the scope of the class, but I haven't studied
18    the class certification briefing.  You can make the arguments
19    with regard to vesting that you want to make, but it wasn't my
20    original intention; and once I decide, you know, when the right
21    vests, there can be focused argument and maybe more focused
22    briefing on the implications of that for 23(b)(2).
23              MS. LARAKERS:  Your Honor, respondents think that it
24    would be -- it would make the other class cert arguments much
25    more straightforward and easier to tackle and to --
```

```
 1            THE COURT:  Once you -- if you know when the vesting
 2   occurs.
 3            MS. LARAKERS:  Precisely, Your Honor.
 4            THE COURT:  That's been my view.  We'll see.  All
 5   right.  Now, the first question is whether Section 1251(f)(1)
 6   bars class-wide declaratory judgment relief.  And in their
 7   reply brief, docket 184 filed on November 15, page 3, note 2,
 8   the petitioners state that if there is a declaratory
 9   judgment -- well, they state that if there's a declaratory
10   judgment, it would provide a basis for future injunctive
11   relief.
12            And it's not perfectly clear to me whether they're
13   talking about a basis for individual injunctive relief or
14   class-wide relief, but if I find that a class-wide declaratory
15   judgment is permissible, is it necessary to decide now whether
16   a class-wide injunctive relief is permissible?  I don't think
17   that it would affect the definition of the class.  And I wonder
18   if the issue of class-wide injunctive relief can be reserved
19   for later when the law may get clarified through all of this
20   litigation that's going on around the country.
21            I note that Judge Saris in Reid did not decide if
22   class-wide injunctive relief is barred by the statute.  And I'm
23   just trying to think practically, although I am going to hear
24   argument on this, and I may decide it anyway.  But what's the
25   petitioners' position on this?
```

1          MR. PROVAZZA:  Your Honor, our position is that as

2     long as there's some form of potential class-wide relief,

3     specifically if it's possible that there's declaratory relief,

4     you don't need to decide the issue today whether class-wide

5     injunctive relief is available.  As long as there's some form

6     of potential relief, a class can proceed and be certified.

7          THE COURT:  All right.

8          MS. LARAKERS:  I would agree, Your Honor, but only to

9     the extent that their declaratory relief is the same as their

10    injunctive relief.  So as long as they match specifically with

11    regard to each form of relief they're asking for, I guess, then

12    we would agree.

13         THE COURT:  I think -- okay.  Okay.  That's what I

14    thought the footnote was intended to signal.  But again, it

15    brings things into sharper focus.

16         All right.  Then I'll tell you that it is my tentative

17    view that essentially for the reasons stated by Judge Saris in

18    the Reid case, Section 1251(f)(1) does not bar class-wide

19    declaratory relief.  And for the reasons explained by the Third

20    Circuit in Alli v. Decker, 650 F. 3d 1007 at 1014-16, this is

21    not an absurd result.

22         And I note that in the November 13, 2018 decision by

23    the Ninth Circuit in Jennings, the Ninth Circuit reached the

24    result, as I read it, that Section 1251(f)(1) does not bar

25    class-wide declaratory relief, remanded to the District Court

1   whether class-wide injunctive relief is barred.

2        Since my tentative view favors the petitioners, does

3   it make sense for me to hear from the respondents first and

4   have the petitioners respond?

5        MR. PROVAZZA:  That works for us, Your Honor.

6        THE COURT:  All right.  Ms. Larakers.

7        MS. LARAKERS:  Your Honor, would you like to hear

8   argument about whether 1252(f)(1) precludes injunctive relief,

9   too, or --

10       THE COURT:  No.  Just declaratory relief for now.

11       MS. LARAKERS:  Your Honor, the government's position

12  is that it also -- that 1252(f)(1) also precludes corresponding

13  declaratory relief in the context of Rule 23(b)(2) classes.  So

14  in the context of other classes, 23(b)(3) or 23(b)(1), it may

15  not be the same argument.  But specifically with Rule 23(b)(2)

16  classes, because the declaratory is the equivalent of

17  injunctive relief, 1252(f)(1) precludes it.  And Your Honor,

18  even though it's your tentative view that it would not create

19  an absurd result in the context of a 23(b)(2) class, the

20  government's position is that it would.

21       The reason for that is summed up well in the assent in

22  Alli v. Decker, but essentially, Your Honor, the reason why

23  it's not an individual request for relief and why the

24  corresponding declaratory relief is precluded by 1252(f)(1) is

25  because a class member would only need to show that they're a

1    member of the class in order to gain the injunctive relief.

2    They would not have to individually show that they are entitled

3    to relief.  So much like it would not look like an individual

4    habeas petition or individual case before this court --

5              THE COURT:  Here.  Let me -- actually, keep going.

6              MS. LARAKERS:  So because a class member would only

7    have to show they're a member of the class but not individually

8    establish that they meet the requisites for the relief sought,

9    that is why it's essentially an injunction and why it would

10   cause an absurd result to say that 1251(f)(1) doesn't equally

11   apply to only corresponding declaratory relief.

12             THE COURT:  But the relief, let's make sure we have a

13   common sense of what the relief sought is.  So in my August and

14   September decisions I said that the individual petitioners had

15   a right to have ICE consider that they were pursuing

16   provisional waivers in deciding whether to remove them before

17   this process was complete.  I didn't hold that ICE couldn't

18   remove them.  It was just one factor to be considered.

19             The relief sought, I think, by an individual would

20   be -- they would allege that ICE is not considering or

21   considering in good faith, perhaps, the fact that I'm pursuing

22   this process where my spouse has applied for this relief.  It

23   wouldn't -- it would still be up to ICE to decide on an

24   individual basis whether the person should be allowed to stay

25   in the United States or be removed.

1           Do you agree with that in terms of the definition of

2    relief sought?

3           MS. LARAKERS:  Yes, as you define the relief.  I don't

4    know if petitioners agree with the scope of relief.  I don't

5    know if that's what they're seeking; but yes, Your Honor,

6    essentially.

7           THE COURT:  Okay.  Go ahead.

8           MS. LARAKERS:  So it doesn't matter what relief is

9    sought, Your Honor.  So it would work like this:  If Your Honor

10   were to issue a class-wide declaratory relief, a person, in

11   order to gain an injunction from that declaratory relief, would

12   only need to come to this court and show that they are a class

13   member, not that they are individually entitled to a due

14   process right, not that they are individually entitled to a

15   substantive due process right, not that equal protection has

16   been violated, but only that they are a class member.  And I

17   think that's what Congress's main aim was in Section

18   1252(f)(1), is to make sure if a right is declared, it's only

19   as to an individual, and that individual should have to prove

20   the merits of their due process claim on an individual basis.

21          THE COURT:  Why?  It's a common question.  The

22   language of -- I'll help you by being more transparent.  Rule

23   Rule 23(b)(2) provides for the issuance of -- 23(b)(2) applies

24   if the party opposing the class, respondents here, has acted or

25   refused to act on grounds that apply generally to the class so

1    that final injunctive relief or corresponding declaratory

2    relief is appropriate respecting the class as a whole.

3           So if the petitioners prevail and I ordered only

4    declaratory relief, I would saying that for everybody in this

5    class, defined later, ICE Boston has to consider they're

6    pursuing -- they're at some stage, particular stage of the

7    provisional waiver process.

8           But why should -- the word "or" suggests that they're

9    two different things, the declaratory relief and injunctive

10   relief.  So that's one point.  The Supreme Court in <u>Steffel</u>

11   said that declaratory relief is a milder form of relief than

12   injunctive relief.  I expect Mr. Lyons would agree with that.

13          Can I ask him a question or two?  I think it will

14   bring it into sharp focus.  Mr. Lyons, come on up here.

15          This may help.  Let me tell you, if I were to issue a

16   declaratory judgment -- you can stand up.  If I were to issue a

17   declaratory judgment, I would in effect be telling you what

18   your legal obligations are, but I wouldn't be ordering you to

19   do anything.  I would be expecting that you would follow the

20   law as I described it unless some higher court says it was

21   wrong.

22          MR. LYONS:  Correct, sir.

23          THE COURT:  If I issue -- and then if one or more of

24   the petitioners thought you weren't following the law, they

25   would come back to court, and they could move for an

1    injunction.  And if there was any ambiguity in what you were

2    required to do, it could get clarified.  And if I thought that

3    you were going to -- that you were violating the law as I

4    described it and that you were going to continue to violate it,

5    I would issue an injunction.  And then if you continued to

6    violate it, you could be held in contempt and locked up --

7              MR. LYONS:  Yes, sir.

8              THE COURT:  -- either until you start obeying the law,

9    and also punished if you intentionally violated it.  So that's

10   one option.  Declaratory judgment, but there's no threat that

11   you could get locked up immediately, essentially, without

12   further litigation, much further litigation.

13             If I issue an injunction, that's enforceable.  If a

14   petitioner were to come back and say, In my case ICE,

15   personified by Mr. Lyons, didn't follow the law as you

16   described it, Judge Wolf, then you could be locked for that

17   violation without that longer process.

18             MR. LYONS:  Yes, sir.

19             THE COURT:  Would you have a preference as to whether

20   I issue a declaratory judgment or an injunction right away?

21             MR. LYONS:  Of course the path of least resistance is

22   the best, so declaratory.

23             THE COURT:  Okay.  They're not the same thing.  You

24   can take your seat.

25             MR. LYONS:  Yes, sir.

1          THE COURT:  And this is not an academic issue.  If you

2    look at my decision, which the Supreme Court eventually agreed

3    nine to nothing, St. Patrick's Day Parade case, <u>South Boston</u>

4    <u>Allied War Veterans Council</u>, 875 F. Supp. 891 at 920.

5          With regard to the St. Patrick's Day Parade of 1995, I

6    was asked to issue a declaratory judgment that the organizers

7    of the parade could exclude gays and lesbians at the time and

8    an injunction ordering the city essentially to give them a

9    permit and let them do that.

10         And I issued the declaratory judgement, but I didn't

11   issue the injunction even though the plaintiffs had prevailed

12   on the merits because of considerations of comity essentially.

13   I found that, I expected correctly that the city would obey the

14   law and that a Federal Court didn't need to and therefore

15   shouldn't issue this order to the mayor.

16         So, you know, this happens.  If I thought that ICE

17   wasn't going to obey the law, then I would issue an injunction.

18   In 2002 in a transsexual prisoner case, I didn't issue a

19   declaratory judgment, but it was that practical effect.  I

20   found they were being deliberately indifferent but the wrong

21   person was making the decision, so I didn't issue any

22   injunction relating to the hormones.  And then in 2012 it came

23   to another issue.  I found that they would continue to violate

24   the law, so I issued an injunction.

25         I think Mr. Lyons, essentially, shows that the Supreme

1    Court was right in Steffel, that real people discern the

2    difference between declaratory judgment and an injunction.

3         MS. LARAKERS:  Your Honor, and the government agrees

4    there is a difference between declaratory and injunctive

5    relief.  In a 23(b)(2) class, when the declaratory relief can

6    only be corresponding declaratory relief, and with 1252(f)(1)'s

7    clear limit on injunctive relief, when you put those two things

8    together, it's the government's position that it precludes the

9    corresponding declaratory relief in this case.

10        THE COURT:  So was Reid a 23(b)(2) class?

11        MS. LARAKERS:  Yes, I believe so, Your Honor.

12        THE COURT:  And Alli v. Decker.

13        MS. LARAKERS:  Yes, Your Honor, I believe so.

14        THE COURT:  Hold on a second.  I'm not finding this

15   immediately in Alli.  Maybe the petitioners can look -- Reid is

16   23(b)(2).  Go ahead.

17        MS. LARAKERS:  So Your Honor, the advisory committee

18   notes when it was talking about the corresponding declaratory

19   relief and what that is in the context of a Rule 23(b)(2)

20   class, it said it would be the equivalent of an injunction.

21        THE COURT:  Something can be equivalent but not the

22   same as.

23        MS. LARAKERS:  Well, yes, Your Honor.  The point --

24   the whole point of 1252(f)(1) is to ensure that individuals

25   have to prove the merits of their own cases.  And I think by

1    using the word --

2              THE COURT:  Then what's the value of a class action?

3              MS. LARAKERS:  Your Honor, in the immigration context,

4    I think Congress is making it clear that it didn't want any

5    class actions in the immigration context that would enjoin or

6    restrain the sections that are relevant here.

7              THE COURT:  I think the petitioners point out there's

8    another section, I believe the next section or the previous

9    section, that barred injunctive and declaratory relief

10   expressly.  Is that right?

11             MS. LARAKERS:  Yes, Your Honor.  However, our argument

12   is very limited here.  It's only because the relief here is

13   corresponding declaratory relief and that the advisory

14   committee notes make it very clear that that corresponding

15   declaratory relief is unlike other relief.  It is the

16   equivalent of the injunction.  It should function as an

17   injunction if a class member comes to court.

18             THE COURT:  It's not the equivalent of an injunction

19   in the sense that if Mr. Lyons violates it, he's at risk of

20   getting promptly locked up.

21             MS. LARAKERS:  Yes.

22             THE COURT:  And it provides your client a chance to

23   reflect on what he's going to do in the future and perhaps

24   avoid getting detained in some of these facilities that

25   petitioners were unlawfully detained in for a long time.

1          MS. LARAKERS:  Yes, Your Honor.  However, it is the

2    equivalent injunction in the sense that a person would only

3    have to show that they're a member of the class and would not

4    have to prove their individual case in front of this court.

5          THE COURT:  No.  Actually, that's not right.  To get

6    an injunction, they would have to prove that the violation of

7    law was likely to continue.  I mean, this is actually -- it's

8    not academic.  It's not academic to Mr. Lyons.

9          The -- hold on one second.  In Farmer v. Brennan, the

10   Supreme Court addressed what the standards are for injunctive

11   relief, that this was in the Eighth Amendment context.  First

12   you have to prove a substantive violation, so a violation of

13   the Eighth Amendment, deliberate indifference to the serious

14   medical need.

15         And then the Supreme Court wrote, "To establish

16   eligibility for an injunction, the inmate must demonstrate the

17   continuance of that disregard during the remainder of the

18   litigation and into the future."  So it wouldn't be enough with

19   me or properly I think before any federal judge to get an

20   injunction against the United States in effect by just showing

21   that there's been a past violation of a legal obligation.

22   There has to be a demonstration that's likely to continue in

23   the future.  And that's what I was getting at in questioning

24   Mr. Lyons.  So it's not all they would have to do.  And you

25   might very well come in and say, We're not going to do it any

1    more.  Then there would be no injunction, if I was persuaded.

2         MS. LARAKERS:  Yes, Your Honor.  I think the point

3    that I'm trying to make is that the individual would not have

4    to come before this court and say that -- and start all over

5    again and say, I have a due process right because I have this

6    application pending, et cetera.  And that is what the

7    government believes Congress was trying to prevent in

8    1252(f)(1).

9         And again, our argument is just limited to the

10   corresponding declaratory relief in (b)(2) because (b)(2)

11   corresponding declaratory relief means the equivalent of an

12   injunction.

13        THE COURT:  So is that argument that (b)(2) can never

14   be invoked against the government?

15        MS. LARAKERS:  Your Honor, in the immigration context,

16   I believe that would be --

17        THE COURT:  Why?  Okay.

18        MS. LARAKERS:  Because 1252(f)(1) only applies to

19   enjoining 1231.  And perhaps, Your Honor, Congress felt that --

20   perhaps it knew, and I don't have support for it, but perhaps

21   it knew that it would be -- that any injunction enjoining any

22   of these sections would be based on constitutional grounds.

23        THE COURT:  What's that?

24        MS. LARAKERS:  That any injunction would be based on

25   constitutional grounds.

