**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ) | |
| LILIAN PAHOLA CALDERON JIMENEZ ) | |
| and LUIS GORDILLO, et al., ) | |
| ) | |
| Individually and on behalf of all others ) | No. 1:18-cv-10225-MLW |
| similarly situated, ) | |
| ) | |
| Plaintiffs-Petitioners, ) | |
| ) | **ORAL ARGUMENT REQUESTED** |
| v. ) | |
| ) | **MOTION TO EXCEED PAGE** |
| KIRSTJEN M. NIELSEN, et al., ) | **LIMIT FILED FEB. 21, 2019** |
| ) | |
| Defendants-Respondents. ) | |
| ) | |

**SUPPLEMENTAL MEMORANDUM IN SUPPORT OF PETITIONERS'**
**MOTION FOR CLASS CERTIFICATION**

# TABLE OF CONTENTS

**Page**

**INTRODUCTION**................................................................................................1

**PETITIONERS' PROPOSED CLASS** ................................................................5

**ARGUMENT** ....................................................................................................6

I.    The scope of the proposed class is proper because the putative class members all have a due process interest in living in the United States with their families while they pursue lawful status under the provisional waiver regulations. .......................7

    A.    The Court correctly held Petitioners have a due process interest in remaining in the United States with their families while pursuing lawful status under the provisional waiver process.................................................8

    B.    The liberty interest the Court recognized is present during the entire provisional waiver process, which begins with the filing of an I-130. ......10

II.    The scope of Petitioners' proposed class is appropriate as to Petitioners' APA claim because the members of the proposed class all have standing to challenge the government's unlawful abandonment of its provisional waiver regulations. ...19

    A.    Petitioners have adequately alleged class-wide APA violations. ..............20

    B.    The members of the putative class have suffered an injury in fact and fall within the INA's "zone of interest." ........................................................23

III.    For the same reasons, Respondents' actions violated the INA and its regulations, which all putative class members have standing to challenge..............................25

IV.    Respondents' actions violated the equal protection rights of all putative class members.................................................................................................26

**CONCLUSION** ................................................................................................27

i

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*United States ex rel. Accardi v. Shaughnessy*,
   347 U.S. 260 (1954).................................................................................................8

*Ali v. United States*,
   849 F.3d 510 (1st Cir. 2017).................................................................................18

*Arevalo v. Ashcroft*,
   344 F.3d 1 (1st Cir. 2003)...................................................................7, 8, 15, 17

*Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 252 (1977)..............................................................................................26

*Atieh v. Riordan*,
   727 F.3d 73 (1st Cir. 2013)...................................................................................23

*Batalla Vidal v. Duke*,
   295 F. Supp. 3d 127 (E.D.N.Y. 2017), *motion to certify appeal granted sub
   nom. Batalla Vidal v. Nielsen*, No. 16CV4756NGGJO, 2018 WL 333515
   (E.D.N.Y. Jan. 8, 2018) ........................................................................................23

*Batalla Vidal v. Nielson*,
   291 F. Supp. 3d 260 (E.D.N.Y. 2018) .................................................................27

*Brennan v. Cunningham*,
   813 F.2d 1 (1st Cir. 1987)......................................................................................8

*Ceta v. Mukasey*,
   535 F.3d 639 (7th Cir. 2008) .........................................................................17, 25

*Clarke v. Sec. Indus. Ass'n*,
   479 U.S. 388 (1987)..............................................................................................24

*Clean Air Council v. Pruitt*,
   862 F.3d 1 (D.C. Cir. 2017)..................................................................................22

*De Araujo v. Gonzalez*,
   457 F.3d 146 (1st Cir. 2006)..................................................................................8

*De Jesus Martinez v. Nielsen*,
   341 F. Supp. 3d 400 (D.N.J. 2018) .................................................................10, 21

*Fernandez-Vargas v. Gonzales*,
   548 U.S. 30 (2006)........................................................................................4, 10, 15

*F.C.C. v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009)........................................................................................................22

*Judulang v. Holder*,
565 U.S. 42 (2011)..........................................................................................................20

*Kerry v. Din*,
135 S. Ct. 2128 (2015)....................................................................................................18

*KG Urban Enters. v. Patrick*,
No. 11-12070-NMG, 2014 WL 108307 (D. Mass. Jan. 9, 2014) ...........................26

*Landgraf v. USI Film Prod.*,
511 U.S. 244 (1994)........................................................................................................16

*Lin v. Nielson*,
18-cv-03548-GJH (D. Md. Nov. 19, 2018) .............................................................21

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)........................................................................................................23

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
567 U.S. 209 (2012)........................................................................................................23

*Nat'l Ass'n for the Advancement of Colored People v. Trump*,
298 F. Supp. 3d 209 (D.D.C. 2018) ..........................................................................24

*Nat'l Petrochemical & Refiners Ass'n v. EPA*,
287 F.3d 1130 (D.C. Cir. 2002)...........................................................................24, 25

*O'Hara v. Diageo-Guinness, USA, Inc.*,
306 F. Supp. 3d 441 (D. Mass. 2018) ......................................................................23

*Obergefell v. Hodges*,
135 S. Ct. 2584 (2015)....................................................................................................18

*Ortega v. Holder*,
747 F.3d 1133 (9th Cir. 2014) ...........................................................................15, 17

*Patel v. U.S. Citizenship & Immigration Servs.*,
732 F.3d 633 (6th Cir. 2013) .....................................................................................24

*Plyler v. Doe*,
457 U.S. 202 (1982)........................................................................................................26

*Ramos v. Nielsen*,
321 F. Supp. 3d 1083 (N.D. Cal. 2018) ...................................................................22

iii

*Regents of the Univ. of California v. U.S. Dep't of Homeland Sec.*,
    908 F.3d 476 (9th Cir. 2018) ................................................................27

*Saget v. Trump*,
    345 F. Supp. 3d 287 (E.D.N.Y. 2018) ...........................................26, 27

*Sandin v. Connor*,
    515 U.S. 472 (1995)..........................................................................9

*I.N.S. v. St. Cyr*,
    533 U.S. 289 (2001)...................................................................15, 22

*Kentucky Department of Corrections v. Thompson*,
    490 U.S. 454 (1989).......................................................................8, 9

*Villavicencio Calderon v. Sessions*,
    30 F. Supp. 3d 944 (S.D.N.Y. 2018)...........................................10, 21

*Waldron v. INS*,
    17 F.3d 511 (2d Cir.1993)...............................................................18

*Wilkinson v. Austin*,
    545 U.S. 209 (2005).......................................................................8, 9

*Ying Fong v. Ashcroft*,
    317 F. Supp. 2d 398 (S.D.N.Y. 2004), *amended on reconsideration in part*
    *sub nom. Fong v. Ashcroft*, No. 03 CIV. 7261 (AKH), 2004 WL 1348994
    (S.D.N.Y. June 15, 2004)................................................................18

*You v. Nielsen*,
    No. 18 Civ 5392 (S.D.N.Y. Aug. 2, 2018) .......................................26

*Zadvydas v. Davis*,
    533 U.S. 678 (2001)..........................................................................8

**Federal Statutes**

5 U.S.C. § 553.....................................................................................5

5 U.S.C. § 706(2)(A)...................................................................5, 20, 21

8 U.S.C. § 1154(b) .................................................................................3

8 U.S.C. § 1252(g) ...............................................................................22

Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L.
    No. 104-208, § 301, 110 Stat. 3009-546 (codified at 8 U.S.C. § 1182(a)(9)(B))...................13

