```
                   UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS


                                    )
LILIAN PAHOLA CALDERON JIMENEZ      )
and LUIS GORDILLO, et al.,          )
Individually and on behalf of       )
all others similarly situated.      )
                                    )   Civil Action
          Plaintiffs-Petitioners,   )   No. 18-10225-MLW
                                    )
v.                                  )
                                    )
KIRSTJEN M. NIELSEN, et al.,        )
                                    )
          Defendants-Respondents.   )
                                    )



              BEFORE THE HONORABLE MARK L. WOLF
                 UNITED STATES DISTRICT JUDGE



                          HEARING


                        May 3, 2019



         John J. Moakley United States Courthouse
                    Courtroom No. 10
                   One Courthouse Way
                Boston, Massachusetts  02210




                          Kelly Mortellite, RMR, CRR
                          Official Court Reporter
                          One Courthouse Way, Room 5200
                          Boston, Massachusetts  02210
                          mortellite@gmail.com
```

```
 1    APPEARANCES:

 2    Counsel on behalf of Plaintiffs-Petitioners:
      Adriana Lafaille
 3    American Civil Liberties Union
      211 Congress Street
 4    Boston, MA 02110
      617-482-3170
 5    alafaille@aclum.org

 6    Kathleen M. Gillespie
      Attorney at Law
 7    6 White Pine Lane
      Lexington, MA 02421
 8    339-970-9283
      kathleen.m.gillespie@outlook.com
 9
      Stephen Nicholas Provazza
10    Matthew W. Costello
      Shirley X. Cantin
11    Colleen M. McCullough
      Wilmer Hale LLP
12    60 State Street
      Boston, MA 02109
13    617-526-6313
      stephen.provazza@wilmerhale.com
14    matt.costello@wilmerhale.com
      shirley.cantin@wilmerhale.com
15    colleen.mccullough@wilmerhale.com

16    Counsel on behalf of Defendants-Respondents:
      Thomas E. Kanwit
17    U.S. Attorney's Office
      1 Courthouse Way
18    Suite 9200
      Boston, MA 02210
19    617-748-3100
      thomas.kanwit@usdoj.gov
20
      Mary Larakers
21    William Weiland
      U.S. Department of Justice, Office of Immigration Litigation
22    District Court Section
      P.O. Box 868
23    Washington, DC 20044
      202-353-4419
24    mary.l.larakers@usdoj.gov
      William.h.weiland@usdoj.gov
25
```

```
 1                    P R O C E E D I N G S
 2    (Case called to order.)
 3              THE COURT:  Good morning.  Would counsel please
 4    identify themselves for the court and for the record.
 5              MS. LAFAILLE:  Good morning, Your Honor.  Adriana
 6    Lafaille for the petitioners.
 7              MS. CANTIN:  Good morning, Your Honor.  Shirley Cantin
 8    of Wilmer Hale for the petitioners as well.
 9              MR. PROVAZZA:  Good morning, Your Honor.  Steve
10    Provazza of Wilmer Hale for the petitioners.
11              MR. COSTELLO:  Good morning, Your Honor.  Matt
12    Costello of Wilmer Hale also for the petitioners.
13              MS. McCULLOUGH:  Good morning, Your Honor.  Colleen
14    McCullough for the petitioners.
15              MS. GILLESPIE:  Good morning, Your Honor.  Kathleen
16    Gillespie for the petitioners.
17              MR. WEILAND:  Good morning, Your Honor.  Wil Weiland
18    for the United States.
19              MS. LARAKERS:  Good morning, Your Honor.  Mary
20    Larakers on behalf of the United States.
21              MR. KANWIT:  Good morning, Your Honor.  Thomas Kanwit
22    on behalf of the United States.
23              THE COURT:  Okay.  Yes.  I received a notice that Todd
24    Lyons' term as acting field office director had expired and
25    former deputy field office director Marcos Charles has
```

1     succeeded him.  Mr. Charles states he will continue Mr. Lyons'

2     relevant policies and practices.  Is all that correct?

3             MS. LARAKERS:  Yes, Your Honor.

4             THE COURT:  And is Mr. Charles here?

5             MS. LARAKERS:  Yes, Your Honor.

6             THE COURT:  So it's my understanding that all of the

7     prior representations made to the court on behalf of ICE

8     relating to this case remain reliable and, among other things,

9     Mr. Charles has final decisionmaking authority for DHS for the

10     purposes of this case.  Is that also correct?

11             MS. LARAKERS:  Yes, that's my understanding, Your

12     Honor.

13             THE COURT:  Okay.  Thank you.  And then you reported

14     that the parties' efforts -- I do understand that you worked at

15     this -- to settle this case didn't succeed.  But after I decide

16     the motion to dismiss, or the remainder of it, and perhaps

17     class certification issues, you'll resume those discussions.

18     Did I read your report accurately?

19             MS. LAFAILLE:  Yes, Your Honor.  And that resistance

20     came from the government.  But yes, we're always willing to

21     engage in those discussions.

22             THE COURT:  Okay.  Correct?

23             MS. LARAKERS:  Yes, Your Honor.

24             THE COURT:  All right.  So we're here today with

25     regard to at least initially the defendants' motion to dismiss.

1    It's my present intention to hear argument on the various

2    issues essentially in the order I described in my April 29

3    order, to then decide -- and it's my goal to do all of this

4    orally, hopefully today -- the class certification issues,

5    particularly the class definition issues.  I think I'll

6    probably ask you after I decide -- if I deny the motion to

7    dismiss with regard to any count or theory, I propose that we

8    address what are the implications for the definition of the

9    putative class.  And then after class certification is decided,

10   it will be necessary to determine if there are remaining

11   discovery disputes.  But do the parties want to be heard on and

12   essentially proceeding in that framework?

13          MS. LARAKERS:  Yes, Your Honor.  I think that makes

14   sense.

15          MS. LAFAILLE:  Agree, Your Honor.

16          THE COURT:  All right.  Then as on April 29, I issued

17   an order, number 238, indicating that I intended to hear

18   argument on the issues presented in the following order,

19   recognizing that to some extent several of the issues,

20   including the question of when a due process right vests, are

21   interwoven with others.  But I want to start with the

22   Administrative Procedures Act claim and then move to the

23   Immigration and Nationality Act related regulations claim, then

24   go to whether there's a due process right to apply for and

25   receive a decision regarding a Form 130 petition and a Form 112

1    petition while in the United States.

2         I said previously that I would then go to whether the

3    citizen spouses have a liberty interest for due process

4    purposes, I may put that after the Equal Protection argument,

5    and then class certification and discovery.

6         So why don't we start with the respondents' motion to

7    dismiss the Administrative Procedures Act claim.

8         MS. LARAKERS:  Yes, Your Honor.

9         THE COURT:  Hold on one second.  Okay.  Go ahead.

10        MS. LARAKERS:  So, Your Honor, our primary position

11   with regard to the APA claim is that this court lacks

12   jurisdiction to review this claim under 1252(g).  Your Honor

13   already found that 1252(g) applies to petitioners' claims

14   because they arise out of ICE's discretionary decision to

15   execute their removal order.  And while the Suspension Clause,

16   as Your Honor found, may provide review in a habeas context,

17   the Suspension Clause does not apply to the APA by its plain

18   terms.  The suspension --

19        THE COURT:  Well -- okay.  Go ahead.

20        MS. LARAKERS:  So the Suspension Clause only applies

21   to the suspension of the writ of habeas corpus.  It says

22   nothing about the APA.

23        THE COURT:  But this is an APA claim raised in a

24   habeas corpus proceeding, isn't it?

25        MS. LARAKERS:  Yes, Your Honor, and the government

1    doesn't dispute that there may be situations where an APA claim

2    and a habeas claim can proceed at the same time.  That's not

3    what we're arguing here.  We're arguing that there is no review

4    under the APA because there's a statute that precludes review.

5    So if there wasn't 1252(g), it very well may be that the APA

6    and habeas case could proceed at the same time if the habeas

7    didn't provide another adequate remedy.  But that's no the

8    issue here.

9         The issue here is whether Section 1252(g) precludes

10   review under the APA.  And it's clear that it does because this

11   court has already found that Section 1252(g) applies to

12   petitioners' claims, and but for the Suspension Clause, this

13   court wouldn't have jurisdiction over this action.  And because

14   the Suspension Clause only applies to habeas actions, it can't

15   be applied in the APA context.

16        So as Your Honor knows, the suspension clause deals

17   particularly with the suspension of the writ of habeas corpus.

18   It says nothing about the Administrative Procedures Act.  The

19   Administrative Procedures Act precludes review to the extent

20   that another statute precludes review.  And here 1252(g)

21   clearly does.

22        I don't know if Your Honor has any further questions

23   about our claim that the claims actually do fall under Section

24   1252(g).

25        THE COURT:  Well, at the moment, I do think they fall

1    under 1252(g).  But I also understand that under the APA, 5

2    U.S.C. Section 703, judicial review of a claim can occur in any

3    applicable form of a legal action, including habeas corpus.

4                 MS. LARAKERS:  Yes, Your Honor.

5                 THE COURT:  So if the statute provides for review of

6    an APA claim and habeas corpus proceedings, and this is a

7    habeas corpus proceeding, why can't it be reviewed here?

8                 MS. LARAKERS:  Because the APA also precludes review

9    to the extent that another statute precludes review.

10                So Section 1252(g) would overrule the later sections

11   in the APA allowing -- ordinarily allowing for review, Your

12   Honor.  And the government doesn't dispute that ordinarily the

13   APA does allow for review when a person comes into the court

14   claiming that an agency wronged them in some way.  However, in

15   this particular circumstance, because Section 1252(g) applies,

16   that specific portion overrules, precludes --

17                THE COURT:  But the reason we're here in habeas is

18   because the defendants are in custody for the purposes of

19   habeas corpus.  So in what kind of a habeas corpus proceeding

20   would a court have the power to review an APA claim?

21                MS. LARAKERS:  So perhaps Your Honor in -- in any

22   habeas corpus proceeding that doesn't happen under 1252(g).  So

23   I think, for example, if the habeas claim had something to do

24   with, the person was in custody but also had something to do

25   with a direct violation of the regulation --

```
 1              THE COURT:  Like what?
 2              MS. LARAKERS:  Your Honor, I can't think of one off
 3    the top of my head.
 4              THE COURT:  Well, you can't think of one.  This is
 5    a -- first of all, that was off the top of your head.  You're
 6    well prepared.  But if you can't think of one, it renders 5
 7    U.S.C. Section 703 meaningless.  It says APA claims can be
 8    reviewed in habeas proceedings, but you can't -- if I adopt
 9    your argument, you can't think of any habeas proceeding in
10    which the court could review a claim.
11              MS. LARAKERS:  Your Honor, I'm sure I could.  The
12    issue I'm having is to think of a claim, a habeas claim that
13    wouldn't also result from -- that wouldn't also preclude --
14    1252(g) wouldn't also preclude it.
15              THE COURT:  Exactly, exactly.
16              MS. LARAKERS:  1226(c), Your Honor, so --
17              THE COURT:  Timeout.
18              MS. LARAKERS:  Sorry, Your Honor.
19              THE COURT:  You live with this.  Here, you're going to
20    have to explain to me or remind me what 1226(c) is.  You know,
21    yesterday I'm doing a criminal case.  Today I'm doing an
22    immigration case.  1226(c) is what?
23              MS. LARAKERS:  Okay.  Well, let me back up, Your
24    Honor.  I think maybe an easier context to go into is the
25    prisoner context, Your Honor.  A prisoner could bring a claim
```

1   stating that not only is his particular detention unlawful but

2   also it's contrary to a regulation, like a Board of Prisons

3   regulation as well, and that the prison is not only

4   violating -- not only is his detention unlawful under the

5   Constitution but it's also unlawful because the regulation

6   provides otherwise.  Perhaps in that situation there could be a

7   habeas claim and an APA claim.  However, here we have Section

8   1252(g) as specific provisions of the INA to deal with.  And

9   those specific provisions of the INA overrule those later

10  provisions in the APA.

11          THE COURT:  What the provisions of the INA?

12          MS. LARAKERS:  1252(g), Your Honor.

13          THE COURT:  That strips the court of jurisdiction to

14  do?

15          MS. LARAKERS:  To review claims arising from any

16  action taken to execute a removal order.

17          THE COURT:  But I mean, I have to go back to what I

18  wrote in Jimenez, but here they're not challenging a specific

19  decision.  They're challenging a whole regime.  Do you have any

20  cases that support the argument you just made?

21          MS. LARAKERS:  Yes, Your Honor.  They're mostly

22  included in my motion to dismiss briefing.

23          THE COURT:  What's the best of them for you?

24          MS. LARAKERS:  Well, Your Honor, the best of them is

25  probably AADC, but also in Candra v. Cronen, Judge Saris held

1   that the APA claim couldn't be reviewed either.

2            THE COURT:  Let me see that.

3            You're talking about 361 F. Supp. 148 I think --

4            MS. LARAKERS:  Yes.

5            THE COURT:  -- with regard to the APA claim.  Where

6   does she discuss the APA claim?

7            MS. LARAKERS:  In my briefing, Your Honor.

8            THE COURT:  No, in the Candra decision.

9            MS. LARAKERS:  It's with regard to the children's

10  claim, I believe, Your Honor.

11           THE COURT:  It says, "The government first points to

12  1252(g), but the provision by its plain language applies only

13  to claims brought by or on behalf of an alien.  Count II is not

14  brought by or on behalf of Candra but the Candra children, who

15  are U.S. citizens."

16           MS. LARAKERS:  So if you look at page -- I've got to

17  find the pin cite.  I think it's 158.  So Judge Saris says,

18  "The Candra children's APA claim is likely within the

19  jurisdictional bar to the extent that it seeks an injunction or

20  a stay."  And then, "Furthermore, the government makes a strong

21  argument that ICE's decisions on stay applications are

22  committed to agency discretion by law."

23           The relief sought in this case, Your Honor, is in part

24  a stay of the final order of removal, at least until Your Honor

25  pointed out ICE considers a provisional waiver process.  So ICE

1    cannot --

2             THE COURT:  I'm sorry.  Go ahead.

3             MS. LARAKERS:  So Your Honor, the petitioners seek a

4    stay of removal until the procedures are complied with under

5    the Fifth Amendment.  So because they seek a stay of removal,

6    it falls under -- their claims arise from the decision to

7    execute a removal order, and it's barred by 1252(g), and the

8    APA also precludes review.

9             THE COURT:  I'm just taking a closer look at Judge

10   Saris's decision.

11            MS. LARAKERS:  Yes, Your Honor, and --

12            THE COURT:  Wait.  I'm reading this.

13            MS. LARAKERS:  Sorry.

14            THE COURT:  But it goes on.  This is at the end of

15   page 158.  "The Candra children are also seeking a declaration

16   that ICE has instituted a new policy of denying all stay

17   applications in contravention of its own regulations requiring

18   consideration for multiple factors without going through the

19   required rulemaking process.  The court likely has jurisdiction

20   to examine a challenge to the agency's decision to revoke a

21   rule without going through the rulemaking process."

22            That's precisely the contention here.  So Judge Saris,

23   it appears to me, in Candra is agreeing with the petitioners in

24   this case, as the judge in Maryland did yesterday in the Lin

25   case that they cited as additional authority.

1          MS. LARAKERS:  Well, Your Honor, with regard to the

2    <u>Lin</u> case --

3          THE COURT:  Wait a minute.  Let's go back to Judge

4    Saris.  I asked you in effect a compound question.  Why

5    isn't -- isn't the claim here not -- they're not attacking one

6    particular decision.  They're saying, as I understand it, the

7    provisional waivers were issued through the APA process and now

8    they're being ignored, and the policy -- something that was

9    supposed to promote the opportunities for American citizens to

10   stay together with their wives and children, promote family

11   values, is actually being used as a trap because they get

12   called in for their I-130 interviews and arrested and are

13   detained and are subject to removal.  But my understanding is

14   the claim in this case is the claim, the type of claim that

15   Judge Saris said would survive in <u>Candra</u>.

16         MS. LARAKERS:  Your Honor, the government doesn't

17   agree with the entire decision.  I think we agree with the

18   portion that says that 1252(g) applies.  So to the extent that

19   the -- and I know that the opinion later on explains the other

20   part of the claim but our contention is that you can't separate

21   out those claims, the claim itself arising from the decision to

22   execute a removal order.  And but for ICE's decision to execute

23   a removal order, there would be no claim in this court.  There

24   would be no one that has standing to bring the claim.  So the

25   proof is there in the relief that the petitioners seek in the

1   form of a stay of removal.  And, Your Honor, we also have to

2   think about the fact that in Colon v. Carter the First Circuit

3   said that, you know, "Although we do not lightly interpret a

4   statute to confer unreviewable power, the ultimate analysis is

5   always one of Congress' intent."

6          THE COURT:  And a number of District Courts at least

7   have addressed this APA issue, one as recently as yesterday in

8   a preliminary injunction context.  And a number of District

9   Courts have found the APA claim is plausible.  It survives a

10  motion to dismiss.

11         Are there district or circuit cases that address this

12  specific claim, comparable claim that the APA is in effect

13  being repealed without going through the required process and

14  come out in favor of the government?

15         MS. LARAKERS:  Your Honor, I think that's, you know,

16  it's a -- Your Honor, I do not know.  There may be some in my

17  prior motion to dismiss briefings, because I think the

18  supplemental briefing was -- I know, Your Honor, it was focused

19  more on the fact that assuming that 1252 applies as Your Honor

20  already found.  I don't have the cases written down right here

21  that I may have cited in previous briefing, and I cannot --

22         THE COURT:  So you can't think of one?

23         MS. LARAKERS:  Your Honor --

24         THE COURT:  Because there are -- okay.

25         MS. LARAKERS:  Your Honor, ultimately here, you know,

1    it's a question of Congressional intent.  But for ICE's

2    decision to execute an order of removal, there would be no

3    plaintiff with standing in this court; therefore, their claims

4    have to arise from the decision to execute a removal order, and

5    1252(g) bars that claim.

6         Your Honor, also 701(a)(2) also precludes their claim

7    to the extent that it's -- to the extent that execution of

8    removal orders are within the sole discretionary authority of

9    ICE.

10        THE COURT:  They're not attacking -- I think I wrote

11   about this in detail in <u>Jimenez</u>.  They're not attacking a

12   particular discretionary decision.  They're attacking an

13   alleged wholesale refusal to follow the law that the

14   provisional waiver regulations constitute.

15        MS. LARAKERS:  So perhaps, Your Honor, it would be

16   helpful to move on to the merits of their APA claim to show

17   that that's not really what they're asking for in this court.

18   Because I think it's clear that, when you look at the

19   regulations, it's the discretion that they're attacking and not

20   the -- and not the program as a whole.

