```
                    UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS


                                    )
LILIAN PAHOLA CALDERON JIMENEZ      )
and LUIS GORDILLO, et al.,          )
Individually and on behalf of       )
all others similarly situated.      )
                                    )   Civil Action
          Plaintiffs-Petitioners,   )   No. 18-10225-MLW
                                    )
v.                                  )
                                    )
KIRSTJEN M. NIELSEN, et al.,        )
                                    )
          Defendants-Respondents.   )
                                    )



                 BEFORE THE HONORABLE MARK L. WOLF
                   UNITED STATES DISTRICT JUDGE


                         MOTION HEARING


                         May 16, 2019



             John J. Moakley United States Courthouse
                      Courtroom No. 10
                      One Courthouse Way
                 Boston, Massachusetts  02210




                              Kelly Mortellite, RMR, CRR
                              Official Court Reporter
                              One Courthouse Way, Room 5200
                              Boston, Massachusetts  02210
                              mortellite@gmail.com
```

APPEARANCES:

Counsel on behalf of Plaintiffs-Petitioners:
Adriana Lafaille
American Civil Liberties Union
211 Congress Street
Boston, MA 02110
617-482-3170
alafaille@aclum.org

Kathleen M. Gillespie
Attorney at Law
6 White Pine Lane
Lexington, MA 02421
339-970-9283
kathleen.m.gillespie@outlook.com

Stephen Nicholas Provazza
Matthew W. Costello
Shirley X. Cantin
Wilmer Hale LLP
60 State Street
Boston, MA 02109
617-526-6313
stephen.provazza@wilmerhale.com
matt.costello@wilmerhale.com
shirley.cantin@wilmerhale.com

Counsel on behalf of Defendants-Respondents:
Eve A. Piemonte
U.S. Attorney's Office
1 Courthouse Way
Suite 9200
Boston, MA 02210
617-748-3100
eve.piemonte@usdoj.gov

Mary Larakers
William Weiland
U.S. Department of Justice, Office of Immigration Litigation
District Court Section
P.O. Box 868
Washington, DC 20044
202-353-4419
mary.l.larakers@usdoj.gov
William.h.weiland@usdoj.gov

1                    P R O C E E D I N G S
2    (Case called to order.)
3              THE COURT:  Good afternoon.  Would counsel please
4    identify themselves for the court and for the record.
5              MR. PRUSSIA:  Good afternoon, Your Honor.  Kevin
6    Prussia from Wilmer Hale on behalf of petitioners.
7              MS. LAFAILLE:  Good afternoon, Your Honor.  Adriana
8    Lafaille for the petitioners.
9              MS. CANTIN:  Good afternoon, Your Honor.  Shirley
10   Cantin for the petitioners.
11             MR. SEGAL:  Good afternoon, Your Honor.  Matthew Segal
12   for the petitioners.
13             MR. COSTELLO:  Good afternoon, Your Honor.  Matt
14   Costello, Wilmer Hale for the petitioners.
15             MR. PROVAZZA:  Good afternoon, Your Honor.  Stephen
16   Provazza of Wilmer Hale for the petitioners.
17             MS. GILLESPIE:  Good afternoon, Your Honor.  Kathleen
18   Gillespie for the petitioners.
19             MR. WEILAND:  Good afternoon, Your Honor.  Will
20   Weiland for the United States.
21             MS. LARAKERS:  Good afternoon, Your Honor.  Mary
22   Larakers for the United States.
23             MS. PIEMONTE:  Good afternoon, Your Honor.  Eve
24   Piemonte for the respondents.
25             THE COURT:  Okay.  And is acting regional director

1  Marco -- it is Chavez -- present?

2           MS. LARAKERS:  Marcos Charles, yes, Your Honor.

3           THE COURT:  I can't read my own writing.  Thank you.

4           Yesterday I issued an order giving you the proposed

5  agenda for today.  I said I intend to or aim to decide orally

6  the motion to dismiss concerning petitioners' equal protection

7  and due process vesting claims.

8           Second, reserve judgment on the contention that the

9  citizen spouses have a liberty interest in remaining in the

10  United States with their alien spouses and therefore a right to

11  due process before their alien spouses are removed, reserving

12  judgment because at the May 3 hearing the parties agreed that

13  that issue would have no practical effect on discovery or

14  anything else.  The open issue left by the Supreme Court or the

15  open question on that left by the Supreme Court may be

16  clarified as we proceed in this case.

17          I said I might hear argument, further argument on

18  respondents' contention concerning subject matter jurisdiction

19  over the claims of individuals ordered removed after August 29,

20  2016, that I would hear argument on discovery issues and

21  address scheduling.

22          Is there something else that ought to be on the

23  agenda?

24          MS. LAFAILLE:  Your Honor, petitioners' motion for

25  class certification is still pending.

1          THE COURT:  Yes.  I didn't note that.  All right.

2          Yes.  After -- before the discovery issues we'll see

3    what kind of class my rulings have defined, or classes

4    possibly.  Anything else?

5          MS. LARAKERS:  No, Your Honor.

6          THE COURT:  So I have done a lot of work since I saw

7    you last on the equal protection issue.  And for reasons that I

8    will explain in detail, the respondents' motion to dismiss

9    Count 3, the equal protection claim, is being denied.  Count 3

10   alleges that Executive Order 13768 and the execution of final

11   orders of removal against petitioners are motivated by a desire

12   to discriminate based on race and national origin.  As I said,

13   the motion to dismiss this claim is denied.

14          In <u>Trump v. Hawaii</u>, a case on which the respondents

15   heavily rely, the Supreme Court rejected the plaintiffs'

16   challenge under the Establishment Clause to Proclamation 9645,

17   the so-called "travel ban," which indefinitely barred entry by

18   nationals from six predominantly Muslim countries.  The

19   plaintiffs argued that the proclamation's primary purpose was

20   to discriminate against Muslims.  The court applied rational

21   basis review in evaluating the proclamation, holding that

22   "courts must consider not only the statements of a particular

23   President, but also the authority of the Presidency itself."

24          Importantly, the policy at issue in <u>Hawaii</u> was

25   directed at aliens living outside of the United States.  The

1    Supreme Court wrote, reiterating a principle it had addressed

2    before, that "foreign nationals seeking admission have no

3    constitutional right to entry."  That's at 138 Supreme Court

4    2419.  And as I understand it, aliens outside of the

5    jurisdiction of the United States are generally not entitled to

6    constitutional protections.

7         By contrast, the Supreme Court has found that aliens

8    living inside the United States, including those whose presence

9    is unlawful, have a right to equal protection under the Fifth

10   Amendment.  That ruling was made in Plyler v. Doe, 457 U.S.

11   202, 210 in 1982, essentially reaffirming a comparable ruling

12   in Yick Wo v. Hopkins, 118 U.S. 356, 368-69.  In Plyler, the

13   Supreme Court wrote that "we have clearly held that the Fifth

14   Amendment protects aliens whose presence in this country is

15   unlawful from invidious discrimination by the Federal

16   Government."  That's at 457 U.S. page 210.  Petitioners in the

17   instant case reside in the United States unlawfully.  Many have

18   resided here for a long time.  Therefore, under Plyler,

19   petitioners have a constitutional right to Fifth Amendment

20   equal protection.  That distinguishes this case from Trump v.

21   Hawaii.

22        In Arlington Heights v. Metro Housing Development

23   Corp., the Supreme Court stated the test for determining

24   whether a facially neutral policy, such as President Trump's

25   Executive Order 13768, violates equal protection under the

Fifth Amendment.  The Supreme Court stated at 429 U.S. 265-66,

To establish an equal protection claim, "plaintiffs must prove

racially discriminatory intent or purpose," and that requires

more than establishing only a disproportionate impact.  The

Supreme Court went on to say, however, "When there is proof

that a discriminatory purpose has been a motivating factor in

the decision, judicial deference [to the President] is no

longer justified."

Importantly, the Supreme Court in <u>Arlington Heights</u>

clarified that the plaintiffs need not establish that the

"challenged action rested solely on racially discriminatory

purposes."  That's at page 265.  The Supreme Court wrote that,

"Rarely can it be said that a legislature or administrative

body operating under a broad mandate made a decision motivated

solely by a single concern, or even that a particular purpose

was the 'dominant' or 'primary' motive."  Rather, plaintiffs

need only demonstrate that an improper, discriminatory motive

constituted "a motivating factor in the decision."  That's at

265-66.  This determination involves "a sensitive inquiry into

such circumstantial and direct evidence of intent as may be

available."  More specifically, the Supreme Court explained

that such evidence may include:  "the impact of the official

action"; "the historical background of the decision;" "the

specific sequence of events leading up to the challenged

decision;" "departures from the normal procedural sequence;"

and any "substantive departures . . . particularly if the

factors usually considered important by the decisionmaker

strongly favor a decision contrary to the one reached;" the

"legislative or administrative history," including

"contemporary statements by members of the decisionmaking body,

minutes of its meetings, or reports."

Therefore, petitioners in the instant case need not

allege that discrimination was the sole or primary purpose of

Executive Order 13768 and the Department of Homeland Security's

removal policies following from that order.  Instead,

petitioners must only plausibly allege that discrimination was

one motivating factor.  The Executive Order 13768, "Enhancing

Public Safety in the Interior of the United States," issued on

January 25, 2017 states that "interior enforcement of our

Nation's immigration laws is critically important to the

national security and public safety of the United States.  Many

aliens who illegally enter the United States and those who

overstay or otherwise violate the terms of their visas present

a significant threat to national security and public safety."

