UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| LILIAN PAHOLA CALDERON JIMENEZ ) | |
| and LUIS GORDILLO, et al., ) | |
| Individually and on behalf of ) | |
| all others similarly situated. ) | |
| ) | Civil Action |
| Plaintiffs-Petitioners, ) | No. 18-10225-MLW |
| ) | |
| v. ) | |
| ) | |
| KEVIN McALEENAN, et al., ) | |
| ) | |
| Defendants-Respondents. ) | |
| ) | |

BEFORE THE HONORABLE MARK L. WOLF
UNITED STATES DISTRICT JUDGE

MOTION HEARING

June 27, 2019

John J. Moakley United States Courthouse
Courtroom No. 10
One Courthouse Way
Boston, Massachusetts  02210

Kelly Mortellite, RMR, CRR
Official Court Reporter
One Courthouse Way, Room 5200
Boston, Massachusetts  02210
mortellite@gmail.com

APPEARANCES:

Counsel on behalf of Plaintiffs-Petitioners:
Adriana Lafaille
Matthew Segal
American Civil Liberties Union
211 Congress Street
Boston, MA 02110
617-482-3170
alafaille@aclum.org

Kathleen M. Gillespie
Attorney at Law
6 White Pine Lane
Lexington, MA 02421
339-970-9283
kathleen.m.gillespie@outlook.com

Stephen Nicholas Provazza
Colleen McCullough
Shirley X. Cantin
Wilmer Hale LLP
60 State Street
Boston, MA 02109
617-526-6313
stephen.provazza@wilmerhale.com
shirley.cantin@wilmerhale.com

Counsel on behalf of Defendants-Respondents:
Eve A. Piemonte
U.S. Attorney's Office
1 Courthouse Way
Suite 9200
Boston, MA 02210
617-748-3100
eve.piemonte@usdoj.gov

Mary Larakers
U.S. Department of Justice, Office of Immigration Litigation
District Court Section
P.O. Box 868
Washington, DC 20044
202-353-4419
mary.l.larakers@usdoj.gov

<pre>
 1                      P R O C E E D I N G S
 2    (Case called to order.)
 3            THE COURT:  Good afternoon.  Would counsel please
 4    identify themselves for the court and for the record.
 5            MS. LAFAILLE:  Good afternoon, Your Honor.  Adriana
 6    Lafaille for the petitioners.
 7            MS. CANTIN:  Good afternoon.  Shirley Cantin, Wilmer
 8    Hale, for the petitioners.
 9            MS. McCULLOUGH:  Good afternoon.  Colleen McCullough
10    for the petitioners.
11            MR. SEGAL:  Good afternoon, Your Honor.  Matthew Segal
12    for the petitioners.
13            MS. LARAKERS:  Good afternoon, Your Honor.  Mary
14    Larakers on behalf of the United States.
15            MS. PIEMONTE:  Good afternoon, Your Honor.  Eve
16    Piemonte on behalf of the United States.
17            THE COURT:  And Ms. Larakers, is Marcos Charles there
18    with you?
19            MS. LARAKERS:  Yes, Your Honor.
20            THE COURT:  He's still the acting field office
21    director?
22            MS. LARAKERS:  Yes, Your Honor.
23            THE COURT:  As I understand it, there are two general
24    issues to be addressed at this hearing.  One is what additional
25    information, if any, should be provided to class counsel
</pre>

1    regarding the possible removal of class members, including but

2    not limited to information on the monthly reports that ICE has

3    been providing voluntarily to petitioners.  The second issue is

4    discovery.

5          Is that accurate, and is there anything else that

6    should be on the agenda, generally?

7          MS. CANTIN:  That's accurate from our perspective,

8    Your Honor.

9          MS. LARAKERS:  Yes, Your Honor.

10          THE COURT:  Then I want to start with regard to this

11    issue of possible removals.  From what I've read in your

12    reports and submissions, it appears that the acting field

13    office director, Mr. Charles, or his deputy are making the

14    final decisions on the removal of aliens who are pursuing

15    provisional waivers and therefore are in the class in this

16    case.  Is that correct?

17          MS. LARAKERS:  Yes, Your Honor, as I understand it.

18          THE COURT:  Why don't we ask Mr. Charles.  Here, stand

19    up.

20          MR. CHARLES:  Yes, Your Honor, it is.

21          THE COURT:  And who is the deputy now?

22          MR. CHARLES:  Todd Lyons, sir.

23          THE COURT:  All right.  So basically --

24          MR. CHARLES:  Just trying to get comfortable.  Sorry.

25          THE COURT:  Is it your intention to continue to make

1    those final decisions yourself or rely on Mr. Lyons to make

2    them?

3           MR. CHARLES:  My intention is to utilize Mr. Lyons or

4    another DFOD if Mr. Lyons isn't available, or myself.

5           THE COURT:  Is there one other deputy field office

6    director?

7           MR. CHARLES:  We have an acting deputy field office

8    director.

9           THE COURT:  Who is that?

10          MR. CHARLES:  It's currently Vance Ely.

11          THE COURT:  Could you spell that, please?

12          MR. CHARLES:  Vance, V-a-n-c-e.  E-l-y, Ely, last

13   name.

14          THE COURT:  And do you know if Mr. Ely has read all of

15   my relevant orders in this case?

16          MR. CHARLES:  I am not sure, sir.

17          THE COURT:  Have you discussed them with him?

18          MR. CHARLES:  I have.

19          THE COURT:  Would it be any problem if I ordered him

20   to read them all?

21          MR. CHARLES:  No, Your Honor.

22          THE COURT:  Well, this is helpful.  But part of the

23   reason I start with this is -- well, let me ask you this.

24   Mr. Charles, by law how long can you serve as acting field

25   office director?

1          MR. CHARLES:  240 days.

2          THE COURT:  And about how long have you served so far?

3          MR. CHARLES:  Approximately 45 days.

4          THE COURT:  So it would be permissible for you to be

5     the acting field office director for another 200 days, roughly.

6     Has anybody communicated with you how long your tenure in this

7     position is likely to be?

8          MR. CHARLES:  No, Your Honor.

9          THE COURT:  All right.  And do you -- actually, did I

10    question you at some point about whether you were familiar with

11    my orders?

12         MR. CHARLES:  You did, sir.

13         THE COURT:  And did we discuss the fact that a

14    violation of the orders, any of the orders, could be a civil

15    and/or criminal contempt?

16         MR. CHARLES:  We did, Your Honor.

17         THE COURT:  All right.  And does it continue to be

18    your intention to obey the orders?

19         MR. CHARLES:  It is, Your Honor.

20         THE COURT:  And do you understand that if you were to

21    get a directive, say, from the Department of Homeland Security

22    in Washington that directed you to do something that would

23    violate the orders I've issued in this case, your obligation is

24    to follow the orders and, I would expect, tell whoever gave you

25    the direction, We can't do that; the judge has prohibited it?

1          MR. CHARLES:  Correct, Your Honor.

2          THE COURT:  All right.  You may be seated for now.

3          I mean, this relates to some of the more specific

4     issues because Mr. Charles -- well, I'm generally satisfied

5     that Mr. Charles and Mr. Lyons have read my orders.  They

6     understand my orders.  They are familiar, they're aware and

7     sensitive to the consequences that could result from violating

8     any of the orders.  And as long as Mr. Charles and Mr. Lyons at

9     least are making the final decisions concerning removal, I may

10    not -- you know, certain other discovery may not be necessary

11    or certain discovery may not be necessary or appropriate.

12         I'd say, having just heard of Mr. Ely, I'm inclined to

13    order that he read my orders, discuss them with Mr. Charles and

14    counsel and file an affidavit that he's familiar with them and

15    understands that any violation could be a civil and/or criminal

16    contempt.

17         Do you want to be heard on that?

18         MS. LARAKERS:  I have no objection to that, Your

19    Honor.  However, I did want to let you know that that deputy

20    field office director position is actually rotating, so it is

21    Vance Ely and two other individuals, so it would be on a

22    rotating basis taking those duties.  So if you would like to

23    order that, we can extend that to the other two individuals as

24    well and have all of them --

25         THE COURT:  Do you know all of their names?

```
1                MR. CHARLES:  Yes, sir.  Aldean Beaumont.

2                THE COURT:  How do you spell the first name?

3                MR. CHARLES:  A-l-d-e-a-n.

4                THE COURT:  Yes.

5                MR. CHARLES:  Beaumont, B-e-a-u-m-o-n-t.

6                THE COURT:  And is there a third?

7                MR. CHARLES:  Todd Thurlow.

8                THE COURT:  Todd?

9                MR. CHARLES:  Thurlow, T-h-u-r-l-o-w.

10               THE COURT:  All right.  So let's proceed on the

11      assumption that I'm going to issue that order essentially with

12      the agreement of the respondents.  And I'm inclined to also

13      order essentially immediate notice if Mr. Charles is informed

14      that there's going to be a new field office director or

15      somebody who hasn't been identified today, Mr. Lyons and the

16      other three, is going to become an acting deputy field office

17      director.  And I would require a representation that that

18      person has read the orders and discussed them with counsel and

19      understands them and the consequences if there's a violation.

20      And then I may have all the people who haven't been questioned

21      before in at some point, just to make sure.

22               But do you have any concern or objection to that, Ms.

23      Larakers?

24               MS. LARAKERS:  No, Your Honor.

25               THE COURT:  All right.  Then there's -- well, do the
```

1    petitioners want to be heard on that?

2              MS. CANTIN:  On which issue, Your Honor?

3              THE COURT:  The one I was just discussing.

4              MS. CANTIN:  I think we're fine with what Your Honor

5    has proposed regarding the immediate notice and affidavits.

6              THE COURT:  Where is the chart with the notice that

7    you put in here?  All right.

8              MS. CANTIN:  Your Honor, if I may clarify.  I

9    understood your question to be about filing the affidavits to

10   be sure they understand their orders and the consequences of

11   not abiding by them.  My colleague, Ms. McCullough, would like

12   to address the robust notice that we've requested.

13             THE COURT:  I'm going to that right now.  You mean the

14   notice to the class members?

15             MS. CANTIN:  Exactly.

16             THE COURT:  That's what I'm going to next.

17             So docket number 290-1 was filed with the petitioners'

18   June 25, 2019 report.  It's a notice of potential legal rights.

19   And if I understand it correctly, the proposal is that this

20   document or something similar be given to all people, all

21   individuals identifiable as class members if they for some

22   reason have an in-person encounter with ICE, either they're

23   checking in or they're arrested to be detained and removed.

24             MS. McCULLOUGH:  Yes, Your Honor.

25             THE COURT:  Is that an accurate understanding of what

1    you're asking?

2            MS. McCULLOUGH:  Yes, Your Honor.

3            THE COURT:  Well, I've certified a class under Rule

4    23(b)(2).  Rule 23(c)(2) provides that I may order appropriate

5    notice.  Do you want to explain briefly why you think this is

6    appropriate?

7            MS. McCULLOUGH:  Your Honor, the situation that

8    happened with Mr. V a couple of weeks ago illustrated the need

9    for some kind of notice to go to class members and also for

10   class counsel to receive more information about class members

11   before enforcement actions are taken against them, so we see

12   this as part of an overall increase in the robustness of the

13   reporting and the notice that would happen.

14           This is important because class members have to make,

15   in many cases, very quick decisions about their situation,

16   decisions like whether to contact an attorney and potentially,

17   you know, to speak with their families.  So giving them

18   information that they're a member of this class, information

19   about their legal rights and then contact information for class

20   counsel is essential for them to make those decisions.

21           THE COURT:  Okay.  And from the respondents'

22   perspective, why shouldn't the notice be required or why

23   shouldn't I order that this notice be given not to everybody in

24   the class but to people that ICE identifies as members of the

25   class when ICE is in human direct contact with them for some

1  other reason?

2        MS. LARAKERS:  So originally, Your Honor, the parties

3  contemplated that the reporting would take the place of this

4  class notice.  And then we came up with the reporting scheme

5  that we were willing to provide.  We just think it should be

6  one or the other.  It's not that one is more appropriate than

7  the other.  It's not that we don't think that this class notice

8  isn't particularly appropriate.  It's just that we agreed to

9  provide the reporting with the spreadsheet which we believe is

10 sufficient to show consideration, and we're just not willing to

11 go beyond that.

12       And again, you know, to the extent that all of this is

13 tied to an action that must be taken before removal, that is

14 another step that ICE is required to take before removal, and

15 then that would imply that they're not allowed to effectuate

16 removal before that requirement is met.  So it is some sort of

17 injunction on removing a class member before that's done.

18       THE COURT:  Well, I don't -- I have a better

19 understanding now than I had at the outset of the hearing the

20 last time I saw you about why you're talking about an

21 injunction, arguing in effect that this would be an injunction.

22 I don't view it as an injunction.  I view it as an exercise of

23 my authority under Rule 23(c)(2), appropriate notice.

24       And so far it seems to me that the information that

25 you're giving to petitioners' counsel, class counsel, is

1   useful, it's valuable, but it isn't notice to members of the

2   class.  And I do think it would be in everybody's interest,

3   including Mr. Charles', to minimize the risk of a repetition of

4   what happened about ten days ago with Mr. V, where class

5   counsel learn about somebody; they don't know where the person

6   is, or they don't know if the person wants to be represented or

7   whether the person wants to be removed.

8          And it seems to me that, A, the purpose of notice is

9   to tell the class members, not to tell class attorneys.  So

10   this would be more -- this would more directly serve that

11   purpose and would also minimize the risk that we're going to

12   have more disruptive motions for temporary restraining orders.

