# EXHIBIT C

**Page 1**

```
           UNITED STATES DISTRICT COURT
           OR THE DISTRICT O  MASSACHUSETTS

*********************************
LILIAN PAHOLA CALDERON JIMENEZ,
et al.,
           Petitioners,
  vs.                    CA NO.  : 8 CV  0225 MLW
KEVIN McALEENAN, et al.,
           Respondents.
*********************************

                  CON IDENTIAL
        VIDEOTAPED DEPOSITION O  MARCOS CHARLES
        WILMER CUTLER PICKERING HALE AND DORR LLP
                    60 State Street
                  Boston, Massachusetts
                 July  6, 20 9  9:56 a.m.




                  Darlene M. Coppola
                Registered Merit Reporter
                Certified Realtime Reporter
```

**Page 2**

APPEARANCES:

Representing the Petitioners:
   WILMER CUTLER PICKERING HALE AND DORR LLP
   60 State Street
   Boston, MA 02109
   BY: MICHAELA P. SEWALL, ESQUIRE
       COLLEEN M. MC CULLOUGH, ESQUIRE
   T 617.526.6144
   E michaela.sewall@wilmerhale.com
-and-
   AMERICAN CIVIL LIBERTIES UNION
   FOUNDATION OF MASSACHUSETTS, INC.
   211 Congress Street
   Boston, MA 02110
   BY: ADRIANA LAFAILLE, ESQUIRE
   T 617.482.3170
   E alafaille@aclum.org
-and-
   LAW OFFICE OF KATHLEEN M. GILLESPIE
   6 White Pine Lane
   Lexington, MA 02421
   BY: KATHLEEN M. GILLESPIE, ESQUIRE
   T 339.970.9283
   E Kathleen.M.Gillespie@outlook.com

**Page 3**

APPEARANCES (Continued):

Representing the Respondents:
   U.S. DEPARTMENT OF JUSTICE
   Civil Division
   Office of Immigration Litigation
   Ben Franklin Station
   PO Box 868
   Washington, DC 20044
   BY: MARY L. LARAKERS, ESQUIRE

   E
-and-
   U.S. DEPARTMENT OF JUSTICE
   United States Attorney's Office
   John Joseph Moakley U.S. Courthouse



   BY: EVE A. PIEMONTE, ESQUIRE
   T

**Page 4**

APPEARANCES (Continued):

Also Representing the Respondents:
   U.S. DEPARTMENT OF HOMELAND SECURITY
   15 New Sudbury Street
   Room 425
   Boston, MA 02203
   BY: Confidential PII



Also Present
Matthew Costello, Esquire
Jonathan Cox, Esquire
Darryn Carroll, Videographer

# Pages 5–268 Omitted

269

1   A. Oh, I don't know. It's been a while.
2   Q. Has ICE distributed any written
3 guidance to ICE Boston employees on the POCR
4 review process?
5   A. No.
6   Q. Are individuals conducting POCR
7 reviews told what factors to consider in
8 determining whether to continue to detain
9 somebody?
10  A. They recommend -- they make a
11 recommendation, whether to continue detention
12 or release, and they are taught what factors
13 may require a continued detention or recommend
14 to release.
15  Q. Are they given any guidance on how to
16 weigh those factors?
17  A. Not specifically.
18  Q. Are they given any unspecific guidance
19 on how to weigh those factors?
20  A. No, not that I can think of offhand,
21 other than the training that they receive at
22 the academy and the informal training they
23 receive by experienced DOs and their SDDO.
24  Q. And what factors are they told to

270

1 consider?
2   A. I don't know.
3   Q. Are they told to consider an
4 individual's application for I-130?
5   A. I would look at that if I was the
6 deportation officer.
7   Q. But are the deportation officers
8 instructed to look at that?
9   A. I don't know.
10  Q. Are they instructed to consider
11 somebody's status as a Calderon class member?
12  A. For continued detention?
13  Q. Yes.
14  A. No. It is indicated within the POCR
15 if they are a class member though.
16  Q. Where is it indicated in the POCR if
17 they're a class member?
18  A. I instructed them to put it in the
19 comments section of the POCR.
20  Q. Where's the comment section of the
21 POCR?
22  A. I can't remember which page. I don't
23 recall what page it's on.
24

271

1   (Exhibit No. 12 marked for
2 identification.)
3
4 BY MS. SEWALL:
5   Q. The court reporter has handed you
6 what's been marked Exhibit 12.
7       Do you recognize this document?
8   A. (Witness reviews document.)
9       It's the notice for custody review.
10  Q. Have you seen this document before
11 today?
12  A. This specific document?
13  Q. Yes.
14  A. I don't know. Maybe. I recognize the
15 name.
16  Q. It's [Confidential PII]
17  A. Correct.
18  Q. And it's a notice to alien of file
19 custody review, correct?
20  A. Correct.
21  Q. In the second paragraph says, "Your
22 custody status will be reviewed on or about
23 November 20, 2018," correct?
24  A. Correct.

272

1   Q. It states, "You may submit any
2 documentation you wish to be reviewed in
3 support of your release prior to the date
4 listed above," correct?
5   A. Correct.
6   Q. If you look at Exhibit 10, it's this
7 big spreadsheet?
8   A. Uh-huh.
9   Q. And [Confidential PII] is the fourth from the
10 bottom?
11  A. Right.
12  Q. And if you go over to the column on
13 date POCR conducted and decisions, it says,
14 "The POCR was conducted on November 1, 2018."
15      Do you see that?
16  A. It says what?
17  Q. It says, "The POCR was conducted on
18 November 1, 2018."
19      Do you see that?
20  A. Yes.
21  Q. That is 20 days before he was told it
22 would be conducted in this notice to alien,
23 file custody review --
24      MS. LARAKERS: Objection.

273

1  BY MS. SEWALL:
2     Q.  -- correct?
3     A.  Correct.
4     Q.  Was he informed his review would take
5  place early?
6     A.  I don't know. I would have to look at
7  the case history on this one.
8     Q.  Was his attorney informed?
9     A.  I don't know.
10
11       (Exhibit No. 13, marked for
12 identification.)
13
14 BY MS. SEWALL:
15    Q.  The court reporter has handed you
16 what's been marked Exhibit 13. This is the
17 decision to continue detention for Mr. [Confidential PII]
18 correct?
19    A.  Correct.
20    Q.  This decision to continue detention
21 doesn't mention his submission of any
22 documents, right?
23    A.  I'm reading through it right now.
24    Q.  Okay. Take your time.

