UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


```
                              )
LILIAN PAHOLA CALDERON JIMENEZ )
and LUIS GORDILLO, et al.,     )
Individually and on behalf of  )
all others similarly situated. )
                              )      Civil Action
       Plaintiffs-Petitioners, )     No. 18-10225-MLW
                              )
v.                            )
                              )
KEVIN McALEENAN, et al.,       )
                              )
        Defendants-Respondents. )
                              )
```


BEFORE THE HONORABLE MARK L. WOLF
UNITED STATES DISTRICT JUDGE


HEARING


August 2, 2019


John J. Moakley United States Courthouse
Courtroom No. 10
One Courthouse Way
Boston, Massachusetts  02210


Kelly Mortellite, RMR, CRR
Official Court Reporter
One Courthouse Way, Room 5200
Boston, Massachusetts  02210
mortellite@gmail.com

1    APPEARANCES:

2    Counsel on behalf of Plaintiffs-Petitioners:
     Adriana Lafaille
3    American Civil Liberties Union
     211 Congress Street
4    Boston, MA 02110
     617-482-3170
5    alafaille@aclum.org

6    Shirley X. Cantin
     Michaela Sewall
7    Wilmer Hale LLP
     60 State Street
8    Boston, MA 02109
     617-526-6313
9    shirley.cantin@wilmerhale.com
     michaela.sewall@wilmerhale.com
10
     Counsel on behalf of Defendants-Respondents:
11   Mary Larakers
     William Weiland
12   U.S. Department of Justice, Office of Immigration Litigation
     District Court Section
13   P.O. Box 868
     Washington, DC 20044
14   202-353-4419
     mary.l.larakers@usdoj.gov
15   William.h.weiland@usdoj.gov

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2            THE COURT:  Good afternoon.  Would counsel please
 3      identify themselves for the court and for the record.
 4            MS. LAFAILLE:  Good afternoon, Your Honor.  Adriana
 5      Lafaille for the petitioners.
 6            MS. SEWALL:  Good afternoon, Your Honor.  Michaela
 7      Sewall for the petitioners.
 8            MS. CANTIN:  Good afternoon.  Shirley Cantin for the
 9      petitioners.
10            MS. LARAKERS:  Good afternoon.  Mary Larakers on
11      behalf of the United States.
12            MR. WEILAND:  Good afternoon, Your Honor.  Wil Weiland
13      on behalf of the United States.
14            THE COURT:  Okay.  You may be seated.  Is Mr. Charles
15      present?
16            MS. LARAKERS:  Yes, Your Honor.  And Todd Lyons is as
17      well, Your Honor.
18            THE COURT:  Excellent.  All right.  We're here
19      pursuant to my July 30 and 31 orders.  The hearing was
20      triggered by the filing about a week ago of the motion to show
21      cause by the petitioners, but there are some other pending
22      matters as well.  And I think it would be most efficient to
23      take up the other matters first, but let me just check
24      something.
25            The petitioners filed this morning a redacted
```

```
 1   declaration without filing under seal the unredacted
 2   declaration.  And when I saw that about two hours ago, I
 3   ordered that it be filed under seal forthwith since there's no
 4   provision for filing redacted documents without filing the
 5   unredacted documents under seal.  But I don't know whether the
 6   respondents have seen this filing that was made within about
 7   the last hour.  Have you seen it?
 8            MS. LARAKERS:  Your Honor, we have seen it, and the
 9   petitioners identified the individual who the declaration
10   relates to.  We haven't received an unredacted version.  But
11   since it's just the name, we can make out what it says.
12            THE COURT:  You haven't received the unredacted
13   version?
14            MS. LARAKERS:  No, Your Honor.  But the only
15   information that's redacted is his identifying information, and
16   they did identify the person.
17            THE COURT:  Well, they'll give you one right now.  But
18   why was the sealed document not filed simultaneously?
19            MS. CANTIN:  Your Honor, I apologize.  It wasn't filed
20   simultaneously.  We just finished the redacted version shortly
21   before the hearing.  We then followed on with an email to Ms.
22   Loret with the unredacted versions, and since then it has
23   already been filed with the clerk's office.
24            THE COURT:  No, I don't think that's right.  It was
25   filed -- the declaration was filed this morning.  It's got a
```

1    footnote.  It says if the court wants an unredacted version,

2    we'll bring it to the hearing.  There's no provision for that.

3         And I'm sitting there, I don't know how the

4    defendants -- you know, I suppose they could have pieced it

5    together to see who was supposed to have a hearing on June 6,

6    but it's just impermissible.  We've had delays in getting your

7    sealed documents.  I put this on a fast track.  You say in

8    effect this is an emergency matter.  People are being detained

9    and deported, and then you don't file your papers properly.

10   It's unacceptable.

11        And I also don't understand why the name should be

12   redacted.  I was not in Boston when I issued the order last

13   Friday, and I put the names in, and then I was reminded that I

14   had approved a year ago a protective order that said the names

15   would not be in the public record.  Why shouldn't the names be

16   in the public record?  Because I find it very difficult to

17   determine who we're talking about if the names are redacted.

18        MS. SEWALL:  Your Honor, I think under the current

19   protective order, as you noted, it calls for class members'

20   names to be redacted.  I think the concern that the reason we

21   included that in the protective order was because we're

22   concerned in the political climate about family members and

23   public filings going with the spouse's name.

24        THE COURT:  I guess I don't understand -- I guess -- I

25   mean, I know it's in the protective order.  That's why I

1   amended my order, but the protective order also provides that,

2   if I give you notice, I can modify it.  And if the names are

3   used -- wasn't Ms. Calderon's name used?  Wasn't Junqueira's

4   name used?  All of a sudden, you know, the human beings who are

5   affected's names can't be used.

6       And the problem is aggravated when the defendants

7   don't know -- I mean, in effect the declaration takes the

8   position that Mr. Lyons' affidavit is inaccurate and may be

9   deliberately false.  But it doesn't -- when it's filed a couple

10   of hours before the hearing at which you want to raise that

11   issue, discuss that issue, it doesn't tell them who the person

12   is.  That doesn't seem fair.

13       MS. SEWALL:  Yes.  I think we appreciate the concern.

14   Generally speaking, the thought process behind it was that our

15   named petitioners have opted to come forward and put their

16   names in this case.  For class members who we represent in

17   terms of the class, we feel a little bit less comfortable

18   putting their name forward in our paper and sort of putting the

19   spotlight on them when they are sort of brought into the

20   situation unwillingly.

21       THE COURT:  Well, you know, this is Standard Financial

22   Management.  I've written about this extensively more recently

23   than I did in the late 1980s.  The records on which judicial

24   decisions are made are presumptively public, and there has to

25   be some justification, sufficiently weighty justification to

1  deprive the public of access to that information.  You know, I

2  don't know that that generally exists.  It might in some

3  particular case in some particular circumstance.  But I don't

4  know, even though the government agreed to it, now that I've

5  focused on it, why I should permit that.

6          MS. SEWALL:  The other thought process, to address

7  your point about the public notice function, is we would

8  include information that the public -- that allows the public

9  to understand our claims and identify what we're alleging.  But

10 we didn't think that the individuals' names were necessary for

11 that purpose.

12         THE COURT:  Let me have the declaration, both versions

13 of it.

14         I mean, with regard -- so the redacted declaration

15 that was filed this morning, it's 327-1.  The unredacted, I

16 don't know what the number is, but it was filed sometime after

17 noon today.  This is part of what delayed my coming in about 15

18 minutes.  You know, what is the particular harm that would

19 occur in your view if the name of the person making the

20 declaration, the spouse or the name of the alien was included

21 in the public record?

22         MS. CANTIN:  Your Honor, for the same reason as

23 Ms. Sewall just identified.  But if it is the court's

24 preference that we unredact this name, I can consult with her

25 to make sure she's comfortable.  Because she's put a lot of

1   personal information --

2        THE COURT:  Did you tell her that it was going to be

3   confidential?

4        MS. CANTIN:  Yes, I did.  I said we would like to file

5   a public version of the declaration.  We will redact the names

6   that is consistent with the agreement we have with the

7   government, but all the other information will be on the public

8   record.  And because there was a lot of personal information,

9   we did redact her and her husband's names.  But again, I can go

10  back to her and --

11       THE COURT:  Well, the alternative, if I decide that

12  this needs to be public, then the alternative is this has to be

13  withdrawn.  It's not up to her.  It's not up to you.  If you

14  assured somebody that their name would not be public, that's

15  not an assurance that you can give without qualification.

16  Although I did sign the protective order, so I'm sensitive to

17  that.  But there have been times certainly at the inception of

18  this case where the media has taken a strong interest, and in

19  media reports I've seen, counsel has appeared with your

20  clients.  And I just don't know that you should get to pick and

21  choose.

22       MS. LAFAILLE:  If I might, because this is

23  something -- you know, I feel a little bit of responsibility

24  for the particular redactions at issue here.  This is something

25  with our clients that we discussed with them at length that we

1    prep them for that we go into eyes open about media attention.

2    And, you know, being a public-facing plaintiff in a case like

3    this, that's just not a discussion that we've been able to have

4    with these 13 individuals who are just, you know, private

5    individuals who happen to be members of this class and, you

6    know, for whom we're certainly seeking something on their

7    behalf.  But, you know, I just have some discomfort in putting

8    their names forward in a case, you know, where I know that that

9    will be immediately available to others on the Internet without

10   having prepared them for that.

11          THE COURT:  Well, I did sign the protective order, and

12   I did, without focusing on this, say that the names could be

13   redacted.  I doubt that that's generally justifiable.  But I

14   think I won't at the moment unseal the unredacted declaration,

15   but I'm ordering that by the close of business, 6:00 on

16   Tuesday, which is August 6, you either file a statement that

17   there's no objection to the unredacted version being unsealed

18   or file a memorandum explaining why you think this is

19   justified.

20          And you should look at cases like the First Circuit

21   decision in Standard Financial Management, which is about 1988.

22   You should look at the First Circuit decision in Kravetz, which

23   is a criminal case.  But that's about 2011.  You could look --

24   and for some reason it's not on Westlaw, or at least it wasn't

25   recently -- look at my June 2018 decision in Arkansas Teacher

1    v. State Street.  It's got a long discussion of what's

2    justified.  And I'm putting you on notice that I'm considering

3    modifying the protective order that, you know, absent a motion

4    to seal based on particular facts unique to that case that the

5    names should be included.  And the government can be heard on

6    this.  I'm supposed to give essentially notice to the public,

7    the media, if the courtroom is going to be closed so people

8    know that it's happening and can come in and ask for unsealing.

9         But I don't want to impede our progress today, and I

10   understand why you told the declarant that her name wouldn't be

11   used.  I don't understand why an unredacted version wasn't

12   filed for the public record -- for the court docket so I could

13   have known several hours ago who you were talking about and

14   read the corresponding parts of the affidavit and memorandum

15   from the government.  But, okay.

16        MS. CANTIN:  Understood and thank you.

17        THE COURT:  All right.  Let me have the folder with

18   the joint report.

19        All right.  Here is what I have in mind as an agenda.

20   First I need to issue an order memorializing the June 27, 2019

21   oral decisions that I made.  As I ordered, you developed

22   language to implement those decisions.  You have one dispute

23   because I think it's not something that I decided in June,

24   although it was discussed, and that's whether ICE should be

25   required to provide notice to class members who file a form

1    I-246 application for stay of removal.

2         You have agreed on a form of a notice now, and that

3    appears to me to be fine, but I'll give you a chance to argue

4    whether people who have filed a form I-246 should receive

5    notice from ICE.

6         Then I want to hear from you about Mr. Charles'

7    deposition and whether it should be continued so he can respond

8    substantively to certain questions after reviewing relevant

9    documents.

10        The respondents have filed an unopposed request to

11   extend the deadline for limited discovery that I ordered on May

12   17 from July 31 to August 14.  There's now, as I understand it,

13   an issue as to whether the respondents should be ordered to

14   produce the Certified Administrative Record regarding the

15   Administrative Procedures Act claim concerning the provisional

16   waivers.  I don't know if there are other discovery disputes.

17   There's a new joint protective order.  It's not clear to me how

18   it differs from the existing protective order, and I believe it

19   has the same provision that concerns me about deleting the

20   names, redacting the names.

21        The plaintiff has a request for a Rule 16(b)

22   conference and to begin general discovery or to expand

23   discovery.  I don't intend to address today the respondents'

24   motion that essentially characterizes my June 27, 2019 order as

25   a preliminary injunction, the order regarding reporting

