# EXHIBIT 1
# Public Version

AFFIDAVIT OF KIMBERLY WILLIAMS, ESQ.

1. I am an Associate Attorney with Rubin Pomerleau, P.C., and one of the attorneys representing ▇▇▇▇▇▇▇▇ in his immigration proceedings along with my managing partners, Jeffrey B. Rubin and Todd C. Pomerleau.
2. I am presently barred in New York State under the First Judicial Department of the Appellate Division, license # 540174. I am also barred in the U.S. Court of Appeals for the Third Circuit.
3. It is my understanding that his family wishes his name to be redacted in the context of the *Calderon* litigation due to the sensitive information that has been included. Although that information is largely available in the habeas case filed on his behalf, the filings in that case are not electronically available to the public, and the case has not garnered the same level of attention as the *Calderon* case. For that reason, and consistent with the other filings in the *Calderon* case, I ask that Mr. ▇▇▇'s name be redacted in this declaration.
4. I am aware of the government's arguments in the *Calderon* case with regard to Mr. ▇▇▇ and wish to clarify a few points about his post-order custody.
5. Mr. ▇▇▇ has had an administratively final order of removal since November 13, 2018. A petition for review of his order of removal has been argued and is pending before the U.S. Court of Appeals for the First Circuit ("First Circuit").
6. In more than nine months of post-order detention, Mr. ▇▇▇ has never been given a meaningful custody review.
7. I believe that any thoughtful review of Mr. ▇▇▇'s detention would conclude that he poses no danger or flight risk. Although he has some criminal history, it involves a number of incidents of driving without a license and a single incident in 2016 for which he was convicted on December 20, 2017 for resisting arrest, assault and battery on a police officer, and disorderly conduct. His 2017 convictions are currently on direct appeal, and he is presently represented by court-appointed counsel.
8. Moreover, Mr. ▇▇▇ has very compelling family circumstances. His family members—including his U.S. citizen wife and the five profoundly wounded U.S. citizen children that the couple care for—are hanging together by a thread and desperately need him home. I believe that if anyone had evaluated Mr. ▇▇▇'s custody or interviewed him with an open mind, they would not have been able to conclude that he posed any danger or flight risk. Unfortunately, that meaningful review of Mr. ▇▇▇'s detention has never occurred.
9. On November 29, 2018, Mr. ▇▇▇ was served with a notice that his custody would be reviewed on or about February 11, 2019, and that he could submit documentation in support of his release prior to that date.
10. As the review approached, I began to assemble documents to submit in support of his release which we were simultaneously compiling for submission with his Form I-212, Application for Permission to Reapply for Admission into the United States after Deportation or Removal. However, before I could submit them, Mr. ▇▇▇'s review was conducted on January 25, 2019 – 17 days before the deadline to submit documents – and a notice of a decision to continue his detention was issued on January 28, 2019. I would have

1

submitted evidence in support of Mr. ▉'s release prior to the deadline had the decision to continue his detention not already been made.

11. Mr. ▉ received notice of the decision to continue his detention on January 29, 2019. The notice also stated that if he was still detained on May 12, 2019, his next custody review would be made by the Washington, D.C. office (HQ RIO). Our office was notified of this decision several days later, on or about February 5, 2019. Both Mr. ▉ and his wife were both devastated upon learning of the denial, and his wife suffered severe mental and emotional trauma as a result.

12. At that point, I did not submit documents in support of his release because the review was complete, and I therefore believed that ICE would not consider releasing Mr. ▉ at that time.

13. Once our office learned of this decision, we pushed up our timeline to file the Form I-212, submitted a motion to reconsider his appeal with the Board of Immigration Appeals along with a stay motion, submitted a stay request with ICE (Form I-246), and filed Mr. ▉'s habeas petition with this Court all between February 8, 2019 and February 11, 2019.

14. The timing of this early review coincided with our office's filing of a motion to stay his removal with the First Circuit. In late January 2019, our office received notice pursuant to the First Circuit's Local Rule 18.0 notifying us of the Government's intent to execute Mr. ▉'s removal order. We thus submitted a motion for stay of removal to the Court. However, after issuing a temporary stay for 10 business days, the First Circuit ultimately denied the stay motion in early February.

15. Mr. ▉'s next review should have been completed around the end of April, three months after the prior review. ICE did not provide a notice of that review or complete that review.

16. However, on May 24, 2019, ICE gave my client a notice stating that it would not be reviewing his custody because he had failed to cooperate with his removal. Our office received a copy of this notice, which was emailed to Attorney Rubin on May 28, 2019.

17. This alleged failure to cooperate is based on a single incident in which my client refused to sign paperwork for a Brazilian travel document at a meeting that was unannounced and outside the presence of counsel.

