UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


```
                                )
LILIAN PAHOLA CALDERON JIMENEZ   )
and LUIS GORDILLO, et al.,       )
Individually and on behalf of    )
all others similarly situated.   )
                                 )   Civil Action
          Plaintiffs-Petitioners, )  No. 18-10225-MLW
                                 )
v.                               )
                                 )
KEVIN McALEENAN, et al.,         )
                                 )
          Defendants-Respondents. )
                                 )
```


BEFORE THE HONORABLE MARK L. WOLF
UNITED STATES DISTRICT JUDGE


MOTION HEARING


August 27, 2019


John J. Moakley United States Courthouse
Courtroom No. 10
One Courthouse Way
Boston, Massachusetts  02210


Kelly Mortellite, RMR, CRR
Official Court Reporter
One Courthouse Way, Room 5200
Boston, Massachusetts  02210
mortellite@gmail.com

1    APPEARANCES:

2    Counsel on behalf of Plaintiffs-Petitioners:
     Adriana Lafaille
3    Matthew Segal
     American Civil Liberties Union
4    211 Congress Street
     Boston, MA 02110
5    617-482-3170
     alafaille@aclum.org
6    msegal@aclum.org

7    Jonathan Cox
     Matthew W. Costello
8    Wilmer Hale LLP
     60 State Street
9    Boston, MA 02109
     617-526-6313
10   jonathan.cox@wilmerhale.com
     matt.costello@wilmerhale.com
11
     Counsel on behalf of Defendants-Respondents:
12   Eve A. Piemonte
     U.S. Attorney's Office
13   1 Courthouse Way
     Suite 9200
14   Boston, MA 02210
     617-748-3100
15   eve.piemonte@usdoj.gov

16   Mary Larakers
     U.S. Department of Justice, Office of Immigration Litigation
17   District Court Section
     P.O. Box 868
18   Washington, DC 20044
     202-353-4419
19   mary.l.larakers@usdoj.gov

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2              (The following proceedings were held in open court
 3    before the Honorable Mark L. Wolf, United States
 4    District Judge, United States District Court, District of
 5    Massachusetts, at the John J. Moakley United States Courthouse,
 6    One Courthouse Way, Courtroom 10, Boston, Massachusetts, on
 7    Tuesday, August 27, 2019.)
 8              THE COURT:  Good afternoon.  Would counsel please
 9    identify themselves for the court and for the record.
10              MR. SEGAL:  Good afternoon, Your Honor.  Matthew Segal
11    for the petitioners.
12              MS. LAFAILLE:  Good afternoon.  Adriana Lafaille for
13    the petitioners.
14              MR. COX:  Good afternoon.  Jonathan Cox for the
15    petitioners.
16              MR. COSTELLO:  Good afternoon, Your Honor.  Matt
17    Costello for the petitioners.
18              MS. LARAKERS:  Good afternoon, Your Honor.  Mary
19    Larakers on behalf of the United States.
20              MS. PIEMONTE:  Good afternoon, Your Honor.  Eve
21    Piemonte on behalf of the respondents.
22              THE COURT:  I apologize for the delay in coming in,
23    but I wanted to get properly organized to hopefully decide at
24    least many of the pending matters today.  Is Mr. Charles
25    present?
```

```
1              MS. LARAKERS:  Yes, Your Honor.

2              THE COURT:  Is Mr. Lyons with him today?

3              MS. LARAKERS:  Not today, Your Honor.

4              THE COURT:  Well, on my agenda I have the petitioners'

5    motion to show cause, the joint report concerning discovery,

6    the defendants' motion to reconsider the order requiring

7    reporting.

8              Is there anything else that ought to be on the agenda?

9              MS. LAFAILLE:  Your Honor, we filed a motion to

10   withdraw the stay of removal for one of the individuals

11   affected.

12             THE COURT:  A motion to withdraw the stay of removal?

13             MS. LAFAILLE:  Yes.

14             THE COURT:  When did you file that?

15             MS. LAFAILLE:  On August 16.  It's docket 353.  It's

16   an assented-to motion for one of the individuals who didn't

17   want to be delayed any further --

18             THE COURT:  You're going to have to keep your voice

19   up.  Okay.  So this would let Mr. K, as he's called, be removed

20   from the country, correct?

21             MS. LAFAILLE:  Correct, Your Honor.

22             THE COURT:  Since that's what he prefers, the motion

23   is hereby allowed.

24             Anything else that should be on the agenda?  No.

25             Okay.  I would like to take the issues relating to the
```

1    show cause motion in a particular order.

2            In Jimenez, 317 F. Supp. 3d 626 at 650-53, I explain

3    why it appears that under 8 C.F.R. Section 241.4 ICE does not

4    have the right, the authority to obtain for up to 90 days an

5    alien taken into custody after the expiration of his or her

6    removal period.  More specifically, it appeared to me that the

7    regulations require ICE to decide whether to detain such an

8    individual approximately 30 days after the alien's arrest.

9    That's at page -- there's something wrong with this.  It's page

10   651, I believe.

11           The petitioners have asked in their recently filed

12   reply memorandum that the court decide this issue.  The

13   respondents requested additional time to brief it further, as I

14   understand it.  That's in the sur-reply, docket number 360

15   beginning at page 23.

16           In denying the respondents' request for more time than

17   the seven days previously ordered for the sur-reply, I stated

18   that I would provide additional time for further briefing if it

19   would be fair or helpful.  That was in the August 21, 2019

20   order, docket number 358.  I find that it would be fair and

21   helpful to have further briefing on this issue.  Among other

22   things, the Supreme Court's March 2019 decision in Kisor, 139

23   Supreme Court 2400 at 2414, may have some relevance.  It

24   discusses Auer deference, which I discussed in Jimenez, and

25   talks about the differing degrees of deference that should be

1    given, depending on the nature of the agency's explanation.

2         So while if you want, I'll hear you on whether I

3    should provide more time for both of you to further brief this

4    issue.  If you don't want to try to change my mind on providing

5    more time, I'll ask you how much you each want.

6         MS. LARAKERS:  Your Honor, would that be in the

7    context of this motion for an order to show cause, or would

8    that be a new motion -- our position is that it would

9    essentially be a motion for preliminary injunctive relief since

10   it would apply to the class as a whole, and they're asking for

11   an interpretation that would affect the class as a whole.

12        THE COURT:  I suppose all of these things are related.

13   I don't see it as a new motion.  I see it as part of the show

14   cause motion.  But we can come back to that later.  I mean,

15   it's an issue that was raised.

16        Let me ask you this.  What's the implication, what's

17   the point of your question?

18        MS. LARAKERS:  So Your Honor, that declaration that

19   you make with regard to that how those POCR regulations are to

20   be interpreted, that declaration would require ICE to change

21   the way it's conducting POCRs for the entire class, not merely

22   just a couple of individuals.  Even if their request here is

23   limited to a couple of individuals, petitioners know that that

24   affects the class as a whole, so I don't think it's appropriate

25   to do it in a motion for an order to show cause.  It's focused

1    on specific individuals.

2            THE COURT:  Well, I think we can come back to this at

3    the end, but I haven't focused on the specific individuals.

4    There are -- and this is part of what I'm going to ask you, I

5    expect, in connection with other rulings that I'm at the moment

6    prepared to make today.

7            But here, I think it might be best to go through the

8    other issues and then see what an appropriate schedule would be

9    for further briefing.  Okay?

10            MS. LARAKERS:  Okay, Your Honor.

11            THE COURT:  Do the petitioners want to be heard on

12    this?

13            MS. LAFAILLE:  No, Your Honor.  That sounds fine.

14            THE COURT:  All right.  Then assuming without finding

15    that the defendant may detain an alien for up to 90 days before

16    making a decision on detention, under 8 C.F.R. Section 241.4,

17    there's the question of whether ICE has violated the

18    regulation; and if so, is there a threat it will continue to do

19    so.

20            As I see it at the moment, there are five discrete

21    issues embedded in this.  One is whether ICE providing notice

22    at the time of an arrest of a detention review in about 90 days

23    satisfied the requirement that notice of that review be given

24    approximately 30 days before the review as required by Section

25    241.4(h)(2).  Second is whether conducting a detention review

1    two to 14 days before the on or about date stated in the notice

2    violated an alien's right to submit information in writing in

3    support of release, which he or she has under Section

4    241.4(h)(2).  And those two to 14 days I take from docket

5    number 354 at 6, note 5 of the petitioner's submission that

6    asserts that for particular named members of the class, the

7    reviews were conducted two to 14 days before the date for

8    submission of documents or information in the notice, allegedly

9    depriving the petitioner of the opportunity to be heard as

10   contemplated by the regulation or in accordance with the

11   requirements of due process.

12          A third issue is, if the requirements of the

13   regulations of due process are not met, must the plaintiff show

14   prejudice to establish a violation and to be entitled to

15   relief.  That may be inartfully phrased because maybe there's

16   no violation without prejudice, but it's the prejudice

17   question.

18          Fourth, if a showing of prejudice is required, have

19   each of the, I believe, seven named plaintiffs made that

20   demonstration.

21          And fifth, something that may not be ripe for decision

22   now, what should be the remedy for any proven violation of

23   Section 241.4 or due process relating to the 90-day review.

24   I'm putting aside now the 180-day review, so-called.

25          Does that sound like an accurate and complete

```
 1   description of the issues relating to the 90-day review?

 2            MS. LAFAILLE:  Mostly, yes, Your Honor.  With the

 3   exception that, for people who are having their release

 4   revoked, that the regulation doesn't provide for the ordinary

 5   90-day review but for an interview within the first three

 6   months.  And so as to those individuals -- well, that

 7   individual, that would be a slightly different issue with

 8   regards to the initial review.

 9            THE COURT:  I may have -- which individual is that?

10            MS. LAFAILLE:  That's the one that is described in

11   part G of our filings.

12            THE COURT:  So when you say your filings, do you mean

13   in your reply in the supplemental memorandum filed on August

14   16?

15            MS. LAFAILLE:  Yes, Your Honor.  Yes, Your Honor.

16            THE COURT:  And this is the individual described in 3,

17   G?

18            MS. LAFAILLE:  Yes.

19            THE COURT:  And you want to refer to that individual

20   as what, rather than by the person's name.

21            MS. LAFAILLE:  We had proposed, because we've worked

22   with all of the individuals in the same order in our most

23   recent briefs, that we could use those letters.

