# EXHIBIT C

## [REDACTED]

**Page 1**

```
            UNITED STATES DISTRICT COURT
         OR THE DISTRICT O  MASSACHUSETTS

*********************************
LILIAN PAHOLA CALDERON JIMENEZ,
et al.,
            Petitioners ,
vs.                        CA NO.  : 8 CV  0225 MLW
KEVIN McALEENAN, et al.,
            Respondents.
*********************************

            CON IDENTIAL
   VIDEOTAPED DEPOSITION O  MARCOS CHARLES
   WILMER CUTLER PICKERING HALE AND DORR LLP
            60 State Street
          Boston, Massachusetts
          July  6, 20 9  9:56 a.m.




            Darlene M. Coppola
          Registered Merit Reporter
          Certified Realtime Reporter
```

**Page 2**

APPEARANCES:

Representing the Petitioners:

WILMER CUTLER PICKERING HALE AND DORR LLP
   60 State Street
   Boston, MA 02109
   BY:  MICHAELA P. SEWALL, ESQUIRE
        COLLEEN M. MC CULLOUGH, ESQUIRE
   T 617.526.6144
   E michaela.sewall@wilmerhale.com
-and-
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF MASSACHUSETTS, INC.
   211 Congress Street
   Boston, MA 02110
   BY:  ADRIANA LAFAILLE, ESQUIRE
   T 617.482.3170
   E alafaille@aclum.org
-and-
LAW OFFICE OF KATHLEEN M. GILLESPIE
   6 White Pine Lane
   Lexington, MA 02421
   BY:  KATHLEEN M. GILLESPIE, ESQUIRE
   T 339.970.9283
   E Kathleen.M.Gillespie@outlook.com

**Page 3**

APPEARANCES (Continued):

Representing the Respondents:

   U.S. DEPARTMENT OF JUSTICE
   Civil Division
   Office of Immigration Litigation
   Ben Franklin Station
   PO Box 868
   Washington, DC 20044
   BY:  MARY L. LARAKERS, ESQUIRE
   T 202.353.4419
   E mary.l.larakers@usdoj.gov
-and-
   U.S. DEPARTMENT OF JUSTICE
   United States Attorney's Office
   John Joseph Moakley U.S. Courthouse
   1 Courthouse Way
   Suite 9200
   Boston, MA 02210
   BY:  EVE A. PIEMONTE, ESQUIRE
   T 617.748.3369
   E eve.piemonte@usdoj.gov

**Page 4**

APPEARANCES (Continued):

Also Representing the Respondents:

   U.S. DEPARTMENT OF HOMELAND SECURITY
   15 New Sudbury Street
   Room 425
   Boston, MA 02203

Also Present

Matthew Costello, Esquire
Jonathan Cox, Esquire
Darryn Carroll, Videographer

Confidential
Transcript of Marcos Charles
Conducted on July 16, 2019

---

**5**

1                    IND X
2               XAM NAT ON
3  Witness Name                      Page
4  MARCOS CHAR S
5     Direct By Ms  Sewa              9
6

                   XH B TS
7
    xhibit      Description          Page
8
   No 1     Dec aration o Marcos     21
9           Char es
10 No 2     Dec aration o Acting     52
11          Deputy Fie d O ice
           Director Vance  y
12 No 3     Dec aration o Todd      101
           yons
13
   No 4     Memorandum dated        111
14          June 13, 2019
15 No 5     Dec aration o Acting    116
           Fie d O icer Director
16          Marcos Char es
17 No 6     Dec aration o Acting    134
           Fie d O ice Director
18          Marcos Char es
19 No 7     Dec aration o Acting    140
           Fie d O ice Director
20          Marcos Char es
21 No 8     Memo dated June 21,     148
           2019
22
   No 9     Spreadsheet             152
23
   No 10    Spreadsheet             155
24

---

**6**

1                  INDEX
2                EXHIBITS
3  Exh b     Desc p on              Page
4  No 11     Aff dav  f o  ICE      191
           Rep esen a ve
5
   No 12     Le e  da ed            271
6            Augus 22, 2018
7  No 13     Dec s on o Con nue     273
           De en on, A  adeu
8            Mendes
9  No 14     No ce o A en of        286
           F e Cus ody Rev ew
10
   No 15     Dec s on o Con nue     289
11          De en on
12 No 16     Dec s on o Con nue     300
           De en on
13
   No 17     No ce o A en of        307
14          F e Cus ody Rev ew
15 No 18     No ce o A en of        308
           F e Cus ody Rev ew
16
   No 19     Dec s on o Con nue     310
17          De en on
18 No 20     Dec s on o Con nue     312
           De en on
19
20
21
22
23
24

---

**7**

1         THE VIDEOGRAPHER:  Here
2  begins Disc No. 1 in the videotaped deposition
3  of Marcos Charles in the matter of Jimenez
4  versus Cronen, et al., in the United States
5  District Court, District of Massachusetts,
6  Case No. 1:18-CV-10225-MLW.
7         Today's date is July 16 2019 and the
8  time on the video monitor is 9:56 a.m. The
9  videographer today is Darryn Carroll
10 representing Planet Depos.  This video
11 deposition is taking place at 60 State Street,
12 Boston, Massachusetts.
13        Would counsel please voice identify
14 themselves and state whom they represent?
15        MS. SEWALL:  My name is Michaela
16 Sewall, and I represent the petitioners.  And
17 with me today is Colleen McCullough, also on
18 behalf of the petitioners; Andrea Lafaille, on
19 behalf of the petitioners; and Kathleen
20 Gillespie on behalf of the petitioners.
21        MS. LARAKERS:  My name is Mary
22 Larakers and I represent the respondents.
23        MS. PIEMONTE:  Eve Piemonte for
24 the respondents.

---

**8**

1         ███████████████████████
2  respondents.
3         THE VIDEOGRAPHER:  Thank you.
4  The court reporter today is Darlene Coppola
5  representing Planet Depos.
6         Will the reporter please swear in the
7  witness.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

---

9

1          MARCOS CHARLES,
2      a witness called for examination by
3  counsel for the Plaintiffs, having been
4  satisfactorily identified by the production
5  of his government identification badge,
6  being first duly sworn by the Notary
7  Public, was examined and testified as
8  follows:
9
10         MS. LARAKERS:  And I just want
11 it to be on the record that we'll proceed
12 under the usual stipulations, that all
13 objections, except as to form, are reserved
14 until the time of trial.  All motions to
15 strike are also reserved until the time of
16 trial.  And the witness has 30 days to read
17 and sign the transcript and waive any notary
18 and filing.  And then I also just wanted to
19 mark the entire transcript today as
20 confidential under the protective order.
21         MS. SEWALL:  No objection.
22         MS. LARAKERS:  Great.
23
24         DIRECT EXAMINATION

0

1  BY MS. SEWALL:
2     Q.  Good morning.
3     **A.  Good morning.**
4     Q.  Will you please state and spell your
5  name for the record?
6     **A.  Marcos Charles, M-A-R-C-O-S,**
7  **C-H-A-R-L-E-S.**
8     Q.  And do you understand that you're
9  testifying under oath today, Mr. Charles?
10    **A.  I do.**
11    Q.  Your answers are subject to the
12 penalty of perjury?
13    **A.  Yes.**
14    Q.  You'll give truthful testimony today,
15 correct?
16    **A.  Yes.**
17    Q.  I will be asking you a number of
18 questions today.  If you do not understand a
19 question that I ask you, just let me know so I
20 can change the question to make it clearer.
21        Do you understand that?
22    **A.  I do.**
23    Q.  If you need a break at any time, just
24 tell me or tell your attorney and we will try

1  to accommodate it.  The only -- the only time
2  we wouldn't take a break is if a question is
3  pending.  I would ask you to answer the
4  question, and then we can take the break
5  afterwards.
6     **A.  Understand.**
7     Q.  Do you understand that?
8     **A.  I do.**
9     Q.  If you realize at any time today that
10 your answer to a previous question was not
11 accurate or complete, please let me know so
12 that we can get that corrected on the record.
13        Do you understand that?
14    **A.  I do.**
15    Q.  And is there any reason why you would
16 not be able to recall events and testify
17 accurately here today?
18    **A.  No.**
19    Q.  Will you please describe your
20 educational background since high school?
21    **A.  Bachelor's degree in criminology,**
22 **University of Texas Gainesville -- sorry,**
23 **Texas A&M Gainesville.  I wish I went to UT.**
24 **And that's it.**

2

1     Q.  And where do you work currently?
2     **A.  I currently work for ICE ERO at the**
3  **Burlington office.**
4     Q.  What's your current title?
5     **A.  My current title is acting field**
6  **office director.**
7     Q.  And what is the jurisdiction of ICE
8  ERO Burlington office?
9     **A.  We oversee Vermont, New Hampshire,**
10 **Maine, Massachusetts, Connecticut, and Rhode**
11 **Island.**
12    Q.  And is -- is it generally referred to
13 as the Boston field office?
14    **A.  Yes, it is.**
15    Q.  Do you understand if I refer to that
16 office as ICE Boston today --
17    **A.  I do.**
18    Q.  -- or Boston field office, one of
19 those two?
20    **A.  Yes.**
21    Q.  And what are your current
22 responsibilities as -- you said acting FOD --
23    **A.  Yes.**
24    Q.  -- of ICE Boston?

3

1       A.   So as acting FOD of ICE Boston, I
2  oversee all activities, enforcement, including
3  arrests, detention, removal for all of
4  enforcement and removal in the Boston field
5  office.
6       Q.   Do you oversee orders of supervision?
7       A.   I do, not directly.  I have
8  supervisors that handle that.
9       Q.   Which supervisors handle that?
10      A.   Right now I have -- Assistant Field
11  Office Director Tony Schuler is over
12  nondetained ATD.
13      Q.   And so, generally speaking, an
14  assistant field office director would oversee
15  orders of supervision?
16      A.   Correct.
17      Q.   How many assistant field office
18  directors are there at ICE Boston?
19      A.   There are six on the books.
20      Q.   And one of them oversees orders of
21  supervision?
22      A.   He oversees nondetained, and ATD
23  orders of supervision are part of it.
24      Q.   What do the other assistant FODs do?

4

1       A.   Let's see.  I have an assistant field
2  office director over in Providence.  He
3  oversees the Providence area.  I have one in
4  Manchester that oversees St. Albans,
5  Manchester, and Portland, and then I have one
6  in Hartford that oversees Hartford.  There's
7  three.
8            I have a field -- or an assistant
9  field office director over custody management
10  and removal.  I also have an assistant field
11  office director that is detailed to
12  headquarters at this time.
13      Q.   So it sounds like you have --
14      A.   Is that right, six?
15      Q.   Four that are assigned to nondetained
16  and ATD orders of supervision in various
17  areas?
18      A.   No -- well, they cover their offices.
19      Q.   And what other responsibilities are
20  there besides nondetained and ATD orders of
21  supervision?
22      A.   For whom?
23      Q.   Do they all have the same
24  responsibility or do they all have different

5

1  responsibilities?
2            And let me clarify.
3            So I understand they're in different
4  geographic regions --
5       A.   Uh-huh.
6       Q.   -- but do those individuals have the
7  same responsibilities over those geographic
8  regions?
9       A.   Yes.
10      Q.   And what are those responsibilities?
11      A.   They manage the ongoings at their
12  offices, so every -- every aspect within that
13  office.
14      Q.   And I think we touched on this a
15  little bit, but what are your responsibilities
16  in your current role?  Can you list -- can you
17  tell me all of them at a high level?
18      A.   Everything, overseeing -- it just --
19  daily operations of the Boston field office to
20  include everything from administration,
21  procurement, budget, allocation of assets,
22  enforcement efforts, carrying out headquarter
23  directives and detention management, custody
24  management, removals.  Offhand, that's --

6

1  that's what I can think of.
2       Q.   And do you report to anybody?
3       A.   I do.
4       Q.   Who do you report to?
5       A.   I report to Deputy Assistant Director
6  Ricardo Wong, who is the DAD for ERO field
7  operations west -- or east.
8       Q.   And is he what you would say is your
9  first line of --
10      A.   Yes, he is.
11      Q.   -- first-line supervisor?
12      A.   Yes, he is.  He's my first-line
13  supervisor.
14      Q.   You have a second-line supervisor?
15      A.   Would be the assistant director for
16  field operations and headquarters, Henry
17  Lucero.
18      Q.   Anybody above him?
19      A.   The deputy executive assistant
20  director, who is currently David Marin,
21  acting.
22      Q.   Anybody else besides that?
23      A.   The executive assistant director,
24  Nathalie Asher.

7

1    Q.   Anybody above Nathalie Asher?
2    A.   The -- I don't know who the current
3 acting deputy director for ICE is right now.
4 I believe -- I can't remember who it is
5 offhand.
6    Q.   And then above that?
7    A.   The acting director, who is Matt
8 Albence.
9    Q.   And above that?
10    A.   I believe he answers to the deputy
11 secretary.
12    Q.   Does anybody report to you?
13    A.   Yes.
14    Q.   Directly?
15    A.   Yes.
16    Q.   Who reports to you directly?
17    A.   The deputy field office director and
18 acting deputy field office director.
19    Q.   What's the difference between a deputy
20 field office director and acting deputy field
21 office director?
22    A.   An acting deputy field office director
23 is an actual assistant field office director,
24 who has been given the responsibility as an

8

1 acting deputy for a short period of time.
2    Q.   How many deputy field office directors
3 report to you?
4    A.   I have one deputy field office
5 director and one acting field office director.
6    Q.   Who's the deputy field office
7 director?
8    A.   Todd Lyons.
9    Q.   And who's the acting field office
10 director?
11    A.   Currently, I believe it is Vance Ely.
12    Q.   And is the acting deputy field office
13 director a rotating position?
14    A.   Yes.
15    Q.   How does that work?
16    A.   They rotate monthly.
17    Q.   Monthly?
18    A.   Monthly.
19    Q.   And it is an assistant field office
20 director who fills the job?
21    A.   Correct.
22    Q.   And you had listed six assistant field
23 office directors.  Do they all rotate into the
24 position?

9

1    A.   No, they do not.
2    Q.   Who rotates into the position?
3    A.   The assistant field office directors
4 that are currently in charge of the
5 suboffices.
6    Q.   And who are those individuals?
7    A.   That would be Vance Ely, Aldean
8 Beaumont, and Todd Thurlow.
9    Q.   How long have you worked at ICE?
10    A.   I've worked for ICE since 2008.
11    Q.   And what other positions have you held
12 at ICE?
13    A.   Assistant officer in charge,
14 supervisory detention deportation officer,
15 assistant field office director, deputy chief
16 of staff, acting deputy chief of staff, deputy
17 field office director.
18    Q.   Where were those positions located?
19    A.   Assistant officer in charge of the
20 Eloy Detention Center in Phoenix field office;
21 supervisory detention deportation officer at
22 the Tucson suboffice in the Phoenix field
23 office; assistant field office director for
24 Oklahoma in Oklahoma for the Dallas field

20

1 office; deputy chief of staff at ERO
2 headquarters; acting chief of staff, ERO
3 headquarters; deputy field office director,
4 Boston; and acting field office director,
5 Boston.
6    Q.   And you came to work in the Boston
7 field office on February 3, 2019; is that
8 correct?
9    A.   Yes.
10    Q.   You started as a deputy field office
11 director?
12    A.   Correct.
13    Q.   Why did you come to the Boston office?
14    A.   I was promoted as a field -- as a
15 deputy field office director.
16    Q.   Were you offered the position in
17 Boston?
18    A.   I was initially offered the position
19 in St. Paul Minnesota, and it got moved to
20 Boston.
21    Q.   How -- why did it get moved to
22 Boston?
23    A.   They needed a deputy field office
24 director in Boston.

2

1    Q.   Who offered you the position in
2  Boston?
3    **A.   I believe it was, at the time, the**
4  **deputy executive associate director, Corey**
5  **Price.**
6    Q.   And you became acting field office
7  director on May 1, 2019; is that correct?
8    **A.   I believe it was May 2nd or May 5th.**
9  **I don't believe it was the 1st.**
10
11       (Exhibit No. 1 marked for
12  identification.)
13
14  BY MS. SEWALL:
15    Q.   The court reporter has handed you
16  what's been marked Exhibit 1.
17       Do you recognize this document?
18    **A.   Yes.**
19    Q.   It's a declaration that you have
20  submitted in this case, correct?
21    **A.   (Witness reviews document.)**
22       **That's -- yeah, May 1st, May 1st.**
23    Q.   Sorry.  If you just listen to the
24  question, it's --

22

1    **A.   I'm sorry.**
2    Q.   That's okay.
3       This is a declaration you've submitted
4  in this case, correct?
5    **A.   Correct.**
6    Q.   And if you go to the third page,
7  that's your signature?
8    **A.   Correct.**
9    Q.   Correct?
10    **A.   Correct.**
11    Q.   And it was signed on May 2, 2019?
12    **A.   Yes.**
13    Q.   And if you turn to the first
14  paragraph, the last sentence -- the first
15  paragraph says you are currently serving as
16  the acting field office director for the
17  Boston office.
18       The second sentence says you've been
19  serving in this position since May 1, 2019,
20  correct?
21    **A.   Correct.**
22    Q.   So does that refresh your
23  recollection --
24    **A.   Yes.**

23

1    Q.   -- starting date?
2    **A.   Yes.**
3    Q.   Were you offered the position as
4  acting field office director?
5    **A.   I was placed in the position of acting**
6  **field office director.**
7    Q.   Who placed you in the position?
8    **A.   The -- it would have been the**
9  **assistant director for field operations at the**
10  **time.**
11    Q.   Why were you offered the position?
12    **A.   I was placed there because Acting**
13  **Field Office Director Todd Lyons had exhausted**
14  **his acting time of 240 days.**
15    Q.   And did you -- why did you accept the
16  position?
17    **A.   Because that's my duty as deputy field**
18  **office director.**
19    Q.   In any of your prior positions at ICE,
20  has a court made a finding that you or your
21  field office acted improperly?
22    **A.   No.**
23    Q.   Have you ever testified at trial
24  before?

24

1    **A.   Yes.**
2    Q.   Which trial?
3    **A.   I've testified as an arresting officer**
4  **several times.  I don't recall the cases.**
5    Q.   Have you ever been deposed before?
6    **A.   Yes.**
7    Q.   How many times?
8    **A.   Once, maybe twice.**
9    Q.   And what were the -- what was the
10  subject matter of those cases?
11    **A.   One was an EEO filing and I was a**
12  **supervisor at the time for border patrol, and**
13  **one was a lawsuit by somebody that was**
14  **arrested by border patrol.**
15    Q.   Any others you can think of?
16    **A.   No.**
17    Q.   So that sounds like two cases you
18  provided deposition testimony in?
19    **A.   Correct.**
20    Q.   When did you first learn about this
21  litigation?
22    **A.   When I was notified I was coming to**
23  **Boston, so maybe December 2018.**
24    Q.   How did you learn about it?

25
1    A.   I was informed by then the Acting
2 Field Office Director Todd Lyons.
3    Q.   What did he say to you about it?
4    A.   That there was ongoing litigation
5 based on some detainees that hadn't received
6 POCRs in time.
7    Q.   Anything else?
8    A.   No.  It was pretty general.
9    Q.   And when did you first learn that you
10 were going to give a deposition in this case?
11    A.   At court.  I don't remember the date.
12    Q.   From that day to today, have you
13 talked with anyone other than counsel about
14 your deposition?
15    A.   No.
16    Q.   Do you understand that you're
17 appearing here today as a representative of
18 ICE on a particular topic?
19    A.   I do.
20    Q.   The topic is how the Boston ERO
21 identifies individuals as Calderon class
22 members and its supervision, arrest,
23 detention, and removal of these class members
24 from July 30, 2018 to the present.

26
1        Do you understand that?
2    A.   Correct.
3    Q.   Did you do anything to prepare to
4 testify on this topic?
5    A.   Yes.
6    Q.   What did you do?
7    A.   I --
8        MS. LARAKERS:  Object.  Don't --
9 you can say that you talked to us, but not the
10 conversation.
11        THE WITNESS:  Yes.
12        MS. SEWALL:  I'll ask more
13 specific questions.
14        MS. LARAKERS:  Okay.
15 BY MS. SEWALL:
16    Q.   Did you review any documents?
17    A.   Yes.
18    Q.   Approximately how many documents did
19 you review?
20    A.   I don't recall.
21    Q.   Did any of those documents refresh
22 your recollection on issues you're going to
23 testify about today?
24    A.   Yes.

27
1    Q.   Which documents?
2    A.   All of them.
3    Q.   Do you remember any of the -- what the
4 documents were?
5    A.   They were declarations and case
6 summaries.
7    Q.   Whose declarations?
8    A.   It was AFOD, Alan Greenbaum, and
9 acting FOD, Todd Lyons.
10    Q.   Did you review your declarations?
11    A.   I did not.
12    Q.   What were the case summaries?
13    A.   There were several case summaries I
14 reviewed, Calderon class members.
15    Q.   Do you remember any particular?
16    A.   No, not specifically.
17    Q.   Did you meet with your attorneys?
18    A.   I did.
19    Q.   How long did you meet with them?
20    A.   Several hours.
21    Q.   And when was that meeting?
22    A.   Yesterday.
23    Q.   Did you talk to anyone other than
24 attorneys?

28
1    A.   No.
2    Q.   When you say you reviewed case
3 summaries of Calderon class members, what are
4 case summaries?
5    A.   Just that, just the summary of what I
6 reviewed before making decision on removal.
7    Q.   So is it -- is it somebody's A-file?
8    A.   No, just a case summary.
9    Q.   Where are these case summaries
10 located?  Are they located in a database at
11 ICE?
12    A.   No, they're not.
13    Q.   They're physical copies?
14    A.   No.  They're just an e-mail, e-mail
15 case summaries.  And I did review some of the
16 case summaries through our enforcement removal
17 module, ER.
18    Q.   So first, on the e-mail case
19 summaries, what's the process for creating
20 these?
21    A.   The deportation officer in charge of
22 that case puts together a summary and forwards
23 it up the chain.
24    Q.   Are these created only for removal



**29**

1 decisions?
2    A.   The ones I reviewed were.
3    Q.   Are there ones that are created for
4 arrest and detention decisions?
5    A.   Not that I -- not that I look at.
6 There may be, but I don't know.
7    Q.   Who would you ask if you wanted to
8 find that out?
9    A.   I would ask my deputy field office
10 director.
11   Q.   What's done with the case summaries
12 after they're created by the deportation
13 officer and moved up the chain?
14   A.   Once they get to me?
15   Q.   Does anything happen before they get
16 to you besides coming from the deportation
17 officer?
18   A.   They're reviewed by the supervisors in
19 the chain.
20   Q.   Do the supervisors add to it?
21   A.   If need be.
22   Q.   What sort of information might they
23 add?
24   A.   Whatever may be needed.

**31**

1    A.   Correct.
2    Q.   These case summaries are used in
3 removal decisions, correct?
4    A.   Correct, along with several other
5 items.
6    Q.   What other items are used?
7    A.   For removal decision?
8    Q.   Correct.
9
10
11
12
13
14   Q.   What about information for arrest and
15 detention?
16   A.   As what -- I'm sorry, can you...
17   Q.   Sorry.  Yes, I'll rephrase.
18
19
20
21
22   Q.   What information do you know is used
23 in arrest and detention decisions?
24   A.   For illegal aliens just in general

**30**

1    Q.   Anything in particular that you can
2 think of?
3    A.   No.
4    Q.   What sort of information does a
5 deportation officer include in the case
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

**32**

1
2
3
4
5
6    A.   In general, it's going to be -- well,
7 first off, I'm not talking about a case
8 summary at this point, but as a first -- when
9 I was a first-line supervisor, my deportation
10 officers reviewed the criminal history, their
11 flight risk, their last known location,
12 family, if they were married, if they had
13 children.  Let's see.  Property, everything
14 that would -- that would need to be considered
15 before making an arrest and keeping officer
16 safety in mind.
17   Q.   For both removal decisions and arrest
18 and detention decisions, you mentioned that
19 the officers would consider flight risk.
20        What goes into a flight risk
21 consideration?
22   A.   There is a consideration of when the
23 subject entered the country, if he has an
24 established address, if that person has failed

33

1  to report to any court dates, if the person
2  has been on supervision before and absconded.
3  Criminal history would also be considered in
4  there, if they have any outstanding wants or
5  warrants for criminal violations.
6      Q.  So aside from case summaries and
7  declarations, did you review anything else in
8  preparation for your deposition that refreshed
9  your recollection?
10     A.  No.
11     Q.  Do you understand if I refer to this
12 litigation it's the Calderon class action?
13     A.  Yes, I do.
14     Q.  You understand it's a class action,
15 correct?
16     A.  Correct.
17     Q.  What's your understanding of the
18 class?
19     A.  The class is people with final orders,
20 who have pending or approved I-130 petition by
21 their USC spouse, who have not left the
22 country based on that final order of removal.
23     Q.  And what is your understanding of why
24 this litigation was brought?

34

1      A.  To my understanding, it's because
2  initially there was a finding that there were
3  several detainees that weren't getting their
4  post-ordered custody reviews in time and then
5  have expanded from there.
6      Q.  What did it expand into, in your
7  understanding?
8      A.  To arrests made at USCIS for people
9  that were going for their I-130 interviews.
10     Q.  Anything else?
11     A.  I think that's pretty general.
12     Q.  So you mentioned POCR, the detained
13 violations, which was POCR violations,
14 correct --
15     A.  Correct.
16     Q.  -- and arrests at USCIS for people
17 going for I-130 interviews?
18     A.  Correct.
19     Q.  Can you think of anything else?
20     A.  I mean, furtherance for the
21 provisional waiver from -- based on the I-130.
22     Q.  Have you heard the term "provisional
23 waiver process" before?
24     A.  Yes.

35

1      Q.  When did you first hear that term?
2      A.  When I got to Boston.
3      Q.  And what -- what do you -- what do you
4  understand the provisional waiver process to
5  be?
6      A.  Subjects who are here with a -- that
7  are in the country illegally who have been
8  petitioned -- or are the recipients of a
9  petition by their USCIS spouse or child in
10 order for them to stay in the United States,
11 not to return to their country, while awaiting
12 for possible legal status in the United
13 States.
14     Q.  Who told you about the provisional
15 waiver process?
16         MS. LARAKERS:  Objection.  Don't
17 answer to the extent that it involves
18 conversations with counsel.
19     A.  Okay.  I discussed it with acting AFOD
20 Lyons -- or I'm sorry, Acting FOD Lyons at the
21 time.
22     Q.  What was the approximate date of that
23 conversation?
24     A.  Sometime between February and May.

36

1      Q.  Of?
2      A.  2019.
3      Q.  And was that an in-person conversation
4  or over e-mail or some other --
5      A.  In person.
6      Q.  Did you take any notes?
7      A.  I did not.
8      Q.  Do you understand what the procedure
9  of the provisional waiver process is, which
10 applications need to be filled out?
11     A.  I know generally.  I don't know
12 specifically every step that's a USCIS
13 function.
14     Q.  What's your general understanding?
15     A.  Is that they have to have an approved
16 I-130 or I-212, and then they can process for
17 an I-601A.
18     Q.  And then what happens once they
19 process for an I-601A?
20     A.  I'm not sure specifically what
21 happens.  I do know they do not have to return
22 to their country in order to apply for any
23 kind of benefits at that point.
24     Q.  What's the purpose of the provisional

37

1  waiver process?
2      **A.   I don't understand that question.**
3      Q.   You understand that the provisional
4  waiver process is codified in regulations,
5  correct?
6      **A.   Correct.**
7      Q.   And regulations have the force of law,
8  correct?
9      **A.   Correct.**
10     Q.   What is stated in those regulations as
11 the purpose of the provisional waiver process?
12     **A.   I can't recite it, but I believe part**
13 **of it is to keep family unity so that the**
14 **person doesn't have to be separated from his**
15 **or her family while awaiting the disposition**
16 **of their case.**
17     Q.   Do you know who's eligible to
18 participate in the provisional waiver process?
19     **A.   I don't know specifically, no.**
20     Q.   You understand that the Calderon class
21 members are eligible to participate in the
22 provisional waiver process?
23     **A.   I am.**
24     Q.   What makes somebody ineligible to

38

1  participate in the provisional waiver process?
2      **A.   I'm not sure on -- on all those**
3  **aspects.**
4      Q.   Would a disturbing-the-peace
5  conviction disqualify somebody?
6      **A.   I don't know.**
7      Q.   Would a resisting-arrest conviction
8  disqualify somebody?
9      **A.   I don't know.**
10     Q.   Would a disorderly-conduct conviction
11 disqualify somebody?
12     **A.   I don't know.**
13     Q.   Would a speeding ticket disqualify
14 somebody?
15     **A.   I don't know.**
16     Q.   Would a driving-without-a-license
17 conviction disqualify somebody?
18     **A.   I don't know.**
19     Q.   Would a DUI conviction disqualify
20 somebody?
21     **A.   I don't know.**
22     Q.   Would an OUI conviction disqualify
23 somebody?
24     **A.   I don't know.**

39

1      Q.   Would a drug-possession conviction
2  disqualify somebody?
3      **A.   I don't know.**
4      Q.   Would a drug-distribution conviction
5  disqualify somebody?
6      **A.   I would imagine if it's a felony, yes.**
7      Q.   Is it your understanding a felony
8  disqualifies somebody --
9      **A.   No, it's not.**
10     Q.   -- from participating in the
11 provisional waiver process?
12     **A.   No.**
13     Q.   Do you know if a felony disqualifies
14 somebody from participating in a provisional
15 waiver process?
16     **A.   No, I don't.**
17     Q.   Would a theft conviction disqualify
18 somebody from participating in the provisional
19 waiver process?
20     **A.   I don't know.**
21     Q.   Would an assault conviction disqualify
22 somebody?
23     **A.   I don't know.**
24     Q.   Would being separated from your spouse

40

1  disqualify somebody?
2      **A.   I don't know.**
3      Q.   Do you know how long you would have to
4  be separated from your spouse before it would
5  disqualify somebody --
6      **A.   No.**
7      Q.   -- if it did?
8      **A.   I do not.**
9      Q.   Has ICE conducted a formal training
10 for ICE Boston employees on the provisional
11 waiver process?
12     **A.   No.**
13     Q.   Has ICE distributed any written
14 guidance to ICE Boston employees on the
15 provisional waiver process?
16     **A.   No.**
17     Q.   Has ICE distributed any documents to
18 ICE Boston employees describing the
19 provisional waiver process?
20     **A.   Can you repeat that one?**
21     Q.   Has ICE Boston distributed -- or
22 has -- sorry.
23          Has ICE distributed any documents to
24 ICE Boston employees describing the

4

1  provisional waiver process?
2      **A.  No.**
3      Q.  Has ICE distributed any documents to
4  ICE Boston employees concerning the
5  provisional waiver process at all?
6      **A.  No.**
7      Q.  Has ICE distributed a written manual
8  to ICE Boston employees on the provisional
9  waiver process?
10     **A.  No.**
11     Q.  Has ICE given ICE Boston employees any
12 written guidance on how to consider the
13 provisional waiver process?
14     **A.  Can you repeat that again, please?**
15     Q.  Has ICE given ICE Boston employees any
16 written guidance on how to consider the
17 provisional waiver process?
18     **A.  No.**
19     Q.  Has ICE distributed any written
20 guidance to ICE Boston employees on how to
21 consider the provisional waiver process in
22 removal decisions?
23     **A.  No.**
24     Q.  Has ICE distributed any written

43

1  supervisory decisions?
2      **A.  No.**
3      Q.  Has ICE distributed any written
4  guidance to ICE Boston employees on how to
5  identify Calderon class members?
6      **A.  No.**
7      Q.  Has ICE conducted any formal training
8  for ICE Boston employees on this litigation --
9      **A.  No.**
10     Q.  -- the Calderon litigation?
11     **A.  (Witness nodding.)**
12     Q.  Has ICE distributed any written
13 guidance to ICE Boston employees on the
14 Calderon litigation?
15     **A.  No.**
16     Q.  Has ICE distributed any documents to
17 ICE Boston employees describing the Calderon
18 litigation?
19     **A.  No.**
20     Q.  Has ICE distributed any documents to
21 ICE Boston employees concerning the Calderon
22 litigation at all?
23     **A.  No.**
24     Q.  Has ICE distributed any written

42

1  guidance to ICE Boston employees on how to
2  consider the provisional waiver process in
3  detention decisions?
4      **A.  No.**
5      Q.  Has ICE distributed any written
6  guidance to ICE Boston employees on how to
7  consider the provisional waiver process in
8  arrest decisions?
9      **A.  No.**
10         MS. LARAKERS:  I'm sorry,
11 objection.  Can you, just for the record,
12 clarify ICE HQ or ICE Boston as giving ICE
13 Boston for those questions?
14         MS. SEWALL:  When I say ICE, I
15 just -- it could be anybody at ICE.
16         MS. LARAKERS:  Okay.
17 BY MS. SEWALL:
18     Q.  If you don't understand my question at
19 any time, you can always ask me.
20         Did you understand my question?
21     **A.  I did.**
22     Q.  Has ICE distributed any written
23 guidance to ICE Boston employees on how to
24 consider the provisional waiver process in

44

1  guidance to ICE Boston employees on how the
2  Calderon litigation might effect removal
3  decisions for class members?
4      **A.  No.**
5      Q.  Has ICE distributed any written
6  guidance to ICE Boston employees on how the
7  Calderon litigation may affect detention
8  decisions for class members?
9      **A.  No.**
10     Q.  Has ICE distributed any written
11 guidance to ICE Boston employees on how the
12 Calderon litigation may effect arrest
13 decisions for class members?
14     **A.  No.**
15     Q.  Has ICE distributed any written
16 guidance to ICE Boston employees on how the
17 Calderon litigation may affect supervisory
18 decisions for class members?
19     **A.  No.**
20     Q.  When you arrived at ICE Boston as a
21 deputy FOD in February 2019, did you receive
22 any training on the provisional waiver
23 process?
24     **A.  No.**

Transcript of Marcos Charles
Conducted on July 16, 2019

---

45

1    Q.   When you arrived at ICE Boston as
2  deputy FOD in February 2019, did you receive
3  any training on the Calderon litigation?
4    **A.   No.**
5    Q.   When you became acting FOD of ICE
6  Boston on May 1, 2019, did you receive any
7  training on the provisional waiver process?
8    **A.   No.**
9    Q.   When you became acting FOD of ICE
10 Boston on May 1, 2019, did you receive any
11 training on the Calderon litigation?
12   **A.   No.**
13   Q.   Who decides if an alien on an order of
14 supervision is to be removed?
15   **A.   Who decides if they'll be removed or**
16 **who decides to put them in removal to bring**
17 **them in and arrest them, two different things?**
18   Q.   Who decides if they'll be removed?
19   **A.   The FOD or deputy field office**
20 **director will make the final decision on**
21 **removal of a Calderon class member on all**
22 **Calderon class members.**
23   Q.   And before the FOD or deputy FOD makes
24 the final decision, what's the decision-making

---

46

1  process before that?
2    **A.   I'm sorry?**
3    Q.   You said the FOD or deputy FOD makes
4  the final decision, correct?
5    **A.   Correct.**
6    Q.   Who -- based on what do they make the
7  final decision?
8    ███████████████████████████████████
9    ███████████████████████████████████
10   ███████████████████████████████████
11   ███████████████████████████████████
12   ███████████████████████████████████
13   Q.   So before we get to what you
14 consider -- and my question was not clear, so
15 this is my fault.
16       But who makes -- I guess who makes the
17 initial decision on removals?  If the deputy
18 FOD or the FOD makes the final decision, who
19 makes the initial decisions?
20   **A.   I don't understand the question**
21 **because they don't just decide to remove.  I**
22 **mean, there's processes -- there's steps prior**
23 **to removal if somebody is on nondetained.**
24   Q.   Can you describe the steps prior to

---

47

1  removal?
2    **A.   Well, they have to be taken into**
3  **custody initially.**
4    Q.   Do they always have to be taken into
5  custody?
6    **A.   For us to remove them, yes.  For them**
7  **to remove themselves, no.**
8    Q.   Can they receive instructions to leave
9  the country?
10   **A.   Yes.**
11   Q.   Is that not considered removal by ICE?
12   **A.   Yeah, I mean, it's a removal.  We're**
13 **not executing it physically, but it is a**
14 **removal.**
15   Q.   So if -- they don't necessarily have
16 to be taken into custody in order to be
17 removed?
18       MS. LARAKERS:  Objection.
19 Form.
20 BY MS. SEWALL:
21   Q.   You can answer.
22   **A.   They can remove themselves at that**
23 **point, but in order for us to physically**
24 **remove them, they have to be taken into**

---

48

1  **custody or we have to verify departure.**
2    Q.   So for somebody on an order of
3  supervision, they could either be taken into
4  custody and removed by ICE or they could be
5  ordered by ICE to leave the country at a
6  certain date, correct?
7    **A.   They can follow their final removal**
8  **order based on the immigration judge and**
9  **remove themselves.**
10   Q.   Correct, but the two avenues that I'm
11 talking about right now would be either
12 they're taken into custody by ICE and removed
13 by ICE or ICE instructs them to leave.
14       Those are two avenues that they could
15 leave, correct?
16       MS. LARAKERS:  Objection.  Form.
17   **A.   No, not really.  I think that maybe**
18 **we're not under -- I'm not understanding your**
19 **question clearly, but if somebody is -- if the**
20 **final order of removal is executed and ICE**
21 **tells them that they have to leave on a**
22 **certain date, we're not ordering them removed.**
23 **We've just following through with the**
24 **immigration judge's order of removal.**

49

1  BY MS. SEWALL:
2      Q.  What happens if they don't leave on
3  that date that ICE orders them?
4      A.  If -- then we will most likely take
5  them into custody and have them removed.
6      Q.  And do you have -- does the -- does
7  the FOD --
8      A.  I just want to clarify.
9      Q.  Sure.
10     A.  That is just in general, not
11 specifically Calderon class members.
12     Q.  Does you -- does  the FOD or the
13 deputy FOD make the final decision on whether
14 to order somebody who's under an order of
15 supervision to remove?
16             MS. LARAKERS:  Objection.  Form.
17     A.  Again, that's -- are you speaking
18 general or Calderon class members?
19 BY MS. SEWALL:
20     Q.  General.
21     A.  General, no, that's not at that level.
22 That's not made by the FOD or deputy FOD.
23     Q.  Who makes that decision, generally?
24     A.  That usually would be the deputation

50

1  officer with the assistance of the concurrence
2  with the SDDO and maybe the assistant field
3  office director, depending on the case.  It's
4  case by case.  It all depends.  None of
5  them are -- it's not a catch-all.
6      Q.  And then what -- and does the FOD or
7  deputy FOD make the final decision on whether
8  to order somebody who's under an order of
9  supervision to remove when it's a Calderon
10 class member?
11             MS. LARAKERS:  Objection.  Form.
12     A.  Can you repeat the question?
13 BY MS. SEWALL:
14     Q.  Does the FOD or the deputy FOD make
15 the final decision on whether to order a
16 Calderon class member who's under an order of
17 supervision to remove?
18             MS. LARAKERS:  Objection.  Form.
19     A.  The -- field office director or DFOD
20 will make the final review and have the final
21 say in the removal of a Calderon class member.
22     Q.  And who brings the case to the DFOD's
23 attention?
24     A.  The assistant field office director.

