**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

LILIAN PAHOLA CALDERON JIMENEZ, and LUIS GORDILLO, *et al.*,

Individually and on behalf of all others similarly situated,

Plaintiffs-Petitioners,

v.

KEVIN K. McALEENAN, *et al.*,

Defendants-Respondents.

No. 1:18-cv-10225-MLW

**ORAL ARGUMENT REQUESTED**

**PETITIONERS' SECOND SUPPLEMENTAL MEMORANDUM IN SUPPORT OF THEIR MOTIONS FOR ORDER TO SHOW CAUSE AND FOR INTERIM RELEASE**

At the August 27, 2019 hearing in this case, ICE Boston promised to reconsider the detention of each of the seven individuals at issue in Petitioners' show-cause motion "with an open mind," and "decide whether it's appropriate to release them." Hr'g Tr. 19:1-8. The government indicated that such a review would involve balancing the equities of each case, including whether the person posed a danger or flight risk, and against the backdrop of the POCR violations that have occurred. *Id.* at 19:1-32:15. The government did not do this. Instead, it continued detaining all six people—even those who it did not find posed *any* danger or flight risk—based merely on its claim that it has secured or is close to securing travel documents.

The government's promised reviews delayed judicial resolution of Petitioners motion, prolonging the detention of these individuals and the consequent hardship on their U.S. citizen families. And any potential relief is still more than a month away, even though the Court has indicated that Petitioners are likely to succeed on the merits of their claims. Immediate interim

release from detention is thus warranted. For example, release is certainly warranted for and , whom ICE did not find posed any danger or flight risk.

As Petitioners have argued previously, the seven people at issue—including one previously released during this Court's stay, —are also entitled to ultimate relief in the form of either an order of release or a bail hearing conducted by the Court.

**I. The Six Detained Individuals Should Be Released Pending a Decision on the Merits, and While Their Removal Is Stayed by This Court.**

Immediate interim release is appropriate to prevent further undue, and unwarranted, hardship on the detained individuals, their U.S. citizen spouses, and their young children during the month between now and the November 4 hearing. The following individuals have been detained between 146 and 409 days after a final order of removal, and could be reunited with their families while awaiting the November 4, 2019 hearing in this case.

- (detained 296 days post-order): detention was continued even though he was not found to be a danger or flight risk, based solely on ICE's prediction that it will be able to obtain a travel document. Dkt. 377-2 (Ex. B). Because of his detention, his wife—a resident instructor at a mental health program—has had to take on a second job while juggling care for their six-year-old daughter. Dkt. 355-43 (Ex. 14) ( Decl.).[1]

- (detained 340 days post-order): detention was continued even though he was not found to be a danger or flight risk, based solely on ICE's possession of a travel document. Dkt. 377-6 (Ex. F). His detention has left his wife, a nurse, working two jobs while caring for a seven-year-old and toddler alone. Dkt. 355-51 (Ex. 22) ( Decl.).[2]

- (detained 146 days post-order): was found "not suitable for release" because of ICE's ability to remove her. ICE also found her to be a danger based on a single drug conviction stemming from a 2019 arrest. Dkt. 377-5 (Ex.

---

[1] The notice does reference two misdemeanor convictions that are more than five years old. Dkt. 377-2 (Ex. B); *see also* Dkt. 354-43 (Ex. 14) ( Decl.) ¶ 18. But it does not conclude that Mr. poses a danger or flight risk based on these convictions.

[2] The notice references a decade-old conviction for assault and battery that stemmed from a dispute with an ex-girlfriend. Dkt. 377-6 (Ex. F); Dkt. 355-5 (Ex. 22) ( Decl.) ¶ 10. But it does not conclude that Mr. poses a danger or flight risk based on it.

E). Ms. [redacted] fled years of violence in Honduras because of her sexual orientation. She is a wife and mother who has explained that she has "learned from [her] mistake," "will not be involved in any crime," and just wants to "be by [her] wife's side to continue working with her to build our life together." Dkt. 355-35 (Ex. 6) ([redacted] Decl.) ¶¶ 4, 14-15.

