UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


|  |  |
|---|---|
| LILIAN PAHOLA CALDERON JIMENEZ and LUIS GORDILLO, et al., Individually and on behalf of all others similarly situated. Plaintiffs-Petitioners, v. KEVIN McALEENAN, et al., Defendants-Respondents. | Civil Action No. 18-10225-MLW |


BEFORE THE HONORABLE MARK L. WOLF
UNITED STATES DISTRICT JUDGE


MOTION HEARING


October 10, 2019


John J. Moakley United States Courthouse
Courtroom No. 10
One Courthouse Way
Boston, Massachusetts  02210


Kelly Mortellite, RMR, CRR
Official Court Reporter
One Courthouse Way, Room 5200
Boston, Massachusetts  02210
mortellite@gmail.com

```
 1    APPEARANCES:

 2    Counsel on behalf of Plaintiffs-Petitioners:
      Adriana Lafaille
 3    American Civil Liberties Union
      211 Congress Street
 4    Boston, MA 02110
      617-482-3170
 5    alafaille@aclum.org

 6    Kathleen M. Gillespie
      Attorney at Law
 7    6 White Pine Lane
      Lexington, MA 02421
 8    339-970-9283
      kathleen.m.gillespie@outlook.com
 9
      Shirley X. Cantin
10    Colleen McCullough
      WilmerHale LLP
11    60 State Street
      Boston, MA 02109
12    617-526-6313
      shirley.cantin@wilmerhale.com
13
      Matthew Segal
14    American Civil Liberties Union
      211 Congress Street
15    Boston, MA 02110
      617-482-3170
16    msegal@aclum.org

17    Counsel on behalf of Defendants-Respondents:
      Mary Larakers
18    J. Max Weintraub
      U.S. Department of Justice, Office of Immigration Litigation
19    District Court Section
      P.O. Box 868
20    Washington, DC 20044
      202-353-4419
21    mary.l.larakers@usdoj.gov
      jacob.weintraub@usdoj.gov
22

23

24

25
```

INDEX

WITNESS                                                           PAGE

MARCOS CHARLES

    Direct Examination By Ms. McCullough                            54

    Cross-Examination By Mr. Weintraub                              76

    Redirect Examination By Ms. McCullough                          78

    Recross-Examination By Mr. Weintraub                            97

    Further Redirect Examination By Ms. McCullough                  99

E X H I B I T S

Exhibit No.          Received

    1................ 60

    2................ 69

    3................ 89

    4................ 91

    5................ 91

    6................ 91



```
 1                    P R O C E E D I N G S
 2   (Case called to order.)
 3             THE COURT:  Good afternoon.  Would counsel please
 4   identify themselves for the court and for the record.
 5             MS. LAFAILLE:  Good afternoon, Your Honor.  Adriana
 6   Lafaille for the petitioners.
 7             MS. McCULLOUGH:  Good afternoon, Your Honor.  Colleen
 8   McCullough for the petitioners.
 9             MS. CANTIN:  Good afternoon.  Shirley Cantin for the
10   petitioners.
11             MR. SEGAL:  Good afternoon, Your Honor.  Matthew Segal
12   for the petitioners.
13             MS. GILLESPIE:  Good afternoon, Your Honor.  Kathleen
14   Gillespie for the petitioners.
15             MS. LARAKERS:  Good afternoon, Your Honor.  Mary
16   Larakers on behalf of the United States.
17             MR. WEINTRAUB:  Good afternoon, Your Honor.  Max
18   Weintraub on behalf of the United States.
19             THE COURT:  I apologize for the delay in starting.
20   I've been studying the submissions that have been coming in at
21   a rapid rate, and it took a little longer than I hoped.
22             Are Mr. Charles, Mr. Greenbaum, Mr. Simon and Mr.
23   Bernacke present as ordered?
24             MS. LARAKERS:  Yes, Your Honor.  They're all outside.
25             THE COURT:  Okay.
```

1          MS. LARAKERS:  I will also mention that Todd Lyons is

2     here because this morning we learned that in Mr. Charles'

3     absence he signed the detention decision for one of the

4     individuals on behalf of Mr. Charles.  He was just directed to

5     sign because he was absent.  Mr. Charles was the one that made

6     the decision.  But out of an abundance of caution, we have him

7     here.

8          THE COURT:  Okay.  So you have them outside in view of

9     the sequestration order, but the government's entitled to --

10     the defendants are entitled to designate a representative to be

11     in the courtroom if you would like.  Would you like Mr. Charles

12     or somebody else to be present?

13          MS. LARAKERS:  No, Your Honor.

14          THE COURT:  Okay.  There may emerge some questions

15     that Mr. Charles or somebody else should address in advance of

16     possible testimony, but we'll proceed.

17          Essentially, on August 26, I conducted a hearing that

18     addressed a range of issues, including whether, as the

19     petitioners contend, ICE is unlawfully detaining class members

20     by not giving them timely or proper reviews at either the

21     90-day or 180-day mark, if those are indeed the applicable

22     deadlines, which is an open question.

23          But ICE agreed to review de novo based on the

24     submission of additional information the detention of the six

25     class members I think who were detained.  I received or began

1    to receive further briefing on the issues, and last Thursday I

2    believe, October 3, the petitioners filed a motion for interim

3    release of the six detained aliens pending the November 4, 2019

4    hearing that I scheduled concerning primarily whether ICE is

5    systematically violating the law in detaining aliens who are

6    arrested after the expiration of their removal periods who are

7    part of the class in this case.

8         As I wrote in September 2018, I believe, I doubt that

9    Section 221 -- I'm sorry -- 241.4, which provides for reviews

10   at 90 and 180 days, applies when aliens are detained after the

11   expiration of their so-called removal period.  That's in

12   Calderon or Jimenez, 317 F. Supp. 33 at 626, 648-56.

13        In addition, as I said on August 26, 2019, it appears

14   that ICE may be regularly violating Section 241.4 regarding the

15   90- and 180-day reviews if that regulation does apply to the

16   class in this case.  But these are complicated issues, and they

17   have far-reaching, perhaps nationwide implications.

18        So the briefing is just complete.  I want to study the

19   issue, the issues.  I also have other cases to deal with,

20   although this one is very high priority, so I scheduled a

21   hearing on the motion to show cause, as it's called for

22   November 4 and, if necessary, November 5, 2019.  That prompted

23   the plaintiffs to seek to file the motion for temporary relief

24   pending the November 4 hearing.

25        As the parties agreed and I found in 2018, the

1    unlawful detention of an alien and separation of that alien

2    from his American citizen spouse and in many cases American

3    citizen children is a form of irreparable harm even if that

4    alien is going to be removed at some point.

5            So receiving the motion for interim release, which I

6    think came to my attention last Friday, I ordered the

7    government to respond on Monday evening, by Monday evening,

8    which it did, and I scheduled this hearing for today.  So I

9    think that I'm not intending today, as I wrote in my order, to

10   take up the range of issues relating to whether Section 241.4

11   applies and other things that are not immediately -- I guess

12   I'm proceeding on the assumption that it does apply, although

13   that's not actually my view but tentative view.

14           But the defendants claim for the first time in the

15   submission that was made on October 7, I guess, that the

16   plaintiffs are not actually seeking release from custody but

17   stays of their orders of removal and therefore this court lacks

18   jurisdiction to decide the pending motion under 8 United States

19   Code, Section 1252(g).  I have stayed the removal from the

20   jurisdiction of the plaintiffs under the All Writs Act so I

21   could decide the custody issues, and I have been doing that in

22   cases in the last two years.  I think this is the first --

23   well, this is the first time the issue of whether jurisdiction

24   to do that exists.

25           This argument relates to the decision I issued last

1  year in Jimenez, 334 F. Supp. 3d 370, 383-85 where I decided

2  that Section 1232(g) would strip jurisdiction over the

3  questions then presented, but the court nevertheless had the

4  authority under the Suspension Clause of the Constitution to

5  decide whether the Department of Homeland Security is deporting

6  or removing the aliens without considering their application

7  for provisional waivers, even though I recognize the court

8  cannot review a discretionary decision, basically the merits of

9  a discretionary decision, if the Department of Homeland

10 Security is actually exercising its discretion considering the

11 correct factors.

12        So I think two things.  One, perhaps I ought to give

13 the petitioners first and then the defendants an opportunity to

14 provide an overview of what this is about and then, since

15 there's a question about the court's jurisdiction authority to

16 decide the immediate issues, we'll move to the jurisdiction

17 point.  Would you like to start with the overview, please?

18        MS. LAFAILLE:  Sure, Your Honor.  So the motion today

19 deals with six individuals who have spent a total of five years

20 and one month in custody after their final order of removal.

21 Several of their families are here today and others are coming

22 tomorrow.  And this is really about something simple.  We have

23 raised serious claims about systemic violations of the

24 Post-Order Custody Regulations that I know we're in the process

25 of resolving here, but for the time being, you know, all this

1    is about is giving these families some interim relief that they

2    desperately need and that we think is more than warranted given

3    the events that have occurred since our last hearing.

4         Relief is warranted because under traditional PI

5    factors, we've shown a likelihood of success on the merits and

6    irreparable harm and a balance of the equities supports it.

7    It's warranted in exercise of this court's equitable powers as

8    a habeas court, and it's warranted particularly because the

9    government here has delayed justice by promising that it would

10   consider the release of these individuals with an open mind and

11   has entirely failed to embark on the process that it promised

12   to complete the last time we were here in this courtroom.

13        Two of the individuals have not even been alleged to

14   pose a danger or flight risk, Your Honor.  And for all of the

15   individuals here, the overriding justification given by the

16   government for their detention is simply that the government,

17   you know, has a travel document or believes that it can soon

18   get one.

19        THE COURT:  Let me -- this is an overview, but some of

20   this is synergistic.  Well, actually, just keep going.  Keep

21   going.  It will be too much of a digression.  Go ahead.

22        MS. LAFAILLE:  Sure, Your Honor.  So last year when we

23   were here Your Honor recognized that these kinds of violations

24   require prompt remedies; that simply allowing the government to

25   repeat custody reviews was not an equitable solution; and as a

1    result of the rulings that Your Honor made last year, Ms. De

2    Souza went home to her family and had her life back and her son

3    who is ten years old got his mother back.  And, you know,

4    that's what these families are here for.  These are families

5    that have been separated for far too long.  And while we sort

6    these issues out, they simply should not continue to suffer the

7    consequences of these failed review processes and the

8    government's efforts to delay justice.

9         THE COURT:  And what would the defendants like to say

10   as a sort of preamble or overview?

11        MS. LARAKERS:  So Your Honor, this is a motion for

12   temporary injunctive relief, and as such petitioners have the

13   burden to prove that they are likely to succeed not only on the

14   merits of their claim that ICE has violated the Post-Order

15   Custody Review regulations but also that the remedy for that is

16   release.  And even though this court has previously recognized

17   that some violations of the POCR -- some POCR violations could

18   result in release, it is not these alleged violations here,

19   where ICE has conducted individualized reviews both as a result

20   of the Post-Order Custody Review Process but also as a result

21   of this court's order that it do so pursuant to the provisional

22   waiver regulations.  And in the face of --

23        THE COURT:  And -- okay.  Keep going.

24        MS. LARAKERS:  In the face of those --

25        THE COURT:  Actually, make note.  This is the first

1    time in 15 years I've had tea on the bench, but I've got a sore

2    throat, and I think we may be here for a while.  Go ahead.

3         MS. LARAKERS:  I understand, Your Honor.  So in the

4    face of those individualized reviews that have now been done

5    three times, but at least two times prior to this court's

6    hearing on August 27, petitioners are not able to show that

7    their detention is unlawful, even if they can show that they're

8    entitled to more procedures to ensure that that detention is

9    further proper.

10        So here the respondents suggest that the remedy, if

11   any, is a mandamus, a writ of mandamus to comply with the POCR

12   regulations to the extent that they have been violated.  And

13   because this court has already ordered that to be done and

14   because ICE already -- did those reviews again with an open

15   mind as this court ordered, there is no further relief that

16   this court should issue.

17        THE COURT:  So now I'll give you an overview

18   because -- so this can be as focused and as helpful to me in

19   making informed decisions quickly.  This is a habeas

20   proceeding.  The issue is whether each or all of the six

21   detained aliens should be released and returned to their family

22   pending resolution of whatever issues need to be resolved to

23   determine essentially whether they ought to be released from

24   custody.  If they're released from detention on conditions, I

25   think everybody agrees they're still in custody for habeas

1    purposes.  And when I've issued these orders under the All

2    Writs Act, it's been intended to keep the particular alien or

3    aliens in the jurisdiction temporarily so I don't lose the

4    authority to decide the issue.  That's one.

5          Two, my understanding, and this is what I set out in

6    my decision, written decision last September, I think, it's my

7    understanding that if ICE considered what it's legally required

8    to consider, including the fact that the aliens were applying

9    for provisional waivers, and deciding to remove them and

10   therefore to detain them pending getting -- to detain them and

11   then remove them based on the documents that ICE already has

12   for some of them, that would be the clearest case, the court

13   wouldn't have the authority to decide whether ICE gave

14   sufficient weight to the provisional waivers.  But if ICE --

15   you know, if the court were to find that ICE wasn't considering

16   everything the law requires it to consider, including the

17   provisional waiver -- the fact that aliens are pursuing

18   provisional waivers, then as a practical matter it wouldn't

19   have exercised its discretion at all and the habeas relief

20   relating to detention and custody would be permissible.

21         And then -- and this I laid out in my decision in

22   June, written decision in June 2018.  Since habeas is an

23   equitable remedy, while I've listened to you, I probably

24   wouldn't send it back to ICE again to try to do it right, or,

25   if I did, I'd order a whole new set of people make the

1    decision, I would conduct a sort of bail hearing myself.  And

2    that's why I ordered that ICE make the arrangements necessary

3    to have the aliens here tomorrow if that is indeed necessary

4    and appropriate.

5         So that's my framework.  Do you want to be heard on

6    that general framework?

7         MS. LAFAILLE:  No, Your Honor.

8         THE COURT:  It sounds right to the petitioners; is

9    that correct?

10        MS. LAFAILLE:  Yes, I think it's generally right, yes.

11        THE COURT:  And how about from the defendant's

12   perspective?

13        MS. LARAKERS:  Yes, generally, Your Honor.

14        THE COURT:  Okay.  Now, what I didn't mention there is

15   this very recent argument, and perhaps I misunderstand it, that

16   I have no jurisdiction to do anything under 1252(g) because in

17   part Judge Young said that 10 or 12 years ago but it didn't

18   involve the Suspension Clause analysis.  So I'd like to -- is

19   that something the government wants to argue?

20        MS. LARAKERS:  Yes, Your Honor, we would like to argue

21   that.

22        So it's not that this court lacks jurisdiction to

23   review whether there has been a POCR violation.  This court has

24   jurisdiction to review whether there's been a POCR violation.

25   It has jurisdiction to order the release of aliens generally

1    because it has the jurisdiction to review whether detention is

2    unlawful.  What this court doesn't have jurisdiction to do is

3    to stay the removal of those aliens pending the outcome of

4    those questions.

5          THE COURT:  Well, if the alien is removed -- see, this

6    goes -- if the alien is removed, they're removed based on -- I

7    think this is getting to an issue that I've left open, and

8    there are a lot of hard issues that I'm reminded of every time

9    I come back to this.  I have decided I have the authority to

10   issue a declaratory judgment.  I left open the issue whether I

11   have the authority to issue an injunction.  And that issue, as

12   I pointed out many times under Farmer v. Brennen, for example,

13   would be moot if I declare the law and ICE follows the law.

