UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


)
LILIAN PAHOLA CALDERON JIMENEZ    )
and LUIS GORDILLO, et al.,        )
Individually and on behalf of     )
all others similarly situated.    )
                                  )   Civil Action
        Plaintiffs-Petitioners,   )   No. 18-10225-MLW
                                  )
v.                                )
                                  )
KEVIN McALEENAN, et al.,          )
                                  )
        Defendants-Respondents.   )
                                  )


BEFORE THE HONORABLE MARK L. WOLF
UNITED STATES DISTRICT JUDGE


MOTION HEARING

* * * * * R E D A C T E D * * * * *


October 11, 2019


John J. Moakley United States Courthouse
Courtroom No. 10
One Courthouse Way
Boston, Massachusetts  02210


Kelly Mortellite, RMR, CRR
Official Court Reporter
One Courthouse Way, Room 5200
Boston, Massachusetts  02210
mortellite@gmail.com

1    APPEARANCES:

2    Counsel on behalf of Plaintiffs-Petitioners:
     Adriana Lafaille
3    American Civil Liberties Union
     211 Congress Street
4    Boston, MA 02110
     617-482-3170
5    alafaille@aclum.org

6    Shirley X. Cantin
     Colleen McCullough
7    WilmerHale LLP
     60 State Street
8    Boston, MA 02109
     617-526-6313
9    shirley.cantin@wilmerhale.com

10   Matthew Segal
     American Civil Liberties Union
11   211 Congress Street
     Boston, MA 02110
12   617-482-3170
     msegal@aclum.org
13
     Counsel on behalf of Petitioners Moniz and Ferreira:
14   Jeffrey B. Rubin
     Todd Pomerleau
15   Rubin & Pomerleau
     One Center Plaza
16   Boston, MA 02108
     jbr@rubinpom.com
17
     Counsel on behalf of Defendants-Respondents:
18   Mary Larakers
     J. Max Weintraub
19   U.S. Department of Justice, Office of Immigration Litigation
     District Court Section
20   P.O. Box 868
     Washington, DC 20044
21   202-353-4419
     mary.l.larakers@usdoj.gov
22   jacob.weintraub@usdoj.gov

23

24

25

1                                INDEX

2    WITNESS                                              PAGE

3    MICHAEL BERNACKE

4       Direct Examination By Ms. Cantin                    13
        Cross-Examination By Ms. Larakers                   71
5       Redirect Examination By Ms. Cantin                  73

6    ELTON MONIZ

7       Direct Examination By Mr. Rubin                     84
        Cross-Examination By Ms. Larakers                   92
8       Redirect Examination By Mr. Rubin                   96

9    TAYLOR MONIZ

10      Direct Examination By Ms. Cantin                   100
        Cross-Examination By Ms. Larakers                  103
11
     ROMILSON FERREIRA
12
        Direct Examination By Mr. Pomerleau                106
13      Cross-Examination By Ms. Larakers                  113
        Redirect Examination By Mr. Pomerleau              122
14
     RACHEL GREGOIRE, Sworn
15
        Direct Examination By Ms. McCullough               124
16      Cross-Examination By Ms. Larakers                  130

17
                       E X H I B I T S
18
     Exhibit No.           Page
19

20      7 ............... 36

21      8 ............. 118

22

23

24

25

PROCEEDINGS

1

2      THE COURT:  Good morning.  Would counsel please

3  identify themselves for the court and for the record.

4      MS. LAFAILLE:  Good morning, Your Honor.  Adriana

5  Lafaille for the petitioners.

6      MS. CANTIN:  Shirley Cantin for the petitioners.

7      MS. McCULLOUGH:  Colleen McCullough for the

8  petitioners.

9      MR. SEGAL:  Good morning, Your Honor.  Matthew Segal

10  for the petitioners.

11      MS. LARAKERS:  Good morning, Your Honor.  Mary

12  Larakers on behalf of the United States.

13      MR. WEINTRAUB:  Good morning, Your Honor.  Max

14  Weintraub on behalf of the United States.

15      THE COURT:  Okay.  Do we have Mr. Moniz, Mr. Ferreira,

16  and Ms. Rodriguez present?

17      MS. LARAKERS:  Yes, Your Honor.

18      THE COURT:  They're seated in the jury box.  There

19  were some complications or imperfections in the communication

20  between ICE and the marshals service in getting them here and

21  into the courtroom.  However, with his usual consummate

22  professionalism, Deputy Marshal Kevin Neal navigated that.  So,

23  as I ordered on Monday, those individuals are here.

24      Today happens to be Mr. Neal's last day as a deputy

25  marshal in the District of Massachusetts, hopefully only for a

1    while.  He has received what is at least nominally

2    characterized as a promotion that will take him to Rhode

3    Island.  He will be much missed personally as well as

4    professionally.  He represents the best traditions of the

5    United States Marshals Service, which does provide exceptional

6    service to the judges in the administration of justice and the

7    public in this district.

8            So it's a happy coincidence that I have this

9    opportunity to mark this milestone in his 18-year career as a

10   marshal in this district and to say we all wish him well and

11   look forward hopefully to his return.  Thank you very much.

12           And the stenographer will prepare that for the records

13   of the court.  Maybe a copy for Mr. Neal as well.  All right?

14           All right.  On my agenda as of now for today, I have

15   hearing from Mr. Bernacke regarding the decision to continue

16   the detention of Mr. Moniz.  Then I think there's a question of

17   whether I should take testimony from or regarding the three

18   aliens who are still detained as the relief or one form of

19   relief, alternative relief that the petitioners are seeking or

20   a decision by me as to whether they should be released pending

21   possible removal, removal.  And then I realized in preparing

22   for today that at the August 27 hearing and in the August 28

23   order I directed the parties to report whether ICE should be

24   allowed to remove any class member who is released from

25   detention, although they're still in custody for habeas

1      purposes as a result of the conditions on their release.

2              The parties didn't address that issue in their recent

3      submissions because none of the six aliens had been released.

4      But now three of them are being released.  So I think I want to

5      hear from you at least preliminarily on that issue, if it's

6      ICE's desire to remove individuals who have been released from

7      detention.

8              Is there anything else that ought to be on the agenda?

9              MS. LARAKERS:  Your Honor, I do have just two

10     housekeeping matters and points of clarification.  Mr. Charles

11     may have testified yesterday about an interview that was done

12     for Mr. Ferreira.

13             THE COURT:  Actually, is Mr. Charles in the courtroom?

14             MS. LARAKERS:  He is not, Your Honor.

15             THE COURT:  Let's bring him in.  I'd like him to hear

16     this, I think.

17             MS. LARAKERS:  This is clarification about his

18     testimony.

19             THE COURT:  Go ahead.  Tell me that.

20             MS. LARAKERS:  Right.  So he may have testified about

21     the interview that was done for Mr. Ferreira, and he was unsure

22     about when the interview was done, whether it was before his

23     decision to continue detention or after.  It was indeed after

24     his decision to continue detention because it was not until

25     that time that he came into compliance with obtaining a travel

1    document, and then was therefore entitled to a true 180-day

2    review.

3              THE COURT:  Excuse me.  We discussed interviews as I

4    recall that at the August 27 hearing.

5              MS. LARAKERS:  He was not one of the individuals who

6    we were discussing who was already scheduled for an interview

7    at that time.  The individuals we were discussing were other

8    individuals who were already scheduled for an interview.

9    Mr. Ferreira had not yet been scheduled for an interview

10   because he had not yet been scheduled for an interview --

11             THE COURT:  Hold on just one second.  Don't we have

12   interpreters for these people?  Are there interpreters for the

13   aliens?

14             MS. LAFAILLE:  Yes, Your Honor.  We were -- we have

15   one interpreter here today who speaks both Portuguese and

16   Spanish.

17             THE COURT:  Not simultaneously, probably.

18             MS. LAFAILLE:  Correct.  So our intention -- we

19   unfortunately were not able on the timeline to find any

20   federally-certified interpreters in Portuguese or Spanish,

21   unfortunately, for today, so our intention was to have her

22   translate the testimony.

23             THE COURT:  Okay.  Just the testimony?

24             MS. LAFAILLE:  Yes, Your Honor.

25             THE COURT:  All right.  The interpreter can be seated

1    then.

2              MS. LAFAILLE:  I'm sorry, Your Honor.  Could I have a

3    moment?

4              THE COURT:  Why don't you go ahead.

5              MS. LARAKERS:  So Mr. Ferreira was not one of the

6    individuals on August 27 who ICE had agreed was entitled to a

7    interview at the time pursuant to his 180-day review.

8    Subsequently he did become eligible for an interview, his

9    180-day review, after coming into compliance with his travel

10   document.  And then he was subsequently scheduled for an

11   interview.  That interview was done and taken into

12   consideration later by Mr. Charles but not prior to his initial

13   decision to continue detention on September 19 because I don't

14   believe the interview had happened yet.  And I think there was

15   some -- Mr. Charles was unclear about when that interview may

16   have taken place, whether it was before then, before his

17   decision, or after.

18             THE COURT:  How did he consider it?

19             MS. LARAKERS:  Your Honor, he can certainly testify to

20   that and explain that to you, but the interview had simply not

21   been done prior to the 19th, I do not believe.  And he was

22   unclear.  He knew that the interview had taken place.  He just

23   couldn't remember whether it was done before or after.

24             The second point of clarification.

25             THE COURT:  Well, let's go one at a time.

1            MS. LARAKERS:  Sure.

2            THE COURT:  Had the petitioners been informed of this

3    previously?

4            MS. LAFAILLE:  Well, Your Honor, I think Ms. Larakers

5    is -- this is essentially testimony here.  We have not received

6    any notices of interview for Mr. Ferreira.  I understand from

7    his counsel that he was interviewed after the review, the

8    September reviews took place.  But I think these are facts that

9    are relevant to November that are certainly documents that we

10   should receive.

11           THE COURT:  Are there any implications for today?

12           MS. LAFAILLE:  Today I think, on the subject of

13   interim release, Your Honor, I think it's not disputed that he

14   was not interviewed as part of his custody review, you know, so

15   I appreciate that Ms. Larakers doesn't dispute that.  And, you

16   know, I don't think he's -- I don't think the exact -- you

17   know, there are obviously a lot of underlying facts that we

18   need to get clarification on before November that I don't think

19   are central to the question of interim release today.

20           MS. LARAKERS:  Your Honor, it's undisputed between the

21   parties that we have a fundamental disagreement about when his

22   180-day review was supposed to be done.  ICE felt that he was

23   not eligible to receive a 180-day review and therefore even --

24   if petitioners agreed with us, which they do not, that he was

25   ineligible, then he would not be entitled to an interview.  So

1   it's tied up with issues that are going to be addressed at the

2   November hearing.

3           I think the parties agree that, assuming that he was

4   not eligible for 180-day review, there's no reason why an

5   interview should have been done prior to the 19th.  So I think

6   that's something that could be taken up in November.  It's

7   just, Mr. Charles obviously couldn't remember when that

8   interview was done yesterday, and I wanted to clarify that

9   point.

10          THE COURT:  All right.  And what's the second point?

11          MS. LARAKERS:  The second point is that there was

12  testimony about when Mr. Charles decided to remove the

13  petitioners as opposed to continue their detention.  And I

14  think there was some equivocation in between those decisions,

15  in part because as Your Honor may imagine, when he's deciding

16  whether to continue their detention, he's also simultaneously

17  deciding whether to remove them, because that's an essential

18  part.

19          However, the initial decision to remove petitioners

20  was done in July on or about the date that they were detained

21  or the date that they have a final order.  And petitioners

22  don't dispute that that decision to remove was made because

23  they received the justifications from Mr. Charles which was

24  from DOJ counsel that was sent to us from Mr. Charles that had

25  the short paragraph Your Honor ordered about why he decided to

1   move forward with the removal despite being eligible to pursue

2   a provisional waiver.

3           Those justifications were sent to petitioners' counsel

4   in July.  And that's when Mr. Charles made the initial decision

5   to move forward with their removal even though he may have made

6   another decision to move forward with removal and detention on

7   September 19 as this court ordered.  And I just think that

8   there was some equivocation between decision to remove,

9   decision to detain.  And I wanted to clarify that point.  But

10  certainly if Your Honor would like to examine at what point he

11  made the initial decision to move forward with removal, we can

12  certainly do that today.

13          THE COURT:  Well, do the petitioners think in view of

14  this information there's a need to have further testimony now

15  from Mr. Charles?

16          MS. LAFAILLE:  Your Honor, perhaps we could confer on

17  that between Mr. Bernacke's testimony -- after Mr. Bernacke's

18  testimony.  But I do want to emphasize all of these are, you

19  know, facts that are not fully -- you know, in petitioners'

20  possession, and I think it highlights the need for us, for

21  petitioners to be given access to some of these records that

22  keep being mentioned between now and the November hearing.

23          MS. LARAKERS:  Your Honor, I don't know what records

24  she's referring to.  There's one record of removal that was

25  provided to them in July pursuant to this court's order about

1    the removal of the aliens.  That's the record I'm talking

2    about.  If the court would like a copy of those, we can

3    certainly do that.  But it is undisputed that they received

4    those justifications by email in accordance with this court's

5    order, so I don't know what documents --

6              THE COURT:  Well, I scheduled an emergency hearing on

7    these detention issues.  I didn't know there were continued

8    discovery disputes, and I don't even know if you've conferred

9    about the disputes that seem to be emerging, but you need to.

10   As I understand, the plaintiffs are not asking -- the

11   petitioners are not asking now for further testimony of

12   Mr. Charles.  We'll see where we are later today.  That's one.

13            And two, is there any objection to Mr. Charles being

14   in here?  I think it would be useful for him, particularly if

15   the detainees testified, to hear it.  And is there a reason he

16   shouldn't hear Mr. Bernacke, too?

17            MS. LAFAILLE:  Your Honor, I think for the same

18   reasons that Your Honor issued the initial sequestration order,

19   we object to him being here for Mr. Bernacke's testimony.

20            THE COURT:  Okay.  We'll leave him outside for now,

21   but it's not -- I haven't decided that I'm going to hear any

22   testimony, although you said yesterday you would like me to.

23   We'll go one step at a time.

24            MS. LAFAILLE:  Your Honor, there are some housekeeping

25   matters with regards to the potential testimony.  I could cover

1   those --

2           THE COURT:  Cover them later.  If they're not going to

3   testify, those issues are moot.  So let's get Mr. Bernacke,

4   please.  Right there.  Why don't you leave your water bottle

5   somewhere else.

6           THE WITNESS:  Is this okay?

7           THE COURT:  Not really.

8           MICHAEL BERNACKE, Sworn

9           THE COURT:  You may proceed.

10          MS. CANTIN:  Thank you, Your Honor.

11  DIRECT EXAMINATION BY MS. CANTIN:

12  Q.   Good morning, Mr. Bernacke.

13  A.   Good morning.

14  Q.   My name is Shirley Cantin, and I have a couple of

15  questions for you today.

16      Mr. Bernacke, you were in the courthouse yesterday,

17  correct?

18  A.   Yes, ma'am.

19  Q.   Between yesterday and this morning have you discussed this

20  case with any other ICE witnesses?

21  A.   No.

22  Q.   Okay.  You are currently HQ RIO chief, correct?

23  A.   Yes, ma'am.

24  Q.   And what does HQ RIO chief stand for?

25  A.   Headquarters removal and international operations.

1    Q.    How long have you held this position?

2    A.    About two years.

3    Q.    And what are your duties and your responsibilities as HQ

4    RIO chief?

5    A.    I am responsible for supervising a staff who liaisons with

6    various embassies and consulates in Washington, D.C. and

7    outside of area to obtain travel documents.  I'm also

8    responsible for reviewing Post-Order Custody Review

9    recommendations.

10   Q.    Okay.  Are you in charge of the Boston ERO custody

11   recommendations?

12   A.    I am in charge of 44 countries.  Those countries have

13   cases that span throughout all 24 field offices in the United

14   States.  That includes Boston.

15   Q.    Who do you report to?

16   A.    I report to Nicole Wright, who is my deputy assistant

17   director.

18   Q.    And who reports to you?

19   A.    I have a number of staff, about eight detention and

20   deportation officers that I can think of offhand.

21   Q.    Does Mr. Marco Charles report to you?

22   A.    No, he does not.

23   Q.    Mr. Greenbaum?

24   A.    No, he does not.

25   Q.    Mr. Simon?

1    A.    No, he does not.

2    Q.    Does anybody at the Boston ERO report to you?

3    A.    No.   They have a different reporting chain.

4    Q.    Now, as HQ RIO chief, you're familiar with the Post-Order

5    Custody Review regulations, correct?

6    A.    Yes, ma'am.

7    Q.    And would you understand that if I referred to that as the

8    POCR regulations?

9    A.    Yes, ma'am.

10   Q.    As HQ RIO chief are you responsible for ensuring ICE's

11   compliance with Section 241.4?

12   A.    Yes, ma'am.

13   Q.    When was the last time you reviewed Section 241.4?

14   A.    Yesterday.

15   Q.    What's your understanding of the requirements of Section

16   241.4?

17   A.    241.4 outlines sort of the structure in which Post-Order

18   Custody Reviews are conducted.

19   Q.    How do you ensure compliance by ICE with Section 241.4?

20   A.    I review cases, Post-Order Custody Review cases.   I make

21   decisions in compliance with the regulations.   I weigh the

22   facts of each case in accordance with the regs.

23   Q.    And so we're clear, in your position you conduct the

24   180-day custody reviews, correct?

25   A.    Yes, ma'am.

1   Q.   How often do you conduct these 180-day custody reviews in

2   your position?

3   A.   Weekly.

4   Q.   And what percent of your time would you attribute to doing

5   the 180-day custody reviews?

6   A.   Anywhere from 10 to 20, 25 percent, rough estimate.

7   Q.   Approximately how many 180-day post custody reviews have

8   you conducted during your two years as HQ RIO chief?

9   A.   I don't know.  Many.

10  Q.   More than 25?

11  A.   Yes.

12  Q.   More than 100?

13  A.   Potentially.

14  Q.   How much -- how many would you say you conduct on average

15  per week?

16  A.   Five to ten, perhaps, less.  It depends.

17  Q.   Mr. Bernacke, what's your understanding of how the 180-day

18  post custody review process works?

19  A.   The field offices have deference in terms of conducting

20  field reviews up to, you know, 90 days to 180 days.  After that

21  the case is transferred over to headquarters.  We conduct a

22  review based on the equities of the case, the immigration

23  history, criminal history, and render a decision at the 180-day

24  mark and any subsequent reviews that occur thereafter.

25  Q.   Who makes the ultimate decision on these 180-day custody

1    reviews?

2    A.    I do.

3    Q.    Mr. Bernacke, are you familiar with the title executive

4    associate commissioner?

5    A.    I am aware of that term.

6    Q.    Who is that person?

7    A.    This is a legacy INS term.  I believe the interpretation

8    of that is the executive associate director for enforcement and

9    removal operations these days.  However, I'm not sure.

10   Q.    Okay.  So is that person you?

11   A.    No.

12   Q.    Who is that person currently at headquarters?

13   A.    I believe, if my interpretation is correct, that is Tim

14   Robbins.  He's the acting executive director.

15   Q.    Could you spell that person's last name?

16   A.    R-o-b-b-i-n-s.

17   Q.    And he is also conducting these 180-day reviews?

18   A.    I believe that authority is delegated down to my level.

19   Q.    Okay.  Is he your superior?

20   A.    He is the director of ERO.  He is the person in charge of

21   enforcement and removal operations.

22   Q.    In doing these reviews, by the time it gets to you, do you

23   receive a recommendation on whether to continue detaining a

24   person?

25   A.    Can you repeat that?

1    Q.    Yes.  When you receive a custody review file, is there a

2    recommendation made to you as to whether that person's

3    detention should continue?

4    A.    Yes, ma'am.

5    Q.    Who do you receive that recommendation from?

6    A.    The detention and deportation officer who serves as the

7    case officer for that case.

8    Q.    Is it a single person or do you receive that

9    recommendation from a panel of people?

10   A.    I receive it from a number of personnel on my team, but it

11   is a single person who is handling the case at that time.

12   Q.    So for example, do you receive those recommendations from

13   Mr. Charles?

14   A.    That case, the 180-day transfers are transferred up to

15   headquarters.  There's not necessarily a recommendation.  It is

16   a transfer that occurs from the field office.  A headquarters

17   officer, a detention and deportation officer who is assigned to

18   ICE headquarters, to my unit, reviews that case and makes a

19   recommendation.

20   Q.    So somebody in your unit makes the preliminary

21   recommendation on detention?

22   A.    Yes, ma'am.

23   Q.    It's not somebody from Boston who's making that

24   recommendation to you?

25   A.    Generally, no.

 1   Q.   Are you familiar with the title or role HQPDU director?

 2   A.   I am.

 3   Q.   What does that stand for?

 4   A.   I don't know what the acronym stands for.  I think it is

 5   the post order detention unit.  And what was the subsequent

 6   part of that question?

 7   Q.   That was the question.

 8   A.   Okay.

 9   Q.   Are you that person?

10   A.   Again, it's one of those legacy INS terms that exists

11   within the regulations that I am unsure of the definition or

12   who that title is delegated to.

13        THE COURT:  So just to clarify, when you're talking

14   about legacy INS term, are you referring to the fact that

15   before there was a Department of Homeland Security, there was

16   an Immigration and Naturalization Service --

17        THE WITNESS:  Yes, sir.

18        THE COURT:  -- in the Department of Justice?

19        THE WITNESS:  Yes, sir.

20        THE COURT:  And at the time this regulation was

21   promulgated, as you understand it, was the Immigration and

22   Naturalization Service or INS structure being referenced in

23   these regulations?

24        THE WITNESS:  Yes, sir.

25        THE COURT:  Okay.

1  BY MS. CANTIN:

2  Q.   Mr. Bernacke, how are detainees notified of their 180-day

3  custody review?

4  A.   I am aware that they are given written notice and then the

5  case is transferred up to ICE headquarters.  After that occurs

6  that's when we render the decision and the decision is

7  communicated to the detainee.

8          THE COURT:  Excuse me.  So the written notice is given

9  before the case is transferred?

10         THE WITNESS:  I believe so.  I believe so.

11 BY MS. CANTIN:

12 Q.   In connection with the 180-day review, are detainees

13 entitled to an interview?

14 A.   Pursuant to the regulations, I'm aware that they are.

15 Q.   So to be clear, the regulations require an interview in

16 connection with the 180-day review, correct?

17 A.   To my understand, yes.

18 Q.   How often does ICE conduct these 180-day interviews?

19 A.   Not often from what I'm aware of.

20 Q.   Why not?

21 A.   It's something that we have not done to my knowledge.  I

22 don't know why.

23 Q.   When was the first time ICE realized that pursuant to the

24 regulations these detainees were entitled to a 180-day custody

25 interview?

1  A.   I don't know.  For these particular detainees or just in

2  general?

3  Q.   Generally.

4  A.   Generally, I don't know.

5  Q.   When did you become or when did ICE become aware that the

6  detainees at issue here in this case should have received

7  180-day interviews?

8  A.   When did I or when did ICE?  Can you clarify that, please.

9  Q.   We can take that one at a time.  When did ICE realize?

10 A.   I don't know when ICE realized.  I realized that, I was

11 informed of that last month in September.

12 Q.   So you were informed for the first time in September 2019

13 that detainees under the regulations were entitled to a 180-day

14 interview?

15 A.   Correct.

16 Q.   Mr. Bernacke, are interviews important to the Post-Order

17 Custody Review framework?

18 A.   I believe that compliance with the regulations is

19 necessary.

20 Q.   My question is are interviews important to this process.

21 A.   Again, I believe that the compliance with the regulations

22 is necessary.

23 Q.   Based on an interview does ICE sometimes make a different

24 decision than it otherwise might make?

