# EXHIBIT A

DECLARATION OF ACTING FIELD OFFICE DIRECTOR

<u>TODD LYONS</u>

Pursuant to the authority of 28 U.S.C. § 1746, I, Todd Lyons, an Acting Field Office Director ("Acting FOD") for U.S. Department of Homeland Security, United States Immigration and Customs Enforcement, Enforcement and Removal Operations, Burlington, Massachusetts declare as follows:

1. I am the Acting Field Office Director (FOD) for U.S. Department of Homeland Security, United States Immigration and Customs Enforcement, Enforcement and Removal Operations Boston Field Office ("ICE ERO Boston"). I have been serving in this position since most recently December 28, 2019. I am stationed in Burlington, Massachusetts.

2. Prior to my current role, I was a Deputy Field Office Director in the Boston Field Office. My duties in that position included oversight of the operations in the Boston Field Office.

3. Among my official duties as the Acting FOD is the responsibility for managing and monitoring the scheduling and execution of removal orders for aliens detained in ICE custody or otherwise encountered within the Boston Field Office's area of responsibility.

4. Also, among my official duties as the Acting FOD is approving the effectuation of removal orders for <u>Calderon</u> class members.

5. I have experience utilizing ICE record systems to obtain information regarding specific aliens. ICE maintains electronic and paper records on aliens in the course of its regularly conducted business activity. These records are made in the course of regularly conducted business activity at or near the time of relevant events by a person with knowledge of these events. In preparing this declaration, I have examined ICE official records,

1

including the Enforce Alien Removal Module ("EARM") and PLAnet. EARM is the ICE electronic database utilized by ERO to maintain information regarding the custody and removal status of aliens. PLAnet is the ICE electronic database maintained by ICE's Office of the Principal Legal Advisor as a case and document management system. These databases are the electronic records ordinarily relied upon to ascertain an alien's immigration and criminal history, current case status, and plans for removal, if any.

6. In the course of preparing this declaration, I have examined the official electronic records available to me regarding the immigration history and custody status of Salvador Rodriguez Aguasviva, ("Petitioner"), Administrative File No. ▮▮▮▮▮▮▮▮ I have also examined the Petitioner's Alien File ("A-File") and the documents contained within. I have further discussed this case internally with Officers within the ICE ERO Boston detained unit.

7. In making the determination to effectuate the Petitioner's removal order, I fully considered the following information.

Immigration Record

8. The Petitioner is a citizen and national of the Dominican Republic.

9. The Petitioner was encountered by a U.S. Border Patrol Agent on July 2, 2015 near Laredo, Texas. The Border Patrol Agent determined that the Petitioner had unlawfully entered the United States and placed him under arrest. Upon apprehension, the Petitioner told the U.S. Border Patrol Agent that he would not be harmed or face persecution if he was removed to the Dominican Republic, that he did not have fear or concern about being removed to the Dominican Republic, and that he entered the United States for the

purpose of seeking employment. Nonetheless, the Petitioner later asserted a fear of return to the Dominican Republic and therefore was not processed for expedited removal.

10. On August 6, 2015, the Petitioner was served with a Notice to Appear ("NTA") in person. The NTA contained a paragraph advising the Petitioner that he was required to provide the Department of Homeland Security ("DHS") with his full mailing address. Further, the paragraph advised the Petitioner that he was required to immediately notify the immigration court and DHS whenever he changed his address during the course of his immigration proceedings. The paragraph explained that the immigration court would mail notices of his future immigration hearings to the address he provided to the immigration court. The paragraph also contained a provision warning the Petitioner that if he failed to attend an immigration court hearing, a removal order may be entered by an immigration judge and that he could be arrested and detained by DHS.

11. The Petitioner appeared before an immigration judge in Oakdale, Louisiana on August 31, 2015. He sought his release from ICE detention and provided a statement to the immigration court from a sponsor indicating that he would reside at 503 Midwood Street, Union Dale, New York, 11553, if he was released. An immigration judge issued a bond order releasing him upon payment of $7,500.

12. On August 31, 2015, the immigration judge also provided the Petitioner and his attorney with a hearing notice for his next scheduled hearing, then set for October 5, 2015 in Oakdale, Louisiana. The hearing notice advised the Petitioner of the consequences of failing to appear at future hearings and the requirement to provide the immigration court with his address throughout the removal proceeding.

13. Because the Petitioner was released from ICE custody after payment of the $7,500 bond, his next hearing was reset to June 23, 2016 in the New Orleans immigration court.

14. On May 26, 2016, the Petitioner's attorney filed a motion to change venue from the New Orleans immigration court to the New York immigration court. In this motion, the Petitioner's attorney asserted that the Petitioner now resided at 503 Midwood Street, Union Dale, New York, 11553. The Petitioner's attorney advised the immigration judge in the motion that he had informed the Petitioner of his scheduled hearing with specific time, date and place. Further, the Petitioner's attorney advised the immigration judge in the motion that he had explained the consequences of failing to meet deadlines or appearances at scheduled hearings.

