```
                    UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS



                                    )
LILIAN PAHOLA CALDERON JIMENEZ      )
and LUIS GORDILLO, et al.,          )
Individually and on behalf of       )
all others similarly situated.      )
                                    )        Civil Action
          Plaintiffs-Petitioners,   )        No. 18-10225-MLW
                                    )
v.                                  )
                                    )
KEVIN McALEENAN, et al.,            )
                                    )
          Defendants-Respondents.   )
                                    )




                BEFORE THE HONORABLE MARK L. WOLF
                  UNITED STATES DISTRICT JUDGE



                         TELECONFERENCE



                         March 25, 2020
                           2:16 p.m.




                              Kelly Mortellite, RMR, CRR
                              Official Court Reporter
                              One Courthouse Way, Room 5200
                              Boston, Massachusetts  02210
                              mortellite@gmail.com
```

APPEARANCES:

Counsel on behalf of Plaintiffs-Petitioners:
Adriana Lafaille
Matthew Segal
American Civil Liberties Union
211 Congress Street
Boston, MA 02110
617-482-3170
alafaille@aclum.org

Kathleen M. Gillespie
Attorney at Law
6 White Pine Lane
Lexington, MA 02421
339-970-9283
kathleen.m.gillespie@outlook.com

Stephen Nicholas Provazza
Wilmer Hale LLP
60 State Street
Boston, MA 02109
617-526-6313
stephen.provazza@wilmerhale.com

Counsel on behalf of Defendants-Respondents:
Eve A. Piemonte
U.S. Attorney's Office
1 Courthouse Way
Suite 9200
Boston, MA 02210
617-748-3100
eve.piemonte@usdoj.gov

Mary Larakers
J. Max Weintraub
U.S. Department of Justice, Office of Immigration Litigation
District Court Section
P.O. Box 868
Washington, DC 20044
202-353-4419
mary.l.larakers@usdoj.gov

P R O C E E D I N G S

1

2          THE COURT:  Let me ask the following before I ask

3  counsel to identify themselves.  Do we have court staff in the

4  courtroom now?

5          COURTROOM CLERK:  We do.

6          THE COURT:  Who is that?  I'd like to know whether

7  there are members of the media or public present.

8          COURTROOM CLERK:  It's Richard Nici.  He was on

9  earlier.  Rich, are you there?

02:16 10          MR. NICI:  I am here.

11          THE COURT:  I'm sorry, I can't hear you.  Rich, are

12  you there?

13          COURTROOM CLERK:  I know he was in the courtroom

14  earlier.  We spoke to him a minute ago.

15          THE COURT:  Is there anybody else in the courtroom?

16          COURTROOM CLERK:  I do not know.

17          THE COURT:  Okay.  All right.  Why don't you, starting

18  with counsel for petitioners, petitioner, identify themselves

19  for the record and let me know who is going to speak for the

02:16 20  petitioner.

21          MR. PROVAZZA:  Good morning.  Yes, sir, Your Honor.

22  This is Stephen Provazza on behalf of petitioners and class

23  member Salvador Rodriguez-Aguasviva, and I will be speaking for

24  the petitioners.

25          THE COURT:  Okay.  And who else?  Are there others

```
 1    with you?
 2                COURTROOM CLERK:  Yes.
 3                MS. GILLESPIE:  Kathleen Gillespie for petitioners.
 4                THE COURT:  Who else?
 5                MS. LAFAILLE:  Good afternoon, Your Honor.  This is
 6    Adriana Lafaille for the petitioners.
 7                MR. SEGAL:  Good afternoon, Your Honor.  Matthew Segal
 8    for the petitioners.
 9                MR. PRUSSIA:  Good afternoon, Your Honor.  This is
10    Kevin Prussia for the petitioners.
11                THE COURT:  Okay.  And for the respondents?
12                MR. WEINTRAUB:  Good afternoon, Your Honor.  Max
13    Weintraub representing the federal government.
14                THE COURT:  And are you going to be speaking for the
15    government today, Mr. Weintraub?
16                MR. WEINTRAUB:  Yes, Your Honor.
17                THE COURT:  Okay.
18                MS. LARAKERS:  Good afternoon, Your Honor.  Mary
19    Larakers on behalf of the respondent.
20                MS. PIEMONTE:  Good afternoon, Your Honor.  Eve
21    Piemonte from the United States Attorney's Office on behalf of
22    the respondent.
23                THE COURT:  And is Todd Lyons, the acting director,
24    present on the phone?
25                MR. WEINTRAUB:  He may not be, Your Honor.  I can tell
```

1    you that it is our understanding that he was diagnosed with the

2    viral flu last Wednesday.  He began having issues on Friday on

3    the flight back from California.  He was ordered Tamiflu and

4    self-quarantine, and he has subsequently lost his sense of

5    smell and taste and began running a fever of over 100 which is

6    still standing.

7         THE COURT:  On a human level, I'm very sorry to hear

8    that.  However, I ordered that he be present.  Is there

9    somebody else representing ICE-ERO on the phone?

02:18 10      MR. WEINTRAUB:  I don't know, Your Honor.  And I am

11   not certain that that's how we understood the court's order.

12        THE COURT:  Well, of course it was going quickly, but

13   you have a standing order that -- this is a hearing, and it's

14   open to the public.  I expect there will be media in the

15   courtroom.

16        COURTROOM CLERK:  Your Honor --

17        THE COURT:  The acting director has been ordered to be

18   present for every hearing.

19        COURT REPORTER:  I'm sorry, Your Honor.  You're

02:19 20   breaking up.  This is Kelly.  Are you on speaker?

21        THE COURT:  Well, do the best you can.  I have to keep

22   this on speaker -- well, maybe not.

23        There's a standing order.  What I said is that on a

24   human level, I'm very sorry to hear about Mr. Lyons' condition

25   since they sound like symptoms of the coronavirus.  However,

we're dealing with an emergency motion concerning somebody else

who may be being exposed to infected people, and there's a

standing order that, in this case, the acting director of

ICE-ERO be at every hearing.  This is a hearing.  It sounds

like there's compelling reasons for Mr. Lyons to not be on the

call, but there should be somebody else from ICE.  Who is

acting in his stead?

MR. WEINTRAUB:  Your Honor, I'm not able to make that

representation right now.

THE COURT:  Well, I suggest Ms. Larakers get on the --

phone and --

MS. LARAKERS:  Yes, Your Honor.

THE COURT:  -- call ICE and get somebody on this call.

MS. LARAKERS:  Yes, Your Honor.  And I think there

was.  I did inform ICE-ERO of the phone call because they asked

to be able to listen in, ICE OPLA, Your Honor, the attorney's

office.

THE COURT:  Well, I want whoever is substituting for

Mr. Lyons on this call.

MS. LARAKERS:  Yes, Your Honor.  I've been told that

two attorneys from ICE OPLA are on the phone and that the

call-in information was just sent to Director Lyons, and I will

ask them immediately to send it to those who are acting in his

stead.

THE COURT:  Yes, who are the ICE -- I don't know what

    1  the acronym stands for.  You've got two ICE lawyers.  Where,

    2  from Washington, D.C., on the phone?

