# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| LILIAN PAHOLA CALDERON JIMENEZ, and LUIS GORDILLO, *et al.*, | ) ) ) | |
| Individually and on behalf of all others similarly situated, | ) ) ) | No. 1:18-cv-10225-MLW |
| Plaintiffs-Petitioners, | ) ) ) | |
| v. | ) ) | |
| CHAD WOLF, *et al.*, | ) ) | |
| Defendants-Respondents. | ) ) | |

## PETITIONERS' RESPONSE IN OPPOSITION TO RESPONDENTS' MOTION FOR A PROTECTIVE ORDER AND TO LIMIT THE SCOPE OF A DEPOSITION

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................... 1

BACKGROUND ....................................................................................................... 2

ARGUMENT ............................................................................................................. 6

I.      Petitioners' Deposition Topics Seek Relevant Information................................. 6

        A.      USCIS's Adjudication of Provisional Waiver Applications Is Relevant to Petitioners' Claims and Respondents' Defenses...................................................... 8

              1.      USCIS practices and policies for adjudicating applications are relevant to Petitioners' claims of an improper scheme of entrapment.......................... 8

              2.      Respondents Rely on USCIS Practices and Policies in Defending This Case .................................................................................................... 13

        B.      DHS's Motivations in Restricting Access to the Provisional Waiver Process Is the Proper Subject of Discovery .................................................................. 14

              1.      DHS's Motivations in Restricting Access to the Provisional Waiver Process Are Relevant to Petitioners' Claims ........................................... 14

              2.      Respondents' Procedural Objections to Topic 23 Fail ............................ 16

II.     Proportionality Favors Discovery on Topics 9, 19, and 23 ............................... 19

## INTRODUCTION

Respondents ask this Court to endorse their outright refusal to provide any testimony on three topics that seek information that is relevant to the unlawful conduct alleged in Petitioners' complaint.  In doing so, however, Respondents fail to establish that the discovery sought by Petitioners—which relates to USCIS's cooperation in ICE's unlawful scheme to prevent petitioners from accessing a path to lawful status, and to DHS's motivations in interfering in that path—is irrelevant to their claims.

As Petitioners allege, and as borne out at every stage of this case, USCIS and ICE are partners in a scheme brought about by President Trump's Executive Order 13768 to arrest, detain, and remove individuals applying for the Provisional Waiver Process.  Dkt. No. 27 (Am. Compl.) at ¶¶ 37, 102-103; *see also, e.g.* Dkt. No. 137-1 at 10-11.  Indeed, discovery has shown that local USCIS may have been the impetus for this entire program of arrests at its offices in response to Executive Order 13768.  Ex. A (Cronen Dep.) at 99:7-17 (then-ICE Assistant Director, Enforcement Division testifying that the first time he recalled "ICE Boston receiving information from CIS about individuals coming in to USCIS buildings" was after a meeting with USCIS District Director Denis Riordan in which Riordan "advised that *per the new executive orders* . . . he wanted to inform [ICE Boston] that final orders of removal were in their office buildings doing whatever CIS paperwork they would require") (emphasis added).[1]  The testimony Petitioners seek about how USCIS adjudicates the applications that constitute the very process at issue in this case is relevant to their claims under the Administrative Procedures Act (APA), the Immigration and Nationality Act (INA), the Due Process Clause, and the Equal

---

[1] All referenced Exhibits are attached to the contemporaneously filed October 19, 2020 Declaration of Stephen N. Provazza ("Provazza Decl."). Citations to "Ex. []" refer to exhibits to the Provazza Decl.

Protection Clause.  Additionally, DHS's motivation in creating Executive Order 13768, and in taking any other actions to restrict access to the Provisional Waiver Process, is an element of Petitioners' equal protection claim.  May 16, 2019 Hr'g Tr. 9:12-11:2; *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268-71 (1977).

Preparing a witness on the topics on which Petitioners seek testimony does not impose an undue burden on Respondents, and would be proportionate to the needs of the case.  This court should deny Respondents' motion.

## BACKGROUND

Petitioners filed their Amended Class Action complaint on April 10, 2018, alleging that DHS was using the path to lawful status outlined in the Provisional Waiver Process to trap and remove noncitizens.  The Process includes five steps and was made available to those with final orders of removal starting in 2016.  Dkt. No. 27 (Am. Compl.) at ¶¶ 26-36.  The first three steps involve the submission of forms to U.S. Citizenship and Immigration Services (USCIS).  In adjudicating the first of these forms (the I-130 Petition for Alien Relative), USCIS required individuals with final orders to appear for interviews.  But at the same time, it was coordinating with Immigration and Customs Enforcement (ICE), whose officers would appear at the interviews to arrest, detain, and remove the applicants.  *Id*. ¶¶ 1-4, 26-29, 37-100.  As alleged in the Amended Complaint, "[i]n effect, the government's one hand beckons Petitioners forward, and its other hand grabs them."  *Id.* ¶ 2.  Petitioners further alleged that this conduct was the product of animus based on race and national origin.  *Id.* ¶¶ 110-11.

