# Exhibit C

| | | | |
|---|---|---|---|
| 1 | | work with law enforcement agencies during the | 09:58:54 |
| 2 | | adjudication process? | 09:58:57 |
| 3 | A. | I would say yes. | 09:58:59 |
| 4 | Q. | And prior to October of 2017, there was no other | 09:59:00 |
| 5 | | formal policy about how to coordinate arrests with ICE | 09:59:06 |
| 6 | | in any other document, was there? | 09:59:09 |
| 7 | A. | Not that I am aware of. | 09:59:15 |
| 8 | Q. | Why was this guidance issued in October of 2017? | 09:59:17 |
| 9 | A. | I'm sorry, what was that?  Can you repeat that? | 09:59:23 |
| 10 | Q. | Why was this guidance issued in October of 2017? | 09:59:26 |
| 11 | A. | The agency -- I don't -- I don't -- I don't have a | 09:59:34 |
| 12 | | specific memo to point to on why it was issued, but | 09:59:39 |
| 13 | | the agency must have felt that it was necessary to put | 09:59:44 |
| 14 | | into -- to the CHAP.  I can't point to anything that | 09:59:48 |
| 15 | | said why this CHAP insertion -- was inserted into the | 09:59:51 |
| 16 | | CHAP. | 09:59:56 |
| 17 | Q. | This update was approximately eight months after the | 09:59:56 |
| 18 | | Kelly memo that we discussed.  Right? | 10:00:02 |
| 19 | A. | Yes. | 10:00:06 |
| 20 | Q. | Do you think it's accurate to say that this was | 10:00:07 |
| 21 | | updated to provide guidance about how to implement the | 10:00:09 |
| 22 | | Kelly memo? | 10:00:12 |
| 23 | | MR. WEILAND:  Are you asking his personal | 10:00:16 |
| 24 | | opinion? | 10:00:17 |
| 25 | | MS. SLATER:  I'm asking his opinion as a | 10:00:18 |

| | | |
|---|---|---|
| 1 | | memorandum or something that says this Chapter 2, | 10:12:26 |
| 2 | | Part B, Volume 13 was created because of some document | 10:12:32 |
| 3 | | or something along those lines. | 10:12:35 |
| 4 | Q. | Did your practice of referring individuals with a | 10:12:44 |
| 5 | | final order always include individuals with no | 10:12:48 |
| 6 | | criminal history? | 10:12:51 |
| 7 | A. | I'm sorry, repeat that question. | 10:12:52 |
| 8 | Q. | Did your practice of referring individuals with final | 10:12:53 |
| 9 | | orders of removal always include referring individuals | 10:12:57 |
| 10 | | with no criminal history? | 10:13:01 |
| 11 | A. | Yes.  We would refer anyone with a final order of | 10:13:03 |
| 12 | | removal. | 10:13:06 |
| 13 | Q. | So you referred those individuals to ICE based solely | 10:13:08 |
| 14 | | on their final order status? | 10:13:11 |
| 15 | A. | And if we were scheduling an interview for them, yes. | 10:13:15 |
| 16 | Q. | And does that go back for your entire time at N11 | 10:13:22 |
| 17 | | through 2004? | 10:13:26 |
| 18 | A. | To the best of my knowledge, yes.  The best I can | 10:13:27 |
| 19 | | remember. | 10:13:30 |
| 20 | Q. | What's the purpose of that practice as it relates to | 10:13:31 |
| 21 | | noncriminal final order individuals? | 10:13:34 |
| 22 | A. | Though noncriminal, they still have an outstanding | 10:13:39 |
| 23 | | final order of removal and, again, it's our | 10:13:41 |
| 24 | | responsibility to contact ICE ERO about these -- these | 10:13:43 |
| 25 | | individuals. | 10:13:53 |