**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| LILIAN PAHOLA CALDERON JIMENEZ, and LUIS GORDILLO, *et al.*, <br><br> Individually and on behalf of all others similarly situated, <br><br> Plaintiffs-Petitioners, <br><br> v. <br><br> CHAD WOLF, *et al.*, <br><br> Defendants-Respondents. | No. 1:18-cv-10225-MLW |

**PETITIONERS' MEMORANDUM IN SUPPORT OF THEIR**
**MOTION TO COMPEL DISCOVERY**

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................1

BACKGROUND ................................................................................................................2

ARGUMENT .....................................................................................................................6

I.  Respondents Should Produce USCIS Documents Regarding the Scheduling of I-130
Interviews ...............................................................................................................7

II.  Respondents Should Produce Documents Related to Executive Order 13768 .................10

III.  Respondents Should Produce Documents from the ICE Office of Public Affairs and
USCIS External Affairs Directorate ..............................................................................15

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Aronstein v. Mass. Mutual Life Ins. Co.*,
   No. 15-12864-MGM, 2017 WL 2818993 (D. Mass. June 29, 2017) ...........................6, 10, 16

*BPP Retail Props., LLC v. N. Am. Roofing Servs., Inc.*,
   300 F.R.D. 59 (D.P.R. 2014) .........................................................................................6

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
   140 S. Ct. 1891 (2020) (published June 18, 2020) ...............................................14

*Diaz-Padilla v. Bristol Myers Squibb Holding Liab. Co.*,
   No. 04-1003 (PG/GAG), 2005 WL 783076 (D.P.R. Apr. 4, 2005)..........................6

*Grajales v. Puerto Rico Ports Auth.*,
   682 F.3d 40 (1st Cir. 2012)...........................................................................14

*Green v. Cosby*,
   152 F. Supp. 3d 31 (D. Mass. 2015) ..............................................................6

*In re New England Compounding Pharmacy, Inc. Prods. Liab. Litig.*,
   MDL No. 13-2419-FDS, 2013 WL 6058483 (D. Mass. Nov. 13, 2013)..........................12, 17

*Vázquez-Fernández v. Cambridge Coll., Inc.*,
   269 F.R.D. 150 (D.P.R. 2010) ......................................................................7, 16

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 252 (1977)........................................................................................11

**Federal Statutes**

Administrative Procedures Act (APA) ......................................................................1

Immigration and Nationality Act (INA) ...................................................................1

**Other**

Executive Order 13768 ........................................................................... *passim*

**INTRODUCTION**

Petitioners' Amended Complaint alleges a scheme that was implemented in response to President Trump's Executive Order No. 13768 and born of racial animosity, in which noncitizens were drawn in to U.S. Citizenship and Immigration Services (USCIS) offices through the prospect of a path to lawful status, only to be handed over to Immigration and Customs Enforcement (ICE) for arrest and removal.  Discovery to-date has further revealed that ICE and USCIS coordinated the scheduling of these arrests and carefully worked to keep them out of the public eye as unsuspecting families continued to walk into a trap.  Petitioners allege that Respondents' actions violate the Administrative Procedures Act (APA), the Immigration and Nationality Act (INA), the Due Process Clause, and the Equal Protection Clause.  As is their right in litigation, Petitioners seek discovery related to these events and these allegations.

Among other things, Respondents have refused to provide: 1) USCIS records regarding the scheduling of I-130 interviews; 2) Department of Homeland Security (DHS) records regarding the purpose and motivations behind Executive Order 13768 and its implementation memorandum by then-Secretary John Kelly; and 3) ICE and USCIS records relating to the agencies' public messaging around arrests at USCIS offices.  Petitioners' requests are relevant, proportional to the needs of this case, and not unduly burdensome.  Although Petitioners have attempted to negotiate in good faith in order to avoid litigation regarding these requests, Respondents' refusal to produce documents has been consistent and nearly categorical. Petitioners therefore seek an order compelling Respondents to produce responsive documents relating to these topics.

1

**BACKGROUND**

Petitioners filed their Amended Class Action complaint on April 10, 2018.  In it, Petitioners alleged that DHS was unlawfully detaining and removing noncitizens who were seeking lawful status through their U.S. citizen spouses under a five-step provisional waiver process that was made available to those with final orders of removal by changes to the provisional waiver regulations in 2016.  Dkt. No. 27 (Am. Compl.) at ¶¶ 26-36.  The first three steps of that process involve the submission of forms to USCIS.  In adjudicating the first form (the I-130 Petition for Alien Relative), USCIS required many individuals with final orders to appear for interviews.[1]  But at the same time, the agency was coordinating with ICE, whose officers would appear at the interviews to arrest, detain, and remove the applicants.  *Id.* ¶¶ 1-4, 26-29, 37-100.  Petitioners allege that this conduct, carried out under President Trump's Executive Order 13768, was the product of animus based on race and national origin.  *Id.* ¶¶ 56, 110-11.

