```
1
                        UNITED STATES DISTRICT COURT
2                  FOR THE DISTRICT OF MASSACHUSETTS

3
                              )
4    Lilian Pahola Calderon     )
     Jimenez and Luis Gordillo, )
5    et al., Individually and   )
     On Behalf of All Others    )
6    Similarly Situated,        )
                              )   Civil Action
7         Plaintiffs-Petitioners, )  No. 1:18-cv-10225-MLW
                              )   Pages 1 to 62
8    v.                         )
                              )
9    Alejandro Mayorkas, et al., )
                              )
10        Defendants-Respondents. )
                              )
11

12
                   BEFORE THE HONORABLE MARK L. WOLF
13                  UNITED STATES DISTRICT JUDGE

14
                         ZOOM VIDEO HEARING
15

16
                          October 25, 2024
17                          12:15 p.m.

18
                John J. Moakley United States Courthouse
19                       Courtroom No. 2
                       One Courthouse Way
20                Boston, Massachusetts 02210

21

22
                   Jessica M. Leonard, CSR, FCRR
23                    Official Court Reporter
                John J. Moakley United States Courthouse
24                     One Courthouse Way
                   Boston, Massachusetts 02210
25              JessicaMichaelLeonard@gmail.com
```

```
 1
        APPEARANCES:
 2
        On Behalf of the Plaintiffs-Petitioners:
 3
             WILMER HALE LLP
 4           By: Kevin S. Prussia
             60 State Street
 5           Boston, MA 02109
             617-526-6243
 6           kevin.prussia@wilmerhale.com

 7           WILMER CUTLER PICKERING HALE AND DORR LLP
             By: Jonathan A. Cox
 8           60 State Street
             Boston, MA 02109
 9           617-526-6609
             jonathan.cox@wilmerhale.com
10
             ATTORNEY AT LAW
11           By: Kathleen M. Gillespie
             6 White Pine Lane
12           Lexington, MA 02421
             339-970-9283
13           kathleenmgillespieesq@gmail.com

14           ACLU OF MASSACHUSETTS
             By: Adriana Lafaille
15           One Center Plaza
             Suite 850
16           Boston, MA 02108
             617-482-3170
17           alafaille@aclum.org

18
        On Behalf of the Defendants-Respondents:
19
             U.S. DEPARTMENT OF JUSTICE
20           OFFICE OF IMMIGRATION LITIGATION,
             DISTRICT COURT SECTION
21           By: Mary Larakers
             P.O. Box 868
22           Ben Franklin Station
             Washington, DC 20044
23           202-353-4419
             mary.larakers@usdoj.gov
24

25      (Continued.)
```

```
 1
     APPEARANCES (continued):
 2
     On Behalf of the Defendants-Respondents:
 3
         U.S. DEPARTMENT OF JUSTICE
 4       OFFICE OF IMMIGRATION LITIGATION,
         DISTRICT COURT SECTION
 5       By: William Weiland
         P.O. Box 868
 6       Ben Franklin Station
         Washington, DC 20044
 7       202-305-0770
         william.h.weiland@usdoj.gov
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
                    Proceedings reported and produced
25                   by computer-aided stenography.
```

1                      P R O C E E D I N G S

2          THE COURT:  Good afternoon.  Would counsel please

3    identify themselves for the Court and for the record?

4          THE CLERK:  Would you like me to call the case, Your

5    Honor?

6          THE COURT:  Sure.  Go ahead.

7          THE CLERK:  Your Honor, this is the civil matter of

8    18-cv-10225, *Calderon Jimenez v. Cronen et al.*

9          THE COURT:  Would counsel please identify themselves

10   for the Court and for the record?

11         MR. PRUSSIA:  This is Kevin Prussia from Wilmer Hale

12   on behalf of the petitioners.  Also with me from my firm is

13   Jonathan Cox and Christina Luo.  Mr. Cox will be doing most --

14   I anticipate will be doing most of the speaking this afternoon.

15         THE COURT:  Okay.  Anybody else for the plaintiffs?

16         MS. GILLESPIE:  Kathleen Gillespie for the plaintiffs.

17         MR. COX:  This is Jonathan Cox.  We also have Adriana

18   Lafaille in this conference room with us here.  Allyson Slater

19   may also be attending from Wilmer Hale on behalf of the

20   petitioners.  I believe she's coming from a memorial service,

21   and so she may be a few minutes late coming into the conference

22   room.

23         THE COURT:  Okay.

24         And for the respondents, the defendants?

25         MS. LARAKERS:  Yes, Your Honor.  Mary Larakers and

1    William Weiland on behalf of the United States.

2        THE COURT:  And I'll reiterate what those -- I'm

3    conducting this hearing by video conference because I perceive

4    some urgency to it, and I know counsel for the defendants are

5    not in Boston -- I think in Washington or Texas, perhaps -- and

6    Ms. Larakers has had a number of other things to do this week;

7    but, although it's being done by video, everyone is reminded

8    that broadcasting and recording are not permitted.  Okay.

9        This case involves a Rule 23(b)(2) class action

10   brought by -- brought in 2018 by aliens ordered removed from

11   the U.S. who remained here nevertheless and married United

12   States citizens.  It was intensively and, I would say,

13   impressively litigated until 2021.  Since then, the case had

14   been stayed to allow the parties to engage in intensive,

15   protracted settlement discussions.

16       On October 17, 2024, a week ago yesterday, the parties

17   filed a joint motion for preliminary approval of their

18   settlement agreement.  With that motion or a memorandum, an

19   affidavit of counsel, a copy of the settlement agreement, and a

20   proposed notice didn't include a proposed order as I find has

21   been customary in class action cases where preliminary approval

22   of the settlement is requested.

23       On October 18, one week ago today, I issued a

24   memorandum of order raising questions regarding the proposed

25   settlement and identifying errors in the memo and support of

1    it.  I scheduled a hearing for October 23 and, at the

2    respondent's request, postponed it until today.

3            In that memorandum and order, I directed the parties

4    to be prepared to address the settlement generally and the

5    implications of *Aleman-Gonzalez* 596 U.S. 543, which prohibits a

6    district judge from ordering class-wide injunctive relief in an

7    immigration case such as this one.

8            I also directed the parties to be prepared to discuss

9    the implications, if any, of *Texas v. Department of Homeland*

10   *Security*, and raised some other questions.

11           I've since read the settlement documents carefully,

12   which I didn't have the opportunity to do a week ago, and I've

13   read *Aleman-Gonzalez* carefully as well.  I'll say that it

14   appears to me that the settlement is consistent with

15   *Aleman-Gonzalez* because, if I understand it correctly, I'm only

16   being asked to approve a private agreement to settle a class

17   action and would not be ordering the Government, the Department

18   of Homeland Security, to do anything.

19           I'm being asked to dismiss the case and retain

20   jurisdiction to enforce the settlement agreement, which the

21   Supreme Court has held is permissible in *Kokkonen*, 511 U.S.

22   375.  And this is analogous to a case in which I discussed

23   *Kokkonen* in detail, *Disability Law Center v. Massachusetts*

24   *Department of Correction*, 960 F. Supp. 2d, 271.

25           As I understand it, it's -- in addition, under the

1    settlement agreement, if there are disputes regarding certain

2    enforcement actions and they could not be resolved by a dispute

3    resolution procedure, I would be required to decide disputes or

4    claims by individual class members and would not be asked to

5    issue any class-wide relief.

6          So at the moment, my tentative view is that the

7    proposed settlement is consistent with, permissible under

8    *Aleman-Gonzalez*.  The implications, if any, of *Texas v.*

9    *Department of Homeland Security* are unclear.

10         And, in fact, I wonder whether that temporary

11   restraining order is inconsistent with 8 U.S.C., Section 1252

12   F-1 in *Aleman*, but I think the order still stands; so I do want

13   to hear about whether it has any implications for this case.

14         So I do want to hear from the parties on the questions

15   I've raised, and I know there's some others; but it's possible

16   that at the end of this hearing I may be in a position to

17   decide whether to preliminarily approve the settlement and

18   authorize the issuance of notice without a further hearing.

19         So, I think, first, I'd like an overall explanation of

20   the settlement to try to assure that I properly understand it,

21   and then I'll have some discrete questions.

22         And, among other things, I want to know whether the

23   parties now agree that there are two Rule 23(b)(2) classes.

24   I'd like to know what the subclass is, but, as you know, when I

25   read the memo in support, I was surprised to see, for example,

1    that the parties wrote a memo that said there was a right to

2    opt out of a (b)(2) class and I would find that language in the

3    notice; but, I think, under Rule 23 there is no right to opt

4    out of a (b)(2) class, and the parties properly left that

5    language outside of the notes.

6          And I want to know whether you agree that I correctly

7    stated the standards for approval of -- preliminary approval of

8    a (b)(2) class and -- for notice, which, with regard to notice,

9    is different than what's required for b(3) opt-out classes.

10         Are you going to go first, Mr. Cox?

11         MR. COX:  Yes, Your Honor, happy to do that and

12   provide an overview of the settlement, answer whatever

13   questions.

14         Of course, we apologize for the errors regarding the

15   23(b)(2) versus 23(b)(3) issues, and happy to address why the

16   settlement is still permissible in approval --

17         THE COURT:  Right.  I do want you to do it, but let's

18   be clear about this.  So you agree the memo had errors?  When I

19   pointed out errors -- they were wrong.

