UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


)
LILIAN PAHOLA CALDERON JIMENEZ,    )    Civil Action: 18-10225-MLW
and LUIS GORDILLO, et al.,         )
Individually and on behalf of      )
all others similarly situated,     )
                                   )
          Plaintiffs-Petitioners,  )
                                   )
V.                                 )
                                   )
ALEJANDRO MAYORKAS, et al.,        )
                                   )
          Defendants-Respondents.  )



BEFORE THE HONORABLE MARK L. WOLF
UNITED STATES DISTRICT JUDGE


MOTION HEARING


January 16, 2025


John J. Moakley United States Courthouse
Courtroom No. 2
One Courthouse Way
Boston, Massachusetts  02210

Kelly Mortellite, RPR, RMR, CRR
Official Court Reporter
One Courthouse Way, Room 3200
Boston, Massachusetts  02210
mortellite@gmail.com

1    APPEARANCES:

2    Counsel on behalf of Plaintiffs-Petitioners:

3    Adriana Lafaille
     ACLU of Massachusetts
4    One Center Plaza
     Suite 850
5    Boston
     Boston, MA 02108
6    617-482-3170
     alafaille@aclum.org

7
     Kevin S. Prussia
8    Christina Luo
     Jonathan A. Cox
9    Wilmer Hale LLP
     60 State Street
10   Boston, MA 02109
     617-526-6243
11   kevin.prussia@wilmerhale.com
     christina.luo@wilmerhale.com
12   jonathan.cox@wilmerhale.com

13   Kathleen M. Gillespie
     Attorney at Law
14   6 White Pine Lane
     Lexington, MA 02421
15   339-970-9283
     kathleenmgillespieesq@gmail.com

16

17   Counsel on behalf of Defendants-Respondents:

18   Eve A. Piemonte
     U.S. Attorney's Office
19   1 Courthouse Way
     Boston, MA 02210
20   617-748-3100
     eve.piemonte@usdoj.gov

21
     Mary Larakers
22   U.S. Department of Justice, Office of Immigration Litigation
     District Court Section
23   Washington, DC 20044
     202-353-4419
24   mary.l.larakers@usdoj.gov

25

```
 1              P R O C E E D I N G S
 2         (The following proceedings were held in open court
 3    before the Honorable Mark L. Wolf, United States
 4    District Judge, United States District Court, District of
 5    Massachusetts, at the John J. Moakley United States Courthouse,
 6    One Courthouse Way, Courtroom 2, Boston, Massachusetts, on
 7    January 16, 2025.)
 8  (Case called to order.)
 9         THE COURT:  Good afternoon.  Would counsel please
01:00 10  identify themselves for the court and for the record.
11         MR. PRUSSIA:  Good afternoon, Your Honor.  Kevin
12    Prussia from Wilmer Hale on behalf of the
13    plaintiff-petitioners.
14         MS. LUO:  Good afternoon, Your Honor.  Christine Lou
15    on behalf of petitioners.
16         MS. LAFAILLE:  Good afternoon, Your Honor.  Adriana
17    Lafaille also on behalf of petitioners.
18         THE COURT:  Hold on one second, please.  All right.
19         MS. GILLESPIE:  Kathleen Gillespie for the
01:00 20  petitioners.
21         MR. COX:  Good afternoon, Your Honor.  Jonathan Cox on
22    behalf of petitioners.
23         MS. LARAKERS:  Good afternoon, Your Honor.  Mary
24    Larakers on behalf of the United States.
25         MS. PIEMONTE:  Good afternoon, Your Honor.  Eve
```

1    Piemonte on behalf of the United States.

2         THE COURT:  Thank you.  The deadline I established for

3    members of the class to inform me, the court, if any of them

4    wanted to speak today has passed.  There are a number of people

5    present in the courtroom.  Is there any class member in the

6    courtroom who wants to be heard, not through counsel but to say

7    something today?

8         Evidently there is not.  Okay.  The history of this

9    case to this point is well summarized in the joint memorandum

01:01 10  in support of the pending motion for approval of the past

11   parties' settlement agreement.  That's docket 671.  But I'll

12   just say the following briefly.  This is a -- I'll ask you to

13   correct or clarify anything I say if it doesn't seem to be

14   accurate or sufficiently complete.  But this is a case in which

15   in 2019 I certified a Rule 23(b)(2) class and the subclass of

16   aliens who had been ordered removed from the United States and

17   subsequently married U.S. citizens and therefore may have been

18   eligible to have their orders of removal vacated and have been

19   approved to remain in the United States with their citizen

01:02 20  spouses and families.  It has been alleged that the Department

21   of Homeland Security unlawfully deprived them of that

22   opportunity and in many cases unlawfully detained them.

23        After certification of the classes, the parties

24   engaged in extensive fact discovery, including substantial

25   document production by the defendants and several depositions.

1    In 2021, the case, with the agreement of the parties, was

2    stayed to permit them an opportunity to attempt to negotiate a

3    mutually agreeable settlement.  Those negotiations, it appeared

4    to me previously and continues to appear to me, were conducted

5    in good faith and at arm's length until 2024.  The parties

6    reported to the court regularly and repeatedly requested more

7    time to continue their negotiations, which I granted.

8        The settlement agreement -- well, on October 17, 2024,

9    the parties filed a motion for approval of their proposed

01:04 10    settlement agreement that they had negotiated.  The settlement

11    agreement provides for dismissal of the case with prejudice

12    with the court retaining jurisdiction to enforce that agreement

13    pursuant to Federal Rule of Civil Procedure 41(a)(2) as

14    permitted by the Supreme Court's decision in *Kokkonen*, 511 U.S.

15    375 at 381-82, a 1994 decision.

16        At an October 25 hearing I scrutinized the proposed

17    settlement.  There was a lengthy discussion of it which was and

18    remains very helpful.  At the conclusion of that hearing, for

19    the reasons I described in detail, I found that the proposed

01:05 20    settlement was likely to be found fair, reasonable, and

21    adequate for a range of reasons.  But among other things, as

22    the parties agreed and I found, the proposed settlement was

23    consistent with the Supreme Court's ruling in *Garland v. Aleman*

24    *Gonzalez*, 142 Supreme Court 2057 at 2064-65, a 2022 decision

25    because the agreement does not or would not require the court

1   to order anything and particularly doesn't require the ordering

2   of any class-wide relief.  Indeed it only authorizes the court

3   to adjudicate any individual claims that defendants have

4   violated the settlement agreement if such an individual dispute

5   is not resolved in mediation.

6           On November 4, 2024, I issued an order preliminarily

7   approving the proposed settlement, and I ordered that notice be

8   given to the classes, there's a class and a subclass, that the

9   court had approved as appropriate in a manner the court had

10  found to be reasonable.  I had approved that notice as

11  appropriate and the means of distributing it as reasonable.

12          The class members were advised of their right to

13  object to the proposed settlement by January 3, 2025.  There

14  was no objection by January 3, and as of today, because we

15  checked, no objection has been filed.

16          Do the parties agree that's an accurate summary of the

17  main events up to now?

18          MR. PRUSSIA:  Yes, Your Honor, we agree.

19          MS. LARAKERS:  Yes, Your Honor.

20          THE COURT:  Okay.  All right.  And I've read your very

21  good joint memo in support of the motion for final approval,

22  but I certainly would like to hear from you to assure that I

23  have an accurate understanding of the agreement and the factors

24  to be considered under Rule 23(b)(2) in determining whether a

25  proposed settlement is fair, reasonable, and adequate.

1           This was discussed in detail on October 25, 2024, and

2       I don't think it's going to be necessary to cover everything

3       that was discussed then.  But I don't want you to feel limited

4       in what you want to present.  As I say, I want to assure that I

5       have an accurate and complete understanding, and I think it

6       would be helpful to have another transcript of the meeting of

7       the settlement particularly.

8           I also have some questions that I would like the

9       parties to address at some point in their presentations without

01:09 10    necessarily altering the way they present their arguments

11      today.  But here are those, maybe some of those questions.

12          First, are there any agreements required to be

13      disclosed under Federal Rule of Civil Procedure 23(e)(3)?

14          Second, I'd like confirmation that there will be no

15      payment of attorneys' fees to plaintiffs' attorneys, despite

16      their long, hard, good work in this case.

17          I'll renew the question I asked last October:  How

18      many estimated class members are there?  And although this is

19      addressed in the memo in a way that at the moment I find

01:10 20    persuasive, why is the treatment of Ms. De Souza and Mr. Gao

21      equitable?  Importantly to me, I'd like to know whether Lima,

22      Viana and -- I'm sorry.  There are three related cases.

23          MS. LAFAILLE:  Mr. Lima is the third person.

24          THE COURT:  Who is that?

25          MS. LAFAILLE:  Lima, I believe.

1          THE COURT:  Right.  Thank you -- who have stayed

2   related cases members of the class.  You told me last October

3   you would find out.  I'd like to know if Todd Lyons is still

4   the Boston bureau director and whether he's still on detail in

5   Washington, whether Patricia Hyde is still the acting director.

6   And I don't think we discussed this last time, but it appears

7   from one of the declarations that the deputy director is David

8   Westling.

9          I may want to know the names of present occupants of

01:11 10   some of the Department of Homeland Security offices referenced

11   in the settlement agreement, and I want to know whether the

12   individuals who have responsibilities under the settlement

13   agreement have been informed of those responsibilities.

14          I'd also like to know how the class members will be

15   informed of approval of the settlement agreement, the terms of

16   it and their rights under it.  That is, assuming it's approved.

17          And we went over this in October, but time has passed.

18   I'd like some further perhaps repetitive discussion of the

19   meaning of the settlement and the court's role in it, including

01:13 20   explanation of Section 2(a) concerning ICE reviewing and

21   requesting on a case by case basis presumptively joining

22   motions to reopen and dismiss filed by noncitizen class members

23   to comply with certain requirements and the meaning of the

24   terms "serious immigration fraud" or is a "repeated immigration

25   violator" that's used in pertinent parts of the provision and

the court's role with regard to Section 2, if there are

eventually disputes.

Then I'd like another explanation of Section 3

regarding enforcement actions and the responsibilities of

citizenship and immigration services under the agreement, and

there are somewhat different standards I believe in Sections 2

and 3, and I'd like to be refreshed on those.  Okay?

So why don't I hear first from the plaintiffs and then

from the government.

01:15  MR. PRUSSIA:  Thank you, Your Honor, Kevin Prussia.

I'll start briefly by just addressing Your Honor's first two

questions, and then I'll pass it to Ms. Lafaille who will

complete our presentation.  We won't be able to answer all of

Your Honor's questions because some of those I think are best

answered by respondents of course.

