UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


                                  )
LILIAN PAHOLA CALDERON JIMENEZ,   )        Civil Action
and LUIS GORDILLO, et al.,        )        No. 18-10225-MLW
Individually and on behalf of     )
all others similarly situated,    )
     Plaintiffs-Petitioners,      )
                                  )
v.                                )
                                  )
KRISTI NOEM, et al.,              )
     Defendants-Respondents.      )



BEFORE THE HONORABLE MARK L. WOLF
UNITED STATES DISTRICT JUDGE


Scheduling Videoconference


August 6, 2025
1:48 p.m.



John J. Moakley United States Courthouse
Courtroom No. 17
One Courthouse Way
Boston, Massachusetts  02210




Kelly Mortellite, RPR, RMR, CRR
Official Court Reporter
One Courthouse Way, Room 3200
Boston, Massachusetts  02210
mortellite@gmail.com

```
 1    APPEARANCES:

 2    Counsel on behalf of Plaintiffs-Petitioners:

 3    Adriana Lafaille
      American Civil Liberties Union
 4    211 Congress Street
      Boston, MA 02110
 5    617-482-3170
      alafaille@aclum.org
 6
      Jonathan Cox
 7    Kevin Prussia
      Wilmer Hale LLP
 8    60 State Street
      Boston, MA 02109
 9    617-526-6313
      jonathan.cox@wilmerhale.com
10
      Kathleen M. Gillespie
11    Attorney at Law
      6 White Pine Lane
12    Lexington, MA 02421
      339-970-9283
13    kathleenmgillespieesq@gmail.com

14
      Counsel on behalf of Defendants-Respondents:
15
      Mary Larakers
16    U.S. Department of Justice, Office of Immigration Litigation
      District Court Section
17    P.O. Box 868
      Washington, DC 20044
18    202-353-4419
      mary.l.larakers@usdoj.gov
19
      Eve A. Piemonte
20    Mark Sauter
      U.S. Attorney's Office
21    1 Courthouse Way
      Suite 9200
22    Boston, MA 02210
      617-748-3100
23    eve.piemonte@usdoj.gov

24

25
```

```
 1                    P R O C E E D I N G S
 2          COURTROOM CLERK:  Persons granted remote access to the
 3    proceedings are reminded of the general prohibition against
 4    photographing, recording, rebroadcasting of court proceedings.
 5    Violation of these prohibitions may result in sanctions,
 6    including removal of court-issued media credentials, restricted
 7    entry to future hearings, denial of entry to future hearings
 8    and such other sanctions, including for contempt of court, as
 9    may be deemed necessary by the court.
10          Will you please mute your phone if you're not
11    speaking, and also, if you're just observing, please turn the
12    video off also.  Thank you.
13          THE COURT:  Good afternoon.  I apologize for the delay
14    in starting, but there's a lot to try to master quickly here,
15    and it took me a little longer than I anticipated.  Other than
16    the participants, others should take their pictures off in case
17    I go back to gallery view.
18          Would counsel please identify themselves for the court
19    and for the record.
20          COURTROOM CLERK:  Your Honor, can I call the case?
21          THE COURT:  I wish you would.
22          COURTROOM CLERK:  Your Honor, this is the civil matter
23    of 18-CV-10225, Calderon Jimenez v. Cronen, et al.
24          THE COURT:  Would counsel please identify themselves
25    for the record.
```

1          MR. COX:  Good afternoon, Your Honor.  This is

2     Jonathan Cox from Wilmer Hale on behalf of the petitioners.

3     With me in the room here we have Caitlin Luo, also from Wilmer

4     Hale, counsel of record.  Peter Merritt and Caitlin Galvin have

5     not entered appearances.  They're also from Wilmer Hale.  They

6     have pending motions for admission in the district waiting for

7     their swearing in ceremonies.  Kevin Prussia is also appearing

8     remotely on behalf of petitioners on a separate feed.  We have

9     also in the room with me Adriana Lafaille from the ACLU and

01:43 10     Kathleen Gillespie on behalf of petitioners.

11          Also appearing on the line, Your Honor, are Tim Caron

12     from Celedon Law who is the private immigration attorney for

13     Mr. Batista, the subject of the motion, as well as Vanessa

14     Firmino who is Mr. Batista's wife.

15          THE COURT:  Ms. Larakers just sent a message that she

16     can't unmute.  Have you solved that yet?  We did this virtually

17     because I thought you would probably be in Texas and this would

18     be efficient.  Can you say anything now?

19          MS. LARAKERS:  Yes, Your Honor.  The host has let me

01:44 20     unmute now.  I appreciate it, Your Honor.  Thank you.

21     Appearing on behalf of the government is me, Mary Larakers, and

22     my colleagues Eve Piemonte and Mark Sauter.

23          THE COURT:  Okay.  I ordered this scheduling

24     conference this Monday after the parties filed their joint

25     report on Friday after 5:00 but before 6:00, so it was timely

1       filed.  I'd like to recite what I understand to be essentially

2       the status of this case.

3              It started in 2018.  I'll ask you if this summary,

4       which is a broad overview of what I think is relevant for

5       today, to see whether it's accurate and then give you a chance,

6       each of you a chance to explain the specific events relating to

7       Mr. Batista leading up to this hearing.  And then I want to

8       address what I understand to be the disputed issues and perhaps

9       -- well, and some other questions I had.

01:46 10       Basically, this is a hearing in connection with

11      Mr. Batista's motion to enforce the class action settlement.

12      The members of the class are aliens, non-U.S. citizens who were

13      ordered removed at various times in the past but have become

14      married to U.S. citizens.  Some of them have U.S. citizen

15      children.  And there's a pathway within the Department of

16      Homeland Security regulations for them to attempt to stay in

17      the United States in order to keep families that include

18      American citizens intact.

19             I finally approved the proposed settlement agreement

01:47 20      of this case, which as I said started in 2018, on January 16,

21      2025.  The settlement agreement is docket number 654-1.  And in

22      approving the settlement I dismissed the case but retained

23      jurisdiction to enforce the settlement agreement.  In its most

24      pertinent part I think the settlement obligates the Department

25      of Homeland Security not to take enforcement action against a

1    class member, enforcement action, including detention or

2    removal from the United States, unless it determines in good

3    faith based on facts in the class member's case that he or she

4    poses a threat to public safety.

5    As I said, if there's no enforcement action, and

6    particularly, although maybe this needs to be clarified but I

7    don't think it's material for today, particularly if the

8    Department of Homeland Security joined a motion to vacate the

9    orders of removal, the order of removal.  But in any event, if

01:48  10   there's no enforcement action, the class member would be

11   allowed to stay in the United States with his family while

12   Citizenship and Immigration Services, the Department of

13   Homeland Security, decides whether to favorably adjudicate the

14   case and put the non-citizen on a path to stay here permanently

15   with his family.

16   Section 6 of the settlement agreement creates a

17   process for resolving any disputes.  The parties must try in

18   good faith to resolve their dispute without the court's

19   involvement.  If they fail, the class member can file a motion

01:49  20   to enforce the settlement agreement with regard to that

21   particular class member.  There can't be any class-wide relief.

22   As I understand it, at this point the court decides

23   only if Boston Immigration and Customs Enforcement, ICE, if

24   deputy field office director -- if a Boston ICE deputy field

25   office director decided to detain and/or remove the class

1    member because that deputy field office director found in good

2    faith that the person poses a threat to public safety.

3         On July 22, 2025, class counsel filed on behalf of

4    Mr. Batista a motion to enforce the settlement agreement,

5    that's docket 690, and a memorandum in support of it, docket

6    691.  On July 23, 2025, I ordered that Mr. Batista not be

7    removed from Massachusetts during the pendency of the motion,

8    and I issued a second order directing the parties to confer and

9    try to settle their dispute and, if they failed, propose a

01:51 10   schedule for litigating it.

11        I also directed them to identify the deputy field

12   office director or directors who made the decisions relating to

13   Mr. Batista's enforcement decisions and to identify who he or

14   she discussed those decisions with and also to identify other

15   potential witnesses.  That's docket 696.

16        On August 1, as I said, the parties filed a joint

17   report identifying certain disputed issues, and on August 4, I

18   also said, I ordered the scheduling conference to address those

19   issues.

01:52 20        Is that a fair brief summary of the relevant

21   chronology and pertinent parts of the settlement agreement?

22        MR. COX:  Yes, I believe it is, Your Honor.

23        MS. LARAKERS:  Yes, Your Honor.

24        THE COURT:  Thank you.  All right.  The chronology, at

25   least from Mr. Batista's perspective, is in the memorandum in

1    support of his motion to enforce settlement, docket number 691.

2         But Mr. Cox, would you like to let me know, remind me

3    what the relevant chronology is from your perspective, and then

4    I'll ask Ms. Larakers to supplement that if she wishes.

5         MR. COX:  Yes, Your Honor.  Mr. Batista's chronology

6    as relevant here goes back to 2016.  In February of 2016 he

7    arrived in the United States with his mother and sister from

8    Brazil, and there was a finding that -- well, on arriving in

9    the United States, they made a claim, they were given

01:54 10  humanitarian parole and entered the country.  And our

11   understanding is in the nine years after they were admitted

12   until his arrest in March of 2025, there was no further

13   interactions with ICE or Department of Homeland Security.  So

14   he had no order of removal as it was finalized until after he

15   was detained.

16        Our understanding is that in March of this year, as

17   part of what we understand to be a broader ICE sweep in the

18   greater Boston area -- and just to clarify, to go back a

19   moment, he was paroled, not admitted into the United States,

01:54 20  just to be crystal clear about that, in 2016.

21        Fast forward to March of this year, our understanding

22   is that as part of an ICE sweep in the greater Boston area, he

23   was arrested after taking his stepdaughter to school.  Again,

24   he had, as we understand it, no order of removal at that point.

25   He was in custody starting in March.  His wife, Ms. Firmino,

1    filed his I-130 petition or application on March 25, 2025.  And

2    in early April, ICE formally issued -- I guess he had an

3    appearance with respect to a credible fear interview.  It was

4    determined there was no such credible fear, and he was issued

5    an expedited order of removal.

6         THE COURT:  Let me see if I understand this.  That was

7    an asylum interview?

