## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

LILIAN PAHOLA CALDERON JIMENEZ,
and LUIS GORDILLO, *et al.*,

Individually and on behalf of all others
similarly situated,

   Plaintiffs-Petitioners,

 v.

KRISTI NOEM, *et al.*,

   Defendants-Respondents.

No. 18-cv-10225-MLW

**REDACTED PUBLIC VERSION**

**MOTION TO SEAL PENDING**

## PETITIONERS' REPLY MEMORANDUM IN SUPPORT OF
## <u>MOTION TO ENFORCE SETTLEMENT AGREEMENT</u>

## <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION ................................................................................................. 1

II.   FACTS ............................................................................................................... 2

III.  THE GOVERNMENT'S OPPOSITION CONFIRMS THAT ITS DETERMINATIONS
      WERE NOT MADE IN "GOOD FAITH" AS REQUIRED UNDER THE SETTLEMENT
      AGREEMENT ...................................................................................................... 5

      A.    "Good Faith" Requires Respect for Reasonable Expectations of the Parties ......... 6

      B.    The Record Cannot Support a Finding of Current Dangerousness ........................ 7

      C.    The Written Record Further Undermines the Government's Positions.................. 9

            1.    ICE's April 2025 Detention Determination Was Impermissibly Based
                  Solely on Old Criminal History, Without Showing a Current Threat .......... 10

            2.    ICE's June 27, 2025 Removal Determination Signals Lack of
                  Good-Faith Review of Mr. Batista's Supporting Materials.......................... 11

            3.    The Circumstances of Mr. Batista's Arrest and Removal Order
                  Further Demonstrate a Lack of Good Faith .................................................... 11

            4.    The Court Should Not Consider ICE's August 1, 2025 Decision ............... 12

      D.    Other Evidence Suggests Non-Individualized Influences on the Government's
            Efforts to Detain and Remove Mr. Batista............................................................ 14

IV.   REMAINING ISSUES RAISED IN THE COURT'S AUGUST 8, 2025 ORDER.............. 16

      A.    The Deliberative Process Privilege Does Not Protect the Government's
            Communications ................................................................................................... 16

      B.    Applicability of the Federal Rules of Evidence .................................................... 19

      C.    Appealability of an Order by the Court ................................................................ 19

V.    HEARING AND PROPOSED WITNESSES ......................................................... 20

VI.   CONCLUSION ................................................................................................. 20

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Coal. for Humane Immigrant Rts. v. Noem*,
　25-cv-872-JMC, 2025 WL 2192986 (D.D.C. Aug. 1, 2025)....................................................12

*Fairholme Funds, Inc. v. United States*,
　128 Fed. Cl. 410 (Fed. Cl. 2016) .........................................................................................18

*In re Pharmaceutical Indus. Average Wholesale Price Litig.*,
　254 F.R.D. 35 (D. Mass. 2008).......................................................................................17, 18

*In re Off. Of Comptroller of Currency*,
　145 F.3d 1422 (D.C. Cir. 1998) .....................................................................................17, 18

*Johnson v. Boston Public Schools*,
　906 F.3d 182 (1st Cir. 2018)................................................................................................19

*Kaufman v. C.I.R.*,
　784 F.3d 56 (1st Cir. 2015)....................................................................................................6

*Kerr v. U. S. Dist. Ct. for N. Dist. of Calif.*,
　426 U.S. 394 (1976) .............................................................................................................18

*Negron Gaztambide v. Hernandez Torres*,
　145 F.3d 410 (1st Cir. 1998)................................................................................................20

*Pramco, LLC ex rel. CFSC Consortium, LLC v. San Juan Bay Marina, Inc.*,
　435 F.3d 51 (1st Cir. 2006)..................................................................................................19

*Roe v. Mayorkas*,
　22-cv-10808, 2024 WL 5198705 (D. Mass. Oct. 2, 2024) ..................................................18

*Texaco Puerto Rico, Inc. v. Dep't of Consumer Affairs*,
　60 F.3d 867 (1st Cir. 1995)..................................................................................................17

*United States v. Acevedo-Osorio*,
　118 F.4th 117 (1st Cir. 2024).................................................................................................6

*United States v. Metropolitan Dist. Comm'n*,
　847 F.2d 12 (1st Cir. 1988)..................................................................................................19

*Vasquez Perdomo v. Noem*,
　No. 25-4312, 2025 WL 2181709 (9th Cir. Aug. 1, 2025) ...................................................16

*Wang Lab'ys, Inc. v. Applied Computer Scis., Inc.*,
   926 F.2d 92 (1st Cir. 1991) ................................................................................19

**Federal Statutes**

8 U.S.C. § 1225(b)(1) ................................................................................................12

28 U.S.C. § 1291 ......................................................................................................19

**Regulations**

8 C.F.R. § 235.3 .......................................................................................................12

**Other Authorities**

Black's Law Dictionary ..............................................................................................6

Fed. R. Evid. 801(c)(2) ............................................................................................19

Fed. R. Evid. 1101 ...................................................................................................19

Restatement (Second) of Contracts § 205 ................................................................6

## I.    INTRODUCTION

In February 2025, this Administration vowed to "bring[] hell" to Boston and its neighboring communities in retaliation for local officials' refusal to cede to the Administration's demands regarding immigration enforcement.  Class member Guilherme Batista Armondes was arrested by ICE the following month, and the Government's opposition materials make clear that his arrest was not the result of a targeted enforcement action against him personally.  Nor does his arrest appear to be the result of any reasoned determination that he poses a threat to the public.  Rather, Mr. Batista's (possibly warrantless) arrest was made on the first day of a highly publicized series of mass raids overseen by the Administration's so-called "border czar," Tom Homan, in an effort to meet the Administration's well-documented quotas for immigration arrests and deportations—demands that have only become more onerous in recent months.

