WILMERHALE

December 12, 2025

Kevin S. Prussia

+1 617 526 6243 (t)
+1 617 526 5000 (f)
kevin.prussia@wilmerhale.com

The Honorable Patti B. Saris
United States District Court, District of Massachusetts
John Joseph Moakley United States Courthouse
One Courthouse Way, Suite 2300
Boston, MA 02210

> Re: Petitioner Miguel Angel Coello Farfan's Motion to Enforce Settlement Agreement (ECF No. 748)

Dear Judge Saris,

      Class counsel submit this letter regarding Petitioner Miguel Angel Coello Farfan's Motion to Enforce the *Calderon* Settlement Agreement (ECF No. 748). Counsel for the Government has represented that U.S. Immigration and Customs Enforcement ("ICE") determined that Mr. Coello poses a threat to public safety or national security under Section III of the Settlement Agreement. ECF No. 750-1 at 2; *see also* ECF 768 at 1-2. Mr. Coello has moved to enforce the Settlement Agreement before this Court, contending that ICE has failed to make a determination in good faith that Mr. Coello currently poses a public safety threat, based on the facts specific to his case. ECF No. 749 at 5-7. Class counsel provide this letter to give further background about (i) issues that the Court has previously addressed regarding administration of the motion-to-enforce process, and (ii) ICE's obligations under Section III(A) of the Settlement Agreement to make good-faith determinations regarding a class members' present dangerousness.

**<u>Background</u>**

      For a summary of the parties' litigation history and the *Calderon* Settlement Agreement, class counsel incorporate by reference the background section that they submitted in their motion to enforce the Settlement Agreement on behalf of Mr. Fernando Fagner Costa and Mr. Tauland Deshati. *See* ECF No. 761 at 3-11.

      Section III of the *Calderon* Settlement Agreement states that the Boston division of ICE's Enforcement and Removal Operations ("ICE ERO")—which has jurisdiction over the all of New England—can take enforcement actions against noncitizen class members ***only*** if it has both (i) considered their pursuit of the provisional waiver process, a series of steps under federal regulations that certain noncitizens married to U.S. citizens can take to obtain lawful status, and (ii) determined, in good faith, that they pose a threat to public safety or national security based on the individualized facts of the noncitizen's case. ECF No. 654-1 § III(A). By requiring any enforcement action to be justified by facts specific to a noncitizen class member's case, the Settlement Agreement prohibits ICE from making detention and removal determinations based on or influenced by Administration policies designed to increase deportation numbers—a

December 12, 2025
Page 2

WILMERHALE

concern that this Court has previously entertained. *See* ECF No. 706 at 3. In the case of Mr. Coello—a noncitizen class member with a U.S. citizen wife—his motion to enforce raises genuine questions about whether ICE has complied with its obligations to make a good-faith determination of dangerousness under the Settlement Agreement, and whether ICE has failed to provide the full record of its determination for the Court's review.

**The Complete Record of ICE's Determination is Necessary for Judicial Review**

Mr. Coello is not the first class member to have brought a motion to enforce before this Court contending that ICE ignored or improperly weighed evidence. *See* ECF No. 691 at 7-9; ECF No. 713 at 7-11. A prior session of this Court therefore had a chance to consider the appropriate record and procedures for resolving such motions.

In a previous motion to enforce brought by a class member, the Court concluded that because it is required under Section III of the Settlement Agreement to decide whether ICE made its public safety determination in good faith, such oversight requires access to a full record and an evidentiary hearing. *See* ECF No. 706 at 3-4 (ordering Government to provide affidavits and produce full record of its removal determination in prior motion to enforce); ECF No. 704 at 32:11-32:17 (counsel for Government acknowledging that it "believe[s] what the settlement agreement has set up here is essentially review on an administrative record. The administrative record in this case is defined by the settlement agreement, the facts in the class member's case, and the standard of review"); *id.* at 32:18-34:8, 52:12-53:3 (Court explaining that "a hearing is likely to be necessary" because, to evaluate whether ICE made its decision in good faith, the Court must make a "credibility judgment" and assess whether ICE's determination was "influenced by something that's not in the administrative record").