```
1            THE COURT:  I'm sorry.  Here, take a step back.  We're
2      talking shorthand, and I want to make sure I understand you.
3      What are the implications of whether or not it's a
4      constitutional ground?  Or why are you making that argument?
5            MS. LARAKERS:  Your Honor, an individual who comes to
6      this court, and it's the government -- as you can see, it's the
7      government's position in the rest of the brief, due process is
8      an individualized fact-specific analysis.  And it's the
9      government's motion that, especially in the immigration
10     context, a person should have to come before the court, present
11     all the facts available in their case in order to show they
12     have a due process right.
13           THE COURT:  Not to show that they have a right.  I
14     think to show that the right is violated.  Why have hundreds or
15     more cases where the judge keeps making the same finding; that
16     you have to consider that the person is pursuing the
17     provisional waiver process, to use the lexicon I've used so
18     far, and then the person would come in and say that it's not
19     being done in my case.  There would be no possibility of an
20     injunction unless there was proof based on the individual case
21     that consideration was not being given to the fact that that
22     person might get a provisional waiver.
23           MS. LARAKERS:  Your Honor, I think it's in the second
24     step of that analysis.  First, whether a person has the due
25     process right; but second, what procedures are due.  Your Honor
```

1    defines that as consideration.  However, I think petitioners

2    define it a little bit more broadly and ask for a little bit

3    more relief.  And certainly an alien should be allowed to bring

4    that case and request specific relief that is specific to their

5    case.

6              THE COURT:  I don't think you'd enjoy living here all

7    winter --

8              MS. LARAKERS:  No, Your Honor.

9              THE COURT:  -- two dozen times.  It's a lot colder

10   here than it is in Texas or Washington.

11             MS. LARAKERS:  Your Honor, I think the government's

12   position is just based on the statute.  And in our view,

13   corresponding declaratory relief is the same thing as an

14   injunction here.  Practically speaking, it would cause the

15   absurd result in Alli v. Decker and that is the sum of our

16   argument.  I don't have anything else, Your Honor, unless you

17   have any further questions.

18             THE COURT:  Okay.  What would the petitioners like to

19   say?

20             MR. PROVAZZA:  Your Honor, the government is asking

21   you to do something that no court has ever done before.

22   They're asking you to rule that Section 1252(f)(1) applies to

23   declaratory relief.  There's no basis in the statutory text for

24   that interpretation, and that would require you to ignore

25   on-point cases in the First Circuit.

1            THE COURT:  Which ones?

2            MR. PROVAZZA:  The plain text --

3            THE COURT:  Which on-point cases?

4            MR. PROVAZZA:  Judge Saris' Reid decision and also the

5     First Circuit in Arevalo v. Ashcroft interpreted Section

6     1252(f)(1).  They looked at the language "enjoin" and

7     "restrain," and they ruled that "enjoin" means a permanent

8     injunction and "restrain" means a temporary injunction.  And

9     they didn't read it that that referred to declaratory relief.

10           Just to a couple of Ms. Larakers' arguments.  When

11    Congress passed Section 1252(f)(1), they knew how Rule 23

12    worked and how 23(b)(2) had two different types of remedies.

13    There could be an injunction.  There could be a corresponding

14    declaratory relief.  They focused the language on injunctive

15    relief.

16           And practically, if a class member -- if there's

17    declaratory relief and a class member wants to challenge that

18    the government has violated that declaration, they wouldn't

19    just show up in court and say, I'm a member of the class.  They

20    would have to come and show that the declaratory relief was

21    violated and that some sort of injunction would be proper.

22    It's not just automatic when they show up.

23           And Your Honor, the Supreme Court in Jennings v.

24    Rodriguez addressed Section 1252(f)(1).  They didn't rule that

25    it prohibited any sort of class certification.  They didn't

1    rule that it prohibited declaratory relief.  What they did is

2    they remanded the petitioners' claims in that case to the Ninth

3    Circuit to consider two questions:  one, whether Section 1252

4    (f)(1) would apply to the remaining constitutional claims; and

5    two, if they did apply, whether a declaratory relief was

6    available to sustain the class.  The Supreme Court was assuming

7    that there would be declaratory relief available, that

8    1252(f)(1) wouldn't apply to declaratory relief.

9              THE COURT:  Say that again, please.

10             MR. PROVAZZA:  All right.  So when the Supreme Court

11   remanded the case, they gave two instructions to the Ninth

12   Circuit:  one, to look at whether Section 1252(f)(1) would

13   apply to the class's constitutional claims; and two, if Section

14   1252(f)(1) prohibited a class-wide injunction, whether there

15   was corresponding declaratory relief available.  So the Supreme

16   Court was actually assuming that Section 1252(f)(1) wouldn't

17   apply to declaratory relief.

18             THE COURT:  Let me see if I understand it.  That's

19   because they remanded to determine whether if declaratory

20   relief -- if the Court of Appeals concludes that it may issue

21   only declaratory relief, then the Court of Appeals should

22   decide whether that remedy can sustain the class on its own.

23             MR. PROVAZZA:  Correct, Your Honor.

24             THE COURT:  I don't know if -- I've got Jennings up.

25   I don't know if this is logically where this most fits, and

```
 1    both sides can address this.  The Supreme Court wrote, "Section
 2    1251(f)(1) thus prohibits federal courts from granting
 3    class-wide injunctive relief against the operation of Sections
 4    1221-32.  The Court of Appeals held that this provision did not
 5    affect its jurisdiction over respondent's statutory claims
 6    because those claims did not seek to enjoin the operation of
 7    the immigration detention statutes but to enjoin conduct not
 8    authorized by the statutes.  This reasoning does not seem to
 9    apply to an order granting relief on constitutional grounds."
10         Why wouldn't it apply to an order granting relief on
11    constitutional grounds?
12         MR. PROVAZZA:  So in the context --
13         THE COURT:  What do you think that was intended to
14    communicate?
15         MR. PROVAZZA:  So in the context of Jennings v.
16    Rodriguez, the Supreme Court looked at the Ninth Circuit
17    statutory interpretation of some detention provisions, and they
18    found the canon of constitutional avoidance couldn't apply
19    there.
20         THE COURT:  Could not apply?
21         MR. PROVAZZA:  Did not apply.  So when they remanded
22    the case to consider the constitutional claims, they were
23    anticipating that maybe the lower court would say that Section
24    1222 -- 1226 was unconstitutional because it didn't have a
25    six-month -- it didn't have an individualized determination or
```

```
 1    any provision for bond hearings, so that Section 1226 could
 2    never be applied constitutionally.  So it was focused on
 3    whether, you know, injunctive relief at the lower court level
 4    would prohibit the government from ever using that provision of
 5    the INA to detain someone.
 6              THE COURT:  It wouldn't apply to constitutional
 7    claims -- I'm sorry.  Say that again.
 8              MR. PROVAZZA:  Your Honor, I believe the Supreme Court
 9    was anticipating that if the case went back down to the
10    District Court and the District Court said 1226 is
11    unconstitutional because it doesn't provide for bond hearings,
12    that would -- if the District Court then issued an injunction
13    saying 1222 -- sorry, I keep mispronouncing it -- 1226 is
14    unconstitutional in any application and enjoined the government
15    from using it for any application, that would implicate
16    1252(f)(1).
17              THE COURT:  All right.  Because it would be enjoining
18    the operation of the statute, not a violation of the statute.
19              MR. PROVAZZA:  Correct, it would be an injunction of
20    any operation of that statute.
21              MS. LARAKERS:  Your Honor, I think that part of the
22    argument fits more in with whether 1252(f)(1) precludes
23    injunctive relief.  And I think what the Supreme Court was
24    saying is that saying that -- saying that the statute allows
25    one thing but does not allow the violation of it, it's just
```

1      another way to construe a constitutional argument.

2           The government doesn't argue 1252(f)(1) in purely

3      statutory interpretation cases.  When the government believes

4      that the case is purely about whether the express terms of the

5      statute are being violated, we don't argue 1252(f)(1).  We only

6      argue 1252(f)(1) when it's on -- when they're trying to enjoin

7      or restrain the operation of 1231 on constitutional grounds.

8           So the Supreme Court was making it clear that this

9      whole -- they're not trying to enjoin the statute.  They're

10     trying to enjoin violations of the statute, that that was just

11     a legal sleight of hand.  And so that sort of argument which I

12     believe encompasses the petitioners' argument here does not

13     work in the constitutional context.

14          THE COURT:  All right.  It does fit better later.  I

15     had the case out.  Is there more you'd like to say?

16          MR. PROVAZZA:  Your Honor, I would like to point out

17     just two things.  In Rodriguez, the court was dealing with a

18     statutory limitation.  The class was seeking to limit the

19     application of 1226 by reading something into the statute.  So

20     to say it never applied to statutory claims --

21          THE COURT:  Here.  We'll come back to Jennings when we

22     address whether there can be class-wide -- whether 1251(f)(1)

23     bars injunctive relief in the context of this case.  But is

24     there more you'd like to say on the issue of whether it bars

25     class-wide declaratory relief?

1          MR. PROVAZZA:  No, Your Honor.

2          THE COURT:  Well, at some point I'll organize my

3    thinking and explain this more fully.  Essentially for the

4    reasons stated by Judge Saris in Reid and the Third Circuit in

5    Alli v. Decker, I find that Section 1251(f)(1) does not bar

6    class-wide declaratory relief.  There's a distinction, a

7    significant distinction between an injunction and a declaratory

8    judgment.  As the Supreme Court explained in Steffel,

9    declaratory judgment is not -- is a milder remedy.  It's not,

10   for example, enforceable by contempt.  That makes a real

11   difference.

12          And I think perhaps the value I can add to Judge

13   Saris' very thoughtful thorough discussion in the Third Circuit

14   is that a declaratory judgment does not automatically lead to

15   an injunction.  To get an injunction, a class member -- well, a

16   petitioner would have to show not only the law as articulated

17   in the declaratory judgment was violated but that, as the

18   Supreme Court wrote in Farmer v. Brennen, 511 U.S. 8, 45-47,

19   "To establish eligibility for an injunction, the inmate must

20   demonstrate the continuance of the violation during the

21   remainder of the litigation and into the future."  So I think

22   that's a very important distinction and one that could be

23   outcome-determinative in a particular case.

24          All right.  Then this following issue I may not

25   decide.  Is the petitioner -- as the petitioners stated, it

```
 1    won't affect the scope of any class.  Judge Saris didn't decide
 2    it in Reid.  Section 1251(f)(1) states, "Regardless of the
 3    nature of the action or claim or the identity of the party or
 4    parties bringing the action, no court other than the Supreme
 5    Court shall have jurisdiction or authority to enjoin or
 6    restrain the operation of the provisions of part 4 of this
 7    subchapter as amended by a particular act other than with
 8    respect to application of such provisions to an alien against
 9    whom proceedings under such part have been initiated."
10         So the issue is whether the injunctive relief being
11    sought here would enjoin or restrain the operation of the
12    relevant provisions.  The Ninth Circuit has previously held
13    that it wouldn't.  There's a distinction between enjoining the
14    operation of a statute generally and the violation of a statute
15    in particular cases.  But why don't I hear from the petitioners
16    first I think on this and then the government.
17         MR. PROVAZZA:  Your Honor, Section 1252(f)(1) doesn't
18    preclude injunctive relief unless it enjoins or restrains a
19    part of the INA.  That's not the type of injunctive relief that
20    petitioners are seeking here.  They're simply seeking an
21    injunction that would require the government to follow the law,
22    to follow the provisional waiver process and not engage in
23    conduct that would nullify it.
24         Respondents still haven't identified which portion of
25    INA would be enjoined or restrained by requirement -- by the
```

1    injunctive relief.  They cite Section 1231(a)(1), but there's

2    nothing in that statute that requires them to remove putative

3    class members without considering their provisional waiver

4    application.

5          THE COURT:  Hold on just one second.  Okay.  Could you

6    say that again, please.

7          MR. PROVAZZA:  Respondents cite Section 1231(a)(1).

8    There's nothing in the text of that statute that requires

9    respondents to --

10         THE COURT:  Hold on just one second.  Do we have 1231

11   here?  Go ahead.

12         MR. PROVAZZA:  Again, there's nothing in the text of

13   the statute that requires them to remove class members based

14   solely on their final orders of removal and not consider their

15   provisional waiver applications.

16         Any junction would only enforce the legal limits on

17   removal and detention that already exist in Section 1231 that

18   exist in other portions of the INA, supporting regulations and

19   the Constitution.  So this isn't a wholesale injunction on

20   responsibility to remove anyone.  It would just be a very

21   narrow injunction that would require them to follow the law and

22   the restrictions they themselves have placed on their ability

23   to remove people under Section 1231.

24         THE COURT:  Basically your argument is that while

25   1231(a)(1)(A) says, "Except as otherwise provided in this

```
 1    section, when an alien is ordered removed, the Attorney General
 2    shall remove the alien from the United States within a period
 3    of 90 days, in this section referred to as the 'removal
 4    period.'"  But your argument is there's also a statutory
 5    provision that authorizes the provisional waiver process and
 6    petitioners here are only seeking in effect a mandatory
 7    injunction directing ICE to consider the fact that a petitioner
 8    is pursuing a provisional waiver and doesn't prohibit them --
 9    doesn't prohibit ICE from removing aliens generally or even the
10    petitioners if they make a -- if they consider the right
11    factors and make a good faith decision to remove.
12              MR. PROVAZZA:  Your Honor, just one point I'd like to
13    make is that the injunctive relief might need to be more than
14    mandatory consideration of the provisional waiver process.  It
15    might have to be something that protects class members and
16    would provide more protections potentially than the minimum due
17    process rights they might be entitled to.
18              THE COURT:  Well, that's not what I decided
19    previously.
20              MR. PROVAZZA:  Yes, Your Honor.  There might be a
21    difference between the minimum constitutional requirements that
22    ICE is required to follow when making removal decisions and the
23    type of injunctive relief that the court would have to issue to
24    make sure that the their constitutional rights aren't violated.
25              THE COURT:  Well, if I issue -- why?
```