**Rules**

Fed. R. Civ. P. 23 ................................................................................................................6

**Regulations**

8 C.F.R. § 212.2(h) ...........................................................................................................3

8 C.F.R. § 212.7(e).............................................................................................6, 9, 12, 22

Provisional Unlawful Presence Waivers of Inadmissibility for Certain Immediate
    Relatives; Final Rule, 78 Fed. Reg. 536 (Jan. 3, 2013) ...............................11, 13, 19

Expansion of Provisional Unlawful Presence Waivers of Inadmissibility; Final
    Rule, 81 Fed. Reg. 50244 (July 29, 2016) ...................................................... *passim*

**Constitutional Provisions**

U.S. Const. amend. V.......................................................................................... *passim*

## INTRODUCTION

In 2016, the Department of Homeland Security (DHS) promulgated regulations offering certain noncitizens with final orders of removal a five-step path to seek legal status that does not require them to spend months or years away from their U.S. citizen spouses.  This "provisional waiver process" is their only path to lawful status through their U.S. citizen spouses without prolonged separation.  In August 2018, this Court held that due process protects people pursuing this process, and thus prevents DHS from removing them without considering their pursuit of lawful status and the regulations that seek to keep their families together.  Dkt. 159.  In December 2018, the Court ordered supplemental briefing on questions asking, in effect, whether that same due process protection attaches at *the first two steps* of this process, or only at *the successful conclusion of the second step*.  Dkt. 193.

As explained below, the answer is that there *is* a protected due process interest at every step and that, even if there were not, preventing someone from embarking on the initial steps would *still violate* the due process interest that attaches to the remaining steps. Accordingly, any class-wide relief in this case should encompass people embarking on the first step of the provisional waiver process.

Petitioners and putative class members are U.S. citizens and their noncitizen spouses with final orders of removal.  To gain lawful status under the "provisional waiver process" the noncitizen spouse must:  (1) be the beneficiary of a marriage petition filed by their U.S. citizen spouse (Form I-130); (2) secure conditional "consent[] . . . to reapply[] for admission" after departure on a final order of removal (Form I-212); (3) obtain a provisional unlawful presence waiver (Form I-601A); (4) attend an immigrant visa interview at a U.S. consulate abroad; and (5)

become a lawful permanent resident upon admission to the United States.  *See* Am. Compl. ¶¶ 30-36.  Each couple in the putative class has begun the process by filing an I-130.

The due process interest the Court identified protects those who are at the first step of this process—not merely those who are prepared to submit I-601A applications—for three reasons. First, the regulations created a single pathway for noncitizens with final orders of removal to pursue legal status without spending years outside the United States, and the resulting due process interest arises with regard to that entire process.  While the *mechanism* for building that process was a change to the regulations governing the third step, it would be misguided to believe that the regulators did not design an entire path.  *See infra* Section I.B.1.

Second, even if the due process interest the Court identified did not attach to the first two steps—the I-130 and I-212 applications—the Due Process Clause would not leave the government free to sabotage them.  Because those steps are prerequisite to and the *exclusive* means to reach the remaining steps, in which there is an unquestionable due process interest, sabotaging the initial steps violates the due process interest in the remaining steps even if the government achieves this illicit end through means that are not stand-alone due process violations.  It does not matter if the government prevents people from reaching the I-601A step by detaining and removing people with pending I-130 applications, as has been its practice, or instead by hiding all the pens and pencils that people use to fill out immigration forms. The due process interest in the I-601A step is implicated as soon as the government takes action—any action—to prevent people who have set out in its direction from reaching it. *See infra* Section I.B.2.

Third, even if the I-601A regulations would not otherwise create a liberty interest that attached throughout the entire provisional waiver process, they do in this case because the

regulations are designed to protect the U.S. citizen petitioners' due process right to live in the

United States with their spouses, and create the legitimate expectation that they will do so.  *See*

*infra* Section I.B.3.

Finally, even if Petitioners' *due process* claim allowed for distinctions between stages of

the provisional waiver process—and it does not—such a distinction is not possible for

Petitioners' claims under the Immigration and Nationality Act, Administrative Procedures Act,

and Equal Protection Clause.  All the putative class members have standing to raise these claims

because all of them are harmed by the government's unlawful abandonment of the promises

contained in the 2016 regulations.  Petitioners' proposed class definition should therefore not be

narrowed.

Consistent with the principles articulated above, and as further explained below,

Petitioners respond as follows to the Court's questions:

**(a) Whether the statutes and regulations governing the Form 1-130 ("Petition for an Alien Relative") and/or the Form I-212 ("Application for Permission to Reapply for Admission into the United States After Deportation or Removal") establish a right to apply for each and, therefore, alone create a liberty interest which entitles an alien to Due Process.**

Yes.  Respondents concede that Petitioners have a due process right to file I-130 and I-

212 applications and have them considered and decided.  *See, e.g.*, Dec. 6, 2018 Hr'g Tr. at 79:3-

7; 93:22-94:3.  Mandatory language in immigration laws and regulations is not required to make

clear that the establishment of an immigration benefit and application process creates a

legitimate expectation that it will be adjudicated according to applicable law.  *See infra* Section

I.A & n. 1.  Nevertheless, such language is present here.  *See* 8 U.S.C. § 1154(b) ("the Attorney

General shall … approve" an I-130 if he "determines that the facts in the petition are true");

8 C.F.R. § 212.2(h) (requiring I-212 applicant to "be notified of the decision"); *id.* § 212.2(j)

(requiring applicant for conditional I-212 to receive approval conditioned on departure).

**(b) If there is a right to apply for approval of an 1-130 application or 1-212 application, whether there is a right to receive a decision regarding those applications while still in the United States.**

Yes.  Petitioners do not argue that this right derives from the I-130 and I-212 procedures themselves.  Rather, as explained in response to (c), Petitioners contend their due process interest in receiving a decision on these applications while they are in the United States is a consequence of the procedure established by the I-601A regulations.

**(c) Whether the statutes and regulations governing the provisional wavier process establish a right to apply for a provisional wavier beginning at the 1-130 or 1-212 stage.**

Yes.  For three reasons discussed in the Introduction and the Argument below, the 2013 and 2016 regulations establish a due process right that extends to the entire provisional waiver process, including the I-130 stage.  First, the regulations created *one process* for seeking lawful status that begins with the filing of an I-130, even though the *mechanism* for creating that process required only an amendment to the procedures for seeking an unlawful presence waiver. *See infra* Section I.B.1.  Second, even if the liberty interest created by the I-601A regulations attached only to the Form I-601A, that liberty interest has "vested" in individuals who have taken actions that "enhance the significance" of the I-601A application to their lives, including the filing of an I-130.  *See infra* Section I.B.2; *Fernandez-Vargas v. Gonzales*, 548 U.S. 30, 44 n.10 (2006).  Third, the due process right should be liberally applied to protect the entire process, starting with the filing of an I-130 application, because the provisional waiver regulations protect a due process right in U.S. citizens remaining in the United States with their spouses.  *See infra* Section I.B.3.