21        So if we look specifically at the rulemaking

22   challenge, there can be no rulemaking challenge where the

23   petitioners fail to point to a single portion of the rule that

24   has been changed.  I think indeed the rule itself encompasses

25   for administrative priorities to change, and it states very

1    clearly in the Federal Register comments that, you know, as I
2    said over and over again in the briefing, that it doesn't
3    protect from an institution of removal proceedings or in fact
4    being removed from the United States.  And of course that
5    argument is much stronger with regard to people who don't yet
6    have an approved I-212, but it also applies to people who have
7    a pending I-601A, as the Federal Register comments say, that a
8    pending or approved provisional waiver does not protect an
9    individual from removal.

10        THE COURT:  And didn't I address the implications of
11   that in my prior, I call it Jimenez decision?

12        MS. LARAKERS:  You did with regard to due process,
13   Your Honor, and it may be true that there could be a due
14   process interest here at least with regard to the I-601 people
15   as you found, but just because there's a due process interest
16   does not also mean that there's been a violation of the
17   regulation and a corresponding right that is found in the text
18   of the regulation.  Those are two separate distinct inquiries.

19        THE COURT:  I don't think -- I don't understand --
20   well, anyway.  I understand their argument to be that the
21   provisional waiver regulations, the constellation, emerge from
22   the process required by the Administrative Procedures Act.
23   They can be revoked if those procedures are followed, but they
24   can't just be reversed, nullified, without following those
25   procedures, and therefore there's a violation of the APA and

1    the decision not to follow the provisional waiver regulations,

2    which are laws, is arbitrary and capricious.  It's essentially

3    the same argument as I see it at the moment under two headings.

4    But that's the argument, I think.

5           MS. LARAKERS:  And Your Honor, perhaps that would be

6    true with a different regulation.  Perhaps making a regulation

7    a nullity would be true if that regulation spoke on or wasn't

8    just merely silent but didn't have the language that we have in

9    the Federal Register comments and in the regulation here, and I

10   think that's what makes the key difference here; that the

11   Federal Register comments themselves say that even an approved

12   or a pending 601A doesn't protect an individual from removal,

13   that it actually builds into that the agency actually thought

14   about when they were enacting it about the policies of DHS

15   changing, such that it may not be in the future as it was in

16   the previous administration that people applying for the I-601A

17   were not enforcement priorities.  Those priorities have changed

18   and the regulation built that into it because it says in

19   accordance with current DHS policies, governing --

20          THE COURT:  Just one second.  Stop.  Okay, go ahead.

21          MS. LARAKERS:  So I have several places where it can

22   be found.  It can be found at the 2013 regulations, at 554 and

23   again at 555.

24          THE COURT:  Let me -- what page?

25          MS. LARAKERS:  554 and then again at 555.

1          THE COURT:  I think I have the right pages.  What is

2     the language you want me to look at?

3          MS. LARAKERS:  It starts with, "DHS reminds the

4     public" --

5          THE COURT:  Okay.

6          MS. LARAKERS:  -- "that the filing or approval of a

7     provisional unlawful presence waiver application will not," and

8     then it goes on and the last sentence, "protect an alien from

9     being placed in removal proceedings or removed from the United

10    States in accordance with current DHS policies governing

11    initiation of removal proceedings and the use of prosecutorial

12    discretion."

13         So again, Your Honor, while a regulation or a claim of

14    this type could possibly be reviewable under the APA as I think

15    many courts have found with regard to the DACA litigation,

16    that's not the case here because we have regulations that say

17    that it shall not protect someone from being removed from the

18    United States.

19         And that's the key here.  The APA claim and the INA

20    claim are very closely intertwined in that way, and without

21    being able to point to a specific provision in the provisional

22    waiver regulations other than this general purpose that is

23    being violated or changed, there can't be a rulemaking

24    challenge, and there can't be a violation of the APA, and there

25    can't be an INA claim either.  They all flow from each other.

1    Because at the minimum petitioners would have to show the
2    portion of the regulation that's being changed.  But when the
3    regulation contemplated that, administrative priorities changed
4    and said clearly there is no due process right, that these
5    regulations do not protect an individual from being removed.
6    Where that's what the regulations say, there can be no
7    rulemaking challenge that removing an individual suddenly
8    changed that rule.

9         And indeed I think it's clear when you look at
10    petitioners' argument and other than this purpose of the
11    regulations, they can't point to a portion of the regulation
12    that would be expressly violated, and so that's the lens
13    through which we have to view the APA claim and the INA claim.
14    It's a very strict statutory regulatory analysis.

15         And, you know, I went on to the merits because that
16    also shows that 1252(g) applies, because it shows that they're
17    not actually attacking the text of the regulation.  They're
18    attacking the discretionary decision that is inherent in the
19    regulations.

20         THE COURT:  How is that different than the argument I
21    rejected in my September 2018 Jimenez decision?  I quoted the
22    Supreme Court in Accardi.  I said it's important to emphasize
23    the court is not reviewing the manner in which discretion was
24    exercised.  If such were the case, it would be discussing the
25    evidence in the record supporting or undermining petitioners'

```
 1    claims to discretionary relief rather the court objects to
 2    DHS's alleged failure to exercise its own discretion contrary
 3    to existing valid regulations.  And I quoted Succar.  "The
 4    Attorney General cannot categorically refuse to exercise
 5    discretion favorably for classes deemed eligible by the
 6    statute.  This court may therefore decide petitioners' claim on
 7    a petition for habeas corpus under 28 United States Code
 8    Section 2241," citing the First Circuit decision in Gonsalves.
 9    How is this analysis different than that?
10         MS. LARAKERS:  So, Your Honor, it goes back to what
11    the regulation required in Accardi and what the regulation
12    required in Succar.
13         THE COURT:  Basically you're saying -- and you can
14    make this argument -- it's not personal -- that I was wrong in
15    Jimenez.  The question -- and I've continued to think about
16    that.  But, but, the question I'm asking you, which you haven't
17    answered yet, is, assuming without your conceding that my
18    analysis was right in Jimenez, how is the argument you're
19    making now materially different than the one I rejected last
20    September?
21         MS. LARAKERS:  Your Honor, because the standards are
22    different.  The standards in due process are different than
23    those in the statutory interpretation, in the regulatory
24    interpretation context, which is what we're dealing with in an
25    APA rulemaking challenge, and it's what we're dealing with in
```

1    the INA challenge.  And I think <u>Jennings</u> clearly stands for

2    that proposition.

3          Now, Your Honor, as you know, our position is that

4    with regard to a positive law, such as where the regulation --

5    where the due process right claim is coming from a section of

6    positive law such as a regulation, there has to be very --

7    there has to be some sort of textual hook there.  But I

8    recognize at least for the purposes of this argument that the

9    Due Process Clause is more flexible than a statutory

10   interpretation or regulatory interpretation argument.

11         And the statutory interpretation and the regulatory

12   interpretation argument is what we're talking about here in the

13   APA and the INA claim.  So it has to be a much stricter

14   analysis.  So if we look at <u>Accardi</u> and if we look at the

15   statutory or the regulatory interpretation section in <u>Accardi</u>

16   and then look at that section in <u>Succar</u>, we see things that we

17   do not see in the regulations here.  Namely, even in <u>Accardi</u>,

18   the Supreme Court recognized that the decisive fact was that

19   the regulation required DHS -- sorry -- the board was required,

20   as it still is, to exercise its own judgment when considering

21   appeals.  The regulation said, I believe it used the word

22   "shall," but it was express language.  It required the result.

23         And the same thing is true with the regulation in

24   <u>Succar</u>, except for that was an even stronger case because that

25   was with regard to the statutory right.  The statute itself,

1    not merely the regulation, made people eligible, a whole class

2    of people eligible.

3            THE COURT:  But these -- Christine, I just want them

4    to listen to the argument.

5            The provisional waiver regulations make a class of

6    people eligible for discretionary decisions, I think, by DHS as

7    to whether they ought to be allowed to stay in the United

8    States while pursuing waivers, you know, during the provisional

9    waiver process.  It's analogous.

10           MS. LARAKERS:  So it makes an individual eligible, I

11   suppose you could say eligible for a discretionary decision.

12   That wasn't the regulation in Accardi, and it wasn't the

13   regulation or the statute in fact in Succar.  Those regulations

14   and statutes didn't allow.  It was mandated that the person

15   shall be considered.

16           Here, that's not the case.  This regulation not

17   only -- not only does it not give a stay of removal, which is

18   what petitioners seek in the interim, but it expressly says

19   that it shall not protect from removal.  And because there's no

20   textual hook here as there was in Accardi and as there was in

21   Succar, there can be no corresponding APA right, no rulemaking

22   challenge and no INA claim.

23           And Your Honor, again, you know that doesn't conflict

24   with the Due Process Clause necessarily because I think for

25   purposes of this -- you know, purposes of your September 21

1  order, you recognize that the Due Process Clause may be a

2  little bit more flexible.

3  THE COURT:  Where did I do that?

4  MS. LARAKERS:  Well, Your Honor --

5  THE COURT:  I mean, I wasn't talking about the APA or

6  the INA at all.  These issues have come into focus essentially

7  since December.

8  MS. LARAKERS:  Yeah.  So Your Honor, if we look at

9  the -- I'm just trying to express how it's not necessarily

10  adverse to your September 21 order because your September 21

11  order was talking about the Due Process Clause and here we're

12  talking about the interpretation of a statute and a regulation.

13  And I think Jennings stands for the proposition that a

14  constitutional claim and a statutory claim are different things

15  and they have different standards.  And the statutory -- in

16  order to find a statutory or regulatory right, you have to look

17  in the text of the regulations and find that right as they did

18  in Accardi, as they did in Succar, and here, because that

19  language is not at all present.  And it's not just language

20  that, you know, makes it seem like someone should be able to

21  apply.

22  THE COURT:  Following the language I read from Jimenez

23  at page 387, I wrote, "The court concludes that 8 C.F.R.

24  Section 212.7 requires DHS, as acting through ICE, to consider

25  an eligible alien's application for a provisional unlawful

1    presence waiver before deciding to remove him or her from the

2    United States.  The regulation entitles an eligible applicant

3    to relief that is distinct from a waiver granted when an alien

4    is outside of the United States."  But I found a right in

5    Section 212.7.

6            MS. LARAKERS:  Your Honor, I would say that that

7    analysis was done under the Due Process Clause.  And while

8    obviously I made arguments strenuously against that, and the

9    government doesn't take that position that there's a due

10   process interest here at all, I think there is more -- Your

11   Honor could find more flexibility in the Due Process Clause

12   perhaps.

13           But I think Jennings makes it very clear that a

14   statutory interpretation argument, a regulatory interpretation

15   argument is a strict analysis, and you have to find that

16   textual hook that requires the relief sought.  And as in

17   Accardi, as in Succar, as in Jennings even, without that

18   textual hook, there can be no claim that the respondents

19   violated the regulations themselves, even if, you know, as the

20   Jennings court recognized, there could be a Due Process Claim.

21   You know, Jennings remanded it for the due process question.

22           So, you know, while I'll make arguments later that to

23   the extent that it's a portion of positive law where the

24   petitioners claim that the due process right comes from a

25   section of positive law, such as a regulation, it should be

1    confined to the regulation itself, while I'll make that

2    argument, I think it's -- you know, it's certainly a much

3    stricter analysis and there is a lot of case law about how

4    strict the analysis has to be in a statutory and regulatory

5    interpretation claim.

6         And I think if we view, if we view this APA claim and

7    this INA claim as just merely interpreting the statute at hand,

8    it's very clear that this regulation, that this statute and

9    regulatory scheme, when interpreted by its plain terms, does

10   not allow the relief sought by petitioners even if Your Honor

11   finds that the Due Process Clause does.

12        THE COURT:  And let's say I was wrong in finding that

13   1252(g) strips jurisdiction.  I noticed that the judge in

14   Maryland yesterday is among those who disagreed with that

15   analysis.  Would that end the inquiry, if I were to change my

16   mind on 1252(g) and not find the authority to review under the

17   Suspension Clause?

18        MS. LARAKERS:  Well --

19        THE COURT:  What are the implications of that for your

20   argument?

21        MS. LARAKERS:  Then we would move on to the other

22   section of APA precluding review, which is Section 701(a)(2).

23   Your Honor, those arguments are similar to the ones under

24   1252(g), but I think that, when we look at AADC and the dicta,

25   the long dicta by Justice Scalia, we see that these types of

1    claims that petitioners are bringing are more akin to selective

2    enforcement claims that, you know, I've got factors that you

3    didn't consider, I've got things in my file that you should

4    have considered before you decided to execute my removal order.

5    And those are, you know, discretionary decisions at the height

6    of executive power that are not suitable for judicial review.

7          And so I think we would look at 701(a)(2) to see if

8    that separate section that precludes review of decisions that

9    are within the executive -- within the agency's sole

10   discretion, whether that also precludes review.  And of course

11   that overlaps with the 1252(g) argument.

12         But Your Honor doesn't -- Section 1252(g), going back

13   to that, it does apply and you can see that it applies when you

14   look at whether there's any cognizable claim under the INA,

15   whether there's any cognizable claim that the respondents

16   violated the regulation.  When there's no cognizable claim that

17   the person violated the regulation, then you can see that what

18   they're really challenging is discretion.  Because if there's

19   no violation of the regulation --

20         THE COURT:  They're alleging you ignored the

21   regulation and violated it by not -- you know, you understand.

22   In my Jimenez decision, I'll call it, I didn't decide that

23   nobody who had applied for a provisional waiver or at any stage

24   couldn't be removed.  I only ordered that you had to consider

25   the fact that the person was seeking a provisional waiver.

1          MS. LARAKERS:  Yes, Your Honor, and I understand those

2     practical considerations as I think you made very clear.  But

3     for the purposes of this, you know, legal argument, it's clear

4     that they're challenging the discretion because they're

5     challenging that a factor wasn't considered.  They're saying

6     that the 601A regulations should have been considered in that

7     discretionary decision to execute their removal order, and that

8     challenge that there's something lacking in ICE's discretion

9     here, and I think even it's part of this court's proposed

10    relief that there be something added, that there be something

11    added to that discretion.  And I think that's why Your Honor

12    found that their claims are encompassed within Section 1252(g),

13    because the regulations themselves don't say that they're

14    required to the relief that they seek, so they're seeking to

15    add on something to ICE's discretionary authority, a new

16    factor, and that necessarily falls within ICE's discretionary

17    authority.

18          THE COURT:  Okay.  I recognize that there's a

19    relationship between the APA claim and the INA claim, but I

20    think it will be easiest for me to hear the argument on them

21    separately, and you can continue to point out the relationship

22    between the arguments.  But how do the petitioners respond to

23    this, please?

24          MS. LAFAILLE:  So, Your Honor, before I get into the

25    substance of that, I do want to note, and I know we'll discuss

1   this later, but so I don't lose the thought, that all of these

2   arguments are all-or-nothing arguments.  All of them, you know,

3   the claim either rises or falls with regard to the class as a

4   whole.  And, you know, I think it certainly will be relevant

5   later that there's no distinction here being drawn between

6   people at different stages of the provisional waiver process.

7            THE COURT:  You mean for the APA --

8            MS. LAFAILLE:  Correct, Your Honor.

9            THE COURT:  This is part of the reason I put the APA

10   first.  A, I thought it was your strongest argument.  B, I

11   thought that if I don't dismiss your APA claim, then your class

12   definition is appropriate.  These are all tentative views.

13            I'll give you a preview of coming attractions.  My

14   tentative view is that your APA and INA claims survive the

15   motion to dismiss, that your Due Process Claim vests -- and now

16   I'm -- when you have an approved, what, I-230?  Although I may

17   be confusing the numbers.

18            MS. LAFAILLE:  Either and I-130 or an I-212, Your

19   Honor.

20            THE COURT:  You have to have an approved I-212.

21   That's the defendant's argument if they accept there's a Due

22   Process Claim.  I don't think the Equal Protection claim is

23   plausible because at the moment, and of course this is a huge

24   issue, is the test Arlington or is the test Hawaii, but I think

25   the test is Hawaii.  But there might be a subclass for due

1    process purposes if my tentative views, which might change,

2    that's narrower than the APA class that I would probably

3    certify if I don't dismiss the APA claim.  But I think that's

4    consistent with what you were just saying about all or nothing,

5    that if the APA claim is not dismissed, then your class

6    definition is the appropriate one?

7              MS. LAFAILLE:  Yes, Your Honor.  And obviously we'll

8    have lots to talk about --

9              THE COURT:  Later, but go ahead.

10             MS. LAFAILLE:  -- with regards to due process and

11   equal protection.

12             THE COURT:  You've got a lot to talk about concerning

13   the APA and the INA.  I told you what my tentative view is.

14             MS. LAFAILLE:  Yes, Your Honor.

15             What happened in this case, Your Honor, was that the

16   government enacted regulations that were designed to keep

17   families together, and then it all but erased them.  And that

18   conduct falls in the heartland of what the APA prohibits.

19             Now, the government is misreading the APA in a very

20   important way.  The government conduct violates the APA when it

21   is arbitrary and capricious or not in accordance with law.  And

22   although, you know, we think -- and we think the court has

23   already held that the government conduct here was not in

24   accordance with law.  It's also --

25             THE COURT:  What conduct?

1          MS. LAFAILLE:  That the annihilation of these

2    regulations was not in accordance with law.  It's also the case

3    that this was a reversal of policy that is arbitrary and

4    capricious under the APA.  And that's the case because even

5    when the government acts within the bounds of its statutory and

6    regulatory authority, it still cannot simply change its course

7    without reasoned explanations and reasoned considerations of

8    relevant nonarbitrary factors.  And none of that is present in

9    this case.

10          What we have here is a regulation that is on the books

11    that is all but wiped out, and we have eligibility for relief

12    being made into, at best, a sport of chance.  Those are things

13    that are arbitrary, clearly arbitrary and capricious under all

14    of the Supreme Court's case law.

15          With regards to the jurisdictional arguments being

16    made, Your Honor, this claim falls outside of 1252(g) because

17    it is a claim that the government, as Judge Saris acknowledged

18    in Candra, this is a claim that the government wholesale

19    reversed its regulations without following the proper procedure

20    and without giving reasons for doing so.  That kind of claim is

21    not encompassed by 1252(g).

22          THE COURT:  Here.  Remind me of what 1252(g) says.

23          MS. LAFAILLE:  It bars jurisdiction for claims by or

24    on behalf of any alien arising from a decision or action by the

25    Attorney General to commence proceedings, adjudicate cases, or

1    execute removal orders.  And here what we're challenging, Your

2    Honor, is not a decision or action to execute removal orders.

3    Here what we're challenging is a decision that rules on the

4    books do not have to be followed.  Even if 1252(g) applied to

5    the claims of the non-citizens in this case, the Suspension

6    Clause would still protect this court's jurisdiction, and

7    that's because, as this court acknowledged, 703 of the APA

8    allows judicial review under the APA to occur in any

9    appropriate proceeding, including habeas corpus.  And the APA

10   requires courts to find unlawful government conduct that is

11   arbitrary and capricious.  So the Suspension Clause's

12   protection for consideration of legal and constitutional claims

13   encompasses these claims because they're plainly legal claims.