For present purposes, the court accepts as true that

the Executive Order was motivated at least in part by a desire

to protect national security and public safety.

However, that is not the end of the inquiry.  Rather,

under Arlington Heights, petitioners have stated an equal

protection claim on which relief can be granted if they

1    plausibly allege that discrimination was another motivating

2    factor.

3            Petitioners' allegations concerning President Donald

4    Trump's statements and policies allege a plausible claim that

5    racial animus was one reason for the Executive Order.  As

6    described earlier, under Arlington Heights, the court may

7    consider "contemporary statements by members of the

8    decisionmaking body," as well as the "historical background of

9    the decision . . . particularly if it reveals a series of

10   official actions taken for invidious purposes."  That is

11   Arlington Heights at 267-68.

12           With regard to this case, during the 2016 Presidential

13   campaign, Mr. Trump allegedly referred to Mexican immigrants as

14   criminals and rapists.  This is alleged in paragraph 111 of the

15   Amended Complaint.  Since becoming President, he has questioned

16   why the United States could not have more immigrants from a

17   predominantly white country, Norway:  as he indicated he would

18   like less immigration from "shithole" countries such as Haiti,

19   El Salvador and African countries; and he has stated that

20   Haitians "all have AIDS."  These comments are "contemporary

21   statements" from the ultimate decisionmaker that support an

22   inference that a desire to remove racial minorities from the

23   United States was a motivation for issuance of the Executive

24   Order and related policies.

25           Similarly, animus can be inferred from other executive

1   decisions in the same general time period as the promulgation

2   of the Executive Order and DHS's decision to prioritize

3   final-order aliens for removal without regard to their

4   participation in the provisional waiver process.  In

5   particular, petitioners allege that President Trump rendered

6   one million aliens unlawfully present in the United States by

7   rescinding the Deferred Action For Children Arrivals, or DACA,

8   program and limited opportunities to become citizens for Lawful

9   Permanent Residents in the military.  This historical evidence

10  of policies that could reasonably be regarded as motivated by

11  racial animus contributes to making petitioners' equal

12  protection claim plausible.

13          Under Arlington Heights, a "substance departure" from

14  normal procedures, usual procedures, can also be construed as

15  evidence of racial animus.  Here, Executive Order 13768,

16  according to which DHS justifies its decision to circumvent the

17  provisional waiver process by arresting and detaining aliens at

18  the first step of that process, was issued less than five

19  months after DHA extended the provisional waiver process to

20  individuals with final orders of removal.  The arrests and

21  detentions of the named petitioners began only a year later.

22  That's in the Amended Complaint, paragraph 65-66, 82 and 91.

23  The plausibly alleged nullification of the provisional waiver

24  process that I found on May 3 so shortly after its creation

25  represents a sudden and substantial change of policy and

1    procedure, further supporting an inference of an invidious

2    discriminatory motive for the Executive Order.

3         I note that in their Memorandum in Further Support of

4    Their Motion to Dismiss, docket number 220 at pages 24-25,

5    respondents in only one sentence assert that petitioners' equal

6    protection claim "is nothing more than a selective enforcement

7    claim."  This contention is not developed and is therefore

8    deemed waived under the doctrine enunciated in Zaninno, 895 F.

9    2d 1, 17.  In any event, the court finds that petitioners'

10   claim is not properly characterized as challenging selective

11   enforcement.  Unlike a selective enforcement claim, petitioners

12   are not contending that a particular enforcement action is

13   being applied to them but not to others who, except for their

14   national origin or race, are similarly-situated.  This

15   contrasts to Reno v. American-Arab Discrimination Committee,

16   525 U.S. 471, 491.  Therefore, petitioners have plausibly

17   alleged an equal protection claim on which relief can be

18   granted, and the motion to dismiss with regard to Count 3 is

19   being denied.

20        Although not material to the outcome of the motion to

21   dismiss, which I've denied for the reasons I just stated, I

22   note that the instant case is distinguishable from Trump v.

23   Hawaii in another important respect.  In applying rational

24   basis review, the Supreme Court in Hawaii emphasized that the

25   President retained "broad discretion" under the Immigration and

Nationality Act to "suspend the entry of aliens into the United
States."  That's at page 2408.  More specifically, the court
stated, "by its terms, Section 1182(f) exudes deference to the
President in every clause."  There, the court found that the
President had "undoubtedly" fulfilled the sole requirements set
forth in the statute:  that is, that the President find the
entry of the covered aliens "would be detrimental to the
interests of the United States."  The court rejected
plaintiffs' "request for a searching inquiry into the
persuasiveness of the President's justifications" based on "the
broad statutory text and the deference traditionally accorded
the President in this sphere."

However, in contrast to the President's broad
statutory authority to issue Proclamation 9645, DHS's authority
to deport petitioners in the instant case is limited by statute
and regulation.  More specifically, although the INA grants the
executive the authority to remove aliens present unlawfully,
the INA and regulations issued pursuant to it impose limiting
requirements as well.  In particular, as this court has held,
DHS's failure to consider an alien's participation in the
provisional waiver process before instituting an enforcement
action would violate the Constitution and the INA by nullifying
the provisional waiver process itself.  The broad judicial
deference afforded in <u>Hawaii</u> based on the President's express
statutory authority to issue Proclamation 9645 is, therefore,

1    not justified in this case where the President's statutory

2    authority to restrict access to the provisional waiver process

3    for those eligible to pursue it either does not exist, or is at

4    least more limited.  And I have in mind Youngstown Sheet and

5    Tube Company v. Sawyer, 343 U.S. 579, 635-36.  There, Justice

6    Jackson, Robert Jackson in 1952 wrote that "When the President

7    acts pursuant to an express or implied authority of Congress,

8    his authority is at its maximum, for it includes all that he

9    possesses in his own right plus all that Congress can delegate.

10   In these circumstances, and in these circumstances only, may it

11   be said, for what it's worth," Justice Jackson said, "to

12   personify federal sovereignty."

13          Finally, the class petitioners seek to have certified

14   is correctly defined as it proposes it for the equal protection

15   claim.  It's the class I indicated on May 3 I would certify for

16   alleged violations of the Administrative Procedures Act and the

17   Immigration and Nationality Act.  That is, a class that is

18   defined as any citizen and his or her noncitizen spouse who has

19   a final order of removal and has not departed the U.S. under

20   that order; two, is the beneficiary of a pending or approved

21   I-130 petition for alien relative filed by the U.S. citizen

22   spouse; and, three, is not ineligible for a provisional waiver

23   under 8 C.F.R. Section 212.7(e)(4)(i) or (vi); and, fourth, is

24   within the jurisdiction of the Boston ICE-ERO field office

25   comprising Massachusetts, Rhode Island, Connecticut, Vermont,

1    New Hampshire, and Maine.

2         Respondents argue that the proposed definition of the

3    equal protection class is not appropriate because the class is

4    not limited to individuals of a particular race or national

5    origin.  However, all members of the proposed class are

6    properly within the scope of the class as to Count 3 because

7    they all have standing to challenge the allegedly

8    discriminatory policy on equal protection grounds.

9         In <u>Craig v. Boren</u>, the Supreme Court held that the

10   female had standing to assert a gender-based discrimination

11   claim that males between 18 and 20 had been denied equal

12   protection because she herself suffered an economic injury on

13   account of this policy.  <u>Boren</u> instructs that an individual

14   need not be part of the group against which a policy allegedly

15   discriminates to challenge it, as long as she suffers some

16   injury -- in <u>Boren</u> it was economic injury -- caused by the

17   allegedly discriminatory policy.

18        In the instant case, all members of the putative

19   class, even those not part of a racial or ethnic group that is

20   the subject of the alleged discriminatory animus motivating

21   Executive Order 13768, are nevertheless injured by it.  More

22   specifically, all putative class members are injured by DHS's

23   policy of ordering removal or detention of an alien solely

24   because she is subject to a final order of removal because each

25   faces a substantial risk of arrest, detention and/or removal

1    without consideration of their participation in the provisional

2    waiver process.

3           All class members, therefore, have standing to

4    challenge the Executive Order in DHS's removal policies based

5    on the Order.  Accordingly, they are all properly included

6    within the scope of the class for purposes of the equal

7    protection claim in Count 3.

8           With regard to the motion to dismiss the due process

9    claim, that is Count 2, I've previously denied the motion to

10   dismiss the full claim.  The remaining issue is the scope of

11   the due process class.  That is determined by when the liberty

12   interest I found in my September 2018 memorandum and order

13   vests.  I now find that that liberty interest is created or

14   vests when the alien has an approved I-130 and a conditionally

15   approved I-212 as the respondents have argued for the purpose

16   of this vesting issue.

17          As this court recognized in its September 21, 2018

18   memorandum and order, 334 F. Supp. 3d at 386, in order to have

19   a due process interest in a certain benefit arising from

20   regulations, the regulations must create a "legitimate claim of

21   entitlement" to it, as the Supreme Court said in Kentucky

22   Department of Corrections, 490 U.S. 454 at 460.  The court

23   continues to find that the Kentucky Department of Corrections

24   case provides the correct framework for analysis for cases

25   involving due process interests in immigration relief, contrary

1  to petitioners' assertion that the decision in <u>Kentucky</u>
2  <u>Department of Corrections</u> should be limited to prison cases.