13          MS. LARAKERS:  Your Honor, again, it's not

14   particularly that this class notice is appropriate.  I think

15   we're on the same wavelength.  I understand where you're coming

16   from with regard to notice under Rule 23(c)(2).  And I think in

17   any other type of situation, including immigration-type related

18   cases from across the nation, that wouldn't make a difference.

19   Requiring class notice wouldn't make a difference in that type

20   of case.

21          But in all those other types of cases there is a

22   preliminary injunction enjoining the respondents from doing a

23   certain thing.  In this case, it would be a preliminary

24   injunction enjoining the respondents from removing class

25   members prior to consideration.  And because we don't have

1    that -- and then in any other type of case, this reporting,

2    this class notice would be issued in connection with that.

3         Now, class notices in other respects may not enjoin

4    anything of the government.  It may just require the government

5    to do something.  But because petitioners are seeking class

6    notice in this case prior to ICE being able to do something,

7    that is why it's enjoining respondents from effectuating

8    removal prior to that notice.

9         THE COURT:  Well, all of this is organic.  We'll see

10   where we are at the end of the hearing.  But I'm ordering that

11   this notice -- and I'm going to ask in a minute whether it

12   should be in more than one language -- not be provided to every

13   member of the class but be provided when there is an in-person

14   contact between ICE and a member of the class.

15        At the moment I'm not issuing any injunction or

16   deciding what the consequences will be if the notice is not

17   given.  It might depend on whether it was an inadvertent error

18   or a deliberate violation of the direction to provide the

19   notice.  But I think it serves the purposes of Rule 23 and also

20   the orderly administration of justice and the orderly

21   administration of the ICE field office, but we'll see where we

22   come back.

23        When I have an assurance that Mr. Charles, Mr. Lyons,

24   and, if I'm satisfied with the others, are themselves making

25   the decision and then the class members are aware that there's

1    a class action, that they have lawyers they can call, I'll have

2    to hear all the argument, but that will weigh in your favor

3    that certain discovery is not necessary.  I should trust them.

4    I should trust Mr. Charles.  I should trust that members of the

5    class know they can call a lawyer, and therefore this requested

6    discovery is unnecessary and burdensome.  But we'll see where

7    we come out at the end.  I may revise any of these rulings at

8    any time.

9         MS. LARAKERS:  Yes, Your Honor.  One quick thing on

10   the notice, if you're going to order it.  The first time we saw

11   this notice, the actual notice, is with the filing of docket

12   290-1.  So my client hasn't had ample time to review it to see

13   if they have any specific objections to what the notice says.

14   I look at this document and I certainly can't see anything

15   glaring, but I would like my client to look at it.

16        THE COURT:  Well, we might take a break.  But I mean,

17   this was filed two days ago, but it was filed late.  So you

18   basically had it for a day or day and a half.

19        MS. LARAKERS:  My intention is not to burden the court

20   with another dispute over this.  I just want to make sure that

21   they have time to review it and know that it's going to be

22   ordered prior to since they -- they've seen it, I've sent it to

23   them, but to make sure that they review it with that eye that

24   it's going to be ordered, Your Honor.

25        THE COURT:  Well, all right.  I understand what you're

1    requesting.  And it's also not complete.  It doesn't have

2    telephone numbers and email address.  Is it sufficient for this

3    to be in English only?

4              MS. McCULLOUGH:  We would provide translated versions

5    of this, Your Honor.

6              THE COURT:  Into what languages?

7              MS. McCULLOUGH:  I know Spanish and Portuguese for

8    sure and perhaps other languages as well.

9              THE COURT:  Spanish and Portuguese.  And what was the

10   end of that?

11             MS. McCULLOUGH:  Perhaps other languages as well.  We

12   haven't come up with a full list yet, Your Honor.

13             THE COURT:  Well, I'm going to issue an order, so at

14   the moment, subject to changing my mind, I'm ordering that this

15   notice be prepared by the petitioners in English, Portuguese

16   and Spanish.  And is it contemplated that ICE will then

17   reproduce it and give it to aliens in the language that they're

18   communicating with the aliens in?

19             MS. McCULLOUGH:  Yes, Your Honor.

20             THE COURT:  Okay.

21             MS. LARAKERS:  Your Honor, I would ask just for, on

22   the operational standpoint, that it be specific at what point

23   that they should give it.  Sometimes ICE may come into contact

24   with an individual who may be a class member but they don't

25   know that they're a class member until a little later.  So if

```
 1     your order is specific that says when ICE becomes aware that
 2     someone is a class member, to serve the notice.
 3              THE COURT:  Is there any problem with that?
 4              MS. McCULLOUGH:  We would expect that ICE is aware
 5     that someone is a class member before any enforcement action is
 6     taken against them.
 7              THE COURT:  Well, ICE is -- you're reporting on
 8     particular individuals, correct?
 9              MS. LARAKERS:  Yes, Your Honor.
10              THE COURT:  So those are people you've identified as
11     class members?
12              MS. LARAKERS:  Right.  And so those people would get
13     it, but there may be a situation where a person is arrested in
14     the field and then upon bringing them back, you know, for
15     processing, asking them questions, doing informal interview,
16     then they might be aware that they're a class member or upon
17     the time where the PCQS is checking.
18              THE COURT:  I would say if and when ICE identifies an
19     alien as a member of the class through some human contact,
20     personal contact, the notice needs to be promptly provided.
21              MS. LARAKERS:  Okay.
22              THE COURT:  Okay?
23              MS. LARAKERS:  Yes.
24              MS. McCULLOUGH:  Just to clarify that, Your Honor,
25     this would apply -- just to make sure I understand your order,
```

1    it would apply to any encounters with ICE, including, for

2    example, if class members apply for a stay of removal that ICE

3    adjudicates.  Is that Your Honor's order?

4         THE COURT:  Well, I think you're being more specific

5    than what I understood from the filings, but yes, I guess.

6         MS. LARAKERS:  Your Honor --

7         THE COURT:  Well, when ICE -- I don't know.  Does the

8    ICE field office deal with those people?

9         MS. LARAKERS:  Yes, that could happen.  That is one

10   way a person could find out that they're a class member.  We

11   don't have any specific objection to that, but I think that

12   your order in exactly the way you just said would cover those

13   individuals because it would be, if ICE knows that they're a

14   class member, they should provide it promptly.  That would

15   include people applying for stays of removal, if ICE knew that

16   they're a class member.

17        THE COURT:  All right.  And I asked you this before.

18   It's my present intention to memorialize in my order that final

19   removal -- as agreed by ICE or respondents, final removal

20   decisions shall be made by the acting field office director or

21   Assistant Field Office Director Lyons or any of the other three

22   people who have certified that they've read the orders, they've

23   discussed them with Mr. Charles, they've discussed them with

24   counsel and understand the consequences of not obeying.

25        MS. LARAKERS:  Your Honor, if I may ask a clarifying

1    question on that?

2              THE COURT:  Sure.

3              MS. LARAKERS:  You would require that the DFOD or --

4    sorry, the deputy field office director or the field office

5    director make that final decision, correct?

6              THE COURT:  Right.

7              MS. LARAKERS:  Not like the first time they come into

8    contact.

9              THE COURT:  I assume somebody makes a recommendation

10   and it goes up the chain.  But here, let's go to the chart.

11   Where is the chart?  Exhibit 291.  Where is the chart?  I've

12   got it.

13             All right.  This may come into sharper focus if we go

14   to the next item on my agenda.  So docket number 291-1 is this

15   redacted chart that I think was filed by the petitioners.

16             MS. McCULLOUGH:  Yes, Your Honor.

17             THE COURT:  And it has certain information, including

18   who the ERO decisionmaker was.  It says FOD or DFOD, field

19   office director or deputy field office director.

20             MS. LARAKERS:  Yes, Your Honor.

21             THE COURT:  And with regard to the two aliens who were

22   removed, it's got about a three-line explanation for each as to

23   what was considered in the removal.  And as I understand it,

24   the respondents have no objection -- although I may need a

25   fuller explanation -- but as I understand it, no objection to

1    providing the information that's on the chart but it will not

2    provide the brief narrative of the matters considered without a

3    court order.

4         MS. LARAKERS:  Yes, Your Honor.  As I understand it

5    through conversations with my client, we're confident that that

6    description is being done at ICE every single time it's being

7    created in this chart.  ICE wants to be able to focus on

8    actually doing the consideration, not creating charts for

9    petitioners.

10        THE COURT:  You're going to have to create the chart

11   anyway.  The question is whether it's going to have a couple of

12   lines.  And really, I mean, I'm going to listen to the argument

13   if there's a dispute, but I think it would be in ICE's,

14   particularly Mr. Charles', enlightened self-interest if he

15   considers -- as was the case, let's say, for the first alien.

16   It says, "The field office director has considered the

17   [redacted] potential eligibility for a Form 601A application

18   for provisional unlawful presence waiver.  The field office

19   director further considered the alien's criminal history,

20   including recent criminal charges for OUI, sexual assault and

21   criminal threatening.  Based on such considerations, the field

22   office director determined to effectuate the alien's order of

23   removal from the United States."

24        It provides class counsel some information, some

25   detail, and it provides it to the court.  And if it's written

1    out, has to be written out, it might provide greater assurance

2    that the decisionmaker considered everything and there wouldn't

3    be any reasonable basis to claim there's a violation of the

4    court's orders.

5            MS. LARAKERS:  Your Honor, we believe that even absent

6    those couple of lines that we give to petitioners that it would

7    be apparently clear if anyone testified in this court that that

8    consideration was done, regardless of what's being put on the

9    chart.

10           THE COURT:  If anyone testified in the court.

11           MS. LARAKERS:  Yeah.

12           THE COURT:  I'm trying to minimize the need for

13   anybody to testify in the court.

14           MS. LARAKERS:  I understand, Your Honor.  Again, it's

15   not -- we don't have any extreme operational concerns with

16   providing it.  If ordered, we certainly can do it.  It's just

17   in aggregate, what should ICE be focused on?  And when you look

18   at the aggregate of what they're requesting and you look at

19   what we're providing, we're willing to provide the spreadsheet.

20   We think that that's sufficient.  If the court believes

21   otherwise, then obviously you can order it.

22           THE COURT:  What do the petitioners say about this?

23           MS. McCULLOUGH:  Your Honor, the situation that

24   happened with Mr. V and the affidavits and argument at the last

25   hearing demonstrate that even the kind of three-sentence

1    explanation of reasons here would not adequately show that

2    respondents are really giving meaningful consideration to this

3    process rather than simply acknowledging their knowledge of it.

4         This spreadsheet shows that they may know that a

5    person has an I-130 or an I-212, and the reasons similarly show

6    that information.  But they don't show, for example, how that

7    information is being considered, what the process is and that

8    the purpose of the provisional waiver regulations of keeping

9    people with their families while they pursue this process is

10   really being considered.

11        For that reason, we would ask that, in addition to

12   reasons being provided, contemporaneous documents showing

13   that --

14        THE COURT:  We're getting there next.  All right.  I

15   am ordering that there be a brief narrative description of what

16   factors were considered, what information was considered in

17   making the decision, essentially comparable to the several

18   lines on this docket number 291-1.  And we'll attach this to

19   the order.

20        Again, we'll see where all this comes out.  But now

21   we're getting into what's next on my agenda, and that is, if

22   I'm assured that Mr. Charles, who I believe understands my

23   orders and has been taking them seriously, as Mr. Lyons did, is

24   making the decision, the final decision himself.  And if you

25   and, if necessary, eventually I get this explanation, I mean,

 1   if this person -- you know, I assume this person who was

 2   ordered removed does have recent criminal charges for OUI,

 3   sexual assault and criminal threatening and the respondents say

 4   it would be -- well, I wonder why as a routine matter you need

 5   more than that, unless and until it's shown that Mr. Charles

 6   can't be trusted.  Go ahead.

 7        MS. McCULLOUGH:  The facts of this litigation have

 8   shown and what happened with Mr. V show a knowledge of the

 9   pursuit of provisional waivers, but we don't know what ICE

10   believes consideration means for these people.

11        THE COURT:  Well, I offered you the opportunity on

12   about May 16 to take Mr. Charles' deposition.  You haven't

13   availed yourself of that yet.  If you asked him, you might know

14   the answer to that question.

15        MS. McCULLOUGH:  Yes, Your Honor.  And we do intend to

16   take that deposition shortly, and we appreciate the opportunity

17   for that discovery.

18        We think that with respect to each individual removal

19   decision, in order to adequately represent our clients, the

20   class members, before they're removed, we would need more than

21   a statement that will be offered to us through litigation

22   counsel that their provisional waivers have been adequately

23   considered.

24        THE COURT:  Ms. Larakers.

25        MS. LARAKERS:  So Your Honor, it's exactly what you

just said.  There's been no indication, petitioners have not
been able to state that they have any reason to mistrust what
has been happening in the ICE Boston field office since Your
Honor issued its order back in August of last year.  Absent
such indication, any reporting should be extremely limited
here.

THE COURT:  I don't think this is that limited.  It's
just the issue now is -- I mean, what's the problem -- you
explain some of this in your writing, but what's your concern
about having to produce contemporaneous records reflecting the
decisionmaking process?

MS. LARAKERS:  Because in aggregate what they want
diverts ICE's resources from doing what this court said it
should do.  Every time I have to go back to ICE and ask for
this document or this document or every time they have to go
look at it in the file, that takes another person away from
ICE's operations.