274

1     A.  (Witness reviews document.)
2         It says it was a review of the file.
3  What was your question again? I'm sorry.
4     Q.  This decision to continue his
5  detention does not mention his submission of
6  any documents, right?
7     A.  Does not.
8     Q.  It does not have a comment section,
9  does it?
10    A.  No. This isn't a POCR review form.
11    Q.  What's the POCR review form?
12    A.  The form that we use to conduct our
13 POCRs.
14       MS. SEWALL: Have we been
15 provided with that form.
16       MS. LARAKERS: No, not that I
17 know of. It's an internal form.
18 BY MS. SEWALL:
19    Q.  The second and third paragraphs state
20 the reasons for the decision to continue his
21 detention, correct?
22    A.  Correct.
23    Q.  And then the fourth paragraph says,
24 "Upon review of the facts of your case,

275

1  including your final order of removal issued
2  by an immigration judge, successful removal of
3  tampering with your ICE GPS monitoring device,
4  and your lack of substantial equities, I have
5  determined that you would pose a flight risk
6  if you were to be released from ICE custody."
7         Do you see that?
8     A.  I do.
9     Q.  What does "lack of substantial
10 equities" mean?
11    A.  I'm not sure specifically what he's
12 referring to. I would have to look at the
13 case, but it could be that he had no
14 residence. I -- I don't know. I would have
15 to look at the case.
16    Q.  When you say "look at the case," what
17 are you referring to?
18    A.  Look at the A-file, look at the file,
19 look at the EARM, look at the materials that
20 were available at that time.
21    Q.  So as you sit here today, you don't
22 know --
23    A.  No. I can't --
24    Q.  -- about the case?

276

1     A.  -- positively say what lack of
2  substantial equities are.
3     Q.  Mr. [Confidential PII] is married to a U.S.
4  citizen, correct?
5     A.  I believe he is.
6     Q.  He has a pending I-130 application?
7     A.  Yes, he does.
8     Q.  Was that considered by Mr. Lyons in
9  deciding to continue his detention?
10       MS. LARAKERS: Objection.
11    A.  I don't know.
12 BY MS. SEWALL:
13    Q.  Was it known by Mr. Lyons at the time
14 he conducted his POCR review?
15       MS. LARAKERS: Objection.
16    A.  I don't know.
17 BY MS. SEWALL:
18    Q.  Is marriage to a U.S. citizen not
19 considered a substantial equity in the United
20 States?
21       MS. LARAKERS: Objection.
22    A.  It depends on the case.
23 BY MS. SEWALL:
24    Q.  In this case, it was not considered a

Confidential
Transcript of Marcos Charles
Conducted on July 16, 2019

70 (277 to 280)

---

Page 277

1 substantial equity in the United States?
2  A. I don't know.
3  Q. Is status of the Calderon class member
4 not considered a substantial equity in the
5 United States?
6  A. When looking at it now on Calderon
7 class members, I would take that into
8 consideration at this time. There was no
9 class member -- there was no class defined at
10 that time.
11  Q. You're saying, because there was no
12 class defined when this decision to continue
13 detention was reviewed, it -- Todd Lyons did
14 not consider --
15  A. I don't know if he considered it or
16 not. I'm just saying, based on that, if it
17 was me reviewing it, there was no class
18 defined, then we couldn't necessarily consider
19 that there was a class membership when we were
20 looking at this.
21  Q. Did he consider the filing of an I-130
22 application?
23  A. I don't know.
24  Q. Does ICE conduct a second custody

Page 278

1 review within 90 days of the first custody
2 review?
3  A. Yes, 180 days.
4  Q. Who conducts that review?
5  A. Headquarters.
6  Q. Do you ever conduct one --
7  A. No.
8  Q. -- 180-day reviews?
9  A. No, I have not.
10  Q. Is it always done by headquarters?
11  A. I would say almost always. I don't
12 recall doing a 180 before.
13  Q. Who decides when the second review
14 will be conducted?
15  A. At -- I'm sorry, I don't understand
16 the question.
17  Q. Who decides when the second review
18 will be conducted?
19  A. It's at 180 days, if they're still in
20 custody, post-order.
21  Q. If you look back at this Exhibit 10,
22 the spreadsheet, Mr. [Confidential PII] Mr. [Confidential PII]
23 received his first custody review on November
24 1, 2018, correct?

Page 279

1  A. Correct.
2  Q. He received his second custody review,
3 post-180, on -- it looks like March 5, 2019,
4 correct?
5  A. Correct.
6  Q. That's, let's see, December, January,
7 February. That's over three months after --
8 that's about four months after his POCR was
9 conducted, right?
10  A. Correct.
11  Q. So that's more than 90 days after his
12 initial POCR was conducted?
13  A. It appears to be.
14  Q. Well, why didn't he receive a second
15 custody review within 90 days?
16  A. I don't know.
17  Q. Did ICE make a good finding -- a
18 finding of good cause to postpone his
19 review?
20  A. I would have to look at the case.
21  Q. Where would that be recorded?
22  A. Most likely within the A-file.
23  Q. So Mr. [Confidential PII] received a custody
24 review before the 30-days' notice date that he

Page 280

1 was given -- 20 days before his 30-days'
2 notice. He was told he did not have
3 substantial equity in the United States,
4 despite the fact that he's married to a U.S.
5 citizen, and then he did not receive a second
6 custody review after 90 days, correct?
7   MS. LARAKERS: Objection.
8  A. I don't know. I would have to look at
9 the indication completely. Based on what's on
10 this spreadsheet, that's -- looking at the
11 spreadsheet, those are the dates that are in
12 here. I would have to actually look at the
13 case.
14 BY MS. SEWALL:
15  Q. Well, going on these documents that
16 we have here, it appears that ICE Boston did
17 not follow the POCR regulations for Mr.
18 [Confidential PII] is that correct?
19   MS. LARAKERS: Objection.
20  A. No.
21 BY MS. SEWALL:
22  Q. Why?
23  A. Because headquarters is in charge of
24 the 180 POCRs and anything after. We don't