```
 1    requirements.  The respondents' reply is due August 9.  I'll
 2    take that up sometime in the future.  And then there's the
 3    plaintiffs' motion to show cause why the respondents are not
 4    illegally detaining certain class members.
 5         Is there anything else that we should be discussing
 6    today?
 7         MS. SEWALL:  Not from our perspective, Your Honor.
 8         THE COURT:  Okay.
 9         MS. LARAKERS:  No, Your Honor.
10         THE COURT:  All right.  So I think you agreed on
11    language that implements the decisions regarding discovery that
12    I made on June 27, and there's this open issue regarding
13    whether ICE should be required to provide the class notice on
14    which you've agreed to class members who file a form I-246.
15    I'm interested in hearing you on this.  I've read what you've
16    written.  But I guess it's the petitioners who are urging that
17    I issue such an order, so why don't I hear from the petitioners
18    first.
19         MS. SEWALL:  Sure, Your Honor.  I think it's our
20    position that you did order --
21         THE COURT:  Well, I've read the transcript, and I
22    think it's ambiguous.  And I'm treating this not as a motion to
23    reconsider or a request to reconsider something I decided, but
24    I'm just going to decide it de novo now that it's in focus.  I
25    was deciding a lot of things, and at a minimum I didn't
```

 1    communicate a decision clearly.  And now I think I know more

 2    about the issue; and after I hear you, I'll know even more.

 3         MS. SEWALL:  Sure.  So when somebody files the

 4    application for a stay, it includes information on if they are

 5    a class member.  It's apparent from the application to stay, so

 6    it's our position that, once that gets filed, the government

 7    has the information that it needs and it wouldn't be unduly

 8    burdensome for them to give class notice, the class notice

 9    papers to that individual.

10         THE COURT:  Do we have an idea about how many people

11    we're talking about?

12         MS. SEWALL:  No, Your Honor.  I'm not sure how many

13    people there are.  That's not -- I don't think that's something

14    that we have learned from the government quite yet.  But we do

15    know that when you bring your paperwork in, it does include

16    information on whether you are a class member.

17         THE COURT:  Pull that microphone a little closer to

18    you, please.  Keep your voice up.

19         MS. SEWALL:  Sure.  And Ms. Lafaille is telling me

20    that we did receive some discovery from last night that shows

21    it's about 20 people per month.  So that's the number of people

22    that we're talking about.  As long as I could look at the

23    papers, look at the documents from last night, I would --

24    sorry.  The background on this is that the government

25    produced -- rolled out its first production yesterday, August

1    1, in the late afternoon.  And I think there was some

2    information in that production concerning how many individuals

3    check in for stays per month.  And from our initial review, it

4    looks like it's 20 people per month.

5         THE COURT:  Well, they don't check in -- this may make

6    a difference.  They don't check in in person for a stay.  I

7    think the government's position is they might file something

8    and then -- here.  You can't listen to me and read that.

9    Ms. Lafaille knows enough not to talk to you when I'm talking.

10   This is similar.  If the two of you want to communicate -- here

11   is the general point.  I think in June my reasoning was when

12   they were having some -- when ICE was having some human contact

13   with a class member, it would be reasonable and appropriate

14   that they give them, that person, the notice.

15        Now, ICE says that they may not have some human

16   contact with somebody filing an I-246 petition and that

17   person -- there may not be any immediate threat that that

18   person is going to be detained or deported.  And if there is a

19   detention or deportation notice, then there would be human

20   contact, and they would give them the notice.

21        But here.  Why don't you talk and see what one of you

22   wants to say to me.

23        MS. SEWALL:  Sure.

24        MS. LAFAILLE:  Your Honor, I would say that's -- the

25   moment someone is denied a stay, that communicates to that

1    person -- whether the government plans to act on it or not,

2    that communicates to that person that they can be deported at

3    any moment.  And we think it's very important to those class

4    members that they be able to communicate with class counsel.

5         THE COURT:  Well, that's actually a narrower group.  I

6    thought you were asking that the notice be given to everybody

7    that applies for a stay, not everybody who was denied a stay.

8         MS. LAFAILLE:  Well, that is what we're asking for,

9    Your Honor.  Learning that our class members are being granted

10   stays I think is an important part of understanding how the

11   government is treating our class members.  So there's the side

12   of our being able to understand the government conduct, but I

13   also just really want to focus on the individual.

14        We've talked to some of our clients who have been

15   denied stays.  One client's son described it to me that it was

16   like someone had died every day in his house for years on end.

17   I mean, these people are living under tremendous pressure.  We

18   think it would be immensely important for them to know that

19   they're part of a case, to know that there may be things they

20   can do to reduce the risk of being removed.  And, you know, I

21   just think that that would be a tremendously important point of

22   contact.

23        THE COURT:  And this would be, your understanding

24   based on the information you received last night is that this

25   would be about 20 more people a month who would receive the

1   notice?

2          MS. LAFAILLE:  No, Your Honor.  We received a chart of

3   adjudications for stays and deferred action, so we know that

4   the government tracks it on a monthly chart.  The total number

5   of stay adjudications in a month is about 15 to 20.  So that's

6   the number of people that would have to be screened for whether

7   they're Calderon class members.  And the notes that are already

8   in that chart contain information about things like, you know,

9   what the equities were that those people were presenting,

10  including, you know, I-130 applications filed on them by --

11         THE COURT:  Well, you said there are 15 to 20

12  adjudicated, but I thought the request was for everybody who

13  filed -- that everybody who filed get the notice.  Not

14  everybody who got a decision or everybody who got a denial.

15         MS. LAFAILLE:  Right.  My understanding, Your Honor,

16  is that stay adjudications typically don't take a particularly

17  long time.  The number of people who file in a given month and

18  get adjudicated, it's not going to be a precise one to one.

19  But I think that, you know, those are somewhat co-extensive in

20  my understanding of that.

21         THE COURT:  So it's your understanding it's 15 to 20 a

22  month?

23         MS. LAFAILLE:  That they would be screening for

24  possible Calderon class membership.  This is not a group of

25  hundreds of people, and the chart we received already has

 1    information right there that would be relevant to determining

 2    whether someone is a Calderon class member.

 3              THE COURT:  What information does it have?

 4              MS. LAFAILLE:  It contains notes such as, for example,

 5    that an I-130 application was filed for that individual by a

 6    U.S. citizen in one case that I saw.

 7              THE COURT:  And would ICE have to look beyond that?

 8    If somebody has filed an I-130, are they a class member?

 9              MS. LAFAILLE:  Your Honor, I think that ICE should

10    look beyond that in deciding whether to adjudicate someone's

11    stay.

12              THE COURT:  I'm not -- I'm talking about to report to

13    you.  I mean, it's the respondent's position that it would be

14    too burdensome.

15              MS. LAFAILLE:  I understand that.

16              THE COURT:  I'm not -- I don't understand I'm being

17    asked at this point to influence how they make their

18    discretionary decisions concerning stays.  I'm focused on what

19    information you're going to get.  And they say it would be very

20    burdensome.

21              But now I think I've heard for the first time it would

22    be 15 to 20 people a month, and if the threshold is it's people

23    who have a pending or approved I-130, if they had to look at

24    one column, you might argue that's not so burdensome.  They

25    have the chart anyway.