18. It is standard practice for our office to instruct our clients not to sign documents without discussing them with us first, unless they are confident that they understand what they are signing. This instruction is based on years of experiences having both ICE and consular officials provide false or misleading information to our clients. Many of our clients, including Mr. ▉, have low educational levels and/or did not finish school. They do not fully understand what has been asked of them to sign and know that signing the wrong thing could mean accidentally getting themselves deported or abandoning their cases. Often, our clients speak some English so documents are frequently explained only in English instead of the client's native language, i.e. Portuguese for Mr. ▉, which only further causes confusion for our clients.

19. In the year that I have directly represented Mr. ▉ on behalf of the firm, I have found his personality to be very passive and congenial. He does not want to cause trouble or conflict. Even though he has been told not to sign papers without talking to us first, he

2

often gets confused and thinks that he is doing the right thing when he signs something after he has been asked to do it by an officer. I was informed that he signed his 90-day review notice after which I reminded both him and his wife again not to have him sign any future documents without first talking with our office, which they both acknowledged they understood.

20. In addition, it is often a fight to get copies of what has been served on clients, and to be notified of meetings between officials and our clients. Accordingly, we do not favor having our clients sign things that we have not been given a copy of or had the opportunity to discuss with them. Moreover, in my experience with working with the Boston ICE Office over the last year, it has been nearly impossible to reach officers via phone and/or get a return call, fax, or email within a reasonable timeframe, if at all. Often, I must make multiple attempts to contact officers, and on many occasions, my correspondence goes unanswered. While this does not apply to every Deportation Officer, regular, timely communication with an officer is the exception, not the rule.

21. By way of example, another one of our clients who is also a *Calderon* class member, Mr. ▉, was recently asked to sign paperwork agreeing to a custody review interview and designating a representative on his behalf on August 15, 2019. At first, he did not sign the paperwork because he knew it needed to be discussed with me first. Once we discussed it, he agreed to do an interview and designated me as his representative. He also conveyed to his ICE officer that our office had not received copies of the paperwork and needed to be served, but the ICE officer dismissed that concern and told him that ICE works through the detainee and not through his attorney. On August 16, 2019, I sent a fax to his Deportation Officer, requesting copies of the papers served on our client and once again reminding ICE about the instructions we provide our clients about not signing documents until we have reviewed those papers first.

22. Since this Court issued an order preventing Mr. ▉'s transfer out of the jurisdiction on February 11, 2019, Mr. ▉ himself has been told more than once that he is on a list to be deported immediately and/or instructed to pack his things. Once, on July 18, 2019, despite this Court's order, his phone account was shut off because he was going to be transferred for removal, and he had to call us through another client's account to tell us what was happening. We have had to contact the U.S. Attorney's Office twice – on July 3, 2019 and July 18, 2019, to make sure that he is not removed and to ensure that ICE comply with the order issued from this Court. These incidents have caused unnecessary stress on him, his wife, and our office. Because of these incidents, we have been particularly concerned that Mr. ▉ could be asked to sign something in which he gave up his rights, and have emphasized our instruction that he not sign things without discussing them with us first.

23. While I cannot recall specific dates, the Boston ICE Office, through multiple communications I have had with more than one officer, was aware of my request that we be contacted before anyone communicates with Mr. ▉ (or any of our office's clients) or asks him to sign anything. Despite our request, ICE has never contacted our office to communicate with us about the consulate's intention to visit Mr. ▉, or provided us with a copy of any paperwork that Mr. ▉ must sign in order to assist in obtaining his

3

travel document. It is therefore not accurate to describe Mr. ▮ as uncooperative, and particularly unfair to continue to deny him the custody review that was already overdue at the time the alleged noncooperation arose.

24. In any event, due to an apparent change in Brazilian law or policy, it is my understanding that the Brazilian consulate now issues travel documents with or without a noncitizen's cooperation. It is my understanding that ICE has been able to obtain a travel document for Mr. ▮ and the issue of his cooperation with that process is moot.

25. The May 24, 2019 Failure to Cooperate notice also stated that ICE Boston had, in its discretion, conducted a custody review. However, neither Mr. ▮ nor I had notice of it. He was neither given the opportunity to provide documents nor was he interviewed as part of that review.

26. Mr. ▮ was notified orally on August 21, 2019 that he is being interviewed on Wednesday, August 28, 2019 based on statements he made to his wife and me. I have received no written notice of this. However, on Friday, August 23, 2019, after contacting his Deportation Officer, I learned for the first time that Mr. ▮ can submit documents before his interview. However, due to a number of other pressing matters, it is extremely difficult for me to properly assemble materials within such a short time frame. I have both called and emailed ICE requesting that our office be given additional time to submit documents but have not yet heard back.

27. Both I and my managing partners are deeply concerned about the lack of due process our client has received regarding his post-order custody reviews. He has not once received a proper review that he is entitled to under the regulations. Moreover, it is deeply concerning that he is only now getting a new custody review after more than nine months has passed since his removal order became final on November 13, 2018 (will be 288 days on August 28, 2019). Unfortunately, given our experience with ICE's handling of his and other clients' recent custody reviews, we have lost faith that our client will get a fair shot during this review process.

Signed under pains and penalties of perjury.

_____          08/26/2019
Kimberly Williams                        Date