24            THE COURT:  G?

25            MS. LAFAILLE:  Yes.
```

1        THE COURT:  All right.  So this raises an issue under

2   Section 241.4(1)(l) that I haven't focused on.  Are there

3   any --

4        MS. LAFAILLE:  It's L.

5        THE COURT:  Oh, that's an L.

6        MS. LAFAILLE:  Yes.

7        THE COURT:  Are there any other issues relating to the

8   90-day review?

9        MS. LAFAILLE:  No, Your Honor.

10        THE COURT:  Apparently not.

11        All right.  Then there are some things I would like to

12   get either confirmed or clarified.  Am I correct that following

13   the August 2, 2019 hearing, ICE reviewed documents submitted by

14   the deadline in the notice to -- I think this person's name is

15   in the record, isn't it?

16        MS. LAFAILLE:  No, Your Honor, not in the public

17   record.

18        THE COURT:  Not?

19        MS. LAFAILLE:  No.

20        THE COURT:  Call this person RJM.  After his detention

21   review was conducted prior to the date in his notice and ICE

22   decided to release him.  Is that right?

23        MS. LARAKERS:  Yes, Your Honor.

24        THE COURT:  Am I correct?

25        MS. LAFAILLE:  I'm sorry, Your Honor.  If I could just

1    clarify that.  The documents ICE reviewed, it appears, are not

2    actually the documents -- ICE has indicated that something was

3    reviewed, which may have been a motion for stay that he filed

4    later, but I'm not aware that ICE has ever reviewed the

5    documents that he submitted by that 90-day review deadline.

6              MS. LARAKERS:  Your Honor, to the extent that there's

7    a distinction, which I am just hearing right now, I don't

8    know -- I don't know the answer to her question.

9              THE COURT:  Well -- I'm sorry.  Go ahead.

10             My memory is that Mr. Lyons said at the last hearing

11   that the documents had been delivered to the wrong address or

12   office and that ICE would get them and review them?

13             MS. LAFAILLE:  Right.  And to be clear, the filing was

14   made as an in-person filing.  There's only one window to make

15   in-person filings.  And at that point, the ICE officer has to

16   route it to either the detained or non-detained unit.  It's not

17   a matter of the attorney going to the wrong place or anything.

18             THE COURT:  I see.

19             MS. LAFAILLE:  But the release information that we've

20   gotten from ICE does not indicate that those documents were

21   ever found or reviewed.

22             MS. LARAKERS:  Your Honor, I've been informed that

23   documents were reviewed.  I didn't even know that there was an

24   application for a stay filed.  ICE reviewed documents and

25   released the individual.  So to the extent that this even is an

1    issue, I think it's moot.

2            THE COURT:  It's leading up to my next question, which

3    is this:  Am I correct that ICE represented that it will

4    consider de novo the detention of any class member whose

5    detention was continued as a result of a review being conducted

6    prior to the date in his or her notice at least -- well, if the

7    alien submits a different information or argument?  I thought

8    that was the import of your sur-reply brief at page 7 and Mr.

9    Lyons' declaration, docket number 318 on page 7.

10           MS. LARAKERS:  Yes, that is currently ICE's practice.

11   So if any of the individual aliens submitted documents, even

12   now, those documents would be reviewed de novo to make a de

13   novo custody determination.

14           THE COURT:  Because -- and I'll give you an

15   opportunity to be heard on this, but it seems to me that with

16   regard to the named individuals in the motion to show cause,

17   that's the appropriate next step.  There is this intriguing

18   issue of whether prejudice is required and been shown, but I

19   note in Waldron, one of the cases on which petitioners rely

20   heavily, a foundation for Leslie, on which petitioners also

21   rely, that's 17 F. 3d 511 at 518, the Second Circuit found that

22   prejudice was not required but the remedy was a remand to the

23   agency.  And it seems to me that providing an opportunity to

24   give ICE or ICE Boston additional information now or additional

25   argument so they can consider the circumstances presented in

1   the motion to show cause would be appropriate.

2          I myself wouldn't be inclined to order the release of

3   all of the aliens at issue without some review of danger or

4   risk of flight.  If I understand it correctly, all of them have

5   criminal records of some sort.  There's a possibility that they

6   would be a danger to the community or at risk of flight, and I

7   would -- you know, I might conduct a bail hearing myself.

8   That's the remedy I was planning to utilize in June of 2018,

9   but I would prefer to have ICE do it voluntarily first.

10          I think there are five left, maybe we're down to four,

11   who were allegedly reviewed prematurely.  And with regard to

12   RJM, ICE reviewed the matter and let him out.  I think it's an

13   indication that they will do any such review in good faith and

14   that would either moot the necessity of deciding whether there

15   was a violation of 241.1(h)(2) or whether prejudice -- or at

16   least postpone it, and similarly moot or postpone whether it's

17   necessary to decide whether prejudice has to be demonstrated to

18   obtain relief.

19          So I think I was just told that ICE would review the

20   four or five that are left if they provide additional

21   information or argument.  Is that right?

22          MS. LARAKERS:  Yes, Your Honor.  And that is an option

23   that we've presented to petitioners' counsel as well.

24          I would like to say that I think that's also the

25   appropriate remedy here.  That I think is consistent with what

1    Justice Kennedy was saying in Zadvydas and what he has said

2    elsewhere in the criminal context, Your Honor.  His dissent in

3    Zadvydas, which the court has focused on heavily in its prior

4    orders, talked about how there would be habeas jurisdiction for

5    a court to review a violation of the Post-Order Custody

6    Reviews.  And in that dissent, he analogized the detention

7    authority in 1231(a)(6) for the purposes of removal with the

8    detention authority in the pretrial detention context and other

9    criminal contexts.  And when we look at a decision written by

10   Justice Kennedy in Montalvo (phonetic), he talks about what the

11   appropriate remedy is for a violation of those types of

12   statutes that provide for hearing and review.

13            THE COURT:  Well, you know, at the moment you're ahead

14   and you don't want to sink this, but it depends.  As I've said

15   before, habeas is an equitable remedy.  In June of 2018, seeing

16   the egregious and persistent failure to follow the POCR

17   regulations, I wasn't going to rely on ICE to belatedly do the

18   bail reviews while the petitioners were suffering irreparable

19   harm because they, among other things, perhaps they hadn't

20   received timely notice of those reviews.

21            Right now -- I don't think I'm obligated to use that

22   remedy, but right now I'm inclined to let ICE take at least the

23   first, you know, or the next look at this rather than doing it

24   myself.

25            MS. LARAKERS:  Yes, Your Honor.  And my argument is

 1    just very narrow.  I'm saying on these circumstances present --

 2              THE COURT:  Well, let's hear what the petitioners say.

 3              MS. LAFAILLE:  Your Honor, we strongly, strongly

 4    disagree with that remedy for the exact same reasons that they

 5    were inappropriate a year ago when Ms. De Souza, who is here

 6    today, was before the court.

 7              The individuals that are before the court today, we're

 8    talking about seven individuals who have been detained for a

 9    collective four years and nine months with one, one single

10    arguably valid 90-day POCR review between all of them.  Not a

11    single one of them, other than that one instance, has had a

12    review where ICE has given them an opportunity and considered

13    documents in support of their release.

14              THE COURT:  But do they have documents that they would

15    submit?

16              MS. LAFAILLE:  Yes, Your Honor.  All of these are

17    individuals who are motivated to be released from detention.

18    They have the U.S. citizen spouses.  They all have equities in

19    the United States.  And what's particularly troubling about the

20    government's last submission, in addition to the repeated and

21    consistent violations of these regulations, including the

22    entire, complete flouting of the requirement for an interview,

23    is that --

24              THE COURT:  Well, the requirement for the interview --

25              MS. LAFAILLE:  I understand; it comes at the 180-day

1    review, Your Honor.

2         THE COURT:  Well, I'm not sure -- you have to remind

3    me of these things, but go ahead.

4         MS. LAFAILLE:  What's particularly troubling about the

5    government's last submission is that in arguing that the

6    individuals here were not prejudiced by these violations, what

7    the government says is their equities are not that important to

8    a Post-Order Custody Review.

9         THE COURT:  Well, here is part of my point.  Whether

10   prejudice has to be shown or not is a contested issue.  I mean,

11   I had you do this briefing on an expedited, fairly fast track.

12   I told you I wanted to have this hearing before my law clerk

13   leaves on Friday, who has been familiar with this, and the last

14   filing was on Friday night.  You wanted extensions until 12:59

15   beyond the usual 6:00 p.m., and I've been working on this.

16        But if I have to decide some of these issues, I may

17   have to take time and delve into them more deeply, and your

18   clients are detained.  And I might or might not find that they

19   have to show prejudice.  And then, if they do have to show

20   prejudice, whether what you focused on is a cognizable form of

21   prejudice or whether they have to show either if they had a

22   timely opportunity to present evidence they either would

23   probably have been released or could probably have been

24   released.  You know, these are all intriguing issues.  And then

25   however I decide them, sooner or later, they might go to the

1     First Circuit.

2          And, you know, it just seems to me that ICE has shown

3     that when cases come on its radar screen after being presented

4     to the court, in a good number of them, they decide to release

5     the individuals.  And you've got -- you're here advocating for

6     individual human beings who want to get out of detention, and

7     you think there are compelling human reasons why they should be

8     let out, and there should be reasonable assurances that they're

9     not going to be dangerous and they're not going to run away.

10    And, you know, if ICE is willing to do this and you're willing

11    to make a presentation to ICE on behalf of each of these -- how

12    many are there?  Seven, five, four?

13          MS. LAFAILLE:  Who are before the court today?

14          THE COURT:  Yes.

15          MS. LAFAILLE:  Seven.

16          THE COURT:  So seven are still detained that didn't

17    include --

18          MS. LAFAILLE:  No.  That includes the individual who

19    has been released pending this court's decision on this motion.

20          THE COURT:  G?

21          MS. LAFAILLE:  Yes.

22          THE COURT:  But I just decided --

23          MS. LAFAILLE:  I'm sorry, not G.

24          THE COURT:  So then there's only six, right?

25          MS. LAFAILLE:  No, Your Honor, because his claims are

1    still live before this court.  The legality of his post-order

2    detention is still before the court.  The fact that the

3    government has voluntarily released him pending this motion

4    does not make his claims moot.

5         THE COURT:  Wait a minute.  This is not working.

6    We're not talking about the same person.  I just allowed a

7    motion --

8         MS. LAFAILLE:  No, I'm sorry, not the individual who

9    wants to be removed, Your Honor.  That's not the person I was

10   speaking of.

11        THE COURT:  But that was one of the seven, wasn't it?

12        MS. LAFAILLE:  No, no, no.  That's an individual who

13   was not one of the seven.

14        THE COURT:  All right.  Maybe this is going too fast.

15   But the point is, I could ask Mr. Charles.  Mr. Charles, would

16   you come join your lawyer, please, lawyers.

17        Would you say your name for the record.

18        MR. CHARLES:  Marcos Charles, acting field office

19   director for Boston ERO.

20        THE COURT:  Why don't you stay standing.  Have you

21   been listening to the colloquy I've been having with your

22   counsel particularly?

23        MR. CHARLES:  Yes, Your Honor.

24        THE COURT:  And do you understand I've been told that

25   if the individuals I've been asked to order be released through

1    lawyers, if they want, present to you information or even if

2    not new information, argument, as to why they should be

3    released that you would consider that what lawyers call de

4    novo, with an open mind, starting from scratch, and decide

5    whether it's appropriate to release them on whatever conditions

6    or not?

7              MR. CHARLES:  Yes.  We'll take all documentation into

8    consideration and an interview if necessary.

9              THE COURT:  And what?

10             MR. CHARLES:  And an interview if necessary.

11             THE COURT:  Okay.  And do you understand that if the

12   petitioners are dissatisfied with your decision, they still may

13   ask me to make the same decision?

14             MR. CHARLES:  Yes, Your Honor.

15             THE COURT:  And Ms. Lafaille, if I require this, you

16   know, provide this -- order this opportunity, how long would it

17   take you to prepare and present the arguments for each of the

18   seven?

19             MS. LAFAILLE:  Subject to consulting here, you know,

20   perhaps two weeks, but if I could just be heard a little bit

21   further, Your Honor.

22             THE COURT:  You can sit down.

23             MS. LAFAILLE:  More than a year ago when we were here

24   and the court found violations of these very same regulations

25   in the case of Ms. De Souza, the government of course sought

1    this very remedy, just give us a chance to do it again.

2           Before we even got to the hearing, they had already

3    given Ms. De Souza a notice of a new review in 30 days' time,

4    which is exactly what they've done for people here.  They've

5    been handing people interview notices, telling someone orally

6    without any written notice that there was going to be an

7    interview without notice to his counsel.

8           And, you know, I think the court is not quite correct

9    in saying that when the case, for example, of Ms. De Souza was

10   brought to the government's attention, they released her.  When

11   the case was brought to their attention, they doubled down on

12   wanting to detain her, and it was only after this court

13   announced here that it would order a remedy and that it would

14   hold a hearing that the government realized that this was

15   someone that they should release.

16          The same remedy is warranted here.  And if the court

17   is prepared to schedule individualized procedures or provide

18   for individualized procedures before this court, I'm sure that

19   the government would take that opportunity to examine these

20   cases more closely.

21          THE COURT:  Well, they've done some things since a

22   year ago June that gives me more confidence that they will --

23   you know, are likely to make an honest, good-faith informed

24   assessment, A; and B, there's some vexing legal issues that may

25   be mooted, and these people may get out if they're entitled to

1    get out, or if it's reasonable to release them, much faster.

2    I'm actually not in a position to say I'm going to conduct

3    seven bail reviews in two weeks or maybe even in two months.

4            MS. LAFAILLE:  And I doubt if the court -- if the

5    court ordered the government to identify anyone who it