5

1      Q.  Who brings it to it assistant field
2  office director's attention?
3      A.  The supervisory detention deportation
4  officer.
5      Q.  Who brings it to the supervisory
6  detention deportation officer's attention?
7      A.  The deportation officer.
8      Q.  And that's the bottom of the chain,
9  correct?
10     A.  Correct.
11     Q.  And the DFOD position is rotating,
12 right?
13     A.  Correct, the acting DFOD position is
14 rotating.
15     Q.  And the current DFOD is Todd Lyons,
16 and the current acting DFOD is Vance Ely,
17 correct?
18     A.  Yes.
19     Q.  Have either of them been trained on
20 the provisional waiver process?
21     A.  I don't know.
22     Q.  Have either of them been trained on
23 the Calderon litigation?
24     A.  When you say "trained," can you be

52

1  specific on training?
2      Q.  Has there been any formal training on
3  the Calderon litigation for those two
4  individuals?
5      A.  No.  When I say -- when you're saying
6  "formal," they haven't been sat down and gone
7  through any -- we've spoken about it, and
8  they've read court documents based on Judge
9  Wolf's decisions.
10
11     (Exhibit No. 2 marked for
12 identification.)
13
14 BY MS. SEWALL:
15     Q.  Do you recognize this document?
16     A.  I do.
17     Q.  It is the declaration of Acting Deputy
18 Field Office Director Vance Ely, correct?
19     A.  Correct.
20     Q.  And it's date -- signed by Mr. Ely?
21     A.  Yes.
22     Q.  And it is dated July 10, 2019,
23 correct?
24     A.  Correct.

53

1    Q.  If you turn to Paragraph 4, the third
2  sentence says, "Further, I am writing this
3  declaration to ensure the Court that I am
4  aware of the ongoing litigation in this matter
5  and have read the following orders as directed
6  by the Court."
7        And then it lists a memorandum and
8  order from June 10, 2018 and a memorandum and
9  order from September 21, 2018.
10       Do you see that?
11       MS. LARAKERS:  Objection.
12   **A.  Yes.**
13 **BY MS. SEWALL:**
14   Q.  When did Mr. Ely first read those
15 orders?
16   **A.  I don't know.**
17       MS. LARAKERS:  Objection.
18 BY MS. SEWALL:
19   Q.  How many times did Mr. Ely read those
20 orders?
21   **A.  I don't know.**
22       MS. LARAKERS:  Objection.
23 BY MS. SEWALL:
24   Q.  Was Mr. Ely making final decisions

54

1  about removal of class members before he read
2  these orders?
3    **A.  I don't know.**
4    Q.  Mr. Ely did not receive any training
5  on the provisional waiver process, correct?
6    **A.  Correct.**
7    Q.  He did not receive any training on
8  this Calderon litigation, correct?
9    **A.  Formal training, no.**
10   Q.  This -- if you turn to Paragraph 5, he
11 writes, "Additionally, I write this
12 declaration to state that, consistent with the
13 court's June 28, 2019 order, after reading the
14 above orders concerning detention and removal,
15 I discussed each with Marcos Charles, acting
16 field office director for the Boston field
17 office, and with counsel representing the
18 government in this case."
19       Do you see that?
20   **A.  Yes.**
21   Q.  When did this conversation occur?
22       MS. LARAKERS:  Objection.
23   **A.  I don't recall the exact date.**
24 **BY MS. SEWALL:**

55

1    Q.  Do you recall approximately when it
2  occurred?
3        MS. LARAKERS:  Objection.
4    **A.  No.  Within the last two to three**
5  **weeks.**
6  **BY MS. SEWALL:**
7    Q.  This declaration was submitted on July
8  10, correct?
9    **A.  Correct.**
10   Q.  So sometime before then?
11   **A.  Yes.**
12   Q.  And if you -- if you look at Paragraph
13 4, the second sentence says, "I am writing
14 this declaration in response to the court's
15 June 28, 2019 order," correct?
16   **A.  Correct, so sometime between June 28**
17 **and July 10.**
18   Q.  And you don't remember an approximate
19 date within that range?
20   **A.  No.**
21       MS. LARAKERS:  Objection.
22 BY MS. SEWALL:
23   Q.  Who was present at the -- at this
24 conversation?

56

1        MS. LARAKERS:  Objection.
2    **A.  I believe it was me, Vance Ely, Aldean**
3  **Beaumont, Todd Thurlow.  I don't recall who**
4  **was on from counsel.**
5  **BY MS. SEWALL:**
6    Q.  Was it an in-person conversation?
7    **A.  It was the --**
8        MS. LARAKERS:  Objection.
9    **A.  -- phone.**
10 **BY MS. SEWALL:**
11   Q.  Everybody was on the phone?
12   **A.  Correct.**
13       MS. LARAKERS:  Objection.
14 BY MS. SEWALL:
15   Q.  Teleconference?
16   **A.  Teleconference.**
17       MS. LARAKERS:  Objection.
18 BY MS. SEWALL:
19   Q.  How long did the conversation last?
20       MS. LARAKERS:  Objection.
21 Sorry, I don't want to have keep objecting.
22 It's a simple thing.
23       I just -- you asked which
24 conversation, and I think there are two.  So

57

1 can you clarify which conversation you're
2 talking about in Paragraph 5, and then I won't
3 object to the line of questioning.  There may have
4 been two conversations.  It may have been
5 one, but it was a compound question, so -- and
6 I don't want to have to keep objecting because
7 it's simple.
8          MS. SEWALL:  That's okay.  You
9 can keep objecting --
10          MS. LARAKERS:  Okay.
11          MS. SEWALL:  -- but thank you
12 for letting me know.
13 BY MS. SEWALL:
14   Q.   Going back to my question on who was
15 present, you said it was you, Vance Ely, Todd
16 Thurlow?
17   **A.   Aldean Beaumont.**
18   Q.   Aldean Beaumont and counsel, but you
19 don't remember who?
20   **A.   I don't remember who from counsel was**
21 **on.**
22   Q.   And that conversation occurred
23 sometime between June 28 and July 10?
24   **A.   Correct, at least -- it was at least**

58

1 **one conversation.  It may have been a couple.**
2   Q.   Do you remember how many conversations
3 you had with these individuals?
4   **A.   I speak with my AFODs all the time,**
5 **so no.**
6   Q.   I'm -- so I'm referencing specifically
7 this Paragraph 5 in Vance Ely's declaration,
8 where he says, "After reading the above orders
9 concerning detention and removal, I discussed
10 each with Marcos Charles, acting field office
11 director, and with counsel representing the
12 government in this case."
13          Was this, what he's referring to, one
14 conversation or more than one conversation?
15   **A.   I don't know.**
16   Q.   You don't have any recollection?
17   **A.   No, I don't know what he's referring**
18 **to exactly in his declaration.  I don't know**
19 **if he's referring to one conversation or more**
20 **than one conversation.**
21   Q.   But there was at least one
22 conversation, one teleconference --
23   **A.   Correct.**
24   Q.   -- that we talked about?

59

1   **A.   (Witness nodding.)**
2   Q.   How long did that teleconference
3 last?
4   **A.   I don't remember.**
5   Q.   Did it last an hour?
6   **A.   I don't know.**
7   Q.   Half hour?
8   **A.   (Witness nodding.)**
9   Q.   Ten minutes?
10   **A.   I don't remember.  It was definitely**
11 **not ten minutes.**
12   Q.   So it could have been twenty minutes
13 to an hour?
14   **A.   I don't think I've ever been on a**
15 **teleconference less than ten -- that's only**
16 **ten minutes.**
17          **Sure, something like that.  Anywhere**
18 **between a half hour and an hour.**
19   Q.   Anywhere between a half hour and an
20 hour?
21   **A.   Yeah.**
22   Q.   Mr. Ely was the assistant field office
23 director for eleven years until July 2, 2019,
24 when he became acting deputy field office

60

1 director, correct?
2   **A.   I'm sorry, can you repeat that?**
3   Q.   Mr. Ely was an assistant field office
4 director for eleven years until July 2, 2019,
5 when he became the acting deputy field office
6 director, correct?
7   **A.   I don't know specifically how long he**
8 **has been an assistant field office director.**
9 **Looking at his declaration -- I don't know.**
10 **Is it in there?  I -- yeah, I don't know how**
11 **long he's been in that -- assistant field**
12 **office director.**
13   Q.   If you look at --
14   **A.   Yeah, eleven years, Paragraph 2.**
15   Q.   Why did Mr. Ely become a deputy FOD on
16 July 2, 2019?
17   **A.   Rotation.**
18   Q.   And who is Mr. Ely's predecessor?
19   **A.   I believe it was Aldean Beaumont.**
20 **Prior to that was Todd Thurlow.**
21   Q.   And before -- before Mr. Ely became --
22 when -- sorry.  Scratch that.
23          Before this conversation that we
24 discussed, the teleconference that we just

6

1  discussed --
2    A.  Uh-huh.
3    Q.  -- had you discussed the court's
4  orders with Mr. Ely, Mr. Beaumont, or
5  Mr. Lyons -- sorry, no.
6      -- Mr. Ely,  Mr. Beaumont, or Mr.
7  Thurlow.
8        MS. LARAKERS:  Objection.
9    A.  Not specifics, no.
10 BY MS. SEWALL:
11   Q.  And you don't know if any of those
12 individuals had read the court's orders before
13 sometime between June 28 and July 10, correct?
14       MS. LARAKERS:  Objection.
15   A.  I don't know.
16 BY MS. SEWALL:
17   Q.  But at least, when they were deputy
18 FODs, they were making final removal
19 decisions, correct?
20       MS. LARAKERS:  Objection.
21   A.  As an acting deputy FOD, they have the
22 authority to make final removal decisions.
23 BY MS. SEWALL:
24   Q.  Including Calderon class members?

62

1    A.  Including Calderon class members.
2      As acting deputy field office
3  directors, for those three specifically, they
4  are only the acting field office directors for
5  suboffice, not the Burlington office.
6    Q.  They're acting deputy field office
7  directors?
8        MS. LARAKERS:  Objection.
9    A.  Correct.
10 BY MS. SEWALL:
11   Q.  Who is the acting deputy field office
12 director for the Burlington office?
13   A.  Todd Lyons.  He's not acting.  He's
14 the deputy field office director.  He's -- he
15 covers the whole -- all of Boston AOR.
16   Q.  So will you please tell me a complete
17 list of every person at ICE Boston who makes
18 the final decision whether to remove a
19 Calderon class member in any situation?
20   A.  Myself, Deputy Field Office Director
21 Todd Lyons.  In case we would have to, it
22 could be Vance Ely, Aldean Beaumont, Todd
23 Thurlow.  It would be very rare for any of
24 those three to make that decision.

63

1    Q.  In what circumstances would they make
2  the decision?
3        MS. LARAKERS:  Objection.
4    A.  It would -- it would just be a rare
5  occasion.  Most -- most of the time Todd or I
6  are available.
7  BY MS. SEWALL:
8    Q.  So it would occur when you or Todd
9  were not available to make the decision?
10       MS. LARAKERS:  Objection.
11   A.  It could.
12 BY MS. SEWALL:
13   Q.  And what other circumstances would it
14 occur?
15   A.  I -- that's how rare it would be.  I
16 can't really think of what circumstances it
17 would be.  It could happen.  It would just be
18 rare.
19   Q.  Who decides if an alien is to be
20 detained?
21   A.  Detention is -- on any -- again, any
22 alien?
23   Q.  Yes.
24   A.  By the deportation officer.

64

1    Q.  And the deportation officer makes the
2  final decision on that on detainment?
3        MS. LARAKERS:  Objection.
4    A.  They will -- they'll discuss it with
5  their supervisor and possibly their AFOD
6  before actually putting somebody in detention.
7  BY MS. SEWALL:
8    Q.  Who decides if a Calderon class member
9  is to be detained?
10   A.  Deputy field office director or field
11 office director or acting deputy field office
12 director.
13     Is it okay if I just say FOD, DFOD,
14 and acting?
15   Q.  Yes.
16   A.  Okay.  Thank you.
17   Q.  I would ask that you say acting or
18 assistant because AFOD gets a little
19 confusing.
20   A.  Okay.
21   Q.  What are the steps taken to decide if
22 a Calderon class member is to be detained?
23       MS. LARAKERS:  Objection.
24   A.  Can you be more specific with that

65

1  question?
2  BY MS. SEWALL:
3      Q.  Sure.  DFOD makes -- the acting FOD,
4  the DFOD, or the acting DFOD will make the
5  final decision on whether to detain, you
6  testified, correct?
7      A.  Correct.
8      Q.  Who -- where do you get -- where do
9  you hear from the case -- who tells you about
10 the case?
11          MS. LARAKERS:  Objection.
12     A.  The AFOD.
13 BY MS. SEWALL:
14     Q.  Is that the assistant?
15     A.  Assistant field office director.
16     Q.  And who tells the assistant field
17 office director?
18     A.  Either the SDDO or the DO.
19     Q.  What's a DO?
20     A.  Deportation officer.
21     Q.  How many SDDOs are there in the Boston
22 field office?
23     A.  15, 18.  I don't remember how many
24 positions -- actual positions we have, but I

66

1  think that's what we have available right now.
2      Q.  Did those 15 to 18 people ever read
3  the court's orders in this litigation?
4      A.  Not to my knowledge.  I don't know.
5      Q.  Did you ever talk to those 15 to 18
6  people about the court's orders in this
7  litigation?
8      A.  Not specifically.
9      Q.  Did you ever communicate with them in
10 any way about the court's orders in this
11 litigation?
12     A.  Yes.
13     Q.  How did you communicate with them?
14     A.  Sent the broadcast e-mail outlining
15 the findings of the court along with meetings
16 with the AFODs and supervisors who then met
17 with their staff.
18     Q.  When did you meet with the AFODs and
19 supervisors?
20     A.  I meet with them weekly.
21     Q.  And when did you discuss this
22 litigation with them?
23     A.  It's been discussed a few times.
24     Q.  You discussed it with them a few

67

1  times?
2      A.  Yes.
3      Q.  Do you recall the dates?
4      A.  No.
5      Q.  And when you said AFODs and
6  supervisors, is that -- is the supervisor
7  SDDOs?
8      A.  Correct.
9      Q.  So you've implemented with the SDDOs
10 in person?
11     A.  Yes.
12     Q.  All 15 to 18 of them?
13     A.  No.
14     Q.  How many SDDOs have you met with?
15     A.  The ones that were -- are at the
16 Burlington office, so ten.
17     Q.  When did that meeting occur?
18     A.  It's a weekly meeting.
19     Q.  You meet with them each week to talk
20 about this case?
21     A.  No.
22     Q.  Do you recall which -- the approximate
23 date that you did -- you did talk about this
24 case with them?

68

1      A.  I believe the last time I spoke to the
2  supervisory staff and mentioned the Calderon
3  litigation was last week.
4      Q.  Was counsel present at that meeting?
5      A.  No.
6      Q.  What did you say at that meeting to
7  them?
8      A.  I don't recall specifics.  I just know
9  that it's -- it's a weekly topic --
10     Q.  What --
11     A.  -- subtopic.
12     Q.  What generally would you say to them
13 at these meetings?
14     A.  To make sure that they're following
15 the guidance that was put out --
16     Q.  What was the guidance that was put
17 out?
18     A.  -- in the e-mail.
19         It just described who was -- who the
20 class members were, the steps that they need
21 to take in order to document class membership,
22 what they need to do to ensure that anybody
23 that may be a class member -- that information
24 is properly recorded within all arrests and

69
1 detention documents, who can -- who is the
2 authority to approve arrests, detention, and
3 removal for Calderon class members.  I'm sure
4 there's something I'm missing, but that's what
5 I can remember offhand.
6    Q.   Who makes the arrest decisions?
7    A.   Generally?
8    Q.   For Calderon class members.
9    A.   For Calderon class members, it has to
10 be approved by assistant field office
11 director.
12    Q.   By the assistant field office
13 director, you said?
14    A.   Correct, for the unit.  And if the
15 assistant field office director for the unit
16 is not available, they have to move it forward
17 to the deputy field office director or acting
18 deputy field office director.
19    Q.   So there are six assistant field
20 office directors, correct?
21    A.   Correct.
22    Q.   Have they read the court's orders in
23 this case?
24    A.   I don't know if all six have read.  I

70
1 know three have.
2    Q.   Which three have read?
3    A.   Vance Ely, Aldean Beaumont, and Todd
4 Thurlow.
5    Q.   The other three, you don't know about?
6    A.   No.
7    Q.   But they can make final arrest
8 decisions on Calderon class members,
9 correct?
10    A.   Correct.
11    Q.   And they have not received any
12 training on the provisional waiver process,
13 correct?
14    A.   Correct.
15         MS. LARAKERS:  Objection.
16 BY MS. SEWALL:
17    Q.   I want to turn to the e-mail you sent
18 to the SDDOs and the DOs.
19    A.   Okay.
20    Q.   Has everybody read that e-mail?
21         MS. LARAKERS:  Objection.
22    A.   I believe everybody -- well, I can't
23 say yes for sure, but everybody that -- all
24 deportation officers had to sign a sign-in

7
1 sheet indicating that they had read it and
2 that they had discussed it with their
3 supervisor.
4 BY MS. SEWALL:
5    Q.   So every SDDO and DO needed to sign a
6 sign-in sheet to confirm that they had read
7 the e-mail that you sent?
8    A.   Correct.
9         MS. LARAKERS:  Objection.
10    A.   Well, I don't know about the e-mail,
11 but that they had discussed it with -- I can't
12 remember the wording on what they were
13 specifically supposed to do, but I know that
14 they had to meet with their DOs and the DOs
15 had to sign in saying that they were -- that
16 they had discussed the -- the e-mail with
17 their supervisors.
18 BY MS. SEWALL:
19    Q.   So only -- so you don't know if they
20 read it, but they had to confirm that they
21 discussed it with their supervisors?
22    A.   Correct.
23         MS. LARAKERS:  Objection.
24 BY MS. SEWALL:

72
1    Q.   And their supervisor are the SDDOs?
2         MS. LARAKERS:  Objection.
3    A.   Correct.
4 BY MS. SEWALL:
5    Q.   And you're not sure if the SDDOs have
6 read it?
7         MS. LARAKERS:  Objection.
8    A.   I -- I think they had to sign in also.
9 BY MS. SEWALL:
10    Q.   What sort of sign-in sheets are these?
11    A.   Just a basic sign-in sheet, name.
12    Q.   Where are they kept?
13    A.   I believe they're kept in our office.
14    Q.   Did any of the SDDOs or DOs come to
15 you with any questions on your e-mail?
16    A.   No.
17    Q.   Did any of the assistant FODs come to
18 you with questions on your e-mail?
19    A.   Not that I recall.
20    Q.   Did Todd Lyons ever send out an e-mail
21 similar to what you were describing?
22    A.   Maybe.
23    Q.   Do you know one way or the other?
24    A.   I know he sent out e-mails before

73

1  about the Calderon litigation.
2      Q.  To all SDDOs and DOs?
3      A.  To the field office.
4      Q.  To the entire field office?
5      A.  Yes.
6      Q.  And were there sign-in sheets required
7  for people to certify that they read the
8  e-mails?
9      A.  I don't know.
10     Q.  Besides these e-mails, has there been
11 any informal training at the Boston field
12 office on the provisional waiver process?
13     A.  Just those discussions.
14     Q.  Has there been any informal training
15 at the Boston field office on the Calderon
16 litigation?
17     A.  Well, that's what -- I'm sorry, that's
18 what I meant on the Calderon litigation.
19     Q.  Was there any on the provisional
20 waiver process, generally?
21     A.  Not that I know of.
22     Q.  Judge Wolf has ordered that ICE Boston
23 has certain obligations to class members,
24 correct?

74

1              MS. LARAKERS:  Objection.
2      A.  I -- okay, yes.
3  BY MS. SEWALL:
4      Q.  The Calderon class members?
5      A.  The Calderon class members.
6      Q.  Is that correct?
7              MS. LARAKERS:  Objection.
8      A.  Yes.
9  BY MS. SEWALL:
10     Q.  Did you understand those obligations?
11             MS. LARAKERS:  Objection.
12     A.  Yes.  I'm not sure what you're
13 referring to with "obligations."  Can you
14 define those?
15 BY MS. SEWALL:
16     Q.  What do you understand he's ordered
17 ICE Boston to do with respect to Calderon
18 class members?
19     A.  Take any consideration that their
20 provisional waiver says.
21     Q.  What does that mean to you?
22     A.  That we have to consider that they may
23 be eligible for a provisional waiver prior to
24 removing the class member.

75

1      Q.  Do you consider whether an individual
2  is eligible for the provisional waiver process
3  prior to moving the class member?
4              MS. LARAKERS:  Objection.
5      A.  I wouldn't know if they're eligible
6  because I don't work for USCIS.  That would be
7  a USCIS call, if they were actually eligible.
8  BY MS. SEWALL:
9      Q.  So you don't know if somebody's
10 eligible -- if a -- if somebody is eligible
11 for a provisional waiver?
12             MS. LARAKERS:  Objection.
13     A.  No.
14 BY MS. SEWALL:
15     Q.  How do you find out if somebody's
16 eligible for the provisional waiver process?
17     A.  I would have to discuss that with CIS.
18     Q.  Do you discuss it with CIS?
19     A.  I do not personally.
20     Q.  Who discusses it with CIS?
21     A.  I don't know at what point if any --
22 the only time we talk to CIS on where they are
23 in the process is when we have to talk to them
24 to see who actually filed the I-130, and that

76

1  doesn't always indicate that they're in the
2  process for the provisional waiver.
3      Q.  When do you talk to CIS to find out if
4  somebody filed an I-130?
5      A.  I don't.
6      Q.  When does ICE Boston, anyone at ICE
7  Boston, talk to CIS?
8      A.  The deportation officer would -- once
9  they see that they have an I-130 either
10 pending or approved, would contact USCIS to
11 find out who petitioned for that individual.
12     Q.  And is that the only question that
13 they ask, who petitioned for the individual?
14     A.  I don't know.  I don't know.
15     Q.  You don't know the process?
16     A.  No.
17             MS. LARAKERS:  Objection.
18     A.  I don't know if they ask that
19 question, what other questions they may ask.
20 BY MS. SEWALL:
21     Q.  Do you know what information they look
22 to get?
23             MS. LARAKERS:  Objection.
24     A.  Based on what?  Because there's

77

1 several different things that we could be
2 asking for.
3 BY MS. SEWALL:
4    Q.   So you said when a deportation officer
5 sees that an I-130 application is pending or
6 approved for an individual, they call CIS --
7    A.   Uh-huh.
8    Q.   -- to ask for certain information?
9    A.   Correct.
10        MS. LARAKERS:  Objection.
11 BY MS. SEWALL:
12   Q.   What information do they ask for?
13   A.   The only thing that I'm concerned with
14 in this case would be whether or not they --
15 who -- who was petitioning for that
16 individual.  If CIS -- they may also ask if
17 they have any other petitions outstanding that
18 are in record, and that would also be looked
19 at.
20   Q.   But they might not ask that?
21   A.   They may not.
22   Q.   But they will ask who petitioned for
23 the individual?
24   A.   Definitely.

78

1    Q.   And so, as you understand the court's
2 order, you're obligated to take and to
3 consider the provisional -- whether somebody
4 is eligible for provisional waiver process
5 prior to removal a Calderon class member --
6        MS. LARAKERS:  Objection.
7 BY MS. SEWALL:
8    Q.   -- correct?
9    A.   I believe that -- can you repeat that?
10 Sorry.
11 BY MS. SEWALL:
12   Q.   As you understand the court's order,
13 you're obligated to consider whether a person
14 is considered for the -- whether a person is
15 eligible for the provisional waiver process
16 prior to removal of that person?
17   A.   No.
18        MS. LARAKERS:  Objection.
19   A.   My understanding is that they are in
20 process to -- not that they are eligible, but
21 that they could be eligible.
22 BY MS. SEWALL:
23   Q.   But you don't know whether somebody
24 could be eligible?

79

1    A.   I do not.
2    Q.   How do you consider it?
3    A.   I'm sorry?
4    Q.   How do you consider it if you don't
5 know --
6        MS. LARAKERS:  Objection.
7 BY MS. SEWALL:
8    Q.   -- whether somebody's eligible?
9    A.   That's the whole thing, can they be
10 eligible.  Could they be eligible or are they
11 eligible are two different things.
12   Q.   Which one do you consider?
13   A.   Could they be eligible.
14   Q.   How do you consider could they be
15 eligible if you don't --
16   A.   If they have a pending I-130 or an
17 approved I-130.  And if they're -- if they
18 have moved forward to a 601A, we'll definitely
19 look at that also.
20   Q.   So you do have an understanding of
21 whether they could be eligible for a
22 provisional waiver process?
23        MS. LARAKERS:  Objection.
24   A.   My understanding is, if they have a

80

1 pending or approved I-130, then I must
2 consider that fact, that they could be
3 eligible for a 601A waiver, before I remove
4 them.
5 BY MS. SEWALL:
6    Q.   Do you understand that -- do you
7 understand the court's order to apply to
8 detention and removal decisions -- I mean,
9 detention and arrest decisions?
10        MS. LARAKERS:  Objection.
11   A.   I'm sorry?
12 BY MS. SEWALL:
13   Q.   Do you understand the court's order to
14 apply to detention and arrest decisions?
15        MS. LARAKERS:  Objection.
16   A.   I don't understand the question.
17 BY MS. SEWALL:
18   Q.   Are you obligated to consider whether
19 somebody could be eligible for a provisional
20 waiver in executing detention and arrest
21 decisions?
22   A.   No.
23        MS. LARAKERS:  Objection.
24 BY MS. SEWALL:

8

1    Q.   Are you obligated to consider whether
2 somebody could be eligible for the provisional
3 waiver process in executing decisions
4 regarding orders of supervision?
5            MS. LARAKERS:  Objection.
6    A.  No.
7 BY MS. SEWALL:
8    Q.   Do you consider whether somebody could
9 be eligible for the provisional waiver process
10 in executing arrest and detention decisions?
11            MS. LARAKERS:  Objection.
12    A.  Can you repeat that, please?
13 BY MS. SEWALL:
14    Q.   Do you consider whether somebody could
15 be eligible for the provisional waiver process
16 in executing arrest and detention decisions?
17            MS. LARAKERS:  Objection.
18    A.  I consider the fact that somebody is a
19 Calderon class member before a detention
20 decision.
21 BY MS. SEWALL:
22    Q.   Is that different from considering
23 whether that person is eligible for the
24 provisional waiver process in executing an

82

1 arrest and detention decision?
2            MS. LARAKERS:  Objection.
3    A.  Yes.
4 BY MS. SEWALL:
5    Q.   How?
6    A.  A Calderon class member would have to
7 be petitioned by a USC spouse.
8    Q.   How do you consider the fact that
9 somebody is a Calderon class member before a
10 detention decision?
11            MS. LARAKERS:  Objection.
12    A.  I'm -- I'm a little confused by the
13 question.  How do I consider it?
14 BY MS. SEWALL:
15    Q.   Yes.
16    A.  Like, can you be more specific with
17 that?
18    Q.   How does it factor into your
19 consideration?
20
21
22
23
24

83

1 there's -- it varies case by case.
2            Again, it's not a -- everybody's the
3 same, either everybody gets detained or nobody
4 gets detained.  That's not what I look at.
5 Every case is different.
6    Q.   How do you consider the fact that
7 somebody could be eligible for the provisional
8 waiver process in your detention decisions?
9            MS. LARAKERS:  Objection.
10    A.  Is that the same question?
11 BY MS. SEWALL:
12    Q.   Do you want me to repeat it?
13    A.  It sounded like the same question you
14 just asked me.
15    Q.   I'll repeat it.
16        How do you consider the fact that
17 somebody could be eligible for the provisional
18 waiver process in your detention decisions?
19            MS. LARAKERS:  Objection.
20    A.  Same thing, it's case-by-case basis.
21 There's different factors in every case.
22 BY MS. SEWALL:
23    Q.   Can you give me any information on how
24 you consider it?

84

1
2
3
4
5
6    Q.   What difference does it make that they
7 could be eligible for the waiver?
8            MS. LARAKERS:  Objection.
9
10
11
12
13
14
15
16
17
18
19
20
21            MS. LARAKERS:  Objection.
22    A.  Would their -- can you re -- I want to
23 make sure I understand the question.  Can you
24 repeat it?

85

1  BY MS. SEWALL:
2      Q.  Sure.  I'll rephrase.
3      A.  Okay.
4      Q.  Do you -- do you only consider --
5  scratch that.
6          How do you weight the fact that
7  somebody's a Calderon class member in your
8  detention decisions?
9          MS. LARAKERS:  Objection.