- [redacted] (detained 409 days post-order): [redacted], who has lived in the United States since 1988, was found "not suitable for release" because ICE has a travel document. ICE also notes as a flight risk "factor" that [redacted] cut off his GPS device in 2018. Dkt. 377-3 (Ex. C). But [redacted] reported to ICE immediately after accidentally doing so, and has explained that he understands the mistake that he made, that he will comply with all conditions of release, and that he wants nothing more than to "provide and care for [his] wife and her grandson"—the 10-year-old boy for whom Mr. [redacted] is the only father he has ever had in his life. Dkt. 355-30 (Ex. 1) ([redacted] Decl.) ¶¶ 5, 8-9, 22; Dkt. 355-33 (Ex. 4) ([redacted] Decl.) ¶¶ 7, 11-14.

- [redacted] (detained 325 days post-order): Mr. [redacted] was found to present a risk of flight based on his final order of removal and the fact that his I-212 was denied but is on appeal. He was found to pose a danger based on a December 2017 conviction for assault and battery on a police officer and resisting arrest. Finally, ICE denied his release because it has a valid passport. Dkt. 377-1 (Ex. A). Mr. [redacted] return home is desperately needed to help care for his family, including a five-year-old son who was born drug addicted, three step-children whose father committed suicide two years ago, a 10-year-old niece struggling with behavioral issues, a new step-grandbaby, and wife who is battling her own health issues and holding her family together by a thread. Dkt. 355-50 (Ex. 21) ([redacted] Decl.).

- [redacted] (detained 294 days post-order): Mr. [redacted] was denied release based on the likelihood that the government would obtain a travel document and the conclusion that he posed a danger based on his recent convictions, including for armed assault with intent to murder. Dkt. 377-4 (Ex. D). Although Mr. [redacted] presents criminal history that is admittedly more serious than the other individuals at issue in this motion, he has now been detained for nearly ten months, has taken strides to rehabilitate himself, Dkt. 355-54 (Ex. 25) (Rubin Decl.), and could be released pursuant to conditions of release that might include a curfew, house arrest, and/or participation in programs.

Is it appropriate for the Court to use its equitable powers in habeas to alleviate the suffering of these families by ordering the above individuals' interim release on any appropriate conditions. *See* Dkt. 95 at 57 (describing the Court's equitable powers). The government has now confirmed that its motivation for continuing to detain these individuals is its ability to remove them, *see* Dkt. 377 at 10, 14, making it hard to justify detention during a period in which they indisputably cannot be removed. *See Zadvydas v. Davis*, 533 U.S. 678, 690, 698 (2001).

Further detention during the pendency of Petitioners' show-cause motion is particularly unwarranted where, after systemic violations of 8 C.F.R. § 241.4, the government delayed a judicial remedy by promising that it would meaningfully consider each individual for release and then failed to make good on that promise. As this Court wrote in June 2018:

> It would be particularly unfair to require that petitioners remain detained for another 30 days while ICE attempts to remedy its failure to follow its regulations and to provide each of them due process. As explained earlier, both petitioners face the prospect of being deported and separated from their families. Each day with their families is, therefore, precious. Any unjustified loss of liberty for even one more day would be a particularly painful form of irreparable harm to them and to the United States citizens who love them.

Dkt. 95 at 59; *see also* Hr'g Tr. 14:15-20 ("[H]abeas is an equitable remedy. In June of 2018, seeing the egregious and persistent failure to follow the POCR regulations, I wasn't going to rely on ICE to belatedly do the bail reviews while the petitioners were suffering irreparable harm because . . . they hadn't received timely notice of those reviews.").[3] Thus, this Court should use its equitable power to release these individuals.