14   And I think in many respects, you know, there have been a

15   number of times since June of 2018 where I found that ICE was

16   trying to follow the law as I described it and I denied some of

17   the relief that was requested.

18         But these issues are tied up with each other,

19   intertwined, and I mean, this was in very sharp focus a year

20   ago June, and Ms. Lafaille mentions Ms. De Souza.  And I had

21   Mr. Lyons and his colleagues look at the film of Ms. De Souza

22   being reunited with her son.  And, you know, I thought it was

23   generally -- I know it was conceded because it was argued that

24   I shouldn't take any testimony on irreparable harm, according

25   to the government, but even if somebody is going to be removed,

1    you know, let's say in a week or a month, those days with their

2    families are unique and precious; and if they're being

3    unlawfully detained because ICE essentially didn't exercise its

4    discretion, didn't follow the law in making the decisions to

5    detain them, they would be entitled to that relief.

6           And just to expand on this -- and you'll explain this

7    at some point.  You know, I learn in what you filed a couple of

8    days ago that you have travel documents that would permit the

9    immediate removal of at least some of the six.  If I were

10   satisfied that the right -- that there wasn't a failure to

11   consider what should be considered in reaching the decision of

12   removal, if you asked me to lift the stay of removal with

13   regard to those particular individuals, I would listen to the

14   petitioners, but I expect I would do that.  But there's still

15   that basic issue as to whether the right -- whether the

16   necessary things are being considered.

17          MS. LARAKERS:  Precisely, Your Honor, and that's the

18   reason why we argue that there is no jurisdiction here because

19   there is no claim by petitioners that the things that need to

20   be considered prior to removal have not been considered.

21          THE COURT:  You think they're not arguing that?

22          MS. LARAKERS:  They just, they just argued in their

23   recent motion for interim relief that ICE may not have

24   considered the provisional waiver process.  But that has been

25   rebutted clearly by Marcos Charles writing up those paragraphs

1    and sending them to petitioners before there was even a claim

2    that a POCR violation had occurred.

3            THE COURT:  When you say "those paragraphs," you mean

4    in the letters?

5            MS. LARAKERS:  No.  Separate, this court has ordered

6    that Marcos Charles or someone, a decisionmaker at ICE Boston

7    provide an explanation about why they're intending to remove a

8    specific alien even though they are pursuing the provisional

9    waiver process.

10           THE COURT:  Wait a minute.  What document are you

11   referring to?

12           MS. LARAKERS:  Your Honor, the reporting, I'm

13   referring to the reporting that this court ordered.

14           THE COURT:  The one-page chart?

15           MS. LARAKERS:  Yes, in addition to the explanation

16   that you ordered that ICE Boston give.

17           THE COURT:  But just --

18           MS. LARAKERS:  Sorry.  So let me try to reframe this,

19   Your Honor.

20           This court has jurisdiction over whether ICE has

21   violated the POCR regulations.  However, there is no claim or

22   no plausible claim by petitioners that ICE has failed to

23   consider --

24           THE COURT:  I think the term is colorable I wrote

25   previously, but go ahead.

1          MS. LARAKERS:  -- that ICE has failed to consider

2     something it is required to consider prior to removal.

3          THE COURT:  You think there's no such claim?

4          MS. LARAKERS:  Yes, Your Honor.

5          THE COURT:  Or there's no such meritorious claim?

6          MS. LARAKERS:  Yes, Your Honor.

7          THE COURT:  Well, they're two different things.

8          MS. LARAKERS:  I don't think that there's any such --

9     they just made a claim that they have concerns about whether

10    ICE has considered the provisional waiver process at all.  I

11    don't think that that claim is even remotely colorable since

12    Marcos Charles provided those explanations detailing why he

13    decided to proceed with removal despite the fact that some of

14    these individuals may be potentially eligible to pursue a

15    provisional waiver.

16         THE COURT:  When did he make that filing?

17         MS. LARAKERS:  Those reports were given to

18    petitioners.  They weren't filed.

19         THE COURT:  They weren't filed.

20         MS. LARAKERS:  They weren't filed.  This court ordered

21    that we give them.  There has been no claim we haven't.  We've

22    been giving them.

23         So this court's jurisdiction and the application of

24    the Suspension Clause has always been based on a claim by

25    petitioners that the underlying removal order is not executable

1    for some reason.  One reason, the primary reason being here

2    that ICE has failed to consider the provisional waiver process

3    before removing them.

4         And the reason why this wasn't an issue back when we

5    addressed the POCR regulations prior, last year, is because

6    they still had that claim.  They had a claim that even if the

7    POCR -- even if they could be removed despite the allegations

8    of POCR, that still ICE hasn't considered what it has to

9    consider prior to removing them.  Here this is a challenge

10   where ICE has considered everything it needs to consider prior

11   to removal.  And for that reason, this court can't issue any

12   relief that would prevent ICE from removing those individuals

13   even if there are alleged POCR violations.

14        THE COURT:  All right.  And Ms. Lafaille will clarify

15   this.  It's been my understanding that they are contending that

16   ICE didn't consider everything it was legally required to

17   consider, including the fact that the aliens were pursuing

18   provisional waivers in deciding, A, to remove them and, B, to

19   detain them pending relief from my stay or imminently getting

20   documents that would provide a basis for seeking relief from my

21   stay.

22        Maybe the petitioners can clarify their position?

23        MS. LAFAILLE:  Sure, Your Honor.  It's absolutely not

24   the case that we are satisfied that the government has

25   adequately considered the provisional waiver process.

1          THE COURT:  But there's two -- you put a word in there

2     that might make a decisive difference.  I doubt --

3          MS. LAFAILLE:  Your Honor, if I --

4          THE COURT:  Here, you can explain.  But I guess I need

5     to know, is it your position that they haven't considered at

6     all and, if they say they have, that's pretextual?  Because I

7     think this is a factual issue in part.  And I've actually

8     thought I might hear some testimony this afternoon on the

9     process.  But anyway, you say they haven't adequately

10    considered it.  Are you saying that they really haven't

11    considered it at all, although they claim to have, or are you

12    saying they haven't given it sufficient weight?

13         MS. LAFAILLE:  Well, you know, our concern is that it

14    hasn't been -- it's certainly -- there's a couple of parts.  It

15    hasn't been considered as described to this court and that it

16    hasn't been given appropriate weight.  But I do want to get

17    back to what the government is essentially -- where we are with

18    this motion and what the government's argument boils down to.

19         This is a motion that was in fact brought to challenge

20    the detention and the violation of the Post-Order Custody regs.

21    You know, the allegations here are extremely serious.  The

22    government is systematically violating every relevant

23    requirement of these regulations at the 90-day and 180-day

24    review.  I mean, entirely depriving citizens of the opportunity

25    to participate through failing to give proper notice, doing

1    reviews before the opportunity to submit documents, failing to

2    conduct interviews.

3         I mean, this would be like if Your Honor did a

4    sentencing, you know, without an allocution, without an

5    opportunity to respond to the sentencing memo and without

6    participation in creating the PSR.  I mean, Your Honor would

7    never approach sentencing that way.  But that's how the

8    government has approached these Post-Order Custody Reviews, and

9    it's resulted in the detention of these individuals now for

10   collectively more than five years.

11        So those are the serious issues that we are working

12   out.  What the government is now trying to challenge is the

13   fact that Your Honor stayed removal during the pendency of this

14   motion raising these very serious issues back on July 26 of

15   2019.  That order, the appeal period for it has run.  The

16   government has never expressed a challenge to it, has really

17   waived that challenge.  And what we're talking about here is

18   just the interim release of these individuals who are part of a

19   motion that is pending before the court that the parties have

20   briefed and argued and are preparing to tee up for the court

21   for November.

22        THE COURT:  So the reason I exercised my authority

23   under the All Writs Act, to stay removal, although I can't -- i

24   because of the colorable and more than colorable claims that

25   the POCR regulation -- that Section 241.4, if it applies, as

1    the government contends, is being systematically violated.  The

2    180-day review, for example, as I said in August, to start it

3    at 210 days just may make sense, but it's not the way the

4    regulation is written and there's a good chance that the

5    petitioners will prevail on that.

6         And then the concern is that if these people are being

7    detained because they're going to be removed when there's no --

8    without -- I mean, it seems to me there's a factual issue, and

9    I haven't worked this through, but it's part of what we're here

10   to do.  And what's coming into focus, it's a question of when

11   this should be done, now or in November.  I think it's the

12   petitioners' contention -- the petitioners don't concede, if I

13   understand it right, that the provisional waiver, eligibility

14   for provisional waivers is being taken into account even though

15   Mr. Charles says it is.  Although I know that in the

16   provisional waiver -- I mean, the letters for the six aliens

17   who are detained provide a lot more information than I've ever

18   seen before, and they read as if they may have been written by

19   lawyers.  And having more information is not bad, but there's

20   no mention of the provisional waiver in any of the six letters

21   that I saw.

22         MS. LARAKERS:  So Your Honor, to unpack that a little,

23   petitioners have still not made a claim that this court would

24   have jurisdiction to review an order to stay their removals.

25   Ms. Lafaille just said that they're not challenging the fact

1     that ICE Boston considered it at all.  They're challenging the

2     adequacy, that they're challenging the weight, which this court

3     has already said it doesn't have jurisdiction to review.

4            THE COURT:  And that's my present view, and it can all

5     evolve.  But I reach that view after pretty careful -- well,

6     after careful deliberation last year.  However, it appears to

7     me that there may be a factual issue, and that is whether the

8     provisional waiver -- the fact that somebody is pursuing a

9     provisional waiver has really been considered.  And, you know,

10    the answer to that may be yes, but I don't know what the

11    process was to develop those letters and decisions -- well,

12    those letters and -- for example -- well, I don't know.

13           MS. LARAKERS:  Well, Your Honor, those are two

14    separate decisions with two separate regulations with two

15    separate purposes.  We already have ICE Boston doing the

16    consideration in accordance with the purpose that this court

17    has declared with regard to the provisional waiver process.

18    That was done at the time that each of these individuals was

19    detained or at the time their final order was issued.

20           Separately, we have the Post-Order Custody Review

21    process, which has its own set of regulations, its own purpose.

22    And that purpose is to prevent prolonged detention.  That's why

23    those letters are written in such a way, because we have two

24    totally separate regulations.  And while equities are concerned

25    in both of them and while this court may want to explore that,

```
 1    that's separate from this court's jurisdiction and what this
 2    court has jurisdiction to do.  So I'd like to get away from --
 3            THE COURT:  Let me pause, and this isn't rhetorical
 4    because every time I pick this up, I delve deeply into it, and
 5    then I put it aside and do other things.  So go back to June,
 6    May and June of 2018.  I was interpreting Section 241.4, wasn't
 7    I?
 8            MS. LARAKERS:  Yes, Your Honor.
 9            THE COURT:  And so why is it two separate sets of
10    regulations if -- if the decision to remove were to be found
11    fundamentally flawed because eligibility for provisional
12    waivers wasn't being taken into account and somebody was being
13    detained just because -- well, because or primarily because
14    it's possible to get papers for them, the flawed decision to
15    detain would have infected the decision -- I'm sorry.  The
16    flawed decision to remove would have infected the decision to
17    detain.
18            In other words, I think their argument is or at least
19    what they would have to show is that the provisional waiver
20    eligibility is not being considered at all and therefore the
21    court -- there is a question.  Therefore what?  You know, the
22    court should require that it be done again and that the
23    petitioners be allowed to stay in the United States while it is
24    done again by somebody.  Is that the argument?
25            MS. LAFAILLE:  So Your Honor, I think that is part of
```

1     the argument, and I do want to clarify what I meant when I said

2     wait.  I think some of our issue with the government is that

3     the government equates consideration with knowledge.  And

4     that's akin to saying, you know, on my way to court when I was

5     deciding whether to show up for this hearing, I considered

6     that -- there was a new TV show out that I wanted to watch.

7     You know, can I say that I considered it if I knew about it

8     but, you know, I wasn't really going to give it any meaningful

9     weight.

10          And that essentially relates more to what Your Honor

11     identified as pretextual, and it's not essentially an inquiry

12     into the decision itself but just whether this process is

13     accounted for fairly in the way that the regulations require.

14          Now, getting back to 241.4, the Post-Order Custody

15     Regulations also require the government to consider whether

16     removal is in the public interest.  And, you know, that

17     certainly has to encompass consideration of the provisional

18     waiver process which, you know, it's not really disputed that

19     the government didn't consider as part of its Post-Order

20     Custody Review.

21          THE COURT:  They didn't?

22          MS. LAFAILLE:  I mean, as Your Honor mentioned, it's

23     not anywhere in these notices.  I think what Ms. Larakers just

24     indicated is they didn't consider it part of this process, you

25     know, that they believed they've considered it separately back

1   in June or July.  But I do want to also emphasize, even if none

2   of that were true --

3        THE COURT:  Hold on just a second.  I mean, this is

4   going fast, and a lot of this didn't come through clearly in

5   the papers.  The provisional waiver regulations are an

6   expression of the public interest.  They're evidence of the

7   public interest.  And it's, as I recall, in the Federal

8   Register.  The motivation for the provisional waiver

9   regulations is to promote the interest of United States

10  citizens, not aliens but United States citizens, who presumably

11  have fallen in love with an alien who years ago was ordered

12  deported and often had children with that alien.  And it's

13  regarded as being in the public interest to keep the families

14  of U.S. citizens intact.  And it's codified in a regulation

15  which is a law.  So I want -- you'll get a chance, but keep

16  going.

17       MS. LAFAILLE:  I also want to emphasize, however, that

18  back in June 2018 before we had really gotten into the meat of

19  this case and the provisional waiver regulations, Your Honor

20  decided these issues, you know, without any regard for the

21  provisional waiver process.  And I think that even if the

22  provisional waiver process were completely satisfied and even

23  if, you know, the government was not required to consider it

24  further, that would not substantially alter the merits of our

25  claims here because our claims can stand on their own based on

1  the very clear violations of the Post-Order Custody

2  Regulations.

3        Now, what the government is saying is essentially,

4  sure, I might have released -- you know, we might have released

5  someone if we had conducted a proper review at 90 days back

6  when we didn't have a travel document.  They might have been

7  with their family all this time, but, you know, too late.  Now

8  we've kept them in detention this entire time, violating their

9  rights.  And now it's somehow outside of the court's equitable

10 powers to order release just because the government has taken

11 advantage of that.

12        THE COURT:  Release pending what?

13        MS. LAFAILLE:  Well, release period.

14        THE COURT:  Well, no.  I mean, I've held, as I

15 understand it, that the government is not prohibited from

16 removing every alien who is pursuing a provisional waiver.

17 They just have to consider the fact -- I mean, one of the

18 petitioners before me now I think -- and correct me if I'm

19 confused -- had been convicted, one is convicted of assaulting

20 a police officer.  One is charged with attempted murder or

21 convicted of attempted murder?

22        MS. LAFAILLE:  So, yeah, an assault with intent to

23 murder, Your Honor, I think.  But the vast majority of the

24 people we're talking about.

25        THE COURT:  No. We're going to go one at a time, and

1   every life is precious.  But they can -- they might consider

2   all of the --

3           MS. LAFAILLE:  Right, Your Honor.

4           THE COURT:  They have to consider the relevant

5   factors.  I haven't issued any order.  I haven't said the law

6   prohibits them from removing somebody who has been convicted of

7   attempted murder.  I'm making what should be the unremarkable

8   point is they have to follow proper process to reach that

9   decision.