25 A.   Can you repeat that again.

1    Q.   Sure.  Based on an interview would ICE sometimes come to a

2    different decision with respect to that particular detainee in

3    terms of whether to release or to continue detention?

4    A.   I think it would depend if there are variances with the

5    history and the facts that are provided in the case.

6    Q.   So you would agree that an interview allows a detainee to

7    give more facts in the circumstances of their case, correct?

8    A.   I think it depends on what they attest to and whether or

9    not there is any truthfulness to what they attest to.

10             THE COURT:  Here.  I think something needs to be

11   clarified, and that is whether this is hypothetical or real.

12             Prior to whatever date in September you learned that

13   an interview was required, had you ever conducted a detention

14   review of a detainee who had been interviewed?

15             THE WITNESS:  Prior to these cases, no.

16             THE COURT:  So all of this is hypothetical.

17   BY MS. CANTIN:

18   Q.   Mr. Bernacke, in connection with the 180-day review, do

19   the detainees have an opportunity to submit documents in

20   support of release?

21   A.   They do.

22   Q.   What training have you received on the POCR regulations?

23   A.   I have received training that was provided by my division.

24   Q.   And what does that training entail?

25             MS. LARAKERS:  Objection.  Your Honor, that could

```
 1    potentially call for attorney-client privileged information if
 2    those trainings were provided by the Office of Chief Counsel
 3    from ICE.
 4               THE COURT:  Is training legal advice?
 5               MS. LARAKERS:  Yes, Your Honor.
 6               THE COURT:  Well, lay a foundation.  Who did he
 7    receive the training from, and we'll see if the requirements of
 8    the privilege are -- we'll see if the privilege is implicated
 9    and if the requirements are satisfied or met.
10               THE WITNESS:  Yes, it is conducted by ICE attorneys.
11               THE COURT:  You got this training?
12               THE WITNESS:  Yes, sir.
13               THE COURT:  When did you first get it?
14               THE WITNESS:  I believe back in 2009 when I became a
15    deportation officer.
16               THE COURT:  2009?
17               THE WITNESS:  Yes, sir.
18               THE COURT:  Who gave you the training?
19               THE WITNESS:  I don't recall the person's name.
20               THE COURT:  Do you know whether or not the person was
21    a lawyer?
22               THE WITNESS:  I do believe so.  Again, it was ten
23    years ago.
24               THE COURT:  Were you given anything to read?
25               THE WITNESS:  We were given binders of material,
```

1  training material.

2         THE COURT:  What was in the binders?

3         THE WITNESS:  Various materials all the way from bond

4  management to detention management, a plethora of topics that

5  are covered and executed by deportation officers in the field.

6         THE COURT:  Did you read everything that was in there?

7         THE WITNESS:  I did.

8         THE COURT:  And when is the last time you got any

9  training, or how often did you get training on the POCR

10  regulations?

11         THE WITNESS:  The POCR regulation training is not

12  recurring.  I have not had it.  It is something that we have --

13  we have made a recurring training for field personnel.

14         THE COURT:  I'm sorry.  Could you say that again?

15         THE WITNESS:  We haven't made that training subsequent

16  to my initial training a recurring training for field

17  personnel.

18         THE COURT:  I guess --

19         THE WITNESS:  I've only received that training once.

20         THE COURT:  In 2009?

21         THE WITNESS:  Yes, sir.

22         THE COURT:  But I thought you said it's now recurring.

23         THE WITNESS:  It is now for field personnel.

24         THE COURT:  As of when?

25         THE WITNESS:  As of when?  I believe within the past

1    three years.  I'm not sure, though.

2              THE COURT:  But you didn't get it?

3              THE WITNESS:  No, sir.  I've been at headquarters for

4    the past two years, and I have not -- I did not receive that

5    training in my last stint in the field.

6              THE COURT:  Do people in headquarters get any

7    training?

8              THE WITNESS:  Not in terms of this particular

9    training.  Our staff executes that training, along with ICE

10   counsel.

11             THE COURT:  What do you mean you execute the training?

12             THE WITNESS:  We send our personnel out to the field

13   to conduct the training.

14             THE COURT:  So your people conduct the training?

15             THE WITNESS:  Yes, sir.

16             THE COURT:  Are they all lawyers?

17             THE WITNESS:  So they go in tandem with ICE attorneys.

18             THE COURT:  Okay.  But nobody trains the trainers on a

19   recurring basis?

20             THE WITNESS:  Correct.

21             THE COURT:  And you're ultimately in charge?

22             THE WITNESS:  Correct.

23             THE COURT:  And you didn't know until this case a

24   month ago that the regulations require interviews of detainees?

25             THE WITNESS:  No, sir.

1          THE COURT:  What's that?

2          THE WITNESS:  No, sir, I was not aware.

3          THE COURT:  Why not?  Why not?

4          THE WITNESS:  I was just not aware.  It's something

5     that was not trained to me.  I had not been instructed of that.

6          THE COURT:  What's the provision of the regulation

7     that requires, provides for interviews?

8          MS. CANTIN:  I believe it's Section 241.4(i)(3), and

9     it's got the header "Personal Interview."

10          THE COURT:  I'm sorry.  It's (i)(3)?

11          MS. CANTIN:  (i)(3).

12          THE COURT:  3 looks to me to be talking about, "shall

13     advise the alien of the notice to comply."  Can you read me the

14     language?

15          MS. CANTIN:  Yes, if the HQ -- I can put it up.

16          THE COURT:  Please do.

17          MS. CANTIN:  It's my marked-up copy.

18          THE COURT:  That's all right.

19          Are we looking at 241.4?

20          MS. CANTIN:  Yes, Your Honor.  Yes.  And if I may

21     approach, I can bring up a copy.

22          THE COURT:  Okay.  I found it.

23          MS. CANTIN:  Okay.

24          THE COURT:  But you should put it up, please.

25          All right.  Why don't you go ahead.

```
 1              MS. CANTIN:  Okay.
 2    BY MS. CANTIN:
 3    Q.   Mr. Bernacke, do you see on the screen the personal
 4    interview provision of 241.4?
 5    A.   Yes, ma'am.
 6    Q.   Do you see the mention of a review panel?  Do you see
 7    that?
 8    A.   I do.
 9    Q.   I asked you about that earlier.  Who is the review panel?
10    A.   I believe it's a constitute of field personnel.
11    Q.   Excuse me?
12    A.   A constitute of field personnel.
13    Q.   Field personal?
14    A.   Field.
15    Q.   So there are people whose job titles are review panelist
16    who do the job of the review panel?
17    A.   No.  I believe they are field deportation officers who
18    constitute that review panel.  That's my understanding.
19    Q.   So they are the folks who are supposedly tasked with
20    interviewing the detainee?
21    A.   Among other things.
22    Q.   Okay.  Mr. Bernacke, I'd like to turn your attention to
23    Mr. Elton Moniz.
24              THE COURT:  Actually, just before you do that, I'm
25    sorry to interrupt, but I'm trying to understand this.  So this
```

1   section that says "Personal Interview," that's in 8 C.F.R.

2   Section 241.4, correct?

3          THE WITNESS:  Yes, sir.

4          THE COURT:  And was it your testimony that you're in

5   charge of assuring compliance for ICE with Section 241.4?

6          THE WITNESS:  Yes, sir.

7          THE COURT:  Nationally?

8          THE WITNESS:  Yes, sir.

9          THE COURT:  And you weren't aware that there was a

10  requirement in certain circumstances that the detainee be

11  interviewed?

12         THE WITNESS:  No, sir.

13         THE COURT:  Have you ever -- did you ever read these

14  regulations before they came to your attention in this case?

15         THE WITNESS:  Yes, I have read them.  I wish I could

16  commit all provisions of law to memory.  I did not have these

17  committed to memory.

18         THE COURT:  Do you have a handbook or something, a

19  manual that provides guidance?

20         THE WITNESS:  I do.

21         THE COURT:  And when is the last time you read that

22  it?

23         THE WITNESS:  I read it yesterday, as I mentioned.

24         THE COURT:  And before this case when is the last time

25  you read it?

1            THE WITNESS:  Last month when this was raised to my

2     attention.

3            THE COURT:  That's what I meant.  But before that, had

4     you read it before this all came to your attention in this

5     case?

6            THE WITNESS:  I generally read the INA, the

7     Immigration and Nationality Act, when certain -- pursuant to

8     certain circumstances and cases.  That occurs probably about

9     monthly.

10           THE COURT:  But that's the statute.

11           THE WITNESS:  Correct, in addition to 8 C.F.R.  I'm

12    subsuming both sections.

13           THE COURT:  I was asking you a different question.  Is

14    there some kind of manual that ICE produces that discusses and

15    advises on obligations under the regulations?

16           THE WITNESS:  To my awareness, no.

17           THE COURT:  There's no manual.

18           THE WITNESS:  To my awareness, no.

19           THE COURT:  Do you have any legal training?

20           THE WITNESS:  I do.

21           THE COURT:  What's your legal training?

22           THE WITNESS:  What I experienced in my basic training

23    with ERO and also in the Border Patrol Academy.

24           THE COURT:  I'm sorry.  Where?

25           THE WITNESS:   In the Border Patrol Academy.

1          THE COURT:  Okay.  But you hadn't gone to law school?

2          THE WITNESS:  No, no, sir.  I didn't realize that's

3   what you meant.

4          THE COURT:  I need to be more precise.  So there's no

5   manual that provides guidance on 241.4 for you?

6          THE WITNESS:  Not that I'm aware.  There are

7   individualized policy memos within ICE but no manual per se.

8          THE COURT:  There's individual policy guidance?

9          THE WITNESS:  To my awareness, yes.

10          THE COURT:  Where is that found?

11          THE WITNESS:  On our internal intranet.

12          THE COURT:  Have you looked to see if there's any

13   internal guidance about personal interviews?

14          THE WITNESS:  To my awareness there is not.

15          THE COURT:  Okay.  Go ahead.

16   BY MS. CANTIN:

17   Q.   Mr. Bernacke, for the 180-day custody review when do the

18   regulations require that ICE send notice of this review?

19   A.   Send notice to the alien prior to the review occurring or

20   afterward?

21   Q.   Well, first, are the detainees entitled to a notice of

22   their 180-day review?

23   A.   I believe so, I believe it occurs 30 days prior.

24   Q.   And does ICE always follow the 30-day notice procedure?

25   A.   That is something that the field generally conducts.  I'm

1   not involved in that procedure.

2   Q.   Okay.  I'd like to turn to Mr. Elton Moniz.  Mr. Bernacke,

3   you conducted a POCR review for Mr. Moniz in September of 2019?

4   A.   Yes, ma'am.

5   Q.   Is that right.  That was a 180-day custody review,

6   correct?

7   A.   I believe it was beyond the 180-day mark at that point.

8   Q.   Why were you tasked with conducting Mr. Moniz's review?

9   A.   He is a citizen national of Cape Verde as it has been

10  communicated to my unit.  I am responsible for conducting those

11  sorts of reviews for that country.

12  Q.   You're responsible for all Cape Verde detainees?

13  A.   Correct.

14  Q.   Who informed you that you would be conducting the

15  September 2019 custody review?

16  A.   I believe my staff did.

17  Q.   Who is your staff?

18  A.   Detention and deportation officer on my team.

19  Q.   And do you know who informed them?

20  A.   The field refers those cases at the 180-day or beyond

21  mark.  And we have an administrative assistant on my team who I

22  know takes those cases and assigns them out to the team.

23  Q.   This September 2019 180-day review of Mr. Moniz, you

24  understand that wasn't his first 180-day review, correct?

25  A.   Correct.

1   Q.   In fact, you conducted two prior 180-day reviews, correct?

2   A.   Yes, ma'am.

3   Q.   You conducted a 180-day review in June of 2019 this year,

4   correct?

5   A.   Yes, ma'am.

6   Q.   Did you conduct the March 2019 review?

7   A.   I'm sorry?

8   Q.   There was also a March 2019 review --

9   A.   Okay.

10  Q.   -- for Mr. Moniz.  Did you conduct that review?

11  A.   I believe so.

12  Q.   When did you learn that you would conduct the third

13  180-day review for Mr. Moniz?

14  A.   Last month, September 2019.

15  Q.   What was your understanding of the purpose of this review,

16  given that he had already had two prior 180-day reviews?

17  A.   Another 90 days had elapsed.  It was the next cadence in

18  terms of conducting the review, and it was to ascertain whether

19  or not he was amenable to release or continued detention.

20  Q.   Who if anyone did you discuss this review with?

21  A.   I discussed it with my staff.

22  Q.   Did you discuss it with Mr. Charles?

23  A.   I did not.

24  Q.   Mr. Lyons?

25  A.   I did not.

1    Q.    Anybody from the Boston ERO?

2    A.    No, ma'am.

3    Q.    Who on your staff did you discuss this review with?

4    A.    Detention and deportation officer.

5    Q.    The folks assigned to Mr. Moniz's case?

6    A.    Yes.

7    Q.    What were their names?

8    A.    Jody Scott.

9    Q.    Jody Scott?

10   A.    Jody Scott.

11   Q.    Any others?

12   A.    No -- ICE counsel, I believe.

13         THE COURT:  What was ICE counsel's name?

14         THE WITNESS:  Joan Lieberman and Krista Lesh and

15   Monica Burke as well.

16         THE COURT:  What's that?

17         THE WITNESS:  Monica Burke, the third individual.

18         THE COURT:  Who was the second one?

19         THE WITNESS:  Krista Lesh.

20         THE COURT:  How do you spell Lesh.

21         THE WITNESS:  L-e-s-h.

22         THE COURT:  Was it -- at what point in the process did

23   you talk to the lawyers?

24         THE WITNESS:  At the last month, last month prior to

25   conducting the latest custody determination.

1          THE COURT:  Prior to it?

2          THE WITNESS:  Yes, sir.

3    BY MS. CANTIN:

4    Q.   You just testified you talked to Jody Scott about the

5    September 2019 custody review?

6    A.   Yes, ma'am.

7    Q.   How long was that discussion?

8    A.   It was incremental.  It occurred over several days.  I

9    would have to say in total probably about 45 minutes to an

10   hour.

11   Q.   And this was after you received notice you would be

12   conducting the September 2019 review?

13   A.   Correct.

14   Q.   Where did you have these conversations?

15   A.   At ICE headquarters.

16   Q.   What did you two discuss?

17   A.   Equities, immigration, criminal history and the ability

18   for us to obtain a travel document.

19        Do you mind if I pour some water?

20   Q.   That's fine.

21          THE COURT:  That's fine.  We supply the water.

22          THE WITNESS:  Appreciate it.

23   Q.   Are you ready?

24   A.   I'm ready.

25   Q.   Did you understand this review was being conducted as part

1    of this ongoing litigation?

2    A.    Yes.

3    Q.    What did you understand about how this review was related

4    to this ongoing litigation?

5    A.    Can you specify a little bit?

6    Q.    Did you understand that as a result of an August 2019

7    hearing that this court had asked whether ICE would conduct

8    with an open mind this 180-day custody review hearing?

9    A.    Yes.

10   Q.    Mr. Bernacke, when was the first time you heard about the

11   Calderon class action litigation?

12   A.    I believe last month, September 2019.

13   Q.    You were not aware of this ongoing litigation prior to

14   September 2019?

15   A.    It could have been August.  However, it was just within

16   the very recent past.

17   Q.    Are you aware if anybody else at ICE headquarters was

18   aware of this ongoing class action litigation?

19   A.    My division had been informed of it.  Those include the

20   other HQ RIO chiefs from RIO and our superiors as well.

21   Q.    Mr. Bernacke, you were conducting 180-day custody reviews

22   before August and September 2019 of this year, correct?

23   A.    Yes, ma'am.

24   Q.    But you had no idea that the Calderon class action

25   litigation had been pending in this court before August or

1    September 2019, correct?

2    A.   I was not aware of that.

3    Q.   What was your understanding of when Mr. Moniz's September

4    2019 custody review had to be completed by?

5    A.   September 19 I believe was the date that we had to

6    ascertain whether or not there was the ability to remove him.

7             MS. CANTIN:  Okay.  I'd like to introduce as Exhibit 7

8    Mr. Moniz's decision to continue detention which is dated

9    September 24, 2019.

10            THE COURT:  This is admitted.

11            (Exhibit 7 admitted into evidence.)

12            MS. CANTIN:  Your Honor, may I approach?

13            THE COURT:  Yes.

14            MR. WEINTRAUB:  What exhibit number are we counting

15   this?

16            THE COURT:  7.  That's the right number isn't it?

17   BY MS. CANTIN:

18   Q.   Mr. Bernacke, do you recognize this document?

19   A.   Yes, ma'am.

20   Q.   Okay.  What is it?

21   A.   It is a continued detention letter.

22   Q.   I'm going to turn to page 2 of this document, which is

23   also on the screen.  Is that your signature?

24   A.   Yes, ma'am.

25   Q.   Okay.  And you signed that document on September 24, 2019,

1    correct?

2    A.   Yes, ma'am.

3    Q.   Did any attorneys review this document before you signed

4    it?

5    A.   Yes, ma'am, the first two pages that we're looking at.

6    Q.   Who are those attorneys?

7    A.   Mark Sauter and I believe others from the ICE legal team.

8    I am unsure of the names right now.  I don't know everybody

9    that was involved.

10   Q.   You made the decision to continue Mr. Moniz's detention,

11   correct?

12          THE COURT:  Well, all right.  You can ask it whatever

13   way you want, but I am interested in knowing who made the

14   decision.  Who made the decision?

15          THE WITNESS:  To?

16          THE COURT:  To continue detention.

17          THE WITNESS:  I did.

18   BY MS. CANTIN:

19   Q.   You made the decision to continue Mr. Moniz's detention in

20   September 2019?

21   A.   Yes, ma'am.  Yes, ma'am.

22   Q.   When did you make that decision?

23   A.   Initially September 19.

24   Q.   You made that decision on September 19, 2019?

25   A.   I issued the continued detention letter on September 24.

1  Q.   Okay.  So you made that about five days before you signed

2  this document?

3  A.   Yes, ma'am.

4  Q.   How long did you spend making the decision?

5  A.   Again, I had discussed this with my staff for about 45

6  minutes to an hour discussing the criminal history of the

7  alien, the immigration history and equities.

8       THE COURT:  Where was Mr. Moniz when you were making

9  this decision?

10       THE WITNESS:  His physical location?

11       THE COURT:  Yes.

12       THE WITNESS:  I know that he was detained within the

13  custodial purview of the Boston field office.  I don't know his

14  exact location.

15  BY MS. CANTIN:

16  Q.   How did you make your decision?

17  A.   Again, I weighed all the equities in his case.  He has a

18  family here in the United States.  He has expressed indicia of

19  wanting to rehabilitate himself.  I also took into

20  consideration things such as the availability of his travel

21  document and the fact that he has a very serious criminal

22  history.  He attempted to -- he assaulted somebody with the

23  intent to murder a person, destruction of property, et cetera.

24  Q.   We'll get to all of those factors.  Mr. Bernacke, what if

25  anything did you review in making your decision?

1  A.   I reviewed a case file that included an overview from the

2  Boston field office, a summary of his immigration and criminal

3  history in addition to equities here in the United States.

4  Q.   So you reviewed his case file.  Did you go into the ICE

5  database?

6  A.   I did not.

7  Q.   Other than his case file did you receive any other

8  documents?

9  A.   No, ma'am.

10  Q.   Did you review his POCR submissions?

11  A.   That is included in his case file.

12  Q.   Do you know when those POCR submissions were made, the

13  date of those?

14  A.   I don't recall offhand.

15  Q.   All right.  Who did you receive the case file or the

16  documents you received from, you reviewed from?

17  A.   From my staff.

18  Q.   From your staff.  Did anybody else review these documents?

19  A.   Yes.  My staff did in addition to personnel from the

20  Boston field office.

21  Q.   Who is your staff, Jody Scott?

22  A.   Yes, ma'am.

23  Q.   Who are the folks from the Boston field office that

24  reviewed the documents?

25  A.   The upper management chain, to include Marcos Charles.

1  Q.    Did Ms. Scott make a recommendation to you based on the

2  file she had reviewed?

3  A.    She did.

4  Q.    Did Mr. Charles make a recommendation?

5  A.    He did.

6  Q.    Mr. Bernacke, who drafted this notice that we have here?

7  A.    ICE counsel and my staff.

8  Q.    So you did not draft this notice?

9  A.    No, ma'am.

10 Q.    Was this notice drafted before or after you made your

11 determination on September 19?

12 A.    I believe it was after.

13         THE COURT:  You say you believe it was after.

14         THE WITNESS:  Yes, sir.

15         THE COURT:  Do you have a memory?

16         THE WITNESS:  I'm confident that it was after.

17 BY MS. CANTIN:

18 Q.    Did Ms. Scott draft this notice?

19 A.    Her and ICE counsel.

20 Q.    Is this typical practice, that others draft the notice for

21 you?

22 A.    Yes, ma'am.

23 Q.    Do you know if this draft notice or the notice is off a

24 template that ICE has?

25 A.    Not this particular -- not this particular notice.  Again,

1    this was individualized for this person.  However, I do want to

2    note that all cases are individually reviewed and the facts of

3    their cases are provided within the context of the notices.

4    Q.    Were there prior versions of this notice?

5    A.    I believe so.

6    Q.    How many prior versions of this notice for Mr. Moniz?

7    A.    I don't know.

8    Q.    Did you revise or edit this decision to continue detention

9    after you received a draft?

10   A.    No, ma'am.

11   Q.    So what if any input did you have into this document?

12   A.    I reviewed it for accuracy and signed it.  If there was an

13   issue with it, I would have flagged it and ensured corrections

14   were made.

15   Q.    I'd like to walk through this notice.  In the middle of

16   this notice, the decision to continue detention, it states

17   that, "Pursuant to 8 C.F.R. 241(i)(6), a 180-day interview was

18   conducted."  Is that right?

19   A.    Yes, ma'am.

20   Q.    Is this the first time that ICE conducted an interview for

21   Mr. Moniz in connection with his 180-day reviews?

22   A.    To my knowledge, yes.

23   Q.    Who conducted that interview?

24   A.    Personnel from the Boston field office.

25   Q.    Do you know who?

1  A.   I believe -- I know it was a deportation officer, female

2  deportation officer.  I don't remember her name.

3  Q.   Do you remember how many people were there?

4  A.   I believe two, however many the regulations provide for.

5  Q.   Do you know how long the interview was?

6  A.   I don't know.

7  Q.   Did you receive a summary of the interview?

8  A.   I did.

9  Q.   Did you review that?

10  A.   I did.

11  Q.   What did you understand the purpose of this interview to

12  be?

13  A.   To ascertain any equities, any favorable factors that

14  would provide for Mr. Moniz to stay in the United States, or to

15  be released from custody, I should say.

16  Q.   Was your decision to continue detention based on that

17  interview?

18  A.   It was based on a number of factors.  Again, it's a

19  holistic case review.  That includes immigration history, his

20  criminal history and any equities in the United States to

21  include those that were communicated orally through the

22  interview.

23  Q.   Okay.  This written notice accurately conveys the reasons

24  for your decision to continue detention; is that correct?

25  A.   Yes, ma'am.

1   Q.   And it reflects all of the factors that you considered in

2   making that decision?

3   A.   I feel it does.

4   Q.   Okay.  The notice states that "ICE acknowledges favorable

5   factors you present in favor of release."  Do you see that?

6   A.   Yes, ma'am.

7   Q.   What factors were those, the favorable factors?

8   A.   Again, the family members that he has in the United

9   States, ties to the community, his church membership, his

10  provisional waiver.  That was one thing that was in the

11  forefront of my mind, et cetera.

12  Q.   We'll get to the provisional waiver.  So in making your

13  decision, you're aware that Mr. Moniz has a U.S. citizen

14  spouse?

15  A.   Yes, ma'am.

16  Q.   For the record, she's here, Ms. Moniz is in the courtroom

17  today.  And you considered that U.S. citizen spouse, correct?