15. The Petitioner's attorney also filed a motion to withdraw on May 26, 2016 in which he asserted that the Petitioner now resided at 503 Midwood Street, Union Dale, New York, 11553 and that the Petitioner would be obtaining counsel in New York. The Petitioner's attorney also asserted in the motion to withdraw that he had had explained the consequences of failing to meet deadlines or appearances at scheduled hearings to the Petitioner.

16. The immigration judge granted the Petitioner's motion to change venue to New York on June 6, 2016. The immigration judge also granted the Petitioner's attorney's motion to withdraw on the same date. The immigration court mailed the immigration judge's orders granting these motions to the Petitioner at the address he had provided the court – 503 Midwood Street, Union Dale, New York, 11553 as well as to his now prior attorney of record.

17. The Petitioner was scheduled for a master calendar hearing in the New York immigration court for September 22, 2016. The Petitioner did not appear at this master calendar hearing.

18. An immigration judge entered an <u>in absentia</u> removal order on September 22, 2016. Per the removal order, the immigration judge determined that the New York immigration court had provided the Petitioner with written notification of the time, date, and location of his hearing. The immigration judge also found that the Petitioner had been provided with a written warning that the failure to attend this hearing would result in issuance of an order of removal, absent exceptional circumstances.

19. The Petitioner was encountered by a U.S. Border Patrol Agent in Lebanon, New Hampshire on September 4, 2019 while the Petitioner was leaving a hotel construction site. The U.S. Border Patrol turned the Petitioner over to ICE for detention pursuant to its authority under 8 U.S.C. § 1231 in order to effectuate his removal order.

20. On or about October 8, 2019, the Petitioner filed a motion to reopen his removal proceedings with the New York immigration court. In his motion, he claimed that he had not received notice of his immigration hearing because he moved to Massachusetts and did not reside in New York at the address he provided to the immigration court. He blamed this lack of notice on the fact that his aunt, at whose address he had intended to reside in New York, did not provide him with the notice of hearing. He did not provide any affidavit or evidence from his aunt to support this claim.

21. The immigration judge entered a stay of removal during the adjudication of the motion to reopen on October 9, 2019.

22. On October 30, 2019, the immigration judge denied the Petitioner's motion to reopen. The immigration judge found that the immigration court mailed the hearing notice for his September 22, 2016 hearing to the address the Petitioner provided in his change of venue motion in May 2016. Further, the immigration judge found it significant that the Petitioner's attorney, in the change of venue motion, advised him of the need to appear at scheduled appearances. Additionally, the immigration judge noted that the Petitioner had received an NTA with the consequences of failing to appear and failing to update the immigration court as to his address and of the statutory obligations to provide the immigration court with his address. The immigration judge also noted that the Post Office did not return the hearing notice as undeliverable. Therefore, the immigration judge found that the presumption of proper delivery of regular mail to the provided address was not rebutted.

23. Additionally, the immigration judge found that the Petitioner had not demonstrated any exceptional circumstances which prevented him from attending his hearing. As such, the immigration judge denied the motion to reopen.

24. The Petitioner did not appeal the denial of the motion to reopen to the Board of Immigration Appeals within the thirty-day appeal period.

<u>Consideration of Calderon Class Membership</u>

25. In terms of the Petitioner's <u>Calderon</u> class membership, I am aware of and I considered the following:

26. The Petitioner married a United States citizen on November 18, 2019, while he was detained in ICE custody at the Strafford County detention facility.

27. On January 10, 2020, ERO Boston determined that the Petitioner's United States citizen spouse had filed an I-130 Petition with U.S. Citizenship and Immigration Services on or about January 7, 2020.

28. Therefore, ERO Boston determined that the Petitioner was a <u>Calderon</u> class member and provided the Petitioner and his attorney of record with the <u>Calderon</u> class notice.

29. On or about January 16, 2020, I was briefed by officers within the ERO Boston detained unit regarding the factual background of this case to aid in my determination of whether ERO should move forward with effectuating his removal order.

30. I am fully aware that this Court has ordered that "ICE may not order the removal of an alien pursuing a provisional wavier solely because he or she is subject to a final order of removal. Rather, ICE must consider the reasons for the provisional waiver regime and the facts of the alien's particular case before deciding to order a removal that eliminates [US]CIS's opportunity to decide the merits of the request, and the right of the alien to pursue, and potentially receive, a provisional wavier." <u>Jimenez v. Nielsen</u>, 334 F.Supp.3d 370, 390 (D. Mass. 2018).

31. As such, when I reviewed the factual background of this case, I noted and considered that the Petitioner had married a United States citizen in November of 2019 and that she had filed an I-130 on his behalf in early January of 2020. I considered the letter that he wrote to ERO in October of 2019, in which he requested to get married to his then-girlfriend and that he claimed that he loved her and wanted to share his life with her. I considered the reasons for the provisional unlawful presence waiver regulation – namely, promoting family unity by reducing the time that eligible individuals are separated from their family members while they seek an immigrant visa through consular processing abroad.