    3          MS. LARAKERS:  No, Your Honor, from Boston.

    4          THE COURT:  Who are they?

    5          MS. LARAKERS:  That's Ron Seely and Mark Sauter.  Both

    6  of them have been present in chambers with you before, Your

    7  Honor.

    8          THE COURT:  Yes.  All right.  Well, I think it's

    9  essential that an operational person with the fullest authority

02:22 10  be on this call, so they should be tracking that person down or

   11  they can interrupt when they are ready to tell me they have or

   12  have not contacted the appropriate individual and that he or

   13  she is joining the call.  Okay?

   14          MS. LARAKERS:  Yes, Your Honor.

   15          THE COURT:  Is that Mr. Seely, Mr. Sauter?  Who is

   16  going to do it?

   17          MR. SEELY:  Yes, Your Honor.  This is Ron Seely.  I

   18  will contact Mr. Lyons right now, and I think he is able to

   19  call in.  So if you could just stand by, I'm just giving him

02:23 20  the number.

   21          THE COURT:  All right.  Look, if he's ill, I want one

   22  of his deputies.  Because if I issue an order, it's going to

   23  have to be implemented as soon as possible, and I don't think

   24  that should be Mr. Lyons' responsibility.  I also have some

   25  questions that shouldn't be answered by attorneys but should be

1    answered by representatives of ICE-ERO.

2              MR. NICI:  Your Honor, this is Rich Nici in the

3    courtroom.

4              THE COURT:  Yes.  Are there any members of the public,

5    including members of the media, present?

6              MR. NICI:  There is one member of the media present.

7              THE COURT:  Okay.

8              COURTROOM CLERK:  Your Honor, this is Magda, I believe

9    it's Mr. Hawkinson who is present.

02:24 10             THE COURT:  Okay.

11             COURTROOM CLERK:  And also, just so you are aware, the

12   dial-in information, the telephone dial-in was circulated to

13   the media.

14             THE COURT:  Well, we'll need to discuss how we're

15   going to deal with that.  But, okay.  Are there any other

16   members of the media on the phone?

17             MR. VILLANI:  Yes, Your Honor.  Chris Villani with

18   Law360.

19             THE COURT:  And that's fine because this is open to

02:25 20   the public.  And if Mr. Hawkinson wants to leave and get on the

21   phone -- he should have been told before coming into the

22   courtroom, the courthouse, that we just learned several hours

23   ago that one court employee who was tested is infected with the

24   virus.  So anybody coming into the courthouse who hasn't been

25   ordered to come into the courthouse should be aware of that and

 1    make decisions concerning whether they think it's prudent to be

 2    there.

 3           Okay.  But as I said, we're on the record.  This is

 4    open to the public.  There was an emergency motion filed last

 5    night seeking the interim relief of class member Salvador

 6    Rodriguez-Aguasviva or alternatively a prompt hearing today.  I

 7    issued one order last night and a second this morning that

 8    superseded the first one.

 9           The order, as participants know, directed the parties

02:26 10    to confer and for ICE to report by 12:00 noon today whether

11    they had resolved the dispute by agreement and, if not, to file

12    its opposition.  ICE filed that opposition, and I had scheduled

13    a hearing for 1:30.  It's been slightly deferred in part

14    because of -- well, because of things that have been going on.

15           So I do want to take this up promptly.  I want to hear

16    you on the motion I issued both last night and this morning

17    accelerating the schedule, and I said if I was not able to

18    resolve the motion based on this telephone conference we would

19    have a hearing in the courthouse tomorrow morning at 11:00, it

02:27 20    would be necessary to have ICE and Mr. Larakers and

21    Mr. Weintraub present because it was my intention to have the

22    petitioner present, too.  And if we had more time, I would have

23    had maybe him on this call if we had more time to arrange it.

24    But if I think it's necessary or appropriate to hear from him,

25    my first choice would be to have that done in the courthouse

1  tomorrow, but the state might resist or ICE might resist

2  transporting him.  We'll see.

3        And let me preface all of this by saying the

4  following.  We've now been litigating this case first as an

5  individual action then as a class action for about two years.

6  And the parties have worked -- well, after I had to decide a

7  number of things when the cases weren't mooted by the releases

8  of detainees, but in May and June of 2018, after I issued my

9  initial decisions finding that ICE had not followed the law in

02:29 10  detaining individuals, aliens, married to U.S. citizens, while

11  the parties have continued to have disputes, they've worked

12  with I would say commendable cooperation in resolving a number

13  of those disputes and making them necessary for me to decide

14  sometimes novel or complex issues.  And I really commend that,

15  and I really am sorry to hear that Mr. Lyons is ill.

16        MR. WEINTRAUB:  Your Honor, if I could, I just want to

17  report to the court that Deputy Field Officer Director Marcos

18  Charles is on the line and Acting Field Office Director Todd

19  Lyons is also on the line.

02:30 20        THE COURT:  Okay.  Well, Mr. Charles, thank you for

21  being on the line.  As I was just saying, not knowing that Mr.

22  Lyons could join the call, that I'm very sorry to hear that

23  he's ill at all and has symptoms that may suggest that he's

24  been infected by the coronavirus.  And if he wants to stay on

25  the line, he can.  If he wants to allow Mr. Charles, who does

1    need to stay on the line --

2              MR. LYONS:  No.  Your Honor, I'll stay on the line.

3              THE COURT:  Okay.  That was Mr. Lyons?  You're all

4    going to have to say who you are when you speak.  I'm sorry, I

5    should have said that earlier.

6              But anyway, I really appreciate the cooperative way

7    you've worked, and it's meant that the things I've needed to

8    decide, I really did need to decide, and ICE Boston, I'll call

9    it, has been responsible in many of the decisions that its made

02:31 10   in my view.  And we haven't been litigating every issue that

11   could be litigated, and maybe it's because things are moving

12   very fast or maybe there are some national policies, as I infer

13   from the fact that one of the affidavits I've received

14   necessarily on short notice from ICE was a declaration filed in

15   a case in the Southern District of New York.

16             But whatever it is, we have apparently an issue that I

17   need to decide, so I want to hear you on it, and I have some

18   questions, and we'll see where we are and whether it will be

19   necessary to continue tomorrow.  As I said, ordinarily I would

02:32 20   want to hear from the petitioner, but given the request for an

21   expedited schedule in the unique circumstances in which we're

22   operating, we weren't able to -- well, I didn't ask that that

23   be attempted to be arranged.

24             So I'll tell you, in case you have access to

25   computers, there's one case that the parties didn't cite that I

1    think is meaningful.  It's Mapp v. Reno, 241 F.3d 221 at 230.

2    It's a 2001 Second Circuit case with a thorough and thoughtful

3    discussion as to whether the court has the authority to order

4    an immigration detainee's release on bail.  It concludes that

5    the court does.  I think that it's -- well, I think that the

6    Glynn v. Donnelly case, which is the First Circuit case cited

7    by the petitioners, 470 F.2d 95, 98, is a materially different

8    case because we're talking about the standards for bail in a

9    habeas petition in a criminal case, so it involved not just

02:34 10   allegations that the detainee was a criminal but proof that he

11   had committed a crime and wasn't presumed to be innocent.

12        I think the fact that this is a civil detainee in an

13   immigration case is material to the analysis.  And the way Mapp

14   described the relevant issue was that a court considering a

15   habeas petition's fitness for bail must inquire into whether

16   the habeas petition raises substantial claims and whether

17   extraordinary circumstances exist that make the grant of bail

18   necessary to make the habeas remedy effective.