In July and August 2018, Petitioners took limited discovery pursuant to the Court's order. Dkt. No. 117 (July 16, 2018 Order).  This discovery revealed a concerted effort to use the Provisional Waiver Process to target individuals for detention and removal rather than, as contemplated by the regulations, a method to minimize family separation and encourage

2

noncitizens with final orders to seek to obtain legal status.  Dkt. No. 129 (Pet'rs' Suppl. Mem. in

Supp. of their Mots. for Prelim. Inj. Relief).  On August 23, 2018, this Court denied

Respondents' motion to dismiss Petitioners' claims on certain counts.  Aug. 23, 2018 Hr'g Tr.;

Dkt. No. 159 (Sept. 21, 2018 Order).  On October 3, 2018, the parties filed a joint report in

which they stated that "Respondents will not object to discovery from or relating to USCIS on

the basis that USCIS is not a named party, but Respondents reserve their rights to object to such

discovery on any other basis."  Dkt. No. 162 (Oct. 3, 2018 Joint Report) at ¶ 2(a).  In exchange,

Petitioners agreed not to amend their complaint to add USCIS.  Dkt. No. 158 (Sept. 12, 2018

Joint Report) at ¶ 3(a).

On May 16, 2019, and memorialized in an order on May 17, 2019, the Court denied

Respondents' motion to dismiss with respect to the remaining counts and certified a class of

petitioners.  May 16, 2019 Hr'g Tr.; Dkt. No. 253 (May 17, 2019 Order).

In a scheduling conference on August 27, 2019, the parties discussed the issue of

discovery from DHS and USCIS.  Petitioners' counsel explained that Petitioners were interested

in not only discovery related to communications between ICE Headquarters and ICE Boston, but

also to "the reasons for ... a pretty clear change in policy or practice in early 2018,[2] the reasons

for that and whether there's an unconstitutional animus behind" them.  Aug. 27, 2019 Hr'g Tr.

58:15-19.  On this issue, the Court concluded:

> I'm authorizing limited discovery from ICE headquarters
> concerning essentially -- …. policy directives to Boston.  And
> there's not a dispute about that.  It sounds as if, though, it's possible
> that the petitioners will be looking for more in connection with their
> equal protection claim, and I'd have to go back and refresh myself
> on my equal protection analysis. But ***if the petitioners make a
> request that you think is beyond the narrow focus -- well, that's
> beyond policy directives given to ICE Boston from headquarters***

---

[2] Petitioners' counsel intended to refer to the policy change in 2017.

> ***and they say, Well, we're entitled to this because it's relevant to
> our equal protection argument, try to work it out. And if you don't
> work it out, it will be more concrete for me so I can essentially
> apply the Rule 26(b) test to something.*** You can tell me how
> burdensome it would be.  They can tell me how relevant it is.  And
> I can make a well-informed decision."

*Id.* at 60:15-61:5 (emphasis added).

The parties further discussed discovery from USCIS.  The Court concluded that it was
"not prohibiting discovery from CIS that is relevant to a claim in the amended complaint." *Id.*
67:17-68:7.  In relevant part, the Court then entered an order stating that "petitioners' discovery
is allowed and limited as follows: a. Petitioners may take discovery from ICE Headquarters
concerning policy directive given to ICE-Boston.  ***Petitioners may take discovery from U.S.
Citizenship and Immigration Services that is relevant to the claims in petitioners' Amended
Complaint (Docket No. 27)***."  Dkt. No. 366 (Aug. 28, 2019 Order) at ¶ 3 (emphasis added).

On December 13, 2019, Petitioners served their 30(b)(6) Notice of Deposition on DHS.
Among other requests, this notice included the following three topics that are the subject of
Respondents' motion (the "Topics"):

> Topic 9: All USCIS practices and policies relating to adjudicating
> the applications that comprise the Provisional Waiver Process.
>
> Topic 19: The reasons that Ms. Amy Chen's I-130 Petition for Alien
> Relative, filed for her husband, Deng Gao, on June 23, 2016, was
> not approved until October 30, 2018.[3]
>
> Topic 23: DHS's motivations in taking any steps to restrict
> eligibility for or access to the Provisional Waiver Process, including
> any motivations relating to racial animus or animus based on
> national origin.

Regarding each of these Topics, Respondents have refused to provide any testimony whatsoever.

---

[3] Amy Chen and Deng Gao are named petitioners in this action.  At the time of filing the
complaint, Ms. Chen's I-130 Petition was pending.  *See* Dkt. No. 27 (Am. Compl.) at ¶ 99.

Regarding Topics 9 and 19, Respondents first raised objection in a meet and confer on January 22, 2020, and then in an email on January 27.  Provazza Decl. at ¶ 2; Ex. B at 2 (Jan. 27, 2020 Email from Larakers to Petitioners' Counsel).  Petitioners explained the relevance of Topics 9 and 19 on February 19, 2020, and asked Respondents to respond with their availability to meet and confer.  *Id.*  Several months later, on July 20, 2020, Petitioners' counsel raised this issue again in an email to Respondents' counsel.  Respondents' counsel replied, stating that "[the parties] appear to be at an impasse on the relevance of these topics, and Defendants will be seeking a protective order."  Ex. C at 3 (July 22, 2020 Email from Weiland to Provazza).