On August 23, 2018, this Court denied Respondents' motion to dismiss Petitioners' claims on certain counts.  Aug. 23, 2018 Hr'g Tr.; Dkt. No. 159 (Sept. 21, 2018 Order).  On May 16, 2019, the Court denied Respondents' motion to dismiss with respect to the remaining counts and certified a class of petitioners.  May 16, 2019 Hr'g Tr.; Dkt. No. 253 (May 17, 2019 Order).

---

[1] Interviews are not required in order for an application to be approved, *see* Dkt. No. 548 (Resp'ts' Mot. for a Protective Order) at 9 n.1 (citing 8 C.F.R. §§ 204.1, 245.6), but class members were frequently required to attend interviews.

Petitioners served their First Set of Requests for Production on September 25, 2019.  Ex. A (Pet'rs' First Set of Reqs. for Produc.).[2]  From the outset, the parties disagreed about the scope of relevant discovery from USCIS.  *See, e.g.*, Dkt. No. 158 ¶ 3 (Sept. 18, 2018 Joint Status Report); Dkt. No. 371 (Aug. 27, 2019 Hr'g Tr.) (discussing scope of USCIS discovery).  Respondents ultimately agreed to produce documents regarding class members or ICE arrests at USCIS facilities.  *See* Ex. B (Resp'ts' Resps. and Objs. to Pet'rs' First Set of Reqs. for Produc.) at 19-21 (Resp. to RFP No. 20).

But the parties have been unable to reach agreement regarding Petitioners' requests for documents regarding the general policies and practices impacting the scheduling of I-130 interviews by USCIS.  Ex. A (Pet'rs' First Set of Reqs. for Produc.) at RFP Nos. 24 and 25.  Specifically, Request No. 24 sought documents relating to the I-130 interviews of noncitizens who fell or would have fallen within the *Calderon* class, and Request No. 25 sought documents relating to the scheduling of "stand-alone" I-130 interviews by USCIS for individuals within the jurisdiction of the Boston ICE Enforcement and Removal Operations (ERO) since August 29, 2016.  *Id.*[3]  As to both requests, Respondents initially refused to produce any responsive documents not already being produced in response to other requests.  *See* Ex. B (Resp'ts' Resps. and Objs. to Pet'rs' First Set of Reqs. for Produc.) at 25-26 (Resp. to RFP Nos. 24-25); Ex. C (Letter from Provazza to Larakers, Feb. 26, 2020) at 2.[4]  Although Petitioners offered to seek

---

[2] All referenced Exhibits are attached to the contemporaneously filed November 30, 2020. Declaration of Colleen McCullough ("McCullough Decl.").  Citations to "Ex. A-U" refer to exhibits to the McCullough Declaration.

[3] "Stand-alone" I-130 petitions are those that are not filed together with applications to adjust status.  The I-130 petitions filed by *Calderon* class members are "stand-alone."

[4] Petitioners first informed Respondents of the deficiencies in their Responses and Objections to the First Set of Requests for Production in a November 26, 2019 letter.  *See* Ex. D (Letter from McCullough to Larakers, Nov. 26, 2019) at 4.  The parties discussed Petitioners' First Set of Requests for Production on December 16, 2019 and on January 22, 2020.  Ex. E (Letter from

only documents reflecting USCIS *policies and practices* for scheduling stand-alone I-130 interviews, as opposed to records reflecting the scheduling of each interview, Respondents nevertheless refused.  Respondents are thus withholding communications relating to, for example, the push by USCIS field offices like Lawrence to schedule numerous backlogged "stand-alone" I-130 interviews beginning in the fall of 2017—which generated a series of arrests—and other information regarding the policies and practices that determined whether and when a class member might have been required to appear for an I-130 interview.

Petitioners served their Second Set of Requests for Production on June 1, 2020, to which Respondents provided their Responses and Objections on June 30, 2020.  Ex. G (Pet'rs' Second Set of Reqs. for Produc.); Ex. H  (Resp'ts' Corrected Resps. and Objs. to Pet'rs' Second Set of Reqs. for Produc.).  Among other things, the Second Set of Requests for Production sought DHS documents regarding the purpose for and motivations behind formulating, drafting, or implementing Executive Order 13768 and the Kelly Memorandum, Ex. G (Pet'rs' Second Set of Reqs. for Produc.) at RFP Nos. 44 and 46, and documents from the ICE Office of Public Affairs and USCIS External Affairs Directorate related to arrests at USCIS offices in the jurisdiction of ICE Boston ERO.  *Id.*, at RFP Nos. 47 and 48.[5]  After Respondents refused to produce

---

Provazza to Larakers, Dec. 19, 2019); Ex. C (Letter from Provazza to Larakers, Feb. 26, 2020). On January 22, 2020, Petitioners offered to limit the scope of outstanding documents responsive to Requests 24 and 25 to "policies and practices that may dictate whether and when a class member would be scheduled for an I-130 interview."  Ex. C (Letter from Provazza to Larakers, Feb. 26, 2020) at 2 (describing the offer made in the January 22, 2020 conference).  Petitioners further raised this issue in subsequent conferences in an attempt to narrow or resolve this dispute, but Respondents continued to refuse to produce any documents showing any of the USCIS policies and practices that govern when a class member would be scheduled for an I-130 interview beyond one section of the USCIS Consolidated Handbook of Adjudication Procedures ("CHAP") relating to coordination between ICE and USCIS.  *See* Ex. F (Letter from Provazza to Larakers, Oct. 2, 2020) at 2 (memorializing the parties' September 29, 2020 conference).