20         MR. COX:  Yes, that's right, Your Honor.

21         THE COURT:  And every one of you, I think, has your

22   name on the memo.  So you're certifying under Rule 11 that

23   there's a legal basis for the statements made in the memo.  The

24   work in this case is -- as I said earlier, I haven't seen you

25   in years.  It's been at a very high level.  It's been excellent

1    work.

2           Why are there errors -- see, when there are errors in

3    the memo, then it causes me to be concerned about everything

4    else.  So far everything else seems to be checking out.

5           I mean, did any of you read the memo?  Did you read

6    the memo?

7           MR. COX:  Yes, Your Honor.  And I think in this

8    instance it may have -- first and foremost, again, there's

9    little more than we can do to apologize for those errors.

10   They're inexcusable, and we're grateful that the Court

11   identified them when it did, and we're proceeding with the

12   approval process using the correct standards.

13          I think in this instance, Your Honor, it may have been

14   a matter of having looked at the memo too many times, and

15   sometimes, when you're trading memos back and forth, errors can

16   go unnoticed and -- there's little more I can do than apologize

17   for that issue, Your Honor.

18          THE COURT:  All right.  But -- all right.  So I've

19   stated the standards correctly.

20          Go ahead.  Now explain to me the settlement, and then

21   I'll ask the defendants to do the same thing.  Go ahead.

22          MR. COX:  And, first and foremost, Your Honor, I can

23   speak for the petitioners.  We're very proud of the settlement

24   agreement.  We think it captures the legal rulings that Your

25   Honor has made over the course of this litigation.

1          It's added procedural and substantive protections for

2    the class members, and, I think, gives both sides an elegant

3    way to resolve this case and preserve all of the substantive

4    and procedural rights of the class members.

5          The primary provisions of the settlement agreement

6    are, first, in Section 2, the motions to reopen.  Now, that

7    establishes a process that will allow most noncitizens, the

8    ones who have final orders of removal by the class definition,

9    to seek to have ICE join a motion to reopen and dismiss their

10   removal proceedings in immigration court.  That will involve --

11         THE COURT:  Those are petitions that would be filed in

12   immigration court?

13         MR. COX:  Yes.  That's right, Your Honor.

14         THE COURT:  And these are people who have already been

15   ordered removed, right?  So what's in the immigration court?

16         MR. COX:  Well, this would be an opportunity for them

17   to reopen those immigration proceedings and then have the order

18   of removal dismissed, which actually has some -- several

19   substantive benefits for the class members as they proceed,

20   ultimately, the end goal of getting lawful permanent resident

21   status, as I can explain.

22         And so, as part of this, the noncitizen would be

23   required to submit specific documentation, a declaration of

24   intent to leave the U.S. for consular processing or for

25   adjustment of status -- that they would be eligible for that

1    after the removal -- dismissal of removal order.

2           THE COURT:  Presumptively, the Department of Homeland

3    Security would join in the motion to reopen and vacate the

4    removal order, right?

5           MR. COX:  Yes.  And that joinder is an important

6    substantive step, Your Honor, because, in many ways, that opens

7    up possibilities for dismissal that would not otherwise be

8    available to class members without that joinder.

9           THE COURT:  But -- and I may be jumping ahead a little

10   bit, but the settlement agreement provides that -- while it's

11   presumptively Department of Homeland Security will join, that's

12   in their sole discretion, and, as I read it, although your memo

13   didn't explain this, that would not be subject to the dispute

14   resolution.  As I read the agreement, that's in their sole

15   discretion, and it's not -- maybe I should let you keep going.

16   You can come back to this.

17          But it seems to me there may be some ambiguity or

18   something, because, on one hand, it says with regard to

19   reopening that's in the sole discretion.  With regard to

20   enforcement actions, they have to make good-faith decisions.

21   And then, it says both of those provisions are subject to

22   possible review by me.  But I don't know -- if it's in their

23   sole discretion, I don't know what I would be reviewing.

24          But why don't you go ahead.  We'll come back to it.

25          MR. COX:  Yes, Your Honor.  I think this is, in many

1    ways exemplary, of the sorts of issues that have come up many

2    times over the course of this litigation.  Section 2 provides

3    that it is ultimately a matter of ICE discretion, but it does

4    specify what the assessment entails.

5         And so it involves an assessment of the totality of

6    the facts and circumstances that an individual, one, is a

7    threat to public safety, typically because of serious criminal

8    conduct; two, is a threat to national security; or, three, has

9    engaged in serious immigration benefit fraud or is a repeat

10   immigration violator.

11        And those would be the sort of enumerated

12   circumstances under which ICE could exercise its -- DHS could

13   exercise its discretion not to join.

14        So I think, Your Honor, if there were an issue where

15   there was some plausible basis to believe that ICE had simply

16   not considered those factors and had decided not to join, then

17   I think that would be an issue that might warrant the Court's

18   attention.

19        But I think that -- and I'll let Ms. Larakers --

20        THE COURT:  That might be an issue for the Court to

21   decide?

22        MR. COX:  That's right.  Section 2 disputes are

23   covered by the dispute resolution procedures under Section 4,

24   the enforcement provision.

25        THE COURT:  All right.  Actually -- and I think, now

1    that I'm reading again, they would have -- ICE can decline to

2    join if ICE determines at its sole discretion based on an

3    assessment of the totality of the facts and circumstances.

4         So, if they just didn't consider anything, then, if

5    it's me, I would have the authority to reverse the decision.

6    But, if they considered what they're supposed to consider, I

7    wouldn't decide -- well, essentially that would be it.  It

8    doesn't have the good-faith qualification that's under

9    enforcement actions under III A, I think.

10        Anyway, go ahead.  But that was helpful.

11        MR. COX:  Just substantively, the motions to reopen

12   would be a significant benefit for class members for a couple

13   of reasons.  For class members that have either already been

14   paroled or are admitted to the United States under a visa, the

15   removal under the final order of removal or dismissal --

16        THE COURT:  That had been admitted to the United

17   States under what?

18        MR. COX:  Under a visa, Your Honor.  If someone came

19   under a tourist visa, for example.  For those individuals,

20   having the final order of removal dismissed would allow them to

21   proceed to an adjustment of status, and they would be able to

22   remain in the United States for that process.

23        For individuals who entered the U.S. unlawfully and

24   would therefore need to go outside the U.S. for the provisional

25   waiver as part of completing the process of attaining lawful

1    permanent residency, the motion to reopen would allow those

2    individuals to skip the step of the form I-212 which is the

3    waiver of the -- the form that provisionally approves entry

4    after a final order of removal.

5         So, for all members of the class who choose to avail

6    themselves of this motion to reopen provision, it would be

7    strictly better or at least equivalent to going through the

8    full provisional waiver process.

9         And we can also talk, in context of the Parole in

10   Place program, Keeping Families Together program, how that

11   would interact with that set of issues as well.

12        THE COURT:  But that's the program that's at issue in

13   *Texas v. Department of Homeland Security*, right?

14        MR. COX:  Yes, Your Honor.  So that's the motion to

15   reopen.

16        The next substantive area -- substantive set of

17   provisions in the settlement agreement are enforcement actions.

18   So this requires that -- an enforcement action is defined, as

19   it has been throughout this case, as:

20        Arrests, decisions to detain or continue to detain,

21   removals or orders to remove can be taken only after both

22   considering the eligibility of the provisional waiver process

23   and determining that the class member poses a national security

24   or public safety threat.

25        And those determinations have to be made not by a line

1   officer but at the higher level of a deputy field office

2   director or higher.  And we've also included some provisions

3   that ICE would not be able to transfer noncitizen class members

4   in custody outside the jurisdiction -- essentially to evade the

5   protections.

6          THE COURT:  Well, I issued orders at the beginning of

7   this case -- for example, in *Calderon,* before it was a class

8   action, on April 13, 2018, Dkt. No. 32, I prohibited moving.

9   Is it contemplated that this agreement would supersede and

10  modify that order?  I think so.

11         MR. COX:  Yes, Your Honor.  I think this would

12  supersede the sort of substantive restrictions that have been

13  placed in this case.

14         THE COURT:  Because I believe they're -- the same

15  order was applied to everybody.  They couldn't be moved to

16  evade jurisdiction here.  But okay.  I think it's valuable, to

17  the extent I've been able to identify the questions quickly, to

18  have this discussion now because, if there's ever dispute in

19  the future, it will be more clear what was represented to me

20  and how this ought to be interpreted.

21         Keep going.  This is helpful.

22         MR. COX:  The other provision I wanted to draw Your

23  Honor's attention to is one that bears on the issues that

24  precipitated this litigation in the first place.  And there are

25  protections specifically for arrests at USCIS.  And that,

1    essentially, requires that, for such arrests, there must be

2    prior written approval of the field office director as an

3    ordinary matter as well as the other protections -- other

4    requirements for the enforcement action under the other

5    provisions of Section 3.

6              THE COURT:  Who is the field officer director now?

7              MR. COX:  It's James Lyons, Your Honor.  Excuse me --

8    Todd Lyons.  Excuse me.

9              THE COURT:  Okay.  I wondered whether it was Todd

10   Lyons.  He had the position the last time I dealt with the

11   case.

12             MS. LARAKERS:  Your Honor, I will jump in to mention

13   that right now he is on a detail, but he is still the -- he is

14   still the field office director of Boston, but right now there

15   is someone acting in his role who has filed the declaration as

16   required by your court's orders, and her name is Patricia Hyde.

17   But Todd Lyons is the field office director; he's just on

18   detail right now.