Just on question one, if there are any additional

agreements, the sole agreement between the parties has been

filed with the court.  There are no additional agreements with

the parties.

01:15  THE COURT:  Excuse me just one second.

Okay.

MR. PRUSSIA:  Then, just briefly, Your Honor, to your

second question, Your Honor is correct I can confirm that there

is no agreement to pay plaintiffs' attorneys' fees.

THE COURT:  Okay.  Thank you.

1          MS. LAFAILLE:  Good afternoon, Your Honor.  With the

2    court's indulgence, I'm not going to be addressing the court's

3    questions.  I'll turn it over to Christina Luo in a moment.

4          I want to thank the court for the energy and attention

5    devoted to this matter over the past seven years.  I also

6    wanted to thank the government counsel and the officials

7    involved in this case for the many moments in which they

8    demonstrated the humanity that we felt this case and the people

9    impacted by it deserved.  And despite everything that happened,

01:17 10   there really were many, many moments of that.

11          I want to thank my co-counsel at Wilmer Hale, which

12   donated approximately 11,000 hours to this case over seven

13   years, and immigration attorney Kathleen Gillespie, who has

14   provided invaluable assistance to us over the past seven years

15   as well.  I also want to thank our clients for the trust they

16   have placed in us and for their continued determination to help

17   others.

18          THE COURT:  Should the record reflect that many of

19   them are in the courtroom, or some of them?

01:17 20         MS. LAFAILLE:  Yes, Your Honor.  Yes.  Lilian Calderon

21   is here with her husband, Luis Gordillo, and Ms. De Souza is

22   also here.

23          THE COURT:  Thank you.

24          MS. LAFAILLE:  We are here today to explain why we

25   think this settlement is fair, reasonable, and adequate.  And

1    as part of that, I want to review some of the ground that we

2    have covered together over the life of this case.  I want to go

3    back to a time before this case, a day in March 2017 when five

4    noncitizens were arrested at USCIS offices in Lawrence,

5    Massachusetts when they went in for interviews in connection

6    with their efforts to seek lawful status.

7         Attorneys helped bring a habeas petition for one of

8    those noncitizens which came before Your Honor, but this case

9    and the certified class did not exist, and most of the other

01:18 10   ones could never be found or identified by the attorneys who

11   were seeking to help them.

12        Discovery in this case would later reveal

13   communications between ICE and USCIS in October of 2017 when

14   USCIS was getting ready to schedule some two dozen noncitizens

15   for similar interviews.  ICE decided that it would arrest most

16   of them.  But this time it asked for the interviews to be

17   spaced out no more than one or two at a time to reduce the

18   operational burden on ICE and avoid triggering negative media

19   attention.  So the people on that list began getting called in

01:19 20   for interviews.  And that brings us to January 2018.

21        THE COURT:  Did you say that was occurring in Boston?

22        MS. LAFAILLE:  Yes, Your Honor.  That takes us to

23   January 2018, when the people from that list were getting

24   called in for interviews, and it brings us to the events of

25   this case.

1          Seven years ago today was the last day before Lilian

2    Calderon's USCIS interview.  Lilian and Luis testified in this

3    case about how they provided set routines and structures for

4    their kids who were one and four years old at the time,

5    routines about dinner, reading, bedtime, and so I imagine that

6    seven years ago today, on the night before Lilian's interview,

7    they followed those routines together.

8          The next day, January 17, 2018, Lilian and her

9    husband, her high school sweetheart Luis, went to a USCIS

01:20 10    office in Rhode Island.  They were there to demonstrate that

11    their marriage was bona fide.  The application they had filed,

12    the I-130, was the first step in a series of steps through the

13    provisional waiver process, a regulatory process that allows

14    certain noncitizens, including those with final orders of

15    removal, to remain in the United States with their families

16    while taking steps to pursue their lawful permanent resident

17    status by virtue, as relevant here, of their marriage to a U.S.

18    citizen.

19          At her interview, a USCIS officer told Lilian that her

01:21 20    marriage was bona fide and her I-130 was approved, but he also

21    told her that ICE was there to see her.  And suddenly, Lilian

22    was an ICE detainee, slated for deportation.

23          This lawsuit began as a habeas petition for Lilian.

24    Almost immediately, Your Honor began scrutinizing this case and

25    began connecting it to other events.  And while Lilian was

1    released soon after her petition was filed, and as we've

2    mentioned she and her husband are here with us today, there

3    were others like her.

4        One of the people Lilian met in detention was Lucimar

5    De Souza.  Like Lilian, Lucimar was married to a U.S. citizen,

6    and she was also arrested at her interview at a USCIS office in

7    Boston.  Lucimar and her husband and three other couples joined

8    this case as plaintiffs in April of 2018 when it became a class

9    action lawsuit.  In the ensuing years, this case has given us

01:22 10   many demonstrations of the vulnerable position that families

11   like Lilian's and Lucimar's were in in 2018 and the importance

12   of class-wide remedies for which we seek approval today.

13       For example, we now know that in February 2018 ICE and

14   USCIS were communicating about the next batch of 21 people with

15   final orders of removal who were being scheduled for interviews

16   and ICE detentions at USCIS offices.  But then this litigation

17   existed, and this court had begun scrutinizing arrests at

18   USCIS's offices.

19       ICE halted its practices of arresting putative class

01:22 20   members at their interviews and those people were spared

21   arrest.  To our knowledge, there has not been a I-130 arrest in

22   the New England area ever since, and we hope there won't be

23   again.

24       This court's legal rulings have been critical to the

25   protections that class members have benefited from since that

time.  The court held in this case that ICE cannot simply carry out a blanket enforcement policy targeting every removable noncitizen for detention and deportation without accounting for the provisional waiver regulations.

The provisional waiver regulations are designed to keep noncitizens with their families in the United States while they pursue lawful status.  And as this court held, ICE officials must account for these regulatory goals in their enforcement decisions.

01:23   THE COURT:  As I understand it, I mean, the purpose of that is to keep families that include U.S. citizens intact.

MS. LAFAILLE:  Yes.

THE COURT:  And also perhaps to free up the limited Department of Homeland Security resources, particularly ICE resources, so they can be focused on people who are dangerous, threats to national security but dangerous.

MS. LAFAILLE:  Absolutely.

THE COURT:  Is that essentially the purpose of these regulations that are laws?

01:24   MS. LAFAILLE:  Absolutely, Your Honor.  And that's why this court also held that removing people who are eligible for the provisional waiver process based on their final order of removal alone is unlawful.  That holding is very significant. And although the settlement in this case, the proposed settlement will be over in two years, that holding will endure.

1          The discovery in this case brought to light that ICE

2     officials knew nearly nothing about the provisional waiver

3     process or the class members' eligibility for it.  They thought

4     removal was appropriate in these cases in part because, in

5     their view, these noncitizens had no path to relief and had

6     been ill-advised to even attend their I-130 interviews to begin

7     with.

8          Through numerous depositions and hearings and rulings

9     in this case, I am now confident that many ICE officials now

01:25 10    have a better understanding of the provisional waiver process

11    and their legal obligations.

12          THE COURT:  I hope and trust that is right.  You all I

13    think remember my rulings better than I do at this point.  But

14    I have a vivid memory -- you haven't talked about the

15    detention.  Maybe you're getting to that.  But the person in

16    Washington responsible I think for a quarter of the country and

17    who had been administering the program since sometime in the

18    Obama administration didn't know that the regulations, which

19    are laws, required, A, a review within six months, not after

01:26 20    six months, and required an interview of the detained person.

21    That individual testified that, until I required his attendance

22    in court, he didn't know what the regulations provided,

23    although he was responsible for their implementation for I

24    think a quarter of the country.

25          So I hope you're right and will continue to be right

that the Department of Homeland Security understands and will
continue to understand its legal obligations, and that will
give some redeeming value to this arduous case if that's
correct.  And I can see from the proposed settlement that
counsel for the government has worked to promote that
understanding, which is what lawyers for the government are
expected to do, of course, make sure their clients understand
the law and follow it.  But it's not to be taken for granted,
and it's a good thing.

01:27 10    MS. LAFAILLE:  Your Honor beat me to it.  I was just
going to start talking about the scrutiny given in this case to
ICE's compliance with the post order custody regulations, which
provide a process for people detained after final order of
removal to obtain regular reviews of their custody and have
input into those reviews.

Early on in this case Your Honor zeroed in on the fact
that in cases like these where a removal order is more than 90
days old, the 90-day removal period in which the statute
mandates detention is long over and detention is not mandatory.
01:28 20  Instead, ICE has the discretion to release.  That is something
the government wavered on in the beginning of this case.

In an early filing in this case when Your Honor asked
the government to state the basis of Lilian's detention and say
whether it was mandatory or discretionary, the government
paradoxically stated, and I quote, that "her detention was

1    never viewed as a matter of being mandatory or discretionary."

2    But the government later admitted, as I believe they had in the

3    2017 habeas case before Your Honor, *Arriaga*, that detention in

4    these circumstances is discretionary, and the government has

5    reaffirmed that plain language understanding to us over the

6    ensuing years.

7        The court also scrutinized numerous violations of the

8    post order custody regulations.  Some of these violations with

9    regards to the required 90-day review were that ICE was not

01:28 10   providing timely notice of reviews, was not consistently

11   providing notice to counsel, was in many cases conducting

12   reviews very late, and was in other cases conducting reviews

13   prior to the date by which they had told noncitizens to provide

14   materials and thereby depriving noncitizens of their

15   opportunity to submit evidence in support of their release.

16       In May 2018, Your Honor found that ICE had violated

17   the post order custody regulations in the case of Ms. De Souza,

18   Lucimar.  And as a result of Your Honor's ruling, she was

19   immediately released just before Mother's Day.  Lucimar is here

01:29 20   today with her two daughters and her son Anthony, who at the

21   time of her detention was ten years old.

22       THE COURT:  Is he the one that wanted to go to jail

23   with his mother?

24       MS. LAFAILLE:  Yes, Your Honor, he is.

25       And also seven years ago, Anthony touched us all with

1   the video of his emotional collapse when he was reunited with

2   his mom after her release.  In the intervening years, Anthony

3   has lost his father, Lucimar's husband, Sergi, to cancer.  But

4   as a result of this court's scrutiny of ICE's compliance with

5   its regulations, Anthony is able to be with his mother.  This

6   court's focus on compliance with the post order custody

7   regulatory process also caused then Acting Field Office

8   Director Tom Brophy to, for the first time ever in his career,

9   order an internal audit.