8         MR. COX:  Yes.

9         THE COURT:  What is a credible fear interview?

01:56 10       MR. COX:  Well, Your Honor, it's essentially an

11   opportunity for someone to establish that they have a credible

12   fear of persecution when they to return to their home country.

13        What makes this a little unusual or more than a little

14   unusual, Your Honor, is the fact that this was an expedited

15   order of removal nine years after his entry into the country.

16   Again, he didn't go through the normal process for an order of

17   removal.  This was I think a very strange procedural issue

18   where he was paroled into the United States.  As far as we can

19   tell, the position of the government is that he was in the

01:56 20   process of arriving for that entire nine-year period and then

21   only after he was arrested -- again he was arrested with no

22   final order of removal.  After he was arrested, the government

23   then obtained the expedited removal order and then is seeking

24   to remove him from the country, again, nine years after his

25   admission without the ordinary due process that an immigrant

1    would receive before removal.

2          THE COURT:  What's the ordinary due process?  You can

3    remind me.

4          MR. COX:  That would be an appearance in front of an

5    immigration judge.  In this instance, because he had been in

6    the country for so long -- Ms. Lafaille, I should clarify, is

7    the expert on expedited removal procedures, but I'll give a

8    capsule summary of how this operates.

9          The expedited order of removal is really supposed to

01:57 10  apply when someone is appearing at the border or port of entry

11    in the United States.  The expedited removal is essentially

12    where they turn them around and send them back out for

13    admission to the country.

14          Now, that can be stayed effectively if, for example,

15    someone is claiming asylum and is seeking to present evidence

16    of a credible fear, but that's all supposed to happen in a

17    relatively speedy way.  Alternatively, you could have an

18    expedited removal order.  I think the regulations provide for a

19    two-year window in which a determination can be made.  But the

01:58 20  upshot is it's supposed to be an expedited procedure, as the

21    name applies, not something that drags on for nine years as it

22    did in this instance, only after his arrest in March.

23          THE COURT:  Is there any pending challenge to his

24    order of removal?

25          MR. COX:  Well, I don't believe there is a separate

challenge, Your Honor, and I want to be -- I don't want to

speak on his behalf on this specific point because this is a

little bit -- it goes parallel to the pending motion in front

of Your Honor, but from my perspective sitting here, it is a

deeply strange situation and I think is legally very

problematic.  And I think, as relevant here, it corroborates

what is animating our motion for enforcement of the settlement

agreement, which is that ICE made a decision to remove him and

then after that decision has been sort of backfilling the

record to check the boxes, including by I think conducting an

inadequate review under the settlement agreement.

So he received his expedited order of removal in April

of 2025.  After he received that order, he became a class

member.  At that point the government notified petitioners of

his intended removal.  Just at the same time, though, his

private counsel, Mr. Caron, had filed a habeas petition again

before he actually became a class member based on the grounds

that he had been arrested in a warrantless way without an order

of removal and challenged the basis for his detention on those

grounds.  That was the habeas motion in front of Judge Casper.

While that motion was pending he became a class

member, and then as part of those habeas proceedings, the

government informed his counsel that he was going to be

transferred outside of Massachusetts for the purposes of

removal.  And then at that point we, as class counsel, became

1    involved to escalate this as part of the Calderon dispute

2    resolution process and the -- go ahead.

3              THE COURT:  When you say he became a class member this

4    year, why wasn't he always a class member after I certified the

5    class?

6              MR. COX:  Well, Your Honor, there were two things that

7    were missing in his case.  First, he didn't have a pending

8    I-130.  That was filed earlier this year.  And then the next

9    thing --

02:01 10              THE COURT:  Just to refresh my recollection and to try

11    to make this intelligible to everybody who wasn't here when we

12    started this case, you, Ms. Larakers, me and others, in 2018,

13    what's an I-130?

14              MR. COX:  A Form I-130 I believe is the formal name

15    for the petition for an alien relative.  It's a document that

16    seeks to establish a bona fide relationship between, in this

17    instance the immigrant and his U.S. citizen spouse,

18    Ms. Firmino.  And that is the first step in the provisional

19    waiver process that this litigation has been centered on.  And

02:02 20    the second --

21              THE COURT:  And then -- I'm sorry.  And then the next

22    step is you go to a Citizenship and Immigration Services office

23    and establish that your marriage is valid and not fraudulent?

24              MR. COX:  That's right.  And if Your Honor will

25    recall, that's what actually kicked off this litigation in

1   2018, is that there were arrests at those interviews at USCIS

2   offices.

3         So the I-130 was the first thing that was missing.

4   The second thing is the order of removal because he didn't have

5   a final order of removal until early April, after he had been

6   arrested when that expedited removal order was formally

7   entered.  So after his final order of removal, that completed

8   the checklist for his class membership.  We were then alerted

9   by the government, which is part of their reporting obligations

02:03 10   under the settlement.  At the same time there were habeas

11   proceedings in front of Judge Casper.

12         THE COURT:  I'm going to interrupt you with apologies

13   because in an ordinary era this would go without saying.  I'm

14   pleased to hear that the government, as required by the

15   settlement agreement, alerted you that there was a class

16   member, now a class member who was not previously.  It's just

17   what I expect but not take for granted.  Go ahead.

18         MR. COX:  Your Honor, I do agree with that.  I think

19   the reporting for the most part has gone very well, and we've

02:03 20   had cooperative dialogue with the government, not just about

21   Mr. Batista but about other class members.  And, you know, it's

22   unfortunate in this instance I think we've reached an impasse

23   that requires Your Honor's intervention.

24         THE COURT:  Okay.  Keep going.

25         MR. COX:  So after his final order of removal had been

1    entered, the expedited order, he became a class member.  At the

2    same time, though, he had this pending habeas challenge in

3    front of Judge Casper.  That's something that started before he

4    became a class member.  And as part of that habeas, the

5    government was obligated to report whether they were going to

6    move him outside of the Commonwealth for purposes of removal.

7    They did that in -- I want to make sure I have the correct date

8    here.  They did it on June 24 of this year.

9         And that intent to remove him came after Mr. Batista's

02:04 10    counsel, Mr. Caron, had submitted various materials to the

11    government in support of his release, things like letters of

12    support, other information about his role in the community, his

13    role in the family, and nevertheless the government informed

14    the court, Judge Casper, of its intent to transfer Mr. Batista

15    outside of Massachusetts for purposes of removal in late June.

16         At that point, Your Honor, we as class counsel became

17    more directly involved and were working under the dispute

18    resolution procedures of the settlement.

19         THE COURT:  Let me pause you here.  I issued an order

02:05 20    early in the case ordering that there not be removal without I

21    think five days' or two days' notice.  They revised your

22    proposed order regarding removal, the one that was filed I

23    think July 22, because in a habeas case the District of

24    Massachusetts would lose jurisdiction if the individual was

25    moved out of the country.  But this is not a habeas case.  I've

1    retained jurisdiction to enforce the settlement agreement.  So

2    I don't know where in Massachusetts Mr. Batista is now, but if

3    he had been moved out of Massachusetts, that would not have

4    deprived me of jurisdiction in this case.  Right?

5         MR. COX:  That's right, Your Honor.  My understanding,

6    however, is that he's still being held in Massachusetts at the

7    Plymouth detention facility.  So I think we're okay no matter

8    which standard applies, but I agree with you that even moving

9    him outside of Massachusetts wouldn't deprive Your Honor of

02:07 10   jurisdiction.

11         THE COURT:  Do you know whether he's received the bail

12   reviews that I've ordered in this case, that I found were

13   required in this case?

14         MR. COX:  I'm glad you brought that up, Your Honor,

15   because he has not.  The government's position -- I'll let Ms.

16   Larakers speak to this at the appropriate time.  The

17   government's position is that because his detention is

18   happening under the statute for the expedited order of removal,

19   it is not required to go through the Post-Order Custody Review

02:07 20   procedures that Your Honor encountered earlier in the case.

21   That's the 90-day review after the final order has been entered

22   to determine whether an individual's continued detention is

23   still appropriate.

24         So the government's position, as we understand it, is

25   that because of the procedural posture, because of his

1  expedited order of removal nine years after his parole into the

2  country, he doesn't get the Post-Order Custody Review.

3       MS. LARAKERS:  Your Honor, if I may, because I don't

4  want to -- I know we've had issues with the POCR regulations in

5  the past, and I want to ensure Your Honor that I still take

6  those very seriously.  ICE has made a conscious decision in

7  this case, completely conscious decision in this case not to

8  give Mr. Batista a Post-Order Custody Review.

9       That is because, as Jonathan just stated, the

02:08 10  Post-Order Custody Review process as defined in 8 C.F.R. 241.4

11  refers to detention under the detention statute located in 8

12  U.S.C. 1231.  That is the detention statute for all of the

13  class members that you have seen thus far.

14       Until today Mr. Batista is detained under a completely

15  different detention statute.  That is 8 U.S.C. 1225, and that

16  does not have a corresponding system or procedure for providing

17  Post-Order Custody Review or review of his detention status.

18       So it's a conscious decision.  The government believes

19  that it is entirely defensible.  And interestingly, if he

02:09 20  didn't have this order of removal, then he wouldn't be a class

21  member, so we wouldn't be here at all.  But I just wanted to

22  quickly clarify that because ICE has made that conscious

23  decision and still takes the court's order regarding the

24  Post-Order Custody Review procedure seriously and will continue

25  to do so with regard to class members in the future who are

```
 1   detained under 8 U.S. 1231.
 2              MR. COX:  Your Honor, this is --
 3              THE COURT:  Go ahead.
 4              MR. COX:  This is an issue that I think was just
 5   brought to our attention this morning regarding this difference
 6   in views on the Post-Order Custody Review.  As we understand
 7   what the government is saying, well, Section 241.4, that's the
 8   detention, the POCR provision applies to an alien ordered
 9   removed who is inadmissible under Section 212 of the
10   Immigration and Naturalization Act.
11              Now, Mr. Batista certainly is an alien as ordered
12   removed and is inadmissible under Section 212.  In fact he had
13   to be inadmissible under Section 212 to be eligible for
14   expedited removal.  And the government implemented the POCR
15   regulations to avoid the I think obvious constitutional
16   concerns about holding someone in detention indefinitely
17   without procedural due process.
18              THE COURT:  Sorry.  Say that again, please.
19              MR. COX:  Well, the POCR regulations were implemented
20   to avoid the I think obvious constitutional worries that you
21   would have about holding someone in detention indefinitely
22   without some opportunity to be heard on whether that detention
23   is necessary or appropriate.  But even though he is an alien
24   ordered removed and inadmissible under Section 212 and even
25   though there are those constitutional concerns, we understand
```

1    the government's position to be that if there's an individual

2    whose detention is mandatory under the expedited removal

3    statute, then they don't get any Post-Order Custody Review at

4    all because that's not explicitly provided for in the enabling

5    statute or the removal regulation.