At the time of the sweep, the only justifications supporting Mr. Batista's arrest appear to be his ethnicity and the fact that he was driving a vehicle in an area of Massachusetts that is associated with migrant communities.  He was arrested on his way home from dropping his daughter off at school—without any individualized suspicion of engaging or having engaged in any criminal activity.  That unlawful seizure has led to a series of efforts by the Government to backfill the rationale for taking enforcement action against him, including by latching on to stale criminal charges (since vacated or dismissed) as a basis for his detention and removal.

The Government's *post hoc* rationales violate the Settlement Agreement, which requires an individualized assessment of current dangerousness.  All the Government can point to in support of its determinations are years-old incidents from when Mr. Batista was only eighteen years old.  Missing from the Government's brief or declarations is any explanation of what threat that Mr. Batista, now twenty-four years old, poses ***today***.  Under these circumstances, that cannot

comprise a good-faith determination of current dangerousness, particularly when there are significant mitigating factors, strong U.S. ties, and concerning evidence that the Government was motivated by considerations other than the facts specific to Mr. Batista's case.

## II.    FACTS

Petitioners set forth the factual background for their Motion in their opening memorandum.  ECF No. 691 at 5–10.  Below, Petitioners identify additional facts that were revealed or otherwise made relevant in connection with the Government's August 15, 2025 opposition, ECF No. 710 ("Opp'n"), and accompanying production of relevant ICE records.

Mr. Batista arrived at the U.S. border with his mother and sister on January 29, 2016, when he was 14 years old.  Ex. A[1] at 2.  After U.S. Customs & Border Patrol ("CBP") deemed Mr. Batista and his family inadmissible at the border, Mr. Batista's mother invoked a credible fear of return to Brazil due to domestic violence.  *Id.*  Mr. Batista's family was granted humanitarian parole into the United States on February 1, 2016.  ECF No. 692-4 at 14.  For more than nine years, ICE and U.S. Citizen & Immigration Services ("USCIS") did not schedule Mr. Batista's credible-fear interview or institute removal proceedings against him.  While ICE claims that CBP issued Mr. Batista a Form I-860 Notice and Order of Expedited Removal before granting his parole, *see* ECF No. 710-1 (hereinafter "Charpentier Decl.") ¶ 5; ECF No. 710-2 (hereinafter "Chan Decl.") ¶ 10, ███████████████████████████████ ██████████████████████████████████████████ ████████████████████████████████.  Ex. B at 1–2; Ex. C at 33.

In February 2025, White House border czar Tom Homan warned that he would "bring[] hell" to the Boston area in apparent retaliation for Boston's sanctuary city policies.  Ex. D at 1.

---

[1] Citations to "Ex. __" are to the Declaration of Jonathan A. Cox, filed herewith.

Mr. Homan then traveled to Massachusetts to oversee personally a "targeted enforcement operation" that resulted in the arrest of more than 370 undocumented immigrants between March 18 and 23, 2025.  Ex. E at 1; Ex. F at 1.  Mr. Batista was arrested by ICE agents on the first day of this operation.  Chan Decl. ¶ 11.

The record does not establish that Mr. Batista was arrested pursuant to a valid warrant. According to the declaration of Keith Chan submitted in Mr. Batista's habeas proceedings, an I-200 Warrant was issued and served on Mr. Batista the same day that he was arrested by ICE agents.  Ex. G ¶ 10.  But Mr. Chan never specified that the warrant was issued *before* Mr. Batista's arrest.  *Id.*; Ex. H at 1.  The record also contains no indication that ICE had determined, at the time of his arrest, that Mr. Batista was a threat to public safety.  It is undisputed that Mr. Batista had no final order of removal when detained by ICE.  Chan Decl. ¶ 11; Charpentier Decl. ¶ 6.  Following his arrest, Mr. Batista was detained at the Plymouth County Correctional Facility, where he continues to be held to this day.[2]

After Mr. Batista's detention, ICE did not initiate regular removal proceedings.  Instead, ICE took the remarkable step of reinitiating the expedited removal process—which it had not pursued for nine years—by scheduling Mr. Batista for a credible fear interview.  Overruling Mr. Batista's request to reschedule so that his attorney could be present, USCIS held the interview on April 1, 2025.  Ex. C at 16–18.  While the interviewing officer determined Mr. Batista himself to be credible, she nonetheless concluded that the fear he expressed of returning to Brazil did not meet the standard for a credible fear of persecution.  *Id.* at 31–32.  On April 16, 2025, this