As demonstrated during previous proceedings in this case, the record of ICE's determination may include:

1. identification of the ICE ERO Deputy Field Office Director(s) ("DFOD") who made the decision at issue, *see* ECF No. 696 at 1-2;

2. identification of each person with whom the DFOD(s) discussed their decision, *id.*;

3. sworn affidavits from the DFOD(s) explaining their decision-making process, including what evidence they considered, who they communicated with and what they discussed, and the ultimate reasons for their decision, *see* ECF No. 706 at 3-4;

4. production of all documents, records, and evidence that the DFOD considered, *id.*;

5. production of all non-privileged communications regarding the enforcement decision at issue, *id.*; and

6. sworn affidavits regarding whether the DFOD was informed by, motivated by, or made aware of any policy or quota from within the executive branch to increase the number of deportations, *see id.*; *see also* ECF No. 717 at 3 (concluding that media reports describing

December 12, 2025  
Page 3

WilmerHale

       ICE officials "directing or urging ICE employees to increase the number of aliens arrested and/or removed from the United States" would be relevant to issue of whether determination was "made in good faith, based only on the facts of [the class member's] case").[1]

Production of these documents and materials would appropriately serve to develop the record necessary to decide the question of good faith.

       The government's approach in the present dispute—in which it has submitted only a declaration by Mr. Charpentier—contrasts with the more comprehensive submission it was previously required to make, and also with its own previous acknowledgment that the Court should review the full record before the decision-maker. *See* ECF No. 768-1; ECF No. 704 at 32:11-32:17. The Government has produced no record of its internal deliberations and communications regarding Mr. Coello's public safety determination and has not identified the individuals with whom Mr. Charpentier discussed his decision. Critically, the Government has also failed to produce any record of the actual evidence that Mr. Charpentier had before him when he made his public safety determination—including those materials that were not submitted by Mr. Coello for consideration. And Mr. Charpentier has produced no record or evidence of his calls and text messages with Mr. Coello's alleged victim's mother, nor does he provide the name or text messages of the Deportation Officer that communicated with the alleged victim herself.

---

[1] An ICE press release suggests that ICE arrested Mr. Coello during a four-day sweep in response to Connecticut's Trust Act, which the Administration considered to be so-called "sanctuary legislation." *Connecticut Is a Sanctuary No More*, ICE.gov (Aug. 20, 2025), https://www.ice.gov/news/releases/connecticut-sanctuary-no-more-ice-federal-partners-remove-dangerous-illegal-aliens (including Mr. Coello in list of notable arrests). The raid, which ICE coined "Operation Broken Trust," resulted in the arrest of 65 noncitizens. This fact, together with recent reports from multiple outlets indicating that ICE officials have been directed to achieve specific quotas of arrests and removals, casts doubt on ICE's claim that Mr. Coello was individually determined to be a public safety threat based **solely** on the facts specific to his case, rather than broader policy determinations. *See, e.g.*, Laura Strickler & Julia Ainsley, *ICE Has Arrested Nearly 75,000 People with No Criminal Records, Data Shows*, NBC News (Dec. 7, 2025, 5:00 a.m.), https://www.nbcnews.com/politics/immigration/ice-arrested-nearly-75000-people-no-criminal-records-data-shows-rcna247377 (reporting that internal ICE data revealed nearly 75,000 arrests of noncitizens with no criminal records during Trump Administration's ongoing pressure to meet arrest targets; the majority of those arrested through mid-October were young men from Central and South America); Julia Ainsley et al., *A Sweeping New ICE Operation Shows How Trump's Focus on Immigration Is Reshaping Federal Law Enforcement*, NBC News (Jun. 4, 2025, 5:00 a.m.), https://www.nbcnews.com/politics/justice-department/ice-operation-trump-focus-immigration-reshape-federal-law-enforcement-rcna193494 (reporting that in May of 2025, White House deputy chief of staff Stephen Miller threatened to fire senior ICE officials if they did not begin arresting at least 3,000 migrants per day).