```
 1            MR. PROVAZZA:  Well, Your Honor, for example, our
 2    proposed injunction and PI motion would have ensured that every
 3    class members -- it would have ensured class members'
 4    constitutional rights weren't violated.  It would still allow
 5    for ICE to exercise their removal authority in certain
 6    circumstances, but it would protect class members from the
 7    constitutional violation.
 8            The injunctive relief doesn't have to match up
 9    perfectly with the minimum constitutional requirements.  It
10    would just have to ensure that the harm is remedied and
11    prevented in the future.
12            THE COURT:  Well, I haven't studied the preliminary
13    injunction.  What's the difference?  What are you seeking
14    beyond what I defined in August and September?
15            MR. PROVAZZA:  Your Honor, I think we'd be looking for
16    a class-wide injunction that ensured that the provisional
17    waiver process was adequately considered in every decision and
18    that we would need safeguards for class members beyond just --
19            THE COURT:  What kind of safeguards?
20            MR. PROVAZZA:  Well, for example, in our proposed
21    preliminary injunction, individuals would be allowed to remain
22    in the United States while they pursue provisional waivers,
23    unless they met certain -- ICE found that they met certain
24    criteria, such as they presented a national security threat or
25    they weren't diligently pursuing provisional waivers and they'd
```

 1   be able to then exercise their authority to remove them.

 2            THE COURT:  All right.  Why don't you go ahead.

 3            So I mean, you know, the government argues that the

 4   distinction between enjoining the operation of the statute and

 5   enjoining violations is illusory.  And you've been addressing

 6   that somewhat.  Is there more you would like to say on that?

 7            MR. PROVAZZA:  Well, Your Honor, not every injunction

 8   would necessarily enjoin the operation of a statute.  We don't

 9   believe this would be an adequate injunction, but if the court

10   ordered that respondents provide recording, that wouldn't be

11   something that would restrain their ability to exercise their

12   ability to remove people.

13            So Section 1231 -- Section 1252(f)(1) is really just a

14   narrow restriction on the court's jurisdiction over class

15   claims.  And again, although we don't think it's necessary to

16   decide this issue at this point, it shouldn't prohibit the

17   class from seeking injunctive relief.

18            THE COURT:  The respondents I think focus on the

19   language that only the Supreme Court can enjoin the operation

20   of a statute.  What should I make of that language?

21            MR. PROVAZZA:  I think that illustrates that when

22   Congress passed the statute, they anticipated that classes

23   could be certified to challenge the INA.  It would just be up

24   to the Supreme Court whether they could issue an injunction

25   that would restrain the operation of one of those sections.

1          So again, I don't think anything about Section

2     1252(f)(1) removes the court's jurisdiction to certify a class.

3          THE COURT:  If this case were seeking to enjoin,

4     restrain the operation of a statutory provision, I would wonder

5     if this case -- I would wonder if I had jurisdiction or whether

6     this is a case that has to be brought in the Supreme Court.

7     Ordinarily, the Supreme Court has appellate jurisdiction.  I

8     don't know how the Supreme Court would decide whether to enjoin

9     or restrain the operation of a provision of the INA if no lower

10    court had made that decision.

11         Do you have any thoughts on that?

12         MR. PROVAZZA:  I think that anticipates that a class

13    can be certified at the District Court level and make its way

14    up to the Supreme Court, who then have jurisdiction to issue an

15    injunction that would restrain a portion of the INA.

16         THE COURT:  If it agreed with the District Court.

17         MR. PROVAZZA:  If it agreed --

18         THE COURT:  And the Court of Appeals.

19         MR. PROVAZZA:  Correct, Your Honor.

20         THE COURT:  If that's what it means, unless it's

21    telling the Supreme Court it's got to take every appeal from a

22    class action injunction in an immigration case, I don't know

23    what it means.  You may be back to Marbury v. Madison; what's

24    the right court to bring the case in.  And I'm sure the Supreme

25    Court justices would love to be doing this over and over all

1    over the country, improve their statistics.

2          Is there more you'd like to say on this?

3          MR. PROVAZZA:  Nothing further, Your Honor.

4          MS. LARAKERS:  So Your Honor, on this point,

5    1252(f)(1) is abundantly clear.  It is a limit on class-wide

6    injunctive relief, and that's what the Supreme Court said in

7    AADC, in Reno, Your Honor.

8          THE COURT:  Here.  Let me -- I don't think I have that

9    one out.  Arab Anti-Discrimination Committee?

10         MS. LARAKERS:  Yes, Your Honor.

11         THE COURT:  It said it where?  All right.  It says it

12   I think in 525 U.S. 479.

13         MS. LARAKERS:  Sounds right, Your Honor.

14         THE COURT:  "1252(f) prohibits Federal Courts from

15   granting class-wide injunctive relief against the operation of

16   Sections 1221 to 31 and specifies that this ban does not extend

17   to individual cases."  That's the language?

18         MS. LARAKERS:  Yes, Your Honor.  It's hard to imagine

19   how this case doesn't fall squarely within --

20         THE COURT:  But that's the same language as the

21   statute.  I still have to construe what operation means.

22         MS. LARAKERS:  Yes, Your Honor.  So operation means

23   the normal operation of Section 1231.  The normal operation of

24   Section 1231 is the removal of aliens with final orders of

25   removal.

1          And the Supreme Court made clear that the argument

2     petitioners are using, the argument that the Ninth Circuit in

3     Rodriguez used, doesn't work in -- when you're enjoining a

4     statute on constitutional grounds.  So it doesn't work in a

5     constitutional context because you are still enjoining -- by

6     bringing a constitutional claim, you're admitting that you're

7     enjoining the normal operation of the section.  You're just

8     stating that the Constitution prevails, and the Constitution

9     requires more than what the statute says.  And it's for that

10    reason that this argument that you're not enjoining the statute

11    but you're enjoining violations or enjoining what the statute

12    doesn't allow for, that's why it doesn't apply to

13    constitutional claims.  Because when you bring a constitutional

14    claim, you are essentially admitting that the statute's normal

15    operation is at odds with the Constitution.

16          THE COURT:  And what do you view as the constitutional

17    claim in this case?

18          MS. LARAKERS:  The constitutional claim is that a

19    person has a procedural -- as Your Honor held already -- that a

20    person has a procedural due process right to pursue the

21    provisional waiver process.  And that's what this court has

22    held.

23          This court has found that under the Constitution, the

24    alien is entitled to consideration of their pursuit of the

25    provisional waiver process, not that as a matter of statutory

1    interpretation of Section 1231 that an alien is entitled to it.

2          THE COURT:  But what -- and this may come into sharper

3    focus once I hear the vesting argument because in my current

4    conception there's a kind of hybrid nature to this, that there

5    has to be -- and you argue, I think -- a statute or regulation

6    that creates the kind of interest, a right, subject to that

7    they -- well, there has to be a statute or regulation that

8    creates an interest that implicates a person's right,

9    constitutional right to procedural due process.  So it does

10   have a constitutional dimension, but it's not solely

11   constitutional.  I just have to think a little bit more about

12   the implications of that observation.

13          MS. LARAKERS:  So Your Honor, if this court were to

14   find that this is a statutory question, that this is a question

15   of whether the text of Section 1231 outside the Constitution

16   and outside what the regulation giving rise to a right under

17   the Constitution says, if that's the claim, then Section

18   1252 -- the government wouldn't be arguing Section 1252 because

19   we don't argue it in purely statutory construction cases.

20          But as the Supreme Court in Jennings held, this

21   violation of the statute argument, that isn't a statutory

22   argument.  That is a constitutional claim.  And the

23   constitutional claim here would place a prerequisite on

24   removal.  And while that may -- while this court has held that

25   that is required under the Constitution, that's not how the

1    normal operation of Section 1231 works.  And because the relief

2    sought here would enjoin that normal operation, ICE removing an

3    individual without consideration, that is what precludes the

4    injunctive relief.  And then it's very clear in Section

5    1252(f)(1) that it precludes class-wide injunctive relief

6    enjoining the operation of; and the operation here is that ICE

7    may remove people under Section 1231 regardless of whether they

8    have a provisional waiver pending.  However, if the

9    Constitution -- if there are other constitutional procedures

10   required, that's separate and apart from.

11           THE COURT:  It's becoming more clear to me that this

12   relates more closely than I perceived to the vesting issue and

13   the way I articulated the vesting issue earlier today.

14           In other words, if the petitioners can show me and

15   persuade me that there's something in this statutory and

16   regulatory scheme that gives an alien -- certain aliens, in

17   this case an alien married to an American citizen -- a right to

18   apply for an I-130, then it could be -- might be even a

19   statutory violation there and -- where is the statute, the

20   I-130 statute that we were looking at yesterday?

21           So I was looking at 8 United States Code Section

22   1154(a)(1)(A)(3)(i).  It says, "An alien who is described in

23   subclause II," Roman Numeral II, "may file a petition with the

24   Attorney General under this clause for classification of an

25   alien if the alien demonstrates to the Attorney General that;

1    I(aa), the marriage or intent to marry a U.S. citizen was

2    entered into in good faith."  So it occurred to me when it says

3    such an alien, somebody who is married to an American citizen,

4    may apply for an I-130, does that mean that the alien has a

5    right to apply for an I-130, and that right vests before the

6    right to apply for a 601A waiver, but since it's an essential

7    step in the process of getting the 601A waiver, you know, is

8    that where -- you know, is that where the class definition

9    should begin?

10          And then -- and I don't know what else there is that

11   would support or cut against analysis that indicates that

12   there's a right to apply for an I-130, and I'm not sure I found

13   what creates -- you know, arguably creates the right to the

14   I-212.

15          But if 1154 is interpreted to mean that an alien

16   married to an American citizen has a right to file a petition

17   for an I-130 but the person who has filed the petition and --

18   then they're entitled to a decision on the petition.  I've

19   decided that before.  I mean, that's what I decided in August

20   and September.  If they get removed before they get a decision,

21   why isn't that a violation of the statute?

22          MS. LARAKERS:  Briefly, Your Honor, and certainly we

23   should brief this more fully.  But I believe the reason why

24   petitioners didn't make that argument is because there's

25   nothing -- the reason why I think this court found a due

1    process right to exist is because there is a lot of language in

2    the provisional waiver process that makes it explicitly

3    available to even final order aliens.

4              THE COURT:  You're talking about the 601A.

5              MS. LARAKERS:  Yes, Your Honor.

6              THE COURT:  I really -- you didn't make the argument.

7    You didn't brief it before.  I didn't focus on it.  I was just

8    talking about the provisional waiver process starting at the

9    I-130, which is the way it was briefed.

10             MS. LARAKERS:  I understand, Your Honor.  However, if

11   you were looking for a corresponding right in the I-130, I

12   think Your Honor would like to see something in the I-130 or in

13   the 212 that has similar language to what the 601A provisional

14   waiver regulations and the comments say.  And that is that --

15             THE COURT:  What language is that?

16             MS. LARAKERS:  That it is available to final order

17   aliens that the agency specifically created this -- explicitly

18   extended this to final order aliens.  And I think that's part

19   of the analysis that this court used in order to find that a

20   due process right exists at some point.

21             If you're going to move it back, then the question is

22   whether that same sort of language is in those regulations.

23   And Your Honor, I don't -- while we can brief it and I will

24   show you that it doesn't exist, it doesn't exist.  And I think

25   there are courts around the country that have held that

1    adjustment -- that a person doesn't have a due process right

2    even to an adjustment of status application, and I believe the

3    I-130, too, but again we would have to brief it and it will be

4    fully before this court.

5         THE COURT:  Well, I mean, there are two decisions, one

6    in New Jersey and one in the Southern District of New York --

7    and again, this is leaping ahead a little bit -- but that hold

8    without a lot of analysis that the provisional waiver -- put

9    that aside for the moment.

10        MS. LARAKERS:  Yes, Your Honor.  We could go back to

11   how this would enjoin the operation of Section 1231.  Normal

12   operation of Section 1231 is to allow ICE to remove aliens with

13   final orders of removal.  If the regulations curb that right at

14   all, it's because of the Constitution, not because it's a

15   statutory requirement.  And that's the reason why Jennings

16   specifically dismissed that argument, not a violation of the

17   statute.  It said to not "seek to enjoin the operation of

18   immigration statutes but to enjoin conduct not authorized by

19   the statute."

20        THE COURT:  So what do you think they did in Jennings?

21        MS. LARAKERS:  So they dismissed the same argument

22   that petitioners make here in a constitutional context, and

23   that's because when you are arguing -- if your claim is that

24   the statute is unconstitutional as applied, you're essentially

25   admitting that the normal operation, the way this statute

1   works, is unconstitutional, not that the statute -- not that

2   the statute itself requires it but that the Constitution

3   requires that the statute be amended, requires something that

4   the statute doesn't.  And that's why they dismissed it, that

5   same exact argument when you're making that argument on the

6   constitutional grounds.  Because you're already admitting by

7   making that constitutional argument that you are enjoining the

8   statute, you're enjoining it for constitutional reasons, but

9   you're still enjoining the normal operation of the statute.

10          THE COURT:  But they didn't decide that issue, did

11   they?

12          MS. LARAKERS:  They didn't decide the issue of whether

13   the constitutional claim would impose -- whether you can issue

14   an injunction based on the constitutional claim because that

15   wasn't decided by the Ninth Circuit.  But they said -- the

16   argument that Ninth Circuit relied on, that distinction that

17   the Ninth Circuit relied on in order to say that 1252(f)(1)

18   doesn't apply, Jennings said specifically that that argument

19   does not apply on constitutional grounds.

20          THE COURT:  Where does it say that?  It says, "This

21   does not seem to apply to an order granting relief on

22   constitutional grounds."

23          MS. LARAKERS:  Right, Your Honor.  That's the question

24   that they remanded.

25          THE COURT:  Right.  All they said was it's an open

1    question.  They didn't say you can't do it.  They could have.

2              MS. LARAKERS:  Your Honor --

3              THE COURT:  Although it wasn't teed up for them.

4              MS. LARAKERS:  Yes, Your Honor.  In as many words they

5    said that this argument does not seem to apply on

6    constitutional grounds.  So it seems -- I think that is about

7    as clear as the Supreme Court could have been without the issue

8    directly in front of them to say to the Ninth Circuit, Don't

9    use this analysis if you're going to find that this section and

10   to find that 1252(f)(1) doesn't apply.

11             I think that's precisely what they're saying, Your

12   Honor.  And it would be hard to imagine what injunctive relief

13   1252(f)(1) was trying to prohibit if not injunctive relief that

14   places a prerequisite on removing final order aliens.  I can't

15   think of one myself.  Of course that's -- I have racked my

16   brain and cannot think of one myself.

17             You just have to look at the statute and determine

18   whether that statute would normally allow removal of final

19   order aliens.  And I think in holding that the Constitution --

20   it's the Constitution that requires additional procedures to be

21   put in place and not the statute.  It makes it clear that you

22   are enjoining -- that the relief the petitioners seek is

23   enjoining the normal operation of the statute.  And any other

24   argument to try to get around that is merely, as the First

25   Circuit said in <u>Aguilar v. ICE</u>, creative pleading to get around

1    a very expressed jurisdictional limit.

2           THE COURT:  Well, how -- if the District Courts don't

3    have the authority to issue injunctions on constitutional

4    grounds, or maybe on any grounds, how would the issue get to

5    the Supreme Court?

6           MS. LARAKERS:  So Your Honor, just as any other case

7    gets to the Supreme Court.  I think at the Supreme Court level,

8    so in any of these immigration cases, Zadvydas, you look at

9    Clark, any of those cases the plaintiffs could have moved for

10   class certification at that point, could have asked the Supreme

11   Court to apply their holding to a class of aliens.

12          THE COURT:  You can move for class certification in

13   the Supreme Court?

14          MS. LARAKERS:  I think that this section makes it

15   clear that you can ask the Supreme Court to do that, to issue a

16   class.

17          Now, that is normally not the operation, but I think

18   the argument that plaintiffs would have is that this section

19   says that no other District Court can do it.  This section says

20   that the Supreme Court is the only court that has the

21   jurisdiction to do it.  And so I think the government's

22   position is that the Supreme Court would be allowed to do it in

23   that context.

24          THE COURT:  Well, even if they be allowed to do it --

25   and I didn't think I was going to have to look at whether it