**(d) Explain their respective positions on the merits of the petitioners' claims concerning the Administrative Procedure Act, 5 U.S.C. §§553, 706(2)(A), and the Equal Protection Clause of the Fifth Amendment, and the relevance of those claims for certification of the proposed class.**

Petitioners' remaining claims readily support certification of the proposed class, and, indeed, allow no distinction between those who are eligible to submit a Form I-601A and those who are at earlier stages. Petitioners' claim under the Administrative Procedures Act (APA)—like their claim under the Immigration and Nationality Act (INA)—is that the government has unlawfully deviated from its provisional waiver regulations. *See infra* Sections II, III. Petitioners' equal protection claim is that this deviation has been driven by impermissible animus. *See infra* Section IV. These claims are meritorious. With regard to each of these claims, every putative class member—all of whom once stood to benefit from the 2016 regulations—has standing to challenge DHS's unlawful sabotage of the regulatory process, and is properly within the class.

**(e) Any other issues that should be decided prior to further briefing and argument concerning class certification.**

In addition to the claims mentioned in the Court's questions, Petitioners' INA claim is adequately pled and also supports certification of the proposed class.

## PETITIONERS' PROPOSED CLASS

On August 23, 2018, this Court denied the government's motion to dismiss after holding that it had jurisdiction over Petitioners' claims and that due process protects Petitioners' interest in remaining with their spouses in the U.S. while seeking lawful status under the provisional waiver process. Dkt. 159. Petitioners have moved to certify a class, *see* Dkt. 46, defined as:

> any U.S. citizen and his or her noncitizen spouse who (1) has a final order of removal and has not departed the U.S. under that order; (2) is the beneficiary of a pending or approved I-130, Petition for Alien Relative, filed by the U.S. citizen spouse; (3) is not "ineligible" for a provisional waiver under 8 C.F.R. § 212.7(e)(4)(i) or (vi); and (4) is within the jurisdiction of the Boston

> Immigration and Customs Enforcement (ICE) Enforcement and Removal
> Operations field office (covering New England).

The proposed class closely tracks the category of people that DHS sought to benefit when it

expanded the provisional waiver process in 2016 to include individuals with final orders of

removal. *See* Expansion of Provisional Unlawful Presence Waivers of Inadmissibility; Final

Rule, 81 Fed. Reg. 50244, 50259 (July 29, 2016) ("2016 Final Rule").  The class excludes each

of the three sets of final-order individuals that DHS made ineligible to seek lawful status under the

provisional waiver process:  those who are under 17, those who are subject to "reinstatement" of a

prior removal order, and those with pending adjustment of status applications. *See* 8 C.F.R. §

212.7(e)(4)(i), (v), and (vi).

        In opposing class certification, the government has primarily argued that the class

is overbroad, not that it does not satisfy the Rule 23 factors.  Dkt. 178.  The Court's

supplemental briefing order addresses the scope of the appropriate class.  Dkt. 193.

## ARGUMENT

        Petitioners' proposed class is appropriately defined because the government's actions

have violated due process and other legal rights with regard to individuals at all stages of the

provisional waiver process.  The proposed class narrowly encompasses a category of final order

individuals, and their U.S. citizen spouses, that DHS sought to benefit when it expanded the

provisional waiver process in 2016.  To each of these American families, the 2016 regulations

held out the promise of a path by which they could seek lawful status for the noncitizen spouse

without the prolonged family separation that was previously required.  Each of these families set

out on that path by filing an I-130.  And when a sea-change in policy all but eliminated the

possibility that they would one day reach the end of the path intact, the futures of each of these

6

families were imperiled, in violation of due process, the APA, the INA, and equal protection.

Each of the Petitioners' claims thus warrants certification of the class as defined.

I.    **The scope of the proposed class is proper because the putative class members all have a due process interest in living in the United States with their families while they pursue lawful status under the provisional waiver regulations.**

Due process safeguards the putative class members' liberty interests in living with their families in the United States during the entire provisional waiver process, which begins with the filing of an I-130.  Due process protects the "legitimate expectation[s]" created by laws and regulations, including the provisional waiver regulations.  *See* Dkt. 159 at 29 (quoting *Arevalo v. Ashcroft*, 344 F.3d 1, 11, 14 (1st Cir. 2003)).  Here, the legitimate expectation of a procedure that will unify rather than harm American families is not limited to individuals with approved I-130 and I-212 applications.  Instead, each member of the proposed class has a liberty interest that arises from the I-601A regulations.

DHS's contrary arguments misapprehend the regulations and due process.  In the government's view, DHS can wholly undermine the regulations by quickly deporting their intended beneficiaries before they have been able to reach the I-601A step.  But the Court has already recognized Petitioners' liberty interest in having their applications for lawful status considered while they are in the United States.  That holding properly extends to everyone in the proposed class because the regulations created one process rather than isolated application forms; because due process protects the substantive rights created by the I-601A regulations from interference that occurs before an individual files an I-601A form; and because the regulations and the Constitution protect the rights of U.S. citizens to live in the United States with their spouses.

7

A.   **The Court correctly held Petitioners have a due process interest in remaining in the United States with their families while pursuing lawful status under the provisional waiver process.**

This Court has already held that the noncitizen Petitioners have a protected liberty interest in remaining in the United States during their pursuit of lawful status under the provisional waiver regulations.  Dkt. 159 at 28-38.  The Constitution protects citizens and noncitizens alike from being deprived of liberty without due process.  *Id.* at 28-29; *see Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).  And the liberty interests the Due Process Clause safeguards include both those that "arise from the Constitution itself" and those that "arise from an expectation or interest created" by laws or regulations.  Dkt. 159 at 29 (quoting *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005)).

When the government creates a procedure for noncitizens to seek legal status, due process shields these noncitizens' "right to seek relief" even when there is no "right to the relief itself."  *See Arevalo*, 344 F.3d at 15 (citing *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954).  As this Court explained, "the availability of relief (or, at least, the opportunity to seek it) is properly classified as a substantive right and a legitimate expectation even when the relief depends on the exercise of an agency's discretion."  Dkt. 159 at 29 (internal quotations and citation omitted).[1]

---

[1] At the December 2018 hearing, the Court inquired about *Kentucky Department of Corrections v. Thompson*, 490 U.S. 454 (1989).  *See* Dec. 6, 2018 Hr'g Tr. 7:12-18.  As this Court has indicated, when the government creates an immigration benefit that noncitizens may apply for, adjudication is mandatory and triggers due process interests.  *See* Dkt. 159 at 29-30.  *Kentucky*'s focus on specific mandatory *language* has been abandoned in the prison context, and does not apply to immigration laws and regulations.  *Kentucky* did not alter the longstanding rule that individuals have a due process right to an administrative decision where regulations give them a "legitimate expectation" that their application for a benefit will be adjudicated.  *Kentucky*, 490 U.S. at 462 (laws and regulations "create[] a protected liberty interest by placing substantive limitations on official discretion"); *see also Accardi*, 347 U.S. at 265-66; *De Araujo v. Gonzalez*, 457 F.3d 146, 154 (1st Cir. 2006); *Brennan v. Cunningham*, 813 F.2d 1, 2-3, 8 (1st Cir. 1987).  Instead, *Kentucky* sought to apply that principle to the prison context, where the myriad rules that

Applying these principles, the Court concluded that DHS's 2013 and 2016 provisional waiver regulations create a due process interest in the ability to seek lawful status under the regulations *while living the United States*. *Id.* at 31-36.   Accordingly, it held that DHS could not deport individuals pursuing provisional waivers solely on the basis of their final orders of removal without giving appropriate consideration to their pursuit of lawful status and the regulations' purposes. *Id.* at 35-38.