14        And finally, Your Honor, with regards to the argument

15   that there is essentially no law to apply, this is an extremely

16   narrow exception to the APA's jurisdiction, and we think it's

17   foreclosed by this court's prior order.  There clearly is law

18   here to apply.  Your Honor wrote at length about that law and

19   about what the regulation here requires.

20        THE COURT:  Are there -- didn't Judge Saris decide or

21   indicate that 1252(g) didn't apply to the APA argument?

22        MS. LAFAILLE:  Yes, Your Honor, and I don't actually

23   have --

24        THE COURT:  Candra?

25        MS. LAFAILLE:  -- I don't actually have Candra in

1   front of me, but she did, as Your Honor pointed out, note that

2   the court likely has jurisdiction to examine a challenge to the

3   agency's decision to revoke a rule without going through proper

4   procedures.

5        THE COURT:  Okay.  Is there additional argument you'd

6   like to make on this?

7        MS. LAFAILLE:  Not unless Your Honor has questions.

8        THE COURT:  What do you think are the other decisions,

9   I think they would be District Court decisions, that best

10  explain and support the reasoning you contend is correct?

11       MS. LAFAILLE:  So Your Honor is aware, the cases,

12  specific cases specifically on point is are the Martinez v.

13  Dicensio and Lin decisions, but I also think that the Supreme

14  Court's decisions on arbitrary and capricious review like

15  F.C.C. v. Fox and Judulang v. Holder make it extremely clear

16  that the actions of the government here are arbitrary and

17  capricious.

18       THE COURT:  And Lin, the Lin decision you provided

19  yesterday is a second Lin decision; essentially there's

20  yesterday's in conjunction with the preliminary injunction?

21       MS. LAFAILLE:  Correct, Your Honor.

22       THE COURT:  All right.  The briefing on this

23  Administrative Procedures Act claim, which is Count 4, is

24  thorough, and the argument has tested but not altered my

25  tentative view that the motion to dismiss Count 4 should be

1    denied, therefore I'm denying it.

2         In summary, the reasons for denying it are as follows:

3    Petitioners argue that respondents have violated the

4    Administrative Procedures Act or APA for two reasons.  One,

5    that ICE has altered substantive rules without notice and

6    comment rulemaking and without consideration of the reliance

7    interests created by the regulations in violation of 5 United

8    States Code Section 553.  That contention is made in the

9    amended complaint in paragraphs 123 to 27.

10        Second, petitioners allege that detaining and removing

11   noncitizen petitioners without allowing them to follow the

12   provisional waiver procedures is arbitrary and capricious and

13   in violation of 5 United States Code Section 706(2)(a) because

14   that represents an abandonment of the binding promises provided

15   by the regulations and is a decision not based on "a

16   consideration of the relevant factors" nor "tied . . . to the

17   purposes of" the regulations, as required by Judulang, 565 U.S.

18   42 at 53, 55.

19        And I've decided previously in this case in the due

20   process context that respondents have a duty to consider the

21   fact that an alien and his or her spouse are seeking a

22   provisional waiver in deciding whether to remove somebody.  I

23   haven't decided that everybody pursuing a provisional waiver

24   has a right not to be removed.  Both APA claims are reviewable

25   by this court.  Contrary to petitioners' contention -- well,

1     I'm of the view that Section 1252(g) does strip this court of

2     jurisdiction and therefore the Suspension Clause of the

3     Constitution is implicated, something I wrote about in detail

4     in Jimenez, 334 F. Supp. 3d 370, in this case.

5          Courts differ on that issue, and if review is not

6     stripped by 1252(g), the authority to review exists.  If it is

7     stripped by 1252(g), the Suspension Clause provides the

8     opportunity and obligation for this court to exercise

9     jurisdiction over the APA claims.  And the discussion of

10    1252(g) in Jimenez is at 334 F. Supp. 3d 384 to 85.

11         Under the APA, 5 United States Code Section 703,

12    judicial review of a claim can occur in "any applicable form of

13    legal action, including . . . habeas corpus," as Judge Saris

14    noted in Putnam, 441 F. Supp. 2d 253 at 255 to 56, citing

15    cases.  In addition, the bar to review an agency action that's

16    committed to agency discretion by law in 5 U.S.C. Section

17    701(a)(2) does not apply here because petitioners' APA claim,

18    like its Due Process Claim, challenges ICE's "failure to

19    exercise its own discretion" as opposed to any particular

20    discretionary determination, as I discussed in Jimenez, 334 F.

21    Supp. at 385.

22         On the merits, petitioners plausibly allege that the

23    respondents have violated the APA by effectively repealing,

24    without explanation, the provisional waiver regulations, 5

25    United States Code Section 551, Sections 4 and 5.  An agency

1  may not "depart from a prior policy sub silentio or simply
2  disregard rules that are still on the books," as the Supreme
3  Court wrote in F.C.C. v. Fox Television, 556 U.S. 502 at 513 to
4  15.  More specifically, "An agency changing its course must
5  supply a reasoned analysis," and the court may not infer the
6  agency's reasoning from mere silence, as the Supreme Court said
7  in State Farm, 463 U.S. 29 at 57.  The Supreme Court has stated
8  that the APA "mandates that agencies use the same procedures
9  when they amend or repeal a rule as they've used to issue a
10 rule in the first instance."  That's Perez, 135 Supreme Court
11 1199 at 1206.
12        Here it's alleged and plausibly alleged that ICE's
13 decision to remove individuals before they can pursue the
14 provisional waiver process constitutes a substantial change in
15 course from DHS's prior policy which was promulgated after
16 notice and comment.  By extending the benefits of the
17 provisional waiver regulations to aliens with final removal
18 orders in 2016, DHS allowed individuals pursuing an unlawful
19 presence waiver, an I-601, to be considered for the relief of a
20 provisional waiver while in the United States.  Failure to give
21 consideration to applications for this relief and in fact
22 rendering it impossible for individuals to pursue the relief by
23 arresting them in some instances at the beginning of the
24 process while they're in a government office applying for an
25 I-130 effectively reverses that policy.

1          This change in course was not the result of any notice

2     and comment rulemaking or reasoned analysis in the Federal

3     Register -- or the Federal Register.

4          Multiple other District Courts have found nearly

5     identical APA claims concerning the provisional waiver process

6     to be plausible.  These decisions include Lin v. Nielsen, a

7     November 19, 2018 District of Maryland case, and a reiteration

8     of the analysis in that case in a May 2, 2019 decision on

9     preliminary injunction, which at pages 8 to 10 has reasoning

10    with regard to the merits of the motion to dismiss that I think

11    is succinct and correct.

12         Another District Court decision rejecting the argument

13    the government makes here is the De Jesus Martinez, 341 F.

14    Supp. 3d 400 at 410, a 2018 New Jersey decision.  In the

15    Southern District of New York the same argument was rejected in

16    Villavicencio, 330 F. Supp. 3d 944 at 958.

17         Petitioners also state a plausible claim that

18    respondents' failure to consider participation in the

19    provisional waiver process in enforcement decisions is

20    arbitrary, capricious and abuse of discretion or otherwise not

21    in accordance with law as required by 5 U.S.C. Section 706

22    because that policy is not in accordance with the purposes and

23    proper functioning of the immigration laws, which the Supreme

24    Court said is required in Judulang, 565 U.S. at 55.

25         In assessing an APA claim in the immigration context,

1     courts assess whether the agency action is "tied, even if

2     loosely, to the purposes of the immigration laws or the

3     appropriate operation of the immigration system."  More

4     specifically, this court's reasoning in its September 21, 2018

5     decision finding that removal of petitioners without

6     consideration of participation in the provisional waiver

7     process would render "meaningless" the "binding promises" of

8     the provisional waiver regulations indicates that DHS's conduct

9     may not be tied or is not tied to the purposes of the

10    immigration law or at least the "appropriate operation" of the

11    immigration laws.  Something I discussed in Jimenez, 334 F.

12    Supp. at 389.

13         Although ICE maintains statutory authority to deport

14    individuals, including individuals participating in the

15    provisional waiver process, this court has previously held that

16    ignoring participation in the provisional waiver process

17    entirely does not accord with a prevailing purpose of the

18    Immigration and Nationality Act or its regulations.  I have

19    referred to the INA as the parties have.

20         So for those reasons, the motion to dismiss Count 4 is

21    denied.  I don't know -- are the arguments concerning the

22    parameters of the putative class the same or different with

23    regard to the INA?

24         MS. LARAKERS:  Same or different, like, as the due

25    process?

1          THE COURT:  No, not due process.  Due process I think

2     is different.  You're running ahead on that one at the moment.

3     Let me do the following.  And anything I decide particularly

4     with regard to class certification can be changed.  In fact,

5     class certification can be changed at any time in the course of

6     the case, as can any ruling until the case is over.

7          But at the moment, the proposed class definition is --

8     petitioners seek certification of a class defined as any U.S.

9     citizen and his or her noncitizen spouse who has, one, a final

10    order of removal and has not departed the United States under

11    that order; two, is the beneficiary of a pending or approved

12    I-130 petition for alien relatives filed by the U.S. citizen

13    spouse; three, is not ineligible for a provisional waiver under

14    8 C.F.R. Section 212.7(e)(4)(i), or 6 and 4, is within the

15    jurisdiction of Boston ICE-ERO field office comprising

16    Massachusetts, Rhode Island, Connecticut, Vermont, New

17    Hampshire and Maine.  That's the requested definition of the

18    putative class?

19          MS. LAFAILLE:  Yes, Your Honor.

20          THE COURT:  And it's petitioners' argument that for

21    the APA claim at least that's the correct definition.  That's I

22    think what you meant earlier by saying this is all or nothing.

23          MS. LAFAILLE:  Yes, Your Honor.

24          THE COURT:  All right.  Now, understanding that the

25    government objects to the APA ruling, the ruling denying the

 1   request to dismiss the APA claim, if you accept, as you must,

 2   that I've denied the motion to dismiss, has the government --

 3   and I'm not deciding now whether class certification is

 4   appropriate.  But does the government assert that petitioners'

 5   proposed definition of the putative class is defective in some

 6   way with regard to the APA claims, not the Due Process Claims?

 7          MS. LARAKERS:  Yes, Your Honor.  It's defective

 8   because it includes people who do not yet have an approved

 9   I-212, so it goes back to my textual argument.  Just like

10   there's no due process right, there's no textual hook making it

11   unlawful to remove an individual who doesn't have an approved

12   I-212.  So it's the same analysis.  It's just a different

13   standard under the APA claim.

14          THE COURT:  Well, I think I've just rejected that

15   argument, though, for APA purposes.  Ms. Lafaille, why is this

16   a correct definition based upon the APA ruling I just made?

17          MS. LAFAILLE:  So, with the APA claim what we have is

18   a wholesale government practice and a change in policy, as Your

19   Honor just found.  And the question here that would be relevant

20   to class scope is one of standing.  And the question would be

21   who has standing to challenge that violation of the APA.

22          We've laid out in our briefs how every petitioner and

23   class member in this case has standing to challenge that

24   because of the very substantial risk that they face that these

25   regulations that were designed to help them keep their families

1   together will in fact result in their families being torn

2   apart.  The government has not challenged at all our arguments

3   about standing and our arguments that petitioners and the

4   putative class members are all clearly within the zone of

5   interest for the relevant statutes.

6           MS. LARAKERS:  So Your Honor, I think now that we know

7   that the APA claim isn't going to be dismissed, I think as you

8   know and I think as petitioners would agree, the INA claim

9   falls within the APA.  Because the INA isn't its own

10  independent grounded jurisdiction.  It has to be reviewed under

11  some sort of statute.  So it would be reviewed under the

12  Administrative Procedures Act to the extent that plaintiffs

13  claim that it's a violation of the provisional waiver

14  regulations to remove them.  So it would fall under that

15  contrary to law portion.

16          Our claims aren't arising -- our claim that it should

17  be -- the class at the very least should be limited isn't so

18  much related to their rulemaking challenge but more related to

19  whether those individuals without an approved I-212, whether it

20  was a violation of the INA to -- whether it's a violation of

21  the INA to remove them.

22          THE COURT:  Before I do the class certification, I

23  think -- and I thought there might be some difference for class

24  certification differences between the APA and the INA.  But is

25  there more you'd like to say about the merits of your INA --

1   your motion to dismiss under the INA and regulations.

2        MS. LARAKERS:  Not much, Your Honor.  Just that this

3   is akin to, this is a statutory interpretation, regulatory

4   interpretation, so we have to look at the text of the

5   regulation itself.  And because the text of this regulation

6   does not cabin discretion, in fact, it expressly says that, you

7   know, as I've repeated many times, that it doesn't protect an

8   individual from removal, that there can be no textual hook

9   there required for their statutory or regulatory argument.

10        And I think Jennings very clearly stands for that

11   proposition, that you cannot turn a regulation or statute into

12   its polar opposite.  And because this regulation and the

13   Federal Register comments say no interim benefits because they

14   say that a person shall not be protected from removal, even by

15   filing an I-601A, granting a stay of removal even in the

16   interim would be turning that language into its polar opposite,

17   and that's not allowed by Jennings.  And I think Jennings is

18   the key case at hand here.  It's a statutory interpretation

19   case.

20        And importantly, Your Honor, the petitioners don't

21   make an argument that -- a constitutional avoidance argument,

22   nor could they.  So when you're looking at interpreting a

23   statute or a regulation, you're looking at whether the text of

24   the regulation itself allows for the result that you seek.  And

25   whether you're looking at it under just pure statutory

1    regulatory interpretation or whether you're looking to avoid a

2    certain interpretation to avoid constitutional concerns,

3    whatever it is, it still has to be a plausible -- it still has

4    to be a plausible interpretation of the regulation.  And here I

5    think petitioners have said that they don't make it a

6    constitutional avoidance argument, that it's just based on the

7    regulation itself.

8            THE COURT:  I don't think either party cited Smith,

9    508 U.S. 23, where the Supreme Court says that statutory

10   construction is a holistic endeavor.  It's a familiar concept.

11   You don't look at, you know, one provision or one line alone.

12   You look at the express language in the context of the whole

13   statute.  And the purpose is manifest by the words in the

14   statute.  And I think that has implications here.

15           MS. LARAKERS:  If you look at the statute

16   holistically, a statutory interpretation argument isn't an

17   argument about the purposes of the regulation.  Statutory and

18   regulatory interpretation requires a close examination of the

19   text, and a close examination of the text here says that an

20   individual -- that the provisional waiver doesn't protect an

21   individual from being removed, and it certainly doesn't protect

22   an individual from being removed prior to when they have a

23   I-212 approved.

24           That gets into my second argument, which I won't make

25   here right at this point in time, but it's a strict analysis.

1   I think the leading case on this has to be <u>Jennings</u>.  And even

2   taking into account this holistic approach, petitioners fail to

3   point to a single part in the regulation other than its spirit

4   and purpose.

5        THE COURT:  But it's essentially I think -- and I'll

6   listen -- the same argument, that even in the due process

7   context, I didn't find that somebody seeking a provisional

8   waiver couldn't be deported, just that it had to be considered.

9   Regulations like statutes are laws.  I wrote about that at

10  length previously.  And the regulations create the provisional

11  waiver process, and the argument, as I understand it under the

12  INA -- and that's where you're correct in saying it's closely

13  linked to the APA -- is that ICE is ignoring the provisional

14  waiver process and removing people without considering the

15  process and to some extent rights at some point created by the

16  provisional waiver process, and that's arbitrary or capricious

17  or contrary to law, contrary to the regulations, which are

18  laws.  So what's wrong with that analysis?

19       MS. LARAKERS:  So I think we can look at this as sort

20  of like a funnel, right?  At the very -- the rights get limited

21  as we go down the funnel.  And at the very tip of that funnel

22  is their claim that respondents violated the regulations

23  themselves, which requires a close look at the text.  Maybe

24  perhaps, you know, as Your Honor stated, you don't have to

25  find -- I think the rulemaking challenge in that sense is a

1    little bit different.  A challenge to an overarching policy

2    that, as Your Honor may find, is a sub silentio departure is

3    also different from whether respondents actually violate the

4    texts of the regulations themselves.  I think no one disputes

5    that the new Executive Order replaced the old priorities.  But

6    here, that's not the challenge.

7            THE COURT:  The order can't replace the regulations.

8            MS. LARAKERS:  Yes, Your Honor.  And I think that's

9    why you've found that there may be a rulemaking challenge, but

10   it doesn't follow, it doesn't follow that there's a challenge,

11   that they can state a challenge for a violation of the

12   regulations themselves because that requires a strict

13   interpretation of the text.

14           THE COURT:  Well, it may be useful to go back to the

15   standard that applies to a motion to dismiss, and that is, is

16   there a plausible claim?  Because I can consider the Executive

17   Order.  It's referenced in the complaint, I believe.  But the

18   question here is, is there a plausible claim.  They're alleging

19   that the provisional waivers were not considered at all.  Maybe

20   you'll show that they were considered, or they'll fail to prove

21   they weren't considered at all, or since the relief that's

22   being sought is prospective, right, declaratory relief, you

23   know, maybe if ICE was doing it wrong, unlawfully previously,

24   it's not doing it unlawfully anymore.  This goes to questions

25   of injunctive relief.  Anyway.

1          But why is this their claim not plausible?

2          MS. LARAKERS:  Their claim isn't plausible because

3     they even fail to point to text in the regulation itself that

4     is violated when respondents remove an individual without

5     considering the provisional waiver process.  They have to be

6     able to point to text.  That's what Jennings stands for.  And

7     that may be a holistic approach of the text, maybe not just

8     looking at one portion of the text.  But even looking at the

9     text as a whole, you still get the same result.

10         And Your Honor, I think it's -- we should look at, you

11    know, a case that this court has cited before, Ceta v. Mukasey.

12    I think that gives us a good example here.  Now, that

13    regulation at issue in Ceta said that it would ordinarily be

14    appropriate for an immigration judge to grant a continuance in

15    the event that a person has a right to an adjustment -- can

16    adjust status in the United States.  Perhaps if there were

17    similar language in this statute that it shall ordinarily be

18    appropriate for ICE to grant a stay of removal or it shall

19    ordinarily be appropriate or ICE shall consider when a person

20    has a 601A waiver or if it even mentioned ICE at all in a way

21    that required something on behalf of ICE.  But the regulation

22    didn't.  And in fact it says the exact opposite by saying it

23    shall not protect from removal.