3       The language of a regulation, in particular "mandatory
4  language," including "specific directives to the decisionmaker
5  if the regulations' substantive predicates are present, a
6  particular outcome must follow," continues to be the principal,
7  if not essential, indicator of whether the regulations create a
8  "legitimate claim of entitlement."  That's discussed in
9  <u>Kentucky Department of Corrections</u> at 461-63, and also in cases
10 such as <u>Town of Castle Rock</u>, 545 U.S. at 757-58, and <u>Aguilar</u>,
11 700 F. 3d 1238 at 1244.

12      As this court recognized in the September 2018
13 decision, the language of the provisional waiver regulations
14 establish a right to receive an answer concerning a provisional
15 waiver, an I-601A, in the United States.  I discuss this in
16 <u>Jimenez</u>, 334 F. Supp. 3d at 387-89.  However, there is no
17 language in the statute or regulations governing the I-130 or
18 the I-212 or in the I-601A form establishing a right to receive
19 an answer regarding an I-130 or an I-212 while the alien is in
20 the United States.  Instead, petitioners continue to argue that
21 the "design and purpose" of the I-601A regulation was to create
22 a single process for relief and that it would be "absurd" to
23 interpret the regulations as allowing ICE to remove individuals
24 at the outset of that process.  However, while the existence of
25 a process relief -- I'm sorry -- while the existence of a

1  process for relief supplies the basis for the plausible APA and

2  INA claims that the court has previously found are adequately

3  alleged, the due process/legitimate entitlement case law does

4  not support its application to petitioners' due process claim.

5       The Kentucky Department of Corrections line of cases

6  continues to instead emphasize the importance of the language

7  of the regulations.  Supreme Court and First Circuit case law

8  also indicate that a "legitimate claim of entitlement" does not

9  "vest" until an individual is eligible to apply for and receive

10  the relief sought.  I have in mind American Manufacturers

11  Mutual Insurance Company, 526 U.S. 40, 60-61 and Martel v.

12  Fridovich, 14 F. 3d 1, 2.  It is particularly evident in the

13  line of First Circuit immigration cases concerning

14  retroactivity, upon which the parties rely.  Those cases

15  include Santana, 731 F. 3d at 60, Goncalves, 144 F. 3d at 114,

16  Arevalo, 344 F. 3d 1, 7.  In the instant case, an individual is

17  not eligible to apply for a provisional waiver, an I-601A,

18  until he or she has obtained an approved I-130 and a

19  conditionally-approved I-212 form.  Accordingly, the right does

20  not vest until those applications have been adjudicated.

21       I will add that in the oral argument on May 3, 2019,

22  petitioners contended that INS v. St. Cyr indicates that

23  individuals who have submitted I-130 forms have a vested

24  interest in a provisional waiver.  St. Cyr is 121 Supreme Court

25  2271.  In particular, petitioners claim that St. Cyr precludes

1  interpreting the First Circuit decisions in <u>Santana</u>, <u>Arevalo</u>

2  and <u>Goncalves</u> as indicating that an individual must be eligible

3  for the relief sought to have a vested interest in the relief.

4  However, <u>St. Cyr</u> does not alter my analysis with regard to

5  Count 2 and when the liberty interest is created.

6           It is true that St. Cyr would have needed to

7  eventually be in removal proceedings to apply for Section

8  212(c) relief.  Nevertheless, for the purposes of determining

9  whether he had a vested right, the court regarded St. Cyr as

10  "eligible" at the time of his guilty plea.  The court stated

11  that an alien would have a vested interest if he, "would have

12  been eligible for Section 212(c) relief at the time of their

13  plea," or of his plea.  That's at 2293.  The fact that St. Cyr

14  was not yet in removal proceedings did not lead the Supreme

15  Court to deem him not "eligible," at least for the purpose of

16  ascertaining his vested interest.  The court, in effect,

17  treated placement in removal proceedings as concerning the

18  practical availability of relief in the future, but not

19  eligibility for it.

20           Indeed, other language in the decision suggests that

21  the distinction between subject to deportation and being "in"

22  deportation proceedings was not material to the eligibility

23  determination.  The court wrote:  "two most important legal

24  consequences ensued from respondent's entry of a guilty plea in

25  March 1996:  (1) He became subject to deportation, and, (2) he

became eligible for a discretionary waiver of that deportation under the prevailing interpretation of Section 212(c)."  That's in St. Cyr at 2287.  As this quotation indicates, St. Cyr became "eligible" for 212(c) relief -- and therefore had a vested interest in it -- by becoming subject to deportation.

Thus, the Supreme Court's reasoning in St. Cyr does not persuade this court that an individual not yet eligible to obtain, or apply for, a particular form of immigration relief can nevertheless have a due process interest in that relief.

So that's the ruling on the second point.

As I said, I'm reserving judgment on whether a citizen spouse has a liberty interest in remaining in the United States with his or her alien spouse and therefore a right to due process before the alien spouse is removed.  On May 3, at pages 53 to 4 of the transcript, draft transcript, the parties agreed that in view of my other rulings on the motion to dismiss issues, this question has no practical effect.

As I indicated earlier, in view of the fact that this issue was left open by the Supreme Court in Kerry v. Din, it might be clarified by the Supreme Court or the First Circuit during the pendency of this case.  I find it's most appropriate to defer deciding the issue.

I think the remaining issue before class certification is whether the court has subject matter jurisdiction over the claims of individuals ordered removed after August 29, 2016.

1          Generally speaking, the court has the authority to

2     revise any ruling before final judgment and to revise decisions

3     concerning class definition as well.  I find now that the court

4     does have subject matter jurisdiction over aliens with final

5     orders of removal issued after August 29, 2016.  However, if

6     there is jurisprudence that emerges during the pendency of this

7     case on this issue that you think might be material to the

8     analysis, might either reinforce my decision or prompt me to

9     revise it, you're specifically directed to bring that authority

10    to my attention.

11          However, with regard to this issue, respondents claim

12    that the court does not have subject matter jurisdiction over

13    the claims of class members ordered removed after the

14    Department of Homeland Security expanded the provisional waiver

15    process to persons with final orders of removal on August 29,

16    2016.  More specifically, respondents contend that because this

17    subset of individuals could have raised their legal and

18    constitutional claim in their initial removal proceedings with

19    review in the Court of Appeals under 8 USC Section

20    1252(a)(2)(D), they had an adequate substitute for habeas corpus

21    and therefore this court cannot exercise subject matter

22    jurisdiction over their claims as a result of the Suspension

23    Clause of the Constitution.  The court does not find this

24    contention to be meritorious.

25          It is true that unlike the rest of the petitioners in

1   this case, the subset ordered removed after August 29, 2016
2   were not prevented from seeking review in the Court of Appeals
3   of their final orders of removal on the basis that it was too
4   late to file a motion to reopen.  However, in the September 21,
5   2018 memorandum and order in this case, the court held that
6   petitioners would not be unable to adequately raise their claim
7   in the Court of Appeals for a separate and independent reason.
8   In particular, their claims did not challenge the validity of
9   their removal orders, and I should have said I think that
10  petitioners would not have been able to adequately raise their
11  claims in the Court of Appeals.

12          As I wrote in September 2018, "In any event
13  petitioners' claims would not be subject to judicial review in
14  the First Circuit under Section 1252(a)(1) of their final
15  orders of removal or their motions to reopen them."  I cited
16  St. Cyr at 313.  "Judicial review of a final order by a Court
17  of Appeals," I wrote, "includes all matters on which the
18  validity of the final order is contingent," and I cited cases.

19          As indicated earlier, petitioners do not challenge the
20  validity of their orders of removal or any decision on which
21  they are contingent.  Rather, they only challenge ICE's
22  decision on behalf of DHS to enforce the order while they are
23  pursuing provisional waivers.  Just as with all the other
24  members of the putative class, the subset of class members
25  ordered removed after August 29, 2016 are only challenging

1    ICE's decision on behalf of DHS to enforce the order while they

2    are pursuing provisional waivers.  The subset's constitutional

3    and legal claims therefore do not go to the validity of their

4    removal orders.  Accordingly, in the circumstances of this

5    case, the Court of Appeals could not have served as an adequate

6    substitute for the subset's claims through the exercise of

7    jurisdiction under 8 United States Code Section 125(a)(2)(D).

8    I wrote about that in Jimenez, 334 F. Supp. 3d at 385.  I was

9    quoting or referencing the Supreme Court's decision in St. Cyr,

10   433 U.S. at 314 and 381.  As a result, the Suspension Clause is

11   implicated because there is not an adequate substitute that

12   would have allowed for a stay of removal.  Therefore the court

13   has subject matter jurisdiction over the putative class members

14   ordered removed after August 29, 2016.

15         All right.  So with regard -- I think that brings us

16   to class certification.  I haven't understood that there was

17   any dispute about the propriety of certifying a class.  The

18   dispute was on what the definition of the class should be.  And

19   I think I've decided the issues necessary to define the class.

20   But do the parties agree with that or have a different view?

21         MS. LARAKERS:  Your Honor, we did have a different

22   view under the -- specifically under the due process claim.