We just want to keep ICE focused on what this court
ordered it to do back in August and September, and we want to
keep any reporting focused and limited to something that shows
enough consideration.  As I understand, Your Honor says that,
you know, perhaps this spreadsheet in addition to a brief
explanation could be that.  And we're only asking that the
court limit the reporting at least to that, which again
respondents didn't agree to, but at least to the spreadsheet

1  plus the explanation of reasons because there is no reason at

2  this time to distrust what ICE Boston is doing.  Because in

3  aggregate, maybe supplying that on one or two aliens at the

4  beginning is not too burdensome, but again, Your Honor, we

5  don't know how many people are --

6          THE COURT:  Are there concerns that there would be a

7  deliberative process privilege that would have to be

8  considered?

9          MS. LARAKERS:  Yes, Your Honor.  And again, every

10  document we produce has to be reviewed for privilege several

11  times, so they're asking for that document, not only asking for

12  that document but asking for it within 48 hours, where that

13  document -- everything that goes out the door at ICE has to be

14  reviewed.  And again, if it's as Your Honor said, if it's

15  pre-decisional, as many of these notes in their records may be

16  pre-decisional, that is deliberative process.

17          And again, what we're providing with this explanation

18  in the chart is exactly that post-deliberative decision.

19  That's what we're already providing.  Those records may have

20  more than just deliberative process privilege.  They may be

21  law-enforcement sensitive about operations currently ongoing

22  within ICE as well.  The idea that because the possibility is

23  there, because it has to be reviewed, because the person

24  pulling that document is just one more person that is not going

25  to be able to sit down and look at a file, in aggregate, that

1    causes an operational concern.

2         THE COURT:  Well, I'm denying without prejudice the

3    request for contemporaneous records regarding the decisions to

4    remove made by Mr. Charles and his deputies because I do think

5    that it would be, based on what I know now, unnecessarily

6    burdensome and implicate issues of privilege; and based on the

7    performance of the ICE field office, at least since my

8    decisions last August with regard to removal, it's not

9    necessary.  But like any order, this can be reconsidered at any

10   time if problems emerge.

11        All right.  So what additional information do the

12   petitioners want that's not already on this chart?  And I think

13   I'll make a copy of this chart Exhibit 1 to today's hearing so

14   the record reflects what we're talking about.  But as I said,

15   it's docket number 291-1.

16        What else are you asking for beyond the chart?

17        MS. McCULLOUGH:  Your Honor, we also would ask for

18   information about the date that the final removal -- date that

19   the final order of removal was entered and the date of the

20   applications and decisions on their applications with USCIS.

21        THE COURT:  What's the relevance of that?  I'm sorry.

22   Tell me everything else you want.

23        MS. McCULLOUGH:  Yes.  This is laid out in a chart in

24   docket 290 --

25        THE COURT:  Which one?

```
 1              MS. McCULLOUGH:  In docket 290.

 2              THE COURT:  Okay.  What page?

 3              MS. McCULLOUGH:  Page 2 to 3 and a little on 4.  So

 4   for example, we would ask for information that would allow us

 5   to find and contact class members, so this would include where

 6   they're being held, their country of origin, which would allow

 7   us to look them up in the ICE detainee locator, contact

 8   information for their spouse.

 9              THE COURT:  Well, where is this on pages 2 and 3?  I

10   know I've read this, but I want to focus on it.

11              MS. McCULLOUGH:  On page 290, the leftmost column says

12   "Monthly Reporting," and the second row down discusses the

13   request that we've made.

14              THE COURT:  I see.  So you want the name, alien

15   number, country of origin and contact information for the

16   individual's file, including location, if detained.  And ICE is

17   agreeable, according to the chart, to giving the name and alien

18   number.  Is that correct?

19              MS. LARAKERS:  Yes, Your Honor.

20              THE COURT:  And what's the reason for objecting to

21   providing the country of origin -- let's do them one at a time.

22   The country of origin.

23              MS. LARAKERS:  Your Honor, again, this is just, all of

24   our arguments in aggregate is we don't want to provide it.  If

25   they're saying they need it to look a specific person up, we
```

1    don't have any specific objection.  It's just, again, in

2    aggregate everything they're looking for --

3           THE COURT:  Well, right now you don't have to worry

4    about looking for the contemporaneous records.  That should

5    alleviate your concerns.

6           All right.  And do you need the country of origin to

7    locate the person?  The alien number is not enough.

8           MS. McCULLOUGH:  Correct, Your Honor.

9           THE COURT:  All right.  I'm going to order that you

10   add to the chart the country of origin.  I'm ordering that.

11          MS. LARAKERS:  Is that dependent on them not being

12   able to look it up in the system?  Because I've gotten

13   conflicting answers on whether you need it or not.  If their

14   representation -- you know, I haven't ran the system.  I've

15   just gotten conflicting answers on that.  So if it's based on

16   their representation that they can't look up the alien absent

17   that, then --

18          MS. McCULLOUGH:  That's correct.  The online system

19   requires you, if you're looking up by name, to include --

20          THE COURT:  Could you talk into the microphone.  I'm

21   having some difficulty hearing you.

22          MS. McCULLOUGH:  Sorry, Your Honor.  Yes, it does

23   require you to input the country of origin.

24          THE COURT:  And why do you want the contact

25   information for the individual and the individual's spouse?

1    Put aside where the person is detained.

2            MS. McCULLOUGH:  Right.  If the person is detained,

3    obviously their location of detention would be the information

4    we would need to find them.  If they're not detained --

5            THE COURT:  Would that show up in the system?  If you

6    had their name, their alien number and their country of origin,

7    would it tell you where they are?

8            MS. McCULLOUGH:  Yes.

9            THE COURT:  So they don't have to put it on the chart.

10   You could find it.

11           MS. McCULLOUGH:  Yes, Your Honor.  If they are not

12   detained, and then for the situation of their spouse, we would

13   request contact information for them.

14           THE COURT:  You say if they're not detained, then you

15   wouldn't know where they were?

16           MS. McCULLOUGH:  Correct, Your Honor.

17           THE COURT:  If they're not detained, why do you need

18   to know where they are?

19           MS. McCULLOUGH:  I mean, we request this monthly

20   reporting information for people who have applied for a stay of

21   removal, for example, and those people might not be in

22   detention.

23           THE COURT:  But they'll have received a notice that if

24   they want to talk to you, they know they can call you up or

25   send you an email.

1          MS. McCULLOUGH:  Your Honor, to fully represent them,

2     relying on them to call us is concerning, given that it's

3     possible that they simply wouldn't reach out or wouldn't

4     understand the situation.  And we also want to understand, you

5     know, the facts of their case as they may be relevant to this

6     litigation.

7          THE COURT:  Okay.  So if they're detained, it will be

8     sufficient for you to have the name, the alien number and the

9     country of origin, correct?

10          MS. McCULLOUGH:  We would also ask for the contact

11     information for their spouse, if possible.

12          THE COURT:  In order to find the person.

13          MS. McCULLOUGH:  Yes, yes, Your Honor.

14          THE COURT:  All right.  And then if they're not

15     detained, are you saying that the record, the ICE records

16     wouldn't show you where they live --

17          MS. McCULLOUGH:  The records that we are receiving

18     from ICE -- well, we haven't --

19          THE COURT:  -- if you went on the system?

20          MS. McCULLOUGH:  The system is only to look up

21     detained individuals.

22          THE COURT:  It's only to look up people who are

23     detained?

24          MS. McCULLOUGH:  Yes.

25          THE COURT:  And is this report only with regard --

1    that I marked as Exhibit 1, is it only with regard to people

2    who are being ordered removed, or is it everybody who has an

3    encounter with ICE?

4         MS. McCULLOUGH:  We receive that report because those

5    people are imminently removed.  Respondents have agreed to

6    provide monthly reporting of people who are checking in and

7    people who -- and going forward people who are detained,

8    although we haven't received that yet.

9         THE COURT:  But the people who are checking in, are

10   you asking that ICE be required to tell you, give you the

11   contact information for them and their spouses?

12        MS. McCULLOUGH:  Yes, Your Honor, because those are

13   our clients and our class members in this litigation, and

14   knowing the circumstances of their case is important for us.

15        THE COURT:  What makes you think that ICE has the

16   information on their spouses, for example?

17        MS. McCULLOUGH:  We would ask if they have it.  If

18   they don't have it, of course we would understand, receiving a

19   record that says we don't have this information.  We think that

20   this information would be -- it would be in the I-130 petition.

21   So we have included in here a request that, if we ask for it,

22   that ICE provide that.  You know, we wouldn't need that in

23   every single case, but we were hoping for some kind of back and

24   forth that would allow us to get that if needed.

25        THE COURT:  Well, that you can do anyway.

1          MS. LARAKERS:  Your Honor, we didn't agree to that one

2     specifically because we don't always have that information at

3     hand.  Of course the government has the information on the

4     I-130 petition, but ICE doesn't have immediate access to it.

5     And again, if you're going to order that we provide the contact

6     information for the individual checking in or where they're

7     detained so they can go see them, then they can get that

8     information through those ways and given that it's just not

9     always immediately available to the officer.

10          THE COURT:  All right.  Well, with regard to the

11     request for name, alien number, country of origin and contact

12     information for the individual and spouse, including location

13     detained, I'm ordering that ICE provide the name, alien number

14     and country of origin.  I'm not ordering that it provide

15     contact information for the individual and spouse, including

16     the location detained, if detained.

17          It's my understanding that with the name, alien number

18     and country of origin, plaintiffs' counsel will be able to

19     determine whether somebody is detained and, if so, where.  And

20     because the aliens will have the notice, if they have a

21     question -- Mr. Segal, why don't you go outside if you want to

22     talk.

23          MS. GILLESPIE:  Sorry.

24          MR. SEGAL:  Sorry, Your Honor.

25          THE COURT:  Since the aliens will have the notice that

1    they're members of the class and can consult counsel if they

2    want to, I think weighing what I perceive to be the need for

3    the information of plaintiffs' counsel and the burden on

4    respondents, I'm not ordering that now.  We'll see how this

5    works.

6         Then the petitioners want the date of -- I'm looking

7    at docket number 290 -- want the date of the final order of

8    removal and the respondents' objection.  Why do you want the

9    date of the final order of removal?

10        MS. McCULLOUGH:  It might be worth considering this

11   row, along with the one following, which requests the I-130,

12   I-212 and I-601A status.  And the reason that we requested this

13   is something that ICE considered in Mr. V's case was that he

14   had not filed an I-212, for example, but then when we learned

15   more about his situation, we learned that his final order of

16   removal was entered in the fall, and he had not been

17   represented by an attorney since that time.  And so that's

18   information that we would want to know about our class members.

19        And this is information that ICE should have, if

20   they're considering a person's pursuit of provisional waivers,

21   and so we don't think that asking them to provide this is a

22   burdensome request.  In this case we have -- we have not asked,

23   for example, for all the A-Files of all the class members,

24   which is something that we think that we would be entitled to

25   as a matter of discovery.  And originally we asked for the

1    limited reporting, and respondents have been providing some

2    limited reporting with the expectation that we could work with

3    them to inquire further.  But given that respondents have not

4    been willing to work with us, we have listed these things that

5    we think, you know, are limited and are simple for them to

6    provide and that would allow us to have enough information on

7    our class members to advise them and to make decisions in this

8    case.

9            THE COURT:  Actually, looking at the -- well, if we

10   look at the chart -- and this isn't rhetorical on my part.  So

11   the information that's on this Exhibit 1, docket number 291-1,

12   for the first alien it says the I-130 is approved; for the

13   second alien it says it's pending, right?  Do you see that?

14           MS. McCULLOUGH:  You're looking at 291-1, Your Honor?

15           THE COURT:  Correct.

16           MS. McCULLOUGH:  For the I-212 it says no.

17           THE COURT:  Right, okay.  It says no for both of them.

18           MS. McCULLOUGH:  Right.

19           THE COURT:  So for these individuals, you get that

20   information, the status of the -- why is that not sufficient?

21           MS. McCULLOUGH:  Well, in the case of Mr. V, Your

22   Honor, and, you know, each case will be different, but he also

23   had -- his chart looked very similar.  He had an approved I-130

24   and did not have an I-212, and Mr. Charles stated in his

25   declaration that that was one of the things he considered in

1    deciding to remove him.  But he didn't get a final order of

2    removal that would allow him -- that would make sense for him

3    to pursue the I-212 and I-601A and that made him a class member

4    until the fall, at which point he was not represented by an

5    attorney.  So if the question is --

6              THE COURT:  At that point, according to what I recall

7    being told, he was separated from his wife, right?

8              MS. McCULLOUGH:  Yes, Your Honor.

9              THE COURT:  But I mean, I'm trying to figure this out,

10   and I could revise this later, but I think your primary

11   interest is in knowing about people who are detained and/or in

12   imminent danger of being removed.  Is that right?

13             MS. McCULLOUGH:  Yes, Your Honor, that's certainly our

14   primary interest.

15             THE COURT:  And are you getting or will you be getting

16   prompt notice of people who are in the class who have been

17   detained?

18             MS. McCULLOUGH:  No, Your Honor.  That's another

19   question which we can address now or --

20             THE COURT:  What's that?

21             MS. McCULLOUGH:  We can address that now, if you

22   prefer, or later when it appears in our proposal.

23             THE COURT:  But what are they giving you now, monthly

24   reports, and the monthly reports show who is detained?

25             MS. McCULLOUGH:  They will be, yes, Your Honor.  They

1   have not provided it yet.  I believe they will be providing one

2   for June in early July.

3          MS. LARAKERS:  And in addition, if the person is going

4   to be removed prior to their inclusion on that month's report,

5   we're giving them notice that they're going to be removed so

6   that the situation doesn't arise where we've already removed

7   the person before they're included on that monthly report.

8          THE COURT:  And we'll get to whether you're going to

9   get five days' notice or not.  But if I accept the petitioners'

10  request, are they going to have to give you information on the

11  status of the I-130s, I-212s and I-601As on every member of the

12  class?