281

1  conduct those.
2  Q. So ICE did not follow the POCR
3  regulations for Mr. [Confidential PII], is that correct?
4  A. I don't know.
5       MS. LARAKERS: Objection.
6  BY MS. SEWALL:
7  Q. And ICE Boston conducted his initial
8  custody review 20 days before he -- it was
9  noticed for; is that right?
10       MS. LARAKERS: Objection.
11  A. I don't know. I would have to look at
12  it.
13  BY MS. SEWALL:
14  Q. So we just did look at it.
15  A. No. We just looked at the spreadsheet
16  that has the dates that were input into it. I
17  would have to actually look at the file.
18  Q. So you think that the spreadsheet is
19  not enough information to tell you about
20  whether there's been a POCR violation,
21  correct?
22  A. I would have to -- the only way to see
23  if there was a POCR violation, or why the POCR
24  was done before the date on the notice and to

282

1  know why headquarters conducted it at that
2  date, would be by looking at what EARM case
3  file, A-file. That would be the way -- that's
4  how I would be able to tell. I wouldn't be
5  able to tell you that definitively by looking
6  at just these forms in front of me and this
7  spreadsheet.
8  Q. So this spreadsheet does not
9  definitively tell you whether there's been a
10  POCR violation?
11       MS. LARAKERS: Objection.
12  A. No.
13  BY MS. SEWALL:
14  Q. ICE still intends to remove Mr. [Confidential]
15  after July 22, correct?
16  A. He is still being forwarded for
17  removal at this point.
18  Q. What's ICE Boston's current policy to
19  remedy a POCR violation?
20  A. It would be -- if there was a POCR
21  violation found, the deportation officer would
22  definitely be spoken with. The supervisor,
23  anybody that saw it, would definitely be
24  talked with to find out what exactly happened,

283

1  why the violation occurred. And then based on
2  that information, we would go forward with
3  either retraining or counseling.
4  Q. And what's the policy with respect to
5  the alien for whom the POCR violations have
6  been violated?
7       MS. LARAKERS: Objection.
8  A. What is the policy?
9  BY MS. SEWALL:
10  Q. Yes.
11  A. There's no policy.
12  Q. What's the practice?
13  A. There's -- we would have to look at
14  the case and see exactly what happened and
15  take it case by case.
16  Q. That's different from what the
17  practice was in -- as of July 2018, is it not?
18       MS. LARAKERS: Objection.
19  A. I don't know exactly what the practice
20  was July 2018.
21  BY MS. SEWALL:
22  Q. Do you know what the practice was in
23  September 2018?
24  A. No.

284

1  Q. Do you know what it was in December
2  2018?
3  A. No.
4  Q. Do you know what it was in March 2019?
5  A. Yes, just what I said right now.
6  Q. When did this practice that you said
7  right now begin, as far as you know?
8  A. We haven't had to do it yet.
9  Q. So when is it your understanding that
10  this -- what you testified to as the practice
11  began?
12  A. That's what I would do if there's a
13  POCR violation.
14  Q. Are you -- did you ever discuss the
15  policy for -- or the practice for remedying a
16  POCR violation with Mr. Lyons, Ms. Adducci, or
17  Mr. Brophy?
18  A. No.
19  Q. Are you aware that Mr. Brophy
20  testified in this case that ICE Boston
21  released people when it was found that it had
22  violated their rights under the POCR
23  regulations?
24  A. I don't -- I don't recall exactly

285

1 reading that.
2  Q. Are you aware that Ms. Adducci also
3 testified that ICE Boston released people when
4 it found violations of their POCR rights?
5     MS. LARAKERS: Objection.
6  A. No, I don't.
7 BY MS. SEWALL:
8  Q. Who -- who decided to change to the
9 current policy?
10  A. There hasn't been a need to. What I'm
11 saying is that if there was a POCR violation,
12 that would be an option. If it was a -- if
13 releasing the individual, based on just the
14 error or violation, wasn't going to be a
15 public safety or national security threat,
16 then I don't see a problem with it. If it
17 did, then I do see a problem with it.
18  Q. Okay. So that's a little different
19 from what you said before.
20     Can you clarify to me what the current
21 practice would be with respect to the alien
22 whose POCR rights were violated?
23  A. It would be on a case-by-case basis.
24 I have to look at it and see exactly what

286

1 happened and if it would be a national threat
2 or public safety risk to have that individual
3 out.
4  Q. And you said there have been know POCR
5 violations since you took office?
6  A. Not that I'm aware of.
7  Q. Have there been any POCR violations
8 since July 2018?
9  A. I would have to check, but I don't
10 think so.
11  Q. You don't know?
12  A. I don't know. I don't think so.
13  Q. Who would know?
14  A. Acting Field Office Director -- Deputy
15 Field Office Director Todd Lyons.
16  Q. You don't know if a class member's --
17 a class member in detention has undergone a
18 POCR violation since July 2018?
19  A. I don't know.
20  Q. Have you looked into that?
21  A. No.
22
23    (Exhibit No. 14 marked for
24 identification.)