```
 1              MS. LAFAILLE:  Right, Your Honor.  And I can't say
 2    that they would never look beyond the chart, but certainly when
 3    someone puts forward a stay application, it's not a set form.
 4    People present their equities to the agency.  And the course of
 5    adjudicating that application, I think, you know, discerning
 6    whether someone is a Calderon class member is something that --
 7    whether someone has a U.S. citizen spouse is something they're
 8    going to learn in the course of the application in the ordinary
 9    course.
10              THE COURT:  Well, it's not -- you're not a member of
11    the class if you have a U.S. citizen spouse.  Don't you have to
12    have to a pending or approved I-130?
13              MS. LAFAILLE:  Right.  And that's the type of
14    information that you would typically put in a stay application
15    because it's any --
16              THE COURT:  Well, does somebody have this chart here
17    that you got last night?
18              MS. LAFAILLE:  I don't, Your Honor.
19              THE COURT:  Does the government have it?
20              MS. LARAKERS:  I do not, Your Honor.  Not with me,
21    Your Honor.  I think what I have to say may address that
22    numbering issue.
23              THE COURT:  Go ahead.
24              MS. LARAKERS:  I think there's just a fundamental
25    misunderstanding about what these stay applications look like,
```

1    the form they come in and the volume.

2         So as I understand the request is that they want for

3    everyone who files a stay who is a class member, they want them

4    to receive that notice.  If the chart has 15 to 20 people in

5    it, that might be 15 to 20 people a month.  But that's not

6    taking into account the burden that goes into screening those

7    applications and if that would impose a time period on the

8    screening of all stay applications for class members.

9         So first it's my general understanding that ICE Boston

10   and other ICE offices around the country get hundreds of stay

11   applications each year.  Those stay applications vary in their

12   contents because the applicant can submit whatever they want in

13   support of the stay.  They've gotten -- I know that ICE Boston

14   and other ICE offices have gotten requests for stays of removal

15   that are merely a line, Give me a stay of removal, or, Give me

16   a stay of removal at family members.  So their contention that

17   it would always include information about whether they're a

18   class member isn't necessarily correct.

19        Now, I would assume that if somebody wants a stay of

20   removal, they're going to highlight those equities.  But from

21   my understanding, those equities are not always present.  So

22   that's the first point.

23        THE COURT:  Hold on just one second.  Okay.  Go ahead.

24        MS. LARAKERS:  Along with the fact that ICE doesn't

25   know what the stay application is going to say, it's not a

1    uniform application that they submit, so in the instance if

2    someone says, I have a pending I-130, ICE would have to go and

3    look up whether they were a class member separately.  Because

4    again, on their system, it only shows that they have a pending

5    I-130.  Then they have to, you know, inquire with USCIS or with

6    the individual alien who filed that I-130, whether it be, you

7    know, a brother who wouldn't be a class member, or whether it

8    be a U.S. citizen spouse, and then they would be a class

9    member.

10         THE COURT:  A brother can file an I-130?

11         MS. LARAKERS:  Yes, Your Honor.  So they would have to

12   do that initial screening, and it would not always be apparent

13   from the face of the application.

14         Additionally, many stay applications are rejected

15   without even looking at the contents because they do not meet

16   the basic requirements.  And this happens more often than you

17   would think, even with attorneys.

18         THE COURT:  They don't meet the basic requirements.

19   What does that mean?

20         MS. LARAKERS:  That means that they haven't paid the

21   applicable fee.  They didn't file it at the correct place.

22   They didn't include a travel document for the time period for

23   which they are requesting a stay.  Because obviously if ICE is

24   going to give them a stay of removal, they want to make sure

25   they have a travel document available, so like a passport to

1   some extent.  And that happens much more often than Your Honor

2   would think, even with attorneys filing stays of these

3   applications who you would presume would know.  So that's not

4   even counting the individual person who may not be able to

5   determine what they need to file.  So those applications are

6   just rejected, because they don't meet the basic requirements,

7   they're not screened at all.

8          So the issue with ordering this is a couple-fold.

9   First, you know, it would be burdensome because I think there

10  are a lot of applications.  There may be a small amount of

11  number that are class members, but ICE would have to do that

12  review.

13         THE COURT:  Well, I thought I just heard there were 15

14  or 20 a month.

15         MS. LARAKERS:  If those are the people who are

16  identified as being -- I am assuming from her -- I haven't seen

17  it, seen the chart.  But assuming from her --

18         THE COURT:  You haven't seen the chart?

19         MS. LARAKERS:  No, Your Honor.

20         THE COURT:  The chart was produced in discovery.

21         MS. LARAKERS:  I haven't personally reviewed every

22  single --

23         THE COURT:  Who --

24         MS. LARAKERS:  We have multiple people doing document

25  review on this case, Your Honor.

1          THE COURT:  Is this a chart that ICE -- does it appear

2     to be a chart that ICE regularly makes, or was it a chart made

3     for the purposes of discovery in this case?

4          MS. LARAKERS:  Your Honor, I can't answer that

5     question without --

6          THE COURT:  You can consult your clients.

7          MR. WEILAND:  May I, Your Honor?

8          THE COURT:  Yeah.  Maybe they know what it is.

9          MS. LARAKERS:  But I think regardless, Your Honor,

10    even if it's 15 to 20, that's how many people have to get the

11    notice, but that's not how many stay applications may have been

12    reviewed, including rejections.

13         And then the second part separate from the burdensome

14    argument is that it's difficult to quantify, you know, in a

15    written order when we would be required to do this.  Would we

16    be required to do it with the stay application that we reject

17    that may have had the underlying information it but we didn't

18    look at it because it was rejected because it wasn't properly

19    filed?  Would it include people who write in, I would like a

20    stay of removal, and then we would have to go and see and look

21    to see if that person is a class member.  There's a lot of ifs

22    ands and buts.

23         And on balance, when you balance the burden and those

24    issues against the fact that just because somebody has a denied

25    stay doesn't mean that they're going to have their order of

1    removal executed.  I think that petitioners, they seem to draw

2    a close connection between having a stay denied and having a

3    removal order executed, but that's simply not the case.

4         There's a section of the ERO that does these stay

5    applications.  It doesn't necessarily every time they get a

6    stay application across their desk refer them for removal.

7    That's sort of the picture that petitioners would have --

8    present to have this done, have this reporting done, but that's

9    not what is really going on in ICE Boston ERO.

10        And then when you balance all of that against the fact

11   that ICE Boston is currently giving the class notice to anyone

12   who they identify as a class member who is checking in, who

13   they're having personal contact with, they're going to get that

14   class notice at the time that it is most meaningful.  And so

15   when you balance the burdens in with that, we would just ask

16   that you not produce it at this time.

17        Now, of course petitioners could come forward later if

18   they see that -- you know, because we're providing reporting on

19   whether they've applied for a stay of removal, right?  So if

20   they see on the reporting that a stay was denied recently and

21   then they get picked up the next week, then maybe they have a

22   little bit more basis to say, you know, there's a connection

23   here; this needs to be reported on.  But right now we just

24   don't think it's most necessary on balance with the burden.

25        THE COURT:  Do we know -- what did we find out about

1    the chart?

2          MR. WEILAND:  Yes, Your Honor.  And as I was sitting

3    here I have one more question for my client.  But what I'm

4    informed is I believe what we were talking about is a monthly

5    report that goes from the field office to headquarters for

6    completed adjudications.  It's not necessarily reflective of

7    the number of applications that may have been received.

8          THE COURT:  But that's very helpful.  So, you know,

9    this is essentially a record of regularly conducted activity,

10   and it shows adjudications, not filings, and it shows -- does

11   it show whether they've been denied or granted?

12         MR. WEILAND:  Yes, sir.  I believe it shows what

13   the -- so it's how many were adjudicated by your office that

14   month; what was your determination.

15         THE COURT:  On each of them?

16         MR. WEILAND:  I do believe, yes, sir.

17         THE COURT:  So basically what I've heard so far is

18   there are about 15 to 20 adjudications -- I'll give you a

19   chance to talk to your client, or Mr. Charles or Mr. Lyons can

20   come up and join you.  I'm going to have to talk to Mr. Lyons

21   eventually anyway.

22         MR. WEILAND:  Is it all right if they just sit behind

23   at the table here?

24         THE COURT:  Yes, they can both sit right behind you.

25         MR. WEILAND:  Thank you, Your Honor.

1          THE COURT:  And they can say their names for the

2      record.

3          MR. LYONS:  Todd Lyons.

4          MR. CHARLES:  Marco Charles.

5          THE COURT:  The acting director and the acting deputy

6      director, correct?

7          MR. CHARLES:  Acting field office director.

8          MR. LYONS:  Permanent deputy director, sir.

9          THE COURT:  Permanent, until you become acting again.

10     Based on what I've heard -- well, can I ask -- Mr. Charles and

11     Mr. Lyons can answer this.  Are there about 15 -- have either

12     of you seen this chart that petitioners' counsel referenced as

13     having been --

14         MR. LYONS:  No, Your Honor.  But we do submit a

15     monthly stayed adjudication report to our headquarters which

16     shows adjudications, not filings, just the ones we've actually

17     made a ruling on.

18         THE COURT:  And what I'm -- I am concerned about

19     burden and complexity, and obligations should be clear and

20     feasible.  And the fact that people who work for ICE know that

21     a denial, doesn't mean -- there's going to be an imminent

22     removal doesn't mean that an alien and his or her family know

23     that.  There can be extreme anxiety.

24         But if there are 15 to 20 adjudications a month and

25     ICE, you know, the Boston office reports to headquarters every

1    month on those adjudications, and even if all of them were

2    denied, you're talking about 15 or 20 people who ICE has

3    identified -- well, does the form show whether they have a

4    pending or approved I-130, the report that goes to Washington?

5              MR. LYONS:  I would have to review it again, sir.  I

6    haven't seen it.

7              THE COURT:  Ms. Lafaille saw it.  Does it indicate

8    whether there's a pending or approved I-130?

9              MS. LAFAILLE:  So what I saw was a notes column that,

10   you know, presumably contained notes which were not

11   insubstantial that were taken from the application.  So I did

12   see a note about an I-130 in one case.  That I assume would be

13   the kind of information that --

14             THE COURT:  So what I'm thinking of doing, and the

15   parties can address this, is ordering that the notice be given

16   to any alien whose petition for a stay of removal, I-246

17   application for a stay of removal has been denied, and the

18   record that the Boston office sends to Washington indicates

19   that that person has a pending or approved I-130.  It sounds to

20   me at the moment like that would strike an appropriate balance.

21   ICE wouldn't have to look for information on everybody who

22   files an application but people who have been denied and who

23   ICE knows without any further investigation of the underlying

24   records is a class member would get the notice.

25             MS. LARAKERS:  I think that that's, you know, more

definite than we started with, Your Honor.  I would have a

question about whether ICE would have to provide that for

rejected applications as well as denied.  Like, if they're

rejected for not meeting the qualifications because they're not

looking at --

THE COURT:  Does the chart include rejections?

MS. LARAKERS:  No, Your Honor.

THE COURT:  Mr. Lyons, you can't shake your head.  The

transcript --

MR. LYONS:  No, Your Honor, it doesn't.  Rejections

are more common, as Ms. Larakers said, than denials.

MS. LARAKERS:  So as I understand, it would be the

people who ICE can identify from the stay application itself

that they're a class member, and then they would send that

notice upon learning from the application itself without any

further underlying investigation that they're a class member.

THE COURT:  It was actually -- it was actually more

limited than that.  It's that the chart reflects that they're a

class member.  The monthly report to headquarters discloses

that.

MS. LARAKERS:  Yes, Your Honor.  And I think that

would -- I think that would address a lot of our burden

concerns, although it doesn't -- we still have our other

arguments that it's just not connected.  But assuming you

believe on balance that to be the correct course of action, it

 1  would reduce the burden on ICE.

 2       THE COURT:  Does the petitioner want to be heard on

 3  that?

 4       MS. LARAKERS:  Your Honor, I would -- I would like to

 5  have a little bit more time with my client to ask if there's

 6  anything I missed --

 7       THE COURT:  I'll give you a chance to do that.  Not

 8  quite yet.  Let me hear from Ms. Lafaille.

 9       MS. LAFAILLE:  Your Honor, I don't want to belabor the

10  point.  I think it actually would be beneficial to ICE and to

11  this case for the people adjudicating stay applications, if

12  they don't already -- I believe they already do because I

13  believe those are adjudicated at very high levels -- to have

14  awareness of this case.  And, you know, I think what Ms.

15  Larakers said about if the application --

16       THE COURT:  I'm sorry.  I think you said that the

17  people making the decisions should be aware of this case.

18       MS. LAFAILLE:  That's right, Your Honor.

19       THE COURT:  But that's at a high level, you just said.

20       MS. LAFAILLE:  I believe that stay adjudications are

21  made at very high levels of I believe Mr. Charles --

22       THE COURT:  You understand, Mr. Charles and Mr. Lyons,

23  at that level, right?  They know about this case.

24       MS. LAFAILLE:  Exactly, Your Honor.  And so to the

25  extent that -- you know, I don't think -- I think what Ms.

1    Larakers described does not sound burdensome, which is that if
2    an application reveals that someone is a Calderon class member,
3    that's something they're going to want to be considering anyway
4    in their treatment of that application.  And I think it makes
5    all sense for people who are receiving those adjudications, I
6    understand if the court wants to limit it to denials, obviously
7    we think it would be useful to hear from people who are granted
8    as well.  But, you know, I think it would be --
9            THE COURT:  It actually might be --
10           MS. LAFAILLE:  -- all of those people.
11           THE COURT:  Okay.  So here we're talking about giving
12   notice.  So it could be denials.  It could be that they give
13   notice to everybody who has an adjudication on the merits of
14   their requests for a stay who ICE knows from the application
15   has a pending or approved I-130.  That's what you're asking for
16   at this point.
17           MS. LAFAILLE:  That would be a fair accommodation.
18           THE COURT:  Who the person making the decision knows,
19   it might be somewhere in ICE.  Do you want to talk to your
20   clients, including about that possible order?
21           MS. LARAKERS:  Yes, Your Honor.
22           (Discussion off the record.)
23           MS. LARAKERS:  Your Honor, we don't have any further
24   burden concerns than what we just mentioned.
25           THE COURT:  But would it be a problem if I -- would

1    your argument be different if I said they were going to have to