6    thought -- give the government a time period to identify anyone

7    who it thought, you know, whose detention it was going to

8    contest, understanding that a finding had been made that these

9    regulations had been violated which, you know, they clearly

10   have on multiple counts for each of these individuals, I think

11   that might move the ball forward more quickly and more justly

12   for these individuals whose families are here in the courtroom

13   with us today and who have been waiting an extraordinarily long

14   time without the most basic procedures for them to provide

15   input on their custody.

16           THE COURT:  What do you mean they've been deprived of

17   the most basic procedures?  Because I've been doing this fast,

18   and that's why I wanted to identify the issues.  And you told

19   me in effect that I missed one, the person who had been

20   revoked.  But the problems are they received essentially 90

21   days' notice of the detention hearing, which may not be

22   approximately 30 days but arguably gives them more time to

23   prepare their case, but I have to enforce the regulation.

24           Then there's the issue whether some of them were

25   reviewed prematurely, I think two to 14 days, and whether

1    that's on or about the date and, if it wasn't, whether they

2    were prejudiced, and then what does prejudice mean?  Is it

3    prejudice in the sense of, you know, like in a 2255, arguing

4    somebody was deprived of a fair trial?  There's a reasonable

5    probability the result might have been different or would have

6    been different or could have been different.

7         And it seems that even the First Circuit maybe uses

8    different iterations of the standard rather than are they

9    prejudiced because they've been separated from their loved

10   ones.  It may not be the test.  They're all very interesting

11   issues, but your clients might be sitting while I try to figure

12   them out, and they might get out if I give Mr. Charles the

13   first chance to look at this.

14        MS. LAFAILLE:  I understand that, Your Honor.  But I

15   do think that prejudice issues, while complex, are not

16   ultimately that consequential for the case, even assuming

17   there's a prejudice requirement, even taking the cases that the

18   government cited.  We're looking at essentially a test of

19   whether there could have been a different result.

20        THE COURT:  Or would have been.

21        MS. LAFAILLE:  I don't think would have been, Your

22   Honor, is supported by the cases, but whether there could have

23   been a different result.  And, you know, I think it's

24   abundantly clear when we look at these individuals who have had

25   no opportunity to come forward and present any -- these have

1    been reviews conducted entirely without the voice of the people

2    affected and entirely without any consideration of equities

3    other than --

4              THE COURT:  Well, why -- other than what?

5              MS. LAFAILLE:  Other than whatever ICE might have had.

6              THE COURT:  I know, but why did they have no

7    opportunity?

8              MS. LAFAILLE:  Well, Your Honor, that goes back to all

9    of these violations.  It's the persistent failings of notice.

10   For example, no notice is given about the 180-day reviews.

11   Those reviews were conducted without notice, all of them.  The

12   reviews were conducted without interviews, all of them.  Not a

13   single interview occurred.  The revocation, as I mentioned, the

14   three-month required interview, completely all of the

15   revocation procedures just completely ignored.  And then this

16   issue that the court has focussed on.

17             THE COURT:  That involves one person in the

18   revocation?

19             MS. LAFAILLE:  So the language I think could be read

20   to involve two people.  It certainly involves one person.

21   There are two people who are detained on revocations of

22   release.  The one for whom it's arguable has five other

23   violations in his case already, so this might not be the

24   decisive one.  Then the issue that the court identified, that

25   was an issue a year ago in Ms. De Souza's case, was a lack of

 1     an opportunity to present documentation for a 90-day review.

 2          THE COURT:  Unlike RJM, I think we're calling him,

 3     none of them provided any information, did they?

 4          MS. LAFAILLE:  Well, that's actually not true.  So the

 5     individual described at letter A did send ICE a request to --

 6     he sent a letter -- and his wife is here in the audience today,

 7     he sent a letter to ICE asking them to please re-review his

 8     detention, and he got back a note -- he didn't hear back, and

 9     then he wrote an inquiry about that.  And he got back a

10     response to that inquiry, which the government characterizes as

11     a review of his detention but which merely informed him of the

12     result of the initial review, which was that it had been

13     decided that he was a danger of flight risk, so there was not

14     going to be any new review conducted.

15          But Your Honor, for the government to say that people

16     didn't submit documents was before the deadline the decision

17     had been made already and there was nothing informing people

18     that they could still submit any documents, you know, really

19     fails to have an appreciation for what the basic requirements

20     of notice and an opportunity to be heard mean.

21          THE COURT:  Hold on just a second.  Well, I'll confess

22     I didn't focus on the interview component.  Just a second.

23          So have all of the seven named people involved here

24     been detained more than 180 days?

25          MS. LAFAILLE:  No, Your Honor.  All but one of them

1    have.

2            THE COURT:  All but one of them?

3            MS. LAFAILLE:  Yes.  Well, I should say the individual

4    who was released after the previous hearing, who I think is not

5    moot, he was also not detained for 180 days.  He was detained

6    for about five months.

7            THE COURT:  But it's 241.4(i)(3) 1 to 2 that requires

8    the interview, you say on page 11 and 12 of your brief.  So let

9    me look at that up.  I don't think it's been disputed.  Let me

10   read it.

11            Well, with regard to all of them, which I think you

12   said all but one who are now detained, if there was a violation

13   of 241.4 relating to the 180-day interview, as a practical

14   matter, that would be a ground for relief independent of any

15   defect or lack of -- imperfection or defect regarding the

16   90-day notice.  Is that right?

17            MS. LAFAILLE:  I think that's right that these can be

18   independent violations.  I also think that we should look at

19   the cumulative effect because, you know, certainly if someone

20   had at some point -- if there were other valid reviews, that

21   certainly affects the importance of a single -- although I

22   think any one of these violations is sufficient by themselves,

23   it's relevant that the individuals here are all the subject of

24   multiple violations of these regulations, not a single one.

25   And many of them have violations at both the 90-day review and

1  the 180-day review.

2        THE COURT:  But I think you would argue that the

3  violations concerning the 180-day reviews alone would be a

4  basis for relief, and then there's a question of what the

5  relief is.

6        MS. LAFAILLE:  Absolutely, Your Honor.

7        THE COURT:  And therefore you want me to conduct the

8  bail reviews?

9        MS. LAFAILLE:  I think that at a minimum, the court

10  should find that the regulations have been violated and, yes,

11  agree to conduct a review of any individual who has not been

12  released in, say, two weeks' time.

13        THE COURT:  All right.  So that would depend on my

14  finding one or more violations.

15        MS. LAFAILLE:  Yes, Your Honor.

16        THE COURT:  What do the respondents say about that

17  approach?

18        MS. LARAKERS:  Right.  So first, Your Honor is right

19  that you would have to find violations in every case in order

20  to grant any remedy.  And unlike the way petitioners

21  characterize it, the facts of each one of these cases is

22  different, and some of the legal analysis changes with regard

23  to each individual alien.  For example, there are some people

24  who the government's position is were not even entitled to a

25  180-day review.

1          THE COURT:  Why would they not be entitled to a

2    180-day review?

3          MS. LARAKERS:  One of them failed to comply with his

4    removal by failing to get -- failing to sign off on a travel

5    document.  And the other one, due to a complicated procedural

6    history, was scheduled for removal and then unscheduled to

7    comply with the court's order and then scheduled again, and his

8    removal was stayed, and so it's now being conducted, the

9    review.  But essentially it would be a drawn-out process to

10   even identify what violations, if any, there were in these

11   cases.

12         And Your Honor is correct that some of these may moot

13   out if ICE is just given the opportunity to review documents.

14   And Your Honor is right.  There are other vexing legal issues,

15   such as whether they have to show prejudice, what that

16   prejudice is they have to show, what the remedy is, which for

17   these -- despite their characterization that this is just like

18   a year ago, this isn't just like a year ago.

19         Each one of these individuals did receive a review.

20   And in fact, because of this court's orders, they've received

21   more of a review than they ever would have gotten under the

22   POCR regulations because ICE now has to independently consider

23   whether they should even remove the alien at all based on the

24   fact that they're pursuing a provisional waiver, which also has

25   to be taken into account with regard to the remedies.

1          So there are a lot of issues on the table here that
2     the court is going to have to work through that may or may not
3     be mooted.  And I think at the very least, if they submit
4     documents, then we're in a position where the issues have been
5     narrowed, and then we can focus on the rest of the issues
6     moving forward.  Obviously I can't make any representations
7     about what ICE is going to do when they receive those
8     documents, but obviously there are a lot of options that ICE
9     has with regard to enforcing someone's removal order, and that
10    includes putting him on an ankle monitor in order to remove
11    them.  That includes strict orders of supervision.  So I think
12    that that is the quickest way forward to resolve these issues.
13          THE COURT:  At least to -- it may be the quickest way
14    forward to resolve situations of the seven people who are
15    detained, the petitioners argue, unlawfully.  I don't know
16    whether it will moot the issues, but I think I've said this
17    before in this case, possibly in the lobby, you know,
18    petitioners have ardent counsel.  They have clients and they
19    have a cause.  And I don't think they want the clients to
20    suffer for the cause.  I don't.  And they don't, they don't.
21          MS. LARAKERS:  Your Honor is right that, you know,
22    along with these reviews that ICE could do, based on updated
23    documentation from the alien, you know, ICE is also going to
24    have to consider the merit of any petitioners' argument and
25    will have to consider whether they want to move forward and

1     litigate that or if they would rather take an alternative

2     route.  And I think that that's something ICE should be allowed

3     to consider without this, you know, this motion, and to allow

4     ample time to consult with my client about it as well, to which

5     I have not had much, Your Honor.

6          THE COURT:  No.  This has gone fast, and I've spent a

7     lot of time on this, but so far all of this argument is

8     uncommonly helpful.

9          Well, I've spent a lot of time since Friday on this,

10    Saturday, but --

11         MS. LARAKERS:  Your Honor, I think it narrows the

12    issue from the government's perspective as well because we --

13    we would gladly accept the opportunity to submit documents, as

14    Mr. Lyons said in his declaration, you know, a potential remedy

15    for us is the -- any proper remedy of violation for us is

16    remand, so I think that just narrows the issues for the parties

17    to brief out.

18         THE COURT:  I said this earlier.  That's one option.

19    It's not the only option --

20         MS. LARAKERS:  I understand that, Your Honor.

21         THE COURT:  -- if I find the violation.

22         MS. LARAKERS:  Yes, Your Honor, and I understand that

23    especially in view of this court's orders last year.  And as

24    you can see in our briefs, we've studied that issue,

25    respondents have studied that issue.  And I think that in

1    _Zadvydas_ there is a balancing that has to occur, and it's not

2    just based on, you know, foreseeability of removal.  It's based

3    on, as Your Honor said last summer, whether there's been a

4    violation of the procedures protecting that right.  And I think

5    that _Zadvydas_ does build in -- it builds in jurisdiction for

6    the court to balance the procedural issue of any procedural

7    violations that occur to the alien against that interest that

8    they have to ensure that their detention is reasonably related

9    to removal.

10           So if we got down the road and any bail hearing would

11   be conducted, our position is that it wouldn't be a bail

12   hearing.  It would be similar, but it would be a balancing

13   based on the question presented in _Zadvydas_, which I'd like to

14   read to the court the precise question, which I think

15   encompasses an allowance for the court to consider the

16   violations of the POCR regulations.  That court said that, to

17   determine whether 1231(a)(6) detention is lawful, it says,

18   "Whether a set of particular circumstances amounts to detention

19   within or beyond a period reasonably necessary to secure

20   removal," and in that the court could consider a violation of

21   the POCR regulations and whether that any deprivation resulted

22   in detention that wasn't reasonably related.  Maybe it wasn't

23   reasonably related because there was no flight risk.  Maybe it

24   wasn't reasonably related because there was no dangerousness.

25   But when there was a violation and therefore a constitutional

 1    issue, I think _Zadvydas_ does allow that balancing to occur.

 2         THE COURT:  And if I understand you right, I agree.  I

 3    said this earlier.  If there was a violation but I thought

 4    somebody, if released, would be a threat to commit violent

 5    crimes, that wouldn't be an equitable remedy for the violation.

 6    If that's what we're talking about, I agree with you.

 7         MS. LARAKERS:  Yes, Your Honor.  And that circles back

 8    to our position that ICE should just be allowed to do -- to

 9    conduct the review in the first place.  And Your Honor, that's

10    consistent with the body of law that we're looking at in this

11    area.

12         THE COURT:  And so I think the petitioners said that

13    they, you know, could be prepared in about two weeks to make

14    those presentations and you said a number of times provide

15    additional documents.  I don't know if there are additional

16    documents for each of them.  But there's information in these

17    submissions.

18         Mr. Charles, did you read the -- it's called the reply

19    of the petitioners.  They filed it a week ago Friday, which I

20    think would have been at about midnight on Friday the 16th.

21         MR. CHARLES:  No, Your Honor.

22         THE COURT:  You haven't seen that yet?

23         MR. CHARLES:  No, Your Honor.

24         THE COURT:  Because it discusses the circumstances of

25    particular people.  And there are seven cases that at the

1    moment raise this issue.  And it doesn't mean that the issues

2    will be moot because they're capable of recurring if any or all

3    of these seven people are released.  That's my current

4    tentative view.  But I've written on mootness previously in

5    this case.