24  BY MS. SEWALL:

86

21          MR. LARAKERS:  Objection.
22      A.  Can you repeat it, please?
23  BY MS. SEWALL:
24      Q.  Would somebody's status as a Calderon

87

1  class member affect a removal decision
2  differently than it would affect an arrest or
3  detention decision?
4          MS. LARAKERS:  Objection.
5      A.  Yes.
6      Q.  How?
7          MS. LARAKERS:  Objection.
8      A.  In order for -- I have to take into
9  consideration that they could be eligible for
10 a provisional waiver on removal.  While under
11 arrest and detention, I don't.
12 BY MS. SEWALL:
13     Q.  Do you consider it in arrest and
14 detention decisions?
15         MS. LARAKERS:  Objection.
16     A.  I'm sorry?
17 BY MS. SEWALL:
18     Q.  Do you consider it in arrest and
19 decisions?
20         MS. LARAKERS:  Objection.
21     A.  What's "it"?  I'm sorry.
22 BY MS. SEWALL:
23     Q.  Do you consider a person's eligible
24 for the provisional waiver process in arrest

88

1  and detention decisions?
2      A.  I do.  I -- on detention decision, I
3  look at that, but on the arrest decision,
4  that's made by the AFOD.
5      Q.  Does the AFOD consider a person's
6  eligibility for provisional waiver process in
7  the arrest -- in his or her arrest decision?
8      A.  They consider that it is a Calderon
9  class member in their arrest decision.
10     Q.  How does it factor into their
11 decision?
12         MS. LARAKERS:  Objection.
13     A.  Again, it's got to be taken as a
14 whole.  It can't be -- it's not just one
15 thing, but it's at a higher level.  There's
16 more scrutiny because they're a Calderon class
17 member.
18 BY MS. SEWALL:
19     Q.  Have you provided any guidance to --
20 have you provided any guidance to an AFOD on
21 how to consider a person's eligibility for
22 provisional waiver process in an arrest
23 decision?
24     A.  No.

89

1    Q.   What instruction have you given, if
2  any, to AFODS concerning how to consider a
3  person's eligibility for a provisional waiver
4  process in an arrest decision?
5    A.   That they have to consider the fact
6  that they are a Calderon class member before
7  making an arrest of that individual.
8    Q.   And you don't tell them -- you haven't
9  given them any guidance on how to consider
10 that fact?
11   A.   No.
12        MS. LARAKERS:  Objection.
13   A.   I believe my AFODs know their job.
14 BY MS. SEWALL:
15   Q.   And what is their job?
16        MS. LARAKERS:  Objection.
17   A.   To supervise their units properly and
18 to make sure that arrests are conducted
19 properly.
20 BY MS. SEWALL:
21   Q.   And so how would it be improper --
22 would it be improper for them to fail to
23 consider that somebody is a Calderon class
24 member?

90

1        MS. LARAKERS:  Objection.
2    A.   If they did not take into account that
3  it was Calderon class member, they would
4  definitely be spoken with.
5  BY MS. SEWALL:
6    Q.   What would they be told?
7        MS. LARAKERS:  Objection.
8    A.   They need to make sure that they
9  consider the fact that this is a Calderon
10 class member prior to making any decisions.
11 BY MS. SEWALL:
12   Q.   And if I'm an AFOD and I ask you, "How
13 I'm supposed to consider that," what would you
14 say?
15        MS. LARAKERS:  Objection.
16   A.   I would say you have to take into
17 account that they may be eligible for
18 provisional waiver.
19 BY MS. SEWALL:
20   Q.   And if I say to you, "Why does it
21 matter that they're eligible for provisional
22 waiver," what would you say?
23        MS. LARAKERS:  Objection.
24   A.   Because we have to -- in order to

91

1  remove that individual, we have to take into
2  consideration their eligibility for the -- the
3  waiver.  So if we are going to -- the arrest
4  as it -- is at a lower threshold because an
5  arrest can still allow somebody to be put on
6  supervision and not detention.  I'm -- only
7  reason I detain people is to remove them.
8    Q.   So what does that mean, it's at a
9  lower level, you don't have to think about it
10 as much?
11        MS. LARAKERS:  Objection.
12   A.   If I arrest somebody and put them in
13 process but they will stay on a nondetained
14 docket, then that still allows them to
15 continue with their provisional waiver
16 process, if that's what they are seeking.
17 BY MS. SEWALL:
18   Q.   So why -- so is it -- it doesn't come
19 into play as much in an arrest decision?  Is
20 that what you're telling me?  I don't
21 understand.
22        MS. LARAKERS:  Objection.
23   A.   It's still a consideration because, if
24 we arrest somebody and put them in detention

92

1  and they try to -- and then try to remove
2  them, we have to consider the fact that they
3  may be eligible for petition -- for
4  provisional waiver.
5  BY MS. SEWALL:
6    Q.   And if I asked you how you consider
7  the fact that they're eligible for provisional
8  waiver, you couldn't tell me?
9    A.   It's --
10        MS. LARAKERS:  Objection.
11   A.   It varies.  There's nothing -- you
12 have to take the totality of the case.
13 You can't just -- it's not one thing.
14 BY MS. SEWALL:
15   Q.   So you have to take it as the totality
16 of the case.  How does it weigh into the
17 totality of the case?
18        MS. LARAKERS:  Objection.
19   A.   On arrest or detention or removal?
20 BY MS. SEWALL:
21   Q.   All of them.
22   A.   Again, it's -- it's -- I'm not going
23 to speculate as to what case is what.  If you
24 want to ask me about a specific case you want to ask me about,

93

1   I may be able to help answer a question on
2   that.  But in general, it depends.  It -- just
3   every case is different.
4       Q.   So you have no high-level description
5   of how it might affect an arrest decision, a
6   detention decision, or a removal decision; is
7   that correct?
8            MS. LARAKERS:  Objection.
9       A.   It's scrutinized more if it's a
10  Calderon class member.
11  BY MS. SEWALL:
12      Q.   In what way is it scrutinized more?
13      A.   Well, when we have to -- we have
14  reporting requirements that we have to abide
15  by and we have -- there's more effort put into
16  a Calderon class member due to all the
17  reporting requirements that have been put on
18  us by the court.
19      Q.   So you have to do more because you
20  have to later put the arrest down on a
21  report?
22           MS. LARAKERS:  Objection.
23      A.   Not really, but we do have to identify
24  the Calderon class member, and we have to

94

1   monitor that, and we monitor the cases
2   throughout detention.  And again, if we're
3   going to make an arrest, it's because I want
4   to make a removal on that individual.  And
5   when I say "I," I mean ICE ERO Boston field
6   office.
7       Q.   So you testified that an arrest,
8   detention, or removal decision will be
9   scrutinized more if it's a Calderon class
10  member because you have reporting
11  requirements, correct?
12      A.   That's one of the reasons.
13           MS. LARAKERS:  Objection.
14  BY MS. SEWALL:
15      Q.   What's another reason?
16      A.   There's several reasons.  I mean,
17  again, I can't just be -- I can't be specific
18  on a reason, or one or two reasons.  Every
19  case is different and every case requires, you
20  know, review at some point to decide whether
21  or not to arrest that person.
22           A Calderon member that is arrested
23  still has -- again, may be eligible for that
24  provisional waiver, and that's one of

95

1   considerations we have to take.
2       Q.   So you said there's several reasons
3   that an arrest, detention, or removal decision
4   will be scrutinized more if it's a Calderon
5   class member in addition to the reporting
6   requirements?
7       A.   Correct.
8       Q.   What are those several reasons?
9            MS. LARAKERS:  Objection.  Asked
10  and answered.
11      A.   It's just -- there's several different
12  ones.  Again, I can't be specific on every
13  reason because every case is different.
14  BY MS. SEWALL:
15      Q.   So you can tell me that there are
16  several reasons, but you can't tell me the
17  several reasons?
18           MS. LARAKERS:  Objection.
19      A.   It depends on the case.
20           MS. PIEMONTE:  Would now be a
21  good time to take a break?
22           MS. SEWALL:  Sure, yes.
23           MS. LARAKERS:  Thank you.
24           THE VIDEOGRAPHER:  We are off

96

1   the record at 11:28 a.m.
2
3            (Recess taken from 11:28 a.m.
4            to 11:45 a.m.)
5
6            THE VIDEOGRAPHER:  We are on the
7   record at 11:45 a.m.
8   BY MS. SEWALL:
9       Q.   Hello again.
10      A.   Hello.
11      Q.   You mentioned an e-mail you sent to
12  the office of -- to the entire Boston office
13  about the Calderon litigation, correct?
14      A.   Correct.
15      Q.   When did you send that e-mail?
16      A.   I don't remember the date.
17      Q.   Do you remember the approximate date?
18      A.   It was in May.
19      Q.   Early May or late May?
20      A.   Late May, mid to late May.
21      Q.   And you didn't -- you don't know if
22  Mr. Lyons had sent any sort of similar e-mail
23  before you became acting FOD?
24           MS. LARAKERS:  Objection.

97

1    A.   I know he sent out an e-mail regarding
2  Calderon litigation.  I don't remember the
3  specifics of that e-mail.
4  BY MS. SEWALL:
5    Q.   What were the specifics of your
6  e-mail?
7    A.   Is it -- is that like the same -- we
8  talked about this one before, correct?
9    Q.   Yes.
10    A.   It gave direction on who was
11  authorized to approve arrests of class
12  members, detention of class members, removal
13  of class members, the steps that the officer
14  needed to take to record the fact that they
15  were a Calderon class member, within
16  different -- at different stages, within EARM,
17  within different documents.  That's pretty
18  general, but...
19    Q.   Anything else?
20    A.   I don't recall.  If you have it, I can
21  probably look at it.
22    Q.   I don't have it, no.
23    A.   Yeah, I don't recall.
24    Q.   And besides sending that e-mail, you

98

1  mentioned you had some conversations with your
2  deputy FODs and assistant FODs?
3    A.   My AFODS, my SDDOs, and my DFOD.
4    Q.   You had in-person conversations with
5  FODs, SDDOs, and DFODs?
6    A.   I had teleconferences with the AFODs,
7  some in-person with the AFODS that are in
8  Burlington, same thing with the supervisors in
9  Burlington.
10    Q.   Did you have conversation with AFODs
11  who are not in Burlington?
12         MS. LARAKERS:  Objection.
13    A.   Yes, teleconference.
14  BY MS. SEWALL:
15    Q.   And you can't recall when these
16  conversations occurred?
17    A.   No.
18    Q.   You can't recall how long they
19  lasted?
20    A.   No.
21    Q.   You can't recall what was discussed?
22    A.   No, not specifically.
23    Q.   Do you recall generally what was
24  discussed?

99

1  A.   As I stated before, we have weekly
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

00

1    A.   meetings with the AFODs and
2  supervisors where we discuss all topics of
3  what's going on within the field office.
4    Q.   Do you recall generally what was
5  discussed with respect to the Calderon
6  litigation?
7    A.   Not specifically -- generally, we just
8  discussed the -- the last meeting, which was
9  last week was to ensure -- just a reminder to
10  ensure that deportation officers, what they
11  were supposed to be -- as far as documentation
12  in the of case of class members.
13    Q.   So the conversation that you can
14  remember is to remind the deportation officers
15  to continue documenting Calderon class
16  members?
17    A.   Correct.
18    Q.   You can't remember any others?
19    A.   No.
20    Q.   Besides these -- this e-mail and the
21  teleconference with the AFODS and then some
22  in-person meetings with people in Burlington,
23  did you do anything else to inform your office
24  about the provisional waiver process?

01

1    A.  No.
2    Q.  Did you do anything else to inform
3 your office about the Calderon litigation?
4    A.  No.
5
6       (Exhibit No. 3 marked for
7 identification.)
8
9 BY MS. SEWALL:
10   Q.  The court reporter has handed you
11 what's been marked Exhibit 3.
12      Do you recognize this document?
13   A.  Yes.
14   Q.  What is it?
15   A.  Declaration by -- let's see -- Acting
16 Field Office Director Todd Lyons.
17   Q.  It's dated September 12, 2018; is that
18 correct?
19   A.  Correct.
20   Q.  If you turn to Paragraph 12 of this
21 declaration --
22   A.  Uh-huh.
23   Q.  -- he states, "Additionally, steps are
24 being taken to ensure that ERO personnel

02

1 receive training to refresh them on how to
2 consider the totality of the circumstances in
3 each alien's case, including pending petitions
4 or applications for immigration benefits, when
5 taking enforce actions.  My office will record
6 who has attended the training to ensure that
7 all officers making these decisions have done
8 so."
9       Do you see that?
10   A.  I do.
11   Q.  What is he referring to?
12   A.  I'm not sure.
13   Q.  If you look back at Exhibit 1, turn to
14 Paragraph 8 -- sorry, Paragraph 9, on the
15 third page.
16      You state, "I have reviewed the
17 measures DFOD Lyons took to ensure officers
18 are given the tools and guidance they need to
19 make these informed discretionary
20 determinations and have no plans at this time
21 to discontinue or alter any of the procedures
22 DFOD Lyons implemented as detailed in his
23 September 12, 2018 declaration to this Court."
24      Do you see that?

03

1    A.  I do.
2    Q.  When you submitted this declaration to
3 the court, it was an accurate statement,
4 correct?
5    A.  Correct.
6    Q.  And you stated you had reviewed the
7 measures DFOD Lyons took to ensure officers
8 are given the tools and guidance they need to
9 make informed discretionary determinations,
10 correct?
11   A.  Correct.
12   Q.  And one of the measures DFOD Lyons
13 took is to ensure that ERO received training
14 to refresh them on how to consider the
15 totality of the circumstances in each alien's
16 case, correct?
17   A.  Correct.
18   Q.  But you state today that you don't
19 know what he's referring to when he says,
20 "steps are being taken to ensure that ERO
21 personnel received training to refresh
22 them"?
23   A.  No.  I don't -- I don't know
24 specifically what training he's referring to.

04

1 I know that as far as the tools and guidance
2 that they -- they've been given, we make sure
3 they all have access to all our systems of
4 review.  We make sure that they know how to --
5 and when I say "we," I don't mean me
6 specifically.  I mean there's -- supervisors
7 ensure that they know how to use the systems,
8 how to use the one system that we use to
9 access USCIS information, and make sure that
10 they know of the Calderon litigation.
11      The training that he's referring to
12 specifically, I don't know because I wasn't
13 here.  I have reviewed it and I know what -- I
14 know what I reviewed that they had done and
15 the measures put in place weren't changed at
16 all, but specifically that training, I don't
17 know what -- what the specific training is.
18   Q.  So as you understand it, the tools and
19 guidance that DFOD Lyons is referring to in
20 this paragraph is that they know how -- that
21 employees know how to use the systems and they
22 have access to the systems and --
23   A.  And that they know what to look for in
24 a -- for a possible -- at that time, back in

05
1  2018, it would have been possible class
2  membership.
3      Q.  And so that is all the tools and
4  guidance they have been given to make informed
5  discretionary determinations with respect to
6  Calderon class members?
7          MS. LARAKERS:  Objection.
8      A.  There may be more; just not that I can
9  recall.  It's pretty general that everybody
10 receives that training, and there's not going
11 to be -- there's nothing specific to a
12 Calderon training, nor is there a specific
13 training on -- at that time, a Calderon class
14 member was somebody that had -- that had a
15 final order with -- pending or an approved
16 I-130.  And at that point, I don't believe it
17 was even considered that it was even
18 considered that it was a USC spouse.  I think
19 they may have been considering all I-130s at
20 that time.
21     Q.  So today, you're testifying that you
22 don't know what DFOD Lyons said -- meant when
23 he said ERO personnel -- that they were taking
24 steps to ensure that ERO personnel received

06
1  training to refresh them on how to consider
2  the totality of the circumstances in each
3  case?
4          MS. LARAKERS:  Objection.
5      A.  Specifically, no, I don't know exactly
6  what he's -- which training he's referring to.
7  BY MS. SEWALL:
8      Q.  Are you planning to submit an updated
9  declaration to the court?
10         MS. LARAKERS:  Objection.
11     A.  If need be.
12 BY MS. SEWALL:
13     Q.  Do you think it's needed?
14         MS. LARAKERS:  Objection.
15     A.  I don't.
16 BY MS. SEWALL:
17     Q.  You don't think that this statement in
18 Paragraph 9 is misleading?
19         MS. LARAKERS:  Objection.
20 BY MS. SEWALL:
21     A.  No, because I don't know what training
22 he's speaking of.  It could be any -- any
23 training.
24     Q.  And you've testified that there is no

07
1  training, correct?
2          MS. LARAKERS:  Objection.
3      A.  There's no Calderon training.  There
4  was no Calderon class at that time either.
5  BY MS. SEWALL:
6      Q.  I'm not talking about Calderon
7  training.  I'm talking about training to
8  refresh employees on how to consider the
9  totalities of the circumstances in each
10 alien's case, including pending petitions or
11 applications for immigration benefits when
12 taking enforcement actions.
13         MS. LARAKERS:  Objection.
14     A.  That's just your -- that's your
15 run-of-the-mill training.
16 BY MS. SEWALL:
17     Q.  And he also states, "My office will
18 record who has attended the training to ensure
19 that all officers making these decisions have
20 done so."
21     Do you have any understanding of what
22 that means?
23         MS. LARAKERS:  Objection.
24     A.  That he -- I'm assuming, because I

08
1  don't -- I've not seen it, that there was a
2  sign-in roster saying that they've been talked
3  to or discussed this information.
4  BY MS. SEWALL:
5      Q.  Discussed what information?
6      A.  The information --
7          MS. LARAKERS:  Objection.
8      A.  -- about looking for Calderon --
9  possible Calderon class members.
10     Q.  So that was the refresh training?
11         MS. LARAKERS:  Objection.
12     A.  I imagine.
13 BY MS. SEWALL:
14     Q.  But you don't know?
15     A.  I don't know.
16     Q.  And you're not planning to submit an
17 updated declaration to the Court to clarify?
18     A.  Again, if need be, I will.
19     Q.  So when you said you've reviewed the
20 measures DFOD Lyons took to ensure officers
21 were given the tools and guidance they need to
22 make these informed discretionary
23 determinations and have no plans at this time
24 to discontinue or alter any of the procedures

09

1  DFOD Lyons implemented, you weren't sure what
2  the procedures he took actually were?
3           MS. LARAKERS:  Objection.
4      A.  Those procedures were that they
5  received that training.
6  BY MS. SEWALL:
7      Q.  What training?
8      A.  Just that, the one that he said --
9  which is a refresher training that I'm --
10 again, I don't know what specific training
11 he's referring to, but there are several
12 trainings that we have available.
13     Q.  Can you describe them to me?
14     A.  I --
15          MS. LARAKERS:  Objection.  Don't
16 answer to the extent that it includes
17 trainings from ICE Office of Chief Counsel.
18     A.  There's plenty of trainings as far
19 as -- that are available to officers in our
20 training modules, not to mention just
21 on-the-job training by your supervisor and
22 other experienced officers on how to run
23 correct checks.
24 BY MS. SEWALL:

0

1      Q.  And do any of those trainings discuss
2  the provisional waiver process?
3      A.  No.  We -- that is -- that's a USCIS
4  function.
5      Q.  So your office doesn't need to know
6  about the provisional waiver process?
7           MS. LARAKERS:  Objection.
8      A.  Our officers need to know about the
9  potential for Calderon class members.
10 BY MS. SEWALL:
11     Q.  How are they going to know about the
12 potential for Calderon class members without
13 understanding anything about the provisional
14 waiver process?
15          MS. LARAKERS:  Objection.
16     A.  By the guidance that we had set forth
17 for them to -- what to look for.
18 BY MS. SEWALL:
19     Q.  And what was the guidance that you set
20 forth on what to look for?
21     A.  It was in that memo.
22     Q.  The e-mail that you sent?
23     A.  The e-mail, sorry.  The e-mail that I
24 sent out.

09

1      Q.  Where you -- it was basically -- the
2  guidance was anyone with a pending or approved
3  I-130?
4           MS. LARAKERS:  Objection.
5      A.  Pending I-130, USC spouse, final
6  order, removal was not left on that removal
7  order.
8  BY MS. SEWALL:
9      Q.  And they've not been given any other
10 information on this -- on how to -- how to
11 identify class members or consider their
12 eligibility for provisional waivers?
13     A.  No.
14     Q.  You can put that to the side.
15     A.  Okay.
16
17          (Exhibit No. 4 marked for
18 identification.)
19
20 BY MS. SEWALL:
21     Q.  The court reporter has handed you
22 what's marked Exhibit 4.
23          Do you recognize this document?
24     A.  I do.

2

1      Q.  What is it?
2      A.  It's an e-mail with a partial
3  spreadsheet on it.
4      Q.  We're going to try to have a print
5  that has a whole spreadsheet.  I didn't quite
6  see that until we got here.
7          Have you seen this document before?
8      A.  I have.
9      Q.  And when did you see it?
10     A.  I don't recall.
11     Q.  Did you see it before yesterday?
12     A.  Yes.
13     Q.  In what context did you see it?
14          MS. LARAKERS:  Objection.  Don't
15 answer to the extent that it involves
16 conversations with counsel.
17     A.  It was sent so we could look at it for
18 review or just so we could know what was on
19 it.  I believe this is the one.
20 BY MS. SEWALL:
21     Q.  So was the -- the e-mail itself
22 or this --
23     A.  Oh, no, not this e-mail, just the
24 spreadsheet, I'm sorry, yeah.



3

1    Q.  So this e-mail is -- the subject line
2  is Calderon -- it's from Mary Larakers to --
3  it says W-H-A-C-O-U-M-A Calderon class action,
4  correct --
5    A.  Correct.
6    Q.  -- and others.
7       It was sent on June 13, 2019?
8    A.  Okay.
9    Q.  Subject line is "Calderon class member
10 ▇▇▇▇▇▇▇▇"
11      Do you see that?
12   A.  I do.
13   Q.  And the e-mail states, "Pursuant to
14 our agreement in ECF No. 260, respondents
15 notify you of a class member who they have
16 scheduled for removal before his inclusion in
17 the monthly detention report."
18      Do you see that?
19   A.  I do.
20 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
21 ▇▇▇▇▇
22   A.  Yes.
23   Q.  I'm probably mispronouncing that.
24      It says -- and you're familiar with

4

1  ▇▇▇▇▇▇▇▇▇▇
2    A.  Not specifically, no.
3    Q.  Do you know who he is?
4    A.  I know he was in detention.
5    Q.  Do you know anything else about him?
6    A.  No, I don't remember anything about
7  him.
8    Q.  He was detained on June 2, 2019,
9  correct?
10   A.  Yes, according to the e-mail.
11   Q.  Do you recall the circumstances of his
12 detention?
13   A.  Not at all.
14   Q.  Do you recall who made the decision to
15 detain him?
16   A.  No, I do not.
17   Q.  He is scheduled to be removed outside
18 of the AOR to stage removal on June 18, 2019,
19 correct?
20   A.  According to the e-mail, yes.
21   Q.  And do you remember the circumstances
22 of the decision to remove him?
23   A.  No.
24   Q.  Do you know who made the final

5

1  decision to remove him?
2    A.  I do not.  I imagine it was either I
3  or DFOD Lyons.
4    Q.  And do you know who made the decision
5  ▇▇▇▇▇▇▇▇▇▇▇▇
6    A.  No, I do not.
7    Q.  Do you know who first told you about
8  Mr. ▇▇▇▇▇▇▇?
9        MS. LARAKERS:  Objection.  Don't
10 answer to the extent it involves conversations
11 with counsel.
12   A.  No, I do not.
13 BY MS. SEWALL:
14   Q.  Have you reviewed any documents
15 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇
16   A.  Probably.
17   Q.  Do you remember when?
18   A.  No.
19   Q.  Do you remember which documents?
20   A.  No.
21   Q.  Do you remember how long you reviewed
22 any documents?
23   A.  No.
24

6

1        (Exhibit No. 5 marked for
2  identification.)
3
4  BY MS. SEWALL:
5    Q.  Do you recognize this -- the court
6  reporter is handing you what's been marked
7  Exhibit 5.
8       Do you see this document?
9    A.  I do.
10   Q.  What is it?
11   A.  A declaration, my declaration.
12   Q.  What's the date?
13   A.  The date signed?
14   Q.  Yes.
15   A.  June 29 -- June 19, 2019.
16   Q.  And it's signed by you?
17   A.  It is.
18   Q.  Please turn to the third paragraph.
19   A.  Okay.
20   Q.  So the first sentence says, "I made
21 the determination to effectuate Mr. Blank's
22 final order of removal."
23      This is the only copy of this document
24 that we have received, and it's redacted to

7

1  ensure privacy, but I can represent to you
2  ███████████████████████
3     A.  Okay.
4     Q.  All these redacted areas say
5  ████████████
6     A.  Okay.
7     Q.  The second sentence in this same
8  paragraph, Paragraph 3, says, "In doing so, I
9  considered numerous factors beyond the
10 ████████████████████████████
11 removal," correct?
12    A.  Correct.
13    Q.  And then you list, in the next
14 sentence, three factors -- well, the factors
15 that you considered.
16       You said, "Specifically, I considered
17 ████████████████████████████
18 form I-130 petition for alien relative, which
19 is U.S. citizen wife, from whom he stated he
20 is now separated, filed with the United States
21 Citizen and Immigration Services on August 10,
22 2015 and that it was approved on January 28,
23 2016."
24       Do you see that?

8

1     A.  I do.
2     Q.  The second factor said that you
3  ██████████████████████████
4  filed a Form I-212, Application for Permission
5  to Reapply for Admission to the United States
6  After Deportation or Removal, or Form I-601A,
7  Application for Provisional Unlawful Presence
8  Waiver, per USCIS databases.
9        Do you see that?
10    A.  I do.
11    Q.  And finally, you say you considered
12 ███████████████████████████
13 criminal records, which you described in
14 Paragraph 14 to 21 of the declaration that you
15 provided for this matter and signed on
16 June 17, 2019.
17       Do you see that?
18    A.  I do.
19    Q.  These are all the -- you don't list
20 any other factors that you considered,
21 correct?
22    A.  Not on this declaration, no.
23    Q.  I'd like to focus on the first factor
24 that you list here --

9

1     A.  Okay.
2  ████████████████████████████
3  had an approved I-130 that was approved on,
4  what you said, January███ 2016.
5        How did you consider that factor in
6  ██████████████████████████
7  removal?
8     A.  The fact that he had -- that he had an
9  I-130 petition from his USC spouse.  That was
10 just a factor.
11    Q.  How did you consider that factor in
12 ████████████████████████
13 removal?
14       MS. LARAKERS:  Objection.
15    A.  I looked at it objectively and used
16 that as one of the factors to continue to move
17 forward with the -- his removal.
18 BY MS. SEWALL:
19    Q.  And how did you consider the fact
20 that -- that factor in deciding to effectuate
21 his removal?
22       MS. LARAKERS:  Objection.
23    A.  I'm not sure what you're asking when
24 you ask my how I -- how I used it.

20

1  BY MS. SEWALL:
2     Q.  How did you make your decisions,
3  generally, your removal decisions?
4     A.  I take the totality of the
5  circumstances of the case and decide based on
6  everything put together.
7     Q.  So how did you use this factor and put
8  it together with everything else?
9     A.  Just like that.  That was one of
10 factors I considered along with everything
11 else.
12    Q.  How did you consider it?
13       MS. LARAKERS:  Objection.
14    A.  Are you asking me if I gave it a
15 certain amount of weight?
16 BY MS. SEWALL:
17    Q.  I'm asking you how you considered it.
18       MS. LARAKERS:  Objection.
19    A.  That's how I considered it.  I just --
20 it was one piece of the puzzle or of the
21 whole -- of the whole case as to how I'm going
22 to look at this.
23 BY MS. SEWALL:
24    Q.  How did it inform your decision?

2

1    A.  It weighed partially compared to the
2  other factors that were -- that weighed just
3  as much within the -- within the decision.
4    Q.  You can't tell me anything else about
5  substantively you considered this factor in
6  making your removal decision?
7         MS. LARAKERS:  Objection.
8    A.  That he had an I-130 petition?
9  BY MS. SEWALL:
10   Q.  Yes.
11   A.  It was one -- it's just one of the
12  factors.  It's not -- it wasn't the basis or
13  my decision solely because he had an I-130
14  petition.
15   Q.  So I think when we were talking about
16  this before -- you know, this is obviously
17  something we talked about a fair amount
18  today -- I asked you how you considered the
19  fact that a person is eligible for the
20  provisional waiver process and effectuating
21  removal decisions, and you told me it's one of
22  many factors, you can't tell me, in general,
23  how you consider it.  You said it maybe if you
24  ask me about a specific case, I could tell you

22

1  how I considered it.
2    A.  Okay.
3    Q.  Now I'm asking about a specific case.
4  I'm saying, "how did you consider it"," and
5  you're telling me it's one of many factors.
6         Do you understand that telling me it's
7  one of many factors actually doesn't tell me
8  anything about how you considered it?
9         MS. LARAKERS:  Objection.
10   A.  I understand that, but it's also very
11  specific on the totality of what was here
12  without actually having that file and looking
13  at it and being there at that point in time.
14  When I was looking at it, I can't tell you
15  exactly how I weighed it.
16  BY MS. SEWALL:
17   Q.  When you made your decision, did you
18  take any contemporaneous notes on your
19  decision?
20   A.  Probably not.
21   Q.  Did you discuss your decision with
22  anybody?
23         MS. LARAKERS:  Objection.  Don't
24  answer to the extent it involves conversations

23

1  with counsel.
2    A.  No.
3  BY MS. SEWALL:
4    Q.  Did you write an e-mail to anybody
5  about your decision?
6    A.  I believe I did, just that it was a
7  continued removal.
8    Q.  Who did you write the e-mail to?
9    A.  Most likely the AFOD that sent me the
10  information in the case summary.
11   Q.  Did you instant message anybody about
12  your decision?
13   A.  No.
14   Q.  Did you text message anybody about
15  your decision?
16   A.  No.
17   Q.  Did you have any other conversations
18  or communications with anybody in any way,
19  shape, or form about your decision?
20         MS. LARAKERS:  Again, objection.
21  Don't answer to the extent it involves
22  counsel.
23   A.  Maybe verbal.
24  BY MS. SEWALL:

24

1    Q.  Which verbal communications did you
2  have?
3    A.  Discussing the case.
4    Q.  Discussing the case with whom?
5    A.  It was either with my AFOD or my -- or
6  Todd Lyons, my DFOD.
7    Q.  But you can't remember?
8    A.  No, I can't.
9    Q.  Before deciding to effectuate his
10  removal, did you ever talk to
11  ▮▮▮▮▮▮▮▮▮▮▮
12   A.  No.
13   Q.  Before deciding to effectuate his
14  removal, did you ever talk to
15  ▮▮▮▮▮▮▮▮▮
16   A.  No.
17   Q.  Before deciding to effectuate his
18  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
19  children?
20   A.  No.
21   Q.  Before deciding to effectuate his
22  removal, did you --
23   A.  Yes, I did.  I did -- I reviewed his
24  file, so I would know if he had children or

25

1  not.  I just don't recall if he did or not.
2      Q.  Which file would tell you if he had
3  children?
4      A.  It was in his A-file and I-213, or
5  maybe somewhere in there.  It could be in a
6  couple of different places.
7      Q.  Would it necessarily be in those
8  files?
9      A.  No.
10     Q.  So it might be in there, but it might
11 not?
12     A.  It might not be.
13     Q.  So before deciding to effectuate his
14 ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
15 children?
16     A.  I don't recall if he did or not.
17     Q.  Before deciding to effectuate his
18 removal, did you know how many children he
19 had?
20     A.  No.
21     Q.  Before deciding to effectuate his
22 removal, did you know if his children were
23 U.S. citizens?
24     A.  I don't recall.

26

1      Q.  Before deciding to effectuate his
2  removal, did you know how old his children
3  are?
4      A.  I don't recall.
5      Q.  Before deciding to effectuate his
6  removal, did you know who cares for his
7  children?
8      A.  I don't recall.
9      Q.  Before deciding to effectuate his
10 removal, did you know if his children have any
11 health issues?
12     A.  I don't recall.
13     Q.  Before deciding to effectuate his
14 ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
15 cares for his children?
16     A.  I wouldn't know that.
17     Q.  Before deciding to effectuate his
18 ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
19 provides for his family?
20     A.  I wouldn't know that either.
21     Q.  Would that be -- information be in his
22 file?
23     A.  Maybe.
24     Q.  Is it likely to be in his file?

27

1          MS. LARAKERS:  Objection.
2      A.  I don't know.
3  BY MS. SEWALL:
4      Q.  Before deciding to effectuate his
5  removal, did you know if his family has any
6  other sources of income besides his
7  earnings?
8      A.  No.
9      Q.  Before deciding to effectuate his
10 ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
11 wife has any health issues?
12     A.  No.
13     Q.  Did you know if his children have any
14 health issues?
15     A.  That was -- I think you asked me that
16 one.  I said no.
17     Q.  Did you know if his wife is able to
18 contribute to the family financially?
19     A.  I have no idea.
20     Q.  Did you know if -- how often
21 ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
22     A.  I do not know.
23     Q.  Did you know how often
24 ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

28

1      A.  No, I do not.
2  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
3  his wife were in the process of
4  reconciliation?
5      A.  I don't know.
6      Q.  So before deciding to effectuate
7  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
8  anything about his U.S. citizen family, did
9  you?
10         MS. LARAKERS:  Objection.
11     A.  I don't know anything that is not in
12 the file.
13 BY MS. SEWALL:
14     Q.  And you don't know what's in the file?
15     A.  I can't -- I can't recall what's in
16 file.  I look at several files.
17     Q.  So you don't know one way or the other
18 whether you considered anything about his U.S.
19 citizen family?
20     A.  No.
21     Q.  So you didn't even know -- you don't
22 know, sitting here today, whether you
23 considered the fact that he had children,
24 correct?

**Page 29**

1          MS. LARAKERS:  Objection.
2     A.  I -- I'm sorry?
3  BY MS. SEWALL:
4     Q.  You don't know, sitting here today,
5  whether he had any children?
6          MS. LARAKERS:  Objection.
7     A.  If it was in the file, I took it into
8  consideration.  Whatever was in the file, I
9  took into consideration.  Whatever was in the
10 case summary, I took it into consideration.
11 Whatever was in the EARM, I took into
12 consideration.
13     Other than that, because I did not
14 ████████████████████████████████████████
15 ████████████████████████████████████████
16 do not know his relationship with his wife --
17 estranged wife or his children or what he does
18 to earn money or what his wife does to earn
19 money because I do not know him personally,
20 nor did I speak with him.  That is -- my job
21 is not to speak with the people that we have
22 in custody.
23     Q.  Did you ask anybody else to speak with
24 him about these issues?