Moreover, even if this Court were to rely not just on its equitable powers, but were to look to the temporary restraining order factors to determine whether to grant this motion for emergency interim release, those factors are satisfied. *Cablevision of Boston, Inc. v. Pub. Improvement Comm'n*, 38 F. Supp. 2d 46, 53 (D. Mass.), *aff'd*, 184 F.3d 88 (1st Cir. 1999). This Court has largely acknowledged Petitioners' likelihood of success on the merits, *see* Hr'g Tr. 39-52, and the irreparable harm the detainees and their spouses and children are suffering, *see* Dkt. 95 at 57. Because the government has already demonstrated that its reasons for wanting to

---

[3] All references to a Hearing Transcript are to the transcript from the August 27, 2019 hearing, unless otherwise noted.

detain the Petitioners have little (or, in two cases, nothing) to do with flight risk and danger, the government's interest will not be greatly harmed by an order releasing the detainees during a period in which they cannot be removed. This is effectively the situation [REDACTED] is in after having been released on August 6, 2019. That situation is workable: the individuals' claims would remain before this Court, but each person would not be subject to unjust, continued detention as a result of Respondents' disregard of this Court's orders, and the inability to hold immediate bail hearings. Finally, the public interest will be served by permitting the people at issue to return to the families and children who depend on their care. *See* Dkt. 355 Exs. 1 ([REDACTED] Decl.), 4 ([REDACTED] Decl.), 6 ([REDACTED] Decl.), 14 ([REDACTED] Decl.), 21 ([REDACTED] Decl.), 22 ([REDACTED] Decl.), and 25 ([REDACTED] Decl.).

## II. ICE's Refusal to Make a Custody Determination Based on the Equities, Contrary to Its Promises to This Court, Provides Additional Reason for this Court to Order Interim Relief.

This litigation has repeatedly shown that ICE does not take the POCR process seriously. Petitioners are now additionally concerned that ICE does not take this litigation seriously. This Court gave ICE an opportunity to conduct new reviews and to respond to its violations of individuals' rights. ICE promised to conduct meaningful reviews. But it did not. ICE's conduct, and its response to the problems with that conduct, suggests that its repeated violations of the POCR process will not stop unless it experiences consequences consistent with the relief Petitioners seek here.

### A. The Government Led the Court and Petitioners to Believe that It Would Meaningfully Consider Releasing Individuals Whose Detention Was Not Necessary to Protect the Community or Prevent Flight.

On August 27, 2019, the Court gave the government an opportunity to consider releasing the six detained individuals even though the Court had essentially determined that Petitioners were likely to succeed on the merits of their show-cause motion. ICE represented that it would

review the custody of each of the detained individuals "de novo, with an open mind, starting from scratch, and decide whether it's appropriate to release them." Hr'g Tr. 19:1-8 (statement of the Court, to which Mr. Charles responded: "Yes. We'll take documents into consideration and an interview if necessary.").

In the process of arguing that ICE should have another opportunity to review custody of the individuals in question, the government addressed the scope of the judicial inquiry that would otherwise occur. It argued that "in *Zadvydas* there is a balancing that has to occur, and it's not just based on, you know, foreseeability of removal." Hr'g Tr. 29:25-30:2. It further acknowledged that:

> [T]he court could consider a violation of the POCR regulations and whether that any deprivation resulted in detention that wasn't reasonably related. Maybe it wasn't reasonably related because there was flight risk. Maybe it wasn't reasonably related because there was no dangerousness. … I think *Zadvydas* does allow that balancing to occur.

Hr'g Tr. 30:20-31:1.

Demonstrating its understanding of considerations of flight risk and danger, the Court then stated, "If there was a violation but I thought somebody, if released, would be a threat to commit violent crimes, that wouldn't be an equitable remedy for the violation." Hr'g Tr. 31:3-5. Respondents' counsel responded to this statement that therefore "ICE should just be allowed to … conduct the review in the first place." Hr'g Tr. 31:8-9. ICE Boston did not clarify that its review would be based largely not on whether somebody "would be a threat to commit violent

crimes"—or on any equities at all—but instead on ICE Boston's possession of a valid travel document.[4]

Based on ICE's representations, this Court did not decide the remedy for ICE Boston's violations of the seven individuals' POCR rights but instead gave the parties three weeks to attempt to resolve the issue. Dkt. 366. During this time, the Court stated that class counsel could provide ICE Boston with documents in support of each of the seven individuals' release, and ICE Boston must decide "whether to continue the detention of each of them or to release them on appropriate conditions." Dkt. 366. The Court stated that "roughly about three weeks from now, depending on how meritorious the arguments are and how persuasive counsel are, some or all of these seven people might be out of detention." Hr'g Tr. 32:12-15.