10          MS. LAFAILLE:  That's right, Your Honor, and that's

11  the essence of our claim under the provisional waiver process.

12  And, you know, of course the individuals that we are talking

13  about here, you know, yes, there is one with slightly more

14  serious criminal history which I believe is still on direct

15  appeal.  But I think we're generally talking about some

16  individuals who haven't even been found to pose -- half of the

17  individuals have not been found to pose any danger in the most

18  recent review, and some have been found -- you know, one has a

19  single criminal conviction for a drug offense which was cited

20  as a basis for danger.

21          But of course that goes to, as Your Honor said, the

22  ultimate decision, which is not our quarrel here.  What we are

23  trying to -- here we have a motion pending that relates to the

24  release of those individuals, and what will be the proper

25  remedy come November, you know, I think is something that we

1    should discuss in November.  I don't think, for example, that

2    it would be equitable for the court to order release and the

3    government be permitted to detain someone the next day.  You

4    know, I think that's something that we should discuss in

5    November.  But for right now --

6           THE COURT:  If I ordered release, on what basis would

7    they -- you say detain them the next day or remove them the

8    next day?

9           MS. LAFAILLE:  Right.  For example, if the court

10   ordered release and the government said, Well, okay, now we've

11   released them, but now we're going to detain them the next day

12   for removal, for example, I don't think that would be

13   equitable.  So I think that come November, the parties should

14   talk about what would be an equitable remedy, you know,

15   involving -- I think it would have to involve release, but, you

16   know, the question of how that remedy would be handled I think

17   is a legitimate one for November.  But right now we have a

18   period of time in which these individuals cannot be removed --

19          THE COURT:  Well, they can't be removed because of my

20   order.

21          MS. LAFAILLE:  That's right, Your Honor, but your

22   order was not challenged by the government.  This is a pending

23   motion raising serious claims.  These individuals are

24   unlawfully detained.  I think Your Honor has already noted a

25   likelihood of success on the merits of that claim.  And all

1    we're seeking here today is just, you know, rather than the

2    government have the advantage of getting to keep people in its

3    custody during the pendency of this motion, these individuals

4    should have the opportunity to go home and be with their

5    families while this motion is pending.  They've already been

6    detained, and the government has gotten the benefit of their

7    detention for far too long.

8              THE COURT:  I mean, as I've said, it seems to me that

9    you would have to prove that essentially the decisions to

10   detain were not made in a lawful way.  They didn't -- they were

11   based on a decision to remove that didn't consider what was

12   legally required.  And then that was not -- one of the problems

13   would be that that wasn't taken -- the reason for detention was

14   we've decided to remove them and we've got documents.  But if

15   the decision to remove failed to consider something essential,

16   not just didn't give it adequate weight, they would have to do

17   it again.  ICE would have to do it again.

18             MS. LAFAILLE:  I think maybe if I can boil down the

19   question this way.  You know, what the government is saying is

20   that irrespective of any violations that have occurred, as long

21   as -- the government can violate the Post-Order Custody

22   Regulations freely as long as they have a travel document, and

23   that simply can't be the case, Your Honor.  It can't,

24   particularly when the court is faced with violations as

25   systemic as these violations.  It's not equitable to say that

1    simply the government gets to do what it wants for as long as

2    it can without -- you know, and once it's time for judicial

3    scrutiny, they can avoid that scrutiny because they've used

4    that time to get travel documents.  I don't think that anything

5    in 1252 or otherwise strips the court of its basic authority to

6    do justice in cases of unlawful detention.

7         THE COURT:  Well, okay.  There has to be unlawful

8    detention, and then habeas is an equitable remedy.  But there's

9    not -- I don't have a --  I'm obliged to do it as legally

10   correct, and the law aims to be just and to be fair to the

11   government and the public it represents as well as to the

12   aliens.  But whatever the law is is what has to be enforced by

13   the court.

14        So the first question is what's legally correct, but

15   if they haven't made decisions in a legally correct way, then

16   the court has the discretion to fashion an equitable remedy.

17        MS. LARAKERS:  So Your Honor, I think we've gotten a

18   little bit away from the jurisdictional argument, which is of

19   course of primary importance to the government here.  If

20   petitioners' concern is prolonged post-order detention, and the

21   only obstacle to that removal is this court's stay, then what

22   they're essentially doing is bootstrapping a removal claim into

23   a Post-Order Custody Review claim.

24        And they seem now to recognize that without a removal

25   hook, without arguing in some way that the removal is invalid,

1       that they can't invoke the Suspension Clause and they can't

2       therefore invoke this court's jurisdiction to stay removal.

3       And separate and apart from the government's arguments that we

4       made prior that the Suspension Clause doesn't apply, they

5       clearly cannot even invoke the Suspension Clause even under

6       their own argument absent that removal hook.  And now they're

7       trying to make the argument that that removal hook comes from

8       the fact that ICE should have for a second time --

9              THE COURT:  No.  I think this is going back to last

10      December.  I think that -- well, I have to think this through,

11      but under the Suspension Clause, if ICE -- well, these people

12      are in custody.  If ICE decided to release say one of these six

13      aliens with no restrictions, no check-in, no curfew, no

14      nothing, then you might argue that they're no longer in

15      custody, and the court lacks jurisdiction over that alien, you

16      might be right.  But as long as they're in custody I think all

17      of these issues are intertwined.

18             MS. LARAKERS:  Your Honor --

19             THE COURT:  Since it was at least tentatively my view

20      that if ICE considered, you know, genuinely considered

21      everything it's legally required to consider in deciding to

22      remove and had documents necessary to remove somebody, if I

23      would lift my order concerning that individual, my present view

24      is I would lift -- you know, I'd lift my order, but I thought,

25      maybe mistakenly, that one of the things petitioners are

1    challenging is whether there was -- whether there was proper --

2    whether the right factors were considered in deciding to remove

3    and therefore whether the right factors were considered with

4    regard to the decision to detain.  Because the detention,

5    they're arguing, is based almost exclusively or exclusively on

6    the fact that there's a removal order.

7          MS. LARAKERS:  So what I'm hearing Your Honor say is,

8    our position based on this court's order -- so if ICE

9    considered what it was legally required to consider under the

10   provisional waiver that there would be no more impediment to

11   ICE's removal of that alien and --

12         THE COURT:  That -- I'm sorry.  Keep going.  Keep

13   going.

14         MS. LARAKERS:  And petitioners also seem to recognize

15   that, and so now they argue that that consideration of the

16   provisional waiver process has to happen twice, that it has to

17   happen at the outset before you even decide to remove, which it

18   clearly has been done here, and then separately under the

19   Post-Order Custody Review regulations.  And if that second part

20   isn't done under the Post-Order Custody Review regulations that

21   that not only affects their detention but it also affects their

22   removal.

23         THE COURT:  Put aside the removal, just for the

24   moment, just for the moment, on detention because the

25   regulation is -- yeah, I think the regulation Ms. Lafaille is

1    referring to and the one that you heavily rely on is 241.4.

2              MS. LARAKERS:  I believe it's (g), Your Honor.

3              THE COURT:  What's that?

4              MS. LARAKERS:  (g), (g)(3) I think.

5              THE COURT:  (g)(3), "Availability of Travel

6    Documents."  "In making a custody determination, the district

7    director and the Director of the HQPDU shall consider the

8    ability to obtain a travel document for the alien.  If it is

9    established at any stage of a custody review that, in the

10   judgment of the Service, travel documents can be obtained, or

11   such document is forthcoming, the alien will not be released

12   unless immediate removal is not practicable or in the public

13   interest."

14             So why didn't -- I think the argument is that ICE is

15   required to consider whether immediate removal is in the public

16   interest.  One element of the public interest, an important one

17   in these cases, is the fact that this alien is married to an

18   American citizen and may be eligible, be found to be eligible

19   to stay in the United States, get the provisional waiver.  But

20   I understood your argument to be that ICE doesn't have to

21   consider that in the detention decision.  Did I understand your

22   argument correctly?

23             MS. LARAKERS:  No, Your Honor.  I think that those are

24   all considerations and that ICE can assign those considerations

25   the weight it wishes to and this court can't review the weight

1    that that is given.

2         THE COURT:  Two things.  One, I don't know -- I'm not

3    sure -- well, it would be a factual question as to whether in

4    making the detention decision ICE considered the public

5    interest as manifest in the provisional waiver provision.

6    Because you argued a few moments ago, I thought, that they

7    weren't required to consider the provisional waivers in two

8    stages, the removal stage and the detention stage, and I'm now

9    coming to think that that is required.

10         MS. LARAKERS:  Your Honor, public interest and the

11    provisional waiver process are not -- they're not --

12    petitioners can't conflate those two.

13         THE COURT:  Why?

14         MS. LARAKERS:  Because the public interest with regard

15    to removal in Section 241.4 doesn't make any reference to the

16    provisional waiver process.  And to the extent that this court

17    wants to argue about whether that should be a part of the

18    public interest even though it certainly wasn't at the time

19    that regulation was written back in 2001 because the whole

20    process didn't exist, to the extent that the court wants to

21    hear argument on that, it may be appropriate to bring the

22    witnesses in and hear whether we even need to hear argument

23    about that.

24         THE COURT:  You mean whether they considered it.

25         MS. LARAKERS:  Yes, Your Honor, because it may be a

 1   moot point.  It may be a moot point if --

 2          THE COURT:  No.  That's -- here, let me finish.

 3   Hearing the witnesses is something I had in mind possibly

 4   doing, and then the question is should it be today or in

 5   November or something.  But, you know, some of them are here.

 6   They're all here.  That's part of the reason I ordered them

 7   here.

 8          MS. LARAKERS:  But what I want to bring that back to

 9   is that even if ICE didn't do the right thing it was supposed

10   to do under the POCR regulations, let's even assume for a

11   second that they were required to consider the provisional

12   waiver process and that part of the regulation and that wasn't

13   done.  What is the remedy for that?  It can't be -- the remedy

14   can't be a stay of removal because that --

15          THE COURT:  Go ahead.

16          MS. LARAKERS:  It can't be a stay of removal because

17   that was already -- that consideration that the court required

18   under the provisional waiver process was already done, so it

19   can't be a stay of removal.

20          THE COURT:  If it's been done.

21          MS. LARAKERS:  If it's been done.  But I think for now

22   --

23          THE COURT:  No.  The remedy would be what I wrote in

24   June of 2018.  I would, I expect, conduct the bail hearing

25   myself.  I did that the first time in an immigration case in

1    Flores-Powell in 2010.  And this is an equitable remedy.  I

2    could do that.

3              MS. LARAKERS:  Okay.

4              THE COURT:  And some of them might get out and some of

5    them might not.  Then if they got out, I expect I would impose

6    some conditions.  You know, they'd get out if I was satisfied

7    there wasn't a likelihood they would be a danger or flee if

8    released on certain conditions.

9              MS. LARAKERS:  I understand that, Your Honor, but even

10   assuming that's the analysis that this court ultimately

11   determines, that still has to do with whether they should get

12   out of detention or not, not whether this court should impede

13   their removal.

14             THE COURT:  That would be a second question.  You

15   might -- if the petitioners make a colorable claim that the

16   fact that they were pursuing provisional waivers wasn't

17   considered at all, it would be a factual issue, and I'd hear

18   some testimony on it.  And Mr. Charles would tell me what he

19   did for the cases he decided, and the others would tell me what

20   they did.  Well, I don't know who decided on removal.  But

21   whoever the decisionmaker was would testify, and if I was

22   satisfied that the right things had been considered, that they

23   made the decision and the right things had been considered,

24   then you would be allowed to remove them, I expect.

25             MS. LARAKERS:  I understand, Your Honor, and let me

1    before I forget affirmatively move to lift the stay of removal

2    for each one of these individuals because as we stated in our

3    briefing and as I'm sure you'll hear from the witness available

4    today, we have a travel document available for each of them, or

5    the country that will issue the travel document has said that

6    upon this court lifting the stay would immediately issue a

7    travel document.  So first let me get that out of the way.

8    Second --

9         THE COURT:  Well, the way you make a motion is you

10   file it.  But anyway, go ahead.

11        MS. LARAKERS:  Second, Your Honor, it's still not --

12   they're still not answering the question about why the removal

13   needs to be stayed in the interim and why a POCR violation,

14   even for failure to consider the provisional waiver process a

15   second time under this public interest part, they still don't

16   explain how that should -- that that should result in a stay of

17   removal.  And that is why we argue this court lacks

18   jurisdiction to stay the removal because the only thing they

19   have left here is an alleged violation.

20        THE COURT:  In your view, if you moved one of these --

21   if the petitioners -- so they're part of a class.  But let's

22   say it was an individual case -- and in fact, one of these has

23   his own case.  If the case was filed, and before I did anything

24   ICE moved that individual to Louisiana, would a judge in

25   Massachusetts have habeas jurisdiction over that person who is

1  in custody in Louisiana?

2          MS. LARAKERS:  No, Your Honor.

3          THE COURT:  No.  That's why I issued the order.

4          MS. LARAKERS:  I understand, Your Honor.  But not

5  being moved out of the jurisdiction is separate and apart from

6  whether we can remove the individual at all.  You're preventing

7  ICE from removing the individual out of this country.  And if

8  they were removed out of this country, they wouldn't be in

9  detention at all.  And that's the point of the Post-Order

10 Custody Review regulations.  And this is why we argue that this

11 court lacks jurisdiction because no matter what violation the

12 court finds under a Post-Order Custody Review process theory,

13 no violation of a Post-Order Custody Review can result in a

14 stay of removal.

15         THE COURT:  That might or might not be right.  Okay.

16 So one of these people you say, I think, St. Lucia will issue a

17 travel document if I lift the stay of removal.  I think that's

18 backwards, but let's say that's true.  So hypothetically,

19 what's a reasonable estimate, how long would it take to get

20 that document?

21         MS. LARAKERS:  Your Honor, I'd have to ask ICE.  I

22 don't know.  But the reason -- it's actually not backwards

23 because St. Lucia in this case I believe travel documents have

24 been issued twice, and the consulate, when a court issues a

25 stay of removal --

```
1          THE COURT:  Well, whatever it is.  Okay.  So let's say
2   I said when you get the travel document for that person, you
3   can remove that person.  So the process I've heard in certain
4   cases is you get a travel document and then you have to get an
5   airline reservation or something, right?
6          MS. LARAKERS:  Yes, Your Honor, or ICE has charter
7   flights that leave on a regular basis.  And I think I
8   understand where Your Honor is going.
9          THE COURT:  You'll understand it better if I
10  articulate it.
11         MS. LARAKERS:  Yes.  Sorry, Your Honor.  Go ahead.
12         THE COURT:  And I may understand it better if I
13  articulate it.  So let's say that process, say it will take two
14  weeks to get the document and two weeks to get the person on a
15  flight, so that's a month.  You know, that's a month that a
16  mother might spend with her child.  That's a month that a
17  father might spend with his child who he'll never see again.
18  You know, we started this, as I recall, right before Mother's
19  Day in May of 2018.  And you were going to Texas.  You were
20  going to see your mother.  That was a big deal for your mother,
21  I bet.  And then you're busy, and you have to work all over the
22  country, so she didn't get to see you very much.  And I don't
23  mean to personalize this too much, but even that month is a
24  significant thing because I do think -- I expect that some of
25  these people are going to be removed from the United States.
```

1    Some people pursuing provisional waivers have been removed,

2    haven't they, during the pendency of this case?