18  A.   Yes, ma'am.

19  Q.   Do you know that Mr. Moniz has a five-year-old

20  stepdaughter?

21  A.   I do.

22  Q.   And you know that Mr. Moniz is the only father this little

23  girl has ever known?

24  A.   I do.

25  Q.   Do you consider that factor?

1   A.   I did.

2   Q.   Were you aware that as a result of Mr. Moniz's detention

3   Mrs. Moniz currently has no permanent home?

4   A.   I don't recall that.  However, I am sensitive to the facts

5   of every single case I review --

6   Q.   But you didn't know that fact?

7        THE COURT:  You've got to let him finish the answer,

8   please.

9   A.   I'm sensitive to the impact of all my decisions in terms

10  of any case that I review.  Again, as I mentioned before, it is

11  a holistic case review that weighs equities, public interest

12  factors, criminal history, immigration history, availability of

13  a travel document.  You know, these decisions are not taken

14  lightly and are taken very seriously.

15  Q.   But were you aware of the fact that Mrs. Moniz and their

16  five-year-old daughter --

17  A.   Not that I recall offhand.

18  Q.   Were you aware that Mr. Moniz has an ailing mother?

19  A.   I do, I am aware of that.

20  Q.   And you considered her medical records that were submitted

21  that showed that she's struggling with depression?

22  A.   Yes, I was aware.

23  Q.   And other mental health conditions?

24  A.   Yes, I was aware she had depression.

25  Q.   Mr. Bernacke, you stated that you considered serious

1  negative factors; is that right?

2  A.  Yes, ma'am.

3  Q.  One of the factors is Mr. Moniz's criminal convictions?

4  A.  Yes, ma'am.

5  Q.  These four criminal convictions listed here, you

6  understood that was all part of one incident, correct?

7  A.  Yes, ma'am.

8  Q.  Do you know when Mr. Moniz was convicted of those crimes?

9  A.  I believe it was in December of 2016.

10  Q.  You understand that was more than four and a half years

11  ago, right, four and a half years ago?

12  A.  2016?

13  Q.  I have a different understanding of when he was -- but you

14  understand Mr. Moniz was convicted of those crimes when he was

15  19 or 20 years old; do you know that?

16  A.  I -- I wasn't aware of that offhand.  I did not recall

17  that.  I don't recall his age at this point in time.

18  Q.  Okay.  In making your decision did you consider that he is

19  in the process of appealing those convictions?

20  A.  I wasn't aware of that.

21       THE COURT:  Excuse me, Ms. Lafaille.  Put the

22  interpreter back where he was.  It's a distraction.  If you

23  want to be in this courtroom, just sit quietly and listen.

24       MS. LAFAILLE:  I'm sorry.  I apologize, Your Honor.

25  It's just to clarify.  This is Mr. Moniz's attorney.

1          THE COURT:  I'm sorry.  Whoever it is, you can sit

2     within the rail, but you can't be bouncing around because I'm

3     trying to listen to the testimony and you're very distracting,

4     so go back.

5     BY MS. CANTIN:

6     Q.   Mr. Bernacke, were you aware that Mr. Moniz served

7     approximately four years for those previous convictions?

8     A.   He served four years?

9     Q.   Correct.

10    A.   My understanding is that he was convicted in December of

11    2016 and was released to ICE custody in 2017.

12    Q.   If I can represent to you that he served four years for

13    those convictions, did you consider that fact?

14    A.   The records that were presented to me did not indicate

15    that.

16    Q.   Were you aware that while serving four years in prison

17    Mr. Moniz never got into any trouble?

18    A.   Again, I am unaware of how much time he served in custody.

19    Q.   That he never got into an altercation?

20    A.   Again, you know, the question is predicated upon him

21    serving a four-year sentence, and to my knowledge he was

22    convicted in late 2016 and released to ICE custody in 2017.

23    Q.   So you then did not consider that while serving time

24    Mr. Moniz regularly attended church?

25    A.   I don't know the relevancy of that question, to be honest,

1    because, again, it is predicated upon a four-year sentence.

2    Q.   So you did not know or consider that while he was serving

3    time, he got baptized?

4    A.   I was aware that he had been baptized, but again, this is

5    all predicated on a four-year sentence, and I don't know the

6    accuracy of that.  And I couldn't speak to any behavior that he

7    had in terms of his time serving a four-year sentence.

8    Q.   So you did not know that Mr. Moniz, while he was serving

9    time, worked while he was in prison?

10   A.   I am aware that, while in custody, he generally exhibited

11   good behavior, and I'm again going off the time in custody that

12   I am aware of, that he exhibited good behavior.  Again, he has

13   serious criminal history where he intended to kill somebody,

14   destroy property, had I believe a firearms offense, which also

15   weighed in my mind when making a custodial decision.

16   Q.   Were you aware that while in prison he received a

17   certificate of achievement for participation in the Beacon

18   program?

19   A.   I was aware of that.

20   Q.   Okay.  And you know that Beacon is a 12-session program in

21   emotional literacy that explores human behavior and choice.

22   Did you know that?

23   A.   Yes, ma'am.  However, I was not aware that -- I'm just

24   acknowledging your question.  I was not aware of the contents

25   of that course.  However, again, he is a serious criminal

1    alien, convicted of violent crimes, something that was at the

2    forefront of my mind when making a custodial decision.  I am

3    aware of his equities to include that.

4    Q.   But you were not aware of the fact that Mr. Moniz served

5    time for the convictions?

6    A.   I am aware that he served time.  It's just not the

7    four-year sentence that you represented.

8    Q.   Were you aware that while serving time Mr. Moniz also

9    completed the Correctional Recovery Academy program?

10   A.   I don't recall.

11   Q.   You've reviewed his POCR submissions, correct?

12   A.   I did, but I don't recall that offhand.

13   Q.   But you don't recall that, okay.  You understand that the

14   Correctional Recovery Academy is geared toward reducing

15   recidivism.

16   A.   I'm not aware of that.

17   Q.   Did you consider that fact in your decision that Mr. Moniz

18   is trying to rehabilitate?

19   A.   Again, I don't recall him taking that course.  It's not

20   something that I committed to memory.  However, I can say that

21   I considered the positive factors in his case when making a

22   decision.

23   Q.   You're aware that Mr. Moniz has been detained with ICE

24   since December of 2018, correct?

25   A.   Yes.  I believe actually it was 2017 that he was released

1  to our custody.

2  Q.   You believe it was December 2017 that he's been in ICE

3  custody?

4  A.   I don't know the month.  I just know that he came into ICE

5  custody in December of 2017 per the records that I can recall

6  offhand.

7  Q.   Are you sure that he was -- is that your testimony, that

8  he was released to ICE?

9  A.   I believe so, but again, again I'm not entirely 100

10  percent sure.

11  Q.   So you don't know one way or the other?

12  A.   As I mentioned before, my recollection of the record is

13  that he was convicted in December of 2016 and was released to

14  ICE custody in 2017.  I think I mentioned that previously in

15  response to your questions.

16  Q.   Since being in ICE detention, have you considered Mr.

17  Moniz's good behavior in detention?

18  A.   Like I mentioned, I have considered all the positive

19  equities in his case.

20  Q.   So you understand that he has cooking responsibilities in

21  detention?

22  A.   I don't recall that offhand.  I don't have that committed

23  to memory at this time.

24  Q.   You understand that he has cleaning responsibilities while

25  he's in detention?

1  A.   I don't have that committed to memory.

2  Q.   You understand that due to his good behavior that he has

3  his own cell; he doesn't have to share a cell?

4  A.   Again, I don't have that committed to memory, and I

5  considered all the positive equities in this case.

6  Q.   You understand that the correctional facility that he was

7  serving his time in, Mr. Moniz was released a few months early

8  due to good behavior.  Did you consider that?

9  A.   Again, I considered all the positive equities in his case

10  that I was aware of.

11  Q.   In this notice, this paragraph that says, "In addition

12  to," talks about the travel document.  This statement says, "In

13  addition to determining that your release would pose a danger

14  to the community and the safety of others, ICE has determined

15  that you are not suitable for release because ICE is currently

16  working with the government of Cape Verde to secure a travel

17  document."  Did you write this sentence?

18  A.   I did not write that sentence.

19  Q.   What does "not suitable for release" mean?

20  A.   He is not, in ICE's opinion, amenable to being released

21  because he presents a danger to the community.

22  Q.   Focusing on just the travel document, so you didn't have

23  the authority to release Mr. Moniz, right, because of the

24  likelihood of the travel document?

25  A.   Both factors.  Again, you know, it's a holistic approach

1    to case management in making a custody determination.  We take

2    a look at the positive equities, whether or not there is a

3    public interest for this individual to be released, the

4    availability of a travel document and his criminal history.

5    Q.    Mr. Bernacke, in making your decision you never spoke to

6    Mr. Moniz, correct?

7    A.    No.

8    Q.    Never spoke to Mrs. Moniz, correct?

9    A.    No, ma'am.

10   Q.    You never spoke to anybody from Mr. Moniz's family before

11   about the case, correct?

12   A.    No, ma'am.

13   Q.    All right.  Mr. Bernacke, you mentioned the provisional

14   waiver process.  Do you recall that?

15   A.    I think I mentioned the provisional waiver but not the

16   process.

17   Q.    Okay.  Are you familiar with the provisional waiver

18   process?

19   A.    In a rudimentary sense.

20   Q.    What's your understanding of what that process is?

21   A.    It is contingent upon the filing of an I-130, I believe

22   also an I-601 or I-212, whether or not the individual has been

23   selected for a diversity visa, the amount of time they've

24   accrued with the unlawful presence here in the United States,

25   and some other factors that I'm not aware of offhand.

1    THE COURT:  Excuse me.  Is that -- when did you

2    develop that understanding of the provisional waiver process,

3    before you became alerted to this case or since?

4    THE WITNESS:  Since I became alerted to it.  I've

5    known about I-601s and I-212s in the past as that is a question

6    that frequently comes up with individuals who are subject to

7    removal.  So I had a very nascent understanding of the process

8    but a little bit more fidelity at this point in time.

9    THE COURT:  Well, you may want to pursue that.  Go

10   ahead, or not.

11   BY MS. CANTIN:

12   Q.   What's your understanding of the purpose of the

13   provisional waiver process?

14   A.   It's to waive the removability of an individual so they

15   could re-enter the United States or potentially stay here if

16   they're currently present.  Also to ensure family unification

17   during the pendency of an immigrant visa.  That way consulate

18   processing is no longer necessary.

19   Q.   Could you remind me, what did you just testify to, when

20   was the first time you heard about the provisional waiver

21   process?

22   A.   When I first became a deportation officer.  I would have

23   to say around 2009.

24   Q.   And when did you hear about it again in connection with

25   this litigation?

1    A.    Last month.

2    Q.    You testified earlier that you considered Mr. Moniz's

3    pursuit of the provisional waiver process in making this

4    decision to continue detention; is that right?

5    A.    Correct.

6    Q.    Where is that consideration reflected in your decision to

7    continue detention?

8    A.    I would say -- if you can move the paperwork up a little

9    bit.  It would be in the paragraph that starts with, "ICE

10   acknowledges the favorable factors present in favor of your

11   release."  I think that's subsumed in that paragraph.

12   Q.    Do you know if Mr. Moniz has applied for an I-130?

13   A.    I am aware of that.

14   Q.    Did you consider that?

15   A.    Yes.

16   Q.    Do you know if Mr. Moniz's I-130 has been approved?

17   A.    I don't know the status of the I-130 at this point in

18   time.

19   Q.    You don't know that?

20   A.    No, ma'am.

21   Q.    You don't understand that I-130 is the first step in the

22   provisional waiver process?

23   A.    Yes, ma'am.

24   Q.    Do you know whether Mr. Moniz has applied for an I-212?

25   A.    I don't know that.

1    Q.    Do you know whether Mr. Moniz has an approved I-212?

2    A.    I don't know.

3    Q.    Do you know whether Mr. Moniz has applied for an I-601A?

4    A.    I don't know.

5    Q.    So you don't know whether he has an approved I-601A?

6    A.    No, ma'am.

7    Q.    You say you considered the provisional waiver process that

8    Mr. Moniz is embarking on.

9    A.    Yes, ma'am.

10   Q.    But you don't know what stage of the provisional waiver

11   process he's at, correct?

12   A.    I do not.  I do know that he is seeking one.

13   Q.    Mr. Bernacke, what training if any have you received on

14   the provisional waiver process?

15   A.    None.

16   Q.    What training have you provided on the provisional waiver

17   process?

18   A.    None.  It's something that's adjudicated by USCIS and

19   tangentially associated with ICE, which is why there is a lack

20   of availability of training.

21   Q.    Mr. Bernacke, did Mr. Moniz receive a 90-day review?

22   A.    I believe so.

23   Q.    Did ICE give Mr. Moniz notice of that review?

24   A.    That's something within the jurisdiction of the Boston

25   field office.  That's something that I don't control or manage,

1    so I'm unaware.

2    Q.   So you do not know?

3    A.   Yes.

4    Q.   So you're not aware that Mr. Moniz was given notice of his

5    90-day review nearly 90 days before the review occurred?

6    A.   I was unaware of that.

7    Q.   As you sit here today, do you have the authority to

8    release Mr. Moniz?

9    A.   Yes.

10   Q.   Mr. Bernacke, are you aware that last year this court,

11   Judge Wolf, concluded that there were systemic violations of

12   Section 241.4 by ICE?

13   A.   I am aware.  I think those were within the scope of the

14   Boston field office.

15   Q.   What is your understanding of the violations that this

16   court found last year?

17   A.   My understanding is that there were late notices to the

18   individuals, to the detainees, that the 90-day notices were

19   also I believe issued late as well.

20   Q.   Did you read this court's June 11, 2018 order regarding

21   the violations of the POCR regulations?

22   A.   Yes, ma'am.  Yes, ma'am.

23   Q.   You read it?

24   A.   Yes, ma'am.

25   Q.   When did you read that order?

1    A.    Yesterday.

2    Q.    Before yesterday had you ever read that order?

3    A.    No, ma'am.

4    Q.    Were you involved in the decision last summer to release

5    dozens of people who were deprived of the reviews required by

6    241.4?

7    A.    If I could, I just want to indicate, for the order that

8    you just mentioned, the June 2018, I'm unsure of the month.  I

9    do want to clarify that.  I don't recall when the order was

10   issued.

11   Q.    Do you recall reading an order about violations of POCR

12   regulations?

13   A.    I do, with a Brazilian national who was arrested at the

14   USCIS office, if that's the same one that you're referring to.

15            THE COURT:  I believe it is.

16   Q.    I apologize.  Did you answer the question, were you

17   involved in the decision last summer to release dozens of

18   people who were deprived of the reviews guaranteed by 241.4?

19   A.    Not that I recall.

20   Q.    Is it appropriate for ICE to take action in response to

21   violations of 241.4?

22   A.    I believe it is ICE's obligation to correct actions where

23   some level of impropriety was found, or I guess erroneous

24   application of law.

25   Q.    After the court found those violations in June 2018, what

1  corrective action if any did ICE take to rectify those

2  violations?

3  　　　　MS. LARAKERS:  Objection.  There has not been a

4  foundation laid for that because he didn't testify about even

5  knowing or being involved in any process after those POCR --

6  after this court's order.

7  　　　　THE COURT:  I thought his testimony was that he's

8  responsible within ICE for assuring compliance of 241.4.

9  　　　　MS. LARAKERS:  Yes, he is, Your Honor, but he didn't

10  testify -- I think her question assumes that he knew about this

11  court's order prior to when he stated he did.

12  　　　　THE COURT:  Why don't you amplify the foundation,

13  please.

14  BY MS. CANTIN:

15  Q.  Mr. Bernacke, you testified earlier that you're the person

16  at ICE headquarters responsible for ensuring compliance with

17  241.4, correct?

18  A.  I am one of the people, again, as I mentioned prior, in

19  prior questions, I am responsible for 44 countries, for removal

20  responsibilities and case management responsibilities for 44

21  countries.  I don't recall the nationals subject to that order

22  being within my custodial purview at ICE.  I think they were

23  all handled at the Boston field office level.  So no, I was not

24  involved in that to my recollection.

25  Q.  Since then you've become aware that that court found

1    violations of 241.4 last summer?

2    A.    Yes, ma'am.

3    Q.    Are you aware of any corrective action that ICE has

4    undertaken to remedy those violations?

5    A.    Again, that was within the purview of the Boston field

6    office.  I do not work for the Boston field office, so I am

7    unaware.

8    Q.    So you were unaware?

9    A.    Yes, ma'am.

10   Q.    So headquarters did not do anything in response to the

11   court's order finding violations of 241.4?

12   A.    I couldn't tell you.  Again, it was within the Boston

13   field office.  I don't manage the Boston field office.  So if

14   any remediative actions were taken at ICE headquarters, I was

15   not involved.

16   Q.    Who at the Boston ERO, if anybody, would have been

17   responsible for rectifying those violations?

18   A.    I have to imagine the chain of command at the management

19   team at the Boston field office.

20   Q.    Is that Mr. Charles?

21   A.    He is one of those individuals.

22   Q.    Is it Mr. Lyons?

23   A.    He is one of those individuals as well.

24   Q.    Is there anybody above Mr. Charles that would have been

25   responsible for taking corrective action?

1    A.   Not at the Boston field office, no.

2    Q.   Are you aware that other judges in the District of

3    Massachusetts have found that violations have occurred with

4    respect to 241.4?

5    A.   I was unaware of that.

6    Q.   Has anybody -- have you ever been reprimanded or

7    disciplined in connection with these findings of violations?

8    A.   No, ma'am.

9    Q.   Are you aware of anybody else at ICE headquarters that has

10   been reprimanded or disciplined in connection with these POCR

11   violations?

12   A.   I'm unaware.

13   Q.   Are you aware that there is a present show cause motion

14   pending that the petitioners have filed?

15   A.   I'm unaware of that.

16   Q.   Are you aware that one year later petitioners allege that

17   ICE continues to systematically violate Section 241.4?

18   A.   Yes.

19   Q.   When did you become aware of petitioners' contentions that

20   ICE continues to systematically violate Section 241.4?

21   A.   September 2019.

22   Q.   When you were ordered to redo the custody review of

23   Mr. Moniz?

24   A.   When I -- when I became aware of the litigation that he is

25   involved in.

1    Q.   What's your understanding of the violations that

2    petitioners are currently alleging to have occurred with

3    respect to the six detainees?

4    A.   As far as I know -- I am unaware of the specifics right

5    now.  I really couldn't tell you with any degree of certainty.

6    I know the interview process is involved with that, but I don't

7    know the specifics of the other allegations at this point in

8    time --

9    Q.   But you understand -- I apologize.  Please continue.

10    A.   No.  I just don't have them committed to memory.

11    Q.   So you understand ICE violated the interview requirement

12    in connection with the 180-day custody review?

13    A.   I am aware that is an allegation.

14    Q.   No interviews occurred, right?

15    A.   To my knowledge, no.

16    Q.   After receiving notice that petitioners have alleged

17    systematic violations, did you investigate any of petitioners'

18    claims?

19    A.   Can you specify a little bit, please?

20    Q.   Sure.  After you became aware that petitioners have

21    alleged ICE is systematically violating the 180-day custody

22    review process, did you investigate any of petitioners' claims?

23    A.   If there's an allegation of wrongdoing, it's not within my

24    jurisdiction to do that.  We have an Office of Professional

25    Responsibility internal affairs department that addresses those

1  sorts of violations.

2  Q.   Even though you're the person responsible for ensuring

3  that ICE is complying with these POCR regulations?

4  A.   Again, this is a -- can you specify a little bit before I

5  answer that?

6  Q.   Sure.  You said there is somebody else at ICE whose

7  responsibility it is to deal with these contentions, but you

8  also testified that you're the person at ICE headquarters that

9  is responsible for ensuring that ICE is complying with the POCR

10  regulations.

11  A.   Right.  I believe these are allegations at this point in

12  time.  There hasn't been a finding of any wrongdoing, so I

13  don't believe that corrective action has been taken as a result

14  of that.

15  Q.   Are you aware of anybody at ICE headquarters that is

16  looking into whether these violations have been regulated?

17  A.   I'm not aware, no.

18       THE COURT:  Can I get something clarified?  You

19  mentioned an Office of Professional Responsibility, right?

20       THE WITNESS:  Yes, sir.

21       THE COURT:  Is it the duty of the Office of

22  Professional Responsibility to decide whether a particular

23  officer or employee of ICE engaged in some misconduct and then

24  decide what sanction if any should be imposed?

25       THE WITNESS:  Correct.  That's my understanding.

1          THE COURT:  And is it called OPR?

2          THE WITNESS:  Yes, sir.

3          THE COURT:  Okay.  So is OPR's -- does OPR focus on

4     discrete possible violations by individuals?

5          THE WITNESS:  That is my understanding, yes.

6          THE COURT:  Okay.  But with regard to whether there

7     should be training or additional training, is that the

8     responsibility of OPR?

9          THE WITNESS:  I'm sure that could be a finding that

10    results from one of their investigations.

11         THE COURT:  Additional training for a particular

12    individual?

13         THE WITNESS:  Yes, sir.

14         THE COURT:  But what about systemic improved training;

15    is that OPR's responsibility?

16         THE WITNESS:  I think it depends on the scope, if it's

17    a team of employees, small team of employees, or if it's bigger

18    than that.

19         THE COURT:  And if it's bigger than that, whose

20    responsibility is it to train officers to comply with the law?

21         THE WITNESS:  I don't know if I understand your

22    question, sir.

23         THE COURT:  Well, let me make it a little more

24    concrete.  Do you understand a regulation is a law?

25         THE WITNESS:  It is a regulation derived from statute.

```
 1                THE COURT:  I'm telling you.

 2                THE WITNESS:  Yes.

 3                THE COURT:  I'll help you.

 4                THE WITNESS:  Okay.  Thank you.

 5                THE COURT:  Did you also read my September 2018

 6    decision in this case?

 7                THE WITNESS:  Was that a verbal decision, oral

 8    decision?

 9                THE COURT:  It was verbal, then it was written.

10                THE WITNESS:  Okay.  Yes, I did.

11                THE COURT:  And do you remember I reiterated the fact

12    that a regulation is a law?

13                THE WITNESS:  Correct.

14                THE COURT:  So if a person violated a regulation, he

15    violated the law.  Do you understand that?

16                THE WITNESS:  Yes, sir.

17                THE COURT:  And if -- and do you understand that

18    Section (i)(3)(1) requires a personal interview in certain

19    circumstances?

20                THE WITNESS:  I do understand that.

21                THE COURT:  And it was your testimony that until this

22    case came to your attention about a month ago, no such

23    interviews were conducted by ICE?

24                THE WITNESS:  Correct.

25                THE COURT:  And whose responsibility at ICE is it to
```

1  rectify that?

2       THE WITNESS:  The management leadership team at ICE,

3  director on down.

4       THE COURT:  Do you have responsibility for that?

5       THE WITNESS:  I do.

6       THE COURT:  Have you initiated any action to keep the

7  people under your supervision from repeatedly violating the

8  law?

9       THE WITNESS:  I have discussed potential policy

10  rectifications issues with counsel.  Those are currently a

11  deliberative process at this point in time.

12       THE COURT:  But you haven't done anything -- have you

13  done anything else?

14       THE WITNESS:  Not yet, no.

15       THE COURT:  So as far as you know, everybody under

16  your supervision continues to violate the law by not giving

17  these personal interviews when the regulation requires them?

18       THE WITNESS:  We are continuing with past practice at

19  this point in time.

20       THE COURT:  You made a decision to detain -- to detain

21  some of the aliens in this case and other aliens over the years

22  because they broke the law, correct?

23       THE WITNESS:  Correct.

24       THE COURT:  And you read my June 2018 decision where I

25  found that ICE in Boston was ignorant of the requirements of

1    the POCR regulation and violating the law repeatedly, correct?