32. I have since considered the declaration submitted by Petitioner's wife in this case as well as the documents submitted by the Petitioner's attorney in support of his personal interview which was conducted with ERO on January 22, 2020. Specifically, I considered that the Petitioner's wife asserts that he supports her emotionally and financially and that he has a good relationship with her adult children. Further, I considered that the Petitioner's wife indicates that she suffers from major depression disorder, bipolar disorder, and serious anxiety and that the Petitioner helps her confront these issues. Additionally, I considered that she misses the Petitioner's companionship and support and that she desires to continue living with him. I also noted and reviewed the letter from the Petitioner's wife's outpatient clinician noting the difficulty she has experienced since the Petitioner's detention began and that the clinician believes his release would benefit the Petitioner's wife's "ability to thrive."

33. Against this backdrop, I also considered numerous factors that I believe render the Petitioner a severe flight risk and likely ultimately unlikely to benefit from any approved Form I-601A, provisional unlawful presence waiver and above-stated reasons for the provisional unlawful presence waiver regulation.

34. For example, I considered the fact that the Petitioner entered the United States illegally in July of 2015. I considered that he initially told the U.S. Border Patrol Agent upon apprehension that he would not be harmed or face persecution if he was removed to the Dominican Republic, that he did not have fear or concern about being removed to the Dominican Republic, and that he entered the United States for the purpose of seeking employment.

35. I then considered that the Petitioner, when faced with expedited removal to the Dominican Republic, provided a different account of actually fearing return to the Dominican Republic and of being harmed there in the past. This major inconsistency as to the purpose for his illegal entry into the United States and whether he actually feared harm from the Dominican Republic was considered as a flight risk factor.

36. I further considered the fact that the Petitioner received ample notice of the statutory requirement to provide his current address to the immigration court from DHS, the immigration court, and his immigration attorney while he was in removal proceedings and of the consequences of any failure to do so.

37. I further considered the fact that the Petitioner failed to attend his hearing in the New York immigration court in September of 2016, despite the immigration court mailing his hearing notice to the address he provided to the immigration court only a few months earlier in May 2016.

38. Additionally, I considered the fact that despite the Petitioner having full knowledge that he was in removal proceedings, there is no evidence that he inquired with DHS or the immigration court regarding the status of his removal proceedings. I also considered that he failed to file a motion to reopen his removal proceedings until after he was detained by ICE in September of 2019.

39. Further, I considered the fact that an immigration judge in New York denied his motion to reopen, finding that he had received notice of his statutory obligations to update the immigration court with his address and of the consequences for failure to do so and failure to appear in immigration court. I further considered that the immigration judge found that the hearing notice was sent to the address the Petitioner had provided and that

9

the hearing notice was not returned as undelivered. Additionally, I considered that the immigration judge had not found any exceptional circumstances for the Petitioner's failure to appear at his hearing.

40. Also, I considered that the Petitioner had not appealed the immigration judge's denial of his motion to reopen to the Board of Immigration Appeals.

41. The above facts led me to believe that the Petitioner, despite being recently married to a United States citizen and despite her recent filing of the I-130 petition on his behalf, was a flight risk and would likely not comply with any Order of Supervision, a condition of which requires an alien to provide an address to ICE, to report for ICE check-ins as instructed, and to depart the United States as ordered.

42. Additionally, the above facts led to my belief that the Petitioner is likely unable to benefit from consular processing with an approved I-601A waiver because if he departs the United States, the U.S. Department of State ("DOS") may find the alien inadmissible under Section 212(a)(6)(B) of the Immigration and Nationality Act for failure to attend his removal proceeding without reasonable cause. I considered that because there is no waiver of this ground of inadmissibility, if found to be inadmissible by the DOS, the Petitioner must remain outside the United States for a period of five years. The above facts led to my belief that even if his pending Form I-130 is approved, and even if his yet to be filed I-212 waiver is conditionally approved, and even if his Form I-601A is originally approved, the Petitioner's may be unlikely to expeditiously consular process because I believed it was likely he is inadmissible for failure to attend his removal proceeding without reasonable cause. While ICE does not dictate determinations of inadmissibility to the DOS, ICE considers the Petitioner's entire immigration history,

including any potential grounds of inadmissibility that may impede the ability to obtain an immigrant visa through the expedited consular processing envisioned by the provisional unlawful presence waiver, Form I-601A.

43. I remain fully aware that DOS makes the ultimate determination as to inadmissibility under Section 212(a)(6)(B) of the Immigration and Nationality Act for failure to attend his removal proceeding. However, based upon the review of the facts of his case, I do not believe he would be able to satisfy the exception to this ground of inadmissibility by demonstrating that he had reasonable cause for failing to attend the hearing, and as such, I consider the Petitioner to be an extreme flight risk and therefore have determined to proceed with effectuating his valid final order of removal from the United States.

I declare under penalty of perjury that the foregoing is true and correct.

Signed on the Nineteenth day of February, 2020

_____
Todd Lyons
Acting Field Office Director
U.S. Department of Homeland Security
United States Immigration and Customs Enforcement
Burlington, Massachusetts