19        So I think something like that, I think I do have the

02:35 20   authority to grant the motion at the moment, and I'm interested

21   in hearing from you on that, and that I should consider a

22   question similar to the question in Mapp and also the issues

23   that would come up more conventionally in a criminal case as to

24   whether bail is appropriate or release on certain conditions is

25   appropriate, including whether there's evidence that the

petitioner is likely to be dangerous to the community, which I
don't think ICE is alleging, or whether it is proved by a
preponderance of the evidence if other requirements are met
that no combination of reasonable conditions will assure that
he won't flee.  So that's my sense of the present questions.

Mr. Provazza, it's your motion, and you've had a
chance to read the respondents' opposition.  Would you like to
go first?

MR. PROVAZZA:  Yes, Your Honor.

THE COURT:  Go ahead.

MR. PROVAZZA:  Before I start, Your Honor, if I
accidentally talk over you, I apologize ahead of time.  It's
not my intention.

Your Honor, we filed our motion because we've become
increasingly concerned with Salvador Rodriguez-Aguasviva's
health and safety in Plymouth County Jail.  I think we're all
intimately familiar with what's going on with coronavirus, the
risks involved for our families and the way that we protect
ourselves, including social distancing, sanitary conditions,
promptly washing your hands and just staying away from other
people.  And we're asking the court to exercise its equitable
powers for Mr. Rodriguez-Aguasviva's release now before
coronavirus explodes in the Plymouth County Jail.  And we know
that a sheriff's department employee working in the Plymouth
County Jail has now tested positive for Covid-19.  So it

1   appears to be a question of when, not if, the disease will

2   start to spread in the prison.

3          So prison is just about the worst place that

4   Mr. Rodriguez-Aguasviva could be right now.  Prisons are

5   crowded.  Prisoners can't self-isolate.  They can't practice

6   appropriate social distancing.  The facilities lack proper

7   sanitization and hygiene.  And coronavirus outbreak in prison

8   isn't just a possibility.  It's almost a certainty once

9   somebody in the prison has it, given the conditions.

02:38 10          And just to put it in a larger context, you know, a

11   WBUR story this morning talked about how the Middlesex County

12   D.A. has already gone ahead and released 40 prisoners awaiting

13   trial and has started reviewing cases of people already serving

14   sentences.  And the Massachusetts D.A. has released 25 percent

15   of pretrial detainees in Franklin and Hampshire County jails.

16          ICE has also recognized that this is a big issue.

17   They issued their own press release last week explaining that

18   they were ramping down enforcement against individuals who

19   don't pose public safety risks and they would exercise their

02:38 20   discretion to delay enforcement and use alternatives to

21   detention when that's appropriate.

22          And I'd also like to flag for the court that based on

23   information we have received from ICE and research we have done

24   on the ICE detention tracker, we believe that there is at least

25   six other class members detained in Massachusetts and that

1    there's at least two other people other than

2    Mr. Rodriguez-Aguasviva currently detained in Plymouth.  And

3    for some of these people we don't have any information about

4    their criminal history or any potential threat to public

5    safety, so we intend to work with the government and check

6    whether -- why they ended up where there are and whether any of

7    these individuals could be saved by release.  Although that's

8    not the subject of today's motion, I just wanted to note that

9    for the court.

02:39 10          THE COURT:  Let me ask you this.  Did you say there

11    were six other class members detained and four of them are in

12    Plymouth?

13          MR. PROVAZZA:  Three of them -- based on the

14    information that we've been able to gather from the ICE website

15    and also the notices we've been receiving, that's our

16    understanding.

17          THE COURT:  Four or three at Plymouth?

18          MR. PROVAZZA:  Three in Plymouth.

19          THE COURT:  Okay.  Because, according to The Boston

02:39 20    Globe today, different sheriffs in charge of jails are taking

21    different approaches to this.  But go ahead.

22          MR. PROVAZZA:  Turning to specifically

23    Mr. Rodriguez-Aguasviva, nowhere in the records have we seen so

24    far while litigating this issue has there been any indication

25    that he's a public safety risk.  ICE didn't include that in his

1    initial removal notification.  That wasn't included in Mr.

2    Lyons' affidavit, and no one has mentioned that in any of the

3    briefings.  The only thing that went into Mr. Lyons' removal

4    decision is related to a perceived flight risk and issues

5    flowing from his final order of removal.  And the only evidence

6    that -- sorry, Your Honor?

7            THE COURT:  I don't know what caused that.  That

8    wasn't me.  Keep going.

9            MR. PROVAZZA:  The only evidence cited that

02:40 10   Mr. Rodriguez-Aguasviva may be a flight risk are the facts

11   underlying his removal order, that he didn't appear at or

12   respond to removal -- his removal hearing and notices a few

13   years ago.  His wife lives in Massachusetts, in Lawrence, and

14   there's --

15           THE COURT:  Excuse me, stop, stop.  Where does she

16   live?

17           MR. PROVAZZA:  In Lawrence, Massachusetts.

18           THE COURT:  Do you know, is it an apartment?  Is it a

19   home?

02:41 20           MR. PROVAZZA:  I don't know that, Your Honor.

21           THE COURT:  And is it proposed that the petitioner

22   live with her if he's released?

23           MR. PROVAZZA:  Your Honor, we haven't discussed

24   conditions of his release, so I can't speak to that.  But I

25   mean, appropriate conditions for his release, if the court

1  determines to release him on bail, that could be one of the

2  things that is imposed.  And we can talk to her about that and

3  find out.

4          THE COURT:  Go ahead.

5          MR. PROVAZZA:  One other issue we wanted to flag is

6  that there are still some documents that Mr. Lyons relied on

7  when making his determination that we haven't received.  The

8  government produced some POCR materials and EARM database

9  tracking information about individuals they interact with.  We

02:42 10  received EARM printouts, but we still don't have the October

11  2019 immigration decision that is at the core of the removal

12  decision, the May 26 motion to change venue, the May 2016

13  motion to withdraw by Mr. Rodriguez-Aguasviva's immigration

14  counsel or any of the immigration court hearing notices that

15  Mr. Lyons cited.

16          THE COURT:  At the moment, I don't see that as

17  particularly important.  Why don't you explain to me what you

18  think the substantial question that you've raised is.  I have

19  reviewed the submission, although necessarily quickly.  But

02:43 20  what do you think is the substantial question you've raised?

21          MR. PROVAZZA:  For today's motion, Your Honor?

22  Whether --

23          THE COURT:  No, no, no.  With the underlying habeas

24  petition.

25          MR. PROVAZZA:  The underlying motion, emergency motion

1    seeking stay his removal, to stop his removal, Mr.

2    Rodriguez-Aguasviva, who was originally to be removed based on

3    his final order of removal being in absentia.  And we received

4    a notice from opposing counsel that Mr. Rodriguez-Aguasviva was

5    going to be removed because he was unlikely to receive -- I'm

6    sorry if I'm paraphrasing and not quoting, Your Honor --

7    unlikely to receive his I-601A.

8         THE COURT:  Because he was -- because he didn't appear

9    at his removal hearing.