Regarding their objections to Topic 23, Respondents first raised concerns in July 2020, over seven months after Petitioners had served their 30(b)(6) Notice.  In response to an email from Petitioners inquiring as to the status of Respondents' 30(b)(6) designations, on July 22, 2020, Respondents' counsel emailed Petitioners and raised, for the first time, a reservation about designating someone on Topic 23.  Ex. C at 3 (July 22, 2020 Email from Weiland to Provazza).  The parties thereafter exchanged correspondence and held a teleconference to discuss the Topic.  *Id.* at 1 (July 24, 2020 Email from Provazza to Weiland).  During that teleconference on July 29, 2020, Respondents provided, for the first time, a reason for their refusal: that they believed DHS was beyond the scope of discovery.  Provazza Decl. at ¶ 3.  Respondents' counsel never provided a further basis for their objection to Topic 23.

Respondents finally provided their written designations on certain agreed-upon topics on July 29, 2020.  These did not include objections, nor did Respondents' counsel ever provide written objections to Petitioners' 30(b)(6) Notice.  Ex. D (July 29, 2020 Email from Weiland to Petitioners' Counsel).

5

**ARGUMENT**

Petitioners are entitled to the discovery they seek because it is both relevant and

proportional to the needs of the case.  Under Federal Rule of Civil Procedure 26(b)(1):

> Parties may obtain discovery regarding any nonprivileged matter
> that is relevant to any party's claim or defense and proportional to
> the needs of the case, considering the importance of the issues at
> stake in the action, the amount in controversy, the parties' relative
> access to relevant information, the parties' resources, the importance
> of the discovery in resolving the issues, and whether the burden or
> expense of the proposed discovery outweighs its likely benefit.

Fed. R. Civ. P. 26(b)(1).  In seeking testimony responsive to Topics 9, 19, and 23, Petitioners are

pursuing information that relates to the precise scheme laid out in the Amended Complaint, and

is proportional to the needs of the case; indeed, it imposes a limited burden on Respondents, who

make almost no showing to the contrary.[4]

## I.      Petitioners' Deposition Topics Seek Relevant Information

Petitioners' Topics 9, 19, and 23 seek information that is relevant to their claims that

DHS violated the APA, INA, Due Process Clause, and Equal Protection Clause when DHS

weaponized the Provisional Waiver Process against the very people it was created to protect.

Parties are entitled to obtain proportional discovery into "***any nonprivileged matter*** that

is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1) (emphasis added).

Discovery is not limited to bolstering the precise facts enumerated in the complaint, but is

"designed to help define and clarify the issues." *In re Intuniv Antitrust Litig.*, No. 16-cv-12396-

---

[4] Respondents' Motion is captioned as one for a "Protective Order Under Rule 26(b)(2)(C)(iii)."
That Rule, however, does not provide for a "Protective Order."  Rather, Rule 26(c)(1) sets forth
the standard for obtaining a protective order.  The Rule states, in relevant part, that "[t]he court
may, for good cause, issue an order to protect a party or person from annoyance, embarrassment,
oppression, or undue burden or expense, . . . ." Fed. R. Civ. P. 26(c)(1).  Respondents have
failed to make that showing.  Nothing in Respondents' Motion comes close to asserting that the
requested would cause "annoyance, embarrassment, oppression, or undue burden or expense."

ADB, 2018 WL 6590616, at *2 (D. Mass. Dec. 14, 2018).  Thus, "[a] variety of types of information not directly pertinent to the incident in suit could be relevant to the claims or defenses raised in a given action.  For example, other incidents of the same type, or involving the same product, could be properly discoverable" under Rule 26(b)(1).  Fed. R. Civ. P. 26(b)(1) advisory committee's note to 2000 amendment (commenting on the meaning of the rule after the 2000 amendment). The discovery sought here easily meets this threshold, as it is directly relevant to the "incident in suit" – the weaponization of the Provisional Waiver Process to facilitate increased arrest, detention, and removal of those individuals with final orders.

Respondents make much of the 2000 amendment to Rule 26(b)(1) changing the scope of discovery from all matters relevant to the "subject matter involved in the action" to matters relevant to "any party's claim or defense."  Resp'ts' Br. 5-7.  But they exaggerate the implications of this change, making the "mistake" of "argu[ing] that no fact may be discovered unless it directly correlates with a factual allegation in the complaint or answer.  Such a restrictive approach would run counter to the underlying purpose of the [2000] rule changes." *Thompson v. Dep't of Hous. & Urban Dev.*, 199 F.R.D. 168, 172 (D. Md. 2001).[5]  The standard for discovery is what is relevant to the claims, not what "directly correlates" to the facts plead. *Id.*  If the government was correct, Petitioners would be forced to amend their complaint incrementally multiple times during discovery in order to establish a basis to learn additional

---

[5] Further, the *Thompson* court explained that courts and litigants should not "become consumed with the philosophical exercise of debating the difference between discovery relevant to the 'claims and defenses' as opposed to the 'subject matter' of the pending action." *Thompson*, 199 F.R.D. at 172.  Instead, "the practical solution to implementing the [2000] rule changes may be to focus more on [the proportionality of the discovery sought], than to attempt to divine some bright line difference between" what is relevant to the "subject matter" and what is relevant to a "claim." *Id.*; *see also Masterson v. Huerta-Garcia*, No. 2:07-CV-01307, 2010 WL 4053924, at *4 (E.D. Cal. Sept. 30, 2010) (citing *Thompson*); *United States v. Educ. Mgmt. LLC*, No. 2:07-cv-00461, 2013 WL 3854453 at *6 (W.D. Pa. May 14, 2013) (citing *Thompson*).

facts relevant to their existing claims.  The rules require no such thing, and plainly entitle

Petitioners to the discovery sought here.