[5] Respondents served their Responses and Objections on June 30, 2020.  Ex. G (Pet'rs' Second Set of Reqs. for Produc.).  Petitioners wrote to Respondents regarding the deficiencies in

responsive documents, and following a discovery conference on July 29, 2020, Petitioners'

counsel wrote to Respondents' counsel proposing a compromise that would narrow Request Nos.

44 and 46 to DHS documents relating to Executive Order 13768 and the Kelly Memorandum

that involve racial and other classifications or animus, and would narrow Request Nos. 47 and 48

to documents from the ICE Office of Public Affairs and USCIS External Affairs Directorate

discussing arrests at USCIS offices within the jurisdiction of ICE Boston.  Ex. J at 3 (Letter from

Provazza to Larakers, Aug. 10, 2020).  Respondents refused.  *See* Ex. K (Aug. 24, 2020 Email

from Weiland to Pet'rs).  Petitioners requested a final discovery conference on September 29,

2020 to again attempt to narrow or reach a compromise regarding several Requests, including

Nos. 24, 25, 44, 46, 47, and 48.  The parties were unable to reach agreement.  Ex. F (Letter from

Provazza to Larakers, Oct. 2, 2020).

Having conferred with Respondents and considered their requests in light of the needs of

this case, Petitioners now move for the following categories of documents, which reflect a

narrowing of Petitioners' original RFPs:

1. **USCIS Documents Regarding the Scheduling of I-130 Interviews (responsive to RFP Nos. 24 and 25)**:  Documents and communications reflecting the USCIS policies and practices that may dictate or influence whether and when a class member would be scheduled for an I-130 interview from August 29, 2016 to the present.

2. **Materials related to Executive Order 13768 (responsive to RFP Nos. 44 and 46)**: Documents and communications in the possession of the Office of the Secretary of Homeland Security, including but not limited to the Secretary, Deputy Secretary, DHS Chief of Staff, and Executive, from January 20, 2017 to February 20, 2017, regarding the purpose for, and motivations behind Executive Order 13768 and Secretary Kelly's February 20, 2017 memorandum implementing that Executive Order.

---

their Response and Objections to Petitioners' Second Set of Requests for Production on July 23,
2020.  Ex. I (Letter from Provazza to Larakers, July 23, 2020).  Counsel for the parties spoke on
July 29, 2020 to attempt to resolve their disputes, but Respondents continued to refuse to
produce any documents in response to these requests.  *See* Ex. J (Letter from Provazza to
Larakers, Aug. 10, 2020) (memorializing July 29, 2020 conference).

3. **Materials from the ICE Office of Public Affairs and USCIS External Affairs Directorate (responsive to RFP Nos. 47 and 48)**:  Documents and communications in the custody of the local or headquarters-based ICE Office of Public Affairs or the USCIS External Affairs Directorate discussing arrests at USCIS offices in the jurisdiction of ICE Boston ERO.

## ARGUMENT

The discovery Petitioners seek is both relevant and proportional to the needs of the case.

Under Federal Rule of Civil Procedure 26(b)(1):

> Parties may obtain discovery regarding *any* nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

Fed. R. Civ. P. 26(b)(1) (emphasis added).  The burden on the party seeking discovery to show relevance is "not onerous."  *Aronstein v. Mass. Mutual Life Ins. Co.*, No. 15-12864-MGM, 2017 WL 2818993, at *2 (D. Mass. June 29, 2017).  Upon such a showing, "the party resisting discovery has the burden of showing *specifically* how the documents requested are not relevant or how the request at issue is overly broad, burdensome, or oppressive."  *Id.* (summarizing *BPP Retail Props., LLC v. N. Am. Roofing Servs., Inc.*, 300 F.R.D. 59, 61 (D.P.R. 2014)) (emphasis added); *Diaz-Padilla v. Bristol Myers Squibb Holding Liab. Co.*, No. 04-1003 (PG/GAG), 2005 WL 783076, at *2 (D.P.R. Apr. 4, 2005) ("[T]he party seeking discovery over another's objection must first make a showing, as meager as that may be, of relevance.  Thereafter, the burden shifts to the opposing party to show why discovery should not be permitted.").  This Court and others in the First Circuit routinely grant discovery motions where the opposing party fails to provide specific objections and responses articulating irrelevance, overbreadth, or burden. *See, e.g.*, *Green v. Cosby*, 152 F. Supp. 3d 31, 37-38 (D. Mass. 2015) (finding defendant wife's blanket statement that her role as defendant's business manager had "no bearing" on the issues

was insufficient to meet her burden of showing discovery would impose an undue burden);

*Vázquez-Fernández v. Cambridge Coll., Inc.*, 269 F.R.D. 150, 160-62 (D.P.R. 2010) (granting

motion to compel where defendant "merely provide[d] a blanket objection" without stating

specific reasons).