19             THE COURT:  Okay, good.  Thank you.

20             MR. COX:  Unless Your Honor has further questions on

21   the enforcement action provisions, I can move to Section 4 --

22             THE COURT:  I think I do.  Hold on a second.

23             It says that ICE can take enforcement action only

24   after considering -- I put this in my order last week -- I-130

25   petition.  What does that mean?

1          MR. COX:  This, Your Honor, I think, is intended to

2     embody the law of the case that has been established since

3     fairly early on -- since 2018, I believe -- and in Your Honor's

4     order in the motion to dismiss, which I think is Docket 159,

5     essentially ordering that ICE, as a matter of law in this

6     instance, is obliged to consider a class members's eligibility

7     for the provisional waiver process before taking enforcement

8     actions.

9          THE COURT:  And you won't insult me by refreshing me.

10     You've been working on this, I haven't, for a number of years.

11     So the provisional waiver process is what?

12          MR. COX:  Your Honor, it involves a series of steps

13     for -- and I'll focus on the class members in this case --

14     class members married to U.S. citizens that ultimately want to

15     achieve lawful permanent resident status in the United States.

16          And class members in this instance have final orders

17     of removal, and initially in 2013 and then amplified in 2016,

18     there were regulations that provided a mechanism for those

19     individuals to -- for many of those individuals to do the vast

20     majority of their paperwork and processing in the United

21     States, allowing them to only briefly leave the country for

22     consular process before returning and becoming lawful permanent

23     residents.

24          THE COURT:  So these are the regulations with the

25     stated intention, in effect, of keeping families that include

1    U.S. citizens together and permitting the alien spouse to do

2    almost everything necessary to see whether a waiver of the

3    usual -- well, the waiver of the requirement of removal but

4    also a waiver of the requirement that you apply while you were

5    outside the United States.

6          They can stay together in the United States while the

7    application was being submitted and considered by citizenship

8    and immigration services.  Because it's CIS that decides

9    whether to grant the waiver, not ICE; is that right?

10          MR. COX:  Yes, Your Honor.  In a nutshell, the

11   regulations allowed noncitizens to spend a few weeks outside

12   the United States, instead of several years, as their

13   applications are being processed.

14          THE COURT:  But I'm seeking confirmation or

15   clarification that my understanding is right.  When it says

16   that ICE has to -- where is this provision? -- it has to

17   consider the I-130 visa petition, it considers the fact that

18   there's such a petition pending before CIS.  Because it's not

19   ICE that decides it.  Am I right?

20          MR. COX:  Yes, that's right, Your Honor.

21          THE COURT:  Thank you.

22          MR. COX:  If Your Honor doesn't have any further

23   questions about the enforcement section, I can turn to --

24          THE COURT:  This section, if there's a dispute and

25   it's not resolved in the dispute resolution procedure, would

1    come to the District Court.  And one of the things I would have

2    to decide is whether whatever determination was made was made

3    in good faith; is that right?

4           MR. COX:  Yes, Your Honor.  And, again, this is one

5    area where we have tried to honor and embody the principles --

6    the legal principles that Your Honor set out towards the

7    beginning of this case that -- and, again, looking back, your

8    motion to dismiss order, Docket 159, ordered that ICE must

9    consider an eligible alien's application for a provisional

10   unlawful presence waiver before deciding to remove him or her

11   from the United States.  That's on page 31.

12          On page 35, ICE may deport an alien before CIS has the

13   opportunity to adjudicate his or her application for

14   provisional waiver, but only if it makes an individualized

15   decision to do so based on more than the mere fact that the

16   alien is subject to a final order of removal.

17          And then, Your Honor --

18          THE COURT:  Hold on just one second.  Let me see if I

19   have 159.  Yeah.  I have it.  Just a minute.  What page did you

20   just reference?

21          MR. COX:  I was quoting from pages 31 and 35 of that

22   order.

23          THE COURT:  So I was interpreting 8 CFR,

24   Section 212.7, it says on 31.  And then, what's the other page?

25          MR. COX:  35, Your Honor.

1          THE COURT:  Okay.  I have it, thank you.  So it echoes
2     that.
3          MR. COX:  Yes, Your Honor.  And that provision also
4     adds the additional layer that the removal decision -- I just
5     want to make sure I get this right -- is that it's -- there
6     must be not only consideration for provisional labor
7     eligibility but also determination that the class member poses
8     a national security or public safety threat in order to take
9     that enforcement action.
10          THE COURT:  There are some regulations or directives
11     to ICE -- I think it might be 1600 -- that, in addition to
12     public safety and national security -- well, actually, it's up
13     here in your earlier section on reopenings.
14          That, with regard to reopening the immigration
15     proceedings, there's a third permissible basis for ICE to
16     decline to participate.  That is, if the person has engaged in
17     serious immigration benefit fraud or is a repeat immigration
18     violator.  But that's not a basis for taking an enforcement
19     action under Section III A.  Right?
20          MR. COX:  That's right.  III A is narrower, Your
21     Honor.
22          THE COURT:  Okay.
23          MR. COX:  With respect to named petitioners, Your
24     Honor, we've also included some specific language for them.
25     So, class representative Deng Gao, there was an agreement to

1    move -- to reopen and dismiss his removal proceedings within 30

2    days of the effective date.

3          And then, for Lucimar de Souza, there would be

4    adjudication of her I-601A within 30 days of the effective

5    date.  So those are, again, just targeted provisions for

6    specific class members.

7          THE COURT:  And, in determining whether the proposed

8    settlement is fair, I have to decide whether it treats class

9    members equally.  It sounds like they may get expedited

10   treatment.  Why is that fair?

11         MR. COX:  Well, Your Honor, they have been class

12   representatives.  They've been involved in this process.  For

13   Lucimar de Souza, if Your Honor recalls, she, I think, had some

14   pretty extraordinary things happening to her.  They were the

15   subject of extensive hearings, and ultimately she was released

16   after violation --

17         THE COURT:  I recall.  But you recall better, I

18   expect.  Why don't you remind me.

19         MR. COX:  Yes, Your Honor.  She had been detained by

20   ICE despite her proceeding through the provisional waiver

21   process, and she had not been given, as you recall, the POCR --

22   compliance with the POCR regulations.  And I believe Your Honor

23   ultimately --

24         THE COURT:  P-O-C-R.  POCR?

25         MR. COX:  That's right.  POCR, Post-Order Custody

1    Review.  And Your Honor ruled at a hearing, I believe, in 2018,

2    that there had been procedural due process violations with

3    respect to her detention, and ultimately ICE agreed to release

4    her, I believe, during that hearing.  And that's where we --

5    she, I think, has been particular -- had some challenges as a

6    result of the Government's conduct.

7         THE COURT:  She's from Rhode Island?  Is she from

8    Rhode Island?  Is she the person -- right?

9         MR. COX:  She was from Massachusetts, Your Honor.

10        THE COURT:  Massachusetts?  Is she the person whose

11   son wanted to go to jail with her?

12        MR. COX:  Yes, Your Honor.  And she, I believe, was

13   released on Mother's Day.

14        THE COURT:  There was some television piece that

15   showed them being reunited.  Is that the person?

16        MR. COX:  Yes, Your Honor.

17        THE COURT:  That was -- she did suffer significantly

18   as a result of what I found to be a violation of the rights

19   under the regulations.

20        Okay.  And what about Mr. Deng?

21        MR. COX:  Well, his -- essentially, he has a pending

22   motion to reopen.  I believe -- or a drafted motion to reopen

23   that was provided for Your Honor.  I believe it's Exhibit B,

24   attached to the settlement memo.  And, essentially, that would

25   offer him, I think, similar relief to what --

1          THE COURT:  Hold on a second.  It's not Exhibit B to
2    the Slater affidavit.  It's Exhibit B to the memo?
3          MR. COX:  Excuse me, Your Honor.  It is Schedule A --
4    it is Dkt. No. 654-1.
5          THE COURT:  654-1 is the settlement agreement.  It's
6    Exhibit A.  Okay.  I see.  Joint motion.
7          MR. COX:  Exhibit A and then Schedule A, which is
8    attached to the settlement agreement.  So it's all part of the
9    same docket entry, Your Honor.
10         THE COURT:  I see.  Okay.  But basically they're two
11   named plaintiffs, and they're not getting rights under the
12   agreement that anybody else wouldn't get, it's just that their
13   cases may be dealt with first.
14         MR. COX:  Yes, Your Honor.
15         THE COURT:  Or early.  Okay.  Let me see what else.
16         Let me ask you this:  If I approve the settlement, do
17   you contemplate that I will be issuing an order that could be
18   enforceable by contempt?
19         I can help you with this.  I think the answer is no.
20   Because I'm not -- well, I just want to know about this.  I had
21   this colloquy with Mr. Lyons about contempt, and he said, You
22   don't have to issue an order that would be punishable by
23   contempt.  I'm going to do it anyway.
24         But I think I would just be approving the settlement
25   agreement, retaining the right under Rule 41(a)(2) to condition

1    the -- you want the case dismissed not stayed, right?  That's

2    what the agreement provides, correct?

3        MR. COX:  Correct.  We've already been stayed for a

4    while, and I think we want to progress towards getting this

5    case closed.

6        THE COURT:  No, that's reasonable.  Then *Kokkonen*

7    reminds that a dismissal can be conditioned -- can be on

8    certain conditions, and Rule 41(a)(2) expressly provides that.

9    So you didn't give me a proposed order; so I don't know --

10   which seems odd.