01:30 10         In May 2018, ICE reviewed the Boston office's files

11  and identified violations of the post order custody regulations

12  in some 35 to 40 cases which resulted in additional noncitizens

13  being released from detention.

14         The following year, in 2019, Your Honor convened a

15  series of hearings about continued noncompliance with the post

16  order custody regulations.  As Your Honor was recalling, an ICE

17  headquarters official responsible for compliance with these

18  regulations testified that he was unaware until this litigation

19  that these regulations required ICE to interview noncitizens as

01:31 20  part of their 180-day reviews.

21         THE COURT:  As I recall, they weren't even getting the

22  documents within 180 days.  They were being sent after 180

23  days.

24         MS. LAFAILLE:  That was often the case, Your Honor.

25  As a result of these proceedings, ICE had to reform its

1    procedures for post order custody reviews on a nationwide

2    scale.  Also as a result of these hearings, a number of

3    noncitizens detained in violation of these regulations were

4    reunited with their families.  Sam Busisi was released after

5    about a year of detention in violation of the post order

6    custody regulations and is here today with his wife.

7              This court's scrutiny --

8              THE COURT:  Sorry, who is that, please?

9              MS. LAFAILLE:  Sam Busisi is here today with his wife.

01:32 10   This court's scrutiny of his detention has allowed him to spend

11   the last five years with his wife and young children.  And I

12   know that they are continuing to pursue his lawful status and

13   hope that the settlement being proposed here today will be of

14   help to them.

15             This morning I heard from Theresa St. Pierre.  On

16   Christmas Eve in 2019, Your Honor ordered the release of her

17   husband, Soeum Kim, from detention.

18             THE COURT:  What was her husband's name?

19             MS. LAFAILLE:  Soeum Kim.

01:32 20             THE COURT:  How do you spell that?

21             MS. LAFAILLE:  S-o-e-u-m, Kim, K-i-m, and he had been

22   detained for nine months without proper custody reviews.

23   During those months, he had missed the birth of his child.

24   Seoum and Theresa wanted to be here today, but they worried it

25   would be triggering and difficult for their children, one of

1  whom is on the autism spectrum and other whose birthday is

2  today.  Theresa wrote this morning, "Please thank Judge Wolf

3  for us.  He was fair in his order and upheld his judicial

4  obligations and at the same time had deep compassion."

5      There have been other cases of post order custody

6  regulation noncompliance that we have not had to bring to the

7  court because we have been able to work directly with

8  government counsel to provide relief to class members whose

9  procedural rights were violated.

01:33  10      THE COURT:  Which is commendable.  Go ahead.  It's

11  commendable that the government participated and didn't require

12  every dispute to be litigated, so that's commendable.

13  Shouldn't be surprising, but it's what should happen.

14      MS. LAFAILLE:  Yes, Your Honor.  We've worked with

15  government counsel on many, many issues over the years and hope

16  to continue to have a productive working relationship.

17      This case has been about keeping families together,

18  and the families impacted by this case are some of the most

19  vulnerable, and we've had many demonstrations throughout this

01:34  20  case about just how vulnerable class members are to the rapid

21  churn of ICE's enforcement machinery.

22      In the very first days of this case, after this court

23  entered an order that prevented Lilian from being moved out of

24  Massachusetts, she was placed in a van and taken to New

25  Hampshire, where noncitizens are often taken before being flown

1   further south to be put on removal flights.  We got word of it

2   from her family and contacted the government, and the van was

3   turned around.

4        After Lucimar De Souza was released in May 2018, she

5   attended an ICE check-in.  And there, in violation of another

6   of this court's orders, she was instructed that she had to buy

7   a ticket to leave the United States within 60 days.  Again,

8   because of this litigation and this court's orders, we were

9   able to address that and cancel that departure instruction.

01:35 10      We've had more recent reminders of the vulnerability

11  of class members and the important protections that this

12  court's ruling have provided in more recent days too.  One

13  class member went to her ICE check-in this fall in Rhode Island

14  and was given an instruction to buy a plane ticket to depart

15  the United States in 60 days.  She was fitted with a GPS

16  tracking device to make sure that she complied with that

17  instruction.  But before she left the office, someone realized

18  that she was a class member, and suddenly the GPS tracker came

19  off, the departure instruction was canceled, and she was told

01:35 20  to check back in with ICE in a year.  She's in the United

21  States with her family today.

22       And her case is a powerful reminder of the protections

23  that this case has been providing to class members, protections

24  that we wish to continue through the settlement agreement.  The

25  fact that her class membership was almost missed of course does

1    raise concerns with us about ICE's procedures for ensuring that
2    it does not instruct the class members to depart or otherwise
3    take enforcement action without considering their class
4    membership and, going forward, this settlement.

5        We've raised these concerns with government counsel
6    and hope that they are working with ICE to ensure that class
7    members are not missed when ICE is instructing people to depart
8    the United States or take other enforcement actions.

9        Before I turn things over to my co-counsel, I want to
10    say a few more words about Lilian.  After being released from
11    detention and pursuing her I-212 and I-601A waiver
12    applications, in 2019, she went to Guatemala for her interview
13    at the U.S. Consulate and was granted an immigrant visa.  She
14    came back to the United States as a lawful permanent resident.

15        This past November, Lilian Calderon took the oath of
16    citizenship and became a U.S. citizen.  And I can think of no
17    one more deserving.  The USCIS official who seven years ago
18    approved her I-130 and told her that ICE was waiting for her
19    was the official running that naturalization ceremony.
20    Lilian's story reminds us --

21        THE COURT:  Did he know that?

22        MS. LAFAILLE:  I think he did, Your Honor.

23        THE COURT:  What's his name?

24        MS. LAFAILLE:  I know his first name is John.  I don't
25    know his last name.

1          THE COURT:  Okay.

2          MS. LAFAILLE:  Lilian's story reminds us of what this

3   case is all about.  Seven years ago, ICE wanted to deport

4   Lilian.  And if they had done that, yes, she could have pursued

5   her green card from overseas, applying for her waivers and

6   waiting months or years overseas, depending on the wait times

7   for her applications.  Lilian and Luis are strong and resilient

8   and I know that they would have found their way.  But what

9   would have been the purpose of shattering their young family in

01:38 10  that way?

11          We heard in the testimony here in this case about how

12   the routines and structure that Lilian and Luis carefully built

13   for their kids were shattered and how Lilian's 27-day detention

14   had traumatized their children and family.  We heard from Luis

15   about how their daughter had nightmares and would wake up

16   screaming and asking for her mother.

17          This case forces us to ask our government colleagues

18   what the purpose of that suffering had and what good it served

19   for the United States and what would separating Lilian's family

01:38 20  for longer than those 27 days have achieved.  Those hardships

21   are precisely the ones that the provisional waiver regulations

22   seek to prevent.

23          I look forward to working with our colleagues in

24   government to ensure that the process of implementing the

25   settlement is a smooth one.  In the next two years, the

1    protections of this settlement will be gone, but the holdings
2    of this case will not be.  And no matter what the national
3    priorities are, ICE's discretion to make humane decisions,
4    decisions not to separate families like these, will still exist
5    as will this court's legal rulings, and so will ICE's
6    obligation to comply with the law and carry out any enforcement
7    in a manner that accounts for the family unification purposes
8    of the provisional waiver regulations.  Thank you, Your Honor.
9            MS. LUO:  Good afternoon, Your Honor.  Christina Luo
10   on behalf of petitioners.  I wanted to echo the sentiments that
11   Ms. Lafaille addressed just now.  In particular, we wanted to
12   thank Your Honor for the time and attention given to this case.
13   As Ms. Lafaille alluded to, it's been a long road to get to
14   where we are today, and we are very pleased to be before you
15   seeking final approval of the settlement agreement.
16            As we discussed during the October hearing,
17   petitioners are very proud of the settlement agreement, and we
18   believe it strikes a nice elegant balance between preserving
19   and protecting the rights of our class members, while also
20   accommodating competing interests by safeguarding judicial
21   resources and allowing ICE to uphold the nation's immigration
22   laws.
23            At a high level, this settlement agreement is intended
24   to codify many of the same commitments that ICE has agreed to
25   throughout this litigation and as a result of Your Honor's

1    rulings, as well as to provide additional benefits for class

2    members beyond what we have already achieved in this

3    litigation.

4          I know Your Honor didn't want to go through every

5    single piece of the settlement agreement again, but I did want

6    to highlight --

7          THE COURT:  I didn't mean to discourage you from doing

8    it.  I've already been refreshed on things that I didn't

9    recall.  Take whatever time you were planning to take to cover

01:41 10   what you think is important.

11          MS. LUO:  Absolutely, Your Honor.

12          THE COURT:  Because I also think in addition to making

13    sure that I have an accurate and complete understanding of the

14    settlement agreement which was discussed extensively in

15    October, I think having a record in one place might be

16    valuable.

17          MS. LUO:  Absolutely, Your Honor.

18          The first main provision of the settlement agreement

19    relates to motions to reopen, which would be available to

01:41 20   eligible noncitizens who demonstrate that they are prima facie

21    eligible and go through the steps that are outlined in the

22    settlement agreement.

23          THE COURT:  This is a motion to reopen -- just one

24    second.  Let me get this out.

25          It's to reopen what?

1          MS. LUO:  Motions to reopen their removal proceedings

2     and to dismiss them in immigration court.

3          THE COURT:  That was my understanding but I think --

4          MS. LUO:  Yes, Your Honor.

5          THE COURT:  Just one second.

6          So now you're talking about Section 2 of the

7     settlement agreement I think.

8          MS. LUO:  That's right.

9          THE COURT:  Which is docket number 654-1.

01:43 10          MS. LUO:  That's correct.

11          THE COURT:  Go ahead.

12          MS. LUO:  So under this term, Section 2 of the

13     agreement, ICE can only decline to join an individual's motion

14     to reopen after having made a case by case assessment and

15     determined based on an individualized assessment of the facts

16     and circumstances that the individual could pose a threat to

17     public safety, national security, or is engaged in serious

18     immigration benefit fraud.

19          THE COURT:  And what does "serious immigration benefit

01:44 20     fraud" mean?

21          MS. LUO:  That could contemplate a whole host of

22     different types of fraud that could be possible, for example,

23     if a noncitizen fraudulently files multiple forms of relief

24     that they may not be eligible to.  But it's important to note

25     that the term of the settlement agreement does state that the

immigration benefit fraud must be serious in order for ICE to have decided, concluded that.

THE COURT:  And then there's another clause in that provision that says it can be denied if the person is a repeat immigration violator.