6         So this is an area where it sounds to us like the

7    government is saying that someone who was paroled into the

8    United States nine years ago and did not receive a final order

9    of removal until earlier this year can be held in detention

02:12 10   without any kind of procedural due process as part of that

11   detention, which seems to us incorrect.

12        THE COURT:  That's why I asked about the detention,

13   but if his detention is going to be challenged, it may, it

14   probably needs to be in another case because this case has been

15   dismissed, except I have jurisdiction in matters relating to

16   enforcement of the settlement.

17        MR. COX:  Your Honor, his detention was initially

18   challenged as part of that separate habeas proceeding before

19   the final order of removal, before he became a class member.

02:13 20   And, you know, just given the way that this has unfolded over

21   the last couple of months, from our perspective the way to tee

22   this up was to present it to Your Honor as part of the dispute

23   resolution process.  And the authority that you retain as

24   specified in Section 6 of the settlement agreement includes the

25   authority to release class members whose enforcement actions

1    don't comply with the requirements of Section 3.  So that's

2    exactly why we've presented it to you this way.

3            THE COURT:  Okay.  But I'd have to make a decision

4    that the decisions to detain and remove were not made in good

5    faith.  Right?

6            MR. COX:  That's right.  That's the crux of the issue.

7            THE COURT:  Okay.  Actually, you're telling me more

8    than I understood from the memo in support of the motion, but

9    some of this I think has recently emerged or evolved.  So keep

02:14 10   going and then I'll hear from Ms. Larakers.

11           MR. COX:  So after we started the dispute resolution

12   process in late June, we made sure that Ms. Larakers and the

13   government representatives in this case had access to the full

14   record, you know, his letters of support, the other materials

15   that were prepared in connection with his detention by

16   Mr. Caron and the government.

17           THE COURT:  By who?

18           MR. COX:  Mr. Caron, his private immigration counsel.

19           THE COURT:  Okay.  Go ahead.

02:15 20   MR. COX:  So we ensured that the government had all

21   those materials, and on June 30 and July 7, the government

22   reported to us that the ICE district field office director

23   level officer had again decided to remove Mr. Batista after

24   considering those materials.  They informed us that they would

25   remove him no sooner than July 15.

1          I want to speak very briefly, Your Honor, about

2    another class member who presented similar issues in the same

3    time period.  This is Mr. Nguyen.  We referred to him in the

4    briefing.  I think there was some of the email exchanges we had

5    about him.  But this is another class member who had a

6    conviction in Pennsylvania about 12 years ago for possession

7    with intent to distribute marijuana.  He was sentenced to

8    parole.  He completed that parole, had no run-ins with the law

9    after that -- sorry, excuse me.  He was sentenced to probation

02:16 10   and had no run-ins with the law after that period until he was

11   arrested by ICE in April.

12          So on parallel tracks we were working with the

13   government on dispute resolution for both Mr. Batista and

14   Mr. Nguyen.  And so on July 15, we informed the government that

15   we were going to be moving to enforce the settlement agreement

16   with respect to both Mr. Batista and Mr. Nguyen.  The

17   government asked for a few extra days to go back to ICE, have

18   them take another look at the materials and see whether it was

19   going to continue with the detention and removal of those

02:17 20   individuals.  And on Friday, July 18, they told us they would

21   be releasing Mr. Nguyen but still intended to remove

22   Mr. Batista.  And then -- go ahead.

23          THE COURT:  No.  You go ahead, keep going.  Well, you

24   saw I was poised to say something to you.

25          I saw in your memo that they had released Mr. Nguyen.

1    Have they abandoned the intent or effort to remove him?

2    MR. COX:  Well, Your Honor, the broader question might

3    be better directed to Ms. Larakers, but if they do intend to

4    remove him, they are required to give us a renewed notice under

5    the settlement agreement of their intent to do so.  We have not

6    heard any indication that they are planning to do so.  We

7    certainly hope they aren't, but I defer to Ms. Larakers if

8    there have been any developments with respect to Mr. Nguyen.

9    THE COURT:  She can do this later, and I know this is

02:18 10   one of the disputed discovery issues as to whether you want to

11   get more information relating to Mr. Nguyen and then present

12   what you want to present to me.  At the moment, I'm not

13   inclined to get into that.  Go ahead.

14   MR. COX:  Well, I'm close to the end of the story,

15   Your Honor.  They informed us on July 18 that they would not be

16   releasing Mr. Batista and that they would be proceeding with

17   his removal within the next, I think they told us within the

18   next week, and that's the reason we ended up filing the motion

19   before Your Honor on the 22nd.

02:19 20   So that I think is a fair chronology.  It is a

21   convoluted chronology because there are a lot of things

22   happening in parallel and a lot of things that, even after all

23   the twists and turns of this case still strike us as very

24   unusual.  But I hope that's given Your Honor a sense of where

25   we are.

1          THE COURT:  No.  It's good.  It really amplifies what
2     I understood from reading the materials.

3          Ms. Larakers, what if anything would you like to say
4     to supplement that and try to get me up to speed?

5          MS. LARAKERS:  Sure.  Thank you, Your Honor.

6          So the way Your Honor has defined the scope of its
7     review here under the settlement agreement we absolutely agree
8     with as an initial matter.

9          As far as the chronology of Mr. Batista's case here,
02:20 10    it's a little interesting.  This case begins with him receiving
11    a final order of removal in March 2025, this year.  Petitioners
12    have raised several issues that they believe to be present with
13    regard to that final order of removal.  But if they were to
14    bring those issues before a different court and ultimately
15    prevail, he wouldn't be a class member because he wouldn't have
16    a final order of removal.

17         So really we just need to skip forward.  He has a
18    final order of removal.  He's a class member, he becomes a
19    class member in March 2025 as a result of his final order of
02:20 20    removal and because he filed, his wife filed a Form I-130
21    petition on his behalf after he was detained.

22         So in April 2025 -- well, in March 2025, after he
23    becomes a class member, ICE promptly informs petitioner's
24    counsel that he has become a class member and that he is
25    detained.  Then in April 2025, shortly thereafter, ICE makes

1    the decision to remove Mr. Batista and promptly notifies

2    petitioner's counsel of their decision to remove Mr. Batista.

3         THE COURT:  This case doesn't fit the paradigm

4    anticipated by the settlement agreement because he wasn't a

5    class member at the time he was detained by ICE, but if he had

6    been a class member previously, then he couldn't, as I

7    understand it under the agreement, Section 3A, have been

8    detained unless there was a decision that he was a threat to

9    public safety.  Is that right?

02:22 10         MS. LARAKERS:  That's right, Your Honor.  And I think

11    the settlement agreement -- the parties knew that this could be

12    a possibility, someone becoming a class member after being in

13    custody, and the settlement agreement encompasses that idea.

14    And ICE has trained officers to identify people as class

15    members even after they come into detention.  Mr. Batista was

16    timely identified as a class member.  We timely notified

17    plaintiffs' counsel of his class membership and that we

18    intended to continue to detain him.  Then ICE made the decision

19    to remove Mr. Batista based on their determination that he is a

02:23 20    public safety risk.  ICE, under the agreement, pursuant to the

21    agreement, provided the brief explanation referred to in the

22    agreement of their reasons to remove Mr. Batista, and that

23    included some significant criminal history.

24         THE COURT:  Well, you said "significant criminal

25    history."  If it's one of the exhibits, I haven't read it yet,

1    I confess.

2         MS. LARAKERS:  I can briefly go through it, Your

3    Honor.  There was, at the time in April 2025, there was a

4    conviction from 2019 of possession with an intent to distribute

5    a Class A narcotic, to wit oxycodone.  The police report states

6    that there were 50 to 60 pills found in Mr. Batista's vehicle.

7    Then in October 2020, again, at the time the information ICE

8    had was that he was arraigned on a domestic violence offense.

9    Then the last thing --

02:24 10         THE COURT:  Was he convicted of that offense?

11         MS. LARAKERS:  No.  The charges were dismissed.  And

12    again, that's the information that ICE had before it at the

13    time.  ICE did not have the benefit of the police report at the

14    time.  Then in August of 2022, there was a police report, there

15    was an arrest for driving with a license suspended, and the

16    police report indicates there was some erratic driving.  So

17    that encompassed his criminal history at the time in April

18    2025.

19         THE COURT:  When was the erratic driving matter?

02:24 20         MS. LARAKERS:  That was in August of 2022.  So at this

21    time in April 2025, Mr. Batista had not submitted any materials

22    in support of his release.

23         Two months later, in June 2025, late June 2025,

24    petitioners' counsel got involved with Mr. Batista's case.

25    Petitioners' counsel notified respondents' counsel that

1  Mr. Batista has submitted information that petitioners would

2  like to be considered in support of his release.  The reason

3  why ICE -- ICE had not previously identified that he had

4  submitted those materials in support of his release.  Other ICE

5  officers had considered it.  But because the way it was

6  submitted was not through respondents' counsel and because it

7  wasn't brought to respondents' counsel's attention and because

8  it was submitted through the stay of removal request and

9  submitted directly to ICE, those materials weren't put together

02:25 10  with the DFOD's consideration.  So the parties were able to

11  work that out.  Petitioners' counsel brought it to respondents'

12  counsel's attention.  We promptly got that information over to

13  ICE, and ICE absolutely agreed to consider that information.

14      So at the end of June, ICE considers all the

15  information that Mr. Batista has submitted in support of his

16  release in addition to his criminal history and determines that

17  he is a public safety risk at the end of June.

18      THE COURT:  It was --

19      MS. LARAKERS:  Then plaintiffs filed their -- sorry.

02:26 20      THE COURT:  -- ICE had earlier detained him Mr. Cox

21  said while taking his stepdaughter to school and achieved an

22  order allowing his expedited removal and detained him.  He was

23  already detained.  Okay.