---

[2] Plymouth—the sole facility in Massachusetts housing immigrant detainees—has contracted with ICE to hold only 250 people, Ex. I at 6; ICE's most recent statistics show that at least 443 individuals are currently detained at the facility, Ex. J at 4.  More than 67 percent of ICE detainees at Plymouth have no criminal history, and more than 85 percent have been determined to possess "no ICE threat level" at all.  *Id.*

determination was affirmed on appeal to an immigration judge.  Ex. B at 1.  ICE then issued an

Expedited Order of Removal—more than **_nine years_** after Mr. Batista had arrived in the United

States, and while he was already in ICE custody.  Charpentier Decl. ¶ 10.  This order made him a

class member subject to the Settlement Agreement.  The record contains no indication that ICE

had determined, at the time that Mr. Batista received his removal order, that he was a threat.

Instead, it was only after arresting Mr. Batista and securing his removal order that ICE faced the

requirement under the settlement to determine whether he poses a threat to public safety.

On April 17, 2025—after Mr. Batista had become a member of the _Calderon_ class

pursuant to his final order of removal—ICE determined to continue his detention.  Charpentier

Decl. ¶ 11.  Mr. Charpentier asserts that when he made the April 17, 2025 determination, he

"communicated via email with AFOD Chan" and "noted [Mr. Batista's] criminal history

included convictions for two counts of possession with intent to distribute a class A controlled

substance, his charge for domestic violence, and his arrest for operating after a suspended

license."  _Id_. ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████.  Ex. K at 2.

Class counsel were informed on April 23, 2025 of ICE's intention to remove Mr. Batista.

ECF No. 692-3 at 12–14.  At that time, however, ICE was under a separate obligation in Mr.

Batista's parallel habeas proceedings to provide advance notice of its intent transfer Mr. Batista

out of Massachusetts for the purpose of removal.  ICE provided that notice on June 24, 2025, and

a day later class counsel contacted the Government to invoke the _Calderon_ dispute resolution

process and ensure that ICE considered new materials submitted in support of Mr. Batista's

release.  _Id_. at 10–11.  On June 27, 2025, the Government agreed to conduct a new consideration

of Mr. Batista's removal determination in view of that new evidence. *Id*. at 5–8.

████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

████. *Compare id*., *with* Charpentier Decl. ¶ 14 ("I considered the individual facts of his case, including … the documents and information in Mr. Batista's renewed request for release, and the underlying facts surrounding his criminal history."), *and* ECF No. 692-3 at 2 (Government counsel stating that "the DFOD level officer who made the decision to remove Mr. Batista and provided the explanation considered … the Renewed Request for Release packet").

After the parties could not reach a resolution concerning ICE's continued enforcement against Mr. Batista, class counsel filed their Motion to Enforce the Settlement Agreement on July 22, 2025. ECF No. 690. In his declaration, Mr. Charpentier states that, on approximately July 28, 2025, he obtained the 2020 police report for Mr. Batista's dismissed domestic violence charge, and again determined that he posed a public safety risk. Charpentier Decl. ¶ 21. Mr. Charpentier provides no explanation for why the Government sought to obtain Mr. Batista's 2020 police report only after class counsel filed the Motion to Enforce.

## III. THE GOVERNMENT'S OPPOSITION CONFIRMS THAT ITS DETERMINATIONS WERE NOT MADE IN "GOOD FAITH" AS REQUIRED UNDER THE SETTLEMENT AGREEMENT

ICE's assurances of "good faith" fail on three counts: *First*, the facts of Mr. Batista's case—namely, that he has spent the past half decade working and caring for his family, with only

a civil driving offense—simply do not support the conclusion that he poses a genuine threat. **Second**, the record of ICE's hurried determinations regarding Mr. Batista demonstrates that ICE focused those decisions on the mere existence of old charges. **Third**, evidence regarding ICE's quotas, policies, and targets strongly suggests that ICE's treatment of Mr. Batista was not individualized. On each of these bases, ICE violated the Settlement Agreement.

A.    **"Good Faith" Requires Respect for Reasonable Expectations of the Parties**

The Settlement Agreement mandates that before taking an enforcement action, ICE must make a "good faith" determination, "based on the facts in the Noncitizen Class Member's case," that the class member "poses a threat to public safety or threat to national security." ECF No. 654-1 § III(A). The First Circuit has recognized the definition of good faith in Black's Law Dictionary, which contains "several components," including "'(1) honesty in belief or purpose'" and "'(2) faithfulness to one's duty or obligation[.]'" *Kaufman v. C.I.R.*, 784 F.3d 56, 70 (1st Cir. 2015) (quoting "Good Faith," *Black's Law Dictionary* (10th ed. 2014) (emphases omitted)). This definition aligns with the Restatement (Second) of Contracts, which "emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party" in its definition of "good faith." Restatement (Second) of Contracts § 205 cmt. a (Am. L. Inst. 1981). The First Circuit has similarly applied the Restatement definition of "good faith" in analogous circumstances. *See, e.g.*, *United States v. Acevedo-Osorio*, 118 F.4th 117, 130–31 (1st Cir. 2024) (applying duty of good faith to defendant's plea agreement, citing Restatement (Second) of Contracts § 205).