December 12, 2025  
Page 4

WILMERHALE

     Class counsel respectfully suggest that the Court may wish to compel the production of additional records. ICE's failure to provide many important materials regarding its public safety determination may make it difficult to assess whether ICE actually determined in good faith that Mr. Coello currently poses a public safety threat. Without a full accounting of the materials to which Mr. Charpentier had access, the communications he engaged in regarding Mr. Coello's case, and disclosure of any other policies or pressures affecting his decision-making, it is impossible to determine whether ICE was influenced by improper considerations and whether its determination was made in good faith. Requiring ICE to produce the complete and full record of its determination regarding Mr. Coello would aid in the Court's resolution of the pending motion.[2]

     Finally, class counsel respectfully submit that hearing testimony and evidence from the relevant ICE decision-makers, including cross-examination, would be the most effective way for the Court to judge their credibility and assess the bases for their determination. Should the Court agree to hear or receive evidence, the parties previously agreed that the Federal Rules of Evidence would apply to any evidence or testimony introduced. Indeed, the Court previously

---

[2] Insofar as the Government intends to rely on the deliberative-process privilege to withhold materials regarding its decision-making process, that privilege is inapplicable here. The First Circuit has held that "[t]o qualify for the privilege, a document must be (1) predecisional, that is, antecedent to the adoption of agency policy, and (2) deliberative, that is, actually related to the process by which policies are formulated"; it has also emphasized that such a privilege is "not absolute." *Texaco P.R., Inc. v. Dep't of Consumer Affs.*, 60 F.3d 867, 884-85 (1st Cir. 1995) (internal citations and quotation marks omitted). The privilege is routinely denied where documents "may shed light on alleged government malfeasance," *id.* at 885, or when the Government's intent is central to its case, because "it makes no sense to permit the government to use the privilege as a shield," *In re Off. of Comptroller of Currency*, 145 F.3d 1422, 1424 (D.C. Cir. 1998).
     Relying on this authority and reasoning in a previous motion to enforce brought in this case, the Court ruled that the deliberative-process privilege does ***not*** shield ICE's internal communications from disclosure when the agency's good faith is at issue. ECF No. 717 at 4-5 (explaining that, when question before Court concerns Government's intent and whether it acted in good faith, as required by Settlement Agreement, deliberative-process privilege is routinely denied); ECF No. 728 at 3-4 (holding that "the deliberative process privilege does not protect the [Government's] emails from disclosure"). Here, as with that prior motion to enforce, the good faith of ICE's decision-making is undisputably at issue. ICE entered a Settlement Agreement that explicitly placed its good-faith deliberations at issue; if the Court determines that records of those deliberations are material to the present motion, ICE cannot now hide its deliberations from view by retroactively invoking the deliberative-process privilege as a shield.

December 12, 2025
Page 5

WILMERHALE

adopted the parties' position that those Rules would apply to any future hearing.  *See* ECF No. 717 at 2-3.[3]

The Rules of Evidence apply to civil proceedings in the U.S. district courts, and no exception to the Rules applies here.  *See* Fed. R. Evid. 1101; ECF No. 713 at 19; ECF No. 717 at 2.  The Rules, however, do not apply to administrative proceedings and, therefore, do not limit the facts that ICE could have considered in determining whether Mr. Coello posed a threat to public safety or national security under the Settlement Agreement.  ECF No. 710 at 15; ECF No. 713 at 19; ECF No. 717 at 2-3.  Thus, Petitioners expect that at a hearing on Mr. Coello's motion to enforce, the Rules would not preclude testimony regarding the facts that ICE considered in making its determinations.  That is true whether or not such evidence would otherwise be admissible, because the question at issue here concerns ICE officials' state of mind, *i.e.*, whether they acted in good faith when determining to remove Mr. Coello.  Evidence from the administrative record before ICE would not be offered for its truth, so there is no need for any relaxation of the Rules to introduce and consider such evidence.  *See* Fed. R. Evid. 801(c)(2); ECF No. 717 at 3; ECF No. 728 at 1-3 (continuing to find that media reports regarding ICE's desire to increase number of removals would not constitute inadmissible hearsay).