```
 1    makes any difference as a habeas case, but this is a habeas
 2    corpus case.  If there's a constitutional -- if somebody says
 3    they're being detained in violation of the Constitution or laws
 4    of the United States, including regulations, the suspension
 5    clause requires that there be some court in which to get
 6    relief.  But unless the Supreme Court is obligated to hear
 7    every single one of these cases, appeals of every single one of
 8    these cases, how would it get to the Supreme Court?
 9              MS. LARAKERS:  Well, Your Honor, the suspension clause
10    isn't implicated here because there is no corresponding right
11    to class-wide habeas relief.
12              Section 1252(f)(1) does not suspend the right of an
13    individual habeas petitioner, which is what the suspension
14    clause says.  So to say that it doesn't apply in habeas
15    petitions is tantamount to arguing there's a right to
16    class-wide habeas relief, and that has no basis in law.
17              1252(f)(1) says that an individual person can obtain
18    that injunction, and certainly if this court holds that the --
19    that it doesn't apply to declaratory relief, issues the
20    declaratory relief, that will mean someone will be able to come
21    in and get that individual injunction.  However, there is no
22    right to class-wide habeas relief.  An individual still has a
23    right to get that injunction individually from this court, so
24    it does not implicate St. Cyr or any of the case law
25    surrounding St. Cyr or the suspension clause.
```

1          Your Honor, I don't have much more.  I think

2     petitioners are going to bring up the fact that it doesn't

3     apply in habeas cases.  It does apply in habeas cases.  1252

4     says, "Regardless of the nature of the action or the claim or

5     the identity of the party or the parties."  It wasn't amended

6     in light of St. Cyr because it didn't need to be amended in the

7     light of St. Cyr because it does not even arguably suspend the

8     individual right to habeas corpus.  There is simply no reason

9     to amend the statute when there wasn't a constitutional issue.

10         And the Supreme Court has never -- hasn't taken issue

11    with limiting forms of injunctive or declaratory relief where

12    there is a sufficient way to get that relief elsewhere.  Here

13    there is a sufficient way to get relief elsewhere.  Your Honor

14    mentioned it.

15         First, they come in in an individual context, which is

16    what the government's argument is; or they could come -- if

17    this court holds that it doesn't apply to declaratory relief,

18    they can come individually and seek the injunction.  But that

19    clearly does apply to habeas relief.  And any suggestion that

20    St. Cyr is implicated or that Congress should have admitted it

21    in light of St. Cyr simply makes -- it is really tantamount to

22    arguing there's a right to class-wide habeas relief.

23         Your Honor, in summation our argument is very simple.

24    There's nothing in -- the normal operation of Section 1231

25    allows ICE to remove aliens without considering the provisional

1    waiver process.  The petitioners' requested relief would place

2    a prerequisite on the removal.  And separate and apart from

3    whether that constitutional -- that is required by the

4    Constitution, this court is without jurisdiction to issue that

5    relief on a class-wide -- issue that injunctive relief on a

6    class-wide basis, as made perfectly clear by the Supreme Court

7    in AADC.

8             THE COURT:  All right.  Do you want to be heard

9    further?

10            MR. PROVAZZA:  Yes, Your Honor.  So just addressing

11   something respondents keep saying over and over again is that

12   there can't be any restraint on the normal operation of the

13   INA.

14            Apparently, according to their theory, the only thing

15   you can look at to determine the normal operation of the INA is

16   the exact language of that individual statutory provision.  And

17   that just can't be the case.

18            If the court ordered respondents to follow the law,

19   they can't only look just at that statutory provision.  Under

20   their theory, if they decided to remove just black people and

21   no other group of people, that's not something the court could

22   enjoin.  It just can't be -- that can't be a normal operation

23   of Section 1231.

24            Second, there are other statutory claims here.  This

25   isn't just purely a due process case.  We've raised questions

1    under the APA.  We've raised that this violates the INA.  So

2    there are -- there just are statutory limitations on what ICE

3    can do under Section 1231(a).

4         And addressing Ms. Larakers's point regarding habeas,

5    Section 1231 --

6         THE COURT:  I haven't -- I didn't do it with regard to

7    the motions to dismiss and I haven't focused on the INA,

8    Immigration and Nationality Act or the APA, Administrative

9    Procedures Act.  What's the argument based on those statutes?

10         MR. PROVAZZA:  Well, first that arresting people at

11    the I-130 stage effectively and sub silentio repeals the

12    provisional waiver process, and that's arbitrary and

13    capricious.

14         THE COURT:  That violates the APA?

15         MR. PROVAZZA:  That violates the APA.  And second,

16    that respondents' action in effectively repealing the

17    provisional waiver process violates the INA.

18         THE COURT:  Why does it violate the INA?

19         MR. PROVAZZA:  It violates the provisions of the INA

20    that allows the creation of the provisional waiver process.

21         THE COURT:  Okay.  Well, I am going to take this

22    question under advisement.  It's not material, as petitioners

23    note, to the definition of a putative class, and it does seem

24    to be intertwined with the vesting issue.

25         It's now 11:45, and I've given you a possible

1    alternative framework for thinking about the vesting issue.  I

2    may give you an extended lunch break so you can think about

3    that.

4           Is there any -- probably the petitioners but both

5    sides, is there any redaction to the way I framed those

6    questions?  Is there a right to apply for an I-130?  What's the

7    source of the right?  Same questions for the I-212.  Maybe you

8    considered all of that, and is there a reason you think those

9    are the wrong questions.

10          MR. PROVAZZA:  Your Honor, while there might be a

11   right to apply for an I-130, the provisional waiver regulations

12   set up a process that people have a liberty interest in

13   applying for it.  And viewing it at the I-130 stage is just the

14   wrong way to view what the provisional waiver process is.  It's

15   a three-step process for people to seek lawful status in the

16   United States through their spouse.  So it necessarily begins

17   with the filing of an I-130 and carries through to the approval

18   of an I-601A.

19          THE COURT:  But the government's viewing this as when

20   do you have a right -- the provisional waiver is the 601A,

21   right?

22          MR. PROVAZZA:  The provisional waiver application is

23   the 601A.

24          THE COURT:  Right.  So they're saying this doesn't

25   vest until -- under Kentucky v. Department of Corrections, you

 1   need a right to something before there's a right to due

 2   process, and the right to the provisional waiver doesn't come

 3   until that third stage of what we've been calling the process.

 4   And that may or may not be right, but it may be right under the

 5   Supreme Court's jurisprudence.

 6          So if that's right, then it prompted me to think,

 7   well, is there a right to apply for these earlier stages in

 8   what we're calling the process.  I understand your policy

 9   argument, but I don't -- I still have this question about

10   whether my question is a good question or not.

11          MS. LARAKERS:  As I understand your question, Your

12   Honor, you're presenting sort of an alternative argument.  So

13   if you were to find that the provisional waiver regulations

14   don't allow that due process right to vest until the 212 stage,

15   then is there a separate -- is there a separate regulation or

16   separate statutory language that gives a different right that

17   vests at the I-130 stage?

18          So if the provisional waiver regulations don't have

19   that mandatory language under Kentucky, then does I-130 or does

20   the 212 regulations and statutes do it.  Is that --

21          THE COURT:  Yeah, that's essentially it.  And it's a

22   somewhat different framework for the petitioners' argument.

23   Because, you know, it does seem to be true that, you know,

24   there's a universe of people who might get provisional waivers;

25   some get granted, I assume.  And if they're all detained and

1    removed at the I-130 stage, it means that the 601 provisional

2    waiver regulations will have no practical meaning or effect,

3    although -- I think it's important to keep this in mind.

4    Congress, in enacting legislation concerning the provisional

5    waivers, was concerned about American citizens and American

6    families.  These were American citizens who were being deprived

7    of their wives, their husbands, their mothers.  And, you know,

8    I wrote this in September.  You know, there are cases that say

9    that the INA, Immigration Nationality and Act, has provisions

10   that recognize that sometimes it's more important to keep

11   American families together, keep American citizens with their

12   spouses and parents, than to do what otherwise would be done

13   under the act.  But if everybody gets arrested and detained and

14   removed when they go in to show their marriage is genuine -- I

15   think I understand the argument -- it's the equivalent of

16   repealing the regulation without going through the process

17   required by the Administrative Procedures Act.

18           MS. LARAKERS:  Your Honor, I'd only ask, I think that

19   is an issue that needs to be briefed substantively, and I would

20   certainly like the opportunity to do a full analysis of all the

21   case law available.

22           THE COURT:  I'm going to let you do that.  But I also

23   want to hear more argument on the vesting issue today.  I

24   expect I'm going to let you do that.  We'll see where we are

25   after I hear the argument on vesting.

1            But look, it's quarter of 12:00.  As I said, I'm going

2      to give you a little extra time for lunch and to do a little

3      work.  So I'm ordering that you come back at 1:30 and be

4      prepared to argue the vesting and, probably in a preliminary

5      way, address the way I've just framed the questions.

6            The petitioners are still, you know, free to argue

7      that Kentucky v. Department of Corrections is not the right

8      framework for its -- for whatever you want to argue.  Anyway.

9      I have questions that at the moment I don't have answers to on

10     vesting.

11           All right.  Is there anything further before we stop

12     for lunch?  Court is in recess.

13           (Recess taken 11:47 a.m. to 1:45 p.m.)

14           THE COURT:  Okay.  With regard to what we've been

15     calling the vesting issue, I think the general framework, but

16     you can address this, is Kentucky v. Department of Corrections

17     indicates to me that a statute or regulation is needed to

18     create a liberty interest for which there's a right to due

19     process.  And this essentially is what I wrote about in

20     September.

21           In Arevalo, 344 F. 3d at 14, the First Circuit said,

22     "The availability of relief or at least the opportunity to

23     pursue it is properly characterized as a substantive right."

24     It discusses Carranza and Goncalves that are similar and

25     Santana.

1          In Santana, 731 F. 3d 50 at 55 -- and 56 and 60, the

2     First Circuit said that "the provision at issue unambiguously

3     gives the alien a right to file the motion to reopen."  That's

4     separate than the right to have a particular decision.

5          And at 60, the First Circuit noted that the Supreme

6     Court admonishes courts not to "adopt a construction with

7     regard to an entire class of aliens" that would "completely

8     nullify a procedure so intrinsic a part of the legislative

9     scheme."

10         So that's my tentative view of the framework, and

11    that's what prompted me to ask you earlier to begin focusing

12    on, although this may require more briefing, whether there are

13    statutes or regulations that create a right to apply for an

14    I-130 or an I-212, as well as, if you get over those hurdles, a

15    601A waiver.

16         Would petitioners like to go first?

17         MR. PROVAZZA:  Sure, Your Honor.  So the key question

18    is whether, when someone files an I-130, do they then have a

19    liberty interest in the provisional waiver process, and the

20    answer to that is yes.

21         Now, there are multiple reasons why the answer is yes.

22    As we explained in our briefs, the 2016 regulations created a

23    liberty interest for the class.  As Your Honor suggested and

24    identified one other potential path to yes, that there's a

25    liberty interest in every stage of the provisional waiver

1    process.

2         And as Your Honor pointed out, in <u>Kentucky v.</u>

3    <u>Department of Corrections</u>, that case was about whether there is

4    a liberty interest.  And this court has already ruled in its

5    September 21 order that there's a liberty interest created by

6    the I-601A.

7         THE COURT:  By the I-601 -- well, but I didn't rule on

8    when the liberty interest vests, when it comes into being.

9         MR. PROVAZZA:  That's correct, Your Honor.  And I

10   think there's multiple paths to the answer of whether the I-130

11   triggers a liberty interest here.  One path is that the

12   benefits created by the I-601A, you can view it as the whole

13   I-130, I-212, I-601A process, and there is also someone has an

14   interest in applying for a I-130, someone who has an interest

15   in applying for a I-212.  I think a case that better provides a

16   better frame to consider this is actually <u>INS v. St. Cyr</u> where

17   the Supreme Court considers that when liberty interest vests.

18        THE COURT:  Let me look at <u>St. Cyr</u>.  What page?

19        MR. PROVAZZA:  Page 321.  So --

20        THE COURT:  Hold on a second.  Let me look at it.

21   Okay.  Go ahead.

22        MR. PROVAZZA:  So there's a little context in <u>St. Cyr</u>.

23   Mr. St. Cyr was an individual who pled guilty to a crime.  And

24   at the time he pled guilty, he had the ability, if he ever

25   ended up in removal proceedings, to apply for a 212C, which

1    would allow the immigration judge to determine to exercise

2    their discretion on whether to allow him to remain in the

3    United States.

4         After he pleaded guilty but before he entered

5    immigration proceedings, Congress effectively eliminated the

6    ability for him to apply for a 212C, unrelated to the I-212.

7    And the Supreme Court here found that even though he had not

8    applied for the 212C, even though he wasn't in immigration

9    proceedings and therefore could apply for a 212C, his liberty

10   interest vested when he pled guilty to the crime.

11        THE COURT:  Where do I find that on 321?  Maybe toward

12   the end.

13        MR. PROVAZZA:  It might be more toward the end, Your

14   Honor.  Hold on one second.  The ultimate holding is at 326.

15   Your Honor, I can't find any language right now in quickly

16   looking over this that says the exact statement.  But I think

17   that's implicit.

18        THE COURT:  Hold on just a second.

19        MR. PROVAZZA:  Sure.

20        THE COURT:  So what do you think are the implications

21   of St. Cyr and why?

22        MR. PROVAZZA:  Your Honor, when Congress creates or

23   when the rule-makers create a benefit and create a process,

24   your liberty interest in that doesn't just vest when you have

25   the physical ability to actually send in the application or

1    here when you're standing in immigration -- or before you enter

2    your immigration proceedings to file 212C to appeal to the

3    discretion of an immigration judge; that when the provisional

4    waiver process was created, it created -- the people whose

5    rights -- who gained rights from that process should consider

6    the benefits, intended beneficiaries of the provisional waiver

7    regulations, and it's more than just who can actually mail in

8    their I-601A to USCIS.

9           THE COURT:  All right.  What's your next argument?

10          MR. PROVAZZA:  So Your Honor mentioned earlier that

11   there's -- you talked about the policy argument, but I think

12   that it's really important that it just cannot be that the

13   legal protections of the provisional waiver process don't vest

14   until the I-212 is approved.  That would lead to absurd

15   results, and the rule-makers couldn't have intend to allow ICE

16   to deport people and detain people before they could actually

17   become eligible for the benefit.

18          And again, this is not a policy argument.  This is a

19   constitutional argument that this just cannot be a

20   regulatory -- I don't remember what the rule-makers

21   considered -- and a constitutional argument that it just cannot

22   be that that is the case.

23          The rule-makers created a process with three different

24   applications.  Those take time.  They cost applicants money.

25   And USCIS and ICE used those very applications to target class

1    members for detention and removal.  Under respondents' theory,

2    they can go back to targeting individuals at I-130 interviews

3    without any repercussions.

4         Additionally, the actual people eligible for

5    provisional waivers at the time that the regulation was created

6    was basically a null set.  It couldn't be that the rule-makers

7    created this regulation with no beneficiaries at the time that

8    it was created.

9         Additionally, when the 2016 regulations were

10   promulgated, it revived the I-212 as a useful form for people

11   to file Stateside.  So again, this means that --

12        THE COURT:  So let me -- so the 2016 regulations made

13   aliens with outstanding orders of removal eligible to possibly

14   get a 601A waiver for the first time?

15        MR. PROVAZZA:  Yes, yes, Your Honor.

16        THE COURT:  It expanded.  So then -- but they had to

17   get a 212 waiver first before they could be considered -- or

18   they had to get an I-212 approval or exception before they

19   could be considered for a 601A waiver.  Is that the right

20   procedure?

21        MR. PROVAZZA:  That's correct, Your Honor.

22        THE COURT:  And the argument is what?

23        MR. PROVAZZA:  That prior to 2016, filing an I-212

24   while you're still in the United States just didn't have the

25   benefits it did once the provisional waiver regulations were

1    enacted in 2016.  So this means when the rules were

2    promulgated, there was basically no eligible individuals under

3    respondents' definition.  And it can't be that DHS --

4    respondents can eviscerate the provisional waiver regulations

5    before the intended beneficiaries actually become able to file

6    the I-601A.

7           And this line-drawing is arbitrary and it's not rooted

8    in any part of the regulation or in the realities of what

9    people have to do to apply for provisional waivers.

10          THE COURT:  Well, is Kentucky v. Department of

11   Corrections, does that provide a proper framework for CIS?

12          MR. PROVAZZA:  Your Honor, if you're trying to

13   determine whether there is a liberty interest, it does.  Here

14   there is a liberty interest.  USCIS must process these

15   applications.

16          THE COURT:  No, but that's the -- so under Kentucky v.

17   DOC says you look to the statute and regulations to see if

18   there's a liberty interest and therefore a right to due

19   process.  And at least in Kentucky, they say you look for

20   mandatory language, you know, like -- and this is in the prison

21   context and they were limiting the rights of prisoners.

22          But is there any -- and I'm going to give you more

23   time to look at this, I expect, but is there any language that

24   you can point to that indicates that an alien -- any language

25   in the statute or regulation or both that indicates that an

```
 1   alien has a right to apply for an I-130 and a right to apply

 2   for an I-212?