In reaching this conclusion, the Court acknowledged that the regulations require DHS to exercise its discretion in deciding whether to grant provisional unlawful presence waivers in each case. *Id.* at 30.   But the Court also recognized that the expectation that noncitizens would remain in the United States while seeking such waivers was central to the regulations. *Id.* at 31-36.   The provisional waiver regulations created relief that is *distinct* from a waiver granted while the alien is outside of the United States.   *Id.* at 31-34 (citing 2016 Final Rule, 81 Fed. Reg. 50244 and 8 C.F.R. § 212.7(e)).   Their design and purpose were to keep noncitizens with their U.S. citizen families during most of the legalization process.   Dkt. 159 at 31-32.   As the Court explained:

> [A] decision by ICE to remove an alien pursuing a provisional waiver solely because he or she has a final order of removal would, as a practical matter, eliminate that alien's right to apply for a provisional waiver and [United States Citizenship and Immigration Services (USCIS)]'s opportunity to decide the merits of the application before the alien must depart the United States and be separated from his or her family.   The binding promises to United States citizens and their alien spouses in the provisional waiver regulations would be meaningless, and their purposes would be undermined, if ICE were not required to consider that an alien with a final order of removal is seeking a provisional waiver before requiring him or her

---

govern the individual's interaction with the state make it necessary to distinguish those that create a "legitimate claim of entitlement" from those that do not.   490 U.S. at 460-61.   Later prison cases have eschewed this reliance on mandatory language and adopted a more functional approach. *See Sandin v. Connor*, 515 U.S. 472, 483 (1995); *Wilkinson v. Austin*, 545 U.S. 209, 223 (2005).   More importantly, however, separate analysis of whether an "entitlement" is created is unnecessary in the context of immigration benefits.   Instead, when the government creates immigration benefits for which individuals may apply, specific mandatory language is not needed to create a legitimate expectation that an application will be adjudicated according to law. *See* Dkt. 159 at 29-30.

> to leave the United States.  There is no reason to conclude that, having promulgated the provisional waiver regulations in 2013, and amended them in 2016 to make aliens with final orders of removal eligible for such waivers, the Secretary of DHS intended to allow ICE to ignore the regulations and their important purposes.

*Id.* at 35-36.  As argued below, the Court's conclusions apply not only to those who are already eligible to file I-601A applications, but to all members of the putative class.

> **B.      The liberty interest the Court recognized is present during the entire provisional waiver process, which begins with the filing of an I-130.**

The government has argued that the due process interest recognized by the Court applies only to individuals who have completed each of the prerequisites to filing the I-601A form.  This contention supposes that the "binding promises" recognized by the Court can be readily overcome—and the regulations' intended beneficiaries could all be abruptly separated rather than kept together—so long as DHS achieves this separation before USCIS approves the preceding applications.  But neither the regulations nor due process are so trifling.  First, the putative class members all have a liberty interest in their ability to seek lawful status under the provisional waiver regulations because these regulations created a single process that they have already begun.  Second, and independently, the Supreme Court has explained that rights have "vested" if an individual "took an action that enhanced their significance to him in particular." *Fernandez-Vargas*, 548 U.S. at 44 n.10.  By filing an I-130, the class members have easily cleared that threshold.  Third, due process separately protects the interests of U.S. citizens in receiving the regulation's benefits of family unity throughout the legalization process.[2]

---

[2] Two district courts have found that DHS's detention and intended removal of noncitizens who did not yet have approved I-212 applications violated due process. *See Villavicencio Calderon v. Sessions*, 330 F. Supp. 3d 944, 958-59 (S.D.N.Y. 2018); *De Jesus Martinez v. Nielsen*, 341 F. Supp. 3d 400, 409-10 (D.N.J. 2018).

### 1.   The provisional waiver regulations created a single process that begins with the filing of an I-130.

The liberty interest that arises from the provisional waiver regulations extends to the entire provisional waiver process.  The regulations' design and purpose make clear that they created a single process, not an isolated application form.  That point is amply confirmed by the facts of this case.

In enacting the provisional waiver regulations, DHS recognized that it could achieve a lofty goal by turning one small knob.  The I-130 and conditional I-212 applications already existed, but current law had made them of no material use to those who were ineligible to adjust their status within the United States and did not want to endure the long separation associated with applying for inadmissibility waivers overseas.  The provisional waiver regulations designed and assembled a *process* to keep American families together while the noncitizen spouse sought lawful status; expanding the I-601A was simply the *mechanism* by which that was achieved.

DHS confirmed its intent to create a *process* in its explanations of the 2013 and 2016 regulations.  First, the 2013 regulations created the I-601A to allow noncitizen spouses who were subject to the unlawful presence ground of inadmissibility to receive a provisional waiver of that bar while remaining in the United States.  Provisional Unlawful Presence Waivers of Inadmissibility for Certain Immediate Relatives; Final Rule, 78 Fed. Reg. 536 (Jan. 3, 2013) ("2013 Final Rule").  Precisely because it was understood that the regulations' beneficiaries would begin by filing I-130 petitions, commentators suggested DHS allow concurrent submission of the I-130 with the I-601A.  The rulemakers rejected that approach and explained that the provisional waiver process was to proceed serially, *i.e.*, by requiring approval of the I-130 before proceeding to an I-601A.  *See*, *e.g.*, *id.* at 547-48 ("Allowing the filing of the Form I-

601A after the Form I-130 . . . is approved is more efficient for USCIS and often is more efficient for the applicant as well.").

The rulemakers' analysis of the costs, benefits, and impact of the newly available provisional waiver also show that they considered it to be a process that included the filing of an I-130, as well as the new I-601A.  When DHS calculated the financial costs to impacted families of seeking the regulation's benefits, it included the cost of preparing and submitting the Form I-130.  *Id.* at 573.  And when the agency described the purposes of the rule, it spoke of relieving the burden on "American families . . . separated while the immigrant visa applicant is going through the immigrant visa process," not merely families of individuals with approved I-130s.  *Id*. at 542.  Indeed, DHS predicted that by making the path toward lawful status more accessible, the new regulations would give rise to an increased number of applications—beginning with an increase in "immigrant visa petitions for alien relatives," *i.e.*, I-130 petitions.  *Id.* at 566, 572.

Next, the 2016 regulations "expand[ed] the class of eligible individuals who can benefit from provisional waivers" to include those with final orders of removal.  *See* 2016 Final Rule, 81 Fed. Reg. at 50259.  As in 2013, the 2016 regulations created a sequential process, explaining that noncitizens with final orders would need approved I-130 and I-212 applications prior to filing Form I-601A.  *Id.* ("DHS has decided against allowing the concurrent filing of provisional waiver applications and immigrant visa petitions" and "also declines to allow concurrent filing of Form I-212 and provisional waiver applications."); *see* 8 C.F.R. § 212.7(e).  The regulation aimed to encourage eligible noncitizens to pursue lawful status, lower the government's processing costs, and "reduce[] hardships to U.S. citizen families."  2016 Final Rule, 81 Fed. Reg. at 50244-45; *see* Dkt. 159 at 7-8.

These regulations carried the potential to transform the lives of impacted families.  Prior to the 2016 regulations, putative class members had no other way to obtain legal status in the United States through their spouses due to their final orders of removal.  The regulations beckoned families out of the shadows with the promise that they might receive legal status, and instructed them to start that process by paying for and filing I-130 and then I-212 applications—forms they were previously eligible to file, but from which they would not otherwise have materially benefitted.[3]

Although the government has argued that the 2016 regulations were intended to benefit merely those who already had approved I-130 and I-212 applications, Dkt. 178 at 22, virtually *no one* would have been in that position at the time of the regulations' enactment.  Indeed, prior to 2016, there was little reason for anyone to have already sought and obtained approval of these two forms.