24         So when we look at those two cases, we see that that

25    cabining on discretion isn't present in this statute.  So you

 1    can't have -- there can be no plausible claim that ICE is

 2    required to consider the provisional waiver process by the

 3    regulatory statute.  And again, Your Honor, it doesn't mean

 4    that there's no Due Process Claim.  It doesn't mean that

 5    there's -- those standards are different.  It just means that

 6    there's no statutory claim here, a claim for the violation --

 7    and I keep on saying statutory but Your Honor understands it's

 8    regulatory -- there can be no claim for a violation of the

 9    regulations themselves.  And that sums up our argument, Your

10    Honor.

11            THE COURT:  Okay.  And the response is?

12            MS. LAFAILLE:  Your Honor, just briefly because I

13    think the court's prior order addresses this.  The plain

14    language that Ms. Larakers refers to is the provision of the

15    regulations creating the provisional unlawful presence waiver.

16    Yes, it doesn't prohibit removal in any specific case, but it

17    can't be interpreted to say that every beneficiary should be

18    removed as soon as they come into contact with the government.

19    And that's the policy that was being applied here.

20            THE COURT:  All right.

21            Well, the motion to dismiss Count 1, the claim based

22    on the Immigration and Nationality Act, INA, and related

23    regulations is denied because plaintiffs, petitioners have

24    stated a plausible claim on which relief can be granted.

25            As the parties recognize, this claim overlaps to some

1   degree with the APA claim.  As I've held last year in this

2   case, 334 F. Supp. 3d at 387, 8 C.F.R. Section 212.7 "requires

3   DHS, acting through ICE, to consider an eligible alien's

4   application for a provisional unlawful presence waiver before

5   deciding to remove him or her from the United States."

6           Respondents now assert that the Supreme Court's ruling

7   in Jennings precludes a statutory claim because the plain text

8   of the INA cannot be interpreted to require the relief

9   petitioners seek, which I interpret to be consideration of the

10  provisional waiver process that's been applied for or invoked.

11  Nor can the statute -- the government also argues that the

12  statute cannot be interpreted in the manner advocated by

13  petitioners without triggering the canon of constitutional

14  avoidance, which respondents say "has no application" in the

15  absence of "more than one plausible construction."  That's

16  Jennings, 138 Supreme Court at 842.

17          I think it's a correct statement of the general

18  principle in Jennings, but it's really not relevant to the

19  analysis here.  The INA and its regulations are properly

20  interpreted as requiring consideration of the provisional

21  waiver process and the court doesn't rely on any constitutional

22  or constitutional avoidance principle.  "Statutory construction

23  is a holistic endeavor," as the Supreme Court wrote in Smith,

24  508 U.S. 233.

25          Here the INA and provisional waiver regulations create

1    a statutory scheme that begins with the filing of an I-130 and

2    goes up to the point of submitting an I-601A.  That scheme

3    would be nullified if the relevant regulations were interpreted

4    as allowing the government to make it impossible for an

5    individual to apply for a provisional waiver by arresting or

6    detaining the individual while pursuing the I-130.  This

7    relates to the discussion of Ceta, 535 F. 3d 639 at 646, in

8    Jimenez, 334 F. Supp. 3d at 386 to 90, and another relevant

9    case is Kalilu, 548 F. 3d 1215.

10            The reasoning of a recent Southern District of New

11   York case is, I find, instructive and persuasive.  That case

12   essentially reinforces the reasoning in my September 2018

13   decision in this case with regard to petitioners' due process

14   claim and also applies to the claim under the INA and

15   associated regulations.  The case to which I refer is You, 321

16   F. Supp. 3d 451 at 465, denying a motion to dismiss an INA

17   claim by interpreting the regulatory scheme as a whole and

18   specifically "declin[ing] to read the INA in a way that

19   nullifies its adjustment of status scheme."

20            To the extent, if any, that the regulations are

21   ambiguous -- and I don't find them ambiguous for the pertinent

22   purpose -- to the extent there's ambiguity, deference under

23   Chevron or Auer should not be afforded to DHS's interpretation

24   of them because DHS's position qualifies as a "post hoc

25   rationalizatio[n] advanced by an agency seeking to defend past

1    agency action under attack," <u>Bowen</u>, 488 U.S. 212-213, to which

2    in <u>Auer</u>, 519 U.S. at 462, the Supreme Court noted deference is

3    not due because there is "reason to suspect that the

4    interpretation does not reflect the agency's fair and

5    considered judgment."

6              Essentially here, the argument under the APA is

7    essentially the flip side of the INA argument and analysis, and

8    that is that ICE, Department of Homeland Security, does not

9    have the discretion to ignore the provisional waiver

10   regulations and to in effect nullify them without considering

11   them and deciding whether to remove certain aliens who are

12   seeking relief under the provisional waiver process.

13             So now I think it may be, particularly under the APA,

14   appropriate to decide what the parameters of a putative class

15   would be, given those two rulings.  I don't even have a

16   tentative view at the moment as to how I'm going to come out on

17   the question of whether citizen spouses -- well, I do have a

18   tentative view, not as well informed as most of my tentative

19   views, how I would come out on whether U.S. citizen spouses

20   have a liberty interest for due process purposes.

21             What's the argument, Ms. Lafaille, that they have --

22   even if they don't have a liberty interest, they're in the APA

23   class?  I think I know what it is, but I'm not confident.

24             MS. LAFAILLE:  So for the same reasons I mentioned

25   earlier, Your Honor, the citizens here have standing to raise

1    APA claims based on the violations that this court has just

2    recognized.  They are clearly within the zone of interest of

3    the Immigration and Nationality Act.  The U.S. citizens here

4    are the ones that initiate the process by petitioning for their

5    U.S. citizen spouse.  And they are injured clearly by the

6    government conduct here.

7          THE COURT:  Okay.  And what's the government's

8    argument, that the proposed definition of the class is not

9    appropriate for APA and INA purposes, putting aside due process

10   for the moment?

11         MS. LARAKERS:  Your Honor, it doesn't have to do with

12   the U.S. citizen petitioners.  It's about the alien

13   petitioners.  Because, you know, as I've stated, you know, a

14   person who doesn't have an approved I-212 cannot even apply for

15   a I-601A.  So that's our argument.  If you want to hear more

16   about those reasons, I can tell you, but I don't want to --

17   * * * * * * * * * *

18         THE COURT:  Okay.  I think -- this was fully briefed,

19   as I understand it, and I'll rule on it.  For the purposes of

20   the APA and the INA, the petitioners seek certification of a

21   class defined as any U.S. citizen and his or her noncitizen

22   spouse who has, one, a final order of removal and has not

23   departed the U.S. under that order; two, is the beneficiary of

24   a pending or approved I-130 petition for alien relative filed

25   by the U.S. citizen spouse; three, is not ineligible for a

1    provisional waiver under 8 C.F.R. Section 212.7(e)(4)(1) or

2    (vi); and four, is within the jurisdiction of Boston ICE-ERO

3    field office comprising Massachusetts, Rhode Island,

4    Connecticut, Vermont, New Hampshire and Maine.  I find that

5    that is the appropriate definition of the putative class for

6    APA purposes and also INA purposes.

7         Respondents assert that the scope of an APA and INA

8    based class should not include aliens "who are not even

9    facially eligible to apply for a provisional waiver or who

10   clearly do not fit into the group of individuals the

11   provisional waiver was designed to help."  However, the class

12   is not overbroad for the purposes of the APA claim because all

13   petitioners have standing under the APA.  Plaintiffs asserting

14   APA claims must establish both Article III standing and be

15   arguably within the zone of interests to be protected or

16   regulated by the statute allegedly violated.  That's the test

17   of Match-E-Be-Nash, 567 U.S. at 224.  Here, respondents do not

18   dispute the fact that noncitizens with pending I-130

19   applications are within the "zone of interests" protected by

20   the INA.  In any event, those noncitizens are within the zone

21   of interest protected by the INA.

22         Indeed, all of the alien putative class members suffer

23   Article III injury in fact because they face substantial risk

24   that they'll be arrested, detained or removed due to DHS's

25   failure to consider their pursuit of lawful status.  That's the

1    test of Lujan, 504 U.S. 555 at 560, 61.  In addition, all

2    putative class members also fall within the INA zone of

3    interests.  This test is lenient.  Under the APA a plaintiff

4    has standing unless her interests are "so marginally related to

5    or inconsistent with the purposes implicit in the statute that

6    it cannot reasonably be assumed that Congress intended to

7    permit the suit," as the D.C. circuit wrote in National

8    Petrochemical, 287 F. 3d 1130 at 1147.

9          Notably, it is sufficient that the interest sought to

10   be protected is "arguably" within the zone of interest to be

11   protected as the Supreme Court said in Bennett, 520 U.S. 154 at

12   175.  Citizen spouses are also arguably or also in the zone of

13   interests even if they do not have a due process -- have a

14   liberty interest for due process analysis, something I have not

15   yet decided.

16         All the class members' interests are related to the

17   promises and purposes of the INA because they are either aliens

18   applying for lawful status based on family ties or are citizen

19   spouses assisting in that process.  This court has already

20   recognized the purpose of the INA is to keep families together,

21   in particular to provide noncitizen family members with an

22   avenue to obtain lawful status in order to promote the

23   integrity of the family unit.  I wrote about that in Jimenez,

24   334 F. Supp. 3d at 387, citing cases.

25         Courts have consistently found that applicants for

1    lawful status under the INA fall into the statute zone of

2    interest.  That was the decision of the Second Circuit in

3    Mantena, 809 F. 3d 721 at 733, the Sixth Circuit in Patel, 732

4    F. 3d 633 at 637, and in National Association for the

5    Advancement of Colored People v. Trump, 298 F. Supp. 3d 209 at

6    235.  In addition, in Hawaii v. Trump, which was vacated on

7    other grounds, the Ninth Circuit had little trouble concluding

8    that the citizen plaintiff was within the zone of interests of

9    the INA to challenge, providing standing, EO2 based on his INA

10   statutory claim because he asserted the travel ban, which was

11   at issue in that case, prevented his mother-in-law from

12   reuniting with her family.  That's 859 F. 3d 741 at 766.

13        It's now almost noon.  I think it would be helpful to

14   me to recess now.  When we resume, I want to hear argument on

15   the Due Process Claim and then the Equal Protection claim and I

16   think finally the standing of the citizen spouses.  Given the

17   ruling that I just made with regard to the scope of the APA and

18   INA class, is there any practical effect of how I come out on

19   whether the citizen spouses have standing -- have a liberty

20   interest for due process purposes?

21        MS. LAFAILLE:  There may not be, Your Honor.  I mean,

22   it's possible that at the end of the case there could be

23   differences between the relief, although I don't think that

24   there would be, but I don't think for this juncture of the case

25   there is.

1          THE COURT:  That's part of the reason I put it down at

2     the end.  I thought if I defined the class for APA purposes the

3     way I've defined it, the citizen spouses are in the case.  And

4     whether they're in the case for a Due Process Claim as well as

5     an APA claim can be decided later.  The Supreme Court couldn't

6     reach a consensus.  The First Circuit hasn't addressed this at

7     all since 1970 and not after Din.  It's a fascinating issue.

8     But there are a lot of fascinating issues in this case.  And if

9     the citizen spouses are in the case anyway, I might defer

10    deciding that.  What does the government think?

11         MS. LARAKERS:  Your Honor, as of right now I can't

12    think of a difference.  The only difference I could possibly

13    think of is if it mattered with regard to the scope of any

14    discovery order.  But I can't -- I still can't think of a

15    practical reason.  I just want to flag that in case it comes up

16    in the future.

17         THE COURT:  No.  It is.  And as you've probably

18    noticed, I'm not averse to deciding issues, hard issues, but

19    there are so many of them.  If they don't make a difference, I

20    may not decide it now.  But if there comes a point where it

21    does make a difference, then I would decide it.

22         MS. LARAKERS:  Okay.

23         THE COURT:  So you're not waiving anything.  Just

24    thinking about being practical, okay?

25         MS. LARAKERS:  Yes, Your Honor.

1          THE COURT:  All right.  It's about 12:00.  I'd like

2     you to come back at 2:15.  As I told you, at the moment my

3     tentative, not final, view is that the government is right with

4     regard to when the due process right -- when the interest

5     creating a right to due process vests.  I think Kentucky

6     Department of Corrections, which I've discussed previously, is

7     an important case for this analysis.

8          And then with regard to the Equal Protection claim, I

9     think the answer turns on what's the right question.  Is it the

10    standard in Arlington?  If it's the standard in Arlington, I

11    think the petitioners would prevail.  If it's the standard in

12    Hawaii, I think the government would prevail.  And I know

13    Hawaii has been distinguished in other contexts like DACA or

14    TPS, but in both of the -- at least for TPS, which I think was

15    Judge Casper's case, there were people who -- it dealt with

16    petitioners who were in the United States lawfully and there

17    was no stated national security or public safety rationale

18    purpose to the action at issue.  But the Executive Order that's

19    at the heart of the equal protection argument petitioners make

20    in this case says that it's being issued for national security

21    and public safety purposes.  And I tell you that so you can

22    think about the implications of that tentative analysis.

23         And I haven't -- we may take another break after that.

24    I haven't looked closely at class certification.  Let's just

25    say for the APA class, is it the government's contention that

1      the requirements for class certification are not met?

2              MS. LARAKERS:  Your Honor did clear up some of them,

3      but we have a new one that hasn't been heard before about the

4      jurisdiction part because there are people who are fresh out of

5      removal proceedings who could have, not even theoretically,

6      could have actually raised their claim in removal proceedings

7      with regard to the provisional waiver process, appealed that,

8      and appealed that through the administrative appeals process --

9              THE COURT:  These are people who had their removal

10     proceedings when?

11             MS. LARAKERS:  After 2016 and who were also married

12     during those removal proceedings.  So they would have had the

13     full benefit of the regulations.

14             THE COURT:  So the question is whether they should be

15     in the class?

16             MS. LARAKERS:  Right.

17             THE COURT:  I ordered you to have two days available

18     for this.  I'm trying to do this in a way we don't have to come

19     back on Monday.  So we'll see where we are, because I'm trying

20     to keep up with you, but there's a lot to keep up with.

21             All right.  Court is in recess.

22             (Recess taken 11:56 a.m. - 12:14 p.m.)

23             THE COURT:  Good afternoon.

24             MR. KANWIT:  Good afternoon, Your Honor.

25             THE COURT:  We should move to the motion to dismiss

1    Count 2, the refinement of the due process analysis.  I

2    previously found that the petitioners have a liberty interest

3    rooted in the provisional waiver regulations, but it only

4    emerged in the course of the litigation that there was a

5    dispute as to when that liberty interest vests.

6         So as I understand it, the petitioners allege that it

7    vests at the outset of the I-130 application stage, and the

8    respondents assert that it vests only when an alien has a

9    conditionally approved I-212 and therefore a right to have his

10   or her 601A petition decided while he or she is in the United

11   States.  Is that a fair statement of the issue?

12        MS. LAFAILLE:  Your Honor, just a clarification.  My

13   understanding had been that the court had ruled for purposes of

14   the motion to dismiss that the vesting argument was waived.  My

15   understanding was that we were discussing it for purposes of

16   commonality as it relates to class scope and class

17   certification.

18        THE COURT:  Well, I didn't -- no.  You can argue that,

19   but this only came into sharp focus -- well, into focus at all

20   in the course of matters.  And I think in December I ordered

21   that you go back to your briefs, consolidate your arguments,

22   but I didn't prohibit new arguments.  And I don't think this is

23   a -- I mean, this is the argument I anticipated.

24        MS. LAFAILLE:  Okay.

25        THE COURT:  But is that essentially the point that I

1    respond to your -- I mean, you can make the argument if you
2    want, but I didn't -- all right.  I'm prepared and I think it's
3    appropriate to decide the merits of this and to not treat it as
4    waived.  Although it wasn't developed earlier in December I
5    essentially, I think, afforded a second bite at the apple.
6            So it's the government's motion to dismiss.  As I
7    said, I'm tentatively of the view that the government's
8    position is correct and that under the Kentucky Department of
9    Corrections line of cases, which I discussed in my September
10   decision in this case, there would have to be a right to
11   something for there to be, rooted in a regulation, for there to
12   be a liberty interest for due process purposes.  And it now
13   seems to me that there's a liberty interest once there's an
14   approved I-212 and the interest is in having the 601A
15   adjudicated while the alien is in the United States, but I
16   don't at the moment think it's created earlier by any statute
17   or regulation.
18           And the petitioners argue that's an absurd result.  It
19   might be, or at least an odd one.  But at the moment it seems
20   to me the legally correct one and one that's not as odd or
21   arguably unfair as it might be if the due process argument
22   claim was the only claim, but the APA and INA claims have
23   survived.  So the people who don't have a -- who would not
24   have, on my current analysis, a due process claim are still in
25   the case and in the class.

1          But anyway.  What's the government's argument, please?

2          MS. LARAKERS:  So Your Honor, you defined the issue

3     correctly.  What decides this issue is what standard is

4     applicable.  And that -- or what framework, I think as we've

5     called it in our briefs.  The proper legal framework is

6     Kentucky, Castle Rock, Roth, Sullivan, these Supreme Court

7     cases that are determining whether a due process right exists

8     from a source of positive law.  And that positive law can be a

9     contract, it can be a regulation, it can be a statute.

10         But when analyzing whether a source of positive law

11    creates a due process interest, it requires the court to look,

12    to examine closely the language of the regulations and to find

13    whether there's a legitimate claim of entitlement.  And the

14    legitimate claim of entitlement test is a procedural test for

15    due process rights in general, but when we're looking at

16    whether there's a legitimate claim of entitlement arising from

17    a regulation or a statute or a contract, the proper framework

18    is Kentucky, Town of Castle Rock, Roth, and as Your Honor has

19    mentioned.

20         So what all of these cases have in common is they

21    found that the due process right is limited to what the

22    regulation says.  And whether there's -- whether you say that

23    it's mandatory language or when you look closely at the

24    language to determine whether there was some cabined

25    discretion, you're looking for essentially the same thing,

1      which is language in the regulation that confers a due process

2      interest.

3              I won't go into it.  I think this court knows that

4      this is the framework that's applicable.  The objection that

5      petitioners raise in their brief to this framework is that it's

6      not applied in immigration cases.  That's not true as is stated

7      in the briefing.  Many courts have cited these cases, including

8      Kentucky and Roth and Sullivan, in determining whether a

9      regulation or a statute, immigration regulation or statute

10     creates a due process right.  And, you know, those cases as

11     listed in my brief are Mendez-Garcia, Ruiz-Diaz.

12             THE COURT:  Slow down.  This has got to be written

13     down, but I also have to hear it and process it.

14             MS. LARAKERS:  Sorry.  So there are two Ninth Circuit

15     cases, Mendez-Garcia and Ruiz-Diaz.  Mendez-Garcia is 840 F. 3d

16     655.

17             THE COURT:  I'm sorry.  So in Mendez-Garcia, what page

18     would you like me to look at?