23         THE COURT:  Yeah, the due process class -- okay.  I

24   said I decided all the issues but I didn't say what the class

25   was.  I think there has to be a subclass for the due process

1   claim that's narrower than the class on the other claims.  And

2   on the due process claim, it will be limited to individuals who

3   have conditionally approved I-212s.  Is that your position?

4          MS. LARAKERS:  Yes.  There were other points in my

5   briefing about whether even individuals in that proposed class

6   would be entitled to the same relief that petitioners seek.  I

7   understand that that argument is diminished if the relief is

8   only consideration.  However, because petitioners seek much

9   broader relief than consideration, then it certainly -- then

10  our position is that that class can't even be certified for

11  purposes of the relief that they seek, which is much broader

12  than consideration.

13         THE COURT:  How do the petitioners respond to that?

14         MS. LAFAILLE:  Your Honor, I do think that Your

15  Honor's resolution of the scope issues resolves really all the

16  disputed issues with regards to class certification.

17         With regards to Mrs. Larakers's claim that the

18  relief -- it's not apparent to me right now that the relief we

19  seek under any claim is distinct.  You know, some of these

20  issues of course may be fleshed out when, after discovery, we

21  can hone exactly what we think the appropriate relief is.  But

22  it's not the case that what we seek is vastly different than

23  consideration.  You know, I think the question is how to ensure

24  that consideration is adequate and what are the remedies that

25  are necessary to do so.

1          THE COURT:  And going back to my -- let me have the

2     discovery file.  I addressed this in my December 7, 2018 order.

3     The class is being certified for the purpose of declaratory

4     relief.  I left open the question whether there could be

5     class-wide injunctive relief.  And if we get to the point where

6     the petitioners on some or all claims are entitled to be or

7     found to be entitled to some form of declaratory relief, you

8     know, exactly what the declaratory judgment would be -- in

9     fact, I'm going to talk to you about that in the context of the

10     discovery disputes -- will be an issue that needs to be

11     resolved.  But I don't think that it's necessary to or

12     appropriate to decide that question now.

13          With regard to the Administrative Procedure Act, the

14     Immigration and Nationality Act and equal protection claims, as

15     I said on May 3, I believe, I'm certifying a class defined as

16     follows:  Any United States citizen and his or her noncitizen

17     spouse who has:  one, a final order of removal and has not

18     departed the U.S. under that order; two, is the beneficiary of

19     a pending or approved I-130 petition for alien relative filed

20     by a United States citizen spouse; 3, is not ineligible for a

21     provisional waiver under 8 C.F.R. Section 212.7(e)(4)(i) or

22     (vi) -- that's (4)(1) or (6); and, four, is within the

23     jurisdiction of Boston ICE, the Boston ICE-ERO field office,

24     which is comprised of Massachusetts, Rhode Island, Connecticut,

25     Vermont, New Hampshire and Maine.

1            With regard to the due process subclass, in that

2     subclass are only aliens who meet the other criteria and have

3     an approved I-130 and a conditionally approved I-212.

4            Okay.  And as I said earlier, and may have said twice,

5     I'm reserving judgment on the question of whether a citizen

6     spouse has a liberty interest in remaining in the U.S. with his

7     or her alien spouse and therefore a right to due process before

8     the alien spouse is removed.  The Supreme Court didn't decide

9     that issue in Kerry v. Din.  There's no First Circuit decision.

10    It has no practical effect for the progress of this case, and I

11    think -- I'll hope for guidance from the Supreme Court or the

12    First Circuit before deciding the merits of that claim.

13            Now -- what?

14            MS. LARAKERS:  I apologize, Your Honor.  I think there

15    is one remaining issue with regard to class certification, and

16    that's on the detention claims which we dealt with at the

17    beginning of this case.

18            As I understand, they have a detention-related

19    procedural due process claim and detention-related claim for

20    the violation of the regulations.  So I think that there would

21    have to at least be a separate class for the detention claims.

22            THE COURT:  Defined how?

23            MS. LARAKERS:  Your Honor, certainly not defined as

24    the way they put it here because the claims -- for example,

25    even as this court held last year, the Post-Order Custody

1  Review regulations are applicable to people who are detained,

2  post-order detention detained under 1231(a)(6), which is what

3  we've been calling the discretionary detention and not

4  mandatory detention, which is under 1231(a)(1), which says that

5  the Attorney General shall detain an alien during the first 90

6  days of the removal period.  Their class isn't defined whether,

7  you know --

8          THE COURT:  This is going back.  I don't think any of

9  the named petitioners were detained within 90 days.

10         MS. LARAKERS:  Right, Your Honor.  But there are

11  certainly some who could be.

12         THE COURT:  I understood that it was the petitioners'

13  position that this didn't have to be decided now.

14         MS. LAFAILLE:  That's right, Your Honor.

15         THE COURT:  Why?

16         MS. LAFAILLE:  Your Honor, we do think that the

17  detention claims are class-wide because this is conduct that

18  every class member is at risk of being subject to.

19         THE COURT:  You need to raise your voice or speak into

20  the microphone.

21         MS. LAFAILLE:  Apologies, Your Honor.  We don't think

22  that it needs to be decided right now, for practical purposes.

23  We started this case at a time when the government was

24  attempting to detain and remove most of our clients.

25  Certainly.  You know, where this case goes, the remedy with

1    regards to removal will of course impact how frequently the

2    government is going to be detaining people and what the

3    necessary remedies, if any, might be with regards to detention.

4    So I think it might be appropriate to leave for later in the

5    case and to assess then whether there are any remedies being

6    sought with regards to detention and how to treat the class

7    certification issues in that regard.

8              MS. LARAKERS:  So Your Honor, we would obviously

9    prefer that it be decided now.  We think it's a very easy issue

10   for the court to decide class certification on that count.

11   Because I think it's very clear, looking back at your court's

12   order, perhaps what the court may perceive that class to be.

13             THE COURT:  Where did you address this in your briefs?

14             MS. LARAKERS:  I can pull that up for you.

15             THE COURT:  Anyway.  Just go ahead.

16             MS. LARAKERS:  So -- and I think it may have practical

17   purposes.  And the last thing I'm sure we all want to do is be

18   back here arguing the same motion later.  It could have

19   practical purposes, specifically I think in discovery when we

20   look at the due process claim.  Your Honor, along with saying

21   that it's a violation --

22             THE COURT:  When do you think -- how do you think the

23   class should be defined?  I don't think there's a dispute that

24   the Rule 23 criteria for defining a class are satisfied, so now

25   we're talking about definition.  What definition do you

1  advocate?

2       MS. LARAKERS:  So it would have to be at least limited

3  to people who are in 1231(a)(6) detention, that discretionary

4  detention portion.  So it would have to -- the class would have

5  to look like the petitioners -- the fact pattern from the named

6  petitioners in this case.  So it would have to be people whose

7  removal period has run for purposes of the Post-Order Custody

8  Review regulations.

9       THE COURT:  But what I didn't decide is whether the

10  removal period ran before any of them were detained.  What I

11  found, as I recall, is even on the government's argued

12  position, which I don't think is the way ICE was construing it,

13  my sense is that, until the litigation in this case, people in

14  this regional office had no idea there were any regulations

15  that they had to follow.  But this actually goes to another

16  point that I was going to raise next.

17       Let's just pause for a minute because -- I'm

18  certifying this class under Rule 23(b)(2).  And under Rule

19  23(c)(3)(ii)(A), giving notice to the class is discretionary.

20  Now, neither party has said anything to me about giving notice.

21  You seem to assume that it's not necessary to give necessary or

22  appropriate to give notice to the members of the class.  Is

23  that the petitioners' position?

24       MS. LAFAILLE:  Your Honor, I think it might be useful

25  for us to discuss that with the government and perhaps get back

1 | to the court.

2 |      MS. LARAKERS:  Your Honor, this is a non-opt-out

3 | class, so regardless of notice to the class, the relief is

4 | going to apply to the class as a whole.  There's not a class

5 | member that can opt out of the relief.  That specific rule

6 | you're referring to I think is, you know, very important in

7 | cases where, you know, obviously there's a mandatory rule about

8 | opting out in those cases as well.  But I think particularly in

9 | this type of Rule 23(b)(2) class which concerns constitutional

10 | issues, I don't think notice to the class would necessarily --

11 | we can talk to petitioners, and maybe --

12 |      THE COURT:  Well, but I'm trying to figure out perhaps

13 | why I should decide this issue, and conceivably, for example,

14 | it could affect discovery.  But I also -- and along those

15 | lines, this is something I've commended, continue to commend if

16 | it's going to continue.  Are the parties assuming that ICE will

17 | continue to provide the monthly reports to the petitioners that

18 | it has been providing?

19 |      MS. LARAKERS:  Your Honor, we assume that that is a

20 | provision that we've agreed to as parties in exchange for

21 | staying the preliminary injunction motion.  So as long as the

22 | preliminary injunction is stayed, we understood the court to

23 | order that reporting being given to the petitioners.

24 |      THE COURT:  Is that petitioners' understanding?

25 |      MS. LAFAILLE:  Yes, Your Honor.

1          THE COURT:  All right.  So your intention is to

2     continue that reporting, and I think that's positive.  And will

3     that reporting assist the petitioners in knowing whether they

4     think a class member is being, in their view, unlawfully

5     removed and give you sufficient notice and give the class

6     members sufficient notice to try to seek judicial relief?