13         MS. McCULLOUGH:  This would just be individuals in the

14  reporting that we request who come into contact with ICE.  So

15  it's not every class member.

16         THE COURT:  So it would include everybody who checks

17  in?

18         MS. McCULLOUGH:  Yes, Your Honor.

19         THE COURT:  And how many people is that, roughly?

20         MS. McCULLOUGH:  We've been receiving check-in

21  reports, maybe 25.

22         THE COURT:  Only 25?

23         MS. LARAKERS:  Per month, Your Honor.  But it

24  wouldn't -- yes, it would be for every person -- they're

25  seeking this for every person who ICE comes into contact with,

1    every person who ICE reports on, which are people being

2    detained and people checking in with ICE currently.

3           THE COURT:  And what's the problem with providing this

4    information for the people who check in?

5           MS. LARAKERS:  Your Honor, it just goes to back to,

6    even if we would have offered that, they weren't going to stop

7    asking for everything else.  We couldn't use it here.

8           So there isn't any operational concern with providing

9    information that's included on ICE's, what they call the PCQS

10   system, the claims on their system.  So if it's included on the

11   claims system, there's not an operational concern.  If, for

12   example, they have to wall CIS because that information isn't

13   on there, then that presents an operational concern.

14          As I understand, the information included on PCQS is

15   if it's approved or denied, and it might have the approval or

16   denial date.  But because USCIS systems and ICE systems aren't

17   linked up, you know, we can't necessarily rely on that date all

18   the time.

19          THE COURT:  Okay.  At the moment I'm not ordering that

20   you regularly provide the status, including filing date --

21   well, actually, let me take a step back.  ICE agreed, I'm told,

22   in 290, to give the status of an alien's I-130 and I-212 and

23   I-601A.  So you're willing to do that?

24          MS. LARAKERS:  Yes, it will say pending or approved or

25   denied.

1          THE COURT:  Okay.  But not the final decision date if
2    a decision has occurred?
3          MS. LARAKERS:  No, Your Honor.
4          THE COURT:  Okay.  So I'm ordering that you provide
5    the status of an alien's I-130, I-212 and I-601A but not the
6    filing date or decision date if a decision has occurred.
7          And you're willing to provide the most recent attorney
8    of record the contact information?
9          MS. LARAKERS:  Yes, Your Honor.
10          THE COURT:  Okay.  I'm ordering that.  Then you're
11    willing to provide the status of the most recent stay
12    application, correct?
13          MS. LARAKERS:  Yes, Your Honor, for the people who we
14    have agreed to reporting on.  The disconnect there is for
15    people who ICE isn't in contact with, either through checking
16    in or through detention.
17          THE COURT:  Okay.
18          MS. LARAKERS:  And if they submit just a random stay
19    request, that's who we're not currently reporting on.  So there
20    wouldn't be any information on that individual.  But for
21    individuals we're currently reporting on, which are the people
22    who ICE is coming into contact with, that's the people who
23    we're willing to provide just whether they've applied for a
24    stay and the outcome.
25          MS. McCULLOUGH:  The reason that we are interested in

1    the stay decisions, Your Honor, is these are class members

2    about whom we may not otherwise know.  And if a stay

3    application is denied, ICE may attempt to remove that person in

4    short order, as we have learned.  And this is what happened

5    with Lilian Calderon at the beginning of this case.  And, you

6    know, given sort of the swiftness of removal, having some

7    knowledge that this person exists and being able to be in touch

8    with them would be helpful in understanding their situation.

9         THE COURT:  Well, a couple of things.  One, pursuant

10   to what I'm ordering, those people will get the notice that

11   they're in the class and can contact class counsel, correct?

12        MS. McCULLOUGH:  Yes, Your Honor.

13        THE COURT:  And Ms. Larakers, why would it be

14   burdensome, how many of these are there, and what's the problem

15   with providing, you know, information on --

16        MS. LARAKERS:  Your Honor, because it's more about --

17   yes, ICE gets a lot of stay applications every day from many

18   different people.  But it's more as -- it's more as to why is

19   it relevant.  Because a person's stay application is denied,

20   that doesn't mean that they're going to be removed.  Their stay

21   application could be denied for many different reasons.  The

22   biggest reason being because it's not properly filed.  For

23   example, they don't have a proper passport.  If those initial

24   requirements aren't met, ICE may not even be looking at whether

25   they're a class member or not because you just have to give ICE

1    what they need in order to approve it.

2          So there are many reasons why these things are denied.

3    And again, if that individual is picked up sometime in the

4    future, in order to be removed, then ICE will be providing

5    information on that person.  If as a result of that stay

6    application they're required to check in with ICE, then

7    petitioners will be provided that information.  So it's an

8    overlap of it's not really relevant and, practically, it just

9    wouldn't happen -- it doesn't seem like that would happen.

10          THE COURT:  All right.  I'm not ordering -- I am

11    ordering that you inform class counsel of the status of the

12    most recent stay application, which you've agreed to, for

13    people who are reporting but not ordering that you provide that

14    information for anybody else; nor am I ordering that you

15    provide the applicable stay decisions and dates or a copy of

16    the most -- of any recent stay decision over the last six

17    months, for example.

18          All right.  Supervision information, if applicable,

19    check-in date, next report.  The respondents are willing to

20    provide check-in date, next report and instructions given,

21    correct?

22          MS. LARAKERS:  Yes, Your Honor.  And those

23    instructions are, Come back with plane ticket, which I haven't

24    seen yet on a report other than for one individual who wanted

25    to be removed; or, Come in at, you know, XX date with your

1    travel documents.  Those are generally what the instructions

2    say.

3            THE COURT:  And then you're not willing to provide

4    information on any restrictive condition, such as GPS

5    monitoring.

6            MS. LARAKERS:  Yes, Your Honor, because it doesn't

7    have anything to do with whether they're going to be removed or

8    not.  And they would have to go into the system, pull that

9    paper that says what they're on, put it down, so it's just one

10   more layer.

11           THE COURT:  So why do you need that?

12           MS. McCULLOUGH:  We would request this as part of the

13   instructions that are given to them.

14           THE COURT:  What's that?

15           MS. McCULLOUGH:  We would request this as part of the

16   instructions that are given to them.  If the person is on GPS

17   monitoring, presumably at the check-in, the person who is

18   checking them in would know about that and could include that

19   in the instructions.

20           THE COURT:  But why do you -- they can give you more

21   than I'm ordering, but why do you need it?  Why do you need to

22   know if somebody is on GPS?

23           MS. McCULLOUGH:  This is another burden and

24   interference in a person's pursuit of provisional waivers.

25           THE COURT:  Why is that?

1          MS. McCULLOUGH:  Because people don't generally like

2    having GPS monitoring.  It could be uncomfortable.  And knowing

3    that this -- we're not obviously asking that nobody be given

4    GPS monitoring, but it's just information about our class

5    members that we would want to have to know the way that ICE is

6    treating them.

7          THE COURT:  At the moment, I don't --

8          MS. LAFAILLE:  Your Honor, could I just add something

9    for a moment?

10          THE COURT:  What is this, a tag-team wrestling match?

11    Go ahead.

12          MS. LAFAILLE:  So another thing that can happen with

13    restrictive conditions of confinement is that people are

14    ordered to stay at home certain days of the week.  You know,

15    all of this is just about giving us a slightly more fulsome

16    picture of what is going on so that we don't have to go back

17    and forth with the government each time, which they have not

18    been willing to do.

19          I mean, each of these little things are little things

20    that may or may not matter in a given case, but when we know

21    that we're going to have this information, it's going to let us

22    have a big picture, be able to have a fulsome picture of what's

23    happening to our class members, which is all that we want.

24          MS. LARAKERS:  Your Honor, they should at least have

25    to show some sort of relevance to what this court has ordered.

1    There's no restriction on ICE in how they decide, based on each
2    individual's flight risk, how they supervise that person.  And
3    again, they can get that information because you've already
4    ordered us to give the contact information for that person, so
5    they can call them and they can ask them.  And indeed, they
6    would probably get more information about how burdensome it is
7    on their life.  But certainly no GPS -- go ahead.

8            THE COURT:  I'm not ordering that ICE provide
9    information on restrictive conditions of supervision.  I mean,
10   if cases arise where, you know, somebody's on GPS monitoring or
11   indeed ordered to stay at home and then they are scheduled for
12   an appointment at CIS, and the restrictive condition -- ICE
13   doesn't give them permission to go to CIS, that would be a
14   matter of concern.  I mean, that's a hypothetical.  But I don't
15   know whether there's any real risk that that's going to occur.
16   And I'll just repeat, whatever I'm ordering now can be revised,
17   so we'll see.

18           Then on the next one, ICE is willing to give the
19   date -- with regard to detained aliens, ICE is willing to give
20   the date detained as to individuals who are in the class who
21   were class members at the time of detention.  So I'm ordering
22   that.  But not for the date and result of any -- actually, I
23   thought there was another dispute here.  Does it come up later?
24   ICE doesn't want to provide information on individuals who
25   become a member of the class after they're detained.  Is that

1    later on in this list somewhere?

2         MS. McCULLOUGH:  I believe that appears at the

3    beginning of this monthly reporting section.

4         THE COURT:  It's where?

5         MS. McCULLOUGH:  The second row at the beginning of

6    the chart.

7         THE COURT:  I see, okay.  What's the problem with

8    providing the information on people who become eligible -- who

9    become class members after they're detained?  I assume those

10   are people who get detained, and then their spouse files an

11   application for an I-130.  Is that who we're talking about?

12        MS. LARAKERS:  Right.  It would be that person, yes.

13        THE COURT:  About how many people is that likely to

14   be?

15        MS. LARAKERS:  Very, very little, Your Honor.

16        THE COURT:  I think that they should -- you know, if

17   ICE knows that somebody's become a member of the class, I think

18   they should know that person is a member of the class because

19   you're going to be giving that person the notice.  So I'm

20   ordering that if somebody is detained and later becomes a

21   member of the class by virtue of the filing of an I-130

22   application that that information be provided to class counsel.

23        MS. LARAKERS:  Okay, Your Honor.  And this probably

24   won't become an issue.  I just want the court to know that

25   because it may -- that date that they come onto the list may be

1    later, right?  So it's just a matter of timing, Your Honor, but

2    we understand we will have to provide information, the same

3    information we're already agreeing to provide.

4            I don't think we actually agree -- just for the

5    record, I don't think we actually agree to provide the date

6    that they were detained.

7            THE COURT:  Well, I'm ordering that in view of the

8    decisions I made last May and June that essentially launched

9    this -- well, with regard to ICE not giving timely custody

10   reviews even under its interpretation of the regulation, which

11   may be too generous to ICE, I think that's important

12   information.

13           MS. LARAKERS:  The date detained, Your Honor?

14           THE COURT:  Yes.

15           MS. LARAKERS:  Okay.  There also are class members

16   that have been detained for a longer period of time because

17   they were in pre-order detention.  Prior to final order of

18   removal, sometimes they just flow right into post-order.  I'm

19   sorry, Your Honor.  I just wanted to put that on the record.

20           THE COURT:  It's okay.

21           MS. LARAKERS:  That's the reason why an individual

22   could be detained.  You may see someone on the list, someone

23   who has been detained for a year, but that may be because they

24   were in proceedings for ten months.

25           THE COURT:  Well, I think it's important that class

1   counsel know when people were detained because, as I believe

2   I've said before, about a year ago I developed the firm

3   impression that the people responsible for administering

4   detention at ICE didn't even know the regulations requiring

5   custody reviews existed.  And in fact, even after -- who was

6   the acting field office director who came from Detroit?  Her

7   name was Rebecca --

8           MS. LARAKERS:  Adducci, Your Honor.

9           THE COURT:  What's that?

10          MS. LARAKERS:  Adducci.

11          THE COURT:  Right.  When I questioned her, she didn't

12  seem to know the regulations existed, even though they were at

13  the heart of the case.

14          Are you familiar with those regulations, Mr. Charles?

15          MR. CHARLES:  Yes, Your Honor.

16          THE COURT:  Okay.  You want to be very careful about

17  not violating those regulations.

18          MR. CHARLES:  Yes, Your Honor.

19          THE COURT:  Because there you're talking about

20  people's liberty.

21          And the next one, respondents are willing to -- as to

22  individuals who did not appear on a prior detention report and

23  are scheduled for removal, respondents agree to provide

24  information about upcoming removal, including the decisionmaker

25  and the reasons for the removal.

1            That would be on the chart as I've required it,

2     wouldn't it?

3            MS. LARAKERS:  Yes, Your Honor.  Sorry.  I wanted

4     to -- I didn't know --

5            THE COURT:  Okay.

6            MS. LARAKERS:  -- if we talked about the date and

7     result of custody review.

8            THE COURT:  The date and result of any custody

9     interview.

10           MS. LARAKERS:  That is an issue where I think we would

11    need to have a certified detained class for the POCR issue,

12    Your Honor.  I don't want to get into a needless back and forth

13    with petitioners about when -- because it could appear --

14           THE COURT:  Because I haven't certified a class, I

15    haven't decided whether to certify a class on the custody

16    claim.

17           MS. LARAKERS:  Yes, Your Honor.  So you can imagine,

18    petitioners receive a chart where it shows that someone has

19    been detained for a year but has yet to receive a custody

20    review.  That immediately becomes a question:  Why haven't they

21    gotten a custody review yet?  The answer is going to be, well,

22    because that person actually did not have a final order of

23    removal, he's scheduled for an upcoming custody review.  So

24    that's the type of situation that providing that reporting

25    would cause significant amounts of back and forth with ICE

1    about the date of custody reviews.  And while it may not be

2    burdensome to require it for people who, you know, in our

3    interpretation of what that class should be, we don't have that

4    class, and I think petitioners would probably disagree.