287

1
2 BY MS. SEWALL:
3  Q. Do you recognize this document?
4  A. (Witness reviews document.)
5     It's the notice of file review.
6  Q. It's for Confidential, correct?
7  A. Correct.
8  Q. Have you seen this document before
9 today?
10  A. I don't recall specifically seeing
11 this one.
12  Q. The middle paragraph says, "Your
13 custody status will be reviewed on or about
14 March 12, 2019."
15     Do you see that?
16  A. I do.
17  Q. If you look back at this spreadsheet
18 for Mr Confid it's the second to the top --
19 second from the bottom?
20  A. Correct.
21  Q. For the column date POCR conducted and
22 decisions --
23  A. Uh-huh.
24  Q. -- it says, "90-day POCR conducted

288

1 March 18, 2019."
2     Do you see that?
3  A. Correct.
4  Q. That's four days before the review is
5 noticed for, correct?
6     MS. LARAKERS: Objection.
7  A. Correct.
8 BY MS. SEWALL:
9  Q. Was Mr. Confid informed that his custody
10 review would take place early?
11  A. I don't know.
12  Q. Was his attorney informed that
13 Mr. Confid custody review would take place
14 early?
15  A. I don't know.
16  Q. Who would you ask to find out?
17  A. The AFOD over at custody management.
18  Q. What documents would you look at to
19 find out?
20  A. I would look at the A-file.
21     MS. PIEMONTE: Excuse me, just
22 to clarify the record, I think the spreadsheet
23 says March 8, not March 18th.
24     MS. SEWALL: I think I said

289

1 March 8th, did I not?
2  MS. PIEMONTE: I'm looking at
3 this. It indicates the 18th as to my notes,
4 so I just wanted to make sure.
5  MS. SEWALL: It says March 8th.
6 I can confirm that. That's four days before
7 March 12, 2019.
8
9  (Exhibit No. 1 marked for
10 identification.)
11
12 BY MS. SEWALL:
13  Q. Do you recognize this document?
14  A. I do.
15  Q. It's the decision to continue
16 detention for Confidential
17  A. Yes.
18  Q. It's signed by Mr. Lyons?
19  A. It's actually signed by me for
20 Mr. Lyons.
21  Q. Oh, okay. So you've seen this
22 document before today?
23  A. Yes.
24  Q. The decision to continue his detention

290

1 does not mention his submission of any
2 documents, correct?
3  A. Correct.
4  Q. Do you know if he or his attorney
5 attempted to submit documents to be considered
6 in making a custody decision?
7  A. I do not.
8  Q. The second and third paragraph discuss
9 the reasons for his continued detention,
10 correct?
11  A. Correct.
12  Q. And the fourth paragraph says, "Upon
13 review of the facts of your case, including
14 your criminal convictions for interfering
15 fearing with an officer, resisting arrest, and
16 failure to appear, I have determined that you
17 would pose a safety risk to the community if
18 you were to be released from ICE custody."
19  Do you see that?
20  A. Yes.
21  Q. This does not mention that he is
22 married to a U.S. citizen, correct?
23  A. Correct.
24  Q. It does not mention that he has an

291

1 approved I-130 application, correct?
2  A. Correct.
3  Q. Was that considered in determining
4 whether to continue his detention?
5  A. No.
6  Q. Did ICE Boston know about his I-130
7 when it decided to continue to detain him?
8  A. I believe we did.
9  Q. But it didn't consider it in
10 determining to continue his detention?
11  A. It's just one of several factors,
12 again, that wouldn't preclude him from
13 detention, or nor would it cause us to release
14 him.
15  Q. I'm sorry, I -- I asked you if the
16 fact that he had an approved I-130 was
17 considered?
18  A. Oh, I'm sorry, I just heard the merge.
19  Q. Oh, it's okay.
20  I asked if the fact that he had an
21 approved I-130 was considered in determining
22 to continue his detention, and you testified
23 that it was not considered?
24  A. I'm sorry. Yes, that's one of

292

1 factors. The married to a U.S. citizen isn't
2 necessarily one of the factors.
3  Q. Anybody who had an approved I-130
4 application is generally -- well, I guess
5 that's not true, but I guess then the question
6 would be, did ICE consider his status as a
7 Calderon class member when it decided to
8 continue to detain him?
9  A. Again, one of the many factors.
10  Q. And do you know that it considered
11 those factors?
12  A. When I looked at this POCR, I looked
13 at the A-file the documentation within the
14 A-file and EARM, so if -- at the time, which
15 was preCalderon membership definition, it
16 would be the fact that he was a possible
17 Calderon litigant or member.
18  Q. And was that considered in continuing
19 to detain him?
20  A. The I-130, the fact that he was a
21 possible, yes.
22  Q. How do you know?
23  A. Because I did the review.
24  Q. And you remember?

293

1  A.  Well, anything that I review that's --
2  that's possible Calderon is part of my
3  consideration.
4  Q.  So what if that is information was not
5  in the file?
6  A.  Then I wouldn't take it into
7  consideration.
8  Q.  So you can't remember one way or the
9  other whether you actually considered it?
10  A.  If it was in the file or within EARM,
11  then I would have taken it into consideration.
12  Q.  But if it was not in the file or EARM,
13  you would not have taken it into
14  consideration?
15  A.  Correct.
16  Q.  So as you sit here today, you can't
17  recall whether you took it into -- or whether
18  it was taken into consideration for this
19  particular decision?
20  A.  If it was in there, I took it into
21  consideration.
22  Q.  As you sit here today, you cannot
23  recall one way or the other whether you
24  actually did consider --

294

1  A.  No.  What I'm saying is that --
2  Q.  Wait until I finish my question.  The
3  court is going to go a little crazy with us.
4  A.  Yeah, sorry.
5  Q.  So my question is:  As you sit here
6  today, do you remember if it was considered in
7  deciding to continue to detain Mr. [Confidential]
8  A.  As I sit here today, I do not remember
9  if it was in the file or not.
10  Q.  Do you remember if it was considered
11  in deciding to continue to detain him?
12  A.  I can't say either way because I don't
13  remember if it was in the file.
14  Q.  You would have to look at the file to
15  find out?
16  A.  Correct.
17  Q.  So Mr. [Confidential] received this custody
18  review on March 8, 2019 correct?
19  A.  Correct -- wait.  Received the custody
20  review notice?  Is that what you're asking me?
21  Q.  No.  He received the -- he -- he
22  received this decision on March 8, 2019, and
23  the spreadsheet indicates that this was the
24  day that the POCR was conducted, on March 8,