2    report, they were going to have to give the notice to everybody

3    whose adjudicated -- whose motion or application for a stay was

4    adjudicated if the individual making the decision knew that

5    that person had a pending or an approved I-130?  Now, I'm not

6    limited to denials but just all of them.

7             MS. LARAKERS:  Pending or approved 130 class member,

8    correct, Your Honor?

9             THE COURT:  Yes.

10            MS. LARAKERS:  And new from the basis of what was

11   submitted in the application?

12            THE COURT:  Yes.

13            MS. LARAKERS:  I don't have any additional burden

14   arguments to make there.  They would be diminished I think.

15            THE COURT:  All right.  So I'm ordering that the

16   notice be given to everyone who has an adjudicated -- well,

17   every class member.

18            All right.  I have to refine the language.  But I'm

19   going to order or I am ordering that the notice be given to

20   each class member whose application for a stay has been

21   adjudicated if the person, the official making the

22   adjudication, adjudicating the request knows from the

23   application that the individual is a class member based on

24   information submitted in the application.  That doesn't impose

25   an obligation on the adjudicating official to do further

1  investigation.  Okay?

2         So I'm going to incorporate that in an order with

3  everything else you agreed I had ordered on June 27 and we'll

4  issue that soon.

5         All right.  Now, what's the issue or issues with

6  regard to whether Mr. Charles' deposition should be continued?

7  I'm not sure I have the pertinent parts of the deposition, but

8  I thought the issue was that he was asked about some specific

9  individuals, and he didn't know about those individuals because

10  he hadn't reviewed their files.  And I don't know if -- I guess

11  I need to know what the petitioners are asking for and why.

12         MS. SEWALL:  Sure, Your Honor.  So at the end of the

13  deposition we held the deposition open because we had not

14  received any of the documents in that limited discovery period

15  that Your Honor had ordered the government to produce and also

16  because Mr. Charles was unable to testify to the specifics of

17  many of the cases that we went through in addition to a few

18  other --

19         THE COURT:  I know I have some of his deposition.  Do

20  I have all of it?

21         MS. SEWALL:  You do.  We filed under seal --

22         THE COURT:  Hold on just a second.  I'll get it.

23         I have the deposition, and I'm hoping to see some of

24  the questions and answers that indicate there were some things

25  that Mr. Charles couldn't answer because he hadn't reviewed the

1    files.

2            MS. SEWALL:  Sure, we can go through.  One point that

3    I might make is Mr. Charles often said he would need to look at

4    the documents, and that's fair enough.  But a deposition is not

5    a memory competition -- contest.  We didn't have the documents.

6    We wanted to go forward with the deposition --

7            THE COURT:  And I urged you to go ahead without the

8    documents and see what he had to say, and I said you wouldn't

9    get just one bite at the apple.

10           MS. SEWALL:  Yes.  And actually, what the deposition

11   itself revealed is we need the documents that the government

12   has agreed to produce, but we also need to enter into an open

13   discovery time because a lot of the documents that he had said

14   he would need to refer to in order to understand if there had

15   been POCR violations or other issues were documents that the

16   government has refused to provide to us, documents such as case

17   summaries from the deportation officer concerning the removal

18   of a class member, the EARM printout, which Your Honor might

19   remember discussing at the last hearing at some length.

20           THE COURT:  I don't.

21           MS. SEWALL:  So anyway, these are documents that he

22   mentioned that he does review when making removal decisions and

23   he would need to review, including the A-File as well.

24           So while we held the deposition open in light of this

25   pending document production, the larger concern is the

1   deposition shows we need an open discovery period.

2       THE COURT:  Well, I have this next on my agenda.  And

3   there was certain limited discovery I thought you needed to

4   deal with immediate issues, and it's my present inclination to

5   have you back in before the end of August -- I'm about to start

6   a three-week criminal trial on Monday -- probably about the

7   last week in August for a scheduling conference where you can

8   hopefully -- you know, see what you can agree on regarding the

9   scope of discovery and what you disagree on.  That's my

10  inclination.  But you haven't been heard on that yet.

11      But right now, can you tell me where I find in the

12  deposition some of these questions where Mr. Charles says, "I

13  have to look at more documents"?

14      MS. SEWALL:  Sure.  Let's see.  If we go to let's say

15  page 148.

16      THE COURT:  148?

17      MS. SEWALL:  Actually, I'm sorry.  If we can go to --

18  I think the best might be let's say page 122.  This is a series

19  of questions that we were asking about a particular class

20  member, Mr. V.  There was a motion back in June concerning his

21  planned removal.  And when I was asking Mr. Charles about

22  Mr. V, Mr. Charles could not remember the specifics of the

23  case.  He couldn't remember who had made the decision to arrest

24  Mr. V.  He couldn't remember who had made the decision to

25  detain him.  I believe Mr. Charles --

1          THE COURT:  Hold on just one second.  Let me -- so

2    this is page 122?

3          MS. SEWALL:  It might be.

4          THE COURT:  I'm reading it.  I'm sorry.  Is that what

5    you want me to read, 122?

6          MS. SEWALL:  It might help if we go -- there's a long

7    series of questions.  Actually, it might help to go back to

8    page 111.

9          THE COURT:  What page?

10         MS. SEWALL:  Page 111.  And now that I put you to page

11   111, I'll start.  You can sort of skim to page 113, and it

12   starts to talk about an email we received from counsel about

13   Calderon class member Vasquez Funez on page 113 at line 9.  I

14   think that would be the best place to start.

15         THE COURT:  So how many particular people do you want

16   to ask Mr. Charles about because he didn't remember the

17   specifics of their case?

18         MS. SEWALL:  Well, we got, for the first time in July,

19   this past July, we got a list of who the government identified

20   as class members that are currently in detention.  We also had

21   received a few emails from counsel before that about

22   individuals to be removed, such as Mr. V, Mr. Vasquez.

23         THE COURT:  You know, his name hasn't been redacted

24   from the transcript that you filed.

25         MS. SEWALL:  Right.

1          THE COURT:  Isn't that inconsistent -- what's that?

2          MS. SEWALL:  The transcript is under seal.  This

3    transcript that you're looking at was filed under seal I

4    believe.

5          THE COURT:  That's too broad, too.  You need to file

6    redacted copies.  You can't seal everything because it has

7    something subject to the protective order.  But go ahead.

8          MS. SEWALL:  Yes, and we filed an updated version

9    after Your Honor's order.

10         THE COURT:  Of this?

11         MS. SEWALL:  We filed an updated version of this that

12   is redacted, and it only cites to the portions of the

13   transcript that --

14         THE COURT:  I'm sorry.  That's good.

15         MS. SEWALL:  But this I refer you to because it's

16   easier for you to read.

17         THE COURT:  It is.

18         MS. SEWALL:  So I asked about Mr. V because in that

19   particular circumstance I think Mr. Charles had actually

20   submitted a number of declarations about his case in June when

21   we filed our motion.  But come July, a month later, he couldn't

22   remember the details of the case.

23         THE COURT:  So my question was, how many people did

24   you ask him about where you got answers "I can't remember"?

25         MS. SEWALL:  So there were 13 individuals listed on

1     the detain spreadsheet, and there were these individuals before

2     that, so I'd say it was about 15 that I was asking general

3     questions on in terms of who -- more specific questions on who

4     arrested, who made the decision, did they consider the

5     provisional waiver.

6             THE COURT:  So you would like him to review the files

7     of those 15 people and then answer the questions he wasn't able

8     to answer on July 16?

9             MS. SEWALL:  Well, I think that's part of why we held

10    the deposition open.  But I think the more fundamental problem

11    is that in response to the questions he has said he would need

12    to look at the documents, and there are several times he said,

13    Well, if you have the document, I can look at it, and I didn't

14    have the document.  And it's a document that the government has

15    not actually agreed to provide.

16            THE COURT:  Are these documents you're getting now or

17    not --

18            MS. SEWALL:  As I understand it, they are not going to

19    provide us with A-Files, EARM printout or the case summaries,

20    which are the three documents he repeatedly said he would need

21    to look at to know if the provisional waiver -- participation

22    of provisional waiver process was considered or not.

23            So I mean, there's pages of questions on that and a

24    lot of "I don't knows."

25            THE COURT:  This is something you're going to have to

1    discuss, you're going to have to brief, and it means you're not

2    going to get Mr. Charles' deposition in the near future.

3          MS. SEWALL:  So Your Honor, I think if we ask

4    counsel -- we could try to negotiate, but we have been doing

5    that for quite some time, and I'm relatively certain we're not

6    going to get any further in our negotiations.

7          THE COURT:  That may be it.  So then you're going to

8    have to give me what your discovery requests are and what your

9    proposed schedule is for producing the discovery, and then

10   we'll have another hearing, and I'll decide.

11         MS. SEWALL:  So in the ordinary course, we could serve

12   our discovery directly on the government.  And, Your Honor,

13   we've gone through this process of showing that -- I think --

14         THE COURT:  I think it's going to delay things,

15   though.  You'll make your discovery requests.  They'll move to

16   quash, or they'll object and then, you know, you'll respond.

17   I'm trying to expedite this actually.

18         MS. SEWALL:  Yes, I think -- so what I think would be

19   the most helpful is, if we could serve our discovery requests

20   in the ordinary fashion, they could respond.

21         THE COURT:  Well, in the ordinary fashion you can't

22   serve any discovery requests until you have a Rule 16(b)

23   conference, which we haven't had.

24         MS. SEWALL:  Correct, so when the time comes.

25         THE COURT:  There may be certain automatic discovery

1    you're entitled to.

2         MS. SEWALL:  Excuse me?  I'm sorry.

3         THE COURT:  There may be certain automatic discovery

4    you're entitled to without making the request.  And I think we

5    are getting to the point where, you know, this should be

6    treated as more as a conventional case.  But look at the

7    automatic discovery rules, say, you know, we're entitled to

8    this.  You know, we'll file our request for production of

9    documents by this date.  Any objections should be filed by this

10   date.

11        MS. SEWALL:  In the normal 16(b) conference.

12        THE COURT:  Yeah.

13        MS. SEWALL:  Yeah, okay.  Good.  That is I think what

14   we were looking for as the next step as well.

15        In terms of the Charles deposition, I don't know that

16   it would be productive to do it again in short order for the

17   reasons that I was just describing.

18        THE COURT:  It sounds like it wouldn't be.

19        MS. SEWALL:  Yes, correct.

20        THE COURT:  You would have to determine what documents

21   you're going to get.  Let me ask you this.  Was the

22   deposition -- this is in part for my own edification.  Was the

23   deposition you took helpful?

24        MS. SEWALL:  Yes, it was helpful.  We went through a

25   number of topics.  I think some of the fallbacks of what was

1  going on is that the government has taken a very strict view of

2  what we are allowed to ask about, so there were a number of

3  disputes where we weren't allowed to -- they were objecting to

4  lines of questions that I think were absolutely properly within

5  the scope of the deposition.

6          So I think one of the frustrations we're having is

7  there is this FOD turnover continually.  So we asked for a

8  30(b)(6) deposition, and I don't think there was much effort

9  made --

10         THE COURT:  What kind of turnover?  Oh, field office

11  director.

12         MS. SEWALL:  Field office director.  I'm starting to

13  learn the lingo.  So there's been a lot of turnover, and we are

14  getting fragments of information.  But then when we talk to one

15  person, they say they can't testify to what the other person

16  did.  They don't know; they can't remember.

17         So we asked for a 30(b)(6) witness, and I don't

18  believe that the government properly prepared the witness.  He

19  didn't talk to people before his deposition.  He could have

20  talked to Mr. Lyons.  The government has said, you know, he was

21  responsible for so much information; no individual human could

22  have come up with those things.  But I think if he had spent

23  some more time looking through the cases before, that would

24  have helped, or the government could have designated more than

25  one person to testify.  He couldn't recall measures that Lyons

1   had took after July 2018 to make changes in the office that

2   were supposed to address your order.

3          So we are going through this rigamarole of,

4   frustration I think is the best way to put it, where we're

5   getting fragments of information, and then we come to these

6   hearings and we hear more information that we've never heard

7   because we can't send an interrogatory asking for --

8          THE COURT:  Well, we may be close to the point when

9   you can do that, and then this will --

10          MS. SEWALL:  As I said, I'm not sure that another

11   deposition should --

12          THE COURT:  Actually, so while I understood from the

13   joint report there was a request for resumption soon after

14   Mr. Charles' deposition, now what I'm hearing is that's not

15   requested, but the petitioners would like to have a Rule 16(b)

16   conference, and there would be discovery to schedules and

17   perhaps parameters of discovery discussed, and then there will

18   be discovery.

19          MS. SEWALL:  Correct.

20          THE COURT:  Does the government want to be heard on

21   that approach?

22          MS. LARAKERS:  So Your Honor, I'd just like to be

23   heard on the deposition part of this, and then if you would

24   allow my colleague to address discovery more generally --

25          THE COURT:  That would be fine.

1          MS. LARAKERS:  So just for the record, you know,

2     respondents completely disagree with the characterization of

3     the testimony and the characterization of what Mr. Charles knew

4     and did not know during the deposition and these assumptions

5     that the government did not properly prepare the 30(b)(6)

6     witness.

7          That being said, I think the transcript speaks for

8     itself.  And I think Mr. Charles is a very good witness in that

9     he is careful to answer the question that he is asked and not

10    to speculate.  And I think that is important to create a clear

11    record here, and that's mostly why I disagree with the

12    characterization of the testimony.

13         I would also disagree with the characterization of the

14    documents they are going to receive, first because the category

15    of documents we're providing is a broad category on the

16    policies and practice of ICE Boston with regard to class

17    members.  It's a very broad category that I don't think

18    petitioners can say that they don't know that they're going to

19    get documents that Mr. Charles reviewed.  In fact, I've seen

20    some of the documents, and I know that some of those case

21    summaries that they refer to as not having reviewed are in

22    those documents.  So I think it's important for them to get

23    those documents first before they make representations about

24    what they do and do not have now.

25         And I would ask that any clarification on reopening

1   his deposition, I would ask for clarification on it because I

2   think already five -- at least five hours were used.  And under

3   Rule 30(b)(6), it's usually limited to seven.  So I just want

4   to highlight that that may be a disagreement we have in the