6           So if the petitioners, you know, present you with

7    additional documents or information or argument with regard to

8    seven cases, knowing this isn't the only responsibility you

9    have, about how long do you think it would take you to review

10   and decide those cases?

11          MR. CHARLES:  Seven cases should take maybe a week.

12          THE COURT:  All right.  So basically roughly about

13   three weeks from now, depending on how meritorious the

14   arguments are and how persuasive counsel are, some or all of

15   these seven people might be out of detention.

16          I think it's appropriate to take that course, and then

17   I think I'm going to do something that I can't recall having

18   done in the last 34 -- well, the 34 years I've been a judge,

19   which -- I'm not going to make a ruling, but I'm going to tell

20   you what my thinking is on the interpretation of these

21   regulations so you can address them when the time comes.

22          But Ms. Lafaille, if it turns out you need a little

23   more time, you can ask me for it, and we've got Labor Day in

24   here.  Let me have the book, please.

25          I'm inclined to order that by, say, September 13,

1   petitioners' counsel present to ICE, to Mr. Charles, whatever

2   written -- well, whatever documents, information -- so it

3   doesn't have to be in a document.  It can be in an affidavit --

4   and argument regarding each of the seven detained individuals.

5   And then unless he requests more time, I'm ordering that by --

6   let me give you a little more time.  I'm ordering that these

7   submissions be made by September -- well, do you want one less

8   day or one more weekend to make the submissions?  I have reason

9   for this.  I'd either order the submissions due on the 12th or

10  on the 16th rather than Friday the 13th.  Which do you prefer?

11          MS. LAFAILLE:  I think we'll take the 12th, Your

12  Honor.  But if I could just respond to something that was said

13  earlier, Your Honor.  These individuals are our cause.  They're

14  here, and they know that.  And, you know, if I thought for a

15  moment that the fastest route for their release was to abandon

16  this motion, of course we would have done that, Your Honor.

17          THE COURT:  I'm not even suggesting you're abandoning

18  the motion.  I think the issues are not going to be moot.  I

19  think -- and I try to correct myself.  I know you're devoted to

20  the human beings of your clients; all of you are.  I don't

21  think you -- at the moment they can argue mootness but I don't

22  think at the moment you have the dilemma of -- I think there

23  may be a way to get some of them out faster if they deserve to

24  be out and to prepare a record for me to consider in an

25  informed and efficient way if that becomes necessary.  And I

1  worked on these issues, but I can tell that I would like some

2  of my thinking further tested, either reinforced or altered,

3  because two of the decisions I'm inclined to make would have

4  very I think significant consequences for the way ICE operates

5  and maybe not just in New England.

6          So you want the 12th?

7          MS. LAFAILLE:  Yes, Your Honor.  And if I might just

8  ask -- because some of these individuals have their own

9  immigration counsel and they'll be able to do things faster, so

10 I might just ask that if ICE is being given a week to make a

11 decision that that week start whenever the materials are turned

12 in to them.

13         THE COURT:  Is that okay?

14         MR. CHARLES:  It may depend on the date, Your Honor.

15         THE COURT:  I'm going to give them -- here.  All of

16 this -- I'm going to hear about all of this again, Mr. Charles,

17 particularly with regard to anybody who is not released.  I

18 think you don't know what emergencies you might have to deal

19 with.  You might be out of town.  I'm ordering that decisions

20 be rendered by September 19.  And I expect that if you get

21 material before September 12 and consistent with your other

22 duties you can focus on it, you'll make the decisions as

23 promptly as you can and not wait until the 19th to announce all

24 of them.

25         MR. CHARLES:  I will, Your Honor.

1           MS. LARAKERS:  I do want to mention, Your Honor, that

2    this isn't just a matter of ICE Boston.  This involves ICE

3    headquarters because the jurisdiction over the custody

4    determinations transfers at a certain point.  So I don't

5    want -- I just want the court --

6           THE COURT:  Actually, that's a good point.  Okay.  So

7    at 180 days it transfers to ICE headquarters.  Does Mr.

8    Charles even have the authority to make the decision?

9           MR. CHARLES:  I do not, Your Honor.  I can make a

10   recommendation.

11          THE COURT:  You can make a recommendation.

12          MR. CHARLES:  Yes, Your Honor.

13          MS. LARAKERS:  So this will be a conversation

14   obviously that we're going to have to have on our side.

15   However, I wanted to make that clear because --

16          THE COURT:  So what Mr. Charles would do is make a

17   recommendation by the 19th?

18          MS. LARAKERS:  No, Your Honor.  I view your order is

19   we need to have a decision by the 19th.  I don't ask even for

20   an extension of the timeline.  I just wanted the court to know

21   that when it's reviewing pleadings in the future, if there's an

22   alleged violation, it knows where that violation is coming

23   from.

24          THE COURT:  Yes.  I've focused on 241.1(k)(2)(ii,) so

25   that's what you're talking about, I think.

1          MS. LARAKERS:  Yes, I'm talking just about the

2    dichotomy between the 90 day and 180 day and who is making

3    those decisions and who is conducting those procedures.

4          THE COURT:  Well, who is the human being who is going

5    to --

6          MS. LARAKERS:  For this decision, 180-day review, it

7    would be someone at ERO headquarters.

8          THE COURT:  Do we know --

9          MS. LARAKERS:  I do not know that person.  I don't

10   even know if Marcos knows that person.

11         MR. CHARLES:  I don't know exactly who that would be.

12         MS. LAFAILLE:  Your Honor, maybe the respondents would

13   disagree, but outside the context of the Post-Order Custody

14   Review as a matter of resolving matters in litigation, I

15   believe they have the general authority to release individuals

16   who are in their custody on orders of supervision.

17         THE COURT:  Well, I mean, I think -- you raised this.

18   They know you're going to come in and ask me to release these

19   people if they don't.  And they're not going to release people

20   if they don't think there's a proper basis.  But sometimes

21   there's a range of reasonable decisions.  And if one reasonable

22   decision is to release them and then -- because whoever makes

23   the decision in Washington is going to have to come here and

24   defend it.  Sometimes it's nice here in September and October,

25   and sometimes it's hurricane season.  But I mean, that's just

1    part of it.  But okay.  So those are the timelines.

2              MS. LAFAILLE:  Your Honor, can I just add one other

3    thing?  This I don't think will be too controversial.  But

4    there are certain individuals that I think we agree should have

5    been interviewed, and for that reason the government has now

6    acted to schedule interviews.  So might I just suggest that

7    within that timeframe that the respondents be open to any

8    requests to reschedule those interviews in order --

9              THE COURT:  You mean to do the interviews in that

10   timeframe?

11             MS. LAFAILLE:  I believe they're all scheduled within

12   that timeframe.  I don't know if any are still --

13             THE COURT:  Are you asking that they be postponed or

14   that they be conducted?

15             MS. LAFAILLE:  That if there's a request to postpone

16   them by a week or so -- because some of them are scheduled for

17   tomorrow.

18             THE COURT:  Why wouldn't they want to be interviewed?

19             MS. LAFAILLE:  Well, they may want to be better

20   prepared for --

21             THE COURT:  Okay.  So the idea is they'd be

22   rescheduled.

23             MS. LAFAILLE:  Within the timeframe.

24             THE COURT:  Within the timeframe.

25             MS. LARAKERS:  Yes, Your Honor.  We only schedule

1    those reviews quickly because we ordinarily give 30 days, but

2    we schedule those reviews quickly on the request of the

3    individual alien.  So if they requested they want to push it

4    off, of course we would do so.

5            THE COURT:  All right.  But when they say "put it

6    off," just --

7            MS. LARAKERS:  Reschedule.

8            THE COURT:  -- they would like the interviews to be

9    better informed.  So I think what Ms. Lafaille is suggesting is

10   they collect whatever documents and information, whatever

11   arguments they or their lawyers want to make, and they present

12   those, and then they be interviewed, because the submissions

13   might raise questions or possibly moot the necessary of an

14   interview if somebody is going to be released.

15           Is that what you had in mind?

16           MS. LAFAILLE:  Yes.  And again, just if they choose to

17   do that.  Not if they want to proceed with an interview.

18           THE COURT:  All right.  Well, this is I think helpful.

19   It's my understanding that this is done -- you may be seated.

20   Well, maybe not -- regularly in some courts, for example, in

21   California Federal Courts.

22           I'm going to give you my present views on some of the

23   legal issues because two of them are consequential,

24   institutionally consequential, and this is all going fast.

25   Since I don't think the human beings who personify these issues

1   will be prejudiced because now they're going to get a review
2   first by ICE and possibly by me if I find violations, I think
3   this will facilitate informed decisionmaking by me.
4           So let me just -- all right.  Let me tell you the
5   following:  I haven't thoroughly -- well, I haven't to my
6   satisfaction studied the prejudice issues.  So if the
7   regulations have not been properly followed, must the
8   petitioners demonstrate prejudice.  This is particularly
9   tentative, but at the moment, I'm inclined to find that they do
10  not need to show prejudice.  If a premature review violated --
11  if the review was done prematurely, before the date or possibly
12  materially before the date on which they were told to submit
13  information, was the deadline for submitting information, I
14  believe that would -- I'm inclined to believe that that would
15  violate a fundamental right, the right to due process, by
16  depriving the defendant of an opportunity, meaningful
17  opportunity to be heard, and that the analysis of the Second
18  Circuit in Waldron, 17 F. 3d 511 at 518, and in the Third
19  Circuit, Leslie, 611 F.3d 171, 178, would apply.  They found no
20  prejudice was required, and at least implicitly Judge Saris did
21  that in Rombot, too, Rombot also.
22          If prejudice is a requirement, it's not at the moment
23  clear to me exactly what the right articulation of the test is.
24  Sometimes the test seems to be articulated as whether a
25  different outcome would have resulted, as respondents argue; or

1    whether, as petitioners assert, they only need to show a

2    different outcome could have resulted.

3         In Franco-Ardon, relied upon by the respondents, the

4    First Circuit indicated that the petitioner could show the

5    requisite prejudice such as by demonstrating a likelihood of

6    success with respect to the original petition, 922 F. 3d at 25.

7    However, Judge Saris in another case reasoned that if the

8    government had -- well, she used the "could have" or "could

9    well have found" standard in Pensamiento, 315 F. Supp. 3d 684

10   at 693.  And there are other cases that use that.

11        Although the First Circuit used as an example such as

12   by demonstrating a likelihood of success, they didn't I believe

13   say that's always required.  And I would want to look at the

14   standard in Section 2255 cases, which are habeas proceedings

15   relating to getting a new trial.  What's a reasonable

16   probability.  It doesn't mean more likely than not.  It means

17   is your confidence in the result injured, essentially.  So

18   that's my very tentative thinking with regard to prejudice.

19        I believe that ICE has agreed that it's revised its

20   notice to provide that it will give notice of a 90-day review

21   at the time of arrest, advise the alien that the alien must

22   submit information by day 60, that the custody review will be

23   on or about day 75, and the alien will be notified of the

24   decision by day 90.  That's in Exhibit 8 of the sur-reply,

25   docket number 360-1.  But do I understand that correctly, Ms.

1    Larakers; that's the notice that ICE is now using or going to

2    use?

3         MS. LARAKERS:  Yes.  So a clear date by which to

4    submit documents that will always be at least 30 days, allow

5    the alien at least 30 days to submit documents, and then a

6    clear on or about date with regard to the review that has

7    nothing to do with their date to submit documents, which will

8    occur around day 75.

9         THE COURT:  And then -- okay.  Because what that

10   should do is prevent a recurrence of reviews occurring before

11   the deadline for submitting information.  And that's a positive

12   thing.  But my understanding from the discussion at the August

13   2 hearing, pages 35 to 36, is there are about 13 to 15 class

14   members detained each month.

15        MS. LARAKERS:  There were only -- so we've done two

16   months of detention reporting.  The first one is the one that

17   you have before you, which I think was the 13 to 15 people.  I

18   can't remember the exact number.  But this month there were

19   only two people I believe on the July list, additional people

20   because we're not repeating the old list on the new list.

21        THE COURT:  So there are two more than there --

22        MS. LARAKERS:  Two more than there were in June.

23        THE COURT:  In June.

24        MS. LARAKERS:  I believe.  Two, yeah.

25        MS. LAFAILLE:  Right.  So the June list was 13 people,

1   but included -- it wasn't 13 people detained within the month

2   of June.  Many of them had been detained for very long periods

3   of time.  New detentions were I believe two or three.

4         THE COURT:  Okay.  So let's say there are 15 class

5   members now detained, roughly.  My question to ICE was going to

6   be whether it was willing and able to give a second notice,

7   approximately 30 days before the 60-day deadline.  It doesn't

8   seem burdensome, and it may be necessary, if my reasoning with

9   regard to Section 241.4(h)(2) endures.  So I suggest you start

10  thinking about this seriously because my present view with

11  regard to Section 241(h)(2) is as follows:

12        It appears to me now that giving notice 90 days or

13  even 60 days before a detention review is not approximately 30

14  days in advance of the detention review, which is what's

15  required by Section 241.4(h)(2).  Contrary to the defendants'

16  contention, "approximately" doesn't mean at least.  There are

17  criminal cases that discuss what "on or about" means, and

18  usually I instruct reasonably near, what does reasonably near

19  mean.  But at the moment I don't think the criminal cases are

20  the right comparator for these purposes, because in a criminal

21  case the indictment alleges the crime occurred on or about a

22  certain date to give notice to the defendant of what he needs

23  to defend against.  And here, as I said and wrote last year,

24  every day of unlawful detention is a form of irreparable harm,

25  and indeed the respondents agreed with that.

1          So I understand the argument that there may be a

2    benefit to an alien getting earlier notice than 30 days.  It

3    provides more time to develop your case for release.  And I

4    understand the petitioners' argument, if you get the notice

5    amid many other pieces of paper at a shocking time, you've just

6    been arrested, maybe it will not be understood or appreciated.