**Page 30**

1     A.  I did not.
2     Q.  So when you decided to remove him, you
3  didn't consider whether it would create a
4  financial hardship for his family, did you?
5          MS. LARAKERS:  Objection.
6     A.  No, I did not.
7  BY MS. SEWALL:
8     Q.  When you decided to remove him, you
9  didn't consider whether it would create
10 emotional hardship for his family, did you?
11         MS. LARAKERS:  Objection.
12    A.  If there was something in his file
13 that would indicate that there would be an
14 emotional hardship to his family, I would have
15 looked at it and considered it.
16 BY MS. SEWALL:
17    Q.  But you don't know whether you did or
18 not?
19    A.  I don't recall.
20    Q.  You understand that the Court has
21 ordered that ICE may not order the removal of
22 an alien pursuing a provisional waiver solely
23 because he or she is subject to a final order
24 of removal; is that right?

**Page 31**

1          MS. LARAKERS:  Objection.
2     A.  Can you repeat that?
3  BY MS. SEWALL:
4     Q.  The court has ordered that ICE may not
5  order the removal of an alien pursuing a
6  provisional waiver solely because he or she is
7  subject to a final order of removal, correct?
8     A.  Yes, that was the court's decision.
9     Q.  And the court has ordered ICE must
10 consider the reasons for the provisional
11 waiver regime and the facts of the alien's
12 particular case before deciding to order
13 removal, correct?
14         MS. LARAKERS:  Objection.
15    A.  Can you repeat that?
16 BY MS. SEWALL:
17    Q.  And the court has ordered that ICE
18 must consider the reasons for the provisional
19 waiver regime and facts of the alien's
20 particular case before deciding to order
21 removal, correct?
22         MS. LARAKERS:  Objection.
23    A.  Yes.
24 BY MS. SEWALL:

**Page 32**

1     Q.  And you did not consider the reasons
2  for the provisional waiver regime in executing
3  his removal, did you?
4          MS. LARAKERS:  Objection.
5     A.  I considered everything that was in
6  front of me that I had access to review.
7     Q.  Sitting here today, can you the
8  testify to me that you considered the
9  provisional waiver regime -- the purposes of
10 the provisional waiver regime in executing
11 ████████████████████████████████████
12    A.  I took into consideration the fact
13 that he had a -- he was -- he had an I-130, an
14 approved or pending I-130, and that he -- it
15 was by his USC spouse and he had a final order
16 of removal.  I took all those factors into
17 consideration.
18    Q.  You don't remember how you took that
19 factor into consideration though?
20         MS. LARAKERS:  Objection.
21    A.  I took it into consideration.
22 BY MS. SEWALL:
23    Q.  You said it was one factor among the
24 many factors that you would consider in the

33

1  totality of circumstances, correct?
2      A.  Correct.
3      Q.  But you couldn't tell me how it was
4  considered within the totality of the
5  circumstances; is that right?
6          MS. LARAKERS:  Objection.
7      A.  Correct.
8  BY MS. SEWALL:
9      Q.  You said, in deciding to effectuate
10 the removal, you would have looked into the
11 case summary, right?
12     A.  Correct.
13     Q.  You would have looked into the file?
14     A.  His A-file.
15     Q.  His A-file?
16     A.  (Witness nodding.)
17     Q.  Is there another file you would have
18 looked into or just the A-file?
19     A.  Probably just the A-file, whatever we
20 had, whatever we had available.
21     Q.  And you said something about -- you
22 would have looked into what was on EARM?
23     A.  Correct.
24     Q.  What's -- what would have been on

34

1  EARM?  What type of information?
2          MS. LARAKERS:  Objection.  Don't
3  answer to the extent that it's law enforcement
4  privileged.
5      A.  Just information about his case.
6      Q.  Would you have looked into anything
7  else?
8      A.  His criminal history.
9      Q.  Where would that have been?
10     A.  Also within -- somewhere within the
11 summary and within the A-file.
12     Q.  So the three areas that you -- the
13 three, say, documents, I guess, for lack of a
14 better word, that you would have looked at
15 would have been the case summary, the A-file,
16 and the information about his case on EARM?
17     A.  Correct.
18     Q.  And that's the universe of documents?
19     A.  Yes.
20
21         (Exhibit No. 6 marked for
22 identification.)
23
24 BY MS. SEWALL:

35

1      Q.  The court reporter has handed you
2  what's been marked as Exhibit 6.
3          Do you recognize this document?
4      A.  Yes.
5      Q.  What is it?
6      A.  A declaration, my declaration.
7      Q.  If you turn to the last page, it was
8  signed on June 17, 2019 by you, correct?
9      A.  Correct.
10     Q.  Please turn to Paragraph 30.
11         So again, you'll see some redactions
12 here.  And again, this is the only copy of
13 this document we have received, and I can
14 represent that the redactions say
15 ███████████
16     A.  Okay.
17     Q.  You state that on June 1, 2019, ICE
18 ████████████████████
19 had been arrested, correct?
20     A.  Paragraph 30, correct.
21     Q.  Who notified ICE?
22     A.  I don't know.
23     Q.  Who -- do you know who at ICE was
24 notified?

36

1      A.  No, I do not.
2      Q.  Do you know who searched his
3  immigration records?
4      A.  No, I do not.
5      Q.  Do you knpw which immigration records
6  they searched?
7      A.  No, I do not.
8      Q.  Do you know if that search showed that
9  he had an approved I-130?
10     A.  I do not.  If it's here, that he had
11 an I-130, then they found that he had an
12 I-130.
13     Q.  Do you know if the person -- do you
14 know if the person who searched -- who --
15 sorry.
16         If you turn to Paragraph 31.
17     A.  Uh-huh.
18     Q.  Sorry.  Paragraph 30 -- so on
19 Paragraph 31, you see that he was actually
20 arrested on June 2, 2019, correct?
21     A.  Correct.
22     Q.  Do you know if the person who decided
23 to arrest him had identified him as a Calderon
24 class member?

Transcript of Marcos Charles
Conducted on July 16, 2019

37

1    A.  I don't know.  I'm assuming they did,
2  but...
3    Q.  Do you know one way or the other?
4    A.  No.  I -- I can say "yes" because he's
5  on the spreadsheet and we're here discussing
6  it, so...
7    Q.  When was the spreadsheet created?
8    A.  I don't -- I don't know.  I don't
9  know.
10   Q.  It was created after the fact of --
11   A.  Was it after this?  I don't know.
12   Q.  You would know better than I would.
13   A.  I don't remember.  I don't remember
14 the date.  It would have had to have been
15 after -- let's see.
16   Q.  You testified a bit about having to
17 create spreadsheets for Calderon class
18 members, correct?
19   A.  Correct.
20   Q.  Generally speaking, what is the
21 process for creating those spreadsheets?
22   A.  I don't create the spreadsheets, so I
23 don't -- I mean, the process for actually
24 creating the spreadsheet, or are you asking me

38

1  a question about information on the
2  spreadsheet?
3    Q.  The process for creating the
4  spreadsheet.
5    A.  I just want to be specific on this
6  because you're asking me about the creation of
7  the spreadsheet, or are you asking me about
8  the information that's put into the
9  spreadsheet?  Because I don't know who
10 actually created the spreadsheet in Excel.  I
11 don't know who created the spreadsheet, the
12 original spreadsheet.  I don't know.
13   Q.  Do you know the general process for
14 creating these types of spreadsheets?
15   A.  In Excel?
16   Q.  I'm not that --
17   A.  Are you talking about creating the
18 spreadsheet or are you talking about --
19   Q.  I'm talking about --
20   A.  -- information within the spreadsheet?
21   Q.  I'm not asking you who opened up an
22 Excel document and put the information in.
23   A.  Okay.
24   Q.  I'm asking about the general process

39

1  for how these spreadsheets are created and
2  filled in at your office.
3          MS. LARAKERS:  Objection.
4    A.  For -- you said these spreadsheets, so
5  the Calderon spreadsheet?
6  BY MS. SEWALL:
7    Q.  Yes.
8    A.  Yes.  I know -- I know how the -- how
9  the input -- the data gets input into the
10 spreadsheet.
11   Q.  How does it get input into the
12 spreadsheet?
13   A.  The DO and SDDO and AFOD work together
14 to put everything in there.  The AFOD reviews
15 it.
16   Q.  And when do they do that?
17   A.  At some point before it gets to me.
18   Q.  And you have no idea at what point in
19 time they input the information into the
20 spreadsheet?
21          MS. LARAKERS:  Objection.
22   A.  No, I don't.  It could vary, depending
23 on the case.
24   Q.  Do you know that the spreadsheets

40

1  aren't relied upon to make law enforcement
2  decisions, correct?
3    A.  They're informational.
4    Q.  Are they relied on upon to make law
5  enforcement decisions?
6          MS. LARAKERS:  Objection.
7    A.  I don't understand that question.
8  There's no information within that spreadsheet
9  that I don't have somewhere else.
10 BY MS. SEWALL:
11   Q.  Give me one moment.
12   A.  Sure.
13
14      (Exhibit No. 7 marked for
15 identification.)
16
17 BY MS. SEWALL:
18   Q.  So the court reporter has handed you
19 what's been marked as Exhibit 7.
20      Do you see that?
21   A.  I do.
22   Q.  What is this document?
23   A.  It is a -- my declaration.
24   Q.  And if you turn to the last page, it

4

1  was signed on June 20, 2019 by you; is that
2  correct?
3     **A.  Correct.**
4     Q.  And if you turn to the fourth
5  paragraph, it says, "ICE will provide
6  petitioners with a representation that ICE --
7  Boston ICE ERO considered more than the
8  outstanding removal order when respondents
9  seek to remove a class member.  ICE will
10 provide this information by adding two columns
11 to the detention spreadsheet.  ICE has agreed
12 to provide petitioners an ECF number, 260.
13 First, ICE will include a column that
14 specifies who made the decision to take
15 enforcement action against a class member,
16 either the field officer director or the
17 deputy field office director.  Second, ICE
18 will also include a column that states
19 whether, in deciding to effectuate the removal
20 of class member, the deciding official
21 considered the class member's potential
22 eligibility to apply for a Form I-601A,
23 Application for Provisional Unlawful Presence
24 Waiver.  Please note that this spreadsheet

42

1  will not be relied upon when deciding to take
2  an enforcement action.  Rather, it will be
3  created by ICE Boston at the direction of the
4  field office director or deputy field office
5  director who made the decision to effectuate
6  the removal of the class member."
7        Do you see that?
8     **A.  I do.**
9     Q.  So this spreadsheet is made after you
10 decided to remove a class member, correct?
11    **A.  This spreadsheet?  The information**
12 **is -- the part that is input after I make the**
13 **decision to remove an individual is just one**
14 **column of that spreadsheet.  All the other**
15 **information is already there.**
16    Q.  So what you say in this last sentence,
17 "Rather, it will be created by ICE Boston at
18 the direction of the field office director or
19 deputy field office director who made the
20 decision to effectuate the removal of the
21 class member."
22        Does that indicate that the
23 spreadsheet is made once the decision to
24 remove has been made?

43

1     **A.  No.**
2     Q.  When is the spreadsheet -- the -- are
3  you saying that the spreadsheet is created --
4  sorry, step back.
5        You don't know when the spreadsheet --
6  information is input in the spreadsheet?
7        MS. LARAKERS:  Objection.
8  BY MS. SEWALL:
9     Q.  Is that what you testified?
10    **A.  I don't know when -- as it moves along**
11 **the line, there are -- there's information**
12 **input into that spreadsheet.  When it gets to**
13 **me the only -- the columns that aren't filled**
14 **are the decision part.**
15    Q.  So when you testified that you assumed
16 that the arresting officer knew about
17 ████████████████████████████████
18 that information is in the spreadsheet, that
19 didn't actually make sense.
20        MS. LARAKERS:  Objection.
21    **A.  Well, not -- okay, not because it was**
22 **in the spreadsheet, but it's in the**
23 **spreadsheet because knew he was a class member**
24 **or had --**

44

1     Q.  So you knew he was a class member
2  before he was arrested?  Is that what the
3  spreadsheet tells us?
4        MS. LARAKERS:  Objection.
5     **A.  No, that's not what the spreadsheet**
6  **says.  The spreadsheet is just a record of**
7  **what we know about the individual by the time**
8  **it gets to me.**
9  **BY MS. SEWALL:**
10    Q.  So if we go back do my question, did
11 the arresting officer know that
12 ████████████████████████████████████████
13 at the time he made his decision to arrest,
14 what's your answer?
15    **A.  I do not.**
16    Q.  Would the arresting officer have made
17 any documentation of his decision aside from
18 this spreadsheet?
19    **A.  Upon arrest?**
20    Q.  At any time.
21    **A.  Upon arrest, they would have done**
22 **their encounter and apprehension form, along**
23 **with inputting -- well, it's also in EARM.**
24    Q.  So encounter and apprehension form.

45

1    Did you say that's in EARM?
2    A.  Uh-huh.
3    Q.  Anything else?
4    A.  What do you mean?
5    Q.  Would they have documented their
6  decision anywhere else?
7    A.  They would have put down their -- the
8  encounter and information within that
9  document.  And actually, it's actually input
10 into our processing system and then dumped
11 into that form.
12   Q.  Would they have put it anywhere else
13 or is this the only place that they would have
14 put it?
15   A.  I think that's the only place that it
16 would go.
17   Q.  And if we look back on Paragraph 31 of
18 Exhibit 6 --
19   A.  Paragraph -- I'm sorry.
20   Q.  31 of Exhibit 6.
21   A.  Yes.
22   ████████████████████████████████████
23 arrested on June 2, 2019.  We talked about
24 that, right?

46

1    A.  Correct.
2    Q.  Do you know who decided to detain --
3  ████████████████████████████████████
4    A.  No.
5    Q.  Do you know if the detaining -- the
6  person who made the decision to detain him
7  knew that he was a Calderon class member?
8    A.  I do not.
9    Q.  Where would the person -- what --
10 sorry, strike that.
11      What -- how would -- would the person
12 who had detained him recorded his detention
13 decision anywhere?
14   A.  No.
15   Q.  If you look at Paragraph 32 of the
16 same document --
17   A.  Uh-huh.
18   Q.  -- at that second sentence -- oh, you
19 know what, sorry.  I'm on the wrong document.
20      Let's go back to Exhibit 5.
21   A.  Okay.
22   Q.  This is your June 19, 2019
23 declaration.
24   A.  Okay.

47

1    Q.  If you look at Paragraph 3, the third
2  ████████████████████████████████████
3  beneficiary of a form I-130 petition for an
4  alien relative, which is U.S. citizen spouse,
5  from whom he stated he is now separated.
6    A.  Correct.
7    Q.  Where is that information coming from,
8  "from whom he stated he is now separated"?
9    A.  It would have been in the case summary
10 and may been in the A-file on the encounter
11 information.  I can't say for sure that it was
12 there, but it was in one of those two
13 locations.
14   Q.  You don't remember, as you sit here
15 today --
16   A.  No.
17   Q.  -- where you got this information?
18   A.  No.
19      MS. SEWALL:  When do you want to
20 break for lunch?
21      MS. LARAKERS:  Any time.
22      MS. SEWALL:  15 minutes or so?
23      MS. LARAKERS:  Sure.
24 BY MS. SEWALL:

48

1    Q.  Exhibit -- let's see.
2
3      (Exhibit No. 8 marked for
4  identification.)
5
6  BY MS. SEWALL:
7    Q.  The court reporter has handed you
8  what's been marked Exhibit 8.
9      Do you recognize this document?
10   A.  I recognize the portion of this
11 spreadsheet.
12   Q.  This is an e-mail from Mary Larakers
13 to class counsel regarding -- and the subject
14 line is -- it was sent -- sorry.
15      The e-mail was sent June 21, 2019 and
16 the subject line is "Class Member Notice of
17 Removal," correct?
18   A.  Yes.
19   Q.  And then the body of the e-mail has
20 another spreadsheet similar to what we were
21 discussing before, correct?
22   A.  Correct.
23   Q.  And it is cut off in this version.
24 We're working to get versions where it's not

49

1  cut off.  Maybe we can replace those or we can
2  just have a new document.  I'll admit those in
3  later on, but I think this should be okay for
4  our purposes right now.
5           The e-mail notes -- so the e-mail
6  notes that two class members -- ICE has
7  scheduled two class members for removal as
8  early as next week, correct?
9     A.  Correct.
10    Q.  The two class members listed here are
11  ████████████████████████████████████
12  correct?
13    A.  Correct.
14    Q.  Do you recognize these individuals?
15    A.  I recognize their names.
16    Q.  Do you remember if you were the person
17  who decided to remove them?
18    A.  I believe I was.  I don't...
19  ██████████████████████████████
20  application, correct?
21    A.  Yes.
22    Q.  Do you know the date that it was
23  approved?
24    A.  Not offhand.

50

1  ████████████████████████████████████
2  I-130 application, correct?
3     A.  Correct.
4     Q.  And you don't know what date that was
5  filed, do you?
6     A.  No.
7  ██████████████████████████████████
8           Do you remember who told you about Mr.
9  █████████
10    A.  No.
11    Q.  Do you remember when you first heard
12  ████████████████
13    A.  No.
14    Q.  Do you remember on what date you
15  decided to effectuate his order of removal?
16    A.  No.
17    Q.  Do you remember if, before you decided
18  to effectuate his order of removal, you
19  ████████████████████████████████████
20    A.  I reviewed the same documents, case
21  summary, whatever I had available, the EARM.
22    Q.  So it would be the case summary, the
23  A-file, and information on the EARM?
24    A.  Correct.

5

1     Q.  Do you know how long you reviewed
2  those documents?
3     A.  No.
4     Q.  Do you know if you discussed Mr.
5  ████████████████████
6     A.  I don't remember.
7     Q.  Did you discuss your decision to
8  ████████████████████████████████████████
9  excluding any communications you may have had
10  with counsel?
11    A.  I may have spoken with the AFOD.
12    Q.  But you can't remember?
13    A.  No.
14    Q.  Did you -- do you remember if, before
15  you made the decision to remove him, you put
16  anything about your decision to remove
17  ████████████████████████
18    A.  I probably responded to an e-mail
19  with -- with concur or, you know, a --
20  continue with removal.
21    Q.  And that e-mail would have gone to the
22  AFOD?
23    A.  Yes.
24    Q.  Did you make any contemporaneous notes

52

1  about your removal decision?
2     A.  No.
3     Q.  Did you put anything in writing, like
4  a memorandum or -- a memorandum or a text
5  message --
6     A.  No.
7     Q.  -- or an instant message?
8     A.  No.
9     Q.  I'm going to introduce the next
10  exhibit, which is actually the full
11  spreadsheet.
12    A.  The full spreadsheet?
13    Q.  Yes, which we had printed for us very
14  quickly.
15
16           (Exhibit No. 9 marked for
17  identification.)
18
19  BY MS. SEWALL:
20    Q.  So this is the same as the document we
21  were just looking at Exhibit 8, except for
22  it's a -- shows the full spreadsheet,
23  correct?
24    A.  Correct.

53

1          MS. LARAKERS:  Objection.  Can
2 you just clarify it's Exhibit 9?  She did it,
3 but...
4          MS. SEWALL:  Yes.
5 BY MS. SEWALL:
6     Q.   This is what the court reporter has
7 marked Exhibit 9, correct?
8     **A.   Correct.**
9     Q.   And you are listed in the far right
10 column as the ERO decision-maker?
11    **A.   Correct.**
12    Q.   Correct?
13    **A.   Correct.**
14    Q.   And do you see the column that says,
15 "Criminal"?
16    **A.   Yes.**
17    Q.   What does a yes marked in the criminal
18 column mean?
19    **A.   That person has a criminal history.**
20    Q.   Does it mean that the person has a
21 criminal conviction or any sort of criminal
22 history?
23    **A.   Any sort of criminal history.**
24    Q.   So that could be an arrest?  An arrest

54

1 could be a criminal history?
2     **A.   An arrest pending charges or**
3 **conviction.**
4     Q.   Arrest pending charges or conviction.
5          Is it a criminal history even if the
6 charges get dismissed?
7     **A.   It should just be pending criminal**
8 **charges and convictions.**
9     Q.   And so it wouldn't include arrests?
10    **A.   Not if there was no charges attached**
11 **to it.**
12    Q.   And if there's a no in that column, it
13 means there are no pending criminal charges or
14 convictions?
15    **A.   Correct.**
16    Q.   You see the second column -- it's on
17 ███████████████
18 ██████████
19    **A.   Yes.**
20    Q.   It's a little hard to tell, but his
21 criminal column here says, "Yes," right?
22    **A.   Correct.**
23    Q.   And below that, in the second
24 paragraph, it says -- it talks about

55

1 ████████████████████████████████████
2 recent criminal charges for possession with
3 intent to distribute controlled substance.
4     Q.   Do you see that?
5     **A.   Yes.**
6
7          (Exhibit No. 10 marked for
8 identification.)
9
10 BY MS. SEWALL:
11    Q.   The court reporter has handed you
12 what's been marked as Exhibit 10.
13         Do you recognize this document?
14    **A.   Yes.**
15    Q.   This is another detention spreadsheet?
16    **A.   Correct.**
17    Q.   If you look to the fifth column down,
18 you see --
19    **A.   The fifth row?**
20    Q.   Yes, the fifth row.  Sorry.
21    **A.   That's all right.**
22 ██████████████████████████████
23 correct?
24    **A.   Correct.**

56

1     Q.   That's the person we were just talking
2 about?
3     **A.   Uh-huh.**
4     Q.   If you look into the criminal column
5 for him, it says, "No."
6          Do you see that?
7     **A.   I do.**
8     Q.   Do you know why there was a "yes" on
9 June 21 and then a "no" in this spreadsheet?
10 This spreadsheet was sent to us on July 12.  I
11 can give you the cover e-mail, if that's
12 helpful.
13    **A.   Yeah.  No, I don't know specifically**
14 **why.**
15    Q.   Do you know -- who would you ask if
16 you wanted to find out?
17    **A.   I would ask my AFOD over custody**
18 **management.**
19    Q.   Could it mean that the charges were
20 dropped?
21    **A.   It may.**
22    Q.   But he's still on the removal list,
23 correct?
24    **A.   Correct.**

---

**57**

1    Q.  Do you know what -- on what date it
2    ██████████████████████████████████
3    arrested?
4       A.  No, I do not.
5       Q.  Do you know who made the decision to
6    ████████████████████
7       A.  I do not.
8       Q.  Do you know if the person who decided
9    to arrest him had identified him as a Calderon
10   class member before deciding to arrest him?
11      A.  No, I do not.
12      Q.  Do you know who decided to detain
13   ████████████
14      A.  No.
15      Q.  Do you know if the person who decided
16   █████████████████████████████████
17   Calderon class member prior to deciding to
18   detain him?
19      A.  I do not.
20   █████████████████████████████████
21   correct?
22      A.  Correct.
23      Q.  Would you have identified him as a
24   Calderon class member prior to your removal

---

**58**

1    decision?
2       A.  Yes.
3       Q.  Do you remember identifying him as a
4    Calderon class member prior to his removal
5    decision?
6       A.  I didn't identify him personally.
7       Q.  But you know that he was identified --
8       A.  Uh-huh.
9       Q.  -- prior to your removal decision and
10   that -- you took that into account?
11      A.  Yes.
12      Q.  How did you consider his status as a
13   Calderon class member in affecting your
14   removal decision?
15      A.  It held just as much weight as every
16   other factor that I take into account for
17   removal decisions.
18      Q.  Can you tell me anything about the
19   substantive decision you made in terms of how
20   the Calderon class membership status factored
21   into your decision?
22         MS. LARAKERS:  Objection.
23      A.  It -- again, it was just another --
24   it -- I took the whole totality of the case

---

**59**

1    and looked at it and made the decision.
2    BY MS. SEWALL:
3       Q.  Before deciding to effectuate his
4    ████████████████████████████████
5    charges?
6       A.  I did.
7       Q.  How did those -- how did that factor
8    into your overall decision?
9       A.  Same thing, just another factor.
10      Q.  Would the fact of an I-130 application
11   ever be enough to outweigh criminal charges
12   for an OUI?
13         MS. LARAKERS:  Objection.
14      A.  It's not -- they're not one-on-one
15   weight against each other.  It's the totality
16   of everything that I have available for me to
17   review.
18      Q.  How do criminal charges factor into
19   your decision substantively?
20         MS. LARAKERS:  Objection.
21      A.  It's the same thing.  It's one of
22   factors I weigh in.  Nothing outweighs
23   another.
24   BY MS. SEWALL:

---

**60**

1       Q.  How do you consider criminal charges
2    when deciding whether to effectuate a removal
3    of somebody?
4          MS. LARAKERS:  Objection.
5       A.  Same thing.  It's just one of the
6    factors I consider.
7    BY MS. SEWALL:
8       Q.  Can you tell me anything about how it
9    might weight into your decision?
10         MS. LARAKERS:  Objection.
11      A.  It's just another factor.  It doesn't
12   hold more or less weight than anything else.
13   It's all taken as a totality.
14   BY MS. SEWALL:
15      Q.  Did you consider his criminal charges
16   ███████████████████████████
17      A.  Yes.
18      Q.  Before deciding to effectuate
19   ██████████████████████████████████
20   ████████████████
21      A.  No.
22      Q.  Did you ever ask anybody to talk to
23   ████████████
24      A.  Not specifically, no.



**Page 6**

1 █████████████████████████
2 lawyer?
3    A.  No.
4    Q.  Before deciding to effectuate his
5 ████████████████████████
6 children?
7    A.  Again, if it was in his information, I
8 would have known that.
9    Q.  But you don't know?
10    A.  I can't -- I don't remember
11 specifically if he does or doesn't.
12    Q.  So you don't know whether you
13 considered -- you don't know whether you knew
14 he had children before you decided to
15 effectuate his removal?
16    A.  Correct.
17    Q.  Before deciding to effectuate his
18 removal, did you know how many children he
19 had?
20    A.  No.
21    Q.  Before deciding to effectuate his
22 removal, did you know if his children are U.S.
23 -- United States citizens?
24    A.  I don't know.

**Page 62**

1    Q.  Before deciding to effectuate his
2 removal, did you know if he had a newborn baby
3 born after his detention?
4    A.  I -- I wouldn't know that.
5    Q.  Do you know -- before you decided to
6 effectuate his removal, did you know if his
7 children have any health issues?
8    A.  I wouldn't know that, unless it was in
9 the file.
10    Q.  And do you know if it was in the file?
11    A.  I do not.
12    Q.  Do you know -- before deciding to
13 effectuate his removal, did you know if Mr.
14 ████████████████████
15    A.  I don't know.
16    Q.  Did you -- before deciding to
17 effectuate his removal, did you know if Mr.
18 ████████████████████
19    A.  I don't know.
20    Q.  Before deciding to effectuate his
21 removal, did you know if his family has any
22 ████████████████████████████
23 income?
24    A.  I do not.

**Page 63**

1    Q.  Before deciding to effectuate his
2 ████████████████████████████
3 any health issues?
4    A.  No.
5    Q.  So before deciding to effectuate Mr.
6 ████████████████████████████
7 here today, whether you considered anything
8 about his United States family?
9    A.  I took into consideration everything
10 that was available to me to review.
11    Q.  And you can't remember if that had any
12 information about his United States family?
13    A.  I do not.
14    Q.  So you can't tell me, as you sit here
15 today, whether you considered the financial
16 hardship it would present on his family if he
17 were removed?
18        MS. LARAKERS:  Objection.
19    A.  If there was something that indicated
20 there was a financial hardship that would be
21 felt by his family that was in any of the
22 documentation in front of me, I would have
23 looked at it.
24 BY MS. SEWALL:

**Page 64**

1    Q.  How would that have a weighted in your
2 decision?
3    A.  Just another factor.
4    Q.  Would you reevaluate your removal
5 decision if you had information about his
6 children that you didn't have before your
7 removal decision?
8        MS. LARAKERS:  Objection.
9    A.  I would review it again.
10 BY MS. SEWALL:
11    Q.  If you learned, you know, after he's
12 on this detention list, that he had a newborn
13 baby while he was in detention, would that --
14 would you reevaluate your removal decision?
15    A.  It would --
16        MS. LARAKERS:  Objection.
17    A.  -- be a factor.
18        MS. SEWALL:  I think we can take
19 a break.
20        MS. LARAKERS:  Okay.  Sounds
21 good.
22        THE VIDEOGRAPHER:  We are off
23 the record at 12:49 p.m.
24

65

1           (Recess taken from 12:49 p.m.
2           to 1:54 p.m.)
3
4           THE VIDEOGRAPHER:  We are on the
5  record at 1:54 p.m.
6  By MS. SEWALL:
7     Q.  Good afternoon.
8     **A.  Good afternoon.**
9     Q.  I'd like you to look at Exhibit 9,
10 which you already have.  This is an e-mail we
11 talked about that provided notice of removal
12 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
13 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
14    **A.  Let me find it here real quick.  Got**
15 **it.**
16    Q.  I'd like you to turn to the second
17 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
18    **A.  Okay.**
19    Q.  You determined to execute on his
20 removal order, correct?
21           MS. LARAKERS:  Objection.
22    **A.  Correct.**
23 BY MS. SEWALL:
24    Q.  And it says he had a pending I-130

66

1  application, correct?
2     **A.  Yes.**
3     Q.  Do you know who arrested Mr. -- who
4  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
5  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
6     **A.  No.**
7     Q.  Do you know if the person who made the
8  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
9  considered his status as a Calderon class
10 member?
11    **A.  No.**
12    Q.  Do you know if the person who decided
13 to arrest him considered the provisional
14 waiver regulations?
15    **A.  No.**
16    Q.  Do you know who decided to detain
17 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
18    **A.  No.**
19    Q.  Do you know if the person who decided
20 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
21 his status as a Calderon class member?
22    **A.  No.**
23    Q.  Do you know if the person who decided
24 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

67

1  the provisional waiver process in making that
2  determination?
3     **A.  No.**
4     Q.  And you decided to execute on the
5  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
6           MS. LARAKERS:  Objection.
7     **A.  Correct.**
8  BY MS. SEWALL:
9     Q.  In making that decision, did you
10 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
11 Calderon class member?
12    **A.  Yes.**
13    Q.  How do you know that you considered
14 it?
15    **A.  Because he was a Calderon class**
16 **member.**
17    Q.  And do you know that from the
18 spreadsheet?
19    **A.  No.  I know it from the fact that it**
20 **was given to me.  The case summary was given**
21 **to me with -- which identified him as a**
22 **Calderon class member.**
23    Q.  And who gave you the case number?
24    **A.  The AFOD.**

68

1     Q.  Which AFOD?
2     **A.  I believe it was AFOD Tina**
3  **Guarna-Armstrong.**
4  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
5  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
6     **A.  I don't recall.**
7     Q.  What did -- what did Ms. Tina -- I
8  mean, what did Ms. Guarna-Armstrong tell you
9  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
10    **A.  She e-mailed me the information, the**
11 **case summary, as to his class membership**
12 **and -- just the case summary and let me know**
13 **that he was pending removal.**
14    Q.  And she let you know in that e-mail
15 that he was a Calderon class member?
16    **A.  Yes.**
17    Q.  Did she say anything else about him?
18           MS. LARAKERS:  Objection.  Don't
19 answer to the extent it involves
20 recommendation about -- that's a deliberative
21 process privilege.
22    **A.  No, no recommendation, just the**
23 **information.**
24 BY MS. SEWALL:

69

1    Q.   What other information did she
2  provide?
3    A.   Case summary.
4    Q.   And did she comment at all on the case
5  summary or highlight any specific facts?
6    A.   Not that I recall.
7    Q.   Did she create the case summary?
8    A.   No.
9    Q.   Who created the case summary?
10   A.   It should have been the deportation
11 officer who has this case.
12   Q.   On what day did you decide to
13 ██████████████████████████████████████
14 removal?
15   A.   I don't recall.
16   Q.   Do you recall if, before that date,
17 ██████████████████████████████████████
18 ████████████████████████
19   A.   Yes.
20   Q.   Which documents did you review?
21   A.   Case summary, A-file, EARM comments,
22 case history.
23   Q.   Does the EARM provide a summary for
24 you to look at?

70

1    A.   No.
2    Q.   Do you have to go tab by tab through
3  the EARM --
4    A.   I do.
5    Q.   -- to find information?
6    A.   Yes.
7    Q.   And that's online?
8    A.   It's on our intranet -- well, our
9  access to intranet.
10   Q.   You do it while you're on the
11 computer?
12   A.   Yes.
13   Q.   Which tabs do you look at?
14   A.   I'm sorry?
15   Q.   Which tabs do you look at?
16   A.   Any tab that may have potential
17 information that I would need to make an
18 assessment of the case.
19   Q.   And which tabs are those?
20   A.   It could be any tabs that are within
21 the system.
22   Q.   Which tabs are within the system?
23   A.   Oh, there's -- there's several.  I --
24 I -- there's no way I could name off all the

7

1  tabs.
2    Q.   How many tabs, approximately, are
3  there?
4  ████████████████████████████████████████
5  ████████████████████████████
6  ████████████████████████████
7  ████████████████████
8  ████████████
9    Q.   Who would know, if we wanted to find
10 out?
11   A.   I don't know who specifically would
12 know, maybe somebody at headquarter's data
13 systems.  I don't know even know what position
14 they would hold, that could tell you that.
15   Q.   Do you --
16   A.   Maybe some of the developers.
17 ████████████████████████████████████████
18 ████████████████████████████████████████
19 ████████████████████████████████████████
20 ████████████████████
21 ████████████████
22 ████████████
23 ████████████████████████████████████████
24 ████████████████████████████████

72

1  ████████████████████████████████████████
2  ████████████████████████████████████
3  ████████████████████████████
4  ████████████████████████████████
5    Q.   So which tabs did you look at when
6  ████████████████████████████████
7  ████████████
8    A.   All the tabs that I would have needed
9  to look at in order to get the information, to
10 find the information I was looking for.
11   Q.   And which are the tabs you would need
12 to find the information you were looking for?
13   A.   Depends on what was available to me
14 within the case and what I was looking -- what
15 I was looking for within the case.
16   Q.   So --
17   A.   It could have been any of those tabs.
18   Q.   So you don't remember which tabs you
19 looked at --
20   A.   No.
21 ████████████████████████████████████
22 ████████████
23   A.   I do not.
24   Q.   You don't remember even one -- which



73

1 one of the tabs --
2 ▓▓▓▓▓▓
3    Q.   Is that one you would typically always
4 look at when deciding to effectuate an
5 individual's removal?
6    A.   That's one that I look at no matter --
7 that's probably the first tab I look at no
8 matter what.
9    Q.   Is there a second tab you might look
10 at?
11 ▓▓▓▓▓▓
12 ▓▓▓▓▓▓
13 ▓▓▓▓▓▓
14 ▓▓▓▓▓▓
15 ▓▓▓▓▓▓
16 ▓▓▓▓▓▓
17 ▓▓▓▓▓▓
18 ▓▓▓▓▓▓
19 ▓▓▓▓▓▓
20 ▓▓▓▓▓▓
21 ▓▓▓▓▓▓
22    Q.   So you don't remember which tabs you
23 ▓▓▓▓▓▓
24    A.   Not specifically.