### B. Contrary to This Court's Order, ICE Refused to Review Mr. [REDACTED] Custody

In direct violation of the Court's order, ICE refused to review [REDACTED] custody. The Court required ICE to review documents and decide on the custody of each of the seven people in our motion for order to show cause reply brief. Dkt. 366 (stating that Petitioners shall provide documents "in support of the release of the seven class members" who are the subject petitioners' motion," and that ICE Boston shall "decide whether to continue the detention of each of them."). Even though Petitioners' counsel submitted documents in support of Mr. [REDACTED] continued release, ICE did not conduct a custody review. But Mr. [REDACTED] was only released on

---

[4] Indeed, ICE Boston should have mentioned this fact at the hearing, because it already possessed the ability to remove several if not all of the individuals in question at the time of the hearing. *See, e.g.*, Dkt. 317-2 (Ex. A) (Lyons Decl.) ¶¶ 32-36 (referring to Mr. [REDACTED]). ICE Boston did not review Mr. [REDACTED] dangerousness or flight risk, but instead relied on the same fact that existed at the time of the hearing—its claimed ability to remove him. *See supra*, p. 2 & n.1.

August 6, 2019 "while [his] removal is stayed by the court." Pets.' Reply Br., Dkt. 355-46 (Ex. 17). Thus, for all purposes related to this motion, Mr. [redacted] continues to be detained. Releasing someone pending the resolution of a motion that seeks their release does not moot any claims under the motion.

**C. The Government's Detention Notices Reveal that ICE Violated the Court's Orders and Did Not Fulfill its Promise to Meaningfully Consider the Need to Detain and Remove the Six Other Individuals in Question.**

The government's notices requiring the continued detention of the six detained individuals at issue in this motion reveal that ICE violated the Court's orders and its representations to the Court in at least three ways.

*First*, ICE's reviews were not completed by September 19; it is not clear when they were completed. Although Respondents communicated to Petitioners on September 19, 2019 that they would not release any of the individuals in question, its detention decisions are dated between September 22 and 24, 2019, and one even references the issuance of a travel document for Ms. [redacted] on September 20, 2019. *See* Dkt. 377 Exs. A-F. These belated notices suggest a post-hoc attempt to justify a decision not to release anyone who was the subject of Petitioners' motion, rather than a good-faith review.

*Second*, ICE's review was far from "de novo, with an open mind." Instead, ICE decided not to release a single person, even the individuals that it could not conclude posed any danger or flight risk. These decisions and Respondents' brief confirm that ICE's ability to remove each of the six individuals whose custody it reviewed was the primary factor in its decision to continue their detention. *See* Dkt. 377 at 14 ("ICE's multiple reviews in each of the detainees' cases confirmed its ability to effectuate removal and by extension the detainees ineligibility for release."); *id.* at 10 (calling the "ability to remove" each person "the primary consideration" in the reviews that occurred); *id.* ("[I]t is only the stay of removal that bars removal for the

detainees and therefore detention remains fully warranted.”).[5] Thus, after using the promise of a meaningful review to defer a judicial resolution of Petitioners’ motion, ICE used the extra time to shore up its travel documents and to conclude that detention was warranted in every case based solely on its claimed ability to effect removal.

*Third*, the notices also reveal that ICE has not accurately described how it considers class members’ pursuit of the provisional waiver process. ICE has told this Court that it

Yet it is unlikely that a conviction more than ten years old presents such an exceptional circumstance warranting depriving Mr. of the opportunity to pursue the provisional waiver process, when it did not cause him to be found to present a danger or flight risk. The same is easily true of Mr. convictions, which did not cause him to be found a danger or flight risk; and Mr. “several misdemeanor traffic offenses,” which did not cause him to be determined to pose a danger. Dkt. 377-3 Ex. C. That ICE continues to pursue these individuals’ detention and removal despite their pursuit of provisional waivers—which was not mentioned as a