3         MS. LARAKERS:  I believe so, Your Honor, yes.  Some

4    upon their own request, but yes.

5         MS. LAFAILLE:  Could I just --

6         MS. LARAKERS:  Your Honor, in that month time period,

7    Your Honor could order release of the individual.  We're not

8    contesting this court's jurisdiction to order release generally

9    to look at whether there's been a Post-Order Custody Review

10   violation.  This court could order release.

11        THE COURT:  Let's go get Mr. Charles, because this is

12   really important, and I have other important cases, too.  And

13   I'm trying to write one of them, and I've put it aside to do

14   this because I was reminded that I said, and I deeply believe,

15   in the spring of 2018 that even one day of unjustified

16   detention is a form of irreparable harm, and I don't want my

17   schedule to possibly inflict irreparable harm on somebody.  But

18   I mean, these issues -- and I must have spoiled your weekend

19   with the order that I issued last Friday.  But I'm here now.

20   I'm going to be away a while next week, and I just didn't want

21   this to get delayed.

22        And you each did very helpful briefing quickly, but

23   things are coming into much sharper focus, and I think if it's

24   reasonable to let some, not necessarily all of these people out

25   until roughly November 4 and you do some more briefing on some

```
 1    of these issues that are coming into sharper focus, once
 2    they're decided in an orderly, informed way, there's a
 3    reasonable likelihood you're going to be able to remove some or
 4    all of these people.  But if they've been -- and I didn't have
 5    this order pending for two years.  Some of these people have
 6    been detained for --
 7              MS. LAFAILLE:  14 months is the longest.
 8              THE COURT:  What's that?
 9              MS. LAFAILLE:  14 months is the longest.
10              THE COURT:  -- 14 months.
11              MS. LARAKERS:  Your Honor, you may not have had this
12    order pending for a year, but with regard to -- sorry.  The
13    individual habeas person in front of this court, that stay of
14    removal has been pending since February.  And with regard to
15    another individual, a previous judge in this district had a
16    stay of removal.  Then the First Circuit had a stay of removal.
17    So in fact, when you add up all that time, ICE has had very
18    little time to remove them if at all.  And that's also
19    considering the time that ICE knows that a pending stay order
20    is coming, so they don't want to inadvertently violate an
21    order.
22              THE COURT:  Which is good.
23              MS. LAFAILLE:  ICE removed someone the day we filed --
24              THE COURT:  What's that?
25              MS. LAFAILLE:  ICE removed someone the day we filed
```

1    our initial motion, you know, within hours of Your Honor

2    issuing a stay.  So I'm not sure --

3              THE COURT:  Wait a minute.  They removed somebody --

4              MS. LAFAILLE:  When we initially filed this motion.

5              THE COURT:  Which motion?

6              MS. LAFAILLE:  The motion for order to show cause

7    alleging the unlawful detention of the class members, you know,

8    ICE removed someone the day after we filed the motion, even

9    though we had been meeting and conferring about the motion.

10   And the court, as ICE could have anticipated, entered a stay

11   the very next day.

12             But I do want to just add one, just put a finer point

13   on what Your Honor said about the time that these individuals

14   might have with their families.  Detention here has prevented

15   these individuals in some cases from presenting their cases to

16   ICE in the most favorable light.  So there are individuals who,

17   for example, have an approved I-130 but can't move on to the

18   next step because it's I think $800 to file an I-212

19   application, and they don't have money for that, let alone an

20   attorney anymore.

21             So there are things that these individuals could do to

22   present their cases in a more favorable light to ICE when it

23   comes to removal if the remedy for their unlawful detention

24   were in effect, which is their release.

25             THE COURT:  So who is here, Mr. Charles, Mr. Lyons?

1            MS. LARAKERS:  All of the decisionmakers are here in

2    addition to Mr. Lyons, who was just a signatory.

3            THE COURT:  Is Mr. Lyons in the courtroom or outside?

4            MS. LARAKERS:  He's outside, Your Honor.  I would also

5    just like to mention before we bring them in that there is one

6    individual who I was just informed of whose I-130 has been

7    denied.  So while I don't think that that would impact them

8    bringing in an individual habeas claim and I understand that

9    we're already here, the court should know that because it would

10   be our position that they're no longer a class member and no

11   longer entitled to that consideration.

12           THE COURT:  And I'm --

13           MS. LARAKERS:  Even if it happened before, which it

14   did.

15           THE COURT:  And you're coming to know me.  I'm willing

16   to really put all of this under the microscope and some might

17   be entitled to -- some might be in the class, some might not be

18   in the class, some might be entitled to relief, some might not

19   be entitled to relief.  But I'm getting all kinds of new

20   information today.  And it's not a criticism.  It's because

21   there's urgency to this, and it's had to go unusually fast.

22           MS. LARAKERS:  I just wanted to inform the court

23   before the court asked a question about that individual and

24   then it found out on the stand and then there was some

25   confusion.

1          THE COURT:  Well, I'm not -- I don't know whether --

2          MS. LARAKERS:  I don't know what their position is.

3          THE COURT:  I think there's two things we could do

4     now, and they're not mutually exclusive.  One, we could have

5     them come in one at a time subject to the sequestration order.

6     But I don't know -- and it may be good to do it spontaneously

7     and see what process they went through and did they consider

8     the public interest generally and the provisional waivers

9     particularly in making the detention decisions.  Or, you know,

10    we can talk about whether we can do this in a more deliberate

11    fashion or should do it in a more deliberate fashion, which

12    would require some discussion of scheduling.

13         MS. LAFAILLE:  Your Honor, just to a brief point on

14    that specific individual, that's a case that we're aware of

15    that involves potential ineffective assistance and there is

16    likely going to be a new I-130 filed very soon.

17         THE COURT:  All right.  I can't zero in on the

18    individuals, and you're not even mentioning the names.

19         MS. LARAKERS:  What does the court mean by a more

20    deliberate process?  I think the government is particularly

21    interested in getting this motion resolved quickly, and

22    whatever way the court would like to do that --

23         THE COURT:  Well, what I would do is sit down with

24    Mr. Charles, and we've done this before, and see whether he'd

25    be comfortable in voluntarily releasing some of these people at

1    least on certain conditions perhaps until this all gets sorted

2    out.

3          The alternative is he can take the stand.  I've

4    cleared my schedule for today and for tomorrow, although I have

5    some other important things to do tomorrow, and let's see what

6    he considered.  I'm not asking whether he considered the right

7    factors.

8          Do you want to question Mr. Charles?  I don't know who

9    Mr. Bernacke is.  Apparently he's from Washington and does the

10    180-day reviews after 180 days?

11          MS. LAFAILLE:  Sure, Your Honor.  I mean, we are

12    prepared to question them.  Of course, if they're prepared to

13    make releases, that is of course why we're here.

14          THE COURT:  Should we talk about whether -- because

15    that would be a more deliberate process, although the

16    sequestration order would stay in effect.  You could talk to

17    them, but they can't talk to each other about the decisions

18    that are at issue here.

19          MS. LARAKERS:  Your Honor, if I could get a brief

20    recess to talk to my client about it, then I'd like to.  I

21    think our position, and what he's probably going to ask me, he

22    doesn't want to waive any arguments that we're making here

23    because he believes in them and he believes he shouldn't have

24    to release any of these individuals, let alone give them a stay

25    of removal, so I think that's a big concern here.

1          THE COURT:  And I think the plaintiffs would agree.

2     This is in the nature of settling something.  If there's some

3     agreement, I think it would be without prejudice to your legal

4     positions.  You just would provide more time to clearly

5     identify the questions and address those questions.  But not

6     with people who could safely, reasonably be released to be with

7     their family, not in detention during this sorting out period.

8          MS. LARAKERS:  Would the court lift the stay of

9     removal if they were released such that they -- I understand

10    they wouldn't be -- the court wouldn't allow them to be brought

11    back into detention to be removed, but there are other ways

12    such as requiring them to show up --

13         THE COURT:  I --

14         MS. LARAKERS:  That's just another question I'm going

15    to be asked.

16         THE COURT:  I can't answer that because frankly -- I

17    suppose the answer to that is no, not right now.  But I looked

18    at the Ferreira Batista affidavit, and Mr. Charles said I

19    considered the provisional waiver.  He wasn't cross-examined on

20    it, but it's there, and maybe he can be cross-examined on it

21    and if I was satisfied that he did it, that might be the end of

22    that matter.

23         I mean, whether he made the decision that I would have

24    made is not the issue.  But I think I need to know more about

25    the process.  I believe that -- you know, there are a whole

1    range of issues here.  I might have to decide whether I can

2    issue an injunction.  But I've done this with Mr. Charles, with

3    Mr. Lyons.  I've explained in a thoughtful way, I don't know if

4    it's a persuasive way to the government, you know, what their

5    obligations are, and they've told me they're doing it.  I might

6    very well be satisfied with that again.  But I haven't -- we

7    haven't delved into that yet.

8         MS. LARAKERS:  So I think that there may be some

9    middle ground in between the two options now that I'm hearing,

10   Your Honor.  There are three individuals which were only --

11   whose review was purely done by ICE Boston and done by the same

12   person.  So our position -- the review, the review to remove

13   the individual at first and the POCR review is all done by

14   Mr. Charles.  And so it sounds like, to me, if Mr. Charles were

15   to testify about those three individuals, then we may be able

16   to move forward with removal with those individuals.  Maybe we

17   could get a decision on those individuals.

18        THE COURT:  This is not the subject -- this wasn't the

19   subject of this hearing.  It's not -- look.  I'll tell you

20   where we are right this minute.  Either I'm going to start with

21   Mr. Bernacke -- he's the fellow from Washington, right?

22        MS. LARAKERS:  There are actually three from

23   Washington.  So Mr. Bernacke is one of the individuals.

24        THE COURT:  Simon.

25        MS. LARAKERS:  Simon is another --

```
 1            THE COURT:  Look, we'll figure out the order.  They're
 2    going to come in and, you know, tell me what they did.  And
 3    then when I've heard enough, I'll see whether they made proper
 4    decisions, although there could be more briefing that's
 5    required.  The alternative is, as I said, to do this in a more
 6    deliberate way.  There are I think four of these six where ICE
 7    found that there was no risk of flight or danger.  They were
 8    detaining them because they had or expected they would soon
 9    have documents.  And so ICE has already determined that there
10    would not be any danger to the community or risk of flight if
11    they were let out, and then these increasingly fascinating and
12    complicated issues could be breached and argued.  And if
13    there's going to be hearings, which there might or might not
14    need to be, it can be done in a more deliberate way.
15            MS. LARAKERS:  I think I can get that answer from my
16    client very quickly, Your Honor.  I have one final question,
17    and this is a much simpler one.  ICE's concern would be that
18    they would be able to dictate the conditions --
19            THE COURT:  They'd be able to what?
20            MS. LARAKERS:  They'd be able to decide the conditions
21    during that release period.  ICE is not -- frankly, Your Honor,
22    ICE is not interested in conferring with petitioners on that.
23    They believe that that is within their sole discretion during
24    -- at least during this time period.
25            THE COURT:  We're in an equitable proceeding.  There
```

1    would have to be reasonable conditions.  And this is going to

2    have to get resolved within the next 24 hours.  I'm not in the

3    jurisdiction, I'm not in the country the first several days of

4    next week.  So, you know, this is it.  But I haven't heard any

5    controversies over conditions of release in the course of this

6    case.  I'd expect them to be reasonable.  Anyway.

7         MS. LARAKERS:  I think at a bare minimum, it would

8    probably -- it may include an ankle monitor, Your Honor, I

9    think at a bare minimum for these individuals.  And then if it

10   became clear that they didn't need that ankle monitor within a

11   couple of weeks, then we could take it off.

12        THE COURT:  Do you anticipate a problem with that?

13        MS. LAFAILLE:  No, we don't anticipate objecting to

14   that.

15        MS. LARAKERS:  All right.  I'd just like some time to

16   talk to my client.

17        THE COURT:  Okay.  And they haven't heard all of this

18   but -- all right.  Now, when you say your client, who is the

19   personification of your client for this purpose?

20        MS. LARAKERS:  Here it has to be both Marcos Charles

21   and headquarters because headquarters is the one with

22   jurisdiction.

23        THE COURT:  So who is here from headquarters?

24        MS. LARAKERS:  The three individuals that made the

25   decision outside.

```
 1          THE COURT:  But you've got a sequestration order where
 2   you shouldn't be talking to the potential witnesses together.
 3          MS. LARAKERS:  We can talk to them separately, Your
 4   Honor, unless Your Honor would allow us to talk to them as a
 5   whole for the limited purpose of informing them that the court
 6   -- that without waiving any of our arguments that the court
 7   would like to know if they would be willing to release on
 8   conditions.
 9          THE COURT:  And just tell them that, otherwise,
10   they're probably going to start testifying this afternoon about
11   the process they went through, and I may sit down and talk with
12   you -- anyway.  Here.  How much time do you -- and I almost had
13   Mr. Charles at least stay in here despite the sequestration
14   order, but there's a conference room right outside the door to
15   the right.  Take 10 or 15 minutes.  Does that seem sufficient?
16          MS. LARAKERS:  15 minutes, Your Honor would be --
17          THE COURT:  Better?
18          MS. LARAKERS:  Yes.
19          THE COURT:  All right.  Let's see, even if you're not
20   finished, your discussions, since they haven't heard this
21   colloquy, may evoke more questions.  So even if you don't have
22   a final answer, we'll reconvene at quarter of 4:00 and we'll
23   see where we are and where we're going.
24          MS. LARAKERS:  And Your Honor, we can speak to them
25   together?  Or do we need to speak to them separately?
```

1          THE COURT:  You can speak to them together.  Is there

2    any objection to that?

3          MS. LAFAILLE:  As long as they're not talking about

4    sort of the past review processes that have occurred, Your

5    Honor.

6          THE COURT:  Right.  You should be talking about where

7    we are and not what issues have emerged, what they'll be

8    testifying about shortly perhaps.

9          MS. LARAKERS:  Yes, Your Honor.

10          THE COURT:  All right.  But thank you.  Court is in

11    recess.

12          (Recess, 3:29 p.m. - 3:56 p.m.)

13          THE COURT:  Okay.  It's almost 4:00, and I understand

14    counsel have conferred.  Where are we?

15          MR. WEINTRAUB:  Your Honor, after discussing with ICE

16    and also with plaintiffs' counsel, petitioners' counsel, ICE

17    will agree on order of condition the release of petitioners

18    Sisse, Semedo and Leon.

19          THE COURT:  Hold on just a second.  Let me make a

20    note.

21          MR. WEINTRAUB:  I apologize, Your Honor.  Your Honor,

22    may we approach?

23          THE COURT:  What's that?

24          MR. WEINTRAUB:  May we approach for a moment?

25          THE COURT:  Yes.  In fact, if it would be conducive to

1    clear candid discussions, we can -- here, I'll see counsel in

2    the jury room.  I wanted Mr. Charles to hear this.  Is there

3    somebody from Washington who should also be present, or is that

4    sufficient?

5            MR. WEINTRAUB:  I'll bring in Mr. Bernacke.

6            THE COURT:  All right.  We will be in recess.

7            **\* \* \* SEALED LOBBY CONFERENCE \* \* \***

8            THE COURT:  I will say for the public record that the

9    parties have reached agreement to release three of the six

10   petitioners on mutually agreeable conditions.  There are three

11   more as to whom there remains a dispute, and I'm going to hear

12   testimony starting now concerning the process by which the

13   decision to detain those three was reached.  It's the -- we

14   didn't discuss this.  It's the petitioners' motion.  Should the

15   petitioners question the witnesses first, or would you prefer

16   to cross-examine?