2              THE WITNESS:  Correct.

3              THE COURT:  And do you understand that my

4    understanding of your testimony today is that you and everybody

5    you're responsible for supervising has been violating this law

6    that requires personal interviews in certain circumstances?

7              THE WITNESS:  As I mentioned, we are taking steps to

8    rectify the issue.

9              THE COURT:  Well, actually you didn't say that.  You

10   said you spoke to counsel.

11             THE WITNESS:  Again, to initiate a process to rectify

12   the issue.

13             THE COURT:  Have you sent a notice out to all of your

14   people saying that if an alien is not recommended for relief, a

15   relief panel should personally interview the detainee?

16             THE WITNESS:  At this point in time, no.  Again, I

17   mentioned that we are taking steps to rectify the issue.

18             THE COURT:  What steps?

19             THE WITNESS:  We're taking steps to take another look

20   at the regulation.  Again, I don't know how much I can mention,

21   as it's all deliberative at this point in time.

22             THE COURT:  Well, talking to lawyers is not a step to

23   rectify it.

24             THE WITNESS:  There are implementation procedures that

25   we have to go about.  That includes training, that includes

```
1    guidance to the field, guidance to headquarters, et cetera.
2         THE COURT:  You haven't provided any guidance to the
3    field?
4         THE WITNESS:  Not yet, no.
5         THE COURT:  So you've read this regulation now.
6         THE WITNESS:  Yes, sir.
7         THE COURT:  And have you discussed it with counsel?
8         THE WITNESS:  Yes, sir.
9         THE COURT:  And do you think you have an understanding
10   of it now?
11        THE WITNESS:  Yes, sir.
12        THE COURT:  And about how many detainees a week or a
13   month would you say are entitled to interviews under the
14   regulation, roughly?
15        THE WITNESS:  It would be a shot in the dark if I were
16   to estimate that number, sir.
17        THE COURT:  Why?
18        THE WITNESS:  Again, I only handle 44 countries.
19   There's about 200 countries on the planet.
20        THE COURT:  So for your 44 countries, about how many a
21   week or a month would it be?
22        THE WITNESS:  I believe I mentioned earlier anywhere
23   from less than five to ten a week.
24        THE COURT:  Okay.  So let's say it's five a week,
25   minimum.  So that's at least 20 a month, right?
```

1             THE WITNESS:  I believe so.

2             THE COURT:  And you learned about this regulation

3    about a month ago, right?

4             THE WITNESS:  Yes, sir.

5             THE COURT:  So is it essentially correct for me to

6    understand there are probably at least 20 people whose legal

7    rights have been violated in the last month and you haven't yet

8    taken any steps to stop that?

9             THE WITNESS:  I believe I mentioned that we -- I have

10   taken steps to ameliorate that situation.

11            THE COURT:  Well, have you communicated -- you've had

12   discussions that should lead to a process to send -- you know,

13   to provide the interviews.  Is that what I should understand?

14            THE WITNESS:  I don't know how much specificity I can

15   get into --

16            THE COURT:  Look, if your lawyers want to assert a

17   deliberative process privilege, I know what a deliberative

18   process privilege is.  I'm not asking you what your

19   communications were to lawyers or others at ICE.  I'm asking

20   about what's been done.

21            THE WITNESS:  We have not effectuated any change at

22   this point in time.

23            THE COURT:  And I think you may have been asked this

24   before.  It says, "If the HQPDU director does not accept the

25   panel's recommendation to grant release after a records review

1  or if the alien is not recommended for release, a review panel

2  shall personally interview the detainee."  Who is the HQPDU

3  director?

4        THE WITNESS:  Again, I think I mentioned that that was

5  a legacy INS term.  In this case I made the custody decision

6  for Mr. Moniz.

7        THE COURT:  Okay.  So is it your understanding that

8  for the purposes of this regulation you're the HQPDU?

9        THE WITNESS:  For the purposes of this case, yes.

10        THE COURT:  And is there a review panel to personally

11  interview detainees?

12        THE WITNESS:  I believe the regulation states that

13  it's professional members of the service.  So I believe those

14  can be identified amongst any ICE personnel who is involved and

15  has the legal authority to conduct these sorts of reviews.

16        THE COURT:  You think there's another part of the

17  regulation that defines the review panel?

18        THE WITNESS:  I think it's part of the same sentence

19  in that particular section of the regulations.

20        THE COURT:  You may continue.

21  BY MS. CANTIN:

22  Q.   Picking up where the court left off, I had a few more

23  questions just about the review panel.  Is the review panel

24  consistent -- should it consist of people at the Boston ERO or

25  people at headquarters?

1    A.    I don't believe that I'm in a position to recommend who

2    the personnel are.  Regulations provide for professional staff

3    of the service.  I think that is the verbiage in the

4    regulation.  I don't know if I'm in a position to make a policy

5    call on that.

6    Q.    So you don't know who the review panel is; is that right?

7    A.    For purpose of this case or in general?

8    Q.    For the purposes of the regulations.

9    A.    Again, it's professional staff of the service.  That's

10   what the regulation provides for.

11   Q.    Is it your position that ICE hasn't complied with Section

12   241.4?

13   A.    I believe that is the allegation.  Again, as I mentioned

14   earlier in testimony, I think federal agencies are subject and

15   should comply with regulations.

16   Q.    Has ICE complied with Section 241.4?

17   A.    I believe that is currently being litigated in court, so

18   I'm not really in a position to make that determination.

19   Q.    ICE doesn't have the ability to comply with Section 241.4,

20   correct?

21   A.    Again, again, that is something that we are taking steps

22   to ameliorate.  That's my answer.

23   Q.    Are you aware the court held an August 27, 2019 hearing in

24   this case?

25   A.    I'm unaware of that.

1    Q.   So you're not aware that after that hearing the court

2    expressed a tentative view that ICE had in fact committed

3    violations of the POCR regulations?

4    A.   Again, I don't recall that offhand.  I may have read it

5    somewhere, but I don't recall that offhand.

6    Q.   So you were not disciplined or reprimanded at any point in

7    connection with those tentative findings from August 2019,

8    correct?

9    A.   No.

10   Q.   Just two final questions, Mr. Bernacke.  What is Heath

11   Simon's position at the Boston ERO?  Excuse me, headquarters.

12   A.   He's unit chief.

13   Q.   What does that mean?

14   A.   Supervisor to detention and deportation officers.  He

15   holds the same position I do.

16   Q.   So he's your counterpart?

17   A.   He is.

18   Q.   And Mr. Greenbaum's position?

19   A.   He is -- at the time he rendered the decision in this case

20   he was acting unit chief.  Again, one of my counterparts.

21           MS. CANTIN:  Pass the witness.

22           THE COURT:  Okay.  It's 12:45.  Would counsel like to

23   at least begin examining?  Do you have any questions?

24           MS. LARAKERS:  Yes, Your Honor.  Just a few.  I think

25   we can wrap it up.

1          THE COURT:  Okay.

2    CROSS-EXAMINATION BY MS. LARAKERS:

3    Q.   Okay.  Mr. Bernacke, you're seeing what's been marked as

4    Exhibit 7.  If you see in the paragraph that starts, "However,"

5    it says that "ICE also notes the serious negative factors that

6    weigh in favor of continued detention and demonstrate that your

7    release would pose a danger to the community and to the safety

8    of others."

9    A.   Yes, ma'am.

10   Q.   Is that a determination that you made?

11   A.   It is.

12   Q.   And why did you make that determination?

13   A.   Due to his criminal record.  He was convicted of, as it

14   states in the paragraph, armed assault with intent to murder,

15   assault with a dangerous weapon, two counts, possession of a

16   firearm without an FID card.

17          THE COURT:  Here.  This all has to be written down, so

18   speak more slowly and more clearly, please.

19          THE WITNESS:  Yes, sir.  Will do.

20   A.   So the paragraph which I concurred with states that the

21   individual, that Mr. Moniz has a criminal record that includes

22   convictions for armed assault with the intent to murder,

23   assault with a dangerous weapon, which is two counts,

24   possession of a firearm without an FID card and malicious

25   destruction of property.

1   Q.   Do the regulations permit you to release someone if you

2   believe they are likely to pose a threat to the community

3   following release?

4   A.   No.  And it also bars me from releasing individuals who

5   are violent, and I would say that in my judgment that these are

6   violent crimes.

7   Q.   Do you know if Mr. Moniz had a pending Form I-130

8   application when you were making the decision to detain him?

9   A.   Yes, I was aware that he had a provisional waiver pending.

10  Q.   Does the fact that he had a pending I-130 reflect a

11  manifestation of the public interest in your opinion?

12  A.   It does.

13  Q.   Then did you consider the public interest when deciding

14  whether to detain Mr. Moniz?

15  A.   I did.  Again, as I mentioned before, I considered the

16  fact that he has an ailing mother, he has a U.S. citizen

17  spouse, child, that he has been baptized into a church and is

18  attending church, a number of factors that were elaborated

19  upon.

20       I feel that public interest is sort of a two-way street in

21  that the public interest would not be served if a violent

22  criminal was released pending removal from the United States.

23  Q.   Does the stage in Mr. Moniz's provisional waiver process,

24  would that have impacted your decision to detain him?

25  A.   Again, I take a holistic approach towards these decisions

1    where I'm looking at all the facts of the case.  That includes,

2    you know, the presence of a provisional waiver.  If the waiver

3    had been granted and posed to be an impediment to removal,

4    obviously I would have released that person, allowed that

5    person to adjust status.

6            MS. LARAKERS:  Okay.  That's all I have, Your Honor.

7            THE COURT:  Is there any further direct?

8            MS. CANTIN:  Very few short questions, Your Honor.

9    REDIRECT EXAMINATION BY MS. CANTIN:

10   Q.   Mr. Bernacke, you think that Mr. Moniz poses a danger to

11   the community, correct?

12   A.   Yes.

13   Q.   You understand he served time for his convictions,

14   correct?

15   A.   I do.

16   Q.   You understand that our state prison system released

17   Mr. Moniz, correct?

18   A.   I do.

19   Q.   You understand that he was released one to two months

20   early, in advance of when he was supposed to be released, for

21   good behavior, correct?

22   A.   I do.  However, the regulations do not permit me to

23   release a violent individual, and I do believe that he does

24   pose a danger to the community.  These convictions occurred

25   less than three years ago.

1    Q.   You testified that you considered the provisional waiver

2    process in your decision to continue detention, correct?

3    A.   Yes, ma'am.

4    Q.   You knew that the completeness of your custody review

5    would be at issue today, correct?

6    A.   Correct.

7    Q.   You knew you would be testifying about whether you took a

8    holistic approach to that review, correct?

9    A.   Correct.

10   Q.   You studied Mr. Moniz's file yesterday, correct?

11   A.   I reviewed it during the custody decision that I made at

12   the time.

13   Q.   Did you study his file yesterday?

14   A.   I reviewed it.

15   Q.   You looked at your decision again, correct?

16   A.   Yes, ma'am.

17   Q.   You assessed where the provisional waiver would fit into

18   that letter, correct?

19   A.   I did, at the time that I made the custody determination.

20   Q.   At the time you made the custody review determination, you

21   considered the provisional waiver?

22   A.   Yes.  I also considered his criminal history, which is

23   very serious.

24          MS. CANTIN:  No further questions, Your Honor.

25          THE COURT:  All right.  Thank you.  Your testimony is

1    complete.  You're excused from the courtroom, but you shouldn't

2    leave.  And you're still subject to the sequestration order,

3    the order I issued that directed you not to tell anybody what

4    you were asked or what you answered in this testimony.  Okay?

5              THE WITNESS:  Sounds good.  Thank you.

6              THE COURT:  All right.  How do the parties each

7    propose we proceed from here after lunch?

8              MS. LARAKERS:  So Your Honor, I think we've now heard

9    from two witnesses who have established at this juncture that

10   the threshold question that you had yesterday about whether

11   they considered the public interest about whether they made

12   their decision in good faith on September 19 to continue the

13   detention, we've heard testimony about that and the answer to

14   that question --

15             THE COURT:  There's also another issue that I hadn't

16   been aware that has been emerged, and that is, if they didn't

17   follow the right process, the legally required process -- and I

18   don't know how this applies to any particular person, but if

19   you consider the right fact -- the findings of fact and

20   conclusions of law and if you don't follow the law that's

21   intended to generate information so a properly informed

22   decision can be made and then a court can defer to the

23   decision, that's an issue to be dealt with.  And I didn't

24   anticipate it, so I haven't thought it through, but anyway, go

25   ahead.

1          MS. LARAKERS:  So Your Honor, with regard to that

2     question, that is a question that needs to be addressed at the

3     November hearing because it goes to whether the right remedy is

4     release at that November hearing.

5          But here, where this particular motion is about

6     whether ICE did the process that this court ordered it to do on

7     September 19, which included, in Mr. Moniz's case, an interview

8     since ICE had failed to provide that before, you just heard

9     testimony that ICE did provide that interview.  ICE did

10    consider the public interest in deciding to detain him.  ICE

11    did consider that he had a pending I-130 as part of a

12    provisional waiver process.  And ICE determined that it could

13    not release him based on the fact that it determined that he

14    was a threat to public safety.  And based on that testimony,

15    that threshold question that this court had yesterday is

16    satisfied:  ICE did conduct the review with regard to Mr. Moniz

17    in good faith, with regard to Ms. Rodriguez in good faith, with

18    regard to all of the individuals that ICE decided not to

19    release.

20         THE COURT:  Okay.  So you think I should not hear any

21    testimony from the detainees?

22         MS. LARAKERS:  No, Your Honor.  Not only do I think

23    that that's not appropriate at this stage because petitioners'

24    allegation here is that ICE didn't conduct a good faith review

25    that this court ordered and their second allegation being that

1  they are likely to succeed on the merits of their claim that

2  the remedy is release and because they would have to meet that

3  burden.

4           THE COURT:  I think they're discrete issues.  They

5  would have to show there's a reasonable -- if we put this in

6  the preliminary injunction/temporary restraining order

7  framework, they'd have to show there's a reasonable likelihood

8  they'll succeed on the merits of their claim that for a

9  particular detainee there's been a violation of the POCR

10  regulations and there's the threat of imminent irreparable

11  harm.  And then I have to consider the public interest, which

12  -- the public interest, but if there's a reasonable likelihood

13  of success on the merits -- well, a balance of hardships, the

14  conventional factors.  If there's a reasonable likelihood of

15  success on the merits and a threat of imminent or ongoing

16  irreparable harm, then I would have to decide what is the

17  equitable remedy.  And I think one of the things they're asking

18  for is release, and another thing they're asking for is that I

19  conduct the bail -- the detention decision de novo myself.

20           So let me see what the petitioners -- how the

21  petitioners think we ought to proceed in the circumstances.

22  Well, go ahead.

23           MS. LARAKERS:  So in that context, in that framework

24  that you're looking at, you're right; they not only would have

25  to show that they're likely to succeed on the merits of their

1   claim that there's been a violation of the POCR regulations but

2   also that the proper remedy for these three individuals here

3   would be release or bail hearing.  And what this court has just

4   heard in the testimony is that even if there were public

5   interest present in their cases that ICE, under the

6   regulations, was not permitted to remove -- to release them

7   once they determined that they were a danger to the community

8   and of flight.

9        THE COURT:  I'd have to look at that.  But I will say

10  that it's axiomatic that it's in the public interest that the

11  government follow the law.  And the whole idea of due process

12  is, procedural due process is if people are given an

13  opportunity and the opportunity to be heard provided by the

14  law, you know, they get a chance to present information and in

15  this case be interviewed, that the decision might be different

16  than it would be if the law were not violated.  Anyway, let me

17  see how the petitioners propose we proceed today at this point.

18       MS. LAFAILLE:  Your Honor, the testimony has confirmed

19  what we've been saying since we filed this motion.  The

20  Post-Order Custody Regulations are being systematically

21  violated.  The question of whether the reviews that were done

22  in September as an attempt to, you know, resolve issues in

23  litigation complied with the Post-Order Custody Regulations, of

24  course they didn't.  ICE is not minimally set up, as we've just

25  heard, to conduct proper reviews.  Mr. Bernacke doesn't even

1  know who is on the review panel, and, you know, talked about

2  how he -- he wouldn't be in a position to recommend who should

3  be on the panel.

4         THE COURT:  Okay.  It's very close to 1:00.  What do

5  you propose, that I hear from the detainees today?

6         MS. LAFAILLE:  Yes, I think we've demonstrated --

7         THE COURT:  Okay, okay.  That's what I'm going to do.

8  Because I don't know where this is going.  We're here.  There's

9  the threat of irreparable harm.  I now have an issue that I

10  didn't foresee about, and it may just relate to Mr. Moniz.  I

11  don't -- this has got to be sorted out.  But we're here,

12  they're here.  I'll permit questioning and cross-examination of

13  the detainees so the record will be complete, and then I'll

14  listen to you and probably have to take some time to think

15  about it to see where we are and where we're going.  Okay?

16         MS. LAFAILLE:  Your Honor --

17         THE COURT:  And in what order would you like to hear

18  the detainees?

19         MS. LAFAILLE:  Can I make a couple of points?

20         THE COURT:  Yes, if they're housekeeping issues.

21         MS. LAFAILLE:  Yes.  So the attorney that represents

22  Mr. Moniz and Mr. Ferreira, two attorneys are here, and I think

23  it would make sense for them to handle the direct of their

24  clients.

25         THE COURT:  I don't have a problem with that.  Does

1    the government?

2              MS. LARAKERS:  No, Your Honor.

3              THE COURT:  That's fine.

4              MS. LAFAILLE:  Okay.  The other point I wanted to make

5    is just that the spouses of these three detainees are also here

6    and I think could also provide helpful testimony as to whether

7    they --

8              THE COURT:  Yeah.  I may --

9              MS. LAFAILLE:  -- pose a danger of flight risk during

10   this interim period.

11             THE COURT:  I might permit it.  There's a limited

12   amount of time.  And Monday is a holiday, I'm not going to be

13   back in the courthouse until Thursday.  I've literally dropped

14   everything and rearranged my schedule for this week for this,

15   but it's going to have to be done quite efficiently, focused,

16   after lunch.  I'll hear from the detainees, and if there's some

17   brief testimony from their spouses that is relevant and may be

18   helpful, if time permits, I'll do it.  In what order do you

19   propose that the detainees be questioned?

20             MS. LAFAILLE:  I propose that we start with

21   Mr. Ferreira.

22             THE COURT:  Then who?

23             MS. LAFAILLE:  Then perhaps Mr. Moniz, because their

24   counsel is here.

25             THE COURT:  Then Ms. Rodriguez?

1          MS. LAFAILLE:  Yes.

2          THE COURT:  And do each have spouses that you propose

3     testify?

4          MS. LAFAILLE:  Yes, Your Honor.

5          THE COURT:  It's going to have to be very efficient,

6     like no more than 15 minutes a witness.

7          MS. LAFAILLE:  Okay.

8          THE COURT:  All right.  It's 1:00.  We'll resume at

9     2:00.  Court is in recess.

10          Actually, I'm sorry to do this.  I think it would be

11     useful for Mr. Charles and Mr. Bernacke to hear that testimony.

12     Is there any objection to that?

13          MS. LAFAILLE:  No, Your Honor.

14          MS. LARAKERS:  No, Your Honor.

15          THE COURT:  Okay.  They should be present in the

16     courtroom for that.  Court is in recess.

17          (Recess taken 1:01 p.m. - 1:57 p.m.)

18          THE COURT:  It's 2:00.  We seem to be missing the

19     detainees.  Why is that?

20          Hold on a second.  Here they come.  In the jury box,

21     please.  Wait a second.  I need all three of them.

22          All right.  I had understood we were going to start

23     with Mr. Ferreira and then Mr. Moniz and then Ms. Rodriguez.

24     But is there a request to alter that?

25          MS. LAFAILLE:  Yes, Your Honor, there is a request by

```
 1    his counsel to start with Mr. Moniz.

 2              THE COURT:  Why is that?

 3              MR. RUBIN:  Good afternoon.  May I approach the court?

 4    My name is Jeff Rubin.  I represent Elton Moniz.  Basically he

 5    speaks perfect English, Your Honor.  I thought that maybe --

 6    with the interpreter, to the extent that Mr. Ferreira and the

 7    other detainees need an interpreter for the purpose of flow to

 8    the court, but I will defer to Your Honor who you want to hear

 9    from in any order.

10              THE COURT:  Just a minute.

11              All right.  I really do want to get through this, but

12    okay.  If you'd like to start with Mr. Moniz, you may.  Is

13    there another witness relating to him you would like to call?

14              MR. RUBIN:  Your Honor, my partner Todd Pomerleau is

15    here.  He's entered his appearance and he will directly --

16              THE COURT:  No, no.  Is there a Mrs. Moniz that you

17    want to present?

18              MR. RUBIN:  Yes, please.

19              THE COURT:  But, both sides, you're going to have to

20    be quite efficient, okay?  Mr. Moniz, you should approach the

21    witness stand and be sworn.

22              MR. WEINTRAUB:  Your Honor, before -- I apologize and

23    I realize that I run the risk of Your Honor's wrath, but could

24    I just be heard very briefly before we start?

25              THE COURT:  Go ahead.
```

1          MR. WEINTRAUB:  Your Honor, the purpose of this

2     hearing was to determine whether ICE complied with the court's

3     August 27 order to reexamine the individual's detention with an

4     open mind in considering the newly submitted material.

5          The court heard an awful lot today that relates to

6     matters that are more properly heard for November 4.  The

7     testimony in this case, despite what else the court heard, in

8     all three instances the court heard that the ICE officer who

9     issued the decision considered the newly submitted material,

10    considered the equities and made the decision.

11         THE COURT:  This is fine.  You're reiterating.

12         MR. WEINTRAUB:  What --

13         THE COURT:  What's new?  I heard that before, and I'm

14    not hearing argument on the merits today as to whether there

15    should be a remedy.  I want a record that will permit me to

16    make all the decisions I need to make if I get to that decision

17    point.  And quite frankly, we're going to have to examine in

18    careful detail the testimony I heard from Mr. Bernacke because

19    a process conducted by the person in Washington ultimately

20    responsible for the POCR reviews who doesn't know that there's

21    an obligation to give an interview raises a question about

22    whether the process leading up to the decision is correct and

23    whether the information required was available.

24         MR. WEINTRAUB:  I will raise a new issue just to

25    clarify because I know Your Honor is interested in only new

1    items.

2           THE COURT:  I'm interested in hearing the testimony.

3    Because I'm going out of the country on Sunday and every -- and

4    I want to have all the information necessary to make whatever

5    decisions I may need to make, and I may not need to rely on --

6           MR. WEINTRAUB:  Your Honor, two of these individuals

7    have already had their interviews.  It's undisputed that

8    Mr. Ferreira had an interview October 2.  He wasn't eligible

9    prior because of his failure to comply, and Mr. Moniz had his

10   interview on September 9, and Ms. Rodriguez was never eligible.

11          THE COURT:  Look, I appreciate this.  It's an

12   amplification of what I considered before, and I don't

13   frankly -- you're saying maybe I should hear this on November

14   4th.  I'm going to hear it now.  You can be seated.

15          MR. WEINTRAUB:  Thank you, Your Honor.

16          ELTON MONIZ, Sworn

17          THE COURT:  Go ahead.

18   DIRECT EXAMINATION BY MR. RUBIN:

19   Q.   Good afternoon, Mr. Moniz.  Could you just tell the court

20   your name and how old you are.

21   A.   Elton (inaudible) Moniz, and I'm 25 years old.

22   Q.   And how long have you lived in the United States?

23   A.   Since I was very young, five years old.

24   Q.   And since you've been in the United States, have you gone

25   to school or had employment?

1    A.    Yes.  I graduated high school.

2    Q.    And after high school did you have any jobs?

3    A.    Yes, I did.

4          THE COURT:  Excuse me just one moment.  Let me have

5    the Moniz letter, please.

6          Go ahead.

7    Q.    Where have you worked since you graduated from high

8    school?