02:44 10        MR. PROVAZZA:  Yes, which formed the basis for his

11   final order of removal.  And so the two big points there are,

12   one, that that understanding is a legal error.  The reasoning

13   they gave in that notification they sent us, the I-601A is

14   specifically made available by USCIS to people with in absentia

15   orders.  The notice and comment record shows that the 601A was

16   intended to benefit people with in absentia orders.

17        And the second point is that their removal decision

18   wasn't based solely on the factors and reasons he had a final

19   order of removal.  And there is nothing independent from the

02:45 20   facts surrounding his final order of removal that made them

21   decide to remove Mr. Rodriguez-Aguasviva.  And the reasons they

22   pointed to are reasons that almost everyone with an in absentia

23   final order of removal would have -- failing to attend their

24   removal proceedings, is exactly the reason they're even

25   eligible for a provisional waiver application.

1          THE COURT:  And basically, while Mr. Lyons in his

2     affidavit in response to the petition for habeas gives a much

3     fuller -- gives other reasons, including that, even if he

4     got -- if the petitioner got an approved I-601A, when he went

5     back to the Dominican Republic, the U.S. Consular Officer would

6     be unlikely to give him a visa to return to the United States

7     because he didn't have a good reason to miss his removal

8     hearing.

9          So is it your argument that those reasons are

02:46 10    pretextual or that at a minimum I should conduct some kind of

11    evidentiary hearing to determine what the reasons were for the

12    order of removal and whether they comply with my earlier

13    orders?

14          MR. PROVAZZA:  So Your Honor, we believe that Mr.

15    Lyons' affidavit is problematic for two reasons.  First, that

16    it is unclear when the factors he says led to his decision to

17    remove Mr. Rodriguez-Aguasviva took place.  So it appears from

18    the affidavit and the timing of when he received the notice and

19    the response filing, including his affidavit was filed, that

02:46 20    there might have been multiple instances where Mr. Lyons

21    determined to remove him.

22          THE COURT:  I'm sorry.  Say that again, please.  Could

23    you say that again, please?  I wonder, are you all able to hear

24    me?  Mr. Provazza, I was hoping that you would repeat what you

25    just said about multiple instances.

1          MS. LAFAILLE:  Your Honor, this is Adriana Lafaille.

2    Maybe I can jump in until Mr. Provazza is able to come back.

3    I'm not sure exactly what is happening.  But I think the point

4    he was trying to make was that the affidavit contained post hoc

5    rationalizations that did not align to any particular decision

6    point and that what was clear was that the decision had been

7    made based on legal error, and there was really no way for the

8    court to evaluate the relevance of the other information

9    provided in the affidavit when it's simply post hoc information

02:48 10   that is given after the fact to support the decision the

11   government did not deny was based on legal misunderstanding.

12          THE COURT:  Okay.  That's what I --

13          MR. PROVAZZA:  Your Honor, Steve Provazza back on the

14   phone.  I apologize.  My phone just cut out.

15          THE COURT:  Ms. Lafaille just re-articulated the

16   points you were making, and then I was asking, it would be

17   helpful if one of you would tell me why I shouldn't think the

18   petitioner would be a risk of flight if he's released.

19          MR. PROVAZZA:  Well, Your Honor, he's married to

02:48 20   someone living in Massachusetts.  There's nothing in any of the

21   documents we have seen that indicates that he is a flight risk.

22          THE COURT:  I'm asking why.  I don't know what he did

23   before.  I don't know how long he's lived in this community.

24   He's married to somebody in Massachusetts.  And what else, if

25   anything, suggests he's not a flight risk?

1              MS. LAFAILLE:  Your Honor, may I point the court to

2       the declarations --

3              THE COURT:  Go ahead.

4              MS. LARAKERS:  -- Mr. Rodriguez at ECF 467-1.

5              THE COURT:  Hold on just a second.  Let me try to pull

6       this up.  I may have lost -- no, here it is.  No.  I'm going to

7       have to get back on ECF.  Hold on just one minute, please.  It

8       seems to have cut out.  All right.  What is this, 18-10225 I

9       think?

02:50  10              MR. PROVAZZA:  Correct.

11              THE COURT:  We've been at this too long if I've

12       memorized the number.  What is the docket number of the

13       declaration, please?

14              MR. PROVAZZA:  467-1.

15              THE COURT:  All right.  So this is the declaration of

16       Anna Rodriguez.  Let me look at it.  I've read it before.

17              All right.  So this indicates in paragraph 10 that the

18       two of them were living together because Mrs. Rodriguez's

19       daughter moved in with them when she was pregnant.

02:52  20              MR. PROVAZZA:  Your Honor, to draw your attention to

21       paragraph 2, he moved in with her in Lawrence on June 5, 2017.

22              THE COURT:  So he's lived in Lawrence for three years?

23              MR. PROVAZZA:  Mm-hmm.  I'll also note in paragraph 3,

24       he supports his wife financially.  She is disabled since 2014.

25              THE COURT:  And she says in paragraph 18, "I would do

1     whatever I can for him to be back with me in our home in

2     Massachusetts."  So I assume the intention would be that he

3     would live with her.

4              MR. PROVAZZA:  Yes, Your Honor.  And I think that

5     answers your earlier question about conditions of release.

6              THE COURT:  All right.  And is there more you'd like

7     to say at this point, or should I hear from Mr. Weintraub?

8              MR. PROVAZZA:  Two more points, Your Honor.

9              First, although -- we asked opposing counsel if we

02:53 10     could cite the record of Mr. Rodriguez-Aguasviva's arrest.

11     It's protected by the protective order.  And since this is an

12     open hearing, we had to run that by them ahead of them.  We

13     still haven't heard back.  But at a very high level, we believe

14     the record of arrest also supports that he is not a public

15     safety risk or a flight risk.  And one other point, Your

16     Honor --

17              THE COURT:  His arrest by ICE?

18              MR. PROVAZZA:  How he came into ICE custody through

19     Customs and Border Patrol.

02:53 20              THE COURT:  Well, anyway.  If this is relevant, I'll

21     ask the members of the media to go off the line for a while,

22     but I at the moment think it's probably not material.  Okay.

23              MR. PROVAZZA:  If I could address the respondents'

24     filing earlier today, that they attached an affidavit from the

25     Plymouth County Sheriff's Department that describes some of the

efforts they've taken to prevent coronavirus from getting into
the prison, but it seems that prison staff have already brought
that inside.  So while there are steps made to postpone an
outbreak, it seems to have already arrived.  And the only
things they've done to protect people inside is to restrict
their movement more, to change their schedules for lunch and
for recreation, and to just keep up with their already existing
cleaning schedule.  Based on this, we believe you should
exercise your equitable powers to order his release to protect
his health and safety.

THE COURT:  At quick glance, when I looked at the
affidavit filed in the Southern District of New York, the Moon
affidavit, it looked like Essex County was doing less than say
the Bergen County Jail or some of the other jails referenced.
All right.  Mr. Weintraub.

MR. WEINTRAUB:  Your Honor, for the most part we're
going to let our pleading do the speaking for us.  We think
that, as relates to this specific filing, they have failed to
show that circumstances are such that release is warranted.
The affidavit from the sheriff's department shows that they are
aware, that they are taking all efforts in conjunction with the
CDC and the Massachusetts Department of Health, and that
they're doing everything they can to protect individuals who
are detained.