### A.  USCIS's Adjudication of Provisional Waiver Applications Is Relevant to Petitioners' Claims and Respondents' Defenses

| |
|---|
| Topic 9: All USCIS practices and policies relating to adjudicating the applications that comprise the Provisional Waiver Process |
| Topic 19: The reasons that Amy Chen's I-130 Petition for Alien Relative, filed for her husband, Deng Gao, on June 23, 2016, was not approved until October 30, 2018. |

Contrary to Respondents' assertions, Topics 9 and 19, which inquire into USCIS policies

and practices for adjudicating applications as part of the Provisional Waiver Process, are directed

to the central issues in this case.  Further, Respondents have put the adjudication of these

applications at issue by relying on them in justifying the removal of class members.

### 1.  USCIS practices and policies for adjudicating applications are relevant to Petitioners' claims of an improper scheme of entrapment

USCIS practices and policies are at issue in this case.  For one, the Provisional Waiver

Process, which gives rise to Petitioners' claims, is a process that is adjudicated and administered

***by USCIS***.  Further, the Complaint alleges that ICE unlawfully conducted arrests of individuals

***at USCIS offices*** during (or immediately after) interviews in connection with an I-130

application, thereby interfering with Petitioners' pursuit of a Provisional Waiver.  Dkt. No. 27

(Am. Compl.) at ¶¶ 2, 47-53, 65-66.  Respondents' effort to cast the discovery Petitioners seek as

unrelated to their allegations about the arrest and removal of class members is without merit.

Respondents' "relevance" argument is an attempt to avoid the commitment the

government made in October 2018 not to object to the discovery "on the basis that USCIS is not

a named party," if Petitioners did not amend the complaint to add USCIS.  Dkt. No. 158 (Sept.

12, 2018 Joint Report) at ¶ 3(a); Dkt. No. 162 (Oct. 3, 2018 Joint Report) at ¶ 2(a).  The

government's Motion repeatedly justifies its refusal to provide discovery because, according to

the government, "[t]he complaint does not allege that any USCIS action is unlawful," "Petitioners' complaint only alleges that **ICE Boston** has interfered with the 'provisional waiver process,'" and the Petitioners have not made "***any*** pleaded allegation that USCIS is unlawfully interfering with a class member's pursuit of a provisional waiver"—a repackaging of the very objection that the government promised not to make when the parties reached an agreement that Petitioners did not need to add USCIS as a named party in order to obtain discovery.  Resp'ts' Br. at 3, 7, 9 (emphasis in original).  Having made representations that the Court accepted and relied upon when setting a schedule for this case, Respondents' argument should be barred by the doctrine of judicial estoppel.  *See Alternative Sys. Concepts, Inc. v. Synopsys, Inc*., 374 F.3d 23, 32–33 (1st Cir. 2004) ("As a general matter, the doctrine of judicial estoppel prevents a litigant from pressing a claim that is inconsistent with a position taken by that litigant either in a prior legal proceeding or in an earlier phase of the same legal proceeding.") *Flores-Powell v. Chadbourne*, 677 F. Supp. 2d 455, 461 n.9 (D. Mass. 2010) ("[E]ven if respondents intended to alter their position, the doctrine of judicial estoppel operates to prohibit such a shift because the court accepted the [prior] representation and relied on it when structuring this proceeding.")

In any event, the extent to which USCIS acted contrary to its own lawful regulations in facilitating or encouraging these arrests is a relevant issue in this case and Petitioners must be permitted to explore the contours of such regulations, policies, and practices with an appropriate USCIS designee.

By way of example, if USCIS changed its standards or procedures for adjudicating the relevant applications in a way that would harm class members to remove "impediments" to their removal or decided to simply stop processing class members' I-130 applications once ICE determined that it would no longer arrest them (as may have been the case for named Petitioner

Deng Gao, whose application sat in a queue for nearly a year after having been received by the Boston office, *see* Dkt. No. 50-7 at ¶ 17[6])—USCIS's conduct in implementing such action (or inaction) would plainly be relevant to Petitioners' claims.  In the government's view, however, Petitioners cannot so much as ask these questions, or any other questions about their policies and practices with regard to the relevant applications, because the specific allegations are not already in the complaint.  There is no bases for such a narrow view of discovery.  *See* Fed. R. Civ. P. 26(b)(1); *Thompson*, 199 F.R.D. at 172.

Discovery so far has only bolstered the need for this inquiry into USCIS's role.  That discovery has made clear that the unlawful actions alleged in the Amended Complaint were not the result of unfortunate happenstance or conduct by ICE alone—but the product of deliberate and active coordination between DHS's sub-agencies ICE and USCIS.  Far from a passive conduit for ICE's unlawful actions, USCIS was an active participant—coordinating with ICE to facilitate obstruction of Petitioners' ability to avail themselves of the Provisional Waiver Process.

For example:

---

[6] Mr. Gao's wife filed an I-130 in June 2016.  Dkt. No. 50-7 at ¶ 12.  USCIS informed Mr. Gao's attorney in January 2018 that his file had been received in Boston on December 22, 2017 and was awaiting the scheduling of an interview. *Id.* ¶ 17.  The matter continued to sit in queue until counsel in this matter interceded and contacted counsel for the government about the delay in August 2018 and then again in October 2018.  Ex. K at 1, 2 (Email from Lafaille to Respondents' Counsel, Aug. 23, 2018; Email from Lafaille to Respondents' Counsel, Oct. 23, 2018).  Following this discussion between counsel, Mr. Gao's I-130 was approved without an interview on October 30, 2018.  *Id.* at 1 (Email from Larakers to Lafaille, Oct. 30, 2018).