As described below, USCIS policies governing the scheduling of I-130 interviews,

documents relating to the motivations behind the passage of Executive Order 13768, and

documents relating to USCIS's and ICE's efforts to keep arrests out of the press are all relevant

to Petitioners' claims and proportional to the needs of the case.

I. **Respondents Should Produce USCIS Documents Regarding the Scheduling of I-130 Interviews**

**USCIS Documents Regarding the Scheduling of I-130 Interviews (responsive to RFP Nos. 24 and 25)**:  Documents and communications reflecting the USCIS policies and practices that influenced or influence whether and when a class member would be scheduled for an I-130 interview from August 29, 2016 to the present.

Documents relating to USCIS's policies and practices that determined the scheduling of

I-130 interviews are relevant to Petitioners' claims—indeed, they go to core issues in this case—

and impose no undue burden on Respondents.  Whether and when USCIS scheduled individuals

for interviews relates to Petitioners' claims of a collaboration between USCIS and ICE that cut

off access to the provisional waiver process.  As part of that scheme, USCIS required individuals

with final orders to appear in person at a USCIS office for interviews with the ostensible purpose

of adjudicating I-130 applications, only to turn those individuals over to ICE for arrest,

detention, and removal.  Dkt. No. 27 (Am. Compl.) at ¶¶ 1-4, 26-29, 37-100.  Petitioners have

learned through discovery that USCIS worked with ICE to schedule these interviews, including by spreading them out to ensure ICE availability to make arrests and to avoid public scrutiny.[6]

Despite the central relevance of USCIS's scheduling of I-130 interviews, Respondents have produced only limited discovery into USCIS's scheduling policies. For example, in response to a different request for production—Petitioners' Request No. 20—Respondents produced the chapter from the USCIS Consolidated Handbook of Adjudication Procedures ("CHAP") governing USCIS's coordination with ICE. *See* Ex. M (McCleary Dep. Ex. 3) (CHAP Vol. 13 Part B, Ch. 2, Oct. 4, 2017). The 2017 version of that document described USCIS's policy of allowing for interviews to be scheduled solely for the purpose of facilitating an arrest.[7] That policy was changed in 2019—during the pendency of this litigation—to prohibit the scheduling of interviews for the sole purpose of facilitating an arrest.[8] *See* Ex. N (McCleary Dep. Ex. 4) (CHAP Vol. 13 Part B, Ch. 2, Dec. 17, 2019). Those chapters—which may be only a sliver of the guidance or communication that USCIS possesses regarding scheduling I-130 interviews—indicate that USCIS believed its scheduling of those interviews played an important role in ICE arrests of noncitizens in USCIS offices. But Respondents refuse to produce further documents showing how USCIS decided to schedule the I-130 interviews of class members.

Such documents could help explain idiosyncrasies in USCIS's scheduling of I-130 interviews. For instance, in 2017, USCIS accelerated scheduling of I-130 interviews that had

---

[6] *See* Dkt. No. 551-05 (Riordan Dep.) at 88:7-17 (testifying that scheduling of interviews in conjunction with ICE was for the benefit of USCIS); Dkt. No. 551-05 (Riordan Dep.) at 89:8-13 (testifying that interest from ERO would dictate when an interview was scheduled); Ex. L (Graham Dep. Ex. 6) (ICE officer e-mailing USCIS officer about his preference not to schedule all I-130 interviews "at one time," and requesting USCIS to "schedule one or two at a time and spread them apart").

[7] Dkt. No. 551-08 (McCleary Dep.) at 65:17-20; 65:25-66:7.

[8] Dkt. No. 551-08 (McCleary Dep.) at 74:11-16.

"backlog[ged]" over the years[9]—even though USCIS had no obligation to conduct interviews of these individuals and USCIS knew that all or nearly all of these individuals would be arrested by ICE.[10]  Further, evidence suggests that USCIS allowed applications to languish once the arrests stopped.  For instance, Petitioner Deng Gao's I-130 application was submitted in June 2016, sent to the Boston USCIS office in December 2017, and then left in a queue for an interview for nearly a year, until it was finally approved in October 2018 without any interview and only after counsel intervened  in this case.  *See* Dkt. No. 50-7 at ¶ 17.[11]  Thus, how USCIS determined that an I-130 applicant should be required to appear for an interview at USCIS and the factors that determined when these interviews were scheduled is critical to Petitioners' understanding of USCIS's involvement in the scheme to effectively cut off all access to the 2016 provisional waiver process.