11       But I think you would want it dismissed under that

12   rule, and then, you know, the condition would be that I retain

13   jurisdiction to enforce the agreement -- well, to enforce the

14   agreement, which gives the Court a limited -- hopefully --

15   role.

16       That's what you want, right?

17       MR. COX:  Yes.

18       THE COURT:  So a dismissal on that condition?

19       MR. COX:  Yes.

20       THE COURT:  So, when you give me your proposed order,

21   that will be in the proposed order, if we get that far.

22       But then, the question I was asking you is, is that an

23   order punishable by contempt?  And my immediate reaction is no,

24   because I haven't ordered the Government to do anything.  I'm

25   just -- have you read my *Disability Law Center* decision that

1   goes through this in some detail?

2        MR. COX:  I believe I have, Your Honor.  I will

3   confess that I've not read it in the recent past.

4        THE COURT:  Well, you all should, because as soon as I

5   read your agreement in *Aleman-Gonzalez*, I thought of it because

6   it's a framework for what you're trying to do here.  I thought

7   maybe you even knew that and thought you'd have -- anyway.

8        But this is -- my current sense is that I wouldn't,

9   but part of the reason I want to talk about this -- and I'll

10  now order you to order the transcript of this hearing.  Both

11  sides.  You can share the costs.

12       Because, you know, if I approve this settlement --

13  and, at the moment, it looks permissible and reads fair.  Good

14  work on both sides, including limiting the role of the Court

15  depending on how many class members and how many disputes -- I

16  think there should be a record of what the contemporaneous

17  understanding was.

18       I'll help you out.  You want to look at the *Disability

19  Law Center* decision.  It's 960 F. Supp. 2d 278.  The first head

20  note -- second head note:  A federal court can retain

21  jurisdiction to enforce a private settlement agreement.

22       That was when a case was stayed, but then it relies on

23  *Kokkonen,* which is where a case was dismissed.  All right.

24       About how many members of the class do you think there

25  are?

1          MR. COX:  It's a good question, Your Honor.  We look

2     back -- well, bottom line:  We think it could be in the

3     hundreds.  It is a -- there are individuals moving in and out

4     of the class as time passes, of course, but I think we provided

5     some information in the context of the motion to certify the

6     class -- the affidavits of William Joyce and Steven Bourne.

7          I would -- so, based on what we know in our position,

8     as petitioners outside looking in, we believe it could be in

9     the hundreds.  If Ms. Larakers wants to address from the

10    Government's perspective, she may have more insight on what

11    they have on their side, but from our perspective I think it

12    would be in the hundreds, likely.

13         THE COURT:  All right.  Am I right that, if the Court

14    were going to have to review anything under this, it would only

15    be individual claims and not claims for class-wide relief,

16    right?

17         MR. COX:  Yes, Your Honor.  That was a deliberate

18    decision to accommodate the ruling in *Aleman-Gonzalez.*

19         THE COURT:  But, I think, at the moment

20    *Aleman-Gonzalez* is also accommodated because I'm not ordering

21    the Government to do anything.  I'm just --

22         MR. COX:  Yes.  It's a belt-and-suspenders approach --

23         THE COURT:  -- approving the settlement.

24         MR. COX:  Excuse me.  I'm sorry, Your Honor.

25         Yes.  It's a belt-and-suspenders approach.  It's a

1   settlement agreement; it's something that ICE is agreeing to,

2   itself, without a court order.  And, should the Court have to

3   get involved with enforcing the terms, it would be on an

4   individualized basis only.

5        THE COURT:  Okay.  And motions to enforce would have

6   to be brought within two years of the effective date?

7        MR. COX:  Yes, Your Honor.  That's the reach of the

8   settlement agreement, and after that it would be -- it would be

9   back to class members bringing individual claims.

10       THE COURT:  So they could bring individual -- they

11  could bring new cases?

12       MR. COX:  Yes, Your Honor.  We would be content to

13  have the settlement term go out as far as possible, but this is

14  part of the negotiation process -- the term of the agreement.

15       THE COURT:  And, as I read it, a motion under the

16  agreement would have to be filed within two years.  Resolving

17  it might go beyond two years.

18       MR. COX:  I believe that's right, Your Honor, yes.

19       THE COURT:  All right.  Well, we may have just done

20  it, but do you want to talk about *Aleman*?  We'll see if I

21  understand it correctly, and why this is lawful in view of

22  *Aleman*?

23       MR. COX:  Yes, I'm happy to, Your Honor.  And then, of

24  course, Ms. Larakers can supplement with the Government's

25  perspective on *Aleman-Gonzalez*, but, when that decision came

1    out, the parties discussed it.  It was something that we took

2    into account as part of the settlement drafting process.

3            And the essential explanation, Your Honor, is that --

4    from our perspective as to why *Aleman-Gonzalez* is not precluded

5    the settlement agreement is, first, that opinion does not refer

6    to settlements or enforcing settlement agreements, as this is

7    one -- this is an area instead, where, as I mentioned a few

8    moments ago, the restrictions are ones that the Government has

9    agreed to.  And so that's -- it's not a Court order imposing

10   that ruling on the Government.  It's, instead, an agreement

11   that they're entering into voluntarily.

12           And then, with respect to the second issue, the

13   settlement agreement still gives ICE the ability to enforce

14   immigration laws on individualized basis; and, importantly,

15   should Your Honor's attention be required for enforcement, it

16   would be for an individual, rather than any class of

17   individuals.

18           THE COURT:  And only after dispute resolution process

19   is pursued and fails, right?

20           MR. COX:  Yes, Your Honor.  And the goal, of course,

21   would be, as we have over the course of this stay -- is to

22   resolve issues without the Court's attention.  And I think

23   we've been successful at that, for the most part, and the idea

24   would be only things that are -- that can't be resolved would

25   be elevated for Your Honor's attention.

1          THE COURT:  All right.  And, in your memo that

2     somebody wrote, you mentioned *Texas v. Department of Homeland*

3     *Security*, which I've now read and find confusing because it

4     relies on what Supreme Court justices can do, where the

5     applicable statute says the Supreme Court can do things that

6     lower court judges can't do, but -- does it have any

7     implications for this case?  It's enjoining something.

8          MR. COX:  Well, so, Your Honor, what that is enjoining

9     is the Keeping Families Together program, which was announced

10    after the parties had sort of reached agreement in principle on

11    the settlement agreement during the DOJ review process.

12          The parties did speak extensively about how KFT, the

13    Keeping Families Together, or Parole in Place program would

14    interact with the settlement.  And we're in agreement that the

15    settlement would in no way prejudice individuals from

16    participating in the KFT program if that injunction is

17    ultimately lifted.

18          And I can't stand here and prognosticate about what

19    will happen with that, but what I can tell you is that, from

20    our perspective, if the program goes into effect, class members

21    would be -- would still be fully able to use that program to

22    pursue lawful permanent resident status instead of the

23    provisional waiver program, if they chose to.

24          So, for example, the KFT program.  I believe the

25    language that is included in that regulation is that there's a

1    presumption that individuals with final orders of removal will

2    not be eligible for the Keeping Families Together relief.

3           In our settlement agreement, we have the provision

4    that allows for motions to reopen and dismiss final orders of

5    approval.  For individuals that use that, they would then be

6    able to either pursue the KFT program and remain in the United

7    States if that is available, if the injunction is lifted;

8    alternatively, they could use the provisional waiver process,

9    file their I-601A, and then leave the country for consular

10   processing.

11          So under no circumstances, as we understand it, would

12   a class member be prejudiced, or have their ability to use the

13   KFT program be compromised, because of this settlement

14   agreement.  In fact, on the contrary, we think they would -- if

15   the program is reinstated, it would allow many class members to

16   use that program instead of the provisional waiver process.

17          THE COURT:  If there are hundreds of class members, is

18   there any way -- and maybe there's no way -- of estimating how

19   many disputes might require resolution by the court?  It's

20   probably impossible to predict.

21          MR. COX:  Your Honor, I think the way we like to view

22   it is that, hopefully, past will be prologue in this instance,

23   that the -- what we've seen over the course of the stay is that

24   the parties have been able to work together and in relatively

25   few things have required Your Honor's review.

 1          THE COURT:  If you look in the *DLC, Disability Law*
 2  *Center* case, I start by saying that those were constitutional
 3  questions, but I quote something I wrote, I think, in 1987 or
 4  '8 that I think settlements are highly desirable.  Of course,
 5  that's the jurisprudence with regard to class actions
 6  generally.
 7          So this is obviously, evidently, the result of hard
 8  work on both sides that appears to me to serve the Government's
 9  legitimate interests but also benefit the class and doesn't put
10  the Court in the position of performing what should be
11  executive functions, which is my strong preference.
12          But they have to perform them lawfully.  And,
13  unfortunately, as I recall, when I was deeply immersed in this,
14  key DHS officials like the fellow from Washington didn't even
15  know what the regulations he was administering required, like
16  you have to interview the detainee before deciding to detain
17  him or her more than six months; and they weren't making the
18  decisions in the time required by the regulations.
19          But, as long as they know what's required by the
20  settlement agreement and strive in good faith to perform what's
21  been agreed to, either there shouldn't be many disputes, or
22  they shouldn't lose any of them.
23          That brings me to another question.  Is there -- so if
24  a -- what's contemplated?  Let's say a class member has a
25  dispute.  Does class counsel expect to represent them in the

1    dispute, or do they have to get their own lawyer and do it

2    themselves?