MS. LUO:  That's right.

THE COURT:  What is a repeat immigration violator?

MS. LUO:  It would be a similar set of facts.  For example, if a noncitizen repeatedly submits fraudulent forms or requests the same relief over and over again, even if they're not entitled to such relief.  But again, the key language there would be that the noncitizen has to be found to be a repeat immigration violator.

MS. LARAKERS:  Your Honor, if I may, just because I think it would be helpful.  This term is intentionally broad because the agreement contemplates that these cases will be reviewed on a case by case basis.  And instead of laboriously looking into each and every circumstance that could happen, the parties agreed to intentionally draft this term broadly because there could be a lot of different scenarios which could fall under "serious immigration fraud."

THE COURT:  From your perspective, what are some examples?  Because conceivably -- well, that actually gets to another point.  I'm not sure with regard to this provision, if I ever have to resolve any disputes, God forbid, but I'll do

1    it, you know, I need to know what it means.  And this relates

2    to another question.  But what would be an example in your

3    conception of what would fall under serious immigration benefit

4    fraud?

5        MS. LARAKERS:  Sure.  So I would first have to say

6    that every circumstance would be looked at on a case by case

7    basis.  So what may be serious in one case may not be serious

8    in another case if there are mitigating factors.  But one type

9    of serious infraction could be an individual filing frivolous

01:46 10   asylum applications, having been known to file frivolous asylum

11   applications, which is rare.

12        THE COURT:  Not only frivolous but it would have to be

13   fraudulent, wouldn't it?

14        MS. LARAKERS:  Well, frivolous --

15        THE COURT:  Serious immigration benefit fraud in the

16   sense that --

17        MS. LARAKERS:  Well, the filing of a frivolous asylum

18   application contemplates that an individual has attempted to

19   commit fraud by presenting a story to the immigration court

01:47 20   that was not in fact true.

21        THE COURT:  So, that I understand.  To present a story

22   that's not true with an intent to deceive the person deciding

23   whether to grant asylum, that would be fraud.  If somebody

24   applied for asylum based on truthful facts but they didn't

25   justify asylum, maybe it wasn't even a close question, but they

1    sincerely had a well founded fear that they'd be persecuted if
2    they were sent back to their home country, it just wasn't
3    sufficient, you know, sufficient or nearly sufficient to meet
4    the standard, I think that would be fraud.
5            MS. LARAKERS:  Right.  There is a distinct difference
6    in between frivolous asylum applications and applications that
7    simply did not meet the standard.  And frivolous asylum
8    applications is a term of art that I think Your Honor -- I'm
9    not -- I don't practice in immigration court every day, but as
01:48 10    I understand the way Your Honor put it is --
11            THE COURT:  I don't either.
12            MS. LARAKERS:  The way you Your Honor put it is more
13    accurate.  But, again, Your Honor, even in that circumstance,
14    ICE would weigh the individual circumstances in each case.
15            THE COURT:  Then it says "Repeat immigration
16    violator."  What do you think that means?
17            MS. LARAKERS:  Your Honor, it could be, as counsel
18    said, someone who has filed applications consistently with
19    fraudulent information on them, an individual who may have
01:48 20    committed marriage fraud in the past and may have committed
21    marriage fraud several times in the past, individuals like
22    that.
23            And Your Honor, this term in the agreement is not in
24    the agreement because we think it's going to happen all the
25    time.  It's really just a safeguard, if you will.  And of

1course the conflict resolutions procedures are also important
2because I'm sure the parties would engage on this if this
3circumstance were to happen.
4THE COURT:  I think, I'll hear you both on this and
5then we'll go back to the plaintiff, but this relates to my
6general observation about what the standard of review, if I
7ever have to review anything, is.
8This says that these decisions, whether to join
9motions to reopen, are in ICE's sole discretion based on
01:49 10assessment of the totality of the facts relating to three
11things.  So I think we discussed this in October, but my
12present understanding but possible misunderstanding is this
13means that if ICE -- if I'm having to review something, a
14decision in an individual case, if ICE considered all of these
15factors, I don't have the authority to reverse the decision.  I
16can only reverse the decision if they didn't consider the
17factors.
18Is that a proper understanding of the settlement
19agreement with regard to this provision 2, which is captioned
01:50 20Motions to Reopen?
21MS. LARAKERS:  In our view, yes, Your Honor.  The
22reason for the difference there is because the motion to reopen
23process was never an issue that was litigated before this
24court.  There's no standard that this court has set and that we
25can fall back on.  The sole discretion here is important also

1    because this is handled in a completely different system in

2    immigration court, so that layer of protection for ICE is

3    present in that portion of the settlement agreement, but it

4    doesn't say the sole discretion advice in the enforcement

5    section.  The parties have a practice of working out the latter

6    but not necessarily the former.  So that was intentional, Your

7    Honor.

8         THE COURT:  Okay.  I just wanted to see if I

9    accurately understood it, and if I ever have to go back to this

01:51 10   and start by reading the transcript of this proceeding, I can

11   find that answer in the transcript, which I think is the same

12   answer you gave me collectively in October of last year.

13        All right.  Thank you.  Very helpful.

14        MS. LUO:  And petitioners would agree with the way

15   Your Honor described your review.  Under that circumstance, if

16   an individual were to bring a motion to enforce Section 2, the

17   motions to reopen provision, Your Honor's inquiry would be to

18   determine or to review whether or not ICE did in fact make an

19   individualized determination based on the individual's facts

01:52 20   and circumstances.

21        THE COURT:  Okay.

22        MS. LUO:  And this provision has tangible benefits to

23   eligible class members in several ways.  First, Your Honor, for

24   a subset of our class members who entered on a visa or paroled

25   into the United States, they would otherwise be eligible to

1    adjust for status if not for the order of removal.  So this

2    provision allows them to adjust -- if successful this provision

3    would allow them to adjust their status in the United States

4    without having to leave.

5            THE COURT:  They would have to leave -- I guess

6    "adjustment of status" is a term of art, but they'd have to

7    leave briefly, right?

8            MS. LUO:  No.

9            THE COURT:  Who went to Guatemala?

01:53  10           MS. LUO:  Ms. Calderon.

11           THE COURT:  Right.

12           MS. LUO:  Sorry.  She entered the United States

13    unlawfully the first time, and as a result she would not be

14    eligible to adjust for status.

15           THE COURT:  But if somebody came on a visitor's visa

16    and overstayed and didn't enter unlawfully, they might not have

17    to leave.  Is that what I should understand?

18           MS. LUO:  That's correct, Your Honor.  That would just

19    be a subset of our class members.  But Your Honor is correct,

01:53  20    for other class members who did enter the United States

21    unlawfully, they would still need to consular process abroad,

22    but this motion to reopen provision still has tangible benefits

23    for them as well.  For example, it would allow those class

24    members to -- it would obviate the need for these class members

25    to have to file a form I-212, which is one of the steps of the

1    provisional waiver process, and that form is required for

2    individuals who have the orders of removal, so if they no

3    longer have an order of removal, they would no longer need to

4    file that form.

5          But importantly, Your Honor, the reopening term is

6    also important because we have spoken to many attorneys for

7    class members and the immigration bar who discussed the very

8    real and perceived risks of living with an order of removal.

9    Many are afraid to go abroad and consular process because their

01:54 10    order of removal imposes a burden on them and prevents them

11    from participating in the provisional waiver process.  And

12    we've learned that taking the step of the vacating order of

13    removal would be something that would facilitate class members'

14    attempts to obtain lawful status.

15          The next key term of the settlement agreement pertains

16    to enforcement actions, which Your Honor asked about as well.

17    This provision effectively memorializes the legal principles

18    set out in Your Honor's memorandum and order denying in part

19    the government's motion to dismiss, docket 159, from September

01:55 20    of 2018, in which you found that ICE must, quote, "consider an

21    eligible alien's application for a provisional and lawful

22    presence waiver before deciding to remove him or her from the

23    United States."

24          The settlement agreement preserves similar obligations

25    on ICE as well.  The settlement agreement provides that ICE,

1    Boston ERO, can only take enforcement actions after both

2    considering that the noncitizen is eligible for a provisional

3    unlawful presence waiver and be determined that in good faith

4    the class member poses a national security or public safety

5    threat.

6         The next key provision of the settlement agreement

7    relates to two of the named petitioners, Mr. Deng Gao --

8         THE COURT:  Actually, let me go back to the

9    enforcement actions.

01:55 10        MS. LUO:  Sure, Your Honor.

11        THE COURT:  Is the level -- if I have to resolve a

12   dispute concerning enforcement actions, is the level of review

13   different than it is for decisions regarding joint motions to

14   reopen?

15        MS. LUO:  Yes, Your Honor.  Your Honor was correct

16   that Section 3 regarding enforcement actions has this "in good

17   faith" language, and so we think that your review, if a motion

18   to enforce were to be brought, would be a little bit more --

19   could be a little bit more searching.  Your Honor would have

01:56 20   the option to have a wider line of inquiry, so to speak, to

21   determine whether or not ICE made their determination in good

22   faith.

23        THE COURT:  Hold on just one second.  Determining in

24   good faith.  The good faith is not an element with regard to

25   motions to reopen, correct?

1         MS. LUO:  That's correct, Your Honor.

2         THE COURT:  All right.  Okay.

3         MS. LUO:  So with respect to the provision of the

4    settlement agreement, that provides benefits to two of our

5    named petitioners, Mr. Deng Gao and Ms. Lucimar De Souza.  ICE

6    has agreed to join Mr. Gao's motion to reopen and dismiss his

7    removal proceedings within 30 days of the settlement agreement

8    becoming effective.  And for Ms. De Souza, USCIS has agreed to

9    adjudicate her I-601A application also within 30 days of the

01:57 10   settlement agreement becoming effective.

11         And Your Honor asked about how this treatment is

12   equitable if the provision specifically --

13         THE COURT:  Well, why it doesn't render the settlement

14   inequitable concerning the class.  You addressed this in your

15   memo, I know, but tell me again.

16         MS. LUO:  Yes, Your Honor.  As Your Honor noted during

17   the October hearing, all class members are fundamentally

18   treated equally.  With respect to these two named plaintiffs,

19   the reopening provision for Mr. Gao simply reflects that ICE is

01:58 20   also already familiar with Mr. Gao's case and has agreed to

21   join his motion to reopen without requiring him to submit a new

22   request.  And the relief that is provided for Mr. Gao here is

23   comparable to that available to all class members under Section

24   2.

25         For Ms. De Souza, this simply accelerates the timing

1      of the adjudication of an application that is part of the

2      provisional waiver process, which again all class members are

3      entitled to pursue.