24      MS. LARAKERS:  So obviously ICE, it would have been

25  great if ICE had had the information before earlier, but

1    nonetheless we ended up in June with ICE having considered all

2    the documents that he had submitted in support of his release,

3    the DFOD level officer considering all the information.

4             THE COURT:  That person's name was what?

5             MS. LARAKERS:  The person who made the decision in

6    June to remove Mr. Batista, his name is John Charpentier and he

7    is the deputy field office director for ICE Boston.

8             So that brings us to petitioners' motion to enforce.

9    Petitioners file their motion to enforce --

02:27 10             THE COURT:  Let me just -- was there a decision made

11    -- maybe it wasn't part of this process, but was a decision

12    made to detain in April of 2025?

13             MS. LARAKERS:  Yes, Your Honor.  After he received his

14    final order of removal and ICE determined that he was a class

15    member, DFOD Charpentier decided to continue his detention and

16    made that same finding, that he was a public safety risk, and

17    then the decision in -- the initial decision to remove

18    Mr. Batista that did not have the benefit of the information

19    that he submitted in support of his release because that wasn't

02:28 20    submitted to ICE until after, in April 2025, that decision was

21    made by Keith Chan who was an assistant field office director

22    but he was acting as the deputy field office director at the

23    time.

24             THE COURT:  Wait a minute.  This was in April?

25             MS. LARAKERS:  Yes.

1          THE COURT:  I thought you said Mr. Charpentier made

2     the decision --

3          MS. LARAKERS:  So we have a couple of decisions to

4     remove, Your Honor.  We have the initial decision to remove him

5     in April wherein ICE did not consider the materials submitted

6     in support of his release because they had not yet been

7     submitted.  That decision was made by Keith Chan.

8          Then we have a decision that did have the benefit of

9     the materials submitted in support of Mr. Batista's release.

02:29 10   That decision was made at the end of June by DFOD Charpentier.

11    Then petitioners file their motion to enforce and all the

12    arguments therein.

13         Subsequent to that, Your Honor, ICE was able to obtain

14    the police report that is connected to his October 2020

15    domestic violence arrest.  Now, ideally, Your Honor, ICE

16    recognizes that they would have gotten that police report

17    earlier and considered that police report earlier.  The reason

18    why they didn't is simply just because for domestic -- as I

19    understand, for domestic violence police records, you have to

02:30 20   send someone down to the actual police precinct to get that

21    record.  It can't be done electronically, so it was just a

22    little bit more difficult to get that record.  ICE ultimately

23    was able to get that record.  They did not get that record

24    until after petitioners filed their motion to enforce.

25         So after ICE was able to consider that information in

addition to all the information I previously talked about, ICE

issued another decision just a couple of days ago, another

explanation that discusses that police report that's connected

to that 2020 domestic violence arrest, in addition to all the

other information, including Mr. Batista's documents he

submitted in support of his release.  I believe petitioners'

position is that that decision isn't before the court because

the information was obtained after they filed their motion to

enforce.  Respondents' position is the opposite, that the

decision that this court should really be reviewing here is the

last decision, which is the August decision that includes that

October 2020 police report.

THE COURT:  On that decision --

MS. LARAKERS:  I'm sorry.

THE COURT:  I think this is the first time I heard of

that decision.

MS. LARAKERS:  The respondents referenced it in our

joint status report, and the petitioners stated that they don't

believe that determination was made properly under the

settlement agreement, but it was only a couple of lines on each

side, Your Honor.

But regardless, respondents' position here is that

regardless of whether this court considers the August decision,

which includes that October 2020 police report, or considers

the determination made at the end of June, respondents have

1   acted in good faith here and made the determination in good

2   faith here and have complied with the settlement agreement.

3          THE COURT:  But there's another element in the test.

4   It has to be made in good faith and based on the facts of the

5   non-citizen class member's case, right?

6          MS. LARAKERS:  Yes, Your Honor.

7          THE COURT:  So if there was some general policy that

8   wasn't particular to Mr. Batista's case, in your view, could

9   that have properly been considered?

02:32 10       MS. LARAKERS:  Your Honor, I think the answer to that

11   is it would depend on what that policy was.

12         THE COURT:  Let me -- go ahead, finish, then I'll make

13   it more concrete.

14         MS. LARAKERS:  Sure.  That would depend on what that

15   policy was.  I would assume that petitioners would say any sort

16   of policy with any of those words in it would be violative of

17   the settlement agreement.  It obviously would depend on what

18   the policy was.

19         THE COURT:  Well, let's say the policy was that we're

02:33 20   not arresting, detaining and removing enough people.  We're not

21   finding enough serious criminals, which this case educated me

22   to understand was the priority going back to 2018, to go for

23   the serious criminals.  But now let's say there was direction

24   to maximize the number of people who can be removed because

25   we're not removing enough people.  Could that be considered in

1    your view?

2         MS. LARAKERS:  Could the fact that the policy exists

3    be considered?

4         THE COURT:  If that's something that one of the deputy

5    field office directors considered.  We're under an instruction

6    and encouraged to remove as many people as possible.  And

7    therefore, they have somebody with a criminal record, this can

8    help us meet that direction, quota perhaps.  You're going to

9    get a chance to reflect on this because it's a question that

02:35 10   occurred to me in going through this.  It depends on what's in

11   the record, but I think that's something that would be

12   discoverable.  That's relevant, in my present conception.

13   You'll get a chance to brief it.

14         But this is an agreement that was reached last year

15   and approved in January, finally approved.  And I have

16   understood that the focus was to be on when the facts of the

17   non-citizen class member's case persuaded the deputy field

18   office director to decide in good faith that this person posed

19   a threat to public safety.  Essentially, it seems to me it

02:36 20   should have been the same decision that would have been made a

21   year ago on the same facts.

22         MS. LARAKERS:  So Your Honor, I think the answer to

23   your question is, if that factor was considered at all, which,

24   here it wasn't, but if that factor was considered at all, I

25   think it would depend, I think it would come down to the way

1    the DFOD articulates the way that factor was considered and how

2    he nonetheless complied with the settlement agreement if that

3    factor was considered.

4         It's my understanding and the opposition we intend to

5    write would reflect there's no rule of thumb, there's no

6    policy, there's no guidance that is overarching this case being

7    applied to this settlement.  This settlement agreement is being

8    applied to the Calderon class members and only the settlement

9    agreement.

02:37 10        Now, if ICE comes into contact with more criminal

11   aliens as a result of other efforts that it's making, that's

12   possible.  But at bottom, ICE is complying with the terms of

13   the settlement agreement, and it's the terms of this settlement

14   agreement that are driving ICE's decisions with regard to class

15   members.  And our opposition will explain that the allegations

16   of bad faith with regard to an overarching policy or guidance

17   or rule of thumb that those don't exist and that the DFOD

18   specifically here made a determination in good faith based on

19   all the facts in Mr. Batista's case that he's a public safety

02:38 20   risk.  And frankly, Your Honor --

21        THE COURT:  The -- well, keep going.

22        MS. LARAKERS:  It's not surprising that the parties

23   disagree in this case.  But ultimately that's what the

24   government believes we have here, is we have a disagreement.

25   But the fact that reasonable minds may disagree over whether

1    Mr. Batista is a public safety risk isn't the standard, and

2    respondents intend to submit a substantial opposition with a

3    substantial declaration from DFOD Charpentier explaining all

4    the facts that he considered, explaining that there is no rule

5    of thumb, and explaining that he determined that Mr. Batista in

6    good faith and based on the facts in this case presents a

7    safety risk.  And respondents would only ask that the court

8    wait to see that opposition before we go down the road of what

9    additional information may be needed to resolve this dispute.

02:38 10           THE COURT:  Well -- go ahead.

11           MS. LARAKERS:  And the reason for that is because we

12    believe what the settlement agreement has set up here is

13    essentially review on an administrative record.  The

14    administrative record in this case is defined by the settlement

15    agreement, the facts in the class member's case, and the

16    standard of review for this court, as this court has already

17    stated is --

18           THE COURT:  But there's two things, and I was going to

19    get to this in a minute but we never finished with this

02:39 20    section.  I'm going to set a hearing date.  When I get your

21    submission, I can decide it's not necessary.  But it's also my

22    present intention that you get to work on this.  That's why I

23    wanted to have this hearing so promptly.  It's relevant whether

24    there were quotas established or directions to increase the

25    number of people being detained and removed because the numbers

1   that were anticipated, promised, weren't being generated,

2   weren't resulting.

3        And the reason I think a hearing is likely to be

4   necessary, I can't make a decision until I have all the

5   information as to whether to go ahead with it.  Essentially

6   it's a credibility judgment.  Was it in good faith?  And in

7   those communications -- we'll get to this, too, but as Judge

8   Silberman wrote for the District of Columbia Circuit -- my

9   former boss when he was the Deputy Attorney General -- that

02:40 10  when the official's actions and the reasons for the actions are

11  at issue, then the deliberative process privilege doesn't

12  apply.  And if it's a general policy anyway, it wouldn't --

13  I'll tell you the cases, it's consistent with a First Circuit

14  case.

15       So the declaration, affidavit, there will probably be

16  multiple, of Mr. Chan as well as Mr. Charpentier, and any

17  document discovery, we'll get to that.  I think that's going to

18  need to include that.  What are the general directions, and was

19  there some direction of pressure to step up the number of

02:42 20  people being detained and removed.

21       MS. LARAKERS:  Your Honor, I think if we're talking

22  about legal principles here that may, by analogy, apply to the

23  settlement agreement, I think we also need to look at the

24  standard for expanding the administrative record, which I think

25  here is properly defined as the facts in Mr. Batista's case.

1    Your Honor identifies --

2         THE COURT:  Usually, and you haven't pulled my

3    decisions on this, but if a court's reviewing an administrative

4    record to determine whether a decision was arbitrary and

5    capricious, which is analogous, it's not the same question but

6    it's analogous, I believe that a decision is arbitrary and

7    capricious if it's influenced by something that's not in the

8    administrative record.  You do this more than I do it.

9         MS. LARAKERS:  Well, yes, Your Honor.  And that goes

02:43 10   to whether -- again, it goes to our opposition in which we will

11   explain that there is no overarching principle, no guidance, no

12   rule of thumb.  And once that has been stated on behalf of the

13   government, and petitioners' standard that they have to meet in

14   order to get discovery once the government has said that there

15   is no policy that isn't influencing their decisions, the

16   standard they have to meet is a strong showing of bad faith to

17   expand that administrative record, a strong showing.