The Court should apply a definition of "good faith" similar to the definitions set forth above, *i.e.*, reflecting the reasonable expectations of the parties. Accordingly, in making enforcement actions, the Government must honestly and faithfully execute the purpose and expectations of the Settlement Agreement—that is, it must determine that a class member

*currently* poses a risk to public safety or national security, based solely on an ***individualized*** and comprehensive consideration of the facts (good and bad) specific to a class member's case, without influence or bias from any outside considerations.

### B.    The Record Cannot Support a Finding of Current Dangerousness

A determination that Mr. Batista is a public safety threat based on offenses allegedly committed when he was eighteen years old—and notwithstanding evidence that he has spent the last five years focused on his family and business—cannot have been made in good faith.

Despite the declarations and (heavily redacted[3]) contemporaneous justifications that the Government provided, it still has not explained its conclusory leap from ***past*** charges to ***current*** dangerousness.  To detain or remove Mr. Batista, ICE must find that he "***poses*** a threat to public safety or threat to national security."  ECF No. 654-1 § III(A).  The present tense makes clear that a good-faith determination requires finding dangerousness ***today***—not merely identifying ***past*** conduct and assuming that it signifies a current threat.  But despite several opportunities, the Government has never explained what threat Mr. Batista now "poses" to the public.

In his declaration, Mr. Charpentier admits that his review was narrow and entirely retrospective.  He explains that, during his June 2025 determination, he "considered that the incident occurred in 2019 but did not believe that passage of time to be particularly significant," and further attests that he believed Mr. Batista "still posed a threat to public safety," because he remained "very concerned" about the drug charges.  Charpentier Decl. ¶¶ 14–16.  In addition, Mr. Charpentier stated with little explanation that he "found the police report to be detailed and reliable" and "did not find Mr. Batista's statements to police [at the time of the arrest in 2019] to

---

[3] As discussed below, Petitioners contest the Government's claim that the deliberative process privilege applies to their communications.  *See infra* Section IV.A.

be particularly persuasive." *Id.* ¶ 16. He also claims to have considered Mr. Batista's other contact with law enforcement and found the fact of his dismissed 2020 domestic violence charges "concerning," *id.* ¶ 17, but said nothing more about the basis for that concern.

This cannot be a good-faith determination. First, the facts of Mr. Batista's case do not support a finding of current threat to public safety or national security, nor has the Government articulated to Petitioners **what** current threat Mr. Batista actually poses to the public.[4] The Government simply points to years-old criminal charges against Mr. Batista—since vacated or dismissed—as evidence of current "threat," without further explanation. But the evidence actually before ICE for its consideration paints an entirely different picture. Mr. Batista has had no run-ins with the law in the last five years except for a $100 civil driving infraction, providing strong evidence that he does **not** pose a current threat to public safety. Moreover, there is ample evidence that he is a contributing and integral part of his family and community. Mr. Batista is a dedicated husband, father, and stepfather to three young daughters, and is actively involved in caring for them and providing for them. He is also a tireless worker and contributor to the economy and community, having started his own small business and received praise from his employees and associates. And Mr. Batista's family and community have written extensively that his continued detention and removal pose a far greater threat to them than anything the Government has articulated, causing them severe economic, personal, and emotional harm. *See generally* ECF No. 691 at 5–10; ECF No. 692-4 at 16–40.

Second, applying the appropriate definition of "good faith," the Government had a duty

---

[4] The Settlement Agreement requires ICE to assess a class member's dangerousness and report its determinations to class counsel. ECF No. 654-1 §§ III(A), V. Accordingly, Petitioners justifiably expect that the Government will at least be able to articulate **what** current threat a detained individual poses.

and obligation under the Settlement Agreement to make its determinations honestly and faithfully after considering *all* available facts specific to Mr. Batista's case.  Implicit in that responsibility is that the Government will not exercise bias or unnecessarily discount evidence. Yet Mr. Charpentier's June determination of present dangerousness appears to have, in essence, rested on his isolated examination of the 2019 police report, which he seems to have credited fully.  But Mr. Charpentier does not acknowledge other relevant facts surrounding Mr. Batista's 2019 arrest, including that Mr. Batista did not receive a custodial sentence.  In fact, Mr. Batista was sentenced to one year of probation with "administrative supervision," ECF No. 692-4 at 11–12, which is a lighter form of probation that often does not require in-person check-ins with the probation department.  Ex. L at 5.  Mr. Batista's records further indicate that he successfully completed probation a year later, resulting in the case being dismissed on March 17, 2022.  ECF No. 692-4 at 11–12.  And with respect to the 2020 domestic violence charge, again, Mr. Charpentier had no information in June 2025 beyond the mere fact of the charge, which was dismissed and not described in any detail in the materials then available to Mr. Charpentier. Charpentier Decl., Ex. 1 at 9.  Neither Mr. Charpentier nor Mr. Chan acknowledges these issues in their declarations, much less explain how their determinations accounted for them.[5]