**The Government's Obligation to Make Determinations in "Good Faith" Requires ICE to Assess Mr. Coello's Current Dangerousness Based on the Facts Specific to His Case**

Section III of the Settlement Agreement expressly requires that before ICE initiates any enforcement action against a class member—defined as arrests, decisions to detain or continue detention, orders to depart, and removal, *see* ECF No. 654-1 § I(E)—it must make a "good faith" determination, "based on the facts in the Noncitizen Class Member's case," that the individual "poses a threat to public safety or threat to national security."  *Id*. § III(A).

---

[3] Class counsel also note that when class members challenged enforcement actions through the Settlement Agreement's conflict resolution procedures, ICE would notify class counsel that it had considered additional materials submitted to ICE by class members and would provide class counsel with an explanation of how it had weighed those materials when making its public safety determinations.  *Compare* ECF No. 692-3 at 3-5, *with* ECF No. 750-1 at 2-7.  This allowed class counsel and the Government to engage in productive conversations regarding whether a good-faith determination was made, which the parties are required to have as part of the conflict resolution procedures set forth in Section VI.C of the Settlement.  However, beginning in or around early November 2025, ICE began simply repeating bare conclusory statements that ICE has not changed its determination that the class member at issue was a public safety threat—thus preventing class counsel or class members' attorneys from understanding exactly what information ICE had considered in making its supposed good-faith determinations.  In taking this approach, ICE reduces the value of the meet-and-confer provision of Section VI.C and makes it far more likely that issues need to be litigated before the Court.

December 12, 2025
Page 6

**WILMERHALE**

The Government accurately recites that while the Settlement Agreement does not define "good faith," the First Circuit has previously applied the relevant definition from Black's Law Dictionary, requiring "(1) honesty in belief or purpose" and "(2) faithfulness to one's duty or obligation." *Kaufman v. C.I.R.*, 784 F.3d 56, 70 (1st Cir. 2015) (emphasis omitted) (quoting "Good Faith," Black's Law Dictionary (10th ed. 2014)). The Government, however, appears erroneously to treat its "good faith" requirement as a purely subjective standard, implying that so long as Mr. Charpentier **subjectively believed** his decision was made in good faith, his actual good faith has been demonstrated. *See, e.g.*, ECF No. 768 at 2, 17.

But subjective belief is only half of the Government's good faith requirement. Under the First Circuit's definition, the Government must **also** show that it has faithfully executed its obligations to class members in making its determination. *Cf. United States v. Acevedo-Osorio*, 118 F.4th 117, 130 (1st Cir. 2024) (construing Government's duty of good faith in executing a criminal plea agreement as requiring "consistency with the justified expectations of the other party" (citing Restatement (Second) of Contracts § 205)). Here, the plain language of Section III defines the parties' obligations and justified expectations under the Settlement Agreement. Pertinent here, Section III(A) requires that ICE reach its public safety determinations based on two overlapping requirements: (1) a class member cannot be subject to an enforcement action on any basis other than **current** dangerousness; and (2) a determination of current dangerousness must be based on **individualized** facts specific to the class member's case. Thus, any decision that does not meet these two elements cannot have been made in good faith, whether or not the decisionmaker had an honest belief in his or her decision.

That any determination must be grounded in **current** dangerousness is manifest from the terms of the Settlement Agreement. To detain or remove a class member such as Mr. Coello, ICE must find that he "**poses** a threat to public safety or threat to national security." ECF No. 654-1 § III(A) (emphasis added). The use of the present tense necessitates establishing dangerousness **today**—not merely identifying past conduct and presuming that alleged past conduct signifies a current threat to public safety. In application, this requirement means that ICE cannot automatically deem a class member a public safety threat based on years-old criminal allegations. That is particularly true where, like here, there is evidence of rehabilitation following the criminal allegations, a subsequent pardon or vacatur of the old criminal conviction, and no evidence of any subsequent criminal history. To make a good-faith determination about whether a noncitizen class member "poses" a public safety threat, ICE must evaluate the class member's present dangerousness, including evidence of rehabilitation and growth, lack of criminal history or recidivism, strong and supportive family life (including with immediate U.S. citizen relatives and family members), dedication to a career, and contributions to their community.