 3             MR. PROVAZZA:  Your Honor, I believe the structure of

 4   the regulations --

 5             THE COURT:  Well, here.  Is there any language you can

 6   point me to?

 7             MR. PROVAZZA:  Do you mind if I talk to co-counsel for

 8   one second, Your Honor?

 9             THE COURT:  That's fine.

10             (Counsel conferring.)

11             MR. PROVAZZA:  Ms. Lafaille might speak to this point.

12             THE COURT:  That's fine.

13             MS. LAFAILLE:  Hi, Your Honor.  Good afternoon.

14             So to just begin with the specific point about

15   mandatory language within each of these steps, obviously it's

16   our broader view that the 601A process itself creates a

17   cohesive process.  Your Honor cited to language earlier today

18   relating to the petitioners' statutory ability to file an I-130

19   application.  I do want to point --

20             THE COURT:  What did I cite to?  I think I cited to 8

21   U.S.C. Section 1154.

22             MS. LAFAILLE:  Yes, that's the provision.  So

23   (a)(1)(A)(ii), an alien spouse -- sorry.  "Any citizen claiming

24   that an alien is" -- (a)(1)(A)(i), "Any citizen claiming that

25   an alien is entitled to classification by reason of a
```

1  relationship or to immediate relative status may file a

2  petition" --

3       THE COURT:  Hold on a second.  All right.  Okay.

4       MS. LAFAILLE:  Turning to 1154(b), this section, Your

5  Honor, establishes something that the government has previously

6  acknowledged.

7       THE COURT:  Hold on just a second.  1154(b).

8       MS. LAFAILLE:  In my printout, that's on page 8 of the

9  printout, if Your Honor's is the same.

10       With regard to the --

11       THE COURT:  Hold on.  I haven't found it yet.  (b),

12  which says, "investigation, consultation, approval."

13       MS. LAFAILLE:  Yes, Your Honor.  What this section

14  establishes, and I'll turn to the language in a minute, is that

15  the I-130 is -- it's not only that the adjudication of it is

16  required but the actual grant of an I-130 is required for

17  non-citizens who have bona fide marriages to U.S. citizens.  So

18  with this, unlike the I-212 and the 601A, the I-130 is not

19  discretionary relief.  It's mandatory.

20       THE COURT:  So basically if you prove that you have a

21  good faith marriage to an American citizen, you get the I-130;

22  there's no discretion?

23       MS. LAFAILLE:  Exactly.  And, you know, that language

24  is in there.  "The Attorney General shall, if he determines

25  that the facts stated in the petition are true," you know,

1    "approve the petition and forward a copy thereof to the

2    Department of State."

3            THE COURT:  Okay.  Because I mean, what are the

4    implications of that not being discretionary?

5            MS. LAFAILLE:  The implications are, Your Honor, that

6    this claim that -- you know -- we think is well-established in

7    immigration law and cases like Accardi and Arevalo that these

8    immigration benefits create a liberty interest for the

9    non-citizens and also, we think, for the U.S. citizen spouses.

10   That principle is even stronger here.  There's not only a

11   liberty interest in the adjudication and in the right to apply

12   for discretionary relief.  There's an actual right to this

13   relief.

14           THE COURT:  Okay.  And that relief is a

15   prerequisite -- do the regulations permit applying for an I-212

16   at the same time an alien applies for an I-130?

17           MS. LAFAILLE:  Yes, Your Honor.  The I-212 can be

18   filed concurrently with the I-130.  Many attorneys prefer to do

19   it sequentially because the argument for an I-212 is

20   strengthened by having an approved I-130.

21           THE COURT:  All right.  Have you been able to, in the

22   little time I gave you, find anything other than Section 1154

23   for the right to apply for the I-130?

24           MS. LAFAILLE:  For the right to apply?  I mean, I

25   think this is very -- we haven't found anything else, Your

1   Honor, but I think this is quite conclusive as to the right to

2   apply for an I-130 and to be in fact granted an I-130.

3          THE COURT:  And then what about the I-212?

4          MS. LAFAILLE:  With regard to the I-212, the I-212

5   regulations are at 8 CFR 212.2.

6          THE COURT:  Let me get them.  Go ahead.

7          MS. LAFAILLE:  And so subsection (h) -- well, let me

8   go backwards.  Subsection (j) applies specifically to the

9   conditional I-212, which is the one filed by people still in

10  the United States.  And that provides for advance approval of

11  that I-212.  "An alien whose departure will execute an order of

12  deportation shall receive a conditional approval depending on

13  his or her satisfactory departure."

14         THE COURT:  I noted that, but it says --

15         MS. LAFAILLE:  But I think another provision --

16         THE COURT:  What does that mean?  "An alien whose

17  departure will execute an order of deportation shall receive a

18  conditional approval depending upon his or her satisfactory

19  departure."

20         The I-212, that is a discretionary decision, isn't it?

21         MS. LAFAILLE:  Right.  So I don't -- the language is a

22  little bit funny.  I wouldn't argue that this creates a right

23  to a grant of an I-212, but it certainly creates -- it's

24  mandatory language with regards to the adjudication of the

25  I-212 for non-citizens who apply within the United States and

1    specifically provides that, in that case, the manner in which

2    any I-212 is granted is that it's conditioned upon the

3    departure.

4         And I do want to get to (h) though, because I think

5    that's perhaps the clearest language on this point.

6         THE COURT:  All right.  So it says, "An applicant who

7    has submitted a request for consent to reapply for admission

8    after deportation or removal must be notified of the decision."

9    Is that the pertinent part?

10        MS. LAFAILLE:  Exactly, if the application is denied,

11   the applicant must be --

12        THE COURT:  I can't hear you.

13        MS. LAFAILLE:  If the application is denied, it goes

14   on, the applicant has to be notified of reasons.

15        This again is language akin to what Your Honor looked

16   at in the 601A regulations that we discussed the last time we

17   were here that confirms what this line of immigration cases

18   say, which is that when an immigration benefit is created by

19   statute or by regulation, the agency doesn't have the

20   discretion to simply burn those applications as they come in

21   the door.

22        THE COURT:  Let me ask you two questions.  So an

23   applicant who has submitted a request for consent to reapply

24   for admission after deportation or removal, the petitioners

25   were ordered removed, but they didn't leave.  Is that still

```
 1   removal within the meaning of the statute, do you think, do you
 2   argue?
 3           MS. LAFAILLE:  Right.  This is because the ground is
 4   not triggered unless they leave, so when they apply within the
 5   United States, that's why it's a conditional application that
 6   becomes effective upon departure.  It's a conditional grant
 7   that becomes --
 8           THE COURT:  I think you're arguing that this should be
 9   read after they've been ordered deported or removed.  Then the
10   second --
11           MS. LAFAILLE:  So I would say that "after" does not
12   modify the submitted or request.  It's consent to reapply for
13   admission after deportation or removal.  And what they're
14   seeking is consent that, after being removed, they will apply
15   for readmission.
16           THE COURT:  So your argument here is if somebody's
17   applied for an I-212, it has to be decided.
18           MS. LAFAILLE:  Correct.
19           THE COURT:  All right.  And then the respondents might
20   say, Well, we can give them the decision when they're outside
21   the United States.  How would you respond to that?
22           MS. LAFAILLE:  Right, Your Honor.  And I think this is
23   where we turn to our arguments about the 601A process, which
24   Your Honor labeled as policy arguments but are arguments about
25   the intention and the meaning of that regulation.
```

1          And as I think the language of that rule-making amply

2    reveals, as the description of the process throughout the 2013

3    and 2016 regulations amply reveals, what DHS was doing was

4    creating a process by which U.S. citizens and their spouses

5    would be able to avoid the harm and the extraordinary pain of

6    family separation that our clients have already testified to

7    here.  And those regulations create liberty interests that

8    vest -- you know, if we're using that terminology -- or that

9    are alive at the time that they're eligible to begin this

10   process and certainly by the time that they've paid an

11   application fee to the United States government and begun the

12   process of seeking lawful status under regulations that the

13   government itself has put forward.

14          THE COURT:  So the basic argument I think is that in

15   2016, the regulations were amended as authorized by statute to

16   make people with prior orders of removal eligible for

17   provisional 601A waivers; and to apply for a 601A waiver, you

18   have -- a person, a couple have to have an I-130 approved

19   showing their marriage was in good faith, it's a real marriage,

20   not a sham, and then an I-212, which is a discretionary

21   decision.  But if they apply, ICE has to decide and notify

22   them.  And it would be illogical to allow them to be removed or

23   deported and frustrate their ability to have a decision made on

24   the 212 while they're in the United States and a decision ever

25   to be made on the 601A because, if they're removed, why should

1    ICE expend its limited resources making a decision that will be

2    moot.  They're already out of the United States.  They can't

3    get a provisional waiver.

4         Does that kind of capture the argument?

5         MS. LAFAILLE:  That's right.  And maybe just to

6    reframe it a little bit in terms of the framework that the

7    parties have discussed in their briefs, what I think the

8    government identified in its briefs is that this, what it calls

9    vesting, is not a separate legal argument about how the due

10   process clause and, you know, the fundamental principles

11   against arbitrary government that the due process clause

12   protects.

13        We're not here having a technical argument about how

14   the due process clause applies.  What we're having here is a

15   discussion about the intention and the meaning of regulations

16   and the intended beneficiaries of regulations to which we know

17   the due process clause attaches.  And we think it's clear that

18   from context, from the text of the regulations, that those

19   regulations are intended to benefit people who were eligible to

20   begin this process and to set out a process for them to come

21   forward, and that the way to analyze this so-called vesting

22   issue is to understand the intention and the intended

23   beneficiaries of those regulations.

24        THE COURT:  Well, but intention is typically discerned

25   from the language of a statute or a regulation.  You don't even

1   go to the legislative history unless there's some ambiguity.

2   And maybe there's some ambiguity here.

3          Is there more -- and do you feel that in the hour and

4   a half I gave you, hour and 45 minutes I gave you to eat lunch

5   and do this research, you've researched this issue

6   exhaustively?

7          MS. LAFAILLE:  Your Honor, I think with regards to

8   whether there is mandatory language with regards to the

9   adjudication of these applications, yes.  You know, I think

10  it's clear that these are not applications -- the result is

11  discretionary but not the procedures themselves.

12         THE COURT:  Okay.  What would the government say about

13  this?

14         MS. LARAKERS:  So Your Honor, would you like to hear

15  first about the I-130 vesting stage, or would you like to hear

16  about my arguments about why it vests as 212 first?  The issue

17  you addressed at lunch --

18         THE COURT:  You can start with the 212 if you want.

19         MS. LARAKERS:  Sure, Your Honor.  So the framework

20  that Your Honor identified is exactly right.  To determine

21  whether a due process liberty interest exists, there is a very

22  strict framework to apply.  Otherwise, it would be too easy to

23  override Congressional intent and the agency's discretion if

24  you did not have the strict framework to apply.

25         So the framework we're looking at is whether the

1     regulation contains explicitly mandatory language.  And I think

2     that's further buttressed by --

3               THE COURT:  That comes from where, Kentucky?

4               MS. LARAKERS:  That comes from Kentucky, yes, Your

5     Honor.  And I think that's further buttressed by the First

6     Circuit decisions that are most on point here.  In none of the

7     First Circuit decisions was the alien not yet eligible to

8     apply.  In each and every First Circuit decision, the alien

9     immediately upon receiving a decision could file that

10    application.  And in fact, in each situation the alien had

11    actually attempted to submit that application.  So the only

12    thing that was holding that application back from being

13    processed is the decision of the government to not process it,

14    the law that they were applying.  That's not the case here.

15              A person is not eligible to apply for an I-601A waiver

16    until they have an approved I-212.  And as the petitioner has

17    mentioned, it can be filed concurrently with the I-130.  And I

18    will also mention as a sidenote, although it's not absolutely

19    necessary for our argument, that when you file applications,

20    you can update that application.  So you can certainly send in

21    more evidence upon an I-130 being -- upon an I-130 being

22    approved.  So I think there's a -- there's an agency process by

23    which, like more evidence can be submitted, et cetera.  And if

24    you'd like that briefed, we certainly can do that as well.

25              So what's important here is that the First Circuit has

1    never gone further than allowing a due process right where the

2    person is eligible to apply.  And within the context of the

3    Supreme Court decision on point, there must be explicitly

4    mandatory language.

5         Now, turning to that mandatory language, the

6    regulation is abundantly clear that a person must have an

7    approved Form I-212 to apply.  That's at 81 Federal Register

8    146 at 502.56.

9         THE COURT:  Is it in the regulation?

10        MS. LARAKERS:  Yes, it's also in the regulation.  But

11   the comments are what further expand on why someone must have

12   an approved I-212 in order to apply.

13        THE COURT:  Hold on a second.  What page of the

14   Federal Register did you say?

15        MS. LARAKERS:  502.56.

16        THE COURT:  Sorry.  502.56.

17        MS. LARAKERS:  It's also the actual text of the

18   regulation is in 212.7(e)(4)(iv).

19        THE COURT:  Did you give me 212?

20        MS. LARAKERS:  I think they're attached, Your Honor.

21        THE COURT:  Sorry.  212 what?

22        MS. LARAKERS:  212.7(e)(4)(iv).  I know it's --

23        THE COURT:  Sorry.  Little e, what number, four?

24        MS. LARAKERS:  4.

25        THE COURT:  4, which says "Ineligible Aliens."

```
 1              MS. LARAKERS:  And then go to the little four, so the
 2      Roman numeral iv.
 3              THE COURT:  "Unless the alien has been granted a 212."
 4              MS. LARAKERS:  So that's the mandatory language we're
 5      looking for here.  It doesn't say -- the 2016 regulations don't
 6      discuss the I-130 in the same way.  And in their brief, the
 7      petitioners point out that the 2013 regulations state that, you
 8      know, some sort of process may be starting from the I-130
 9      stage, but that's really inconsequential to the analysis here
10      because an I-212 was not needed for those applicants in 2013.
11      Those applicants in 2013 who were allowed to apply didn't have
12      final orders of removal.  It simply wasn't available to them.
13      So the 2016 regulation --
14              THE COURT:  The 212 was not relevant until 2016?
15              MS. LARAKERS:  Precisely, Your Honor.  So we really
16      need to be looking at the mandatory language in the 2016
17      regulations.  And that states that a person must have an
18      approved I-212 before you're even eligible to apply.
19              And when you look at that in the context of what the
20      First Circuit has held, the First Circuit has only ever held
21      that a person who was eligible to apply has that right.  And an
22      alien here isn't eligible to apply until they have a Form
23      I-212.
24              THE COURT:  So let's say hypothetically I agree with
25      that, but then we get to the questions I put to you.  Is there
```

 1     a right to apply for an I-130, and is there a right to apply

 2     for an I-212?

 3              MS. LARAKERS:  So Your Honor, I think you would have

 4     to -- the petitioners would have to establish that there is an

 5     independent right under Kentucky, under the mandatory language

 6     provision in Kentucky.  They can't borrow the ultimate relief

 7     that someone seeks.  So even though this court knows that

 8     ultimately they will be applying for a provisional waiver, this

 9     court, the Supreme Court's decision in Kentucky doesn't allow

10     you to borrow from future language.  It only allows you to look

11     at the specific language in the regulation.  And that language,

12     as you pointed out -- that language doesn't exist.  And as you

13     pointed out --

14              THE COURT:  It doesn't exist where?  I didn't say it

15     doesn't exist.

16              MS. LARAKERS:  You said, like, our argument would be

17     they can apply from overseas.

18              THE COURT:  They can apply for what from overseas?

19              MS. LARAKERS:  I-130 and I-212 from overseas.  I spent

20     the break looking at the case law behind I-130s and other

21     pending applications that an alien can submit while in the

22     United States.  And I have a couple of cases that show that

23     there is no liberty interest in those types of applications,

24     not even in an I-45 application, which is an application to

25     adjust status; meaning that someone doesn't even have to leave

1   the United States and come back in.

2          They have -- courts have held they don't even have a

3   liberty interest to have their adjustment application

4   processed, even though that would allow them to remain in the

5   United States.

6          THE COURT:  What cases are those?

7          MS. LARAKERS:  So first I have -- okay.  I'll just

8   give you the approximate cite because the name is a little bit

9   hard to understand.  It's 458 Federal Approximate [sic] 120 --

10         THE COURT:  Federal what?

11         MS. LARAKERS:  Appx, Appendix, 120.  That's in the

12  Third Circuit.  And it says that they didn't find any law

13  supporting the proposition that the BIA must reopen proceedings

14  just because someone has a path to adjustment.  So even

15  though --

16         THE COURT:  No.  They don't have to -- the way you're

17  characterizing it, it sounds like you have no right to a

18  particular result.  But I'm focused on, as I was in August and

19  September, on the right to apply.

20         MS. LARAKERS:  Yes, Your Honor.  I will note that

21  there's a little bit -- it's difficult to find case law

22  directly on point for some of these assertions because they're

23  typically made in the motion to reopen context.  So that's

24  typically what circuit courts are looking at.  They're looking

25  at whether they have a right to a motion to reopen because they

```
 1    have an eligibility to apply.