---

[3] The conditional I-212 was all but moribund when it was revived by the provisional waiver regulations.  The filing of conditional I-212 applications prior to departure from the United States was more useful prior to Congress's creation of the unlawful presence ground of inadmissibility in 1996.  *See* Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, § 301, 110 Stat. 3009-546 (codified at 8 U.S.C. § 1182(a)(9)(B)). From 1996 to 2016, the conditional I-212 was used in relatively rare cases, most commonly where an individual with a final order of removal had not yet accrued a year or more of unlawful presence in the United States and therefore did not also need a waiver of unlawful presence, which until 2016 were not available prior to departure from the United States. During this period, most final-order noncitizens who were married to U.S. citizens had nothing to gain by filing a conditional I-212 application in advance of departure since they would still need to spend a prolonged period of time overseas filing and awaiting adjudication of an I-601 unlawful presence waiver, which could be filed simultaneously with an I-212. *See* 8 U.S.C. § 1182(a)(9)(B); *id.* § 1182(a)(9)(A)(iii) (authorizing conditional waivers for those with final order of removal); 2013 Final Rule, 78 Fed. Reg. at 545, 548 (noting that individuals with final orders could file conditional I-212s, but also declining to extend provisional unlawful presence waivers to those with removal orders); 2016 Final Rule, 81 Fed. Reg. at 50245 (extending provisional waiver availability to those with removal orders).

The facts of this case further illustrate the absurdity of interpreting the provisional waiver regulations to create a stand-alone I-601A waiver rather than a single process.  Precisely because it urges this Court to treat the regulations as addressing only the I-601A waiver, the government contends that it may prevent *each and every eligible noncitizen* from benefitting from the provisional waiver process by detaining and removing him or her at the outset of the process, long before he or she is eligible to file Form I-601A.  Indeed, that is the precise action that it was engaging in at the start of this litigation.  Thus, in February 2018, when ICE received a list of 23 individuals who would appear at USCIS over the coming months—most of them likely putative class members—it determined that it wished to detain and remove 21 of them.  Aug. 21 Hr'g Ex. 7, Dkt. 148 at 41-43 (GOV002883-85).  Individuals whom ICE did not detain at their I-130 interviews because they were already under its supervision (including Petitioner Sandro de Souza) did not fare much better.  In fact, each Petitioner in this case who checked in with ICE on an order of supervision was ordered to purchase a plane ticket and depart.  Although Petitioner Lilian Calderon now has an approved I-212 and a pending I-601A, she likely would never have reached that stage in the process had she not filed this litigation.  It is hard to imagine a result more inconsistent with the regulations' purpose to allow individuals like Ms. Calderon to seek lawful status while remaining with their families. Because the regulations created a single process, not merely the I-601A application itself, due process protects all putative class members' interest in receiving the regulations' benefits.

> **2.      Due process rights attach to those who have filed I-130 applications because doing so "enhances the significance" of the I-601A to them.**

The government's argument not only misconstrues the regulations, it also misunderstands due process.  Even if the liberty interest created by the I-601A regulations create only a right to apply for an I-601A waiver, the due process right to be permitted to pursue that application still

protects those who are at the I-130 stage.  In essence, the due process principles that prevent the government from ignoring individuals' eligibility for an I-601A also prohibit it from achieving the same effect by using its detention and removal power to ensure that no one ever becomes eligible to apply.

The Supreme Court has explained that rights "vest" when an individual has "take[n] some action that would elevate [a claim to relief] above the level of hope." *Fernandez-Vargas*, 548 U.S. at 44 n.10.  "[V]ested rights" is "a term that describes something more substantial than inchoate expectations and unrealized opportunities." *Id*. (internal quotations omitted).  Courts "should be informed and guided by 'familiar considerations of fair notice, reasonable reliance, and settled expectations." *I.N.S. v. St. Cyr*, 533 U.S. 289, 321 (2001) (internal quotations and citation omitted); *see also Arevalo v. Ashcroft*, 344 F.3d 1, 15 (1st Cir. 2003) ("The petitioner already had filed for relief when Congress amended the statute.  Discarding her application now would deprive her both of a right that she once had and of the reasonable expectation that she would have the opportunity to convince the Attorney General to grant her relief.").  In *Fernandez-Vargas*, the noncitizen's right to relief had not vested he "never availed himself of [the forms of relief] or took action that enhanced their significance to him in particular . . . ." 548 U.S. at 44 n.10; *see also Ortega v. Holder*, 747 F.3d 1133, 1134 (9th Cir. 2014).

Rights can vest long before people become eligible to apply for the relief in question. Courts that have examined whether the retroactive repeal of discretionary immigration relief raises due process concerns triggering the presumption against retroactivity have found such concerns to exist even when noncitizens were not eligible for the immigration relief at the time the law changed.  *See St. Cyr*, 533 U.S. at 323-24 (right to seek relief vested when individual pled guilty in reliance on potential eligibility for relief); *see also Landgraf v. USI Film Prod.*,

511 U.S. 244, 266 (1994) ("The Due Process Clause also protects the interests in fair notice and repose that may be compromised by retroactive legislation . . . .").

In *St. Cyr*, the Court considered whether Congress's repeal of § 212(c) relief—a form of relief from deportation—was retroactive.  The question in the case was whether people who pled guilty to crimes before 1996, potentially relying on the availability of § 212(c) relief, had a "vested right" to § 212(c) relief, such that the presumption against retroactivity applied.  *Id.* at 321-26.  The Court found that they did, even though they were not in removal proceedings at the time and would not have needed or been able to apply for this form of relief unless they were later put into proceedings.  *Id.*  Because the repeal of § 212(c) relief after the petitioner's guilty plea impaired his vested rights, the presumption against retroactivity applied, and the repeal would not have retroactive effect unless Congress plainly intended it to.  *Id.* at 326.  In other words, the right to the relief from deportation vested at the time of his plea—because of his reliance interests—even though he was not even in deportation proceedings and thus could not apply for 212(c) at the time.

Each of the putative class members has taken steps that enhance the significance of the I-601A to their lives, and acted in reasonable reliance on the availability of the provisional waiver process.  By filing an I-130 application, each has had to pay a fee (now $535) and provide their address and other personal information to the government in order to begin the process of seeking lawful status through his or her marriage—an end result that can only be achieved by obtaining provisional waivers in the United States, or enduring the hardships associated with the previously existing overseas waiver process.  Class members further rely on the existence of the provisional waiver process when they file the I-212, pay $930, and wait months and sometimes years for their applications to be adjudicated.  Taking these steps constitutes "a cognizable

16

reliance interest" in the provisional waiver process that enhances its significance to the couple. *See Arevalo*, 344 F.3d at 14-15; *Ortega*, 747 F.3d at 1134. Due process rights thus attach to those who have filed an I-130, and the government may not detain and remove them without consideration of the regulations' purposes.