19             MS. LARAKERS:  I think the pin cite is 655.

20             THE COURT:  655?

21             MS. LARAKERS:  Yes.

22             THE COURT:  Hold on just a second.

23             Are you talking about the language in Mendez-Garcia

24     that says, "While aliens are entitled to a procedurally fair

25     hearing, aliens have no fundamental right to discretionary

1   relief from removal for the purposes of due process and Equal

2   Protection," or something else?

3            MS. LARAKERS:  That part, but I think both of these

4   Ninth Circuit cases, they were looking at whether -- not just

5   whether a person has discretionary -- a right to a specific

6   result in the discretionary relief, but they were also looking

7   at, that was also going to preclude them from applying for

8   future relief as well.

9            So I think that the important thing that I take from

10  these Ninth Circuit cases is that even where the decision was

11  going to preclude the alien from applying for some future form

12  of relief, such as adjustment of status, which I think was the

13  issue with these cases, the Ninth Circuit still held that

14  because the regulation didn't give them a right to have that

15  considered that they didn't have a due process interest.

16           THE COURT:  Hold on just one second.  What's the cite

17  for Ruiz-Diaz, please?

18           MS. LARAKERS:  703 F. 3d 484.  Sorry.  I'm not sure if

19  I put down the pin cite.  I think that's the pin cite that I

20  was using.

21           THE COURT:  That's okay.  We should be able to find

22  it.  But I'm looking at Mendez-Garcia and I don't see any

23  citation to say Kentucky Corrections.

24           MS. LARAKERS:  It may have been Roth.  Some of them

25  cited Roth.  Some of them cited Sullivan.  I don't think they

1    cited Kentucky, but those Supreme Court cases.

2         THE COURT:  I don't --

3         MS. LARAKERS:  Or Town of Castle Rock.

4         THE COURT:  Actually, I don't see any of those where

5    I'm looking.  Here it is, maybe on a later page.  Okay.  Here

6    it is.  "Nonetheless, we held that aliens could not claim their

7    due process rights were violated because they had not

8    identified a legitimate claim of entitlement to have the

9    petitions approved before their visas expire."

10        MS. LARAKERS:  Right.

11        THE COURT:  And they cite Roth there.

12        MS. LARAKERS:  Right.  So the Supreme Court cases

13   stand for the proposition, first, you know, Kentucky stands for

14   the proposition that there must be, you know, some sort of

15   mandatory language.  Other Supreme Court cases, while not

16   stating expressly that mandatory language is required, still

17   require the same thing.  They looked at what the regulation

18   required, and they found that, unless the person met the

19   requirements of the regulation, then they didn't have a due

20   process interest, or in Roth, I think it was the contract,

21   didn't meet the terms of the contract nor due process interest.

22        Those standards have been applied in immigration cases

23   across the circuits.  In the Ninth Circuit in the cases I've

24   mentioned.  Also in the Tenth Circuit, the Tenth Circuit case

25   actually cites Kentucky.  That's Aguilar-Aguilar, 700 F. 3d

1   1238.  And then there's the Third Circuit case in Mudric, which

2   is 469 F. 3d 94.  And the relevant quote that I pulled from

3   that is, "In making a request for immigration benefits,

4   aliens" --

5        THE COURT:  Hold on a second.  I think 1238, that's

6   where Aguilar-Aguilar starts.  Let me see if I can find the

7   pertinent part.  Okay.  Why don't you --

8        MS. LARAKERS:  And then in Mudric, the Third Circuit

9   case, they stated that in making a request for immigration

10  benefits, aliens only have those statutory rights granted by

11  Congress, you know, or those regulatory rights.

12       So Your Honor, here, you know, this is a correct

13  framework because we're looking at whether a due process

14  interest arises from a source of positive law, which is a

15  regulation.  The regulation here requires that an individual

16  have an I-212 before applying for -- an approved Form I-212

17  before applying for the relief sought, and therefore the

18  Supreme Court and the other circuit courts, which have applied

19  it to immigration cases, forecloses any argument that says that

20  the due process right vests earlier.

21       THE COURT:  And the right in this case is to have the

22  I-610 -- I-601A adjudicated while the alien is in the United

23  States?

24       MS. LARAKERS:  Yes, Your Honor, that's another

25  important distinction.

1           And as Your Honor has recognized, this is a strict

2    analysis, but it's not going to cause an absurd result,

3    especially since we still have INA and APA claims on the table

4    now.

5           The retroactively framework that petitioners cite does

6    not apply.  The retroactivity framework has a test that you

7    can't apply in this case because there's no retroactive statute

8    at hand, so I'm not even sure how to go about that analysis.

9    But to the extent that petitioners borrow the facts from those

10   cases and attempt to analogize, those cases aren't analogous to

11   people who don't have an approved I-212, because in each one of

12   those cases there was nothing standing in the way in between

13   the alien and applying for that relief, except for the

14   retroactive statute.  There was only one barrier in the way,

15   and that was the retroactive statute.  Here there are multiple

16   barriers in the petitioners' way, an I-130 and an approved

17   I-212.

18          And in fact in St. Cyr the alien would have been

19   eligible for 212(c) relief at the time of their plea under the

20   law in effect.  And same thing with Accardi.  The regulation

21   required DHS to exercise its discretion, and the alien was

22   immediately going to receive that relief upon the court

23   striking down the retroactive legislation.

24          And to the extent that petitioners say that it

25   enhances the significance, it's simply not the test.  It's not

1    the framework.  The framework is, you know, Kentucky, Sullivan,

2    Roth, the framework is not Fernandez-Vargas or this

3    retroactivity framework.  And to interpret the case, the

4    petitioners want to interpret the due process interests in the

5    way the due process the petitioners wish would be inconsistent

6    with those Supreme Court cases.

7           THE COURT:  Okay.  Thank you.

8           MS. LAFAILLE:  So Your Honor, let me start by

9    addressing Kentucky and then move on to a couple of our other

10   arguments.

11          No one disputes that the general idea expressed in

12   Kentucky, the need for a legitimate claim of entitlement, is

13   required.  So when we talk about Kentucky being applied in the

14   immigration context, yes, we always need to show a legitimate

15   claim of entitlement.  The question is how to show that.  And

16   in the prison context -- the courts have acknowledged over and

17   over and over that the prison context is an incredibly unique

18   context.  Prisoners do not have the same rights as people

19   outside of prison in any constitutional realm, not in the First

20   Amendment, not under the Equal Protection Clause.  I can't

21   think of a context where the rights of prisoners are equivalent

22   to the rights of people outside of prison.

23          Because prisoners -- the lives of prisoners are highly

24   regulated, there's a need to distinguish between those

25   regulations that create a right for prisoners to sue on them

1    and create that legitimate claim of entitlement, and those

2    regulations that are just providing guidance to prison

3    officials.

4         We don't have that problem in the immigration context.

5    It is well established that when a form of discretionary relief

6    is created, and this court has acknowledged it, a due process

7    interest attaches not to the ultimate result but to the right

8    to have that application considered according to the required

9    criteria.  That's all we're talking about here.

10        The question that Kentucky addresses is whether

11   there's a due process interest.  That's a question this court

12   has already answered.  The answer is yes.

13        The question Kentucky does not address is whether

14   there is -- excuse me -- when that right attaches.  And for a

15   whole host of reasons, we think it's quite clear that the due

16   process right here that this court already recognized is

17   present not merely when someone is at the final stage of the

18   three application forms that are filed within the United States

19   but is also present when someone is filing an I-130.

20        THE COURT:  So your argument is that an alien has a

21   right to a decision on her I-130 and then a right to a decision

22   on her I-212, not any particular decision, but a decision.

23   That's the argument?

24        MS. LAFAILLE:  Yes, Your Honor.

25        THE COURT:  And I think Kentucky and other cases on

1   which the government relies seem to focus on whether there are

2   criteria, where if you meet those criteria, then you win, then

3   you get the relief that you're seeking.  And in this case, the

4   argument is that there are no such criteria that limit ICE's

5   discretion until you have an approved I-212.

6          So is it correct that you need -- I mean, once you

7   have an approved I-212, then the government agrees you have a

8   right to have your 601A decided while you're in the United

9   States.  Is there anything comparable earlier, or do you say

10  you don't need that?

11         MS. LAFAILLE:  So we think it is comparable.  But let

12  me let me take that piece by piece.  So we view this

13  holistically and not in separate steps.  This court has already

14  recognized the right to have that 601A application adjudicated.

15  That's created by the provisional waiver regulations.  Of

16  course you also -- separately you have I-130 -- you know, the

17  government can't simply burn your I-130 applications.  They

18  can't simply burn your I-212 applications.  I think we've

19  established that due process rights attach to those

20  applications, particularly the I-130, which is actually the

21  grant is mandatory if you satisfy the criteria.

22         THE COURT:  Here.  So the I-130 requires that you show

23  your marriage is genuine; and if you show your marriage is

24  genuine, DHS has no discretion to deny giving you the I-130?

25         MS. LAFAILLE:  Correct.  So the government has

1   conceded here that due process interests attach to each of

2   these applications.

3          THE COURT:  No, I don't think -- no, they haven't.

4   You mean each of the --

5          MS. LAFAILLE:  Not to the adjudication in the United

6   States.  They've conceded that there's a right to a fair

7   adjudication of an I-130, of an I-212.  Of course the question

8   we're discussing here is whether there's a right to follow a

9   process within the United States that encompasses the I-130,

10  the I-212, and the I-601A, and we think there is for a couple

11  of reasons.

12         THE COURT:  Let me ask you a question.  This is

13  helpful.  But if you prevail on your APA and/or INA arguments,

14  does this one make any difference?

15         MS. LAFAILLE:  Quite possibly not, Your Honor.  But

16  you know, I don't -- of course it depends, you know, if the

17  court thinks -- and we think the remedies would be quire

18  comparable regardless of the claim.

19         THE COURT:  No.  Part of the reason I ask is, you

20  know, I'm going to strive to get a legally correct answer.  But

21  when you argue that the government's position is absurd, it

22  might -- sometimes the law requires surprising results.  But it

23  wouldn't be so absurd if there are other grounds on which you

24  could get relief.  You know, the fact that somebody has a

25  right -- you know, you're arguing there's a right to have an

1    I-130 decided and a right to have an I-212 decided, and I think

2    I've ruled earlier today that you're correct and that the right

3    is derived -- well, maybe I haven't gotten quite that far.  But

4    that the government can't just ignore the provisional waiver

5    process.  And the I-130 is the first step in the process.

6              MS. LAFAILLE:  Right, Your Honor.

7              THE COURT:  And maybe -- we're not focused on this,

8    and I haven't had to decide it, and to my knowledge ICE is no

9    longer doing it.  But, you know, there's the argument if you

10   arrest people when they arrive for their or at their I-130

11   interview, that violates the APA.  That would be one of your

12   arguments, wouldn't it?

13             MS. LAFAILLE:  Yes.

14             THE COURT:  So it's not that a petitioner -- if my

15   tentative view is my final view, and it might not be, it

16   wouldn't mean that the petitioners, you know, have no way to

17   get the benefit of the provisional waiver process.  It just

18   means they don't have a valid due process claim until they get

19   an approved I-212.

20             Anyway.  I was just trying to figure out the practical

21   implications of this.

22             MS. LAFAILLE:  I see Your Honor 's point about the

23   practical consequences.  But I still think it's important to

24   get this right in terms of our clients and their due process

25   rights.

1          THE COURT:  It's important to the administration of

2     justice to get it right.

3          MS. LAFAILLE:  Absolutely.  And, Your Honor, I think

4     there are a couple of reasons why we think that the right

5     answer here really does look at the entire process and not

6     simply the 601A form.  And the first is that the right that

7     Your Honor already recognized, the due process right, is not

8     simply limited, should not be limited, we think, to the 601A

9     form.  And that's because -- I think of immigration sometimes

10    as a Rube Goldman [sic] machine.

11         THE COURT:  As what?

12         MS. LAFAILLE:  Rube Goldberg, excuse me.  I always

13    forget the name of the machine.

14         THE COURT:  A Rube Goldberg machine?

15         MS. LAFAILLE:  Exactly.  It's a bit of a Rube Goldberg

16    machine, Your Honor.  Yes, it's true that the agency realized

17    that it could have a profound impact on people's lives by

18    turning one small knob.  But there is no sense in which the

19    agency thought that the project it was undertaking was to turn

20    that knob.  The agency understood very well that what it was

21    doing when it turned that knob was creating a process that

22    would transform people's lives.

23         And so the right that this court recognized has to

24    understand -- has to take account for what the regulation was

25    actually doing.  It wasn't creating the 601A form.  It was

1    tying together a process comprised of three different

2    applications.  And the evidence that that's what the agency was

3    doing is throughout the rulemaking.

4         THE COURT:  But that sounds like your APA claim.

5         MS. LAFAILLE:  Your Honor, these claims are certainly

6    connected.  But when Your Honor recognizes that the regulations

7    created a due process right, that right was not limited to the

8    application form.  That right encompasses what the agency

9    created, and the agency created a process.

10        THE COURT:  Yeah, but I wasn't asked to focus on, you

11   know, previously on particular stages of the process or

12   particular regulations or the words in the form.  I thought

13   maybe you would find something in the form and you'd argue that

14   it must not be there.  Anyway.

15        But as I say, this sounds like your APA argument.

16   They can't ignore the process that the regulations set up, and

17   I think I've already ruled that that's a claim on which relief

18   can be granted.  You know, the issue here is when does it

19   become a due process claim and exist as well as an APA and INA

20   claim.

21        MS. LAFAILLE:  Right.  And I think Your Honor has

22   already held that it becomes a due process claim when a form of

23   relief that the agency created is being abridged.  And the form

24   of relief that the agency created is a process.  We know that

25   because when the agency said what are the costs of this process

1    to the people undertaking it, it didn't account just for the

2    cost of filing a 601A form.  It said the costs of this process

3    are the costs of filing an I-130 application, filing a

4    provisional waiver application, legal fees, travel abroad, et

5    cetera.  That's how the agency viewed what it was doing, and it

6    recognized that the number of I-130 applications filed was

7    going to increase.  And it recognized that what it was doing

8    was trying to bring people out of the shadows and make it

9    possible for them to apply for legal status, and that's a

10   process that begins with a filing of an I-130.

11          But I'll move on to my next argument, Your Honor,

12   which is, even if Your Honor does not accept that the agency

13   created one process, it's still the case that the due process

14   right that attaches to the 601A form is abridged when the

15   government cuts off access to that application.  And that's

16   true whether the government makes a blacklist of people who are

17   going to be denied provisional waivers no matter what, as in

18   Accardi.  It's true if the government barricades the door to

19   the building that you need to go to.

20          THE COURT:  Well, that one I've already decided.  I

21   said they can't -- they can exercise discretion, but they have

22   to consider that somebody is pursuing the provisional waiver

23   process and they can't just categorically remove people who are

24   pursuing that process.  I mean, that's what I wrote in

25   September.

1          MS. LAFAILLE:  That's right, Your Honor, and the

2    interference with that right, even if the right is limited to

3    the 601A process, the interference with that right doesn't

4    happen only when someone has a pending 601A.  If the government

5    barricaded the doors, no one would say they haven't interfered

6    with your right to walk in and file a 601A application.

7          THE COURT:  But you don't have a right to file a 601A

8    petition until you have an approved I-212.  Is that right?

9          MS. LAFAILLE:  That's right, Your Honor.  But it's a

10   little bit ironic for the government to fault our clients for

11   not having approved I-212s when it's walking in and arresting

12   them the moment they file a precursor application at an I-130

13   stage.  It's not a question of when the right is present.  It's

14   a -- it's not a question of what the right attaches to for the

15   purposes of this part of our argument.  It's when the

16   government interferes with it.

17         THE COURT:  But I want to -- let's say you had no due

18   process claim here but you had an APA claim.  Keep it simple.

19   So do you think you could prevail on the APA claim by proving

20   that the government is not, you know, permitting people to file

21   their I-130s or their I-212s?

22         MS. LAFAILLE:  Yes, yes, we do.  But I mean, you know,

23   obviously the government has --

24         THE COURT:  But that's in part because -- or that's

25   because the regulations say, you know, if you have an order of

1    removal and you have a citizen spouse, you can apply for an

2    I-130, and if you -- and then there is something mandatory.  So

3    they have to give it to you if you show your marriage is

4    genuine.  That's not discretionary, right?

5            MS. LAFAILLE:  Right.  And, Your Honor --

6            THE COURT:  Does the government agree with that?

7            MS. LARAKERS:  Your Honor, I mean, there are a couple

8    of exceptions to that, but generally yes.  It says "shall

9    approve" in the statute, I believe.

10           THE COURT:  So why doesn't that meet the requirements

11   of Kentucky Department of Corrections?

12           MS. LARAKERS:  Because it's a completely separate

13   application, Your Honor.  That it's not -- the question as you

14   posed it is whether you have a right to obtain a decision on

15   your I-601A within the United States.  That's the liberty

16   interest.

17           THE COURT:  Now I'm compartmentalizing it.  It's not

18   the way it's been argued.  It's not the way I've thought about

19   it.  But, you know, Kentucky says if -- I think Kentucky says,

20   you know, to have a liberty interest, a statute or regulation

21   has to provide that if you meet certain requirements, the

22   government has to do something.  So with regard to the 601A, if

23   you have a conditionally approved I-212, the regulations, I

24   understand, require that the 601A be adjudicated while the

25   alien is in the United States, right?

1           MS. LARAKERS:  Your Honor, as you know, we don't agree

2    with that, but I understand that's what your interpretation is,

3    yes.

4           THE COURT:  Right.  All right.  So why isn't the I-130

5    process analogous?  In other words, you filed an application,

6    you say the alien -- who files the application, the spouse,

7    citizen spouse?

8           MS. LARAKERS:  Spouse.

9           THE COURT:  Citizen spouse files the application --

10   it's interesting -- files the application, decides, you know,

11   not to stay in the shadows but pursue the established legal

12   process.  Do the regulations -- and these are not rhetorical

13   questions.  I haven't looked at the regulations recently or

14   with this question in mind.  And the regulations say that the

15   application and spouse are entitled to an interview at some

16   point?

17          MS. LARAKERS:  No, they don't always get an interview.

18   It's dependent and up to the agency's discretion.

19          THE COURT:  So whether you get an interview is

20   discretionary.  But it does say if you show your marriage is

21   genuine, your I-130 must be approved.  That's not

22   discretionary.  If they make the required showing, they get the

23   I-130, correct?

24          MS. LARAKERS:  Yes, Your Honor.

25          THE COURT:  So why doesn't that create a liberty

1    interest, possibly, for the citizen spouse in the I-130?

2            MS. LARAKERS:  Your Honor, that's not -- that question

3    doesn't need to be answered, and I think, Your Honor --

4            THE COURT:  Why?

5            MS. LARAKERS:  Because it doesn't -- because it's what

6    the 601A regulations require.