7          MS. LAFAILLE:  Your Honor, unfortunately at this time,

8     no.  The reporting that we asked for when the government was in

9     a shutdown was more robust.  And it would have -- we asked and

10    we have asked again for the government to give us, to identify

11    when it detains a class member or to identify when it makes a

12    decision on a stay of removal involving a class member.  The

13    reporting we're getting is very useful, but it covers a limited

14    interaction, which is the interaction of people who are

15    checking in with ICE on orders of supervision.  So it's useful,

16    but unfortunately it's not a complete picture.

17         MS. LARAKERS:  Your Honor, we believe that that

18    reporting is appropriate for practical reasons as well because

19    it shows the people who are people -- generally people who are

20    checking in aren't being selected for removal for other

21    reasons, such as criminal history.  So it gives the petitioners

22    a good snapshot of a person without criminal history coming

23    into ICE and how ICE is making those decisions.  If a person

24    is -- practically speaking, as I understand, if a class member

25    is being detained outside of the pool of people who were

1    checking in, it's because there's another reason why ICE may

2    want to remove them, for example, if they have criminal

3    history.  So it gives the petitioners a snapshot of who have

4    facts that are similar to the named petitioners in this case.

5    So that's why we believed it was appropriate in scope,

6    practically speaking.

7              MS. LAFAILLE:  And what Ms. Larakers just said about

8    the ways that ICE is limiting itself to people with perhaps

9    criminal convictions, that's precisely the kind of thing we

10   would like to be able to verify by getting the slightly more

11   robust reporting that we've requested.

12             THE COURT:  I mean, I had this under -- I think there

13   are things you're going to need to confer on, and this is going

14   to need to be one of them.  There are a lot of complicated

15   issues in this case, and I try to get deeply into them.  And

16   this one really is not teed up for me in the sense of being

17   briefed, but part of what the respondents are looking for is

18   some time after this to confer.

19             But in terms of on the agenda to confer after today

20   are, one, notice to the class.  And I just looked at this

21   quickly, but it's a (b)(2) class and Rule 23(c)(2)(A), it says,

22   "For a (b)(1) or (b)(2) class, for any class certified under

23   Rule 23(b)(1) or (2), the court may direct appropriate notice

24   to the class."

25             And I mean, this is just sort of an almost intuitive

1    observation.  If the respondents are giving the petitioners

2    sufficient information so the petitioners who, now their class

3    counsel -- I don't know if I have to appoint you as class

4    counsel.  I guess not.  It's not a securities case.  But if

5    they have sufficient notice to know whether they think in a

6    case of an individual alien who's in the class the removal --

7    well, if the individual alien and that alien is in the class

8    and they want to seek some judicial relief, if they know

9    enough, then it may not be necessary or appropriate.  It's not

10   legally required, but it may not be appropriate to give notice

11   to the class because, you know, their interests will be

12   protected.

13        If the petitioners don't have sufficient information

14   and have to rely -- maybe the class member should be told

15   you're in this class, and, you know, the case is seeking to

16   assure that you're allowed to pursue the provisional waiver

17   process or to have it considered; and if you think it's not

18   being considered, you can contact your lawyers, and they can go

19   to the judge.  So to me, at the moment, these things seem to be

20   related.

21        MS. LARAKERS:  Your Honor, we think it would be good

22   for us to confer about that and then report back to you.  At

23   this point in time I can say that, you know, any sort of notice

24   to the class, to the entire class would be burdensome if it's

25   not at least limited to people who ICE has interactions with

1  right now.  Because there are many people who are conceivably

2  going through the I-130, the I-212, the I-601A process who

3  aren't checking in with ICE and who isn't on I guess ICE's

4  radar.

5       And after speaking with my client, you know, it's been

6  very clear that to narrow those people down who ICE does not

7  already have regular contact with would be very difficult

8  because it requires, you know, searching through USCIS

9  databases and cross-checking lists with ICE and determining

10  from perhaps individual A Files where people filed their

11  applications.  So I think we will absolutely confer on it and

12  report back, but those are our thoughts right now and how that

13  class notice would have to be limited, if any is given.  But

14  after we see their reasons for having the class notice, then we

15  would be able to more fully respond.

16       THE COURT:  I don't think the petitioners are

17  advocating class notice.  At this point I'm something of a

18  steward for the class.  I am, I have a fiduciary responsibility

19  to the class.  And I mean, in this case I don't think the

20  petitioners want to prompt more interactions between ICE and

21  class members who are not now having any interactions.  But

22  this is just something that hasn't been focused on by the

23  parties, apparently, as well as by the court, so this is on the

24  an agenda to be discussed.  But I think if I had to give notice

25  to the class or I decided to give notice to the class, then

1   there might be a more urgent reason to define the potential

2   class now, who gets notice.  If I'm satisfied that it's not

3   necessary or appropriate to give notice to the class, then the

4   petitioners' proposal might be fine.

5          MS. LARAKERS:  And Your Honor, if I may briefly refine

6   what I said earlier.  I don't think the parties have -- I don't

7   think there's any dispute under what specific detention statute

8   the Post-Order Custody Review regulations apply to.  There is a

9   separate question, as Your Honor pointed out, about when that

10  clock begins for purposes of the Post-Order Custody Review, but

11  there is no dispute that I could, you know, recognize in

12  briefing about whether people are detained under 1231(a)(6).

13  Because, as we I think conceded in our briefing, their removal

14  periods for the purposes of the detention statute, which is

15  1231(a)(1), mandatory detention or 1231(a)(6) permissive

16  discretionary detention had run.

17         What was the -- the only thing in dispute, which would

18  be handled at the merits stage, is when that POCR clock begins.

19  But that does not affect the scope of the class, so you

20  wouldn't need to decide that issue.

21         THE COURT:  They could have -- well, I haven't gone

22  back and studied what I said and wrote a year ago, but it could

23  because it may be that you have no authority to detain anybody

24  after that 90 days.  And whatever it is, if you have the

25  authority to detain what I know I left open -- I found that

1    even on the government's argument about the meaning of the

2    regulations is if, you know, the clock starting running when

3    somebody was found, the regulations were being violated, there

4    may well be a requirement that you give a detention review much

5    earlier than six months.

6            MS. LARAKERS:  Yes, and the class that we say it must

7    at least be limited to would be consistent with that relief.

8    We're only saying that the class would be limited to people who

9    are detained under 1231(a)(6), which is people who, generally

10   speaking, 90 days has passed since the entry of their removal

11   order.

12           And I think -- you know, I can't speak for

13   petitioners, but I don't remember that specific point being

14   disputed since all the named petitioners have had their removal

15   orders run a long time ago, and also I will recognize that the

16   people in this proposed class, it's very likely that there will

17   be much more of them who look like the named petitioners who

18   are in 1231(a)(6) detention.  But the possibility that there

19   may be people in that mandatory detention period is what makes

20   the difference and why I had to bring it up.

21           THE COURT:  All right.  Well, I haven't focused on

22   that, but you're going to need to confer about this.  I might

23   be wrong, but at the moment I see some relationship between

24   notice and defining a class for detention purposes, which

25   petitioners think is not necessary.  We do have a lot to do.

1            Now, with regard to conferring, you did tell me again

2    as recently as May 3, it was in your earlier reports, that once

3    I decide the motion to dismiss, you would renew, maybe

4    particularly if I ordered you but I didn't have to order you,

5    your efforts to see if you can reach some agreement to resolve

6    the whole case.  And I think things are in a better position

7    than they were a year ago, and it's in part because, you know,

8    you've fought hard over what you should fight hard about and

9    have reached some agreements, too.

10           So are the parties still willing, now that you know

11   what I've decided on the motion to dismiss, to go back and try

12   to see if you can resolve all or a good part of this case?

13           MS. LAFAILLE:  Yes, Your Honor.

14           MS. LARAKERS:  Yes, Your Honor.

15           THE COURT:  Okay.  All right.

16           MS. LAFAILLE:  Your Honor, could I just interject

17   something about the named representatives.  I was going to say

18   something else about notice, class notice, which I'll skip.

19   But the petitioners are not at this time seeking to have Lilian

20   Calderon and Luis Gordillo appointed as class representatives

21   because they've left of the United States for consular

22   processing.

23           THE COURT:  There are two of them?  I only remembered

24   one.

25           MS. LAFAILLE:  Luis, Mr. Gordillo is Lilian's husband.

```
 1            THE COURT:  Mr. Calderon?

 2            MS. LAFAILLE:  Yes.  Mr. Gordillo.  Although they

 3     could be class representatives, given that there are four other

 4     couples --

 5            THE COURT:  Well, maybe they could or maybe they

 6     couldn't.  They might be atypical.  We discussed this a little

 7     last time maybe in the lobby.  All right.  So the named

 8     plaintiff's class representatives are who?

 9            MS. LAFAILLE:  So it's the four remaining couples

10     which is Amy Chen and Deng Gao, Oscar and Salina Rivas, Sandro

11     De Souza and Carmen Sanchez, who I can also address in a

12     moment, and Lucimar De Souza and Sergio Francisco.

13            THE COURT:  All right.

14            MS. LAFAILLE:  I did also want to highlight something

15     about Mr. De Souza.  He is with the government's -- with the

16     government's agreement, after some discussions that arose from

17     this case, the government has filed a motion to reopen his

18     immigration proceedings, which we expect will be granted any

19     day.  It's been taking a few months, but we expect that to be

20     granted.  So I leave that to the court's discretion.  He's in

21     the proposed class right now, but he may fall out of it any

22     day.

23            THE COURT:  Okay.  So the implication of that is

24     should he be a class representative because he might soon not

25     be, correct?
```

1          MS. LAFAILLE:  Correct, Your Honor.

2          THE COURT:  Well, what do you propose?

3          MS. LAFAILLE:  Your Honor, we don't have a strong

4    feeling.  I think it would be fine for him to be a class

5    representative, recognizing that, you know, his situation may

6    be changing.