5            THE COURT:  Well, how would you define that class?

6            MS. LARAKERS:  It would be people who are in post-

7    order detention, Your Honor.  It would be, you know, class

8    members with all the normal --

9            THE COURT:  Well, what if I order that you provide for

10   people who are in post-order detention the date and result of

11   any custody review?

12           MS. LARAKERS:  That would solve a lot of the issue,

13   Your Honor.  It's just, again, when they get that spreadsheet,

14   it's going to say still that they've been detained for a year

15   but only just recently received a custody review.  That

16   doesn't -- that's not going to answer the many other questions

17   they have about, well, why didn't this person receive a custody

18   review on time.

19           THE COURT:  Are there very many of them?

20           MS. LARAKERS:  Yes, Your Honor.  Mr. Ferrera is one of

21   them.

22           THE COURT:  About how many, five, ten, 100?

23           MS. LARAKERS:  Your Honor, I don't know, but we do

24   have one case pending before this court that is one.  So if

25   you've got one pending --

1          THE COURT:  I know, but they can't file a motion
2     without conferring under the local rules.  They would call you
3     and say why has Mr. Ferrera been locked up for a year, and
4     you'll say, well, most of that time was pre-ordered detention.
5          MS. LARAKERS:  That's true, Your Honor.  And if it's
6     just the reporting, just the spreadsheet, we're happy to
7     provide it.  I just wanted to flag that that could become an
8     issue in the future.
9          MS. McCULLOUGH:  I think perhaps a simple solution
10    would be the respondents provide the date for final order of
11    removal for anybody in detention.  That would show whether
12    their detention was pre-order or post-order.
13         THE COURT:  Is that acceptable?
14         MS. LARAKERS:  I think you already ordered that, Your
15    Honor.  If it's not ordered, we can consider it ordered.
16         THE COURT:  I'm ordering that you be provided the date
17    of any order of removal.  Is that what you'd like?
18         MS. McCULLOUGH:  Yes, Your Honor.
19         THE COURT:  And do you also want to know if they're in
20    custody?
21         MS. McCULLOUGH:  Yes, Your Honor.  The custody reviews
22    would also be important to those people for the reasons that
23    you mentioned.
24         THE COURT:  All right.  So I'm ordering the custody
25    reviews for individuals in post-order detention and the dates

1    that they were ordered removed and I'd say I guess the dates

2    they were ordered detained, or you don't want to do that?

3                MS. LARAKERS:  Your Honor, that would be -- it may not

4    be relevant.  The date of final order of removal is what's

5    relevant to the post-order custody review.  And again, it

6    wouldn't just be the date that they were ordered removed.  It

7    would be the date that that order became final, so when the

8    appeal time period ended, you know, et cetera, which is usually

9    about 30 days after they're ordered removed.  If they appeal,

10   then the date -- the final order, it's not final yet.

11               THE COURT:  I may direct you to order this transcript

12   and draft a schedule that memorializes what I'm ordering.  You

13   may have a better understanding of this than my law clerk and

14   me.  Okay?

15               MS. LARAKERS:  Yes, Your Honor.

16               THE COURT:  But we'll see.  What's next?  Are we on

17   removal information?

18               MS. LARAKERS:  Yes, Your Honor.  I think this is like

19   an expansion of what we're willing -- what you've already

20   ordered we provide with the brief explanation.  So I think here

21   we need clarification about how brief or what that explanation

22   has to look like.  If what we provided on the two individuals,

23   as they attach to their exhibit, if that's sufficient, then I

24   think that covers --

25               THE COURT:  That's what I have in mind.  Do the

1    petitioners have something more in mind?

2          MS. McCULLOUGH:  Here we also requested a record of

3    the decision, if one exists, and this would be any kind of

4    contemporaneous --

5          THE COURT:  But I've said I'm not ordering

6    contemporaneous records.  Basically, in my view, what's in

7    291-1 is an example of what should be provided.  So that covers

8    all of the removal information.  What's an EARM printout?

9          MS. LARAKERS:  So categorizing it as an EARM printout,

10   it oversimplifies what EARM is.

11         THE COURT:  What is EARM?

12         MS. LARAKERS:  The best way I can explain, Your Honor,

13   is imagine that you have your Internet pulled up, and you have

14   multiple tabs where you're searching different things, you

15   know, different tabs that have different information about the

16   alien.  Any one of those pages at one time can be printed out,

17   but it can't -- because it's this database where you can click

18   on things and it's interactive and you can put things into

19   boxes, because it looks like a Word document that you can, you

20   know, put information into, it's not so simple that you get a

21   printout.

22         This is, again, I think why they're looking for this

23   is because it's another record of decisionmaking.  Again, it's

24   another thing that would have to be reviewed before going out

25   the door.  And that's where the deliberative process privilege

1    could come into play.

2           THE COURT:  It sounds like I'm likely to deny the

3    request for this, but do you want to be heard on it?

4           MS. McCULLOUGH:  This is information that ICE has

5    about our class members, and it is information that they

6    already have input into a system and that chronicles their

7    treatment.

8           THE COURT:  What's the information?

9           MS. McCULLOUGH:  In order to represent these people

10   who are pursuing provisional waivers and ensure that they are

11   able to do so without undo interference, we would want to know

12   what information ICE is using and tracking about them.  And

13   this is only for people who are detained or being ordered to

14   depart, so this is specific to those people.

15          THE COURT:  But I don't know what information you want

16   from the EARM printout that you don't already have or won't

17   already get.

18          MS. McCULLOUGH:  We want to see the whole picture that

19   ICE is seeing.

20          THE COURT:  Like, what's an example of what you want

21   to see?

22          MS. McCULLOUGH:  So we know that it has their criminal

23   history, immigration history.  I personally have not seen an

24   EARM printout, so I can't sort of list the details in it.  And

25   if there are specific things that respondents are not able to

 1    provide that's in it, then we could discuss that with them.

 2            THE COURT:  Well, I'm denying it.  Again, all of this

 3    is without prejudice.  If something comes into sharper focus as

 4    being important, potentially consequential, you can ask me

 5    again.  But generally speaking, I want to get you information

 6    that's of practical importance and doesn't generate work to

 7    determine whether there's privilege, if it's not that

 8    important, and delays it getting to you.

 9            So any notice of revocation of release, release

10    notice, risk classification assessment printout, post-order

11    custody review notice or decision or other similar detention

12    decision only for detained individuals.

13            I'm sorry.  Why is it that you want this?

14            MS. McCULLOUGH:  For detained individuals, we

15    currently don't have any information about the decision to

16    detain them and often don't get any information that they've

17    even been detained until weeks after that's happened.  So this

18    would provide us some information about what's happened for

19    people who are being arrested and detained and who are in our

20    class.

21            MS. LARAKERS:  Your Honor, again, we're giving them

22    the brief reasons why we decided to effectuate their removal,

23    which covers this court's order.  We're giving them -- we've

24    been ordered to give them the contact information for the

25    individual so they can go see that individual.  That individual

1    and their attorney of record, if they have one, will have all

2    of this information other than the risk classification

3    assessment because all of these have to be served on the alien

4    and their attorney of record.  If they ask the alien and the

5    alien says, I was never served one, that causes a different

6    issue for a different day.

7         But this is, again, another document, another request

8    for a document production, not a reporting request, not

9    something we can quantify by simply putting some information

10   down.  This is, again, something that has to be pulled out of

11   their file, given to an attorney, reviewed, pushed out the door

12   and something that they can just get from the alien themselves

13   as well.  Other than the risk classification assessment, which

14   has very a high likelihood of being law-enforcement sensitive,

15   Your Honor.

16        THE COURT:  And in view of the fact that these people

17   will know that they can call their lawyers, you, if they want

18   to -- this one may require more discussion and some

19   deliberation because a year ago I found that ICE was violating

20   the post-order custody review regulations even as it

21   interpreted them, which may have been too generously to ICE.

22        Why do you want this information?  And put aside the

23   risk classification assessment.  I'm not inclined to order you

24   to get that.

25        MS. McCULLOUGH:  As Your Honor mentioned, earlier in

1    this case, one of the named petitioners was detained for I

2    believe more than three months without receiving the post-order

3    custody review.

4         THE COURT:  I think for almost six months.

5         MS. McCULLOUGH:  And it's our contention that our

6    class members' detention should be reviewed, you know, as soon

7    as possible because they are pursuing provisional waivers.

8         THE COURT:  You may have to come back to me on this.

9    My memory, which I think is reliable, is I never decided how

10   quickly the post-order custody reviews had to be conducted

11   because the removal period -- the regulation doesn't address

12   the situations that were before me.  The removal period had

13   expired.

14        I mean, I wrote about this.  I haven't issued a

15   decision on this, but I am inclined to think that these issues

16   have to be addressed promptly, not 30 days before six months

17   runs out.  So you want -- but you're going to promptly find out

18   when somebody's been detained, correct, under the information

19   I've ordered disclosed?  Is that right?

20        MS. McCULLOUGH:  I'm sorry, Your Honor.  Can you

21   repeat that?

22        THE COURT:  So what I've ordered so far, you're going

23   to get prompt notice that a member of the class has been

24   detained, correct?

25        MS. McCULLOUGH:  I don't believe we've reached that

1   point, but that's something that we've asked for.

2          MS. LARAKERS:  Your Honor, they're going to get it

3   within a month.

4          THE COURT:  Okay.  Whether they're going to -- well,

5   within a month, okay.

6          MS. LARAKERS:  They're going to get, at least they're

7   going to get this information in the same month or, you know,

8   the first week of the next month that the person was detained,

9   which is prior to any custody -- assuming they were detained

10  that month, they're at least getting 30 days' notice to submit

11  the paperwork that is associated with their post-order custody

12  review in order to make it meaningful.

13         THE COURT:  They're getting notice when they're

14  detained?

15         MS. LARAKERS:  Yes, Your Honor.  As I understand,

16  ICE's current practice is to be giving that notice that they're

17  going to have a custody review as soon as possible so they can

18  have the most amount of time to submit that documentation, and

19  then the review is being done prior to that 90th day in

20  detention, as we represented was our position back in

21  September.

22         THE COURT:  Yeah.  It may be your obligation to

23  conduct that review --

24         MS. LARAKERS:  Sooner, perhaps, Your Honor.  But the

25  issue here about the reporting, they are already receiving the

1   date that the alien got the custody review, if any, so they'll

2   know from that information and from any information obtained

3   from the alien, because again, you know, the alien is going to

4   receive this notice.  The alien can contact them.  Petitioners

5   are also going to receive their information.  Petitioners can

6   contact them and let them know that, you know, these are the

7   rights they're entitled to and that, if they don't receive a

8   post-order custody review, if they're having issues with that,

9   then that issue can be raised.

10          It's just at this point in time when we have no

11   evidence that ICE is failing to do -- after your court's order

12   and after we had the field office director in here, you know,

13   saying that he takes the post-order custody review seriously

14   and knows what they require at least as ICE interprets them and

15   that those are being done, absent that, the documents that they

16   can just receive and get from the attorney, from the alien

17   themselves, plus the fact that they're receiving the custody

18   date, in balance it's just not needed, it's not needed for ICE

19   to produce that document at this point in time.

20          And then if it becomes an issue in the future, if they

21   can show that an alien has a post-order custody review that

22   wasn't done on time, then we can revisit it.  But at this point

23   in time there's simply no reason why they need this information

24   on top of all the other information that they're getting.

25          MS. McCULLOUGH:  Your Honor, these are individuals who

1    are being arrested and taken away from their United States

2    citizen spouses, in many cases children, and held in jail.  We

3    aren't learning about it until, in many cases, more than 30

4    days after it's happened.  In the case of Mr. V, he was

5    arrested on June 2.  If he hadn't been removed, we still

6    wouldn't know that he was in jail.

7         And all we're asking for here is information about the

8    review process for these people who are pursuing provisional

9    waivers.  And so Your Honor doesn't need to decide this bigger

10   question about what the POCR regulations require.  With respect

11   to our class members, detention and removal is separating them

12   from their family, and it's imposing a hardship that these

13   regulations, you know, were in part intended to prevent.

14        THE COURT:  Okay.  I'm ordering that ICE provide

15   prompt notice of any revocation of release, release notice,

16   post-order custody review notice or decision or other similar

17   detention decision only for detained individuals.  I'm not

18   ordering that the risk classification assessment printout be

19   provided.

20        MS. LARAKERS:  Your Honor, I think that there's a

21   major difference between the notice of revocation of release

22   and release notice.  First of all, I don't know what a release

23   notice is.  ICE has forms.  They have names.  Release notice is

24   not one of those.

25        Notice of revocation of release, I think that's

1    revocation of an order of supervision.  That happens before the

2    person is detained.  That's not an issue in this lawsuit.  The

3    only issue in this lawsuit that has been raised and that is in

4    the complaint is the post-order custody review.  So at most,

5    the only thing that ICE should have to provide is the

6    post-order custody review documents.

7         THE COURT:  Well, is there an order -- well, you're

8    giving them the date that somebody's been detained, right?

9         MS. LARAKERS:  Yes, that's been ordered, Your Honor.

10   We're giving the date of the decision of the post-order custody

11   review.  This is in the request for the document related to

12   that custody review.  If we have to give it, if ordered, we

13   will, Your Honor.  But again, the difference I'm trying to make

14   is between the post-order custody review, which is an issue in

15   this lawsuit and is included in their complaint, and the

16   revocation of release and release notice, whatever that is.