295

1  2019, correct?
2  A.  He was actually given the document on
3  12/18 of '18 for custody review.
4  Q.  Are you looking at Exhibit 18?
5  A.  No.  I'm looking at 14, I'm sorry, but
6  the notice of custody was given to him on
7  12/18 of '18, so that's actually more than --
8  that's actually more than 30-days' notice.
9  Q.  So I think you're --
10  A.  I'm just making a point of it, that
11  it -- he got more than 30-days' notification
12  to gather his information for his review.
13  Q.  So it says that a custody review
14  says -- let me get to Exhibit 14.
15      The notice to the alien of file
16  custody review, says, "Your custody review
17  status will be reviewed on or about March 12,
18  2019," correct?
19  A.  In most locations, it's given 30 days
20  prior to the review, but we gave it to him
21  almost 90 days prior to his review, so he had
22  an additional -- almost 60 days to get that
23  documentation together.
24  Q.  Okay.  But his custody -- his notice

296

1  says it will be on March 12, 2019, correct?
2          MS. LARAKERS:  Objection.
3  A.  It does.
4  BY MS. SEWALL:
5  Q.  And it was conducted on March 8, 2019,
6  correct?
7  A.  Correct.
8  Q.  And you don't know whether he was
9  informed that it would be conducted early,
10  correct?
11  A.  Correct, but he had more than -- more
12  time than normally given to an individual to
13  do that.
14  Q.  And you don't know if his attorney was
15  informed that it would be conducted earlier
16  than what was said in his review, correct?
17  A.  Correct.  It does say, "on or about"
18  on the custody review notification.  It
19  doesn't say specifically on 3/12/19.  It does
20  is say, "On or about 3/12/2019."
21  Q.  If you turn to Exhibit 15, the date of
22  his decision to review detention and the date
23  of his POCR review occurred March 8, 2019,
24  correct?

297

1  A. Correct, which is about three -- March
2  12, 2019.
3  Q. If you could focus on my question.
4  All I'm asking you is: This occurred on March
5  8, 2019, correct?
6  A. Correct.
7  Q. And then we are now at July 16, 2019,
8  correct?
9  A. Correct.
10 Q. It has been over four months since his
11 March POCR review was conducted, correct?
12 A. Correct.
13 Q. But he has never received a second
14 POCR review, correct?
15     MS. LARAKERS: Objection.
16 A. Not that I know of, no.
17 BY MS. SEWALL:
18 Q. Why has he not received a second POCR
19 review?
20 A. He received an imminent removal
21 notice.
22 Q. Does that undercut his right to a POCR
23 review -- a second POCR review within 90
24 days --

298

1  A. Yes.
2     MS. LARAKERS: Objection.
3  BY MS. SEWALL:
4  Q. -- of the first?
5     MS. LARAKERS: Objection.
6  A. Yes.
7  BY MS. SEWALL:
8  Q. Where in the regulations does it say
9  that?
10 A. I would have to look them up. I -- I
11 can't tell you, specifically.
12 Q. But that's your understanding, that if
13 you get an imminent removal notice, and then
14 you're not removed, you still are not entitled
15 to a second POCR review within 90 days of your
16 initial POCR review?
17     MS. LARAKERS: Objection.
18 A. He hasn't been removed as of yet.
19 However, I would have to look at the case to
20 find out specifically why, or what's going on
21 with it right now.
22 Q. So my question is: If an individual
23 received an imminent removal notice after his
24 POCR review, then they're no longer entitled

299

1  to a second POCR review within 90 days of the
2  first?
3  A. It should be looked at again after --
4  if they're not being removed, it should be
5  looked at again and decide whether a POCR
6  needs to be conducted or not. Because it's at
7  headquarters, I don't know the status of
8  that.
9  Q. Do you know if it's required to have a
10 second POCR review within 90 days of the first
11 when, in the interim, an imminent removal
12 notice is issued, but the person has not been
13 removed?
14     MS. LARAKERS: Objection.
15 A. I have to look at it.
16 BY MS. SEWALL:
17 Q. So you don't know one way or the
18 other?
19 A. I would have to look at the actual
20 statute or regulation on that.
21 Q. Does ICE still intend to remove
22 Mr. [Confidential] after July 22?
23 A. It will have to look at that, but as
24 far as I know, yes.

300

1  Q. And Mr. [Confidential] is still in detention?
2  A. I believe he is.
3  Q. So regarding Mr. [Confidential] it's possible
4  that Boston ICE office violated his POCR
5  rights, correct?
6     MS. LARAKERS: Objection.
7  A. I don't know. I would have to look at
8  it. I would have to look at the case. I
9  can't go off just what I have in front of me
10 right now.
11 Q. So you wouldn't know, based on this
12 spreadsheet, whether there was a violation of
13 his POCR rights, correct?
14 A. Correct.
15 Q. And of his documents that we just went
16 through --
17 A. Correct.
18 Q. -- you don't know?
19 A. No.
20
21     (Exhibit No. 16 marked for
22 identification.)
23
24 BY MS. SEWALL:

301

1  Q. Do you recognize this document -- oh,
2  sorry. The court reporter has handed you
3  what's been marked as Exhibit 16.
4     Do you recognize this document?
5  A. I recognize the top document.
6  Q. Have you seen this before today?
7  A. Yes, the top page.
8  Q. This is a decision to continue
9  detention of Mr. [Confidential]
10 A. Correct.
11 Q. And then if you go to the next page --
12 or the third page, rather, you see the notice
13 to alien of file custody review for
14 Mr. [Confidential]
15 A. I do.
16 Q. This states that "Custody status will
17 be reviewed on or about March 28, 2019,
18 correct?
19 A. Correct.
20 Q. And if you look at the spreadsheet,
21 seven rows down, you find Mr [Confidential PII]
22 A. Got it.
23    MS. LARAKERS: Michaela, can you
24 the exhibit number for the spreadsheet?

302

1    MS. SEWALL: Exhibit 10.
2  BY MS. SEWALL:
3  Q. And you go to the date POCR conducted
4  and decisions. It says the POCR was conducted
5  on March 27, 2019, correct?
6  A. Correct.
7  Q. Was Mr. [Confidential] informed that his POCR
8  review would be conducted early?
9  A. I don't know.
10 Q. Was his lawyer informed that his POCR
11 review would be done -- conducted early?
12 A. I don't know.
13 Q. And if you go to the second -- if you
14 go to the first page of Exhibit 16, the second
15 and third paragraphs state the reasons for his
16 continued detention, correct?
17 A. Correct.
18 Q. The fourth paragraph says, "Upon
19 review of the facts of your case, you have
20 failed to demonstrate significant equities
21 within the United States, and thus, I have
22 determined that you would pose a significant
23 risk of flight if you were to be released from
24 ICE custody."