5   future, although I do understand that this court stated that

6   you may get more than one bite at the apple.

7          And then if you don't have any questions about that, I

8   can have my colleague address just discovery in general.

9          THE COURT:  Okay.  You may.

10         MR. WEILAND:  Yes.  Thank you, Your Honor.

11         I think part of the deficit we're operating at here is

12  we haven't yet -- they haven't quite explained exactly what

13  they want.  And everything they ask for is quite expansive, so

14  we have pushed back.  I mean, to characterize it any other way

15  would be disingenuous.

16         But they are asking for and they say as though it's

17  something simple, "Just produce the A-files for hundreds of

18  different individuals."  These are not things that you just hit

19  "print" or you hit "scan" and you send hard copies.  They have

20  to sometimes be recovered from the service center.  There are a

21  lot of moving parts to this.  And so I disagree with the idea

22  that somehow they're entitled automatically to everything that

23  they want.  Your Honor asked the question about whether or not

24  it would be appropriate to set a 16(b) conference to sort of

25  nail down the scope of discovery.  We think the discovery

1    that's been provided already is sufficient for this court to

2    decide the legal issues before it, but if the court is inclined

3    to permit discovery, we certainly think that's the logical --

4            THE COURT:  Well, you know, I'd have to hear your

5    argument on that.  Ordinarily you have civil litigation.  You

6    know, the parties are entitled to discovery.  And I think ICE

7    has done a number of things essentially voluntarily since my

8    decisions last summer, and that's constructive.  I think

9    attention has been devoted to doing things that provide the

10   petitioners with information that is meaningful, you know,

11   rather than having the lawyers spend their time beating each

12   other up.  But maybe -- now I have to understand your

13   respective positions as to whether there should be any more

14   discovery and, if so, what the parameters of it should be.

15           MR. WEILAND:  I understand, Your Honor.

16           THE COURT:  But there's an unopposed request to extend

17   the deadline for limited discovery from July 31 to August 14.

18   Remind me what that discovery is, what remains to be done.

19           MR. WEILAND:  Yes, Your Honor.  This discovery is the

20   limited discovery the court I think eventually decided.  We

21   agreed to produce some things voluntarily, and you set a window

22   sometime in May through July 31, and that is what we're

23   producing.  Ran into a bit of a physics problem with getting it

24   into the machine and reviewed.  And I can give you some numbers

25   of where we stand now and where I expect to be.

1          THE COURT:  But you feel you can get it done by August

2    14?

3          MR. WEILAND:  Yes, Your Honor, I do.

4          THE COURT:  And what's the petitioners' position on

5    this?

6          MS. SEWALL:  We have no objection to extending the

7    deadline to August 14.

8          THE COURT:  And how -- I mean, I would like to have a

9    scheduling conference relating to discovery in this case the

10   last week in August.  I should be finished with my trial, and I

11   have a law clerk who is leaving who is familiar with these

12   things.  It would be valuable to have his assistance.  Is that

13   realistic?

14         You'd have to confer.  You would have to each give me

15   a description -- the petitioners would have to give me a

16   description of the discovery they want.  If the respondents

17   want discovery, which I think they've indicated now that they

18   do, you'd have to describe it.  You'd have to tell me what your

19   proposed schedules -- what your objections are, what your

20   proposed schedules are, and then I'd see you the last week in

21   August unless somebody persuades me that's not a feasible

22   schedule.

23         MS. LARAKERS:  I think we can discuss amongst

24   ourselves whether it's feasible.  It sounds feasible.

25         THE COURT:  Look, I don't have a lot of time on this.

1    I'm going to order it if you think there's a compelling reason.

2    You can ask me to reconsider it, and I might or might not.

3    What's the petitioners' position?  You've wanted to get going.

4            MS. SEWALL:  We do want to get going.  The last week

5    in August, if Your Honor orders it and we can't agree to push

6    it, we could make it work.  However I know that I am traveling

7    on work the last week of August.  I know that Mr. Prussia and

8    Ms. Cantin are unavailable as well.  So it's a -- I know --

9            THE COURT:  You've got about eight lawyers on this

10   case.

11           MS. SEWALL:  Correct.  So if Your Honor orders it, we

12   can make it work, but it would be more convenient even just the

13   week after.

14           THE COURT:  The week after I have no assistants,

15   knowledgeable assistants.  I'll think about it.  Let me see the

16   calendar, please.  Ms. Lafaille, are you going to be here the

17   last week in August?

18           MS. LAFAILLE:  Yes, Your Honor.

19           THE COURT:  I'm inclined to do this at, say, 2:00 on

20   August 27, and you'll work from there.  And, you know, I hope

21   nobody will disrupt her or his vacation for this if that's part

22   of it.  But as I said, the petitioners seem to have about eight

23   lawyers, and you're going to have at least one available who is

24   knowledgeable about this, so it should work.

25           And is one of the disputes whether the respondents

1    should be required to produce the Certified Administrative

2    Record of the Administrative Procedures Act claim?

3         MS. SEWALL:  Yes, Your Honor.  That's something that

4    they had agreed to produce and had told us several times and

5    the court several times that they were working to produce.

6         We received an email about 45 minutes before the

7    filing deadline for our joint report on July 30 saying for the

8    first time they were not going to produce it, which took us

9    very off-guard, and I think this is directly relevant to our

10   APA claims.  I think the government has agreed that it's

11   relevant.

12        THE COURT:  Here, amplify that some.  The APA claim,

13   as I recall it, is not that the provisional waiver regulations

14   were improperly promulgated but they've been essentially

15   nullified without going through the Administrative Procedures

16   Act process because they haven't been followed.

17        MS. SEWALL:  Correct.  And I think sort of the hub of

18   the dispute for a while was the respondents were willing to

19   produce the record leading up to the rule, and what petitioners

20   were most interested in was what was happening after the rule.

21   And they ultimately agreed in a status report, I believe, to

22   produce what we had been asking for.  And then a month later,

23   like I said, we were informed they're not going to produce it.

24        THE COURT:  But is it your understanding -- we'll both

25   have a better understanding in a minute -- that the respondents

1    object to producing what happened -- the record concerning, you

2    know, leading up to the promulgation of the rule, but they're

3    not objecting to what's happened since?

4              MS. SEWALL:  No.  My understanding is they're not

5    going to produce any of it.

6              THE COURT:  What's that?

7              MS. SEWALL:  My understanding is that they're not

8    going to produce any of it.

9              THE COURT:  Well, I don't know what "it" is.  I would

10   think the record for the purposes of the Administrative

11   Procedures Act would be closed at the time the regulation was

12   promulgated.  And then there's discovery about what they've

13   been doing.  That's at the heart of this case.  But what's the

14   government's position?

15             MR. WEILAND:  Yes, Your Honor.  I think our view of

16   what this is is different than petitioners'.  They've never

17   wanted a CAR.  We were the ones saying we --

18             THE COURT:  A CAR is a Certified Administrative

19   Record?

20             MR. WEILAND:  Yes, Your Honor.  My apologies.  They

21   never wanted a Certified Administrative Record.  They've told

22   us they don't think that's appropriate.  They want full-blown

23   discovery, wide open discovery.  And it was our position or my

24   client's position that they wanted the opportunity to try to

25   produce a CAR, Certified Administrative Record.

1          We came before Your Honor and had this conversation

2    where I articulated the position that if this is a rulemaking

3    challenge, APA claim, then what was in the CFR, what was

4    considered by DHS will answer that question without any

5    additional discovery being necessary, and I think Your Honor

6    expressed some skepticism --

7          THE COURT:  This was in the lobby, I think.

8          MR. WEILAND:  We had a further discussion that was

9    here in the record which is what I'm referring to, sir.  I'm

10   not -- we have had conversations in the lobby.

11         THE COURT:  Okay.

12         MR. WEILAND:  As a result, my client, ICE in

13   particular, went back to see if there was some way to put

14   together a CAR that was beyond just the 2016 rulemaking because

15   practically everyone in the courtroom was saying that that was

16   not going to be helpful or useful to the court's decision.  And

17   they didn't want that.  They wanted discovery.

18         I think the issue here is these are inherently

19   discretionary decisions that don't lend themselves very well to

20   an administrative record, and so it was on the 30th of July

21   that DOJ was informed by ICE that a CAR was not going to

22   happen.

23         THE COURT:  But when would -- if I recall correctly,

24   the last relevant revision to the provisional waiver

25   regulations was in 2016; is that right?

1          MR. WEILAND:  I believe that to be correct, yes.  4.

2          THE COURT:  And so would the Certified Administrative

3     Record ordinarily be complete at the promulgation of the

4     regulation?

5          MR. WEILAND:  I think -- yes, sir.  And part of this

6     is, the record, particularly in a regulation of this case, is

7     published for a lot of parts.  So a lot of this is in the

8     Federal Register, the notice and comment, the responses.  I

9     think we have in some instances pointed to parts of that record

10    in support of our motion to dismiss.

11         THE COURT:  Right.  So let's say I was persuaded that

12    you shouldn't have to produce a Certified Administrative Record

13    up to the time the most recent relevant regulation was

14    promulgated in 2016.  Is there more that respondents view as

15    part of the administrative record that it's objecting to making

16    available in discovery?

17         MR. WEILAND:  No.  I think part of the problem here is

18    I'm not certain that petitioners have nailed down a discrete

19    final agency action such that you can then bring in everything

20    considered directly and indirectly as a part of that

21    administrative record.

22          So we were focused on, or at least the position I took

23    before Your Honor was that, if this is a rulemaking challenge,

24    this will be answered by what's in that rule and what was

25    promulgated in the register as part of that rule.

1          My client recognizes that in the absence of a

2    Certified Administrative Record about Boston ICE ERO actions in

3    2017 and 2018, post-rule-promulgation, they're opening

4    themselves up to limited discovery.  And I think this case is

5    tracking that way anyway, and it would be -- well, it's just

6    simply trying to come up with a CAR.  It won't shed any light

7    on the questions.

8          THE COURT:  So you have what's in the Federal

9    Register.  And if I understand it correctly, the respondents

10   recognize that you're going to ask for and there's a good

11   chance I'm going to authorize discovery about what happened

12   after the promulgation of the relevant regulation.  So what's

13   the -- what do you need -- what more do you need from before

14   the regulation was promulgated?

15         MS. SEWALL:  Your Honor, I think we've made it quite

16   clear to the government during negotiations and in status

17   reports that we don't -- that we are fine with them not

18   producing the CAR up until the rule.  However, the government

19   has suggested that the CAR does extend beyond 2016, and we have

20   made very clear that that's what we're interested in, and that

21   is what the government said that they were going to --

22   suggested that they were going to produce to us in their June

23   25 status report and then seems -- I believe has now reneged on

24   doing that.

25         THE COURT:  You believe what?

1          MS. SEWALL:  I believe they have now reneged on doing

2     that.

3          THE COURT:  Reneged on doing what, giving you

4     information after the promulgation?

5          MS. SEWALL:  Exactly.

6          THE COURT:  That's not what Mr. Weiland just said.

7          MS. SEWALL:  In the email he said --

8          THE COURT:  Here.  No.  Listen, listen.  I'm going to

9     read to you from the transcript of what he just said.

10          MS. SEWALL:  Okay.

11          THE COURT:  He said, "The position I took before Your

12    Honor was if this is a rulemaking challenge, this will be

13    answered by what's in the rule and what was promulgated in the

14    register as part of that rule.  My client recognizes that in

15    the absence of a Certified Administrative Record about their

16    Boston ICE ERO actions in 2017 and 2018 post-rule-promulgation,

17    they're opening themselves up to limited discovery.  And I

18    think that's the way" -- "I think this case is tracking that

19    way anyway, and it would be -- well, it's just simply trying to

20    come up with a CAR.  It won't shed any light on these

21    questions."

22          So I think it may be different than what you were told

23    before, but the respondents recognize that they're going to

24    have to produce discovery about certain things that occurred or

25    didn't occur after the promulgation of the revision to the

1    provisional waiver regulation in 2016.  And I believe that's

2    right.  You may have disputes over how much they have to

3    produce or what they have to produce, but you're going to get

4    something.

5         MS. SEWALL:  If that is what they're saying, then, you

6    know, we can accept that and we can continue to wait; that we

7    were told they would produce exactly that information in part

8    of this limited discovery effort that's to wrap up on July 31

9    and now has been extended to August 14.

10        What I'm hearing is that now they realize they might

11   end up having to do it, but they're not actually agreeing to do

12   it.  If I'm mistaken in that, then that's fine.  But I have a

13   little bit of misunderstanding here about what's going on I

14   think because we were --

15        THE COURT:  This is too abstract for me to deal with.

16   Mr. Weiland, did I quote you accurately?

17        MR. WEILAND:  Yes, Your Honor.

18        THE COURT:  And are you still -- you've asked for more

19   time beyond July 31, but I'd have to go back and read exactly

20   what I wrote, but I ordered certain discovery by July 31, now

21   August 14, and you're going to produce that discovery, correct?

22        MR. WEILAND:  Yes, Your Honor.

23        THE COURT:  And then, as I understand it, petitioners

24   are not asking for a conventional Certified Administrative

25   Record because this isn't the challenge to the way the

1    provisional waiver regulations were promulgated.  It's an

2    argument that they've been nullified without going through the

3    steps required by the Administrative Procedures Act, right?

4              MS. SEWALL:  Correct.

5              THE COURT:  You'll be entitled to reasonable discovery

6    concerning whether that's correct, whether that happened and is

7    happening.

8              MS. SEWALL:  And I guess I'm just confused about

9    whether the respondents are agreeing to do that by the August

10   14 deadline or not.

11             THE COURT:  They're going to produce what they were

12   ordered to produce.  I mean, you've been getting some

13   discovery, correct?  Like the chart that came last night.

14             MS. SEWALL:  The first discovery we received was last

15   night.  And I'm not sure that Your Honor even ordered anything

16   about the Certified Administrative Record because respondents

17   had represented that that's something they were going to

18   provide --

19             THE COURT:  I know, but you're not going to get the

20   Certified Administrative Record.  You just told me you don't

21   need it.

22             MS. SEWALL:  I think, when I say, "Certified

23   Administrative Record," what I'm saying is they agreed to

24   provide -- they suggested that the Certified Administrative

25   Record contains the information beyond 2016, and that's what