7          But this is where I think the Supreme Court's decision

8    earlier this year in Kisor is very important.  And as you'll

9    hear, I think it's very important in the 180-day review process

10   in my current conception, which is tentative.  But in Kisor,

11   139 Supreme Court 2400, 2415, the court wrote, talking about

12   deference to an agency's interpretation of its regulation under

13   the Supreme Court's decision in Auer:

14          "First and foremost a court should not afford Auer

15   deference unless the regulation is genuinely ambiguous."  And

16   it cites two cases, one of them Seminole Rock, saying defer

17   only if the meaning of the words used is in doubt.  "If

18   uncertainty did not exist, there is no plausible reason for

19   deference.  The regulation then just means what it means, and

20   the court must give it effect, as the court would any law.

21   Otherwise said, the core theory of Auer deference is that

22   sometimes the law runs out and policy-laden choice is what is

23   left over.  But if the law gives an answer, if there is only

24   one reasonable construction of a regulation, then a court has

25   no business deferring to any other reading, no matter how much

1   the agency insists it would make sense.  Deference in that

2   circumstance would permit the agency under the guise of

3   interpreting the regulation to create a de facto new

4   regulation.  Auer does not and indeed could not go that far."

5           So at the moment it appears to me that giving the

6   seven class members who are presented to me now notice the day

7   they're arrested of a detention review about 90 days later

8   violates the statute, and then there would be a question of

9   what's the appropriate remedy.

10          That's also the conclusion I would reach at the moment

11  with regard to the 180-day review.  And I'll confess that I

12  didn't focus on the interview requirement in doing this

13  analysis, which, on the basis of not having focused on it, but

14  just reread it today, when Ms. Lafaille raised it, appears to

15  be another defect in the way ICE is performing.  But it appears

16  to me at the moment that ICE's current practice of commencing

17  the review required by Section 241.4(k)(2) after 180 days is a

18  violation of the regulation.

19          Section 241.4(k)(2) states, "District director or

20  Director of the Detention and Removal Field Office retains

21  jurisdiction.  When the District director or Director of the

22  Detention and Removal Field Office has advised the alien at the

23  90-day review as provided in paragraph (h)(4) of this section

24  that he or she will remain in custody pending removal or

25  further custody review, and the alien is not removed within

1     three months of the district director's decision, authority

2     over the custody determination transfers from the district

3     director or Director of Detention and Removal Field Office to

4     the Executive Associate Commissioner.  The initial HQPDU" --

5     that's headquarters post-detention unit, I think here -- "The

6     initial HQPDU review will ordinarily be conducted at the

7     expiration of the three-month period after the 90-day review or

8     as soon thereafter as practicable.  The Service" -- capital

9     S -- "Service will provide the alien with approximately 30

10    days' notice of that review."

11         The key language is, The initial HQPDU will ordinarily

12    be conducted at the expiration of the 90-day review, meaning at

13    180, days or as soon thereafter as practicable.  However, ICE's

14    regular practice is to commence the second review at or about

15    210 days after the alien is detained.  This is in the

16    sur-reply, docket number 360 at page 9 and following.

17         More specifically, ICE gives the alien notice of that

18    second review after his case is transferred from the district

19    to headquarters and ordinarily commences that review about 30

20    days later.  ICE relies on a statement in the Federal Register

21    when Section 241.4 was promulgated to justify its

22    interpretation of Section 241.4(k)(2)(ii) and its practices.

23         When the rule was promulgated in December 2000, the

24    Immigration and Naturalization Service, which the C.F.R.

25    defined as the quote, capital S, "Service," end quote, in 65

1    Federal Register 80281-01 at 80282, wrote the following:

2         "If the alien has not been removed or released from

3    detention, detention authority transfers to the newly

4    designated Service component, the HQPDU, under the authority of

5    the Executive Associate Commissioner, Field Operations,

6    Executive Associate Commissioner, either at the end of the

7    90-day removal period or at the expiration of the three-month

8    extension period.  Under either circumstances" -- I'm sorry --

9    "Under either circumstance, the HQPDU will ordinarily commence

10   a custody review within 30 days of the transfer of detention

11   authority or as soon as possible thereafter should unforeseen

12   or emergent circumstances arise.  The alien will receive

13   written notice of the custody review approximately 30 days

14   prior to the scheduled review."  That's in 65 Federal Register

15   80281-01 at 80291-92.  This was in the Federal Register on

16   December 21, 2000.

17        However, the statement in the Federal Register is

18   inconsistent with the unambiguous regulation and does not, in

19   my current view, deserve Auer deference from the court.

20   Generally, a regulation is ambiguous if the meaning of the

21   words is in doubt, as I noted the Supreme Court said recently

22   in Kisor, 139 Supreme Court at 2415, quoting Seminole Rock, 529

23   U.S. at 414.

24        In 2017, I found that a contract could be deemed

25   ambiguous only "if its terms are susceptible to at least two

1    reasonable alternative interpretations or when it contains

2    conflicting terms."  That was in <u>Janssen Biotech</u>, 296 F. Supp.

3    3d 336, 342, citing New Jersey law.

4         A similar standard for putting the meaning of a

5    regulation in doubt appears to be appropriate at this point to

6    me.  The meaning of Section 241.4(k)(2)(ii) is not in doubt.

7    As indicated earlier, it says, "The initial HQPDU review will

8    ordinarily be conducted at the expiration of the three-month

9    period after the 90-day review."  I understand that this should

10   be read in the context of the next sentence, that, as written

11   in Wright & Miller in 33 Federal Practice and Procedure,

12   Section 8437, "The court should determine regulatory meaning in

13   light of the entire rule rather than construe bits of the rule

14   out of context."  So the next sentence states, "The Service

15   will provide the alien with approximately 30 days' notice of

16   that review."  As I said, in the Federal Register, the

17   predecessor to the Department of Homeland Security, the

18   Immigration and Naturalization Service is defined as the,

19   capital S, "Service."

20        Section 241.4(h)(2) concerning the 90-day review

21   states with regard to the notice of the alien that "the

22   District Director or the Director of Detention and Removal

23   Field Office will provide written notice to the detainee

24   approximately 30 days in advance of the pending records

25   review."  Section 241.4 (k)(2)(ii) could have stated that HQPDU

1    will provide the alien with approximately 30 days' notice of

2    the second review.  It used "HQPDU" in the previous sentence.

3           The sentence about providing notice communicates

4    clearly that ICE must provide timely notice of the second

5    review but does not create ambiguity concerning when that

6    review must ordinarily be conducted, which is about 100 days

7    after the alien's detention.

8           I have not been provided any evidence that it would

9    ever, let alone always, be impossible for ICE to provide notice

10   of at least a potential 180-day review about 140 to 150 days

11   after an alien's detention.  Such a notice could, for example,

12   say that, If you have not been removed by whatever the 180-day

13   date is, your detention will be reviewed by HQPDU on or about

14   that date, and you should submit any information you would like

15   considered before that date or by a particular time before that

16   180-day date.

17          You know, again, in Kisor, the Supreme Court recently

18   instructed that where, as here, a regulation is unambiguous,

19   "the court must give it effect like any other law."  As the

20   Supreme Court explained, "If there is only one reasonable

21   construction of a regulation, then a court has no business

22   deferring to any other reading, no matter how much the agency

23   insists it would make more sense.  Deference in that

24   circumstance would permit the agency, under the guise of

25   interpreting a regulation, to create de facto a new

1    regulation."  Auer does not and indeed could not go that far.

2          I also note that if ICE's contention was correct or if

3    the regulation was ambiguous, it appears to me that Section

4    241.4(k)(2)(ii) might be incompatible with Zadvydas, 121

5    Supreme Court 2491, a 2001 decision.  The regulation was

6    promulgated in December 2000, about seven months before

7    Zadvydas was decided.  It was issued in part in response to the

8    Fifth Circuit decision in Zadvydas, 185 F. 3d 279, and the

9    conflicting Ninth Circuit decision, Ma v. Reno, 208 F. 3d. 815,

10   822.

11         As described in the Federal Register and as now

12   interpreted by ICE, under Section 241.4(k)(2)(ii), aliens would

13   ordinarily be detained for at least 210 days or seven months.

14   However in Zadvydas, about seven months later than the Federal

15   Register statement and the promulgation of the regulation, the

16   Supreme Court held that detention for more than six months was

17   presumptively unreasonable if an alien provides good reason to

18   believe there is no significant likelihood of removal in the

19   reasonably foreseeable future.  That was the statement at 121

20   Supreme Court at 701.

21         ICE's practice of detaining aliens for at least 210

22   days before beginning to review whether they should be released

23   might be found unconstitutional under Zadvydas.  If Section

24   241.4(k)(2)(ii) was ambiguous and could plausibly be read to

25   require either that the second review ordinarily commences at

1    180 days after detention or that it ordinarily commences after

2    210 days after detention, the doctrine of constitutional

3    avoidance, which encourages adopting the alternative

4    interpretation that poses no constitutional problems, would

5    favor adoption of petitioners' interpretation of the

6    regulation.

7           The doctrine of constitutional avoidance was recently

8    discussed by the Supreme Court in Jennings, 138 Supreme Court

9    830 at 842, a case decided in 2018.  It was discussed in many

10   other cases, including Gomez, 490 U.S. 858, 864.  However,

11   where, as here, I find at the moment the regulation is not

12   susceptible to more than one reasonable interpretation, the

13   doctrine of constitutional avoidance does not operate, as the

14   Supreme Court also said in Jennings at 842.  It reiterated that

15   earlier this year in Nielsen, 139 Supreme Court 954, 972.  And

16   I made this point in my decision last December in this case,

17   Jimenez, 334 F. Supp. 3d 370, 383.

18          So if I finally decide that ICE has been

19   misinterpreting sections 241.4(h)(2) concerning 90-day notice

20   and 241.4(k)(2)(ii) concerning the 180-day notice, the

21   implications would have to be considered.  That would be I

22   think in effect a declaratory judgment for the reasons stated

23   in court on December 6, 2018 and summarized in my December 7,

24   2018 memorandum and order, docket 193.  I have found that I

25   have the authority to issue class-wide declaratory relief.

1          This would raise the issue of how to proceed.  I

2     haven't decided whether class-wide injunctive relief is

3     permissible.  That was left open by my December 6 decision

4     summarized in the December 7, 2018 memorandum and order at

5     pages 2 to 3.

6          However, as I noted in that order, a preliminary or

7     permanent injunction may not be justified, might not be

8     justified, in any event.  As I wrote in the December 7, 2018

9     order, "To establish eligibility for an injunction restraining

10    the conduct of a government official, a party must prove not

11    only a violation of law, but also that it is likely to continue

12    in the future."  That comes primarily from <u>Farmer v. Brennen</u>,

13    511 U.S. 825 at 845-47.

14         "The Supreme Court has indicated that district courts

15    should use caution in issuing injunctive orders against

16    government officials and that it may be appropriate to give

17    those officials an opportunity to rectify violations of law

18    before issuing an injunction.  In any event, a court may find

19    that a declaratory judgment was and remains justified, but an

20    injunction is not necessary or appropriate because the

21    government has represented that it will obey the law as

22    declared by the court in the future."  And I wrote, "See, for

23    example, <u>South Boston Allied War Council</u>, 875 F. Supp. 891,

24    920," a 1995 decision by me concerning the St. Patrick's Day

25    Parade.

1          So that's my present thinking on these issues.  If I

2     had decided them that way, I would provide the parties an

3     opportunity to get the transcript, which I might -- for ICE to

4     consider whether it intends to revise any or all of its

5     practices, for the parties to confer, and to report how to

6     proceed.  But I haven't made any final decision, and I think

7     that what I want to do is give the parties an opportunity to

8     further brief that reasoning, and anything that I may have

9     overlooked, including the interview requirement of the

10    regulations, and schedule a time for you to argue this further.

11         So you should think about how long you would want for

12    that.  We're going to take a break for about ten minutes, and

13    then I'll come back and discuss with you discovery.

14         Is there anything further before we do that?

15         MS. LARAKERS:  With regard to your prior order, Your

16    Honor, I would request that, for the exchange of documents to

17    go smoothly --

18         THE COURT:  Which prior order?

19         MS. LARAKERS:  The order that petitioners submit any

20    documents on their clients' behalf.  I would ask in order for

21    that process to go more smoothly, more quickly, in this

22    circumstance for petitioners counsel to send them directly to

23    respondents' counsel and then we would immediately forward

24    those on to ICE, just to make sure that everything goes

25    smoothly.

1          THE COURT:  Is there any objection to that?

2          MS. LAFAILLE:  No, Your Honor.

3          THE COURT:  And is there any problem, since some of

4     these class members may have their own counsel, but can you

5     arrange for them to essentially make the submissions through

6     you?

7          MS. LAFAILLE:  Yes, Your Honor, we can do that.

8          THE COURT:  All right.  It's 4:15.  We'll -- go ahead.

9          MS. LARAKERS:  Sorry, one additional request.  If ICE

10    does decide to release one of these or some of these aliens,

11    would the court reconsider its decision staying, temporarily

12    staying their removal?

13         I think that that information will be helpful in

14    discussing with my client because obviously the remedy that

15    petitioners are seeking is release.  While the issue may not be

16    moot because it could happen to other class members in the

17    future, ICE can secure an alien's removal by other means if

18    they still choose to do so after considering the new evidence.

19    And that may be, you know, requiring them to show up with plane

20    tickets.  It would take some time, but I think ICE -- I think

21    that would inform ICE's decision a bit.

22         THE COURT:  I don't know what the petitioners say

23    about that.  Maybe you want to tell me after the break.

24         MS. LAFAILLE:  That sounds good.  Thank you, Your

25    Honor.