74

1 ▓▓▓▓▓▓
2 ▓▓▓▓▓▓
3 ▓▓▓▓▓▓
4    A.   Right.
5    Q.   Can you give me any other information
6 about how you approach the EARM?
7 ▓▓▓▓▓▓
8 ▓▓▓▓▓▓
9 ▓▓▓▓▓▓
10 ▓▓▓▓▓▓
11 ▓▓▓▓▓▓
12 ▓▓▓▓▓▓
13 ▓▓▓▓▓▓
14 ▓▓▓▓▓▓
15 ▓▓▓▓▓▓
16 ▓▓▓▓▓▓
17 ▓▓▓▓▓▓
18 ▓▓▓▓▓▓
19 ▓▓▓▓▓▓
20 ▓▓▓▓▓▓
21 ▓▓▓▓▓▓
22 ▓▓▓▓▓▓
23 ▓▓▓▓▓▓
24 ▓▓▓▓▓▓

75

1 ▓▓▓▓▓▓
2 ▓▓▓▓▓▓
3 ▓▓▓▓▓▓
4 ▓▓▓▓▓▓
5 ▓▓▓▓▓▓
6    Q.   Do you ever have the tabs that you
7 looked at printed up for you?
8    A.   On occasion, I'll print one up.
9    Q.   And those, generally, would be tabs
10 that you've reviewed and relied on?
11    A.   Yes -- well, depends.  I mean, if
12 you're specifically talking about a Calderon
13 case, I don't necessarily generally print
14 those out, unless there's -- I have a question
15 and I want to bring it to somebody's
16 attention.  I periodically review all cases
17 just for data quality.
18    Q.   Now, is ICE Boston relying on
19 spreadsheets to aid employees in inputting
20 information into the EARM?
21    A.   Can you repeat the question?
22    Q.   Is ICE Boston relying on spreadsheets
23 to aid employees in inputting information into
24 the EARM?

76

1    A.   What type of spreadsheets?
2    Q.   Any spreadsheets.
3    A.   I don't think so.
4    Q.   Any spreadsheets that give a visual of
5 what they need to input into the database?
6         MS. LARAKERS:  Objection.
7    A.   No, I don't think so.
8 BY MS. SEWALL:
9    Q.   Any spreadsheets that help avoid
10 missing case call-ups?
11         MS. LARAKERS:  Objection.
12    A.   No.
13 BY MS. SEWALL:
14    Q.   Any spreadsheets that help avoid
15 missing case actions and decisions?
16         MS. LARAKERS:  Objection.
17    A.   Not -- not that I know.  If somebody's
18 using that, they use it on their own.  And
19 it's not a policy that we would use that.
20    Q.   Rebecca Adducci was the acting FOD
21 prior to you, correct --
22    A.   No.
23    Q.   -- acting FOD of ICE Boston?
24    A.   No.

---

77

1  Q. Interim FOD of ICE Boston?
2  A. No.
3  Q. Do you know who Rebecca Adducci was?
4  A. Yes.
5  Q. Who was she?
6  A. She was acting FOD of Boston, but not
7  prior to me. Prior to me was Acting FOD Todd
8  Lyons.
9  Q. That's a strict definition of prior to
10 you. You tripped me up on that one.
11    So she was, at one point, the acting
12 FOD --
13 A. Yes.
14 Q. -- before you became acting FOD --
15 A. Yes.
16 Q. -- correct?
17 A. Yes.
18 Q. Did she -- would it surprise you to
19 know that she testified that she was -- that
20 ICE Boston was creating spreadsheets to help
21 employees input information into the EARM?
22    MS. LARAKERS: Objection.
23 A. I wouldn't know that she did that.
24 BY MS. SEWALL:

---

78

1  Q. So you know nothing about these
2  spreadsheets --
3     MS. LARAKERS: Objection.
4  BY MS. SEWALL:
5  Q. -- if they exist?
6  A. No.
7  Q. Do you know what a go-by is?
8  A. As in what content?
9  Q. Is it a checklist?
10 A. A checklist?
11 Q. Yes.
12 A. Yeah, I know what a checklist is.
13 Q. Is it called a go-by?
14    MS. LARAKERS: Objection.
15 BY MS. SEWALL:
16 Q. Do you know what a go-by is?
17 A. I don't know what -- the definition
18 that's being used for a go-by that you're
19 referring to, but, I mean, I've used the word
20 go-by before.
21 Q. What do you use it to refer to?
22 A. I've used it before as like an
23 instructional -- a go-by, instructions on how
24 to do something.

---

79

1  Q. And in what context have you used it?
2  A. Personal, work.
3  Q. Were there any go-bys distributed to
4  ICE Boston in and around August 2018?
5  A. I don't know.
6  Q. Have you ever collected the print
7  pages -- the pages you print from the EARM
8  spreadsheet on Calderon class members?
9     MS. LARAKERS: Objection.
10 A. Can you repeat that?
11 BY MS. SEWALL:
12 Q. Have you collected the pages that
13 you've printed on Calderon class members from
14 the EARM database?
15    MS. LARAKERS: Objection.
16 A. What EARM printouts?
17 BY MS. SEWALL:
18 Q. You testified that occasionally
19 you'll --
20 A. Yeah.
21 Q. -- print out a page from the EARM if
22 you have a question about --
23 A. Yeah.
24 Q. -- a Calderon class member?

---

80

1  A. I may have.
2  Q. Have you -- have you kept those in
3  your office?
4  A. Most likely, yeah.
5  Q. Have you been instructed to preserve
6  documents related to this litigation?
7  A. Yes.
8  Q. And so you will preserve those
9  documents?
10 A. Yes.
11    MS. LARAKERS: Objection.
12 A. If I have -- if the ones I have
13 printed out are Calderon class members.
14 BY MS. SEWALL:
15 ████████████████████████████████
16 ████████████
17 A. Uh-huh.
18 Q. -- did you discuss your decision to
19 remove him with anybody before -- on the --
20 aside from  -- without revealing
21 communications with counsel, did you discuss
22 ████████████████████████████████████████
23 with anyone?
24 A. It would have been with the AFOD.

---

8

1    Q.   Was that prior to removal?
2    A.   Yes.  I don't believe he's been
3  removed.
4    Q.   Prior to your decision to remove
5  him?
6    A.   Yes.
7    Q.   And what did you discuss?
8    A.   Just the facts of the case.
9    Q.   Which facts, in particular, did you
10 discuss?
11   A.   Anything that was within the case
12 summary or within EARM or in the A-file.
13   Q.   Do you remember any specific facts you
14 discussed?
15   A.   No.
16        MS. LARAKERS:  Objection.
17 Don't -- okay.
18 BY MS. SEWALL:
19   Q.   Did you take any -- did you put any --
20 anything in writing about your decision to
21 
22   A.   There should be an e-mail response
23 from me as to --
24   Q.   The AFOD?

82

1    A.   -- the AFOD to continue to remove
2  or -- removal process.
3    Q.   Anything else?
4    A.   Not that I can think of.
5
6  identified as a class member?
7    A.   I don't recall.
8
9
10 to him?
11   A.   No.
12   Q.   Did you ever instruct anybody to talk
13 to him?
14   A.   No.
15   Q.   Before deciding to effectuate his
16
17
18   A.   No.
19
20 had children?
21   A.   No, again, unless it was in his case
22 summary file or EARM.
23   Q.   Do you recall, as you sit here today,
24 whether it was in his case file?

83

1    A.   I do not.
2    Q.   If it was not in his case file, you
3  didn't consider it; is that correct?
4    A.   Correct.  If it was not front of me,
5  then I wouldn't have known that he had
6  children.
7    Q.   So any information that is not in
8  these individuals' case files is information
9  you would not have considered; is that
10 right?
11   A.   If it's not case file or summary or
12 EARM, I would not have considered it.
13
14
15 his children are U.S. citizens?
16   A.   No.
17   Q.   Did you know how old his children are?
18   A.   No.
19   Q.   Did you know who cares for his
20 children?
21   A.   No.
22   Q.   Did you know if his children have any
23 health issues?
24   A.   Again, if it -- if anything is in the

84

1  case file, that's what I reviewed.  If it's
2  not in there, then I don't know.
3    Q.   And as you sit here today, you can't
4  remember whether you considered these issues?
5    A.   No.
6
7  provides for his family?
8    A.   I do not know.
9    Q.   Did you know if his family has any
10 other source of income?
11   A.   I do not know.
12
13 wife has any health issues?
14   A.   Not that I know of.
15   Q.   So as you sit here today, you can't
16
17
18 about his United States citizen family; is
19 that correct?
20   A.   Yes, that's correct.
21   Q.   If you could look at Exhibit 10,
22 please.  This is a detention spreadsheet.
23        Do you recognize this document?
24   A.   I do.

| 85 |
|---|
| 1    Q.   We talked about it already? |
| 2    A.   Yes. |
| 3    Q.   If you look in the column that says, |
| 4   "Stay of removal I-246." It's towards the |
| 5   middle. |
| 6    A.   Uh-huh. |
| 7    Q.   What does a "no" mean? |
| 8    A.   That they -- there's no stay of |
| 9   removal filed. |
| 10   Q.   No stay of removal was ever filed? |
| 11   A.   I don't know it necessarily means |
| 12 ever. It just means that there's not one |
| 13 currently. |
| 14   Q.   So it means there's not one pending or |
| 15 there's not one on file, period? |
| 16   A.   It could mean either. It could be |
| 17 there's not one on file, there hasn't been |
| 18 one, or there's not one active. |
| 19   Q.   If you see -- in some columns, it |
| 20 says, "No, rejected," and then it gives a |
| 21 date. |
| 22     Do you see that? |
| 23   A.   I do. |
| 24   Q.   In each instance, when a stay of |

| 86 |
|---|
| 1   removal was filed but rejected, is -- are you |
| 2   including that language "no, rejected" and |
| 3   then date? |
| 4   A.   It has not been my instruction to do |
| 5 that. |
| 6   Q.   So a "no" could potentially mean one |
| 7 was filed, but it was rejected? |
| 8   A.   Yes. |
| 9   Q.   Meaning a person just doesn't have a |
| 10 stay of removal? |
| 11   A.   Correct. |
| 12   Q.   So a "no" either means a stay of |
| 13 removal was not filed or it was filed, but it |
| 14 was rejected? |
| 15   A.   It could mean that. |
| 16   Q.   And what does a "yes" mean in that |
| 17 column? There isn't one, but if were one, |
| 18 what would it be? |
| 19   A.   That they currently have a stay of |
| 20 removal. |
| 21   Q.   A granted stay of removal? |
| 22   A.   Well, active, yeah, active, granted |
| 23 stay of removal. |
| 24   Q.   If there were a stay of removal |

| 87 |
|---|
| 1   pending but not decided upon, would there be a |
| 2   "no" or a "yes" in this column? |
| 3   A.   I'm sorry, can you repeat that? |
| 4   Q.   If there were a stay of removal filed |
| 5   but not yet decided upon, would there be a |
| 6   "no" or a "yes" in this column? |
| 7   A.   It would be a -- it would be a "no" |
| 8   until it's been decided upon. |
| 9   Q.   And this column on consideration of |
| 10 potential eligibility for a Form 601(a), |
| 11 Application for Provisional Unlawful Presence |
| 12 Waiver, do you see that? |
| 13   A.   I do. |
| 14   Q.   What does a "yes" mean? |
| 15   A.   We considered it. We considered the |
| 16 potential eligibility and decision for |
| 17 continued removal process. |
| 18   Q.   Have there been any changes in the way |
| 19 that ICE Boston considers potential |
| 20 eligibility for a provisional waiver between |
| 21 July 2018 and today? |
| 22   A.   Can you repeat that one more time? |
| 23   Q.   Have there been any changes in the way |
| 24 that ICE Boston considers potential |

| 88 |
|---|
| 1   eligibility for a provisional waiver between |
| 2   July 2018 and today? |
| 3   A.   No, I don't think so. |
| 4   Q.   Previously -- |
| 5   A.   Go ahead. |
| 6   Q.   Previously, you testified that -- I |
| 7 believe you testified this, but please clarify |
| 8 me if I'm mistaken, that Mr. Lyons used to |
| 9 consider any I-130 application regardless of |
| 10 who filed it; is that correct? |
| 11   A.   At the beginning of litigation, |
| 12 correct. |
| 13   Q.   Has that changed? |
| 14   A.   Yes, that has. |
| 15   Q.   How has that changed? |
| 16   A.   Now that the Calderon class membership |
| 17 has been defined as somebody that has an I-130 |
| 18 pending or approved, by a USC spouse, that's |
| 19 who we considered. |
| 20   Q.   Do you consider an I-130 filed by a |
| 21 U.S. citizen child? |
| 22   A.   Not as a Calderon class member. |
| 23   Q.   Do you consider it at all? |
| 24   A.   Yes. |

89

1   Q.  The same way that you consider it for
2   a -- the application for a Calderon class
3   member?
4     A.  In what aspect?
5   Q.  Well, I'm not quite sure how you
6   consider it, so -- but I guess you would have
7   to tell me.
8     A.  For what -- for what part of the
9   enforcement process are you asking?
10  Q.  Any enforcement action.
11    A.  It's considered, yes.
12  Q.  Is it considered the same way that an
13  I-130 -- a Calderon class member's I-130 is
14  considered?
15    A.  It's considered just as any other
16  application for a benefit would be considered.
17  Q.  Is that the same as what, the way that
18  a Calderon class member's I-130 application is
19  considered?
20    A.  Yes.  It's considered in the same
21  manner.
22  Q.  So it -- then it hasn't changed,
23  except for that you've delineated which is a
24  Calderon class member?

90

1     A.  Correct.
2   Q.  Is that your testimony?
3     A.  (Witness nodding.)
4   Q.  Any other potential changes to the way
5   that ICE Boston considers potential
6   eligibility for a provisional waiver between
7   July 2018 and today?
8     A.  No.  I mean, maybe I'm not
9   understanding the question, but there really
10  hasn't been any change.  We've always
11  considered the fact that they have any kind of
12  benefit or application pending.  That's just
13  one of the many considerations that we take
14  into account when deciding to do any
15  enforcement effort.
16  Q.  Always have considered that?  ICE
17  Boston has always considered that?
18    A.  Since I've been there.
19  Q.  It was not -- since you've been at ICE
20  Boston or since July 2018?
21    A.  I'm going to say since July 2018 for
22  sure, since this litigation started.
23  Q.  It was not considered in the case of
24  Lilian Calderon, for example, was it?

9

1         MS. LARAKERS:  Objection.
2     A.  I don't know.
3   BY MS. SEWALL:
4   Q.  It was not considered in the case of
5   Lucimar de Souza, was it?
6     A.  I don't know.
7         MS. LARAKERS:  Objection.
8     A.  I don't know.
9
10        (Exhibit No. 11 marked for
11  identification.)
12
13  BY MS. SEWALL:
14  Q.  Do you recognize this document?
15    A.  I do.
16  Q.  What is it?
17    A.  It's an affidavit from -- who signed
18  this -- from -- from Acting FOD Todd Lyons.
19  Q.  It's dated February 21, 2018,
20  correct?
21    A.  Correct.
22  Q.  If you turn to Paragraph 5 on the
23  second page -- actually, let's start with
24  Paragraph 4.

92

1     A.  Okay.
2   Q.  This is in response to the Court's
3   question at 1(a) regarding the official who
4   made the decision that she, Calderon Jimenez,
5   should be detained.  That official was
6   ████████████████████████████
7   ████████████████████████████
8         Do you see that?
9     A.  I do.
10  Q.  Then in Paragraph 5, if you go down
11  to -- I think it's the second sentence just
12  towards the middle of the paragraph.  It says,
13  "A valid travel document" -- actually, sorry.
14        Let's start in the first sentence.  It
15  says, "Responding to the Court's question at
16  Paragraph 1(b) regarding the legal basis for
17  the decision, including whether ICE considered
18  her detention mandatory or discretionary" --
19  and then it goes down to second sentence, and
20  it says, "a valid travel document, Calderon's
21  Guatemalan passport, existed for execution of
22  Calderon's final order of removal.  Her
23  children were in care and custody of their
24  father, and she is not eligible of any

93

1 immigration benefits that would allow her to
2 remain in the United States."
3     Do you see that?
4   A. I do.
5   Q. So Todd Lyons is declaring that Lilian
6 Calderon is not eligible of any immigration
7 benefits that would allow her to remain in the
8 United States, correct?
9   A. Correct.
10   Q. But at the time of her arrest or
11 detention, she had an approved I-130
12 application, correct?
13         MS. LARAKERS: Objection.
14   A. I don't know.
15 BY MS. SEWALL:
16   Q. So he was not considering her
17 potential -- her potential eligibility for a
18 provisional waiver, was he?
19         MS. LARAKERS: Objection.
20   A. I don't know.
21 BY MS. SEWALL:
22   Q. You can put that to the side.
23
24

94

1 arrest?
2         MS. LARAKERS: Objection.
3   A. I don't -- I don't recall. I don't
4 think so.
5 BY MS. SEWALL:
6   Q. Were you informed of his detention at
7 the time of his detention -- at the time he
8 was detained? Sorry?
9   A. I don't recall.
10   Q. Do you recall any instructions you
11 gave regarding his arrest or detention?
12   A. No.
13   Q. Who would you talk to to figure out
14
15   A. Probably -- probably one of the AFODs.
16 I don't know how he was arrested. I don't
17 recall, depending on his arrest and what unit
18 arrested him.
19   Q. If you could turn back to Exhibit 10,
20 please.
21   A. Okay.
22   Q. There's a long list of names on this
23
24

95

1   A. I am.
2
3
4
5
6     Can you take a minute to look through
7 every name on this list and let me know when
8 you're finished?
9   A. Okay.
10   Q. You were the person who decided to
11 remove -- made the final decision to remove
12 these individuals, correct?
13   A. Correct.
14   Q. Do you remember the circumstances of
15 any of these individuals' arrest or detention?
16   A. No.
17   Q. Do you recall the factors that you
18 could -- I mean, do you recall the specifics
19 of their case that you considered in
20 determining whether to remove them?
21   A. Not without looking at the case file.
22   Q. As you sit here today, you can't
23 recall any specifics about their cases when
24 you decided -- at the time that you decided to

96

1 remove them?
2   A. No.
3   Q. You can't recall if you knew that any
4 of them had children, for example?
5   A. I know a few did --
6   Q. Which ones?
7   A. -- but also -- I can't -- don't -- off
8 the top of my head, I can't recall.
9   Q. What would you --
10   A. Specifically, who did and if I said --
11 if I mentioned somebody, I don't know if I
12 would be correct, so I wouldn't want to.
13   Q. What you -- you would need to look
14 back at their files to know one way or the
15 other?
16   A. Yeah, I would have to look at their
17 file and their case summary and EARM.
18 Everything I looked at, I look at to make the
19 decision.
20   Q. So when you say look at their file,
21 are you referencing -- what file exactly are
22 you referencing?
23   A. Their A-file.
24   Q. Is it their complete A-file from

**97**

1  USCIS?
2      A.  It is the A-file that we have with us,
3  whatever is in there.
4      Q.  So what's the A-file that you have
5  with you?  Is it different from their A-file
6  with USCIS?
7      A.  No.  It's probably -- it's the same
8  A-file, but we usually have the A-file with us
9  when we're making these decisions.
10     Q.  How often do you have the A-file with
11  you when you make these decisions?
12     A.  Should have it all the time.
13     Q.  Do you have it all the time?
14     A.  I believe on every -- in every case I
15  had it.  If I did -- I don't recall the time
16  that I didn't have access to the A-file
17  immediately.
18     Q.  And that's the A-file from USCIS?
19     A.  That is the alien's A-file.
20     Q.  So you call it up from USCIS when you
21  are going to make a removal decision?
22         MS. LARAKERS:  Objection.
23     A.  No.  Most of the time, we have the
24  A-file while they're in custody.  The only

**98**

1  ones -- these are all people in detention, so
2  we would have their case file with us.
3  BY MS. SEWALL:
4      Q.  At ICE, somewhere at ICE?
5      A.  Yes.
6      Q.  And are there circumstances when you
7  did not review an A-file for an individual?
8      A.  Not that I recall.
9      Q.  Can you recall any circumstance that
10  you didn't review an A-file when effectuating
11  a removal decision?
12         MS. LARAKERS:  Objection.
13     A.  On Calderon class members?
14  BY MS. SEWALL:
15     Q.  Yes.
16     A.  No.
17     Q.  A-file includes applications that the
18  alien has filed, correct?
19     A.  It should.
20     Q.  When you say "it should," does that
21  mean that it does or it does not?
22     A.  It -- it will depend on USCIS, on
23  whether or not they put it in there.  I don't
24  control that.

**99**

1      Q.  So USCIS sometimes does not put that
2  information in there?
3         MS. LARAKERS:  Objection.
4      A.  I don't know.
5  BY MS. SEWALL:
6      Q.  Have you seen an A-file where it's not
7  in there?
8      A.  I've seen an A-file that does not have
9  applications in it.  Whether or not there's
10  been an application filed with USCIS, I'm not
11  sure.
12     Q.  So if you have that information, why
13  do you need to call USCIS to figure out
14  information about the person's application?
15     A.  On which part?
16     Q.  You --
17     A.  There's --
18     Q.  -- testified earlier that you need to
19  call USCIS -- that ICE calls USCIS to get
20  information on the I-130 application?
21     A.  Right.
22     Q.  Correct?
23     A.  Right.
24     Q.  Why do you need to do that?

**200**

1      A.  So if the I-130 application is in the
2  A-file, then whoever is reviewing it -- it's
3  up to the -- the DO reviewing it to
4  determination whether or not that information
5  is in there if they're -- if that information
6  is not within the application, then they'll
7  call USCIS, or if there's no application
8  within the A-file, they'll call USCIS.
9      Q.  So they'll call USCIS to make sure
10  that a person didn't file an I-130 application
11  for every --
12     A.  No.
13     Q.  -- person?
14     A.  No.  They'll call USCIS to determine
15  who filed the I-130 application.
16     Q.  So if it's not in the A-file, they
17  wouldn't call USCIS --
18     A.  No.
19     Q.  -- because they wouldn't know --
20     A.  If there's no -- if there's not an
21  application on file or during a record check
22  of a potential -- within PCQS, which is the
23  system we use to check, if it's not in there,
24  then that -- there's not an I-130 application.

Case 1:18-cv-10225-MLW   Document 375-1   Filed 09/25/19   Page 52 of 86
Confidential
Transcript of Marcos Charles
Conducted on July 16, 2019

51 (201 to 204)

20

```
 1    Q.  How often are A-files updated?
 2            MS. LARAKERS:  Objection.
 3    A.  I don't know.  Whenever something new
 4  gets put in it, it's updated.
 5  BY MS. SEWALL:
 6    Q.  You don't know how often the
 7  information is refreshed?
 8            MS. LARAKERS:  Objection.
 9    A.  It's a living document.
10  BY MS. SEWALL:
11    Q.  So if you have it in your possession,
12  then USCIS can't add to that document once
13  it's in your possession?
14    A.  They can request it.
15    Q.  To add to it?
16    A.  Yes.
17    Q.  So you would have to mail it back to
18  them?
19    A.  It depends on the system in place at
20  the time.  It's different everywhere.
21    Q.  What's the system in place at ICE
22  Boston?
23    A.  If we have the file, USCIS will
24  request it if they need it, and then we'll
```

202

```
 1  send it to them.
 2    Q.  Mail it to them?
 3    A.  Yeah.
 4    Q.  And then you ask them to mail it back
 5  to you?
 6    A.  Correct.
 7    Q.  If you look back at Exhibit 6, please.
 8    A.  Okay.
 9    Q.  This is your June 17, 2019
10  declaration, correct?
11    A.  Correct.
12    Q.  If you please turn to Paragraph 7, it
13  says that "ICE maintains electronic and paper
14  records on aliens in the course of its
15  regularly conducted business activity.  These
16  records are made in the course of regularly
17  conducted business activity at or near the
18  time of relevant events by a person with
19  knowledge of these events."
20        Which records are you referring to in
21  this paragraph?
22    A.  A-files, EARM, temporary files, work
23  files.
24    Q.  What are the temporary files?
```

203

```
 1    A.  If we don't have an A-file with us, if
 2  it's somewhere else, if it's in national
 3  record center with CIS or with some other
 4  entity, we'll create a temporary file until
 5  the A-file gets -- we have access to the
 6  A-file.
 7    Q.  So in certain circumstances, will you
 8  review that temporary A-file rather than the
 9  full A-file from USCIS in executing removal
10  decisions?
11            MS. LARAKERS:  Objection.
12    A.  Not necessarily.
13  BY MS. SEWALL:
14    Q.  But you could?
15    A.  We could.  I mean, it's got potential
16  to happen, but, again, I don't normally make
17  removal decisions on any other cases other
18  than Calderon class members.
19    Q.  And for the Calderon class members,
20  have you ever relied on the temporary
21  A-file --
22    A.  No.
23    Q.  -- created by ICE?
24    A.  No.
```

204

```
 1    Q.  What were the other documents you
 2  mentioned that --
 3    A.  A work folder might be something that
 4  somebody's using just until the -- say another
 5  DO or somebody else has the A-file.  In order
 6  to keep all the documents together, they put
 7  it in an unnumbered work file or a numbered
 8  work file, but there's not an official work
 9  folder numbering system anymore.
10    Q.  There used to be?
11    A.  I believe there was at some point.  I
12  can't say for certain there was.
13    Q.  And this has documents about the
14  alien?
15    A.  Yeah, and it would be something that
16  was -- that would be put into the A-file.
17  It's not a -- it's not a long-term use.
18    Q.  So ICE adds to an A-file as well?
19    A.  Yes.
20    Q.  ICE and CIS both collaborate to make
21  an A-file; is that correct?
22            MS. LARAKERS:  Objection.
23    A.  Yes.  I -- yeah, we don't collaborate,
24  but it's -- an A-file has documents from ICE.
```

205

1  It could be from border patrol.  It could be
2  from CBP.  It could be from USCIS.  You also
3  have -- you also have judgment and conviction
4  documents from criminal history.  There could
5  be stuff on -- there could be medical
6  information in there.  It could be detention
7  center information.
8      Q.  And any other documents you're
9  referring to in this paragraph?
10     A.  Well, electronic would definitely be
11 EARM.  We also use field operation -- field
12 operation worksheets for targets.
13     Q.  What are those?
14     A.  Those are documents we use to -- for
15 operations.  I believe those would be law
16 enforcement sensitive.
17     Q.  Anything else?
18     A.  No.
19     Q.  An alien with a final order of removal
20 can file an I-246 form; is that correct?
21     A.  Can you be more specific?
22     Q.  It's an Application for a Stay of
23 Deportation or Removal?
24     A.  Yes.

206

1      Q.  That's an I-246?
2      A.  (Witness nodding.)
3      Q.  If ICE approves the I-246, ICE agrees
4  not to execute the final order of removal for
5  a certain period of time; is that right?
6          MS. LARAKERS:  Objection.
7      A.  If we -- I'm sorry, ask me that
8  question.
9  BY MS. SEWALL:
10     Q.  If ICE approves the I-246, ICE agrees
11 not to execute the final order removal for a
12 certain period of time?
13     A.  If we approve --
14         MS. LARAKERS:  Objection.
15     A.  -- the stay.
16 BY MS. SEWALL:
17     Q.  For example, ICE could grant a
18 one-year stay of removal?
19     A.  ICE can grant a one-year stay of
20 removal.
21     Q.  There's no other application that an
22 alien can file that will provide the same
23 protection from removal?
24         MS. LARAKERS:  Objection.

207

1      A.  With ICE?
2  BY MS. SEWALL:
3      Q.  Yes.
4      A.  Offhand, I can't think of any.
5      Q.  As part of the I-246 application, an
6  alien can submit materials for ICE's review,
7  correct?
8      A.  Correct.
9      Q.  Materials such as personal medical
10 documentation, documentation concerning
11 employment or financial issues?
12     A.  Correct.
13     Q.  Documentation concerning the alien's
14 spouse?
15     A.  Correct.  They can -- they can add
16 whatever they want to it.
17     Q.  And ICE reviews all of that
18 documentation when deciding whether to approve
19 the I-246 application, correct?
20     A.  ICE reviews all information that's
21 provided.
22     Q.  An applicant must submit the I-246 to
23 a local ERO field office, right?
24     A.  Correct.

208

1      Q.  After ICE Boston ERO receives such an
2  I-246 application, what happens with that
3  application?
4      A.  When -- it gets fee'd in and then
5  pushed up to through the channels to -- for
6  final -- for review by the DFOD and the FOD.
7      Q.  So you review Applications for Stay of
8  Removal?
9      A.  I have.
10     Q.  How many people in the Boston ERO are
11 responsible for that review?
12     A.  It would be the DFODs and the FOD.  An
13 AFOD may review it, but it has -- they'll just
14 review it for information and push it up.
15     Q.  So it has to be a DFOD, an acting
16 DFOD, or a FOD who reviews --
17     A.  Right --
18     Q.  -- and decides?
19     A.  -- and the final decision is on the
20 FOD.
21     Q.  So what might happen during an initial
22 review?  Would the initial reviewer provide a
23 recommendation, whether the application should
24 be approved?

209

1           MS. LARAKERS:  Objection.
2       A.  No, not necessarily.  I mean, they
3   might.
4   BY MS. SEWALL:
5       Q.  But they might just pass it up?
6       A.  Yeah, if they're looking at it,
7   they're looking at it for accuracy or if
8   there's anything missing or anything in the
9   case history that would preclude that I-246
10  from going forward.
11      Q.  Do you believe the I-246 process is
12  important to applicants?
13      A.  Yes.
14      Q.  Why is that?
15      A.  Provides them a means of a stay of
16  removal, so -- in order for them to get their
17  situation put together so that after the time
18  of the stay of removal, they can self-remove
19  or be ready to be removed.
20      Q.  And do you believe the I-246 process
21  is important to ICE?
22      A.  Yeah, yeah.
23      Q.  And why is that?
24      A.  Same reason, it helps -- it helps us

2 0

1   help the person do what they need to do to
2   move forward in their case.
3       Q.  And the I-246 is the usual way that
4   ICE would decide whether to remove someone who
5   has a final order of removal, right?
6           MS. LARAKERS:  Objection.
7       A.  No.
8   BY MS. SEWALL:
9       Q.  Why not?
10      A.  Ask me -- can you ask me again?
11      Q.  The I-246 is the usual way that ICE
12  decides whether to remove someone who has a
13  final order of removal?
14      A.  Sounds like a statement, not a
15  question.
16      Q.  Is that correct is the question.
17      A.  That is not correct.
18      Q.  What's the usual way?
19      A.  If we decide if we're going to remove
20  somebody?
21      Q.  Yes.
22      A.  Again, taking in all the factors of
23  the case.
24      Q.  So the I-246 application has nothing

2

1   to do with the removal decision?
2           MS. LARAKERS:  Objection.
3       A.  If they have an approved stay, then
4   we're not going to remove them until after the
5   period of the stay is expired.
6   BY MS. SEWALL:
7       Q.  But if they don't have an approved --
8   if they have a rejected application or don't
9   have an approved application, then nothing
10  prevents their removal?
11      A.  Which means they do not have a stay,
12  correct.
13      Q.  If an applicant receives a stay under
14  the I-246, how is that noted in the
15  applicant's file?
16      A.  The I-246 -- copy of the I-246 and all
17  documents that were provided with -- are
18  placed in the A-file.  It's notated that they
19  have an approved stay with an EARM.  That's
20  pretty much it.
21      Q.  How does a check-in officer know
22  whether a stay has been granted?
23      A.  They have access to EARM.  They may
24  have access to the file.  Immediate access,

2 2

1   they may not.
2       Q.  From ICE's perspective, what's the
3   difference of granting a one-year stay of
4   removal and having an alien check in only once
5   a year?
6           MS. LARAKERS:  Objection.
7       A.  I'm sorry?
8   BY MS. SEWALL:
9       Q.  From ICE's perspective, what's the
10  difference between granting a one-year stay of
11  removal and having an alien check in only once
12  a year?
13          MS. LARAKERS:  Objection.
14      A.  It could be for different reasons.  A
15  one-year check-in may not -- it could be for
16  several other reasons, other than just for a
17  stay, might not be able to remove that alien
18  for some reason.
19  BY MS. SEWALL:
20      Q.  And if an I-246 is rejected, that
21  means that the alien didn't provide some
22  required documentation; is that correct?
23      A.  Not necessarily.
24      Q.  Why else would it be rejected?

2 3

1    A.  We may not have jurisdiction on the
2  case as far as per the 246.
3    Q.  Is that the only other reason?
4    A.  Not fee'd in properly.  There are --
5  some error of some sort.
6    Q.  Is that like a technical error on
7  ICE's end?
8    A.  No.
9    Q.  What is that, "not fee'd in"?
10   A.  It would be on the person who -- maybe
11 they didn't -- they didn't provide the right
12 type of payment, they didn't pay the right
13 amount.  I mean, there are a number of
14 reasons.
15   Q.  So some requirement was not met?
16   A.  Some requirement was not met.
17   Q.  Sort of like a threshold requirement,
18 is that --
19   A.  Correct.
20   Q.  -- a fair characterization?
21   A.  (Witness nodding.)
22   Q.  Then if it's denied, that means it was
23 substantively considered and denied?
24   A.  Correct.

2 4

1    Q.  Are you aware of any class members in
2  this case who have provided for stays under
3  I-246?
4    A.  I couldn't tell you who.  I know -- I
5  don't know if any of the ones here on this
6  list have or anybody else has, so no.
7    Q.  You can't tell me one way or the
8  other?
9    A.  Just looking at the spreadsheet, I
10 don't know when -- these two individuals that
11 have rejected 246s, one is rejected 1/7/19,
12 and the other one is 2/19/19.  Those -- basing
13 my -- basing the fact that they're on this
14 spreadsheet stating that, I can say that they
15 were rejected at that time.  Other than -- the
16 other ones, I do not know.
17   Q.  And this spreadsheet doesn't indicate
18 when someone has filed an I-246?
19   A.  It does not.
20   Q.  ICE could identify potential class
21 members based on their Form I-246
22 applications, correct?
23        MS. LARAKERS:  Objection.
24   A.  Can you ask that again?