[5] ICE defends this focus by citing to 8 C.F.R. § 241.4(e)(1). But that provision requires that, to release someone, ICE must find ***either*** that travel documents are not available ***or*** that their removal is “not in the public interest.” *Id.* Respondents ignored the public interest, including failing to base their decision on whether any of the six detained individuals presented a flight risk or danger to the public. That was also at the heart of this Court’s order at the August 27 hearing providing ICE three additional weeks to conduct each alien’s custody review *de novo*. ICE did not do that, but instead used the time to obtain travel documents.

consideration in any individuals' notices to continue detention—further violates their rights under the provisional waiver regulations. 8 C.F.R. § 212.7(e); Dkt. 159 (June 21, 2018 Order).

ICE's promise, on August 27, 2019, to conduct meaningful reviews of each individuals' detention did not result in meaningful reviews, nor did it resolve any of the issues before the Court. It only served to prolong these individuals' detention by months. This Court should therefore provide the interim relief of release until it can make a determination on the merits of each individual's claims and continued detention.

## III. Ultimate Relief is Warranted Because ICE Systemically Ignores the Requirements of Section 241.4.

ICE's refusal to evaluate the merits of each individual's detention is particularly egregious given the repeated violations of the individuals' POCR rights. As explained in Petitioners' reply brief, Dkt. 354, and in accordance with the tentative views that this Court expressed at the hearing on August 27, 2019, ICE violated the POCR regulations regarding each person at issue in numerous ways. Respondents' most recent filing fails to give any reason to doubt that widespread violations of § 241.4 occurred, as discussed below.

Relief is warranted because Respondents also provide no reason for the Court to revisit its tentative view that Petitioners do not need to show prejudice. *See* Hr'g Tr. 39:5-31; *see Waldron v. INS*, 17 F.3d 511, 518 (2d Cir. 1993); *Leslie v. Attorney General*, 611 F.3d 171, 178 (3rd Cir. 2010). Respondents contend that not every procedure of § 241.4 "is so closely connected to, and derivative of, the constitutional right at issue in *Zadvydas* so as to excuse a showing of prejudice." Resps. Br., Dkt. 377 at 11. But, tellingly, Respondents make no serious argument that the violations in this case—failing to provide timely notice, interviews, the opportunity to submit documents, or timely reviews—are not so connected to and derivative of the right to liberty. Instead, Respondents focus their arguments on a hypothetical challenge

involving "the provision requiring ICE HQ to conduct the custody review instead of local ICE, or where a copy of employment authorization is not forward to ICE HQ." *Id.* at 11. The distance between those examples and the grave and repeated violations that occurred here demonstrates why prejudice can be assumed in these individuals' cases. In any event, Petitioners have made a sufficient showing of prejudice. *See* Pets.' Reply Br., Dkt. 354 at 14-24.[6] The individuals at issue are entitled to release or, at a minimum, a judicial inquiry into whether detention is necessary.

***<u>Untimely 30-Day Notice of 90-Day Reviews</u>***. ICE did not conduct proper 90-day reviews because it failed to provide notice of those reviews "approximately" 30 days in advance of the first custody review. *See* Hr'g. Tr. 44:5-8 ("[I]t appears to me that giving the seven class members who are presented to me now notice the day they're arrested of a detention review

---

[6] The cases cited by Respondents are unhelpful to them. *United States v. Montalvo-Murillo*, 495 U.S. 711 (1990) is a statutory construction case in which the Supreme Court determined that, where a defendant could not have a prompt bail hearing, the Bail Reform Act did not require his release. *Id.* at 721. The Court confirmed that "[t]he district court, the court of appeals, and this Court remain open to order immediate release of anyone detained in violation of the statute." *Id.* at 721.