17           MS. McCULLOUGH:  We're fine with questioning first,

18   Your Honor.

19           THE COURT:  What's that?

20           MS. McCULLOUGH:  We are fine with questioning first,

21   Your Honor.

22           THE COURT:  Okay.  So two of the three decisions were

23   made by Marcos Charles, the acting director of the regional

24   office.  So Mr. Charles, would you approach the witness stand

25   and be sworn, please.

1              MARCOS CHARLES, Sworn

2          THE COURT:  Could counsel please identify herself for

3     the record.

4          MS. McCULLOUGH:  Colleen McCullough, Your Honor, for

5     the petitioners.

6          THE COURT:  Go ahead.

7     DIRECT EXAMINATION BY MS. McCULLOUGH:

8     Q.   Good afternoon, Mr. Charles.

9     A.   Good afternoon.

10    Q.   Did you prepare for the hearing today?

11    A.   I did.

12    Q.   And what did you do to prepare?

13    A.   I reviewed documents that I had signed prior to on the

14    detainees that we're currently going to talk about.

15         THE COURT:  Mr. Charles, pull that a microphone a

16    little closer to you.

17         THE WITNESS:  You bet.

18         THE COURT:  And if necessary, we'll turn the volume

19    up.

20         THE WITNESS:  How is that?

21         THE COURT:  Better.

22    A.   Reviewing documents that I had signed, reviewing the case

23    history on the two subjects that I signed letters for continued

24    detention.

25    Q.   So you reviewed documents that you had signed regarding

1     those individuals?

2     A.    Yes, in the past and in other documents that I had

3     available.

4     Q.    Did you receive the documents that they had submitted in

5     connection with their custody reviews?

6     A.    Yes.

7     Q.    Did you speak to anybody in preparation for this hearing?

8     A.    I spoke with my legal team.

9     Q.    Did you speak to anybody at headquarters apart from legal?

10    A.    Prior to or after this sequestration?

11    Q.    In preparation for the hearing.

12    A.    Not directly about the hearing, no.  I mean, other than

13    letting them know that we were going to be coming in for this

14    hearing.

15    Q.    Did you speak to anybody at ICE Boston in preparation for

16    the hearing?

17    A.    Yes.

18    Q.    And who did you speak with?

19    A.    I spoke with the detained case management AFOD, my special

20    assistant, the other deputy director, and maybe a supervisor or

21    two to get and again just to gather documentation.

22    Q.    Who is the AFOD that you spoke with?

23    A.    Tina Guarna-Armstrong.

24    Q.    What did you speak with her about?

25    A.    Getting the documentation together, asking her questions,

1    just case information.

2    Q.   What kind of documentation did you speak to her about

3    getting together?

4    A.   POCR worksheets, decision letter, case documentation that

5    the subject had provided and/or their attorney.

6    Q.   Are these documents that she had?

7    A.   They're documents that were in our office.

8    Q.   When did you speak to her?

9    A.   Spoke to her over the last -- when I got notified I was

10   coming to court, I probably talked to her almost every day.

11   Q.   So this was after you reviewed the custody of Mr. Ferreira

12   and Ms. Rodriguez?

13   A.   Excuse me?

14   Q.   You're talking about a conversation you had with her after

15   September 19?

16   A.   Oh, correct.

17   Q.   Okay.  You said you spoke to the deputy director.

18   A.   Yes.

19   Q.   Who is that?

20   A.   Todd Lyons.

21   Q.   And what did you speak to him about?

22   A.   Same thing, gathering information.

23   Q.   And what about the supervisor; you said you spoke to a

24   supervisor or two?

25   A.   Yolanda Marfisi, Jeff Morin.  I think those were the only

```
 1    two I spoke to.  And the same, the same thing, just checking on
 2    documents.
 3    Q.   Did those individuals provide documents to you that were
 4    not in the A-File?
 5    A.   I believe so.  There was some other documents, some that
 6    were in the file.  Most of them are copies, but I think a lot
 7    of it I asked to get scanned and given to me.
 8              THE COURT:  Ms. McCullough, we have a limited amount
 9    of time today, and my primary interest, although you'll be
10    permitted to test it, is what process did he go through, what
11    did he consider in reaching the decisions he reached, if he's
12    the one who reached them.  I want to know who made the decision
13    and what was considered.  That's of primary interest to me at
14    the moment.
15              MS. McCULLOUGH:  Yes, Your Honor.
16    BY MS. McCULLOUGH:
17    Q.   So did you make the decision regarding the custody of
18    Mr. Ferreira?
19    A.   Yes.
20    Q.   And when did you make that decision most recently?
21    A.   Most recently, I believe, I think the last one was signed
22    the 22nd, 19th or 22nd.  I can't recall the exact date on it.
23    Q.   And you made a decision on that date?
24    A.   A decision was made after being -- after document review I
25    believe was on the 13th.
```

1          THE COURT:  Is that September?

2          THE WITNESS:  September 13, yes, sir.

3   Q.   So you made a decision on September 13?

4   A.   I believe -- that's when I reviewed the documentation.  I

5   believe I signed the letter -- I believe I had the letter

6   signed the week after.

7          THE COURT:  You had the letter signed by whom?

8          THE WITNESS:  Todd Lyons.

9          THE COURT:  By Mr. Lyons?

10         THE WITNESS:  Yes, sir.

11  BY MS. McCULLOUGH:

12  Q.   What did you consider in making that decision?

13  A.   I considered the -- and this is Mr. Ferreira, correct?

14  Q.   Yes.

15  A.   I considered the fact that one -- and this is for the

16  custody determination or going forward with removal

17  determination?

18  Q.   Did you make a decision to go forward with removal on

19  September 13?

20  A.   I believe I did.

21  Q.   Okay.  What did you consider for both decisions?

22  A.   For both decisions, looking at, number one, for continued

23  -- for not releasing him, number one, we were able to get a

24  travel document.  We had documentation to get a travel document

25  back to Brazil.  I looked at -- and I weighed that against the

1    fact that he is in process, or he had, I believe at the time he

2    had a 212 pending, but I think that was denied.

3        The fact that he had submitted the documentation for

4    review, letters from -- I want to say there was a declaration

5    of removal, letters from his family, the fact that he had some

6    equities in the U.S., weighed that against the fact that he was

7    arrested and convicted for assault and battery on a police

8    officer, making him currently violent.  I looked at the fact

9    that, would he remain violent, and in my opinion he would

10   because this was a recent act.

11       He also had I believe ten prior arrests for traffic

12   violations.  And even with that fact, after being arrested, he

13   was continuing to drive, again, making him a threat to the

14   community along with the assault and battery on a police

15   officer.  I looked at flight risk.  The fact that he was trying

16   to evade arrest by the police also, in my opinion, makes him a

17   flight risk, weighed that against the fact of his equities in

18   the United States.

19           THE COURT:  When you say weighed against the equities,

20   what do you mean?

21           THE WITNESS:  The fact that he is going through the

22   601A process or eligible to -- I don't think he is anymore, the

23   212 being terminated.  But the fact that he was in the process,

24   the fact that he is married, has a family, married to a U.S.

25   citizen.  I believe he has a stepchild and a USC child.

1          THE COURT:  Does USC mean U.S. citizen?

2          THE WITNESS:  Yes, sir, U.S. citizen.

3          MS. McCULLOUGH:  May I approach the witness, Your

4    Honor?

5          THE COURT:  It would be better if you put the document

6    on the presenter if you know how to do it.

7          MS. McCULLOUGH:  Sure.

8          THE COURT:  Is this the letter evidently signed on

9    9/22/2019 regarding Ferreira?

10          MS. McCULLOUGH:  Yes, Your Honor.

11          THE COURT:  We'll make it Exhibit 1 of today's date.

12          (Exhibit 1 admitted into evidence.)

13   Q.   Can you see that, Mr. Charles?

14   A.   Yes, ma'am.

15   Q.   And this is the letter that you signed on September 22,

16   correct?

17   A.   It's a letter that I had signed, yes.

18          THE COURT:  Was this signed by Mr. Lyons on your

19   behalf?

20          THE WITNESS:  Yes, Your Honor.

21   BY MS. McCULLOUGH:

22   Q.   And did Mr. Lyons participate in the decision to continue

23   Mr. Ferreira's custody?

24   A.   He was on an email chain in which I said go forward with

25   the continued custody and authorized him to sign for me.

1    Q.   And the first sentence of this second page says,

2    "Additionally, while acknowledging you have appealed such

3    decision, United States Citizenship and Immigration Services

4    has recently denied your I-212 waiver application."

5              THE COURT:  Not too fast, please.

6              MS. McCULLOUGH:  Sorry, Your Honor.  Want me to read

7    it again?

8              THE COURT:  Yes.

9              MS. McCULLOUGH:  "Additionally, while acknowledging

10   you have appealed such decision, United States Citizen and

11   Immigration Services has recently denied your I-212 waiver

12   application."  Did I read that correctly?

13   A.   Yes.

14   Q.   Did you consider the fact that that denial was on appeal

15   in making your decision about Mr. Ferreira?

16   A.   I don't recall if I knew it was on appeal, but I figured

17   it would be appealed anyway, so yes.

18   Q.   The reasons that -- you just described the reasons that

19   you decided to continue Mr. Ferreira's custody, correct?

20   A.   Correct.

21   Q.   Are there any other reasons?

22   A.   The review was conducted by -- the initial review was

23   conducted by deportation officers who recommended the continued

24   detention who passed it on up the chain and was concurred by

25   their supervisor and assistant field office director who also

1  concurred.  That was the only other thing.  I believe

2  Mr. Ferreira had a prior POCR also, a 90-day Post-Order Custody

3  Review, if I'm not mistaken.  I may be confusing cases, but I

4  think he had one also that we looked at or that I looked at.

5  Q.   And did you look at that in deciding to continue his

6  custody?

7  A.   I did, I did.  It was another factor, but it wasn't one of

8  the six main factors that I decide whether or not to allow

9  somebody to be released.

10  Q.   You said that in preparation for this hearing you received

11  some documents from Mr. Lyons, from an AFOD and from a

12  supervisor or two, correct?

13  A.   Correct.  I spoke with them about getting documents.  Now,

14  if they all gave me documents, I don't recall.  I do know that

15  I had the file along with several copies of the documentation

16  that Mr. Ferreira or his attorney had provided.

17  Q.   Did you receive new information from them that you hadn't

18  received before?

19  A.   The documentation that his attorney had submitted, I

20  believe that was given to me on the 13th -- sorry, September

21  13.

22  Q.   In preparation for this hearing, did you receive any

23  information that you hadn't received before September 19?

24  A.   For this hearing in particular?  Is this -- now, are you

25  asking me after I was notified that I was going to have to

1    appear in court, which would have been a week and a half ago, a

2    week ago?

3    Q.   Yes.

4    A.   No.

5    Q.   So all of the documents that you received from Mr. Lyons,

6    I believe you mentioned an AFOD and supervisor.  That was all

7    documents that you had seen before?

8    A.   I believe so.  I don't think any new documents have been

9    presented to me over the last week.

10   Q.   As of the August 27 hearing, was it your understanding

11   that Mr. Ferreira was not authorizing the re-issuance of a

12   travel document for his return to Brazil?

13   A.   I'm sorry?

14   Q.   Was it your understanding that Mr. Ferreira has previously

15   not authorized the re-issuance of a travel document?

16   A.   True.  He was a failure to comply.  I believe for 60 days

17   he was a failure to comply.

18   Q.   Was it your understanding that was the situation as of the

19   hearing on August 27?

20   A.   I honestly don't recall.  I believe -- honestly don't

21   remember if he was at that point or not.

22   Q.   But he was at one point before now?

23   A.   Yes, he was.

24   Q.   Okay.  And is it your understanding that somebody who is

25   not cooperating with ICE's attempt to execute their removal

 1   order is not going to be released from custody?

 2   A.   Yes.

 3   Q.   And then in your decision -- I'm going to put it back up.

 4   This is Exhibit 1?

 5          THE COURT:  What does it mean to cooperate with an

 6   order of removal?

 7          THE WITNESS:  He was not -- in this case, I believe he

 8   had been talking with the consulate, telling them not to order

 9   or not to issue a travel document.  I believe that's what he

10   was doing.  He wasn't cooperating with us to fill out the

11   proper documentation to get the travel document.  But I believe

12   in this case he was telling the consulate not to issue the

13   travel document.

14          THE COURT:  Is Mr. Ferreira a citizen of Brazil?

15          THE WITNESS:  Yes, Your Honor.

16          THE COURT:  And does ICE regularly or frequently

17   remove people to Brazil?

18          THE WITNESS:  Yes, Your Honor.

19          THE COURT:  Is there a usual amount of time between

20   getting a document and removing a person?

21          THE WITNESS:  It depends on the availability of

22   flights, anywhere between two weeks to four weeks.

23          THE COURT:  Okay.

24   BY MS. McCULLOUGH:

25   Q.   Are you sure that Mr. Ferreira was speaking to the

1    Brazilian consulate?

2    A.    No.  I'm not sure he spoke to them directly, but I know

3    that he was, in some manner he was communicating with them.  I

4    don't -- I honestly don't recall exactly how.  And forgive me

5    if I'm confusing cases, but I believe that's the case in this

6    one.

7    Q.    You don't know whether he was communicating with the

8    consulate or not?

9    A.    Not directly, I don't know in which manner he was

10   communicating with them.

11   Q.    Are you aware he was asked to sign paperwork relating to

12   his removal without his counsel present?

13   A.    No, I am not.

14   Q.    And this, referring back to Exhibit 1, this is the

15   decision you made regarding Mr. Ferreira on September 22.  This

16   says, "While you were previously noncompliant with assisting

17   ICE in obtaining travel documents on your behalf, you have now

18   provided a valid passport.  Therefore, there is significant

19   likelihood of removal in the reasonably foreseeable future once

20   the U.S. District Court for the District of Massachusetts lifts

21   the current stay of removal issued in your case."  Is that

22   correct?

23   A.    That's correct.

24   Q.    So once he had provided a travel document, that increased

25   the reason to continue detaining him, correct?

1  A.   I'm -- can you repeat that?

2  Q.   The existence of a valid travel document for Mr. Ferreira

3  was a reason that you decided to continue his detention?

4  A.   There was another factor, because now we have a travel

5  document to effect his removal.

6  Q.   So his compliance or noncompliance either way weighed in

7  favor of continuing to his detention?

8  A.   Correct.

9       THE COURT:  Excuse me just a moment.  Go ahead.

10 Q.   Did you review -- excuse me.  You stated that you had

11 reviewed other decisions that had been made in Mr. Ferreira's

12 case, correct?

13 A.   I reviewed -- the other POCR decision?

14 Q.   Yes.

15 A.   Yes, I believe in this case I did.

16 Q.   Did you assess whether the POCR regulations had been

17 followed regarding Mr. Ferreira's previous POCR reviews?

18 A.   I believe Mr. Ferreira's POCR regulations had been

19 followed.

20 Q.   You believe that the POCR regulations had been followed

21 regarding Mr. Ferreira?

22 A.   Correct.

23 Q.   In every instance did you conclude that?

24 A.   I believe so.

25 Q.   Did you consider whether he had been provided a notice of

1    his 90-day custody review approximately 30 days before that

2    review?