9    A.    I worked in a warehouse called Tablets, and it's getting

10   boxes and I do the calculation of the math of the boxes being

11   transferred out the warehouse to the location it's going.

12   Q.    And do you have other family here in the United States?

13   A.    Majority of them.

14   Q.    I'm sorry?

15   A.    Majority of all my families are in the United States.

16   Q.    Okay.  And who is that?

17   A.    Both my parents, my siblings, aunts, uncles, grandparents

18   from both sides, my recent great, great, great grandparent

19   passed away.

20   Q.    And all those people live here in the United States?

21   A.    Yes.

22   Q.    In what state?

23   A.    Massachusetts.

24   Q.    All right.  And where did you grow up in Massachusetts?

25   A.    Brockton, Massachusetts.

```
 1    Q.    Since the age of five?

 2    A.    Yes.

 3    Q.    Okay.  Have you lived outside of Brockton, Massachusetts

 4    since the age of five?

 5    A.    No.

 6    Q.    And again, you're 25, you've testified today?

 7    A.    Yes.

 8    Q.    Okay.  And do your extended family that you referenced,

 9    does anybody have status here in the United States?

10    A.    Majority.

11    Q.    And who is that?

12    A.    My father, my aunts and uncles, my siblings, both my

13    grandparents.

14    Q.    Okay.  And are you married?

15    A.    Yes, I am.

16    Q.    To who?

17    A.    Taylor Alves Moniz.

18    Q.    Is she present today?

19    A.    Yes, she is.

20    Q.    Okay.  Does she have any children?

21    A.    Yes, a five-year-old, Z███.

22    Q.    Do you have a relationship with Z███?

23    A.    Yes, I do, of course.

24    Q.    How old was Z███ when you met her?

25    A.    One and a half, turning two.
```

1   Q.   Did you live with her?

2   A.   No.

3   Q.   So when did you marry with your wife?

4   A.   I married her 2018, June 18, 2018.

5   Q.   Okay.  And did she come to visit you since you've been

6   detained?

7   A.   Yes.

8   Q.   How often?

9   A.   Every week.

10  Q.   Just get to -- how long have you been detained?

11  A.   I've been detained since December 14, 2018.

12  Q.   December of 2014?

13  A.   No.  Are you saying --

14  Q.   In total.

15  A.   In total, since 2015.

16  Q.   Okay.  And what precipitated you being detained in 2015?

17  A.   Repeat that again.

18  Q.   Why did you get detained in 2015?

19  A.   For the crime that I was charged with.

20  Q.   Okay.  And did you plead guilty?

21  A.   Yes, I did.

22  Q.   Okay.  Did you have any criminal record prior to that

23  case?

24  A.   I did in the past.  It was larceny, but it was a

25  misunderstanding and it was dismissed later on in court, in

1  2012.

2  Q.   So that one case, it was dismissed, and then you had this

3  case you just pled guilty on?

4  A.   Correct.

5  Q.   How long were you sentenced?

6  A.   I was sentenced to four to five years in state prison.

7  Q.   And how much time did you actually serve in state prison?

8  A.   My calculation was say three and a half because of good

9  time.

10  Q.   Okay.  How were you able to achieve good time?

11  A.   Well, you have to work, school, programs, stay away from

12  any trouble.  You can't get into any fights.  Any fights you

13  have to -- you have to be on, they will say you will be on hold

14  for six months to be clear to get a job or to do any programs

15  there.

16  Q.   And did you attend programs?

17  A.   Yes, I did.

18  Q.   What programs did you go to?

19  A.   I did the Beacon program, which was I want to say seven to

20  eight months, I think.  I'm not too certain how long.  I also

21  did the CRA, which was a seven-month program.  And I also --

22  Q.   Could I just stop you for a moment.  On the Beacon

23  program, I'm showing the court a certificate here.  Do you

24  recall what types of things you learned at that Beacon program?

25  A.   Anger management, releasing your inner self, feelings,

```
 1   expression, how to deal with depression, stress, anything

 2   that's close to violence.

 3   Q.   Did you in fact learn from that program?

 4   A.   Yes, I did.

 5   Q.   What other programs did you say?

 6   A.   Was the CRA program.

 7   Q.   And when did you complete that program?

 8   A.   I completed it on the 13th of 2018.

 9   Q.   And what did you learn from that?

10   A.   It helps you how to conduct yourself in society, how to

11   have responsibility, how to be a role model to family members,

12   siblings, how to conduct a job, how to manage money, how to

13   interact with people, how to respect others as well.

14   Q.   And did you -- you said you had some work while you were

15   detained as well.

16   A.   Yes.

17   Q.   What was that?

18   A.   I was working in the phase 2 program classes, which is

19   upstairs from the central where all the correction officers

20   located, which I will, like, clean, take the trash out, replace

21   it, clean the office.  Sometimes they would call us to go after

22   count was done to go wax the floors, buff the floors, any

23   painting, any plumbing, you know.

24   Q.   Where would you live if you were -- let me just back up.

25   So you were released from state custody.  When was that?
```

1   A.   December 14, 2018.

2   Q.   Okay.  So then after that where did you go?

3   A.   Straight to Plymouth Correction.

4   Q.   And why did you go to Plymouth Correction?

5   A.   I had an ICE detainer.

6   Q.   So you've been in ICE custody since that time?

7   A.   Correct.

8   Q.   So the last ten months?

9   A.   Yes.

10  Q.   And in ICE custody are you allowed to attend any programs?

11  A.   No.  We're actually, it's like we're separated from

12  population, so we're not able to go to church.  We're not able

13  to do a lot of things that regular trial or sentenced inmates

14  would be able to do.  So you have to have a significant time of

15  good behavior to be able to do certain things there.  And

16  fortunately, because of my behavior and how I conduct myself, I

17  was able to get a job faster than others, and I've been working

18  since then in Plymouth.

19  Q.   Did you say "pastoring others"?

20  A.   Yes.

21  Q.   What do you mean by "pastoring others"?

22       THE COURT:  I think -- I'm sorry.  Go ahead.

23  A.   My explanation for that is meaning, like, staying out of

24  trouble, following the rules respectfully when they tell you

25  stand up for count, shut the door in time, clean out the

1    windows, not having certain things that you're not supposed to

2    have there, which is contraband.  And if you can meet all

3    those, they consider you qualified for a job.

4              THE COURT:  I think he said he got a job "faster" than

5    others.

6              MR. RUBIN:  I'm sorry.  Thank you, Your Honor.

7              THE COURT:  Is that correct?

8              THE WITNESS:  Correct, yes, sir.

9    BY MR. RUBIN:

10   Q.   Now, if you were released from custody, who would you live

11   with?

12   A.   My wife and my daughter.

13   Q.   And you call her your daughter.  This is your

14   stepdaughter?

15   A.   Yes.

16   Q.   Okay.  And where would that be?

17   A.   It would be in Brockton, for not too long.  We're planning

18   to, you know, start working, saving money and move out of

19   Brockton as soon as possible and start a family.

20   Q.   Has your wife filed for a visa petition for you?

21   A.   Yes.

22   Q.   Has that been approved yet?

23   A.   I don't know.  I didn't --

24   Q.   Has anybody told you it's been approved?

25   A.   No.

1   Q.   And so you've talked about future plans in the United

2   States.  Why is that?

3   A.   Because I want to pursue, you know, further my education

4   and help my wife raise my daughter and give her a better

5   education, teach her the right way in life, not to follow in my

6   footsteps in the mistakes I made in the past of my youth, you

7   know, foolish behaviors, help others, help kids, you know, kids

8   that don't know much, that don't know what I went through, you

9   know, and maybe help them to seek a different way out, to go to

10  school and stay out of the streets, stay out of trouble, bad

11  influence of friends, you know.

12  Q.   Were there plans for the state court for you, for example,

13  for probation or parole, when you were released?

14  A.   Yes, there is.

15  Q.   And what is that?

16  A.   That is three years' probation, supervised.

17  Q.   And would you in fact report to probation if you were

18  released?

19  A.   Absolutely.

20  Q.   Would you comply with any orders from this court or from

21  the ICE office?

22  A.   Yes.  Whatever they require, I will do.

23          MR. RUBIN:  I have no more questions, Your Honor.

24  CROSS-EXAMINATION BY MS. LARAKERS:

25  Q.   If I understand your testimony, you testified that you

1   committed these crimes and were convicted of them in your

2   youth?

3   A.   Yes.

4           THE COURT:   Do you want to ask him what the crimes of

5   conviction were?   I don't think he's testified to that yet.

6           MS. LARAKERS:   Sure.

7   Q.   What were you convicted of, Mr. Moniz?

8   A.   Armed assault with attempted murder, possession of firearm

9   without a FID card, malicious damage to a motor vehicle.

10  Q.   And when were you convicted those crimes?

11  A.   May 10, 2015.

12  Q.   And did you plead guilty to those crimes?

13  A.   Yes, I did.

14  Q.   So you say you committed those crimes in your youth,

15  correct?

16  A.   Correct.

17  Q.   But that was only three years ago.

18  A.   Four and a half years ago.

19  Q.   Do you understand that what you've been convicted of is

20  considered an aggravated felony under the Immigration and

21  Nationality Act?

22  A.   Yes, I do.

23  Q.   And do you understand that because you've been convicted

24  of an aggravated felony that this makes you ineligible?

25          MR. RUBIN:   Your Honor, I just object.   That's exactly

1    the legal question we have on appeal at the First Circuit,

2    whether it's a aggravated felony or not.  It's a legal

3    definition.

4         MS. LARAKERS:  I think I'm allowed to ask to the

5    extent of his understanding.

6         THE COURT:  What is the relevance of it, his

7    understanding?

8         MS. LARAKERS:  Because if he understands that he's not

9    eligible to pursue these waivers that he says he's applying

10   for, that makes him a flight risk.  Because there's no reason

11   for him to comply with Immigration if he's never going to be

12   able to pursue the process in the first place.

13        THE COURT:  Ask the question.  The objection is

14   overruled.

15   Q.   Do you understand that there is, currently under the

16   Immigration and Nationality Act, no waiver for the

17   admissibility ground resulting from your conviction for an

18   aggravated felony?

19   A.   Yes, to my knowledge.

20   Q.   And do you understand that under the current law you are

21   not eligible to ever become a legal permanent resident of the

22   United States?

23   A.   Yes.

24   Q.   And yet, it's still your testimony that you're going to

25   comply with ICE, knowing full well that under the current law

1    you're never going to be eligible to be a legal permanent

2    resident in the United States?

3    A.    Correct.

4    Q.    Did you have an interview in connection with your

5    Post-Order Custody Review?

6    A.    Yeah, September 9.

7    Q.    Did you receive notice that you were going to have that

8    interview?

9    A.    Yeah.  It was last-minute.  My attorney advise me.

10   Q.    Are you aware that your attorney wanted to do the

11   interview sooner rather than later?

12   A.    She wanted me to do it later, not sooner, because she was

13   advised way earlier.

14   Q.    Is it your understanding that ICE worked with your

15   attorney to schedule that interview?

16   A.    Not from my knowledge.  I don't know.

17   Q.    Did you have your attorney present during your interview?

18   A.    Yes.

19   Q.    Did you have an opportunity to submit documents in support

20   of your release during that interview?

21   A.    Yes.

22   Q.    Did you have the opportunity to make statements to the ICE

23   official about why you should be released?

24   A.    Yes.

25          MS. LARAKERS:  No further questions, Your Honor.

1          THE COURT:  Is there any redirect?

2          MR. RUBIN:  Just briefly, Your Honor.

3     REDIRECT EXAMINATION BY MR. RUBIN:

4     Q.   So would you trust if I explained to you that you would be

5     eligible for a waiver if you've never had lawful permanent

6     residence, even with these convictions?

7     A.   Yes.

8     Q.   And have you ever been a lawful permanent resident?

9     A.   No.

10    Q.   How did you enter the United States initially at five; do

11    you remember?

12    A.   From my knowledge, a visa.

13    Q.   So you came here on a visa?

14    A.   Yes.

15    Q.   And would you trust if I told you that a person who comes

16    on a visa can adjust status here in the United States?

17    A.   Correct.

18    Q.   So when you just answered the government about never being

19    able to have a green card under the current state of laws, do

20    you truly understand the immigration laws?

21    A.   Not all of it.  From what I read off the paper, it does

22    says that because I have aggravated felony, I couldn't qualify

23    for, like, example -- cancellation of removal.  How do I say --

24    what else?  Asylum, I wouldn't qualify for much.

25    Q.   Did I provide those papers to you, or were they provided

1   at the facility by immigration officials?

2   A.   The facility.

3   Q.   So you're basing your legal understanding on documents

4   that were provided at the facility by people at the facility?

5   A.   Correct.

6   Q.   And prior to just last month did you ever have an

7   interview with ICE, going back to last -- so you were detained

8   by ICE in December.  In June did you have an interview

9   regarding your release?

10  A.   No.

11  Q.   Or July?

12  A.   No.

13  Q.   Or August?

14  A.   No.

15  Q.   So September was the first time?

16  A.   Correct.

17         MR. RUBIN:  Okay.  No more questions, Your Honor.

18         THE COURT:  Anything further from the government?

19         MS. LARAKERS:  No, Your Honor.

20         THE COURT:  Mr. Moniz, one of the things your lawyers

21  are asking for is for the court, me, instead of ICE, to decide

22  whether you should be released pending your possible removal

23  from the United States.  And I haven't decided that I should

24  make that decision.

25         But if you love your wife and you love your daughter

1    and you get released and there's the serious threat that you're

2    going to be removed from the United States, why should I

3    believe that you wouldn't flee with them, try to hide?

4         THE WITNESS:  I wouldn't -- I wouldn't put them at

5    harm.  I wouldn't want to put them in danger.  I wouldn't put

6    in any trouble that it is that I already caused and pain that

7    they already went through.

8         THE COURT:  And you pled guilty to armed assault with

9    intent to murder?

10        THE WITNESS:  Yes.

11        THE COURT:  What were the circumstances?  What

12   happened, essentially?

13        THE WITNESS:  I was at a party and I was drinking.

14   Was with a lot of friends, and a fight broke out.  And somehow

15   I got possession of a firearm.  In self-defense to defend the

16   people I was with, I shot the gun in the air.  And I was

17   scared, and after that I got in the car.  We left, and I was

18   going to get brought home.  Another car pulled up besides us

19   and started shooting into the car.  And out of my reaction,

20   without thinking, and being intoxicated at that time, I reacted

21   back.

22        THE COURT:  You shot back?

23        THE WITNESS:  Correct.

24        THE COURT:  You say somehow you came into the

25   possession of a firearm.

1              THE WITNESS:  Yes.

2              THE COURT:  How did you come into possession of a

3      firearm?

4              THE WITNESS:  Around my surroundings, someone had it.

5      And it was in a middle of a fight if -- it was on the floor

6      while I was wrestling with someone to grab the gun from him,

7      and I took possession of it.

8              THE COURT:  Do those questions suggest any further

9      questions to counsel?

10             MS. LARAKERS:  No, Your Honor.

11             MR. RUBIN:  No, Your Honor.

12             THE COURT:  Okay.  Thank you.  You can take your seat.

13             THE WITNESS:  Thank you, Your Honor.

14             THE COURT:  Would you like to call Ms. Moniz?

15             MS. CANTIN:  We would, Your Honor.

16             THE COURT:  She should approach the witness stand and

17     be sworn.

18             MS. LARAKERS:  Your Honor, we have an objection to her

19     testifying.  We don't think it's particularly relevant to

20     whether he's a flight risk or a danger.  We already have his

21     testimony, I think that that should be sufficient for this

22     court.  In addition, I believe I believe we have a declaration

23     already submitted from Ms. Moniz.  Do we?

24             THE COURT:  I don't think I have the declaration.

25     What's that?

1          MS. LARAKERS:  I think it must be another individual,

2     but Your Honor, he's already testified as to whether he's going

3     to be a flight risk and danger.  I don't see --

4          THE COURT:  When we conduct bail hearings, frequently

5     we hear from people.  So overruled.

6          MS. LARAKERS:  Your Honor, we frequently also get an

7     opportunity to put on victims, to put on police officers, and

8     we haven't had that opportunity either.

9          THE COURT:  And I may give it to you.  But these are

10    the witnesses who are here today.  If you ask for it, and it's

11    relevant and I think it would be a good use of time, I'll give

12    you a chance.

13         Go ahead.

14         <u>TAYLOR MONIZ, Sworn</u>

15    DIRECT EXAMINATION BY MS. CANTIN:

16    Q.   Good afternoon, Ms. Moniz.

17    A.   Good afternoon.

18    Q.   What's your full name for the record, please?

19    A.   Taylor Alves Moniz.

20         THE COURT:  Excuse me.  Pull that microphone closer to

21    you and speak into it loudly and clearly, please, so I can hear

22    you.

23         THE WITNESS:  Okay.

24         THE COURT:  Say your name again, please.

25         THE WITNESS:  Taylor Alves Moniz.

1    BY MS. CANTIN:

2    Q.    Ms. Moniz, you are married to Elton Moniz; is that right?

3    A.    Yes.

4    Q.    Are you a U.S. citizen?

5    A.    Yes, I am.

6    Q.    How old are you?

7    A.    25 years old.

8    Q.    And where do you live?

9    A.    Brockton, Massachusetts.

10   Q.    Who do you currently live with?

11   A.    I live with my daughter, but we don't really have a stable

12   place right now.  I just --

13              THE COURT:  Excuse me just a second.  Turn the volume

14   up, please.

15   A.    Yes, I live with my daughter, but we don't really have a

16   stable place right now.  I just stay with family here and there

17   like my mom, my mother-in-law, my father, because I can't

18   really afford to have my own place right now with the financial

19   hardship that I'm going through.

20   Q.    Are you currently working?

21   A.    Yes, I am.

22   Q.    And where do you work?

23   A.    I work as a personal care attendant through the company

24   called Temps Unlimited.

25   Q.    And what do you do at your job?

1  A.   I help out disabled people with their personal needs.  I

2  wake them up, shower them, bathe them, feed them, help them

3  with their daily activities.

4  Q.   Ms. Moniz, who watches your daughter when you're working?

5  A.   She goes to preschool, but she's been having a lot of

6  behavior problems in preschool.  Ever since my husband has been

7  detained, she has a lot of behavioral problems.  She did get a

8  therapist to help her out with it, but sometimes I get phone

9  calls at work to pick her up from school because she just has

10 tantrums.

11      So Elton's sister, my sister-in-law watches her for me,

12 and she has to -- she's still in high school.  She has to miss

13 school sometimes just to watch our child when I have to pick

14 her up and go back to work.  She did stay back in high school

15 because of the help that she needs to help us out with

16 sometimes for me to work.

17 Q.   When did you and Elton get married?

18 A.   June 18, 2018.

19 Q.   How long have you known Elton?

20 A.   Since we was, like, 12.

21 Q.   What's life been like for you since Elton was held in

22 detention by ICE?

23 A.   Been very hard, just like I said, with finances.  I did go

24 to school to get my nursing assistant certificate.  And I

25 wanted to further my education to become a registered nurse,

1    but going back to school has been hard right now because any

2    time off of work is really crucial, so it's been very hard.

3    Q.   And what would it mean for you for Elton to come home even

4    for an interim period while this motion gets resolved by the

5    court?

6    A.   It would mean a lot, financially, physically, emotionally.

7    Especially with his family, too.  His mom is going through

8    depression and paranoia because of her thoughts and everything.

9    It's been very hard for the family.

10   Q.   Ms. Moniz, is there anything else you'd like to tell the

11   court today about your husband, his release and any safety

12   concerns that you might have about him coming home?

13   A.   I don't have any safety concerns because, yes, my daughter

14   was from a previous relationship, but when my husband and I

15   rekindled our relationship, she was one and a half.  Obviously

16   if I thought that he would be dangerous or had any concerns,

17   obviously I wouldn't have brought my child into that situation.

18   I know that he was really young when he committed those crimes,

19   and I know we all make mistakes, and, you know, things that we

20   do in the past doesn't really define who we become in the

21   future.  And I know that, with another chance, things will be

22   much better.

23        MS. CANTIN:  Thank you.  No further questions, Your

24   Honor.

25   CROSS-EXAMINATION BY MS. LARAKERS:

1    Q.    Good afternoon, Mrs. Moniz.

2    A.    Good afternoon.

3    Q.    Do you know if your husband, Mr. Moniz, has a work permit?

4    A.    I do not know if he does.

5    Q.    Do you know if he's eligible to apply for a work permit?

6    A.    Not to my knowledge, no.

7          MR. RUBIN:  Objection, Your Honor.  That's a legal

8    question --

9          THE COURT:  Well, this is just based on -- I'm not

10   taking it for the truth but just her understanding.

11         MR. RUBIN:  As a lawyer, I have to tell you, as an

12   immigration lawyer, they are eligible to get a work permit when

13   they're --

14         THE COURT:  Here.  Not so fast.

15         MR. RUBIN:  I think it was an unfair question,

16   particularly to elicit a possible misstatement of the law to

17   the court in that I am an experienced immigration lawyer.  It's

18   a ground to have work authorization to be released after an

19   order of removal and be supervised by ICE.  So that's a ground

20   that --

21         THE COURT:  Well, that's helpful to know.  And if it

22   becomes relevant to a decision I need to make, the parties will

23   have to brief the issue.  Why don't you go ahead.

24   BY MS. LARAKERS:

25   Q.    If he doesn't receive -- if he doesn't receive a work

1    permit from the government, do you think he'll be able to
2    otherwise lawfully work in the United States?
3    A.   I believe so.
4         MS. LARAKERS:  No further questions, Your Honor.
5    Actually, sorry.  I did have one more.  Sorry.
6    Q.   Since you've known Mr. Moniz, has he ever taken any trips
7    outside of the country?
8    A.   No, he has not.
9    Q.   Not even a brief trip?
10   A.   No.
11        MS. LARAKERS:  That's all I have, Your Honor.
12        THE COURT:  Let me ask you this.  If Mr. Moniz was
13   released but was facing the threat of being deported or removed
14   soon and wanted to go into hiding somewhere with you and your
15   daughter, would you go?
16        THE WITNESS:  No, I would not.
17        THE COURT:  Why?
18        THE WITNESS:  Because, I mean, we know that he
19   wouldn't do anything like that.  I respect the law.  I respect
20   everything that you guys are going to say.  That's just
21   something I would never do.
22        THE COURT:  All right.  You may take your seat.
23        THE WITNESS:  Thank you, sir.
24        THE COURT:  Who would the petitioners like to call
25   next?

1          MS. LAFAILLE:  We'll call Mr. Ferreira.

2          THE COURT:  Does he need translation to know he should

3     go to the witness stand?  And do we have the interpreter?

4          MR. RUBIN:  This is Jessica -- she's actually a

5     certified Portuguese interpreter.  She works in our office,

6     however.

7          (Interpreter duly sworn.)

8          COURTROOM CLERK:  Would Mr. Ferreira please stand and

9     raise your right hand.

10         ROMILSON FERREIRA, Sworn

11         THE COURT:  Would you identify yourself for the

12    record, please.

13         MR. POMERLEAU:  For the record, Todd Pomerleau on

14    behalf of Mr. Ferreira.  May I begin, please?

15         THE COURT:  Yes.

16    DIRECT EXAMINATION BY MR. POMERLEAU:

17    Q.   Could you please state your full name and age for the

18    record.

19    A.   Romilson Ferreira.  I am 33 years old of age.

20         MR. WEINTRAUB:  Your Honor, is it possible to get the

21    interpreter closer to the microphone?

22         THE COURT:  Right.  You're going to need to speak up.

23         MR. WEINTRAUB:  I understand it was just his name and

24    age.

25         THE COURT:  The interpreter should take the

1    microphone.  Go ahead.