I would like to address briefly, Your Honor had raised

```
 1   the Mapp decision.  There's two issues regarding Mapp that I
 2   would like to raise.  One is that Mapp was a pre-REAL ID Act
 3   case when District Courts still had the authority to review
 4   removal orders and related matters, and that was the posture of
 5   the decision in Mapp, was that it was engaging in an action
 6   that the District Court is no longer permitted to engage in.
 7   Regardless, in --
 8           THE COURT:  But -- excuse me.  I want to understand
 9   this.  Just a minute.  I'm just going to get Mapp.  Just a
10   second.  So in Mapp, the court was doing what?  Reviewing --
11   what was the court doing in Mapp?
12           MR. WEINTRAUB:  My understanding, again, Your Honor,
13   you've just raised it.  So in our review of -- trying also to
14   pay attention to petitioner's counsel -- it appears that the
15   District Court in Mapp was reviewing a removal order, which, as
16   Your Honor knows, is no longer part of the subject matter
17   jurisdiction of District Courts.
18           THE COURT:  I do understand that generally.  However,
19   in this case, and ICE has accepted it, I have determined that
20   ICE has to consider eligibility for provisional waiver.  We
21   don't have unfettered authority to deport, remove.
22           MR. WEINTRAUB:  Although petitioners are finding fault
23   with AFOD Todd Lyons' analysis in his declaration, ICE has done
24   exactly what this court ordered and came to the conclusion that
25   he was not eligible for release or that they should not release
```

02:57 (line 10)
02:58 (line 20)

1    him.

2            THE COURT:  And I know that, you know, it's your

3    position that it was just a brief summary -- again, this goes

4    back to where I started, and I commend you for everything

5    constructive that's been done that has reduced, if not

6    minimized, the number of issues that I have to decide.  And,

7    you know, giving the petitioners five -- these reports and five

8    days' notice of somebody in the class who is subject to removal

9    is very -- it's a positive thing.  And there was just a short

02:59 10    description that said in effect that, you know, Rodriguez had

11    been detained because he couldn't get an I-601A because he was

12    not present at his removal proceeding.  And now it's the

13    petitioners' argument, the way I've read the brief so far, that

14    it's no longer ICE's position that somebody ordered removed in

15    absentia is ineligible for an I-601A.  The explanation has

16    shifted, as I understand it to, well, they wouldn't get the

17    benefit of the 601A because if he left the country, and even if

18    he went back to the Dominican Republic and then applied for a

19    visa, the Consular Officer wouldn't give it to him.

03:00 20            And you know, that may not -- in my mind, there is a

21    credibility question as to what the reasons were, so I'm

22    inclined to think, you know, that there's a meaningful issue,

23    and you briefed it heavily, including in the recent sur-reply,

24    and it's something that the petitioners didn't mention but has

25    engaged my attention.  And, as always, I want to make sure you

1   know what's on my mind so you can address it.  I have to find

2   my paper.  Just one second.

3          I mean, Mr. Rodriguez has been detained since

4   September 4.  The motion to enjoin his removal was filed

5   January 27 and, repeatedly, with the assent of the petitioner,

6   ICE has been given more time to respond.  On January 31 there

7   was a joint motion for an extension of time to file an

8   opposition until February 14.  And I've allowed all of these.

9   On February 13 there was another respondents' unopposed motion

03:02 10   for extension of time to February 20.  Then I received on March

11   5 a notice that Mr. Lyons would be unavailable from March 10 to

12   24, and Ms. Piemonte would be on trial until April 6, so I was

13   asked to schedule a hearing after March 25.  And then on March

14   19, the respondents requested leave, which was granted, to file

15   a sur-reply.  So I'd have to think about where these equitable

16   considerations come in, but --

17          MR. WEINTRAUB:  Your Honor, if I could --

18          THE COURT:  -- for a very long time in part so ICE

19   would have an opportunity to brief the issues.

03:03 20          MR. WEINTRAUB:  But to say that -- to say that ICE has

21   considered Mr. Rodriguez's situation based solely on his in

22   absentia order I think isn't necessarily accurate.  It's also

23   the case that Field Office Director Lyons considered the fact

24   that he did file a motion to reopen and it was denied on

25   October -- in October of 2019, and moreover, he didn't appeal

1    that decision to the Board of Appeals.

2          THE COURT:  And in fact -- and I think it's a little

3    challenging trying to figure this out somewhat on the fly

4    myself.  The merits -- I'm not now deciding the merits of the

5    habeas petition.  I think the issue for me now is does it raise

6    a substantial question, and I'm not even sure that's the

7    necessary issue.

8          What do you say about risk of flight?  I mean, let me

9    -- excuse me.  I asked you a question and now I'm not giving

03:04 10   you a chance to answer.  Let me ask a more basic question.  It

11   appears from the papers that ICE doesn't contend that the

12   petitioner would be a danger to the community if he was

13   released.  Is that right?

14         MR. WEINTRAUB:  I do not believe there's been such a

15   representation; you're correct, Your Honor.

16         THE COURT:  Okay.  And then what are the reasons to

17   think that he would be a risk of flight, particularly now that

18   we're reminded that he's lived in Lawrence, Massachusetts with

19   his wife and seems to be devoted to her family as well as to

03:05 20   her if he were to be released?

21         MR. WEINTRAUB:  Well, Your Honor, there is nothing

22   that -- I don't believe there is anything that the court hasn't

23   already been made aware of.  The only thing standing between

24   Mr. Rodriguez and removal is this court's stay of his removal

25   order.  He failed to appear.  The government can remove him,

1    once this court renders a decision, can remove him at any time.

2    And I don't believe it's beyond the scope of the law

3    enforcement agency's consideration to think that an individual

4    who wants to stay in this country with the wife, with family,

5    would not be a flight risk if he were released at this point

6    where the only bar to his removal is this court where the

7    likelihood of success on his 601-A, as this court has already

8    noted, is slim at best.

9         THE COURT:  I didn't say it was slim.  I didn't say it

03:06 10   was slim.  I haven't developed any view of that, and I'll have

11   to determine the relevance of the view.  What I have to I think

12   determine is what the actual reasons -- whether the proper

13   process was followed.  But go ahead.

14        MR. WEINTRAUB:  ICE has the knowledge that

15   Mr. Rodriguez has a history of receiving notice of the

16   requirement to appear in court and failing to do so.

17        THE COURT:  Let me ask you this.  We're having this

18   hearing on March 25, 2020.  We're having the hearing by

19   telephone because we're in the midst of a coronavirus pandemic.

03:07 20   Where would he go?

21        MR. PROVAZZA:  Your Honor, that calls for speculation

22   that the government is just not --

23        THE COURT:  Well, I mean, it's important that

24   petitioner pointed out to me that his wife wants him to live

25   with her in Lawrence.  Because it wouldn't be appropriate to

1

release him without knowing where he was going to go, making

sure that he had a place to go.  But it appears he does have a

place to go, and there would have to be confirmation of that.

But if I ordered his release, ordinarily I might say, well, he

should be released based on -- you know, subject to electronic

monitoring.  But the District Court is now minimizing that to

keep probation officers from having to be physically in touch

with criminal defendants.  And Mr. Charles may want to speak to

some of this, or Mr. Lyons, if he's well enough.  You know,

what conditions would you want if I decide to order the

release?