(1)     ICE and USCIS worked together to schedule interviews at USCIS offices to

enable ICE to arrest individuals after the interview concluded.[7]  USCIS even coordinated with

ICE to spread out interviews to avoid too many arrests occurring in a single day[8], and based on

the availability of ICE to conduct arrests.[9]  And in at least in one instance, USCIS agreed to

expedite the adjudication of an I-130 Petition at ICE's request in order to facilitate a class

member's detention and removal.[10]

(2)     USCIS apparently provided the impetus for coordinated arrests at USCIS.[11]

According to Boston USCIS Field Office Director Michael McCleary, in October 2017 USCIS

adopted a policy, as outlined in the Consolidated Handbook for Application Procedures

("CHAP"), that allowed for the scheduling of interviews solely for the purpose of facilitating an

arrest.[12]  This policy was changed in 2019—during the pendency of this litigation—to prohibit

---

[7] See Ex. E (Riordan Dep.) at 88:7-17 (testifying that scheduling of interviews in conjunction with ICE was for the benefit of USCIS); *id.* at 87:2-88:6 (USCIS "communicated" with ICE and took "logistical steps" to help facilitate arrests at USCIS offices); Ex. F (Riordan Dep. Ex. 12) (email regarding five arrests conducted at USCIS Lawrence office in March 2017).

[8] Ex. E (Riordan Dep.) at 105:25-106:17; 106:18-20.

[9] Ex. E (Riordan Dep.) at 89:8-13 (testifying that interest from ERO would dictate when an interview was scheduled).

[10] Ex. G, ICE-00049242 (on October 10, 2019, an ICE officer wrote to USCIS asking USCIS to expedite the adjudication of an I-130 Petition because "[w]e are hoping to take [the Calderon class member] back into custody before her travel document expires in December.  Due to recent court orders imposed on us in MA, we would rather not take her into custody with any pending applications, if we can help it."  The USCIS employee responded that she "will have the file pulled and scheduled for the next available date in November.  I will make sure I flag the file as an expedite and I will notify you once we take action on the case.").

[11] Ex. A (Cronen Dep.) at 99:7-99:17 (testifying that the first time Cronen recalled "ICE Boston receiving information from CIS about individuals coming in to USCIS buildings" was after a meeting with Director Riordan, who "advised that per the new executive orders, . . . he wanted to inform [ICE Boston] that final orders of removal were in their office buildings doing whatever CIS paperwork they would require").

[12] Ex. H (McCleary Dep.) at 65:17-20; 65:25-66:7.

the scheduling of interviews for the sole purpose of facilitating an arrest.[13]  But USCIS witnesses have been unable to explain the reason for the policy's adoption, or the 2019 change, another example of why it is critical that Petitioners receive 30(b)(6) testimony from a prepared designee on the practices and policies relevant to the adjudication of class members' applications.

(3)     During this collaboration with ICE, in 2017 USCIS accelerated scheduling of I-130 interviews that had "backlog[ged]" over the years[14]—even though USCIS knew that all or nearly all of these individuals would be arrested[15] and the agency had ***no obligation*** to conduct in-person interviews of these individuals, but could have instead adjudicated the applications on the papers.[16]

---

[13] Ex. H (McCleary Dep.) at 74:11-16.

[14] Ex. E (Riordan Dep.) at 234:8-13 ("Q. So do you believe that the -- the push to adjudicate these I-130s in November of 2017 was a response to these backlogs that had built up from the resources of USCIS being directed toward other applications for a period of time?  A. I do."). *See also* Ex. I (Riordan Dep. Ex. 17) (a November 2017 list of pending I-130 applications included applications from 2014, 2015, and 2016); Ex. E (Riordan Dep.) at 197:2-17; *id.* at 212:2-213:1.

[15] Ex. E (Riordan Dep.) at 130:23-25 (Riordan "was told at one point [ICE ERO] would respond to every case"); 131:10-132:5; 183:5-15 ("And all I'm saying is that the USCIS alerts were going to result in additional in-person visits from ERO, correct?  A. In -- in all probability seemed to be the case.  Q. And the ERO visits would most likely result in arrests, correct?  A. To date, during the period, it did. And I -- probably it would continue on -- on that -- that trend would continue, yes."); Ex. H (McCleary Dep.) at 64:18-21 ("Q. So a referral to ICE ERO, we discussed, often results in arrest of an individual with a final order. Correct?  A. Yes").

[16] Arrests at USCIS offices were sporadic prior to the implementation of then-Secretary Kelly's memo in 2017, at which point ICE informed USCIS they would respond to "every" notification of an individual with a final order.  Ex. E (Riordan Dep.) at 131:10-132:5.  Further, Director Riordan testified that he understood that the Kelly memo was going to lead to an increase in arrests.  *Id.* at 105:1-5.