---

[9] Dkt. No. 551-05 (Riordan Dep.) at 234:8-13 ("Q. So do you believe that the -- the push to adjudicate these I-130s in November of 2017 was a response to these backlogs that had built up from the resources of USCIS being directed toward other applications for a period of time?  A. I do.").  *See also* Dkt. No. 551-09 (Riordan Dep. Ex. 17) (a November 2017 list of pending I-130 applications included applications from 2014, 2015, and 2016); Dkt. No. 551-05 (Riordan Dep.) at 197:2-17; *id.* at 212:2-213:1.

[10] Dkt. No. 551-05 (Riordan Dep.) at 130:23-25 (Riordan "was told at one point [ICE ERO] would respond to every case"); 131:10-132:5; 183:5-15 ("Q. And all I'm saying is that the USCIS alerts were going to result in additional in-person visits from ERO, correct?  A. In -- in all probability seemed to be the case.  Q. And the ERO visits would most likely result in arrests, correct?  A. To date, during the period, it did.  And I -- probably it would continue on -- on that -- that trend would continue, yes.").

[11] Mr. Gao's wife filed an I-130 in June 2016.  Dkt. No. 50-7 at ¶ 12.  USCIS informed Mr. Gao's attorney in January 2018 that his file had been received in Boston on December 22, 2017 and was awaiting the scheduling of an interview.  *Id.* ¶ 17.  The matter continued to sit in queue until counsel in this matter interceded and contacted counsel for the government about the delay in August 2018 and then again in October 2018.  Dkt. No. 551-11 at 1, 2 (Email from Lafaille to Respondents' Counsel, Aug. 23, 2018; Email from Lafaille to Resp'ts' Counsel, Oct. 23, 2018).  Following this discussion between counsel, Mr. Gao's I-130 was approved without an interview on October 30, 2018.  *Id.* at 1 (Email from Larakers to Lafaille, Oct. 30, 2018).

Providing these documents is not unduly burdensome.  Petitioners seek documents reflecting USCIS policies and practices, which Respondents should be able to find without laborious document collection and review.  For example, the CHAP is a USCIS policy document that may include responsive information which Respondents could readily identify.  Indeed, Respondents have already produced multiple versions of one of the chapters of the CHAP.  They have not explained why producing other such chapters, similar guidance, or other communications reflecting policies and practices would be unduly burdensome.  As the party resisting relevant discovery, Respondents must show "specifically how" producing the requested documents "are not relevant or how the request at issue is overly broad, burdensome, or oppressive."  *Aronstein*, 2017 WL 2818993, at *2.  Respondents never did so in the parties' numerous negotiations.  Because Petitioners' request is not unduly burdensome and is proportional to the needs of this case, this Court should compel Respondents to produce these documents.

## II.     Respondents Should Produce Documents Related to Executive Order 13768

**Materials Related to Executive Order 13768 (responsive to RFP Nos. 44 and 46)**:
Documents and communications in the possession of the Office of the Secretary of Homeland Security, including but not limited to the Secretary, Deputy Secretary, DHS Chief of Staff, and Executive, from January 20, 2017 to February 20, 2017 regarding the purpose for, and motivations behind Executive Order 13768 and Secretary Kelly's February 20, 2017 memorandum implementing that Executive Order.

Documents showing the purpose for and motivations behind Executive Order 13768 and the accompanying February 20, 2017 implementation memorandum by Secretary John Kelly are

relevant to at least Petitioners' equal protection claim.[12]  Any burden of production—about which Respondents have made no showing—is outweighed by the importance of these documents to the issues at stake.

ICE witnesses have explained that the arrest and removal of class members that is the subject of Petitioners' claims resulted directly from the Executive Order and Kelly Memorandum.  Following the Executive Order and Kelly Memorandum, ICE's then-Executive Associate Director Matthew Albence issued a memorandum to the agency on February 21, 2017 mandating that "[e]ffective immediately, ERO officers will take enforcement actions against all removable aliens encountered in the course of their duties."  Ex. O (Albence Mem.) at 1.[13]  And ICE began coordinating with USCIS to make arrests "per the new executive order."  *Id.* at 99:7-17; *see also* Ex. P (ICE Resp. to Pet'rs' Interrog. No. 5) (stating that "[i]n accordance with [the February 20, 2017 John Kelly Memorandum,] Boston ERO did not exempt classes or categories of removable aliens from potential enforcement.").

Petitioners can therefore succeed on their equal protection claim by showing that racial animus was at least one motivating factor behind the Executive Order.  *See* May 16, 2019 Hr'g Tr. at 5:9-12, 8:23-9:2; *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268-71 (1977).  This Court explained that "Petitioners' allegations concerning President Donald

---

[12] Although Petitioners had proposed a compromise limiting this request to purposes and motivations as they relate to "race, racial group, national origin, or animus based on race, racial group, or national origin," Ex. J at 3 (Letter from Provazza to Larakers, Aug. 10, 2020), Petitioners do not limit their request here in such fashion.  Petitioners have, however, retained the narrowed date range that they proposed to Respondents as part of an effort to reach agreement regarding Request Nos. 44 and 46.