3         MR. COX:  Well, Your Honor, we want to make sure

4    that -- well, let me step back.  I think what we've observed

5    throughout the stay period -- again, with the hope that past is

6    prologue -- is that the reporting has provided to us

7    information about the plan of enforcement actions.  And then

8    class counsel, with the Government, can have a conversation

9    about whether the Government has been adequately accounting for

10   the provisional waiver process, for example.

11        I think, if there were a class member that wanted to

12   challenge a removal decision under the terms of the agreement,

13   I think there are a few different ways that could happen in

14   front of Your Honor.

15        I think what we have contemplated is that, you know,

16   often they do have their own immigration counsel.  We as class

17   counsel could present that to the Court.  Alternatively, as

18   part of the same docket, if that would be convenient for Your

19   Honor, their separate immigration counsel could enter an

20   appearance and put that in front of Your Honor.

21        I think there would be a few different mechanisms that

22   it could be raised for Your Honor's attention, but the idea

23   being, if there is a dispute, it would have a path to get in

24   front of Your Honor.

25        THE COURT:  I don't want to discus the notice now.

1            I'll mention the following:  There are three cases

2    that are stayed, pending and in conjunction with this case.

3    Two are assigned to me; one's assigned to Judge Young.  They're

4    *Li*, 18-11596-MLW; *Lima,* 19-10400-MLW; and *Viana*, 19-11296-WGY,

5    Judge Young's case.

6            Have you given any -- and I think they have their own

7    counsel.  Have you given any consideration or had any

8    discussions about what would happen in those cases?  I mean, I

9    don't know whether those people are members of the class.  They

10   may be.  Probably are.

11           MR. COX:  Your Honor, we'd have to look into it.  I

12   think there have been some situations where individuals in

13   cases that have been identified as related are not, in fact,

14   class members.  I think that's something we'd need to verify.

15           THE COURT:  Please do.  And, if and when we get to a

16   fairness hearing, final approval hearing, that -- I'll have to

17   know whether those people are subsumed in the class or not.

18           All right.  I think that those are my questions for

19   you.  Who's going to speak for the respondents?

20           Ms. Larakers?

21           MS. LARAKERS:  Yes, Your Honor.

22           THE COURT:  Go ahead.  And essentially the same

23   questions.  But go ahead.

24           MS. LARAKERS:  Where would you like me to start?

25           THE COURT:  Well, I guess, basically, with whether you

1    agree with Mr. Cox's explanation of the settlement and whether

2    there are some other things that you'd like to draw my

3    attention to or emphasize.

4        MS. LARAKERS:  Sure.  I will say that the Government

5    largely agrees with Mr. Cox's explanation of the settlement

6    agreement.  Obviously, it's all laid out for Your Honor here,

7    but I think it was, largely, a good explanation.  I have

8    written down a few notes from his presentation that I just want

9    to cover.

10        I think the first thing he said under the motion to

11   reopen provision.  He said that motions to reopen would not be

12   available for class members if ICE decided not to join those

13   motions to reopen.  While I agree that it is much easier for an

14   individual to obtain a motion to reopen with ICE's joinder,

15   with ICE's approval, they're not foreclosed from receiving a

16   motion to reopen if they move on their own.

17        And, in fact, under current policy, I believe the

18   motion to reopen policy for ICE and for the immigration court

19   is flexible and allows -- is more flexible than it was in the

20   past and allows individuals to move to reopen.  So I will

21   certainly say it is much easier for an individual to obtain a

22   motion to reopen with ICE's joinder, but it's not absolutely

23   impossible is all I would say on that.

24        THE COURT:  And the agreement says that ICE,

25   presumptively, will join.  And then, the way it's written, it

1    looks like there's certain things that can defeat that

2    presumption.  If somebody's found to be dangerous or a threat

3    to national security or has repeated immigration violations.

4            But, you know, absent those three circumstances, is it

5    expected that ICE will join?  Is that what "presumptively"

6    means?

7            MS. LARAKERS:  Yes, absent the circumstances that are

8    covered in the agreement.  So those circumstances are one.  But

9    the other circumstances are -- or the other requirements of the

10   class member under the agreement are demonstrating that they're

11   prima facie eligible to seek one of the forms of relief stated

12   in the agreement; and then, there's also a process that they

13   have to follow -- filling out the right document, a -- those

14   are more procedural rules.

15           But, yes, Your Honor is largely correct that it's

16   mainly the three and then showing they're prima facie eligible

17   for one of those forms of relief.

18           THE COURT:  All right.

19           MS. LARAKERS:  I'll move on to say that Ms. de Souza

20   is actually -- is getting something that the other class

21   members are not.  There's no provision in this agreement for

22   expediting other I-601As; so she is receiving something that

23   others are not.

24           However, I believe the -- the standard is still met

25   here, Your Honor.  Obviously, she was an individual class

1    member in this case.  And, in addition to that, I think the

2    standard is that class members are generally treated the same;

3    so I don't think that giving Ms. de Souza this additional

4    benefit makes the class settlement any less fair.

5            And then one other thing --

6            THE COURT:  And that made sense to me.

7            MS. LARAKERS:  Yes.  And then one other quick point is

8    that, yes, Your Honor, the preference for the Government --

9    and, actually, the settlement requires Plaintiffs to dismiss

10   this lawsuit, and then, Your Honor, under Rule 41(a), would

11   retain jurisdiction to enforce the agreement.

12           And we believe Your Honor is correct that there would

13   not be any contempt possibilities from -- resulting directly

14   from this settlement, because the Court has not ordered

15   anything yet.  There are -- there is the potential for orders

16   to issue from this agreement, and that may be a separate

17   question.  But, as for the agreement itself, contempt is not

18   implicated with regard to the agreement itself.

19           THE COURT:  That's consistent with and amplifies my

20   thinking.  For example, if I had to resolve a dispute, and then

21   I ordered ICE to do something and they didn't do it, then the

22   sanction of contempt would be available -- civil or criminal.

23   But, by approving the settlement, I'm not issuing any order

24   enforceable by contempt.

25           MS. LARAKERS:  Yes, Your Honor, that's correct.  And

1  that goes to -- I can quickly cover the *Aleman-Gonzalez* point,

2  if you'd like --

3          THE COURT:  Yes.  Please.

4          MS. LARAKERS:  -- because that goes along with it.

5  It's the orders that the Government is concerned about, the

6  enforcement orders.  So *Aleman-Gonzalez* clearly says that there

7  could be no class-wide injunctive relief, and that's all we've

8  prevented the Court from doing here is issuing any class-wide

9  injunctive relief as a result of this settlement.

10         So we've just totally avoided the *Aleman-Gonzalez*

11  issue, which makes it easy for this Court to approve and -- but

12  still provides class members with a path for meaningful relief

13  should they need it.

14         The next thing I'll say, you know, broadly, Your

15  Honor, as Jonathan said, we are extremely hopeful that there

16  won't be any issues for this Court to resolve.  The parties

17  have done, I believe, a good job, especially over the past four

18  years since the stay was entered, to resolve any disputes

19  amongst themselves.

20         And I believe the parties have a good understanding of

21  what is required to -- of them under the settlement because the

22  settlement attempts to embody what the parties have been doing

23  over the course of this case.

24         ICE is well practiced in this procedure; plaintiffs

25  are well practiced in bringing up any issues to the Department

 1    of Justice and to ICE, and, for the past four years, we've been

 2    able to work out any disputes ourselves; and so we're hopeful.

 3         THE COURT:  That's very good, and you've touched on

 4    something.  I know that years ago you developed a mutually

 5    acceptable protocol for ICE.  I think people in the class were

 6    reporting to ICE, some of them were going into ICE or somehow

 7    reporting, and, you know, I just haven't heard from you in

 8    years; so that's fine.  That's good.

 9         Does this build on what's been done during the stay?

10    This settlement agreement?

11         MS. LARAKERS:  Yes, Your Honor, and it builds on the

12    trust the parties have built over the course of the stay.  It

13    builds on this Court's orders while also ensuring that there's

14    objective criteria as a backstop for this Court to apply should

15    a dispute ever arise.

16         Obviously, this Court said in its motion to dismiss

17    that ICE must consider the pursuit of a provisional waiver and

18    cannot decide to remove a class member merely because they have

19    a final order of removal.

20         But this Court has also said, if not in that document

21    but in hearings, that you didn't think you had jurisdiction to

22    look at the specific reasons why ICE may believe an individual

23    is a public safety risk or a national security threat, but that

24    your role -- the Court's role is to ensure all appropriate

25    factors are considered.

1          And that's what this agreement attempts to do as

2    well -- is to ensure that ICE is considering all the

3    appropriate factors that Your Honor has identified, but

4    ensuring that ICE retains a sufficient amount of discretion,

5    which is important to them in order to protect the community.

6          THE COURT:  Well, that's very helpful because it's six

7    years since I've been involved in this case.  Well, maybe not

8    six years; maybe it's four years.  And you're reminding me of

9    things.

10         When somebody writes a memo for final approval, you

11   might cite some of what you're telling me today; so I go back

12   and look at what I wrote or said.  And you'll write that memo

13   more carefully than the one that came last week.  But this is

14   useful because it's giving me more detail on what I recall.

15         I made a note.  I came across ICE Directive 160041.

16   Hold on just a second, please.  I'm sorry.

17         Are you familiar with that directive?

18         MS. LARAKERS:  Not off the top of my head, Your Honor.

19   If you provided more detail --

20         THE COURT:  All right.  Then it's not -- well, because

21   it tracks a lot of the language that you have in here.  In

22   fact --

23         MS. LARAKERS:  Is it about the enforcement, for lack

24   of a better word, priorities?