4              THE COURT:  It should be essentially first in line

5      because it's been pending a long time.

6              MS. LUO:  Her application has been pending since 2022,

7      Your Honor.

8              THE COURT:  Okay.

9              MS. LUO:  And the last substantive piece of our

01:59 10   settlement agreement that I wanted to highlight was Section 5

11     with regards to reporting.  Under this provision, respondents

12     must notify class counsel of all enforcement actions taken

13     against class members within five business days of that

14     enforcement action being taken or, in the case of removal, it

15     must be five days before intended removal.

16             THE COURT:  And what are the paradigms for enforcement

17     actions?  What are we talking about?

18             MS. LUO:  In terms of standard of review?

19             THE COURT:  No.  What's an enforcement action?

01:59 20       MS. LUO:  Oh, an enforcement action is defined as

21     arrests, detention, decisions to continue detention, removals,

22     intention to remove.

23             THE COURT:  And what does the Department of Homeland

24     Security have to do with regard to reporting on those events?

25             MS. LUO:  They must notify us in advance or within

```
 1   five business days of the enforcement action being taken.

 2          THE COURT:  Well, all right.  That's actually a

 3   difference.  Do they have to notify you in advance, or do they

 4   have to notify you within five days of it happening if

 5   they're -- which is it?

 6          MS. LUO:  Sorry, Your Honor, I misspoke.  And I just

 7   want to make sure I have the language correct.  Defendants must

 8   notify class counsel of any enforcement action within five

 9   business days after any such enforcement action.

02:00 10        THE COURT:  Okay.  That makes more sense to me

11   because, if they're going to arrest somebody, they're not going

12   to give the person five days' notice because they might

13   disappear.  But I do see that under 5A, so it's after.  But

14   it's important that we all have a common understanding of what

15   this means and that anybody else who comes after us has a basis

16   of easily understanding, knowing what it means.

17          MS. LUO:  That's right, Your Honor.  And I wanted to

18   highlight also, in the case of removals, the agreement

19   stipulates that respondents must notify us no less than five

02:01 20   business days before removal or the date by which an

21   instruction to depart has been given.

22          THE COURT:  Where is that?

23          MS. LUO:  That is a couple of sentences into Section

24   5A.  The sentence reads, quote, "No less than five business

25   days before the named plaintiff or noncitizen class member will
```

1    be removed or the date by which they have been instructed to

2    depart, defendants shall provide class counsel with a brief

3    description of the consideration it completed."

4         THE COURT:  And then what can happen?

5         MS. LUO:  We've had similar language to this effect

6    throughout this litigation.  As a result of respondents

7    notifying us in advance that a class member is ordered removed

8    or has been instructed to depart, we have intervened several

9    times as a result.

02:02 10        THE COURT:  Intervened by talking to the government

11   counsel, trying to work it out?

12        MS. LUO:  That's right.

13        THE COURT:  Then if you didn't work it out, what could

14   happen?

15        MS. LUO:  Well, Your Honor, the settlement agreement

16   contemplates that a motion to enforce could be brought with

17   respect to the class on this reporting provision.  If we look

18   at the language of the conflict resolution provision,

19   plaintiffs can move to enforce only Sections 2 and 3 on behalf

02:03 20   of an individual but --

21        THE COURT:  So this would be Section 3?

22        MS. LUO:  No, Your Honor.  For reporting it's Section

23   5.

24        THE COURT:  Reporting or removal?  Wouldn't removal be

25   an enforcement action?

1          MS. LUO:  Yes, Your Honor, removal would be an

2     enforcement action.

3          THE COURT:  So then it would be subject to the

4     conflict resolution procedures if you didn't work it out in

5     Section 6?

6          MS. LUO:  That's right, Your Honor.  So if -- to

7     clarify, if we have a dispute about -- if class counsel doesn't

8     agree about someone's removal after having already been

9     notified, that would have to be brought by an individual.

02:04 10          THE COURT:  Okay.  So then the individual would evoke

11     the mediation procedure --

12          MS. LUO:  That's correct.

13          THE COURT:  -- to see if it could be worked out.  The

14     person might be represented by class counsel or other counsel

15     or no counsel; is that right?

16          MS. LUO:  That's correct.

17          THE COURT:  And if the mediation procedure didn't

18     resolve it, the issue could be brought to the court, me, and

19     then I would have to decide whether the decision was made in

02:04 20     good faith essentially.

21          MS. LUO:  That's correct, Your Honor.

22          THE COURT:  Okay.  Go ahead.

23          MS. LUO:  Unless Your Honor has any other questions

24     about the provisions or the substance of the settlement

25     agreement, I'm happy to turn to some of your other questions.

1    For example, you asked about the number of class members.

2              THE COURT:  Right.  I'm just thinking about whether I

3    have other questions about the terms.

4              MS. LUO:  Yes, Your Honor.

5              THE COURT:  All right.  I think you raised my

6    questions about the meaning of the settlement agreement.  Okay.

7    How many class members do you estimate?

8              MS. LUO:  With respect to the number of class members,

9    our understanding is the same as what we provided you in our

02:05 10   briefing and previously in the October hearing.  We don't have

11   a great way of tracking the total number of class members, but

12   our best estimate is still somewhat in the hundreds.

13             THE COURT:  Well, last time you told me several

14   hundred, but has anything been done to try to get a better

15   number?  It's not really material but -- well, it could be

16   material if there are thousands of them to go to the

17   reasonableness of the settlement from the court's perspective.

18   But you think it's several hundred still?

19             MS. LUO:  That's correct, Your Honor.

02:05 20         THE COURT:  Does the government have any estimate of

21   how many class members there are?

22             MS. LARAKERS:  No, Your Honor.  Unfortunately, as I

23   stated in the preliminary motion hearing, it is difficult, if

24   not impossible, for DHS to run those numbers because it would

25   require -- it would require two lists to be made, for those

1    lists to be cross-referenced manually, but I think we are in

2    agreement with class counsel in the hundreds.

3            THE COURT:  This covers New England?

4            MS. LARAKERS:  Yes.  And Your Honor, just based on the

5    individuals that we've reported over the past years, there

6    hasn't been that many that we would then understand it to be in

7    the thousands.  I can't rule it out, but we think that the

8    number is certainly manageable by the settlement, by class

9    counsel, and by counsel for the government.

02:06 10            THE COURT:  And this relates to two other questions

11    that I have.  Maybe primarily for the government, Ms. Larakers

12    will get a chance to start wherever she wants to start, but

13    because there's no list of who is in the class, which is

14    unusual but appropriate in this case, you persuaded me last

15    October, how are ICE officials -- so the decision on whether to

16    bring an enforcement action, does it provide the level of

17    official who has to make the decision to initiate an

18    enforcement action?

19            MS. LARAKERS:  Yes, Your Honor.  I believe it has to

02:08 20    be approved by a DFOD.  The decision to remove needs to be DFOD

21    level, so in Section 3C, it says that Boston ERO will not

22    remove, so the removal decision needs to be made by a DFOD

23    level officer.

24            THE COURT:  DFOD level officer.  That means what?

25            MS. LARAKERS:  That's a deputy field office director.

 1   So those are the normally two individuals that are right below

 2   the level of the field office director.

 3           THE COURT:  Who are the deputy field office directors

 4   right now?

 5           MS. LARAKERS:  Your Honor, I don't know right now.

 6   Both are acting, I know both of them are in an acting role.

 7   We've had several of them.

 8           THE COURT:  So they're acting but who -- is

 9   Mr. Westling one of them?

02:09 10         MS. LARAKERS:  I believe so, Your Honor, but I know

11   that has changed over the course of the past year.

12           THE COURT:  I think this is very important that this

13   gives responsibilities to two officials holding a particular

14   office on an acting or permanent basis.  But they need to be

15   educated on this and they can't just have -- they're not going

16   to receive a list, if these people come in, then you've got to

17   do the following.  So they have to know what their

18   responsibilities are.

19           MS. LARAKERS:  And they do, they do, Your Honor.

02:09 20         THE COURT:  How do they know?  Let me put it this way.

21   What have you done to educate them?  What has the government

22   done to educate them?

23           MS. LARAKERS:  We engage with ICE all the time.  So

24   many times we've engaged with ICE.  Sometimes that's through

25   ICE OPLA who then goes directly to ERO.

1          THE COURT:  You're talking shorthand.

2          MS. LARAKERS:  Sorry, Your Honor.  So obviously

3    there's DOJ counsel, then there's ICE counsel, ICE Office of

4    Principle Legal Advisor, and then there's the individuals who

5    are working on the ground, Boston ICE ERO, the operators.

6          THE COURT:  I mean, this is the responsibility of the

7    executive branch, but you're entering into a contract.  It's

8    like a plea agreement.  It's enforceable.  And it can't change

9    if I dismiss the case, but it's important that the human beings

02:11 10    who have responsibility for implementing this enforceable

11    agreement know what their obligations are under the contract,

12    the agreement.

13          If I approve this, which I told you in October is

14    likely and still likely, this is really important.  I don't

15    think it's the end of your responsibilities.  Because you

16    worked so hard to strike this balance that maintains very

17    substantial discretion for ICE and the Department of Homeland

18    Security, I think it should free up resources to focus on truly

19    dangerous people.

02:11 20          I mentioned to you in October that since I last saw

21    you, I've had two MS-13 murder cases with seven defendants, a

22    total of the two cases.  There's a lot of matters that should

23    be high priority.  So this is consistent with protecting people

24    in the United States.  But I hope I don't have to conduct any

25    proceedings where some ICE or CIS official says, Oh, I didn't

1   know I had an obligation to do that.

2       MS. LARAKERS:  No, Your Honor.  There are practices in

3   place both at DOJ and in ICE, Office of Principal Legal

4   Advisor, OPLA, to ensure that never happens.  So each

5   individual per this court's order over the past five years who

6   was in charge of making these enforcement decisions has been

7   read in, has ensured they read the court's orders and

8   understand the importance of the court's orders that align with

9   the settlement agreement in this case.  And next week we are in

02:13 10   the process of scheduling calls with people both at ICE OPLA

11   and at ICE ERO to ensure that we are all on the same page

12   moving forward.

13       THE COURT:  That's what I was hoping to hear.

14       MS. LARAKERS:  Yes.

15       THE COURT:  Because Ms. Lafaille has a more vivid

16   memory of what I decided in this case than I do.  I did a lot

17   of things since I saw you last.  That's good.  I'm glad to hear

18   you have those calls.