18        And I believe once Your Honor reviews our opposition,

19   it is our hope that Your Honor will find that that strong

02:43 20   showing of bad faith to expand the administrative record to

21   conduct hearings, it does not -- has not been properly made.

22   And the reason why that standard exists is an important one

23   because we can't be in this court every couple of months based

24   on mere allegations that have no backbone to them that they

25   considered something they're not supposed to consider.

```
 1              THE COURT:  Well, I'll tell you something else I'm
 2    going to do, with regard to these affidavits, I'm going to do
 3    what the law requires anyway.  I'm going to order, in my
 4    present conception, that any affidavits be accurate, complete
 5    and truthful; and if for some reason it turns out that they
 6    weren't, that can be dealt with as a matter civil or criminal
 7    contempt under the Federal Rule of Criminal Procedure 42.  It
 8    doesn't require prosecution by the Justice Department.  And I'm
 9    going to require that any affidavit on behalf of Mr. Batista
02:45 10    have the same certifications, and I'm going to remind you that
11    under Rule 11, any time you submit anything, it has to be after
12    a reasonable inquiry concerning the truthfulness of it, because
13    you're going to be filing it.
14              And I say, this as a sort of prophylactic observation
15    to both of you, to you, that it's really, as always, crucial
16    that the information that gets submitted be accurate, complete
17    and truthful.  So the petitioner may be able to come in with
18    newspaper articles quoting some significant official saying,
19    "We've given them a quota urging them to step up the removals,"
02:46 20    and that's one of the facts of Mr. Batista's case.
21              I'm just getting into this.  I've been doing a lot of
22    other things.  I haven't done anything in this case since
23    January and nothing in this case for years before that, except
24    give you more time to talk.
25              MS. LARAKERS:  Your Honor, the government understands
```

1    the context in which this dispute is occurring, and it's always

2    been our intention to address that in the opposition.  And

3    certainly, Your Honor, if Your Honor has additional requests or

4    additional questions that ICE can answer, both DOJ, ICE, we

5    will all do our part to get those answers to the court and to

6    ensure that those answers are truthful.

7         And to the extent that this court is going to order

8    some specific items be included in the declaration, we would

9    just ask that we be given a sufficient amount of time to do

02:47 10   that that, if only so that DOJ can have the appropriate

11   conversations with ICE.  And I will just highlight that it can

12   be difficult right now to have those conversations in a short

13   period of time, and I think that was reflected in the other

14   class member's case that they mentioned, when there's a lot of

15   cases going on, there are a lot of priorities that are

16   constantly shifting for both DOJ and for ICE.  And so we just

17   ask that we have the time necessary to prepare those

18   declarations and to ensure the truthfulness of the allegations

19   that we're making, the representations we're making to this

02:48 20   court.

21         THE COURT:  I think this is getting a little ahead,

22   but this is good.  These are all things I intended to go over

23   essentially next because the joint report says the parties are

24   available on August 19 and then not again until the afternoon

25   of September 3.  I'm prepared to have a hearing -- well, I'm

```
 1    willing to have a hearing on the 19th, but I don't know if
 2    that's enough time for you all to properly prepare and for me
 3    to do it, but I'm also concerned that Mr. Batista is detained,
 4    and he's been detained without any bail hearing, apparently,
 5    I'm told.  And I think I held this back in 2018, that's a form
 6    of irreparable harm if it turns out the detention is not
 7    justified factually, legally.  So, you know, that's a dilemma.
 8              MS. LARAKERS:  August 22, Your Honor, we had proposed
 9    August 22 if this court were going to order more information.
02:49 10   I think that's a reasonable timeframe that would allow us to
11    have a fulsome hearing, if necessary, on September 3.
12              THE COURT:  You said the afternoon of September 3.  I
13    have some staffing issues and other issues.  I'm not sure this
14    hearing is going to be a one-hour hearing or two-hour hearing.
15              MS. LARAKERS:  Your Honor, respondents' counsel, we're
16    generally available.  And by "respondents' counsel," I mean me
17    personally, Your Honor, is available generally.  But I think
18    the only date we put in the status report that DFOD Charpentier
19    is not available is the 12th.  I think we would need to go back
02:50 20   and ensure that of Mr. Chan's schedule as well --
21              THE COURT:  The 12th of what month?
22              MS. LARAKERS:  September.  That's the only date --
23              THE COURT:  I'm thinking about having this hearing in
24    August.  If you all have vacations planned or something, I'd
25    rather not disrupt them, but, you know, what's at stake here,
```

1    essentially the allegation is that Mr. Batista is being

2    improperly detained.

3         MS. LARAKERS:  Your Honor, I would ask then at least a

4    week, if not the 22nd.  If Your Honor can't give us until the

5    22nd because it wants to have the hearing in August, we would

6    at least ask the week so we can shift some priorities around.

7         THE COURT:  No, and this is the corollary of my saying

8    that under Rule 11 you have to make a reasonable inquiry as to

9    the reliability of what you're submitting from your clients.

02:51 10   So I do want you to have sufficient time, but I was going to

11   ask -- now I'm asking, you know, what's the -- why was it

12   suggested that we go from August 19, if that's the date, yes,

13   19th, to September 3?  Maybe it's vacation.

14        Some of this pressure would be alleviated if there was

15   an appropriate basis for it.  My countervailing concerns would

16   be diminished if ICE decided to grant release to Mr. Batista on

17   certain conditions, a bracelet.

18        MS. LARAKERS:  Your Honor, I don't think that's going

19   to happen.  I can certainly ask ICE.  I don't think that's

02:52 20   going to happen.  And I think the preference for ICE would be

21   to have a hearing promptly over releasing Mr. Batista, but I

22   can certainly go back to them and ask.

23        THE COURT:  I mean, this is the countervailing

24   tension.  I don't issue orders I don't intend to enforce.  If I

25   don't think it's possible for you to do what's in the order,

 1   then I won't issue the order.  And this doesn't fit well with

 2   my schedule, but I'm just concerned that Mr. Batista's been

 3   detained.  And again, this doesn't fit the classic paradigm as

 4   I understood it.  I thought, you know, it would be a situation

 5   where somebody was known to be a class member -- there's an

 6   enforcement -- there's no enforcement action because they know

 7   they're a class member, then there was a deliberate decision

 8   based on all the information on the particular date, there was

 9   the decision this person is a threat to public safety.  Yes, we

02:54 10  can arrest him; yes, we can detain him; yes, we can remove him.

 11  And then we would talk if there was a disagreement about

 12  whether that was a good faith decision.

 13        All of this -- somebody might be detained for a month

 14  or six weeks, not six or eight months.  I think that's the

 15  paradigm.  It doesn't mean Mr. Batista is not properly a member

 16  of the case, that ICE had the authority to do what it did when

 17  he was not a class member.  It seems to be what I hope to be an

 18  unusual maybe ideally a unique case.

 19        MS. LARAKERS:  Your Honor, frankly I think we have

02:55 20  seen people, frequently, people become class members after

 21  being in detention, but that's why the settlement agreement

 22  encompasses that and why ICE trains their officers to promptly

 23  identify people and how to identify people as class members so

 24  we can promptly make decisions under the settlement agreement.

 25        THE COURT:  Mr. Cox, do you want to say anything to

1    respond to this colloquy I've been having with Ms. Larakers?

2         MR. COX:  Just on the scheduling point, I think Your

3    Honor's suggestion about release until September I think

4    candidly would be preferable from our perspective.  And we're

5    happy to have a substantive hearing on the merits.  Just to

6    flag, in terms of our team's availability, Mr. Prussia is

7    unavailable from the 23rd and onwards through Labor Day.  And

8    again, I think release pending the hearing makes a lot of sense

9    here.  And I do want to circle back to -- well, if there's

02:56 10    anything further on the schedule, I can address that now, but I

11    did want to respond substantively --

12         THE COURT:  Well, on the scheduling, I don't have the

13    authority to order Mr. Batista to be released, and Ms. Larakers

14    is skeptical about whether ICE will exercise its discretion to

15    do that.  So let's assume his detention is continuing.  And,

16    you know, I know this is a difficult time of year, people have

17    plans.  Are you available later in August?

18         MR. COX:  I am, Your Honor.

19         THE COURT:  Okay.  Because I'm sure Mr. Prussia can

02:57 20    speak to you in advance, and we can allow remote access to any

21    hearing, et cetera.

22         MS. LARAKERS:  Your Honor, quickly, I did remember, I

23    have a short trip planned over Labor Day weekend, and I'm

24    realizing that, since I have to travel so far to get anywhere I

25    need to go, staying away from the Labor Day weekend is probably

1    best for a lot of our schedules, that sort of extended period

2    of like Thursday to Tuesday is probably best.  But I can make

3    my travel plans work.  I'll be on the east coast during that

4    weekend anyway.

5         THE COURT:  Well, I have plans for that period, too,

6    but as I say you, somebody is detained.  And you hope to be on

7    the east coast that weekend.  My only advice to you is get a

8    direct flight.  (Technical difficulty) somebody I just called

9    who was flying here from Indiana on a Sunday and didn't arrive

02:58 10   here until Tuesday night after seeing airports in several other

11   states.  Anyway, go ahead, Mr. Cox.

12        MR. COX:  Well, on the schedule, I mean, I think we

13   recognize that every day of his detention is I think

14   unfortunate and is not warranted.  I think on the schedule we

15   can have it -- we have overlapping periods of unavailability

16   for our team, but we can make it work at the court's

17   convenience and what works for an expeditious briefing by the

18   government.  I will say that we are available from the 18th

19   through the 21st.  Appreciating Ms. Larakers's point about the

02:59 20   time it takes to get things, we think that this is something

21   that we can just handle slightly earlier in the month, it

22   sounds like, other than Ms. Larakers' concerns about --

23        THE COURT:  Hold on just a minute.  Say that again.

24        MR. COX:  One option, Your Honor, is to do it -- it

25   seems like we're focusing on the very end of the month rather

1   than something like the 18th through the 20th, 21st.  I think

2   that seems like it would give the government enough time to

3   gather what we need.  We can prepare quickly after we've got

4   the government's submission, and I think that would alleviate

5   some of the scheduling concerns on our end and obviously allow

6   the court to resolve Mr. Batista's issues sooner rather than

7   later.