## C.    The Written Record Further Undermines the Government's Positions

Further evidence that the Government has not acted honestly in its purpose or faithfully in its obligation can be found in the various flaws, contradictions, and questions raised in its

---

[5] To the extent the Government argues that the vacatur of Mr. Batista's conviction based on procedural deficiencies does not alter the underlying facts, Charpentier Decl. ¶ 16, that is incorrect.  The vacatur of Mr. Batista's 2019 plea was due to the fact that he lacked access to a certified Portuguese interpreter during his pre-plea conference with defense counsel—during which the immigration consequences of his plea were explained to him—and instead had to rely on his now-wife, who is not a certified interpreter.  ECF No. 692-4 at 13.  These facts undermine any adverse inferences that may be drawn from the fact of Mr. Batista's vacated plea.

August 15 submission.  Together, these issues suggest an effort to backfill the record to support

ICE's predetermined goal of removing Mr. Batista, made before any finding of dangerousness.

> 1.    **ICE's April 2025 Detention Determination Was Impermissibly Based
> Solely on Old Criminal History, Without Showing a Current Threat**

First, the scant record of communications that the Government has produced contradicts

its assurances of good faith, as well as the declarations of Mr. Charpentier and Mr. Chan.

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████  The contrast is telling.

The Settlement Agreement does not distinguish the findings required for detention and removal;

it requires ICE to conduct the same good faith review for all enforcement actions.  This casts

serious doubt on ICE's insistence that the later determinations were made in good faith.  Instead,

it suggests that ICE made the decision to deport Mr. Batista and then worked backwards to

supply the reasoning necessary to achieve its goal.

### 2. ICE's June 27, 2025 Removal Determination Signals Lack of Good-Faith Review of Mr. Batista's Supporting Materials

Raising further doubts, Mr. Charpentier's declaration appears to contradict the communications record regarding his second removal determination, apparently made on June 27, 2025.  The declaration affirmatively states that Mr. Charpentier considered the materials accompanying Mr. Batista's renewed request for release from ICE detention when making his June 27 determination.  Charpentier Decl. ¶ 14.  █████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████
███████████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████

### 3. The Circumstances of Mr. Batista's Arrest and Removal Order Further Demonstrate a Lack of Good Faith

In addition, the Government's submission raises significant questions about the circumstances surrounding Mr. Batista's arrest and removal order—further casting doubt on the propriety of the removal decision under the Settlement Agreement.  Mr. Batista was arrested on the first day of a "targeted enforcement operation," personally overseen by Tom Homan, to round up undocumented immigrants in the Boston area.  The Government makes no attempt to

explain why or how ICE ERO made the initial decision to arrest Mr. Batista specifically, rather than simply detaining him as part of its larger retaliatory effort. Ex. E at 1; Ex. F at 1. In fact, nothing in the Government's submission indicates that Mr. Batista was stopped and arrested pursuant to a valid warrant. *See also* Ex. G ¶ 10 (Mr. Chan, in prior declaration, stating only that "Mr. Batista was arrested and detained by ICE due to his criminal conduct").

Moreover, the Government's use of expedited removal proceedings, indicating a desire to deport Mr. Batista as quickly as possible, raises significant due process concerns and casts doubt on the subsequent finding of dangerousness. Expedited removal is reserved for immigrants "arriving" in the United States, or who have not been paroled and have been in the country for less than two years. *See* 8 U.S.C. § 1225(b)(1); 8 C.F.R. § 235.3. But identifying Mr. Batista as an "arriving alien" requires a tortured statutory reading, as he had been living in the United States for more than ***nine*** years after receiving humanitarian parole only three days after arrival. *See, e.g.*, *Coal. for Humane Immigrant Rts. v. Noem*, No. 25-cv-872-JMC, 2025 WL 2192986, at *25–30 (D.D.C. Aug. 1, 2025) (finding immigrants who had been paroled into U.S. were not "arriving" aliens under statute and were not subject to Administration's expansion of expedited removal). More concerningly, the Government's submissions suggest that ICE and CBP did not follow proper expedited-removal procedures to begin with. While Mr. Chan states that CBP began expedited-removal proceedings against Mr. Batista after encountering him at the border by "issu[ing] him a Form I-860 Notice," Chan Decl. ¶ 10, the Form I-860 was never actually signed and served on him in 2016, Ex. C at 33—███████████████████████████████, Ex. B at 1–2.

### 4.    The Court Should Not Consider ICE's August 1, 2025 Decision

The Government's unprompted, renewed consideration of Mr. Batista's removal on August 1, 2025—more than a week after Petitioners filed their Motion to Enforce—contradicts

its position that the Court should not be considering new evidence of public-safety risk or lack thereof when weighing Petitioners' Motion.  Later-acquired evidence regarding Mr. Batista is irrelevant to whether the Government made the detention and removal determinations that are the subject of Petitioners' Motion in good faith.  In fact, the Government's unrequested renewed consideration provides further evidence of its *post hoc* attempt to backfill a justification for Mr. Batista's removal, implicitly recognizing that its initial determinations were unsupported.