Moreover, the Settlement Agreement requires that ICE's determination be "based on the facts in the Noncitizen Class Member's case." ECF No. 654-1 § III(A). The Government does not dispute this. *See* ECF No. 680 at 57:13-57:22 (counsel for Government acknowledging that "there would need [to] be an allegation of bad faith or an allegation that a particular relevant fact

wasn't properly considered, and then the court would have a limited review to determine whether all the relevant facts were considered but also whether, based on all of those facts, a good faith determination ... was made"). Accordingly, a decision based solely on the fact of alleged past criminal history, without considering additional evidence available or presented to the Government, cannot have been made in good faith. Where, as in Mr. Coello's case, ICE receives information that puts a class member's alleged criminal history in context—such as allegations of extortion and improper testimony by his alleged victim, the vacating of his conviction by Connecticut Supreme Court due to that improper testimony, and a full pardon after a process in which Mr. Coello maintained his innocence—that information becomes part of "the facts in the Noncitizen Class Member's Case," and Section III(A) requires that ICE consider it in order for a decision to have been made in good faith. *See* ECF No. 710 at 9-10. And where such additional evidence casts significant doubt whether a class member is dangerous, ICE must carefully consider all of those facts to make a good-faith determination under the Settlement Agreement. That is especially true in Mr. Coello's case, where the criminal history consists of a single, eleven-year-old conviction for which the class member has been pardoned.

Given Section III(A)'s requirements, ICE's opposition reflects a troubling lack of engagement with the record in making its determination regarding Mr. Coello, marked by a disregard for prior Connecticut Board of Pardons and Paroles ("CBPP") findings, undue weighting of testimony from a case that was overturned on appeal, and reliance on post hoc speculation. While Mr. Charpentier declares that he reviewed the facts of Mr. Coello's pardon in good faith, he concedes that his review was limited to the "certificate of pardon received from the [CBPP]", along with "FAQs from the state of Connecticut providing general information about pardons." ECF No. 768-1 ¶ 15. The CBPP is an expert panel of individuals "qualified by education, experience or training in the administration of community corrections, parole or pardons, criminal justice, criminology, [and] the evaluation . . . of offenders . . . ." Conn. Gen. Stat. § 54-124a(a)(1) (2024). The CBPP has the statutory authority to make Absolute Pardons, *id*. at § 54-124a(f), which are granted to people who, in the expert panel's determination, "have shown themselves to be rehabilitated" and should "have the opportunity to be a part of the community without the stigma of a criminal record." *Connecticut Board of Pardons and Paroles*, CT.gov (2021), https://portal.ct.gov/-/media/das/communications/communications-list-docs/digest/digest-2020-2021/board-of-pardons-and-paroles.pdf. "Persons granted Absolute Pardons can lawfully say that they have never been convicted of, nor arrested for, a crime in Connecticut." *Id*.

ICE's opposition makes clear that in making his determination regarding Mr. Coello, Mr. Charpentier dismissed the CBPP's determination that Mr. Coello was rehabilitated and deserving of an Absolute Pardon without any articulated basis. Mr. Charpentier did not rely on any new evidence of Mr. Coello's dangerousness that was not available to CBPP's expert panel, but instead relied on his own feeling that Mr. Coello's pardon was uncompelling because "the exact reason for the pardon was unclear." ECF No. 768-1 ¶ 16. But the CBPP only grants pardons to petitioners who it determines have shown themselves to be rehabilitated after reviewing the petitioner's subsequent criminal record, employment, and conducting interviews with witnesses

December 12, 2025
Page 8

**WilmerHale**

and victims, among other relevant information. *Connecticut Board of Pardons and Paroles*, CT.gov (2021). Mr. Charpentier makes no acknowledgement of this fact in his declaration.