 2              THE COURT:  Whether they have a right --

 3              MS. LARAKERS:  To a motion to reopen.

 4              THE COURT:  You mean to have a motion granted?

 5              MS. LARAKERS:  Yes, to have a motion filed -- to have

 6    the motion granted.  Sorry.  To have the motion granted in

 7    order for them to apply for adjustment.

 8              THE COURT:  Well, no.  I understand -- all right.  In

 9    my present conception, this is a different issue.  Whether to

10    reopen is a discretionary decision, right?

11              MS. LARAKERS:  Yes, Your Honor.

12              THE COURT:  One of the cases I cited --

13              MS. LARAKERS:  I understand it's a little bit more

14    tenuous.  I understand it's a little bit more tenuous.  So we

15    have Chambers v. Mukasey, that's 520 F. 3d 445.  That's in the

16    Fifth Circuit.

17              THE COURT:  Say the cite again, please.

18              MS. LARAKERS:  520 F. 3d 445.  That's in the Fifth

19    Circuit.

20              THE COURT:  Do we have that one?

21              MS. LARAKERS:  These haven't been cited in my brief.

22              THE COURT:  Christine, print it out.  520 F. 3d 445.

23              MS. LARAKERS:  And I haven't read the entire case; I

24    just know the snapshot.  They denied the stay application even

25    though the alien claimed that they had an adjustment of status
```

1    application pending.  Then I have Armstrong v. INS.  That's 445

2    F. 2d 1395.  That's a Ninth Circuit case, I believe.  And

3    again, this was denying an application for a stay so the alien

4    could await a decision on a pending visa application.

5         Then I have another one, it's Bowes v. District

6    Director.  That's 443 F. 2d 30.  And they held, the Ninth

7    Circuit held that the pendency of a collateral visa

8    applications does not entitle an alien to a delay of

9    deportation proceedings.

10        So I have a lot of cases here, and I'd certainly like

11   the opportunity to brief them.  But I think the main thing that

12   we need to discuss here is whether the petitioners can borrow

13   from the ultimate regulation, the ultimate relief sought in

14   order to establish a right three steps back, and they simply

15   cannot do so because of Kentucky that each and every

16   application process in the way would have to create a due

17   process right, and I don't want to get too far into the

18   slippery slope, but if this court were to hold that that

19   independent I-130 created such a due process right, then

20   anybody who filed an I-130 would have that same due process

21   right, even if they're not ultimately pursuing the provisional

22   waiver process.

23        THE COURT:  They have the right to have the I-130

24   decided.

25        MS. LARAKERS:  I'm sorry, Your Honor?