Courts confronting similar threats to a noncitizen's ability to access relief have declined to turn this relief into an empty formality. In *Ceta v. Mukasey*, the Seventh Circuit recognized that the BIA's denial of a continuance for reasons unrelated to the adjustment of status statute was a violation of that statute where the effect of denying the continuance was to preclude eligibility for adjustment of status. 535 F.3d 639, 646-49 (7th Cir. 2008). Although the petitioner had not yet filed to adjust his or her status, the *Ceta* court held that a filed or approved I-130 petition combined with that noncitizen's potential eligibility for a status adjustment must be considered in any removal or reopening proceeding before an Immigration Judge. *Id.* at 647. Otherwise, noncitizens would be "trapped within a regulatory interstice"—the law "afford[s] him an opportunity to seek adjustment of status with the USCIS, but he will be deported by Immigration and Customs Enforcement before the USCIS is able to adjudicate that application." *Id.* at 646. Here, too, the government may not vitiate the promises of the provisional waiver regulations on account of timing. Each of the putative class members has a due process interest in being able to obtain the benefits of the provisional waiver regulations, and each is properly within the class.

> **3.      The Due Process Clause separately protects the interests of U.S. citizens in receiving the regulations' benefits of family unity throughout the legalization process.**

The due process right created by the provisional waiver regulations should be liberally applied to include the filing of I-130 applications because the regulations protect the right to live together with one's spouse. *See Ying Fong v. Ashcroft*, 317 F. Supp. 2d 398, 403 (S.D.N.Y.

2004), *amended on reconsideration in part sub nom. Fong v. Ashcroft*, No. 03 CIV. 7261

(AKH), 2004 WL 1348994 (S.D.N.Y. June 15, 2004) ("[I]mmigration regulations which are

derived from and intended to protect constitutional rights are to be liberally applied"); *see also*

*Waldron v. INS*, 17 F.3d 511 (2d Cir.1993) ("[W]hen a regulation is promulgated to protect a

fundamental right derived from the Constitution or a federal statute, and the INS fails to adhere

to it, the challenged deportation proceeding is invalid and a remand to the agency is required.").

Because the U.S. citizen Petitioners have each filed I-130 petitions in the hopes of remaining

with their spouses, and the provisional waiver regulations can—at a minimum—be liberally read

to create the reasonable expectation that that right will be protected rather than sabotaged, the

class properly includes those who have taken only the first step in the process.

   "[M]arriage is one of the vital personal rights essential to the orderly pursuit of happiness

by free men."  *Obergefell v. Hodges*, 135 S. Ct. 2584, 2598 (2015) (internal quotations and

citation omitted).  U.S. citizens thus have a liberty interest in remaining in the United States with

their spouses that triggers the procedural protections of due process.  *Kerry v. Din*, 135 S. Ct.

2128, 2142 (2015) (Breyer, J., dissenting).[4]  The provisional waiver process was created to

protect these rights by "reduc[ing] the hardship that U.S. citizen . . . family members of

individuals seeking the provisional waiver may experience," 2016 Final Rule, 81 Fed. Reg. at

50244, and avoiding "prolonging the separation of these immediate relatives from their U.S.

---

[4] Although it held against the petitioner in *Kerry v. Din*, only three justices believed that she did
not have any due process right in living in the United States with her spouse; two believed any
due process right were satisfied; and Justice Breyer and three other dissenters believed due
process was not satisfied.  *See* 135 S.Ct. at 2131-38 (J. Scalia); *id.* at 2139-41 (J. Kennedy,
concurring); *id.* at 2141-47 (J. Breyer, dissenting); *see also Ali v. United States*, 849 F.3d 510,
515 n.3 (1st Cir. 2017) ("*Din* did not produce a definitive answer to the question of whether a
citizen has a liberty interest, warranting due process, in residing in the United States with his or
her noncitizen spouse.").

citizen spouses, parents, and children." 2013 Final Rule, 78 Fed. Reg. at 536.  By filing the I-130 form, each of the U.S. citizen Petitioners began the process of seeking lawful permanent residency for his or her spouse and could have done so with the legitimate expectation that the promises of the 2016 provisional waiver regulations would be upheld.[5]  Because due process thus entitles all of the Petitioners to have their applications for legal status and the purposes of the provisional waiver regulations considered prior to enforcement action, the class is properly defined with respect to Petitioners' due process claim.

## II.     The scope of Petitioners' proposed class is appropriate as to Petitioners' APA claim because the members of the proposed class all have standing to challenge the government's unlawful abandonment of its provisional waiver regulations.

Petitioners' APA claim also supports certification of the proposed class because each class member is harmed by the government's unlawful abrogation of the 2016 provisional waiver regulations.  Thus, even if "vesting" arguments could yield a valid distinction between class members at different stages of the provisional waiver process for purposes of due process — though they cannot—those distinctions have no application here.

Petitioners' APA claim is that the government's practice of detaining and removing noncitizens who are pursuing lawful status under the 2016 regulations is an all-but abandonment of the regulations' promises that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and violates the notice-and-comment procedures for amending federal regulations.  For each proposed class member—regardless of the stage of the provisional waiver process that he or she has reached—unlawful government conduct has replaced the legitimate

---

[5] In addition to the provisional waiver regulations, USCIS recognizes in its own internal guidance that at the stage of the I-212 application—before a noncitizen can file an I-601A—the applicant has an interest in remaining in the United States "because of the equity involved (*such as a U.S. citizen spouse* …)."  *See* Dkt. 50-1 (USCIS Adjudicator's Field Manual), https://www.uscis.gov/ilink/docView/AFM/HTML/AFM/0-0-0-1/0-0-0-19162/0-0-0-19167.html.

expectation of remaining with their families while seeking legal status with the substantial risk of being torn away from those families when doing so.  Because each class member has standing to challenge the government's violations of the APA, Petitioners' proposed class is appropriately defined as to this claim.

A.     **Petitioners have adequately alleged class-wide APA violations.**

Petitioners have adequately alleged—and limited discovery has reinforced—that the government has violated the APA by ignoring individuals' pursuit of provisional waivers when taking enforcement actions against them, and even targeting them because of their efforts to pursue lawful status.  Although the Court has not ruled on the government's motion to dismiss this claim, its due process ruling rejected each of the arguments for dismissal.  *See* Dkt. 159.

Petitioners' APA claim is two-fold.  *First*, Respondents' class-wide policy and practice of taking enforcement actions against Petitioners and others without consideration of their participation in the provisional waiver process and for no reason beyond their final orders of removal is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  In reviewing the government action at issue here, the Court must evaluate "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Judulang v. Holder*, 565 U.S. 42, 53 (2011) (internal quotations and citations omitted).  The Court should "examin[e] the reasons for agency decisions—or, as the case may be, the absence of such reasons."  *Id.*  These reasons "must be tied, even if loosely, to the purposes of the immigration laws or the appropriate operation of the immigration system."  *Id.* at 55.

DHS's detention and intended removal of noncitizens whom the provisional waiver regulations were intended to benefit has *not* been based upon "a consideration of the relevant factors" nor "tied . . . to the purposes of" the provisional waiver regulations and other relevant

law. *Id.* at 55.[6]  Instead, the agency's actions have turned the law on its head.  Petitioners have

plausibly alleged that ICE has detained and removed putative class members without considering

their efforts to gain lawful status under the 2016 provisional waiver regulations.  *See* Dkt. 159 at

4, 38.  In fact, the available record has proven those allegations correct, confirming that

immigration authorities targeted individuals for arrest and removal at their I-130 interviews and

elsewhere based solely on their orders of removal, and without regard for their pursuit of lawful

status under the provisional waiver process.[7]  Petitioners have thus raised a meritorious claim

under § 706(2).