7            THE COURT:  Well, why --

8            MS. LARAKERS:  First let me answer the question.  The

9    answer to the question at least within the Ninth Circuit was

10   the only one to have made this distinction between the due

11   process and the regulation, and the statutory requirements.

12   Because the statute requires a certain result in the I-130.  So

13   there's never really been a question that needed to be answered

14   about whether there's a corresponding due process interest

15   because if USCIS, if they meet their burden and USCIS doesn't

16   approve their application, then they're in violation of the

17   statute itself.

18           THE COURT:  But that's going to be true -- that would

19   be true concerning the 601A as well.  If you remove somebody

20   with a conditionally approved I-212, under my analysis, you'd

21   be violating a regulation and you would be violating the

22   alien's right to due process.  Nobody has made this argument.

23   Is there a reason you haven't made this argument?

24           MS. LAFAILLE:  Right, Your Honor.  This is precisely

25   where I was going.  We've been focused on the fact that this is

1    one comprehensive process and we don't think the mandatory

2    language requirement of Kentucky is relevant to the immigration

3    context.

4              THE COURT:  Okay.  At the moment I do.

5              MS. LAFAILLE:  If that's where we are, the I-130

6    application has mandatory language not merely making the

7    adjudication mandatory but entitling individuals, these

8    couples, to a result.

9              THE COURT:  But this is what I asked you to brief in

10   December.  I think I'm the one who raised this possibility that

11   hadn't been briefed as of December that, you know, was language

12   in the statutes, the regulations, the forms, that satisfied the

13   Kentucky standard for the I-130 and/or the I-212.  But you

14   didn't -- I don't think you addressed that in your briefs.  So

15   I thought you looked and found there wasn't a good arguable

16   basis for that.

17             MS. LAFAILLE:  No.  I think, and as I recall we

18   addressed this at the last hearing and the government conceded,

19   that an I-130 grant is mandatory when the conditions are

20   satisfied.  I believe that is in our brief.  But it's true that

21   we've been focused on presenting this argument as a process.

22   But to focus in on the I-130, Your Honor, this is a mandatory

23   application, and the conduct we've alleged in the complaint is

24   one of systemic interference with the I-130 application.

25             THE COURT:  I know.  But let me see the regulation,

```
1    please.  What's the regulation for the I-130?

2           MS. LAFAILLE:  Let me find that, Your Honor.  So it's

3    8 USC 1154(b).

4           THE COURT:  1154(b)?

5           MS. LAFAILLE:  Yes.

6           THE COURT:  It says, "Investigation, consultation,

7    approval, authorization to grant preference status.  After an

8    investigation of the facts in each case and after consultation

9    with the Secretary of Labor with respect to petitions to accord

10   status under," two sections of this title, "the Attorney

11   General shall, if he determines that the facts stated in the

12   petition are true and that the alien on behalf of whom the

13   petition is made is an immediate relative or is eligible for

14   preference, approve the petition."  So that's mandatory.

15          MS. LAFAILLE:  Right, Your Honor.  And what we have

16   here, Your Honor, if we recall the facts as they're happening

17   is that practically everyone as far as we know who files an

18   I-130 application -- you know, this is getting into the

19   discovery, if I might do that a little bit.

20          THE COURT:  That's okay.  Go ahead.

21          MS. LAFAILLE:  This is at ECF 148, I believe.  When

22   this case was filed in February 2018, the Lawrence field office

23   emailed ICE to say, you know, we keep getting more of these

24   final order I-130 folks and sent ICE a list of 23 people.  ICE

25   wrote back that it was going to detain 21 of them.  So
```

1    practically everyone, Your Honor, that was filing an I-130 was

2    being funneled into a system that was not going to unify their

3    family, which was the purpose of filing an I-130, but was going

4    to result in the detention and removal of the noncitizen

5    spouse.  And any U.S. citizen spouse who was aware that that's

6    what was happening could not possibly file an I-130.

7            THE COURT:  But is it your argument that 1154(b), what

8    I just said, satisfies the requirements of Kentucky and that

9    line of cases?

10           MS. LAFAILLE:  The requirements of the mandatory

11   language component of Kentucky?

12           THE COURT:  Yes.

13           MS. LAFAILLE:  Absolutely, Your Honor.

14           THE COURT:  Well, why didn't you make it before when I

15   invited you to so I could have focused on it before today?

16   Because I have that.  I must have focused on it previously

17   because I've got it circled from prior hearings.

18           I'll ask the government again.  Why doesn't that

19   satisfy -- if Kentucky is the right test, which is what I came

20   in here believing, why doesn't that create a liberty interest?

21           MS. LARAKERS:  Because of the way the liberty interest

22   is formed in this case.  It has to be connected to having it be

23   done within the United States, Your Honor.  And their argument

24   with regard to the provisional waiver process, that interest is

25   worked in with regard to the I-601A.

1          THE COURT:  But my memory is that -- I mean, was it

2     Ms. Calderon, she was arrested after her I-130 was approved?

3          MS. LARAKERS:  Yes.

4          THE COURT:  But somebody else I've dealt with was

5     arrested before his -- he went for his interview and he was

6     arrested before he had it.  Do I remember that right?

7          MS. LAFAILLE:  I think that was one of the

8     consolidated, Junqueira maybe or one of those cases, I think.

9          THE COURT:  I see.  So the issue is do you have a

10    right to it in the United States.

11         MS. LARAKERS:  Right, Your Honor.  And they have to

12    establish that at each step in the process.  And I think

13    that's -- that's why it's not briefed here because that "within

14    the United States" part isn't satisfied at the I-130 point or

15    at the I-212 point, and it's not satisfied in the I-212

16    regulations, as you have tentatively stated, that you're

17    entitled to it when you have -- that you're entitled to apply

18    for a 601A, once you have an I-130, you have to have an

19    approved I-212.  They have to establish a due process right at

20    each step to have that application adjudicated from within the

21    United States at each step of the process.  The I-601A doesn't

22    do that, as Your Honor's tentative view is right now.

23         THE COURT:  Well, let's look at what I wrote, though,

24    in Jimenez about this.  I'm talking about my decision last

25    September.  I was talking about provisional waiver in September

1    as embracing all three.  This is putting it under a microscope

2    that based on a belated argument -- I'm on page 367.  I said, I

3    quoted the legislative history.  DHS stated that without the

4    ability to pursue a provisional waiver -- although that was in

5    brackets so that's not the exact language -- individuals who

6    must seek a waiver of inadmissibility abroad through a form

7    I-601 waiver process after the immigrant visa interview may

8    face longer separation times from their families in the United

9    States and will experience less certainty regarding the

10   approval of a waiver of the three- to ten-year unlawful

11   presence bar before leaving the United States.

12          The regulation was designed to avoid the extreme and

13   significant emotional and financial hardship that Congress

14   aimed to avoid when it authorized the waiver.  On its website,

15   CIS states that the provisional waiver process was developed to

16   shorten the time U.S. citizens and lawful permanent resident

17   family members are separated from their relatives.  I said,

18   Therefore the provisional waiver regulation protects a

19   prevailing purpose of the INA.

20          Accordingly, in the explanation to the 2016

21   regulation, DHS promised applicants it would decide an

22   application for provisional waiver before the alien was

23   required to leave the United States.  In describing the

24   benefits of the 2016 regulation, DHS said those applying for

25   provisional waiver, which I now understand to mean 601A, will

1    receive advance notice of USCIS's decision before they leave

2    the U.S.  The legislative history that I quoted is talking

3    about the I-601A.  Anyway.

4          MS. LARAKERS:  Your Honor, if I may, I think because I

5    remember back in December when we were talking about this and

6    talking about the possibility of briefing it, you stated and

7    the government's position would be that even if that you have a

8    right in those earlier applications, you don't have a right to

9    pursue them from within the United States.  And that language

10   that you just quoted makes it seem like, once somebody has a

11   pending I-601A, that it connects an individual's staying in the

12   United States with the application.

13         The I-130 regs -- and this wasn't briefed, but the

14   I-130 regs and the I-212 regs and the statutes that I do have

15   cited in my brief do not do that.  There is no connection in

16   between like there may be in the I-601A regulations and

17   stated -- between staying in the United States and that

18   application.  So that's the reason why the 601A -- somebody

19   with an approved I-212 may meet the standard in Kentucky

20   because there's that language but someone with a merely I-130

21   or an I-212 doesn't.  Because it doesn't -- those regulations

22   don't have that same recognition that an alien has a final

23   order of removal, first of all, and still made that relief

24   available and said that they are going to receive a decision on

25   that relief knowing full well that they had a final order of

1    removal.

2          Those are not hallmarks of those other statutes.

3    That's presumably why the petitioners didn't brief it and

4    presumably why they're relying principally and solely on the

5    I-601A regulations and whether those regulations create the due

6    process right.  And as Your Honor has correctly stated, that

7    test is <u>Kentucky</u>.  And while you may be able to satisfy that

8    test when you have an approved I-212, because the statute --

9    because the regulation says something about giving a decision

10   while -- giving a decision on the I-601A, which you can only do

11   within the United States, that may satisfy the test of

12   <u>Kentucky</u>, but it doesn't stand for the same proposition that

13   you can do that at earlier steps in the process.  And that's

14   the reason why that wasn't briefed, Your Honor.  And I think

15   Your Honor --

16          THE COURT:  Okay.  I -- I'm sorry.  Go ahead.

17          MS. LARAKERS:  I don't have the cases in front of me,

18   but when we came back from recess on that December afternoon, I

19   cited several cases, and they were in the motion to reopen

20   context, but it's similar here, where the circuit court said

21   that the IJ didn't have to consider the fact that you were

22   eligible for adjustment of status or eligible to file some form

23   of immigration relief.  The alien did not have an interest in a

24   motion to reopen just so that they could go file an I-130 and

25   apply for adjustment of status.  So I think those cases are

1    very persuasive here.  I can get them for you.  I stated them

2    on the record.

3            THE COURT:  You may get a chance to do it, but let's

4    go back to the petitioners.  Thank you.

5            MS. LAFAILLE:  So Your Honor, I think there are two

6    points that I want to focus on.  One is how to understand when

7    a due process right that attaches to the 601A is violated.  And

8    the notion that that right can only be violated when there's a

9    pending 601A is -- I just don't see how that can be squared

10   with, for example, INS v. St. Cyr.

11           In St. Cyr, there was a vested right to a 212C -- what

12   was called a 212C application that existed even though the

13   noncitizen was not eligible to file a 212C application at that

14   time.  He would only become eligible to file that application

15   if he later came into removal proceedings.  The court found

16   that there was a vested right, at the time that he pleaded

17   guilty to a crime and entered into a plea that preserved

18   eligibility for 212C relief, there was a vested right to that

19   212C relief.  And the framework for that, the Supreme Court

20   recognized in Fernandez-Vargas, is whether there's been a step

21   that enhances the significance of a later step in the process.

22           THE COURT:  This is St. Cyr?

23           MS. LAFAILLE:   This is St. Cyr, Your Honor.

24           Now, the government says, you know, those cases are

25   retroactivity cases.  And yes, the question we're asking here

```
 1    is not is there, you know, is the presumption against
 2    retroactivity applicable.  We're not answering a question about
 3    retroactivity here.  But retroactivity derives from due
 4    process.  Retroactivity concerns exist when there are due
 5    process rights that are hindered.
 6              THE COURT:  Hold on just one second.
 7              MS. LAFAILLE:  Okay.
 8              THE COURT:  Okay.  I'm sorry.  Go ahead.
 9              MS. LAFAILLE:  So Your Honor, to the question of
10    whether --
11              THE COURT:  Actually, go back a little bit.
12              MS. LAFAILLE:  So the notion that the government
13    introduced this concept of vested rights and, you know, now
14    doesn't want to look at pretty much the only legal context in
15    which vested rights are discussed, which is the retroactivity
16    context, which again derives from due process law.  The reason
17    we have this whole area of law is to protect our due process
18    rights.
19              THE COURT:  But I think there are some First Circuit
20    retroactivity cases that I thought were consistent with the
21    government's argument, Santana.
22              MS. LAFAILLE:  What the government points to in those
23    cases is that there were individuals who had filed applications
24    for particular relief.  But nothing in those cases says that
25    that's a requirement for the right to be recognized.  And in
```

1     St. Cyr, in fact, a Supreme Court case, which as far as I know

2     trumps the First Circuit, the noncitizen was not eligible to

3     file the application form, and yet he had a vested right to

4     that form that existed at the time that he pleaded guilty.

5              THE COURT:  Here.  Do you remember where in St. Cyr

6     this is?

7              MS. LAFAILLE:  I could find that, Your Honor.  So for

8     example, page 321.

9              THE COURT:  321.

10             MS. LAFAILLE:  You know, a few lines into the

11    paragraph that starts at the top of 321.  "A statute has" --

12             THE COURT:  Wait, wait, wait.  I've got to find it.

13             How does it start?

14             MS. LAFAILLE:  So the sentence that starts, "A statute

15    has retroactive effect."

16             THE COURT:  Okay.

17             MS. LAFAILLE:  And again, the connection between this

18    and due process is that a statute has retroactive effect when

19    it would impinge due process rights.

20             THE COURT:  Hold on a second.

21             MS. LAFAILLE:  "A statute has retroactive effect when

22    it takes away or impairs vested rights acquired under existing

23    laws or creates new obligations, imposes a new duty or attaches

24    a new disability in respect to transactions or considerations

25    already past."

1          THE COURT:  All right.  But it's talking about vested

2     rights.

3          MS. LAFAILLE:  Which, as far as I know, is what we're

4     talking about here.

5          THE COURT:  I know.  And that's what -- I thought the

6     Kentucky line of cases gave the standard for determining when

7     rights vested.

8          MS. LAFAILLE:  No, Your Honor, not at all.  Kentucky

9     talks about the existence of a right.  It tells us nothing

10    about when that right vested and when someone has engaged in

11    precursor conduct that enhances the significance of that later

12    right.

13         THE COURT:  Where is the language in --

14         MS. LAFAILLE:  So that's in Fernandez-Vargas, which

15    explained what happened in St. Cyr.  And that's at note 10 in

16    Fernandez-Vargas.  Unfortunately, I can't seem to --

17         THE COURT:  I have it here.  Just a second.  Well, I'm

18    not sure I understand how Fernandez-Vargas helps you.  What's

19    the point?

20         MS. LAFAILLE:  So Fernandez-Vargas is talking again

21    about when rights vest, and rights vest when an individual has

22    taken some action that will elevate the claim to relief above

23    the level of hope.  And what the Supreme Court noted as the

24    touchstone is in St. Cyr the individual had taken an action,

25    mainly the guilty plea, that enhanced the significance of that

1    I-212 form that he would later become eligible to file if and

2    when he came into removal proceedings.  Your Honor --

3          THE COURT:  So your argument is that a whole universe

4    of people who might apply for I-130s is not -- all those people

5    who might apply don't have a liberty interest and a due process

6    right but those who do apply have such a vested right.

7          MS. LAFAILLE:  Exactly, Your Honor.  And that's

8    because the thing, the connection between the -- in St. Cyr,

9    the court connected the guilty plea to the I-212 application.

10   And, you know, again, the guilty plea happening in an entirely

11   different legal system, right?  The criminal legal system

12   versus the immigration relief that the noncitizen would later

13   be eligible for in immigration court.  Those were sufficiently

14   connected to recognize a vested right.

15         Here we have something much more connected.  We have

16   an I-130 which is the form that starts the process of seeking

17   lawful status through your spouse and the 601A application, the

18   form that is necessary to complete that process without

19   prolonged family separation.  And that is the only way that

20   these noncitizens can gain lawful status again without being

21   separated from their families for years.

22         So if I could just maybe summarize, Your Honor, what

23   we've talked about here.  Your Honor has already recognized a

24   due process right that attaches to the 601A.  We've argued, you

25   know, in part because this is a Rube Goldberg machine where the

1      agency just turned a knob and created a process that that right

2      attaches to a process.  But even if the right attaches, the

3      right created by the provisional waiver regs attaches only to

4      the 601A, it has vested when someone files an I-130.  And when

5      the government prevents you from ever filing an I-601A by

6      arresting everyone who walks in the door for an I-130

7      interview, they have violated the due process right that

8      attaches to the 601A.

9              THE COURT:  And they've also violated the APA and the

10     INA, you would argue.

11             MS. LAFAILLE:  Yes, Your Honor.  And I think the last

12     point, Your Honor touched on the I-130.  It's true that -- I

13     don't think the I-130 and in a general context -- you know,

14     I-130s can be filed by siblings.  They can be filed to petition

15     for people who are overseas.  I don't think the I-130 generally

16     creates a right for the person to be in the United States.  But

17     what's happening here -- but the I-130 does create a due

18     process interest in the adjudication of an I-130.  And what's

19     happening here is that noncitizens who have a right -- and

20     their citizen spouses who have a right to file I-130s and get

21     them adjudicated cannot possibly do so because they know that

22     if they file that application, their noncitizen spouse will be

23     arrested and detained and deported.  And that in itself is an

24     interference with the due process right that attaches to the

25     I-130 itself.

1          THE COURT:  Well, does this depend on a factual

2    argument that I can't rely on in a -- well, maybe you have the

3    allegation in your complaint.

4          MS. LAFAILLE:  We do, Your Honor.  We think the facts

5    support it, but yes.

6          THE COURT:  But then, you know, Mr. Lyons, among

7    others, have told me they stopped arresting.  Now, maybe I

8    can't take that into account on a motion to dismiss.

9          MS. LAFAILLE:  I think that's right, Your Honor.  I

10   mean, that would go to a question of mootness and the propriety

11   of injunctive relief.  But I don't think a voluntary cessation

12   during the course of litigation is particularly relevant here.

13         THE COURT:  You're taking me back.  I've written about

14   this in this case.  Do you know where in the complaint those

15   allegations are?  Maybe I'll give you time --

16         MS. LAFAILLE:  Sure.  And Your Honor actually quoted

17   them, which I think will be easier for me to find.  So this is

18   at -- and I have the ECF page numbers of Your Honor's opinion,

19   not the Federal Reporter.

20         THE COURT:  You're talking about my September

21   decision?

22         MS. LAFAILLE:  Yes.  So Your Honor has already

23   acknowledged these allegations.

24         THE COURT:  I already what?

25         MS. LAFAILLE:  Your Honor has already acknowledged

1    these allegations of a pattern of arrests indicating that ICE

2    has been systematically targeting for arrest, detention and

3    removal individuals who are applying for provisional waivers or

4    launching that process at their I-130 interviews.  And Your

5    Honor went on to say that claim is plausible.

6              THE COURT:  I said what?

7              MS. LAFAILLE:  That claim is plausible.  This is near

8    footnote 2.  I don't know the page number.

9              THE COURT:  Just a minute.  Here it is.  Can I have

10   some small Post-Its, please.