7          THE COURT:  And then if it changes, you would move to

8    have him removed as a class representative?

9          MS. LAFAILLE:  We could certainly do that, Your Honor.

10         THE COURT:  I think we'll leave it that way.  If it

11   gets to the point -- because I think what you're communicating

12   to me, if I understand it right, is at the moment he's in the

13   class and he's typical of the other class members.  But if his

14   proceedings are reopened, at a minimum he won't be typical and

15   maybe he won't be in the class?

16         MS. LAFAILLE:  Correct, Your Honor.

17         THE COURT:  Do you have any idea when there's likely

18   to be a decision on reopening?

19         MS. LAFAILLE:  I would have thought it would have

20   happened already.  The motion has been pending since November.

21         THE COURT:  It's a joint motion?

22         MS. LAFAILLE:  Yes, Your Honor.

23         THE COURT:  All right.  I'm not appointing Mr. De

24   Souza as a class representative.  But if your predictions don't

25   prove to be prophetic and his case is not reopened, you can

1    move to have him added as a class representative.  Okay?

2              MS. LAFAILLE:  Yes.  Thank you, Your Honor.

3              THE COURT:  All right.  I've looked at the discovery

4    issues, and I think it would be helpful if you give me an

5    overview of them and if I give you some guidance, but I don't

6    have the sense that the discovery disputes can be resolved or

7    all resolved today.  What's the overview of the -- actually,

8    hold on just a second.

9              Do you want to give me an overview on discovery?

10             MS. CANTIN:  Good afternoon, Your Honor.  So the main

11   overview is that for the last five months the parties have been

12   trying, consistent with this court's orders, to work in good

13   faith to move forward with discovery.  But the bottom line is,

14   notwithstanding our best efforts, the government refuses to

15   produce a single additional document beyond what Your Honor

16   ordered last summer.

17             We had hoped that, given what transpired at the May 3

18   rulings, that Your Honor's rulings would have signaled to the

19   government that this case is proceeding and that discovery

20   would be inevitable.  Unfortunately, it appears that, absent an

21   order from Your Honor and this court, the government does not

22   intend to produce anything or to engage in discovery.  And

23   while we have no doubt that respondents' counsel is in good

24   faith trying to move this case forward, it's really become

25   clear that their client respondents will not engage absent a

1  court order from Your Honor that discovery is open in this

2  case.  And given that this court order is the gating item for

3  this case to move forward, petitioners may request today that

4  Your Honor issue an order for discovery to begin.

5      THE COURT:  All right.  Actually I didn't understand

6  that it was the respondents' view -- so if discovery begins,

7  you're not asking me to order any particular discovery where

8  there's a dispute.  You're just asking me to say it's time for

9  discovery to begin?

10     MS. CANTIN:  Yes.  As we understand it, there are two

11  issues.  The main issue right now is currently we understand

12  that discovery is not open, and because that order is in place,

13  the government refuses to engage.

14     THE COURT:  Well, yeah, I did stay discovery.  That's

15  why I thought your motion to compel was premature.  But now

16  I've ruled on the motion to dismiss.  The case is going to go

17  on.  We'll have discovery.  I'll listen to the government, but,

18  you know, I know the government says it's limited to the record

19  as a typical APA case.  However, my present view -- see if this

20  is helpful guidance -- is, first of all, the APA is only one of

21  the I think four remaining claims.  There's an INA claim.  The

22  government views that as the same as the APA claim at the

23  moment.  I don't.  But even aside from that, there's the equal

24  protection claim.  So discovery on the equal protection claim

25  for the class, which is defined as the petitioners proposed it,

1    it's time to get on with that.  And I think that's, as far as I

2    know, the same discovery you would want for the APA claim and

3    the INA claim as well.

4         I also think that the usual rule about review of a

5    record concerning the APA -- in an APA case is not the right

6    principle here.  The APA claim is that the regulations, the

7    plausible APA claim is that the regulations were repealed

8    without going through the Administrative Procedure Act.  It's

9    not that -- and that that is arbitrary and capricious.  So then

10   the petitioners would have to have discovery relevant to

11   whether the respondents were regularly failing or are regularly

12   failing to consider -- this is something I want to get into

13   sharper focus -- the provisional waiver regulations and

14   requirements in ordering people with final orders of removal to

15   depart the United States.  Is that helpful from the

16   petitioners' perspective?

17        MS. CANTIN:  That is helpful.  And if we can

18   anticipate, Your Honor, that discovery is beginning, that is

19   very helpful to the parties to be able to move this case

20   forward.

21        THE COURT:  And then you'd need to confer to see what

22   discovery you agree on and what you disagree on.  But here.

23   Let me hear from the respondents.

24        MR. WEILAND:  Yes, Your Honor.  I would like actually

25   an opportunity to be heard because I think there's more nuance

1    to our assertion of filing a certified administrative record

2    than we've previously been able to discuss.  And we have

3    appreciated the way the court has unpacked this case

4    methodically, and I think addressing the APA, INA, EPE claims

5    in the same sort of fashion would benefit from what we propose.

6         It is my clients' position that they intend to submit

7    a certified administrative record addressing the 2016

8    regulatory change and that that regulation will show one of two

9    things:  Either the petitioners' position about when and what

10   penumbra of rights was created when the regulation was

11   promulgated was considered by DHS in a notice and comment in

12   compliance with 5 U.S.C. 553 and either rejected such that

13   ICE's actions haven't been contrary to anything within the

14   regulation or adopted by DHS, at which point in time the court

15   would have the factual basis it needs to rule on the regulatory

16   review on the rule-making claim.

17        THE COURT:  Here, I understand the argument in the way

18   that I view the petitioners' position and the rulings that I've

19   made.  They don't argue that the 2016 regulations didn't result

20   from a process that complied with the APA.  They argue that

21   they're not being followed or they weren't being followed.  And

22   this may relate to the scope of discovery, that they at least

23   weren't being followed, and it seems to me that the record that

24   you're describing would be relevant, it would be discoverable

25   and possibly helpful to you if it provides a basis for saying

1   ICE wasn't required to consider the regulations, which I doubt

2   will be the case.  But we'll see what it says.  And I mean, I

3   have seen some of what it says and wrote about it last year.

4   But I don't think that that would be sufficient, unless I were

5   to bifurcate discovery, and I don't think that's a good idea at

6   the moment.

7         MR. WEILAND:  Yes, Your Honor.  And I concur with you

8   mostly, in that I don't think the petitioners are raising a

9   challenge to how the 2016 regulation was promulgated, whether

10   or not it complied with 5 U.S.C. 553.

11         What my clients are asserting is that the stance

12   petitioners have taken is that ICE has deviated from the rule

13   that was considered and promulgated by DHS.  If DHS in the

14   proper procedures under 553 actually did consider petitioners'

15   position and rejected it, ICE hasn't deviated from anything in

16   violation of the rule because it was noticed.  It was commented

17   on by DHS in 2016.

18         If, however, that certified administrative record

19   doesn't support or shows or -- actually supports petitioners'

20   position that DHS actually did intend to create a penumbra of

21   rights under the provisional waiver that would exercise ICE's

22   discretion or what they had to consider, then Your Honor would

23   have the factual basis from that to determine that ICE is not

24   doing that --

25         THE COURT:  How would I have the factual basis unless

1  they get discovery on what ICE is doing?

2          MR. WEILAND:  Well, the second prong, and this is the

3  other part of our argument, is, Your Honor has already

4  ordered -- had already conducted discovery in this case.  You

5  had depositions of three acting field office directors from ICE

6  Boston.  I believe a couple of them were even put on the stand.

7  I was only here for a portion of the hearing, so I can't recall

8  them all.  I think I was here in August where Ms. Adducci

9  testified.  And I think they were questioned at some length

10  about what the practices and procedures of ICE Boston were at

11  the time.

12          And so in order to attack the discovery in a

13  methodical matter, as I think this case demands because it is

14  complex and has a lot of moving parts, we think the rule exists

15  for a reason, that the certified administrative record is put

16  before Your Honor and then petitioners come with their specific

17  assertions of why it needs to be supplemented, what they want

18  to supplement it with, such that it paints a complete picture.

19  But until there's a certified administrative record entered

20  into the case, Your Honor, I don't know how you even begin the

21  analysis.