17        THE COURT:  The revocation of release isn't a decision

18   to detain?

19        MS. LARAKERS:  I don't -- not always, Your Honor.  It

20   may be a revocation -- again, the form is not called, I don't

21   think, a revocation of release.

22        THE COURT:  What's it called?

23        MS. LARAKERS:  I think it's called revocation of an

24   order of supervision.  I don't know the answer to that, Your

25   Honor.  My point is that it's the post-order custody review

1    that's at issue in this lawsuit.

2           THE COURT:  I'm ordering that ICE provide class

3    counsel with whatever document notifies an alien that he or she

4    is going to be detained.  And when you write up the schedule of

5    what I'm ordering, Mr. Charles will have found what the

6    document is so you can show it to class counsel and describe it

7    with specificity.  Okay?

8           All right.  Then it says upon request the I-130, I-212

9    and/or the I-601A applications.  Why do class counsel need that

10   from ICE?

11          MS. McCULLOUGH:  In some circumstances we may want

12   contact information for the spouse.  It may be that if a person

13   is unrepresented, they don't have a copy of the forms that they

14   filed.  And these forms can give us a lot of information about

15   their pursuit of provisional waivers.

16          THE COURT:  Well, if the person is detained, you'll

17   know where the person is and can ask, right?

18          MS. McCULLOUGH:  The person may not have -- especially

19   if they're detained, they won't have those --

20          THE COURT:  You can ask what's your spouse's telephone

21   number, right?

22          MS. McCULLOUGH:  Yes, Your Honor.  There is other

23   information in those forms.

24          THE COURT:  I'm not ordering it.  You can ask ICE for

25   it.  I assume it's going to be a limited number of

1    circumstances.  If you run into a problem, you can come back

2    and ask me.  But basically, try to strike a balance so you get

3    what I regard as essential or important information so you can

4    do your job without requiring that ICE go out and look for a

5    lot of documents that may not have any practical significance.

6            MS. LARAKERS:  Your Honor -- go ahead.

7            MS. McCULLOUGH:  We understand that, Your Honor, and

8    that is the situation that we were in until a couple of weeks

9    ago when we were given nothing more than a statement that they

10   considered Mr. V's provisional waivers.

11           THE COURT:  I'm ordering -- you're going to get

12   considerably more.  Try it this way.  Here.  I'm making

13   decisions.  We'll see if it works.  If it doesn't -- you know,

14   if you're not getting something that's important, you'll come

15   back and say, Judge, it was imperfect.  We need this.  Okay?

16           MS. McCULLOUGH:  Yes, Your Honor.

17           MS. LARAKERS:  Your Honor, for the record, this does

18   cause a serious operational concern with USCIS as well because

19   these are included in the individual's A-File.  That A-File is

20   almost never with ICE at the time the individual is detained.

21   And in fact, it may be with USCIS for the purpose of

22   adjudication.  And requesting a copy means that USCIS has to

23   stop its adjudication and either send that A-File to ICE or

24   copy it.  It takes a lot of time.

25           THE COURT:  It's helpful for me to know that and for

 1        it to be on the record, but I'm not ordering it now.

 2              Okay.  So the next one is respondents will provide

 3        class counsel notice within two business days when a class

 4        member is arrested or ICE becomes aware that a class member is

 5        in custody.  So I've already ordered that they give class

 6        counsel notice.  The question is how quickly.  Right?

 7              MS. McCULLOUGH:  Yes, Your Honor.

 8              THE COURT:  And then the respondents want five

 9        business days' notice before removal.  Why don't you explain,

10        please, your respective positions on this notice of detention

11        and removal.

12              MS. McCULLOUGH:  Your Honor, you asked Mr. Charles to

13        explain why respondents were unable to provide five business

14        days' notice to petitioners' counsel before removing class

15        members who are currently parties to this case and whose final

16        rights have not been adjudicated in this lawsuit.  And his

17        explanation for doing so suggested that ICE's concern was that

18        these people may challenge the lawful execution or whether

19        their removal is lawful and may require ICE to stay that

20        removal.

21              So effectively ICE's reason for refusing to give us

22        five days' notice is that it intends to inhibit their ability

23        to exercise their legal rights to ensure that their removal is

24        lawful.

25              THE COURT:  And what's the response to that?

1          MS. LARAKERS:  Your Honor, there is no bad faith here

2     on behalf of ICE not to notify petitioners' counsel.

3          THE COURT:  Hold on just one second.  So I think the

4     discussion is about 284-1, paragraph 3.  Mr. Charles said,

5     "From an operational standpoint, ICE has the ability to

6     effectuate removal in less than five business days.  Thus, if

7     such advance notice is given, it is not uncommon for

8     individuals to take proactive steps to counter ICE operations

9     in an attempt to prevent an individual's removal.  Therefore,

10    providing five business days' notification would in some cases

11    require ICE to stay the removal of aliens with administratively

12    final orders of removal and necessarily affect ICE Boston's

13    limited detention capacity and enforcement operations."

14         Is that what you were referring to?

15         MS. McCULLOUGH:  Yes, Your Honor.

16         THE COURT:  Okay.  So what does that mean,

17    particularly "proactive steps"?

18         MS. LARAKERS:  Well, certainly the way I took it --

19    and certainly you may have questions of Mr. Charles, but the

20    way I took it is that it's known that people have, you know,

21    showed up to airports and showed up -- there can be protests

22    and there can be other sorts of things to keep people from

23    physically being removed.  And there is a law enforcement

24    officer safety issue when people know the exact date that

25    they're going to be removed.  That's what I took it as, Your

1    Honor.

2         Certainly ICE Boston knows the legal rights that these

3    individuals have.  They know what they have to comply with.

4    There is no bad faith on behalf of the government here not

5    to -- to just delay to tell petitioners' counsel so they can't

6    file anything with this court.

7         We're doing -- in fact, we agreed to give the notice

8    prior to the month's end if the individual is being removed out

9    of a showing of good faith.  We're just not willing to put a

10   time date on it because that could affect ICE's operations

11   because ICE does have the ability to remove in under five days.

12        THE COURT:  Well, what if there was some protective

13   order?  Here is an immediate reaction, and I think this is a

14   serious issue.  I understand that -- I mean, I hear your

15   argument that -- I understand I think your argument that if you

16   give somebody notice they're going to be removed in five days,

17   you know, maybe they'll abscond, maybe there will be protests,

18   maybe it will be dangerous if ICE is going to go and get them.

19   Is that involved here?

20        MS. LARAKERS:  Yes, Your Honor.

21        THE COURT:  On the other hand, petitioners are

22   concerned that if the lawyers -- and I guess they'd have to

23   talk to their clients -- don't know this is about to happen,

24   how can they represent them and make any legal arguments that

25   class members have a right to stay here so the provisional

1    waiver process can be pursued?

2         MS. LARAKERS:  I understand that concern, Your Honor.

3    The argument is that there is no bad faith on behalf of the

4    government to provide that reasonable, timely notice to the

5    extent that we can.  And even in Mr. V's case, we provided it

6    in plenty of time for them to consider it and to file a TRO

7    with this court and to meet and confer with respondents about

8    it.

9         THE COURT:  Is it Mr. Charles' position -- he can tell

10   me -- that in some instances ICE wouldn't be able to give five

11   days' notice because it gets the papers saying the receiving

12   country will accept the alien and that may be within five days?

13        MS. LARAKERS:  Yes, Your Honor.  So they may have a

14   person scheduled for a flight but not receive the travel

15   documents yet.  They may not schedule the person for the flight

16   and then receive travel documents at a late point in time, and

17   then they can put them on that flight that's already been

18   scheduled.

19        There are many different situations, which of course

20   he can explain to you.  But it's not because the government is

21   trying to hamper petitioners' ability to represent members of

22   the class.  It's operational concern.  It's security, which,

23   Your Honor mentioned a protective order, but it's mostly

24   operational concern.  And I know this argument ties directly

25   into why I keep calling this a preliminary injunction, because

1   if you require this information, if you require five days'

2   notice, if ICE can't remove an individual, if they can't give

3   five days' notice, that's enjoining them from putting them on

4   that flight.

5        THE COURT:  Well, what I'm thinking of is saying that,

6   you know, unless ICE does not have all the information

7   necessary to schedule the removal more than seven days in

8   advance, it has to give five days' notice, or something like

9   that.  In other words, it creates an exception to the

10  circumstances where, you know, there's a flight going to the

11  Dominican Republic but the travel documents only come three

12  days before.  Then you'd have to give notice when ICE learns, I

13  guess.

14       MS. LARAKERS:  I understand, Your Honor.  And I think

15  in a perfect world, that would work.  I think the fight we next

16  get into that is inevitable is, okay, well, when did ICE know

17  that they were going to remove this person?  Well, ICE may have

18  known on this day.  The FOD may have approved it on this day.

19  They had travel documents all along, but the FOD wasn't sure if

20  he was actually going to remove the individual.  And then we

21  get into a massive fact fight about why we should have given

22  notice.  And that's precisely why we don't want to agree to the

23  notice.  But again, there's no evidence that we're in bad faith

24  trying to deprive anyone of their legal rights.

25       THE COURT:  Well, when do you anticipate giving notice

1   if I don't issue an order establishing a timeline for doing so?

2        MS. LARAKERS:  Your Honor, I receive the information

3   from my client.  I'm not sure exactly how long it takes to get

4   from putting it on the spreadsheet to the attorneys at ICE, for

5   that conversation to happen and for it to get to me.  But it's

6   not -- we're not deliberately trying to delay it so that

7   petitioners don't get it within a reasonable time period.

8   We're doing our best to give reasonable notice, Your Honor.  I

9   have no information that indicates that there's any bad faith

10  involved when we're giving this information.

11       MS. McCULLOUGH:  Removing these people is the ultimate

12  harm that this entire litigation has been brought to prevent

13  and of course is an enormous harm on their families.  And not

14  only that, it also takes them from the jurisdiction of this

15  court while this litigation is ongoing.  And we are not asking

16  for advance notice before a person's arrest.  And many of the

17  things that respondents' counsel pointed out are concerns that

18  may arise if somebody is not in detention.  But for the most

19  part, these people are in detention, I believe in all cases

20  that we have been aware of so far.  And not only that, we are

21  not asking for the date of their removal.  So they could just

22  tell us in advance, five days, without telling us, you know,

23  it's going to happen on this date.  And that's indeed what they

24  did with their most recent notice.

25            So there is still no operational concerns that we can

1    see that realistically prevent five days' notice before people

2    are taken from this country and removed from this case.

3            THE COURT:  All right.  Well, I'm ordering that,

4    unless ICE cannot reasonably provide the five days' notice to

5    class counsel that a member of the class is going to be

6    removed, it shall provide that notice.  If circumstances do not

7    provide -- do not permit five days' notice, then they shall

8    provide notice of the removal to class counsel as promptly as

9    reasonably possible.  And hopefully there will be no cases that

10   require that we litigate whether the notice was given.

11           And again, let's see if this works.  And if there are

12   issues that emerge, I'm saying it repeatedly, I'm willing to

13   reconsider all of this based on experience.  If this proves to

14   be burdensome or impossible for us, I'll consider it further.

15   If class counsel, because they're not getting many of the

16   things I'm not ordering, find they can't adequately and

17   properly represent some of their clients, I'll reconsider this

18   based on experience.  But I think you all try to make it work,

19   and we'll see what happens.

20           MS. LARAKERS:  I understand, Your Honor, and I

21   appreciate your flexibility on the issue.  I just have to say

22   again that we've come a long way since this lawsuit has

23   started.  This court ordered in September of last year that ICE

24   must consider.  We are now here almost a year later where we've

25   had no situation and petitioners have not brought forward a

1    single person that has had any lack of consideration.

2         Ordering five days' notice, even on a reasonable

3    basis, which I do appreciate Your Honor building in, it's

4    still -- it's still enjoining some sort of action of ICE.  It

5    doesn't enjoin it to the max as petitioners wanted, but it is

6    still enjoining some action of ICE.  And that's our position,

7    Your Honor.  It's our position that that's enjoining some

8    conduct of ICE.  And again, without petitioners having to show

9    that --

10        THE COURT:  Then, fine.  I'll give you a date in July.

11   If you want to spend time briefing that -- I don't believe I've

12   issued a preliminary injunction.

13        MS. LARAKERS:  You haven't, Your Honor.

14        THE COURT:  I've set up a process that will permit, I

15   hope, if necessary -- actually, I hope it won't be necessary,

16   but if necessary, an orderly process for the filing of a motion

17   for a temporary restraining order, a response and a hearing on

18   whether some form of injunctive relief should be ordered.  I

19   don't view that as a temporary restraining order or a

20   preliminary injunction.  But you've said this a couple of times

21   in your submissions without briefing it.

22        MS. LARAKERS:  Your Honor, that's all we're asking.

23        THE COURT:  If you want to brief the issue, we'll take

24   it up in August or September or whenever.