303

1    Do you see that?
2  A. I do.
3  Q. It looks like you have signed on
4  behalf of Todd Lyons --
5  A. I did.
6  Q. -- correct?
7  A. Correct.
8  Q. So the reason that ICE cites for
9  continued detention is no significant equities
10 within the United States, correct?
11 A. Correct.
12 Q. What does that mean in the context of
13 Mr. [Confidential] case?
14 A. I would have to look at the file to
15 determine that.
16 Q. You can't remember, as you sit here
17 today?
18 A. No.
19 Q. His marriage to a U.S. citizen was not
20 considered a significant equity in the United
21 States, correct?
22 A. It may have been. I don't -- not as a
23 significant equity, no.
24 Q. And this decision to continue

304

1  detention does not mention that he's married
2  to a United States citizen?
3  A. No, it doesn't.
4  Q. It does not mention that he has an
5  approved I-130, correct?
6  A. No, it doesn't.
7  Q. Was that considered in determining to
8  continue his detention?
9  A. It was one of the factors considered
10 if it was in the file.
11 Q. So if it was in the file, it was
12 considered, but if it was not in the file, it
13 was not considered?
14 A. Correct.
15 Q. As you sit here today, you don't know
16 whether it was in the file or not?
17 A. I don't recall.
18 Q. Mr. [Confidential] initial custody review
19 occurred on March 27, 2019, correct?
20 A. Correct.
21 Q. We're now at July 16, 2019, correct?
22 A. Correct.
23 Q. That's over three months since his
24 initial custody review, correct?

305

1  A. Correct.
2  Q. He has not received a second custody
3 review, correct?
4  A. Not to my knowledge, but it would be
5 at headquarters level.
6  Q. Do you know why he hasn't received a
7 second custody review?
8  A. No, I don't. I do recall that there's
9 something going on with his case. I don't
10 recall what it is. I just remember seeing
11 something about it recently, and I honestly
12 don't remember exactly what it was.
13  Q. So for Mr. [Confidential], he received a
14 custody review before 30 days. His continued
15 detention decision did not mention the fact
16 he's married to a U.S. citizen, and he did not
17 receive a second custody review after 90 days,
18 correct?
19       MS. LARAKERS: Objection.
20  A. Correct.
21 BY MS. SEWALL:
22  Q. So regarding Mr. [Confidential], it's possible
23 that ICE Boston did not follow the POCR
24 regulations, correct?

306

1       MS. LARAKERS: Objection.
2  A. No.
3 BY MS. SEWALL:
4  Q. Why is that not possible?
5  A. It's not -- there's -- if -- there
6 hasn't been a POCR done by the -- for the 180,
7 there's a reason for it. I just don't know
8 what it is. I know there's something going on
9 with this case, and I don't remember what it
10 is.
11  Q. So where would you look to find that
12 out?
13  A. I would have to talk with custody
14 management, AFOD, and maybe headquarters to
15 see who's going on with his 180-day.
16  Q. So this spreadsheet alone does not
17 tell you whether there's be a POCR violation
18 for Mr [Confidential] does it?
19  A. No.
20  Q. Does ICE still intend to remove
21 Mr. [Confidential] after July 22nd?
22  A. As far as I know, yes. I would have
23 to review the case, look at it, see what's
24 going on with it.

307

1
2       (Exhibit No. 17 marked for
3 identification)
4
5 BY MS. SEWALL:
6  Q. The court reporter has handed you
7 what's been marked Exhibit 17.
8      Do you recognize this document?
9  A. (Witness reviews document.)
10     No.
11  Q. This is a notice to alien of file
12 custody review for Mr. [Confidential]
13 correct?
14  A. Correct.
15  Q. It states that "Your custody status
16 will be reviewed on or about February 11,
17 2019," correct?
18  A. Correct.
19  Q. And if you go to Exhibit 10 and you
20 look at the column for Mr. [Confidential] -- it's
21 eight rows down from the top -- it says his
22 POCR was conducted on January 25, 2019,
23 correct?
24  A. Correct.

308

1  Q. That's roughly 17 days before it was
2 noticed for, correct?
3  A. Seventeen days -- I'm sorry?
4  Q. That's roughly 17 days before it was
5 noticed for, correct?
6       MS. LARAKERS: Objection.
7  A. Correct.
8 BY MS. SEWALL:
9  Q. Was Mr. [Confidential] informed that his
10 review would take place early?
11  A. I don't.
12  Q. Was his attorney informed that his
13 review would take place early?
14  A. I don't know.
15  Q. Do you know if he or his attorney
16 attempted to submit documents to be considered
17 in making a custody decision?
18  A. I do not know.
19
20       (Exhibit No. 18 marked for
21 identification.)
22
23 BY MS. SEWALL:
24  Q. Do you recognize -- sorry.

309
1    The court reporter has handed you
2 what's been marked as Exhibit 18.
3    Do you recognize this document?
4    A.  I do not.
5    Q.  This is a notice to alien of file
6 custody review for [Confidential PII],
7 correct?
8    A.  Correct.
9    Q.  It states that Mr. [Confidential] custody
10 review would take place on or about May 7,
11 2019, correct?
12   A.  Correct.
13   Q.  And if you go to the spreadsheet for
14 Mr. [Confidential] -- it's the about the sixth row
15 down -- his POCR was conducted on May 1, 2019,
16 correct?
17   A.  Yes.
18   Q.  It's about six days before it was
19 noticed for?
20   A.  Correct.
21   Q.  Was Mr. [Confidential] informed that his review
22 would take place early?
23   A.  I don't know.
24   Q.  Was his attorney informed that his