```
 1    they were going to produce.
 2         THE COURT:  All right.  I can't resolve that now.
 3    You'll see what you get, and then you'll tell me what you think
 4    you're entitled to.
 5         Now, there's a new protective order.  Let me see.
 6    316.  And why is there a new protective order, proposed
 7    stipulated protective order, number 316?
 8         MR. WEILAND:  Your Honor, that was done at our
 9    request, so if I might --
10         THE COURT:  Sure.
11         MR. WEILAND:  Substantively Your Honor is correct;
12    they are the same.  Procedurally we thought there needed to be
13    more clarity and definitions in the process, and therefore it's
14    a more fulsome explanation of how that would be handled between
15    the parties and then to the court.  But the key provision I
16    believe that you're clued in on is the definition of what is or
17    is not confidential information, and I believe that to be
18    virtually the same.
19         THE COURT:  And I have this concern about the names.
20         MR. WEILAND:  Yes, Your Honor.
21         THE COURT:  All right.  Well, I'll look more closely
22    at this.  I mean, these protective orders only operate
23    pretrial.  If we're in a trial, we'll have to discuss what to
24    do about allegedly confidential information.
25         MR. WEILAND:  I understand.
```

```
1          THE COURT:  Because judicial proceedings are open.

2   Two, you know, if it provides for the filing of certain

3   information under seal, redacted copies have to be filed for

4   the public record, and what's not in the public record should

5   be minimized.  To the maximum extent possible, the information

6   should be public.

7          MR. WEILAND:  Yes, Your Honor.  And if I might, just

8   on the substantive paragraph, there is a modification with

9   regards to names.  It's primarily to do with the names of

10  government officials who may be acting.  We agreed that

11  public-facing officials, the FODs, the DFODs, the AFODs, the

12  decision makers in this case, their names would not be

13  redacted, but we were, because of some incidents in the case,

14  looking to protect some of our lower level functionaries the

15  same way that I think petitioners have sensitivities about

16  their unnamed class members.

17         THE COURT:  You mean people who -- what's an example

18  of a person whose name wouldn't be part of the public record?

19  That person did what, has what role?

20         MR. WEILAND:  A young deportation officer who

21  forwarded an email up the chain of command for a decision.

22         THE COURT:  And why shouldn't his or her name be

23  public?

24         MR. WEILAND:  We have some concerns about officer

25  safety, Your Honor.
```

```
 1              THE COURT:  Based on what?

 2              MR. WEILAND:  We had one -- based on a release of

 3    information in this case, we had one young I believe SDDO

 4    receive harassing communications and threats.

 5              THE COURT:  What's an SDDO?

 6              MR. WEILAND:  Actually, I'm sorry.  I'm being

 7    corrected.  Supervisory -- I'm being corrected here, Your

 8    Honor.  I apologize.  It was a USCIS employee.

 9              THE COURT:  All right.  Well, I'll look more closely

10    at this protective order.  I think it does have a provision

11    that it can be modified -- if it doesn't, I'll add it -- by me

12    if I give you notice and an opportunity to be heard.  Is that

13    in here?

14              MR. WEILAND:  Off the top of my head I can't recall,

15    sir, but that certainly makes sense to the government.

16              THE COURT:  If it's not in there, it will be.  That's

17    the inherent authority I have, and it should be in all of these

18    protective orders.

19              MR. WEILAND:  Yes, Your Honor.

20              THE COURT:  All right.  Here.  Let me see the

21    calendar -- I've got the calendar.  Well, I set the Rule 16(b)