```
1              THE COURT:  What's that?

2              MS. LAFAILLE:  Yes, we can talk about that after the

3     break perhaps.

4              THE COURT:  All right.  When we resume, we'll go to

5     discovery and, if there's time, address the motion to

6     reconsider.  All right?  Court is in recess.

7              (Recess taken 4:14 p.m. - 4:29 p.m.)

8              THE COURT:  It's 4:30, and we seem to be missing at

9     least one of the lawyers.  Who is reappearing?

10             MS. LARAKERS:  Your Honor, Eve Piemonte wanted to go

11    print out our briefing on the motion for reconsideration.  So

12    that's my fault.  I wasn't aware that that was on the agenda

13    today, so I asked her to go print it out.

14             THE COURT:  Actually, at the pace we're going, it may

15    not be.  But that's fine; she's excused.

16             MS. LARAKERS:  Thank you.

17             THE COURT:  All right.  Ms. Lafaille, do you have any

18    response to that request?

19             MS. LAFAILLE:  Your Honor, I think as a blanket matter

20    it would be difficult to agree to that because, again, simple

21    release doesn't moot a motion about the legality of detention.

22    And it, you know, depends on the conditions of the release.

23    And, you know, for example, the individual who was released

24    after our last hearing was released pending the resolution of

25    this motion, so I don't think we're able to say as a blanket
```

1  matter that we would agree that the stay should be lifted.  I

2  think it would depend on whether the detention --

3        THE COURT:  I think this is a matter you should confer

4  and report to me on.  I haven't gone back and looked at my

5  orders.  But when named plaintiffs or class members have been

6  detained, I've issued orders that say they can't be moved out

7  of the jurisdiction of this court, meaning they can't be

8  deported under the All Writs Act.  However, as I understand it,

9  class members who have not been detained have been removed,

10 correct?

11       MS. LAFAILLE:  Yes, Your Honor.

12       THE COURT:  So my memory -- and I just haven't focused

13 on this so I want to be careful about it.  But my memory is

14 that if a class member is not in detention, then they're not

15 subject -- they may not be subject to my order not to move them

16 out of the jurisdiction.

17       So talk about it and see if there's really an issue I

18 need to decide.  I don't think you can do more, Ms. Larakers,

19 now, than give ICE advice on what you think should and will

20 happen if they release people.

21       MS. LARAKERS:  Your Honor, it's not my intention to

22 surprise this court with any removals the court doesn't know

23 about.  It's just information on the view so that I can go back

24 to my client.  Because obviously they do have an interest in

25 removing the individuals that they seek to remove.  That's the

1    entire reason why they were detained in the first place.  So I

2    can't go back to them and advise them about these individuals

3    if I don't know the scope of the court's order.  And that's why

4    I need to confer with the petitioners about whether they would

5    agree to allow them to be removed in an orderly fashion, et

6    cetera.

7         THE COURT:  Right.  And I just can't give you a

8    reliable interpretation of my orders because I haven't thought

9    about this.  I haven't reread them.  But I mean, I did just

10   made the observation that there were class members who weren't

11   detained who have been removed, and I don't think there's been

12   any contention that they were, subject to my orders under the

13   All Writs Act, not to remove them.

14        So, you know, talk about it, but that's what I was

15   saying.  If you don't have a definitive answer from me, do what

16   lawyers often have to do, and that is provide advice as to what

17   you expect the consequence will be.  All right?

18        All right.  Let's move to discovery.  And in case I

19   forget, and I don't think this is necessary, I'm ordering you

20   to order the transcript of today's hearing on an expedited

21   basis, or as quickly as it can be prepared consistent with the

22   stenographer's other responsibilities.

23        So I have your joint statement.  And Magda, do you

24   have blank orders?

25        COURTROOM CLERK:  Yes.

1          THE COURT:  I don't know if -- why don't you give it

2     to them.  I don't know if we'll actually fill out the

3     scheduling order today, but you should have it.

4          All right.  There are some disputes concerning the

5     parameters of discovery but not the scheduling for it.  I

6     thought the disputes were about whether any discovery should be

7     permitted from ICE headquarters, whether any discovery should

8     be permitted for USCIS, whether the plaintiffs should get the

9     administrative record after the 2016 provisional waiver

10    regulations went into effect, if there is such a thing, what

11    the temporal scope of discovery should be.  Should it start in

12    2016?  How many depositions should the petitioners be allowed?

13    Are there other major issues to be resolved?

14         MR. COX:  Not from the petitioners' perspective.  I

15    think Your Honor has identified the court's views the parties

16    raised in their joint report.

17         THE COURT:  All right.  Does it make sense to take

18    them up in the order I just described them, or would you like

19    to do it in some different order?

20         MR. COX:  That seems sensible to me, Your Honor.

21    Thank you.

22         THE COURT:  All right.  Well, you're seeking some

23    discovery from ICE.  And if I read it right, you say you're

24    seeking -- this is on page 5 of the joint report, 357.  You're

25    seeking limited discovery from ICE headquarters concerning

1    policy directives given to ICE Boston.  Is that what you want
2    from headquarters?
3            MR. COX:  Yes, Your Honor.  That's the thrust of it.
4    And I think just to anticipate what I imagine will be a
5    counterargument is of course we understand that documents to
6    the extent they were communications sent from ICE headquarters
7    to ICE Boston would I believe presumably be within the scope of
8    production of documents from custodians at ICE Boston.
9            But of course moving beyond just the communications,
10   the reporting in the documents from the headquarters would also
11   be relevant to, for example, the equal protection claim that
12   Your Honor has ruled can proceed.  And this would --
13           THE COURT:  How is it relevant to the equal protection
14   claim?
15           MR. COX:  Well, if there's a question, a live question
16   concerning the reasons for what I think is a pretty clear
17   change in policy or practice in early 2018, the reasons for
18   that and whether there's an unconstitutional animus behind
19   those would be relevant.  And I think it is not unreasonable at
20   this point to say that that might have been something that
21   originated at the headquarters rather than from ICE Boston.  I
22   mean, ultimately discovery may not bear this out, but that's
23   why we have discovery, to ensure that that can be explored.
24   Those are essentially the reasons.
25           And the other reason, Your Honor, is that Mr. Cronen,

1    who was at the center we believe of the changes back in 2018

2    and 2017, obviously now has a position with headquarters.  And

3    to the extent that he's been communicating with ICE Boston, I

4    think it would be encompassed by requests that I don't think

5    would be very contentious between the parties.  But obviously

6    his remaining involvement and the extent to which he was

7    responsible for articulating or creating or disseminating

8    policies from headquarters to ICE Boston would be relevant at

9    least to the equal protection claims.

10        THE COURT:  And you might argue there may be

11   communications between headquarters and Boston that weren't in

12   writing, that there could be notes or memos at headquarters

13   that wouldn't be found in the files of ICE Boston.

14        MR. COX:  Absolutely, Your Honor.  And there may also

15   have been things like phone calls.  And again, because of the

16   rotation of staffing at ICE Boston, it's entirely possible --

17   and I don't want to veer into speculation, but it's entirely

18   possible that communications were made orally or in other

19   informal manners from headquarters to ICE Boston.  The

20   individuals to whom those communications were made may no

21   longer be at ICE Boston.  So the only entity with possible

22   custody or knowledge about those communications would be at

23   headquarters.  Again, our proposal is to keep it limited and

24   focused, and I think that's something we could work out as part

25   of the discovery process.

1          THE COURT:  Because this sounds to me different,

2     narrower and more focused than what I think you -- what I

3     understood was being asked for originally, which I had

4     expressed reservations about authorizing, just, you know, sort

5     of broadly seeking discovery about -- well, we'll see, but it

6     sounds more focused.  What's the government's position?

7          MS. LARAKERS:  That certainly sounds more focused to

8     us, Your Honor.  I think to the extent there are communications

9     that were between headquarters and ICE Boston, we agree that

10    should be -- that's properly within the scope of discovery.

11    It's those communications that solely happened with people at

12    headquarters that had nothing to do with ICE Boston before or

13    after this lawsuit, had nothing to do with ICE Boston that we

14    want to limit the discovery, where we want to limit it.

15         THE COURT:  Okay.  So I think, I'm authorizing limited

16    discovery from ICE headquarters concerning essentially -- well,

17    what it says on page 5, policy directives to Boston.  And

18    there's not a dispute about that.  It sounds as if, though,

19    it's possible that the petitioners will be looking for more in

20    connection with their equal protection claim, and I'd have to

21    go back and refresh myself on my equal protection analysis.

22         But if the petitioners make a request that you think

23    is beyond the narrow focus -- well, that's beyond policy

24    directives given to ICE Boston from headquarters and they say,

25    Well, we're entitled to this because it's relevant to our equal

1  protection argument, try to work it out.  And if you don't work
2  it out, it will be more concrete for me so I can essentially
3  apply the Rule 26(b) test to something.  You can tell me how
4  burdensome it would be.  They can tell me how relevant it is.
5  And I can make a well-informed decision.  Okay?
6         Then the second one is whether there should be any
7  discovery from U.S. Citizenship and Immigration Services,
8  USCIS.
9         MR. COX:  Yes.  Thank you, Your Honor.  With respect
10 to USCIS, the discovery, the limited discovery that you
11 authorized last summer, which didn't include discovery from
12 USCIS but did reveal communications with USCIS I think was
13 surprising in the extent to which it suggested a degree of
14 collusion or coordination between USCIS and ICE Boston in
15 arresting class -- well, now class members who were seeking
16 provisional waivers.
17        THE COURT:  Is that how it was disclosed; that USCIS
18 was telling ICE when they had scheduled aliens for I-130
19 interviews and then they arranged them in the convenience of --
20        MR. COX:  That's correct, Your Honor.
21        THE COURT:  -- ICE so they could be arrested?
22        MR. COX:  That's correct.  That was as the result of a
23 limited discovery from last summer, which again, did not
24 include discovery from USCIS.  But those emails, because there
25 had been a back and forth communication, were in the custody of

 1   ICE and revealed that the USCIS employees had been involved in

 2   this.

 3           Essentially, Your Honor, again, this is not a fishing

 4   expedition.  I think the requests would be quite reasonably

 5   targeted to determining the extent to which USCIS is involved

 6   in this or continues to be involved in this and the extent to

 7   which they are conducting interviews or scheduling review of

 8   applications in a manner that would inhibit or otherwise thwart

 9   the completion of the provisional waiver process.

10           Again, the one half of this we've seen so far strongly

11   indicates that as of a year ago there were very active

12   discussions between USCIS and ICE Boston about the exact

13   subject of this lawsuit.

14           THE COURT:  And this is not entirely rhetorical.  I

15   have the amended complaint here.  But is one of your

16   contentions that I haven't addressed yet that the arrests at

17   the CIS offices were unlawful?

18           MR. COX:  Yes.  There are particular reasons for that

19   that extend just beyond the interference with the provisional

20   waiver process.  I think, as we articulated, it's been quite a

21   while now since we had a discussion about that problem

22   specifically --

23           THE COURT:  And I'm not trying to resurrect it.

24           MR. COX:  But there was a conflict specifically with

25   regulations that USCIS promulgated about arrests at USCIS

1    facilities, and it's our belief and still remains our belief

2    that by effecting those arrests at interview locations, ICE

3    Boston was violating rules that USCIS had set up governing

4    exactly that sort of thing.

5         THE COURT:  All right.  And again, this is more finely

6    focused than I understood or perhaps misunderstood as recently

7    as August 2.

8         MS. LARAKERS:  Your Honor, I don't think -- I don't

9    know that it is.  What's missing from petitioners' argument is

10   an allegation in the complaint that alleges that what USCIS is

11   doing in communicating with ICE is unlawful, or an allegation

12   as they just stated, that USCIS is actually inhibiting or

13   thwarting the 601-A process, the provisional waiver process, by

14   not scheduling interviews, et cetera.  Neither one of those

15   allegations are in the complaint.  So it's our position, that

16   because those allegations are not in the complaint, they

17   shouldn't get discovery on those allegations.  And any other

18   discovery that they want from USCIS will certainly be wrapped

19   up in the discovery that's provided by ICE.

20        THE COURT:  Again, this is -- I think you're right,

21   that the allegations in the complaint define the parameters of

22   permissible discovery.  However, if a third party may have,