2 5

1  BY MS. SEWALL:
2    Q.  ICE could identify potential class
3  members based on their Form I-246
4  applications; is that correct?
5        MS. LARAKERS:  Objection.
6    A.  The class members, if they were in
7  detention, would have already been identified.
8  And as far as people in nondetained, that may
9  be a way that they were identified, but that's
10 not the only way.
11 BY MS. SEWALL:
12   Q.  But is a way to identify class
13 members?
14        MS. LARAKERS:  Objection.
15   A.  Only if that's the first time that we
16 had them checking in or coming in.
17 BY MS. SEWALL:
18   Q.  It's a way the identify class
19 members?
20        MS. LARAKERS:  Objection.
21   A.  I don't know if we could, honestly.  I
22 don't -- it depends on what -- information
23 that was provided.
24   Q.  Who would you want to ask if you could

2 6

1  find out?
2        MS. LARAKERS:  Objection.
3    A.  I would ask my people that work up in
4  the front, so one of my SDDOs or AFODs that
5  work nondetained.  I would have to look at it.
6  BY MS. SEWALL:
7    Q.  You'd have to look at each --
8    A.  I would have to look the 246
9  application to see if that's something we
10 could gather.
11   Q.  And generally speaking, a person's
12 applications are going to be listed on the
13 I-246 application --
14        MS. LARAKERS:  Objection.
15 BY MS. SEWALL:
16   Q.  -- is that right?
17   A.  I don't recall if they're on there or
18 not.  I don't recall a place on the form
19 itself, but I do know that some of the 246
20 applications that I've seen do have that
21 documentation in them, but not to say that
22 those were Calderon class members and not to
23 say that was in Boston.
24   Q.  So ICE could provide notice of this

2 7

1  litigation to class members who file Form
2  I-246 applications, correct?
3          MS. LARAKERS:  Objection.
4      A.  I don't know if it would be an
5  accurate statement that we could identify them
6  based on that, so I don't know.
7  BY MS. SEWALL:
8      Q.  You testified that many times people
9  will list their applications, including I-130
10 applications?
11          MS. LARAKERS:  Objection.
12     A.  But not always.
13 BY MS. SEWALL:
14     Q.  Right.
15     A.  So it --
16     Q.  So people who do list it, you could
17 identify class members, correct?
18     A.  I guess we could identify them in that
19 sense.
20     Q.  And then you could provide notice to
21 them of this litigation?
22     A.  I believe that we -- there's many
23 different ways we could provide notification.
24 I don't...

2 8

1      Q.  Is that something that ICE would be
2  willing to do?
3          MS. LARAKERS:  Objection.
4      A.  No, not without a court order for us
5  to do that.
6  BY MS. SEWALL:
7      Q.  And why not?
8          MS. LARAKERS:  Objection.
9      A.  We have -- that is a resource issue
10 more than anything.  We have limited resources
11 on what we can do, and our resources at --
12 currently are being stretched very thin.
13 BY MS. SEWALL:
14     Q.  So you have -- if you're adjudicating
15 an application, you know if somebody is a
16 class member if it's listed in the
17 application, correct?
18          MS. LARAKERS:  Objection.
19     A.  If everything is there that we need to
20 identify a class member within that packet.
21 BY MS. SEWALL:
22     Q.  So for those individuals where
23 everything is there that you need to identify
24 a class member, would it be unduly burdensome

2 9

1  to provide that person notice of this
2  litigation?
3          MS. LARAKERS:  Objection.
4      A.  It could be.  I'd would have to
5  research it.  I'd would have to look at it.
6  BY MS. SEWALL:
7      Q.  Can you tell me the reason that it
8  would be too burdensome?
9      A.  Resources.
10     Q.  How many resources would it require?
11          MS. LARAKERS:  Objection.
12     A.  I don't know.  I'd have to look at it.
13 BY MS. SEWALL:
14     Q.  You could also provide reporting on
15 class members who file I-246 applications,
16 correct?
17          MS. LARAKERS:  Objection.
18     A.  Isn't that what we're doing here with
19 this?
20          (Witness indicating.)
21     Q.  No.  This reporting is on detained
22 class members.
23     A.  Don't we have a spreadsheet also for
24 nondetained that are in check-ins?

220

1      Q.  That are in checks-ins, but not
2  nondetains who filed I-246 applications.
3      A.  Well, they would have to come check in
4  in order for us to get that 246.  If they file
5  it -- also, if they file at another location,
6  we wouldn't know.
7      Q.  So if somebody filed an I-246
8  application with the Boston ERO, you're saying
9  they would have to check in to file it?
10     A.  They would have to -- they would have
11 to come -- they would have to come in and do
12 that, so at that time we would most likely put
13 them in a spreadsheet.
14     Q.  So you're saying people who come in
15 and file I-246 applications are included on
16 the spreadsheet?
17          MS. LARAKERS:  Objection.
18     A.  Not necessarily.  If they're coming in
19 and they're on a nondetained docket or if
20 they're in -- if they fall under the Boston
21 AORs jurisdiction, they might, but if somebody
22 comes and files an I-246 but is not under the
23 Boston field office jurisdiction, then why
24 would we include it?  And then what if

22

1  somebody filed an I-246 at another location
2  that wasn't within the Boston AOR?
3      Q.   So if somebody who comes in with an
4  I-246 application, who is within the Boston
5  ERO jurisdiction, files that application, that
6  person will be included on the spreadsheets --
7      A.   I would have to --
8      Q.   -- providing --
9      A.   I can't confirm that.  I would have to
10 look it.
11     Q.   If they're not being included and
12 they -- they could be included without much
13 added effort, it sounds like?
14          MS. LARAKERS:  Objection.
15     A.   Again, I would have to look at it.  I
16 don't want to commit to that right now until I
17 review and look at our resources and what it
18 would take to do that.
19 BY MS. SEWALL:
20     Q.   Who will you talk to to figure out if
21 that's a feasible option?
22     A.   My staff.
23     Q.   Who on your staff?
24     A.   My AFODs over -- my AFOD over in

222

1  nondetained, my deputy field office director.
2      Q.   Todd Lyons?
3      A.   Yes.
4      Q.   Anyone else?
5      A.   No.



223

224

1  BY MS. SEWALL:
2      Q.   This is going to be a
3  highly-confidential transcript.
4          MS. LARAKERS:  It's not that.
5  It's --
6          MS. SEWALL:  It's not going to
7  be shared with anybody.
8          MS. LARAKERS:  I understand
9  that.  And if it were just law enforcement
10 sensitive, maybe, but details about an
11 operation that's going to take place is law
12 enforcement privilege, not just law
13 enforcement sensitive, because counter
14 measures could be taken and our protective
15 order doesn't protect -- we are protected
16 against having to produce law enforcement
17 privileged information.  If you would like to
18 ask, like, whether that --
19          MS. SEWALL:  I'll think about --
20 let me think about a way to phrase it and see
21 if you still object.
22          MS. LARAKERS:  Okay.
23          MS. SEWALL:  So you're
24 instructing him not to answer whether these

Transcript of Marcos Charles
Conducted on July 16, 2019

225

1  raids are going to take place in the Boston
2  ERO?
3          MS. LARAKERS:  Yes.
4          MS. SEWALL:  We can let the
5  record reflect that.  And is that based --
6  which privilege is that based on?
7          MS. LARAKERS:  It's law
8  enforcement privilege.
9  BY MS. SEWALL:
10   Q.   So hypothetically speaking, if the
11  raids were planned to take place in the Boston
12  ERO -- I'm not the saying if they are or if
13  they aren't.  I'm not asking you to answer
14  that question -- would the Boston ERO take
15  steps to -- take steps to make sure that
16  potential Calderon class members are
17  identified?
18   A.   Yes.
19   Q.   Prior to arrest?
20   A.   Prior to arrest.
21   Q.   What steps would be taken?
22  ████████████████████████████████
23  ████████████████████████████████
24  ████████████████████████████████

226

1  ████████████████████████████████
2  ████████████████████████████████
3  ████████████████████████████████
4  ████████████████████████████████
5  ████████████████████████████████
6  ████████████████████████████████
7  ████████████████████████████████
8  ████████████████████████████████
9  ████████████████████████████████
10   Q.   But only the records will show whether
11  that actually happened --
12   A.   Correct.
13   Q.   -- is that correct?
14   A.   Correct.
15   Q.   You have no independent knowledge, as
16  you sit here today?
17   A.   I don't have any independent knowledge
18  of any of the arrests that were made without
19  prior approval.
20   Q.   If these arrests were to take place in
21  the Boston ERO, would there be any sort of
22  official arrest or removal quotas instituted
23  as part of the raids?
24   A.   No.

227

1   Q.   Would there be any unofficial arrest
2  or removal quotas instituted as part of
3  raids?
4          MS. LARAKERS:  Objection.
5   A.   No.
6  BY MS. SEWALL:
7   Q.   Does ICE Boston have any arrest or
8  removal quotas, whether official or
9  unofficial?
10   A.   No.
11   Q.   Is your performance as FOD evaluated
12  in any manner based on number of arrests or
13  removals the office executes?
14          MS. LARAKERS:  Objection.
15   A.   No.
16  BY MS. SEWALL:
17   Q.   Do you have to answer to headquarters
18  if -- about the number of arrests and removals
19  that you execute?
20          MS. LARAKERS:  Objection.
21   A.   Not rating-wise, no.
22  BY MS. SEWALL:
23   Q.   How do you have to answer to them
24  about the arrest totals?

228

1          MS. LARAKERS:  Objection.
2   A.   We make our reports as to what we've
3  arrested and what we've removed.
4   Q.   You testified part of your
5  responsibility as FOD is carrying out
6  headquarter directives?
7   A.   Correct.
8   Q.   Which headquarter directives were you
9  referring to?
10          MS. LARAKERS:  Objection.
11   A.   Operations, budget constraints,
12  administrative -- administrative duties,
13  insofar as our mission support specialists and
14  what they can and can't do, vehicles, mainly
15  administrative things.
16  BY MS. SEWALL:
17   Q.   Have you ever talked to anybody at
18  headquarters about this litigation?
19   A.   Not specifically, no.
20   Q.   What do you mean by "not
21  specifically"?
22   A.   Mentioned that there is litigation,
23  you know, we're having to deal with litigation
24  just like every other AOR in the country is.

Transcript of Marcos Charles
Conducted on July 16, 2019

---

229

1    Q.   And in what context did you mention
2  that?
3    A.   Just in conversation.
4    Q.   Conversation -- in meetings or in
5  passing conversation?
6    A.   Passing conversation.
7    Q.   Where did -- where would the passing
8  conversations take place?
9    A.   It could be over the phone or at -- at
10 headquarters or at meetings or at gatherings,
11 not meetings necessarily.
12   Q.   Conferences?
13   A.   Conferences.
14   Q.   You were recently at a conference,
15 right?
16   A.   I was.
17   Q.   Which conference was that?
18   A.   That was the --
19        MS. LARAKERS:  Objection.
20   A.   -- the FOD conference.
21 BY MS. SEWALL:
22   Q.   And did you discuss this with any
23 other FODs at that conference?
24   A.   Not specifics, no.

---

230

1    Q.   You just mentioned the fact that
2  litigation was ongoing?
3    A.   Yes.
4    Q.   Any other conversation?
5    A.   Not specifically.
6        MS. LARAKERS:  Objection.
7  BY MS. SEWALL:
8    Q.   No other information was discussed?
9    A.   No.
10       MS. LARAKERS:  Objection.
11 BY MS. SEWALL:
12   Q.   Just the fact of the litigation?
13   A.   Yeah, something like there's -- we
14 have litigation, just like every other AOR
15 does, kind of thing.
16   Q.   Are you aware that between July 2017
17 and July 2018, ICE Boston was arresting aliens
18 who presented themselves at CIS offices for
19 I-130 interviews?
20   A.   Yes.
21   Q.   What is the current policy at ICE
22 Boston regarding arrest of individuals who
23 present themselves at CIS offices for I-130
24 interviews?

---

23

1    A.   The only time we would make an arrest
2  at a CIS location would be national security,
3  public safety, immediate threat.
4    Q.   Have employees received any written
5  communication on that policy?
6    A.   I don't know.  I haven't sent anything
7  out.  I don't remember if the Acting FOD Todd
8  Lyons may have sent something out.
9    Q.   You don't know though?
10   A.   I don't remember.  I don't remember if
11 he did and I -- I have not.
12   Q.   If he sent something out, would it
13 have been in an e-mail?
14   A.   Yes.
15   Q.   Do you know the approximate time he
16 would have sent it out?
17   A.   No.
18       MS. LARAKERS:  Objection.
19 BY MS. SEWALL:
20   Q.   You're designated as the 30(b)(6)
21 witness on arrests, detention, and removal of
22 Calderon class members, correct?
23   A.   Correct.
24       MS. LARAKERS:  Objection.

---

232

1  BY MS. SEWALL:
2    Q.   You don't know whether there has been
3  an e-mail sent out about whether there's a
4  policy -- about the policy to arrest or not
5  arrest individuals who present themselves at
6  CIS offices?
7    A.   I don't remember if there was.
8    Q.   Do you know if the policy is followed?
9    A.   Yes.  We have not made any arrests at
10 USCIS.
11   Q.   How do you know that the policy is
12 followed?
13   A.   Because we have not made any arrests
14 at USCIS.
15   Q.   If an arrest at CIS were to occur,
16 would you inform class counsel in the Calderon
17 litigation?
18       MS. LARAKERS:  Objection.
19   A.   Not directly.  I would notify my
20 counsel.
21 BY MS. SEWALL:
22   Q.   If an arrest at USCIS were to occur,
23 would you inform Judge Wolf?
24       MS. LARAKERS:  Objection.

---

233
1    A.  Again, I would not directly.  I would
2  inform my counsel.
3  BY MS. SEWALL:
4    Q.  What are the ramifications -- what
5  would the ramifications be for failing to
6  abide by the policy about arrests at USCIS
7  offices?
8         MS. LARAKERS:  Objection.
9    A.  Depending on the case.  It would
10 definitely depend on the case and the
11 situation.
12 BY MS. SEWALL:
13   Q.  When was the last time that ICE Boston
14 arrested an alien at USCIS offices?
15   A.  I don't know the date.
16   Q.  Has ICE Boston arrested anyone at
17 USCIS offices since July 2018?
18         MS. LARAKERS:  Objection.
19   A.  Not that I know of.
20 BY MS. SEWALL:
21   Q.  Do you know for sure?
22   A.  To the best of my knowledge, no.
23   Q.  Who would you ask if you wanted to
24 find out for sure?

234
1    A.  DFOD Lyons.
2    Q.  Why did ICE Boston begin arresting
3  people at CIS offices to begin with?
4         MS. LARAKERS:  Objection.
5    A.  I don't know why they decided to do
6  that at the time.
7  BY MS. SEWALL:
8    Q.  Has ICE Boston ever informed the
9  public that it will not arrest an alien
10 appearing for I-130 interviews at CIS offices
11 absent national security threat or public
12 safety?
13   A.  I don't -- I don't think so.
14   Q.  Have you ever issued a press release
15 to that effect?
16   A.  I have not.
17   Q.  Why not?
18   A.  Really never thought about doing
19 something like that.
20   Q.  Would you consider doing something
21 like that?
22   A.  I would consider it.  I don't know if
23 I would do it, depending on the situation.
24   Q.  It would encourage people to partake

235
1  in the provisional waiver process, wouldn't
2  it?
3         MS. LARAKERS:  Objection.
4    A.  I don't know.
5  BY MS. SEWALL:
6    Q.  Do you think that some people are too
7  scared to participate because they're worried
8  that they will be arrested, given the history
9  of this case and others around the country?
10         MS. LARAKERS:  Objection.
11   A.  I can't speculate on what other people
12 think.
13 BY MS. SEWALL:
14   Q.  Do you think a press release might
15 help dispel some of that fear?
16         MS. LARAKERS:  Objection.
17   A.  I don't know.
18 BY MS. SEWALL:
19   Q.  And if this is your policy, why not
20 make the policy public?
21         MS. LARAKERS:  Objection.
22   A.  Same reason, just -- I don't know if
23 that needs to be done.
24 BY MS. SEWALL:

236
1    Q.  Doesn't -- I'm not sure it needs to be
2  done, but is it something that you would want
3  to do?
4         MS. LARAKERS:  Objection.
5    A.  I'd have to look at it.
6  BY MS. SEWALL:
7    Q.  Who would you discuss it with?
8         MS. LARAKERS:  Objection.
9  Don't -- if you have had discussions about
10 that, don't reveal the content of those
11 discussions.
12   A.  Right.  I would speak with my --
13         MS. SEWALL:  Is that --
14         MS. LARAKERS:  It would be
15 predecisional.  Obviously, he hasn't made a
16 decision.  He answered he hasn't made a
17 decision about that yet.
18         MS. SEWALL:  But this is not
19 like a -- this isn't a something like a raid.
20 It isn't a public safety issue.
21         MS. LARAKERS:  No.  It's
22 deliberative process.  So if he has had
23 conversations with them, with other people, if
24 other people have made recommendations one way

237

1  or the other, that would be deliberative prior
2  to a decision, the final decision being
3  whether he would -- whether he would decide to
4  issue a press release.
5          He can answer the question.  I'm
6  saying, don't answer the question to the
7  extent that you have -- about conversations
8  that he has had with other people about their
9  recommendations, but he can answer the
10 question.  I'm just saying it should be a
11 caveat -- he does not have to answer if it
12 includes that.
13         MS. SEWALL:  I think I can
14 object to that, but if that's your
15 instruction, that's your instruction.
16    A.  I would talk with my DFOD, my counsel
17 and our public affairs.
18 BY MS. SEWALL:
19    Q.  DFOD is Todd Lyons?
20    A.  Yes.
21    Q.  If this litigation were to go away,
22 you would be free to reinstate a policy of
23 arresting individuals at USCIS offices; is
24 that correct?

238

1          MS. LARAKERS:  Objection.
2    A.  Are you giving me permission to do
3  that?
4  BY MS. SEWALL:
5    Q.  I'm saying, if the litigation were to
6  go away, you would be free to do that; is that
7  correct?
8          MS. LARAKERS:  Objection.
9    A.  I don't -- that would be hypothetical.
10 That's hypothetical.  I don't -- I'm not going
11 to respond a yes or no on that because I --
12 that's not something that I've even
13 considered.
14 BY MS. SEWALL:
15    Q.  I guess the question is:  You would be
16 free to do that if this litigation were to go
17 away?
18         MS. LARAKERS:  Objection.
19    A.  I would be free to do what exactly?
20 BY MS. SEWALL:
21    Q.  Reinstate a policy of arresting
22 individuals who present themselves at I-130
23 interviews at USCIS.
24         MS. LARAKERS:  Objection.

239

1    A.  I mean, technically, we could -- if
2  that -- without the litigation, technically,
3  we could, but I don't see that we would do
4  that.  I don't see that we would change the
5  policy.
6  BY MS. SEWALL:
7    Q.  Your successor -- you're in this job
8  for another 190-ish days, something like
9  that?
10    A.  Something like that.
11    Q.  And your successor after you could
12 reinstate the policy if this litigation were
13 to go away; is that right?
14    A.  Again, I mean, it's -- it's possible.
15 I don't think it's probable.
16    Q.  But you don't know who your successor
17 is going to be?
18    A.  No, I do not.
19    Q.  You're aware that between July 2017
20 and July 2018, ICE Boston coordinated, in
21 certain instances, with CIS to affect arrests
22 of aliens who appeared for I-130 interviews at
23 USCIS?
24         MS. LARAKERS:  Objection.

240

1    A.  Correct.
2    Q.  Does ICE Boston still coordinate with
3  CIS to effectuate arrests for aliens appearing
4  for I-130 interviews?
5    A.  We don't arrest anybody at I-130
6  interviews.
7    Q.  Does ICE Boston communicate with CIS
8  about when people will arrive for their I-130
9  interviews?
10    A.  They do not.
11    Q.  What's that?
12    A.  I do not.
13    Q.  And have you -- have the ICE Boston
14 employees received any written communication
15 about not making these sorts of communications
16 with CIS?
17         MS. LARAKERS:  Objection.
18    A.  Not that I know of.
19    Q.  Has anybody at CIS received any sort
20 of communication from ICE Boston on not
21 making -- on not -- let me restart.
22         Has ICE Boston instructed anyone at
23 CIS not to communicate with ICE Boston on when
24 people are appearing for their I-130

---

**241**

1 interviews in order to effectuate arrests?
2    A.  No.
3    Q.  How do you know that the -- this
4 policy is being followed?
5    A.  Which policy?
6    Q.  How do you know that ICE CIS and ICE
7 Boston are not coordinating to make arrests at
8 CIS offices?
9    A.  Because we haven't made any arrests at
10 USCIS.
11    Q.  If ICE Boston were to collude with CIS
12 to make an arrest, would you inform
13 petitioner's counsel?
14        MS. LARAKERS:  Objection.
15    A.  "Collude" is such a strong word.
16 BY MS. SEWALL:
17    Q.  I'll rephrase.
18        If ICE Boston were to coordinate with
19 CIS to make an arrest of an individual who
20 presented themselves in an I-130 interview,
21 would you inform petitioner's counsel?
22        MS. LARAKERS:  Objection.
23    A.  I would -- again, I would inform my
24 counsel and my --

**242**

1    Q.  You wouldn't inform Judge Wolf?
2    A.  No.
3        MS. LARAKERS:  Objection.
4    A.  Not directly.
5 BY MS. SEWALL:
6    Q.  Is CIS still scheduling I-130
7 interviews?
8        MS. LARAKERS:  Objection.
9    A.  I don't know.  It's a CIS action.
10 BY MS. SEWALL:
11    Q.  You have no information on CIS and
12 their scheduling of I-130 interviews?
13        MS. LARAKERS:  Objection.
14    A.  I do not.
15 BY MS. SEWALL:
16    Q.  What is the RCA?
17    A.  The -- gosh, what does it stand for?
18 My mind just went blank on RCA, but it -- we
19 use -- it's a module within EARM that advises
20 on -- takes factors into consideration on
21 detention or release based on the information
22 that's input into EARM.
23    Q.  Who inputs the information to EARM?
24    A.  The processing officer.

**243**

1    Q.  Is that the --
2    A.  The deportation officer.
3    Q.  And is that --
4    A.  We're being specific with Boston, so
5 yes, it's the deportation officer.
6    Q.  Is that information input when --
7    A.  Sorry, it's killing me.  I'm trying to
8 remember the acronym.  I can't.
9    Q.  Is it risk classification
10 assessment?
11    A.  Thank you.  Yes.
12    Q.  Is the deportation -- God, I just lost
13 my train of thought, sorry.
14        When -- does the deportation officer
15 input that information to EARM prior to making
16 an arrest decision?
17        MS. LARAKERS:  Objection.
18    A.  No.
19 BY MS. SEWALL:
20    Q.  So what's the process -- when does RCA
21 come into play in executing an arrest
22 decision?
23    A.  On an arrest decision?  It does not.
24    Q.  When -- it comes into play on a

**244**

1 detention decision?
2    A.  Correct.
3    Q.  So the deportation officer inputs
4 information after the arrest into RCA --
5    A.  Correct.
6    Q.  -- based on information gathered
7 during the arrest?
8    A.  Based on information gathered at the
9 arrest, any post or past immigration
10 information.  It's an accumulation of
11 immigration history, criminal history, time of
12 entry.
13    Q.  Then RCA spits out a recommendation on
14 whether to detain the person or have them
15 under an order of supervisories?
16    A.  It spits out a -- yeah, a -- I
17 wouldn't call it necessarily a recommendation,
18 but an opinion.
19    Q.  Is one of the factors that you can
20 input for the RCA's consideration whether
21 somebody has an I-130 application?
22    A.  I don't recall if there's any --
23 there's definitely nothing for an I-130,
24 specifically.  I don't recall if there's

Case 1:18-cv-10225-MLW   Document 375-1   Filed 09/25/19   Page 63 of 86
Confidential
Transcript of Marcos Charles
Conducted on July 16, 2019

62 (245 to 248)

245

1 anything for benefits or any kind of
2 petitions.
3    Q.  Who would you ask if you wanted to
4 find that out?
5    A.  Probably one of my AFODs over at -- at
6 large.
7    Q.  Could RCA be set up to have that be a
8 piece of information that's input into it?
9    A.  I don't know.
10         MS. SEWALL:  Do you want to take
11 a quick ten-minute break now?
12         MS. LARAKERS:  Sure.
13         THE VIDEOGRAPHER:  We are off
14 the record at 3:12 p.m.
15
16         (Recess taken from 3:12 p.m.
17         to 3:38 p.m.)
18
19         THE VIDEOGRAPHER:  We are on the
20 record at 3:38 p.m.
21 BY MS. SEWALL:
22    Q.  We talked about how ICE Boston can
23 hold individuals under orders of supervision,
24 correct --

246

1    A.  Correct.
2    Q.  -- as an alternative to detention?
3    A.  (Witness nodding.)
4    Q.  Is an individual status as a Calderon
5 class member considered in giving people
6 restrictive conditions of supervision?
7         MS. LARAKERS:  Objection.
8    A.  I'm sorry, can you repeat that?
9 BY MS. SEWALL:
10    Q.  Is an individual's stat as a Calderon
11 class member considered in giving people
12 restrictive conditions of supervision?
13         MS. LARAKERS:  Objection.
14    A.  Can you define "restrictive conditions
15 of supervision"?
16    Q.  For example, an ankle bracelet, a
17 requirement to stay home once a week,
18 something along those lines?
19    A.  Depending on the case itself and the
20 history of the individual, we can consider
21 alternatives to detention or detention.
22    Q.  And if you have already determined
23 that somebody should not be detained but on an
24 order of release, is their status as a

247

1 Calderon class member considered when deciding
2 which restrictive conditions to impose on the
3 individual?
4    A.  No.
5    Q.  Who decides which restrictive
6 conditions to impose on an individual?
7    A.  It's all based upon the individual's
8 history and case in itself.
9    Q.  And the filing of an I-130 application
10 would have no impact on restrictive conditions
11 to place on them?
12    A.  No.
13         MS. LARAKERS:  Objection.
14 BY MS. SEWALL:
15    Q.  What's the compliance rate for aliens
16 under order of supervision by ICE Boston?
17         MS. LARAKERS:  Objection.
18    A.  I don't know.
19 BY MS. SEWALL:
20    Q.  Do you know where you would look if
21 find that out?
22    A.  Compliance for?
23    Q.  Check-ins.
24         MS. LARAKERS:  Objection.

248

1    A.  So compliance for check-ins, from what
2 point to what point?
3 BY MS. SEWALL:
4    Q.  From the first check-in to the second
5 check-in?
6    A.  I don't know where -- I mean, I don't
7 think that's a stat that we keep.
8    Q.  What measures has ICE Boston taken to
9 identify individuals who are class members?
10    A.  In detention or...
11    Q.  Both in detention and not in
12 detention.
13    A.  The -- to identify people that are in
14 detention, so if they haven't been identified
15 upon arrest or initial screening before
16 detention, if they have not been identified at
17 that time, if they were preclass member, my
18 DOs are conducting monthly scrubs.  Honestly,
19 I -- biweekly scrubs is what we were looking
20 at to have them look at their docket and see
21 if there's any -- anybody that is now a
22 Calderon class member.
23    Q.  Are you saying monthly or biweekly
24 scrubs of the --

249

1    A.  I'm trying to remember the last -- I
2  want to say the last information I put out was
3  that I wanted to have biweekly.
4    Q.  Of the detained docket?
5    A.  Of the detained docket.
6    Q.  By -- who would do those?
7    A.  Deportation officers of the detained
8  docket.
9    Q.  And how would you conduct those
10  scrubs?
11    A.  I would have to look back at my
12  e-mail, if it was two weeks or one month for
13  the last one I sent out.
14    Q.  It's in your e-mail though?
15    A.  Yes.
16    Q.  And who -- how do they conduct those
17  scrubs?
18    A.  They go through their docket and
19  run -- run records checks, run PCQS, to see if
20  anybody has filed or has an approved I-130.
21    Q.  PCQ --
22    A.  PCQS.
23    Q.  What's that?
24    A.  PCQS is a database that we -- I don't

250

1  know who owns it.  It might be CIS, but it
2  gives us information on petitions, I-130
3  petitions.
4    Q.  Could you use this database to figure
5  out who filed an I-130 --
6    A.  No.
7    Q.  -- petition?
8    A.  No.
9    Q.  It just tells you the status of the
10  I-130 petition?
11    A.  Yes.
12    Q.  What's your understanding of the POCR
13  regulations?
14    A.  That anybody that has a final order
15  needs to have a post-order custody review
16  after 90 days of detention.
17    Q.  And actually, returning to
18  identification of Calderon class members, I
19  asked you the measures that ICE has taken to
20  identify Calderon class members?
21    A.  Uh-huh.
22    Q.  And you mentioned the biweekly scrubs
23  of the detained docket, but I forgot to
24  follow-up and ask if there's anything else

251

1  that you've done.
2            MS. LARAKERS:  Objection.
3    A.  For detained members, no, and then on
4  check-ins, we check in for nondetained.
5  BY MS. SEWALL:
6    Q.  I'm sorry, what do you do for
7  check-ins?
8    A.  On check-ins, we do the same thing.
9  When somebody comes to the window, we -- if
10  they have any information about that they've
11  applied or have applied for an I-130 or a 212
12  or a 601A, they're referred to the duty
13  officer that then goes interviews them and
14  goes a little deeper into the case.
15    Q.  Is there a standard screening question
16  that the check-in -- the check-in officer
17  would ask to screen for Calderon class
18  membership?
19    A.  They ask if they have any petitions,
20  if they filed for any petitions or have any
21  approved petitions.
22    Q.  Do they ask specifically if they've
23  ever filed for an I-130 petition?
24    A.  I can't say that they specifically ask

252

1  for that.
2    Q.  Do they ask if they're married to a
3  U.S. citizen?
4    A.  If once they go into the duty officer,
5  the duty officer will go a little deeper into
6  the case and start asking them questions about
7  their petition.
8    Q.  Are these -- so are the people --
9  are the check-in officers who are asking the
10  initial questions -- is there a list of
11  questions that they are supposed to ask or
12  instructed to ask?
13    A.  No.
14    Q.  Do they have any instructions on
15  questions to ask every individual?
16    A.  There are -- they've been instructed
17  to ask if they have any outstanding -- or if
18  they have any petitions that they've applied
19  for.
20    Q.  And when were they -- what -- when
21  were they instructed to do that?
22    A.  I don't know the date.  It was
23  something that AFOD Lyons -- Acting FOD Lyons
24  initiated.

Transcript of Marcos Charles
Conducted on July 16, 2019

64 (253 to 256)

253

1    Q.   And how were they informed to do that?
2    A.   I believe e-mail.
3    Q.   And how many officers are at check-in
4  windows across the jurisdiction of the Boston
5  field office?
6    A.   Oh, throughout the field office, I
7  don't know, total.  We have five at our
8  window -- well, four and a supervisor, one
9  duty.  I don't -- I think Hartford has two or
10 three.  The other -- Manchester, Portland, St.
11 Albans are very small.  I don't know that they
12 actually have many check-ins there, and then
13 Providence, I believe, has -- I think they
14 have one or two.
15   Q.   And --
16   A.   I could find that out though.
17   Q.   Were they required to certify that
18 they had read AFOD Lyons' e-mail?
19   A.   I don't know.
20   Q.   How is it being policed that they
21 would ask these questions of people that check
22 in?
23   A.   The SDDOs over those units are -- have
24 been told to insure that they are.

254

1    Q.   Do you know how the SDDOs insure that?
2    A.   No.
3    Q.   Have you asked?
4    A.   No.
5    Q.   Are you planning to ask?
6    A.   I can.
7    Q.   Are you planning to?
8    A.   I will ask -- I will have my DFOD get
9  with the AFODs over the sections to talk to
10 the SDDOs to ensure that that happens.
11   Q.   And have the check-in officers had any
12 other training on the provisional waiver
13 process of the Calderon litigation?
14   A.   Not that I know of.
15   Q.   Did you -- were they recipients of the
16 e-mail you were describing earlier that you
17 had sent, where you described the class and
18 other particulars about the Calderon
19 litigation?
20   A.   Yes.
21   Q.   So do they have to certify that they
22 have read that e-mail --
23   A.   Yes.
24   Q.   -- and understand it?

255

1    A.   Yes.
2    Q.   Do you know --
3    A.   Well, that they discussed it with
4  their supervisor.  I don't recall if, in the
5  sign-in sheet, it says that they had read the
6  e-mail, but I know for sure it said that they
7  discussed it with their supervisor.
8    Q.   Do you know if they have all certified
9  that they have done that?
10   A.   Yes, I believe they have.
11   Q.   Returning back to the POCR
12 regulations, I asked you what your
13 understanding of the POCR regulations is.
14 Could you answer that again?
15   A.   Every detained alien that has its
16 final order get a post-order custody review
17 first 90 days of their detention and 180 days
18 after that.
19   Q.   And you understand that the
20 regulations require 30-days' notice prior to a
21 custody review?
22   A.   Yes.
23   Q.   What's the purpose of that notice?
24   A.   To allow the subject to get

256

1  information or gather information and produce
2  information that would -- that may allow him
3  for -- to show that they don't need to be in
4  detention or his counsel or her counsel.
5    Q.   Judge Wolf found in this case that ICE
6  Boston had violated the POCR regulations,
7  correct?
8         MS. LARAKERS:  Objection.
9    A.   Correct.
10 BY MS. SEWALL:
11   Q.   And you've reviewed his order?
12   A.   I have.
13   Q.   You read the whole thing?
14   A.   I have.
15   Q.   When did you read it for the first
16 time?
17   A.   After the first time I was in court.
18 I don't remember the date.
19   Q.   And how many times have you read it?
20   A.   Fully, once.  I've probably gone
21 through it a couple of times after that.
22 ████████████████████████████████
23 a review of the detained docket in or around
24 June 2018, correct?