*Lee v. United States*, 137 S.Ct. 1958 (2017), also fails to support Respondents' position. There, the Supreme Court acknowledged that the defendant had demonstrated prejudice from his counsel's ineffective assistance, where his counsel failed to advise him that a guilty plea would lead to mandatory deportation. The Court noted that a defendant "can demonstrate prejudice by showing 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* at 1964. But the Court *did not* hold that other types of constitutional violations *require* a showing of prejudice or the appropriate standard in cases not involving ineffective assistance. Even if the ineffective assistance standard applied, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome," *Strickland v. Washington*, 466 U.S. 668, 695 (1984), a standard that is readily satisfied here. But the *Strickland* standard does not apply. *See Lumataw v. Holder*, 582 F.3d 78, 87 (1st Cir. 2009) ("Because we cannot say the evidence compels a conclusion either way, the error cannot be regarded as harmless." (internal quotation marks and citations omitted)); *Molina v. Whitaker*, 910 F.3d 1056, 1060 (8th Cir. 2018) ("Prejudice requires a showing that the outcome of the proceeding may well have been different had there not been any procedural irregularities." (internal quotation marks and citations omitted)).

about 90 days later violates the statute"); Pets' Reply Br., Dkt. 354 at 3-5 (explaining that ICE's policy was to give notice of the 90-day review approximately *90 days in advance* of that review, and did so in all seven cases). Although ICE contends it is now complying with this requirement, it presents no argument that it complied with this requirement for the seven individuals whose continued detention is now before this Court.

***90-Day Reviews Without the Opportunity to Submit Documents***. ICE did not conduct proper 90-day reviews because it conducted reviews before detainees had an opportunity to submit documents. ICE does not contest that it did not conduct reviews after the deadline to submit documents—it merely argues that the detained individuals were not prejudiced. But that is incorrect. *See* Dkt. 327-1 ([redacted] Decl.). As the Court indicated, ICE's violations are sufficiently serious on their own that Petitioners need not show prejudice. Hr'g Tr. 39:11-17 ("[I]f the review was done prematurely, before the date or possibly materially before … the deadline for submitting information …. I'm inclined to believe that that would violate a fundamental right, the right to due process, by depriving the defendant of an opportunity, meaningful opportunity to be heard"); Pets' Reply Br., Dkt. 354 at 5-8 (explaining that ICE conducted improper reviews before the deadline to submit documents in five cases).

***Waiting 90 Days to Conduct Initial Custody Reviews***. Further, for the reasons described in Petitioners' Reply Brief, ICE should not be able to detain an individual for 90 days before conducting a custody review. Pets.' Reply Br., Dkt. 354 at 8-10 (explaining that belated custody determinations violate 8 C.F.R. § 241.4(h)(2), (h)(1), (k)(2), (k)(3), requiring the review to occur "as soon as possible [] after" the removal period); Dkt. 95 at 41-49. ICE's interpretation is not entitled to deference because ICE has not consistently interpreted § 241.4 even within the context of this litigation, *see* Dkt. 95 at 43, because it is inconsistent with the regulatory scheme

to permit detention that is otherwise discretionary to be rendered mandatory based on the inavailability of review, and because such an interpretation would be constitutionally suspect, *see id.* at 49 ("It would, therefore, be reasonable, and arguably constitutionally necessary, to interpret § 241.4 to require that an alien who is first detained after his or her removal period expires, and who will not be immediately removed, receive a prompt opportunity to demonstrate that § 1231(a)(6) and § 241.4, which address post-removal-period detention, do not authorize her detention."); *see also Kisor v. Wilkie*, 139 S. Ct. 2400, 2415-16 (2019).

***Failure to Conduct Appropriate Review After Revocation***. ICE failed to conduct an appropriate review following revocation of release for Mr. [redacted] and, arguably, Mr. [redacted] Pets. Reply Br., Dkt. 354 at 10 & n. 8 (explaining that ICE did not employ the specialized procedures for people whose orders of supervision are revoked); *see also id.* at 22-23 (explaining that Mr. [redacted] was entitled to notice of the revocation of his order of supervision, an interview, and a decision regarding whether that revocation was warranted). ICE provides no argument that this review was proper.

***Ignoring Notice Requirement for 180-Day Reviews***. ICE's 180-day reviews were improper because they ignored the notice requirement entirely. Hr'g Tr. 48:3-5 ("The sentence about providing notice [in § 241.4(h)(2)] communicates clearly that ICE must provide timely notice of the second review…."); Pets. Reply Br., Dkt. 354 at 10-11 (explaining that ICE did not provide a 30-day notice for any of headquarters' four custody determinations).