3    A.    Could you repeat that?

4    Q.    Did you consider whether he had been provided a notice of

5    his 90-day custody review approximately 30 days before that

6    review occurred?

7    A.    I believe -- no.  I know he was served a notice of review.

8    I don't recall how far ahead it was.  But I thought -- I

9    thought he received one prior to 30 days ahead.

10   Q.    But you don't know whether he received it approximately 30

11   days before that review?

12   A.    I don't recall.  I'd have to look at the file and look at

13   the dates.  I don't remember the date that he received it.

14   Q.    So whether he received it approximately 30 days in advance

15   or not was not something you considered in your most recent

16   custody review?

17   A.    In the custody review or the decision to keep him in

18   custody?  Because it's two different things.

19   Q.    So when you made a custody determination in September

20   about Mr. Ferreira, did you consider the fact that Mr. Ferreira

21   may or may not have received proper notice approximately 30

22   days before his 90-day custody review occurred?

23   A.    That was not a factor in keeping him in custody, my

24   determination to keep him in custody.

25   Q.    And did you consider whether his 90-day custody review

1   occurred before he had the opportunity to submit documents?

2   A.   I did not.

3           MS. LARAKERS:   Objection.   Assumes facts not in

4   evidence.

5           THE COURT:   What's that?

6           MS. LARAKERS:   It assumes a fact that he hasn't

7   testified to.

8           THE COURT:   Why don't you lay a foundation.

9   BY MS. McCULLOUGH:

10  Q.   Did you look at the date for the deadline for Mr. Ferreira

11  to submit documents in connection with his 90-day custody

12  review?

13  A.   I did not.

14  Q.   And you didn't compare that to the date when that custody

15  review actually occurred, did you?

16  A.   No.   I looked at the date of the custody review to make

17  sure that it was within the 90 days.

18  Q.   So that custody review may have occurred before the

19  deadline to submit documents?

20  A.   That review would have occurred prior to his 90 days of

21  being held in custody.

22  Q.   But it could have occurred before --

23          THE COURT:   It's not helpful to me to know whether it

24  could have occurred.   If you have information that would

25  indicate whether or not the original custody review occurred

1    before the deadline for submitting documents, you should show

2    him, and we'll see what the facts are.

3    Q.   Mr. Charles, do you recognize this document?

4    A.   It's notice to an alien of file custody review for

5    Mr. Ferreira.

6    Q.   Okay.  And what's the deadline for him to submit documents

7    according to this?

8    A.   On or about -- "Your custody status will be reviewed on or

9    about February 11, 2019."

10          MS. McCULLOUGH:  May I mark this as Exhibit 2?

11          THE COURT:  Yes.  You'll have to give them to the

12   deputy clerk once we finish.

13          (Exhibit 2 admitted into evidence.)

14   A.   What was the date of service on that one, on Exhibit 2?

15   Okay.

16   Q.   That's not approximately 30 days before February 11,

17   correct?

18   A.   That is approximately 60 -- 71 days.

19   Q.   Okay.  And do you recognize this document?

20   A.   Decision to continue detention.

21   Q.   And this is for Mr. Ferreira?

22   A.   Mr. Ferreira, yes.

23          MS. McCULLOUGH:  Mark this as Exhibit 3.

24          THE COURT:  Yes.

25          (Exhibit 3 admitted into evidence.)

1    Q.   And what's the date on this?

2    A.   January 28, 2019.

3    Q.   And that's before February 11, 2019, his deadline to

4    submit documents, correct?

5    A.   It is in front of the date of the review.

6    Q.   Sorry.  It's before the deadline to submit documents?

7    A.   It's before the date of the review.

8    Q.   This is the date that the review occurred, correct?

9    A.   Okay.  I'm sorry.  Yes.  The review date does say on or

10   about, however.

11   Q.   Okay.  So just to be clear, this review was conducted

12   before the deadline for Mr. Ferreira to submit documents?

13   A.   On or about, correct.

14          THE COURT:  Actually, so do you have copies of those

15   to hand up that we can mark?

16          MS. McCULLOUGH:  Yes.

17          THE COURT:  I'd like to take a look at them.

18          MS. McCULLOUGH:  I just handed Your Honor Exhibit 2.

19   This is Exhibit 3, and this is Exhibit 1.

20          THE COURT:  I think it's the other way around.  Hold

21   on a second.  So the Notice to Alien of File Custody Review is

22   Exhibit 2.  This is 2.  And the Decision to Continue Detention

23   is Exhibit 3.

24          Exhibit 2, it says, in part, "Your custody status will

25   be reviewed on or about 2/11/2019."  Then it says, "You may

1   submit any documentation you wish to be reviewed in support of

2   your release prior to the date listed above," which is 2/11/19.

3   You can go ahead.

4   BY MS. McCULLOUGH:

5   Q.   So just to be clear, Mr. Charles, the portion that His

6   Honor just read from Exhibit 2 states the date that his custody

7   will be reviewed on or about, which is February 11, correct?

8   A.   Correct.

9   Q.   Okay.  It says below, "You may submit any documentation

10  you wish to be reviewed in support of your release prior to the

11  date listed above."  Correct?

12  A.   Correct.

13  Q.   So that was his deadline to submit documents, correct?

14  A.   Prior to February 11.

15  Q.   Okay.  Did Mr. Ferreira receive a 180-day custody review?

16  A.   I don't believe so.

17  Q.   Did ICE review his custody again after 90 days?

18  A.   Yes, on agreement with the court or order of the court we

19  looked at documentation presented by his attorney on September

20  13.

21  Q.   But before that, did ICE review his custody?

22  A.   After his initial 90-day --

23  Q.   Yes.

24  A.   -- and before September 13?  I don't believe so.

25  Q.   Headquarters didn't review his custody, correct?

1    A.    Not until after 180 days.

2    Q.    Did it review his custody after 180 days?

3    A.    He hasn't reached 180 I believe.  If he has, it's just

4    recently.

5    Q.    Well, you realize that he was detained, according to

6    Exhibit 2, he was at least detained as of November 29, 2018,

7    correct?

8    A.    Correct.  I believe he was appealing with the BIA, and

9    then he had 60 days of failure to comply.

10   Q.    So he's been in custody longer than six months?

11   A.    As a final order.

12   Q.    Yes.

13   A.    Well, technically, yes, but failure to comply time doesn't

14   count towards his Post-Order Custody Review time.

15   Q.    Okay.  But my question is has he been longer than six

16   months with ICE?

17   A.    Yes, yes.

18   Q.    So when you reviewed his custody on September 13, you

19   didn't consider the fact that he did not receive -- that he did

20   not receive the notice approximately 30 days before his 90-day

21   review, correct?

22   A.    I did not.

23   Q.    And you did not consider the fact that he had a 90-day

24   POCR review more than ten days before his deadline to submit

25   documents, correct?

1    A.    Correct.

2              THE COURT:  Do you have much more?

3              MS. McCULLOUGH:  Just a couple of questions, Your

4    Honor.

5    BY MS. McCULLOUGH:

6    Q.    When you conducted your review in September -- on

7    September 13, did you consider it to be different from the

8    reviews that you normally conduct?

9    A.    Yes.

10   Q.    How so?

11   A.    It was something we had been ordered by the court to do to

12   review the additional documentation that his attorney had

13   provided so we could look at it with fresh eyes de novo and

14   look at the whole custody situation again.

15   Q.    And did you do an interview as part of this determination?

16   A.    I did not conduct an interview.

17   Q.    Was an interview conducted?

18   A.    Yes.

19   Q.    But you didn't personally speak to Mr. Ferreira?

20   A.    I did not.

21   Q.    And did you look at his -- you testified about his

22   criminal record, correct?

23   A.    Correct.

24   Q.    You testified to a single violent conviction, correct?

25   A.    Correct, against a police officer.

```
1   Q.   But you also saw that there were no other violent criminal
2   convictions on his record, correct?
3   A.   Correct.
4   Q.   And did you speak with his wife?
5   A.   I did not.
6   Q.   Did anybody in your office speak with his wife?
7   A.   Not to my knowledge.
8   Q.   Did you speak to any of his children?
9   A.   I did not.
10  Q.   Are you aware that he's caring for six U.S. citizen
11  children?
12  A.   No, I didn't know it was six.  I thought there was only
13  three, but okay.
14  Q.   And did you know that his wife trusts him with the safety
15  of her children?
16  A.   I wouldn't know that.  I don't know his wife.
17  Q.   And who interviewed him?
18  A.   I believe his deportation officer.  Honestly, I don't
19  remember her last name.  I think her first name is Kelsey.  I
20  don't remember her last name.
21  Q.   When did she interview him?
22  A.   I don't know.  I don't know the date.
23  Q.   Do you know the approximate date?
24  A.   I believe it was September, but I don't -- it was shortly
25  after we got the documentation, I believe.
```

1    Q.    It was after the August 27 hearing in this case?

2    A.    Yes.

3    Q.    And did you speak to her directly?

4    A.    I did not.

5    Q.    Did you receive some kind of written notes from that

6    interview?

7    A.    Yes.  I received a memo outlining the interview.

8              THE COURT:  Are you almost finished?

9              MS. McCULLOUGH:  I'd like to ask -- Mr. Charles made

10   the decision in another detainee's case.  I was going to ask

11   him about that.

12             THE COURT:  We're going to do them one at a time.

13             MS. McCULLOUGH:  Okay.  I have just a couple of more

14   questions about this.

15             THE COURT:  What's that?

16             MS. McCULLOUGH:  I have just a couple of more

17   questions about this.

18             THE COURT:  That's what you told me about ten minutes

19   ago.  Go ahead.

20             MS. McCULLOUGH:  I'll keep it brief.

21   MS. McCULLOUGH:

22   Q.    Did Mr. Ferreira receive a notice of his interview?

23   A.    Prior to the interview?

24   Q.    Yes.

25   A.    I believe he did.  I believe that's what we had discussed

```
 1    on the August 27 that we were going to notify the detainees of
 2    the possible interview, and I believe that -- I don't recall if
 3    he was one of the ones that had to get rescheduled.
 4              THE COURT:  Okay.  Thank you.  You're done for now.
 5              MS. McCULLOUGH:  Okay.  I can move on to asking
 6    about --
 7              THE COURT:  No, no.  We're going to have
 8    cross-examination.  I want to keep each of the aliens separate.
 9    So who would like to examine for the defendants?
10              MR. WEINTRAUB:  I will, Your Honor.  Thank you.  I
11    will keep this brief, Your Honor.  I have very few questions.
12    CROSS-EXAMINATION BY MR. WEINTRAUB:
13    Q.   I believe this was Exhibit 1, and in the middle of this
14    page, do you see where you've written that "ICE acknowledges
15    the favorable factors you present to your ties to the U.S."?
16    A.   Yes, I do.
17    Q.   Does your inclusion -- excuse me.  Does your inclusion of
18    this language suggest anything about whether you considered
19    these factors?
20    A.   Yes.
21    Q.   What does it suggest?
22    A.   That we acknowledged the favorable factors in the
23    documents presented.
24    Q.   And did you consider them?
25    A.   Excuse me?
```

1    Q.   Then did you consider them?

2    A.   Yes.

3    Q.   Thank you.  And this is also Exhibit 1.  At the top of

4    page 2 there you've written, "While acknowledging you have

5    appealed such decision."  Does this suggest anything about

6    whether you considered that Mr. Ferreira had appealed the

7    denial of the I-212 waiver?

8    A.   Yes, it does.

9    Q.   And what does it suggest?

10   A.   That we considered it as a factor.

11   Q.   All right.  And finally, do you know if Mr. Ferreira

12   submitted additional documents to ICE to support his claim for

13   release after his deadline to submit documents for his POCR?

14   A.   Not until this last batch of documents on September 13.

15   Q.   Did he submit documents in September?

16   A.   Yes, he did.

17   Q.   Do you know when?

18   A.   I received them on September 13.

19   Q.   Did you read the documents?

20   A.   Yes, I did.

21   Q.   Did you consider the documents?

22   A.   I did.

23            MR. WEINTRAUB:  I have nothing further, Your Honor.

24            THE COURT:  Is there any redirect?  I have a few

25   questions.

1          MS. McCULLOUGH:  Very briefly.

2     REDIRECT EXAMINATION BY MS. McCULLOUGH:

3     Q.   Mr. Charles, the decision, the September 22nd decision

4     letter that you signed or that you had Mr. Lyons sign, who

5     wrote that letter?

6     A.   Honestly, I don't -- it was probably -- it's a letter that

7     we use.  It's mainly -- a lot of it is a canned letter.  And we

8     input the information in there as far as what we've considered

9     and everything else.  And again that was probably written by

10    the case officer.

11    Q.   Who was the case officer?

12    A.   I don't -- I don't know who the case officer was on this

13    case, the actual deportation officer.  But it's put together

14    after going back and forth with the emails, me telling the AFOD

15    that I reviewed the --

16          THE COURT:  AFOD is -- what's that, A-F-O-D?

17          THE WITNESS:  Yes, sir.  Assistant field office

18    director.

19    A.   Telling the assistant field office director that I've

20    looked at the documentation, letting them know to go ahead, and

21    I give them the fact that I agree that the subject does pose a

22    danger to the community.  I look through the letter after it's

23    given to me to make sure that everything we want in there is in

24    there.

25    Q.   And was everything that you wanted in there included?

1  A.   Yes.

2  Q.   So that letter is a complete and accurate summary of the

3  reasons for your decision?

4  A.   Complete and accurate.  Is that what you said?

5  Q.   Yes.

6  A.   Yes.

7       MS. McCULLOUGH:  No further questions, Your Honor.

8       THE COURT:  All right.  I have a few.  If anybody has

9  an objection, don't be timid about expressing it.

10      Do you recall the August 26 hearing when you were here

11 last?

12      THE WITNESS:  Yes, Your Honor.

13      THE COURT:  And do you recall -- well, did you agree

14 to do a de novo review when I asked you to before I ordered you

15 to?

16      THE WITNESS:  Yes, Your Honor.

17      THE COURT:  And were you willing to do that?

18      THE WITNESS:  Yes, Your Honor.

19      THE COURT:  Did you just testify that you made the

20 decision to remove Mr. Ferreira and the decision to continue

21 his detention together?

22      THE WITNESS:  Shortly, within, I believe it was the

23 same day to continue forward with his removal process and

24 considering the documentation received on the 13th to continue

25 to detain.

1          THE COURT:  So on the 13th you got the documents that

2     were submitted in support of his request to be released from

3     detention; is that right?

4          THE WITNESS:  Yes, Your Honor.

5          THE COURT:  And then what did you do that day, or what

6     did you do once you got the documents, actually?

7          THE WITNESS:  Reviewed them, went through them, asked

8     for his A-File, pulled up his record, EARM, enforcement record

9     database, made sure there was nothing added to the A-File that

10    I hadn't seen already, looked at the packet that was submitted

11    with those documents.  I believe there was a declaration from

12    Mr. Ferreira, letters of support.

13         THE COURT:  Do you remember what the essence of the

14    declaration and the letters were?

15         THE WITNESS:  From Mr. Ferreira, I believe his

16    declaration was that he had made mistakes in the past, that he

17    wanted to be released to be with his family.  And the support

18    letters were very similar, saying that they wanted -- they

19    would like to have Mr. Ferreira back at home.

20         THE COURT:  All right.  And then did you speak to

21    anybody before reaching the conclusion that he should be

22    removed and his detention should continue?

23         THE WITNESS:  I spoke with our assistant field office

24    director Tina Guarna-Armstrong to ask what they had recommended

25    on it.  And from the deportation officer, the supervisory

 1    detention/deportation and assistant field office director all

 2    recommended detention, continued detention.