2    BY MR. POMERLEAU:

3    Q.    Mr. Ferreira, which country are you from?

4    A.    Brazil.

5    Q.    And how long have you lived in the United States?

6    A.    It will be 15 years.

7    Q.    How did you enter the United States?

8    A.    Through Mexico.

9    Q.    Okay.  Do you have any family members living in the United

10   States?

11   A.    Yes, I have a cousin, and my brother lives here, and my

12   son and my wife as well.

13          THE COURT:  Excuse me.  The interpreter is going to

14   have to keep her voice up.

15          INTERPRETER:   Sorry.

16   Q.    How old is your son, and what is his name?

17   A.    Seven years old.

18          INTERPRETER:  And I believe you heard his name.

19   Q.    What is your wife's name?

20   A.    Rachel Gregory, Rachel Jean Gregory.

21   Q.    How long have you been married with her?

22   A.    I married her December 17, 2017.

23   Q.    Prior to your marriage did she have any children of her

24   own?

25   A.    Yes, five children.

1    Q.   All right.  So in total is you, your wife and six children

2    living together?

3    A.   Yes, now it's seven.  Her daughter just had another child.

4    Q.   So would you consider that child to be your grandchild?

5    A.   Yes.

6    Q.   Okay.  What are the ages of the six children and your

7    grandchild?

8    A.   18, 16, 13 and 10 and 7 and I believe two months old.

9    Q.   Okay.  Where do they live?

10   A.   Massachusetts.  Dennis, Cape Cod, Massachusetts.

11   Q.   Cape Cod?

12   A.   Yeah, Cape Cod.

13   Q.   A certain town on Cape Cod?

14   A.   Dennis, Massachusetts.

15   Q.   Dennis, okay.  How long have you been detained for?

16   A.   18 months.

17   Q.   Okay.  Who first arrested you?

18   A.   Barnstable police.

19   Q.   Were you arrested on behalf of Immigration, or was that

20   for a criminal offense?

21   A.   It was a criminal case first.

22   Q.   Okay.  Do you have a criminal record in the United States?

23   A.   Yes.  I have this one and for driving without a license.

24   Q.   Okay.  How many times did you drive without a license?

25   A.   I'm not absolutely sure, but a lot.

1   Q.   More than five times?

2   A.   Yes.

3   Q.   Okay.  And the case that the Barnstable police arrested

4   you for, what were you accused of doing?

5   A.   In the beginning I went to a birthday party for a friend

6   of mine.  And in this party, I'm not sure what they gave me or

7   what happened.  I know that two days later, I hadn't slept, and

8   I was hallucinating.  I saw people following me and messages

9   from people I did not know on my phone.

10       I asked for a friend of mine to take me to the parking lot

11  of Stop & Shop to meet with a contractor that I worked with,

12  and I told him that I was seeing things and if he could help

13  me.  He told me to go to inside of Stop & Shop and call the

14  police and ask for help.  I went in there and I called the

15  police.  And then I went behind where they chop up meat and the

16  butcher, with their permission.  And I asked them to also call

17  the police.

18       The police came.  They introduced themselves to me as the

19  police.  And they asked me to go outside to speak to me.  And

20  when I was walking out, another police arrived.  It was

21  Hyannis --

22  Q.   Okay.  What happened next?

23  A.   And when I was walking out, I turned to him and I said

24  that he was not a police officer.  Why was there another police

25  approaching when I had only called one police?  He asked me to

1   calm down and held my arm back.  And I tried taking my arm

2   back.  He threw me to the ground, and I believe he held a gun

3   up to me.  And I tried defending myself, asking him not to kill

4   me.  "Please don't kill me."  I said, "You are not police."

5   Q.   Did you learn that this was actually a police officer?

6   A.   Up until the point that he tasered me and I calmed down

7   and I cooperated with him.

8   Q.   Then you got arrested after this?

9   A.   Yes, I was arrested.  And I spent one night at the police

10  station.  The next day they took me to court.  That was three

11  days that I hadn't slept.

12  Q.   So at the time when the police interacted with you, were

13  you still feeling the effects of -- were you still

14  hallucinating?

15  A.   Yes, they knew, and they did not take me that day.  And it

16  was also a holiday as well.

17  Q.   Did the court ever require you to go get some treatment

18  right after you got arrested?

19  A.   They appointed me a lawyer at the court, and he said that

20  he could not speak to him because he was not himself.  And they

21  sent me to state mental hospital in Bridgewater, and I stay

22  there for 19 days.  I was hallucinating, saying things that

23  didn't make sense for about two weeks and three days.  A man

24  would come and talk to me in the morning and in the afternoon.

25  Q.   So after you got out of Bridgewater, have you ever

1    hallucinated since then?

2    A.    No.

3    Q.    And prior to this interaction with the Barnstable Police

4    Department had you ever hallucinated before?

5    A.    No, never.

6    Q.    Okay.  And were you convicted of those crimes involving

7    the police?

8    A.    I went to jury trial, but my attorney did not do

9    absolutely anything on my case.  And the judge said that he was

10   going on for too long, and she was going to decide the case

11   that day.

12   Q.    Were you found guilty or not guilty?

13   A.    According to her, yes, because even though nothing

14   happened, it could have happened.

15   Q.    And did you file an appeal?

16   A.    Yes, because I was not satisfied with the decision.

17   Q.    Okay.  Is that appeal still pending, to the best of your

18   knowledge?

19   A.    Yes.

20   Q.    Okay.  And other than this incident, the only other

21   criminal history you have is driving without licenses multiple

22   times?

23   A.    Yes, that's it.

24   Q.    Were you ever previously arrested or accused of being

25   violent since 2004 when you entered the United States?

1    A.    No, never.

2    Q.    Okay.  Since you've been in jail have you ever been

3    accused of assaulting correctional officers or other inmates?

4    A.    No, I never have.

5    Q.    Okay.  You mentioned earlier you were meeting with a

6    contractor.  What do you do for work?

7    A.    Ever since I came to this country, I work in construction.

8    And my construction company also did carpentry.

9    Q.    Okay.  So what is your specialty?

10   A.    I do the finishing touches on the outside of homes, trims,

11   siding, roofing and windows.

12   Q.    So if you were released from custody, would you have the

13   ability to work as a contractor?

14   A.    Yes.  I've worked with all of them for over ten years.

15   Q.    Do you believe they would continue to hire you to do work

16   for them if you were released from jail?

17   A.    Yes, I believe so, because they continue to call and

18   asking me how I am and when I would be released.

19   Q.    Now, what was the sentence you received from the judge for

20   the case where you were hallucinating?

21   A.    Three months, but I only served 19 days in Bridgewater.

22   Q.    Were there any other conditions imposed by the court, such

23   as probation, GPS monitoring, curfews?

24   A.    To stay with a GPS tracker for six months, and two years

25   testing for alcohol and drugs.

1    Q.   Okay.  Have you ever had an opportunity to use the GPS

2    device ordered by the Barnstable court?

3    A.   Not yet.

4    Q.   If released from custody, would you report to probation

5    and follow all of the terms and conditions of your probation?

6    A.   I have no problem following, doing this.

7    Q.   Okay.  And you understand if you don't follow those

8    conditions, you can get arrested and charged with a probation

9    violation?

10   A.   Yes, I understand clearly.

11   Q.   And would you agree if you violate probation you could go

12   to jail for even longer for violating probation?

13   A.   Yes, I recognize that.

14   Q.   Has your wife, Rachel, applied for any green card for you?

15   A.   Yes.

16   Q.   To the best of your knowledge is it still pending?  Has it

17   been approved?

18   A.   It's still pending.

19        MR. POMERLEAU:  All right.  Thank you.  I have no

20   further questions, Your Honor.

21   CROSS-EXAMINATION BY MS. LARAKERS:

22   Q.   Good afternoon, Mr. Ferreira.

23   A.   Good afternoon.

24   Q.   You described an incident that ultimately led to your

25   arrest and conviction for assault and battery on a police

1    officer, correct?

2    A.   Yes.  But I asked for a video of Stop & Shop because I was

3    scared, because there was a lot of cameras, and if somebody was

4    following me, as I was hallucinating.  They never gave me

5    anything about the video.

6              THE COURT:  Okay.  I don't think this is responsive to

7    any question, so what's the next question?

8    Q.   You testified that you were seeing things.

9    A.   Yes.

10   Q.   Were you under the influence of drugs during this

11   incident?

12   A.   Like I said, I don't remember.  I remember that I had two

13   drinks, and after that I was a little confused, and I did two

14   lines of cocaine.

15   Q.   Was it your general practice during that time period in

16   your life to use drugs when you drank?

17   A.   I don't do drugs.

18   Q.   You just testified that you had done two lines of cocaine

19   prior to engaging in that incident with the police officers,

20   correct?

21   A.   I was at a birthday party and I was also taking

22   medication.  And I believe that led me not to know what was --

23   what I was doing and that happened.

24   Q.   Was that medication that was prescribed to you?

25   A.   No.  A friend of mine gave it to me.  It was a weight loss

1    supplement.

2    Q.   You testified that you didn't think that the person that

3    you assaulted was a police officer.

4    A.   Yes.

5    Q.   Why didn't you think this person was a police officer?

6    A.   Because I was seeing things.

7    Q.   Was he wearing a uniform?

8    A.   I believe so.  I don't remember much.

9    Q.   But you still, even though he was wearing a uniform, you

10   still didn't believe he was a police officer?

11   A.   Because I didn't understand why there was two police, and

12   I was seeing things.

13   Q.   You testified that you've also been arrested for driving

14   without a license, correct?

15   A.   Yes.

16   Q.   And the incidents that led up to those arrests for driving

17   without a license, why -- why do you think you were pulled

18   over?

19   A.   I believe it was because I registered all my cars in my

20   Brazilian license.  Because I was never stopped for speeding.

21   I was never stopped for driving drunk.  Every time that I was

22   stopped, it was just, they said it was just to check.

23   Q.   How long have you been married, Mr. Ferreira?

24   A.   I'm married on December 17, 2017.

25   Q.   And when were you ordered removed from the United States?

1  A.   I don't remember because I always appealed my case.

2  Q.   Do you understand that during your immigration proceedings

3  an immigration judge found that you had a significant history

4  of drug use?

5  A.   I understand, but I've never done drugs.  I've done tests

6  and it was never positive.

7  Q.   You testified that you had never done drugs but you also

8  just testified that you did two lines of coke that led to the

9  incident where you assaulted a police officer, correct?

10 A.   Like I said, I was not in the right state of mind.

11 Q.   So it's your testimony today that you have never done any

12 drugs?

13 A.   Truthfully, three times in my whole life.

14 Q.   And one of those times -- one of those times led to the

15 incident where you assaulted a police officer, correct?

16 A.   Yes.

17      INTERPRETER:  Can I just clarify if he said two or 12?

18 A.   Almost two days later.

19 Q.   Do you understand that the outpatient service that you had

20 previously participated in has detailed in a report your

21 habitual and -- habitual use of controlled substances including

22 MDMA and cocaine on a weekly basis?

23      INTERPRETER:  I'm sorry.

24 A.   I don't understand.

25 Q.   You've previously testified that you participated in a

| | |
|---|---|
| 1 | mental health program, correct? |
| 2 | A.   Yes, in Bridgewater, where I was detained. |
| 3 | Q.   And do you understand that that mental health program, in |
| 4 | a record, detailed your habitual use of controlled substances |
| 5 | to include MDMA and cocaine? |
| 6 | A.   I don't understand because I didn't do drugs.  I don't |
| 7 | understand the question exactly. |
| 8 | Q.   Do you understand that you have applied for what is known |
| 9 | as a Form I-212 with Immigration Services? |
| 10 | A.   Yes, I understand. |
| 11 | Q.   And do you understand that that application has been |
| 12 | denied? |
| 13 | A.   It's being appealed. |
| 14 | Q.   But you do understand that it has currently been denied? |
| 15 | A.   I know that I appealed it. |
| 16 | Q.   Okay.  Do you know, do you understand that the reason why |
| 17 | USCIS, United States Citizenship and Immigration Services |
| 18 | denied that application is in part due to your past drug use? |
| 19 | A.   No, because I'm not a drug addict. |
| 20 | Q.   Do you recognize this decision? |
| 21 |         THE COURT:  Is that an exhibit? |
| 22 |         MS. LARAKERS:  Yes, Your Honor, I'd like to mark it as |
| 23 | Exhibit 8. |
| 24 |         MR. WEINTRAUB:  It's already admitted. |
| 25 |         THE COURT:  Exhibit 8, this is the decision to -- |

1          MS. LARAKERS:  No, Your Honor.  This is the United

2     States Citizenship and Immigration Services' decision to deny

3     his Form I-212.

4          THE COURT:  Okay.  It is admitted as Exhibit 8.

5          (Exhibit 8 admitted into evidence.)

6          MS. LARAKERS:  Your Honor, I apologize.  I only have

7     this one copy.

8          THE COURT:  We'll mark it after you use it.

9          MS. LARAKERS:  Okay.

10    Q.   Do you see that this decision is five pages long, as

11    referenced -- is four pages long, excuse me, as referenced by

12    this last page?

13    A.   Yes, but I don't remember receiving this.

14    Q.   Do you see on page 3 here, in the third paragraph it says

15    that, "The record also contains a report from Gosnold Thorne

16    outpatient services detailing your habitual use of controlled

17    substance MDMA and cocaine, on a weekly basis commencing

18    sometime in 2012 or 2013"?

19    A.   When they took me to do this test, they gave me a very

20    elderly woman that did not understand what I spoke to -- what I

21    said to her.

22         MS. LARAKERS:  Your Honor, I just asked if he saw the

23    part in the paragraph.  I don't want this hearing to go on very

24    long, and he's going to have to just answer the question.

25         THE COURT:  Excuse me.  Stop.  Please say what's

1   necessary to answer the question fully.  Do not say more than

2   that.  Your attorney will have a chance to ask you more

3   questions if she thinks some explanation is appropriate.

4   Q.   So that sentence I just read to you --

5   A.   I don't have any -- I am not aware of these papers.

6   Q.   But are you now aware that this is one reason why USCIS

7   denied your Form I-212 application?

8   A.   I don't have because I never did drugs like it states

9   there.

10  Q.   Do you see under the paragraph I just read to you that the

11  decision also says the record also shows that you have been

12  arrested for the unlawful operation of a motor vehicle on 16

13  different occasions in the last 13 years?

14  A.   Yes, I see that.

15  Q.   And do you see under that paragraph it says, "Based on a

16  review of the record, the totality" --

17        THE COURT:  Not too fast.

18  Q.   Do you see that under that it says that, "Based on a

19  review of the record, the totality of the evidence does not

20  support the approval of this discretionary waiver"?

21  A.   Yes, I see.

22  Q.   And do you understand that without United States

23  Citizenship and Immigration Services approving your Form I-212,

24  you were not eligible to emigrate to the United States?

25  A.   I did not know that.

1   Q.   Approximately when did you enter the United States,

2   Mr. Ferreira?

3   A.   I believe it was November of 2004, end of October,

4   November.

5   Q.   Have you ever left the United States since coming in

6   November of 2004?

7   A.   No.

8   Q.   Have you ever traveled to Mexico?

9   A.   No.

10  Q.   Have you ever traveled to Canada?

11  A.   No.

12  Q.   Not even for a day?

13  A.   No.

14  Q.   Have you ever applied for a work permit?

15  A.   No.

16  Q.   During ICE -- during your time in ICE custody, did you at

17  one point refuse to sign documents that were presented by the

18  Brazilian consulate?

19  A.   She told me I had that right if my case was on appeal.

20  Q.   So you refused to sign the documents presented by the

21  consulate?

22  A.   The consulate told me I had that right if my case was

23  being appealed.

24  Q.   Do you understand that you have an obligation to cooperate

25  to obtain travel documents from the Brazilian government?

1    A.   Based on what she told me, I had the right of not signing

2    if my case was being appealed.

3    Q.   So you didn't sign the documents?

4    A.   No, because she told me that I had this right.

5    Q.   Have you ever provided your Brazilian passport to ICE?

6    A.   Yes.

7    Q.   When did you provide that passport?

8    A.   As soon as I knew that I had to give that, I gave it.

9    Q.   When was that?

10   A.   About four weeks ago, four or five weeks ago.

11   Q.   After providing your passport to ICE, did ICE interview

12   you?

13   A.   After I received the denial, they gave me the right to an

14   interview.

15   Q.   So that interview was after you submitted your passport to

16   ICE, correct?

17   A.   Truthfully, the same day they told me that I was going to

18   have one.

19   Q.   And was your attorney present during that interview?

20            INTERPRETER:  I'm sorry, could you repeat the

21   question?

22   Q.   Was your attorney present during that interview?

23   A.   Yes.

24   Q.   And did you have an opportunity to submit documents prior

25   to that interview?

1   A.   I believe in the last minute.

2   Q.   Have you ever committed any other crimes even if you were

3   not arrested for them?

4   A.   No.

5   Q.   And you said you have a carpentry and construction

6   business in Massachusetts, correct?

7   A.   Yes.

8   Q.   Have you ever paid any taxes in connection with that

9   business?

10  A.   Yes.  Before use -- I used to work with my ex-partner.  We

11  would pay it under his name.  And when I opened it under my

12  name, I was arrested and I did not have a chance to file my

13  taxes.

14          MS. LARAKERS:  No further questions, Your Honor.

15          MR. POMERLEAU:  Very briefly, Your Honor, please.

16  REDIRECT EXAMINATION BY MR. POMERLEAU:

17  Q.   Mr. Ferreira, would you agree that you have a condition of

18  probation that requires you to remain drug- and alcohol-free

19  while on probation?

20  A.   Yes.

21  Q.   And do you understand that if you don't remain drug- and

22  alcohol-free you can be in violation of your probation?

23  A.   Yes, I understand.  I am not a drug user.

24  Q.   Okay.  Are you aware that this judge could order that you

25  remain drug- and alcohol-free if he decides to release you from

1   custody?

2   A.   Yes.

3   Q.   Are you aware that Immigration and Customs Enforcement

4   could require you not to use drugs or alcohol or to seek

5   further treatment if they released you from custody?

6   A.   I understand.

7   Q.   And if that is a condition of your release, will you

8   follow that rule set either by the court, by ICE or by the

9   Probation Department of Barnstable County?

10  A.   For the time that it's necessary.

11  Q.   Okay.  You said earlier that you don't agree with that

12  report that was written at the Bridgewater State Hospital.

13  A.   Yes, I'm telling the truth.

14  Q.   Now, the person who interviewed you, you said she was an

15  older woman.  Was the interview conducted in Brazilian

16  Portuguese, or was it conducted in English?

17  A.   It was conducted in English, and it was very difficult for

18  me to understand her.  She kept laughing towards me and saying

19  that it was okay.

20  Q.   Do you speak any English?

21  A.   I now speak a little better, but back at that point I

22  didn't speak very well.

23          MR. POMERLEAU:  All right.  I have no further

24  questions.  Thank you.

25          MS. LARAKERS:  May I approach with the exhibit, Your

1    Honor?

2              THE COURT:  Yes.

3              MS. LARAKERS:  And we have no further questions.  I

4    apologize, I only have the one copy.

5              THE COURT:  Exhibit 8 is the July 29, 2019 decision by

6    CIS denying the Form I-212.

7              All right.  You may -- well, let me see.  If you're

8    released from custody, where would you live?

9              THE WITNESS:  I would live with my wife.

10             THE COURT:  Where does she live?

11             THE WITNESS:  ███████████████████████████.

12             THE COURT:  If you were released but there was a

13   threat that you were going to be removed or deported, sent to

14   Brazil by ICE, why should I think you would not flee, run away?

15             THE WITNESS:  To begin, I want to be released and

16   teach my son the right path in this life and be the man to my

17   wife that she's never had and give myself a chance as well.

18             THE COURT:  Okay.  You may take your seat back in the

19   jury box.  Is there another witness relating to Mr. Ferreira

20   that you would like to present?

21             MS. McCULLOUGH:  Yes, Your Honor.  We'd like to call

22   Rachel Gregoire.

23             THE COURT:  Okay.

24             RACHEL GREGOIRE, Sworn

25   DIRECT EXAMINATION BY MS. McCULLOUGH:

1   Q.   Can you state your whole name for the record.

2   A.   Rachel Jean Gregoire.

3   Q.   Are you married to Romilson Ferreira?

4   A.   Yes, I am.

5   Q.   And are you a U.S. citizen?

6   A.   I am.

7   Q.   How long have you known Romilson?

8   A.   I have known him about seven years.

9   Q.   And what's your relationship like?

10  A.   We've had a great friendship all along, working together

11  to take care of his son.  When he received custody back with

12  him, I worked together with him.  All along we've had a great

13  friendship.  He's been supportive of myself and my children

14  through difficult times.

15  Q.   Do you have kids?

16  A.   I do.  I have five children, and then I have Romilson's

17  son together.

18  Q.   Does Romilson have a relationship with your kids?

19  A.   He does.

20  Q.   What's that relationship like?

21  A.   He is a male role model with them.  He's been very

22  supportive for them through the death of their biological

23  father, which, he took his life by suicide.  And we turned to

24  Romilson for comfort, and he was there supporting all my

25  children up until his arrest.

1    Q.    Do you attend church?

2    A.    We do now, yes.  Romilson got us involved into church,

3    which has been a great support.  We haven't been able to go as

4    much as we'd like.  It's a Brazilian church.  With my anxiety

5    and children, it's been hard to go without him there.

6    Q.    Do you have any concern at all about the safety of your

7    kids with Romilson?

8    A.    I do not.

9    Q.    Why not?

10   A.    If anything, they've benefited from him being around.  I

11   don't fear of him of danger.  He's just been very kind and

12   caring, and he's not an argumentative person, nor combative.

13   He's never been violent.  There's that one incident that I

14   think was more -- just that time.  He's never had any other

15   violence.  The whole time he's been incarcerated, he hasn't had

16   any issues.  If anything, he's getting people together in

17   there, and they do church in there together.

18        He does not have the drug use that's being said he has.

19   He did have a few times, like he said, where he had used drugs.

20   He had over a year of clean drug testing before the arrest, I

21   say the conviction, because there was a time lapse in between

22   there where he was out.  He did random drug testings which came

23   up clear for over a year.

24        I just feel like there's not that issue.  This is a

25   misunderstanding with the two.  He did go to Gosnold on his

1    own, and he spoke to somebody.  And that's where that report

2    came from.  And it was just him with a lady, no interpreter,

3    and when he stated the first time he had used drugs, I'm

4    assuming that's where she --

5              MS. LARAKERS:  Objection, Your Honor.

6    A.   But there's two different things.

7              THE COURT:  Excuse me.  Stop if there's an objection.

8    You have to wait for me to answer it.

9              THE WITNESS:  Sorry.

10             MS. LARAKERS:  First, this is becoming a narrative and

11   I would ask that she just answer the question.  Second, even if

12   the question didn't, she's now testifying about things that are

13   clearly hearsay.

14             THE COURT:  Say what's necessary, please, to answer

15   the question fully but don't go beyond it because there may be

16   an objection.  And unless you lay a foundation that she was

17   there and she heard it, this would be hearsay, for what she was

18   relating toward the end would be hearsay.

19   BY MS. McCULLOUGH:

20   Q.   Does Romilson use drugs?

21   A.   No.

22   Q.   Do you have any concern about his influence on your kids?

23   A.   I do not.

24   Q.   What has been his influence on your kids?

25   A.   A very positive influence.  He guides them, tells them the

1    right from the wrong.  When we were going through a hard time

2    he just got them back on track and talked to them and explained

3    the right way to go and they actually listened to him.

4         Since his incarceration, while he's been held, I've had my

5    own medical issues.  And I've had -- one of my daughters that

6    actually would talk to him for comfort, she spiralled out of

7    control, and that's how we now have a grandbaby that's two

8    months old.  I just feel like doing it by myself has been very

9    difficult.

10   Q.   He had a relationship with your daughter?

11   A.   Yes.  My older daughter who is now 18 relates better with

12   him as a male role model and would talk to him.