          MR. LYONS:  Your Honor, this is Mr. Lyons.  I would

say at a very minimum, we would still do electronic monitoring.

We still have that capability within ICE to do so.

          THE COURT:  Okay.  That's very helpful.  And if I were

to order his release, and I would order -- well, would you want

an order that he be required to reside with his wife and not

leave the home, for example, unless there was some medical

reason to do it?

          MR. LYONS:  I see no problem with that.

          THE COURT:  All right.  And let's say I do issue this

order this afternoon, what would be required to implement it?

He's in the Essex Jail.  What would happen mechanically?

          MR. LYONS:  Sir, this is Mr. Lyons again.  It's

actually Plymouth County.

1          THE COURT:  He's at Plymouth.  I'm sorry.

2          MR. LYONS:  Yes, Plymouth County.  I would have to

3     deal with the staff as far as what would need to be done, but

4     if I could just go back to the GPS portion.

5          THE COURT:  Sure.

6          MR. LYONS:  ICE's biggest fear here is that we do have

7     absconders that have cut their GPS bracelets off, and we've

8     already had one class member do that that I agreed to

9     release --

03:10 10          THE COURT:  I do --

11          MR. LYONS:  -- they weren't going to be a flight risk.

12          THE COURT:  No.  I remember that vividly.  Have you

13     apprehended that person yet?

14          MR. LYONS:  No, Your Honor, we have not.

15          THE COURT:  That person, as I recall, had a history of

16     serious mental illness.  Petitioners' view -- your counsel

17     should correct me if I'm wrong.  But that was the individual

18     who had been arrested for assaulting a police officer when he

19     evidently had used psychodelic drugs and was committed to

03:11 20     Bridgewater State Hospital.  And I was disturbed when I got the

21     report that he had cut off the GPS the day he was supposed to

22     be removed and said that he wasn't going back to Brazil, I

23     think.  And one of the reasons -- he certainly didn't obey my

24     orders, and I was disturbed because this was one -- that set of

25     individuals were examples of what I had in mind when I said

        1    that starting in about June I realized that you and Mr. Charles

        2    particularly -- and I hope I don't get into trouble with

        3    anybody at ICE -- have been very responsible in recognizing

        4    what I've ordered when there are legal defects and, you know,

        5    sometimes agreeing to things that reduce the number of issues I

        6    had to decide, and agreeing to that let that person out on the

        7    condition that he would leave when you decided he should leave

        8    or agree he should leave, and his absconding would injure the

        9    opportunity of other people to get the benefit of the doubt

03:12  10    from you and ICE.

       11         But in my current conception, and Mr. Weintraub or

       12    petitioners can be heard on that, that was a person with a

       13    history of mental illness that, as far as I know, Mr. Rodriguez

       14    doesn't have.

       15         MR. WEINTRAUB:  There's no reason to think that's not

       16    the case, Your Honor.  What Mr. Rodriguez does have is a

       17    failure to respond to requirements to appear in court which

       18    makes him the very definition of a flight risk, Your Honor.

       19         THE COURT:  Well, did that happen once or more than

03:13  20    once?

       21         MR. WEINTRAUB:  I am not certain, Your Honor.

       22         THE COURT:  I mean --

       23         MS. LARAKERS:  Your Honor, it happened -- sorry.  This

       24    is Mary Larakers.  It happened until he received his final

       25    order of removal.  And the additional, one additional factor --

1          THE COURT:  I'm sorry.  He received -- I mean, I

2     understood that the argument is that he gave an address.  A

3     notice of the hearing was sent to that address.  He said that

4     he had left that address, and he didn't, as required, as he had

5     been told, give a new address, but that there was one hearing

6     that he failed to appear at.  So my question was was there more

7     than one hearing that he failed to appear at?

8          MS. LARAKERS:  No, Your Honor.  Specifically because

9     that's when the hearing -- that's when he was given his final

03:14 10   order of removal, was that hearing.  However, after that,

11     despite knowing that he had to appear at immigration court at

12     some point in time, there's no record that he called the court

13     or inquired as to the state of his removal proceedings at all.

14          But I understand Your Honor's -- we are talking about

15     2016.  Now, in 2020, another thing that Mr. Lyons mentioned in

16     his declaration was that he believes that this individual is a

17     flight risk due in part to ICE's belief that he's not likely to

18     benefit from or receive a provisional waiver.

19          At the beginning of this case, Your Honor, I think all

03:15 20   of us were under the impression that, well, if someone has a

21     reason to talk to ICE and a reason to cooperate with the

22     government because they're going to receive a provisional

23     waiver, then that makes them less of a flight risk.  But here,

24     when respondents reasonably believe that this person has no

25     reason to participate with the government to pursue this

process, because ultimately he's not going to benefit from it,
the government believes, reasonably, that that makes him a
flight risk.

THE COURT:  Well, there's some risk of flight.  If
this was in a criminal context, the question would be whether I
was persuaded by a preponderance of the evidence that no
reasonable conditions would assure, reasonably assure, not
guaranty, that he would appear as required in the future and
leave or be deported when the time came if that's the result of
the litigation.  But it's helpful to be reminded.

Let me ask you this, because Mr. Lyons is the one
person who didn't honor his agreement when ICE agreed that he
could be released to depart when his departure date came.  Did
the others that you agreed to release -- and some of them
agreed to leave the country on particular dates.  Did they go?

MS. LARAKERS:  Your Honor, I'd have to ask Mr. Lyons
that.  I'm not aware of any others that failed to report as
required.

MR. LYONS:  Your Honor, I'm not aware of any that
haven't.

THE COURT:  So I mean, this goes back to something we
discussed before.  I said it in court.  I may have said it in
some of our lobby conferences.  You know, being separated from
your family for a day even is a form of irreparable harm, and
many people would value a month with their family and then

1   leave when they have to leave.  And some have.  One didn't.

2   All right.  Is there anything more the respondents

3   would like to say?

4   MS. LARAKERS:  Shortly, Your Honor, and I think this

5   is buried in some of our briefings, but he did not -- another

6   reason why ICE considers him more of a flight risk than maybe

7   the typical class member is that he did not begin pursuing this

8   provisional waiver until he was actually detained.  He didn't

9   file his I-130 until well after he was detained, Your Honor.

03:18 10   THE COURT:  He couldn't.  He didn't get married until

11   after he was detained, did he?  I think he got married after he

12   was detained.

13   MR. PROVAZZA:  Yes, he was married after he was

14   detained.

15   THE COURT:  Okay.  All right.  Is there anything the

16   petitioners would like to say in response?

17   MR. WEINTRAUB:  Yes, Your Honor.  Two points in

18   response.  First, under the Mapp standard that there needs to

19   be a substantial issued raised, I know you haven't ruled that

03:19 20   that's the governing legal standard here, I think what we're

21   hearing from respondents' counsel just highlights the core of

22   what we originally filed our underlying motion about.