(4)     USCIS officials collaborated with ICE without regard to whether an individual was in the process of applying for a Provisional Waiver[17] or knowledge of how the Provisional Waiver process even works.[18]

This discovery evidences that USCIS was entangled with ICE's unlawful activities.  The Topics seek further discovery of the extent and nature of USCIS's involvement, the extent to which USCIS was not (and is not) in compliance with its own practices and policies, and the extent to which USCIS made changes intended to harm class members' pursuit of the Provisional Waiver Process and clear a path for their removal, which would bolster Petitioners' claims under the APA, INA, Due Process Clause, and Equal Protection Clause.

**2.     Respondents Rely on USCIS Practices and Policies in Defending This Case**

Petitioners' discovery is also relevant to Respondents' defenses.  At various points throughout this litigation, Respondents have sought to justify their conduct on the ground that a particular individual or group of individuals would be unlikely to ultimately obtain a provisional waiver.  For example, in January 2020, ICE slated two class members for removal on the basis that one was "likely unable to receive a Form I-601A waiver" and the other "may be unable to receive a Form I-601A waiver" because Respondents had determined that they were "inadmissible under Section 212(a)(6)(B) of the Immigration and Nationality Act for failure to attend [their] removal proceeding[s]."  Dkt. No. 467 (Pet'rs' Mem. in Supp. of Mot. to Enjoin the Removal of Two Class Members) at 4-5.  In their response to Petitioners' motion regarding the

---

[17] Ex. E (Riordan Dep.) at 139:8-13 ("Q. So the fact that an individual is in the process of applying for a provisional waiver does not impact the decision to notify ICE?  A. Again, if there's a warrant of deportation, a final order in the file, we will notify ICE.").

[18] Ex. J (Tiberi Dep.) at 261:25-262:4 ("Q. And do you agree, as part of the provisional waiver process, the applicant would need an approved I-130?  A. I don't know because I do not know about the provisional waiver.").

grounds for these individuals' removal, Respondents put forth additional statements about the

way that USCIS adjudicates provisional waiver applications:

> Respondents are aware that some class members will be unlikely to benefit from any
> approved Form I-601A due to the automatic revocation provision.  It is this
> determination, not the possibility that USCIS could deny their Form I-212 or Form I-
> 601A, that has influenced Respondents' decision to effectuate Petitioners' removal.
> Regardless, "the extreme hardship and discretionary eligibility assessments made during
> a provisional waiver adjudication could be impacted by additional grounds of
> inadmissibility." USCIS also regularly denies Form I-212 applications if it believes the
> alien is inadmissible for failing to attend removal proceedings.

Dkt. No. 489 at 5 n.5 (internal citations and original emphasis omitted).

Respondents cannot, on the one hand, seek to defend its unlawful conduct based on

assertions regarding the way USCIS adjudicates Forms I-212 and I-601A, and on the other hand

deny Petitioners any discovery into the factual basis for those assertions.  As part of the

Provisional Waiver Process, Petitioners are entitled to discovery on the adjudication of these

forms and whether Respondents followed appropriate regulations when making (or predicting)

adjudication decisions for class members.

### B.  DHS's Motivations in Restricting Access to the Provisional Waiver Process Is the Proper Subject of Discovery

> Topic 23: DHS's motivations in taking any steps to restrict eligibility for or access to the
> Provisional Waiver Process including any motivations relating to racial animus or animus
> based on national origin

#### 1.  DHS's Motivations in Restricting Access to the Provisional Waiver Process Are Relevant to Petitioners' Claims

Petitioners' request for testimony on "DHS's motivations in taking any steps to restrict

eligibility for or access to the Provisional Waiver Process, including any motivations relating to

racial animus or animus based on national origin" seeks information relevant to Petitioners' APA

and Equal Protection Clause claims.  The Amended Complaint alleges that DHS's subagencies

(ICE and USCIS) prevented the noncitizen Petitioners and others from obtaining lawful status by

using the promise of lawful status laid out in the provisional waiver regulations to bring

Petitioners into interviews and by arresting, detaining, and attempting to remove them.  Dkt. No.

27 (Am. Compl.) at ¶¶ 2, 47-53, 65-66.  Petitioners' Equal Protection claim alleges that these

efforts were and are "motivated by racial animus and animus based on national origin."  *Id.* ¶

110.

       In denying Respondents' motion to dismiss Petitioners' claim under the Equal Protection

Clause, the Court explained that an inference of an invidious discriminatory motive could be

drawn from the government's "sudden and substantial change" from promulgating the

Provisional Waiver regulations in 2016 to arresting those who attempted to pursue it in 2017.

May 16, 2019 Hr'g Tr. 10:13-11:2.  In particular, the Court referenced the context for "the

promulgation of the Executive Order [No. 13768] and DHS's decision to prioritize final-order

aliens for removal without regard to their participation in the provisional waiver process."  *Id.*

9:12-11:2.  Thus, Petitioners' allegations make clear that DHS's motivations in promulgating the

Executive Order and in prioritizing final-order aliens for removal without regard to their

participation in the Provisional Waiver process are the proper subject of discovery.

       Respondents argue that Topic 23 is overbroad because it covers "any steps" to restrict

eligibility for or access to the Provisional Waiver Process, while Petitioners' Complaint only

refers to "three specific actions," i.e., "the arrest, detention, and removal of class members."