[13] *See also* Ex. Q (Cronen Dep.) at 82:13-16 ("Q. Do you understand the term enforcement action here to refer to removing someone from the United States?  A. I understand it to be those that are encountered could be arrested, detained, and after seeing an immigration judge with a final order, then removed.  Q. So, Mr. Albence here is mandating that ICE remove any removable individual they encounter in the course of their duties, correct?  A. Yes.").

Trump's statements and policies allege a plausible claim that racial animus was one reason for the Executive Order," and that Petitioners' equal protection claim could succeed based on proof that the facially neutral policy found in President Trump's Executive Order 13768 had a "racially discriminatory intent or purpose."  May 16, 2019 Hr'g Tr. at 6-7, 9.  To uncover that racially discriminatory intent or purpose, Petitioners seek documents relating to the formulation, drafting, or implementation of the Executive Order.  Respondents have provided none.  In fact, the total discovery Respondents have agreed to search for or produce relating specifically to the animus alleged in Petitioners' equal protection claim was a search of the documents of certain Boston ERO custodians using eight racial slurs as search terms.  *See* Ex. B (Resp'ts' Resps. and Objs. to Pet'rs' First Set of Reqs. for Produc.) at 29 (Resp. to RFP No. 30).  Request Nos. 44 and 46 seek facts and documents directly relevant to Petitioners' claim as laid out by this Court.

Respondents have provided nothing to show the burden of production beyond a boilerplate objection.  *See* Ex. H (Resp'ts' Corrected Resps. and Objs. to Pet'rs' Second Set of Reqs. for Produc.) at 7, 9 (stating that production "represents a burden that does not outweigh the benefit of the documents sought.").  They have failed to make a single factual assertion as to why producing these documents would be burdensome.  *See In re New England Compounding Pharmacy, Inc. Prods. Liab. Litig.*, MDL No. 13-2419-FDS, 2013 WL 6058483, at *6 (D. Mass. Nov. 13, 2013) (holding a party resisting discovery "cannot rely on a mere assertion that compliance would be burdensome and onerous ***without*** showing the manner and extent of the burden and the injurious consequences of insisting upon compliance." (emphasis added) (quoting *Sterling Merch., Inc. v. Nestle, S.A.*, No. 06-1015(SEC), 2008 WL 1767092, at *2 (D.P.R. Apr. 15, 2008)).  Nor did Respondents expand on this objection during the parties' many negotiations

and conferences, beyond asserting that the Requests went beyond the scope "authorized" by the
Court.

This discovery goes to the heart of Petitioners' case.  As alleged in the Amended
Complaint, the priorities in the Executive Order and Kelly Memorandum are connected to the
Trump administration's goal of enforcing immigration laws against individuals of certain
nationalities or races, and this case illustrates how that objective was put into practice.  Pursuant
to the Executive Order, Respondents trapped and deported individuals who are part of U.S.-
citizen families, despite the fact that they have an available pathway to lawful status under
regulations the very purpose of which was to minimize their time away from their families.
Absent racial or national animus and hostility, it is difficult to fathom a reasonable explanation
for Respondents' conduct.  Uncovering the true purpose is therefore centrally important to this
case and to the public.

Respondents' objection that these Requests seek documents "outside the limitations" of
the "Court's order limited discovery from ICE Headquarters 'concerning policy directives given
to ICE-Boston'" is misplaced.  Ex. H (Resp'ts' Corrected Resps. and Objs. to Pet'rs' Second Set
of Reqs. for Produc.) at 7, 9 (citing Dkt. No. 366 at ¶ 3).  In no way did this Court forbid
Petitioners from seeking discovery from DHS regarding their equal protection claim; rather, the
Court asked the parties to work together to determine what is appropriate and seek the Court's
intervention if the parties could not reach an agreement.  Aug. 27, 2019 Hr'g Tr. at 60:15-61:5.[14]

---

[14] At that hearing, this Court stated:

I'm authorizing limited discovery from ICE headquarters concerning essentially -- …. policy
directives to Boston.  And there's not a dispute about that.  It sounds as if, though, it's possible
that the petitioners will be looking for more in connection with their equal protection claim, and
I'd have to go back and refresh myself on my equal protection analysis. But *if the petitioners
make a request that you think is beyond the narrow focus -- well, that's beyond policy
directives given to ICE Boston from headquarters and they say, Well, we're entitled to this*

But Respondents have refused to work with Petitioners to determine the appropriate scope of discovery from DHS in accordance with this Court's order.

Respondents' recently-filed Motion to Dismiss or for Judgment on the Pleadings, Dkt. No. 560, does not alter Petitioners' right to discovery on this issue.  Respondents filed this motion on November 18, 2020, *five months* after the plurality opinion on which it is based was decided.  *See Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891 (2020) (published June 18, 2020).  During the parties' discovery negotiations, Respondents never raised *Regents* or mentioned any intention to file a motion to dismiss based on it.  The parties have already begun conducting discovery regarding Petitioners' equal protection claim; thus, any motion for a judgment on the pleadings should be heard in conjunction with summary judgment briefing.  *See Grajales v. Puerto Rico Ports Auth.*, 682 F.3d 40, 46 (1st Cir. 2012) ("[O]nce the parties have invested substantial resources in discovery, a district court should hesitate to entertain a Rule 12(c) motion that asserts a complaint's failure to satisfy the plausibility requirement.").  In any event, *Regents* has no bearing on this case; it assessed different allegations of animus relating to a different executive policy.