25         THE COURT:  It has some of the language.  I can't lay

1    my hands on it.

2            Ms. Lafaille could, when time permits, be able to find

3    it probably quickly for you, because I think we found it in

4    looking at a practice advisory issued by the ACLU and others

5    after a settlement in Virginia.

6            Anyway.  It doesn't matter.  As I read it quickly, it

7    was compatible with what's in the settlement agreement.

8            MS. LARAKERS:  Your Honor, I may not be familiar with

9    the specific document without looking at it, but there is a

10   sense in this agreement, you know, ICE has presented terms and

11   agreed to terms that they are, largely, already complying with

12   due to other policies.  And that's good for class members, but

13   that's good for the Government's compliance with the settlement

14   agreement as well.

15           We're doing what we are -- what the current policies

16   and procedures are.  With regard to executive policy, we're

17   also complying with this Court's orders and building on that.

18   So the Government is confident they can comply with this

19   settlement agreement for all those reasons and confident that,

20   if there are any disputes -- that the parties can resolve those

21   without court intervention, hopefully.

22           THE COURT:  My law clerk came across this as a result

23   of reading a July 29, 2024, practice advisory resulting from

24   *Rodriguez Guerra v. Perry* in the Eastern District of Virginia,

25   which also settled.  And the ACLU was one of three

1    organizations that published the advisory.

2           As I said, I didn't see anything inconsistent with

3    what you're asking me to preliminarily approve.  And what's the

4    Government's view of the implications, if any, of *Texas v.*

5    *Department of Homeland Security* for this case?

6           MS. LARAKERS:  The short answer is no implications,

7    Your Honor.

8           THE COURT:  Because?

9           MS. LARAKERS:  Because this agreement does not

10   prohibit class members or prejudice class members from seeking

11   that relief if it ever becomes available to them.

12          THE COURT:  Because that's dealing with something

13   else.  Parole in Place, I think?

14          MS. LARAKERS:  Yes, Your Honor.  It's another form of

15   relief that class members might be able to take advantage of if

16   the policy ever goes into place.  Again, we don't know what

17   policy will come out on the other side of any ultimate decision

18   but --

19          THE COURT:  Is the Department of Justice taking a

20   position in that case?  Because it appears to me that that's a

21   district judge enjoining on a class-wide basis, a nationwide

22   basis, the enforcement of a regulation.

23          And the case it cites for authority is a Supreme Court

24   decision, but the statute that was at issue in *Aleman* and that

25   you've carefully had in mind in devising the settlement -- but

1    the statute says no court but the Supreme Court can enjoin on a

2    class-wide basis the enforcement of, essentially, an

3    immigration regulation.

4          Is the Department of Justice in that case?

5          MS. LARAKERS:  Yes, Your Honor.  It's the Office of

6    Immigration Litigation, if I'm -- yes -- vigorously litigating

7    that case to trial.

8          THE COURT:  And opposing the injunction?

9          MS. LARAKERS:  Yes, Your Honor.

10         THE COURT:  Oh, okay.

11         MS. LARAKERS:  Yes, Your Honor.  We're defending that

12    policy and opposing the injunction for many reasons, Your

13    Honor.  But, yes, if that policy ever were to go into effect,

14    it's another form of relief that class members can seek, as

15    there are other forms of relief that class members can seek

16    that may not be identified by this agreement.

17         THE COURT:  You won't find any record of this.  I can

18    tell you that at least one person in history has been paroled

19    after coming to the United States.

20         I was an assistant to the Attorney General of the

21    United States in 1975 and -- with General Leonard Chapman, the

22    head of the -- the commissioner of the Immigration and

23    Naturalization Service, represented the Attorney General in

24    establishing in Vietnam, Cambodia, and Laotian refugee

25    programs.

1          And there, parole was granted on a group basis after

2    consultation with the House and Senate Judiciary Committees,

3    which was agreed to in his confirmation hearings.  And among

4    the Laotians who came to the United States was General Vang

5    Pao, who worked closely with the CIA in Laos, although I think

6    there was some subsequent scandal concerning that.

7          But, as I recall, he came, with seven of his wives,

8    went to Montana, where the state and the then-senate majority

9    leader, Mike Mansfield -- and then realized he had left one of

10   his wives behind.

11         Well, maybe she was paroled when she was outside the

12   United States, but he got his seventh or eighth wife to

13   Montana, too.  But I think she might have already -- Well, I

14   don't remember.  Now I'm confused; so you can just forget, if

15   you want, what I said.

16         MS. LARAKERS:  Well, Your Honor identifies that the

17   concept of parole, the parole statute, has been around a very

18   long time; and, as I understand it, this program builds on that

19   existing authority.  So, yes, parole has existed for a long

20   time.  It is another thing --

21         THE COURT:  And I used to know more about this than I

22   do, but the purpose of it was family reunification.  And that

23   was the dispute about whether it should be used for groups of

24   citizens, which became particularly acute after, in the

25   President Johnson administration, 100,000 Cubans were paroled.

1          And that led to an informal process where the Attorney
2    General basically wouldn't do it unilaterally without informing
3    and consulting Congress.  But, anyway, it used to be primarily
4    for family reunification.
5          All right.  Is there more you'd like to tell me?
6          MS. LARAKERS:  Your Honor, I'm happy to answer any
7    questions.
8          THE COURT:  All right.
9          Is it also your understanding that motions to enforce
10   would have to be brought within two years after the effective
11   date of the agreement and -- but the litigation might go more
12   than two years?
13         MS. LARAKERS:  Yes, Your Honor.
14         THE COURT:  And the agreement has a provision about
15   when ICE can move somebody outside the Boston enforcement
16   district, and that would -- if I approve the settlement and
17   enter the order, I would be revising my prior orders.  The
18   settlement agreement would supersede what I ordered previously.
19   Is that your understanding?
20         MS. LARAKERS:  Yes, Your Honor.
21         THE COURT:  And then, you should, along with the
22   plaintiffs, look into the effect on the related stayed cases,
23   *Li*, *Lima*, and *Viana*.
24         Let's move to talk about the notice --
25         MS. LARAKERS:  Your Honor, if I may just ask a

1    question.  You had asked in your order to provide an

2    approximate number of class members.  The Government -- as Your

3    Honor may remember, there's no way for the Government to create

4    a list of class members without substantial amount of work.

5           Despite that, we have identified a process that might

6    provide us an estimate; however, even that process would be

7    extremely burdensome.  I've been informed by the agency it

8    requires the creation of several reports and then

9    cross-referencing those reports, and those reports include tens

10   of thousands of individuals.

11          So, Your Honor, we have done our due diligence to

12   reach out to the agencies and to inquire about it, but, to the

13   extent that Your Honor does not need an estimate or no longer

14   wishes to have an estimate, DHS would be very relieved to hear

15   that they don't --

16          THE COURT:  All right.  No, I'm not ordering it, but

17   one element of reasonableness is feasibility.  You know, if

18   there are 10,000 people in the class and there's reason to

19   believe that 3,000 of them are going to have disputes that the

20   Court -- meaning me -- would need to resolve, that might go to

21   the fairness, adequacy, and reasonableness.  Well, the

22   reasonableness of the settlement.  But I haven't seen you in

23   four years and you've been working things out.  So --

24          MS. LARAKERS:  Perhaps it would be helpful for Your

25   Honor to note that our list that we provide to class counsel

1    each month on detained class members are no more than a few

2    each month.  So --

3           THE COURT:  What are no more than a few?

4           MS. LARAKERS:  There's no more than a few detained

5    class members that are reported to class counsel each month.

6           THE COURT:  Okay.

7           MS. LARAKERS:  And those class members represent those

8    who would fall into this public safety national security risk

9    group of individuals.  So I think that provides Your Honor a

10   better metric, perhaps, for considering or for determining how

11   many potential disputes there could even be.  And, again, we

12   haven't had any disputes about it.

13          THE COURT:  As long as the regulations are followed.

14   Now ICE -- I think a lot of people, in addition to me, were

15   educated in the process of this case, like the fellow who came

16   from Washington and said until I ordered -- who was in charge

17   for one quarter of the country, as I recall, of all the reviews

18   of people detained six months.

19          I remember him testifying that, although he had been

20   administering this program for years, going back to 2010 or

21   something, he didn't know that the detainee had to be

22   interviewed before there could be a decision to extend the

23   detention.  But now people, presumably, know.  You know.  And

24   the DHS lawyers know.

25          Okay.  I think you -- I'm not ordering that they do --

1          MS. LARAKERS:  Thank you, Your Honor.

2          THE COURT:  There are dangerous people out there.

3    Since I last saw you, I've had two MS-13 murder cases.  There

4    are many, many fine people married to American citizens,

5    raising children who are American citizens, working, paying

6    taxes; and then there are others who deserve attention from,

7    you know, the limited number of ICE people who are available to

8    go try to find them, lock them up, deport them.  So, you know,

9    if the priorities are right, there shouldn't be many problems.

10          Go ahead.  You have more?

11          MS. LARAKERS:  I will say, because Your Honor

12    mentioned the POCR piece and you may have this question later,

13    you'll see that POCR is not mention in this agreement at all,

14    and that's intentional.

15          Our disputes -- the parties' disputes over the POCR

16    regulations have been focused on what those regulations mean,

17    and the parties came to an agreement that we would allow

18    individuals to file individual habeases outside the context of

19    this agreement should there -- should a class member or,

20    obviously, anyone have a claim that ICE violated those POCR

21    violations.