19       MS. LARAKERS:  Yes, and we will continue to have those

02:13 20   conversations, Your Honor, because we understand that's

21   important too.  While the person's name on this paperwork

22   refers to an office, there are individuals who are making these

23   decisions, and those individuals do need to be informed.

24       THE COURT:  Can you tell me the names of any of those

25   individuals?

1          MS. LARAKERS:  Your Honor, not -- I can refer you to

2     the docket where I've listed all those individuals.

3          THE COURT:  You have?

4          MS. LARAKERS:  Each individual who has read, who has

5     submitted a declaration saying they have read this court's

6     orders is or has been a deputy field office director.  As I

7     understand the individuals, individuals have been rotating

8     through that role as acting, but all those individuals have

9     read the court's orders.

02:14 10          THE COURT:  This won't delay a decision on approval of

11     the settlement, but I'm ordering that -- I'd like to do it

12     tomorrow, but let's say by next Wednesday at noon, the 22nd at

13     noon, you just send me the names, you file the names of the

14     people who hold the offices at least with regard to Boston ERO.

15     Because as I said, I thought -- well, last October I was told

16     Mr. Lyons, who is the director, is in Washington on detail.

17     The acting director is Patricia Hyde.  Now I know there are two

18     deputy directors.  So I'd like to know who is the director, the

19     acting director, who are the acting deputy directors.

02:15 20          MS. LARAKERS:  Yes, Your Honor.  Absolutely won't be a

21     problem.

22          THE COURT:  Thank you.  Okay.

23          MS. LUO:  Your Honor, I was planning to turn to some

24     of your other questions, unless you had any other --

25          THE COURT:  Please.

1          MS. LUO:  Okay.  Your Honor asked about the three
2     habeas cases --
3          THE COURT:  Right.
4          MS. LUO:  -- from your docket.
5          THE COURT:  One of them is on Judge Young's docket.
6          MS. LUO:  That's right, one is on Judge Young's
7     docket.  Our understanding is Mr. Viana, the one on Judge
8     Young's docket, has been dismissed but for the other two cases.
9     For Lee and Viana, we are planning to -- we've reached out to
02:16 10    their counsel and suggest that the parties in those cases
11    confer and report to Your Honor about the status of their
12    cases.
13         THE COURT:  I would have done this long ago.  These
14    cases are on my docket, they're stayed because of this case.
15    If I dismiss this case, then I'd have to reopen those cases.  I
16    would have done that previously.
17         MS. LARAKERS:  Your Honor, Viana is the one on Judge
18    Young's docket.  That case has been dismissed.  Lee and Lima
19    are on your docket.  Lee is no longer a class member.  He has
02:17 20    adjusted to legal permanent resident status and therefore that
21    would moot any of his claims.  So his case should both be
22    dismissed because it's moot and he's no longer a class member.
23         As for Lima, we did reach out to his counsel, they
24    understand that a settlement agreement has been reached in this
25    case.  He is bound by the settlement agreement.

1          THE COURT:  He's in the class?

2          MS. LARAKERS:  Yes, he is a class member.  He's bound

3     by the settlement agreement.  It's our understanding that he's

4     going to seek to take advantage of the motion to reopen

5     procedures in the settlement agreement, but his case -- it's

6     the government's position that his case should be dismissed.

7          THE COURT:  So based on that, it's my intention to

8     dismiss -- well, Viana has been dismissed by Judge Young.

9          MS. LARAKERS:  And Viana, I don't think he was ever a

02:17 10   class member.  I should make that clear.

11         THE COURT:  Okay.  He wasn't a class member.  It was

12    designated as a related case, so if it was a related case, I

13    would take the case because under our rules I have the first

14    case.

15         Lee is moot because he's now a lawful permanent

16    resident, so I'll dismiss his case as moot because he's a

17    lawful permanent resident.  And Lima is a member of the class,

18    and the settlement agreement, because of the nature of the

19    class, nobody can opt-out and all class members are bound, so

02:18 20   since he's a member of the class, I'll dismiss the case on that

21    basis and give him a very short time to move to reconsider if

22    his counsel thinks that's not right.

23         Okay.  That's very helpful, thank you.

24         MS. PIEMONTE:  Your Honor, may I just weigh in on the

25    Lee case.  Lee is not a member of the class.  And so perhaps it

1    may be prudent to allow me -- I'm actually counsel on Lee -- to

2    allow me, Your Honor, to reach out to plaintiff's counsel and

3    ask him to file perhaps a notice of voluntary dismissal because

4    it will be based on grounds other than those being adjudicated

5    here today.

6              THE COURT:  Because he's a lawful permanent resident?

7              MS. PIEMONTE:  That's right, and not a member of the

8    class.

9              THE COURT:  Okay.  I'm ordering that you do that, and

02:19 10   we'll issue a written order, but it may take a while to get to

11    it because I'm in the midst of some urgent things and my

12    availability next week is very limited.

13             Can I see your calendar?

14             I'm ordering, because I'm advised that Lee is a

15    permanent resident alien, the government inform his counsel,

16    and he'll get the order anyway because the case is assigned to

17    me, and either move to dismiss by January 30 or explain why

18    dismissal is not appropriate.

19             MS. PIEMONTE:  Thank you, Your Honor.  I'll do that.

02:20 20             THE COURT:  You can convey that.  In fact, I'll order

21    you to convey it as promptly as possible because it may be

22    before I can issue a written order.

23             MS. PIEMONTE:  I will.  Thank you, Your Honor.

24             THE COURT:  Thank you, okay.  We're back.

25             MS. LUO:  Thank you, Your Honor.  If I may, I believe

there is only one question remaining on the list of Your
Honor's questions from the top of this hearing, and that
relates to how class members will be informed of the settlement
agreement and of their rights under the agreement.  Although
for the next two years class counsel will continue to reach out
to the immigration bar, the website that is being hosted by the
ACLU of Massachusetts regarding the settlement will continue to
be live, and class members can always access that website if
they choose to.

02:21    THE COURT:  How will they know they should look at the
website?

MS. LUO:  If they're informed by class counsel, their
own immigration counsel.

THE COURT:  Well, that's what I thought I asked you.
Are you going to inform them?  Are you going -- you wrote to
many immigration lawyers.  Well, you sent the notice to
immigration lawyers, to organizations that serve immigrants and
refugees, and you put it on the website, and you did it in
various, several different languages.  I think you should do

02:22    the same thing to tell people, if I approve the settlement,
it's been approved, you know, you have these rights, and if you
want to know more about it, get in touch with class counsel.

MS. LUO:  That's right, Your Honor.

THE COURT:  Do I need to order that?  This is like
when I asked -- I don't know if you were here.  Ms. Lafaille

1   was here when I asked Mr. Lyons the first time he appeared, I

2   explained to him what a court order was.  I said a court order

3   can be enforced by contempt.  Do you want me to order you to do

4   this, or would you rather do it voluntarily?  He said, "I'll do

5   it voluntarily."  I'm busy, but should I issue an order that

6   you give notice of the approval and the essence of the

7   settlement to the people you gave notice of this hearing to?

8            MS. LAFAILLE:  Your Honor, if I could just speak to

9   that.  I don't think an order is necessary.  We have every

02:22 10  interest in making sure that class members are aware of the

11  settlement and take advantage of it.  So in addition to plans

12  already in place to re-up all the notice we've done to those

13  lists of attorneys and organizations, the ACLU of Massachusetts

14  communications team is also here today and prepared to do media

15  outreach targeting particularly language media and sources that

16  are likely to reach impacted communities so that they can also

17  learn directly and not just through counsel about the

18  opportunities to engage in the benefits of the settlement.

19           THE COURT:  Okay.  That's what I was hoping for.  Go

02:23 20  ahead.

21           MS. LUO:  Unless Your Honor has any other questions,

22  I'm happy to rest.

23           THE COURT:  I don't think so.

24           MS. LUO:  Thank you, Your Honor.

25           THE COURT:  Ms. Larakers.

1          MS. LARAKERS:  Your Honor, thank you.  Today we're

2     here for final approval of the settlement agreement, and the

3     government would ask that this court approve the settlement

4     agreement in this case because it is fair, reasonable, and

5     adequate.

6          Briefly, Your Honor, this settlement agreement

7     provides meaningful relief to class members by allowing many of

8     them to pursue a provisional unlawful presence waiver without

9     the threat of enforcement action by ICE.  It, at the same time,

02:24 10   preserves ICE's authority and discretion to take enforcement

11    action against class members who pose a public safety or

12    national security risk.  This is important not only for

13    ICE's --

14         THE COURT:  That actually I think gets at something

15    else that we discussed in October I think.  So with regard to

16    reopening, the Department of Homeland Security, ICE, can

17    decline if somebody's a threat to public safety, a threat to

18    national security, or, three, engaged in serious immigration

19    benefit fraud or is a repeat immigration violator.  But with

02:25 20   regard to enforcement action -- let me see.  I thought there

21    was a more narrow provision.

22         MS. LARAKERS:  There's no immigration fraud in the

23    enforcement action section.

24         THE COURT:  That's what I thought.

25         MS. LARAKERS:  Yes, that's right.  That's simply

1    because USCIS will sort that out.  If the individual is engaged

2    in some sort of immigration fraud, that will be found out in

3    their applications for relief.  So USCIS will sort that out.

4         So the settlement, as I said, provides meaningful

5    relief to class members but also protects the community and

6    satisfies the public's interest in ensuring that individuals

7    are removed who do pose a public safety risk and who, by virtue

8    of the fact that they pose a public safety risk, wouldn't be

9    eligible to adjust status or become a legal permanent resident

02:26 10   in the United States anyway.

11        THE COURT:  This is something of a rhetorical

12   question, but does ICE have limited capacity, limited number of

13   people to find and remove people who should be removed?

14        MS. LARAKERS:  Yes, Your Honor, ICE has a budget,

15   operating budget.

16        THE COURT:  And do you expect to permit more of that

17   limited capacity to be focused on finding and removing people

18   who are actually dangerous or threats to national security?

19        MS. LARAKERS:  Well, yes.  Under the settlement

02:27 20   agreement, ICE will focus at least with regard to final order

21   people who are class members, will focus on those individuals

22   who pose a public safety risk.

23        THE COURT:  That's a couple of hundred people that

24   they don't have to look for.  They're married to U.S. citizens

25   and doing whatever they're doing without violating the law.  It

1    seems to me it permits ICE to focus on like the MS-13 type

2    people I mentioned earlier.  And that in my view is one reason

3    that this is reasonable.  But anyway, go ahead.