8           THE COURT:  I'm scheduled to be away then, but maybe

9   I'll change that.

03:00 10        MS. LARAKERS:  Another idea, Your Honor, perhaps, so

11  that we can have the hearing sooner rather than later but

12  lessens the burden on the government, it may be more efficient

13  for Your Honor to ask its questions during a hearing as opposed

14  to having to address it --

15          THE COURT:  I would think that there are relevant

16  documents or there may be relevant documents which you said it

17  would take time to assemble with confidence that they're

18  accurate and complete.

19          Let's just keep doing this and we'll see where we are

03:01 20  in a while, because this helps.  I thought you were going to

21  tell me that it would be impossible to do this after the 19th

22  and before the third.  And what I intend to do is schedule a

23  hearing that can be canceled if I'm persuaded, Ms. Larakers,

24  that the hearing is not necessary.  You'll get -- I'm going to

25  tell you -- and this is all being done pretty quickly, quickly,

1    but in the report you say, well, the documents that petitioner

2    wants will be protected by the attorney-client privilege, and

3    that would be a valid privilege if it hasn't been waived, the

4    deliberative process privilege and the law enforcement

5    privilege.  I'll give you the cites for the cases I

6    particularly have in mind.

7         The deliberative process privilege I think has been

8    recognized widely, including the D.C. First Circuit.  It

9    doesn't apply when the issue itself is somebody's state of

03:02 10   mind.  Usually it's intent.  Here it's good faith.  And I'll

11    give you those cites and you'll find more cases.

12         I do think the documents are likely discoverable.  And

13    if there's some dispute concerning relevance, I hate to have to

14    do this, but I could look at them ex-parte and decide.  If

15    there's no privilege, I don't think that's necessary.  As I

16    said, I'm inclined to have a hearing because I think

17    credibility is an issue, and I think I'd want to hear from at

18    least Mr. Chan who made the first decision or decisions and

19    then Mr. Charpentier who made the subsequent decisions.  Then

03:04 20   you all could brief which decision I should focus on.

21         I haven't read all the exhibits.  Do I have the police

22    report that you've been referencing?

23         MS. LARAKERS:  Your Honor, you will have it in our

24    opposition.  We had already planned in our opposition to have a

25    declaration from DFOD Charpentier and then have a record of the

1    facts in Mr. Batista's case that he considered.  So that will

2    include police reports, the information that Mr. Batista

3    submitted on his behalf in support of his release, documents

4    such as that.

5         What we weren't planning on including is any emails

6    going back and forth at ICE.  I don't -- I haven't seen those

7    emails.  It doesn't appear to me that those would be

8    particularly relevant or interesting, quite frankly, but

9    getting those, because we would have to search, basically have

03:05 10   to search for those, compile them, then if attorneys are on

11   that chain, that complicates matters.

12        Understanding Your Honor's point that the deliberative

13   process privilege is not absolute, another thing I believe the

14   courts consider is whether that information can be obtained in

15   a different way.  And I think the different way here would be

16   for DFOD Charpentier specifically in his declaration to answer

17   any questions that this court has.

18        THE COURT:  This is not exhaustive.  If anybody reads

19   the newspaper, watches television, which I rarely do, listens

03:06 20   to the radio -- and I don't decide things that aren't presented

21   to me in the record, but it just raises a question about

22   whether there was dissatisfaction with the number of aliens

23   being deported at some point and whether, if there was a policy

24   to give priority to people who had histories that made them

25   dangerous.  Because this raises another question, essentially a

1    legal question.  If we were under Section 2 of the agreement,

2    it provides that ICE determine in its sole discretion based on

3    the totality of the facts and circumstances that an individual,

4    one, is a threat to public safety, typically because of serious

5    criminal conduct.  So you have the beginning of that clause in

6    Section 3, a threat to public safety.  It doesn't say typically

7    based -- usually the same words in one section of a statute,

8    maybe in a contract, have the same meaning in another section.

9        So typically based on, because of serious criminal

03:07  10   conduct, then there would be the -- I know from the

11   petitioners' submission, memo in support of the motion for the

12   court, they claim -- they don't put it in these terms I think

13   but it's not serious criminal -- you know, he admitted

14   sufficient facts selling drugs.  Selling drugs is usually

15   serious.

16       Under Massachusetts law we have an unusual provision.

17   You can admit sufficient facts.  It's like an Alford plea I

18   always think of it, in state court.  You admit there's

19   sufficient facts for you to be found guilty but you don't admit

03:08  20   you're guilty.  And then I think they treat it like a

21   conviction, but it's not like he had a trial or pled guilty.

22       And then the domestic violence charge was dismissed,

23   and the others I think you said were driving on a suspended

24   license.  Mr. Batista says that was years ago.  Since, he got

25   married, he has two children and a stepdaughter and he works.

1   So I think the question is whether he poses a danger at the

2   time the decision was made that he was dangerous, six years

3   ago, selling drugs --

4         MS. LARAKERS:  Your Honor, ICE agrees with that and

5   intends to talk about why it gave the information that

6   Mr. Batista submitted about his positive factors maybe less

7   weight than his criminal history and why the criminal history

8   may have weighed more, et cetera.

9         I will disagree with Your Honor's suggestion that the

03:09 10   words in Section 2 may apply to Section 3.  I believe there was

11   some colloquy about the differences between those sections

12   during our final settlement hearing, but that was intentional.

13   Those choices were intentional on behalf --

14         THE COURT:  I'll check that.  I think we had the most

15   detailed colloquy about the meaning of this in the preliminary

16   approval hearing.  I looked at the discussion, for example,

17   good faith, and the distinction, you know, if there's no good

18   faith in Section 2, it is in Section 3, but whatever it is,

19   you'll look for this and you'll remind me.  I just raise the

03:10 20   question.  I don't -- can see the arguments on both sides even

21   applying the principle of inference.

22         Anyway, my tentative view at this hearing, and you

23   should address it in the affidavits, that I would want to hear

24   from the individuals who made each of the decisions, and I'm

25   told that's Mr. Chan and Mr. Charpentier.  I'd want to know who

1    they communicated with concerning Mr. Batista, the facts of his

2    case, and I'd want to know any other relevant matters.  In my

3    current view, any general instructions, directions, that they

4    got to increase the number of detentions because there was

5    dissatisfaction in Washington or somewhere of the number of

6    people being detained and removed would be relevant because

7    then the question would be, I think -- and all this is

8    tentative -- the question would be did the general instructions

9    and possible pressure to increase the number of people being

03:12 10   detained and removed, was that something that the

11   decisionmaker, Chan or Charpentier, knew of.  And, you know,

12   was it in the context of those instructions to meet a quota,

13   increase, maximize the number of detentions.  That might be an

14   improper consideration because it wouldn't be a fact of

15   Mr. Batista's case.  And I don't know what else there might

16   have been.

17         It's my present intention to issue a sequestration

18   order since it appears to me that credibility will be

19   important.  And the sequestration order would prohibit Chan and

03:13 20   Charpentier from discussing this case from the time of the

21   order and possibly, depending on the government, who the

22   government's representative is, might affect the order of

23   witnesses being in the courtroom.  It wouldn't preclude you,

24   Ms. Larakers, from speaking to each of them individually.  And

25   that would be a subject protected by the attorney-client

```
 1   privilege, unless for some reason it was waived.
 2          As usual, this is taking a lot longer and it's
 3   important.
 4          MS. LARAKERS:  Your Honor, I understand your concern
 5   about the sequestration order, and I'm thinking through the
 6   impact of that right now.  And again, I understand the purpose
 7   of it and don't necessarily disagree with the reasoning behind
 8   it, but I need to think through if that would in some way
 9   inhibit us from getting the answers to this court.  It's
10   something I'm thinking through in the moment, but if I can just
11   preserve the ability to object to that in the future.
12          THE COURT:  I'll issue the order and you can ask me to
13   modify it.  But I mean, this happens generally, in criminal
14   cases particularly, there's more that one police officer who is
15   a witness, and they're all going to have the same lawyer from
16   the U.S. Attorney's Office but they're not going to be allowed
17   to talk to each other.  You can talk to both of them or to all
18   witnesses.  It would be bad practice in any event preparing the
19   witnesses together because that's not attorney-client
20   communication.  I want this to be reasonable, I just want it to
21   be reliable.
22          MS. LARAKERS:  I understand, Your Honor.  We'd only
23   move to modify if it was absolutely necessary, which again, I
24   just want to preserve the ability to do that.  We've had
25   sequestration orders in the past, Your Honor.
```

```
 1              THE COURT:  We have, okay.

 2              MS. LARAKERS:  Yes.

 3              THE COURT:  So it's going to be familiar to you.

 4              MS. LARAKERS:  Yes.  I think there was at the very

 5      beginning of this case and it was specific enough that it

 6      didn't cause any issues for the government.  Obviously Mr. Chan

 7      and Charpentier work together every day, but this would be

 8      specifically with regard to discussing the --

 9              THE COURT:  Yes, it doesn't keep them from discussing

03:17 10      everything else.  It's just this one case, discussing

11      Mr. Batista.

12              MS. LARAKERS:  I understand, Your Honor.

13              THE COURT:  Then I'd likely order maybe -- you touched

14      on this, you know, any communication relating to Mr. Batista.

15      If they didn't come from you but there were communications with

16      anybody in the Department of Homeland Security, I think those

17      documents would be discoverable.

18              I mean, this is hypothetical, but if somebody in ICE

19      wrote to the Boston bureau and said, "Pick up Mr. Batista.  Get

03:18 20      him on expedited removal.  We now know he's a member of your

21      class.  It would be great if you found him a threat to safety

22      so that we can add him to the numbers we're supposed to get."

23      This is very hypothetical.  That's relevant.  So we'll see.  Go

24      ahead.

25              MR. COX:  Sorry, Your Honor.  One comment, but I
```

1    didn't want to interrupt Your Honor's point there.

2          THE COURT:  All right.  Well, I told you I'd mention a

3    couple or more, but with regard to the deliberative process

4    privilege because the joint report said that the deliberative

5    process -- the attorney-client privilege, deliberative process

6    privilege and the law enforcement privilege would probably make

7    all the documents that Mr. Batista wants not discoverable.  And

8    I mentioned Silberman's decision in *In re: Subpoena Duces*

9    *Tecum*, 145 F.3d 1422-1424, where the D.C. circuit held that the

03:20 10   privilege doesn't exist.