Contrary to the Government's assertion, Petitioners are not trying to "have it both ways." Opp'n at 8.  Petitioners supplied the Government with additional information via the conflict-resolution process before ICE's June 27, 2025 decision; it would have been appropriate for ICE to obtain and consider Mr. Batista's police report when it conducted its new determination pursuant to that process.  But the Government chose not to—instead, it rushed to make its "renewed" consideration over the course of mere hours (if not minutes), without waiting to obtain any additional information that it believed might help present a more complete picture of Mr. Batista's current dangerousness.  Now that this rushed determination is under scrutiny by the Court, the Government does not get multiple bites at the apple to substantiate its decision *post hoc*.[6]  The sole issue before this Court in Petitioners' Motion is whether ICE's April and June determinations were made in good faith—a determination made after Petitioners' Motion is not evidence that the earlier decision was made in good faith, and in fact suggests the opposite. Accordingly, the Court should disregard the Government's August 1 determination.

---

[6] Moreover, even after reviewing the newly acquired police report for the dismissed 2020 domestic violence charge, the Government still fails to put that report in context—including because it does not acknowledge that ███████████████████████████████████████████ ███████████████████████████████████████

**D.      Other Evidence Suggests Non-Individualized Influences on the Government's Efforts to Detain and Remove Mr. Batista**

The declarations of both Mr. Charpentier and Mr. Chan state that they are "aware of the [Trump] Administration's desires and efforts to increase enforcement of the immigration laws … and to effectuate removal orders," but that they are "not aware of any specific ordered quota of arrests or removals for the Boston ERO office." Charpentier Decl. ¶ 22; Chan Decl. ¶ 16. But these statements are only partially responsive to the Court's query to the Government, which specifically requested information regarding "[w]hether [each director] had been informed or learned before making his decision that any ICE or other official wanted to increase the number of aliens detained and/or removed, ***including but not limited to*** whether the Boston Office of ICE had been given a quota for removals." ECF No. 706 at 3 (emphasis added). Indeed, numerous reports exist of Administration quotas, policies, and targets for ICE arrests and deportations, none of which the Government acknowledges or addresses in its opposition.

First, as discussed above, Mr. Batista was arrested on the first day of a targeted enforcement operation, personally overseen by Tom Homan, to round up a significant number of undocumented immigrants in Greater Boston. Rather than individually and independently determining that Mr. Batista's personal background justified his detention, ICE's arrest of Mr. Batista was apparently conducted as part of a larger retaliatory effort, coordinated with national policymakers, against Boston's "sanctuary city" policies and Mayor Michelle Wu's comments signaling that Boston would not cooperate with ICE. *See supra* Section III.C.3.

Furthermore, at the time Mr. Batista was arrested, reporting from multiple outlets indicated that acting ICE Director Caleb Vitello had directed senior ICE officials in January to begin meeting a daily quota of 1200–1500 arrests per day—including that ***each field office*** should reach at least 75 daily arrests. *See* Ex. M at 1; Ex. N at 1. In subsequent months, pressure

from the White House to detain and deport undocumented immigrants only increased.  By May

2025, reports disclosed that Secretary of Homeland Security Kristi Noem and White House

Deputy Chief of Staff Stephen Miller had met with ICE field office directors and special agents

to demand that they meet a new goal of at least 3000 immigration-related arrests per day.  Ex. O

at 1.  Mr. Miller confirmed this new target to Fox News in a televised interview, explaining that

"[w]e are looking to set a goal of a minimum of 3,000 arrests for ICE every day and President

Trump is going to keep pushing to get that number up higher each and every single day."  Ex. P

at 00:23-00:36.  White House advisor Tom Homan again referred to the 3000-daily-arrest quota

during a July 7, 2025 press conference: "[F]or those that say 3,000 a day is too much, I want to

remind them, do the math.  We'd have to arrest 7,000 every single day for the remainder of this

administration just to catch the ones Biden released into the nation."  Ex. Q at 3.  The next day,

acting ICE Director Todd Lyons issued a memorandum reinterpreting existing law to mandate

detention for all "arriving aliens," instructing ICE officers to detain immigrants "for the duration

of their removal proceedings" without opportunity for release.  Ex. R at 1–2; Ex. S at 1.

Contemporaneous reports corroborate that ICE is instituting extreme detention and

removal procedures to meet White House objectives.  According to internal agency emails

reviewed by the *Guardian*, the acting executive associate director of ICE ERO, Marcos Charles,

ordered ICE officials to detain individuals whom they coincidentally encounter: "All collaterals

encounters [sic] need to be interviewed and anyone that is found to be amenable to removal

needs to be arrested. … We need to turn up the creative knob up to 11 and push the envelope."

Ex. T at 2.  As another ICE official added, "[i]f it involves handcuffs on wrists, it's probably

worth pursuing."  *Id*.  Recent cases confirm ICE's lawless ratcheting up of enforcement actions;

for example, earlier this month, the Ninth Circuit affirmed a temporary restraining order against

ICE's "roving patrols" in the Los Angeles area, where it was stopping and arresting predominantly Hispanic individuals *en masse* without an individualized, reasonable suspicion that they were unlawfully present in the United States.  *See Vasquez Perdomo v. Noem*, No. 25-4312, 2025 WL 2181709, at *1–3, *24 (9th Cir. Aug. 1, 2025).