Additionally, Mr. Charpentier admits in his declaration that his determination relied on testimony from Mr. Coello's alleged victim at his criminal trial—a trial that led to a conviction that the Connecticut Supreme Court later overturned ***because of*** her improper testimony. Mr. Charpentier states in his declaration that he gave weight to the fact that the "jury believed the [alleged] victim's testimony" at Mr. Coello's trial. ECF No. 768-1 ¶ 23. But Mr. Charpentier fails to acknowledge that the Connecticut Supreme Court overturned Mr. Coello's conviction because the trial court had improperly admitted the very testimony on which he now relies, finding that testimony was inappropriate and highly prejudicial to Mr. Coello. The court even observed that it "need not speculate about the prejudicial effect that the evidence could have had on the jury in this case, because the jury's note to the court during deliberations… evidenced its belief that the stricken testimony was significant." *Connecticut v. Miguel C.*, 46 A.3d 126, 136 (Conn. 2012). Basing a current threat determination on evidence deemed ***unreliable*** by the state's highest court is problematic by itself. But it is even more concerning that Mr. Charpentier's declaration fails to even acknowledge the infirmity in this testimony, the reason for Mr. Coello's reversal, and how these considerations weighed in his determination, if at all.

Furthermore, Mr. Charpentier's statements that the alleged victim and her mother had "been pressured about what to say" are raw speculation. ECF No. 768-1 ¶ 20. Mr. Charpentier's conclusion is not tethered to any evidence; rather, it simply reflects his unbounded, personal conjecture based on the alleged victim's answer to an ICE inquiry. Remarkably, Mr. Charpentier discounts the actual statements made by the alleged victim's mother, which explain that she does not consider Mr. Coello to be "a threat to the public," *id.*, and that "[m]y daughter and I think that he deserves a chance with his family," ECF No. 750-2 at 21. In crediting his own speculations over the clear, unequivocal statements provided by the alleged victim and her mother, Mr. Charpentier's determination appears to make every inference against Mr. Coello—raising questions of bias and post hoc justification. Such conduct falls far short of the good faith standard required by the Settlement Agreement.

In sum, the Government's decision-making substituted Mr. Charpentier's speculation for the findings of the CBPP's expert panel and the Connecticut Supreme Court's decision. That the decision-maker in Mr. Coello's case relied on seemingly improper considerations raises substantial questions about whether Mr. Charpentier's public safety determination could have been made in good faith.[4]

---

[4] The parties agree that following an order granting or denying Mr. Coello's motion to enforce—and conclusively resolving his ability to seek relief—the Court's order would be appealable to the First Circuit. The appealability of an order turns on whether judgment in the case is final, meaning nothing remains except execution of the order. *See Wang Lab'ys, Inc. v. Applied Comput. Scis., Inc.*, 926 F.2d 92, 95 (1st Cir. 1991) (citing Fed. R. Civ. P. 58). Accordingly, an

December 12, 2025  
Page 9

**WILMERHALE**

\* \* \*

      For the foregoing reasons, class counsel respectfully request that the Court (a) order that the Government produce the full record of its deliberations and decision-making process; (b) apply the Federal Rules of Evidence to any future hearing; (c) apply a definition of "good faith" that requires honesty and faithfulness to the parties' reasonable expectations under the Settlement Agreement; and (d) interpret Section III(A) to require that ICE's public safety determinations must be based on facts specific to a class member's case, demonstrate his or her current dangerousness, and be uninfluenced by deportation quotas or pressure to increase removal numbers or showcase removals of noncitizens convicted of particular crimes.

Respectfully submitted,

*/s/ Kevin S. Prussia*  
Kevin S. Prussia (BBO # 666813)

cc: Rachel Lerman (counsel for Mr. Coello); all counsel of record

---

order granting or denying Mr. Coello's motion would likely be appealable as long as the order conclusively resolved his ability to seek relief. *See, e.g., Pramco, LLC ex rel. CFSC Consortium, LLC v. San Juan Bay Marina, Inc.*, 435 F.3d 51, 53-54 (1st Cir. 2006) (Court's denial of plaintiff's motion to enforce settlement agreement was final, appealable decision, as there were no additional proceedings left to conduct in district court); *see also Negron Gaztambide v. Hernandez Torres*, 145 F.3d 410, 414-15 (1st Cir. 1998) (Court's decision was final and appealable as it resolved controversy, leaving no further proceedings in district court, regardless of any undecided subsidiary matters).