```
 1            THE COURT:  They have the right to have the I-130
 2    decided.
 3            MS. LARAKERS:  Yes, they do, Your Honor.  However,
 4    they do not have the right to remain in the United States or
 5    decide where they get to wait for that to be decided.  And
 6    that's a separate -- that's the relief that they would be
 7    seeking here.
 8            Now, the procedure and what they're entitled to is a
 9    separate question.  I think the first question is whether they
10    have a liberty interest in the relief sought in applying for
11    the relief.
12            THE COURT:  So your argument is -- so I told you, you
13    know, that very tentatively when I read 8 United States Code
14    Section 1154(a)(1)(A)(i), it says, "Any citizen in the United
15    States claiming that an alien is entitled to classification by
16    reason of a relationship" -- I think this means by reason of
17    marriage to an American citizen, among other things -- "may
18    file a petition for such classification."
19            So I read that tentatively to mean that they had a
20    right to file a petition, a right to ask probably now the
21    Secretary of Homeland Security to determine whether they had a
22    good faith marriage to an American citizen, right?
23            MS. LARAKERS:  Yes, Your Honor.  And they certainly do
24    from outside the United States.  They don't always have that
25    right from inside the United States.  And of course if it were
```

1    granted outside of the United States, that would mean they

2    couldn't pursue the provisional waiver process, but that's an

3    independent -- that provisional waiver process, the ultimate

4    relief sought in this case must be separated from the analysis

5    that we have to do at each step, which is whether there is

6    mandatory language in the I-130 that would give them a right to

7    pursue it here in the United States such that they can apply

8    for the provisional waiver.  Those have to be --

9         THE COURT:  So it's ICE's argument that it could

10   remove the whole universe of aliens married to United States

11   citizens at any time before an individual had an I-212

12   approved.  That's the argument?

13        MS. LARAKERS:  Yes, Your Honor.  It's ICE's argument

14   that -- it's the respondent's argument that it doesn't have to

15   be considered to be pursuing the provisional waiver process.

16   And I think that there has been testimony in this case that ICE

17   does consider all pending applications.  So I don't want to

18   make it seem like our argument lines up with what ICE is

19   actually doing in the field.  There's been testimony to show

20   that they do consider pending applications, and they are

21   looking at pending applications now.

22        THE COURT:  Where is that testimony?

23        MS. LARAKERS:  Your Honor, in the PI testimony,

24   Director Adducci said that she would expect that officers would

25   consider all factors, including whether an I-130 is pending.

1    And I think Todd Lyons' declaration that he submitted states

2    that pending applications will be considered.

3          So I don't -- while that's not part of the legal

4    argument here, our legal argument doesn't reflect exactly what

5    ICE does all the time.

6          THE COURT:  How does that square with the First

7    Circuit's statement in Santana that the Supreme Court

8    admonishes courts not to "adopt a construction which would,

9    with regard to an entire class of aliens, completely nullify a

10   procedure so intrinsic a part of the legislative scheme."

11         In other words, you know, I wrote in September about

12   how it's an important part of the legislative scheme to keep

13   families of United States citizens together, and that interest

14   at times trumps the usual interest in removing somebody from

15   the United States.  So how --

16         MS. LARAKERS:  So Your Honor, I would point out that

17   this is not -- the statutory scheme spoken of there is not the

18   statutory scheme in this case.  I understand that it may be a

19   broader purpose.  However, when the regulation here made it

20   very clear that they did not intend to create a due process

21   right, that due process right has to be very, if at all --

22         THE COURT:  Are you talking about 601?

23         MS. LARAKERS:  Yes, Your Honor.  It has to be

24   extremely limited.  And that's the context in which we have to

25   look at whether somebody has a due process interest in pursuing

1    the provisional waiver process.  I'll also point out that, you

2    know, petitioners argue --

3         THE COURT:  Do you accept that based on 8 U.S.C.

4    1154(a)(1)(A)(i) that there is a liberty interest in filing a

5    petition to show you have a good faith marriage to an American

6    citizen?

7         MS. LARAKERS:  Yes, Your Honor.

8         THE COURT:  Okay.  So there's a liberty interest; you

9    just say that petition can be filed while somebody is outside

10   of the United States?

11        MS. LARAKERS:  Yes, Your Honor.

12        THE COURT:  Or the person can be removed and wait for

13   the decision outside of the United States?

14        MS. LARAKERS:  Yes, Your Honor.  And I think other

15   courts in the Administration Procedure Act context have held

16   that, and certainly I don't think there's any room to argue

17   otherwise.

18        THE COURT:  Held what?

19        MS. LARAKERS:  Held that there is an interest in

20   getting a decision on the application.

21        THE COURT:  So a liberty interest in filing and

22   getting a decision?

23        MS. LARAKERS:  Yes.  It's just -- and of course this

24   is my tentative view without having looked too deeply into it,

25   but yes.  In the other cases I've handled across the country

1    that's the position, that there is a liberty interest in

2    filing.  It's just not the liberty interest that plaintiffs

3    claim here, which is to have it done in the United States that

4    they can apply for an ultimate, a different form of relief.

5         In addition, Your Honor, the petitioners argue that it

6    couldn't have been the rule-makers' intention to help only

7    those with approved I-212s, but that misses the point that it

8    was never the rule-makers' intention for a due process interest

9    to be created.

10        THE COURT:  No.  You just said there's a liberty

11   interest, therefore a due process right with regard to filing

12   an I-130.

13        MS. LARAKERS:  I apologize, Your Honor.  I'm moving

14   back to the 601 application.

15        THE COURT:  Okay.  So now there's a liberty interest

16   with regard to the I-130.  You acknowledge that.  But there's a

17   question of whether filing an I-130 permits -- means that

18   somebody is entitled to get a decision while they're in the

19   United States.  Then what about the I-212?

20        MS. LARAKERS:  Your Honor, our same arguments.

21        THE COURT:  No, but what do the regulations say about

22   the I-212?  It says -- it says -- I'm looking -- I don't know

23   if I discussed this with petitioners.  Maybe you did.  It says

24   in 8 CFR Section 212.7(a)(1), the last line is, "Certain

25   immigrants may apply for provisional unlawful presence waiver

1    of inadmissibility specified in 8 CFR Section 212.7(e)."  I'm

2    having trouble finding -- I'm really not completely sure of

3    what (e)(2)(I) means.

4            MS. LARAKERS:  Is it the conditional --

5            THE COURT:  It says, "USCIS may adjudicate

6    applications for provisional unlawful presence waiver of

7    inadmissibility based on Section 212(a)(9)(B)(v) of the Act

8    filed by eligible aliens."  Are those people ordered removed?

9            MS. LARAKERS:  No.  That's the portion of the INA that

10   allows for a waiver of unlawful presence.  So it's saying we're

11   enacting this and extending it to people with final orders of

12   removal and allowed to apply in the United States.

13           THE COURT:  So they can apply in the United States?

14           MS. LARAKERS:  Right, but it's just referring back to

15   the statutory authority for the provisional waiver regulation,

16   which is a waiver that says -- which is the section that INA

17   just says there shall be a waiver available for unlawful

18   presence.

19           THE COURT:  That's a discretionary decision, but is

20   there authority for the proposition that you're not entitled to

21   get that decision while you're in the United States?

22           MS. LARAKERS:  Yes, Your Honor, because that I-212 has

23   separate significance from the provisional waiver process.

24   When I presented my argument that you could pursue that relief

25   from within or outside the United States, I believe you

1  dismissed that argument because you're depriving them of the

2  whole point of the provisional waiver process.

3          THE COURT:  You're talking about back in September?

4          MS. LARAKERS:  Yes.  I believe that's the reason why

5  you dismissed it.  But if you separate the I-601A, if you set

6  that relief aside and just look at the I-212, that same -- the

7  reasoning that you dismissed my argument for not being able to

8  apply from anywhere outside the United States doesn't apply to

9  the I-212 because the I-212 does give you the same exact right

10 if you apply for it outside of the United States as it does

11 from inside the United States.

12         So I don't think that -- so our argument would be that

13 because it can be sought from outside of the United States,

14 that there is no right to have it.

15         THE COURT:  We'll put this in two parts because I am

16 going to give you more time to find more cases or statutes or

17 regulations if you want or feel you need it.

18         Are there cases that say the fact that you've applied

19 for an I-130 doesn't give you a right to get the answer while

20 you're in the United States?

21         MS. LARAKERS:  Yes, Your Honor.  I think that some of

22 these cases that I set out mention that.  A lot of them again

23 are in the context of a motion to reopen, but I think that's

24 still present.

25         There's also one other one, Gao v. Jenifer, 185 F. 3d

1    548.  That's a Sixth Circuit case that was about special

2    immigrant juvenile status, which is a form of relief that

3    allows people to apply for adjustment of status from within the

4    United States.

5         And Your Honor, I bring up these cases that are

6    different forms of relief because they're essentially all the

7    same with regard to whether a due process right exists.  It all

8    gives an alien an opportunity, a path to adjustment or a path

9    to permanent residence.  So in that case, the Sixth Circuit

10   said that granting an SIJ application, which is the first

11   step --

12        THE COURT:  "SIJ" means?

13        MS. LARAKERS:  Special immigrant juvenile.  So,

14   "Granting the first step to applying for adjustment does not

15   restrain or compel the government with respect to deportation.

16   It merely makes someone eligible for permanent resident

17   status," saying that that person didn't have a due process

18   right to have to wait out their time in the United States to

19   apply for adjustment of status, that it did not restrain the

20   government's ability to remove that person.  Obviously we're

21   going to brief this, Your Honor, and I look forward to doing

22   so.

23        I would like to mention that petitioners haven't

24   pointed to any explicitly mandatory language within the 2016

25   provisional waiver regulations that would allow this court to

1      find that a due process right vests before the I-212.

2              THE COURT:  A due process right to what?

3              MS. LARAKERS:  To -- well, Your Honor, that's the

4      second part of the analysis.

5              THE COURT:  Well, I think that's what we were talking

6      about.  There may not --

7              MS. LARAKERS:  I guess within the United States, the

8      right to apply --

9              THE COURT:  There's not -- there may not be a due

10     process right to get a 212 waiver.  That's a discretionary

11     decision.  There is -- I think you acknowledge that there is a

12     due process right to get a decision on an I-130, but your

13     argument is that doesn't mean you have to get it in the United

14     States?

15             MS. LARAKERS:  Precisely, Your Honor.  So I guess the

16     full sentence would be the right to apply for the relief within

17     the United States.  That's the due process interest that's

18     squarely before the court.

19             THE COURT:  So in your view, it would be legally

20     permissible for ICE -- well, this is the genesis of this case,

21     to schedule every person who has filed for an I-130 based on

22     marriage to a U.S. citizen with an order of removal, to

23     schedule every single one of them for an I-130 interview and

24     then arrest them, detain them and quickly remove them?

25             MS. LARAKERS:  In short, Your Honor, yes, absent other

 1    circumstances.  And again, Your Honor, this --

 2         THE COURT:  Your answer is yes, that it would be

 3    legally permissible to do.  Then wouldn't that render -- the

 4    2016 -- and this is something I haven't -- I haven't focused on

 5    the Administrative Procedure Act, and I don't even remember if

 6    it's fully briefed.  But why wouldn't that render the 2016

 7    amendment to the regulations making these people eligible for

 8    provisional waivers a nullity?

 9         MS. LARAKERS:  Well, Your Honor, I have to go back to

10    the part where -- I have to go back to what the language in the

11    provisional waiver process says, that it was never intended to

12    create a due process interest.  So while that --

13         THE COURT:  No.  It does -- it says -- where does it

14    say that?  The page that I looked at that cites the Champion

15    case said that with regard to I think -- well, with regard to

16    212 or 601, there's no right to appeal.

17         MS. LARAKERS:  Your Honor, it says in 81 Federal

18    Register 146 --

19         THE COURT:  Okay.  Let me find it.

20         MS. LARAKERS:  That's the 2016 one.  And on page

21    50258 --

22         THE COURT:  What number, 8?

23         MS. LARAKERS:  Yes, 8, Your Honor.

24         THE COURT:  I'm sorry.  502 -- what number?

25         MS. LARAKERS:  58.

 1            THE COURT:  58.  Okay.  50258.  I'm trying to find the

 2    page.

 3            MS. LARAKERS:  Yes, Your Honor.

 4            THE COURT:  Under which one?

 5            MS. LARAKERS:  It's in the far right corner.

 6            THE COURT:  I don't have -- I have the number.

 7            MS. LARAKERS:  It's under 2, Your Honor, under 2.

 8            THE COURT:  Motions to reopen?

 9            MS. LARAKERS:  Yes.  It's under "DHS declines," it's

10    in under that paragraph.

11            THE COURT:  Hold on a second.  So this relates to

12    what, the 601A?

13            MS. LARAKERS:  Yes, Your Honor.

14            THE COURT:  I read this in a different form someplace

15    else.  It says, "DHS declines to allow applicants to appeal or

16    otherwise seek reconsideration of the denials."

17            MS. LARAKERS:  It goes on to say, "As a preliminary

18    matter, DHS disagrees that there is a legal due process

19    interest in access to or eligibility for."  So it says "access

20    to," which is the pertinent part, "for discretionary

21    provisional waivers of inadmissibility."

22            THE COURT:  I read the same language someplace else,

23    quoting Champion, and then I read the case.  It said because

24    it's a discretionary decision whether or not to grant the

25    waiver, there's no right to appeal; somebody can be deported.

1    So they didn't put in the regulations the right to appeal.

2            MS. LARAKERS:  I understand, Your Honor.

3            THE COURT:  I do see it says "access to," but I don't

4    think that's --

5            MS. LARAKERS:  Again, Your Honor, I'm not using it to

6    support that there's no due process right here.  You've already

7    found that there is.  It just goes back that you can't rely --

8    that the proper analysis shouldn't be done by relying with

9    regard to the -- with regard to whether there's a right at the

10   I-130 stage or the I-212 stage by looking at the I-601A because

11   I think it's clear that DHS, by adopting these regulations,

12   didn't intend to protect from removal at all.

13           THE COURT:  Didn't intend to what?

14           MS. LARAKERS:  To protect anyone from removal by

15   promulgating the regulations.

16           THE COURT:  They wouldn't have promulgated the -- I

17   think your argument is they intended to protect people who

18   already had an I-212 approved.

19           MS. LARAKERS:  Your Honor, yes.

20           THE COURT:  Protect somebody --

21           MS. LARAKERS:  Your Honor, my argument is that this

22   court has already found that there's a due process interest, so

23   I'm accepting that.  I'm merely saying that the language here

24   can't be borrowed to create a due process interest elsewhere.

25           And Your Honor, to the extent that Your Honor feels

1    like it would make it a nullity, I think that buttresses our

2    argument later that at the very, very least there's a

3    different -- either a different due process interest or

4    different procedures due to somebody who has a Form I-130

5    pending as opposed to somebody who has a Form I-212 pending;

6    that those two groups of people are in distinctly different

7    boats at the very least.  So even if Your Honor finds there's a

8    due process right somewhere in those applications, those two

9    due process rights are separate, and they must create different

10   due process procedures.  I'm in the second step.

11           THE COURT:  They might be separate, but the rights

12   could be equivalent, the right to apply, and the petitioners

13   would argue the right to get the answer while you're in the

14   United States.  Otherwise why -- otherwise, I mean, the

15   Department of Homeland Security could repeal the regulations.

16           I think I need more briefing on the Administrative

17   Procedures Act.  Somebody needs to point me to the briefing

18   because I haven't focused on it.  You can repeal the regulation

19   if you went through the process required by the Administrative

20   Procedures Act, correct?

21           MS. LARAKERS:  Yes, Your Honor.  So with regard to the

22   APA, Your Honor, the sub silentio departure is I think where

23   you're going --

24           THE COURT:  Where am I going?

25           MS. LARAKERS:  With the sub silentio departure, the

1    APA violation that they may have noted.

2         THE COURT:  That's why I say it needs to be briefed.

3         MS. LARAKERS:  Your Honor, very briefly, I had that

4    grouped in the motion to dismiss and the PI app, and those

5    cases -- I know, it was so long ago.

6         THE COURT:  Go ahead.

7         MS. LARAKERS:  Just briefly, when there's been a sub

8    silentio departure, when the courts have held there's been say

9    a sub silentio departure, it's where the agency stopped taking

10   applications or threw all applications out the window.

11        THE COURT:  Here you just want to throw the people out

12   of the window.

13        MS. LARAKERS:  Well, ICE would have to be removing

14   everyone without --

15        THE COURT:  You said they could.  This is not an

16   evidentiary procedure.  I'm trying to do essentially the

17   statutory construction.  I need briefing in this context on the

18   Administrative Procedures Act implications of this, because

19   maybe it -- I don't know what that doctrine is.  It's somewhere

20   in your briefs from many months ago.  Because that -- I mean,

21   we heard that argument today that, you know, if you're right --

22   and you may be -- then this effectively repeals the 2016

23   regulations and without going through the Administrative

24   Procedures Act.  And part of the reason, you know, I need more

25   briefing is I need to know -- I need to decide whether that's

1    impermissible in certain circumstances and whether it's

2    impermissible here.

3            MS. LARAKERS:  Your Honor, I think that would be the

4    right framework to look at that.  I think that would certainly

5    be a better -- it would be a better framework to look at

6    whether this is a cognizable action under the APA rather than

7    whether an I-130 or a 212 gives you a due process interest.

8            THE COURT:  I think I have to look at it in both

9    frameworks.

10           MS. LARAKERS:  Right, I understand, Your Honor.  But I

11   think the government's position would be perhaps the APA is

12   more appropriate there.

13           Your Honor, I did have one more point to make that is

14   fully before this court:  that not only does the right vest --

15   that there are two requirements in order for the right to vest.

16   First, that someone had an approved I-212, but then also that a

17   person be otherwise admissible.  Because the language is very

18   clear that the provisional waiver -- in the provisional waiver

19   regulations that the principal purpose of the regulation was to

20   streamline visa issuance for individuals who were eligible for

21   an immigrant visa and otherwise admissible to the United States

22   but whose family members would experience extreme hardship due

23   to the application of certain unlawful presence grounds.

24           I think you may have read in the briefing that it's --

25   that there is no practical purpose for giving someone a

1    provisional waiver application if they're going to be held
2    inadmissible outside the United States.
3         THE COURT:  But my understanding is that those
4    decisions -- whether there's another ground for inadmissibility
5    is not made by ICE, an agency of the Department of Homeland
6    Security.  It's made by the Department of State through its
7    consular offices and embassies abroad.
8         MS. LARAKERS:  Yes, Your Honor.  But that doesn't
9    curtail what Kentucky says we must look at, which is where do
10   you draw the line with the due process right?  Where is the
11   mandatory language?  And the mandatory language here says that
12   person must be otherwise admissible.  And when DHS says that,
13   it means that no one has facts of inadmissibility on their
14   record.  So people like Ms. Calderon, who do not have any other
15   inadmissibility issues --
16        THE COURT:  But what -- I'm sorry.  Finish your point.
17        MS. LARAKERS:  So it's designed for people like
18   Ms. Calderon, who does not have any other inadmissibility
19   ground or any facts to suggest that she's inadmissible under
20   any other ground besides the unlawful presence, that she will
21   get the maximum practical benefit out of this waiver because as
22   soon as she goes to her visa interview, she will immediately be
23   able to come back in.
24        The reason why DHS drafted it this way is they wanted
25   to make sure people who are ultimately -- where the provisional

1    waiver is ultimately going to be automatically revoked, it

2    wasn't designed for those individuals.

3            THE COURT:  This is another issue I haven't studied

4    perhaps as deeply as I want to.  But my present view is the

5    only -- the relief that I said was required in my August and

6    September decisions is that ICE in good faith consider, among

7    other things, that the person might be eligible for a

8    provisional waiver and was pursuing that option, has to

9    consider that this person has an American citizen spouse, this

10   person has frequently U.S. citizen children, the Immigration

11   and Nationality Act, as courts have said, manifests a

12   particular interest in keeping families of U.S. citizens

13   together, not traumatizing children and spouses and all of

14   that.

15           So I question whether this is the time for the court

16   to say more than that.  I don't think I've said that ICE can't

17   look at this and say, "This person's obviously going to be

18   found inadmissible by the consulate office.  We shouldn't get

19   her hopes up.  We shouldn't waste everybody's time and money.

20   We're not going to give the 212."

21           Then if this is a class action, that person -- that's

22   a discretionary decision, so that I think -- at the moment, not

23   a final answer -- that I think I could not review.  If the

24   person came and said, "That's just a pretext, they did that

25   because I'm from Guatemala, and they don't want any more people

1   here from Guatemala," maybe that could -- perhaps that could be

2   litigated.  But I don't think my decision in September would

3   preclude ICE from making that kind of determination in good

4   faith.

5          MS. LARAKERS:  Precisely, Your Honor, it wouldn't.

6   And the government would agree if there is going to be relief

7   issued in this case, it should be consideration, only

8   consideration as you have just defined it.

9          THE COURT:  But we're doing this in part in connection

10  with defining a potential class for class action purposes.  So

11  a person who might be found inadmissible by ICE would still be

12  in the class.  She would be entitled to a good faith

13  consideration that she's pursuing the provisional waiver

14  process, among other things.  And it doesn't require that ICE

15  give that person an I-212.  It requires that it consider the

16  whole range of relevant factors and exercise judgment.

17         MS. LARAKERS:  Yes, Your Honor, and that's precisely

18  how it would work if that person was a member of the class.

19  But we're looking at the first step here, and we're looking at

20  whether that person has a due process interest at all.  And I

21  would -- our position --

22         THE COURT:  If that person has a right to apply for a

23  212, I believe that person has a due process interest.  What

24  I've heard or understood for the first time today is you're

25  arguing that yes, they have a right to apply and they have a

1    right to a decision, but they don't have a right to be in the

2    United States while they're waiting for the decision.

3              MS. LARAKERS:  Right.  And the further argument is

4    that a person who is not otherwise admissible doesn't have that

5    due process right even in the provisional waiver -- even in

6    applying for the 601A.

7              THE COURT:  Yeah.  That doesn't sound right to me

8    because, if they don't apply, how is there going to be an

9    occasion for ICE to make the decision?

10             MS. LARAKERS:  Because I don't think ICE -- because I

11   don't think that they have that first step in the analysis.

12   The government's position is that they don't have a due process

13   interest to apply for the provisional waiver process.  And Your

14   Honor may disagree, but the only reason --

15             THE COURT:  So far I do.  I mean, if anybody has a

16   right to apply, a person who is otherwise inadmissible has a

17   right to apply and a right to have that fact, if it is a fact,

18   considered with all of the other relevant facts, including the

19   fact that, you know, they're married to a United States citizen

20   and probably they have children who are U.S. citizens, and

21   they're pursuing a path that could lead them to having the

22   opportunity to keep their family intact.

23             MS. LARAKERS:  I understand, Your Honor.  I would only

24   point out that the provisional waiver regulations don't suggest

25   that these individuals have that right to apply because in

1  212 -- very briefly, Your Honor, in 212.7(e) --

2        THE COURT:  I'm sorry.  212.7 --

3        MS. LARAKERS:  (e) and then (3).  So the (3) part says

4  that, "an alien may be eligible to apply for and" -- or I think

5  it says "or receive."  But it does say, "may be eligible to

6  apply for."

7        THE COURT:  No, I don't think so.  That doesn't seem

8  to be what (3) says.  Maybe I'm looking at the wrong thing.

9  What did you say?  This is --

10        MS. LARAKERS:  So (e)(3) --

11        THE COURT:  (e)(3) "Eligible aliens"?

12        MS. LARAKERS:  Yes.  3 starts out, it says -- sorry.

13  I'm going to get the full quote, Your Honor.

14        THE COURT:  "Departure would be inadmissible only

15  under 212(a)(9)(B)(i) of the Act, unlawful presence at the time

16  of the immigrant visa interview."

17        MS. LARAKERS:  Yes, Your Honor.  And more

18  specifically, that 3 says "may be eligible to apply for."

19        THE COURT:  I don't see that.

20        MS. LARAKERS:  So under "Eligible aliens," 3 says,

21  "Except as provided in paragraph (e)(40 of this section, an

22  alien may be eligible to apply for and receive," and then it

23  goes down and has a colon.  So I read that to mean "apply for,"

24  "may be eligible to apply for and receive if" these things

25  exist.

1          THE COURT:  "Apply for and receive a waiver if he or
2     she:  Upon departure would be inadmissible" because they've
3     been ordered previously removed.
4          MS. LARAKERS:  "Would be admissible only" under that
5     section.
6          THE COURT:  Hold on.  What about "Ineligible
7     aliens" --
8          MS. LARAKERS:  Admittedly, Your Honor, it doesn't say
9     that in the "Ineligible aliens" part.
10          THE COURT:  It says you're ineligible if you're
11     subject to an administrative final order of removal, unless the
12     alien has already filed and USCIS has already granted an
13     application for consent to reapply for admission.
14          So that's one of the provisions I thought that
15     suggested a person had arguably a right to apply for a 212.7(e)
16     waiver even if there was some ground for admissibility other
17     than unlawful presence.
18          MS. LARAKERS:  Your Honor --
19          THE COURT:  The unlawful presence makes you
20     ineligible, but then you can get an exception to ineligibility
21     under (4)(iv).
22          MS. LARAKERS:  Your Honor, under the (4)(iv) part,
23     under the "Ineligible aliens" part, that's related to the first
24     part of our argument, that someone must have a 212.  The part
25     under 3, which we just read, being otherwise admissible,

1  admittedly it's not under the "Ineligible aliens" part, but

2  this section still does say, "may be eligible to apply for,"

3  and then says "must be otherwise inadmissible."

4          THE COURT:  And if you're inadmissible for some reason

5  other than unlawful presence, you're ineligible; but then when

6  you go under ineligible, it says that you can get out of being

7  ineligible if you've filed and been granted a provisional

8  unlawful presence waiver under 212.

9          MS. LARAKERS:  Yes, Your Honor.  And that cures the

10  ground of inadmissibility for being removed.

11          THE COURT:  It doesn't -- you're saying it doesn't

12  cure the other grounds.

13          MS. LARAKERS:  Doesn't cure other grounds, precisely.

14  So that's why the government's argument is that any right

15  should be limited to those with an approved I-212 and to people

16  who are otherwise admissible.  And the argument that

17  petitioners put forward that the more general purpose of

18  keeping the families together and extending this relief to

19  final order aliens cuts against the essential tenet of

20  statutory and regulatory interpretation that the more precise

21  provision, the more narrow provision should prevail in any

22  analysis.

23          That's all I have, Your Honor.

24          THE COURT:  Would petitioners like to respond to some

25  of that?

1          MR. PROVAZZA:  Yes, Your Honor, but just two

2     preliminary points.  I would request that, if possible, if you

3     could dismiss Ms. Calderon and Ms. De Souza.

4          THE COURT:  So they can go home?

5          MR. PROVAZZA:  So they can go home.

6          THE COURT:  Okay.  And you have authority to act for

7     them in their absence?

8          MR. PROVAZZA:  No, we don't have authority to act for

9     them in their absence, Your Honor.

10          THE COURT:  Then they should stay.

11          MR. PROVAZZA:  Understood.  Then one other note, and

12     apologies, my fault for not mentioning it before, after lunch

13     Ms. McCullough, our co-counsel, had to go back to the office,

14     so she hasn't been here since lunchtime.  I apologize for not

15     mentioning that sooner.

16          THE COURT:  You seem to have enough lawyers.  You have

17     six left.

18          MR. PROVAZZA:  Understood, Your Honor.

19          To start, I think I want to go back to the fact that

20     the I-130 is the first step in the only available process for

21     class members to get legal status through their spouse.  There

22     isn't a shadow process that they're applying for.  It's the

23     I-130, I-212, I-601A is the only way for them to get legal

24     status through their spouse to come back to the United States.

25     And I think that's important to consider in context of the

1    actual words in the regulation and in the rulemaking.

2           But to tie this back to the Kentucky v. DOC case, that

3    case really goes to whether you can identify a statutory or

4    regulatory right basis for a due process right.  It doesn't

5    really go to when that right vests.  So you know, an analogy --

6           THE COURT:  I don't understand the distinction in the

7    context of this case.  Either you have a right or you don't.  I

8    don't know that vesting -- I think we've understood each other,

9    but it may be more precise to say do you have a right at this

10   stage -- I mean, theoretically, you could have a right in one

11   stage and a series of events, possible events, and not in

12   another stage.

13          MR. PROVAZZA:  Understood, Your Honor.

14          THE COURT:  It would depend on what the statute and

15   regulations say.

16          MR. PROVAZZA:  But I think as a metaphor to what took

17   place in Kentucky v. DOC, you know, if a prisoner has a right

18   to have visitors, that right doesn't just vest when they fill

19   out an application for them to arrive.  If the prison says, "We

20   don't print applications anymore.  I'm sorry; you can't fill

21   out an application.  You can't have more visitors."  They

22   didn't just have a right at the time they sat down and filled

23   out the application.  They have the right -- and here, when the

24   rule-makers created the 2016 regulations, they created one path

25   for class members to get legal status through their spouse.

 1    And the first form they have to fill out is the I-130.

 2            THE COURT:  Is it referred to in the regulations or

 3    the --

 4            MR. PROVAZZA:  It's referred to in the rulemaking,

 5    Your Honor.

 6            THE COURT:  Where is that?

 7            MR. PROVAZZA:  If we can turn to the 2016 regulations,

 8    and if we look at page 50259.  If you look under (e)(1),

 9    concurrent filing, and if you look at this whole section,

10    commenters wrote in and said, Why can't they file the I-130

11    concurrently with an I-601A; why can't they file the I-212

12    concurrently with the I-601A?  And the rule-makers considered

13    that and decided no, this is a process that has different

14    stages and that this leverages the efficiencies of the process.

15    And we're calling people forward to fill out these forms in a

16    certain order.

17            THE COURT:  Let me look at this.  So this is rejecting

18    concurrent filing of the I-212 and 601.

19            MR. PROVAZZA:  601A.

20            THE COURT:  Where does it talk about the I-130?

21            MR. PROVAZZA:  For example, second paragraph, the

22    current denial is a --

23            THE COURT:  Not too fast.

24            MR. PROVAZZA:  Sorry, Your Honor.  Second sentence of

25    the second paragraph.

1          THE COURT:  The family-based immigration visa

2     petitions, the I-130?

3          MR. PROVAZZA:  Yes, Your Honor.

4          THE COURT:  Okay.

5          MR. PROVAZZA:  And this issue is discussed even

6     further if we look back at the 2013 regulations, which again

7     created the provisional waiver process for people without final

8     orders of removal.

9          THE COURT:  Okay.  Go on.

10          MR. PROVAZZA:  Again, if you turn to the 2013

11     regulations on page 538, the same discussion takes place with

12     I-130s being filed concurrently with 601.

13          THE COURT:  What page?

14          MR. PROVAZZA:  548, this is the 2013 regulations, Your

15     Honor.

16          THE COURT:  Do I have the 2013 regulations?  I have

17     them here?  Where?

18          Are you talking about the Federal Register?

19          MR. PROVAZZA:  Sorry, Your Honor.  8 CFR.

20          THE COURT:  I don't know if I have it.  Sorry.  What

21     page?

22          MR. PROVAZZA:  548, beginning on 547, it starts with

23     Section (d)(1) on 547.

24          THE COURT:  "Concurrent filing"?

25          MR. PROVAZZA:  Correct.

1          THE COURT:  Go ahead.

2          MR. PROVAZZA:  The top of second paragraph, they

3    explain they consider --

4          THE COURT:  Where it --

5          MR. PROVAZZA:  -- 601A and decided that the point of

6    this process is to leverage and streamline what USCIS is able

7    to do, and that they should be filed one after the other.

8    Similarly, still in the 2013 regulations, page 573, you can see

9    at the top of page 573 --

10          THE COURT:  I'm sorry.  I'm having trouble finding it.

11          MR. PROVAZZA:  No problem.  Take your time.

12          THE COURT:  573, what would you like me --

13          MR. PROVAZZA:  Your Honor, when you look at how the

14    rule-makers calculated the cost of the provisional waiver

15    process, they explicitly included the I-130 as the first step

16    and the first cost.

17          THE COURT:  Okay.

18          MR. PROVAZZA:  In the prior page, just one other point

19    in the rulemaking is that they acknowledge that the creation of

20    the provisional waiver process, at the very bottom, will

21    increase the number of people filing for I-130s.

22          THE COURT:  The previous page?

23          MR. PROVAZZA:  The previous page, at the very bottom

24    it starts, "In addition to the costs."  It explains that they

25    expect an increase in I-130 applications because of the

 1    provisional waiver regulations.

 2            THE COURT:  Okay.

 3            MR. PROVAZZA:  So all of this demonstrates that USCIS

 4    was calling forward a group of people to come to them to file

 5    an I-130 form, pay a fee and start down the provisional waiver

 6    process.  It wasn't just -- they weren't just creating a form

 7    I-601A that people can fill out and then you have -- that's

 8    what this was created for.  No.  This is a full process for

 9    families with U.S. citizen spouses to fill out three

10    applications and then go abroad and try to get lawful status.

11    And the purpose of the provisional waiver applications was to

12    keep these families together while they sought lawful status.

13            Now, every case that's considered when the provisional

14    waiver process starts, every single case says that it starts

15    with the I-130.

16            THE COURT:  Well, how many cases are there?

17            MR. PROVAZZA:  Villavicencio in the Southern District

18    of New York.  De Jesus Martinez in the District of New Jersey

19    and Lin in the District of Maryland.

20            THE COURT:  So there are three District Court cases.

21    I read two of them.  I don't think I read the Maryland case.

22    They don't seem to explain why.  They don't -- they're not at

23    the level of detail we are right now.

24            MR. PROVAZZA:  Agreed, Your Honor.  I think that's

25    because it was apparent to those courts that this is a process