  ***Second***, by effectively nullifying the provisional waiver process created through notice-

and-comment rulemaking, Respondents have violated the APA's requirements that repealing

such rules also requires notice-and-comment procedures.  *See Lin v. Nielson*, 18-cv-03548-GJH

(D. Md. Nov. 19, 2018) (Dkt. 6 at 4) ("To allow ICE—a federal agency under the jurisdiction of

DHS—to arrest and deport those who seek this legal protection would be to allow DHS to nullify

its own rule without explanation.").  "[A]n agency issuing a legislative rule is itself bound by the

rule until that rule is amended or revoked and may not alter such a rule without notice and

---

[6] *See also Villavicencio Calderon*, 330 F. Supp. 3d at 958 (where by "detaining and attempting to execute Petitioners' order of removal, Respondents have attempted to strip the Petitioner's right to engage in [the provisional waiver process] made available to him" with "no explanation or justification"); *Lin v. Nielson*, 18-cv-03548-GJH (D. Md. Nov. 19, 2018) (Dkt. 6 at 4) ("[T]he very existence of the [provisional waiver] program is nullified if ICE agents can use the application process as a honeypot to trap undocumented immigrants who seek to take advantage of its protections."); *De Jesus Martinez*, 341 F. Supp. 3d at 410 ("[A] failure to follow rules [governing the provisional waiver process] without explanation is arbitrary, capricious, and an abuse of discretion.").

[7] *See* Oct. 24, 2018 Memorandum in Support of Pets' Mot. for Class Cert., Dkt. 175 at 3-7; *see also, e.g.*, Lyons Dep. Tr. 40:19-41:10 (Dkt. 137-4) ("[A]s far as what they were applying for, no, that wasn't one of the options or one of the considerations" on whether to take enforcement action)); Brophy Dep. Tr. 99:11-17 (Dkt. 137-5) ("Q. Executive Order 13768 requires ICE to remove all individuals with final orders of removal, correct? . . . A. I don't know if that the specific language in it or not, but yes.").

comment." *Clean Air Council v. Pruitt*, 862 F.3d 1, 9 (D.C. Cir. 2017) (quotation marks omitted and alterations adopted).  The agency may not "depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 513-15 (2009); *see also Ramos v. Nielsen*, 321 F. Supp. 3d 1083, 1116 (N.D. Cal. 2018) (denying a motion to dismiss and explaining that plaintiffs stated an APA claim where they alleged, by terminating Temporary Protected Status for refugees from El Salvador, Haiti, Nicaragua, and Sudan, DHS "adopted a new policy or practice without an explanation for the change").  But that is exactly what DHS has done.

This Court's due process ruling rejected arguments identical to those Respondents raise in support of their motion to dismiss Petitioners' APA claims.  First, Respondents argue that 8 U.S.C. § 1252(g) jurisdictionally barred Petitioners' APA claim—parroting the same argument that the Court rejected with regard to Petitioners' due process claim.  Dkt. 44 at 19; Dkt. 159 at 16-28.  Second, Respondents argue that ICE's conduct is purely discretionary and unreviewable.  Dkt. 44 at 19-20.  But as this Court held, "[w]hether ICE can remove an applicant for a provisional waiver based solely on an outstanding order of removal" is not an issue of "discretion" but "a question of law concerning what a regulation requires."  Dkt. 159 at 22 (quoting *St. Cyr*, 533 U.S. at 307).  Third, Respondents argue that their conduct is "not inconsistent with 8 C.F.R. § 212.7(e)."  Dkt. 44 at 20.  But this Court has interpreted 8 C.F.R. § 212.7(e) to constrain agency action with respect to individuals pursuing provisional waivers by requiring that ICE consider that pursuit.  Dkt. 159 at 42.  Petitioners have thus pled valid APA claims that can readily form the basis for a class-wide remedy.[8]

---

[8] Because Petitioners have alleged a legally cognizable theory under the APA, the government should produce and certify an administrative record explaining the reasons for and information considered in making its decisions.  *Atieh v. Riordan*, 727 F.3d 73, 76 (1st Cir. 2013).

**B.      The members of the putative class have suffered an injury in fact and fall within the INA's "zone of interest."**

Petitioners' proposed class is appropriately defined with regard to the APA claim because each putative class member has standing to challenge the government's unlawful conduct. Individuals asserting claims under the APA must both satisfy Article III standing and be "arguably within the zone of interests to be protected or regulated by the statute" that was allegedly violated. *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012) (internal quotations and citations omitted). The Petitioners and class members readily satisfy both tests.

*First*, the putative class members all have Article III standing to challenge the government's unlawful conduct. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). All have suffered an injury in fact. They have paid at least one application fee and provided DHS with their address. But because of DHS's failure to consider their pursuit of lawful status—and its specific targeting of such applicants for arrest at the USCIS offices that applicants must visit—the noncitizen class members all face a "substantial risk" that they will be arrested, detained, or removed. *See O'Hara v. Diageo-Guinness, USA, Inc.*, 306 F. Supp. 3d 441, 451 (D. Mass. 2018); *see also Batalla Vidal v. Duke*, 295 F. Supp. 3d 127, 155 (E.D.N.Y. 2017), *motion to certify appeal granted sub nom. Batalla Vidal v. Nielsen*, No. 16CV4756NGGJO, 2018 WL 333515 (E.D.N.Y. Jan. 8, 2018) (individuals subject to removal have suffered injury-in-fact because "[t]here is nothing 'speculative' about the possibility that they would actually be removed"); *Nat'l Venture Capital Ass'n*, 291 F. Supp. 3d 5, 14 (D.D.C. 2017) (explaining that "[g]iven that [plaintiffs] meet the criteria" to be considered for an immigration benefit, the "claim that they have lost even the opportunity to obtain that immigration benefit" "would be far from illusory" (internal quotations and citation omitted)). Because the harm class members face

is "causally connect[ed]" to the unlawful conduct at issue, and is likely to be redressed by a

favorable decision in this case, each of the class members satisfies the requirements of Article III

standing.

**Second**, the putative class members all fall within the INA's "zone of interest."  *See*

*Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987).  The zone-of-interests test for APA

actions forecloses suit only when a plaintiff's "interests are so marginally related to or

inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that

Congress intended to permit the suit."  *Nat'l Petrochemical & Refiners Ass'n v. EPA*, 287 F.3d

1130, 1147 (D.C. Cir. 2002).  Because the class members are applicants for lawful status under

the INA, they and the U.S. citizens who are petitioning for them fall within the statute's zone of

interest.  *See Mantena v.* Johnson, 809 F.3d 721, 733 (2d Cir. 2015) ("What is determinative is

that [the petitioner] falls within the zone of interests protected by the [INA], which conveys

Congress's intent to grant individuals such as [the petitioner] the right to sue under the statute in

federal court."); *Patel v. U.S. Citizenship & Immigration Servs.*, 732 F.3d 633, 637 (6th Cir.

2013) ("[T]he alien, ultimately, is the one who is entitled to the employment visa. The alien's

interest in receiving it is therefore within the zone of interests protected or regulated by the

[INA]."); *Nat'l Ass'n for the Advancement of Colored People v. Trump*, 298 F. Supp. 3d 209,

235 (D.D.C. 2018) (Deferred Action for Childhood Arrivals ("DACA") recipient's "interests fall

within the zone regulated by the INA").  Thus all class members—whether they have pending I-

130s or have moved on to other stages of the provisional waiver process—are properly within

Petitioners' proposed class for purposes of an APA challenge.