11             334 F. Supp. 3d 390, I say, "In their amended

12   complaint petitioners allege with adequate specificity a

13   pattern of arrests at CIS offices indicating that ICE has been

14   systematically targeting for arrest, detention, and removal

15   individuals who are applying for provisional waivers or

16   launching that process at their I-130 interviews.  This claim

17   is plausible."  That's what you have in mind?

18             MS. LAFAILLE:  Yes, Your Honor.

19             THE COURT:  All right.  Well, I think this fits pretty

20   neatly under the APA theory, and I have to -- and why does this

21   create the kind of vested interest necessary to support a due

22   process claim?

23             MS. LAFAILLE:  Well, it creates a due process claim

24   because our clients' ability to access a legal process is being

25   stymied.

 1          THE COURT:  A legal process is what?

 2          MS. LAFAILLE:  To access a legal process that begins

 3    with the filing of an I-130 application and continues to the

 4    other forms that we've discussed.

 5          THE COURT:  And the right to access the legal process

 6    is established by what?

 7          MS. LAFAILLE:  Well, we think there are multiple

 8    sources of that.  We think the 601A applications establish it,

 9    and also the I-130 statute establishes that as to the I-130.

10          THE COURT:  The 601A essentially says that you have a

11    right to pursue the process in the United States, and the

12    government argues that the I-130 statute doesn't say you have a

13    right to pursue that process in the United States.

14          MS. LAFAILLE:  Correct, Your Honor.  And our clients

15    are being stymied from beginning the provisional waiver process

16    and from pursuing an I-130 in the United States or elsewhere

17    because the place they live is the United States, and the

18    moment they file that form, they're setting themselves up for

19    family separation.  And no one knowing what the government

20    conduct was could possibly proceed to file that form.

21          THE COURT:  All right.  Well, if the government would

22    like to respond briefly, you can.  I may have to think about

23    this one a little further.  Or further, I don't know how

24    little.

25          MS. LARAKERS:  So three points.  First, as Your Honor

1   mentioned, it does sound a lot like their APA claim.  There may

2   be a challenge to the policy of arresting people at the I-130

3   office such that they can't get to the 601A process, but that

4   doesn't mean -- and there may be a challenge to the way that

5   policy was conducted and whether it's arbitrary and capricious,

6   but that doesn't mean there's a due process right.

7           And as Your Honor mentioned, how we determine whether

8   there's a due process right is focused on Kentucky.  And not

9   only that, Your Honor, but applying this -- enhancing the

10  significance footnote from a Supreme Court case in this way

11  would be inconsistent with Kentucky and Roth and Sullivan.  So

12  that's the primary issue here.  Not that these cases can't

13  coexist, not that the retroactivity framework can't coexist

14  with Roth, but applying this retroactivity framework where it

15  doesn't apply because it doesn't concern a retroactive statute

16  in a way that would be inconsistent with Kentucky and Sullivan

17  and Roth is not permitted.

18          And I think that the fact that they can't point to a

19  case especially within the First Circuit, where the court has

20  gone that far to declare a due process right where an

21  individual is not eligible for the relief sought yet, that

22  makes it clear that these two ideas aren't supposed to overlap

23  in this particular circumstance.  And I think the Supreme Court

24  recognized that because in Fernandez-Vargas, if we go to page

25  46 --

```
 1              THE COURT:  Hold on a second.  Let me get it, please.
 2     Page 46?
 3              MS. LARAKERS:  Yes.
 4              THE COURT:  Okay.
 5              MS. LARAKERS:  So the Supreme Court was -- this is
 6     around where that footnote is, I believe.  The Supreme Court
 7     says, "For that matter, he could have married the mother of his
 8     son and applied for adjustment of status during that period, in
 9     which case he would at least have a claim, about which we
10     express no opinion."
11              THE COURT:  Hold on just one second.
12              MS. LARAKERS:  So the Supreme Court is clearly saying
13     here "about which we express no opinion."  So while it may be a
14     theoretical possibility that this could be applied to vested
15     rights as petitioners say, it can't be applied in this
16     particular way here not only because the Supreme Court hasn't
17     even clearly said that that would have given him a due process
18     right under a retroactivity analysis but also because applying
19     it in this way is clearly much broader than the Supreme Court
20     has ever gone with regard to Kentucky and Roth and broader than
21     the First Circuit has ever gone.  And in fact, in one of those
22     First Circuit cases -- it slips my mind which one -- but they
23     said that it would be throwing out the application.  And that's
24     the issue; that the individual had a pending application and
25     this would mean that they would be throwing that application
```

1      away.  And that's what we're looking at in the --

2           THE COURT:  But I think the petitioners' argument is

3      this is the functional equivalent of throwing a potential 601A

4      application away.  You can't get to 601A if you get arrested

5      when you're at CIS for your I-130 interview.

6           MS. LARAKERS:  Yes, Your Honor, and I recognize that.

7      But as you've also stated, that sounds like a problem with the

8      overall policy, which is an APA claim and not --

9           THE COURT:  I don't think I said it was a problem with

10     the policy.  The APA claim doesn't relate to a policy.  It

11     relates to a law, a set of regulations that, you know, last

12     year I was dismayed to find that apparently ICE in this area

13     didn't even know existed, the detention regulations they were

14     systematically violating.  This is not a policy argument.

15          MS. LARAKERS:  So, Your Honor, the fact that the First

16     Circuit hasn't gone any further in that analysis makes it clear

17     that these retroactivity claims cannot overlap with -- they can

18     exist, they can coexist, but they cannot overlap with Kentucky.

19     And as soon as you apply this retroactivity, enhancing the

20     significance test in a way that not only goes broader than a

21     retroactivity case has ever gone but also conflicts with the

22     mandatory language requirement and the legitimate expectation

23     of entitlement test, then you have an issue.  And that's the

24     reason why you can't -- the court shouldn't go any further down

25     that line of cases.

```
1          THE COURT:  All right.  It's 3:35.  I'm going to
2    continue to think about this and maybe beyond today.  We're
3    going to take a break until 3:45, and then I want to hear your
4    Equal Protection argument, okay?  Court is in recess.
5          (Recess taken 3:31 p.m. - 3:46 p.m.)
6          THE COURT:  I'm going to take the due process claim
7    under advisement.  I want to do some additional reading and
8    thinking about it, but let's move to the Equal Protection
9    argument.
10          As I said briefly earlier today, I think the key
11   question or the key threshold issue is defining the test.  If
12   it's the Arlington Heights test, the motion to dismiss probably
13   fails.  If it's the Trump v. Hawaii test, it probably succeeds.
14   So I think it would be helpful if the argument started by
15   addressing the test.
16          MS. LARAKERS:  Me first?  Okay.
17          THE COURT:  Go ahead.
18          MS. LARAKERS:  Yes, Your Honor.  Our position is that
19   it is -- that the applicable test is Hawaii because this case
20   concerns a core executive power.  And as Your Honor mentioned,
21   it also -- which is national security.  So to that end it
22   actually --
23          THE COURT:  Core executive power being immigration?
24          MS. LARAKERS:  Immigration.  And that being heightened
25   by it concerning national security.  And I think not only -- we
```

```
 1    don't need to only look at Hawaii but we also look to AADC as
 2    well and Scalia's dicta, which comes out very strong against
 3    selective enforcement claims, especially in the immigration
 4    context, because of the executive's power over immigration and
 5    because of the scope of that power.  And, you know, Trump v.
 6    Hawaii is the applicable test.  And a District Court has --
 7    even though it doesn't concern the Fifth Amendment -- I mean
 8    the Fourteenth Amendment, it does talk about discrimination and
 9    that's what --
10              THE COURT:  What does?
11              MS. LARAKERS:  Trump v. Hawaii.  So it's talking about
12    the same discrimination and whether there's -- in that case
13    whether it was discriminatory against Muslims.  So we're
14    talking about discrimination here, so that point, petitioners'
15    point about it not concerning the Fourteenth Amendment isn't --
16              THE COURT:  It's an Establishment Clause case --
17              MS. LARAKERS:  Yes.
18              THE COURT:  -- Trump.
19              MS. LARAKERS:  Right.  But still considering
20    discrimination against a particular group of people.  So there
21    is no -- it's a distinction without a difference, Your Honor,
22    because we're still looking at discrimination here.  And a
23    District Court has applied Trump v. Hawaii in the Fourteenth
24    Amendment context, and that's the decision, the Eastern
25    District of New York decision in Alharbi v. Miller.  And the
```

```
 1    government's position is that that court got it right with

 2    regard to applying it in the Fourteenth Amendment context.

 3    Specifically, the court said that we have to be conscious of

 4    the Supreme Court's admonition that any rule of constitutional

 5    law --

 6            THE COURT:  What page are you on?

 7            MS. LARAKERS:  Sorry.  You know what, Your Honor?  I

 8    don't have the page.  It's towards the end of the opinion, Your

 9    Honor.  I apologize, I don't have the page.  I may be able to

10    find it here.

11            THE COURT:  It's probably around 21 or 22.

12            MS. LARAKERS:  Yes.  I'm looking for it in here.

13    Anyway, Your Honor, the court there took Trump v. Hawaii,

14    applied it in the Fourteenth Amendment context and said the

15    court seemed to be especially aware that this is an area of

16    core executive power, that we have to be aware that any

17    constitutional ruling that would inhibit the flexibility of the

18    president to make decisions in this core executive area should

19    be adopted with only the greatest caution.  And here, where we

20    have an Executive Order, that is actually facially neutral as

21    to national origin, as to race, as to any of the

22    classifications petitioners cite in their complaint, it's very

23    clear that the court shouldn't go any further.  The court --

24    the order at issue in Alharbi was actually specific procedures

25    that applied to Yemeni documents.
```

1          THE COURT:  I'm sorry.  Say that again, please.

2          MS. LARAKERS:  It was a specific policy with regard to

3     the treatment of documents from Yemen.  Even where there was a

4     classification made on national origin grounds, the court said

5     that we still have to be aware of Trump v. Hawaii and that

6     admonition.  Here where we have a facially neutral Executive

7     Order that cites national security and which says that it shall

8     be applied equally, that admonition should be especially clear.

9     And Your Honor, that's all I have, unless you have questions.

10          THE COURT:  Okay.  And why does -- I think you've

11     answered implicitly why the Arlington Heights test doesn't

12     apply.  But why don't I hear from the petitioners, and maybe

13     you'll respond.

14          MS. LAFAILLE:  Thank you, Your Honor.  I have to say I

15     think this was an area where I was a bit alarmed, and I'm going

16     to have to push the court a bit on its view of Trump v.

17     Hawaii.  I'm just --

18          THE COURT:  On whether it applies or what it means?

19          MS. LAFAILLE:  Whether it applies, Your Honor.  I

20     think --

21          THE COURT:  Right.  Well, I think it's a big issue.

22          MS. LAFAILLE:  Right, Your Honor.  And I think we are

23     light years away from Trump v. Hawaii in this case, and

24     applying it I think would be a very troubling expansion of the

25     government's authority to racially discriminate against

1    noncitizens living in the United States.

2         I'm just not aware of any case that holds that

3    policies that openly discriminate against -- I'm sorry -- that

4    are openly motivated by animus, racial animus against

5    noncitizens living in the United States, and that's the

6    allegation we've made here, are not an Equal Protection

7    violation, particularly when the government is not engaged in

8    legitimate applications of the immigration laws.

9         And I think -- let me just unpack that a little bit

10   because there are several areas where I think this is

11   fundamentally different from Trump v. Hawaii.  So one goes to

12   this, to the noncitizens living in the United States.  All of

13   the noncitizens, everyone in our class by definition is living

14   here.

15        THE COURT:  They're living here, but they're living

16   here unlawfully at the moment.

17        MS. LAFAILLE:  Yes, Your Honor.  But we've always

18   recognized that constitutional rights apply to people who are

19   here, whether they're here lawfully or not.  That's

20   fundamental, they're in a fundamentally different place than

21   people who are overseas.  I mean, take Ms. Calderon, who has

22   been here since she was a toddler.  These are people with deep

23   ties to the United States.  They're parts of American families,

24   deeply embedded in our communities.

25        The second distinction I want to make is with regards

1    to this national security point.  In Trump v. Hawaii, the
2    policy that was being challenged was itself the policy that was
3    being justified on national security grounds.  No one is
4    saying, I have never heard the government say that it is
5    depriving the noncitizens in our class of the opportunity to
6    pursue provisional waivers and that that is justified by
7    national security concerns.  We've never heard that when the
8    government wrote about why it detained Ms. Calderon, when it
9    wrote about why it detained De Souza.  We have never heard the
10   government attempt to justify its conduct here by reference to
11   national security concerns that apply specifically to the class
12   at issue.
13        THE COURT:  Can I take that into account properly in
14   deciding a motion to dismiss?
15        MS. LAFAILLE:  Yes, Your Honor.  I think that's
16   because that's the challenged -- I mean, this goes to what is
17   the challenged conduct and whether that conduct relates to
18   national security.  And the challenged conduct here is the
19   government's application of rules designed to help our
20   noncitizen plaintiffs stay with their U.S. citizen families in
21   the United States.  No one has said that that is justified by
22   national security concerns.  And finally, what I think is, you
23   know, perhaps --
24        THE COURT:  I'm not sure that tells me why I can take
25   their arguments into account in deciding a motion to dismiss.

1              MS. LAFAILLE:  Well, there is no -- there is

2     nothing -- let me put this way.  There is nothing in the

3     Executive Order which I think Your Honor can look at, it's

4     mentioned in our complaint --

5              THE COURT:  Right.

6              MS. LAFAILLE:  -- that links the treatment of

7     noncitizen plaintiffs to national security concerns.  And

8     there's nothing about the actions that are going on in this

9     case that indicates that they implicate national security

10    concerns.  What we're talking about is American families trying

11    to legalize the status of their noncitizen spouse.

12             THE COURT:  Basically this is an argument because I've

13    been asking, you know, what's the practical effect of this.

14    I've found that -- I didn't dismiss the APA and INA claims.  At

15    least with regard to the APA, if the government went through

16    the required process, they could revoke the regulation of the

17    provisional waiver regulations, the whole process but

18    particularly the last step.  And if they did that, your clients

19    would need to have a constitutional argument.

20             MS. LAFAILLE:  Right, Your Honor.  And I think more

21    broadly this is an area where, you know, in the day and age

22    that we live in, a ruling expanding Trump v. Hawaii into the

23    context of government animus against noncitizens living in the

24    United States I think would be a dangerous precedent, and you

25    know --

1          THE COURT:  Anything I decide is not a precedent.  If

2     it has some persuasive value, somebody will follow it.  In some

3     of these cases judges have disagreed with me on 1252(g).  But

4     anyway.

5          MS. LAFAILLE:  The last reason, Your Honor, why I

6     think this would be a vast expansion of Trump v. Hawaii is that

7     the premise of Trump v. Hawaii is that the government was

8     engaged in conduct that the INA authorized.  And the challenges

9     there were saying you can't engage in that conduct for these

10    reasons.  But the premise of the ruling was that the government

11    had the authority under the INA to engage in that conduct.

12         THE COURT:  That is, exclude people from the U.S.?

13         MS. LAFAILLE:  Correct, Your Honor.  And here, the

14    court has already found the government is not engaged in a

15    legitimate enterprise, and I think that's a fundamental

16    distinction between this and Trump V Hawaii.  It also goes

17    to --

18         THE COURT:  Do you explain this in your brief?

19         MS. LAFAILLE:  Yes, we do, Your Honor.

20         Your Honor, I'm just looking for one piece of language

21    that I wanted to highlight for the court.

22         THE COURT:  In your brief?

23         MS. LAFAILLE:  No.  In Trump v. Hawaii actually.

24         THE COURT:  All right.  I seem to have lost the --

25    again.  I've got them, I've got them.  Trump v. Hawaii.

1              MS. LAFAILLE:  Right, Your Honor.  It's at the top of

2    Justice Kennedy's concurrence.  Justice Kennedy's vote was

3    necessary to form the majority.

4              THE COURT:  Just one second.  Do you know what page?

5              MS. LAFAILLE:  Page --

6              THE COURT:  The Equal Protection discussion starts on,

7    looks like page 35, and you might be looking for page 36

8    possibly?

9              MS. LAFAILLE:  I'm looking at Justice Kennedy's

10   concurrence, in what I have as page 2423 of the Supreme Court

11   Reporter.

12             THE COURT:  I've got the wrong version.

13             MS. LAFAILLE:  I think I have another printout that

14   doesn't have U.S. Reporter pages.

15             THE COURT:  Well, all I have is the Westlaw version of

16   it.

17             MS. LAFAILLE:  I'm just looking at Justice Kennedy's

18   concurrence.

19             THE COURT:  Here.  See if you can find it.  We'll find

20   it.

21             MS. LAFAILLE:  It could be page 27 of just the Westlaw

22   numbers.

23             THE COURT:  Okay.  I have Justice Kennedy's

24   concurrence.  It starts on 2423.

25             MS. LAFAILLE:  Right.  So even that, Your Honor,

1    acknowledges that government action can still be subject to

2    judicial review to determine whether or not it is inexplicable

3    by anything but animus.

4         THE COURT:  Right.  And in fact, that is what I've

5    thought about.  And there's a generally applicable Executive

6    Order that on its face says it's concerned about national

7    security and public safety.  And some American citizens commit

8    crimes and some aliens in the United States commit crimes.  You

9    know, why is it inconceivable that a president would feel --

10   well, can't deport all the U.S. citizens who, you know, I

11   regard as being risks of committing serious crimes but here are

12   people here, people who are here unlawfully, I have the

13   authority to remove them and I think the country will be safer.

14   Why is that --

15        MS. LAFAILLE:  Right, but I think the critical

16   distinction is the government has already -- excuse me -- the

17   court has already found that the government has been

18   unlawfully, arbitrarily and capriciously depriving our clients

19   of the opportunity to seek lawful status within the United

20   States.  Unlike in Trump v. Hawaii --

21        THE COURT:  But that could be because -- I found it

22   under regulations and I found a due process right that I now

23   have said I'd consider when does it vest.  And maybe I'll

24   reconsider that.  But the issue here is not whether there's a

25   right or a due process right.  The issue here is whether

 1    there's also a right under the Equal Protection Clause.

 2              MS. LAFAILLE:  That's right, Your Honor.

 3              THE COURT:  And that I haven't decided yet.

 4              MS. LAFAILLE:  That's right.  And when we're

 5    considering whether government conduct was impermissibly

 6    motivated by animus, it makes a difference whether there is any

 7    other explanation for that conduct.  And here, where the court

 8    has already found that that was illegitimate conduct, I see no

 9    reason, I can't fathom an explanation for a policy that seeks

10    to stand in the way of people who are eligible to gain their

11    lawful status in the United States and seeks to harm those

12    individuals.  And when we have the allegations that we have in

13    the complaint, which plausibly allege racial animus on the part

14    of decision makers, I think that's enough for this initial

15    stage to survive -- to establish a plausible claim as, you

16    know, courts have found in the TPS and DACA context.