22          THE COURT:  Well, I don't think there's going to be

23  any objection to your giving them or giving me the record.  The

24  question is, then what?  Let me -- I keep saying something, and

25  I'm not sure -- here, Ms. Larakers, you want to listen to this.

1    It might turn out to be very important and helpful to you.

2              MR. WEILAND:  My apologies, Your Honor.

3              THE COURT:  Here is a question that I have in mind.

4    This is a case for declaratory relief, not at the moment for

5    injunctive relief.  It might be.  But even if it were for

6    injunctive relief, I wrote about this -- I wrote about this

7    briefly in the December 7 order, docket number 193.  One of

8    my -- let's say it's declaratory relief.  What am I being asked

9    to declare; that an alleged or proven past practice of ICE was

10   unlawful, it was inconsistent with the regulations which are a

11   form of law, or am I being asked to declare that what ICE is

12   now doing is unlawful?  Because my sense, understanding, is

13   that ICE is now behaving differently than it did or was

14   performing a year ago.  And that could affect -- it might or

15   might not affect discovery.  It may be everything that's

16   transpired is relevant.

17             If I were doing an injunction, as I wrote on December

18   7, you know, the <u>Farmer v. Brennen</u> standard would apply, and I

19   would have to decide not only whether the government had

20   violated the law, but whether it was likely to do so in the

21   future, once I had said what the law was.  And to some extent

22   in deciding the motion to dismiss and having to decide what

23   states a claim on which relief could be granted, I've told you

24   what as of now I think the law is, for example, on equal

25   protection.

1          So I mean, this relates to my continuing encouragement

2     of you to talk settlement.  And it's possible since now I'm

3     talking about settlement, we ought to go into the lobby.  But,

4     you know, it might be, that based on the information ICE is now

5     providing or somewhat more but a manageable amount more

6     information, you know, there's not a serious concern that the

7     regulations, as the petitioners interpret them, are being

8     violated now.  So the case gets stayed, and, you know, there

9     may be a change in ICE's performance over time.  But if there's

10    a material change, then the stay could be lifted.  Anyway.

11         But with regard to discovery, your argument is what?

12    I should get the record of the -- I don't even know what I

13    would decide.  I get the record.  Then what?

14         MR. WEILAND:  Right, Your Honor.  So my clients'

15    position is that they should be permitted to file this

16    certified administrative record that reflects the

17    decisionmaking that occurred in 2016 because that would shed

18    light on the legal question before you.

19         THE COURT:  And this is -- I haven't thought about

20    this very much.  I don't think there's a problem with their

21    filing the record.  The problem comes if that's going to be the

22    only evidence on which the respondent asks me to decide say the

23    equal protection claim.

24         MR. WEILAND:  Yes, Your Honor.  And this is where we

25    think doing this methodically -- because the record would also

```
1    -- we believe the APA claim addresses the unlawful,

2    unconstitutional assertions of counsel, so the INA claims and

3    the EP claims.  We believe the habeas due process is a separate

4    pillar that you haven't discussed yet, Your Honor.  But in

5    that, once the record is filed, there's only a few exceptions,

6    but petitioners need to show more than just the motion to

7    dismiss has been denied, Your Honor.  They have to show what

8    they think needs to be added to the record so that Your Honor

9    is capable of making a decision.

10        And this somewhat bleeds over into our habeas due

11   process/good cause question.  We think there's an ample amount

12   of evidence already available to this court and to the

13   petitioners that we do intend to supplement with the certified

14   administrative record and that it may be that after folks have

15   seen it, there's no need to supplement the record, for which

16   the burden and expense of going through discovery may be

17   unnecessary.  Unpacking it, as I currently stand before Your

18   Honor, and I haven't seen this record yet, it hasn't been

19   produced, it's a somewhat laborious task and something we need

20   to confer with --

21        THE COURT:  Well, it's too bad you haven't been

22   producing it.  I mean, at least going back two weeks I denied

23   the motion to dismiss on a couple of things.  But go ahead.

24   It's just been two weeks.  Go ahead.

25        MR. WEILAND:  I assure you my clients have been
```

1   working diligently on that.  If the factual record as developed

2   already through the expedited discovery Your Honor ordered

3   earlier and the administrative record that my clients desire to

4   submit satisfies the need for you to be able to make the

5   decision on the legal issue in question here, which I also --

6   I'm not -- I understand that declaratory relief is whether or

7   not ICE was or was not or should or should not take into

8   consideration or is required to take into consideration the

9   provisional waiver when deciding whether or not to enforce a

10  final order of removal.

11          THE COURT:  I think at a minimum, and arguably at a

12  maximum, I should be deciding whether ICE is required to

13  consider the provisional waiver provisions.  And I just looked

14  quickly at it because now we're just sort of morphing into this

15  stage.  In my St. Patrick's Day Parade decision in 1995, South

16  Boston Allied War Veterans Council v. Boston, 873 F. Supp. 891

17  at 905, I talk about the Declaratory Judgment Act and how it's

18  discretionary; a court doesn't even have to -- the fact that a

19  party is entitled to ask for declaratory judgment doesn't mean

20  the court has to issue one.  And so I think sharpening the

21  question that I'm being asked to declare an answer on might be

22  helpful and might or might not affect the parameters of

23  discovery.

24          Anyway.  So how do the -- but I think what you're

25  proposing is that you assemble the administrative record, you

1    produce it to the plaintiffs.  Maybe you file it with the

2    court, but once I have the administrative record you look and

3    decide what else, you know, do they want -- and they might tell

4    you in advance what else they're going to want, so it's going

5    to take a long time to get it, if it doesn't get delayed.  But

6    anyway, go ahead.

7            MS. CANTIN:  Your Honor, as I understood Mr. Weiland's

8    argument, those are directed towards the Administrative

9    Procedures Act.  And we welcome this record.  We suspect that

10   we're going to find that record insufficient and we will want

11   it supplemented.  But that's what the APA -- we will welcome

12   the record and review it, but that doesn't mean the other

13   discovery should be on hold.

14           Your Honor has now allowed the equal protection claim

15   to proceed, the INA claim to proceed, a subclass with a due

16   process claim to proceed, and we're entitled to discovery for

17   those standalone claims.  And what we're seeking is discovery

18   of how and when it come to pass that the Boston ERO suddenly

19   decided to start detaining, arresting and removing noncitizens

20   with no consideration of the provisional waiver process.  We

21   want to know the individuals who made that decision, the

22   factors that were considered in making that decision, how that

23   decision was carried out, and what are ICE's current policies

24   on how to treat noncitizens who are on this path.

25           THE COURT:  And at the moment, the last is the most

1    important to me:  What are they doing now?  And if what they're

2    doing now seems to be consistent with the law or sufficient

3    that you're not going to press for an answer -- because if you

4    press for an answer, it may not be the answer you want.  You

5    don't have the due process class that you hoped for, for

6    example.  Then, you know, you might agree to stay the case, or

7    I might exercise my discretion and say, you know, in the

8    current posture, there's not good reason to invest the time and

9    effort, which is limited for any judge or court, you know, to

10   decide this issue because it doesn't appear that they're

11   violating the law right now.  There may be good reason to

12   believe they were violating the law.  These are just

13   observations, thoughts in mind.

14        MS. CANTIN:  And Your Honor's observation is the same

15   one we shared with the government that what ICE is doing now,

16   what current policies they're implementing is useful for

17   petitioners to know, if anything, to inform the type of relief

18   we might seek.  It would inform settlement decisions and what

19   we'd be asking for in that posture.

20        THE COURT:  And what more do you want to know about

21   what they're doing now?

22        MS. CANTIN:  We don't know anything as to what they're

23   doing now.  As Your Honor pointed out, we received the limited

24   reporting, but Ms. Lafaille explained that that is very limited

25   to people checking into the Burlington office.  We haven't seen

1  anything since Your Honor compelled them to produce things in

2  August.

3          THE COURT:  But you weren't receiving anything when

4  you were finding -- you know, aliens were finding you as

5  lawyers, and you're running in here and arguing successfully

6  that this one is being unlawfully detained, or once a case was

7  brought, people were released from detention.  And, you know,

8  nobody's evidently come to you in this publicized case and

9  said, you know, my rights are being violated; please represent

10 me; please go tell the judge, because I'm in the putative

11 class.

12         MS. CANTIN:  Nobody's come to me personally, Your

13 Honor, but I would defer that question to Ms. Lafaille to see

14 if she can speak to that.

15         THE COURT:  I meant sort of all of you generally.

16         MS. CANTIN:  I understand that.

17         MS. LAFAILLE:  Right.  Your Honor, we have worked with

18 the government over the pendency of this case when being

19 alerted of certain individuals.  We're aware of certain habeas

20 cases pending before this court involving putative class

21 members, but by no means do I think that we have regular access

22 to information or that we are getting aware of all our class

23 members.

24         THE COURT:  And again, and this is just to help inform

25 your discussions.  I had the first of these detention cases.

1    It could have been two years ago today.  I know it was in May

2    of 2017.  And the petitioner was taken into custody when he was

3    at his I-130 interview.  And there was a motion for preliminary

4    injunction.  We came to lunchtime, I signaled evidently clearly

5    that I was likely to interpret the regulations the way the

6    petitioner was advocating, not the way the government was

7    advocating.  And now in a more deliberate way I've done that

8    with regard to the detention regulations.  And the parties

9    agreed to a settlement of that case that afternoon.  But I

10   remember being told, you know, were there other people arrested

11   at the CIS office on the same day or in the same way, and I was

12   told, yes, there were four others, if I remember right, and one

13   has an immigration lawyer, and we don't know where the other

14   three are because the Department of Homeland Security won't

15   tell us.  They say there's a privacy interest.

16          So I suppose what they're saying is they can only --

17   and this again goes to the notice issue.  There may be people

18   who are in the class who are getting removed and they don't

19   know there's a case, and they don't know they have lawyers, so

20   they want some more information.