25        MS. LARAKERS:  Your Honor, that's all we're asking for

```
 1   because our position is any requirement on ICE prior to removal
 2   is an injunction.
 3            THE COURT:  Are there cases that have held that?
 4            MS. LARAKERS:  Yes, Your Honor.
 5            THE COURT:  All right.  They haven't been presented to
 6   me.
 7            MS. LARAKERS:  And Your Honor, this is specifically
 8   why we're asking for the briefing.  Because it's petitioners'
 9   burden here to show that they need this information.
10            THE COURT:  Right now it's your burden to persuade me
11   that I've issued a preliminary injunction.
12            MS. LARAKERS:  Your Honor, any prevention --
13            THE COURT:  I know you said it, but the fact that you
14   keep saying it doesn't persuade me that it's true.
15            Look, we've been doing this for two hours, and there's
16   more to do, and I have other things to do today.  So I've told
17   you, I'll give you a date.  Let me have the calendar.
18            I've repeatedly said in this case, Zannino, if you
19   just mention something in passing in your pleadings and don't
20   brief it, it's waived.  So this issue has never been presented
21   to me, and I haven't decided it.
22            So here we go.  If you want to file something -- well,
23   first I'll have to enter the order -- but requesting relief
24   from this provision, maybe every provision, file it by --
25   because you say this is a preliminary injunction, file it by
```

1    July 19, and any response shall be filed by August 2, any reply

2    by August 9.  We'll see where we go from there.

3           MS. LARAKERS:  Okay.  Again, Your Honor, I appreciate

4    your flexibility on the issue.  It's not that what you've

5    ordered here is unreasonable for the government.  It's maybe

6    just a matter of academics, except for on that last issue with

7    the five days.  That's our biggest issue, Your Honor.

8           THE COURT:  All right.  It is a big issue because if

9    somebody is sent out of the country and if the matter was

10   presented and they would be entitled to a temporary restraining

11   order, preliminary injunction or permanent injunction, that

12   person and particularly their American citizen spouse, and

13   probably children, will have been irreparably harmed because

14   ICE made a mistake.  And this is where we were a year ago.

15   Profound human consequences because ICE violated the law.

16   People are being removed because they violated the law.  They

17   came here illegally, although some of them were brought here

18   when they were three years old.

19          But I know that Mr. Charles, like me and every

20   employee in the United States government, takes an oath to

21   faithfully execute the Constitution and laws of the United

22   States.  And if you violate a law or regulation, you've acted

23   illegally, and you've violated your oath.

24          And I fully -- what I'm ordering today would be very

25   different if I wasn't alert to what I perceive to be the

1    performance of ICE essentially since last June.  I would be

2    ordering much more.  But as I said, as long as I'm assured that

3    Mr. Charles and certain other people are making decisions and

4    certain limited information that you can live with is being

5    given to plaintiffs' counsel -- and I think it might have been

6    reasonable for me to order records of decision, but I don't

7    think it's the most appropriate thing.

8            So anyway.  There we are.  But look, time is limited,

9    and this is bumping into a meeting I have with colleagues.  So

10   I think that resolves all the issues relating to notice,

11   doesn't it?

12           MS. McCULLOUGH:  The last issue is how soon they would

13   notify us that they've detained one of our class members.

14           THE COURT:  How soon would they what?

15           MS. McCULLOUGH:  They would notify us that they have

16   detained one of our class members.  And for this we requested

17   two business days to be notified about that decision.  As I

18   mentioned before, Mr. V was held for 11 days before we had any

19   idea that he had been arrested and detained.  And, you know,

20   there may be class members right now who are in detention about

21   whom we have no idea.

22           THE COURT:  Because they only come up on monthly

23   reports.

24           MS. McCULLOUGH:  Yes, Your Honor.

25           THE COURT:  So you want two days.  What's ICE's

1    position?

2         MS. LARAKERS:  Maybe a clarification on the first

3    point, Your Honor.  I think they want all this information that

4    you're ordering or that they requested within two business

5    days, not just notification that a class member has been

6    detained.  And again, just because a class member has been

7    detained doesn't mean that they're necessarily going to be

8    removed.  ICE has put in several steps that --

9         THE COURT:  Well, I don't understand that I've ordered

10   everything be done in two days.

11        MS. LARAKERS:  Exactly.  You haven't even ordered,

12   Your Honor, that the consideration be done prior to detention.

13   You've ordered that it be done prior to removal.  As I

14   understand, it is being done in many cases prior to detention

15   wherever possible.  There are multiple backstops in this

16   process.  The consideration is happening on every single level.

17   That person may end up being released a couple of days after

18   they're detained if the FOD doesn't agree that the person

19   should be removed.

20        THE COURT:  Where is the -- I'm looking at document

21   290.  Where is this request about two days' notice of

22   detention?

23        MS. McCULLOUGH:  This is the bottom of page 3, Your

24   Honor, the bottom of the chart.

25        THE COURT:  I see.

1          MS. McCULLOUGH:  We're simply requesting the chart

2     that respondents say shows their consideration of provisional

3     waivers, and that information in that chart --

4          THE COURT:  But the chart is with regard to removals,

5     not detentions.

6          MS. McCULLOUGH:  Well, our claim is that these

7     people's pursuit of provisional waivers should be considered

8     before they're arrested and detained.  That also takes them

9     away from their families.  And the purpose of that --

10         THE COURT:  I know it's a major matter, I mean, in

11     human terms, but I haven't even certified a detention class

12     yet, have I?

13         MS. McCULLOUGH:  These claims apply just as much to

14     the class that you have certified, Your Honor.  These are all

15     people who are pursuing provisional waivers.  And this is an

16     interference with that pursuit.  And ICE should at least show

17     that they know these people are pursuing provisional waivers

18     two business days after they've already arrested them and

19     decided to hold them in jail.

20         MS. LARAKERS:  Your Honor, we'd like to briefly

21     mention that they're going to get the notice as you've already

22     ordered that they get.

23         THE COURT:  How quickly are they likely to get the

24     notice?

25         MS. LARAKERS:  Your Honor ordered it as soon as

1    reasonably possible after knowing that they're a class member.

2         THE COURT:  They're going to get the notice that

3    they're represented by counsel.

4         MS. LARAKERS:  Yes, the notice that they're

5    represented by counsel.  In all reality here, we're talking

6    about a very short period of time.  You're already thinking

7    about giving them -- or have given them the five business days'

8    notice before removal.  The fact they said that there should be

9    some sort of notice after detention is something that the court

10   has not focused on yet, as you've stated.  This court's order

11   is focused on consideration prior to removal.  They may not --

12   that same chart may not apply to someone who is in detention.

13        THE COURT:  What chart may not?

14        MS. LARAKERS:  The chart that respondents are

15   providing about the FOD approval.  It may be that someone comes

16   into detention already having been considered for the

17   provisional waiver process but not yet at that DFOD or FOD

18   level yet.  Because that decision, that final decision on

19   removal is being made by the field office director or the

20   deputy field office director.  That decision may happen three

21   days after being in detention.  It varies in each case.

22        But again, on balance, Your Honor, they simply don't

23   just need all of that information within two days.  And in

24   fact, that might actually cut against them.  Because if they

25   want to give ICE times to build in these backstops for multiple

1    layers of review, they want that final decision, Your Honor.

2            THE COURT:  Review of detention or review concerning

3    removal?

4            MS. LARAKERS:  Both, Your Honor.  They're going to

5    want a considered decision by ICE.  And if ICE is required to

6    give them notice within two days, that may rush ICE into that

7    FOD consideration.

8            THE COURT:  Consideration of what?

9            MS. LARAKERS:  Of a pursuit of provisional waiver,

10   Your Honor.

11           The chart that respondents are providing says two

12   things.  It says that the provisional waiver process was

13   considered and who made that consideration, that final --

14   before the effectuation of their removal order.

15           THE COURT:  And isn't it also going to tell them

16   whether the person is detained?

17           MS. LARAKERS:  Yes, Your Honor.

18           THE COURT:  And how quickly are you going to give this

19   chart after a detention?

20           MS. LARAKERS:  It's going to be like -- it's going to

21   be reasonably after the field office director makes a decision

22   on the person's removal and no later than 30 days because we're

23   required to give the report monthly.

24           So if the field office director makes a decision or

25   deputy field office director makes the decision to effectuate

1    removal of a detained person, if that person is going to be

2    removed before their inclusion on that monthly report,

3    respondents have agreed to provide, you know, reasonable

4    notice.  If they're not going to be removed until after the

5    report is given to petitioners, then the report will be given.

6    So there will be no person who is going to be detained longer

7    than 30 days without notice to petitioners.  And again, they

8    don't just want, hey, your class member is detained.  They want

9    all of that information.

10        THE COURT:  Well, I think right here all they want to

11   know is their class member has been detained.

12        MS. LARAKERS:  Perhaps that's what they want, but

13   that's not how I read the report.  But they can clarify.

14        MS. McCULLOUGH:  We would at least want notice that

15   they've been detained.  We would ask for the simple information

16   in this chart stating that they --

17        THE COURT:  No.  Because you don't -- no, I'm not

18   ordering they give you the chart in two days.  I didn't

19   understand that.

20        Look, I ordered you to brief all of this.  You're

21   going to stall all of your discovery because I'm 20 minutes

22   late for a meeting with my colleagues, I have two other

23   appointments today, and then I'm gone.  So I'm ordering that

24   within five days of detention of the class members that ICE

25   inform class counsel that a class member has been detained, but

```
 1    I'm not ordering that you give the chart.  We want a
 2    deliberative process with regard to removal, and the
 3    deliberative process is going to take some time.
 4              MS. LARAKERS:  Would that just be the A number, just
 5    the identity of the person, just name, A number?
 6              THE COURT:  That this person appears to be a member of
 7    the class; he or she has been detained; he or she is being
 8    considered for removal; and he or she has been given the
 9    notice.  But you should give enough information so they can
10    identify the person.  This is the name --
11              MS. LARAKERS:  Right.
12              THE COURT:  -- the alien number, country of origin,
13    person is detained.  I think you ought to say where.
14              MS. LARAKERS:  Enough so that they can look up
15    themselves where they're detained --
16              THE COURT:  Right.
17              MS. LARAKERS:  -- taking the representation, name,
18    alien number?
19              THE COURT:  Yes.
20              MS. LARAKERS:  Okay.
21              THE COURT:  That's that.  Now, I'm ordering that you
22    order preparation of this transcript on an expedited basis,
23    which will be a challenge for the court reporter since we were
24    here until 6:30 last night in another matter, between 6:10 and
25    6:30, but this one should take priority.
```

1      What's the minimum reasonable time for you to confer

2   and agree on -- and I don't want any disagreements -- on what

3   I've just ordered, to prepare a schedule that will be appended

4   to an order that I'll issue after you get the transcript,

5   hopefully tomorrow or Monday.

6          MS. LARAKERS:  So you mean like a proposed order that

7   you can just sign?

8          THE COURT:  Right.  Say, here, for the reasons -- I'm

9   going to issue an order for reasons stated in court on June 27,

10  2019, the following has been ordered, and then I'll either

11  attach it or incorporate it in my order.  You're going to have

12  to get the transcript, confer and agree.  And you don't want to

13  disagree.  If you disagree on anything, tell me what you think

14  I meant, and I'm going to choose one or the other.

15         MS. LARAKERS:  I hope not to have any disagreements,

16  Your Honor.  Can you give us at least a week, Your Honor, since

17  we're not going to have any disagreements?

18         THE COURT:  I think a week from now is the Fourth of

19  July.  Do you want -- and I don't want to ruin your Fourth of

20  July, but I don't want anybody's rights to be injured either.

21  How about two weeks?

22         MS. LARAKERS:  Sounds great.

23         THE COURT:  No later than July 10.

24         MS. LARAKERS:  Sounds great, Your Honor.  Thank you.

25         MS. McCULLOUGH:  Thank you, Your Honor.

1          THE COURT:  Now we have some discovery issues, right?

2    Here, I'll help you with my tentative thinking.  I've already

3    authorized the deposition of Mr. Charles, right?  You've chosen

4    not to take it yet.  You can take that.  Tell me why you want a

5    deposition of somebody from CIS, what's the relevance to a

6    declaratory judgment.  Here, we did this in the lobby but it's

7    under seal.

8          My thinking is about where it was when I last

9    discussed this with you.  I think information concerning what

10   occurred before roughly last spring is relevant.  In many cases

11   I would allow that discovery immediately, but I think it has

12   the potential to have adverse consequences in this case.

13         To get declaratory relief or injunctive relief, the

14   petitioners are going to have to show not only there was a

15   historical violation but that it's continuing and it's likely

16   to persist after any decision by me.  And I see at the moment

17   Mr. Cronen is primarily, if not exclusively, historic.  I'm not

18   inclined to order a deposition of Mr. Cronen.  I've already

19   authorized the deposition of Mr. Charles.  And the open issue

20   is what would -- why should there be a deposition of a

21   representative of CIS, what will it tell us, me, about whether

22   there's some ongoing violation.

23         The petitioners say there's reason to be concerned

24   that CIS is delaying or not scheduling I-130 interviews which

25   would frustrate the operation of the provisional waiver

1    process, but I don't know what that's based on.  I do have a

2    recollection that's mentioned I think in petitioners'

3    submission of one email before last spring when CIS was telling

4    ICE when people were coming in for I-130 interviews, there was

5    a request from ICE of, Can you make it later, our agent is

6    running late.

7           But if that's all there is -- and to my knowledge

8    there haven't been any arrests at the I-130 interviews

9    essentially since this case started, and I haven't issued an

10   order prohibiting them.  I might have if I had to focus on it,

11   or I might not.  But they're not doing it.  So anyway.  That's

12   the frame of mind with which I start.

13          MS. CANTIN:  Good afternoon, Your Honor.  If I could

14   just take a step back.  Everything that we're doing at this

15   point with respect to discovery has two main purposes.  Now

16   that the motion to dismiss has been fully resolved, you

17   certified a class, we are trying to move this case forward to

18   the next phase, and we are trying to get to resolution.

19          Now, whether or not resolution is settlement or

20   preliminary injunction or full-on trial is going to depend on

21   the discovery that we receive.  And after months of

22   negotiation --

23          THE COURT:  There's an open legal issue that I haven't

24   decided, whether I have the authority to grant injunctive

25   relief.  But anyway, go ahead.  That's why I look at this

1    mainly as a declaratory judgment.  That's certainly in the case

2    based on my rulings.