310
1 review would take place early?
2    A.  I don't know.
3
4       (Exhibit No. 19 marked for
5 identification.)
6
7 BY MS. SEWALL:
8    Q.  The court reporter has handed you
9 what's been marked Exhibit 19.
10   Do you recognize this document?
11   A.  (Witness reviews document.)
12      No.
13   Q.  This is a decision to continue
14 detention for Mr. [Confidential] correct?
15   A.  Correct.
16   Q.  The second and third paragraphs
17 contain the reasons for the continued
18 decision --
19   A.  Okay.
20   Q.  -- is that right?
21   A.  Yes.
22   Q.  It's -- it says, "You are a United
23 States citizen and national of El Salvador who
24 entered the United States in an un --

311
1    A.  I'm sorry, can you repeat that?
2    Q.  The second photograph states, "You are
3 a citizen and national of El Salvador who
4 entered the United States in an unknown
5 location, on unknown date, without having been
6 admitted or paroled after inspection by an
7 immigration officer.  You are subject to a
8 final order removal issued on September 25,
9 2014."
10      Do you see that?
11   A.  I do.
12   Q.  And then the next paragraph says, "On
13 review of the facts of your case, including
14 your criminal convictions, I have determined
15 you would pose a risk to public safety if you
16 were to be released from ICE custody."
17      Do you see that?
18   A.  I do.
19   Q.  This does not mention that Mr. [Confidential] is
20 married to a United States citizen, correct?
21   A.  Correct.
22   Q.  It does not mention that he has a
23 pending I-130 and I-212 application,
24 correct?

312
1    A.  Correct.
2    Q.  Was that considered in determining
3 whether to continue his detention?
4    A.  I don't know.
5    Q.  Did ICE Boston know about his pending
6 I-130 and I-212 applications when it decided
7 to continue to detain him?
8    A.  I don't know.  That wouldn't be put
9 into a decision to continue detention anyway.
10   Q.  What wouldn't be put into a decision
11 to continue detention?
12   A.  That information.
13   Q.  Why not?
14   A.  Because it's a decision to continue
15 detention, not a -- not a release
16 notification.
17   Q.  So a decision to continue detention
18 would never reference the fact that somebody
19 had filed -- had a pending or -- a pending
20 I-130 or 212 application?
21   A.  Never.
22
23      (Exhibit No. 20 marked for
24 identification.)

---

Page 33

1
2    A.  It would be on the release
3  notification, perhaps, though, which is
4  beneficial when -- on an earlier -- on an
5  earlier POCR review if he didn't release.
6  BY MS. SEWALL:
7    Q.  The court reporter has handed you
8  what's been marked as Exhibit 20.
9        Do you recognize this document?
10   A.  (Witness reviews document.)
11       Yes.
12   Q.  The second paragraph -- it's a
13 decision to continue detention, correct, for
14 Mr. Confi
15   A.  It is.
16   Q.  And it is signed by you on the second
17 page, correct?
18   A.  Correct.
19   Q.  And the second paragraph, it says, "On
20 May 2, 2019, you were served with a decision
21 to continue detention pursuant to post-order
22 custody review.  On May 6, 2019, you submitted
23 additional documents in support of your
24 release.  These documents have been reviewed

Page 34

1  by ICE -- and have been reviewed, and ICE has
2  also considered favorable factors you present,
3  including your U.S. citizen family members, as
4  well as your intention to seek I-212 and
5  I-601A waivers.  Upon full review of your
6  case, ICE has determine you have not
7  demonstrated that your release would not pose
8  a danger to the community or a significant
9  risk of flight pending your removal from the
10 United States."
11       Do you see that?
12   A.  I do.
13   Q.  So that does mention I-212 and --
14   A.  Only because --
15   Q.  Can I finish my question?
16   A.  Go ahead.
17   Q.  -- that mention an I-212 and I-601
18 pending application and a decision to continue
19 detention, does it not?
20   A.  It does.  However, this is not your
21 typical decision-to-continue-detention
22 notification.  It's based on the fact that he
23 presented additional documentation, and it was
24 brought to our attention.  In order to add

Page 35

1  that information on a document, we put it on
2  here.  It would not normally be put on here.
3  This is a rarity.
4    Q.  You testified that a decision to
5  continue detention would never reference the
6  fact of a pending I-130 application or a
7  pending I-212 application, correct?
8    A.  I stand corrected.  On a normal, it
9  would not.  However, in this case, it does
10 check in.
11   Q.  And this was as recently as -- what
12 date is this, May 15, 2019?
13   A.  Correct.
14   Q.  And you reconducted the POCR review
15 because he submitted documents after the
16 POCR -- the initial POCR review was conducted?
17   A.  Correct.
18   Q.  So we have now gone through a number
19 of cases where ICE conducted a POCR review
20 earlier than the date it noticed the POCR
21 review for, correct?
22       MS. LARAKERS:  Objection.
23   A.  We also have looked at several cases
24 where they had more than their 30-days'

Page 36

1  notification to get the documents together.
2    Q.  I'm sorry, can you answer my
3  question?
4    A.  I'm sorry.
5    Q.  We have gone through about five cases
6  now where ICE conducted a POCR review earlier
7  than the date it noticed the POCR review,
8  correct?
9        MS. LARAKERS:  Objection.
10   A.  No, because its it still says, "On or
11 about."  If you can give me a definition of on
12 or about, then I can probably better answer
13 that question.
14   Q.  I'm not sure that's my responsibility
15 since these are your documents.
16   A.  So it is about the time of
17 notification, so I think that that was in a
18 timely fashion.
19   Q.  Are you aware that the regulations say
20 that you're supposed to give approximately
21 30-days' notice?
22   A.  They were given more than 30-days'
23 notice, but we can cut that back down to
24 30-days' notice.