22    conference for August 27 at 2:00 I think.  We're going to issue

23    an order for that conference, and it's going to require that

24    you confer and make your submissions concerning that by August

25    20.  I anticipate you'll have some substantial disputes, and
```

1    I'll need some time to study them.

2              All right.  Is there anything else?  Hold on a second.

3              Is there anything else before we get to the motion to

4    show cause?

5              MS. SEWALL:  I don't think so.

6              THE COURT:  All right.  Let me have those papers.

7              All right.  I'd like to at least start on this today,

8    but I have the -- do I have the declaration here?

9              I'm interested in hearing from you on this.  The

10   motion was filed I think about eight days ago, and I issued an

11   order requiring that the 13 named individuals not be

12   transferred out of the district, including removed, until I

13   decided the matter.  And I gather -- anyway.

14             It seemed to me, but I need further explanation on

15   this, that the petitioners are complaining that POCR reviews

16   are being done before the deadlines given for submitting

17   documents and that some custody reviews have been conducted

18   late.  It's not completely clear to me and I think also to the

19   respondents what relief is being requested.  Maybe it's release

20   from detention.  But the way the memo was written, it wasn't

21   clear that that was just the six or seven people who allegedly

22   didn't receive timely reviews or whether it's all class

23   members.

24             And then Mr. Lyons submitted a declaration that said,

25   Well, if information came in after the decision was made, it

1    would be considered, but nobody -- the petitioners had

2    identified and submitted such information, and now there's a

3    declaration indicating that one individual had a decision made

4    on June 4, submitted information by June 6, the stated deadline

5    in the notice, and evidently, ICE doesn't know that that's at

6    ICE, unless Mr. Lyons wasn't being truthful.

7            So that's what I understand about the motion.  I'm

8    interested in hearing argument on it, but I'm not sure -- well,

9    we'll see whether it can be resolved.

10           MS. LAFAILLE:  Thank you, Your Honor.  I think we

11   could certainly get into the weeds of some of these cases, but

12   the big picture is that we received reporting about 13 detained

13   class members.  Now, the group has really been whittled down to

14   eight because four have been removed, including one after we

15   filed our motion before the court, and one has --

16           THE COURT:  One was removed after you filed your

17   motion?

18           MS. LAFAILLE:  Yes, Your Honor.

19           THE COURT:  And before I issued my order?

20           MS. LAFAILLE:  Yes, Your Honor.

21           THE COURT:  So that was like within about a 12-hour

22   period?

23           MS. LAFAILLE:  Yes.

24           THE COURT:  Okay.  So now we're talking about eight

25   people subject to my order.

1        MS. LAFAILLE:  That's correct, Your Honor.  And with

2    these eight and with the 13, what we were dismayed to find is

3    that there are violations of the Post Order Custody Regulations

4    in each and every case.  And what I think distinguishes this

5    from the situation we were in last year to some degree is that,

6    first, these are issues that we've talked about and talked

7    about over the course of this litigation.  But second, what I

8    recall from last year is that there was certainly some

9    disorganization, but the government recognized that the

10   regulation had at least, you know, even as they interpreted it,

11   required certain things and that they had fallen short of that.

12       What troubles me very much about this response is

13   that, faced with very plain violations of this regulation, the

14   government does not seem at all troubled and seems to be

15   contorting the meaning of these regulations and forgetting the

16   basic purpose, which is to provide notice and an opportunity to

17   be heard.

18       THE COURT:  Well, you know, they say now they're

19   giving notice essentially, you know, as soon as they can after

20   somebody is detained.  That's what they're doing, they say,

21   correct?

22       MS. LAFAILLE:  Yes, Your Honor.

23       THE COURT:  But isn't that a good thing, putting aside

24   when they do the review, to give people notice that there's

25   going to be a review at some point and they should start

1    assembling documents and arguments to get released?

2         MS. LAFAILLE:  What we've said to them on this is yes,

3    that notice should absolutely continue.  You know, I received a

4    similar notice months ago about something that had to do with

5    my health insurance.  If I hadn't received the notice the week

6    before that actually reminded me to do it, I wouldn't have done

7    it.

8         THE COURT:  I mean, you know, there's a couple of

9    things.  I'm just trying to break this down into more

10   bite-sized pieces.  So you're not complaining that -- because

11   they might have construed it this way.  You don't want them to

12   start giving the notice later.  I think your primary concern is

13   they say you have until June 6 to submit documents that will be

14   considered, and then they make a decision earlier.

15        MS. LAFAILLE:  Well, no, Your Honor, because I am --

16   there are several categories of things here happening.  And

17   including, there are some things, as I sat down with this in

18   preparation for our hearing today, there are actually some

19   things I realize that we hadn't realized before that, you know,

20   I think if this is not ruled on today, we might supplement.

21   And we've alerted the government to those issues as well

22   already.  But, you know, there are late reviews.  There are a

23   total absence of notice, it appears, of the 180-day reviews, a

24   lack of the interviews required for 180-day reviews.  And with

25   respect to the 90-day reviews --

1          THE COURT:  The alien is supposed to be interviewed

2     for the 180-day review?

3          MS. LAFAILLE:  Yes, Your Honor, unless the decision

4     upon the file review, unless the recommendation and file review

5     is to release.

6          THE COURT:  That's not in what you submitted to me,

7     though, is it?

8          MS. LAFAILLE:  Correct, Your Honor.  That's one of the

9     issues I spotted after that I've spoken to the government

10    about.  But the issue with the 90-day reviews, Your Honor, I

11    mean, this is, it's almost the exact same issue we had with

12    Lucimar, we had with Ms. De Souza last year.  We had a notice

13    that was ineffective and a review conducted before the

14    opportunity to provide documents.

15         THE COURT:  Well, the notices that were ineffective

16    last year were because they didn't go to the alien's attorney

17    approximately 30 days before the decision.  The notices were --

18         MS. LAFAILLE:  Right, Your Honor.

19         THE COURT:  -- too late, and at least in one instance

20    given to the alien, not to the alien's attorney.

21         MS. LAFAILLE:  Correct, Your Honor.  And the notices

22    we received in this case also don't indicate that they were

23    given to the attorney, although I understand that perhaps they

24    were.  I don't have full information on that.  There's a cc box

25    that's not checked in many cases.  But the point -- I don't

1    want to minimize the point about early notice, Your Honor,

2    because the regulation requires notice approximately 30 days

3    before the review.

4            THE COURT:  So I'm groping for what remedies you want.

5    So do you want them, approximately 30 days before, this is a

6    reminder, if you want to submit anything us to consider, you

7    need to do it by a particular date?

8            MS. LAFAILLE:  That is the plain letter of the

9    regulations.

10           THE COURT:  Is that what you want?

11           MS. LAFAILLE:  We want them to do it, yes.

12           THE COURT:  I'm trying to figure out what relief you

13   want.

14           MS. LAFAILLE:  Right.  For these individuals, Your

15   Honor, we have eight individuals who are being held on multiple

16   violations of their rights under the Post Order Custody

17   Regulations.  You know, Your Honor has emphasized before the

18   purpose of these, these are not housekeeping measures for the

19   government.  These are provisions intended to give people

20   meaningful notice at a meaningful time so that they have the

21   opportunity to present materials for review and not, you know,

22   if someone -- not be presented with a decision that they've

23   already been denied that opportunity before they've even had

24   the opportunity to submit the materials they might have

25   submitted.

1           We think the appropriate remedy for that is some

2   stronger medicine than what the court was prepared to order

3   last year, because again, we are a year into this, and, you

4   know, release of a substantial number of these people I think

5   is appropriate.

6           THE COURT:  Tell me what you want me to order so that

7   I can think about whether it's appropriate.

8           MS. LAFAILLE:  Well, we've asked for release.  We

9   think, at a minimum, anyone who the government cannot provide a

10  very strong justification based on an imminent public safety

11  risk should be released.

12          THE COURT:  Well, last year I said I was going to

13  order that I would do the bail review.  I don't -- that's a

14  remedy in a habeas petition.  Somebody says they're being

15  detained in violation of the laws of the United States or the

16  Constitution and laws of the United States.  One remedy is to

17  release them.  And you just implicitly recognized this.  If

18  somebody's really dangerous, the fact that they didn't get a

19  notice probably doesn't justify endangering the community by

20  releasing them.  But I was thinking last year of a procedural

21  remedy, not some categorical order.

22          MS. LAFAILLE:  Yes, Your Honor.  And I think, you

23  know, certainly a procedural remedy -- I don't want to saddle

24  the court with eight custody hearings, you know.  I think that,

25  given the opportunities that ICE has had to remedy its issues

1   with these regulations, it would be appropriate.

2        THE COURT:  But they say they're giving -- and you

3   agree this is a good thing.  They're giving prompt notice after

4   somebody's arrested that they can submit information.  You

5   know, I'm concerned if they do make decisions before what they

6   led somebody to believe was the deadline, although they say

7   we're going to make this decision on or about or by, they could

8   say.  And I think you don't want to encourage them to wait

9   until the end of the 90 days.  And I think it may be time for

10  me to have you address what I wrote in my June 11 decision.

11       We've been -- I didn't have to decide whether they get

12  90 days when the removal periods expire before they detain

13  somebody.  What I wrote then is it appears to me that a proper

14  interpretation of the regulation is you give notice as soon as

15  possible after somebody is detained if the removal period is

16  run, and then about 30 days later give them the detention

17  review.  This is <u>Jimenez</u>, 317 F. Supp. 3d 626, starting I think

18  at about maybe 351.  You know, maybe it's time to, you know,

19  make a decision on that because that would make difference.

20       MS. LAFAILLE:  And Your Honor, our position now is

21  what it was then, that when discretion -- when detention is

22  discretionary, these regulations are properly read to require

23  review.  The review can wait 90 days when detention is

24  mandatory for those 90 days but not when detention is

25  discretionary.  That's certainly our position.

1           THE COURT:  It's mandatory if somebody is detained

2     during the removal period?

3           MS. LAFAILLE:  Correct, Your Honor.

4           THE COURT:  But not if they're detained after the

5     removal period?

6           MS. LAFAILLE:  Correct.

7           THE COURT:  And then the review should be done when?

8     I said like in 30 days after the notice.

9           MS. LAFAILLE:  I think that was -- that was a good

10    interpretation of the regulation.  It's not -- in light of the

11    court's ruling in Ms. De Souza's case, it wasn't an issue we

12    pressed for purposes of this motion.

13          THE COURT:  I know, but that -- I'm sorry.  Go ahead.

14          MS. LAFAILLE:  But it does continue to be our position

15    that that is when --

16          THE COURT:  And it may be right.  I wrote that last

17    year.

18          MS. LAFAILLE:  But here, even understanding that the

19    government does not agree that that's the interpretation even

20    under -- you know, putting aside that issue, there are other

21    plain violations.

22          THE COURT:  Well, I mean, the respondents have

23    explanations, you know, for each of them, and they say we said

24    on or about, we gave earlier notice, which is a good thing, and

25    they said I think importantly, and now it's in serious

1    question, they said if information comes in after we've made a

2    decision and before the date we gave somebody as the deadline,

3    we'll consider it de novo.  And Mr. Lyons said and the

4    respondents argue none of the people that are involved in this

5    motion to show cause ever filed anything.

6         And then I have the declaration that was filed today

7    that says that one class member received a notice that

8    information had to be provided by June 6.  A denial was made on

9    June 4.  Nevertheless, her lawyer submitted information on June

10   6.  And evidently, ICE doesn't know it has this information, so

11   it's not doing what Mr. Lyons -- it's not -- doesn't have the

12   practice Mr. Lyons says it has.

13        MS. LAFAILLE:  That's one part of this.  And the other

14   piece of this, Your Honor, is just to -- you know, I think the

15   government trivializes the role that the -- the consequence of

16   conducting these reviews before the time, the deadline to

17   produce the documents.

18        You know, I'd point the court to paragraph 9.  And

19   just, you know, imagine the devastation that these individuals

20   feel learning that they've already been denied.  That is, you

21   know, a reasonable person might not submit documents in the

22   hopes that they might conduct this review.  The reasonable

23   implication of that is that this is not a legitimate process.

24   For someone in detention, they can't -- we can't expect them to

25   have this eternal optimism or an attorney that had already been

1    paid to submit this thing who was going to submit it anyway.  I

2    don't think that detainees who aren't told that they're going

3    to have another opportunity to submit things and in fact

4    receive a notice telling them, you know, that if they're still

5    detained three months from now that there will be a review at

6    headquarters, the reasonable implication of that is not that

7    they should go ahead and submit these materials.  The

8    reasonable implication of that is that they're done.

9         THE COURT:  Well, the -- if ICE has 90 days, would

10    this concern or problem be addressed if the notice ICE issued

11    said, you know, we're going to make a decision on whether to

12    continue your detention on or about June 4; and if there's any

13    information you would like us to consider, you must submit it

14    by May 20, like two weeks before.  And, you know, we may make

15    the decision before June 4.  But, you know, if you get more

16    information before June 4, you can supplement your submission.

17    Would that address the concern?

18         MS. LAFAILLE:  Absolutely, Your Honor.  If the notice

19    communicates -- you know, provides the opportunity to be heard,

20    you know, that is the very -- the definition of the notice in

21    the regulation.  It's a notice provided approximately 30 days

22    before at the time when it's meaningful and providing -- you

23    know, so that the noncitizen can submit documents for

24    consideration.

25         Anything other than that is just an exercise in

 1    checking boxes rather than providing the meaningful review that

 2    this regulation is set out to provide.

 3            THE COURT:  All right.  What would the government like

 4    to say?

 5            MS. LARAKERS:  Your Honor, first I'd like to say that

 6    I think this motion is resolvable.

 7            THE COURT:  Resolvable?

 8            MS. LARAKERS:  Resolvable.  We indicated in our emails

 9    when we were going back and forth with them over this motion

10    that we were willing to take a look at the notice and fix

11    maybe -- you know, remedy some of the issues they have with it.

12    Because at bottom, with regard to the first section of their

13    motion, it doesn't seem to the government that it's a matter of

14    whether you're violating the express provisions of the

15    regulation because the government did give 30 days for the

16    alien to produce documents.  They did do it before the 90th --

17    did the review before the 90th day.  It seems just to be an

18    issue with the language of the notice itself, which is not

19    provided for in the regulation anywhere and therefore is within

20    ICE Boston's discretion.

21            THE COURT:  I just made a suggestion that the

22    petitioners said -- would seem to address things in a

23    satisfactory way.  Do you think that's something your clients

24    would be willing to seriously consider or do?

25            MS. LARAKERS:  Absolutely, Your Honor, we would

1      absolutely consider it.  And it was actually -- I think we're

2      on the same wavelength there with resolving this motion.  I

3      think the only reason why this motion -- this part of the

4      motion wasn't resolved or substantially met-and-conferred over

5      regarding the language of the notice is because what remedy is

6      available to those who petitioners claim had their review

7      early.

8              So I think that's where -- I think that's where we

9      remain in this first issue.  The government is willing to work

10     with petitioners about the actual language in the notice to

11     alleviate some of those concerns.  And to make it -- because we

12     think that's good for ICE and good for petitioners so that

13     everyone knows exactly how to submit documents, exactly what

14     time it's going to be in.  ICE Boston, to be clear, is not

15     willing to change the way it's currently doing the reviews,

16     giving that 30-day notice as soon as possible, conducting the

17     review prior to that 90th day in detention or the expiration of

18     removal period.

19             THE COURT:  I may have to in effect -- I may have to

20     issue in effect a declaratory judgment on that because, as I

21     wrote a year ago, I'm not sure that the -- I think I said it's

22     questionable whether ICE's interpretation that has 90 days,

23     even when it detained somebody after the expiration of the

24     removal period, is correct.  But I think that as a practical

25     matter that may take some more time to resolve.  You know,

 1   improving the notice in the process is very desirable because,
 2   you know, you're talking about remedy, and I'm concerned about
 3   remedies, too.  And I issued that order very quickly last
 4   Friday because I was concerned that there might be people who
 5   are entitled -- I mean, this was a detention issue, but I
 6   wouldn't be able to decide the detention issue if they had been
 7   deported and removed.  But I would like to soon get to the
 8   point where I can lift that order.  Because what was submitted
 9   by the respondents is that there was somebody who would have
10   been removed but for my order.
11            MS. LARAKERS:  Yes, Your Honor.  So I think with
12   regard to these specific individuals, you know, we previously
13   offered petitioners that -- and now there's a stay of removal
14   in effect, so it alleviates their immediate concern that those
15   individuals would be removed.  But we originally offered, just
16   in the case of these individuals as a sign of good faith that
17   we would review any additional documents, as is ICE's stated
18   practice.
19            THE COURT:  Well, I would say it's what Mr. Lyons said
20   under oath is its policy, but the declaration that came in
21   today to me raises serious questions as to whether it's ICE's