23   say, documents or information that's relevant to the

24   allegations of the complaint against a party, discovery from

25   that third party is usually permissible.  In one sense CIS is

1    not technically a third party because I think the Department of

2    Homeland Security Secretary is the defendant.  But it's

3    possible that CIS -- for example, somebody at CIS took notes or

4    wrote a memorandum about an oral communication with ICE Boston,

5    there's no record of that communication in the ICE Boston

6    files, but there is a relevant record in the CIS files.  So

7    that it seems to me is properly discoverable, and then -- you

8    know, as a general matter, so that they can seek discovery from

9    CIS that's relevant to the allegations in the complaint.  And

10    you again could come back and say what they've asked for is too

11    broad, it's too burdensome in view of the attenuated importance

12    of it, something like that.  But I'm not inclined to

13    categorically exclude it.

14        MS. LARAKERS:  Your Honor, then if you're not inclined

15    to categorically exclude it, for that reason I would ask that

16    you state that it shall be related to the allegation that ICE

17    is improperly removing class members while they're pursuing the

18    provisional waiver process because I think that's what we

19    anticipated.

20        THE COURT:  Is there an objection to that?

21        MS. LARAKERS:  Of course -- sorry, Your Honor.

22        THE COURT:  Let me see.  If they agree --

23        MR. COX:  I think I would state it slightly

24    differently, that the request would be related to ICE Boston's

25    interference with the provisional waiver process.  Whether that

1    comes in the form of discussions with USCIS that would make it

2    easier for ICE to, as we would contend, interfere with that

3    process.  So I think interference as a broad concept is what

4    we're looking at in terms of USCIS discovery and not I think

5    the more narrow definition that my sister just described.

6            THE COURT:  I don't know.  Is there much difference?

7            MS. LARAKERS:  I don't think there is, Your Honor.  I

8    think we're talking about the same thing.  We just wanted to

9    keep this focused on ICE Boston's actions.  And to the extent

10   that USCIS is included in ICE Boston's actions and removal,

11   then that's one thing.  To the extent that they allege that

12   USCIS is doing something unrelated to ICE Boston, that's not in

13   the complaint, and that's what we would ask the court to limit

14   it to.  So I think we're on the same page here.  And to the

15   extent that there's any further disagreement, we can come to

16   the court with the specific request.

17           MR. COX:  Just briefly on that, I think that I just

18   want to step back because I think Your Honor made the

19   observation concerning the lack of USCIS as a party.

20           THE COURT:  I said -- I'm sorry.  Go ahead.

21           MR. COX:  I think this is the point that the parties

22   anticipated quite a while back, back in -- sorry, October of

23   2018, in a joint status report, we did reach agreement that,

24   despite the fact that USCIS is not a named party, ICE would not

25   object or Department of Homeland Security would not object to

1  discovery on that basis.  I think they reserved their right to

2  object on other reasons.  But, you know, there is a concern I

3  think that is not speculative but is based on interactions and

4  information from immigration counsel that there may be some

5  recent changes through USCIS interview policies concerning

6  I-130s.  I don't think we can say anything definitive, but I

7  think that would constitute something that we would like

8  discovery into precisely because the I-130 -- as we've

9  described, the I-130 process is part of the provisional waiver

10 process more broadly.

11         Understanding Your Honor's rulings concerning the

12 vesting of rights under that, I think it's still our position

13 that the provisional waiver process encompasses the I-130

14 interviews and therefore USCIS's policies towards scheduling

15 those in a way that would interfere with the process I think

16 would be within the ambit of appropriate discovery based on the

17 claims that we've raised in the amended complaint.

18         THE COURT:  But you would be looking to see whether

19 there were any -- and I won't use the word "collusion" because

20 they are two agencies of the Department of Homeland Security.

21 It's not inherently improper for them to communicate, I don't

22 think, but you would be looking at least in part for evidence

23 of ICE influence on CIS practices or policies.

24         MR. COX:  Yes, that would be the heart of the

25 discovery sought from USCIS.

1          MS. LARAKERS:  Your Honor, I think what they just said

2     is a little bit broader and why we have this dispute.  What I

3     understand that they're seeking -- and certainly if I'm wrong,

4     I'm happy to be on this point.  What I think that they're

5     seeking is that they're alleging that USCIS is not scheduling

6     interviews as they had previously done in the past, such that

7     that would affect a provisional waiver applicant's rights.

8     That's an allegation we have not responded to.  That is an

9     allegation that is not in the complaint.  To the extent --

10         THE COURT:  I haven't given them a deadline for

11    amending the complaint.

12         MS. LARAKERS:  No.  And Your Honor, we could respond

13    to that if you ordered that they could amend the complaint to

14    include that, but the discovery, we would request that the

15    discovery be limited to communications between ICE Boston and

16    USCIS.

17         THE COURT:  What about ICE headquarters and USCIS?

18         MS. LARAKERS:  Your Honor, ICE headquarters is not the

19    one that makes decisions regarding the arrest and removal of

20    class members.  ICE Boston is.  So I don't see how that would

21    be particularly relevant, although I could talk to my clients

22    about that to see whether --

23         THE COURT:  Well, I think we're going to have to do

24    the following.  I mean, I'm going to -- I'm authorizing -- I'm

25    not prohibiting discovery from CIS that is relevant to a claim

1    in the amended complaint.  And I think at this point, while

2    it's useful to have this discussion and then it can help you if

3    you have a dispute, you know, you can remind Mr. Cox, Well, on

4    August 27, you told Judge Wolf this.  And then he'll say, But

5    then I said that.  But whatever it is, I don't think in a

6    discovery order this is too abstract for me to provide more

7    guidance on.  Okay?

8         MR. COX:  Your Honor, I think that's generally our

9    position on these matters, is that without some kind of -- I

10   think you used the word "concrete," having a more concrete

11   dispute to present to the court in the context of specific

12   requests that the parties couldn't work out amongst themselves,

13   I think that's the way discovery proceeds in most cases, and

14   that's how we'd like to proceed here.  Do as much as we can

15   before seeking the court's intervention --

16        THE COURT:  And I may have said this to you before.

17   A, I don't get very many discovery disputes.  And you really

18   want to work hard to make sure you don't present me any because

19   often I'll behave like a baseball arbitrator.  I'll look at

20   which party's position is more reasonable and say, You win, or

21   You lose.  So if you have to come to me on a discovery dispute,

22   don't take an extreme position, you know, hoping I'll split it

23   down the middle and give you half of what you're objecting to.

24   You might lose completely.  And that applies of course to each

25   of you.

1          MS. LARAKERS:  Yes.  And Your Honor, it's not -- the

2     interest of the government here is not to hide the ball.  We're

3     not in the game of doing that, Your Honor.

4          THE COURT:  Now we're into the sports analogies.

5          MS. LARAKERS:  We're into it, Your Honor.  That's not

6     our intention.  Our intention, USCIS has to get a third-party

7     contractor to do discovery, do ESI in general.  That's a drain

8     on their resources.  It goes back to resources, Your Honor,

9     within the agency.  It's not that we're trying to hide things

10    that are relevant.

11          THE COURT:  And there are a number of things you've

12    worked out as a rhythm has developed in this case.  And then,

13    you know, the arguments recently have been about things that

14    are really I would say worth arguing about.  And you're both

15    doing a very good job, both sides.  So it's in your enlightened

16    self-interest to agree on what you can agree on and not bring

17    discovery disputes to me.  And if they're sufficiently

18    important to do that, you'll present them, and I'll decide

19    them.

20          I don't feel I have the same understanding about the

21    request for the administrative record after the 2016

22    provisional waiver regulations went into effect.  I would have

23    thought the administrative record was closed by the time

24    regulations are promulgated.  No?

25          MS. LARAKERS:  Your Honor, we don't have an

1    administrative record that's relevant to the parties -- to the

2    petitioners' claim here.  We tried.  We went and looked, as is

3    our duty in an Administrative Procedure Act case, to go and try

4    to find an administrative record.  The agents couldn't find one

5    because it doesn't exist.

6            THE COURT:  You couldn't find one before the

7    promulgation or after?

8            MS. LARAKERS:  After.

9            THE COURT:  After.

10           MS. LARAKERS:  That's relative to their claim that

11   ICE, by removing people, is essentially revoking the rule.

12           THE COURT:  That's why I just asked my question.

13   Mr. Cox, what are you looking for that you think would be

14   characterized as an administrative record after the

15   promulgation of the regulation?

16           MR. COX:  So Your Honor, the courts have articulated I

17   think there's a distinction between what could be called the

18   Certified Administrative Record, which would be what you

19   traditionally think of --

20           THE COURT:  I noticed that you didn't call it a CAR.

21           MR. COX:  From when it goes into the Federal Register

22   when the regulations actually issued, that's I think a distinct

23   process.  And I don't think there's a dispute between the

24   parties that, you know, once the 2016 regulations are on the

25   books, what we care about are those regulations and the stated

1   rationale for them that's in those regulations in the Federal

2   Register.

3          But the concept of the whole administrative record is

4   something that, you know, precisely for the reason that the

5   Supreme Court in the FCC v. Fox case talks about the sub

6   silentio --

7          THE COURT:  I have no idea what you're talking about.

8   It's not cited in your memo.

9          MR. COX:  Not in this, Your Honor.  But one of the

10  cases we've discussed in the context of the motion to dismiss

11  rulings is the idea that the agency cannot, after a regulation

12  has been promulgated, then silently revoke it by some actions

13  that are implicit --

14         THE COURT:  I understand that's the heart of your APA

15  claim.

16         MR. COX:  Yes.  So the whole administrative record,

17  Your Honor, reflects subsequent documents that would constitute

18  a kind of rulemaking should it have been --

19         THE COURT:  Well, I think you need to articulate your

20  request in a different way, that you need to describe -- you

21  know, you need to not call it the administrative record because

22  they're going to come back and tell you it doesn't exist, and

23  it sounds right to me.  You're going to have to say, We want

24  all records relating to discussions about how the provisional

25  waivers provisions would operate with regard to aliens who had

1    been ordered -- well, this is not a good example -- ordered

2    deported.  You're going to have to specify what you're looking

3    for.

4         MR. COX:  I think I understand.  I think, from our

5    perspective I think we can table the issues concerning the

6    administrative record.  I am optimistic that those would be

7    requests essentially covered by much of the other discovery --

8         THE COURT:  I would think so.

9         MR. COX:  -- in fleshing out the record, so I think we

10   can move past that.  Thank you.

11        THE COURT:  And then there's a question of the

12   timeline.  The petitioners want discovery from 2016 through

13   trial, and I think you say that's because it leads up to the

14   promulgation of Executive Order 13768 on January 25, 2017.  So

15   explain to me what you want and, for example, why you -- I

16   think Donald Trump began as President when, January 20, 2017?

17        MR. COX:  That's right, Your Honor.  Just to explain a

18   little more, I think when we originally had written out our

19   part of the joint status report, we didn't impose any time

20   limitations at all.  Our submission was responsive to the

21   respondents' proposal for limiting discovery moving forward to

22   a field of less than a year, from January 25 of 2017, which is

23   the date of the promulgation of the Executive Order, to the end

24   of 2017, which is the point at which last year's discovery

25   started.

1          THE COURT:  Here.  Let me help you on that.  Subject

2     to hearing from Ms. Larakers, I'm not inclined to put an end

3     date of December 31, 2017.  To the extent they've already

4     produced things that you'll ask for again, as you note, they

5     don't have to produce it again.  To the extent that you didn't

6     ask for everything or they didn't look for everything because

7     the time was compressed, they'd have to supplement it, which

8     they have a duty to do anyway, I think.

9          So to me the bigger issue is when does it start and,

10    given your theory of the case, why would discovery before

11    Donald Trump became President on January 20, 2017 be relevant?

12         MR. COX:  Well, that's precisely the time between the

13    promulgation of the regulations in 2016 to less than a year

14    later when the Executive Order was promulgated.  That's I think

15    essentially a baseline, what you can judge, you know, the

16    changes in behavior afterwards.

17         And I think here it seems like the proximate change in