257

1    A.   I don't know.
2    Q.   He was going through the detained
3   docket for any issues of concern for the POCR
4   regulations, right?
5              MS. LARAKERS:  Objection.
6    A.   Yeah, I don't remember the name,
7   but...
8    Q.   Did he create -- do you know if
9   there's been a report created by him or
10  anyone, in or around the summer of 2018, about
11  the -- any concerns with the detained docket?
12   A.   I know there was some concerns brought
13  about the detained docket at some point, but I
14  don't remember when or by whom.
15   Q.   And you don't know about a written
16  report that might have been -- a report from
17  ████████████████████████████
18   A.   Was he -- do you remember what
19  department or division he was in?
20   Q.   Rebecca Adducci testified that she
21  brought him in to review and do a report on
22  any concerns that he had after he reviewed the
23  detained docket?
24   A.   Okay.

258

1    Q.   Do you know if that report was ever
2   finalized or issued?
3    A.   I don't know.  I have to look --
4    Q.   Who would you ask to find out?
5    A.   I would ask DFOD Lyons.
6    Q.   You, yourself, have never reviewed
7   anything like that?
8    A.   I don't recall seeing that.
9    Q.   And you haven't discussed it with
10  anybody?
11   A.   Not that I recall.
12   Q.   The Boston ERO conducted an audit to
13  identify violations in the POCR regulations,
14  correct?
15   A.   At that time, if that's with Raycroft,
16  okay, yes.
17   Q.   This is a separate audit?
18   A.   Oh, separate audit.
19   Q.   By Brophy, Mr. Brophy.
20   A.   Oh, yes.
21              MS. LARAKERS:  Objection.
22  BY MS. SEWALL:
23   Q.   Have you reviewed that?
24   A.   No.

259

1    Q.   The audit found that there were
2   certain violations of the POCR regulations,
3   correct?
4              MS. LARAKERS:  Objection.
5   Michaela, I've tried to be cooperative here.
6   If you can't clarify that that -- that that
7   happened from July 30 on, it's outside the
8   scope.
9              MS. SEWALL:  The audit report?
10             MS. LARAKERS:  Yes.
11             MS. SEWALL:  I just asked him if
12  he's read it.  This is about what's going on
13  now.
14             MS. LARAKERS:  The audit report
15  was done -- you're saying was done prior to
16  July 30th?
17             MS. SEWALL:  Yes.  The audit
18  report was done prior to -- in your view, that
19  disqualifies me from asking him if he's read
20  the audit report?
21             MS. LARAKERS:  I'm telling you
22  he's not -- he's -- he hasn't -- that's not
23  within his scope of this deposition.
24             MS. SEWALL:  My question was,

260

1   has he read the audit report.
2              MS. LARAKERS:  Okay.  I'm
3   letting you know.  I'm not instructing him not
4   to answer at this time.  I'm telling you that
5   if you keep on -- if you ask questions about
6   that audit report -- not whether he's read,
7   that's fine.  But if you ask questions about
8   the details of that audit report, how it was
9   done, how it was conducted, that's well beyond
10  the -- his scope, so --
11             MS. SEWALL:  When I -- if I were
12  to get to questions on that, I feel like you
13  could object at that point, but I don't think
14  there's anything objectionable asking if he's
15  read the audit report.
16             MS. LARAKERS:  Well, I don't
17  agree with that.  I'm trying to be cooperative
18  here.  I'm just letting you know.  I don't
19  want to have, you know, ten more questions go
20  on about it if it's outside the scope.  I'm
21  just letting you know.
22  BY MS. SEWALL:
23   Q.   You said you have not read the audit
24  report, correct?

261

1    A.  No.
2    Q.  Who conducts POCR reviews at the
3  Boston ERO?
4    A.  The deportation officers will do a
5  review.
6    Q.  And you're aware that that audit
7  report found that people were not being given
8  timely notice of their custody reviews,
9  correct?
10         MS. LARAKERS:  Objection.
11   A.  I don't know because I don't recall
12 reading it.
13 BY MS. SEWALL:
14   Q.  And it found that people were not
15 being given timely custody reviews, correct?
16         MS. LARAKERS:  Objection.
17   A.  I don't know.
18 BY MS. SEWALL:
19   Q.  Has ICE conducted a formal training
20 for ICE employees on POCR reviews?
21   A.  Yes.
22   Q.  What formal training?
23         MS. LARAKERS:  Objection.  Don't
24 reveal the contents of that training if it's

262

1  done by ICE Office of Chief Counsel.
2         THE WITNESS:  Okay.
3    A.  There was training conducted at the
4  field office by our removal unit on POCRs
5  also.  I don't recall the date.
6         MS. SEWALL:  And I think we
7  would be entitled to know if there was a
8  training conducted by officers --
9         MS. LARAKERS:  Yes.
10        MS. SEWALL:  -- so you might
11 want to clarify your instruction.
12        MS. LARAKERS:  I said don't -- I
13 can read it back.  I said don't reveal the
14 contents of that training if it's done by the
15 ICE Office of Chief Counsel.  That's what I
16 said.  That clearly allows him to answer
17 whether there was a training.
18        MS. SEWALL:  I think that might
19 have been better, if you explain that.
20        MS. LARAKERS:  I just literally
21 read it from the record, but okay.  Do you --
22        THE WITNESS:  No.
23        MS. LARAKERS:  Do you
24 understand?

263

1         THE WITNESS:  Yes.
2         MS. LARAKERS:  I can clarify it
3  again, if need be.
4  BY MS. SEWALL:
5    Q.  Let me go back and ask the question
6  again.
7         Has ICE conducted a formal training
8  for ICE Boston employees on POCR reviews?
9    A.  Yes.
10   Q.  When was that training conducted?
11   A.  The last one was conducted sometime
12 within the last two months, three months.
13   Q.  So --
14   A.  So within the last three months.
15   Q.  So approximately three months ago?
16   A.  More or less.
17   Q.  Who attended the training?
18   A.  I don't know specifically who attended
19 the training, but it was -- it was there -- it
20 was available for the officers.
21   Q.  Who was the training conducted by?
22   A.  I believe it was by our removal unit
23 headquarters.
24   Q.  Where is that?

264

1    A.  D.C.  It was -- it was conducted at
2  the field office, but it was conducted by
3  people from headquarters D.C.
4    Q.  Who at headquarters is aware of this
5  litigation?
6    A.  I don't know.
7    Q.  Who -- do you know who at headquarters
8  conducted the training?
9    A.  I don't remember who was here for the
10 training.
11   Q.  Were there any written materials
12 distributed at the training?
13   A.  I don't know.  I did not attend.
14   Q.  Were you at the Boston field office at
15 the time the training was conducted?
16   A.  I was assigned to the Boston office at
17 the time.  I don't recall if I was actually in
18 the building.
19   Q.  Why didn't you attend the training?
20   A.  Because it's for the officers
21 conducting the POCR reviews.
22   Q.  You conduct POCR reviews, correct?
23   A.  No.
24   Q.  You don't conduct any custody

265

1 determinations?
2     A.  I reviewed the POCR after they've
3 been -- after the POCR has been conducted
4 after the 90 days, the final -- I have
5 final -- I'll look at them and sign off on
6 them as the DFOD, or the DFOD will sign off on
7 them.
8     Q.  You have final say --
9     A.  Yes.
10     Q.  -- over the POCRs?
11     A.  Yes.
12     Q.  And you didn't think you needed to
13 attend the training?
14     A.  No.
15     Q.  Why not?
16     A.  I've been reviewing POCRs for the last
17 ten, eleven years.
18     Q.  Did the POCRs -- have you ever run
19 into POCR violations in the last ten, eleven
20 years that you've been reviewing POCRs?
21           MS. LARAKERS:  Objection.
22     A.  Violations, errors, yes.
23 BY MS. SEWALL:
24     Q.  Was the training mandatory or

266

1 optional?
2     A.  I believe it was optional.
3     Q.  Do you know who attended it?
4     A.  I do not.
5     Q.  Do you know how many people attended
6 it?
7     A.  Do not.
8     Q.  Did people sign in to a sheet thing
9 saying they attended it?
10     A.  They would have.
11     Q.  Do you know if it was well attended?
12     A.  I do not.
13     Q.  Who would you ask to find out?
14     A.  My AFOD over custody management.
15     Q.  Who is that?
16     A.  Currently, Tina Guarna-Armstrong.
17     Q.  Does ICE require any new employees
18 hired at ICE Boston to undergo the training?
19     A.  All new deportation officers have to
20 go to an academy where they learn that.
21     Q.  Do deportation officers who come --
22 who are newly hired at the Boston field office
23 have to undergo the specific training?
24     A.  At the academy.

267

1     Q.  So they don't have to undergo the
2 specific training at the Boston field
3 office?
4           MS. LARAKERS:  Objection.
5     A.  No, because they've already received
6 it at the academy.  If they're newly hired,
7 they just received it.
8 BY MS. SEWALL:
9     Q.  So they don't have to do another one
10 once they get to the Boston field office?
11     A.  No.
12     Q.  Are they told about this litigation
13 once they get to the Boston field office?
14     A.  They are.
15     Q.  Are they told about the POCR
16 violations that happened in the past when they
17 get to the Boston field office?
18     A.  I don't know.
19     Q.  Do you know anything about whether --
20 do you know if they're told about -- what they
21 are told about this litigation?
22     A.  No, I do not.
23     Q.  Do you know what they're told about
24 past POCR violations that Judge Wolf found

268

1 that ICE Boston had committed?
2     A.  No, I don't.
3     Q.  Are there any other trainings planned
4 for the future on POCR?
5     A.  Nothing planned currently.
6     Q.  Have you had any formal training on
7 the POCR review process?
8     A.  I have.
9     Q.  What was that training?
10     A.  Deportation -- deportation officer
11 training.  I've gone to a couple of the
12 trainings put on by the removal unit in the
13 past.
14     Q.  Is the deportation officer training
15 what was conducted when you were at the
16 academy?
17     A.  Yes.
18     Q.  How many years ago was that?
19     A.  2009.
20     Q.  And then you said trainings put on by
21 the removal --
22     A.  Removal, yeah, removal coordination
23 unit, I believe, is what they're called.
24     Q.  When were those trainings?

269

1    A.  Oh, I don't know.  It's been a while.
2    Q.  Has ICE distributed any written
3  guidance to ICE Boston employees on the POCR
4  review process?
5    A.  No.
6    Q.  Are individuals conducting POCR
7  reviews told what factors to consider in
8  determining whether to continue to detain
9  somebody?
10    A.  They recommend -- they make a
11  recommendation, whether to continue detention
12  or release, and they are taught what factors
13  may require a continued detention or recommend
14  to release.
15    Q.  Are they given any guidance on how to
16  weigh those factors?
17    A.  Not specifically.
18    Q.  Are they given any unspecific guidance
19  on how to weigh those factors?
20    A.  No, not that I can think of offhand,
21  other than the training that they receive at
22  the academy and the informal training they
23  receive by experienced DOs and their SDDO.
24    Q.  And what factors are they told to

270

1  consider?
2    A.  I don't know.
3    Q.  Are they told to consider an
4  individual's application for I-130?
5    A.  I would look at that if I was the
6  deportation officer.
7    Q.  But are the deportation officers
8  instructed to look at that?
9    A.  I don't know.
10    Q.  Are they instructed to consider
11  somebody's status as a Calderon class member?
12    A.  For continued detention?
13    Q.  Yes.
14    A.  No.  It is indicated within the POCR
15  if they are a class member though.
16    Q.  Where is it indicated in the POCR if
17  they're a class member?
18    A.  I instructed them to put it in the
19  comments section of the POCR.
20    Q.  Where's the comment section of the
21  POCR?
22    A.  I can't remember which page.  I don't
23  recall what page it's on.
24

271

1    (Exhibit No. 12 marked for
2  identification.)
3
4  BY MS. SEWALL:
5    Q.  The court reporter has handed you
6  what's been marked Exhibit 12.
7    Do you recognize this document?
8    A.  (Witness reviews document.)
9    It's the notice for custody review.
10    Q.  Have you seen this document before
11  today?
12    A.  This specific document?
13    Q.  Yes.
14    A.  I don't know.  Maybe.  I recognize the
15  name.
16  ████████████████████████
17    A.  Correct.
18    Q.  And it's a notice to alien of file
19  custody review, correct?
20    A.  Correct.
21    Q.  In the second paragraph says, "Your
22  custody status will be reviewed on or about
23  November 20, 2018," correct?
24    A.  Correct.

272

1    Q.  It states, "You may submit any
2  documentation you wish to be reviewed in
3  support of your release prior to the date
4  listed above," correct?
5    A.  Correct.
6    Q.  If you look at Exhibit 10, it's this
7  big spreadsheet?
8    A.  Uh-huh.
9    Q.  And Semedo is the fourth from the
10  bottom?
11    A.  Right.
12    Q.  And if you go over to the column on
13  date POCR conducted and decisions, it says,
14  "The POCR was conducted on November 1, 2018."
15    Do you see that?
16    A.  It says what?
17    Q.  It says, "The POCR was conducted on
18  November 1, 2018."
19    Do you see that?
20    A.  Yes.
21    Q.  That is 20 days before he was told it
22  would be conducted in this notice to alien,
23  file custody review --
24    MS. LARAKERS:  Objection.

273

1 BY MS. SEWALL:
2    Q.  -- correct?
3    A.  Correct.
4    Q.  Was he informed his review would take
5 place early?
6    A.  I don't know.  I would have to look at
7 the case history on this one.
8    Q.  Was his attorney informed?
9    A.  I don't know.
10
11        (Exhibit No. 13, marked for
12 identification.)
13
14 BY MS. SEWALL:
15    Q.  The court reporter has handed you
16 what's been marked Exhibit 13.  This is the
17 ████████████████████████████
18 correct?
19    A.  Correct.
20    Q.  This decision to continue detention
21 doesn't mention his submission of any
22 documents, right?
23    A.  I'm reading through it right now.
24    Q.  Okay.  Take your time.

274

1    A.  (Witness reviews document.)
2        It says it was a review of the file.
3 What was your question again?  I'm sorry.
4    Q.  This decision to continue his
5 detention does not mention his submission of
6 any documents, right?
7    A.  Does not.
8    Q.  It does not have a comment section,
9 does it?
10    A.  No.  This isn't a POCR review form.
11    Q.  What's the POCR review form?
12    A.  The form that we use to conduct our
13 POCRs.
14        MS. SEWALL:  Have we been
15 provided with that form.
16        MS. LARAKERS:  No, not that I
17 know of.  It's an internal form.
18 BY MS. SEWALL:
19    Q.  The second and third paragraphs state
20 the reasons for the decision to continue his
21 detention, correct?
22    A.  Correct.
23    Q.  And then the fourth paragraph says,
24 "Upon review of the facts of your case,

275

1 including your final order of removal issued
2 by an immigration judge, successful removal of
3 tampering with your ICE GPS monitoring device,
4 and your lack of substantial equities, I have
5 determined that you would pose a flight risk
6 if you were to be released from ICE custody."
7        Do you see that?
8    A.  I do.
9    Q.  What does "lack of substantial
10 equities" mean?
11    A.  I'm not sure specifically what he's
12 referring to.  I would have to look at the
13 case, but it could be that he had no
14 residence.  I -- I don't know.  I would have
15 to look at the case.
16    Q.  When you say "look at the case," what
17 are you referring to?
18    A.  Look at the A-file, look at the file,
19 look at the EARM, look at the materials that
20 were available at that time.
21    Q.  So as you sit here today, you don't
22 know --
23    A.  No.  I can't --
24    Q.  -- about the case?

276

1    A.  -- positively say what lack of
2 substantial equities are.
3 ████████████████████████████
4 citizen, correct?
5    A.  I believe he is.
6    Q.  He has a pending I-130 application?
7    A.  Yes, he does.
8    Q.  Was that considered by Mr. Lyons in
9 deciding to continue his detention?
10        MS. LARAKERS:  Objection.
11    A.  I don't know.
12 BY MS. SEWALL:
13    Q.  Was it known by Mr. Lyons at the time
14 he conducted his POCR review?
15        MS. LARAKERS:  Objection.
16    A.  I don't know.
17 BY MS. SEWALL:
18    Q.  Is marriage to a U.S. citizen not
19 considered a substantial equity in the United
20 States?
21        MS. LARAKERS:  Objection.
22    A.  It depends on the case.
23 BY MS. SEWALL:
24    Q.  In this case, it was not considered a

277

1 substantial equity in the United States?

2 **A. I don't know.**

3 Q. Is status of the Calderon class member

4 not considered a substantial equity in the

5 United States?

6 **A. When looking at it now on Calderon**

7 **class members, I would take that into**

8 **consideration at this time. There was no**

9 **class member -- there was no class defined at**

10 **that time.**

11 Q. You're saying, because there was no

12 class defined when this decision to continue

13 detention was reviewed, it -- Todd Lyons did

14 not consider --

15 **A. I don't know if he considered it or**

16 **not. I'm just saying, based on that, if it**

17 **was me reviewing it, there was no class**

18 **defined, then we couldn't necessarily consider**

19 **that there was a class membership when we were**

20 **looking at this.**

21 Q. Did he consider the filing of an I-130

22 application?

23 **A. I don't know.**

24 Q. Does ICE conduct a second custody

278

1 review within 90 days of the first custody

2 review?

3 **A. Yes, 180 days.**

4 Q. Who conducts that review?

5 **A. Headquarters.**

6 Q. Do you ever conduct one --

7 **A. No.**

8 Q. -- 180-day reviews?

9 **A. No, I have not.**

10 Q. Is it always done by headquarters?

11 **A. I would say almost always. I don't**

12 **recall doing a 180 before.**

13 Q. Who decides when the second review

14 will be conducted?

15 **A. At -- I'm sorry, I don't understand**

16 **the question.**

17 Q. Who decides when the second review

18 will be conducted?

19 **A. It's at 180 days, if they're still in**

20 **custody, post-order.**

21 Q. If you look back at this Exhibit 10,

22 ███████████████████████

23 received his first custody review on November

24 1, 2018, correct?

279

1 **A. Correct.**

2 Q. He received his second custody review,

3 post-180, on -- it looks like March 5, 2019,

4 correct?

5 **A. Correct.**

6 Q. That's, let's see, December, January,

7 February. That's over three months after --

8 that's about four months after his POCR was

9 conducted, right?

10 **A. Correct.**

11 Q. So that's more than 90 days after his

12 initial POCR was conducted?

13 **A. It appears to be.**

14 Q. Well, why didn't he receive a second

15 custody review within 90 days?

16 **A. I don't know.**

17 Q. Did ICE make a good finding -- a

18 finding of good cause to postpone his

19 review?

20 **A. I would have to look at the case.**

21 Q. Where would that be recorded?

22 **A. Most likely within the A-file.**

23 ███████████████████

24 review before the 30-days' notice date that he

280

1 was given -- 20 days before his 30-days'

2 notice. He was told he did not have

3 substantial equity in the United States,

4 despite the fact that he's married to a U.S.

5 citizen, and then he did not receive a second

6 custody review after 90 days, correct?

7 　　　MS. LARAKERS: Objection.

8 **A. I don't know. I would have to look at**

9 **the indication completely. Based on what's on**

10 **this spreadsheet, that's -- looking at the**

11 **spreadsheet, those are the dates that are in**

12 **here. I would have to actually look at the**

13 **case.**

14 BY MS. SEWALL:

15 Q. Well, going on these documents that

16 we have here, it appears that ICE Boston did

17 not follow the POCR regulations for Mr.

18 █████████████

19 　　　MS. LARAKERS: Objection.

20 **A. No.**

21 BY MS. SEWALL:

22 Q. Why?

23 **A. Because headquarters is in charge of**

24 **the 180 POCRs and anything after. We don't**

Case 1:18-cv-10225-MLW   Document 375-1   Filed 09/25/19   Page 72 of 86
Confidential
Transcript of Marcos Charles
Conducted on July 16, 2019                    71 (281 to 284)

281

1 conduct those.
2    Q.   So ICE did not follow the POCR
3 ████████████████████████████████████
4    A.   I don't know.
5         MS. LARAKERS:  Objection.
6 BY MS. SEWALL:
7    Q.   And ICE Boston conducted his initial
8 custody review 20 days before he -- it was
9 noticed for; is that right?
10        MS. LARAKERS:  Objection.
11   A.   I don't know.  I would have to look at
12 it.
13 BY MS. SEWALL:
14   Q.   So we just did look at it.
15   A.   No.  We just looked at the spreadsheet
16 that has the dates that were input into it.  I
17 would have to actually look at the file.
18   Q.   So you think that the spreadsheet is
19 not enough information to tell you about
20 whether there's been a POCR violation,
21 correct?
22   A.   I would have to -- the only way to see
23 if there was a POCR violation, or why the POCR
24 was done before the date on the notice and to

282

1 know why headquarters conducted it at that
2 date, would be by looking at what EARM case
3 file, A-file.  That would be the way -- that's
4 how I would be able to tell.  I wouldn't be
5 able to tell you that definitively by looking
6 at just these forms in front of me and this
7 spreadsheet.
8    Q.   So this spreadsheet does not
9 definitively tell you whether there's been a
10 POCR violation?
11        MS. LARAKERS:  Objection.
12   A.   No.
13 BY MS. SEWALL:
14 ████████████████████████████████████
15 after July 22, correct?
16   A.   He is still being forwarded for
17 removal at this point.
18   Q.   What's ICE Boston's current policy to
19 remedy a POCR violation?
20   A.   It would be -- if there was a POCR
21 violation found, the deportation officer would
22 definitely be spoken with.  The supervisor,
23 anybody that saw it, would definitely be
24 talked with to find out what exactly happened,

283

1 why the violation occurred.  And then based on
2 that information, we would go forward with
3 either retraining or counseling.
4    Q.   And what's the policy with respect to
5 the alien for whom the POCR violations have
6 been violated?
7         MS. LARAKERS:  Objection.
8    A.   What is the policy?
9 BY MS. SEWALL:
10   Q.   Yes.
11   A.   There's no policy.
12   Q.   What's the practice?
13   A.   There's -- we would have to look at
14 the case and see exactly what happened and
15 take it case by case.
16   Q.   That's different from what the
17 practice was in -- as of July 2018, is it not?
18        MS. LARAKERS:  Objection.
19   A.   I don't know exactly what the practice
20 was July 2018.
21 BY MS. SEWALL:
22   Q.   Do you know what the practice was in
23 September 2018?
24   A.   No.

284

1    Q.   Do you know what it was in December
2 2018?
3    A.   No.
4    Q.   Do you know what it was in March 2019?
5    A.   Yes, just what I said right now.
6    Q.   When did this practice that you said
7 right now begin, as far as you know?
8    A.   We haven't had to do it yet.
9    Q.   So when is it your understanding that
10 this -- what you testified to as the practice
11 began?
12   A.   That's what I would do if there's a
13 POCR violation.
14   Q.   Are you -- did you ever discuss the
15 policy for -- or the practice for remedying a
16 POCR violation with Mr. Lyons, Ms. Adducci, or
17 Mr. Brophy?
18   A.   No.
19   Q.   Are you aware that Mr. Brophy
20 testified in this case that ICE Boston
21 released people when it was found that it had
22 violated their rights under the POCR
23 regulations?
24   A.   I don't -- I don't recall exactly

285

1 reading that.
2    Q.  Are you aware that Ms. Adducci also
3 testified that ICE Boston released people when
4 it found violations of their POCR rights?
5          MS. LARAKERS:  Objection.
6    A.  No, I don't.
7 BY MS. SEWALL:
8    Q.  Who -- who decided to change to the
9 current policy?
10   A.  There hasn't been a need to.  What I'm
11 saying is that if there was a POCR violation,
12 that would be an option.  If it was a -- if
13 releasing the individual, based on just the
14 error or violation, wasn't going to be a
15 public safety or national security threat,
16 then I don't see a problem with it.  If it
17 did, then I do see a problem with it.
18   Q.  Okay.  So that's a little different
19 from what you said before.
20        Can you clarify to me what the current
21 practice would be with respect to the alien
22 whose POCR rights were violated?
23   A.  It would be on a case-by-case basis.
24 I have to look at it and see exactly what

286

1 happened and if it would be a national threat
2 or public safety risk to have that individual
3 out.
4    Q.  And you said there have been know POCR
5 violations since you took office?
6    A.  Not that I'm aware of.
7    Q.  Have there been any POCR violations
8 since July 2018?
9    A.  I would have to check, but I don't
10 think so.
11   Q.  You don't know?
12   A.  I don't know.  I don't think so.
13   Q.  Who would know?
14   A.  Acting Field Office Director -- Deputy
15 Field Office Director Todd Lyons.
16   Q.  You don't know if a class member's --
17 a class member in detention has undergone a
18 POCR violation since July 2018?
19   A.  I don't know.
20   Q.  Have you looked into that?
21   A.  No.
22
23       (Exhibit No. 14 marked for
24 identification.)

287

1
2 BY MS. SEWALL:
3    Q.  Do you recognize this document?
4    A.  (Witness reviews document.)
5        It's the notice of file review.
6 ███████████████████████████████
7    A.  Correct.
8    Q.  Have you seen this document before
9 today?
10   A.  I don't recall specifically seeing
11 this one.
12   Q.  The middle paragraph says, "Your
13 custody status will be reviewed on or about
14 March 12, 2019."
15        Do you see that?
16   A.  I do.
17   Q.  If you look back at this spreadsheet
18 ██████████████████████████████
19 second from the bottom?
20   A.  Correct.
21   Q.  For the column date POCR conducted and
22 decisions --
23   A.  Uh-huh.
24   Q.  -- it says, "90-day POCR conducted

288

1 March 18, 2019."
2        Do you see that?
3    A.  Correct.
4    Q.  That's four days before the review is
5 noticed for, correct?
6          MS. LARAKERS:  Objection.
7    A.  Correct.
8 BY MS. SEWALL:
9 ████████████████████████████████
10 review would take place early?
11   A.  I don't know.
12   Q.  Was his attorney informed that
13 █████████████████████████████████
14 early?
15   A.  I don't know.
16   Q.  Who would you ask to find out?
17   A.  The AFOD over at custody management.
18   Q.  What documents would you look at to
19 find out?
20   A.  I would look at the A-file.
21        MS. PIEMONTE:  Excuse me, just
22 to clarify the record, I think the spreadsheet
23 says March 8, not March 18th.
24        MS. SEWALL:  I think I said

289

1 March 8th, did I not?
2         MS. PIEMONTE:  I'm looking at
3 this.  It indicates the 18th as to my notes,
4 so I just wanted to make sure.
5         MS. SEWALL:  It says March 8th.
6 I can confirm that.  That's four days before
7 March 12, 2019.
8
9         (Exhibit No. 1 marked for
10 identification.)
11
12 BY MS. SEWALL:
13    Q.  Do you recognize this document?
14    A.  I do.
15    Q.  It's the decision to continue
16 ███████████████████████
17    A.  Yes.
18    Q.  It's signed by Mr. Lyons?
19    A.  It's actually signed by me for
20 Mr. Lyons.
21    Q.  Oh, okay.  So you've seen this
22 document before today?
23    A.  Yes.
24    Q.  The decision to continue his detention

291

1 approved I-130 application, correct?
2    A.  Correct.
3    Q.  Was that considered in determining
4 whether to continue his detention?
5    A.  No.
6    Q.  Did ICE Boston know about his I-130
7 when it decided to continue to detain him?
8    A.  I believe we did.
9    Q.  But it didn't consider it in
10 determining to continue his detention?
11    A.  It's just one of several factors,
12 again, that wouldn't preclude him from
13 detention, or nor would it cause us to release
14 him.
15    Q.  I'm sorry, I -- I asked you if the
16 fact that he had an approved I-130 was
17 considered?
18    A.  Oh, I'm sorry, I just heard the merge.
19    Q.  Oh, it's okay.
20         I asked if the fact that he had an
21 approved I-130 was considered in determining
22 to continue his detention, and you testified
23 that it was not considered?
24    A.  I'm sorry.  Yes, that's one of

290

1 does not mention his submission of any
2 documents, correct?
3    A.  Correct.
4    Q.  Do you know if he or his attorney
5 attempted to submit documents to be considered
6 in making a custody decision?
7    A.  I do not.
8    Q.  The second and third paragraph discuss
9 the reasons for his continued detention,
10 correct?
11    A.  Correct.
12    Q.  And the fourth paragraph says, "Upon
13 review of the facts of your case, including
14 your criminal convictions for interfering
15 fearing with an officer, resisting arrest, and
16 failure to appear, I have determined that you
17 would pose a safety risk to the community if
18 you were to be released from ICE custody."
19         Do you see that?
20    A.  Yes.
21    Q.  This does not mention that he is
22 married to a U.S. citizen, correct?
23    A.  Correct.
24    Q.  It does not mention that he has an

292

1 factors.  The married to a U.S. citizen isn't
2 necessarily one of the factors.
3    Q.  Anybody who had an approved I-130
4 application is generally -- well, I guess
5 that's not true, but I guess then the question
6 would be, did ICE consider his status as a
7 Calderon class member when it decided to
8 continue to detain him?
9    A.  Again, one of the many factors.
10    Q.  And do you know that it considered
11 those factors?
12    A.  When I looked at this POCR, I looked
13 at the A-file the documentation within the
14 A-file and EARM, so if -- at the time, which
15 was preCalderon membership definition, it
16 would be the fact that he was a possible
17 Calderon litigant or member.
18    Q.  And was that considered in continuing
19 to detain him?
20    A.  The I-130, the fact that he was a
21 possible, yes.
22    Q.  How do you know?
23    A.  Because I did the review.
24    Q.  And you remember?

293

1    A.  Well, anything that I review that's --
2  that's possible Calderon is part of my
3  consideration.
4    Q.  So what if that is information was not
5  in the file?
6    A.  Then I wouldn't take it into
7  consideration.
8    Q.  So you can't remember one way or the
9  other whether you actually considered it?
10   A.  If it was in the file or within EARM,
11 then I would have taken it into consideration.
12   Q.  But if it was not in the file or EARM,
13 you would not have taken it into
14 consideration?
15   A.  Correct.
16   Q.  So as you sit here today, you can't
17 recall whether you took it into -- or whether
18 it was taken into consideration for this
19 particular decision?
20   A.  If it was in there, I took it into
21 consideration.
22   Q.  As you sit here today, you cannot
23 recall one way or the other whether you
24 actually did consider --

294

1    A.  No.  What I'm saying is that --
2    Q.  Wait until I finish my question.  The
3  court is going to go a little crazy with us.
4    A.  Yeah, sorry.
5    Q.  So my question is:  As you sit here
6  today, do you remember if it was considered in
7  ███████████████████████
8    A.  As I sit here today, I do not remember
9  if it was in the file or not.
10   Q.  Do you remember if it was considered
11 in deciding to continue to detain him?
12   A.  I can't say either way because I don't
13 remember if it was in the file.
14   Q.  You would have to look at the file to
15 find out?
16   A.  Correct.
17 ██████████████████████████
18 review on March 8, 2019 correct?
19   A.  Correct -- wait.  Received the custody
20 review notice?  Is that what you're asking me?
21   Q.  No.  He received the -- he -- he
22 received this decision on March 8, 2019, and
23 the spreadsheet indicates that this was the
24 day that the POCR was conducted, on March 8,

295

1  2019, correct?
2    A.  He was actually given the document on
3  12/18 of '18 for custody review.
4    Q.  Are you looking at Exhibit 18?
5    A.  No.  I'm looking at 14, I'm sorry, but
6  the notice of custody was given to him on
7  12/18 of '18, so that's actually more than --
8  that's actually more than 30-days' notice.
9    Q.  So I think you're --
10   A.  I'm just making a point of it, that
11 it -- he got more than 30-days' notification
12 to gather his information for his review.
13   Q.  So it says that a custody review
14 says -- let me get to Exhibit 14.
15       The notice to the alien of file
16 custody review, says, "Your custody review
17 status will be reviewed on or about March 12,
18 2019," correct?
19   A.  In most locations, it's given 30 days
20 prior to the review, but we gave it to him
21 almost 90 days prior to his review, so he had
22 an additional -- almost 60 days to get that
23 documentation together.
24   Q.  Okay.  But his custody -- his notice

296

1  says it will be on March 12, 2019, correct?
2        MS. LARAKERS:  Objection.
3    A.  It does.
4  BY MS. SEWALL:
5    Q.  And it was conducted on March 8, 2019,
6  correct?
7    A.  Correct.
8    Q.  And you don't know whether he was
9  informed that it would be conducted early,
10 correct?
11   A.  Correct, but he had more than -- more
12 time than normally given to an individual to
13 do that.
14   Q.  And you don't know if his attorney was
15 informed that it would be conducted earlier
16 than what was said in his review, correct?
17   A.  Correct.  It does say, "on or about"
18 on the custody review notification.  It
19 doesn't say specifically on 3/12/19.  It does
20 say, "On or about 3/12/2019."
21   Q.  If you turn to Exhibit 15, the date of
22 his decision to review detention and the date
23 of his POCR review occurred March 8, 2019,
24 correct?

297

1    A.   Correct, which is about three -- March
2 12, 2019.
3    Q.   If you could focus on my question.
4 All I'm asking you is:  This occurred on March
5 8, 2019, correct?
6    A.   Correct.
7    Q.   And then we are now at July 16, 2019,
8 correct?
9    A.   Correct.
10   Q.   It has been over four months since his
11 March POCR review was conducted, correct?
12   A.   Correct.
13   Q.   But he has never received a second
14 POCR review, correct?
15        MS. LARAKERS:  Objection.
16   A.   Not that I know of, no.
17 BY MS. SEWALL:
18   Q.   Why has he not received a second POCR
19 review?
20   A.   He received an imminent removal
21 notice.
22   Q.   Does that undercut his right to a POCR
23 review -- a second POCR review within 90
24 days --

298

1    A.   Yes.
2        MS. LARAKERS:  Objection.
3 BY MS. SEWALL:
4    Q.   -- of the first?
5        MS. LARAKERS:  Objection.
6    A.   Yes.
7 BY MS. SEWALL:
8    Q.   Where in the regulations does it say
9 that?
10   A.   I would have to look them up.  I -- I
11 can't tell you, specifically.
12   Q.   But that's your understanding, that if
13 you get an imminent removal notice, and then
14 you're not removed, you still are not entitled
15 to a second POCR review within 90 days of your
16 initial POCR review?
17        MS. LARAKERS:  Objection.
18   A.   He hasn't been removed as of yet.
19 However, I would have to look at the case to
20 find out specifically why, or what's going on
21 with it right now.
22   Q.   So my question is:  If an individual
23 received an imminent removal notice after his
24 POCR review, then they're no longer entitled

299

1 to a second POCR review within 90 days of the
2 first?
3    A.   It should be looked at again after --
4 if they're not being removed, it should be
5 looked at again and decide whether a POCR
6 needs to be conducted or not.  Because it's at
7 headquarters, I don't know the status of
8 that.
9    Q.   Do you know if it's required to have a
10 second POCR review within 90 days of the first
11 when, in the interim, an imminent removal
12 notice is issued, but the person has not been
13 removed?
14        MS. LARAKERS:  Objection.
15   A.   I have to look at it.
16 BY MS. SEWALL:
17   Q.   So you don't know one way or the
18 other?
19   A.   I would have to look at the actual
20 statute or regulation on that.
21   Q.   Does ICE still intend to remove
22 ███████████████
23   A.   I will have to look at that, but as
24 far as I know, yes.