***Failure to Provide 180-Day Interviews***. ICE's 180-day reviews were improper because they failed to conduct the required interviews. Pets. Reply Br. Dkt. 354 at 11-12 (explaining that ICE did not conduct a single interview for any of the three individuals for whom it purported to have conducted 180-day reviews). ICE does not argue that it was authorized to conduct reviews

without interviews; indeed, it scrambled to schedule interviews after this systemic noncompliance was brought to light.

***Untimely 180-Day Reviews***. ICE's 180-day reviews were improper because they were not conducted within 180 days. "The key language [in 8 C.F.R. § 241.4(k)(2)(ii)] is, 'The initial HQPDU will ordinarily be conducted at the expiration of the 90-day review, meaning at 180 days or as soon thereafter as practicable.'" Hr'g Tr. 45:11-13; *see also id.* at 49:2-4 ("[I]f ICE's contention was correct or if the regulation was ambiguous, it appears to me that Section 241.4(k)(2)(ii) might be incompatible with *Zadvydas* …."). However, it is "ICE's regular practice to commence the second review at or about 210 days after the alien is detained." Hr'g. Tr. 45:11-13; *see also* Pets.' Reply Br., Dkt. 354 at 12-13 (explaining that ICE did not conduct timely 180-day reviews for four individuals). Respondents now contend that the 180-day review cannot be conducted within 180 days or "as soon thereafter as practicable" because it is a "multistep process" that requires, among other things, an interview. Dkt. 377 at 7-8. But the steps prescribed by 8 C.F.R. § 241.4(i)(3) (requiring a personal interview), and (5) and (6) (requiring a recommendation following the interview, which would be considered by the Executive Associate Commissioner in issuing a custody determination), could not have delayed the custody review in any of the cases of the detained individuals, because *they were not followed*.

## IV. ICE Will Continue to Expect Impunity for Its Misconduct in the Absence of the Judicial Remedies Sought Here

ICE has shown that it expects no consequences to follow from its misconduct, and it plainly intends to proceed with business as usual in the face of Petitioners' demonstration that ICE has repeatedly violated the detained individuals' POCR and due process rights. It intends to continue the detention of every individual before this Court—including Mr. [redacted] and Mr. [redacted]

for whom it made no finding of dangerousness or flight risk—despite the equities in their cases and despite the violations of their POCR rights. Incredibly, Respondents even claim that releasing these individuals—after prolonged detention separating them from their families and repeated violations of their rights to meaningful review under POCR and due process—would give them a "windfall." Dkt. 377 at 2, 12. But it is ICE that has received a windfall, permitting it to violate § 241.4 and delay judicial review without consequence while families continue to be separated and children continue to suffer. In light of this repeated misconduct, the Petitioners' likelihood of success, and the results of Respondents' custody reviews, it is appropriate for the Court to order release or bail hearings, and to provide interim release during the pendency of Petitioners' show-cause motion.

Respectfully submitted this 3rd day of October, 2019.

*Counsel for the Petitioners*

/s/ *Kevin S. Prussia*
Kevin S. Prussia (BBO # 666813)
Shirley X. Li Cantin (BBO # 675377)
Michaela P. Sewall (BBO # 683182)
Jonathan A. Cox (BBO # 687810)
Colleen M. McCullough (BBO # 696455)
Matthew W. Costello (BBO # 696384)
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000
kevin.prussia@wilmerhale.com
shirley.cantin@wilmerhale.com
michaela.sewall@wilmerhale.com
jonathan.cox@wilmerhale.com
colleen.mccullough@wilmerhale.com
matthew.costello@wilmerhale.com

Matthew R. Segal (BBO # 654489)
Adriana Lafaille (BBO # 680210)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF MASSACHUSETTS, INC.
211 Congress Street
Boston, MA 02110
(617) 482-3170

Kathleen M. Gillespie (BBO # 661315)
Attorney at Law
6 White Pine Lane
Lexington, MA 02421
(339) 970-9283