 3           THE COURT:  Did you speak to anybody at ICE

 4    headquarters or --

 5           THE WITNESS:  I did not.

 6           THE COURT:  -- otherwise communicate about Ferreira's

 7    case with anybody at ICE headquarters before making your

 8    decision?

 9           THE WITNESS:  I did not.

10           THE COURT:  Did you speak to any lawyer or communicate

11    with any lawyer about it?

12           THE WITNESS:  I spoke with ICE counsel via email

13    saying that this --

14           THE COURT:  You don't have to -- although there are

15    some questions as to who the attorney-client privilege covers

16    in these circumstances, I'm not asking you what you said to a

17    lawyer or a lawyer said to you in confidence when you were

18    seeking advice.  I was just asking whether you had a

19    communication.

20           THE WITNESS:  Yes.

21           THE COURT:  Okay.  And essentially, if you want to,

22    you can say what you said to a lawyer in confidence to get

23    advice, but you're not obligated to.  It's protected by the

24    attorney-client privilege.

25           What was the name of the lawyer you spoke to or

1    communicated with?

2              THE WITNESS:  It was Mark Sauter.

3              THE COURT:  Who is it?

4              THE WITNESS:  Mark Sauter.

5              THE COURT:  He's here today?

6              THE WITNESS:  Yes, Your Honor.

7              THE COURT:  What's his position?

8              THE WITNESS:  He's the deputy chief counsel.

9              THE COURT:  In your office?

10             THE WITNESS:  For Boston ERO.

11             THE COURT:  ERO.  All right.  Who wrote the decision

12    to continue detention that's Exhibit 1?

13             THE WITNESS:  I'm not positive on who actually put the

14    letter together.

15             THE COURT:  Is this a typical letter or out of the

16    ordinary in its detail?

17             THE WITNESS:  I would say it's a little more detailed

18    than normal.

19             THE COURT:  Little or a lot?

20             THE WITNESS:  A little.  Depending on the case.  I've

21    seen some more detailed, but this one is fairly detailed.

22             THE COURT:  And in the process of deciding to continue

23    Mr. Ferreira's detention, did you consider the fact that he was

24    pursuing a provisional waiver?

25             THE WITNESS:  I did, Your Honor.

1          THE COURT:  And could somebody put Exhibit 1 back up,

2     please.

3          Did you say in response to earlier questioning that

4     Exhibit 1 is an accurate and complete description of your

5     reasoning with regard to the decision to continue detention?

6          THE WITNESS:  I believe it is.

7          THE COURT:  All right.

8          You may have to give him -- here.  Let me tell you the

9     following and you can look at this to read it to verify if you

10    want.  But from what I've seen reading this before court today,

11    there's no reference to the provisional waiver regulations,

12    you're considering them, in this letter.  I think the lawyers

13    will stipulate to that.  Why not?

14         THE WITNESS:  I felt it -- the essence of it was in

15    the first paragraph on the second page about the denial of the

16    I-212 waiver application.

17         MR. WEINTRAUB:  Your Honor, I apologize.  While I was

18    doing this, I did not hear the question.

19         THE COURT:  I asked him why there was no reference to

20    the provisional waiver application in the letter, and his

21    response was that he referenced that process in the first

22    paragraph on page 2 concerning the I-212 waiver application

23    being denied.  Correct?

24         THE WITNESS:  Correct.

25         THE COURT:  Who wrote this letter?

1          THE WITNESS:  I don't know exactly who wrote it.

2          THE COURT:  Did a lawyer write it?

3          THE WITNESS:  I don't believe so.

4          THE COURT:  All right.  Do my questions suggest any

5     further questions to counsel?

6          MS. McCULLOUGH:  No, Your Honor.

7          MR. WEINTRAUB:  No, Your Honor.

8          THE COURT:  All right.  Ms. McCullough, would you like

9     to question him about, is it Moniz?

10         THE WITNESS:  Rodriguez, Your Honor.

11         THE COURT:  Rodriguez, excuse me.

12         Actually, I'm sorry to do this.  There's another

13    question I intended to ask you.  8 C.F.R. Section 241.4(g), I

14    think it is (3).  It says, "Availability of Travel Document."

15    "In making a custody determination, the district director and

16    the director of the HQPDU shall consider the ability to obtain

17    a travel document for the alien.  If it is established at any

18    stage of a custody review that, in the judgment of the Service,

19    travel documents can be obtained or such document is

20    forthcoming, the alien will not be released unless immediate

21    removal is not practicable or in the public interest."

22         THE WITNESS:  Yes, Your Honor.

23         THE COURT:  Are you familiar with that provision?

24         THE WITNESS:  Yes, Your Honor.

25         THE COURT:  Do you apply it regularly?

1            THE WITNESS:  Yes, Your Honor.

2            THE COURT:  I'm asking you your understanding.  Is it

3    your understanding that that regulation requires you to

4    consider whether release would be in the public interest before

5    deciding whether or not to release an alien?

6            THE WITNESS:  Yes, Your Honor.

7            THE COURT:  And not just in Mr. Ferreira -- do you

8    have a practice as to how you do that, what you consider with

9    regard to the public interest?

10           THE WITNESS:  I consider public interest to be the

11   vast majority of the public, so for instance in Mr. Ferreira's

12   case, the fact that he was convicted of a violent crime

13   outweighed the benefit of releasing him back to the -- he would

14   be more of a threat to the public than a benefit to the public.

15           THE COURT:  And you're familiar with the provisional

16   waiver regulations now at least, right?

17           THE WITNESS:  Yes, Your Honor.

18           THE COURT:  And is it your understanding that those

19   regulations are one manifestation of the public interest?

20           THE WITNESS:  I believe it's a portion of the public

21   interest.

22           THE COURT:  Do you understand the stated purpose of

23   the provisional waiver regulations was to create an opportunity

24   for American citizens married to aliens who had been ordered

25   deported, often appears a long time ago, to keep their families

1    intact?

2              THE WITNESS:  Yes, Your Honor.

3              THE COURT:  And do you regularly consider whether

4    somebody is pursuing that provisional waiver process in

5    deciding whether it's in the public interest to release them?

6              THE WITNESS:  I do, Your Honor.  I believe if the

7    threat to the public is greater than the good to the public,

8    then the subject should remain in custody.  And in

9    Mr. Ferreira's case, I felt that he posed more danger to the

10   public than a benefit to his family and that portion of the

11   public.

12             THE COURT:  Are there instances that you can recall in

13   which you found that the public interest in reuniting an alien

14   with his or her citizen spouse in balance served the public

15   interest?

16             THE WITNESS:  I have released aliens from detention

17   and ordered -- I believe some of the aliens that were

18   originally in this class were released because they were

19   non-criminal, and it was a benefit to the family, and it really

20   served no benefit to keep them in custody.

21             THE COURT:  Can you recall the names of any of those?

22             THE WITNESS:  No, Your Honor, I'm sorry.

23             THE COURT:  Is Mr. Madeira one of them?  Anyway.

24             MS. LARAKERS:  That is one person he's released, Your

25   Honor, yes.

1          THE COURT:  Okay.  Because this is a legal -- this is
2     a legal question I'm going to have to address, but when you
3     weren't in the room, in the courtroom, I expressed the
4     tentative view that the provisional waiver regulations are one
5     manifestation of the public interest.  It's a law that is
6     intended to serve the public interest in keeping American
7     families intact, and I may find that that's something you're
8     legally obligated to consider.  I haven't finally decided that
9     now, but the parties are going to get a chance to brief it.
10    But you've told me you do consider it, right?

11         THE WITNESS:  If I may, Your Honor, as I said, I agree
12    that that is part of public interest; however, I think that,
13    case by case, if the subject poses a greater threat to the
14    greater public, it outweighs it.

15         THE COURT:  And did you read the decision, written
16    decision I issued about a year ago, September, that discussed
17    this provisional waiver process?

18         THE WITNESS:  Yes, Your Honor.

19         THE COURT:  And do you recall I wrote that you were
20    required in deciding whether to remove somebody to consider
21    their eligibility for the provisional waiver process but that
22    you were not prohibited from removing people who are pursuing
23    provisional waivers as long as you consider that among other
24    things?

25         THE WITNESS:  I do recall that.

```
 1              THE COURT:  Do you want to ask about Ms. Rodriguez?

 2              MS. McCULLOUGH:  Yes, Your Honor.

 3    BY MS. McCULLOUGH:

 4    Q.   Mr. Charles, did you make a decision to continue

 5    Ms. Rodriguez's detention in September?

 6    A.   I did.

 7    Q.   And do you recognize this?

 8    A.   I do.  Decision to Continue Detention for Ms. Ana Gabriel

 9    Rodriguez.

10    Q.   And whose signature is that?

11    A.   Todd Lyons on my behalf.

12    Q.   Did you ask him to sign this?

13    A.   I did.

14    Q.   Was he involved in the review of Ms. Rodriguez's custody?

15    A.   Not the -- not the decision process, no.

16    Q.   Who wrote this letter?

17    A.   I am unsure.

18    Q.   Was it somebody who worked for you?

19    A.   I believe it was.

20    Q.   Did you review the letter?

21    A.   I did.

22    Q.   Did you find it to be accurate?

23    A.   Yes.

24    Q.   Did you find it to be a complete representation of the

25    bases for your decision?
```

1   A.   Yes.

2   Q.   This letter doesn't mention Ms. Rodriguez's I-130

3   application, correct?

4   A.   Is there a second page to it?

5   Q.   Yes.

6   A.   I don't believe it does.

7   Q.   And it doesn't mention her eligibility for the provisional

8   waiver process, correct?

9   A.   Correct.

10  Q.   Were you obligated to consider that as part of the public

11  interest?

12  A.   Yes.

13  Q.   When you evaluated Ms. Rodriguez's custody in September,

14  did you look back at previous decisions made regarding her

15  custody?

16  A.   I looked at her file, and I believe she did have a

17  90-day -- I believe she did.

18       MS. McCULLOUGH:  And just for the court I'll mark the

19  decision to continue detention as Exhibit 4.

20       THE COURT:  Yes.

21       (Exhibit 4 admitted into evidence.)

22       THE WITNESS:  Can I see a copy of that?

23       THE COURT:  Why don't we show it to the witness and to

24  his counsel and to the court, please, if you've got extra

25  copies.

```
 1              THE WITNESS:  Thank you.  Is this the whole thing?
 2              MS. McCULLOUGH:  So I just handed you that document as
 3    well as a couple of others that I'll discuss as well.
 4    Q.   So if you could turn to the following letter in that
 5    packet that I handed you.
 6    A.   Yes.
 7    Q.   This is the letter signed 8/5/19, I believe.
 8    A.   I believe so.
 9              MR. WEINTRAUB:  Your Honor, I apologize.  Could I just
10    clarify.  Is the 8/5 decision Exhibit 4?
11              THE COURT:  No.  It looks like it's signed 9/22.
12              MR. WEINTRAUB:  There's a separate document; is that
13    correct?
14              MS. McCULLOUGH:  Sorry for confusing you.
15    Q.   I just handed you a set of documents.  So the first
16    document that I handed up to you is marked as Exhibit 4.  This
17    is signed September 22.  Do you see that, Mr. Charles?
18    A.   Yes.
19    Q.   Okay.  And then the second document that I handed you is
20    this one signed August 5.
21    A.   Correct.
22    Q.   Okay.  And that's marked as Exhibit 5.  And then there's
23    one more document that I handed you.  This is the Notice to
24    Alien of File Custody Review, correct?
25    A.   Correct.
```

1    Q.    And this is signed June 3?

2    A.    Correct.

3          THE COURT:  You've got to offer these one at a time.

4    So which one would you like admitted as Exhibit 5, please?

5          No.  That's not right.  Wait a minute.  Okay.

6    Decision to Continue Detention dated 8/8/19, you want that as

7    Exhibit 5?

8          MS. McCULLOUGH:  I belive it's dated 8/5/19, yeah.

9          THE COURT:  Okay.  That will be Exhibit 5.

10         (Exhibit 5 admitted into evidence.)

11         THE COURT:  Do we have Exhibit 6 yet?  And Exhibit 6

12   is the Notice to Alien of File Custody Review.  It says, "Your

13   status will be reviewed on or about 8/19/2019."  Let me see

14   Exhibit 5.  Go ahead.

15         (Exhibit 6 admitted into evidence.)

16   BY MS. McCULLOUGH:

17   Q.    So Mr. Charles, did you have these documents when you

18   conducted Ms. Rodriguez's review in September?

19   A.    They were in her A-File.

20   Q.    Did you look at them?

21   A.    Yes.

22   Q.    Did you consider whether these documents showed compliance

23   with the POCR regulations?

24   A.    I did not.

25   Q.    So this document, the Notice to Alien of File Custody

1   Review which is marked as Exhibit 6, this states that her

2   custody will be reviewed on or about 8/19/2019.  Correct?

3   A.   Correct.

4   Q.   And she was given this document on June 3, correct?

5   A.   Correct.

6   Q.   And that's more than 30 days before 8/19, correct?

7   A.   Correct.

8   Q.   That's more than two months before?

9   A.   Correct.

10  Q.   And this is the Decision to Continue Detention of

11  Ms. Rodriguez, correct?

12  A.   Correct.

13  Q.   And it was signed on 8/5/19, correct?

14  A.   Correct.

15  Q.   Is that Todd Lyons's signature?

16  A.   Yes, it is.

17  Q.   Did he sign it at your direction?

18  A.   Yes.

19  Q.   Did he make that decision or did you?

20  A.   I don't recall if he made it on his own or if I asked him

21  to.  I don't know.

22  Q.   And that decision was made more than two weeks before the

23  deadline for Ms. Rodriguez to submit documents, correct?

24  A.   It was submitted, yes, two weeks before the on or about

25  date.

1   Q.   So it was two weeks before her deadline to submit

2   documents, correct?

3   A.   Prior to.  It was prior to the date.

4   Q.   Two weeks prior?

5   A.   Yes.

6   Q.   And you didn't consider either of those facts in making

7   your September custody decision for Ms. Rodriguez, correct?

8   A.   I did not.

9   Q.   Do you believe the POCR regulations were followed

10  regarding Ms. Rodriguez?

11  A.   Yes.

12  Q.   Have you reviewed this court's June decision of 2018

13  regarding Ms. De Souza and Mr. Junqueira?

14  A.   Which date?

15  Q.   It was from June 2018.

16  A.   I have.

17  Q.   Are you aware that Ms. De Souza's custody was reviewed

18  before her deadline to submit documents?

19  A.   I don't recall that.

20  Q.   Do you recall whether the court found that to be a

21  violation?

22  A.   No, I don't recall that either.

23  Q.   Have you reviewed ICE procedures regarding conducting

24  reviews before or -- excuse me.  Have you reviewed incidents in

25  which ICE Boston has conducted reviews before the deadline to

1   submit documents?

2   A.   Yes.

3   Q.   And have you found that it has?

4   A.   Excuse me?

5   Q.   And have you found that it has?

6   A.   It has conducted the review on or about the date that was

7   given.

8   Q.   You haven't found incidents where it conducted that review

9   before the deadline given?

10  A.   I have found incidents that there was review prior to the

11  date given on the notice of review that says on or about date.

12  Q.   But in Ms. Rodriguez's case, that didn't weigh in your

13  decision to continue her custody or to release her, correct?

14  A.   It did not.

15  Q.   Even though you found that her previous custody review was

16  conducted early?