13   Q.   You began saying a little bit about the impact of his

14   detention on your family.  What has that impact been?

15   A.    It's been a huge impact because it's just me.  I have my

16   own issues that I'm dealing with.  I have all the children that

17   -- some of them have the anxiety, the depression, PTSD from

18   their father's death.  I have his seven-year-old son who

19   doesn't understand what's going on, has had some behavioral

20   issues in school and at home.

21        The visits are very difficult to get to when you have so

22   many children and you're only allowed so many in a visit and no

23   support, like, on the outside.  Financially, it's very

24   difficult.

25   Q.   Who is his son?

1   A.      R█████ Ferreira.

2   Q.      And what's the impact been on him?

3   A.      I just said, it's been very difficult.  He doesn't

4   understand why he's losing his father, when he's going to be

5   able to come home.  He asks if he can be able to throw him up

6   and play games and things that a father would do, and it's just

7   getting hard to answer those type of questions.  He stayed back

8   in school a year as well for falling behind and behavioral

9   reasons.

10  Q.      What would his release mean to you?

11  A.      It would be great.  I would have some support.  We'd be a

12  family again.  My children would have somebody to be able to

13  relate to.  I'd be able to get back into church full time with

14  my children.  I'd be able to get medical help to get myself

15  back to where I need to be to get back to work and help the

16  family.

17  Q.      You heard Romilson's testimony earlier, right?

18  A.      Yes.

19  Q.      And you heard testimony about offenses for driving without

20  a license, right?

21  A.      Yes, I did.

22  Q.      Did you do anything to avoid that situation after those

23  offenses occurred?

24  A.      We did.  Once he was able to financially afford it, he

25  hired a driver just to drive him back and forth to the jobs.

1    Q.   And if Romilson were released, would you help him comply

2    with any orders of this court?

3    A.   Of course.

4         MS. McCULLOUGH:  No further questions, Your Honor.

5    CROSS-EXAMINATION BY MS. LARAKERS:

6    Q.   Good afternoon.

7    A.   Good afternoon.

8    Q.   Do you speak Portuguese?

9    A.   I don't.

10   Q.   Do you speak -- so you don't speak any Portuguese?

11   A.   I don't speak Portuguese, no.  I understand some of it

12   just because I have a Spanish background.

13        THE COURT:  I'm sorry.  Keep your voice up, please.

14   A.   I don't speak Portuguese, no.

15   Q.   So how do you communicate with Mr. Ferreira?

16   A.   I communicate as best as I can with the English.

17   Q.   How do your children communicate with him?

18   A.   The same way.

19   Q.   But your children don't speak Portuguese?

20   A.   No.

21   Q.   Does his child speak Portuguese?

22   A.   He does not.  He understands it.

23   Q.   But despite that, it's still your testimony that he is

24   able to provide comfort for them and speak to them and

25   communicate with them?

```
1    A.   Yes, he does.

2    Q.   Does Mr. Ferreira drink alcohol?

3    A.   He had drank on occasions in the past prior to our

4    relationship.

5    Q.   Have you ever seen him drink too much alcohol?

6    A.   No.

7    Q.   Has Mr. Ferreira to your knowledge ever used drugs?

8    A.   Just that incident that I'm aware of.

9    Q.   What incident?

10   A.   Of the Stop & Shop.

11   Q.   So you knew that he had used drugs prior to that incident?

12   A.   No.  I said that incident.

13   Q.   So you knew that he had used drugs prior to the incident

14   that resulted in the assault and battery of a police officer?

15   A.   After all this took place, yes.

16   Q.   Okay.  Have you ever seen him use any other drug?

17   A.   No.

18   Q.   Have you ever seen Mr. Ferreira hallucinate on any other

19   occasion?

20   A.   No.

21   Q.   I believe you testified earlier that Mr. Ferreira did not

22   always have custody of his son; is that correct?

23   A.   No.  R█████ was born a drug-addicted baby by his mother,

24   and DCF had taken custody.  They questioned who the father was

25   because the mother gave two names.  So while awaiting further
```

1    DNA tests, I had custody of his son, which he was even unaware

2    of.  He believed the mother had the child.

3         He had to do a parenting class.  And after he succeeded in

4    that, he gained custody of his son because he was the

5    responsible one.  The mother was still out of the picture.

6    Q.   Does Mr. Ferreira to your knowledge have a work permit?

7    A.   No.

8    Q.   If he were released from custody, would you expect

9    Mr. Ferreira to work, even though he does not currently have a

10   work permit?

11   A.   I would expect that we would take whatever processes we

12   needed to or steps to get him to work legally, and if that's

13   not possible, then at least he could be with my children so

14   that I can go back to work and help support the family.

15   Q.   So you would expect that during the interim when he

16   doesn't have a work permit that he would not work?

17   A.   If there's not a legal way to do it, then no.  He could

18   watch the children so I could go to work.  I don't know the

19   legal route to answer that question with the working.

20             MS. LARAKERS:  I understand.  That's all I have.

21   Thank you.

22             THE WITNESS:  Okay.

23             MS. McCULLOUGH:  No further questions, Your Honor.

24             THE COURT:  All right.  Thank you very much.  You're

25   excused.

1          It's 3:30.  I think we'll take about a ten-minute

2     break and then hear the last witness.  Okay?  Is there anything

3     before we do that?

4          MS. LAFAILLE:  Well, I just wanted to prepare the

5     court for the fact that I'd like to confer with Ms. Rodriguez,

6     but it's possible that we won't be putting her up.

7          THE COURT:  Okay.  Then there's a particularly good

8     reason to take a break.

9          MS. LAFAILLE:  Yes.

10          THE COURT:  All right.  Take about ten minutes.  If

11     you need a few minutes more, let the clerk know, please.  Court

12     is in recess.

13          (Recess taken 3:31 p.m. - 3:49 p.m.)

14          THE COURT:  Would the petitioners like to call

15     Ms. Rodriguez?

16          MS. LAFAILLE:  Your Honor, I think a brief sidebar

17     might be helpful.

18          THE COURT:  Okay.

19     **SIDEBAR:**

20          THE COURT:  Good ahead.

21          MS. LAFAILLE:  So the concern is that she's currently

22     trying to find an immigration attorney.  What I think is

23     blatant in the fact of --

24          THE COURT:  You have to speak up.

25     ████████████████████████████████████████████████████████

1 ██████████████████████████████████████████

2 ████████████████

3      ██████████████████████████

4      ████████████████████████████████

5 ████████████████████████████████████████████,

6 there's no one here to make that calculus for her of whether

7 risking the type of cross-examination questions that, you know,

8 go to her criminal -- go to her immigration case, you know, is

9 really a risk for her.

10           So if the court wanted to ask her a couple of limited

11 sort of forward-focused questions, you know, I think she's

12 here, she could answer them.  But, you know, if the question is

13 going to delve into the underlying criminal conduct or, you

14 know, the merits of her immigration case, I'm not comfortable

15 with that risk, and I think we would just rest on the

16 declaration that's been submitted.

17           THE COURT:  Okay.  And the declaration, do I have the

18 declaration?

19           MS. LAFAILLE:  Yes.

20           THE COURT:  Where do I have it?

21           MS. LAFAILLE:  ECF 355, then it's one of the

22 attachments.

23           THE COURT:  What do the defendants say?

24           MR. WEINTRAUB:  If the question is, you know, if we're

25 weighing balances, balancing interests, we have to be able to

1    ask her about them if she's going to testify, take the stand at

2    all.

3                THE COURT:  If she testifies, she needs to be

4    cross-examined within reason on what she testifies to.

5                MR. WEINTRAUB:  But --

6                THE COURT:  Can I finish?

7                MR. WEINTRAUB:  Sure, sure.

8                THE COURT:  And what's her criminal conviction, for

9    possessing drugs, dropped down from possession with intent to

10   distribute, I think.

11               MS. LAFAILLE:  I believe so, yes.

12               THE COURT:  Let me think about this.  The way this

13   works in a criminal case is, if somebody testifies and then on

14   cross-examination asserts a Fifth Amendment, refuses to testify

15   to something that is reasonably related to what she testified

16   to, then the testimony gets struck.  The jury is told not to

17   consider it.  I'm just thinking out loud.

18               So if she went on the stand and you asked her any

19   questions about what gets her here but asked her questions

20   about her marriage or what she's going to do when she gets

21   out --

22   ████████████████████████████████████████████████████████

23   ███████████████████████

24   ████████████████████████████████████████████████████████

25   ████████████████████████████████████████████████



 1  question is will you comply with conditions of release, you

 2  know, she can address that.

 3          THE COURT:  And then there will still be all these

 4  other issues if she's not eligible.  This is something I wanted

 5  to talk to you about.  You don't have to worry about incurring

 6  my wrath.  I did make a decision.  Yesterday we started with

 7  six.  Now there are three.  But, you know, I'm learning things.

 8  Maybe you and your clients are learning some things, too.  I'm

 9  not quite sure where we go from here.  But Ms. Larakers planted

10  a seed.  Yet if you asked me, if you let these people out, can

11  you remove them, and the answer I think still is I don't know.

12  But some of these people seem to be foreseeably removable at

13  some point.  I'm focused on detention.

14          MR. WEINTRAUB:  I understand.

15          THE COURT:  I'm going to do this.  The issues are --

1          MR. WEINTRAUB:  There are two issues that I'm sure

2     petitioners' counsel want to be particularly careful with.  One

3     is her immigration status, because there's a finding, and

4     ██████████████████████████████████████████████████

5               ████████████████████████████████████

6               ████████████████████████████████████████████

7     And so the question -- you know, we can say all we want.  We

8     can examine her about it, but their response is yeah, but I

9     didn't know.  Then the other issue is the criminal history,

10    which is possession, dropped from possession with intent to

11    ████████████████████████████████████████████████████████

12    ████████████████████████████████████████████████████████

13    ██████████████████████████████████████████████████████████

14    the circumstances of that, and I'm sure petitioners' counsel

15    would not want us to when she doesn't have an attorney

16    available looking out for her interests, or even more

17    importantly whether it would even be advisable for her to take

18    the stand.  We're aware of that.  We want to be conscious of

19    that, but we're not going to concede that she should be able to

20    testify if we can't ask her about these things.

21         MS. LARAKERS:  It is particularly -- the underlying

22    applications do particularly go to flight risk.  This entire

23    lawsuit is about, Well, I shouldn't be removed if I'm going to

24    go through this process because clearly you can find me

25    whenever you want and I'll participate with ICE.  That's why we

1 would need to examine the underlying merits of that motion.  We

2 would want to because it's not clear on the merits, and it's

3 clear there's not a particular lot of reasons for her to stick

4 around.

5          THE COURT:  Well, if she takes the stand, there's

6 going to have to be reasonable cross-examination.  So what does

7 she want to do in the circumstances, or what do you want to do

8 in the circumstances?

9          MS. LAFAILLE:  I think in that circumstance we will

10 rely on her declaration submitted to the court.

11          THE COURT:  Is that acceptable to the defendants?

12          MR. WEINTRAUB:  As far as the proceedings are right

13 now, yes.

14          THE COURT:  Okay.  No.  I mean -- I haven't focused on

15 the declarations, but I mean, that's fine.  Well, I haven't

16 focused on the declarations, but if that's acceptable to the

17 defendants, I'll look at them and, you know, you can argue what

18 you want to argue if I even get to this.

19          MR. WEINTRAUB:  And that gets -- that's why I

20 mentioned at this stage of the proceedings.  Because again, as

21 Your Honor will hear me say again, where we are now is the

22 interim release, motion for the --

23          THE COURT:  I think this is a good place to leave this

24 because the declarations -- the Federal Rules of Evidence apply

25 in habeas proceedings.  They don't apply to injunctive

1    proceedings.  I'll have to think about this all the way

2    through.  Turn this into an evidence class.  I think the thing

3    to do is leave this right here because if it's under the rules

4    of evidence, if there's an affidavit and somebody is not able

5    to be cross-examined on it, I might disregard the affidavit.  I

6    mean, if we were having a trial, this is in the nature of

7    preliminary injunction, I think we'd just leave it right here.

8    And, you know, there would be another maybe sort of without

9    prejudice.

10           MS. LAFAILLE:  Right.  By November she may have

11   counsel.

12           MR. WEINTRAUB:  Again, the distinction between the

13   emergency motion for interim relief and the hearing on November

14   4 --

15           THE COURT:  Well, that's one thing I'm going to talk

16   to you about, is what you think is happening on November 4.

17   You've given a lot more thought to this than I have recently,

18   and it seems to be expanding.  But okay, I understand.

19   (End of sidebar.)

20           THE COURT:  Where is the interpreter?  Could you go

21   with Ms. Rodriguez, please.  Does Ms. Rodriguez speak and

22   understand English?

23           MS. LAFAILLE:  I think an interpreter would be

24   helpful, Your Honor.

25           THE COURT:  All right.

```
 1              I think we can do it right there.  She can stay there.
 2    Actually, she'll go on the witness stand.  It will be easier.
 3              ANA RODRIGUEZ, Sworn
 4              THE COURT:  All right.  Would you say your name,
 5    please.
 6              THE WITNESS:  Ana Rodriguez.
 7              THE COURT:  And do you have a lawyer in connection
 8    with your immigration matters?
 9              THE WITNESS:  No, right now I don't.
10              THE COURT:  Did you have one previously?
11              THE WITNESS:  Yes, I had one.
12              THE COURT:  And would you like to have a lawyer to
13    represent you in matters relating to your immigration status,
14    including in this case?
15              THE WITNESS:  Yes.
16              THE COURT:  And I've been told by Ms. Lafaille, the
17    lawyer for a whole class of people that includes you, a whole
18    group of people that includes you, that it would be in her
19    opinion advisable for you not to testify until you get your own
20    lawyer.
21              THE WITNESS:  Okay.
22              THE COURT:  Do you understand that?
23              THE WITNESS:  Yes.
24              THE COURT:  And do you agree with that advice?
25              THE WITNESS:  Yes.
```

```
 1            THE COURT:  All right.  And do you understand that
 2   that means that if I make any decisions concerning whether you
 3   continue to be detained or released, it will be based on the
 4   written record that I have before me and the testimony I heard
 5   from ICE, but it won't be informed by anything you might
 6   testify to right now.  Maybe I should --
 7            THE WITNESS:  Okay, yes.
 8            THE COURT:  However, there will be at least one other
 9   hearing in this case, and it's possible but not certain that
10   you might have an opportunity to testify then.  Do you
11   understand that?
12            THE WITNESS:  Yes.
13            THE COURT:  All right.  Well, I think that from class
14   counsel, particularly Ms. Lafaille, you received very
15   responsible professional advice given the complexities of your
16   case, so I'm not going to hear any testimony from you today.
17   Okay?  You can take your seat back in the jury box.
18            All right.  So let's see where we are and how you
19   propose to proceed.  There is one open question that I
20   mentioned this morning, and I don't know that this or any of
21   the other questions can be resolved today, whether there should
22   be some process that could result -- well, that might permit
23   ICE to remove the three aliens who by agreement are no longer
24   in detention.  I don't know if you had an opportunity to think
25   about that.  What are your thoughts on how we ought to proceed
```

1    with regard to what I've heard today, yesterday and today?

2         MS. LAFAILLE:  We're prepared to make argument in

3    support of interim release, Your Honor.

4         THE COURT:  All right.

5         MS. LARAKERS:  Your Honor, I'd just like to briefly

6    address the possibility of removing the individuals who have

7    been released.  We've conferred about this issue quite a bit.

8    We've been unable to come to an agreement on it.  ICE may very

9    well decide to release the individuals even after the November

10   4 hearing if they can take steps to remove them from the United

11   States.

12        THE COURT:  Say this --

13        MS. LARAKERS:  It is very -- it is important for ICE

14   to know this court's position with regard to removal.

15        THE COURT:  With regard to who?

16        MS. LARAKERS:  The three individuals who have been

17   released.  ICE may -- if ICE had the green light from this

18   court to remove those individuals, ICE, even if that removal

19   didn't happen until after the November 4 hearing, ICE may

20   continue to release them, I guess is what I'm saying.  So it's

21   very important for ICE to know the court's position with regard

22   to that.

23        THE COURT:  And I mean, I heard you.  You raised the

24   issue.  I haven't -- the adversary process hasn't operated on

25   it, with regard to it, but that's a possibility.

1        MS. LARAKERS:  Right.  And of course, as you know, our

2   legal position is that we should be able to remove them since

3   they are released.

4        THE COURT:  The issue, though -- and how many of those

5   that were released were eligible or received last month 180-day

6   reviews, two of them?

7        MS. LARAKERS:  All three, Your Honor.

8        THE COURT:  All three.

9        MS. LARAKERS:  But one of those individuals, one of

10  those individuals was not provided -- in ICE's view was

11  provided the interview on time.

12       THE COURT:  I mean, this is just thinking out loud.

13  If the process of determining that they should be removed was

14  flawed in some material way, that may be an impediment to their

15  removal.  But I think this is an issue that needs some work.

16       MS. LARAKERS:  Sure, Your Honor.  I think our -- we

17  can certainly brief this, but our argument would look something

18  like this.  That regardless of what's happened in the past,

19  regardless of their allegation that they didn't receive a

20  proper interview the first time around, ICE then conducted the

21  interview, the court heard evidence and extensive evidence

22  about what was considered when conducting that interview and

23  that decision to continue detention.  And I think it's going to

24  be very hard for petitioners to argue that the right things

25  weren't considered prior to that detention decision.

1        And now that they're released, because that

2   consideration has been done more than once now, ICE should be

3   able to effectuate their removal.  And removal in the case of

4   these aliens, it may look different.  Some of them may want to

5   purchase their own plane tickets.  Some of them may not want to

6   purchase their own plane tickets but would want to come into

7   ICE's custody for a short period of time in order to just put

8   them on a plane and remove them.  But we would start from our

9   position that the court doesn't have jurisdiction to stay the

10  removal and then later that they're already released, they've

11  already gotten the ultimate relief they wanted --

12       THE COURT:  So I mean, that's a preview of your

13  argument.  Do the petitioners have any immediate reaction?

14       MS. LAFAILLE:  Sure.  So we actually haven't conferred

15  on this issue.  At our September 10 status report we agreed to

16  defer the issue to see whether ICE released anyone.  And then

17  in our subsequent status report we didn't confer about it

18  because ICE hadn't released anyone.

19       Our position is this is interim release, you know, so

20  these individuals are in custody.  Their fate is to be decided

21  at the November 4 hearing along with the other individuals.

22  I'm not sure that it makes sense to tee this issue up now

23  separately from the others.

24       THE COURT:  Well, I think the colloquy we just had

25  with Ms. Rodriguez also may be relevant.  I think you need to

1    go back and talk to the petitioners.

2            First of all, you do need to confer.  Second of all,

3    you know, it's possible that some of the petitioners having

4    been released and having a period of time with their families

5    and not seeing a path to avoid removal eventually would want to

6    go in an orderly way.

7            And I think -- the case is full of surprises.  I'm

8    very surprised Mr. Bernacke didn't know that the regulations

9    that he's in charge of implementing nationwide required

10   interviews.  It means that in the ten years he's been an

11   immigration officer, ICE has been violating the law, and these

12   people are getting removed or detained in part because they

13   violated the law.

14           But again, this is an equitable proceedings, clean

15   hands.  But I don't know what the implications of that are, so

16   we're going to pause on that.  Now, people have been released,

17   and that's a good thing.  I, in the last year and a half,

18   discerned improvement in the performance of the Boston ICE

19   office.  Now there are issues on a larger scale.

20           All right.  I don't know that anything is going to get

21   decided today.  It's 4:15.  But I would like to hear your

22   argument with regard to this interim relief.  It's possible

23   there will be some issues that require some further work by you

24   and then by me.  But go ahead.

25           MS. LAFAILLE:  So Your Honor, our primary argument is

1    that release is the equitable solution here.  These

2    individuals, as I mentioned, have been detained for

3    extraordinarily long periods of time.  Between the six

4    individuals who were in front of the court yesterday, in their

5    five years plus of detention, you know, putting aside these

6    reviews however we characterize them, they had received one --

7    between them all, one arguably appropriate custody review

8    between all of them.

9              THE COURT:  Who got that?

10             MS. LAFAILLE:  I believe that was Mr. Moniz's 90-day

11   review.  The violations that we've seen in the face of the

12   government repeatedly saying to the court that it was complying

13   with the Post-Order Custody Regulations, what we've actually

14   seen are egregious violations being systematically repeated at

15   every stage of the process.

16             THE COURT:  For example, what?

17             MS. LAFAILLE:  For example, notice requirements not

18   being met at all.

19             THE COURT:  Because they were giving notice in Boston

20   too soon?

21             MS. LAFAILLE:  Of the 90-day reviews.  Of the 180-day

22   reviews simply not sending notices.

23             THE COURT:  They didn't send notices?

24             MS. LAFAILLE:  No.

25             THE COURT:  All right.  This is useful.  Go ahead.

1          Well, they didn't receive notices, so they didn't have

2     opportunities to present information until after the August 27

3     hearing.

4          MS. LAFAILLE:  That's correct, Your Honor.  Now, the

5     government argues that a sentence, when they are denied release

6     at the 90-day review, there is a sentence indicating that the

7     case will go to headquarters at 180 days.  And the government

8     argues that that provides notice, but not all of them even

9     received that sentence in their 90-day reviews.

10         The requirements for revocations of release are

11    specific.  They're not being followed systematically.  They

12    require --

13         THE COURT:  What specifically?

14         MS. LAFAILLE:  So those are at 241.4(l), and a person

15    whose release is revoked three months after their detention is

16    supposed to have an interview.  Again, these interviews aren't

17    happening.

18         And then the 90-day review, Your Honor, despite

19    everything we went through with Ms. De Souza last year having

20    had her review conducted before the opportunity, before the

21    deadline to submit documents, it's been a systematic practice

22    of ICE Boston to conduct reviews before the opportunities to

23    submit documents.

24         These violations are incredibly egregious, and I think

25    we'll have a lot to talk about in November.  In the meantime, I

1   think release is equitable because this proceeding has been --

2   this motion for order to show cause has been ongoing since

3   July.  It's complex.  There are documents that I think we

4   should probably review before the November hearing.  And, you

5   know, in the meantime, these families are separated.  They've

6   been separated for an extraordinarily long time.  And, you

7   know, I think if the court finds that there are conditions,

8   which I believe there are, that can safely release these

9   individuals --

10          THE COURT:  Have you proposed conditions?

11          MS. LAFAILLE:  I don't believe we've proposed specific

12   conditions.  We did mention, with regards to -- I think our

13   last filing mentions the possibility with regards to Mr. Moniz

14   acknowledging his record being the most serious, despite all of

15   the growth that he's demonstrated, even something like house

16   arrest, Your Honor, would be incredibly meaningful to these

17   families.

18          THE COURT:  If this were a criminal case and I were

19   making a decision under the bail statute, I'd have to decide

20   whether there were reasonable conditions proposed.  Reasonable,

21   feasible conditions which would reasonably assure that the

22   defendant in that case would not be dangerous or flee in

23   essence.  But it's done in the concrete context of specific

24   proposed conditions.  Where will they live?  Will they have

25   electronic monitoring?  Will they be allowed to go out to work?

1          And yesterday, commendably, there was an agreement to

2     release three on what I was told were the standard conditions,

3     except the person didn't have to stay home a day a week, but

4     they were going to wear electronic monitoring devices, GPS

5     devices.  But I don't know what the standard conditions are

6     myself.  I know what they are in a criminal case but not in an

7     immigration case.

8          MS. LAFAILLE:  This being --

9          THE COURT:  I'm sorry.  Go ahead.

10         MS. LAFAILLE:  This being an equitable proceeding,

11    Your Honor, I think the court could impose those conditions

12    that it thinks are sufficient to protect the community and

13    prevent flight in this case.