23   We heard Mr. Weintraub say that

24   Mr. Rodriguez-Aguasviva's I-601A, his chance of success was low

25   at best, I think is what he said.  And we heard Ms. Larakers

1   say that Mr. Rodriguez-Aguasviva is unlikely to benefit from

2   the provisional waiver process even though people like him are

3   expressly eligible for process.  And there still seems to be a

4   mistake coming from the respondents' side about what an in

5   absentia order means.  And a government lawyer saying that in

6   open court over and over again, repeating that mistake is very

7   concerning about people with in absentia orders and what would

8   happen to Mr. Rodriguez-Aguasviva.

9        Regarding Mr. Ferreira, the individual who absconded,

03:20 10   I don't think Mr. Rodriguez-Aguasviva should be punished for

11   what happened to Mr. Ferreira.  I'd also like to note that,

12   although we represented Mr. Ferreira as class counsel, he had

13   his own immigration lawyer who negotiated his settlement offer.

14   I'd like to also note, for Mr. Rodriguez-Aguasviva, we are only

15   class counsel for him, and he has also an individual

16   immigration attorney that has been pursuing the provisional

17   waiver process on his behalf.

18        So, Your Honor, for the reasons we stated earlier and

19   in the interest of protecting Mr. Rodriguez-Aguasviva from

03:20 20   what's going on, we urge you to exercise your power and release

21   him on appropriate restrictions to keep him safe and allow him

22   to spend this time with his family.

23        THE COURT:  Okay.  Ordinarily I would want to hear

24   from the respondent, Mr. Rodriguez-Aguasviva, before deciding

25   this matter.  However, it wasn't feasible to get him on this

1   telephone call, and I don't -- I had intended, if necessary, to

2   have all of you, including him, in the courtroom tomorrow.  Mr.

3   Lyons can't come to court.  And we might be able to do

4   something by video, but I actually wouldn't feel comfortable,

5   saying that it's too dangerous for me to make you come to the

6   courthouse, but perhaps it's not too dangerous for somebody who

7   is not charged, let alone convicted, of any crime to be in jail

8   for health reasons in this pandemic.

9       I'm going to decide this matter, and I will explain my

03:22 10   decision.  The transcript will be a record of the decision and

11   you must order it.  It's possible I'll write this up, but I do

12   think this is an urgent matter and I should tell you my

13   decision, so I will.

14       First, I've concluded for the reasons described by the

15   Second Circuit in Mapp v. Reno, 241 F. 3d 221 at 230, a 2001

16   Second Circuit case, that District Courts do have the power to

17   order the release of immigration detainees on bail.  I don't

18   think that the REAL ID Act alters that fundamental authority.

19       As I said earlier, I believe that the Glynn v.

03:23 20   Donnelly case, the First Circuit case, 470 F.2d 95, 98 is

21   distinguishable in a material respect.  In Glynn, the First

22   Circuit did hold that in certain extraordinary circumstances a

23   District Court could release a detained petitioner before the

24   petition was decided on the merits.  It created a higher

25   standard or stated a higher standard than the Second Circuit in

1    Mapp.   In Glynn, the petitioner was somebody who had been

2    convicted of a crime.  I believe his appeal had been denied,

3    and then he was petitioning for habeas corpus, but he had no

4    presumption of innocence.

5          In this case, it's important to remember we're talking

6    about a civil detainee, somebody who has never been charged,

7    let alone convicted of any crime.  And I think that the Mapp

8    test or something similar or perhaps less is appropriate.  As I

9    said, the Mapp test where the court in Mapp said -- I don't

03:25 10   know -- somebody perhaps didn't mute their phone because,

11   unless I'm hearing the court reporter, there's something

12   clicking, banging.

13         But the court in Mapp said the court considering a

14   habeas petitioner's fitness for bail must inquire into whether

15   the habeas petitioner raises substantial claims and whether

16   extraordinary circumstances exist to make the grant of bail

17   necessary to make the habeas remedy effective.  And I would add

18   to that that, even if those requirements are met, the court

19   would have to be satisfied that the petitioner would not be a

03:25 20   danger to the community, reasonably assured that the petitioner

21   would not be a danger to the community or not would flee if

22   released on reasonable feasible conditions.

23         I do find, without expressing any prediction of how

24   the merits will be resolved, that a substantial claim or

25   question is raised by the petitioner's habeas petition.  The

1    initial description by ICE of the reason for his detention --

2    well, the reason for his detention sent to petitioner's counsel

3    in an email was that in effect -- well, that he was likely to

4    be unable -- the petitioner was likely to be unable to receive

5    an approved I-601A because he did not appear at his removal

6    hearing.  He was ordered removed in absentia.  The essence of

7    this, the way it was stated initially indicated that ICE was

8    under the impression or misimpression that the petitioner is

9    ineligible for an I-601A.

03:27 10          While I've commended Mr. Lyons and Mr. Charles on many

11   things they've done, since June 2018, I have found ICE has

12   repeatedly failed to understand its own regulations as I held

13   in 2018.  And I learned, to my dismay, in the fall of 2019,

14   when the witness responsible for much of the national program

15   for many years testified that he didn't understand -- he didn't

16   realize there was a regulation that required that everybody

17   detained more than six months had to be interviewed.  It would

18   be sadly consistent with the pattern in this case if ICE

19   misunderstood whether somebody who failed to appear for a

03:28 20   removal hearing was ineligible for an I-601A.

21          And indeed it appears that ICE's position has evolved

22   and they don't take that position anymore.  Mr. Lyons has

23   articulated in his declaration other reasons for the detention,

24   but there is the question of whether those reasons were in his

25   mind when he decided to detain the petitioner or whether the

1    affidavit that appears to have been drafted by a lawyer has

2    rationalizations that weren't part of the decisionmaking

3    process at issue.  That's an issue that I may need to hear

4    testimony on.  I also -- but I do think that there's a

5    substantial question, a substantial claim.

6             In addition, I find that extraordinary circumstances

7    exist that make the grant of bail necessary to make the habeas

8    effective, to make the habeas remedy effective.  To be blunt,

9    we're living in the midst of a coronavirus pandemic.  Some

03:30 10   infected people die; not all, but some infected people die.  If

11   the petitioner is infected and dies, the case will be moot.

12   The habeas remedy will be ineffective.

13            And being in a jail enhances risk.  Social distancing

14   is difficult or impossible.  Washing hands repeatedly may be

15   difficult.  There is, it appears not to be disputed, one

16   court -- one Plymouth County jail employee who has been

17   infected, and there's a genuine risk that this will spread

18   throughout the jail.  Again, the petitioner is in custody with

19   people charged with or convicted of crimes.  He's not been

03:31 20   charged or convicted of anything.

21            I've also considered what I ordinarily consider in

22   making or reviewing bail decisions in criminal cases.  There's

23   no contention that the petitioner will be dangerous to any

24   individual or the community if he's released on reasonable

25   conditions.

1          ICE does contend that he would be a risk of flight.

2    That is based on the fact that he missed one immigration

3    hearing at which his removal was ordered and apparently did not

4    tell ICE of his change of address.  And he is facing a serious

5    risk of being removed.  He may not prevail on the habeas

6    petition.  And if he does, he may not get a provisional waiver.