Resp'ts' Br. 11-12.  As an initial matter, Respondents have not even agreed to provide discovery

from DHS about those "three specific actions."  Further, Petitioners are not limited to discovery

of only the facts that Petitioners already knew about, and therefore plead.  *Thompson*, 199 F.R.D.

at 172.  "Discovery is designed to help define and clarify the issues," *In re Intuniv Antitrust*

*Litig.*, 2018 WL 6590616 at *2 (internal quotation marks omitted), and "other incidents of the

same type" as those described in the complaint are discoverable.  Fed. R. Civ. P. 26(b)(1)

advisory committee's note to 2000 amendment.  If DHS has been taking or took other steps to

prevent Petitioners from accessing the Provisional Waiver Process and facilitate their removal,

then these efforts are "of the same type" as those alleged by Petitioners and discoverable because

they shed light on Respondents' motives and the scope of their unlawful conduct.  *See Kennicott*

*v. Sandia Corp.*, 327 F.R.D. 454, 474 (D.N.M. 2018) (permitting discovery into defendants'

pregnancy discrimination where claims were about gender pay discrimination because

"[p]roblems in one area may indicate that there are problems in other areas. . . .  The Plaintiffs

are entitled to see what is in all the documents related to [the defendants'] problems with its

female employees.").

## 2.      Respondents' Procedural Objections to Topic 23 Fail

None of Respondents' other arguments around Topic 23 fare any better.

*First*, Respondents' argue that they have no obligation to provide testimony on DHS's

motivations in restricting access to the Provisional Waiver Process because this Court "expressly

rejected Petitioners' request to take discovery from all of DHS."  Resp'ts' Br. 10.  That is

incorrect.  While it is true that the Court granted Petitioners' request for discovery from ICE

headquarters concerning policy directives given to ICE-Boston, Dkt. No. 366 (Aug. 28, 2019

Order) at ¶ 3(a), nothing in the Court's order restricted Petitioners to ***only*** that discovery.  To the

contrary, the Court explicitly stated that the parties should "try to work [] out" Petitioners'

requests for discovery from DHS related to Petitioners' equal protection claim, and that the

Court would adjudicate any future disputes that the parties could not resolve.  Aug. 27, 2019

Hr'g Tr. 60:22-61:5 ("[I]f the petitioners make a request that you think is beyond the narrow

focus -- well, that's beyond policy directives given to ICE Boston from headquarters and they

say, Well, we're entitled to this because it's relevant to our equal protection argument, ***try to***

***work it out***.  And if you don't work it out, it will be more concrete for me so I can essentially

apply the Rule 26(b) test to something.") (emphasis added).  Respondents' misconstrue the

Court's order, which set a floor, not a ceiling, for what would constitute relevant discovery from

headquarters.

> ***Second***, Respondents assert (for the first time) that they do not have sufficient

information about what "restrict eligibility for or access to the provisional waiver process"

means.  Resp'ts' Br. 11-12.  But Respondents never asked Petitioners what this means or

objected to the Topic on this basis during the parties' discussions—including six meet and confer

teleconferences and numerous correspondence.  Respondents have therefore failed to satisfy their

obligation to confer in good faith to resolve the parties' disagreement.  Fed. R. Civ. P. 26(c)(1);

L.R. 37.1(a); *Nevada Power Co, v. Monsanto Co.*, 151 F.R.D. 118, 120 (D. Nev 1993) (in

negotiating a discovery dispute, the parties must "present to each other the merits of their

respective positions with the same candor, specificity, and support during informal negotiations

as during the briefing of discovery motions."); *cf. Torres v. Johnson & Johnson*, No. 3:18-

10566-MGM, 2018 WL 4054904, at *1 n.1 (D. Mass Aug. 24, 2018) ("The court expects

counsel to identify actual disputes and make genuine efforts to confer in an attempt to resolve

those disputes before filing a motion to compel.").

> In any event, Respondents have sufficient information about what Petitioners' Topic 23

means because the Topic is articulated plainly and with particularity.  A Rule 30(b)(6) deposition

notice must simply identify topics of examination with "reasonable particularity."  Fed. R. Civ.

P. 30(b)(6).  A notice complies with this requirement when it is "sufficient to inform [the noticed

organization] of the matters which will be inquired into at the depositions so that [it] can

determine the identity and number of persons whose presence will be necessary to provide an

adequate response to any of [the opponent's] potential questions." *Mitsui & Co. (U.S.A.) v. P.R. Water Res. Auth.*, 93 F.R.D. 62, 66 (D.P.R. 1981).

Respondents' overbreadth and vagueness arguments are straw-men—suggesting that the Topic would require Respondents to prepare a designee to testify "about form fees, staffing, employment contracts, national security, fraud investigations, document authentication procedures, and file management procedures." Resp'ts' Br. 12. Nonetheless, to the extent Respondents' brief is an acknowledgement that the agency has undertaken a sweeping array of changes that are harmful to class members' access to the Provisional Waiver Process, that is all the more reason to require the parties to negotiate the reasonable scope of inquiry into the motivations underlying these changes, not to prohibit it altogether.