Because the requested discovery is directly relevant to Petitioners' equal protection claim, Respondents have made no showing of the undue burden this discovery would impose, and this issue is of vital importance to Petitioners' claims, Respondents should be compelled to provide the documents Petitioners seek.

---

*because it's relevant to our equal protection argument, try to work it out. And if you don't work it out, it will be more concrete for me so I can essentially apply the Rule 26(b) test to something.* You can tell me how burdensome it would be.  They can tell me how relevant it is. And I can make a well-informed decision."

Aug. 27, 2019 Hr'g Tr. at 60:15-61:5 (emphasis added).

III.   **Respondents Should Produce Documents from the ICE Office of Public Affairs and USCIS External Affairs Directorate**

> **Materials from the ICE Office of Public Affairs and USCIS External Affairs Directorate (responsive to RFP Nos. 47 and 48)**:  Documents and communications in the custody of the local or headquarters-based ICE Office of Public Affairs or the USCIS External Affairs Directorate discussing arrests at USCIS offices in the jurisdiction of ICE Boston ERO.

Petitioners' requests for ICE and USCIS external affairs documents related to arrests at USCIS offices are relevant to Petitioners' claims about the unlawful scheme perpetuated by the agencies, and their relevance outweighs any burden of production.

Discovery has already revealed the relevance of such documents, as it has so far uncovered how ICE and USCIS attempted to conceal their conduct to avoid publicity or negative media attention.  The District Director of USCIS testified that USCIS's policies regarding where and when arrests could be made at USCIS offices were guided in part by a desire to keep the arrests "out of public view."  Ex. R (McCleary Dep. at 93:18-94:2, 94:25-95:9) (30(b)(6) USCIS designee testifying that it was important to keep arrests "out of the public view"); *see also* Ex. S (Riordan Dep. at 183:1-14) (testifying to the reasons USCIS avoided having multiple ICE arrests in one day); Ex. L (Graham Dep. Ex. 6) (ICE officer asking USCIS not to schedule I-130 interviews "all at one time as it . . . has the potential to be a trigger for negative media interest, as we have seen in the past").  USCIS's attempts to conceal these arrests went beyond helping to keep arrests out of the public eye.  Indeed, more than a year after the scheme began, DHS represented to the immigration bar that there was "no concerted effort to target these cases."  Ex. T (ICE-00011535).  And in February 2018, ICE and USCIS worked together with ICE's Public Affairs Office to craft a public statement for the New York Times that downplayed ICE's coordination with USCIS, stating that ICE "work[ed] with a variety of agencies to gather information" and that "[a]ny individual determined to be in violation of a U.S. immigration laws

may be subject to arrest[.]" Ex. U (ICE-0001470).  Further discovery is critical to understanding the level of ICE's and USCIS's concerted effort to conceal their actions, and is clearly relevant to Petitioners' claims because this concealment made these arrests possible.

Respondents objected to these requests on the basis that any formal response made to the media could be obtained by searching publicly available media sources.  Ex. H (Resp'ts' Corrected Resps. and Objs. to Pet'rs' Second Set of Reqs. for Produc.) at 10, 11.  Even assuming such responses were always published in full, which Petitioners cannot, Petitioners are not interested in simply gleaning ICE's formal responses to the media.  As internal documents have already shown, ICE and USCIS coordinated their outward-facing response in an effort to conceal the true nature of their cooperation.  *See* Ex. U (ICE-0001470).  Informal and non-privileged documents in the custody of the public affairs offices would shed light on ICE's and USCIS's purpose in concealing the arrest coordination scheme, and therefore show the extent of the scheme itself.

Here, as before, Respondents have made no particularized showing of the burden of producing such documents in their objections or in their negotiations with Petitioners.  *Aronstein*, 2017 WL 2818993, at *2; *Vázquez-Fernández*, 269 F.R.D. at 161-62 (granting motion to compel documents for requests where defendant's objections "merely provide[d] a blanket objection, which alone is not sufficient" to pass Rule 34(b)'s specificity requirements).  Respondents' boilerplate objection that the Requests "represent[] a burden that is vastly outweighed by the non-germane benefit of the documents sought" are inadequate.  Ex. H (Resp'ts' Corrected Resps. and Objs. to Pet'rs' Second Set of Reqs. for Produc.) at 9-10.  In any event, Petitioners are seeking specific documents from a targeted group of custodians regarding a narrow topic: arrests at USCIS offices within the jurisdiction of ICE Boston ERO.  Any argument as to burden would

16

therefore be unfounded.  *In re New England Compounding Pharmacy*, 2013 WL 6058483, at *7 (finding respondents failed to make a showing that any burden would be undue by making "no showing as to the nature and extent of the actual burden they would face").