22          THE COURT:  Why don't you explain for the record, and

23    you can refresh me.  What are the POCR regulations?

24          MS. LARAKERS:  So the Post-Order Custody Review

25    regulations were implemented after the Supreme Court's decision

1    in *Zadvydas* to ensure that significant likelihood of removal in

2    the reasonably foreseeable future existed for detainees that

3    have -- already have a final order of removal.

4         And those regulations require many things, but at

5    baseline they require that a review happen approximately every

6    90 days to ensure that that significant likelihood of removal,

7    or SLRRFF, you know, exists.

8         Obviously, at the beginning of this case ICE was

9    violating certain parts of those regulations, and, obviously,

10   over the course of this case ICE has gotten much better and has

11   been complying with those regulations.  As Your Honor knows,

12   Mr. Todd Lyons is very invested in having his employees and

13   those he oversees follow those regulations, and ICE takes those

14   following those regulation very seriously.

15        This agreement doesn't address the Post-Order Custody

16   Review regulations because a separate sufficient process exists

17   for individuals to challenge their detention via -- if they

18   believe that ICE has violated Post-Order Custody Review

19   regulations.

20        And that's through an individual habeas that Your

21   Honor may decide or other courts in this district may decide,

22   but we believe that provides -- those individual habeases

23   provide a sufficient level of protection for class members and

24   any detainee to bring those cases individually and it didn't to

25   be included in this agreement.

1          THE COURT:  Okay.  That makes sense.

2          Let's move to the proposed notice and the form of

3     distributing it.  So, as I wrote, since this is a (b)(2) class,

4     the form of notice -- well, the substance of the notice has to

5     be appropriate and the form of distributing it has to be

6     reasonable.  So who wants to speak first to the appropriateness

7     of the notice and the reasonableness of the method of

8     distributing it?

9          And I think ICE wants 30 days to send it by mail or

10    e-mail.  I'll need to know to whom, and then, if I approve,

11    preliminarily, the settlement, we can pick some dates.  But who

12    wants to speak first to this?

13         Would you like to, or Mr. Cox?

14         MS. LARAKERS:  Your Honor, I can begin, because I can

15    speak from experience in other immigration litigation in our

16    office.  Due to the potential breadth of the class, ICE isn't

17    sending notice -- isn't sending personalized notice to every

18    single class member.

19         Obviously, we just discussed how difficult it is to

20    even get an estimate of class members; and, as I understand it

21    through my research, personalized notice is not normal in this

22    immigration arena.

23         For example, in *Casa Libre,* which, I believe, is

24    mentioned in our brief, there was no personal notice; but there

25    was notice posted on USCIS' website and on plaintiff's

1    organizational website.

2            THE COURT:  Are you going to post this on the ICE

3    website?

4            MS. LARAKERS:  No, Your Honor, because plaintiffs are

5    posting it in several places.  We don't believe that class

6    members generally go to ICE's website to look at things that

7    they may be entitled to; so we don't think it would be

8    particularly effective.  And here we are providing some

9    personalized noticed that was not provided in these other

10   cases.

11           THE COURT:  Who are you going to provide personalized

12   notice to?

13           MS. LARAKERS:  As Your Honor knows, we've been

14   providing lists of individuals to plaintiffs over the past six

15   years, I believe.  We're going to go back two years and provide

16   that notice to the individuals who we reported to plaintiffs

17   had checked in with ICE.

18           THE COURT:  Okay.  They've checked in.  And why is the

19   substance of the notice sufficient, adequate?

20           MS. LARAKERS:  It informs class members of their

21   rights under the settlement is the first major piece.  It puts

22   the settlement into terms that are easy to understand, easily

23   digestible for class members.  And it provides clear

24   instructions on how to object to the settlement and provides

25   instructions on what that objection can look like.

1          And, I believe, Your Honor, after carefully reading

2    the practice manual, the treatise that you cited in your order,

3    that is what courts look at, generally, when they're looking at

4    class notice.  And that's what makes it sufficient.

5          THE COURT:  That's probably the Manual For Complex

6    Litigation, Fourth.  All right.

7          And I think that I was told that ICE -- or maybe it's

8    in the agreement -- that ICE wants 30 days from the

9    effective -- from approval to send out the notices that it's

10   going to e-mail or mail.  Is that right?

11         MS. LARAKERS:  For preliminary approval, right.

12         THE COURT:  For preliminary approval.

13         MS. LARAKERS:  And that's why I was happy to hear that

14   Your Honor was considering potentially preliminarily approving

15   and directing notice earlier than the 19th, because that would

16   provide ICE not only time to do that, but also would put us on

17   an earlier track to have this settlement finally approved.

18         THE COURT:  Well, I think I'm going to be able to

19   orally approve the preliminary settlement now, but, since you

20   didn't give me an order, which Mr. Cox's colleagues in his firm

21   always give me at securities cases, class action cases, you're

22   going to have to draft a proposed order.

23         MS. LARAKERS:  Absolutely, Your Honor.

24         THE COURT:  And, in fact, if I do preliminarily

25   approve this after taking a break, I am going to order you to

 1  have that order by -- file that proposed order by October 31,

 2  because part of the reason we're going fast this week is my

 3  availability in the next month is very limited.  I'll be away

 4  from the courthouse quite a bit starting tomorrow.

 5          All right.  Mr. Cox, do you want to address this, the

 6  notice?

 7          MR. COX:  I agree with Ms. Larakers on the substantive

 8  issues.  I think I'd just like to add a couple points of

 9  amplification.  In addition to the distribution through the

10  Government's channels, we'll also be publishing it on the ACLU

11  website, as she mentioned, and, also, distributing it through

12  local immigration attorneys who have the most direct contact

13  with potential class members.

14          And then we're also -- we're proposing to translate it

15  into four different languages commonly used by class members.

16  I believe Your Honor had previously -- for the previous class

17  notice that we discussed with Your Honor, I think you included

18  Spanish and Portuguese.  We're going to do Spanish, Portuguese,

19  Haitian Creole, and Chinese to make sure we're getting this to

20  as many individuals as possible.

21          THE COURT:  How are you going to get it to

22  immigration?

23          MR. COX:  I think it's going to be distributed -- the

24  ACLU in Massachusetts has a number of strong connections with

25  immigration attorneys, and I think it will be distributed

1    through those networks.

2         THE COURT:  But there are also other immigrant aid

3    organizations.  MIRA is one of them.  I think you -- the ACLU

4    will know who they are, but you should -- there's the

5    International Institute, I know.  There are nonprofits that

6    have this as their mission or part of their mission; so you

7    want to get it to as many of them in this area -- and it's not

8    just in Massachusetts -- as possible.

9         MR. COX:  Of course.

10        THE COURT:  I'm going to take a break and I will -- I

11   do think there's some urgency to this, and I am going to

12   approve the settlement, preliminarily approve the settlement,

13   and order that you send me a proposed order that says, you

14   know, For reasons stated at the hearing on October 25, the

15   Court finds the proposed settlement is likely to be approved --

16   the language of the statute that I pointed out to you in my

17   order last week -- likely to be approved, and the notice is

18   appropriate, and the means of distributing are reasonable.

19        And then it's going to have to have all of the

20   features.  And one thing you'll have to put in the order -- I'm

21   saying this because we're going to put you in a breakout room.

22   You can begin discussing the order.  It's going to have to say

23   that, whatever deadlines the Court sets, it can alter for good

24   cause.  Okay?  We'll see what happens.

25        All right.  Mr. Fleming, can you put them in a

1    breakout room, please?  And maybe my clerk can come in.

2            (A recess was taken from 1:56 to 2:18.)

3            THE COURT:  Mr. Fleming, please tell me when we have

4    everybody.

5            THE CLERK:  I believe we have everybody now, Judge.

6            THE COURT:  All right.

7            This hearing has been very helpful, and I find that I

8    can now decide the joint motion for preliminary approval of

9    settlement agreement, notice of settlement and fairness

10   hearing, Docket 652.  This case began in 2018.  The litigation

11   was intense and intensely adversarial, as found in a number of

12   decisions.

13           The Department of Homeland Security was violating the

14   law in the manner in which it detained aliens ordered removed

15   from the United States -- sometimes many years ago, when they

16   were quite young -- who remained here, married United States

17   citizens, and, in certain instances, were pursuing a legal path

18   to remaining in the country and keeping the families of U.S.

19   citizens intact.

20           However, since this case was stayed in 2021, the past

21   has not proved to be prologue.  The parties have worked

22   cooperatively, constructively, and arduously negotiated a

23   settlement agreement that I now find I am likely to find is

24   fair, reasonable, and adequate.

25           I find -- as required to issue notice pursuant to

1    Federal Rule of Civil Procedure 23(e)(1)(B) and 23(e)(2), I

2    find that the notice is in appropriate form, as required by

3    Rule 23(c), and the proposed manner of giving notice is

4    reasonable as required by Rule 23(e)(1)(B).  Therefore, the

5    joint motion is hereby allowed.

6         I'm likely to, at a final hearing, find the settlement

7    agreement to be fair, reasonable, and adequate because, among

8    other things, it appears -- I won't even say "it appears."  The

9    class representatives and particularly their counsel have

10   adequately and excellently represented the class.

11        The settlement was reached after substantial

12   discovery, document discovery, and depositions.  It was

13   negotiated ardently at arm's length by counsel on both sides,

14   who very effectively represented their clients' legitimate

15   interests.

16        The jurisprudence provides that, in such

17   circumstances, the settlement is presumptively reasonable.