4          MS. LARAKERS:  So the settlement agreement both

5    provides meaningful relief and also protects the public, which

6    is part of ICE, the mission of ICE, and is also in the public's

7    best interest.

8          The settlement agreement also provides an opportunity

9    for class members to move to reopen and dismiss their removal

02:28 10  proceedings with ICE assent.  This provides a myriad of

11    benefits for class members, including allowing some class

12    members to adjust status from within the United States with

13    USCIS.  And all the motions to reopen in this line of relief

14    was not the subject of litigation in this case.

15          ICE has, in my view, generously agreed to it, and it

16    further demonstrates that this settlement agreement is fair,

17    reasonable, and adequate because it allows class members to

18    pursue an avenue of relief that may make more sense rather than

19    having to leave the country.

02:29 20        THE COURT:  Well, also, again, while the Department of

21    Homeland Security would have to do some work to join these

22    motions, you don't have to litigate them presumably.  It frees

23    up some of the lawyers to litigate the more serious cases.

24          MS. LARAKERS:  Yes, Your Honor.  I don't want to

25    diminish the amount of work that ICE will have to do in order

to review all the joint motions to reopen requests that will

come as a result of the settlement agreement, so there is a

burden on ICE with regard to adjudicating and reviewing the

facts of each individual case that is received as part of this

settlement agreement.  But ICE agreed to that provision even

though it wasn't a subject of litigation in this case, and that

just demonstrates that this settlement agreement is fair,

reasonable, and adequate and that it provides more relief than

was even sought originally by plaintiffs.

The other important -- there are many other provisions

in the settlement, but the other main portion --

THE COURT:  I think you earlier addressed my key

questions.

MS. LARAKERS:  Yes, Your Honor.  So the last main

portion I'd like to focus on is the conflict resolution

procedures.  We're hopeful that the parties will be able to

continue to work out any issues in the future as we have in the

past.  Class counsel did raise one individual who was allegedly

originally instructed to depart, but ICE allegedly or did

identify that class member.

We were unable to confirm whether counsel's account,

which as I understand is at least a second-hand account or

third account, is accurate, but we do know at a minimum that

this individual was identified by ICE as a class member in this

case at her check-in, and DOJ, upon learning of the issue from

1    class counsel, immediately engaged with ICE regarding this

2    class member, and the conflict resolution procedures that the

3    parties have engaged in worked and will hopefully continue to

4    work.

5         In fact, most recently, class counsel raised an

6    individual who was under instruction to depart the United

7    States.  DOJ immediately engaged with ICE and learned that the

8    individual was not a class member when originally instructed to

9    depart, as originally alleged by counsel, but the parties

02:31 10   worked together, realized that the individual is now a class

11   member, and ICE immediately withdrew the instruction to depart.

12        So all of this to say, Your Honor, that the parties

13   have successfully worked together in the past, will continue to

14   work together in the future, and that DOJ and ICE take their

15   obligations under the settlement agreement seriously, and every

16   time an issue is raised by a class counsel, DOJ immediately

17   engages with ICE.

18        THE COURT:  So if I approve the settlement, I'm going

19   to dismiss the case while retaining jurisdiction to enforce the

02:32 20   settlement, if necessary, on an individual basis.

21        Do you expect to continue personally to be involved in

22   this matter?

23        MS. LARAKERS:  Yes, Your Honor, for the foreseeable

24   future, that's for sure.

25        THE COURT:  For the next two years?

1           MS. LARAKERS:  Your Honor, I live to serve as a

2     government employee, so I will be here.

3           THE COURT:  What's that?  But you're a litigator and

4     somebody might think the litigation is over.  But I mean, I

5     hope so.  This is really in the public interest.  And not just

6     because of whatever benefits the class members get.  I really

7     believe it's in the government's interest because the

8     government's paramount interest I believe, the Department of

9     Homeland Security repeatedly said, is to focus on getting

02:33 10    dangerous people out of the country as efficiently as possible.

11    Go ahead.

12          MS. LARAKERS:  So the parties intend to work together

13    in the future, and these scenarios that have been raised today

14    just illustrate that the parties are capable of working

15    together to resolve any issues.

16          THE COURT:  Is Mr. Piemonte going to stay on this

17    matter too?

18          MS. PIEMONTE:  Yes, Your Honor.

19          THE COURT:  Okay.  It's good.  I think after starting

02:34 20    in one of the most contentious cases of civil litigation I've

21    had in almost 40 years, it really is commendable, after certain

22    issues were ruled on, you and the Department of Homeland

23    Security developed a means of representing your respective

24    interests, your clients' respective interests zealously but

25    within those parameters working well together.  And I haven't

1  seen you in several years as a result of that.  There's many

2  interests to the administration of justice.

3          MS. LARAKERS:  And Your Honor, that isn't because the

4  parties haven't disagreed on some matters.  We have.  But we

5  have come to a resolution on those matters, and that's

6  important and illustrative of our healthy working relationship.

7          THE COURT:  And I think it would be in the public

8  interest if the recent last couple of years past proves to be

9  prolog.  Is there anything else?

02:35 10        MS. LARAKERS:  Briefly on the good faith provision and

11  enforcement section, which you touched on.

12          THE COURT:  Go ahead.

13          MS. LARAKERS:  I think that, again, that is slightly

14  different.  The review is still limited, as Your Honor

15  recognized.  Essentially from our perspective there would need

16  be an allegation of bad faith or an allegation that a

17  particular relevant fact wasn't properly considered, and then

18  the court would have a limited review to determine whether all

19  the relevant facts were considered but also whether, based on

02:35 20  all of those facts, a good faith determination that the

21  individual was a public safety or national security risk was

22  made.  So the review is limited but it is there.

23          THE COURT:  Okay.  Is there anything further before I

24  take a break and give you an oral decision?

25          MS. LARAKERS:  No, Your Honor.

1          MS. LUO:  Nothing from plaintiffs, Your Honor.

2          THE COURT:  All right.  In anticipation of the

3    possibility, which I said was likely last October, that I would

4    approve the proposed settlement, the deputy clerk has given you

5    a revision of your proposed order that I prepared, and I'd like

6    you to be sure you've reviewed it in about the next ten minutes

7    because if I approve the settlement, I want to enter an order,

8    neither the one I gave you or the one that is slightly

9    modified.

02:36 10          And I know your settlement agreement says you would

11   file a motion to dismiss within five days of the approval of

12   settlement, and that was inserted in your proposed order.  I

13   didn't see any reason to wait five days.  I've got other things

14   to do.  I've got to put down something very consuming.  So at

15   the moment, you'll see in the order I re-drafted, if I allow

16   your motion to dismiss, if I approve the settlement, I don't

17   know that I have to issue a second order.  I think the order

18   you were given earlier today would cover it, but think about

19   that while I'm out.  Okay?  Court is in recess.

02:38 20          (Recess taken 2:38 p.m. - 2:54 p.m.)

21          COURTROOM CLERK:  Court is in session.  Please be

22   seated.

23          THE COURT:  In October 2024, after a lengthy hearing,

24   I preliminarily approved the proposed settlement in this case

25   because I found that I would likely finally approve it.  And in

1   November, I issued an order memorializing that and ordering

2   that notice be given to the class.  As I noted earlier, there

3   have been no objections from the class.

4         The submissions since last year and the information

5   provided today fortifies my prediction that the proposed

6   settlement is fair, reasonable, and adequate as required to be

7   approved under Federal Rule of Civil Procedure 23(3)(2).

8   Therefore, for the reasons I'll briefly describe, I find the

9   proposed settlement is fair, reasonable, and adequate, and I'm

02:56 10   allowing the motion to approve it as provided in the

11   settlement, dismissing the case with prejudice but retaining

12   jurisdiction to enforce the settlement in the manner provided

13   for in the settlement agreement.

14         I find that the class representatives and class

15   counsel have more than adequately represented their clients.

16   They've done it energetically, expertly, for seven years and

17   achieved an excellent result for their clients.  And I'll say

18   the same, although it's not an element of determining whether a

19   settlement is fair, counsel for the government have done the

02:57 20   same.  They've energetically, expertly, represented the

21   government's interests.  And part of the reason that this is

22   reasonable is that it's reasonable from the perspective of the

23   public that the government represents.  It serves the public

24   interest.

25         The class representatives have also adequately

1　represented the class.  The proposal, I know, was negotiated

2　over many years with, as I said, zealous counsel on both sides.

3　And the settlement results after substantial discovery,

4　document discovery by plaintiffs from defendants, depositions.

5　The proposal was negotiated at arm's length.

6　　　　In the circumstances the case law says that it's

7　presumptively reasonable.  The First Circuit said that in *In*

8　*re: Pharma*, 588 F.3d 24 at 32-33.  That presumption is not

9　material in this case.  Even without the presumption, this

02:58 10　settlement would be found to be fair, reasonable, and adequate.

11　　　　The relief provided for the class is adequate.  As

12　I -- what I'm going to say now will substantially track what I

13　said in October when I studied this very closely, but these

14　preliminary thoughts have been confirmed.  The relief is

15　adequate for the class in part because of the costs, risks, and

16　delay of trial and appeal.  It provides immediate relief.  It

17　avoids the need for protracted and inherently uncertain

18　litigation.  And that's important in alleviating the anxiety of

19　members of families that include U.S. citizens, spouses,

02:59 20　children, who may not have to continue to wonder and worry

21　about what's going to happen to them and their ability to stay

22　together as a family in the United States.

23　　　　Although Rule 23 doesn't make this an element of the

24　reasonableness analysis, as I've said again today, I think it's

25　also very reasonable from the perspective of the government.

1   Immigration and Customs Enforcement particularly has limited

2   resources.  There are many aliens unlawfully in the United

3   States.  It's important as it is for everybody in law

4   enforcement and the judiciary and the government to prioritize.

5   And I believe this settlement will permit Immigration and

6   Customs Enforcement, ICE, in New England to give priority to

7   aliens unlawfully in the country who are dangerous or a threat

8   to national security, like the defendants in the two MS-13

9   murder cases that I've had in the last several years.  Chief

03:01 10   Judge Saylor had a bigger one with 46 defendants I think.  But

11   that contributes in my mind to the reasonableness because the

12   settlement preserves the discretion of ICE and others in the

13   Department of Homeland Security Citizenship and Immigration

14   Services while essentially setting up standards for them to

15   perform or implementing standards for them to perform lawfully

16   that I found were being violated earlier in this case.

17        I wouldn't find the proposed settlement to be

18   reasonable if it was unlawful.  However, I find that it is

19   consistent with the Supreme Court's holding in *Aleman Gonzalez*.