11          There, they were talking about if either the

12   Constitution or statute makes the nature of the government

13   official's deliberations the issue, the privilege is a non

14   sequitur.  So here it's not the constitution or statute.  It's

15   the contract.  It appears to me that the deliberative process

16   privilege wouldn't apply in the circumstances in this case,

17   which is consistent with First Circuit's decision *Texaco Puerto*

18   *Rico*, 60 F.3d 867, 884 and following, Judge Saris' thoughtful,

19   typically thoughtful decision in *In re: Pharma Industry*, 254

03:21 20   F.R.D. 35 to 39, District of Mass decision.  I have some more,

21   and you can find more too.

22          Then with regard to the law enforcement privilege,

23   it's *Tsarnaev*, the marathon bomber case, 968 F.3d 24, 75.  The

24   First Circuit said that the judge had erred by relying on the

25   qualified law enforcement investigatory privilege.  As the

1  party asserting the privilege, the government had the burden of
2  showing that withholding the FBI recordings would achieve the
3  privilege's underlying purpose of not jeopardizing an ongoing
4  investigation.  Cited authority.

5       So I don't think based on what you've told me that
6  anything -- that there was any ongoing investigation, so I
7  don't think be the law enforcement privilege is likely to --
8  this actually raises another question I meant to mention to
9  you.  Do the parties assume, agree, dispute, maybe you haven't
03:23 10  thought about it, the Federal Rules of Evidence apply?

11       MR. COX:  Your Honor, I don't know if -- we certainly
12  haven't discussed it.  I don't know if we've thought about it.
13  It seems to me that the rules in many aspects are designed to
14  sort of insulate the factfinder in different circumstances from
15  this from other reliable evidence, things of that nature.  I
16  think Your Honor could use the rules of evidence as a point of
17  guidance but not as ironclad principles that would apply
18  categorically.  I'll confess though, Your Honor, I don't think
19  this has been something that we've really thought about to its
03:24 20  conclusion.

21       THE COURT:  Well, under Rule 1101, I think, I mean,
22  it's a proceeding in District Court, so I don't think this fits
23  any of the exceptions.  And even if they didn't apply, for
24  example, with regard to hearsay, where the rules don't apply,
25  the hearsay still has to have indicia of reliability.

1              MS. LARAKERS:  It's my thought --

2              THE COURT:  Go ahead.

3              MS. LARAKERS:  My first instinct is I think this is

4    like more akin to an evidentiary hearing in which the standard

5    would be relaxed.  Then I think we also have the issue like of

6    -- I think it would be properly viewed in the context of or

7    analogous to the Administrative Procedure Act and how the court

8    treats facts that are added to the record after, if that makes

9    sense.  Do the rules of evidence -- I think the relevant

03:25 10    question may be do the rules of evidence apply to information

11    that is supplemented in the administrative record.

12              THE COURT:  Well, you keep mentioning the

13    administrative record, but the issue here is good faith.  It

14    could be, as you said, I think reasonable people might differ

15    what conclusion to reach with regard to posing a threat to

16    safety, and I'd have to substitute my judgment.  I am to

17    determine whether somebody made the decision in good faith.

18    And if it was a good faith decision, it seemed to be a

19    reasonable decision, you win.  Although, if it doesn't seem to

03:26 20    be a reasonable decision, that might be circumstantial evidence

21    of bad faith, but whatever.  It's just -- this is something to

22    be careful of.  No, I don't think this has come to a decision

23    based on the administrative record, some things are arbitrary

24    and capricious.  It goes to the state of mind, could be.  If it

25    was based solely on the facts relating to Mr. Batista and it

1    was a sincere belief, conclusion that he was going to be

2    dangerous, you would win.  But again, this is all being done

3    very quickly.

4        So what does good faith mean?  There's a First Circuit

5    decision my able law clerk pointed to, *Hoffman,* 784 F.3d 56,

6    70.  They write, this is a tax case, "Importantly Black's Law

7    Dictionary seemingly treats" -- there are two different

8    definitions, both definitions as path to reach a finding.  It

9    defines good faith as having several components, state of mind

03:27 10    consisting in one honesty in belief or purpose; two,

11    faithfulness to one's duty or obligation; three, observance of

12    reasonable commercial standards; or four, absence of intent to

13    defraud.

14        So the first two quickly seem to me to be applicable

15    here.  Did the decisionmaker honestly believe that Mr. Batista

16    posed a threat to public safety, or was the decisionmaker

17    faithful to his duty or obligation, his duty to decide based

18    solely on the facts of Mr. Batista's case and not

19    hypothetically because there's pressure to find people we can

03:28 20    get out of the country fast.

21        MS. LARAKERS:  Your Honor, I didn't mean to suggest

22    that the standard under the Administrative Procedure Act would

23    apply.  I meant that we would -- it's similar to the

24    Administrative Procedure Act in that we have a record and we

25    have a standard to apply that is not de novo.  And Your Honor I

1    believe appropriately defines the standard as good faith.  We

2    can look at that case and go from there and define it.  But

3    with regard to evidence, we're looking at what is this record,

4    what did ICE consider?  Did they consider -- the question for

5    the record being give me what ICE considered with regard to

6    Mr. Batista.  Now, so far as I understand, it's the facts of

7    Mr. Batista's case, Your Honor wants to ensure that before

8    deciding whether Mr. Batista is entitled to relief, we need to

9    answer the question of whether there are any other outside

03:29 10    factors, guidance, information that was also considered.

11        So essentially what Your Honor is talking about is

12    ensuring that the record is complete, that we have all the

13    information that ICE considered.  Is that correct?

14        THE COURT:  Yes.  And that's why I wanted to have this

15    hearing.  I think, you know, you've got to define the questions

16    before you can get the legally correct answer, factually

17    correct answer.  That's why, even though I had to prepare for

18    this very quickly, I think this is going to help sufficiently

19    as possible get to a legally correct decision, factually

03:30 20    correct decision.

21        MS. LARAKERS:  That's why I thought your question with

22    regard to whether the rules of evidence apply was trickier.

23    I've had cases obviously wherein we have a record and then

24    we've had to supplement that record for one reason or another,

25    mostly to explain the record.  And I don't think we've ever --

1    I don't think I've ever addressed whether the rules of evidence
2    apply to that deposition that we did that became part of the
3    record, for example.  I don't think that --
4         THE COURT:  Which hopefully it -- it may not be a
5    material question.  I'm not sure, I don't know what wouldn't be
6    admissible, and then I make a decision.  I don't think the
7    settlement agreement addresses this.  Is my decision
8    appealable?  I know you were aiming for finality.
9         The record should reflect a good long pause.
03:31 10         MR. COX:  Your Honor, you're certainly correct that
11    it's silent on the issue.  I think we may need to do some
12    further thinking --
13         THE COURT:  Well, that's why I'm throwing it out.  And
14    look, I'm going to make the decision I'm going to make,
15    regardless of whether it's appealable.  But I want to put it
16    out there because one of you is going to be disappointed in the
17    result.  I think that's not a good time to say we're
18    disappointed in the result, we're going to appeal, and the
19    other side says no, you have no right to appeal.  I may not be
03:32 20    the ultimate arbiter of whether there's a right to appeal, but
21    I think it's just a good thing to have in mind.
22         So let's come back to the schedule.  Let's say I
23    cancel my plans for the week of August 25 and we're going to
24    have a hearing that week rather than the week before.  So I'm
25    not promising, this not just up to me, I may go see a friend in

```
 1    California.  If we could do it that week, what's the minimum
 2    reasonable period of time, Ms. Larakers, for you to get your
 3    affidavits and relevant documents?
 4             MS. LARAKERS:  Do you want a declaration from
 5    Mr. Chan?
 6             THE COURT:  Yes.
 7             MS. LARAKERS:  A week, Your Honor.
 8             THE COURT:  Okay.
 9             MR. COX:  Your Honor --
10             THE COURT:  Hold on.  So a week from today --
11             MS. LARAKERS:  A week from --
12             THE COURT:  -- or tomorrow?
13             MS. LARAKERS:  A week from -- I can push it a week
14    from today, Your Honor.
15             THE COURT:  So today is the 6th.  That would be the
16    declaration and the relevant documents.  If you produce
17    documents, you know that we have under the Federal Rules of
18    Civil Procedure a continuing obligation if you find more
19    documents, then you've got to produce them promptly.  But if
20    you say a week --
21             MS. LARAKERS:  That would be the opposition,
22    declarations and the documents altogether?
23             THE COURT:  Yes.  And then, Mr. Cox, how much time
24    would you need to respond?  Because I'm going to need time --
25    if they're on the 13th, something like the 19th.  It's a reply,
```

1    so that shouldn't be -- what's that?

2         MR. COX:  If we were to do that schedule, I think we

3    could reply within a week, Your Honor.  What I was going to say

4    is that week I think is uniquely bad for the petitioners' side,

5    in terms of Ms. Lafaille will not be here, Mr. Prussia won't be

6    here.  I think a number of other folks on the team --

7         THE COURT:  All right.  So you want it the previous

8    week?

9         MR. COX:  Either the previous week, or, Your Honor, I

03:35 10    think failing that I think we could do it after Labor Day.  I

11    think that would be -- considering all of the options, none of

12    which is optimal, and considering Your Honor's availability as

13    well, I think that if we did it after Labor Day, I think that

14    would not only accommodate folks' schedules but would also give

15    us the best chance to having the most robust record.

16         THE COURT:  All right.  The next date you're available

17    is September 3, but you said just the afternoon.  I mean, I

18    would schedule the hearing, say, for September 3, maybe the

19    4th, and if it has to go day to day, we can go day to day.  I'm

03:36 20    aiming to decide the matter orally, as I typically do.

21         MR. COX:  I think we can accept dates that week, and

22    again, if it needs to continue day to day, we can accommodate

23    that.  I think given the various options looking at that week

24    seems like it will be the least bad of those options.

25         THE COURT:  All right.  The client is detained, but

1    it's another ten days, and I think it's more important to try

2    to do this deliberately so it's done well.  All right.

3         MS. LARAKERS:  Your Honor, I am only volunteering

4    myself to be here.  I can't speak to anyone else's schedule on

5    the team, but I will be prepared.