While Mr. Charpentier's and Mr. Chan's declarations state that they were "aware of the Administration's desires and efforts" surrounding immigration enforcement, they do not address any of the direct orders or instructions noted above.  Charpentier Decl. ¶ 22; *see* Chan Decl. ¶ 16. When this evidence of ICE's policy priorities is combined with the other evidence in the record—including the contradictory evidence from the Government's opposition materials, the fact that Mr. Batista was detained and slated for removal before he became a class member, and the fact that neither Mr. Charpentier nor Mr. Chan appears to have considered important evidence in the record undermining dangerousness—the only reasonable inference is that ICE did not determine Mr. Batista's current public safety threat in good faith based solely on facts specific to his case, but rather decided to remove him as part of a national and regional effort to increase deportations.  ICE thus strained the record after Mr. Batista became a class member and thus protected by the Settlement Agreement, using hindsight to justify its decision-making.

## IV.    REMAINING ISSUES RAISED IN THE COURT'S AUGUST 8, 2025 ORDER

Below, Petitioners address the remaining issues in the Court's August 8, 2025 Order, ECF No. 706, to the extent they have not been addressed above.

### A.    The Deliberative Process Privilege Does Not Protect the Government's Communications

The deliberative process privilege does not protect the communications made between ICE officials regarding Mr. Batista from disclosure.[7]

---

[7] The Government does not assert the law-enforcement privilege.

As a threshold matter, Petitioners largely agree that the standards identified by the Court are applicable here. "To qualify for the privilege, a document must be (1) predecisional, that is, antecedent to the adoption of agency policy, and (2) deliberative, that is, actually related to the process by which policies are formulated." *Texaco P.R., Inc. v. Dep't of Consumer Affs.*, 60 F.3d 867, 884 (1st Cir. 1995) (internal quotations omitted). However, this privilege is "not absolute"; instead, the Court should consider "the interests of the litigants, society's interest in the accuracy and integrity of factfinding, and the public's interest in honest, effective government." *Id.* at 885.[8] An important exception to the typical balance of interest applies where "a plaintiff's cause of action turns on the government's intent," *In re Off. of Comptroller of Currency*, 145 F.3d 1422, 1424 (D.C. Cir. 1998); "where the documents sought may shed light on alleged government malfeasance, the privilege is *routinely* denied." *Texaco*, 60 F.3d at 885 (emphasis added, internal quotation marks omitted). Here, it is undisputed that the good faith of ICE's decision-making is at issue, so the misconduct exception facially applies—requiring disclosure.

To rebut this facial application of the misconduct exception, the Government argues that the exception does not apply because Petitioners have not made a sufficient showing of improper motive. Opp'n at 14. But this mischaracterizes the *Texaco* standard. There, First Circuit did not require a particular showing, deferring to the district court's finding that the party seeking disclosure had made a "strong showing of arbitrariness and discriminatory motives." *Texaco*, 60 F.3d at 885. Indeed, the test the Government suggests would empower the Government to shield itself from the discovery necessary to make a showing. The First Circuit and other courts have

---

[8] The Court may also consider "(i) the relevance of the evidence sought to be protected; (ii) the availability of other evidence; (iii) the 'seriousness' of the litigation and the issues involved; (iv) the role of the government in the litigation; and (v) the possibility of future timidity by government employees who will be forced to recognize that their secrets are violable." *In re Pharmaceutical Indus. Average Wholesale Price Litig.*, 254 F.R.D. 35 (D. Mass. 2008).

long recognized that such obstruction "makes no sense" where the cause of action "deliberatively exposes government decisionmaking to the light." *Off. of Comptroller of Currency*, 145 F.3d at 1424. Accordingly, the relevant standard for applying the misconduct exception is simply whether "the nature of governmental officials' deliberations" is "*the* issue." *Id.* (emphasis in original). ICE entered into a Settlement Agreement that explicitly placed their good-faith deliberations at issue; ICE cannot now retroactively hide those deliberations from view.

Even if the misconduct exception did not apply, the balance of interests still favors disclosure. The Government argues that disclosure would have a chilling effect on ICE decision-making, but a protective order would "mitigate[] any chilling effect." *Roe v. Mayorkas*, 22-cv-10808, 2024 WL 5198705, at *6 (D. Mass. Oct. 2, 2024); *see Fairholme Funds, Inc. v. United States*, 128 Fed. Cl. 410, 434 (Fed. Cl. 2016) (with protective order, "the risk that … disclosure will have a chilling effect on future deliberations by government employees is diminished"). Here, there is a narrower solution than withholding the communications: the Government can "exclude [them] from the public record by appropriately designating the materials pursuant to the Parties' Protective Order," *Roe*, 2024 WL 5198705, at *6, and they can remain confidential if the Court does not rely on them as evidence of lack of good faith. In the alternative, the Court could conduct an *in camera* review, which would be a "relatively costless and eminently worthwhile method" to assess the Government's assertions. *Kerr v. U. S. Dist. Ct. for N. Dist. of Calif.*, 426 U.S. 394, 405 (1976); *see also, e.g.*, *In re Pharm. Indus. Average Wholesale Price Litig.*, 254 F.R.D. 35, 38 (D. Mass. 2008) (Saris, J.) (after *in camera* review, ordering production of documents to which deliberative process privilege did not apply).[9]

---

[9] Should the Court agree with Petitioners and conclude that the deliberative process privilege does not apply to the communications at issue, Petitioners reserve the right to supplement their arguments and briefing following access to additional Government communications.