```
 1    meant to benefit a class of a group of people, and when the
 2    2016 regulations were created, they were meant to benefit that
 3    group.
 4              THE COURT:  Did the government make the same arguments
 5    it's making to me?
 6              MR. PROVAZZA:  I don't know, Your Honor.  I didn't
 7    read the government's briefing there.
 8              I would just like to mention one more time, the
 9    government cited Arevalo and Goncalves as the First Circuit
10    precedent on point, but those are retroactivity cases.  The
11    controlling case for both of those is St. Cyr, which already
12    dealt with this issue of whether, you know, you don't actually
13    have to be able to file a form.  The process vested when you
14    became the intended beneficiary.
15              And I'd also like to address there, they also said the
16    second prong of their vesting argument is that people that are
17    potentially subject to other bars of inadmissibility other than
18    the unlawful presence bar don't have a vested right in the
19    provisional waiver process.
20              The focus of their argument is they're not in
21    absentia -- individuals with in absentia orders.  But the text
22    of the regulations and DHS's own website say that people
23    eligible with final orders of removal, including in absentia
24    orders --
25              THE COURT:  In absentia means you're outside the U.S.?
```

1          MR. PROVAZZA:  Sorry.  In absentia, that means that

2     you missed an immigration --

3          THE COURT:  You didn't go to a hearing.

4          MR. PROVAZZA:  They say this group of people is

5     excluded from the provisional waiver process and that they have

6     no way to benefit.  But again, the text of the regulation of

7     212.7 and DHS's own website say that people with in absentia

8     orders can apply.

9          THE COURT:  I know a lot of this is in your briefs,

10    but there are certain issues coming into sharp focus, and it

11    may be valuable for you to put them all in one place for me.

12    Go ahead.

13         MR. PROVAZZA:  I think, especially this in absentia

14    order, this is fully briefed in our class certification

15    briefing.  This is an argument --

16         THE COURT:  But that's a problem.  I didn't intend you

17    to do class certification briefing.  You're going to do better

18    if you listen to me.  I wrote it in September, and I must have

19    been doing something else when I signed your order that let you

20    do these things, brief these things simultaneously.

21         I continue to believe that I can't have a hearing

22    that's not going to be more confusing than helpful with regard

23    to class certification until I decide what you're calling the

24    vesting issue.  And I am deeply into what you put in your

25    vesting briefs, and I haven't gone into what you put in your

1    class certification briefs.  So I'm going to give you a chance

2    to put it all in one place so I can focus on it and not have to

3    hunt around for your arguments in different documents.

4          MR. PROVAZZA:  I understand that, Your Honor, but this

5    is an argument they raised in their vesting section and said

6    these people don't have a vested right --

7          THE COURT:  Right.  So that's the place to respond to

8    it, in the vesting brief, not in the class action brief.

9          MR. PROVAZZA:  Understood, Your Honor.

10          THE COURT:  In the future --

11          MR. PROVAZZA:  Understood, Your Honor, but I'm

12    addressing the arguments --

13          THE COURT:  I'm not going to decide this today.  The

14    hearing is helpful, but in part more helpful in raising issues

15    than in making me think I know what the answers are right this

16    minute.  So do you have anything else important you want to --

17          MR. PROVAZZA:  I did just want to reference, Your

18    Honor, the APA claim.  That's something that we have fully

19    briefed.

20          THE COURT:  Where?

21          MR. PROVAZZA:  In the motion to dismiss and in the

22    preliminary injunction motion.

23          THE COURT:  Here.  We're in docket number -- about

24    200.  I'm not having a hearing on a motion for preliminary

25    injunction.  But this is fine.  It's there.  It's not going to

1    be that hard for you to do it.  You just got to put it all in

2    one place so the poor judge can find it.

3              MR. PROVAZZA:  Understood, Your Honor.  And I just

4    wanted to put that in context of -- presumably this was on our

5    motion to certify the class.  And really the question of class

6    certification is whether the APA claim raises common questions.

7              THE COURT:  I told you back in September that I wasn't

8    going to do class certification until I decided vesting, and

9    you've confirmed me in my sense that's the right way to

10   proceed.

11             Here is what we're going to do.  I want -- the fact

12   that I'm mentioning a couple of issues doesn't mean these are

13   the only issues, but I want further briefing on the vesting

14   issue that does at least the following.  And if you have

15   arguments in some of the 200 brief filings that are relevant,

16   put them all in the new filing.

17             But I want to know your positions on whether there are

18   statutes or regulations that provide a right to apply for an

19   I-130 and a right to apply for an I-212.  You know, this is

20   essentially the Kentucky v. DOC argument.  I'd like you to

21   address -- I want you to address whether somebody -- if there's

22   a right to apply and with regard to the I-130, I think, there

23   is a right to get a decision -- you know, what is the authority

24   for the proposition a person has a right to stay in the United

25   States to await that decision or doesn't have a right to stay

1    in the United States.

2           Then, you know, you can reiterate your arguments on

3    whether the provisional waiver regime is a process that starts

4    at the I-130 and that is -- you've been telling me this, but

5    record it -- you think it is or it isn't.  What are the

6    implications of all these references in the Federal Register.

7    And so there's that.

8           And then -- and I haven't focused on this.  It's

9    somewhere in the 200 submissions -- the Administrative

10   Procedure Act argument because there is a certain logic to the

11   contention that if everybody can be arrested when they come in

12   for their I-130 who has an order of removal, the 2016

13   regulations are rendered meaningless, and we're admonished by

14   the Supreme Court not to interpret things that are meaningless.

15   But the life of the law is not logic.  It's experience.  What

16   did Congress intend.  And then anything else.  I'm directing

17   that you order the transcript of today's hearing so we have a

18   record of what we've been discussing and I can refresh myself.

19          What's a reasonable amount of time to do this

20   additional briefing?  And if you do it simultaneously, do you

21   want an opportunity for replies?

22          MS. LARAKERS:  Your Honor, I will say that I've got a

23   lot of briefing due in the month of December, right before the

24   end of the year, including a Fifth Circuit brief, so I would

25   prefer it would be sometime in January, as I am really the only

1    person at my office who knows enough detail about this case to

2    brief it.

3           THE COURT:  I'm not -- I mean, you have an agreement,

4    as I understand it, as to what's going to be done while I'm

5    deciding these matters.  I don't know if there was a timeline

6    on that agreement.  But my general sense is if ICE is willing

7    to continue to do whatever it's doing, if you want to file the

8    briefs in January, we're all busy.

9           MR. PROVAZZA:  Your Honor, do you mind if I just

10   discuss this with Ms. Lafaille?

11          THE COURT:  No, not at all.

12          MR. PROVAZZA:  Thank you.

13          MS. LARAKERS:  Your Honor --

14          THE COURT:  Just wait because now they're talking, and

15   I want them to hear what you're saying.  So just wait.

16          MR. PROVAZZA:  Your Honor, we agree to a briefing due

17   in January, but we would like to note that that might be best

18   in conjunction with continued reporting.

19          THE COURT:  Yes.  That's what I mean.  In fact, I'll

20   see you in the lobby.  It will be easier to do this.  But

21   that's what I meant.  If they're willing to continue to do

22   whatever they've been doing up to this point that the parties

23   agreed upon, then the petitioners will be content.  But these

24   are hard issues.

25          MS. LARAKERS:  Your Honor, I'll speak to my client.

1          THE COURT:  All right.  Okay.  So I'll give you --

2     what if I give you until January 11 to file your briefs?  Does

3     that sound reasonable?  Get you through the holidays, after New

4     Year's.  It's a Friday.  Unless you want a Monday.

5          MS. LARAKERS:  I would love Monday, Your Honor.

6          THE COURT:  Really?  It will wreck your --

7          MS. LARAKERS:  Actually, no, you're right.  Tuesdays

8     are good.  Friday, in your infinite wisdom, Your Honor, that is

9     the right day.

10          THE COURT:  I'm trying to give you a life.

11          MS. LARAKERS:  Yes, thank you, Your Honor.

12          THE COURT:  If you need a day or two more, you can ask

13     for it.  January 11.

14          MR. PROVAZZA:  That's fine, Your Honor.

15          THE COURT:  Do you think you're going to want to file

16     replies maybe?

17          MS. LARAKERS:  Yes, Your Honor.

18          MR. PROVAZZA:  Concurrent replies, yes, Your Honor.

19          THE COURT:  All right.  Any replies shall be filed by

20     January 25.  And then I'll see what we have, and I'll set a

21     hearing date, or I can give you a tentative hearing date.

22     Unless this is school vacation, which seems to believe five

23     days of Christmas in this generation, February 14 and 15.  Is

24     that okay?

25          MS. LARAKERS:  Yes.

1          THE COURT:  All right.

2          MR. PROVAZZA:  Yes, Your Honor.

3          THE COURT:  I want to see counsel with their clients

4     in the lobby.  Anything further for the public session?  Court

5     is in recess.

6          (Adjourned, 3:32 p.m.)

CERTIFICATE OF OFFICIAL REPORTER

1

2

3          I, Kelly Mortellite, Registered Merit Reporter

4   and Certified Realtime Reporter, in and for the United States

5   District Court for the District of Massachusetts, do hereby

6   certify that the foregoing transcript is a true and correct

7   transcript of the stenographically reported proceedings held in

8   the above-entitled matter to the best of my skill and ability.

9                    Dated this 14th day of  December, 2018.

10

11                    /s/ Kelly Mortellite

12                    _____

13                    Kelly Mortellite, RMR, CRR

14                    Official Court Reporter