**III.     For the same reasons, Respondents' actions violated the INA and its regulations, which all putative class members have standing to challenge.**

For the same reasons that they have properly alleged an APA claim, Petitioners have also adequately alleged violations of the INA that all class members have standing to challenge, regardless of the stage of the provisional waiver process that they are in.  Petitioners' class is thus appropriately defined with regard to this claim.

The provisional waiver regulations interpret and apply the INA's provisions for preserving American families, including the statutory waivers of inadmissibility that are available to spouses of U.S. citizens.  *See* Dkt. 159 at 32.  These provisions are violated when, in contravention of its own regulations, DHS targets noncitizens for detention and removal despite their efforts to follow the steps for seeking lawful status that the agency has set out.[9]   Each of the putative class members is a beneficiary of these regulations, and each has standing to challenge the government's violation of them, regardless of whether they have reached the process's final stage.  *See National Petrochemical & Refiners Ass'n,* 287 F.3d at 1147 (considering all regulations integral to the claim to determine the law's scope); *Ceta v. Mukasey*, 535 F.3d 639, 646 (7th Cir. 2008) (reading the INA holistically to avoid rendering the right to pursue legal status through marriage meaningless by removing a person before USCIS has time to adjudicate the pending application); *You v. Nielsen*, No. 18 Civ. 5392 (S.D.N.Y. Aug. 2, 2018) (Dkt. 40 at 19) ("The Court declines to read the INA in a way that nullifies its adjustment of status scheme.").

---

[9] The government's argument for dismissing Petitioners' INA claim has been addressed and rejected in the context of the due process claim.  Specifically, the government argued that a noncitizen's pursuit of provisional waivers does not constrain ICE's decisionmaking on enforcement in any way.  Resps.' Mot. to Dismiss, Dkt. 44 at 13 ("[T]he filing of approval of a provisional unlawful presence waiver . . . has *no effect* on . . . ICE's authority to remove the applicant from the United States.").  But this Court held otherwise.  Dkt. 159 at 41.

**IV.     Respondents' actions violated the equal protection rights of all putative class members.**

Petitioners have properly pled an equal protection violation against Respondents that all putative class members have standing to challenge.  The government denies equal protection of the laws when it acts with discriminatory intent toward individuals because of their race or national origin.  *Plyler v. Doe*, 457 U.S. 202, 210 (1982) ("[T]he Fifth Amendment protects aliens whose presence in this country is unlawful from invidious discrimination by the Federal Government.").  And a plaintiff states a claim where the government's discriminatory intent is merely "a motivating factor in the decision," even if it is not "the dominant or primary one." *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977) (internal quotations omitted).

For an equal protection claim to survive a motion to dismiss, a plaintiff "need only plausibly plead direct or circumstantial evidence of discriminatory intent."  *Saget v. Trump*, 345 F. Supp. 3d 287, 301 (E.D.N.Y. 2018); *see also KG Urban Enters. v. Patrick*, No. 11-12070-NMG, 2014 WL 108307, at *9 (D. Mass. Jan. 9, 2014) ("While no racially disproportionate impact is evident the record permits several inferences of discriminatory intent from the legislative and administrative background . . . ." (citing *Anderson ex rel. Dowd v. City of Boston*, 375 F.3d 71, 83 (1st Cir. 2004))).  The claim can be based on allegations of "contemporary statements by members of the decisionmaking body" including comments made by the President, showing animus toward the group.  *Saget*, 345 F. Supp. at 303-04.

Petitioners have adequately alleged that that Respondents' class-wide practice of arresting, detaining, and removing people pursuing provisional waivers—the majority of whom are not white and come from non-European countries—was motivated by animus based on their race or national origin.  Among other things, President Trump has called immigrants from

countries with nonwhite populations undesirable while speaking favorably of immigration from predominantly white Norway, pardoned a sheriff who violated a court order barring him from racially profiling Latinos, and declined to criticize white nationalist demonstrators.  Am. Compl. ¶ 110-111.  And President Trump and other Administration officials have voiced strong concerns about so-called "chain migration," which allows immigrants to gain lawful status and then sponsor their family members.  Id. ¶ 110.  For good reason, courts examining other immigration policies promulgated by the current administration have found plausible similar allegations of policy-making tainted by animus.  See, e.g., Regents of the Univ. of California v. U.S. Dep't of Homeland Sec., 908 F.3d 476, 518-20 (9th Cir. 2018) (declining to dismiss claim that racial animus motivated rescission of DACA program); Batalla Vidal v. Nielson, 291 F. Supp. 3d 260, 277 (E.D.N.Y. 2018) (holding petitioners stated equal protection claim because President Trump's statements were "sufficiently racially charged, recurring, and troubling as to raise a plausible inference that the decision to end the DACA program was substantially motivated by discriminatory animus"); Saget, 345 F. Supp. at 303-04 (denying motion to dismiss equal protection claim based on termination of Haitian immigration program because allegations of "several instances of . . . anti-immigrant comments made by President Trump" were "more than sufficient to support a plausible inference of the President's animus based on race and/or national origin/ethnicity against non-white immigrants . . . .").  Because Petitioners have adequately alleged that DHS's abandonment of the goals of the provisional waiver regulations is motivated by animus—and that unlawful conduct harms all Petitioners and class members—Petitioners' proposed class is properly defined.

## CONCLUSION

For these reasons, Petitioners' proposed class is appropriate in scope.

Respectfully submitted this 21st day of February, 2019.

<table>
<tr>
<td></td>
<td>/s/  Kevin S. Prussia</td>
</tr>
<tr>
<td>Matthew R. Segal (BBO # 654489)</td>
<td>Kevin S. Prussia (BBO # 666813)</td>
</tr>
<tr>
<td>Adriana Lafaille (BBO # 680210)</td>
<td>Shirley X. Li Cantin (BBO # 675377)</td>
</tr>
<tr>
<td>AMERICAN CIVIL LIBERTIES UNION</td>
<td>Stephen Provazza (BBO # 691159)</td>
</tr>
<tr>
<td>FOUNDATION OF MASSACHUSETTS, INC.</td>
<td>Colleen M. McCullough (BBO # 696455)</td>
</tr>
<tr>
<td>211 Congress Street</td>
<td>Matthew W. Costello (BBO # 696384)</td>
</tr>
<tr>
<td>Boston, MA 02110</td>
<td>WILMER CUTLER PICKERING</td>
</tr>
<tr>
<td>(617) 482-3170</td>
<td>   HALE AND DORR LLP</td>
</tr>
<tr>
<td></td>
<td>60 State Street</td>
</tr>
<tr>
<td>Kathleen M. Gillespie (BBO # 661315)</td>
<td>Boston, MA 02109</td>
</tr>
<tr>
<td>Attorney at Law</td>
<td>Telephone: (617) 526-6000</td>
</tr>
<tr>
<td>6 White Pine Lane</td>
<td>Facsimile:  (617) 526-5000</td>
</tr>
<tr>
<td>Lexington, MA 02421</td>
<td>kevin.prussia@wilmerhale.com</td>
</tr>
<tr>
<td>(339) 970-9283</td>
<td>shirley.cantin@wilmerhale.com</td>
</tr>
<tr>
<td></td>
<td>stephen.provazza@wilmerhale.com</td>
</tr>
</table>

*Attorneys for Petitioners*