17              THE COURT:  I mean, this is a hard question.  I was

18    talking shorthand, and I don't know if I said what the right

19    question is, what the right standard is I think is a hard

20    question, although there are a lot of hard questions.  In the

21    DACA and TPS -- well, in the TPS context like Judge Casper's

22    case, El Centro I think, it's temporary protected status.  So

23    these are people who are authorized to be in the United States,

24    and now that lawful status is being taken away from them, and

25    there was no stated national security reason for doing it.

1          Here, your clients are in the country unlawfully, and

2     the Executive Order cites national security and public safety

3     concerns.  And if Trump v. Hawaii is the right test, I'm not

4     supposed to, I think -- I'm supposed to give a lot of deference

5     to the stated reasons and not probe them.

6          MS. LAFAILLE:  And Your Honor, I think there might be

7     questions remaining about how exactly one would -- you know,

8     what standard of scrutiny would apply to these claims in the

9     immigration context, but I think what we're talking about here

10    is something more preliminary.  In any kind of civil action,

11    someone's statements are allowed to evidence their intent.  And

12    we're talking about an exception to that, you know, almost

13    universal rule that applies to a context where the government

14    is acting at the height of its authority in the national

15    security context with regards to noncitizens outside of the

16    United States and is engaged in the legitimate exercise of the

17    immigration laws.  None of those things are true here.  We have

18    a government engaged in unlawful conduct directed at

19    noncitizens within the United States, and the question here is

20    are we allowed to consider, as we would --

21          THE COURT:  Also, I suppose it's also directed in a

22    way against citizens.

23          MS. LAFAILLE:  Absolutely, Your Honor.

24          THE COURT:  This goes to whether there's a liberty

25    interests that the citizen spouses have, and I need to look at

1    the I-130 regulations.  I think in that context, they're the

2    ones who apply for the I-130.  They're not going to be

3    deported.

4            MS. LAFAILLE:  Again, Your Honor, the question here is

5    one of plausibility, and we're asking whether this court should

6    take what I think --

7            THE COURT:  But if the question is is there a

8    plausible claim on which relief can be granted, and some of the

9    decisions I've read I think confuse these two things.

10   Plausibility is I believe factual, but, you know, a claim on

11   which relief can be granted asked, you know, if the alleged

12   facts are plausible and then proven, does that violate the

13   Equal Protection Clause.  And although my understanding of the

14   law can change or evolve, I think I'm required now to decide

15   what I believe the applicable legal standard is.  Do you agree

16   with that?

17           MS. LAFAILLE:  I do, Your Honor, but I think that the

18   only way that we get to ignore the statements is if we say that

19   there is simply no such thing as an Equal Protection claim

20   brought by noncitizens in the United States.

21           THE COURT:  I don't think it would go that far.  I

22   think, you know, the issue is these statements were made, and

23   maybe there's a plausible claim that racial animus was a

24   motivating factor.  But if there were other motivating factors

25   as some of these cases recognize there often are and one or

1    more of them was legitimate, like national security or public

2    safety, does that mean there's not a viable Equal Protection

3    claim?

4              MS. LAFAILLE:  Again, Your Honor, what I think Your

5    Honor said is very important because it's critical here that

6    we're not engaged in a legitimate exercise of immigration law,

7    and this court has already found that.  And so whatever

8    legitimate --

9              THE COURT:  Not engaged in what?

10             MS. LAFAILLE:  In a legitimate application of

11   immigration law.  And that's what this court has already found.

12             THE COURT:  I found that you have a plausible claim.

13             MS. LAFAILLE:  Yes.  If the facts as we've stated them

14   are true, the government is not engaged in something that is

15   otherwise legitimate, and, you know --

16             THE COURT:  Because it's violating the -- it violated

17   APA.

18             MS. LAFAILLE:  Unlike in Trump v. Hawaii where we had

19   something the court thought the executive branch was clearly

20   exercising authority that it had.  The question is should it

21   deny the executive branch the opportunity to exercise that

22   authority because of claims that the reason it was exercising

23   that authority in that case, you know, violated the

24   Establishment Clause.

25             THE COURT:  So actually that's a distinction I confess

```
 1    I haven't thought about carefully, the statute that gives the
 2    president a lot of authority in deciding who to allow in the
 3    United States and a lot of discretion in deciding who to
 4    exclude.  Here there are regulations that set up the
 5    provisional waiver process, and those are laws, and they bind
 6    the president, and I have found that they've been violated.
 7            Okay.  What more would you like to say?  So what's the
 8    Arlington test?  Is that the test you argue applies?
 9            MS. LAFAILLE:  Yes, Your Honor.  And you know, we're
10    looking there at whether animus was one motivating factor.
11    And, you know, we think -- we've alleged that it was, and we
12    think that, given the very strong statements which the
13    government is not denying evidence animus, we have, you know, I
14    think well satisfied the plausibility standard there.
15            THE COURT:  All right.  Would the government like to
16    respond to that?
17            MS. LARAKERS:  Briefly.  You know, petitioners keep
18    saying that we are not within the realm of the authority that
19    we're allowed to execute, that we're not clearly executing
20    authority that the government has, but that conclusion is
21    precluded by AADC where Scalia says that in all cases
22    deportation is necessary to bring an end to an ongoing
23    violation of United States law.  And the contention --
24            THE COURT:  Let me get this.  This is American --
25            MS. LAFAILLE:  Arab Anti-Defamation --
```

1          THE COURT:  -- v. Reno?

2          MS. LAFAILLE:  Yes.

3          THE COURT:  Let me get it.

4          MS. LARAKERS:  So I'm on page 491, and I'm pulling

5    this particular quote, but it's that entire section.

6          THE COURT:  Hold on.  491?

7          MS. LARAKERS:  491.

8          THE COURT:  Okay.

9          MS. LARAKERS:  I'm pulling this particular quote, but

10   it's that entire dicta in that session where Justice Scalia

11   talks about the vast amount of discretion that the executive

12   has over this field.  And he says, you know, that the

13   contention that a violation must be allowed to continue because

14   it has been improperly selective is not powerfully appealing.

15         THE COURT:  Hold on just one second.  What's the

16   ongoing violation of U.S. law in this case?

17         MS. LAFAILLE:  That the individuals, the petitioners

18   are -- the alien petitioners are here without lawful status,

19   and it's the same one Scalia was talking about in the AADC.

20         THE COURT:  Here they were deporting somebody believed

21   to be part of a terrorist organization.

22         MS. LAFAILLE:  Yes, Your Honor.  But Justice Scalia's

23   dicta I don't think is limited to that.  I think it's very

24   broadly talking about prosecutorial discretion within these

25   three fields, one of them being the execution of removal

1    orders.

2           THE COURT:  Well, there's a general -- I mean, this

3    comes up in say Title VII cases.  There are at-will employees

4    and they can be fired for no reason but you can't fire them

5    because of their race.

6           MS. LARAKERS:  Yes, Your Honor, and I understand that.

7    But the authority we're talking about here is the authority to

8    issue the Executive Order that the president did in this case.

9    And that Executive Order, unlike petitioners suggest,

10   doesn't -- you know, it does build in a certain level of

11   discretion, and it doesn't say that you have to remove every

12   single provisional waiver applicant.  As Your Honor yourself

13   pointed out, it has things about establishing priorities

14   within, you know, each field office and that it's not

15   inconsistent with the Executive Order to consider the

16   provisional waiver process.  Your Honor yourself has said that.

17          So I think the Executive Order is clearly within

18   authority that the president has the power to do.  And for that

19   reason and for the reasons the Supreme Court stated, that

20   admonition in Trump v. Hawaii, that's why the petitioners can't

21   state an Equal Protection claim here.  And again, Your Honor, I

22   would just point also to Alharbi because we think a reading of

23   that case gives us the proper framework we should be applying

24   here as well.

25          THE COURT:  Well, I'm going to give some further

1    thought to the Equal Protection claim, too.

2         Now, there may be one more issue, and I may even be

3    able to decide it.

4         Well, there's more than one issue.  I'm not going to

5    try to decide today whether the citizen spouses have a liberty

6    interest for due process purposes, although I think that

7    argument -- that issue might relate to the I-130.  It's a

8    question that's not briefed, but this was raised in the context

9    of the APA claim.  The defendants assert there's no

10   jurisdiction over -- this may have been made in the context of

11   the due process claim more generally, but there's a contention

12   that the defendants assert there's no jurisdiction over aliens

13   ordered removed after the expansion of the provisional waiver

14   eligibility on August 29, 2016.

15        MS. LARAKERS:  Yes, Your Honor.

16        THE COURT:  Do you want to speak to that briefly?  And

17   this relates to the scope of the APA class, right?

18        MS. LARAKERS:  Yes, and to the due process class,

19   because it applies to, it speaks to who this court has

20   jurisdiction over, so the entire, all the claims.

21        As Your Honor knows, the government's position is that

22   1252(g) bars all the claims, and Your Honor found that this

23   court had jurisdiction under the Suspension Clause.

24   Specifically, Your Honor stated that the substitute here, in

25   order to be adequate, has to provide for a stay of removal

1   until DHS considers the alien's pursuit of the provisional

2   waivers authorized by the statute.

3           THE COURT:  Actually, hold on for just a minute.  Now

4   what did I do with my copy of my Jimenez decision?  See if you

5   can find Jimenez.

6           MS. LARAKERS:  This is on page --

7           THE COURT:  I'm looking for my Jimenez decision.  We

8   can cut through this a little bit.

9           Are you finding it?  Would you go back and see if I

10  left my Jimenez decision in the lobby, please?  I have the

11  pertinent -- I've got it.  September 21.  382 is what I want.

12  382.  Okay.  Why don't you go ahead.

13          MS. LARAKERS:  Okay.  So Your Honor, in talking about

14  what the procedure needed to be in order to be adequate, you

15  stated that it would have to provide for a stay of removal

16  until DHS considers the alien's pursuit of the provisional

17  waivers authorized by statute and DHS regulations.  The

18  procedure available to petitioners who were in removal

19  proceedings after the expansion of the provisional waiver

20  process and who were also married at that time had such an

21  adequate remedy.  They could have raised the issue that they

22  should not have been -- not only not receive a removal order

23  but should not have been placed in removal proceedings at all

24  because this provisional waiver is available to them, they

25  could have made that claim in front of the IJ where an ICE

1    attorney also would have been present to consider it to that

2    end.  But they could have raised that issue in their removal

3    proceedings and stated to the IJ that they can't have a removal

4    order entered against them until they receive that waiver.

5              THE COURT:  Does that got to the validity of the

6    order?

7              MS. LARAKERS:  It wouldn't go to the validity of the

8    order itself likely, Your Honor, but that's not an issue.  I

9    see where you're going, but that's not an issue because the

10   circuit court could have still reviewed that claim because it

11   is a constitutional claim and a question of law.

12             THE COURT:  How could the Court of Appeals have

13   reviewed the claim if I'm right that 1252(g) strips all courts

14   of the right to review?

15             MS. LARAKERS:  Well, first because it wouldn't yet be,

16   you know, a claim arising from the execution.  If it's a

17   removal order, he would still be in proceedings.  And second,

18   1252(a)(2(D) has been construed as a savings clause by the

19   First Circuit.  And the First Circuit has held twice that that

20   savings clause and the jurisdiction of the Court of Appeals as

21   a whole encompasses at least the same parameters as a habeas

22   court did prior to the enactment of the REAL ID Act.

23             THE COURT:  Well, the 1252(g) is in the REAL ID Act?

24             MS. LARAKERS:  It was before and yes after.  The REAL

25   ID Act is what made it clear that habeas jurisdiction is no

```
1   longer available in the District Court either.  So the First

2   Circuit has found that they have jurisdiction, you know,

3   particularly under 1252(a)(2)(D) to review questions of

4   constitutional questions and questions of law, regardless of --

5           THE COURT:  What case?

6           MS. LARAKERS:  Enwonwu.

7           THE COURT:  Which one?

8           MS. LARAKERS:  Enwonwu, E-n-w-o-n-w-u.  That's 438 F.

9   3d, and I think the pin cite is 33.

10          THE COURT:  The pin cite is what?

11          MS. LARAKERS:  33, I believe.

12          THE COURT:  They said that Enwonwu involved only pure

13  questions of law.  Does the instant case involve only pure

14  questions of law?

15          MS. LARAKERS:  The constitutional question and

16  question of law.  So yes, Your Honor, it is a pure question of

17  law whether ICE is required under the regulations to consider

18  whether someone is pursuing a provisional waiver before they

19  remove them.  And that also happens to be a constitutional

20  question, which is in the same jurisdictional statute that

21  they're citing.  It's the (a)(2)(D) refers to constitutional

22  questions.

23          THE COURT:  The case involves facts.  Right now there

24  are alleged facts.  But there has to be factfinding.  They

25  don't do factfinding in the Court of Appeals.
```

1          MS. LARAKERS:  Your Honor, the IJ would have already

2     done that factfinding, so they would have been able to look at

3     the facts that the IJ found and determine whether this

4     individual who is presumptively eligible to pursue a

5     provisional waiver, whether it is unlawful to enter a removal

6     order against them or unlawful not to terminate their

7     proceedings immediately because they have this avenue of relief

8     available to them.  And that would have given the same exact

9     relief that this court is issuing:  the ability to have ICE

10    consider it, the ability to be able to have their proceedings

11    terminated, or their removal order not entered in order so that

12    they can pursue this process.

13         And had they raised that during their removal

14    proceedings, it would have been reviewable by the Court of

15    Appeal under 1252(a)(2)(D) and the Court of Appeals could have

16    issued relief that was appropriate, whether it be allowing the

17    final order of removal but staying the removal.  It could have

18    done multiple different things, terminated proceedings, stayed

19    the removal.  It could have done many different things, but it

20    certainly would have provided relief for these particular

21    petitioners.

22         It's also important to note that Mehilli, that's

23    M-e-h-i-l-l-i, where the First Circuit stated that that 1252

24    (a)(2)(D) section which refers to the circuit court's review of

25    constitutional questions and questions of law is actually a

1    jurisdictional grant on the -- on the circuit court.

2         THE COURT:  And how does this differ from what I

3    decided in Jimenez at 382 when I held that "Petitioners' claims

4    would not be subject to judicial review in the First Circuit

5    under 1252(a)(1) of their final orders of removal or motions to

6    reopen them.  Judicial review of a final order by a Court of

7    Appeals includes all matters on which the validity of the final

8    order is contingent.  As indicated earlier, petitioners do not

9    challenge the validity of their orders of removal or any

10   decision on which they're contingent.  Rather they only

11   challenge ICE's decision on behalf of DHS to enforce the order

12   while they're pursuing provisional waivers."

13        MS. LARAKERS:  So in two respects, Your Honor, first,

14   these petitioners didn't need to file a motion to reopen.  The

15   named petitioners all had their removal orders entered years

16   ago before they could even claim that they could pursue a

17   provisional waiver because it was before the provisional waiver

18   was even available and because they weren't married to U.S.

19   citizens at the time.

20        But these petitioners don't have to file a motion to

21   reopen.  They could have raised this claim the first time, the

22   first time they were placed in removal proceedings, that there

23   is this relief available to them and that they should be

24   allowed to pursue that relief.

25        And the second reason is 1252(a)(2)(D) was not -- we

1    discussed it, but it was not discussed at length with regard to

2    it being a jurisdictional grant.  And that's the second piece

3    of this puzzle.  It wasn't as applicable to the petitioners, to

4    the named petitioners, because this court had already found

5    that the motion to reopen process was not adequate.

6           But here, we need to answer the question of whether

7    the circuit court could review that question of law.  And it

8    clearly can under Section 1252(a)(2)(D), as the circuit court

9    has held twice.  And again, that form of relief can come in

10   many different ways.  It could be a stay of removal.  It could

11   be remanded to the IJ to terminate proceedings.  It could have

12   been many different ways.  But the circuit court could have

13   done something to allow the person to pursue the provisional

14   waiver.

15          THE COURT:  And what does the petitioner say?

16          MS. LAFAILLE:  This is not a meaningfully different

17   argument than the one Your Honor already decided.  The

18   petitioners here are not challenging their final -- the

19   validity of their final orders of removal.  And, you know, to

20   say that the Court of Appeals on a petition for review can

21   consider legal claims and constitutional questions doesn't

22   answer the question legal claims and constitutional questions

23   about what.  It's legal claims and constitutional questions

24   that go to the validity of the order.  And if the First Circuit

25   grants a petition for review, the result is that someone is

1    back in removal proceedings, not that they get to pursue the

2    provisional waiver process.  In fact, the cruel irony of the

3    government's position is that if any of our clients were back

4    in removal proceedings, they would be ineligible to pursue the

5    provisional waiver process.

6              THE COURT:  Say that again, please.

7              MS. LAFAILLE:  If our clients were back in removal

8    proceedings, they would be ineligible to pursue the provisional

9    waiver process.  So for exactly the same reasons that Your

10   Honor recognized previously, there is no mechanism for these

11   particular legal claims to be raised in a petition for review.

12             THE COURT:  All right.  I'm going to think about this

13   one a little further, too.  Some things have come into sharper

14   focus.

15             MS. LARAKERS:  One brief point, Your Honor.  They said

16   that the irony is that they will be placed back into removal

17   proceedings.  As I said, that is not the only relief the Court

18   of Appeals could have issued.  The Court of Appeals could have

19   let the final order of removal live and stayed their removal

20   until the provisional waiver process ended.  They could have

21   remanded it to the IJ to terminate the proceedings.  Those are

22   things that would -- in those situations, would have allowed

23   the individual to pursue the provisional waiver, would have

24   allowed them to be eligible.  They would no longer be in

25   removal proceedings or ineligible to pursue the process if the

```
 1    circuit court had done those two remedies available to them
 2    that they have done before.
 3              THE COURT:  So this is the issue that affects the
 4    scope of the class, and the argument is helpful.  The question
 5    is where do we go from here, and I'll see you briefly in the
 6    lobby with the court reporter to assess that.  I could have you
 7    back on Monday.  I might want to wait a little longer, but I
 8    want to talk about the implications of what I've already
 9    decided for the progress of the case.  Court is in recess.
10              (Recess, 4:37 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3            I, Kelly Mortellite, Registered Merit Reporter

4    and Certified Realtime Reporter, in and for the United States

5    District Court for the District of Massachusetts, do hereby

6    certify that the foregoing transcript is a true and correct

7    transcript of the stenographically reported proceedings held in

8    the above-entitled matter to the best of my skill and ability.

9                    Dated this 11th day of May, 2019.

10

11                    /s/ Kelly Mortellite

12                    _____

13                    Kelly Mortellite, RMR, CRR

14                    Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25