21          MS. CANTIN:  If I may raise one more issue, Your

22   Honor, to the point we don't know what the government is

23   currently doing.  For example, we understand that currently

24   I-130 interviews are not being scheduled at the CIS offices,

25   and we don't understand why that is.  That's just one of the

1    areas we'd like to understand.

2          THE COURT:  Maybe one thing that should be done, I may

3    be interpreting silence as meaning there are no problems.

4    Maybe you ought to update the depositions that you took.

5    Because those depositions were last July, I think, right?

6          MS. CANTIN:  That's correct.  It was in the summer of

7    last year.  And we do --

8          THE COURT:  Would it help to take a deposition, say,

9    of Mr. Charles and see what's going on?  I mean, whoever it is.

10   I don't know who the head of CIS.

11         MS. CANTIN:  That is helpful, but to make that

12   deposition meaningful it would be helpful if the government

13   would produce documents to our document request so that we can

14   be focused in our questioning.

15         THE COURT:  Actually, that's not the way I was taught

16   to litigate.  You'll be waiting forever.  You're not going to

17   be stuck with one deposition.  If you go and take a deposition

18   and he tells you, We're doing A, B and C, and then you make a

19   document request and you get documents and there's reason to

20   think that Mr. Charles is not doing A, B and C, I'll let you

21   ask him again.  But if I were you, I'd want to ask him the

22   questions soon.  Maybe even before he has the documents.

23         MS. CANTIN:  We appreciate that.  And this goes to our

24   other discovery request, is that we intend to notice

25   depositions for Christopher Cronen, who we understood, as

1   Mr. Lyons testified before Your Honor, that Boston ERO was

2   responding to Mr. Cronen's directive to stop individuals that

3   were showing up at I-130.

4          THE COURT:  Didn't Mr. Cronen go to Washington about a

5   year and a half ago or longer?  He's in Washington.

6          MS. CANTIN:  I understand.

7          THE COURT:  I mean, it's not that you -- I'm primarily

8   interested in what's going on now.  I mean, what I'm evolving

9   toward is saying, you know, why don't you take Mr. Charles'

10  deposition in the next two weeks while you're conferring about

11  the parameters of discovery and settlement.  And, you know, you

12  might get answers that persuade you it would be okay to agree

13  to a stay of this case as long as they continue to give you

14  certain information so you can monitor whether there's been

15  some adverse, from your perspective, material change in

16  circumstances.

17         MS. CANTIN:  Your Honor, if I may also request that,

18  because based on the limited discovery you ordered last summer,

19  we found out that, you know, ERO was colluding directly with

20  CIS to orchestrate these detentions and arrests and removals,

21  and they were coordinating in realtime.  In fact, I believe I

22  read an email where ERO requested CIS to delay a marriage

23  interview because certain officers were getting a late start

24  that morning.

25         So we would also respectfully request to depose

1    somebody from the CIS side of the house who is working with ERO

2    in orchestrating these detentions and arrests.  And for

3    efficiency purposes, we would like to do all of this discovery

4    at once so we're not coming to Your Honor in piecemeal fashion.

5         THE COURT:  It would be a lot more efficient if you

6    got some answers and got some regular reporting and then we

7    didn't have to litigate all of this and wait for months.

8         I don't know.  Is there a reason I shouldn't authorize

9    one deposition of ICE and one deposition of CIS?

10        MR. WEILAND:  Yes, Your Honor.  Because we have been

11   providing information.  We have provided to them and to this

12   court the declaration of Mr. Charles, that he is continuing the

13   actions of Mr. Lyons, who was the FOD for the longest period

14   during this case.  I don't think there's any basis to doubt the

15   veracity of that.  I haven't heard anything.  The man's been in

16   the job a week or two, the exact date is lost on me right now.

17   And also, we are reporting beyond just I believe the Burlington

18   office.  It's all the check-ins, and it's a monthly report with

19   where they are in the process.

20        THE COURT:  The CIS point seems to me a different one.

21        MR. WEILAND:  Yes, Your Honor.

22        THE COURT:  I've ordered that people -- that ICE has

23   to consider that people are pursuing the provisional waiver

24   process, but at least for due process purposes you have to have

25   an I-130.  If they're not giving any I-130 interviews, how are

1    you ever going to --

2          MR. WEILAND:  Well, that's news to me, Your Honor.  I

3    would like the chance to ask my clients whether or not that

4    assertion has any merit to it.  I can't say that to you here,

5    but we've never heard anything like that before, or at least I

6    personally have not.

7          I'm not sure what deposing USCIS officials will reveal

8    about what ICE is doing when deciding to enforce a final order

9    of removal.  I think to the extent that petitioners have

10   alleged that USCIS was colluding, that's already been provided.

11   I'm not certain that's entirely improper for officials involved

12   in enforcing the immigration laws of the United States to talk.

13         THE COURT:  Declaratory judgment is a discretionary

14   remedy.  An injunction is an equitable remedy.  If we just look

15   at the due process claim and the detention claim, well, say the

16   due process claim where I've just held you have to have a

17   conditionally approved I-212 to have a due process claim, but

18   if ICE and CIS is, if the Department of Homeland Security said,

19   Well, if we stop giving interviews for I-130s, there will not

20   be anybody who ever has a due process right because the judge

21   has told us it doesn't vest until later, you know, that would

22   be a fact, if it were a fact, that might well be material to

23   how I exercise my discretion on whether to issue a declaratory

24   judgment at all.

25         MR. WEILAND:  Yes, Your Honor, but I don't think you

1    need to order a deposition to establish that fact.  I intend to

2    walk out of this hearing and put it right to my client, and I'm

3    certain we would be able to answer that forthright because

4    that's a pretty extreme assertion.

5         THE COURT:  I don't know.  It may be extreme, but

6    you're talking about the burden of document discovery, and I'm

7    saying if they get to ask some questions, cross-examine on a

8    declaration, either, A, they may decide they don't need all of

9    that discovery, or B, you might have a stronger argument that I

10   should exercise my discretion -- because this is discretionary,

11   what's unduly burdensome -- to say the burden is too great;

12   you've already had his deposition.

13        MR. WEILAND:  Certainly, Your Honor, we would prefer

14   the less burdensome.

15        THE COURT:  I know, but it may be less burdensome to

16   let the witness answer some questions, and then they'll have a

17   better idea of what he says, and I assume he'll be prepared and

18   he'll be candid and we'll see where it goes.

19        MR. WEILAND:  Yes, Your Honor.

20        MS. CANTIN:  Your Honor, and I do understand why the

21   government is pushing back so hard, because based on the sliver

22   of information we saw last summer, candidly, that discovery was

23   illuminating and eye-opening and nothing short of alarming.

24        THE COURT:  Well, that's nice.  I mean, that's not

25   nice, but -- I don't know.  I'm telling you that even though

1    you didn't ask for it, I'm leaning toward ordering that you get

2    comparable discovery now.  Last summer you had a deposition.

3    And did I order that they produce some finite documentary

4    discovery?  Did you get some documents in connection with the

5    depositions last summer?

6              MS. CANTIN:  Those were the alarming ones I just

7    referenced, Your Honor, yes.  So thank you.  We do appreciate

8    that we'll be getting the depositions.

9              THE COURT:  Well, I haven't decided that yet.  I just

10   suggested it.

11             MS. CANTIN:  If I could, just one final note, I think

12   Your Honor is aware, we've previewed, but this is a case of

13   national importance.  It's the only case in the country where

14   we have the potential to find out and to understand what has

15   happened between 2017 and 2018, and our clients deserve to know

16   what happened; why, when there was a rule on the books, that

17   that rule was summarily disregarded.

18             THE COURT:  Well, you know, I have the authority to

19   decide actual cases and controversies, and I think we need to

20   do a little work on the Declaratory Judgment Act.  You would

21   like to know, your clients would like to know, but I just have

22   to think about what's appropriate.  And, you know, a year ago

23   we were talking about, you were presenting to me the most

24   fundamental issue:  Is a person with a constitutional right not

25   to be deprived of liberty without due process being deprived of

1  that right?  And that was an urgent matter.  It had profound

2  human consequences, and it got the highest priority.

3         Now, if there's not something comparable but there's

4  an interest in knowing, you know, what happened two years ago,

5  if it's not continuing and there's not a threat that it's going

6  to resume, I'd have to think about what's most appropriate for

7  the court to do in those circumstances.

8         MS. CANTIN:  Understood, Your Honor.  And to the point

9  of figuring out what's going on now, that's the paramount

10  importance, then I do think the discovery we all just talked

11  about would be helpful on that front.  So thank you.

12         THE COURT:  I'll see counsel in the lobby.

13         (Adjourned, 4:35 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    CERTIFICATE OF OFFICIAL REPORTER

 2

 3              I, Kelly Mortellite, Registered Merit Reporter

 4    and Certified Realtime Reporter, in and for the United States

 5    District Court for the District of Massachusetts, do hereby

 6    certify that the foregoing transcript is a true and correct

 7    transcript of the stenographically reported proceedings held in

 8    the above-entitled matter to the best of my skill and ability.

 9                    Dated this 21st day of May, 2019.

10

11                    /s/ Kelly Mortellite

12                    _____

13                    Kelly Mortellite, RMR, CRR

14                    Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25
```