3          MS. CANTIN:  We have worked with the government, and

4    petitioners have narrowed and tailored the discovery.  Now

5    we're down to eight document requests and three depositions.

6          And the purpose of this very targeted discovery is

7    twofold.  One is to understand what respondents are currently

8    doing so we can assess whether there's an ongoing violation

9    with respect to the due process claim and also now these other

10   three claims that Your Honor has allowed to go forward.  The

11   second is -- and that will inform what type of relief we

12   ultimately seek and whether the information we learned will

13   inform what settlement relief we want.

14         Second is, if we need to be able to prove up our

15   claims at the end of all of this, we need discovery and we need

16   to understand what happened in 2017 and what happened in 2018.

17         THE COURT:  And to me, you might get that later in the

18   case, but I'm not inclined to give it to you now.  It's not a

19   case where you're going to get one deposition from ICE.  And if

20   I don't let you have Mr. Cronen's deposition now, it doesn't

21   mean I'll never let you have it.

22         I do think -- as you know, I think it would be very

23   much in the public interest if you reached an agreed resolution

24   of this case and that I think will be facilitated if you get

25   the information about what's being done now, what's likely to

1    be done in the future.  And one way to resolve the case is to

2    agree to stay it.  We've discussed this before.

3         So if Mr. Charles is there or he has a successor who

4    continues his policies as he's continuing his recent

5    predecessor's policies and you're getting information so you

6    can monitor what's going on and represent any individual class

7    members who have particular issues or urgent problems, you

8    know, the case is stayed.  And then if the practices of ICE

9    change, it can be reactivated.  Or you can agree to a

10   settlement.  And if it's embodied in a court order, the order

11   will run for some period of time.

12        So right now, even though there's discovery I might

13   authorize, if this is full-blown preparation for a foreseeable

14   trial or motion for summary judgment, I think the efficient

15   thing to do would be to focus on what's of immediate importance

16   to facilitate your discussions about resolving the case by

17   agreement.

18        MS. CANTIN:  So to answer Your Honor's two questions

19   about CIS and the deposition of Mr. Cronen, first of all,

20   Mr. Cronen is at the epicenter of this litigation.  And while

21   Your Honor sees Mr. Cronen's role as dealing with the past, in

22   fact, his role very much touches on what's happening in the

23   future and the present.

24        As you know, he was the FOD from August 2016 to

25   January 2018, so he was the FOD when the provisional waiver

1    regulations went into effect, when the Executive Order went

2    into effect in January 2017, when he made the decision to start

3    arresting people categorically at CIS, which Mr. Lyons himself

4    testified to.  And now in January 2018, he moved on to

5    Washington where he is currently supervising all of the field

6    offices and their enforcement actions for the Eastern United

7    States.  So what he is doing in Washington is very relevant to

8    how the administration and ICE is treating class members and

9    their intended future treatment of --

10        THE COURT:  Okay.  I'll help you out.  I'm not

11   authorizing the deposition of Cronen now.  It's denied without

12   prejudice.  Talk to Mr. Charles.  I don't get the impression

13   that Mr. Cronen, that he's controlling what's going on in this

14   district, which is all I have jurisdiction over.  So, you know,

15   take Mr. Charles' deposition.  I'm denying it without

16   prejudice.

17        Go ahead.  What about CIS?

18        MS. CANTIN:  For CIS, the goal is twofold.  Right now

19   we want to understand how CIS is treating class members and

20   what they're doing with respect to the I-130 applications, why

21   they're not scheduling for interviews.

22        THE COURT:  What evidence is there they're not

23   scheduling for interviews?  Why do you make that

24   representation, that argument?  You've got a Rule 11 obligation

25   to have a reasonable factual basis for the assertion that

```
 1    they're not scheduling interviews.
 2              MS. LAFAILLE:  Your Honor, I've heard that myself from
 3    immigration attorneys.  And at a meeting with USCIS leadership,
 4    it was acknowledged by USCIS leadership.
 5              THE COURT:  Who at CIS said that?
 6              MS. LAFAILLE:  I believe it was Mr. Riordan himself.
 7              THE COURT:  Denis Riordan?
 8              MS. LAFAILLE:  (Nodding.)
 9              THE COURT:  And is Denis Riordan the person you'd like
10    to depose?
11              MS. CANTIN:  The government has told us they have
12    selected a 30(b)(6) witness.  I don't know who that person is.
13              THE COURT:  Who would it be?
14              MS. LARAKERS:  I'm sorry, for USCIS?
15              THE COURT:  Who would the CIS witness be?
16              MS. LARAKERS:  Your Honor, that's dependent on when
17    the deposition gets scheduled and the topic of that deposition.
18    We have a couple of people in mind.  I'm not aware of all the
19    names.
20              THE COURT:  Is Mr. Riordan one of them?
21              MS. LARAKERS:  No, Your Honor, he's not.  Again, I
22    don't --
23              THE COURT:  Just to be clear, I know Mr. Riordan.  I'm
24    very -- when I was the chief judge and since, we've done many
25    naturalization ceremonies together.  If he turns out to be the
```

1    witness, you can find some of the ceremonies, I've said nice

2    things about him.  And we've done other things relating to

3    immigration matters together.

4         I wouldn't have any difficulty impartially deciding

5    issues related to him, and maybe he wouldn't even be a witness.

6    But if his testimony or credibility becomes anything I should

7    judge, you should know about that relationship, and you can ask

8    me more about it if and when it becomes an issue.  Go ahead.

9         MS. LARAKERS:  Me, Your Honor?

10         THE COURT:  Okay.  They want to ask CIS primarily --

11    if I understand it right -- whether it's scheduling I-130

12    interviews as it traditionally has.  Is that a fair --

13         MS. CANTIN:  That's one focus of the deposition.  The

14    topic we've articulated is in docket 261.  But we want a

15    deposition of CIS from August 29, 2016 to the present.

16         THE COURT:  I'm not -- I want to know what they're

17    doing now.  The starting date will be about May 15.  I don't

18    know.  It might even be August.  Say after my decisions in

19    August, last August.  Because I don't think -- again, this is

20    without prejudice.  You may go back and ask them again.  But

21    you've got a cause and you've got a client.  And if I were

22    Mr. Segal or whoever is in charge of this, Mr. Prussia, I'd

23    want to be very careful that in pursuing the cause you don't

24    injure your clients.  You want to make -- anyway.  I've

25    explained this before.

1          MS. LARAKERS:  So Your Honor, with regard to USCIS,

2     the focus of this discovery is limited.  It's what ICE Boston

3     is currently doing now.  ICE Boston is the one with control to

4     determine whether to effectuate the removal of class members.

5     Therefore our position is that this discovery should be limited

6     to that because that is going to tailor any declaratory relief

7     issued in this case or whether declaratory relief needs to be

8     issued at all.

9          With regard to the allegations about USCIS delaying

10    interviews, this is the first time that I've heard the

11    statements that Ms. Lafaille made.  We deny in our pleadings

12    that USCIS is failing to interview people to hinder people from

13    applying for provisional waivers.  And again, Your Honor, as I

14    stated in my pleadings, USCIS isn't required to interview I-130

15    applicants.  I find it very curious that they want -- the

16    allegation seems that they want USCIS to interview people and

17    to have to come in for an interview when an interview is not

18    even required under the regulations, and that's the way that

19    this case got started.  So I find that --

20         THE COURT:  Here is what I'm going to do.  I'm denying

21    without prejudice the request for a CIS interview and the

22    interview of Mr. Cronen.  I'm authorizing the deposition of

23    Mr. Charles.

24         Mr. Charles, is there any time in the next month when

25    you don't expect to be in the Boston area?

1          MR. CHARLES:  Yes, Your Honor, there is.  I'll be out

2     of town from July 2 through July 8.

3          THE COURT:  Okay.  I'm ordering that you -- let me

4     have the book -- that you take Mr. Charles' deposition after

5     July 8 and before -- and tell me if this is inconvenient for

6     counsel -- say before July 24.  Find a date.  Is that going to

7     be a problem?

8          MS. CANTIN:  I think that should be fine, Your Honor.

9     And then I just --

10         THE COURT:  Let me finish.  I told you in mid-May you

11    could have taken his deposition and then you would have some

12    evidence that might inform my other decisions.

13         After you take that deposition, if you want to renew

14    your request for additional depositions from CIS or even from

15    Mr. Cronen, although you know what my thinking is about

16    Mr. Cronen, you can do it.  But if CIS is doing something to

17    frustrate the operation of the provisional waiver process, that

18    may be relevant and important if that's being done now, but I

19    think you should develop a fuller factual basis and provide

20    some support.

21         MS. LARAKERS:  Yes, Your Honor.  I would ask that if

22    there are specific allegations with regard to USCIS acting

23    unlawfully that they put that in an amended complaint at the

24    very least, Your Honor.  It's very hard for the government to

25    deny allegations without having a factual basis, and in fact,

1    we would likely not just deny them but move to dismiss any

2    count against USCIS doing that.

3            THE COURT:  They're not a party right now.

4            MS. LARAKERS:  Your Honor, we're not denying discovery

5    on the basis of USCIS because they're not a party.  Certainly

6    if USCIS had any role --

7            THE COURT:  Neither am I.  But now I'm 45 minutes late

8    for a meeting with my colleagues on another case.  So is there

9    document discovery that you're looking for in connection with

10   Mr. Charles' deposition?

11           MS. CANTIN:  Yes.  We're looking for document

12   discovery.  And I just want to point out the government can't

13   be using discovery as a sword and a shield.

14           THE COURT:  Listen.  What's the document discovery you

15   want?  Or I'll say there's none.  I've told you this before.

16   Go in and just ask him the questions.  And then you'll get the

17   documents and you'll be able to see whether they verify what he

18   told you or refute what he told you, contradict what he told

19   you.

20           MS. CANTIN:  The documents are at docket 261.

21           THE COURT:  Hold on a second.  Does somebody have an

22   extra copy of 261?

23           MS. LAFAILLE:  Actually, it's --

24           THE COURT:  It's okay.  I have it.  What page?

25           MS. CANTIN:  Pages 6 to 7, and it's outlined in eight

1   boxes.  There's only eight of them.

2          THE COURT:  So you want them to update whatever I

3   ordered on July 16, 2018?

4          MS. CANTIN:  Yes, and for the first two categories

5   they've agreed to.

6          THE COURT:  Hold on.  That's been agreed to, correct?

7          MS. CANTIN:  Yes.

8          MS. LARAKERS:  There's parts of that order that aren't

9   exactly relevant.  I think this might be useful since you've

10  already stated your feelings about USCIS discovery, and a lot

11  of our disagreement has to do with internal USCIS document

12  discovery.  If you could look in tandem at, you know, their

13  request but more specifically what we --

14         THE COURT:  Here, fine.  I can't look in tandem with

15  it.  I have other matters to do.  I'll see you again in August,

16  unless you just want to take the deposition.  See what he has

17  to say and then come back and tell me what documents you want.

18  You can confer.  If you can agree on document discovery in

19  advance of the deposition, give her the documents.

20         MS. LARAKERS:  We've agreed to provide a lot of

21  documents internal to ICE, not prior to the deposition, but as

22  Your Honor stated, we would allow them to take deposition, or,

23  if they want, to extend and take the deposition sometime in

24  August after they've been provided documents.  We're flexible

25  with that, too.

1          THE COURT:  If you can agree on some document

2     production, give it to them at least a week before the

3     deposition.  If you want another week to take the deposition,

4     fine.  Otherwise -- and you're not going to be limited to one

5     deposition of Mr. Charles if you haven't had document

6     discovery, but see what he says.

7          MS. LARAKERS:  Your Honor, we may have a problem.

8     Depending on the volume of documents which are being loaded

9     into our discovery system right now, we may have a problem

10    providing -- we've agreed to provide a substantial amount of

11    documents thinking that we would have until July 31 to produce

12    those.

13         THE COURT:  Talk about it.  If you want to take the

14    deposition in July without the documents, you can.  If you'd

15    prefer to do it the way you were trained to do it at Wilmer

16    Hale, get the documents, ask me to let you take the deposition

17    in August after you get the documents.

18         MS. CANTIN:  I think we intend to move forward with

19    the deposition at this point, Your Honor.  We were trying to be

20    mindful and respectful of Mr. Charles' time so that we wouldn't

21    need to bring him back, but at this point we're ready to move

22    forward.

23         THE COURT:  Do it.  And then the other thing I'm

24    ordering is, after the deposition, no later than ten days after

25    the deposition you're to confer and see if you've reached an

1    agreement to stay or settle the case.  Because Mr. Charles does

2    have a lot of other responsibilities.  If you can reach some

3    reasonable resolution that will take this off your agenda for

4    the foreseeable future, then you can deal with the other things

5    you need to deal with.  This continues to be a very serious

6    case, but it's not the only case that I have.  See what he has

7    to say and where you want to go from there.

8              MS. CANTIN:  Okay.

9              THE COURT:  Okay.  Court is in recess.

10             (Recess taken 4:45 p.m.)

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3              I, Kelly Mortellite, Registered Merit Reporter

4     and Certified Realtime Reporter, in and for the United States

5     District Court for the District of Massachusetts, do hereby

6     certify that the foregoing transcript is a true and correct

7     transcript of the stenographically reported proceedings held in

8     the above-entitled matter to the best of my skill and ability.

9                         Dated this 28th day of June, 2019.

10

11                    /s/ Kelly Mortellite

12                    _____

13                    Kelly Mortellite, RMR, CRR

14                    Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25