37

1   Q.  So when you're providing these notice
2  dates, and then you have some -- a notice
3  conducted earlier than the notice date,
4  sometimes as early as 20 days earlier than the
5  notice date, you don't know whether the
6  individual or the individual's attorney is
7  notified that the review will take place
8  earlier than the notice date, correct?
9   A.  Correct.
10          MS. LARAKERS:  Objection.
11 BY MS. SEWALL:
12  Q.  And do you know how often this occurs,
13 the review taking place earlier than the
14 on-or-about notice date?
15  A.  I do not.  However, it also benefits
16 the alien that will get released by getting
17 outer earlier than he would have normally
18 based on that review.
19  Q.  Does it benefit -- does it benefit an
20 alien who intends to submit documents and
21 doesn't have time?
22          MS. LARAKERS:  Objection.
23  A.  He's -- the alien -- currently, the
24 notice of review is given quickly, after

38

1  detention, so they have more than their 30
2  days to gather that information.
3  BY MS. SEWALL:
4   Q.  So you think that makes up for the
5  fact that the reviews are potentially taking
6  place earlier without notice going out to the
7  individual or the individual's attorney?
8           MS. LARAKERS:  Objection.
9   A.  The notice is given to the alien of
10 the review at that time.  They are -- they are
11 give -- they're given more than 30-days'
12 notice to gather that documentation.
13 BY MS. SEWALL:
14  Q.  But they're told that a review will
15 happen on --
16  A.  On or about.
17  Q.  -- on or about a certain date and it's
18 happening, at least for these five people, who
19 are class members in an ongoing litigation,
20 earlier than that; is that correct?
21  A.  It's still -- it's about the date that
22 is on the notification.
23  Q.  And the reviews are taking place
24 earlier than the date that's provided for the

39

1  on-or-about date?
2   A.  It's taking place before the
3  on-or-about date.
4   Q.  So do you know if, after these reviews
5  take place, the individual or the individual's
6  attorney are told they can still submit
7  documents for their case?
8   A.  I don't know.  Apparently, some have,
9  or one has for sure.
10  Q.  You -- do you know if they were
11 informed that they could continue to submit
12 documents?
13  A.  I don't know.
14  Q.  We've also seen a number of cases
15 where a second POCR review does not appear to
16 have been conducted within 90 days of the
17 first POCR review, correct?
18  A.  Correct.
19  Q.  Do you know if this is a violation of
20 these class members POCR rights?
21  A.  I do not know, because I would have to
22 look at the case the see where it's at with
23 headquarters.
24  Q.  And so you can't tell from this

320

1  spreadsheet whether there's been a violation
2  of POCR review -- POCR requirements,
3  correct?
4   A.  I cannot.
5   Q.  The people we have reporting on is a
6  fraction of the detained docket, correct?
7   A.  Correct.  It's a -- but not of the
8  Calderon class members.
9   Q.  No, of the detained docket, generally.
10  A.  Correct.
11  Q.  It's a small fraction?
12  A.  (Witness nodding.)
13  Q.  And these are class members in an
14 ongoing litigation, correct?
15  A.  Correct.
16          MS. LARAKERS:  Objection.
17 BY MS. SEWALL:
18  Q.  How many times do you think there's
19 been a POCR violation that you don't know
20 about for the entire detained docket?
21          MS. LARAKERS:  Objection.
22  A.  I don't know.
23 BY MS. SEWALL:
24  Q.  Who at headquarters knows about this

### 321

1  litigation?
2       MS. LARAKERS: Objection.
3    A.  I answered that question like three
4  times already, and I don't know.
5  BY MS. SEWALL:
6    Q.  You have received settlement
7  authority --
8    A.  Correct.
9    Q.  -- full settlement authority for this
10 litigation, correct?
11   A.  Correct.
12   Q.  But you testified that you've never
13 talked to anybody at headquarters about this
14 litigation, except for the fact of this
15 litigation?
16   A.  Correct.
17   Q.  How is that possible, that you have
18 full settlement authority, under those
19 circumstances?
20   A.  It's part of the position.
21   Q.  How is that?  Do you know what ICE's
22 settlement position will be in any given
23 hearing --
24       MS. LARAKERS: Objection.

### 322

1  BY MS. SEWALL:
2    Q.  -- without discussing it with
3  headquarters?
4    A.  No.  I would discuss it with my
5  counsel first.
6    Q.  Counsel does not have settlement
7  authority, correct?
8    A.  Correct.
9    Q.  I would imagine headquarters has
10 settlement authority, correct?
11   A.  And --
12       MS. LARAKERS: Objection.
13   A.  -- which is delegated to me for
14 settlement authority.
15 BY MS. SEWALL:
16   Q.  And Ms. Asher does not appear at every
17 single hearing in this litigation, correct?
18       MR. LARAKERS: Objection.  This
19 is certainly not within the scope of the
20 policies and practice of ICE when detaining or
21 moving a class member.
22       MS. SEWALL: I'm talking about
23 testimony that he gave.  I'm exploring
24 testimony he gave already, and it doesn't seem

### 323

1  as if it could be --
2       MS. LARAKERS: What testimony?
3  Get to the testimony.
4       MS. SEWALL: I said the
5  testimony up front.  He testified that he has
6  not spoken to anybody at headquarters about
7  this litigation, except for the fact of the
8  litigation.  I am exploring that testimony.
9  You can object, but you cannot be giving
10 speaking objections for these sorts of very
11 reasonable questions.
12       MS. LARAKERS: It's not -- it
13 goes to the scope of the -- it goes to the
14 scope of this deposition.
15      MS. SEWALL: If you want to
16 instruct him not to answer, go ahead, but,
17 otherwise, I'm going if continue with my
18 questions.
19      MS. LARAKERS: I'm reserving my
20 objection.
21      MS. SEWALL: You can object and
22 say outside the scope, and then you can stop.
23 This is very disruptive to my questioning of
24 the witness.

### 324

1       MS. PIEMONTE: If we're seeking
2  a protective order, it requires a basis in the
3  transcript.  So to the extent that you're
4  going to pursue it, it's not an objection
5  meant to preserve or to coach the witness in
6  any way, shape, or form.  However, if there
7  are continued questions beyond the scope of
8  what the deposition is here today, I think we
9  have an obligation to preserve, at least on
10 the transcript, the reasons for the objection
11 to allow us to seek a protective order from
12 Judge Wolf, if necessary.
13      MS. SEWALL: And I think you can
14 absolutely say, "Objection.  Beyond the
15 scope."  I don't think we need to get anything
16 further on that.
17      MS. PIEMONTE: We can agree to
18 disagree with that.
19 BY MS. SEWALL:
20   Q.  I'm looking for my last pending
21 question.
22      MS. PIEMONTE: It was regarding
23 settlement authority.
24 BY MS. SEWALL:

# Pages 325–End (Including Index) Omitted