22   practice.  Because Mr. Lyons, either he made a knowingly false
23   material statement under oath and committed the crime of
24   perjury, or I would say at the moment, more likely, he wasn't
25   properly informed if those documents really were submitted.

1    But, you know, there's something he didn't know about.

2            MS. LARAKERS:  Yes, Your Honor.

3            THE COURT:  And the stated policy wasn't the practice

4    in that particular case if that declaration is reliable.

5            MS. LARAKERS:  Yes, Your Honor.  I've been informed

6    that certainly the latter, that it in no way was intentional;

7    that simply we didn't have that information.  And again, this

8    is an evolving situation because we just saw that declaration

9    this morning.  So obviously we're trying to figure this out.

10   But ICE Boston is not -- it is the practice of ICE Boston to

11   review any documents that they know that they have, Your Honor.

12           THE COURT:  Well, somebody -- if it was filed,

13   somebody knew it.  There's some deficient -- if it was filed,

14   there's a deficiency in the process.  And I think what I'm

15   inclined to do is give you some short but reasonable period of

16   time to try to figure out, you know, whether those documents

17   were filed and where they are and why Mr. Lyons didn't know

18   about them when he filed his declaration and what's going to be

19   done to provide reasonable assurances that that doesn't recur.

20           Because if you talk and you revise the notice and you

21   say the review will be done on or before June 4, and if you

22   want to submit anything for our consideration, submit it by May

23   20, and if you develop something after May 20 and before June

24   4, submit that, too, something along those lines, I think the

25   parties are in agreement that would be helpful and appropriate.

1  And then ICE, Mr. Lyons, Mr. Charles, have got to know if

2  anything has been filed even after the original deadline.

3       MS. LARAKERS:  And I think that can be addressed in

4  the notice as well, Your Honor, because it may just be a matter

5  of things not being filed in the right place or having the

6  right title on them such that they would be routed to the right

7  area.  But again, that's the type of information that may be

8  able to be built into the notice and that we can confer with

9  petitioners on.

10      So then what -- because I think that issue moving

11  forward is certainly resolvable, I do just want to point out

12  that, you know, this was -- you know, come to this court as an

13  emergency, but I do want to point out that one of these, at

14  least one of these petitioners had their review done on the

15  89th day.  ICE Boston had to do it on that day.  Otherwise, it

16  would have been in violation of the regulation.

17      I do know and I understand their concern that they

18  interpret the notice to say that you have up until that 90th

19  day; but to comply with their version under the notice, ICE

20  would have had to violate the regulation.

21      THE COURT:  I think that if I were Mr. Charles or Mr.

22  Lyons, I wouldn't -- I would say something like -- let's say

23  May 27 is the 83rd day.  I would say, "This decision will be

24  made on or about May 23 and may be made as late as June 4, and

25  if there's information you would like us to consider, submit it

1   by May 10.  But if you develop information after May 10 and

2   before June 4, submit it."

3          MS. LARAKERS:  And you properly characterize ICE's

4   concerns there.  Enough time so that they have flexibility to

5   conduct the review but also notice for aliens so they can get

6   their information in in time so that ICE can have it.  So I

7   think that's clearly able to be resolved amongst the parties,

8   Your Honor.  So then we're just left back at the remedy for

9   that issue.

10          If Your Honor found that the procedural -- if Your

11   Honor found that there was a procedural due process violation

12   there, Your Honor could balance that procedural due process

13   violation against other factors, but the relief issued would be

14   any -- any relief would be either the benefit of the procedure

15   again or, if it were egregious, it would have to be release in

16   accordance with Zadvydas.  It would not be a bond hearing which

17   may be beneficial for the court and for all parties involved.

18   It would just be a matter of what the Supreme Court did in

19   Zadvydas, which was balance the due process interests.

20          THE COURT:  Well, you don't want to go back there

21   because there's a difference between procedural due process and

22   substantive due process.  I said this in May.  I wrote about it

23   at length.  It was vividly clear to me a year ago.  I re-read

24   it today.  I'm not going to change my mind on that.  You'll

25   have to go find somebody else.  But I think that there's

1    substantial agreement here that, you know, that we have a

2    framework for improving the notice and the process, even before

3    we get to the issue as to whether ICE has as many as 90 days.

4    For the moment, until I make a final decision on that, we'll

5    assume it's up to -- I mean, you can continue to operate as if

6    it's up to 90 days, although I doubt it.  That's one.

7         Then there's a major issue.  I mean, I'll ask Mr.

8    Lyons, have you seen -- unless your lawyer doesn't want you to

9    answer this, unless you want to take the Fifth Amendment.  You

10   have a right not to say anything that might tend to be a link

11   in a chain that would incriminate you in committing a crime,

12   like intentionally making a false statement under oath.

13        MR. LYONS:  I understand, Your Honor.

14        THE COURT:  So you don't have to answer if you're

15   concerned about that.  But did you see this declaration that

16   was filed today about one of the aliens involved in this motion

17   to show cause?

18        MR. LYONS:  Yes, Your Honor.  I saw it at

19   approximately 11:45 when I arrived at the courthouse.

20        THE COURT:  And did you see that the spouse of the

21   alien says under -- actually, this doesn't appear to be under

22   oath -- but asserts that on June 6, her lawyer provided

23   information about the hardship to her family of her husband's

24   continued detention, but two days before there had been a

25   decision to continue his detention?

1          MR. LYONS:  Yes, Your Honor.

2          THE COURT:  And then she says, in effect, that she

3    tried to reach somebody at ICE to assure that they knew the

4    documents were there and would consider them.

5          MR. LYONS:  I didn't see -- I didn't read that part,

6    Your Honor.  I was just focused on the exhibition that's right

7    there.

8          THE COURT:  She wrote, paragraph 9, "I was shocked to

9    learn that a decision had been made before we had a chance to

10   submit our paperwork.  We had been working so hard to compile

11   all the necessary materials to support my husband's release,

12   and I was devastated that our paperwork had not been considered

13   before ICE made the determination to continue custody.  I had

14   personally tried to call the immigration officer listed with my

15   husband's case but could not reach anyone even after several

16   attempts."

17         And then she says, "Even though I understood the

18   determination to continue custody had been made, I nevertheless

19   submitted the paperwork hoping that ICE would consider the

20   document.  In the course of preparing this declaration, I

21   learned that ICE has represented to this court that it has not

22   received any paperwork in support of my husband's release.  Two

23   months have passed since we submitted the paperwork, and I am

24   disheartened that ICE is not aware that we submitted this

25   paperwork, much less considered it."

1        MR. LYONS:  Yes, Your Honor.

2        THE COURT:  All right.  So I may have just asked you

3   this.  Did you know --

4        MR. LYONS:  Absolutely not, Your Honor.

5        THE COURT:  All right.  And do you intend to go back

6   to work and try to find out if this was submitted, and if so,

7   why it didn't come to your attention?

8        MR. LYONS:  Just based on what I've seen so far, I've

9   already got my answer.

10        THE COURT:  You do?

11        MR. LYONS:  Yes.

12        THE COURT:  What's your answer?

13        MR. LYONS:  I personally reviewed each file

14   Thursday -- Tuesday night before I finished my declaration,

15   just knowing the court's expectation of me over the past year.

16   Those documents weren't in any file.  They weren't in any file

17   June 4.  The first time I saw this today, that stamp is for the

18   non-detain unit which --

19        THE COURT:  I'm sorry.  The stamp?

20        MR. LYONS:  I'm sorry.  I'm not sure what page here,

21   on the exhibit where it was stamped June 6.

22        THE COURT:  Yes.

23        MR. LYONS:  That's something that myself and

24   Mr. Charles need to find what happened to those documents.  It

25   didn't go to the detained unit where the person's husband's

 1    case is.  That's the non-detain unit.  So those documents were

 2    never provided to the detain unit or myself.  So we need to

 3    figure out who in the non-detain unit took those.  But the

 4    non-detain unit would never have handled that anyways.

 5           THE COURT:  And how long -- if you give this high

 6    priority, how long do you think it will take you to figure out

 7    how this occurred -- how this occurred?

 8           MR. LYONS:  Well, myself and Mr. Charles already

 9    started it, but we probably have the answer.  It's just,

10    without cell reception, not being available, I don't --

11           THE COURT:  Okay.

12           MR. LYONS:  I will have it by the end of the day.

13           THE COURT:  And once you find out, do you intend to do

14    something to try to assure that this -- if this occurred, it

15    doesn't recur in other cases?

16           MR. LYONS:  Absolutely, Your Honor.  For ICE, I'll say

17    that this was definitely a foul-up on our hand, but also on the

18    attorney's part, who, I've dealt with that attorney before, so

19    I'm not sure why they would have turned it in to the non-detain

20    unit and not the detain officer or the contact for that.

21           MS. LARAKERS:  Your Honor, if I may, back to the

22    notice, I think that --

23           THE COURT:  No, don't go back to the notice yet.

24           MS. LARAKERS:  No.  Specifically what he just said, I

25    think that some of this can be alleviated --

1          THE COURT:  In the notice.

2          MS. LARAKERS:  -- in the notice where we may be able

3     to come to agreement about where we inform aliens where they

4     should file the documents so that there is no question and so

5     that both sides can work together to make sure everything is

6     properly reviewed in time.  So I think that's another thing

7     that can be addressed.

8          THE COURT:  All right.  Well, I'm inclined to give

9     you, say, until next Thursday to confer to see, you know, if

10    you've got some agreement on the notice to see if there is

11    some -- basically whether with regard to the eight that are

12    left, the issue is resolved.  And I think I should ask Mr.

13    Lyons this.  In your declaration you said that if information

14    came in before the deadline in the notice but after a decision

15    was made, you'd consider the issue of detention open-mindedly

16    again.  Is that correct?

17         MR. LYONS:  Yes, Your Honor.

18         THE COURT:  And is it your intention to do that in

19    this case if those documents are indeed somewhere at ICE?

20         MR. LYONS:  Yes, Your Honor.

21         THE COURT:  Because I don't know how reliable the

22    representations are, but this is somebody who apparently

23    committed crimes reportedly, you know, some kind of crimes,

24    according to his wife, ten years ago.  You would know or be

25    able to find out if there was any criminal record since --

1          MR. LYONS:  Yes, Your Honor.

2          THE COURT:  -- since ten years ago.  He's married to

3     an American citizen.  She works full time as a prevention

4     specialist and counselor for children and families, a U.S.

5     citizen, and they've got two kids who are said to be suffering

6     very seriously, as well as the spouse.

7          So, you know, I've been relying on you and Mr. Charles

8     for a long time because I'm trying to keep this case on track

9     so you can do your complete job, which has a lot of important

10    responsibilities, some relating to public safety, and not spend

11    a disproportionate amount of time on this case.  But, you know,

12    the liberty of individuals is implicated in this case.  And

13    when ICE violates the laws, I've found and you acknowledged

14    last year, it has profound human consequences.  And this

15    declaration, to the extent it's true, is a reminder of that.

16         So I think it's best, most appropriate for me to give

17    the parties a chance to work on notice, and there seems to be

18    essentially agreement on that, and for you to see what happened

19    here and take care of this case and report to me.  If you get

20    the documents, do you think you can make a decision by next

21    Thursday?

22         MR. LYONS:  Yes, Your Honor.

23         THE COURT:  So you should report to me what the

24    decision is, as well as how we're going to deal with the

25    notice, what steps you're taking to minimize the risk that

1    anything like this will recur, if this has occurred, and then

2    we'll focus on the discovery issues.  And next Thursday, you

3    should talk.  By next Thursday the parties should talk.  And I

4    have many, many other things to do.  And the petitioners

5    haven't asked me for it, but I mean, one of the things you

6    should discuss is take a look again at my June 11, 2018

7    decision, Jimenez 317 F. Supp. 3d 626.  Because starting at

8    page 651 -- maybe earlier -- 650, I said, "It's questionable

9    whether ICE's more recent interpretation of Section 241.4

10   deserves such judicial deference."  And I explained why it

11   appeared to me that if somebody was detained after the removal

12   period had expired, it was ICE's obligation under the

13   regulations and statute to give notice promptly and then about

14   30 days later do a detention review.

15          Read that over because, again, that would do several

16   things.  I could tell you that's the law or you could choose to

17   do it.  They get 30 days to provide what they want to provide,

18   or they could ask you for more time.  You make a decision.  If

19   you decide that they should be released, you've saved space and

20   money, I assume.  You don't have to pay to detain them

21   unnecessarily.  You've just made the decision faster.  So you

22   might prefer not to have a decision from me on this issue.

23          MS. LARAKERS:  I think it would be appropriate, Your

24   Honor, to brief that, and I think it would also be appropriate

25   to look back at the class definition for any detained class

1   because what Your Honor said just there, that it would apply --

2   that the regulation is ambiguous as to people who were outside

3   the removal period but is likely not ambiguous as to people who

4   are in the removal period, that becomes an issue with the class

5   because we have people who are actually within the mandatory

6   detention period within their removal period still.

7          THE COURT:  In fact, I'll give you a little more time.

8   I want to separate these.  When you make your filing with

9   regard to the scheduling conference, confer and tell me whether

10  you want to litigate this issue or not.  But it could be the

11  position of ICE that we have 90 days, but, you know, we can do

12  it within 45 days after we detain somebody following the

13  removal period ordinarily.  We'll do it voluntarily.  45 not

14  90.  And then I wouldn't have to decide it.

15         And there are many times in these cases where I've

16  ordered briefing, and the day before the hearing, you know, ICE

17  has decided to let the person out.  And I think I understand

18  why.  And what I'm still curious about is how I finally got the

19  opportunity to decide Calderon and Junqueira, and here we are.

20  But just think about it.

21         MS. LARAKERS:  And, Your Honor, if I may say, I think

22  that there are some issues here where -- I think all the cases

23  that we briefed I think we had a fundamental disagreement about

24  whether there was a violation or not.  If there wasn't -- if

25  there wasn't a fundamental disagreement about an alleged

1   violation, then ICE certainly would consider, you know,

2   available relief that we know that this court would be likely

3   to order.  So it's not that in all situations -- ICE recognizes

4   what this court ordered, and it wants to comply with what this

5   court ordered.

6          THE COURT:  And I read what you wrote.  And, you know,

7   I have so much to do that I'm glad that there's substantial

8   agreement on the immediate issues.  Because you did, you made a

9   number of serious points, but it sounds like I'm not going to

10  have to decide them.  But I understand what you're saying, and

11  the tone of this -- not the tone of it -- the substance of this

12  would be different if I thought that Mr. Lyons, you know,

13  deliberately filed a false affidavit or that ICE was not paying

14  careful attention to what I had held previously, but that's not

15  the way I view that now.

16         MS. LARAKERS:  And there are two -- I know that there

17  are some issues that Ms. Lafaille raised in her email that I

18  received this morning.  That's an evolving situation.

19         THE COURT:  There was an email this morning?

20         MS. LARAKERS:  Yes.  She sent an email.  She did send

21  an email.

22         THE COURT:  Who --

23         MS. LARAKERS:  And she just raised the two issues that

24  she spoke about in that email this morning.

25         THE COURT:  I'm sorry.  What issues?

1          MS. LARAKERS:  She raised two issues, and she was

2     arguing something about the 180-day notice of review -- and

3     180-day interview.  ICE is looking at those.  We would like to

4     confer on those with --

5          THE COURT:  Yes, yes.  In fact, I'll see all of you

6     with your clients briefly in the lobby.  The government has

7     until next Friday to respond on this issue, reply on this issue

8     of whether I've issued some kind of injunction.  But anyway, go

9     ahead.

10          MS. LAFAILLE:  Your Honor, I'm just not sure I

11     understand where we are with regards to this motion.  We of

12     course are happy to meet and confer on the notice.  When we

13     talked about meeting -- of course when Ms. Larakers offered to

14     meet and confer about this issue, it was in a context where the

15     government was not willing to stay the removal of the affected

16     individuals.

17          THE COURT:  I know, but now I've ordered the stay, and

18     I'd like to get this resolved so I can lift the stay.

19          MS. LAFAILLE:  Right, Your Honor.  But the stay is one

20     thing and, you know, of course -- you know, I mean, a couple of

21     them already had existing stays, including from this court.

22     But there's also the matter of their continuing custody.  And

23     you know, I think the government perhaps --

24          THE COURT:  They --

25          MS. LAFAILLE:  -- does not appreciate that there are

1    serious violations here that are very much like the ones that

2    Your Honor found a year ago.

3            THE COURT:  Well, I don't know -- talk to them.  Right

4    now I haven't decided -- the relief you ask for was that I

5    order the release of the now eight people.  And I haven't -- I

6    haven't decided whether there was a violation.  They've raised

7    substantial questions about whether there's any violation if

8    they have 90 days and not fewer days, which is the context of

9    your motion.  So I haven't decided the motion, and I suggest

10   you talk to them about it.

11           MS. LAFAILLE:  Understood.  Thank you.

12           THE COURT:  Court is in recess.  I'll see you in the

13   lobby.

14           (Recess, 4:15 p.m.)

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF OFFICIAL REPORTER

I, Kelly Mortellite, Registered Merit Reporter and Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing transcript is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter to the best of my skill and ability.

Dated this 3rd day of August, 2019.


/s/ Kelly Mortellite

_____

Kelly Mortellite, RMR, CRR

Official Court Reporter