18    ICE Boston was in, you know, late 2017, early 2018, but knowing

19    how the provisional waiver regulations were handled in the few

20    months after their promulgation before you saw the change

21    resulting from the Executive Order makes a big difference I

22    think in terms --

23         THE COURT:  What kind of discovery would you be

24    looking for?  Because I think there may be a concern that it

25    would be burdensome.

1          MR. COX:  I think that the one -- just to put a finer

2     point on it, I think one example is we don't want to get to a

3     point at deposition where we ask somebody who had been with ICE

4     Boston for a while, you know, after the Executive Order came

5     out, how did it compare to the policies and practices in 2016

6     after the regulations came out.  And with a strict time bar, I

7     would anticipate an objection saying, No, no, you can't ask

8     about anything before the Executive Order.  That's the sort of

9     practical issue.

10          I think in terms of documentary evidence, I don't want

11     to say we wouldn't be requesting it, but I do think it would be

12     targeted to things like, you know, high-level evidence

13     concerning the way that people who would have been class

14     members back then were treated prior to the promulgation of the

15     Executive Order.  That's the sort of thing we're looking for

16     and to have the latitude in depositions to ask questions that

17     compare the pre- and post-Executive Order regimes.

18          MS. LARAKERS:  Our concern is mainly with the

19     documentary evidence, Your Honor, because even a period of, you

20     know, six months there is a massive amount of emails.  It's a

21     massive amount of discovery that the agency has to go through.

22          So I think if we were going to compromise here, the

23     compromise would be to perhaps allow them to ask orally, and to

24     the extent the individual in the deposition stated that there

25     was a document, like a specific document that they need, then

1    we could work it out that way.  But our concern is even an

2    amount of time of six months, while it may not seem long, it

3    creates a massive amount of documents that, even if ultimately

4    only ten of them are responsive, we're still going to have to

5    review.  And I can imagine the search terms for doing that

6    electronic discovery would be something like provisional

7    waiver.  And in the months right after the promulgation of the

8    new regulation, I cannot imagine how many times DHS officials

9    used the words "provisional waiver."  So I think maybe we can

10   strike a balance there.

11          THE COURT:  So I am going to permit discovery of

12   matters beginning in 2016, you know, including depositions,

13   questions in depositions.  And would you have questions in

14   interrogatories, potentially?

15          MR. COX:  I think we might, Your Honor.  I absolutely

16   take my sister's point about the documentary burden.  And I

17   think one thing maybe we could consider is if a document is

18   referenced with some specificity in a deposition or we see

19   references to documents and other documents that have been

20   produced after 2016, those are very particularized requests we

21   could make, rather than opening the windows and --

22          THE COURT:  All right.  So I am authorizing, I'm

23   permitting discovery of matters beginning in 2016, including

24   questions in depositions and interrogatories and particularized

25   requests for documents that are not unduly burdensome.  And

1     again, you'll have to see what requests you get.  But it sounds

2     like it strikes the balance.

3          MS. LARAKERS:  Yes, Your Honor.  If I may clarify one

4     point.  Does that mean that it shouldn't be -- you know how you

5     have the instructions for discovery, and it says this is the

6     scope, and then all the questions are related to that time

7     period that goes back to 2016.  That's what I am understanding

8     the court to be cautioning against.

9          THE COURT:  Right.  Mr. Cox is saying, We're not going

10    to ask you for all documents relating to the implementation of

11    the provisional waiver provisions prior to January 20, 2017.

12    He's not going to ask for that.  But he is going to say, you

13    know, We're aware of a reference to a memo that was written in

14    September 2017 and issued to ICE Boston and others on how the

15    regulations ought to be interpreted, and we want that memo.

16         Do I understand you right?

17         MR. COX:  Yes, Your Honor.

18         THE COURT:  Okay.  So that's illustrative.

19         Then with regard, do you have a dispute as to whether

20    the four depositions that are taken or started should count

21    against the ten?  I'm inclined to say no.  And not to put a

22    time limit on the renewed deposition of Mr. Charles, but if the

23    defendants feel it's going on so long that it's unfairly

24    burdensome, come see me.  And he has many other important

25    things to do.  This case is very important, but he has other

1    important responsibilities, too.  So you ought to be able to

2    manage this.

3            MR. COX:  Yes, thank you, Your Honor.

4            THE COURT:  And then you have proposed schedule

5    amendments.  I don't think there's any provision in here for

6    initial disclosures.  Is there a reason for that?

7            MS. LARAKERS:  I think, Your Honor, because we have

8    exchanged so much discovery on our side at this point that, you

9    know, we've already done it.  However, if Your Honor would

10   like, we can build that in just to make sure that nothing is

11   overlooked.

12           THE COURT:  I'm just asking a question.  If the

13   parties don't think it's necessary, that's fine with me.

14           MS. LARAKERS:  Your Honor, on our end we haven't

15   received any discovery from plaintiffs, so I think it would be

16   good to build that in.

17           MR. COX:  I can say on the point about initial

18   disclosures, I think that was a deliberate choice.  I think as

19   my sister did represent, the record is better developed at this

20   stage than in typical cases.

21           On the point of bilateral discovery, I think that's

22   something that wasn't really raised in the filings.  It's a

23   little concerning to us because the conduct at issue here is

24   basically what USCIS or what -- excuse me -- what ICE Boston

25   and related agencies did with information in their possession

1    concerning the rights of class members.

2           From our perspective, that doesn't require or warrant

3    discovery into specific class members.  We're past the point of

4    class certification.  We're into the point of learning about

5    class-wide systemic conduct from ICE Boston.  Frankly, having

6    not discussed this with counsel for respondents, I'm not sure

7    what they have in mind for discovery from petitioners, but this

8    is really the first time I've heard it raised.  And that's a

9    concern I just wanted to flag for the court.

10          THE COURT:  Well, since you haven't discussed it, I'll

11   order you to discuss it.

12          MS. LARAKERS:  Okay, Your Honor.  That's reasonable,

13   Your Honor.  I will note that we will be seeking bilateral

14   discovery.

15          THE COURT:  Talk about what it would be so you can see

16   if you have a dispute or not.

17          All right.  So you want any motion to amend or

18   supplement the pleadings by December 6, 2019.  That's fine.

19   You wanted a settlement conference on January 13.  I'm going to

20   put that on January 20 at 3:00 because I may not be here on the

21   13th foreseeably.  Oh, you're going to confer.  Okay.  You're

22   going to confer by the 13th and report to me on settlement by

23   the 13th.  That's fine.  We'll put -- the 21st, there may be a

24   court meeting that afternoon, so we'll put the status

25   conference on January 22 at 3:00.

1              Do you anticipate any experts?

2              MR. COX:  No, Your Honor.  That was not something

3     anticipated.

4              THE COURT:  So fact discovery is to end -- well,

5     that's all discovery is to end by February 28, right?

6              MR. COX:  Yes, close of fact discovery.  Both sides

7     agree on that, yes.

8              THE COURT:  Report further with regard to settlement,

9     but I think you should have more than four days, five days.

10    Report by the 12th of March.  We'll have an -- and these dates

11    may change.  I'm not sure what my availability is going to be.

12    You'll report by the 13th of March, another Friday the 13th,

13    and we'll have conference at 3:00 on the 24th.  And you'll need

14    to report -- and you have this.  In your report, you'll tell me

15    whether either party believes there's a proper basis for

16    summary judgment and essentially the essence of the argument.

17    And then at that March 24th conference I'll either schedule you

18    for summary judgment or schedule you for trial.  I don't think

19    it makes sense to schedule a trial date right now without

20    knowing whether it's going to be interrupted.

21             MR. COX:  Your Honor, very briefly, on the settlement

22    conference point, at least from the petitioners' perspective,

23    when we included that date, that was what was reflected in your

24    model order, which I think contemplated having in front of a --

25    wouldn't have strictly been a private conference again between

1    the parties.  I think we're happy to do that just privately

2    without coming in to see a magistrate judge or something like

3    that.

4         THE COURT:  Right.  I have in mind that you're going

5    to confer with regard to settlement and report to me, and, you

6    know, you could report that you want to go to a magistrate

7    judge or a private mediator, but I don't see that as likely in

8    this case.

9         MR. COX:  Yeah.  Thank you.  I think that's right.  I

10   just wanted to clarify what we are intending to do by the 20th

11   of January.  Thank you.

12        THE COURT:  All right.  I'm not -- I'm going to give

13   you some guidance, but this is not a ruling.  You didn't

14   anticipate that I would address the motion to reconsider.  And

15   now it's 5:20, so I won't hear argument on it.  But it's my

16   current view that the order I issued requiring ICE to provide

17   monthly reports, while enforceable by contempt, is not an

18   injunction, so it doesn't implicate the question of whether the

19   court has the authority in this class action to issue an

20   injunction to the applicable statute, 1292(a)(1).

21        MS. LARAKERS:  Yes, Your Honor.

22        THE COURT:  Yeah.  I think that Wright & Miller

23   helpfully explain that an injunction is something that protects

24   some or all of the relief sought by the complaint or

25   basically -- well, here, let me do this a little differently.

1    That in order to be an injunction, the order must provide some

2    of the relief sought in the complaint even if it's not the most

3    important part of the requested relief.  That's 16 Federal

4    Practice and Procedure Section 3922, the third edition, Judge

5    McCune has a thoughtful decision on this for the Ninth Circuit

6    in In re:  Lorillard Tobacco.  It illustrates the point, 370 F.

7    3d 982 to 986-87.  The order I issued -- the complaint seeks an

8    injunction against removal of the aliens pursuing provisional

9    waivers.  My order doesn't address that at all.

10          So that's my current thinking.  That's not a ruling.

11   When I see you again, if you want to address that in your

12   supplementary briefing, you can.  But although the order I

13   issued is, as I said, enforceable as a matter of civil and/or

14   criminal contempt, it's not an injunction.  So it doesn't

15   require my deciding whether the court has the authority to

16   issue class-wide injunctive relief.

17          All right.  So I think you have a number of issues to

18   brief.  Whether my June 2018 discussion as to why ICE does not

19   have 90 days to do a detention review when it arrests somebody

20   after the removal period and the implications of Kisor for

21   that, I've told you what my current thinking is on whether ICE

22   is following the regulations with regard to 90-day and 180-day

23   reviews.  I haven't in candor, again, considered the interview

24   aspect of that.  So perhaps it could be explained more fully.

25          I've told you my tentative thinking on prejudice.  You

 1   might want to address that further.  I don't know if there are

 2   other issues I told you you could brief.  But how much time do

 3   you want to do this briefing?

 4          MS. LARAKERS:  Your Honor, may I suggest that we

 5   confer about that and get back to you very soon?

 6          THE COURT:  Yes.

 7          MS. LARAKERS:  Because I don't have my calendar on me.

 8          THE COURT:  These are substantial issues.

 9          MR. COX:  I agree with that, Your Honor.  That makes

10   sense to confer.

11          THE COURT:  Let me see your book, please.

12          (Phone interruption.)  I'll have to fine myself.

13   Judicial security.  Sorry.

14          Can you report back, would you like September 6,

15   September 9?  It's that time of year.  But what's a reasonable

16   date for you to have a thoughtful conference and report on the

17   schedule?

18          MR. COX:  September 9 would be I think good for us,

19   Your Honor.  Thank you.

20          THE COURT:  Take the 10th.  Maybe you don't have to

21   work on the weekend as much.  Somebody should get the weekend

22   off once in a while, I've been told.

23          All right.  Anything further in this matter for today?

24          MS. LARAKERS:  No, Your Honor.

25          MR. COX:  No, Your Honor.  Thank you.

1          THE COURT:  Court is in recess.

2          (Recess taken 5:21 p.m.)

3

4              - - - - - - - - - -

5          CERTIFICATE OF OFFICIAL REPORTER

6          I, Kelly Mortellite, Registered Merit Reporter and

7    Certified Realtime Reporter, in and for the United States

8    District Court for the District of Massachusetts, do hereby

9    certify that the foregoing transcript is a true and correct

10   transcript of the stenographically reported proceedings held in

11   the above-entitled matter to the best of my skill and ability.

12                    Dated this 30th day of August, 2019.

13

14              /s/ Kelly Mortellite

15              _____

16              Kelly Mortellite, RMR, CRR

17              Official Court Reporter

18

19

20

21

22

23

24

25