300

1    Q.   And Mr. Leon is still in detention?
2    A.   I believe he is.
3 ████████████████████████████████████████
4 that Boston ICE office violated his POCR
5 rights, correct?
6        MS. LARAKERS:  Objection.
7    A.   I don't know.  I would have to look at
8 it.  I would have to look at the case.  I
9 can't go off just what I have in front of me
10 right now.
11   Q.   So you wouldn't know, based on this
12 spreadsheet, whether there was a violation of
13 his POCR rights, correct?
14   A.   Correct.
15   Q.   And of his documents that we just went
16 through --
17   A.   Correct.
18   Q.   -- you don't know?
19   A.   No.
20
21        (Exhibit No. 16 marked for
22 identification.)
23
24 BY MS. SEWALL:

**301**

1    Q.   Do you recognize this document -- oh,
2  sorry.  The court reporter has handed you
3  what's been marked as Exhibit 16.
4         Do you recognize this document?
5    **A.   I recognize the top document.**
6    Q.   Have you seen this before today?
7    **A.   Yes, the top page.**
8    Q.   This is a decision to continue
9  ████████████████████
10   **A.   Correct.**
11   Q.   And then if you go to the next page --
12 or the third page, rather, you see the notice
13 to alien of file custody review for
14 ████████████
15   **A.   I do.**
16   Q.   This states that "Custody status will
17 be reviewed on or about March 28, 2019,
18 correct?
19   **A.   Correct.**
20   Q.   And if you look at the spreadsheet,
21 ████████████████████████████
22   **A.   Got it.**
23         MS. LARAKERS:  Michaela, can you
24 the exhibit number for the spreadsheet?

**302**

1         MS. SEWALL:  Exhibit 10.
2  BY MS. SEWALL:
3    Q.   And you go to the date POCR conducted
4  and decisions.  It says the POCR was conducted
5  on March 27, 2019, correct?
6    **A.   Correct.**
7    Q.   Was ████████ informed that his POCR
8  review would be conducted early?
9    **A.   I don't know.**
10   Q.   Was his lawyer informed that his POCR
11 review would be done -- conducted early?
12   **A.   I don't know.**
13   Q.   And if you go to the second -- if you
14 go to the first page of Exhibit 16, the second
15 and third paragraphs state the reasons for his
16 continued detention, correct?
17   **A.   Correct.**
18   Q.   The fourth paragraph says, "Upon
19 review of the facts of your case, you have
20 failed to demonstrate significant equities
21 within the United States, and thus, I have
22 determined that you would pose a significant
23 risk of flight if you were to be released from
24 ICE custody."

**303**

1         Do you see that?
2    **A.   I do.**
3    Q.   It looks like you have signed on
4  behalf of Todd Lyons --
5    **A.   I did.**
6    Q.   -- correct?
7    **A.   Correct.**
8    Q.   So the reason that ICE cites for
9  continued detention is no significant equities
10 within the United States, correct?
11   **A.   Correct.**
12   Q.   What does that mean in the context of
13 ████████' case?
14   **A.   I would have to look at the file to
15 determine that.**
16   Q.   You can't remember, as you sit here
17 today?
18   **A.   No.**
19   Q.   His marriage to a U.S. citizen was not
20 considered a significant equity in the United
21 States, correct?
22   **A.   It may have been.  I don't -- not as a
23 significant equity, no.**
24   Q.   And this decision to continue

**304**

1  detention does not mention that he's married
2  to a United States citizen?
3    **A.   No, it doesn't.**
4    Q.   It does not mention that he has an
5  approved I-130, correct?
6    **A.   No, it doesn't.**
7    Q.   Was that considered in determining to
8  continue his detention?
9    **A.   It was one of the factors considered
10 if it was in the file.**
11   Q.   So if it was in the file, it was
12 considered, but if it was not in the file, it
13 was not considered?
14   **A.   Correct.**
15   Q.   As you sit here today, you don't know
16 whether it was in the file or not?
17   **A.   I don't recall.**
18   Q.   ████████' initial custody review
19 occurred on March 27, 2019, correct?
20   **A.   Correct.**
21   Q.   We're now at July 16, 2019, correct?
22   **A.   Correct.**
23   Q.   That's over three months since his
24 initial custody review, correct?



305

1    A.   Correct.
2    Q.   He has not received a second custody
3 review, correct?
4    A.   Not to my knowledge, but it would be
5 at headquarters level.
6    Q.   Do you know why he hasn't received a
7 second custody review?
8    A.   No, I don't.  I do recall that there's
9 something going on with his case.  I don't
10 recall what it is.  I just remember seeing
11 something about it recently, and I honestly
12 don't remember exactly what it was.
13    Q.   So for ████████, he received a
14 custody review before 30 days.  His continued
15 detention decision did not mention the fact
16 he's married to a U.S. citizen, and he did not
17 receive a second custody review after 90 days,
18 correct?
19         MS. LARAKERS:  Objection.
20    A.   Correct.
21 BY MS. SEWALL:
22    Q.   So regarding ████████, it's possible
23 that ICE Boston did not follow the POCR
24 regulations, correct?

306

1         MS. LARAKERS:  Objection.
2    A.   No.
3 BY MS. SEWALL:
4    Q.   Why is that not possible?
5    A.   It's not -- there's -- if -- there
6 hasn't been a POCR done by the -- for the 180,
7 there's a reason for it.  I just don't know
8 what it is.  I know there's something going on
9 with this case, and I don't remember what it
10 is.
11    Q.   So where would you look to find that
12 out?
13    A.   I would have to talk with custody
14 management, AFOD, and maybe headquarters to
15 see who's going on with his 180-day.
16    Q.   So this spreadsheet alone does not
17 tell you whether there's be a POCR violation
18 for ████████ does it?
19    A.   No.
20    Q.   Does ICE still intend to remove
21 ████████ after July 22nd?
22    A.   As far as I know, yes.  I would have
23 to review the case, look at it, see what's
24 going on with it.

307

1
2         (Exhibit No. 17 marked for
3 identification)
4
5 BY MS. SEWALL:
6    Q.   The court reporter has handed you
7 what's been marked Exhibit 17.
8         Do you recognize this document?
9    A.   (Witness reviews document.)
10         No.
11    Q.   This is a notice to alien of file
12 custody review for ████████,
13 correct?
14    A.   Correct.
15    Q.   It states that "Your custody status
16 will be reviewed on or about February 11,
17 2019," correct?
18    A.   Correct.
19    Q.   And if you go to Exhibit 10 and you
20 look at the column for ████████ -- it's
21 eight rows down from the top -- it says his
22 POCR was conducted on January 25, 2019,
23 correct?
24    A.   Correct.

308

1    Q.   That's roughly 17 days before it was
2 noticed for, correct?
3    A.   Seventeen days -- I'm sorry?
4    Q.   That's roughly 17 days before it was
5 noticed for, correct?
6         MS. LARAKERS:  Objection.
7    A.   Correct.
8 BY MS. SEWALL:
9    Q.   Was ████████ informed that his
10 review would take place early?
11    A.   I don't.
12    Q.   Was his attorney informed that his
13 review would take place early?
14    A.   I don't know.
15    Q.   Do you know if he or his attorney
16 attempted to submit documents to be considered
17 in making a custody decision?
18    A.   I do not know.
19
20         (Exhibit No. 18 marked for
21 identification.)
22
23 BY MS. SEWALL:
24    Q.   Do you recognize -- sorry.



309

1    The court reporter has handed you
2  what's been marked as Exhibit 18.
3       Do you recognize this document?
4    A.  I do not.
5    Q.  This is a notice to alien of file
6  custody review for ████████████,
7  correct?
8    A.  Correct.
9    Q.  It states that ██████ custody
10 review would take place on or about May 7,
11 2019, correct?
12   A.  Correct.
13   Q.  And if you go to the spreadsheet for
14 ████████ -- it's the about the sixth row
15 down -- his POCR was conducted on May 1, 2019,
16 correct?
17   A.  Yes.
18   Q.  It's about six days before it was
19 noticed for?
20   A.  Correct.
21   Q.  Was ██████ informed that his review
22 would take place early?
23   A.  I don't know.
24   Q.  Was his attorney informed that his

3 0

1  review would take place early?
2    A.  I don't know.
3
4       (Exhibit No. 19 marked for
5  identification.)
6
7  BY MS. SEWALL:
8    Q.  The court reporter has handed you
9  what's been marked Exhibit 19.
10      Do you recognize this document?
11   A.  (Witness reviews document.)
12  No.
13   Q.  This is a decision to continue
14 detention for ██████, correct?
15   A.  Correct.
16   Q.  The second and third paragraphs
17 contain the reasons for the continued
18 decision --
19   A.  Okay.
20   Q.  -- is that right?
21   A.  Yes.
22   Q.  It's -- it says, "You are a United
23 States citizen and national of El Salvador who
24 entered the United States in an un --

3

1    A.  I'm sorry, can you repeat that?
2    Q.  The second photograph states, "You are
3  a citizen and national of ██████ who
4  entered the United States in an unknown
5  location, on unknown date, without having been
6  admitted or paroled after inspection by an
7  immigration officer.  You are subject to a
8  final order removal issued on ██████
9  2014."
10      Do you see that?
11   A.  I do.
12   Q.  And then the next paragraph says, "On
13 review of the facts of your case, including
14 your criminal convictions, I have determined
15 you would pose a risk to public safety if you
16 were to be released from ICE custody."
17      Do you see that?
18   A.  I do.
19   Q.  This does not mention that ██████ is
20 married to a United States citizen, correct?
21   A.  Correct.
22   Q.  It does not mention that he has a
23 pending I-130 and I-212 application,
24 correct?

3 2

1    A.  Correct.
2    Q.  Was that considered in determining
3  whether to continue his detention?
4    A.  I don't know.
5    Q.  Did ICE Boston know about his pending
6  I-130 and I-212 applications when it decided
7  to continue to detain him?
8    A.  I don't know.  That wouldn't be put
9  into a decision to continue detention anyway.
10   Q.  What wouldn't be put into a decision
11 to continue detention?
12   A.  That information.
13   Q.  Why not?
14   A.  Because it's a decision to continue
15 detention, not a -- not a release
16 notification.
17   Q.  So a decision to continue detention
18 would never reference the fact that somebody
19 had filed -- had a pending or -- a pending
20 I-130 or 212 application?
21   A.  Never.
22
23      (Exhibit No. 20 marked for
24 identification.)

33

1
2     A.  It would be on the release
3  notification, perhaps, though, which is
4  beneficial when -- on an earlier -- on an
5  earlier POCR review if he didn't release.
6  BY MS. SEWALL:
7     Q.  The court reporter has handed you
8  what's been marked as Exhibit 20.
9         Do you recognize this document?
10    A.  (Witness reviews document.)
11        Yes.
12    Q.  The second paragraph -- it's a
13 decision to continue detention, correct, for
14 ▓▓▓▓▓?
15    A.  It is.
16    Q.  And it is signed by you on the second
17 page, correct?
18    A.  Correct.
19    Q.  And the second paragraph, it says, "On
20 May 2, 2019, you were served with a decision
21 to continue detention pursuant to post-order
22 custody review.  On ▓▓▓, 2019, you submitted
23 additional documents in support of your
24 release.  These documents have been reviewed

35

1  that information on a document, we put it on
2  here.  It would not normally be put on here.
3  This is a rarity.
4     Q.  You testified that a decision to
5  continue detention would never reference the
6  fact of a pending I-130 application or a
7  pending I-212 application, correct?
8     A.  I stand corrected.  On a normal, it
9  would not.  However, in this case, it does
10 check in.
11    Q.  And this was as recently as -- what
12 date is this, May 15, 2019?
13    A.  Correct.
14    Q.  And you reconducted the POCR review
15 because he submitted documents after the
16 POCR -- the initial POCR review was conducted?
17    A.  Correct.
18    Q.  So we have now gone through a number
19 of cases where ICE conducted a POCR review
20 earlier than the date it noticed the POCR
21 review for, correct?
22        MS. LARAKERS:  Objection.
23    A.  We also have looked at several cases
24 where they had more than their 30-days'

34

1  by ICE -- and have been reviewed, and ICE has
2  also considered favorable factors you present,
3  including your U.S. citizen family members, as
4  well as your intention to seek I-212 and
5  I-601A waivers.  Upon full review of your
6  case, ICE has determine you have not
7  demonstrated that your release would not pose
8  a danger to the community or a significant
9  risk of flight pending your removal from the
10 United States."
11        Do you see that?
12    A.  I do.
13    Q.  So that does mention I-212 and --
14    A.  Only because --
15    Q.  Can I finish my question?
16    A.  Go ahead.
17    Q.  -- that mention an I-212 and I-601
18 pending application and a decision to continue
19 detention, does it not?
20    A.  It does.  However, this is not your
21 typical decision-to-continue-detention
22 notification.  It's based on the fact that he
23 presented additional documentation, and it was
24 brought to our attention.  In order to add

36

1  notification to get the documents together.
2     Q.  I'm sorry, can you answer my
3  question?
4     A.  I'm sorry.
5     Q.  We have gone through about five cases
6  now where ICE conducted a POCR review earlier
7  than the date it noticed the POCR review,
8  correct?
9         MS. LARAKERS:  Objection.
10    A.  No, because its it still says, "On or
11 about."  If you can give me a definition of on
12 or about, then I can probably better answer
13 that question.
14    Q.  I'm not sure that's my responsibility
15 since these are your documents.
16    A.  So it is about the time of
17 notification, so I think that that was in a
18 timely fashion.
19    Q.  Are you aware that the regulations say
20 that you're supposed to give approximately
21 30-days' notice?
22    A.  They were given more than 30-days'
23 notice, but we can cut that back down to
24 30-days' notice.

37

1    Q.  So when you're providing these notice
2  dates, and then you have some -- a notice
3  conducted earlier than the notice date,
4  sometimes as early as 20 days earlier than the
5  notice date, you don't know whether the
6  individual or the individual's attorney is
7  notified that the review will take place
8  earlier than the notice date, correct?
9    A.  Correct.
10          MS. LARAKERS:  Objection.
11 BY MS. SEWALL:
12   Q.  And do you know how often this occurs,
13 the review taking place earlier than the
14 on-or-about notice date?
15   A.  I do not.  However, it also benefits
16 the alien that will get released by getting
17 outer earlier than he would have normally
18 based on that review.
19   Q.  Does it benefit -- does it benefit an
20 alien who intends to submit documents and
21 doesn't have time?
22          MS. LARAKERS:  Objection.
23   A.  He's -- the alien -- currently, the
24 notice of review is given quickly, after

38

1  detention, so they have more than their 30
2  days to gather that information.
3  BY MS. SEWALL:
4    Q.  So you think that makes up for the
5  fact that the reviews are potentially taking
6  place earlier without notice going out to the
7  individual or the individual's attorney?
8          MS. LARAKERS:  Objection.
9    A.  The notice is given to the alien of
10 the review at that time.  They are -- they are
11 give -- they're given more than 30-days'
12 notice to gather that documentation.
13 BY MS. SEWALL:
14   Q.  But they're told that a review will
15 happen on --
16   A.  On or about.
17   Q.  -- on or about a certain date and it's
18 happening, at least for these five people, who
19 are class members in an ongoing litigation,
20 earlier than that; is that correct?
21   A.  It's still -- it's about the date that
22 is on the notification.
23   Q.  And the reviews are taking place
24 earlier than the date that's provided for the

39

1  on-or-about date?
2    A.  It's taking place before the
3  on-or-about date.
4    Q.  So do you know if, after these reviews
5  take place, the individual or the individual's
6  attorney are told they can still submit
7  documents for their case?
8    A.  I don't know.  Apparently, some have,
9  or one has for sure.
10   Q.  You -- do you know if they were
11 informed that they could continue to submit
12 documents?
13   A.  I don't know.
14   Q.  We've also seen a number of cases
15 where a second POCR review does not appear to
16 have been conducted within 90 days of the
17 first POCR review, correct?
18   A.  Correct.
19   Q.  Do you know if this is a violation of
20 these class members POCR rights?
21   A.  I do not know, because I would have to
22 look at the case the see where it's at with
23 headquarters.
24   Q.  And so you can't tell from this

320

1  spreadsheet whether there's been a violation
2  of POCR review -- POCR requirements,
3  correct?
4    A.  I cannot.
5    Q.  The people we have reporting on is a
6  fraction of the detained docket, correct?
7    A.  Correct.  It's a -- but not of the
8  Calderon class members.
9    Q.  No, of the detained docket, generally.
10   A.  Correct.
11   Q.  It's a small fraction?
12   A.  (Witness nodding.)
13   Q.  And these are class members in an
14 ongoing litigation, correct?
15   A.  Correct.
16          MS. LARAKERS:  Objection.
17 BY MS. SEWALL:
18   Q.  How many times do you think there's
19 been a POCR violation that you don't know
20 about for the entire detained docket?
21          MS. LARAKERS:  Objection.
22   A.  I don't know.
23 BY MS. SEWALL:
24   Q.  Who at headquarters knows about this

32

1  litigation?
2           MS. LARAKERS: Objection.
3      **A.  I answered that question like three**
4  **times already, and I don't know.**
5  **BY MS. SEWALL:**
6      Q.  You have received settlement
7  authority --
8      **A.  Correct.**
9      Q.  -- full settlement authority for this
10 litigation, correct?
11     **A.  Correct.**
12     Q.  But you testified that you've never
13 talked to anybody at headquarters about this
14 litigation, except for the fact of this
15 litigation?
16     **A.  Correct.**
17     Q.  How is that possible, that you have
18 full settlement authority, under those
19 circumstances?
20     **A.  It's part of the position.**
21     Q.  How is that?  Do you know what ICE's
22 settlement position will be in any given
23 hearing --
24          MS. LARAKERS: Objection.

322

1  BY MS. SEWALL:
2      Q.  -- without discussing it with
3  headquarters?
4      **A.  No.  I would discuss it with my**
5  **counsel first.**
6      Q.  Counsel does not have settlement
7  authority, correct?
8      **A.  Correct.**
9      Q.  I would imagine headquarters has
10 settlement authority, correct?
11     **A.  And --**
12          MS. LARAKERS: Objection.
13     **A.  -- which is delegated to me for**
14 **settlement authority.**
15 **BY MS. SEWALL:**
16     Q.  And Ms. Asher does not appear at every
17 single hearing in this litigation, correct?
18          MR. LARAKERS: Objection. This
19 is certainly not within the scope of the
20 policies and practice of ICE when detaining or
21 moving a class member.
22          MS. SEWALL: I'm talking about
23 testimony that he gave.  I'm exploring
24 testimony he gave already, and it doesn't seem

323

1  as if it could be --
2           MS. LARAKERS: What testimony?
3  Get to the testimony.
4           MS. SEWALL: I said the
5  testimony up front.  He testified that he has
6  not spoken to anybody at headquarters about
7  this litigation, except for the fact of the
8  litigation.  I am exploring that testimony.
9  You can object, but you cannot be giving
10 speaking objections for these sorts of very
11 reasonable questions.
12          MS. LARAKERS: It's not -- it
13 goes to the scope of the -- it goes to the
14 scope of this deposition.
15          MS. SEWALL: If you want to
16 instruct him not to answer, go ahead, but,
17 otherwise, I'm going if continue with my
18 questions.
19          MS. LARAKERS: I'm reserving my
20 objection.
21          MS. SEWALL: You can object and
22 say outside the scope, and then you can stop.
23 This is very disruptive to my questioning of
24 the witness.

324

1           MS. PIEMONTE: If we're seeking
2  a protective order, it requires a basis in the
3  transcript.  So to the extent that you're
4  going to pursue it, it's not an objection
5  meant to preserve or to coach the witness in
6  any way, shape, or form.  However, if there
7  are continued questions beyond the scope of
8  what the deposition is here today, I think we
9  have an obligation to preserve, at least on
10 the transcript, the reasons for the objection
11 to allow us to seek a protective order from
12 Judge Wolf, if necessary.
13          MS. SEWALL: And I think you can
14 absolutely say, "Objection.  Beyond the
15 scope."  I don't think we need to get anything
16 further on that.
17          MS. PIEMONTE: We can agree to
18 disagree with that.
19 BY MS. SEWALL:
20     Q.  I'm looking for my last pending
21 question.
22          MS. PIEMONTE: It was regarding
23 settlement authority.
24 BY MS. SEWALL:

325

1    Q.  How is it possible that you have not
2  spoken to anybody at headquarters about --
3  except -- about this litigation, except for
4  the fact of this litigation and that you also
5  have full settlement authority for this
6  litigation?
7    A.  There's been no reason for me to
8  discuss anything with headquarters on the
9  settlement of this case because it hasn't gone
10 to -- we haven't discussed settlement.
11   Q.  So how do you have full settlement
12 authority at hearings?
13   A.  It's been delegated to me to have.
14   Q.  So you have full settlement authority
15 without having spoken with anybody at
16 headquarters regarding what their settlement
17 position might be?
18        MS. LARAKERS:  Objection.  You
19 don't have to answer, to the extent that that
20 includes communications with counsel at
21 headquarters.
22   A.  I believe that the -- that
23 headquarters has delegated to me to make
24 settlement authority on this case based on the

326

1  fact that I'm currently the acting FOD for
2  Boston field office, not based on the case in
3  itself.
4  BY MS. SEWALL:
5    Q.  So due to your petition as acting FOD
6  of the Boston field office, you have full
7  settlement authority?
8    A.  Correct.
9    Q.  And you've never discussed potential
10 settlement that ICE headquarters would agree
11 to?
12   A.  I have not.
13   Q.  And is your authority -- is that
14 authority delegated to you on all ongoing
15 litigations for -- that the Boston field
16 office is named in?
17   A.  I don't know.
18   Q.  You're aware of media reports about
19 ICE's plans to conduct a large-scale operation
20 to remove individuals with final orders of
21 removal, correct?
22   A.  There are several.
23   Q.  And you're aware that it was reported
24 that such an operation would involve detaining

327

1  families in hotel rooms and quickly removing
2  them --
3        MS. LARAKERS:  Objection.
4  BY MS. SEWALL:
5    Q.  -- correct?
6        MS. LARAKERS:  Scope.
7    A.  I don't know.  That's what media is
8  reporting.
9  BY MS. SEWALL:
10   Q.  If such an operation were to be
11 conducted by the Boston ERO, who would you
12 receive the order from?
13   A.  Headquarters.
14   Q.  Has headquarters ever instructed you
15 to consider whether individuals targeted for
16 removal are eligible for the provisional
17 waiver process?
18        MS. LARAKERS:  Objection.  Don't
19 answer, to the extent it involves
20 conversations with counsel.
21   A.  No.
22 BY MS. SEWALL:
23   Q.  Have you ever expressed a concern to
24 headquarters or anyone else, other than your

328

1  attorneys, about whether ICE Boston could
2  conduct a large-scale effort to quickly remove
3  noncitizens with final orders of removal while
4  still complying with obligations to Calderon
5  class members?
6    A.  Can you repeat that?
7    Q.  Have you ever expressed concern to
8  headquarters or anyone else, other than your
9  attorneys -- other than attorneys, about
10 whether ICE Boston could conduct a large-scale
11 effort to quickly remove noncitizens with
12 final orders while still complying with the
13 obligations to Calderon class members?
14   A.  No.
15   Q.  Do you have such a concern?
16   A.  No.
17   Q.  Is there a mechanism in place that
18 would protect Calderon class members if such
19 an operation occurred in New England?
20   A.  Just the fact that the -- what we're
21 doing right now, identifying, and that any
22 removal of a Calderon class member would have
23 to be approved by the field office director --
24 deputy field office director or field office

Confidential

Transcript of Marcos Charles

Conducted on July 16, 2019

329

1  director, acting field office director, acting
2  deputy field office director.
3    Q.  We've gone through several class
4  members that have -- that are pending removal,
5  and you were not aware of whether, as you sit
6  here today, their status as Calderon class
7  members or their petitions for I-130s or any
8  other -- or I-212s were considered in deciding
9  whether to arrest, detain, or remove them,
10 correct?
11       MS. LARAKERS:  Objection.
12   A.  No, not correct.  We've gone over
13 seven or eight class members who have been
14 reviewed, and whatever information was in the
15 file or EARM in the case summary was
16 considered before continuing the removal
17 process.
18 BY MS. SEWALL:
19   Q.  So if you look at Exhibit 10, this is
20 some of the class members we reviewed today,
21 correct?
22   A.  Correct -- well, this is the class
23 members, and we reviewed some of the ones on
24 this document.

330

1    Q.  How many are there on this document?
2    A.  (Witness reviews document.)
3        13 or 14.
4    Q.  And for each of those 13 or 14 people,
5  you told me you did not know who the arresting
6  officer was, correct?
7    A.  Correct.
8    Q.  You told me you did not know if the
9  arresting officer considered their pending or
10 approved I-130 applications, correct?
11   A.  Correct.
12   Q.  You told me you did not know who the
13 officer deciding to detain them was, correct?
14   A.  Not on all of them.
15   Q.  Which ones do you know?
16   A.  I don't remember -- I thought there
17 was somebody -- there might have been one or
18 two that we knew who the deciding detention
19 FOD was.
20   Q.  I don't remember anybody that you said
21 you remembered.
22   A.  Yeah, so everybody that was detained
23 on detention date, prior to the Calderon class
24 membership definition, would -- the arresting

33

1  officer would not have been advised that they
2  needed an AFOD approval prior to making that
3  arrest.  And anybody prior to that would not
4  have required a DFOD or above to approve the
5  detention.
6    Q.  So I don't think that was my question.
7  I think my question was --
8    A.  I understand.  I just wanted to make a
9  point.
10   Q.  -- you didn't know if the detaining
11 officer considered the individuals' pending or
12 approved I-130 application?
13   A.  Correct.
14   Q.  And you made the decision that these
15 individuals should be removed, correct?
16   A.  Correct.
17   Q.  But you can't remember if you
18 considered, for any of these individuals,
19 their I-130 applications, correct?
20       MS. LARAKERS:  Objection.
21   A.  I considered everything that was in
22 front of me at the time.
23 BY MS. SEWALL:
24   Q.  And you can't -- you can't testify

332

1  about exactly what's in front of you at the
2  time, correct?
3    A.  No, I cannot.  I can tell you that I
4  had the A-file, EARM, and the case summary in
5  front of me at the time.
6    Q.  And you don't know what exactly was in
7  the case file summary and the EARM, correct?
8    A.  No, I don't remember that.  I would
9  have to look at it.
10   Q.  Are you aware of media coverage of
11 racist statements made by border patrol agents
12 in Texas?
13       MS. LARAKERS:  Objection.
14   A.  I have seen that in the media.
15 BY MS. SEWALL:
16   Q.  Those statements were made on a shared
17 Facebook page, correct?
18       MS. LARAKERS:  Objection.
19   A.  I believe so, yes.
20 BY MS. SEWALL:
21   Q.  And you worked in Texas in border
22 patrol, correct?
23       MS. LARAKERS:  Objection.
24 Scope.

                                                            333
1      A.  I worked with border patrol in Texas.
2  BY MS. SEWALL:
3      Q.  Were you a member of the Facebook
4  group that has been the subject of media
5  coverage?
6          MS. LARAKERS:  Objection.
7  Scope.
8      A.  At one point, I was.
9  BY MS. SEWALL:
10     Q.  And did you participate in these
11 racist statements that were made by border
12 patrol agents in Texas?
13     A.  I never posted anything on that.
14         MS. LARAKERS:  Objection.
15 BY MS. SEWALL:
16     Q.  Have you seen or heard those racist
17 statements when you were a member of the
18 Facebook page?
19         MS. LARAKERS:  Objection.
20 Scope.
21     A.  Not that I recall.
22 BY MS. SEWALL:
23     Q.  Have you seen or heard anyone at the
24 Boston ERO using derogatory language about

                                                            334
1  noncitizens?
2          MS. LARAKERS:  Objection.
3  Scope.
4      A.  No.
5  BY MS. SEWALL:
6      Q.  You haven't seen or heard a single
7  person at the Boston ERO use derogatory
8  language about noncitizens?
9          MS. LARAKERS:  Objection.
10 Scope.
11     A.  No.
12 BY MS. SEWALL:
13     Q.  Have you seen other heard anyone at
14 the Boston ERO use racist language about
15 noncitizens?
16         MS. LARAKERS:  Objection.
17     A.  I'm sorry, what was that?
18 BY MS. SEWALL:
19     Q.  Have you seen or heard anyone at the
20 Boston ERO use racist language about
21 noncitizens?
22     A.  No.
23     Q.  Are you aware that the president
24 recently tweeted that certain nonwhite

                                                            335
1  congresswoman should go back and help fix the
2  totally broken and crime-infested places from
3  which they came?
4          MS. LARAKERS:  Objection.
5  Scope.
6      A.  I didn't read the article.  I saw
7  something briefly about it.
8  BY MS. SEWALL:
9      Q.  Do you think that racist -- that
10 statement is racist?
11         MS. LARAKERS:  Objection.
12 Scope.
13     A.  Do I think that the president's
14 statement was racist?  I don't know what the
15 president exactly said, and I wouldn't want to
16 make a comment on that unless I read
17 everything in its totality.
18 BY MS. SEWALL:
19     Q.  Do you agree that the president sets
20 the immigration enforcement agenda for the
21 country?
22     A.  No.
23 BY MS. SEWALL:
24     Q.  Who do you think sets the immigration

                                                            336
1  enforcement agenda for the country?
2      A.  I believe his advisors do.
3      Q.  Do you think the president has the
4  ultimate authority over the immigration
5  enforcement agenda for the country?
6      A.  Apparently not.
7      Q.  Why apparently not?
8      A.  Because we're not doing what he's
9  stated he was going to do.
10     Q.  You worked under President Obama,
11 correct?
12     A.  Correct.
13         MS. LARAKERS:  Objection.
14 Scope.
15 BY MS. SEWALL:
16     Q.  Do you agree that immigration
17 enforcement is different under President Trump
18 than under President Obama?
19         MS. LARAKERS:  Objection.
20 Scope.
21     A.  Can you be more specific with that?
22 BY MS. SEWALL:
23     Q.  Do you agree that it's different under
24 President Trump than under President Obama?

337

1        MS. LARAKERS:  Objection.
2   Scope.  He's not here to testify about his
3   opinion either.
4        MS. SEWALL:  This is just
5   questions in his personal capacity.
6        MS. LARAKERS:  He's a 30(b)(6)
7   witness, so he's not here in his personal
8   capacity.  He's here to testify on behalf of
9   ICE.
10        MS. SEWALL:  You're saying he
11  can't testify to anything in his personal
12  knowledge?
13        MS. LARAKERS:  I'm saying the
14  fact -- his opinions about the subject matter
15  is beyond is scope.  That's what I'm saying.
16        MS. SEWALL:  Are you instructing
17  him not to answer.
18        MS. LARAKERS:  No.
19  BY MS. SEWALL:
20    Q.  Do you agree that immigration
21  enforcement is different under President Trump
22  than under President Obama?
23    A.  I agree that under the four presidents
24  that I've served under, it's different every

338

1   president.
2    Q.  Have you ever heard a president say
3   something like nonwhite congresswoman should
4   go back and help fix the totally broken and
5   crime-infested places from which they came?
6    A.  I've never heard that, no.
7        MS. SEWALL:  If we can take just
8   two minutes to check our notes, but I think we
9   should be done or, at most, have five more
10  minutes.
11        MS. LARAKERS:  Okay.
12        THE VIDEOGRAPHER:  We are off
13  the record 5:07 p.m.
14
15        (Recess taken from 5:07 p.m.
16         to 5:12 p.m.)
17
18        THE VIDEOGRAPHER:  We are on the
19  record at 5:13 p.m.
20        MS. SEWALL:  So I have no
21  further questions.  However, I want to put on
22  the record that we are holding the deposition
23  open for two primary reasons:  The first is we
24  have not received document production from the

339

1   government yet; and the second is that
2   Mr. Charles was not adequately prepared to
3   testify on the 30(b)(6) topics.  Specifically,
4   he cannot recall any specifics or for any
5   class members that we have been informed have
6   been arrested, detained, and removed, so we
7   will be holding the deposition open and
8   potentially seeking the deposition of somebody
9   else who can be adequately prepared on these
10  topics.
11        MS. LARAKERS:  Well, we object
12  to those bases for holding the deposition
13  open, but we can raise it with the Court.
14        THE VIDEOGRAPHER:  We are off
15  the record at 5:14 p.m.
16
17        (Deposition concluded at 5:14 p.m.)
18
19
20
21
22
23
24

340

1        CERTIFICATION
2        I, DARLENE M. COPPOLA, a Notary Public, do hereby
3   certify that MARCOS CHARLES, after having
4   satisfactorily identifying himself, came before me on
5   the 16th day of July, 2019, in Boston, Massachusetts,
6   and was by me duly sworn to testify to the truth and
7   nothing but the truth as to his knowledge touching and
8   concerning the matters in controversy in this cause;
9   that he was thereupon examined upon his oath and said
10  examination reduced to writing by me; and that the
11  statement is a true record of the testimony given by
12  the witness, to the best of my knowledge and ability.
13        I further certify that I am not a relative or
13  employee of counsel/attorney for any of the parties,
14  nor a relative or employee of such parties, nor am I
15  financially interested in the outcome of the action.
16        Review was requested.
17        WITNESS MY HAND THIS 17th day of July, 2019.
18
19  [signature]
20
21  DARLENE M. COPPOLA        My commission expires:
22  NOTARY PUBLIC             November 11, 2022
23  REGISTERED MERIT REPORTER
24  CERTIFIED REALTIME REPORTER