17  A.   It was conducted on or about within the regulations.

18        THE COURT:   Look.  We're going to have to stop pretty

19  soon, and I understand that the custody review initially or

20  penultimate review was done on August 5, which was two weeks

21  before the time she was given to submit documents by August 19.

22  I got it.

23  BY MS. McCULLOUGH:

24  Q.   Mr. Charles, did you review the POCR submissions that

25  Ms. Rodriguez submitted to ICE in September?

```
 1   A.   Yes.

 2   Q.   How much time did you spend reviewing those?

 3   A.   I don't recall.

 4   Q.   Did you review them closely?

 5   A.   I reviewed them.

 6   Q.   You didn't review them closely?

 7   A.   I reviewed them.  I looked at everything that was

 8   submitted.  I don't know if there's another definition of

 9   "reviewed."  I didn't glance over them.  I reviewed them.

10   Q.   Right.  You don't feel comfortable saying you reviewed

11   them closely?

12   A.   I reviewed them.

13   Q.   Is the answer to my question yes, you would say you don't

14   feel --

15   A.   Yes, yes.

16   Q.   Did you review her criminal history?

17   A.   Yes.

18   Q.   And did you find any violent offenses?

19   A.   There was no charges of violent crimes, no.

20   Q.   She has a single drug possession conviction, correct?

21   A.   Single drug possession conviction, but the actual charge

22   was for distribution of heroin.

23   Q.   She wasn't convicted of distribution, correct?

24   A.   I believe she pled down to a lesser charge.

25   Q.   Are you aware if she has children?
```

1    A.    I believe she has one son in Honduras.

2    Q.    Do you know how old he is?

3    A.    I want to say ten.

4    Q.    And did you speak to her wife?

5    A.    I did not.

6    Q.    Did you review information from her wife?

7    A.    I reviewed a declaration from her wife.

8    Q.    And did she receive an interview as part of this review?

9    A.    Excuse me, I'm sorry.  Can you repeat the question?

10   Q.    Did she receive an interview as part of this review?

11   A.    Ms. Rodriguez or Ms. Martinez?

12   Q.    Ms. Rodriguez.

13   A.    Yes -- no, she did not.

14   Q.    So you didn't speak to her?

15   A.    I did not.

16   Q.    And nobody at ICE has spoken to her as part of this

17   review?

18   A.    Not to my knowledge.

19   Q.    Has she ever received a custody review from ICE?

20   A.    Not to my knowledge.

21         MS. McCULLOUGH:  No further questions, Your Honor.

22         THE COURT:  Thank you.  Would the government like to

23   examine?

24         MR. WEINTRAUB:  Briefly, Your Honor, just need a

25   moment.

1    CROSS-EXAMINATION BY MR. WEINTRAUB:

2    Q.    All right.  I'm showing you now what's been submitted as

3    Exhibit 5.  If you look on the signature line there --

4    A.    Yes, sir.

5    Q.    Do you see writing beside the signature on that line?

6    A.    Yes.

7    Q.    And do you know what that extra writing is?

8    A.    It's "For."

9    Q.    And does that suggest anything about whether Mr. Lyons

10   signed on your behalf or whether he did it on his own?

11   A.    No, it does not.

12   Q.    I'm sorry?

13   A.    It indicates that he had the authority to sign for me.

14   Q.    Do you know -- do you know if, when you reviewed her

15   materials before the decision letter that was submitted as

16   Exhibit 4, the September 19 letter -- excuse me -- do you know

17   whether Ms. Rodriguez had a pending I-130?

18   A.    Ms. Rodriguez had a pending I-130 that was in the process

19   of being denied by USCIS due to, I believe they could not

20   confirm the validity of the marriage.  And then it was later,

21   the application was later abandoned.

22   Q.    Excuse me.  Is it uncommon to include references to denied

23   applications in decision letters?

24   A.    No.

25   Q.    Could that be a reason why you didn't include the

1    reference to the I-130 in this denial then?

2        THE COURT:  Well, it's not a question of what could

3    be.  There's no reason to ask him a leading question.

4        MR. WEINTRAUB:  Trying to lay a foundation.

5    Q.   Does that explain why you didn't?

6        THE COURT:  Not, "Does it explain it."  Why don't you

7    just ask him why didn't he include it.

8    Q.   Why didn't you include the I-130 reference -- excuse me --

9    in your decision letter?

10   A.   One of the facts was that the pending I-130 was already in

11   the process of being denied and was later then abandoned.

12       THE COURT:  How did you know that?

13       THE WITNESS:  It was in the A-File.  The abandoned

14   part came in later.  That was added to the A-File recently, I

15   believe.

16   Q.   Thank you.  If you look at Exhibit 4, the decision to

17   continue from September of 2019, the second paragraph after the

18   bullet point, it's written that, "ICE has made a determination

19   that you pose a danger to the community and to the safety of

20   others."  Do you see that?

21   A.   I do.

22   Q.   What demonstrated to you that she posed such a danger?

23   A.   Her arrest for distribution of heroin in which they, the

24   police department, had discovered several packets of heroin

25   that was marked individually for sale.

1  Q.   Is an ICE employee in your position permitted to issue a

2  recommendation or decision to release a detainee if there's

3  been a decision that the individual is likely to pose a threat

4  to the community?

5  A.   No, not unless there's a public benefit that would

6  override that, and there's not.

7  Q.   Did you examine -- in this case did you consider whether

8  there was any public benefit?

9  A.   I considered the fact that she had -- although it was in

10  the process of being terminated, had not been terminated yet.

11  And the I-130 that she had and the paperwork, the documentation

12  provided by Ms. Rodriguez and her wife and letters of support,

13  considered all that information.  However, that didn't outweigh

14  the fact that she had been arrested for distribution of heroin,

15  which would make her a public safety issue.

16          MR. WEINTRAUB:  Thank you.  I have nothing further.

17          THE COURT:  Do you have something further?

18          MS. McCULLOUGH:  Yes, Your Honor.

19  FURTHER REDIRECT EXAMINATION BY MS. McCULLOUGH:

20  Q.   This is what was marked as Exhibit 4, the Decision to

21  Continue Detention, signed on September 22.  This says

22  regard -- pointing right where my finger is, this is "On August

23  2, 2019, the consulate of Honduras issued ICE a travel document

24  for your removal, which has since expired."

25          Was that travel document available as of the August 27

1    hearing in this case?

2    A.    No.  That one had expired.

3    Q.    Do you know if it had expired as of August 27?

4    A.    I don't recall how long the travel documents for Honduras

5    are good for.  It may have been just about to expire.

6    Q.    Did you anticipate any difficulty getting another travel

7    document?

8    A.    No.  We get travel documents from Honduras all the time.

9    Q.    And do you believe that it's improper to release somebody

10   if their removal is foreseeable?

11   A.    I believe that that is a great consideration.

12   Q.    And this goes on to say that, "The consulate of Honduras

13   issued a second travel document for you," by "you," it means

14   Ms. Rodriguez, "on September 20, 2019, which is currently

15   valid."  Correct?

16   A.    Correct.

17   Q.    And this was as of September 22, correct?

18   A.    Correct.  So that was the one that was valid at the time.

19   Q.    So you didn't have a travel document for her as of

20   September 19, correct?

21   A.    I don't recall if it was -- I want to say it's a 14- or

22   20-day travel document.  So it may not have been valid at the

23   time of -- honestly, the one on the 20th was valid, which would

24   have been the one that was signed upon.

25   Q.    You thought that the likelihood of getting a travel

1    document or perhaps the fact that ICE had a travel document

2    weighed strongly against releasing her, correct?

3    A.    Correct.

4    Q.    And in fact, you found her not suitable for release

5    because of the availability of a travel document, correct?

6    A.    That's one of the main factors, yes, along with her threat

7    to public safety, which is the major factor in this case

8    because of, number one, we have to be able -- in order for us

9    to release somebody, there can't be a -- one of the main

10   requirements is there's no travel document.  In this case there

11   is a travel document, but there was some public benefit based

12   on the fact that she was in this process for the 601.  However,

13   that opposed to her conviction for a drug crime, and her arrest

14   for a greater drug crime made her a greater threat when weighed

15   against the benefit.

16            THE COURT:  Mr. Charles, right now you're being asked

17   about detention, but did you make the decision that

18   Ms. Rodriguez should be removed in tandem with the decision to

19   detain her?

20            THE WITNESS:  Yes, Your Honor.

21            THE COURT:  And was your reasoning essentially the

22   same?

23            THE WITNESS:  Yes, Your Honor.

24   BY MS. McCULLOUGH:

25   Q.    Is there any written record of your decision to remove?

1    A.    There --

2    Q.    Or to confirm removal?

3    A.    I believe there's email somewhere.

4    Q.    When did you make the decision to continue her detention

5    in September?

6    A.    I received documentation again on the 13th of September is

7    when, based on that.

8    Q.    And when did you make that decision?

9    A.    I had Lyons, DFOD Lyons sign on I believe it was the 22nd,

10   19th, 22nd.

11   Q.    Is that when you made the decision?

12   A.    The final decision was made on that day.

13   Q.    So you didn't make a decision by September 19?

14   A.    I already had a tentative decision by the 19th.  However

15   -- go ahead.

16   Q.    Please finish.

17   A.    But it wasn't -- I don't think we -- I'm trying to

18   remember.  There was something that we were looking for in the

19   case that we had to wait until the 22nd.  I don't recall what

20   it was.

21   Q.    Was it the existence of this travel document?

22   A.    It may have been.

23   Q.    When you conducted this review in September, was your

24   understanding that the existence -- the lack of a travel

25   document was necessary to release somebody?

1   A.   The inability to get a travel document is necessary, not

2   the lack of a travel document.

3   Q.   So if a person had a travel document, they wouldn't be

4   released?

5   A.   That is part of it, yes, but that's not the only factor.

6   Q.   You said that in order to be released, they need to show

7   that they can't or won't get a travel document?

8   A.   That's one of the main factors.  One of the criteria

9   that -- I cannot release somebody unless there is not a travel

10  document, they're not a threat to the community, they're non --

11  they can't be violent.  They have to remain nonviolent.  They

12  have to be able to abide by any release criteria, and they

13  can't be a flight risk.  So all six of those have to be weighed

14  against a public benefit in this case.  Because we knew we

15  could get a travel document for Honduras because we get them

16  every day.

17  Q.   That was the primary factor in your decision to remove

18  Ms. Rodriguez?

19  A.   Which one?

20  Q.   I'm sorry, to continue to detain Ms. Rodriguez.

21  A.   Which part?  All of the above, yes.

22  Q.   The fact that there was a valid travel document?

23  A.   That is a big part, yes.

24       MS. McCULLOUGH:  No further questions, Your Honor.

25       THE COURT:  Okay.  It's 5:40.  I can't hold my staff

1    hostage any longer, so we're going to recess for today.  It's

2    going to be necessary to hear the testimony relating to Moniz,

3    I believe it is, tomorrow.  We're going to do that at 11:00,

4    11:00 a.m., because I'm not available earlier.

5         I think it would be prudent -- I ordered ICE to be

6    prepared to bring some or all of these people here tomorrow,

7    but the focus is on -- but that was because I was contemplating

8    the possibility that I would decide that I needed to conduct

9    bail hearings.  I haven't reached that decision yet.

10        So do the parties want to be heard as to whether the

11   three people who aren't being released by agreement should be

12   brought here tomorrow?

13        MS. LAFAILLE:  Yes, Your Honor, we think they should

14   be brought.  We would like the court to hear from them because

15   at the heart of this motion for interim release is the fact

16   that these individuals we think will not pose a danger or a

17   risk of flight if released in the interim.

18        THE COURT:  Well, I'll order that the three of them be

19   here.  But in my current conception there's a threshold issue.

20   And if I don't find essentially a violation by ICE with regard

21   to a particular individual, I don't know what my authority

22   would be to make the bail decision in effect myself.  So you

23   can be prepared to address that tomorrow.

24        But I was planning to do that in May, I think it was,

25   May, June 2018, because I did find violations.  And one of the

1    issues will be, I think you anticipate this, there may have

2    been violations before September in the sense that reviews were

3    conducted before the time by which the aliens were told they

4    could submit documents for review.  But the government argues

5    that the remedy for that should be to order ICE to do a new

6    review, and if it turns out -- and I'm going to hear you on

7    this -- that I'm satisfied that with regard to a particular

8    individual they did a good faith de novo review and considered

9    everything they're required to consider, I might or might not

10   find that's a sufficient remedy.  So for any earlier -- and I'm

11   not -- this is in the nature of a preliminary injunction in

12   effect.  It's not -- these are decisions that I'm going to hear

13   more on November 4.

14              MS. LAFAILLE:  I assume Your Honor wants me to address

15   that tomorrow, not right now?

16              THE COURT:  Not today but to preserve the options.  So

17   the three people who are not being released by agreement of ICE

18   should be brought to the courthouse tomorrow before 11:00.

19              MS. LARAKERS:  Your Honor, you've already heard

20   Mr. Charles's testimony.  Is it possible that you can make a

21   decision about whether those two individuals that Mr. Charles

22   just testified about --

23              THE COURT:  No.  I think I need to hear the arguments.

24   Just bring them to the courthouse.

25              MS. LARAKERS:  Okay.  Yes, Your Honor.

```
 1              THE COURT:  Are any of them at Suffolk?

 2              THE WITNESS:  I'll have to check.  I don't believe any

 3     of them are.

 4              MS. LAFAILLE:  Yes, Your Honor.

 5              THE COURT:  If you're from Washington, you might be

 6     mystified.

 7              MR. WEINTRAUB:  We're familiar with it.

 8              THE COURT:  You've got all these practical

 9     considerations, and I've been I think sensitive to this case

10     right along.  This case is very important.  You've got other

11     important responsibilities, too.  I didn't order you to let out

12     the three people you let out.  And it moots, makes it

13     unnecessary for me to decide the temporary release issues, and

14     that's good, and it means there are fewer people you need to

15     testify about and gives you more time to do other important

16     things that you need to do, like finding someplace to put all

17     of the people who have been held at Suffolk.

18              THE WITNESS:  Yes, Your Honor.

19              MS. LARAKERS:  Your Honor, is Mr. Charles excused for

20     tomorrow?

21              THE COURT:  No.

22              MS. LARAKERS:  Okay.

23              THE COURT:  Because I've previously ordered that he be

24     at all hearings, and I don't know where this is going.

25              MS. LARAKERS:  Are the rest -- other than
```

1    Mr. Bernacke, are the other potential witnesses excused for

2    tomorrow?

3           THE COURT:  I believe so.  Does the petitioner see any

4    reason to hear from the others from Washington whose aliens

5    have been released by agreement?

6           MS. LAFAILLE:  No, Your Honor.

7           THE COURT:  Okay.  So they're excused.  Mr. Bernacke

8    and Mr. Charles, Mr. Lyons is always welcome, too.  All right.

9    Court is in recess.

10          (Adjourned, 5:42 p.m.)

1                     CERTIFICATE OF OFFICIAL REPORTER

2

3            I, Kelly Mortellite, Registered Merit Reporter

4    and Certified Realtime Reporter, in and for the United States

5    District Court for the District of Massachusetts, do hereby

6    certify that the foregoing transcript is a true and correct

7    transcript of the stenographically reported proceedings held in

8    the above-entitled matter to the best of my skill and ability.

9                     Dated this 15th day of October, 2019.

10

11                   /s/ Kelly Mortellite

12                   _____

13                   Kelly Mortellite, RMR, CRR

14                   Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25