14         THE COURT:  I'd want to hear from the parties on the

15    conditions.  You know, the government is going to argue that

16    whatever procedural defects, and there have been certainly some

17    glaring ones at the 180-day stage, they're cured because after

18    August 26, ICE received what the detainees wanted to submit,

19    and the decisionmaker consulted their lawyers, among others,

20    and they say considered everything in good faith that they

21    should have considered and decided to detain all six initially,

22    and now there are three left.  So how do you respond to that?

23         MS. LAFAILLE:  Well, I think there are several things

24    that make it clear that these reviews were not meaningful or

25    compliant with the law.  The first is Mr. Bernacke's testimony

1    here today really makes clear that ICE is not even equipped to

2    comply with 241.4, Your Honor.  They don't have review panels.

3    They're just simply not set up to comply with these

4    requirements.  And, you know, the reviews that occurred could

5    not possibly have complied.

6          The second thing is the government's own submission in

7    this case.  The government's submission indicates that the

8    reason for continuing the detention of these individuals was

9    the travel document.

10         THE COURT:  Well, in fairness, that was part of it.

11         MS. LAFAILLE:  Well, let me read to you from the

12   government's brief, Your Honor.  "ICE's multiple reviews in

13   each of the detainee's cases confirmed its ability to

14   effectuate removal and by extension the detainee's

15   ineligibility for release."

16         THE COURT:  What document are you reading?

17         MS. LAFAILLE:  This is the most recent submission.

18         THE COURT:  The one made Monday?

19         MS. LAFAILLE:  I'm sorry, not the most recent one.

20   Docket 377 at page 14.

21         THE COURT:  See if you can find that in here, please.

22   What date was that filed?

23         MS. LAFAILLE:  I believe October 1.

24         THE COURT:  October 1.  Where were you reading?

25         MS. LAFAILLE:  The top of page 14.

1          THE COURT:  Where it says, "ICE's multiple reviews in

2     each of the detainee's cases confirmed its ability to

3     effectuate removal and by extension the detainee's

4     ineligibility for release."

5          MS. LAFAILLE:  I mean, to put a finer point on this,

6     ICE just found that three of the individuals that just a couple

7     of weeks ago it thought were ineligible for release, in fact,

8     you know, posed no flight risk or danger and could be released.

9     That itself is a testament to the fact that they didn't really

10    conduct meaningful reviews.

11         THE COURT:  Well, I said yesterday that that was not

12    going to be considered a waiver of any of their positions, and

13    I doubt it would be fair for me to rely on the argument you

14    just made.

15         MS. LAFAILLE:  Very well.  Then let me point to

16    something interesting that Mr. Bernacke said when asked -- you

17    know, of course they know they're here to testify to the

18    completeness of their reviews.

19         THE COURT:  Hold on a second.  What number?

20         MS. LAFAILLE:  377, Your Honor.  I think the

21    unredacted versions have been getting docketed as essentially

22    exhibits --

23         THE COURT:  I can't hear you.

24         MS. LAFAILLE:  I think the unredacted versions have

25    been getting documented essentially as exhibits under the

1    same --

2            THE COURT:  Like 377-1?

3            MS. LAFAILLE:  I think that's right.

4            THE COURT:  Go ahead.

5            MS. LAFAILLE:  Again, I really don't think the

6    legitimacy of the September reviews is by any means the key to

7    our argument here.  You know, I really rest on the underlying

8    year of --

9            THE COURT:  I thought you were going to tell me that

10   Mr. Bernacke said something really interesting.

11           MS. LAFAILLE:  Yes.  You know, when he wasn't focusing

12   on the fact that he knew that he had to testify to the

13   completeness of his review, when he was just asked what was the

14   deadline to complete your review, he said September 19; that

15   was the date that we had to ascertain whether or not there was

16   ability to remove.

17           That's what this review was.  There was nothing these

18   petitioners could have submitted, Your Honor.  This was a

19   review based on ability to remove.  And the government only

20   began saying otherwise after we filed our motion for interim

21   release.

22           THE COURT:  And ability to remove means ability to

23   either have documents or get them soon.

24           MS. LAFAILLE:  Right.

25           THE COURT:  As you understand it.

1           MS. LAFAILLE:  Right, perceived ability at least.  But

2    even putting that aside, Your Honor, I don't think -- the

3    September reviews were a chance for the government to narrow

4    the issues in dispute, not a chance for them to overcome the

5    merits of our legal arguments, and you know, I think the

6    pattern here is of systemic violations.  Even given the chance

7    to do it right, they didn't.

8           But we're talking here about interim release.  This is

9    a complex set of issues.  I think the court has given it a lot

10   of attention, and I think there will be further proceedings.

11   And in the meantime, we have three families that, you know,

12   just need to catch a break and have a moment to be together and

13   even to do some of the things that they've been prevented from

14   doing while in ICE custody to strengthen their immigration

15   cases, such as being able to work on their immigration

16   petitions and things like that that might ultimately help

17   persuade the government not to remove them.

18           THE COURT:  I just want to think this through.  So if

19   they're released on an interim basis, then their hearing is

20   scheduled for November 4 and 5.  I think you have a fuller,

21   more detailed sense of what the agenda for that should be than

22   I do at the moment, and then what relief are you seeking at

23   that hearing?

24           MS. LAFAILLE:  At that hearing we're seeking their

25   release.

1          THE COURT:  From detention.

2          MS. LAFAILLE:  Yes, Your Honor.

3          THE COURT:  And you keep saying you're not seeking an

4     order barring their removal.

5          MS. LAFAILLE:  We're not at this time seeking that.  I

6     do think, though, that some consideration has to be given to

7     the remedy to prevent essentially retaliatory or a re-detention

8     that would really vitiate the relief given.  So, you know, I

9     don't think it would be appropriate for ICE to re-detain them

10    the next day for removal.  I think that kind of thing would,

11    you know, clearly deprive them of the equitable remedy to which

12    they're entitled.

13         THE COURT:  Well --

14         MS. LAFAILLE:  I see that more as perhaps a condition

15    of release, a report date given or something in that.

16         THE COURT:  So they would be released -- I mean, this

17    is of substantial practical as well as legal importance.  So

18    they get released.  Let's say you prevail.  Because there

19    appeared to me, based on what I heard, to be more defects in

20    the process than I anticipated or recognized.  But the idea

21    would be, your argument I think essentially is, whether it's

22    today or November 4, there are conditions on which each of the

23    now three but all six can be detained pending -- I'm sorry --

24    can be released pending some reasonable date in the future for

25    their removal?

1          MS. LAFAILLE:  Yes, Your Honor.  And understanding

2     that --

3          THE COURT:  But that's what this is about, right?

4          MS. LAFAILLE:  Yes.

5          THE COURT:  Did I understand you correctly?  You think

6     basically these people should be released until their removal

7     can be scheduled -- not tomorrow, and I don't know how I might

8     define reasonable -- and then they could be removed.

9          MS. LAFAILLE:  Right, Your Honor.  And I say that

10    without giving up any challenges to their removal that they

11    might have or that we might have but simply as a matter of how

12    -- the resolution of this motion.

13         THE COURT:  Well, challenges to removal they may have

14    they wouldn't be bringing in this case in this court, correct?

15    You said they may have or you as class counsel may have.  So

16    I'm trying to understand where all of this is going, what's at

17    stake.  So they could pursue remedies in the -- well, what does

18    it mean --

19         MS. LAFAILLE:  Right.  The same remedies they might

20    otherwise have been able to pursue as three Calderon class

21    members being subjected to removal.  You know, if they think

22    that the provisional waiver regulations are not being complied

23    with or if we think they're not or if they wish to apply to ICE

24    's discretion for stays of removal or, you know, avail

25    themselves of other legal remedies, I think that's separate and

1    apart from this motion.

2          THE COURT:  The motion for interim relief or the

3    motion for relief --

4          MS. LAFAILLE:  Both, Your Honor.

5          THE COURT:  Both.  So you would be preserving

6    arguments you may have that either there's a systematic failure

7    to follow 241.4, if it's the applicable regulation, which I'm

8    skeptical about, but that issue -- well, anyway -- or in some

9    individual case there was proper basis to argue that the

10   provisional waiver provision wasn't considered or process

11   wasn't considered.

12         MS. LAFAILLE:  Correct, Your Honor.

13         THE COURT:  Let me hear from the government.

14         MS. LARAKERS:  So I want to put this in the context of

15   what this motion really is.  It's a motion for temporary

16   injunctive relief.  Petitioners asked this court to issue that

17   interim relief without the government having any opportunity to

18   put on their own witnesses to explain the flight risk and

19   dangerousness from their own point of view.  And therefore we

20   would object to this court ordering release prior to the

21   government having the opportunity to do that.

22         THE COURT:  And I'll say the following.  The reason,

23   prime reason at least that I wanted to hear from the spouses

24   is, again, we do this if it were a criminal case in the bail

25   context.  If you're thinking of releasing somebody into the

1    custody, usually we release somebody into the custody of

2    somebody else.  And you want to be assured that's a responsible

3    person.  So it's a little -- I mean, you've got the

4    convictions.  But anyway, go ahead.  I just wanted to clarify

5    that.

6            MS. LARAKERS:  So Your Honor, in any normal bond or

7    bail proceeding, the government would be allowed to submit our

8    own witnesses, including but not limited to the arresting

9    officers, the victims of the individuals' crimes and perhaps

10   other individuals.  The government has not been allowed to do

11   that.

12           THE COURT:  I didn't say you couldn't do it.  You

13   didn't ask me to.

14           MS. LARAKERS:  Your Honor, we have had a very limited

15   amount of time.  We obviously filled up the entire time today

16   with their witnesses.  We could come back Monday and do our

17   witnesses.  But certainly it should not -- these individuals

18   should not be released without the government having an

19   opportunity to do that.

20           But even separate and apart from that basic objection

21   is that this is a motion for temporary injunctive relief.  And

22   regardless of the allegations of the POCR violations,

23   petitioners have to show that they're likely to succeed on the

24   merits of their claim that these three individuals sitting

25   here, not the three individuals that were released, but these

 1    three individuals are entitled to release as a result of the

 2    alleged violations in their cases.

 3         THE COURT:  I've said this over and over, I think.  I

 4    don't think that's the right way to frame the question.  I

 5    think they have to show there's a reasonable likelihood that

 6    the law, the regulations have been violated and there's an

 7    imminent threat of irreparable harm.  And neither the balance

 8    of hardships nor the public interest are sufficiently in the

 9    government's favor that they shouldn't get some relief.

10    However, the relief is not necessarily release.  The relief

11    could be a decision by me, by the court, as to whether they

12    should be released.  And that could involve weighing the

13    relevant factors.

14         MS. LARAKERS:  And neither -- the government has legal

15    arguments why petitioners have failed to meet their burden that

16    even that is the proper remedy here for these three

17    individuals.

18         So focusing on the allegations of these three

19    individuals, Ms. Rodriguez, her only allegations are with

20    regard to the 90-day review.  And her only allegation with

21    regard to the 90-day review is that she received that notice

22    too early to be meaningful.  She received that notice about 60

23    days prior to that review.

24         MS. LAFAILLE:  I'm sorry, Your Honor.  I just want to

25    clarify that she also -- the review was conducted --

1          THE COURT:  What's that?

2          MS. LAFAILLE:  I also want to clarify that her review

3    was conducted about two weeks I believe before the deadline to

4    submit documents.

5          MS. LARAKERS:  Which is directly related to the

6    allegedly faulty notice.  So her allegation is that "ICE

7    violated the regulations because I didn't have an opportunity

8    to submit documents," despite the fact that she had at least 30

9    days and despite the fact that in her declaration she does not

10   state that she --

11         THE COURT:  Excuse me.  Let me have the declaration.

12         MS. LARAKERS:  The declaration is ECF 355, and it's

13   Exhibit 5.

14         THE COURT:  Exhibit 5?

15         MS. LARAKERS:  Yes.

16         THE COURT:  I'm looking at -- This is not right.

17   There's something wrong here.

18         MS. LARAKERS:  Your Honor, while they find that, I may

19   back up a little bit.

20         THE COURT:  No, don't.  Okay.  Exhibit 5 in the binder

21   I have is the notice to the alien.

22         MS. LARAKERS:  I think there is also a declaration in

23   that same exhibit.

24         MS. LAFAILLE:  I think it's Exhibit 6, Your Honor.

25         MS. LARAKERS:  Maybe Exhibit 6.

1          THE COURT:  Exhibit 6.  All right.  All right.  I've

2     looked at the declaration.

3          MS. LARAKERS:  So she does not allege in that

4     declaration that she was gathering documents, that she was

5     planning on submitting documents.  She only states in that

6     allegation that she didn't understand the notice and therefore

7     she didn't submit documents.

8          And the reason why she didn't understand that notice

9     is not because of anything that I put in the notice.  It's

10    because it was in English.  And while petitioners may say that

11    this is something that goes to the fact that they don't have to

12    show prejudice, it doesn't.  It goes to whether release is an

13    equitable remedy at all or whether a bail hearing is an

14    equitable remedy at all for someone whose only allegation has

15    to do with a notice that their declaration essentially admits

16    the fact that they submitted documents -- the fact that they

17    didn't submit documents didn't have anything to do with the

18    fact that it came late or early, that it had to do with the

19    fact that it was in English, which petitioners have not

20    contested --

21          THE COURT:  Where is that in here?

22          MS. LARAKERS:  It says she would have submitted

23    documents.

24          THE COURT:  Hold on a second.  I see, paragraph 13.

25          MS. LARAKERS:  Yes.  That's the reason why she didn't

1    understand the notice.  It's not an equitable remedy.

2         THE COURT:  In this case I've required, actually, I

3    think with your agreement, notice in various languages.  I

4    mean, this is another --

5         MS. LARAKERS:  Your Honor, petitioners don't challenge

6    the fact that it comes in English.  There are plenty of legal

7    arguments why documents provided by ICE outside of litigation,

8    NTAs forward are all provided in English, Your Honor.  So when

9    we look at that --

10        THE COURT:  And the courts used to do this, too.  And

11   you're from Texas.  When I was on the Judicial Conference of

12   the United States -- I don't want to get into confidential

13   discussions.  But all forms, like in criminal cases, were in

14   English.  And although there was, to my surprise, some debate,

15   now the forms are also available in Spanish at least.

16        You're right.  It hasn't been raised that this is an

17   issue in this case.  But by definition, people who are here --

18   the people who are going to get these notices are

19   overwhelmingly people who don't have English as their native

20   language, and they may not speak it at all.  So it wouldn't be

21   that hard for the United States government to print the notices

22   in languages that people can understand.

23        MS. LARAKERS:  And deportation officers are very

24   frequently fluent in Spanish and can translate notices for

25   detainees if asked.  It's not an allegation in this case.  And

1    it's not the equitable remedy for an individual who states that

2    the allegation was that she received the notice too early.

3         And then when we look at their motion for interim

4    relief, their motion for interim relief is focused on whether

5    since then ICE has conducted a good faith review.  They state

6    that the interim relief should be issued because ICE has failed

7    to conduct a good faith review.

8         Marcos Charles just testified that he did conduct that

9    good faith review in her Post-Order Custody Review decision and

10   prior to that in her removal decision, in his decision to

11   continue forward with removal.  And when we look at those

12   factors, even if we're just looking at equity here, faced with

13   her criminal history, the fact that ICE can immediately remove

14   her, even if we're just looking at equity, release is not the

15   equitable -- or even the bail hearing that this court conducted

16   is not the equitable remedy there.  It's not the equitable

17   remedy either for Mr. Ferreira.  Again, it's the same --

18        THE COURT:  Okay.  Go ahead.

19        MS. LARAKERS:  Your Honor, my argument is essentially

20   the same for all three of them.  But we need to focus not on

21   these allegedly systemic violations of ICE but what the

22   violations were in the specific cases.  Mr. Ferreira was not in

23   our view entitled to an interview until he received one.

24   Therefore that's not something that this court --

25        THE COURT:  Is that issue briefed?

1          MS. LARAKERS:  Yes, that issue is briefed.  But it's

2    not one of these situations where Mr. Bernacke on the stand

3    would admit that an interview should have been done.  Now, an

4    interview should have been done in Mr. Moniz's case.  However,

5    he did have a significant --

6          THE COURT:  An interview should have been done in Mr.

7    Moniz's case.  At what point are we talking?

8          MS. LARAKERS:  At his 180-day review, but the fact

9    that it wasn't done --

10         THE COURT:  What day was his review done?  When was

11   his review done, in September?

12         MS. LARAKERS:  His 180-day review, I don't know when

13   it was conducted, Your Honor.  It was conducted timely.  I

14   think that this may be the individual where petitioners can

15   concede that the review was conducted on day 182.

16         THE COURT:  Did he get notice of the review?

17         MS. LARAKERS:  I'm sorry?

18         THE COURT:  Did he get notice that the review was

19   going to be conducted?

20         MS. LARAKERS:  In ICE's interpretation, yes.  But

21   again, this is focusing on -- the issues here in these cases

22   are substantially legal ones.  Questions that this court has

23   not yet determined.  So even if there have been violations

24   here, it's not an equitable remedy to order the release or a

25   bail hearing of someone where the majority of the issues are

1   purely legal and where none of them --

2          THE COURT:  I don't think it's purely legal.  To the

3   extent it's legal, part of it is obvious.  There's a

4   regulation.  It's a law.  Mr. Bernacke has been violating the

5   law every time he has detained somebody in his supervisory

6   position because he didn't know about the existence of the law

7   that requires giving an interview.  And, you know, it's about

8   5:00 on Friday afternoon.  But I just can't let that go.  We're

9   talking about an equitable proceeding.  It's equitable for the

10  United States, the formidable United States to violate the law

11  in every single case, and a federal judge should just

12  say that's not something to be concerned about?  Because that's

13  essentially your argument.  You say we have legal arguments.

14         Do you have a legal argument that the government

15  doesn't have to follow Section (h)?

16         MS. LARAKERS:  No, Your Honor, and that is not my

17  argument at all.  My argument is that release is not the

18  equitable remedy here facing the allegations with these

19  specific individuals.

20         THE COURT:  Well, and that, I've repeatedly said, may

21  be right.  I'm not saying if I made the decision based on what

22  I know I would release any or all of them.  On the other hand,

23  and this is where I started in May of 2017, the government

24  decided to release the petitioner in that case and actually,

25  rather than remove him, let him stay until the provisional

1    waiver process was complete.

2         MS. LARAKERS:  Your Honor, we're here today on their

3    motion, on their allegation that ICE failed even after this

4    court ordered to consider in good faith the equities in these

5    individuals' cases.  And we've heard a lot of evidence

6    yesterday and today that that's clearly not the case.

7         And faced with that, this court should not order the

8    release of three individuals who have significant criminal

9    history and who in the determination of the Department of

10   Homeland Security poses a risk to public safety.  And even if

11   we look at the Supreme Court's opinion in Zadvydas, where it

12   was talking about the court's habeas jurisdiction and how this

13   court certainly has habeas jurisdiction and can certainly

14   review allegations of POCR noncompliance, even in Zadvydas the

15   Supreme Court said that there has to be a balancing between the

16   court's equitable power in a habeas and deference to the

17   Department of Homeland Security.

18        THE COURT:  The court doesn't defer to violations of

19   the law.  Again, this is going to have to get into back where

20   we were in June of 2018.  Zadvydas, it's procedural due

21   process.  And as I said, I haven't regarded all of this as

22   futile with regard to the Boston ERO office.

23        Here is what we're going to do.  I'm not going to

24   decide this matter this afternoon.  And I think there are some

25   things of really practical significance.  And it may cut

1   through some of these.  Because, you know, when I sit down to

2   write about this, whether it's before November 4 or afterwards,

3   there will be a written record that ICE has no idea of its

4   legal obligations to give an interview.  And it might -- you'll

5   get a chance to brief this.  The court can't -- I've written

6   this, and you've argued it, it can't decide whether it agrees

7   that ICE made the right decision when it balanced the factors.

8   But, you know, I said previously and I'm encouraged that ICE

9   Boston apparently takes it into account, has to consider, among

10   other things, that the alien is pursuing a provisional waiver.

11   And some people get removed and I think some people don't get

12   removed, which is the way one would -- what the scorecard

13   should look like if impartial decisions are being made.

14         But if the proper process isn't being followed, it

15   might be reasonable to detain somebody, but it also might be

16   reasonable to release them.  For example, there are legions of

17   people out there who haven't got an interview.  And it's

18   possible, unless ICE locks up everybody and -- just like

19   lawyers, it used to be you leave the courtroom and you wish you

20   asked another question.  I wished I asked Mr. Bernacke if he

21   ever reversed a recommendation to detain somebody.

22         But this is a major concern.  How it gets addressed in

23   this case, I don't know.  I didn't understand coming in here

24   today that this is an issue.  But it's really, it's legally

25   necessary and in human terms extremely important that the

1   proper process be followed.  And if the proper process isn't

2   followed, then that's what courts are constituted to do, to

3   hold among, other things, government officials accountable to

4   their duty to obey the law.  What that means in this case is an

5   open question.

6         I'll see you and your clients.  It's going to have to

7   be expedited, but there are a couple of things I that need to

8   be scheduled.  I need to know on what conditions it's proposed

9   that each of these people be released.  And I think that I'm

10  going to give you a time to confer about removal.  We're

11  talking about detention now.  But if somebody is released from

12  detention, they're still in custody for habeas purposes.  But,

13  unless the process by which their removal decision, the

14  decision to remove them is tainted, maybe ICE should be allowed

15  to remove them.

16        And we started yesterday, we were focused on six

17  people, and ICE agreed to release three of them.  And they're

18  not going to be prejudiced for having agreed to release three

19  of them.

20        MS. LARAKERS:  Thank you, Your Honor.  I just would

21  like to leave you with one note.  The government does take

22  these allegations very seriously and DOJ takes them seriously

23  when advising our client as well.  And our primary argument

24  here is with regard to remedies.  And our argument with regard

25  to what those remedies should be for these specific individuals

1    is set forth both in the supplemental briefing and in the

2    opposition to our motion for interim relief, which I think

3    explains in a different way that may be more helpful for the

4    court.  Thank you, Your Honor.

5         THE COURT:  I'm not sure what brief you're talking

6    about.  But that's the third thing, you're going to have to

7    develop a proposed agenda for November 4.  And let me say the

8    following because, you know, we're in a colloquy.  I have

9    things to decide.  But I'm very concerned, you know, that a

10   month ago ICE realized that it was violating the legal rights

11   of everybody who got to 180 days, and it hasn't done anything

12   except talk among themselves to cure that.

13        And if I recall correctly, in the spring of 2018, ICE

14   produced a manual that addressed the POCR regulations that the

15   people here in Boston administering the POCR regulations

16   evidently had never seen.  That's my memory.  And Mr. Bernacke

17   testifies there's no manual, there's no guidance.  I'm ordering

18   you by next Wednesday to tell me if such a document exists.

19   And somebody should look at it and see if it discusses the

20   requirements of 241.4(h)(3), or whatever the personal interview

21   thing is.  Because I don't -- I would prefer not to have

22   somebody come in here and file a suit seeking certification of

23   a nationwide class.

24        MS. LARAKERS:  I wouldn't like to see that, Your

25   Honor, either.

1          THE COURT:  Okay.  Look, we're having this discussion,

2     and we're having it publicly because I believe you.  But, you

3     know, you're the Department of Justice, and when the government

4     behaves illegally, it results in many cases in injustice.

5     Court is in recess.

6               (Recess, 4:56 p.m.)

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3            I, Kelly Mortellite, Registered Merit Reporter

4    and Certified Realtime Reporter, in and for the United States

5    District Court for the District of Massachusetts, do hereby

6    certify that the foregoing transcript is a true and correct

7    transcript of the stenographically reported proceedings held in

8    the above-entitled matter to the best of my skill and ability.

9                    Dated this 14th day of October, 2019.

10

11              /s/ Kelly Mortellite

12              _____

13              Kelly Mortellite, RMR, CRR

14              Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25