7          However, there's no indication that the petitioner has

8    anyplace to go.  Being among other people, say, in a homeless

9    shelter is very dangerous, like being in a jail.  There's no

03:33 10   indication that he has any relatives or others who might take

11   him in other than his wife.  And I am ordering that he live

12   with his wife in Lawrence, Massachusetts; that he stay in their

13   residence, except if there is a medical need for him to leave;

14   and, unless it's a genuine emergency, he would need the

15   permission of ICE to leave.  And he is to be on electronic

16   monitoring, so if he leaves the residence when he hasn't been

17   authorized to leave, ICE would know that and, if appropriate,

18   could come back to me to revoke his release.

19         In addition, there are certain equities that favor the

03:34 20   release of the petitioner.  He's now been detained since

21   September 4, 2019.  On January 27, the motion was filed to

22   enjoin his removal.  As I indicated in the course of the

23   argument, with the assent of petitioner's counsel, class

24   counsel, ICE has repeatedly been given extensions of time to

25   respond to the motion.

1           On January 31, 2020, the parties filed a joint motion

2    to give ICE until February 14 to confer, and then on February

3    13, the respondents filed an unopposed motion for an extension

4    of time to file their opposition until February 20, which I

5    allowed.  Then I was asked not to schedule a hearing in this

6    case until after March 25 because Mr. Lyons would not be

7    available from March 10 to 24.  I accommodated that.  And I was

8    told that local counsel, Ms. Piemonte, would be on trial until

9    April 6.  On March 19 I allowed the respondent's motion for

03:36 10    respondents to file a sur-reply.  And though it's possible,

11    except for ICE asking for and receiving extensions of time to

12    respond or file a sur-reply, that there would have been a

13    hearing and a decision on this case earlier.

14           So essentially we're in a circumstance where an

15    individual who has not been accused of any crime has been

16    detained for -- I think it comes to about six and a half

17    months.  Part of that is because I've stayed his removal

18    pending the decision on his motion to enjoin removal, but

19    because of accommodations to ICE, that wasn't fully briefed

03:37 20    until less than a week ago, and I had been asked to defer to

21    Mr. Lyons' availability, which I did.

22           So for all of those reasons, I'm ordering that the

23    petitioner be released no later than tomorrow, March 26, 2020,

24    on the conditions I articulated and will memorialize in a brief

25    order.

1          I'm ordering counsel for ICE to inform me when he has

2     been released, and if there's some problem with implementing

3     this order by tomorrow, you'll have to let me know promptly.

4     Petitioners' counsel I'm directing, ordering, to inform the

5     petitioner and his wife of my decision, including the

6     requirements that he live with his wife and that he be on

7     electronic monitoring.  And he'll have to confirm for ICE,

8     he'll have to provide ICE her address if they don't have it and

9     confirm her willingness to have her husband with her for the

03:38 10     duration of this case.

11          Now, should I schedule -- and this gets -- Mr. Lyons,

12     I've been repeating myself, but I'm very sorry that you're ill,

13     and I hope it's a conventional illness and not a result of the

14     coronavirus.  But I'd like to either schedule a hearing, which

15     we would probably be able to do by Zoom -- it can't be next

16     week due to my schedule, and I doubt Mr. Lyons would be

17     available, but it could be in April.

18          Do the parties want to confer on what a reasonable

19     schedule, sometime after next week, a reasonable date or dates

03:39 20     for a hearing, which might require some testimony from Mr.

21     Lyons.  Or should I pick a date that can be changed if

22     necessary?

23          MR. WEINTRAUB:  Your Honor, I apologize.  Maybe I just

24     didn't -- which aspect of the litigation?

25          THE COURT:  On the emergency motion -- not on the

```
 1   emergency motion.  On the petition to enjoin his removal.
 2           MR. WEINTRAUB:  Thank you, Your Honor.  I was hoping
 3   that was what it was.  I just wanted to clarify.  Thank you.
 4           THE COURT:  Yes.  So should I give you a chance to
 5   confer on some possible dates?
 6           MS. LARAKERS:  Yes, Your Honor, that would be
 7   beneficial if you could.
 8           THE COURT:  Right.  And I hope Mr. Lyons is going to
 9   recover completely and quickly.  And I think maybe the week of
10   April 13, something like that or later.  All right.  What is
11   sort of a minimum reasonable time for counsel to confer and get
12   back to me, report to me with some proposed dates?  Do you
13   want -- here.  Why don't I say, today is the 25th.  How about
14   by April 1.  I'll give you a week to talk.
15           MR. PROVAZZA:  This is Stephen Provazza, Your Honor.
16   That works for us.
17           THE COURT:  Okay.  My availability next week may be
18   limited.  In fact, here, I'm going to help you.  I'm going to
19   give you until April 8, okay.  And I'm also going to again
20   order that you confer and see whether you can reach some
21   agreement to settle the case.  It's possible, and I think --
22   and Mr. Charles, this may fall to you if Mr. Lyons is ill.  Is
23   ICE able to remove people to the Dominican Republic these days?
24           MR. CHARLES:  Yes, sir, they are.
25           THE COURT:  Okay.  So I'm ordering that you confer.
```

        1    You may have -- if you need more than April 8, I can give it to

        2    you.  Wait a minute.  No.  I'm giving you until April 3 to

        3    report back to me, but you can ask for more time.  You should

        4    confer about whether you can resolve this case.  With the

        5    others, the people we were dealing with last fall, I think we

        6    started with eight, and, by agreement, I didn't have to decide

        7    any of those eight.  It may be that, given some time back with

        8    his family, the petitioner will be willing to go.  He may be in

        9    a different situation than those other eight.  But you've

03:43  10    resolved some challenging issues, and maybe you can again.  If

       11    not, I'll, with reasonable notice, prepare for the hearing and

       12    conduct it and aim to decide the matters orally.  Okay?

       13            And as I said, you're ordered to order a transcript of

       14    this decision.  And I'm going to ask -- well, you are required

       15    to order the full transcript.  I'm going to ask the court

       16    reporter to -- just order it.  Just order the full transcript.

       17    Is there anything else we should be discussing today?

       18            MS. LARAKERS:  No, Your Honor.  I just want to thank

       19    you on behalf of the D.C. folks here for conducting this

03:44  20    telephonically and not requiring us to travel Boston.  We

       21    really appreciate it.

       22            THE COURT:  Well, thank you.  I mean, we've been

       23    together intensively for, as I said, almost two years, and I

       24    just hope everybody will stay well and that we'll each be able

       25    to perform our important relative roles in this adversary

1    system.  And Mr. Lyons, I'll particularly send my best wishes

2    for your recovery.  I'll look forward to questioning you in

3    court again.

4            MR. LYONS:  Thank you, Your Honor.

5            MR. PROVAZZA:  Thank you, Your Honor.

6            MS. LAFAILLE:  Thank you, Your Honor.

7            THE COURT:  All right.  Okay.  Everybody take care.

8    Thank you.

9            (Adjourned, 3:45 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  CERTIFICATE OF OFFICIAL REPORTER

 2

 3           I, Kelly Mortellite, Registered Merit Reporter

 4   and Certified Realtime Reporter, in and for the United States

 5   District Court for the District of Massachusetts, do hereby

 6   certify that the foregoing transcript is a true and correct

 7   transcript of the stenographically reported proceedings held in

 8   the above-entitled matter to the best of my skill and ability.

 9                  Dated this 26th day of March, 2020.

10

11                  /s/ Kelly Mortellite

12                  _____

13                  Kelly Mortellite, RMR, CRR

14                  Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25
```