*Third*, Respondents' "forthcoming motion" is not a basis to grant a protective order. *See id.* at 13-14. As an initial matter, discovery is ongoing and this is the first that Petitioners have heard about Respondents' purported motion. The plurality opinion that serves as the basis for this promised motion—part of *Dep't of Homeland Security v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1915 (2020)—was published on June 18, 2020. Since June 18, counsel for Petitioners and Respondents have met and conferred five times and exchanged numerous emails and letters. In not one of those calls, emails, or letters did Respondents mention *Regents*, nor that they intended to seek to stay discovery of Petitioners' equal protection claim. *See* Fed. R. Civ. P. 26(b)(1) (requiring the parties to have "conferred or attempted to confer" "in good faith" "to resolve the dispute without court action"); L.R. 37.1(a) (requiring the parties to "confer in good faith to narrow the areas of disagreement to the greatest possible extent"); *Nevada Power*, 151 F.R.D. at 120.

More importantly, this Court already denied Respondents' motion to dismiss Petitioners'

Equal Protection Clause claim.  Reconsideration of that decision—which is not authorized by the

Federal Rules—is not justified by the Supreme Court's decision in *Regents*.  That opinion

assessed different allegations of animus relating to a different executive policy.  It did *not*

announce a new rule that, as a matter of law, Presidential statements cannot serve as the basis for

allegations of animus—they can.  And it has no bearing on the statements identified in the

Amended Complaint here, which have a direct causal connection with Executive Order 13768, as

evidenced by the President's own words.  *See* President Donald Trump, Speech Regarding

Executive Order 13768 (Jan. 25, 2017), https://www.govinfo.gov/content/pkg/DCPD-

201700513/html/DCPD-201700513.htm (calling the Executive Order "part of an immigration

reform we outlined during the campaign").

## II.       Proportionality Favors Discovery on Topics 9, 19, and 23

The discovery proportionality factors favor permitting Petitioners to obtain testimony on

Topics 9, 19, and 23.  Under Rule 26, a court should consider "the importance of the issues at

stake in the action, the amount in controversy, the parties' relative access to relevant information,

the parties' resources, the importance of the discovery in resolving the issues, and whether the

burden or expense of the proposed discovery outweighs its likely benefit," in deciding whether to

prevent discovery.  Fed. R. Civ. P. 26(b)(1).  "The party objecting to the discovery demands

must, with some degree of specificity, illustrate the nature and extent of the burden of

production."  *Barella v. Vill. of Freeport*, 296 F.R.D. 102, 105-106 (E.D.N.Y. 2013) (allowing

discovery where production may "shed new light on the allegations").  Once relevance is

established, "the burden is on the refusing party to show that the movant's request is

burdensome, overly broad, vague, or outside the scope of discovery." 8 Fed. Prac. & Proc. Civ. §

2008.1 (3d ed.) (citing *Prasad v. George Washington Univ.*, 325 F.R.D. 1, 3 (D.D.C. 2018)).

Respondents made no showing of burden at all—in fact, these factors all weigh in favor of granting this discovery.

First, the benefit here clearly outweighs any burden by Respondents.  Petitioners are attempting to obtain the information sought by Topics 9, 19, and 23 in the most efficient manner possible; they have already tried to obtain the information sought by Topic 9 from Mirella Tiberi, then Section Chief of the USCIS Lawrence Field Office, who was unable to answer even the most basic questions about the applications that make up the Provisional Waiver process.  *See* Ex. J (Tiberi Dep.) at 261:25-262:4 ("Q. And do you agree, as part of the provisional waiver process, the applicant would need an approved I-130?  A. I don't know because I do not know about the provisional waiver.").  Requiring a designee to sit for a remote deposition on a handful of Topics does not impose a significant burden.  Second, "the parties' relative access to relevant information" also weighs in favor of Respondents' provision of testimony.  Petitioners do not have access to internal USCIS policies, insight into decision-making on particular applications, or the undisclosed ways in which DHS prevented them from accessing the Provisional Waiver Process.  Finally, the allegations in this case are important to the parties and the public, and this discovery could shed significant light on them.

Because Petitioners' Topics are clearly relevant to the claims at issue in this case and proportional to the case's needs, Respondents' motion to limit discovery should be denied.

Respectfully submitted this 19th day of October, 2020.


                                        /s/ Allyson Slater

Matthew R. Segal (BBO # 654489)          Kevin S. Prussia (BBO # 666813)
Adriana Lafaille (BBO # 680210)          Michaela P. Sewall (BBO # 683182)
AMERICAN CIVIL LIBERTIES UNION           Jonathan A. Cox (BBO # 687810)
FOUNDATION OF MASSACHUSETTS, INC.        Allyson Slater (BBO #704545)
211 Congress Street                      Stephen Provazza (BBO # 691159)
Boston, MA 02110                         Colleen M. McCullough (BBO # 696455)
(617) 482-3170                           Matthew W. Costello (BBO # 696384)
                                         Christina Luo (BBO # 705590)
Kathleen M. Gillespie (BBO # 661315)     WILMER CUTLER PICKERING
Attorney at Law                            HALE AND DORR LLP
6 White Pine Lane                        60 State Street
Lexington, MA 02421                      Boston, MA 02109
(339) 970-9283                           Telephone: (617) 526-6000
                                         Facsimile: (617) 526-5000
                                         kevin.prussia@wilmerhale.com
                                         michaela.sewall@wilmerhale.com
                                         jonathan.cox@wilmerhale.com
                                         allyson.slater@wilmerhale.com
                                         stephen.provazza@wilmerhale.com
                                         colleen.mccullough@wilmerhale.com
                                         matthew.costello@wilmerhale.com
                                         christina.luo@wilmerhale.com

                                         *Counsel for Petitioners*