For the foregoing reasons, Petitioners respectfully request that this Court compel the production of the documents described above.

Respectfully submitted this 30th day of November, 2020.

*Counsel for the Petitioners*

/s/  Colleen McCullough

Matthew R. Segal (BBO # 654489)
Adriana Lafaille (BBO # 680210)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF MASSACHUSETTS, INC.
211 Congress Street
Boston, MA 02110
(617) 482-3170


Kathleen M. Gillespie (BBO # 661315)
Attorney at Law
6 White Pine Lane
Lexington, MA 02421
(339) 970-9283

Kevin S. Prussia (BBO # 666813)
Michaela P. Sewall (BBO # 683182)
Jonathan A. Cox (BBO # 687810)
Allyson Slater (BBO # 704545)
Colleen M. McCullough (BBO # 696455)
Matthew W. Costello (BBO # 696384)
Christina Luo (BBO # 705590)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000
kevin.prussia@wilmerhale.com
michaela.sewall@wilmerhale.com
jonathan.cox@wilmerhale.com
allyson.slater@wilmerhale.com
colleen.mccullough@wilmerhale.com
matthew.costello@wilmerhale.com
christina.luo@wilmerhale.com

## **CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 37.1**

Pursuant to Local Rule 37.1, Petitioners certify that the discovery disputes that are the subject of this motion were discussed during the following discovery conferences.

1. Teleconference on December 16, 2019, from 1:30 PM – 2:30 PM (1 hour), during which Ms. Lafaille, Ms. Gillespie, Mr. Cox, Mr. Provazza, Mr. Costello, and Ms. Luo represented Petitioners, and Ms. Larakers and Ms. Hana Shatila represented Respondents. During this teleconference, the parties reached agreement on a number of discovery issues, including documents relied upon in the preparation of responses to Petitioners' discovery requests (*i.e.*, Petitioners' Request Nos. 31 and 32), ICE organization charts (*i.e.*, Petitioners' Request No 35), and documents concerning spoliation and document retention policies (*i.e.*, Petitioners' Request Nos. 36 and 37). Remaining issues included the list of custodians, the production of documents related the Executive Order (*i.e.*, Petitioners' Request Nos. 27 and 28), documents concerning the scheduling of I-130 interviews (*i.e.*, Petitioners' Request Nos. 24 and 25), and documents reflecting animus or using racially disparaging terms (*i.e.*, Request Nos. 29 and 30).

2. Teleconference on January 22, 2020 from 1:00 PM – 1:45 PM (45 minutes), during which Mr. Provazza, Ms. McCullough, Mr. Costello, and Ms. Luo represented Petitioners, and Mr. Weiland and Ms. Larakers represented Respondents. Remaining issues included the scope of USCIS 30(b)(6) topics and the list of custodians from ICE Headquarters.

3. Teleconference on July 29, 2020 from 12:00 PM – 1:00 PM (1 hour), during which Ms. Lafaille, Ms. Slater, Mr. Provazza, Mr. Costello, and Ms. Luo represented Petitioners, and Mr. Weiland represented Respondents. During this teleconference, the parties discussed Petitioners' Second Set of Requests for Production and came to an agreement on several issues, including that Respondents would search for notes, minutes, memoranda, and emails from a limited list of ICE Headquarters custodians regarding policy guidance that would have affected ERO Boston even if not directly communicated to ERO Boston between January 1, 2017 and February 1, 2018 (*i.e.*, Petitioners' Requests Nos. 41 and 42). Remaining issues included documents that were strictly confined to ICE Headquarters custodians that were not given to ERO Boston, and documents relating to Petitioners' equal protection claims.

4. Teleconference on September 29, 2020 from 1:00 PM – 3:00 PM (2 hours), during which Ms. Lafaille, Ms. Gillespie, Ms. Slater, Mr. Provazza, Ms. McCullough, Mr. Costello, and Ms. Luo represented Petitioners, and Mr. Weiland and Ms. Larakers represented Respondents. During this teleconference, the parties agreed that Respondents would produce documents from ICE Headquarters custodians regarding ICE Boston ERO's implementation of the Executive Order as it pertained to individuals with a final order of removal. Remaining issues included the production of documents in the possession of the Office of the Secretary of Homeland Security

from January 20, 2017 to February 20, 2017 regarding the purpose for and motivations behind the drafting of Secretary Kelly's Memorandum and Executive Order 13768 (*i.e.*, Petitioners' Request Nos. 44 and 46), and the production of documents from the ICE Public Affairs Office or the USCIS External Affairs Office discussing arrests at USCIS offices in the jurisdiction of ICE Boston ERO (*i.e.*, Petitioners' Request Nos. 47 and 48).

Petitioners further certify that their Memorandum in Support contains Petitioners'

position as to each of the contested issues.

/s/  Colleen McCullough
Colleen McCullough