18   Here I find it's substantively reasonable.  The relief is

19   adequate because it provides immediate benefits to members of

20   the class rather than subjecting them to protracted litigation

21   and extended uncertainty about whether their families, that

22   include U.S. citizens, will be allowed to remain together in

23   the United States.

24        It treats the class members equally.  Although the

25   named plaintiffs will have certain action by Immigration and

1    Customs Enforcement taken sooner than the same action is

2    expected to be taken on behalf of all class members,

3    fundamentally, all class members are treated equally.

4         The treatment is lawful.  It wouldn't be reasonable if

5    it were unlawful.  But it's consistent with the Supreme Court's

6    ruling in *Aleman-Gonzalez*.

7         I'm now -- if I finally approve the settlement, as I

8    expect I will, I will only be approving a private class action

9    settlement agreement, contract.  I'm not ordering the

10   Government to do anything.  This is not a consent decree

11   enforceable by contempt.

12        I will be asked to and will, if I approve the

13   settlement finally, dismiss the case pursuant to Federal Rule

14   of Civil Procedure 41(a)(2) on Plaintiffs' request and on the

15   terms and conditions of the settlement agreement, which, I

16   agree, are proper.

17        I did something comparable to this in *Disability Law*

18   *Center v. Massachusetts Department of Corrections*, 960 F. Supp.

19   2d 271, at 278.  There I relied in meaningful measure on the

20   Supreme Court's decision in *Kokkonen v. Guardian Life Insurance*

21   *Company of America*, 511 U.S. 375.  I wrote that:

22        "The Supreme Court recognized in *Kokkonen* that a

23   United States district court may retain jurisdiction to enforce

24   the provisions of a private settlement agreement even as it

25   dismisses the litigation that the settlement resolves."  In

1    Kokkonen, "the Supreme Court explained that:

2            "If the parties wish to provide for the court's

3    enforcement of a dismissal-producing settlement agreement, they

4    can seek to do so.  When the dismissal is pursuant to Federal

5    Rule of Civil Procedure 41(a)(2), which specifies that the

6    actions 'shall not be dismissed at plaintiff's instance save

7    upon order of the court and upon such terms and conditions as

8    the court deems proper,' the parties' compliance with the terms

9    of the settlement contract (or the court's 'retention of

10   jurisdiction' over the settlement contract) may, in the court's

11   discretion, be one of the terms set forth in the order."

12           That's what will occur here.  I'm not ordering

13   class-wide relief or any prospective relief if I approve the

14   settlement.  I'm not ordering -- I will not be ordering the

15   Department of Homeland Security to do anything, including

16   ordering it to perform as required by the settlement agreement.

17   The order only approves the settlement agreement and will not

18   be, itself, enforceable by civil or criminal contempt.

19           There will be a limited judicial role which

20   contributes to the reasonableness of settlement.  If a class

21   member believes that the defendant is not -- if a class member

22   believes that the defendant is violating the settlement

23   agreement in his or her particular case and the dispute

24   resolution procedure required by the agreement does not resolve

25   the dispute, the Court will decide that individual claim.

1    The contract, the settlement agreement, doesn't permit

2    an individual to request class-wide relief, doesn't permit

3    anybody to request class-wide relief.

4    If I find a violation of the agreement and order the

5    Department of Homeland Security to take corrective action in an

6    individual case, that order would be enforceable by contempt.

7    However, if the parties continue to act cooperatively

8    and in good faith, as they have in the four years this case has

9    been stayed, I expect there will be few disputes to resolve and

10   it will be feasible to do so.

11   I also find the notice is in appropriate form, as

12   required by Rule 23(c)(2), and the manner and distribution of

13   it is reasonable, as Rule 23(e)(1)(B) requires.

14   Immigration and Customs Enforcement will mail and

15   e-mail the notice to class members of whom it is aware, the

16   Civil Liberties Union; one of class counsel will publicize the

17   notice on its website, provide its immigration lawyers, and

18   provide it to nonprofit organizations in the states embraced by

19   the settlement, which have as their mission assisting

20   immigrants and refugees.  The notice will also be available in

21   languages -- several languages that are most likely to be

22   spoken by the class members.

23   So those are the reasons I'm preliminarily approving

24   settlement.  As I said earlier, I'm ordering the parties to

25   order the transcript of this hearing.  And now I want to

1    discuss any -- and I'm ordering that they file a proposed order

2    preliminarily approving and providing the notice by October 30.

3           If we look at the notice, Docket 654-2, there are some

4    dates that require -- I need to set a deadline for providing

5    notice; I need to set a deadline for objections; I need to set

6    a deadline for the motion for final approve and a date for

7    hearing on it.

8           And, understanding that the Department of Homeland

9    Security has requested, I believe, a month after preliminary

10   approval to distribute the notice, I'd like to know whether the

11   parties agree that having the hearing on about January 15 or 16

12   seems to be feasible.

13          MS. LARAKERS:  That's actually the date we were

14   contemplating, Your Honor.  So that's perfect.

15          MR. COX:  That should also be acceptable to the

16   petitioners, Your Honor.

17          MS. LARAKERS:  I will note, Your Honor, that,

18   obviously, Eve Piemonte isn't here.  And we haven't discussed

19   this with her and her schedule.

20          THE COURT:  She's in the U.S. Attorney's Office.

21          MS. LARAKERS:  Yes, Your Honor.

22          THE COURT:  All right.  Well, one thing I told you is

23   that any of the dates can be changed by me for good cause, and

24   you've got until next Thursday to develop this.

25          So what would be -- working back, what's the date by

1    which notice should be given?

2            MS. LARAKERS:  30 days prior to hearing date, Your

3    Honor.

4            THE COURT:  No.  That's not enough time.  You're going

5    to give notice.  If you get me an order by the 31st and get me

6    a disk with it, so I can revise it if I'm not satisfied with

7    the proposed order and notes, I will have signed it by

8    November 6.

9            Then you want 30 days for ICE to get the notice out.

10   The plaintiffs can start publicizing it immediately after that.

11   Then there has to be a period for objections.  I mean, I

12   thought I read that ICE wanted 30 days to get the notice out.

13   Is that not right?

14           MS. LARAKERS:  Yes, Your Honor, that's right.

15           THE COURT:  So let's say -- if I sign the order on

16   November 6, then ICE would have till December 6 to get the

17   notice out.  Then objections could be due -- and that's the

18   latest notice would go out.  The plaintiff should be getting it

19   out immediately after I sign the order.

20           So the notice goes the 6th of December.  We could

21   have -- we could have objections due January 3.  We could have

22   the memo in support of final approval -- the motion for final

23   approval and the memo in support of it no later than January 8.

24           And a proposed order, if I approve it at that hearing,

25   I would sign.  But you've got to give it to me in a way that I

1    can revise it easily.  And we're going to have the hearing on

2    January 16 at 1:00 p.m., preferably in the courtroom,

3    particularly if there's going to be any objections.  Possibly

4    by Zoom, but preferably in the courtroom.

5         Do those dates sound feasible?

6         MS. LARAKERS:  I believe that's feasible, Your Honor.

7    That would give ICE close to 30 days, close enough to 30 days.

8    ICE would be -- will have sent out their personal notice a

9    month before the objections are due; so that would be around

10   December 3.

11        THE COURT:  Yeah.  The notice has to be sent by the

12   6th.  They can send it sooner.  They can send it out in waves.

13   I don't know what's required.

14        What did you say, Mr. Lyons is away on a detail?

15        MS. LARAKERS:  Yes, Your Honor.  But he's not -- as I

16   understand it, it won't affect ICE.

17        THE COURT:  All right.

18        MS. LARAKERS:  Is Your Honor asking because you would

19   like him to be present at the January 16 hearing?

20        THE COURT:  No.  He's welcome, but he's not ordered.

21        Is there anything else for today?

22        MR. COX:  Nothing from petitioners, Your Honor.  Thank

23   you.

24        THE COURT:  All right.  Let me, in a way, end where I

25   started.  Until I got that memo last Thursday, you all did

1    excellent work ardently advocating for your clients and then

2    energetically complying with my orders that resulted from that

3    intensive litigation.

4         That memorandum is deeply disappointing and

5    surprising.  But you -- the settlement agreement, which is a

6    sophisticated, nuanced document that, I think, at this point

7    strikes an excellent balance between the competing legitimate

8    interests, including the authority and discretion of the

9    executive branch, it's a good piece of work.

10        So make sure you continue to do good work and that

11   you're comfortable, have read -- because your names are on

12   it -- and are comfortable with what you submit from here on in.

13   But, if you are, everything should be fine, okay, and your

14   clients will each be well served.  All right?

15        MS. LARAKERS:  Yes, Your Honor.  Thank you, Your

16   Honor.

17        MR. COX:  Thank you, Your Honor.

18        THE COURT:  All right.  Court is in recess.

19        (Whereupon the hearing was adjourned.)

20

21

22

23

24

25

```
 1                  CERTIFICATE OF OFFICIAL REPORTER

 2

 3              I, Jessica Leonard, Certified Shorthand Reporter

 4    and Federal Certified Realtime Reporter for the United States

 5    District Court for the District of Massachusetts, do hereby

 6    certify that the foregoing transcript is a true and correct

 7    transcript of the stenographically reported proceedings held in

 8    the above-entitled matter, to the best of my skill and ability.

 9              Dated this 4th day of November, 2024.

10

11

12              /s/ Jessica M. Leonard

13              Jessica M. Leonard, CSR, FCRR

14              Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25
```