03:03 20   In *Aleman Gonzalez*, which is *Garland v. Aleman Gonzalez*, 142

21   Supreme Court 2057, a 2022 decision, the Supreme Court held

22   that district judges may not enjoin -- well, may not provide

23   class-wide injunctive relief under the Immigration

24   Naturalization Act, but it specifically held that the pertinent

25   part of the act includes one exception to this general

1   prohibition.

2        "The lower courts retain the authority to enjoin or

3   restrain the operation of the relevant statutory provisions

4   with respect to the application of such provisions to an

5   individual alien against whom proceedings under such part have

6   been initiated."

7        In this case I'm only approving a private class action

8   settlement agreement.  I'm not ordering today the government to

9   do anything.  This is not a consent decree enforceable by

03:04 10   contempt.  I will dismiss the case as required by the

11   settlement agreement pursuant to Federal Rule of Civil

12   Procedure 41(a)(2) on the plaintiffs' request which has been

13   made on the terms and conditions that I deem proper, the terms

14   and conditions in the settlement agreement.

15        This is permissible because, as I've noted before and

16   it's authorized by the Supreme Court jurisprudence.  I

17   discussed that case, *Kokkonen*, 511 U.S. 381-82.  In *DLC v.*

18   *Massachusetts Department of Corrections*, I wrote, and it's the

19   Supreme Court that's more important than what I wrote, of

03:05 20   course," the Supreme Court recognized in *Kokkonen* that a United

21   States District Court may retain jurisdiction to enforce the

22   provisions of a private settlement agreement even if it

23   dismisses the litigation that settlement resolves."  That's at

24   381-82.

25        The Supreme Court explained that, "If the parties wish

1    to provide for the court's enforcement of a dismissal producing

2    settlement agreement, they can seek to do so when the dismissal

3    is pursuant to Federal Rule of Civil Procedure 41(a)(2), which

4    specifies that the action shall not be dismissed at plaintiff's

5    insistence, save upon order of the court and upon such terms

6    and conditions as the court deems proper.

7         "The parties' compliance with the terms of the

8    settlement contract or the court's retention of jurisdiction

9    over the settlement contract may in the court's discretion be

03:06 10   one of the terms set forth in the order," which I will do.

11        So as I said, I'm not ordering any class-wide relief

12   or indeed any prospective relief.  I'm not ordering the

13   Department of Homeland Security to do anything, including

14   performing as required by the settlement agreement, the

15   contract.  I am approving the settlement agreement, but it will

16   not be enforceable by civil or criminal contempt.  The fact

17   there is a limited judicial role contributes to the

18   reasonableness of the settlement.  However, if a class member

19   believes a defendant is violating the settlement agreement in

03:07 20   his or her individual case and the required dispute resolution

21   process does not resolve the dispute, I will decide, or another

22   judge will decide, that individual claim.

23        So the settlement agreement doesn't permit requesting

24   class-wide relief.  And if I find a violation of the settlement

25   agreement and order the Department of Homeland Security to take

corrective action, it will be with regard to the individual

claimant only.  That order, if one enters, would be enforceable

by contempt.  But I've been told that the parties expect to

continue to act cooperatively and in good faith, and therefore,

although there may be several hundred class members, there

should not be many disputes that the court has to resolve.

The proposed method of informing class members and

distributing relief should be effective.  I'm told that the

Civil Liberties Union at least intends essentially to give

notice of this approval and of the class members' rights under

the settlement in the manner in which it gave notice of the

proposed settlement in a form approved by the court as

appropriate and reasonable.

The settlement doesn't involve an award of attorneys'

fees to counsel, who I'm told the private law firm Wilmer Hale

invested 11,000 hours in this case, and the Civil Liberties

Union's contribution must have been comparable.

There are no agreements required to be identified

under Rule 23(e)(3).

And I find the proposal treats all class members

equitably.  Two of the named plaintiffs, De Souza and Gao, will

get relief soon under the settlement agreement, but it's the

same relief that all of the class members will have available

to seek.  But there are good reasons for distinctive treatment.

Ms. De Souza's application for relief has been pending since

1    2022.  Mr. Gao similarly has been waiting a long time.  So

2    unless counsel think I've missed something, those are the

3    reasons I have approved the proposed settlement, and I'd like

4    to turn to the order in just a moment.

5            All right.  Actually, I gave you a draft order earlier

6    today.  So I have the motion to dismiss following final

7    settlement approval, docket 675, which I intend to just endorse

8    "allowed," but it will be implemented by the draft order I gave

9    you earlier today, which I see has some typographical errors,

03:13 10   which will be corrected.  But are there some comments or

11   concerns about the draft order?

12           MS. LUO:  One point we wanted to raise, Your Honor,

13   section or paragraph 4, the very last paragraph of the draft

14   order states, "Motions that are presumably open or pending will

15   be denied as moot."  There are a couple we agree that most are

16   likely to be denied as moot.  There are a couple that are

17   motions to seal.

18           THE COURT:  Which are those, please?

19           MS. LUO:  Our understanding is docket 391 and 565 are

03:13 20   motions to seal.

21           THE COURT:  Which?

22           MS. LUO:  565.

23           THE COURT:  565.

24           MS. LUO:  Correct.

25           THE COURT:  Just those two?

```
 1            MS. LUO:  Just those two, and then docket 312 was a
 2   notice of hearing on motion.  My guess is that perhaps docket
 3   313 was intended.  That is a motion to seal as well.
 4            THE COURT:  All right.  Well, we'll look at those and
 5   make any corrections.  Are there any other comments on the
 6   proposed order?
 7            MS. LARAKERS:  No, Your Honor.  I think the importance
 8   of maybe not denying those motions to seal is because that
 9   would presumably open --
03:14 10          THE COURT:  I'm going allow the motions to seal.
11            MS. LARAKERS:  All right.
12            THE COURT:  And I'll do that in a separate order.
13   That's very helpful.
14            MS. LARAKERS:  The only additional thing that I have,
15   to prevent Your Honor from having to issue another order, is I
16   did get confirmation about who is in charge at ICE Boston ERO
17   on the break.
18            THE COURT:  Go ahead.
19            MS. LARAKERS:  So Todd Lyons is still currently the
03:14 20   acting field office director, although he is --
21            THE COURT:  He's the --
22            MS. LARAKERS:  He's the field office director.  He's
23   currently on detail at headquarters.  Patricia Hyde, who is a
24   deputy field office director, is the acting field office
25   director at this time.  David Westling is an acting deputy
```

1    field office director.  And there is currently one vacant

2    deputy field office director position.

3            THE COURT:  Thank you.  That's helpful.  They've got a

4    lot of work to do.  Okay.

5            This should be the conclusion of a case that started

6    seven years ago.  And speaking to the attorneys, you're just

7    repeating what I think I've said.  You each and all have done a

8    very good job in serving your clients' interests and the public

9    interest.

03:16 10            If I remember correctly, Ms. Larakers just graduated

11    from law school when this case started, right?

12            MS. LARAKERS:  Yes, Your Honor.

13            THE COURT:  Now you've got a lot more experience.  And

14    you've been outnumbered but not overwhelmed.  And I would say

15    plaintiffs' counsel have acted in the highest and best

16    tradition of the legal profession.  You have clients who

17    epitomize the poor and the powerless who too often cannot be

18    heard in court, and you've extended an important and embattled

19    tradition in this country.  And the rule of law, the integrity

03:17 20    of the rule of law, the integrity of the effectiveness of the

21    adversary process, which is essential to promoting justice in

22    the courts, can't be taken for granted.

23            And as somebody who worked as a special assistant to

24    the Attorney General of the United States and Deputy Attorney

25    General of the United States, Deputy of the United States

 1    Attorney for Massachusetts, it's encouraging to know from Ms.

 2    Larakers and Ms. Piemonte and others on behalf of the

 3    government that there are lawyers who not only energetically

 4    represent the government but, even if you've never seen it, are

 5    acting in a manner that's consistent with what's etched in the

 6    rotunda of the entrance to the Attorney General's private

 7    office, a quote from the Supreme Court that, "The government

 8    wins when justice is done its citizens in the court."

 9         In the beginning, the Department of Homeland Security

03:19 10   I found was regularly violating the law and depriving

 11   powerless, generally powerless people of their rights,

 12   including their right to be with their children.  But I know

 13   Ms. Lafaille was careful and candid when she expressed that

 14   over time government counsel and their clients acted with great

 15   humanity, and it wasn't evident -- I'm not talking about

 16   counsel but from their clients -- wasn't evident at the outset

 17   of the case.  And it's a reminder that government attorneys are

 18   not just servants of their clients, but we rely on them to

 19   advise their clients persuasively that they have to obey the

03:20 20   law.

 21         And as I said, plaintiffs' counsel have performed in

 22   the highest tradition of the legal profession over hundreds of

 23   years.  Before he became Vice President of the United States,

 24   President of the United States, John Adams represented the

 25   despised defendants in the so-called Boston Massacre.  So the

1    tradition of representing people who may not be popular,

2    particularly not popular people who don't know them as

3    individual human beings, is longstanding and important in this

4    country.

5         I'm not sure I should say this, but today's proceeding

6    has another benefit.  It has a benefit for me.  Somebody else

7    will have to decide if it's a benefit to the administration of

8    justice.  But being a judge can sometimes be not only difficult

9    but disheartening, and you wonder whether industrious efforts,

03:21 10   which I've been making for almost 40 years, are meaningful.

11   But I'm being reminded today of something that I always strive

12   not to forget.  These are not just interesting legal issues,

13   important legal issues.  They're things that are profoundly

14   important to individual human beings and their families, and

15   this case has required a lot of arduous effort, although not by

16   me recently, but for several years, and it's encouraging to be

17   reminded that sometimes it can make a difference.

18         Is there anything further in this matter for today?

19         MS. LUO:  Nothing from petitioners.

03:22 20       MS. LARAKERS:  No, Your Honor.

21         THE COURT:  Court is in recess.

22         (Adjourned, 3:22 p.m.)

23

24

25

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3            I, Kelly Mortellite, Registered Professional

4    Reporter, Registered Merit Reporter and Certified Realtime

5    Reporter, in and for the United States District Court for the

6    District of Massachusetts, do hereby certify that the foregoing

7    transcript is a true and correct transcript of the

8    stenographically reported proceedings held in the

9    above-entitled matter to the best of my skill and ability.

10                        Dated this 21st day of January, 2025.

11

12                        /s/ Kelly Mortellite

13                        _____

14                        Kelly Mortellite, RPR, RMR, CRR

15                        Official Court Reporter

16

17

18

19

20

21

22

23

24

25