6         THE COURT:  If you need any other lawyers --

7         MS. LARAKERS:  Yes.

8         THE COURT:  Your clients will have to be here too, but

9    hopefully at least around here, people go away Labor Day

03:37 10   usually.

11        MS. LARAKERS:  The only date I got in September was

12   September 12.  I haven't gotten Mr. Chan's dates.

13        THE COURT:  That they couldn't do?

14        MS. LARAKERS:  That they couldn't do.

15        THE COURT:  Let me work with these dates.  I'll aim to

16   get you an order tomorrow, no later than Friday, a written one,

17   but get to work, the sequestration order, which I'll enter

18   orally now, saying that with regard to petitioner Batista

19   Armondes' motion to enforce settlement agreement motion is

03:38 20   hereby ordered.  The party -- this is not it.

21        It is hereby ordered that except for petitioner

22   Guilherme Batista Armondes and the designated representative of

23   defendants-respondents, each witness in this case:  One, shall

24   not discuss this case, including but not limited to his or her

25   prospective testimony with any other witness; two, shall be

excluded from the courtroom when the other witnesses are

testifying; and three, shall not after testifying tell any

prospective witness what he or she was asked or answered.  This

order shall not operate to prevent counsel from conferring with

a witness prior to his or her testimony.  However, unless

protected by the attorney-client privilege or other applicable

privilege, such communications may be explored on direct and/or

cross-examination.

Can you communicate that to your clients promptly,

please?

MS. LARAKERS:  Yes, Your Honor.

THE COURT:  Both sides.  Mr. Cox, do you anticipate

calling any witnesses?

MR. COX:  Your Honor, I think we need to see the

government's record first before we make that final decision,

but it's very possible.

THE COURT:  All right.  Well, I'm going to enter this

order, but the order applies to your witnesses, potential

witnesses.

MR. COX:  Of course.

MS. LARAKERS:  Your Honor, I want to raise -- I want

to briefly discuss that.  It seems that if the relevant

question before this court is whether ICE made a good faith

decision, if petitioners call witnesses to, for example,

testify on Mr. Batista's behalf, the government's position is

1   then we're outside the scope of this court's review, then we're

2   creating a new record.  And I'm not --

3          THE COURT:  Here.  Sorry to interrupt you, but I'm

4   about to agree with you as far as it goes.  It depends on who

5   their potential witnesses are.  Who is the immigration czar,

6   Mr. Homan?  Is that who it is?

7          MS. LARAKERS:  I believe so, Your Honor.

8          THE COURT:  All right.  But, you know, if Mr. Homan

9   came to Massachusetts and visited the office, the ICE-ERO

03:41 10  Boston office and said last March, whenever, before Mr. Batista

11  was encountered, you're not doing a good job, we need more

12  people detained and removed here, so step it up, they might

13  want to question Mr. Homan.  He's got other things to do.  I

14  mean, that just comes to mind.  That's the type of thing --

15  Mr. Cox probably doesn't read the Boston Herald.  I do.

16          If there's a witness, Mr. Cox, you have to be mindful

17  of what Ms. Larakers just said.  We're not litigating whether

18  your client is dangerous.  It's whether it's a good faith

19  decision based on the facts of his case alone that he posed a

03:43 20  danger.

21          MR. COX:  Your Honor, I mean, it could go to the

22  remedy in terms of what the appropriate remedy is if there has

23  in fact been a violation, whether release is in fact

24  appropriate.  I think in that instance, you know, we've seen so

25  far that the government has tried to add in, for example, this

1    new police report after having made the determinations, after

2    we filed this motion.  I think if we get into that sort of

3    thing, it wouldn't be beyond the realm of possibility for the

4    court to hear from some of the individuals that actually know

5    Mr. Batista and could testify to his lack of dangerousness.

6          THE COURT:  I think you would argue the remedy is

7    clear.  They had their chance to decide in a manner consistent

8    with the settlement agreement that he should be detained and

9    removed, deported, and they improperly made the determination

03:44 10   and therefore it's, you know, I would order that he be

11   released.  You can brief this.

12          I haven't thought about remedy.  I just assumed the

13   remedy is, if there's a violation of the agreement, the remedy

14   is to give him the benefit of the bargain.  They don't get

15   another chance to try to do it right, unless there's something

16   new in the future.  If he's arrested and convicted of selling

17   drugs in the future and he hasn't become a United States

18   citizen, he could be detained and removed.

19          MR. COX:  Agree, Your Honor.  We agree that if you

03:45 20   find a violation, the appropriate remedy isn't release.  I was

21   illustrating that to say if there was some dispute about that,

22   I think that's one instance in which other witnesses might be

23   appropriate.

24          THE COURT:  Well, I guess we'll see.  At the moment it

25   doesn't sound right to me.

1          MR. COX:  Your Honor, if you'll indulge me, I did want

2     to say a few more things about the record and the standard of

3     review before we adjourn.

4          THE COURT:  Okay.

5          MR. COX:  So we've had some discussion about, you

6     know, whether discovery would encompass things like whether

7     there was pressure to increase the number of detentions,

8     quotas, things like that.  I will be very interested to see if

9     those things came into the record.  Obviously for an

03:46 10     individualized determination, we think those are inappropriate.

11          THE COURT:  Sorry.  What's inappropriate?

12          MR. COX:  If there were a consideration of something

13     like a topdown pressure to increase the number of removals, if

14     there were quotas, we think that wouldn't be an individualized

15     determination as required by the settlement agreement.

16          THE COURT:  I think Ms. Larakers already may have

17     agreed with that.  I'm ordering you, I'm ordering you all to

18     order the transcript of this proceeding on an expedited basis.

19     Okay.

03:46 20          MR. COX:  We --

21          COURT:  Go ahead.

22          MR. COX:  What I wanted to emphasize from our

23     perspective, Your Honor, is even if there is not that kind of

24     evidence here, we think that there is still a violation of the

25     settlement agreement.  And, you know, we looked, you cited, I

1    think it was the First Circuit citing Black's Law Dictionary.

2    I pulled out my copy of Black's Law Dictionary to look at "good

3    faith."  I saw the language you flagged there, "faithfulness to

4    one's duty or obligation."  The dictionary also cites the

5    restatement of contracts, which talks about "faithfulness to an

6    agreed common purpose and consistency with the expectations of

7    the other party."

8           Our concern here comes down to this idea that, even if

9    there was a -- even assuming for present purposes that there

03:47 10    was no malice behind this decision, that there was no

11   intentional wrongdoing, the settlement agreement still requires

12   consideration of a specific issue, which is whether the

13   individual based on individualized facts poses, present tense,

14   a danger or threat to the public.

15          And Ms. Larakers ran through the government's view of

16   the criminal history, but I mean, ultimately what we're looking

17   at here was a continuance without a finding for possession with

18   intent to distribute that initially resulted in 18 months of

19   probation, that as far as I know was served without incident.

03:48 20   That was vacated earlier this year based on a serious defect

21   with the plea colloquy.  It wasn't a technicality or anything

22   like that.  It was a COVID-era plea colloquy without an actual

23   translator.  I think his wife or now wife was serving as the

24   translator.  It wasn't a technicality that resulted in the

25   vacatur of that plea.

1          The domestic violence charge, he wasn't arrested,

2    contrary to what Ms. Larakers says.  There was a -- he was

3    arraigned several months after the fact, and at the time,

4    certainly at the time the initial determinations were made all

5    they knew was that there had been a charge that had been

6    dismissed.  And then the driving charge, again, almost three

7    years before his arrest, resulted in a 100-dollar civil fine.

8          We think just looking at this record, it's not

9    something that would fall within the agreed, common purpose and

03:49 10   consistency with the justified expectations of the parties.

11   Those kind of facts would justify a finding of present danger,

12   present threat to the public.  Who was he a threat to?  What

13   kind of threat does he pose?  We don't know the answer to that.

14         So what I wanted to emphasize, Your Honor, is even if

15   there is not a smoking gun out there that would draw into

16   question this whole process, we think that on the

17   individualized facts here, the decision wasn't made in good

18   faith.  We don't need to litigate this now.

19         THE COURT:  I know.  Just to react quickly to it,

03:49 20   juries are instructed that facts can be proven by direct or

21   circumstantial evidence.  So direct evidence could be some

22   higher up giving a direction to detain more people, make them

23   happier in Washington, and the decisionmaker having that in

24   mind when he decided that Mr. Batista would pose a threat to

25   safety.

1          Circumstantial evidence would be that, here are the

2     facts, this is what he had before him when he made the

3     decisions, and it's implausible that he could have decided

4     because he had an honest belief, even a mistaken belief, that

5     this person is now dangerous.  So it seems to me what you're

6     saying fits in the framework of circumstantial evidence.

7          MR. COX:  I believe that's right, Your Honor.

8          THE COURT:  All right.  I'm going to try to sort this

9     out.  Is there anything else before we recess, later than I had

03:51 10    anticipated?

11          MR. COX:  Nothing from petitioners, Your Honor.

12          MS. LARAKERS:  Nothing from the government, Your

13    Honor.

14          THE COURT:  All right.  I'll figure out a hearing date

15    I think after Labor Day and try to give you more time, Ms.

16    Larakers, than a week to prepare.

17          MS. LARAKERS:  Thank you, Your Honor.

18          THE COURT:  Mr. Cox, can your side respond the

19    following week, the week before Labor Day?

03:51 20          MR. COX:  Yes, Your Honor.

21          THE COURT:  All right.  Okay.  So order the

22    transcript, please, on an expedited basis, and I'll see my

23    staff or what's left of it in the breakout room, please.  I'll

24    thank the court reporter, as usual.  Court is in recess.

25          (Adjourned, 3:51 p.m.)

1                  CERTIFICATE OF OFFICIAL REPORTER

2

3           I, Kelly Mortellite, Registered Professional

4   Reporter, Registered Merit Reporter and Certified Realtime

5   Reporter, in and for the United States District Court for the

6   District of Massachusetts, do hereby certify that the foregoing

7   transcript is a true and correct transcript of the

8   stenographically reported proceedings held in the

9   above-entitled matter to the best of my skill and ability.

10                  Dated this  8th day of August, 2025.

11

12              /s/ Kelly Mortellite

13              _____

14              Kelly Mortellite, RPR, RMR, CRR

15              Official Court Reporter

16

17

18

19

20

21

22

23

24

25