### B.    Applicability of the Federal Rules of Evidence

Petitioners agree, in part, with the Government regarding the applicability of the Federal Rules of Evidence at a hearing.  The Rules do not apply to administrative proceedings and would not have limited the facts that ICE considered when making its decisions regarding Mr. Batista. *See Johnson v. Boston Public Schools*, 906 F.3d 182, 192 (1st Cir. 2018).  However, the Rules should apply to testimony and evidence presented by ICE officials at any upcoming hearing, as the Rules govern civil proceedings before U.S. district courts, *see* Fed. R. Evid. 1101(a)–(b), and none of the Rules' exceptions are applicable, *see* Fed. R. Evid. 1101(d).  Petitioners expect that the Rules would not preclude testimony regarding the facts that ICE considered in making its determinations—regardless of whether such evidence would otherwise be admissible—because the question at issue here concerns ICE officials' state of mind, *i.e.*, whether they acted in good faith when determining to remove Mr. Batista.  Evidence from the administrative record before ICE would not be offered for its truth, and there is no need for any relaxation of the Rules to introduce and consider such evidence.  *See* Fed. R. Evid. 801(c)(2).

### C.    Appealability of an Order by the Court

The appealability of a decision by this Court on Petitioners' motion would depend on the character of the Court's order.  "A judgment is final and appealable [under 28 U.S.C. § 1291] if the court has 'resolv[ed] the contested matter, leaving nothing to be done except execution of the judgment.'"  *Wang Lab'ys, Inc. v. Applied Comput. Scis., Inc.*, 926 F.2d 92, 95 (1st Cir. 1991) (quoting *United States v. Metro. Dist. Comm'n,* 847 F.2d 12, 14 (1st Cir. 1988)).  Accordingly, an order granting or denying Petitioners' Motion would likely be appealable to the First Circuit as long as the order conclusively resolved Mr. Batista's ability to seek relief.  *See, e.g.*, *Pramco, LLC ex rel. CFSC Consortium, LLC v. San Juan Bay Marina, Inc*., 435 F.3d 51, 53–54 (1st Cir. 2006) (court's denial of plaintiff's motion to enforce settlement agreement was final, appealable

decision, as there were no additional proceedings left to conduct in district court); *see also Negron Gaztambide v. Hernandez Torres*, 145 F.3d 410, 414–15 (1st Cir. 1998).

## V.    HEARING AND PROPOSED WITNESSES

While the Court has sufficient basis to grant Petitioners' Motion without a hearing based on the record before it, Petitioners request a hearing to the extent it will aid the Court in confirming that ICE's determinations were improper under the Settlement Agreement and to further explore the bases for and reliability of Mr. Chan and Mr. Charpentier's determinations. *See supra* Section III.C.  A hearing would also provide an opportunity to explore the role and knowledge of other ICE employees involved in Mr. Batista's enforcement determinations, besides Mr. Chan and Mr. Charpentier.  Should a hearing be necessary, Petitioners would call at least Mr. Chan and Mr. Charpentier to testify about their determinations.  Petitioners also propose that ICE Deportation Officers ███████████████████ be made available to testify. ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████████████████

## VI.    CONCLUSION

For the foregoing reasons, Petitioners respectfully request that this Court grant Petitioners' Motion to Enforce the Settlement Agreement as to Mr. Batista and order the Government to release him from ICE custody so that he can be reunited with his U.S. citizen spouse, young children, and community.

Respectfully submitted this 22nd day of August, 2025.

*Counsel for the Petitioners*

/s/ Kevin S. Prussia
Kevin S. Prussia (BBO # 666813)
Jonathan A. Cox (BBO # 687810)
Christina Luo (BBO # 705590)
Caitlyn N. Galvin (BBO # 715167)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000
kevin.prussia@wilmerhale.com
jonathan.cox@wilmerhale.com
christina.luo@wilmerhale.com
caitlyn.galvin@wilmerhale.com

Adriana Lafaille (BBO # 680210)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF MASSACHUSETTS, INC.
One Center Plaza
Suite 850
Boston, MA 02108
(617) 482-3170
alafaille@aclum.org

Kathleen M. Gillespie (BBO # 661315)
Attorney at Law
6 White Pine Lane
Lexington, MA 02421
(339) 970-9283
kathleenmgillespieesq@gmail.com

**CERTIFICATE OF SERVICE**

I, Kevin Prussia, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: August 22, 2025

*/s/ Kevin S. Prussia*
Kevin S. Prussia (BBO # 666813)